UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM,<br>PLAINTIFFS<br><br>v.<br><br>BRAD LIVINGSTON, JEFF PRINGLE, and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE.<br>DEFENDANTS | § § § § § § § § § § § § § § | CIVIL ACTION NO.<br>3:12-cv-02037 |

## PLAINTIFFS' COMPLAINT

Plaintiffs Stephen McCollum, Stephanie Kingrey, and Sandra McCollum, individually and as heirs at law on behalf of the Estate of Larry Gene McCollum, bring this lawsuit against Defendants because they housed Mr. McCollum in a brutally hot prison cell, causing him to suffer a fatal heat stroke

### STATEMENT OF CLAIMS

1. Plaintiff Stephen McCollum, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of his beloved father, which occurred at the Hutchins State Jail in Dallas, Texas.

2. Plaintiff Stephanie Kingrey, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved father, which occurred at the at the Hutchins State Jail in Dallas, Texas.

3. Plaintiff Sandra McCollum, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved spouse, which occurred at the at the Hutchins State Jail in Dallas, Texas.

4. Defendants Livingston and Pringle are liable for the deprivation of Mr. McCollum's constitutional rights under color of law and in violation of his Eighth and Fourteenth Amendment right to protection from cruel and unusual punishment under 42 U.S.C. § 1983 ("Section 1983").

5. Further, Defendant Texas Department of Criminal Justice is liable for the deprivation of Mr. McCollum's rights under Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), which require public facilities, like the prison, to make reasonable accommodations for people with disabilities, like Mr. McCollum.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act). This Court has supplemental jurisdiction to consider Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

7. Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district and division.

## PARTIES

8. Plaintiff Stephen McCollum is the son of Mr. McCollum. He sues in his individual capacity and as heir at law to Mr. McCollum's estate. He is a resident of McLennan County, Texas.

9. Plaintiff Stephanie Kingrey is the daughter of Mr. McCollum. She sues in her

individual capacity and as heir at law to Mr. McCollum's estate.  She is a resident of McLennan County, Texas.

10.  Plaintiff Sandra McCollum is the surviving spouse of Mr. McCollum.  She sues in her individual capacity and as heir at law to Mr. McCollum's estate.  She is a resident of McLennan County, Texas.

11.  At the time of his death, Mr. McCollum had a surviving spouse, Sandra, and two adult children, Stephen and Stephanie.  He died intestate.  There were no probate proceedings arising from his death, and none were necessary.

12.  Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ).  As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct.  By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody.  At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for nominal, punitive, and compensatory damages.  He can be served with process at 209 W. 14th St., Austin, TX 78701.  *Service is requested.*

13.  Defendant Jeff Pringle was the warden at the Hutchins State Jail at all relevant times.  At all relevant times, Pringle was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for nominal, punitive, declaratory, and compensatory relief.  He can be served with process at 1500 East Langdon Road, Dallas, TX 75241.  *Service is requested.*

14.  The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas.  At all relevant times, it operated the Hutchins State Jail, a public facility with programs and services Mr. McCollum was otherwise qualified for.  TDCJ is a recipient of

federal funds. TDCJ is sued for declaratory, compensatory, and nominal relief. It can be served with process by serving Brad Livingston, its executive director, at 209 W. 14th Street, Austin, Texas 78701. *Service is requested.*

FACTS

15. According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined."

16. On the day Mr. McCollum died, the Dallas area had endured 25 consecutive days where the temperature exceeded 100 degrees Fahrenheit.

17. Defendant Pringle and Defendant Livingston, as well as numerous other TDCJ officials, were well aware of this heat wave Dallas was experiencing and knew inmates were at risk of heat related death and illness at area prisons.

18. At the time of his death, Larry Gene McCollum was fifty-eight. While he was overweight, and suffered from hypertension, he was loved by his family and looking forward to his freedom after serving a short prison sentence of less than two years.

19. He was assigned to serve his sentence at the Hutchins State Jail.

20. In the summer of 2011, when Mr. McCollum arrived at the Hutchins facility, officers told him and other new prisoners "welcome to Hell."

21. Soon after his arrival, prison officials performed an intake physical. The physician's assistant who examined him noted his hypertension, and prescribed hydrochlorothiazide (HCT), a diuretic, to treat his conditions, which he took regularly during his incarceration.

