UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM, | § § § § | |
| PLAINTIFFS | § § | |
| v. | § § | CIVIL ACTION NO. 3:12-cv-02037 |
| | § | |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Stephen McCollum, Stephanie Kingrey, and Sandra McCollum, individually and as heirs at law on behalf of the Estate of Larry Gene McCollum, bring this lawsuit against Defendants because they housed Mr. McCollum in a brutally hot prison cell, causing him to suffer a fatal heat stroke, and failed to contact 911 for 54 minutes as he lay dying before them.

## STATEMENT OF CLAIMS

1.     Plaintiff Stephen McCollum, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of his beloved father, which occurred at the Hutchins State Jail in Dallas, Texas.

2.     Plaintiff Stephanie Kingrey, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved father, which occurred at the at the Hutchins State Jail in Dallas, Texas.

3.    Plaintiff Sandra McCollum, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved spouse, which occurred at the at the Hutchins State Jail in Dallas, Texas.

4.    Defendants Livingston, Eason, Clark, Tate, Sanders and Pringle are liable for violating Mr. McCollum's constitutional rights under the Eighth and/or Fourteenth Amendment right to protection from cruel and unusual punishment under 42 U.S.C. § 1983 ("Section 1983").

5.    Further, Defendants University of Texas Medical Branch and Texas Department of Criminal Justice are liable for the deprivation of Mr. McCollum's rights under Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), which require public facilities, like the prison, to make reasonable accommodations for people with disabilities, like Mr. McCollum.

JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

7.    Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district and division.

PARTIES

8.    Plaintiff Stephen McCollum is the son of Mr. McCollum.  He sues in his individual capacity and as heir at law to Mr. McCollum's estate.  He is a resident of McLennan County, Texas.

9.    Plaintiff Stephanie Kingrey is the daughter of Mr. McCollum.  She sues in her individual capacity and as heir at law to Mr. McCollum's estate.  She is a resident of McLennan

County, Texas.

10.  Plaintiff Sandra McCollum is the surviving spouse of Mr. McCollum.  She sues in her individual capacity and as heir at law to Mr. McCollum's estate.  She is a resident of McLennan County, Texas.

11.  At the time of his death, Mr. McCollum had a surviving spouse, Sandra, and two adult children, Stephen and Stephanie. He died intestate. There were no probate proceedings arising from his death, and none were necessary.

12.  Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ).  As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct.  By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody.  At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for damages. Livingston has appeared in this litigation.

13.  Defendant Robert Eason was the regional director for TDCJ, and supervised the wardens at eleven prisons, including the Hutchins State Jail at all relevant times. At all relevant times, Eason was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity only.  He can be served with process at #2 Backgate Road, Tennessee Colony, TX 75803.

14.  Defendant Jeff Pringle was the warden at the Hutchins State Jail at all relevant times. At all relevant times, Pringle was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for damages. Pringle has appeared in this litigation.

15.  Defendant Richard Clark was a correctional officer at the Hutchins State Jail at all

relevant times. At all relevant times, Clark was acting under color of law. He is sued in his individual capacity for damages. He can be served with process at 1500 East Langdon Road, Dallas, TX 75241.

16. Defendant Karen Tate was a sergeant at the Hutchins State Jail at all relevant times. At all relevant times, Tate was acting under color of law. She is sued in her individual capacity for damages. She can be served with process at 1500 East Langdon Road, Dallas, TX 75241.

17. Defendant Sandrea Sanders was a lieutenant at the Hutchins State Jail at all relevant times. At all relevant times, Sanders was acting under color of law. She is sued in his individual capacity for damages. She can be served with process at 1500 East Langdon Road, Dallas, TX 75241.

18. The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB, through policy made in Galveston, makes housing recommendations to TDCJ based upon prisoners' medical conditions. UTMB is a recipient of federal funds. UTMB is sued for declaratory, compensatory, and nominal relief under federal law. It can be served with process by serving its president, David L. Callender, at 301 University Blvd., Suite 6.100, Administration Building, Galveston, TX 77555-1006. *Service is requested.*

19. The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. At all relevant times, it operated the Hutchins State Jail, a public facility with programs and services Mr. McCollum was otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ is sued for declaratory, compensatory, and nominal relief under federal law. TDCJ has appeared in this litigation.

## FACTS

20. According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills

4

more people than "floods, lightening, tornadoes and hurricanes combined." In July 2011, one of those victims was Larry McCollum.

