# Exhibit Q

Case 4:14-cv-03253  Document 50-5  Filed on 05/15/13 in TXSD  Page 2 of 6

19

Stephen McCollum, et al v.                               Robert Eason
Brad Livingston, et al.                                March 26, 2013

```
 1              THE WITNESS:  I'm sorry.
 2      Q.   (By MR. EDWARDS) Let's talk about situations
 3 where people die or are taken to the hospital and
 4 eventually die.
 5      A.   Okay.
 6      Q.   Are there situations that -- in those situations
 7 where no -- no administrative review needs to happen?
 8      A.   Yes, sir.
 9      Q.   Okay.  What are those situations?
10      A.   A situation where -- I'll give you an example.
11 We have -- let's say we have an offender that has a heart
12 attack on the facility, you know, some type of medical
13 issue where we transport them from the facility to the
14 hospital.  They -- they stay in the hospital for a period
15 of time, okay?  That is what we call physician's -- he's
16 under physician's care and then at some point, you know,
17 we're going to contact the family so they can go up there
18 and visit, thing like that.
19              And let's say at some point he passes away.
20 Then that's considered a physician-attended death and
21 there is not an admin review required --
22      Q.   Okay.
23      A.   -- for that.
24      Q.   Other than a physician-attended death, are there
25 any other situations where an admin review wouldn't be
```

Case 4:14-cv-03253   Document 50-5   Filed on 05/15/13 in TXSD   Page 3 of 6

20

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                       March 26, 2013

1  required for a death resulting from -- resulting at a TDCJ
2  facility?
3      A.   It could be -- and there's a timeline that it
4  has to fall within to be considered a physician-attended
5  death by AEC, and I --
6      Q.   What is that?
7      A.   Well, I'm not real sure the timeline.  And a lot
8  of times what we'll do is we'll call EAC and say, you
9  know, "Is this going to be considered a physician-attended
10 death or not?"  And I'm wanting to think it's somewhere
11 within 72 hours.
12     Q.   Who is the "we" that would call EAC?
13     A.   We have -- at the time Mr. McCollum passed away,
14 it was Kathy Clear.  She was over the Emergency Action
15 Center, and now it is Jill Lewis.
16     Q.   To your knowledge -- I mean did you consider the
17 McCollum death a physician-attended death?
18     A.   Yes, I did.
19     Q.   Why?
20     A.   Because that was the information that we were
21 given from Parkland Hospital, that it was from natural
22 causes and it was a physician-attended death.
23     Q.   Were you aware that -- that Mr. McCollum went
24 nonresponsive at around two o'clock in the morning?
25     A.   Yes, sir, from reading the report and talking to

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                   March 26, 2013

1   Q.   Why not?
2   A.   Because we are taking all the steps that we --
3   we can take to mitigate the heat.  We're doing that every
4   summer, and when you look how vast our operation is
5   throughout the state, and how many offenders that we move
6   through our institutions every summer, how many employees
7   we have working in our institutions every summer, we have
8   very little problems with heat-related illness when you
9   look at the numbers.
10   Q.   Was that true in the summer of 2011, that you
11   had very little problems with heat-related illnesses?
12   A.   In my opinion, yes.  When you look at the
13   numbers, I think we do a wonderful job at taking those
14   steps, taking it very seriously and mitigating the heat on
15   our facilities.
16   Q.   Just to be crystal clear, it's your testimony,
17   as the Texas Department of Criminal Justice
18   representative, that you do a wonderful job mitigating the
19   heat at your facilities?
20   A.   Yes.
21   Q.   Do you believe you did a wonderful job at the
22   Hutchins Unit with regard to Larry Eugene McCollum?
23   A.   Yes, we do -- we did a -- a good job.
24   Q.   Did you make any changes -- I mean the Texas
25   Department of Criminal Justice -- based on Mr. McCollum's

Case 4:14-cv-03253   Document 50-5   Filed on 05/15/13 in TXSD   Page 5 of 6

339

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                   March 26, 2013

```
 1  it, yes, sir.
 2              MR. EDWARDS:  Do you mind going off the
 3  record for one second, Bruce?  And then we're probably
 4  done.
 5              MR. GARCIA:  Off the record 6:36.
 6              (Discussion off the record).
 7              (Exhibits Nos. 45-46 marked).
 8              THE VIDEOGRAPHER:  We're back on the record
 9  at 6:38.
10     Q.   (By MR. EDWARDS) Okay.  We just have a very, very
11  brief time, but we mentioned Kenneth James at the Gurney
12  Unit who died on August 13th, 2011.  Let me show you an
13  autopsy, sir.  With regard to Mr. James, who died at the
14  Gurney Unit, I've highlighted what I believe to be the
15  cause of death in that case.  Would you read that for the
16  jury, sir?
17     A.   Just the highlighted area?
18     Q.   Just the highlighted area, yes.
19     A.   "Cause of death is most likely environmental
20  hyperthermia-related to classic heat stroke."
21     Q.   Okay.  Now, assuming that -- that Mr. James was
22  housed at the Gurney Unit and died from classic heat
23  stroke, that would be heat-related illness which should be
24  brought to your attention and an administrative review
25  should be done, right?
```

Stephen McCollum, et al v.                                  Robert Eason
Brad Livingston, et al.                                 March 26, 2013

1    A.    Yes, sir.
2    Q.    Okay.  To your knowledge, do you know if any
3  sort of administrative review was done with regard to
4  Kenneth James, who died at the Gurney Unit?
5    A.    Without going back in my office and looking at
6  records or calling EAC, I couldn't answer that.
7    Q.    All right.  I want to thank you very much for
8  your time, sir.
9           MR. EDWARDS:  I'll pass the witness with
10 all of about 27 seconds left, sir, but --
11          MR. GARCIA:  We'll reserve.
12          MR. EDWARDS:  Okay.
13          THE REPORTER:  Any stipulations?
14          MR. GARCIA:  No, ma'am.
15          THE VIDEOGRAPHER:  Off the record at 6:39
16 p.m.