UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM, <br> PLAINTIFFS <br><br> v. <br><br> BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. <br> DEFENDANTS | § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. <br> 3:12-cv-02037 |

**PLAINTIFFS' RESPONSE TO DEFENDANT LIVINGSTON'S MOTION TO DISMISS ON THE BASIS OF QUALIFIED IMMUNITY**

Plaintiffs respectfully ask the Court to deny Defendant Brad Livingston's Motion to Dismiss on the Basis of Qualified Immunity, and argue:

1. Livingston's motion should be denied because the pleadings allege with sufficient factual detail he was deliberately indifferent to the deadly conditions at the Hutchins State jail.

   a. Plaintiff's complaint alleges Livingston violated the Eighth Amendment. There are two elements to show prison conditions violated the Eighth Amendment: objective danger, and the defendant's subjective awareness of the danger. *Blackmon v. Garza*, 484 Fed.Appx. 866, 869 (5th Cir. 2012) (unpublished).

   b. The objective danger of 120+ degree temperatures is indisputable. And Plaintiffs' complaint describes Livingston's subjective awareness in detail, satisfying controlling case law on deliberate indifference in the Fifth Circuit. *See Blackmon*, 484 Fed.Appx. at 873.

   c. The pleadings robustly allege Livingston's personal actions as the executive director of TDCJ condoned and approved conditions that directly lead to McCollum's death. These conditions violated the Eighth Amendment.

2. Livingston is not entitled to qualified immunity.

a. By raising qualified immunity in a 12(b)(6) motion, Defendant contends the pleadings do not allege a violation of the constitution and/or the constitutional right was not clearly established when McCollum died. *See Bishop v. Arcuri*, 674 F.3d 456, 460-61 (5th Cir. 2012).

b. But it is beyond question that when McCollum died, the courts had established without any ambiguity putting a prisoner in temperatures threatening heat stroke was unconstitutional. *Blackmon v. Kukua*, 484 Fed.Appx. at 873.

c. Livingston's conscious disregard for the suffering in the prisons he supervises is more than mere negligence – it is deliberate indifference that violates the Eighth Amendment of the Constitution.

For these reasons, and those more fully developed in the attached Brief in Support, Defendant's motion should be denied.

DATED: October 4, 2013.

              Respectfully submitted,

              The Edwards Law Firm
              The Haehnel Building
              1101 East 11th Street
              Austin, TX 78702
                Tel. 512-623-7727
                Fax. 512-623-7729

              By /s/ Jeff Edwards
              JEFF EDWARDS
              State Bar No. 24014406
              Lead Counsel

              Scott Medlock
              State Bar No. 24044783
              Brian McGiverin
              State Bar No. 24067760
              James C. Harrington
              State Bar No. 09048500

              TEXAS CIVIL RIGHTS PROJECT
              1405 Montopolis Drive
              Austin, TX 78741
              (512) 474-5073 [phone]
              (512) 474-0726 [fax]

Eliot Shavin
State Bar No. 18138200
2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
Local Counsel

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM,<br>PLAINTIFFS | § § § § § § | |
| v. | § § | CIVIL ACTION NO.<br>3:12-cv-02037 |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE.<br>DEFENDANTS | § § § § § § § § | |

**BRIEF IN SUPPORT OF PLAINTIFFS'
RESPONSE TO DEFENDANT LIVINGSTON'S MOTION TO DISMISS ON THE BASIS
OF QUALIFIED IMMUNITY**

Larry McCollum died a tragic, pointless, and preventable death caused by exposure to extreme heat in the Hutchins State Jail, where Texas Department of Criminal Justice executive director Brad Livingston knew prisoners were routinely exposed to heat indexes exceeding 120 degrees. Livingston is sued in his individual capacity for knowingly exposing prisoners to the brutal heat that killed McCollum. McCollum's surviving family members respectfully file this brief in support of their response to Livingston's motion to dismiss.

