UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM,<br>PLAINTIFFS | § § § § § § | |
| v. | § § § | CIVIL ACTION NO.<br>3:12-cv-02037 |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE.<br>DEFENDANTS | § § § § § § § § | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEPOSITION OF BRAD LIVINGSTON**

Larry McCollum died a tragic, pointless, and preventable death caused by exposure to extreme heat in the Hutchins State Jail, where Texas Department of Criminal Justice executive director Brad Livingston knew prisoners were routinely exposed to heat indexes exceeding 120 degrees. Livingston is sued in his individual capacity for knowingly exposing prisoners to the brutal heat that killed McCollum.

Plaintiffs respectfully ask the Court to compel Defendant Brad Livingston to appear for deposition.

SUMMARY

Policymakers for the Texas Department of Criminal Justice, including Livingston, made the deliberate choice to imprison people like McCollum – with particular vulnerability to extreme heat – in prisons where indoor heat indexes routinely exceed 120 degrees. Though Livingston knows prisoners suffer (or even die) from these conditions every summer, he took,

and continues to take, no reasonable action to protect them from death. Thus, Livingston is liable for McCollum's death because he knew that the lethal heat endured by prisoners was a serious, system-wide danger in Texas prisons, and because he was deliberately indifferent to that danger. As the executive director of TDCJ, Livingston is one of the few people in the agency who had the ability and authority to approve cooling inmate living areas.

## FACTS

The extreme temperatures inside a TDCJ prison killed Larry McCollum shortly after he began serving a short sentence for a non-violent crime. McCollum began suffering convulsions shortly after 2:00 pm, when the indoor temperatures at the prison still exceeded 90 degrees. Though high-ranking TDCJ officials have long known that extreme temperatures indoors put inmates at risk – especially prisoners like McCollum, who suffered from hypertension, obesity, and diabetes – they have taken no steps to cool the indoor temperatures, or at least provide safe housing to prisoners with heat-sensitive medical conditions, like McCollum.

Unfortunately, McCollum was far from the only man to die indoors from heat stroke in Texas prisons. Since 2007, fourteen men have perished due to the extreme indoor temperatures inside TDCJ facilities.

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicio Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found at 3:30am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Diabetic, schizophrenic, and obsess, died at transfer facility, found shortly after midnight |

Plaintiffs, McCollum's surviving family, have sued TDCJ, officers at the prison, and the high-ranking officials who made the policy-level decisions that ultimately killed McCollum.

3

Plaintiffs now seek to depose Brad Livingston, the executive director of TDCJ and a named defendant in this lawsuit.

## DISCOVERY IN THIS CASE

Previously, this Court ordered the Plaintiffs to develop a factual record to support their request to depose Livingston. After a hearing, the Court entered a minute order granting a motion to quash Livingston's deposition "without prejudice to Plaintiffs seeking leave of Court to take Defendant Livingston's deposition if Plaintiffs are unable to obtain the information sought by using other avenues and modes of discovery." Doc. 28. Since that time, Plaintiffs have served additional interrogatories on Livingston, and deposed other high-ranking policymakers at TDCJ, but were unable to get answers to critical questions. Livingston's chief lieutenants in the correctional division of TDCJ – Rick Thaler and William Stephens – testified several times only Livingston could answer the questions Plaintiffs were asking.

A. *Testimony of Rick Thaler*

Thaler was the director of TDCJ's Correctional Institutions Division – the sector that actually manages the prisons – from 2009 to mid-2013. He testified that Livingston was the final policy maker for the agency – "in most cases an administrative directive [final policy] would be signed by Mr. Livingston."[1]

Livingston could approve any agency expenditures under $1 million without approval from the TDCJ Board of Directors.[2] Other TDCJ officials testified portions of the Hutchins Unit – the prison where McCollum died – could have been climate controlled for under $1 million.[3] Conversely, according to press reports, TDCJ (and, presumably, Livingston) approved spending

---

[1] Ex. 1, Deposition Excerpts of Rick Thaler, p. 54:20-22. The relevant policy, which addresses extreme temperatures in the TDCJ "workplace" is attached as Exhibit 2, and bears a line for Mr. Livingston's signature.
[2] Ex. 1, Thaler Deposition, p. 84:3-12.
[3] Ex. 3, Deposition Excerpts of Tommy Vian in *McCollum v. Livingston*, p. 84:4:22 (air conditioning unit costs approximately $328,000).

$750,000 to cool "swine barns" in the prison's agriculture program to protect the health of pigs raised for slaughter.[4]

According to Thaler, Livingston was aware men were dying from heat stroke inside TDCJ's prisons. Thaler "surely discussed with Mr. Livingston the subject matter of the incidents that were occurring and the steps that were being taken to address the issue" as men died in the summer of 2011.[5]

There were several issues Thaler, however, could not testify about. He did not know if Livingston had personal knowledge of the extreme temperatures inside the prisons.

