# Exhibit 7

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION
STEPHEN McCOLLUM,              §
STEPHANIE KINGREY, AND         §
SANDRA McCOLLU,                §
INDIVIDUALLY AND AS            §
HEIRS AT LAW TO THE            §
ESTATE OF LARRY GENE           §
McCOLLUM,                      § CIVIL ACTION NO.
       Plaintiffs,             § 3:12-CV-02037
                               §
VS.                            §
                               §
BRAD LIVINGSTON, JEFF          §
PRINGLE, RICHARD CLARK,        §
KAREN TATE, SANDREA            §
SANDERS, ROBERT EASON,         §
THE UNIVERSITY OF TEXAS        §
MEDICAL BRANCH AND THE         §
TEXAS DEPARTMENT OF            §
CRIMINAL JUSTICE,              §
       Defendants.             §
```

* * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF
WILLIAM L. STEPHENS
VOLUME 1

October 18, 2013

* * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L. STEPHENS, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on October 18, 2013, from 4:50 p.m. to 8:05 p.m., before Brenda J. Wright, RPR, CSR in and for the State of Texas, reported by machine shorthand, at the Office of the Attorney General, 300 West 15th Street, Suite 1200, Austin,

Stephen McCollum, et al. v.  
Brad Livingston, et al.

William L. Stephens  
October 18, 2013

---

**Page 25**

1 believe in this situation the officer had a radio.
2 I'm not positive, though.
3   Q. You -- and just to make the record clear.
4 The officer doesn't have a phone on him, he would need
5 to tell someone else to call 911?
6   A. Right. Even our phones on the housing area
7 do not have access to call a number outside the
8 institution.
9   Q. Okay. But you think the officer should have
10 taken that step when he ascertained it was an
11 emergency?
12   A. If he ascertained it was an emergency, then,
13 yes.
14   Q. Okay. We talked with Mr. Thaler some about
15 how policies are made for TDCJ. Do you remember that
16 discussion?
17   A. Yes, sir.
18   Q. I'm going to ask you some questions that we
19 asked Mr. Thaler, because since you're in Mr. Thaler's
20 position now, I just want to see if you have any
21 different understanding than he does or maybe you know
22 or remember something that he didn't. Okay?
23   A. Okay.
24   Q. We talked about whether Mr. Livingston, what
25 his level of involvement is with the policies that are

---

**Page 26**

1 made for the Correctional Institutions Division. Do
2 you remember that?
3   A. Yes.
4   Q. And some of the administrative directives or
5 policies that Mr. Livingston has to sign off on and
6 approve. Is that right?
7   A. As I understand it, yes.
8   Q. Okay. Do you know if Mr. Livingston reads
9 those policies before he signs off on them?
10   A. No, I do not know what Mr. Livingston does
11 in this.
12   Q. Has Mr. Livingston ever asked you any
13 questions about one of these policies before his
14 signature --
15   A. No, sir.
16   Q. Okay. Have you ever consulted with him
17 about a policy before he approves it to tell him,
18 like, you know, Mr. Livingston, this is a new policy
19 we're proposing, this is why we think it's necessary,
20 or anything like that?
21   A. About a policy, no.
22   Q. Okay. When have you talked with
23 Mr. Livingston?
24   A. Well, after taking on this job and becoming
25 a -- the director for the Correctional Institutions

---

**Page 27**

1 Division, I've had several conversations with
2 Mr. Livingston about different operational type
3 issues. You know, right now, the Prison Rape
4 Elimination Act is a tremendous issue going on in our
5 agency. The implementation of some current
6 legislation that we're trying to put out is a -- is a
7 tedious task, so I've had conversations with him about
8 those issues.
9   Q. Can you recall any other issues you've
10 talked with Mr. Livingston about besides Prison Rape
11 Elimination Act implementation and the implementation
12 of some new legislation?
13   A. There is issues, yes, sir, I've talked to
14 him about.
15   Q. What else do you remember talking with him
16 about?
17   A. Do you want me to name everything that I've
18 talked to Mr. Livingston about?
