On units with sufficient electrical outlets for offenders to have personal fans, TDCJ has a robust fan program. Offenders are permitted to purchase a fan through the unit commissary, or if indigent, be provided with a personal fan at no cost. Wet cooling towels are also sold to offenders to mitigate the heat. Air flow and fresh air exchange is increased through the usage of floor fans, wall mounted fans, and purge blowers to assist in the movement of air.

TDCJ staff works closely with medical professionals who have identified offenders with conditions that make them more susceptible to the heat and security staff performs additional wellness checks for those offenders.

Further, the TDCJ Risk Management Office takes the following steps: On a unit level, risk managers monitor compliance with AD-10.64 including monitoring daily outdoor temperature readings, coordinating with unit medical personnel to conduct heat-related training each spring, and documenting training as required by policy. The unit risk manager also provides "Heat/Cold Weather Cards" to officers and unit staff and investigates injuries and illnesses suffered by staff or offenders, including those associated with temperature extremes or weather.

Agency-wide, Risk Management monitors compliance with AD-10.64 through an operational review process which is outlined in ED-02.92 *Operational Review Program*. Unit reviews are conducted twice each year, regional reviews are conducted annually, and division level reviews are conducted every three years using checklists published in the Unit Operational Review Manual. Risk Management also posts heat precaution messages for offenders in the ECHO newspaper, including messages in Issues 4, 5, and 6 of Volume 84 and messages in Issues 3 and 6 of Volume 85. Finally, the Risk Management Office prepares training circulars regarding hot weather precautions.

Procedures used to mitigate heat are continually reviewed by TDCJ staff. Division leadership meets prior to each summer to prepare for the upcoming summer. Currently, AD 10.64 is being reviewed to consider any additional steps that may be adopted.

See also heat safety training and circulars produced in response to Plaintiff Stephen McCollum's First Request for Production to TDCJ, numbers 3-5 in *McCollum v. Livingston*, 3:12-cv-02037, U.S. District Court-Northern District- Dallas.


**INTERROGATORY NO. 12:** Please identify and describe in detail all communications you are aware of and/or contributed to discussing temperatures over 90 degrees Fahrenheit in TDCJ facilities.

**RESPONSE:** Defendant objects that this request seeks documents and/or information to which the attorney-client privilege, anticipation of litigation privilege, and litigation strategy privilege may apply. Defendant further objects that this request is overly broad and not reasonably limited in scope, time, or geographic location. This lawsuit is about one offender death at a particular prison unit.

Subject to and without waiving the foregoing objections, I have had periodic discussions concerning high temperatures in inmate housing areas in TDCJ facilities with Jeff Baldwin, Rick Thaler, William Stephens, Jerry McGinty, Jackie Edwards, Oscar Mendoza, Dr. Lanette Linthicum and Bryan Collier.   See also documents produced to plaintiffs' attorneys in *McCollum, et al. v. Livingston, et al.*, 3:12-cv-02037, U.S. District Court, Northern District-Dallas.

In addition, I testified before the 83d Texas Legislature on February 20, 2013, March 13, 2013, and April 10, 2013, at which, on occasion, I was asked about temperatures in TDCJ facilities.

APPENDIX64

## VERIFICATION

STATE OF TEXAS                    §
                                 §
COUNTY OF WALKER                 §

**BEFORE ME**, the undersigned authority, on this day personally appeared Brad Livingston, who, being personally known to me, after being duly sworn upon his oath deposed and stated that the foregoing responses to Plaintiff Kevin Webb's First Request for Interrogatories in *Webb v. Livingston*, Civil Action No. 6:13-cv-00711, are true, correct and complete to the best of his knowledge; and he is authorized to execute this verification.

Brad Livingston
Executive Director
Texas Department of Criminal Justice

**BEFORE ME**, the undersigned authority, on this day personally appeared Brad Livingston, known personally to me to be the person subscribed in the foregoing instrument.

Given under my hand and seal of office on this _16th_ day of November 2013.

Notary Public in and for the State of Texas

Angela Moore
Printed Name

My Commission Expires: _July 23, 2017_

ANGELA L MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP: 07-23-2017

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
GALVESTON DIVISION

GWEN TOGONIDZE, et al.,       §
Plaintiffs,                   §
                             §
v.                            §        CIVIL ACTION NO. 3:13-CV-229
                             §
BRAD LIVINGSTON, et al.,      §
Defendants.                  §        JURY

**DEFENDANT LIVINGTON'S RESPONSES TO PLAINTIFF GWEN TOGONIDZE'S
FIRST REQUEST FOR INTERROGATORIES**

**TO:**   Jeff Edwards, Scott Medlock , The Edwards Law Firm, The Haehnel Building, 1101 East
11th Street Austin, Texas, 78702; Brian McGiverin, James C. Harrington, Texas Civil
Rights Project, 1405 Montopolis Drive, Austin, Texas 78741.


COMES NOW the Defendant, Brad Livingston, by and through counsel, the Texas

Attorney General's Office, and offers the following **Defendant Brad Livingston's Response to**

**Plaintiff Gwen Togonidze's First Set of Requests for Production and Interrogatories**.


Respectfully submitted,


                              **GREG ABBOTT**
                              Attorney General of Texas

                              **DANIEL T. HODGE**
                              First Assistant Attorney General

                              **DAVID C. MATTAX**
                              Deputy Attorney General for Defense Litigation

                              **KAREN D. MATLOCK**
                              Assistant Attorney General
                              Chief, Law Enforcement Defense Division

                              **DEMETRI ANASTASIADIS**
                              Assistant Attorney General
                              Attorney-In-Charge
                              State Bar No. 01164480

1

APPENDIX66

Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / (512) 495-9139 (fax)

ATTORNEYS FOR DEFENDANT
BRAD LIVINGSTON

## CERTIFICATE OF SERVICE

I, **DEMETRI ANASTASIADAS**, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Defendant Brad Livingston's Response to Plaintiff Gwen Togonidze's First Set of Interrogatories** has been served on all counsel of record on December 10, 2013, as follows:

Jeff Edwards                        *Via US Mail 7008 0500 0001 5047 4245*
Scott Medlock
The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702

Brian McGiverin                     *Via US Mail*
James C. Harrington
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741

Kim Coogan                          *Via Interagency Mail*
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711


Bruce Garcia                        *Via Interagency Mail*
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711

**DEMETRI ANASTASIADIS**
Assistant Attorney General

2

APPENDIX67

## FIRST SET OF INTERROGATORIES

1.  Identify all steps you took to protect Alexander Togonidze from heat index temperatures in the Michael Unit in excess of 90 degrees.

**RESPONSE:**
**I was not personally aware of Mr. Togonidze's incarceration at the Michael Unit. However, I am aware the following steps were taken on the Michael Unit to mitigate high temperatures. During the summer months, offenders on the Michael Unit were permitted to wear shorts and a t-shirt in the dayroom and in their housing area rather than the standard-issue TDCJ offender uniform. Water coolers were placed in the offender housing areas, dayrooms, and gyms, and the Warden instructed staff to ensure that the coolers remained full at all times by checking the water level of the coolers every thirty minutes and having the coolers refilled as necessary. Offenders with restricted movement received ice water at meals, to bring back to their cells after meals, in the recreation area and dayroom, and were let out of their cells one at a time to refill their water cups. Offenders were given notice of the additional ice water available via notices posted in each dayroom.**

**Temperatures of offender housing areas were taken throughout the day, recorded, and submitted to the Unit Risk Manager. Offenders with heat restrictions or that were taking psychiatric medication were checked on by officers every twenty minutes and officers conducting those checks were required to submit records of the checks at the end of each shift.**

**The temperature of the water in the showers was lowered in order to provide offenders a means to cool off. The dayrooms had large fans placed in them to increase air flow. Purge fans were turned on throughout the unit and the cells had forced air vents blowing. The Michael Unit also operates an indigent fan program to obtain fans for indigent offenders through the unit commissary.**

**Finally, all staff members and offenders received heat safety training in order to ensure that they recognized the signs and symptoms of heat-related illness. Staff members were given cards to carry which identified the signs and symptoms of heat related illnesses. The cards were to be carried at all times and staff was instructed to take any symptoms of a heat-related illness seriously. The topic of heat-related illnesses and mitigation of the heat was regularly discussed at shift turnouts.**

**See also heat safety training and circulars produced in response to Plaintiff Stephen McCollum's First Request for Production to TDCJ, numbers 3-5 in *McCollum v. Livingston*, 3:12-cv-02037, U.S. District Court-Northern District- Dallas.**

2.  Identify all training you received about heat safety during your employment at the Texas Department of Criminal Justice.

**RESPONSE:  I have not received training about heat safety during my employment with Texas Department of Criminal Justice.**

3

3.  Identify all persons who you believe have knowledge of relevant facts and identify the issues upon which you believe they have knowledge. A response to this interrogatory should include, but is not limited to, all prisoners housed in the dorm with Alexander Togondize.

**RESPONSE:   Defendant objects, offenders' housing history is recorded only on the offender's own housing assignment history and not in separate records by dormitory. Accordingly, to determine all offenders housed with Alexander Togonidze would require a search of every offenders' housing history.**

**Subject to and without waiving the foregoing objection, the individuals likely to have information regarding this case are either named as defendants in this case or have been previously identified in documents released through the discovery process in this case.**

4.  If you contend that some other person or legal entity is, in whole or in part, liable to Plaintiff in this matter, identify that person or legal entity and describe in detail the basis of said liability.

**RESPONSE:   Defendant objects as this interrogatory calls for a legal conclusion. Defendant further objects that this interrogatory invades the attorney work product and the attorney client privileges.**

5.  Please identify each person who provided information or assisted in any way in answering these interrogatories, and as to each such person, please indicate the discovery request with respect to which he or she was involved.

**RESPONSE:   Defendant objects to the extent that this interrogatory is invasive of the attorney client privilege and attorney work product.  Subject to and without waiving the foregoing objection, my attorneys assisted in answering these interrogatories as well as the staff members who have signed verifications for the interrogatories posed to the Agency and the individual Defendants in this case.**

6.  Please identify all persons that Defendant expects to call to testify on Defendant's behalf at trial.

**RESPONSE: Defendant objects to this interrogatory as premature at this juncture. Defendant will designate its witnesses in a timely fashion in accordance with the Court's scheduling order.  Investigation continues; Defendant will supplement this response.**

7.  Please identify the names and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information you may use to support your claims or defenses.

**RESPONSE: Defendant objects to this interrogatory as premature at this juncture. Defendant will designate its witnesses in a timely fashion in accordance with the Court's scheduling order.**

4

8.    Please describe your employment history since January 1, 1993. A response to this interrogatory should identify every employer, along with the address and phone number of the location where you worked, and the dates of your employment.

**RESPONSE:**
| | |
|---|---|
| **Nov. 2004 – Present** | **Executive Director, TDCJ** |
| **June 2001 – Nov. 2004** | **Chief Financial Officer, TDCJ** |
| **1997 – June 2001** | **Deputy Director, Financial Services Division, TDCJ** |
| **1995 – 1997** | **Group Director, Office of Budget and Planning, Texas Governor's Office** |

9.  Please list any professional licenses you hold. A response to this interrogatory should include the name of the licensing agency, and the date you obtained the license.

**RESPONSE:  None**

10.  Please list any educational degrees you have completed.  A response to this interrogatory should include the name of the schools and dates you completed your degrees.

**RESPONSE:  I received a Bachelor of Arts degree in Political Science, with honors, from Metropolitan State College of Denver.  I also hold a Master of Public Affairs degree from the University of Texas at Austin.**

11.  Please describe in detail all actions you are aware of taken to protect prisoners in TDCJ custody from temperature over 90 degrees Fahrenheit.

**RESPONSE:   Defendant objects that this request is overly broad and not reasonably limited in scope, time, or geographic location.**

**Subject to and without waiving the foregoing objection, I am aware of the following steps taken by the Agency to mitigate hot weather on TDCJ Units.  The Agency has mandatory heat precaution training for all staff and offenders each year in April.   Each shift supervisor is instructed to discuss heat awareness and warning signs at shift turnouts during the summer months.   Heat awareness, warning signs, and hydration memos are placed throughout the facility for staff and offenders.  Shower temperatures are lowered. Water coolers with ice are placed in the dorms during summer months. Staff is instructed that offenders identified as needing relief from the heat are allowed to sit in cooler areas. Work shifts are reduced or cancelled and offenders are allowed to wear less clothing in the housing areas.**

**On units with sufficient electrical outlets for offenders to have personal fans, TDCJ has a robust fan program.   Offenders are permitted to purchase a fan through the unit commissary, or if indigent, be provided with a personal fan at no cost. Wet cooling towels are also sold to offenders to mitigate the heat. Air flow and fresh air exchange is increased through the usage of floor fans, wall mounted fans, and purge blowers to assist in the movement of air.**

TDCJ staff works closely with medical professionals who have identified offenders with conditions that make them more susceptible to the heat and security staff performs additional wellness checks for those offenders.

Further, the TDCJ Risk Management Office takes the following steps:  On a unit level, risk managers monitor compliance with AD-10.64 including monitoring daily outdoor temperature readings, coordinating with unit medical personnel to conduct heat-related training each spring,  and documenting training as required by policy.  The unit risk manager also provides "Heat/Cold Weather Cards" to officers and unit staff and investigates injuries and illnesses suffered by staff or offenders, including those associated with temperature extremes or weather.

Agency-wide, Risk Management monitors compliance with AD-10.64 through an operational review process which is outlined in ED-02.92 *Operational Review Program*. Unit reviews are conducted twice each year, regional reviews are conducted annually, and division level reviews are conducted every three years using checklists published in the Unit Operational Review Manual.  Risk Management also posts heat precaution messages for offenders in the ECHO newspaper, including messages in Issues 4, 5, and 6 of Volume 84 and messages in Issues 3 and 6 of Volume 85.  Finally, the Risk Management Office prepares training circulars regarding hot weather precautions.

Procedures used to mitigate heat are continually reviewed by TDCJ staff.   Division leadership meets prior to each summer to prepare for the upcoming summer. Currently, AD 10.64 is being reviewed to consider any additional steps that may be adopted.

See also heat safety training and circulars produced in response to Plaintiff Stephen McCollum's First Request for Production to TDCJ, numbers 3-5 in *McCollum v. Livingston*, 3:12-cv-02037, U.S. District Court-Northern District- Dallas.

12.    Please identify and describe in detail all communications you are aware of and/or contributed to discussing temperatures over 90 degrees Fahrenheit in TDCJ facilities.

RESPONSE:  Defendant objects that this request seeks documents and/or information to which the attorney-client privilege, anticipation of litigation privilege, and litigation strategy privilege may apply.  Defendant further objects that this request is overly broad and not reasonably limited in scope, time, or geographic location.  This lawsuit is about one offender death at a particular prison unit.

Subject to and without waiving the foregoing objections, I have had periodic discussions concerning high temperatures in inmate housing areas in TDCJ facilities with Jeff Baldwin, Rick Thaler, William Stephens, Jerry McGinty, Jackie Edwards, Oscar Mendoza, Dr. Lanette Linthicum and Bryan Collier.  See also documents produced to plaintiffs' attorneys in *McCollum, et al. v. Livingston, et al.*, 3:12-cv-02037, U.S. District Court, Northern District-Dallas.

In addition, I testified before the 83d Texas Legislature on February 20, 2013, March 13, 2013, and April 10, 2013, at which, on occasion, I was asked about temperatures in TDCJ facilities.

## VERIFICATION

| STATE OF TEXAS | § |
| --- | --- |
| | § |
| COUNTY OF WALKER | § |

    **BEFORE ME**, the undersigned authority, on this day personally appeared Brad Livingston, who, being personally known to me, after being duly sworn upon his oath deposed and stated that the foregoing responses to Plaintiff Gwen Togonidze's First Request for Interrogatories in *Togonidze v. Livingston*, Civil Action No. 3:13-CV-229, are true, correct and complete to the best of his knowledge; and he is authorized to execute this verification.

Brad Livingston
Executive Director
Texas Department of Criminal Justice

    **BEFORE ME**, the undersigned authority, on this day personally appeared Brad Livingston, known personally to me to be the person subscribed in the foregoing instrument.

Given under my hand and seal of office on this 18th day of November 2013.

Notary Public in and for the State of Texas

Angela Moore
Printed Name

My Commission Expires: July 23, 2017

ANGELA L MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 07-23-2017

9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **ASHLEY ADAMS, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.6:13-cv-00712-KNM** |
| | § | |
| **BRAD LIVINGSTON, et al.,** | § | |
| **Defendants.** | § | **JURY** |

## DEFENDANT BRAD LIVINGTON'S RESPONSES TO PLAINTIFF ASHLEY ADAMS' FIRST SET OF INTERROGATORIES

**TO:**   Plaintiff, Ashley Adams, by and through her attorneys, Jeff Edwards, Scott Medlock , The Edwards Law Firm, The Haehnel Building, 1101 East 11th Street Austin, Texas; Brian McGiverin, James C. Harrington, Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741.

COMES NOW the Defendant, Brad Livingston, by and through counsel, the Texas Attorney General's Office, and offers the following **Defendant Brad Livingston's Response to Plaintiff Ashley Adams' First Set of Interrogatories**.

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**DAVID C. MATTAX**
Deputy Attorney General for Defense Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

**DEMETRI ANASTASIADIS**
Assistant Attorney General
Attorney-In-Charge

1

State Bar No. 01164480
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / (512) 495-9139 (fax)

ATTORNEYS FOR DEFENDANT
BRAD LIVINGSTON

## CERTIFICATE OF SERVICE

I, **DEMETRI ANASTASIADAS**, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Defendant Brad Livingston's Response to Plaintiff Ashley Adams' First Set of Interrogatories** has been served on all counsel of record on December 10, 2013, as follows:

Jeff Edwards                           *Via Certified Mail NO.  7008 0500 0001 5047 4245*
Scott Medlock,
The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX

Brian McGiverin                        *Via US Mail*
James C. Harrington
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741

Kim Coogan                             *Via Interagency Mail*
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711

Bruce Garcia                           *Via Interagency Mail*
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711

**DEMETRI ANASTASIADIS**
Assistant Attorney General

2

## FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1**.  Identify all steps you took to protect Douglas Hudson from heat index temperatures in the Gurney Unit in excess of 90 degrees.

**RESPONSE:  I was not personally aware of Mr. Hudson's incarceration at the Gurney Unit.**

**However, I am aware the following steps were taken on the Gurney Unit to mitigate high temperatures.  Each shift supervisor was instructed to discuss heat awareness and warning signs at shift turnouts during the summer months.  Heat awareness, warning signs, and hydration memos were placed throughout the facility for staff and offenders. Shower temperatures were lowered and Gurney Unit offenders were given access to showers and sinks 24 hours a day to aid in cooling off as needed.  Air flow and fresh air exchange was increased through the usage of fans and purge blowers to assist in the movement of air, specifically two 60" floor fans and two wall mounted fans were used in each dorm on the Gurney unit and the purge fan was run 24 hours a day.  Water coolers were placed in the dorms during the summer months and the ice in the coolers was replenished three times daily.  Newly received offenders were rotated into the cooler areas of the education building during the weekend.  Finally, offenders that were identified by medical staff as having heat restrictions were checked on by security staff every thirty minutes.**

**See also heat safety training and circulars produced in response to Plaintiff Stephen McCollum's First Request for Production to TDCJ, numbers 3-5 in *McCollum v. Livingston*, 3:12-cv-02037, U.S. District Court-Northern District- Dallas.**

2.  Identify all steps you took to protect Rodney Adams from heat index temperatures in the Gurney Unit in excess of 90 degrees.

**RESPONSE:  I was not personally aware of Mr. Adams' incarceration at the Gurney Unit. However, please see response to Interrogatory No. 1.**

3.  Identify all steps you took to protect Kenneth Wayne James from heat index temperatures in the Gurney Unit in excess of 90 degrees.

**RESPONSE: I was not personally aware of Mr. James' incarceration at the Gurney Unit. However, please see response to Interrogatory No. 1.**

4.  Identify all training you received about heat safety during your employment at the Texas Department of Criminal Justice.

**RESPONSE:  I have not received training about heat safety during my employment with Texas Department of Criminal Justice.**

5. Identify all persons who you believe have knowledge of relevant facts and identify the issues upon which you believe they have knowledge. A response to this interrogatory should include,

3

but is not limited to, all prisoners housed in the dorm with Douglas Hudson, Rodney Adams, and Kenneth Wayne James.

**RESPONSE: Defendant objects, offenders' housing history is recorded only on the offender's own housing assignment history and not in separate records by dormitory. Accordingly, to determine all offenders housed with Mr. Adams, Mr. Hudson, or Mr. James would require a search of every offenders' housing history.**

**Subject to and without waiving the foregoing objection, the individuals likely to have information regarding this case are either named as defendants in this case or have been previously identified in documents released through the discovery process in this case.**

6.  If you contend that some other person or legal entity is, in whole or in part, liable to Plaintiff in this matter, identify that person or legal entity and describe in detail the basis of said liability.

**RESPONSE:   Defendant objects as this interrogatory calls for a legal conclusion. Defendant further objects that this interrogatory invades the attorney work product and the attorney client privileges.**

7.  Please identify each person who provided information or assisted in any way in answering these interrogatories, and as to each such person, please indicate the discovery request with respect to which he or she was involved.

**RESPONSE:  Defendant objects to the extent that this interrogatory is invasive of the attorney client privilege and attorney work product.  Subject to and without waiving the foregoing objection, my attorneys assisted in answering these interrogatories as well as the staff members who have signed verifications for the interrogatories posed to the Agency and the individual Defendants in this case.**

8.  Please identify all persons that Defendant expects to call to testify on Defendant's behalf at trial.

**RESPONSE: Defendant objects to this interrogatory as premature at this juncture. Defendant will designate its witnesses in a timely fashion in accordance with the Court's scheduling order.  Investigation continues; Defendant will supplement this response.**

9.  Please identify the names and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information you may use to support your claims or defenses.

**RESPONSE:  The individuals that will likely to have information regarding the incident are either named as defendants in this case or have been previously identified in documents released through the discovery process in this case.  Defendant will supplement this response.**

4

10.   Please describe your employment history since January 1, 1993. A response to this interrogatory should identify every employer, along with the address and phone number of the location where you worked, and the dates of your employment.

**RESPONSE:**
| | |
|---|---|
| **Nov. 2004 – Present** | **Executive Director, TDCJ** |
| **June 2001 – Nov. 2004** | **Chief Financial Officer, TDCJ** |
| **1997 – June 2001** | **Deputy Director, Financial Services Division, TDCJ** |
| **1995 – 1997** | **Group Director, Office of Budget and Planning, Texas Governor's Office** |

11.   Please list any professional licenses you hold. A response to this interrogatory should include the name of the licensing agency, and the date you obtained the license.

**RESPONSE:  None.**

12.   Please list any educational degrees you have completed.  A response to this interrogatory should include the name of the schools and dates you completed your degrees.

**RESPONSE:   I received a Bachelor of Arts degree in Political Science, with honors, from Metropolitan State College of Denver.  I also hold a Master of Public Affairs degree from the University of Texas at Austin.**

13.   Please describe in detail all actions you are aware of taken to protect prisoners in TDCJ custody from temperature over 90 degrees Fahrenheit.

**RESPONSE:   Defendant objects that this request is overly broad and not reasonably limited in scope, time, or geographic location.**

**Subject to and without waiving the foregoing objection, I am aware of the following steps taken by the Agency to mitigate hot weather on TDCJ Units.  The Agency has mandatory heat precaution training for all staff and offenders each year in April.   Each shift supervisor is instructed to discuss heat awareness and warning signs at shift turnouts during the summer months.   Heat awareness, warning signs, and hydration memos are placed throughout the facility for staff and offenders. Shower temperatures are lowered. Water coolers with ice are placed in the dorms during summer months. Staff is instructed that offenders identified as needing relief from the heat are allowed to sit in cooler areas. Work shifts are reduced or cancelled and offenders are allowed to wear less clothing in the housing areas.**

**On units with sufficient electrical outlets for offenders to have personal fans, TDCJ has a robust fan program.   Offenders are permitted to purchase a fan through the unit commissary, or if indigent, be provided with a personal fan at no cost.  Wet cooling towels are also sold to offenders to mitigate the heat. Air flow and fresh air exchange is increased through the usage of floor fans, wall mounted fans, and purge blowers to assist in the movement of air.**

APPENDIX77

TDCJ staff works closely with medical professionals who have identified offenders with conditions that make them more susceptible to the heat and security staff performs additional wellness checks for those offenders.

Further, the TDCJ Risk Management Office takes the following steps:  On a unit level, risk managers monitor compliance with AD-10.64 including monitoring daily outdoor temperature readings, coordinating with unit medical personnel to conduct heat-related training each spring,  and documenting training as required by policy.  The unit risk manager also provides "Heat/Cold Weather Cards" to officers and unit staff and investigates injuries and illnesses suffered by staff or offenders, including those associated with temperature extremes or weather.

Agency-wide, Risk Management monitors compliance with AD-10.64 through an operational review process which is outlined in ED-02.92 *Operational Review Program.* Unit reviews are conducted twice each year, regional reviews are conducted annually, and division level reviews are conducted every three years using checklists published in the Unit Operational Review Manual.  Risk Management also posts heat precaution messages for offenders in the ECHO newspaper, including messages in Issues 4, 5, and 6 of Volume 84 and messages in Issues 3 and 6 of Volume 85. Finally, the Risk Management Office prepares training circulars regarding hot weather precautions.

