Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013



---

**21**

1 disciplinary coordination office.
2     And then the third deputy director
3 would be responsible for prison and jail operations.
4 Most direct contact dealing with operations on
5 facilities within the regional directors, and
6 responsible for security systems program and our
7 canine program.
8    Q. I'm sure there is a good distinction. I'm
9 having to -- with the first director group, you
10 mentioned that one of their responsibilities was
11 management and operations of the prisons?
12    A. Right.
13    Q. How does that differ from the third
14 category, which you described as prison or jail
15 operations?
16    A. Yeah. Management operations is inclusive of
17 those specific areas that I referenced, security
18 threat group. So any issues that deal with security
19 threat group processing, identification, that
20 particular deputy director would be responsible for
21 dealing directly with the wardens in that area.
22 Again, the training components, training needs, that
23 particular deputy director would deal directly with
24 any specific training needs that the wardens or our
25 regional directors might feel that they need.

**22**

1     The last position that identified the
2 prison and jails, that would be the individual that
3 would be responsible for overseeing all of the other
4 basic activities that occurred on the facilities,
5 reviewing most reports that are generated from the
6 regional office would report directly to that prison
7 and jail operations.
8    Q. Okay. Okay. Does each region have three
9 deputy directors?
10    A. No, sir. Those three deputy directors are
11 located in the central office and support all six
12 regional directors. And at that time, it was all 95
13 facilities out in the field.
14    Q. Gotcha.
15     Who were the three deputy directors for
16 the time period, let's say, 2009 through your
17 retirement?
18    A. Okay. Initially, the three deputy directors
19 in -- that reported to me were Oscar Mendoza. He was
20 in management operations. I want to say he assumed
21 that position in 2000 -- October 2009, September or
22 October 2009. I'm not specific on that date.
23    Q. Okay.
24    A. He held that position until fairly recently.
25 Just prior to my retirement, he moved into a --

**23**

1 another position within the agency.
2    Q. Do you know what position he moved into?
3    A. The division director over administrative
4 review and risk management.
5    Q. Okay.
6    A. Support operations was Tommy Prasifka.
7 Tommy held that position the entire time that I was in
8 my position.
9    Q. Okay.
10    A. And then the third individual in prison and
11 jail operations was Bill Stephens. And, again, he
12 held that position shortly after -- again, all of
13 those were selected in September or October of 2009
14 and held their positions as I indicated.
15    Q. And it's my understanding that Mr. Stephens
16 replaced you upon retirement?
17    A. Yes, sir, he did.
18    Q. And Mr. Stephens is in the room listening to
19 this deposition. Correct?
20    A. Yes, he is.
21    Q. Okay. All right. Now, as we go up the
22 regional directors and then the deputy directors, then
23 do we get to your position, sir?
24    A. Yes, sir.
25    Q. And tell me again a little bit about your

**24**

1 position, what the true role is?
2    A. As the Correctional Institutions Division
3 director, my role is to supervise that entire chain of
4 command that I just outlined there.
5    Q. So you supervise the deputy directors?
6    A. I supervise the deputy doctors, who then
7 supervise the regional directors, who supervise the
8 wardens, who supervise the staff on the facilities,
9 yes, sir.
10    Q. So you're responsible for all of the
11 officers, I assume, in your chain of command, but
12 you're most responsible for making sure that the
13 deputy directors are doing their job properly?
14    A. That's who I have most of my contact with
15 and most of the information is disseminated up the
16 chain of command through them and back down the chain
17 of command through my deputies, yes, sir.
18    Q. Do you have any personal dealings one-on-one
19 or with others in the organization with the regional
20 directors?
21    A. Sure. Sure. Each -- each month, normally,
22 at a minimum, we would have a Correctional
23 Institutions Division directors meeting where we would
24 bring in the regional directors, along with the deputy
25 directors, along with some department and division



APPENDIX125

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**25**

1  heads, to discuss pertinent issues, again, to give
2  information to those regional directors to disseminate
3  out into the field through their wardens meetings and,
4  subsequently, to staff on the facilities through the
5  individual administrations holding their meetings.
6     Q.  Through those meetings you're able to get a
7  better sense of what is going on in the regions.  Is
8  that fair?
9     A.  In most cases.  Those meetings, in most
10 cases, are an opportunity for the central office to
11 disseminate information back down the chain.
12 Information from the field, in all cases, doesn't
13 necessarily wait for a meeting to flow up the chain.
14    Q.  Okay.  So nothing would have prevented
15 Mr. Eason from contacting you directly about a problem
16 in his region.  Correct?
17    A.  No.
18    Q.  He might go through Mr. Stephens or
19 Mr. Mendoza, but it would eventually get to you.  Is
20 that fair?
21    A.  Depending on the level of the problem, it
22 surely might get to me, yes, sir.
23    Q.  Okay.  At the regional meetings that you
24 just mentioned, are wardens generally included?
25    A.  No, sir.

**26**

1     Q.  Do the regional directors have their own set
2  of meetings with the wardens on a monthly basis?
3     A.  I wouldn't say that there is not a month
4  that has been missed, but normally there would be at
5  least one meeting each month.  Historically, regional
6  directors have held those meetings.  As a regional
7  director, I held those meetings with my wardens
8  monthly to, again, discuss current issues and
9  disseminate information to the field.
10    Q.  Do you know if they're as formal as the
11 director meetings that you held on a monthly basis
12 where there would be minutes and notes taken and
13 agendas created?
14    A.  I can't say in all cases there are.  In some
15 cases there very well might be.  As a regional
16 director, I surely initiated a formal agenda when I
17 held my meetings, but there is no necessarily
18 requirement.  In most cases, I would assume that the
19 regional directors out there in the field would cover
20 issues that are pertinent to their particular regions,
21 in addition to any information that was given to them
22 at our Correctional Institutions Division meeting.
23    Q.  In any event, you would expect the regional
24 directors to disseminate information that you thought
25 was important that was discussed at your director

**27**

1  meetings, your higher level director meetings.
2  Correct?
3     A.  Yes, sir.
4     Q.  One of those high level issues was the
5  dangers of extremely hot temperatures in the prison.
6  Right?
7     A.  We surely discussed that issue.
8     Q.  You discussed that in 2009, 2010, 2011,
9  2012, 2013.  Right?
10    A.  Yes, sir.
11    Q.  Did you review any documents in preparation
12 for your deposition today, sir?
13    A.  Yes, sir.
14    Q.  Okay.  Would you show me what documents you
15 reviewed?
16    A.  I don't know if I have that list, but in
17 most cases --
18    Q.  Well, now, let me stop you.  I don't care
19 about most cases.
20    A.  Okay.
21    Q.  I care about what you reviewed in this -- to
22 prepare for this particular deposition?
23    A.  Okay.  I reviewed the deposition that was
24 taken from Mr. Eason.
25    Q.  Okay.

**28**

1     A.  I reviewed the deposition that was taken
2  from Mr. Vian.  The deposition that was taken from
3  Warden Pringle.  The deposition that was taken by, I
4  believe, Lieutenant Sanders.  I reviewed 82.15, which
5  is the EAC summary review.  I reviewed -- it's been
6  some time, but AD 10.64, dealing with temperature
7  extremes.  I have read the document compelling me to
8  be deposed.  The amended complaint on the McCollum
9  case.  I have recently been served -- not necessarily
10 in preparation for this deposition, but have recently
11 been served with the Adams, Webb, and Togonidze, I
12 believe, I have reviewed those.
13    Q.  You and I will both have trouble going
14 through all of the names, but what I'm really -- I
15 assume that you've looked at that complaint.  But is
16 there anything about that complaint that you prepared
17 for this deposition for?
18    A.  No, I didn't.
19    Q.  Okay.
20    A.  Again, after being retired from the agency,
21 I didn't have access to records or documents that were
22 back with the agency.  So I have reviewed American
23 Correctional Association standards in general.
24    Q.  Which ones?
25    A.  Specifically those that deal with the

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX126

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

29

1 accreditation process of the Hutchins Unit.
2     Q.  In preparation for this deposition or just
3 generally through the course of your career?
4     A.  In preparation for this deposition.
5     Q.  Okay.  Anything else?
6     A.  Not that I can -- not that I can think of.
7     Q.  All right.  Let me just roll through them
8 and I apologize for being boring.  It's just important
9 for me to be thorough, at least at this time.
10       What I heard you say, and if I got
11 something wrong, please correct me.  This is not --
12 I'm not trying to...
13       You read Director Eason's deposition?
14     A.  Yes, I did.
15     Q.  You read Mr. Vian's deposition?
16     A.  Yes, sir.
17     Q.  You read Warden Pringle's deposition?
18     A.  Yes, sir.
19     Q.  And he has given a couple of depositions.
20 Did you read multiple parts of his deposition --
21     A.  No.  If there is a second, I have not read
22 that one.
23     Q.  Okay.
24     A.  I'm assuming I read the first.
25     Q.  Okay.  Lieutenant Sanders?

---

30

1     A.  Yes, sir.
2     Q.  Okay.  Did you read any of the depositions
3 of the other correctional officers?
4     A.  No, sir.
5     Q.  Okay.  82.015, which is the EAC summary
6 review process?
7     A.  I believe so, yes, sir.
8     Q.  Okay.  Policy 10.64, which is dealing with
9 temperature extremes --
10     A.  Extremes --
11     Q.  -- in the workplace only.  Correct?
12     A.  Yes.  That's -- yes.
13     Q.  It doesn't -- it's not a policy designed for
14 assessing indoor housing temperatures.  Correct?
15     A.  The directive currently does not address
16 that issue, yes, sir.
17     Q.  That is a -- is that a hole in the system
18 that you think should be fixed?
19     A.  Sure.  I think that through discussions
20 with -- in these cases, to make sure that staff is
21 clear on -- extremely clear on their obligations out
22 there.  And I would feel, from being a warden in the
23 field for many years, I was pretty clear that heat
24 extremes could occur in any area of the facility,
25 inside or outside.  So mitigation steps that we took

---

31

1 to mitigate those heat issues for many years didn't
2 stop at the dorm door.
3     Q.  Okay.
4       MR. EDWARDS:  Let me just object as
5 nonresponsive after "sure."
6     Q.  (BY MR. EDWARDS)  And that's just lawyering
7 stuff, so...
8       Do you know why there isn't -- strike
9 that.
10       Do you know why there wasn't an actual
11 policy designed and implemented by the Texas
12 Department of Criminal Justice concerning extremely
13 high temperatures inside the housing areas?
14     A.  Well, I think in reviewing our efforts over
15 the years that I have been with the system,
16 particularly in the administrative positions from
17 where -- the warden's position and above, those steps
18 were initiated at the facility level.  For many years,
19 as I'm sure we'll get to here eventually, an e-mail
20 has been sent out from the central administration
21 outlining the need to ensure we're addressing
22 heat-related conditions in all areas of our facility.
23     Q.  Sure.
24     A.  Very few -- very few issues in our system
25 rise to the level that the central office has for many

---

32

1 years put out basically a public notice to all staff
2 as this is a high priority in our system.  So that had
3 served to be effective for many years to bring focus
4 to the subject matter going into each seasonal period.
5 And that, in addition to the policies that we have in
6 place about appropriately housing the offenders in our
7 system as a whole, dealt with those issues.
8     Q.  Okay.  You're talking about this informal
9 e-mail that went out every year, every May, about the
10 dangers of heat and you've got to take steps to
11 protect inmates from the dangers of heat.  Right?
12     A.  Yes, sir.
13     Q.  Okay.  And there has been testimony in this
14 case that that served as some sort of de facto
15 practice or policy of the agency.  Would that be your
16 opinion as well?
17     A.  It surely served as a directive memo to the
18 agency for staff to take at a minimum those
19 precautionary steps to mitigate the heat.
20     Q.  Okay.  But my question is a little bit
21 different.  My question is, why did that informal
22 e-mail not become a formal agency process, if you
23 know?
24     A.  I don't know specifically why it didn't
25 become a formal process, but that directive is just as

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ee7f83

APPENDIX127

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

33

1 strong as any policy that is put in place. And, in
2 fact, in some cases, emphasizes the subject matter
3 even more so.
4    Q. Has anybody in the Texas Department of
5 Criminal Justice ever been disciplined for not
6 adhering to that informal e-mail, to your knowledge?
7    A. I don't know to my knowledge. I don't know
8 of anyone to my knowledge.
9    Q. Okay. Are you aware of anyone not
10 adequately protecting inmates from heat, to your
11 knowledge?
12    A. To my knowledge -- can you repeat the
13 question?
14    Q. Yeah. Are you aware of anyone ever in the
15 Texas Department of Criminal Justice system not
16 adequately protecting inmates from the dangers of
17 extreme heat?
18        MS. COOGAN: Objection. Form.
19    Q. (BY MR. EDWARDS) And I assume you would be.
20    A. Well, again, directly in those -- in those
21 cases out there, I am trying to remember of a specific
22 incident. But we do have processes and procedures out
23 there, and I'm not going to attest that every staff
24 member that has ever been in our agency has always
25 followed those. But a specific example, I can't name

---

34

1 one for you.
2    Q. Well, if somebody were to violate your
3 formal policy, 10.64, temperature extremes in the
4 workplace, that would be clearly delineated and there
5 would be a discipline process for that. Correct?
6    A. Could be a disciplinary process, but could
7 be -- it could be counseling.
8    Q. Sure. What the discipline process would be,
9 that's up to you?
10    A. Right.
11    Q. But there would be a clear line that this
12 doesn't fly because you're violating a policy?
13    A. Right.
14    Q. Fair? Okay. There is a difference between
15 kind of an informal e-mail directive and a formal
16 agency policy in your mind, isn't there?
17    A. I would agree.
18    Q. Okay. Having a formal agency policy
19 suggests greater importance. Is that fair?
20    A. I could agree with that, yes.
21    Q. Okay. We've got the temperature extremes.
22 Now, you mentioned the ACA standards generally, and I
23 believe you said, in particular, as to the
24 accreditation process at Hutchins?
25    A. Yes, sir.

---

35

1    Q. Can you elaborate on that, because you've
2 got me at a little bit of a disadvantage. I'm not
3 as -- I'm sure I'm not as familiar with those as you
4 are.
5    A. Okay. Again, each facility that we have
6 within our agency is required to go through an
7 accreditation process that is performed by the
8 American Correctional Association. That association
9 comes in and evaluates every facility against the
10 national standards of conditions, conduct of staff,
11 access to medical care, appropriate treatment and
12 classification of offenders, and quality of life. So
13 Hutchins is surely one of those facilities that has
14 gone through that process, and I reviewed those
15 documents to see when they had gone through that
16 process.
17    Q. Okay. When did Hutchins go through that
18 process?
19    A. They've actually been through that process,
20 I believe, three times, because they're reaccredited
21 every three years. An institution is required to go
22 through every 36 months. So my recollection says that
23 the last time they went through it was actually this
24 year. I want to say it was January of 2013. And I
25 believe the two subsequent reviews were done in 2010

---

36

1 and 2007.
2    Q. Any talk about the indoor temperatures in
3 those documents?
4    A. There is talk about the environmental
5 conditions in the housing areas. There are standards
6 that deal with air flow, there are standards that deal
7 with the temperature as a whole, and in those audits,
8 Hutchins passed those standards.
9    Q. Do you know if any of the audits took place
10 in the summer?
11    A. I want to say that Hutchins was audited in
12 January one year and maybe the spring. I don't know
13 that any of them took place in the summer.
14    Q. Did any of them take place when it was
15 110 degrees outside?
16    A. Again, I don't know what the temperature was
17 when those audits took place. But, again, as I
18 recall, those audits took place during the beginning
19 of the year.
20    Q. Okay. Did you make available or do you know
21 if the internal heat temperature documents which
22 register readings in the 130s, 140s, even 150 degrees
23 in the period of July 2011 were ever made available to
24 any ACA member?
25        MR. GARCIA: Objection.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX128

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

---

37

1  Mischaracterizes the evidence.
2      A. I do not know what documents the team
3  reviewed when they conducted their audit.
4      Q. (BY MR. EDWARDS) Okay. Who would?
5      A. I would assume the ACA panel might.
6      Q. Who is that?
7      A. That's the national accreditation panel that
8  actually performed the audit theirself. They produce
9  a report of their findings. That report goes to a
10  panel who considers accreditation.
11      Q. All right. Well, have you ever -- I mean,
12  were you aware that there are documents in this
13  particular case which indicate apparent indoor
14  temperatures -- or excuse me.
15      Are you aware that there are documents
16  in this case which show that the outside temperature,
17  when you count actual temperature plus humidity,
18  apparent temperature, exceeded 130 degrees?
19      MS. COOGAN: Objection. Form.
20      MR. GARCIA: Objection.
21  Mischaracterizes testimony. And evidence.
22      A. I believe, in the documents that I received,
23  I can't remember if that was referenced. I remember a
24  document, I want to say maybe an attachment in
25  Mr. Eason's deposition, that referenced a temperature

---

38

1  of -- of somewhere close to the hundred range. So
2  that's a temperature document I remember. I don't
3  remember if that document referenced a heat index or
4  not. So if I have reviewed it, I don't remember
5  seeing it.
6      Q. (BY MR. EDWARDS) Okay. Well, I mean, in
7  your job as a -- and was -- is it director of the
8  criminal institution division, is that your formal
9  title, sir?
10      A. Yes, sir.
11      Q. Okay. In that role, did you ever review the
12  temperature readings at the prisons that you were
13  supervising during the summer periods?
14      A. Not personally. I cannot say that I
15  reviewed temperature documents from every system or
16  any unit that was out there on the -- I relied on my
17  wardens.
18      Q. Okay. And I just want to be -- I'm not
19  asking if you reviewed every single document ever.
20      A. Okay.
21      Q. I'm asking if you reviewed any of them?
22      A. I do not remember reviewing an individual
23  document per se.
24      Q. Let's say a document was sent to you which
25  said that the temperature, heat and humidity, is above

---

39

1  130 degrees. Would that cause you concern?
2      A. It would surely cause me to make sure that
3  those individuals at that unit were taking -- making
4  all mitigation attempts to address issues to ensure
5  that all of the mitigation steps that we have put in
6  place were put in place, to make sure that those unit
7  administrators were discussing any necessary issues
8  with risk management, with health services, to ensure
9  that all actions that were being taken were sufficient
10  to deal with the issue.
11      Q. Okay. So if you -- those high temperatures,
12  you would say, look, wardens have to review those
13  temperature logs. Correct?
14      A. Yes, sir. I would hope that the wardens
15  were reviewing the temperature logs. Yes, sir.
16      Q. And your expectation would be that the
17  warden would then take appropriate measures when
18  you're dealing with extreme temperatures. Correct?
19      A. Yes, sir.
20      Q. Okay. Are you aware of the chart by the --
21  the weather chart that's in a lot of your training
22  documents?
23      A. I believe it's similar to the one that is in
24  1064, I believe.
25      Q. Exactly. Where it talks about heat stroke

---

40

1  may be possible, or heat stroke might be probable, or
2  heat stroke is imminent?
3      A. Yes, sir.
4      Q. Okay. What does the word "imminent" mean to
5  you?
6      A. Immediate.
7      Q. Okay. That's what it means to me. Would it
8  surprise you that that's not what it means to
9  Warden Pringle?
10      MR. ANASTASIDIS: Objection. Calls for
11  this witness to speculate as to what another person
12  might believe or might not believe.
13      A. Again, imminent, to me, is immediate. I
14  would think that most individuals would interpret it
15  as that.
16      Q. (BY MR. EDWARDS) Okay. It would be
17  dangerous to interpret it any other way. Right?
18      MR. GARCIA: Objection. Speculation.
19      A. Again, that would be my interpretation of it
20  as being immediate.
21      Q. (BY MR. EDWARDS) I appreciate that because
22  I think we can agree that's what the word actually
23  means. But my question -- and let me withdraw that
24  part of it -- but my question is, if you treat the
25  word "imminent" as meaning just possible, and that's

---

APPENDIX129



Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

41

1  in your policies to protect inmates, if you treat it
2  that way, wouldn't you be necessarily endangering
3  inmates?
4      A.  Well, and again, I would say that imminent,
5  in my definition, would be immediate.  So immediate
6  would mean that whatever circumstance you happen to be
7  talking about would -- would occur in a short period
8  of time.
9      Q.  Of course.  If you're about to go over a
10  waterfall that would be an imminent danger.  Right?
11      A.  I would agree.
12      Q.  It's not possible, it's imminent.
13  Different.  Right?
14      A.  I would agree.
15      Q.  Okay.  All right.  The -- within the three
16  deputy director groups, sir, what does the...
17      A.  Director of manufacturing logistics?
18      Q.  You've got better hearing than me.  Yes.
19  What does the director of manufacturing logistics do?
20      A.  That director position was responsible for
21  supervising offender industry within the institutions,
22  warehousing for the system, freight transportation for
23  the system.  Those were the -- were the major
24  components of that position.
25      Q.  I mean, would that include kind of the

---

42

1  management of the agricultural programs relating to
2  pigs?
3      A.  No, sir.  At one time that was included, but
4  that was separated out years ago.
5      Q.  Who runs that?
6      A.  Again, when I left the agency in May,
7  Matt Demny was the director of that particular
8  division.
9      Q.  Where is he on the kind of the structural
10  chain?  Who is his supervisor and how high does it go?
11      A.  I believe he would report, in the
12  organizational structure, through the chief financial
13  officer.
14      Q.  Who is that?
15      A.  It would be Jerry McGinty.
16      Q.  Is the chief financial officer at your
17  structural level or is he above you?
18      A.  He reported directly to the executive
19  director, so I mean, he was basically another
20  division.
21      Q.  Is that Director Livingston?
22      A.  Yes, sir.
23      Q.  Okay.  So any decision to provide cooling
24  for pigs, that would not be something that you would
25  have been responsible for?

---

43

1      A.  No, sir.
2      Q.  Okay.  In fact, you wouldn't even be in that
3  line of implementation or ability to stop that?
4      A.  No, sir.
5      Q.  We would go Director Livingston, CFO
6  McGinty, Mr. Matt Demny.  Fair?
7      A.  Again, I don't know who is the final
8  approval for that, but Matt Demny, as the division
9  director, would be involved in that process.
10      Q.  Okay.  Prior to this year, were you aware
11  that TDCJ was spending hundreds of thousands of
12  dollars on cooling equipment for pigs?
13      A.  No, sir.
14      Q.  Does that offend you, when they don't spend
15  it on inmates?
16      A.  Again, I wouldn't compare my offender
17  population to swine, but again --
18      Q.  Why not?
19      A.  I can't speak -- I can't speak to what the
20  needs are of the agriculture division.
21      Q.  Would you place the needs of your inmate
22  population on at least an equal level to the needs of
23  the swine in the division?
24      A.  Again, I wouldn't -- I wouldn't put them in
25  the same priority level.  It's obvious that the

---

44

1  offender population is our ultimate responsibility and
2  appropriate care of them surely takes priority.
3      Q.  Okay.  All right.  Is Director Livingston at
4  your regional director meetings?
5      A.  No, sir.  Not normally, no, sir.
6      Q.  Normally not?
7      A.  Normally not.
8      Q.  Does he get -- how is he made aware of
9  issues in the system that you have identified as
10  needing policies or needing changes?
11      A.  Again, there is a -- the major communication
12  and efforts between myself in my role as a division
13  director and Mr. Livingston was face-to-face
14  communication, and myself delivering information to
15  Mr. Livingston on current issues within my division or
16  reviewing, in some cases, particular incidents.
17      Q.  Do you ever send him e-mails?
18      A.  Not very often.  I was right down the
19  hallway from him.  So if there was an incident where
20  he happened to be maybe in Austin during the
21  legislative session and I happened to be in Huntsville
22  and there was an incident, I might have sent him an
23  e-mail.  But -- but in most cases I either picked up
24  the phone and told him directly or went down with a
25  face-to-face meeting and briefed him on issues.

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX130

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

45

1    Q.  So you would occasionally send him e-mails
2  about particular issues in the prison system?
3    A.  Again, very -- very infrequently. I can't
4  remember the last time that I sent him an official
5  e-mail briefing him on anything, but I'm not going to
6  sit here and say that I've never sent him an e-mail.
7    Q.  Were you ever told not to send e-mails to
8  him?
9    A.  Never.
10    Q.  Never told that they might be a matter of
11  public record, so communicate directly with me?
12    A.  Never thought about that at all.
13    Q.  I appreciate that, but Director Livingston
14  never told you that?
15    A.  Never told -- never told me that at all.
16      MR. ANASTASIDIS:  Jeff, I don't want to
17  break up your train of thought, but we did discuss
18  things that Mr. Thaler reviewed, and one of them was
19  the ACA standards. This is a copy for you if you
20  would like to use it or just have it for your records.
21      MR. EDWARDS:  Sure. Thank you very
22  much.
23    Q.  (BY MR. EDWARDS) Would you like to take a
24  short break?
25    A.  Sure.

---

46

1    Q.  Or do you want to keep going? It's really
2  up to you.
3    A.  How long are you going to keep me here? If
4  you're going to keep me here for three more hours,
5  then --
6    Q.  I'm going to keep you here for probably
7  three more hours, but not much more than that.
8      MR. ANASTASIDIS:  Jeff, I would like a
9  break. There is additional documents. These are some
10  of the ACA documents, but I want to make sure you have
11  all of the ACA documents he reviewed.
12      MR. EDWARDS:  Sure. Okay. Let's take
13  a break and why don't you get those for me and that
14  would be great.
15      THE VIDEOGRAPHER:  We're off the record
16  at 9:55 a.m.
17      (RECESS.)
18      THE VIDEOGRAPHER:  We're back on the
19  record the time is 10:14 a.m.
20    Q.  (BY MR. EDWARDS) Did you ever send e-mails
21  to Director Eason?
22    A.  I cannot recall -- I cannot recall any
23  incident that I would have sent him an e-mail
24  directly, necessarily. If I send directives out, it
25  could have been general mainframe e-mails potentially

---

47

1  that dealt with subject matter for the entirety of the
2  field out there, quite possibly.
3    Q.  Robert Eason, is he a personal friend of
4  yours or are you more business colleagues?
5    A.  Business colleague.
6    Q.  Okay. And I don't mean to suggest that you
7  don't think he is nice or anything like that, I
8  just -- what about Director Stephens, are you personal
9  friends as well as business colleagues?
10    A.  I would consider him a friend, but more so
11  our relationship has been business.
12    Q.  Okay. Do you send e-mails -- did you send
13  e-mails to Mr. Stephens in the course of your career
14  as director of the criminal institution division?
15    A.  I'm sure there -- there are some e-mails out
16  there, yes, sir.
17    Q.  Did you ever send him an e-mail about the
18  high rate of deaths due to extreme heat in the Texas
19  prison system?
20    A.  I don't recall a specific e-mail about that
21  subject matter.
22    Q.  Did you ever talk to him about it?
23    A.  Yes, sir.
24    Q.  What did you talk to Director Stephens about
25  the dangers of extreme heat in the Texas prison system

---

48

1  and the resulting deaths that happened from them?
2    A.  Well, as was discussed earlier, we had many
3  discussions going into the seasonal periods of each
4  year. Mr. Stephens was surely involved in our
5  meetings with the regional directors. Any issues that
6  were to arise, again, Mr. Stephens in most cases was
7  the first contact point from the regional director
8  level. So if it was a particular issue that needed to
9  be discussed, he would normally make contact with me.
10  Again, in most cases, we made a practice of meeting to
11  discuss most issues at the end of each business day,
12  and in some cases that is the time when we would
13  discuss any matters that arose on the unit that he
14  thought that I needed to be aware of.
15    Q.  Some of those conversations at the end of
16  business days included the problems associated with
17  heat inside the prisons?
18    A.  Some of those discussions during summer
19  months would have included what steps were being taken
20  out on the facilities to deal with heat-related
21  issues, yes, sir.
22    Q.  Did you ever talk to -- well, okay.
23      Tell me about the actual process
24  that -- of how policies are made at TDCJ, how exactly
25  are they made, if you know?

---



Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

49

1    A.  Well, as I can speak from a division
2  director's level.  If there is an identified need for
3  policy development, then the proponents in that
4  particular division would initiate that policy.  There
5  surely would be input from the divisional leadership
6  and those elements within that division that that
7  policy would affect.  That policy would be put out in
8  draft form.  If that policy affected any other
9  division, there would be an opportunity to process
10  that for review from all those divisions through our
11  Executive Services Division.
12        If the policy crossed divisional lines,
13  then it would fall in the category of an
14  administrative directive.  And that administrative
15  directive, after review, modification, and processing,
16  would be finalized and then forwarded for signature to
17  the appropriate entity.
18    Q.  Okay.  I think you threw a lot out at me,
19  and I just want to -- anyone can identify a need and
20  draft a policy.  Is that correct?
21    A.  Not anyone.  But a -- an issue that is --
22  requires a policy direction, depending on what that
23  need happens to be.  The agency has, currently,
24  hundreds of policies, so there -- it's not very
25  frequently that new policies are adopted.  In many

---

50

1  cases, policies are modified in our current system to
2  cover the subject matter that would address most
3  issues, but there might be an occurrence where a new
4  policy for a new program or a new initiative would be
5  developed.
6    Q.  Okay.  Correct me if I've misunderstood
7  anything you said.  Look, anybody can identify a need.
8  The proponents in the division, if they do so, they
9  can try to initiate a formal policy by drafting
10  something and then sending it on to the appropriate
11  levels.  Is that fair?
12    A.  That's fair.
13    Q.  Okay.  Would you agree with me that that
14  hasn't happened with regards to indoor housing
15  temperatures at TDCJ in any of its facilities?
16    A.  As far as a specific policy referencing
17  indoor temperatures, the agency has relied on that
18  e-mail that we referenced earlier.  There is not a
19  separate policy to address that issue.
20    Q.  Okay.  There easily could have been drafts
21  circulating around by any of the regional directors or
22  anyone up the food chain up through Director
23  Livingston if they wanted to.  Right?
24    A.  If a need was identified to develop that
25  policy, that surely could be initiated by a multitude

---

51

1  of individuals, yes, sir.
2    Q.  Okay.  Don't you think you need such a
3  policy?
4    A.  Well, again, as we spoke earlier, the issue
5  that you're referencing is the issue of ensuring that
6  we're dealing with the needs of offenders and offender
7  housing area.  The agency has historically dealt with
8  that process, in my opinion, through that notification
9  to staff of requirements every year, in addition to
10  ensuring that we're meeting the necessary fire and
11  safety and health services requirements as we house
12  our offenders day in, day out in our institutions.
13  And there are surely policies that cover those
14  portions.  An additional policy that deals with
15  specific temperature or specific initiatives or
16  mitigation efforts for offender housing areas would be
17  something that would look similar to information that
18  has been disseminated for many years, it would just be
19  codified in a policy -- more than likely, an existing
20  policy.
21    Q.  Even after 2000 -- even after the summer of
22  2011 when at least ten people died of hyperthermia,
23  you're not aware of anyone circulating a draft policy
24  relating to indoor housing temperatures?
25    A.  I have left the agency.  There was

---

52

1  discussion about the drafting of such policy, but I
2  can't speak to that since -- since I left in May.
3    Q.  There was discussion in this year before you
4  left or prior to that?
5    A.  This year before I left.
6    Q.  Okay.  Prior to this lawsuit being filed,
7  are you aware of any discussion relating to changing
8  policies with regards to indoor temperatures in the
9  housing areas?
10    A.  Adopting a policy -- a -- modifying a policy
11  or changing a policy?  You said, changing a policy.
12    Q.  Either.  Creating one?
13    A.  I don't know of any conversation that took
14  place as it related to changing the method by which we
15  put out instructions for mitigating steps to take
16  during this seasonal period, so...
17    Q.  You mentioned that if this were to occur, it
18  would go to the Executive Services Division?
19    A.  Yes, sir.
20    Q.  What is that?
21    A.  That is a -- a division within the agency
22  that deals with the -- Emergency Action Center process,
23  it deals with policy development from the agency
24  perspective.  Again, as I mentioned before, it deals
25  with dissemination of policies that -- across

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7cc7f83

APPENDIX132

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

53

1  divisional lines, so they would be the ultimate
2  drafters and producers of those policies. And also
3  serve as a function of research and collection of
4  statistical data for the agency.
5      Q.  Would you be on that Executive Services
6  Division, or is that somebody else?
7      A.  That's a different division.
8      Q.  Who ran that division, do you know? And
9  I'm -- basically, '09 to the present, if you know?
10     A.  That division -- the individuals in that
11  division would have reported to Jeff Baldwin.
12     Q.  Jeff Baldwin. And who is Jeff Baldwin? I'm
13  sure I should know, but --
14     A.  Jeff Baldwin is chief of staff in the
15  agency.
16     Q.  Chief of staff to Director Livingston?
17     A.  Yes, sir.
18     Q.  So would he be the best person to ask about
19  changing policies, modifying policies, creating
20  policies relating to indoor temperatures in the
21  housing areas?
22     A.  As it relates to agency policy and ADs, that
23  falls under his purview, yes, sir.
24     Q.  Okay. And he, again, reports directly to
25  Director Livingston?

54

1      A.  Yes, sir.
2      Q.  They work hand in hand, to your knowledge?
3      A.  As all division directors do, yes, sir.
4      Q.  Did Mr. Stephens function kind of as your
5  chief of staff in a way?
6      A.  I wouldn't say that. All three deputy
7  directors carried on different responsibilities and
8  covered different components of the Correctional
9  Institutions Division, so Mr. Stephens surely had his
10  portion of that.
11     Q.  Each of them collectively functioned as
12  essentially a chief of staff for you?
13     A.  Yes.
14     Q.  Fair?
15     A.  They reported -- I relied on them to -- to
16  bring issues to my attention that needed to be
17  addressed, yes, sir.
18     Q.  Okay. When a policy is finally made, is
19  Director Livingston -- does it require his approval?
20     A.  In -- there is different signatures, but in
21  most cases an administrative directive would be signed
22  by Mr. Livingston. There are some administrative
23  directives that would be signed by the executive
24  deputy director.
25     Q.  Would he be involved at all in -- did you

55

1  ever -- I mean, did you have personal conversations
2  with Director Livingston about the extreme heat inside
3  the Texas prison system, generally?
4      A.  In general, particularly in -- as we went
5  into each seasonal year, we surely generated the
6  initial notification to all staff. There, I'm sure,
7  were conversations that we had as we were going into
8  each seasonal period where I would assure
9  Mr. Livingston that directions were put out to the
10  field and training was being conducted. As we had the
11  incidents occur in 2011, I would have surely discussed
12  with Mr. Livingston the subject matter of the
13  incidents that were occurring and steps that were
14  being taken to address the issue.
15     Q.  Okay. So the individuals that died in --
16  well, when did you take over your job as --
17     A.  2009.
18     Q.  2009. Okay. So any offender death that was
19  linked to hyperthermia, you would have discussed that
20  with Director Livingston?
21     A.  I can't say that I discussed specific
22  individual incidents with Mr. Livingston in all cases.
23  In some cases, the cause of death wasn't identified
24  until sometime after -- after the incident. But the
25  general subject matter about, as Health Services

56

1  Division provided information that we were dealing
2  with deaths as a result of hyperthermia, the general
3  subject matter surely would have been discussed with
4  Mr. Livingston.
5      Q.  Okay. And even before you discussed deaths
6  due to hyperthermia with Mr. Livingston, do you know
7  if he was knowledgeable about the dangers extreme heat
8  posed to inmates in the Texas prison system?
9      A.  I can't speak for Mr. Livingston.
10     Q.  Would you expect him to be knowledgeable
11  about the dangers of extreme heat in the Texas prison
12  system?
13     A.  I would expect that Mr. Livingston is
14  knowledgeable about many things, but I can't speak to
15  what his knowledge level was in any particular area.
16     Q.  Well, you train all of your officers, from
17  the lowest correctional officer up until yourself,
18  heading the Correctional Institutional Division --
19     A.  Right.
20     Q.  -- about the dangers of extreme heat in the
21  prison system. Right?
22     A.  Yes, sir.
23     Q.  Wouldn't you expect the executive director
24  of the prison system to be equally knowledgeable about
25  those policies and problems?



APPENDIX133

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

57

1    A. I would assume that Mr. Livingston is
2 knowledgeable about policies within the agency, yes,
3 sir.
4    Q. Well, specifically, would you expect him to
5 be knowledgeable about the particular danger that
6 heat, extreme heat inside the prison system poses to
7 inmates?
8        MR. ANASTASIDIS: Objection. Asked and
9 answered, and also calls for speculation.
10    A. Again, I think I answered your question. I
11 can't speak to his knowledge. Again, generally, I
12 would say that Mr. Livingston is aware of most issues
13 within the agency and policies that are written to
14 address those issues.
15    Q. (BY MR. EDWARDS) Okay. Well, when you talk
16 to him about people dying due to -- of hyperthermia
17 due to indoor heat, was he surprised?
18    A. I surely don't think that -- particularly,
19 when we had the first discussion in 2011, that any of
20 us were anticipating or expecting any deaths to occur.
21 So I don't know if "surprise" is the right word, but
22 it surely was information that we had discussed that
23 we never had discussed before.
24    Q. Prior to 2011, you never talked about deaths
25 in the Texas prison system with -- with Director

---

58

1 Livingston relating to heat?
2    A. No, sir, I did not.
3    Q. Okay. Were you aware that other people had
4 died in the Texas prison system due to heat-related
5 illness prior to 2009?
6    A. I cannot say that -- that I had direct
7 knowledge relating to any specific incident of a
8 heat-related illness death in the system prior to
9 2009.
10    Q. Well, were you aware that correctional
11 officers would routinely complain about the high heat
12 inside the prison?
13    A. I don't know if I would use the word
14 "routinely." I worked inside those systems for many
15 years myself, and surely conditions were uncomfortable
16 but not unbearable.
17    Q. Okay. Let me change it. Were you aware
18 that correctional officers throughout the prisons in
19 TDCJ system would complain about the heat and how hard
20 it was for them to work in that heat?
21    A. Again, I might have not answered your
22 question directly, but as it relates to formal
23 complaints rising to my level, individuals bringing
24 complaints from staff to my level, I cannot say that I
25 recall having specific conversations about complaints

---

59

1 coming from staff in the field.
2    Q. Would it surprise you to learn that
3 correctional officers have, in fact, complained about
4 the intense heat at the Hutchins Unit?
5    A. It wouldn't surprise me that there are some
6 staff members that would complain about many
7 conditions, to include the environment they work in.
8    Q. Well, does the environment you work in, is
9 it 100 degrees on a consistent basis during the
10 summer?
11    A. The environment that I worked in?
12    Q. Yes.
13    A. For the most part, no, not during the
14 position that I held as director for the agency.
15    Q. Right. Your office was air conditioned.
16 Right?
17    A. Yes, it was.
18    Q. All of your senior staff's offices were air
19 conditioned. Right?
20    A. Yes, sir.
21    Q. All of your wardens' offices, including
22 Warden Pringle at the Hutchins Unit, their office is
23 air conditioned. Right?
24    A. Yes, sir.
25    Q. Your correctional officers and the inmates

---

60

1 in the housing areas, they don't have that benefit.
2 Isn't that correct?
3    A. That is correct. For the most part, yes.
4    Q. Okay. And that's a choice that the agency
5 has made not to air condition those areas. Right?
6    A. There are some facilities that were not
7 constructed with air conditioning, yes, sir.
8    Q. And that's a choice that TDCJ is continuing
9 to make now. Isn't that correct?
10    A. TDCJ has not made the determination that it
11 is necessary to air condition all of the facilities in
12 our agency, yes, sir.
13    Q. In fact, TDCJ has done absolutely nothing
14 from 2009 to the present to cool the temperatures in
15 the housing areas that aren't air conditioned. Isn't
16 that correct?
17    A. That is -- I would disagree with that.
18    Q. Tell me why.
19    A. I disagree in the sense that to say that
20 TDCJ has done nothing to cool the housing area
21 environments, as we go into every year, we continue to
22 look at the environment as a whole. Facilities
23 Division is responsible for ensuring that ventilation
24 systems, exhaust systems, fans are operating
25 appropriately. Unit administrations are responsible

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX134

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013



61

1  for evaluating housing areas, multi-purpose areas, for
2  the request of any additional fans that could be
3  placed in those areas to help with air flow.  Again,
4  we take the steps that are outlined in the e-mail to
5  mitigate conditions within the housing areas.  But,
6  again, to say that nothing has been done, I think, is
7  an inaccurate statement.
8      Q.  Okay.  And I understand that you have put
9  out this e-mail and that steps are taken to mitigate
10  the effects of this intense heat that prisoners and,
11  frankly, guards experience.  Right?
12     A.  We put out that e-mail to mitigate the
13  extreme temperatures, yes, sir.
14     Q.  Well, now, that's what I want to drill down
15  on.  Okay?
16     A.  Okay.
17     Q.  I am interested in you telling -- there is a
18  difference between mitigating the effects of super hot
19  conditions and actually eliminating the heat and
20  taking the temperature down.  You would agree with me
21  on that.  Right?
22     A.  I would agree.
23     Q.  You can bring a lot of ice water to someone
24  in a 115-degree environment.  Right?
25     A.  Sure.

62

1      Q.  But it doesn't change -- doesn't take the
2  temperature down to a safe level, does it?
3      A.  It would not -- ice water would not reduce
4  the temperature of the dormitory.
5      Q.  It might help a person be able to live in
6  that type of condition, but it doesn't do anything to
7  fix the actual condition of extreme heat.  Fair?
8      A.  It -- ice water would not reduce the
9  temperature in dorms, I agree.
10     Q.  All right.  Now, along those lines, I'm
11  handing you -- it's been previously marked, but we'll
12  mark it again as Exhibit 50.  And that is, I believe,
13  the e-mail that is sent out consistently by you.
14         (Deposition Exhibit No. 50 marked.)
15         MR. EDWARDS:  There you go Demetri.
16  Sorry.
17         MR. ANASTASIDIS:  Thank you.
18     Q.  (BY MR. EDWARDS)  And take as long as you'd
19  like, but would you agree with me that this is the
20  e-mail that has been basically sent out, at least from
21  '09 to the present, concerning these heat precautions?
22     A.  With some minor modifications in the
23  present, yes, it is.
24     Q.  Okay.  Well, we'll talk about those.  But
25  what I'm very interested in is, point me to anything

63

1  in those precautions that actually reduce the
2  temperature inside the housing areas.
3      A.  Well, again, as I referenced earlier, the
4  only specific item covered in here is the appropriate
5  use of your air flow systems, your exhaust flow
6  systems to move any buildup of heat within those
7  housing areas outside those housing areas.
8      Q.  And I want to ask you about that.
9      A.  Okay.
10     Q.  We'll talk about the ventilation systems or
11  whatever.  Anything other than ventilation systems in
12  this precaution which you would contend actually would
13  lower the temperature?
14     A.  No, sir.
15     Q.  Okay.  Now, I want to make sure that we're
16  on the same page because my understanding is that
17  those ventilation systems effectively blow hot air.
18  Is that correct?
19     A.  Well, in some cases those exhaust systems
20  are blowing hot air out of the housing area, yes.
21     Q.  If it's a hundred degrees, the air they're
22  blowing in and out is effectively a hundred degrees.
23  Right?
24     A.  I don't know what the temperature would be,
25  but you could make that assumption.



64

1      Q.  It's kind of like the difference between air
2  conditioning your car and a vent system in your car.
3  Right?
4      A.  Somewhat, yes.
5      Q.  Okay.  Like, for instance, you're driving
6  from Huntsville to Austin in the dead of summer, there
7  is quite a difference between using air conditioning
8  in your automobile and not having air conditioning but
9  just putting the vent on.  Right?
10     A.  That's correct.
11     Q.  One is -- cools the environment and lets you
12  live in the temperature that you can live in.  Right?
13     A.  One is -- one would cool the environment,
14  the other would move the air.
15     Q.  Okay.  Tell me what medically beneficial
16  effect you're aware of with regards to moving
17  extremely hot air around to your prison population, in
18  particular in the Hutchins Unit?
19         MR. GARCIA:  Objection, compound.
20  Objection, speculation.
21     Q.  (BY MR. EDWARDS)  Let me withdraw that.
22         Tell me any benefit that you're aware
23  of that would take place at the Hutchins Unit from
24  moving hot air around through a ventilation system?
25         MR. GARCIA:  Objection, vague.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX135

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

65

1   Objection, speculation.
2       A.  Well, again, the effects of the exhaust
3   systems in all our housing areas and the fans that are
4   available there in some cases, as I say, are there to
5   move that hot air out of the particular housing area.
6   But in other cases, those fans are there for the
7   effects of the offender population.  And, again,
8   although it might not reduce the temperature, it
9   allows for some comfort for those individuals that
10  have the ability to access those fans.
11      Q.  Now, are you aware that the fans actually,
12  because of the energy they use, actually increase the
13  temperature?
14          MR. GARCIA:  Objection, speculation.
15          MS. COOGAN:  Join.
16      A.  I'm not aware of that.
17      Q.  (BY MR. EDWARDS)  If that were the case,
18  would that trouble from a policy making standpoint?
19          MR. ANASTASIDIS:  Objection.  Rule --
20  go ahead.
21          MR. GARCIA:  Speculation.
22          MR. ANASTASIDIS:  Objection, Rule 602.
23  This witness has no personal knowledge.
24          MS. COOGAN:  Join.
25      A.  Again, I would hope that nothing would

66

1   increase the temperature in those dorms, but I have no
2   knowledge of whether that would happen or not.
3       Q.  (BY MR. EDWARDS)  Well, have you asked
4   anybody if the fans actually reduce the temperature or
5   provide some benefit?
6       A.  I specifically have -- from the Facilities
7   Division guidance and consulting with the
8   Facilities Division as we go into every year, it's
9   their, I would assume in this case, expert opinion
10  that they serve that purpose of dispensing that hot
11  air from the dormitories.  Specifically have I asked
12  that question?  I can't say that I have.
13      Q.  Okay.  But as the former head of the
14  criminal institution division, at least from '09 until
15  early this year, I mean, did anyone ever talk to you
16  about why these fans are there -- well, strike that.
17          As the head of the Criminal
18  Institutions Division from '09 to at least the --
19  almost the present, or slightly -- whenever you
20  retired --
21          MR. ANASTASIDIS:  Correctional
22  Institution, not Criminal Institution.
23          MR. EDWARDS:  I apologize.  Let me
24  restate that.  That's a Freudian slip, I suppose.
25      Q.  (BY MR. EDWARDS)  As the head of the

67

1   Correctional Institutions Division from '09 to 2012,
2   isn't it your responsibility to know whether or not
3   these fans are helping or hurting the inmates?
4       A.  I surely rely on the expertise of
5   individuals in the field.  And as we move into each
6   seasonal period, we rely on the Facilities Division to
7   help us address that issue.  The Facilities Division
8   puts extreme emphasis on ensuring that our ventilation
9   and exhaust systems are functioning appropriately.
10  From the CID's perspective, additional fans are
11  purchased for the comfort of offenders in those
12  particular areas each year and distributed as
13  requested by unit administrations due to need.
14      Q.  Is it your understanding, based on talking
15  to these people, that the hot air is blown out of the
16  housing area?
17      A.  Yes, sir.
18      Q.  If that's incorrect, where -- well, where
19  did you get that belief?
20      A.  Again, that's --
21      Q.  Facilities Division?
22      A.  -- in general conversations with the
23  Facilities Division.
24      Q.  Okay.  Who in particular?
25      A.  Specifically, I -- I can't say.  That has

68

1   been a -- a recommendation by the Facilities Division
2   as long as I have been at our institutions.
3       Q.  Is that Mr. Vian?
4       A.  Mr. Vian is currently deputy director over
5   that area and he plays some role in oversight.  But of
6   the facilities staff that is on at every facility
7   that's responsible for maintenance functioning and
8   ventilation systems in our housing areas.
9       Q.  Anyone with any medical background advising
10  you about whether or not these fans are -- are
11  beneficial in moving hot air out of the dorm?
12      A.  I don't know of anybody from the Health
13  Services Division that has given me input relating to
14  exhaust systems and their functioning in a housing
15  area.
16      Q.  Well, is the purpose of these fans to --
17  well, so you've never in a conversation with anyone
18  from the Health Services Division of TDCJ as to
19  whether or not these fans are actually beneficial from
20  a medical standpoint?
21      A.  I think as it -- and, again, depending on --
22  are we talking about the exhausting fans or are we
23  talking about the floor fans that are put in, or
24  either?
25      Q.  Either?

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX136

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

69

1    A.  Again, floor fans help circulate the air.
2  Again, more for comfort level.  Exhaust fans, it would
3  be my premise from Facilities Division instruction
4  that they help expel hot air from the dormitories.
5  Health services staff discussions have -- have, to my
6  recollection, not involved discussions about fans
7  themselves, more so the appropriate steps to take to
8  address any offender issues.
9    Q.  Okay.  This expelling of hot air, it gets
10  replaced with what kind of air?
11    A.  Again, as was mentioned earlier, there is --
12  the intake fans bring in air from the outside.  It's
13  not cooled, so there is not cool air flowing into the
14  housing areas.
15    Q.  Now, if one of the problems is that people
16  with certain medical conditions cannot cool their
17  bodies, would you agree with me that fans are
18  worthless as a means to protect them from this?
19    A.  I don't know that I have the medical
20  expertise to say that they're worthless.
21    Q.  Well, if they were worthless, that would be
22  a problem.  Right?
23      MR. ANASTASIDIS:  Objection.  Calls for
24  the witness to speculate.
25    A.  Again, it's not my belief that they are

70

1  worthless.
2    Q.  (BY MR. EDWARDS)  Based on what?
3    A.  Based on, again, the ability to generate air
4  flow within the dorms and provide for some comfort
5  level for the offenders.
6    Q.  Okay.  Is that just based on your personal
7  experience?
8    A.  Personal experience and -- and, again, those
9  conversations that I've had with facilities staff.
10    Q.  Can you tell me any particular individual in
11  the facilities staff who has told you that these fans
12  can somehow help a body cool?
13    A.  Not -- no.
14    Q.  Okay.  Have you ever had a conversation with
15  anyone with any medical background as to whether or
16  not these fans can help a body cool or a person
17  acclimate to an extremely high temperature?
18    A.  Again, there might have been a conversation,
19  but I do not recall.
20    Q.  Okay.  Would you agree with me that it's
21  pretty important for the person in charge of the
22  overall prison system, at least the Correctional
23  Institutions Division, for them to know these answers?
24    A.  I think it would be important to talk to the
25  experts in the field that -- that are -- that can give

71

1  those answers.  And, again, as it relates to fans,
2  most of my information has flowed from the
3  Facilities Division, not from the Medical Division.
4    Q.  Ever had a conversation with anyone from
5  UTMB about these exhaust fans?
6    A.  Not that I can recall.
7    Q.  Ever had a conversation with anyone from
8  UTMB about, how can we lower the temperature to make
9  it safe for these prisoners?
10    A.  There have surely been conversations with
11  Health Division staff relating to conditions within
12  the housing areas and steps that -- steps that should
13  be taken to help mitigate the heat.
14    Q.  Okay.  When you say Health Services
15  Division, just so I'm clear, you're talking about the
16  Texas Department of Criminal Justice Health Services
17  Division.  Correct?
18    A.  Yes, sir, I am.
19    Q.  Okay.  Is Doctor Linsicum involved in that?
20    A.  Doctor Linthicum.  Yes, sir.
21    Q.  Linthicum.  Excuse me.
22      Did she give you any suggestions about
23  how to lower these temperatures which are dangerous?
24    A.  Again, Doctor Linthicum has discussed this
25  issue, and extensively, as we go into every seasonal

72

1  period, she works closely with contracted health
2  service staff to ensure that appropriate measures are
3  being taken on the facilities to deal with any issues
4  and appropriately house offenders on our facilities.
5  Doctor Linthicum and I have had a multitude of
6  discussions about ensuring that water is available for
7  these offenders.  I cannot say that -- I would be
8  assuming there might have been a conversation about
9  fans, but I don't want to assume that we had that
10  conversation.
11    Q.  Okay.  As you testify here today, other than
12  making sure that water is available to inmates, can
13  you think of any other conversations you had with
14  Doctor Linthicum or anybody from the Health Services
15  Division about lowering the temperatures or mitigating
16  the heat in particular units?
17    A.  Sure.  As it relates to the overall factor
18  of mitigating the heat, again, those conversations
19  have been more comprehensive about how we deal with
20  the individuals that in some cases might be more
21  susceptible to heat-related illness.
22    Q.  Like who?
23    A.  As some of those factors that were named
24  earlier, if there is a medical condition or an
25  individual is on medication that the Health Services



APPENDIX137

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**73**

1  Division as identified might be more susceptible to
2  heat-related illness, there is a variety of that
3  criteria that they use.
4      Q.  Sure.
5      A.  Then we've talked about ensuring that staff
6  in the field is aware of those individuals so that we
7  can ensure that those mitigation efforts that we have
8  put out there are taking place, and that if an
9  individual is suffering from any heat-related illness
10 that is identified appropriately so that individual
11 can get immediate health service care.
12     Q.  Heat stroke is a medical emergency.  Right?
13     A.  Yes, sir.
14     Q.  It requires immediate care.  Correct?
15     A.  Yes, sir.
16     Q.  From a doctor or a medical provider, not
17 from like a supervisor or a lieutenant or sergeant.
18 Correct?
19     A.  I would say that that's surely a situation
20 that requires attention by a health service
21 professional.
22     Q.  You would expect all of your correctional
23 officers to know that, certainly, during the period
24 2009 until the present.  Correct?
25     A.  Yes, sir.

---

**74**

1      Q.  You would expect any human being to know
2  that.  Right?
3      A.  I don't know if I would go that broad on any
4  human being, but --
5      Q.  Fair enough.  Any human being with any job
6  where they're responsible for taking care of people,
7  you would expect them to know that when they come upon
8  someone suffering a heat stroke, that that's a medical
9  emergency and they've got to get immediate medical
10 care.  Fair?
11     A.  I would say, if they have identified an
12 individual suffering from heat stroke, they should
13 know to get him medical care -- immediate medical
14 care.
15     Q.  Well, even if they don't know it's
16 absolutely and they see somebody
17 convulsing and nonresponsive and unable to have an
18 conversation for an extended period of time, then
19 that's an emergency that needs care.  Right?
20     A.  I would surely say that should involve
21 contact with health service professionals, yes, sir.
22     Q.  Okay.  What is the budget for the Texas
23 Department of Criminal Justice?  At least, let's say,
24 give or take, in 2013?
25     A.  The entire budget?

---

**75**

1      Q.  Yeah.
2      A.  Okay.  I think it runs approximately
3  $3 billion.
4      Q.  Okay.  Would you agree with me that, like,
5  one way you could just remedy this problem of people
6  with certain medical conditions experiencing heat
7  stroke due to really high temperatures is to just get
8  the temperature to a safe level through using cooling?
9      A.  Well, again, there are -- if -- taking your
10 presumptive question, if you were to reduce the
11 temperature in all housing areas in the Texas
12 Department of Criminal Justice, then the temperature
13 in the dormitory would surely be more livable, more
14 comfortable for the offender population.
15     Q.  Well, I'm not really concerned about comfort
16 right now.  I'm really concerned about the livable
17 part.  So let me ask you, of the employees that are
18 working in the air conditioned environments of all of
19 the facilities in the Texas Department of Criminal
20 Justice, are you aware of anybody dying from heat
21 stroke?
22     A.  Not to my knowledge, no, sir.
23     Q.  Okay.  Now, but you are aware of a lot of
24 people dying of heat stroke who are living in the
25 inside housing areas, inmates.  Right?

---

**76**

1      A.  I'm aware of some incidents, particularly in
2  2011, where hypothermia was determined to be the cause
3  of death, yes, sir.
4      Q.  Not just 2011, 2012.  Right?
5      A.  There are a couple of instances in 2012,
6  yes, sir.
7      Q.  And I assume you would agree with me that a
8  couple of incidents in 2012 is a couple of incidents
9  too many.  Right?
10     A.  I would agree.
11     Q.  And I assume you would agree with me that
12 ten incidents in 2011 is off the charts too many.
13 Right?
14     A.  I would agree that any number is too many.
15     Q.  Okay.  Because this is not a problem that
16 can't be fixed.  Right?  This is a problem that can be
17 fixed?
18          MR. GARCIA:  Objection.  Is there a
19 question in there?
20     Q.  (BY MR. EDWARDS)  Isn't this a problem that
21 can be fixed by lowering the temperature and
22 eliminating the potential for extreme heat to cause
23 heat stroke?
24          MR. GARCIA:  Objection, compound
25 question.  Objection, speculation.

---

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013




---

77

1    MS. COOGAN: And vague.  By whom?
2    A.  Again, we have safely housed individuals in
3  our institutions for many years.  There surely is a --
4  an environment where temperatures are not controlled,
5  and portions of our populations do live in those
6  environments.  It's been our practice to ensure that
7  appropriate steps are taken to mitigate the heat in
8  those particular circumstances, and that offenders are
9  appropriately housed in accordance with their health
10  service needs, so...
11    Q.  (BY MR. EDWARDS) I appreciate that, sir,
12  and I don't mean to be rude --
13    MR. EDWARDS:  But I'm going to object
14  as nonresponsive.
15    Q.  (BY MR. EDWARDS) Did you safe -- did the
16  Texas Department of Criminal Justice safely house
17  Larry Gene McCollum?
18    MR. ANASTASIDIS:  Objection, vague and
19  calls for speculation.
20    A.  I don't know what you mean by safely house,
21  but I will respond to that question of, Mr. McCollum
22  suffered from a heat-related illness.  The autopsy
23  indicated that it was from hyperthermia, so the living
24  conditions were a partial causal factor of his death.
25    Q.  (BY MR. EDWARDS) Did you review his

---

78

1  autopsy?
2    A.  Yes, sir.
3    Q.  His autopsy actually said it was due to lack
4  of air conditioning in the prison.  Correct?
5    A.  Yes, sir.
6    Q.  Okay.  So let me ask you again.  In your
7  opinion, as the director of the Correctional
8  Institutions Division, did the Texas Department of
9  Criminal Justice and the Hutchins facility, in
10  particular, safely house Larry Gene McCollum?
11    A.  Again, those housing criteria are based on
12  the evaluation of that individual's medical condition
13  upon arrival.  In this particular case, because he
14  suffered from heat-related illness, that again is a
15  causal factor of his death, so...
16    Q.  So did you safely house him or not?
17    A.  Well, again, in this particular case, I
18  believe I -- I believe I answered the question.  He
19  was housed in that time in accordance with his known
20  medical criteria.  We surely -- surely did not
21  identify, in my opinion, an opportunity to -- to deal
22  with his medical issue.
23    Q.  What does that mean?  What do you mean when
24  you say that?
25    A.  Well, again, I -- I would again rely on the

---

79

1  broad question about, was he properly housed at --
2    Q.  Let me stop you.  I didn't ask you if he was
3  properly housed.  I asked you if he was safely housed.
4    A.  Oh.
5    Q.  Does that change your answer?
6    A.  Well, again, I don't know if it -- if it
7  changes my answer, but, again, I feel that in his
8  particular case, the environmental conditions caused
9  his death, so -- or were a contributing factor to his
10  death, so he should have been housed otherwise.
11    Q.  In an air conditioned environment.  Right?
12    A.  I can't make that determination.  It would
13  be Health Services.
14    Q.  Okay.  A $120,000 expenditure, do you
15  consider that a significant and expensive expenditure
16  in the context of a $3 billion budget?
17    MR. GARCIA:  Objection, speculation.
18    A.  Again, a $120,000 expenditure is -- in
19  comparison to $3 billion is fairly small, but within a
20  particular degree of that $3 billion could be a
21  substantial portion.
22    Q.  (BY MR. EDWARDS) Sure.  And I asked you a
23  pretty broad question.
24    A.  Right.
25    Q.  In order to effectuate a change that would

---

80

1  cost $120,000, what would need to happen?  Could that
2  be done by the warden level, would that require
3  regional director's approval, would that require your
4  approval, sir, or would it require even more sets of
5  approval?  A facilities expense of that kind?
6    A.  Facility --
7    MR. GARCIA:  Objection, compound.
8    MS. COOGAN:  And vague.
9    A.  There are specific work requests that can be
10  generated within our agency contingent on the dollar
11  amount that determines the approval level for that
12  particular expenditure.  So a major work request at
13  $120,000 level, I believe, would -- would surely go
14  through whatever divisional component was responsible
15  for it, up through that division director to the
16  Facilities Division for -- for approval.  Ultimately,
17  if it was a long term or a -- a major work request, it
18  ultimately could go to the facilities review board for
19  approval.
20    Q.  (BY MR. EDWARDS) Okay.  So what I'm trying
21  to get -- I mean, and I am going to have to reask it
22  because there were some objections, and I apologize.
23    But major work requests, would putting
24  in air conditioning be considered a major work
25  request?

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83



APPENDIX139

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

81

1    A.  Yes, it would.
2    Q.  Okay.  A major work request that costs,
3  let's say, for instance, $120,000, what level of
4  approval would be necessary to make that happen?
5        MS. COOGAN:  Objection, incomplete
6  hypothetical.
7    A.  Again, I believe I answered the question.
8  It would go through the division director level, it
9  would go through Facilities Division and on to the
10  facilities review board.
11    Q.  (BY MR. EDWARDS)  And, again, just so I
12  understand.  Mr. Vian would be the Facilities Division
13  director?
14    A.  Mr. Inmon, Frank Inmon is the
15  Facilities Division director.  Mr. Vian is the deputy
16  director.
17    Q.  Okay.  The division director, is that the --
18  is that the six regional director positions?
19    A.  No.  That would be -- if it dealt with a
20  particular facility, it would be generated on the unit
21  level, pass up through your regional director level,
22  your regional Facilities Division level, it would come
23  through the deputy director level within CID and to
24  me.  If it dealt with a particular program area on the
25  facility, then it would go through that particular

---

82

1  divisional director.
2    Q.  All right.  Well, let me ask it this way.
3  Let's say that there was a decision made to air
4  condition, you know, a housing -- one of the housing
5  areas at the Hutchins Unit.
6    A.  Okay.
7    Q.  And let's say hypothetically that it cost
8  $120,000.
9    A.  Right.
10    Q.  Okay.  Who would need to be involved in that
11  decision in order to make that happen?  Could you make
12  that happen, or would it take more than that?
13    A.  It would take more than that for the
14  expenditures to be expended, yes, sir.
15    Q.  I'm trying to -- who exactly would have to
16  be involved?  How would this process have to start?
17    A.  Just as I mentioned, the process would start
18  out on the unit level.  The warden, the unit
19  administrator would identify that request and initiate
20  it.  It would go to the unit maintenance supervisor.
21  It would basically include the data relating to a cost
22  estimate, equipment necessary, in some cases,
23  materials required.  It would then go to the regional
24  maintenance supervisor who would, again, review the
25  facilities, maintenance supervisor on the unit levels,

---

83

1  the information, sign off on it.  It would go to
2  the -- a regional director in that particular region.
3  From there it would go to, in most cases,
4  Mr. Stephens, who would review it.  And subsequently
5  it would come to me, and then it would be forwarded to
6  the Facilities Division for final processing.  And
7  they would make the determination as to whether or not
8  it's a -- something that would have to be designed.
9        And then, ultimately, if the project
10  was to move forward, it would go to a facilities
11  review board process where that review board would get
12  together and approve the funding for it.
13    Q.  And is there -- okay.  Let's say it cost
14  $250,000, would the process be different?
15    A.  The process would still be the same.
16    Q.  Let's say it cost a million dollars, would
17  the process be different?
18    A.  It would be different as it relates to the
19  approval level.  At some point in time that approval
20  level would ratchet up and ultimately would have to go
21  to the Board of Corrections for approval before that
22  project could move forward.
23    Q.  Tell me at what level you need the Board of
24  Corrections to be involved, what monetary level?  I
25  hope I'm making myself clear.

---

84

1    A.  I believe it's a million dollars.  I believe
2  it's a million dollars.
3    Q.  As -- anything under a million dollars,
4  Director Livingston, yourself, the
5  Facilities Division, you guys have the power to make
6  that happen without Board approval?
7        MS. COOGAN:  Objection.  Incomplete
8  hypothetical.
9    Q.  (BY MR. EDWARDS)  Is that true?
10        MS. COOGAN:  Objection.  Incomplete
11  hypothetical.
12    A.  I believe so.
13    Q.  (BY MR. EDWARDS)  All right.  And somewhat
14  above a million dollars, you believe the board -- the
15  Board of Corrections would need to approve that.
16  Correct?
17    A.  Correct.
18    Q.  Okay.  Other than the extra step of Board of
19  Corrections approval, assuming that we're above the
20  million dollar mark, are there any other steps that
21  need to happen at the -- at the below-board approval
22  for a million dollar-plus expenditure?
23    A.  When you say "other steps," are you talking
24  about steps within the divisions or approval --
25    Q.  You rolled through kind of like how the

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX140

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

85

1  process normally would go.
2      A.  Right.
3      Q.  And what I'm trying to think -- and you've
4  told me that for expenditures under a million dollars.
5      A.  Right.
6      Q.  And I've got that, I think.
7      A.  Right.
8      Q.  And now you've added an extra step, look, if
9  it's greater than a million dollars, we've got to get
10  the Board of Corrections to approval it.
11      A.  Right.
12      Q.  And what I'm trying to think -- is it just,
13  you go through the same steps, and then you have an
14  extra step, which is, you take it to the board and
15  Director Livingston would present it to the board and
16  they would say yea or nay.  Is that your
17  understanding?
18      A.  Basically, it's presented to the board, yes,
19  sir.
20      Q.  Okay.  Now, are you aware, during your time
21  as the head of the Correctional Institutions Division,
22  of anybody saying, look, we need to air condition the
23  Hutchins Unit?
24      A.  No, sir.
25      Q.  Anybody ever say, look, we need to air

86

1  condition just a couple of housing dorms at the
2  Hutchins Unit.  It's too hot for these people with
3  heat-sensitive illnesses.  Anybody ever say that to
4  you?
5      A.  No, sir.
6      Q.  Did anything prevent you from saying that to
7  other people?
8      A.  No, sir.
9      Q.  Are you aware of any cost study being done
10  about the cost of air conditioning -- let's start with
11  the Hutchins Unit?
12      A.  No, sir.
13      Q.  Are you aware of any studies being done with
14  regards to air conditioning any of the prison units,
15  the housing areas?
16      A.  Not to my knowledge, no, sir.
17      Q.  And you're, you know, pretty high up in the
18  food chain with the Texas Department of Criminal
19  Justice.  Right?
20      A.  Not any longer, no, sir.
21      Q.  Fair enough.  You certainly were, though,
22  weren't you?
23      A.  Yes, sir.
24      Q.  Okay.  You would expect to be made aware of
25  if there are these discussions going on internally.

87

1  Right?
2      A.  Yes, sir.
3      Q.  Okay.  Because I've read the newspaper
4  articles where the spokesperson for the Texas
5  Department of Criminal Justice is talking about that
6  it might cost $50 million.  Are you aware of any study
7  anywhere that the Texas Department of Criminal Justice
8  commissioned or even is aware of supporting that
9  number?
10      A.  I don't know of any study, no, sir.
11      Q.  Okay.  Assuming that the newspapers are
12  correct and that the expenditure relating to cooling
13  for the pigs was $750,000, as I understand your
14  testimony, that would not have required board -- the
15  Board of Corrections approval, that would have been
16  below that.  Correct?
17      A.  Again, that's -- that's to my knowledge.
18      Q.  Okay.  I mean, if it turned out that you
19  could air condition a substantial portion of the
20  Hutchins facility housing area for under a million
21  dollars, would you support doing that?
22      A.  Well, again, as I stated earlier, in
23  discussions with the individuals responsible for
24  overseeing the institutions, along with me the other
25  division directors, particularly after the incidents

88

1  that we had in 2011, those discussions with the
2  Administrative Risk Management Division, the
3  Facilities Division, and the Health Services Division
4  director, our discussions focused on what efforts do
5  we need to initiate to ensure that we don't have any
6  future incidents and mitigate the opportunities for
7  future incidents related to heat-related illnesses and
8  heat-related deaths.
9          And as we focused our efforts on that
10  and reviewed those incidents, we focused on what we
11  thought would continue to address that issue, and look
12  at any areas where we felt that there was room for
13  improvement.  And so, through that determination, we
14  felt that we could continue to safely house offenders
15  in our populations, short of air conditioning all of
16  our facilities, by, again, ensuring that we were
17  reconcentrating our efforts on mitigating the
18  situations in the dorms and ensuring that individuals
19  that were housed in our facilities were housed in
20  accordance with their needs, security and health
21  service needs, ensuring that we were not just relying
22  any longer on individual offenders to bring forth an
23  issue, particularly those offenders that we felt were
24  more susceptible potentially to any heat-related
25  illness.  And that is when the discussion between

APPENDIX141

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**89**

1 health services and myself determined that we would
2 create our wellness checklist system. So that we also
3 just did not rely on staff routinely walking through
4 the dorms making a general observation of all
5 offenders, that they dedicate their time and effort to
6 ensuring that we were checking on these individuals
7 that might be more susceptible to heat-related
8 illnesses. And that we also reemphasized our focus on
9 the job that we were responsible for, and any time
10 that you send out a list or you label particular
11 individuals at, say, look at these, we want to be
12 careful to make sure that staff didn't assume they
13 didn't have to look at anybody else. So we also
14 ensured that as we move forward and discuss those
15 issues, we left in place the need to ensure we were
16 checking on the entirety of the population, but
17 focused our effort on ensuring that, should any
18 individual be in a situation that required health
19 service care, that we were identifying them
20 immediately and getting those individuals appropriate
21 care.
22        Again, with that being said, it was
23 through those discussions that we felt that we could
24 continue to do that, as we have done for many years,
25 short of air conditioning our facilities.

---

**90**

1        MR. EDWARDS: Okay. Let me object as
2 nonresponsive.
3   Q. (BY MR. EDWARDS) But I appreciate your
4 answer.
5        Again, let me ask you again, if it --
6 if there were data to say that you could air condition
7 a significant portion of the housing units at the
8 Hutchins Unit for under a million dollars, would you
9 be in favor of doing that and air conditioning those
10 areas?
11   A. Again --
12   Q. That's a yes or no.
13   A. Okay. If that's my only options, with no
14 other information, then I would have to say, no.
15   Q. Even though that's the only way you can be
16 sure to eliminate the risk of heat stroke. Correct?
17        MS. COOGAN: Objection. Incomplete
18 hypothetical question.
19        MR. ANASTASIDIS: Calls for
20 speculation.
21   A. And, again, I -- I would be making that
22 assumption, but I believe that there is a -- an
23 opportunity to safely house offenders short of air
24 conditioning facilities.
25   Q. (BY MR. EDWARDS) Okay. So then you're -- I

---

**91**

1 mean -- well, what if it only cost $150,000, would you
2 change your mind?
3        MS. COOGAN: Same objection.
4   A. Again, I mean, I don't know that cost is --
5 cost is a driving force here. I mean, if -- if the
6 determination was made through consensus of staff at
7 the Texas Department of Criminal Justice that the only
8 way we felt we could safely house our offenders was
9 through air conditioning our facilities, then that's
10 the decision that would have been made and that's the
11 direction we would have moved forward no matter what
12 the funding cost was.
13   Q. (BY MR. EDWARDS) I just want to make
14 certain I understand you. Whether it costs $100,000
15 or $25 million, the position that you would advocate
16 is, if it's necessary to protect our offenders from
17 death by heat stroke, we ought to do it, if it's
18 necessary?
19   A. If it's necessary.
20   Q. Okay. Now, do you think that the Texas
21 Department of Criminal Justice and, in particular, the
22 region in which Director Eason supervised during
23 the -- let's say, 2010, 2011, 2012 time period, did a
24 wonderful job protecting inmates from the dangers of
25 extreme heat?

---

**92**

1   A. Well, again, as was mentioned earlier, any
2 time we have one incident or one death relating to any
3 subject matter, in this case, heat-related illness, I
4 would say as an agency as a whole, we need to evaluate
5 those circumstances and, again, make sure we're
6 meeting the needs of the offenders in our population.
7 So to select a region, any time we had a -- a death in
8 our facilities, I consider that a -- an issue and, in
9 some cases, a failure of -- of our -- some system that
10 surely has to be evaluated and ensure that we're doing
11 everything we can. In some cases, those deaths are
12 unforeseen and in some cases, unpreventable. In other
13 cases, there are surely issues through our processes
14 as we review our policies that we didn't -- did or did
15 not follow that would have allowed us to do a better
16 job of meeting our responsibilities.
17   Q. Mr. McCollum's death was preventable, wasn't
18 it?
19        MR. GARCIA: Objection. Speculation.
20        MS. COOGAN: Join.
21   A. Again, I'm not -- that does call for
22 speculation, but I -- I...
23   Q. (BY MR. EDWARDS) He died of hyperthermia,
24 at least according to the autopsy, due to a lack of
25 air conditioning.

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX142

24 (Pages 93-96)

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                         October 18, 2013

93

1   A.  Right.
2   Q.  Do you think that TDCJ could have prevented
3   that by placing him in an environment that had air
4   conditioning?
5           MR. ANASTASIDIS:  Objection.  This
6   witness is not qualified to give a medical opinion.
7           MR. EDWARDS:  I'm not asking for a
8   medical opinion.
9   A.  Again, I would say that he was housed in
10  accordance with -- with his health service criteria at
11  the time.  In hindsight, I can't tell you what health
12  service would have -- would have -- how health
13  services would have evaluated his condition and
14  whether or not he needed to be relocated to another
15  facility or a different institution due to his
16  condition.
17  Q.  As I understand your testimony, one death
18  from heat stroke is too many in the entire prison
19  system.  Is that correct?
20  A.  Any death in our system is -- is something
21  that we take seriously and surely work to make it
22  preventable.
23  Q.  Okay.  That's your goal.  Right?  That you
24  take these deaths seriously and you work to prevent
25  them.  Right?  That's the goal.  That's what you

94

1   should be doing.  Fair?
2   A.  Right.
3   Q.  Did you do that in 2011, in the summer of
4   2011, did you do everything possible to stop these
5   deaths by heat stroke in the summer of 2011?
6   A.  I think that moving into the summer of 2011,
7   every reasonable step was taken to address those
8   issues.  Those reasonable steps had been in place for
9   our -- for many years, and provide for that safe
10  environment for the offender population.  In 2011,
11  there surely was a need to re-evaluate our processes
12  and make appropriate adjustments.
13  Q.  Did it require ten people to die before you
14  started re-evaluating?
15          MR. GARCIA:  Objection.  Argumentative.
16  A.  Again, any time we had a death, once the
17  issue arose in 2011, we immediately began looking at
18  the issue.  Those deaths occurred in a very short
19  period of time over a -- a course of less than a
20  month.  And our actions that were taken surely were
21  implemented as we moved forward to identify those
22  individuals and any individuals that additional needs
23  were required to avoid similar incidents.
24  Q.  (BY MR. EDWARDS)  Okay.  I want to make sure
25  I understand.  I mean, is it the position of the Texas

95

1   Department of Criminal Justice, at least was it your
2   position, that it required a death before you examined
3   whether or not the extreme heat was posing a danger to
4   inmates?
5   A.  No.  We address that issue going into it.
6   Q.  Of course not.  Right?
7   A.  We address that issue going into every
8   season.
9   Q.  Well, okay.  But you had a number of
10  heat-related illnesses before Mr. McCollum died in the
11  summer of 2011, didn't you?
12  A.  There were heat-related illnesses, yes, sir.
13  Q.  Employee heat-related illnesses and inmate
14  heat-related illnesses.  Right?
15  A.  There were some, yes, sir.
16  Q.  Okay.  Does it require a death before you
17  take precautions and change these measures that you
18  allege mitigate the heat?
19  A.  No.
20  Q.  It certainly shouldn't.  Right?
21  A.  No, sir.
22  Q.  If people are suffering heat exhaustion,
23  complaining of heat, fainting, whatever, you ought to
24  examine that right away.  Right?
25          MR. GARCIA:  Objection.  Compound.

96

1   A.  And we did.
2   Q.  (BY MR. EDWARDS)  And you did.  Okay.  And
3   you did and, to your knowledge, Director Stephens did.
4   Correct?
5   A.  Yes, sir.
6   Q.  And to your knowledge, Director Eason would
7   have examined that.  Right?
8   A.  Yes, sir.
9   Q.  Okay.  And you certainly would hope that
10  Warden Pringle would exam those that occurred at his
11  facility.  Right?
12  A.  Reviewed the fact -- circumstances, yes,
13  sir.
14  Q.  Okay.  And certainly your directors meetings
15  you would be updating Regional Director Eason and
16  making sure that he tells his wardens that he's
17  supervising, look, this summer is extremely hot.
18  We've got to take extra precautions.  Right?
19  A.  Surely -- surely was addressed at every
20  regional directors meeting that we had, the need to
21  take precautions relating to heat-related illnesses.
22  Q.  And you recall specifically doing that and
23  addressing that at these regional meetings in the 2011
24  time period before Mr. McCollum died.  Right?
25  A.  I surely had it on my agenda, so I am sure I

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX143

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**97**

1 addressed it.
2    Q.  Okay.  And this is my question.  To not
3 address it would have been unacceptable.  Correct?
4    A.  Well, again, to bring attention to it and
5 take appropriate action is --
6    Q.  And I appreciate --
7    A.  -- is appropriate.
8    Q.  And that's what you did.  That's what you're
9 telling this jury you personally did.  Correct, sir?
10    A.  Right.
11    Q.  Okay.  Now, my question, though, is a little
12 bit different.  You would agree with me that to not do
13 that would be dangerous to the inmate population.
14 Right?
15       MR. GARCIA:  Objection.  Speculation.
16    A.  To not review incidents and make a
17 determination as to anything that could be done to
18 avoid future incidents?
19    Q.  (BY MR. EDWARDS)  Of course.
20    A.  Right.
21    Q.  Look, you're at the top of the food chain.
22 You and Director Stephens, Director Eason, you guys
23 are responsible for making sure these policies, even
24 if they're informal e-mails, actually get implemented.
25 Right?

---

**98**

1    A.  Yes, sir.
2    Q.  Okay.  And to not raise the awareness of the
3 warden at a particular unit, if you didn't do that, if
4 you just said, hey, not my responsibility, somebody
5 else will take care of it, you would tell this jury,
6 look, that's unacceptable; then I wouldn't be doing my
7 job.  Is that fair?
8       MR. GARCIA:  Objection.  Compound.
9    A.  Again, surely as -- as was mentioned, that
10 was a subject matter that was covered at every
11 meeting.
12    Q.  (BY MR. EDWARDS)  And there was an
13 obligation to cover it at every meeting because to not
14 cover it would endanger the lives of inmates housed in
15 your facilities.  Right?
16       MR. GARCIA:  Objection.  Speculation.
17    A.  Again, it was surely a subject matter that
18 should be covered for the appropriate housing and
19 treatment of individuals in the facility.
20    Q.  (BY MR. EDWARDS)  And it's not speculation,
21 is it?  You teach all of your officers and provide
22 training that extreme heat endangers the lives of
23 inmates.  Right?
24       MR. ANASTASIDIS:  Objection.  Calls for
25 cumulative evidence to be presented.

---

**99**

1    A.  Extreme heat could cause heat-related
2 illness which ultimately could relate in death.
3    Q.  (BY MR. EDWARDS)  And you provide a chart
4 where you say, look, it's possible, it's probable,
5 it's imminent.  Right?
6    A.  Right.
7    Q.  And north of 130 degrees, heat stroke is
8 imminent.  Right?
9       MR. GARCIA:  Objection.  Speculation.
10    A.  I believe that's what the chart reflects.
11    Q.  (BY MR. EDWARDS)  And that's a better way --
12 the chart reflects that it's imminent north of 130
13 degrees.  Right?
14    A.  I believe --
15       MR. GARCIA:  Objection.
16 Mischaracterizes the evidence --
17    Q.  (BY MR. EDWARDS)  Okay.  So --
18       MR. GARCIA:  Mischaracterizes the
19 evidence.
20       Let me get my objection in, please.
21 Thank you.
22    Q.  (BY MR. EDWARDS)  So would you expect any
23 administrator running a prison, if temperatures hit
24 those imminent levels, to take immediate steps to deal
25 with it?

---

**100**

1       MR. GARCIA:  Objection.  Speculation.
2 Mischaracterizes the evidence.
3    A.  Well, again, I would expect individuals
4 overseeing the institutions to take continuous steps,
5 that they elevate the level of those steps as the -- a
6 rise in temperature continued, to increase the
7 vigilance of ensuring that the steps were being
8 followed to -- to increase the vigilance of staff that
9 was supervising those offenders and to increase the
10 supervision of those offenders to ensure that we were
11 providing appropriate care.
12    Q.  Is there a temperature that you're aware of
13 that just, look, that's too hot to safely run a
14 prison?
15    A.  No, sir, I'm not.
16    Q.  150 degrees?
17       MR. GARCIA:  Objection.  Speculation.
18    A.  Again, I don't know of a specific
19 temperature.
20    Q.  (BY MR. EDWARDS)  Would you agree with me
21 that if the chart you're using suggests that heat
22 stroke is imminent at a certain level that that might
23 be a temperature that you might say, look, if it gets
24 this high, we have to take special steps?
25       MR. GARCIA:  Objection, compound.

---

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**101**

1 Objection, speculation. Objection, mischaracterizes
2 the testimony --
3     A. Well, again, there are steps out there --
4        THE WITNESS: Oh, sorry.
5        MR. GARCIA: Go ahead.
6     A. There are steps out there. As I said, you
7 surely would increase your vigilance, you sure would
8 increase your supervision. That chart, again, is one
9 specifically in our policy requires that if you're in
10 a work environment that you slow your work pace down,
11 that you increase your water breaks, that -- so there,
12 again, are increased actions as the threat level of
13 excessive temperatures gets higher.
14     Q. Now, there is a temperature at which you
15 don't let people work outside. Right?
16     A. Ultimately, I couldn't recall what that
17 temperature level is.
18     Q. But there is a specific temperature?
19     A. Again, I'm not sure.
20     Q. Okay. These measures right here on
21 Exhibit 50, if they weren't being followed at the
22 Hutchins Unit, I assume you would be extremely
23 critical of the officers or warden who wasn't
24 following them?
25        MS. COOGAN: Objection. Vague.

---

**102**

1     A. I would surely -- surely be wanting to
2 determine why they weren't being followed.
3     Q. (BY MR. EDWARDS) Because they're really
4 important to be provided. Right?
5     A. There surely are some important mitigating
6 steps there, yes, sir.
7     Q. Discuss the importance of making water
8 available to the inmates.
9     A. Again, in all our housing areas, of course,
10 water is available year round through water fountains
11 or water portals. During the summer months we bring
12 in additional water coolers. Again, in most cases,
13 those coolers should be replaced multiple times
14 throughout the day to allow for additional opportunity
15 for offenders to drink cool water in their housing
16 environment.
17     Q. And if that wasn't happening, you would be
18 critical. Correct?
19     A. I surely would want to know why it was not
20 happening, yes, sir.
21     Q. Well, regardless, whether it was not
22 happening because someone is just a mean, rotten
23 person, or someone is absolutely incompetent, you
24 would be critical. Right?
25     A. It surely would be a step that should be

---

**103**

1 being taken to assist in the mitigation.
2     Q. Well, what is your understanding of how much
3 water in these jugs ought to be provided to 48 inmates
4 who are living in a housing area?
5     A. I can't determine how much water should be
6 provided. They should be checked on routinely, and if
7 it's needed to be refilled, it should be refilled.
8     Q. So it should -- there should be constant
9 access to ice cold water. Fair?
10     A. I believe that -- yeah. I believe that the
11 direction that we give was that we would encourage at
12 a minimum of each shift that that cooler is refilled.
13 But our intent is to, again, continue that process so
14 that it is available to the offenders in the housing
15 area.
16     Q. Okay. Well, those are different standards.
17 Right?
18     A. Right.
19     Q. Okay. I mean, have you been in the
20 Hutchins Unit in the summer?
21     A. Yes, sir.
22     Q. It's brutally hot, right, in the housing
23 areas in the summer months? Based on your experience?
24     A. It's surely warm. It's like most of our
25 prison environments, yes, sir.

---

**104**

1     Q. I'm not suggesting that it's any hotter, the
2 temperature depends. But there are internal documents
3 that suggest it's routinely above a hundred degrees in
4 there. Would that be consistent with your experience?
5     A. I don't know if I would say consistently
6 above a hundred, but it is hot in the housing areas,
7 yes, sir.
8     Q. It certainly would meet your standard for
9 extreme heat. Right?
10        MR. GARCIA: Objection. Vague.
11     A. It surely is -- surely would be high heat
12 and would, again, require that increased vigilance
13 that I talked about earlier.
14     Q. (BY MR. EDWARDS) All right. And so I
15 believe you told me, look, you need to be -- you need
16 to provide constant access to iced water. Is that
17 fair? Is that a fair characterization of your
18 testimony?
19     A. In most cases. And in some cases, again,
20 during summer months, we -- we work hard to put out
21 ice water in all of the housing areas and ensure that
22 we have iced substances for each meal for the offender
23 population. So we -- we surely make all efforts to do
24 that, and the warden should be making all efforts to
25 do that.

---

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**105**

1  Q.  It is your intent for there to be constant
2  access to ice cold water for the inmates in these
3  extremely hot indoor temperatures.  Correct?
4  A.  As much as possible, yes, sir.
5  Q.  And what would prevent someone from bringing
6  in ice water to the inmates?  What would make it
7  impossible to do that?
8  A.  I don't know that anything would make it
9  impossible to do that.  There are occasions where --
10 particularly during the summer months on larger
11 facilities, where the ice makers struggle to keep up
12 in some cases with the distribution of the ice to the
13 housing areas.  But other than -- short of that.
14 Q.  Sure.  Short of there being an ice shortage,
15 which I think you would tell the jury, we ought to go
16 buy extra ice if our ice makers break.  Right?
17 A.  And, again --
18 Q.  Nothing --
19 A.  I'm talking about continuing to distribute
20 it -- to distribute ice water to the dormitories.
21 There might be a -- time period where that ice maker
22 is catching up.
23 Q.  You might miss a time or two, but that
24 shouldn't be, we dropped the bucket off, we come back
25 in eight hours, we do it again.  It should be

---

**106**

1  constantly monitored because, otherwise, you place
2  inmates in danger.  Right?
3  A.  Particularly during -- as the heat continues
4  to increase, that would be something that I would
5  surely think is reasonable and should be done.
6  Q.  Okay.  And these jugs of water we're talking
7  about, are they ten-gallon jugs that you might see at
8  a soccer game?  The kind that you dump on the coach at
9  the Super Bowl?
10 A.  Similar to that.  Similar to those size,
11 yes, sir.
12 Q.  Okay.  Are you aware of how many cups of
13 water are in those jugs?
14 A.  I don't know.
15 Q.  Are you aware of what the recommended amount
16 of water a human being should drink in periods of heat
17 where it's greater than 90 degrees?
18 A.  I can't say that I know, no, sir.
19 Q.  As a policy maker for the Texas Department
20 of Criminal Justice, with actual authority make this
21 happen, don't you think you should be aware of that?
22 A.  Well, again -- again, that -- that ice jug
23 there is to supplement the water supply that's
24 currently already in the dormitories.  So I don't want
25 to make the assumption here that that is the only

---

**107**

1  method by which offenders receive fluids in their
2  housing area.  There are --
3  Q.  Sinks you're talking about.  Right?
4  A.  There are water fountain spigots on the
5  sinks that are used as water fountains, similar to
6  water fountains that you would find in other -- in
7  other housing areas on other facilities.
8  Q.  Is that warm water or ice cold water?
9  A.  It's not ice cold water, no, sir.
10 Q.  It's not like a water fountain in a little
11 elementary school.  Right?
12 A.  It's not chilled water, it is not.  But it
13 is water, and hydration is -- the most important issue
14 here.  That cool water surely preferred, but hydration
15 is important.
16 Q.  Okay.  Now, is hydration, in your opinion,
17 the most important issue or is lowering the
18 temperature an equally important issue?
19    MS. COOGAN:  Objection.  Calls for an
20 expert opinion.
21 A.  Well, again, as it relates to providing
22 mitigating circumstances and from discussions with
23 health service staff, the most important thing that
24 you can do particularly to help reduce your body
25 temperature is to intake plenty of fluids during those

---

**108**

1  time periods.  So, again, I --
2  Q.  (BY MR. EDWARDS)  You've been specifically
3  told that that's the most important thing you can do
4  for most people is to increase your water intake --
5  A.  Well, again --
6  Q.  -- to cool your body.  Right?
7  A.  -- in dealing with health service staff,
8  that's --
9  Q.  That's what they've told you?
10 A.  That's surely something that they want us to
11 ensure that the offender population does to stay
12 hydrated.
13    THE VIDEOGRAPHER:  Excuse me,
14 Mr. Edwards, I need to change tapes.
15    MR. EDWARDS:  Okay.  Let's take a
16 break.  Thank you.
17    THE VIDEOGRAPHER:  We're off the record
18 at 11:34 a.m.
19    (RECESS.)
20    THE VIDEOGRAPHER:  We're back on the
21 record.  The time is 11:52 a.m.
22 Q.  (BY MR. EDWARDS)  Did you have any
23 involvement in the construction or designs of prisons
24 built in the 1990s, sir?
25 A.  No, sir.

---

APPENDIX146

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

---

109

1    Q.  Do you know who would have?
2    A.  In general, I'm sure the Facilities Division
3  or Construction Division would have played an integral
4  role in that, but as far as individuals that were
5  involved in that process, no, sir, I couldn't -- at
6  that time I couldn't know who would have been the
7  decision makers.
8    Q.  Would the executive director of the agency
9  have been one person involved, in all likelihood?
10    A.  As it relates to the design of the facility,
11  again, I would be speculating, and I wouldn't know if
12  they would have final say as it related to the number
13  of institutions --
14    Q.  Sure.
15    A.  -- the size of institutions, probably.  As
16  it related to the design, I would not know.
17    Q.  Would you agree with me that air
18  conditioning was a common attribute of housing in the
19  1990s?
20    A.  For the most part, yes, sir.
21    Q.  Actually, speaking of that, have you ever
22  been in a public building in the last 25 years that
23  didn't have air conditioning?  Other than your
24  prisons?
25    A.  Not that I can think of, no, sir.

---

110

1    Q.  Any library, any school, any -- I don't
2  know -- anything you can think of?
3        MR. ANASTASIDIS:  Objection.  Asked and
4  answered.
5    A.  Again, no, sir, I can't.
6    Q.  (BY MR. EDWARDS)  Okay.  Do you know if
7  Guantanamo Bay is air conditioned?
8    A.  No, sir, I do not.
9    Q.  I apologize if I asked you this specific,
10  but have you ever had any specific conversations about
11  lowering the indoor temperature inside the housing
12  areas of the TDCJ units that aren't air conditioned?
13    A.  Again, those considerations that we
14  referenced earlier, conversations with the
15  Facilities Division about what could be done to ensure
16  proper ventilation was working in those particular
17  facilities.
18    Q.  Let me ask you about that, because I
19  remember you telling me about the ventilation and
20  stuff, but like did you specifically ask about that to
21  get the temperature lower?
22    A.  Sure.
23    Q.  Okay.  Are there any documents that -- you
24  know, where there is -- where you're finding out if
25  the ventilation systems are actually lowering the

---

111

1  temperature inside, outside?
2    A.  I don't know of any that I could produce,
3  no, sir.
4    Q.  Okay.  Well, I'll represent to you that
5  there are documents in this case in which the Risk
6  Management Division -- that indicate that the
7  temperature inside or outside are plus or minus two or
8  three degrees.  Is that consistent with your
9  experience?
10    A.  It differs in areas of the state, but I have
11  seen at least one document that indicated that.
12    Q.  And did you see that in your position as --
13  as director?
14    A.  I believe I saw it in reviewing the
15  documents for this deposition.
16    Q.  Okay.  So you also reviewed the -- the
17  documents from Mr. Story relating to the temperatures
18  inside the prison?
19    A.  I believe that was one of the attachments
20  that was in one of the depositions.
21    Q.  That's a good way to say it.  You reviewed
22  all of the attachments to all of the depositions which
23  you mentioned earlier?
24    A.  I believe I did.
25    Q.  Okay.  Well, one of the attachments I think

---

112

1  we talked about earlier reflected temperatures outside
2  of 149 degrees.  Do you recall that?
3        MS. COOGAN:  Objection.  Vague, to the
4  continued use of the word "temperature" as opposed to
5  "ambient air temperature" or "apparent temperature"
6  because I think it's misleading.
7    A.  Again, as I mentioned earlier --
8    Q.  (BY MR. EDWARDS)  Let me ask that again.
9    A.  Okay.
10    Q.  The temperature logs that your correctional
11  officers fill out, they reflect the apparent
12  temperature.  Correct?
13    A.  The temperature -- the dorm temperature,
14  yes, sir.
15    Q.  The temperature, including humidity, what
16  the actual effective temperature is on a human being.
17  Right?
18    A.  I would have to look at the log.
19    Q.  Okay.  All right.  Well, assume with me that
20  there are documents that indicate, in the week
21  preceding Mr. McCollum's death at the Hutchins Unit,
22  that the temperature logs reflected temperatures of --
23  and I'm talking about apparent temperatures -- of
24  149 degrees on more than one occasion.  What should
25  Warden Pringle have done when he saw this?

---

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

113

1      MR. GARCIA: Objection. Speculation.
2      A. Well, again, I think the -- the efforts that
3   are put forth, the conversations that, as the warden,
4   that I would have with my staff on the particular
5   facility, Facilities Division staff, Health Service
6   staff, Risk Management staff, we would have been
7   discussing any options we had available to mitigate
8   the circumstances.
9      Q. (BY MR. EDWARDS) All right. At a minimum,
10  seeing temperatures like that, 120 degrees, 130
11  degrees, 140 degrees on temperature logs, it ought to
12  ring a bell in the warden's mind, I need to get with
13  my people and take whatever steps I can to mitigate
14  this heat?
15     A. Again, as a past unit administrator, for
16  sure the actions that I would take.
17     Q. Okay. And that would include getting with
18  risk management to find out if inmates are in danger,
19  talking to correctional officers about recognizing the
20  signs and symptoms of heat stroke and making sure
21  everybody is prepared if the unfortunate event of a
22  heat stroke happens. Right?
23     A. Surely increasing our vigilance, yes, sir.
24     Q. Okay. One of the things in the heat
25  precaution list is personal fans, or at least I think

---

114

1   that's correct. Do you recall that?
2      A. Yes, sir.
3      Q. Okay. Is that meant to be like an
4   accommodation that helps comfort prisoners, by TDCJ?
5      A. In some cases, yes, sir.
6      Q. Would you agree with me -- well, do you
7   know -- at the Hutchins Unit there are no plugs for --
8   to plug in personal fans so they're not allowed. Is
9   that accurate --
10     A. Yes, sir.
11     Q. So is it fair to say that TDCJ is not making
12  that little accommodation in terms of personal fans
13  available to people at the Hutchins Unit?
14     A. Offenders at the Hutchins Unit do not have
15  the availability of an outlet to use a personal fan.
16     Q. Which denies them the benefit of a personal
17  fan. Right?
18     A. Well, again, if they have one in their
19  possession, it wouldn't do them any good, so...
20     Q. Well, I assume you are, but let me make
21  sure. Are you aware of the increased danger to
22  inmates when they are acclimating to these higher
23  apparent temperatures in transfer facilities?
24     A. Again, I don't know how much general
25  knowledge I have about how that affects the body

---

115

1   coming in, but again, I would rely on health service
2   staff to assist me in that process.
3      Q. Well, lots of these deaths are happening at
4   these transfer facilities. Right?
5      A. There are some that have occurred at the
6   transfer facilities.
7      Q. Gurney Unit, the Hutchins Unit, the
8   Garza Unit?
9      A. Yes, sir.
10     Q. Those are all transfer units. Right?
11     A. Yes.
12     Q. Okay. All those deaths -- most of those
13  deaths at those units happened before there was time
14  for an intake physical. Right?
15     MR. GARCIA: Objection. Speculation.
16     A. Again, I would have to review the documents.
17  I -- the intake physical normally takes place after
18  the initial assessment on the day of arrival. That
19  physical would take place normally -- again, I'm
20  trying to do this from memory -- the third or fourth
21  day of the individual's time that he has arrived on
22  the facility.
23     In the event that any immediate medical
24  needs were identified, of course, at that first
25  triage, health services would take care of any

---

116

1   immediate needs. But the normal physical, I believe,
2   is done on the third or fourth day, but I'm not the
3   expert to testify to that.
4      Q. Sure. And I'll represent to you that there
5   has been testimony in this case that the intake
6   physical, at least with regard to the Hutchins Unit,
7   is done in a period seven to ten days --
8      MR. GARCIA: Objection.
9   Mischaracterizes the testimony.
10     MS. COOGAN: Join.
11     Q. (BY MR. EDWARDS) -- from the time of entry.
12     A. Again, I'm --
13     MR. ANASTASIDIS: Objection. There is
14  no question on the floor. You represented him some
15  facts. You have not asked him a question.
16     You do not have to answer his
17  narrative.
18     Q. (BY MR. EDWARDS) Is it your understanding
19  that the intake physical could take seven to ten days
20  at the Hutchins Unit, based on your review of Director
21  Eason and Warden Pringle's depositions?
22     A. I don't remember those statements in the
23  deposition, to be honest with you.
24     Q. If they said that, would that surprise you?
25     A. Again, normally that physical --

---

Stephen McCollum, et al. v.                Richard C. Thaler
Brad Livingston, et al.                    October 18, 2013

---

117

1        MR. ANASTASIDIS: Objection. Whether
2 this inmate -- this witness would be surprised by an
3 event or not is not relevant to any issue in this
4 case.
5    Q.  (BY MR. EDWARDS) You can answer --
6        MS. COOGAN: Join. And I object that
7 that's not even the right deposition.
8        MR. ANASTASIDIS: If you're able to
9 answer that, you can go ahead.
10   A.  Well, again, historically, I believe that
11 physical is normally done during those first few days
12 of entering the facility. So I don't know that
13 "surprise" would be a word that I would use.
14   Q.  (BY MR. EDWARDS) Your expectation would be
15 these intake physicals are done within four days of an
16 inmate's arrival at a facility?
17   A.  I would -- I would say, surely within the
18 first few days, normally, that's what I would believe
19 to be the process.
20   Q.  Well, that's fair. Can you think of any
21 reason why it would take seven to ten days to get
22 someone an intake physical?
23   A.  I can't -- I can't speak for health services
24 or -- or how long it would take for them to get
25 through the hundred or so each week that show up on

---

118

1 the Hutchins facility.
2    Q.  Okay. So about a hundred people come each
3 week? Do you see any problems with not having intake
4 physicals done -- or strike that.
5        Do you see any problems with having
6 intake physicals done, four or five, six, seven,
7 eight, nine, ten days after an inmate arrives?
8    A.  Well, again, from my experience, there is a
9 process that is put in place for initial screening of
10 individuals assigned to any institution. Of course,
11 that first contact would be generated from the entity
12 that is actually transferring the individual to us.
13 So any immediate or urgent medical care needs would
14 normally be passed on from that entity to us and, in
15 many cases, prior to the individual being transferred
16 in to us. So that would be the first measure.
17        And the second measure would be that
18 initial assessment by a health service personnel upon
19 arrival. So health service staff has established that
20 policy and used that triage, in my experience, to
21 determine whether or not an immediate contact with a
22 health care professional was required or that they
23 would be processed through the normal intake process.
24 So, again, assuming those processes are working
25 appropriately, then I don't know that I could say that

---

119

1 I have -- I would have a problem with those taking
2 place a few days after arrival.
3    Q.  Well, most inmates, when they're coming to a
4 transfer facility, are coming from county jails.
5 Right?
6    A.  They are.
7    Q.  Those are air conditioned. Right?
8    A.  Most of the them, probably, I believe.
9    Q.  By -- well, you familiar with that a law
10 requires them to be air conditioned?
11   A.  I'm somewhat familiar with that jail
12 standard out there, yes, sir.
13   Q.  Okay. Can you think of any good reason why
14 county jails would have to be air conditioned, but
15 state jails can house people in temperatures over a
16 hundred degrees?
17        MR. ANASTASIDIS: Objection. Calls for
18 this witness to speculate.
19        MR. GARCIA: Objection. Argumentative.
20   A.  Again, I can't speculate as to why the
21 county jails adopted that standard.
22   Q.  (BY MR. EDWARDS) Well, the county jails
23 adopted -- are you aware that the legislature passed a
24 law requiring the county jails to air condition their
25 facilities?

---

120

1    A.  I'm not personally aware of that law, no,
2 sir.
3    Q.  Okay. Can you think of any legitimate
4 reason why the county jails would have to air
5 condition, but state jails -- the state prison
6 facilities wouldn't have to?
7        MR. ANASTASIDIS: Objection. Asks this
8 witness to form an opinion as to something he has no
9 personal knowledge or ability to formulate.
10        MR. GARCIA: And argumentative.
11   A.  I can't speak for the legislature as to why
12 they would --
13   Q.  (BY MR. EDWARDS) Okay. I'm not asking you
14 to speak for the legislature. I'm representing to you
15 that county jails are air conditioned, which is
16 consistent with your experience. Correct?
17   A.  Yes, sir.
18   Q.  Okay. Also, you've told me that many prison
19 facilities are not air conditioned, like the
20 Hutchins Unit. Right?
21   A.  Correct.
22   Q.  Can you think of any good reason for that
23 distinction?
24        MR. GARCIA: Objection. Argumentative.
25   A.  Well, again, I think that, as you stated, if

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
c4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX149

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

121

1 indeed it's a true statement that there is legislative
2 intent for all county jails to be air conditioned,
3 then that was mandated by the legislature, so county
4 jails follow those instructions.
5      Q.   (BY MR. EDWARDS) Any other reason you can
6 think of?
7           MS. COOGAN: Objection. Speculation.
8      A.   No.
9      Q.   (BY MR. EDWARDS) Okay. You don't need
10 this -- this high heat in order to effectively punish
11 the inmates for the crimes they've committed, do you?
12     A.   No, sir, not at all.
13     Q.   Okay. Is there any penal purpose like
14 specifically for keeping -- there being no air
15 conditioning in the prisons?
16     A.   No -- no -- as it relates to not bringing
17 conditioned air into systems as a form of punishment,
18 absolutely not.
19     Q.   Okay. Tell me what the EAC system is, sir.
20     A.   It's the Emergency Action Center. It's a
21 hub that collects information from different
22 divisional components, different facilities and units,
23 on incidents that have occurred throughout the system.
24     Q.   Is it fair to say that the purpose is to
25 inform supervisors about problems at the prison?

---

122

1      A.   In some cases it disseminates information
2 about incidents that have occurred. Some are
3 problems, some are just incidents.
4      Q.   I understand -- I appreciate that. It would
5 include prisoner injuries?
6      A.   To the EAC center, yes, sir. In some cases
7 it would, yes.
8      Q.   Including prisoners that die?
9      A.   Prisoners that have died in the institution,
10 there would be an EAC report sent to the Emergency
11 Action Center.
12     Q.   Prisoners who suffer heat stroke and die,
13 there would be an EAC report. Right?
14     A.   There should be an EAC report on any death
15 in our system.
16     Q.   Who reviews the reports from the EAC system?
17 If you know?
18     A.   Again, depending on the category of the
19 report, most reports are filed -- are forwarded to the
20 EAC center. They're filed there in the Emergency
21 Action Center. If there is an action plan that
22 accompanies that report, then that action plan and a
23 copy of that report would be forwarded to the
24 appropriate, in most cases, deputy director within the
25 division to ensure that the -- any action plan was

---

123

1 implemented.
2           Again, those reports are available for
3 review, but as far as when they come in from the
4 facilities, the EAC department is the depository for
5 that information.
6      Q.   With regards to the McCollum case, I guess,
7 would regional -- then Regional Director Eason have
8 seen the EAC reports?
9      A.   Yes. That EAC report, when it leaves the
10 facility, funnels through the regional director's
11 office prior to forwarding to the EAC center.
12     Q.   And then would it also get to you and
13 Mr. Stephens?
14     A.   Not necessarily in all cases. Again, if it
15 required an action plan, then that is something that
16 would surely have gone to the appropriate deputy
17 director, depending on what the circumstances were of
18 the EAC report.
19     Q.   Do you review most reports involving deaths?
20     A.   Many -- many of the reports I have reviewed,
21 but I can't say that I review every report that
22 involves an offender death.
23     Q.   Okay. Did you review the report involving
24 Mr. McCollum?
25     A.   I have subsequently reviewed that report. I

---

124

1 can't -- I cannot remember, in 2011, at what point
2 that I personally became aware of it or what documents
3 I reviewed, but I have reviewed it prior to this
4 deposition.
5      Q.   Okay. Do you believe -- I mean, I'm trying
6 to drill down on it a little bit. Should you have
7 reviewed it in 2011 when it came in?
8      A.   Well, again, there is multiple entities that
9 report to me, particularly as it -- as it relates to
10 an offender's death. So in some cases that report is
11 actually reviewed personally by me, in other cases
12 there are discussions with my appropriate deputy
13 director. Potentially, in these cases, discussion
14 with the Health Services Division director regarding
15 the circumstances surrounding the particular incident.
16 So, again, I can't assure you that in all cases I
17 review every report.
18     Q.   But it's important for the people in the
19 hierarchical chain to be reviewing these to discover
20 patterns. Right?
21     A.   Well, it's surely important that we discuss
22 the facts concerning the particular incident and
23 determine if there is any modifications to procedures
24 or policies that should take place as we move forward,
25 yes, sir.

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX150

32 (Pages 125-128)

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

125

1    Q.   And are you aware of how many heat stroke
2  deaths there were in 2011 in the region supervised by
3  Director Eason?
4    A.   There would have been seven.
5    Q.   That is a very high number.  Is that
6  correct, for one region?
7    A.   Yes, sir.
8    Q.   Did you guys make any changes other than to
9  make sure you were following this e-mail that you guys
10 send out every May?
11   A.   Well, again, that's -- that summer in 2011,
12 is -- we were surely dealing with temperatures that
13 arose.  Different parts of the state were affected
14 differently, again, because it was driven from the
15 temperature.  So Warden Eason -- or Mr. Eason, I'm
16 sorry, there surely were conversations that took place
17 about what additional training, what additional
18 instruction, what, if any, additional steps were being
19 discussed with his unit wardens that needed to take
20 place.  Again, those deaths in that particular year
21 occurred in a -- a relatively short period of time,
22 but those conversations took place over that --
23 sometime over that two- or three-week period.
24   Q.   Okay.  So over those two or three weeks, you
25 do recall specifically talking with Director Eason

126

1  about these deaths and how important it was to add
2  additional training and instruction?
3    A.   Well, again, generally, during any formal
4  meeting we would have had, I surely would talk
5  directly with Mr. Eason.  Whether I spoke with
6  Mr. Eason or Mr. Stephens spoke with Mr. Eason, I
7  cannot tell you for sure.
8    Q.   Is heat illness or heat stroke a specific
9  type of problem type or -- and if that's not the right
10 word, tell me -- that's delineated by the report?
11 Like is there assault, heat stroke, and stuff like
12 that?  Is it separated out to make it easier for you
13 guys to spot patterns?
14   A.   It -- I'm trying to remember.  I believe
15 it's broken out by staff and offender, but I'm not
16 sure whether -- whether specific details on the
17 summary report of the EAC, how they break that out as
18 it relates to heat-related issues.
19   Q.   I believe you told me that -- that after the
20 deaths occurred in 2011, that you implemented a
21 wellness check policy or a heat list.  Did I -- am I
22 recalling that accurately?
23   A.   Yes.
24   Q.   Is that kind of a change that you guys made
25 specifically because of the high number of deaths in

127

1  the summer of 2011?
2    A.   Well, again, deaths of any nature sure do
3  bring some additional attention to -- to any effort.
4  And, obviously, as we discussed what we were currently
5  doing out there to identify any individuals that
6  potentially were -- were suffering from heat-related
7  illness, I felt, and Doctor Linthicum concurred, that
8  relying on in some cases offenders to self report or
9  in other cases for our staff to identify individuals
10 as they routinely made their rounds was surely
11 something that was in place and had provided some
12 level of identification for many years.  We felt that
13 we needed to step up that effort and put an extra
14 burden on staff out there in order to make sure that
15 if health service staff felt that anybody might be
16 susceptible as we move into the seasonal time of the
17 year, no matter what the temperature was, that we
18 would create a -- a checklist whereby the staff member
19 would make face-to-face contact with the individual to
20 check on their well-being throughout the day, so that
21 if they noticed any signs of distress or any initial
22 signs of a potential heat-related illness so that
23 health service staff could be notified immediately and
24 appropriate care could be given.
25   Q.   Okay.  That sounds like it's an

128

1  accommodation or a benefit that the department, TDCJ,
2  is now providing to people who with -- I don't know,
3  heat vulnerable propensities.  Is that fair?
4    A.   Yes, sir.
5    Q.   Okay.  And those -- I want to go through
6  that list of kind of people with heat vulnerable
7  propensities or disabilities.  And what I mean by that
8  is, it affects the way they live and function in the
9  environment.  We're talking about depression.  That's
10 one of them.  Right?
11   A.   Well --
12       MR. GARCIA:  Objection.  Compound.
13   Q.   (BY MR. EDWARDS)  Is it one of them?
14   A.   Well, again, what -- what we rely on is the
15 expertise of the health service professionals.  So
16 when we talk about the totality of individuals that
17 are included in that list, I would surely, through
18 general conversations with health service staff, say
19 that several of those groups that we talked about
20 earlier, particularly those that were on psychotropic
21 medications, potentially, those that had hypertension
22 issues, would surely be on that list.
23   Q.   What about diabetics?
24   A.   I would again make the assumption that most
25 diabetics, because their medical condition would be on

APPENDIX151

33 (Pages 129-132)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

129

1 there, but again, health service professionals would
2 be the experts.
3      Q.   And the health service professionals that
4 you talk about, that is -- is medical providers at the
5 University of Texas Medical Branch, or the Health
6 Services Division of TDCJ?
7      A.   In this case, it would be the individual
8 providers at the facility that identify those
9 individuals on their facilities.
10     Q.   Are they employed by UTMB or are they
11 employed by TDCJ?
12     A.   To my knowledge, they're -- would be
13 employed by UTMB.
14     Q.   Okay.  So this licensed vocational nurse who
15 might look at somebody when they get off the bus into
16 the system and do that initial, is there an immediate
17 need, that would be a UTMB person.  Right?
18     A.   Right.
19     Q.   Okay.  And TDCJ is relying on UTMB to assess
20 their heat-sensitive vulnerabilities.  Right?
21     A.   Correct.
22     Q.   Okay.  So we went through psychotropic --
23 people on psychotropic drugs, people with
24 hypertension, diabetics.  What about mentally ill
25 persons or people with depression that have to take

130

1 medications where the heat affects them?
2      A.   Again, I would say that list would be
3 inclusive of those that take medications that would
4 increase their propensity to heat-related illness.
5 But, again, I'm not the subject matter expert in
6 there, so I don't want to tell you anything for
7 definite that I'm not sure of.
8      Q.   Okay.  What about obesity, is that something
9 that TDCJ teaches people, that people who are obese
10 are vulnerable to extreme heat as well?
11     A.   Again, surely they can be.  At what level
12 that individual is placed on that list, again, I'm --
13 I cannot tell you.
14     Q.   All right.  But after the summer of 2011,
15 the policy changed at TDCJ to rely on UTMB to identify
16 these people who were vulnerable to extreme heat and
17 actually place them on a list where your officers
18 would conduct wellness checks on them throughout the
19 day?
20     A.   Right.  Prior to 2011, we've always relied
21 on UTMB to ensure that the individuals could be
22 appropriately housed on any of our facilities.  But
23 subsequent to the incidents in 2011, that additional
24 measure of development of that checklist was
25 developed.

131

1      Q.   Okay.  And was that developed in
2 coordination with UTMB or was that just developed by
3 TDCJ out the concern for its inmate population?
4      A.   Well, I work with --
5      Q.   If you know?
6      A.   I work with Doctor Linthicum, so her
7 interaction with our health care providers, I could
8 not speak to the degree that -- that they worked
9 together on it.  But it was something that
10 Doctor Linthicum and -- and I myself discussed.
11     Q.   (BY MR. EDWARDS) Is Doctor Linthicum -- and
12 I apologize, I probably should know this -- is she
13 employed by UTMB or is she employed by TDCJ?
14     A.   She is employed by TDCJ as the health
15 service director.
16     Q.   Okay.  So other than Doctor Linthicum, did
17 you discuss this with anyone at UTMB?
18     A.   No, sir.
19     Q.   Okay.  All right.  Now, when that initial --
20 I don't know if you call it assessment, or kind of
21 when they come in, assessing immediate needs, if the
22 UTMB person doing that were to say, this person needs
23 to be housed in an air conditioned environment, would
24 TDCJ follow that recommendation?
25     A.   Yes.

132

1      Q.   That's like a hundred times out of a
2 hundred.  You're not providing medical care, they are.
3 Right?
4      A.   Well, again, any medical restrictions that
5 were placed on an offender, we surely -- medical
6 surely has the autonomy to make those decisions and we
7 would have to abide by them.
8      Q.   Okay.  Now, in a situation where UTMB said,
9 look, this person needs to be housed in an air
10 conditioned environment, would you be able to say,
11 whoa, huh-uh, that's too expensive.  Or would you have
12 to follow their recommendation?
13     A.   Again, if that were to happen today, then
14 the normal process would be that UTMB would notify the
15 unit administrator, the unit classification process.
16 We would have to find appropriate housing for that
17 offender.  If it was potentially possible to put that
18 individual in a -- in a portion of the facility that
19 had controlled air on that particular facility, at
20 least temporarily, that would be the first action.
21       And then, subsequent to that,
22 classification would find an appropriate facility that
23 had conditioned air and that transfer would be
24 initiated for that individual.
25     Q.   Okay.  And there are, in fact, facilities

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
c4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX152

34 (Pages 133-136)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

**133**

1  that do have conditioned air?
2      A.   There are some.
3      Q.   Okay.  Were you familiar with the Blackmon
4  lawsuit during your time at TDCJ?
5      A.   I want to say that might have occurred as I
6  was -- I didn't have any involvement in it.  And just
7  my recollection is that that is something that might
8  have occurred when I was in my other role in the
9  Manufacturing and Logistics Division, I'm not sure.
10     Q.   Okay.  When did you -- I mean, have you been
11 made aware of deaths at the Byrd Unit due to heat?
12     A.   Again --
13     Q.   In 2007?
14     A.   Through discovery of this lawsuit, yes, sir.
15     Q.   Do you know how long Director Livingston has
16 been in his position?
17     A.   The current executive director's position, I
18 want to say that -- maybe eight or nine years.  But,
19 again, I'm not sure on that date, so...
20     Q.   Okay.  Is he made aware of inmate deaths at
21 facilities?
22          MR. GARCIA:  Objection.  Asked and
23 answered.
24     A.   Again, in some cases there would be some
25 discussion, but not in every case on every death, no,

**134**

1  sir.
2      Q.   (BY MR. EDWARDS)  Have you had discussions
3  with Doctor Linthicum or anyone at UTMB about the
4  problem of acclimation from air conditioned county
5  facilities to transfer facilities that aren't air
6  conditioned?
7          MS. COOGAN:  Objection.
8  Doctor Linthicum, as he testified, works for TDCJ, so
9  your question is vague and misleading because you
10 represented -- you said, have you had discussions with
11 Linthicum or anybody else that works at UTMB.
12         MR. EDWARDS:  Well, we'll break it up.
13     Q.   (BY MR. EDWARDS)  Have you had any
14 conversations with Doctor Linthicum about acclamation
15 and the problems that ensue from coming from air
16 conditioned facilities to non-air conditioned
17 facilities?
18     A.   Again, I can't remember any specific
19 conversations about acclimation.  We have had repeated
20 conversations about individuals in-taking into our
21 system and appropriate care for those offenders.
22     Q.   Okay.  Same question as to anybody from
23 UTMB?
24     A.   No, sir, I -- most communications, direct
25 communications with UTMB at the leadership level take

**135**

1  place through Doctor Linthicum.  And -- although there
2  are occasional times when we would meet, those are
3  very seldom directly.  Doctor Linthicum manages that
4  part of the process.
5      Q.   If you were to talk with people at UTMB, do
6  you recall who it would be?  Would it be Doctor
7  Murray, would it be someone else?
8      A.   Again, over my tenure with -- with the
9  department, and particularly in my Correctional
10 Institutions Division director's job, there were
11 subject matter that related to a hospital in Galveston
12 where Doctor Murray might have been present.  But --
13 but routinely, again, unit-based issues in my case
14 were mostly taken directly to Doctor Linthicum for
15 discussion with our contracting partners.
16     Q.   Okay.  Now, you've told me that you had been
17 in the Hutchins Unit in the summer.  I'm going to ask
18 you questions about other units.  Okay?
19     A.   Okay.
20     Q.   Have you been in the Gurney Unit in the
21 summer during your tenure from '09 to 2012 -- or 2013?
22     A.   I've been on Gurney Unit, but I don't
23 know -- I can't remember what time of the year that
24 was.
25     Q.   What about the Hodge Unit?

**136**

1      A.   No, sir.
2      Q.   What about the Garza West Unit?
3      A.   I have been on Garza East and West, but,
4  again, I have been down -- I've been down there a
5  couple of times.  I want to say one time might have
6  been during the summer or spring, the other time I
7  believe was in the fall.
8      Q.   What about the Michael Unit?
9      A.   No, sir.
10     Q.   What about the Huntsville Unit?
11     A.   Yes, sir.
12     Q.   Okay.  Do you know why the Walker Sayle Unit
13 is air conditioned?
14     A.   No, sir, I do not.
15     Q.   Do you know why Skyview or Montford are air
16 conditioned?
17     A.   Skyview and Montford are inpatient mental
18 health facilities, and those are conditioned air.
19     Q.   Did UTMB or -- did UTMB ever tell you that
20 these facilities should have air conditioning?
21     A.   Again, when --
22     Q.   Or does it predate you?
23     A.   Yeah.  Again, when those facilities were
24 constructed, to my knowledge, surely at Montford --
25 Skyview is somewhat older -- they were constructed for

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX153

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

137

1  that purpose, I believe, and similar to Jester IV,
2  have conditioned air.
3      Q.  Okay.  Do you know when Montford or Skyview
4  were constructed?
5      A.  I can't -- I cannot speak to Skyview.  I
6  want to say the Montford facility would have been in
7  the mid '90s.
8      Q.  Mid '90s?  Okay.
9          (Deposition Exhibit No. 51 marked.)
10     Q.  (BY MR. EDWARDS)  Sir, I'm going to hand you
11 the inclement weather policy.  Could you confirm that
12 that is, in fact, the inclement weather policy for
13 TDCJ?
14         MR. EDWARDS:  Demetri, there you go.
15         MR. ANASTASIDIS:  Thank you.
16     A.  This is security memorandum 6.07.
17     Q.  (BY MR. EDWARDS)  And is the subject line
18 Inclement Weather?
19     A.  Yes, sir.
20     Q.  And does inclement weather, according to
21 this policy, include temperatures, hot or cold, that
22 may pose safety, health, or security risks?
23     A.  Yes.
24     Q.  Why does this -- well, I guess, would you
25 agree with me that this policy only addresses outdoor

---

138

1  recreation and outdoor labor?
2      A.  Yes.
3      Q.  Do you know why this policy has your
4  signature on it?
5      A.  Because it is a divisional inclement weather
6  policy as opposed to agency inclement weather policy.
7      Q.  Help me -- explain that to me in a little
8  more -- what does that mean, a divisional policy as
9  opposed to an agency policy?
10     A.  Meaning again, as I explained earlier, if
11 it's a policy that affects multiple divisions and is
12 sent out by the executive leadership, then it would be
13 in an administrative directive form.  It is a policy
14 that in some cases supplements agency policy, specific
15 in some cases to the division or activities within
16 that division, then that might be signed by the
17 division director.  In this case, a security
18 memorandum is generated in most cases issued to
19 deal with security matters within the Correctional
20 Institutions Division specifically, so it wouldn't --
21 would not be the policy that would go across the board
22 to all divisions.
23     Q.  Okay.  Is there any -- it looks like a
24 determination whether or not the conditions are hot
25 and pose a danger must be made by the warden.  Do I

---

139

1  have that -- is that accurate?
2      A.  As it relates to a continuation of
3  recreation, the warden would have the final call, yes,
4  sir.
5      Q.  And if he decides that there is inclement
6  weather, hot or cold conditions that pose a danger,
7  according to this, he is supposed to bring the outdoor
8  people -- outdoor labor, recreation inside.  Correct?
9      A.  Correct.
10     Q.  Did anyone have to approve this besides
11 yourself before it became final?
12     A.  No, sir.
13     Q.  Okay.  At least -- or I guess I'll ask, for
14 you and for TDCJ, do you agree that the National
15 Weather Service is a reliable source of information
16 about weather?
17     A.  Yes, sir.
18     Q.  Okay.  And is there any more specific
19 guidance as to at what temperature this policy should
20 be implemented by a warden?  90 degrees, 95 degrees,
21 97 degrees, 101 degrees?
22     A.  There is no specific temperature that I see.
23     Q.  Do you provide any guidance to the wardens
24 as to when they should do this?
25     A.  No, sir.  Again, as a warden, when I made

---

140

1  this determination, I made it in conjunction with my
2  administrative review and risk manager officer on the
3  facility and my Health Services Division.
4      Q.  Who would have been your risk management
5  person?  Would that have been Sharon Howell?
6      A.  No.  I'm talking about other -- the old term
7  would have been the fire and safety officer, the risk
8  management officer on the facility.
9      Q.  Okay.
10     A.  So each facility has a fire and safety
11 officer, or a risk management officer on their
12 facility that assists them in safety and
13 training-related issues, in fire and safety issues on
14 a facility.
15     Q.  You may not know this, but would that be
16 Mr. Story as to the Hutchins Unit?
17     A.  Yes.  I believe it is Mr. Story, yes.
18     Q.  So would Mr. Story and Mr. Pringle get
19 together and decide, look, it's -- these conditions
20 are getting pretty hot, we need to bring people in?
21     A.  Again, I can't dictate exactly how
22 Warden Pringle made this determination as his case.
23 But as a warden, that's the individuals that I
24 involved when I made that decision.
25     Q.  Okay.  Are there any checks to see if

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
c4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX154

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

141

1  wardens are, in fact, following this inclement weather
2  security memorandum?
3      A.  Just, again, besides visual checks by the
4  regional director, if the warden is not following in
5  the recommendations, could be notified, the regional
6  director.  If there is an offender complaint filed,
7  particularly at the second level, those complaints
8  would go to the regional director for addressing.  So
9  other than that, as far as a team going out and
10 checking to make sure he is complying with this, I
11 don't know of any formal check process.
12     Q.  Fair enough.  Basically what I'm trying to
13 figure out is, if the temperature is 100 degrees ten
14 days in a row, do they -- is there any document that
15 gets sent from the warden up where you could say,
16 whoa, that -- seven days in a row, guys, we need to
17 make sure that you're bringing people in from the rec
18 yard or from the -- anything formal like that?
19     A.  I don't know of any formal document in that
20 case that would be forwarded up the chain, no, sir.
21     Q.  Okay.  All right.  Your understanding as one
22 of the policy makers -- well, is it fair that you're
23 one of the policy makers for the Texas Department of
24 Criminal Justice, at least in your role as director of
25 the criminal institution division?

---

142

1      A.  There are some policies that I surely play a
2  role in developing, yes, sir.
3      Q.  Based on your experience, at least at the
4  facilities that UTMB manages health care, does TDCJ
5  and UTMB work together to make sure that prisoners get
6  access to health care?  At least, is that the way it's
7  supposed to work?
8      A.  Yes, sir.  I would say that the two entities
9  work together to ensure access to health care, yes,
10 sir.
11     Q.  Okay.  Does TDCJ rely on UTMB to make sure
12 that prisoners are safe and healthy?
13         MS. COOGAN:  Objection.  Vague.
14     A.  Again, we surely rely on that contract
15 entity to provide those services to our offender
16 population, yes, sir.
17     Q.  (BY MR. EDWARDS)  Okay.  Decisions relating
18 to the time that UTMB is on a facility.  For instance,
19 whether there is eight hours of UTMB care or 24-hour
20 care, who makes that call?  Let's start, do you make
21 that decision?
22     A.  No, sir.
23     Q.  Okay.  Do you know if Director Livingston is
24 involved in that decision?
25     A.  I cannot directly tell you who makes the

---

143

1  final decision, no, sir.
2      Q.  We would have to ask him that?  You can't
3  help us in with regard?
4      A.  Well, again, no, sir.  I don't know directly
5  who makes the final call.
6      Q.  Okay.  Do you have any suspicions as to who
7  makes the final call?
8      A.  Again, I don't -- I don't know directly --
9      Q.  I understand you don't know and this is a
10 very difficult question they can object,
11 speculation.  I totally -- I'm just trying to -- help
12 me out a little bit.  Do you have any idea?
13     A.  There would surely be some coordination
14 between Doctor Linthicum and the health service
15 providers who -- who determine the resources needed
16 for appropriate health care on our facilities.  That
17 surely would be discussed with executive
18 administration, the same as I would discuss any issues
19 with executive administration.  But as far as who made
20 the final determination and the decision and who is
21 informed of it, I cannot speak to that.  I'm not -- I
22 don't have -- I'm not an expert on that subject
23 matter.
24     Q.  All right.  If you don't know, you don't
25 know.

---

144

1      A.  I don't know.
2      Q.  Okay.  Do you know if there was ever 24-hour
3  care, medical care at the Hutchins Unit?
4      A.  Again, my first direct interactions with
5  Hutchins Unit was when I came into the directorship in
6  2009.  I do not believe there was ever 24-hour care
7  there.  But, again, I'm not the expert --
8      Q.  We'll ask somebody else.
9      A.  -- don't take my word for it.
10     Q.  Okay.  What about at Gurney, do you know if
11 there was 24-hour care at Gurney?
12     A.  No, sir.  I do not whether that --
13     Q.  And then the period I'm asking you about,
14 let's say, is '09 to 2012.
15     A.  Okay.
16     Q.  Or 2013, excuse me.  You don't know?
17     A.  As far as I remember, I do not remember
18 24-hour care at those two facilities during my
19 tenure --
20     Q.  Okay.  And I suspect I know the answer, so I
21 apologize in advance for asking this, but let's go
22 through the list.  What about Garza West?
23     A.  Again, I do not know.
24     Q.  Michael Unit?
25     A.  And is this during --

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

145

1    Q.  From '09 to 2013.
2    A.  '09 through 2013, again, Michael Unit has
3  24-hour care.
4    Q.  Okay.  What about Huntsville?
5    A.  Huntsville -- I believe it does, but I'm not
6  sure.  Because we have a transit population there, I
7  believe it does.
8    Q.  And all those units that I mentioned, UTMB
9  assists in the provision of medical care except for
10  Hodge?  Oh, I'm -- strike that.
11    A.  All of them, yes.
12    Q.  I may not have asked you this and -- does
13  Hodge have 24-hour care?
14    A.  Again, we're co-located up there, Hodge and
15  Skyview, so I'm not sure on the number of hours of
16  care.  I could have told you that several months ago,
17  but I'm not sure right now.
18    Q.  All right.  Well, we'll ask
19  Director Stephens.
20        Fair to say that not having 24-hour
21  medical care at a facility denies -- well, strike
22  that.
23        Fair to say that not having 24-hour
24  medical care would delay a prisoner's access to care?
25        MS. COOGAN:  Objection.  Calls for

---

146

1  speculation.
2    A.  Again, I don't know what you would consider
3  delay.  There are mechanisms put in place for
4  offenders to access care even during the hours after
5  medical staff is not on -- on the facility.  How long
6  that takes to walk the individual to the infirmary, to
7  call the medical personnel that's on call, if you're
8  considering that a delay, I don't know how many extra
9  minutes you add there.  But, again, there is not
10  direct access after hours, if that's what you're
11  asking.
12    Q.  Okay.  Well, let's walk through that.  We've
13  got places with 24-hour medical care on-site.  Right?
14    A.  Correct.
15    Q.  Okay.  That -- then you could get the inmate
16  to the medical provider quickly.  Correct?
17    A.  Correct.
18    Q.  Okay.  If you don't have that and you have
19  to do some sort of telemedicine accommodation, it's
20  going to delay things, who knows exactly how much, but
21  it's not going to get the -- a medical provider there
22  as quickly.  Is that fair?
23    A.  Again, there surely could be a minimal delay
24  in accessing that care, yes, sir.
25    Q.  Do you know if licensed vocational nurses

---

147

1  are authorized to diagnose illness?
2    A.  No, sir, I do not.
3    Q.  Okay.  Now, if a prisoner at the
4  Hutchins Unit needs medical care after hours, is it
5  true that the only way to get it there is to call 911?
6    A.  The only way to get a physical individual
7  there to provide the care?
8    Q.  Yes.
9    A.  Again, transportation -- well, depending on
10  the circumstances.  Again, as we mentioned before, in
11  some cases, a -- a minor medical issue that requires
12  them to be seen from a -- a health service provider
13  could require transport -- transportation by security
14  staff.  All emergency medical treatment of individuals
15  would be by 911 from the local community responding.
16    Q.  Okay.  So the only way to get actual medical
17  care in the event of an emergency would be to call
18  911.  Right?
19        MS. COOGAN:  Objection.  Misstates his
20  testimony.
21        MR. EDWARDS:  No, it doesn't, but --
22        MS. COOGAN:  Well, then it's
23  repetitive.
24    A.  Again, there is some access to medical care
25  through the telemedicine system that we talked about.

---

148

1  In minor situations that surely is an option.  But for
2  emergent medical care, 911 would be the appropriate
3  mechanism.
4    Q.  (BY MR. EDWARDS)  Okay.  Well, it's the only
5  mechanism, right, to get actual emergent care to the
6  facility.  Right?
7    A.  Emergent care, yes, sir.
8    Q.  Yeah.  Okay.  I mean, an officer can't make
9  a diagnosis.  Right?
10    A.  No, sir.
11    Q.  Now, were you ever aware of a practice at
12  the Hutchins Unit of not contacting 911 in the event
13  of medical emergencies and instead contacting
14  supervisors?
15    A.  No, sir, I was not.
16    Q.  Would that be a dangerous practice to have
17  at any prison facility, if it existed?
18    A.  When you say, not contacting emergency
19  medical care, contact the supervisor, can you specify?
20    Q.  Sure.  Let's say somebody is having a
21  seizure right there.
22    A.  Right.
23    Q.  And is convulsing and is nonresponsive and
24  unable to communicate with you.
25    A.  Right.

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX156

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013



149

1    Q.  You'd agree, that's an emergency situation
2  you've got to deal with.  Right?
3    A.  Seizure is a serious medical situation.
4    Q.  Of course.  Should they, A, call their
5  supervisor and wait ten to 15 minutes for them to come
6  down and evaluate the situation; or, B, institute an
7  emergency call to 911?
8    A.  Well, again, when you say, was I aware of a
9  practice, I guess I will answer it this way.  In any
10  emergent situation in our institutions, supervisory
11  staff should always be available to immediately
12  respond to the area.  And when I say immediately
13  respond, with the supervisory coverage we have on our
14  facilities, that should --
15        THE VIDEOGRAPHER:  Excuse me.
16  Somebody's phone is ringing.
17    A.  With the supervisory staffing that we have
18  in our facility, that should occur in an emergency
19  situation, in -- immediately.  Okay?  As it relates to
20  the staff member making the 911 call, there is no
21  staff member inside the facility that has the
22  capabilities of -- of accessing 911.  As you're
23  probably aware, they have -- in some cases they have
24  telephone access, in some cases they will be equipped
25  with a radio where they could immediately contact an

150

1  entity and say, I need the supervisor, or I need
2  emergency care.  But that individual themselves would
3  have no capabilities of dialing 911.
4    Q.  Sure.  Let's take my example.  Okay.  A
5  person, seizure, nonresponsive.  We've agreed he needs
6  immediate medical care.  Right?
7    A.  Right.
8    Q.  Okay.  In that situation, a correctional
9  officer is there, should they initiate the 911
10  process, or contact their supervisor, wait ten,
11  15 minutes for the supervisor to come and not initiate
12  the 911 process?
13    A.  And, again, in the explanation that I gave
14  you, their first contact would be their supervisor as
15  they initiate our emergency incident response process.
16  Okay?  That supervisor should immediately go to there.
17  If for some reason there is delay, that correctional
18  officer surely has the opportunity to inform that
19  supervisor by radio, we need 911, this is what I have,
20  and that process could be initiated.
21    Q.  Okay.  So nothing prevents, at least to your
22  knowledge, a correctional officer from initiating a
23  911 process if people -- if there is a delay in
24  getting people to help him?
25    A.  There is no policy out there that prohibits

151

1  that from occurring, no, sir.
2    Q.  If there was a -- not a policy, but just a
3  practice, a way of doing things of just waiting until
4  your supervisor shows up before initiating the 911
5  process, would you agree with me that that could delay
6  potentially lifesaving care?
7    A.  Again, in an emergency situation, I would
8  hope the supervisor would respond immediately.  But,
9  indeed, if that was not happening, then -- then surely
10  that would be a situation of concern.
11    Q.  Okay.  Are you aware of the time delay in
12  this particular case between recognizing Mr. McCollum
13  having seizures and being nonresponsive and contacting
14  911?
15    A.  I'm aware of the time, by reviewing the
16  report and discussing it with others, yes, sir.
17    Q.  Okay.  It's an hour delay.  Right?
18    A.  Just short of an hour, I believe.
19  50-something minutes, yes, sir.
20    Q.  Somewhere between 50 minutes and a little
21  more than an hour, somewhere like that.  Right?
22    A.  Yes.
23    Q.  You would agree that's off the charts
24  unacceptable in this situation.  Right?
25    A.  Again, in -- in reviewing the facts as they

152

1  were there, again, the encouragement and the direction
2  to the field is, when in doubt, seek -- seek treatment
3  for -- for the offender.
4    Q.  Sure.
5    A.  So in retrospect, not knowing all that the
6  staff was dealing with there, I would surely say that
7  it would have been appropriate to initiate that 911
8  call earlier, yes, sir.
9    Q.  Okay.  Inappropriate to not initiate that
10  911 call sooner.  Right?
11    A.  Well, again, looking at the circumstances as
12  I can see them now, surely would have initiated it
13  earlier, yes, sir.
14    Q.  Okay.  That happened in July of 2011, I
15  think July 22nd, 2011.  Is that your understanding as
16  well?
17    A.  I believe that was the date of the
18  occurrence, yes, sir.
19    Q.  Okay.  And you were notified about -- and
20  you received an EAC report and there was an
21  administrative review in which all of this situation
22  was discussed and described.  Right?
23    A.  Again, I don't know exactly what documents I
24  reviewed.  At some point I would have been notified of
25  that, but I cannot recall exactly when that



**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX157

39 (Pages 153-156)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

153

1 notification took place.
2    Q.  Do you know if these officers have been
3 disciplined for the delay in contacting 911?
4    A.  I do not know whether they have been
5 disciplined, no, sir.
6    Q.  Should they be?
7    A.  Well, again, it's a determination that is
8 made through the review process of the warden and the
9 regional director, and in some cases as they review
10 the administrative review, looking at the officers'
11 actions afterward, they surely -- surely can criticize
12 the fact that there was a delay in the call.  I don't
13 know that -- where any level of responsibility lies in
14 that entire process, but there is officers out there
15 that, as you know, make difficult decisions every day
16 dealing with the offender population, and as to
17 whether or not formal disciplinary should have been
18 taken, at what level, again --
19    Q.  Well, let's change the question.  Should
20 formal retraining have been done?
21    A.  I surely believe that retraining, not only
22 for that particular -- those particular staff members,
23 but for staff on that facility to ensure that the
24 correct message was out there to the staff.
25    Q.  You don't want this to happen again.  Right?

154

1    A.  That's correct.
2    Q.  I mean, Warden Pringle ought to have had
3 those officers in and said, look, guys, in all
4 circumstances initiate 911 when someone is seizing and
5 nonresponsive.  Right?  Whether he disciplined them or
6 not, he should have had that conversation.  Right?
7         MR. GARCIA:  Objection.  Compound.
8 Speculation.
9    A.  Again, as a warden, that's something that
10 surely I would have done.
11    Q.  (BY MR. EDWARDS)  And if you were that
12 warden, of course you would have done that.  Fair?
13    A.  Again, as a warden, I surely would have
14 reviewed those circumstances with staff involved.
15    Q.  Do you know if Warden Pringle has done that?
16    A.  No, sir, I do not.
17    Q.  Would you be critical of Warden Pringle if
18 he had not had those conversations with his officers?
19    A.  Again, I would -- I would hope that subject
20 matter relating to those incidents and dealing with
21 those incidents was covered with all staff, to include
22 those officers, by Warden Pringle.
23    Q.  Okay.  Otherwise, nothing changes and you're
24 destined to repeat your failures.  Right?
25    A.  Surely if there is not additional

155

1 instructions given, the same decisions could be made,
2 yes, sir.
3    Q.  This -- after this e-mail is sent out, I
4 believe there has been previous testimony that --
5 well, strike that.
6         Are you responsible for sending out
7 Exhibit 50 or is somebody else responsible for it?
8 And I'm talking about that '09 to before you retired
9 time period.
10    A.  Yeah.  In most cases that would come from my
11 office.  In some cases it might have been disseminated
12 from Mr. Stephens' office.
13    Q.  Okay.  There has been testimony in this case
14 that a circular, a risk management circular was read
15 aloud to officers about recognizing the signs and
16 symptoms of heat stroke and heat exhaustion.  Were you
17 aware that that was going on in -- at the
18 Hutchins facility?
19    A.  Not -- not directly aware, but heat
20 preparedness training, as I mentioned before, is
21 required to be conducted on each facility, in addition
22 to the training that the correctional staff receive as
23 they go through their pre-service and in-service
24 training.
25    Q.  And this training was going on from the time

156

1 you started your job as director of Correctional
2 Institutions Division.  Right?
3    A.  As far as I know, training -- yes.
4    Q.  It wasn't in response to this epidemic of
5 heat deaths in 2011, was it?
6    A.  No, sir.
7    Q.  Okay.  So you would expect that your
8 officers to be well versed in what the signs and
9 symptoms of recognizing heat stroke are.  Right?
10    A.  We surely try to ensure that they are
11 appropriately trained, and an additional step that is
12 taken is, they are provided a card that they carry on
13 person which would identify those signs for them.
14    Q.  Certainly you would expect Warden Pringle to
15 understand what the signs and symptoms of heat stroke
16 are.  Right?
17    A.  Generally, yes, sir.
18    Q.  If he had no idea what they were, would that
19 trouble you?
20    A.  Well, again, I would think he would have
21 some general idea, but -- because --
22    Q.  You certainly would hope that he would have
23 a general idea.  Right?
24    A.  Sure.
25    Q.  Okay.  I agree.  If he didn't, would that

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX158

40 (Pages 157-160)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

157

1  trouble you, since he is running a prison with
2  extremely hot temperatures inside?
3      A.  Again, it would surely be a training
4  opportunity forward, yes, sir.
5      Q.  That's a bit of an understatement.  Correct?
6      A.  It's a statement, yes, sir.
7      Q.  Okay.  It's -- fair enough.
8          Who is responsible for making sure that
9  correctional officers receive this training at the
10 individual facilities?  We'll start with Hutchins?
11     A.  Again, the administrator on the facility is
12 ultimately responsible for ensuring that the training
13 is conducted.  And he would utilize his department
14 heads and his security supervisors to provide that
15 training in conjunction, in many cases, with health
16 service staff.
17     Q.  There has been testimony that this circular,
18 I think it's like three or four pages, was read
19 aloud -- you may have noticed this in one of the
20 depositions -- was simply read aloud to the officers.
21 Do you think that that is effective training?
22     A.  Well, again, there are different kind of
23 training techniques.  Getting up in front of a -- an
24 audience and with the information dissemination surely
25 is one way.  I would hope that we supplement that with

158

1  situational and example training.  I'm hoping that
2  since that subject matter was covered repeatedly
3  throughout the seasonal months that that wasn't the
4  only opportunity for shift supervisors to discuss
5  heat-related illness issues with their staff and signs
6  and symptoms of such.
7      Q.  Okay.  This was such a pervasive issue and
8  such a concern of yours as the director of the
9  Correctional Institutions Division that you made sure
10 that there was lots of training and lots of
11 opportunities for people to understand, heat stroke is
12 a problem and you need to be able to recognize it
13 right away?
14     A.  Again --
15     Q.  True?
16     A.  We put that information out there to ensure
17 that we could respond appropriately, yes, sir.
18     Q.  And we'll go through some -- the minutes
19 from these regional director meetings.  It appears
20 that heat awareness is something that is discussed
21 consistently throughout the course of your tenure.  Is
22 that your memory as well?
23     A.  Surely during those seasonal months, yes,
24 sir.
25     Q.  Okay.  Fair enough.

159

1          These wellness checks that you
2  instituted after the summer of 2011, what is an --
3  what is your understanding of what an officer is
4  supposed to look for?
5      A.  Again, that was just an additional step that
6  was put in place as -- as, in general, through the
7  seasonal period as they made their rounds, the process
8  that was in place prior to the wellness check was,
9  basically, they did a general overview.  If indeed
10 they happened to be making their rounds and saw
11 somebody in distress or somebody symptomatic of
12 heat-related illness, then they surely would bring
13 that to the attention of medical staff for appropriate
14 treatment.
15          The contact -- the direct contact with
16 these individuals just ensured if an individual was
17 lying on his bunk, if an individual was in distress
18 and might not notice by an idle round through the
19 dorm, that the officer would make some contact with
20 that individual, get some response, and -- and have
21 some opportunity, just as an -- an additional stopgap
22 measure to identify anybody that might be struggling.
23     Q.  Okay.  Is that an accommodation that TDCJ
24 has chosen to provide for its population that is
25 vulnerable to heat illness?

160

1      A.  Again, that's a -- a procedure that we have
2  put in place to assist those individuals that might be
3  vulnerable to heat-related illnesses, and in many
4  cases those contacts are made repeatedly throughout
5  the seasonal period -- or the majority without any --
6  any indication of issue.  But, again, it's an extra
7  opportunity for us to ensure that we're making some
8  communication with the population, giving them an
9  opportunity to indicate to us should they be
10 struggling or having any symptoms.
11     Q.  Sure.  Anything prevent you from putting
12 that into place in the -- in 2010?
13     A.  No, sir.
14     Q.  Okay.  Why didn't you put it into place in
15 2010?
16     A.  Again, as we evaluated the incidents that
17 occurred in 2011, this is a -- an additional step that
18 we're taking to, hopefully, ensure that we're bringing
19 extra awareness to staff's attention out there, making
20 sure that as they make their rounds, although, again,
21 it's repeatedly discussed in shift briefings, that
22 that is constantly on their mind as they make their
23 rounds.  As we went through 2010, there was no
24 indication to me or others that our identification
25 process of these illnesses wasn't sufficient to

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX159

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

161

1 address the issue.
2     Q.   There was no identification process, though,
3 was there, sir?
4     A.   When I say identification process, I'm
5 referring to the ability to identify somebody that was
6 in distress, not identifying those that might be
7 susceptible to heat-related illness. Okay? There was
8 no information besides maybe work restrictions on a
9 work roster that would allow a dorm officer to know
10 who had any of those illnesses. So our attempt, after
11 2011, was to, again, use the resources that I had
12 immediately available to me, which is our staff that
13 patrols those areas, to work with Doctor Linthicum to
14 ensure that we put forth that extra effort and made
15 contact with these individuals as they made their
16 security rounds.
17     Q.   Okay. And while I guess you hadn't suffered
18 through ten deaths in one summer, you had had people
19 die from heat stroke in your custody due to -- with
20 heat-sensitive vulnerabilities. Correct?
21     A.   Well, again, I -- I don't -- I'm not purview
22 to that information. Surely there are individuals in
23 our system that -- that die every year for a multitude
24 of health reasons. But, again, those -- to my
25 knowledge, those deaths were not related to this

---

163

1         MR. GARCIA: Objection. Asked and
2 answered.
3     Q.   (BY MR. EDWARDS) Right?
4     A.   Again, the --
5         MR. GARCIA: Objection. Asked and
6 answered.
7     Q.   (BY MR. EDWARDS) Right? Of course.
8     A.   Again, the --
9     Q.   Was that, yes?
10     A.   No. I said, again, surely was aware that
11 through health service direction they had identified
12 certain illnesses that were more susceptible to
13 heat-related illnesses, yes, sir.
14     Q.   Okay. Do you recall any -- any discussion
15 about speeding up the process of getting prisoners on
16 this wellness checklist during the summer of 2011?
17     A.   Again, discussions concerning the wellness
18 checklists took place, the best of my recollection --
19 and, again, I could be off -- would have been towards
20 the end of 2000 -- the summer of 2011. And most of
21 those discussions and surely the decision to implement
22 that checklist was implemented as we rolled into the
23 seasonal period in 2012.
24     Q.   Just so I'm clear. Is that decision made to
25 put someone on that heat checklist made by the initial

---

162

1 particular issue.
2     Q.   Okay. Well, do you know the circumstances
3 between the death of James Shriver at the Byrd Unit,
4 on August 8th, 2007?
5     A.   No, sir, I do not.
6     Q.   Do you know the circumstances of Dioncio
7 Robles's death at the Byrd Unit on August 13th, 2007?
8     A.   No, I do not.
9     Q.   Okay. You haven't -- well, so you don't
10 know whether or not those are heat-related
11 hyperthermia deaths?
12     A.   Well, again, from the discovery there, I --
13 I see --
14     Q.   Prior to today, you didn't know that?
15     A.   Well, when I reviewed that document.
16     Q.   Okay.
17     A.   So...
18     Q.   But when you say you didn't have access,
19 certainly, as the director of the criminal institution
20 division, certainly you had the ability to find out,
21 didn't you?
22     A.   Sure. Sure.
23     Q.   Okay. And certainly you were aware of the
24 dangers that heat posed to people with particular
25 illnesses or disabilities. Right?

---

164

1 UTMB nurse or licensed vocational nurse seeing the
2 inmate the first time, or by the person who does the
3 intake physical, whenever that happens, three, four,
4 seven, ten days later?
5     A.   Again, as I discussed with Doctor Linthicum,
6 anybody that the health service wants to place on that
7 list, can be placed on that list. So it was my intent
8 that anybody on the facility that Health Services
9 Division determined might be susceptible to
10 heat-related illness would be on that list.
11     Q.   Immediately upon entry into the facility or
12 after they get their intake physical?
13     A.   Well, again, if there were individuals that
14 need to be placed on that list because of the triage
15 initially into the facility, then -- then surely there
16 was nothing that I know that prohibited health
17 services from putting them on that list for -- to be
18 checked on.
19     Q.   Do you know if the LVNs were instructed
20 about this?
21     A.   I can't --
22     Q.   Putting people on the list right away?
23     A.   I cannot speak to that.
24     Q.   Do you know if Rodney Adams was put on this
25 list right away?

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX160

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                         October 18, 2013




165

1    A.  I cannot speak to that.
2    Q.  Do you know if Albert Hinojosa was put on
3  this list?
4    A.  No, sir, I do not know.
5    Q.  Would you acknowledge that there would be a
6  problem if you didn't put people with heat-sensitive
7  disabilities or vulnerabilities on a heat list right
8  away, and waited the three, four, or seven days before
9  they get an intake physical?
10      MR. GARCIA:  Objection.  Speculation.
11    Q.  (BY MR. EDWARDS)  From a correctional
12  standpoint?
13    A.  Well, again, we would be relying on the
14  system that was in place prior to the implementation
15  of the wellness checklist, and that would be relying
16  on the correctional staff working that area to
17  identify an offender that would be -- was in distress
18  or having problems.  As I mentioned earlier, one of
19  the struggles with the developing the wellness
20  checklist was to encourage our staff or train our
21  staff not to just focus on the wellness checklist,
22  because -- just because an individual might not be
23  susceptible or have a condition that would make them
24  susceptible to heat-related illness, it does not
25  prevent them from experiencing a heat-related illness.

166

1  So, again, what we would have had to rely on, if that
2  indeed occurred, was for the staff member to identify
3  that individual through their normal rounds, in
4  addition to those that they were identifying through
5  the wellness checklist.
6    Q.  Okay.
7      MR. EDWARDS:  Let me object as
8  nonresponsive.
9    Q.  (BY MR. EDWARDS)  And my question is a
10  little different, sir.  It's -- if there -- if the
11  person is not put on a wellness checklist right away
12  by that initial nurse, okay, and instead, they're put
13  on it later, when they have an intake physical,
14  however many days, four, five, six, whatever days
15  away, do you see a problem from trying to manage this
16  pro -- this situation, do you see a problem that could
17  occur?
18    A.  Sure.  And the intent was to place the
19  individual on the list so they receive the
20  additional -- the additional checks and additional
21  scrutiny.  Now, again, although we put that wellness
22  checklist in place here within the last year, we
23  functioned with our correctional staff identifying
24  those issues for many years prior to that.  So, again,
25  there would still be a mechanism there for that to be

167

1  identified, but adding that individual to the list
2  would surely allow for additional scrutiny by security
3  staff as they make their rounds.
4    Q.  Better to identify it right away, because
5  there is no more protection and the benefit of
6  identifying and protecting the inmate actually occurs?
7    A.  Well, again, it sure would be -- give us an
8  opportunity to interact with that inmate --
9    Q.  Sure.
10    A.  -- directly each time that we made our
11  rounds.
12    Q.  And you're not saying that you need this
13  wellness checklist in order for officers to
14  appropriately respond to people who are showing signs
15  and symptoms of heat illness.  Right?  That's the
16  whole point of all your training that you do.  Right?
17      MR. GARCIA:  Objection.  Compound.
18    A.  Again, the officers are trained to identify
19  those illnesses.  This wellness checklist was put in
20  place just as an additional measure to -- to identify
21  those struggling that might have a higher propensity
22  to those illnesses.
23    Q.  (BY MR. EDWARDS)  If Mr. McCollum was, in
24  fact, struggling for a period of days, and inmates
25  told officers about this, should they have gotten him

168

1  to see the medical provider at the facility?
2    A.  Surely if any staff member received
3  information that any offender needed medical
4  attention, they should have checked on that offender
5  and referred that individual to -- to the health
6  services department.
7    Q.  Okay.
8      MR. EDWARDS:  All right.  We've got two
9  minutes left on the tape.  Let's take a short break
10  and then we'll dive into your director meetings.
11      MR. GARCIA:  How much more have you
12  got?
13      MR. EDWARDS:  The 12 director meetings.
14  About an hour, I think.
15      THE VIDEOGRAPHER:  Let's go off the
16  record.  We're off the record at 1:10 p.m.
17      (LUNCH RECESS)
18      THE VIDEOGRAPHER:  We're back on the
19  record.  The time is 2:16 p.m.
20    Q.  (BY MR. EDWARDS)  Sir, we've taken a short
21  break for lunch.  Are you ready to continue?
22    A.  Yes, sir.
23    Q.  Okay.  We were talking a little bit about
24  the wellness checklist that I believe you told me was
25  implemented towards the end or at least after the



APPENDIX161

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

169

1  summer of 2011?
2  **A. Yes, sir.**
3  Q. Regional Director Eason testified, I
4  believe, that that was a policy that you, in fact,
5  began. Is that correct? That's how I understood it
6  as well.
7  **A. Again, that was in consultation with**
8  **Doctor Linthicum, but that was surely something that**
9  **began during my tenure, yes, sir.**
10  Q. Did you discuss that with Executive Director
11  Livingston as well?
12  **A. I'm sure that I briefed him on steps that we**
13  **were taking to address the issues as we moved forward.**
14  **The wellness checklist was one of those items that was**
15  **outlined.**
16  Q. Okay. So fair to say that you may have had
17  primary responsibility for dealing with the issues in
18  the prison, but you would brief Director Livingston
19  and -- and coordinate a response?
20  **A. Surely would brief Mr. Livingston on what**
21  **actions were taking place to address particular**
22  **issues, yes, sir.**
23  Q. I guess what I'm -- did he let you do
24  whatever you wanted with regards to how you ran the
25  Correctional Institutions Division or did he -- or

---

170

1  would he -- or could he say, you know what, I don't
2  think we should do that?
3  **A. Surely as executive director, he had the**
4  **ability to instruct me to go a certain direction.**
5  Q. Okay. Certainly he had the ability to
6  implement policies along with you. Correct?
7  **A. He has the policy making ability, yes, sir.**
8  Q. Okay. He could have instituted security
9  memorandums along with you, or had you do that.
10  Correct?
11  **A. Again, he -- those memorandums would have**
12  **been generated out of my office as the division**
13  **director over the Correctional Institutions Division,**
14  **but if -- felt there was a need and that was pointed**
15  **out by Mr. Livingston, it surely would have been**
16  **looked at and addressed.**
17  Q. Okay. And he certainly could have ordered a
18  study as to how much air conditioning or cooling a
19  unit would cost. Right?
20  **A. He could have ordered that, yes, sir.**
21  Q. Okay. Did you guys ever discuss whether you
22  should do that?
23  **A. A study particularly dealing with air**
24  **conditioning in all of the rest of the facilities?**
25  Q. Let's start with air conditioning, and then

---

171

1  I'll ask one more question.
2  **A. No, sir, not to my recollection. Not**
3  **directly.**
4  Q. What about just cooling mechanisms, just
5  getting the temperature down to kind of a livable
6  level?
7  **A. Again, in general, we had discussions about**
8  **actions that were being initiated. I don't recall**
9  **specific conversations about cooling mechanisms in the**
10  **dormitories or in the housing areas.**
11  Q. Okay. To your knowledge, is anything done
12  to make sure that prisoners on the list for wellness
13  checks get to go to an air conditioned part of the
14  prison to cool off?
15  **A. Again, that's a -- a subject that was**
16  **discussed generally that has not been included in the**
17  **e-mail dissemination to this point. But many**
18  **facilities use that as an avenue to provide an area**
19  **for those individuals that showed any signs of**
20  **heat-related illness. In most cases, surely during**
21  **the hours of operation of the infirmary, the infirmary**
22  **would have been the preferred place to take that**
23  **individual so that he could have been evaluated by**
24  **health service staff. And then, again, if it was**
25  **necessary to allow that individual some relief through**

---

172

1  **that method, then the infirmary would have been an**
2  **appropriate place to leave that offender for whatever**
3  **period of time, in a holding area more than likely.**
4  Q. Okay. As I listen to you talk, it sounds
5  like there is no formal instruction that you need to
6  get people on this wellness list into areas that are
7  air conditioned for at least a couple of hours a day.
8  Is that fair?
9  **A. To this point to my knowledge there is no**
10  **formal instruction about a requirement to get all**
11  **individuals on that list into a specific area in**
12  **any -- during any particular day, yes, sir.**
13  Q. Now, one consequence of there not being any
14  formal instruction would be, does that leave it to the
15  discretion of the wardens how to deal with whether or
16  not inmates are going to be allowed to go to cooler
17  places?
18  **A. Well, again, besides general instructions**
19  **out to the field that it does allow the**
20  **decision-making process at the warden level as to what**
21  **is appropriate for their particular facility, yes,**
22  **sir, it does.**
23  Q. Okay. Is there any -- is there any reason
24  why -- let's use the Hutchins Unit -- couldn't use
25  some of the spaces that are air conditioned in the

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7cc7f83

APPENDIX162

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013



---

173

1  housing areas as -- call them respite areas or to get
2  out of the heat?
3      A.  Again, on some facilities there are some
4  areas that could be used for respite areas.  That
5  would be more difficult on other facilities.  Again,
6  there is nothing that restricts any warden from
7  utilizing whatever resources they have available.
8  On -- on most facilities there are no respite areas
9  immediately in the housing area vicinity, but on
10  Hutchins, there -- there I believe are -- there are a
11  couple.
12      Q.  There are some rooms, if I'm remembering my
13  visit there.
14      A.  I believe in testimony there was a
15  multi-purpose room that was referenced.
16      Q.  Okay.  It certainly would be reasonable to
17  let an inmate have access to that room, in your
18  opinion?
19      A.  That is a -- surely a mechanism by which
20  unit administrations can help, again, mitigate the
21  heat factors during the summer months.
22      Q.  Certainly that would have been an option
23  back in 2011 when Mr. McCollum was at the
24  Hutchins Unit, if made known to him.  Correct?
25      A.  Well, yeah.  Again, as it relates to respite

---

174

1  areas, at that time, most of those offenders would
2  have been taken to the unit infirmary, but it surely
3  could have been available, yes, sir.
4      Q.  Would you agree that one important part of
5  having any sort of, I don't know, respite area would
6  be communicating to the inmates that if they're
7  feeling symptoms of exhaustion or being overcome by
8  heat that they could go there?
9      A.  Communicating general information as it
10  relates to signs and symptoms of heat-related illness,
11  in addition to any mechanisms they had to address
12  those issues would be appropriate.
13      Q.  Okay.  It is true, though, that the -- the
14  ability go to respite areas with air conditioning was
15  never communicated to prisoners at the Hutchins Unit
16  prior to the end of the summer of 2011.  Correct?
17      A.  I don't have any knowledge as to whether
18  that was or not.
19      Q.  Okay.  Sir, let me show you Exhibit 52.
20          (Deposition Exhibit No. 52 marked.)
21      Q.  (BY MR. EDWARDS) Would you identify that for
22  the jury, please.
23      A.  This is a communication dated August 16th,
24  2011, addressed to the Honorable Sylvester Turner,
25  Texas State Representative, signed by Brad Livingston,

---

175

1  Executive Director.
2      Q.  And it is my understanding that you wrote
3  this letter.
4      A.  No, sir, I did not.
5      Q.  Okay.  Did Mr. Livingston write this letter,
6  then, to the best of your knowledge?
7      A.  I could not speak to who wrote this letter.
8      Q.  Is that his signature?
9      A.  I would assume it's his signature.
10      Q.  Have you ever seen his signature before?
11      A.  I have, but to be honest with you, I don't
12  recall what it looks like.
13      Q.  All right.  Okay.  Well, at least in this
14  letter it looks like Mr. Livingston is talking about
15  system-wide protocols and what the -- the system is
16  doing to protect inmates from the dangers of heat.  Is
17  that your -- is that a fair reading of this document?
18      A.  I'm reading over it.
19          That appears to be what is being
20  addressed.
21      Q.  Since you did not author this, I guess would
22  it be better for us to ask questions of Director
23  Livingston about this letter?
24      A.  I don't know who would be better to offer --
25  to ask the questions of, but I can't tell you who



---

176

1  authored this.
2      Q.  In order for him to have written this, he
3  would have had to have gathered this information.
4  Would you agree with me?
5      A.  I agree.
6      Q.  And do you know who he would have gathered
7  this information from, if not you?
8      A.  Well, I would -- I would say that part of
9  this information relating to processes we had in place
10  and procedures that we had in place appear to come
11  directly from -- from the communication that we sent
12  out annually.  I know that there have been occasions
13  when I have discussed the issue with Mr. Livingston's
14  chief of staff, heat-related issues, should we get any
15  inquiry from the legislature.  So that very well could
16  have occurred that I spoke with Mr. Baldwin concerning
17  this subject matter, but as to who drafted this
18  letter, I can't speak to that.
19      Q.  Tell me about the conversations you've had
20  with Mr. Baldwin concerning heat-related questions or
21  issues?
22      A.  Again, to the best of my recollection, I
23  seem to recall having a -- a discussion in reference
24  to questions from Mr. Turner's office.  Those general
25  discussions would have been similar to most



---

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**177**

1  discussions that I had with Mr. Baldwin when he called
2  and asked for a description of practices in place or
3  policies in place within my division, and I would have
4  supplied him a general overview or, in some cases, a
5  copy of the -- a copy of the appropriate document that
6  covered that subject matter.
7      Q.  Which would have been what?
8      A.  Well, from reading this document, I -- I
9  don't remember, but it appears that a lot of this
10  information would have come from that initial memo,
11  not all. Mr. Baldwin could have gathered some of this
12  information from other entities if he was the one that
13  would have drafted this.
14      Q.  Okay. Do you have any idea what he is
15  talking about -- and I'm presuming Mr. Livingston
16  wrote this, but in the document that he signed,
17  working with the Facilities Division to maximize all
18  ventilation systems.
19          If you don't know what he is talking
20  about, please just tell me you don't know.
21      A.  Again, I don't know directly what he is
22  referencing.
23      Q.  Okay. Would you agree with me that the
24  system-wide protocols that were and will continue to
25  remain in place, at least listed in Mr. Livingston's

---

**178**

1  letter to the Honorable Sylvester Turner, have
2  absolutely nothing to do with lowering the temperature
3  in the housing areas?
4      A.  The subject matter in this letter, from
5  briefly reading over it, appears to cover those issues
6  that we have discussed concerning efforts to ensure
7  the offender population is hydrated, to ensure that
8  they're offered showers, to ensure that we are working
9  with the Facilities Division. And also talks about
10  the -- some efforts that are made to ensure safe
11  transfer of offenders.
12      Q.  Okay. It deals with the mitigation of this
13  extreme heat, not the elimination of the extreme heat.
14  Right?
15      A.  It is with the mitigation factors, yes, sir.
16      Q.  And not the elimination. Right?
17      A.  I don't see anywhere where elimination is
18  mentioned in this document.
19      Q.  Okay. Well, I mean, I just want to -- we
20  could -- strike that.
21          The Texas Department of Criminal
22  Justice could elimination extreme heat in the housing
23  areas by placing cooling mechanisms inside the housing
24  areas. Right?
25      A.  Can you repeat your question?

---

**179**

1      Q.  Sure.
2          MR. EDWARDS:  Would you actually repeat
3  the exact question so I don't...
4          (The reporter read back requested text.)
5          MR. GARCIA:  Objection, speculation.
6  Objection, vague as to "cooling mechanisms."
7      A.  Again, the decision to place, as you
8  referenced, cooling mechanisms in all housing areas
9  within the Texas Department of Criminal Justice would
10  surely have to be discussed to include resource
11  availability to ensure that that could be done.
12      Q.  (BY MR. EDWARDS)  Okay. If it could be
13  done?
14      A.  It's mechanically possible to install
15  cooling mechanisms, I would assume, but I'm not a
16  facilities engineer in those housing areas.
17      Q.  You would assume that you could eliminate
18  extreme heat inside. Right?
19      A.  I would assume that you could affect the
20  temperature inside housing areas by installation of
21  cooling systems.
22      Q.  Sure. I mean, the warden's office doesn't
23  suffer from extreme heat, does it, in any of your
24  facilities?
25      A.  Not to my knowledge.

---

**180**

1      Q.  Your office doesn't suffer from extreme
2  heat, does it?
3          MR. ANASTASIDIS:  Objection. It's
4  argumentative and irrelevant.
5          MR. GARCIA:  And asked and answered.
6      A.  And I don't have an office, but...
7      Q.  (BY MR. EDWARDS)  When did you, your office
8  when you were the Correctional Institutions Division
9  director, it never suffered from extreme heat, did it?
10          MR. GARCIA:  Objection --
11          MR. ANASTASIDIS:  Renew the objection
12  for relevancy.
13          MR. GARCIA:  Asked and answered.
14      A.  Again, no, sir.
15      Q.  (BY MR. EDWARDS)  Okay. The armory at the
16  Hutchins Unit where the guns and bullets are stored,
17  that never suffered from extreme heat because it's air
18  conditioned. Right?
19      A.  It is.
20      Q.  I would assume that you would tell me that
21  the guns and the bullets are not as important as
22  protecting the inmates. Is that fair?
23      A.  I would surely say that the safety of the
24  offender population takes top priority in our system.
25  I would also say that ensuring that the armory weapons

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX164

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

181

1  are functioning properly is important to providing the
2  safety and well-being of the citizens of Texas.
3      Q.   Sure.  Air conditioning the armory may very
4  well be important, but if you're evaluating it, you
5  would tell the jury that it's not as important as
6  protecting the safety and the welfare of the inmate
7  population which is in your custody.  Fair?
8          MR. GARCIA:  Objection.  Speculation.
9      A.   Again --
10     Q.   (BY MR. EDWARDS)  Your opinion?
11     A.   Worded as that, the welfare of the offender
12  population, no, weapons are not as important.  Again,
13  separate question from air conditioning.
14     Q.   I appreciate that.
15     A.   Okay.
16     Q.   And in the letter from Mr. Livingston, he
17  writes that the TDCJ understands its responsibility
18  and is committing to ensuring the safety and welfare
19  of our staff and offenders.
20          Do you agree with that?
21     A.   Yes, sir.
22     Q.   Do you think any reasonable and responsible
23  policy maker at the Texas Department of Criminal
24  Justice -- and I include you, Director Stephens and
25  Director Livingston -- ought to adhere to that?

182

1      A.   Yes, sir.
2      Q.   And he writes, after discussing, the agency
3  has taken a number of actions to mitigate the impact
4  of extreme heat.  That it will continue to examine any
5  means that may provide further assistance.
6          Do you see that?
7      A.   Yes, I do.
8      Q.   Okay.  Even after 14 deaths since 2007,
9  you're still not aware of an examination of air
10  conditioning these housing areas?
11     A.   I'm not aware of a study to determine the
12  probability of air conditioning all housing areas, no,
13  sir.
14     Q.   Anywhere in this letter to Representative
15  Turner does it discuss the knowledge on the part of
16  TDCJ that ten people died -- excuse me -- as of this
17  date, nine people died of hyperthermia while in your
18  custody, any mention of that?
19     A.   It's not mentioned in this letter, no, sir.
20     Q.   Do you think that that would be important
21  for a legislator or a policy maker to know when
22  evaluating whether or not the department is doing
23  enough to protect the inmates from the dangers of
24  extreme heat?
25          MR. GARCIA:  Objection.  Speculation.

183

1      A.   Again, I would --
2      Q.   (BY MR. EDWARDS)  In your opinion?
3      A.   I would assume that Mr. Livingston had
4  continued conversations with the legislative officials
5  and wouldn't assume that this is the only discussion
6  that he had.
7      Q.   All right.  Well, that's a good point.
8  Based on your knowledge of Director Livingston and
9  policy making functioning at the department, with the
10  legislature, fair to say that this is not the -- this
11  is not the only discussion that Director Livingston
12  and his staff would have had with members of the
13  legislature about heat-related issues?
14          MR. GARCIA:  Objection.  Speculation.
15     A.   Again, I would --
16     Q.   (BY MR. EDWARDS)  Based on your knowledge?
17     A.   I would be speculating.  I don't know of any
18  specific other discussion that any individual had, but
19  I would presume that there might have been some.
20     Q.   You would expect there to be continuing
21  discussion about this issue because of its import?
22          MR. GARCIA:  Objection.  Speculation.
23     A.   Again, that would have to be an assumption.
24     Q.   (BY MR. EDWARDS)  Okay.  Did you have
25  ongoing conversations with members of the legislature

184

1  or Mr. Livingston and staff about the -- about
2  heat-related issues in the system?
3      A.   Yes, sir, I did.  As outlined earlier, yes,
4  sir.
5      Q.   Okay.  Thank you.
6          Thank you, sir.  Would you tell the
7  jury briefly -- and, again, I do apologize, you may
8  have discussed this for a moment before -- but the
9  purpose of the directors meetings that you earlier
10  talked about that you had on a monthly basis?
11          MR. GARCIA:  Objection.  Asked and
12  answered.
13     A.   Again, it was common practice for me as a
14  division director to hold a monthly meeting.  That
15  monthly meeting would have been attended by the deputy
16  directors within the Correctional Institutions
17  Division, the regional directors within the
18  institutional -- Correctional Institutions Division,
19  training director, department heads, and some division
20  directors, at least for portions of that meeting, to
21  discuss subject matter at that particular time, and in
22  some cases give them an opportunity to discuss issues.
23     Q.   Were attendance lists kept at these
24  meetings?
25     A.   I don't know that there is an attendance

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX165

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

185

1  roster out there.
2    Q.  Okay.  Is there any way that you can think
3  of where I could determine who was at the particular
4  meetings other than, you know, the list of the agenda
5  of who may be speaking?
6    A.  I don't know that there is.  There is a --
7  in many cases, a few division directors or department
8  heads on the agenda, and in most cases we had
9  representation from most all divisions at the
10  meetings.  So unless they played a role in delivering
11  a -- some particular subject matter that month, their
12  name necessarily would not appear on that agenda.  And
13  then I don't know of any -- any roster -- surely there
14  wasn't one in any of my possession that would have
15  outlined exactly who was there at those meetings.
16    Q.  Okay.
17       (Deposition Exhibit No. 53 marked.)
18    Q.  (BY MR. EDWARDS) Is Exhibit 53 a copy of the
19  agenda for the regional directors meeting from
20  July 16th, 2010?
21    A.  This is a copy of Mr. Stephens' portion of
22  the regional directors meeting, yes, sir.
23    Q.  Okay.
24       MR. ANASTASIDIS:  Do y'all have an
25  extra copy of that?

---

186

1       MR. EDWARDS:  Oh, yeah.  Sorry.
2    Q.  (BY MR. EDWARDS) Okay.  Would you have
3  another portion of -- I mean, Mr. Stephens was your
4  subordinate at the time?
5    A.  Correct.
6    Q.  Would there be a different set of notes or
7  documents pertaining to you, sir?
8    A.  There would in most cases be a secondary
9  agenda of topics that I would have produced.
10    Q.  Okay.  Would you flip to page two of that.
11  Is that -- is that the secondary agenda or is that
12  still --
13    A.  No, sir.  No, sir.  These are actually just
14  notes from -- from this agenda.
15    Q.  Okay.  So in addition to -- at least with
16  Exhibit 53, the notes on these agenda, were these, to
17  the best of your knowledge, crafted by Mr. Stephens?
18    A.  To my knowledge, I -- I could not tell you
19  who crafted these notes.
20    Q.  Okay.  Is that your signature -- or is that
21  your handwriting, I'm sorry, sir?
22    A.  My handwriting?
23    Q.  Yeah, on the --
24    A.  No.
25    Q.  No?

---

187

1    A.  No, sir, it's not.
2    Q.  All right.
3       MR. EDWARDS:  Well, let's go off the
4  record for a second.
5       THE VIDEOGRAPHER:  Going off the video?
6       MR. EDWARDS:  Yes, if that's all right
7  with everyone.
8       THE VIDEOGRAPHER:  We're off the record
9  at 2:42 p.m.
10       (OFF THE RECORD.)
11       THE VIDEOGRAPHER:  We're back on the
12  record at 2:43 p.m.
13       MR. EDWARDS:  And just so the record is
14  clear, Director Thaler has identified that there are
15  additional records that he would have authored, and
16  you know, myself and Mr. Medlock will go back and see
17  if they're in the documents that have already been
18  produced.  And if not, we will confer with Demetri --
19  I would be more respectful, but I'll butcher your last
20  name -- and arrange for -- and arrange for those
21  documents to be produced at a later time.  Fair
22  enough?
23       MR. ANASTASIDIS:  We'll be happy to
24  look for them.
25       MR. EDWARDS:  Okay.

---

188

1    Q.  (BY MR. EDWARDS) Take a look at the first
2  page there, sir, of these directors meeting notes.
3    A.  Okay.
4    Q.  Do you recall, in July 16th, 2010, what
5  would have been discussed about heat issues?
6    A.  Again, specifically what issues were
7  discussed in July of 2010 --
8    Q.  You don't know?
9    A.  -- I wouldn't have any recollection as to
10  specifics.
11    Q.  Take a look at -- it's page 469 on that
12  document.
13    A.  Right.
14    Q.  And there is a discussion where it says,
15  heat issues?
16    A.  Yes, sir.
17    Q.  It says, make sure you're covering in
18  wardens meetings.
19       Does that refresh your recollection at
20  all?
21    A.  Again, I don't know if I -- I covered this
22  agenda or Mr. Stephens covered this agenda, but
23  that's -- that would surely be the intent of covering
24  subject matter at regional directors and CID meetings
25  to be -- to ensure that the information was

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX166

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

189

1  disseminated back to staff on the facilities.
2      Q.   Sure. This doesn't help you -- help
3  transport you back to July 16th, 2010, but your
4  understanding, based on your experience and doing this
5  for a while, you fully expect that you discussed it,
6  you made it clear to your regional directors, get with
7  your wardens, make sure you're on top of this, that
8  heat is a danger, take steps to help the inmates.
9  Fair?
10     A.   It surely appears from this document that
11  there was a similar discussion to that, yes, sir.
12     Q.   Okay. Now, I want you to take a look at the
13  next section. It says, medical after hours coverage.
14  But before I get there, sir, and I apologize.
15          In that section, Heat Issues, where it
16  says, the wardens meetings, are those the meetings
17  that -- that the regional director has with his
18  particular wardens?
19     A.   That's what that would be referencing, I
20  would assume.
21     Q.   So Director Eason would have meetings with
22  the wardens in his region?
23     A.   Yes, sir.
24     Q.   Okay. All right. So this medical after
25  hours coverage says, e-mail sent to RD slash wardens.

190

1  Do you know who RD would be?
2      A.   It appears to say, regional directors and
3  wardens.
4      Q.   And wardens. Okay. Thank you. And it
5  says, continue to use DMS on units with UTMB coverage.
6  Use 911 where needed. Turn machine on for offender
7  and step out of room.
8          What does that mean?
9      A.   Again, I didn't make these notes nor do I
10  remember that conversation, so I -- I can't answer
11  that for you.
12     Q.   Okay. Now, you -- well, you would have been
13  present during this meeting. Correct?
14     A.   I may have been.
15     Q.   You may have been?
16     A.   Yeah.
17     Q.   Okay. How --
18     A.   Again --
19     Q.   How would we find out if you actually were?
20     A.   Again, I don't know that there is an
21  attendance to show whether I was actually at this
22  meeting or not. In most all cases, our CID meetings
23  were a -- conducted on two days.
24     Q.   Uh-huh.
25     A.   So in some cases that CID meeting might have

191

1  been held with the department heads. If I was in the
2  central office, I would have been in attendance. And
3  I'm not saying in this case that I wasn't in July of
4  2010, but if I would have been out of the office,
5  Mr. Stephens and the deputies would have held the
6  meeting, and I normally followed up the following day
7  with a meeting directly with the regional directors.
8      Q.   Okay. What is DMS, if you know?
9      A.   That's the -- as you referred earlier, the
10  telemedicine system that is used to provide access to
11  a medical personnel off-site.
12     Q.   Okay. And it says, use 911 where needed.
13  You just don't know what that is in reference to?
14     A.   I could not tell in what context that was
15  discussed. Again, not knowing who -- who made these
16  notes, I'm not sure what that was referenced.
17     Q.   Okay.
18          (Deposition Exhibit No. 54 marked.)
19     Q.   (BY MR. EDWARDS)  Sir, was that 53?
20     A.   Yes, sir.
21     Q.   You can keep that for a little while. Let
22  me hand you this one. This looks like -- would you
23  identify that for the jury?
24     A.   It appears to be an agenda for the
25  Correctional Institutions Division directors meeting.

192

1  It looks like it's dated 8-12-2010.
2      Q.   And it looks like you're giving the opening
3  remarks there, so is it safe to say that you were
4  there?
5      A.   If I was in attendance, I would have given
6  opening remarks. That's commonly placed on all the
7  agendas.
8      Q.   Okay.
9      A.   Again, in most cases I tried to attend. And
10  if I was there, I surely would have opened the meeting
11  and I would have conducted the meeting. In my
12  absence, my deputy director would have done that.
13     Q.   All right. Would you turn to page 473 of
14  that document, sir.
15     A.   Okay.
16     Q.   It looks like under the section, after hours
17  on call system.
18     A.   Right.
19     Q.   That 296 UTMB personnel were laid off. Do
20  you recall that?
21     A.   I recall that there was a reduction in force
22  with the University of Texas Medical Branch staff, and
23  I believe that did occur in 2010.
24     Q.   Did that impact UTMB's ability to provide
25  medical care to the inmate population, laying off 296

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX167

49 (Pages 193-196)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

193

1  medical providers?
2      A.  Again, it reduced the number of individuals
3  that were available for use by UTMB.
4      Q.  Is it fair to assume that that means that
5  less medical care would have been provided to the
6  inmates?
7      A.  Again, not knowing which 296 individuals
8  were laid off, I can't answer that question.
9      Q.  Okay.  It looks like -- and then it goes on
10 to say, modification to unit clinic hours.
11         Is that -- did I read that correctly?
12     A.  Yes.
13     Q.  Okay.
14     A.  That's what it appears to say.
15     Q.  Yeah.  And it says, one RN on unit eight
16 hours.
17         Did I read that correctly?
18     A.  Yes.
19     Q.  Okay.  What does that mean?
20     A.  Again, interpreting these notes, it
21 references, I would assume, the RN on -- I don't know
22 what unit it's referencing -- for eight hours.  So
23 other than what it says there, one RN on unit eight
24 hours, I'm not sure which facility it's referencing or
25 what facilities it's referencing.

194

1      Q.  Okay.  So you don't know if that's just a
2  policy that's throughout all -- all units?
3      A.  Again, I'm not sure, on these particular
4  notes, what it's referencing.
5      Q.  Okay.
6      A.  As -- again, not making any assumptions, I'm
7  not sure exactly what it's referencing.
8      Q.  Okay.  It looks like to the right it says,
9  Doctor Lincicum -- or Doctor Linthicum, excuse me --
10 and there is, in parentheses, the word "handout."  Do
11 you see that?  Look directly next to the after hours
12 on call system, sir.
13     A.  Right.
14     Q.  Do you think that it would be better to ask
15 questions of her as to this?
16     A.  Again, whether she can answer questions as
17 it relates to these specific notes, I don't know.  But
18 it does reference her in reference to this subject
19 matter.
20     Q.  Okay.  Well, it says, one LVN and CMA after
21 hours on call.  Do you have any idea what that means?
22     A.  Again, I'm assuming it's referencing a
23 facility or facilities.  I would assume that that
24 statement is referencing staff that is available on
25 that facility or facilities.

195

1      Q.  Okay.  Then it says, 79 units have 12-hour
2  coverage.  And I can't read the next word, which says,
3  only eight hours?  Could you help me?
4      A.  It appears to say, Keegan only eight hours,
5  which is a facility in downtown Houston.
6      Q.  Gotcha.  Then it says, after that, call 911.
7         Do you have any idea what that means?
8      A.  Again, reading the document and trying to
9  interpret it, I would assume that the indication is,
10 after that eight-hour coverage period, should there be
11 any issues on that facility, 911 is the recourse for
12 medical attention.
13     Q.  Okay.  With EAC reports or when inmates
14 suffer serious injuries, is it generally the practice
15 of TDCJ to video the scene and actually use a video
16 camera?
17     A.  As an -- did you say in an accident, when an
18 offender has a serious injury?  Not in most cases.  I
19 don't know that that would be a situation where a
20 video camera would be...
21     Q.  I've just seen documents where it says, you
22 know, bring video camera, and there never ever is a
23 video, it seems.
24     A.  Well, again, that's standard protocol.  Any
25 time there is any type of an emergency, rather than

196

1  respond, a supervisor would be responding, what we
2  would refer to initially as our A Responders,
3  additional staff would be responding to the scene.
4  One of those individuals in any emergency response
5  would have the responsibility of retrieving a video
6  camera.  If they arrived on the scene and it was a use
7  of force situation, something that required a -- a
8  videotape by policy to be conducted, then that would
9  be initiated upon arrival on the scene.
10         In other cases, there would be
11 situations where a video camera would not be used in
12 those particular situations.  So in some you might
13 have.  I'm not saying there has never been a
14 situation --
15     Q.  No, no.  That's fine.
16         Would you have expected the McCollum
17 incident where, you know, he was there for, you know,
18 50 minutes, an hour, to be a situation where someone
19 would have video'd that?
20     A.  No, sir.
21     Q.  Okay.  Okay.  Take a look at number seven on
22 this exhibit.  And just for the jury, that's
23 Exhibit 54.  Would you read the section under
24 Discussion?
25     A.  It says, share with wardens to watch for

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX168

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

197

1  issues and make sure we are taking steps necessary to
2  control. Pass out water, do not confiscate fans, make
3  sure staff are provided for as well.
4      Q.  Okay. Do you have a copy of the handout
5  that was provided at that meeting? Or at least it
6  appears that was provided?
7      A.  Which handout? I'm sorry, which handout are
8  you referencing?
9      Q.  Under number seven, where it says, heat
10  precautions, et cetera, and then there is, in
11  parentheses, handout. Do you have any idea what was
12  in that handout? If you don't, you don't.
13      A.  No, I can't recall. I was trying to
14  determine, but I...
15      Q.  All right. Do you recall ever talking about
16  temperate air flow?
17      A.  Again, specifically, temperate air flow, no,
18  sir, I do not. And I don't know what would have been
19  referenced in there, nor can I discern from reading
20  the notes what might have been referenced.
21      Q.  Well, it's in that main like, you know,
22  heading section, so --
23      A.  Right.
24      Q.  That's not your word, though, temperate air
25  flow?

198

1      A.  No.
2      Q.  Okay. All right. Do not confiscate fans.
3  Do you recall there being an issue with correctional
4  officers confiscating inmate fans?
5      A.  I don't recall a specific issue. That's a
6  reminder we put out routinely. I'm not, again, saying
7  that there might not have been an incident in some
8  facility in the state where that occurred or
9  detained -- or we became aware of it and addressed it
10  to all of the regional directors to ensure that that
11  was reemphasized. So, again -- but a specific
12  situation, I cannot recall a specific situation.
13      Q.  The important thing -- well, is it fair for
14  us to glean from this that at least in August of 2010,
15  you're having meetings discussing the dangers of
16  extreme heat, and you're making sure your regional
17  directors are communicating to the wardens, you need
18  to take steps to protect the inmates?
19      A.  Surely disseminating information to ensure
20  that we're working closely with the divisions on --
21  for providing any mitigation or following through on
22  any mitigation efforts and working closely with health
23  services and fire and safety on particular facilities
24  to ensure that's done.
25      Q.  It says to watch for issues. Is that

199

1  heat-related issues like passing out or stroking?
2      A.  Again, that's -- I would be making an
3  assumption as to what that is referencing, but I would
4  say that could be short based or broad based about any
5  issues that might even relate to instructions that
6  were given to the field.
7      Q.  You would just be speculating on that point,
8  but --
9      A.  Right.
10      Q.  -- based on your experience, you probably
11  could, but that's what -- you don't have any personal
12  knowledge of that?
13      A.  Right.
14      Q.  Okay. Now, passing out ice water, I just
15  want to be clear, that is absolutely one of the things
16  that TDCJ has decided, this is something -- this is a
17  benefit that we're going to provide to the inmate
18  population to help mitigate this heat is actually ice
19  water passed out in jugs. Right?
20          MR. GARCIA: Objection. Asked and
21  answered.
22      A.  Again, that is one of the instructions that
23  we give to our wardens, to ensure ice water is
24  available on the dorms.
25      Q.  (BY MR. EDWARDS) Okay. So if ice water,

200

1  you know, water with blocks of ice in it or ice cubes
2  in it, isn't being passed out by the correctional
3  officers responsible for that or the warden
4  responsible for that wouldn't be doing their job.
5  Correct?
6          MR. GARCIA: Objection. Asked and
7  answered.
8      A.  Again, that's one of those precautions that
9  we take during summer months and, as was mentioned
10  earlier in my response, we instruct our wardens to
11  ensure that it's happening.
12      Q.  (BY MR. EDWARDS) And if they don't do this
13  and they don't make sure that's happening, they're
14  effectively endangering the lives of the inmate
15  population. Right?
16          MR. GARCIA: Objection. Asked and
17  answered. Objection. Speculation.
18          MS. COOGAN: Join.
19      Q.  (BY MR. EDWARDS) Right?
20      A.  And, again, I believe I answered that
21  earlier.
22      Q.  Okay. Well, humor me. Is the answer, yes?
23      A.  The answer is, again, that's not the only
24  source of hydration, but it surely is an additional
25  effort that we make available to the offender

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

201

1  population to mitigate the circumstances in the
2  housing areas.
3     Q.  Would you go to 482, sir.  Who is Eileen
4  Kennedy?
5     A.  She was a regional director in Region IV.
6     Q.  Okay.  Who is Diane Kukua?
7     A.  Diane Kukua, again, at this time I believe
8  was a warden at the Ellis Unit.
9     Q.  Okay.  If you would, turn to 484.  It says,
10 Mr. Thaler's agenda.  Do you have any idea what that
11 is?
12    A.  Yes.
13    Q.  What is it?
14    A.  This would be a copy of my -- of my agenda.
15    Q.  Okay.  So as I look at this, it appears you
16 wouldn't have been talking about heat, heat would have
17 been talked about by somebody else, at least at this
18 meeting?
19    A.  In some cases.  There are -- in some cases,
20 as you review my agenda and Mr. Stephen's agenda,
21 there will be duplicate subject matter.  So you might
22 very well see something on Mr. Stephens' agenda that
23 also shows up on my agenda.  In other cases, it would
24 be covered on one of the two.
25    Q.  Okey-doke.

202

1           (Deposition Exhibit No. 55 marked.)
2           MR. EDWARDS:  Demetri, do you want one?
3           MR. ANASTASIDIS:  Please.  If you have
4  an extra copy, yes.  Thank you.
5     Q.  (BY MR. EDWARDS)  I'm handing you
6  Exhibit 55.  Is that a copy of your May 2011
7  Correctional Institutions Division directors meeting?
8     A.  It is titled Correctional Institutions
9  Division directors meeting and dated 5-12-2011.
10    Q.  Okay.  It appear that you gave the opening
11 remarks at that meeting.  Correct?
12    A.  Again, if I was present, yes, I did.
13    Q.  If you weren't present, who would have given
14 the opening remarks?
15    A.  In most cases that would have been one of my
16 deputies, again.
17    Q.  It does say, though, that the speaker was
18 yourself.  Correct?
19    A.  Yes, it does.
20    Q.  Okay.  All right.  Why don't you flip over
21 to page 595.
22    A.  Okay.
23    Q.  And it looks like, in May of 2011, one of
24 your agenda topics is, again, heat precautions.
25    A.  Yes, sir.

203

1     Q.  I mean, it appears to me, based on these
2  documents, you're personally involved in making sure
3  that precautions are taken at each of these
4  facilities, including the Hutchins facility.  Is that
5  fair?
6     A.  It surely would have been discussed at this
7  meeting with the regional directors.
8     Q.  Okay.  Would you flip to the next page, sir.
9  Do you recall discussing heat precautions at this
10 meeting?
11    A.  Again, heat precautions was a topic that I
12 left on my agenda, and we discussed each time that we
13 met specific topics that were discussed in -- in June
14 of -- or May -- I'm sorry.  May of 2011, I could not
15 detail or recall.
16    Q.  Okay.  You just know you talked about them?
17    A.  Yes, sir.
18    Q.  Okay.  Take a look at the number three,
19 where it says, offender access to medical care.
20    A.  Uh-huh.
21    Q.  And then the person's name is Sharon Howell.
22    A.  Yes, sir.
23    Q.  As of May 12th, 2011, what position was --
24 did Sharon Howell hold with the department?  If you
25 know?

204

1     A.  I'm not sure of her title.  She worked in
2  the general counsel's office.
3     Q.  Okay.  Would you read the discussion
4  section, please?  Beginning with lawsuit, dash?
5     A.  The notes say, lawsuit, dash, security left
6  offender unresponsive.  It looks like, six H --
7  representing six hours, I'm assuming -- security -- it
8  says, security make medical do it.  TDCJ slash UTMB
9  both dropped ball in this situation.  Ultimately
10 warden's responsibility.
11    Q.  Do you recall that discussion?
12    A.  I do not recall that discussion or what
13 incident in this case is being referenced.  I'm trying
14 to recall, but I don't -- I do not -- I do not recall
15 which incident is being referenced.
16    Q.  Regardless, a security officer, based on
17 this document, left an offender unresponsive for a
18 significant period of time.  Correct?
19    A.  That's -- again, that's what the note says.
20    Q.  Okay.  And it looks like an acknowledgment
21 that the department, TDCJ, and UTMB, at least in
22 Ms. Howell's opinion, both dropped the ball.  Is that
23 accurate?
24    A.  That's also the notes that are stated here.
25    Q.  And then ultimately it's the warden's

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

---

205

1  responsibility when TDCJ and UTMB drop the ball at a
2  particular facility?
3      A.  That's what the note says here.
4      Q.  Do you agree with that sentiment?
5      A.  I agree that the warden surely burdens --
6  holds the burden of responsibility on many issues that
7  occur on his facility.  He does not have, or she does
8  not have total autonomy on all operations on the
9  facility, so there surely would be some shared
10  responsibility in some areas.
11      Q.  Okay.  If you would, flip to page 603, sir.
12  As I read that, it looks like there is a breakout
13  session with RT.  I'm assuming that that is you?
14      A.  That appears to be so, yes, sir.
15      Q.  Okay.  Where you're talking about heat
16  precautions?
17      A.  Yes, sir.
18      Q.  And that an officer, correctional officer
19  actually died in Beeville.  Is that a fair
20  characterization?
21      A.  Two different subject matters.
22      Q.  Okay.
23      A.  Heat precautions were surely talked about.
24  It was on my agenda and I would have covered that.
25      Q.  Okay.

---

206

1      A.  The second agenda item there talks about the
2  physical agility test that is required for all staff
3  within our department, and references a -- a situation
4  where an officer passed away while taking this test at
5  one of our training facilities.  So it's two different
6  subjects.
7      Q.  Okay.  Did heat play a role in that
8  officer's death, to your knowledge?
9      A.  Not to my knowledge, no, sir.
10      Q.  When you say, not to -- could have, it might
11  have, it might not have.  Is that fair?
12      A.  I don't believe it had anything to do with
13  it.  I believe that it was a, to the best of my
14  recollection, cardiac arrest.  And I don't even -- I'm
15  not even sure whether they were outdoors when they
16  were taking the physical agility test.  But it had
17  more to do with the condition of the staff member and
18  the stress on the test.
19      Q.  Let's talk about that.  Does the Texas
20  Department of Criminal Justice consider deaths by
21  cardiac arrest that occur in indoor temperatures above
22  90 degrees to be heat related or not?
23      A.  I can't respond to that question.
24      Q.  You don't know?
25      A.  I don't know.

---

207

1      Q.  Okay.  I guess -- it says, take appropriate
2  precautions, employer -- employee ease, plus
3  offenders.
4          What does that reference?
5      A.  Again, not being my notes --
6      Q.  If you don't know, that's okay.  I just --
7  you know, because you seemed to know how the -- the
8  officer died during the PAT test.
9      A.  So that was an incident that happened very
10  infrequently, unfortunately.  So, again, I'm not
11  sure -- I'm not sure what that is referencing.
12      Q.  Okay.  Now, I understand that employee
13  deaths during PAT tests occur infrequently, but
14  heat-related illnesses don't occur infrequently in the
15  department.  Is that --
16          MS. COOGAN:  Objection.  Argumentative.
17          MR. GARCIA:  Speculation and vague.
18      Q.  (BY MR. EDWARDS)  Sir, I mean, do you get a
19  lot of heat-related illness -- illnesses at TDCJ?  You
20  know, people suffering heat exhaustion, fainting,
21  throwing up, vomiting, you know, amongst your
22  correctional staff?
23          MR. GARCIA:  Objection.  Compound.
24          MR. ANASTASIDIS:  Objection.  Vague.
25          MS. COOGAN:  And vague as to the term

---

208

1  "a lot."
2      Q.  (BY MR. EDWARDS)  Is it -- you tell me.  I
3  mean --
4      A.  There are occurrences throughout the
5  seasonal period, but I surely wouldn't qualify that as
6  a lot.  In most cases, those are individuals that are
7  performing work functions, staff, or in some cases our
8  offenders that work in various areas at our
9  facilities.
10      Q.  Okay.  During the summer months do you find
11  that employees are absent from work more often than
12  the other months of the year?
13      A.  Not -- not necessarily.  Our -- our
14  shortages for staff are -- are fairly consistent.
15  There are probably a slight rise in employee absences
16  during the summer months.
17      Q.  Do you think that might be due to the fact
18  that the indoor housing areas are not air conditioned
19  and that your workers have to work in that --
20          MS. COOGAN:  Objection.  Speculation.
21      A.  Again, that would be speculation.  But in my
22  years of experience, I would say it has more to do
23  with kids being out of school.
24      Q.  (BY MR. EDWARDS)  Okay.  Okay.  So if
25  correctional officers testify at trial that their

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX171

53 (Pages 209-212)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

209

1 experience is that more people are absent from work
2 and miss shifts during the summer due to the heat,
3 would you disagree with that?
4     A.  Again, I have no evidence to indicate that.
5 I'm not saying that there hasn't been somebody that
6 testified to that.  But as a warden on a facility for
7 12 years, as a regional director, there were a
8 multitude of reasons why individuals did not report
9 for duty.  I would have not -- not -- would have not
10 listed the conditions of the working environment due
11 to heat during the summer as one of those causal
12 factors for employee absences, in my professional
13 opinion.
14     Q.  Okay.  All right.
15         (Deposition Exhibit No. 56 marked.)
16     Q.  (BY MR. EDWARDS)  Take a look at July 14th,
17 2011.  It's Exhibit 56, sir.  Again, this is another
18 one of these monthly meetings.  Right?
19     A.  It appears to be so, yes, sir.
20         MR. ANASTASIDIS:  Do you have an extra
21 copy for me, Jeff?
22         MR. EDWARDS:  I do.  I do.
23     Q.  (BY MR. EDWARDS)  Oh, you know what?  I gave
24 you the wrong copy, Mr. Thaler.  Do you mind if I take
25 that back and switch that out?  Sorry about that.

210

1     A.  The highlighted portions were helping me.
2     Q.  Well, unfortunately, they help me more than
3 they might help you.
4         At the risk of an asked and answered
5 objection, this is the July 14th, 2011 directors
6 meeting notes and agenda?
7     A.  It's dated and it appears to be such, yes,
8 sir.
9     Q.  Okay.  All right.  Why don't you flip to
10 page 618.
11     A.  Okay.
12     Q.  Under the heading, EAC Update, again, there
13 is a handout.  Do you have a copy of that handout?
14     A.  Again, not to my knowledge.  I'm not sure
15 what handout is referenced here.
16     Q.  Okay.
17     A.  The -- in most cases, this individual whom
18 was working in executive services at the time covered
19 a monthly EAC report and provided a handout to all
20 regional directors, that EAC report, if it's the one
21 referenced here, dealt with appropriate time reporting
22 graphs for the regional director to ensure that they
23 were processing their EAC reports in a timely manner.
24 So not knowing for sure what that handout is, I would
25 maybe make an assumption that that is exactly what was

211

1 passed out.
2     Q.  Okay.  Well, it appears to say that the
3 incidents have increased with hot weather, and that
4 there have been ten offender and 20 employee
5 heat-related issues as of July 14th, 2011.  Did I read
6 that correctly?
7     A.  Yes, you did.
8     Q.  Okay.  I mean, to me, that would indicate
9 that all of the regional directors, Director Stephens
10 and yourself, are being made aware by the EAC people
11 that, look, the incidents with heat are rising, and
12 that there have been ten offender and 20 employee
13 heat-related issues to date, this year.  Fair?
14     A.  It indicates that many has occurred, yes.
15     Q.  Okay.  That's a -- that's 30 incidents.
16 Correct?
17     A.  That's 30 incidents, ten offenders out of
18 156,000.
19     Q.  Okay.  Is that how you look at it?  Ten
20 offenders out of 156,000?
21         MR. GARCIA:  Objection.  Argumentative.
22         MR. ANASTASIDIS:  Objection.
23 Argumentative.
24     A.  Again, we have to look at -- measure the
25 number of incidents that we're having across the

212

1 board.  If it's a larger number, it surely would be of
2 greater concern.  20 employees out of 35,000, surely
3 something we would also have to look at.  If that
4 number spikes from year to year at any particular
5 time, it's surely an indicator that we need to ensure
6 that we're taking appropriate measures to increase our
7 focus on the issue and make sure that we're doing
8 everything that we say we're doing.
9     Q.  (BY MR. EDWARDS)  Okay.  And that's what --
10 I mean, to me, that suggests, look, that's a number
11 that is significant enough for a person in your
12 position at the time to say, hey, we need to make sure
13 we're doing what we're saying we're doing.  Right?
14     A.  Well, again --
15         MR. GARCIA:  Objection.  Is that a
16 question?
17         MR. EDWARDS:  You bet it is.
18     A.  Well, again, as covered when we started this
19 agenda, the topic of heat-related precautions was
20 covered repeatedly.
21     Q.  (BY MR. EDWARDS)  Uh-huh.
22     A.  Those ten offenders would cover the array of
23 everything that's -- we're required to do on a monthly
24 basis inside our institutions.  This takes us into the
25 middle of the summer.  As I said, most heat-related

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7cc7f83

APPENDIX172

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

213

1 instances that I recall, particularly as it dealt with
2 the offenders and employees were work-related issues.
3 So there surely were additional discussions about
4 ensuring that we were not taking offenders out in work
5 squads or in areas and exposing them to strenuous
6 activity during the hotter parts of the day. But we
7 worked thousands of offenders every day within our
8 institutions, and although, again, one illness or one
9 injury is important to us, ten in the perspective of
10 156,000 over a month and a half of the summer is -- is
11 surely a -- a number that wouldn't cause grave
12 concern.
13     Q.   Would it cause you any concern?
14     A.   Again, one incident would --
15     Q.   This is 30, not one.
16          MS. COOGAN:  Please let the witness
17 finish his answer.
18     A.   As I mentioned before, incidents, no matter
19 what the precautions you take, are going to -- are
20 going to occur.  So I would have to look at each
21 specific incident to see whether or not that is
22 alarming or not.  But just simply referencing the
23 number, to the scale of number of staff involved in
24 this process, the 35,000 that work out on our
25 facilities, those are -- that's a fairly minimal

214

1 number for the job we're required to do day in, day
2 out, inside and outside our institutions.
3     Q.   (BY MR. EDWARDS)  Ten people died the summer
4 of 2011 from hyperthermia.  Is that a minimal number
5 in the context of the amount of prisoners that TDCJ
6 houses?
7     A.   Again, as was referenced earlier, one death
8 is too many.  So we surely make all efforts to look at
9 every situation that we have to determine whether or
10 not policies and procedures were followed in each
11 particular incident, and make sure that we're meeting
12 our obligations to staff and the offender population
13 in -- as it relates to that particular subject matter.
14     Q.   Well, my question is just, you've got --
15 you're on notice of -- at least as of July 14th, 2011,
16 and at this point, at least, in most of Texas, it's
17 starting to get really hot.  Is that correct?
18          MR. ANASTASIDIS:  Objection to the
19 phrase "really hot."
20          MR. GARCIA:  Objection to the compound
21 nature of the question.
22     A.   Again, I don't recall what the temperatures
23 were --
24     Q.   (BY MR. EDWARDS)  Do you recall the summer
25 of 2011, sir?

215

1          MR. ANASTASIDIS:  Objection.  Recall
2 what part of the summer of 2011?
3     Q.   (BY MR. EDWARDS)  All parts of it?
4     A.   I don't -- I don't --
5     Q.   Do you recall July of 2011?  Do you have any
6 memory of it?  Do you have any memory of how hot it
7 was here in Texas?
8          MR. GARCIA:  Objection, argumentative.
9 Objection, compound.  Relate it to one question,
10 Counsel.
11     Q.   (BY MR. EDWARDS)  Do you recall how hot it
12 was in Texas in 2011, during July?
13     A.   I remember that in 2007 there were hot days
14 in -- during the summer months in July and August,
15 yes.
16     Q.   Now, I may have misheard you, but I believe
17 you might have said 2007.  You probably meant 2011 --
18     A.   I'm sorry.  2011.
19     Q.   I just want the record to be clear, so let
20 me ask it one more time.
21          Do you recall how hot it was in the
22 summer of 2011, particularly in July of 2011?
23          MR. ANASTASIDIS:  Objection.  Vague.
24     Q.   (BY MR. EDWARDS)  Okay.
25          MR. ANASTASIDIS:  If you're able to

216

1 answer it, go ahead.  And if you're not, don't --
2     A.   Again, I don't specifically remember how hot
3 it was in July.  I do remember that, as most Texas
4 summers are, July was hot in 2011.
5     Q.   (BY MR. EDWARDS)  Let me ask it a little
6 different way.
7          Do you recall that it was even hotter
8 than previous Texas summers?
9          MR. GARCIA:  Objection.  Vague.
10     A.   Again, I don't know how -- how to compare.
11 I have gone through several hot summers in my career
12 with TDCJ, so comparatively, depending on what year
13 you're talking about, there were a number of hot days
14 in 2011.
15     Q.   (BY MR. EDWARDS)  Okay.  All right.  Well,
16 given -- you know, we'll go to the actual temperatures
17 for the heat.  But given the number of incidents and
18 the heat, do you recall doing anything in particular
19 in terms of instructing the regional directors or the
20 wardens, hey, this is really hot.  We've already had
21 30 incidents as of July 14th, 2011.  If you don't
22 recall, that's fine.
23     A.   Again, I do not recall.
24     Q.   Okay.  Would you flip to page 620.
25          I'm sorry.  Page 619.  I apologize,

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX173

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

217

1  sir. Under section five, Ag Issues, it looks like a
2  drought is being experienced. Do you have any
3  knowledge of that?
4      A.  Again, I'm -- I would not know -- this would
5  have been covered by Matt Demny, the agricultural
6  supervisor. I assume by these notes that he was
7  referring to a drought being experienced in portions
8  or a portion of the state resulting -- affecting the
9  agricultural operation.
10     Q.  And he is the one who we should talk to
11  about the pigs. Right?
12     A.  Again, the swine program is underneath his
13  purview as Agricultural Division director.
14     Q.  Okay. Do you recall any specific mention of
15  not enough hay due to the drought?
16     A.  Again, I'm not sure whether it was 2011 if
17  he mentioned it. I'm sure there were, but on years
18  where there is a lack of rainfall, he does cover that
19  subject matter because he is required to keep up the
20  livestock.
21     Q.  Okay. With regards to those 30 heat-related
22  issue incidents that were discussed on July 14th,
23  2011, do you recall the specifics of any one of them?
24     A.  No. And in most cases, being reported out
25  by the individual that's stated here, again, assuming

---

218

1  that this individual was there and not an employee of
2  this individual, she would have referenced those
3  numbers similar to -- total numbers similar to she
4  would on any other type of incident. And in most
5  cases, there wasn't discussion about specific
6  incidents, just general numbers.
7      MR. EDWARDS: Let me object as
8  nonresponsive.
9      Q.  (BY MR. EDWARDS) Sir, my question is
10  just -- it's a more basic one.
11     Do you recall any specific talk of
12  specific incidents, any one of the 30 mentioned there,
13  where specific detail was given?
14     A.  No.
15     Q.  Do you recall -- okay. Thank you.
16     (Deposition Exhibit No. 57 marked.)
17     Q.  (BY MR. EDWARDS) Let's move on to
18  August 2011. By this time, people have started dying
19  of heat stroke in the prison system. Right?
20     A.  There were several incidents that had
21  occurred, yes, sir.
22     MR. ANASTASIDIS: Jeff, may I trouble
23  you for a copy?
24     MR. EDWARDS: Oh, yeah. I'm sorry,
25  Demetri. Of course.

---

219

1      MR. ANASTASIDIS: Thank you.
2      MR. EDWARDS: And you can give this to
3  your director.
4      MR. ANASTASIDIS: Thank you.
5      Q.  (BY MR. EDWARDS) In fact, Douglas Hudson
6  had died of hyperthermia. Isn't that correct?
7      A.  I don't have the list in front of me, but if
8  you say so.
9      Q.  A 62-year old man, no memory of that?
10     A.  Generally, I don't remember the specific
11  date.
12     Q.  Okay. That's fine. You gave the opening
13  remarks, or at least it appears that you gave the
14  opening remarks --
15     A.  If I was present I would have, yes, sir.
16     Q.  Okay. And under the section Opening
17  Remarks, would you -- would you read the discussion
18  points?
19     A.  It says -- it appears to say, heat, take
20  precautions, slash, monitor.
21     Q.  Okay. What does that mean?
22     A.  Again, I'm not -- I'm not sure.
23     Q.  Okay. Well, you gave the remarks and I
24  guess this is my one chance to ask you about it. What
25  do you recall specifically telling your -- you know,

---

220

1  your regional directors and your staff?
2      A.  Again, from this document I cannot assure
3  you that I gave the opening remarks, so...
4      Q.  If you didn't give the opening remarks, who
5  would it have been? Would it have been Director
6  Stephens?
7      MR. GARCIA: Objection. Asked and
8  answered.
9      MR. EDWARDS: Not for this meeting.
10     A.  It would have been one of my deputy
11  directors. It could have been Mr. Stephens or one of
12  the other two deputies would have held the meeting.
13     Q.  (BY MR. EDWARDS) Okay. What is, central,
14  all offenders have been removed, mean?
15     A.  This was the year that the legislature
16  closed the central facility and the offenders were all
17  moved out of that facility.
18     Q.  Would you flip to page 634, sir. Do you see
19  the section labeled Heat?
20     A.  Yes, sir.
21     Q.  Am I reading this right? Do not turn water
22  off in cells, make sure passing out ice water?
23     A.  Yes, sir.
24     Q.  Was there an issue with -- were people
25  turning off the water in cells?

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX174

56 (Pages 221-224)

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

---

221

1    A. I do not personally remember an issue with
2 that.
3    Q. It says, Stephens. Is that -- should we ask
4 Mr. Stephens --
5    A. It appears Mr. Stephens covered that topic.
6    Q. Okay. Can you think of a reason why staff
7 would turn off water in the cells?
8    A. No, sir.
9    Q. Okay. All right. If you flip to the next
10 page, it looks like there is a heat awareness
11 discussion and that Mr. Stephens is giving that. Is
12 that a fair characterization of page 635?
13    A. It's listed as an item, yes, sir.
14    Q. Okay. Let me ask you about the water in the
15 cells. In a facility like Hutchins, there aren't
16 really cells, there are just dorm units.
17    A. Correct.
18    Q. Would that refer to like water like in the
19 sinks and stuff like that?
20    A. No. Again, I would have to be speculating
21 on what this was actually referencing.
22    Q. Okay.
23    A. But because it references cells, I think
24 that would be talking about a cellblock, not a
25 dormitory housing area.

---

222

1    Q. Okay. Do you know if prisoners, upon
2 entering the Hutchins facility or, frankly, any
3 transfer facility at TDCJ were issued a cup upon
4 arrival?
5    A. I don't know that it was standard policy to
6 issue a cup, no, sir.
7    Q. Do you think that having a cup makes it
8 easier to drink water in a prison facility?
9    A. Having -- having a drinking device would
10 make it easier to drink water, yes, sir.
11    Q. Is a cup a drinking device?
12    A. Yes.
13    Q. Okay. Has -- my understanding, through the
14 testimony here, is that at Hutchins, no cups were
15 passed out to offenders immediately upon entry, at
16 least when Mr. McCollum entered the facility. Is that
17 consistent with your memory?
18    A. That's consistent with my memory, yes, sir.
19    Q. Has that been changed?
20    A. I believe it has at Hutchins. And I believe
21 that -- again, I'm no longer with the system, but
22 instruction has been to ensure that individuals that
23 are accessing, particularly the ice water that is
24 passed out, have the availability of a cup to drink
25 out of. I -- I do have to also say that in my

---

223

1 extended career in the agency, I don't know that I
2 ever received a complaint from an offender as a warden
3 through the grievance process that they did not have
4 some mechanism to be able to retrieve water and drink
5 water, whatever that happened to be. But in most
6 cases, also, should that offender not have anything,
7 if he were to ask a staff member, I would assume that
8 staff member would assist him with a cone cup or some
9 device, or some item so that the individual could have
10 something to drink out of.
11        MR. EDWARDS: Okay. Let me object as
12 nonresponsive.
13    Q. (BY MR. EDWARDS) But I appreciate that,
14 sir.
15    A. Okay.
16    Q. Okay. Would you flip to page 638. And I'm
17 afraid I know the answer but --
18    A. Okay.
19    Q. -- where it says, heat awareness done, do
20 you recall anything about that -- that talk or that
21 agenda item?
22    A. No, sir.
23    Q. Okay. Would you turn to page 639, sir.
24    A. Okay.
25    Q. There appears to be a UTMB handout for

---

224

1 eight-hour facilities.
2    A. Yes, sir.
3    Q. It doesn't appear that Hutchins is on this
4 list. Do you know why?
5    A. No, I don't know why.
6    Q. Okay. Tell me what KOP means.
7    A. Carry on person.
8    Q. Carry on person. At this time, were other
9 non-24-hour facilities already KOP?
10        MS. COOGAN: Objection. Vague.
11    A. I'm sorry. Can you repeat that?
12    Q. (BY MR. EDWARDS) Yeah. Were other
13 non-24-hour facilities, excluding the Hutchins Unit,
14 KOP facilities, if you know?
15        MS. COOGAN: Objection. Vague.
16    A. Again, my general knowledge is, carry on
17 person medication was used throughout the system for
18 dispensing some medications.
19    Q. (BY MR. EDWARDS) Okay. If you would turn
20 to 642, sir. It looks like, again, you're talking
21 about heat precautions here, or at least the people at
22 this meeting are?
23    A. Right.
24    Q. And it says, make sure every warden is
25 directly involved and we are taking care of offenders

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363

e4b80f89-fea3-48f6-8dfc-0e54f7cc7f83

APPENDIX175

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

225

1 and staff.
2         Do you know what precipitated that?
3     A. I'm sure, as we moved into the month of
4 August and dealt with situations, again, as I
5 mentioned through the -- throughout the deposition,
6 our discussions with unit staff, our discussions with
7 division heads increased. There was the initial
8 discussions with the Health Services Division about
9 providing an even more directed focus on individuals
10 that fell in certain sub groups, and I'm sure
11 that's -- that's what it's referencing, in addition
12 to, again, ensuring that the -- wardens were --
13 regional directors were ensuring that the wardens were
14 directly involved in working with those entities to
15 get that accomplished.
16     Q. These precautions you're talking about in
17 August, are these the same types of precautions and
18 instructions and warnings you would have provided in
19 May and June and July?
20     A. Again, when we reference this note, as I'm
21 referencing this note, in -- in item number six on
22 this -- this handout that we're reviewing, it would
23 have surely covered those items that we require every
24 facility and have required every facility to
25 participate in.

---

226

1         It appears also to notate the
2 additional steps, the beginning of the formation of
3 that wellness checklist and identifying individuals
4 that -- that we need to focus our attention on, or
5 give a higher degree of attention to and cooperation
6 with the Health Services Department.
7         THE VIDEOGRAPHER: Mr. Edwards.
8         MR. EDWARDS: Sure.
9         THE VIDEOGRAPHER: We're off the record
10 at 3:37 p.m.
11         (RECESS.)
12         THE VIDEOGRAPHER: We're back on the
13 record at 3:38 p.m.
14     Q. (BY MR. EDWARDS) Sir, do you have any idea
15 what is meant by "management training"? Does it have
16 anything to do with the heat precautions?
17     A. This appears to reference a training topic.
18 It appears to reference the training of midline
19 supervisors. It appears to reference a discussion
20 about wardens training for the next two years.
21     Q. Okay. With regard to the heat precautions
22 up in number six, where it says, make referrals to
23 health services as needed, what is that referencing?
24     A. Again, from reading these notes, I would
25 conclude that that was ensuring that staff on the

---

227

1 facility, when they were to identify an individual
2 with the symptoms of a heat-related illness, were
3 contacting health service providers for -- for care.
4     Q. Prior to this time, should they have been
5 doing this prior to this time or was that new?
6     A. Sure. They have always been required to do
7 that. This again was just talking about stressing the
8 importance of it to staff and, again, ensuring that we
9 were following through with ensuring that was
10 happening.
11     Q. Okay. Under number six it says, rotate
12 staff assignments where heat is an issue.
13         Do you see that? Down at the bottom?
14     A. I'm sorry. Oh, I'm sorry. Down -- okay. I
15 was looking at number six up top. I'm sorry.
16     Q. That's okay.
17     A. Yes, sir.
18         What was the question? I'm sorry.
19     Q. Yeah. Just what is meant by, that rotate
20 staff assignments where heat is an issue, if you know?
21     A. Again, I would conclude that that is a --
22 determining that particularly staff that's assigned to
23 outside areas are rotated and not put on 12-hour
24 shifts, but could -- could apply to, in some cases,
25 those areas where you have staff that are working

---

228

1 throughout the facility. That, again, wouldn't be
2 applicable on many of our facilities because most of
3 our facilities, particularly those that were built
4 prior to the late '90s, working assignments in either
5 condition are the same -- in either position are the
6 same. Sorry.
7     Q. Do you know if Warden Pringle was instructed
8 to rotate staff assignments for individuals working
9 inside the Hutchins Unit?
10     A. I don't know specifically if he was
11 instructed.
12     Q. Okay. Here it says, ask question when have
13 an incident, fan, water, health services contacted, et
14 cetera. Do you know why that was there, or is that
15 just more of the same, the exact same thing, it's just
16 different words here?
17     A. Again, I'm not sure what that is
18 referencing. That's carrying on through number six,
19 so I'm sure there was a litany of issues that -- that
20 had to be covered.
21     Q. Well, those questions should have been asked
22 for every death that occurred. Right?
23     A. These questions should have been asked?
24     Q. Yes.
25     A. Again --

---

58 (Pages 229-232)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

229

1    Q.   There is nothing new about August 11th,
2  2011, that says, oh, now we need to ask these
3  questions.  These are just questions that you should
4  have been asking, or your people should have been
5  asking with regard to all heat-related illnesses.
6  Right?
7    A.   These are -- as referenced in these notes
8  here, these are reiterating our need to stay focused
9  on the issue, and one case referencing the beginnings
10  of that wellness checklist.
11   Q.   Are you familiar at all with the
12  circumstances behind the death of Kenneth Wayne James?
13   A.   Again, generally.  I was served with a --
14  I'm trying to --
15   Q.   We'll keep -- we'll ask those questions
16  later.  That's fine.
17        If you would flip to 2012, and we'll
18  make this the next exhibit, 58.
19        (Deposition Exhibit No. 58 marked.)
20   Q.   (BY MR. EDWARDS)  There you go.  Are these
21  the minutes from the March 15th, 2012 meeting?
22        MR. ANASTASIDIS:  Do you happen to have
23  an extra copy of that too, Jeff?
24        MR. EDWARDS:  I do.
25        MR. ANASTASIDIS:  Thank you.

---

230

1        MR. EDWARDS:  You're welcome.
2    A.   Yes, sir.  It appears to be dated
3  March 15th, 2012.
4    Q.   (BY MR. EDWARDS)  Okay.  Would you take a
5  look at page 757, sir.  Does that mean that -- at the
6  top corner, it looks like it says, B. Livingston.  Is
7  that correct?
8    A.   It does.
9    Q.   Does that mean that Brad Livingston attended
10  this meeting?
11   A.   He could have, yes, sir.
12   Q.   I understand that he could have.  Does that
13  likely mean that he probably did?
14   A.   I would say that he made an appearance at
15  the meeting, yes, sir.
16   Q.   Okay.  Now in your experience would he have
17  just made an appearance and then left after giving his
18  presentation or would he be privy to all of this
19  information?
20   A.   In most cases, Mr. Livingston would show up
21  and address the -- address the staff attending the
22  meeting and then step out.
23   Q.   Okay.
24   A.   I don't recall any -- any meeting where
25  Mr. Livingston attended the whole meeting.

---

231

1    Q.   The entire thing?  Okay.  All right.  And
2  then if you will look at page 754, that's just more of
3  the same.  Heat-related illnesses, make sure that you
4  talk about it every month, make sure that the wardens
5  are on notice of this.  That type of instruction?
6    A.   General discussion, yes, sir.
7    Q.   Okay.  Do you recall talking about the --
8  the high number of deaths the previous summer due to
9  hyperthermia?
10   A.   In general.  I surely remember speaking
11  about that at a regional directors meeting.  Whether
12  it was this one or one prior to this, I'm not real
13  sure.
14   Q.   Okay.  Well, let me flip -- flip to page
15  760.  And why don't you take a look at heat-related
16  illness training, and if you could read the first
17  sentence in the discussion portion of that, please,
18  sir?
19   A.   It says, ten deaths last year relating to
20  heat.
21   Q.   Okay.  So certainly you were aware by this
22  time that ten people had died related to the heat in
23  the summer of 2011.  Right?
24        MR. ANASTASIDIS:  Objection.  Asked and
25  answered.

---

232

1    A.   Yes, sir.
2    Q.   (BY MR. EDWARDS)  Anybody at that meeting
3  should have been aware that ten people had died
4  related to the heat in TDC custody.  Right?
5        MR. ANASTASIDIS:  Objection.  Calls for
6  speculation.
7        THE REPORTER:  I'm sorry.
8        MR. ANASTASIDIS:  If you can answer
9  that question without speculating, do so, please.
10   A.   Again, the subject matter appears to be
11  covered.
12   Q.   (BY MR. EDWARDS)  Okay.  Then it says, big
13  star, talk to WS.  Do you know what that is?
14   A.   That is going to reference a talk to William
15  Stephens.
16   Q.   Is that your handwriting?
17   A.   No, sir.
18   Q.   And do you have any idea who that is, whose
19  handwriting this is?
20   A.   No, sir.
21   Q.   Okay.  And then just more discussion about
22  training and wellness checks like we've talked about
23  before?
24   A.   There is discussion about that, yes, sir.
25   Q.   Okay.  Do you know if Director Eason was at

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX177

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**233**

1  this meeting?
2      A.  Again, from this document, I -- I can -- I
3  cannot tell.
4      Q.  Now, on page 765, there is the heading, Heat
5  Preparations.  Do you have any idea what that is all
6  about?  If you don't, just let me know.
7      A.  No, I do not.  I'm assuming maybe that that
8  might have been a deputy director's agenda item, and
9  since it was covered earlier, that it might not have
10  been covered there.  That would be my assumption.
11      Q.  You just don't know, though?
12      A.  I don't know.
13      Q.  Okay.  Now, take a look at page 766.  It
14  looks like there are several offender deaths
15  discussed.  Is that accurate?
16      A.  Yes, sir.
17      Q.  Now, these don't appear to be heat-related
18  deaths.  Correct?
19      A.  Correct.
20      Q.  My question is, did you ever have any
21  discussions at your directors meetings about all of
22  the people that died of heat-related deaths, like you
23  appear to be having about these particular people on
24  document 766?
25      A.  Well, again, I guess I can answer it this

---

**234**

1  way:  Surely some of the subject matter relating to
2  those heat-related deaths was talked about.  What you
3  see on this page here is a list of deaths that
4  occurred that at the time required a serious incident
5  review be conducted.  And what this outlines is those
6  four serious incident review incidents that were
7  discussed at the regional directors meeting, and to
8  finalize the reports and to speak with those
9  particular regional directors that either conducted
10  these serious incident reviewed or were responsible
11  for the facilities where these incidents occurred.
12  And this was our mechanism at the conclusion of the --
13  meeting to have those discussions.
14      Q.  What -- were the heat-related deaths serious
15  incidents?
16      A.  Any death is a serious incident, but --
17      Q.  That wasn't a loaded question, sir.
18      A.  Okay.
19      Q.  Were they serious incidents requiring --
20      A.  They did not require a serious incident
21  review, no, sir.
22      Q.  Tell me why not.
23      A.  Again, that's not a -- an item that the
24  agency has historically listed as a serious incident
25  review issue.  And I would -- I would say, in most

---

**235**

1  cases up until 2011, issues were -- those issues were
2  so infrequent that it was just never -- it was never
3  addressed.
4      Q.  Is it now considered a serious incident
5  which requires review since it's no longer infrequent.
6          MS. COOGAN:  Objection --
7      A.  Again --
8      Q.  (BY MR. EDWARDS)  Let me ask you, do you
9  consider it infrequent, hyperthermia and heat stroke
10  in the Texas prison system, as you sit here today,
11  currently?
12      A.  Again, through the month of -- the months of
13  July and August of 2010, there were surely numerous
14  incidents.  I still believe that -- that those
15  situations are infrequent, although they do occur.
16      Q.  Okay.  Well --
17          (Deposition Exhibit No. 59 marked.)
18      Q.  (BY MR. EDWARDS)  -- as you testify here
19  today, do you believe that heat-related deaths should
20  warrant a serious incident review?
21      A.  Again, that's something that -- again, I'm
22  not in a position to make that decision any longer,
23  but --
24      Q.  Well, you were.
25      A.  -- surely would -- would in some cases, I

---

**236**

1  think, be something that should be discussed.
2      Q.  Okay.  Let's take a look at April 2012.  It
3  looks like ten deaths in 2011.  Psychotropic meds need
4  to be considered.
5          Again, is this more of the same?
6  Weren't you already considering the need to -- it's on
7  page 769, sir.
8      A.  Right.
9      Q.  Weren't you already considering people on
10  psychotropic meds to be heat vulnerable and in need of
11  your protection?
12      A.  Again, we were, and again, forgive me, but I
13  don't remember the nature of that conversation.
14      Q.  Okay.  All right.  It says, one incident
15  already this year, in 2012.  Do you know what that is
16  about?
17      A.  Again, I believe -- I believe this is the
18  subject matter that for some reason Mr. Stephens was
19  covering at the time, so...
20      Q.  Okay.  Well, we'll ask him if you don't
21  know.  Okay.  And, again, it says, make sure we are
22  providing water and watching for signs.
23          And this is -- again, this is stuff
24  you've been saying since 2009.  Right?
25      A.  Surely stuff that -- the direction we've

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX178

60 (Pages 237-240)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

237

1 been reiterating for a number of years, yes, sir.
2     Q.  Well, do you see any, you know, need to
3 reiterate it differently than telling the -- at the
4 regional directors meetings?  I mean, did you ever
5 personally go down to the units and say, guys, enough
6 is enough, no more of this is going to happen, and
7 give a speech to the correctional officers?
8     A.  Again, in -- in my capacity dealing with
9 35,000 individuals out there, dissemination of
10 information down the chain of command is surely
11 something that I have to rely on.  And there was
12 wardens training that was conducted where I had an
13 opportunity to directly address all of the -- all of
14 the wardens.  And then -- at that opportunity and
15 through my deputy directors through assistant wardens
16 training and majors training, we had an opportunity to
17 address these issues during their training period.
18 So -- but the reality of the beast is, although I
19 would love to be able to talk to every correctional
20 officer and every staff member out in the field about
21 every issue, the enormity of the agency makes that
22 quite difficult.
23     Q.  How far is the Gurney Unit from where your
24 offices were located?
25     A.  A couple of hours.

238

1     Q.  Okay.  That -- that unit had multiple deaths
2 in the summer of 2011.  Correct?
3     A.  Yes, sir.  It had two.
4     Q.  All right.
5         (Deposition Exhibit No. 60 marked.)
6     Q.  (BY MR. EDWARDS)  Here you go.  We're on to
7 June 2012, sir.
8         Okay.  June 2012, after all this talk,
9 you still have, if you take a look at 783, 13 offender
10 heat-related incidents and ten employees so far.
11         Did I read that accurately, under EAC
12 Reports and Issues?
13     A.  Yes, sir.
14     Q.  Okay.  It seems similar to the year before.
15 Well, it's in June, so maybe it's even higher than the
16 year before.  Is that fair?
17     A.  That's earlier in the summer, yes, sir.
18     Q.  Okay.  I mean, did it ever occur to you that
19 what you were doing wasn't getting through and wasn't
20 working?
21     A.  Again, I think that as you look across the
22 parameters of the entire agency, many of the measures
23 we put in place were working well throughout the
24 majority of our facilities.  Again, there are numbers.
25 Any incident is not a -- an incident we want to see,

239

1 but when you're dealing with the large numbers of
2 offenders and staff and you're dealing with the
3 weather in this state and you're dealing with the
4 environmental condition that -- that we deal with,
5 that number is not a -- not a number I -- out of a --
6 to a magnitude that --
7     Q.  What is the basis for you saying that?  That
8 that number is not out of the magnitude?
9     A.  Well, again, just from my experience in the
10 system, knowing what we require our staff to do day
11 in, day out, inside and outside our institutions,
12 again, not having the data in front of me to see
13 exactly where these incidents occurred, it's hard for
14 me to determine whether or not that -- any of those
15 incidents required additional actions.
16     Q.  Well, okay.  And I don't know the
17 particulars of each incident, I'm just trying to
18 figure out, you're making -- you're implying that
19 there is lots of inmates and lots of correctional
20 officer, therefore, it's fair to expect 23
21 heat-related illnesses to your employees and to the
22 people in your custody.  And I'm just trying to get a
23 flavor for how on earth you can make such a statement,
24 what is your baseline for that?
25         MR. GARCIA:  Objection.  Argumentative.

240

1     Q.  (BY MR. EDWARDS)  What is your baseline for
2 making a statement that 23 heat-related illnesses
3 during the month of June isn't outside the norm of an
4 agency of your size and scope?
5         MR. GARCIA:  And I'll object to the
6 characterization as illnesses.
7         MS. COOGAN:  Join.
8     A.  And, again, just from my years of experience
9 in the agency, my interaction with our other divisions
10 in dealing with these particular situations, the
11 nature of our business and the requirement for us to
12 run operations 24 hours a day inside and outside our
13 institutions and support our facilities, to assume
14 that there would not be any heat-related illnesses
15 for -- on staff or offenders in our system,
16 particularly those that are performing job functions
17 for us, I would say would be, in my person, in my
18 personal opinion, outside the form of what society
19 deals with.
20     Q.  (BY MR. EDWARDS)  Okay.  And it's just based
21 on your personal experience at the agency?
22     A.  Yes, sir.
23     Q.  If these numbers were coming out of nursing
24 homes in the state of Texas, do you think that that
25 would be a high incidence rate?

APPENDIX179

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

241

1      MR. GARCIA: Objection. Speculation.
2      MS. COOGAN: Absolutely. Incomplete
3  hypothetical, and inappropriate.
4      MR. ANASTASIDIS: Objection.
5  Irrelevant.
6      A.  I would have no -- no way to determine what
7  the norm would be in nursing homes throughout the
8  state.
9      Q.  (BY MR. EDWARDS) Are there any comparable
10 industries that you've assessed whether or not your
11 numbers are higher than their numbers?
12     A.  Not a formal assessment, no, sir.
13     Q.  Anybody ever thought, hey, let's look at
14 other industries where workers are exposed to heat and
15 compare the incidents in the Texas prison system with,
16 I don't know, people smelting ore or doing things like
17 that?  Any thought on the -- at the prison system to
18 like look at that and determine whether or not there
19 is an excessive number of heat-related incidents?
20     MR. GARCIA: Objection. Compound.
21 Argumentative. Speculation.
22     Q.  (BY MR. EDWARDS) Sir, I'm not asking you
23 for --
24     MR. GARCIA: Multifarious and --
25     Q.  (BY MR. EDWARDS) -- a conclusion, I'm

242

1  asking, have you looked at any other industries to
2  determine whether or not there are a high number of
3  incidents of heat-related injury at the prison system?
4      A.  No, I have not.
5      Q.  And these aren't -- the incidents we're
6  talking about aren't just to inmates, they're also to
7  your employees.  Right?
8      A.  Yes, sir.
9      Q.  Has OSHA, to your knowledge, contacted you
10 about the rate of heat-related incidents?
11     A.  Not to my knowledge, no.
12     Q.  Okay.  On page 789, sir, it says that any
13 donation above $500 has to go to the board for
14 approval.  Is that just referring to charitable
15 donations or is that something else?
16     A.  That's just referring to charitable
17 donations.
18     Q.  All right.
19     (Deposition Exhibit No. 61 marked.)
20     Q.  (BY MR. EDWARDS) Let's move on to
21 August 2012. August 18th.
22     MR. EDWARDS: There you go.
23     MR. ANASTASIDIS: Thank you.
24     MR. EDWARDS: Sure.
25     Q.  (BY MR. EDWARDS) Tell me about the boiling

243

1  water in trash cans, what you recall about that.
2      A.  What page are you on?
3      Q.  I don't know.  In the front on the agenda,
4  it says, boiling water in trash cans, and it says that
5  Mr. Stephens will talk about it.  If you recall
6  anything about it.
7      A.  Again, I would have to defer to Mr. Stephens
8  on that.
9      Q.  Okay.  Okay.  It's on page 816.
10     A.  Okay.
11     Q.  It says, boiling water in trash cans.  I
12 mean, that's --
13     A.  Okay.
14     Q.  It seems like a dangerous practice.  Was
15 that a dangerous practice to be employing at the Texas
16 Department of Criminal Justice?
17     A.  From reviewing this note, it appears to
18 me -- and, again, I would defer to Mr. Stephens --
19 that in some cases in our food service department
20 areas, there were offenders that were putting hot
21 water into plastic trash cans and moving it from one
22 area of the kitchen to another.  And it appears that
23 this -- because that is a dangerous practice, that was
24 covered during this wardens -- or during the regional
25 directors meeting to disseminate to the wardens to

244

1  their food service managers to make sure that practice
2  wasn't taking place.
3      Q.  Okay.  It says, potential for danger, tort
4  claims paid, do not use this practice, exclamation
5  point.  Right?
6      A.  Right.
7      Q.  Okay.  Do you think the fact that the tort
8  claims were paid helped end that practice?
9      A.  No.  That's a -- that's been a common --
10 common discussion in the agency, I would say, by our
11 fire and safety staff.  So in this particular
12 situation, I'm not sure what year we're talking about
13 in the tort claim or when this might have occurred,
14 but I'm assuming this was just a reiteration of what
15 should be a good common sense practice in the food
16 service department.
17     Q.  Well, I agree that it would be a good common
18 sense practice, but for some -- was it condoned by the
19 department?
20     A.  It wasn't condoned by me, no, sir, nor do I
21 know of anybody that condoned it.
22     Q.  Okay.  It was a dangerous practice and TDCJ,
23 to the best of your knowledge, has now gotten rid of
24 it?
25     A.  To my knowledge, yes.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX180



Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

245

1    Q. All right. If you would take a look at 811,
2 sir, under the EAC Reports and Issues.
3    A. Yes, sir.
4    Q. It looks like in -- you know, in the summer
5 of 2012, at least through August 18th, you had 50
6 employee heat incidents?
7    A. Yes, sir.
8    Q. And 56 offender or prisoner heat incidents?
9    A. Yes, sir.
10    Q. And one person died?
11    A. Yes, sir.
12    Q. Do you recall who that was?
13    A. I believe that would -- on 816, that would
14 have been offender Adams, I believe.
15    Q. Okay. Do you know if anybody died after
16 offender Adams that summer?
17    A. There was one other at the Garza facility.
18 Hinojosa, maybe.
19    Q. Then on page 813, it's just more of the
20 same, the same type of training recommendations?
21    A. Discussing those issues, yes, sir.
22    Q. Still no -- still no discussion about air
23 conditioning or cooling?
24    A. No, sir.
25    Q. Okay. Let's talk about 820. At the top,

246

1 under Breakout Agenda?
2    A. Yes, sir.
3    Q. It says, chill towels.
4    A. Yes, sir.
5    Q. What is the point of chilled towels? Is
6 that to help cool people?
7    A. Again, that's a -- a comfort effort. It's a
8 chilled towel that, basically, soaked in water, once
9 soaked in water, it would stay fairly cool for a
10 period of time.
11    Q. It looks like you're shipping them to sell
12 to people?
13    A. They were shipped to the unit commissaries,
14 yes, sir.
15    Q. Okay. So you didn't give them away as a
16 precaution, you offered them for sale to the inmates
17 if they'd like to buy them?
18    A. In this particular case, no, sir, they were
19 for sale. They were not issued to the offender
20 population.
21    Q. What do you make on chilled towels?
22    A. I couldn't speak to that. I don't know.
23 The commissary --
24    Q. Who would know the profit margin on these
25 neon yellow chilled towels that you're selling to

247

1 inmates to protect themselves?
2    A. It would be the education, recreation
3 director, and I'm not sure who that is at this point.
4    Q. Okay. Did anyone think to make the chilled
5 towels available to inmates, I don't know, back in
6 2010, or 2011?
7    A. That was not discussed, no, sir.
8    Q. Okay. All right. If you could look at page
9 822. At the bottom of the page, it says, Health
10 Service Issues?
11    A. Yes, sir.
12    Q. And then it says your name, Thaler?
13    A. Yes, sir.
14    Q. It says, question medical orders that do not
15 make good practice. What does that mean?
16    A. That was just a reiteration to our staff in
17 the field that every division answers to somebody
18 higher in that division, and if there was a warden
19 that felt that an offender was not getting appropriate
20 medical treatment, that they should bump that up the
21 chain of command so that it could be addressed by a
22 higher level of health service staff or a higher level
23 of staff within the Correctional Institutions
24 Division.
25    Q. Was that a problem that wardens were

248

1 noticing, that people weren't getting the care they
2 needed from the health service providers?
3    A. In this particular case, I'm not sure
4 whether that was in reference to a particular
5 situation. I would assume there would have been
6 something that would have caused that conversation to
7 take place. In most cases, those situations are
8 resolved between senior level health service staff,
9 either within the division or maybe within UTMB, but
10 we just want to make sure that wardens, when they felt
11 the issue was not appropriately addressed, that they
12 continued to pursue that issue.
13    Q. So it's not okay for a warden or a
14 correctional officer who sees someone in need to just
15 say, hey, that's UTMB's problem, not our problem.
16 Fair?
17    A. We have an obligation to allow those
18 individuals to have access to health care
19 professionals.
20    Q. Okay. And then we've got, on page 823, more
21 of the same, do everything we can to ease heat issues.
22        Do you see that?
23    A. Yes, sir.
24    Q. Do you believe the department is doing
25 everything it can to help ease heat issues?



Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

249

1     A.  I believe that we're doing many things to
2  help ease heat issues.  I think that the department,
3  as always, needs to continue to look at whatever is
4  available out there to assist in that process.
5     Q.  One of the things that's available to assist
6  in that process is cooling mechanisms.  Right?
7  Misters.
8         MR. GARCIA:  Objection.  Vague, cooling
9  mechanisms.
10        MS. COOGAN:  Repetitive.
11        MR. GARCIA:  Oh, asked and answered.
12    Q.  (BY MR. EDWARDS)  Sir, one of the things
13  that's out there are cooling mechanisms like misters
14  or air conditioning.  Right?
15        MR. GARCIA:  Objection.  Asked and
16  answered.
17    A.  Again, that is -- a litany of options are
18  out there.  And if the agency were to consider cooling
19  devices, that would be an option, yes.
20    Q.  (BY MR. EDWARDS)  All right.
21        (Deposition Exhibit No. 62 marked.)
22    Q.  (BY MR. EDWARDS)  Take a look at --
23        MR. ANASTASIDIS:  What exhibit are you
24  on, Jeff?
25        MR. EDWARDS:  Oh, I'm sorry.

250

1     Q.  (BY MR. EDWARDS)  Sir, what exhibit is that?
2         MR. EDWARDS:  Did I give you that,
3  Demetri?
4         MR. ANASTASIDIS:  No.
5         MR. EDWARDS:  62.
6     Q.  (BY MR. EDWARDS)  April 11th, 2013.
7         MR. ANASTASIDIS:  Thank you.
8         MR. EDWARDS:  You're welcome.
9     Q.  (BY MR. EDWARDS)  Okay.  Take a look at page
10  906, please, sir.
11    A.  Okay.
12    Q.  Is says that there is an April 19th meeting.
13  Do you see that?
14    A.  Yes.
15    Q.  E-mail will come out system-wide after
16  meeting.
17        Is that different than the e-mail that
18  had previously been sent out?
19    A.  This one in 2013 would have been slightly
20  different, yes, sir.
21    Q.  What would have been different about it?
22    A.  The inclusion wellness checklist, and the
23  discussion of assuring we're working closely with
24  Health Services Division on every facility to make
25  staff aware of those offenders that are more

251

1  susceptible to heat-related illnesses and we're doing
2  our wellness checks.
3     Q.  Okay.  Now, if you look at page 912, sir.
4  It says, heat related mediation and a handout.
5         On page 912, sir.
6     A.  I'm there.
7     Q.  Did you participate in that breakout agenda
8  and discuss the heat related mediation?
9     A.  This -- this -- again, from the document I'm
10  reviewing here and Mr. Stephens' notes here, I'm --
11  again, I'm not sure I was there when those items were
12  covered, because that continues with Mr. Stephens and
13  Mr. Prasifka.  To the best of my recollection, they
14  might have held even that portion of the meeting.  I
15  did at some point in time come in, though, because
16  there is agenda items that I covered at the end of
17  this -- at the end of this meeting.  So, again, what
18  days that agenda was covered, I'm not sure.  This was
19  during the legislative session, so there were many
20  days when I was not in the Huntsville area.
21    Q.  Okay.  Are you aware that there was a
22  mediation in this case, and I assume that that's what
23  was handed out.  But were you ever made privy to that
24  document?
25    A.  I did see that document, I think, just prior

252

1  to -- just prior to my retirement, I believe.  It
2  might have been the month before.
3     Q.  Okay.  All right.  Just give me one second.
4     A.  Okay.
5     Q.  When exactly did you retire, sir?
6     A.  The effective date was May 31st.
7     Q.  May 31st?
8     A.  May 31st.
9     Q.  Okay.  And in terms of effective date, did
10  you stay a couple of weeks later or did you stay --
11    A.  No.  No.  I was gone prior to May 31st, but
12  May 31st was the official date.
13    Q.  Okay.  So as of May 31 of this year, 2013,
14  any questions in terms of running the criminal --
15  excuse me -- the Correctional Institutions Division
16  should be directed to Mr. Stephens.  Is that fair?
17    A.  Yes, sir.
18    Q.  Okay.  All right.
19        MR. ANASTASIDIS:  Excuse me.  Could you
20  update us when you get a chance on how much time has
21  been used in this deposition.
22    Q.  (BY MR. EDWARDS)  Just a few more questions,
23  sir.
24    A.  Okay.
25    Q.  And I understand -- I'm tired, too, so I

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX182

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013



253

1  appreciate that. Not as tired as I'm sure you're
2  going to be after this, but did you ever review the
3  autopsy reports of the individuals that your agency
4  concluded died heat-related deaths while inside the
5  housing areas?
6            MR. GARCIA: Objection.
7  Mischaracterizes the evidence.
8       A. Again, of those ten incidents that were
9  in -- occurred in 2011, whether I reviewed the entire
10 autopsies or not I can't say for sure. But I would
11 say that I have seen most of them and surely had
12 discussions with the health service department in
13 reference to the issues and the findings.
14      Q. And I apologize. Let me just ask it one
15 more time to just deal with the objection.
16      A. Okay.
17      Q. Of the deaths that on your internal
18 documents are described as heat-related deaths that
19 you were talking about during your directors
20 meetings --
21      A. Right.
22      Q. -- have you reviewed the autopsies for those
23 incidents?
24      A. In most all situations, yes.
25      Q. Okay. Sir, you'll have a chance to review

254

1  your deposition and read it, I'm letting you know.
2  But as you testify here today, is there anything that
3  you just feel, look, I need to change an answer or
4  anything like that?
5       A. Again, I am sure as I read my deposition I
6  will be -- be aware of a statement that I made
7  unintendedly, but nothing jumps out at me at this
8  point right now that I would need to correct at this
9  time.
10      Q. Okay. You certainly don't think there is
11 anything right now that you'd say, hey, look,
12 Mr. Edwards, I misspoke here? You'll have an
13 opportunity to read it to double check, but nothing is
14 jumping out right now?
15      A. No. The only -- the only one issue that
16 I -- again, I'll have to go back and review my
17 statement that I can think of right now is the -- the
18 issue of the -- the formal -- formalization of the
19 policy and whether or not that is a -- hole in the
20 current system. But, again, I'd have to review my
21 testimony and -- and see if I said what I meant to
22 say.
23      Q. Sure. Certainly you would agree that when
24 inmates arrive at TDCJ jails that they need to be
25 assessed for serious medical conditions that can

255

1  ultimately lead to their death if they're placed in
2  extremely hot temperatures. Right?
3       A. Sure. And I feel that the system and
4  policies that are in place now allow for, again, as I
5  mentioned earlier, that review prior to their
6  transportation into any of our facilities, and then
7  the subsequent review from the health service provider
8  upon intake that I believe, if functioning properly,
9  allows us to properly classify and house that
10 offender, whatever those restrictions might be.
11      Q. Okay.
12            MR. EDWARDS: And let me just object as
13 nonresponsive after the word "sure." But I very much
14 appreciate your time, sir, and it has been long
15 enough. But thank you very much. Okay?
16            We'll pass the witness.
17            MR. ANASTASIDIS: No questions.
18            MS. COOGAN: I have a couple, but I
19 promise I'll go fast, Mr. Thaler.
20            EXAMINATION
21 BY MS. COOGAN:
22      Q. Mr. Thaler, I'm going to preface these
23 questions with, do you know the answer, because you
24 might not.
25      A. Okay.

256

1       Q. And that's fine.
2       A. Okay.
3       Q. Do you know how many new inmates come into
4  the system from county jail each week, system-wide,
5  approximately?
6       A. Intake for the system, I don't know that I
7  have a weekly figure, but intake for the system on an
8  annual basis is approximately 72,000.
9       Q. So in addition to the 150,000 that you have
10 on a regular basis, some of those people leave and
11 then approximately 72,000 new ones come in each year?
12      A. That was -- that was the figure that held
13 over the last few years when I was in office.
14      Q. I want to ask you about the -- the policy
15 that came out in 2011 or the beginning of 2012 related
16 to the heat lists or the wellness checklists. Is that
17 different or -- from the work restrictions that come
18 off of the HSM 18?
19      A. Again, the mechanisms that health services
20 utilizes to -- to notify staff, I believe they use the
21 same system in order to generate that list, but I
22 would -- I'm not for sure.
23      Q. Okay.
24            MR. EDWARDS: Let me object to the
25 extent that calls for speculation.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX183

65 (Pages 257-260)

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

257

1    Q.   (BY MS. COOGAN) And let me preface the
2  question with, if you know.
3    A.   Okay.
4    Q.   And this is something I don't know, and so
5  I'm just trying to understand it, who would know.
6        Isn't it right that when -- that the
7  medical personnel from UTMB either participate in or
8  complete the HSM 18, the document that has the work
9  restrictions on it, do you know what I'm referring to?
10    A.   I know what document you're referring to,
11  yes, ma'am.
12    Q.   Okay.  And do you know if that HSM 18 then
13  goes either to classification or the count room or
14  somewhere and a work roster is generated that tells
15  sergeants who has a work restriction and who doesn't?
16  Do you know if that's right?
17        MR. EDWARDS:  Objection.  Foundation.
18    A.   Again, I am not sure.  I can't answer that
19  question.
20    Q.   (BY MS. COOGAN) Okay.  That's fine.  I'll
21  ask somebody else.
22        And then my real question is, when
23  y'all -- I know -- when y'all came up with this policy
24  for the wellness check in 2011, 2012, do you know if
25  that was something that was the same as or different

---

258

1  from this list that came off the HSM 18, do you know?
2    A.   I do not.
3    Q.   Okay.  Do you know how many air conditioned
4  beds there are system-wide?
5    A.   Specific number of beds, I would have to
6  research that.  I could not tell you the specific
7  number of beds.
8    Q.   Okay.  Or air conditioned cells?
9    A.   Again, the same response.
10    Q.   Do you know how many inmates system-wide
11  would go on this wellness checklist because they have
12  psychotropic medications, high blood pressure,
13  depression, diabetes, or obesity, do you know
14  system-wide if -- how many people would be on that
15  list?
16        MR. EDWARDS:  I've got to object to the
17  foundation of that, but --
18        MS. COOGAN:  That's the "do you know"
19  part.
20        MR. EDWARDS:  Not really.
21    Q.   (BY MS. COOGAN) Do you know?
22    A.   No, ma'am, I do not know.
23    Q.   Okay.  And so this is not a loaded question
24  or a trick question or anything like that.  You said
25  earlier that if UTMB said somebody needs to be in an

---

259

1  air conditioned cell, that y'all, TDCJ, could make
2  that happen?
3    A.   Yes, ma'am, we would have to make that
4  happen.
5    Q.   And my question for you is, do you know if
6  there are even enough air conditioned cells to
7  accommodate all of the people, inmates, who would be
8  on this list?
9    A.   Again, not knowing the -- that number, or
10  those that University of Texas Medical Branch would
11  designate as a necessary housing restriction, I cannot
12  answer that question.
13    Q.   And so can you even say for sure that --
14  that you would have enough air conditioned cells or
15  beds to accommodate UTMB if they made such a request?
16    A.   Again, not knowing what that request would
17  be, I can't answer that question.
18    Q.   Okay.  Do you know who decides, between UTMB
19  or TDCJ or Correctional Managed Health Care Committee
20  or the legislature, do you know who decides how many
21  air conditioned cells there will be?
22    A.   I guess in that case I'm going to have to
23  again respond, no, I do not.
24    Q.   That's okay.  I've been trying to find out
25  for a long time.  You're not the first one who doesn't

---

260

1  know.
2        And do you know if -- how the number of
3  air conditioned beds, how it's decided?  If it's a
4  percentage or if it's --
5    A.   No, I do not.
6    Q.   Okay.  Let me just show you this.
7        MS. COOGAN:  Can I have a sticker?
8        (Deposition Exhibit No. 63 marked.)
9    Q.   (BY MS. COOGAN) What has been marked as
10  Exhibit 63, which is a mediated proposal update, and
11  ask you if you have just ever seen that before?
12    A.   This is the document I believe that I saw a
13  copy of prior -- just prior to leaving the
14  organization.
15    Q.   Do you know if anybody from UTMB
16  participated in the negotiation of that document or
17  creation of that document?
18    A.   No, I do not.
19    Q.   And do you know if TDCJ, while you were
20  there, changed or made any policies based on that
21  proposal?
22    A.   Again, you referenced policies, so that
23  policy revision or development would take a while.
24  So, while I was still there, I don't know of any
25  policies that were redrafted and finalized prior to my

---

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX184

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

261

1 departure.
2         MR. EDWARDS: Let me object as
3 nonresponsive.
4     Q. (BY MS. COOGAN) Do you know if anything at
5 TDCJ got changed because of that?  The same question
6 but I'm getting around his objection.
7         Do you know if any policy, procedure,
8 AD, anything got changed or added or modified or an
9 e-mail went out because of that policy?  Excuse me,
10 that proposal?
11         MR. EDWARDS: Let me object to the
12 characterization.  That mediation agreement I believe
13 is what you showed him.  Right?
14         MS. COOGAN: Well, I'm going to say
15 Exhibit 63.  But it says "proposal" on it, and I
16 didn't see your signature, so I didn't assume it was
17 an agreement.  But if you're telling me it is.  Is it?
18         MR. EDWARDS: I need to look at it.
19 There is an agreement.  I thought that's what you
20 handed him, but is that not true?
21         MS. COOGAN: Let me make a request for
22 production for that.
23         MR. EDWARDS: Sure.
24     Q. (BY MS. COOGAN) If you know.  It's not a
25 trick question.

262

1     A. Again, some of these actions were
2 continuous.  As far as the development of a formal
3 policy that was drafted and disseminated, it did not
4 happen prior to me leaving the agency in May.
5         MS. COOGAN: That's all the questions I
6 have.  Thank you.
7             EXAMINATION
8 BY MR. GARCIA:
9     Q. Director, my name is Bruce Garcia and I
10 represent the regional director, and the officers off
11 the Hutchins Unit in this facility -- I mean, this
12 incident.  And I wanted to ask you just a few
13 questions about your review of the McCollum incident
14 report.  Okay?  Do you remember the EAC report you
15 testified to earlier regarding offender McCollum?
16     A. Yes, sir.
17     Q. And you gave some testimony in that -- in
18 that area regarding the actions of the correctional
19 staff on the Hutchins facility.  Do you recall that
20 testimony?
21     A. Yes, sir.
22     Q. And I believe your testimony -- and if sum
23 it up incorrectly, please tell me so -- essentially
24 was that in hindsight, looking back at their actions
25 on that evening of July 22nd of 2011, that it was your

263

1 opinion that those officers could benefit from some
2 retraining.  Did I characterize that correctly, sir?
3     A. Yes, sir.
4     Q. And I would assume by those officers --
5 well, if you could tell me, which officers you are
6 referring to in regards to that answer specifically,
7 sir?
8     A. In response to that question, it would have
9 been the -- the staff that initially responded to the
10 incident.
11     Q. Would that be the CO, the first CO who
12 arrived on the scene as one of those individuals,
13 possibly?
14     A. Yes, sir, it would be.
15     Q. Would that be the sergeant who then
16 responded to the scene at the request of the CO?
17     A. Yes, sir.
18     Q. And then would that also include the
19 lieutenant who responded at the request of the
20 sergeant?
21     A. Again, as a unit administrator, as I
22 addressed that, not judging the performance of any of
23 those individuals, I think it would be essential and
24 imperative that we ensured that we emphasized to staff
25 the immediate need to not -- to request assistance

264

1 from a health service professional and not -- not
2 carry that load on their shoulders.
3     Q. So it's your belief that they should have
4 simply just made the medical call quicker and not
5 waited as long as they did.  Is that correct?
6     A. Again, I'm -- I wasn't at the -- at the
7 scene, so I don't know what circumstances those
8 individuals were dealing with.  But in hindsight,
9 after evaluating the facts, I'm sure in most cases
10 they might come to the same conclusion.
11     Q. And in regards to your conclusion, I want to
12 make sure I understand what your conclusion is in
13 this -- in the McCollum incident.  Okay?  Is it your
14 conclusion that if the officers had responded quicker
15 that Mr. McCollum would be alive today, or is it
16 simply your conclusion that they needed to take that
17 chance to maybe see if he would be alive today?
18     A. Again, I don't -- I can't speak to the fact
19 of actually the results of the medical evaluation of
20 the offender, so I can't speak as to the fact of
21 whether or not that individual would have suffered any
22 different end result because of any actions or
23 inactions of the staff.
24     Q. Okay.
25         MR. GARCIA: Thank you.  No further



APPENDIX185

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

---

**265**

1  questions.
2        MR. EDWARDS:  Nothing here.
3        MR. ANASTASIDIS:  I don't have any more
4  questions.
5        Do you want to go on to Mr. Stephens?
6        THE VIDEOGRAPHER:  That concludes the
7  deposition.  The time right now is 4:35 p.m.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**267**

1                    SIGNATURE
2
3        I, RICHARD C. THALER, have read the
4  foregoing deposition and hereby affix my signature
5  that same is true and correct, except as noted above.
6
7
8        _____
9
        RICHARD C. THALER
10
11  JOB NO. 131018BJW
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**266**

1        CHANGES AND CORRECTIONS
2  RICHARD C. THALER - October 18, 2013 VOLUME 1
3  [DISREGARD IF WAIVED]
4
   Reason Codes:  (1) to clarify the record; (2) to
5  conform to the facts; (3) to correct a transcription
   error; (4) other (please explain).
6  PAGE/LINE   CHANGE                REASON CODE
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25  JOB NO. 131018BJW

---

**268**

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3  STEPHEN McCOLLUM,            §
   STEPHANIE KINGREY, AND       §
4  SANDRA McCOLLU,              §
   INDIVIDUALLY AND AS          §
5  HEIRS AT LAW TO THE          §
   ESTATE OF LARRY GENE         §
6  McCOLLUM,                    § CIVIL ACTION NO.
         Plaintiffs,            § 3:12-CV-02037
7                               §
   VS.                          §
8                               §
   BRAD LIVINGSTON, JEFF        §
9  PRINGLE, RICHARD CLARK,      §
   KAREN TATE, SANDREA          §
10 SANDERS, ROBERT EASON,       §
   THE UNIVERSITY OF TEXAS      §
11 MEDICAL BRANCH AND THE       §
   TEXAS DEPARTMENT OF          §
12 CRIMINAL JUSTICE,            §
         Defendants.            §
13  • • • • • • • • • • • • • • • • • •
14       REPORTER'S CERTIFICATION
        ORAL AND VIDEOTAPED DEPOSITION OF
15            RICHARD C. THALER
                VOLUME 1
16           October 18, 2013
    • • • • • • • • • • • • • • • • • •
17       I, BRENDA J. WRIGHT, Certified Shorthand
18  Reporter in and for the State of Texas, hereby certify
19  to the following:
        That the witness, RICHARD C. THALER, was duly
20  sworn by the officer and that the transcript of the
21  oral deposition is a true record of the testimony
22  given by the witness;
        I further certify that pursuant to Federal
23
24  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as
25

---

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363

e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX186

Stephen McCollum, et al. v.
Brad Livingston, et al.

Richard C. Thaler
October 18, 2013

269

```
 1  well as Rule 30(e)(2) that the signature of the
 2  deponent:
 3       __X__ was requested by the deponent and/or a
 4  party before completion of the deposition and is to be
 5  returned within 30 days from date of receipt of the
 6  transcript.  If returned, the attached Changes and
 7  Corrections and Signature pages contain any changes
 8  and the reasons therefor;
 9       _____ was not requested by the deponent and/or a
10  party before the completion of the deposition.
11       That $_____ is the deposition
12  officer's charges for preparing the original
13  deposition transcript and any copies of exhibits,
14  charged to PLAINTIFFS;
15       That pursuant to information given to the
16  deposition officer at the time said testimony as
17  taken, the following includes all parties of record:
18  For the Plaintiffs:
        Mr. Jeff Edwards
19      THE EDWARDS LAW FIRM
        The Haehnel Building
20      1101 East 11th Street
        Austin, Texas 78702
21      512-623-7727/512-623-7729 (fax)
        jeff@edwards-law.com
22          -and-
        Mr. Scott Medlock
23      TEXAS CIVIL RIGHTS PROJECT
        1405 Montopolis Drive
24      Austin, Texas 78741
        512-474-5073/512-474-0726 (fax)
25
```

270

```
 1  For the Defendants Jeff Pringle, Richard Clark, Karen
    Tate, Sandrea Sanders, Robert Eason and Texas
 2  Department of Criminal Justice:
        Mr. Bruce R. Garcia
 3      Assistant Attorney General
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 4      Law Enforcement Defense Division 012
        Post Office Box 12548
 5      300 West 15th Street
        Austin, Texas 78711-2548
 6      512-463-2080/512-495-9139 (fax)
        bruce.garcia@texasattorneygeneral.gov
 7
    For the Defendants Brad Livingston, William Stephens
 8  and Richard Thaler:
        Mr. Demetri Anastasidis
 9      Assistant Attorney General
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
10      Law Enforcement Defense Division 012
        Post Office Box 12548
11      300 West 15th Street
        Austin, Texas 78711-2548
12      512-463-2153/512-495-9139 (fax)
        demitri.anastasidis@texasattorneygeneral.gov
13
    For the Defendant University of Texas Medical Branch:
14      Ms. Kim Coogan
        Assistant Attorney General
15      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        Law Enforcement Defense Division
16      Post Office Box 12548
        Austin, Texas 78711-2548
17      512-463-2080/512-495-9139 (fax)
        kim.coogan@texasattorneygeneral.gov
18
19       I further certify that I am neither attorney
20  nor counsel for nor related to nor employed by any of
21  the parties to the action in which this deposition is
22  taken;
23       Further, I am not a relative nor an employee of
24  any attorney of record in this cause, nor am I
25  financially or otherwise interested in the outcome of
```

271

```
 1  the action.
 2       Certified to by me this 28TH day of OCTOBER,
 3  2013.
 4
 5      BRENDA J. WRIGHT, Texas CSR No. 1780
        Expiration Date:  12-31-14
        WRIGHT WATSON & ASSOCIATES
 6      Firm Registration No. 225
        Expiration Date:  12-31-13
 7      3307 Northland Drive
        Suite 185
 8      Austin, Texas 78731
        512-474-4363/51-474-8802 (fax)
 9      www.wrightwatson.com
    JOB NO. 131018BJW
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**WRIGHT WATSON & ASSOCIATES**

(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363

c4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

APPENDIX187