UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM,<br><br>            PLAINTIFFS<br><br>v.<br><br><br>BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE.<br>            DEFENDANTS | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br>3:12-cv-02037<br>JURY DEMAND |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs Stephen McCollum, Stephanie Kingrey, and Sandra McCollum, individually and as heirs at law on behalf of the Estate of Larry Gene McCollum, bring this lawsuit against Defendants because they housed their father, Mr. McCollum, in brutally hot, unconstitutional conditions, causing him to suffer a fatal heat stroke, and failed to contact 911 for almost an hour as he lay dying before them.

STATEMENT OF CLAIMS

1.   Plaintiffs Stephen McCollum, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of his beloved father, which occurred at the Hutchins State Jail in Dallas, Texas.

2.   Plaintiff Stephanie Kingrey, individually, as heir at law to the Estate of Larry Gene McCollum, and as the executor of Mr. McCollum's estate, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved

father, which occurred at the at the Hutchins State Jail in Dallas, Texas.

3.    Plaintiff Sandra McCollum, individually and as heir at law to the Estate of Larry Gene McCollum, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved spouse, which occurred at the at the Hutchins State Jail in Dallas, Texas.

4.    Defendants Livingston, Eason, Clark, Tate, Sanders and Pringle are liable for violating Mr. McCollum's constitutional rights under the Eighth and/or Fourteenth Amendment right to protection from cruel and unusual punishment under 42 U.S.C. § 1983 ("Section 1983").

5.    Further, Defendants University of Texas Medical Branch and Texas Department of Criminal Justice are liable for the deprivation of Mr. McCollum's rights under Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), which require public facilities, like the prison, to make reasonable accommodations for people with disabilities, like Mr. McCollum.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

7.    Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district and division.

## PARTIES

8.    Plaintiff Stephen McCollum is the son of Mr. McCollum.  He sues in his individual capacity and as heir at law to Mr. McCollum's estate.  He is a resident of McLennan County, Texas.

9.    Plaintiff Stephanie Kingrey is the daughter of Mr. McCollum.  She sues in her

individual capacity, as heir at law to Mr. McCollum's estate, and as the executor of Mr. McCollum's estate, as appointed by the probate court in McLennan County. She is a resident of McLennan County, Texas.

10. Plaintiff Sandra McCollum is the surviving spouse of Mr. McCollum. She sues in her individual capacity and as heir at law to Mr. McCollum's estate. She is a resident of McLennan County, Texas.

11. At the time of his death, Mr. McCollum had a surviving spouse, Sandra, and two adult children, Stephen and Stephanie. He died intestate. Ms. Kingrey was appointed executor of the estate by the probate court in McLennan County.

12. Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ). As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for damages. Livingston has appeared in this litigation.

13. Defendant Robert Eason was the regional director for TDCJ, and supervised the wardens at eleven prisons, including the Hutchins State Jail, at all relevant times. At all relevant times, Eason was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity only for damages. Eason has appeared in this litigation.

14. Defendant Jeff Pringle was the warden at the Hutchins State Jail at all relevant times. At all relevant times, Pringle was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for damages.

Pringle has appeared in this litigation.

15.   Defendant Richard Clark was a correctional officer at the Hutchins State Jail at all relevant times.   At all relevant times, Clark was acting under color of law. He is sued in his individual capacity for damages. Clark has appeared in this litigation.

16.   Defendant Karen Tate was a sergeant at the Hutchins State Jail at all relevant times. At all relevant times, Tate was acting under color of law. She is sued in her individual capacity for damages. Tate has appeared in this litigation.

17.   Defendant Sandrea Sanders was a lieutenant at the Hutchins State Jail at all relevant times.   At all relevant times, Sanders was acting under color of law. She is sued in her individual capacity for damages. Sanders has appeared in this litigation.

18.   The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. At all relevant times, UTMB was the medical provider at the Hutchins State Jail, services Mr. McCollum was otherwise qualified for. UTMB is a recipient of federal funds.   UTMB is sued for declaratory, injunctive, and compensatory relief under federal law. UTMB has appeared in this litigation.

19.   The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas.   At all relevant times, it operated the Hutchins State Jail, a public facility with programs and services Mr. McCollum was otherwise qualified for.   TDCJ is a recipient of federal funds.   TDCJ is sued for declaratory, injunctive, and compensatory relief under federal law.   TDCJ has appeared in this litigation.

FACTS

20.   According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year."   On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." In July 2011, one of

those victims was Larry McCollum.

21.  On the day Mr. McCollum died, the Dallas area had endured 25 consecutive days where the temperature exceeded 100 degrees Fahrenheit.

22.  Defendants Pringle, Eason, Clark, Tate, Sanders, Livingston, as well as numerous other TDCJ and UTMB officials, were well aware of this heat wave Dallas was experiencing and knew inmates were at risk of heat related death and illness at area prisons – especially prisoners with heat-sensitive disabilities like Mr. McCollum. Moreover, Defendants Livingston, Pringle, Eason, Clark, Tate, and Sanders all knew that the temperature inside the dorm where Mr. McCollum was housed was well over 100 degrees, and that the heat combined with the humidity (the "heat index") made it feel like the temperature exceeded 120 degrees.

   *A.  Mr. McCollum's Disabilities*

23.  At the time of his death, Larry Gene McCollum was fifty-eight years old. TDCJ and UTMB knew he was overweight and morbidly obese, and suffering from hypertension and diabetes.

   *Hypertension*

24.  Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated or exacerbated.

25.  Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

26.  As a consequence, UTMB and TDCJ policy recognizes patients taking diuretics to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to

5

work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

27. As one would expect, hypertension, combined with Mr. McCollum's history of diabetes and obesity, substantially limited his ability to climb, walk, stand, and breathe, and limited the operation of his respiratory, circulatory, and cardiovascular systems. His medication was necessary to protect his health from his disability.

28. As was well known to each of the Defendants through training, prior to Mr. McCollum's death, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with extreme heat, diminishes the body's ability to regulate internal temperature.

*Diabetes*

29. Diabetes is a chronic disease caused by an insulin imbalance. Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

30. Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

31. Diabetes can also reduce blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

32. UTMB's policies and medical providers identify diabetes as a condition that affects heat tolerance and that renders inmates susceptible to significant injury and/or death from extremely high temperatures – like those at the Hutchins State Jail in July 2011.

33. The American Diabetes Association suggests people with diabetes "stay indoors as much as possible and drink plenty of fluids" and "seek shelter if you do not have air conditioning

6

and the heat is beginning to make you feel ill."

34.   Moreover, failing to provide treatment and monitoring of diabetes is "off the charts unacceptable" according to the medical providers at Hutchins, including Ananda Babbali, the physician's assistant supervising Mr. McCollum's care at the prison. Despite this, Mr. McCollum received no treatment whatsoever for his diabetes. The condition was entirely ignored.

*Obesity*

35.   Mr. McCollum was 5' 10" tall, and weighed 330 pounds when he arrived at the Hutchins State Jail. Medically, he was morbidly obese. His weight was clearly outside the normal range for someone of his height.

36.   His body mass index was greater than 40, and he was twice his ideal weight, according to the Centers for Disease Control.

37.   Mr. McCollum's obesity likely contributed to, or was a cause of, his hypertension and diabetes, and thus affected his digestive, cardiovascular, nervous, and endocrine systems.

38.   Mr. McCollum's obesity also substantially limited his ability to walk, stand, breathe, and climb.

39.   More specifically, it limited his ability to climb in and out of the top bunk UTMB and TDCJ assigned him, limiting his ability to access food and water at the prison.

Yet despite the fact that Mr. McCollum informed TDCJ and UTMB personnel of his hypertension and diabetes, and that his obesity was obvious to even a layperson, no one from the prison (neither TDCJ nor UTMB personnel) took any steps to evaluate or monitor McCollum's hypertension or diabetes, or provide him any accommodation for his obesity, or provide any accommodation to protect him from the extreme heat they knew he would have to endure. Instead, they ignored his disabilities altogether.

### B.   Mr. McCollum is Welcomed to "Hell"

40.  Mr. McCollum was convicted of a minor property offense, and sentenced to serve two years at the Hutchins State Jail outside Dallas. Because he would receive some time credit for weeks he spent at the McLennan County Jail in Waco, Mr. McCollum was supposed to spend less than two years in prison.

41.  On or about July 15, 2011, Mr. McCollum arrived at the Hutchins facility. Officers told him and other new prisoners "welcome to Hell."

42.  Soon after his arrival, a UTMB vocational nurse performed what was apparently a triage or "self assessment" of Mr. McCollum and other newly arrived prisoners. Mr. McCollum told the nurse he suffered from diabetes (which she recorded in his chart), and was taking a prescription medication, Clonidine, for hypertension. The nurse also reviewed forms sent with him by the McLennan County jail that showed he weighed 330 pounds and was 5' 10" tall, though his obesity was also obvious.

43.  In light of these conditions, the nurse referred Mr. McCollum and his triage record to the physician's assistant at the prison, Ananda Babbili. Without examining or questioning him, Babbili ignored his diabetes altogether, but noted his hypertension, and changed his prescription from Clonidine to hydrochlorothiazide (HCTZ), a diuretic, to treat his hypertension. Importantly, Clonidine is not a diuretic. Because TDCJ and UTMB policies are completely silent on how to house prisoners taking diuretics during periods of extreme heat, Babbili did nothing to accommodate him.

44.  Diuretics remove water from the blood to decrease blood pressure. Diuretics thus increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance. This was all known to UTMB and Babbili. Yet Babbili never informed McCollum of the drug's consequences and prescribed it knowing the prison – inside and outside – was well

over 100° and Mr. McCollum would have great difficulty living in the extreme heat.

45. Moreover, despite his need for treatment for his diabetes, which also placed him in danger from the high temperatures inside the unit, Mr. McCollum was not monitored or given any treatment for his disability – or even given any accommodations to protect him from the extreme heat in light of his diabetes.

46. Though Mr. McCollum was obviously obese, and had great difficultly walking short distances, TDCJ and UTMB assigned him to a top bunk. In prison, a bunk assignment is very important because when prisoners are counted to make sure everyone is present, they must be in their bunk when they live in a dormitory setting, like at the Hutchins State Jail. Thus, prisoners are required to get in and out of their bunk several times a day.

47. But, UTMB and TDCJ's practice at the time was to ignore obesity when making bunk assignments. UTMB did not routinely recommend TDCJ assign even morbidly obese prisoners to bottom bunks. And TDCJ officers testified that it was not unusual to see extremely overweight prisoners, like Mr. McCollum, housed in a top bunk, even though housing people weighing over 300 pounds on a bunk they are required to climb on and off of several times each day is an obvious hazard. Tellingly, UTMB and TDCJ have since changed this policy, and now assign obese prisoners to bottom bunks.

48. Although UTMB makes recommendations for housing and bunk assignments based on prisoners' medical conditions, UTMB had no policies or procedures to prevent housing 300 pound men in top bunks, and made no such recommendation to protect Mr. McCollum. Moreover, even if UTMB did recommend TDCJ assign obese prisoners to bottom bunks, this recommendation would not be made until after the prisoner received an intake physical, even though the triage nurse could obviously see a newly arrived prisoner was obese and would need a lower bunk. Of course, a 330 pound man's need for a lower bunk would be obvious even to a

9

layperson.

49.   Additionally, despite his medical conditions, TDCJ housed Mr. McCollum in a dormitory area that was not air conditioned or climate controlled in any way. Even though state law requires county jails to keep indoor temperatures between 65 and 85 degrees, there is no similar regulation for state prisons. *See* 37 Tex. Admin. Code § 259.160.

50.   As a consequence, it was brutally hot in his dormitory at all times while Mr. McCollum was in the Hutchins State Jail. In fact, the heat index regularly exceeded 120° inside the dorm where McCollum lived and TDCJ records document heat indexes exceeding 130° on multiple occasions, and even reaching 150° – all of which were known to Defendants. Despite this, Defendants failed to provide Mr. McCollum adequate shelter from this extreme heat.

51.   Air-conditioned housing is available at some TDCJ prisons, but not for minimum custody prisoners (like Mr. McCollum) at the Hutchins State Jail. Of the 97 state-operated TDCJ prisons, 56 have some air conditioning in inmate living areas. Ironically, solitary confinement cells (including death row) are routinely air-conditioned – at the Hutchins State Jail, summer temperatures in the solitary confinement cells are routinely 20 to 30 degrees cooler than the minimum custody dorms where Mr. McCollum lived. While inhumane heat conditions are never justified, it is ironic, and as these facts illustrate, tragic, that prisoners obediently serving their time for non-violent property offenses do not receive relief from the extreme heat, while prisoners who are allegedly combative, assault staff, or are sentenced to death live in safe conditions.

52.   TDCJ and UTMB officials, including but not limited to Eason, Pringle, Clark, Tate, Sanders, and Livingston, were aware many TDCJ prisoners live with obesity, diabetes and hypertension, and are housed in non-air-conditioned TDCJ facilities, including the Hutchins State Jail.

C.   *Extreme Temperatures at the Hutchins Unit Killed Mr. McCollum*

53.   During the seven days Mr. McCollum spent in the Hutchins Unit, the outdoor temperatures reached 102 degrees Fahrenheit. The outdoor heat index, the combination of temperature and humidity, made the air temperature feel like it was over 150 degrees Fahrenheit, according to official TDCJ records. The National Oceanic and Atmospheric Administration's heat index chart (below) is incorporated into UTMB and TDCJ training materials, and shows a heat index over 130 degrees makes heat stroke "likely with continued exposure," and is "extremely dangerous." TDCJ documents describe heat stroke at such temperatures as "imminent."

**Temperature (°F)**

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**
Caution   Extreme Caution   Danger   Extreme Danger

54.   Despite these extremely high reported heat indexes, no one at the Hutchins State Jail, including staff from TDCJ and UTMB, did a single thing differently or made any attempt to get

prisoners to cooler, safe temperatures.

55.   People with heat-sensitive disabilities, like Mr. McCollum, are put at even greater risk at these extremely high temperatures. TDCJ and UTMB acknowledge this chart is an accurate predictor of heat-related illnesses in prisoners.

56.   But even though TDCJ and UTMB's own internal policies and documents acknowledge the incredible danger extreme heat indexes pose to prisoners with heat-sensitive medical conditions (like Mr. McCollum), none of the Defendants did anything differently when the heat index reached the "extreme danger" category. Sadly, even today no changes have been made to protect prisoners when heat indexes reach these "extremely dangerous" levels.

57.   Shortly before Mr. McCollum's death, an email from the Hutchins facility's safety officer advised Warden Pringle that "random samplings of temperatures taken in the [prisoner] housing areas reflect a 2 to 3 degree difference from the outside Unit temperature. These temperature readings in the [prisoner] living areas are 2 to 3 degrees lower than the outside temperature."

58.   The email went on to inform Pringle that on July 13, 2011, two days before Mr. McCollum arrived at the prison, indoor air temperatures exceeded 100 degrees Fahrenheit (without accounting for humidity). The email even told Pringle that in the dorm Mr. McCollum was housed in the temperature was 101 degrees, a mere three degrees cooler than the outside temperature. At the same time, the outdoor heat index, according to the email, was 123 degrees – the high end of the "danger zone" according to NOAA and the TDCJ and UTMB policies. Thus, the heat index indoors was at least 120 degrees – and well within the NOAA "danger zone."

59.   Prisoners complained the metal tables inside the dormitories were too hot to touch, and that inmates would sleep on the concrete floor.

60.   Despite this, Defendants took no steps to reduce the heat levels inside the housing

12

dorms. They did not bring in temporary cooling devices (like misters, foggers, or portable air conditioners) and they did not move prisoners with disabilities rendering them dangerously susceptible to extreme heat – like Mr. McCollum – to air-conditioned portions of the prison or to other prisons with air-conditioned housing areas. They did not even ensure prisoners had cool water to drink.

61. TDCJ advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics.

62. All these conditions describe Mr. McCollum, and were well known to the Defendants.

63. Thus, inmates like Mr. McCollum were in grave danger, and as the areas remain non-air-conditioned, current inmates with similar conditions, remain in danger.

64. Such intense heat is known to be harmful, and is cruel and unusual punishment serving no legitimate penal purpose.

65. Moreover, the Hutchins Unit, has no medical staff at the facility after 6:00 p.m., even though over 2,200 men are housed there every night and significant numbers (greater than 10%) suffer from obesity, hypertension, or diabetes and are at greater risk from the extreme heat. High-level TDCJ and UTMB officials, such as Livingston, and UTMB director Owen Murray, made this decision for financial reasons despite knowing it placed inmates at risk after 6:00 p.m., and at grave risk in emergency situations where medical care was immediately needed, such as when a prisoner suffered a heat stroke. The TDCJ employees at the Hutchins Unit, including Pringle, Clark, Tate and Sanders knew there was no medical staff at the facility after 6:00 p.m., and that for a prisoner to receive immediate medical attention they would have to be transported to a hospital by ambulance.

13

66.  On the night of July 22, 2011, the Dallas area experienced temperatures over 90 degrees until after 1 a.m. That day, the heat in Dallas was sweltering – 98 degrees Fahrenheit, with 79 percent humidity. The heat index exceeded 130 degrees Fahrenheit, meaning the heat index inside the housing areas was more than 127 degrees.

67.  That night, around 2:00 or 2:10 a.m., Mr. McCollum began suffering convulsions.

68.  Another prisoner quickly notified Officer Clark, who was patrolling the dormitories in Mr. McCollum's building at the time. Officer Clark arrived at Mr. McCollum's bedside, and observed him unconscious, unresponsive, and convulsing. Clark believed Mr. McCollum was having a seizure and in need of immediate care. Clark knew this was a medical emergency.

69.  Rather than immediately calling for an ambulance – as McCollums' condition plainly called for and which could have been accomplished in a matter of seconds – Clark instead called for his supervisor to observe McCollum. Clark did this despite acknowledging that he subjectively believed McCollum's condition was a medical emergency, that medical care was urgently needed, and that his supervisors had no medical training or expertise.

70.  Just as incredible, this decision not to have 911 called or an ambulance dispatched before a supervisor observed the emergency was par for the course at the Hutchins Unit and remains the way things are done even today. Regional Director Eason also agreed this was the proper procedure – that a supervisor must observe a prisoner in person before she can call 911. When Eason and Pringle reviewed Mr. McCollum's death, they found no problem with the individual officers' actions, and ratified their decisions to delay treatment for Mr. McCollum.

71.  Yet, instead of immediately taking Mr. McCollum to a cool place, or packing his body with ice, as could have easily been done and Clark knew needed to happen immediately, he just notified his direct supervisor, Sgt. Tate. Sgt. Tate arrived at Mr. McCollum's bunk between 2:15 and 2:20 a.m.

14

72. When Sgt. Tate arrived, the situation remained an obvious medical emergency requiring actual medical intervention. Sgt. Tate observed Mr. McCollum's entire body shaking and "trembling," and assumed he continued to seize. She noted his skin was "flushed" and warm to the touch, as if he were running a fever. Tate tried to speak to Mr. McCollum, and dripped water on his face, but he did not respond. Thus, Tate knew McCollum was unresponsive, convulsing, and needed immediate care.

73. Incredibly, despite believing McCollum's condition was a medical emergency and despite being able to ask that 911 be contacted and an ambulance dispatched, Tate did not do this. Tate also did not take McCollum to one of the many air-conditioned places in the prison, or use ice to cool his body, as she knew she should have done. Instead, she called her supervisor, Lieutenant Sanders, a woman she knew had no specialized medical training and would not be able to provide immediate help. And Tate made this decision knowing that medical care for McCollum would be further delayed.

74. According to Tate, she was following standard practice at the Hutchins Unit.

75. Lt. Sanders did not arrive at Mr. McCollum's bedside until around 2:40 a.m., at least thirty minutes after Clark first found him. Though Mr. McCollum was still intermittently seizing, unconscious and unresponsive, Sanders, who also recognized that McCollum was a diabetic, still did not immediately call 911. Rather, she delayed what was obviously needed, an ambulance, and contacted an off-site medical unit she knew did not have doctors.

76. After delaying further by conferring with an off-site nurse (an utterly worthless exercise as, by law, nurses are incapable of providing a medical diagnosis) at another prison over 130 miles away, Sanders finally had an ambulance called. She delayed despite knowing that Mr. McCollum needed immediate medical attention that no one at the Hutchins Unit at that time was qualified to provide. Her decision to call 911 did not occur until 3:05 a.m., almost an hour after

15

Clark first found Mr. McCollum convulsing.

77.   Even while contacting the off-site nurse, though she knew Mr. McCollum needed medical attention, Sanders did not have him taken to a cool place in the prison, or pack his body with ice, as she knew she should have done.

78.   At no point did Mr. McCollum respond to any of the officers. He remained unconscious and intermittently convulsing from the "seizure."

79.   In fact, the general practice at the Hutchins State Jail, as was well known to Warden Pringle, Lt. Sanders, and Sgt. Clark, was to let patients experience seizures in the middle of the night, and just refer them to the infirmary the next morning. Letting Mr. McCollum experience a "seizure" without immediately calling for medical help was standard practice at the Hutchins Unit, and known to Pringle, Sanders, Tate and Clark. Other TDCJ executives, however, recognized this practice was highly inappropriate and dangerous.

80.   Moreover, though TDCJ training materials repeatedly state that when someone is suffering heat exhaustion, let alone a heat stroke, they need to be immediately moved to an air-conditioned area, and provided ice packs for their body. This did not happen here, however, because Mr. McCollum had inexplicably been placed on a top bunk. Because Clark, Tate, and Sanders could not lift a 330 pound man off a top bunk, they left him convulsing and unresponsive on the bunk even after 911 was finally called. Even after 911 was called, they did not bring ice packs to his body, as they easily could have done.

81.   As a consequence of their total lack of care, and senseless and unconscionable delay, Mr. McCollum died.

82.   When Mr. McCollum finally arrived at the hospital, his body temperature was 109.4 degrees Fahrenheit.  The extreme heat caused him to suffer multi-system organ failure.

83.   Mr. McCollum slipped into a coma, and died after spending six days in the intensive

care unit.

84.   An autopsy conducted by the Southwestern Institute of Forensic Sciences concluded he died of hyperthermia, due to housing "in a hot environment without air conditioning."

85.   The autopsy found Mr. McCollum was "predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension."

86.   High-ranking TDCJ officials, including Richard Thaler, the deputy director, testified Clark, Tate, and Sanders should not have delayed calling 911, and they should have called 911 immediately, and acknowledged that if a practice existed to the contrary, it would endanger prisoners and be unacceptable. Despite Thaler's negative assessment of the lengthy delay, and obvious indifference it shows, Pringle and Eason did not believe the officers did anything wrong. Instead, Pringle and Eason ratified and ignored the officers' indifference by incredibly concluding the officers acted appropriately though they delayed emergency medical care for over an hour to a man they knew was convulsing, and unresponsive, allowing McCollum to suffer a painful heat stroke.

    D.   *TDCJ and UTMB's Polices Deliberately Ignored Conditions Causing Death*

87.   In addition to the indifference shown by individuals to McCollum's hypertension, diabetes, obesity, and "seizures"/heatstroke, serious deficiencies in TDCJ and UTMB policies and procedures, which were approved by and known to TDCJ and UTMB's highest-ranking officials, including but not limited to Eason, and Livingston, proximately caused Mr. McCollum's death.

88.   TDCJ officers report all heat related illnesses to TDCJ headquarters to inform high-ranking officials, including Eason and Livingston, when prisoners or TDCJ employees become ill.  Eason regularly reviewed emails and correspondence showing prisoners were dying from heat stroke, and that employees were suffering heat-related injuries. Of course, similar reports

17

are made to Pringle about his own facility, the Hutchins State Jail.

89.   As the conditions at the Hutchins State Jail are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Mr. McCollum, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas cooled, or to make sure inmates with medical conditions that render them particularly vulnerable to extreme heat (such as diabetes, obesity, or hypertension) were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat, a decision, of course they made from the comfort of their own air conditioned offices.

*i).   TDCJ Prisons' Housing Areas Are Not Air Conditioned or Cooled*

90.   Though indoor temperatures at TDCJ prisons routinely exceed 100 degrees and the heat indexes in July and August exceeded 130 degrees, the prisons are not air-conditioned or otherwise cooled, and TDCJ makes no effort to lower the indoor temperatures for its human prisoners with other technologies like portable air conditioners, foggers, or misters.

91.   Moreover, TDCJ and UTMB officials, including Defendants Livingston, Eason, Owen and Pringle, took no steps to remedy this despite knowing and informing their employees that extreme heat could and would cause serious injury or death, even after ten people died from heat stroke in the summer of 2011.

92.   In fact, TDCJ trains all its employees that "heat stroke occurs when the body is subjected to more heat than the body can possibly handle. Heat stroke is a serious medical condition and may lead to death without immediate emergency medical attention. In heat stroke, body temperature rises too quickly resulting in the death of body tissue." TDCJ officials, like Livingston, Eason, Clark, Tate, Sanders, and Pringle, knew "victims of prolonged or high heat can develop heat cramps or heat exhaustion.  If heating continues, the condition can progress to a

18

heat stroke and death."

93.   And this is exactly what happened in 2011.

94.   In fact, system-wide, at least ten people in TDCJ custody, including Mr. McCollum, died of heat-related causes in the summer of 2011. Two men died before that, in 2007. All were, or should have been, known to UTMB and TDCJ, including Livingston and Eason. Seven of these deaths happened in the region Eason supervises in a three-week period.

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

95.  These men were not the first to die from hyperthermia in TDCJ custody. In 2007, two men died. One died in 2004, and another in 2001. As far back as 1999, Judge William Wayne Justice expressly noted and warned TDCJ officials that prisoners were dying of heat-related illnesses in TDCJ custody. *Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

96.  Despite Judge Justice's warning, John Cardwell died of hyperthermia in TDCJ

custody in 2001. And Ricky Robertson died in custody of hyperthermia in 2004. But TDCJ and UTMB made no changes to protect other men in the future.

97.  It is likely that there were more heat-related injuries and deaths as hypertension is known to be an underreported cause of death by medical examiners and pathologists.

98.  Moreover, this is a uniquely TDCJ problem. Large county jails in Texas are almost uniformly air conditioned, and the Texas Commission on Jail Standards requires county jails keep temperatures between 65 and 85 degrees Fahrenheit. Yet despite the fact that the state requires counties to protect inmates in jails from extreme heat, TDCJ refuses to provide adequate, safe shelter from the blistering Texas summers to prisoners.  See 37 Tex. Admin. Code § 259.160.   Despite his knowledge of this policy, and his knowledge of the extremely hot conditions in TDCJ facilities in the summer of 2011, Livingston and Eason and, at least at the Hutchins State Jail, Warden Pringle, took no action to cool down these exceptionally dangerous and hot conditions. Livingston's refusal to cool inmate living areas was a moving force causing Mr. McCollum's death.  Likewise, Livingston and Eason's failure to cool these areas or move inmates with heat-sensitive disabilities to air-conditioned areas was a cause of McCollum's death.

99.  Moreover, these conditions also put TDCJ and UTMB employees at risk. In fact, before Mr. McCollum's death, an officer at the Hutchins Unit had to be hospitalized after suffering a heat stroke while working at the prison, and TDCJ and UTMB employees were regularly injured by high temperatures each summer at the Hutchins Unit. TDCJ executives, including Eason and Livingston, frequently review workers compensation complaints where employees were injured by extreme temperatures. The officers' union has repeatedly raised these concerns with Livingston and other high-level TDCJ staff, but no changes have been made to protect the health and safety of TDCJ and UTMBs own employees.

21

100. In fact, the union representing TDCJ many employees has spoken out publicly in favor of Plaintiffs' lawsuit, and in favor of cooling the housing areas where inmates work and prisoners live to protect the correctional officers and other employees from the dangerous heat.

101. Approving air conditioning or other cooling mechanisms in TDCJ prisons would require action at the highest levels of the agency, including authorization and approval from Livingston – approval he has to date refused to provide. TDCJ has a $3 billion annual budget, but it would cost less than $1 million to air condition all the housing areas at the Hutchins State Jail.

102. Perversely, TDCJ does provide climate-controlled conditions for the pigs its agricultural programs raise for slaughter – at the cost of $750,000 per pig barn.

103. Livingston, as TDCJ's chief financial officer, approved purchasing additional "climate controlled swine barns" even *after* this suit was filed and *after* he knew human beings were dying at alarming rates from heat stroke. Livingston's deputy even told the press that these climate-controlled barns were necessary to protect the lives of vulnerable pigs.

104. In fact, TDCJ policies Livingston improved for implementation require the pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort."

105. TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees. Temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit."

106. Upon information and belief, the inmate housing areas at the Hutchins Unit, including the dormitory where Mr. McCollum was incarcerated, could be "climate controlled" at

a similar – or lower – cost than the climate controlled pig barns.

107. Top UTMB officials testified that air-conditioned housing areas would be medically beneficial for prisoners with disabilities like Mr. McCollum – just like it is for the pigs.

### ii). Policies Ignore Dangers in Housing Areas

108. TDCJ's formal, written policies applicable at all facilities only address how to accommodate prisoners assigned to perform convict labor at the prisons during periods of extreme heat. For example, work outside may be curtailed when it is very hot outside. TDCJ and UTMB policies require certain additional precautions be taken to protect all prisoners (even those without medical conditions) before they can work in temperatures exceeding 85 degrees. But despite their actual knowledge of the extreme temperatures, their knowledge of the dangers of such heat, and the punitive nature of exposing prisoners to such heat, there is <u>no</u> corresponding policy to protect prisoners from extreme temperatures in housing areas. No corresponding policy addresses *indoor* temperatures, even though temperatures inside are virtually identical to outdoor temperatures.

109. UTMB policy states "it is the responsibility of [the prison] medical staff to provide guidelines to assist the facility administration in the determination of safe and healthful *work* conditions. Every reasonable effort shall be made in the interest of preventing heat-related injuries *in the workplace*." (emphasis added). The policy is completely silent on housing assignments for prisoners, like McCollum, likely to suffer heat-related injuries even though temperatures inside are virtually identical to outdoor temperatures.

110. Moreover, though UTMB and TDCJ policy and training recognize extreme temperatures can be deadly, and at least nineteen people died from hypertension in non-air conditioned housing units since 1999, TDCJ and UTMB policies have never and still do not address protecting prisoners from heat in housing areas.

111. Incredibly, TDCJ policies do ensure safe living conditions for the pigs raised for slaughter by requiring use of foggers at 80 degrees, and identifying 95 degrees as the "upper critical limit" temperature pigs should be exposed to.

*iii). Prisoners Do Not Receive Intake Physicals Right Away*

112. Prisoners also do not receive a physical examination from a doctor or physician's assistant when they arrive at a TDCJ prison, including the Hutchins State Jail. Many prisoners wait a week to ten days to receive their physical. Thus, prisoners like McCollum who are sick and particularly susceptible to danger from extreme hear, are purposefully left in danger.

113. Though Mr. McCollum's blood was drawn for labwork, his labs were never evaluated before his heat stroke. If a doctor looked at the labwork available to UTMB, they would have seen that he was already dehydrated and likely fighting the early stages of heat exhaustion when the blood was drawn.

114. The intake physical is critical to protecting prisoners from extreme temperatures, because it is the first opportunity for medical staff to identify medical conditions and disabilities that require accommodations to protect prisoners from heat. Any delay in this physical denies prisoners this accommodation, and leaves them in danger. Indeed, three of the men who died of hyperthermia in 2011 (and at least one of the men who died in 2012) had been incarcerated less than a week and had disabilities similar to Mr. McCollum.

115. The intake physical is also the first time a prisoner can have his housing assignment restricted by UTMB. Thus, until the intake physical conducted by a UTMB doctor or physician's assistant took place, UTMB effectively chose not to protect Mr. McCollum, and virtually guaranteed he would be exposed to dangerous temperatures.

*iv). TDCJ and UTMB Do Not Provide Safe Housing for Prisoners with Disabilities*

116. When UTMB finally does perform the physical, medical staff make mandatory

24

housing recommendations for prisoners. UTMB, among other things, can prohibit prisoners with certain medical conditions from working in prison jobs where they would be exposed to high temperatures. For a prisoner with asthma, for example, UTMB may prohibit TDCJ from assigning that prisoner to work in dusty environments. The form UTMB staff complete, which Babbili and other staff was familiar with, can also require prisoners be housed: 1) in "single level" facilities or on the ground floor (for prisoner using wheelchairs, for example); 2) with prisoners who have similar medical conditions; or 3) in a single cell. TDCJ and UTMB's housing decisions, however, do not contemplate special housing for people with disabilities adversely affected by extreme temperature, even though they are well aware of the risk to vulnerable prisoners and the previous deaths caused by heat strokes.

117. UTMB also recommends bunk assignments for prisoners during the intake physical. But – incredibly – obesity is not a factor that would cause UTMB to issue a lower-bunk restriction.

118. UTMB officials, including Babbili, were aware many TDCJ prisoners live with hypertension, diabetes, or are obese, but are housed in non-air-conditioned, non-climate-controlled TDCJ facilities, including the Hutchins State Jail. While these housing decisions are ultimately made by TDCJ, Warden Pringle acknowledged following recommendations made by UTMB, and confirmed that he would have moved prisoners to air conditioned facilities if told to do so by UTMB.

119. UTMB decision-makers are aware of the serious risks extreme heat poses to prisoners with heat-sensitive disabilities like Mr. McCollum, and knew about all of the deaths mentioned herein.

120. For example, UTMB policy prohibits prisoners taking certain drugs, including hydrochlorothiazide, from "work[ing] or recreat[ing] in environments where the apparent air

temperature is 95 [degrees] or higher." Though prisoners taking hydrochlorothiazide are prohibited from "recreating" in areas where the temperature exceeds 95 degrees, no one from UTMB made a recommendation to *house* Mr. McCollum safely – guaranteeing he would spend 24 hours a day in extremely hot conditions. And this was not an oversight – UTMB and TDCJ policy did not even contemplate protecting prisoners with heat-sensitive disabilities from extreme temperatures.

121.    Of the 97 state-operated TDCJ facilities, 56 have some air conditioning in inmate living areas. Yet Livingston, Eason, Owen and Pringle took no steps to house prisoners with known medical conditions complicated by heat, such as those suffering from diabetes, hypertension, obesity, or prescribed diuretics, in locations that were air conditioned.

*v*). *TDCJ Does Not Provide Air-Conditioned Respite Areas*

122. TDCJ trains its employees that during hot months they should "spend more time in air conditioned places.  Air conditioning in homes and other buildings markedly reduces danger from the heat.  If you cannot afford an air conditioner, spending some time each day during hot weather in an air-conditioned environment affords some protection." Employees are advised to "stay in an air conditioned area if possible," and are only allowed to work outside for two hours at a time.

123. Indeed, several areas where TDCJ employees work at the Hutchins State Jail, including Pringle's office, are air conditioned.

124. TDCJ even chose to air condition the armory, rather than prisoner housing areas, because of concerns the prison's weapons could be damaged by the heat.

125. In these parts of the prison, the temperatures were a comfortable, and livable, 70 to 75 degrees.

126. And, of course, TDCJ provides "climate controlled" conditions for the pigs it raises

for slaughter.

127. Significantly, Defendants chose not to provide prisoners, like Mr. McCollum, these opportunities to cool off in an air-conditioned environment at the Hutchins State Jail.  Nor did anyone at TDCJ, including Defendants, ever notify McCollum of any other prisoner when they arrived that they could spend time in air conditioned parts of the prison.

*vi*). *Prisoners Are Not Provided Adequate Cold Water*

128. Hutchins State Jail officials, including Pringle and Sanders, failed to provide or ensure adequate additional drinking water was provided to prisoners. No formal policy governed the provision of water. Officers allegedly only brought one large jug per fifty-eight prisoners to the prisoner living areas three times a day. The jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and were frequently filled with lukewarm water in July 2011, rather than ice water. According to Director Eason, the provision of ice water was to occur as much as possible and should not have been so limited – though there was no policy requiring anyone to follow Eason's suggestion. At the Hutchins State Jail, however, the provision of additional water to stay hydrated did not occur, and even today the prison does not document when water is provided to prisoners.

129. Even if adequate water were brought to Mr. McCollum's dorm, he would have had to get on and off his top bunk to get to it – a hardship not placed on able-bodied, non-obese prisoners.

130. Moreover, pursuant to TDCJ policy, which was known to Directors Livingston and Eason, as well as Warden Pringle, Mr. McCollum was not issued a cup when he entered prison, shortly before his death. Without a cup, Mr. McCollum could not drink any of the water provided in the water jugs (much less a sufficient amount of water to counteract the extreme temperatures), whether or not adequate water was provided, and whether or not the water was

cold. Livingston, Eason and Pringle knew this policy denied this basic accommodation to prisoners like Mr. McCollum, yet chose not to remedy it.

   *vii*). *Prisoners Are Not Provided Personal Fans at the Hutchins Unit*

131. TDCJ officials, including Eason, Pringle and Livingston, prohibit new prisoners at the Hutchins Unit, like Mr. McCollum, from owning personal fans to cool themselves, though personal fans are available to other prisoners convicted of more serious crimes in other TDCJ prisons and are part of TDCJ's alleged plan to combat the heat inside its non-air conditioned unites.

132. Eason and Pringle, moreover, knew the windows in the areas at Hutchins where prisoners live are sealed shut, and cannot be opened.

133. The ability to open windows and use personal fans, while it does nothing to decrease the temperature inside, at least would increase comfort in the Hutchins State Jail's housing areas in a minimal way. But prisoners at Hutchins did not even receive this accommodation.

   *vi*). *These Conditions Continue at the Hutchins Unit*

134. After Mr. McCollum's death, brutal indoor temperatures continued at the Hutchins State Jail.  Indoor air temperatures as high as 106 degrees Fahrenheit were recorded weeks later, and a prisoner was hospitalized due to heat stroke in the summer of 2012.

135. While Livingston, Eason, and Pringle were aware of the brutal heat in the Dallas area, including inside the Hutchins Unit in the weeks preceding Mr. McCollum's injuries and death, and Eason and Livingston were notified of numerous other deaths, they took no steps to remedy the situation and provided no reasonable accommodations for prisoners like Mr. McCollum whose disabilities made them more susceptible to heat stroke.

136.   Likewise, Livingston, Eason, Pringle, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees, and failed to take reasonable

28

steps to protect the health and safety of prisoners.

137. Livingston, Eason, and Pringle as well as TDCJ and UTMB also knew TDCJ routinely housed people with obesity, hypertension and diabetes in extremely hot facilities like the Hutchins State Jail. TDCJ's policies and practices, which Livingston, Eason, UTMB director Owen and Pringle knew about, make no accommodation for people with hypertension or diabetes during periods of extreme temperatures.

138. UTMB, TDCJ, Livingston, Eason, and Pringle – at a minimum – failed   to take reasonable steps to safely house Mr. McCollum and protect him from heat stroke, a risk they were well aware of at the time. Livingston, Eason, and Pringle were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

139. At the time of Mr. McCollum's death, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Eason, and Pringle are not entitled to qualified immunity.

140. Plainly, the conditions at Hutchins State Jail result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Mr. McCollum, as well as others with heat-sensitive disabilities. These conditions are not reasonably related to any penological interest.

141. TDCJ and UTMB discriminated against Mr. McCollum due to his disabilities – obesity, hypertension and/or diabetes – by denying him reasonable accommodations necessary to allow him access TDCJ and UTMB's programs and services, including safe housing. The extreme heat in TDCJ facilities denies people like Mr. McCollum access to TDCJ facilities.

CAUSES OF ACTION

I. <u>EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT</u>
(As to Defendants Livingston, Eason and Pringle Only, in Their Individual Capacities)

142. Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

143. By subjecting Mr. McCollum to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Eason and Pringle acted with deliberate indifference to Mr. McCollum's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

144. The extreme temperatures Defendants tolerated at the Hutchins State Jail proximately caused Mr. McCollum's untimely death.

145. Plaintiff brings these claims through 42 U.S.C. § 1983.

II. <u>AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT</u>
(As to Defendant TDCJ and UTMB Only)

146. TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

147. Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and to UTMB, and have the same mandate as the Rehabilitation Act.  42 U.S.C. § 12131 *et seq.* (2008).

148. The Hutchins State Jail is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes.  Mr. McCollum was otherwise

30

qualified to participate in the programs and services at the Hutchins State Jail provided by TDCJ and/or UTMB.

149. For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Mr. McCollum was a qualified individual regarded as having a physiological impairment that substantially limited one or more of his major life activities. Defendant TDCJ and UTMB knew Mr. McCollum suffered from hypertension, and was prescribed diuretic medications. He was also known to have diabetes, and to have been morbidly obese. Each of these conditions, alone or in combination, made Mr. McCollum a qualified individual with a disability. Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and refusing to protect him from the extreme temperatures that took his life and make reasonable accommodations to safely house him.

150. As alleged above and herein, TDCJ and UTMB failed to and refused to reasonably accommodate Mr. McCollum's disability while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.  That failure and refusal caused his death.

151. As alleged above, TDCJ and/or UTMB failed, and refused to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Mr. McCollum's disability.  These failures and refusals caused his death.

152. Among other things, UTMB and TDCJ failed to:

    a.  Provide safe housing;

    b.  Provide access to climate-controlled housing;

    c.  Assign Mr. McCollum to a bottom bunk;

    d.  Provide Mr. McCollum with a fan or cup;

    e.  Assign Mr. McCollum to a climate-controlled facility;

31

    f.   Provide medical treatment; and,

    g.   Provide an intake physical.

153. As Mr. McCollum died as a direct and proximate result of TDCJ and UTMB's intentional discrimination against him, Plaintiffs are entitled to all damages allowed by law.

III.    <u>EIGHTH AND FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE</u>
(As to Defendants Livingston, Eason, Pringle, Clark, Tate and Sanders Only, in Their Individual Capacities)

154. Defendants Clark, Tate and Sanders denied Mr. McCollum health care for a serious medical need when they found him unresponsive and suffering from convulsions, and delayed calling an ambulance for almost an hour. Clark, Tate and Sanders knew from observing Mr. McCollum that he needed medical attention that could not be provided at the prison, but delayed his access to care until it was too late. Their deliberate indifference to Mr. McCollum's serious medical need proximately caused his death and additional suffering.

155. Eason, Livingston, and Pringle knew about and ratified the decision to delay prisoners access to medical care. Eason and Pringle knew requiring officers to go through the chain of command and consult with an off-site nurse before calling an ambulance would seriously delay access to medical care. Their deliberate indifference to prisoners suffering from emergent medical conditions was a proximate cause of  Mr. McCollum's death.

156. Eason, Pringle, and Livingston also knew about and effectively ratified an informal TDCJ policy of failing to provide immediate medical attention to non-responsive prisoners suffering seizures at prisons where there was no available medical staff. Their deliberate indifference to prisoners suffering from emergent medical conditions contributed to Mr. McCollum's death.

157. Eason, Pringle, and Livingston failed to adequately train and supervise Clark, Tate and Sanders. Their failure and refusal to instruct officers who find unresponsive inmates

suffering convulsions to immediately seek emergency medical treatment proximately caused Mr. McCollum's death.

DAMAGES

158.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of the wrongful death of Larry Gene McCollum, Deceased, Plaintiffs assert claims under 42 U.S.C. § 1983 and the wrongful death and survivorship statutes as specifically pled herein.

159. More particularly, Plaintiffs Stephanie Kingrey, Stephen McCollum, and Sandra McCollum in their capacity as heirs at law to the Estate of Larry Gene McCollum, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;

- past mental anguish;

- loss of services and other economic damages (including loss of earning capacity);

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

160.    Plaintiffs Stephanie Kingrey, Stephen McCollum, and Sandra McCollum in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, and affection of Larry McCollum;

- loss of services, and;

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

INJUNCTIVE AND DECLARATORY RELIEF
(As to Defendant TDCJ Under the ADA and Rehabilitation Act)

161. Pursuant to the ADA, ADAAA and Rehabilitation Act, the Plaintiffs seek appropriate injunctive and declaratory relief, including, but not limited to, the measures already adopted by TDCJ following the mediation before Magistrate Judge Andrew Austin in this case.

162. The mediated settlement agreement of the injunctive claims against TDCJ included:

    a. Placing incoming, non-medically assessed prisoners whose self-assessment indicates a heat-related risk upon a temporary wellness checklist, until medically evaluated with documentation;

    b. Development of a training video on the identification of and response to, apparent heat-related illness or injuries, in cooperation with appropriate medical experts;

    c. Review of the feasibility of respite areas for newly received prisoners or previously identified prisoners on the heat list along with development of appropriate documentation;

    d. Identification of prisoners at risk of heat injury in a manner visible to all staff;

    e. Development of a formal written policy that addresses excessive heat in prisoner housing areas; and,

    f. Providing a report to the warden, regional director, Correctional Institutions Division director, Executive Director, and TDCJ board whenever a prisoner dies in custody due to hyperthermia, or where heat, high temperatures, or the heat index is a cause or contributing cause of death.

Plaintiffs also seek any injunctive relief necessary to conform TDCJ's policies, practices, and procedures to those imposed by the ADA, ADAAA, Rehabilitation Act, and United States Constitution.

ATTORNEYS' FEES AND COSTS

163. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also request attorneys' fees, costs, and expenses against TDCJ and UTMB for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. § 12205.

PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A.    Award compensatory damages against Defendants only;

B.    Award punitive damages against individual Defendants only;

C.    Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this Complaint;

D.    Find that Plaintiffs are the prevailing party in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

E.    Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: January 14, 2014.

> Respectfully submitted,
>
> The Edwards Law Firm
> The Haehnel Buidling
> 1101 East 11th Street
> Austin, Texas 78702
> Tel.    512-623-7727
> Fax.    512-623-7729
>
> By____/s/ Jeff Edwards_____
> JEFF EDWARDS
> State Bar No. 24014406
> *Lead Counsel*
> Scott Medlock
> State Bar No. 24044783

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Eliot Shavin
State Bar No. 18138200

2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
*Local Counsel*

ATTORNEYS FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.