# Exhibit 4

# UNITED STATES DISTRICT COURT
# NORHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |  |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM, <br> PLAINTIFFS <br><br> v. <br><br> BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH, and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE <br> DEFENDENTS | § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. <br> 3:12 cv 02037 |

## AFFIDAVIT OF GLENDA M. ADAMS

|  |  |
|---|---|
| STATE OF TEXAS | § |
|  | § |
| COUNTY OF WALKER | § |

BEFORE ME, the undersigned authority, personally appeared Glenda M. Adams, M.D., M.P.H., known to me personally, who after being duly sworn, deposed and stated as follows:

"My name is Glenda M. Adams. I am over the age of 18, competent to make this affidavit, and have personal knowledge of the facts herein stated. I am making this affidavit in connection with the cause of action entitled Stephen McCollum, Stephanie Kingrey, and Sandra McCollum v. Brad Livingston, Jeff Pringle, Richard Clark, Karen Tate, Sandrea Sanders, Robert Eason, the University of Texas Medical Branch, and the Texas Department of Criminal Justice, Civil Action No. 3:12 cv 02037.

I earned my Doctor of Medicine in 1976 from the University of Texas Medical Branch at Galveston (UTMB), and received my Masters of Public Health in 1993 from the University of Texas School of Public Health in Houston. I am a physician in good standing, having been licensed by the Texas State Board of Medical Examiners since 1976.

1

I am currently the Senior Medical Director of Inpatient Operations for The University of Texas Medical Branch Correctional Managed Care (UTMB CMC). I have been with UTMB CMC since June 1995. My current duties involve 1) supervising the physicians, advanced practice nurses, and physician assistants at infirmaries within TDCJ that are contracted to be staffed by UTMB employees, 2) assisting UTMB CMC Utilization Review with infirmary bed placements and patient flow, and 3) serving on multiple Correctional Managed Care (MC) joint healthcare committees. MC healthcare committees are composed of physician, nurse, pharmacy, mental health, and dental representatives from TDCJ, UTMB, and Texas Tech universities.[1] Of note is that the TDCJ Health Service Division determines the chairperson for each joint committee, including the CMC Health Services Policy and Procedure Committee. The TDCJ Division Director of Health Services has final approval of all CMC Health Service policies. The University providers (UTMB and Texas Tech) are required by contract to follow TDCJ and CMC policies and procedures.

Prior to 1995, I was employed for eight years by the Texas Department of Criminal Justice (TDCJ) as a physician at the Diagnostic Unit, now renamed the Byrd Unit. The Diagnostic/Byrd Unit is a TDCJ reception unit with 'intake' operations very similar to those at the Hutchins Unit. Hence, I have many years of experience in correctional medicine and I am personally familiar with intake processing of TDCJ offenders, the CMC Policy and Procedure Committee, and the medical housing available to TDCJ offenders in the TDCJ units that are contracted to be staffed by UTMB employees.

In preparing this affidavit, I have reviewed the following documents provided by the Office of the Attorney General of Texas:
1. Plaintiffs' *First Amended Complaint*
2. Mr. Larry Gene McCollum's medical records from McLennan County Jail, the TDCJ Hutchins Unit, and Parkland Hospital in Dallas, Texas
3. The TDCJ Office of Inspector General (OIG) Investigative Report #2011.03006
4. The February 7, 2013 deposition of physician assistant Ananda Babbili and the October 18, 2013 depositions of Richard Thaler and William L. Stephens.
5. The TDCJ Offender Orientation Handbook(2004) in effect in 2011
6. The TDCJ Statistical Report for Fiscal Year 2011 (September 1, 2010 through August 31, 2011)
7. The 2010 - 2011 UTMB / Correctional Managed Health Care Committee Contract

Plaintiffs' *Complaint* alleges UTMB deprived Mr. Larry Gene McCollum of his rights under 'Title II of the Americans with Disabilities Act (ADA), and the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131, *et. seq.,* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Rehabilitation Act).' More specifically, it is my understanding Plaintiffs allege -
1. Mr. McCollum was 58 years old, obese and had hypertension and diabetes.
2. UTMB inappropriately treated Mr. McCollum for hypertension by placing him on the diuretic hydrochlorothiazide (HCTZ) rather than continuing the drug clonidine (a non-diuretic).'

---

[1] TDCJ is represented by its own Health Services Division on CMC joint *healthcare* committees. In general, CMC joint healthcare committees, UTMB, and Texas Tech communicate with TDCJ Security and/or Classification leadership through the TDCJ Health Services Division.

3. Mr. McCollum would likely have lived had the UTMB physician assistant Babbili prescribed clonidine rather than HCTZ.
4. UTMB never evaluated or provided treatment to Mr. McCollum for diabetes.
5. UTMB, through policy made in Galveston, makes housing recommendations to TDCJ based upon prisoners' medical conditions. UTMB violated Mr. McCollum's ADA rights by not ordering a bottom bunk and air conditioned housing for Mr. McCollum.
6. In 2011 UTMB knew but failed (and continues to fail) to take action to reduce 'extremely dangerous' temperatures in the Hutchins Unit offender housing areas.
7. UTMB is negligent for not performing complete physical exams on offenders upon arrival to TDCJ from county jails to fully identify disabilities and make accommodations.
8. UTMB made the decision to not staff the Hutchins unit with medical personnel 24/7 for 'financial reasons' and this decision placed Mr. McCollum and other offenders at 'grave' risk.
9. UTMB 'discriminated against Mr. McCollum due to his disability, hypertension and/or diabetes, by denying him reasonable accommodations necessary to allow him access [to] TDCJ and UTMB's programs and services.'

## *Fact Findings from Medical Records*

The medical records indicate Mr. McCollum entered TDCJ at the Hutchins State Jail on Friday, July 15, 2011. The only medical information accompanying him from the McLennan County Jail was the standard Texas Uniform Health Status Update (TUHSU) which indicated he was 5 foot 10 inches tall, weighed 330 pounds, had no special housing or transportation needs, no pending specialty clinic appointments, no known allergies, and a negative Tuberculosis (TB) Skin Test on June 27, 2011. However, the TUHSU did indicate that Mr. McCollum had been prescribed the medication 'clonidine 0.1 mg orally as needed' for hypertension. There was no mention of Mr. McCollum having diabetes or receiving medication for diabetes.[2] [Exhibit 1, TUHSU for Mr. McCollum from McLennan County Jail]

Standard operating procedures for all new offenders arriving to TDCJ include screening for urgent or emergent medical, dental, and/or mental health conditions requiring immediate attention. Mr. McCollum's Correctional Managed Care Intake History and Health Screening form, completed and signed on July 15, 2011, indicates he reported a personal *history* of a back injury, cavities, depression, diabetes, glasses, gum disease, high blood pressure, mental illness, and rheumatism/arthritis. However, he indicated his only 'current' problems were needing a tooth pulled and depression. He specifically denied thoughts of self injury and symptoms of psychosis. The screener noted no obvious injuries, deformities, or impaired motor activity. [Exhibit 2, Correctional Managed Care Intake History and Health Screening form for Mr. McCollum]

---

2 Post mortem review of Mr. McCollum's McLennan County Jail medical records indicate 1) Mr. McCollum entered the jail June 23, 2011 and provided a medical history of *only* 'arthritis in back and knee' – he did not claim hypertension or diabetes, 2) he was prescribed clonidine for an elevated blood pressure discovered upon entry into the jail but only required the medication on June 24, 26, 27, and 28. His blood pressure readings did not require medication from June 30th through July 7th, and no blood pressures were recorded after July 7, 2011.

3

After completing his initial medical screen on the morning July 15, 2011, Mr. McCollum was seen by two licensed vocational nurses (LVN's).  The first LVN (Ms. McKinney) took Mr. McCollum's history for infectious diseases, gave him a tetanus vaccination, applied a Tuberculosis skin test, acquired his verbal consent for laboratory testing, and provided HIV pre-test counseling.  Later the same day, a second LVN (Ms. Connell) informed the physician assistant (PA Babbili) of Mr. McCollum's history of hypertension from the McLennan County Jail and prior treatment with clonidine 'prn' (as needed).  Mr. Babbili gave a verbal order to substitute low dose hydrochlorothiazide (HCTZ) 25 mg to be taken every morning in place of the 'prn' clonidine.

Mr. McCollum was seen in the medical department by LVN McKinney on Monday, July 18, 2011 to have his TB skin test read.  The test was negative.  He was interviewed that same day to complete his routine mental health screening.[3]  He was again seen in the medical department on Wednesday, July 20, 2013 to have his blood drawn for laboratory studies.  There is no indication Mr. McCollum exhibited overt functional limitations or offered any complaints of difficulty completing his activities of daily living at any of these encounters with medical personnel.  Nor is there documentation that he requested any special accommodation during these medical department visits. Similarly, there is no documentation that Mr. McCollum exhibited a physical or mental impairment that substantially limited one or more of his daily life activities.

Mr. McCollum's laboratory results were routinely reported in the EMR on the morning of Thursday, July 21, 2011.  While several results were abnormal requiring clinical correlation and follow up, none of the results were of such a significant or critical nature that the reference laboratory, LabCorp, notified the Hutchins medical department of a need for immediate review or intervention.  Non-critical intake laboratory results are routinely reviewed by a physician or midlevel provider during the intake physical exam or sooner if a patient requests or requires a medical appointment prior to the scheduled physical exam.  In this case, Mr. McCollum would have had his intake physical exam within seven business days of arrival at Hutchins pursuant Correctional Managed Care policy, and his lab results would have been reviewed by a physician or midlevel provider at that time, unless Mr. McCollum requested an appointment sooner.

Here, prior to his intake physical exam, in the early morning of July 22, Mr. McCollum was found by TDCJ security staff unconscious in his bed having a seizure.  After an unclear amount of time TDCJ staff contacted UTMB Nursing Triage via telephone at approximately 03:16 AM.  UTMB nursing advised that Mr. McCollum should be transferred 911 to Parkland Hospital in Dallas.

Upon arrival at Parkland Hospital Mr. McCollum was comatose with a temperature greater than 109 degrees.  He suffered rhabdomyolysis (muscle cell breakdown) with multi-organ failure and anoxic brain injury from his high body temperature and prolonged seizures.  His differential diagnoses were hyperthermia due to environmental exposure v. neuroleptic malignant syndrome v serotonin

---

3  Mr. McCollum was scheduled for further mental health evaluation based upon his history and complaint of depression. This evaluation never occurred due to Mr. McCollum's transfer to Parkland Hospital on July 22, 2011 and eventual death on July 28, 2011.

4

syndrome v hypothalamic stroke v meningitis v sepsis. At one point it was suggested that he might have a genetic predisposition for environmental heat stroke.[4]

Mr. McCollum's body temperature was returned to normal with treatment but his neurological condition continued to deteriorate and he developed extensive brain damage. On July 28, 2011 after consultation with the treating physician, the family decided to withdraw artificial life support and Mr. McCollum was pronounced deceased at 11:35 PM.

At autopsy, the pathologist concluded 'Based on the autopsy and the history available to me, it is my opinion that Larry Gene McCollum, a 58 year-old white male, died as the result of hyperthermia. The decedent was in a hot environment without air conditioning, and he may have been further predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorothiazide) for hypertension.' The manner of death was 'accident.' Of note is that the Autopsy Report states Mr. McCollum had a history of hypertension with cardiac hypertrophy as an associated finding. However, the Autopsy Report makes _no_ mention of diabetes and Mr. McCollum had _no_ significant coronary atherosclerosis (thickening of the arteries with plaque formation) typically found in long standing hypertensive and diabetic individuals. [Exhibit 3, Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner Autopsy Report on Larry Gene McCollum]

## _Discussion of Plaintiffs' Allegations_

Mr. Larry Gene McCollum's various medical records confirm he was a 58 year old, obese white male. The Texas Uniform Health Status Update sent by the McLennan County Jail reported Mr. McCollum had a diagnosis of hypertension.[5] However, 'prn clonidine' is not appropriate first line or even second line treatment for hypertension. According to the National Institutes of Health (NIH) _Seventh Report of the Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure_ (JNC 7), the initial drug for the treatment of hypertension should be a thiazide diuretic - e.g. hydrochlorothiazide (HCTZ). In accordance with JNC 7, the CMC Disease Management Guideline (DMG) for Hypertension recommends HCTZ as initial treatment for hypertension.[6] Physician Assistant Babbili followed the CMC DMG and the national standard of care for the treatment of hypertension when he prescribed HCTZ instead of clonidine for Mr. McCollum.[7]

---

4 Parkland Hospital Medical Records, page 12.
5 Recorded blood pressures at McLennan County Jail (not available to UTMB during Mr. McCollum's time at the Hutchins Unit) indicate probable Stage 1 hypertension.
6 The Correctional Managed Care Pharmacy and Therapeutics Committee is a joint CMC committee comprised of physician, nurse, and pharmacy representatives from TDCJ, UTMB, and Texas Tech. This committee develops Disease Management Guidelines (DMG's) for CMC providers to follow based upon National Guidelines and evidence based medicine in the literature.
7 Due to a high potential for abuse and the risk of serious hypotension and/or rebound hypertension resulting in stroke, clonidine is not used in TDCJ except in closely monitored, urgent situations where a very elevated blood pressure must be reduced within an hour or two

According to Mr. McCollum's TDCJ medical record and medication compliance records, he never took the prescribed HCTZ in July 2011. But even assuming he did, the mild dehydration caused by HCTZ could have been corrected with adequate oral hydration. Reports from offenders in Mr. McCollum's housing area indicate he was not drinking adequate amounts of fluids prior to his death.[8] Many antihypertensive medications, including clonidine, have the potential to increase an individual's risk for a heat related illness.[9] Thus, Plaintiffs' assertion that 'Mr. McCollum would likely have lived had the UTMB physician assistant Babbili prescribed clonidine rather than HCTZ' is highly speculative, without basis in fact, and without merit.

Mr. McCollum was obese and certainly at increased risk for developing diabetes. On July 15, 2011 he noted a *history* of diabetes on his TDCJ Intake History and Health Screening form[10]; however, he did not claim diabetes as a *current* medical problem. McLennan County Jail did not identify him as a diabetic. He was on no medication for diabetes and he never requested or complained of a need for diabetes medication during his time at the Hutchins Unit.

Contrary to Plaintiffs' allegation, UTMB did, in fact, evaluate Mr. McCollum for diabetes with laboratory studies drawn on July 20, 2011. Mr. McCollum did not meet criteria for a diagnosis of diabetes. 'In 2009, an International Expert Committee that included representatives of the ADA (American Diabetes Association), the International Diabetes Federation (IDF), and the European Association for the Study of Diabetes (EASD) recommended the use of the A1C to diagnose diabetes, with a threshold of 6.5% or greater, and ADA adopted this criterion in 2010.'[11] Mr. McCollum's A1C was 6.2% (An A1C of 5.7% to 6.4% indicates increased risk for future diabetes). Further, as previously noted, Mr. McCollum's autopsy does not identify him as diabetic.

During the TDCJ 'intake' screening process offenders are instructed verbally and in writing how to access healthcare.[12] [Exhibit 4, *TDCJ Administrative Directive AD-06.07*] They are also provided a copy of the *Offender Orientation Handbook.* [Exhibit 5] A description of the general 'Receiving and Screening' process (pages 1-4) along with instructions on how to access healthcare services (pages 33–36) are included in the *Handbook.* Page 34 of the *Handbook* states 'All offenders may access the medical department by submitting a sick call request slip or by direct request to a security officer or supervisor.' Mr. McCollum would also have been aware of how to access healthcare services due to his previous incarceration from 2002 to 2004.

Offenders arriving to TDCJ are 'housed according to security needs.' [*Offender Orientation Handbook*, page 1] No housing restrictions were ordered for Mr. McCollum during his initial intake screening because he had no restrictions at McLennan County Jail and it was not apparent to

---

8  TDCJ Office of Inspector General (OIG) Investigative Report #2011.03006, page 167, 176, etc.
9  Animal studies suggest clonidine may impede thirst regulation and decrease fluid intake.
10  Mr. McCollum did not report having hypertension or diabetes upon entry to the McLennan County Jail.
11  Position Statement of the American Diabetes Association, *Standards of Medical Care in Diabetes – 2011*, Diabetes Care: January 2011, vol. 34, page S12.
12  TDCJ Administrative Directive AD – 06.07 states "The Texas Department of Criminal Justice (TDCJ) shall provided all incarcerated offenders with full access to health services. These procedures must be communicated orally and in writing to offenders upon arrival to the unit."

screeners any were required.

UTMB does not monitor bunk assignments or general population living areas and was unaware Mr. McCollum was assigned a top bunk by TDCJ or that he was having any difficulty with his housing assignment. The TDCJ *Offender Orientation Handbook* states on page 2, 'Offenders are hereby advised of their responsibility to report a disability.' Also, 'It is the responsibility of the security staff to facilitate access to health services.' [Exhibit 4, *TDCJ Administrative Directive AD-06.07*] If Mr. McCollum complained of problems climbing in and out of his bunk to TDCJ security staff[13], neither he nor security notified UTMB. Mr. McCollum never submitted a sick call request while at the Hutchins Unit or otherwise requested assistance or accommodation from medical staff. Had UTMB been made aware, Mr. McCollum could have been provided a medical 'pass' for a lower bunk pending his intake physical exam and completion of his Health Summary for Classification (HSM-18).[14]

While it is true that there are policies allowing, even requiring, UTMB to identify housing restrictions for offenders – these are not UTMB policies 'made in Galveston' but rather Correctional Managed Health Care policies made by the joint TDCJ, UTMB, and Texas Tech Policy and Procedure Committee.[15] As previously noted, TDCJ through its Health Services Division has final approval of all CMC Health Care policies. Importantly, the policy dealing with housing restrictions does *not* have 'air conditioning' or 'climate controlled housing' as a choice for UTMB to recommend. [Exhibit 6, *CMC Policy A-08.4 Offender Medical and Mental Health Classification*, Attachment A] Further, per TDCJ Health Services Liaison (HSL)[16], 'HSL cannot request reassignment of an offender to an air conditioned or climate-controlled facility. Providers requesting reassignment of offenders to this type of environment should be referred to their Utilization Review/Management Department for inpatient placement.' [Exhibit 7, TDCJ Health Services Liaison Facility Types List, page 2] Hence, if determined that air conditioned housing is medically necessary for an offender, UTMB must find the offender an 'inpatient' bed.

There are approximately 1700 air conditioned 'inpatient' beds that UTMB Inpatient Operations and Utilization Review manage for TDCJ (1100 inpatient mental health beds, 60 wheelchair dorm beds, 80 acute care hospital beds, and 471 infirmary beds). Due to being a limited resource, in general, 'inpatient' beds are reserved for offender patients requiring close medical or mental health

---

13 According to the TDCJ Office of Inspector General (OIG) Investigative Report #2011.03006, several offenders reported Mr. McCollum complained to security officers about difficulty getting in and out of his upper bunk.

14 The Health Summary for Classification (HSM-18) is a standard computer form completed during the intake physical exam and updated thereafter as needed which is used to provide medical and mental health information on each offender to TDCJ Classification to assist TDCJ in assigning the offender appropriate housing, work, transportation, disciplinary, and program restrictions.

15 The joint Correctional Managed Care Health Care Policy and Procedure Committee is composed of physician, nurse, dentist, mental health, and healthcare administration representatives from TDCJ, UTMB, and Texas Tech. TDCJ Classification and Security do not participate on this committee but are represented by the TDCJ Health Services Division.

16 Health Services Liaison (HSL) is a department within the TDCJ Health Services Division responsible for coordinating the "transfer of offenders who require intake and/or reassignment for medical purposes." From TDCJ Online, Health Services Division, Office of Health Services Liaison.

monitoring or who cannot complete their activities of daily living without assistance from medical staff. At the time of his entry into TDCJ, Mr. McCollum did not require an 'inpatient' bed.

In 2011 UTMB was under contract to the Correctional Managed Health Care Committee (CMHCC) to provide medical, dental and psychiatric care to offenders in the custody of TDCJ.[17] As part of the healthcare services provided, UTMB offered and continues to offer multiple special programs for offenders with disabilities. These include programs such as the Developmental Disabilities Program, Chronically Mentally Ill Program, Program for the Aggressive Mentally Ill Offender, Physically Handicapped Offender Program, Assistive Disability Services, American Sign Language Interpreter Services, Chronic Care Services, Terminally Ill Services, and Elder Care. However, unless the offender requires a 'regional medical facility, infirmary, or hospital' bed, the TDCJ State Classification Committee determines an offender's unit placement. Article VI of UTMB's contract with CMHCC/TDCJ states[18] -

## Article VI
## OFFENDER POPULATION

**The Texas Department of Criminal Justice shall have responsibility for placement of offenders. This will be accomplished in conformity with the governing statute, Chapter 494, the Texas Government Code, and existing classification criteria. The Texas Department of Criminal Justice State Classification Committee shall have sole responsibility for the placement of offenders in the units, provided however, that the decision to admit or discharge an offender patient to/from a regional medical facility, infirmary or hospital is the sole responsibility of the treating physician. TDCJ shall make a good faith effort to initiate the review, classification and transfer of offender patients from infirmary beds upon notification that the offender patient is able to return to the population. Concerns about delays in transfer of discharged patients from an infirmary shall be communicated to the TDCJ Division Director for Health Services.**

Hence, except under _very_ limited circumstances, UTMB does not determine an offender's unit of assignment. Further, while assigned to a particular unit, TDCJ Security and the Unit Classification Committee determine an offender's housing assignment with input from healthcare staff as appropriate when a disability or condition that interferes with activities of daily living is identified. Again, neither TDCJ nor Mr. McCollum made known to UTMB that Mr. McCollum needed or desired any accommodation, or that he had a physical or mental impairment that substantially limited one or more of his daily life activities.

Offenders are in the _custody_ of TDCJ. Conditions of confinement such as housing, food, potable water, clothing, and other necessities of daily living are the responsibility of TDCJ. Maintenance of

---

17 Starting in 2012-2013 biennium, UTMB began contracting directly with TDCJ rather than the Correctional Managed Health Care Committee.

18 2010 – 2011 UTMB / Correctional Managed Health Care Committee Contract, page 32. See Exhibit 8.

physical structures, utilities, etc. is also the responsibility of TDCJ.[19] Monitoring and control of temperatures in the TDCJ offender housing areas are solely under the purview of TDCJ security administration. Plaintiffs' allegation that UTMB knew but failed (and continues to fail) to take action to reduce 'extremely dangerous' temperatures in the Hutchins Unit offender housing areas is untrue and unfair. UTMB provides medical care. UTMB does not monitor and is not made aware of the temperatures in the TDCJ offender housing areas. But even if TDCJ shared this information with UTMB, as an independent contractor UTMB has no control over the heating and cooling of TDCJ facilities except at the prison hospital in Galveston, Texas.

Plaintiffs' allegation that UTMB is negligent for not performing a physical exam immediately upon an offender's arrival to TDC is not valid. While offenders entering county jails often come 'off the street' and may be unable to adequately communicate their medical problems due to recent trauma, drug and/or alcohol intoxication, unidentified and untreated medical conditions, etc. - by the time these offenders arrive to TDCJ they have had medical evaluations and treatment. County jails are required to provide a Uniform Health Status Update on each offender transferred to TDCJ. This Health Status Update plus the TDCJ Intake Screening process identifies offenders with immediate healthcare needs and allows for prompt evaluation by appropriate healthcare staff. Offenders who require special housing due to a disability are identified and when necessary transferred either through TDCJ Health Services Liaison or UTMB Utilization Review.[20] If the Intake Screening misses a need for accommodation, offenders are made aware upon arrival to TDCJ both verbally and in writing on how to make their needs known. The short delay prior to the intake physical exam is necessary to populate an offender's electronic medical record (EMR) which can occur only after Security confirms the offender's identity and assigns a TDCJ number. This delay of 2 to 7 days[21] is shorter than the average wait for a healthcare appointment in the community. Contrary to Plaintiffs' assertions 1) a physical exam immediately upon arrival to TDCJ is not medically necessary and would offer little, if any, increased protection against a heat related illness, 2) the lack of an immediate physical exam does not deny prisoners any accommodation, and 3) UTMB has not 'purposely left (Mr. McCollum or any offender) in danger.'

Similarly, Plaintiffs' claim that – 'UTMB made the decision to not staff the Hutchins unit with medical personnel 24/7 for financial reasons and this decision placed Mr. McCollum and continues to place other offenders at grave risk' is contrary to fact. Hutchins has never been a unit with 24/7 medical staffing. Hutchins was a 16 hour medical facility when it opened in April 1995 and remained a 16 hour unit until September 2011 when medical hours were reduced to 12 hours per day. Medical hours of operation on any particular TDCJ unit are determined primarily by the acuity or medical needs of the offenders housed on that unit. If an offender requires close medical monitoring he is immediately transferred to a facility with 24 hour on site nursing services. Mr. McCollum did

---

19 2010 - 2011 UTMB / Correctional Managed Health Care Committee Contract, page 11, Section G, Item #1, "maintenance of TDCJ facilities." See Exhibit 9.
20 Offenders do not receive work assignments until after their intake physical exams so the need for work restrictions upon arrival to TDCJ is not an issue.
21 Correctional Managed Health Care Policy E-34.1 states 'A comprehensive medical evaluation will be completed on all new incoming offenders within seven days of their arrival in the system.'

9

not have a medical condition requiring 24 hour nursing availability. Further, the decision to reduce clinic hours at Hutchins had no impact on Mr. McCollum as his demise was prior to implementation of the reduced clinic hours. Of note is that most correctional institutions including Texas jails, TDCJ units, and even Federal Bureau of Prisons facilities do *not* have providers (physicians, physician assistants, advanced practice nurses) on site after the usual 8 hour work day. While providers are 'on call' and available for consultation electronically, true emergencies such as heat stroke must be transferred 911 to the nearest hospital emergency room – the same as in community, non-correctional settings (e.g. nursing homes).

In conclusion, except for the 1700 'inpatient' beds that UTMB manages for TDCJ, UTMB has no ability to provide air conditioned housing for offenders incarcerated in Texas prisons. In 2011, TDCJ received almost 74, 000 new intakes and had an average population of about 156,000.[22] At least half of these offenders had health conditions or took medications that *potentially* placed them at increased risk for a heat related illness.[23] Currently there are 7,600 offenders on diabetes medications and 39,484 offenders on antihypertensive meds in TDCJ.[24] The numbers alone make it very clear UTMB cannot place everyone with risk factors for a heat related illness in air conditioned housing. UTMB does place those at highest risk (e.g. T6 and above spinal cord lesions, 70 percent and above total body burn scars, congenital inability to sweat, etc.) in permanent 'inpatient' climate controlled housing. UTMB also places offenders who experience symptoms of heat stroke and/or significant heat related worsening of their disease symptoms (e.g. severe asthmatics, some multiple sclerosis and sickle cell disease patients, etc.) in 'inpatient' housing during the summer months. However, Mr. McCollum never complained to medical staff of feeling ill. He never complained to medical about his bunk assignment or reported any problems with completing his activities of daily living. He never sought medical assistance or requested accommodation. UTMB never discriminated against Mr. McCollum or denied him access to any TDCJ or UTMB program or service.

The above opinions are based upon my review of the materials provided, my knowledge of UTMB, CMC, and TDCJ policies and procedures, and reasonable medical probability. I reserve the right to amend this affidavit should additional information become available.

Further affiant sayeth not."

Glenda Adams, M.D., M.P.H.

Given under my hand and seal of office this __9th__ of January, 2014, A.D.

PHOEBE M. LANGLEY
Notary Public, State of Texas
My Commission Expires
December 30, 2015

Notary Public in and for the State of Texas

---

22 TDCJ Statistical Report for Fiscal Year 2011, page 1 indicates total population of Prison, State Jail, and SAFP offenders on August 31, 2011 was 156,522. Page 2 shows total TDCJ new receives for 2011was 73,988.
23 Estimate computed from data provided by UTMB CMC Quality & Outcomes Analyst Earl King. See Exhibit 10.
24 Data provided by CMC Pharmacy Director, Dr. Stephanie Zepeda.

Case 3:12-cv-02037-3 Document 114-1 Filed 01/15/14 Page 11 of 11 PageID 1809

**AFFIDAVIT OF GLENDA M. ADAMS**
**List of Exhibits**

Exhibit 1 – Texas Uniform Health Summary Update from McLennan County Jail for Larry Gene McCollum

Exhibit 2 - Correctional Managed Care Intake History and Health Screening form for Larry Gene McCollum

Exhibit 3 - Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner Autopsy Report on Larry Gene McCollum

Exhibit 4 - Texas Department of Criminal Justice Administrative Directive (AD) – 06.07, Access to Health Services

Exhibit 5 - Texas Department of Criminal Justice Offender Orientation Handbook

Exhibit 6 - Correctional Managed Health Care Policy A-08.4, Attachment A – Guidelines for Completing the Health Summary for Classification Form

Exhibit 7 - TDCJ Health Services Liaison Facility Types List

Exhibit 8 - Page 32, Agreement between Correctional Managed Health Care Committee and the University of Texas Medical Branch for Correctional Health Services, FY 2010 – 2011 Biennium

Exhibit 9 - Page 11, Agreement between Correctional Managed Health Care Committee and the University of Texas Medical Branch for Correctional Health Services, FY 2010 – 2011 Biennium

Exhibit 10 - Data from the UTMB CMC Office of Quality and Outcomes Management - Earl King