IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, § | | |
|     Plaintiffs, § | | |
| § | | |
| v. § | | CIVIL NO. 3:12-CV-02037-L-BK |
| § | | |
| BRAD LIVINGSTON, *et al.*, § | | |
|     Defendants. § | | |

## ORDER

Pursuant to the District Court's *Order of Reference* (Doc. 104), this case is before the Court on Plaintiffs' *Motion to Compel Deposition of Brad Livingston*, the executive director of the Texas Department of Criminal Justice ("TDCJ"). (Doc. 103). For the reasons set forth below, the motion is **GRANTED IN PART**.

A.  Background

Plaintiffs, the surviving wife and children of Larry Gene McCollum, have filed a lawsuit against various TDCJ officials and the University of Texas Medical Branch ("UTMB"), stemming from the death of McCollum in July 2011 while he was housed in the Hutchins State Jail in Dallas, Texas. (Doc. 119 at 1-2). Plaintiffs claim that TDCJ officials violated McCollum's Eighth and/or Fourteenth Amendment right to be free from cruel and unusual punishment and that both TDCJ and UTMB, which makes housing recommendations to TDCJ based on prisoners' medical conditions, violated the Americans with Disabilities Act and the Rehabilitation Act of 1973. *Id.* at 2.

Plaintiffs allege in the operative complaint that McCollum was obese at the time of his arrival at the jail, and he reported to TDCJ and UTMB officials that he suffered from both hypertension and diabetes. *Id.* at 7-8. He was prescribed hydrochlorothiazide, a diuretic, shortly

after his arrival. *Id.* at 8. Diuretics remove water from the blood to decrease blood pressure, thereby increasing the risk of heat stroke due to the resulting dehydration and electrolyte imbalance. *Id.* Plaintiffs note that McCollum was assigned to an un-airconditioned dormitory in the jail. *Id.* at 10. The temperature exceeded 100 degrees Fahrenheit in Dallas for the 25 days immediately preceding McCollum's death, and the heat index exceeded 120 degrees inside the dorm where he lived. *Id.* at 4, 10, 12. Approximately one week after his arrival at the jail, McCollum began having convulsions at around 2:00 a.m. *Id.* at 14. Plaintiffs aver that another prisoner notified a guard, and after a delay of approximately an hour an ambulance was called to take McCollum to the hospital. *Id.* at 14-16. When he arrived, McCollum's internal body temperature was 109.4 degrees Fahrenheit, and he slipped into a coma. *Id.* at 16-17. Six days later, he died of hyperthermia. *Id.* at 17. Plaintiffs contend that an autopsy concluded that McCollum was "predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorothiazide) for hypertension." *Id.*

     Plaintiffs allege that Defendant Livingston was aware of the heat wave in Dallas during the summer of 2011 and knew that inmates were at risk of heat-related death and illness, particularly those prisoners with heat-sensitive disabilities like McCollum. *Id.* at 5. Moreover, they claim that Livingston knew the temperature inside the dorm where McCollum lived was well over 100 degrees, and that the heat index made it feel like the temperature exceeded 120 degrees. *Id.* Plaintiffs contend that Defendants know that such intense heat is harmful, and exposure to it constitutes cruel and unusual punishment serving no legitimate penal purpose. *Id.* at 13. They further assert that despite Livingston's knowledge of such conditions and numerous heat-related deaths in prison facilities, he took no action to cool down the facilities or ensure that

inmates with heat-sensitive disabilities were housed in or moved to air-conditioned areas, which was a moving force causing McCollum's death. *Id.* at 21, 26, 29.

One year ago, Plaintiffs sought to depose Livingston. Defendants moved for a protective order and to quash the subpoena. (Docs. 20, 21). Following a hearing, the undersigned granted those motions, finding that Plaintiffs should first use less burdensome and intrusive means to obtain the information they sought. (Docs. 28, 29). The Court advised Plaintiffs that if they did not obtain all of the relevant information sought after conducting Rule 30(b)(6) depositions and exercising other methods of discovery, they could seek leave of court to depose Livingston. After having pursued discovery through various other methods over the past several months, Plaintiffs now seek such leave. (Doc. 103).

**B.     Applicable Law**

Federal Rule of Civil Procedure 26(b)(1) provides that, unless the court orders otherwise, the parties may obtain discovery regarding any relevant, nonprivileged matter. Nevertheless, "[q]ualified immunity protects government officials serving in a discretionary capacity from liability for actions undertaken in their official capacities." *Lion Boulos v. Wilson*, 834 F.2d 504, 507 (5th Cir. 1987). A defendant entitled to claim qualified immunity also is shielded from "the burdens of broad-reaching discovery." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Discovery is permissible, however, if (1) the defendant's immunity claim turns at least partially on a factual question; (2) the district court is unable to rule on the immunity defense without further clarification of the facts; and (3) the discovery is narrowly tailored to uncover only those facts needed to rule on the immunity claim. *Boulos*, 834 F.2d at 507-08.

Moreover, exceptional circumstances must exist before the involuntary depositions of

high agency officials such as Livingston are permitted. *In re Office of Inspector Gen., R.R. Retirement Bd.*, 933 F.2d 276, 278 (5th Cir. 1991) (stating that "top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions."). Furthermore, assuming the information in question is discoverable, if other persons can provide the information sought, then discovery is not permitted against the high level official. *SEC v. Cuban*, Case No. 3:08-CV-2050-D, 2009 WL 4544178, *4 (N.D. Tex. 2009) (Fitzwater, C.J.); *see also In re FDIC*, 58 F.3d 1055, 1062 (5th Cir. 1995) ("We think it will be the rarest of cases . . . in which exceptional circumstances can be shown where the testimony is available from an alternate witness.").

C.  **Arguments and Analysis**

Plaintiffs contend in their *Motion to Compel* that after this Court granted Livingston a protective order, they served additional discovery on him and deposed other high-ranking policymakers at TDCJ, but were unable to get answers to critical questions. Livingston's chief lieutenants in the correctional division of TDCJ – Rick Thaler and William Stephens – testified several times that only Livingston could answer the questions Plaintiffs asked. (Doc. 103 at 4). For example, Thaler did not know if Livingston was knowledgeable about the dangers of extreme heat to Texas inmates prior to the hyperthermia deaths in 2011. (Doc. 103-3 at 5). Thaler also did not know who decided to end 24-hour medical care at the jail where McCollum was housed, which Plaintiffs allege is critical due to the delay in jail staff obtaining medical care for him. (Doc. 103 at 5-6 & n.5; Doc. 105-3 at 31). Stephens testified that any decision to cool the prisons would have to be addressed with Livingston, who would have to coordinate the effort among multiple TDCJ departments. (Doc. 103-10 at 6).

Plaintiffs argue that Thaler's and Stephens's testimony demonstrates that Livingston has relevant knowledge and, as such, they should be allowed to depose him. (Doc. 103 at 7). They point out that while Livingston denied in his interrogatory responses having personal knowledge of "any specific [prisoner's] heat related injuries," Thaler testified that he told Livingston about the "incidents" where men died in 2011. Plaintiffs assert that they are entitled to learn when Livingston became aware that prisoners were dying due to heat-related injuries and what, if anything, he did when informed about it. (Doc. 103 at 7). Further, in interrogatories, Livingston identified Thaler as one of the authors of a letter to state Representative Sylvester Turner about the steps TDCJ takes to protect prisoners from extreme heat during the summer, but Thaler denied ever seeing the letter. (Doc. 103-1 at 175; Doc. 103-3 at 7; Doc. 103-8 at 4-5). Plaintiffs assert that the letter is an essential piece of evidence bearing Livingston's signature, and they are entitled to question him about it. (Doc. 103 at 7).

Defendants respond that no further discovery from Livingston should be permitted until the Court rules on his pending motion to dismiss based on qualified immunity. (Doc. 105 at 11-12, 22). They contend that all Plaintiffs' areas of inquiry could have been explored in interrogatories to Livingston and, in any event, the proposed subject matter is irrelevant to the question of immunity. *Id.* at 18, 20. Defendants also insist that the information sought already has been provided by other deponents and in their responses to written discovery. *Id.* at 26.

Upon consideration of the law and the parties' arguments, the Court grants Plaintiffs' motion in part. As held by the *Boulos* Court, discovery under the circumstances presented is permissible only if Livingston's immunity claim turned at least partially on a factual question, and the district court could not rule on the immunity defense without further clarification of the

5

facts. *Boulous*, 834 F.2d at 507-08. A review of Livingston's pending motion to dismiss, however, reveals that his arguments are confined to the four corners of Plaintiffs' complaint, its alleged insufficiency to state a claim as a matter of law, and Livingston's entitlement to qualified immunity. (Doc. 121). The undersigned thus does not anticipate that the district court will need further clarification of the facts from Livingston before ruling on his dismissal motion.

Nevertheless, the Court concludes that Livingston has relevant information that cannot be obtained from any alternate witness. As Plaintiffs point out, while Livingston denied being aware of any *specific* prisoner's death, Thaler testified that he discussed the subject matter of the deaths with him and the steps being taken to address the issue. This is clearly relevant information. As such, Plaintiffs are entitled to learn when Livingston learned about the deaths and what, if any, steps he took thereafter. Other examples of permissible areas of inquiry include the circumstances surrounding the drafting of the letter to Rep. Turner, Livingston's knowledge of the dangers of extreme heat in the prison system, and whether Livingston was involved in the decision to end 24-hour medical care at the jail. In short, on the facts of this case, Plaintiffs have demonstrated the necessary exceptional circumstances to go forward with Livingston's deposition after the District Court rules on Livingston's pending motion to dismiss. *In re Office of Inspector General*, 933 F.2d at 278. Moreover, the Court finds that alternate forms of discovery will not suffice. Plaintiffs have already utilized such other methods, but some of Livingston's answers could be viewed as evasive.[1] Only cross-examination will enable Plaintiffs

---

[1] For example, in response to Plaintiffs' Interrogatory 2, which requested that Livingston identify "all heat-related injuries to inmates in TDCJ facilities at any TDCJ unit you were aware of," Livingston responded, "I cannot recall any specific offenders [sic] illness." (Doc. 105-1 at 6).

6

to obtain full and complete answers to their questions.

**D.     Conclusion**

For the reasons set forth above, Plaintiffs' *Motion to Compel Deposition of Brad Livingston* (Doc. 103) is **GRANTED IN PART**.  Brad Livingston is **ORDERED** to appear for deposition within 30 days after District Judge Lindsay rules on Livingston's Motion to Dismiss (Doc. 85).

**SO ORDERED** on February 18, 2014.

_____
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE