UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:12-cv-02037 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § | |
| DEFENDANTS | § | |

**BRIEF IN SUPPORT OF PLAINTIFFS'
RESPONSE TO DEFENDANT LIVINGSTON'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT ON THE BASIS OF QUALIFIED IMMUNITY**

## TABLE OF CONTENTS

I. FACTS............................................................................................................7

   A.  MᴄCᴏʟʟᴜᴍ'ꜱ Tʀᴀɢɪᴄ Dᴇᴀᴛʜ............................................................ 7

   B.  Lɪᴠɪɴɢꜱᴛᴏɴ'ꜱ Pᴏʟɪᴄɪᴇꜱ ᴀɴᴅ Dᴇʟɪʙᴇʀᴀᴛᴇ Iɴᴀᴄᴛɪᴏɴ
      Cᴀᴜꜱᴇᴅ MᴄCᴏʟʟᴜᴍ'ꜱ Dᴇᴀᴛʜ................................................. 8

II. STANDARD OF REVIEW – RULE 12(B)(6) MOTIONS

    ARE DISFAVORED AND RARELY GRANTED................................ 10

III.  ARGUMENT ................................................................................ 11

   A.  Lɪᴠɪɴɢꜱᴛᴏɴ Aᴘᴘʀᴏᴠᴇᴅ ᴀɴᴅ Iᴍᴘʟᴇᴍᴇɴᴛᴇᴅ Pᴏʟɪᴄɪᴇꜱ ᴛʜᴀᴛ Vɪᴏʟᴀᴛᴇ
      ᴛʜᴇ Eɪɢʜᴛʜ Aᴍᴇɴᴅᴍᴇɴᴛ ................................................... 11

   B.  Lɪᴠɪɴɢꜱᴛᴏɴ ɪꜱ ɴᴏᴛ Eɴᴛɪᴛʟᴇᴅ ᴛᴏ Qᴜᴀʟɪꜰɪᴇᴅ Iᴍᴍᴜɴɪᴛʏ Bᴇᴄᴀᴜꜱᴇ ᴛʜᴇ
      Lᴀᴡ ɪꜱ Cʟᴇᴀʀʟʏ Eꜱᴛᴀʙʟɪꜱʜᴇᴅ: Exᴛʀᴇᴍᴇ Tᴇᴍᴘᴇʀᴀᴛᴜʀᴇꜱ Vɪᴏʟᴀᴛᴇ ᴛʜᴇ
      Eɪɢʜᴛʜ Aᴍᴇɴᴅᴍᴇɴᴛ ......................................................... 17

      1)  *The Right to Protection from Extreme Temperatures*
         *is Clearly Established*........................................... 17

      2)  *Livingston's Actions Were Not Objectively Reasonable*................... 18

   C.  Lɪᴠɪɴɢꜱᴛᴏɴ, Iɴᴅɪᴠɪᴅᴜᴀʟʟʏ, Cᴀɴɴᴏᴛ Sᴇᴇᴋ Dɪꜱᴍɪꜱꜱᴀʟ ᴏꜰ Pʟᴀɪɴᴛɪꜰꜰꜱ'
      Cʟᴀɪᴍꜱ ꜰᴏʀ Iɴᴊᴜɴᴄᴛɪᴠᴇ Rᴇʟɪᴇꜰ......................................... 22

    CONCLUSION ............................................................................ 23

## TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*Bell v. LeBlanc*,
No. 3:13-cv-00368-BAJ, Doc. 87 (M.D. La. Dec. 13, 2013) ………...  5, 11, 17

*Blackmon v. Garza*,
484 Fed.Appx. 866 (5th Cir. 2012) (unpublished) ………..………  6, 11, 17

*Blackmon v. Kukua*,
738 F.Supp.2d 398 (S.D. Tex. 2010) …………………………….  12, 17

*Parker v. Am. Airlines, Inc.*,
516 F. Supp. 2d 632 (N.D. Tex. 2007) …………………………..  10

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*,
677 F.2d 1045 (5th Cir. 1982) …………………………………  10

*Lindquist v. City of Pasadena*,
525 F.3d 383 (5th Cir. 2008) …………………………………  10

*Patrick v. Wal-Mart, Inc.-Store No. 155*,
681 F.3d 614 (5th Cir. 2012) …………………...…………...  10

*Thomas v. City of Galveston*,
800 F.Supp.2d 826 (S.D. Tex. 2011) …………………..…………...  11

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) …………………………………  11

*Ruiz v. Johnson*,
37 F.Supp.2d 855 (S.D. Tex. 1999) …………………………….  12

*Bishop v. Arcuri*,
674 F.3d 456 (5th Cir. 2012) …………………………………  11, 17, 18

*Farmer v. Brennan*,
511 U.S. 825 (1994) ………………….……………………….  13, 14

*Thompkins v. Belt*,
828 F.2d 298 (5th Cir. 1987) …………………………………  14

*Iqbal v. Ashcroft*,
556 U.S. 662 (2009) …………………………………………..  10, 11, 15

*Easter v. Powell,*
467 F.3d 459 (5th Cir. 2006) …………………………………….. 16

*Lindsey v. McGinnis,*
23 F.3d 407 (6th Cir. 1994) …………………………………….... 16

*Obata v. Harrington,*
2013 WL 1442481 (D. Hawai'i 2013) ……………………………. 16, 17

*Gates v. Cook,*
376 F.3d 323 (5th Cir. 2004) ……………………………………. 10, 13, 17, 18, 19

*Valigura v. Mendoza,*
265 F. Appx. 232 (5th Cir. 2008) ……………………………….... 17

*Jones'El v. Berge,*
374 F.3d 541 (7th Cir. 2004) ……………………………………. 18

*Graves v. Arpaio,*
623 F.3d 1043 (9th Cir. 2010) ………………………………….. 18

*Lopez v. State,*
720 S.W.2d 201 (Tex. App. – San Antonio 1986) ……………… 18

*Lee v. Young,*
533 F.3d 505 (7th Cir. 2008) ……………………………………. 19, 20, 21

*Hayes v. Snyder,*
546 F.3d 516 (7th Cir. 2008) …………………………………… 21

*Durmer v. O'Carroll*
991 F.2d 64 (3rd Cir. 1993) ……………………………...……… 21

*Fantone v. Herbik*
2013 WL 2564429 (3rd Cir. 2013) ……………………………… 21

*Meza v. Livingston,*
607 F.3d 392 (5th Cir. 2010) …………………………………… 23

*United States v. Georgia,*
546 U.S. 151 (2006) ……………………………………………… 23

**BRIEF IN RESPONSE**

Defendant Brad Livingston is the final policymaker for the Texas Department of Criminal Justice. Despite knowing that extreme heat during the summer constituted cruel and unusual punishment for all prisoners, and actually endangered the lives of prisoners with medical conditions such as hypertension, diabetes, and morbid obesity, Livingston did nothing to cool the temperatures indoors and failed to implement policies that would protect such prisoners from serious harm. Instead, he deliberately chose to expose prisoners to indoor heat indexes over 120 degrees. As a consequence, Larry McCollum, a man with diabetes, hypertension, and obesity, died from heat stroke inside the Hutchins State Jail. Moreover, nine other similarly disabled prisoners died from heat stroke in 2011, and two more men died in 2012 as a direct result of the extreme indoor temperatures and Livingston's decision to ignore this obvious danger to the men and women he is obligated to protect. Thus, Plaintiffs respectfully ask the Court to deny Livingston's Rule 12(b)(6) or 12(c) motion to dismiss.

**SUMMARY OF RESPONSE**

TDCJ does not air condition, or provide other climate control to most prisoner housing areas. Thus, the heat index indoors regularly exceeds 100 degrees in Texas prisons, and repeatedly soared above 120 in July 2011 at the Hutchins State Jail, where McCollum died. Courts have concluded temperatures over 88 degrees threaten human life when people have underlying heat-sensitive medical conditions (like McCollum), and constitute cruel and unusual punishment when they are inflicted on prisoners. *Bell v. LeBlanc*, No. 3:13-cv-00368-BAJ, Doc. 87 (M.D. La. Dec. 13, 2013). The Fifth Circuit has previously also held "a reasonable jury could … conclude that such measures [as

TDCJ takes to protect inmates from heat] were inadequate to satisfy the Eighth Amendment's demands." *Blackmon v. Garza*, 484 Fed.Appx. 866, 871 (5th Cir. 2012) (unpublished).

Plaintiffs allege TDCJ policymakers, including Livingston, made the deliberate choice to imprison people like McCollum – that they knew had a particular vulnerability to extreme heat – in prisons where indoor heat indexes routinely exceed 120 degrees. Though Livingston knows these temperatures are hazardous not just for prisoners but also for TDCJ's employees (and even the pigs the agency raises for slaughter), he took, and continues to take, no reasonable action to protect prisoners from the dangerous effects of the heat, even after knowing twelve prisoners have died as a direct consequence. Thus, Livingston is liable for McCollum's death because he knew that the lethal heat endured by prisoners was a serious, system-wide danger in Texas prisons, and because he was deliberately indifferent to that danger.

As the executive director of TDCJ, Livingston is one of the few people in the agency who had the ability and authority to approve cooling inmate living areas. But he did nothing.

Livingston cannot claim qualified immunity because his failure to protect vulnerable people, like McCollum, was clearly unconstitutional at the time McCollum died.

## I.    FACTS

### A.  McCollum's Tragic Death

McCollum died at age fifty-eight, while serving a short prison sentence for forgery.[1] When he arrived at the Hutchins State Jail, officers told him, "Welcome to Hell."[2] Though he told the nurse who performed an initial evaluation that he suffered from diabetes and hypertension, and he was obviously obese, no measures were taken to protect him from the high heat indexes inside the dormitory where TDCJ assigned him to live.[3] Disturbingly, this is by design. TDCJ policy actually recognizes people with McCollum's medical conditions are at increased risk of heat stroke, but provides for no additional measures to protect them, and does nothing to reduce the temperatures inside.[4]

Moreover, though even a layperson could see McCollum was obese (in fact, he weighed 330 pounds but was only 5' 10" tall),[5] TDCJ had no policy to ensure he was assigned to a bottom bunk.[6] In fact, he was assigned to a top bunk, and had great difficulty getting on and off to get the limited water TDCJ provided.[7]

McCollum died just a few days later when the heat index inside the prison rose above 120 degrees Fahrenheit.[8] He began suffering convulsions in his bunk and became unresponsive shortly after 2:00 a.m. Because of his obesity, the officers could not get McCollum down off the bunk to take him to a cool part of the prison.[9] Even though there

---

[1] Doc. 119, Plaintiffs' Second Amended Complaint, ¶ 42.
[2] *Id.*, ¶ 43.
[3] *Id.*, ¶ 44.
[4] *Id.*, ¶¶ 26, 33, 63.
[5] *Id.*, ¶ 36.
[6] *Id.*, ¶¶ 48-50.
[7] *Id.*
[8] *Id.*, ¶ 52.
[9] *Id.*, ¶ 83.

was no medical staff at the prison after hours,[10] it took officers almost an hour to call an ambulance to take him to Parkland Hospital.[11] When he got there, his body temperature was a stunning 109.4 degrees.[12] The extreme heat caused multi-system organ failure. He slipped into a coma and died a few excruciating days later.[13] An autopsy concluded he died of hyperthermia, due to being "in a hot environment without air conditioning."[14]

**B. Livingston's Policies and Deliberate Inaction Caused McCollum's Death**

Plaintiffs' Second Amended Complaint alleges Livingston personally approved specific policies that threatened serious harm to McCollum and thousands of other prisoners like him:

a).    Livingston approved obviously inadequate policies that no reasonable person would believe could protect prisoners with heat-sensitive medical conditions from extreme temperatures (such as just providing additional water when heat indexes reached 120);

b).    Livingston failed to provide air conditioning or other cooling in the Hutchins State Jail housing areas, approving policies and practices that denied prisoners safe housing, and that would be illegal in county jails in Texas;[15]

c).    Livingston approved TDCJ policies that make no accommodations for housing people with medical conditions (like hypertension, morbid obesity, and diabetes) known to cause medical emergencies and death during periods of extreme temperature;[16]

d).    Livingston approved policies and contracts with the University of Texas Medical Branch, the prison's medical provider, that allowed newly arrived prisoners to go a week to ten days without receiving an intake physical where housing restrictions are assigned;[17]

e).    Livingston approved policies that deprived prisoners of the minimal, obviously inadequate, accommodations TDCJ did take to attempt to protect

---

[10] *Id.*, ¶ 67.
[11] *Id.*, ¶¶ 70-79.
[12] *Id.*, ¶ 84.
[13] *Id.*, ¶ 85.
[14] *Id.*, ¶ 51, 86.
[15] *Id.*, ¶ 91.
[16] *Id.*, ¶ 123.
[17] *Id.*, ¶¶ 114-17.

prisoners from the heat (including policies and practices prohibiting McCollum from having a fan,[18] or even a drinking cup for cool water, or continued access to ice water);[19]

f).     Livingston approved policies that allowed obese prisoners to be assigned to top bunks;

f).     Livingston approved ending after-hours medical care at the Hutchins State Jail, causing the fatal hour-long delay;[20] and,

g).     Livingston took no steps to house prisoners with medical conditions complicated and endangered by high temperatures in air-conditioned areas.[21]

In stark contrast, Livingston did approve the purchase of climate-controlled hog barns to protect TDCJ's agricultural products from the heat and implemented and approved specific policies to protect *pigs* from high temperatures. TDCJ's policies require pigs live in a "comfortable environment," and that temperatures in the hog barns not exceed 85 degrees.[22] No such protections exist for human prisoners.

Though the individual officers who delayed providing McCollum emergency medical treatment for an hour certainly contributed to his untimely death, they were not the ones who made the decisions that exposed McCollum to the hazardous temperatures in the first place. Had the temperatures in the Hutchins State Jail been safe, there would not have been a medical emergency for officers to subsequently ignore and treat with deliberate indifference. Livingston therefore effectively created and indisputably condoned the conditions that brought McCollum to the verge of death by heat stroke – the officers who left McCollum in his bunk unresponsive and seizing for an hour, simply pushed him over the edge.

---

[18] *Id.*, ¶ 133.
[19] *Id.*, ¶ 132.
[20] *Id.*, ¶ 67.
[21] *Id.*, ¶ 123.
[22] *Id.*, ¶¶ 104-107.

## II.   STANDARD OF REVIEW – RULE 12(b)(6) MOTIONS ARE DISFAVORED AND RARELY GRANTED

The Court should deny Livingston's Rule 12(b)(6) motion because it cannot be granted unless the pleadings are deficient on their face.

Motions to dismiss for failure to state a claim "are viewed with disfavor and [are] rarely granted." *Parker v. Am. Airlines, Inc.*, 516 F. Supp. 2d 632, 634 (N.D. Tex. 2007) (citing *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)). When reviewing a motion to dismiss, Courts are required to accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Lindquist v. City of Pasadena*, 525 F.3d 383, 386 (5th Cir. 2008) (internal quotation marks and citations omitted).[23]

A claim is correctly pled when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store No. 155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations," it only "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. And when a governmental entity is the defendant, plaintiffs will often not have access to critical documents before

---

[23] Livingston, however, introduces numerous allegations outside the pleadings, including citations to www.livescience.com (a website featuring stories about "6 Failed Olympic Winter Sports," (http://www.livescience.com/43089-photos-6-failed-winter-olympic-sports.html), and many other stories of dubious veracity), and statements about accreditations the Hutchins State Jail has allegedly received. (Of course, even assuming the Hutchins State Jail is accredited, the Fifth Circuit has held "it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to" accrediting bodies. *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004)).

Thus, Rule 56 requires converting Livingston's motion to one for summary judgment, and the Plaintiffs would request an opportunity to take his deposition in order to properly respond.

conducting discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011).[24]

The pleadings overwhelmingly show Livingston violated Mr. McCollum's constitutional right to be free from substantial risk of serious harm, which was clearly established law at the time of his death. *See Bishop v. Arcuri*, 674 F.3d 456, 460-61 (5th Cir. 2012) (describing two-element standard for qualified immunity).

## III. ARGUMENT

### A. Livingston Approved and Implemented Policies that Violate the Eighth Amendment

Prison officials violate the Eighth Amendment when a prison condition is objectively dangerous, and the official is subjectively aware of the problem but disregards it. *See*, *e.g.*, *Blackmon v. Garza*, 484 Fed.Appx. at 869.

First, Livingston does not contest exposing prisoners to 120+ heat indexes is not objectively serious. *See also Blackmon*, 484 Fed. Appx. at 870-71 (high heat indexes objectively serious, especially for prisoners with pre-existing medical conditions); *Bell*, No. 3:13-cv-00368-BAJ, at 43 ("It is axiomatic that a prison official's failure to provide inmates relief from extreme temperatures may constitute an Eighth Amendment violation"). Indeed, high temperatures in TDCJ prisons killed at least nine other men in 2011.[25] As far back as 1999, federal judges had expressly noted prisoners in TDCJ

---

[24] The standard of review is the same for a motion filed under Rule 12(c). *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).
[25] *Id.*, ¶ 96. As the Second Amended Complaint notes, hyperthermia is an underreported cause of death, so it is very likely that heat contributed to far more fatalities. *Id.* ¶ 99.

custody were dying from exposure to extreme summer temperatures.[26] Two prisoners died from heat stroke shortly thereafter, and another two died just a few summers before McCollum's death.[27] At least two more died in 2012.[28] And TDCJ policies Livingston knew of explain that high heat indexes are "extremely dangerous."[29]

Second, Plaintiffs Second Amended Complaint alleges Livingston was well aware of the dangerous temperatures inside Texas prisons.[30] Even though state law requires county jails to keep indoor temperatures between 65 and 85 degrees, indoor temperatures in the state prisons routinely soar over 90 degrees and into the 100s every summer.[31] Livingston knew TDCJ regularly housed people with heat-sensitive medical conditions in these temperatures.[32] He had been sued before in his individual capacity over extreme temperatures in TDCJ prisons.[33] Livingston even approved purchasing climate-controlled

---

[26] *Id.*, ¶ 97. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999) (three prisoners died in summer of 1998).

[27] *Id.*, ¶ 96 (Dionicio Robles and James Shriver died in 2007), 97 (John Cardwell died in 2001, and Ricky Robertson died in 2004).

[28] *Id.*, ¶ 96 (Albert Hinojosa and Rodney Adams died in 2012). As this Court noted on page 3 of its June 4, 2013 order on concerning discovery, deaths that precede McCollum and that occurred during a "reasonable time following McCollum's death are relevant to the issue of deliberate indifference."

[29] *Id.*, ¶¶ 55, 58.

[30] *Id.*, ¶¶ 22, 92-93, 100.

[31] *Id.*, ¶ 138.

[32] *Id.*, ¶ 139.

[33] *See Blackmon v. Kukua*, 738 F.Supp.2d 398 (S.D. Tex. 2010). Though the trial court granted summary judgment on the claims against Livingston, the prisoner's allegations provided him notice that prisoners were deprived "minimal civilized measures of life's necessities" in prisons extremely similar to the Hutchins State Jail. *See Blackmon v. Kukua*, 758 F.Supp.2d at 408.

Notably, *Blackmon* addressed the quality of the summary judgment *proof* against Livingston, not the adequacy of the *pleadings*. *Blackmon v. Kukua*, 758 F.Supp.2d at 411. Regardless, the pleadings here are far more robust than the complaint in *Blackmon*. Blackmon's complaint against Livingston, for example, did not allege a system-wide problem resulting in multiple deaths resulting from high-level policy decisions. And the trial court relied exclusively on the fact Livingston did not review Blackmon's grievances about the heat. As discussed below, Livingston did not need personal knowledge an injury would befall any particular prisoner – he merely needed to know conditions in his prison were dangerous.

hog barns and approved special protective policies for pigs because he knew high temperatures were dangerous for swine.[34]

Moreover, the danger was not only obvious to people with heat-vulnerable disabilities like McCollum, it was cruel and unusual for even healthy prisoners.[35] A jury may infer Livingston was aware of obvious facts. *Blackmon*, 484 Fed.Appx. at 873 (*citing Gates*, 376 F.3d. at 340). In a similar case, where an older gentleman on diuretics was also exposed to extreme temperatures, the Fifth Circuit explained:

> [The Warden] testified that she was aware that the summer heat was "intense." Moreover, the evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners. The training highlighted the particular risks to prisoners such as [the plaintiff]—an older inmate taking medications with a diuretic effect. Thus, the obvious nature of the risks to [the plaintiff] would further support a jury finding that Defendants were deliberately indifferent to the risks to [the plaintiff's] health.

*Blackmon*, 484 Fed.Appx. at 873. Indeed, the complaint alleges citizens throughout the Dallas area experienced heat indexes exceeding 130 the day McCollum suffered the fatal heat stroke.[36]

Likewise, it is not necessary to show Livingston predicted McCollum, in particular, would fall prey to the heat and die. Plaintiffs need only show Livingston was aware the heat was a widespread danger to prisoners generally, or to prisoners with known heat-sensitive medical conditions, like McCollum. *See Farmer v. Brennan*, 511 U.S. 825, 843-44 (1994). And Plaintiffs pled he did – a fact Livingston does not dispute. Livingston's protestations he never "had any knowledge of McCollum's circumstances prior to his death" are irrelevant because Livingston knew about and tolerated the

---

[34] *Id.*, ¶¶ 104-08.
[35] *Id.*, ¶¶ 66, 141.
[36] *Id.*, ¶ 52, 69, 137.

dangerous condition that ultimately killed McCollum.[37] The Supreme Court has long acknowledged:

> If, for example, prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep but instead ... would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

*Farmer*, 511 U.S. at 843-44. Livingston did not need to "guess beforehand" that McCollum, in particular, would ultimately be the victim of his indifference. He knew the conditions in his prisons posed a grave danger to people like McCollum.

Plaintiffs' Second Amended Complaint alleges Livingston is liable for these conditions because he personally and intentionally crafted policies and procedures that he knew would result in prisoners being exposed to these temperatures. "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (internal citations omitted).

Here, Livingston approved TDCJ policies that protect prisoners from forced outdoor labor – and even "recreating" outside – during extremely hot days, and chose to completely ignore the hazards he knew prisoners faced indoors from the extreme heat.[38] The policy Livingston approved disregards the well-known fact that at the Hutchins State Jail, as well as many other TDCJ prisons, the indoor and outdoor temperatures are virtually identical on the hottest summer days.[39] Approving and implementing these

---

[37] Doc. 121, Livingston's Motion to Dismiss on the Basis of Qualified Immunity, p. 1.
[38] *Id*., ¶¶ 110, 118, 122.
[39] *See id*., ¶ 59.

14

obviously deficient policies is Livingston's "own misconduct" – not liability under *respondeat superior* or any other traditional supervisory liability theory. *See Iqbal v. Ashcroft*, 556 U.S. 662, 677 (2009).

Livingston's job description,[40] which he cites in his motion, involves "establishing agency … policies, and procedures," "review[ing], evaluat[ing], establish[ing], and enforce[ing] agency goals, objectives, standards, operating policies, procedures, rules, [and] regulations," and "direct[ing] the management and execution of the annual operating budget."[41] In this case, Livingsotn is sued for "establish[ing] … policies and procedures," and "enforce[ing] … operating policies [and] procedures" that violate thousands of inmates' constitutional rights by exposing them to hazardous temperatures, and that killed McCollum, a prisoner whose medical conditions TDCJ *and* Livingston knew made him particularly vulnerable.

For example, it was a deliberate policy choice to require prisoners to purchase cups and fans from the commissary, instead of issuing these simple items to prisoners on arrival.[42] Instead of incurring the miniscule expense of issuing even paper cups to prisoners (as the Hutchins State Jail does now), Livingston approved policies requiring prisoners to purchase cups to drink from the prison commissary. And, tragically, because a prisoner cannot purchase anything from the commissary until they are issued an identification card and otherwise processed in, McCollum could not buy a cup to drink from. Thus, Livingston knew he could not access the limited water TDCJ provided to

---

[40] Livingston's job description, of course, is also evidence outside the pleadings and requires converting this motion into one for summary judgment under Rule 56.
[41] Livingston's Motion to Dismiss, Doc. 121, p. 26.
[42] *Id.*, ¶ 132.

prisoners in jugs – the so-called critical step the agency purports to take to protect prisoners from heat indoors.[43]

Likewise, Livingston was intimately involved in the decision to end after-hours medical care at the Hutchins State Jail, which caused the fatal hour-long delay in obtaining treatment for Mr. McCollum.[44] Delaying, or in this case, effectively denying, access to needed medical care violates the Eighth Amendment. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (denying qualified immunity to nurse who delayed treatment of prisoner). Livingston made these decisions to save the agency money, though he knew these policies would put prisoners' lives at risk.

Livingston's authority on this point is both distinguishable and unpersuasive. In *Lindsey v. McGinnis*, a pro se prisoner complained the prison failed to provide "24-hour on-site *physician* coverage." 23 F.3d 407 (6th Cir. 1994) (emphasis added). Having a *doctor* on-site 24-hours a day is far different from having a nurse (or any other medical staff at all) available when 2,200 men are at risk of heat stroke and an ambulance cannot be called before checking with medical staff first.[45]

Likewise, in *Obata v. Harrington* the pro se prisoner could not even demonstrate "he required emergency medical care," much less that he was denied care because there was no after-hours coverage. 2013 WL 1442481 (D. Hawai'i 2013). The language in

---

[43] On this issue, Livingston willfully misreads Plaintiffs' complaint. The complaint is not that McCollum had no access to water *at all*, but that he could not "drink any of the water *provided in the water jugs* (much less a sufficient amount of water to counteract the extreme temperatures)." *Id.*, ¶ 132 (emphasis added). McCollum might have been able to drink the warm water from the sink by cupping his hand, but he could not access the one thing TDCJ actually did (however inadequate) to purportedly protect prisoners from heat. And, of course, McCollum did die, in part, because he was dehydrated.

[44] *Id.*, ¶ 67.

[45] Moreover, in *Lindsey* a doctor actually "extensively" examined the plaintiff. *Lindsey*, 23 F.3d at 407. Any complaint about lack of after-hours care was a red herring, unlike here where the delay in an actual medical evaluation caused McCollum's death. 2nd Amd. Complaint ¶¶ 78-79.

*Obata* that Livingston incorrectly relies on is not only dicta, it resulted because the prisoner did not make the initial showing that his medical condition was objectively serious. Here, McCollum died because of the delay in providing him medical care. When he began convulsing, even a nurse would have been able to order McCollum to the air-conditioned infirmary where he would immediately begin cooling off, and packing his body with ice until an ambulance could arrive.

### B. Livingston is not Entitled to Qualified Immunity Because the Law is Clearly Established: Extreme Temperatures Violate the Eighth Amendment

To defeat qualified immunity, Plaintiffs need only show 1) the official violated a clearly established constitutional right, and 2) the official's conduct was not objectively reasonable. *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012).

#### 1) The Right to Protection from Extreme Temperatures is Clearly Established

The Eighth Amendment prohibits the prison system from housing inmates in conditions that threaten the substantial risk of serious harm – for instance, temperatures threatening heat stroke. *Blackmon v. Garza*, 484 Fed.Appx. at 869.

Federal courts in Texas and the Fifth Circuit have repeatedly found high temperatures unconstitutional (*id.* 869-70), in opinions published long before McCollum entered the Hutchins State Jail. *See Blackmon v. Kukua*, 758 F.Supp.2d at 413-14 (collecting cases showing the right was clearly established). The Court in *Bell v. LeBlanc*, No. 3:13-cv-00368-BAJ, Doc. 87 (M.D. La. Dec. 13, 2013), reviewed several decisions holding high indoor temperatures violated prisoners' constitutional rights. *See*, *e.g.*, *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004); *Valigura v. Mendoza*, 265 F. Appx. 232 (5th Cir. 2008); *Jones'El v. Berge*, 374 F.3d 541 (7th Cir. 2004) (affirming trial court injunction

requiring air conditioning); *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010) (affirming trial court injunction requiring housing inmates taking heat-sensitive medications in temperatures below 85 degrees).

Texas courts have even held people criminally liable for leaving dogs in "hot, very hot" cars. *Lopez v. State*, 720 S.W.2d 201, 202 (Tex. App. – San Antonio 1986) (pet. denied).

Thus, at the time McCollum died, the law was clearly established that prison officials violate the Eighth Amendment by exposing inmates (especially those most vulnerable) to temperatures consistently over 90 degrees. *See, e.g.*, *Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004).

### 2) Livingston's Actions Were Not Objectively Reasonable

Once a right is clearly established, a decision violating that right is objectively unreasonable. "If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable." *Bishop*, 674 F.3d at 460 (internal citations omitted).

Livingston should be denied qualified immunity because the pleadings demonstrate his liability. Plaintiffs do not allege he was merely negligent. Rather, Plaintiffs allege he actually knew heat conditions inside the prisons' dorm areas was extraordinarily dangerous; he knew housing prisoners in dangerous heat was unconstitutional; he knew the limited accommodations TDCJ provided to combat high temperatures (like cups and fans) were unavailable to prisoners at the Hutchins State Jail; but he did it anyway.

In *Gates*, the Fifth Circuit set a minimum floor for accommodations that must be implemented to protect prisoners from extreme indoor temperatures. 376 F.3d at 337. There, the Fifth Circuit held the trial court's injunction did not require more than the Constitution. Thus, *Gates* is the constitutional minimum.

But here, Livingston's policies do not come close to reaching *Gates* minimum floor. At a bare minimum, prisons must provide windows that open, sufficient drinking water, and personal fans. *Gates*, 376 F.3d at 339. Because Livingston's policies denied McCollum a drinking cup and a fan, and the prison's physical plant denied him windows that open, and Livingston did nothing to reduce the temperatures inside, Livingston's policies are unreasonable and violate the constitution.

Despite Livingston's protestations, this is not a case where individual medical providers were interposed between prison policy makers and the injured inmate. This case is the opposite – Livingston's policies prevented McCollum from seeing a doctor to restrict his housing. McCollum's first opportunity for medical providers to restrict his housing would have been his intake physical. But because the policies and contract with UTMB that Livingston approved intentionally allowed a week to ten days to pass before the physical took place, McCollum was left vulnerable during that time. And McCollum died before the physical took place.

*Lee v. Young*, 533 F.3d 505 (7th Cir. 2008), which Livingston mistakenly relies on, is entirely distinguishable. In *Lee*, an asthmatic prisoner complained he was exposed to secondhand tobacco smoke. But the prison's policies resulted in his transfer to a non-smoking cell, he was seen by a doctor who specifically determined that pursuant to the prison's policies he did not need to be transferred to a non-smoking prison, and the

prison's medical staff found his asthma was "controlled." *Id.*, at 507-08. Most importantly, the policy set by the high-ranking prison official defendants was to *prohibit* smoking in the designated "non-smoking" cells where the inmate was housed.

In this case, Livingston implemented no policy to protect prisoners with heat-sensitive medical conditions from being housed in extreme temperatures, and had no policies to lower the dangerously high temperatures indoors. (And, of course, there was no medical determination that McCollum could be safely housed in the extremely hot Hutchins State Jail, because he had not received an intake physical yet,[46] and TDCJ's policies do not provide for protections for prisoners vulnerable to heat stroke, before or after their initial medical evaluation). In *Lee*, the prison's policies specifically allowed housing accommodations for asthmatic prisoners, but the doctors concluded he did not need it. Here, Plaintiffs allege there were *no policies* to accommodate prisoners who needed safe housing – which McCollum obviously did. In *Lee*, "the record [was] replete with instances of concern, not indifference." *Id.*, at 511. The failure to provide climate-controlled housing for heat-vulnerable prisoners, like McCollum, would be analogous to the prison in *Lee* only protecting asthmatics from working in dusty environments but not from being housed with smokers.[47] The Seventh Circuit recognized "If Lee brought suit against medical staff, if prison officials contravened doctors' orders, and if the same officials *took no steps* towards reducing Lee's exposure to ETS, this would be a very different case." *Id.* at 512 (emphasis added). That is this case, where Plaintiffs have also sued TDCJ and the medical provider for failing to take any steps to protect McCollum

---

[46] *Id.*, ¶¶ 114-17.

[47] Furthermore, *Lee* was dismissed on summary judgment, where the quality of the proof could be determined, not on the allegations in the pleadings. *Lee*, 533 F.3d at 509.

from death. In *Lee*, the policies were sound and were implemented poorly – here, there was no policy to protect men like McCollum from the extreme indoor temperatures, even though it was known to Livingston and TDCJ that the extreme heat posed grave dangers to individuals with heat-vulnerable conditions such as McCollum.

*Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008) also does not help Livingston. In *Hayes*, a prisoner complained to the warden when the prison doctor refused to treat his testicular pain. Because the warden reviewed the patient's medical records, and conferred with the doctor about his condition, the court concluded that the warden was not deliberately indifferent. The warden reasonably believed that the doctor was seeing and treating the patient.

This case is different. Livingston approved a policy and procedure that prevented McCollum from receiving an intake physical – the first contact with a medical provider who could restrict his housing – until he had already been incarcerated a week to ten days. Unlike the warden in *Hayes*, Livingston could not reasonably believe McCollum was being evaluated by a doctor for appropriate housing because he knew TDCJ's contract with UTMB allowed a week to ten days for the physical to take place. Thus, for those seven to ten days, there was no medical provider interposed between Livingston and McCollum.[48]

In fact, Plaintiffs allege TDCJ and the medical provider, UTMB, "do not contemplate special housing for people with disabilities adversely affected by extreme

---

[48] Other authority Livingston cites, such as *Durmer v. O'Carroll*, 991 F.2d 64 (1993), and *Fantone v. Herbik*, 2013 WL 2564429 are equally unavailing. *Durmer* and *Fantone* address the prisoner/patient's complaints about the corrections officials in one paragraph. If anything, *Durmer* and *Fantone* stand for the same proposition as *Hayes* – that when a corrections official actually knows a prisoner is receiving medical care from a doctor that he is not deliberately indifferent. That is not what Plaintiffs' allege here.

temperature, even though they are well aware of the risk to vulnerable prisoners and the previous deaths caused by heat strokes."[49]

Livingston argues he is "not a doctor," "[h]e is an accountant."[50] This is not only outside the pleadings, it is entirely irrelevant. Though his background may be in finance instead of corrections or medicine, he assumed a position where he is ultimately responsible for the welfare of over 150,000 prisoners of the State of Texas. And he is handsomely compensated for this responsibility.[51] His signature appears on the TDCJ policies relevant to this case. He approved the policies and practices that resulted in McCollum's death. And he approved spending $750,000 to purchase climate-controlled hog barns and implemented policies to keep temperatures under 85 degrees for pigs when he knew prisoners were dying from extreme temperatures and when he knew the temperatures would be illegal in county jails[52].

McCollum and nine other men died in prisons around the state during the summer of 2011 due to extreme conditions Livingston was aware of and did nothing about. As the director of a prison system, Livingston is responsible for those deaths, no matter his personal background.

### C. Livingston, Individually, Cannot Seek Dismissal of Plaintiffs' Claims for Injunctive Relief

Livingston is sued only in his individual capacity for damages. Livingston, in his *official c*apacity, is the Texas Department of Criminal Justice pursuant to the *Ex Parte Young* legal fiction. *See*, *e.g.*, *Meza v. Livingston*, 607 F.3d 392, 412 (5th Cir. 2010). The

---

[49] 2nd Amd. Complaint, ¶ 118, 122.

[50] Livingston's FRCP 12(c) Motion, Doc. 19, p. 9.

[51] "Government Employee Salaries: Bradley M Livingston," *Texas Tribune*, http://www.texastribune.org/library/data/government-employee-salaries/state-of-texas/bradley-m-livingston/1109466/ (current through Feb. 27, 2013) (salary of $186,300, plus benefits).

[52] 2nd Amd. Complaint, ¶ 51, and 37 Tex. Admin. Code § 259.160.

motion to dismiss can only seek to dismiss the claims against Livingston in his *individual* capacity – the state agency has separate counsel, and has not sought to dismiss the claims for injunctive relief. Furthermore, the Second Amended Complaint only brings claims for injunctive relief under the Americans with Disabilities Act and Rehabilitation Act, which do not provide a cause of action against individuals.[53] Plaintiffs do not need to employ the *Ex Parte Young* fiction because the ADA and Rehabilitation Act waive sovereign immunity. *See, e.g.*, *United States v. Georgia*, 546 U.S. 151 (2006). (Indeed, following mediation in April 2013 with the agency specifically designed to address Plaintiffs' injunctive claims, TDCJ agreed to institute a number of reforms. Thus, Plaintiffs are already prevailing parties for purposes of injunctive relief.)[54] Thus, the Court should disregard Livingston's request to dismiss the claims for injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion.

In the alternative, should the Court feel that the pleadings are deficient in any way, Plaintiffs would respectfully ask for leave to amend, and would request the opportunity to depose Director Livingston to develop facts concerning his personal knowledge of the dangers posed by extreme heat, and his decision to do nothing to reduce the temperatures inside prison housing areas for human prisoners.

DATED: February 21, 2014.

---

[53] 2nd Amd. Complaint, ¶ 163-64.
[54] A copy of the mediated agreement to resolve the claims for injunctive relief is attached as Exhibit 1, as well as a letter from TDCJ confirming implementation of the same.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
      Tel.    512-623-7727
      Fax.   512-623-7729

By     /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
Scott Medlock
State Bar No. 24044783

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Eliot Shavin
State Bar No. 18138200
2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
Local Counsel

ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.

24