IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCULLOM, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. |
| | § | 3:12-CV-02037 |
| BRAD LIVINGSTON, et al., | § | |
| Defendants. | § | |

**THE UNIVERSITY OF TEXAS MEDICAL BRANCH'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant the University of Texas Medical Branch (UTMB), by and through its Attorney, the Attorney General for the State of Texas, and submits this Defendant UTMB's Motion For Summary Judgment. In support thereof, the Defendant respectfully offers the following:[1]

**I.**

**FACTS**

In their Second Amended Complaint, plaintiffs allege that defendants UTMB and TDCJ "housed Mr. McCollum in a brutally hot prison cell, causing him to suffer a fatal heat stroke, and failed to contact 911 for 54 minutes as he lay dying before them". Plaintiffs' Second Amended Complaint. [D.E.119 at page 1]. Regarding defendant UTMB, plaintiffs allege that McCollum arrived at the TDCJ Hutchins unit on July 12, 2011. They allege that he was triaged by a nurse, and his medical file was sent to UTMB physician assistant Babbili who, without seeing the patient, prescribed medication. Plaintiffs allege that approximately one week later, the temperatures in the prison, along with the effects of the medication, caused Mr. McCollum's

[1] Defendant currently has on file its Joint Motion To Extend Deadlines [D.E. 159]. Should this court grant defendants' motion, UTMB would like the opportunity to amend this motion.

death. Plaintiffs' only allegations against UTMB are under the Americans With Disabilities Act and Federal Rehabilitation Act. Plaintiffs seek against UTMB declaratory, compensatory and nominal relief under federal law. D.E. 119 at ¶160.

Mr. McCollum was first incarcerated at TDCJ in 2003, and housed at the Cole unit in Bonham, Texas. He was released in 2004. In May 2008, he was arrested in McLennan County and housed in the county jail. He was transferred to the TDCJ Hutchins State Jail on July 15, 2011. According to the medical records, the only medical information accompanying him from the McClennan County Jail was the standard Texas Uniform Health Status Update (TUHSU) which indicated he was 5 foot 10 inches tall, weighed 330 pounds, had no special housing or transportation needs, no pending specialty clinic appointments, no known allergies, and a negative Tuberculosis (TB) Skin Test on June 27, 2011. However, the TUHSU did indicate that Mr. McCollum had been prescribed the medication 'clonidine 0.1 mg orally as needed' for hypertension. There was no mention of Mr. McCollum having diabetes or receiving medication for diabetes. See Exhibit 1, TUHSU for Mr. McCollum from McLennan County Jail; Exhibit 2, affidavit of Dr. Glenda Adams.

Standard operating procedures for all new offenders arriving to TDCJ include screening for urgent or emergent medical, dental, and/or mental health conditions requiring immediate attention. Mr. McCollum's Correctional Managed Care Intake History and Health Screening form, completed and signed on July 15, 2011, indicates he reported a personal *history* of a back injury, cavities, depression, diabetes, glasses, gum disease, high blood pressure, mental illness, and rheumatism/arthritis. He specifically denied thoughts of self injury and symptoms of psychosis. The screener noted no obvious injuries, deformities, or impaired motor activity. See

Exhibit 3, Correctional Managed Care Intake History and Health Screening form for Mr. McCollum; Exhibit 2, affidavit of Dr. Glenda Adams.

After completing his initial medical screen on the morning of July 15, 2011, Mr. McCollum was seen by two licensed vocational nurses (LVN's). The first LVN (Ms. McKinney) took Mr. McCollum's history for infectious diseases, gave him a tetanus vaccination, applied a Tuberculosis skin test, acquired his verbal consent for laboratory testing, and provided HIV pre-test counseling. Later the same day, a second LVN (Ms. Connell) informed the physician assistant (PA Babbili) of Mr. McCollum's history of hypertension from the McLennan County Jail and prior treatment with clonidine "prn' (as needed). Mr. Babbili gave a verbal order to substitute low dose hydrochlorothiazide (HCTZ) 25 mg to be taken every morning in place of the 'prn' clonidine. See Exhibit 3, Correctional Managed Care Intake History and Health Screening form for Mr. McCollum; Exhibit 2, affidavit of Dr. Glenda Adams; Ex. 5, McCollum's medical records available to Mr. Babbili upon arrival at Hutchins.

Mr. McCollum was seen in the medical department by LVN McKinney on Monday, July 18, 2011 to have his TB skin test read. The test was negative. He was interviewed that same day to complete his routine mental health screening. He was again seen in the medical department on Wednesday, July 20, 2013 to have his blood drawn for laboratory studies. There is no indication Mr. McCollum exhibited overt functional limitations or offered any complaints of difficulty completing his activities of daily living at any of these encounters with medical personnel. Nor is there documentation that he requested any special accommodation during these medical department visits. Similarly, there is no documentation that Mr. McCollum exhibited a physical or mental impairment that substantially limited one or more of his daily life activities.

Mr. McCollum's laboratory results were routinely reported in the EMR on the morning of Thursday, July 21, 2011. While several results were abnormal requiring clinical correlation and follow up, none of the results were of such a significant or critical nature that the reference laboratory, LabCorp, notified the Hutchins medical department of a need for immediate review or intervention. Non-critical intake laboratory results are routinely reviewed by a physician or midlevel provider during the intake physical exam or sooner if a patient requests or requires a medical appointment prior to the scheduled physical exam. In this case, Mr. McCollum would have had his intake physical exam within seven business days of arrival at Hutchins pursuant to Correctional Managed Care policy, and his lab results would have been reviewed by a physician or midlevel provider at that time, unless Mr. McCollum requested an appointment sooner.

Here, prior to his intake physical exam, in the early morning of July 22, Mr. McCollum was found by TDCJ security staff unconscious in his bed having a seizure. After an unclear amount of time TDCJ staff contacted UTMB Nursing Triage via telephone at approximately 03:16 AM. UTMB nursing advised that Mr. McCollum should be transferred via 911 to Parkland Hospital in Dallas. Mr. McCollum died at Parkland hospital several days later. The Dallas County pathologist concluded that Mr. McCollum died of hyperthermia. See Exhibit 4, autopsy. Plaintiffs allege that UTMB intentionally discriminated against Mr. McCollum because of and solely based on his disability, and that the discrimination caused his death.

## II.

## DISCRIMINATION CLAIMS

### A. Americans With Disabilities Act

Title II of the ADA provides that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132 (2000 ed.)(emphasis added). "Qualified individual with a disability'" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). The Act defines "'public entity'" to include "any State or local government" and "any department, agency, . . . or other instrumentality of a State," § 12131(1). *US v. Georgia*, 546 U.S. 151 (January 10, 2006).

### B. Rehabilitation Act

No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 USCS § 705(20)], shall, *solely by reason of his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. 504 of the Rehabilitation Act of 1973, 29 USCS § 794. (Emphasis added).

**C. Intentional Discrimination Required for Compensatory Damages**

The ADA and RA are federal anti-discrimination statutes designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities". *Rizzo v. Children's World Learning Center, Inc*. 173 F.3d 254, 261 (5th Cir.1999). The Acts were never intended to be substitutes for common law causes of action for negligence or medical malpractice. *Capps v. UTMB*, 2007 U.S.LEXIS 68246 (E.D.Texas 2007); *Lentini v. King*, 2007 U.S.LEXIS 6268 (S.D.Mississippi 2007). A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination. *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002); *Carter v. Orleans Parish Pub. Sch*., 725 F.2d 261, 264 (5th Cir. 1984); *Guardians Assoc. v. Civil Service Comm*., 463 U.S. 582 (1983). Presumably, Plaintiffs believe that an unidentified UTMB employee should have done something to medically prevent McCollum's death despite the fact that he never complained about his conditions, never filed a grievance, never made a request for medical assistance or otherwise alerted UTMB staff to any problems. Nonetheless, neither the ADA nor the RA creates an obligation upon parties to undertake or initiate action, other than to stop intentional and discriminatory exclusion from already existing programs. Neither the language, purpose, or history of the RA reveals an intent to impose an affirmative-action obligation on all recipients of federal funds." *Southeastern Community College v. David*, 442 U.S. 397, 411 (1979). In this case, there is no evidence that McCollum sought participation in any program, service or benefit offered by UTMB. There is no evidence that McCollum was intentionally discriminated against by any UTMB employee, or that any intentional discrimination caused

McCollum to be denied access to any program, service or benefit. As a result, all claims against UTMB should be dismissed as a matter of law.

**D. No Evidence of Disability**

Plaintiffs allege that at the time of his death, Larry McCollum was fifty-eight years old, morbidly obese, suffered from hypertension and possibly diabetes. Plaintiffs have presented no evidence that McCollum was disabled. Even McCollum's medical records do not support plaintiff's contentions. See Ex. 5, McCollum's medical records available to Mr. Babbili upon arrival at Hutchins.

According to the Department of Justice, "disability" means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment. 28 CFR 35.104, Disability. The phrase "major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 28 CFR 35.104, Disability. As the Supreme Court explained, the terms "substantially" and "major" need to be interpreted strictly to create a demanding standard for qualifying as disabled. *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). In determining whether an individual is substantially limited in a major life activity, the following factors should be considered: the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. *Toyota*, 534 U.S. at 196.

Plaintiffs have not pled, nor is there evidence, that McCollum *actually* had a physical or mental impairment that substantially limited one or more of his major life activities. Nor have

they identified a single UITMB employee whom they allege actually intended to discriminate against Mr. McCollum as required for plaintiffs to receive compensatory damages.

**E. Application of Plaintiffs' Allegations to Facts**

**1. <u>Prescription of hypertension medication</u>**

Plaintiffs allege that UTMB physician's assistant Babbili discriminated against McCollum when he changed his prescription from Clonidine to hydroclorothiazide (HCTZ). D.E. 119 at 45. Plaintiffs assert that the HCTZ medication was dangerous to McCollum and caused or contributed to his death.

Plaintiffs' own medical expert, Dr. Susie Vassallo, testified that HCTZ was the appropriate medication for Mr. McCollum. See Exhibit 6, testimony of Dr. Vassallo, page 57/10-20.

**2. <u>Housing without air-conditioning</u>**

Plaintiffs allege UTMB discriminated against McCollum by allowing him to be housed in a prison unit without air conditioning. D.E.119 at ¶92. However, UTMB, as a statutory medical contractor, does not make housing placement decisions. TDCJ's Classification Department makes housing decisions. See Texas Govt. Code §501.146; Exhibit 7, TDCJ/UTMB Contract p. 32 Article VI; p. 11(G)(1)(3).

**3. <u>UTMB policies</u>**

Plaintiffs allege that UTMB's policies deliberately ignored conditions causing McCollum's death. D.E. 119 at ¶118. Plaintiffs do not cite to a particular policy which they claim is discriminatory. In fact, plaintiffs acknowledge that at least one UTMB policy establishes guidelines to assist the facility administration in the determination of safe and healthful work conditions. D.E.119 at ¶111. Plaintiffs' complaint is that a similar policy ***should exist*** regarding

housing conditions. However, UTMB does not make decisions regarding housing, housing conditions, or whether air conditioning is provided in the prisons. Even if a jury decides that living conditions in the prisons are too hot, UTMB is not the proper party to make the changes.

Further, the *absence* of a policy applies equally to all inmates. UTMB cannot be said to have discriminated against disabled inmates, because of their disabilities, when the policy is absent as to all inmates.

**4. Intake physicals**

Plaintiffs allege that "prisoners do not immediately receive a physical examination from a doctor or physician's assistant when they arrive at a TDCJ prison." D.E. 119 at ¶114-117.

In truth, when a new inmate comes into the TDCJ system, literally when he gets off the bus, he is immediately seen by medical personnel and assessed for immediate problems, like current illness, injury or medication needs. Then, a comprehensive medical evaluation is to be completed on all new incoming offenders within seven days of their arrival in the system. See Exhibit 8, Health Appraisal of Incoming Offenders. The policy is the same for all offenders. In this case, McCollum was immediately seen by a licensed vocational nurse who noted that he needed his high blood pressure mediation, which was immediately prescribed by physician's assistant Babbili. Unfortunately, Mr. McCollum died before his comprehensive health appraisal was conducted. UTMB's policy to treat inmates for immediate medical needs, then to see them for a comprehensive physical exam is not discriminatory.

**5. Medical negligence is not discrimination**

Accepting plaintiff's allegation that McCollum was disabled, a failure to 'attend to the medical needs of [a] disabled prisoner' is not a violation of the ADA. *Nottingham v. Richardson*,

2011 U.S. Dist. LEXIS 116017 (N.D. Tex. Sept. 29, 2011); *Woods v. TDCJ*, 2008 U.S. LEXIS 3945 (S.D. Tex. Jan. 18, 2008); *Bryant v. Madigan*, 84 F.3d 246,249 (7th Cir.1996).

In a case similar to the case at bar, *Rosario v. Washington Mem.Hsptl*, 2013 U.S. Dist. LEXIS 70611 (W.D. Penn., March 6, 2013) plaintiff was a mentally ill patient who attempted suicide. Plaintiff asserted that defendants violated his rights under the ADA or RA when they did not provide adequate treatment or take proper steps to have him committed for mental health observation. The court held that the plaintiff's claims amounted to an alleged failure to treat or alleged medical malpractice, including a failure to involuntarily commit plaintiff. The claims all failed to state a claim under the ADA or RA. The *Rosario* case is similar to this case because here, plaintiffs claim that UTMB should have moved McCollum to different housing.

The court held that the Constitution does not establish any particular level of treatment, and that the ADA does not impose on the States a "standard of care" for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities". Citing *Olmstead v. Zimring*, 527 U.S. 581, 603 n.14 (1999). See also *Vela v. Travis County*, 2011 U.S. Dist. LEXIS 7112 (Jan. 25, 2011)(inadequate medical care does not provide a basis for an ADA claim unless medical services were withheld by reason of a disability). In addition, other courts have held that a lawsuit under the Rehabilitation Act or the Amercians With Disabilities Act cannot be based on medical treatment decisions. See *Fitzgerald v. Correctional Corp. of America*, 403 F.3d 1134, 1144 (10th Cir. 2005); *Shelton v. Arkansas Dept. of Human Services*, 2011 U.S. Dist. LEXIS 34013 (March 29, 2011)(ADA and RA claims dismissed because they were premised on the medical decision to remove [inmate] from suicide watch).

**III.**

**REQUIRED SOVEREIGN IMMUNITY FINDINGS**

Sovereign immunity bars Title II claims against public entities "unless Congress has validly abrogated that immunity under its power to enforce the Constitution's substantive guarantees through the Fourteenth Amendment." *Duncan v. Univ. of Texas Health Science Ctr. at Houston*, No. 11-20025, 469 Fed. App'x 364, 367 (5th Cir. Apr. 10, 2012). Because plaintiff has sued a public entity under the ADA, the case is governed by Title II of that statute. In *United States v. Georgia*, 546 U.S. 151, 126 S. Ct. 877, 163 L. Ed. 2d 650 (2006), the Supreme Court held that when courts consider sovereign immunity in the context of Title II claims, they should first address whether the conduct challenged by the plaintiff violates Title II, then resolve whether the conduct also violates the Fourteenth Amendment, and finally, if Title II is violated but not the Fourteenth Amendment, address whether Title II validly abrogates sovereign immunity in these circumstances. Id. at 159; *Brockman v. Tex. Dep't of Crim. Justice*, 397 Fed. Appx. 18, 23 (5th Cir. 2010). "The purpose of this rule is to prevent courts from unnecessarily addressing the constitutional issue of whether the ADA may validly abrogate sovereign immunity in the absence of a violation of the Fourteenth Amendment." *Brockman*, 397 Fed. Appx. at 23. The Fifth Circuit has noted that "when lower courts have unnecessarily reached issues concerning the constitutionality of the ADA's abrogation of sovereign immunity, the offending portions of their decisions have been vacated on appeal." Id. (concluding on appeal that ADA claims were either untimely or had been waived, and thus, vacating the portions of the magistrate judge's opinion, adopted by the district court, that concerned abrogation of sovereign immunity under the ADA); see also *Hale v. King*, 642 F.3d 492, 503 (5th Cir. 2011) (vacating portions of the district court's decision that addressed whether plaintiff's allegations established

violations of the Fourteenth Amendment and whether Title II of the ADA validly abrogates state sovereign immunity, since "such an inquiry, which would include resolution of constitutional issues, is unnecessary unless and until *Hale* has stated a violation of Title II"). In this case, plaintiff has failed to demonstrate a violation of the ADA. See infra. Therefore, the Court need not proceed further in the sovereign immunity analysis.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for
Defense Litigation

KAREN D. MATLOCK
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/KIM COOGAN
KIM COOGAN
Assistant Attorney General
State Bar No. 00783867
P. O. Box 12548, Capitol Station
Austin, Texas 78711

**ATTORNEYS FOR DEFENDANT**
**UNIVERSITY OF TEXAS MEDICAL BRANCH**

## NOTICE OF ELECTRONIC FILING

I, KIM COOGAN, Assistant Attorney General of Texas, certify that I have electronically submitted for filing **The University of Texas Medical Branch's Motion For Summary Judgment** to the Court, on May 2, 2014 in the Northern District of Texas, Dallas Division.

/s/ Kim Coogan
KIM COOGAN
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I, KIM COOGAN, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **The University of Texas Medical Branch's Motion For Summary Judgment** has been served by placing same in the United States Mail on this the 2nd day of May, 2014, addressed to:

Jeff Edwards
Scott Medlock
The Edwards Law Firm
1101 E. 11th Street
Austin, Texas 78702

Brian McGiverin
Wayne Krause-Yang
Texas Civil Rights Project
4920 N. IH-35
Austin, Texas 78751

Bruce R. Garcia — ***Via Hand-Delivery***
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711

Demetri Anastasiadis — ***Via Hand-Delivery***
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711

/s/KIM COOGAN
KIM COOGAN
Assistant Attorney General