UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM,<br><br>                  PLAINTIFFS<br><br>v.<br><br>BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE.<br><br>                  DEFENDANTS | § § § § § § § § § § § § § § § § | CIVIL ACTION NO.<br>3:12-cv-02037<br>JURY DEMAND |

**PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
SANCTIONS; REQUEST FOR SHOW CAUSE ORDER; AND MOTION TO
COMPEL**

## TABLE OF CONTENTS

**Summary**...........................................................................................................**4**

  **I. Factual Background** ....................................................................... **5**

     a.  Case Background........................................................................ 5

     b.  Defendants' Representations up until April 25, 2014......................... 6

     c.  UTMB's Production on April 25, 2014............................................ 10

     d.  The status of discovery between April 25 and today. ....................... 13

  **II. Argument & Authorities** ................................................................. **15**

     a.  Defendants had a duty to disclose persons with knowledge and

       documents that may be relevant.................................................. 15

     b.  Defendants' failure to adhere to the basic rules of discovery has

       prejudiced Plaintiffs.  Sanctions are warranted................................ 16

  **III. Prayer for Sanctions/Prayer to Compel Production and**

       **Produce Witnesses**..................................................................... **21**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Bayoil, S.A. v. Polembros Shipping, Ltd.*,
   196 F.R.D. 479 (S.D. Tex. 2000)........................................................ 15

*Blackmon v. Garza*,
   484 Fed. Appx. 866 (5th Cir. 2012) (unpublished)..................... 10

*Clearvalue, Inc. v. Pearl River Polymers, Inc.*,
   242 F.R.D. 362 (E.D. Tex. 2007)....................................................... 15

*Mercury Air Group, Inc. v. Mansour*,
   237 F.3d 542 (5th Cir. 2001). ............................................................ 15

*Nat'l Ass'n of Radiation Survivors v. Turnage*,
   115 F.R.D. 543 (N.D. Cal. 1987)....................................................... 15

*R & R Sails Inc. v. Insurance Co. of State of PA*,
   251 F.R.D. 520 (S.D. Cal. 2008) ...................................................... 15

*VirnetX Inc. v. Cisco Systems, Inc.*,
   2012 WL 7997962, (E.D. Tex. August 8, 2012) ........................... 16

## Summary

Plaintiffs have been the victims of Defendants' gamesmanship.  After nearly two years of litigation and 14 depositions, Plaintiffs just learned that the Defendants have failed to disclose countless witnesses with knowledge that Defendants should have disclosed in their initial disclosures and/or interrogatory responses.

Further, Defendants have failed to produce an untold number of documents that Defendants should have produced with their initial disclosures or in response to requests for production. Most shockingly, only recently have Defendants even *begun* to identity what potentially relevant documents might exist and begun any meaningful process of searching for those documents—almost two years after this case was filed.

Defendants' failure to adhere to the basic rules of discovery has prejudiced Plaintiffs.  In the course of this litigation, Plaintiffs revealed strategy and expended hundreds of hours without access to key documents responsive to their claims—all due to Defendants' failure to comply with the Rules.  As a consequence, Plaintiffs have been forced to operate in the dark about what witnesses exist and what documents are relevant to this case.  At worst, Defendants intentionally withheld information and documents in an effort to prejudice Plaintiffs.  At best, Defendants have acted with a cavalier disregard of their discovery obligations.

Additionally, despite Plaintiffs' urgent and repeated requests that Defendants inform Plaintiffs whether relevant documents have been destroyed (either through document-retention policies or manual deletion), Defendants have made no such assurances and have resisted Plaintiffs' requests to depose knowledgeable IT personnel. Nor have Defendants been willing to have a meaningful conversation about the adequacy

and scope of the search Defendants are conducting.  Accordingly, so that Defendants do not benefit from their gamesmanship, to try to put Plaintiffs in the position they would have been in had Defendants complied with their obligations, and to deter such conduct going forward (from the State of Texas and the Executive Director of TDCJ, no less), Plaintiffs respectfully request the Court award appropriate sanctions against Defendants; that they be ordered to show cause why they should not be sanctioned; and that the Court compel Defendants to respond to discovery.

I.   **Factual Background**

   a.   *Case Background.*

This case arises from a heat stoke suffered by Larry Gene McCollum while he was incarcerated at the Hutchins State Jail.  This case is one in a series of cases involving inmates who have died from heat-related causes while in the care of Defendants. Texas prisons are not air-conditioned and indoor heat indexes regularly reach 130 degrees in the summer months.  In fact, at least ten prisoners died from heat stroke in 2011 alone.[1] Those cases are being litigated in federal courts across the state in Houston, Tyler, and Corpus Christi, in addition to this Court.  This case was the first filed and is the most developed.  It is currently set for trial in November 2014.

This case was filed in 2012.  Over the course of two years, Plaintiffs have sent numerous written discovery requests and taken 14 depositions. The parties have engaged in a comprehensive motions-practice.  Plaintiffs have incurred hundreds-of-thousands of dollars in expenses and time.  *See* Ex. 1, Appx. p. 2.

---

[1] During the course of discovery, Plaintiffs have found at least 19 men have died of heat

A major issue in this case (and all the extreme-heat cases) is who knew of the dangers caused by extreme indoor temperatures and when did they know of them. As one would expect in such a case, the party seeking to prove the other had knowledge will naturally rely at least in part on documents—most logically documents such as emails or meeting minutes. In this case, a key question those documents will answer is to what extent the Defendants knew of the dangers faced by people like Mr. McCollum who suffer from disabilities that make them more susceptible to heat stroke. Without these documents, proving what Defendants knew and when they knew it becomes more difficult, and the fact-finders may never learn the truth.

### b. Defendants' Representations up until April 25, 2014.

During the Rule 26 conference in this case and repeatedly afterwards in companion extreme-heat case Rule 26 conferences, and when asked directly and incredulously by Plaintiffs' counsel on several occasions, Defendants represented that they had virtually no emails discussing heat in Texas prisons and that even high-level prison administrators rarely used email.[2] Plaintiffs took Defendants at their word.

TDCJ's, Livingston's, and Pringle's initial disclosures served in December of 2012 lists only a few witnesses that "are likely to have information that bears significantly on any claim or defense." *See* Ex. 2, Appx. p. 5. Subsection (b) of the initial disclosures indicated that Defendants were providing a "copy of all documents…in the possession, custody, or control of the party that are likely to bear significantly on any

---

[2] Defendant UTMB was not a party to the original Rule 26 conference because it was added after that conference had taken place. UTMB, however, was well aware of its discovery obligations as is now evidenced by their April 25 production and assurances that it is conducting a search for more responsive documents.

claim or defense" and that Defendants would supplement that which was not initially provided. Ex. 2, Appx. p. 6-7.  These statements in the initial disclosures are enough to create a duty for TDCJ, Pringle, and Livingston[3] to produce what relevant documents they had and to identify persons with knowledge.  Additionally, though, Plaintiffs also sent written discovery seeking information Defendants have wrongfully withheld.

Plaintiffs' first Requests for Production and Interrogatories sent to Defendants TDCJ, Pringle, and Livingston in November of 2012 asked those defendants to "identify all persons who you believe have knowledge of relevant facts and identify the issues upon which you believe they have knowledge."  *See* Ex. 3, Appx. p. 15; Ex. 4, Appx. p. 21; Ex. 5, Appx. p. 27.  TDCJ was also asked to "identify all heat-related injuries (including, but not limited to, fatalities, where the cause of death is listed as "hyperthermia") of inmates in Texas Department of Criminal Justice facilities between January 1, 1990 to the present."  *See* Ex. 3, Appx. p. 13.  Pringle and Livingston were both asked to "identify all heat-related injuries" to inmates in TDCJ's facilities while Pringle and Livingston were employed by TDCJ. Ex. 4, Appx. p. 3; Ex. 5, Appx. p. 26.  These Defendants were then asked to produce "all documents or other physical or tangible evidence related to, referred to, identified in, or that formed the basis of any answer to the previous interrogatories."  *See* Ex. 3, Appx. p. 16; Ex. 4, Appx. p. 22; Ex. 5, Appx. p. 28.  Accordingly, to the extent TDCJ, Pringle, or Livingston had any potentially relevant documents, they had a duty to disclose them.  To the extent these

---

[3] Livingston, Pringle, and TDCJ were the only signatories to the initial disclosures.  The other Defendants were added later.  UTMB did not provide its initial disclosures until April of 2014—one year after it was added to the suit in April of 2013 (Doc. 43).

Defendants knew of any persons with knowledge, they had a duty to disclose them. Thus, any such witnesses and documents should have been disclosed in 2012.

Further, after TDCJ disclosed that a total of 10 employees and inmates had heat-related injuries at the Hutchins prison from 2009-2012, Plaintiffs sought "all documents" related to those other injuries. *See* Ex. 6, Appx. p. 33. TDCJ objected based on HIPAA concerns, redacted parts of documentation, and provided what appeared to be all responsive documents. *Id.*

UTMB sent its Rule 26 disclosures just weeks ago in April of 2014—a year after it had been added as a Defendant. *See* Ex. 7, Appx. p. 35. In these disclosures, UTMB acknowledges its duty to disclose all persons "likely to have discoverable information" and documents that "are relevant to disputed facts." *See* Ex. 7, Appx. p. 35, 36. In August of 2013, UTMB responded to a request for production that asked for "all documents related to the inmate heat injury in any TDCJ facility where UTMB provides medical care between 2007 and 2012." *See* Ex. 8, Appx. p. 42. UTMB's response after objecting was that "UTMB has no records responsive to this request."[4] *Id.* As recently as March 20, 2014, UTMB answered interrogatories that asked to identify heat-related injuries and heat-related deaths. To the injury interrogatory, UTMB objected and falsely

---

[4] This is the *third time* in this heat litigation that Plaintiffs' counsel has learned that UTMB does, in fact, have documents that UTMB claimed it did not have. In *Hinojosa v. Livingston*, No. 2:13-cv-319 in the Southern District of Texas, UTMB claimed it did not have autopsies but they did. *See* Doc. 32, 34, *Hinojosa v. Livingston*, 2:13-CV-319 (S.D. Tex.). In *Webb v. Livingston*, No. 6:13-cv-711 in the Eastern District of Texas, UTMB claimed that they did not have "investigations" into heat-stroke deaths when they, in fact, did. *See* Doc. 106, *Webb v. Livingston*, No. 6:13-cv-711 (E.D. Tex).

stated[5] that answering it would create an undue burden. *See* Ex. 9, Appx. p. 46. To the death question, UTMB responded that it "does not maintain a list or record of inmate deaths in the usual course of business." *Id.* A corresponding request for production sought all documents "related to, referred to, identified in, or that formed the basis of any answer to the previous interrogatories." *See* Ex. 10, Appx. p. 52. UTMB's response was minimal.

From 2012 up until April 25 of this year, the Defendants provided few emails, internal correspondence, or intra-agency correspondence regarding heat in the prisons and the harmful, sometimes deadly, effect it was having on inmates. The emails that were provided were mostly disclosed as part of additional document productions—such as an internal investigation file that happened to include some emails—instead of a stand-alone search for responsive documents.

Having only those documents that Defendants produced, and based on Defendants' disclosures as to what witnesses existed, Plaintiffs engaged multiple experts and prepared for and took numerous depositions. During those depositions, Plaintiffs necessarily divulged trial strategy to Defendants and incurred significant expenses and attorneys' fees—all without the benefit of extremely relevant documents.

---

[5] In fact, UTMB had been providing monthly emails updating senior TDCJ leadership of all heat-related illnesses and deaths since at least 2010 in an easy to read spreadsheet. *See* Ex. 12, Appx. p. 57.

   *c.   UTMB's Production on April 25, 2014.*

UTMB produced 392 pages of emails on April 25—one week before the deadline then in place for dispositive motions.[6]  The emails (though few) create a completely different picture as to the responsive documents that exist and the people with knowledge in this case.  Most of the emails show multiple recipients.  But rarely were multiple emails produced.  Many of the documents also show that they included attachments, but no attachments are produced.   Despite being only 392 pages, these emails directly contradict the prior discovery responses dating back to December 2012.  The emails also demonstrate that TDCJ did, in fact, communicate via email regarding the heat; that UTMB created monthly reports of heat-related incidents for offenders as early as 2010 and that these "databases" were provided to "senior" officials; that heat-related deaths were tracked; that heat-related illness reports were provided to high-level administrators; that senior officials knew of and discussed the heat crisis that existed in the Texas prisons; that at least some UTMB nursing staff frantically sought help in caring for patients only to be ignored by those higher up the chain of command; and that Dr. Charles Adams, a senior policymaker at UTMB and UTMB's and TDCJ's expert in *Blackmon v. Garza*, 484 Fed. Appx. 866 (5th Cir. 2012) (unpublished)—one of the seminal extreme heat cases out of the Fifth Circuit—knew that prisoners needed "cooling."

---

[6] These documents were originally provided earlier in the week but could not be opened on Plaintiffs' counsel's computer.  Much to Ms. Coogan's—UTMB's counsel's—credit, she provided a readable copy within hours of our request.  Additionally, had UTMB not produced these documents, TDCJ would almost certainly still be withholding responsive documents. In fact, it is doubtful they would have even searched.

Specifically, the emails include the following:

- Ex. 11, p. Appx. p. 55.  With the subject line "Heat Ad Seg offenders," this email demonstrates that as early as 2010 Mr. Thaler— Director of the Correctional Institutions Division at TDCJ who Plaintiffs deposed on October 13, 2013—had given a directive for health services to "pay closer attention to ad seg offenders on psychotropic meds due to them being more at risk" of heat-related illnesses.  This email shows that top TDCJ officials knew of the dangers associated with the heat and that those on psychotropic medications were "more at risk."

- Ex. 12, p. Appx. p. 57. Attaches a database called "heat related incidents 081310."  As with all of the emails produced, the attachment was not produced. But the fact that it exists indicates that TDCJ/UTMB have been documenting heat-related incidents and sharing them as least as early as 2010.  In fact, Kimberly McLearen (a previously undisclosed witness) states in another email that she keeps a "database" of all heat-related incidents that is "sent to senior leadership at the end of every month."  Ex. 13, p. Appx. p. 59.  Yet none of these databases have been produced in this litigation. Nor has any Defendant produced any email conversations or any other correspondence or meeting minutes—*any documentation*— acknowledging the existence of these records or any persons with knowledge about these documents until now.  Instead, UTMB, for example, has stated that it has "no records" identifying heat-related illnesses. *See* Ex. 8, Appx. p. 42.

- Ex. 14, Appx. p. 63.  A "Heat-Related Illness Reporting Form" exists and acts as a "reporting system" of heat-related incidents.  TDCJ "audited" the accuracy of this reporting system.  No party has produced any copies of this form or any correspondence related to this form, how it is used, or any information about anything regarding this form or any audit.

- Ex. 15, Appx. p. 66.  As early as June 9, 2011, an email from TDCJ to both UTMB and Texas Tech Health Services Center (the two medical providers for TDCJ) states that Dr. Lannette Linthicum, TDCJ's Chief Medical Officer, is to be informed about all offenders who suffer heat-related illnesses and what email address to send it to.

- Ex. 16, Appx. p. 69-71.  William Stephens, then Deputy Director of TDCJ's Correctional Institutions Division who Plaintiffs deposed on October 18, 2013, was sent an email about heat-related issues at one of the prisons.  That email states that water was only being passed out "once daily and sometimes twice" at a prison and that the ice machines were either "broke" or could not keep up with the demand.   Not only does this email directly contradict repeated assertions by TDCJ that TDCJ has few

relevant emails, it also contradicts the claim that senior officials like Stephens have no relevant emails—unless, of course, they deleted them.

• Ex. 17, Appx. p. 73. This email indicates that TDCJ has audited its policies and procedures related to the heat. Yet Defendants have not provided this audit or provided any documents related to this audit. Neither the sender nor the recipient of this email has been disclosed as a person with knowledge.

• Ex. 18, Appx. p. 75-79. Dr. Charles Adams—Senior Medical Director of Outpatient Services at UTMB—criticizes how little water is being offered to inmates and states that it is his opinion that passing out water 2-3 times a day is "insufficient" and asks for a report for all TDCJ regions as to how each region provides water and ice to the inmates. (In Exhibit 19, Dr. Adams states that inmates need "cooling" to protect them from the heat. *See* Ex. 19, Appx. p. 81.) None of these regional reports that the Senior Medical Director requests are provided except the one in the body of this email. Nor have Defendants provided any correspondence, assessments, or communications about the reports or what other UTMB doctors believe is needed to keep inmates alive in the excessive heat.

• Ex. 20, Appx. p. 85. Jerri Robison (a previously undisclosed witness—a nurse) emails Justin Robison (a previously undisclosed witness) after an inmate almost died from heat stroke and indicates that there is a disagreement between TDCJ and UTMB where TDCJ for some reason "can't be allowed to take temps." Nurse Robison states, "They know how to do it. This scares the hell out of me. This guy could have died…Seems like a simple measure to save a life."

• Ex. 21, Appx. p. 89-90. An alarmed email from Justin Robison, Director of Nursing at UTMB (a previously undisclosed witness) states that he is "very concerned" about the disregard "rank" is showing to the patients. He notes that there were *three deaths in the past six days from heat in a single prison*.[7] He includes an email from a nurse manager (a previously undisclosed witness) who lists 21 problems at her particular prison, including that the inmates are not provided enough water and ice and correctional officers are "not honoring heat restrictions." She states that she is

> not getting much if any cooperation from rank. Was told no on more [water] coolers…I am very frustrated at the lack of cooperation from Warden Haynes. HELP!!!!

---

[7] Critically, UTMB and TDCJ have only ever previously acknowledged *two* heat-related deaths at this prison.

- Ex. 22, Appx. p. 92-95.  An email conversation where a nurse at one prison complains about an air-conditioner outage in the medical unit where she works.  The warden was contacted at least twice, as was the regional director.  W.E. Jarrett—Regional 1 Operations Manager at UTMB—states that the prison's "heat situation has reached the highest levels of TDCJ and [Correctional Managed Care—which includes UTMB]."

- Ex. 23, Appx. p. 97. There is a reference to a heat-related inmate death in the summer of 2013.  Yet TCDJ has repeatedly said that nobody died of heat-related causes in the summer of 2013.

> *d.  The status of discovery between April 25 and today.*

Plaintiffs have now been told that UTMB has started to search for emails.  Given that McCollum's death was on July 22, 2011, many of the relevant documents will be from before that date.  On a conference call Plaintiffs' and Defendants' counsel had on May 2[8] (which ended when Defendants hung up the phone on Plaintiffs), UTMB indicated that it did not know the specifics of the search but said that it would be filing later that day an affidavit of UTMB's IT specialist in a related heat-death case pending in the Eastern District of Texas and that the affidavit would include the details of the search.[9]  That affidavit is attached as Exhibit 26.  The details provided in that affidavit are silent as to whether back-up tapes are being searched.  Further, although UTMB's counsel has indicated that the documents will be produced in 6-8 weeks[10], the affidavit

---

[8] A memorialization of that conversation is attached.  *See* Ex. 24, Appx. p. 100.

[9] That case is 6:13-cv-00711-JDL, *Webb et al v. Livingston et al.*  Document 124 is the filing and Exhibit D is the affidavit.  In that case, UTMB faces sanctions for blatantly misrepresenting in open court that no peer-review documents were in UTMB's custody.  While UTMB's counsel was obviously the victim of her clients' malfeasance, it is further evidence of UTMB's willingness to skirt the rules and engage in gamesmanship.  *See* Ex. 25, Appx. p. 103.

[10] *See* Ex. 27, Appx. p. 114.

from UTMB's IT person states that it will take 90 days for the results because of an unexplained "slow connection."  *See* Ex. 26, Appx. p. 111.

TDCJ has also represented that it has begun searching for emails and believes its production will be on the week of May 12.  On the same May 2 conference call, TDCJ did not disclose the specifics of what was being searched or which custodians were being searched.  Although TDCJ did subsequently identify the custodians whose emails are being searched, TDCJ is only searching the emails of 6 people.  *See* Ex. 28, Appx. p. 116.

Concerned that the Defendants' failure to discover relevant emails has resulted in the loss of electronically stored information, Plaintiffs' counsel sent a letter to Defendants requesting they confirm that Defendants have taken affirmative steps to identify and preserve all potentially relevant electronically stored information and have prevented such information from being destroyed (including destruction by routine document purging).  *See* Exhibit 29, Appx. p. 119.  On the May 2 conference call, Defendants did not answer the question and later sent the emails attached.  *See* Ex. 30, Appx. p. 122.[11] Defendants' only substantive representation has been that they assume the general counsel's offices at UTMB and TDCJ did what was "appropriate."

Plaintiffs have also repeatedly requested that Defendants engage Plaintiffs in a conversation about the scope and adequacy of the search being conducted.  *See* Ex. 31, Appx. p. 126.  Plaintiffs are concerned that Defendants' search is not adequate and only captures the tip of the iceberg of what is responsive.  *See Id.*  Defendants have not been willing to engage thus far. *See Id.*  TDCJ emailed Plaintiffs on May 8 and indicated that

---

[11] Plaintiffs' counsel regrets having to attach these derisive emails; however, they evidence the lack of seriousness with which certain Defendants and their counsel—particularly Director Livingston's counsel—view this case and their obligations under the Rules.

any discussion about email searches would be "premature." *See* Ex. 32, Appx. p. 131-132.

## II.    Argument & Authorities

### a. *Defendants had a duty to disclose persons with knowledge and documents that may be relevant.*

TDCJ, Pringle, and Livingston made written representations in their initial disclosures that they were identifying witnesses and producing relevant documents. They never for more than a year-and-a-half supplemented their terse responses. Additionally, Defendants told Plaintiffs orally that they had no emails. *See* Ex 1, Appx. p. 2; Ex. 33 Appx. p. 134. Now, two years into litigation, Defendants state that they have begun to search for them.

Federal courts have the inherent power, as well as the authority of several rules of civil procedure, to impose sanctions where they are warranted. *Bayoil, S.A. v. Polembros Shipping, Ltd.*, 196 F.R.D. 479, 481 (S.D. Tex. 2000) (striking personal jurisdiction defense as sanction under Court's inherent power where party deleted documents). Appellate review of sanctions is narrow because "the imposition of sanctions is often a fact-intensive inquiry, for which the trial court is given wide discretion." *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001).

Rule 26(g) states that by signing a discovery response "an attorney or party certifies that to the best of the person's knowledge, information, and belief *after a reasonable inquiry*…is complete and correct as of the time it is made." FRCP 26(g)(1)(A) (emphasis added). If a party acts in violation of this rule without "substantial justification," the Court may award an appropriate sanction against the party, the attorney, or both. FRCP 26(g)(3). *See Nat'l Ass'n of Radiation Survivors v. Turnage*,

115 F.R.D. 543, 554 (N.D. Cal. 1987) (issuing sanctions in part because discovery responses did not reflect a reasonable inquiry where party failed to disclose relevant documents) (cited approvingly in *Clearvalue, Inc. v. Pearl River Polymers, Inc.*, 242 F.R.D. 362, 375, 384 (E.D. Tex. 2007) (stating that discovery process is an "honor system" that requires parties to produce relevant documents in its possession.);  *R & R Sails Inc. v. Insurance Co. of State of PA*, 251 F.R.D. 520, 524-525 (S.D. Cal. 2008) (sanctions warranted where party failed to establish that it had performed a reasonable inquiry into the existence of relevant documents; therefore court could not find that incorrect certifications under Rule 26 were "substantially justified").

A sanction that "simply imposes fees and expenses and orders" that proper discovery take place allows the wrongful party to get away with what it sought to achieve—obtaining an advantage over the party who was wronged.  *See VirnetX Inc. v. Cisco Systems, Inc.*, 2012 WL 7997962, *5 (E.D. Tex. August 8, 2012) (J. Davis) (awarding sanctions against party who wrongfully stopped a deposition).  "Such a nominal sanction would not provide any deterrent effect and would not put" the aggrieved party in the position it was in prior to the wrongful acts.  *Id.*  Absent a meaningful sanction, future litigants faced in a similar situation may choose to act wrongfully because the benefits outweigh the costs.  *Id.*

   b. *Defendants' failure to adhere to the basic rules of discovery has prejudiced Plaintiffs.  Sanctions are warranted.*

Plaintiffs have spent hundreds-of-thousands of dollars in expenses and attorney time developing this case over the past two years.  *See* Ex. 1, Appx. p. 2.  Plaintiffs have prepared for and taken 14 depositions, sent numerous written discovery requests, and

engaged in a comprehensive motions practice—a practice almost entirely instigated by Defendants.

Defendants failed to produce databases that track heat-related illnesses.  Exhibits 12 and 13 show that as early as 2010—a year before McCollum's death—these databases tracked heat-related illnesses and were shared with senior leadership.  Yet when asked for documents related to heat-related illnesses at TDCJ facilities, UTMB stated that it had "no records."  *See* Ex. 8, Appx. p. 42.  TDCJ claimed it would be "unduly burdensome" and that the request was "overbroad." *See* Ex. 3, Appx. p. 13.  To this day, neither party has produced these documents.[12]   These documents and others like them may be crucial to this case because they show the sheer number of incidents and that "senior leadership" knew about these incidents and did nothing—or, at least, that any response was "insufficient," according to UTMB's Senior Medical Director.  *See* Ex. 18, Appx. p. 75.  Importantly, Plaintiffs did not have copies of these documents when Plaintiffs deposed Defendants' key witnesses—including 30(b)(6) witnesses—and did not even know they existed.

TDCJ, Livingston, and Pringle served initial disclosures and discovery responses in December of 2012 that purported to identify all witnesses with knowledge and produce

---

[12] While TDCJ has claimed it will soon produce responsive documents, the search that TDCJ conducted to obtain these documents appears to be insufficient as TDCJ's representation was that it only searched the emails of six individuals.  It is not clear whether the production that TDCJ says will occur this week will even include these databases.  TDCJ has provided little guidance or assurances as to how it is conducting its search. As they have thus far refused to put an IT person up for deposition, their assurances are highly suspect at this point.

documents that were likely to bear significantly on any claim or defense.[13] *See* Ex. 2, Appx. p.  5, 6; Ex. 3, Appx. p. 5; Ex. 4, Appx. p. 21; Ex. 5, Appx. p. 27.  Further, these Defendants were asked to identify all heat-related injuries in TDCJ facilities and produce all documents related to those injuries.  *See* Ex. 3, Appx. p. 13, 16; Ex. 4, Appx. p. 20, 22; Ex. 5, Appx. p. 26, 28.  TDCJ, Livingston, and Pringle produced very little, including virtually no emails about the heat and repeatedly indicated that no emails existed.  At worst, TDCJ, Livingston, and Pringle knowingly withheld responsive documents and information.  At best, TDCJ, Livingston, and Pringle failed to make a reasonable inquiry as to what documents existed before they responded to discovery requests.

UTMB is no less culpable of failing to make a "reasonable inquiry" into the existence of relevant documents.  UTMB acknowledges its duty to disclose witnesses who are "likely to have discoverable information" and documents that are "relevant to disputed facts."  *See*  Ex. 7, Appx. p. 35, 36.  UTMB's response to a request for production that asked for all documents related to inmate heat injuries was that "UTMB has no records responsive to this request."  *See*  Ex. 8, Appx. p. 42.  As recently as two months ago, Plaintiffs asked UTMB for documents related to responses to interrogatories that asked for information identifying heat-related injuries and deaths.  UTMB did not produce its databases that tracked <u>all</u> heat-related illnesses and deaths since at least 2010.  Nor did UTMB identify or produce the monthly emails updating senior leadership of all

---

[13] Plaintiffs do not fault these Defendants for not knowing every single witness in 2012. Nor do Plaintiffs fault these Defendants for not immediately turning over all responsive documents consistent with the representations in those initial disclosures and discovery responses. What is problematic—and what has prejudiced Plaintiffs here—is that TDCJ, Livingston, and Pringle made no "reasonable inquiry" into what existed at that time, caused their counsel to make misrepresentations on which Plaintiffs relied, and made no reasonable efforts to produce those documents.  Even now, two years into litigation, it's not even clear that they ever have.

heat-related illnesses and deaths. UTMB did not produce any documents related to the audit of "Heat-Related Illness Reporting Forms."  Nor did UTMB identify the nurses, senior leadership, or other employees whose emails reflect the dire situation in Texas prisons and those employees' comments partially captured above.  UTMB certainly did not produce documents related to these people either.  Instead, UTMB's responses claim undue burden or that it has "no records," or "does not maintain a list or record of inmate deaths in the usual course of business."  Ex. 8, Appx. p. 42; Ex. 9, Appx. p. 46; Ex. 10, Appx. p. 52.  This was patently false.

Defendants now say that they have begun searching for emails.  Neither party has made any representation that it is now searching for other electronically stored information besides emails—such as the databases.  In a phone conference on May 2, Defendants' counsel indicated that it did not have any specific knowledge of what documentation preservation efforts were made at UTMB and TDCJ but stated that they assumed the general counsel's office at those organizations did what was necessary.  UTMB states that its IT department is gathering documents and will produce them in either 6-8 weeks or 90 days.  TDCJ has indicated that it will be supplementing its discovery the week of May 12 but TDCJ's search protocols to find those documents appear grossly inadequate as it only searched the emails of 6 TDCJ employees.  *See* Ex. 28, Appx. p. 116.   TDCJ has refused to even have a conversation about a more comprehensive search that captures, for example, emails to/from Defendants in this lawsuit such as Senior Warden Pringle.  After two years of litigation, TDCJ has said that such a conversation would be "premature."  *See* Ex. 32, Appx. p. 131.

As a consequence of Defendants' gamesmanship, Plaintiffs have had to take numerous depositions and engage experts with an incomplete, and potentially misleading, picture of the facts.  A major issue in this case is what senior officials knew about the heat-related incidents and when they knew.  The emails provided paint a completely different picture than the one Defendants have portrayed thus far.  Not only did senior leadership know how dangerous the heat was to inmates, they were getting repeated updates about injuries and deaths and not only ignored the severity of the problem, they ignored specific pleas for help from their employees.  Due to Defendants' failure to learn what responsive documents exist, preserve them, obtain them, and produce them when those documents should have been produced with the initial disclosures in December of 2012, Plaintiffs will likely have to re-depose several witnesses.  Additionally, to ensure that Plaintiffs will soon have everything responsive and to inquire as to what evidence is now permanently deleted, Plaintiffs will have to now depose IT staff at both UTMB and TDCJ regarding preservation and retrieval of electronically stored information.

Simply having an opportunity to conduct necessary discovery, however, does not put Plaintiffs back in the position they would have been had Defendants adhered to their duty as litigants in federal court.  Plaintiffs have divulged trial strategy and have been unfairly disadvantaged in this case and, potentially, in the companion extreme-heat cases.  Thus, monetary sanctions, while helpful and warranted here, would not fully remedy Defendants' wrong and would not act as a sufficient deterrent.

Here, if this Court does *not* award sanctions, the message to the bar is clear: ignore the rules of civil procedure; do not disclose witnesses with knowledge—especially those that do not help your case; make no effort to produce relevant documents timely;

and delay production so that you can see how the other side is going to develop their case.  If your opponent has to devote significant time, money, and effort, even better.

### III.   Prayer for Sanctions/Prayer to Compel Production and Produce Witnesses

Given Defendants conduct and the prejudice to Plaintiffs, Plaintiffs respectfully request the Court grant sanctions that are appropriate and just, and more particularly, Plaintiffs request that Defendants be required to show cause why they should not be sanctioned.  Plaintiffs respectfully request that the Court compel as follows:

1.   Defendants' counsel be ordered to meet with Plaintiffs' counsel to discuss the issues Plaintiffs identified in their May 7 letter regarding ESI search protocol and any other issues regarding Defendants' search and retrieval of electronically stored information.  The parties should be ordered to attempt to agree on specific ESI search protocols. To the extent the Parties cannot agree, Plaintiffs request the Court appoint a Special Master to mediate such disputes and that all costs associated with such Special Master be assessed against Defendants.

2.   Defendants produce within 30 days, in a format selected by Plaintiffs, all responsive documents in its possession, custody, and control of the interrogatories and requests for production.  Because UTMB has a "slow connection" and has stated under oath that it cannot comply until September (*See* Ex. 26, Appx. p. 111), Plaintiffs respectfully request that an independent, third-party technology firm of Plaintiffs' choosing be retained to find and compile responsive documents.  Plaintiffs request that all costs associated with this search and compilation be assessed against Defendants.

3.   Defendants must present at a time and place convenient for Plaintiffs, Defendants' IT personnel who are most knowledgeable about Defendants' preservation and retrieval of electronically stored information (both generally and specifically in this case). Plaintiffs request that Defendants pay all costs associated with these depositions, including reasonable attorneys' fees.[14]

---

[14] Plaintiffs have attempted to begin the process of finding a mutually agreeable time and place for these depositions. TDCJ and UTMB are unwilling to produce such witnesses at this time.  *See* Ex. 32, Appx. p. 131-132.

4.           Defendants produce any preservation letters, litigation holds, etc. sent in this case within 7 days.  Additionally, Plaintiffs request the Court order each Defendant to answer the following interrogatories and file their answers with the Court within 7 days[15]:

    i.  Explain all steps you took to preserve and retrieve electronically stored information that may be relevant to this case.  Include the date you took any such action.  (The answer would include, at a minimum, the date and scope of any "litigation hold"; who was notified to preserve documents; what efforts were made to identify "key players" in this case; what was done to ensure all potentially relevant electronically stored information was preserved and when such acts occurred).

    ii.  Explain the efforts that were taken or could be taken to obtain any potentially relevant electronically stored information that was either manually deleted by any computer user or that was purged consistent with any document retention policy.  The answer would include, at a minimum, what efforts were taken—and could be taken—to obtain any emails, databases, or other files deleted by a user or purged in accordance with a records retention policy.

    iii.  If any potentially electronically stored information that may have been relevant to this case is irretrievable, identify it to the best of your ability and explain why it cannot be retrieved.

    iv.  Explain the extent to which you have back-up tapes and what information is on those back-up tapes.  If any back-up tapes no longer contain electronically stored information from 2009-2012, provide the date that it was lost.[16]

---

[15] As of now, counsel for Defendants have refused to provide us with litigation hold letters, the date of any such letters, or any confirmation that they took any affirmative steps to preserve electronically stored information.

[16] Plaintiffs intend to serve these interrogatories to Defendants in each of the heat-related cases within the next few days.  Nevertheless, Plaintiffs respectfully request the Court to order their answers without objections.

Plaintiffs trust that if the Court finds Defendants' conduct sanctionable, it will award appropriate sanctions.  Plaintiffs respectfully request that the following sanctions be part of what the Court orders:

1.      Plaintiffs request, if they believe it necessary, that they be permitted to re-open any deposition previously taken after Defendants produce responsive documents and Plaintiffs have had an adequate opportunity to review such documents.  Plaintiffs request that all such depositions be open for an additional 3 hours[17] for each deponent, should Plaintiffs choose.  Plaintiffs further request that the Court award all costs, including attorneys' fees for the preparation and taking of these additional depositions and all costs associated with any amendments to expert reports.  Plaintiffs can submit a later pleading with the Court identifying the cost and attorneys' fees.

2.      The discovery period in this case had closed on May 2.  The Court on May 5, however, stayed that and other deadlines.  *See* Doc 162. Plaintiffs request that a new deadline for discovery be set as to all parties that enables Plaintiffs to have sufficient time to obtain necessary discovery.

3.      Defendants pay reasonable attorneys' fees and costs associated with this motion in the amount of $28,550.[18]  This figure is calculated as follows:

| | | | | |
|---|---|---|---|---|
| Jeff Edwards, | 9 | hours x $450/hr. | = $ | 4,050 |
| Sean Flammer, | 64.5 | hours x $350/hr. | = $ | 22,575 |
| Scott Medlock, | 5.5 | hours x $350/hr.[19] | = $ | 1,925 |
| | | **Total** | **= $** | **28,550** |

4.      Defendants pay reasonable attorneys' fees and costs in an amount the Court deems fair and just.  Plaintiffs note that TDCJ has an annual budget of over $3 billion.[20]  UTMB has an annual budget of

---

[17] To the extent Plaintiffs believe they need more than an additional 3 hours, Plaintiffs will seek leave of Court if Defendants do not agree to more time.

[18] *See* Ex. 1, Appx. p. 2-3.

[19] This Court has already approved these rates for Mr. Edwards and Mr. Medlock in Doc. 137.  Mr. Flammer was not then a part of Plaintiffs' counsels' firm.  His qualifications and experience are discussed in Exhibit 1, Appx. p. 2-3.

over $1.6 billion.[21] If the Court deems Defendants' conduct sanctionable, Plaintiffs ask the Court to award an amount sufficient for Defendants to be deterred from repeating their acts in the future.

Dated: May 12, 2014.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
Tel.    512-623-7727
Fax.    512-623-7729

By      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Scott Medlock
State Bar No. 24044783
Sean Flammer
State Bar No. 24059754
Lead Counsel

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
c/o TRLA 4920 N. I-35
Austin, TX 78751
(512) 474-5073 [phone]
(512) 474-0726 [fax]

---

[20] *See* Texas Department of Criminal Justice: Annual Review 2012, p. 12, http://www.tdcj.state.tx.us/documents/Annual_Review_2012.pdf (last accessed May 5, 2012).

[21] *See* University of Texas Medical Branch at Galveston: Operating Budget Fiscal Year Ending August 31, 2014, "Operating Budget: FY2014." http://www.utmb.edu/utmbreports/#20 (last accessed May 5, 2014).

Eliot Shavin
State Bar No. 18138200
2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
Local Counsel

**ATTORNEYS FOR PLAINTIFFS**

### <u>CERTIFICATE OF CONFERENCE</u>

By my signature above, I certify that I had a phone conversation with counsel for all Defendants on Friday, May 2 to discuss these discovery issues.  Counsel hung up the phone on us.  Following that phone call, Plaintiffs sent numerous letters to Defendants' counsel regarding these issues.  One letter requested another meeting but Defendants refused.  We were not able to come to a resolution of these discovery issues.

By     /s/ Jeff Edwards
JEFF EDWARDS

### <u>CERTIFICATE OF SERVICE</u>

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.

By     /s/ Jeff Edwards
JEFF EDWARDS