UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, and SANDRA  §
McCOLLUM, individually, and STEPHANIE  §
KINGREY, individually and as independent  §
administrator of the Estate of LARRY GENE  §
McCOLLUM,  §
           PLAINTIFFS  §
 §
 §
v.                 §    CIVIL ACTION NO.
 §     3:12-cv-02037
 §     JURY DEMAND
BRAD LIVINGSTON, JEFF PRINGLE,  §
RICHARD CLARK, KAREN TATE,  §
SANDREA SANDERS, ROBERT EASON, the  §
UNIVERSITY OF TEXAS MEDICAL  §
BRANCH and the TEXAS DEPARTMENT OF  §
CRIMINAL JUSTICE.  §
         DEFENDANTS  §

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
SANCTIONS; REQUEST FOR SHOW CAUSE ORDER; AND MOTION TO
COMPEL AGAINST DEFENDANTS TDCJ, LIVINGSTON, CLARK, SANDERS,
TATE, AND EASON**

   "*Civil litigation in this country is conducted on an honor system. Only in rare
circumstances can a party force its way into an opposing party's corporate offices and
root through its documents unfettered. Rather, each party is responsible for conducting
its own search of its own documents and turning over all of the relevant, non-privileged
documents. Each side must trust that the other has not withheld or destroyed the
proverbial smoking gun. When one side intentionally violates this honor code, it damages
not only the opposing party but the legal profession as a whole and the entire system of
civil justice.*"

    —Honorable Judge Leonard Davis, Eastern District of Texas[1]

---

[1] *ClearValue v. Pearl River Polymers, Inc.*, 242 F.R.D. 362, 384 (E.D. Tex. 2007),
*affirming in part and reversing in part, Clearview, Inc. v. Pearl River Polymers, Inc.*, 560
F.3d 1291 (5th Cir. 2009).

## I.    INTRODUCTION

The Texas Department of Criminal Justice and the individual defendants represented by TDCJ's counsel[2] (including Executive Director Brad Livingston and Regional Director Robert Eason) have utterly failed to abide by the honor system. Despite being represented by attorneys who should be extremely knowledgeable about the prison system's structure, and, in some cases, who have represented TDCJ and its officials for decades in complex matters, TDCJ admits its general counsel and the Office of the Attorney General "manifest[ly]" and "undisputed[ly]" "fail[ed] … to identify and appreciate the level to which the Health Services Division was involved in the tracking of heat-related illness." Doc. 183, p. 10.

But even this shocking admission understates the magnitude of the TDCJ Defendants' failures. Because of the manner in which TDCJ and its counsel have violated the civil litigation "honor system," significant sanctions are needed.[3]

## II.    THE TDCJ DEFENDANTS ADMIT TO FAILING TO MAKE A REASONABLE INQUIRY FOR RESPONSIVE DOCUMENTS

Defendants TDCJ, Robert Eason and Brad Livingston do not contest they failed to make the "reasonable inquiry" required by Federal Rule of Civil Procedure 26(g)(1).  In fact, after being caught red-handed, they admit it.  *See* Doc. 183, TDCJ Response*,* p. 1 ("Nor do [TDCJ and the individual defendants] dispute that—until recently—they failed

---

[2] Throughout this Reply, Plaintiffs refer to the "TDCJ Defendants" to mean TDCJ, Livingston, Clark, Sanders, Tate, and Eason—all the defendants in this case except UTMB, who filed a separate response.

[3] In fact, the conduct of TDCJ, Livingston, and their counsel in this case is so egregious the court should strongly consider death penalty sanctions, as any lesser sanction may be insufficient to act as a deterrent. *Arista Records, LLC v. Tschirhart*, 241 F.R.D. 462, 464 (W.D. Tex. 2006) ("A district court possesses the inherent power to sanction a litigant by dismissing the case").

to meet those obligations …"). And the TDCJ Defendants concede some sanction is appropriate. *Id*., p. 12 ("TDCJ is unopposed to bearing the cost" of reopening depositions). A failure to make a reasonable inquiry alone is sanctionable, even absent bad faith. *In re Byrd, Inc.*, 927 F.2d 1135, 1137 (10th Cir. 1991).

While a show cause order is still needed, the affidavits attached to Defendants' Response demonstrate this was not a mere oversight, but how TDCJ and the Office of the Attorney General typically approach litigation against the agency. Bruce Garcia and Cynthia Milne concede it was their "standard practice" for the Attorney General to simply "forward[] the discovery to the [TDCJ] Office of General Counsel for the substantive responses." Doc. 183.1, p. 2; Doc. 183.2, p. 3.

Courts have awarded extremely severe sanctions for similar misconduct. In *Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448, 461-463 (S.D. Ohio 1995), an employee sued Anheuser-Busch alleging he was exposed to a dangerous chemical while canning beer. As here, outside counsel for Anheuser-Busch "essentially abdicated all responsibility to the client's in-house counsel" to locate and find responsive documents. *Id.* at 461.  As here, the in-house counsel, in turn, was "grossly deficient in his efforts to obtain all of the documents responsive" to discovery requests and an order on a motion to compel, failing to produce hundreds of responsive documents. *Id.* As here, Anheuser-Busch's employee who was "most likely to have significant information" was not asked what documents he had and only a small portion of the documents he had were produced. *Id.* The court found this discovery practice constituted "gross negligence and evidenced a lack of good faith in discharging the responsibility [counsel] had undertaken as a lawyer." *Id.*

The court noted that while it may be reasonable for in-house counsel to play a significant role in responding to discovery, "trial counsel must exercise some degree of oversight to ensure that their client's employees are acting competently, diligently and ethically." *Id.* The Court expanded on the duty a lawyer has when responding to a request for production. The court wrote that the lawyer must

> formulate a plan of action which will ensure full and fair compliance with the request. Such a plan would include communicating with the client to identify the persons having responsibility for the matters which are the subject of the discovery request and all employees likely to have been the authors, recipients or custodians of documents falling within the request. The plan should ensure that all such individuals are contacted and interviewed regarding their knowledge of the existence of any documents covered by the discovery request, and should include steps to ensure that all documents within their knowledge are retrieved. All documents received from the client should be reviewed by counsel to see whether they indicate the existence of other documents not retrieved or the existence of other individuals who might have documents, and there should be appropriate follow up. … [T]he Court believes these basic procedures should be employed by any careful and conscientious lawyer in every case.

*Id.* The *Bratka* court could be talking about the facts in this case.

Because this failure to make a reasonable inquiry was the "standard practice" of the Office of the Attorney General and TDCJ, this systemic deficiency likely goes well beyond this litigation.

## III.   TDCJ ACTED IN BAD FAITH AND COMMITTED FRAUD

But merely failing to make a reasonable inquiry that would have uncovered thousands of responsive documents is just the tip of the iceberg. TDCJ actually acted in bad faith and committed fraud, justifying sanctions under the Court's inherent power. *See Amsted Indus. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994). The TDCJ Defendants made continuous material misrepresentations that Plaintiffs relied on to

4

their detriment. *See Allstate Ins. Co. v. Receivable Finance Co., L.L.C.,* 501 F.3d 398, 406 (5th Cir. 2007) (stating elements of fraud).  When the TDCJ Defendants made those misrepresentations, they either knew the statements were false or they made those statements recklessly without any knowledge of the truth. *Id.*  Though Plaintiffs cannot get inside the heads of TDCJ, its agents, or lawyers, Plaintiffs believe the Court can infer the TDCJ Defendants' intent (and bad faith) from the facts presented and the continuous conduct throughout this case.

A.      **TDCJ's Misrepresentations in Discovery Responses**

1.  *Livingston's Misrepresentations*

TDCJ Executive Director Brad Livingston had multiple opportunities in responses to interrogatories to disclose the scope of Dr. Lannette Linthicum's involvement. Livingston was asked to identify people with knowledge relevant to Plaintiffs' claims and the issues upon which they had knowledge. *See* Ex. 1, Livingston's Response to Plaintiff's First Interrogatories, p. 3. Livingston failed to identify Linthicum and her role, even though, by statute, he appointed her to lead the Health Services Division to "develop[] policies and procedures for implementation of [TDCJ's] managed health care plan." *See* TEX. GOV'T CODE §§ 501.133(a)(1). Livingston stated *under oath* in his verification that his answers were *"true, correct, and complete." Id.* at 6 (emphasis added). But Livingston never mentions Linthicum or the Health Services Division – even though officials in the "Executive Director's Office" received multiple emails from Dr. Linthicum about heat-related deaths and injuries. Ex. 2, Linthicum Emails to "Executive Director's Office." Livingston did not finally disclose Linthicum as a witness until March 3, 2014, Ex. 3, Livingston's March 3, 2014 Supplemental Disclosures.

Additionally, Livingston was asked to "Identify all steps you took to protect Larry McCollum from heat index temperatures at the Hutchins Unit in excess of 90 degrees." *See* Ex. 1, Livingston's Response to Plaintiff's First Interrogatories, p. 3. He does not mention the Health Services Division or Dr. Linthicum. Instead, his response was, "I did not know Larry McCollum."

Despite all this, Livingston contends the claims against him should be dismissed because he delegated medical care decisions to TDCJ's doctors. *See* Ex. 4, Livingston's Interrogatory Responses in *Webb v. Livingston*. In his Motion to Dismiss the Second Amended Complaint, Livingston argues "the responsibility for medical treatment and assignment is the responsibility of medical officials at an inmate's unit." Doc. 121, p. 11. But even this obscures Linthicum's role. Livingston's argument implies that medical care is wholly the responsibility of the medical provider – UTMB – not TDCJ. *See also id*. ("The delegation *to UTMB* of inmate medical treatment … is a long established common sense practice and policy.") (emphasis added). Defendants' Response to this motion finally clarifies this is not true – UTMB is not "wholly" responsible, but TDCJ's Health Services Division "monitors the quality of care, investigates medical grievances and conducts operational review audits of health care services at TDCJ facilities." Doc. 183, p. 3.  And, in this case, tracked heat-related injuries and deaths for years.

Additionally, Livingston has been represented by two separate teams of Assistant Attorneys General, and still failed to make accurate disclosures.[4]

---

[4] Notably, though Plaintiffs have begun to receive Linthicum's emails, the production thus far only includes emails she *received* but not emails she *sent*. Because Livingston alleges he completely delegated prisoners' medical care to Linthicum, her outgoing emails are critical.

In light of the above, this Court's finding that Livingston's responses to written discovery were "evasive" seems too generous. Doc. 129, p. 6 (ordering Livingston to appear for deposition if his motion to dismiss based on qualified immunity is denied). Indeed, Livingston's evasive and obstructionist tactics continue. Of all the named Defendants, Livingston is the only one who *still* has not produced *any* responsive emails.[5] Though Livingston has asserted qualified immunity, he remains one of the key witnesses in Plaintiffs' Americans with Disability Act and Rehabilitation Act claims, and must make candid responses to written discovery. *Dollar v. Long Mfg.,* 561 F.2d 613, 616 (5th Cir. 1977). Had he appeared for deposition months ago, Plaintiffs may well have had a clearer picture and been in a better position to mitigate the prejudice.

2.      *TDCJ's Misrepresentations*

a.      *The Heat Injury Database*

Since this case was filed, TDCJ has been dishonest with the parties and the Court about the mere existence of critical documents – including the database of inmate heat injuries maintained by Dr. Linthicum. The emails are only the tip of the iceberg showing TDCJ's lack of candor.

---

[5] While preparing this Reply, Plaintiffs' counsel continued to request Livingston's emails. At a meeting on June 3, 2014, his counsel stated the TDCJ General Counsel's Office had at least some responsive emails from a preliminary search. Ex. 5, Declaration of Sean Flammer; Ex. 6, Declaration of Scott Medlock. Other TDCJ officials' emails have been produced on a rolling basis as the preliminary search is completed, and Plaintiffs have reviewed at least some of Robert Eason, Rick Thaler, William Stephens, and Dr. Linthicum's emails at this time. Livingston's attorney assigned to handle electronic discovery (Assistant Attorney General Alan Cooke) stated he believed some of Livingston's emails should be available soon, but he needed to contact the Office of the General Counsel. But on June 4, 2014, when asked for an estimated time the emails would be available, Demetri Anastasiadis, Livingston's litigation counsel, responded "do you have any suggestions on how TDCJ IT tech personnel can speed up the search?" and refused to even give an estimate for when some emails might be available. Ex. 7, Anastasiadis email to Plaintiffs' Counsel.

TDCJ repeatedly told the Plaintiffs and the Court that documents like the database of heat-related injuries did not exist, and would be incredibly burdensome to create. *See, e.g.*, Doc. 42 ("The task of potentially culling through over a million inmates who've spent time in TDCJ over the last 23 years to determine which ones died of heat related causes is similarly daunting."); Ex. 8, TDCJ's Response to Plaintiffs' Interrogatory No. 2 (objecting "overly broad and unduly burdensome" to request to "identify all heat-related injuries").[6] The emails conclusively prove TDCJ has kept a database of these injuries for years, and the burden of producing it would be minimal. *See* Ex. 9; Ex. 10.

b.      *Heat Stroke Deaths*

TDCJ has also consistently denied, or refused to look, to find out exactly how many inmates have died from heat stroke in its prisons.

TDCJ's Rule 30(b)(6) witness, Robert Eason, testified he did not know of any heat-related deaths in TDCJ's prisons other than Mr. McCollum and Rodney Adams.

> Q: Okay, other than Mr. Adams and Mr. McCollum, as you testify here today, are you aware of any other heat-related illness/deaths at any of the Texas Department of Criminal Justice facilities you oversee?
>
> A: To my knowledge, those are the only two that have been ruled heat-related to my knowledge.

Ex. 11, Deposition of Robert Eason, 217:23-218:3. Eason testified that he was only aware of one death (Adams) from heat-related causes at the Gurney Unit (though TDCJ now admits at least three men died there) and that he was aware of only two heat-related deaths system-wide since the summer of 2011.  *See* Ex. 11, 217:12-14; 217:23; 218:3. Eason even claimed TDCJ did a "wonderful job" of mitigating the heat, and had "very

---

[6] Notably, TDCJ never attached an affidavit attesting to why the search would be burdensome.

little problems with heat-related illnesses." *Id*., 110:10-15. (And even astoundingly said TDCJ did a "good job" mitigating the effect of the heat at the Hutchins Unit "with regard to Larry McCollum." *Id*. 110:21-23.).

Eason's testimony was not merely misleading, but was dishonest. When asked about particular inmates, Eason denied Alexander Togonidze had a body temperature of 106 degrees and died of heat stroke. *Id*., 217:12-218:3. But Eason initialed a memo he received on September 6, 2011 stating Togondize's "provisional autopsy" indicated the "cause of death" was "hyperthermia." Ex. 12, Memo to Robert Eason from Todd Foxworth. He then wrote a memo stating Togonidze died of "hyperthermia" and his body temperature was 106 degrees. *Id*. Eason likely lied about each inmate's death.

Even after the Court ordered TDCJ to disclose all the heat-related inmate deaths since 1990, TDCJ only looked as far back as 2001, but still uncovered sixteen inmates who died from heat stroke – all under circumstances similar to Mr. McCollum. Doc. 58; Ex. 13, Court-Ordered Response to Interrogatory No. 2; Doc. 119, Second Amended Complaint, ¶ 20.

But despite the Court's order, TDCJ *still* failed to do a diligent search for inmates who *died* of heat stroke. In fact, Plaintiffs, through their own diligence, have learned about four other deaths *where the death was the subject of litigation*.[7] As this Court has

---

[7] In the *Ruiz* class-action litigation, Judge William Wayne Justice noted expert witnesses testified that "regarding heat-related illness," "three of the 16 people who became ill because of heat had died. [The expert] was particularly disturbed that inmates using psychotropic drugs, which can be photosensitive, were not being more aggressively protected from sun exposure." *Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999). Plaintiffs found the inmates' names by combing through the state archives to retrieve the expert's report. Ex. 14, Report of Dr. Jeffrey L. Metzner, p. 18. But TDCJ's counsel in this case – including Bruce Garcia, Demetri Anastasiadis, Lawrence Wells, Karen Matlock, and Sharon Felfe Howell (TDCJ's General Counsel) – who also represented the

noted, these deaths establish a pattern of indifference. This failure is a separate basis for sanctions under Rule 37 in addition to the Court's inherent powers.

### B.    TDCJ's Failure to Take Steps to Preserve Documents

After approximately eighteen months of denying emails existed, TDCJ is finally beginning to look to see what documents it has. But from the documents TDCJ has already disclosed, it appears responsive documents have been destroyed, and few steps were taken to preserve them.

For example, Plaintiffs specifically requested Eason's emails "related to heat." Ex. 15, TDCJ's February 28, 2014 Responses to Plaintiffs' Request for Production No. 1 and 2. After this motion for sanctions and a show cause order was filed, TDCJ began to disclose Eason's emails.

But it does not appear Eason retained many relevant emails. The emails Eason produced do not include emails he sent that were forwarded to Dr. Linthicum and are found in her email production. *Compare* Ex. 16, Eason's Emails *with* Ex. 17, Linthicum

---

agency at this stage of the *Ruiz* litigation, did nothing to provide Plaintiffs this information discussed in a published opinion.

More recently, Plaintiffs learned Charles E. Finke, Jr. died of hyperthermia in a TDCJ prison in 1999. Finke's family sued TDCJ, alleging that, because he took psychotropic mediations, Finke "should not be exposed to temperature extremes" but "was placed in an unairconditioned holding cell." Ex. 18, Finke Amended Petition. Though Plaintiffs' investigation of Finke's death is ongoing, it is likely the Office of the Attorney General's Law Enforcement Defense Division defended the agency. Plaintiffs learned about the death when they were contacted by a whistleblower.

Thus, despite a court order, TDCJ failed to make a reasonable inquiry into these deaths. Regardless of TDCJ's records retention policies, a reasonable inquiry of the Law Enforcement Defense Division's own files, or even the memories of attorneys' litigating this case, would have found at least four more heat-related deaths.

Emails from Eason. Thus, except for these emails that Dr. Linthicum saved, it appears Eason's responsive emails were deleted.

Cynthia Milne's affidavit seems to confirm the worst – that even after this lawsuit was filed TDCJ did nothing to retain Eason's emails. Milne states a "notice to retain" was sent on July 11, 2012 to "the Hutchins State Jail Warden [Pringle]," "Warden secretary, law librarian, safety officer [Roy Storie], EAC, Serious Incident Review, and Administrative Review." Doc. 183.2. Though Eason was Warden Pringle's direct supervisor, and involved in the "administrative review," he was not told to retain his emails. *See* Ex. 11, Deposition of Robert Eason, 153:11-15 (involvement in administrative reviews). Based on Milne's affidavit, TDCJ failed to preserve emails from Livingston, his executive staff, Linthicum, her executive staff, and countless others who may have responsive documents – even though Livingston was a named defendant.[8]

## IV.   TDCJ AND THE ATTORNEY GENERAL'S EXCUSES ARE NOT CREDIBLE

The only word to describe TDCJ's counsel's claim that he only learned about "the role of TDCJ Health Services Division"[9] on May 1, 2014 is "unbelievable" – as in "not able to be believed because unlikely."[10] In a case alleging prisoners were dying because the prison system failed to accommodate their heat-sensitive medical conditions, TDCJ's Health Services Division should have been contacted immediately. TDCJ's claim is like

---

[8] Plaintiffs still do not know how badly this has prejudiced their case, and may never be able to know the full extent of the prejudice.

[9] *See* Doc. 183.1, Declaration of Bruce Garcia, ¶ 9.

[10]    Cambridge    Dictionaries    Online,    *available    at*: http://dictionary.cambridge.org/dictionary/american-english/unbelievable_2 (last visited June 3, 2014).

General Motors failing to consult the engineering department in a lawsuit alleging cars were sold with defective ignition switches that caused fatal explosions.[11]

The Health Services Division exists to "ensure health care services are provided to incarcerated offenders in the custody of the Texas Department of Criminal Justice."[12] Throughout this litigation, Plaintiffs alleged these very policies identified prisoners at risk of death caused by the extreme temperatures inside TDCJ's prisons, but failed to protect them from harm. *See, e.g.*, Doc. 1, ¶¶ 27, 54 ("As was well known to Defendants prior to Mr. McCollum's death, hypertension itself also increases a patient's susceptibility to heat stress"; "TDCJ's policies and practices … make no accommodation for people with hypertension during periods of extreme temperatures").

Even though Plaintiffs identified Dr. Linthicum as a witness early on, from TDCJ's response it seems clear no one from the Office of the General Counsel or the Attorney General's office thought to contact her. That *Plaintiffs* identified Linthicum in their initial disclosures makes TDCJ's failure to make a reasonable inquiry even *more* egregious – not less problematic as TDCJ argues. Plaintiffs essentially did TDCJ's job for them, and TDCJ still failed to make a reasonable inquiry.

Moreover, Plaintiffs identified Dr. Linthicum as a member of the policy-making committee. If TDCJ (or UTMB) performed a reasonable inquiry, it would have immediately become clear her role was far more significant. As Defendants acknowledge, through their failure to make a reasonable inquiry, even their lawyers did

---

[11] And though Plaintiffs' counsel continues to believe Mr. Garcia personally did not intentionally lie to them, his client's misrepresentations to him have injured the Plaintiffs.

[12] *See* Texas Department of Criminal Justice, *Health Services Division*, *available at*: http://www.tdcj.state.tx.us/divisions/hs/ (last visited June 3, 2014).

not know Linthicum was purportedly TDCJ's point-person on extreme heat in the prisons. Essentially, Plaintiffs thought Linthicum was just a chief engineer at GM, when, in fact, she was leading a task force responding to exploding ignition switches – and Defense counsel never asked.

It is equally specious to say the TDCJ General Counsel and Office of the Attorney General are unfamiliar with Dr. Linthicum and do not have "frequent contact" with her division.[13] Dr. Linthicum is TDCJ's highest-paid employee, and one of the state's most well-compensated workers.[14] A Westlaw search for "Linthicum and prison" shows seventeen cases where she was either a defendant or a witness – though the number of unreported cases filed by *pro se* prisoners, or cases that were settled without a formal order, is likely far higher. A PACER search of just the Southern District of Texas' records show "Lannette Linthicum," or some variations thereof, has been a party in over 50 cases.[15] TDCJ's counsel in this litigation has even appeared on her behalf before.[16]

The Health Services Division itself was monitored by the federal courts as part of the *Ruiz v. Estelle* prison-reform class action for decades. *See Ruiz v. Estelle*, 679 F.2d

---

[13] Doc. 183, TDCJ's Response, p. 3.

[14] *Government Employee Salaries: Lannette C. Linthicum*, TEXAS TRIBUNE, *available at*: http://www.texastribune.org/library/data/government-employee-salaries/university-of-texas-medical-branch/lannette-c-linthicum/905869/ (last visited June 3, 2014) (salary of $311,880) and *Government Employee Salaries: Texas Department of Criminal Justice*, TEXAS TRIBUNE, *available at* http://www.texastribune.org/library/data/government-employee-salaries/state-of-texas/departments/texas-department-of-criminal-justice/5/ (last visited June 3, 2014).

[15] The Southern District is where Linthicum resides and can be served with process.

[16] *See* Doc. 10, TDCJ's Certificate of Interested Parties (identifying Nadine Philpotts as counsel); and *Johnson v. Murray*, 548 Fed. Appx. 277 (5th Cir. 2013) (attorney Nadine Philpotts appearing for Dr. Linthicum).

13

1115, 1166-67 (5th Cir. 1982) (affirming district court's entry of injunctive relief) and *Ruiz v. Johnson*, 154 F.Supp.2d 975, 999 (S.D. Tex. 2001) (terminating health care portion of the injunction).[17] In 1986, TDCJ acknowledged that federal class action litigation heavily influenced the prison's health care system.[18] Though beginning in 1993 TDCJ contracted with University of Texas Medical Branch to provide care to prisoners, TDCJ did not (and could not) relinquish its constitutional duty to ensure adequate health care. It continued to review inmates' health care grievances[19] and provide oversight of the quality of care provided in prison system, to ensure it was constitutionally adequate and complied with requirements from the *Ruiz* litigation.[20]

When TDCJ worked to terminate the *Ruiz* injunction, Dr. Linthicum testified and was represented by some of the same lawyers representing TDCJ and Livingston today. *See Ruiz v. Johnson*, 37 F.Supp.2d at 902. TDCJ even regularly designates Dr. Linthicum as an expert witness in all manner of cases involving medical care provided to prisoners. *See*, *e.g.*, *McCoy v. Texas Department of Criminal Justice*, No. C.A. 05-370, Doc. 44, (S.D. Tex. April 10, 2006) (case brought under the ADA and Rehabilitation Act). UTMB even designated Linthicum as an expert in this case. Doc. 114.

---

[17] Notably, TDCJ's current general counsel, Sharon Felfe Howell, appeared on TDCJ's behalf during the termination proceedings.

[18] Evaluation of the Texas Department of Corrections, Texas Sunset Advisory Commission, p. 112-13 (1986) ("1986 Sunset Report"), *available at* https://www.sunset.texas.gov/public/uploads/files/reports/Department%20of%20Correcti ons%20(TDCJ)%20Staff%20Evaluation%201986%2070th%20Leg.pdf

[19] Report on Texas Department of Criminal Justice *et al.*, Texas Sunset Advisory Commission, p. 192 (1998), *available at* https://www.sunset.texas.gov/public/uploads/files/reports/Criminal%20Justice_Pardons% 20and%20Paroles_%20Correctional%20Managed%20Health%20Care%20Staff%20Rep ort%201998%2076th%20Leg%20.pdf

[20] *Id.*, p. 192.

Finally, when TDCJ responded to interrogatories about which officials "authored, developed, consulted on, conferred about or otherwise contributed to" the relevant policies (TDCJ Administrative Directive 10.64 and Correctional Managed Health Care Policy B-15.2), TDCJ identified "Dr. Lannette Linthicum" and "TDCJ's medical director" (presumably Linthicum) as contributors. Ex. 19, TDCJ's Response to Plaintiffs' Interrogatory No. 4 and 5 (March 25, 2013). Even at that relatively late stage, TDCJ did not make a reasonable inquiry into the Health Services Division's role, and their counsel admits he did not even meet with Linthicum until May 1, 2014 – almost two years after this case was filed, over a year after identifying her in discovery responses, and the day before dispositive motions were then due.

## V.   TDCJ'S FAILURE TO COMPLY WITH THE CODE OF HONOR PREJUDICED PLAINTIFFS

Contrary to the TDCJ Defendants' assertions, and for the reasons stated in their initial motion, Plaintiffs have suffered real prejudice. Every expert opinion, every expert consultation, and every deposition was colored with a grossly incomplete picture of the facts. If the facts necessary to try this case are pieces of a jigsaw puzzle, TDCJ has refused to give Plaintiffs the corners, sides, or a picture of the completed puzzle.

As described above, Eason's emails appear to have been deleted. Eason is a party and TDCJ's Rule 30(b)(6) witness. The loss of these documents cannot be understated.[21]

And it is simply not true Livingston and TDCJ have always conceded they "[knew] of the high temperatures within its prisons and regarded it as a potential risk to the health and safety of offenders." Doc. 183, p. 14. In TDCJ and Livingston's answer to

---

[21] It is equally likely, though Plaintiffs cannot be certain at this time, that electronic documents from key players, including Livingston, Thaler, Stephens, and Linthicum.

this lawsuit, the Defendants denied "Defendant Pringle and Defendant Livingston, as well as numerous other TDCJ officials, were well aware of [the] heat wave Dallas was experiencing and knew inmates were at risk of heat related death and illness at area prisons." *See* Doc. 1, ¶ 17; Doc. 9, ¶ 17. Defendants Livingston and TDCJ claimed they had "insufficient information and are unable to admit or deny" whether "TDCJ officials, including Defendants Livingston … knew extreme heat could and would cause serious injury or death." *See* Doc. 1, ¶ 31; Doc. 9, ¶ 31. And Defendants denied "Livingston and Pringle knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees." *See* Doc. 1, ¶ 51; Doc. 9, ¶ 50-58.

Plaintiffs' harm has not only been monetary. Plaintiffs can be compensated for their work on the motion, the reply,[22] and their time and expenses so far in this case. But Plaintiffs have also revealed trial and deposition strategy and been denied access to key documents that would have confirmed legal theories they were forced to develop differently – such as that TDCJ took no action despite knowing two men died from heat

---

[22] Plaintiffs' counsel has incurred the following attorneys' fees associated with this reply:

| | | | | |
|---|---|---|---|---|
| Jeff Edwards, | 10.5 | hours x $450/hr. | = $ | 4,725 |
| Sean Flammer, | 25.1 | hours x $350/hr. | = $ | 8,785 |
| Scott Medlock, | 24 | hours x $350/hr. | = $ | 8,400 |
| Brian McGiverin, | 4 | hours x $325/hr. | = $ | 1,300 |
| | | Total | = $ | 23,210 |

Additionally, should the Court wish to see Plaintiffs' detailed billings and expenses, Plaintiffs would respectfully request that they be permitted to submit them to the Court under seal for in camera review.

Contrary to TDCJ's assertion, attorneys' fees are not capped in this case by the Prison Litigation Reform Act because the claims are not brought by a "prisoner." *See Janes v. Hernandez*, 215 F.3d 541, 543 (5th Cir. 2000). Any argument the fees are capped in this case is frivolous.

stroke in 2007. *See* Doc. 43, Amended Complaint, ¶ 80. Whether the same depositions would have been taken can be legitimately debated. Likewise, Plaintiffs may have sued additional defendants (such as Dr. Linthicum), a topic open for debate. What cannot be debated, however, is that Plaintiffs would have conducted many of those depositions differently had they had access to even the few hundred pages produced by TDCJ since Plaintiffs' Motion for Sanctions and had Plaintiffs been able to cross-examine witnesses and experts with evidence known to Defendants.

Finally, some of these documents are akin to the smoking gun Judge Davis warned about. It is simply not true that the newly-discovered emails do not "provide relevant knowledge or insight as to TDCJ's belief or knowledge of heat-related issues before [McCollum's] death." Doc. 183, p. 13. For example, in *June 2009*, over two years before McCollum was even incarcerated, Dr. Linthicum sent an email to the "executive director's office" that TDCJ "had developed a working paper a few years back that had bulleted steps of what has been done to control temperatures" in response to a question about "if the agency has taken measure[s] *to prevent further heat related deaths* following these incidents [the 2007 heat-related deaths]." Ex. 2, Email from Linthicum to Executive Director's Office (emphasis added).[23] Not only had prisoners died when this email was sent, TDCJ also faced pending litigation alleging the extreme heat in the prisons was unconstitutional.[24] Contrary to Defendants' suggestion, these emails are not just responsive, they are highly probative and go to the heart of Plaintiffs' case. Due to

---

[23] Notably, Plaintiffs still have not received this "working paper."

[24] *See Blackmon v. Garza*, No. 2:08-cv-273, Doc. 1 (S.D. Tex.) (filed Aug. 1, 2008). Shortly thereafter, Livingston was named in the *Blackmon* lawsuit in his individual capacity. *Id.*, Doc. 113-1.

Defendants conduct, however, Plaintiffs will never definitively know how many more emails like this existed.

**VI.    CONCLUSION**

State agencies and the executives who run them have the same discovery obligations as any other litigant. A violation of the honor system – especially by executives at a state agency charged with upholding the law and by attorneys working for the State's lawyer – should not be tolerated or it will happen again. Thus, significant sanctions are appropriate in this case.

Dated: June 5, 2014.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
Tel.    512-623-7727
Fax.    512-623-7729

By      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
Scott Medlock
State Bar No. 24044783
Sean Flammer
State Bar No. 24059754
Lead Counsel

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
c/o TRLA 4920 N. I-35
Austin, TX 78751
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Eliot Shavin
State Bar No. 18138200
2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
Local Counsel

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.

By      /s/ Jeff Edwards
JEFF EDWARDS

19