UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 3:12-cv-02037 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS; REQUEST FOR SHOW CAUSE ORDER; AND MOTION TO COMPEL AGAINST DEFENDANT TDCJ**

**APPENDIX OF EXHIBITS**

| Exhibit | Page | Description |
|---|---|---|
| **Exhibit 1** | 3 | Defendant Livingston's Responses to Plaintiff Stephen McCollum's First Set of Request for Production and Interrogatories |
| **Exhibit 2** | 10 | Emails from Lannette Linthicum to Executive Directors |
| **Exhibit 3** | 17 | Defendant Brad Livingston's Responses to Sandra McCollum's First Set of Requests for Admission, Requests for Production, and Interrogatories |
| **Exhibit 4** | 29 | Defendant Brad Livingston's Answers to Plaintiff Kevin Webb's Second Set of Interrogatories |
| **Exhibit 5** | 36 | Declaration of Sean Flammer |
| **Exhibit 6** | 39 | Declaration of Scott Medlock |
| **Exhibit 7** | 45 | Email from Demetri Anastasiadis |
| **Exhibit 8** | 48 | Defendant TDCJ's Responses to Plaintiff's Requests for Production and Interrogatories |
| **Exhibit 9** | 62 | Email from Jerri Robison |

| **Exhibit 10** | 64 | Email from Kimberly McLearen |
| **Exhibit 11** | 66 | Excerpts from Robert Eason's Deposition |
| **Exhibit 12** | 74 | Memo from Todd Foxworth to Robert Eason |
| **Exhibit 13** | 79 | TDCJ Offender Hyperthermia Deaths |
| **Exhibit 14** | 83 | Jeffrey L. Metzner, M.D., Report |
| **Exhibit 15** | 104 | Defendant TDCJ's Responses to Sandra McCollum's Ninth Set of Requests for Production and Requests for Admissions |
| **Exhibit 16** | 116 | Emails from Robert Eason |
| **Exhibit 17** | 143 | Emails from Lannette Linthicum |
| **Exhibit 18** | 154 | Finke First Amended Original Petition and Request for Disclosure |
| **Exhibit 19** | 160 | Defendant TDCJ's Responses to Sandra McCollum's First Set of Requests for Production, and Interrogatories |

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Stephanie McCollum, *et al.*, | § | |
| | § | |
| v. | § | **Civil Action No. 3:12-CV-02037** |
| | § | |
| Brad Livingston, *et al.*, | § | |
| Defendants. | § | **JURY DEMAND** |

**DEFENDANT BRAD LIVINGSTON'S RESPONSES TO PLAINTIFF
STEPHEN McCOLLUM'S FIRST SET OF REQUESTS FOR
PRODUCTION AND INTERROGATORIES**

**TO:**   Jeff Edwards, The Edward Law Firm, The Bremond Houston House, 706 Guadalupe, Austin,
Texas 78701; Scott Medlock, Brian McGiverin, James C. Harrington, Texas Civil Rights
Project, 1405 Montopolis Drive, Austin, Texas 78741; and Eliot Shavin, 2600 State Street,
Dallas, Texas 75204

COMES NOW the Defendant, Brad Livingston, by and through counsel, the Texas Attorney

General's Office, and offers the following **Defendant Brad Livingston's Responses to Plaintiff**

**Stephen McCollum's First Set of Requests for Production and Interrogatories**.

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**DAVID C. MATTAX**
Deputy Attorney General for Defense Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

**BRUCE R. GARCIA**
Assistant Attorney General
Attorney in Charge
State Bar No.  07631060
So. Dist. Bar No. 18934

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / Fax (512) 495-9139

**ATTORNEYS FOR DEFENDANTS
TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, BRAD LIVINGSTON AND JEFF
PRINGLE**

## CERTIFICATE OF SERVICE

I, **BRUCE R. GARCIA,** Assistant Attorney General of Texas, do hereby certify that a true

and correct copy of the above and foregoing **Defendant Brad Livingston's Responses to Plaintiff**

**Stephen McCollum's First Set of Requests for Production and Interrogatories** has been served

by courier services on this the 21st day of December, 2012 addressed to:

Jeff Edwards
The Edwards Law Firm
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701

Scott Medlock
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741

Eliot Shavin
2600 State Street
Dallas, Texas 75204

**BRUCE R. GARCIA**
Assistant Attorney General

-2-

5

## FIRST SET OF INTERROGATORIES

1.    Identify all steps you took to protect Larry McCollum from heat index temperatures in the Hutchins Unit in excess of 90 degrees.

**RESPONSE:** I did not know Larry McCollum.

2.    Identify all heat-related injuries (refer to definition paragraph R) to inmates in Texas Department of Criminal Justice facilities at any TDCJ unit you were aware of during your employment with TDCJ.

**RESPONSE:** Objection, overly broad and unduly burdensome, not limited in time or scope, seeks information that is privileged under HIPAA. Subject to and without waiving, I am not personally aware of any specific offender's heat related injuries.

3.    Identify all heat-related injuries to employees of the Texas Department of Criminal Justice working in Texas Department of Criminal Justice facilities at any TDCJ unit during the term of your employment, including, but not limited to, injuries where employees filed workers compensation claims.

**RESPONSE:** Objection, overly broad and unduly burdensome, not limited in time or scope, seeks information that is privileged under HIPAA. Subject to and without waiving, I am not personally aware of any specific employee's heat related injuries.

4.    Identify all training you received about heat safety during your employment at the Texas Department of Criminal Justice.

**RESPONSE:** I have not received training about heat safety during my employment with Texas Department of Criminal Justice.

–3–

6

5.    Identify all persons who you believe have knowledge of relevant facts and identify the issues upon which you believe they have knowledge. A response to this interrogatory should include, but is not limited to, all prisoners housed in the dorm with Larry McCollum on July 22, 2011 and July 23, 2011.

**RESPONSE:**  Please see the OIG Investigation Report.  Hutchins State Jail Warden Jeff Pringle and TDCJ-CID Region II Director Robert Eason may have knowledge pertinent to this interrogatory.  Defendant will supplement.

6.    If you contend that some other person or legal entity is in whole or in part liable to Plaintiff in this matter, identify that person or legal entity and describe in detail the basis of said liability.

**RESPONSE:**  None at this time.

7.    Please identify each person who provided information or assisted in any way in answering these interrogatories, and as to each such person, please indicate the discovery request with respect to which he or she was involved.

**RESPONSE:**  My attorneys assisted me.

8.    Please identify all persons that Defendant expects to call to testify on Defendant's behalf at trial.

**RESPONSE:**  Defendant will supplement.

9.    Please identify the names and. if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--you may use to support your claims or defenses.

**RESPONSE:**  Defendant will supplement.

--4--

7

## REQUESTS FOR PRODUCTION

1.     Please produce all documents or other physical or tangible evidence related to, referred to, identified in,   or that formed the basis of any answer to the previous interrogatories, identifying the specific interrogatory to which that document or evidence is related.

**RESPONSE:** Objection, overly broad and unduly burdensome.  Subject to and without waiving, please see defendant's disclosures, and responses to plaintiff's requests for production.

2.     Please produce all documents, including but not limited to inmate grievances and correspondence from state officials, you reviewed prior to July 22, 2011 regarding heat and/or high temperatures in TDCJ facilities, including, but not limited to, inmate grievances regarding conditions at the Hutchins Unit.

**RESPONSE:** Objection, overly broad and unduly burdensome, not limited in scope or time.  Subject to and without waiving, I do not review offender grievances.

3.     Please produce all documents you intend to introduce as exhibits at trial.

**RESPONSE:** Defendant will supplement per the Federal Rules of Civil Procedure and the scheduling order entered into by the parties in this matter.

4.     Please produce a copy of all documents, electronically stored information, and tangible things that you have in your possession, custody, or control and may use to support your claims or defenses.

**RESPONSE:** Objection, overly broad, not limited in scope, time or particularity.  Subject to and without waiving, Defendant will supplement per the Federal Rules of Civil Procedure and the scheduling order entered into by the parties in this matter.

## VERIFICATION

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF WALKER** | § |

**BEFORE ME,** the undersigned authority, on this day personally appeared Brad Livingston, who, being personally known to me, after being duly sworn upon his oath deposed and stated that the foregoing responses to interrogatories in *McCollum v. Livingston*, Civil Action No. 3:12cv02037, are true, correct and complete to the best of his knowledge; and he is authorized to execute this verification.

Brad Livingston
Executive Director
Texas Department of Criminal Justice

**BEFORE ME,** the undersigned authority, on this day personally appeared Brad Livingston known personally to me to be the person subscribed in the foregoing instrument.

Given under my hand and seal of office on this /8 day of December, 2012.

Notary Public in and for the State of Texas

Angela Moore
Printed Name

My Commission Expires: July 23, 2013

ANGELA L MOORE
NOTARY PUBLIC - STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 23, 2013

9

# Exhibit 2



**RE: Deaths with Cause**
Lannette Linthicum  to: Karen Hall                    06/25/2009 04:18 PM

Cc:  "george.crippen@tdcj.state.tx.us", "D'Cunha, Lisa A.",
"marjorie.davis@tdcj.state.tx.us",
"Phyllis.Mcwhorter@tdcj.state.tx.us", Phyllis. Mcwhorter, Kirk
Moss, Barbara Pixley

| From: | Lannette Linthicum/Health_Services/TDCJ |
|---|---|
| To: | Karen Hall/Executive_Directors_Office/TDCJ@TDCJ |
| Mail #: | |
| Cc: | "george.crippen@tdcj.state.tx.us" <george.crippen@tdcj.state.tx.us>, "D'Cunha, Lisa A." <ladcunha@utmb.edu>, "marjorie.davis@tdcj.state.tx.us" <marjorie.davis@tdcj.state.tx.us>, "Phyllis.Mcwhorter@tdcj.state.tx.us", <Phyllis.Mcwhorter@tdcj.state.tx.us>, Kirk |

Karen,
I discussed this with Jeff this afternoon. CID had developed a working paper a few years back that had
bulleted steps of what has been done to control temperatures. Check with Kirk Moss and/or Barbara
Pixley.

Lannette Linthicum, MD, CCHP-A, FACP
Director, Health Services Division
Texas Department of Criminal Justice
3009A Highway 30 West
Huntsville, TX  77340
(936) 437-3542 (work)
(936) 437-3541 (fax)

The information contained in this electronic mail and any attachments is intended for the exclusive use of
the addressee(s) and may contain confidential, privileged, or proprietary information.  Any other
interception or use of these materials is strictly prohibited.  If you have received these materials in error,
please notify me immediately by telephone and destroy all electronic information received.

---

| Karen Hall | I have a call in to Risk Management, but do any... | 06/25/2009 02:43:44 PM |
|---|---|---|



Karen
Hall/Executive_Directors_Offi
ce/TDCJ

06/25/2009 02:42 PM

To  "D'Cunha, Lisa A." <ladcunha@utmb.edu>
cc  "george.crippen@tdcj.state.tx.us"
<george.crippen@tdcj.state.tx.us>,
"lannette.linthicum@tdcj.state.tx.us"
<lannette.linthicum@tdcj.state.tx.us>,
"marjorie.davis@tdcj.state.tx.us"
<marjorie.davis@tdcj.state.tx.us>,
"Phyllis.Mcwhorter@tdcj.state.tx.us"
<Phyllis.Mcwhorter@tdcj.state.tx.us>
Subject  RE: Deaths with Cause

I have a call in to Risk Management, but do any of you know if the agency has taken measure to prevent
further heat related deaths following these incidents?

"D'Cunha, Lisa A." <ladcunha@utmb.edu>



"D'Cunha, Lisa A."
<ladcunha@utmb.edu>
06/25/2009 11:18 AM

To  "Riley.Tilley@tdcj.state.tx.us" <Riley.Tilley@tdcj.state.tx.us>,
    "Phyllis.Mcwhorter@tdcj.state.tx.us"
    <Phyllis.Mcwhorter@tdcj.state.tx.us>
cc  "george.crippen@tdcj.state.tx.us"
    <george.crippen@tdcj.state.tx.us>,
    "lannette.linthicum@tdcj.state.tx.us"
    <lannette.linthicum@tdcj.state.tx.us>,
    "marjorie.davis@tdcj.state.tx.us"
    <marjorie.davis@tdcj.state.tx.us>,
    "Karen.Hall@tdcj.state.tx.us" <Karen.Hall@tdcj.state.tx.us>,
    "Julie.Artherholt@tdcj.state.tx.us"
    <Julie.Artherholt@tdcj.state.tx.us>
Subject  RE: Deaths with Cause

CORRECTION:
we 2 deathS due to hyperthermia for time period 2007 to present:

TDCJ # 390315 James Ramirez Shriver DOD - 8/08/07
TDCJ # 1443175 Dionicio Robles Jr.  DOD - 8/13/07

sorry about that.
lisa

From: D'Cunha, Lisa A.
Sent: Thursday, June 25, 2009 11:01 AM
To: Riley.Tilley@tdcj.state.tx.us; Phyllis.Mcwhorter@tdcj.state.tx.us
Cc: george.crippen@tdcj.state.tx.us; lannette.linthicum@tdcj.state.tx.us;
marjorie.davis@tdcj.state.tx.us; Karen.Hall@tdcj.state.tx.us;
Julie.Artherholt@tdcj.state.tx.us
Subject: RE: Deaths with Cause

Riley,
we only have 1 death due to hyperthermia for time period 2007 to present:
TDCJ # 1443175 Dionicio Robles Jr.  DOD - 8/13/07

From: Riley.Tilley@tdcj.state.tx.us [Riley.Tilley@tdcj.state.tx.us]
Sent: Thursday, June 25, 2009 10:52 AM
To: Phyllis.Mcwhorter@tdcj.state.tx.us; D'Cunha, Lisa A.
Cc: george.crippen@tdcj.state.tx.us; lannette.linthicum@tdcj.state.tx.us;
marjorie.davis@tdcj.state.tx.us; Karen.Hall@tdcj.state.tx.us;
Julie.Artherholt@tdcj.state.tx.us
Subject: RE: Deaths with Cause

Good Morning,

Please know that Jeff Baldwin will be here at 1:00 p.m. expecting a report for
Rep. Turner.  Please let me know by noon where we stand.

Thanks,

Riley

Linthicum emails- TDCJ 661

Riley Tilley
Executive Services
P.O. Box 99
Huntsville, Texas 77342
(936) 437-6510
FAX:   (936) 437-2125
E-Mail:  riley.tilley@tdcj.state.tx.us


Phyllis Mcwhorter/Health_Services/TDCJ

06/25/2009 08:02 AM


To
        "D'Cunha, Lisa A." <ladcunha@utmb.edu>
cc
        "lannette.linthicum@tdcj.state.tx.us"
<lannette.linthicum@tdcj.state.tx.us>, "Riley.Tilley@tdcj.state.tx.us"
<Riley.Tilley@tdcj.state.tx.us>, George Crippen/Health_Services/TDCJ@TDCJ,
Marjorie Davis/Health_Services/TDCJ@TDCJ
Subject
        RE: Deaths with CauseLink<
Notes:///862571380058526A/38D46BF5E8F08834852564B500129B2C/3ADA7EC3A824F927862
575DF00770F23>




HSL does not keep this data either, but I wonder if it wouldn't be able to be
culled from Dr. Kelley's mortality database. I'm copying Marjorie
Davis-Fletcher to see if she can offer any input.

Note: Protected Health Information (PHI) is personal and sensitive information
related to a person's health care. It is being faxed after appropriate
authorization from the patient or under circumstances that do not require
patient authorization. You, the recipient are obliged to maintain it in a
safe, secure and confidential manner. Re-disclosure without additional
patient consent or as permitted by law is prohibited.  Unauthorized
re-disclosure or failure to maintain confidentiality could subject you to
penalties described in federal and state law.  Important warning:  This
message is intended for the use of the person or entity to which it is
addressed and may contain information that is privileged and confidential, the
disclosure of which is governed by applicable law. If you are not the intended
recipient, or the employee or agent responsible to deliver it to the intended
recipient, you are hereby notified that any disclosure, copying or
distribution of this information is strictly prohibited. If you have received
this message by error, please notify the sender immediately to arrange for
return or destruction of these documents.



"D'Cunha, Lisa A." <ladcunha@utmb.edu>

06/24/2009 04:39 PM


Linthicum emails- TDCJ 662

To
         "lannette.linthicum@tdcj.state.tx.us"
<lannette.linthicum@tdcj.state.tx.us>, "Riley.Tilley@tdcj.state.tx.us"
<Riley.Tilley@tdcj.state.tx.us>, "Phyllis McWhorter, RN"
<phyllis.mcwhorter@tdcj.state.tx.us>
cc

Subject
         RE: Deaths with Cause

i will look through our databases for 2007 & 2009 and get back with you
tomorrow.

From: lannette.linthicum@tdcj.state.tx.us
[lannette.linthicum@tdcj.state.tx.us]
Sent: Wednesday, June 24, 2009 3:44 PM
To: Riley.Tilley@tdcj.state.tx.us; D'Cunha, Lisa A.; Phyllis McWhorter, RN
Subject: Re: Deaths with Cause

I am not sure why Lisa and her staff can not provide this data. We are not
in the office today due to building issues. I am not sure if but the health
services liaison office may have some statistics.

   ----- Original Message -----

   From: Riley Tilley
   Sent: 06/24/2009 02:42 PM CDT
   To: Lannette Linthicum
   Cc: Karen Hall
   Subject: Fw: Deaths with Cause

Good Afternoon Dr. Linthicum,

We received this request for Rep. Turner today.  I called Carolyn McMillian
and Lisa D'Cuna.  Lisa recommended that I contact you.

Does Health Services track heat related deaths?  If so, would you please
provided this data for us to send to Mr. Baldwin.

Karen informed Mr. Baldwin that it is doubtful we would be able to provide
this information today.

Thank you in advance for your assistance,

Riley


Riley Tilley
Executive Services
P.O. Box 99
Huntsville, Texas 77342
(936) 437-6510

Linthicum emails- TDCJ 663

```
FAX:  (936) 437-2125
E-Mail:  riley.tilley@tdcj.state.tx.us
----- Forwarded by Riley Tilley/Executive_Directors_Office/TDCJ on
06/24/2009 02:23 PM -----

              Karen
              Hall/Executive_Di
              rectors_Office/TD                                  To
              CJ                  Riley
                                  Tilley/Executive_Directors_Office/T
              06/24/2009 02:15    DCJ@TDCJ, Julie
              PM                  Artherholt/Executive_Directors_Offi
                                  ce/TDCJ@TDCJ

                                                                 cc

                                                            Subject
                                  Fw: Deaths with Cause




----- Forwarded by Karen Hall/Executive_Directors_Office/TDCJ on 06/24/2009
02:15 PM -----

              Jeff
              Baldwin/Executive
              _Directors_Office                                  To
              /TDCJ               Karen
                                  Hall/Executive_Directors_Office/TDC
              06/24/2009 01:59    J@TDCJ
              PM
                                                                 cc

                                                            Subject
                                  Fw: Deaths with Cause




Call me re attached?  Thanks.


----- Forwarded by Jeff Baldwin/Executive_Directors_Office/TDCJ on
06/24/2009 01:57 PM -----

              "Alison Brock"
              <Alison.Brock@hou
              se.state.tx.us>                                    To
                                  <tina.rodriguez@tdcj.state.tx.us>,
              06/24/2009 12:31    <jeff.baldwin@tdcj.state.tx.us>
```

Linthicum emails- TDCJ 664

15

PM                                                                                    cc

                                                                              Subject
                                          Deaths with Cause


Tina and Jeff,

Our office would like to request deaths, including heat related deaths
within TDCJ from the time period of 2007-2009.

Any chance I could get that this afternoon?

Thank you very much,

Alison Brock
Legislative Aide
Office of Rep. Sylvester Turner
P.O. Box 2910
Austin, Texas 78768
Phone: (512) 463-0554
Cell: (512) 294-0044
Fax: (512) 463-8380
alison.brock@house.state.tx.us

Linthicum emails- TDCJ 665

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| Stephanie McCollum, *et al.*, | § | |
| | § | |
| v. | § | **Civil Action No. 3:12-CV-02037** |
| | § | |
| Brad Livingston, *et al.*, | § | |
| Defendants. | § | **JURY DEMAND** |

## DEFENDANT BRAD LIVINGSTON'S RESPONSES TO PLAINTIFF SANDRA McCOLLUM'S FIRST SET OF REQUESTS FOR ADMISSION, REQUESTS FOR PRODUCTION AND INTERROGATORIES

TO:  Jeff Edwards, The Edward Law Firm, The Bremond Houston House, 706 Guadalupe, Austin, Texas 78701; Scott Medlock, Brian McGiverin, James C. Harrington, Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741; and Eliot Shavin, 2600 State Street, Dallas, Texas 75204

COMES NOW the Defendant, Brad Livingston, by and through counsel, the Texas Attorney General's Office, and offers the following **Defendant Brad Livingston's Responses to Plaintiff Sandra McCollum's First Set of Requests for Admission, Requests for Production and Interrogatories**.

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**DAVID C. MATTAX**
Deputy Attorney General for Defense Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

18

*B— R. A*

**BRUCE R. GARCIA**
Assistant Attorney General
Attorney in Charge
State Bar No. 07631060

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / Fax (512) 495-9139

**ATTORNEYS FOR DEFENDANTS TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
BRAD LIVINGSTON AND JEFF PRINGLE**

## CERTIFICATE OF SERVICE

I, **BRUCE R. GARCIA,** Assistant Attorney General of Texas, do hereby certify that a true

and correct copy of the above and foregoing **Defendant Brad Livingston's Responses to Plaintiff**

**Sandra McCollum's First Set of Requests for Admission, Requests for Production and**

**Interrogatories** has been served by placing same in the United States Mail, postage prepaid, on

March 25, 2013 addressed to:

Jeff Edwards
The Edwards Law Firm
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701

Scott Medlock
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741

Eliot Shavin
2600 State Street
Dallas, Texas 75204

*B—R. A*

**BRUCE R. GARCIA**
Assistant Attorney General

–2–

## FIRST SET OF INTERROGATORIES

1.      Identify all steps you took to protect inmates in TDCJ facilities from heat indexes above 90 degrees from January 1, 2007 to present.

**RESPONSE: OBJECTION, Over broad and not reasonably limited in scope or time. For steps taken to protect inmates at the Hutchins State Jail from heat indexes above 90 degrees from January 1, 2009 to present see documents previously produced in accordance with Plaintiffs' previous requests for production and deposition testimony of Warden Jeff Pringle.**

**See also heat safety training and circulars produced in response to Plaintiff Stephen McCollum's First Request for Production to TDCJ, numbers 3-5.**

**Subject to the previous answers and without waiving all previous objections,**

**The Agency takes the following measures. Each year in April, the Agency has mandatory heat precaution training for all staff and offenders. Each shift supervisor was instructed to discuss heat awareness and warning signs at shift turn outs during the summer months. Heat awareness, warning signs, and hydration memos were placed throughout the facility for staff and offenders. Shower temperatures were lowered and showers times were extended. Water coolers with ice were place in the dorms during summer months. Water is made available during meal times. Staff was instructed that offenders identified or requested relief from the heat were allowed to sit in cooler areas. Work shifts are reduced or cancelled and offenders are allowed to wear less clothing in the housing areas. Allowing fans in all custody levels, permitting offenders to purchase a fan if they do not have one, and ensuring a program is in place allowing the permanent issue of a fan to an offender who is indigent with priority to offenders with significant medical needs that are negatively impacted by the heat. Air flow and fresh air exchange is increased to assist in the movement of air. The procedures are reviewed continually by TDCJ staff.**

2.      Identify all people you discussed heat, high temperatures, heat indexes, or air conditioning in inmate housing areas in TDCJ facilities with from January 1, 2007 to the present.

**RESPONSE: Objection, over broad as to time. From 2009 to present I have had periodic discussions concerning high temperatures in inmate housing areas in TDCJ facilities with Jeff Baldwin, Rick Thaler, Jerry McGinty, Jackie Edwards, Oscar Mendoza, Dr. Lanette Linthicum and Bryan Collier.**

3.      Identify all people you consulted or conferred with before writing your August 16, 2011 letter to Rep. Sylvester Turner (Plaintiffs' Bates Nos. 000026-27). If you did not write the letter, please identify who did.

**RESPONSE: The letter was drafted by Jeff Baldwin, with assistance from Jerry McGinty and Rick Thaler.**

4.      Identify all people who authored, developed, consulted on, conferred about or otherwise contributed to drafting Administrative Directive AD-10.64 (rev. 5) (Sept. 19, 2006): Temperature Extremes in the TDCJ Workplace (Bates Nos. TDCJ – RFP #3 – 6-13).

**RESPONSE: I have no personal knowledge of who authored, developed, consulted on, conferred about or contributed to drafting Administrative Directive AD-10.64 (rev. 5). The Administrative Directive would have been proposed by a division and staffed through all TDCJ division heads in accordance with Executive Directive 01.21 (rev. 4) April 19, 2002, entitled "TDCJ Policies and Procedures System." After review, and resolution of any concerns from division heads, the Administrative Directive would have been staffed through the Deputy Director at the time, Ed Owens, for his or my signature.**

5.      Identify all people who authored, developed, consulted on, conferred about or otherwise contributed to drafting Correctional Managed Health Care Policy Manual B-15.2 (Revised 11/07).

**RESPONSE: I have no personal knowledge of who drafted Correctional Managed Health Care Policy Manual B-15.2 (Revised 11/07).**

6.      Describe in detail the process for making capital improvements at prisons (including installation of air conditioning). A response to this interrogatory requires a detailed description of how capital improvements are approved, including whose approval is required before capital improvements are made.

For purposes of this interrogatory, "capital improvements" includes any new construction, and any additions to existing structures beyond normal maintenance and repair.

**RESPONSE: Objection, over broad in scope. See attached Executive Directive 10.06 (rev. 4), February 27, 2004, entitled, "Construction, Maintenance, Renovation, or Alteration of TDCJ Facilities."**

7.      Describe in detail any process for making sure conditions in TDCJ facilities satisfy constitutional minimums.

**RESPONSE: Objection overbroad and undue burden, vague as to the term "constitutional minimums," not reasonably limited in scope or time, and not calculated to lead to the discovery of admissible evidence. Without further clarification from plaintiff regarding what "conditions" they are referring to, defendant cannot answer this interrogatory.**

–4–

8.      Identify any changes made to TDCJ operations related to heat or extreme temperatures after
Gates v. Cook , 528 F.3d 323 (5th Cir. 2004).

**RESPONSE: OBJECTION, vague. The interrogatory does not specify if TDCJ made changes
pursuant to *Gates v. Cook* or simply made changes after 2004.  The interrogatory does not
specify how *Gates v. Cook* would require changes to be made in TDCJ operations.**

**Subject to and without waiving, TDCJ annually reviews agency practices related to heat and
extreme temperatures.  See training, circulars, and policies produced pursuant to Plaintiffs'
previous requests for production. One of the approved injunctions in *Gates v. Cook*, to provide
fans, ice water, and daily showers in Mississippi prisons, were already in place when I became
Executive Director in 2004.**

9.      Identify any changes made to TDCJ operations related to heat or extreme temperatures after
Valigura v. Mcndoza, 265 Fed. App'x. 232 (5th Cir. 2008).

**RESPONSE: OBJECTION, vague in regards to "after." The interrogatory does not specify if
TDCJ made changes pursuant to *Valigura v. Mendoza* or simply after 2008. The interrogatory
also fails to specify what changes, if any, *Valigura v. Mendoza* required TDCJ to make.
Plaintiffs should clarify how *Valigura v. Mendoza*, 265 Fed. App'x. 232 (5th Cir. 2008), an
unpublished per curiam decision of the Fifth Circuit to affirm the lower court's denial of
TDCJ employees' motion for summary judgment, should impact TDCJ operations,
particularly in light of the facts that the *Valigura v. Mendoza* Fifth Circuit decision did not
specify any changes to be made to TDCJ operations, and the TDCJ employee defendants
subsequently won their case at trial.**

**Subject to and without waiving, TDCJ annually reviews agency practices related to heat and
extreme temperatures.  See training, circulars, and policies produced pursuant to Plaintiffs'
previous requests for production. No changes to TDCJ operations were made pursuant to the
Fifth Circuit opinion in *Valigura v. Mendoza*, 265 Fed. App'x. 232 (5th Cir. 2008).**

10.     Identify any changes made to TDCJ operations related to heat or extreme temperatures after
Blackmon v. Kukua, No. 11-40316 (5th Cir. July 30, 2012).

**RESPONSE: OBJECTION, vague in regards to "after." The interrogatory does not specify if
TDCJ made changes pursuant to *Blackmon v. Kukua* or simply after 2008. The interrogatory
also fails to specify what changes, if any, *Blackmon v. Kukua* required TDCJ to make.
Furthermore, the Fifth Circuit in *Blackmon v. Kukua*, a per curiam unpublished decision to
reverse and remand a the lower court's awarding of a directed verdict to TDCJ employee
defendants, specifically did not suggest that the remedial measures required by the *Gates* court
are insufficient to address the risks of high heat and humidity, or, in *dictum*, that air
conditioning is mandatory to meet the requirements of the *Eighth Amendment*. To the
contrary, the Fifth Circuit merely held that there was a factual dispute between plaintiffs and**

--5--

defendants that the *Gates* remedial measures were fully implemented which created an issue of fact that ought to have been decided by a jury, and not by a judge with a directed verdict.

Subject to and without waiving, TDCJ annually reviews agency practices related to heat and extreme temperatures. See training, circulars, and policies produced pursuant to Plaintiffs' previous requests for production. No changes to TDCJ operations were made pursuant to the Fifth Circuit opinion in *Blackmon v. Kukua*, No. 11-40316 (5th Cir. July 30, 2012).

11.    Describe in detail how your signature arrived on the bottom of Administrative Directive AD-10.64 (rev. 5) (Sept. 19, 2006): Temperature Extremes in the TDCJ Workplace (Bates Nos. TDCJ – RFP #3 – 6-13).

RESPONSE: The Administrative Directive would have been presented to me in accordance with Executive Directive 01.21 (rev. 4) April 19, 2002, entitled "TDCJ Policies and Procedures System." It is TDCJ policy that the Executive Director or Deputy Executive Director will be the signature authority for all Administrative Directives.

TDCJ has 149 Administrative Directives and 41 Executive Directives which bear either my or the Deputy Director's signature.  For perspective, in 2006 alone I signed 42 other Administrative Directives and Executive Directives.

12.    Identify who was the director of the TDCJ Institutional Division for past 10 years.

RESPONSE: The TDCJ Institutional Division has not existed since 2003, when it was merged with the Operations Division, Private Facilities Division, and the State Jail Division to create the Correctional Institutions Division.  The current director of the TDCJ Correctional Institutions Division is Rick Thaler.  He has been the director since 2009.

13.    Identify all TDCJ policies that protect prisoners from heat in housing areas.

RESPONSE: OBJECTION, overly broad, as to subject and undu burden as plaintiff as repeatedly requested and obtained this information.  Subject to and without waiving:

For steps taken to protect inmates at the Hutchins State Jail from heat housing areas at the Hutchins State Jail housing areas see documents previously produced in accordance with Plaintiff Stephen McCollum's First Request for Production to Defendant Texas Department of Criminal Justice, number 3-5, and Warden Pringle's deposition.

–6–

23

## REQUESTS FOR PRODUCTION

1.      Please produce all correspondence with Texas legislators about heat, high temperatures, heat indexes, or air conditioning in TDCJ facilities from January 1, 2007 to present.

**RESPONSE: Objection overbroad undue burden and not reasonably limited in scope or time. Subject to and without waiving, see attached correspondence with Texas legislators about heat, high temperatures, heat indexes, or air conditioning in TDCJ facilities from January 1, 2009 to present.**

2.      Please produce all communications you personally reviewed about air conditioning in TDCJ facilities from January 1, 2007 to present.

**RESPONSE: Objection, overbroad undue burden and not reasonably limited in scope or time. Subject to and without waiving, I have not reviewed any correspondence about air conditioning the Hutchins State Jail from January 1, 2009 to present.**

3.      Please produce all documents you reviewed about any heat-related injuries to prisoners in TDCJ facilities from January 1, 2007 to present.

**RESPONSE: Objection, overbroad undue burden and not reasonably limited in scope or time. Subject to and without waiving, I have no records about any heat-related injuries to prisoners at the Hutchins State Jail from January 1, 2009 to present.**

4.      Please produce all documents you reviewed about any heat-related workplace injuries to TDCJ employees from January 1, 2007 to present.

**RESPONSE: Objection, overbroad undue burden and not reasonably limited in scope or time. Subject to and without waiving, I have no records of any documents related to heat-related workplace injuries to TDCJ employees at the Hutchins Unit from January 1, 2009 to present.**

5.      Please produce a copy of your calendar from June 1, 2011 to August 31, 2011.

**RESPONSE: Objection, overbroad undue burden, and not calculated to lead to the discovery of admissible or relevant evidence.**

6.      Please produce a copy of your resume or curriculum vitae.

**RESPONSE: Objection, undue burden, and plaintiff is seeking documents that have no relevance to the issues before this Court.**

–7–

## REQUESTS FOR ADMISSION

1.    Prisons are constitutionally required to protect prisoners from extreme temperatures.

**RESPONSE: Objection, vague and overbroad and calls for a legal conclusion. Subject to and without waiving, DENY as to, "Prisons are constitutionally required to protect prisoners from extreme temperatures." ADMIT to, "prisoners are to be protected from conditions determined to be cruel and unusual punishment under the 8th Amendment."**

2.    You are responsible for the operation of all TDCJ facilities.

**RESPONSE: OBJECTION. Vague. Subject to and without waiving, ADMIT to, "the authority to administer, organize, manage, and supervise the daily operations of the TDCJ is delegated to the executive director who may, in turn, further delegate this authority to staff as appropriate."**

3.    You were aware TDCJ housed prisoners in buildings that were not air conditioned in the summer of 2011.

**RESPONSE: OBJECTION, vague as the term "air conditioned" is not defined. Subject to and without waiving, ADMIT to, "I was aware that TDCJ housed prisoners in buildings that did not have the air cooled by air conditioners with a refrigeration cycle in the summer of 2011."**

4.    You were aware TDCJ housed prisoners in buildings that were not air conditioned at the Hutchins Unit in the summer of 2011.

**RESPONSE: OBJECTION, the term "air conditioned" is not defined. CANNOT ADMIT OR DENY. ADMIT to "I was aware that TDCJ housed prisoners in buildings that did not have the air cooled by air conditioners with a refrigeration cycle at the Hutchins Unit in the summer of 2011."**

5.    You were aware in the summer of 2011 that during prolonged heat waves the risk of heat-related illnesses increases.

**RESPONSE: OBJECTION, vague, and overbroad as to the term "heat related illnesses." Subject to and without waiving, ADMIT to, "during extended periods of extremely high temperatures, without precautions, an individual may experience medical issues, up to and including death."**

6.    You were aware in the summer of 2011 that during prolonged heat waves increase the risk of heat-related death.

–8–

25

**RESPONSE: OBJECTION, vague and overbroad as to the terms "prolonged heat waves" and "heat related death." Subject to and without waiving, ADMIT to, "during extended periods of extremely high temperatures, without precautions, an individual may experience medical issues, up to and including death."**

7.    You were aware in the summer of 2011 that high temperatures can cause death.

**RESPONSE: OBJECTION, vague and overbroad, the term "high temperatures" is not defined.**

8.    You were aware in the summer of 2011 that certain medical conditions increase a person's risk of suffering heat-related illnesses.

**RESPONSE: OBJECTION, vague, and overbroad as to the terms "certain medical conditions" and "heat related illnesses." Subject to and without waiving, ADMIT to, "during extended periods of extremely high temperatures that without precautions an individual may experience medical issues, up to and including death."**

9.    You were aware in the summer of 2011 that certain medical conditions increase a person's risk of heat-related death.

**RESPONSE: OBJECTION, vague, and overbroad as to the term "certain medical conditions" and "heat related death." Subject to and without waiving, ADMIT to, "during extended periods of extremely high temperatures that without precautions an individual may experience medical issues, up to and including death." DENY as to, "I was aware that 'certain medical conditions' increased a person's risk of death specifically relating to the summer of 2011."**

10.    You were aware in the summer of 2011 that prisoners in TDCJ custody have hypertension.

**RESPONSE: OBJECTION, vague and overbroad. Subject to and without waiving, ADMIT to, "in the summer of 2011 I was aware that among the approximately 150,000 prisoners in TDCJ custody, some may have hypertension, but I have no personal knowledge as to any specific prisoners."**

11.    You were ware in the summer of 2011 that prisoners in TDCJ custody have diabetes.

**RESPONSE: OBJECTION, vague and overbroad. Subject to and without waiving, ADMIT to, "in the summer of 2011 I was aware that among the approximately 150,000 prisoners in TDCJ custody, some may have diabetes, but I have no personal knowledge as to any specific prisoners."**

12.    You are familiar with policies and procedures you have signed.

**RESPONSE: OBJECTION, vague to the term "familiar." Subject to and without waiving, ADMIT.**

13. You were aware TDCJ had no written policy in July 2011 regarding housing prisoners during periods of extreme temperatures.

**RESPONSE: OBJECTION, vague to the terms "policy" and "housing prisoners." Subject to and without further information, DENY.**

14.     You were aware temperatures in Texas routinely exceeded 100 degrees Fahrenheit in the summer of 2011.

**RESPONSE: OBJECTION, vague to the term "routinely." Subject to and without waiving, ADMIT to, "I was aware that temperatures in Texas reached 100 degrees a number of times in the summer of 2011."**

15.     Your office is air conditioned.

**RESPONSE: OBJECTION, vague as the term "air conditioned" is not defined. Subject to and without waiving, ADMIT to, "My office has its air cooled by air conditioners with a refrigeration cycle."**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **Stephanie McCollum,** *et al.,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-CV-02037** |
| | § | |
| **Brad Livingston,** *et al.,* | § | |
| **Defendants.** | § | **JURY DEMAND** |

### VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF | § |

BEFORE ME, the undersigned notary public, on this day personally appeared **BRAD LIVINGSTON**, who after being duly sworn, stated under oath that he has knowledge of the foregoing Answers contained in **Defendant Brad Livingston's Responses to Plaintiff Sandra McCollum's First Set of Requests for Interrogatories,** that he is duly authorized to execute this verification, and that all of such answers are true and correct.

_____
BRAD LIVINGSTON

SWORN TO and SUBSCRIBED before me by _Brad Livingston_

on _March 22_, 2013.

_____
Notary Public in and for the State of Texas

ANGELA L MOORE
NOTARY PUBLIC - STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 28, 2013

My Commission Expires: _July 23, 2013_

–11–

28

# Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

KEVIN WEBB, individually and §
as representative of the Estate of §
ROBERT ALLEN WEBB, et al. §
§           Civil Action No. 6:13cv711
Plaintiff §
§           CONSOLIDATED ACTIONS
§
vs. §
§
BRAD LIVINGSTON, et al. §
§
Defendants §

---

ASHLEY ADAMS, individually and §
as the representative of the Estate of §
RODNEY GERALD ADAMS, and §
WANDA ADAMS, individually, et al. §
§           Civil Action No. 6:13cv712
Plaintiffs §
§
vs. §
§
BRAD LIVINGSTON, et al. §
§
Defendants §

---

GWEN TOGONIDZE, as the next friend §
of J.T., a minor child and heir-at-law to §
the ESTATE OF ALEXANDER §
TOGONIDZE, §
§           Civil Action No. 6:14cv93
Plaintiff §
§
vs. §
§
BRAD LIVINGSTON, et al. §
§
Defendants §

30

TO:   Plaintiff, Kevin Webb, by and through his attorney of record, Jeff Edwards, EDWARDS
LAW FIRM, The Haehnel Building, 1101 East 11th Street, Austin, Texas 78702.

Defendant Brad Livingston, through the Attorney General of Texas, submits the
following **Defendant Brad Livingston Answers to Plaintiff Kevin Webb's Second Request
for Interrogatories.**

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for Civil Litigation

KAREN D. MATLOCK
Assistant Attorney General
Chief, Law Enforcement Defense Division

DEMETRI ANASTASIADIS
Assistant Attorney General
Attorney-In-Charge
State Bar No. 01164480

Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463.2080 / (512) 495.9139 Fax

**ATTORNEYS FOR DEFENDANT
BRAD LIVINGSTON**

2

## CERTIFICATE OF SERVICE

I, DEMETRI ANASTASIADIS, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Defendant Brad Livingston's Answers to Plaintiffs' Second Request for Interrogatories**, has been served by placing the same in the United States Postal Service, postage prepaid, certified return receipt requested, on this the 5th day of May, 2014, addressed to:

Jeff Edwards                                    *Via Certified Mail No. 7010 1060 0000 3700 7626*
Scott Medlock
THE EDWARDS LAW FIRM
The Haehnel Building
1101 East 11th Street
Austin, Texas  78702
jeff@edwards-law.com
*scott@edwards-law.com*
*Attorney for Plaintiffs*

Bruce R Garcia
Assistant Attorney General
Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711
bruce.garcia@texasattorneygeneral.gov
*Attorneys for Defendants*

Kim Coogan
Assistant Attorney Generals
Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711
kim.coogan@texasattorneygeneral.gov
*Attorneys for Defendants*

DEMETRI ANASTASIADIS
Assistant Attorney General

3

32

## REQUEST FOR INTERROGATORIES NO. 14:

Identify all studies you are aware of related to projections of temperatures inside TDCJ facilities, including, but not limited to, any projections related to future heat waves, summer weather, or climate change, conducted from 2001 to the present

## RESPONSE:

I am not aware of any studies related to projections of temperatures inside TDCJ facilities.

## REQUEST FOR INTERROGATORIES NO. 15:

Describe in detail any changes made to TDCJ, UTMB, Texas Tech University Health Science Center, or Correctional Managed Health Care Committee policies related to heat, high temperatures inside prisons from 2001 to the present.

## RESPONSE:

Defendant objects that this request is overly broad and not sufficiently limited as to scope or time.

Subject to and without waiving the foregoing objections, I am not personally aware of the specific details of changes to medical policies. Rather, the responsibility for managing any such changes would have been delegated to my director of Health Services, Dr. Linthicum. Further, while I am aware of and familiar with changes to other TDCJ policies in a general sense, the responsibility for managing the details of any such changes would be delegated to an appropriate division director. As an example, I am generally familiar with changes made to AD-10.64 and am generally aware that a wellness check policy was implemented, but the specific details of any such changes would have been delegated to Mr. Thaler and now Mr. Stephens in their authority as director of the Correctional Institutions Division.

## REQUEST FOR INTERROGATORIES NO. 16:

Identify all officials with UTMB, Texas Tech University Health Science Center, and/or the Correctional Managed Health Care Committee who you spoke with, corresponded with, consulted with, or otherwise communicated with regarding housing for prisoners at-risk of heat-related illnesses during the summer months from 2007 to the present.

## RESPONSE:

Defendant objects that this request seeks documents and/or information to which the attorney-client privilege, anticipation of litigation privilege, and litigation strategy privilege may apply. Defendant further objects that this request is overly broad and not reasonably limited in scope, time, or geographic location.

8

Subject to and without waiving the foregoing objections, I have had periodic discussions concerning high temperatures in inmate housing areas in TDCJ facilities with Jeff Baldwin, Rick Thaler, William Stephens, Jerry McGinty, Jackie Edwards, Oscar Mendoza, Dr. Lannette Linthicum and Bryan Collier. Any communications with UTMB or the committee would have been delegated through Dr. Lannette Linthicum, I would not have personally had such communications. See also documents produced to Plaintiffs' attorneys in *McCollum, et al. v. Livingston, et al.*, 3:12-cv-02037, U.S. District Court, Northern District-Dallas.

9

## VERIFICATION

| | | |
|---|---|---|
| **STATE OF TEXAS** | | § |
| | | § |
| **COUNTY OF WALKER** | | § |

    **BEFORE ME,** the undersigned authority, on this day personally appeared Brad Livingston, who, being personally known to me, after being duly sworn upon his oath deposed and stated that the foregoing responses to Plaintiff Kevin Webb's Second Request for Interrogatories in *Webb v. Livingston*, Civil Action No. 6:13-cv-00711, are true, correct and complete to the best of his knowledge; and he is authorized to execute this verification.

Brad Livingston
Executive Director
Texas Department of Criminal Justice

    **BEFORE ME,** the undersigned authority, on this day personally appeared Brad Livingston, known personally to me to be the person subscribed in the foregoing instrument.

Given under my hand and seal of office on this 1st day of May 2014.

Notary Public in and for the State of Texas

Angela Moore
Printed Name

My Commission Expires: 7/23/17

ANGELA L MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 07-23-2017

7

# Exhibit 5

STATE OF TEXAS      §
                           §
COUNTY OF TRAVIS     §

## DECLARATION OF SEAN FLAMMER

BEFORE ME, the undersigned authority, on this date personally appeared Sean Flammer, who being by me first duly sworn, did depose on his oath and state as follows:

1. My name is Sean Flammer. I am over the age of eighteen, of sound mind, and am in all ways competent to make this affidavit. The facts stated herein are based upon my personal knowledge and are true and correct.

2. I am an attorney at Edwards Law.

3. On June 3, 2014, I went to the Attorney General's Office for a meeting with TDCJ counsel. Counsel for Brad Livingston was also there. During our discussion, it was represented that Office of General Counsel had Brad Livingston's emails ready for the Office of Attorney General and that they were to be produced to Plaintiffs soon, just as Linthicum's and Stephens's emails had been produced.

4. I spent 25.1 hours researching, drafting, and revising the reply to the TDCJ Defendants' response to the motion for sanctions.

Further, Affiant sayeth not.

_____
Sean Flammer

SUBSCRIBED and SWORN TO before me, by the said Sean Flammer, on this the 2nd day of June, 2014, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

My commission expires: 7|19|17



LINDSEY MARIE KNAPTON
Notary Public, State of Texas
My Commission Expires
July 19, 2017

LINDSEY MARIE KNAPTON
Notary Public, State of Texas
My Commission Expires
July 19, 2017

# Exhibit 6

STATE OF TEXAS § 
 § 
COUNTY OF TRAVIS §

## DECLARATION OF SCOTT MEDLOCK

BEFORE ME, the undersigned authority, on this date personally appeared Scott Medlock, who being by me first duly sworn, did depose on his oath and state as follows:

1. My name is Scott Medlock. I am over the age of eighteen, of sound mind, and am in all ways competent to make this affidavit. The facts stated herein are based upon my personal knowledge and are true and correct.

2. I am an attorney at Edwards Law.

3. On June 3, 2014, I went to the Attorney General's Office for a meeting with TDCJ counsel. Counsel for Brad Livingston was also there. During our discussion, it was represented that the Office of General Counsel had Brad Livingston's emails ready for the Office of Attorney General and that they were to be produced to Plaintiffs soon, just as Linthicum's and Stephens's emails had been produced. I emailed Mr. Anastasiadis and Mr. Cook—two of Livingston's counsel—on June 4, 2014 to ask when they intended to produce Mr. Livingston's emails. The response is attached as **Exhibit A**.

4. I spent 24.0 hours researching, drafting, and revising the reply to the TDCJ Defendants' response to the motion for sanctions.

Further, Affiant sayeth not.

_____
Scott Medlock

SUBSCRIBED and SWORN TO before me, by the said Scott Medlock, on this the 2nd day of June, 2014, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

My commission expires: 7|19|17



LINDSEY MARIE KNAPTON
Notary Public, State of Texas
My Commission Expires
July 19, 2017

40

LINDSEY MARIE SHARION
Notary Public, State of Texas
My Commission Expires
July 19, 2017

# Exhibit A

**Subject:** Livingston's emails
**Date:** Wednesday, June 4, 2014 at 6:24:52 PM Central Daylight Time
**From:** Anastasiadis, Demetri
**To:** Jeff Edwards
**CC:** Scott Medlock, Cook, Allan, jessica.marsh@tdcj.state.tx.us, cynthia.milne@tdcj.state.tx.us, sharon.howell@tdcj.state.tx.us, Garcia, Bruce, Sean Flammer, Woltersdorf, Deborah, Matlock, Karen, Wells, Lawrence, Coogan, Kim, Anastasiadis, Demetri, jessica.marsh@tdcj.state.tx.us, Molinare, Shanna

Jeff,

As always, very nice to hear from you directly. Responding to your queries,  I recall at yesterday's meeting that you were told by Bruce and Matt that the emails of various TDCJ employees, including Livingston,  have not been fully gathered, that efforts were being made in that direction by TDCJ IT personnel and that you would be notified when the search has yielded its results. I do not recall a deadline by which this was promised or you giving us a deadline by which you must have it and the reasons thereof. If I am mistaken in my recollection, please let me know. Is today's email an indication that you must have these by a certain date,  and if so, can you explain the reason for that and do you have any suggestions on how TDCJ IT tech personnel can speed up the search?  I recall your crew being fully informed of the process yesterday and explaining why obtaining results from the different computer systems may take whatever time the search process takes under the parameters of this case. Perhaps Sean, your IT knowledgeable attorney has a suggestion on how to conduct the search in a speedier manner that our IT people may not be aware of.  I am not sure why you say "there is no reason they should not have already been produced."  My recollection is that Bruce and Matt did provide the reasons why all the emails you ask for, including Livingston's, have not yet been produced.

Of course,  as was clearly communicated to you and your group yesterday,  someone will let you know when the documents are ready so that you may "pick the documents up." ... if yout desire to "pick the documents up" or  have them picked up. By the way, I have asked this question about 3 or 4 times in the last few days but I do not recall a yes or no answer.  Do you intend on attempting to go forward with Livingston, Thaler and Stephens' depositions on June 11, 13, 2014?

Thank you for any response you may have that will allow us to resolve these matters to everyone's satisfaction.

**From:** Jeff Edwards [mailto:jeff@edwards-law.com]
**Sent:** Wednesday, June 04, 2014 5:56 PM
**To:** Anastasiadis, Demetri
**Cc:** Scott Medlock; Cook, Allan; jessica.marsh@tdcj.state.tx.us; cynthia.milne@tdcj.state.tx.us; sharon.howell@tdcj.state.tx.us; Garcia, Bruce; Sean Flammer; Woltersdorf, Deborah; Matlock, Karen; Wells, Lawrence
**Subject:** Re: Livingston's emails

Demetri and Everyone Else:

How you internally handle things is your decision.  Alan is not an attorney of record on this case. We need those Livingston emails and there is no reason they should not have already been produced. Please let me know when we can pick the documents up.

Jeff

Sent from my iPhone

On Jun 4, 2014, at 4:57 PM, "Anastasiadis, Demetri" <demetri.anastasiadis@texasattorneygeneral.gov> wrote:

> Scott,
>
> As we told you at yesterday's meeting,  Allan will be handling discovery issues related to ESI including emails.   Also, as Allan told you yesterday,  he will be out of state until next week.  I am forwarding your inquiry to TDCJ/OGC.  I am confident that Allan will update you on this issue promptly upon his return to Austin.
>
> --------------------------------------------------------------------------------
> **From:** Scott Medlock [mailto:scott@edwards-law.com]
> **Sent:** Wednesday, June 04, 2014 4:34 PM
> **To:** Cook, Allan; Anastasiadis, Demetri
> **Cc:** Garcia, Bruce; Jeff Edwards; Sean Flammer
> **Subject:** Livingston's emails
>
> Allan and Demetri,
>
> Do we have an ETA on when Livingston's emails can be disclosed? Y'all said you needed to check on that at our meeting yesterday. Thanks.
>
> Scott
>
> Scott Medlock
> Edwards Law
> 1101 East 11th Street
> Austin, TX 78702
> (512) 623-7727
> (512) 623-7729 (fax)
> *Like us on Facebook and follow us on Twitter @Edwards_Law*
>
> This email and any files attached are privileged and confidential, and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer.  Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

# Exhibit 7

Wednesday, June 4, 2014 at 6:41:41 PM Central Daylight Time

**Subject:** Livingston's emails
**Date:** Wednesday, June 4, 2014 at 6:24:52 PM Central Daylight Time
**From:** Anastasiadis, Demetri
**To:** Jeff Edwards
**CC:** Scott Medlock, Cook, Allan, jessica.marsh@tdcj.state.tx.us, cynthia.milne@tdcj.state.tx.us, sharon.howell@tdcj.state.tx.us, Garcia, Bruce, Sean Flammer, Woltersdorf, Deborah, Matlock, Karen, Wells, Lawrence, Coogan, Kim, Anastasiadis, Demetri, jessica.marsh@tdcj.state.tx.us, Molinare, Shanna

Jeff,

As always, very nice to hear from you directly. Responding to your queries,  I recall at yesterday's meeting that you were told by Bruce and Matt that the emails of various TDCJ employees, including Livingston,  have not been fully gathered, that efforts were being made in that direction by TDCJ IT personnel and that you would be notified when the search has yielded its results.  I do not recall a deadline by which this was promised or you giving us a deadline by which you must have it and the reasons thereof. If I am mistaken in my recollection, please let me know.  Is today's email an indication that you must have these by a certain date,  and if so, can you explain the reason for that and do you have any suggestions on how TDCJ IT tech personnel can speed up the search?  I recall your crew being fully informed of the process yesterday and explaining why obtaining results from the different computer systems may take whatever time the search process takes under the parameters of this case. Perhaps Sean, your IT knowledgeable attorney has a suggestion on how to conduct the search in a speedier manner that our IT people may not be aware of.  I am not sure why you say "there is no reason they should not have already been produced."  My recollection is that Bruce and Matt did provide the reasons why all the emails you ask for, including Livingston's, have not yet been produced.

Of course,  as was clearly communicated to you and your group yesterday,  someone will let you know when the documents are ready so that you may "pick the documents up." … if yout desire to "pick the documents up" or  have them picked up.  By the way, I have asked this question about 3 or 4 times in the last few days but I do not recall a yes or no answer.  Do you intend on attempting to go forward with Livingston, Thaler and Stephens' depositions on June 11, 13, 2014?

Thank you for any response you may have that will allow us to resolve these matters to everyone's satisfaction.

**From:** Jeff Edwards [mailto:jeff@edwards-law.com]
**Sent:** Wednesday, June 04, 2014 5:56 PM
**To:** Anastasiadis, Demetri
**Cc:** Scott Medlock; Cook, Allan; jessica.marsh@tdcj.state.tx.us; cynthia.milne@tdcj.state.tx.us; sharon.howell@tdcj.state.tx.us; Garcia, Bruce; Sean Flammer; Woltersdorf, Deborah; Matlock, Karen; Wells, Lawrence
**Subject:** Re: Livingston's emails

Demetri and Everyone Else:

How you internally handle things is your decision.  Alan is not an attorney of record on this case.  We need those Livingston emails and there is no reason they should not have already been produced.  Please let me know when we can pick the documents up.

Jeff

Sent from my iPhone

On Jun 4, 2014, at 4:57 PM, "Anastasiadis, Demetri" <demetri.anastasiadis@texasattorneygeneral.gov> wrote:

Scott,

As we told you at yesterday's meeting,  Allan will be handling discovery issues related to ESI including emails.   Also, as Allan told you yesterday,  he will be out of state until next week.  I am forwarding your inquiry to TDCJ/OGC.  I am confident that Allan will update you on this issue promptly upon his return to Austin.

---

**From:** Scott Medlock [mailto:scott@edwards-law.com]
**Sent:** Wednesday, June 04, 2014 4:34 PM
**To:** Cook, Allan; Anastasiadis, Demetri
**Cc:** Garcia, Bruce; Jeff Edwards; Sean Flammer
**Subject:** Livingston's emails

Allan and Demetri,

Do we have an ETA on when Livingston's emails can be disclosed? Y'all said you needed to check on that at our meeting yesterday. Thanks.

Scott

Scott Medlock
Edwards Law
1101 East 11th Street
Austin, TX 78702
(512) 623-7727
(512) 623-7729 (fax)
*Like us on Facebook and follow us on Twitter @Edwards_Law*

This email and any files attached are privileged and confidential, and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer.  Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

# Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| Stephanie McCollum, *et al.*, | § | |
| | § | |
| v. | § | **Civil Action No. 3:12-CV-02037** |
| | § | |
| Brad Livingston, *et al.*, | § | |
| Defendants. | § | **JURY DEMAND** |

## DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE'S RESPONSES
## TO PLAINTIFFS' REQUESTS FOR PRODUCTION AND INTERROGATORIES

**TO:**  Jeff Edwards, The Edward Law Firm, The Bremond Houston House, 706 Guadalupe, Austin, Texas 78701; Scott Medlock, Brian McGiverin, James C. Harrington, Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741; and Eliot Shavin, 2600 State Street, Dallas, Texas 75204

COMES NOW the Defendant, Texas Department of Criminal Justice, by and through counsel, the Texas Attorney General's Office, and offers the following **Defendant Texas Department of Criminal Justice's Responses to Plaintiffs' Requests for Production and Interrogatories**.

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**DAVID C. MATTAX**
Deputy Attorney General for Defense Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

_B—— R. A_

**BRUCE R. GARCIA**
Assistant Attorney General
Attorney in Charge
State Bar No.  07631060
So. Dist. Bar No. 18934

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / Fax (512) 495-9139

**ATTORNEYS FOR DEFENDANTS
TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, BRAD LIVINGSTON AND JEFF
PRINGLE**

## CERTIFICATE OF SERVICE

I, **BRUCE R. GARCIA,** Assistant Attorney General of Texas, do hereby certify that a true

and correct copy of the above and foregoing **Defendant Texas Department of Criminal Justice's**

**Responses to Plaintiff's First Set of Requests for Production and Interrogatories** has been

served by courier service on this the 21st day of December 2012 addressed to:

Jeff Edwards
The Edwards Law Firm
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701

Scott Medlock
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741

Eliot Shavin
2600 State Street
Dallas, Texas 75204

_B—— R. A_

**BRUCE R. GARCIA**
Assistant Attorney General

-2-

## FIRST SET OF INTERROGATORIES

1.  Identify all steps you took to protect Larry McCollum from heat index temperatures in the Hutchins Unit in excess of 90 degrees.

RESPONSE:   Each year in April the Agency has mandatory heat precaution training for all staff and offenders.   Each shift supervisor was instructed to discuss heat awareness and warning signs at shift turn outs during the summer months.  Heat awareness, warning signs, and hydration memos were placed throughout the facility for staff and offenders. Shower temperatures were lowered and showers times were extended. Water coolers with ice were place in the dorms during summer months. Staff was instructed that offenders identified or requested relief from the heat were allowed to sit in cooler areas.

See also attached heat safety training and circulars produced with Request for Production 3-5.

2.  Identify all heat-related injuries (including, but not limited to, fatalities, where the cause of death is listed as "hyperthermia") of inmates in Texas Department of Criminal Justice facilities between January 1, 1990 to the present.

RESPONSE   Objection, overly broad and unduly burdensome, not limited in time or scope, Defendant further objects to the extent this seeks medical information privileged under HIPAA.
Subject to and without waiving between fiscal year 2008 to present, there have been three offender heat-related injuries in the Hutchins State Jail.  The first was in June of 2009, the second in July of 2011 to Larry Gene McCollum, and the third was in June of 2012.

3.  Identify all heat-related injuries (refer to definition paragraph R) to inmates in Texas Department of Criminal Justice facilities between January 1, 1990 to the present.

**RESPONSE**:  See response to TDCJ Interrogatory No. 2

3.  Identify all heat-related injuries to inmates in the Hutchins Unit between January 1, 2002 to the present.

**RESPONSE**:  See response to TDCj Interrogatory No. 2.

-3-

4.   Identify all heat-related injuries to employees of the Texas Department of Criminal Justice working in Texas Department of Criminal Justice facilities between January 1, 2002 to the present, including, hut not limited to, injuries where employees filed workers compensation claims.

**RESPONSE**:   Objection, overly broad, unduly burdensome and not reasonably limited in time or scope. Defendants also object to the extent Plaintiff's interrogatory seeks medical information protected by HIPPA. Subject to and without waiving:

From fiscal year 2008 to present there have been seven employee heat-related injuries at the Hutchins State Jail. Three occurred in 2009, two in 2010 and two in 2012, five filed workers' compensation claims.

5.   Identify all heat-related injuries to employees of the Texas Department of Criminal Justice in the Hutchins Unit between January 1, 2002 to the present, including, but not limited to, injuries where employees filed workers compensation claims.

**RESPONSE**:   See TDCJ response to Interrogatory No. 4.

6.   Describe in detail why all inmate housing areas at the Hutchins Unit are not air conditioned, identifying all people responsible for decisions not to air condition any part of the Hutchins Unit.

**RESPONSE**:   Objection, overly broad, unduly burdensome and not calculated to lead to the discovery of relevant or admissible evidence. The Hutchins unit was constructed in the mid 1990's All decisions made regarding these issues were made in the 1990's, by former administrators.

7.   Identify all persons who authorized Larry McCollum's placement in each housing area he spent time in during his 2011 incarceration at the Hutchins Unit and describe in detail the basis for each placement. A response to this interrogatory should identify each location Larry McCollum was housed, including building, bunk number, and whether he was assigned to an upper or lower bunk.

**RESPONSE**:   Please see memo from P. Escobedo regarding housing and bunk assignments.

-4-

8.      Identify all persons who you believe have knowledge of relevant facts and identify the issues upon which you believe they have knowledge. A response to this interrogatory should include, but is not limited to, all prisoners housed in the dorm with Larry McCollum on July 22, 2011 and July 23, 2011.

RESPONSE: Please see Defendant's initial disclosure. In addition, Defendants have ordered and will supplement with the Office of Inspector General Investigation. See attached dorm roster for July 21, 2011, Hutchins State Jail shift rosters for June and July 2011, and the reports produced in response to Request for Production 22.

9.      If you contend that some other person or legal entity is, in whole or in part, liable to Plaintiff in this matter, identify that person or legal entity and describe in detail the basis of said liability.

RESPONSE: Unknown at this time, should another responsible party become apparent, Defendants will supplement.

10.     Please describe in detail all steps that you have taken to bring the Hutchins Unit into compliance with the Americans with Disabilities Act and the Rehabilitation Act. Please include information about what modifications (if any) have been made at the prison, whether a transition plan and self-evaluation have been completed (as those terms are used in the ADA), and what services and programs at the jail exist to accommodate inmates' disabilities.

RESPONSE: Objection, overly broad, unduly burdensome, not limited in time or scope and not reasonably calculated to lead to the discovery or admissible evidence. In addition this interrogatory is vague and overbroad as to the term "inmate disabilities". Subject to and without waiving, please see TDCJ's response to Request for Production No.25.

11.     Please identify each person who provided information or assisted in any way in answering these interrogatories, and as to each such person, please indicate the discovery request with respect to which he or she was involved.

RESPONSE:  Warden Jeff Pringle, Interrogatory 1, 7, 8, 12, 14,

-5-

53

Robert Warren, Risk Management Division, Interrogatories 2-5, 15,
Frank Inmon, Facilities Management, Interrogatory 13

12.     Please identify all persons employed at the Hutchins Unit whose duties included spending
        time in the dormitories during the summer of 2011, including, but not limited to, sworn
        law enforcement officers and non-sworn employees.

**RESPONSE**:   Objection, overly broad - all employees except administrative duties may require
                some time in the dormitories.

13.     Please identify who was responsible for construction of the Hutchins Unit, including, but
        not limited to, the construction firm and any architects involved in the design of the
        Hutchins Unit. A response to this interrogatory should include information about the
        design of the ventilation system at the Hutchins Unit.

**RESPONSE**:   Objection, overly broad, unduly burdensome, and vague and not calculated to lead
                to the discovery of admissible or relevant evidence.  Subject to and without
                waiving:
                Architects / Engineers:
                Aguirre Associates Inc. - Designed the Ventilation
                Latta Technical Services Inc.
                Mulhauser McCleary Associates Inc.
                HNTB Corporation

14.     Please describe why inmates at the Hutchins Unit were not permitted to use personal fans
        in 2011.

**RESPONSE**:   The dormitories do not have electrical outlets.

15.     Please describe in detail "heat conditions" assigned to prisoners at the Hutchins Unit
        including, but not limited to, why prisoners are assigned these conditions and what action
        (if any) TDCJ takes when a prisoner is assigned "heat conditions."

**RESPONSE**:   Objection, vague as to the term "heat conditions".  See response to TDCJ request
                for Production No. 3.

-6-

54

16.    Please describe in detail all TDCJ policies about what personal property prisoners at the Hutchins unit were allowed to possess in July 2011. A response to this interrogatory should include what items newly-arrived prisoners at the Hutchins Unit are issued on arrival, what items can be purchased from the prison commissary, and when newly-arrived prisoners can purchase items from the commissary.

RESPONSE: See attached policies, AD 03.72 (rev. 5), "Offender Property," dated September 1, 2002, Offender Orientation Handbook, dated November 2004).

17.    Please identity all persons that Defendant expects to call to testify on Defendant's behalf at trial.

**RESPONSE**: Defendants have made no decisions at this time regarding trial testimony. Defendants will supplement per the Federal Rules of Civil Procedure and the scheduling order.

## REQUESTS FOR PRODUCTION

1.    Please produce all documents or other physical or tangible evidence related to, referred to,  identified in, or that formed the basis of any answer to the previous interrogatories, identifying the specific interrogatory to which that document or evidence is related.

**RESPONSE**: Objection, overly broad and unduly burdensome.  Please see specific responses for specific document references.

2.    Please produce all documents, including. but not limited to inmate grievances and correspondence from state officials, reviewed by Jeff Pringle or Brad Livingston prior to July 22, 2011 regarding heat and/or high temperatures in TDCJ facilities.

-7-

**RESPONSE**: Objection, overly broad and unduly burdensome, not reasonably limited in scope or time, and vague as to the term "state officials." Subject to and without waiving please see grievances filed on the Hutchins Unit for July, 2010 to the present attached as TDCJ's response to request for production No.2.

3.    Please produce copies of all relevant policy documents governing procedures that were in place during 2011 at the Hutchins Unit related to heat, temperature, or heat index. The request includes any rules or policies governing acceptable temperatures in TDCJ inmate housing areas during the summer months or other periods of high temperatures.

**RESPONSE**: Objection, overly broad and unduly burdensome and this request may include documents protected by the attorney client privilege.  Subject to and without waiving, see responses attached as TDCJ's response to request for production No.3 and No.4.

4.    Please produce all documents that describe, or are used in, or are otherwise related to the training of officers at the Hutchins Unit related to high temperatures at the prison prior to July 22. 2011.

**RESPONSE**: Objection, overly broad and unduly burdensome and this request may include documents protected by the attorney client privilege.  Subject to and without waiving, see TDCJ's response to request for production No.3 and No.4

5.    Please produce all work orders for the repair of ice machines, fans, ventilation, sinks,  and showers for inmate housing areas at the Hutchins Unit, including, but not limited to, AD84 forms, created from January 1, 2011 to the present.

**RESPONSE**: Objection, overly broad and unduly burdensome.  Subject to and without waiving see TDCJ's response to Request for Production No.5.

6.    Please produce all current documents that describe, or are used in, or are otherwise related to the training of officers at the Hutchins Unit related to high temperatures at the prison.

**RESPONSE**: Objection, repetitive, unduly burdensome.  See TDCJ previous responses to Request  for production No. 3 and No. 4.

-8-

56

7.   Please produce all documents related to heat, high temperatures, or heat index related to any training Jeff Pringle or Brad Livingston received from TDCJ prior to July 22. 2011.

**RESPONSE**:   Objection, repetitive, unduly burdensome.  Subject to and without waiving, please see TDCJ responses to Request  No. 3, No. 4. and No. 7.

8.   Please produce all documents Brad Livingston or Jeff Pringle reviewed at any time prior to July 22, 2011 showing any medical treatment any person (including inmates and TDCJ employees) received related to heat-related injuries.

**RESPONSE**:   Objection, overly broad and unduly burdensome not limited in time or scope.  In addition security does not have access to offender medical records.  That information is kept by the medical providers.

9.   Please produce all documents, including any diagrams or pictures, related to the structure and function of any ventilation system (including, but not limited to, the air handlers, and fans) at the Hutchins Unit.

**RESPONSE**:   Objection, overly broad and unduly burdensome and not limited in scope and calls for the creation of a document.

10.   Please produce a diagram of the Hutchins Unit, identifying which portions (if any) of the facility are air conditioned, and any locations where Larry McCollum was housed prior to his death.

**RESPONSE**:   Objection, calls for the creation of a document. Subject to and without waiving, no such document as requested exists.

11.   Please produce a diagram of the dorm to which Larry McCollum was assigned on the date he died. The diagram must include notations of the length of all interior walls.

**RESPONSE**:   Objection Plaintiff is asking for the creation of a document.

12.   Please provide a detailed and complete list of all areas in the Hutchins Unit that are air conditioned.

-9-

**RESPONSE**:  Objection calls for the creation of a document.  Subject to and without waiving, no such list exists.

13.    Please provide a detailed and complete list of all areas in the Hutchins Unit that are NOT air conditioned.

**RESPONSE**:  Objection, calls for the creation of a document.  Subject to and without waiving, no such list exists.

14.    Please provide a detailed and complete list of all TDCJ facilities where some or all inmate housing areas are air conditioned. indicating which portions of each facility are air conditioned.

**RESPONSE**:  Objection, calls for creation of a document.  Subject to and without waiving, no such document as described or requested exists.

15.    Please provide all medical and infirmary records related to Larry McCollum, while he was incarcerated by TDCJ.

**RESPONSE**:  Defendants have ordered all medical information from the contract medical care providers and will supplement.

16.    Please provide all grievances filed by prisoners at the Hutchins Unit related to heat, high temperature, or heat index from January 1. 2007 to the present.

**RESPONSE**:  Objection overbroad and unduly burdensome, and repetitive.  Subject to and without waiving, See TDCJ's response to request for production No. 2.

17.    Please provide all grievances filed by prisoners in all TDCJ facilities related to heat. high temperature, or heat index from January 1, 2007 to the present.

**RESPONSE**:  Objection, overly board and unduly burdensome, repetitive, not reasonably limited in time or scope, and not calculated to lead to the discovery of admissible

-10-

evidence.  Subject to and without waiving, see TDCJ's response to plaintiffs request for production No.2.

18.     Please produce all purchase orders for ice, ice machines, water, water bottles, water jugs, and fans from the Hutchins Unit from January 1, 2007 to the present.

**RESPONSE**:  Objection, overly board and unduly burdensome, not reasonably limited in time or scope.  Subject to and without waiving, defendant has ordered and will supplement if any documents are responsive.

19.     Please produce all documents related to ventilation design at the Hutchins Unit, including any documents related to ventilation, air conditioning, air flow, and fan placement in inmate housing areas.

**RESPONSE**:  Objection, overbroad and unduly burdensome, not reasonably limited in scope, and vague as to the terms "ventilation design", "air flow" and "fan placement". Subject to and without waiving defendants have ordered and if any documents are responsive, they will supplement.

20.     Please produce all documents related to any decision to not air condition any portion of the Hutchins Unit.

**RESPONSE**:  Objection, overbroad, not reasonably limited in scope or time. Subject to and without waiving, defendants have ordered and if any documents are responsive to this request, will supplement.

21.     Please produce all documents related to any additional water or ice provided to inmates in any location Larry McCollum was housed at the Hutchins Unit during his confinement there.

**RESPONSE**:  See TDCJ's response to request for production No.3.

-11-

22.     Please produce all documents related to any investigation conducted into Larry McCollum's death, including, but not limited to, any autopsy, investigation by the TDCJ Office of the Inspector General investigation conducted by any other law enforcement body (including,  but not limited to the Texas Department of Public Safety) and/or any investigation or peer review conducted by the University of Texas Medical Branch (or any other entity providing medical care to Larry McCollum).

**RESPONSE**:  Defendant has ordered and will supplement.  The OIG investigation is still open at this time.  Defendant objects to the extent this request seeks documents not in the Texas Department of Criminal Justice's care custody and control such as a peer review from the UTMB or any other entity providing medical care.

23.     Please produce all documents showing temperatures and heat indexes recorded at the Hutchins Unit from January 1, 2007 to the present.

**RESPONSE**:  See TDCJ's response to request No.23.

24.     Please produce all documents presented to the Texas Board of Criminal Justice related to heat, temperature, heat index, or air conditioning at any TDCJ facility from January 1, 1990 to the present.

**RESPONSE**:  Objection, overly broad and unduly burdensome, repetitive and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, this request is not reasonably limited in scope or time.

25.     Please produce all accreditation reports generated by any accrediting bodies since January 1, 2007 pertaining to the Hutchins Unit.

**RESPONSE**: See attached TDCJ's response to request for production No. 25.

-12-

26.     Please produce and separately identify all records related to any disciplinary actions taken against TDCJ personnel since January 1, 2002 for failing to comply with TDCJ policies and/or procedures related to heat, temperature, and/or heat index at the Hutchins Unit.

**RESPONSE**:  Objection, overly broad and unduly burdensome, not reasonably limited in scope or time. Subject to and without waiving, defendants are unaware of any disciplinary actions for failure of a staff member to comply with TDCJ policies regarding heat.

27.     Please produce all audio or video recordings of Larry McCollum.

**RESPONSE**:  No such recordings exist.

-13-

# Exhibit 9

| | |
|---|---|
| **From:** | Robison, Jerri D. |
| **Sent:** | Thursday, April 10, 2014 8:48 PM |
| **To:** | Osteen, Jennifer K. |
| **Subject:** | FW: heat incident |
| **Attachments:** | Heat Related Incidents 081310.xls |

I show that I forwarded the email on same date at 3:10.

Denee' Robison, RN, BSN
Region 2 DON UTMB/CMC
Shelia-936-437-1439
Cell Phone-806-438-7966

***Employee Advisory Council - UTMB CMC Representative***
http://blog.utmb.edu/EAC/

Employee Advisory Council
Employee Advisory Council Contact Form

 Health

Confidentiality Notice:  This email transmission contains confidential or legally privileged information that is intended for the individual party or entity named in the email address.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or reliance upon the contents of this email is strictly prohibited.  If you have received this email transmission in error, please reply to the sender and delete the message from your system.  Thank you.

**From:** Knight, Tina
**Sent:** Friday, August 13, 2010 3:06 PM
**To:** phyllis.mcwhorter@tdcj.state.tx.us; Robison, Jerri D.
**Cc:** Bouchard, Grizelda R.
**Subject:** heat incident

Tina Knight, RN, MSN, MHA
UTMB-CMC
Ramsey Cluster Nurse Manager
(281) 595-3491 x1311

# Exhibit 10

| | |
|---|---|
| **From:** | Robison, Jerri D. |
| **Sent:** | Thursday, April 10, 2014 10:01 PM |
| **To:** | Osteen, Jennifer K. |
| **Subject:** | FW: heat-related illness |

!
!
Denee` Robison, RN, BSN
Region 2 DON UTMB/CMC
Shelia-936-437-1439
Cell Phone-806-438-7966

***Employee Advisory Council - UTMB CMC Representative***
http://blog.utmb.edu/EAC/

Employee Advisory Council
Employee Advisory Council Contact Form

 Health

Confidentiality Notice:  This email transmission contains confidential or legally privileged information that is intended for the individual party or entity named in the email address.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or reliance upon the contents of this email is strictly prohibited.  If you have received this email transmission in error, please reply to the sender and delete the message from your system.  Thank you.

!
**From:** McLearen, Kimberly S.
**Sent:** Monday, June 25, 2012 4:17 PM
**To:** Brandon, George R.; Brysch, Rachel C.; Davis, Mark A.; Easter, Vicky; Fread, Brenda K.; Gilford, Yonette E.; Hankins, Gregory D.; Iredell, Debra L.; Johnson, Martha F.; Kempsky, Paul E.; McGowan, Rebecca; Moon, Lisa G.; Outlaw, Patricia A.; Pratt, Deanna; Quiroz, Jolly R.; Smith, Teri B.; Staples, Relda A.; Swanson, David A.; Turner, Darlene B.; Webb, Lucinda L.; White, Alice F.
**Cc:** Saenz, Hilario; Robison, Justin R.; Robison, Jerri D.; Brown, Paul V.
**Subject:** FW: heat-related illness

I wanted to remind everyone about the below email.  I should be receiving an email about all offenders with heat related illness with the below information.  I have only been receiving from a couple of units.  I keep a database that is sent in to senior leadership at the end of each month.

Thanks,
Kim

**From:** Abbott, Kirk D.
**Sent:** Wednesday, August 17, 2011 12:12 PM
**To:** Brown, Christopher M.; Brysch, Rachel C.; Colbert, Vickie K.; Davis, Mark A.; Easter, Vicky; Gilford, Yonette E.; Goodwin, David; Greff, Edward T.; Iredell, Debra L.; James, George F.; Johnson, Martha F.; Kempsky, Paul E.; McGowan, Rebecca; Moon, Lisa G.; Outlaw, Patricia A.; Pratt, Deanna; Quiroz, Jolly R.; Saenz, Hilario; Staples, Relda A.; Swanson, David A.; Turner, Darlene B.; Webb, Lucinda L.; White, Alice F.
**Cc:** McLearen, Kimberly S.
**Subject:** FW: heat-related illness

1

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

STEPHEN MCCOLLUM, STEPHANIE     )
KINGREY, and SANDRA McCOLLUM,   )
individually and as heirs at    )
law to the Estate of LARRY GENE )
McCOLLUM,                        )
    Plaintiffs,                 )
                                )
vs.                             )     CIVIL ACTION NO.
                                )     3:12-CV-02037
BRAD LIVINGSTON, JEFF PRINGLE,  )
AND THE TEXAS DEPARTMENT OF     )
CRIMINAL JUSTICE,               )
    Defendants.                 )

**************************************************************

ORAL AND VIDEOTAPED RULE 30(B)(6) DEPOSITION OF

THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE (ROBERT EASON)

MARCH 26, 2013

**************************************************************

    ORAL RULE 30(B)(6) DEPOSITION OF THE TEXAS
DEPARTMENT OF CRIMINAL JUSTICE (ROBERT EASON), produced as
a witness at the instance of the Plaintiffs and duly
sworn, was taken in the above-styled and numbered cause on
the 26th day of March, 2013, from 9:42 a.m. to 12:00 noon
and 1:05 p.m. to 6:39 p.m., before Kathleen Nevils,
Certified Shorthand Reporter in and for the State of
Texas, reported by computerized stenotype machine at the
offices of the Attorney General, 300 West 15th St.,
Austin, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                            March 26, 2013

```
 1        Q.    Why not?

 2        A.    Because we are taking all the steps that we --

 3   we can take to mitigate the heat.  We're doing that every

 4   summer, and when you look how vast our operation is

 5   throughout the state, and how many offenders that we move

 6   through our institutions every summer, how many employees

 7   we have working in our institutions every summer, we have

 8   very little problems with heat-related illness when you

 9   look at the numbers.

10        Q.    Was that true in the summer of 2011, that you

11   had very little problems with heat-related illnesses?

12        A.    In my opinion, yes.  When you look at the

13   numbers, I think we do a wonderful job at taking those

14   steps, taking it very seriously and mitigating the heat on

15   our facilities.

16        Q.    Just to be crystal clear, it's your testimony,

17   as the Texas Department of Criminal Justice

18   representative, that you do a wonderful job mitigating the

19   heat at your facilities?

20        A.    Yes.

21        Q.    Do you believe you did a wonderful job at the

22   Hutchins Unit with regard to Larry Eugene McCollum?

23        A.    Yes, we do -- we did a -- a good job.

24        Q.    Did you make any changes -- I mean the Texas

25   Department of Criminal Justice -- based on Mr. McCollum's
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

68

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                             March 26, 2013

1    A.    I don't know that.

2    Q.    If he got there on July 15th, should he have had

3  it done by July 22nd?

4    A.    If it falls in that -- that seven-day window, my

5  understanding of the way the intake process works, and

6  again, like I spoke earlier, I'm at somewhat of a

7  disadvantage on intake inner workings.  Never been a

8  warden on one of those facilities, but to my knowledge, he

9  should have had a medical assessment some time during that

10  process.

11    Q.    Okay.  And, sir, as the regional director who

12  was responsible -- you were responsible for conducting the

13  administrative review of what happened with Mr. McCollum,

14  right?

15    A.    Yes, sir.

16    Q.    Okay.  Mr. -- Warden Pringle sent his -- his

17  assessment of what happened.  He sent it on to you, right?

18    A.    Yes, sir.

19    Q.    Okay.  And as you testify here today -- well, I

20  just want to make sure.  You told me you don't know

21  whether or not he had a medical assessment or an intake

22  assessment from a P.A. or a medical doctor, right?

23    A.    Well, I know that when Mr. McCollum was taken to

24  the hospital, that was, I believe, after his seven-day

25  window.  And I don't have the dates right here in front of

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

```
 1  in the Texas Department of Criminal Justice, right?

 2      A.    We had another offender that died.

 3      Q.    Prior to Mr. Adams --

 4      A.    I don't know -- I can't sit here and testify

 5  that if the medical circumstances and all the certain

 6  situations surrounding it is similar to what we're talking

 7  about today.

 8      Q.    You haven't gone over it in as great of detail

 9  as you have with Mr. McCollum's in preparation for this

10  deposition; is that fair?

11      A.    Yes, sir.

12      Q.    Okay.  As you testify here today, are you aware

13  of other deaths at the Gurney Unit that were heat-related?

14      A.    No, sir.

15      Q.    If -- if people died -- let's say if two people

16  had died at the Gurney Unit in 2011, the summer of 2011,

17  should you have been made aware of it given your job as

18  regional director?

19      A.    I am made aware of it, sir.

20      Q.    Well, let me ask --

21      A.    I'm made aware of every offender death in my

22  region.

23      Q.    Okay.  Other than Mr. Adams and Mr. McCollum, as

24  you testify here today, are you aware of any other

25  heat-related illness/deaths at any of the Texas Department
```

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

70

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                       March 26, 2013

```
 1   of Criminal Justice facilities you oversee?
 2        A.     To my knowledge, those are the only two that
 3   have been ruled heat-related to my knowledge.
 4        Q.     All right.  What about at other units where you
 5   don't have direct oversight responsibility?
 6        A.     I can't -- I don't have any knowledge of other
 7   deaths on other facilities in other regions.  That stuff
 8   doesn't go through me or -- that information is not shared
 9   with me.
10        Q.     Well, let me ask you this:  Have you made your
11   counterparts aware of the heat-related illnesses and
12   deaths that you -- you do know about?
13        A.     I don't do that.  Our CID leadership does that.
14        Q.     Who's that?
15        A.     That is Mr. Thaler or Mr. Stephens.
16        Q.     Mr. Thaler's -- not Mr. Livingston; Mr. Thaler;
17   is that fair?
18        A.     Mr. Thaler is the one who conducts our CID
19   meetings, yes.
20        Q.     At the CID meetings -- and I may be
21   misremembering this, so please correct me if I'm wrong --
22   have any of these heat-related deaths been discussed?
23        A.     We discussed -- he mentioned Mr. McCollum's
24   death during the CID meeting.
25        Q.     Mr. Stephens did?
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

71

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                        March 26, 2013

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3   STEPHEN MCCOLLUM, STEPHANIE    )
     KINGREY, and SANDRA McCOLLUM,  )
 4   individually and as heirs at   )
     law to the Estate of LARRY GENE)
 5   McCOLLUM,                       )
          Plaintiffs,               )
 6                                  )
     vs.                            )      CIVIL ACTION NO.
 7                                  )      3:12-CV-02037
     BRAD LIVINGSTON, JEFF PRINGLE, )
 8   AND THE TEXAS DEPARTMENT OF    )
     CRIMINAL JUSTICE,              )
 9        Defendants.               )
10              REPORTER'S CERTIFICATE FOR THE
11       ORAL RULE 30(B(6) DEPOSITION Of TEXAS DEPARTMENT OF
12              CRIMINAL JUSTICE (ROBERT EASON)
13                      MARCH 26, 2013
14        I, Kathleen Nevils, a Certified Shorthand Reporter
15   in and for the State of Texas, do hereby certify that the
16   foregoing deposition is a full, true and correct
17   transcript;
18        That the foregoing deposition of TEXAS DEPARTMENT
19   OF CRIMINAL JUSTICE (ROBERT EASON) was taken by me in
20   stenograph on March 26, 2013, the said witness having been
21   by me first duly cautioned and sworn to tell the truth,
22   the whole truth and nothing but the truth, and the same
23   was thereafter reduced to typewriting by me or under my
24   direction.  The charge for the completed deposition is
25   $_____ due from Plaintiffs;
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

72

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                            March 26, 2013

1        That the amount of time used by each party at the
2   deposition is as follows:
3        Jeff Edwards  - (05:58)
4        I further certify that I am neither counsel for,
5   related to, nor employed by any of the parties in the
6   action in which this proceeding was taken, and further
7   that I am not financially or otherwise interested in the
8   outcome of the action.
9        I further certify that before the completion of the
10  deposition, the Deponent and/or the Plaintiff/Defendant
11  did request to review the transcript.
12        WITNESS MY HAND, this the 10th day of April, 2013.
13
14
15
                          _____

                          Kathleen Nevils
16                        Certified Shorthand Reporter in
                          and for the State of Texas
17                        Certificate No. 1628
                          Expires December 2013
18                        Wright Watson & Associates, LLC
                          Registration No. 225
19                        Expiration Date:  12-31-13
                          3307 Northland Drive
20                        Suite 185
                          Austin, Texas 78731-4960
21                        512.474.4363
22  Job No. 130326KVN
23
24
25

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

73

# Exhibit 12



Texas Department of Criminal Justice

Brad Livingston
Executive Director

### ADMINISTRATIVE INCIDENT REVIEW

### INCIDENT NUMBER:  I-11200-08-11

### TEXAS DEPARTMENT OF CRIMINAL JUSTICE

### MARK W. MICHAEL UNIT

August 8, 2011

| | |
|---|---|
| **To:** | **Emergency Action Center** |
| **Thru:** | **Robert Eason, Region II Director** |
| **From:** | **Todd Foxworth, Senior Warden, Mark W. Michael Unit** |
| **Subject:** | Offender Death |

RECEIVED
AUG 2011
REGION 2
DIRECTOR

Received

SEP  .6 2011

EAC

**Persons
Involved:**  Togonidze, Alexander, 1578039, a 44 year old white male, serving a 60 year sentence for aggravated robbery with a deadly weapon, out of Collin County, Texas.

**Summary:**  On 8/8/2011, at approximately 0750 hours, Officer Jerry Whitley, CO3, was conducting a bed book count on 4 building, 2 section. 3 row.  When Officer Whitley asks Offender Togonidze, Alexander, 1578039, in 41 cell to bring his identification card to the cell door, he did not get a response from him.  Officer Whitley had the control picket officer, Christine Bartick, CO 3, call for a supervisor. Sergeant Domonic Odiaka responded to the scene and determined that medical assistance was necessary.  Medical responed  and determined that Offender Togonidze was breathing and had a pulse.  Offender Togonidze was transported by gurney to the Michael Unit Emergency Room for further treatment.

In the emergency room it was determined that Offender Togonidze was in Cardiac Arrest and was treated with the Automatic External Defibulator (AED). Medical staff called 911 and an ambulance was dispatched to the unit.  Offender Togonidze was pronounced deceased at 0814 hours by Doctor Gary Wright, a Michael Unit Physician.  A rectal temperature was taken, which was 106 degrees. When it was noted that the heat may have been a factor in causing the cardiac arrest, Misty Atchison, Michael Unit Risk Management, went to 4 building, D pod, 41 cell and took a temperature reading, which was 86.2 degrees.

Office of the Inspector General, Tony Allison had been contacted at 0810 hours and arrived at the emergency room at 0822 hours.  Mr. Allison conducted a

75

Incident Number:    I-11200-08-11
8/8/2011

visual exam of Offender Togonidze's body and found a facial bruise which he believed was caused by the offender falling.  No foul play or assault was suspected by Mr. Allison.  Justice of the Peace, Carl Davis, had been contacted and arrived on the unit at 0850 hours and agreed with the determination of death and signed the order for an autopsy to be done.  Carnes Funeral Home arrived at the Michael Unit at 1135 hours and took possession of the body.  At 1150 hours, Emergency Action Center, Ginger Kellogg, was contacted and issued the number I-11200-08-11 for this incident.

**Employee
Action/Inaction:**        All actions taken by staff were appropriate during this incident.

**Attachments:**          TNG-93
E-mail
Temperature Reading E-Mail
Statements from staff
Copy of Travel Card
Order for Autopsy
Inquest Transport Order
Chaplain Packet
Provisional Autopsy Report
Medical Records
Photos on CD

**Statements:**           Officer J. Whitley, CO3
Officer C. Bartick, CO3
Sergeant D. Odiaka

Incident Number:   I-11209-08-11
8/8/2011

**Administrative Review:**

Warden's/Administrative Supervisor's Comments:

On 8/8/2011, at approximately 0750 hours, Offender Togonidze, Alexander, 1578039, was unresponsive when ask for his identification card during a bed book count.  A supervisor was called for and determined that medical assistance was needed.  When medical arrived they found the offender to be breathing and had a pulse but took him to the emergency room for further evaluation.  In the emergency room it was determined that he was possibly having Cardiac Arrest.  Cardiac Pulmonary Resuscitation was initiated but Offender Togonidze failed to respond to all efforts, he was pronounced deceased at 0814 hours by Michael Unit Physician, Doctor Gary Wright.  Justice of the Peace, Carl Davis, ordered an autopsy.  The Provisional Autopsy Report from The University of Texas Medical Branch, dated 8/10/2011, states the cause of death is hyperthermia, and the manner of death is accidental.  It should be noted that Michael Unit Risk Manager, Misty Atchison, did go to the offender's cell and do a temperature reading, recording the temperature at 86.2 degrees.  We are currently awaiting the final report that may or may not have a secondary cause of death.  Offender Togonidze's family has been contacted, with our condolences, and will claim the body.

_____
Todd Foxworth
Senior Warden

_____8-16-2011_____
Date

77

Incident: I-11200-08-11 / Offender Death / Michael Unit.

Regional Director/Assistant Director's Comments:

An investigation into the offender death that occurred on August 8, 2011, on the Michael Unit involving Offender Togonidze, Alexander TDCJ #1578039, indicated that employee action or in-action was not a contributing factor in the incident. All employees' actions during this incident were in accordance with agency policy and procedures.

On August 8, 2011, at or about 0750 hours, Offender Togonidze was not responsive when asked for his identification card during a bed book count. A supervisor was requested, upon his arrival a determination that medical assistance was needed. Unit medical staff arrived and observed the offender breathing with a pulse. The offender was transported by gurney to the unit medical department. It was determined that the offender was in cardiac arrest and Automatic External Defibulator (AED) was utilized. Emergency Medical Services were requested; however, all efforts failed and the offender was pronounced deceased at 0815 hours by Dr. Gary Wright. Offender Togonidze's body temperature was 106 degrees.

Office of the Inspector General Tony Allison was notified and initiated an investigation. The case number is pending. Justice of the Peace Carl Davis arrived at the unit at 0850 hours and ordered an autopsy. The provisional autopsy report dated August 10, 2011, indicated the cause of death as hyperthermia and the manner of death as accidental. The family was contacted and will claim the body. Carnes Funeral Home arrived at 1135 hours and took possession of the body.

On the date of the incident at 0830 hours, the air temperature in the housing area was 86.2 degrees and 71% humidity for a heat index of 93 degrees. The following heat precautions are taken on the Michael Unit to minimize heat related illnesses: air flow is monitored, all ventilation fans in the area were functioning properly, offenders are allowed to wear commissary shorts and t-shirts in the housing area, and ice water is placed in the housing areas throughout the day. Offender Togonidze did have a commissary fan in his cell. All staff and offenders are trained on heat awareness and precautions in accordance with AD 10.54, Temperature Extremes in the Workplace.

This office requires will review this incident in 90 days.

Signature: _____   Date: _____

Robert Eason
Region II Director

78

# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| Stephanie McCollum, *et al.*, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-02037 |
| | § | |
| Brad Livingston, *et al.*, | § | |
| Defendants. | § | **JURY DEMAND** |

**AFFIDAVIT OF KAREN HALL**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF WALKER | § |

BEFORE ME, the undersigned authority, personally appeared Karen hall, who, being duly sworn by me, deposed as follows:

"My name is Karen Hall.  I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

"I am the custodian of records for the Executive Services Department, Texas Department of Criminal Justice (TDCJ).   I have received a request for a list of all heat-related deaths, including fatalities where the cause of death is listed as hyperthermia, of inmates in TDCJ facilities between January 1, 1990 and the present.  TDCJ has only maintained a record of offender deaths from January 1, 2001 to present.  The entries of such records were made as a regularly conducted activity and a regular practice of TDCJ, and were made at or near the time the information was transmitted to TDCJ by the University of Texas Medical Branch (UTMB).

"The records indicate the following information on heat-related deaths, including fatalities where cause of death is listed as hyperthermia, of inmates in TDCJ facilities between January 1, 2001 and present:

_____

Karen Hall

SWORN TO AND SUBSCRIBED before me on this the 12 day of June, 2013.

–1–

80

*Connie Jo Gongre*
_____
NOTARY PUBLIC, STATE OF TEXAS

*Connie Jo Gongre*
_____
(Printed name)

*July 7, 2014*
_____
Commission Expiration Date



CONNIE JO GONGRE
Notary Public, State of Texas
My Commission Expires
JULY 7, 2014

Notary without Bond

–2–

## Texas Department of Criminal Justice
## Offender Hyperthermia Deaths
## CY2001 - CY2013 (YTD June)

| DOD | TDCJ ID | LAST NAME | FIRST NAME | MIDDLE | IMMEDIATE CAUSE OF DEATH |
|---|---|---|---|---|---|
| 8/4/2001 | 1041651 | Cardwell | John | Wayne | Hyperthermia |
| 7/16/2004 | 1172218 | Robertson | Ricky | L | Hyperthermia |
| 8/8/2007 | 00390315 | Shriver | James | R | Cardiac Arrhythmia* |
| 8/13/2007 | 01443175 | Robles Jr | Dionicio | | Hyperthermia |
| 7/25/2011 | 01722504 | Hudson | Douglas | Earl | Hyperthermia |
| 7/28/2011 | 01721640 | McCollum | Larry | Gene | Hyperthermia |
| 8/3/2011 | 00680515 | Meyers | Thomas | | Hyperthermia |
| 8/4/2011 | 01569761 | Webb | Robert | Allen | Hyperthermia |
| 8/8/2011 | 01457546 | Cook | Charles | Lee | Hyperthermia |
| 8/8/2011 | 01395315 | Martone | Michael | David | Hyperthermia |
| 8/8/2011 | 01578039 | Togonidze | Alexander | | Hyperthermia |
| 8/12/2011 | 01128380 | Marcus | Kelly | Don | Hyperthermia |
| 8/13/2011 | 01726849 | James | Kenneth | Wayne | Hyperthermia |
| 8/20/2011 | 01517660 | Alvarado | Daniel | | Hyperthermia |
| 8/4/2012 | 01797921 | Adams | Rodney | Gerald | Hyperthermia |
| 8/29/2012 | 01802681 | Hinojosa | Albert | | Cardiac Arrhythmia* |

The offender deaths above include only those for which an autopsy has been received.

*The immediate cause of death was cardiac arrhythmia, however, hyperthermia was noted as an underlying cause.

# Exhibit 14

JEFFREY L. METZNER, M.D., P.C.
3300 EAST FIRST AVENUE
SUITE 590
DENVER, COLORADO  80206
———
TELEPHONE (303) 355-6842
FACSIMILE  (303) 322-2155

December 31, 1998

Donna Brorby, Esq.
660 Market Street, Suite 300
San Francisco, CA  94104

RE:   Texas Department of Criminal Justice

Dear Ms. Brorby:

I have completed my initial assessment regarding issues related to the mental health care services provided to inmates at the Texas Department of Criminal Justice (TDCJ). I site visited the Estelle Unit in Huntsville, Texas during December 18-20, 1998. During December 18, 1998 I met with the following staff:

1. Tim Simmons (Assistant Warden),
2. Kent Dickerson (Manager of Health Services),
3. Dean Buzbee, M.S. (Responsible Psychologist),
4. Bobby Vincent, M.D. (Facility Medical Director),
5. Bryan Buck (Captain),
6. Mary Adams, RN (Facility DON),
7. Lisa Lopez, RRA (Registered Records Administrator),
8. Marciano Limsiaco, M.D.,
9. Robert Komer, D.O.,and
10. Ray Neuse, M.Ed.

Warden F.E. Figueroa was unavailable for the opening meeting due to another commitment.

Re:  Texas Department of Criminal Justice
     Page 2 of 20

Sources of information utilized in this assessment included review of the following documents:

1. Texas Department of Criminal Justice Mental Health Services Policy Manual,
2. a document entitled "University of Texas Medical Branch Managed Healthcare Psychiatric Inpatient Program" (Jester IV Unit),
3. audits by various psychiatrists (Drs. Wang, Jurczak, Conklin, Stellman, and Elliott) concerning mental health services offered at the following TDCJ institutions:
    - a)     Clements,
    - b)     Diagnostic (Byrd),
    - c)     Estelle,
    - d)     Gatesville,
    - e)     Goree,
    - f)     Huntsville,
    - g)     Jester IV,
    - h)     Montford,
    - i)     Neal,
    - j)     Ramsey I,
    - k)     Skyview,
    - l)     Stiles, and
    - m)     Woodman,
4. a January 1998 audit report entitled "Managed Health Care at the Texas Department of Criminal Justice" authored by the Office of the State Auditor,
5. the Texas Department of Criminal Justice Formulary (5th Edition, 1998-1999),
6. Manual of Policies and Procedures for Health Services (TDCJ Institutional Division),
7. documents relevant to heat-related illnesses,
8. critical drug list for the Estelle Unit (December 18, 1998), and
9. 30 healthcare charts of inmates at the Estelle Unit.

Overview – Estelle Unit Complex

The Estelle Unit complex generally has an inmate count of about 2800 inmates.  The various facilities within the Estelle Unit usually have the following counts:

1. Main building:  2268 (which includes a 66-bed segregation unit)
2. High Security:  640
3. Geriatrics Center:  60
4. Substance Abuse Felon Punishment Facility:  188
5. East Regional Medical Facility:  120

Re:  Texas Department of Criminal Justice
     Page 3 of 20

The High Security Unit, which is a segregation unit, has inmates with Level I, Level II, and Level III privileges.  Level I inmates have seven hours of recreational time per week, Level II inmates have four hours per week, and Level III inmates have three hours per week.  The security classification levels for inmates in the main building range from minimum to close security.  This facility consists predominantly of celled housing except for dormitory living in the geriatrics center.  All the cells are double-bunked except for the High Security Unit and the segregation unit within the main building, which are single-celled.

Information regarding the mental health services at the Estelle Unit was obtained from Mr. Buzbee. The mental health services have been provided as part of the University of Texas Medical Branch system for about 1½-2 years.  A psychiatrist is the Director of Mental Health systemwide and has two assistant directors (a nurse for the southern region, and a masters level LPC for the northern region).  The responsible psychologist at each facility reports to one of the assistant directors.

The funded mental health staff positions were as follows:

- 2.0 FTE Social Workers,
- 1.0 FTE Psychiatric Nurse,
- 3.0 FTE Psychologists (Masters level), and
- 2 Contract Psychiatrists (providing psychiatric coverage three days per week for a total of 35 hours per week).

There were currently no vacancies within the mental health staff.  Mr. Buzbee reported that staff vacancies are generally filled within about one month.

There were 222 inmates on the active mental health caseload with housing locations as follows:

1. High Security Unit (46)
2. SAFPF (55)
3. Main Building (103)
4. RMF (14)
5. Geriatrics (4)

The mental health caseload represented about eight percent of the inmate population at the Estelle Unit.  In addition, there generally are about 150-200 inmates who are on the inactive mental health caseload, which means that they have had a history of mental

Re:  Texas Department of Criminal Justice
     Page 4 of 20

health treatment within the Texas Department of Criminal Justice but are no longer receiving mental health treatment.  The mental health roster in the main building has been as high as 200 in the past.  Several months ago the caseload in the main building significantly decreased related to a transfer of many close inmates to another facility in exchange for inmates with a minimum security classification due to the need for more workers at the Estelle Unit.

Twenty-two inmates were receiving individual therapy, fifteen inmates were receiving group therapy, and the rest of the caseload inmates were receiving case management services.  The three group therapies include one rational behavior therapy group and two HIV therapy groups.  There was not a significant waiting period for group therapies.  Inmates receiving case management services were reported by Mr. Buzbee to generally be seen on a monthly basis.  Very few of the active caseload inmates were not receiving psychotropic medications.

Co-payments are not charged to inmates receiving mental health services although the department is able to make such charges related to relevant legislation.

All inmates newly admitted to the Estelle Unit receive a "chain triage" which involves review of their healthcare records by either the nurse, psychologist, or social worker. These chart reviews are assigned according to housing units.  Mr. Buzbee reported that interviews triggered by the chain triage are generally performed within 24 hours except during weekends.

Main Building

I briefly walked through three of the tiers in the A Unit (segregation unit) within the main building.  I talked to three inmates in punitive segregation status and four other inmates on segregation status.  One of these inmates was a caseload inmate and had just recently been admitted to a pre-hearing detention cell.  Several of these inmates were doing disciplinary time following an infraction related to masturbation. .  In general, treatment is not readily available for inmates with sexual disorders until they are within one or two years of completing their sentence.

Caseload inmates are seen by a mental health clinician on a weekly basis during the rounds process.  A "boilerplate" progress note is written to document such rounds. These inmates confirmed that daily rounds were being made by the nursing staff.

I toured several housing units in the main building.  Each wing contained three tiers of 21 cells that were all double-celled.  The housing units were very clean.  The showers were dark and did not appear to be very clean.

Re:  Texas Department of Criminal Justice
Page 5 of 20

Close security inmates receive two hours per day of recreation time in a group yard.

During December 20, 1998 I met with two groups of inmates who were receiving mental health services in the main building at the Estelle Unit (see Appendix I). These inmates reported that it generally took an hour to go through pill call line in order to get their medications.  They indicated that correctional officers frequently harassed them during the pill call line.  Medications were intermittently not timely renewed which resulted in lapses of medications for up to a week at a time.

The inmates reported that they do meet with their counselor on a monthly basis but they do not receive counseling.  These meeting were described as being very brief and characterized by answering the following question: "On a scale of 1 to 5, how do you rate yourself?"

Most of these inmates reported that their meetings with the psychiatrist was every three months.  They stated that they did not receive education regarding either their medications or diagnosis.

Information was obtained regarding their experiences at Jester IV and the Skyview Unit.  They reported that several doctors, especially Dr. Tchokoev, treated them disrespectfully.  They frequently were perceived as not telling the truth by him.

It was reported by these inmates that indoor temperatures during the summer get very hot.  However, they indicated that there were not specific provisions made for cooling for inmates on psychotropic medications except for exempting them from outdoor work.  Two of the inmates reported that they had heat related problems during this past summer.  The charts of these inmates were reviewed (see Appendix II).

A second group of four inmates, who reportedly were receiving mental health services (see Appendix I), were interviewed.  Two of these inmates were now apparently on the inactive caseload.  The inmates indicated that they periodically had problems obtaining the medications due to pill call line issues.  They reported that they had very brief monthly contacts with their case managers.  One of the inmates described his case manager as speaking to him in a negativistic fashion.  Both of the caseload inmates reported monthly meetings with the psychiatrist.  One inmate also reported heat related problems during the summer months which consisted of feeling dizzy and weak. However, this inmate did not obtain specific treatment for these symptoms.  The charts of these inmates were briefly reviewed which was generally consistent with information obtained from them.

Re:  Texas Department of Criminal Justice
     Page 6 of 20

Five inmates (see Appendix I), who were all receiving mental health treatment and were in the SAFP, were interviewed in a group setting.  These inmates all reported satisfaction with the substance abuse program which was a therapeutic community model.  They saw their psychiatrist on a monthly basis and generally had monthly case management meetings which were of brief duration.  They did not have difficulties obtaining the medications through the pill call line.

The medical charts of these inmates were reviewed which were consistent with the information provided by these inmates.  These inmates reported that water is available as needed during particularly hot days.  They indicated that they had not experienced heat related problems.

I met with Marciano Limsiaco, M.D.  Dr. Limsiaco had been providing psychiatric services to the Estelle Unit since 1989.  Dr. Komer, who has been working at the Estelle Unit since 1994, is responsible for the psychiatric coverage for the High Security Unit.  Dr. Limsiaco indicated that Zoloft is the only SSRI on the formulary and that Zyprexa, Risperdal, and Clozaril are all non-formulary medications.  However, he stated that it was not a difficult procedure to prescribe non-formulary medications and that he was prescribing such medications to patients.

Dr. Limsiaco generally sees caseload inmates every two to three months once they are stable.  Inmates needing to be seen on a more frequent basis are generally scheduled every one to two weeks.

It was anticipated by Dr. Limsiaco that inmates would complain about long pill call lines although they did not have problems obtaining their medications.  Most of Dr. Limsiaco's caseload were being prescribed medications for treatment of either depression or anxiety.  He estimated that about 20-25 percent of the caseload have a chronic schizophrenic illness. Inmates in need of a more intense level of mental health care are transferred to the intermediate care units at Skyview or Jester IV.  Dr. Limsiaco reported that it was not difficult to transfer inmates to these units when clinically appropriate.

I reviewed the December 18, 1998 critical drug list which listed every medication being prescribed to inmates in this prison complex.  I was unable to identify any inmates who had been prescribed either an atypical antipsychotic medication or a SSRI other than Zoloft.

Re:  Texas Department of Criminal Justice
     Page 7 of 20

<u>High Security Unit</u>

I interviewed Ray Neuse, M.Ed., who has been working in the prison system for the past fifteen years and at the Estelle Unit for six months.  His primary responsibility is to monitor inmates on psychotropic medications and to perform mental health assessments.  There are two clinicians assigned to the High Security Unit plus a psychiatrist.  The psychiatrist had been providing two days of eight hours per day psychiatric coverage but beginning the week of December 18, 1998 was providing one ten-hour day of psychiatric coverage per week.

The psychiatrist had been seeing inmates in the triage office on the wing but for the past 2½ months has been seeing inmates in an office setting off of the wings.

Mr. Neuse stated that there were not difficulties transferring inmates to an intermediate care unit.  However, inmates with self-mutilation problems generally were returned to the High Security Unit within three days following transfer.

Mental health caseload inmates were seen by the mental health clinician on a weekly basis at the cell front. The rounds process is documented by a typed "form" progress note, which is used unless the inmate has specific complaints.  They are not seen in an office setting by the psychologist or social worker unless they submit a specific request for such a meeting.  In other words, there were no routine office visits with the clinicians except by request from the inmate.

During the past week, chain triages were administered to fifteen newly admitted inmates to the High Security Unit.  Mr. Neuse reported that there were about ten to twenty sick call request forms for mental health that needed to be triaged per week.

During December 18, 1998, I interviewed Robert Komer, M.D.  Dr. Komer is now providing one day per week of 10 hours of coverage to the High Security Unit.  He reported that he generally has 25-35 minutes allotted for a new patient evaluation and generally 15-20 minutes for follow-up assessments.  He usually has follow-up appointments with his caseload inmates every 14-30 days.  He estimated about one-third of the caseload were receiving antidepressant medications, one-third antipsychotic medications, and one-third mood-stabilizing medications.  Dr. Komer expressed some hesitancy in prescribing atypical antipsychotic medications due to their newness.  He has not had difficulties obtaining laboratory results.

Dr. Komer reported that there were not significant obstacles in transferring inmates to an immediate care unit when clinically indicated.

Re:  Texas Department of Criminal Justice
        Page 8 of 20

I observed Marianne Anderson, R.N. perform segregation rounds in K unit.  This was a Level I housing unit for gang members.  Ms. Anderson was very comfortable with the rounds process.  She reported that the mental health staff are very responsive to referrals by the medical department.  Ms. Anderson indicated it was uncommon to find psychotic inmates in the High Security Unit.  She reviewed with me a nursing protocol that is used when mental health coverage is provided by the psychiatrist on-call.  This protocol involved obtaining a basic database prior to calling the psychiatrist.

I walked cell to cell in C Section where I briefly talked with most of the inmates on this unit and reviewed fourteen of their medical charts (see Appendix III).  I also walked on the D-wing range and attempted to interview six inmates (see Appendix III).

C-wing and D-wing each had two tiers with seventeen cells on either side (total 64 cells).  The noise level on both of these wings was high throughout the site visit which was described by correctional officers as being a very common.  A number of problem inmates in C section were described as self-mutilators who were not on the mental health caseload.  It is likely that many of these inmates (see Appendix III) had personality disorders associated with borderline and/or antisocial features which made them very difficult to treat.

I briefly talked with Captain Franky Reescano who is the captain at the High Security Unit.  He estimated that about four to five inmates per week cut themselves and about 10-15 inmates require use of chemical agents for cell extractions or other similar reasons.  Most of the use of chemical agents and inmates who cut themselves were in wings C, D and H.

Captain Reescano reported that many of the inmates who cut themselves return from Skyview, apparently have their medications discontinued, and then cut on themselves several days later.  He reported that mental health staff will evaluate these inmates but will not provide input or consultation regarding management other than reporting that these inmates were a security problem and not a mental health problem.

Approximately 60-70% of the second shift correctional officers and about 40% of the first shift correctional officers were new (and very young) officers.  It was reported that none of these correctional officers have received specific training regarding mental health although many of the older officers did have experience working with psychiatric patients at the old Estelle Unit when it was a psychiatric facility.

Re:  Texas Department of Criminal Justice
       Page 9 of 20

## Review of Other Estelle Unit Audits

The July 29, 1998 mental health audit report concerning the Estelle Correctional
Facility by Dennis Jurczak, M.D. was reviewed.  Dr. Jurczak reported finding "serious
deficiencies in psychiatric care during this audit... [he] was also struck by the number
of inmates who apparently had Axis I diagnoses in the past but who were now on the
inactive list with no present Axis I diagnosis... ."  Dr. Jurczak concluded that "the
High Security Unity is not an appropriate setting for the housing and/or care of
mentally ill prisoners... the number of mentally ill inmates on the High Security Unit
are not now being afforded adequate psychiatric treatment... several obviously
psychotic and extremely disruptive inmates are receiving no psychiatric care... ."  Dr.
Jurczak expressed significant concerns regarding the lack of usage of newer
antipsychotic medications within the Estelle Correctional Facility.

Thomas Conklin, M.D. also evaluated aspects of the mental health care within the
Estelle Unit during July 1998.  His August 1998 report focused on review of suicide
attempts and gestures among inmates in the Estelle Unit.  He concluded that "review of
the thirteen charts of suicide attempts and 'self-mutilation' inmates previously
mentioned revealed some disturbing practices.  These are as follows:

1.  <u>All</u> suicide gestures by inmates are seen as manipulating the correctional
    system with the conscious intent of secondary gain.  In not one case was the
    inmate's behavior seen as reflecting mental pathology that could be treated.
2.  Diagnoses in these cases were always one of the following:
    'no Axis I diagnosis'
    'no diagnosis'
    'ASPD' (antisocial personality disorder)
    'ASPD' with borderline features' "

Dr. Conklin reported that "the mental health staff is of the opinion that all of these
conditions are untreatable and so no treatment is given... ."

Dr. Conklin concluded that "the staff is too meager and too ill-trained for the job they
have to do.  There is no program available for seriously or chronically psychologically
impaired individuals.  Either a hospital system or at the minimum group and supportive
therapy should be available.  None of them are seen as requiring mental health services
and that simply is not so... ."

Re:  Texas Department of Criminal Justice
        Page 10 of 20

**ASSESSMENT:** Significant problems were found in the mental health care delivery system at the Estelle Unit complex.  In general, the mental health treatment available to inmates in this complex consisted of the use of psychotropic medications and case management.  Case management in this context is best described as periodic monitoring in contrast to actual treatment.  However, even this monitoring has significant flaws which included brief meetings with inmates and cell front assessments in the segregation units.  Psychopharmacological treatment was problematic due to a formulary which did not include atypical antipsychotic medications and only one SSRI medication.  There were also significant problems pertinent to the diagnostic assessment process.

Many inmates with significant behavioral problems and functional impairments, who have been diagnosed in the past as having a serious mental illness associated with psychotic features, are frequently diagnosed as either malingering or having no Axis I diagnosis. Consequently, they were not receiving mental health follow-up and/or psychotropic medications. Axis II diagnoses were either not mentioned or, when diagnosed, did not have a treatment plan formulated relevant to the particular Axis II diagnosis despite significant associated functional impairments.

Ironically, many inmates who are diagnosed with serious mental illnesses associated with psychotic features receive little more treatment than those diagnosed without a disorder except for the use of psychotropic medications.  However, these inmates were often uninformed regarding the use of their particular medications and/or have not received therapeutic trials of newer medications available such as Risperdal or Olanzapine.

The lack of a specific treatment program for inmates with serious mental illnesses is particularly problematic at the Estelle Unit complex.  There was a significant number of inmates with serious mental illnesses who were housed within the High Security Unit.  Such inmates were generally housed in wings C, D, and H.  It was in this unit that case management services were particularly ineffective related largely to the cell front interview process in contrast to meeting with a clinician in a reasonably private office setting.  Unfortunately, inmates with serious mental illnesses often did not even receive cell front monitoring due to past assessments that they did not have an Axis I disorder and/or were malingering.  These diagnoses were often formulated at the Skyview Crisis Management Unit (see Appendix IV).  Reference should be made to Dr. Stellman's report (see "Review of Other Mental Health Audit Reports" section) which summarizes the deficiencies in the assessment process at the Skyview Crisis Management Unit.

There clearly have been problems concerning a "heat plan" relevant to inmates being prescribed psychotropic medications.  Reference should be made to Appendix II which

Re:  Texas Department of Criminal Justice
        Page 11 of 20

provides an example of the potential dangers associated with lack of an adequate plan. Review of pertinent discovery documents indicated that remedial measures have been instituted relevant to this issue although I was unable to find a comprehensive policy and procedure concerning this issue relative to inmates receiving psychotropic medications.

The placement of inmates with serious mental illnesses in the High Security Unit, without adequate mental health resources being available to such inmates, has resulted in many of these inmates having their psychiatric symptoms intensified which has contributed to a harmful environment within several of the High Security Unit wings.

Review of Death Records

The medical charts of eight inmates who died during the past two years within the TDCJ were reviewed (see Appendix V).  This review revealed significant system problems related to poor documentation, diagnostic assessments, and frequent determinations that an inmate did not require treatment due to "no diagnosis on Axis I."  These records also revealed some of the significant obstacles faced by many inmates who were attempting to obtain mental health treatment.

Review of Other Mental Health Audit Reports

**Jester IV Unit**

The December 6, 1998 report by Roberta Stellman, M.D. was reviewed.  Dr. Stellman described a staffing shortage that included both psychiatrists (one physician per 50 acute care patients) and other professional staff.  The consequences of these staffing shortages included inadequate psychiatric assessments on the crisis management unit and noncompliance with the ten hours per week treatment recommendations by TDCJ and UTMB.

The complete lack of privacy for the inmates housed within the Jester IV unit was striking.  Dr. Stellman indicated that there was "no attempt at establishing a private, confidential, and therapeutic atmosphere most conducive to self-disclosure."

The lack of adequate assessments within the crisis management pod resulted in a high rate of inmates receiving no Axis I diagnosis.  "In this system, the primary treatment in this entry pod is isolation, superficial evaluation, and discharge back to the same environment that precipitated the admission in the first place.  Almost all contacts with

Re:  Texas Department of Criminal Justice
     Page 12 of 20

the patients are made cell side, with an interviewer standing in the corridor, outside the cell... ."

The over-reliance on imprecise diagnostic categories of not otherwise specified (NOS) and the absence of a diagnosis in those individuals admitted to crisis management was of significant concern.  "Even patients who formerly were hospitalized and diagnosed with schizophrenia are treated in this facility under a non-specific category of "psychosis NOS.  The documentation does not contain the physician's rationale for change in diagnosis or deletion of a former illness.  There is an underutilization of Axis I diagnoses in those people admitted to the crisis management pod... The unavailability of crisis intervention therapy is evident in this facility as it elsewhere in this system. The most likely explanation is that treatment on crisis management can not be accomplished with as great a number of patients compared to so few staff... there is simply too little time to gather significant past personal and family history to accurately develop a good differential diagnosis... ."

## Gatesville Unit

Dr. Stellman's December 10, 1998 report indicated that the "overall care at Gatesville is quite poor... psychological and psychiatric notes do not provide adequate present, past, and family history.  Documentation of risk factors for dangerousness is obviously lacking... the gatekeepers of psychiatric care do not have the training and competencies necessary to carry out this role with the absolute authority they are given.  Inmates have no recourse or access to medical care if the gatekeeper denies it... the complete lack of privacy during psychological encounters in the high stress segregation units is unjustified... treatable conditions are not diagnosed and treatment, therefore, is not initiated... surprisingly, many inmates are not given an Axis I diagnosis.  Yet the more difficult diagnosis of a personality disorder is readily made, usually antisocial personality disorder without [adequate] documentation... self-injury is too often labeled 'attention-seeking' and again the dynamics of the behavior are disregarded... being assigned or scheduled for 'counseling' may only mean one visit by the psychologist... women returning from Mountainview, Jester IV, or Skyview may not be seen routinely upon their return for an assessment of their adjustment... even when an inmate repeatedly requests a doctor's visit, staff not necessarily trained to recognize, diagnose, and treat severe psychopathology block these requests... even women on the caseload may not be seen in a timely fashion when medications are changed, their assignment is altered, or if they return from a psychiatric unit... ."

Re:  Texas Department of Criminal Justice
     Page 13 of 20

## Skyview Unit

The December 13, 1998 report by Dr. Stellman summarized significant problems in the mental health care provided to inmates at this unit.  Inmates on the crisis management unit received little therapeutic contact except for brief encounters and no crisis intervention treatment other than environmental isolation.  "All too often previous diagnoses are removed."  Dr. Stellman noted "an absence of Axis I diagnosis particularly in crisis patients... even when an individual has a major Axis I diagnosis, the label malingering is added inappropriately.  Attempts by inmates to manipulate intolerable situations by self-injury and transfer are treated with a rapid return to the UOA [with] no development of treatment plan to develop better coping skills."  Insufficient staffing to meet UTMB program requirements was present.

A November 2, 1998 report by Richard Elliott, M.D., Ph.D. was reviewed.  Dr. Elliott indicated that approximately one-third of inmates referred to Skyview are retained for more intensive treatment and two-thirds are returned to the referring units.  "Inmates are returned after an evaluation period of approximately three days which they usually do not receive medication or further treatment services."  A preliminary study of clinical recidivism was done during August 1998.  "Of 47 discharges during that month, 14 returned in the next one to two months.  This leads to an estimate of a clinical recidivism rate of approximately thirty percent in two months."

Dr. Elliott concluded that "based on the information available at this time, I believe there are several significant deficiencies in the care of inmates on the acute unit at Skyview.  First, there is a lack of physician input into assessments and medication management... ."  Dr. Elliott concluded that there was an inadequate psychiatrist to patient ratio at Skyview which, when the vacant psychiatric position was filled, would result in five psychiatrists for over 400 inmates.  This was described as being "an unacceptable ratio given the high number of admissions to Skyview."

## Stiles Unit

Dr. Stellman indicated in her December 1, 1998 report that "observed practices and frequency of visits, monitoring of drug levels and assessment of mentally ill inmates off the caseload is at variance with reported practices by the staff."

The diagnostic categories of not otherwise specified was reported to be used too frequently and there was an absence of the development of a differential diagnosis.  "Diagnoses made at an early date are not picked up and carried through... when a diagnosis is dropped, the record does not reflect the rationale for deleting this from

Re:  Texas Department of Criminal Justice
     Page 14 of 20

consideration.   There is an absence of the assignment of an Axis II diagnosis... the individual treatment plan is frequently absent, when it is filled out, major problems are omitted, goals are too global, and there is no update [in the] chart if the goals are met or modified... ."

Management and assessment of inmates in isolation units were not adequate.  "Several inmates were obviously psychotic or seriously impaired but were not under any professional scrutiny."   Lack of timely follow-up of inmates transferred back to the Stiles Unit from an acute unit was reported.

Problems were also present concerning the use of seclusion.  "Those most distressed individuals are allowed to be housed for up to three days without being seen by a trained mental health professional.  There is little documented evidence of adequate crisis intervention treatment and an over reliance on isolation and transfer to a crisis management unit."   There was also not enough clinical staff to provide adequate treatment to the inmates on the mental health caseload.

**Woodman Unit**

Dr. Stellman's December 5, 1998 report described inadequate numbers of clinical staff available (2.0 FTE Master level psychologists) to provide mental health services to this 900-bed women's unit.  "Formulary and non-formulary medications are discontinued frequently upon entry into Woodman.  All non-formulary medications are stopped by non-psychiatric staff without substitution or regard for consequences of the discontinuation, including withdrawal seizures and at least one case of transfer to Mountainview.  Patients are not consulted about the discontinuation nor are they given information regarding possible risks concerning this practice.  The medical staff do not automatically refer any patient entering on psychotropics to the psychiatrist.  Even when psychotropics are continued, there most often is a three-day delay in initiating medication."

Dr. Stellman assessed the "psychiatric practice at this facility [to be] abysmal.  Patients are routinely not seen by psychiatry and there is poor responsiveness to requests for consultation by psychology or medical."   Lack of timely assessments by the psychiatrists was described by Dr. Stellman.

**Ramsey I Unit**

Dr. Jurczak indicated in his December 11, 1998 report that "the ambulatory psychiatric care provided at Ramsey I is adequate."

Re:  Texas Department of Criminal Justice
      Page 15 of 20

## James Byrd Unit

Dr. Jurczak's October 19, 1998 report indicated that "the medical and psychiatric screening, intake evaluation, care and treatment provided at the James Byrd Unit is timely and medically appropriate, the facilities are adequate for the provision of care and the staff appear professional in attitude and appearance... ."

## Thomas Goree Unit

Dr. Jurczak concluded in his October 19, 1998 report that "the medical and psychiatric care provided inmates at the Thomas Goree Unit is timely and medically appropriate. The facilities are adequate and the staff appeared professional in appearance and attitude... ."

## Huntsville Unit

Dr. Jurczak's October 19, 1998 report indicated that "the ambulatory psychiatric clinic facilities at the Huntsville Unit are adequate, the staff are professional in demeanor and appearance, and that a good working arrangement exists between the medical and psychiatric staffs... ."  Problems in the psychiatric care described by Dr. Jurczak included documentation of baseline laboratory studies and minimizing patients' signs and symptoms which have led to "the placing of patients on the inactive list resulting in the discontinuance of treatment and monitoring."

## John P. Montford Psychiatric/Medical Facility

The December 14, 1998 report by Richard Elliott, M.D., Ph.D. was reviewed.  It was Dr. Elliott's opinion that "overall, psychiatric care at the Montford Unit is consistent with community psychiatric inpatient care.  The primary area of concern would be the lack of physical assessment prior to initiating treatment with psychotropic medication. A secondary area of concern is a shortage of psychiatrists... ."

## Neal Unit and Clements Unit

The November 24, 1998 mental health audit report by Stanley Wang, M.D. was reviewed.  Dr. Wang described significant shortages of mental health clinical staff at the Neal Unit (essentially one FTE ACP II for 350 caseload inmates).  In addition, there was a full-time nurse practitioner and a part-time psychiatrist who provide medication management services to inmates at the Neal Unit.  Dr. Wang concluded that "the psychiatric staffing is woefully inadequate... ."

Problems related to the pill call line and tracking medication non-compliance were summarized by Dr. Wang.  These problems included long lines, arbitrary decisions by

Re:  Texas Department of Criminal Justice
     Page 16 of 20

either the CMA or other pharmacy personnel "to simply cut the line off and shut the pharmacy pill dispensing," and intimidation by gang members.

## Managed Healthcare at the Texas Department of Criminal Justice

A January 1998 audit report entitled "Managed Health Care at the Texas Department of Criminal Justice," which was authored by the Office of the State Auditor, was reviewed.

Significant problems in the monitoring of the TDCJ managed healthcare system were described.  This report concluded that "although a number of processes exist to evaluate and/or monitor aspects of performance, these processes do not interface or link with each other to provide a comprehensive monitoring and evaluation system.  Because the basis of several of the monitoring processes is self-monitoring, review of operations by another party becomes even more necessary."

Specific problems were found with the TDCJ's operational review process.    These problems included:

a) No criteria of performance standards exist to determine, quantitatively, when a unit is assessed to be in compliance with the Ruiz final settlement and the department policies and procedures.
b) Compiling the results of individual unit Operational Reviews audits does not provide a systemwide identification and assessment of trends or specific and recurring areas of non-compliance.
c) Although the department's Health Services Division administers the Operation Review process and must approve the unit's corrective action plans, it lacks the authority to enforce the corrective action plans.
d) One-fourth of the units audited during 1996 did not have at least an 80 percent compliance rate.

The audit report also described significant gaps in the current QI/QM system that is maintained by each prison.  For example, "some units continue to report each year on indicators that have been at 100 percent compli[ance], instead of focusing on other problem areas that could benefit from scrutiny."  The department's health services division does not verify that corrective actions take place in response to various units' QI/QM findings.    Medically related information and feedback received from the grievance and liaison correspondence processes were noted to not be effectively managed, communicated, or evaluated.

Re:  Texas Department of Criminal Justice
      Page 17 of 20

Other findings included the lack of a standardized system to ensure that monitoring is performed consistently across all units and the need for improvements to be made concerning the credentialing processes for practitioners.

Appendix V of this report, entitled "An Evaluation of Managed Healthcare in the Texas Prison System," which was written by Jacqueline Moore and Associates (Consultants to the Correctional Managed Healthcare Advisory Committee) was reviewed.  This report specifically did not review mental health services "because they were recently transferred to the managed care system and sufficient data was not available to evaluate the effect of managed care."  The current medication administration process was difficult to audit related to missed medications or not-given medications due to the nature of the pharmacy tracking system.  It was also noted that the current operational review process for TDCJ did not audit the pharmacy system

## Manual of Policies and Procedures for Health Services for the TDCJ Institutional Division

The TDCJ Manual of Policies and Procedures for Health Services was reviewed.  This section will highlight selected policies and procedures pertinent to the mental health care delivery system.  They included the following:

TDCJ Policy number A-09.1 (Privacy of Care) indicates that "clinical encounters will be performed in private (i.e., only authorized health services staff will be present), with a security chaperone present when the offender proposes a probable risk of safety to himself, the healthcare provider or others."

TDCJ Policy number C-20.1 (Training for Correctional Officers) does include a requirement for training to include the area of recognizing signs and symptoms of mental illness and suicide prevention.  However, this training is for an unspecified amount of time, which is to occur at least every two years for all correctional officers who work with offenders.

TDCJ Policy number C-24.1 (Staffing Levels) indicates that "a written staffing plan shall be established by each facility to assure that a sufficient number of qualified health care personnel of varying types are available to provide adequate evaluation and treatment consistent with contemporary standards of care."

TDCJ Policy number G-51.1 (Special Needs Offenders) defines offenders with special mental health needs to include, but not be limited to, "self-mutilators, sex offenders, the aggressively mentally ill, suicidal offenders, and substance abusers."  This policy indicates that TDCJ will provide services for offenders who require close medical

Re:  Texas Department of Criminal Justice
      Page 18 of 20

supervision and/or multidisciplinary care.  Offenders with special mental health needs are included in this group of offenders.  This policy also requires the development of a written individual treatment plan for offenders receiving such treatment.

<u>Heat Related Illnesses</u>

I reviewed reports relevant to inmates experiencing heat-related illnesses.  There were at least sixteen inmates who experienced significant symptoms related to hyperthermia from June 10 - July 30, 1998.  Three of these inmates died as a result of hyperthermia.  At least four of these inmates were known to be either receiving psychotropic medications or having a history of mental illness.  However, in general, these reports did not make reference to the presence or absence of psychotropic medication use.  There was documentation that at least one inmate who died due to hyperthermia had initially became symptomatic during a bus trip.  Inmates on the same bus reported that the correctional officers were non-responsive to their complaints of elevated temperature within the bus.

Mr. Archie White died at the age of 48 years during June 30, 1998 due to exogenous hyperthermia.  This inmate apparently had been prescribed tricyclic antidepressant medications based on the toxicology report.  It is interesting that the autopsy report did not make a connection between the use of antidepressant medications and exogenous hyperthermia.

Mr. Anselmo Lopez was a 41 year old man who died during July 14, 1998 due to probable hyperthermia.  A review of the autopsy report did not reference whether antipsychotic medications had been prescribed to this man.  However, review of other documents did indicate that this inmate had been prescribed psychotropic medications.

Mr. James Moore was a 47 year old man with a history of paranoid schizophrenia who died during July 30, 1998 due to hyperthermia.  Mr. Moore was receiving Haldol and Cogentin which are medications that put him at higher risk of developing hyperthermia during times of elevated environmental temperatures.  The autopsy report did not make reference to the probable relationship between elevated temperatures, use of psychotropic medications, and hyperthermia.

A July 28, 1998 memorandum from Gary Johnson (Director, Institutional Division) to Wayne Scott (Executive Director) regarding heat was reviewed.  This memorandum provided a synopsis of actions taken by TDCJ during the past several months "in preparation for and response to the Texas summer heat."

Re:  Texas Department of Criminal Justice
      Page 19 of 20

## Summary and Opinion

Unfortunately, the significant problems found in the mental health care delivery system at the Estelle Unit appear to reflect systemwide deficiencies based on my review of healthcare records and other mental health audit reports.  These significant problems included not recognizing or minimizing symptoms indicative of major mental illnesses by either over-diagnosing malingering or "no Axis I diagnosis."  There appeared to be a variety of reasons for these problems which included staffing shortages, inadequate assessment procedures (e.g., cell side assessments), staff education issues, and probable clinical biases.  It was striking that these problems were commonly described in the various audit reports summarized in this report.

There appeared to be a clear perception, based on review of healthcare records, by the mental health clinicians that mental health treatment was not be offered to inmates whose dysfunctional behaviors were assessed to be due to Axis II problems.  Such a practice did not appear to be consistent with TDCJ Policy number G-51.1 (Special Needs Offenders).  Many inmates with serious mental illnesses are not receiving adequate treatment as a result of this practice. This was particularly true for inmates who have been labeled as being "self-mutilators, manipulators, or having no Axis I diagnosis."  The consequences for such inmates have included increased suffering and death (see Appendix IV – Review of Death Records).

Inmates with serious mental illnesses often have their symptoms intensified due to not only receiving inadequate treatment but by being placed in an environment that makes their mental illnesses worse, such as the High Security Unit.  The housing of inmates with serious mental illnesses who continue to be symptomatic with non-mentally ill inmates creates an environment that is detrimental to both staff and inmates.

The death review process was problematic related to documentation concerning identified problems and proposed corrective actions.  The review of death records (see Appendix IV) almost uniformly revealed systemwide problems related to documentation, diagnostic assessments, and inadequate treatment services.  Problems related to accessing mental health treatment were clearly experienced by Inmate 805040 who encountered major obstacles by various clinicians relative to obtaining treatment.  The death of Inmate 692804 appears to have been related to a grossly negligent diagnostic process.

Re:  Texas Department of Criminal Justice
      Page 20 of 20

The number of inmates experiencing hyperthermia during the past year was very alarming.  Review of discovery materials contain documentation of similar problems occurring during 1997.  It is encouraging that remedial actions were developed during July 1998 although it is unclear why it took so long for such a plan to be developed.  It is also unclear from review of the discovery materials the specific nature of a "heat plan" for inmates receiving psychotropic medication.  It was alarming that the various autopsy reports and incident reports relevant to inmates experiencing hyperthermia did not often reference or assess the relationship between the hyperthermia and use of psychotropic medications.

Systemwide problems related to the use of psychotropic medications are present based on review of the various mental health audit reports.  These problems included many inmates not having reasonable access to the use of atypical antipsychotic medications and SSRI medications (other than Zoloft), medication distribution problems, abrupt discontinuation of psychotropic medications without adequate or timely psychiatric assessments, and an unclear system relevant to monitoring patient compliance with psychotropic medications.

Significant staffing shortages are present in various units as summarized in the mental health audit reports.  Credentialing of mental health staff also appears to be problematic based on the audit report by the Office of the State Auditor.  It would be useful to obtain further discovery relevant to corrective action taken by TDCJ pertinent to the Office of the State Auditor's report concerning monitoring the healthcare system and the QI/QM process.

Please do not hesitate to contact me if I can answer any further questions.

Sincerely,

Jeffrey L. Metzner, M.D.
Diplomate, American Board of Psychiatry and Neurology

# Exhibit 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| Stephen McCollum, *et al.*, | § | |
| Plaintiffs. | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-02037 |
| | § | |
| Brad Livingston, *et al.*, | § | |
| Defendants. | § | **JURY DEMAND** |

### DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE'S
### RESPONSES TO PLAINTIFF SANDRA McCOLLUM'S NINTH SET
### OF REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSIONS
### (DATE OF SERVICE – 01/28/14)

TO:    Jeff Edwards, Scott Medlock ,The Edward Law Firm, The Haehnel Building, 1101 East 11th Street, Austin, TX, 78702; Demetri Anastasiadis, Office of the Attorney General, P.O. Box 12548, Austin, Texas 78711; and Kim Coogan, Assistant Attorney General, Office of the Attorney General, P.O. Box 12548, Austin, Texas 78711.

**COMES NOW** the Defendant, Texas Department of Criminal Justice, by and through counsel, the Texas Attorney General's Office, and offers the following **Defendant Texas Department of Criminal Justice's Responses to Plaintiff Sandra McCollum's Ninth Set of Requests for Production, and Requests for Admissions (Date of Service – 01/28/14).**

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**DAVID C. MATTAX**
Deputy Attorney General for Defense Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

*Matt Greer w/ permission*

*[signature]*

**BRUCE R. GARCIA**
Assistant Attorney General
Attorney in Charge
State Bar No. 07631060
So. Dist. Bar No. 18934
P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / Fax (512) 495-9139

**ATTORNEYS FOR DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**

## CERTIFICATE OF SERVICE

I, **BRUCE R. GARCIA,** Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Defendant Texas Department of Criminal Justice's Responses to Plaintiff Sandra McCollum's Nineth Set of Requests for Production, and Requests for Admissions (Date of Service – 01/28/14)** has been served by placing same in the United States Mail, postage prepaid, on February 27, 2014 addressed to:

Jeff Edwards                                    CM/RRR  7008 0500 0001 5048 6101
Scott Medlock
The Edwards Law Firm
The Haehnel Building,
1101 East 11th Street,
Austin, TX, 78702

Demetri Anastasiadis  **(Hand Delivered)**
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711

Kim Coogan   **(Hand Delivered)**
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711

*Matt Greer w/permission*

_____
**BRUCE R. GARCIA**
Assistant Attorney General

Defendant Texas Department of Criminal Justice's Responses to Plaintiff Sandra McCollum's Ninth Set of Requests for Production, and Requests for Admissions (Date of Service – 01/28/14).

## REQUESTS FOR ADMISSION

**REQUEST NO. 1.**   TDCJ uses misters in agricultural buildings where pigs are housed.

**RESPONSE:**
Objection, vague as to the term "agriculture buildings". Subject to and without waiving the foregoing objections, Defendant admits that some of TDCJ's livestock buildings are equipped with misters.

**REQUEST NO. 2.**   TDCJ does not use misters in inmate housing areas at the Hutchins Unit.

**RESPONSE:**
Admit.

**REQUEST NO. 3.**   TDCJ did not use misters in the inmate housing areas at the Hutchins Unit where Mr. McCollum was housed.

**RESPONSE:**
Admit.

**REQUEST NO. 4.**   TDCJ uses evaporative coolers in agricultural buildings where pigs are housed.

**RESPONSE:**
Objection, vague as to the term "agriculture buildings". Subject to and without waiving the foregoing objections, Defendant admits that some of TDCJ's livestock buildings are equipped with evaporative coolers.

**REQUEST NO. 5.**   TDCJ does not use evaporative coolers in inmate housing areas at the Hutchins Unit.

**RESPONSE:**
Admit.

**REQUEST NO. 6.**   TDCJ did not use evaporative coolers in the dorms where Mr. McCollum was housed at the Hutchins Unit.

**RESPONSE:**
Admit.

**REQUEST NO. 7.**    TDCJ uses drippers in agricultural buildings where pigs are housed.

**RESPONSE:**
**Defendant objects that the term "drippers" is not defined.  Without further information regarding "drippers" Defendants can neither admit or deny.**

**REQUEST NO. 8.**    TDCJ does not use drippers in inmate housing areas at the Hutchins Unit.

**RESPONSE:**
**See response #7.  Subject to and without, admit.**

**REQUEST NO. 9.**    TDCJ did not use drippers in the dorms where Mr. McCollum was housed at the Hutchins Unit.

**RESPONSE:**
**See response #7.  Subject to and without, admit.**

**REQUEST NO. 9.** TDCJ uses foggers in agricultural buildings where pigs are housed.

**RESPONSE:**
**Defendant objects that the term "foggers" is not defined.  Subject to and without waiving Defendant admits that TDCJ Agribusiness, Land and Minerals Policy L/S 6.03.01 "Swine Program Management Procedures" states on page 12 under V. Finisher Slab Management C. Hot Weather Precautions 2. Foggers that "Foggers should be used to keep hogs cool with a water mist.  The foggers should be turned on when temperatures reach over 80 degrees Fahrenheit."**

**REQUEST NO. 10.** TDCJ does not use foggers in inmate housing areas at the Hutchins Unit.

**RESPONSE:**
**See response #9 above regarding "foggers".  Subject to and without, admit.**

**REQUEST NO. 11.** TDCJ did not use foggers in the dorms where Mr. McCollum was housed at the Hutchins Unit.

**RESPONSE:**
**See response #9 above regarding "foggers".  Subject to and without, admit.**

**REQUEST NO. 12.** TDCJ policy requires pigs be kept at "comfortable" temperatures.

**RESPONSE:**
**Defendant objects that the phrase "comfortable temperatures" is not defined.   Subject to and without waiving the foregoing objections, Defendant admits that TDCJ Agribusiness, Land and Minerals Policy L/S 6.03.01 "Swine Program Management Procedures" states on page 2 under Procedures – Animal Welfare that ". . . animals are provided the basics needs to perform at the highest level.   This includes . . . a comfortable environment with ventilation."**

**REQUEST NO. 13.** TDCJ policy requires use of drip-system timers to cool pigs when temperatures exceed 74 degrees.

**RESPONSE**
**Deny.**

**REQUEST NO. 14.** TDCJ does not require use of drip-system timers to cool prisoner housing areas at any temperature.

**RESPONSE:**
**Admit.**

**REQUEST NO. 15.** TDCJ did not use drip-system timers in any dorms where Mr. McCollum was housed at the Hutchins Unit.

**RESPONSE:**
**Admit.**

**REQUEST NO. 16.** TDCJ policy requires keeping pig barns at around 85 degrees.

**RESPONSE:**
**Defendant admits that TDCJ Agribusiness, Land and Minerals Policy L/S 6.03.01 "Swine Program Management Procedures" states on page 8 under C. Farrowing Program 4. Environment that "The barns should be kept around 85 degrees for baby pig comfort." On page 11 under IV. Nursery Management A. Hot Nursery 5. Environment that "For newly weaned pigs the temperature should be at least 88 degrees..."**

**REQUEST NO. 17.** TDCJ has no policy requiring inmate housing areas at the Hutchins Unit be kept below any temperature.

**RESPONSE:**
**Admit.**

**REQUEST NO. 18.** TDCJ policy requires employees to "be aware of the comfort levels of sows and pigs."

**RESPONSE**
**Defendant admits that TDCJ Agribusiness, Land and Minerals Policy L/S 6.03.01 "Swine Program Management Procedures" states on page 8 under C. Farrowing Program 4. Environment that [employees and offenders assigned to the farrowing barn should] "Always be aware of the comfort level of sows and pigs."**

**REQUEST NO. 19.** TDCJ has no policy to provide comfortable temperatures for inmates in the dorms where Mr. McCollum was housed at the Hutchins Unit.

**RESPONSE:**
**Defendant objects that the term "comfortable temperatures" is not defined and vague. Subject to and without waiving the foregoing objection, admits.**

**REQUEST NO. 20.** TDCJ uses foggers when temperatures exceed 80 degrees in buildings where pigs are housed.

**RESPONSE**
**Defendant admits that TDCJ Agribusiness, Land and Minerals Policy L/S 6.03.01 "Swine Program Management Procedures" states on page 12 under V. Finisher Slab Management C. Hot Weather Precautions 2. Foggers that "Foggers should be used to keep hogs cool with a water mist. The foggers should be turned on when temperatures reach over 80 degrees Fahrenheit."**

**REQUEST NO. 21.** TDCJ policy identifies 95 degrees as the "upper critical limit" for pigs.

**RESPONSE**
**Defendant admits that the TDCJ Swine Program Treatment Book – 2012(a), page two, identifies the upper critical temperature for hot nursery pigs, cold nursery pigs, grower pigs, and finisher pigs as 95 degrees Fahrenheit.**

**REQUEST NO. 22.** TDCJ policy identifies temperatures above 95 degrees can negatively influence pigs' health.

**RESPONSE**
**Defendant admits that TDCJ Agribusiness, Land and Minerals Policy L/S 6.03.01 "Swine Program Management Procedures" refers to the Pork Quality Assurance Certification Manual published by the National Pork Board which states that keeping pigs at a temperature above or below their critical temperature can negatively influence the pigs' health.**

**REQUEST NO. 23.** TDCJ policy requires "some form of cooling" when temperatures in areas where pigs are housed "approach upper critical limits."

**RESPONSE**
**Defendant admits that TDCJ Agribusiness, Land and Minerals Policy L/S 6.03.01 "Swine Program Management Procedures" refers to the Pork Quality Assurance Certification Manual published by the National Pork Board which states that "some form of cooling should be provided when temperatures approach upper critical limits."**

**REQUEST NO. 24.** TDCJ policy does not identify an "upper critical limit" for human beings.

**RESPONSE:**
**Defendant objects that the phrase "upper critical limit" is not defined and vague.  Subject to and without waiving the foregoing objections, Defendant admits that there is not a policy stating that a specific temperature is an "upper critical limit" for humans.**

**REQUEST NO. 25.** TDCJ policy does not require "some form of cooling" at any temperature in the inmate housing areas where Mr. McCollum lived at the Hutchins Unit.

**RESPONSE:**
**Deny.**

**REQUEST NO. 26.** TDCJ policy identifies the preferred temperature range for buildings where pigs are housed to be between 60 and 80 degrees.

**RESPONSE:**
**Defendant admits that the TDCJ Swine Program Treatment Book – 2012(a), page two, identifies the preferred temperature recommendation for a lactating sow as being 60 degrees Fahrenheit to 80 degrees Fahrenheit.**

**REQUEST NO. 27.** TDCJ policy does not identify a preferred temperature range for inmate housing areas at the Hutchins Unit.

**RESPONSE**
**Defendant objects that the phrase "preferred temperature range" is vague, ambiguous, and not defined.  Subject to and without waiving the foregoing objections, Defendant admits that there is not a policy stating that offender dorms at the Hutchins State Jail are required to remain within a specified range of temperatures.**

**REQUEST NO. 28.** The National Weather Service is a reliable source for temperature data.

**RESPONSE:**
**Defendant objects as the phrase "reliable source of information" is not defined. Defendant further objects that this request is vague and overly broad. Subject to and without waiving the foregoing objections, Defendant admits that the National Weather Service is a component of the National Oceanic and Atmospheric Administration and provides weather, water, and climate data.**

**REQUEST NO. 29.** The National Oceanic and Atmospheric Administration is a reliable source for temperature data.

**RESPONSE:**
**Defendant objects as the phrase "reliable source of information" is not defined. Defendant further objects that this request is vague and overly broad. Subject to and without waiving the foregoing objections, Defendant admits that the National Oceanic and Atmospheric Administration's Mission is "Science, Service, and Stewardship. "**

**REQUEST NO. 30.** The National Weather Service is a reliable source for information about weather conditions.

**RESPONSE:**
**Defendant objects as the phrases "reliable source of information" and "weather conditions" are not defined. Defendant further objects that this request is vague and overly broad. Subject to and without waiving the foregoing objections, Defendant admits that the National Weather Service is a component of the National Oceanic and Atmospheric Administration and provides weather, water, and climate data. Without further information Defendants can neither admit or deny.**

**REQUEST NO. 31.** The National Oceanic and Atmospheric Administration is a reliable source for information about weather conditions.

**RESPONSE:**
**Defendant objects as the phrases "reliable source of information" and "weather conditions" are not defined. Defendant further objects that this request is vague and overly broad. Subject to and without waiving the foregoing objections, Defendant admits that the National Oceanic and Atmospheric Administration's Mission is "Science, Service, and Stewardship." Without further information Defendants can neither admit or deny.**

**REQUEST NO. 32.** The National Oceanic and Atmospheric Administration website states "Heat is the number one weather-related killer in the United States. NOAA National Weather Service statistical data shows that heat causes more fatalities per year than floods, lightning, tornadoes, and hurricanes combined. Heat is the number one weather-related killer in the United States. NOAA National Weather Service statistical data shows that heat causes more fatalities per year than floods, lightning, tornadoes, and hurricanes combined." (See http://www.crh.noaa.gov/lmk/?n=noaaexcessiveheat.

**RESPONSE:**
Defendant admits that the sentence as stated request appears on the website linked in the request.

**REQUEST NO. 33.** Admit that Larry McCollum was obese.

**RESPONSE:**
Defendant objects that this request is not properly posed to Defendant TDCJ. Defendant TDCJ does not and cannot diagnose a medical condition; rather, such actions would be the purview of the University of Texas Medical Branch.  Subject to and without waiving, Defendant admits UTMB documents indicate MCCollum was obese.

**REQUEST NO. 34.** Admit that Larry McCollum was morbidly obese.

**RESPONSE:**
Defendant objects that this request is not properly posed to Defendant TDCJ. Defendant TDCJ does not and cannot diagnose a medical condition; rather, such actions would be the purview of the University of Texas Medical Branch.  Subject to and without waiving, Defendant admits UTMB documents indicate MCCollum was obese.

114

**Defendant Texas Department of Criminal Justice's Responses to Plaintiff Sandra McCollum's Ninth Set of Requests for Production, and Requests for Admissions (Date of Service – 01/28/14).**

## REQUESTS FOR PRODUCTION

1. Please produce all emails, letters, or other correspondence received by Brad Livingston related to heat, temperature, extreme temperature, heat index, or air conditioning prior to July 23, 2011.

**RESPONSE**
**Defendant objects that this request is over broad and not reasonably limited in scope or time.   Subject to and without waiving the foregoing objection, Please see the documents previously produced to in this case.**

2. Please produce all emails, letters, or other correspondence received by Robert Eason related to heat, temperature, extreme temperature, heat index, or air conditioning prior to July 23, 2011.

**RESPONSE**
**Defendant objects that this request is over broad and not reasonably limited in scope or time.   Subject to and without waiving the foregoing objection, Please see the documents previously produced to plaintiffs' attorneys in this case.**

3. Please produce all proposals submitted for bid number IT648783 dated May 29, 1013.

**RESPONSE**
**Objection, irrelevant, not reasonably limited in scope. These responses seek documents created 22 months after the death of the decedent. As such they have no relevance to any matter in this cause of action.**

4. Please produce all correspondence with Art's Way Scientific, Inc. regarding bid number IT648783.

**RESPONSE**
**Objection, irrelevant, not reasonably limited in scope. These responses seek documents created 22 months after the death of the decedent. As such they have no relevance to any matter in this cause of action.**

115

# Exhibit 16

## DECLARATION OF <u>ROBERT EASON</u>

"I am over 21 years of age, of sound mind, capable of making this declaration, and personally acquainted with the facts herein stated.

"I am the custodian of records for the <u>Correctional Institutions Division</u> of the Texas Department of Criminal Justice ("TDCJ"). Attached are true and correct copies of e-mails sent to or from Robert Eason related to heat-related illnesses, heat-related deaths, or high temperatures inside TDCJ facilities, which are kept by the TDCJ in the regular course of its business activity.  The entries of such records were made as a regularly conducted activity and a regular practice of the TDCJ, and were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

"My name is <u>Robert Eason</u>  and I am an employee of the TDCJ, a governmental agency.  I am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the foregoing is true and correct."

Executed in <u>Walker County</u> State of Texas, on the <u>09</u> day of May 2014.


_____
ROBERT EASON



**Fw: Heat Related Concerns**
Lannette Linthicum   to: William Stephens                      08/16/2012 01:31 PM
Cc:  robert.williams

| | |
|---|---|
| From: | Lannette Linthicum/Health_Services/TDCJ |
| To: | William Stephens/Institutional/TDCJ@TDCJ |
| Mail #: | LL-996 |
| Cc: | robert.williams@tdcj.state.tx.us |

FYI

Lannette Linthicum, MD, CCHP-A, FACP
Director, Health Services Division
Texas Department of Criminal Justice
Two Financial Plaza, Suite 625
Huntsville, TX  77340
(936) 437-3542 (work)
(936) 437-3541 (fax)

The information contained in this electronic mail and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information.  Any other interception or use of these materials is strictly prohibited.  If you have received these materials in error, please notify me immediately by telephone and destroy all electronic information received.

----- Forwarded by Lannette Linthicum/Health_Services/TDCJ on 08/16/2012 01:30 PM -----

| | |
|---|---|
| From: | "Adams, Charles D." <cdadams@utmb.edu> |
| To: | "Linthicum, Lannette C." <lannette.linthicum@tdcj.state.tx.us>, "Williams, Robert" <robert.williams@tdcj.state.tx.us>, "george.crippen@tdcj.state.tx.us" <george.crippen@tdcj.state.tx.us> |
| Cc: | "Murray, Owen J." <ojmurray@utmb.edu> |
| Date: | 08/15/2012 03:44 PM |
| Subject: | FW: Heat Related Concerns |

Good Afternoon,
I received this report from our Region 3 and would like to share with you. As you can see, there is a wide variance in the individual unit's frequency of supplying ice. I am going to get similar reports from the other regions and will share them with you when I receive them.
Danny

Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division
UTMB-CMC

From: Adams, Charles D.
Sent: Wednesday, August 15, 2012 3:33 PM
To: Moultrie, Jane M.

Subject: RE: Heat Related Concerns

Thank you Jane. I intend to forward this to Drs. Linthicum and Williams and ask the other regions to send in a similar summary for their region. Personally, I don't believe that passing out ice twice a day is sufficient.

Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division
UTMB-CMC

From: Moultrie, Jane M.
Sent: Wednesday, August 15, 2012 2:17 PM
To: Adams, Charles D.
Subject: FW: Heat Related Concerns

fyi for region III

Jane Murray Moultrie, MD
UTMB-Correctional Managed Care
Medical Director, Pam Lychner and Joe Kegans State Jails
Region 3 Medical Director
Mobile 281.543.5263
Office 281.454.5036 ext. 6237

From: Chavers, Jason L.
Sent: Wednesday, August 15, 2012 1:48 PM
To: Moultrie, Jane M.
Subject: FW: Heat Related Concerns

Follow-up on this topic

Jason Chavers
Region III Operations Manager
(281) 454-5036 x 6254

From: Patel, Pinkee
Sent: Wednesday, August 15, 2012 11:39 AM
To: Chavers, Jason L.
Subject: RE: Heat Related Concerns

Summaries as follows:

Pack/Luther/Hamilton - For Pack, Luther and Hamilton, the trend I see is at Pack.  One offender states he is having heat related illness and then a couple more jump in.  I also see that TDCJ staff is trying to ensure the offender is ok so they error on the side of caution and bring the offender in just to be safe.

Lychner/Kegan - We have had nothing out of the ordinary regarding heat related concerns.  Medical is not issuing Ice and water at this time, but TDCJ facility leadership providing access to water/ice. Mcwhorter did not hear back from Tucker, but found out they are taking care of business pushing water and

08/09/12 - George Weldon # 666823 8-9-12,was working in fields and started having chest pain radiating down arm.  Inmate took shower first and then ambulated to Medical by field boss. He was diagnosed with heat exhaustion and IV was started.


From: Chavers, Jason L.
Sent: Monday, August 13, 2012 12:59 PM
To: Abke, Sarah J.; Dostal, Susan; Mcwhorter, William B.; Noor, Naushad; Patel, Pinkee; Reed, Denise J.; Roberts, Margaret E.; Strunk, Paul E.; Oaks, Terry; Williams, Larry W.
Cc: Moultrie, Jane M.
Subject: Heat Related Concerns

How are things going out at our units in relation to heat related issues and/or offenders getting access to ICE and water?  Have not heard anything out of the ordinary but would like to know if we are monitoring.

I know we posted signs but what are your units doing in relation to providing ice to the offenders during times of extreme heat?

Please reply back to Pinkee Patel for all of your units so I can update Dr. Moultrie and Dr. Adams.  Please respond to this request by COB Wednesday, August 15th.

Thanks

Jason

Jason L. Chavers
Regional Operations Manager
Region 3

4 Jester Road, Richmond, Texas 77406
P (281) 277-3700 x 4288
C (936) 577-1035

Lychner State Jail, Atascocita, Texas 77396
P (281)-454-5036 x 6254

[UTMB_Health_tag_PMS_rgb.png]

Employee Advisory Council
http://blog.utmb.edu/EAC/

Confidentiality Notice:  This email transmission contains confidential or legally privileged information that is intended for the individual party or entity named in the email address.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or reliance upon the contents of this email is strictly prohibited.  If you have received this email in error, please reply to the sender and delete the message from your system.  Thank you.


image001.png



Fw: heat related illness
Robert Williams   to: William Stephens          08/22/2012 08:48 AM
Cc:  lannette.linthicum

| From: | Robert Williams/Health_Services/TDCJ |
| To: | William Stephens/Institutional/TDCJ@TDCJ |
| Mail #: | RW-1925 |
| Cc: | lannette.linthicum@tdcj.state.tx.us |

FYI.  You will notice that the UTMB Region 1 includes multiple TDCJ regions.  I did not see any problems with the report.  I think it demonstrates the measures being taken by each unit to prevent heat injury. Thank you very much for the efforts made on yours and your dedicated staff's part.


Robert Lewis Williams, M.D.
Deputy Director, Health Services Division
Texas Department of Criminal Justice
Phone:  (936) 437-3535
Fax:  (936) 437-3166


The information contained in this electronic mail and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information.  Any other interception or use of these materials is strictly prohibited.  If you have received these materials in error, please notify me immediately by telephone and destroy all electronic information received. Nothing in this message should be construed as digital or electronic signature unless expressly stated to the contrary herein.

----- Forwarded by Robert Williams/Health_Services/TDCJ on 08/22/2012 08:45 AM -----

| From: | "Adams, Charles D." <cdadams@utmb.edu> |
| To: | "Williams, Robert" <robert.williams@tdcj.state.tx.us>, "Linthicum, Lannette C." |
| | <lannette.linthicum@tdcj.state.tx.us> |
| Date: | 08/22/2012 07:55 AM |
| Subject: | FW: heat related illness |


FYI.


Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division
UTMB-CMC


From: Stokes, Corrine B.
Sent: Wednesday, August 22, 2012 7:43 AM
To: Adams, Charles D.
Cc: Morris, Susan M.; Jarrett, W. E.; Saenz, Hilario; McLearen, Kimberly S.
Subject: FW: heat related illness


Region One Heated Related Concerns as of 8-16-12.

Thanks


Corrine B. Stokes, Admin. Secretary
Region I  - UTMB - Correctional Managed Care
967 Ofstie Street
Beeville, TX  78102
cbstokes@utmb.edu<mailto:cbstokes@utmb.edu>
(361)362-6301  Phone
(361) 362-6303  Fax


Confidentiality Notice:  This email transmission contains confidential or
legally privileged information that is intended for the individual party or
entity named in the email address.  If you are not the intended recipient, you
are herby notified that any disclosure, copying, distribution or reliance upon
the contents of this email is strictly prohibited.  If you have received this
email transmission in error, please reply to the sender and delete the message
from your system.  Thanks.

---

From: Adams, Charles D.
Sent: Tuesday, August 21, 2012 9:02 AM
To: Vincent, Bobby M.; Dalecki, Robert E.; Jarrett, W. E.; Morris, Susan M.
Subject: heat related illness

I don't recall receiving a summary of your region's heat related problems for
July. Please send them this week. I will forward to Drs. Linthicum and
Williams for their review.

Thanks,

Danny


Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division
UTMB-CMC




REGION ONE  Heat Related Summaries  8-16-12.doc

| Region One Units: | Heat Related Summaries As of 8-16-12 |
|---|---|
| BARTLETT | Bartlett security sends ice/water out to dorms twice a day. Water is available at all times |
| BRIDGEPORT | Bridgeport -- The entire unit is air conditioned. The dayrooms in each POD (housing) have large igloo coolers that have ice and water available. The offenders were allowed recreation outside during the morning hours and restricted to gym recreation during times of extreme heat. Bridgeport had only one offender with heat exhaustion this summer, and this was before the unit initiated recreation outside in morning and gym recreation after noon each day. |
| BRISCOE | Briscoe provides water and ice on a continual basis daily. |
| CONNALLY | Re: Connally Unit. There are no air conditioned housing areas at the Connally Unit. Water is available 24/7. Ice is passed in sections 3 times daily at 0700, 1300 and 1900. Water and ice are available in recreation areas on a continuous basis. |
| COTULLA | Cotulla has Air Conditioning in all of the dorms. But they have continuous water and ice on the Recreation Yard daily. |
| CRAIN | Per Warden Walker water and ice is supplied every hour, which is mandatory and as needed. |
| DAWSON | Dawson has Air Conditioning though out the dorms. Security provides water and Ice though out the dorms daily and for all recreational activities. |
| DOMINGUEZ | Cold water is delivered twice a day, there are wall fans in the living area and a fan in the center of the living area. We have no heat related injuries thus far. Constant supply of cold water is available at the field and garden job site. Additionally we have cool water stations set up in all temperature sensitive work areas such as the kitchen. We should also make sure that the officers working in heat extremes have water coverage. |
| ESTES | The Estes unit is air conditioned through out. The dorms have sinks with running water in each cell. Security provides ice water at all times during Recreation. |
| GARZA | On the Garza West Unit, ice is delivered to offenders in the dorms 4 times a day - 0530, 0930, 1430, and 1830. On the Garza East and Work Camp Unit, ice is delivered to offenders in the dorms 3 times a day - 0700, 1300, and 1700. |

| | |
|---|---|
| | Ice and water is also available to offenders where ever their work areas are. Currently in this high heat season, offenders who work in the field are not being required to work. |
| GLOSSBRENNER | Water and ice is distributed a minimum of 5 times daily to all dorm and work areas.<br><br>Temperature gauges are in the kitchen; laundry and housing areas - depending on levels - fans- tempered air and/or opening windows occurs.<br><br>Water breaks are given frequently and as needed for outside workers - they do not go out in the middle of the day.<br><br>We have an active personal fan program not only for indigent but for individuals to purchase fans and/or have a loaner until they receive money. All chronic patients receive a fan on entrance to the unit.<br><br>To date we haven't had a heat related incident. |
| HALBERT | At Halbert Unit, there have been no heat related illnesses/injuries.<br>BB offenders have access to water coolers on the yard, and water fountains in the dorms and buildings.<br>All Field Squads take water coolers with them, when they leave the unit for their assigned destinations.<br>Drinks are served by Food Services, with every meal.<br>Medical does not provide ice for TDCJ, at BB.<br>BB dorms have tempered air, and fans.<br>Showers are available anytime, accessibility dependant on the offenders' daily treatment schedules.<br>There is no outside rec, until the evening; day room rec only, until then. |
| HILLTOP | HT - The Hilltop/Trusty Camp Unit completes at least one ice call per shift. The Food Service Department initiates the call. Each dorm brings their designated coolers outside where they are picked up by offenders serving extra duty. The coolers are taken to the ice house where they are filled with ice and water. The coolers are then returned to the dorms. The coolers are then re-filled with water as needed until the next ice call. |
| HOBBY | Hobby has ice water(coolers) supplied to all the housing areas twice per shift each day. The offenders also are provided water during meal times. |
| HUGHES | Daily water distribution on the Hughes Facility; 1000 am, 1200 pm, 1500 pm, 0700 pm and 2100 pm, water and ice distribution/replenished. Officers instructed to request replenishment as needed. |
| HUTCHINS | Hutchins distributes ice 3x/day. There is no outside rec after 10 a.m. We do not have an outside work squad that must work outside for long periods of time. The |

| | |
|---|---|
| | offenders who are at highest risk for heat-related illness have been moved to an air-conditioned dorm. Medical provides an updated list of heat restrictions to security daily. |
| LINDSEY | On the Lindsey Unit water is available in dorm sinks and showers at all times during the day. CCA security staff is to ensure a water jug on each rec yard is filled as they empty.  Ice is added if the temp. is above 100 degrees.  All dorms are air conditioned. |
| LOCKHART | Air conditioned, and security provides ice and water during recreational activities. |
| LOPEZ | Follows TDCJ SOP for heat extremes.   Provide ice and water 3x daily:<br>-1st shift,<br>-2nd shift<br>-3rd shift<br>No heat related emergencies |
| KYLE | Air conditioned, and security provides ice and water during recreational activities. |
| MARLIN | The Marlin Unit is air conditioned, but water is offered during recreation hours. |
| MCCONNELL | The inmates at McConnell Unit get water and ice four times per day in the housing units, they get water three times per day at the chow hall, and they have unlimited water in the day room. |
| MT. VIEW | MV - all living areas are air conditioned except seg. Water is issued every hour in seg.  there are water fountains or coolers in every living area and water available in their cells. |
| MURRAY | LM - In general population coolers are in the day rooms and available to offenders all day.  The water is changed out mid day and when night shift comes on.  In ad-seg and cell block the offenders are given ice water twice during the day and twice at night. |
| SAN SABA | At the San Saba Unit, there have been no heat related illnesses/injuries.<br>N2 offenders have access to water fountains on the rec. yard, gym, dorms, and other buildings. Sally port has water fountain in it as well.<br>All Work Squads take Igloo water coolers with them and are with them and available.<br>Ice water is served by Food Services, with every meal. Medical does not provide ice for TDCJ, at N2.<br>All enclosed buildings in N2 are air conditioned including dorms. Showers are available anytime in dorms during normal operating hours. |
| SEGOVIA | Follows TDCJ SOP for heat extremes.   Provide ice and water 3x daily:<br>-1st shift,<br>-2nd shift<br>-3rd shift<br>No heat related emergencies. |

| STEVENSON | There are no air conditioned housing areas at the Stevenson Unit except transient/Seg. Water and ice are made available in coolers in housing areas and day rooms 24/7. For medium G4 custody offenders who do not have unlimited access, these offenders are escorted to water/ice every 2 hours. |
|---|---|
| TORRES / NEY | We have a working farm at Torres and they get 15 minute water breaks and do not work in excess of 100 degrees. They recently (two weeks ago) put huge igloo water coolers in all outside cages at both units with water cups. They also have these igloo coolers in all of our dorms at both units. I have walked into these dorms and seen them out on a stand with the cups and have seen meeting postings for hydration everywhere on their boards. I have also posted about 4 of these signs throughout our medical clinics. Bottom line is our guys have unlimited, unrestricted access to water. I have also let the kitchen use ice from our commercial ice machine at Torres since the population is larger and more guys getting the water. Every Monday morning we pull the Forvus listing for the unit captains so we have a current list of guys that have heat restrictions so security can accommodate them. As far as I know there have been no heat related incidences at either unit for the month of August so far. |
| TRAVIS | Travis is not air conditioned. Outdoor recreational activities are limited/canceled during days of extreme heat. Ice and water is provided by security. |
| WILLACY | -AC in all dorms. -Provides 5 gallon ice and water coolers 2x daily. |
| WOODMAN | Daily distribution of ice and water. Three times a day (0600 am, 1200 pm, 0600 pm), fresh ice and water distributed. Officers instructed to replenish water as needed. No heat related emergencies |



*file*

Fw: heat related illness

Robert Williams   To: William Stephens          08/22/2012 08:48 AM
Cc: lannette.linthicum

| From: | Robert Williams/Health_Services/TDCJ |
| To: | William Stephens/Institutional/TDCJ@TDCJ |
| Mail #: | RW-1925 |
| Cc: | lannette.linthicum@tdcj.state.tx.us |

FYI. You will notice that the UTMB Region 1 includes multiple TDCJ regions. I did not see any problems with the report. I think it demonstrates the measures being taken by each unit to prevent heat injury. Thank you very much for the efforts made on yours and your dedicated staff's part.

Robert Lewis Williams, M.D.
Deputy Director, Health Services Division
Texas Department of Criminal Justice
Phone: (936) 437-3535
Fax: (936) 437-3166

The information contained in this electronic mail and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information. Any other interception or use of these materials is strictly prohibited. If you have received these materials in error, please notify me immediately by telephone and destroy all electronic information received.
Nothing in this message should be construed as digital or electronic signature unless expressly stated to the contrary herein.
----- Forwarded by Robert Williams/Health_Services/TDCJ on 08/22/2012 08:45 AM -----

| From: | "Adams, Charles D." <cdadams@utmb.edu> |
| To: | "Williams, Robert" <robert.williams@tdcj.state.tx.us>, "Linthicum, Lannette C." <lannette.linthicum@tdcj.state.tx.us> |
| Date: | 08/22/2012 07:55 AM |
| Subject: | FW: heat related illness |

FYI.


Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division
UTMB-CMC


From: Stokes, Corrine B.
Sent: Wednesday, August 22, 2012 7:43 AM
To: Adams, Charles D.
Cc: Morris, Susan M.; Jarrett, W. E.; Saenz, Hilario; McLearen, Kimberly S.
Subject: FW: heat related illness


Region One Heated Related Concerns as of 8-16-12.



Emails Eason- TDCJ 57

Thanks


Corrine B. Stokes, Admin. Secretary
Region I  - UTMB - Correctional Managed Care
967 Ofstie Street
Beeville, TX  78102
cbstokes@utmb.edu<mailto:cbstokes@utmb.edu>
(361)362-6301  Phone
(361) 362-6303 Fax


Confidentiality Notice:  This email transmission contains confidential or
legally privileged information that is intended for the individual party or
entity named in the email address.  If you are not the intended recipient, you
are herby notified that any disclosure, copying, distribution or reliance upon
the contents of this email is strictly prohibited.  If you have received this
email transmission in error, please reply to the sender and delete the message
from your system.  Thanks.

_____

From: Adams, Charles D.
Sent: Tuesday, August 21, 2012 9:02 AM
To: Vincent, Bobby M.; Dalecki, Robert E.; Jarrett, W. E.; Morris, Susan M.
Subject: heat related illness

I don't recall receiving a summary of your region's heat related problems for
July. Please send them this week. I will forward to Drs. Linthicum and
Williams for their review.

Thanks,

Danny.


Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division
UTMB-CMC




REGION ONE  Heat Related Summaries  8-16-12.doc


Emails Eason- TDCJ 58

| Region One Units: | Heat Related Summaries As of 8-16-12 |
|---|---|
| BARTLETT | Bartlett security sends ice/water out to dorms twice a day. Water is available at all times |
| BRIDGEPORT | Bridgeport -- The entire unit is air conditioned. The dayrooms in each POD (housing) have large igloo coolers that have ice and water available. The offenders were allowed recreation outside during the morning hours and restricted to gym recreation during times of extreme heat. Bridgeport had only one offender with heat exhaustion this summer, and this was before the unit initiated recreation outside in morning and gym recreation after noon each day. |
| BRISCOE | Briscoe provides water and ice on a continual basis daily. |
| CONNALLY | Re: Connally Unit. There are no air conditioned housing areas at the Connally Unit. Water is available 24/7. Ice is passed in sections 3 times daily at 0700, 1300 and 1900. Water and ice are available in recreation areas on a continuous basis. |
| COTULLA | Cotulla has Air Conditioning in all of the dorms. But they have continuous water and ice on the Recreation Yard daily. |
| CRAIN | Per Warden Walker water and ice is supplied every hour, which is mandatory and as needed. |
| DAWSON | Dawson has Air Conditioning though out the dorms. Security provides water and Ice though out the dorms daily and for all recreational activities. |
| DOMINGUEZ | Cold water is delivered twice a day, there are wall fans in the living area and a fan in the center of the living area. We have had no heat related injuries thus far. Constant supply of cold water is available at the field and garden job site. Additionally we have cool water stations set up in all temperature sensitive work areas such as the kitchen.<br><br>We should also make sure that the officers working in heat extremes have water coverage. |
| ESTES | The Estes unit is air conditioned through out. The dorms have sinks with running water in each cell. Security provides ice water at all times during Recreation. |
| GARZA | On the Garza West Unit, ice is delivered to offenders in the dorms 4 times a day - 0530, 0930, 1430, and 1830.<br><br>On the Garza East and Work Camp Unit, ice is delivered to offenders in the dorms 3 times a day - 0700, 1300, and 1700. |

Emails Eason- TDCJ 59

| | |
|---|---|
| | Ice and water is also available to offenders where ever their work areas are.  Currently in this high heat season, offenders who work in the field are not being required to work. |
| GLOSSBRENNER | Water and ice is distributed a minimum of 5 times daily to all dorm and work areas.

Temperature gauges are in the kitchen; laundry and housing areas - depending on levels - fans- tempered air and/or opening windows occurs.

Water breaks are given frequently and as needed for outside workers - they do not go out in the middle of the day.

We have an active personal fan program not only for indigent but for individuals to purchase fans and/or have a loaner until they receive money.  All chronic patients receive a fan on entrance to the unit.

To date we haven't had a heat related incident. |
| HALBERT | At Halbert Unit, there have been no heat related illnesses/injuries.
BB offenders have access to water coolers on the yard, and water fountains in the dorms and buildings.
All Field Squads take water coolers with them, when they leave the unit for their assigned destinations.
Drinks are served by Food Services, with every meal.
Medical does not provide ice for TDCJ, at BB.
BB dorms have tempered air, and fans.
Showers are available anytime, accessibility dependant on the offenders' daily treatment schedules.
There is no outside rec, until the evening; day room rec only, until then. |
| HILLTOP | HT - The Hilltop/Trusty Camp Unit completes at least one ice call per shift.  The Food Service Department initiates the call.  Each dorm brings their designated coolers outside where they are picked up by offenders serving extra duty.  The coolers are taken to the ice house where they are filled with ice and water.  The coolers are then returned to the dorms.  The coolers are then re-filled with water as needed until the next ice call. |
| HOBBY | Hobby has ice water(coolers) supplied to all the housing areas twice per shift each day.  The offenders also are provided water during meal times. |
| HUGHES | Daily water distribution on the Hughes Facility; 1000 am, 1200 pm, 1500 pm, 0700 pm and 2100 pm, water and ice distribution/replenished.  Officers instructed to request replenishment as needed. |
| HUTCHINS | Hutchins distributes ice 3x/day.  There is no outside rec after 10 a.m.  We do not have an outside work squad that must work outside for long periods of time.  The |

| | |
|---|---|
| | offenders who are at highest risk for heat-related illness have been moved to an air-conditioned dorm. Medical provides an updated list of heat restrictions to security daily. |
| LINDSEY | On the Lindsey Unit water is available in dorm sinks and showers at all times during the day.CCA security staff is to ensure a water jug on each rec yard is filled as they empty.  Ice is added if the temp. is above 100 degrees.  All dorms are air conditioned. |
| LOCKHART | Air conditioned, and security provides ice and water during recreational activities. |
| LOPEZ | Follows TDCJ SOP for heat extremes.  Provide ice and water 3x daily:<br>-1st shift,<br>-2nd shift<br>-3rd shift<br>No heat related emergencies |
| KYLE | Air conditioned, and security provides ice and water during recreational activities. |
| MARLIN | The Marlin Unit is air conditioned, but water is offered during recreation hours. |
| MCCONNELL | The inmates at McConnell Unit get water and ice four times per day in the housing units, they get water three times per day at the chow hall, and they have unlimited water in the day room. |
| MT. VIEW | MV - all living areas are air conditioned except seg. Water is issued every hour in seg.  there are water fountains or coolers in every living area and water available in their cells. |
| MURRAY | LM - In general population coolers are in the day rooms and available to offenders all day.  The water is changed out mid day and when night shift comes on.  In ad-seg and cell block the offenders are given ice water twice during the day and twice at night. |
| SAN SABA | At the San Saba Unit, there have been no heat related illnesses/injuries.<br>N2 offenders have access to water fountains on the rec. yard, gym, dorms, and other buildings. Sally port has water fountain in it as well.<br>All Work Squads take Igloo water coolers with them and are with them and available.<br>Ice water is served by Food Services, with every meal. Medical does not provide ice for TDCJ, at N2.<br>All enclosed buildings in N2 are air conditioned including dorms. Showers are available anytime in dorms during normal operating hours. |
| SEGOVIA | Follows TDCJ SOP for heat extremes.  Provide ice and water 3x daily:<br>-1st shift,<br>-2nd shift<br>-3rd shift<br>No heat related emergencies |

Emails Eason- TDCJ 61

| STEVENSON | There are no air conditioned housing areas at the Stevenson Unit except transient/Seg.<br>Water and ice are made available in coolers in housing areas and day rooms 24/7.  For medium G4 custody offenders who do not have unlimited access, these offenders are escorted to water/ice every 2 hours. |
| --- | --- |
| TORRES / NEY | We have a working farm at Torres and they get 15 minute water breaks and do not work in excess of 100 degrees. They recently (two weeks ago) put huge igloo water coolers in all outside cages at both units with water cups. They also have these igloo coolers in all of our dorms at both units. I have walked into these dorms and seen them out on a stand with the cups and have seen meeting postings for hydration everywhere on their boards. I have also posted about 4 of these signs throughout our medical clinics. Bottom line is our guys have unlimited, unrestricted access to water. I have also let the kitchen use ice from our commercial ice machine at Torres since the population is larger and more guys getting the water. Every Monday morning we pull the Forvus listing for the unit captains so we have a current list of guys that have heat restrictions so security can accommodate them.<br>As far as I know there have been no heat related incidences at either unit for the month of August so far. |
| TRAVIS | Travis is not air conditioned. Outdoor recreational activities are limited/canceled during days of extreme heat. Ice and water is provided by security. |
| WILLACY | -AC in all dorms.<br>-Provides 5 gallon ice and water coolers 2x daily. |
| WOODMAN | Daily distribution of ice and water.  Three times a day (0600 am, 1200 pm, 0600 pm), fresh ice and water distributed.  Officers instructed to replenish water as needed.<br>No heat related emergencies |

# E-Mail Message
## June 14, 2013

**TO:**    Lannette Linthicum, MD, (Marsha Brumley) Health Services, CID
Deputies, Regional Directors, Kirk Moss, Wardens, and Public
Information (John Hurt, Jason Clark, & Connie Durdin)

**SUBJECT:**    Reminder:  Heat Precaution

Due to the potential for extreme heat conditions during this time of the year, it is imperative that everyone continue to take precautions to help reduce heat-related illnesses.  All employees shall pay particular attention to policies and procedures related to heat precautions due to the expected extreme heat conditions.

I, again ask everyone to review the message # 487862, dated 05/01/2013, which outlines the appropriate precautions and actions to be implemented.  All necessary preventive measures should be taken to ensure the safety of staff and offenders.  Wardens should continue to work closely with Health Services staff to proactively identify and address issues relating to this subject matter.

Any additional resources or assistance needed to address the challenges of these conditions should be addressed to my office.  I appreciate your continual attention and focus on this issue.

**Authority:**  William Stephens, Director, Correctional Institutions Division

SUPPLY.

- RESTRICT OUTSIDE ACTIVITY (WORK HOURS) IN ACCORDANCE WITH AD-10.64, "TEMPERATURE EXTREMES IN THE TDCJ WORK PLACE."

- ENSURE ALL STAFF AND OFFENDERS WORKING IN AREAS OF EXTREME HEAT SUCH AS, FIELD, MAINTENANCE, AND YARD SQUADS ARE PROVIDED FREQUENT WATER BREAKS.

- REFRAIN FROM TRANSPORTING PSYCHIATRIC INPATIENT OFFENDERS TO ANOTHER FACILITY VIA CHAIN BUS.

- TRANSPORT OFFENDERS DURING THE COOLEST HOURS OF THE DAY.

- SCREEN OUTGOING CHAIN TO ENSURE THE SELECTED MODE OF TRANSPORTATION IS APPROPRIATE.

- ALLOW OFFENDERS TO TAKE FANS WHEN BEING TRANSPORTED OFF THE UNIT FOR A MEDICAL APPOINTMENT.

- USE INFO PAC REPORT (IMS042), IMF MEDICAL SCREEN OR HSIN SENSITIVE MEDICAL RESTRICTIONS (INCLUDING BUT NOT LIMITED TO AN OFFENDER ON PSYCHOTROPIC MEDICATIONS) TO DETERMINE APPROPRIATE TRANSPORTATION METHOD.

- LOAD AND UNLOAD TRANSFER VEHICLES AS QUICKLY AS POSSIBLE (SECURITY IS THE FIRST PRIORITY AT EVERY BACKGATE; HOWEVER, WE MUST ALWAYS BE AWARE OF HEAT RELATED ISSUES WHEN BUSES OCCUPIED BY OFFENDERS SIT FOR ANY LENGTH OF TIME. BUSES MAY CIRCLE THE PERIMETER IF THE UNIT FORESEES AN EXTENDED WAIT TIME). EVERY REASONABLE EFFORT SHALL BE MADE TO ENSURE BUSES GET IN AND OUT OF THE BACKGATE IN A SAFE AND EXPEDIENT MANNER.

- TRANSFER VEHICLES PARKED FOR MORE THAN 15 MINUTES ARE REQUIRED TO PLACE A PREVIOUSLY PURCHASED FAN ON THE VEHICLE. UNITS SHALL ENSURE FANS, EXTENSION CORDS, ETC., ARE IN PALCE AND AVAILABLE WHEN NEEDED.

- STORE PAPER TOWELS TO BE SATURATED WITH WATER AND USED DURING EMERGENCY SITUATIONS WHEN TRANSPORTING OFFENDERS.

- WATER COOLERS ON BUSES SHALL BE REFILLED AT VARIOUS TIMES DURING THE TRIP TO ENSURE WATER REMAINS AT THE APPROPRIATE TEMPERATURE (TRANSPORTATION).

- WHEN USING FANS, AIR SHOULD BE DRAWN THROUGH THE STRUCTURE AND EXHAUSTED OUTSIDE. TAKE FULL ADVANTAGE OF THE FRESH AIR EXCHANGE SYSTEM OR PREVAILING WINDS TO ASSIST IN THE MOVEMENT OF AIR AS APPLICABLE.

- INCREASE AIR FLOW BY USING BLOWERS, NORMALLY USED TO MOVE HOT AIR IN THE WINTER, WHEN APPROPRIATE. ATTACH RIBBONS TO VENTS TO ENSURE BLOWERS ARE USED APPROPRIATELY. ENSURE ALL NEEDED MAINTENANCE TO BLOWERS HAS BEEN COMPLETED.

- ALLOW ADDITIONAL SHOWERS FOR OFFENDERS WHEN FEASIBLE.

- ALLOW OFFENDERS TO WEAR SHORTS IN DAYROOMS AND RECREATIONAL AREAS.

- MAKE WATER AVAILABLE DURING MEAL TIMES.

- REMEMBER, OFFENDER FANS SHOULD NOT BE CONFISCATED DUE TO PROPERTY RESTRICTION DURING THIS TIME. FANS SHALL BE CONFISCATED ONLY IF THEY ARE ALTERED.

- FANS SHALL BE ALLOWED TO ALL CUSTODY LEVELS (TO INCLUDE ADMINISTRATIVE SEGREGATION AND DISCIPLINARY STATUS). OFFENDERS WITH FANS STORED BASED ON THESE RESTRICTIONS SHALL HAVE THEIR FANS RE-ISSUED FOR THE TIME PERIOD SPECIFIED IN THIS POSTING.

- ALL OFFENDERS SHALL BE PERMITTED TO PURCHASE A FAN IF THEY DO NOT HAVE ONE.

- ENSURE THE FAN PROGRAM IS IN PLACE ALLOWING THE PERMANENT ISSUE OF A FAN TO AN OFFENDER WHO HAS BEEN INDIGENT FOR THE PREVIOUS SIX MONTHS, ON A FIRST COME FIRST SERVE BASIS. OFFENDERS WHO HAVE SIGNIFICANT MEDICAL NEEDS, BASED ON A CONDITION OR MEDICATION THAT IS NEGATIVELY IMPACTED BY THE HEAT, SHALL BE GIVEN PRIORITY.

- WARDENS ARE ENCOURAGED TO COORDINATE WITH THEIR FOOD SERVICE AND MAINTENANCE DEPARTMENTS TO ENSURE ICE-MACHINES ARE WORKING PROPERLY.

IT IS REQUIRED THAT EACH DEPARTMENT POSTS THIS NOTICE IN COMMON AREAS ON THE FACILITY. YOUR ATTENTION TO THIS MATTER IS GREATLY APPRECIATED.

AUTHORITY:   RICK THALER, DIRECTOR
             CORRECTIONAL INSTITUTIONS DIVISION

Sent to:     UNTS          <list>                        (to)
             ADMN          <list>                        (to)
             HBU8343       BUENDEL, HELEN                 (to)
             MBR2736       BRUMLEY, MARSHA               (to)
             GCR9820       CRIPPEN, GEORGE RN, MSN, PHDC  (to)
             JMO3699       MONTROSS, JIM                 (to)

Emails Eason- TDCJ 76



**Fw: Heat Related Illness**
**Lannette Linthicum**  to: Kirk Moss
Cc: William Stephens

02/16/2012 10:28 AM

| | |
|---|---|
| From: | Lannette Linthicum/Health_Services/TDCJ |
| To: | Kirk Moss/Institutional/TDCJ@TDCJ |
| Mail #: | LL-569 |
| Cc: | William Stephens/Institutional/TDCJ@TDCJ |

FYI

Lannette Linthicum, MD, CCHP-A, FACP
Director, Health Services Division
Texas Department of Criminal Justice
Two Financial Plaza, Suite 625
Huntsville, TX 77340
(936) 437-3542 (work)
(936) 437-3541 (fax)

The information contained in this electronic mail and any attachments is intended for the exclusive use of
the addressee(s) and may contain confidential, privileged, or proprietary information. Any other
interception or use of these materials is strictly prohibited. If you have received these materials in error,
please notify me immediately by telephone and destroy all electronic information received.

----- Forwarded by Lannette Linthicum/Health_Services/TDCJ on 02/16/2012 10:27 AM -----

| | |
|---|---|
| From: | "Adams, Charles D." <cdadams@utmb.edu> |
| To: | "Moultrie, Jane M." <jmmoultr@utmb.edu>, "Morris, Susan M." <smmorris@UTMB.EDU>, "Vincent, Bobby M." <bmvincen@UTMB.EDU>, "Wright, Gary G." <ggwright@UTMB.EDU>, "Smith, Monte K." <mksmith@UTMB.EDU> |
| Cc: | "Zepeda, Stephanie D." <sdzepeda@UTMB.EDU>, "Williams, Robert" <robert.williams@tdcj.state.tx.us>, "lannette.linthicum@tdcj.state.tx.us" <lannette.linthicum@tdcj.state.tx.us>, "Adams, Glenda M." <gmadams@utmb.edu> |
| Date: | 02/16/2012 06:53 AM |
| Subject: | FW: Heat Related Illness |

Good Morning,

Looking back at the problems that we encountered last summer, I would forward
this to your unit teams for discussion in their monthly/quarterly meetings and
ask them to involve the warden in strategies to deal with heat related
illness, at their particular units. I would even open the topic of restricting
outside recreation during certain temperature extremes. They get a little
"queezy" when this is brought up, but if you look at the unprecedented number
of heat related deaths that we experienced last year, it would certainly be
justified in certain circumstances. If you have thoughts on this topic, please
share.

Thanks,

Danny

Emails Eason- TDCJ 85

Charles D. (Danny) Adams, MD, MPH
Senior Medical Director- Outpatient Division
UTMB-CMC

From: Zepeda, Stephanie D.
Sent: Wednesday, February 08, 2012 3:35 PM
To: Smock, Stephen R.; Coates, Kelly; Williams, Anthony K.; Eubank, Gary J.;
Adams, Glenda M.; Adams, Charles D.; Penn, Joseph; Echols, Beverly A.; Horton,
Billy E.; Murray, Owen J.
Subject: Heat Related Illness

Hi,

In preparation for the upcoming summer and due to the number of heat related
illnesses reported last summer and number of inquiries on how to manage
patients on medications that put patients at increased risk, I thought it
would be beneficial to put an educational program together for unit health
care staff.  Dr. Angela Koranek put it together.

As you know, health services has a policy that addresses this issue (Heat
Stress Policy B-15.2) and the information in the policy was incorporated into
the presentation.  I was hoping that you could review and make recommendations
for changes or additions and that this program could be offered through the
CED and CLP.  I thought it could be offered each year just prior to the
summary.

Your thoughts?  Thanks.

Stephanie Zepeda, PharmD.
Director, Pharmacy Services
UTMB Health
Correctional Managed Care
2400 Avenue I
Huntsville, TX 77340
Phone: 936-437-5300
Fax: 936-437-5311
sdzepeda@utmb.edu

Confidentiality Notice:  This email transmission contains confidential or
legally privileged information that is intended for the individual party or
entity named in the email address.  If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution or reliance
upon the contents of this email is strictly prohibited.  If you have received
this email transmission in error, please reply to the sender and delete the
message from your system.  Thank you.


Heat Related Illnesses 2012.pptx



**Fw: updated "Possible Heat-Related Deaths 2012" List**

Lannette Linthicum   to: Karen Hall, Jeff Baldwin, R.C. Thaler                    09/20/2012 02:08 PM

Cc:  William Stephens

| From: | Lannette Linthicum/Health_Services/TDCJ |
|---|---|
| To: | Karen Hall/Executive_Directors_Office/TDCJ@TDCJ, Jeff Baldwin/Executive_Directors_Office/TDCJ, R.C. Thaler/Institutional/TDCJ@TDCJ |
| Mail #: | LL-1114 |
| Cc: | William Stephens/Institutional/TDCJ@TDCJ |

For your information.

Lannette Linthicum, MD, CCHP-A, FACP
Director, Health Services Division
Texas Department of Criminal Justice
Two Financial Plaza, Suite 625
Huntsville, TX 77340
(936) 437-3542 (work)
(936) 437-3541 (fax)

The information contained in this electronic mail and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information. Any other interception or use of these materials is strictly prohibited.  If you have received these materials in error, please notify me immediately by telephone and destroy all electronic information received.

----- Forwarded by Lannette Linthicum/Health_Services/TDCJ on 09/20/2012 02:07 PM -----

| From: | Kathryn Buskirk/Health_Services/TDCJ |
|---|---|
| To: | Lannette Linthicum/Health_Services/TDCJ@TDCJ |
| Cc: | Robert Williams/Health_Services/TDCJ@TDCJ, Phyllis Mcwhorter/Health_Services/TDCJ@TDCJ, George Crippen/Health_Services/TDCJ@TDCJ, Chris Black-Edwards/Health_Services/TDCJ@TDCJ |
| Date: | 09/20/2012 10:30 AM |
| Subject: | updated "Possible Heat-Related Deaths 2012" List |

A final autopsy report was received today and the attached list updated accordingly.



Possible Heat-Related Deaths 9-20-12.doc

Kathryn Buskirk, M.D., CMD
Director of Quality Monitoring and Compliance
Health Services Division
Texas Department of Criminal Justice
(936)437-4008

Emails Eason- TDCJ 144

**Possible Heat-Related Deaths 2012**
**Updated 9-20-2012**

| Name | TDCJ # | Unit of Assignment | Age | Medications | Date of Death | Autopsy Location | Autopsy Information |
|---|---|---|---|---|---|---|---|
| 1.  Adams, Rodney | 1797921 | Gurney | 45 | Vistaril, Cymbalta, Cogentin | 8-4-12 | UTMB-Galveston | 9-20-12-Final Autopsy: "…the cause of death was hyperthermia…" |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

Emails Eason- TDCJ 145

139



**Fw: Executive Quality Committee-Possible Heat-Related Death List-August 2012**

Lannette Linthicum   to: Karen Hall, Jeff Baldwin, R.C. Thaler, William Stephens          08/16/2012 01:53 PM

Cc: Bryan Collier, Jason Clark

From:   Lannette Linthicum/Health_Services/TDCJ
To:     Karen Hall/Executive_Directors_Office/TDCJ@TDCJ, Jeff Baldwin/Executive_Directors_Office/TDCJ, R.C. Thaler/Institutional/TDCJ@TDCJ, William Stephens/Institutional/TDCJ@TDCJ

Mail #:   LL-997
Cc:     Bryan Collier/Parole/TDCJ@TDCJ, Jason Clark/Executive_Directors_Office/TDCJ@TDCJ

FYI, only one to date.

Lannette Linthicum, MD, CCHP-A, FACP
Director, Health Services Division
Texas Department of Criminal Justice
Two Financial Plaza, Suite 625
Huntsville, TX  77340
(936) 437-3542 (work)
(936) 437-3541 (fax)

The information contained in this electronic mail and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information. Any other interception or use of these materials is strictly prohibited. If you have received these materials in error, please notify me immediately by telephone and destroy all electronic information received.

―― Forwarded by Lannette Linthicum/Health_Services/TDCJ on 08/16/2012 01:51 PM ―――

From:    Kathryn Buskirk/Health_Services/TDCJ
To:      Lannette Linthicum/Health_Services/TDCJ@TDCJ, George Crippen/Health_Services/TDCJ@TDCJ,
Cc:      Phyllis Mcwhorter/Health_Services/TDCJ@TDCJ, Chris Black/Health_Services/TDCJ@TDCJ
Date:    08/14/2012 01:35 PM
Subject: Executive Quality Committee-Possible Heat-Related Death List-August 2012

Attached is the "Possible Heat-Related death List" for 2012, as of August 14, 2012.
I will be tracking and sending you updates.



Possible Heat-Related Deaths 2012 8-13-12.doc

Kathryn Buskirk, M.D., CMD
Director of Quality Monitoring and Compliance
Health Services Division
Texas Department of Criminal Justice
(936)437-4008

Emails Eason- TDCJ 146

## Possible Heat-Related Deaths 2012
### Updated 8-14-2012

| Name | TDCJ # | Unit of Assignment | Age | Medications | Date of Death | Autopsy Location | Autopsy Information |
|------|--------|--------------------|-----|-------------|---------------|------------------|---------------------|
| 1. Adams, Rodney | 1797921 | Gurney | 45 | Vistaril, Cymbalta, Cogentin | 8-4-12 | UTMB- Galveston | Pending |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Emails Eason- TDCJ 147

141



**Suspected TDCJ Offender Heat Related Deaths- Preliminary Autopsy Findings**

Lannette Linthicum  to: R.C. Thaler, William Stephens          08/24/2011 02:16 PM
Sent by: **Marsha Brumley**
Cc:          Bryan Collier, Jeff Baldwin, Robert Williams

| | |
|---|---|
| From: | Lannette Linthicum/Health_Services/TDCJ |
| To: | R.C. Thaler/Institutional/TDCJ@TDCJ, William Stephens/Institutional/TDCJ@TDCJ |
| Mail #: | LL-1061 |
| Cc: | Bryan Collier/Executive_Directors_Office/TDCJ@TDCJ, Jeff Baldwin/Executive_Directors_Office/TDCJ@TDCJ, Robert Williams/Health_Services/TDCJ@TDCJ |
| Sent by: | Marsha Brumley/Health_Services/TDCJ |

There are the eight preliminary autopsy results on the suspected heat related offender deaths from UTMB Autopsy Services. There are two additional autopsies being done at the Medical Examiners offices. One is being done at the Harris County Medical Examiner's Office and the other at the Dallas County Medical Examiner's Office. Those offenders are:

Larry McCollum #1721640, Dallas County
Michael Martone #1395315, Harris County

The preliminary results are that three offender deaths are due to hyperthermia (heat related) they are Charles Cook #1457546, Alexander Togonidze #1578039, and Kenneth James #1726849. The cause of death has not yet been determined in four of the cases.  We will need to wait for additional testing to be done to determine their causes of death. They are: Nancy Yarbrough #1387800, and Thomas Meyers #680515, Shearry Black #1797435 and Kelly Marcus #1128380. Finally, Robert Webb #1569761, preliminary cause of death was determined not to be heat related, but instead, due to sudden cardiac death.

      

Charles-Cook-1457546.PDF   Alexander-Togonidze-1578039.PDF   Robert-Webb-1569761.PDF   Shearry-Black-1497435.PDF



Thomas-Meyers-680515.PDF

    

Kelly-Marcus-1128380.PDF   Kenneth-James-1726849.PDF   Nancy-Yarbrough-1387800.PDF

Lannette Linthicum, MD, CCHP-A, FACP
Director, Health Services Division
Texas Department of Criminal Justice
Two Financial Plaza, Suite 625
Huntsville, TX  77340
(936) 437-3542 (work)
(936) 437-3541 (fax)

The information contained in this electronic mail and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information. Any other interception or use of these materials is strictly prohibited.  If you have received these materials in error, please notify me immediately by telephone and destroy all electronic information received.

Emails Eason- TDCJ 153

# Exhibit 17

DECLARATION OF LANNETTE LINTHICUM, M.D.

"My name is Lannette Linthicum and I am the Director of the Health Services Division of the Texas Department of Criminal Justice (TDCJ), a governmental agency. I am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the following statements are true and correct.

"I am over 21 years of age, of sound mind, capable of making this declaration, and personally acquainted with the facts herein stated.

"Attached are true and correct copies of all e-mails sent to or from me in the regular course of business regarding heat-related illnesses, heat-related deaths, air conditioning, or high temperatures inside TDCJ facilities."

Executed in Walker County, State of Texas, on the 3D day of May 2014.

Lannette Linthicum, M.D.
Director, Health Services Division
TDCJ

**Fw: Adams, Rodney #1797921**
Lannette Linthicum  to:  Kathryn Buskirk                           08/06/2012 09:18 AM
Cc:  "Robert Williams"

From:      Lannette Linthicum/Health_Services/TDCJ
To:        "Kathryn Buskirk" <kathryn.buskirk@tdcj.state.tx.us>
Mail #:
Cc:        "Robert Williams" <Robert.Williams@tdcj.state.tx.us>

Dr. Buskirk,
FYI, looks like this is our first heat related death for 2012.
    Lannette Linthicum

  ----- Original Message -----
      **From:** Lannette Linthicum
      **Sent:** 08/06/2012 09:15 AM CDT
      **To:** Phyllis Mcwhorter
      **Subject: Fw: Adams, Rodney #1797921**
FYI
------Original Message------
From: Karen Hall
To: Jeff Baldwin
To: Dr. Lannette Catherine Linthicum, MD, CCHP-A. FACP
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 7:00 PM


------Original Message------
From: William Stephens
To: R C Thaler
To: Oscar Mendoza
To: Thomas Prasifka
To: Karen Hall
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 7:00 PM

Fyi.  I will have them do a "Regional Review" on this death since it appears that heat was a factor.
------Original Message------
From: Jay Eason
To: Bill Stephens
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 6:20 PM

Boss,

Doctors at ETMC, Tyler, removed Offender Adams from the ventilator. They pronounced him deceased at
1750.

Please see the below message from Warden Goings.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason

Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 18:10

The offender was taken off the ventilator at 541 pm. Offender passed 550 pm, declared deceased by Dr.
Jones of East Tyler Medical Center. Contacting EAC, OIG, OMT and Justice of the Peace. Also notifying
family to insure they are aware if the hospital have not done so as of yet.
------Original Message------
From: Robert Eason
To: Reginald Goings
Cc: William Stephens
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 5:12 PM

Ok, thanks for the update.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 17:10

Officers at the hospital just called the doctors started removing the iVs at 458 pm. The offender is still on
the ventilator. Not sure of the rationale behind removing the IVs at this time.
------Original Message------
From: Robert Eason
To: Reginald Goings
Cc: William Stephens
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 10:43 AM

Okay. Please keep me posted.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 10:40

The doctor for Adams has called the family in.
------Original Message------
From: Robert Eason
To: Reginald Goings
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 8:58 AM

Also, please ensure we're providing paper drinking cups especially to newly received offenders who don't
have a drinking cup.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 08:11

Yes sir.
------Original Message------
From: Robert Eason
To: Reginald Goings
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 8:11 AM

Sorry! I had the wrong PIN #. Lol. Please see the below message.

Thanks,

RJE
------Original Message------
To: Dennis Miller
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 07:52

Reggie,

Please send me an update on Offender Ramirez's condition at ETMC, Tyler and Offender Adam's condition as well.

Also, please put some staff together today to check on the following heat precaution issues:

•check all fans to ensure they're operational

•check all exhaust fans to ensure they're operational

•ice water available at all times in each housing area

•intake air flow is operating properly in each housing area

•a heat restriction list is on each housing area and the officers are documenting their 30min. checks for each offender on the list

•hot water is turned off in the showers

•heat awareness training is part of the intake process

•offenders are allowed to wear shorts and t-shirts/tank-tops in their housing areas

•signs posted in the housing areas about drinking plenty of water to stay hydrated

•AC is operational in separation

•AC is operational in the back of our transport vans

Please ensure we're in compliance in all these areas. Let me know by this afternoon if we're not.

Thanks,

RJE

------Original Message------
From: Kelvin Scott

To: Bill Stephens
To: Robert Eason
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 3, 2012 21:40


------Original Message------
From: 328B0894
To: Kelvin Scott
Subject: Adams, Rodney #1797921
Sent: Aug 3, 2012 9:39 PM

Just received an update that the offender Adams official diagnosis is heat stroke, hyperthermia and possible heart attack.
The offender is on a ventilator to assist in breathing. Chaplain taylor is contacting the next of kin.

**Fw: Adams, Rodney #1797921**
Lannette Linthicum  to: Phyllis McWhorter, RN                          08/06/2012 09:15 AM

From:        Lannette Linthicum/Health_Services/TDCJ
To:          "Phyllis McWhorter, RN" <phyllis.mcwhorter@tdcj.state.tx.us>
Mail #:

FYI
------Original Message------
From: Karen Hall
To: Jeff Baldwin
To: Dr. Lannette Catherine Linthicum, MD, CCHP-A. FACP
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 7:00 PM


------Original Message------
From: William Stephens
To: R C Thaler
To: Oscar Mendoza
To: Thomas Prasifka
To: Karen Hall
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 7:00 PM

Fyi.  I will have them do a "Regional Review" on this death since it appears that heat was a factor.
------Original Message------
From: Jay Eason
To: Bill Stephens
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 6:20 PM

Boss,

Doctors at ETMC, Tyler, removed Offender Adams from the ventilator. They pronounced him deceased at
1750.

Please see the below message from Warden Goings.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 18:10

The offender was taken off the ventilator at 541 pm. Offender passed 550 pm, declared deceased by Dr.
Jones of East Tyler Medical Center. Contacting EAC, OIG, OMT and Justice of the Peace. Also notifying
family to insure they are aware if the hospital have not done so as of yet.
------Original Message------
From: Robert Eason
To: Reginald Goings
Cc: William Stephens
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 5:12 PM

Ok, thanks for the update.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 17:10

Officers at the hospital just called the doctors started removing the iVs at 458 pm. The offender is still on the ventilator. Not sure of the rationale behind removing the IVs at this time.
------Original Message------
From: Robert Eason
To: Reginald Goings
Cc: William Stephens
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 10:43 AM

Okay. Please keep me posted.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 10:40

The doctor for Adams has called the family in.
------Original Message------
From: Robert Eason
To: Reginald Goings
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 8:58 AM

Also, please ensure we're providing paper drinking cups especially to newly received offenders who don't have a drinking cup.

RJE
------Original Message------
From: Reginald Goings
To: Robert Eason
Subject: Re: Adams, Rodney #1797921
Sent: Aug 4, 2012 08:11

Yes sir.
------Original Message------
From: Robert Eason
To: Reginald Goings
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 8:11 AM

Sorry! I had the wrong PIN #. Lol. Please see the below message.

Thanks,

RJE
------Original Message------
To: Dennis Miller
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 4, 2012 07:52

Reggie,

Please send me an update on Offender Ramirez's condition at ETMC, Tyler and Offender Adam's condition as well.

Also, please put some staff together today to check on the following heat precaution issues:

•check all fans to ensure they're operational

•check all exhaust fans to ensure they're operational

•ice water available at all times in each housing area

•intake air flow is operating properly in each housing area

•a heat restriction list is on each housing area and the officers are documenting their 30min. checks for each offender on the list

•hot water is turned off in the showers

•heat awareness training is part of the intake process

•offenders are allowed to wear shorts and t-shirts/tank-tops in their housing areas

•signs posted in the housing areas about drinking plenty of water to stay hydrated

•AC is operational in separation

•AC is operational in the back of our transport vans

Please ensure we're in compliance in all these areas. Let me know by this afternoon if we're not.

Thanks,

RJE

------Original Message------
From: Kelvin Scott
To: Bill Stephens
To: Robert Eason
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 3, 2012 21:40


------Original Message------
From: 328B0894
To: Kelvin Scott
Subject: Adams, Rodney #1797921
Sent: Aug 3, 2012 9:39 PM

Just received an update that the offender Adams official diagnosis is heat stroke, hyperthermia and possible heart attack.
The offender is on a ventilator to assist in breathing. Chaplain taylor is contacting the next of kin.

**Fw: Adams, Rodney #1797921 update**
Lannette Linthicum  to: Phyllis McWhorter, RN                                    08/06/2012 09:14 AM

From:     Lannette Linthicum/Health_Services/TDCJ
To:       "Phyllis McWhorter, RN" <phyllis.mcwhorter@tdcj.state.tx.us>
Mail #:

FYI
------Original Message------
From: Karen Hall
To: Jeff Baldwin
To: Dr. Lannette Catherine Linthicum, MD, CCHP-A. FACP
Subject: Fw: Adams, Rodney #1797921 update
Sent: Aug 4, 2012 8:50 AM


------Original Message------
From: William Stephens
To: R C Thaler
To: Oscar Mendoza
To: Thomas Prasifka
To: Karen Hall
Subject: Fw: Adams, Rodney #1797921 update
Sent: Aug 4, 2012 8:48 AM

According to the report this morning, the medical staff do not expect Adams to live much longer
------Original Message------
From: Kelvin Scott
To: Bill Stephens
To: Jay Eason
Subject: Fw: Adams, Rodney #1797921
Sent: Aug 3, 2012 9:40 PM


------Original Message------
From: 328B0894
To: Kelvin Scott
Subject: Adams, Rodney #1797921
Sent: Aug 3, 2012 9:39 PM

Just received an update that the offender Adams official diagnosis is heat stroke, hyperthermia and
possible heart attack.
The offender is on a ventilator to assist in breathing. Chaplain taylor is contacting the next of kin.

# Exhibit 18

CAUSE NO. 0322058

| | | |
|---|---|---|
| NORMAN FINE, AS NEXT FRIEND OF | § | IN THE DISTRICT COURT OF |
| CHARLES E. FINKE, JR. | § | |
| | § | |
| VS. | § | WALKER COUNTY, TEXAS |
| | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE AND ANNIE LINCOLN, M.D. | § | 12TH  JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES NORMAN FINE, As Next Friend of CHARLES E. FINKE, III, a Minor, Plaintiff in the above-referenced cause of action and files this his First Amended Original Petition complaining of the TEXAS DEPARTMENT OF CRIMINAL JUSTICE and ANNIE LINCOLN, M.D., Defendants, and for cause of action would respectfully show the Court as follows:

I.

This case is determined to be conducted under Level 3 of the Texas Rules of Civil Procedure.

DISCOVERY: Pursuant to Rule 190.4 of the Texas Rules of Civil Procedure and, pursuant to 194, Defendants are requested to disclose, within 50 days of service of this request, the information or material described in Rule 194.2 (a) - (k).  A Motion for Discovery Plan will be submitted to the Court shortly after all Defendants make their appearance.

II.

PARTIES, VENUE AND JURISDICTION

2a.     Plaintiff Norman Fine is an individual residing in California and Charles E. Finke,


155

III is a minor child residing in Llano County, Texas.

2b.      Defendant, TEXAS DEPARTMENT OF CRIMINAL JUSTICE (hereinafter "TDCJ") a state penal institution and has already appeared and answered herein.

2c.      Defendant, ANNIE LINCOLN, M.D., is a medical doctor doing business and practicing medicine in Lubbock County, Texas.  Dr. Lincoln has already appeared and answered herein.

2d.      Venue is proper in Walker County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE §15.002, because all or a substantial part of the cause of action alleged to herein, occurred in Walker County, Texas.

2e.      Plaintiff brings this suit under Defendants' common or assumed names under Rule 28 of the Texas Rules of Civil Procedure.  Plaintiff reserves the right to substitute the true names of Defendants at a later time.

III.

FACTS

3a.      On or about May 25, 1999, Charles E. Finke, Jr. was transferred to the Monford Unit in Lubbock, Texas for psychiatric evaluation and monitoring.  Charles E. Finke, Jr. was taking Thorazine, Cogentin, Valproic Acid, Doxepin, Hydroxyzine, Benadryl and Maalox while under the care and treatment of Dr. Lincoln.  Cogentin is an "anticholinergic" medication, used to control spasms.  Cogentin's use is contraindicated with Thorazine or a tricyclic antidepressant, such as Doxepin or Norpramine, or antihistamine such as Benadryl or Vistaril.  Cogentin reduces the body's ability to  sweat, where Thorazine causes extremely high body temperatures.  The combination of Cogentin and Thorazine is known to cause heat stroke and/or death from hyperthermia.

3b.     On or about August 2, 1999, Charles E. Finke, Jr. was discharged by Dr. Lincoln and transferred to the Huntsville Unit for holding until he was to be paroled on or about August 9, 1999. On August 8, 1999, Charles E. Finke, Jr. was placed in an unairconditioned holding cell in preparation for his release.  Charles E. Finke, Jr. was found dead in his cell at approximately 12:20 p.m., with an axillary temperature of 106° F after being packed ice.  Defendant TDJC knew or should have known that Plaintiff's decedent should not be exposed to temperature extremes.

IV.

LIABILITY OF TEXAS DEPARTMENT OF CRIMINAL JUSTICE

4a.     Defendant TDCJ is liable to Plaintiff because of the theories of ostensible agency, respondeat superior and vicarious liability.  The acts of negligence of Dr. Lincoln and the jailers are hereby incorporated herein as acts of negligence of TDCJ.

4b.     Further and in the alternative, Plaintiff brings this claim pursuant to § 101.021 of the TEX. CIV. PRAC. & REM. CODE (TEXAS TORTS CLAIMS ACT).

4c.     Defendant TDCJ and its employees, agents and representatives' and Dr. Lincoln's individual acts of negligence were a proximate cause of the injury and damages which Plaintiff suffered.  Further, individual Defendants were negligent, said negligence being the proximate cause of Plaintiff's damages as herein alleged.   The negligent conduct includes, but is not limited to, the following specific acts:

1.     Prescribing combinations of contraindicated medications;

2.     Failing to closely monitor the contraindicated medication;

3.     Failing to place Mr. Finke in an air conditioned holding cell while waiting to be released from the facility;

4.      Failing to monitor the temperature of the holding cell in which Mr. Finke was placed; and

5.      Confining Plaintiff's decedent in a holding cell with a temperature extreme of 91°.

4d.     Plaintiff would further show that negligence of Defendant TDCJ's representatives, agents, servants and employees in the condition and/or use of the Unit's tangible personal property proximately caused the damages to Plaintiff as alleged herein.  The condition of the property was temperature extremes of 93° and the use was the confinement of Mr. Finke to that temperature extreme in light of the medication was being administered.

4e.     At all times material to this case, all representatives, agents, servants and employees of TDCJ who were in any way connected with the events made the subject of this lawsuit, were acting within the course and scope of their employment or official duties and in furtherance of the duties of their offices or employment with TDCJ.

4f.     Plaintiff would further show that Defendant TDCJ has waived its immunity pursuant to § 101.021(2) Tex. Civ. Prac. & Rem. Code.

4g.     Plaintiff reserves the right to amend these allegations upon the completion of discovery to conform to the evidence.

## V.

5a.     Plaintiff brings this cause of action for wrongful death pursuant to § 71.002 of Tex. Civ. Prac. & Rem. Code on behalf of the minor, Charles E. Finke, III, who is the natural child of Charles E. Finke, Jr.

5b.     As a result of Defendants' negligence, Plaintiff Charles E. Finke, III has suffered pecuniary loss, loss of companionship and society and has sustained mental anguish and

bereavement, and loss of inheritance.

VI.

Plaintiff would show that Charles E. Finke, Jr. was a white male, 38 years old with a life expectancy of 37.4 years according to the 1989 Life Tables issued by the Untied States Department of Health and Human Services attached as Exhibit "1" to Plaintiff's Original Petition and incorporated herein by reference.

VII.

Plaintiff would show unto the Court only that they are in compliance with the notice provisions of § 101.101(c) of the Texas Civil Practices and Remedies Code in that TDCJ had actual notice and a subjective awareness that its fault produced or contributed to the death of Charles E. Finke, Jr. which occurred in their Huntsville facility.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that Defendants be cited to appear and answer and that upon final hearing, Plaintiff recover judgment against the Defendants jointly and severally, for his damages as they may appear at trial hereof, prejudgment and post-judgment interest, costs of court, and such other relief to which Plaintiff may be justly entitled.

Respectfully submitted,

**THE LAW OFFICE OF
W. BRICE COTTONGAME & ASSOC., P.C.**

**W. BRICE COTTONGAME**
State Bar No. 04872500
**RENEE C. SUMMERS**
State Bar No. 24009971
1701 River Run, Suite 503
Fort Worth, Texas 76107
(817) 877-4900 - Telephone
(817) 877-0334 - Telecopier

# Exhibit 19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| Stephanie McCollum, *et al.*, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-02037 |
| | § | |
| Brad Livingston, *et al.*, | § | |
| Defendants. | § | **JURY DEMAND** |

## DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE'S RESPONSES TO PLAINTIFF SANDRA McCOLLUM'S FIRST SET OF REQUESTS FOR PRODUCTION AND INTERROGATORIES

**TO:**   Jeff Edwards, The Edward Law Firm, The Bremond Houston House, 706 Guadalupe, Austin, Texas 78701; Scott Medlock, Brian McGiverin, James C. Harrington, Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741; and Eliot Shavin, 2600 State Street, Dallas, Texas 75204

COMES NOW the Defendant, Texas Department of Criminal Justice, by and through counsel, the Texas Attorney General's Office, and offers the following **Defendant Texas Department of Criminal Justice's Responses to Plaintiff Sandra McCollum's First Set of Requests for Production and Interrogatories**.

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**DAVID C. MATTAX**
Deputy Attorney General for Defense Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

**BRUCE R. GARCIA**
Assistant Attorney General
Attorney in Charge
State Bar No. 07631060
So. Dist. Bar No. 18934

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / Fax (512) 495-9139

### ATTORNEYS FOR DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE, BRAD LIVINGSTON AND JEFF PRINGLE

### CERTIFICATE OF SERVICE

I, **BRUCE R. GARCIA,** Assistant Attorney General of Texas, do hereby certify that a true

and correct copy of the above and foregoing **Defendant Texas Department of Criminal Justice's**

**Responses to Plaintiff Sandra McCollum's First Set of Requests for Production and**

**Interrogatories** has been served by placing same in the United States Mail, postage prepaid, on

March 25, 2013 addressed to:

Jeff Edwards
The Edwards Law Firm
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701

Scott Medlock
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741

Eliot Shavin
2600 State Street
Dallas, Texas 75204

**BRUCE R. GARCIA**
Assistant Attorney General

## INTERROGATORIES

1.      For the TDCJ prisons where inmate housing areas are presently air conditioned, please provide the annual cost of air conditioning these facilities.

**RESPONSE: Objection, vague as the term "air conditioned" is not defined. Subject to and without waiving, air-conditioning is not listed as a separate item on any invoices paid by the TDCJ, as such, unknown.**

2.      For any TDCJ prison facility where air conditioning was installed in the past 10 years, please state the name of the facility, the date air conditioning was installed in the inmate housing areas, and provide a detailed description of any costs associated with installing air conditioning at those facilities.

**RESPONSE: Objection, the term "air conditioning" is not defined. Subject to and without waiving, air conditioning has not been installed at any TDCJ prison facility in the past 10 years. Moreover, no TDCJ Prison facilities were constructed in the last ten years.**

3.      Identify all inmates who died while in the custody of the Hutchins Unit between January 1, 2006 to the present. A response to this interrogatory should include the inmate's name, date of birth, date of death, offense, sentence length, and cause of death. (This interrogatory calls for information about prisoners assigned to the Hutchins Unit, whether or not the prisoner died within the Hutchins Unit facility or in a medical facility after transfer from the Hutchins Unit.)

**RESPONSE: Objection, overbroad and undue burden. Object to the relevance of offense and sentence length. Object to the scope of time. Notwithstanding these objections, see autopsies produced in accordance with Plaintiff Stephen McCollum's Second Request for Production, Number 1. Also attached is response to Interrogatory No. 3.**

4.      Identify all people who authored, developed, consulted on, conferred about or otherwise contributed to drafting Administrative Directive AD-10.64 (rev. 5) (Sept. 19, 2006): Temperature Extremes in the TDCJ Workplace (Bates Nos. TDCJ – RFP #3 – 6-13). For each person identified, describe in detail their role in contributing to the document.

**RESPONSE: Objection, overly broad in scope and time.**

**The proponent of Revision 5 of Administrative Directive 10.64 was Debbie Liles, formerly of the Administrative Review and Risk Management Division.**

**It was sent to all division heads in accordance with Executive Directive 01.21 (rev. 5) March 7, 2003. The policy was reviewed between December 19, 2005 and January 27, 2006, by Doug Dretke, Bryan Collier, Bonita White, Cynthia Milne, Jeff Baldwin, Madeline Ortiz, Celeste Byrne, Raymond Pyeatt, Carol Blair Johnston, Dr. Lanette Linthicum, Frank Inmon, Mike**

–3–

**Viesca, John Benestante, Kim Vernon, Judi Benestante, Allen Sapp, Raven Kazen, Dimitria Pope, Debbie Liles, Dee Wilson, John Moriarity, and Robert Bray. After review and resolution of any concerns from division heads who were in place at the time of review, the Administrative Directive was sent by David Standlee, through Debbie Liles and Jeff Baldwin, to Deputy Director Ed Owens for signature. Deputy Director Ed Owens signed the policy on September 19, 2006.**

5.      Identify all people who authored, developed, consulted on, conferred about or otherwise contributed to drafting Correctional Managed Health Care Policy Manual B-15.2 (Revised 11/07). For each person identified, describe in detail their role in contributing to the document.

**RESPONSE:** The Correctional Managed Health Care Committee (CMHCC) and its partner agencies - The Texas Department of Criminal Justice (TDCJ), the University of Texas Medical Branch (UTMB,) and the Texas Tech University Health Sciences Center (TTUHSC) collaborate through joint medical review committees and promulgate policies and procedures for the TDCJ health care delivery systems. In 2007 the Joint Policy and Procedure Committee **revised** Policy B-15.2 "Heat Stress". Attachment A contains the minutes of the October 11, 2007 Policy and Procedure Committee Meeting. The committee members who participated in the policy revision are listed in attachment A as well. After the Policy and Procedure Committee met, the committee's recommendations were forwarded to the UTMB, TTUHSC and TDCJ medical directors for approval. The approval signature sheet for the UTMB medical director is attachment B. The approval signature sheet for the TTUHSC medical director is attachment C. The approval signature sheet for the TDCJ medical director is attachment D. Notification of Policy B-15.2 "Heat Stress" changes was distributed to all TDCJ units in December 2007 (see attachment E). The revised Policy B-15.2 "Heat Stress" that was effective in November 2007, is at attachment F.

**Correctional Managed Health Care Policy Manual B-15.2 was developed by the Infection Control Committee in 2007. The Infection Control Committee was and is made up of University of Texas Medical Branch and TDCJ personnel. The TDCJ personnel on the Committee in 2007 were: Michael Kelley, M.D. (Chair); Myra Walker, R.N.; Chris Carter; and John Dunphy.**

6.      Describe in detail the process for making capital improvements at prisons (including installation of air conditioning). A response to this interrogatory requires a detailed description of how capital improvements are approved, including whose approval is required before capital improvements are made.

For purposes of this interrogatory, "capital improvements" includes any new construction, and any additions to existing structures beyond normal maintenance and repair.

–4–

**RESPONSE: Objection, overly broad in scope. For purposes of renovating the Hutchins State Jail to provide air-conditioning to all areas, see attached Executive Directive 10.06 (rev. 4), February 27, 2004, entitled, "Construction, Maintenance, Renovation, or Alteration of TDCJ Facilities".**

**As the cost of renovating the Hutchins State Jail to provide air-conditioning to all areas would most likely exceed $1,000,000, the project would require Texas Board of Criminal Justice approval.**

7.      Please identify all "cooler areas" prisoners were allowed to "sit in" at the Hutchins Unit during July 2011 ("cooler areas" and "sit in" are used as identified in Pringle Interrogatory Response 1).

**RESPONSE: The multi-purpose rooms and barbershops in buildings A, B, C, D, E, and F, the offender holding cell in the G-Building, Medical (offender waiting area), Intake Processing/Receiving and offender holding cells of the K-Building, and the Chapel.**

8.      For any TDCJ prison facility identified in the Response to Plaintiff Sandra McCollum's Interrogatory No. 2, please identify every person employed by TDCJ who authorized or approved installation of air conditioning.

**RESPONSE: Not applicable.**

## REQUESTS FOR PRODUCTION

1.      All documents showing any opportunities prisoners were given to "sit in cooler areas" at the Hutchins Unit during July 2011 ("cooler areas" and "sit in" defined as used in Pringle's Response to Stephen McCollum's Interrogatory No. 1).

**RESPONSE: There are no documents responsive to this request. The instructions were oral from Warden Pringle to security staff.**

2.      Produce any property of Larry Gene McCollum in TDCJ's possession or control.

**RESPONSE: All property of Larry Gene McCollum in TDCJ's possession or control was returned to Ms. Sandra McCollum on August 9, 2011.**

–5–

3.      Please produce all tracking logs from C building at Hutchins Unit from July 15, 2011 to July 22, 2011.

**RESPONSE: See Previous TDCJ Response to Stephen McCollum Request for Production No. 3.**

4.      Produce all policies related to intake and receiving of prisoners at Hutchins Unit that were in effect in July 2011.

**RESPONSE:  See Intake Procedure Manual attached.**

5.      Produce any documents distributed or provided to prisoners notifying inmates about ability to go to cooler areas from May 1, 2011 to September 1, 2011 at the Hutchins Unit.

**RESPONSE: See Response to Request for Production 1.**

6.      Produce all Correctional Managed Health Care policies related to heat, heat stress, or temperature extremes in effect from January 1, 2007 to the present.

**RESPONSE: See attached, Correctional Health Care Policy Manual D-27.2, including attachments A-C (effective October 15, 2012),**

**Correctional Managed Health Care Policy Manual B-15.2 (Revised 11/07) (replaced by D-27.2).**

7.      Produce any documents showing any lockdowns or other security-related events from July 15, 2011 to July 22, 2011 at the Hutchins Unit that would have interrupted normal prison activities.

**RESPONSE: See attached EAC #I-10440-07-11, Natural Attended Death, TDCJ # 1698391, on July 25, 2011.**

8.      Produce all logs from the C building at the Hutchins Unit from July 15, 2011 to July 22, 2011 showing which TDCJ employees entered the building.

**RESPONSE: See Response to Request for Production No. 3.**

9.      Produce any documents informing prisoners about accommodations available during periods of high temperature from May 1, 2011 to July 22, 2011 at the Hutchins Unit.

**RESPONSE:  See documents produced pursuant to Plaintiff Stephen McCollum's First Request for Production, Number 4.**

–6–

10.     Produce any documents showing what the multi-purpose rooms in C building at the Hutchins Unit were being used for in July 2011.

**RESPONSE: Documents have been ordered and will be supplemented if in Defendant's possession.**

–7–