## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

_____
§
IN RE TEXAS PRISON HEAT        §        MDL Docket No._____
LITIGATION                     §
_____§

## EXHIBIT 8 TO MOTION OF DEFENDANTS FOR TRANSFER
## OF ACTIONS TO THE SOUTHERN DISTRICT OF TEXAS PURSUANT
## TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED
## PRETRIAL PROCEEDINGS

## *WEBB* COMPLAINT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| KEVIN WEBB, individually and as the representative of the Estate of Robert Allen Webb, and EDNA WEBB, CHRISTAN CARSON, and CASEY AKINS, individually and as heirs at law | § § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § | CIVIL ACTION NO. 6:13cv711 |
| BRAD LIVINGSTON, RICK THALER, WILLIAM STEPHENS, OWEN MURRAY, ROBERT EASON and TOMMIE HAYNES, in their individual capacities, the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and the UNIVERSITY OF TEXAS MEDICAL BRANCH. | § § § § § § § § § | |
| DEFENDANTS | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Robert Allen Webb died of heat stroke in Texas Department of Criminal Justice custody because Defendants, Texas corrections officials, fail to protect prisoners from brutally hot temperatures inside the TDCJ Hodge Unit. Webb's survivors file this second amended complaint pursuant to the Court's scheduling order seeking redress for their father and son who perished at the Hodge Unit.

### STATEMENT OF CLAIMS

1. Prisoners are dying of heat stroke while in Defendants' custody at prisons across Texas.

2. The survivors of one of these men, Robert Allen Webb, bring claims as heirs-at-law and as statutory wrongful death beneficiaries.

1

3.      Plaintiffs claim the individual defendants are liable under 42 U.S.C. § 1983 for violating Webb's constitutional rights under color of law, in violation of his Eighth and Fourteenth Amendment right to protection from cruel and unusual punishment.

4.      Plaintiffs further claim TDCJ and the University of Texas Medical Branch caused Webb's death by failing to provide reasonable accommodations for his disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and § 1343 (civil rights).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as the events complained of occurred in this division and district.

## PARTIES

7.      Plaintiff Kevin Webb, Mr. Webb's natural son, sues in his individual capacity as a statutory beneficiary under the Texas Wrongful Death Act and as representative of Mr. Webb's estate. At the time of his death, Mr. Webb had three adult children (and no minor children).  He died intestate, and there were no probate proceedings arising from his death, as none were necessary.  Kevin Webb is a resident of Smith County, Texas.

8.      Casey Akins is a surviving daughter of Mr. Webb, and sues in her individual capacity as statutory beneficiary of the Texas Wrongful Death Act and as heir-at-law of the Estate of Robert Allen Webb. Ms. Akins resides in Polk County, Texas.

9.      Christan Carson is a surviving daughter of Mr. Webb, and sues in her individual capacity. She is a resident of Madison County, Texas.

2

10. Edna Webb is the mother of Mr. Webb, and sues in her individual capacity as a statutory beneficiary of the Texas Wrongful Death Act. She is a resident of Harris County, Texas.

11. Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ). As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for nominal, punitive, and compensatory damages. Livingston has been served and appeared in this litigation.

12. Defendant Tommie Haynes was the warden at the Hodge Unit at all relevant times. At all relevant times, Haynes was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for nominal, punitive, declaratory, and compensatory relief. Haynes has been served and appeared in this litigation.

13. Defendant Rick Thaler is the director of TDCJ's Correctional Institutions Division. The Correctional Institutions Division manages all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, Texas, in

3

Walker County. Thaler has been served and appeared in this litigation.

14.  Defendant William Stephens is the deputy director of TDCJ's Correctional Institutions Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Stephens is a resident of Huntsville, Texas, in Walker County. Stephens has been served and appeared in this litigation.

15.  Defendant Robert Eason was the regional director for TDCJ's "Region II," and supervises eleven prisons, including the Hodge Unit. As the regional director, he is responsible for the supervision of all personnel at the Hodge Unit. Eason was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Eason is a resident of Anderson County, Texas. Eason has been served and appeared in this litigation.

16.  Dr. Owen Murray is the chief physician executive for UTMB's correctional managed care program and oversees the medical, mental health and dental services provided to prisoners within more than 100 units in the Texas Department of Criminal Justice served by UTMB, including the Hodge Unit. Dr. Murray oversees program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business development, continuing medical education, and staff recruitment and development. He is responsible for formulating policies and procedures related to inmate healthcare for UTMB.

4

He is sued in his individual capacity for punitive and compensatory damages. Murray has been served and appeared in this litigation.

17.   The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Hodge Transfer Facility, a public facility with programs and services the deceased and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, compensatory, and nominal relief. TDCJ has been served and appeared in this litigation.

18.   The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB's high-ranking policymakers reside and work in Galveston. Through UTMB's Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the Hodge Unit, and the other prisons where inmates died of heat stroke. UTMB is a recipient of federal funds. UTMB is sued for compensatory relief. UTMB has been served and appeared in this litigation.

## FACTS

**Extreme Temperatures are Killing Texas Prisoners**

19.   According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Robert Allen Webb, died at TDCJ's brutally hot Hodge Unit.

20.   Like most other TDCJ prisons, the Hodge Unit's inmate living areas are not air conditioned, and the heat index or apparent indoor temperatures (see chart below) routinely exceeds 100 degrees.

21.     Livingston, Thaler, Stephens, Eason, Haynes and Murray each knew the entire state, including the Rusk area where the Hodge Unit is located, was experiencing a severe heat wave during the entire summer of 2011.

22.     These temperatures lasted late into the night, providing no relief to prisoners. Even early in the morning, indoor apparent temperatures were sweltering.

23.     As each of the individual Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2011, temperatures this high cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

24.     In fact, TDCJ and UTMB incorporate this chart, promulgated by the National Oceanic and Atmospheric Administration (NOAA), into agency policies well before 2011.

### Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

Caution    Extreme Caution    Danger    Extreme Danger

6

25.   The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

26.   The chart shows the increasing dangers of exposure to extreme apparent temperatures for *healthy* people – from "caution" to "extreme caution" up to "danger" and finally "extreme danger" where heat stroke becomes "imminent."

27.   For people with heat-sensitive disabilities, like Webb, the danger is far greater.

28.   The apparent temperatures routinely reach the red "extreme danger" zones indoors at the Hodge Unit.

29.   Yet the Defendants have done nothing to cool the indoor temperatures to protect inmates from death by heat stroke.

30.   Though the Defendants know the danger escalates as apparent temperatures increase, they do not do anything differently at the "extreme danger" level than at the "caution" level.

31.   In fact, TDCJ's regional director Robert Eason has stated under oath that "imminent" means the same thing as "possible" despite the chart's clear meaning.

32.   Upon information and belief, Director Eason's supervisors, including Defendants Livingston, Stephens, and Thaler, have not corrected this dangerous belief despite knowing the difference between the words "imminent" and "possible" and the real increased danger escalating apparent temperatures pose.

33.   It was well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions, like depression or mental illnesses, or who take certain medications, like psychotropics, are much more vulnerable to extreme temperatures. As the chart shows, while these extreme temperatures are punishing and cruel for all prisoners to live with,

this heat is especially deadly for people with these medical conditions and disabilities. Prisoners'
with heat-sensitive disabilities have medical conditions that prevent their bodies from regulating
their temperature, putting them at much greater risk of death.

34.     Since 1998, at least nineteen men have died in TDCJ prisons from hyperthermia –
or heat stroke.

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|--------|---------------|------------|-------------|-------|
| Archie White | 48 | Unk | June 30, 1998 | 104 | Unk | Prescribed tricyclic antidepressants |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications and diuretics |
| John Cardwell | Unk | Unk | Aug. 4, 2001 | Unk | Unk | Unknown |
| Ricky Robertson | Unk | Unk | July 16, 2004 | Unk | Unk | Unknown |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

35.     In fact, it is likely that there were more heat related injuries and deaths as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists. And heat contributes to deaths where pathologists are trained to list another official "cause" on the autopsy – such as a heart attack brought on by extreme temperatures. Indeed, TDCJ, UTMB, Livingston, Thaler, Stephens, Eason, and Murray know heat was a contributing cause in many additional prisoners' deaths in TDCJ prisons.

36.     These nineteen men all shared certain characteristics. They all suffered underlying medical conditions the Defendants knew put them at much greater risk of heat stroke, including taking psychotropic drugs to treat some form of mental illness, suffering from diabetes or hypertension, or taking diuretics to treat hypertension. TDCJ and UTMB policies identify these conditions as putting patients at risk of heat stroke.

37.     All nineteen men died in late July and August – the hottest days of the Texas summer, when all Texas residents know the heat is intense.

38.     And, of course, these are just the men who *died* of heat stroke. Many other prisoners in TDCJ custody are sent to the infirmaries with heat-related medical conditions each summer. Some are even transported to community emergency rooms, at great expense, to save their lives from these dangerous conditions.

**TDCJ Officials Did Not Care Prisoners Were Dying of Heat Stroke**

39.     Judge William Wayne Justice observed in 1999 in a published opinion that TDCJ prisoners were dying of heat-related injuries. *Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

40.     Despite Judge Justice's early warning, TDCJ made no changes to protect prisoners from extreme temperatures.

41.     At least eight of the nineteen men who died, including Webb, lived in prisons in TDCJ's "Region II" – where Defendant Eason is the regional director. As the regional director, Eason reviews reports on each prisoner's death.

42.     Even though ten men died of heat stroke in 2011 – and eight of them died in his "region" – Eason did not consider these deaths a serious problem. In fact, in the face of these deaths, he stated TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, he and Defendant Haynes took no action to protect future prisoners, like Webb, in the face of TDCJ's obviously inadequate procedures.

43.     Eason's direct supervisors, Defendants Livingston, Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke were regularly discussed at meetings Thaler and Stephens held with their deputies, including Eason. Even though the existing policies were obviously inadequate, Livingston, Thaler, Stephens and Eason continued to follow the same deadly course of conduct. Air conditioning the Hodge Unit or other prisons was never even discussed. Nor was moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons discussed or implemented.

44.     Nor did Executive Director Livingston take steps to cool the non air-conditioned prisons – even though prisoners continued to die from extreme temperatures over several years, and deaths from heat stroke were happening at an alarming rate in July and August 2011.  In fact, even today – after 19 deaths– Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

45.     Though Livingston, Thaler, Stephens, Eason, and Haynes each knew the vast majority of prisoner housing areas in the prisons in Region II, including the Hodge Unit, were not air conditioned or otherwise climate controlled, and that indoor temperatures routinely went over 90 degrees, the actions they took were obviously inadequate.

46.     For example, TDCJ directives told wardens to ensure one ten-gallon jug of ice water was provided to each cellblock every eight hours. Because the average cellblock houses over 50 men, any reasonable corrections official would know this pitiful amount of water was completely inadequate for prisoners to drink enough to protect them from the heat. In fact, the water would frequently be consumed within minutes.

47.     Livingston, Thaler, Stephens, Eason, and Haynes approved and implemented these procedures though no reasonable person would believe just providing additional water would protect people with heat-sensitive medical conditions from apparent temperatures over 100 degrees.

48.     Other measures TDCJ implemented were also obviously inadequate at the extremely high apparent temperatures inside the Hodge Unit. No reasonable corrections official would believe allowing prisoners to take additional showers and wear less clothing would protect people with heat-sensitive disabilities from apparent temperatures over 100.

49.     While Livingston, Thaler, Stephens, Eason, and Haynes knew that the risk of fatal heat stroke increased as apparent temperatures went above the "caution" zone to the "danger" and "extreme danger" zones, they had no policy to provide additional protections as the apparent temperatures increased. The small amount of cold water, for example, was provided when temperatures reached the "caution" zone, but no additional water or any other protective measures (adequate or not) were implemented as the apparent temperatures went up.

50.     In fact, TDCJ has no formal policy to protect prisoners from extreme temperatures in the housing areas. TDCJ's formal policies only address protecting prisoners from heat outdoors during forced labor. Livingston, Thaler, Stephens, Eason, and Haynes know that the sickest prisoners are prohibited from working, and, instead, spend virtually all their time in

non-air conditioned housing areas. But there is no policy to address safe housing, or steps to protect inmates who are not assigned to forced labor.

51.    Warden Haynes, the man directly responsible for the safety of the men imprisoned in the Hodge Unit, did nothing beyond TDCJ's obviously inadequate measures to protect the men in his care from extreme heat.

52.    TDCJ trains its employees that during hot months they should "spend more time in air conditioned places.  Air conditioning in homes and other buildings markedly reduces danger from the heat.  If you cannot afford an air conditioner, spending some time each day during hot weather in an air-conditioned environment affords some protection." Employees are advised to "stay in an air conditioned area if possible," and are only allowed to work outside for two hours at a time.

53.    But despite acknowledging in its training materials that air conditioning is the simplest way to protect people from extreme temperatures, TDCJ, Livingston, Thaler, Stephens, Eason, and Haynes did nothing in the summer of 2011 to allow prisoners to spend even a short amount of time in the parts of the Hodge Unit that were air conditioned. For example, prisoners with heat-sensitive disabilities could have easily been given an opportunity to spend a few hours in the air-conditioned visitation rooms on the hottest days of the year.

54.    For TDCJ to make a necessary capital improvement like air conditioning the prisons, or installing any climate control measures, action by the most senior TDCJ officials, including Defendant Livingston, would be needed. Despite prisoners continuing to die from extreme temperatures, Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

55.    These hazardous conditions serve no penological purpose. In fact, county jails in Texas are required by law to keep indoor temperatures between 65 and 85 degrees. *See* 37 Tex.

Admin. Code § 259.160.  It is only when inmates are sent to TDCJ prisons that they are exposed to extremely hot indoor temperatures.

56.     Some TDCJ cells, including solitary confinement cells at virtually all 110 TDCJ prisons, are air conditioned. But decisions to house prisoners in these air conditioned cells are made for security reasons based on inmates' disciplinary records, not based on their medical needs. At the Hodge Unit, there is no air conditioned housing available for prisoners without behavior problems, like Webb, who were not assigned to solitary confinement.

57.     Though TDCJ has a $3 billion annual budget, and has told the press air conditioning every cell in the system would cost only $55 million (though it cannot produce any documentation to prove up this estimate, and the cost could be far lower), Livingston consciously has decided not to even ask for this appropriation and continues to insist that TDCJ takes adequate steps to protect prisoners.

58.     And despite the alarming number of completely preventable deaths, Eason said publicly he considers adding any air conditioning to TDCJ's prisons a waste of money.

59.     TDCJ officials, including Livingston, Thaler, Stephens, Eason, and Haynes, are not only endangering the inmates, but also their own employees who are required to work in the same blistering conditions. Each summer, correctional officers routinely fall ill at prisons around the state due to heat-related causes. Every day, officers sweat through their heavy uniforms while supervising prisoners.

60.     In fact, in a rare development, the correctional officer's union has found common cause with the prisoners, and publicly supported the extreme temperatures lawsuits brought against TDCJ.

61.     But while they ignore the hazards to prisoners and correctional officers, TDCJ officials, including Livingston, have approved installing climate controlled hog barns to protect

14

the welfare of TDCJ's agricultural products. Livingston approved purchasing "climate controlled swine barns" – at a cost of $750,000 – even *after* he knew ten human beings had died in 2011, and two more had died in 2012. Livingston's deputy even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke. But Livingston has made no attempts to provide the human beings he is responsible for the same protection afforded the pigs raised for slaughter.

62.    TDCJ policies Livingston approved for implementation require the pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees. Temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit."

63.    The pig barns use devices such as misters, foggers, and portable air conditioners to cool the pigs on the hottest days. Though such devices are inexpensive[1] and simple to install, no one at TDCJ has ever considered using them in the extremely hot prison housing areas.

64.    Upon information and belief, the inmate housing areas at the Hodge Unit could be "climate controlled" at a similar – or lower – cost than the climate controlled pig barns.

65.    TDCJ even air conditions the prison armories because of concerns the heat could damage the prisons' weapons.

---

[1] A portable air conditioner, for example, costs less than $300 and only requires an electrical outlet to operate.

**UTMB Executives, Including Murray, Did Not Care Prisoners Were Dying of Heat Stroke**

66.   UTMB executives, including Dr. Murray, were similarly unconcerned. No changes were ever made to UTMB's policies and procedures, even as patients under its care died from hyperthermia. Though Dr. Murray routinely reviews prisoners' deaths, and knew many prisoners had died from heat stroke, he took no action to change UTMB's policies or procedures to prevent future deaths.

67.   Despite being responsible for ensuring prisoners medical needs are attended to, Dr. Murray, on behalf of UTMB, has been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat.  In fact, Dr. Murray knows that extreme heat above 90 degrees indoors is harmful medically and lethal to prisoners suffering from depression and mental illness, and who are over forty years of age, like Webb. Dr. Murray, as the chief physician for UTMB concerning correctional care, knows that prisoners with such conditions, like Webb, are endangered if placed into brutally hot conditions.

68.   Likewise, Dr. Murray has long known TDCJ does not air condition most inmate living areas and has even given press tours in which he described cells as blazing hot in summer. Moreover, as part of his duties as head of correctional care for UTMB, Dr. Murray has personally examined nearly all of the facilities he is responsible for providing care to, including the Hodge Unit.

69.   UTMB makes recommendations based on prisoners' medical conditions to TDCJ for forced labor assignments, but it does not make housing recommendations related to protecting heat-sensitive prisoners from extreme temperatures. For example, UTMB might prohibit a prisoner taking psychotropic drugs from forced labor outdoors on hot days, but it makes no corresponding recommendations for protecting prisoners from extreme temperatures inside. The sickest prisoners in TDCJ custody are already not required to work – because of UTMB's

recommendations. But UTMB and TDCJ know that when temperatures exceed 90 degrees indoors that the housing areas become just as dangerous, and that there is no UTMB or TDCJ mechanism to prevent medically vulnerable prisoners from being housed in these conditions.

70.   Thus, neither UTMB or TDCJ have any policy or procedure to protect inmates their own policies identify as vulnerable to heat stroke from unsafe housing. This is not because protections from extreme temperatures in housing areas are unnecessary, but because TDCJ and UTMB have jointly designed a system where this obvious problem is ignored.

71.   This procedure is jointly designed by UTMB and TDCJ, and approved by Murray and Livingston. Murray and Livingston know there is no mechanism to routinely house prisoners vulnerable to heat stroke due to their medical conditions or disabilities in climate controlled housing, even when they have suffered heat-related illnesses in the past.

72.   UTMB policy states "it is the responsibility of [the prison] medical staff to provide guidelines to assist the facility administration in the determination of safe and healthful *work* conditions. Every reasonable effort shall be made in the interest of preventing heat-related injuries *in the workplace*." (emphasis added). The policy is completely silent on housing assignments for prisoners, like Webb, likely to suffer heat-related injuries even though temperatures inside are virtually identical to outdoor temperatures.

73.   Though Dr. Murray and UTMB know that none of the nineteen prisoners who died collapsed during forced labor, and that most were simply sweltering in the housing areas when they suffered the heat strokes,[2] Murray and UTMB have taken no action to protect heat-sensitive prisoners from unsafe housing.

---

[2] One of the prisoners who died in 1998 suffered a heat stroke while on a bus being transported between prison facilities.

74.   Dr. Murray and other UTMB officials have recognized that if a prisoner has suffered from a heat-related medical condition in a previous summer, like Webb, it is medically necessary for the patient to receive climate-controlled housing during future summers. But UTMB has no policy to ensure prisoners who have already suffered a heat-related medical condition receive such housing. And Murray does not train the physicians, nurses, and other healthcare providers he supervises that climate-controlled housing is necessary for these patients.

75.   Even if UTMB made these recommendations, however, TDCJ does not have enough climate-controlled beds to house every prisoner who needs the protections. TDCJ receives more requests for air conditioned housing each year from UTMB than it can meet. In fact, TDCJ tells UTMB that except for the most dire circumstances (such as for end-stage cancer patients), its medical providers cannot recommend air conditioned housing. Thus, TDCJ discourages UTMB from recommending air-conditioned housing for prisoners who need it.

76.   Thus, though Dr. Murray was aware that in August 2011 the Hodge Unit's housing areas were extremely hot and dangerous for individuals like Webb, he did nothing to protect men like Webb from harm.

**People with Certain Medical Conditions Webb Suffered from are Especially Vulnerable to Extreme Temperatures**

77.   TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

78.   TDCJ and UTMB policies specifically acknowledge certain medical conditions, like depression and other psychiatric conditions, affect heat tolerance.

79.   TDCJ also advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including psychotropics. Though many TDCJ prisoners are young and healthy

18

enough to survive and merely suffer in these inhuman conditions, Defendants know that prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death from heat.

80.    Unfortunately, many TDCJ inmates suffer from these conditions, including Webb and the other men who died.

81.  TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason, Haynes, and Murray know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury.

**Correctional Officers at the Hodge Unit are Inadequately Trained**

82.    Because the apparent temperatures are so high, it is imperative TDCJ's low-level employees recognize heat-related illnesses and get prisoners emergency medical care. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A training circular is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated after Mr. Shriver and Mr. Robles died in 2007 – or, even more shamefully, after the ten prisoners died in 2011, and two more died in 2012.

83.    UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

84. As the warden and regional director, Haynes and Eason are directly responsible for training the front-line officers charged with protecting prisoner's lives. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ corrections officers receive adequate

training and for supervisors Eason and Haynes. Each failed to provide adequate training and supervision, and many people died as a consequence.

85. Murray is responsible for training and supervising UTMB medical providers. But he fails to instruct his subordinates that patients who have previously suffered heat-related symptoms must be transferred to air conditioned housing.

**When Men Died in 2007, TDCJ and UTMB Failed to Make Changes**

86.   Two TDCJ and UTMB victims died at TDCJ's Byrd Unit in 2007. The first prisoner to die, James Shriver, came to the Byrd Unit on the afternoon of August 7, 2007 from a TDCJ inpatient, mental-health facility that was air conditioned. That day the apparent temperature reached 105 degrees. Shortly before 5:00 am the next day, officers found him dead in his cell.

87.   Less than a week later, Dionicio Robles died of heat stroke at the Byrd Unit. He also came to the Byrd Unit from a TDCJ inpatient mental health facility that was air conditioned. He arrived at the Byrd Unit on August 3, 2007, and was dead less than ten days later. The day he died the apparent temperature topped 106 degrees. He was also found dead in his cell shortly before 5:00 am.

88.   Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions like Webb, and were prescribed psychotropic drugs like Webb, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

89.   Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including Livingston, Murray, Thaler and Stephens. But even though two men with serious disabilities died under extremely similar circumstances, TDCJ and UTMB made no changes to operations to protect the lives of vulnerable prisoners in the future. Rather, they

20

continued to operate TDCJ while exposing individuals in its care to temperatures they knew endangered human life.

90.   Each summer, TDCJ sends an informal email to each prison advising wardens to institute obviously inadequate precautions against the heat – such as providing additional fans, and the jugs of cold water. Though men died in 1999, 2001, 2004, and 2007, TDCJ officials, including Livingston, Thaler, Stephens, and Eason, continued to send out the same email making the same inadequate precautions. Though these measures were proven inadequate, no changes were made.

91.   Similarly, after the two men died in 2007, Dr. Murray instituted no changes to UTMB's housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.

92.   Incredibly, even after ten men died of heat stroke in 2011, TDCJ and UTMB still made no changes.

93.   In August 2008, Eugene Blackmon sued concerning the extreme heat he endured. UTMB and TDCJ officials, including Livingston, were named Defendants (though Livingston was dismissed before trial).

94.   Though his case went to trial in February 2011, and TDCJ and UTMB officials listened to testimony about the danger associated with extreme temperatures, no changes were made. Dr. Charles Adams, a chief UTMB physician and Murray's deputy who attended the trial, testified the extreme temperatures did not violate Mr. Blackmon's rights, flippantly saying "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away." In other words, Murray and UTMB – in the face of legal action and people dying from heat stroke at alarming levels – continued to ignore the problem and kept prisoners in grave danger.

95.   The next summer, ten men died of heat stroke.

**As Men Died in 2011, TDCJ and UTMB Failed to Make Changes**

96.   On July 22, 2011, Larry Eugene McCollum died of heat stroke. He was found unresponsive in his bunk at the Hutchins Unit, a TDCJ prison Eason supervises. He was hospitalized in Dallas until life-support was withdrawn on July 28, 2011.

97.   Shortly after Mr. McCollum's heat stroke, Douglas Hudson was found unconscious, having a seizure in his cell at the Gurney Unit on July 24, 2011. He received medical attention at the prison, and his body temperature was 105 degrees. He was eventually flown by helicopter to Palestine Regional Medical Center, but died of heat stroke on July 25, 2011. The Gurney Unit is one of the prisons Eason supervises.

98.   A few days later, on August 3, 2011, Thomas Meyers died at the Coffield Unit after suffering a heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention. The Coffield Unit is also within Eason's supervision region.

99.   The next day, Webb died at the Hodge Unit.

100.   Throughout the rest of the summer, six more men (including another at the Hodge Unit, Charles Cook, within days of Webb's death), all suffering from similar disabilities known to make them vulnerable to extreme heat, died from heat stroke in TDCJ's prisons.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions**

101.   Livingston, Thaler, Stephens, Eason, Haynes, Murray, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed to take reasonable and adequate steps to protect the health and safety of prisoners.

102.   And Livingston, Thaler, Stephens, Eason, Murray and Haynes all knew inmate living areas at the Hodge Unit were not air conditioned, and that the apparent temperatures routinely skyrocketed over 100 degrees during the hot Texas summers.

103.   At all relevant times, Livingston, Thaler, Stephens, Eason, Murray and Haynes knew that extreme temperatures can be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with depression and mental illnesses in extremely hot facilities like the Hodge Unit. Moreover, TDCJ's policies and practices, which Livingston, Thaler, Stephens, Eason, Murray, and Haynes knew about, make no accommodation for people with mental illnesses during periods of extreme temperatures.

104.   Eason and Haynes worked at the Hodge Unit, or in nearby Tennessee Colony, every day, and knew about the extreme temperatures the area experiences each summer.

105.   Though Livingston, Thaler and Stephens work in Austin and Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months.

106.   Likewise, Murray and other UTMB executives (including senior physician Charles Adams) know Texas summers are extremely hot – and that temperatures inside the prisons remain "blazing" high for weeks on end.

107. Additionally, Eason, Haynes, Thaler, Stephens, Murray, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90° at all times during the summer months.

108.   As the conditions at the Hodge Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Webb, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas cooled by air

conditioning or temporary cooling system/unit, or to make sure inmates with serious mental illnesses were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat. A decision, of course, they made from the comfort of their own air conditioned offices.

109.    TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Eason and Haynes routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison.

110.    Likewise, UTMB conducts morbidity and mortality reviews for every prisoner who dies. These reports would show inmates regularly died due to heat-related causes. Murray is aware of the results of these reviews, and knew the heat was killing prisoners.

111.    UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, Murray, and Haynes – at a minimum – failed to take reasonable steps to safely house prisoners at the Hodge Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Murray, Thaler, Stephens, Eason, and Haynes were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

112.    Meaningfully addressing these conditions would require action at the highest levels of the agency, including authorization and approval from Livingston and Thaler.  They have refused to act, authorize or otherwise approve actions to address these conditions.

113. UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, Hayne, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Hodge Unit and protect them from heat stroke, a risk they were well aware of at the time.

Livingston, Murray, Thaler, Stephens, Eason, and Haynes were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

114.    Despite the epidemic of heat-related deaths, the Defendants have refused to act, authorize or otherwise approve actions to address these conditions.

115.    At the time of Webb's death, the law was clearly established that temperatures exceeding 90° are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Murray, Thaler, Stephens, Eason, and Haynes are not entitled to qualified immunity.

116.    Plainly, the conditions at the Hodge Unit result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Webb, as well as the prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest. Rather, they endanger the lives of the weakest, sickest, prisoners in TDCJ custody.

**Webb was Disabled**

117.    Webb suffered from severe mental illnesses. In high school, he was diagnosed as suffering from bipolar disorder.

118.    Webb only completed the ninth grade, and was enrolled in special education classes for most of his time in school. He had trouble concentrating, even when he tried to take GED classes in TDCJ. Because of his disabilities, he always had great difficulty reading and writing.

119.    But his life began to fall apart when his father with whom he was very close, died. His disabilities caught up to him. Before going to prison, Webb spent time homeless, living on the streets. He reported hearing voices, most often of his father.

120.    When he arrived in TDCJ custody, UTMB doctors diagnosed him with "adjustment disorder with mixed anxiety and depression" and prescribed Thorazine (chlorpromazine), Celexa (citalopram), and Omeprazole. UTMB found he had "borderline intellectual functioning," and he needed help completing simple tasks, like making a short voice-recording so he could access the TDCJ prison payphone system.

121.    Thorazine is known to affect thermoregulation – the body's ability to cool itself. Thorazine is an antipsychotic, or psychotropic drug, which TDCJ and UTMB recognize puts prisoners like Webb at heightened risk of heat-related injury.

122.    Depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the neurological system.

123.    As a result of his mental illnesses, TDCJ and UTMB enrolled Webb in the "Mentally Retarded Offender Program" (MROP),[3] and housed him with other prisoners with developmental disabilities at the Hodge Unit in Rusk, Texas.

124.    Webb also suffered from Hepatitis C, and received treatment from UTMB for the disease while in TDCJ custody.

125.    TDCJ and UTMB officials, including Livingston, Murray, Thaler, Stephens, Eason and Haynes, knew prisoners with depression and taking powerful psychotropic drugs lived in Texas prisons and were at risk for heat-related injury, yet refused to accommodate them during the extreme heat of the Texas summers.

---

[3] Many people with developmental disabilities consider the term "mentally retarded" offensive, and it is used here only because that is the term Defendants choose.

126.    TDCJ and UTMB discriminated against Webb by denying him reasonable accommodations necessary to allow him access to TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people with disabilities like Webb access to TDCJ facilities and programs.

**Webb's Death**

127.    At the time of his death, Webb was a fifty year-old man. A native of the Houston area, he loved to fish and hunt with his family. He was a loving father who always attended his children's school and athletic events.

128.    Webb was convicted of non-aggravated robbery, and sentenced to serve time in TDCJ. He expected to be paroled April 2012.

129.    He spent several summers at the Hodge Unit. Each year, he suffered symptoms of heat exhaustion.

130.    In August 2009, he wrote a sick call, concerned he was "drinking a lot of water and I'm still dizzy, dehydrated, cramps and muscle spasms. I am having these symptoms all day, and all night. Please can you help me?" He wrote "I get dizzy, feel like I'm light headed, like I'm gonna faint" and "my eyes get blurry so could you please see me?" When he saw UTMB staff the next week, he told nurses "I'm very dehydrated (even though I'm drinking plenty of water). … I have these symptoms all day long." Dizziness, nausea, blurred vision, muscle cramps and dehydration are all symptoms of heat exhaustion.

131.    In August 2010, he reported suffering "diarrhea, dizziness and nausea" to UTMB medical providers. Nurses noted his skin was warm to the touch, and he complained of dehydration and dry mouth. Though he was again suffering from heat exhaustion, UTMB and TDCJ provided him no accommodations.

132.    In July 2011, shortly before his death, he again complained to UTMB medical staff he was having "dizzey spells." UTMB medical simply staff ignored the pattern of Webb suffering heat illness from the heat because they had not been trained by Murray that patients who previously experienced heat-related illnesses needed additional protections, and because UTMB had no policy instructing them that patients like Webb (who experienced heat illnesses before) were at increased risk of heat stroke.

133.    In the month before Webb died, the Rusk area had endured 18 days where the temperature exceeded 100 degrees Fahrenheit. Temperatures soared as high as 107°.

134.    A few weeks before his death, Webb's brother, Sidney Webb, visited him at the Hodge Unit. During the visit, Webb drank several cold Cokes that Sidney bought him from the vending machine, and complained about the extreme heat in the cell blocks. Sidney thought his brother looked terrible – he was pail and gaunt. Sidney asked if he could buy cold Cokes from the prison commissary, and Webb responded "those Cokes are so hot they explode."

135.    Webb believed the heat would kill him – he talked with his brother about giving his property away and his impending death.

136.    Webb told his brother he'd been experiencing difficulty breathing recently, and had tried to go to the infirmary.

137.    In the weeks before he died, Webb made several visits to the prison infirmary, complaining about the heat, including on the day he died.

138.    Two days before his death, Webb made a desperate phone call to his mother. He complained "it's hot and I'm sick," and told her he was sleeping on the concrete floor to try and stay cool. He was "real depressed" and suffering in the sweltering temperatures.

139.    On the night of August 4, 2011, the Rusk area experienced temperatures near 90 degrees after midnight. That day, the heat in Rusk was sweltering – 105 degrees Fahrenheit, with

50 percent humidity. The heat index, the combination of temperature and humidity, made the air temperature feel like it was over 137 degrees. According to TDCJ's heat matrix, at these temperatures "heatstroke [is] imminent." But Warden Haynes did nothing.  No one from UTMB or TDCJ did anything to cool the indoor temperatures or remove prisons vulnerable to such extreme heat.

140.    Shortly after 3:00 am that night, Webb was found nude, laying on the floor of his cell, and unresponsive. His skin was hot to the touch.

141.    Webb was pronounced dead at 3:55 am.

142.    The autopsy noted Webb "had several risk factors for [heat stroke]: lack of air conditioning, chronic illness, and use of Thorazine," – an autopsy of which senior UTMB officials, including Murray, were aware.

CAUSES OF ACTION

EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Murray, Eason and Haynes Only, in Their
Individual Capacities)

143.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

144.    By subjecting Webb to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Murray, Thaler, Stephens, Eason and Haynes acted with deliberate indifference to the his serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

145.    The extreme temperatures Defendants tolerated at the Hodge Unit proximately caused Webb's untimely death.

146.    Plaintiffs bring these claims through 42 U.S.C. §1983.

29

AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT
AMENDMENT ACT AND REHABILITATION ACT
(As to Defendants TDCJ and UTMB Only)

147.    TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, services, programs, or activities and reasonably modify such facilities, services, programs or activities to accomplish this purpose. 29 U.S.C. §794.

148.    Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act.  42 U.S.C. §§12131 et seq..

149. Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperatures actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

150.    The Hodge Unit is a facility, and its operation comprises services, programs or activities of TDCJ and UTMB for Rehabilitation Act, ADA, and ADAAA purposes. Webb was otherwise qualified to receive the services of and participate in the programs or activities provided by TDCJ and/or UTMB at the Hodge Unit.

151.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Webb was a qualified individual regarded as having a physiological or mental impairment that substantially limited one or more of his major life activities. Defendants TDCJ and UTMB knew Webb suffered from mental illnesses, and was prescribed medications to treat his disabilities. Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and

refusing to accommodate his disabilities and protect him from the extreme temperatures that took his life.

152.   As alleged above and herein, TDCJ and UTMB failed and refused to reasonably accommodate Webb, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused his death.

153.   As alleged above, TDCJ and/or UTMB failed and refused to reasonably modify its policies, practices or procedures to ensure Webb access to the facilities, services, programs or activities of the Hodge Unit by reasonably accommodating his disabilities. These failures and refusals caused his death.

154.   Webb died as a direct result of TDCJ and UTMB's intentional discrimination. Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

## NEGLIGENCE – TEXAS TORT CLAIMS ACT – PRESCRIPTION DRUGS
### (As to Defendant UTMB)

155.   As described above, UTMB employees negligently used personal property, the prescription drugs prescribed Plaintiffs' decedent, to treat his disability.

156.   Use of these prescription drugs was dangerous in the conditions of extreme heat and contributed to Webb's death.

157.   Moreover, UTMB employees knew, or should have known the medications substantially increased Webb's  risk of suffering fatal heat strokes prior to their deaths.

158.   UTMB had actual notice that Webb died as a result of the extremely hot conditions, lack of air conditioning and the effects of the drugs (thorazine) he was prescribed, and a subjective awareness that its fault contributed to Webb's death.

159.   Thus, no exceptions to the waiver of sovereign immunity under the Texas Tort Claims Act apply.

31

DAMAGES

160.    Webb's survivors are entitled to compensatory, and punitive damages against the individual Defendants in the maximum amounts allowed by law.

161.    Webb's survivors are entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by law.

162.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of Webb's wrongful death, Plaintiffs assert claims under the United States Constitution and 42 U.S.C. §1983, the ADA, ADAAA, and Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

163.    More particularly, Plaintiffs Kevin Webb, Christan Carson, and Casey Akins, in their capacities as heirs-at-law to the Estate of Robert Allen Webb, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;

- past mental anguish;

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act or as allowed by law.

110.    Plaintiffs Kevin Webb, Casey Akins, Christan Carson, and Edna Webb, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, services, and affection of Robert Allen Webb; and,

32

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

111.     Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also requests attorneys' fees, costs, and expenses against TDCJ for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs requests that the Court:

A.     Award compensatory damages, nominal and presumed damages against Defendants to the survivor plaintiffs;

B.     Award punitive damages against the individual Defendants only under Section 1983 and the Wrongful Death Act, and through the Survival Statute to the survivor plaintiffs;

C.     Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.     Grant such other and further relief poas appears reasonable and just, to which Plaintiff may be entitled.

Date: March 14, 2014.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
  Tel.   512-623-7727
  Fax.   512-623-7729

By      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
Scott Medlock
State Bar No. 24044783


Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
  (512) 474-5073 [phone]
  (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS



CERTIFICATE OF SERVICE

I certify a copy of this document was served on counsel for the parties through the Court's
electronic filing system.

By      /s/ Jeff Edwards
JEFF EDWARDS

34

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| KEVIN WEBB, individually and as the representative of the Estate of Robert Allen Webb, and EDNA WEBB, CHRISTAN CARSON, and CASEY AKINS, individually and as heirs at law | § § § § § § | |
| **PLAINTIFFS** | § § | |
| v. | § § | CIVIL ACTION NO. 6:13cv711 |
| BRAD LIVINGSTON, RICK THALER, WILLIAM STEPHENS, OWEN MURRAY, ROBERT EASON and TOMMIE HAYNES, in their individual capacities, the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and the UNIVERSITY OF TEXAS MEDICAL BRANCH. | § § § § § § § § | |
| **DEFENDANTS** | § § | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Robert Allen Webb died of heat stroke in Texas Department of Criminal Justice custody because Defendants, Texas corrections officials, fail to protect prisoners from brutally hot temperatures inside the TDCJ Hodge Unit. Webb's survivors file this second amended complaint pursuant to the Court's scheduling order seeking redress for their father and son who perished at the Hodge Unit.

STATEMENT OF CLAIMS

1.     Prisoners are dying of heat stroke while in Defendants' custody at prisons across Texas.

2.     The survivors of one of these men, Robert Allen Webb, bring claims as heirs-at-law and as statutory wrongful death beneficiaries.

1

3.      Plaintiffs claim the individual defendants are liable under 42 U.S.C. § 1983 for violating Webb's constitutional rights under color of law, in violation of his Eighth and Fourteenth Amendment right to protection from cruel and unusual punishment.

4.      Plaintiffs further claim TDCJ and the University of Texas Medical Branch caused Webb's death by failing to provide reasonable accommodations for his disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and § 1343 (civil rights).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as the events complained of occurred in this division and district.

PARTIES

7.      Plaintiff Kevin Webb, Mr. Webb's natural son, sues in his individual capacity as a statutory beneficiary under the Texas Wrongful Death Act and as representative of Mr. Webb's estate. At the time of his death, Mr. Webb had three adult children (and no minor children).  He died intestate, and there were no probate proceedings arising from his death, as none were necessary.  Kevin Webb is a resident of Smith County, Texas.

8.      Casey Akins is a surviving daughter of Mr. Webb, and sues in her individual capacity as statutory beneficiary of the Texas Wrongful Death Act and as heir-at-law of the Estate of Robert Allen Webb. Ms. Akins resides in Polk County, Texas.

9.      Christan Carson is a surviving daughter of Mr. Webb, and sues in her individual capacity. She is a resident of Madison County, Texas.

2

10.   Edna Webb is the mother of Mr. Webb, and sues in her individual capacity as a statutory beneficiary of the Texas Wrongful Death Act. She is a resident of Harris County, Texas.

11.   Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ). As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct.  By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody.  At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for nominal, punitive, and compensatory damages. Livingston has been served and appeared in this litigation.

12.   Defendant Tommie Haynes was the warden at the Hodge Unit at all relevant times. At all relevant times, Haynes was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for nominal, punitive, declaratory, and compensatory relief. Haynes has been served and appeared in this litigation.

13.   Defendant Rick Thaler is the director of TDCJ's Correctional Institutions Division. The Correctional Institutions Division manages all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, Texas, in

3

Walker County. Thaler has been served and appeared in this litigation.

14. Defendant William Stephens is the deputy director of TDCJ's Correctional Institutions Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Stephens is a resident of Huntsville, Texas, in Walker County. Stephens has been served and appeared in this litigation.

15. Defendant Robert Eason was the regional director for TDCJ's "Region II," and supervises eleven prisons, including the Hodge Unit. As the regional director, he is responsible for the supervision of all personnel at the Hodge Unit. Eason was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Eason is a resident of Anderson County, Texas. Eason has been served and appeared in this litigation.

16. Dr. Owen Murray is the chief physician executive for UTMB's correctional managed care program and oversees the medical, mental health and dental services provided to prisoners within more than 100 units in the Texas Department of Criminal Justice served by UTMB, including the Hodge Unit. Dr. Murray oversees program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business development, continuing medical education, and staff recruitment and development. He is responsible for formulating policies and procedures related to inmate healthcare for UTMB.

He is sued in his individual capacity for punitive and compensatory damages. Murray has been served and appeared in this litigation.

17.  The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Hodge Transfer Facility, a public facility with programs and services the deceased and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, compensatory, and nominal relief. TDCJ has been served and appeared in this litigation.

18.  The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB's high-ranking policymakers reside and work in Galveston. Through UTMB's Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the Hodge Unit, and the other prisons where inmates died of heat stroke. UTMB is a recipient of federal funds. UTMB is sued for compensatory relief. UTMB has been served and appeared in this litigation.

## FACTS

**Extreme Temperatures are Killing Texas Prisoners**

19.  According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Robert Allen Webb, died at TDCJ's brutally hot Hodge Unit.

20.  Like most other TDCJ prisons, the Hodge Unit's inmate living areas are not air conditioned, and the heat index or apparent indoor temperatures (see chart below) routinely exceeds 100 degrees.

21.    Livingston, Thaler, Stephens, Eason, Haynes and Murray each knew the entire state, including the Rusk area where the Hodge Unit is located, was experiencing a severe heat wave during the entire summer of 2011.

22.    These temperatures lasted late into the night, providing no relief to prisoners. Even early in the morning, indoor apparent temperatures were sweltering.

23.    As each of the individual Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2011, temperatures this high cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

24.    In fact, TDCJ and UTMB incorporate this chart, promulgated by the National Oceanic and Atmospheric Administration (NOAA), into agency policies well before 2011.

**Temperature (°F)**

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**
Caution    Extreme Caution    Danger    Extreme Danger

25.     The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

26.     The chart shows the increasing dangers of exposure to extreme apparent temperatures for *healthy* people – from "caution" to "extreme caution" up to "danger" and finally "extreme danger" where heat stroke becomes "imminent."

27.     For people with heat-sensitive disabilities, like Webb, the danger is far greater.

28.     The apparent temperatures routinely reach the red "extreme danger" zones indoors at the Hodge Unit.

29.     Yet the Defendants have done nothing to cool the indoor temperatures to protect inmates from death by heat stroke.

30.     Though the Defendants know the danger escalates as apparent temperatures increase, they do not do anything differently at the "extreme danger" level than at the "caution" level.

31.     In fact, TDCJ's regional director Robert Eason has stated under oath that "imminent" means the same thing as "possible" despite the chart's clear meaning.

32.     Upon information and belief, Director Eason's supervisors, including Defendants Livingston, Stephens, and Thaler, have not corrected this dangerous belief despite knowing the difference between the words "imminent" and "possible" and the real increased danger escalating apparent temperatures pose.

33.     It was well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions, like depression or mental illnesses, or who take certain medications, like psychotropics, are much more vulnerable to extreme temperatures. As the chart shows, while these extreme temperatures are punishing and cruel for all prisoners to live with,

this heat is especially deadly for people with these medical conditions and disabilities. Prisoners'
with heat-sensitive disabilities have medical conditions that prevent their bodies from regulating
their temperature, putting them at much greater risk of death.

34.    Since 1998, at least nineteen men have died in TDCJ prisons from hyperthermia –
or heat stroke.

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|--------|---------------|------------|-------------|-------|
| Archie White | 48 | Unk | June 30, 1998 | 104 | Unk | Prescribed tricyclic antidepressants |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications and diuretics |
| John Cardwell | Unk | Unk | Aug. 4, 2001 | Unk | Unk | Unknown |
| Ricky Robertson | Unk | Unk | July 16, 2004 | Unk | Unk | Unknown |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

35.     In fact, it is likely that there were more heat related injuries and deaths as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists. And heat contributes to deaths where pathologists are trained to list another official "cause" on the autopsy – such as a heart attack brought on by extreme temperatures. Indeed, TDCJ, UTMB, Livingston, Thaler, Stephens, Eason, and Murray know heat was a contributing cause in many additional prisoners' deaths in TDCJ prisons.

36.     These nineteen men all shared certain characteristics. They all suffered underlying medical conditions the Defendants knew put them at much greater risk of heat stroke, including taking psychotropic drugs to treat some form of mental illness, suffering from diabetes or hypertension, or taking diuretics to treat hypertension. TDCJ and UTMB policies identify these conditions as putting patients at risk of heat stroke.

37.     All nineteen men died in late July and August – the hottest days of the Texas summer, when all Texas residents know the heat is intense.

38.     And, of course, these are just the men who *died* of heat stroke. Many other prisoners in TDCJ custody are sent to the infirmaries with heat-related medical conditions each summer. Some are even transported to community emergency rooms, at great expense, to save their lives from these dangerous conditions.

**TDCJ Officials Did Not Care Prisoners Were Dying of Heat Stroke**

39.     Judge William Wayne Justice observed in 1999 in a published opinion that TDCJ prisoners were dying of heat-related injuries. *Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

40.     Despite Judge Justice's early warning, TDCJ made no changes to protect prisoners from extreme temperatures.

41.     At least eight of the nineteen men who died, including Webb, lived in prisons in TDCJ's "Region II" – where Defendant Eason is the regional director. As the regional director, Eason reviews reports on each prisoner's death.

42.     Even though ten men died of heat stroke in 2011 – and eight of them died in his "region" – Eason did not consider these deaths a serious problem. In fact, in the face of these deaths, he stated TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, he and Defendant Haynes took no action to protect future prisoners, like Webb, in the face of TDCJ's obviously inadequate procedures.

43.     Eason's direct supervisors, Defendants Livingston, Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke were regularly discussed at meetings Thaler and Stephens held with their deputies, including Eason. Even though the existing policies were obviously inadequate, Livingston, Thaler, Stephens and Eason continued to follow the same deadly course of conduct. Air conditioning the Hodge Unit or other prisons was never even discussed. Nor was moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons discussed or implemented.

44.     Nor did Executive Director Livingston take steps to cool the non air-conditioned prisons – even though prisoners continued to die from extreme temperatures over several years, and deaths from heat stroke were happening at an alarming rate in July and August 2011.  In fact, even today – after 19 deaths– Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

45.     Though Livingston, Thaler, Stephens, Eason, and Haynes each knew the vast majority of prisoner housing areas in the prisons in Region II, including the Hodge Unit, were not air conditioned or otherwise climate controlled, and that indoor temperatures routinely went over 90 degrees, the actions they took were obviously inadequate.

11

46.     For example, TDCJ directives told wardens to ensure one ten-gallon jug of ice water was provided to each cellblock every eight hours. Because the average cellblock houses over 50 men, any reasonable corrections official would know this pitiful amount of water was completely inadequate for prisoners to drink enough to protect them from the heat. In fact, the water would frequently be consumed within minutes.

47.     Livingston, Thaler, Stephens, Eason, and Haynes approved and implemented these procedures though no reasonable person would believe just providing additional water would protect people with heat-sensitive medical conditions from apparent temperatures over 100 degrees.

48.     Other measures TDCJ implemented were also obviously inadequate at the extremely high apparent temperatures inside the Hodge Unit. No reasonable corrections official would believe allowing prisoners to take additional showers and wear less clothing would protect people with heat-sensitive disabilities from apparent temperatures over 100.

49.     While Livingston, Thaler, Stephens, Eason, and Haynes knew that the risk of fatal heat stroke increased as apparent temperatures went above the "caution" zone to the "danger" and "extreme danger" zones, they had no policy to provide additional protections as the apparent temperatures increased. The small amount of cold water, for example, was provided when temperatures reached the "caution" zone, but no additional water or any other protective measures (adequate or not) were implemented as the apparent temperatures went up.

50.     In fact, TDCJ has no formal policy to protect prisoners from extreme temperatures in the housing areas. TDCJ's formal policies only address protecting prisoners from heat outdoors during forced labor. Livingston, Thaler, Stephens, Eason, and Haynes know that the sickest prisoners are prohibited from working, and, instead, spend virtually all their time in

non-air conditioned housing areas. But there is no policy to address safe housing, or steps to protect inmates who are not assigned to forced labor.

51.   Warden Haynes, the man directly responsible for the safety of the men imprisoned in the Hodge Unit, did nothing beyond TDCJ's obviously inadequate measures to protect the men in his care from extreme heat.

52.   TDCJ trains its employees that during hot months they should "spend more time in air conditioned places.  Air conditioning in homes and other buildings markedly reduces danger from the heat.  If you cannot afford an air conditioner, spending some time each day during hot weather in an air-conditioned environment affords some protection." Employees are advised to "stay in an air conditioned area if possible," and are only allowed to work outside for two hours at a time.

53.   But despite acknowledging in its training materials that air conditioning is the simplest way to protect people from extreme temperatures, TDCJ, Livingston, Thaler, Stephens, Eason, and Haynes did nothing in the summer of 2011 to allow prisoners to spend even a short amount of time in the parts of the Hodge Unit that were air conditioned. For example, prisoners with heat-sensitive disabilities could have easily been given an opportunity to spend a few hours in the air-conditioned visitation rooms on the hottest days of the year.

54.   For TDCJ to make a necessary capital improvement like air conditioning the prisons, or installing any climate control measures, action by the most senior TDCJ officials, including Defendant Livingston, would be needed. Despite prisoners continuing to die from extreme temperatures, Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

55.   These hazardous conditions serve no penological purpose. In fact, county jails in Texas are required by law to keep indoor temperatures between 65 and 85 degrees. *See* 37 Tex.

Admin. Code § 259.160. It is only when inmates are sent to TDCJ prisons that they are exposed to extremely hot indoor temperatures.

56. Some TDCJ cells, including solitary confinement cells at virtually all 110 TDCJ prisons, are air conditioned. But decisions to house prisoners in these air conditioned cells are made for security reasons based on inmates' disciplinary records, not based on their medical needs. At the Hodge Unit, there is no air conditioned housing available for prisoners without behavior problems, like Webb, who were not assigned to solitary confinement.

57. Though TDCJ has a $3 billion annual budget, and has told the press air conditioning every cell in the system would cost only $55 million (though it cannot produce any documentation to prove up this estimate, and the cost could be far lower), Livingston consciously has decided not to even ask for this appropriation and continues to insist that TDCJ takes adequate steps to protect prisoners.

58. And despite the alarming number of completely preventable deaths, Eason said publicly he considers adding any air conditioning to TDCJ's prisons a waste of money.

59. TDCJ officials, including Livingston, Thaler, Stephens, Eason, and Haynes, are not only endangering the inmates, but also their own employees who are required to work in the same blistering conditions. Each summer, correctional officers routinely fall ill at prisons around the state due to heat-related causes. Every day, officers sweat through their heavy uniforms while supervising prisoners.

60. In fact, in a rare development, the correctional officer's union has found common cause with the prisoners, and publicly supported the extreme temperatures lawsuits brought against TDCJ.

61. But while they ignore the hazards to prisoners and correctional officers, TDCJ officials, including Livingston, have approved installing climate controlled hog barns to protect

14

the welfare of TDCJ's agricultural products. Livingston approved purchasing "climate controlled swine barns" – at a cost of $750,000 – even *after* he knew ten human beings had died in 2011, and two more had died in 2012. Livingston's deputy even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke. But Livingston has made no attempts to provide the human beings he is responsible for the same protection afforded the pigs raised for slaughter.

62.     TDCJ policies Livingston approved for implementation require the pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees. Temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit."

63.     The pig barns use devices such as misters, foggers, and portable air conditioners to cool the pigs on the hottest days. Though such devices are inexpensive[1] and simple to install, no one at TDCJ has ever considered using them in the extremely hot prison housing areas.

64.     Upon information and belief, the inmate housing areas at the Hodge Unit could be "climate controlled" at a similar – or lower – cost than the climate controlled pig barns.

65.     TDCJ even air conditions the prison armories because of concerns the heat could damage the prisons' weapons.

_____

[1] A portable air conditioner, for example, costs less than $300 and only requires an electrical outlet to operate.

15

**UTMB Executives, Including Murray, Did Not Care Prisoners Were Dying of Heat Stroke**

66.   UTMB executives, including Dr. Murray, were similarly unconcerned. No changes were ever made to UTMB's policies and procedures, even as patients under its care died from hyperthermia. Though Dr. Murray routinely reviews prisoners' deaths, and knew many prisoners had died from heat stroke, he took no action to change UTMB's policies or procedures to prevent future deaths.

67.   Despite being responsible for ensuring prisoners medical needs are attended to, Dr. Murray, on behalf of UTMB, has been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat.  In fact, Dr. Murray knows that extreme heat above 90 degrees indoors is harmful medically and lethal to prisoners suffering from depression and mental illness, and who are over forty years of age, like Webb. Dr. Murray, as the chief physician for UTMB concerning correctional care, knows that prisoners with such conditions, like Webb, are endangered if placed into brutally hot conditions.

68.   Likewise, Dr. Murray has long known TDCJ does not air condition most inmate living areas and has even given press tours in which he described cells as blazing hot in summer. Moreover, as part of his duties as head of correctional care for UTMB, Dr. Murray has personally examined nearly all of the facilities he is responsible for providing care to, including the Hodge Unit.

69.   UTMB makes recommendations based on prisoners' medical conditions to TDCJ for forced labor assignments, but it does not make housing recommendations related to protecting heat-sensitive prisoners from extreme temperatures. For example, UTMB might prohibit a prisoner taking psychotropic drugs from forced labor outdoors on hot days, but it makes no corresponding recommendations for protecting prisoners from extreme temperatures inside. The sickest prisoners in TDCJ custody are already not required to work – because of UTMB's

recommendations. But UTMB and TDCJ know that when temperatures exceed 90 degrees indoors that the housing areas become just as dangerous, and that there is no UTMB or TDCJ mechanism to prevent medically vulnerable prisoners from being housed in these conditions.

70.  Thus, neither UTMB or TDCJ have any policy or procedure to protect inmates their own policies identify as vulnerable to heat stroke from unsafe housing. This is not because protections from extreme temperatures in housing areas are unnecessary, but because TDCJ and UTMB have jointly designed a system where this obvious problem is ignored.

71.  This procedure is jointly designed by UTMB and TDCJ, and approved by Murray and Livingston. Murray and Livingston know there is no mechanism to routinely house prisoners vulnerable to heat stroke due to their medical conditions or disabilities in climate controlled housing, even when they have suffered heat-related illnesses in the past.

72.  UTMB policy states "it is the responsibility of [the prison] medical staff to provide guidelines to assist the facility administration in the determination of safe and healthful *work* conditions. Every reasonable effort shall be made in the interest of preventing heat-related injuries *in the workplace*." (emphasis added). The policy is completely silent on housing assignments for prisoners, like Webb, likely to suffer heat-related injuries even though temperatures inside are virtually identical to outdoor temperatures.

73.  Though Dr. Murray and UTMB know that none of the nineteen prisoners who died collapsed during forced labor, and that most were simply sweltering in the housing areas when they suffered the heat strokes,[2] Murray and UTMB have taken no action to protect heat-sensitive prisoners from unsafe housing.

---

[2] One of the prisoners who died in 1998 suffered a heat stroke while on a bus being transported between prison facilities.

17

74.  Dr. Murray and other UTMB officials have recognized that if a prisoner has suffered from a heat-related medical condition in a previous summer, like Webb, it is medically necessary for the patient to receive climate-controlled housing during future summers. But UTMB has no policy to ensure prisoners who have already suffered a heat-related medical condition receive such housing. And Murray does not train the physicians, nurses, and other healthcare providers he supervises that climate-controlled housing is necessary for these patients.

75.  Even if UTMB made these recommendations, however, TDCJ does not have enough climate-controlled beds to house every prisoner who needs the protections. TDCJ receives more requests for air conditioned housing each year from UTMB than it can meet. In fact, TDCJ tells UTMB that except for the most dire circumstances (such as for end-stage cancer patients), its medical providers cannot recommend air conditioned housing. Thus, TDCJ discourages UTMB from recommending air-conditioned housing for prisoners who need it.

76.  Thus, though Dr. Murray was aware that in August 2011 the Hodge Unit's housing areas were extremely hot and dangerous for individuals like Webb, he did nothing to protect men like Webb from harm.

**People with Certain Medical Conditions Webb Suffered from are Especially Vulnerable to Extreme Temperatures**

77.  TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

78.  TDCJ and UTMB policies specifically acknowledge certain medical conditions, like depression and other psychiatric conditions, affect heat tolerance.

79.  TDCJ also advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including psychotropics. Though many TDCJ prisoners are young and healthy

18

enough to survive and merely suffer in these inhuman conditions, Defendants know that prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death from heat.

80.     Unfortunately, many TDCJ inmates suffer from these conditions, including Webb and the other men who died.

81.   TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason, Haynes, and Murray know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury.

**Correctional Officers at the Hodge Unit are Inadequately Trained**

82.     Because the apparent temperatures are so high, it is imperative TDCJ's low-level employees recognize heat-related illnesses and get prisoners emergency medical care. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A training circular is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated after Mr. Shriver and Mr. Robles died in 2007 – or, even more shamefully, after the ten prisoners died in 2011, and two more died in 2012.

83.     UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

84. As the warden and regional director, Haynes and Eason are directly responsible for training the front-line officers charged with protecting prisoner's lives. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ corrections officers receive adequate

training and for supervisors Eason and Haynes. Each failed to provide adequate training and supervision, and many people died as a consequence.

85. Murray is responsible for training and supervising UTMB medical providers. But he fails to instruct his subordinates that patients who have previously suffered heat-related symptoms must be transferred to air conditioned housing.

**When Men Died in 2007, TDCJ and UTMB Failed to Make Changes**

86. Two TDCJ and UTMB victims died at TDCJ's Byrd Unit in 2007. The first prisoner to die, James Shriver, came to the Byrd Unit on the afternoon of August 7, 2007 from a TDCJ inpatient, mental-health facility that was air conditioned. That day the apparent temperature reached 105 degrees. Shortly before 5:00 am the next day, officers found him dead in his cell.

87. Less than a week later, Dionicio Robles died of heat stroke at the Byrd Unit. He also came to the Byrd Unit from a TDCJ inpatient mental health facility that was air conditioned. He arrived at the Byrd Unit on August 3, 2007, and was dead less than ten days later. The day he died the apparent temperature topped 106 degrees. He was also found dead in his cell shortly before 5:00 am.

88. Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions like Webb, and were prescribed psychotropic drugs like Webb, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

89. Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including Livingston, Murray, Thaler and Stephens. But even though two men with serious disabilities died under extremely similar circumstances, TDCJ and UTMB made no changes to operations to protect the lives of vulnerable prisoners in the future. Rather, they

20

continued to operate TDCJ while exposing individuals in its care to temperatures they knew endangered human life.

90.  Each summer, TDCJ sends an informal email to each prison advising wardens to institute obviously inadequate precautions against the heat – such as providing additional fans, and the jugs of cold water. Though men died in 1999, 2001, 2004, and 2007, TDCJ officials, including Livingston, Thaler, Stephens, and Eason, continued to send out the same email making the same inadequate precautions. Though these measures were proven inadequate, no changes were made.

91.  Similarly, after the two men died in 2007, Dr. Murray instituted no changes to UTMB's housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.

92.  Incredibly, even after ten men died of heat stroke in 2011, TDCJ and UTMB still made no changes.

93.  In August 2008, Eugene Blackmon sued concerning the extreme heat he endured. UTMB and TDCJ officials, including Livingston, were named Defendants (though Livingston was dismissed before trial).

94.  Though his case went to trial in February 2011, and TDCJ and UTMB officials listened to testimony about the danger associated with extreme temperatures, no changes were made. Dr. Charles Adams, a chief UTMB physician and Murray's deputy who attended the trial, testified the extreme temperatures did not violate Mr. Blackmon's rights, flippantly saying "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away." In other words, Murray and UTMB – in the face of legal action and people dying from heat stroke at alarming levels – continued to ignore the problem and kept prisoners in grave danger.

21

95. The next summer, ten men died of heat stroke.

**As Men Died in 2011, TDCJ and UTMB Failed to Make Changes**

96. On July 22, 2011, Larry Eugene McCollum died of heat stroke. He was found unresponsive in his bunk at the Hutchins Unit, a TDCJ prison Eason supervises. He was hospitalized in Dallas until life-support was withdrawn on July 28, 2011.

97. Shortly after Mr. McCollum's heat stroke, Douglas Hudson was found unconscious, having a seizure in his cell at the Gurney Unit on July 24, 2011. He received medical attention at the prison, and his body temperature was 105 degrees. He was eventually flown by helicopter to Palestine Regional Medical Center, but died of heat stroke on July 25, 2011. The Gurney Unit is one of the prisons Eason supervises.

98. A few days later, on August 3, 2011, Thomas Meyers died at the Coffield Unit after suffering a heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention. The Coffield Unit is also within Eason's supervision region.

99. The next day, Webb died at the Hodge Unit.

100. Throughout the rest of the summer, six more men (including another at the Hodge Unit, Charles Cook, within days of Webb's death), all suffering from similar disabilities known to make them vulnerable to extreme heat, died from heat stroke in TDCJ's prisons.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions**

101. Livingston, Thaler, Stephens, Eason, Haynes, Murray, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed to take reasonable and adequate steps to protect the health and safety of prisoners.

102.    And Livingston, Thaler, Stephens, Eason, Murray and Haynes all knew inmate living areas at the Hodge Unit were not air conditioned, and that the apparent temperatures routinely skyrocketed over 100 degrees during the hot Texas summers.

103.    At all relevant times, Livingston, Thaler, Stephens, Eason, Murray and Haynes knew that extreme temperatures can be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with depression and mental illnesses in extremely hot facilities like the Hodge Unit. Moreover, TDCJ's policies and practices, which Livingston, Thaler, Stephens, Eason, Murray, and Haynes knew about, make no accommodation for people with mental illnesses during periods of extreme temperatures.

104.    Eason and Haynes worked at the Hodge Unit, or in nearby Tennessee Colony, every day, and knew about the extreme temperatures the area experiences each summer.

105.    Though Livingston, Thaler and Stephens work in Austin and Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months.

106.    Likewise, Murray and other UTMB executives (including senior physician Charles Adams) know Texas summers are extremely hot – and that temperatures inside the prisons remain "blazing" high for weeks on end.

107. Additionally, Eason, Haynes, Thaler, Stephens, Murray, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90° at all times during the summer months.

108.    As the conditions at the Hodge Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Webb, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas cooled by air

23

conditioning or temporary cooling system/unit, or to make sure inmates with serious mental illnesses were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat. A decision, of course, they made from the comfort of their own air conditioned offices.

109.   TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Eason and Haynes routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison.

110.   Likewise, UTMB conducts morbidity and mortality reviews for every prisoner who dies. These reports would show inmates regularly died due to heat-related causes. Murray is aware of the results of these reviews, and knew the heat was killing prisoners.

111.   UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, Murray, and Haynes – at a minimum – failed to take reasonable steps to safely house prisoners at the Hodge Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Murray, Thaler, Stephens, Eason, and Haynes were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

112.   Meaningfully addressing these conditions would require action at the highest levels of the agency, including authorization and approval from Livingston and Thaler.  They have refused to act, authorize or otherwise approve actions to address these conditions.

113. UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, Hayne, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Hodge Unit and protect them from heat stroke, a risk they were well aware of at the time.

Livingston, Murray, Thaler, Stephens, Eason, and Haynes were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

114.    Despite the epidemic of heat-related deaths, the Defendants have refused to act, authorize or otherwise approve actions to address these conditions.

115.    At the time of Webb's death, the law was clearly established that temperatures exceeding 90° are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Murray, Thaler, Stephens, Eason, and Haynes are not entitled to qualified immunity.

116.    Plainly, the conditions at the Hodge Unit result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Webb, as well as the prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest. Rather, they endanger the lives of the weakest, sickest, prisoners in TDCJ custody.

**Webb was Disabled**

117.    Webb suffered from severe mental illnesses. In high school, he was diagnosed as suffering from bipolar disorder.

118.    Webb only completed the ninth grade, and was enrolled in special education classes for most of his time in school. He had trouble concentrating, even when he tried to take GED classes in TDCJ. Because of his disabilities, he always had great difficulty reading and writing.

119.    But his life began to fall apart when his father with whom he was very close, died. His disabilities caught up to him. Before going to prison, Webb spent time homeless, living on the streets. He reported hearing voices, most often of his father.

120.    When he arrived in TDCJ custody, UTMB doctors diagnosed him with "adjustment disorder with mixed anxiety and depression" and prescribed Thorazine (chlorpromazine), Celexa (citalopram), and Omeprazole. UTMB found he had "borderline intellectual functioning," and he needed help completing simple tasks, like making a short voice-recording so he could access the TDCJ prison payphone system.

121.    Thorazine is known to affect thermoregulation – the body's ability to cool itself. Thorazine is an antipsychotic, or psychotropic drug, which TDCJ and UTMB recognize puts prisoners like Webb at heightened risk of heat-related injury.

122.    Depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the neurological system.

123.    As a result of his mental illnesses, TDCJ and UTMB enrolled Webb in the "Mentally Retarded Offender Program" (MROP),[3] and housed him with other prisoners with developmental disabilities at the Hodge Unit in Rusk, Texas.

124.    Webb also suffered from Hepatitis C, and received treatment from UTMB for the disease while in TDCJ custody.

125.    TDCJ and UTMB officials, including Livingston, Murray, Thaler, Stephens, Eason and Haynes, knew prisoners with depression and taking powerful psychotropic drugs lived in Texas prisons and were at risk for heat-related injury, yet refused to accommodate them during the extreme heat of the Texas summers.

---

[3] Many people with developmental disabilities consider the term "mentally retarded" offensive, and it is used here only because that is the term Defendants choose.

26

126.   TDCJ and UTMB discriminated against Webb by denying him reasonable accommodations necessary to allow him access to TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people with disabilities like Webb access to TDCJ facilities and programs.

**Webb's Death**

127.   At the time of his death, Webb was a fifty year-old man. A native of the Houston area, he loved to fish and hunt with his family. He was a loving father who always attended his children's school and athletic events.

128.   Webb was convicted of non-aggravated robbery, and sentenced to serve time in TDCJ. He expected to be paroled April 2012.

129.   He spent several summers at the Hodge Unit. Each year, he suffered symptoms of heat exhaustion.

130.   In August 2009, he wrote a sick call, concerned he was "drinking a lot of water and I'm still dizzy, dehydrated, cramps and muscle spasms. I am having these symptoms all day, and all night. Please can you help me?" He wrote "I get dizzy, feel like I'm light headed, like I'm gonna faint" and "my eyes get blurry so could you please see me?" When he saw UTMB staff the next week, he told nurses "I'm very dehydrated (even though I'm drinking plenty of water). … I have these symptoms all day long." Dizziness, nausea, blurred vision, muscle cramps and dehydration are all symptoms of heat exhaustion.

131.   In August 2010, he reported suffering "diarrhea, dizziness and nausea" to UTMB medical providers. Nurses noted his skin was warm to the touch, and he complained of dehydration and dry mouth. Though he was again suffering from heat exhaustion, UTMB and TDCJ provided him no accommodations.

132.   In July 2011, shortly before his death, he again complained to UTMB medical staff he was having "dizzey spells." UTMB medical simply staff ignored the pattern of Webb suffering heat illness from the heat because they had not been trained by Murray that patients who previously experienced heat-related illnesses needed additional protections, and because UTMB had no policy instructing them that patients like Webb (who experienced heat illnesses before) were at increased risk of heat stroke.

133.   In the month before Webb died, the Rusk area had endured 18 days where the temperature exceeded 100 degrees Fahrenheit. Temperatures soared as high as 107°.

134.   A few weeks before his death, Webb's brother, Sidney Webb, visited him at the Hodge Unit. During the visit, Webb drank several cold Cokes that Sidney bought him from the vending machine, and complained about the extreme heat in the cell blocks. Sidney thought his brother looked terrible – he was pail and gaunt. Sidney asked if he could buy cold Cokes from the prison commissary, and Webb responded "those Cokes are so hot they explode."

135.   Webb believed the heat would kill him – he talked with his brother about giving his property away and his impending death.

136.   Webb told his brother he'd been experiencing difficulty breathing recently, and had tried to go to the infirmary.

137.   In the weeks before he died, Webb made several visits to the prison infirmary, complaining about the heat, including on the day he died.

138.   Two days before his death, Webb made a desperate phone call to his mother. He complained "it's hot and I'm sick," and told her he was sleeping on the concrete floor to try and stay cool. He was "real depressed" and suffering in the sweltering temperatures.

139.   On the night of August 4, 2011, the Rusk area experienced temperatures near 90 degrees after midnight. That day, the heat in Rusk was sweltering – 105 degrees Fahrenheit, with

50 percent humidity. The heat index, the combination of temperature and humidity, made the air temperature feel like it was over 137 degrees. According to TDCJ's heat matrix, at these temperatures "heatstroke [is] imminent." But Warden Haynes did nothing.  No one from UTMB or TDCJ did anything to cool the indoor temperatures or remove prisons vulnerable to such extreme heat.

140.    Shortly after 3:00 am that night, Webb was found nude, laying on the floor of his cell, and unresponsive. His skin was hot to the touch.

141.    Webb was pronounced dead at 3:55 am.

142.    The autopsy noted Webb "had several risk factors for [heat stroke]: lack of air conditioning, chronic illness, and use of Thorazine," – an autopsy of which senior UTMB officials, including Murray, were aware.

## CAUSES OF ACTION

### EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Murray, Eason and Haynes Only, in Their Individual Capacities)

143.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

144.    By subjecting Webb to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Murray, Thaler, Stephens, Eason and Haynes acted with deliberate indifference to the his serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

145.    The extreme temperatures Defendants tolerated at the Hodge Unit proximately caused Webb's untimely death.

146.    Plaintiffs bring these claims through 42 U.S.C. §1983.

29

AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT
AMENDMENT ACT AND REHABILITATION ACT
(As to Defendants TDCJ and UTMB Only)

147.    TDCJ and UTMB have been, and are, recipients of federal funds, and thus
covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of
federal monies to reasonably accommodate persons with disabilities in their facilities, services,
programs, or activities and reasonably modify such facilities, services, programs or activities to
accomplish this purpose. 29 U.S.C. §794.

148.    Further, Title II of the ADA, and the Americans with Disabilities Act
Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation
Act.  42 U.S.C. §§12131 et seq..

149.  Title II of the ADA and the ADA Amendments Act protect prisoners with
disabilities because exposure to extreme temperatures actually violates the Eighth and Fourteenth
Amendments of the U.S. Constitution.

150.    The Hodge Unit is a facility, and its operation comprises services, programs or
activities of TDCJ and UTMB for Rehabilitation Act, ADA, and ADAAA purposes. Webb was
otherwise qualified to receive the services of and participate in the programs or activities
provided by TDCJ and/or UTMB at the Hodge Unit.

151.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Webb
was a qualified individual regarded as having a physiological or mental impairment that
substantially limited one or more of his major life activities. Defendants TDCJ and UTMB knew
Webb suffered from mental illnesses, and was prescribed medications to treat his disabilities.
Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated
against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and

30

refusing to accommodate his disabilities and protect him from the extreme temperatures that took his life.

152.    As alleged above and herein, TDCJ and UTMB failed and refused to reasonably accommodate Webb, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused his death.

153.    As alleged above, TDCJ and/or UTMB failed and refused to reasonably modify its policies, practices or procedures to ensure Webb access to the facilities, services, programs or activities of the Hodge Unit by reasonably accommodating his disabilities. These failures and refusals caused his death.

154.    Webb died as a direct result of TDCJ and UTMB's intentional discrimination. Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

NEGLIGENCE – TEXAS TORT CLAIMS ACT – PRESCRIPTION DRUGS

(As to Defendant UTMB)

155.    As described above, UTMB employees negligently used personal property, the prescription drugs prescribed Plaintiffs' decedent, to treat his disability.

156.    Use of these prescription drugs was dangerous in the conditions of extreme heat and contributed to Webb's death.

157.    Moreover, UTMB employees knew, or should have known the medications substantially increased Webb's  risk of suffering fatal heat strokes prior to their deaths.

158.    UTMB had actual notice that Webb died as a result of the extremely hot conditions, lack of air conditioning and the effects of the drugs (thorazine) he was prescribed, and a subjective awareness that its fault contributed to Webb's death.

159.    Thus, no exceptions to the waiver of sovereign immunity under the Texas Tort Claims Act apply.

31

DAMAGES

160.    Webb's survivors are entitled to compensatory, and punitive damages against the individual Defendants in the maximum amounts allowed by law.

161.    Webb's survivors are entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by law.

162.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of Webb's wrongful death, Plaintiffs assert claims under the United States Constitution and 42 U.S.C. §1983, the ADA, ADAAA, and Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

163.    More particularly, Plaintiffs Kevin Webb, Christan Carson, and Casey Akins, in their capacities as heirs-at-law to the Estate of Robert Allen Webb, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;

- past mental anguish;

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act or as allowed by law.

110.    Plaintiffs Kevin Webb, Casey Akins, Christan Carson, and Edna Webb, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;

- past and future loss of companionship, society, services, and affection of Robert Allen Webb; and,

32

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

111.     Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also requests attorneys' fees, costs, and expenses against TDCJ for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs requests that the Court:

A.     Award compensatory damages, nominal and presumed damages against Defendants to the survivor plaintiffs;

B.     Award punitive damages against the individual Defendants only under Section 1983 and the Wrongful Death Act, and through the Survival Statute to the survivor plaintiffs;

C.     Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.     Grant such other and further relief poas appears reasonable and just, to which Plaintiff may be entitled.

Date: March 14, 2014.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
  Tel.  512-623-7727
  Fax.  512-623-7729

By    /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
Scott Medlock
State Bar No. 24044783


Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
  (512) 474-5073 [phone]
  (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS



CERTIFICATE OF SERVICE

I certify a copy of this document was served on counsel for the parties through the Court's electronic filing system.

By    /s/ Jeff Edwards
JEFF EDWARDS

34