**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| _____ | § | |
| IN RE TEXAS PRISON HEAT | § | MDL Docket No._____ |
| LITIGATION | § | |
| _____ | § | |

**EXHIBIT 12 TO MOTION OF DEFENDANTS FOR TRANSFER
OF ACTIONS TO THE SOUTHERN DISTRICT OF TEXAS PURSUANT
TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED
PRETRIAL PROCEEDINGS**

***TOGONIDZE* COMPLAINT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| GWEN TOGONIDZE, as the next friend of J.T., a minor child and heir-at-law to the ESTATE OF ALEXANDER TOGONIDZE, | § § § § | |
| PLAINTIFF | § § § | |
| v. | § § | CIVIL ACTION NO. 3:13-cv-229 |
| BRAD LIVINGSTON, RICK THALER, WILLIAM STEPHENS, ROBERT EASON and TODD FOXWORTH, in their individual capacities, the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and the UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § § | JURY DEMANDED |
| DEFENDANTS | § | |

**COMPLAINT**

Alexander Togonidze died in Texas Department of Criminal Justice custody because Defendants, Texas corrections officials, fail to protect prisoners from dying from heat stroke in the brutally hot TDCJ Michael Unit. Mr. Togonidze's minor son seeks redress for the death of his father.

STATEMENT OF CLAIMS

1.      Prisoners are dying of heat stroke while in Defendants' custody at prisons across Texas. The minor son of one of these men, Alexander Togonidze, brings claims through his mother as an heir-at-law and as a statutory wrongful death beneficiary against Defendants for taking Mr. Togonidze's life.

2.      The Plaintiff claims the individual defendants are liable for damages for violating Mr. Togonidze's constitutional rights under color of law, in violation of his Eighth and

1

Fourteenth Amendment right to protection from cruel and unusual punishment under 42 U.S.C. §1983.

3.      Further the Plaintiff claims TDCJ and UTMB caused Mr. Togonidze's death by failing to provide reasonable accommodations for his disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act).

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1), as Defendant UTMB resides in this district, and all Defendants reside in this state.

## PARTIES

6.      Plaintiff Gwen Togonidze is the natural mother and next friend of J.T., Mr. Togonidze's minor son, and sues in her representative capacity on behalf of J.T., who is a statutory beneficiary under the Texas Wrongful Death Act. Mrs. Togonidze is Mr. Togonidze's ex-wife. At the time of his death, Mr. Togonidze had only one child. He died intestate, and there were no probate proceedings arising from his death, as none were necessary. Ms. Togonidze is a resident of Dallas County, Texas.

7.      Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ). As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under

2

color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served with process at 861 B IH 45 North, Huntsville, TX 77320.

8.   Defendant Todd Foxworth was the warden at the Michael Unit at all relevant times. At all relevant times, Foxworth was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for nominal, punitive, declaratory, and compensatory relief. He can be served with process at 379 FM 2972, Rusk, Texas 75785.

9.   Defendant Rick Thaler is the director of TDCJ's Correctional Institutions Division. The Correctional Institutions Division manages all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, Texas, in Walker County. He can be served with process at 861 B IH 45 North, Huntsville, TX 77320.

10.   Defendant William Stephens is the deputy director of TDCJ's Correctional Institutions Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and

compensatory damages. Stephens is a resident of Huntsville, Texas, in Walker County. He can be served with process at 861 B IH 45 North, Huntsville, TX 77320.

11.   Defendant Robert Eason was the regional director for TDCJ's "Region II," and supervises eleven prisons, including the Michael Unit. As the regional director, he is responsible for the supervision of all personnel at the Michael Unit. Eason was acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Eason is a resident of Anderson County, Texas.

12.   The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Michael Unit, a public facility with programs and services Mr. Togonidze and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, compensatory, and nominal relief. It can be served with process by serving Brad Livingston, its executive director, at 861 B IH 45 North, Huntsville, TX 77320.

13.   The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB's high-ranking policymakers reside and work in Galveston. Through UTMB's Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the Michael Unit. UTMB is a recipient of federal funds. UTMB is sued for compensatory relief. It can be served with process by serving its president, David L. Callender, at 301 University Blvd., Suite 6.100, Administration Building, Galveston., TX 77555-1006.

# FACTS

**Extreme Temperatures are Killing Texas Prisoners**

14.     According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Alexander Togonidze, died at TDCJ's brutally hot Michael Unit.

15.     The Michael Unit's inmate living areas are not air conditioned, and the heat index or apparent indoor temperatures (see chart below) routinely exceeds 100 degrees.

16.     These temperatures last late into the night, providing no relief to TDCJ's prisoners. Even early in the morning, indoor apparent temperatures are very high.

17.     Temperatures this high cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

18.     TDCJ and UTMB incorporate this chart, promulgated by the National Oceanic and Atmospheric Administration (NOAA), into agency policies.

**Temperature (°F)**

|  | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **40** | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| **45** | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| **50** | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| **55** | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| **60** | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| **65** | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| **70** | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| **75** | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| **80** | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| **85** | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| **90** | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| **95** | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| **100** | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

*(vertical axis label: Relative Humidity (%))*

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

Caution    Extreme Caution    Danger    Extreme Danger

19.    The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

20.    The indoor apparent temperatures routinely reach the red "extreme danger" zones indoors at the Michael Unit. According to NOAA, when the apparent temperature reaches "extreme danger" heat stroke is "imminent."

21.    People with certain medical conditions, like diabetes or hypertension, or who take certain medications, like psychotropics or diuretics, are much more vulnerable to extreme temperatures. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death.

22.     Since 2007, thirteen men have died in TDCJ prisons from heat-related causes.

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |

23.     In fact, it is likely that there were more heat related injuries and deaths as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists.

24.     These men all shared certain characteristics. Most took psychotropic drugs to treat some form of mental illness, suffered from diabetes, or took diuretics to treat hypertension. Most

7

collapsed in the middle of the night, or were found dead early in the morning. And they all died in late July and early August – the hottest days of the Texas summer.

25.     Eight of these men, including Mr. Togonidze, lived in prisons in TDCJ's "Region II" – where Defendant Eason is the regional director. As the regional director, Eason reviews reports on each prisoner's death.

26.     Even though ten men died of heat stroke in 2011 – and eight of them died in his "region" – Eason did not consider these deaths a serious problem. In fact, in the face of these deaths, he believed TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, he and Defendant Foxworth took no action to protect future prisoners, like Mr. Togonidze, in the face of TDCJ's obviously inadequate procedures.

27.     Eason's direct supervisors, Defendants Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke were regularly discussed at meetings Thaler and Stephens held with their deputies, including Eason. As the existing policies became obviously inadequate, Thaler, Stephens and Eason continued to follow the same deadly course of conduct. Air conditioning the Michael Unit or other prisons was never even discussed.

28.     For TDCJ to make a necessary capital improvement like air conditioning the prisons, action by the most senior TDCJ officials, including Defendant Livingston, would be needed. Despite prisoners continuing to die from extreme temperatures, Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

29.     These hazardous conditions serve no penological purpose.

**TDCJ Denied Mr. Togonidze Safe Housing**

30.    Air-conditioned housing is available at some other TDCJ prisons. Of the 97 state operated TDCJ prisons, 56 have some air conditioning in inmate living areas. Ironically, solitary confinement cells (including death row) are routinely air conditioned. While inhumane heat conditions are never justified, it is ironic that prisoners who obediently serve their time do not receive relief from the extreme heat, while prisoners who are allegedly combative, assault staff, or are sentenced to death live in safe conditions.

31.    Of course, areas like Livingston, Eason, Stephens, Thaler, and Foxworth's offices are air conditioned – a comfortable 75 degrees. TDCJ even air conditions the armory at the prison because of concerns the prison's weapons could be damaged by the heat

32.    TDCJ and UTMB policies only provide protections from heat to inmates performing outdoor prison labor. If a prisoner suffers from heat-sensitive conditions, they cannot "work or recreate in environments where the apparent air temperature is 95° F or higher." The policy, however, makes *no* accommodations for prisoners' housing assignments, or locations they are required to live in, even though temperatures in living areas routinely reaches the "extreme danger" zone. TDCJ and UTMB policy only addresses preventing heat-related injuries "in the workplace."

33.    UTMB makes mandatory housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair, for example, could not be assigned to a top bunk. But UTMB and TDCJ policies do not contemplate special housing for prisoners with heat-sensitive disabilities.

34.    Significantly, Defendants chose not to provide prisoners at the Michael Unit, including Mr. Togonidze, opportunities to cool off in an air conditioned environment. Though

some parts of the Michael Unit are air conditioned and available to use as a respite area, such as the visitation rooms, prisoners are not given a chance to cool off.

35.     Eason considers adding any air conditioning to TDCJ's prisons a waste of money.

**People with Certain Medical Conditions are Especially Vulnerable to Extreme Temperatures**

36.     TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

37.     TDCJ and UTMB policies list certain medical conditions that "may affect heat tolerance." These conditions include: diabetes, cardiovascular disease, and psychiatric conditions.

38.     TDCJ advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics and psychotropics. Though many TDCJ prisoners are young and healthy enough to survive and merely suffer in these inhuman conditions, prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death.

39.     Unfortunately, many TDCJ inmates suffer from these conditions, including Mr. Togonidze and the other men who died.

**Correctional Officers at the Michael Unit are Inadequately Trained**

40.     Because the apparent temperatures are so high, it is imperative TDCJ's low-level employees recognize heat-related illnesses and get prisoners emergency medical care. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A training circular is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated after Mr. Shriver and Mr. Robles died in 2007.

41.     UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

42.     As the warden and regional director, Foxworth and Eason are directly responsible for training the front-line officers charged with protecting prisoners' lives.

**When Men Died in 2007, TDCJ and UTMB Failed to Make Changes**

43.     Two TDCJ and UTMB victims died at TDCJ's Byrd Unit in 2007. The first prisoner to die, James Shriver, arrived at the Byrd Unit less than 24 hours before his death. Though he had served several years in prison, he came to Byrd on the afternoon of August 7, 2007 from a TDCJ inpatient, mental-health facility that was air conditioned. That day the apparent temperature reached 105 degrees. Shortly before 5:00 am the next day, officers found him dead in his cell.

44.     Less than a week later, Dionicio Robles died of heat stroke at the Byrd Unit. He also came to the Byrd Unit from a TDCJ inpatient mental health facility that was air conditioned. He arrived at the Byrd Unit on August 3, 2007, and was dead less than ten days later. The day he died the apparent temperature topped 106 degrees. He was also found dead in his cell shortly before 5:00 am.

45.     Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

46.     Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including Livingston, Thaler and Stephens. But even though two men died

under extremely similar circumstances, TDCJ made no changes to operations to protect the lives of vulnerable prisoners in the future.

**As Men Died in 2011, TDCJ and UTMB Failed to Make Changes**

47.     The first TDCJ prisoner to die from heat stroke in 2011 was Larry Eugene McCollum. He was found unresponsive in his bunk at the Hutchins Unit, a TDCJ transfer facility Eason supervises, on July 22, 2011. He was hospitalized in Dallas until life-support was withdrawn on July 28, 2011.

48.     Shortly after Mr. McCollum's heat stroke, Douglas Hudson was found unconscious, having a seizure in his cell at the Gurney Unit (another prison Eason supervises) on July 24, 2011. He received medical attention at the prison, but his body temperature was 105 degrees. He was eventually flown by helicopter to Palestine Regional Medical Center, and died of heat stroke on July 25, 2011.

49.     A few days later, on August 3, 2011, Thomas Meyers died at the Coffield Unit after suffering a heat stroke. Serving time for a burglary, Mr. Meyer's body temperature was 105.6 degrees when he received medical attention. The Coffield Unit is also within Eason's supervision region.

50.     The next day, shortly after 3 am, Robert Allen Webb was found on the floor of his cell, nude and unresponsive. His skin was hot to the touch. Prison staff attempted resuscitation, but it was too late. He died less than half an hour after he was found. The autopsy noted that when body temperatures reach the levels Mr. Webb experienced, "all cellular structures are destroyed and cellular necrosis occurs in less than 5 minutes." The Hodge Unit is another prison within Eason's supervision region.

51.     Four days later, Alexander Togonidze died at the Michael Unit.

**TDCJ Officials at the Highest Levels Knew About these Deadly Conditions**

52.     Livingston, Thaler, Stephens, Eason, Foxworth, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed to take reasonable steps to protect the health and safety of prisoners.

53.     And Livingston, Thaler, Stephens, Eason, and Foxworth all knew inmate living areas at the Michael Unit were not air conditioned, and that the apparent temperatures routinely skyrocketed during the hot Texas summers.

54.     At all relevant times, Livingston, Thaler, Stephens, Eason, and Foxworth knew that extreme temperatures can be deadly.

55.     Livingston, Thaler, Stephens, Eason, and Foxworth, as well as TDCJ and UTMB, also knew TDCJ routinely housed people with hypertension, diabetes, and mental illness in extremely hot facilities like the Michael Unit. Moreover, TDCJ's policies and practices, which Livingston, Thaler, Stephens, Eason, and Foxworth knew about, make no accommodation for people with mental illnesses during periods of extreme temperatures.

56.     Eason and Foxworth worked at the Michael Unit, or in nearby Tennessee Colony, every day, and knew about the extreme temperatures the area experiences each summer.

57.     Though Livingston, Thaler and Stephens work in Austin and Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months.

58.     Instead of having a formal policy, TDCJ relies on an informal email to protect prisoners from the extreme temperatures indoors. Stephens and Thaler send the email in May of each year to remind wardens and regional directors to begin to take heat-safety precautions. But even this email does not provide for any way to protect a prisoner with heat-sensitive medical

conditions from extreme temperatures. Instead, it relies on measures the 2007 deaths proved to be inadequate, like increasing water intake and providing additional fans.

59.     The email is recycled each year – the text is virtually identical, and has not changed even after men began to die. Thaler and Stephens know the measures described in the email are inadequate, but have taken no action to improve TDCJ's response to heat-related emergencies.

60.     High-level TDCJ officials have been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District observed prisoners were dying of heat-related causes as far back as 1999. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

61.     Among other lawsuits, Livingston was a named defendant in *Blackmon v. Kukua*. In *Blackmon*, Livingston filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the inmates are housed [at Mr. Blackmon's prison] are not air conditioned." Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit. *Blackmon* went to trial in February 2011, just a few months before Togonidze died at the Michael Unit.

62.     High-ranking UTMB officials were dismissive of the *Blackmon* suit. Dr. Charles Adams, a chief UTMB physician, testified the extreme temperatures did not violate Mr. Blackmon's rights, flippantly saying "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away."

63.     As the conditions at the Michael Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Mr. Togonidze, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas

14

cooled by air conditioning, or to make sure inmates with serious mental illnesses were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat. A decision, of course, they made from the comfort of their own air conditioned offices.

64.     TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Eason and Foxworth routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison.

65.     UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, and Foxworth – at a minimum – failed to take reasonable steps to safely house prisoners at the Michael Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Thaler, Stephens, Eason, and Foxworth were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

66.     Meaningfully addressing these conditions would require action at the highest levels of the agency, including authorization and approval from Livingston and Thaler. They have refused to act, authorize or otherwise approve actions to address these conditions.

67.     At the time of Mr. Togonidze's death, the law was clearly established that temperatures exceeding 90° are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Thaler, Stephens, Eason, and Foxworth are not entitled to qualified immunity.

68.     Plainly, the conditions at the Michael Unit result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Mr. Togonidze, as well as the prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest.

**Mr. Togonidze had a Disability**

*Depression*

69.      Mr. Togonidze suffered from severe mental illnesses. When he arrived in TDCJ custody, UTMB doctors diagnosed him with depression.

70.      Depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating.

71.      Depression is a physiological condition affecting body systems, including the neurological system. Before being treated for depression, Mr. Togonidze often had difficulty sleeping. His anti-depressants helped Alex to sleep regularly.

72.      As a result of his mental illness, UTMB staff prescribed him pamelor (Nortriptyline), a tricyclic antidepressant.

73.      Tricyclic antidepressants put patients at a much higher risk for heat stroke. UTMB policy recognizes patients taking pamelor "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

*Diabetes*

74.      While in prison, Mr. Togonidze was also diagnosed with diabetes, which runs in his family.  UTMB medical professionals placed him on a treatment regimen, and he was seen regularly at the diabetes chronic care clinic at the Michael Unit.

75.      Diabetes is a chronic disease caused by an insulin imbalance that affects the endocrine, digestive, circulatory, and nervous systems.  Insulin is a hormone produced by the pancreas to control blood sugar.

76.     Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

77.     Diabetes can also reduce blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

78.     UTMB's policies identify diabetes as a condition "that may affect heat tolerance."

*Hypertension*

79.     Mr. Togonidze also suffered from hypertension, and was prescribed medications, including atenolol (Tenormin), by UTMB for the disease while in TDCJ custody.

80.     Atenolol is known to affect thermoregulation – the body's ability to cool itself. Atenolol is a beta blocker, which reduce the body's ability to sweat. UTMB policy recognizes atenolol puts prisoners like Mr. Togonidze at heightened risk of heat-related injury.

81.     TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason and Foxworth, knew prisoners with hypertension, depression, and diabetes lived in Texas prisons and were at risk for heat-related injury, yet refused to accommodate them during the extreme heat of the Texas summers.

82.     TDCJ and UTMB discriminated against Mr. Togonidze by denying him reasonable accommodations necessary to allow him access to TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people like Mr. Togonidze access to TDCJ facilities.

**Mr. Togonidze's Death**

83.     At the time of his death, Alexander Togonidze was a forty-four year-old man. He immigrated from the Republic of Georgia. He hoped to build a better life for himself in America.

84.     He married Mrs. Togonidze after he moved to America, and they had a son together, J.T. Mr. Togonidze worked in the hospitality industry, and had a job at a hotel in Dallas.

85.     Unfortunately, Mr. Togonidze was laid off after the September 11 attacks when the travel industry suffered a serious downturn. Feeling worthless when he was unable to provide for his family, Mr. Togonidze fell prey to depression and drug abuse. He committed a drug-related robbery to support his addiction. Police arrested him, and he was sentenced to serve time in TDCJ.

86.     Almost immediately he began suffering from symptoms of heat exhaustion. On August 10, 2009, he was admitted to the prison UTMB clinic for a heat rash. Heat rash occurs when the skin sweats excessively to cool the body through perspiration. The sweat clogs the pores, irritating the skin and making it appear red and prickly. Heat rash commonly occurs during periods of hot, humid weather, like the Michael Unit typically experiences every summer.

87.     On August 18, 2009, Mr. Togonidze was diagnosed at the clinic as suffering from "heat exhaustion." The nurse who examined him noted he displayed "weakness, fatigue and anxiety." She prescribed him "a pitcher of water with salt" before sending him back to his cell.

88.     Later that day, Mr. Togonidze was brought back to the infirmary on a stretcher. The nurse noted he had "labored and increased" breath and his skin was "hot to touch." His body temperature was 100.4 degrees Fahrenheit. He was again prescribed a "pitcher of warm salt water." He was allowed to take ten days off from his prison job, but sent back to his hot cell.

89.     In August 2010, he reported suffering "diarrhea, dizziness and nausea" to UTMB medical providers. Nurses noted his skin was warm to the touch, and he complained of dehydration and dry mouth. Though he was again suffering from heat exhaustion, UTMB and TDCJ provided him no accommodations.

90.     In the days preceding Mr. Togonidze's death, the Tennessee Colony area had endured 39 consecutive days where the temperature exceeded 100 degrees Fahrenheit. Temperatures soared as high as 116°.

91.     On the night of August 7, 2011, the Tennessee Colony area experienced temperatures over 90 degrees after midnight. That day, the heat in Tennessee Colony was sweltering – 102 degrees Fahrenheit, with 65 percent humidity. The heat index, the combination of temperature and humidity, made the air temperature feel like it was over 136 degrees. According to TDCJ's heat matrix, at these temperatures "heatstroke [is] imminent."

92.     Shortly before 8 am on the morning of August 8, 2011, Mr. Togonidze collapsed on the floor of his cell. His skin was hot to the touch – later his body temperature would be measured as over 106 degrees.

93.     Medical staff attempted CPR, but it was too late. Mr. Togonidze was pronounced dead at 8:15 am.

94.     The autopsy concluded that he had died of hyperthermia – heat stroke – which had caused "severe organ damage."

CAUSES OF ACTION

EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Eason and Foxworth Only, in Their Individual
Capacities)

95.     Plaintiff incorporates the previous paragraphs as if alleged herein, and further pleads:

19

96.     By subjecting Mr. Togonidze to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Eason and Foxworth acted with deliberate indifference to the his serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

97.     The extreme temperatures Defendants tolerated at the Michael Unit proximately caused Mr. Togonidze's untimely death.

98.     Plaintiff brings these claims through 42 U.S.C. §1983.

### AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT
### (As to Defendants TDCJ and UTMB Only)

99.     TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, services, programs, or activities and reasonably modify such facilities, services, programs or activities to accomplish this purpose. 29 U.S.C. §794.

100.    Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act.  42 U.S.C. §§12131 et seq.

101. Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperatures actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

102.    The Michael Unit is a facility, and its operation comprises services, programs or activities of TDCJ and UTMB for Rehabilitation Act, ADA, and ADAAA purposes. Mr.

Togonidze was otherwise qualified to receive the services of and participate in the programs or activities provided by TDCJ and/or UTMB at the Michael Unit.

103.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Mr. Togonidze was a qualified individual regarded as having a physiological or mental impairment that substantially limited one or more of his major life activities. Defendants TDCJ and UTMB knew Mr. Togonidze suffered from mental illness, and was prescribed medications to treat his disabilities. Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAA and Rehabilitation Act, by failing and refusing to accommodate his disabilities and protect him from the extreme temperatures that took his life.

104.    As alleged above and herein, TDCJ and UTMB failed and refused to reasonably accommodate Mr. Togonidze, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused his death.

105.    As alleged above, TDCJ and/or UTMB failed and refused to reasonably modify its policies, practices or procedures to ensure Mr. Togonidze access to the facilities, services, programs or activities of the Michael Unit by reasonably accommodating his disabilities. These failures and refusals caused his death.

106.    Mr. Togonidze died as a direct result of TDCJ's intentional discrimination. Plaintiff are entitled to the maximum amount of compensatory damages allowed by law.

DAMAGES

107.    Mr. Togonidze's son, J.T., is entitled to compensatory and punitive damages against the individual Defendants in the maximum amounts allowed by law.

108.    J.T. is entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by law.

21

109.   As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiff and were the moving force of Togonidze's wrongful death, Plaintiff asserts claims under the United States Constitution and 42 U.S.C. §1983, the ADA, ADAAA, and Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

110.   More particularly, Plaintiff Gwen Togonidze, in her representative capacity as the next friend of J.T., the sole heir-at-law to the Estate of Alexander Togonidze, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act or as allowed by law.

110.   J.T., asserting a wrongful death claim through his next friend, Gwen Togonidze, has incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Alexander Togonidze; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

ATTORNEYS' FEES AND COSTS

111.   Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to recover attorneys' fees and costs. Plaintiff also requests attorneys' fees, costs, and expenses against TDCJ for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a.

PRAYER FOR RELIEF

THEREFORE, Plaintiff requests that the Court:

A.     Award compensatory damages against Defendants to J.T., through his next friend, Gwen Togonidze;

B.     Award punitive damages against the individual Defendants only under Section 1983 and the Wrongful Death Act, and through the Survival Statute to J.T., through his next friend, Gwen Togonidze;

C.     Find that Plaintiff is the prevailing party in this case and award her attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.     Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: June 21, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
 Tel.   512-623-7727
 Fax.   512-623-7729

By      /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

ATTORNEYS FOR PLAINTIFF

Respectfully Submitted,

 /s/Scott Medlock
Scott Medlock
State Bar No. 24044783
Brian McGiverin

23

State Bar No. 24067760
James C. Harrington
State Bar No. 09048500
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
  (512) 474-5073 [phone]
  (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFF