**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| ——————————————— | § | |
| IN RE TEXAS PRISON HEAT | § | MDL Docket No._____ |
| LITIGATION | § | |
| ——————————————— | § | |

**EXHIBIT 14 TO MOTION OF DEFENDANTS FOR TRANSFER
OF ACTIONS TO THE SOUTHERN DISTRICT OF TEXAS PURSUANT
TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED
PRETRIAL PROCEEDINGS**

***BAILEY* CLASS-ACTION COMPLAINT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID BAILEY, MARVIN RAY YATES, | § | |
| KEITH COLE, and NICHOLAS DIAZ | § | |
| individually and on behalf of those similarly | § | |
| situated, | § | CIVIL ACTION NO. |
| Plaintiffs, | § | 4:14-cv-1698 |
| | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| BRAD LIVINGSTON, in his official | § | |
| capacity, ROBERTO HERRERA, in his | § | |
| official capacity, and TEXAS | § | |
| DEPARTMENT OF CRIMINAL JUSTICE, | § | |
| | § | |
| Defendants. | § | |

**CLASS ACTION COMPLAINT**

Since 2011, at least twelve prisoners have died from heat stroke because of the sweltering temperatures inside buildings where the Texas Department of Criminal Justice houses inmates. Hundreds more have suffered heat-related illnesses, many of whom were housed at the Wallace Pack Unit.

Despite this, TDCJ has done nothing to lower the temperatures inside the housing areas at the Pack Unit. As this inflicts needless suffering on prisoners, and exposes them – many of who are sick, elderly, and disabled – to serious risk of harm, Plaintiffs ask the Court to enjoin TDCJ from continuing this dangerous practice.

## STATEMENT OF THE CASE

1.      Plaintiffs, on behalf of themselves and those similarly situated, bring this lawsuit because the Texas Department of Criminal Justice (TDCJ) refuses to cool inmate housing areas, despite the dangerously hot indoor temperatures prisoners are forced to live in.

2.      TDCJ operates the Wallace Pack Unit ("Pack Unit"). The Pack Unit is a medical and geriatric prison where the indoor inmate housing areas are not climate controlled. As a result, during the hot Texas summers the apparent temperatures routinely exceed 100 degrees inside inmate housing areas, threatening the health and welfare of all inmates living there, especially the elderly, sick, and disabled.

3.      TDCJ knowingly subjects Plaintiffs and the Class to extremely hot temperatures inside prisoners' housing areas in violation of the Eighth and Fourteenth Amendments to the Constitution.

4.      TDCJ is acutely aware of the health risk that extreme heat poses, especially to prisoners with heat-sensitive medical conditions and disabilities. Nevertheless, TDCJ refuses to make reasonable accommodations for these prisoners with disabilities, in violation of the Americans with Disabilities Act and Rehabilitation Act.

5.      Injunctive and declaratory relief are the only means to address TDCJ's studied indifference to the fact that extremely hot, indoor temperatures constitute cruel and unusual punishment to prisoners. Plaintiffs ask the Court to order Defendants to keep indoor apparent temperatures below dangerous levels, and cool indoor temperatures to 88 degrees or lower.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act).

7.    Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PLAINTIFFS

8.    David Bailey is a 51-year-old prisoner incarcerated at the Pack Unit in Grimes County, Texas. He was convicted of a drug offense, and is not expected to be released from custody until 2020.

9.    Marvin Ray Yates is a 69-year-old prisoner incarcerated at the Pack Unit. He was convicted of driving while intoxicated, and is not expected to be released from custody until 2019.

10.    Keith Cole is a 60-year-old prisoner incarcerated at the Pack Unit. He is not expected to be released from custody.

11.    Nicholas Diaz is a 26-year-old prisoner incarcerated at the Pack Unit who uses a wheelchair. He was convicted of a drug offense, and is not expected to be released from custody until 2016.

## DEFENDANTS

12.    Brad Livingston is the executive director of the Texas Department of Criminal Justice. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

13.    Roberto Herrera is the warden of the TDCJ Pack Unit. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory

3

and injunctive relief.

14.     Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. Tᴇx. Gᴏᴠ'ᴛ Cᴏᴅᴇ § 493.004. At all relevant times, it operated the Pack Unit, a public facility with programs and services Plaintiffs and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. Its failure to protect inmates with disabilities from dangerous heat violates their rights under the Americans with Disabilities Act and the Rehabilitation Act.

## FACTS

### A.     The Pack Unit Houses Sick, Elderly Prisoners

15.     The Pack Unit is a TDCJ prison located in Navasota, Texas, in Grimes County.

16.     Most prisoners assigned to the Pack Unit are minimum-custody inmates serving time for non-violent offenses.

17.     The Pack Unit began operating in September 1983. It presently has the capacity to house 1,478 inmates. As of January 2014, the prison incarcerated approximately 1,386 men.

18.     Like most prisons, the population of the Pack Unit is fluid, as new prisoners arrive and prisoners who have completed their sentences are released. Likewise, prisoners are frequently transferred between TDCJ prisons for various reasons related to prison management.

19.     The Pack Unit is a medical facility, and houses geriatric prisoners, prisoners with disabilities, and prisoners with chronic medical problems. The Pack Unit is one of the few TDCJ facilities that has wheelchair-accessible housing.

20.     As of January 2014, the Pack Unit housed 114 men over the age of 70, and 211 over the age of 65. Over half the men at the Pack Unit are over the age of 50.

## B.     The Pack Unit's Inmate Housing Is Not Air Conditioned

21.     The vast majority of prisoners at the Pack Unit, including Plaintiffs, are housed in inmate dormitories. The dorms do not have air conditioning, or any other form of climate control technology that lowers the indoor temperatures during the summer.

22.     The ventilation system at the Pack Unit does not lower the indoor temperatures. Rather, the ventilation system just brings in "fresh" hot air from outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning.

23.     TDCJ Executive Director Brad Livingston has admitted "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

24.     In fact, it is often hotter inside the housing areas than outdoor temperatures. The dormitories at the Pack Unit have exterior walls made of metal and thin insulation. The walls become hot to the touch during the summer when exposed to direct sunlight, and, on the hottest days, hold heat in like a parked car.

25.     Stainless steal tables in the inmate dormitories become hot to the touch. Prisoners have to lay towels down on the table to rest their elbows while sitting.

26.     Inmates routinely sleep on the concrete floor because their metal bunks are warm to the touch, and the floor is marginally cooler.

27.     The windows in some of the inmate dormitories, including the one Plaintiff Bailey is housed in, are sealed shut.

28.     In the dorms where the windows do open, the temperature is not cooler when the windows are open in the summer.

29.     As a result, and as TDCJ knows, there is little difference between the indoor and outdoor temperatures at the Pack Unit. Indeed, to many prisoners, including Plaintiffs, the indoor temperatures actually feel hotter than the temperatures outdoors during the summer.

30.     Defendants know very few parts of the prison accessible to prisoners have air conditioning, and inmates' time in these places is strictly limited. The law library, for example, has air conditioning, but inmates can only go there once per week. The education building has air conditioning, but only inmates enrolled in educational programming can go there, and it is only large enough to accommodate 25-30 prisoners at any time. (Bailey, for example, is not enrolled in any educational programming.) The visitation building is also air conditioned, but inmates can only go to visitation one time per week, and only if they have a visitor there to see them and are eligible to receive visitors.

31.     Thus, Plaintiffs are rarely allowed to go to air-conditioned portions of the prison during the summer.

32.     But, of course, Warden Herrera's office is air conditioned, as are all the administrative offices in the prison, and even the prison's armory.

**C.      The Vast Majority of TDCJ's Inmate Housing is Not Climate Controlled**

33.     In fact, though TDCJ imprisons over 150,000 prisoners system-wide, there are only 551 beds available with air conditioning for inmates with medical conditions system-wide. These extremely limited beds are reserved for the patients at the most extreme risk of heat-related illness (such as advanced-stage cancer patients), and are not available even for patients with multiple conditions that make them more susceptible to heat-related illness, injury, or death – like Plaintiffs. TDCJ's medical providers have testified before the Texas Legislature that these beds are filled by inmates who are so sick that they will never recover and will likely die in them.

34.     TDCJ's medical provider, the University of Texas Medical Branch, has testified there simply are not enough beds system-wide to accommodate even the prisoners with serious medical conditions who are at greater risk of heat-related illness, injury or death. TDCJ utilizes a Utilization Review Committee to determine which inmates are assigned the climate-controlled beds.

35.     Dr. Glenda Adams, one of the senior medical providers at UTMB who has been designated as an expert witness for TDCJ, testified as follows:

> Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?
>
> A: Pretty much. That's a fair description.
>
> Q: Do you know how many of those triage beds or cells you're talking about?
>
> A: How many are there?
>
> Q: Yeah.
>
> A: Absolutely … there were 471 [in 2011]. We now have 481.[1]
>
> Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?
>
> A: No, but it's all we have.
>
> Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?
>
> A: Essentially, yes.

36.     In other words, TDCJ knows it does not have enough air-conditioned beds to

---

[1] Dr. Adams testified about the beds available to the University of Texas Medical Branch, which provides healthcare to the majority of TDCJ prisoners. The Texas Tech University Health Science Center, which also provides care to TDCJ inmates, has additional beds available. Together, the UTMB and Texas Tech beds total 551.

safely house prisoners at risk of heat-related illness, injury or death.

37.     In fact, there are no air-conditioned beds available for prisoners at the Pack Unit.

38.     In other litigation, TDCJ has admitted it "knows of the high temperatures within its prisons and regard[s] it as a potential risk to the health and safety" of prisoners.

39.     Likewise, Livingston has admitted knowing "TDCJ ha[s] no written [policy] to address high temperatures in prisoner housing areas."

40.     There is no penological purpose behind refusing to provide prisoners with climate-controlled housing. In fact, the State of Texas requires county jails to keep indoor temperatures between 65 and 85 degrees. *See* TEX. ADMIN. CODE § 259.160.

41.     Indeed, TDCJ even air conditions limited portions of inmate housing areas at other prisons – including administrative segregation and solitary confinement cells, including Death Row. But decisions to place prisoners in these cells are made for security, not medical, reasons. At the Pack Unit, there are no air-conditioned cells available for prisoners without behavior problems.

42.     Even most maximum-security federal prisons in hot climates, like Texas, are routinely air conditioned. For example, the prison housing terrorism suspects in Guantanamo Bay, Cuba, is air conditioned.

43.     In fact, the American Correctional Association mandates prisons be able to "mechanically lower" temperatures in inmate housing areas. The Pack Unit is in violation of this standard.

44.     Most TDCJ prisons, including the Pack Unit, were built after air conditioning became common in public buildings in Texas.

45.     TDCJ officials made an intentional decision not to air condition the prisoner

8

housing areas at the Pack Unit.

46.     And TDCJ, including Brad Livingston and the Texas Board of Criminal Justice, have intentionally decided to continue exposing prisoners to extremely high indoor apparent temperatures at the Pack Unit.

**D.      Temperatures Inside the Pack Unit are Dangerously High During the Summer**

47.     TDCJ routinely records the outdoor apparent temperatures at the Pack Unit during the summer. According to TDCJ's own internal records, the outdoor apparent temperatures at the Pack Unit routinely exceed 100 degrees during the summer.

| Year | # Days: High Over 100 | # Days: High 90-99 | # Days: High 80-89 | # Days: High Below 80 |
|------|----------------------|--------------------|--------------------|----------------------|
| 2011 | 75 | 16 | 1 | 0 |
| 2012 | 45 | 43 | 2 | 0 |
| 2013 | 73 | 16 | 3 | 0 |

48.     This comes as no surprise to Texans, given the brutal summer temperatures and high humidity in the Houston area.

49.     Pursuant to TDCJ policy and practice, Warden Herrera reviews this data daily during the summer, and knows that apparent temperatures at the Pack Unit are dangerous.

50.     Likewise, Director Livingston is aware that apparent temperatures inside TDCJ prisons are hazardous during the summer.

51.     According to the National Weather Service (NWS), summer temperatures in the future will not be lower than temperatures from 2011–2013. In fact, temperatures will likely be higher.

52.     Upon information and belief, the indoor temperatures at the Pack Unit are just as

9

high as the outdoor temperatures, if not higher, just as they are at numerous other TDCJ facilities.

**E.     The Extreme Temperatures at the Pack Unit Threaten Illness, Injury and Death.**

*A.     Extreme Heat Can Injure or Kill People*

53.     According to the NWS, "heat is the number one weather-related killer in the United States." Hundreds of people die from exposure to extreme heat each year, and thousands are injured. On average, heat kills more people in the United States than hurricanes, tornadoes, floods, or lightning combined.

54.     According to the NWS, the American Medical Association, the Environmental Protection Agency (EPA), and the Center for Disease Control and Prevention (CDC), "[m]aintaining a consistent internal body temperature, generally 98.6° [Fahrenheit], is essential to normal physical functioning." Excessive heat can "stress the body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

55.     High temperatures and humidity prevent the human body from regulating its temperature. When exposed to heat, the heart will beat faster to increase blood flow to the skin, in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

56.     Likewise, the body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, the sweat cannot evaporate, preventing the body from cooling. In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

10

57.     Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat-related illnesses may develop.

58.     Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

59.     **Heat Exhaustion:** Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health (NIOSH), include fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing.

60.     According to the Mayo Clinic, heat exhaustion can quickly progress to heat stroke if the person does not cool down quickly.

61.     **Heat Cramps:** Heat cramps can consist of "[m]uscle pain or spasms usually in the abdomen, arms, or legs," according to NIOSH.

62.     Heat cramps are extremely painful. TDCJ's own medical policy recognizes that pain from heat cramps "may be quite severe" and "may occur even at low ambient temperatures."

63.     **Heat Stroke:** NIOSH describes heat stroke as "the most serious heat-related disorder," in which "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms often include hot, dry skin; hallucinations; chills; headaches; confusion; and slurred speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given." According to resources published online by the Mayo Clinic, "[i]n a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles."

64.     In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "[t]he different forms of heat-related illness … increase in

11

severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

65.     Indeed, TDCJ's own medical policies recognize heat stroke is "a medical emergency," that "the onset is often sudden," and that "death may occur."

66.     Upon information and belief, virtually all prisoners at the Pack Unit, regardless of underlying medical conditions, suffer at least some symptoms of heat-related illness or injury each summer. Typical symptoms include: headaches, dizziness, nausea, lightheadedness, elevated temperature, and heavy sweating.

   B.     *People with Medical Conditions that Impair Cooling are at Additional Risk*

67.     Though all people suffer in the heat, people with physiological conditions that impair their body's ability to cool are at increased risk of suffering heat-related illness, injury, or death.

68.     TDCJ policy recognizes inmates with certain "underlying medical condition[s] … place them at increased risk," including: "cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, asthma, cystic fibrosis, diabetes, psychiatric conditions, Sjogren's syndrome, sweat gland dysfunction, [and] thyroid dysfunction." Heat tolerance weakens, and the risk of heat-related illness increases, for people who suffer from these conditions. TDCJ policies and procedures recognize prisoners with these conditions are at greater risk of heat-related illness, injury, and death.

69.     Similarly, TDCJ's policies state the risk of heat-related illness increases for individuals who use "anticonvulsants, anticholinergics, antihistamines, antipsychotics, antidepressants, beta blockers, [and] diuretics." Typically, these drugs impair the body's ability to cool itself. These medications are used to treat a wide range of illnesses and disabilities, including

12

hypertension, chronic pain, allergies, epilepsy, depression, and bipolar disorder. TDCJ policies and procedures also recognize these medications increase prisoners' risk of heat-related illness and death, and that these prisoners "should not be allowed to work or recreate in environments where the apparent temperature is 95 degrees or higher."

70.     TDCJ acknowledges people with the following medical conditions and disabilities are at heightened risk of heat-related illness: obesity, diabetes, hypertension, cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction.

71.     TDCJ also acknowledges other factors increase the risk of heat-related illness, such as age (particularly for people over 65).

72.     According to the CDC, the heat stroke mortality rate increases with age. For example, the rate of heat stroke deaths doubles between ages 35 and 55. The CDC also recognizes that people over the age of 65 are more prone to heat stress.

73.     Upon information and belief, numerous prisoners at the Pack Unit suffer from the medical conditions that place them at increased risk of heat-related illness, injury, or death, or are prescribed the medications TDCJ identifies as putting people at increased risk of heat-related illness, injury, or death.

74.     As TDCJ knows, throughout the TDCJ system, there are thousands of prisoners who suffer from these medical conditions that impair their body's ability to cool. There are over 5,000 prisoners with cardiovascular disease, over 9,000 with chronic obstructive pulmonary disease (COPD), over 8,000 with diabetes, and over 36,000 with a diagnosed psychiatric condition. Because the Pack Unit is a medical and geriatric facility, there are greater numbers of these prisoners housed at the Pack Unit than at other TDCJ prisons.

13

75.     TDCJ is well-aware that it houses inmates with disabilities, like Plaintiffs, who require reasonable accommodations because their disabilities are impacted by exposure to extremely high indoor apparent temperatures. As TDCJ's policies identify these prisoners as being at additional risk of heat-related illness, injury, or death, their need for an accommodation is obvious.

76.     TDCJ could reasonably accommodate these prisoners with heat-sensitive disabilities by housing them in climate-controlled conditions, or transferring them to climate-controlled facilities.

77.     Upon information and belief, prisoners at the Pack Unit with these heat-sensitive disabilities experience symptoms of heat-related illness more frequently or more intensely than able-bodied prisoners. These prisoners with disabilities are also at greater risk of heat-related illness, including heat exhaustion, heat cramps, and heat stroke.

C.      *Heat in TDCJ's Prisons is Deadly*

78.     Since 1998, at least twenty TDCJ prisoners in facilities around Texas have died of hyperthermia, or heat stroke, as set forth in the table below.

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|--------|---------------|------------|-------------|-------|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | V | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications for schizophrenia |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | I | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | V | Prescribed diurectics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | III | Bipolar with depression, prescribed psychtropic medications, |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | II | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

79.     These twenty men all shared certain characteristics. As TDCJ knew, they all suffered underlying medical conditions and heat-sensitive disabilities that put them at much greater risk of heat stroke, including taking psychotropic drugs to treat a mental illness, suffering from diabetes or hypertension, or taking diuretics to treat hypertension.[2]

80.     Plaintiffs also suffer from these same heat-sensitive medical conditions.

81.     Moreover, it is likely far more TDCJ prisoners were killed by heat because hyperthermia is an underreported cause of death.

82.     Heat can also cause or aggravate other illnesses, even triggering medical emergencies such as heart attacks. According to the World Health Organization (WHO), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

83.     The CDC, NWS, and EPA recognize that sudden exposure to heat contributes to a variety of illnesses, including cardiovascular disease, and increases the likelihood of illness and death.

84.     The CDC, EPA, and NWS assert that while an average of 182 deaths per year in the United States are specifically attributed to heat-related illness, there is evidence that between 1,700 and 1,800 deaths each summer are "heat-attributable." These agencies all recognize this tendency to underreport number of deaths caused by heat.

---

[2] Six wrongful death lawsuits brought by the families of eight of these men are currently pending. *See McCollum v. Livingston*, No. 3:12-cv-02307 (N.D. Tex.); *Adams v. Livingston*, 6:13-CV-712 (E.D. Tex.); *Webb v. Livingston*, 3:13-CV-711 (E.D. Tex.); *Togonidze v. Livingston*, 3:13-CV-229 (E.D. Tex.); *Martone v. Livingston*, 4:13-CV-3369 (S.D. Tex.); *Hinojosa v. Livingston*, 2:13-CV-319 (S.D. Tex.).

85.     The underreporting of heat-attributable deaths is because, in the general population,

> [T]he great majority of excess deaths in hot weather are not due to hyperthermia, but to the cardiovascular consequences of heat stress in elderly and vulnerable people. Since these deaths are mostly recorded as due to heart failure or coronary or cerebral thrombosis, few of the heat-related deaths are specifically attributed to heat in death certificates and national statistics.

G. C. Donaldson, W.R. Keatinge, and R.D. Saunders, *Cardiovascular responses to heat stress and their adverse consequences in healthy and vulnerable populations*, 19 INTERNAT'L J. OF HYPERTHERMIA, 225, 230 (2003).

86.     As all Texans know, however, it is not just the temperature but also the humidity that contributes to heat. The heat index is a measure of "apparent temperature," based on ambient temperature and humidity, which the NWS says closely approximates how air temperature is "felt" by the human body. The NWS publishes a chart which illustrates how exposure to high heat indexes increases the risk of heat-related illnesses:

# NOAA's National Weather Service

## Heat Index

### Temperature (°F)



**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

☐ Caution      ☐ Extreme Caution      ▨ Danger      ■ Extreme Danger

87. The NWS correlates heat index ranges to risk levels:

    a.    Caution (light yellow; heat index 80-90° F) - "Fatigue possible with prolonged exposure and/or physical activity."

    b.    Extreme Caution (mustard yellow; heat index 91-104° F) - "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

    c.    Danger (orange; heat index 105-125° F) - "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

    d.    Extreme Danger (red; heat index >126° F) - "Heat stroke likely."

88. The NWS warns that exposure to heat index greater than 105° F "may cause increasingly severe heat disorders with continued exposure or physical activity."

89. TDCJ incorporates a version of the NWS chart into its policies and training materials, and is well aware of the facts described by the NWS. Like the NWS chart, TDCJ's

18

version recognizes that as the heat index increases, the risk of increasingly severe heat-related illnesses goes up. When the heat index exceeds 90 degrees, according to TDCJ, "heat exhaustion" becomes "possible." Above 105 degrees, "heat stroke" becomes "possible." Above 130 degrees, heat stroke becomes "imminent."

90.   Importantly, the NWS and TDCJ charts are designed to predict the risk to people who *do not* suffer from medical conditions that increase their susceptibility to heat-related injuries. These charts predict the risk to "healthy" people, not people who have an increased risk of heat-related illness or injury due to medical conditions, medications or age.

91.   Both the NWS and TDCJ charts show that prisoners living in the Pack Unit are exposed to indoor heat indexes that put inmates at risk of heat exhaustion, and heat cramps virtually every day of the summer.

92.   Though TDCJ's policies recognize that escalating extreme temperatures put prisoners at increased danger, TDCJ's policies do nothing to provide additional protections to inmates in the extremely hot housing areas as apparent temperatures go up.

93.   In fact, TDCJ has no formal, written policy to protect prisoners from extreme temperatures in the indoor inmate housing areas. TDCJ has no policy to lower indoor temperatures in inmate housing areas.

94.   In reality, no mitigation measures short of climate control or a policy to re-locate inmates to cooler housing areas can adequately protect people from these extreme temperatures. Without climate controlled housing, prisoners will inevitably suffer heat-related illnesses and injuries, and be placed at increased risk of death.

95.   In fact, Dr. Charles Adams, M.D., the medical director supervising medical care provided at multiple TDCJ prisons, stated "they need cooling" when he was told a prison's

infirmary "ha[d] been inundated with heat related issues."

**F.      Inmates and Officers at the Pack Unit Routinely Suffer Heat-Related Injuries During the Summer**

95.      Every summer, inmates at the Pack Unit suffer heat-related injuries.

96.      Internal emails from July 2012 state that, at the Pack Unit, "the trend has been noted that the [inmates suffering from heat-related illness] are primarily in housing" – as opposed to prisoners working outside.

97.      TDCJ's medical provider has admitted being "particularly concerned" about the conditions at the Pack Unit. In a four-day period in 2012, twelve prisoners were seen in the prison's infirmary for heat-related illnesses. Seven of these prisoners were taking medications that placed them at increased risk of heat-related illnesses.

98.      Upon information and belief, three of the prisoners treated for heat-related illness in June 2012 at the Pack Unit were *not* taking any medication that put them at increased risk, and did not have any medical condition that put them at increased risk of heat-related illness. Despite the absence of any additional heat-related risk factors, these prisoners were still injured by the high apparent temperatures.

99.      Most of the prisoners at the Pack Unit who suffered heat-related illness or injuries were not working outside, but were simply housed in the extremely hot indoor dormitories.

100.    Each summer, inmates at the Pack Unit are treated by medical staff for heat-related illnesses and injuries.

101.    Upon information and belief, it is very likely that many additional prisoners are not reporting their heat-related illnesses.

102.    Likewise, correctional officers who work in the inmate housing areas also routinely suffer heat-related injuries. Officers routinely sweat through their uniforms, and have to

towel sweat off their faces when leaving the inmate dormitories.

103.    In fact, last summer a 57-year-old correctional officer at the Pack Unit was taken to the emergency room after becoming dizzy. She was diagnosed with heat exhaustion and dehydration.

104.    In a rare development, the correctional officer's union has even found common cause with the prisoners, and publicly supported the extreme temperature lawsuits brought against TDCJ.

105.    The correctional officer's union has made numerous public requests for the prison housing areas to be air conditioned, but TDCJ routinely ignores these requests for safe working conditions.

106.    But while TDCJ knows about and ignores the hazards to prisoners and correctional officers, TDCJ officials approved installing climate controlled hog barns to protect the welfare of TDCJ's agricultural products. TDCJ's detailed policies require the pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit." High-ranking TDCJ officials even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke.  TDCJ has no similar policy to protect humans.

### G. The Plaintiffs' Disabilities Put them at Increased Risk of Heat-Related Injury or Death.

#### A. Bailey Suffers from Heat-Related Disabilities and is at Increased Risk

107. David Bailey suffers from several of these medical conditions and disabilities that increase his risk of heat-related injury or death. For example, he takes a diuretic to treat his hypertension. Heat aggravates hypertension, and caused Bailey to experience extreme fatigue, and dizziness in the past.

108. Bailey also suffers from asthma. He experiences breathlessness from minor tasks when it is untreated. Extreme heat aggravates Bailey's asthma, making it even more difficult to work and perform other physical tasks.

109. Likewise, Bailey takes an antihistamine daily to treat allergies that aggravate his asthma. Antihistamines are drugs TDCJ identifies as medications likely to interfere with the body's ability to cope with extreme temperatures.

110. Bailey also takes benztropine to treat a traumatic brain injury (TBI). Due to his TBI, Bailey suffers symptoms similar to Parkinson's disease, including tremors, seizures, and severe muscle cramps. Benztropine is a drug TDCJ recognizes increases a patient's risk of heat-related illness. Benztropine limits the body's ability to sweat, which decreases the body's ability to protect itself from high temperatures.

111. TBI is an injury to the brain, and limits the operation of the brain as a major bodily function. Bailey's TBI makes it difficult for him to think, concentrate, read, and communicate. Likewise, when Bailey is not taking the benztropine, he experiences painful muscle cramps and tremors.

112. Bailey has been taken to the infirmary in the past due to heat-related illnesses during the summer.

113.    TDCJ prohibits Bailey from working in forced outdoor convict labor when apparent temperatures are above 95 degrees, but does nothing to make sure he is not housed in similarly high apparent temperatures. He is also not allowed to go to outdoor recreation when the apparent temperature is over 95, and is instead forced to remain inside the extremely hot dorms on those days.

B.    *Yates Suffers from Heat-Related Disabilities and is at Increased Risk*

114.    Marvin Yates suffers from hypertension, and takes a diuretic medication to treat his disability.

115.    He also suffers from chronic obstructive pulmonary disease (COPD). COPD impairs the operation of Yates' respiratory system.

116.    Yates' COPD makes it very difficult for him to perform any manual task. He cannot lift objects, perform work, or even stand for an extended period of time. He becomes short of breath after walking short distances, like from his dormitory to the chow hall.

117.    Both his disabilities are aggravated during the summer due to the high indoor temperatures. During previous summers at the Pack Unit, he has experienced several symptoms of heat-related illnesses, including dizziness, painful muscle cramps, fatigue, blurred vision, and headaches.

C.    *Cole Suffers from Heat-Related Disabilities and is at Increased Risk*

118.    Keith Cole suffers from diabetes and hypertension. He has a history of chronic cardiovascular disease, and has had two stents placed in his body.

119.    When his diabetes is not treated properly, Cole feels dizzy and cannot walk or stand properly. He had difficulty concentrating, thinking, or reading.

120.    Cole takes a diuretic and a beta blocker to control his cardiovascular disease. When

his cardiovascular disease is uncontrolled, he suffers from shortness of breath, difficulty breathing, and chest pains. His cardiovascular disease and hypertension impairs his respiratory, circulatory, and cardiovascular systems.

121.    Cole has been treated for heat exhaustion in the past at the Pack Unit.

122.    During previous summers, Cole has tried to spend extra time in the air-conditioned infirmary after receiving treatment for his disabilities. Though nurses encouraged him to spend extra time in the infirmary, the warden ordered him out of the infirmary and to return to his blazing hot dormitory.

*D.    Diaz Suffers from Heat-Related Disabilities and is at Increased Risk*

123.    Nicholas Diaz was born with congenital spinal deformities, including scoliosis and Morquios Syndrome, which require him to use a wheelchair for mobility. Due to his physical disabilities, he can only walk very short distances without feeling extreme pain, and has been told by doctors to use a wheelchair whenever possible.

124.    Diaz also suffers from asthma. His asthma makes it difficult to breathe and sleep, especially during the hot summers.

125.    Diaz has suffered heat-related injuries in the past.

*E.    Others at the Pack Unit are at Risk of Heat-Related Injuries*

126.    Plaintiffs' medical conditions are typical of other inmates at the Pack Unit. Like Plaintiffs, many other prisoners at the Pack Unit suffer from medical conditions or disabilities that place them at increased risk of heat-related illness, injury, or death, or take medications to treat their conditions or disabilities that create an increased risk of heat-related illness, injury, or death.

127.    Because the Pack Unit is a geriatric and medical facility, upon information and belief, there are more than 100 prisoners housed there who suffer from the above described

medical conditions.

F.     The Plaintiffs Suffer from Qualifying Heat-Related Disabilities

    i.     Hypertension

128.    Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated or exacerbated.

129.    Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

130.    As a consequence, TDCJ policy recognizes patients taking diuretics to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

131.    Hypertension, can substantially limit a patient's ability to walk, stand, and breathe, and limit the operation of his respiratory, circulatory, and cardiovascular systems.

132.    Hypertension itself also increases a patient's susceptibility to heat stress, and, combined with extreme heat, diminishes the body's ability to regulate internal temperature. Thus, a patient with hypertension will be at additional risk of heat-related injuries, and suffer additional pain and punishment above and beyond what an able-bodied inmate at the Pack Unit experiences.

    ii.     Asthma

133.    Asthma is a chronic lung disease that inflames and narrows the airways. It substantially limits sufferers' ability to breathe, causing recurring periods of wheezing, chest tightness, shortness of breath, and coughing. Asthma also substantially limits the operation of the

respiratory system.

134. Heat and humid air can trigger asthma symptoms, causing asthma patients to suffer more pain and punishment in hot environments than people without asthma.

135. TDCJ's medical provider recognizes that asthma is a condition that places patients at increased risk of heat-related illnesses.

       *iii.    Traumatic Brain Injury (TBI)*

136. TBI is a chronic injury to the brain that prevents normal operation of a major bodily function (the brain).

137. Benztropine (Cogentin) is a powerful medication Bailey takes to control symptoms of his TBI. TDCJ's medical provider lists benztropine, and many similar medications, as a drug with "specific warnings from the manufacturer to avoid excessive heat and dehydration" and identifies it and many other medications as "drugs associated with heat stress." TDCJ's medical policies state inmates taking drugs like benztropine who "also have an underlying medical condition that places them at increased risk" of heat-related illness, injury, or death" and these patients should not "be allowed to work or recreate in environments where the air temperature is 95 degrees or higher." Even these patients, however, are not regularly housed in climate controlled living areas.

       *iv.    Diabetes*

138. Diabetes is a chronic disease caused by an insulin imbalance. Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

139. Diabetes impairs the body's ability to adjust to increases in temperatures by

affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

140.    Diabetes also reduces blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

    *v. Chronic Obstructive Pulmonary Disease (COPD)*

141.    COPD is a disease that makes it difficult to breathe. It includes chronic bronchitis and emphysema.

142.    COPD causes frequent coughing, shortness of breath, and tightness in the chest, among other symptoms.

143.    COPD impairs the operation of the respiratory, circulatory, and cardiovascular systems.

144.    Heat exacerbates COPD, because the body needs to breathe in additional oxygen to help cope with the heat. This requires additional breathing, which is impaired by COPD.

145.    Plaintiffs take their medications because the prescriptions are necessary to protect their health from their disabilities.

146.    Upon information and belief, there are more than 100 otherwise-qualified prisoners with heat-sensitive disabilities housed at the Pack Unit.

## CLASS ACTION

147.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

148.    Plaintiffs propose to represent a class composed of all inmates who currently are,

or who will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas.

149.    Plaintiffs also seek to represent the following sub-classes of people who 1) are incarcerated at the Pack Unit, or will be in the future, 2) are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas, and either:

3a.     **Heat-Sensitive Subclass:** (i) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction); or, (ii) are prescribed an anticonvulsant, anticholinergic, antipsychotics, antihistamines, antidepressants, beta blockers, or diuretic; or, (iii) are over age 65.

3b.     **Disability Subclass:** suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability.

150.    **Numerosity**: The joinder of each class member would be impracticable because each class is so numerous. The approximate number of class members exceeds 1,300 as the Pack Unit houses over 1,300 inmates. Joining all 1,300 members of the class is impracticable.

151.    The subclasses are also sufficiently numerous to satisfy Rule 23(a). Upon information and belief, because the Pack Unit is a medical and geriatric facility, at least 100 inmates incarcerated there are likely to suffer from at least one medical condition or disability that

would make them a class member.  Likewise, upon information and belief, TDCJ houses a high number of inmates with qualifying disabilities at the Pack Unit.

152.   As of January 2014, 211 prisoners at the Pack Unit were over age 65. Joining all 211 prisoners over age 165 would be impracticable.

153.   Identifying every inmate at the Pack Unit who is a subclass member would require interviewing hundreds of prisoners, and reviewing each of their medical records. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

154.   **Commonality**: Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.

A.   The common questions of law and fact for the proposed **General Class** are:

1)   Does exposing prisoners to the high apparent temperatures in the housing areas at the Pack Unit violate the Eighth Amendment?

2)   Are the members of the General Class entitled to declaratory and injunctive relief?

B.   Further, the common questions of law and fact for the subclasses are:

1)   For the **Heat-Sensitive Subclass**:

a)   Is the risk of heat-related injuries for the Heat-Sensitive Subclass increased when members are exposed to the high apparent temperatures in housing areas of the Pack Unit?

b)   Does exposing members of the Heat-Sensitive Subclass to the high apparent temperatures in the housing areas at the Pack Unit violate their Eighth Amendment rights?

      c)     Are the members of the Heat-Sensitive Subclass entitled to declaratory and injunctive relief?

   2)     For the **Disability Subclass**:

      a)     Do the members of the Disability Subclass a) suffer from a disability that substantially limits one or more of their major life activities and b) *either* suffer from a disability that increases the risk of heat-related illness, injury, or death *or* receive any medical treatment necessary to treat their disability that increases the risk of heat-related illness, injury or death?

      b)     Does TDCJ provide reasonable accommodations to prisoners with heat-related disabilities exposed to high apparent temperatures in the housing areas at the Pack Unit?

      c)     Is TDCJ immune from claims for injunctive and declaratory relief brought under the ADA and Rehabilitation Act?

      d)     Are members of the Disability Subclass entitled to declaratory and injunctive relief?

155.    **Typicality:** Plaintiffs' claims are typical and representative of each class member's claims against Defendants. The Pack Unit's housing areas all reach roughly the same temperature levels; they all threaten inmates' wellbeing. Plaintiffs' interest in reducing the danger of heat-related illness, injury, or death is identical to every other inmate's interest. All members of the class are similarly injured by Defendants' wrongful conduct.

156.    **Class Counsel:** Plaintiffs and their counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interests contrary to those of class members. Plaintiffs' counsel includes a non-profit law firm, the Texas Civil Rights Project (TCRP), whose mission is

to protect the civil rights of low-income Texans. TCRP has prosecuted many class actions, or multi-plaintiff cases that obtained class-like injunctive and declaratory relief. Likewise, Plaintiffs' class counsel, Edwards Law, has litigated complex commercial and civil rights cases, including class actions against multinational corporations and governmental entities. Specifically, Plaintiffs' counsel has extensive experience in heat-related temperature litigation against TDCJ, as Plaintiffs' counsel represent the families of eight men who died of heat stroke in TDCJ prisons.

157.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all Class members is impracticable. Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating this case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct.

158.    Plaintiffs do not seek damages except as may be incidental to declaratory or injunctive relief.

## CAUSES OF ACTION

I.      EIGHTH AND FOURTEENTH AMENDMENT: CONDITIONS OF CONFINEMENT
        (Against Defendants Livingston and Herrera in their Official Capacities)

159.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

160.    Pursuant to 42 U.S.C. § 1983, Livingston and Herrera, in their official capacities, are deliberately indifferent to the substantial risk of serious harm to prisoners at the Pack Unit caused by their choice to expose prisoners to high apparent temperatures inside the housing areas, and unnecessarily and wantonly cause the Plaintiffs pain.

161.    The high indoor temperatures at the Pack Unit pose an unreasonable risk to prisoners' future health.

31

162.     Defendants are aware that extreme heat in their facilities' housing areas poses substantial risk of serious injury to inmates, including Plaintiffs. Defendants' knowledge is demonstrated by TDCJ policies and practices, as well as the well-documented history of injuries to inmates and employees at the Pack Unit. But Defendants are indifferent to the risk, failing to take obvious steps to mitigate it.

163.     In light of the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within TDCJ's own policy, knowledge of TDCJ's medical providers, and the history of inmate and staff injuries, Defendants know of the risk of heat-related illness, injury, or death exists at the Pack Unit.

164.     Defendants are acting with deliberate indifference to Plaintiffs' constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that protect inmates from exposure to extreme heat, and which annually cause injuries to prisoners.

165.     Defendants' deliberate indifference to Plaintiffs' risk of serious medical problems puts Plaintiffs at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions.

166.     Defendants' policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the Eighth Amendments, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

167.     As a proximate result of Defendants' unconstitutional policies, practices, acts, and omissions, Plaintiffs and class members have suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

II.     THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT
(Against Defendant TDCJ)

167.     For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Plaintiffs are qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities.

168.     TDCJ fails to reasonably accommodate prisoners with heat-sensitive disabilities. These disabilities (such as asthma, COPD, hypertension, obesity, diabetes, and mental illnesses treated with psychotropic medications) place prisoners at increased risk of heat-related illness, injury, or death, and cause them to suffer more pain and punishment than able-bodied prisoners.

169.     TDCJ acknowledges in internal documents that people with certain disabilities (like diabetes, hypertension or cardiovascular disease), or who take certain medications to treat their disabilities (like psychotropics, antihistamines, or diuretics), are much more vulnerable to extreme temperatures. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death from heat.

170.     Plaintiffs suffer from these heat-sensitive disabilities.

171.     TDCJ has been, and is, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

172.     Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and has the same mandate as the Rehabilitation Act.  42 U.S.C. §12131 *et seq.*

173.     Title II of the ADA and the ADA Amendments Act protects prisoners with disabilities because exposure to extreme temperatures also actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

174.     The Pack Unit and other TDCJ units are facilities, and their operation comprises a

program and service for Rehabilitation Act, ADA, and ADAAA purposes. Plaintiffs are presently qualified to participate in programs, activities and services in TDCJ facilities at the Pack Unit, such as incarceration in the inmate housing areas.

175.    Defendants know that Plaintiffs suffer from heat-sensitive disabilities, and were prescribed medications to treat their disabilities. Despite their knowledge, TDCJ's officers intentionally discriminated against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures.

176.    As alleged above, TDCJ fails and refuses to reasonably accommodate Plaintiffs while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.

177.    As shown above, TDCJ failed, and refused, to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate the Plaintiffs disabilities.

## INJUNCTIVE AND DECLARATORY RELIEF

178.    Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983, the ADA, ADAAA, and Rehabilitation Act against Defendants, for themselves and the class, to require TDCJ to provide safe housing conditions at the Pack Unit.

179.    Without permanent injunctive relief, Defendants will continue their same perilous practices and conduct, disregarding federal and state legal mandates, endangering the lives and the welfare of current and future prisoners at the Pack Unit.

180.    Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein.

181.    Plaintiffs ask that the Court enjoin Defendants to maintain a heat index of 88 degrees or lower inside each of the Pack Unit's housing areas (calculated using the NWS heat index table).

182.     Plaintiffs and members of the class are entitled to injunctive and declaratory relief to end this unlawful discrimination.

183.     Plaintiffs do not seek damages.

## ATTORNEYS' FEES

184.     Pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205 Plaintiffs are entitled to recover attorneys' fees, litigation expenses, and court costs, including expert costs.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the Court award the following relief:

A.  Certify this action as a class action, as described above;

B.  Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this Complaint, on behalf of the Plaintiffs, and the class;

C.  Permanently enjoin Defendants to abate the risk of serious harm described above by taking steps including, but not limited to, maintaining a heat index of 88 degrees or lower inside the Pack Unit's housing areas (calculated using the NWS heat index table);

D.  Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses;

E.  Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
   Tel. 512-623-7727
   Fax. 512-623-7729

By  /s/ Jeff Edwards     
JEFF EDWARDS
State Bar No. 24014406
Scott Medlock
State Bar No. 24044783
Sean Flammer
State Bar No. 24059754
Lead Counsel

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Ranjana Natarajan
State Bar No. 24071013
UNIVERSITY OF TEXAS SCHOOL OF LAW
CIVIL RIGHTS CLINIC
727 E. Dean Keeton Street
Austin TX 78705
(512) 232-7222 [phone]
(512) 232-0800 [fax]

ATTORNEYS FOR PLAINTIFFS