**Exhibit G**

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

---

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3   ...............................................

4   STEPHEN McCOLLUM, STEPHANIE    :
    KINGREY, and SANDRA McCOLLUM,  :
5   individually and as heirs      :
    at law in the Estate of        :
6   LARRY GENE McCOLLUM,           :
            Plaintiffs,            :
7                                  :
    VS.                            :  CIVIL ACTION NO.
8                                  :
    BRAD LIVINGSTON, JEFF PRINGLE, :  3:12-cv-02037
9   RICHARD CLARK, KAREN TATE,     :
    SANDREA SANDERS, ROBERT EASON, :
10  THE UNIVERSITY OF TEXAS        :
    MEDICAL BRANCH and the TEXAS   :
11  DEPARTMENT OF CRIMINAL JUSTICE,:
            Defendants.            :
12
13  ...............................................

14          ORAL AND VIDEOTAPED DEPOSITION OF
             THE DESIGNATED REPRESENTATIVE OF
15      THE UNIVERSITY OF TEXAS MEDICAL BRANCH
                    BY AND THROUGH
16            ROBERT VERNON SHAFFER, JR.

17                  MAY 30, 2014

18
    ...............................................
19       ORAL AND VIDEOTAPED DEPOSITION OF THE DESIGNATED
    REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH
20  BY AND THROUGH ROBERT VERNON SHAFFER, JR., produced as a
    witness at the instance of the Plaintiffs, and duly
21  sworn, was taken in the above-styled and numbered cause
    on Friday, May 30, 2014, from 2:18 to 5:21 p.m., before
22  Mary C. Dopico, Certified Shorthand Reporter No. 463 and
    Notary Public in and for the State of Texas, reported by
23  machine shorthand and audio/video recording at the
    offices of Rebecca Sealy Hospital, 404 8th Street,
24  Galveston, Houston, Texas, pursuant to Notice and Court
    Order and the Federal Rules of Civil Procedure and the
25  provisions stated on the record or attached hereto.
```

---

Page 2

```
1  A P P E A R A N C E S

2

3  COUNSEL FOR PLAINTIFFS:
4     Mr. Sean P. Flammer
       The Edwards Law Firm
5      The Hachnel Building
       1101 East 11th Street
6      Austin, Texas  78702
       Tel: 512/623-7727  Fax: 512/623-7729
7      E-mail: sean@edwards-law.com
8
    COUNSEL FOR DEFENDANT UNIVERSITY OF TEXAS MEDICAL
9   BRANCH:
10    Ms. Kim Coogan
       Assistant Attorneys General
11     P.O. Box 12548
       Austin, Texas  78711-2548
12     Tel: 512/463-2080  Fax: 512/495-9139
       E-mail: kim.coogan@texasattorneygeneral.gov
13
14  COUNSEL FOR DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL
    JUSTICE AND INDIVIDUAL TDCJ DEFENDANTS:
15
       Mr. Bruce R. Garcia  (Appearing Telephonically)
16     Assistant Attorneys General
       P.O. Box 12548
17     Austin, Texas  78711-2548
       Tel: 512/463-2080  Fax: 512/495-9139
18     E-mail: bruce.garcia@texasattorneygeneral.gov
19
    ALSO PRESENT:
20
       Jennifer Osteen, UTMB Litigation Support Manager
21
       Lauren Kelleher, Texas Civil Rights Project
22
23  REPORTED BY:                  VIDEO BY:
     Mary C. Dopico, CSR, RPR, CRR   Brian Birmingham
24  Wright Watson & Associates
25
```

---

Page 3

```
1                       INDEX
              ORAL AND VIDEOTAPED DEPOSITION OF
2           THE DESIGNATED REPRESENTATIVE OF
             THE UNIVERSITY OF TEXAS MEDICAL BRANCH
3         BY AND THROUGH ROBERT VERNON SHAFFER, JR.
                    MAY 30, 2014
4                                              PAGE
    Appearances...................................   2
5
    Proceedings/Stipulations......................   5
6
    Changes and Signature Page....................  136
7
    Reporter's Certification......................  138
8
9   ROBERT VERNON SHAFFER, JR.,
      Examination, by Mr. Flammer.................   6
10
11  SHAFFER EXHIBITS
12  Exhibit 1.....................................  11
13     Plaintiffs' Notice of Intention to Take Oral
        Deposition of Rule 30(b)(6) Witness(es) and
14      Subpoena Duces Tecum (6 pages)
15  Exhibit 2.....................................  23
16     Documents responsive to Category 6 of Subpoena
        Duces Tecum (20 pages total)
17
       04-21-2014 e-mail to Robert V. Shaffer and Louis
18     E. Perrin from Jennifer K. Osteen, Subject:
        Privileged and Attorney-Client Communication/Work
19     Product
20     10-23-2013 memo to Louis Perrin from Kristen
        Perkins, Subject: Litigation Hold
21
       05-13-2014 e-mail from Jennifer Osteen to
22     Jennifer Osteen, Subject: Litigation Hold,
        Attachments: document preservation notice.pdf and
23     ESI Questionnaire.pdf
24     05-13-2014 Important Document Preservation
        Notice to Distribution List from UTMB's Department
25     of Legal Affairs
```

---

Page 4

```
1  SHAFFER EXHIBITS (CONT'D)                       PAGE
2  Exhibit 3.....................................  55
3     UTMB Handbook of Operating Procedures, Records and
       Information Management Retention (44 pages)
4
5  Exhibit 4.....................................  97
6     Questionnaire of questions from plaintiffs' counsel
       and responses from UTMB's counsel (12 pages)
7
8  Exhibit 5.....................................  119
9     Defendant UTMB's Response to Plaintiffs' Motion for
       Discovery Sanctions (3 pages)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 5

1            P R O C E E D I N G S
2
3            THE VIDEOGRAPHER:  Today's date is May
4 30, 2014.  The time is 2:18 p.m.  We are here for the
5 videotaped deposition of Robert Shaffer in the United
6 States District Court, Northern District of Texas,
7 Dallas Division, Stephen McCollum and Sandra McCollum,
8 individually, and Stephanie Kingrey, et al., versus Brad
9 Livingston, et al., Civil Action No. 3-12-CV-02037.
10           Today we're located in Houston, Texas --
11 Galveston, Texas, at the UTMB medical branch.
12           Will counsel please voice identify
13 yourselves, whom you represent, and then the court
14 reporter will swear in the witness.
15           MS. COOGAN:  Kim Coogan, here for UTMB.
16 And just for the record, I don't think this was properly
17 noticed for video; but we can take that up later.
18           Go ahead.  This is Jennifer Osteen.
19           MS. OSTEEN:  I'm the Litigation Support
20 Manager here at UTMB.
21           MR. FLAMMER:  Sean Flammer, Edwards Law
22 for the plaintiffs.
23           MR. GARCIA:  Bruce Garcia for the TDCJ
24 defendants and the TDCJ.
25           MR. FLAMMER:  And plaintiffs -- Texas

Page 6

1 Civil Rights Project, Lauren Kelleher, is also here, as
2 well.
3           THE VIDEOGRAPHER:  And the court reporter
4 here today is Mary Dopico, and the videographer is Brian
5 Birmingham.
6           MR. FLAMMER:  All right.
7           MS. COOGAN:  She's going to swear you in.
8           MR. FLAMMER:  Oh, I'm sorry.
9
10           ROBERT VERNON SHAFFER, JR.,
11 having first been duly sworn, testified as follows:
12
13           EXAMINATION
14
15 BY MR. FLAMMER:
16      Q.  All right, Mr. Shaffer.  Will you please state
17 your name for the record?
18      A.  Robert Vernon Shaffer, Jr.
19      Q.  Okay.  What I'd like to do is -- before we
20 really begin with the substance -- is just kind of talk
21 about some general mechanics of this deposition.
22      A.  Sure.
23      Q.  Have you given a deposition before?
24      A.  No, I haven't.
25      Q.  Okay.  Do you understand that the testimony

Page 7

1 that you give here today is the same as if you gave a
2 testimony at trial?
3      A.  I do.
4      Q.  And you see we have a court reporter here and
5 she's taking things down.  It is videoed, but if you
6 would, instead of head nods, say "Yes" or "No" because
7 it's easier for her to -- to record that.
8      A.  Oh, ab -- Absolutely.
9      Q.  Okay.  If you don't understand any question
10 I -- I ask you, then just say so and I'll rephrase it or
11 do whatever we need to do to make sure that we're
12 accurate, that we're clearly communicating?
13      A.  Sure.
14      Q.  Okay.  And so I'm going to assume that you
15 understand unless you say otherwise; okay?
16      A.  Sounds good.
17      Q.  And so we can agree that if -- that if I ask
18 the question, you answer it, that you understood the
19 question?
20      A.  Correct.
21      Q.  Okay.  And if at any time you need to take a
22 break, just let me know.  We're not in a marathon.
23      A.  Okay.
24      Q.  We can -- We can definitely take breaks.  And
25 like I said, if you need to take one, take one.

Page 8

1      A.  Sounds good.
2      Q.  If at any point you need to change an answer,
3 correct something you say, if we go out to the restroom
4 and you come back and you say:  Oh, you know what, there
5 was something else I wanted to add or delete or
6 whatever, and just go ahead and say it.
7      A.  Okay.
8      Q.  Okay?  Just let me know and we'll make sure
9 it's clear.
10      A.  Sure.
11      Q.  Electronically stored information, can we
12 agree that we can just say ESI?
13      A.  Absolutely.
14      Q.  Okay.  Can you just go ahead and give us a --
15 kind of a thumbnail sketch of your background, from
16 where you went to college and then onward.
17      A.  Okay.  I spent the first 20 years of my career
18 in the United States Marine Corps.  I did go to college
19 at the University of -- or Hawaii Pacific University for
20 a short time.  I never graduated.
21           I got out of the Marine Corps in 1997,
22 went into the IT industry; started my career in IT with
23 Sprint.  I was a network solution consultant.
24           I had several industry certifications to
25 include Microsoft Certified Systems Engineer, Cisco

**ROBERT VERNON SHAFFER, JR. - May 30, 2014**
**DESIGNATED REPRESENTATIVE OF UTMB**

Page 9

1 Certified Networking Professional.

2          I started out here at UTMB in 2001 as a
3 Lead Security Analyst and moved up to the Director of
4 Information Security in 2006.

5          I moved away from the technical aspects
6 of IT and more into the compliance realm, where I felt
7 the need to go out and get certifications that support
8 my position; so I am currently certified as a Certified
9 Information Systems Security Professional and certified
10 in risk and information audit controls through the
11 International Security Consortium and the Information --
12 Information Systems Audit Control Council.

13          So I -- My job here is I maintain
14 oversight over the security program.  I actually review,
15 produce, and change policies and standards.  We do risk
16 management on systems and processes.  We provide
17 training for all the individuals here at UTMB to include
18 data owners, technical personnel, and an end user
19 environment.

20     Q.    Okay.  And what is your title now?

21     A.    Director of Information Security.

22     Q.    Okay.  And you've had that role since when?

23     A.    2006.  I was interim from 2006 to 2009, then
24 I -- then I was actually promoted into the position.

25     Q.    Okay.  And you say you are interim?

Page 10

1     A.    Interim.  I was --

2     Q.    Oh, I understand.

3     A.    There was a -- When the last security officer
4 left, I filled in and took over that role until I was
5 officially hired on.

6     Q.    Got you.  I just --

7     A.    Got you.

8     Q.    I misheard you.

9     A.    Okay.

10     Q.    And so tell us more about your -- your current
11 role as director.  What are your responsibilities when
12 it comes to document retention and also retrieving
13 documents.

14     A.    Well, as far as document retention goes, my
15 role as an end user, I -- it's not my area of expertise.
16 We have a director for that particular field here at
17 UTMB, so I defer to that person to provide the expert
18 guidance and whatever else needs to be done for the UTMB
19 population.

20          As far as electronic discovery of ESI, we
21 actually provide everything for the legal side of the
22 house.  They'll go ahead and perform -- provide us with
23 a letter that says:  Hey, we have a litigation hold of a
24 dis -- any type of discovery request.  We'll take that,
25 we'll see the names that they've identified, the search

Page 11

1 criteria.  We'll go out there, identify all of their
2 repositories or information resources that they may
3 store stuff on and then we'll go out there and conduct a
4 search.

5     Q.    Okay.  Let's talk about that more in just a
6 minute.  Let's go ahead --  I'm going to mark this as
7 Exhibit 1.

8          (Shaffer Exb. No. 1 was marked.)

9     Q.    (By Mr. Flammer)  I'm handing you what's been
10 marked as Exhibit 1.  Have you seen this document
11 before?

12     A.    I have.

13     Q.    Okay.  And this is the notice of the
14 deposition; is that correct?

15     A.    Yes, sir.

16     Q.    And can you turn with me to Exhibit A?

17     A.    I'm there.

18     Q.    Are you speaking here on behalf of UTMB today?

19     A.    I am.

20     Q.    Okay.  And are you the witness that UTMB has
21 produced to talk about UTMB's document retention
22 policies today?

23     A.    I am not.

24     Q.    You're not?

25     A.    Not for document retention.

Page 12

1     Q.    Okay.  Who would we speak to about document
2 retention?

3     A.    I'd have to defer to legal.  I -- I'm not the
4 expert in that field.  I can't point to an individual.
5 There might be other people.  It's really the person who
6 is in charge of that area.

7     Q.    Okay.

8     A.    I do know it's a compliance function here at
9 UTMB, so it would probably be one of the leaders in the
10 compliance area.

11     Q.    Okay.  Let's go to number 2 on Exhibit A.  It
12 says:  The date and scope of any litigation holds,
13 preservation letters, etcetera, that were sent from
14 outside counsel to UTMB and/or that were communicated
15 internally within UTMB regarding any litigation
16 regarding the heat conditions in Texas prisons.

17          Are UT --  Are you UTMB's witness on that
18 issue?

19     A.    I am not.

20     Q.    Okay.  Number 3 is:  The date and scope of any
21 litigation holds, preservation letters, etcetera, that
22 were sent from outside counsel to UTMB and/or that were
23 communicated internally within UTMB regarding any
24 litigation regarding this case.

25          Are you UTMB's witness on that issue?

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 13

1    A.   I am not.

2    Q.   Number 4 is:  All steps taken by UTMB to

3 preserve and retrieve electronically-stored information

4 that may be relevant to this litigation.

5         Are you UTMB's witness on that?

6    A.   Partial witness.

7    Q.   Can you explain?

8    A.   I don't do all steps.  I just have a small

9 component of it as far as retrieving information --

10 primarily e-mail, things like that.

11    Q.   So are you saying that you are the agency

12 representative of all steps taken by UTMB to retrieve

13 electronically stored information that may be relevant

14 to this litigation but you are not UTMB's witness as to

15 all steps taken by UTMB to preserve electronically

16 stored information that may be relevant to this

17 litigation?

18    A.   I am not.

19    Q.   For either?

20         MS. COOGAN:  Well, perhaps you could ask

21 him what he knows about those subjects, whether --

22 rather than whether he's a designated witness for those

23 subjects.

24         MR. FLAMMER:  Understood.  Okay.  I think

25 what I'll do is go through these categories --

Page 14

1         MS. COOGAN:  Sure.

2         MR. FLAMMER:  -- and just make sure we're

3 on the same page; and then -- then I can ask the

4 questions and see if he's the person we need to talk to;

5 and if he's not, then we'll just move on.

6    Q.   (By Mr. Flammer)  Let's look at category

7 number 5, the back-up tape -- Actually, let's look at

8 4, just to be clear.  You said partial.  Can you just

9 explain more what you mean?

10    A.   Well, there is a component that belongs to

11 legal; and there's a component that belongs to other

12 departments throughout the university.  So I primarily

13 look for documents in e-mails that might be part of

14 the -- an information store or somewhere else that's

15 stored on a -- on a drive or a local computer, something

16 like that.  But there's other relative -- relevant

17 information that may or may not be out there that I

18 wouldn't be involved in.

19    Q.   Okay.  But as it comes to electronically

20 stored information --

21    A.   No, I'm not the one that -- Again, a partial.

22 I don't see go out and look for, you know, medical

23 records or anything like that.  That's usually something

24 that's conducted by another party.

25    Q.   What about e-mails?

Page 15

1    A.   E-mail, yes.

2    Q.   Okay.  Is there anybody else who's UTMB's

3 witness on e-mail?

4    A.   No.                    .

5    Q.   Okay.

6    A.   I'm the witness on the e-mails.

7    Q.   And what about documents stored either on

8 servers or people's computers?

9    A.   I would be considered that individual, as

10 well.

11    Q.   Okay.  Okay.  Okay.  Let's look at number 5.

12 Now, the back-up architecture at UTMB, including what is

13 backed up, when it is backed up, how long those back-up

14 tapes are retained, and how long information that is

15 backed up is retained on back-up tapes.

16         Are you UTMB's witness on that category?

17    A.   I'm a witness, yes.

18    Q.   Okay.  Number 6:  What efforts were made to

19 determine who the key players are in this case and what

20 was to done to preserve and retrieve electronically

21 stored information in their possession, custody or

22 control?

23    A.   I am not.

24    Q.   Okay.  Number 7 is:  The efforts that have

25 been taken and can be taken to obtain any potentially

Page 16

1 relevant electronically stored information that was

2 either manually deleted or that was purged through

3 automatic document retention policies.

4    A.   I am --

5    Q.   Are you --

6    A.   -- the witness.

7    Q.   You are the witness --

8    A.   Yes.

9    Q.   -- for UTMB on number 7?

10    A.   Yes.

11    Q.   Number 8:  Whether any electronically stored

12 information that may be relevant to this case has been

13 deleted.

14         Are you UTMB's witness on number 8?

15    A.   I am the witness.

16    Q.   And number 9:  Whether any electronically

17 stored information that may be relevant to this case is

18 irretrievable.

19         Are you UTMB's witness --

20    A.   I am --

21    Q.   -- on that topic?

22    A.   -- UTMB's witness.

23    Q.   And if you would, I do -- I do the same thing

24 when I'm talking, if you would, just let me finish the

25 question before you answer --

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 17

1    A.   All right.

2    -- just so she can get it down.

3    A.   Not a problem.

4    Q.   And I'll try to do the same for you.

5         Number 10:  What efforts can be taken to

6    obtain any electronically stored information that has

7    been deleted?

8         Are you UTMB's witness on that topic?

9    A.   I am.

10   Q.   Number 11:  The identity of any electronically

11   stored information that has been depleted or that is

12   irretrievable.

13        Are you UTMB's witness on that topic?

14   A.   I am.

15   Q.   Number 12:  A physical location of

16   electronically stored information that may be relevant

17   to this case.

18        Are you UTMB's witness on that category?

19   A.   You know, I'd have to go back to a partial

20   witness.  I mean, I can testify to it, to what I know;

21   but, yeah, I'll be the witness.  Yeah, I am the witness

22   to what I know.

23   Q.   Okay.  Is that not part of your -- your area

24   of expertise?

25   A.   Well, it is.  Yeah -- my area of expertise is

Page 18

1    broad.  I'm at -- The IT infrastructure here, it's not

2    like I have complete knowledge of everything.  It's

3    somewhat broad and limited in certain areas.

4         So I'm not going to sit here and -- and

5    pretend like I'm an expert in all areas of this because

6    I'm not.  You know, when it comes to the security

7    related things, yes.  You know, like your back-up, I'm

8    not the -- the know-all to end-all.  I can talk to it in

9    general terms.

10   Q.   Okay.  Number 13:  All efforts taken

11   concerning the preservation of electronically stored

12   information related to heat-related illness of inmates

13   in TDCJ prison facilities where inmates are housed in

14   non-air-conditioned areas.

15        Are you UTMB's witness on that topic?

16   A.   I am not.

17   Q.   Number 14:  All efforts taken concerning the

18   preservation of electronically stored information

19   related to incidents where inmates have died from

20   heat-related causes in TCDJ prison facilities where

21   inmates are housed in non-air-conditioned areas.

22        Are you UTMB's witness on that topic?

23   A.   I am not.

24        MR. FLAMMER:  Ms. Coogan, are there any

25   other witnesses that you plan on presenting today?

Page 19

1         MS. COOGAN:  There are not any more

2    witnesses that I plan on presenting today.  And I will

3    say this for the record, whether he can provide you with

4    the information that you need with regard to these broad

5    categories of course will depend on the questions that

6    you ask.

7         So, I would say just for the record that

8    these are all very, very, very broad categories; and

9    there's a certain amount of vagueness to them, as well.

10        So the best way to determine whether this

11   witness can answer the specific questions you have in

12   mind is simply to ask him.  I think he'll -- might

13   surprise you with how much he does know.

14   Q.   (By Mr. Flammer)  Okay.  Let's turn to the

15   next page on Exhibit B.  Exhibit B is a subpoena for

16   documents.

17        Have you brought any documents with you

18   today?

19   A.   That or we've got some litigation hold

20   requests and then we have your -- so I guess this is a

21   notice to take oral disposition (sic) of rule -- so --

22   Q.   Okay.

23   A.   -- that's all I have.

24   Q.   May I see these, please?

25        THE WITNESS:  Is that okay?

Page 20

1         MS. COOGAN:  Yes.  He can have those.

2    Those are his copies.

3         THE WITNESS:  Oh.

4    Q.   (By Mr. Flammer)  I'll take a look at these at

5    a break.  Now, just to be sure though, the stack of

6    documents that you just handed me, sir, are these all

7    the documents -- What I'm going to do is I'm going to

8    go through all these categories.

9         Number 1 is:  All documents you have

10   reviewed in preparation for your deposition.

11        Are these all the documents that you

12   reviewed in preparation for your deposition today?

13   A.   Yes.

14   Q.   Have you reviewed any other documents besides

15   these in preparation for your deposition today?

16   A.   Yeah.  And preparation, I'm -- That's it.

17   That's all I've reviewed.  I haven't reviewed anything

18   else, and I've only reviewed those on a cursory glance

19   because it was just given to me an hour -- an hour and a

20   half ago.

21   Q.   Okay.  And number 2:  All documents concerning

22   any document preservation efforts, including the

23   preservation of electronically stored information

24   related to this litigation.

25        Are these all the documents that are in

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 21

1 category number 2?

2   A.   Yes.

3   Q.   Are there any other documents?

4   A.   No.

5   Q.   Okay.   Number 3:  All --

6   A.   Let's go back to 2.

7   Q.   Go ahead.

8   A.   All documents concerning any document

9 preservation efforts including the pre -- Oh, that's

10 it.

11   Q.   Okay.   And number 3:  All documents concerning

12 document retrieval, including the retrieval of

13 electronically stored information related to this

14 litigation.

15        Are the documents you handed me today all

16 the documents that fit within category number 3?

17   A.   Yes.

18   Q.   Okay.   And document number -- sorry, category

19 number 4, all documents concerning the preservation

20 and/or retrieval of electronically stored information

21 related to this case.

22        Are the documents that you handed me just

23 moments ago all the documents that are in category

24 number 4?

25   A.   Yes.

Page 22

1   Q.   Category number 5:  All documents concerning

2 the preservation and retrieval of electronically stored

3 information related to heat-related illnesses of inmates

4 in TDCJ prison facilities where inmates are housed in

5 non-air-conditioned areas.

6        Are the stack of documents that you just

7 handed me all documents that are in category number 5?

8   A.   Yes.

9   Q.   And category number 6:  All documents

10 concerning the preservation and retrieval of

11 electronically stored information related to incidents

12 where inmates have died from heat-related causes in TDCJ

13 prison facilities where inmates are housed in

14 non-air-conditioned areas.

15        Are the documents that you handed me all

16 the documents in category number 6?

17   A.   Yes.

18   Q.   Okay.   Let's go ahead and mark the documents

19 you handed me.   Looks like there are four documents; is

20 that correct, sir?

21   A.   Yes, sir.

22        MR. FLAMMER:  Let's go ahead and mark

23 those.

24        THE REPORTER:  Each individually?

25        MR. FLAMMER:  I beg your pardon?

Page 23

1        THE REPORTER:  Each individually?

2        MR. FLAMMER:  We can go with one stack.

3        (Shaffer Exb. No. 2 was marked.)

4   Q.   (By Mr. Flammer)  When you do electronic

5 discovery for UTMB, is the scope of your role any

6 litigation or public information requests UTMB-wide or

7 just UTMB Correctional Managed Care?

8        MS. COOGAN:  Objection, vague.  And I --

9 I'm going to ask, to the extent that you can, to be as

10 specific as you can.  Because you just used the term

11 "discovery" when he does discovery, quote; and I don't

12 know what you mean by that.  He doesn't answer discovery

13 for any clients on behalf of UTMB.  So when you say

14 quote --

15        MR. FLAMMER:  Oh, I'm sorry.

16        MS. COOGAN:  -- he does --

17        MR. FLAMMER:  Did I say answer?

18        MS. COOGAN:  -- discovery.

19        MR. FLAMMER:  Okay.

20        MS. COOGAN:  I think that's --  I'm going

21 to object to that as vague.

22        MR. FLAMMER:  Sure.  I'll rephrase.

23        MS. COOGAN:  Okay.

24        MR. FLAMMER:  I'll rephrase.  That's --

25        MS. COOGAN:  Thank you.

Page 24

1   Q.   (By Mr. Flammer)  Have you ever assisted any

2 attorneys in responding to discovery requests in

3 litigation that had to do with UTMB Correctional Managed

4 Care?

5   A.   Yes.

6   Q.   Okay.  When was the first time you did that?

7   A.   Some --

8        MS. COOGAN:  Objection, vague.

9        Go ahead.  Sir.

10   A.   Oh, concerning this specific case?

11   Q.   (By Mr. Flammer)  No.  Just in general.  I

12 just want to talk about general things first.

13   A.   Well, we've been doing it for years.

14   Q.   Okay.

15   A.   I mean, I -- Probably 2001, when I started

16 working here.

17   Q.   Okay.  Okay.  And that would be in lit -- in

18 the context of litigation, public information requests?

19   A.   Litigation, public information requests.

20   Q.   Okay.  What is your understanding of about

21 what this case is about?

22   A.   Just, from what I understand, it has to do

23 with some heat-related deaths because of lack of

24 air-conditioning in our prison units.

25   Q.   Okay.  I want to talk about the physical

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 25

1 location of where things are stored.
2     A.    Sure.
3     Q.    Does UTMB have servers?
4     A.    Yes.
5     Q.    Are those servers here in Galveston?
6     A.    Some are.  Some are located in Arlington,
7 Texas.  Some are located in Houston, Texas.
8     Q.    Okay.  And does -- Do your job
9 responsibilities -- In your job responsibilities do you
10 deal with the servers in those other areas?
11     A.    Yes.
12     Q.    Okay.  And do those servers capture different
13 information or are they backing each other up?
14     A.    Some back each other up.  Some capture
15 different information.
16     Q.    Okay.  When an employee saves a document, like
17 a Word document at their computer, what are the
18 different options that employee has as to where he or
19 she can save the document?
20     A.    I mean, stored on their local drive, they
21 could store it on their network drive, or they can store
22 it in an e-mail server, or removal drives, too, if they
23 have personal stuff.
24     Q.    Okay.  And just to be clear, you were saying
25 that a Word -- a Word document could be saved on an

Page 26

1 e-mail server?
2     A.    Sure, as part of an e-mail.
3     Q.    Okay.  Okay.
4     A.    We send them all the time as an attachment.
5     Q.    But as far as, like, just creating a
6 Word document or Excel or some other application --
7     A.    It would be their net -- network storage space
8 over their local drive.
9     Q.    Okay.  Does every employee have their own
10 allotted --
11     A.    No.
12     Q.    -- space on the server?
13     A.    No.  Most do.  It depends on the department,
14 on whether they want to incur that added expense.
15         I know a lot of the CMC folks do not have
16 network drive space, so a lot of their stuff is stored
17 locally or is maintained on the Exchange server.
18     Q.    And when you said a lot of the Correctional
19 Managed Care people, could you be more specific about
20 who do you mean?
21     A.    The front line employees, the clinicians.
22 Usually the upper level management have their own
23 network drive space; but as far as the people that's
24 actually out there providing the care and communicating
25 with the folks or -- they don't have network space.

Page 27

1     Q.    And so for the folks that were on the front
2 lines, I believe was the term you used, do they --
3 because they don't have network drive space, are there
4 options to either save it on a desktop or save it on a
5 thumb drive --
6         MR. GARCIA:  Objection, form.
7     Q.    (By Mr. Flammer)  -- or CD?
8     A.    Well, they can save it on a -- Yeah.  They
9 can save it on a desktop.  They could leave it in their
10 e-mail.  They could copy it to a thumb drive.  We don't
11 recommend that.  It's not part of our -- our standard.
12 So if they do it, they do it outside of our own
13 policies, if you will, and -- but, you know, there's
14 not -- there's no technical means to prevent that from
15 happening.
16     Q.    And right now you're talking about when they
17 save it on an external source.
18     A.    Right.
19     Q.    Is that what you're talking about?
20     A.    Yes, sir.
21     Q.    Okay.  If a person on the front lines saves,
22 let's say, again, a Word document on their desktop, how
23 long -- is there any UTMB policy as to how long that
24 document should retain -- be retained?
25         MS. COOGAN:  That -- Objection, vague to

Page 28

1 the term "desktop," whether that's local or a server.
2         But if you know, then go ahead and answer
3 the question.
4     A.    Traditionally a desktop is a personal -- or a
5 computer that's sitting on a desk.  So folks can --
6 Yeah, there is no back-up capability.  We do not back up
7 a desktop.
8     Q.    Okay.
9     A.    So it could be out there for a year, it could
10 be out there 10 years.
11     Q.    And is "local drive" and "desktop" the same
12 thing?
13     A.    "Local drive" is the drive within a desktop,
14 yes, sir.
15     Q.    Okay.  So was it up to the employee as to --
16 as to how long to retain that document on their desktop?
17     A.    Speaking from my own personal experience,
18 because that is not my area of expertise, I am
19 responsible for retaining data that I create in
20 accordance with our data retention schedule.  So that's
21 what I know of that.  I can't speak for anybody else
22 here at UTMB.
23     Q.    Okay.  Because you're not the expert on --
24 you're not UTMB's witness on UTMB's document retention
25 policies.

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 29

1    A.    Yes, sir.  Correct.

2    Q.    Okay.  Let's talk about the upper management
3  that you said has their own network space.  How much
4  space on the network is allotted for these individuals?

5    A.    I -- I can't answer that.  I don't know.  It
6  varies from department to department.

7    Q.    Okay.

8    A.    I --

9    Q.    Within Correctional Managed Care?

10    A.    I don't know how much space they're allotted
11  on our network servers.

12    Q.    Okay.  But it does vary depending on the
13  individual?

14    A.    Yes.  I can't say that with 100 percent
15  confidence; but I know -- You know, you get senior
16  level of management's probably going to have a little
17  bit more privileges than somebody in the lower level of
18  management; so it's -- There is a tendency that, you
19  know, people at certain levels require more space.

20    Q.    Okay.  Can an individual request more space?

21    A.    Sure.

22    Q.    And would that be granted freely or --

23    A.    I can't answer that.  That's not my area.  I
24  mean, that doesn't come through my office.  That goes
25  directly to the operations side of the house.

Page 30

1    Q.    And what office would that be?

2    A.    Office of Information Services.

3    Q.    Okay.  So if an employee, someone in upper
4  management, wanted more space, that's who they would
5  direct their question to, not you?

6    A.    Correct.

7    Q.    Okay.  The documents that are saved on the
8  network, how long are they -- how long do they exist on
9  the network?

10    A.    I believe --  Again, this is just my general
11  knowledge of the back-up system here.  I think they are
12  retained for six months.  They're backed up several
13  times throughout the day, then that back-up is retained
14  for six months.

15          So that's just specifically to documents
16  or network storage space.  It does not refer to our
17  Exchange Mail System.

18    Q.    Okay.  Let's go ahead and jump to the Exchange
19  Mail System.

20    A.    Okay.

21    Q.    The Exchange Mail System, can you explain how
22  that differs from Outlook?  Or is that what --

23    A.    It's Outlook.

24    Q.    -- commonly referred to as Outlook.

25    A.    The Exchange is the server component.  The

Page 31

1  Outlook is the client component.  So they interact with
2  each other.

3    Q.    Okay.  So UTM -- Is it -- Is it a fair
4  characterization then to say that UTMB uses Outlook
5  as --

6    A.    Yes.

7    Q.    -- the Court would understand it?

8    A.    Yes.

9    Q.    Okay.  And how widespread is the use of
10  e-mails?

11    A.    It's institutional wide.

12    Q.    Okay.  Nurses use it?

13    A.    Sure.  Everybody's -- Everybody has an e-mail
14  account who needs one.

15    Q.    Okay.  Are there any employees that would not
16  need one?

17    A.    Sure.  There's specific contractors,
18  maintenance type people who do, you know, like
19  landscaping and things like that.

20    Q.    Okay.  But folks in the Correctional Managed
21  Care, nurses or anyone on up the chain --

22    A.    Yes.

23    Q.    -- they'll have e-mail.

24    A.    Yes, sir.

25    Q.    When an e-mail is sent to a UTMB user that has

Page 32

1  e-mail, is it -- if I used the word "inbox," what does
2  that mean to you?

3    A.    That's a repository where all new e-mail comes
4  to until they remove it to another folder.

5    Q.    All right.

6    A.    That's their primary source of e-mail.

7    Q.    Okay.  And when an e-mail comes in and hits
8  the inbox, how long is it -- is there a policy that it
9  stays there for a certain period of time before it's
10  automatically deleted?

11    A.    If there is a policy as far as document
12  reten -- I'm not that expert.  I know that my own
13  personal e-mail box, that stays out there until I remove
14  it or delete it --

15    Q.    Okay.

16    A.    -- in the inbox.

17    Q.    Is there a --  Do you have a size limitation
18  for how big your inbox can be?

19    A.    I believe it's 450 megabytes.

20    Q.    Is your inbox pretty cluttered, like mine is?

21    A.    Well, actually, I archive mine off.  So
22  I'll -- I'll archive the stuff off.  Because once you
23  hit that limit, you know, you can't send e-mail out.
24  They usually call it e-mail jail.  So I always try to my
25  Exchange portion of it, the Outlook portion of it clean

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 33

1 so I don't have those problems.

2    Q.   Okay. Tell us what you mean by that. I mean,
3 how do you -- I mean, you've got e-mails coming in your
4 inbox and then what do you do to make sure your inbox
5 doesn't get to big?

6    A.   What I have is a .pst file that's attached, in
7 the archive file, where you can do auto archiving and
8 it's built in, or a .pst file where I just copy stuff
9 from my sent items and my deleted items to my archived
10 folder whenever it gets close to that maximum limit
11 there is other folks out there has it automatically set
12 up where it automatically copies it down to an archive
13 folder.

14    Q.   Okay. But you're not aware, sitting here
15 today, you're not aware of any -- any policies at UTMB
16 that deletes e-mails after a certain period of time in
17 your inbox?

18    A.   There is no policy here at UTMB for
19 deleting -- deleting e-mails after a certain amount of
20 time in your inbox.

21    Q.   Okay. Now, you said that the -- it's 450
22 megabytes, I believe, as you said is the limit on the
23 inbox?

24    A.   Let me qualify that by saying that is my -- I
25 have 450 megabytes. I don't know what the institutional

Page 34

1 standard is for sizes of the mailbox. I have never
2 requested more. I do know it has upped on occasion; but
3 I think that's just because of the capacity of our
4 storage system is up.

5         So I can't say that everybody in the
6 university gets an increase every time their storage
7 capacity comes up. This is me talking about my own
8 resources personally.

9    Q.   Okay. As the director of IT, do you mean --
10 Do you have any knowledge of the capacity that folks --
11 that other UTMB employees have?

12    A.   No, I -- I don't sit on that. That's all
13 based on the storage that IS operations -- and as for a
14 correction, I'm not a director of IT. I'm a director of
15 information security, and I report to the General
16 Counsel here at UTMB.

17    Q.   Okay.

18    Q.   So...

19    Q.   You mentioned the archive folder.

20    A.   Yes, sir.

21    Q.   Do other UTMB employees -- And, particularly,
22 when I am talking about UT employees, I'm talking about
23 the Correctional Managed Care.

24    A.   Sure.

25    Q.   Is that -- Can we --

Page 35

1    A.   Yeah.

2    Q.   -- safely assume that for the purpose of this
3 deposition we're talking about UTMB employees.

4    A.   I assumed --

5    Q.   That's who I'm focusing on, both, you know, at
6 the senior level and then also on down to the nurses.
7 Okay?

8    A.   Yes, sir.

9    Q.   When they archive -- Let me put it this way.
10 Do they archive e-mails?

11    A.   Some do, some don't.

12    Q.   Okay.

13    A.   We'll find archived e-mails out on work
14 stations. Sometimes there's some CMC employees that
15 prefer to keep it on their -- in their inbox on the
16 Microsoft Exchange server.

17    Q.   Okay. And those e-mails that are put into the
18 archive, what does it mean then when they're put into
19 the archive? How is that different than staying in the
20 inbox?

21    A.   Well, it's actually copied off the e-mail
22 server to a stand-alone file called a .pst file. So --
23 And then that resides on that local system.

24         So even if that server goes down, they
25 still have access to that e-mail on that local system.

Page 36

1    Q.   Because the local system is the -- the Outlook
2 exchange on the individual's computer?

3    A.   The local system is the Outlook client on the
4 individual's computer. It'll query any e-mail wherever
5 you point to it. So, you know, its first -- Its first
6 function is to connect to Exchange server. If that
7 Exchange server is unavailable, A, because the server
8 went down or, B, maybe there is a problem with a link
9 it'll go out there and look at that local file that
10 you've been archiving off the Exchange server.

11    Q.   Okay. So just to be clear, when they move the
12 e-mails from the inbox to the .pst file --

13    A.   Yes, sir.

14    Q.   -- which is the archive --

15    A.   Yes, sir.

16    Q.   -- where is that served? Is it on their
17 computer or is it somewhere else?

18    A.   It depends on where the client puts it, or the
19 individual CMC employee. They could have it -- If they
20 have a network drive, they can have it on the network
21 drive. Or if they have a piece of removable media, they
22 can put it on that as well. So it could be a number of
23 places.

24         The places that we, as an institution,
25 has as a standard is on a network drive if they have a

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 37

1  network drive or the local PC.

2      Q.   Okay.  Earlier we were talking about whether

3  there was any automatic deletion policies for e-mails in

4  the inbox.  Are there any automatic deletion policies

5  for e-mails in the sent folder?

6      A.   That's a -- I would like to get some

7  clarification about "automatic deletion policies."

8           Are you talking about a technical process

9  that automatically deletes e-mail at a specific --

10  specified point in time, or are you talking about an

11  administrative policy that says:  Individuals need to

12  delete these e-mails?

13     Q.   I'm talking about an automatic policy where

14  you, from the user's perspective, they have an inbox --

15     A.   Right.

16     Q.   -- and e-mails come in; and today's May 30th.

17  So if there was an e-mail that was sent to the me, let's

18  say, April 15th.

19     A.   Right.

20     Q.   And I have -- and that there was a 30-day

21  deletion policy, that e-mail that was -- that used to be

22  in my inbox, that was there on April 15th, is now gone.

23  Is that the way it works at UTMB?

24          MS. COOGAN:  Objection to the term

25  "policy."  Go ahead.

Page 38

1          THE WITNESS:  Oh, thanks.

2      A.   Automatic policy that automatically deletes

3  e-mail after a specified amount of time, the answer is

4  no.  We do not have an automated policy that goes out

5  there and automatically deletes e-mail.

6           All e-mail deletion has to be manually

7  done by the owner of that e-mail box.

8      Q.   (By Mr. Flammer)  Okay.  Are you aware of any

9  direction that UTMB gives employees as to when or why to

10  delete certain e-mails?

11          MS. COOGAN:  Objection, vague.  Go ahead.

12     A.   I'm not aware of any policy other than what I

13  personally know on how I maintain my own, which is --

14  you know, I'm free to delete anything that's considered

15  transitory e-mail, which is just general stuff that I

16  have in my mailbox.  If I don't think it's related or

17  it's not original documentation, I'm allowed to delete

18  it whenever I feel it's necessary.

19     Q.   Okay.  If an e-mail is sent to a UTMB

20  correctional care employee and that user deletes the

21  e-mail --

22     A.   Yes, sir.

23     Q.   -- is it gone?  Is it irretrievable?

24     A.   It is not gone.  If it -- if it's deleted off

25  the Exchange server so they're not -- it's not being

Page 39

1  archived to a .pst, it's retained for four days after

2  they delete it from their deleted items box within

3  Outlook.  So they have the ability to retrieve that

4  e-mail after they have re -- deleted it --

5      Q.   Okay.

6      A.   -- for four days.

7      Q.   So let me just break that down.

8      A.   Okay.

9      Q.   All right.  So if I'm a UTMB employee in the

10  Correctional Managed Care division, I get an e-mail and

11  I want to delete it.  I delete it and then does that

12  e-mail go to my deleted folder?

13     A.   Yes, sir.

14     Q.   Okay.  And then how long does it stay in the

15  deleted folder?

16     A.   Until you go out there and delete it from that

17  deleted folder.  So it could stay out there for years.

18     Q.   So I have to go into the deleted folder and

19  then I again say delete?

20     A.   Yes, sir.

21     Q.   And then once I do that --

22     A.   It's retained --

23     Q.   -- is it --

24     A.   -- for four days.

25          I'm sorry.

Page 40

1      Q.   No.  Go ahead.  Please, no.  Thank you.

2      A.   It's retained for four days.

3      Q.   Okay.

4      A.   On the Exchange server.

5           There is a qualification to that in that,

6  yeah, there is a way to bypass that archive on the

7  Exchange server where if you hold down your shift key

8  and then hit delete, it doesn't go to the archive spot;

9  so people can bypass that function if they have

10  knowledge of how the system works.

11     Q.   When you say how "that function," you're

12  talking about the four-day retention?

13     A.   Yes, sir.

14     Q.   Okay.  Can you -- Can you explain the reasons

15  why you have that four-day retention?

16     A.   It's specifically for people who accidentally

17  delete stuff so we can go out there and retrieve it.

18     Q.   Okay.  Let's talk about, besides e-mails,

19  other documents.

20     A.   Sure.

21     Q.   If a user creates a Word document, again, and

22  saves it on the drive, the network drive, how long is

23  that document retained?

24     A.   Until it's deleted by the end user.

25     Q.   So the end user has to delete it?

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 41

1    A.    Yes, sir.

2    Q.    There is no automatic deletion policy?

3    A.    No.

4    Q.    Same thing with spreadsheets?

5    A.    Every -- Yes, sir.  Spreadsheets.

6    Q.    Every -- Every document must be deleted by

7 the end user?

8    A.    There is no automatic deletion process here at

9 UTMB.  So if a user keeps something out there on that

10 assigned drive, that stays there until the end user hits

11 the delete button.

12    Q.    Does UTMB give any guides to users as to what

13 should be saved and what should be deleted?

14    A.    There is a -- Again, it's not my area of

15 responsibility, but there is a document retention

16 schedule out there that people are briefed on; and, you

17 know, it's up to the individual end user or departments

18 to actually make sure their folks are educated.

19    Q.    Okay.  Are you aware of any internal audits as

20 to a UTMB employee's compliance with those policies?

21    A.    Can you answer -- or say that question again?

22    Q.    Sure.

23            MR. FLAMMER:  Do you want to read that

24 question back?

25            MS. COOGAN:  No.  He --  You promised him

Page 42

1 at the beginning of the deposition that if he didn't

2 understand the question, you -- and he told you -- that

3 you would rephrase it.  So I'm going to ask you to

4 rephrase it, not just to repeat it.

5            MR. FLAMMER:  Well, I believe he just

6 doesn't hear me.  It wasn't --

7            THE WITNESS:  I didn't hear the first

8 part.

9            MS. COOGAN:  Okay.

10            THE WITNESS:  Okay.

11            MS. COOGAN:  I apologize.

12            MR. FLAMMER:  Thank you, ma'am.  Go

13 ahead.

14            THE REPORTER:  But because of the

15 interruption, I didn't get the full question.

16            MR. FLAMMER:  Okay. okay.

17    Q.    (By Mr. Flammer) Are you aware, sir, of any

18 audits or reviews of UTMB employees' compliance with the

19 document retention policies?

20    A.    I'm not aware of audits about that.

21    Q.    Do you have any knowledge as to whether or

22 not -- or how widespread compliance is with the --

23    A.    I have no knowledge of that either.  I have

24 two people in my area.  I'm focused on those people with

25 regards to policy compliance here at UTMB when it comes

Page 43

1 to document retention.

2    Q.    You said you have two people that do that?

3    A.    I have two people who work in my area as

4 security analysts.

5    Q.    Oh, you --

6    A.    They are unrelated to any other thing with

7 regards to document retention or anything like that.

8    Q.    So it's those other two people that do the

9 document retention, not you, is what you're saying?

10    A.    No.  That's not what I'm saying.  What I'm

11 saying is I have two people in my area who have their

12 own function outside of document retention.  Those are

13 the folks I worry about as far as compliance with

14 document retention.

15            So I can state that we understand

16 document retention within my area, and we comply with

17 it.

18    Q.    Okay.

19    A.    I can't talk to any other department here at

20 UTMB.  Again, it probably should be directed to the

21 director that takes care of records retention.

22    Q.    What is that person's name?

23    A.    Oh, I don't know who that would be.  It would

24 be a compliance issue.  I would go through compliance to

25 get that information.

Page 44

1    Q.    Okay.  Well, I had a list here of questions

2 about document retention.

3            You said in your -- in your role you're

4 just not the -- you're not UTMB's representative on that

5 topic --

6    A.    I am not.

7    Q.    -- is that correct?

8            MS. COOGAN:  And --  And let me just make

9 this objection just for the record.  He can tell you

10 physically on the computer how the documents are

11 retained, if that's what you mean by document retention;

12 and then we have the document retention schedule here

13 attached as an exhibit.

14            MR. FLAMMER:  Okay.

15            MS. COOGAN:  So I guess it depends on

16 what you mean by document retention.

17    Q.    (By Mr. Flammer) But you don't know the

18 document retention policy for meeting minutes?

19    A.    I know they are to be maintained for -- I

20 can't tell you off the top of my head how long.  I think

21 it's a year for meeting minutes or other things like

22 that, or policies and practice standards, development

23 and things like that.  I know that that there's a

24 retention around that type of stuff.

25    Q.    (By Mr. Flammer) Can you explain to the Court

## ROBERT VERNON SHAFFER, JR. - May 30, 2014
## DESIGNATED REPRESENTATIVE OF UTMB

Page 45

1  what a black-up tape is?

2      A.    Really, a back-up tape is a legacy item that

3  would -- used to be or is still in some cases is still

4  used to back up data, in case of disaster recovery or

5  accidental deletion, so you can recover it.

6      Q.    Can you just tell us, tell the Court about

7  what the UTMB back-up tape architecture is?

8      A.    What we have here at UTMB, we're moving away

9  from back-up tapes.  We only use that for legacy

10  systems.

11            We do transmit back-up data to the

12  Arlington data center as a disaster recovery site, so

13  it's backed up over the network.  And then it's not

14  copied to tape.  It's copied to another hard drive

15  source.

16      Q.    All right.  Can you tell me what you mean by

17  "legacy system"?

18      A.    Legacy systems are antiquated systems, systems

19  that are -- reached the end of their life and they're no

20  longer really supported by the manufacturer.  But we

21  still use them because we have a specific process that

22  can't be upgraded at this time, so we'll go ahead and

23  use those legacy systems.

24      Q.    And what legacy systems does UTMB use right

25  now?

Page 46

1      A.    Oh, we have --  There's some research systems

2  that's considered legacy where they have microscopes

3  that's hooked up to, you know, systems like that.

4            As far as on the medical side of the

5  house, all of our EMRs and -- that's pretty much, I want

6  to say, not leading edge but pretty close to leading

7  edge systems.  They're fairly new.  They're upgraded on

8  a regular basis.

9      Q.    What about as far as e-mails are concerned?

10      A.    E-mail is -- it's on a system that's within

11  the scope of it's life, let's put it that way.  It's not

12  at the end of the life, but it's not like it came out

13  last week so...

14      Q.    When did UTMB start using Exchange?

15      A.    I can't answer that.  It was here before I got

16  here.

17      Q.    Okay.  It was here before you got here.

18      A.    Yes, sir.

19      Q.    And you got here in 2001?

20      A.    Yes, sir.

21      Q.    So UTMB has been using for e-mail

22  communications Outlook --

23      A.    Yes, sir.

24      Q.    -- since at least 2001.

25      A.    Yes, sir.

Page 47

1      Q.    And a few minutes ago we were talking about

2  the auto -- a possible automatic deletion policy --

3      A.    Yes, sir.

4      Q.    -- at UTMB, and you were saying that UTMB

5  doesn't have one.

6      A.    Not that I'm aware of.

7      Q.    And has that always been the case to the best

8  of your knowledge?

9      A.    To the best of my knowledge, we've never had

10  an automatic deletion program.

11      Q.    Has there been any other systematic purging of

12  e-mails after a certain period of time that you know of?

13      A.    Not to my knowledge.

14      Q.    Okay.  All right.  With the Arlington back up

15  center, can you explain to us how that works?

16      A.    Well, did you want to get that pen first?

17      Q.    Yeah, thank you.

18            MR. FLAMMER:  Pardon me, ma'am.  I

19  dropped my pen.

20      Q.    (By Mr. Flammer)  Thank you, sir.

21      A.    It's basically the same premise as the tape

22  back-up.  Our data is backed up to the Arlington data

23  center several times throughout the day; and, again,

24  it's pushed over a network that is operated -- owned and

25  operated by the UT system and the State of Texas.

Page 48

1            It's used for disaster recovery when -- a

2  perfect example would be Hurricane Ike where you lose

3  systems and things like that.  You can bring them up

4  quickly, you can restore it, and then you get back on

5  with your business.

6      Q.    Okay.  And how long is that back-up retained?

7      A.    I can't give you the exact number, as it's not

8  my area of expertise.  I want to say six months, but I

9  can't be exact about that.

10      Q.    And so just to be --  All right.  Assuming it

11  is six months, you said several times a day it's backed

12  up --

13      A.    Yes, sir.

14      Q.    -- to that location.

15      A.    (Nods head affirmatively.)

16      Q.    And so meaning that five and a half months

17  prior to to today, if we wanted on the system up there

18  in Arlington, they would have the three different

19  snapshots --

20      A.    Yes, sir.

21      Q.    -- from five and a half months ago?

22      A.    Yes, sir.

23      Q.    Okay.

24      A.    And it's not a -- it's not a full data back up

25  several times throughout the day.  So what it does is it

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 49

1 completes a data back up and then it looks at the CRC
2 checks and the hashing and then it does an incremental.
3 So it just backs up the things that's been changed.
4          So say you have a document up there
5 today, tomorrow you change a word in it, just that word
6 is going to be changed in that document or backed up --
7     Q.    Got you.
8     A.    -- to -- to, you know, I guess facilitate, for
9 lack of better words, the original document.
10     Q.    Okay.
11     A.    Does that make sense?
12     Q.    And is that backing up done both for retrieval
13 and disaster recovery?
14     A.    Yeah.  We use it for anything that's deleted.
15 So if you lost a file today, misplaced it, deleted it
16 whatever, you could call up the help desk and tell them:
17 Hey, I need this file and it was on the file sharing.
18 And they'll be more than happy -- or retrieve it for
19 you.
20     Q.    Okay.  So you talked about legacy and we
21 talked about the Arlington back up center.  Are then
22 e-mails, would that be something that goes to the
23 Arlington back-up center?  I guess that's not part of
24 the legacy system?  Is that correct?
25     A.    No.  It's -- E-mail's not really backed up

Page 50

1 where you could have --  It's maintained --  I can't
2 tell you whether the physical location of the e-mail
3 server is here or it's north Houston at Guhn Road; but
4 it's retained on that server, and that's where it
5 archived at.  So that is not backed up on a regular
6 basis.
7     Q.    So e-mails are not backed up?
8     A.    Well, I meant other than the archive, right.
9 It is backed up for disaster recovery purposes; and when
10 I say that, that is catastrophic failure of an e-mail
11 system.
12     Q.    Okay.  So just to be clear, so the -- I want
13 to separate two different things.
14     A.    Okay.
15     Q.    The inbox and the archive.
16     A.    Right.
17     Q.    And within the inbox, that would include other
18 folders --
19     A.    Yes.
20     Q.    -- is that correct?
21     A.    Yes, sir.
22     Q.    So inbox, and that may include other folders,
23 versus the .pst file --
24     A.    Right.
25     Q.    -- that is the archive.

Page 51

1     A.    Yes, sir.
2     Q.    Okay.  So the inbox, that is not backed up; is
3 that correct?
4     A.    It is --  The messages within the inbox are
5 archived after they've been deleted from the deleted
6 folders item.
7     Q.    For four days.
8     A.    For four days.
9          The entire system is backed up for
10 catastrophic reasons, meaning that if you lost the
11 system, you could rebuild that to a given point in time,
12 but it's not -- it's not for recovering mailboxes or
13 deleted e-mails or anything like that.
14     Q.    Okay.  And that the inboxes -- we're still
15 talking about the inboxes, not the .pst file -- the
16 inboxes are backed up for what you believe is six
17 months?
18     A.    No.  They're not.  They're four days.  Four
19 days.
20     Q.    Just -- Just -- Just e-mails that are
21 deleted or all e-mails are backed up for four days?
22     A.    Okay.  So on your Exchange server, you have
23 your inbox.  We've already agreed what that is -- has
24 got all these subfolders and everything.  The only thing
25 that's archived, once it's been deleted, is I delete

Page 52

1 something from any folder within that mail account, it
2 goes to my deleted items.  Once I delete it from the
3 deleted item, it goes to a four-day archive.  It can be
4 retrieved then.  That is all the mailbox, individual
5 mailbox back-up processes that exist for Exchange.
6     Q.    Okay.  So what happens if the server goes out?
7 What happens if the e-mails are saved on a server and
8 then it goes out?
9     A.    So that is the catastrophic thing.  That is
10 backed up and then you can recreate that for a
11 catastrophic event and it recreates all of the e-mails
12 stores, the 12,348 or whatever it is today.  It doesn't
13 allow you to recover individual e-mails or e-mail
14 accounts.  Does that make sense?
15     Q.    I think so.
16     A.    Okay.
17     Q.    I think so.
18     A.    Well, I don't know.
19     Q.    Okay.
20     A.    I'm trying my best.
21     Q.    The .pst -- Let's talk about the .pst file.
22 Is that backed up?
23     A.    It depends.  It depends on where they stored
24 at.  If it's that .pst file stored on the local
25 computer, desktop, it is not backed up.  If it's stored

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 53

1 on a network drive, it is backed up and retained for six
2 months.  And that's my estimation that retention there
3 is six months.  It may be different.
4     Q.   Okay.  Okay.  If you wanted to find a
5 particular person's -- can we -- can we -- what does the
6 word "custodian" mean to you in the context of a
7 discussion about e-mails?
8     A.   A custodian to me is somebody who actually
9 maintains and supports the e-mails accounts.  It's not
10 the person who owns it.  The owner is the individual who
11 is assigned that account.
12          A custodian is somebody who will either
13 support or maintain it as far as a technical -- from a
14 technical perspective.  Yeah.
15     Q.   Okay.  I just want to make sure we're clear on
16 the terminology for the purposes of today's deposition.
17     A.   Yeah.  Sure.
18     Q.   So -- So a "user" is the word that we should
19 be talking about --
20     A.   User is a commonly accepted word --
21     Q.   Okay.
22     A.   -- here as far as end user resources.
23     Q.   If you wanted to find the e-mails of a user,
24 where would you look?
25     A.   In the exchange system.  There would be

Page 54

1 several places we'd look.  One, our initial I guess
2 investigation would start at the Exchange server level,
3 where that mailbox resides.  We would go in there and,
4 you know, look through all the e-mails.
5          Okay.  Then we'll go out there and see if
6 that person's been assigned network shares.  If they've
7 been assigned network shares, we go out there and look
8 for .psts.  Then we'll go out and look for that
9 computer, desktop, and then we'll do a search on that
10 desktop to see if they have any .psts out there.
11     Q.   Okay.
12          MR. FLAMMER:  Do you-all want to take a
13 break for a couple minutes?
14          MS. COOGAN:  Sure.
15          THE VIDEOGRAPHER:  Off the record at
16 3:16.
17          (Off the record from 3:16 - 3:24.)
18          THE VIDEOGRAPHER:  Back on the record at
19 3:24.
20          MR. FLAMMER:  Okay.  Thank you.  And,
21 Ms. Coogan, I just want to talk about what we talked
22 about during the break.
23          I asked for a -- for you to go get
24 somebody to talk about UTMB's document retention
25 policies, and you wanted to respond to that request.

Page 55

1          MS. COOGAN:  When I got your subpoena,
2 which was Exhibit A, I understood this entire exhibit to
3 be re -- was about how documents are retained within the
4 computer system, and that's what this witness can talk
5 about.
6          I did not understand what I think you're
7 asking for now which is how long documents are retained?
8 Is that -- Am I right?
9          MR. FLAMMER:  Yes.
10          MS. COOGAN:  Okay.  So I know I've
11 already produced it once before.  Let me reproduce the
12 document, UTMB document retention plan, and that's just
13 for Correctional Managed Care.
14          MR. FLAMMER:  Okay.  Thank you.  Let's go
15 ahead and have this marked.
16          MS. COOGAN:  Yeah.  Let's do.
17          MR. FLAMMER:  And then also --
18          MS. COOGAN:  Hang on.  She can't type and
19 listen to you at the same time.
20          (Shaffer Exb. No. 3 was marked.)
21          MS. COOGAN:  If I could just finish my
22 response to you --
23          MR. FLAMMER:  Go ahead.
24          MS. COOGAN:  We don't have any objection
25 to producing a witness to talk about how long documents

Page 56

1 are retained under the document retention plan; but this
2 witness is -- is here about how long they're physically
3 kept on the computers, which is what -- as part of
4 electrically -- electronically stored information, which
5 is what I understood you to be asking for.
6          MR. FLAMMER:  And what about a witness on
7 categories 2, 3, 13, and 14, and 6?
8          MS. COOGAN:  It depends on what you want
9 to know about those things.  The litigation hold letters
10 were produced by this witness.
11          MR. FLAMMER:  And those are the documents
12 that were just handed to me?
13          MS. COOGAN:  Yeah --  No.  Well --
14          MR. FLAMMER:  Or Exhibit No. 2?
15          MS. COOGAN:  Whatever it was that you got
16 from the witness earlier, to the extent that they exist.
17          MR. FLAMMER:  (Nods head affirmatively.)
18          MS. COOGAN:  So what is it -- What kind
19 of witness is it that you want to know?  What is it that
20 you want to know about that, so I can know what kind of
21 witness to get.
22          MR. FLAMMER:  I mean, the categories that
23 were in the subpoena.
24          MS. COOGAN:  And I hear what you're
25 saying, and I'm confessing that I don't understand your

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 57

1  categories.  I don't understand what kind of witness you
2  want.
3          I thought you wanted a computer expert,
4  and you're telling me that's not what you want; is that
5  right?
6          MR. FLAMMER:  It's more than that.
7          MS. COOGAN:  Okay.
8          MR. FLAMMER:  It's more than just the
9  computer -- computer expert.  But why don't we do this?
10 Why don't we continue on --  But go ahead.  I mean,
11 can -- can you produce these people today?
12         MS. COOGAN:  Which people on which -- on
13 which subject?
14         MR. FLAMMER:  Well, I mean, UTMB's
15 document retention policy.  So, for example, how long
16 certain documents are retained, like spreadsheets
17 perhaps tracking heat-related illnesses.
18         MS. COOGAN:  What is the document
19 retention policy on how long they're supposed to be
20 retained?  Or how are they retained on the computer?
21         MR. FLAMMER:  Both.
22         MS. COOGAN:  Okay.  This witness can talk
23 to you about how they're retained on the computer.
24         If you're talking about a witness that
25 can testify about the document retention plan and

Page 58

1  compliance, policy 6.1.5 of the UTMB Handbook, I can do
2  that for you.  I can't do it today, but I can do that.
3          MS. OSTEEN:  Can I talk?
4          MS. COOGAN:  Yeah.
5          MS. OSTEEN:  I need to talk to you.
6          MS. COOGAN:  Presumably now.
7          THE VIDEOGRAPHER:  Do you want to go off
8  the record?
9          MR. FLAMMER:  Yeah.  Let's go ahead and
10 go off the record.  Thank you.
11         THE VIDEOGRAPHER:  Off the record at
12 3:28.
13         (Off the record from 3:28 - 3:29.)
14         THE VIDEOGRAPHER:  Back on the record at
15 3:29.
16         MS. COOGAN:  So I think part of my
17 confusion is that if it's patient related and it's in
18 the electronic medical record, those are going to be
19 part of TDCJ's records.  Right?
20         MS. OSTEEN:  Retention policies.
21         MS. COOGAN:  Retention policies.  But I
22 can produce somebody that can say that for you.
23         MR. FLAMMER:  So are you saying that UTMB
24 doesn't keep records for the -- doesn't keep records
25 pertaining to individual inmates?

Page 59

1          MS. OSTEEN:  This is all --
2          MS. COOGAN:  Yeah, I don't either.  Okay
3  so we will just have to produce somebody who can talk
4  about the electronic medical record and then all of
5  these categories, Exhibit 3, identifies the categories
6  of documents that are retained.
7          So maybe that will shed some light on the
8  kind of witness that you want me to -- to produce; or
9  maybe you can help me be more specific with what you're
10 looking for.
11         MR. FLAMMER:  Okay.  And what about
12 category number 2, the date, scope of any litigation
13 holds, preservation letters, etcetera, that were sent
14 from outside counsel to UTMB and/or that were
15 communicated internally within UTMB regarding any
16 litigation regarding the heat conditions in Texas
17 prisons?
18         MS. COOGAN:  You have anything that
19 came --  Nothing came from outside counsel.
20         MR. FLAMMER:  Okay.
21         MS. COOGAN:  So if you want to know about
22 preservation letters on litigation holds, you're holding
23 them in your hand.
24         MR. FLAMMER:  And that's Exhibit 2.
25         MS. COOGAN:  Yes.

Page 60

1          MR. FLAMMER:  Okay.  And these were all
2  internal --  I haven't had a chance to look at these.
3  It looks like these were all internal communications
4  regarding litigation holds.
5          MS. COOGAN:  Well, take -- take a look at
6  them and if you want to -- if we want to talk about --
7  obviously there's -- some of those are going to be
8  attorney/client and attorney work-product, have
9  privileged information within them.  Not within the
10 document, but within the confidential communications.
11 But if you need to talk to --  If you want to know when
12 they were done, you have them in your hand.
13         MR. FLAMMER:  Okay.  So this -- So this
14 is the scope, so -- Exhibit 2 is the scope of any
15 preservation letters, litigation holds, that were sent
16 regarding heat --
17         MS. COOGAN:  They are the letters.
18         MR. FLAMMER:  They are the letters.
19         MS. COOGAN:  They are the letters, yes.
20         MR. FLAMMER:  Okay.
21         MS. COOGAN:  They're not just about the
22 scope of it.  They are the actual preservation
23 materials.
24         MR. FLAMMER:  Okay.  And what about
25 category --  So are you --  Are you say --  So you're

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 61

1 saying that there really isn't a need to have a person
2 from number 2; is that -- Is that what you're saying?
3 Or there isn't a person or --
4            MS. COOGAN:  You can have anybody you --
5 you want to.  I'm just telling you I need -- I don't
6 understand if I've produced the actual preservation
7 letters, if you -- what kind of person you want.
8            I mean, somebody that can read English?
9 Do you want somebody that drafted them?  Do you want
10 somebody who gathered the documents?  Do you want
11 somebody who put them on the computer?  Do you want to
12 know how they're stored on the computer?  Do you want to
13 know how to print them out?  Do you want to know when
14 they were destroyed.  You've got to give me just a
15 little bit more information so I can get the right
16 person for you.
17            MR. FLAMMER:  I just haven't had a chance
18 to look at these yet.
19            MS. COOGAN:  Okay.  I'm not --
20            MR. FLAMMER:  During the next break, I'll
21 take a look at them.
22            MS. COOGAN:  I'm not fussing at you.
23 I -- I'm telling you I -- clearly I misunderstood the
24 subpoena, and I want to make that right.
25            MR. FLAMMER:  Okay.

Page 62

1            MS. COOGAN:  But I need more information
2 even still.
3            MR. FLAMMER:  Okay.  What about category
4 number 6?
5            MS. COOGAN:  I think that's completely
6 privileged, and I assert that privilege.
7            MR. FLAMMER:  The whole scope of 6 is
8 privileged?  Is that your position?
9            MS. COOGAN:  I think that who the key
10 players are, who our persons with knowledge of relevant
11 facts is not privileged; and I think that question has
12 been answered.  But what -- what was the internal
13 thought process on how those people were determined I
14 think is privileged.
15            Who I think is a key player may not be
16 the same as who you think is a key player.  I think my
17 obligation is to turn over all players.  Whether you
18 think they're key or not, I don't think you're entitled
19 to my opinion about that.
20            MR. FLAMMER:  Okay.  Okay.
21            MS. COOGAN:  Maybe the "key players" is
22 the term that's ambiguous.  Maybe you want to know how
23 search terms were determined.  There is a hundred and --
24            MR. FLAMMER:  Does UTMB have a witness
25 who can talk about how UTMB determined what users may

Page 63

1 have relevant information that should be searched?
2            MS. COOGAN:  Prob --  I'm sure.  Yeah.
3            MR. FLAMMER:  And you'll produce --
4            MS. COOGAN:  I mean, those 139
5 custodians, how those 139 custodians were chosen?
6            MR. FLAMMER:  Right.  And when they were
7 chosen.
8            MS. COOGAN:  I'm not sure.  I would have
9 to talk to UTMB about that and -- and I'll have to think
10 about whether that's privileged or not.  You have the
11 139 names, and you've also been asked to submit names of
12 your own that you think are relevant.  But the thought
13 process behind -- I mean, I think -- I think the Rules
14 only require that we turn over five custodians.
15            MR. FLAMMER:  And --  Well, I disagree
16 with that; but that's okay.  We can agree to disagree.
17            MS. COOGAN:  Okay.
18            MR. FLAMMER:  But, also, from our
19 perspective is when those individuals were identified
20 and when they were told to start deleting documents or
21 to preserve documents.
22            MS. COOGAN:  And those would be in those
23 preservation letters that you have right in front of
24 you.
25            MR. FLAMMER:  Okay.

Page 64

1            MS. COOGAN:  And there is not anything
2 else.
3            MR. FLAMMER:  Okay.
4            MS. COOGAN:  So if you don't see it, it
5 doesn't exist.
6            MR. FLAMMER:  Understood.  And what about
7 categories 13 and 14?  Does UTMB have a witness --
8            MS. COOGAN:  Well, I mean, you can ask --
9 This witness that's here right now can tell you how --
10 what's being done regarding --  Do you mean physically
11 how are they being preserved?
12            MR. FLAMMER:  Yeah, and all efforts
13 taken.  So what was done?  When was it done?  How was it
14 done?
15            MS. COOGAN:  Okay.  You have the
16 preservation letters in front of you; and if it's not in
17 those preservation letters, it wasn't done.  I don't
18 know how else I can say it.  But this witness that's
19 here can talk about how electronically-stored
20 information was preserved once preservation letters went
21 out.  And the preservation letters you have.  So does
22 that answer your question?
23            MR. FLAMMER:  I'm not sure if it does or
24 not; but what I propose is I'll just go ahead and --
25 Either way, there -- there are no other witnesses that

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 65

1 you are prepared to put forth today besides

2 Mr. Schaeffer; is that correct.

3          MS. COOGAN:  Not -- I have not prepared

4 to do that.  If you can tell me somebody specifically, I

5 can try to do it.

6          MR. FLAMMER:  Do you mean a specific

7 name?

8          MS. COOGAN:  Or specifically you want --

9 what you want them to talk about.

10          MR. FLAMMER:  I guess we're just having

11 some miscommunication problems, because I'm talking

12 about the topics listed on Exhibit A.

13          MS. COOGAN:  And I -- I thought I was,

14 too.

15          MR. FLAMMER:  All right.  Why don't we

16 just go ahead and continue on --

17          MS. COOGAN:  Okay.

18          MR. FLAMMER:  -- with questions of

19 Mr. Shaffer and we'll address that later.

20     Q.    (By Mr. Flammer)  Mr. Shaffer, if an employee

21 leaves, what happens to those employees' e-mails?

22     A.    When an employee leaves, we go ahead and

23 disable that account.  That account is disabled for 30

24 days and then it's deleted.

25          So now a legal or -- or even a department

Page 66

1 management has the option to put a security hold on that

2 account for business continuity purposes and things like

3 that; and we'll allow that security hold to be as long

4 as they want it to be.  So it could be six months.  It

5 could be a year.  And if they want to extend it all the

6 time, we are more than happy to extend the security

7 hold.

8          But once it's -- it comes to an end, we

9 delete the -- all of the stores.  When I say stores,

10 talking e-mail, everything that's on their network

11 drive.  Their -- their desktop stuff, it remains; but

12 everything else is deleted.

13     Q.    Okay.  Are you aware of any employees leaving

14 and then that information being kept or actively, you

15 know, affirmatively saved related to this litigation?

16     A.    Act -- Say that again?

17     Q.    Sure.  That was probably a very poorly worded

18 question.  Apologize.

19          Are you aware of any employees that left

20 and then their e-mails and possibly other documents were

21 then decided to be saved because it was relevant --

22     A.    I -- I --

23     Q.    -- or potentially relevant to this litigation?

24     A.    I am not aware of that either.

25     Q.    All right.  So generally speaking, what is

Page 67

1 done to preserve ESI when a lawsuit is filed against

2 UTMB?

3     A.    Again, I can't speak to all ESI.  I can speak

4 to e-mails and things that are stored on their H-drives

5 and desktop things like that, things within the

6 electronic medical record, maybe your Peoplesoft

7 financial, all that stuff is produced by some other

8 department.  Typically the custodian who -- who supports

9 that system.

10          So what we do is once we receive a

11 litigation hold or any kind of discovery request from

12 legal, we take those individuals, we identify all of

13 their storage areas that's been assigned by UTMB, and

14 then we go out there and search for .pst files; or if

15 it's just the Exchange, we export all of the e-mail out

16 of the Exchange mailbox to another .pst file.  We then

17 go ahead and retain it or store it on an information

18 security server.

19          We'll do the search against the .pst

20 files based on a criteria that's been given us to us by

21 legal; and all the filtered e-mail is then delivered to

22 legal and for their review and retention after that.

23     Q.    Okay.  And has that be done in this case?

24     A.    It is currently being processed.  It's -- The

25 last time I spoke to the analyst that's conducting the

Page 68

1 review or the discovery, he said he's about 70 percent

2 complete with the e-mail stores; and we're still going

3 to go out there and do some discovery on the desktops,

4 the local hard drives out there in the prison units.

5     Q.    Okay.  And do you take images?  Do you take

6 images of those hard drives?

7     A.    We don't do an image.  What we'll do is go out

8 and search for .pst files under their profile and then

9 we'll pull that .pst file over the network and treat it

10 like any other .pst file.

11          We don't physically touch the PC.  It's

12 all done over -- remotely over the network.

13     Q.    Okay.  And that part of it hasn't been done

14 yet, the local drives?

15     A.    Right.  We're about 70 percent complete with

16 the Exchange, and then the local drives are -- you know,

17 depending -- the search for .psts on a local drive

18 is nothing.  Depending on how big these .pst files are,

19 because some folks have gigabytes.  They're real slow

20 leaks.  Sometimes it can take up to 12, 14 hours to pull

21 that information across that wire.

22     Q.    When a lawsuit is filed against UTMB, is there

23 a -- a letter that gets sent to you or an e-mail or any

24 sort of notification to you?

25     A.    Yes, sir.

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 69

1    Q.   And what does that tell you to do?

2    A.   The letters are what was provided to you

3 earlier, that is the -- the template; but it tells us

4 who's been identified in the litigation hold request or

5 e-discovery request and then provides us with keywords

6 and we'll go out there and try to identify all the data

7 that we know exists.  And then we do a search based on

8 the key terms that were provided to us.

9    Q.   Can you show me in Exhibit 2 where that is,

10 the standard letter you said?

11    A.   This is the standard letter that comes; and

12 then typically it has a -- like this one has keywords

13 here.

14    Q.   Right.

15    A.   Then you have a list of all the people that's

16 been targeted there.

17    Q.   Okay.

18    A.   So...

19    Q.   And so the keywords are your -- you're talking

20 about the document that has the Exhibit 2.  And, you

21 know what, let's go ahead and mark these individually.

22 Actually, that's going to make it messy.

23         When you said the standard language, are

24 you referring to this e-mail sent Tuesday, May 13th,

25 2014.  Jennifer -- Is it Osteen?

Page 70

1         MS. OSTEEN:  Osteen.

2    Q.   (By Mr. Flammer)  Ms. Osteen.  Is that the

3 e-mail that you're referring to?

4    A.   Yes, sir.

5    Q.   Okay.  Thank you.

6    A.   As far as the formatting.

7    Q.   And are you typically a recipient of that

8 e-mail?

9    A.   Yes.  Yes, sir.  I'm usually copied on them;

10 and then I'll review them.  And the record goes to the

11 analyst that typically does our e-discovery.

12    Q.   And I see it's stapled to that same e-mail,

13 there's a document that says:  Important document

14 preservation notice.  Please read thoroughly and

15 acknowledge receipt immediately.  And this was dated May

16 13, 2014.

17         Is a document that has this same

18 language -- although maybe with the cases different -- a

19 document that is attached to that e-mail?

20    A.   Yeah, I can't say with certainty that everyone

21 of them has that document on there.  I've seen the

22 document before.  But it's not like I scrutinize every

23 document for a discovery request that comes to through

24 my office.

25    Q.   How often do you receive discovery requests?

Page 71

1    A.   A few times a week.  And mostly it's a public

2 information request.  We do get our fair share of

3 litigation requests and discovery holds as well.

4    Q.   Okay.  And you're not aware of any other

5 document preservation notices regarding any of the

6 individuals named here until this e-mail was sent in May

7 of 2014?

8    A.   I can't -- Sorry.  I can't speak directly to

9 individuals named.  I know there's been a couple of

10 documents that's been in -- produced for this case.  As

11 far as the names there's one of them that had a hundred

12 and some.  There's another one that had, you know, nine

13 or ten.  I can't -- I -- It's not like I go over there

14 and, you know, match up the names or anything.

15    Q.   Okay.  And then I really want to -- I want to

16 walk through, you know, really what's done, step by step

17 when you receive one of these.

18    A.   Okay.

19    Q.   So you receive one of these e-mails --

20    A.   Yes.

21    Q.   -- that says "preserve all documents," and

22 then what happens next?

23    A.   What happens next is we identify resources

24 assigned to that individual.

25    Q.   What does that mean, "resource assigned" --

Page 72

1    A.   Resources is network drives, e-mail accounts,

2 end user computers, work stations.  We identify that and

3 then we go out there and the -- the Exchange e-mail

4 account will go out there, access it, we'll export all

5 data that's in there to a .pst file.

6    Q.   So you -- So would it be a fair

7 characterization to say that you go and kind of take a

8 snapshot of what's there?

9    A.   I'd say yeah, absolutely.

10    Q.   And what's the timeline between receiving one

11 of these and then going and taking one of these

12 snapshots?

13    A.   It's typically within four days, depending on

14 the extent of it; but I know the public information

15 request, I think we have four days to do that.  So we

16 try to stay within the time limits that they've put on

17 there.  You know, I'm not saying that every time we meet

18 those time constraints; but that's what we strive for.

19 I venture to say more times than not we do meet their

20 time constraints.

21    Q.   And who identifies what -- who -- what people

22 for you to then go out there and take snapshots of their

23 inboxes and everything?

24    A.   The legal department.

25    Q.   Okay.  Are you involved in any of those

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 73

1  conversations?
2      A.   I -- I am not.
3      Q.   So the legal department says:  Hey, can you
4  please go and take a snapshot of these ten people or
5  whatever?
6      A.   Yes, sir.
7      Q.   And if that -- if the individuals identified
8  have Blackberries, iPhones, some sort of other mobile
9  device, do you go take a snapshot of that device, as
10 well?
11     A.   I do not.
12     Q.   Okay.  Do folks in the senior CMC leadership,
13 do those folks have mobile devices?
14     A.   Yes, sir.  Well, I -- I'm going to make an
15 assumption that they do.
16     Q.   And they --
17     A.   I can't say for -- for a fact that they do
18 have a UTMB-owned device or personally-owned device
19 that's used for UTMB business.
20     Q.   Is it possible that those individuals might
21 have potentially relevant information stored on their
22 mobile devices?
23     A.   Yes, sir.
24     Q.   What about personal computers for those
25 individuals?  Do you go and take a snapshot of their

Page 74

1  personal computers?
2      A.   No, sir.
3      Q.   Or just a limited part of their personal
4  computer that might be relevant to work?
5      A.   No, sir.
6      Q.   Is it possible that they might have
7  information that might be discoverable or relevant to
8  the lawsuits on their personal computers?
9      A.   Yes, sir.
10     Q.   In the McCollum case that we're here about --
11 and do you understand that there are a series of cases
12 around Texas that all involve people that have died
13 from -- from the heat in -- in the prisons?
14     A.   Yes, sir.
15     Q.   And it's not just one case.  There are
16 several.
17     A.   Yes, sir.
18     Q.   Do you know how documents were retained -- or
19 I should say retrieved, I'm sorry, documents were
20 retrieved relevant to that litigation before May of
21 2014?
22     A.   It was retrieved in the -- If it came to my
23 office, it was retrieved in the manner that I just
24 explained to you, as far as we identify resources, we go
25 out there and pull the .pst files, export mails to a

Page 75

1  .pst file, and then we filter based on search criteria
2  that's given to us by legal.
3      Q.   Okay.  And is there usually a delay between --
4  or I should say how long of a delay is there normally
5  between when you go and you take those snapshots to when
6  you then provide the search terms and you then run the
7  search?
8      A.   Typically, it's within a few days.  So, I
9  mean, they give us time constraints.  We try to fall
10 within those time constraints.  Depending on how big
11 this litigation hold is or e-discovery request is,
12 sometimes we may fall outside of those time constraints,
13 but it's always within the time that's been -- where
14 we've been asked to provide the information.  I guess
15 that sounds right.
16     Q.   Okay.  And do you take the -- So do you take
17 the snapshots from these individuals' computers and from
18 the network when the lawsuit is filed or at some earlier
19 time?
20     A.   Okay.  I -- I just want to make sure we're
21 talking apples to apples.  We're throwing a new term out
22 there, "snapshot."  I'm saying we're going out there and
23 capturing data that is e-mail related.
24          Now you've thrown out "snapshot."  I'm
25 not sure what your definition of that is.

Page 76

1      Q.   Okay.  That's a -- Okay.  Thank you.  So
2  you're saying you go out there and you take the .pst
3  file that's on their computer.
4      A.   Yes.
5      Q.   And that .pst file is basically everything
6  that's in their inbox and possibly archived; is that
7  correct?
8      A.   Sure.  Yes, sir.
9      Q.   Okay.
10     A.   And it might be multiple .pst files; but yes,
11 sir.
12     Q.   Okay.  And is that what you understood me to
13 mean when I said "snapshot"?
14     A.   Yeah, I -- Yes, it is.  I just wanted to make
15 sure that we both understood and we were both talking
16 the same language here.  Okay.
17     Q.   Me, too.  And that's why I asked that
18 follow-up question.
19     A.   Okay.
20     Q.   On the Microsoft Exchange server, are there --
21 is it kind of broken up by user so that if you wanted to
22 find one user's e-mails, you can easily identify that
23 one user's --
24     A.   Yes.
25     Q.   -- .pst files?

## ROBERT VERNON SHAFFER, JR. - May 30, 2014
## DESIGNATED REPRESENTATIVE OF UTMB

Page 77

1    A.   No.  We're talking different things again.
2 The Microsoft Exchange server does not have .pst files.
3 Okay?  It has e-mail accounts which are live data.
4              Now, .pst files are used to archive that
5 live data off to a local hard drive, a desktop, or
6 something like that.
7    Q.   But -- But the Microsoft Exchange server,
8 now, just to be clear, has within its structure the
9 different users.
10   A.   Yes.
11   Q.   So you can easily identify someone's e-mails
12 and then just -- and then look at those e-mails.
13   A.   Everybody is assigned a unique ID here and
14 every unique ID is associated with an e-mail account.
15   Q.   Okay.  And is it fair to say that you don't
16 know when -- what stage of litigation exists when you
17 receive the document preservation notice?  Is that fair
18 to say?
19   A.   I -- I have no idea what stage they're in.  I
20 just get a letter from them, we do what the letter says,
21 and then we just move on down the road, so...
22   Q.   Okay.  What does the term "litigation hold"
23 mean to you?
24   A.   Litigation hold means to me that it's any data
25 that might be associated with a -- a perceived or an

Page 78

1 actual litigation, whether it's litigation has been
2 filed or litigation has -- is rumored.
3              A litigation hold is to identify and hold
4 that information in a state that -- where it can't be
5 changed for an upcoming court appearance or something
6 like that.
7    Q.   Okay.  And would the document preservation
8 notice that we talked about earlier that you handed me
9 today, that's part of Exhibit 2, would you consider that
10 a litigation hold?
11   A.   I -- I'd need to look at the document you're
12 referring to.
13   Q.   Here.  I'll also point you to the subject line
14 which says litigation hold, as well.
15   A.   Yes, I would refer -- I would say this is a
16 litigation hold.  It's a litigation hold.
17   Q.   Okay.  And is the process you've described
18 earlier, where the legal tells you the people to go look
19 at and the -- then you go and find their e-mails,
20 find out what other documents they may have, is that the
21 conduct that follows the litigation hold being sent to
22 you?
23   A.   Yes.  Yes.
24   Q.   Okay.  Now, prior to this litigation hold that
25 we've just talked about, sent in May of 2014, are you

Page 79

1 aware of any other preservation efforts made before then
2 to retain electronically stored information related to
3 deaths at TDCJ facilities --
4    A.   Yes.
5    Q.   -- due to excessive heat?
6    A.   I believe there was one in April and I think
7 there was something in October, as well; and that's just
8 based on these documents that were provided to me right
9 before the meeting.  But I do know the latest request
10 came on the heels of a -- of an earlier request.
11   Q.   I want to hand you a memo that's a part of
12 Exhibit 2.  At the top it says legal affairs.  And on
13 the second page there is a list of people identified.
14 Are those UTMB employees?
15   A.   I can't tell you.
16   Q.   Do you have any idea what -- what that list
17 is?
18   A.   I -- It's a list of names that we wanted
19 e-mail boxes searched for.
20   Q.   And so those are the employees that --
21   A.   I don't know.
22   Q.   You don't know if they're employees --
23   A.   I meant -- Again, I'll make an assumption
24 that these are employees; but they -- None of the names
25 look familiar to me.  There's 12,000 some odd -- These

Page 80

1 are mostly people -- are -- These could be people out in
2 prison units, hundreds, you know, tens of miles away.  I
3 mean, they could be -- could be anybody.  They could be
4 employees or they could be somebody else.  I don't know.
5 I haven't looked at it.
6    Q.   Okay.  And I'm not trying to be difficult.
7 I'm just trying to understand what this list is.
8              Is -- Would you be asked to retaken
9 documents from the Microsoft Exchange server that aren't
10 employees?
11   A.   No.
12   Q.   Okay.  You're just saying:  Look, there are
13 12,000 employees of UTMB.  I don't know any of these
14 people, and I can't identify them.
15   A.   I'm sorry.  These are -- Actually, the letter
16 itself says these are TDCJ personnel.  So they're not
17 UTMB personnel.
18   Q.   Okay.
19   A.   There is -- Looking for letters or
20 communications between UTMB personnel and TDCJ
21 personnel.
22   Q.   Okay.  And that's a search you can do?
23   A.   I can do it on the UTMB side.  So if you as a
24 UTMB employee sent something out to these folks, I could
25 look at your e-mail box.  I cannot look at the TDCJ

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 81

1 side.

2    Q.   Is it possible to look at -- Would you have

3 to go into my particular user store?

4    A.   Yes.

5    Q.   Is "store" the word?

6    A.   I would go with "account."

7    Q.   Account.  Okay.

8    A.   Just the main account.

9    Q.   All right.

10   A.   E-mail account.

11   Q.   Okay.  So would you have to go into my

12 individual account to look for all e-mails I sent to a

13 particular person, or could -- Is it possible to say:

14 We want to collect all e-mails sent from UTMB people to

15 person X at such and such a date and such address?

16   A.   Yes.  We can do that.

17   Q.   You can do that?

18   A.   (Nods head affirmatively.)

19   Q.   And prior to this October legal affairs memo,

20 you're not aware of any litigation holds related to any

21 possible litigation involving deaths at TDCJ prisons; is

22 that correct?

23   A.   I am not aware of anything prior to these

24 memos and -- and requests that came to my office.

25   Q.   If anything was sent or there was any other

Page 82

1 litigation hold or preservation efforts, you'd be aware

2 of it; is that correct?

3    A.   I should be aware of it.  If it was cc'd to

4 me, I would be aware of it or at least I'd reviewed the

5 document.  Again, I didn't scrutinize it.  I may have

6 review it and then it was passed off to the analyst who

7 provided the -- the service.

8    Q.   Okay.  Now, I'm looking at the litigation hold

9 that was sent in May of 2014, and I'm looking at the

10 scope -- a time period and scope.

11   A.   Yes, sir.

12   Q.   And it says:  Documents dated from January

13 2007 to the present should be preserved, including all

14 documents created or prepared during that time period or

15 hereafter, or referring or relating to that period --

16        MS. COOGAN:  Where are you?

17        MR. FLAMMER:  Kim, I'm on the third page.

18 This is the -- on the attachment to the litigation hold

19 that was sent Tuesday, May 13 --

20        MS. COOGAN:  Oh, time --

21        MR. FLAMMER:  -- at 2:48.

22        MS. COOGAN:  Okay.  Time period and

23 scope.

24   A.   I got you.

25        MS. COOGAN:  I think he's right there.

Page 83

1    Q.   (By Mr. Flammer)  So it says:  Documents dated

2 from January 2007 to the present should be preserved,

3 including all documents created or prepared during that

4 time period or hereafter, or referring or relating to

5 that period, regardless of when the document was created

6 or prepared.

7        Do you suspect that there are many

8 documents that may be part of that scope that are no

9 longer accessible?

10        MS. COOGAN:  Objection, vague.

11        Go ahead and answer it if you can.

12   A.   I -- I don't know the answer to that.  So...

13   Q.   (By Mr. Flammer)  I'm just asking if you

14 suspect.

15        MS. COOGAN:  Same objection.

16   A.   If I --

17        MS. COOGAN:  Go ahead.

18   A.   Okay.  I -- I couldn't even go there.  I --

19 I don't know what -- I don't know what's been deleted,

20 what's been -- I can't really address that at all.  I

21 don't know.

22        I mean, those are individual things.

23 These are departments that have data they have deleted,

24 they may not.  I don't know what's out there as far as

25 the scope of data regarding that requirement.

Page 84

1    Q.   Do you have a lot of e-mails on your computer

2 there from 2007 or 2008 --

3    A.   I don't know.

4    Q.   -- or 2009?

5    A.   I do not.

6        MR. FLAMMER:  And, Kim, just to be sure,

7 I -- I just want to make sure we're very, very clear.  I

8 have a lot of questions that I could avoid asking if my

9 understanding is correct.  My understanding is that

10 Exhibit 2, which is the litigation hold -- in particular

11 the litigation hold that I'm holding right here, that

12 was sent on Tuesday, May 13, 2014 at 2:48 p.m. -- that

13 this is -- this combined with the e-mail of April 21st,

14 2014 at 4:48 and, also, the legal affairs memo that is

15 October 23rd, 2013, I want to be crystal clear that

16 these are -- this is all there is related to any of the

17 heat cases, any of the heat death cases.  We're talking

18 about McCollum, the Webb consolidated matter, Hinojosa,

19 Martone, all the cases, this is the scope of it; and

20 there is nothing additional; correct?

21        MS. COOGAN:  That's my understanding,

22 yes.

23        MR. FLAMMER:  Okay.  And so there was no

24 other litigation hold either sent from outside counsel

25 to in-house or within -- communicated within UTMB about

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 85

1 the need to preserve documents except for Exhibit 2.

2            MS. COOGAN:  That's my understanding,

3 yes.

4     Q.   (By Mr. Flammer)  Sir, without telling me

5 about specific communications you had with your

6 attorneys, when did you become aware of the litigation

7 about the heat deaths?

8     A.   I mean, I became familiar with it when they

9 first came out with the initial one.

10            I don't put a lot of -- not that I put a

11 lot of thought into it; but then once the scope was

12 expanded, because there was some e-mails that were

13 supposedly found that was archived by a UTMB or a CMC

14 employee, that's when I became really familiar with what

15 was going on.

16            So that would be probably April, early

17 May time frame.

18     Q.   We're talking about this year, 2014?

19     A.   Oh, yes, sir.

20     Q.   Okay.  And it wasn't until October -- again

21 I'm not -- I want to make sure we're very clear, because

22 I could avoid a lot of the stuff that I was going to

23 ask, it wasn't until October of 2013, when this legal

24 affairs memo was sent, that anything was done to

25 preserve documents that may have related to this

Page 86

1 litigation?

2            MS. COOGAN:  That -- Objection, that as

3 vague and calling for speculation.

4            Do you mean by him?

5            MR. FLAMMER:  Or maybe this is a better

6 question, if you are willing to just talk about it on

7 the record, and then I can move on.  And if I'm wrong

8 then I'll -- then we can talk about -- I can ask

9 questions.  But nothing was done to preserve

10 electronically-stored information up until this

11 litigation was sent on October 23rd, 2013; is that

12 correct?

13            MS. COOGAN:  Same -- same objection.

14            MR. FLAMMER:  No.  I mean, I'm asking

15 you.  I'm not --

16            MS. COOGAN:  I don't know.  I don't work

17 here.

18            MR. FLAMMER:  Okay.

19            MS. COOGAN:  Okay?

20            MR. FLAMMER:  Okay.

21     Q.   (By Mr. Flammer)  You're not aware of any

22 other efforts to preserve electronically stored

23 information prior to October 2013 related to the

24 McCollum case; are you?

25     A.   Correct.  When that first memo there was

Page 87

1 issued, that's probably when I -- I say probably.  It's

2 when I became knowledgeable of it.  And I would suspect

3 that it wasn't until the third -- the one in May is

4 where I really got familiar with it.

5     Q.   Okay.

6     A.   So I can't -- you know, I can't really talk to

7 when I first heard about this or first recall seeing

8 anything about it.

9     Q.   But sitting here today, you have no

10 recollection of hearing anything prior to October --

11     A.   No.

12     Q.   -- 2013 --

13     A.   No.

14     Q.   -- about the death of Douglas Hudson?

15     A.   No, sir.

16     Q.   Kenneth James?

17     A.   No, sir.

18     Q.   Robert Webb?

19     A.   No, sir.

20     Q.   Alexander Togonidze?

21     A.   No, sir.

22     Q.   Michael Martone?

23     A.   No, sir.

24     Q.   And as far as the deaths of Larry McCollum,

25 that was not something, sitting here today, you have

Page 88

1 know any recollection of until May of 2014; is that

2 correct.

3     A.   That's correct, sir.

4     Q.   And the same thing with Albert Hinojosa?

5     A.   Unless it was specified in an earlier

6 document, that's the first time that I became aware of

7 it.

8     Q.   Okay.

9     A.   There was many names that was listed there.

10     Q.   So what was done to preserve electronically-

11 stored information regarding the Larry McCollum case?

12     A.   We received a request from legal.  We

13 identified the resources that was assigned to the

14 individuals that were in -- referenced in that request.

15            We went out there, captured -- exported

16 all their e-mail to a .pst file from their Exchange mail

17 account, looked on their network assigned resources, if

18 they had any, or .pst files, went out to their

19 computers, local computers for -- searched for .pst

20 files, brought them in, conducted a search based on

21 keywords that the office of legal affairs gave us and

22 then we provided the filtered documents to legal

23 affairs.

24     Q.   And this is the search that's ongoing right

25 now; is that correct?

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 89

1    A.    Yes, sir.

2    Q.    And there's been no prior search of -- that

3 you just described that's happened in this case; is that

4 correct?

5    A.    Every document we get from legal affairs that

6 requests us to do a litigation hold or do a search based

7 on a search criteria, we conduct that.  The latest one

8 we have we're involved, I believe there's 139 people, is

9 the one that's ongoing right now.  It was issued on May

10 14th, I believe.

11    Q.    Okay.  And that's the one that is about all

12 the heat cases, the Webb case, McCollum case, Hinojosa,

13 Martone, I think I said McCollum as well.  Is that

14 correct?

15    A.    I don't know the spe -- the specific names;

16 but it's all about the heat-related cases and the

17 names --

18    Q.    Okay.

19    A.    -- that's referenced in that e-mail.

20    Q.    And what I need to know is with respect to

21 those heat cases, has there -- before the work that

22 you're currently doing, this -- this search that you

23 just described, has there been one prior to that?

24    A.    I believe there was in April, that was

25 limited.  I believe it involved nine people, if I'm not

Page 90

1 mistaken.

2    Q.    In April of 2014.

3    A.    Yes, sir.

4    Q.    Okay.  And did that -- Is that the search

5 that revealed approximately 392 pages of e-mails?

6    A.    I -- (Shakes head negatively.)  I can't tell

7 you.

8    Q.    Okay.

9    A.    We do discovery requests all the time.  I

10 don't know what...

11    Q.    That's fair.  Okay.

12    A.    (Nods head affirmatively.)

13    Q.    Okay.  And prior to that one in April, there

14 hasn't been any -- There was no other retrieval

15 process?

16    A.    Not to my knowledge.  If there was, it's one

17 of those where the request wasn't scrutinized and I have

18 no knowledge of it because it wasn't scrutinized.

19    Q.    Okay.  And I just want to be crystal clear.

20 You would have -- If it's done at UTMB, if a search

21 like the one that you described is done at UTMB, you

22 would know about it; is that correct?

23    A.    I and the -- My office is the only one that

24 can go out there and do these searches.

25    Q.    And you personally would know about it.

Page 91

1    A.    I personally would know about it.  I'm cc'd on

2 every request that comes through my office.  There is a

3 ticket created on every request so we can follow the

4 length of time that it takes us to do it and what was

5 actually done.

6    Q.    Okay.  What efforts could be taken to obtain

7 any potentially relevant electronically stored

8 information that was manually deleted by any user?

9         MS. COOGAN:  Objection, vague.  Go ahead

10 and answer as best you can.

11    A.    I mean manually deleted by a potential user, I

12 have no knowledge of what they've deleted, so --

13 especially if it's off a --

14    Q.    (By Mr. Flammer)  Okay.

15    A.    -- an e-mail server.

16    Q.    Well, let's talk about e-mails first.

17    A.    All right.

18    Q.    If a person deleted an e-mail, and you've

19 talked about earlier how someone deletes an e-mail and

20 then it goes into the deleted folder.

21    A.    Yes, sir.

22    Q.    And then once they delete the e-mails from the

23 deleted folder, it's saved for four days.

24    A.    Yes.

25    Q.    And we can find it within four days.

Page 92

1    A.    (Nods head affirmatively.)

2    Q.    Once four days passes, is there anything that

3 can be done to obtain that e-mail?

4    A.    Not to my knowledge.

5    Q.    Okay.  They're not -- they're not on any

6 back-up tapes?

7    A.    The only back-up tape or back-up system that

8 would be relevant in this would be a catastrophic -- a

9 disaster recovery where you cannot restore an individual

10 mailbox from a time in past.  It's a point in time where

11 the entire system can be restored.

12    Q.    Okay.

13    A.    And I don't know what that point in time is,

14 whether it's yesterday or seven days ago.  I've heard

15 seven days for the entire e-mail exchange.

16    Q.    And so just so I'm crystal clear on that, what

17 you're saying is that that disaster recovery back up,

18 however -- if it's in a back-up tape or some other

19 system, it only going back seven days.

20    A.    That's what's coming to mind right now.

21 Again, I'm not an expert on the Exchange system, I...

22    Q.    Okay.  Does the -- Do the e-mails in a

23 person's deleted box, does that count towards, let's

24 say, for example, the 450 megabyte limit --

25    A.    It does.

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 93

1    Q.   -- that one might have?

2    A.   The deleted folders, it is counted against the
3 450 megabyte limit or whatever limit they have.  But
4 once it leaves that and goes to the other deleted folder
5 on the server, then it's no longer counted as part of
6 their e-mail space.

7    Q.   Have there been any efforts -- Okay.  Let go
8 back to the --

9         All right.  So we talked about e-mails.
10 What about the other documents, such as Word documents,
11 Word Perfect documents, Excel documents, spreadsheets,
12 word processing, any other sort of document that one --
13 besides e-mails -- that a person might save on either
14 their local drive or on the network that has been
15 deleted, what can be done to retrieve those documents?

16   A.   That has been deleted?

17   Q.   Yes.

18   A.   If it's on the local drive, there is nothing
19 you can do.  I don't -- Let me rephrase that.  You can
20 do a -- There are utilities out there that can undelete
21 deleted stuff as long as it hasn't been written over by
22 something else.  Okay?

23        On a server, if it's been deleted, we can
24 go out there and retrieve it from our back-up if we know
25 it's deleted.  But you have to have that -- you have to

Page 94

1 have a comparison there of what it looks like today
2 versus what it looked like yesterday so...

3    Q.   Otherwise you don't know it's been deleted?

4    A.   I don't know.  That means you've got to look
5 at every back-up tape of every individual, and it's
6 like -- I don't know if you can actually do that.

7    Q.   Does it -- But the way the back-up tapes or
8 the back-up infrastructure works, if it's not a back-up
9 tape -- the system we talked about up in Arlington --

10   A.   Yes.

11   Q.   -- is it easily identifiable whose documents
12 they are?

13   A.   Yes.

14   Q.   In other words -- Okay.  So if I wanted to
15 find person X, if I wanted to find all their documents,
16 whatever, word processing, spreadsheets, can I go into
17 that back-up system and easily retrieve those documents?

18   A.   Yes.

19   Q.   Now, and just to be clear, I think earlier we
20 talked about a six month going back.

21   A.   Yes, sir.

22   Q.   Okay.  So the -- So the answer -- So the
23 question I asked was -- or I'll just -- let me rephrase.

24        What efforts could be taken to obtain a
25 document that had been deleted -- that had been deleted

Page 95

1 on the -- on the server?  And the answer is about six
2 months in the back-up tapes; is that right?

3    A.   Again, that is my estimation of it.  It may be
4 longer.  It may be shorter.

5        But, yes, if it's backed up to our
6 back-up solution, it could easily be retrieved by making
7 a request.  It's easily identifiable.  If I delete a
8 message today or say a Word document, I call up the help
9 desk, say I deleted it.  It's a matter of a few minutes.
10 I go out, identify my resources, and retrieve that
11 information.

12   Q.   Okay.  And we talked about the hard drives.
13 So getting away from the servers.  The hard drives, it's
14 my understanding that, you know, my personal computer,
15 for example, I could have -- I could create a Word
16 document and I want -- I delete it.  It's still there.

17   A.   Yes, sir.

18   Q.   Until I overwrite it with more information.
19 Is that your understanding as well?  Is my understanding
20 correct?

21   A.   That's correct, sir.

22   Q.   Okay.  Has there been any effort made to find
23 out what is on those people's hard drives?

24   A.   Not to my knowledge.  We have never done
25 anything to retrieve deleted files off of a member's

Page 96

1 hard drive.

2    Q.   Okay.  And I believe you said right now
3 you-all are still finishing up -- you go 70 percent
4 through the e-mails and then the next step is to go out
5 and capture peoples' documents off the hard drives is
6 next; is that correct?

7    A.   Whatever is in that search criteria, we'll go
8 ahead and take care of.  I do know, speaking to the
9 analyst that is performing this discovery, he said he
10 was 70 percent complete with the e-mail portion of it.
11 So he will obviously go through everything that's been
12 outlined in that discovery litigation hold request and
13 do what needs to be done.

14   Q.   Okay.  And you talked about these 139 people
15 that are being searched relevant to these heat cases.
16 Has there been any effort to determine whether any ESI
17 that may be relevant to these cases has been deleted --

18   A.   No.

19   Q.   -- from those 140 people, 139 people?

20   A.   No.

21   Q.   Okay.  Have those people been contacted?

22   A.   Not by my staff.

23   Q.   Okay.  Are you aware of them being contacted
24 at all?

25   A.   I believe just from my earlier conversation

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 97

1 with Jennifer, I believe there was a questionnaire or a
2 survey.
3    Q.   Okay.  Let's talk about that.
4         MR. FLAMMER:  Let's mark this, please.
5         (Shaffer Exb. No. 4 was marked.)
6    Q.   (By Mr. Flammer)  All right.  I would like to
7 present to you what's marked as Exhibit 4.  This is a --
8 This is a letter --  Counsel and I have been
9 communicating, and this is a letter that she sent in
10 response to some questions I asked.  And I just had some
11 questions I wanted to ask you about.
12   A.   I'm sorry, sir.  What was -- Who is this
13 from?
14   Q.   This is from your counsel.
15   A.   Okay.
16   Q.   Okay.  And you'll see there, I'll represent to
17 you, that the -- the questions are questions that I
18 posed, at least I believe so, and then the responses are
19 counsel's.
20   A.   Sure.
21   Q.   Are you aware of, in the first question there,
22 the first bullet point, do you have any knowledge about
23 the heat reports?
24   A.   Do I have any knowledge?  I mean, I have
25 knowledge of this whole case, just an overview of it.

Page 98

1 So, I mean --
2    Q.   But I mean any particular documents, do you
3 have any knowledge of these documents at all?
4    A.   No.  No.
5    Q.   Okay.  Now there's a reference to King &
6 Spalding discovery center.
7    A.   Yes, sir.
8    Q.   Are you familiar with King & Spalding?
9    A.   I am.  We had a short meeting about it
10 approximately a week ago.
11   Q.   Okay.  And are -- are you the person at UTMB
12 who is corresponding with King & Spalding about this?
13   A.   I am not.  It's my know -- or my understanding
14 is the office of legal affairs.
15   Q.   So it's your understanding that legal affairs
16 is talking with King & Spalding --
17   A.   Yes, sir.
18   Q.   -- about the discovery efforts?
19   A.   Yes.
20   Q.   And is it your understanding that King &
21 Spalding is helping out with the discovery in this case?
22   A.   I am aware of that.  I don't know if they have
23 contracted yet, but I know there is discussions that's
24 going on.
25   Q.   Okay. well, let me ask, I mean, are -- Is

Page 99

1 your office the one that is going out and -- Let me
2 rephrase here.
3         Earlier you talked about how the process
4 being done here is that legal has told you -- And if I
5 mistake anything, correct me.
6    A.   Okay.
7    Q.   And feel free to interrupt me.
8    A.   Okay.
9    Q.   And if I misstate anything here.
10   A.   Sure.
11   Q.   My understanding of what you said is that
12 legal has asked you and your office to -- They've
13 presented a list of 139 names and basically said, you
14 know:  Can you go, please, and find -- get all the
15 e-mails of these people with these certain search terms;
16 and in addition to e-mails, other documents on their
17 local hard drive or on the server that may have -- that
18 may be relevant to this litigation.  Is that true?
19   A.   We go by whatever they have in the document.
20 So we'll look for the specific -- or the document
21 specified in their request.  We don't go above and
22 beyond in what they request us to do.
23         So if they ask us to look for documents,
24 we look for documents.  If they just want us to look for
25 e-mail, we'll look for e-mails.

Page 100

1    Q.   Is it your understanding that documents is
2 different than e-mails?
3    A.   Oh, yes, sir.
4    Q.   Okay.  Are you doing a word search to -- just
5 on the e-mails?
6    A.   Yes.
7    Q.   Or are you doing a word search just on
8 documents as well?
9    A.   We do a word search on e-mails unless it's
10 specified to look for documents, as well.  This last one
11 is specified to look for documents.  We're looking for
12 documents, as well.
13   Q.   And when you said the last one, you're talking
14 about the heat cases?
15   A.   The 2014 letter from legal affairs, they --
16 they outlined specifically what they want us to look
17 for.  We go out there and look for that type of data.
18   Q.   And is that your office that's doing that?
19   A.   For the most part, with regards to if it's
20 locally stored documents or stuff that's on their
21 H-drive or in the e-mail, yes.
22         If it's documents that may be stored in
23 the EMR or Peoplesoft, H -- human capital system, then
24 no.  It would be somebody from that department.  I don't
25 get involved in that type of data discovery.

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 101

1    Q.    Okay.  But your under -- Okay.  Okay.

2          And then when you run this word search

3  against these e-mails and you collect them all, is the

4  end -- what is the end result?  What is the format?  Is

5  it a large .pst file?

6    A.    No.  It's a format that's actually been

7  produced by our discovery tool called Sherpa.  So it's

8  kind of got like an organizational type chart where you

9  will have an individual and then you'll have the

10  different categories under there where it found those

11  e-mails.

12    Q.    Okay.  And are you capturing any metadata

13  along with the e-mails?

14    A.    Whatever's embedded in the e-mail or the

15  documents, we capture that metadata; but we don't go out

16  and look for additional metadata unless it's embedded.

17    Q.    And the embedded would include the to, the

18  from, the cc --

19    A.    Yeah.

20    Q.    -- the BCC --

21    A.    Yeah.

22    Q.    -- the date, the author.

23    A.    Yeah.  Typically that's it, but there's more

24  that can be -- Whatever metadata has been defined on

25  it, we capture.

Page 102

1    Q.    If there is an e-mail with an attachment

2  attached to it, are you capturing the attachment as

3  well?

4    A.    Yes, sir.

5    Q.    And does the word search apply to the

6  attachments --

7    A.    Yes, sir.

8    Q.    -- in addition to the e-mails themselves?

9    A.    Yes, sir.

10    Q.    Have you seen the litigation hold notice and

11  litigation questionnaire?

12    A.    Yes.

13    Q.    And is that document also attached to the

14  e-mail of Tuesday, May 13, 2014 at 2:48 that's part of

15  Exhibit 2?

16    A.    Yes.

17    Q.    Is -- Is this a document that is an internal

18  document here that you use in other cases, as well?

19    A.    Yes, sir.

20    Q.    Can you explain what predictive coding is, if

21  you know?

22    A.    I can't.

23    Q.    Okay.  So it's your understanding that you're

24  going to go -- your office is going to go capture all

25  this information and then turn it over to legal

Page 103

1  affairs --

2    A.    No.

3    Q.    -- and that -- No.  Tell me.  Go ahead.  How

4  am I wrong there?

5    A.    On personally owned stuff, we don't capture

6  that data.  So if it's personally owned, they're storing

7  stuff out there, they're storing stuff on gmail, I am of

8  the opinion that legal affairs is working with that

9  individual to provide that information to them.

10          I have no jurisdiction or authority to go

11  through an individual's personal devices or personal

12  e-mail accounts.

13    Q.    Okay.  Who is the anal -- you mentioned a

14  analyst --

15    A.    Yes, sir.

16    Q.    -- earlier.

17          Is that an in-house analyst?

18    A.    Yes, sir.

19    Q.    And what's that person's name?

20    A.    Louis Perrin.

21    Q.    Louis Barron?

22    A.    Louis Perrin.

23    Q.    Does he work in your department?

24    A.    Yes, sir.

25    Q.    And is it a fair characterization to say that

Page 104

1  he is the one, you know, doing a lot of the work on this

2  and you're supervising or are you --

3    A.    No.  He's -- He's a primary analyst on

4  e-discovery.  If there's a request, he's out, and

5  there's a request that comes in that needs to be

6  addressed right away, I'll go ahead and fulfill that

7  request.  But, you know, 99 percent of the time, it's

8  him actually fulfilling the request.

9    Q.    Okay.  Now, on the -- on the non-e-mails being

10  retrieved, the Word documents, Excel documents, any

11  other sort of documents, are you capturing metadata on

12  those documents as well?

13    A.    Whatever is embedded on the document itself is

14  what we capture.  So you right click and go to

15  properties, it's going to have the creation tape, you

16  know, the author's name, whatever's been enabled as far

17  as metadata, it's going to be recaptured.

18    Q.    Okay.  So the date last modified --

19    A.    Yes.

20    Q.    -- would be part of it.

21          What about the file path?

22    A.    The file path is still there as well.

23    Q.    And then once you capture all this

24  information, who do you give it to?  In this case, in

25  this particular instance --

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 105

1    A.    We don't --
2    Q.    -- are you giving -- Go ahead.  I'm sorry.
3    A.    We don't parce out the metadata versus the
4  document.
5    Q.    Yeah.
6    A.    Everything, the native document with the
7  embedded metadata is provided to the office of legal
8  affairs.
9    Q.    Okay.  And do you have any knowledge about
10  what legal affairs is saying they're going to do with
11  that, as far as giving it to the plaintiffs in those
12  cases?
13    A.    I don't know what those documents do as far as
14  once that's done.
15    Q.    Okay.  Are you aware of any determination as
16  to when UTMB anticipated litigation for heat injuries?
17    A.    No, sir.
18    Q.    Are you aware of when UTMB anticipated any
19  litigation for deaths in TDCJ facilities related to
20  excessive heat?
21    A.    My only knowledge is in the three documents
22  that were provided.  So other than that, I have no
23  knowledge.
24    Q.    Okay.  This is going to get tedious and I
25  apologize; but I just need to ask this to be sure.

Page 106

1          Are you aware of when UTMB anticipated
2  litigation that led to the death of Archie White?
3    A.    No.
4    Q.    Have you ever heard of Archie White?
5    A.    No.
6    Q.    Are you aware of when UTMB anticipated
7  litigation related to the death of Anselmo Lopez?
8    A.    No.
9    Q.    Have you ever heard of Anselmo Lopez?
10    A.    No.
11    Q.    Are you aware of when UTMB anticipated
12  litigation related to the death of James Moore?
13    A.    Let me clarify something.  I'm aware of these
14  names based on this conversation that we had right now.
15  But previous to this conversation, I was not aware of
16  these names.
17    Q.    Okay.
18    A.    And the response to that is no.
19    Q.    Okay.  Are you aware of when UTMB anticipated
20  litigation related to the death of Charles Finke?
21    A.    No.
22    Q.    Have you heard of Charles Finkey prior to
23  today?
24    A.    No.
25    Q.    Are you aware of when UTMB anticipated

Page 107

1  litigation related to the death of John Cock -- John
2  Cardwell?
3    A.    No.
4    Q.    Have you heard of John Cardwell before today?
5    A.    No.
6    Q.    Are you aware of when UTMB anticipated
7  litigation related to the death to Ricky Robertson?
8    A.    No.
9    Q.    Have you heard of Ricky -- Ricky Robinson?
10    A.    No.
11    Q.    Are you aware of UTMB -- UTMB anticipated
12  litigation related to the death of James Shriver?
13    A.    No.
14    Q.    Have you heard of James Shriver before today?
15    A.    No.
16    Q.    Are you aware of when UTMB anticipated
17  litigation related to the death of Dionicio Robles?
18    A.    No.
19    Q.    Have you heard of Dionicio Robles before
20  today?
21    A.    No.
22    Q.    Are you aware of when UTMB anticipated
23  litigation related to the death of Douglas Hudson.
24    A.    No.
25    Q.    Have you heard of Douglas Hudson?

Page 108

1    A.    No.
2    Q.    Are you aware of when UTMB anticipated
3  litigation related to the death of Larry McCollum?
4    A.    No.
5    Q.    Have you ever heard of Larry McCollum before
6  today?
7    A.    Well --
8    Q.    Besides the e-mails.
9    A.    No.
10    Q.    Are you aware of when UTMB anticipated
11  litigation relating to the death of Thomas Meyers?
12    A.    No.
13    Q.    Had you ever heard of Thomas Meyers before
14  today?
15    A.    No.
16    Q.    Are you aware of when UTMB anticipated
17  litigation related to the death of Robert Webb?
18    A.    No.
19    Q.    Have you ever heard of Robert Webb before
20  today or these e-mails?
21    A.    No, sir.
22    Q.    Are you aware of when UTMB anticipated
23  litigation related to the death of Alexander Togonidze?
24    A.    No.
25    Q.    Have you heard of Alexander Togonidze before

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 109

1 today?

2     A.     No.

3     Q.     Are you aware of when UTMB anticipated

4 litigation related to the death of Charles Cook?

5     A.     No.

6     Q.     Have you ever heard of Charles Cook before

7 today?

8     A.     No.

9     Q.     Are you aware of when UTMB anticipated

10 litigation related to the death of Michael Martone?

11     A.     No.

12     Q.     Have you heard of Michael Martone before

13 today?

14     A.     No.

15     Q.     Are you aware of when UTMB anticipated

16 litigation related to the death of Kelly Marcus?

17     A.     No.

18     Q.     Have you ever heard of Kelly Marcus before

19 today?

20     A.     No.

21     Q.     Are you aware of when UTMB anticipated

22 litigation regarding the death of Kenneth Wayne James?

23     A.     No.

24     Q.     Have you ever heard of Kenneth Wayne James

25 before today?

Page 110

1     A.     No.

2     Q.     Almost done.

3     A.     All right.

4     Q.     Are you aware of when UTMB anticipated

5 litigation related to the death of Daniel Alvarado?

6     A.     No.

7     Q.     Have you ever heard of Daniel Alvarado before

8 today?

9     A.     No.

10     Q.     Are you aware of when UTMB anticipated

11 litigation related to the death of Rodney Adams?

12     A.     No.

13     Q.     Have you ever heard of Rodney Adams?

14     A.     No.

15     Q.     Are you aware of when UTMB anticipated

16 litigation related the death of Albert Hinojosa?

17     A.     No.

18     Q.     Have you ever heard of Albert Hinojosa before

19 today?

20     A.     No.

21     Q.     Are you aware when UTMB anticipated litigation

22 related to injuries related to excessive heat?

23     A.     No.  I'm going to have to take a break.  I had

24 a big Coke,

25     Q.     Sure.  Let's go ahead and take a break.

Page 111

1                 THE VIDEOGRAPHER:  Off the record at

2 4:36,

3                 (Off the record from 4:36 - 4:43.)

4                 THE VIDEOGRAPHER:  Back on the record at

5 4:43,

6     Q.     (By Mr. Flammer)  In the search of the

7 e-mails, the word search that you're doing, will it

8 capture e-mails that are in sent or deleted folders?

9     A.     Yes.

10     Q.     It'll capture everything in that person's --

11 any of the folders?

12     A.     Any of the folders, whether it's on a .pst --

13 Well, it's all on .pst, yes, whether it is in any of the

14 folders.

15     Q.     Now, is it possible that users have deleted

16 e-mails?

17     A.     Oh, yes.

18     Q.     Okay.  And is it possible that because you're

19 doing the search now in 2014, as opposed to years prior,

20 or at some point prior, that documents that you would

21 have obtained in a prior search you cannot obtain now?

22     A.     Correct.

23     Q.     And would you agree with me that the universe

24 of captured documents will be less complete today than

25 it would have been had the search have been done

Page 112

1 prior --

2     A.     I am not --

3     Q.     -- if documents had not been deleted?

4     A.     It would depend on what was deleted.  I mean,

5 if they didn't delete anything, then it would be the

6 exact same thing.  I mean, it's dependent on an

7 individual what they did or did not do.

8     Q.     Right.  But would you agree with me that

9 almost certainly all of these custodians have deleted

10 some e-mails?

11     A.     I can assume that they have.  I mean, there's

12 folks out there that's got gigabytes worth of .psts.

13 They haven't deleted stuff for 15 years, so -- But

14 that's -- I guess, that's an anomaly.  There's not a

15 lot of them that's like that, so yes.

16     Q.     Do you know of anybody, any custodians being

17 searched that fit the description you just described?

18     A.     I know there's people out there that's been

19 identified with .psts that are several gigs large.

20     Q.     And identified in this litigation?

21     A.     I -- I can't say that wholeheartedly; but I

22 know my analyst has brought to it my attention.  I can't

23 recall when it's in this one or in a public information

24 request or discovery or a previous one.

25                 But I know there's always talk about

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 113

1 pulling these things over these slow links from the
2 prison systems because it takes several hours.
3        Q.    But you -- But you would agree with me that
4 it's a fair assumption that all or almost all of these
5 people have probably deleted e-mails.
6              MS. COOGAN:  Objection, repetitive, calls
7 for speculation.
8        A.    Okay.
9              MS. COOGAN:  Answer if you can.
10       A.    I would agree.
11       Q.    (By Mr. Flammer)  And you would agree that --
12 that the picture that is painted when someone reviews
13 all the e-mails could be potentially different if they
14 don't have all of the e-mails that may be responsive?
15       A.    Correct.
16       Q.    And that if e-mails were sent and received and
17 there were discussions that were had in 2009, 2010, 2011
18 and those discussions, those e-mails are now gone, that
19 we won't know if those discussions existed by looking at
20 e-mails?
21       A.    True.
22       Q.    I'm looking on page 1 of the exhibit there.
23 Is it 4?
24       A.    Yes, sir.
25       Q.    At the bottom bullet point, kind of in the

Page 114

1 fourth and fifth line up from the bottom, it says:
2 However, 32 of these 41 individuals left UTMB's
3 employment prior to the initiation of this pending
4 litigation.
5              32 individuals that have been identified
6 as potentially having relevant documents have left.  Is
7 that your understanding?  Or 41 have left?  Is that your
8 understanding?
9              MS. COOGAN:  Objection, form.
10       A.    30 -- Sorry.
11             MS. COOGAN:  Go ahead.
12       Q.    (By Mr. Flammer)  I'll withdraw the question.
13             Go ahead -- Go ahead and read this
14 bullet point.
15       A.    However, 32 of these 41 individuals left
16 UTMB's employment prior to the initiation of this
17 pending litigation.
18       Q.    (By Mr. Flammer)  Okay.  And so my
19 understanding of this is that of the 139 individuals
20 identified, 41 are no longer employed at UTMB.  I'm
21 getting that from two lines up.  And then 32 of them
22 left prior to suit being filed.  Is that your
23 understanding, or do you have an understanding about the
24 topics in this paragraph?
25       A.    I didn't write the paragraph.  I wasn't --

Page 115

1        Q.    I know you didn't write it, but are you aware
2 of this?
3        A.    Well, I'm just reading it right now.  I mean,
4 I would agree with your -- your interpretation of the
5 paragraph, that 41 are no longer employed, and 32 of
6 these were left prior to the pending litigation.
7        Q.    And is it your understanding that of the 139
8 these 32 -- there are no e-mails for us to look at; is
9 that correct?
10       A.    I -- I don't know.  I -- Reading this,
11 that's what it sounds like; but, again, the way it works
12 is that once you're terminated from UTMB's service, we
13 disable your account, 30 days later we delete it, unless
14 there's been a -- some kind of litigation or any type of
15 security hold placed on it.
16       Q.    And a couple of questions about the word
17 search being performed, sir.
18       A.    Yes, sir.
19       Q.    When you run the word searches, you're only
20 running them against the last names of certain
21 individuals; is that correct?
22       A.    However the keywords are defined for us is
23 what we run them against.
24       Q.    Okay.
25       A.    We don't go outside the scope of the

Page 116

1 definition or the search criteria.
2        Q.    The criteria given to you by legal.
3        A.    Yes, sir.
4        Q.    So legal asks you to do the job, you do the
5 job is what you're saying?
6        A.    Yes.
7        Q.    You don't this do more, you don't do less.
8 You try to do the job that they ask you to do.
9        A.    We're not legal.  They're legal.  We're
10 technicians.
11       Q.    Is that a "Yes"?
12       A.    We don't go outside the scope of what legal
13 has provided us.
14       Q.    Okay.  I'm looking at page 3, question number
15 7.  The question is:  Does the search include everyone
16 who we know of that died due to heat?  And the response
17 is:  UTMB's search does not include every offender who
18 was believed to have died due to heat.  Do you know why
19 that is?
20       A.    I have no idea, sir.
21       Q.    And you don't --
22       A.    I don't -- I have no idea.
23       Q.    You have no idea because that's not something
24 that -- That -- The search terms weren't your
25 formulations.  That was legal's?

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 117

1    A.   Right, yes.

2    Q.   Have you engaged in a back and forth with
3 legal about some of these terms as to whether or not
4 they're too broad and capturing too much?

5    A.   The only time we've ever really brought it up
6 to legal is when we do searches on first names; and it
7 produces just way too much documents that, you know, we
8 can't manage them.

9    Q.   Do you provide any feedback to legal regarding
10 the search terms.

11   A.   No.  We don't.  I -- I don't.  Now, if there
12 is a conversation between the analyst and legal, that
13 might be on the sidebar or something like that.

14   Q.   Are you aware of any conversations?

15   A.   No.  I'm not aware of any conversations with
16 regards to that other than when we have the first names
17 or the same name of a sender who is also, you know,
18 somebody we're targeting, it produces every e-mail in
19 that sender's e-mail box.

20   Q.   Okay.  So, for example, if one of the search
21 terms is AC, you -- you don't have a conversation with
22 legal that, you know, it might be possible that people
23 refer to air-conditioning as A "slash" C, not just AC?

24   A.   No, we don't do that.

25   Q.   And similarly, if the search term they provide

Page 118

1 to you is air "space" conditioning, you don't say:  Hey,
2 you know what?  Sometimes people talk about
3 air-conditioning and they write air "dash" conditioning.
4 That's not a conversation you had with them?

5    A.   That's not a typical conversation we had with
6 legal.

7    Q.   And that's not a conversation to your
8 knowledge anyone in your office has had with legal about
9 the search being done in this case; is that correct?

10   A.   The only knowledge I had about a conversation
11 is when it's a first term -- or a first name term that
12 we're searching on, because it produces way too much.
13 Or if it's a person named Smith and we're look -- we're
14 looking for e-mails that references Smith, it produces
15 all that e-mail and it -- say, Ben Smith's e-mail box.
16 So when the volumes are excessive, that is when it
17 usually initiates a conversation with legal.

18   Q.   Okay.  Have the volumes been excessive in this
19 case?

20   A.   A few of occasions they have where it produced
21 it -- because it produces -- because we were looking for
22 a person named Smith, both looking in an e-mail named
23 Smith.  So it produced everything.

24   Q.   I got you.  If -- If the goal -- If you
25 start from the assumption that the goal is to find

Page 119

1 responsive documents, for example, that conversations
2 about air-conditioning, and the search terms include AC
3 but not A "slash" C or the terms include air con -- air
4 "space" conditioning, but do not include air "hyphen"
5 conditioning, would you agree the search is inadequate?

6         MS. COOGAN:  Objection, calls for
7 speculation.

8         Go ahead.

9    A.   It wouldn't produce the correct results, yes.
10 I would agree with that, or the intended results.

11   Q.   (By Mr. Flammer)  I talked with you about --

12        MR. FLAMMER:  Let's mark this.

13        (Shaffer Exb. No. 5 was marked.)

14   Q.   (By Mr. Flammer)  Sir, I'm a handing you
15 what's been marked as Exhibit 5.  If you ignore the
16 first page and just go to the second page, have you seen
17 this document before?

18   A.   Yes, sir.

19   Q.   What is this document?

20   A.   It's an affidavit about my position and how
21 I -- my understanding of -- well, my role here at UTMB
22 and basically the way we handle the process of
23 electronically stored information.

24   Q.   I'm looking at paragraph 2, sir, and the last
25 phrase there:  And overseeing the collection of

Page 120

1 electronically stored information for litigation
2 purposes and Public Information Act requests.

3    A.   Yes.

4    Q.   What percentage of your job would you say
5 roughly deals with that with regard to the other
6 responsibilities you have?

7    A.   5 to 10 percent.

8    Q.   Is there one area of your job that you spend
9 more time doing been any -- anything else?

10   A.   Risk management and probably education.

11   Q.   Okay.  Can you tell us more about what risk --
12 in plain, simple terms -- what risk management from your
13 perspective in your role?

14   A.   Risk management is just identification of
15 risks that may be associated with information systems.
16 So you're looking at systems and possesses that are
17 meeting the standards that we put in place, so they're
18 the confidentiality, the integrity, the availability of
19 the data is not negatively impacted because of, you
20 know, hacking attempts or malicious deletions and things
21 like that.  We're just going out there to make sure
22 they're following the correct possesses.

23        If they aren't, we're there to put in
24 mitigating controls or a system of taking care of
25 whatever the issue is.

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 121

1         So that's probably the largest portion of
2 our -- of our role here, is -- is risk management. And
3 then oversight of the operational team as well.  So
4 there's an operational component, too; and I guess that
5 all funnels into risk management, but making sure that
6 the -- the technical side is doing what they're supposed
7 to, that they're in compliance with our policies and
8 stuff.
9         My role is to produce a policy saying:
10 This is the way the program is supposed to be run.  They
11 have the freedom of implementing whatever technical
12 device or administrative control that satisfy that
13 requirement; and then I maintain oversight to a make
14 sure it's operating as expected.
15    Q.   Are there any policies about document
16 preservation when it comes to litigation?
17         MS. COOGAN:  Objection, vague.
18         MR. FLAMMER:  I'll withdraw that.  It was
19 a poorly worded question.
20    Q.   (By Mr. Flammer)  Are there any policies that
21 relate to the preservation of ESI?  Question mark.
22    A.   As far as policies, no.
23    Q.   On looking at page 2 of your affidavit, and
24 I'm looking at paragraph 4 --
25    A.   Yes, sir.

Page 122

1    Q.   -- the last line --  Well, go ahead.  Why
2 don't you just go ahead and just read paragraph 4?
3    A.   This will involve searching the identified
4 terms against the individual's Exchange e-mail accounts
5 and their Personal Storage Table located on network
6 drives and their assigned computers.  Due to slow
7 connection speeds to the TDCJ units and facilities, it
8 is anticipated that the search will take approximately
9 90 days to complete.
10    Q.   And why 90 days?
11    A.   The time's subjective; but there --  Again,
12 there's a lot of folks out there that we're looking at.
13 A lot of it has to do with system identification.  It's
14 not like these people have assigned computers.  They
15 have shared computers.  So we've got to go out there and
16 investigate to see what computer they are actually
17 using; and then we got to go out there and search for
18 .pst files.  And then based on the size of those .pst
19 files, it can take 10 to 14 hours to pull one across the
20 wire.
21         I say --  That's the extreme side, 10 to
22 14 hours; but if you have five or six people that's out
23 at the facility and they have all these large files, it
24 can take upwards of three or four days just to get the
25 file over to UTMB -- the files.

Page 123

1    Q.   And you're talking --  Would that be the
2 Microsoft Exchange or --
3    A.   That would be the .pst files.  As they get the
4 e-mails, you know it goes to the Exchange file or the
5 Exchange Mail System; and then it's automatically
6 downloaded to the .pst if they have it configured that
7 way.  So that resides on that local machine at the unit.
8    Q.   Aren't you going to the server to get the
9 e-mails?
10    A.   That's where --  Initially that's where we go.
11 We go to the server and export everything that's
12 maintained there; but then we go out there and do the
13 search on their local computers or local drives,
14 whatever you want to call it.
15         And a lot of these people have these
16 stored on the .pst files because it's local to that
17 system in case there's -- you know, maybe a link goes
18 down or the server goes down, they still have access to
19 those e-mails.
20         Is that kind of making sense?
21    A.   I think so.  Yeah.
22    A.   Okay.  So anyway the size of those e-mails is
23 really --  I guess that's the -- the funnel that really
24 makes this so long and I guess -- well, a long ordeal,
25 for lack of better words.

Page 124

1         And again it's subjective.  It could be
2 longer.  It could be shorter.  I don't know.  It's based
3 on what we see out there.
4    Q.   And you said right now the analyst said you're
5 about 70 percent done with pulling e-mails off the
6 server?
7    A.   Yes, sir.
8    Q.   And then once you pull the e-mails off the
9 server, then you're going to get the .pst files from the
10 local computers?
11    A.   Yes, sir.
12    Q.   And there will be a lot of overlap; right?
13    A.   Yes, sir.
14    Q.   And so do you have a -- hashtag, is that the
15 proper term -- MD5 hashtag?
16    A.   MD5 hash -- yes.
17    Q.   And then you --  Do you dupe them or how do
18 you --
19    A.   We don't.  I --  We go out there and do the --
20 do the search based on the criteria they give you and
21 then we provide all the e-mails to the office of legal
22 affairs.  I believe they manually go through whatever we
23 produce, and then they pull out whatever is relevant to
24 the case.
25    Q.   And sitting here today you're unaware of the

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 125

1 relationship with King & Spalding to the extent one
2 exists?

3     A.   I'm aware there's communication between the
4 organization and UTMB going on.  To the extent of it, I
5 don't know.  I don't know if we're in some kind of
6 contractual agreement or not.

7     Q.   Okay.  Do you have an estimate as to how --
8 how many gigs of data are in the -- You know,
9 earlier -- Okay.  Let me back up.

10         You said 70 percent done of getting
11 e-mails from the exchange server.

12         Do you have any idea how many gigs or how
13 many e-mails we're talking about?

14     A.   I can't recall off the top of my head.  I know
15 it was brought to my attention, but there was 9,000
16 alone that's produced from the CMC EMR, so...

17         MR. FLAMMER:  Let's take a short break.
18 I think I'm just about done.

19         THE VIDEOGRAPHER:  Off the record at
20 5:03.

21         (Off the record from 5:03 - 5:10.)

22         THE VIDEOGRAPHER:  Back on the record at
23 5:10.

24     Q.   (By Mr. Flammer)  All right.  I want to ask
25 you, have you ever heard of Eugene Blackman?

Page 126

1     A.   No.

2     Q.   Are you aware of any litigation involving
3 Eugene Blackman?

4     A.   No.

5     Q.   I want to talk again about one of the
6 documents that is Exhibit 2, this May 13th, 2014 e-mail,
7 the subject line:  Litigation hold.

8     A.   Yes.  I got it.  Yes.

9     Q.   I see here only a few recipients, Carolanda
10 Bremond.  Do you know who that person is?

11     A.   I do.

12     Q.   What department is she in?

13     A.   Office of legal affairs.

14     Q.   And then Carolee King is in legal, as well?

15     A.   Yes, sir.

16     Q.   We know who Owen Murray is.  You're Robert
17 Shaffer.  And Louis Perrin --

18     A.   Is the analyst.

19     Q.   -- is the analyst.

20     A.   Yes.

21     Q.   Security analyst.

22         Who else did this go to?

23     A.   I don't know.  I didn't send it out.

24     Q.   Do you know if this went to any of the 139
25 users, except for Owen Murray?

Page 127

1     A.   I have no idea, sir.

2     Q.   Do you know --  Do you have any knowledge as
3 to whether or not any of the 139 users were sent any
4 litigation hold of any sort?

5     A.   I'd know there was a survey that was sent out.
6 I don't know when it was sent out or by whom, but it's
7 my understanding that some type of survey, whether it
8 was one of the e-discovery requests like we got before
9 or something different but...

10     Q.   And you said you don't know when that was sent
11 out, but was --

12     A.   It was just through conversation where I
13 learned of it.  So I don't know anything other than a
14 brief conversation that said there might -- there was a
15 survey that went out to individuals.  I -- It wasn't
16 produced by my office.

17     Q.   Okay.  Do you know if that was -- if that
18 survey was filled out and sent to those people in 2014
19 or before?

20     A.   I don't know.  I have no idea.

21         I just know there --  It's my
22 understanding, based on a brief conversation, that there
23 was a survey sent out.  I don't know who sent it out.  I
24 don't know who the recipients are.  I don't know who
25 responded or anything else.

Page 128

1     Q.   Okay.  When did you have that conversation?

2     A.   Actually earlier today.

3         MR. FLAMMER:  Ms. Coogan, on Exhibit A,
4 the deposition notice, for categories 13 and 14, I'm
5 just concerned, because we -- there are several
6 categories here that have been noticed; and we need to
7 be able to talk to people -- and I know I understand now
8 it's Friday, it's past 5:00 o'clock, and I imagine
9 people are gone.

10         MS. COOGAN:  What would you like to talk
11 to someone about?

12         MR. FLAMMER:  Categories 1, 2, 3, 6, 13
13 and 14?

14         MS. COOGAN:  13 and 14, you've got them
15 in your hand and you've asked this witness about them
16 several times.  Am I mistaken?

17         MR. FLAMMER:  Well, I mean, I just want
18 to be sure --  So all efforts taken concerning the
19 preservation of ESI related to heat-related illnesses of
20 inmates at TDCJ prison facilities where inmates were
21 housed in non-air-conditioned areas, you're pointing me
22 towards Exhibit 2; is that correct?

23         MS. COOGAN:  That's all I'm aware of.

24         MR. FLAMMER:  And so what --  I mean,
25 what I'm trying to say --  And neither of us want to

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 129

1 argue.  We just want to get to the truth here and we
2 just want to make sure we're all on the same page.
3          MS. COOGAN:  Okay.
4          MR. FLAMMER:  And I understand -- I hear
5 what you're saying and what you're saying is that's all
6 you know of.
7          MS. COOGAN:  Right.
8          MR. FLAMMER:  And that's why we noticed
9 the agency rep so we can get a full answer to the
10 question not just I don't know.  Do you understand what
11 I'm saying?  Is that fair?
12          MS. COOGAN:  Well, all I can do is
13 present people who can answer questions.
14          MR. FLAMMER:  That's all I need.
15          MS. COOGAN:  And this is the guy who does
16 the electronically stored information searches, and he
17 said he got these.
18          MR. FLAMMER:  But he also told me he's
19 not the person to ask about 13 and 14 or 1, 2, 3, and 6.
20 And 4 was a little ambiguous.
21          MS. COOGAN:  Number 1 does not relate to
22 electronically stored information.
23          MR. FLAMMER:  Right.  So that's going to
24 be someone different, and we already talked about that.
25 And you'll put somebody up.

Page 130

1          MS. COOGAN:  Yes.
2          MR. FLAMMER:  And will you represent that
3 you and I can work together to find a reasonable time in
4 the next week to get that done?
5          MS. COOGAN:  Yes.
6          MR. FLAMMER:  And can that get done to
7 the Austin?
8          MS. COOGAN:  No.  The Rules say let's go
9 to the witness.  But it's 5:00 o'clock and we both have
10 four-hour drives ahead of us.
11          So I've exhausted all of my discussions
12 with you on that.  I've told you everything I know and
13 everything I can do for you.
14          So we can just play it back if you would
15 like.
16          MR. FLAMMER:  I don't know what that
17 means.  What do you mean?
18          MS. COOGAN:  Okay.  Let me say it one
19 more time.
20          Remember how I was saying how I thought
21 retention meant how it was retained on the computer, and
22 this is the witness who could answer those questions?
23          MR. FLAMMER:  Right.
24          MR. GARCIA:  I remember.
25          MS. COOGAN:  Okay.  That still is today

Page 131

1 still what I believe.
2          MR. FLAMMER:  Okay.
3          MS. COOGAN:  And I've given you the
4 document retention policy.
5          So I'm unclear what you need from me.
6          But we can talk about that next week, and
7 I promise to work with you on that.
8          MR. GARCIA:  And, Sean, I'm going to have
9 the same problem with category number 1.
10          MR. FLAMMER:  Okay.
11          MR. GARCIA:  Just so you know.
12          MR. FLAMMER:  Okay.
13          MS. COOGAN:  I'm not opposed to it in any
14 form whatsoever.
15          MR. GARCIA:  Me either.
16          MS. COOGAN:  I just am not certain I
17 understand, and I don't want to produce the wrong person
18 or be accused of not having produced someone.  So if
19 you're not talking about the document retention policy
20 and you're not talking about physical electronic
21 retention, I'm not sure what you mean; and, therefore,
22 I'm not sure what witness to produce.
23          MR. FLAMMER:  Okay.
24          MS. COOGAN:  But I'm all ears.
25          MR. FLAMMER:  Would you agree with me

Page 132

1 that this is a conversation we could have had before had
2 you voiced that to me?
3          MS. COOGAN:  No.  I'm not going to be
4 deposed right now.  Okay?  I've told you my position.
5 I've said I've misunderstand.  I still don't understand.
6 I'm asking for clarification; and I tell you what, I'm
7 going home.  So are you done with this witness or not?
8          MR. FLAMMER:  I'm done with this witness.
9          MS. COOGAN:  Then this deposition is
10 terminated.  Off the record.  I'd love to talk about it
11 next week?  I'll make an appointment?  How about Monday
12 morning at the hearing?  How about talking about it at
13 the hearing on Monday?
14          MR. FLAMMER:  Ms. Coogan, I just want to
15 talk to you about -- You know, we noticed the
16 deposition.  The court ordered that it take place today
17 at 2:00 o'clock.
18          MS. COOGAN:  You're done, Mr. Shaffer.
19          MR. FLAMMER:  Mr. Shaffer, thank you,
20 sir.  I appreciate it.
21          MR. GARCIA:  Thank you, Mr. Shaffer.
22          THE WITNESS:  Thank you.
23          MR. FLAMMER:  Ms. Coogan, are you not
24 willing to engage in a conversation about --
25          MS. COOGAN:  I done engaged in all my

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 133

1 conversations with you. I'm sorry I can't make you
2 understand it.
3           I need for you to tell me, if you're not
4 talking about the paper retention policy in your hand
5 and you're not talking about the electronic retention
6 policy, I don't understand what you need in from me.
7           MR. FLAMMER: I need a witness --
8           MS. COOGAN: But I'm happy to do it.
9           MR. FLAMMER: I need a witness because
10 the document is not -- I need a witness --
11           MS. COOGAN: I need a, brother. Amen. A
12 witness to talk about what?
13           MR. FLAMMER: To talk about these topics.
14           MS. COOGAN: Explain it to me. If you
15 don't want the paper retention policy and don't want the
16 electronic retention policy, what would you like? Do
17 you need somebody who can read the English and read the
18 policy to you?
19           MR. FLAMMER: That can tell me what the
20 policy is and about the policy, whether it's enforced or
21 not?
22           MS. COOGAN: The policy is the po -- You
23 have the policy. What do you mean what it is? Are you
24 being Clintonesque?
25           MR. FLAMMER: What about --

Page 134

1           MR. GARCIA: It's available online. So
2 it's available to all parties.
3           MS. COOGAN: He's got it in his hands.
4           MR. FLAMMER: What about number 13?
5           MS. COOGAN: What does it say?
6           MR. FLAMMER: All efforts taken
7 concerning preservation of ESI related to heat-related
8 illnesses of inmates in TDCJ prison facilities where
9 inmates were housed in non-air-conditioned areas.
10           And what you have told me is --
11           MS. COOGAN: No. What the witness told
12 you is that any electronically stored information
13 requests go through him; and he told you several times
14 that he would personally be aware of it because it would
15 personally come across his desk. And these are all that
16 he's aware of.
17           MR. FLAMMER: But he also told me he's
18 not the guy to ask that; and then when I asked you, the
19 answer I hear is: That's all I know of.
20           So what I -- What I need is someone that
21 the agency can designate as being the person who counsel
22 and the witness agree this is the guy or gal on this
23 issue and then that person can answer the question.
24           MS. COOGAN: Okay.
25           MR. FLAMMER: That's all.

Page 135

1           MS. COOGAN: All right. I will work on
2 that.
3           MR. FLAMMER: Just what was noticed.
4 That's all.
5           MS. COOGAN: I don't agree that that's
6 what was noticed, but I will work on it anyway.
7           MR. FLAMMER: Okay.
8           MS. COOGAN: Okay.
9           MR. FLAMMER: We're done for today.
10 Thank you. We're off the record.
11           THE VIDEOGRAPHER: Off the record.
12           (The deposition concluded at 5:21 p.m.)
13           (Signature requested.)
14           (-oOo-)

Page 136

1           CHANGES AND SIGNATURE
2 WITNESS: THE DESIGNATED REPRESENTATIVE OF THE
3           UNIVERSITY OF TEXAS MEDICAL BRANCH
4           BY AND THROUGH ROBERT VERNON SHAFFER, JR.
5 DATE: MAY 30, 2014
6 PAGE  LINE  CHANGE                    REASON
7 ____  ____  _____  _____
8 ____  ____  _____  _____
9 ____  ____  _____  _____
10 ____  ____  _____  _____
11 ____  ____  _____  _____
12 ____  ____  _____  _____
13 ____  ____  _____  _____
14 ____  ____  _____  _____
15 ____  ____  _____  _____
16 ____  ____  _____  _____
17 ____  ____  _____  _____
18 ____  ____  _____  _____
19 ____  ____  _____  _____
20 ____  ____  _____  _____
21 ____  ____  _____  _____
22 ____  ____  _____  _____
23 ____  ____  _____  _____
24 ____  ____  _____  _____
25 ____  ____  _____  _____

ROBERT VERNON SHAFFER, JR. - May 30, 2014
DESIGNATED REPRESENTATIVE OF UTMB

Page 137

```
1       I, ROBERT VERNON SHAFFER, JR., have read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted above.
4
5                    _____
6                    ROBERT VERNON SHAFFER, JR.
7
8  THE STATE OF _____:
9  COUNTY OF _____:
10
11          Before me, _____,
12  on this day personally appeared ROBERT VERNON SHAFFER,
13  JR., known to me or proved to me on the oath of
14  _____ or through
15  (description of identity card or other document) to be
16  the person whose name is subscribed to the foregoing
17  instrument and acknowledged to me that he\she executed
18  the same for the purpose and consideration therein
19  expressed.
20      Given under my hand and seal of office on this
21  _____ day of _____, _____.
22
23                    _____
24                    NOTARY PUBLIC IN AND FOR
25                    THE STATE OF _____

                      My Commission Expires: _____
```

Page 139

```
1  deposition, as set forth in typewriting, is a full, true
2  and correct transcript of the proceedings had at the
   time of taking said deposition.
3       I further certify that pursuant to FRCP Rule
   30(f)(1) that the signature of the deponent was
4  requested by the deponent or a party before the
   completion of the deposition and returned within 30 days
5  from date of receipt of the transcript.  If returned,
   the attached Changes and Signature Pages contain any
6  changes and the reasons therefor;
7       I further certify that I am neither attorney or
   counsel for, nor related to or employed by any of the
8  parties to the action in which this deposition is taken,
   and further that I am not a relative or employee of any
9  attorney or counsel employed by the parties hereto, or
   financially interested in the action.
10
        I further certify that charges for the preparation
11  of the foregoing completed deposition were $ _____
    for the original thereof, charged to Attorney(s) for
12  Plaintiffs.
13      GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 5th
    day of June, 2014.
14
15
16
                      _____
17                    Mary C. Dopico, CSR, RPR, CRR
                      CSR No. 463, Exp. 12-31-2014
18                    Notary Public, State of Texas
    Independent Contractor To:  Commission Expires 1-31-2017
19  Wright, Watson & Associates
    Firm Registration No. 225
20  Expires 12-31-2015
    7800 N. MoPac Expressway, Suite 120
21  Austin,TX 78759
    Tel. 512-474-4363
22
23
24
25
```

Page 138

```
1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION
3  ......................................................
4  STEPHEN McCOLLUM, STEPHANIE         :
   KINGREY, and SANDRA McCOLLUM,       :
5  individually and as heirs           :
   at law in the Estate of             :
6  LARRY GENE McCOLLUM,                 :
            Plaintiffs,                 :
7                                       :
   VS.                                  :  CIVIL ACTION NO.
8                                       :
   BRAD LIVINGSTON, JEFF PRINGLE,       :  3:12-cv-02037
9  RICHARD CLARK, KAREN TATE,           :
   SANDREA SANDERS, ROBERT EASON,       :
10 THE UNIVERSITY OF TEXAS              :
   MEDICAL BRANCH and the TEXAS         :
11 DEPARTMENT OF CRIMINAL JUSTICE,      :
            Defendants.                 :
12                                       :
13  ......................................................
14          REPORTER'S CERTIFICATION
                     TO THE
15      ORAL AND VIDEOTAPED DEPOSITION OF
           THE DESIGNATED REPRESENTATIVE OF
16      THE UNIVERSITY OF TEXAS MEDICAL BRANCH
                 BY AND THROUGH
17          ROBERT VERNON SHAFFER, JR.
                  MAY 30, 2014
18
19  ......................................................
20      I, Mary C. Dopico, Certified Shorthand.  Reporter
    in and for the State of Texas, do hereby certify that
    the facts stated by me in the caption hereto are true;
    that the foregoing deposition of THE DESIGNATED
21  REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH
    BY AND THROUGH ROBERT VERNON SHAFFER, JR., the witness
22  hereinbefore named, was taken by me in machine
    shorthand, the said witness having been by me first duly
23  cautioned and sworn to tell the truth, the whole truth,
    and nothing but the truth, and later transcribed from my
24  machine shorthand notes to typewritten form by me.
25      I further certify that the above and foregoing
```

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363