22. Before arriving at Hutchins, Mr. McCollum also took clonidine to control his hypertension.

23. Diuretics remove water from the blood to decrease blood pressure. Diuretics thus

4

increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance.

24. Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated.

25. Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

26. As one would expect, it substantially limited Mr. McCollum's ability to walk, stand, and breathe, and limited the operation of his respiratory, circulatory, and cardiovascular systems. His medication was necessary to protect his health from his disability.

27. As was well known to Defendants prior to Mr. McCollum's death, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

28. TDCJ officials, including Pringle and Livingston, were aware many TDCJ prisoners live with hypertension, and are housed in non-air-conditioned TDCJ facilities, including the Hutchins State Jail.

29. Despite his medical condition, TDCJ housed Mr. McCollum in a dormitory area with over 200 men.

30. As the housing area was not air conditioned, it became brutally hot while Mr. McCollum was there. Despite this, Defendants failed to provide Mr. McCollum adequate shelter from this extreme heat.

31. Moreover, TDCJ officials, including Defendants Livingston and Pringle, knew extreme heat could and would cause serious injury or death.

32. In fact, TDCJ trains all its employees that "heat stroke occurs when the body is subjected to more heat than the body can possibly handle. Heat stroke is a serious medical condition and may lead to death without immediate emergency medical attention. In heat stroke, body temperature rises too quickly resulting in the death of body tissue." TDCJ officials, like Livingston and Pringle, knew "victims of prolonged or high heat can develop heat cramps or heat exhaustion. If heating continues, the condition can progress to a heat stroke and death."

33. Likewise, TDCJ trains its employees that during hot months they should "spend more time in air conditioned places. Air conditioning in homes and other buildings markedly reduces danger from the heat. If you cannot afford an air conditioner, spending some time each day during hot weather in an air-conditioned environment affords some protection." Employees are advised to "stay in an air conditioned area if possible," and are only allowed to work outside for two hours at a time. Indeed, several areas where TDCJ employees work at the Hutchins State Jail, including Pringle's office, are air conditioned. In these parts of the prison, the temperatures were a comfortable 75 degrees.

34. Significantly, Defendants chose not to provide prisoners, like Mr. McCollum, these opportunities to cool off in an air conditioned environment at the Hutchins facility.

35. Additionally, TDCJ advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics.

36. All these conditions describe Mr. McCollum.

37. During the week Mr. McCollum spent in the Hutchins Unit, the outdoor temperatures reached 102 degrees Fahrenheit. The outdoor heat index, the combination of

temperature and humidity, made the air temperature feel like it was over 150 degrees Fahrenheit, according to official TDCJ records.  According to the National Oceanic and Atmospheric Administration, a heat index over 130 degrees makes heat stroke "likely with continued exposure," and is "extremely dangerous."

38. Shortly before Mr. McCollum's death, an email from the Hutchins facility's safety officer advised Pringle "random samplings of temperatures taken in the [prisoner] housing areas reflect a 2 to 3 degree difference from the outside Unit temperature.  These temperature readings in the [prisoner] living areas are 2 to 3 degrees lower than the outside temperature."

39. The email went on to inform Pringle that on July 13, 2011, two weeks before Mr. McCollum's death, indoor air temperatures exceeded 100 degrees Fahrenheit.

40. Furthermore, Pringle knew the prison's air-handler units were broken in several prisoner living areas.

41. Thus, inmates like Mr. McCollum remained in grave danger.

42. On the night of July 22, 2011, the Dallas area experienced temperatures over 90 degrees until after 1 a.m.  That day, the heat in Dallas was sweltering – 98 degrees Fahrenheit, with 79 percent humidity.  The heat index exceeded 130 degrees Fahrenheit.

43. That night, Mr. McCollum suffered a seizure, which was later diagnosed as "heat shock."  He fell from his bunk at around 3:00 a.m., and was taken to the emergency room at Parkland Hospital.

44. When Mr. McCollum arrived at the hospital, his body temperature was 109.4 degrees Fahrenheit.  The extreme heat caused him to suffer multi-system organ failure.

45. Mr. McCollum slipped into a coma, and died after spending six days in the intensive care unit.

46. An autopsy concluded he died of hyperthermia, due to housing "in a hot

7

environment without air conditioning."

47. The autopsy found Mr. McCollum was "predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension."

48. At 6:30 a.m. the day after Mr. McCollum died, the heat index recorded outside the Hutchins State Jail was 95 degrees Fahrenheit.

49. System-wide, eight other people in TDCJ custody died of heat-related causes in the summer of 2011.

50. After Mr. McCollum's death, brutal indoor temperatures continued at the Hutchins State Jail.  Indoor air temperatures as high as 106 degrees Fahrenheit were recorded weeks later.

50. While Livingston and Pringle were aware of the brutal heat in the Dallas area, including inside the Hutchins Unit in the weeks preceding Mr. McCollum's injuries and death, they took no steps to remedy the situation and provided no reasonable accommodations for prisoners like Mr. McCollum whose disabilities made them more susceptible to heat stroke.

51. Likewise, Livingston and Pringle knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees, and failed to take reasonable steps to protect the health and safety of prisoners.

52. TDCJ officers report all heat related illnesses to TDCJ headquarters to inform high-ranking officials, including Livingston, when prisoners or TDCJ employees become ill.

53. As the conditions at the Hutchins State Jail are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Mr. McCollum, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk.

54. Yet Livingston and Pringle knew TDCJ routinely housed people with hypertension in extremely hot facilities like the Hutchins State Jail.  TDCJ's policies and practices, which

Livingston and Pringle knew about, make no accommodation for people with hypertension during periods of extreme temperatures.

55. As Livingston and Pringle failed to take reasonable steps to safely house Mr. McCollum and protect him from heat stroke, Livingston and Pringle were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

56. At the time of Mr. McCollum's death, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Livingston and Pringle are not entitled to qualified immunity.

57. Livingston also knew TDCJ policy and practice prohibited air-conditioning in most areas where prisoners live, including McCollum's housing area.

58. Though large county jails in Texas are almost uniformly air conditioned, and the Texas Commission on Jail Standards requires county jails keep temperatures between 65 and 85 degrees Fahrenheit, TDCJ refuses to provide adequate shelter from the blistering Texas summers. *See* 37 Tex. Admin. Code § 259.160. Despite his knowledge of this policy, and his knowledge of the extremely hot conditions in TDCJ facilities in the summer of 2011, Livingston took no action to improve these exceptionally dangerous conditions. Livingston's refusal to air condition inmate living areas was a moving force causing Mr. McCollum's death.

59. Livingston and Pringle also knew some areas of the Hutchins State Jail where officers worked, such as Pringle's office and the officer pickets, were air conditioned. Of the 97 state-operated TDCJ facilities, 56 have some air conditioning in inmate living areas. Livingston and Pringle took no steps to house prisoners with known medical conditions complicated by heat, such as those suffering from hypertension or prescribed diuretics, in locations that were air conditioned.

60. Despite air conditioning the areas where officers work, Livingston and Pringle failed

9

to provide air conditioning in the areas where prisoners are required to live. Livingston and Pringle air condition places where officers work, such as the prison's armory and administrative offices, because of concerns the high temperatures and humidity will damage the prison's weapons and paper files.

61. On information and belief, though Pringle knew the intense heat during the summer of 2011 would last late into the night, Pringle prohibited prisoners from taking small measures to reduce their temperatures, like take extra showers, after 10:30 p.m. Moreover, the water in the prison showers remained hot even during the summer, providing little relief.

62. Hutchins facility officials, including Pringle, failed to provide additional drinking water to prisoners. Officers only brought one large jug per fifty-eight prisoners to the prisoner living areas each afternoon. The jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and were frequently filled with lukewarm water.

63. Per TDCJ policy, Mr. McCollum was not issued a cup when he entered prison, shortly before his death. Without a cup, Mr. McCollum could not drink any cold water provided in the water jugs, whether nor not adequate water was provided, and whether or not the water was cold. Livingston and Pringle knew this policy denied this basic accommodation to prisoners like Mr. McCollum.

64. Likewise, TDCJ officials, including Pringle and Livingston, prohibit new prisoners, like Mr. McCollum, from owning personal fans to cool themselves, though personal fans are available to other prisoners convicted of more serious crimes in other TDCJ prisons.

65. Pringle, moreover, knew the windows in the areas at Hutchins where prisoners live are sealed shut, and cannot be opened.

66. Plainly, the conditions at Hutchins State Jail result in gratuitous pain and suffering, and posed an imminent danger of serious physical illness, injury, or death to Mr. McCollum, as

well as others. These conditions are not reasonably related to any penological interest.

67. TDCJ discriminated against Mr. McCollum due to his disability, hypertension, by denying him reasonable accommodations necessary to allow him access TDCJ's programs and services. The extreme heat in TDCJ facilities denies people like Mr. McCollum access to TDCJ facilities.

## CAUSES OF ACTION

### I. EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston and Pringle Only, in Their Individual Capacities)

68. By subjecting Mr. McCollum to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston and Pringle acted with deliberate indifference to Mr. McCollum's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

69. The extreme temperatures Defendants tolerated at the Hutchins State Jail proximately caused Mr. McCollum's untimely death.

70. Plaintiff brings these claims through 42 U.S.C. § 1983.

71. Plaintiff is entitled to punitive damages against Livingston and Pringle in their individual capacities.

### II. AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT
(As to Defendant TDCJ Only)

72. TDCJ has been, and is, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this

purpose.  29 U.S.C. § 794 (2008).

73. Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and have the same mandate as the Rehabilitation Act.  42 U.S.C. § 12131 *et seq.* (2008).

74. The Hutchins State Jail is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes.  Mr. James was otherwise qualified to participate in the programs and services at the Hutchins State Jail.

75. For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Mr. McCollum was a qualified individual regarded as having a physiological impairment that substantially limited one or more of his major life activities.  Defendant TDCJ knew Mr. McCollum suffered from hypertension, and was prescribed diuretic medications.  Despite this knowledge, TDCJ's officers intentionally discriminated against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and refusing to protect him from the extreme temperatures that took his life.

76. As alleged above, TDCJ failed and refused to reasonably accommodate Mr. McCollum's disability while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.  That failure and refusal caused his death.

77. As alleged above, TDCJ failed, and refused to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Mr. McCollum's disability.  These failures and refusals caused his death.

78. Mr. McCollum died as a direct result of TDCJ's intentional discrimination against him.  Plaintiff is entitled to the maximum amount of compensatory damages allowed by law.

## DAMAGES

79. Plaintiff is entitled to compensatory, punitive, presumed, and nominal damages

against Defendants in the maximum amounts allowed by law.

80.     As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of the wrongful death of Larry Gene McCollum, Deceased, Plaintiffs assert claims under 42 U.S.C. § 1983 and the wrongful death and survivorship statutes as specifically pled herein.

81. More particularly, Plaintiffs Stephanie Kingrey, Stephen McCollum, and Sandra McCollum in their capacity as heirs at law to the Estate of Larry Gene McCollum, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

82.     Plaintiffs Stephanie Kingrey, Stephen McCollum, and Sandra McCollum in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Larry McCollum; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

83.  Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also request attorneys' fees, costs, and expenses against TDCJ for the ADA,

ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. § 12205.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A.   Award compensatory damages against Defendants, as well as nominal and presumed damages as appropriate;

B.   Award punitive damages against individual Defendants;

C.   Grant declaratory and injunctive relief, as set out in this Complaint;

D.   Find that Plaintiff is the prevailing party in this case and award him attorneys' fees, court costs, expert costs, and litigation expenses; and,

E.   Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: June 26, 2012.

        Respectfully submitted,

        The Edwards Law Firm
        The Bremond Houston House
        706 Guadalupe
        Austin, Texas 78701
        Tel.   512-623-7727
        Fax.   512-623-7729

        By   /s/ Jeff Edwards
        JEFF EDWARDS
        State Bar No. 24014406
        *Lead Counsel*

        /s/Scott Medlock
        Scott Medlock
        State Bar No. 24044783
        Brian McGiverin
        State Bar No. 24067760
        James C. Harrington
        State Bar No. 09048500

        TEXAS CIVIL RIGHTS PROJECT
        1405 Montopolis Drive

Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Eliot Shavin
State Bar No. 18138200

2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
*Local Counsel*

ATTORNEYS FOR PLAINTIFFS