21.   On the day Mr. McCollum died, the Dallas area had endured 25 consecutive days where the temperature exceeded 100 degrees Fahrenheit.

22.   Defendants Pringle, Eason, Clark, Tate, Sanders, Livingston, as well as numerous other TDCJ and UTMB officials, were well aware of this heat wave Dallas was experiencing and knew inmates were at risk of heat related death and illness at area prisons. Moreover, Defendants Pringle, Eason, Clark, Tate, and Sanders all knew that the temperature inside the dorm where Mr. McCollum was housed was well over 100 degrees as each spent time inside the Hutchins housing dorm areas during July 2011.

   A.   *Mr. McCollum's Disabilities*

23.   At the time of his death, Larry Gene McCollum was fifty-eight years old.  He was overweight, suffered from hypertension and reported to the prison and to UTMB medical personnel that he had diabetes.

24.   Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated.

25.   Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

26.   As a consequence, UTMB and TDCJ policy recognizes patients taking diuretics to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

27.  As one would expect, hypertension substantially limited Mr. McCollum's ability to walk, stand, and breathe, and limited the operation of his respiratory, circulatory, and cardiovascular systems. His medication was necessary to protect his health from his disability.

28.  As was well known to each of the Defendants through training, prior to Mr. McCollum's death, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

29.  Diabetes is a chronic disease caused by an insulin imbalance.  Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from too little insulin. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

30.  Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

31.  Diabetes can also reduce blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

32.  According to the Mayo Clinic, diabetics have higher rates of hospitalization, dehydration, and death when exposed to extreme temperatures.

33.  UTMB's policies and medical providers identify diabetes as a condition that affects heat tolerance and that renders inmates susceptible to significant injury and/or death from extremely high temperatures – like those at Hutchins in July 2011.

34.  The American Diabetes Association suggests people with diabetes "stay indoors as much as possible and drink plenty of fluids" and "seek shelter if you do not have air conditioning

and the heat is beginning to make you feel ill." Moreover, failing to provide treatment and monitoring of diabetes is "off the charts unacceptable" according to the medical providers at Hutchins, including PA Babbali. Yet despite the fact that Mr. McCollum informed TDCJ and UTMB personnel of his hypertension <u>and</u> diabetes, no one from the prison (neither TDCJ nor UTMB personnel) ever took steps to evaluate or monitor McCollum's diabetes.

     *B.   Mr. McCollum is Welcomed to "Hell"*

35.   Mr. McCollum was convicted of a minor property offense, and sentenced to serve two years at the Hutchins State Jail outside Dallas. Because he would receive some time credit for weeks he spent at the McLennan County Jail in Waco, Mr. McCollum was supposed to spend less than two years in prison.

36.   He was assigned to serve his sentence at the Hutchins State Jail.

37.   On or about July 15, 2011, Mr. McCollum arrived at the Hutchins facility. Officers told him and other new prisoners "welcome to Hell."

38.   Soon after his arrival, a UTMB nurse performed what was apparently a triage of Mr. McCollum and other newly arrived prisoners. Mr. McCollum told the nurse he suffered from diabetes, and was taking a prescription medication, Clonidine, for hypertension. Importantly, Clonidine is not a diuretic.

39.   In light of these conditions, the nurse referred Mr. McCollum to the physician's assistant at the prison, Babbili. Without examining or questioning him, Babbili noted his hypertension, and changed his prescription from Clonidine to hydrochlorothiazide (HCTZ), a diuretic, to treat his hypertension. Mr. McCollum took the HCTZ regularly during his incarceration.

40.   Diuretics remove water from the blood to decrease blood pressure. Diuretics thus increase a patient's risk of heat stroke, because they cause dehydration and electrolyte

imbalance. This was all known to UTMB and PA Babbili. Yet Babbili never informed McCollum of the drug's consequences and prescribed it knowing the prison – inside and outside was well over 100° and Mr. McCollum would have difficulty acclimating to the extreme heat.

41. Though Babbili knew taking hydrochlorothiazide was dangerous in the extreme temperatures Mr. McCollum would be living in, he prescribed the drug anyway. Babbili knew of, and disregarded, the serious risks associated with prescribing a diuretic to a person, like Mr. McCollum, who would be forced to live in extreme temperatures. Mr. McCollum likely would have lived had Babbili continued his prescription for Clonidine, which is not a life-threatening diuretic. Babbili's conduct wantonly disregarded the serious risk to Mr. McCollum's health posed by prescribing hydrochlorothiazide.

42. Moreover, despite his need for treatment of his diabetes, which also placed him in danger from the high temperatures inside the unit, Mr. McCollum was not monitored or given any treatment for his disability.

43. Additionally, despite his medical conditions, TDCJ housed Mr. McCollum in a dormitory area with over 50 men, that was not air conditioned

44. As a consequence, it became brutally hot while Mr. McCollum was there. In fact, the heat index was regularly above 120° inside the dorm where McCollum lived and even reached 150° temperatures – all of which were known to Defendants. Despite this, Defendants failed to provide Mr. McCollum adequate shelter from this extreme heat.

45. TDCJ and UTMB officials, including but not limited to Eason, Pringle, Clark, Tate, Sanders, and Livingston, were aware many TDCJ prisoners live with diabetes and hypertension, and are housed in non-air-conditioned TDCJ facilities, including the Hutchins State Jail.

C. *Extreme Temperatures at the Hutchins Unit Kill Mr. McCollum*

46. During the six days Mr. McCollum spent in the Hutchins Unit, the outdoor

8

temperatures reached 102 degrees Fahrenheit. The outdoor heat index¸ the combination of temperature and humidity, made the air temperature feel like it was over 150 degrees Fahrenheit, according to official TDCJ records. According to the National Oceanic and Atmospheric Administration, UTMB and TDCJ training materials, a heat index over 130 degrees makes heat stroke "likely with continued exposure," and is "extremely dangerous." TDCJ documents describe heat stroke at such temperatures as "imminent."

47.   Shortly before Mr. McCollum's death, an email from the Hutchins facility's safety officer advised Pringle "random samplings of temperatures taken in the [prisoner] housing areas reflect a 2 to 3 degree difference from the outside Unit temperature. These temperature readings in the [prisoner] living areas are 2 to 3 degrees lower than the outside temperature."

48.   The email went on to inform Pringle that on July 13, 2011, two days before Mr. McCollum arrived at the prison, indoor air temperatures exceeded 100 degrees Fahrenheit. The email even told Pringle that in the dorm Mr. McCollum was housed in the temperature was 101 degrees, a mere three degrees cooler than the outside temperature. At the same time, the outdoor heat index, according to the email, was 123 degrees.

49.   Despite this, Defendants took no steps to reduce the heat levels inside the housing dorms. They did not bring in cooling devices and they did no move prisoners with disabilities rendering them dangerously susceptible to extreme heat – like Mr. McCollum – to air conditioned portions of the prison.

50.   TDCJ advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics.

51.   All these conditions describe Mr. McCollum.  An had Babbili performed even the most basic of exams, simply asked Mr. McCollum a questions, or looked at his height and

weight, he would have known this.

52. Thus, inmates like Mr. McCollum were in grave danger, and as the areas remain non-air-conditioned, current inmates with similar conditions, remain in grave danger.

53. Such intense heat is effectively punishment and serves no legitimate penal purpose.

54. Moreover, the Hutchins Unit, has no medical staff at the facility after 6:00 p.m., even though over 2,200 men are housed there every night and significant numbers (greater than 10%) suffer from hypertension or diabetes and are at greater risk from the extreme heat – especially when first acclimating to such harsh temperatures. High-level TDCJ and UTMB officials, such as Livingston, Eason and UTMB director Owen Murray, made this decision for financial reasons despite knowing it placed inmates at risk during the evening, and at grave risk in emergency situations where medical care was immediately needed. The TDCJ employees at the Hutchins Unit, including Pringle, Clark, Tate and Sanders knew there was no medical staff at the facility after 6:00 p.m., and that for a prisoner to receive immediate medical attention they would have to be transported to a hospital by ambulance.

55. On the night of July 22, 2011, the Dallas area experienced temperatures over 90 degrees until after 1 a.m. That day, the heat in Dallas was sweltering – 98 degrees Fahrenheit, with 79 percent humidity. The heat index exceeded 130 degrees Fahrenheit, meaning the heat index inside the housing areas was more than 127 degrees.

56. That night, Mr. McCollum suffered an apparent seizure in his bunk around 2:10 a.m.

57. His bunkmate quickly notified Officer Clark, who was patrolling the dormitories in Mr. McCollum's building at the time. Officer Clark arrived at Mr. McCollum's bedside, and observed him unconscious, unresponsive, and convulsing. Clark believed Mr. McCollum was having a seizure and in need of immediate care.

58. Rather than immediately calling for an ambulance – as McCollums' condition

10

plainly called for and which could have been accomplished in a matter of seconds – Clark instead called for his supervisor to observe McCollum. Clark did this despite acknowledging that he subjectively believed McCollum's condition was a medical emergency and that medical care was urgently needed.

59.   Just as incredible, this decision not to have 911 called or an ambulance dispatched before a supervisor observed the emergency was par for the course at the Hutchins Unit and remains the way things are done even today.

60.   In any event, after Clark notified his direct supervisor, Sgt. Tate. Sgt. Tate arrived at Mr. McCollum's bunk between 2:15 and 2:20 a.m.

61.   When Sgt. Tate arrived, the situation remained an obvious medical emergency requiring actual medical intervention. Sgt. Tate observed Mr. McCollum's entire body shaking and "trembling," and assumed he continued to seize. She noted his skin was "flushed" and warm to the touch, as if he were running a fever. Tate tried to speak to Mr. McCollum, and dripped water on his face, but he did not respond. Thus, Tate knew McCollum was unresponsive and convulsing and needed immediate care.

62.   Incredibly, despite believing McCollum's condition was a medical emergency and despite being able to ask that 911 be contacted and an ambulance dispatched, Tate chose instead to call for her supervisor, Lieutenant Sanders, a woman she knew had no specialized medical training and would not be able to provide immediate help. And Tate made this decision knowing that medical care for McCollum would be further delayed.

63.   Lt. Sanders did not arrive at Mr. McCollum's bedside until around 2:40 a.m., thirty minutes after Clark first found him. Though Mr. McCollum was still intermittently seizing, unconscious and unresponsive, Sanders, who also recognized that McCollum was a diabetic, did not immediately call 911. Rather, she delayed what was obviously needed, an ambulance, and

contacted an off-site medical unit she knew did not have doctors.

64.   After conferring with a nurse (who by law is incapable of providing a medical diagnosis) at another prison over 130 miles away, Sanders finally had an ambulance called. She delayed despite knowing that Mr. McCollum needed immediate medical attention that no one at the Hutchins Unit at that time was qualified to provide. Her decision to call 911 did not occur until 3:04 a.m., almost an hour after Clark first found Mr. McCollum convulsing.

65.   At no point did Mr. McCollum respond to any of the officers. He remained unconscious and intermittently convulsing from the "seizure."

66.   As a consequence of the delay, Mr. McCollum died.

67.   An informal TDCJ policy, approved and ratified by Pringle, Eason, and Director Livingston, possibly, UTMB, treats seizures as a minor event not requiring immediate medical attention. Of course, correctional officers like Clark, Tate and Sanders have no medical training, and cannot assess or diagnose a "seizure" or any other serious medical condition. Frequently, according to Warden Pringle and Lieutenant Pringle, prisoners discovered by correctional officers will be allowed to continue to seize and merely referred to the medical department in the morning. At prisons like the Hutchins Unit, where there is not around the clock medical staff, correctional officers routinely fail to provide any immediate medical care to prisoners suffering seizures. Plainly, this practice evidences a shocking disregard for people suffering heat stroke and with disabilities making people susceptible to heat stroke, and intentionally denied Mr. McCollum what a ten year old would have known her needed immediate transfer to a hospital where he could receive medical care.

68.   When Mr. McCollum finally arrived at the hospital, his body temperature was 109.4 degrees Fahrenheit.  The extreme heat caused him to suffer multi-system organ failure.

69.   Mr. McCollum slipped into a coma, and died after spending six days in the intensive

care unit.

70.   An autopsy concluded he died of hyperthermia, due to housing "in a hot environment without air conditioning."

71.   The autopsy found Mr. McCollum was "predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension."

D.   *TDCJ and UTMB's Polices Deliberately Ignored Conditions Causing Death*

72.   In addition to the indifference shown by individuals to McCollum's hypertension, diabetes, and "seizures"/heatstroke, serious deficiencies in TDCJ and UTMB policies and procedures, which were approved by and known to TDCJ and UTMB's   highest-ranking officials, including but not limited to Eason, Livingston and Murray, proximately caused Mr. McCollum's death.

73.   TDCJ officers report all heat related illnesses to TDCJ headquarters to inform high-ranking officials, including Eason and Livingston, when prisoners or TDCJ employees become ill.

74.   As the conditions at the Hutchins State Jail are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Mr. McCollum, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas cooled by air conditioning, or to make sure inmates with medical conditions such as diabetes or hypertension were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat, a decision, of course they made from the comfort of their own air conditioned offices.

(*i*).   *TDCJ Prisons Are Not Air Conditioned*

75.   Though indoor temperatures at TDCJ prisons routinely exceed 100 degrees and the

heat indexes in July and August exceeded 130 degrees, the prisons are not air-conditioned.

76. Moreover, TDCJ and UTMB officials, including Defendants Livingston, Eason, Owen and Pringle, took no steps to remedy this despite knowing and informing their employees that extreme heat could and would cause serious injury or death.

77. In fact, TDCJ trains all its employees that "heat stroke occurs when the body is subjected to more heat than the body can possibly handle. Heat stroke is a serious medical condition and may lead to death without immediate emergency medical attention. In heat stroke, body temperature rises too quickly resulting in the death of body tissue." TDCJ officials, like Livingston, Eason, Clark, Tate, Sanders, and Pringle, knew "victims of prolonged or high heat can develop heat cramps or heat exhaustion.  If heating continues, the condition can progress to a heat stroke and death."

78. And this is exactly what happened in 2011.

79. In fact, system-wide, at least ten people in TDCJ custody, including Mr. McCollum, died of heat-related causes in the summer of 2011. All were, or should have been known to UTMB and TDCJ, including Livingston and Eason. Six of these deaths happened in the region Eason supervises.

      a. Douglas Hudson, 62, died of hyperthermia at TDCJ's Gurney Unit in Tennessee Colony on July 25, 2011.

      b. Thomas Meyers, 46, died of hyperthermia at TDCJ's Coffield Unit in Tennessee Colony on August 3, 2011.

      c. Robert Webb, 50, died of hyperthermia at TDCJ's Hodge Unit in Rusk, Texas on August 4, 2011.

      d. Alexander Togonidze, 44, died of hyperthermia at TDCJ's Michael Unit in Tennessee Colony on August 8, 2011.

      e. Charles Cook, 53, died of hyperthermia at TDCJ's Hodge Unit in Rusk on August 8, 2011.

     f.   Michael Martone, 57, died of hyperthermia at TDCJ's Huntsville Unit in Huntsville on August 8, 2011.

     g.   Kelly Marcus, 36, died of hyperthermia at TDCJ's Connally Unit in Kenedy on August 12, 2011.

     h.   Daniel Alvarado, 44, died of hyperthermia at TDCJ's Huntsville Unit in Huntsville on August 20, 2011.

     i.   Kenneth James, 52, died of heat stroke at the Gurney Unit on August 13, 2011.

80.  These men were not the first to die from hyperthermia in TDCJ custody. In 2007, two men died. As far back as 1999, Judge William Wayne Justice expressly noted and warned TDCJ officials that prisoners were dying of heat-related illnesses in TDCJ custody.

81.  It is likely that there were more heat related injuries and deaths as hypertension is known to be an underreported cause of death by medical examiners and pathologists.

82.  Moreover, this is a uniquely TDCJ problem, large county jails in Texas are almost uniformly air conditioned, and the Texas Commission on Jail Standards <u>requires</u> county jails keep temperatures between 65 and 85 degrees Fahrenheit. Yet despite the fact that the state protects inmates in jails, it and the TDCJ in particular refuse to provide adequate shelter from the blistering Texas summers. *See* 37 Tex. Admin. Code § 259.160.  Despite his knowledge of this policy, and his knowledge of the extremely hot conditions in TDCJ facilities in the summer of 2011, Livingston and Eason and, at least at Hutchins, Warden Pringle took no action to cool down these exceptionally dangerous and hot conditions. Livingston's refusal to air condition inmate living areas was a moving force causing Mr. McCollum's death.  Likewise, Livingston and Eason's failure to cool these areas or move sick inmates in grave danger into air-conditioned areas, also was a cause of McCollum's death.

83.  Approving air conditioning in TDCJ prisons would require action at the highest levels of the agency, including authorization and approval from Livingston, approval he has to

date refused to provide.

*(ii). Policies Ignore Dangers in Housing Areas*

84. TDCJ's formal, written policies applicable at all facilities only address how to accommodate prisoners assigned to perform convict labor at the prisons during periods of extreme heat. For example, work outside may be curtailed when it is very hot outside. TDCJ and UTMB policy requires certain additional precautions be taken to protect all prisoners (even those without medical conditions) before they can work in temperatures exceeding 85 degrees. But despite their knowledge of the damages of such hear and punitive nature of exposing prisoners to such heat, despite their knowledge of the dangers of such heat, there is no corresponding policy to protect prisoners from extreme temperatures in housing areas. No corresponding policy addresses indoor temperatures, even though temperatures inside are virtually identical to outdoor temperatures.

85. UTMB policy states "it is the responsibility of [the prison] medical staff to provide guidelines to assist the facility administration in the determination of safe and healthful *work* conditions. Every reasonable effort shall be made in the interest of preventing heat-related injuries *in the workplace*." (emphasis added). The policy is completely silent on housing assignments for prisoners likely to suffer heat-related injuries even though temperatures inside are virtually identical to outdoor temperatures.

86. Moreover, though UTMB and TDCJ policy and training recognizes extreme temperatures can be deadly, and at least ten people died from hypertension in non-air conditioned housing units, TDCJ and UTMB policies have never and still do not address protecting prisoners from heat in housing areas.

*(iii). Prisoners Do Not Receive Intake Physicals Right Away*

87. Equally troubling, Prisoners do not immediately receive a physical examination from

a doctor or physicians assistant when they arrive at a TDCJ prison. Many prisoners wait a week to ten days to receive their physical. Thus, prisoners like McCollum who are sick and particularly susceptible to danger from extreme hear when acclimating, are purposefully left in danger.

88.   The intake physical is critical to protecting prisoners from extreme temperatures, because it is the first opportunity for medical staff to identify medical conditions and disabilities that require accommodations to protect prisoners from heat. Any delay in this physical denies prisoners this accommodation, and leaves them in danger. Indeed, three of the men who died of hyperthermia in 2011 had been incarcerated less than a week and had disabilities similar to Mr. McCollum/.

(*iv*). *TDCJ Does Not Provide Safe Housing for Prisoners with Medical Conditions*

89.   Upon information and belief, when UTMB performs the physical, medical staff make mandatory housing recommendations for prisoners. UTMB, among other things, can prohibit prisoners with certain medical conditions from working in prison jobs where they would be exposed to high temperatures. For a prisoner with a chronic leg injury, for example, UTMB may prohibit TDCJ from assigning that prisoner to a top bunk. The form UTMB staff complete, which Director Murray and other staff was familiar with, can also require prisoners be housed: 1) in "single level" facilities or on the ground floor (for prisoner using wheelchairs, for example); 2) with prisoners who have similar medical conditions; or 3) in a single cell. TDCJ and UTMB's housing decisions, however, do not contemplate special housing for people with disabilities adversely affected by extreme temperature.

90.   UTMB officials, including Murray and Babbili, were aware many TDCJ prisoners live with hypertension and diabetes, and are housed in non-air-conditioned TDCJ facilities, including the Hutchins Unit. These housing decisions are made by TDCJ, based on medical

recommendations made by UTMB.

91.   UTMB decision-makers, including Murray, are aware of the serious risks extreme heat poses to prisoners with medical conditions like Mr. McCollum. Murray was aware of these policies, but deliberately indifferent to the risk posed to prisoners due to assignment to these harsh living conditions.

92.   For example, UTMB policy prohibits prisoners taking certain drugs, including hydrochlorothiazide, from "work[ing] or recreat[ing] in environments where the apparent air temperature is 95 [degrees] or higher." Though prisoners taking hydrochlorothiazide are prohibited from "recreating" in areas where the temperature exceeds 95 degrees, Babbili made no recommendation to house Mr. McCollum safely.

93.   Of the 97 state-operated TDCJ facilities, 56 have some air conditioning in inmate living areas. Livingston, Eason, Owen and Pringle took no steps to house prisoners with known medical conditions complicated by heat, such as those suffering from diabetes, hypertension or prescribed diuretics, in locations that were air conditioned.

(*v*). *TDCJ Does Not Provide Air Conditioned Respite Areas*

94.   TDCJ trains its employees that during hot months they should "spend more time in air conditioned places.  Air conditioning in homes and other buildings markedly reduces danger from the heat.  If you cannot afford an air conditioner, spending some time each day during hot weather in an air-conditioned environment affords some protection." Employees are advised to "stay in an air conditioned area if possible," and are only allowed to work outside for two hours at a time.

95.   Indeed, several areas where TDCJ employees work at the Hutchins State Jail, including Pringle's office, are air conditioned.

96.   TDCJ even air conditions the armory at the prison because of concerns the prison's

weapons could be damaged by the heat.

97.   In these parts of the prison, the temperatures were a comfortable 75 degrees.

98.   Significantly, Defendants chose not to provide prisoners, like Mr. McCollum, these opportunities to cool off in an air conditioned environment at the Hutchins facility.  Nor did anyone at TDCJ, including Defendants, ever notify McCollum of any other prisoner when they arrived that they could request to spend time in air conditioned parts of the prison.

(*vi*). *Prisoners Are Not Provided Adequate Cold Water*

99.   Hutchins facility officials, including Pringle and Sanders, failed to provide or ensure adequate additional drinking water was provided to prisoners. Officers only brought one large jug per fifty-eight prisoners to the prisoner living areas three times a day. The jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and were frequently filled with lukewarm water in July 2011. According to Director Eason, the provision of water was to occur as much as possible and should not have been so limited. At Hutchins, however, the provision of additional water to stay hydrated did not occur.

100. Moreover, pursuant to TDCJ policy, which was known to Directors Livingston and Eason, as well as Warden Pringle, Mr. McCollum was not issued a cup when he entered prison, shortly before his death. Without a cup, Mr. McCollum could not drink any of the water provided in the water jugs, whether or not adequate water was provided, and whether or not the water was cold. Livingston, Eason and Pringle knew this policy denied this basic accommodation to prisoners like Mr. McCollum, yet chose not to remedy it.

(*vii*).   *Prisoners Are Not Provided Personal Fans at the Hutchins Unit*

101. TDCJ officials, including Eason, Pringle and Livingston, prohibit new prisoners at the Hutchins Unit, like Mr. McCollum, from owning personal fans to cool themselves, though personal fans are available to other prisoners convicted of more serious crimes in other TDCJ

prisons and are part of TDCJ's alleged plan to combat the heat inside its non-air conditioned unites.

102. Eason and Pringle, moreover, knew the windows in the areas at Hutchins where prisoners live are sealed shut, and cannot be opened.

103. The ability to open windows and use personal fans, while it does nothing to decrease the temperature inside, at least would increase comfort in the Hutchins Unit's housing areas in a minimal way. But prisoners at Hutchins did not even receive this accommodation.

(*vi*). *These Conditions Continue at the Hutchins Unit*

104. After Mr. McCollum's death, brutal indoor temperatures continued at the Hutchins State Jail.  Indoor air temperatures as high as 106 degrees Fahrenheit were recorded weeks later.

104. While Livingston, Eason, and Pringle were aware of the brutal heat in the Dallas area, including inside the Hutchins Unit in the weeks preceding Mr. McCollum's injuries and death, and Eason and Livingston were notified of numerous other deaths, they took no steps to remedy the situation and provided no reasonable accommodations for prisoners like Mr. McCollum whose disabilities made them more susceptible to heat stroke.

105.    Likewise, Livingston, Eason, and Pringle, TDCJ and UTMB  knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees, and failed to take reasonable steps to protect the health and safety of prisoners.

106. Livingston, Eason, and Pringle as  well as TDCJ and UTMB also knew TDCJ routinely housed people with hypertension and diabetes in extremely hot facilities like the Hutchins State Jail. TDCJ's policies and practices, which Livingston, Eason, UTMB director Owen and Pringle knew about, make no accommodation for people with hypertension or diabetes during periods of extreme temperatures.

107. UTMB, TDCJ, Livingston, Eason, and Pringle – at a minimum – failed    to take

reasonable steps to safely house Mr. McCollum and protect him from heat stroke, A risk they were well aware of at the time, Livingston, Eason, and Pringle were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

108. At the time of Mr. McCollum's death, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Eason, and Pringle are not entitled to qualified immunity.

109. Plainly, the conditions at Hutchins State Jail result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Mr. McCollum, as well as others in his condition. These conditions are not reasonably related to any penological interest.

110. TDCJ and UTMB discriminated against Mr. McCollum due to his disability, hypertension and/or diabetes, by denying him reasonable accommodations necessary to allow him access TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people like Mr. McCollum access to TDCJ facilities.

CAUSES OF ACTION

I. <u>EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT</u>
(As to Defendants Livingston, Eason and Pringle Only, in Their Individual Capacities)

111. Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

112. By subjecting Mr. McCollum to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Eason and Pringle acted with deliberate indifference to Mr. McCollum's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

113. The extreme temperatures Defendants tolerated at the Hutchins State Jail proximately caused Mr. McCollum's untimely death.

114. Plaintiff brings these claims through 42 U.S.C. § 1983.

II.  AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT
(As to Defendant TDCJ and UTMB Only)

115. TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

116. Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act.  42 U.S.C. § 12131 *et seq.* (2008).

117. The Hutchins State Jail is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes.  Mr. McCollum was otherwise qualified to participate in the programs and services at the Hutchins State Jail provided by TDCJ and/or UTMB.

118. For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Mr. McCollum was a qualified individual regarded as having a physiological impairment that substantially limited one or more of his major life activities. Defendant TDCJ and UTMB knew Mr. McCollum suffered from hypertension, and was prescribed diuretic medications. He was also known to have diabetes, and to have been obese. Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and refusing to protect him from the extreme

temperatures that took his life.

119. As alleged above and herein, TDCJ and UTMB failed to and refused to reasonably accommodate Mr. McCollum's disability while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.  That failure and refusal caused his death.

120. As alleged above, TDCJ and/or UTMB failed, and refused to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Mr. McCollum's disability.  These failures and refusals caused his death.

121. Mr. McCollum died as a direct result of TDCJ's intentional discrimination against him. Plaintiff is entitled to the maximum amount of compensatory damages allowed by law.

### III.   EIGHTH AND FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE
(As to Defendants Livingston, Eason, Pringle, Clark, Tate and Sanders Only, in Their Individual Capacities)

122. Defendants Clark, Tate and Sanders denied Mr. McCollum health care for a serious medical need when they found him unresponsive and suffering from convulsions, and delayed calling an ambulance for almost an hour. Clark, Tate and Sanders knew from observing Mr. McCollum that he needed medical attention that could not be provided at the prison, but delayed his access to care until it was too late. Their deliberate indifference to Mr. McCollum's serious medical need proximately caused his death and additional suffering.

123. Eason, Livingston, and Pringle knew about and ratified the decision to delay prisoners access to medical care. Eason and Pringle knew requiring officers to go through the chain of command and consult with an off-site nurse before calling an ambulance would seriously delay access to medical care. Their deliberate indifference to prisoners suffering from emergent medical conditions was a proximate cause of  Mr. McCollum's death.

124. Eason, Pringle, and Livingston, upon information and belief, knew about and effectively ratified an informal TDCJ policy of failing to provide immediate medical attention to

non-responsive prisoners suffering seizures at prisons where there was no available medical staff. Their deliberate indifference to prisoners suffering from emergent medical conditions contributed to Mr. McCollum's death.

125. Eason, Pringle, and Livingston failed to adequately train and supervise Clark, Tate and Sanders. Their failure and refusal to instruct officers who find unresponsive inmates suffering convulsions to immediately seek emergency medical treatment proximately caused Mr. McCollum's death.

DAMAGES

126. Plaintiff is entitled to compensatory, punitive, presumed, and nominal damages against Defendants in the maximum amounts allowed by law.

127. As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of the wrongful death of Larry Gene McCollum, Deceased, Plaintiffs assert claims under 42 U.S.C. § 1983 and the wrongful death and survivorship statutes as specifically pled herein.

128. More particularly, Plaintiffs Stephanie Kingrey, Stephen McCollum, and Sandra McCollum in their capacity as heirs at law to the Estate of Larry Gene McCollum, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;

- past mental anguish;

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

129.     Plaintiffs Stephanie Kingrey, Stephen McCollum, and Sandra McCollum in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, services, and affection of Larry McCollum; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

### ATTORNEYS' FEES AND COSTS

130. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs.  Plaintiffs also request attorneys' fees, costs, and expenses against TDCJ for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. § 12205.

### PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A.   Award compensatory damages against Defendants only;

B.   Award punitive damages against individual Defendants only;

C.   Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this Complaint;

D.   Find that Plaintiffs are the prevailing party in this case and award him attorneys' fees, court costs, expert costs, and litigation expenses; and,

E.   Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: April 5, 2013.

Respectfully submitted,

The Edwards Law Firm
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701
Tel.    512-623-7727
Fax.    512-623-7729

By____/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
*Lead Counsel*

/s/Scott Medlock_____
Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Eliot Shavin
State Bar No. 18138200

2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
*Local Counsel*

ATTORNEYS FOR PLAINTIFFS