**SUMMARY**

Policymakers for the Texas Department of Criminal Justice, including Livingston, made the deliberate choice to imprison people like McCollum – with particular vulnerabilities to extreme heat – in prisons where indoor heat indexes routinely exceed 120 degrees. Though Livingston knows prisoners suffer (or even die) from these conditions every summer, he took,

4

and continues to take, no reasonable action to protect them from death. Thus, Livingston is liable for McCollum's death because he knew that the lethal heat endured by prisoners was a serious, system-wide danger in Texas prisons, and because he was deliberately indifferent to that danger. As the executive director of TDCJ, Livingston is one of the few people in the agency who had the ability and authority to approve cooling inmate living areas. Livingston cannot claim qualified immunity because his failure to protect vulnerable people, like McCollum, was clearly unconstitutional at the time McCollum died.

## I. STANDARD OF REVIEW – RULE 12(b)(6) MOTIONS ARE DISFAVORED AND RARELY GRANTED

The Court should deny Livingston's Rule 12(b)(6) motion because it cannot be granted unless the pleadings are deficient on their face. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010) (citation omitted).

Motions to dismiss for failure to state a claim "are viewed with disfavor and [are] rarely granted." *Parker v. Am. Airlines, Inc.*, 516 F. Supp. 2d 632, 634 (N.D. Tex. 2007) (citing *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)). When reviewing a motion to dismiss, Courts are required to accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Lindquist v. City of Pasadena*, 525 F.3d 383, 386 (5th Cir. 2008) (internal quotation marks and citations omitted). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotations and citations omitted).

A claim is correctly pled when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store No.*

*155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations," it only "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. And when a governmental entity is the defendant, plaintiffs will often not have access to critical documents before conducting discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011).

The pleadings overwhelmingly show Livingston violated Mr. McCollum's constitutional right to be free from substantial risk of serious harm, which was clearly established law at the time of his death. *See Bishop v. Arcuri*, 674 F.3d 456, 460-61 (5th Cir. 2012) (describing two-element standard for qualified immunity).

## II. ARGUMENT – THE COMPLAINT ALLEGES LIVINGSTON VIOLATED THE EIGHTH AMENDMENT

### A. The pleadings show Livingston violated a clearly-defined constitutional right.

McCollum died at age fifty-eight, while serving a short prison sentence for forgery.[1] He was especially vulnerable to extreme temperatures because he took a diuretic to treat his hypertension, and suffered from diabetes.[2]

When he arrived at the Hutchins State Jail, officers told him, "Welcome to Hell."[3] McCollum died just a few days later when the heat index inside the prison rose above 120 degrees Fahrenheit.[4] He began suffering a "seizure" shortly after 2:00 a.m. Even though there

---

[1] Doc. 43, Plaintiffs' Amended Complaint, ¶ 35.

[2] *Id.*, ¶¶ 23-34.

[3] *Id.*, ¶ 37.

[4] *Id.*, ¶ 44.

was no medical staff at the prison overnight,[5] it took officers almost an hour to call an ambulance to take him to Parkland Hospital.[6] When he got there, his body temperature was a stunning 109.4 degrees.[7] The extreme heat caused multi-system organ failure. He slipped into a coma and died a few excruciating days later.[8] An autopsy concluded he died of hyperthermia, due to being "in a hot environment without air conditioning."[9]

Livingston is liable under the Eighth Amendment for Mr. McCollum's death because:

1) Prison conditions that objectively threatened a substantial risk of serious harm killed McCollum; and,

2) Livingston personally knew about this life-threatening danger but recklessly disregarded it.

*Blackmon v. Garza*, 484 Fed.Appx. 866, 869 (5th Cir. 2012) (unpublished) (the test for Eighth Amendment liability has an objective element and a subjective element).

### 1. *Livingston Knew Extreme Temperatures Were Deadly*

Plaintiffs will prove Livingston was aware of brutal heat in Texas prisons by showing it was obvious; a jury may infer he was aware of obvious hazards. *Blackmon*, 484 Fed.Appx. at 873 (*citing Gates*, 376 F.3d at 340). In a similar case, the Fifth Circuit explained:

> [The Warden] testified that she was aware that the summer heat was "intense." Moreover, the evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners. The training highlighted the particular risks to prisoners such as [the plaintiff]—an older inmate taking medications with a diuretic effect. Thus, the obvious nature of the risks to [the plaintiff] would further support a jury finding that Defendants were deliberately indifferent to the risks to [the plaintiff's] health.

---

[5] *Id.*, ¶ 54.

[6] *Id.*, ¶¶ 56-66.

[7] *Id.*, ¶ 68.

[8] *Id.*, ¶ 69.

[9] *Id.*, ¶ 70.

7

*Blackmon*, 484 Fed.Appx. at 873. Plaintiffs allege Livingston knew indoor air temperatures in TDCJ facilities regularly exceeded 90 degrees.[10] Indeed, the complaint alleges citizens throughout the Dallas area experienced heat indexes exceeding 130 the day McCollum suffered the fatal heat stroke.[11] Livingston would have known about the high temperatures that existed throughout the state.[12]

Similarly, Livingston knew the vast majority of TDCJ prisons, including the Hutchins State Jail, were not air conditioned.[13] Even though state law requires county jails to keep indoor temperatures between 65 and 85 degrees, indoor temperatures in the state prisons routinely soar over 100 degrees every summer.[14] He also knew extreme heat could cause serious injury or death, and poses an even higher risk of harm to prisoners known to be vulnerable to the heat – such as those over 40, with hypertension, diabetes, or taking drugs that dehydrate the body, like McCollum.[15]

Livingston, as the executive director, was uniquely positioned to approve measures, like air conditioning or other cooling mechanisms that would bring down the outrageous indoor temperatures at the Hutchins State Jail – just as the Director and TDCJ do for pigs raise for slaughter in TDCJ's agricultural programs.[16] Likewise, Livingston was intimately involved in the

---

[10] *Id.*, ¶ 105.

[11] *Id.*, ¶ 55.

[12] *Id.*, ¶ 22.

[13] *Id.*, ¶ 76.

[14] *Id.*, ¶ 82 (citing TEX. ADMIN. CODE § 259.160).

[15] *Id.*

[16] *See* Mike Ward, "Steamy prisons, cool pig barns: Climate-controlled barns show swine are better off than guards, convicts, critics say," *Austin American-Statesman*, Aug. 17, 2013 (attached as Exhibit 1). In June 2013 – after the pleading deadline - TDCJ signed a contract to purchase six climate controlled "swine barns." Livingston's deputy, Bryan Collier, told the press the climate controlled barns were necessary because "pigs can't sweat." Elizabeth Koh, "Climate-controlled Swine Buildings Dismay

decision to end 24-hour medical care at the Hutchins State Jail, which caused the fatal hour-long delay in obtaining treatment for Mr. McCollum.[17] Livingston made these decisions to save the agency money, though he knew these policies would put prisoners' lives at risk.

Livingston's decisions created an obvious threat to McCollum. Extreme heat in the Hutchins State Jail was (and is) long-standing, well-documented, and expressly noted by prison officials.[18] System-wide, nine other people in TDCJ's custody died from heat-related causes in 2011.[19] As far back as 1999, federal judges had expressly noted prisoners in TDCJ custody were dying from exposure to extreme summer temperatures.[20] Two prisoners had died from heat stroke just a few summers before.[21] And at least two more died in 2012.[22] In all, fourteen men died from heat stroke in TDCJ's prisons during the past six years, as shown in the chart below:

---

Inmates' Advocates," *Texas Tribune*, Aug. 16, 2013 (attached as Exhibit 2). Likewise, Plaintiffs' complaint alleges diabetics, like McCollum, have difficulty sweating to cool the body. Amd. Complaint, ¶ 30.

[17] *Id.*, ¶ 54.

[18] *Id.*, ¶¶ 47-48. (records show the prison recorded outdoor heat indexes of 150 the week before Mr. McCollum died, and emails showed "random samplings taken in the prisoner housing areas reflect a 2 to 3 degree difference from the outside [prison] temperature.")

[19] Id., ¶ 79-80.

[20] Id., ¶ 80. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

[21] Id., ¶ 80.

[22] As this Court noted on page 3 of its July 24, 2013 (Doc. 69) "These similarities suggest a pattern of behavior by the Defendants that could be relevant to the issue of deliberate indifference."

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicio Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found at 3:30am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility, found shortly after midnight |

10

But despite all these previous deaths, no life-saving changes were made before McCollum arrived at the Hutchins State Jail. In fact, only after suit was filed did TDCJ make significant changes at the Hutchins Unit with regards to the extreme heat and identifying particularly vulnerable individuals.

And these extreme temperatures were not confined to a single prison facility – Plaintiffs allege they exist in prisons around the state. ("Livingston's refusal to air condition inmate living areas was a moving force causing Mr. McCollum's death.").[23] The jury may infer Livingston was aware of the number of fatalities racked up year after year due to TDCJ's decision to expose prisoners to this obvious hazard.

Previous lawsuits have also brought these particularly dangerous conditions to Livingston's personal attention. In *Blackmon v. Kukua*, 758 F.Supp.2d 398 (S.D. Tex. 2010), Livingston was sued in his individual capacity over nearly identical prison conditions in a different TDCJ prison. Though the trial court granted summary judgment on the claims against Livingston, the prisoner's allegations provided him notice that prisoners were deprived "minimal civilized measures of life's necessities" in prisons extremely similar to the Hutchins State Jail. *See id*., at 408.[24] The court denied the remaining defendants requests for qualified immunity, and sent the case to trial.[25]

---

[23] Plaintiffs' Amd. Complaint, ¶ 82.

[24] Notably, *Blackmon* addressed the quality of the summary judgment *proof* against Livingston, not the adequacy of the *pleadings*. *Blackmon v. Kukua*, 758 F.Supp.2d at 411. Regardless, the pleadings here are far more robust than the complaint in *Blackmon*. Blackmon's complaint against Livingston, for example, did not allege a system-wide problem resulting in multiple deaths resulting from high-level policy decisions. And the trial court relied exclusively on the fact Livingston did not review Blackmon's grievances about the heat. As discussed below, Livingston did not need personal knowledge an injury would befall any particular prisoner – he merely needed to know conditions in his prison were dangerous.

[25] At trial, the district court erroneously dismissed the case at the close of the plaintiff's evidence on a motion for a judgment as a matter of law. This decision was reversed by the Fifth Circuit in *Blackmon v. Garza*, 484 Fed.Appx. 866 (5th Cir. 2012).

Likewise, it is not necessary to show Livingston predicted McCollum, in particular, would fall prey to the heat. Plaintiffs need only show Livingston was aware the heat was a widespread danger to prisoners, or at least to heat-vulnerable prisoners like McCollum. *Farmer v. Brennan*, 511 U.S. 825, 843-44 (1994). Livingston's protestations he never "met Larry McCollum or knew anything about him" are irrelevant because Livingston knew about and tolerated the dangerous condition that ultimately killed McCollum.[26] The Supreme Court has long acknowledged:

> If, for example, prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep but instead ... would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

*Farmer*, 511 U.S. at 843-44. *See also Blackmon v. Garza*, 484 Fed.Appx. at 873 ("a jury could reasonably conclude that the heat-related health risks to [a prisoner] were obvious"). Plaintiffs allege Livingston knew the extreme temperatures inside the prisons were dangerous, and that TDCJ policy and practice did not cool the temperatures in the areas prisoners live, including the area where McCollum lived. Livingston did not need to know McCollum, in particular, would ultimately be the victim of his indifference.

Livingston also knew that TDCJ imprisoned many people over the age of 40, or suffering from hypertension and diabetes, like McCollum, who are especially vulnerable to heat.[27] *See Blackmon*, 484 Fed.Appx. at 871 ("[The inmate] was on medication for high blood pressure, which functioned as a diuretic and had the potential to make the high temperatures in the [prison] dorm even more dangerous to [him] than to other prisoners. This court has acknowledged that medications can impact a prisoner's ability to contend with extreme heat"). But even though

---

[26] Doc. 85, Livingston's Motion to Dismiss on the Basis of Qualified Immunity, Doc. 19, ¶ 1.

[27] Plaintiffs' Amd. Complaint, ¶ 45.

TDCJ has 56 prison units that offer some air-conditioned inmate housing, where especially-vulnerable inmates could easily be transferred, Livingston refused to make any effort to protect them or issue any policy direction in that regard.

And Livingston surely knew ending 24-hour medical care at the Hutchins State Jail would jeopardize prisoners suffering medical emergencies. Even under ideal circumstances, officers would have to call an ambulance to transport a prisoner to an outside hospital. But here, there were no medical staff at the prison when McCollum suffered the heat stroke, and officers delayed contacting 911 for nearly an hour – something that a competent medical provider would never have permitted and that resulted in the denial of life saving emergency medical care for McCollum.[28] Here, time mattered, and Livingston's penny-wise decision to eliminate medical staff cost McCollum his life.

### 2. Plaintiffs Allege Livingston's Personal Involvement Caused Mr. McCollum's Death

The Amended Complaint alleges Livingston personally approved specific policies that threatened serious harm:

a).   He approved policies that made no accommodation for prisoners during periods of extreme temperatures (including policies and practices prohibiting McCollum from having a fan, or even a drinking cup for cool water);[29]

b).   He failed to provide air conditioning or other cooling in the Hutchins State Jail, approving policies and practices that denied prisoners safe housing;[30]

c).   He approved TDCJ policies that make no accommodations for housing people with medical conditions (like hypertension and diabetes) known to cause medical emergencies and death during periods of extreme temperature;[31]

---

[28] *Id.* ¶¶ 54, 57-64.

[29] *Id.*, ¶¶ 100-101.

[30] *Id.*, ¶¶ 82-83.

[31] *Id.*, ¶ 106.

13

      d). He approved ending round-the-clock medical care at the Hutchins State Jail, causing the fatal hour-long delay;[32] and,

      e). He took no steps to house prisoners with medical conditions complicated by high temperatures in air-conditioned areas.[33]

This is not an attempt to sue Livingston merely because he is at the top of the TDCJ food chain. On the contrary, as TDCJ's executive director he personally approved the policies and practices that caused McCollum's death.

      Though the individual officers who delayed providing McCollum emergency medical treatment for an hour certainly contributed to his untimely death, they were not the ones who made the decisions that exposed McCollum to the hazardous temperatures in the first place. Had the temperatures in the Hutchins State Jail been safe, there would not have been a medical emergency for the officers to treat with deliberate indifference. Livingston therefore effectively created and indisputably condoned the conditions bringing McCollum to the verge of death – Tate, Sanders and Clark, the officers who left McCollum in his bunk unresponsive and seizing for an hour, simply pushed him over the edge.

      Importantly, Plaintiffs do not argue Livingston is liable under *respondeat superior* for the officers' failure to provide McCollum medical care the night he suffered the heat stroke. Instead, Livingston is liable for creating and approving the dangerous conditions that *caused* the heat stroke. Had Tate, Clark and Sanders been Johnny-on-the-spot and immediately secured care for McCollum, he still would have suffered a painful heat stroke due to Livingston's high-level decisions – he just might have lived.

      And, of course, had Livingston not ended 24-hour medical care at the Hutchins State Jail, an on-site nurse or doctor would have been available to treat McCollum immediately. Instead,

---

[32] *Id.*, ¶ 54.

[33] *Id.*, ¶ 93.

the officers delayed calling 911 for an hour while contacting a nurse over 130 miles away for medical records. A nurse would have been a few yards away from McCollum's dorm, and could have, and surely would have, immediately consulted the records, initiated emergency treatment, and gotten an ambulance but for Livingston's decision to end around-the-clock care.

### B. Livingston Authored and Implemented a Constitutionally Deficient Policy

Here, Livingston is liable for McCollum's death because he authored, approved and implemented a policy that failed to provide any protection to prisoners, particularly heat-vulnerable prisoners such as McCollum, housed in extreme temperatures. Livingston approved and implemented a policy and practice that "prohibited air-conditioning in most areas where prisoners live, including McCollum's housing area."[34] The TDCJ policy on "Extreme Temperatures," which Livingston personally approved, does not address *housing* prisoners safely – it only contemplates limiting outdoor convict labor during extreme temperatures.[35] When the indoor heat index eclipses 120, this is equivalent to removing window panes in an Upstate New York prison during the dead of winter. *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1987) (denying summary judgment for commissioner of New York prison system when prisoner exposed to "subfreezing" temperatures).

Likewise, Livingston approved measures that further endangered McCollum. He ended 24-hour medical care at the Hutchins State Jail. He approved policies that made it more difficult for McCollum to drink water by denying him a cup. He refused to allow prisoners at the Hutchins State Jail access to personal fans, even though other prisoners at other prisons had their own fans. These were not decisions made locally at the prison, but globally for the system from Livingston's office in Huntsville.

---

[34] *Id.*, ¶ 76.

[35] *Id.*, ¶ 84.

"Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (internal citations omitted). Plaintiffs' complaint alleges Livingston's policy itself violated McCollum's constitutional rights, resulting in his death.

Cases Livingston relies on confirm policymakers can be responsible for well-known, dangerous prison conditions. The Fifth Circuit in *Duvall v. Dallas Co.*, for example, confirmed "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." 631 F.3d 203, 207 (5th Cir. 2011).[36] The facts in *Duvall* are similar. The county jail consistently tolerated known staph infection rates well above those in similar facilities. Though simple, inexpensive measures could have combatted the staph, the county's policymakers chose to do nothing. *Id.*, at 208-09. As a result, the plaintiff lost an eye due to developing a drug-resistant staph infection. Like Livingston here, the county sheriff knew a jail condition was dangerous but failed to correct it. The Fifth Circuit affirmed a jury verdict for the prisoner.

C. **Livingston is Not Entitled to Qualified Immunity Because the Law is Clearly Established: Extreme Temperatures Violate the Eighth Amendment**

The Eighth Amendment prohibits the prison system from housing inmates in conditions that threaten the substantial risk of serious harm – for instance, temperatures threatening heat stroke. *Blackmon v. Garza*, 484 Fed.Appx. at 869. Federal courts in Texas and the Fifth Circuit have repeatedly found high temperatures unconstitutional (*id.* 869-70), in opinions published long before Mr. McCollum entered the Hutchins State Jail. *See Blackmon v. Kukua*, 758

---

[36] Notably, *Duvall* affirmed a verdict for the plaintiff. It does not address the adequacy of pleadings. In any event, Plaintiffs adequately plead the allegations *Duval* requires – that policymakers decisions were the moving force behind the constitutional injury.

F.Supp.2d at 413-14 (collecting cases showing the right was clearly established). Texas courts have even held people criminally liable for leaving dogs in "hot, very hot" cars. *Lopez v. State*, 720 S.W.2d 201, 202 (Tex. App. – San Antonio 1986). At the time McCollum died, the law was clearly established that prison officials violate the Eighth Amendment by exposing inmates (especially those most vulnerable) to temperatures consistently over 90 degrees. *See*, *e.g.*, *Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004).

Livingston should be denied qualified immunity because the pleadings demonstrate his liability. Plaintiffs' complaint does not allege he was merely negligent. Rather, he actually knew heat inside the prisons' dorm areas was extraordinarily dangerous; he knew housing prisoners in dangerous heat was unconstitutional; but he did it anyway.

Livingston argues he is "not a doctor," "[h]e is an accountant." Livingston's FRCP 12(c) Motion, Doc. 19, p. 9. This does not matter. Though his background may be in finance instead of corrections, he assumed a position where he is ultimately responsible for the welfare of over 150,000 prisoners of the State of Texas. He is handsomely compensated.[37] His signature appears on the TDCJ policies relevant to this case. He approved the policies and practices that resulted in McCollum's death.[38]

McCollum and nine other men died in prisons around the state during the summer of 2011 due to extreme conditions Livingston was aware of and did nothing about. As the director

---

[37] "Government Employee Salaries: Bradley M Livingston," *Texas Tribune*, http://www.texastribune.org/library/data/government-employee-salaries/state-of-texas/bradley-m-livingston/1109466/ (updated May 12, 2012) (salary of $186,300, plus benefits).

[38] And presumably, he approved the $750,000 to cool the areas where pigs raised for slaughter are housed instead of human prisoners. *See* n. 16. Plaintiffs respectfully asks the Court to take judicial notice of the *Austin American-Statesman* and *Texas Tribune* articles where Bryan Collier, Livingston's deputy, explains that because pigs cannot sweat, cooler temperatures are critical for young pigs. Collier does not discuss why TDCJ does not take similar protective measures for the prisoners they know cannot sweat and cool their bodies, such as McCollum and many others who have died.

of a prison system, Livingston is responsible for those deaths, no matter his personal background.[39]

### III. LIVINGSTON, INDIVIDUALLY, CANNOT SEEK DISMISSAL OF PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF

Livingston is sued in his individual capacity for damages, and in his official capacity for injunctive relief. Livingston, in his official capacity, is the Texas Department of Criminal Justice pursuant to the *Ex Parte Young* legal fiction. *See*, *e.g.*, *Meza v. Livingston*, 607 F.3d 392, 412 (5th Cir. 2010). The motion to dismiss only seeks to dismiss the claims against Livingston in his individual capacity – the state agency has separate counsel, and has not sought to dismiss the claims for injunctive relief. (Indeed, following mediation in March 2013, TDCJ agreed to institute a number of reforms, the Plaintiffs are already the prevailing parties for purposes of injunctive relief.)[40] Thus, the Court should disregard Livingston's request to dismiss the claims for injunctive relief.

### **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's motion. In the alternative, should the Court feel that the pleadings are deficient in any way, Plaintiffs would respectfully ask for leave to amend, and would request the opportunity to depose Director Livingston[41] to develop facts concerning his personal knowledge of the dangers posed by extreme heat.

---

[39] The parties have agreed the Plaintiffs will take the depositions of Livingston's chief deputies – William Stephens and Rick Thaler – on October 18, 2013. If the court is inclined to grant this motion, the Plaintiffs respectfully request they have the opportunity to complete these depositions and amend their complaint, if appropriate. Courts should typically give parties opportunities to amend their pleadings before dismissing claims with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

[40] A copy of the mediated agreement to resolve the claims for injunctive relief is attached (as Exhibit 3), as well as a mediation update to the court from TDCJ confirming implementation of the same (as Exhibit 4).

[41] Pursuant to the Court's previous ruling on this subject, Plaintiffs are deposing Director Livingston's immediate subordinates, Mr. Thaler and Mr. Stephens on October 18, 2013.

DATED: October 4, 2013.

        Respectfully submitted,

        The Edwards Law Firm
        The Haehnel Building
        1101 East 11th Street
        Austin, Texas 78702
            Tel.    512-623-7727
            Fax.   512-623-7729

        By    /s/ Jeff Edwards
        JEFF EDWARDS
        State Bar No. 24014406
        Lead Counsel

        Scott Medlock
        State Bar No. 24044783
        Brian McGiverin
        State Bar No. 24067760
        James C. Harrington
        State Bar No. 09048500

        TEXAS CIVIL RIGHTS PROJECT
        1405 Montopolis Drive
        Austin, TX 78741
        (512) 474-5073 [phone]
        (512) 474-0726 [fax]

        Eliot Shavin
        State Bar No. 18138200
        2600 State Street
        Dallas, Texas 75204
        214-522-2010 (telephone)
        214-720-9594 (fax)
        Local Counsel

        ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.