> Q: And even before you discussed deaths due to hyperthermia with Mr. Livington, do you know if he was knowledgeable about the dangers extreme heat posed to inmates in the Texas prison system?
>
> A: I can't speak for Mr. Livingston.
>
> Q: Would you expect him to be knowledgeable about the dangers of extreme heat in the Texas prison system?
>
> A: I would expect Mr. Livingston is knowledgeable about many things, but I can't speak to what his knowledge level was in any particular area.[6]

Thaler also did not know who made decisions to end 24-hour medical care at the Hutchins Unit.[7] As this decision was made for financial reasons, Livingston, TDCJ's former

---

[4] Ex. 4, Mike Ward, "Steamy prisons, cool pig barns: Climate-controlled barns show swine are better off than guards, convicts, critics say," *Austin American-Statesman*, Aug. 17, 2013 (attached as Exhibit 4(a)). In June 2013 – after the pleading deadline - TDCJ signed a contract to purchase six climate controlled "swine barns." Livingston's deputy, Bryan Collier, told the press the climate controlled barns were necessary because "pigs can't sweat." Elizabeth Koh, "Climate-controlled Swine Buildings Dismay Inmates' Advocates," *Texas Tribune*, Aug. 16, 2013 (attached as Exhibit 4(b)). Likewise, Plaintiffs' complaint alleges diabetics, like McCollum, have difficulty sweating to cool the body. Amd. Complaint, ¶ 30.
[5] Ex. 1, Thaler Deposition, p. 55:10-14.
[6] Ex. 1, Thaler Deposition, p. 56:5-15.
[7] Ex. 1, Thaler Deposition, p. 142:17-143:5. This decision was critical, because the officers at the prison delayed calling 911 for over an hour as McCollum suffered convulsions and was non-responsive. If 24-hour care had been available at the Hutchins Unit, actual medical staff would have been just yards away from McCollum's bunk.

CFO and a self-described "accountant"[8] would likely know who made this decision (if he did not make it himself).

Critically, Thaler denied writing a letter to State Representative Sylvester Turner for Livingston's signature. In interrogatories to Livingston, he identified Thaler as an author of a letter to Rep. Turner about the steps TDCJ takes to protect prisoners from extreme temperatures during the summer.[9] But Thaler had never seen the letter before.[10] The letter is an essential piece of evidence because it confirms Livingston had personal knowledge of the dangers posed by extreme temperatures inside the prisons' housing areas. Likewise, Thaler assumed Livingston had spoken with other legislators about the temperatures inside the prisons.[11]

B. *Testimony of William Stephens*

Stephens was Thaler's deputy until Thaler retired in mid-2013 – Stephens then assumed his position. Like Thaler, there were critical gaps in his testimony that only Livingston can fill.

Though policies are prepared for Livingston's signature, Thaler did not know if Livingston actually read the policies before signing them.[12] "I do not know what Mr. Livingston does in this." Likewise, Livingston never asked him any questions about the policies he signed.[13]

Stephens also did not know if Livingston had personal knowledge of the extreme temperatures in the prison dormitories. He had never spoken with Livingston about the indoor temperatures.[14] "I have not had that conversation with him, no, sir." Stephens had also never seen the letter to Rep. Turner before.[15]

---

[8] Doc. 19, Livingston's Motion to Dismiss, p. 9.
[9] Ex. 5, Livingston Response to Interrogatory No. 12. The letter itself is attached as Ex. 6.
[10] Ex. 1, Thaler Deposition, p. 175:2-4.
[11] Ex. 1, Thaler Deposition, p. 183:3-19.
[12] Ex. 7, Excerpts from Deposition of William Stephens, p. 26:8-11.
[13] Ex. 7, Stephens Deposition, p. 26:12-21.
[14] Ex. 7, Stephens Deposition, p. 28:6-9.
[15] Ex. 7, Stephens Deposition, p. 76:1-9.

Despite this, Stephens described Livingston as "involved" in the operation of the prisons,[16] and "very engaged" in TDCJ's problems.[17]

Stephens testified that any decisions to cool the prisons would have to pass Livingston's desk. This choice would likely involve input from multiple TDCJ departments – including facilities and finance – thus requiring Livingston's input.[18]

Thaler and Stephens testimony demonstrates Livingston has relevant knowledge, and Plaintiffs should be allowed to take his deposition.

## ARGUMENT

The Federal Rules of Civil Procedure allow parties to "depose any person." Fed. R. Civ. Proc. 30(a)(1). Plaintiffs' claims for personal liability against Livingston are based in part on his personal, long-term knowledge of heat injury and death throughout the Texas prison system. *See Blackmon v. Garza*, 484 Fed.Appx. 866, 873 (5th Cir. 2012) (unpublished).

Livingston denies personal knowledge of "any specific [prisoner's] heat related injuries." Exhibit 8, Defendant Brad Livingston's Responses to Interrogatories, Interrogatory 2, p. 3. But Thaler testified he told Livingston about the "incidents" where men died in 2011. Plaintiffs are entitled to learn when Livingston became aware men were dying, and what, if anything, he did when informed about these deadly conditions.

Likewise, Livingston identified Thaler as a person who wrote the letter to Rep. Turner – but Thaler had never seen the letter before. Because the letter is an essential piece of evidence bearing Livingston's signature, Plaintiffs are entitled to question him about it.

Similarly, the critical policy in this case – which protects prisoners forced to perform convict labor, but not prisoners with heat-sensitive medical conditions housed in extreme temperatures –

---

[16] Ex. 7, Stephens Deposition, p. 115:7-13.
[17] Ex. 7, Stephens Deposition, p. 137:20-138:2.
[18] Ex. 7, Stephens Deposition, p. 138:3-23.

bears Livingston's signature. Thaler acknowledged Livingston would be the final policymaker, and should have reviewed and signed the document.

Even if Plaintiffs cannot hold Livingston personally liable in this case, he is still a witness knowledgeable about TDCJ's policies and procedures. Plaintiffs also allege TDCJ discriminated against McCollum under the meaning of the Americans with Disabilities Act and Rehabilitation Act by failing to provide him accommodations for his heat-sensitive disabilities. For example, TDCJ had no policy to provide safe housing for prisoners with heat-sensitive disabilities, and did not provide night-time medical care at the Hutchins Unit though it knew high temperatures exposed people with heat-sensitive disabilities to extreme temperatures well into the night. (McCollum, for example, began suffering his heat stroke shortly after 2:00 am. Because there were no medical staff at the prison at that time, he did not receive medical attention for over an hour, until it was too late.)

"Depositions of high ranking officials may be permitted where the official has first-hand knowledge related to the claim being litigated." *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007). "Federal courts have permitted the depositions of high level executives when conduct and knowledge at the highest corporate levels of the defendant are relevant in the case." *Kimberly-Clark Corp. v. Cont'l Cas. Co.*, 2006 U.S. Dist. LEXIS 86469, *5 (N.D. Tex. 2006) (Fitzwater, J.) (refusing to quash deposition of multi-national corporation's C.E.O. in contract dispute). This Court has allowed depositions of high level executives not only to discover their personal knowledge but also to "test his answers in light of other evidence … obtained through discovery" and to "challenge [other witnesses'] credibility at trial." *Id*. at *11.

Evidence of Livingston's personal knowledge is critical to Plaintiffs' claims and his defenses. Under similar circumstances, courts have permitted the deposition of the Governor of Illinois (*Bagley v. Blagojevich*, 486 F. Supp. 2d 786 (C.D. Ill. 2007) (suit alleging governor personally ordered firing of mid-level correctional officers)), the Governor of Puerto Rico (*Prisma Zona Exploratoria De Puerto Rico, Inc. v. Calderon*, 154 F.Supp.2d 245 (D. Puerto Rico 2001) (free speech retaliation

8

suit)), the mayor of Atlanta (*Atlanta Journal and Constitution v. City of Atlanta Dept. of Aviation*, 175 F.R.D. 347 (N.D. Ga. 1997) (suit regarding free speech implications of placement of news racks at Hartsfield International Airport)), and CEOs of multinational corporations (*Conti v. American Axle and Mfg., Inc.*, 326 Fed.Appx. 900 (6th Cir. 2009); *Morales v. E.D. Etnyre & Co.*, 229 F.R.D. 661 (D. N.M. 2005)). Even the President of the United States must give his deposition from time to time. *See Clinton v. Jones*, 520 U.S. 681, 705 (1997), *affirming* 72 F.3d 1354, 1358 (8th Cir. 1996) ("[T]he President, like all other government officials, is subject to the same laws that apply to all other members of our society. As the Supreme Court has observed, 'Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law'").[19]

Indeed, in related litigation, Livingston admits to testifying about extreme temperatures before the Texas legislature earlier this year.[20] (Livingston did not, however, produce a transcript of his testimony, his prepared remarks, or even a hyperlink to the videotape of the legislative hearing.) He can also give testimony to this Court.

## CONCLUSION

Livingston, like all other litigants, should be required to give his deposition. Plaintiffs have established he has personal knowledge of men dying in TDCJ's prisons due to extreme temperatures, and the policies TDCJ implements to mitigate the heat. They are entitled to his testimony.

DATED: December 4, 2013.

Respectfully submitted,

---

[19] President Clinton is not the only Commander in Chief to appear for a deposition. Presidents Jimmy Carter, and Gerald Ford also gave depositions. *See Jones v. Clinton*, 72 F.3d 1354, 1366 (8th Cir. 1996). Presidents who testified before committees of Congress under threat of subpoena include Thomas Jefferson, Abraham Lincoln, James Monroe, and Ulysses S. Grant. *Id.*

[20] Ex. 9, Livingston's Responses to Interrogatory 12, *Webb v. Livingston*, 6:13-cv-711-JDL (E.D. Tex.).

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
    Tel.   512-623-7727
    Fax.  512-623-7729

By   /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Scott Medlock
State Bar No. 24044783
Lead Counsel

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Eliot Shavin
State Bar No. 18138200
2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
Local Counsel

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

    By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.