19   Q. How -- well, let's -- how often do you talk
20 with Mr. Livingston?
21   A. I would say, daily.
22   Q. Daily. Fair enough. Does he work in the
23 same office as you?
24   A. Excuse me?
25   Q. Does he work in the same physical office

---

**Page 28**

1 as --
2   A. No, sir, not in the same office. He's down
3 the hallway.
4   Q. Okay. The same office building?
5   A. The same building, that's correct.
6   Q. Have you ever talked with Mr. Livingston
7 about the temperatures inside the housing areas?
8   A. I have not had that conversation with him,
9 no, sir.
10   Q. Have you ever approached him about that?
11   A. No, sir, I have not.
12   Q. You've never told him that you think that's
13 an important issue that you need to talk about with
14 him?
15   A. I have not had the conversation with
16 Mr. Livingston about temperatures in the dorms.
17   Q. Why not? Why haven't you ever talked with
18 him about that?
19   A. Because I feel we are doing a good job of
20 mitigating the circumstances and the -- the effects
21 that the temperature in the dorms has on the
22 offenders.
23   Q. So you -- because you think that you're
24 doing a good job, you don't see any need to involve
25 Mr. Livingston. Is that --

---

Case 4:14-cv-03253   Document 103-10   Filed on 12/04/13 in TXSD   Page 4 of 9

Stephen McCollum, et al. v.                William L. Stephens
Brad Livingston, et al.                    October 18, 2013

**Page 73**

1  And I don't mean aggressive like a --
2  A.  Yeah, bad word there. Yes, sir, I believe
3  it's reasonable that they should -- they could check
4  on him.
5  Q.  Just wake him up maybe, hey, are you doing
6  okay?
7  A.  I believe that's a reasonable expectation,
8  yes, sir.
9  Q.  Okay. We've had some discussion about -- we
10 were calling them respite areas with Mr. Thaler,
11 places where the inmates have an opportunity to go to
12 where it is air conditioned. Do you recall that?
13 A.  Yes, sir.
14 Q.  How are inmates informed about these
15 opportunities to go to one of these cooled-off areas?
16 A.  There should be a posting on the bulletin
17 board in the dorm. If -- you know, again, if the
18 officer is witnessing stress or the inmate is having
19 some difficulty in the -- in his activities and all,
20 then should be allowed to go to that area.
21 Q.  So the --
22 A.  Request -- request permission from the
23 officer, or in some cases we may escort him to our
24 infirmary, wherever that may be.
25 Q.  So the -- there would be either a posting in

**Page 74**

1  the dorm on the bulletin board, or the officer, if
2  they noticed somebody looked in distress, they could
3  say, hey, do you need to go to cool off?
4  A.  That is correct.
5  Q.  Any other ways that an inmate would be
6  informed by TDCJ about that opportunity?
7  A.  At this point, I can't recall any other way.
8  Q.  How does a posting on the bulletin board get
9  approved?
10 A.  The warden approves postings on the bulletin
11 board. Now, there is times, because of maybe a
12 systemic issue, the director or the division head,
13 because of the -- I guess, the wide significance of it
14 that would require it to be posted on the board.
15 Q.  Generally, like a correctional officer, a
16 low level officer, couldn't just put something up on
17 the board, though. It should be approved by the
18 warden. Is that --
19 A.  Generally, that doesn't happen. The warden
20 approves the posting on the bulletin board.
21 Q.  And are copies of those postings kept
22 anywhere? Like if the warden said, we're going to put
23 this posting up about heat, would a copy of that go in
24 the file somewhere?
25 A.  I -- my experience is that it's dependent

**Page 75**

1  upon the posting. I will tell you that not all
2  postings go -- you know, the commissary will post
3  their list every so often of items that we're out of
4  stock and things, and those wouldn't be. But I guess
5  I would answer that, it's dependent upon the posting.
6  Q.  Would a posting about protecting prisoners
7  from heat be something that a -- the warden should be
8  keeping?
9  A.  I'm not sure that there is a requirement for
10 that posting to be filed somewhere. Again, based upon
11 my experience as being a warden and my operational
12 review sergeant on my unit, I had that individual
13 responsible for posting things on the day room, and
14 they would keep a copy of what they were posting. But
15 I can't tell you there is any clear guidelines out
16 there about what they should keep copies of and what
17 they should not.
18 Q.  Okay. Take a look at Exhibit 52 for me,
19 Mr. Stephens.
20 A.  Yes, sir.
21 Q.  That's a letter that we talked about with
22 Mr. Thaler that has Mr. Livingston's signature on it
23 to Representative Sylvester Turner. Does that look --
24 is that right?
25 A.  That's correct.

**Page 76**

1  Q.  Were you involved in the drafting of this
2  letter?
3  A.  I don't remember being involved in this
4  drafting.
5  Q.  Do you know -- before today, had you ever
6  seen a copy of that letter?
7  A.  No, sir. And I will say that up until
8  getting the job that I have now, I don't think I ever
9  drafted a letter for Mr. Livingston.
10 Q.  Okay. Is that something you do in your
11 current position?
12 A.  I've done one.
13 Q.  What was that about?
14 A.  It was -- it was a response to a family
15 member, and I think I did such a bad job they won't
16 ask me again.
17 Q.  That's a good way to get out of things in
18 the future.
19 A.  Well, it wasn't on purpose. I tried.
20 Q.  All right. Let's talk about these directors
21 meetings.
22 A.  Sure.
23 Q.  You are looking at Exhibit 53. That's the
24 meeting from July 2010. Is that right?
25 A.  That's correct.

Stephen McCollum, et al. v.  
Brad Livingston, et al.

William L. Stephens  
October 18, 2013

113

1 you see that, Mr. Stephens?
2    A. Yes, sir. I'm sorry. 58?
3    Q. Yes, Exhibit 58. Yes. If I could refer you
4 to page 649.. The first page, I'm sorry.
5    A. These start with seven.
6    Q. 749.
7    A. Okay. All right. 749.
8    Q. It looks like you discuss security reviews
9 at this meeting and had a handout?
10   A. Yes, sir.
11   Q. And then on page 750, it looks like you --
12 excuse me. It looks like, on page 751, it indicates
13 you discussed heat preparations?
14   A. Yes, sir.
15   Q. Given that this is the March minutes, what
16 would it mean that you were discussing heat
17 preparations?
18   A. Getting ready, preparing for the upcoming
19 summer months.
20   Q. And what would that include?
21   A. Make sure they have sufficient water
22 coolers, make sure the fans are in operational order,
23 make sure that we're starting to reemphasize training
24 and having an awareness out there in the field.
25   Q. Anything else?

114

1    A. I can't think of it right now.
2    Q. Okay. You see page 754?
3    A. Yes, sir.
4    Q. Do you see where it says Heat-Related
5 Illness at the bottom?
6    A. Yes, sir.
7    Q. Do you see where it says, talk about every
8 month?
9    A. Yes, sir.
10   Q. Is that, again, part of emphasizing --
11   A. I make that assumption, yes, sir. Based
12 upon -- I didn't write these notes either.
13   Q. And you don't have any direct memory of this
14 meeting?
15   A. No, sir.
16   Q. You see page 757?
17   A. Yes, sir.
18   Q. You see on that first line all the way on
19 the right, it says, B. Livingston?
20   A. I see that, yes, sir.
21   Q. I assume that is Brad Livingston?
22   A. Yes, sir.
23   Q. Do you remember if he was at this meeting?
24   A. I don't remember if he was at the meeting,
25 but my assumption is, based upon these notes, he

115

1 probably was.
2    Q. How often does Mr. Livingston attend one of
3 these meetings?
4    A. Not very often. He has been known to stick
5 his head in there, though, and if he -- I don't know.
6 Not often. I couldn't guess.
7    Q. From your point of view, how involved is
8 Mr. Livingston with the day-to-day operations of the
9 actual prison units as opposed to the other things
10 that TDCJ does?
11   A. Well, my experience dealing directly with
12 Mr. Livingston has started in the last four months,
13 and I can tell you, he is involved.
14   Q. Do you ever send e-mails to Mr. Livingston?
15   A. I can't think of a time I've sent him an
16 e-mail, no, sir.
17   Q. I'll refer you to page 760.
18   A. Yes, sir.
19   Q. Do you see that? Do you see where it says
20 Heat-Related Illness in the middle?
21   A. Yes, sir.
22   Q. On the side there is an asterisk, then it
23 says, talk to WS. I assume that's you?
24   A. I make that assumption, too. Again, I
25 didn't write the note, so...

116

1    Q. Do you have any recollection of this
2 meeting?
3    A. No, sir, no direct recollection.
4    Q. Do you remember anybody specifically coming
5 up to talk to you after this meeting about heat
6 precautions?
7    A. No, sir.
8    Q. Do you have any recollection why it would
9 say, talk to WS, there?
10   A. No, sir.
11   Q. You would agree that it appears that at this
12 meeting there were -- it was discussed that ten men
13 had died last year, relating to heat?
14   A. I agree.
15   Q. Okay. And that the other things that were
16 checked -- discussed were fans, training, and wellness
17 checks?
18   A. Yes, sir.
19   Q. Would it be fair to say that around this
20 time period was when the change was made to create the
21 wellness checks system that we've talked about
22 earlier?
23   A. I think it -- not -- not being able to
24 remember exactly when it happened, I would say,
25 generally, around this time, yes, sir.

Stephen McCollum, et al. v.  
Brad Livingston, et al.

William L. Stephens  
October 18, 2013

---

137

1  A. -- and this is just one of them I would look
2  at.
3  Q. That would be one item on your list?
4  A. Yes, sir.
5  Q. Do you have any doubt that it was very hot
6  inside at the Hutchins Unit during the summer?
7  A. No, sir, I don't have any doubt.
8  Q. How about the Gurney Unit, any doubt?
9  A. No, sir, I don't have any doubt.
10 Q. How about the Michael Unit?
11 A. No, sir.
12 Q. The Huntsville Unit?
13 A. No, sir.
14 Q. The Hodge Unit?
15 A. No, sir.
16 Q. The Garza East Unit?
17 A. No, sir.
18 Q. Garza West Unit?
19 A. No, I don't have any.
20 Q. Okay. If -- would you characterize
21 Mr. Livingston as being hands-on with the prison
22 system?
23 A. Yes, sir. I -- yes, sir. I would -- he is
24 a very good leader of this agency.
25 Q. He is very engaged with the problems that

---

138

1  the agency is facing. Is that fair?
2  A. I would say he's engaged, yes, sir.
3  Q. If Director Livingston told you to -- that
4  he thought we needed to implement air conditioning in
5  some part of the Hutchins Unit, would you take steps
6  to make that happen?
7  A. I wouldn't be involved in that.
8  Mr. Livingston would actually coordinate the folks on
9  the facilities side of the agency.
10 Q. He would talk to the folks like Mr. Vian and
11 that --
12 A. Or Mr. Inmon.
13 Q. Mr. Inmon is Mr. Vian's supervisor?
14 A. Yes, sir.
15 Q. Okay. But he would go down through the
16 Facilities Division to make that happen?
17 A. Sure. And probably budget and finance area.
18 Q. If you wanted -- if you decided,
19 hypothetically, that you thought, we really need to
20 air condition parts of the Hutchins Unit, would you
21 take that up to Mr. Livingston, and then if he agreed,
22 it would go back down through the Facilities?
23 A. Yes, sir. That would be my route.
24 Q. Okay. Are you familiar with TDCJ's
25 agricultural program?

---

139

1  A. We have some.
2  Q. Do you know anything about the program that
3  raises pigs?
4  A. No, sir.
5  Q. Okay. Do you know what those pigs are
6  raised for, what the purpose --
7  A. I assume for the meat.
8  Q. They're raised for slaughter?
9  A. Yes, sir.
10 Q. Is that --
11 A. I say, I assume. I know we have the packing
12 plant at Michael, I know they slaughter the pigs and
13 then the meat, in turn, goes to our kitchens.
14 Q. You've seen various parts of the system
15 that -- like the packing plant is one part of the
16 system that would process the pigs?
17 A. Sure. And while being the Region II
18 director in Tennessee Colony, there were different
19 places they kept pigs.
20 Q. Were you -- did you ever go to any of those
21 places that kept the pigs?
22 A. I have, yes, sir.
23 Q. Were any of those places climate controlled?
24 A. No, sir.
25 Q. None of the places you visited?

---

140

1  A. No, sir.
2  Q. Do you know if there are --
3  A. Well, the packing plant was.
4  Q. The packing plant?
5  A. Yes, sir. But where we actually -- the pigs
6  are raised and whatnot was not.
7  Q. Could there be parts of the system where the
8  pigs are kept in climate controlled conditions?
9  A. I haven't been to every pig farm in every
10 part of the state. I'm sorry.
11 Q. That's fine.
12 A. But I don't know. There could be.
13 Q. If there were media reports that that was
14 true, would you have any reason to dispute that?
15 A. No, sir.
16 Q. Okay. We heard Mr. Thaler talk about the
17 wisdom of the decision to climate control the swine
18 barns but not some of the inmate housing areas. Do
19 you remember that?
20 A. The wisdom?
21 Q. The -- he -- I believe Mr. Thaler testified
22 he thought that that -- those resources could be
23 better spent taking care of the prisoners than the
24 pigs. Do you remember that?
25 A. No, sir, I don't remember that.

---

Case 4:14-cv-03253   Document 103-10   Filed on 12/04/13 in TXSD   Page 7 of 9

Stephen McCollum, et al. v.                          William L. Stephens
Brad Livingston, et al.                                 October 18, 2013

**145**

1  Q. Is that Mr. Clark, Jason Clark?
2  A. Jason Clark. That's correct.
3  Q. Thank you for your time, Mr. Stephens. I
4  appreciate you staying. I passed when I promised
5  Mr. Garcia that we would be done tonight. Appreciate
6  it.
7       THE WITNESS: Yes, sir.
8       MS. COOGAN: I have no questions for
9  Mr. Stephens.
10      MR. GARCIA: I have no questions at
11 this time.
12      MR. ANASTASIDIS: No questions.
13      THE VIDEOGRAPHER: That concludes the
14 deposition. We're off the record at 8:01 p.m.

**146**

1       CHANGES AND CORRECTIONS
2  WILLIAM L. STEPHENS - October 18, 2013   VOLUME 1
3  (DISREGARD IF WAIVED)
4
   Reason Codes: (1) to clarify the record; (2) to
5  conform to the facts; (3) to correct a transcription
   error; (4) other (please explain).
6  PAGE/LINE   CHANGE                  REASON CODE
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 JOB NO. 131018BJW

**147**

1                SIGNATURE
2
3       I, WILLIAM L. STEPHENS, have read the
4  foregoing deposition and hereby affix my signature
5  that same is true and correct, except as noted above.
6
7
8       _____
        WILLIAM L. STEPHENS
9
10
11 JOB NO. 131018BJW

**148**

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF TEXAS
2             DALLAS DIVISION
3  STEPHEN McCOLLUM,           §
   STEPHANIE KINGREY, AND      §
4  SANDRA McCOLLU,             §
   INDIVIDUALLY AND AS         §
5  HEIRS AT LAW TO THE         §
   ESTATE OF LARRY GENE        §
6  McCOLLUM,                   § CIVIL ACTION NO.
        Plaintiffs,            § 3:12-CV-02037
7                              §
   VS.                         §
8                              §
   BRAD LIVINGSTON, JEFF       §
9  PRINGLE, RICHARD CLARK,     §
   KAREN TATE, SANDREA         §
10 SANDERS, ROBERT EASON,      §
   THE UNIVERSITY OF TEXAS     §
11 MEDICAL BRANCH AND THE      §
   TEXAS DEPARTMENT OF         §
12 CRIMINAL JUSTICE,           §
        Defendants.            §
13 . . . . . . . . . . . . . . . . .
14      REPORTER'S CERTIFICATION
   ORAL AND VIDEOTAPED DEPOSITION OF
15         WILLIAM L. STEPHENS
              VOLUME 1
16          October 18, 2013
   . . . . . . . . . . . . . . . . .
17      I, BRENDA J. WRIGHT, Certified Shorthand
18 Reporter in and for the State of Texas, hereby certify
19 to the following:
20      That the witness, WILLIAM L. STEPHENS, was duly
21 sworn by the officer and that the transcript of the
22 oral deposition is a true record of the testimony
23 given by the witness;
24      I further certify that pursuant to Federal
25 Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as

Case 4:14-cv-03253   Document 103-10   Filed on 12/04/13 in TXSD   Page 8 of 9

Stephen McCollum, et al. v.                William L. Stephens
Brad Livingston, et al.                    October 18, 2013

### 149

1  well as Rule 30(e)(2) that the signature of the
2  deponent:
3  __X__ was requested by the deponent and/or a
4  party before completion of the deposition and is to be
5  returned within 30 days from date of receipt of the
6  transcript. If returned, the attached Changes and
7  Corrections and Signature pages contain any changes
8  and the reasons therefor;
9  ____ was not requested by the deponent and/or a
10 party before the completion of the deposition.
11     That $_____ is the deposition
12 officer's charges for preparing the original
13 deposition transcript and any copies of exhibits,
14 charged to PLAINTIFFS;
15     That pursuant to information given to the
16 deposition officer at the time said testimony as
17 taken, the following includes all parties of record:
18 For the Plaintiffs:
       Mr. Jeff Edwards
19     THE EDWARDS LAW FIRM
       The Haehnel Building
20     1101 East 11th Street
       Austin, Texas 78702
21     512-623-7727/512-623-7729 (fax)
       jeff@edwards-law.com
22        -and-
       Mr. Scott Medlock
23     TEXAS CIVIL RIGHTS PROJECT
       1405 Montopolis Drive
24     Austin, Texas 78741
       512-474-5073/512-474-0726 (fax)
25

### 150

1 For the Defendants Jeff Pringle, Richard Clark, Karen
   Tate, Sandrea Sanders, Robert Eason and Texas
2 Department of Criminal Justice:
       Mr. Bruce R. Garcia
3      Assistant Attorney General
       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
4      Law Enforcement Defense Division 012
       Post Office Box 12548
5      300 West 15th Street
       Austin, Texas 78711-2548
6      512-463-2080/512-495-9139 (fax)
       bruce.garcia@texasattorneygeneral.gov
7
   For the Defendants Brad Livingston, William Stephens
8  and Richard Thaler:
       Mr. Demetri Anastasidis
9      Assistant Attorney General
       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
10     Law Enforcement Defense Division 012
       Post Office Box 12548
11     300 West 15th Street
       Austin, Texas 78711-2548
12     512-463-2153/ 512-495-9139 (fax)
       demetri.anastasidis@texasattorneygeneral.gov
13
   For the Defendant University of Texas Medical Branch:
14     Ms. Kim Coogan
       Assistant Attorney General
15     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
       Law Enforcement Defense Division
16     Post Office Box 12548
       Austin, Texas 78711-2548
17     512-463-2080/512-495-9139 (fax)
       kim.coogan@texasattorneygeneral.gov
18
19     I further certify that I am neither attorney
20 nor counsel for nor related to nor employed by any of
21 the parties in the action in which this deposition is
22 taken;
23     Further, I am not a relative nor an employee of
24 any attorney of record in this cause, nor am I
25 financially or otherwise interested in the outcome of

### 151

1  the action.
2      Certified to by me this 1ST day of NOVEMBER,
3  2013.

                    _Brenda [signature]_
                    _____
5
       BRENDA J. WRIGHT, Texas CSR No. 1780
6      Expiration Date: 12-31-14
       WRIGHT WATSON & ASSOCIATES
7      Firm Registration No. 225
       Expiration Date: 12-31-13
8      3307 Northland Drive
       Suite 185
9      Austin, Texas 78731
       512-474-4363/51-474-8802 (fax)
10     www.wrightwatson.com
    JOB NO. 131018BJW

# Exhibit 4A