Procedures used to mitigate heat are continually reviewed by TDCJ staff.   Division leadership meets prior to each summer to prepare for the upcoming summer. Currently, AD 10.64 is being reviewed to consider any additional steps that may be adopted.

See also heat safety training and circulars produced in response to Plaintiff Stephen McCollum's First Request for Production to TDCJ, numbers 3-5 in *McCollum v. Livingston*, 3:12-cv-02037, U.S. District Court-Northern District- Dallas.

14.     Please identify and describe in detail all communications you are aware of and/or contributed to discussing temperatures over 90 degrees Fahrenheit in TDCJ facilities.

RESPONSE:  Defendant objects that this request seeks documents and/or information to which the attorney-client privilege, anticipation of litigation privilege, and litigation strategy privilege may apply.  Defendant further objects that this request is overly broad and not reasonably limited in scope, time, or geographic location.  This lawsuit is about one offender death at a particular prison unit.

Subject to and without waiving the foregoing objections, I have had periodic discussions concerning high temperatures in inmate housing areas in TDCJ facilities with Jeff Baldwin, Rick Thaler, William Stephens, Jerry McGinty, Jackie Edwards, Oscar Mendoza, Dr. Lanette Linthicum and Bryan Collier.  See also documents produced to plaintiffs' attorneys in *McCollum, et al. v. Livingston, et al.*, 3:12-cv-02037, U.S. District Court, Northern District-Dallas.

In addition, I testified before the 83d Texas Legislature on February 20, 2013, March 13, 2013, and April 10, 2013, at which, on occasion, I was asked about temperatures in TDCJ facilities.

6

APPENDIX78

## VERIFICATION

STATE OF TEXAS          §
                        §
COUNTY OF WALKER        §


**BEFORE ME**, the undersigned authority, on this day personally appeared Brad Livingston, who, being personally known to me, after being duly sworn upon his oath deposed and stated that the foregoing responses to Plaintiff Ashley Adams' First Request for Interrogatories in *Adams v. Livingston*, Civil Action No. 6:13-CV-00712, are true, correct and complete to the best of his knowledge; and he is authorized to execute this verification.


Brad Livingston
Executive Director
Texas Department of Criminal Justice

**BEFORE ME,** the undersigned authority, on this day personally appeared Brad Livingston, known personally to me to be the person subscribed in the foregoing instrument.

Given under my hand and seal of office on this 18th day of November 2013.


Notary Public in and for the State of Texas

*Angela Moore*
Printed Name

My Commission Expires: July 23, 2017

ANGELA L MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 07-23-2017

9

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION
STEPHEN McCOLLUM,              §
STEPHANIE KINGREY, AND         §
SANDRA McCOLLU,                §
INDIVIDUALLY AND AS            §
HEIRS AT LAW TO THE            §
ESTATE OF LARRY GENE           §
McCOLLUM,                      § CIVIL ACTION NO.
        Plaintiffs,            § 3:12-CV-02037
                               §
VS.                            §
                               §
BRAD LIVINGSTON, JEFF          §
PRINGLE, RICHARD CLARK,        §
KAREN TATE, SANDREA            §
SANDERS, ROBERT EASON,         §
THE UNIVERSITY OF TEXAS        §
MEDICAL BRANCH AND THE         §
TEXAS DEPARTMENT OF            §
CRIMINAL JUSTICE,              §
        Defendants.            §
```

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL AND VIDEOTAPED DEPOSITION OF
WILLIAM L. STEPHENS
VOLUME 1

October 18, 2013

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

        ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L.
STEPHENS, produced as a witness at the instance of the
PLAINTIFFS, and duly sworn, was taken in the
above-styled and numbered cause on October 18, 2013,
from 4:50 p.m. to 8:05 p.m., before Brenda J. Wright,
RPR, CSR in and for the State of Texas, reported by
machine shorthand, at the Office of the Attorney
General, 300 West 15th Street, Suite 1200, Austin,

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3    STEPHEN McCOLLUM,              §
     STEPHANIE KINGREY, AND        §
4    SANDRA McCOLLU,               §
     INDIVIDUALLY AND AS           §
5    HEIRS AT LAW TO THE           §
     ESTATE OF LARRY GENE          §
6    McCOLLUM,                     §
          Plaintiffs,             § CIVIL ACTION NO.
7                                  § 3:12-CV-02037
     VS.                           §
8                                  §
     BRAD LIVINGSTON, JEFF         §
9    PRINGLE, RICHARD CLARK,       §
     KAREN TATE, SANDRA            §
10   SANDERS, ROBERT EASON,        §
     THE UNIVERSITY OF TEXAS       §
11   MEDICAL BRANCH AND THE        §
     TEXAS DEPARTMENT OF           §
12   CRIMINAL JUSTICE,             §
          Defendants.             §
13
14   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15      ORAL AND VIDEOTAPED DEPOSITION OF
             WILLIAM L. STEPHENS
16                 VOLUME 1

17            October 18, 2013

18   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

         ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L.
19  STEPHENS, produced as a witness at the instance of the
20  PLAINTIFFS, and duly sworn, was taken in the
21  above-styled and numbered cause on October 18, 2013,
22  from 4:50 p.m. to 8:05 p.m., before Brenda J. Wright,
23  RPR, CSR in and for the State of Texas, reported by
24  machine shorthand, at the Office of the Attorney
25  General, 300 West 15th Street, Suite 1200, Austin,
```

---

**Page 2**

```
1   Texas, pursuant to the Federal Rules of Civil
2   Procedure and the provisions stated on the record or
3   attached herein.
4              APPEARANCES
5   For the Plaintiffs:
     Mr. Jeff Edwards
6    THE EDWARDS LAW FIRM
     The Haehnel Building
7    1101 East 11th Street
     Austin, Texas 78702
8    512-623-7727/512-623-7729 (fax)
     jeff@edwards-law.com
9         -and-
     Mr. Scott Medlock
10   TEXAS CIVIL RIGHTS PROJECT
     1405 Montopolis Drive
11   Austin, Texas 78741
     512-474-5073/512-474-0726 (fax)
12
   For the Defendants Jeff Pringle, Richard Clark, Karen
13 Tate, Sandrea Sanders, Robert Eason and Texas
   Department of Criminal Justice:
14   Mr. Bruce R. Garcia
     Assistant Attorney General
15   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     Law Enforcement Defense Division 012
16   Post Office Box 12548
     300 West 15th Street
17   Austin, Texas 78711-2548
     512-463-2080/512-495-9139 (fax)
18   bruce.garcia@texasattorneygeneral.gov
19 For the Defendants Brad Livingston, William Stephens
   and Richard Thaler:
20   Mr. Demetri Anastasidis
     Assistant Attorney General
21   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     Law Enforcement Defense Division 012
22   Post Office Box 12548
     300 West 15th Street
23   Austin, Texas 78711-2548
     512-463-2153/512-495-9139 (fax)
24   demetri.anastasidis@texasattorneygeneral.gov
25
```

---

**Page 3**

```
1        APPEARANCES - CONTINUED
2
   For the Defendant University of Texas Medical Branch:
3    Ms. Kim Coogan
          -and-
4    Ms. Erika Hime
          -and-
5    Ms. Lacey Mase
     Assistant Attorney General
6    Law Enforcement Defense Division
     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
7    Post Office Box 12548
     Austin, Texas 78711-2548
8    512-463-2080/512-495-9139 (fax)
     kim.coogan@texasattorneygeneral.gov
9
   Videographer:
10   Mr. Patrick Knapick
11 Also Appearing:
     Ms. Deborah Woltersdorf
12   Paralegal, OFFICE OF THE ATTORNEY GENERAL
     deborah.woltersdorf@texasattorneygeneral.gov
13
     Mr. Josh Barron
14
     Mr. Tobias D. Hunziker
15   TEXAS DEPARTMENT OF CRIMINAL JUSTICE
16   Mr. Richard Thaler
17   Mr. Neal Spradlin
18   Mr. Kyle Smith
19
20
21
22
23
24
25
```

---

**Page 4**

```
1           STIPULATIONS
2       The attorneys for all parties present stipulate
3   and agree to the following items:
4
5       That the deposition of WILLIAM L. STEPHENS is
6   being taken pursuant to Notice;
7
8       That the deposition is being taken pursuant to
9   the Federal Rules of Civil Procedure;
10
11      That the original transcript will be submitted
12  to the witness' attorney, MR. DEMETRI ANASTASIDIS;
13
14      That the witness or the witness' attorney will
15  return the signed transcript to the court reporter
16  within 30 days of the date the transcript is provided
17  to the witness' attorney. If not returned, the
18  witness may be deemed to have waived the right to make
19  the changes, and an unsigned copy may be used as
20  though signed.
21
22
23
24
25
```

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX81

2 (Pages 5-8)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**5**

1                 INDEX
2
3  Appearances........................................  2
   Stipulations.........................................  3
4
   WILLIAM L. STEPHENS
5
      Examination by Mr. Medlock...............  6
6
7  Changes and Corrections..........................  146
   Witness' Signature.................................  147
8  Reporter's Certificate............................  148
9                 EXHIBITS
10                            PAGE
   NO.   DESCRIPTION               MARKED
11
   64................................................  6
12     Resume
   65................................................  31
13     Heat Precaution memorandum - 06/20/2013
   66................................................  123
14     August 8, 2011 E-mails
   67................................................  131
15     August 9, 2011 E-mails
16
17
18
19
20
21
22
23
24
25

---

**6**

1          (Per agreement of all counsel present, the
2  reading of the Federal introduction is waived.)
3          (Deposition Exhibit No. 64 marked.)
4          THE VIDEOGRAPHER:  We're on the record
5  in the deposition of William Stephens, recorded on the
6  18th day of October, 2013.  The time is 4:49 p.m.
7          Madam Court Reporter, would you please
8  swear in our witness.
9          WILLIAM L. STEPHENS,
10 having been first duly sworn, testified as follows:
11             EXAMINATION
12 BY MR. MEDLOCK:
13     Q.  Good afternoon, Mr. Stephens.  My name is
14 Scott Medlock.  I'm an attorney and I represent the
15 family of Larry Gene McCollum in this case.  Do you
16 understand that?
17     A.  Yes, sir.
18     Q.  And you -- it's -- we have been through a
19 deposition for Mr. Thaler already today and you sat in
20 on that deposition.  Is that correct?
21     A.  Yes, sir.
22     Q.  And before we started Mr. Thaler's
23 deposition, we went over some kind of rules of the
24 road for the deposition.  Do you recall that?
25     A.  Yes, sir.

---

**7**

1      Q.  Do you remember all of the -- what was
2  discussed there and do you agree that we can operate
3  under the same premises for your deposition?
4      A.  Yes, sir.
5      Q.  Okay.  So you -- have you ever been deposed
6  or testified before, Mr. Stephens?
7      A.  Yes, sir.
8      Q.  Okay.  Approximately how many times, do you
9  recall?
10     A.  I remember being deposed once before.  I've
11 testified in trial, oh, I'm going to say about
12 eight -- seven or eight times.
13     Q.  And were all of the depo -- the deposition
14 and the trial testimony, were all of those while you
15 were an employee of the Texas Department of Criminal
16 Justice?
17     A.  That is correct.
18     Q.  Do you remember what the deposition that you
19 gave was?
20     A.  It was a RLPA case.  It was a combination of
21 an offender named Odneil and other offender named
22 Garner, regarding grooming standards.
23     Q.  Regarding the ability of Muslim prisoners to
24 wear beards?
25     A.  That's correct.  And Odneil was a

---

**8**

1  Native American that wanted to grow long hair.
2      Q.  And were those tried as one case or were
3  those separate cases you testified --
4      A.  They were separate trials.
5      Q.  Okay.  Oh, so those were trials.  I'm sorry.
6  I thought I asked you about the deposition that you --
7      A.  Those -- the deposition was together.
8      Q.  Was both Odneil and Garner?
9      A.  Yes, sir.
10     Q.  Okay.  And then you testified in the trial
11 of one or both of those cases?
12     A.  Both of them.
13     Q.  Okay.  And then what other trials do you
14 recall that you testified in?
15     A.  I'm trying to -- there was an offender named
16 Brown years ago, in the early 2000 -- well, it was
17 late '90s.  It was injury case.  He was claiming he
18 got hurt on -- while working at the Stevenson Unit.
19 And then there has been several either RIFRA or RLPA
20 cases that deal with offender grooming standards, if I
21 remember, back -- oh, an another Native American,
22 too.  Iron Thunderhorse was a Native American.
23         We had an offender named Garrett, an
24 offender named -- wow, just drew a blank.  What --
25 well, it was Garner.  I testified in Garner and

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX82

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**9**

1 Odneil. And I'm sorry, I don't remember the other
2 one's name, but there were several of them in the
3 Tyler courthouse that I testified in and one in
4 Austin.
5  Q. It sounds -- from your memory, it sounds
6 like you testified in one case where a prisoner was
7 injured, and the other cases you remember testifying
8 in were all related to prisoners' ability to practice
9 their religious belief in prison. Is that accurate?
10  A. I need to add one more. I'm sorry.
11  Q. Uh-huh.
12  A. There was also one in the late '80s, early
13 '90s that dealt with -- it was a failure to protect.
14 One offender assaulted another one.
15  Q. Is it Mr. Sheets?
16  A. Yeah. Sheets, and I'm trying to remember
17 the other one's name. Jenks.
18  Q. And just like you -- just now you remembered
19 something else and went back and corrected your
20 answer.
21  A. Yes, sir. I'm sorry about that, too.
22  Q. No, that's fine. Could you go -- just
23 anytime during --
24  A. I just remembered another one. His name was
25 Gooden. He was actually a religious accommodation.

---

**10**

1    MS. COOGAN: What about Mr. McBride?
2  A. McBride was another one, I'm sorry. And
3 there was a girl named Arrington.
4  Q. (BY MR. MEDLOCK) Did you testify in
5 Ms. Arrington's case?
6  A. Yes, I sure did.
7  Q. You did? I should remember that one.
8  A. Arrington was a deaf offender.
9  Q. Okay. Whether or not you get any assistance
10 from these folks in this room who have represented you
11 over the years, if you remember something else to add
12 to an answer, can you just speak up and --
13  A. I will. I'm sorry.
14  Q. That's okay. The other thing that it looks
15 like you and I are already doing is, I'll try and ask
16 the question completely, and if you could wait for me
17 to ask the question, then I'll wait for you to give
18 the entire answer. Because we've already given the
19 court reporter a long day here and that just makes her
20 life more difficult.
21  A. Yes, sir.
22  Q. Does that sound like something we can agree
23 on?
24  A. Yes, sir.
25  Q. Okay. All right. Now, you've got in front

---

**11**

1 of you what is marked as Exhibit 64. Is that right?
2  A. That's correct.
3  Q. And this is a -- a copy of your biography,
4 essentially. Is that right?
5  A. Yes, sir.
6  Q. Is this -- there is a number of different
7 prison facilities in the Texas Department of Criminal
8 Justice listed on here where you've worked.
9  A. Yes, sir.
10  Q. Beginning in 1981 with the Wynne Unit up
11 until the point where you were -- where you became the
12 position you have today. Is that approximately right?
13  A. Yes. But as a correction -- from the period
14 I was correctional officer to the period in 1992 at
15 the Robertson Unit, I worked at several other
16 facilities.
17  Q. What other facilities did you work at during
18 that '81 to '92 period?
19  A. I worked at the Pack 2 Unit, which is the
20 Luther Unit now. I worked at the -- the Diagnostic
21 Unit, which is the Byrd Unit now. I worked at the
22 Cotulla Unit, which is in Cotulla, Texas. Those are
23 the three that weren't listed.
24  Q. Okay. You said the Byrd Unit. It was
25 called the Diagnostic Unit when you worked there?

---

**12**

1  A. Yes, sir.
2  Q. Is that what we would call a transfer
3 facility in the TDCJ?
4  A. No, sir. It would be a diagnostic and
5 intake facility. Now, you know, our typical transfer
6 facilities are your Gurneys and Middletons and Garzas
7 and those. Now, some of the same processes that go on
8 on those facilities go on at the Diagnostic or the
9 Byrd Unit, yes, sir.
10  Q. Is the -- same functions that were
11 performed at the Byrd Unit today, were they also
12 performed when you worked there in -- what year were
13 you at the Byrd Unit? Let me state that.
14  A. I was at the Byrd Unit for a few months in
15 1990. I worked in the back of the kitchen as a
16 correctional officer. I really didn't get out of the
17 kitchen much, so I wasn't real familiar with all of
18 the operations going on.
19  Q. Okay. But now you are the director of the
20 Correctional Institutions Division. Is that right?
21  A. That's correct.
22  Q. What do you understand that goes on at
23 Byrd Unit today?
24  A. I understand that there is still diagnostic
25 intake processing, preparing that offender, trying --

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX83

4 (Pages 13-16)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013



---

**13**

1  the testing that we take to properly classify and to
2  properly assign that offender to a facility in this
3  state.
4      Q.   Basically, at the Byrd Unit they would
5  decide which of the various TDCJ facilities a prisoner
6  goes to to do the majority of their sentence. Is that
7  fair?
8      A.   Right. They -- they obtain all of that
9  information. I think the final assignment is by the
10  State Classification Committee members and the group
11  that's at the -- another location in Huntsville. But
12  the Byrd Unit does provide all of that processing that
13  goes on.
14      Q.   And how -- you said there is some sort of
15  distinction between a facility like Gurney or Hutchins
16  and the Byrd Unit. Could you explain that to me?
17      A.   Yeah. I just got caught up in the prison
18  slang when you said, a transfer facility, and I
19  apologize for that. But, typically, there -- their
20  responsibilities and duties are similar.
21      Q.   Okay. So the -- functionally, there is not
22  a whole lot of difference?
23      A.   Yes. That's correct. Functionally, there
24  is not.
25      Q.   Okay. So just to go through this, you

---

**14**

1  worked at the Pack 2 Unit, the Byrd Unit in
2  approximately 1990, and the Cotulla Unit. And then in
3  1992 you became a major at the Robertson Unit?
4      A.   Yes, sir. That's correct.
5      Q.   And then an assistant warden at the
6  Allred Unit?
7      A.   Yes, sir. That's correct.
8      Q.   And then you were the senior warden at the
9  Montford Unit?
10      A.   And again, I made a mistake there, too. I
11  forgot to tell you about some other units I was an
12  assistant warden at.
13      Q.   All right. Where else were you an assistant
14  warden?
15      A.   He was an assistant warden at the
16  Stevenson Unit in Cuero, and the Garza East Unit in
17  Beeville.
18      Q.   And is the Garza East Unit also a transfer
19  facility?
20      A.   The Garza East Unit is a transfer facility.
21      Q.   Okay. So then you became a senior warden at
22  the Montford Unit?
23      A.   That's correct.
24      Q.   Then you were the warden at the
25  Telford Unit?

---

**15**

1      A.   That's correct.
2      Q.   Then the McConnell Unit?
3      A.   Yes, sir.
4      Q.   And then you became the Regional II director
5  in 2005. Is that right?
6      A.   Yes, sir. That's correct.
7      Q.   What facilities are in Region II?
8      A.   Okay. You -- the Hutchins Unit is in
9  Region II, the Boyd Unit, the Buster Cole, the Choice
10  Moore, the Telford, Johnston, Skyview Hodge, Coffield,
11  Michael, Beto, Powledge, and Gurney.
12      Q.   And that's the region where Mr. Eason was
13  also formerly the regional director. Is that right?
14      A.   That's correct. He was a regional director
15  in Region II.
16      Q.   In Region II. Okay. And as of Mr. Thaler's
17  retirement, you are the Correctional Institutions
18  Division director?
19      A.   That's correct.
20      Q.   Okay. And your educational background, you
21  have a bachelors degree from criminology and
22  corrections from Sam Houston. Is that right?
23      A.   That's correct.
24      Q.   And do you have any additional education
25  beyond the bachelors degree?

---

**16**

1      A.   No, sir. That's all I got.
2      Q.   Okay. Have you taken any courses towards a
3  masters or anything like that?
4      A.   No, sir.
5      Q.   Okay. Mr. Stephens, have you ever been a
6  party to a lawsuit before?
7      A.   I believe I was on that Sheets and Jenks, I
8  believe I was a defendant. I'm not sure. I may not
9  have been, but I do not believe I've ever been a --
10  defendant. I'm not sure.
11      Q.   Before these suits about the --
12      A.   Now, I could have been -- when you say a
13  lawsuit, some of them might have got dismissed before
14  trial or something that I don't remember or aware of,
15  so, I'm -- I really don't recall.
16      Q.   To the best of your recollection, you
17  remember the Sheets and the Jenks case?
18      A.   Yeah. Buy I -- as I think about it, I
19  remember Officer Brickell and Officer Spillar were the
20  actual defendants. I happened to be the supervisor on
21  duty that night and I think I was just a witness.
22      Q.   Okay. None of these cases that you've
23  testified in, you were a defendant. Is that fair?
24      A.   Yeah. I'm not sure about Brown, but -- I
25  could have been in Brown.



---

APPENDIX84

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**17**

1  Q. Okay. Do you remember what the outcome of
2  the Brown case was?
3  **A. They determined that -- they ruled on the**
4  **State's side of the matter.**
5  Q. Did that go to a jury or --
6  **A. Yes. It was a jury trial.**
7  Q. Okay. And that was a case about a -- a
8  prisoner who was injured at the Stevenson Unit?
9  **A. Yes. He claimed he had a -- his back was**
10 **injured and we were assigning him a job that was**
11 **causing more injury to his back.**
12 Q. Without telling me what you talked about,
13 did you meet with anyone to prepare for this
14 deposition today?
15 **A. Yes, sir. I met with Mr. Demetri, I did**
16 **meet with him.**
17 Q. Did you meet with anyone else?
18 **A. Well, some people that worked with him. I**
19 **met briefly with Bruce.**
20 Q. Okay. So Mr. Anastasidis and Mr. Garcia?
21 **A. Right. And Deborah, who was sitting here**
22 **earlier, I met with her.**
23 Q. Ms. Woltersdorf, Mr. Anastasidis' assistant?
24 **A. And, of course, I had discussions with other**
25 **people about it.**

---

**18**

1  Q. Who else did you discuss it with?
2  **A. I've had general discussions with**
3  **Mr. Thaler. I've had general discussions with**
4  **Mr. Eason. I believe that's it.**
5  Q. What did you talk about with Mr. Thaler?
6  **A. Oh, I have just been in -- in the group**
7  **meetings with him today.**
8  Q. They were part of the meetings with your
9  attorney?
10 **A. Yes, sir.**
11 Q. Did you ever talk with Mr. Thaler about this
12 case when your attorneys weren't present?
13 **A. After being served with the lawsuit, I'm**
14 **sure I did have some general conversations, but I**
15 **don't remember the contents of them.**
16 Q. And what about with Mr. Eason?
17 **A. Oh, sure. You know, of course, based upon**
18 **Mr. Eason working for me now, we have had general**
19 **conversations about the case. Sure.**
20 Q. What have you talked about with Mr. Eason on
21 those occasions where your attorneys weren't there?
22 **A. Well, there were some questions I had after**
23 **reading his deposition. Specifically, I don't know --**
24 **I don't remember any of the -- the matters.**
25 Q. You don't remember what you talked about

---

**19**

1  with Mr. Eason about his deposition?
2  **A. No, sir.**
3  Q. Did you talk about anything related to this
4  case other than Mr. Eason's deposition with him?
5  **A. No, I can't recall any. Well, about this**
6  **case, now we have conversations every day.**
7  Q. Okay.
8  **A. About lots of things.**
9  Q. Fair enough. What -- do you remember what
10 questions you had for Mr. Eason about his deposition?
11 **A. It's been some time back, Mr. Medlock. If**
12 **you'll give me a second.**
13 Q. Sure.
14 **A. It seems like it was, in general, about the**
15 **administrative review and maybe some of the -- some of**
16 **the testimony about the actions of the officers.**
17 Q. What did you --
18 **A. And what went on that night.**
19 Q. What did you want to know about the
20 administrative review?
21 **A. Well, first of all, I wanted to see if he**
22 **had an opportunity to look at it, and he had signed**
23 **it. And -- and other than that, I can't think of**
24 **anything other than just the general contents of it.**
25 Q. Do you remember talking with him about any

---

**20**

1  other prisoners who had died from heat stroke or
2  hyperthermia?
3  **A. Oh, yes, sir. We've talked about them --**
4  **other prisoners that have died from heat thermia.**
5  Q. How many -- how often did you talk with
6  Mr. Eason about the prisoners who died from
7  hyperthermia?
8  **A. I can't give you a number how often. It**
9  **wasn't often. It wasn't often after being served with**
10 **this trial.**
11 Q. Okay. Do you remember --
12 **A. Lawsuit.**
13 Q. -- what you talked about with Mr. Eason?
14 **A. No, sir, not -- not at all.**
15 Q. Do you remember any of the questions you
16 asked him about the --
17 **A. No, sir.**
18 Q. Do you remember talking with him that a
19 large number of these deaths seem to have happened in
20 Region II?
21 **A. Did I talk to him about it?**
22 Q. Right.
23 **A. I think he was -- he brought that forward,**
24 **yes, sir.**
25 Q. He vol --

---

Stephen McCollum, et al. v.                    William L. Stephens
Brad Livingston, et al.                         October 18, 2013

---

21

1   A. It was a discussion, yes, sir.
2   Q. What did you -- what do you remember about
3 that discussion?
4   A. I remember him saying that he was beat up
5 pretty hard in his deposition about it.
6   Q. Was that because --
7   A. He took it personal. I mean, he took the
8 incidents and the occurrences in his region
9 personally, even when they occurred.
10   Q. That's because he is responsible for --
11   A. Absolutely. He holds himself accountable.
12   Q. Would you say that he thought that the staff
13 in his region could have done better in those
14 situations?
15   A. I don't remember that specifically being
16 said about any of the cases, other than specifically
17 he felt like the staff -- he commented that he felt
18 like they acted appropriately in McCollum -- McCollum
19 case, I'm sorry.
20   Q. Have you had a chance to review the
21 administrative review and the Emergency Action Center
22 report for the McCollum case?
23   A. I have reviewed it.
24   Q. Are you critical of the performance of the
25 correctional officers in that case?

---

22

1   A. Do you have the report available so I could
2 look at it? If you're going to ask me questions about
3 a specific report, I'd like to have a chance to look
4 at it.
5   Q. And, you know, I don't think I have a copy
6 of that with me right now.
7   A. Okay.
8   Q. But do you remember having any criticism of
9 those officers?
10   A. Me personally having criticism of the
11 officers? Difficult to say. I wasn't there in the
12 entire situation. Certainly, in retrospect, looking
13 back on the incident, I wish we would have called 911
14 sooner.
15   Q. You would agree with Mr. Thaler that the
16 delay in calling 911 was too long in that situation.
17 Is that fair?
18   A. I agree there was a significant delay and I
19 wish they would have called 911 sooner, yes, sir.
20   Q. Okay. And would you agree that it wasn't --
21 that in a situation like Mr. McCollum, where the
22 inmate is having a seizure, is convulsing, is
23 unresponsive, that that would -- it would be
24 inappropriate to wait for the sergeant and then wait
25 for the lieutenant and cause an hour delay before

---

23

1 calling 911?
2   A. Yeah. As I understand, reading it, the
3 first officer on the scene approached Mr. McCollum on
4 the bed and witnessed what he did, and he initially
5 called the supervisor to report to the scene, as well
6 as a video camera. He initiated -- our terminology is
7 ICS, Incident Command System. That is certainly a
8 standard protocol.
9       I certainly think that at some point
10 when there was a delay for the supervisor to get
11 there, I wish the officer would have took some
12 initiative, notified his -- whoever he contacted the
13 first time that I'm calling 911.
14   Q. So maybe after ten minutes when the
15 supervisor doesn't --
16   A. I really can't put a time on it, I'm sorry.
17   Q. Such just as an example --
18   A. Yes, sir.
19   Q. -- at some point, you think that he should
20 have stepped up and said, I'm going to call 911 now,
21 or I'm going to tell the person who has access to the
22 telephone, we need 911?
23   A. Not having the report in front of me, okay,
24 I believe the officer -- there was an radio down there
25 on the wing. I do believe they had the opportunity to



---

24

1 tell whomever, their supervisor on the radio, we need
2 911 and let's call it.
3   Q. And you think that would have been
4 appropriate in this situation?
5   A. Yes, sir.
6   Q. Okay. If the officer who -- the
7 correctional officer who first arrived, if he believed
8 it was an emergency at that point, should he have
9 waited any time before calling 911? Or making sure
10 911 was called?
11   A. The message that I have put out all along
12 has been, if you feel like you need Emergency Medical
13 Services and they're not on the unit, call 911.
14   Q. Okay. So you would agree, if the officer
15 thought that it was an emergency and there was no
16 medical services available at the unit, that he should
17 have immediately called 911?
18   A. If the officer makes a -- an ascertation
19 that it needs -- that this is an emergent medical,
20 serious life-causing situation, then the officer
21 should call 911.
22   Q. Okay.
23   A. Or excuse me, the officer doesn't have the
24 ability in the housing area. The officer could make a
25 request, either by phone or by the radio, and I



---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX86

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**25**

1  believe in this situation the officer had a radio.
2  I'm not positive, though.
3      Q.  You -- and just to make the record clear.
4  The officer doesn't have a phone on him, he would need
5  to tell someone else to call 911?
6      A.  Right.  Even our phones on the housing area
7  do not have access to call a number outside the
8  institution.
9      Q.  Okay.  But you think the officer should have
10  taken that step when he ascertained it was an
11  emergency?
12      A.  If he ascertained it was an emergency, then,
13  yes.
14      Q.  Okay.  We talked with Mr. Thaler some about
15  how policies are made for TDCJ.  Do you remember that
16  discussion?
17      A.  Yes, sir.
18      Q.  I'm going to ask you some questions that we
19  asked Mr. Thaler, because since you're in Mr. Thaler's
20  position now, I just want to see if you have any
21  different understanding than he does or maybe you know
22  or remember something that he didn't.  Okay?
23      A.  Okay.
24      Q.  We talked about whether Mr. Livingston, what
25  his level of involvement is with the policies that are

---

**26**

1  made for the Correctional Institutions Division.  Do
2  you remember that?
3      A.  Yes.
4      Q.  And some of the administrative directives or
5  policies that Mr. Livingston has to sign off on and
6  approve.  Is that right?
7      A.  As I understand it, yes.
8      Q.  Okay.  Do you know if Mr. Livingston reads
9  those policies before he signs off on them?
10      A.  No, I do not know what Mr. Livingston does
11  in this.
12      Q.  Has Mr. Livingston ever asked you any
13  questions about one of these policies before his
14  signature --
15      A.  No, sir.
16      Q.  Okay.  Have you ever consulted with him
17  about a policy before he approves it to tell him,
18  like, you know, Mr. Livingston, this is a new policy
19  we're proposing, this is why we think it's necessary,
20  or anything like that?
21      A.  About a policy, no.
22      Q.  Okay.  When have you talked with
23  Mr. Livingston?
24      A.  Well, after taking on this job and becoming
25  a -- the director for the Correctional Institutions

---

**27**

1  Division, I've had several conversations with
2  Mr. Livingston about different operational type
3  issues.  You know, right now, the Prison Rape
4  Elimination Act is a tremendous issue going on in our
5  agency.  The implementation of some current
6  legislation that we're trying to put out is a -- is a
7  tedious task, so I've had conversations with him about
8  those issues.
9      Q.  Can you recall any other issues you've
10  talked with Mr. Livingston about besides Prison Rape
11  Elimination Act implementation and the implementation
12  of some new legislation?
13      A.  There is issues, yes, sir, I've talked to
14  him about.
15      Q.  What else do you remember talking with him
16  about?
17      A.  Do you want me to name everything that I've
18  talked to Mr. Livingston about?
19      Q.  How -- well, let's -- how often do you talk
20  with Mr. Livingston?
21      A.  I would say, daily.
22      Q.  Daily.  Fair enough.  Does he work in the
23  same office as you?
24      A.  Excuse me?
25      Q.  Does he work in the same physical office

---

**28**

1  as --
2      A.  No, sir, not in the same office.  He's down
3  the hallway.
4      Q.  Okay.  The same office building?
5      A.  The same building, that's correct.
6      Q.  Have you ever talked with Mr. Livingston
7  about the temperatures inside the housing areas?
8      A.  I have not had that conversation with him,
9  no, sir.
10      Q.  Have you ever approached him about that?
11      A.  No, sir, I have not.
12      Q.  You've never told him that you think that's
13  an important issue that you need to talk about with
14  him?
15      A.  I have not had the conversation with
16  Mr. Livingston about temperatures in the dorms.
17      Q.  Why not?  Why haven't you ever talked with
18  him about that?
19      A.  Because I feel we are doing a good job of
20  mitigating the circumstances and the -- the effects
21  that the temperature in the dorms has on the
22  offenders.
23      Q.  So you -- because you think that you're
24  doing a good job, you don't see any need to involve
25  Mr. Livingston.  Is that --

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX87

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

29

1    A.  Well, there will be -- as the months
2  progress -- really, we've been busy on lots of things.
3  Okay?  And I'm not telling you that the heat in the
4  dorms is any less important than anything else.  But
5  as we go through the next several months, we'll be
6  having conversations about the implementation of some
7  changes in AD 1064, which is the heat extremes.
8    Q.  And what -- are those changes to AD 1064 --
9  for the record, AD 1064 is the policy about
10  temperature extremes in TDCJ?
11    A.  In the work force.
12    Q.  In the workplace.  And that policy does not
13  address extreme temperatures in the housing areas.  Is
14  that --
15    A.  It does not, no, sir.
16    Q.  What are the changes that are coming to
17  AD 1064?
18    A.  We're going to incorporate some of the
19  things in the annual e-mail, which y'all have
20  discussed in Mr. Thaler's deposition.  We're going to
21  incorporate some of those -- or the majority of those
22  issues into that policy.
23    Q.  And those would be the wellness checks?
24    A.  That will be one of the things.  That's
25  correct.

30

1    Q.  What are the other things?
2    A.  If you'll let me see the annual e-mail, as
3  we've referenced, I'll read them to you.
4    Q.  Exhibit 50 is the annual e-mail.
5    A.  If you'll show me the one that was signed in
6  2013, that would probably be the more current one.
7    Q.  Okay.  I don't know that we have a copy of
8  the 2013 e-mail with us.
9    A.  Then I probably wouldn't be able to testify
10  based on the exhibit you've given me.
11    Q.  Do you know what changes are being made from
12  this 2011 e-mail?
13    A.  Not by the 2011.  I have a good idea about
14  the 2013 e-mail.
15    Q.  So -- but you can't tell me what those
16  changes are?
17    A.  I'm not sure what -- if anything changed
18  from the 2011 to the 2013 as I sit here today.
19    Q.  So you're not sure if there were any changes
20  made from the 2011 e-mail?
21    A.  To 2013, that's correct.
22    Q.  2013.  Okay.  Do you think that there should
23  have been changes made from the 2011 e-mail to the
24  2013 e-mail?
25    A.  I think there were.

31

1    Q.  Okay.  But you don't know what --
2    A.  And I do know the wellness checks was one of
3  them.
4    Q.  Do you know --
5    A.  And it might have been the only one, but I'm
6  not sure.
7        MR. MEDLOCK:  Can we make this an
8  exhibit.
9        MR. EDWARDS:  Demetri, do you have the
10  2013?
11        MR. ANASTASIDIS:  Yeah, that's it right
12  there.
13        MR. EDWARDS:  Okay.
14        (Deposition Exhibit No. 65 marked.)
15    Q.  (BY MR. MEDLOCK)  I'm going to mark this
16  Number 65.  Does that appear to be the 2013 e-mail
17  that we were discussing?
18    A.  That does appear to be that e-mail.
19    Q.  Okay.  Looking at the 2013 e-mail, can you
20  tell me what changes were being made there?
21    A.  It appears, between 2011 and 2013, the
22  change was the inclusion of some wording on the
23  wellness check.
24    Q.  No other changes?
25    A.  I don't see any right now.  Of course, I

32

1  took a quick glance at it.
2    Q.  Okay.  And the wellness checks are what we
3  talked about with Mr. Thaler, the prisoners are now
4  being put on a list that -- by the Health Services
5  Division, and then the officers are instructed to do
6  an additional visual inspection of those inmates.  Is
7  that fair?
8    A.  Right.  The -- that is a general way of
9  putting it, yes, sir.
10    Q.  Okay.  Would you -- is there anything that
11  you would elaborate on that description?
12    A.  Well, other than they should seek assistance
13  for any offender that they feel like needs some.
14    Q.  And when would a correctional officer think
15  to seek assistance?  As the director --
16    A.  I don't understand.
17    Q.  -- as the Correctional Institutions Division
18  director, when would you expect one of your
19  correctional officers to seek additional assistance?
20    A.  I assume, based upon his observations of the
21  inmate, and he feels like the inmate needs some
22  medical attention.
23    Q.  And we were -- I believe Ms. Coogan was
24  asking Mr. Thaler some questions about how an inmate
25  gets put on that list for the wellness checks.  Do you



APPENDIX88

9 (Pages 33-36)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

33

1  know at what point the inmate is put on the list for
2  the wellness checks?
3       A.  No.  I know that the health services staff
4  are the medical providers on the unit.  They contact
5  the security side, usually our unit count rooms, and
6  that information is transferred over to -- to the
7  officers that's working the housing areas.  And
8  actually how that occurs, I'm sorry, I don't know.
9       Q.  So you don't know if that happens at the
10  initial assessment by the nurse when the inmate comes
11  off the bus, or if that happens at the intake physical
12  or at some other point.  Is that fair?
13      A.  Well, one of the changes, when we go back to
14  1064, will say that it will happen at that initial
15  assessment that the medical staff does when the
16  offender arrives on the unit.  Now, currently, the
17  messages won't reflect that that we have in front of
18  us.  That will be one of the changes in this.
19      Q.  That will be one of the changes that's made
20  to the new version of AD 1064?
21      A.  Yes.
22      Q.  Okay.
23      A.  But, you know, I will say that that practice
24  is just going to be codified; it's not really a
25  change.  It should have been the practice all along

---

34

1  that medical staff, when that offender arrives, should
2  he need medical attention or placed on the -- a
3  wellness checklist, the assumption was, when we were
4  drafting the e-mail, that that would be done.  We will
5  specify it in the upcoming message.
6       Q.  And when you say that that always should
7  have been done, there wasn't a general practice to do
8  these wellness checklists like we've talked about
9  today before 2011.  Is that right?
10      A.  As of 2011 and 2012, in that time there.  I
11  said "always."  I apologize for that.
12      Q.  And I'm just trying to make the record
13  clear.
14      A.  Sure.
15      Q.  When the -- so when the -- in 2011 and 2012
16  when you started this wellness checklist practice, the
17  thinking would be that they would get -- the prisoner
18  would be put on the wellness checklist at the initial
19  triage if the nurse or whoever is performing that
20  triage identified that that was appropriate?
21      A.  Well, the -- the -- the indication was, is
22  that at any time medical felt like the offender needed
23  a check, that would occur.
24      Q.  But that -- you would agree with me that
25  that initial triage would be the earliest time that

---

35

1  could occur?
2       A.  Yeah.  When he arrives on the unit, yes,
3  sir.
4       Q.  Let me ask a question about when a -- if a
5  prisoner is immediately identified as having a
6  disability, like the prisoner comes off the bus and
7  they're using a wheelchair, do they have any
8  additional assessment done immediately or how do they
9  get the HSM-18 generated?
10      A.  I'm not sure.  I -- as far as the practice
11  that's going on when they get there.  But I will tell
12  you that, as reviewing some policies in my job, I have
13  seen that there is, once that initial assessment he
14  gets -- I'm going to say, gets off the bus, that they
15  make an initial assessment, and then they refer it
16  over to the unit provider or another higher level
17  medical staff member that can make a determination.
18      Q.  And would that be done more quickly for
19  someone using a wheelchair?  I mean, obviously,
20  someone using a wheelchair needs some accommodations
21  on the HSM-18, like you can't put someone using a
22  wheelchair in a top bunk.  Correct?
23      A.  You remember, we're talking about prisons
24  here.
25      Q.  Right.

---

36

1       A.  Just because a guy is in a wheelchair, there
2  needs to be some sort of medical evaluation to
3  determine whether he needs that wheelchair or not.
4       Q.  And that's fair enough.  I'm just saying, if
5  someone arrives using a wheelchair, would that
6  person -- you wouldn't put that person on a top bunk
7  pending an evaluation by the medical --
8       A.  No.  That --
9       Q.  -- staff?
10      A.  That should be referred over to the higher
11  level, again, medical practitioner to make a
12  determination.  Medical would determine if he needed a
13  lower bunk.
14      Q.  And you would make -- you would expect that
15  would be done immediately, because you can't have that
16  person being assigned a top bunk?
17      A.  I expect that to happen, yes.
18      Q.  Okay.
19      A.  In person, yes, sir.
20      Q.  Okay.  We talked a minute ago about how
21  policies are made in TDCJ.  Is the process for making
22  policies any different if the policy is related to
23  medical care or some medical issue?
24      A.  I believe it goes a different route, through
25  the Medical Health Services -- TDCJ Health Services

---

APPENDIX89

Stephen McCollum, et al. v.                    William L. Stephens
Brad Livingston, et al.                          October 18, 2013

---

37

1 Division, yes.
2     Q.   How does the -- the Correctional Managed
3 Health Care Committee play in the policy making for
4 medical --
5     A.   I can't testify to that. I don't have
6 enough knowledge.
7     Q.   Would Doctor Linthicum be the appropriate
8 person to ask about that?
9     A.   That's who I would refer you to, yes, sir.
10     Q.   Did you have any involvement in the
11 construction or design of the prisons built in the
12 1990s?
13     A.   No, sir.
14     Q.   Do you know anyone who would have been?
15     A.   No, sir.
16     Q.   Now, some of the inmate housing areas in
17 some of the prisons do have air conditioning. Is that
18 correct?
19     A.   That's correct.
20     Q.   Do you know -- can you generally describe
21 what types of areas those are?
22     A.   What type of areas? The housing areas?
23 There are some general population housing areas.
24 There are some -- I'm really not sure of your
25 question. I'm sorry.

---

38

1     Q.   Sure. Is there any specific reason why
2 those areas as opposed to other areas have air --
3     A.   The areas that I'm aware of that are -- in
4 particular, that need air conditioning are the ones
5 that house the mental health offenders, the inpatient
6 mental health offenders, in our infirmaries or our
7 regional medical facilities. As far as the reasoning
8 or justification, that's what I'm aware of. Now,
9 there is others with them, but I'm not able to...
10     Q.   What are the other ones that you're aware?
11     A.   Other units?
12     Q.   Other units. Aside -- leaving aside the
13 inpatient mental health facilities, what other units
14 are you aware of that have air conditioning in
15 inmate --
16     A.   Now, I'm going to miss some here. Okay?
17     Q.   Okay. And if -- and let me take a step
18 back.
19          If there is -- if it's a certain type
20 of housing area, let's -- let's ask it this way. Is
21 administrative segregation typically air conditioned?
22     A.   Some are and some are not.
23     Q.   Okay. Do you know why some administrative
24 segregation areas are air conditioned?
25     A.   The only thing I can tell you, it was the

---

39

1 original design of the facility. The ones that are.
2     Q.   Do you know -- the Hutchins Unit is one that
3 has air conditioning in the ad seg area. Is that
4 right?
5     A.   I believe there is a portion in there that
6 is air conditioned, yes, sir. In their K building.
7     Q.   Okay.
8     A.   I don't know how many beds or cells, but...
9     Q.   There is a -- I know that there are
10 different designs of prisons, like there is a design
11 called the Michael prototype. Are you familiar with
12 those types of designs?
13     A.   I worked at four of them, yes, sir.
14     Q.   Okay. Are there -- the Hutchins Unit, for
15 example, is not a Michael prototype?
16     A.   No, sir, it's not.
17     Q.   Do you know what is -- does it have a name,
18 like a Michael prototype, its design?
19     A.   Again, prison slang, a large state jail.
20     Q.   Okay. A large state jail?
21     A.   Yes, sir.
22     Q.   Are there other large state jails?
23     A.   Yes, sir.
24     Q.   Which are those?
25     A.   That would be the Plane State Jail, the

---

40

1 Lychner State Jail, and the Dominguez State Jail.
2     Q.   And do you know if the -- because those have
3 the same design as Hutchins, are those ad seg areas
4 air conditioned?
5     A.   You know, I'm going to make that assumption
6 but I couldn't tell you definitive if they are or not.
7     Q.   That would -- because the design is the
8 same --
9     A.   Yes.
10     Q.   -- you would think that --
11     A.   And, unfortunately, I don't remember on
12 those.
13     Q.   Okay. So we've talked about how the ad seg
14 areas at some prisons are air conditioned. What other
15 types of housing areas like that are air conditioned?
16 And I'm not asking you to say like, you know, the ad
17 seg in the Hutchins is air conditioned and, you know,
18 this at the other unit is air conditioned. But if
19 there is group -- types of housing areas like that
20 that are air conditioned, if you could tell me that.
21 Does my question make sense?
22     A.   I don't understand your question, no, sir.
23     Q.   Okay. I'm trying to avoid having you list
24 like, you know, at the Montford Unit this, that, and
25 the other parts are air conditioned. Do you know if

---

APPENDIX90

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**41**

1  there are, generally, some parts of the prisons that
2  are air conditioned and some that aren't?
3     A.  You mentioned before the Michael prototypes.
4  They are a 12 building, has some sort of system in
5  there that -- I say air conditioned. It's just
6  going -- I'm not sure about the real term for it, if
7  it is a true air-conditioner or whatever, but --
8  climate control, I'll say that. Some end group
9  facilities. These are some small transfer facilities
10  that the agency opened in the early '90s, they have
11  air conditioning. Our expansion cellblocks have some
12  sort of climate control. There are some substance
13  abuse facilities. And I'm probably missing some here,
14  but that's the ones that come to mind right now.
15     Q.  Okay. You said the 12 building on the
16  Michael prototypes. Is the 12 building on the Michael
17  prototypes typically used for some function?
18     A.  It typically houses administrative
19  segregation offenders.
20     Q.  Okay. It's also ad seg. And what about --
21  and the small transfer facilities, is that entire
22  facility air conditioned or just a portion of it?
23     A.  Cotulla Unit that I mentioned was one of
24  them that I worked at and it was air conditioned.
25  And, again, you mentioned before the Montford Unit, it

---

**42**

1  is entirely air conditioned. I was the warden there.
2     Q.  Is that also true for the Skyview Unit?
3     A.  Yes, sir. I believe the housing areas are.
4  Yes, sir, they are. Sorry.
5     Q.  And --
6     A.  Jester IV Unit as well, it's another
7  inpatient site facility. And the regional medical
8  facility is the Carole Young Unit. The one at the
9  Estelle Unit. And then the one at the Montford Unit
10  in Lubbock.
11     Q.  Okay. And is just that the --
12     A.  And then our infirmaries that house our
13  inmates on our units are air conditioned.
14     Q.  The infirmary at every unit is air
15  conditioned?
16     A.  Every unit that has an infirmary. Not all
17  of them has an infirmary that houses inmates.
18     Q.  Like I would assume the infirmary at the
19  Hutchins Unit doesn't house inmates because there is
20  not somebody in 24 hours --
21     A.  I don't believe Hutchins has an infirmary.
22  They have a medical department. I don't believe they
23  have an infirmary that's housing inmates in there.
24     Q.  Okay. You said expansion cellblocks?
25     A.  Yes, sir. There is one of those at the

---

**43**

1  Bill Clements Unit, there is one of those at the
2  Allred Unit, there is one of those at the Estelle
3  Unit, and one at the Gib Lewis Unit.
4     Q.  What is an expansion cellblock?
5     A.  An expansion cellblock, again, was an
6  expansion to our existing populations, our existing
7  units. They were placed on these units to house
8  offenders. These are cellblocks. It's the term
9  expansion cellblock versus an expansion dorm. Again,
10  during this same time we placed expansion dorms on
11  several of our facilities.
12     Q.  The --
13     A.  It was just due to a need for additional
14  beds in our agency back in the '90s.
15     Q.  So the expansion cellblocks were built in
16  the '90s?
17     A.  Yes, I believe they were. I opened the one
18  at the Robertson Unit, and it was about '94 or '95.
19     Q.  Okay.
20     A.  Or '93, I'm sorry. Probably.
21     Q.  And all of those expansion cellblocks have
22  air conditioning?
23     A.  Expansion cellblocks, they have some sort of
24  climate control. I don't know what the actual system
25  is called.

---

**44**

1     Q.  But if you were -- and I -- I understand
2  that you might not know the engineering behind what
3  they're doing, but if you were to walk from the
4  outside where it's 110 degrees into one of these
5  expansion cellblocks, the temperature would come down
6  significantly and you could tell?
7     A.  Well, it would be cooler.
8     Q.  Okay. You don't know how that happens,
9  but --
10     A.  No, sir.
11     Q.  -- you can tell it's cooler.
12        Okay. You said the substance abuse
13  facilities. How many of those are there?
14     A.  I would be wrong if I start -- I had the
15  Johnston Unit in my -- my region. Some of the
16  substance abuse, I'm not going to tell you all of them
17  are. But I had the Johnston Unit in my region when I
18  was in Region II. There is one in Estelle. It's not
19  air conditioned. There is the Henley Unit is, down
20  in Dayton. Glossbrenner I believe is, but I'm not
21  sure. I probably need to back off on Glossbrenner
22  because I'm not real confident -- comfortable with
23  that one.
24     Q.  We've heard some testimony in this case that
25  the Walker Sayle Unit is some sort of substance abuse

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX91

Stephen McCollum, et al. v.  
Brad Livingston, et al.

William L. Stephens  
October 18, 2013

---

**45**

1 facility and is air conditioned. Does that sound
2 accurate to you?
3    **A. I heard the testimony, yes, sir.**
4    Q. Do you know why the substance abuse
5 facilities are air conditioned?
6    **A. No, sir, I do not.**
7    Q. Okay. Other than it was part of the
8 original design, do you know why the expansion
9 cellblocks are air conditioned?
10    **A. No, sir.**
11    Q. No reason that you know of?
12    **A. No.**
13    Q. And the same with the ad seg cellblocks, you
14 don't have any knowledge of --
15    **A. No, sir.**
16    Q. -- why those are air conditioned?
17    **A. No, sir.**
18    Q. Okay. The prisoners who are housed on death
19 row in Texas, are -- they're in ad seg. Is that
20 correct?
21    **A. They're at the Polunsky Unit, which is a**
22 **Michael type facility again that -- they're housed in**
23 **12 building. And there is some sort of climate**
24 **control in that building. And, again, when I used the**
25 **term air conditioning, I may be wrong about that. I**

---

**46**

1 **would just rather my testimony say they're climate**
2 **controlled.**
3    Q. And that's fair enough. But your
4 understanding is that the death row inmates are housed
5 in some climate controlled housing?
6    **A. Yes.**
7    Q. Can you describe for the jury why someone
8 would be put in administrative segregation in TDCJ?
9    **A. Sure. The offender is a current escape**
10 **risk. He is a threat to the physical safety of**
11 **offenders and staff. And he is a member of one of the**
12 **security threat groups that we've identified as being**
13 **disruptive in our agency.**
14    Q. And some -- the prison lingo is, security
15 threat group. Someone on the street might understand
16 that to be like a prison gang. Is that correct?
17    **A. That's correct.**
18    Q. Okay. Anyone else who goes to
19 administrative segregation?
20    **A. We have some offenders in administrative**
21 **segregation in the category of protective custody.**
22    Q. Is it fair to say that the protective
23 custody inmates are the minority of the folks who are
24 in administrative segregation?
25    **A. There is less of the protective custody,**

---

**47**

1 that's correct.
2    Q. Have you ever asked anyone at TDCJ why all
3 of these portions of the prisons are air conditioned?
4    **A. I can't remember ever asking anyone that**
5 **question.**
6    Q. Was it ever a question that you had, why are
7 these parts of the prisons air conditioned or climate
8 controlled?
9    **A. I can't remember if I have ever questioned**
10 **that, no.**
11    Q. I believe Ms. Coogan asked Mr. Thaler if he
12 knew the absolute number of beds or cells that were
13 climate controlled. Do you know the answer to that?
14    **A. No, sir.**
15    Q. You were making a distinction between air
16 conditioning and climate control. Are you aware of
17 other -- do you know what that distinction is?
18    **A. I do not have any training or technical**
19 **knowledge of that, no, sir.**
20    Q. Okay. But you're aware that there are --
21 that there is air conditioning and then there is other
22 measures that could --
23    **A. Sure. I've heard people use terms, but I**
24 **wouldn't know the distinction between them.**
25    Q. Okay. But you have seen things like a

---

**48**

1 mister system that blows cool water on people versus
2 an air conditioning system. Maybe a swamp cooler or
3 an evaporative cooler, do you know anything about --
4    **A. I know about a mister system, but I'm -- a**
5 **swamp cooler is -- I've heard of those.**
6    Q. Uh-huh.
7    **A. My daddy used to talk about them. In his**
8 **old houses where it used to circulate a water system,**
9 **I believe, and cool but -- I've heard of those.**
10    Q. Okay. Have you ever discussed using one of
11 those other climate control systems in any of the TDCJ
12 facilities with anyone?
13    **A. No, sir.**
14    Q. When you worked at these various prisons,
15 Mr. Stephens, I assume you worked in some of them
16 during the summer. Is that fair?
17    **A. Yes. Yes.**
18    Q. And you would work as a correctional officer
19 in some of the portions of the building that were not
20 air conditioned or climate controlled. Is that
21 correct?
22    **A. That's correct.**
23    Q. Was it your experience that it got very hot
24 in some of these housing areas?
25    **A. Yes.**

---

13 (Pages 49-52)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**49**

1    Q.  Did you ever become sick or ill from the
2  temperatures in the -- when you were working in those
3  areas?
4    A.  I can't remember ever becoming sick or ill,
5  no, sir.
6    Q.  Do you remember seeing any other prison
7  staff who became sick or ill?
8    A.  At what period?
9    Q.  At any period when you were working in
10 the -- on the actual prison facilities.
11   A.  I would have to say, yes.  Specific
12 incidents, I don't remember.  But there has been
13 occurrences where I've seen staff get sick.  I've seen
14 offenders get sick in the summer months.  Usually they
15 had overexerted theirselves or had some sort of
16 existing medical condition that really didn't adapt
17 well to the heat.
18   Q.  So you were aware that some people have
19 medical conditions that make it more dangerous for
20 them to be in areas where the temperature is very hot?
21        MS. COOGAN:  Objection.  Calls for
22 speculation.
23   A.  Yes, sir.  I just wasn't sure whether I was
24 supposed to answer after that.
25   Q.  (BY MR. MEDLOCK)  Unless your lawyer tells

---

**50**

1  you not to answer --
2    A.  Okay.
3    Q.  -- if you could go ahead and answer the
4  question.
5    A.  Okay.
6    Q.  She's just making the objection for the
7  record and the judge may or may not sustain that later
8  on.  Okay?
9        MR. ANASTASIDIS:  You can go ahead and
10 answer.
11       THE WITNESS:  I did, sir.
12   Q.  (BY MR. MEDLOCK)  And you're also aware that
13 it's very hot outside at these prison units.  Is that
14 fair?
15   A.  Hot outside?  Yes, sir.
16   Q.  Are you aware that sometimes there is not
17 much of a -- a difference between the indoor
18 temperature and the outdoor temperature at these
19 facilities?
20   A.  Yes, sir.
21   Q.  Okay.  Have you reviewed any of the
22 temperature documents at the Hutchins Unit?
23   A.  Unless they were -- I believe some of them
24 might have been attached to a -- a deposition or
25 something that I might have read.  It seems like I did

---

**51**

1  go across them.
2    Q.  Do you remember seeing an e-mail that said
3  that it's maybe two to three degrees cooler indoors
4  than outdoors at the Hutchins Unit in the summer of
5  2011?
6    A.  No, sir.
7    Q.  We've talked a little today about personal
8  fans for prisoners.  Do you remember that
9  conversation?
10   A.  Yes, sir.
11   Q.  Now, there are some prison facilities where
12 there are plug outlets so they can have -- the inmate
13 can have a personal fan, and there are some where
14 there is no plug outlet.  Is that basically the
15 distinction where a personal fan is available and when
16 one is not?
17   A.  Yes, sir.
18   Q.  Is there any commonality that the areas that
19 don't have the plug outlet have?  Like what types of
20 areas would not have a plug outlet available --
21   A.  I don't understand your question.
22   Q.  Okay.  Well, it seems that a number of these
23 situations where the prisoners didn't have personal
24 fans was in a dormitory style setting.  Does that seem
25 fair?

---

**52**

1    A.  Yes, sir.  I believe that -- I believe
2  that's fair, yes, sir.
3    Q.  Typically, in the dormitory style housing in
4  TDCJ, are there outlets for personal fans?
5    A.  Please repeat your question.
6    Q.  Sure.  I'm just trying to determine if that
7  is kind of a -- a -- like a commonality between the
8  dorms or if, you know, at the Hutchins Unit maybe they
9  don't have -- they have dorms, but they don't have
10 plug outlets, but at the Gurney Unit they have dorms,
11 but they do have plug outlets, or is that kind of a
12 part of the design of the dorms?  Does that make
13 sense?
14   A.  Yeah, I believe it's more the design of the
15 dorm.  I don't believe -- I don't remember Gurney
16 having plugs and -- in the dorm.
17   Q.  And I'm just using Gurney as an example.
18   A.  Oh, okay.
19   Q.  I haven't been in there, and I couldn't tell
20 you if they do or not --
21   A.  I don't believe they do.
22   Q.  But your understanding, generally, is that
23 the dormitory style housing typically would not have a
24 plug outlet?
25   A.  We have some dorms that do, but the -- the

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72c1-4350-a49e-946a9deb2499

APPENDIX93

Stephen McCollum, et al. v.                        William L. Stephens
Brad Livingston, et al.                              October 18, 2013

---

53

1  ones constructed like Hutchins, Gurney, do not.
2      Q.  Okay.  What -- are Hutchins and Gurney the
3  same design style?
4      A.  No, sir.  Now, I will tell you they are
5  similar, then they are different.  But, you know, when
6  you talk about a structure that is one building that
7  has four dorms that stretch to the outside and a
8  central housing control picket with windows that you
9  can see in the dorms, then that is similar.  But there
10  are some slight differences.
11      Q.  So the housing buildings at the Hutchins and
12  the Gurney Unit are very similar?
13      A.  I would say they're similar, yes, sir.
14      Q.  Maybe the design of the entire unit is
15  different?
16      A.  That's true as well.
17      Q.  Okay.  Has there ever been a study or a cost
18  estimate done to determine what the cost would be of
19  installing additional plug outlets to allow more
20  people to have personal fans?
21      A.  I don't recall one being made.
22      Q.  Have you ever asked for that to be done?
23      A.  No, sir.
24      Q.  Have you ever considered that that is
25  something that should be looked into?

---

54

1      A.  Well, I will tell you, as an assistant
2  warden of the Garza East Unit in 1998, as you walked
3  around and looked, I considered, yes, looked at.  But
4  as far as a study or any kind of official -- I didn't
5  do that.  I haven't done that.
6      Q.  When you were at Garza East, you just kind
7  of noticed, like, hey, it might be possible to do
8  this?
9      A.  I don't know that I said it would be
10  possible, no, sir.  I guess I looked around and just
11  to see if it would be possible.  With my lack of any
12  kind of engineering skill or -- I did do that.
13      Q.  It just kind of crossed your mind, this
14  might be something --
15      A.  Yes, sir.
16      Q.  -- we could do.  But you never followed up
17  on that to --
18      A.  No, sir.
19      Q.  Let's talk about the Emergency Action Center
20  reports, briefly.  Those identify injuries to
21  employees and to prisoners.  Is that fair?
22      A.  Well, the Emergency Action Center, there is
23  a large number of different types of incidents that
24  are reported there, not just injuries to employees and
25  offenders.

---

55

1      Q.  Among the many things that are identified
2  would be injuries to employees, injuries to offenders?
3      A.  That's correct.
4      Q.  And is it your understanding that a kind of
5  separate category that the Emergency Action Center
6  reports generate is -- or that some way, when those
7  reports are generated, that it identifies specifically
8  heat as a category?
9      A.  I don't know that heat is a category.  I'm
10  not aware of that.
11      Q.  Okay.
12      A.  I don't know how they code -- code their
13  data.
14      Q.  Okay.  So you don't know, if you went back
15  to the Emergency Action Center and said, hey, run me
16  all of the heat-related incidents in the past six
17  months, if they could just do that based on the data,
18  or if they would need to go and review the reports
19  individually, or how they would do that?
20      A.  That's a long question.  Could you repeat
21  it, please?
22      Q.  Sure.  Is there some -- do you know if, when
23  the Emergency Action Center report is generated, is
24  there any sub category that would include heat that
25  would make it more easy to identify?

---

56

1      A.  There could be, but I don't work over there,
2  so I don't know how they track it.
3      Q.  No one has ever given you a report saying,
4  here are all of the heat-related incidents?
5      A.  I've received a report that says that.
6      Q.  Okay.
7      A.  I don't know -- I don't remember if I
8  received it from EAC or health services, but I've
9  received a report that said that.
10      Q.  When did you receive that?
11      A.  Oh, 2012, 2013, in that general area.
12      Q.  Was that the first time you had ever seen a
13  report like that?
14      A.  That I'm -- that I remember today, yes, sir.
15      Q.  Do you remember how many incidents were
16  listed on that report?
17      A.  I believe the report I saw had 14 of them.
18      Q.  Do you remember what month that report came
19  out?
20      A.  No, sir.
21      Q.  Those 14 incidents, do you remember if those
22  were to -- incidents involving staff, or prisoners
23  or some combination --
24      A.  Oh, I'm sorry.  I thought you were talking
25  about offender deaths due to hyperthermia.  That's the

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX94

15 (Pages 57-60)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

57

1 report I thought you were asking about. I apologize.
2 Q. Okay. So you've seen a report that says
3 there were 14 --
4 A. Yes, sir. It was a spreadsheet.
5 Q. Okay. Do you know who generated that
6 spreadsheet?
7 A. No. As I mentioned before, I don't know if
8 it was the Emergency Action Center or health services.
9 Q. Do you know what period that spreadsheet
10 covered, like from beginning in what year?
11 A. 2007 through 2012.
12 Q. Okay. Now, to clarify my earlier question,
13 have you ever seen a similar report but discussing
14 like injuries to employees or prisoners as opposed to
15 deaths related to heat?
16 A. I can't recall if I have.
17 Q. Mr. Stephens, do you think it would be a
18 good idea to install some sort of climate control in
19 the prisoner housing areas?
20     MR. GARCIA: Objection. Vague.
21 A. I don't believe it's necessary to install
22 air condition -- or climate control in all of the
23 offender housing areas.
24 Q. (BY MR. MEDLOCK) You said, in all of the
25 offender house --

---

58

1 A. I thought that's how your question was
2 phrased.
3 Q. Okay. You may very well be right there.
4 A. Okay.
5 Q. Do you think that you have enough climate
6 controlled beds presently?
7 A. Climate controlled beds presently for what?
8 Q. For the agency's needs? So that you can
9 protect prisoners who are susceptible to heat-related
10 illness or death?
11 A. Yeah. I don't know what that whole
12 environment looks like, but I think, based upon the
13 steps that we're taking to mitigate the effects of the
14 heat, then we do have a sufficient number of beds,
15 yes, sir.
16 Q. And there was some testimony with Mr. Thaler
17 earlier today that the steps that TDCJ is focusing on
18 is to mitigate the effects of the heat, not to
19 actively bring down the temperature. Would you say
20 that's a fair assessment?
21 A. That was the discussion earlier with
22 Mr. Thaler, yes.
23 Q. And you would -- you would agree that that's
24 an accurate description of the agency's --
25 A. I would agree with what is an accurate?

---

59

1 Q. That the agency is concentrating on
2 mitigating the effects versus actually bringing down
3 the temperature?
4 A. I agree.
5 Q. You would agree with that? Okay.
6     For the facilities we just talked about
7 where there is a medical reason for having air
8 conditioning, like for the Montford Unit to -- because
9 it's an inpatient psychiatric facility, do you know
10 how the decision was made to air condition those
11 facilities?
12 A. No, sir.
13 Q. Do you know if the medical providers, UTMB
14 or Texas Tech, were involved in those decisions?
15 A. No, sir.
16 Q. Do you know if it's medically necessary to
17 air condition the inpatient psychiatric facilities?
18 A. That would be a medical decision. I'm not
19 able to make that.
20 Q. Okay. Would it be your assumption that
21 because that appears to be a medical decision, that
22 UTMB or Texas Tech would have been involved in those
23 decisions?
24     MS. COOGAN: Objection. Calls for
25 speculation.

---

60

1 A. I don't remember if they were even around in
2 the '90s when the units were constructed or designed.
3 At some point, we -- we didn't have the universities
4 providing the medical, so I can't answer that one.
5 Q. (BY MR. MEDLOCK) Okay. I'm going to show
6 you Exhibit 51 --
7 A. Yes, sir.
8 Q. -- Mr. Stephens. That's the inclement
9 weather security memorandum that we talked about with
10 Mr. Thaler earlier today.
11     Do you recognize that?
12 A. Yes, sir.
13 Q. Are you familiar with that document?
14 A. Yes, sir.
15 Q. There was a question about the -- I believe
16 the language the memorandum used --
17 A. Back real quick?
18 Q. Yeah. The policy or the -- is this a
19 policy? Can I fairly call it that?
20 A. That is a security memorandum, yes, sir.
21 Q. Okay. The security memorandum defines
22 inclement weather to include temperatures,
23 parentheses, hot or cold. Do you see that?
24 A. I see that.
25 Q. Do you know at what point a temperature

---

APPENDIX95

Stephen McCollum, et al. v.                    William L. Stephens
Brad Livingston, et al.                        October 18, 2013



---

61

1 becomes hot or cold?

2    A.  No, sir.

3    Q.  So you couldn't say, like this applies when

4 the temperature is over 90 or below 40 or --

5    A.  No, sir.

6    Q.  Okay.  Do you have any opinion about when

7 specifically that policy should kick in when the

8 temperature is hot?

9    A.  No, sir -- excuse me.  No, sir.

10        And if you don't mind, I would like to

11 say that through my 32 years in the agency as a

12 correctional officer, as a mid-level supervisor, as an

13 assistant warden, a warden, a major, regional

14 director, that recreation, as this policy pertains to,

15 I can't remember any time that I shut down recreation

16 because of heat.  Now, what I've done is gone out

17 there and limited their activities, the strenuous

18 activities of them and tell them, no basketball, or

19 whatever.  I certainly support any out-of-cell

20 activity that we can give the offenders.  I was

21 fortunate, the units I worked on, there were covered

22 recreation areas, and I would encourage the inmates

23 to -- just to walk, get around, and stay up under

24 there.

25        MR. MEDLOCK:  I'll object to the

---

62

1 nonresponsive portion of that answer, but thank you

2 for that.

3    Q.  (BY MR. MEDLOCK)  Do you know if there are

4 some warden -- was that a decision that you made as

5 the warden at those facilities?

6    A.  Right.  I believe that was my discretion

7 within that policy.

8    Q.  Okay.  So there might be some other wardens

9 that would say, if the temperature is above 90, I'm

10 not letting guys go to outside rec.  Is that right?

11    A.  I'm not aware of any.

12    Q.  Okay.  What about if the temperature were

13 above a hundred?

14    A.  I'm not aware of any.

15    Q.  Over 110?

16    A.  Again, I'm not aware of any.

17    Q.  Okay.  You don't -- is that something that

18 you would be aware of as the Correctional Institutions

19 Division director?

20    A.  Only if there were some complaints that they

21 didn't run recreation today.  You know, you get those

22 complaints every so often.  But I can't recall or

23 remember any -- that there was any complaints because

24 we closed the rec yard because it was too hot.

25    Q.  Okay.  That's a -- another thing I wanted to

---

63

1 ask you about that.  That policy -- that policy

2 doesn't address anything to be done in the housing

3 areas.  That policy --

4    A.  It mentions day rooms in here, and the day

5 rooms are in the housing areas.

6    Q.  What does it say about the day rooms?

7    A.  It just -- let me see.  When it defines a

8 recreational facility, it lists day rooms.

9    Q.  Why would it list day rooms in the same way

10 that it talks about outdoor recreation?

11    A.  I'm not sure, other than, as an agency, we

12 identify those areas as recreational facilities

13 throughout, because the offender is allowed some

14 out-of-cell activity, and while they're in the day

15 room there are some activities that take place that

16 fall up under recreation, such as playing board games,

17 watching TV, and some of those things that happen in

18 the day room.

19    Q.  Let's talk about the medical

20 providers at the prisons.  The medical provider at the

21 Hutchins Unit was the University of Texas Medical

22 Branch.  Is that right?

23    A.  That's correct.

24    Q.  And UTMB, at the least at the Hutchins Unit,

25 is responsible for ensuring that the prisoners'

---

64

1 medical needs are attended to.  Is that fair?

2    A.  That is correct.

3    Q.  Now, if UTMB made housing recommendations

4 for a prisoner, would TDCJ follow those

5 recommendations?

6    A.  Yes, sir.

7    Q.  Now, we talked earlier with Mr. Thaler about

8 the hours that the medical care is available at the

9 Hutchins Unit.  Do you recall that?

10    A.  No, sir, I don't recall that part of it.

11    Q.  Okay.  You would -- it's my understanding

12 that there is medical staff at the Hutchins Unit from

13 9:00 a.m. to 6:00 p.m.  Is that right?  To the best of

14 your knowledge?

15    A.  The best of my knowledge, yes.

16    Q.  That sounds fair?

17    A.  Yes, sir, that sounds fair.

18    Q.  Okay.  Do you know if there had ever been

19 24-hour care at the Hutchins Unit?

20    A.  I do not know if there has ever been

21 24-hour.

22    Q.  Okay.  Do you know if there ever was 24-hour

23 care at the Gurney Unit?

24    A.  I do not know.

25    Q.  Okay.  What about at the Garza West Unit,



---

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**65**

1 was there ever 24-hour care there?

2     A. Garza -- which one?

3     Q. West?

4     A. Yes, it was.

5     Q. There was. Do you know when that ended?

6     A. When I -- no, sir, I don't. I just -- I go

7 back to my experience as an assistant warden at

8 Garza East, there was 24-hour medical at Garza West.

9     Q. And you -- I'm sorry, I know you told me

10 earlier. When were you at Garza West?

11     A. No, sir, I was at Garza East.

12     Q. You were at Garza East. My apologies.

13     A. It was in 1997 through 1998.

14     Q. And Garza East and Garza West are adjacent

15 to each other?

16     A. That's correct.

17     Q. Is there 24-hour medical care at the

18 Michael Unit?

19     A. Yes, there is.

20     Q. Is there 24-hour medical care at the

21 Hodge Unit?

22     A. It's -- you know, they're a complex,

23 Skyview, Hodge, and the medical staff is -- it's on

24 one campus or the other, I'm not sure which one. But,

25 yes, sir, there is.

---

**66**

1     Q. What do you mean when you say that it's a

2 complex?

3     A. Well, they're within the same perimeter

4 fence.

5     Q. So is that -- for a layman, would that be

6 like having two prisons in the same fence?

7     A. That would be fair.

8     Q. Okay.

9     A. Yes, sir.

10     Q. Do they have separate administrative

11 offices?

12     A. No, sir.

13     Q. They have one --

14     A. One warden, two assistant wardens, and two

15 majors. I assume that's what you're asking. They're

16 over Skyview Hodge.

17     Q. Okay. And what about the Huntsville Unit,

18 does it have 24-hour medical care?

19     A. I'm not sure.

20     Q. Okay. Do you know who was involved in the

21 decision to end 24-hour medical care at the Garza East

22 Unit?

23     A. No, sir.

24     Q. And --

25     A. You asked Garza East?

---

**67**

1     Q. Yes.

2     A. Okay. No, sir.

3     Q. That's the one you were at. Right?

4     A. Yes, sir, that's the one I was at.

5     Q. You don't know how it came to be that there

6 was no longer --

7     A. No, sir, I don't.

8     Q. Okay.

9        MR. MEDLOCK: We need a quick break to

10 switch videotapes.

11        THE VIDEOGRAPHER: We're off the record

12 at 6:07 p.m.

13        (RECESS.)

14        THE VIDEOGRAPHER: We're back on the

15 record at 6:19 p.m.

16     Q. (BY MR. MEDLOCK) Mr. Stephens, you said

17 there was an answer you wanted to clarify?

18     A. Right. The last question you asked me about

19 Garza East, you asked me when did they stop having

20 24-hour medical.

21     Q. Uh-huh.

22     A. I didn't remember them having 24-hour

23 medical. I remember, during my experience at

24 Garza East, if an inmate had a medical complaint or

25 problem, then we went over to Garza West with them.

---

**68**

1 Again, they worked as a complex.

2     Q. Okay. Much like the Skyview Hodge complex?

3     A. Yes.

4     Q. Okay. Thank you for that clarification,

5 Mr. Stephens.

6        I want to look back at Exhibit 50.

7 That's the 2011 version of the e-mail regarding heat

8 precautions. Is that right?

9     A. That's correct.

10     Q. Okay. Do you know -- and we talked about

11 how there were some changes made for the 2013 version

12 of that e-mail. Is that right?

13     A. That's correct.

14     Q. For the -- essentially, it's been the

15 testimony in this case, and tell me if you disagree,

16 that a version of that e-mail is sent out every year.

17 Is that right?

18     A. That's correct.

19     Q. And would you agree that there are small, if

20 any, changes made to that e-mail each year? Pre-2013?

21     A. I would agree. I would agree that there --

22 there has been small, if any, changes.

23     Q. How long have you been receiving a version

24 of that e-mail?

25     A. I don't know how far back they go. I really

---

18 (Pages 69-72)

Stephen McCollum, et al. v.                    William L. Stephens
Brad Livingston, et al.                          October 18, 2013

---

69

1  don't know. It seems like it was early 2000, but I'm
2  not sure.
3      Q. Okay. Safe to say, before 2007?
4      A. Yes, sir.
5      Q. Before 2004, is that safe?
6      A. I don't know.
7      Q. Okay. Do you remember any changes being
8  made to that e-mail prior to this year, prior to 2013?
9      A. I don't remember any, no, sir.
10     Q. Okay. We've talked about wellness checks
11  this afternoon. Can you tell me the difference
12  between a wellness check and just an officer
13  performing a count?
14     A. Right. An officer that's performing a count
15  is going through -- it depending upon which kind of
16  count. We do a head count, and then we do a roster
17  count, a bed book count. They go by different terms,
18  but they mean the same thing. An officer that --
19  going through the dorm, he may -- in a dormitory
20  environment, he may be able to stand in one area and
21  look over at the different bunks and count the
22  offenders standing in one location.
23         An officer that's doing a roster count
24  or a bed book count would actually physically look at
25  the inmate's ID card and try to identify him from

---

70

1  there.
2         And a wellness check would be the
3  officer actually going in a situation where inmates
4  are either confined to their cell or on their bunks,
5  actually go around and personally observe them a lot
6  closer than just standing in one general area of the
7  dorm and looking at everyone.
8      Q. So the officer, during a wellness check,
9  would actually come up to the inmates that he is
10  supposed to be doing the wellness check for?
11     A. Well, I would say, yes, in a case if they
12  may be laying on the bed. But if they're sitting in
13  the day room watching TV, you know, they may -- he
14  looks fine, he is not having any problems or issues.
15  It's just depending upon, I guess, the -- what is
16  going on in the inmate and his activities.
17     Q. So if the inmate had stayed in his bunk all
18  day, the officer would probably actually go up to the
19  bunk in the dormitory rather than just saying, oh, he
20  is out in the day room watching TV, he appears fine?
21     A. I would think so.
22     Q. Is that fair?
23     A. I would think so.
24     Q. Okay. And what does an officer look for
25  when they're performing a wellness check?

---

71

1      A. Signs of distress. I think, as the e-mail
2  said, they're showing signs that they may be
3  exhibiting stress issues and we refer them over to
4  medical, seek assistance for them.
5      Q. Should the officer try and talk to the
6  prisoner or --
7      A. I would hate that the officer would wake the
8  inmate up if he was sleeping and he was peaceful and
9  appeared to be not labored in his breathing, I would
10  hate that the officer would -- that old statement,
11  don't wake up a sleeping dog, you know. You just --
12  you try to go about your business.
13     Q. Say it's in the middle of the day and the
14  officer notices that this guy who is on the wellness
15  checklist has been in the bunk all day, would that --
16     A. Mr. Medlock, I've seen them guys sleep all
17  day. Them being in a bed in the middle of the day is
18  no unusual incident.
19     Q. If the officer who was supervising that
20  housing area had noticed, hey, this guy hasn't gotten
21  up at all all day, would then you expect an officer
22  doing a wellness check to maybe poke in in the middle
23  of the day and say, hey, are you all right?
24     A. I would think, if that officer had a concern
25  based upon what he saw, yes, he would need to check on

---

72

1  him. Yes, sir.
2      Q. Like if the -- how often are the wellness
3  checks performed?
4      A. Every 30 minutes, I believe.
5      Q. So if the officer had been on shift for six
6  hours and had not seen the guy -- had done the
7  wellness checks every 30 minutes but the guy is -- in
8  the middle of the day is still in the bunk, then maybe
9  the officer should --
10     A. Yeah. I would say that that officer is
11  responsible not just for supervising that one
12  offender, he is responsible for supervising -- I
13  believe there is 80 inmates in every dorm, and there
14  is four dorms there. I'm not sure about the total
15  number, but -- it may be a little less than that, but
16  not much. But he's got a lot of responsibilities and
17  duties to be checking on all the inmates.
18     Q. Sure. I'm just talking about the inmates
19  who he's supposed to be performing wellness checks
20  for.
21     A. Right.
22     Q. Does that seem reasonable, if somebody
23  hasn't been up out of their bunk all day in the middle
24  of the day, that maybe the officer should be a little
25  more aggressive with him when doing a wellness check?

---

APPENDIX98

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

73

1 And I don't mean aggressive like a --
2    A. Yeah, bad word there. Yes, sir, I believe
3 it's reasonable that they should -- they could check
4 on him.
5    Q. Just wake him up maybe, hey, are you doing
6 okay?
7    A. I believe that's a reasonable expectation,
8 yes, sir.
9    Q. Okay. We've had some discussion about -- we
10 were calling them respite areas with Mr. Thaler,
11 places where the inmates have an opportunity to go to
12 where it is air conditioned. Do you recall that?
13    A. Yes, sir.
14    Q. How are inmates informed about these
15 opportunities to go to one of these cooled-off areas?
16    A. There should be a posting on the bulletin
17 board in the dorm. If -- you know, again, if the
18 officer is witnessing stress or the inmate is having
19 some difficulty in the -- in his activities and all,
20 then should be allowed to go to that area.
21    Q. So the --
22    A. Request -- request permission from the
23 officer, or in some cases we may escort him to our
24 infirmary, wherever that may be.
25    Q. So the -- there would be either a posting in

---

74

1 the dorm on the bulletin board, or the officer, if
2 they noticed somebody looked in distress, they could
3 say, hey, do you need to go to cool off?
4    A. That is correct.
5    Q. Any other ways that an inmate would be
6 informed by TDCJ about that opportunity?
7    A. At this point, I can't recall any other way.
8    Q. How does a posting on the bulletin board get
9 approved?
10    A. The warden approves postings on the bulletin
11 board. Now, there is times, because of maybe a
12 systemic issue, the director or the division head,
13 because of the -- I guess, the wide significance of it
14 that would require it to be posted on the board.
15    Q. Generally, like a correctional officer, a
16 low level officer, couldn't just put something up on
17 the board, though. It should be approved by the
18 warden. Is that --
19    A. Generally, that doesn't happen. The warden
20 approves the posting on the bulletin board.
21    Q. And are copies of those postings kept
22 anywhere? Like if the warden said, we're going to put
23 this posting up about heat, would a copy of that go in
24 the file somewhere?
25    A. I -- my experience is that it's dependent

---

75

1 upon the posting. I will tell you that not all
2 postings go -- you know, the commissary will post
3 their list every so often of items that we're out of
4 stock and things, and those wouldn't be. But I guess
5 I would answer that, it's dependent upon the posting.
6    Q. Would a posting about protecting prisoners
7 from heat be something that a -- the warden should be
8 keeping?
9    A. I'm not sure that there is a requirement for
10 that posting to be filed somewhere. Again, based upon
11 my experience as being a warden and my operational
12 review sergeant on my unit, I had that individual
13 responsible for posting things on the day room, and
14 they would keep a copy of what they were posting. But
15 I can't tell you there is any clear guidelines out
16 there about what they should keep copies of and what
17 they should not.
18    Q. Okay. Take a look at Exhibit 52 for me,
19 Mr. Stephens.
20    A. Yes, sir.
21    Q. That's a letter that we talked about with
22 Mr. Thaler that has Mr. Livingston's signature on it
23 to Representative Sylvester Turner. Does that look --
24 is that right?
25    A. That's correct.

---

76

1    Q. Were you involved in the drafting of this
2 letter?
3    A. I don't remember being involved in this
4 drafting.
5    Q. Do you know -- before today, had you ever
6 seen a copy of that letter?
7    A. No, sir. And I will say that up until
8 getting the job that I have now, I don't think I ever
9 drafted a letter for Mr. Livingston.
10    Q. Okay. Is that something you do in your
11 current position?
12    A. I've done one.
13    Q. What was that about?
14    A. It was -- it was a response to a family
15 member, and I think I did such a bad job they won't
16 ask me again.
17    Q. That's a good way to get out of things in
18 the future.
19    A. Well, it wasn't on purpose. I tried.
20    Q. All right. Let's talk about these directors
21 meetings.
22    A. Sure.
23    Q. You are looking at Exhibit 53. That's the
24 meeting from July 2010. Is that right?
25    A. That's correct.

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX99

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**77**

1    Q.  Did you attend that meeting?
2    A.  I don't remember if I was there or not.  I
3  see my name up here as presenting some agenda topics.
4    Q.  Would that indicate to you that you probably
5  were at the meeting or --
6    A.  That would indicate that I was probably
7  there, yes, sir.
8    Q.  But you don't remember this meeting
9  specifically.  Is that fair?
10    A.  No, sir.
11    Q.  Okay.  I will refer you to page 469.  Do you
12  see where it says Heat Issues?
13    A.  I see that.
14    Q.  Do you see it says, make sure you are
15  covering in wardens meetings?
16    A.  Yes, sir.
17    Q.  Do you remember what was discussed there?
18    A.  No, sir.  I -- and, again, I don't know who
19  wrote this.  Whose handwriting this is.
20    Q.  Fair that's not your handwriting?
21    A.  That's fair.
22    Q.  Okay.  Do you remember if you presented on
23  this issue at this meeting?
24    A.  I -- no, I don't remember.  I would only
25  assume I did since it's part of my agenda topics on

**78**

1  the front page.
2    Q.  Okay.  Do you remember ever discussing heat
3  issues at directors meetings?
4    A.  Oh, yes, sir.
5    Q.  Okay.  I mean, when I say "discussing," I
6  mean you leading the discussion.
7    A.  Yes, sir.
8    Q.  Okay.  You've done that?
9    A.  Yes, sir.
10    Q.  You may well have done it in July of 2010?
11    A.  I may well have done it.
12    Q.  Okay.  And it looks like the note here says
13  to make sure you're covering in wardens meetings.  Is
14  the wardens meeting the meeting that the regional
15  director has with the wardens?
16    A.  That is right.  Just as Mr. Thaler said
17  before is, the typical practice is, after the CID
18  meeting, the regional directors go back in their
19  respective regions and conduct a meeting with all of
20  their wardens and their regional team.
21    Q.  And in July of 2010, you were the deputy
22  director of Prison and Jails Operations for the
23  Correctional Institutions Division.  Is that right?
24    A.  Yes, sir.
25    Q.  Tell me what the deputy director of Prison

**79**

1  and Jail Operations for the Correctional Institutions
2  Division --
3    A.  Well, I oversaw the regional directors in
4  the operations who oversaw the wardens, I had
5  responsibilities on the -- I guess, the security
6  operations of the units.  I was responsible for
7  security -- a separate office of security systems that
8  takes care of staffing and the technology, the camera
9  systems, our use of force equipment, our armories
10  equipment, as well as the canine coordinator who is
11  responsible for our tracking dogs, our narcotics dogs,
12  our search and rescue dogs, our canine dogs, as well
13  as over the field operations and field force
14  operations.
15    Q.  What is field force operations?
16    A.  That's -- you see the offenders work outside
17  in the gardens and doing the landscaping, you
18  probably -- if you have seen it before, the officers
19  typically are on horseback and the offender is doing
20  the work out there.  It's usually garden type work.
21    Q.  And you oversee that entire operation -- the
22  entire --
23    A.  There is a major that is assigned to that
24  security systems.  He is over -- he does all the
25  technical and the direct oversight of it.

**80**

1    Q.  And then you supervise the majors.  Is
2  that --
3    A.  Well, that major would actually report to
4  the warden of security systems, who reported directly
5  to me.
6    Q.  I see.  So you kind of, as your role as
7  regional director -- as deputy regional director, or
8  deputy director -- let me just start over.
9        Your role as deputy director of the
10  Prison and Jail Operations for the Correctional
11  Institutions Division, these were kind of the areas
12  that you were assigned to supervise within the total
13  operations of the correctional institutions?
14    A.  Within the Correctional Institutions
15  Division.
16    Q.  Okay.  The armories, we talked about that
17  with Mr. Thaler.  To your knowledge, are the armories
18  at all of the prisons in air conditioned parts of the
19  prison?
20    A.  I make that assumption.  All of the ones
21  that I've been associated with were.
22    Q.  The canine unit, you said that was the
23  tracking dogs?
24    A.  There is tracking dogs, then we have dogs
25  that are trained for narcotic detection, cell phone

---

Stephen McCollum, et al. v.                    William L. Stephens
Brad Livingston, et al.                         October 18, 2013

---

**81**

1  detection, and then there is some cadaver dogs, and
2  then there is search and rescue dogs.
3      Q.   Where are those dogs, where are -- where do
4  they live?
5      A.   There is different kennels throughout the
6  state. Not every unit will have one. I used to know
7  the number, I forgot the number, how many kennels
8  there were out there. They're usually attached to a
9  unit that has a work squad that works outside the
10  fence.
11           Now, the narcotic and the cell phone
12  detection dogs, they're assigned to the regional
13  offices. And within those kennels there is
14  probably -- we only have about five or six cadaver
15  dogs in the whole agency, and they work and train
16  those.
17      Q.   So there might be like a kennel at, say, the
18  Michael Unit?
19      A.   Michael does not have a kennel, but the unit
20  next to it, the Coffield Unit does.
21      Q.   Okay. So there is a kennel at the Coffield
22  Unit, there is a kennel at some other units?
23      A.   Yes, sir.
24      Q.   Are those kennels climate controlled in any
25  way?

---

**82**

1      A.   No, sir.
2           I take that back. There is a heater in
3  them. I mean, we do have heaters in them.
4      Q.   There is heat, but nothing --
5      A.   Yes, sir.
6      Q.   Nothing for -- strike that.
7           There is something to deal with -- to
8  abate the cold for the dogs, but nothing to abate the
9  heat. Is that fair?
10      A.   That's fair.
11      Q.   Okay. I apologize for that digression.
12  Let's go back to Exhibit 53.
13      A.   Sure.
14      Q.   Back to page 469. Do you recall that
15  discussion about medical after-hours coverage?
16      A.   Not the specific meeting, no, sir. I can't
17  tell you I remember the specific meeting. That
18  happened three years ago, or over three years ago.
19      Q.   Okay. You see where it says, use 911 where
20  needed?
21      A.   Yes, sir.
22      Q.   Would that be consistent with what we talked
23  about earlier that if there was some sort of an
24  emergency and there was no medical staff on the unit,
25  someone should call 911?

---

**83**

1      A.   Yes, sir.
2      Q.   And that's something that was communicated
3  to the regional directors at least as early as
4  July 2010?
5      A.   According to this, yes, sir.
6      Q.   Okay. Let's look at Exhibit 54. That's
7  the -- Exhibit 54 is the August 2010 regional
8  directors minutes. Is that correct?
9      A.   What's the date, sir?
10      Q.   August 12, 2010.
11      A.   Yes, sir, that's correct.
12      Q.   Okay. And it looks like you discussed heat
13  precautions at that meeting. Is that correct?
14      A.   That's correct.
15      Q.   And there was a handout?
16      A.   That's what it says, yes, sir.
17      Q.   Do you remember what was in that handout?
18      A.   No, not at all.
19      Q.   Do you remember if you prepared that
20  handout?
21      A.   No, sir.
22      Q.   Typically, if there was a handout for your
23  portion of the presentation, would you prepare that?
24      A.   Somebody may have prepared it and handed it
25  to me as just general information that they're trying

---

**84**

1  to get out to the field. I can't say I prepare all of
2  them, no, sir.
3      Q.   Okay. Are there some of them that you
4  prepare?
5      A.   I would have to say, some I have prepared,
6  yes, sir.
7      Q.   Okay. But you don't remember if this
8  particular one was one that you prepared or not?
9      A.   No, sir.
10      Q.   You don't remember who may have prepared it
11  for you?
12      A.   No. And I don't remember what the handout
13  was about.
14      Q.   When a handout like that is distributed at a
15  directors meeting, are copies of that kept anywhere?
16      A.   I'm not aware that they are. I'm not aware
17  of the structure where you keep the handout copies,
18  no, sir.
19      Q.   Do you know how the notes are kept at these
20  meetings?
21      A.   I don't know who kept the notes. I know
22  individuals keep their own notes that are present at
23  the meeting.
24      Q.   Do you keep your own notes?
25      A.   Not typically, because I'm a presenter.

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX101

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

85

1 And -- there were notes that I kept, if Mr. Thaler was
2 presenting something that he hasn't already discussed
3 or whatever, but it was very seldom that I took notes
4 at a -- at a directors meeting.
5    Q. Do you keep your notes when you do take
6 notes?
7    A. For -- I guess I do for a while, on a
8 notebook somewhere.
9    Q. Do you retain those notebooks or do you --
10    A. No, sir. Usually once the notebook is full,
11 I just throw it away.
12    Q. You toss it --
13    A. I don't keep the notebooks.
14    Q. Okay.
15    A. I use it as a quick reference to go back and
16 check off things as I've accomplished them.
17    Q. Okay. Let's go to page 473 in Exhibit 54.
18 Do you see item five, After Hours On-Call System?
19    A. Yes, sir.
20    Q. Do you see where it says, 296 unit UTMB
21 personnel laid off?
22    A. Yes, sir.
23    Q. What do you remember about that?
24    A. I remember 296 UTMB personnel laid off, just
25 based on what I'm reading here today.

---

86

1    Q. Do you remember, was there any discussion
2 about which facilities they worked at or how that
3 would affect the agency's ability to provide health
4 care to prisoners?
5    A. Doctor Linthicum presented it. I don't
6 remember. It appears Doctor Linthicum, based upon
7 this information here. But, no, sir, I don't remember
8 if -- what the handout consisted of. It shows that
9 there was a handout.
10    Q. But you don't remember any of that
11 discussion?
12    A. No. I do remember the event. I mean, that
13 was a significant event, you lay that many staff
14 members off that -- so I do remember that event. And
15 I do remember that there was discussions, whether it
16 was this meeting or other meetings, about the
17 modifications of medical hours on the units.
18    Q. How was that presented to you at these
19 meetings? Was it present as like, this is what is
20 going to happen, or was there discussion about how to
21 effectuate that change?
22    A. Effectuate?
23    Q. How that make that change?
24    A. Oh. No, sir. It was, here is what is
25 happening.

---

87

1    Q. Who -- do you know who made that decision?
2    A. No, sir, I do not.
3    Q. Do you know who made the decisions about,
4 you know, where these employees' jobs are going to be
5 taken away from? Like are they going to be -- are we
6 going to lose "X" many employees at the Michael Unit
7 or "Y" many at the Hutchins Unit?
8    A. Could you repeat your question, please?
9    Q. Yeah. Was there any discussion about kind
10 of how those layoffs were going to affect the ability
11 to provide medical care at specific units? Like were
12 some units going to lose more UTMB employees than
13 others or was there any discussion about that?
14    A. I remember a discussion about it, yes.
15    Q. What do you remember about it?
16    A. I just remember, just like you said, that
17 there was discussion about, this unit will lose this
18 many and this unit will go -- the modified hours of
19 their clinics. I remember that.
20    Q. And was that something that you gave -- the
21 people at this meeting gave input on, or was this just
22 something Doctor Linthicum said, you know, this is
23 what's going to happen?
24    A. Yeah. It was already decided that here is
25 what's going to happen. And then we, as CID, we work

---

88

1 operations from that.
2    Q. So you were just kind of informed, this is
3 what --
4    A. Yes, sir.
5    Q. Okay. Do you know who made those decisions?
6    A. No, sir.
7    Q. Would you -- as someone who is pretty high
8 up in the hierarchy at TDCJ, would you assume that
9 this decision was one that was made above your role in
10 the hierarchy?
11    A. Well, I assume this decision was made by
12 the -- the division that is over the -- the medical
13 care on the unit, and that would have been health
14 services.
15    Q. Okay. So that's something we might need to
16 ask Doctor Linthicum about?
17    A. Someone in health services, yes, sir.
18    Q. Okay. Do you remember -- it says, one LVN
19 and CMA after hours on call. Do you see that?
20    A. Yes, sir.
21    Q. Do you -- I assume LVN is licensed
22 vocational nurse?
23    A. Right.
24    Q. What is a CMA?
25    A. I have no idea.

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX102

23 (Pages 89-92)

Stephen McCollum, et al. v.          William L. Stephens
Brad Livingston, et al.               October 18, 2013

---

89

1  Q.  Okay.  It says -- what does that mean, on
2 call.
3  **A.  What does "on call" mean?**
4  Q.  Yeah.
5  **A.  I assume someone is on call, as -- you're**
6  **not there, but you're taking the calls.**
7  Q.  Okay.  So that would be someone they could
8 contact but wasn't actually at the facility?
9  **A.  I agree with that.**
10  Q.  Okay.  And, again, here it says that after
11 hours, someone should call 911.  Is that --
12  **A.  That's what it says.  After that, call 911.**
13  Q.  Okay.  And it says, after hours contact
14 medical hub.  What is a medical hub?
15  **A.  They use the hub where -- there is clustered**
16  **units I mentioned before, like a -- at Huntsville Unit**
17  **they have five units inside Huntsville.**
18  Q.  Uh-huh.
19  **A.  If a unit doesn't have medical on-site, then**
20  **they'll use a hub system and you call a -- whatever --**
21  **in the Huntsville area it would be the Estelle Unit,**
22  **that's the hub.**
23  Q.  Okay.
24  **A.  And that's basically what that term means.**
25  Q.  There would be a group of prisons and one

---

90

1 has a medical facility and the others don't?
2  **A.  Well, they have medical personnel on the**
3  **unit.**
4  Q.  But they don't -- they might not have
5 24-hour care?
6  **A.  That's correct.**
7  Q.  Okay.  And then it says, contact provider
8 from list provided.  What does that mean?
9  **A.  Where do you see that at?  I'm sorry.**
10  Q.  It says, contact medical hub.  If
11 unavailable, contact provider from list provided.
12  **A.  Yeah, it does say that.  I don't know.**
13  Q.  You don't know what that means?
14  **A.  No, sir.**
15  Q.  Okay.  And on number seven, Heat
16 Precautions?
17  **A.  Yes, sir.**
18  Q.  What did you mean -- it says, share with
19 warden to watch for issues.
20     Is that what you presented?
21  **A.  It appears that way.**
22  Q.  What did you mean by that?
23  **A.  Wow.  Watch for offender issues, offenders**
24  **that are showing signs of being susceptible to the**
25  **heat.**

---

91

1  Q.  And how would the wardens know to -- what
2 signs would they be watching for?
3  **A.  Well, I believe right before that, in the**
4  **month of April and May, we did their annual training**
5  **on heat stress and heat precautions, and in that**
6  **training that's provided.**
7  Q.  And that would be --
8  **A.  But, again, I didn't write this, so I don't**
9  **know how detailed I was in that day.  I mean, whoever**
10  **wrote this used the word "issues."**
11  Q.  You could have been more detailed --
12  **A.  I could have been more, could have been**
13  **less.**
14  Q.  Fair enough.  But you would expect them to
15 rely on the training that they had previously received
16 to identify those issues?
17  **A.  I agree.**
18  Q.  Okay.  Take a look at page 482.
19  **A.  Yes, sir.**
20  Q.  You see it's got some names listed there in
21 the middle the page.  Eileen Kennedy,
22 Rick Vogelgesang?
23  **A.  Vogelgesang.**
24  Q.  Vogelgesang?
25  **A.  Yes, sir.**

---

92

1  Q.  Do you know why those names are listed
2 there?
3  **A.  No, sir, I didn't write this.**
4  Q.  Do you know if it would be likely those
5 people attended that meeting?
6  **A.  No, sir.  I can't comment on it.**
7  Q.  Let's look at Exhibit 55.
8  **A.  Yes, sir.**
9  Q.  Is that the May 2011 agenda?
10  **A.  That's correct.**
11  Q.  Let's go to page 596.
12  **A.  Yes, sir.**
13  Q.  You see in the middle where it says Offender
14 Access To Medical Care?
15  **A.  Yes, sir.**
16  Q.  Have you read that -- the blurb underneath
17 that?
18  **A.  Do you want me to read it out loud?**
19  Q.  You just -- you can read it to yourself.
20  **A.  Okay.**
21    **Okay, sir.**
22  Q.  Do you recall this discussion at this
23 meeting?
24  **A.  No, I do not.**
25  Q.  Okay.  This says -- it says, security left

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
b339ddc5-72c1-4350-a49e-946a9deb2499

APPENDIX103

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

93

1 offender unresponsive six H.  Do you think that would
2 mean six hours?
3    A.  My assumption it means that, yes, sir.
4 Again, I didn't write it, so I don't know what the
5 notes tell us.
6    Q.  And then it says, security make medical do
7 it, exclamation point.
8        Do you see that?
9    A.  Yes, sir, I do.
10   Q.  What does, security make medical do it,
11 exclamation point, in this context, mean to you?
12   A.  It means they were really stressing it with
13 the exclamation mark.
14   Q.  But what does -- leaving aside the
15 exclamation mark, what does that -- "security make
16 medical do it"?
17   A.  I don't know.  Do what, I don't know.
18   Q.  Okay.  Do you think that could mean security
19 should make sure that medical comes and attends to
20 this inmate?
21   A.  I think that's a fair assumption, yes, sir.
22   Q.  Okay.  Can you think of any other context
23 that would make sense in?
24   A.  No.
25   Q.  Okay.

---

94

1    A.  It's telling me that -- or we're doing
2 something for medical that medical ought to be doing.
3 I don't know.  I didn't write it, again.
4    Q.  That seems fair.  In either case, it would
5 seem that -- it also says, TDCJ, UTMB both dropped
6 ball.  Do you see that?
7    A.  Yes, sir.
8    Q.  You would agree that both TDCJ and UTMB
9 would have a responsibility to make sure a prisoner
10 gets medical care?
11   A.  Access to medical, yes, sir.
12   Q.  Okay.  And that if indeed a prisoner was
13 left unresponsive for six hours, that would be the
14 fault of TDCJ and UTMB?
15       MS. COOGAN:  Objection.  Calls for
16 speculation.
17   A.  I assume this inmate they're referencing was
18 in some sort of medical distress.  I assume that,
19 based upon the context of this, so I agree with you.
20   Q.  (BY MR. MEDLOCK)  And the reason why both
21 TDCJ and UTMB have responsibility to ensure access to
22 medical care is because the officers, the security
23 staff need to make sure that the prisoner has the
24 ability to get to where the medical staff are.
25   A.  I agree.

---

95

1    Q.  Is that fair?
2    A.  Yes, sir.
3    Q.  Or that the security staff need to inform
4 the medical staff, this guy is unresponsive, we need
5 somebody to come check him out.
6    A.  I agree.
7    Q.  That's also fair?
8    A.  Yes, sir.
9    Q.  So it would be -- and then there would be
10 areas where both TDCJ and UTMB would have
11 responsibility, like making sure someone got a medical
12 exam that they needed.  Is that fair?
13   A.  Say that again, please.
14   Q.  If a -- like --
15   A.  If we're not talking about quality of
16 care --
17   Q.  Correct.
18   A.  -- we're just talking about access to care,
19 yes, sir, I agree.
20   Q.  Okay.  So you would agree like when the
21 prisoners get off the bus at a transfer facility
22 coming into the system, that TDCJ and UTMB would have
23 some responsibility to make sure that the prisoner is
24 initially triaged?
25   A.  I believe TDCJ has a responsibility to have

---

96

1 that in their policy, that the offender is initially
2 triaged.
3    Q.  And would you believe that TDCJ should
4 ensure that a prisoner gets an initial intake
5 physical, too?
6    A.  I believe that TDCJ should provide that
7 offender access to that medical provider, yes, sir.
8    Q.  Okay.  Whether the prisoner participates in
9 the intake physical or not, you have to make sure that
10 he has the opportunity to get there?
11   A.  You get in the case sometimes where they
12 actually refuse, I'm not going to go see the nurse.
13 So, you know, we have protocols in place, so
14 every time, no, I can't tell you that we have that
15 obligation.  They have the opportunity to refuse.
16   Q.  Right.  They have the opportunity to go get
17 the medical evaluation?
18   A.  Sure.
19   Q.  Or get the intake physical?
20   A.  Yes, sir.
21   Q.  Okay.  And you would agree that in a --
22 would you agree that that is ultimately the warden's
23 responsibility to ensure that there is access to
24 medical care?
25   A.  Access to care, yes, sir, I believe the

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX104

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**97**

1 warden should be involved in that. I don't know about
2 that statement, though. I don't know if this was --
3 the whole deal was the ultimate responsibility of the
4 warden or -- I'm not sure what --
5    Q.   Sure.  But as a general matter, you would
6 agree that whether or not it was the warden's
7 responsibility in this specific situation, that
8 generally --
9    A.   I believe the warden should have processes
10 in place to provide that offender access to medical
11 care.
12    Q.   Let's go to page 603.
13    A.   Page two -- three.
14    Q.   You see at the top there where it says Heat
15 Precautions, and then says PAT Test?
16    A.   I do.
17    Q.   Do you remember if this officer who died
18 during the PAT test had anything to do with the
19 temperatures?
20    A.   No, sir, I do not.  I believe it was a -- I
21 believe this officer was taking the PAT test, and as
22 y'all were asking Mr. Thaler earlier, I felt real bad
23 because I can't remember his name.  But I do remember
24 he was taking the physical agility test and had a
25 heart attack during the process of taking the test.

---

**98**

1    Q.   Do you remember like what month of the year
2 that happened?
3    A.   That -- it's dated up here May, so I'm
4 assuming it happened sometime before May.  And I'm
5 just assuming that this was a necessary -- so I'm
6 thinking April or March, but I'm not sure.  I'm not
7 sure.
8    Q.   And is it -- it's your recollection, like
9 Mr. Thaler, that there is nothing that heat and this
10 officer's death have to do with each other, other than
11 they happen to be on this page next to each other?
12    A.   Yeah.  I think that's two separate topics.
13    Q.   Okay.  Let's look at Number 56.  This is the
14 July 14, 2011 directors minutes.  Is that right?
15    A.   Yes, sir, it is.
16    Q.   And let's look at page 618.
17    A.   Yes, sir.
18    Q.   Do you see where it EAC Update?
19    A.   Yes, sir.
20    Q.   You see where it says, incidents have
21 increased with hot weather?
22    A.   Yes, sir.
23    Q.   Is that typically true during the summer,
24 that EAC incidents go up?
25    A.   EAC incidents?

---

**99**

1    Q.   Things that are reported to the -- that EAC
2 reports would be generated for?
3    A.   All of the different reports?
4    Q.   Sure.
5    A.   I don't know if they raise in the summer or
6 not.  I don't know if, you know, when you look at the
7 totality of all the EAC reports, if there is actually
8 more that occur in the summer than the winter.  I
9 haven't studied it that close.
10    Q.   You've never looked at like a bar graph that
11 shows --
12    A.   Right.  I've seen many and didn't pay
13 attention to whether it was more total incidents in
14 the summer than more -- than in the winter.
15    Q.   Okay.  Do you know if there would be anyone
16 who would know that?
17    A.   Well, I assume the EAC, if we looked at
18 their reports, it may show that.  I mean, if you're
19 just trying to determine, are there more incidents in
20 the summer months than in the winter months, they
21 would have that data.
22    Q.   And that would be --
23    A.   Emergency Action Center.
24    Q.   The name here is Kathy Cleere, would she
25 be --

---

**100**

1    A.   She's retired.
2    Q.   She's retired.  Who is in her position now?
3    A.   The person that I would tell you to -- if
4 you're trying to find someone to go to would be in
5 Executive Services.  It would be Karen Hall.
6    Q.   Hall, like you walk down a hall, H-a-l-l?
7    A.   Yes, sir.
8    Q.   And it says here that there were ten
9 offender, 20 employee heat-related issues as of
10 July 2011.  I assume that's for that calendar year.
11 Does that seem fair?
12    A.   Again, that's an assumption.  I don't know
13 if that's ten to 20 in the last two months, ten or 20
14 in the last month, in the last week, I don't know
15 that.
16    Q.   Okay.  Do those numbers concern you that
17 there would be ten offender and 20 employee
18 heat-related issues?
19    A.   Well, certainly I think that heightens
20 everyone's awareness, that, they, this is amongst us,
21 this is real.  Let's make sure that we're training our
22 staff, make sure we're keeping this at the forefront
23 of our activities.
24    Q.   Do you know how serious a heat-related issue
25 needs to be to show up on an EAC report?

---

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

101

1    A.  I'm sorry.  I don't.
2    Q.  Like somebody might have like a headache
3  from it being too hot, but I assume something like
4  that would not get reported on an EAC report?
5    A.  If they reported it, they may.  It may if
6  they got medical care or something on the unit.  I'm
7  not sure.  I'm sorry.  I would have to look that up
8  and -- and research that.
9    Q.  If somebody went to the hospital, that would
10 almost certainly be on an EAC report?
11   A.  Oh, yes.  And they were provided some
12 medical care.
13   Q.  Would that be any medical care, like if they
14 got an aspirin for a headache or if they went to the
15 hospital or -- anything in between?
16   A.  It could be in between, when you talking
17 about offenders and employees.
18   Q.  Okay.  For employees do you know -- do you
19 know anything about workers' compensation claims that
20 are made against the agency related to heat?
21   A.  I don't understand your question.  There is
22 different processes in workers' compensation, so I
23 don't know.
24   Q.  If an employee has a -- an injury that is
25 determined to be heat related and they file a workers'

102

1  compensation claim, is that something that you would
2  review or --
3    A.  As a warden, I would have reviewed it.  As a
4  supervisor, I would have reviewed it.  But I don't
5  review them today in --
6    Q.  Okay.
7    A.  It's been a while since I reviewed a
8  workers' compensation report.
9    Q.  Do you remember ever reviewing, when you
10 were a warden or a supervisor, workers' comp claims
11 related to heat?
12   A.  Specifically related to heat, no.  I know
13 that the ARRM Division, Administrative Review and Risk
14 Management puts out some reports.  I do not remember
15 if they are specifically broke down heat related.
16   Q.  But they -- so the Risk Management Division
17 puts out a report about workers' comp --
18   A.  I believe that's who would have that report,
19 yes, sir.
20   Q.  See page 623?
21   A.  Yes, sir.
22   Q.  It says Heat Precautions.  Take measures
23 fluids.  Stress at meetings.
24   A.  Yes, sir.
25   Q.  Was there anything you recall about that

103

1  discussion?
2    A.  No, sir.
3    Q.  Okay.  I've handed you Exhibit 57.
4    A.  Yes, sir.
5    Q.  Is that the August 2011 regional directors
6  meeting --
7    A.  Yes, sir.
8    Q.  -- minutes?
9        Let's start with page 630.
10   A.  Yes, sir.
11   Q.  You see where it says Opening Remarks at the
12 top?
13   A.  Yes, sir.
14   Q.  And it says, Heat, take precautions slash
15 monitor?
16   A.  Yes, sir.
17   Q.  And it appears -- do you remember if
18 Mr. Thaler gave those remarks?
19   A.  No, sir.  I'm making that assumption, his
20 name is by there, but that's all that is is an
21 assumption.
22   Q.  You don't remember anyone else making those
23 remarks?
24   A.  Well, I'd better look through the whole
25 report.  Are you talking about during this moment,

104

1  this moment in the report?
2    Q.  Right.
3    A.  No, sir, I don't remember.
4    Q.  Okay.  Let's go to page 634.  There it says
5  Heat, and it says, Stephens, next to it.
6    A.  Yes, sir.
7    Q.  Do you see that?
8    A.  Yes, sir.
9    Q.  Does that mean you likely made those
10 remarks?
11   A.  Yes, sir.
12   Q.  Since the -- where it's says Heat and the
13 Stephens is handwritten, does that make it more or
14 less likely that you actually would have been there
15 and made those remarks?
16   A.  I would say it would be more likely that I
17 made those remarks.
18   Q.  Do you recall making those remarks at the --
19   A.  No, sir.
20   Q.  -- at the August 2011 meeting?
21   A.  No, sir.  I wish there was more information
22 there so it would jog my memory, but I don't.  We
23 obviously had someone turn some water off to a cell
24 somewhere and I was trying to make a point to them.
25   Q.  Because they -- especially during the

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX106

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**105**

1  summer, that shouldn't be done?
2      A.  Well, any time, you know, when -- at times
3  inmates will flood -- we call it flood the run and
4  create a disturbance and stuff.  But I don't know what
5  was going on right here.
6      Q.  In any case, whatever was going on, you
7  would agree that they shouldn't -- officers shouldn't
8  be turning off the water in the cells?
9      A.  Yeah.  It's not something that -- and we
10  have some processes in place.  There is actually a
11  policy on interruption of the water service.  But we
12  still have to pass out water to the offender.  If we
13  have to turn his toilet water off, we need to provide
14  him some water.
15      Q.  And that's because for all of the reasons
16  we've talked about today, that it's important to stay
17  hydrated, especially during periods where the
18  temperature is high?
19      A.  Yes, sir.
20      Q.  You would agree that it would be
21  inappropriate for an officer to turn off the water to
22  punish an inmate for doing something like flooding the
23  run?
24      A.  To punish an inmate?  Yes, sir, I agree that
25  officers aren't there to punish inmates.

---

**106**

1      Q.  They're just there to keep everybody safe
2  and secure and to do their job professionally?
3      A.  Yeah.  I would give you a story.  When I was
4  at Montford, we did have to turn the water off in the
5  cell because these guys would drink themselves
6  intoxicated with the water.  I mean, there are certain
7  circumstances in -- whether it -- you know, if it
8  created a disturbance issue, that you have to, but we
9  still provide them some drinking water.
10      Q.  And in that situation, did you consult with
11  medical before doing that?
12      A.  Oh, absolutely.  At the Montford Unit when I
13  was there, yes, sir.
14      Q.  Let's go to page 639, Mr. Stephens?
15      A.  Yes, sir.
16      Q.  You see where it says, UTMB eight-hour
17  facilities?
18      A.  Yes, sir.
19      Q.  Do you remember what the discussion here was
20  about?
21      A.  No, sir, I don't.
22      Q.  Does looking at the list of facilities jog
23  your memory any?
24      A.  No, sir.
25      Q.  And you don't -- I assume you don't remember

---

**107**

1  the handout that looks like it was distributed there?
2      A.  No, sir, I don't.
3      Q.  Let's go to page 642.
4      A.  Okay.
5      Q.  You see there it says Heat Precautions?
6      A.  Yes, sir.
7      Q.  It says, make sure every warden is directly
8  involved?
9      A.  I do.
10      Q.  Is that because the warden is the one
11  ultimately responsible at the prisons for making sure
12  the heat precautions take place?
13      A.  I believe that's because that's who
14  Mr. Thaler is holding ultimately responsible.
15      Q.  Would you also hold the warden --
16      A.  Oh, absolutely.  I'm just -- it looks like
17  he presented the topic is the reason I'm saying it.
18      Q.  I see.  Because the page says Mr. Thaler's
19  Agenda at the top?
20      A.  Yes, sir.
21      Q.  Would that lead you to believe that
22  Mr. Thaler was actually there and presented as opposed
23  to having you present for him?
24      A.  I would say so.  He has got an agenda there.
25      Q.  Do you remember -- it says here, coordinate

---

**108**

1  with health services for offenders who are at higher
2  risk, especially on psychiatric medication.
3          Do you see that?
4      A.  No, sir.  Where are we at?
5      Q.  On page 642.
6      A.  Yes, sir.
7      Q.  Under Action Items For Heat Precautions?
8      A.  Coordinator -- oh, okay.  I see it.
9      Q.  Do you see that?  Do you remember what the
10  discussion was about?
11      A.  No.  And, again, I didn't write this, so I
12  don't know if they're paraphrasing there.
13      Q.  Does that seem consistent with what we've
14  talked about earlier today with making wellness checks
15  and --
16      A.  Oh, I agree.  It's just consistent with it,
17  yes, sir.
18      Q.  That it seems like this might be one of the
19  times that this was first discussed.  Is that fair?
20      A.  One of the first times?
21      Q.  Well, the idea to coordinate with medical to
22  make a list to do the wellness checks?
23      A.  It doesn't mention wellness checks there.
24      Q.  Sure.  But it says you should coordinate
25  with health -- what does it mean to you that it says,

---

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

**109**

1  coordinate health services?
2   A.  Yeah. It doesn't say a list, but it
3  certainly tells me that you need to be coordinating
4  and those inmates that are at higher risk, make sure
5  you're coordinating and letting medical know about
6  them. But it could have been referencing a list, I
7  don't know.
8   Q.  You don't know what that was --
9   A.  No, sir.
10   Q.  Okay. And make referrals to health services
11  as needed. What does that mean to you?
12   A.  It means, get the monkey off your back. Put
13  the quality of care to medical. It means -- that
14  means access to care. That's what that means.
15   Q.  To make sure that prisoners who appear to
16  need medical attention for a heat issue get to
17  medical?
18   A.  That's correct.
19   Q.  And would you expect the officers to rely on
20  their training to determine when that type of referral
21  needed to be made?
22   A.  Yes, sir.
23   Q.  Then it looks like, at the bottom of the
24  page, there is a number six.
25   A.  I see it.

**110**

1   Q.  Do you see where it says, rotate staff
2  assignments --
3   A.  Yes, sir.
4   Q.  -- where heat is issue. What does that mean
5  to you?
6   A.  Keep a rotation if you have an officer --
7  and this -- it works well in some situations where you
8  have an officer that works in a control center that's
9  in a housing unit. Control center, they're allowed to
10  sit down, they're allowed to be comfortable where
11  they're out walking around and going in and out of
12  dorms and real active, and you try to rotate them out.
13  If you have an officer that's out there working on the
14  sidewalk, escorting inmates, you have an officer
15  that's working in administrative segregation, running
16  up and down the stairs all day long, you try to rotate
17  officers to difference positions that allow some
18  sedentary work.
19   Q.  And I assume here it's also talking about
20  where heat is an issue, to keep officers, like an
21  officer who is working in a housing area where it's
22  not air conditioned, maybe rotate them out with an
23  officer who is working in an air conditioned --
24   A.  That could be one, yes, sir.
25   Q.  Would that sound like a good idea to you?

**111**

1   A.  Yes, sir. That could be one.
2   Q.  And that's something you would do --
3   A.  When it's available.
4   Q.  Sure. That's something you would do to
5  protect the officer's health and safety from the heat?
6   A.  Sure.
7   Q.  Okay. And in here it says, any concerns
8  should be made known to administration. Do you see
9  that?
10   A.  Yes, sir.
11   Q.  What does that mean to you?
12   A.  I didn't write it. I'm sorry, I don't know
13  what that means. But Mr. Thaler was always
14  preaching -- I used the word preaching -- directing,
15  instructing the staff out in the field to let us know
16  if there is concerns and issues out there. So, you
17  know, we want to be a resource, we want to help them.
18   Q.  So would that mean that if -- you would
19  expect people actually working day to day at the
20  prisons to communicate up to the administration if
21  they were having heat-related issues?
22   A.  I wouldn't only say it if the people at the
23  institutions weren't in the meeting, this message was
24  getting out to the staff that was in the meetings.
25   Q.  Okay. So you would expect the regional

**112**

1  directors to communicate that down the chain of
2  command to report things like that back up?
3   A.  That is --
4   Q.  When there is a heat-related issue?
5   A.  Yes, sir.
6   Q.  If there were correctional officers who
7  testify they were discouraged from making heat-related
8  workers' compensation claims, what would you say to
9  that?
10   A.  I would say that that's -- that's not
11  appropriate, for one. I don't know who would
12  discourage them. But all employees have avenues on
13  how to report problems, complaints, grievances,
14  issues. I mean, those avenues are there.
15   Q.  Would one of those avenues be through their
16  union?
17   A.  Could they talk to a union representative?
18  Sure. They have that access.
19   Q.  Do you ever communicate with the union
20  representatives about concerns that employees have?
21   A.  Yes, sir.
22   Q.  Is heat ever a concern that --
23   A.  I can't remember any of the meetings I sat
24  in that heat was an issue, no, sir.
25   Q.  Okay. Let's move on to the March 2012. Do

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX108

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

113

1  you see that, Mr. Stephens?
2      **A. Yes, sir. 58?**
3      Q. Yes, Exhibit 58. Yes. If I could refer you
4  to page 649. The first page, I'm sorry.
5      **A. These start with seven.**
6      Q. 749.
7      **A. Okay. All right. 749.**
8      Q. It looks like you discuss security reviews
9  at this meeting and had a handout?
10     **A. Yes, sir.**
11     Q. And then on page 750, it looks like you --
12 excuse me. It looks like, on page 751, it indicates
13 you discussed heat preparations?
14     **A. Yes, sir.**
15     Q. Given that this is the March minutes, what
16 would it mean that you were discussing heat
17 preparations?
18     **A. Getting ready, preparing for the upcoming**
19 **summer months.**
20     Q. And what would that include?
21     **A. Make sure they have sufficient water**
22 **coolers, make sure the fans are in operational order,**
23 **make sure that we're starting to reemphasize training**
24 **and having an awareness out there in the field.**
25     Q. Anything else?

114

1      **A. I can't think of it right now.**
2      Q. Okay. You see page 754?
3      **A. Yes, sir.**
4      Q. Do you see where it says Heat-Related
5  Illness at the bottom?
6      **A. Yes, sir.**
7      Q. Do you see where it says, talk about every
8  month?
9      **A. Yes, sir.**
10     Q. Is that, again, part of emphasizing --
11     **A. I make that assumption, yes, sir. Based**
12 **upon -- I didn't write these notes either.**
13     Q. And you don't have any direct memory of this
14 meeting?
15     **A. No, sir.**
16     Q. You see page 757?
17     **A. Yes, sir.**
18     Q. You see on that first line all the way on
19 the right, it says, B. Livingston?
20     **A. I see that, yes, sir.**
21     Q. I assume that is Brad Livingston?
22     **A. Yes, sir.**
23     Q. Do you remember if he was at this meeting?
24     **A. I don't remember if he was at the meeting,**
25 **but my assumption is, based upon these notes, he**

115

1  probably was.
2      Q. How often does Mr. Livingston attend one of
3  these meetings?
4      **A. Not very often. He has been known to stick**
5  **his head in there, though, and if he -- I don't know.**
6  **Not often. I couldn't guess.**
7      Q. From your point of view, how involved is
8  Mr. Livingston with the day-to-day operations of the
9  actual prison units as opposed to the other things
10 that TDCJ does?
11     **A. Well, my experience dealing directly with**
12 **Mr. Livingston has started in the last four months,**
13 **and I can tell you, he is involved.**
14     Q. Do you ever send e-mails to Mr. Livingston?
15     **A. I can't think of a time I've sent him an**
16 **e-mail, no, sir.**
17     Q. I'll refer you to page 760.
18     **A. Yes, sir.**
19     Q. Do you see that? Do you see where it says
20 Heat-Related Illness in the middle?
21     **A. Yes, sir.**
22     Q. On the side there is an asterisk, then it
23 says, talk to WS. I assume that's you?
24     **A. I make that assumption, too. Again, I**
25 **didn't write the note, so...**

116

1      Q. Do you have any recollection of this
2  meeting?
3      **A. No, sir, no direct recollection.**
4      Q. Do you remember anybody specifically coming
5  up to talk to you after this meeting about heat
6  precautions?
7      **A. No, sir.**
8      Q. Do you have any recollection why it would
9  say, talk to WS, there?
10     **A. No, sir.**
11     Q. You would agree that it appears that at this
12 meeting there were -- it was discussed that ten men
13 had died last year, relating to heat?
14     **A. I agree.**
15     Q. Okay. And that the other things that were
16 checked -- discussed were fans, training, and wellness
17 checks?
18     **A. Yes, sir.**
19     Q. Would it be fair to say that around this
20 time period was when the change was made to create the
21 wellness checks system that we've talked about
22 earlier?
23     **A. I think it -- not -- not being able to**
24 **remember exactly when it happened, I would say,**
25 **generally, around this time, yes, sir.**

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX109

30 (Pages 117-120)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

117

1    Q. Okay. I'm going to hand you Exhibit 59,
2  sir.
3    A. Yes, sir.
4    Q. This is the April 2012 minutes. Is that
5  right?
6    A. Yes, sir.
7    Q. And from that first page, it looks like --
8  it's a little hard to read, but it looks like you
9  discussed heat-related deaths?
10   A. Yes, sir.
11   Q. Is that accurate? Then on page 769 --
12   A. Yes, sir.
13   Q. -- again, you discussed that there were ten
14 deaths in 2011?
15   A. Yes, sir.
16   Q. Do you remember that?
17   A. Oh, I don't remember the meeting
18 specifically, no, sir.
19   Q. Does that sound like something you would
20 have discussed at a meeting around that time?
21   A. I don't have any reason not to -- when the
22 subject is offender deaths, not to say that there was
23 ten deaths, no, sir.
24   Q. And you wouldn't dispute that this was
25 probably something that you all talked about at this

118

1  meeting --
2    A. Yeah. Not being the person or whoever wrote
3  it, no.
4    Q. Would Mr. Eason have been at this meeting?
5    A. Typically, all the regional directors are
6  there. I can't tell you whether he was there or not.
7    Q. Okay. But, generally, he should have been
8  there?
9    A. Typically, all the regional directors are.
10   Q. And he was a regional director at that time?
11   A. Yes, sir.
12   Q. Okay. If Mr. Eason wasn't there, would
13 these notes be provided to him or would this
14 information otherwise be conveyed to him?
15   A. He would send a representative.
16   Q. And then that person should report back to
17 him?
18   A. Sure.
19   Q. Especially on a topic important, where ten
20 people had died the previous year?
21   A. All topics. He would be there -- a
22 representative would be there for every topic.
23   Q. You would expect whoever his representative
24 was to communicate all that to him?
25   A. Yes, sir.

119

1    Q. And, again, here it says, psychotropic meds
2  need to be considered. Do you see that?
3    A. Yes, sir.
4    Q. Would you agree with that, that that's a
5  consideration to take when determining --
6    A. I'm not a medical provider. I think medical
7  makes the determination who gets on the -- these
8  wellness lists. I see, check wellness, later on. I
9  don't know what that refers to, so -- I do understand
10 that, based upon my experience working with TDCJ,
11 particularly at a -- an inpatient site facility, that
12 psychotropic medications are -- let's say, heat plays
13 a -- a significant factor in causing illness when the
14 guy takes psychotropic medication.
15   Q. Okay. You and I may not understand the
16 chemistry --
17   A. Yes, sir, I agree.
18   Q. -- but you would agree that that's a
19 consideration that needs to be taken?
20   A. Yes, sir.
21   Q. And that guys taking psychotropic
22 medications, based on your experience working at the
23 inpatient psych facility and the knowledge you've
24 gained from working at TDCJ, that those people are
25 more susceptible to heat-related illness?

120

1    A. I agree.
2    Q. And you knew that from when you were working
3  at the Montford Unit, so well before this meeting in
4  2012?
5    A. Yes, sir.
6    Q. Now, it also says here, one incident already
7  this year.
8    A. Yes, sir.
9    Q. Do you remember who -- was that another
10 death?
11   A. I don't know, based on the note here,
12 whether that was another death or not.
13   Q. Okay. Do you remember if any particulars
14 about this incident were discussed at this meeting?
15   A. No, sir.
16   Q. Okay. And it also says, get wellness
17 checklists in place.
18   A. Yes, sir.
19   Q. Do you know if that means that wellness
20 checklists were -- had not been implemented yet, if or
21 that was still --
22   A. No. I'm just saying, this is in April and,
23 you know, the summer months are coming, so just make
24 sure they're in place.
25   Q. I see. But you need to gear up to make sure

APPENDIX110

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

121

1 that happens in the summer of 2012?
2    **A.** Yes, sir.
3    **Q.** Okay. Look at Number 60. It's the
4 June 2012 minutes.
5    **A.** Yes, sir.
6    **Q.** And it appears you attended this meeting?
7    **A. It appears that way, yes, sir.**
8    **Q.** Okay. Let's go to page 783.
9    **A.** Yes, sir.
10    **Q.** Do you see where it says, 13 offender
11 heat-related incidents and ten employee so far?
12    **A.** Yes, sir.
13    **Q.** Do you remember anything about that
14 discussion?
15    **A.** No, sir.
16    **Q.** Okay. Do you remember anything about this
17 meeting in particular?
18    **A. Not in particular, no, sir.**
19    **Q.** Again, in here it says, do wellness checks.
20 That was something you were implementing in June of
21 2012?
22    **A.** Yeah. It says the presenter is a
23 Kathy Cleere, but it does say, do wellness checks, on
24 it.
25    **Q.** Let's take a look at 61.

---

122

1    **A.** Yes, sir.
2    **Q.** The August 16, 2012 meeting?
3    **A.** Yes, sir.
4    **Q.** Take a look at page 823.
5    **A.** Yes, sir.
6    **Q.** Do you see where it says, heat-related
7 illness training?
8    **A.** I do.
9    **Q.** It says, do everything we can to ease heat
10 issues. Do you see that?
11    **A.** Yes, sir.
12    **Q.** What does "do everything we can" mean to
13 you?
14    **A. I didn't write it. I don't know. It**
15 **appears that Mr. Thaler was the presenter. I don't**
16 **remember this specific meeting.**
17    **Q.** You don't remember if that was actually
18 something that came out of someone's mouth or if that
19 just got --
20    **A. I don't know if somebody was paraphrasing**
21 what he said.
22        Are we through with this now?
23    **Q.** Yeah.
24        Let's mark this 66?
25    **A.** Yes, sir.

---

123

1        (Deposition Exhibit No. 66 marked.)
2    **Q.** (BY MR. MEDLOCK) This appears to be an
3 e-mail that was sent to you.
4    **A. That's correct.**
5    **Q.** And then it looks like you forwarded it to
6 Mr. Thaler?
7    **A. And Mr. Mendoza, Thomas Prasifka, and**
8 **Kathy Cleere, that's correct.**
9    **Q.** Okay. And originally this was forwarded to
10 you from -- this is something that was forwarded to
11 you from Mr. Eason. Is that right?
12    **A. That's correct.**
13    **Q.** And it looks like these e-mails were all
14 sent on August 8th, 2011. Is that right?
15    **A.** Yes, sir.
16    **Q.** Can you read the portion of that that
17 Mr. Eason wrote to you?
18    **A. Boss, here is the information on the**
19 **offender at Michael we discussed a few minutes ago.**
20    **Q.** And then it says RGE?
21    **A.** Okay. Yes, sir, RJE.
22    **Q.** RJE. That's how Mr. Eason would sign his
23 e-mail? Is that --
24    **A. He did on this one, yes, sir.**
25    **Q.** Did you frequently get e-mail from

---

124

1 Mr. Eason?
2    **A. I get messages -- e-mails from my regional**
3 **directors, yes, sir, so I have to answer that,**
4 **frequently, yes.**
5    **Q.** Do you remember -- from this e-mail it looks
6 like you maybe had a telephone conversation with
7 Mr. Eason before he forwarded this to you?
8    **A.** I agree.
9    **Q.** Do you remember that conversation?
10    **A.** No, sir.
11    **Q.** And then you forwarded it to Mr. Thaler and
12 the other people we discussed. Right?
13    **A. That's correct.**
14    **Q.** And what did -- when you forwarded it, what
15 did you say?
16    **A. Another one. Housing temperature not**
17 **extreme. May not be heat related.**
18    **Q.** Why did you say that it may not be heat
19 related?
20    **A. I was just going by the housing temperature**
21 that's down in the body of the report.
22    **Q.** Did you have any suspicion that the heat
23 might have played a factor in this prisoner's death at
24 this time?
25    **A. I used the word "may," so I -- I don't**

---

APPENDIX111

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

125

1 remember that. And using the word "may," I can't tell
2 you I was definitive one way or the other.
3     Q.   This was during the time when there were --
4 excuse me. Can we put this 66 sticker on your copy?
5     A.   Sure.
6     Q.   I apologize about that.
7          This was around the period in 2011 when
8 the ten men died from heat-related illnesses. Is that
9 right?
10     A.   It was during that period of time, yes, sir.
11     Q.   Okay. So that might be why you said
12 "another one"?
13     A.   I don't know why I said "another one." I
14 might have sent him multiple reports at the time. I
15 don't remember that.
16     Q.   What do you mean when you say, you might
17 have sent him multiple reports?
18     A.   I might have sent another message to
19 Mr. Thaler about another incident. I might have sent
20 Mr. Thaler another report about this same incident. I
21 don't know.
22     Q.   We might have to look at your other e-mails
23 from that period to determine what you meant by that?
24     A.   I don't know.
25     Q.   You can't say one way or another right now

---

126

1 what "another one" meant here?
2     A.   No, sir.
3     Q.   Is it fair to say that it could mean that it
4 was another prisoner who may have died from a
5 heat-related illness?
6          MS. COOGAN: Objection. Calls for
7 speculation.
8     A.   I would say it could be, yes, sir.
9     Q.   (BY MR. MEDLOCK) And in the -- the kind of
10 body of the message down here at the bottom, you see a
11 couple of lines down in the middle, core body
12 temperature was 106 degrees?
13     A.   Yes, sir.
14     Q.   You would agree that's an extremely high
15 body temperature, wouldn't you?
16     A.   Yes, sir.
17     Q.   That might lead someone to believe that this
18 was a heat-related injury or death?
19     A.   Just that factor in itself, yes, sir.
20     Q.   And that the housing area temperature was
21 86.5?
22     A.   That's correct.
23     Q.   And that it was that temperature at
24 8:05 a.m.?
25     A.   Yeah, that's -- yes, sir, that's when he was

---

127

1 found nonresponsive. Yes, sir.
2     Q.   You would agree that 86.5 indoors at
3 8:00 a.m. was pretty hot. Right?
4     A.   Not for Texas.
5     Q.   Well, you would agree -- you don't think
6 that 86.5 degrees indoors is hot?
7     A.   Oh, I believe it's warm.
8     Q.   Okay.
9     A.   I mean, when we get into this, what is hot,
10 what is -- I -- I really don't have a standard on
11 that.
12     Q.   Okay. But you -- do you have any opinion
13 about whether that's a safe temperature to have the
14 housing area?
15     A.   No, sir.
16     Q.   Okay. And you would agree that, as someone
17 who has lived in Texas, that generally it's cooler in
18 the morning at, say, 8:00 a.m. than it is later in the
19 day?
20     A.   Oh, yes, sir.
21     Q.   So 8:00 a.m. would have been one of the
22 cooler times of the day at the Michael Unit on this
23 date, at this time of the year?
24     A.   Yes, sir.
25     Q.   Would you agree? Okay.

---

128

1          At this time, had you discussed that
2 there were prisoners dying of heat-related injuries
3 with Mr. Thaler?
4     A.   I don't remember.
5     Q.   Do you remember if you discussed that with
6 Mr. Eason?
7     A.   I don't remember.
8     Q.   Do you remember reviewing any other e-mails
9 like this from Mr. Eason's region at this time?
10     A.   I can't say any specific e-mail, but I'm
11 sure there were e-mails coming out of his region.
12 There is an e-mail comes out of everyone's region.
13     Q.   What about e-mails regarding heat-related
14 injury or death?
15     A.   I can't remember of any. I'm not saying
16 there wasn't any, but I can't remember.
17     Q.   Was -- would it be standard for Mr. Eason to
18 forward you an e-mail like this when a prisoner died
19 in his region?
20     A.   Well, yes. You know, we're running a prison
21 here. And when I read this thing I see, he is found
22 in his cell unresponsive. My first concern is, was it
23 a homicide. Was it a suicide. I mean, we're talking
24 about the Hodge Unit -- excuse me. What unit?
25 Michael Unit here.

---



APPENDIX112

33 (Pages 129-132)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

129

1    Q.  Uh-huh.
2    A.  So it could be a suicide.  There could be
3  other factors involved.  So I will tell you that it's
4  not uncommon that I would receive a message about an
5  offender death.
6    Q.  Would you be more concerned -- why would you
7  be more -- would you be more concerned if it was a
8  homicide than if it was a heat-related death?
9    A.  Well, if it's a homicide, then I've got a
10  killer walking out there someone and he might kill
11  someone again.  So -- and in the prison environment, I
12  would say, if I had to rank them, a little higher.
13  But, I mean, a death, there is no good thing when an
14  offender death occurs.
15    Q.  So you would specifically be concerned about
16  a homicide because you want to make sure that nothing
17  happens to anybody else.  Right?
18    A.  Of course.
19    Q.  And you would want to take every step
20  possible to make sure --
21    A.  Well, I want to find the person that killed
22  him.
23    Q.  Right.  And, in part, to make sure that no
24  one else gets hurt by this person?
25    A.  By that person.  That's correct.

130

1    Q.  Because you don't want to see anybody get
2  hurt for whatever reason.  Is that fair?
3    A.  Well, that's fair.
4    Q.  To your knowledge, has any one person at
5  TDCJ ever killed ten people during a summer?
6    A.  No.
7    Q.  Okay.  You would be much more concerned if
8  ten people died than one person died.  Fair?
9    A.  Sure.
10        MR. ANASTASIDIS:  Mr. Stephens, are you
11  okay or are you needing a break?
12        THE WITNESS:  We can take a break.  I'm
13  okay, though --
14        MR. ANASTASIDIS:  I'm not suggesting
15  that you should.
16        THE WITNESS:  Okay.  I'm okay.
17        MR. ANASTASIDIS:  I'm just checking on
18  your welfare.
19        THE WITNESS:  Thank you.
20        MR. MEDLOCK:  And I don't have too much
21  more.  I made a promise to Bruce about 8:00 o'clock.
22        MR. ANASTASIDIS:  I'm doing a count.
23        MR. MEDLOCK:  A wellness check.
24        MR. EDWARDS:  Why don't we take a
25  break, just two minutes.

131

1        MR. MEDLOCK:  Yeah, just briefly.
2        THE VIDEOGRAPHER:  We're off the record
3  at 7:37 p.m.
4        (RECESS.)
5        (Deposition Exhibit No. 67 marked.)
6        THE VIDEOGRAPHER:  We're back on the
7  record.  The time is 7:46 p.m.
8    Q.  (BY MR. MEDLOCK)  Mr. Stephens, while we
9  took a break, I put Exhibit 67 in front of you.
10    A.  Yes, sir.
11    Q.  Have you had a chance to look at that?
12    A.  Yes, sir.
13    Q.  That appears to be an e-mail to you from
14  Kathy Cleere in the Emergency Action Center office?
15    A.  Yes, sir.
16    Q.  Does that look right?
17    A.  Yes, sir.
18    Q.  And this e-mail was sent one day after the
19  last e-mail we were talking about, August the 9th,
20  2011.  Is that right?
21    A.  That's correct.
22    Q.  Okay.  And this says -- it looks like it's
23  similar to the last e-mail, and that there is a
24  description of what happened to the prisoner, and then
25  a little commentary from Ms. Cleere.  Is that a fair

132

1  characterization?
2    A.  That's correct.
3    Q.  And it looks like Ms. Cleere's commentary
4  says, report says staff at Herrmann told the escort
5  officer that death could be heat related.
6        Do you see that?
7    A.  Yes, sir.
8    Q.  And would you suspect that's Hermann
9  Memorial Hospital in Houston?
10    A.  I would suspect that, yes, sir.
11    Q.  Okay.  And that Ms. Cleere was relaying that
12  to you because she thought the death could be heat
13  related?
14    A.  Yes, sir.  I believe that might be -- that
15  could be and possibly is her assumption.
16    Q.  Okay.  And then you see at the bottom of the
17  narrative part where it says, body temperature was
18  108?
19    A.  Yes, sir.
20    Q.  And you would agree again with me that
21  that's an extremely high body temperature?
22    A.  That's correct.
23    Q.  And it says that it 1900, the unit reported
24  the temperature at 102.  Do you see that?
25    A.  Yes, sir.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX113

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

133

1    Q.  1900 would mean, in layman's terms,
2  7:00 p.m.?
3    A.  7:00 o'clock p.m., that's correct.
4    Q.  And would that, combined with that his body
5  temperature was 108, lead you to suspect that this was
6  a heat-related death?
7    A.  I could suspect that.  That's correct.
8    Q.  Especially after receiving an e-mail the day
9  before about another potential heat-related death?
10   A.  I could suspect that, yes, sir.
11   Q.  Okay.  Do you remember if you received any
12 other e-mails like this identifying potential
13 heat-related deaths during the summer of 2011?
14   A.  I don't remember.
15   Q.  Okay.  That's something we might have to
16 check your e-mail to find out?
17   A.  Sure.
18   Q.  What did you do after you received this
19 e-mail from Ms. Cleere?
20   A.  Oh, I don't remember what I did after I
21 received the e-mail.
22   Q.  Did you call the warden at the Hodge Unit?
23   A.  Where?
24   Q.  I'm sorry.  Was -- what --
25   A.  This is the Huntsville.

---

134

1    Q.  This is the Huntsville Unit.  Did you call
2  the warden at the Huntsville Unit?
3    A.  I probably -- if I would have called anyone,
4  it would have been the regional director, in Region I.
5    Q.  And who was the regional director in
6  Region I?
7    A.  Oh, at that time it was probably
8  Michael Upshaw.
9    Q.  You would have talked to Mr. Upshaw just
10 like you talked with Mr. Eason the day before about
11 Mr. Togonidze's death?
12   A.  That's correct.
13   Q.  Why wouldn't you talk directly to the
14 warden?
15   A.  I didn't see a need to.  The regional
16 director is -- the warden is directly responsible to
17 the regional director, so I felt like that -- and I've
18 got all the confidence that the regional directors
19 would take care of any issues that I needed to discuss
20 with them.
21   Q.  You expected the regional director to call
22 the warden and make sure that the warden knew about
23 this and was going to handle it?
24   A.  Yes, sir.  That would be my expectation.
25   Q.  You were kind of going down the chain of

---

135

1  command, just like you would expect someone to bring
2  something to you up through the chain of command.  Is
3  that fair?
4    A.  I was going down the chain of command.
5  That's correct.
6    Q.  Is there any point where you would be
7  concerned that going down through the chain of command
8  wasn't working, maybe you needed to talk to a warden
9  directly?
10   A.  I have done that.
11   Q.  What types of incidents have you done that
12 in?
13   A.  I can't think of one off the top of my head
14 about what type of one.  I can tell you that there
15 were some units that I actually did a -- a
16 walk-through and see if they had different precautions
17 out for the heat awareness and the heat preparedness.
18   Q.  Do you remember what units those were?
19   A.  I know I went to the -- I've been to
20 Hutchins.  I went to a -- a unit in Region VI, I don't
21 know which one.  And I went to one in Region IV.
22   Q.  When did you go to Hutchins?
23   A.  I'm not sure of the date.
24   Q.  Do you remember if it was the summer of 2011
25 or --

---

136

1    A.  It was probably late summer.
2    Q.  Of 2011?
3    A.  It would probably or -- I don't know.  It
4  might have been 2012.  I'm sorry, I don't remember
5  when it was.
6    Q.  Okay.  It would have been 2011 or 2012?
7    A.  Yes, sir.
8    Q.  It would have been after Mr. McCollum's
9  death?
10   A.  Yes, sir.
11   Q.  And would you have visited Region VI around
12 the same time?
13   A.  I don't remember when I went to Region VI.
14   Q.  How about Region IV?
15   A.  Again, I don't remember.  As a deputy
16 director, I made rounds of different regions and
17 different units looking at a variety of things, and
18 part of my -- part of my rounds was looking at these
19 particular issues.
20   Q.  Okay.  That was just the time you went out,
21 around that time, that you were making sure to look
22 for stuff related to heat-related issues.  Is that
23 fair?
24   A.  Well, I look at a variety of issues --
25   Q.  Sure.




---

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

137

1   A. -- and this is just one of them I would look
2 at.
3   Q. That would be one item on your list?
4   A. Yes, sir.
5   Q. Do you have any doubt that it was very hot
6 inside at the Hutchins Unit during the summer?
7   A. No, sir, I don't have any doubt.
8   Q. How about the Gurney Unit, any doubt?
9   A. No, sir, I don't have any doubt.
10   Q. How about the Michael Unit?
11   A. No, sir.
12   Q. The Huntsville Unit?
13   A. No, sir.
14   Q. The Hodge Unit?
15   A. No, sir.
16   Q. The Garza East Unit?
17   A. No, sir.
18   Q. Garza West Unit?
19   A. No, I don't have any.
20   Q. Okay. If -- would you characterize
21 Mr. Livingston as being hands-on with the prison
22 system?
23   A. Yes, sir. I -- yes, sir. I would -- he is
24 a very good leader of this agency.
25   Q. He is very engaged with the problems that

---

138

1 the agency is facing. Is that fair?
2   A. I would say he's engaged, yes, sir.
3   Q. If Director Livingston told you to -- that
4 he thought we needed to implement air conditioning in
5 some part of the Hutchins Unit, would you take steps
6 to make that happen?
7   A. I wouldn't be involved in that.
8 Mr. Livingston would actually coordinate the folks on
9 the facilities side of the agency.
10   Q. He would talk to the folks like Mr. Vian and
11 that --
12   A. Or Mr. Inmon.
13   Q. Mr. Inmon is Mr. Vian's supervisor?
14   A. Yes, sir.
15   Q. Okay. But he would go down through the
16 Facilities Division to make that happen?
17   A. Sure. And probably budget and finance area.
18   Q. If you wanted -- if you decided,
19 hypothetically, that you thought, we really need to
20 air condition parts of the Hutchins Unit, would you
21 take that up to Mr. Livingston, and then if he agreed,
22 it would go back down through the Facilities?
23   A. Yes, sir. That would be my route.
24   Q. Okay. Are you familiar with TDCJ's
25 agricultural program?

---

139

1   A. We have some.
2   Q. Do you know anything about the program that
3 raises pigs?
4   A. No, sir.
5   Q. Okay. Do you know what those pigs are
6 raised for, what the purpose --
7   A. I assume for the meat.
8   Q. They're raised for slaughter?
9   A. Yes, sir.
10   Q. Is that --
11   A. I say, I assume. I know we have the packing
12 plant at Michael, I know they slaughter the pigs and
13 then the meat, in turn, goes to our kitchens.
14   Q. You've seen various parts of the system
15 that -- like the packing plant is one part of the
16 system that would process the pigs?
17   A. Sure. And while being the Region II
18 director in Tennessee Colony, there were different
19 places they kept pigs.
20   Q. Were you -- did you ever go to any of those
21 places that kept the pigs?
22   A. I have, yes, sir.
23   Q. Were any of those places climate controlled?
24   A. No, sir.
25   Q. None of the places you visited?

---

140

1   A. No, sir.
2   Q. Do you know if there are --
3   A. Well, the packing plant was.
4   Q. The packing plant?
5   A. Yes, sir. But where we actually -- the pigs
6 are raised and whatnot was not.
7   Q. Could there be parts of the system where the
8 pigs are kept in climate controlled conditions?
9   A. I haven't been to every pig farm in every
10 part of the state. I'm sorry.
11   Q. That's fine.
12   A. But I don't know. There could be.
13   Q. If there were media reports that that was
14 true, would you have any reason to dispute that?
15   A. No, sir.
16   Q. Okay. We heard Mr. Thaler talk about the
17 wisdom of the decision to climate control the swine
18 barns but not some of the inmate housing areas. Do
19 you remember that?
20   A. The wisdom?
21   Q. The -- he -- I believe Mr. Thaler testified
22 he thought that that -- those resources could be
23 better spent taking care of the prisoners than the
24 pigs. Do you remember that?
25   A. No, sir, I don't remember that.

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX115

Stephen McCollum, et al. v.                    William L. Stephens
Brad Livingston, et al.                         October 18, 2013

---

141

1    Q.   Okay.  What do you remember about
2  Mr. Thaler's testimony about the --
3    A.   I remember Mr. Thaler saying that he valued
4  the offenders' safety and the offenders' lives over
5  the pigs.
6    Q.   Would you agree with that?
7    A.   Absolutely.
8    Q.   If there was a choice to be made between
9  climate controlling the swine barns to protect the
10  pigs being raised for slaughter or to protect the
11  inmates, would you -- how -- what would you decide to
12  protect?
13    A.   Not knowing the ins and outs of why a pig
14  barn needed to be climate controlled, I'm really not
15  able -- I could only speculate.  I will tell you
16  that -- I would tell you that my stance is that the
17  offenders' safety and well-being is a -- certainly has
18  a higher priority than the pigs.
19    Q.   You personally --
20    A.   My personal feeling, yes, sir.
21    Q.   -- would put the offenders' safety over the
22  safety of the pigs?
23    A.   Yes, sir.
24    Q.   Okay.  And if you were making the decision
25  about how to allocate those resources, you would put

---

142

1  those resources towards protecting the prisoners, not
2  the pigs?
3    A.   Again, I didn't make those decisions.  I
4  don't know what all played into those decisions that
5  was made.  I can't answer that question.  I can't -- I
6  mean, it would be very easy to second guess those
7  decisions without knowing why they were made.
8    Q.   But if you -- if it's really that simple to
9  the -- deciding to apply resources one way or the
10  other, if there is no other factors going into it, you
11  would protect the prisoner over the pigs.  Is that
12  fair?
13        MS. COOGAN:  Objection.  Calls for
14  speculation.
15    A.   Yes.
16    Q.   (BY MR. MEDLOCK)  Thank you.
17        Do you know who Bryan Collier is?
18    A.   Yes, sir, I do.
19    Q.   Where is he in the TDCJ hierarchy?
20    A.   Bryan Collier is the deputy executive
21  director for TDCJ.
22    Q.   And is -- so he is -- safe to say, he is
23  directly below Mr. Livingston?
24    A.   Yes, sir.
25    Q.   Do you report to Mr. Collier?

---

143

1    A.   I report to Mr. Livingston.  There is lots
2  of things that I report to Mr. Collier about, but my
3  direct report is Mr. Livingston.
4    Q.   Would it be fair to say that Mr. Collier is
5  like right hand of Mr. Livingston, kind of does what
6  he needs?  Sometimes you might talk to Mr. Collier, or
7  sometimes you might talk to Mr. Livingston?
8    A.   No, I think you would have to ask him or Mr.
9  Livingston if he is the right hand, when you use that
10  term "right hand."  But I do -- the -- again, the
11  experience in this job is four months, and I know they
12  work real closely together.
13    Q.   Do you talk to Mr. Collier frequently?
14    A.   Yes, sir.
15    Q.   Does he office in the same building with
16  you?
17    A.   Yes, sir, he does.
18    Q.   Okay.  In Huntsville?
19    A.   Yes, sir.
20    Q.   Do you think that when Mr. Collier speaks to
21  the media that he might be speaking on behalf of
22  Mr. Livingston for the agency?
23        MR. ANASTASIDIS:  Objection.
24  Speculation.
25        MR. GARCIA:  Objection.  Speculation.

---

144

1    Q.   (BY MR. MEDLOCK)  If you know?
2    A.   I don't know who he speaks for.
3    Q.   If Mr. Collier said something was wrong,
4  would it be your expectation that Mr. Livingston would
5  do something to correct that?
6        MR. GARCIA:  Objection.  Speculation.
7        MR. ANASTASIDIS:  Join.
8    A.   Excuse me?
9    Q.   (BY MR. MEDLOCK)  If Mr. -- to the media, if
10  Mr. Collier made a statement that was wrong to the
11  media, would it be your expectation, based on your
12  position in TDCJ, that Mr. Livingston would do
13  something to correct that?
14    A.   I have absolutely no expectations of what
15  Mr. Collier and Mr. Livingston would do in that
16  matter.
17    Q.   Okay.  Do you ever get inquiries from the
18  media?
19    A.   No, sir, not direct.  They go through the
20  public information office.
21    Q.   If a reporter happened to get your direct
22  line and called you up, what would you do with that
23  call?
24    A.   I would get them to the public information
25  office.

---

APPENDIX116

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

---

145

1    Q.  Is that Mr. Clark, Jason Clark?

2    A.  Jason Clark.  That's correct.

3    Q.  Thank you for your time, Mr. Stephens.  I

4  appreciate you staying.  I passed when I promised

5  Mr. Garcia that we would be done tonight.  Appreciate

6  it.

7         THE WITNESS:  Yes, sir.

8         MS. COOGAN:  I have no questions for

9  Mr. Stephens.

10        MR. GARCIA:  I have no questions at

11 this time.

12        MR. ANASTASIDIS:  No questions.

13        THE VIDEOGRAPHER:  That concludes the

14 deposition.  We're off the record at 8:01 p.m.

15

16

17

18

19

20

21

22

23

24

25

---

146

1         CHANGES AND CORRECTIONS

2  WILLIAM L. STEPHENS - October 18, 2013   VOLUME 1

3  [DISREGARD IF WAIVED]

4

   Reason Codes:  (1) to clarify the record; (2) to

5  conform to the facts; (3) to correct a transcription

   error; (4) other (please explain).

6  PAGE/LINE   CHANGE               REASON CODE

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 JOB NO. 131018BJW

---

147

1              SIGNATURE

2

3       I, WILLIAM L. STEPHENS, have read the

4  foregoing deposition and hereby affix my signature

5  that same is true and correct, except as noted above.

6

7

8       _____

            WILLIAM L. STEPHENS

9

10

11 JOB NO. 131018BJW

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

148

1         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS

2              DALLAS DIVISION
   STEPHEN McCOLLUM,          §

3  STEPHANIE KINGREY, AND      §
   SANDRA McCOLLU,            §

4  INDIVIDUALLY AND AS        §
   HEIRS AT LAW TO THE        §

5  ESTATE OF LARRY GENE       §
   McCOLLUM,                  § CIVIL ACTION NO.

6     Plaintiffs,             § 3:12-CV-02037

7                             §
   VS.                        §

8                             §
   BRAD LIVINGSTON, JEFF      §

9  PRINGLE, RICHARD CLARK,     §
   KAREN TATE, SANDREA        §

10 SANDERS, ROBERT EASON,      §
   THE UNIVERSITY OF TEXAS    §

11 MEDICAL BRANCH AND THE     §
   TEXAS DEPARTMENT OF        §

12 CRIMINAL JUSTICE,          §
      Defendants.            §

13

14        REPORTER'S CERTIFICATION
       ORAL AND VIDEOTAPED DEPOSITION OF

15          WILLIAM L. STEPHENS
              VOLUME 1

16          October 18, 2013

17      I, BRENDA J. WRIGHT, Certified Shorthand

18 Reporter in and for the State of Texas, hereby certify

19 to the following:

20      That the witness, WILLIAM L. STEPHENS, was duly

21 sworn by the officer and that the transcript of the

22 oral deposition is a true record of the testimony

23 given by the witness;

24      I further certify that pursuant to Federal

25 Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as

---

38 (Pages 149-151)

Stephen McCollum, et al. v.
Brad Livingston, et al.

William L. Stephens
October 18, 2013

149

1 well as Rule 30(e)(2) that the signature of the
2 deponent:
3    __X__ was requested by the deponent and/or a
4 party before completion of the deposition and is to be
5 returned within 30 days from date of receipt of the
6 transcript. If returned, the attached Changes and
7 Corrections and Signature pages contain any changes
8 and the reasons therefor;
9    _____ was not requested by the deponent and/or a
10 party before the completion of the deposition.
11    That $_____ is the deposition
12 officer's charges for preparing the original
13 deposition transcript and any copies of exhibits,
14 charged to PLAINTIFFS;
15    That pursuant to information given to the
16 deposition officer at the time said testimony as
17 taken, the following includes all parties of record:
18 For the Plaintiffs:
19    Mr. Jeff Edwards
   THE EDWARDS LAW FIRM
   The Haehnel Building
20    1101 East 11th Street
   Austin, Texas 78702
21    512-623-7727/512-623-7729 (fax)
   jeff@edwards-law.com
22    -and-
   Mr. Scott Medlock
23    TEXAS CIVIL RIGHTS PROJECT
   1405 Montopolis Drive
24    Austin, Texas 78741
   512-474-5073/512-474-0726 (fax)
25

151

1 the action.
2    Certified to by me this 1ST day of NOVEMBER,
3 2013.
4
5
   _____
6    BRENDA J. WRIGHT, Texas CSR No. 1780
   Expiration Date: 12-31-14
7    WRIGHT WATSON & ASSOCIATES
   Firm Registration No. 225
8    Expiration Date: 12-31-13
   3307 Northland Drive
9    Suite 185
   Austin, Texas 78731
10    512-474-4363/51-474-8802 (fax)
   www.wrightwatson.com
   JOB NO. 131018BJW
11
12
...
25

150

1 For the Defendants Jeff Pringle, Richard Clark, Karen
 Tate, Sandrea Sanders, Robert Eason and Texas
2 Department of Criminal Justice:
3    Mr. Bruce R. Garcia
   Assistant Attorney General
   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
4    Law Enforcement Defense Division 012
   Post Office Box 12548
5    300 West 15th Street
   Austin, Texas 78711-2548
6    512-463-2080/512-495-9139 (fax)
   bruce.garcia@texasattorneygeneral.gov
7
 For the Defendants Brad Livingston, William Stephens
8 and Richard Thaler:
   Mr. Demetri Anastasidis
9    Assistant Attorney General
   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
10    Law Enforcement Defense Division 012
   Post Office Box 12548
11    300 West 15th Street
   Austin, Texas 78711-2548
12    512-463-2153/512-495-9139 (fax)
   demetri.anastasidis@texasattorneygeneral.gov
13
 For the Defendant University of Texas Medical Branch:
14    Ms. Kim Coogan
   Assistant Attorney General
15    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
   Law Enforcement Defense Division
16    Post Office Box 12548
   Austin, Texas 78711-2548
17    512-463-2080/512-495-9139 (fax)
   kim.coogan@texasattorneygeneral.gov
18
19    I further certify that I am neither attorney
20 nor counsel for nor related to nor employed by any of
21 the parties to the action in which this deposition is
22 taken;
23    Further, I am not a relative nor an employee of
24 any attorney of record in this cause, nor am I
25 financially or otherwise interested in the outcome of

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363  3307 Northland Dr., Ste. 185  Austin, TX 78731-4946  (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

APPENDIX118

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION
STEPHEN McCOLLUM,               §
STEPHANIE KINGREY, AND          §
SANDRA McCOLLU,                 §
INDIVIDUALLY AND AS             §
HEIRS AT LAW TO THE             §
ESTATE OF LARRY GENE            §
McCOLLUM,                       § CIVIL ACTION NO.
        Plaintiffs,             § 3:12-CV-02037
                                §
VS.                             §
                                §
BRAD LIVINGSTON, JEFF           §
PRINGLE, RICHARD CLARK,         §
KAREN TATE, SANDREA             §
SANDERS, ROBERT EASON,          §
THE UNIVERSITY OF TEXAS         §
MEDICAL BRANCH AND THE          §
TEXAS DEPARTMENT OF             §
CRIMINAL JUSTICE,               §
        Defendants.             §
```

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

ORAL AND VIDEOTAPED DEPOSITION OF
RICHARD C. THALER
VOLUME 1

October 18, 2013

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

ORAL AND VIDEOTAPED DEPOSITION OF RICHARD C.
THALER, produced as a witness at the instance of the
PLAINTIFFS, and duly sworn, was taken in the
above-styled and numbered cause on October 18, 2013,
from 9:00 a.m. to 4:35 p.m., before Brenda J. Wright,
RPR, CSR in and for the State of Texas, reported by
machine shorthand, at the Office of the Attorney
General, 300 West 15th Street, Suite 1200, Austin,

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

**Page 1**

```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION

STEPHEN McCOLLUM,             §
STEPHANIE KINGREY, AND        §
SANDRA McCOLLU,               §
INDIVIDUALLY AND AS           §
HEIRS AT LAW TO THE           §
ESTATE OF LARRY GENE          §
McCOLLUM,                     §  CIVIL ACTION NO.
        Plaintiffs,           §  3:12-CV-02037
                              §
VS.                           §
                              §
BRAD LIVINGSTON, JEFF         §
PRINGLE, RICHARD CLARK,       §
KAREN TATE, SANDREA           §
SANDERS, ROBERT EASON,        §
THE UNIVERSITY OF TEXAS       §
MEDICAL BRANCH AND THE        §
TEXAS DEPARTMENT OF           §
CRIMINAL JUSTICE,             §
        Defendants.           §

   *   *   *   *   *   *   *   *   *   *   *   *   *

                ORAL AND VIDEOTAPED DEPOSITION OF
                        RICHARD C. THALER
                            VOLUME 1

                        October 18, 2013

   *   *   *   *   *   *   *   *   *   *   *   *   *

         ORAL AND VIDEOTAPED DEPOSITION OF RICHARD C.
THALER, produced as a witness at the instance of the
PLAINTIFFS, and duly sworn, was taken in the
above-styled and numbered cause on October 18, 2013,
from 9:00 a.m. to 4:35 p.m., before Brenda J. Wright,
RPR, CSR in and for the State of Texas, reported by
machine shorthand, at the Office of the Attorney
General, 300 West 15th Street, Suite 1200, Austin,
```

**Page 2**

```
 1  Texas, pursuant to the Federal Rules of Civil
 2  Procedure and the provisions stated on the record or
 3  attached herein.
 4             APPEARANCES
 5  For the Plaintiffs:
 6     Mr. Jeff Edwards
       THE EDWARDS LAW FIRM
 7     The Haehnel Building
       1101 East 11th Street
       Austin, Texas 78702
 8     512-623-7727/512-623-7729 (fax)
 9     jeff@edwards-law.com
              -and-
10     Mr. Scott Medlock
       TEXAS CIVIL RIGHTS PROJECT
       1405 Montopolis Drive
11     Austin, Texas 78741
       512-474-5073/512-474-0726 (fax)
12
    For the Defendants Jeff Pringle, Richard Clark, Karen
13  Tate, Sandrea Sanders, Robert Eason and Texas
    Department of Criminal Justice:
14     Mr. Bruce R. Garcia
       Assistant Attorney General
15     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
       Law Enforcement Defense Division 012
16     Post Office Box 12548
       300 West 15th Street
17     Austin, Texas 78711-2548
       512-463-2080/512-495-9139 (fax)
18     bruce.garcia@texasattorneygeneral.gov
19  For the Defendants Brad Livingston, William Stephens
    and Richard Thaler:
20     Mr. Demetri Anastasidis
       Assistant Attorney General
21     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
       Law Enforcement Defense Division 012
22     Post Office Box 12548
       300 West 15th Street
23     Austin, Texas 78711-2548
       512-463-2153/512-495-9139 (fax)
24     demitri.anastasidis@texasattorneygeneral.gov
25
```

**Page 3**

```
 1             APPEARANCES - CONTINUED
 2
    For the Defendant University of Texas Medical Branch:
 3     Ms. Kim Coogan
 4     Ms. Erika Hime
              -and-
 5     Ms. Lacey Mase
       Assistant Attorney General
 6     Law Enforcement Defense Division
       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 7     Post Office Box 12548
       Austin, Texas 78711-2548
 8     512-463-2080/512-495-9139 (fax)
       kim.coogan@texasattorneygeneral.gov
 9
    Videographer:
10     Mr. Patrick Knapick
11  Also Appearing:
       Ms. Deborah Woltersdorf
12     Paralegal, OFFICE OF THE ATTORNEY GENERAL
       deborah.woltersdorf@texasattorneygeneral.gov
13
       Mr. Josh Barron
14
       Mr. Tobias D. Hunziker
15     TEXAS DEPARTMENT OF CRIMINAL JUSTICE
16     Mr. William Stephens
       TEXAS DEPARTMENT OF CRIMINAL JUSTICE
17
       Mr. Neal Spradlin
18
       Mr. Kyle Smith
19
20
21
22
23
24
25
```

**Page 4**

```
 1             STIPULATIONS
 2      The attorneys for all parties present stipulate
 3  and agree to the following items:
 4
 5      That the deposition of RICHARD C. THALER is
 6  being taken pursuant to Notice;
 7
 8      That the deposition is being taken pursuant to
 9  the Federal Rules of Civil Procedure;
10
11      That the original transcript will be submitted
12  to the witness' attorney, MR. DEMETRI ANASTASIDIS;
13
14      That the witness or the witness' attorney will
15  return the signed transcript to the court reporter
16  within 30 days of the date the transcript is provided
17  to the witness' attorney. If not returned, the
18  witness may be deemed to have waived the right to make
19  the changes, and an unsigned copy may be used as
20  though signed.
21
22
23
24
25
```

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013



**Page 5**

1
2                     INDEX
3   Appearances...................................... 2
    Stipulations...................................... 3
4
    RICHARD C. THALER
5
        Examination by Mr. Edwards.............. 6
6       Examination by Ms. Coogan............... 255
        Examination by Mr. Garcia................ 262
7
    Changes and Corrections..................... 266
8   Witness' Signature.............................. 267
    Reporter's Certificate.......................... 268
9
                    EXHIBITS
10
11  NO.   DESCRIPTION                       PAGE
                                            MARKED
12  50.................................................. 62
        Heat Precaution 2011 - Reminder
13  51.................................................. 137
        Security Memorandum - November 4, 2011
14  52.................................................. 174
        August 16, 2011 letter
15  53.................................................. 185
        Correctional Institutions Division Regional
16      Director's Meeting - July 16, 2010
    54.................................................. 191
17      Correctional Institutions Division Regional
        Director's Meeting - August 12, 2010
18  55.................................................. 202
        Correctional Institutions Division Regional
19      Director's Meeting - May 12, 2011
    56.................................................. 209
20      Correctional Institutions Division Regional
        Director's Meeting - July 14, 2011
21  57.................................................. 218
        Correctional Institutions Division Regional
22      Director's Meeting - August 11, 2011
    58.................................................. 229
23      Correctional Institutions Division Regional
        Director's Meeting - March 15, 2012
24
25

**Page 6**

1   RICHARD C. THALER
2
        EXHIBITS - CONTINUED
3
                                            PAGE
4   NO.   DESCRIPTION                       MARKED
5   59.................................................. 235
        Correctional Institutions Division Regional
6       Director's Meeting - April 12, 2012
    60.................................................. 238
7       Correctional Institutions Division Regional
        Director's Meeting - June 14, 2012
8   61.................................................. 242
        Correctional Institutions Division Regional
9       Director's Meeting - August 16, 2012
    62.................................................. 249
10      Correctional Institutions Division Regional
        Director's Meeting - April 11, 2013
11  63.................................................. 260
        Mediation Proposal Update
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 7**

1         (Per agreement of all counsel present, the
2   reading of the Federal introduction is waived.)
3         THE VIDEOGRAPHER:  We're on the record
4   in the deposition of Rick Thaler, recorded on the 18th
5   day of October, 2013.  The time is 9:06 a.m.
6         Madam Court Reporter, please swear in
7   the witness.
8         RICHARD C. THALER,
9   having been first duly sworn, testified as follows:
10             EXAMINATION
11  BY MR. EDWARDS:
12      Q.  Good morning, sir.
13      A.  Good morning.
14      Q.  Would you kindly introduce yourself to the
15  jury?
16      A.  Richard Charles Thaler.
17      Q.  My name is Jeff Edwards and I'm an attorney
18  that represents the family of Larry Gene McCollum.  Do
19  you understand that?
20      A.  Yes, sir.
21      Q.  I won't belabor this, but I understand that
22  you -- have you given several depositions in your
23  career?
24      A.  A couple, yes, sir.
25      Q.  Okay.  Well, then I'll just go through kind

**Page 8**

1   of -- I call them rules of the road or just kind of
2   ground rules for the deposition.  Just -- and if you
3   have any questions about them, by all means, let me
4   know.  All right?
5       A.  Yes, sir.
6       Q.  Okay.  One that's pretty important is, if I
7   ask you a question and you answer it, I'm going to
8   assume that you have understood my question, as long
9   as you think that's fair.  Do you think that's fair?
10      A.  Yes, sir.
11      Q.  Okay.  Secondly, I don't think we're going
12  to be here an extraordinarily long time, but if for
13  any reason you need a break, or a glass of water, use
14  the restroom, please let me know.  All right?
15      A.  Yes, sir.
16      Q.  Now, the only time that that may -- I may
17  quibble with you is, if there is a question pending, I
18  would ask for your courtesy in answering it.  Does
19  that sound all right?
20      A.  Fair enough.
21      Q.  Okay.  If you don't understand a question,
22  let me know.  All right?
23      A.  All right.
24      Q.  And if at any point during the deposition
25  you feel like something you have said is incorrect,

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

9

1  please let me know.  All right?
2     A.  Yes, sir.
3     Q.  This is my one chance to get to ask you
4  questions about this particular case.  Fair?
5     A.  Okay.  Fair.
6     Q.  Now, the few depositions in which you've
7  testified before, would you tell me about those?
8     A.  I cannot remember specifically what cases
9  those were.
10    Q.  Okay.  What in general did they relate to?
11    A.  To be honest with you, I cannot recall.  I
12 want to say the only deposition that I can recall
13 taking was when I was a warden, and it -- I would be
14 assuming if I tried.  I want to say, to the best of my
15 recollection, it dealt with religious issues or
16 relating to the services of Muslims in our system.
17    Q.  Okay.  Have you ever been deposed, to the
18 best of your recollection, about the dangerousness of
19 heat levels inside the Texas prison system?
20    A.  No, sir.
21    Q.  Are you knowledgeable about the potential
22 dangers of high temperatures inside the Texas prison
23 system?
24    A.  I'm knowledgeable about environments within
25 the Texas prison system, yes, sir.

10

1     Q.  Do you believe that high temperatures inside
2  the Texas prison system can be dangerous, sir?
3     A.  I surely believe that extreme temperatures,
4  hot or cold, inside our institutions require our
5  attention and could affect the wellness of offenders,
6  yes, sir.
7     Q.  Okay.  Let me ask you specifically.  As you
8  testify here today, based on your knowledge of the
9  Texas prison system, would you agree with me that high
10 temperatures, above 90 degrees, inside Texas prisons
11 can be dangerous and deadly to offenders?
12    A.  Again, I would -- I would agree that under
13 certain circumstances, high temperatures create an
14 additional risk to the offender population and staff
15 working in those facilities.
16    Q.  And that additional risk is that people can
17 die.  Correct?
18    A.  In certain circumstances that has occurred,
19 yes, sir.
20    Q.  Okay.  And certainly, you know that now,
21 based on your experience in the Texas prison system.
22 Correct?
23    A.  Yes, sir.
24    Q.  And certainly, you knew that back in 2007,
25 2008, or 2009, based on your experience in the Texas

11

1  prison system.  Correct?
2     A.  No, sir.
3     Q.  You didn't know in 2009 that high level --
4  high temperatures were dangerous for offenders?
5     A.  I did know they were dangerous, yes, sir.  I
6  thought you were asking the question about those
7  temperatures could cause death.
8     Q.  Okay.  You knew in 2009 that high
9  temperatures were dangerous for offenders, but you
10 weren't sure if they could cause death?
11    A.  I knew in 2009, high temperatures could
12 cause additional risks to offenders in our population,
13 yes, sir.
14    Q.  Including death?
15    A.  In extreme circumstances, yes, sir.
16    Q.  Okay.  What are the extreme circumstances
17 that you're talking about?
18    A.  It would be a multitude of circumstances.
19 But just from -- in 2009, I couldn't outline those for
20 you, except that just from common knowledge as an
21 individual, not necessarily from experiences within
22 the system, extremely high temperatures, particularly
23 in a work environment, could lead to heat stroke and
24 death.
25    Q.  So fair to say that as of 2009, just based

12

1  on your experience as just a human being, you knew
2  that high temperatures inside could lead to heat
3  stroke?
4     A.  I knew that high temperatures could lead to
5  the risk of heat stroke, yes, sir.
6     Q.  What is the difference between the risk of
7  heat stroke and actual heat stroke, in your opinion?
8     A.  Well, there are certain risk factors which
9  would cause the probabilities of heat stroke to occur
10 to be higher, when I refer to that, but to directly
11 answer your question, it could cause -- high
12 temperatures could cause heat stroke.
13    Q.  Sure.  And I appreciate that.  I mean, I
14 think you were answering my question.  What are those
15 additional risk factors that you knew about, let's
16 say, back in 2009, that would make it even more
17 probable that someone would suffer a heat stroke?
18    A.  Through training within the system,
19 strenuous activity in those high-temperature
20 conditions, failure to adequately intake liquids,
21 fluids, water, could add to those conditions.
22    Q.  What else?
23    A.  In certain circumstances, health-related
24 issues could cause to -- additional risk.
25    Q.  What health-related issues in particular,

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX122

4 (Pages 13-16)

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

---

13

1 sir?
2     A. There are a multitude of health-related
3 issues out there. Most commonly would be those that
4 were on medications that -- that would cause -- cause
5 that individual to have difficulty dealing with heat.
6     Q. Are you talking about antipsychotic
7 medications?
8     A. Yes, sir.
9     Q. Psychotropic medications?
10    A. Yes, sir.
11    Q. Diuretics that might cause the body to
12 dehydrate?
13    A. Possibly, yes, sir.
14    Q. All right. So you knew about that back in
15 2009. What about, did you know that heart disease or
16 hypertension made the risk of heat stroke higher for
17 an individual?
18    A. I can't say that I actually was in any
19 discussions about that particular illness, but surely
20 it would be logical to assume that maybe it could.
21    Q. Are you aware of training documents in the
22 Texas Department of Criminal Justice which indicate
23 that hypertension does, in fact, increase the
24 likelihood of a person suffering a heat stroke in high
25 temperatures?

---

14

1     A. Somewhat, yes, sir. I believe it is in the
2 training documents.
3     Q. And those training documents, I believe --
4 well, let me ask you. Were those training documents
5 in place in 2007, 2008, 2009 time period?
6     A. I believe they were, yes, sir.
7     Q. Certainly, it would be your expectation that
8 the correctional officers that are working in your
9 facilities know those training protocols. Correct?
10    A. Yes, sir.
11    Q. Certainly, you would acknowledge that you
12 would, in fact, be aware of those training protocols.
13 Correct?
14    A. Yes, sir.
15    Q. In fact, you would responsible for devising
16 them and implementing them. Correct?
17    A. In -- ultimately, the components of the
18 agency that I supervise, our training department, our
19 wardens on our facilities, our supervisors on the
20 facility, would be responsible for delivering that
21 training. And those individuals do report up the
22 chain to me.
23    Q. And you would responsible for making sure
24 they're doing their job. Correct?
25    A. I would be making sure for reviewing and

---

15

1 ensuring that the policy in the field was followed.
2     Q. Okay. Is another way -- and I want to be
3 fair here -- another way to say that policy is being
4 followed in the field, making sure that your
5 subordinates are doing their jobs correctly?
6     A. Sure.
7     Q. What about other medical conditions like
8 diabetes, were you aware that that would pose a higher
9 risk of potential heat stroke in the Texas prison
10 system if temperatures were high?
11    A. Again, to my recollection, that wouldn't
12 have been specifically something that I -- that I
13 would have knowledge of, but it very well could be.
14    Q. What about age, are you familiar with age
15 being a risk factor with exposure to high temperatures
16 inside?
17    A. Again, generally, those -- those individuals
18 that are higher -- at higher risk to any susceptible
19 illness or injury, I relied heavily on health service
20 to help me with. But I could certainly see where age
21 could result in additional health concerns.
22    Q. Common sense. Fair?
23    A. I would agree.
24    Q. Okay. Likewise, common sense would tell you
25 that -- that I should remember my question before I

---

16

1 start asking it.
2         Let's take a step back.
3     A. Okay.
4     Q. Tell me about your background. And I
5 know -- I know how long you've been with the agency,
6 so just, if you could, just give me your kind of
7 nutshell summary of your background from the time you
8 began with the agency, and then I'll probably ask some
9 more pointed questions -- hopefully, better than the
10 last one -- about kind of your role and
11 responsibility.
12    A. Okay. I began my career with the Texas
13 Department of Criminal Justice in 1980 as a
14 correctional officer at the Huntsville Unit.
15        In March of 1983, I promoted to the
16 position of sergeant of correctional officers at
17 the -- at that time -- Ramsey III facility.
18    Q. Okay.
19    A. In Brazoria County.
20        In September 1984, I promoted to
21 lieutenant of correctional officers at that same
22 facility.
23        In March of 1986, I promoted to captain
24 of correctional officers at the Clemens Unit, again,
25 in Brazoria County.

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX123

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

17

1        In 1989, I promoted to major of
2   correctional officers at the Retrieve Unit there in
3   Angleton, Texas.
4        And in 1990, I was promoted to
5   assistant warden at the Pack 2 Unit.
6        In 1992, I was promoted to senior
7   warden at the Smith Unit in Lamesa, Texas.
8        I served in that capacity until 1994,
9   when I was promoted to a warden's position at the
10  Ramsey I Unit back in Brazoria County.
11       In 1996, again, I was promoted to the
12  position of warden, senior warden, at the
13  Telford Unit, T-e-l-f-o-r-d, Unit in Bowie County,
14  Texas.
15       And in 1999, I was transferred to the
16  Estelle Unit in Walker County as a warden.
17       In 2003, I was promoted to regional
18  director for Region I, which encompassed into the
19  Huntsville area.
20       In 2006, I was promoted to division
21  director of the Manufacturing Logistics Division,
22  there in Huntsville, Texas.
23       And in 2000 -- July of 2009, I was
24  promoted into the director's position of the
25  Correctional Institutions Division and served in that

---

18

1   capacity until my retirement in May of this year,
2   2013.
3        Q.   All right.  So let's go back to 2003 when I
4   believe you told me that you became the regional
5   director of the region that would include Huntsville?
6        A.   Right.
7        Q.   Who would be serving in that position today,
8   or has kind of the structural situation changed?
9        A.   As far as the named individual?
10       Q.   Sure.
11       A.   I believe Richard Alford is currently the
12  Region I director.
13       Q.   Okay.
14       A.   At least he was when I left in May.
15       Q.   Walk me through -- each region has its own
16  director?
17       A.   Correct.  There is six regions across the
18  state of Texas.
19       Q.   Okay.  So we've met Mr. Eason in this case.
20  Is he a regional director?
21       A.   Yes, sir.
22       Q.   Currently?  Okay.  Or -- okay.
23       A.   Well, I say currently --
24       Q.   He was one of the six --
25       A.   I believe since I left, I believe he --

---

19

1        Q.   He was promoted?
2        A.   He has moved to another position.
3        Q.   Okay.  So we've got the six regional
4   directors.  And as I understand it, and please correct
5   me if I'm wrong, their job is to supervise wardens at
6   individual prisons in those regions?
7        A.   Their job is to supervise the unit
8   administration, which would be the warden at each
9   facility within their region, yes, sir.
10       Q.   Fair to say that their responsibility is
11  staying on top of issues in their particular region?
12       A.   Their responsibility is to ensure that
13  appropriate actions are being taken on their facility,
14  yes, sir.
15       Q.   Fair to say that they should be
16  knowledgeable about deaths that are occurring to
17  offenders in their region?
18       A.   In all cases that there is a death in their
19  region, they would be involved in that notification
20  process.
21       Q.   So if there was an epidemic of heat stroke
22  in a particular region, is it fair to say that the
23  regional director should know about that?
24       A.   The regional director should know about any
25  deaths in their region, yes, sir.

---

20

1        Q.   All right.  Above the regional director, who
2   is next in kind of the -- I guess, the organizational
3   hierarchy, up through yourself?
4        A.   Above the regional directors, there is --
5   within the Correctional Institutions Division, there
6   is three deputy directors.  Those three deputy
7   directors serve to supervise different components of
8   operations out in the field on all of the facilities
9   and for support service functions in the central
10  office.
11       Q.   You would you describe briefly the three
12  different organizational functions of the deputy
13  directors?
14       A.   Sure.  There is a deputy director's position
15  that would be responsible for our security threat
16  group management office.  That same deputy director
17  would be responsible for our training division.  That
18  same deputy director would also be responsible for
19  management operations, which includes policy review
20  and dissemination.
21       The second regional director -- our
22  second deputy director, excuse me, would be
23  responsible for support services such as
24  classification department, food service, laundry
25  service, offender transportation, offender

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX124