1              **IN THE UNITED STATES DISTRICT COURT**
              **FOR THE SOUTHERN DISTRICT OF TEXAS**
2                     **HOUSTON DIVISION**

3  STEPHEN MCCOLLUM, ET AL      )      No. 4:14-CV-3253
                                )
4                               )
   VS.                          )      Houston, Texas
5                               )      2:31 p.m.
                                )
6  BRAD LIVINGSTON, ET AL       )      July 28, 2015

7

8
    ********************************************************
9
                        **STATUS CONFERENCE**
10
           **BEFORE THE HONORABLE KEITH P. ELLISON**
11
                 **UNITED STATES DISTRICT JUDGE**
12

13  ********************************************************
    APPEARANCES:
14
    FOR THE PLAINTIFFS:
15
         Mr. Jeffrey S. Edwards
16       Mr. Scott Charles Medlock
         The Edwards Law Firm
17       1101 East 11th Street
         Austin, Texas  78702
18       Tel:  512-623-7727

19       Mr. Michael Singley
         The Singley Law Firm, PLLC
20       4131 Spicewood Springs Road
         Suite O-3
21       Austin, Texas  78759
         Tel:  512-917-7129
22

23

24

25

1  APPEARANCES:  (CONTINUED)

2  FOR THE DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE:

3       Ms. Cynthia Burton
        Mr. Bruce R. Garcia
4       Mr. Matthew J. Greer
        Office of the Attorney General
5       PO Box 12548
        Austin, Texas  78711
6       Tel:  713-463-2080

7   FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:

8       Mr. Stephen Michel Fernelius
        Mr. Graig J. Alvarez
9       Ms. Kara Stauffer Philbin
        Fernelius Alvarez, PLLC
10      1221 McKinney, Suite 3200
        Houston, Texas  77010
11      Tel:  713-654-1200

12      Ms. J. Lee Haney
        Ms. Shanna Elizabeth Molinare
13      Office of Texas Attorney General
        PO Box 12548
14      Austin, Texas  78711
        Tel:  512-463-2080

15  Also Present:

16      Mr. Amin Alehashem

17      Mr. David James

18  Proceedings recorded by mechanical stenography.

19  Transcript produced by computer-assisted transcription.

20

21

22

23

24

25

1          THE COURT:  Okay.  Good afternoon and welcome.

2          I know you've probably just gone through

3 it with the court reporter, but I'm going to need for my

4 own reference to do appearances of counsel one more time.

5          We'll start with plaintiff, of course.

6          MR. EDWARDS:  Jeff Edwards for the plaintiffs,

7 along with Scott Medlock, Mike Singley.

8          Amin, would you stand up with David and

9 announce yourself?

10          MR. ALEHASHEM:  Amin Alehashem.

11          THE COURT:  Sorry?

12          MR. ALEHASHEM:  Amin Alehashem.

13          THE COURT:  Welcome to all of you.  Welcome.

14          MR. EDWARDS:  And David James.

15          MR. JAMES:  And David James.

16          THE COURT:  Okay.  For defendants, Ms. Burton.

17          MS. BURTON:  Good afternoon, Your Honor.

18 Cynthia Burton and Matt Greer, Bruce Garcia, on behalf of

19 the Texas Department of Criminal Justice defendants.

20          THE COURT:  Thank you all very much.

21          MS. HANEY:  Good afternoon, Your Honor,

22 Lee Haney, Shanna Molinare, Steve Fernelius, Graig Alvarado

23 and Kara Philbin on behalf of UTMB and the UTMB defendants.

24          THE COURT:  Thank you.  Welcome to you too.

25          Okay.  As I understood it, we had a

00:00:-16

00:00:00

00:00:08

00:00:21

00:00:37

1 question about withdrawal of one set of counsel.  Do we

2 still need to tend to that, or has that been resolved?

3 University of Texas, I thought, had withdrawn from the

4 case, their clinical program.

00:00:54   5              MS. BURTON:  Your Honor, we don't object to the

6 motion to withdraw.  We do think -- and we are

7 investigating some questions that we have, but it doesn't

8 need to be addressed today.

9              THE COURT:  Okay.  Very well.  Very well.

00:01:05  10 Okay.  I don't know if you had already discussed a program

11 for today or not, but I thought -- absent an agreement from

12 you, what I thought we'd do is go through each of the cases

13 that is pending and see if we are in agreement as to what

14 their current status is.  Then we'll go through each of the

00:01:29  15 cases in detail and deal with pending motions.  Does that

16 sound agreeable?  Okay.  All right.

17              In the Martone case, M-A-R-T-O-N-E,

18 there's no stay in place, and I think we've deferred the

19 qualified immunity motion while we did some limited

00:01:56  20 discovery; is that correct?

21              MR. EDWARDS:  Yes.  Yes, Your Honor.  And I

22 think the Webb decision will lead to eventually depositions

23 being taken in that case.

24              THE COURT:  Right.  Right.  Is that your

00:02:08  25 understanding, Ms. Burton?

                    1          MS. BURTON:  Yes, Your Honor.

                    2          THE COURT:  Ma'am, could you give me your name

                    3   one more time?  I'm sorry.

                    4          MS. HANEY:  Yes, sir, Lee Haney.

00:02:16            5          THE COURT:  Haney.  Thank you.

                    6               Okay.  In the McCollum case, we've stayed

                    7   that pending district court ruling on the motion to

                    8   dismiss.  In the Webb case, we've stayed pending the

                    9   interlocutory appeal to the Court of the qualified immunity

00:02:41           10   decision, and -- and the -- let's see, the Fifth Circuit

                   11   has determined it did not have jurisdiction to review; is

                   12   that correct?

                   13          MS. BURTON:  Yes, Your Honor.

                   14          MR. EDWARDS:  Yes, Your Honor.

00:03:03           15          THE COURT:  Okay.  So that stay can be lifted;

                   16   is that correct?

                   17          MR. EDWARDS:  Yes, Your Honor.

                   18          MS. BURTON:  Yes, Your Honor.

                   19          THE COURT:  All right.

00:03:09           20          MS. BURTON:  Just one thing that we wanted to

                   21   say, Your Honor, is at this point, it's very unlikely that

                   22   we would be filing a notice of appeal on that case.

                   23          THE COURT:  Okay.

                   24          MS. BURTON:  But we do have another case

00:03:21           25   pending, Hinojosa.

1          THE COURT:  I was going to get to Hinojosa

2  next, yeah.

3          MS. BURTON:  Okay.

4          THE COURT:  And the discovery has been stayed

00:03:28    5  in that case, pending the appeal of denial of qualified

6  immunity, and we still don't have a ruling.  I mean, we

7  checked it just an hour ago, and we still don't have a

8  ruling on that.

9          Okay.  Okay.  And then in the Caddell

00:03:46   10  case, we -- we have a tricky issue there, because

11  defendants' position is they complied with one set of

12  requirements, and that should be an airtight defense on

13  qualified immunity.  So we'll take that up -- we'll take

14  that up last.

00:04:10   15          Okay.  On Martone versus Livingston, there

16  are no pending motions in that case, no discovery stay in

17  place, and there's been a deferred ruling on qualified

18  immunity while limited discovery is proceeding.  So I think

19  we can't do anything about that today; is that correct?

00:04:44   20          MR. EDWARDS:  Well, I think -- I think how we

21  proceed in Martone will be affected by what the Court

22  desires us to do in the Webb case, I think.

23          THE COURT:  Okay.

24          MS. BURTON:  If I may, Your Honor.

00:05:04   25          THE COURT:  Yes.

1          MS. BURTON:  I think we'll be discussing that

2    more in more detail later.  I know UTMB has some points

3    they want to make, but there is an issue with regard to the

4    limited discovery towards the executives and the expanse of

00:05:21    5    discovery that we have going on in the Bailey case.

6          THE COURT:  Well, Bailey I'm going to do last.

7    But it is --

8          MS. BURTON:  But with regard to 30(b)(6) --

9          THE COURT:  Right.

00:05:29   10          MS. BURTON:  -- depositions.

11          THE COURT:  Right.

12          MS. BURTON:  And there are still questions

13    about how we streamline, and we need the Court's assistance

14    in terms of time, place and manner.

00:05:42   15          THE COURT:  Okay.  And then turning to McCollum

16    versus Livingston, and here I think I'm significantly at

17    fault.  I didn't do some of the things I should have done.

18          We have plaintiff motion to strike and

19    other motions that the parties disagree about.  What --

00:06:07   20    plaintiff had filed a motion to strike UTMB's objections to

21    magistrate Judge Toliver's order on the motion for

22    sanction.  Toliver is T-O-L-I-V-E-R.

23          I think UTMB mistakenly filed objections

24    to Judge Toliver's report and recommendation in this Court

00:06:35   25    rather than with Judge Lindsay, and UTMB requested that

1 this Court transfer its objections.  And I misread UTMB's

2 response.  I thought that it meant plaintiffs' motion to

3 strike was moot.

4                   Anyway, Judge Lindsay overruled similar

00:06:56    5 objections that TDC -- TDCJ had properly filed.  And then

6 I -- even then, I failed to transfer the objections to

7 Judge Lindsay.  So those -- I apologize.  I got that wrong.

8 But it seemed to me that the motion to strike would now be

9 moot, but the parties seem to think it's not moot.

00:07:35   10                   So, Mr. Edwards, it's your motion.  Tell

11 me what I need to do on this.

12                   MR. EDWARDS:  Very briefly, without going into

13 the subject matter of the sanctions motion, this happened

14 back, I believe, in January-ish time frame.  And UTMB's

00:07:53   15 counsel filed the motion objecting to the magistrate's

16 recommendations in this court.

17                   THE COURT:  Yeah.

18                   MR. EDWARDS:  We immediately communicated that

19 that was the wrong court.

00:08:03   20                   THE COURT:  Not the right place, yeah.

21                   MR. EDWARDS:  And they nevertheless decided to

22 proceed onward, forcing us to incur additional attorneys'

23 fees.  And in so doing, our position is simply, this wasn't

24 a mis -- this wasn't an accidental mistake.  This was a

00:08:17   25 knowing mistake that was pointed out to them.

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1              And after they read our brief, which is

2  identical to the conversation that I had with the former

3  counsel for UTMB, they then realized, oh, we really did

4  need to do this in Dallas, and then asked for forgiveness.

00:08:33    5  Which is fine if the Court is so inclined to send it to

6  Judge Lindsay, but given Judge Lindsay's immediate

7  overruling of TDCJ's objections, our position would simply

8  be they chose to file in the wrong court, therefore, they

9  would lack jurisdiction to re-file or transfer over to

00:08:51   10  Judge Lindsay.

11              Thank you, Your Honor.

12              THE COURT:  Okay.  Ms. Haney.

13              MS. HANEY:  If I may respond briefly,

14  Your Honor.

00:08:57   15              THE COURT:  Yes.

16              MS. HANEY:  And, yes, the motion should have

17  been filed in Dallas.  Unfortunately, I did not recollect

18  fully the conversation that we had with Judge Lindsay.

19  When I had the conversation with --

00:09:08   20              THE COURT:  Mr. Edwards.

21              MS. HANEY:  -- Mr. Edwards, I was not informed

22  that he had the benefit of the trial, of the hearing

23  transcript, which clearly had a discussion that it -- I

24  agreed that it should be in Dallas.  And as soon as I had

00:09:18   25  the benefit of seeing that transcript, obviously, this was

1  not the correct court for it to be filed in, which is why

2  we ask that the Court consider moving our objections to

3  Dallas.

4              THE COURT:  Well, I mean, is there something

00:09:30   5  left for Judge Lindsay to decide, or did he pretty --

6  pretty clearly signal his ruling when he ruled on the TDCJ

7  objections?

8              MS. HANEY:  Your Honor, we would like -- I

9  would certainly like to think that we had some objections.

00:09:45  10              THE COURT:  You mean some other ones?

11              MS. HANEY:  Some other ones that should be

12  given due consideration.

13              THE COURT:  Okay.  I'll transfer it to -- to

14  the extent that I can, to Judge Lindsay, which I think

00:09:56  15  would moot the motion to strike.

16              And on the general question of attorneys'

17  fees and sanctions, my -- my philosophy on that, especially

18  in a case like this with as many parts and many litigants,

19  I'm going to keep tabs on the conduct from all parties, and

00:10:13  20  by the end of the case, I'll be ready to impose sanctions

21  or attorneys' fees if I think they're appropriate.  But I'm

22  not inclined to do it motion by motion.

23              So that's what I'm going to do.

24              MS. HANEY:  Yes, sir.  Thank you.

00:10:27  25              THE COURT:  Not just on this motion but on most

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 sanction motions.

2          MS. HANEY:  Thank you, Your Honor.

3          MR. EDWARDS:  Just to clarify, Your Honor, does

4 that mean that you're going to be transferring the motion

00:10:36  5 to the Northern District?

6          THE COURT:  Yeah, I'm not -- I don't think I've

7 ever done that before.  I don't know what document I sign,

8 but I'll try to.  Maybe I'll just phone Sam.  Would that

9 work?

00:10:45  10          MR. EDWARDS:  It's fine if you were to phone

11 Judge Lindsay and let him know that TDC -- that UTMB has

12 objected and that his --

13          THE COURT:  Okay.

14          MR. EDWARDS:  That's fine.

00:10:55  15          THE COURT:  Okay.  Okay.  Now, I think we -- we

16 are left with the question of Mr. Livingston's state of

17 knowledge, L-I-V-I-N-G-S-T-O-N.  So the complaint, the

18 second amended complaint in McCollum, alleges that

19 Mr. Livingston inadequately responded to a recognized risk

00:11:56  20 to protect heat-sensitive inmates like Mr. McCollum.  And

21 if -- if those allegations are true, then I think it would

22 probably constitute demonstrations that Mr. Livingston

23 acted with deliberate indifference to a known risk.

24          So I guess what we need to do is defer

00:12:34  25 ruling while we do narrowly-tailored discovery.  That's

1  what it seems like to me we need to do, but let me hear

2  from you if you disagree.

3          MR. EDWARDS:  The difference between the

4  McCollum motion and the other motions, the -- for instance,

00:12:51  5  the Martone motion where you did exactly that, the Webb

6  motions where the Fifth Circuit approved doing exactly

7  that, is that McCollum is -- was 18 months into discovery

8  and that depositions of many of the defendants have been

9  taken.

00:13:06  10          And so, you know, if the -- if TDCJ is

11  honestly planning on appealing that ruling, then I suppose

12  that we could go down that road with regard to Director

13  Livingston; however, if the Court could consider Judge

14  Toliver's prior rulings in which she -- she had made a

00:13:27  15  ruling that once the Court decides the issue, then Director

16  Livingston would be made available for a deposition.  And I

17  believe her ruling indicated that it would be unlimited in

18  nature.

19          You know, in some respects, this is a

00:13:43  20  difficult issue because we have the Bailey case in which

21  Director Livingston is going to be deposed, which is --

22  plaintiffs' position is separate and apart from these

23  wrongful death actions.  But if we're going to go down the

24  road, clearly Webb, your decision in Martone would indicate

00:14:01  25  that qualified immunity is inappropriate based on the

1 pleadings, and then we can do the limited deposition.

2                What I want to be very careful about,

3 especially with the directions given to my opponents, is if

4 we do limited discovery as to the executive level of

00:14:17  5 defendants, that does not apply in the Bailey case, which

6 we do view as completely separate.

7                THE COURT:  Yeah.

8                MR. EDWARDS:  And so there's a -- there's a

9 difference of opinion on that, and I respectfully ask the

00:14:31 10 Court to weigh in on that, because while I think it's

11 fairly clear that they're running on separate tracks,

12 they're different defendants, that -- that the scope of the

13 remedy is different, what knowledge matters is different,

14 that does not appear to be TDCJ's position.

00:14:46 15                THE COURT:  Okay.  Let me hear from TDCJ, then,

16 on that.  You-all must have missed each other terribly

17 since our last hearing.

18                MR. GREER:  Glad you said that.  Always.

19                Your Honor, with regard to the motion

00:15:03 20 that's outstanding on Director Livingston at this time,

21 it's actually quite similar to the Hinojosa issue that's

22 still -- we're still waiting on that panel.  So obviously,

23 we've heard from the Webb panel in this case.  We haven't

24 yet heard from the Hinojosa panel.  We certainly see the

00:15:19 25 benefit of taking this issue to a higher level with the

1  benefit of a full record.  But it's difficult for us to say

2  that none of these appeals would go any further until we've

3  actually heard from Hinojosa.

4                    In other words, if the Hinojosa decides --

00:15:35    5  decides their case in a way that's different from the way

6  that the Fifth Circuit handled Webb, that could create a

7  panel split and we have a situation where maybe we're in

8  en banc review, or something further.

9                    So to jump into the -- the Livingston

00:15:53   10  12(b)(6) that's still pending in McCollum, I think the best

11  way is to wait and see what the Hinojosa panel decides.

12  And if they decide it in favor of the plaintiffs, I think

13  that will -- would likely have a dispositive effect on that

14  motion.

00:16:06   15                    In terms of it going forward and in terms

16  of, you know, a limited deposition, limited to qualified

17  immunity and those issues as separate from the Bailey case,

18  you know, our intent is to streamline.  And while they are

19  separate cases, they are far more alike than they are

00:16:27   20  different.  And I think the questions that Director

21  Livingston -- would be directed to him, there will be a

22  considerable amount of overlap.

23                    So maybe there's some hybrid compromise

24  that can be found, but to say that they have to be two

00:16:42   25  separate and distinct depositions, given the overlap in

1  those subjects, I think there is a way to streamline them

2  and make this process more effective rather then having our

3  people sit multiple times over and over.

4                    So waiting on Hinojosa, based on what

00:17:00  5  Hinojosa says, I think that's the better way to approach

6  this, and, of course, if that goes their way, then this

7  question goes away.

8                    THE COURT:  Well, if it does go plaintiffs'

9  way, then, do I understand you're saying that

00:17:12  10  Mr. Livingston would be available for a deposition which

11  didn't have any limitations?

12                    MR. GREER:  Well, I think it would still have

13  to be limited to the subjects of qualified immunity, but if

14  there was a way to accomplish that and accomplish what we

00:17:29  15  need to accomplish for the Bailey case, we would be willing

16  to find a compromise in that rather than having two

17  complete separate days of depositions.

18                    THE COURT:  Well, I understand the reason.

19  That's not a good solution, but I just -- I'm trying to

00:17:43  20  understand where we're disagreeing.

21                    I don't think anybody thinks that the need

22  for two different depositions is compelling.

23                    But, Mr. Edwards, what -- what would --

24  would one deposition unlimited suffice?

00:17:56  25                    MR. EDWARDS:  Provided -- one deposition

1 unlimited, provided we can work out timing requirements

2 that take into effect -- account that there are eight

3 separate wrongful death matters and we need to go into

4 eight separate ideas.

00:18:11  5            So provided we could come up with

6 additional hours to justify that, I have no need to take

7 two depositions if they're unlimited and we can work out an

8 agreement as to time.  I think we may be able to work out

9 an agreement as to time, but I know we will not be able to

00:18:27  10 work out an agreement as to scope.

11           And so if the scope is limited to

12 qualified immunity, then we need -- we definitely need two

13 and then perhaps a third deposition, once the Court were to

14 rule on qualified immunity.  Our preference would be to

00:18:41  15 streamline and would be to do one deposition that would be

16 unlimited, provided everybody knows the rules going in and

17 provided we have sufficient time to complete that such that

18 none of the wrongful death plaintiffs are prejudiced.

19           THE COURT:  Okay.

00:18:54  20           MR. EDWARDS:  Thank you.

21           THE COURT:  Let me hear from you, and I'll have

22 to take a short break.  We've got an emergency call in

23 another case.

24           MR. GREER:  I'll be brief, then, Judge.

00:19:13  25            I don't think that we could -- we can

1  necessarily say it's going to be an open and unlimited

2  deposition.  There would have to be some designation, a

3  portion as to where those will fall.  I think the idea that

4  we need to ask Mr. Livingston in-depth questions about each

00:19:27    5  individual death is a little bit beyond reality, given that

6  I think his involvement is on a much higher level than the

7  individuals specifically at issue.  It's going to be -- I

8  would assume it would have to be more broad about policy

9  matters.

00:19:41   10          So in that regard, I don't -- I think we

11  could accomplish this in one day.  I do think we can

12  appropriately designate what portion goes where, to do this

13  efficiently.

14          THE COURT:  Excuse me for one second.  Keep

00:19:55   15  your seats.  Keep your seats.

16          (Break taken from 2:51 to 3:01.)

17          THE COURT:  Please sit down.  Well, I had to

18  spend time on a meaningless discovery fight.  I'm sure glad

19  this suit doesn't involve any of that.

00:29:26   20          Okay.

21          (Laughing.)

22          MR. GREER:  Your Honor, may I make one other

23  comment?

24          THE COURT:  Yes.

00:29:30   25          MR. GREER:  That is something that I left off

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  so we could break, but I think it was mentioned early on in

2  this case, and I think it was mentioned by you that some of

3  these depositions, it might benefit from having you present

4  for.

00:29:41  5          THE COURT:  I think for Mr. Livingston, I may

6  need to be there for either all of his deposition or some

7  of it.

8          MR. GREER:  I think that would give us -- some

9  of these issues about scope --

00:29:51  10          THE COURT:  I think that's part of my job.

11          MR. GREER:  -- and I --

12          THE COURT:  Yes, sir.

13          MR. GREER:  -- and I think that would also

14  probably just extend just to maybe a couple --

00:30:02  15          MS. HANEY:  A couple of top --

16          MR. GREER:  -- additional --

17          MS. HANEY:  -- officials as well, Your Honor,

18  with Dr. Owen Murray in particular.

19          MS. BURTON:  And Mr. Stephens, which would be

00:30:08  20  for TDCJ.

21          MR. GREER:  I think it's a small handful, but I

22  think that would solve a lot of these disputes.

23          THE COURT:  Where are we going to do these?

24          MR. GARCIA:  Where would the Court like to do

00:30:20  25  them?  Austin is the place we are available.

1          THE COURT:  You-all have a preliminary

2  conversation.  Austin is fine; Houston is fine.  If we need

3  to do them at the prison, that's fine too, as long as we

4  can get a court reporter in there.

00:30:31    5          MS. BURTON:  If I may, with regard to the

6  executives, we can present them in TDCJ headquarters.  We

7  can present them in Austin or here in Houston at the

8  courthouse or some other place.

9          THE COURT:  Well, there are many of you and

00:30:47   10  just one of me and both of my law clerks, so you-all pick

11  out a place that works for you, and I'll be there.

12          MS. BURTON:  So that's our primary concern,

13  Your Honor, is time, place and manner for these top

14  executives.

00:30:59   15          THE COURT:  And I don't think I can -- I'm not

16  sure I can form a judgment in advance of what is a

17  reasonable time.

18              I take Mr. Edwards' point, there are

19  different prisoners.  There are different units.  I assume

00:31:11   20  there are.

21          MS. BURTON:  Yes.

22          THE COURT:  And a different timeline.  I mean,

23  I don't know how -- what's reasonable for each different

24  defendant.  Every life is precious, to be sure.  Without

00:31:24   25  being there, I don't know that I can form a judgment as to

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 what's needlessly repetitive and what's not.

2          MS. BURTON:  So I think what we should do is

3 confer about that, but --

4          THE COURT:  Yeah.

00:31:33    5          MS. BURTON:  -- with the agreement that the

6 Court would be present for these top executives for UTMB

7 and TDCJ.

8          THE COURT:  That's fine.

9               Do you object, Mr. Edwards?

00:31:41   10          MS. BURTON:  I think the other details, we can

11 start to work out.

12          MR. EDWARDS:  I have no objection to you being

13 present for any deposition you would like, obviously.  And

14 I think that based on some preliminary discussions with

00:31:51   15 some of the counsel, that we could probably work towards

16 a -- some sort of agreement as to at least time and then

17 present that to you.  That's my -- that's my thought on it.

18          THE COURT:  Okay.  Very well.

19               Okay.  Let's just turn to Webb, which has

00:32:19   20 been consolidated with -- is it Togonidze,

21 T-O-G-O-N-I-D-Z-E, and Adams?  I believe we now have a

22 motion for discovery sanctions.  And plaintiffs -- I think

23 that UTMB made false statements about the existence of some

24 documents.  UTMB says someone who did the document review

00:32:59   25 in-house didn't realize that -- that they would be

1  peer-review documents, and for that reason, they weren't

2  produced.

3            Then we have state law concerns and HIPAA

4  concerns.  That's all capitals, H-I-P-A-A.

00:33:22   5            Have you made any progress on resolving

6  this?

7            MR. MEDLOCK:  Your Honor, just to give you a

8  very brief outline of what happened here -- this is

9  Scott Medlock for the plaintiffs -- this is actually a

00:33:39   10  discovery dispute that predates the order for sanctions

11  that was approved in the Northern District before that,

12  before McCollum was transferred here.

13            Essentially what -- and that kind of

14  actually fed in the electronic store -- electronically

00:33:56   15  stored information issue kind of fed from this issue.

16  There were some investigations that we had requested into

17  the deaths of prisoners from heat exhaustion -- or from

18  heat stroke.

19            Those -- we were first told that those

00:34:10   20  records were privileged.  Then we were told the records did

21  not exist.  Then we did some extensive briefing on, no,

22  actually those records do exist, you need to produce them.

23            At that point, UTMB about-faced and said,

24  oh, actually, the records do exist.  Here, we will produce

00:34:27   25  them in camera for review.  Records were produced, were

1  reviewed in camera by the courts and then were produced to

2  us.

3          THE COURT:  Well --

4          MR. MEDLOCK:  We have the records.  The only

00:34:35  5  issue is kind of the false statements that were made that

6  required us to do some work.

7          THE COURT:  I understand that, but in a large

8  organization when there's a significant document request,

9  these things do happen.  I mean, I'm not -- I'm not quick

00:34:48 10  to assume there's bad faith, but let me hear from -- let me

11  hear from defendant.

12          MS. HANEY:  Yes, Your Honor.  My co-counsel,

13  Ms. Molinare, is actually going to address this point.

14          THE COURT:  Yes.  Tell me your name one more

00:34:59 15  time.  I'm sorry.

16          MS. MOLINARE:  Shanna Molinare.

17          THE COURT:  Thank you.

18          MS. MOLINARE:  Your Honor, there actually were

19  no misstatements made at any course.  At the time that any

00:35:09 20  statement was made, it was what was believed to be true at

21  the time.

22          The plaintiffs have confused a lot of

23  different documents, a lot of different discovery requests,

24  in the issues.  In Webb specifically, their motion for

00:35:24 25  discovery sanctions comes out of their request for peer

1    reviews and some Morbidity and Mortality Review Committee

2    records.

3              They got information from -- about those

4    reviews from deposition testimony in McCollum.  Instead of

00:35:42    5    talking with us and asking us whether or not we were the

6    custodian of the M and M records, they filed their motion

7    for sanctions.  We are not the custodian of those records,

8    and we could have told them we cannot produce them to you

9    because we do not have them.

00:35:56    10              With regard to the peer-review documents

11    that are at issue in Webb, none of the -- there were no

12    peer reviews that were responsive to any of the requests in

13    Webb.  So their motion for sanctions, it was -- it wasn't

14    even -- it's not even appropriate in Webb.

00:36:12    15              And as we explained, the reason that

16    additional documents came to light was in response to an

17    Adams -- a request in Adams which was much broader than any

18    of the requests made in Webb.  And that's when the

19    additional facility reviews were discovered, which as

00:36:31    20    Mr. Eubank explained, it's not a nursing peer review.  And

21    because we can construe one of the requests for

22    investigations liberally, we said, here -- we let them know

23    that here they are, but we're not going to give them over

24    to you until the Court has determined what we're going to

00:36:48    25    do with our state privileges.

24

1                      And that's why we asked for the in-camera

2    review.  There has been no bad faith.  There has been no

3    trying to hide any sort of records, and everything that we

4    have ever discovered that is in any way responsive to any

00:37:02    5    of the requests has been produced.

6                      At this point, we just don't think that

7    there's any -- there's anything left to discuss regarding

8    this motion.

9                      THE COURT:  Okay.  Thank you very much.

00:37:11   10                      Okay.  Mr. Medlock.

11                      MR. MEDLOCK:  Just briefly, Your Honor, there

12   was a finding of bad faith by the Northern District in the

13   electronically stored information issue, and it's kind of

14   the same thing here, failure to look for the documents that

00:37:28   15   they should know exist.  And it's -- to some extent,

16   they're still playing a shell game here, Your Honor.  We

17   asked for investigations, whether they called them

18   morbidity, mortality reviews, or peer reviews, or death

19   investigations, or whatever.  We're using, you know, a

00:37:43   20   common term that they should know these -- investigations

21   either happen or they don't.  And they told us that first,

22   they're privileged, then they said, oh, no, they just don't

23   exist.  And, you know, that caused us to do a lot of work

24   we wouldn't have otherwise had to do.  That's why we're

00:38:00   25   requesting our attorney fees on that issue alone.

1          That's all we have, Your Honor.

2          THE COURT:  Okay.  As I've said before, I'm

3  going to carry along all these motions for sanctions and

4  attorneys' fees rather than decide them motion by motion.

00:38:13    5          Tell me what I need to examine in camera.

6  I'm not sure what I'm looking for if I do an in-camera

7  review.

8          MS. MOLINARE:  That's already been determined,

9  Your Honor.  Those records have already been disclosed to

00:38:23   10  the plaintiffs.

11          THE COURT:  So no more in camera?

12          MS. MOLINARE:  No.

13          THE COURT:  Okay.  Yeah, I'm not going to order

14  anything more than that.  The documents have been produced.

00:38:37   15  That's the -- the main objective.

16          So I guess we now -- the stay is lifted --

17  as I've said before, the stay is lifted for all purposes.

18  Okay.  All right.  Very well.

19          Okay.  In Adams versus Livingston, the

00:39:04   20  case is consolidated with Webb for discovery purposes, and

21  there are four motions to dismiss pending.  Three are based

22  on qualified immunity claims.  Those claims, motion is

23  filed by Owen Murray, M-U-R-R-A-Y, Nancy Betts, B-A --

24  B-E-T-T-S, and Stephen Fields.

00:39:27   25          Now, were these motions to dismiss based

1  on the qualified immunity argument that went up on the

2  consolidated appeal?

3                    MS. MOLINARE:  The Betts and Fields motions to

4  dismiss would not be, Your Honor.

00:39:42    5                    THE COURT:  Okay.

6                    MS. MOLINARE:  Because they are individuals

7  that are specifically just for that case.

8                    THE COURT:  Okay.

9                    MS. MOLINARE:  They're not executive level

00:39:50   10  defendants, so the arguments there --

11                    THE COURT:  How about Murray, then?

12                    MS. MOLINARE:  Murray's would be very similar

13  to the arguments made in the other cases with respect to

14  qualified immunity as an executive.

00:40:04   15                    MR. MEDLOCK:  Your Honor, Betts and Fields are

16  very similar to the motions in the Martone case that you

17  have already denied from those nurses, though.  It's kind

18  of the same legal issue and the same qualified immunity

19  argument.

00:40:15   20                    THE COURT:  So I need to rule on those?

21                    MR. MEDLOCK:  Yes.

22                    THE COURT:  And they're ripe?

23                    MR. MEDLOCK:  They're ripe, Your Honor.

24                    THE COURT:  Then the fourth motion to dismiss

00:40:22   25  was filed by UTMB, and you're seeking dismissal of the ADA

1  and Rehabilitation Act claims; is that right?

2             MS. MOLINARE:  Yes, Your Honor.  I mean, I know

3  there was -- there is that motion that was filed.

4             THE COURT:  And is that ready to be decided?

00:40:39  5             MS. MOLINARE:  Yes, Your Honor.

6             THE COURT:  Okay.

7             MR. EDWARDS:  And, Your Honor, those motions

8  are identical to the motions that were denied in Martone

9  and that were also denied in the Webb matter before they

00:40:50  10  were consolidated.

11             THE COURT:  Okay.  I'll turn to those.

12             MS. HANEY:  Your Honor, if I may, with respect

13  to the ADA motion on behalf of UTMB in the Adams case, I

14  think we would request that that motion be withdrawn from

00:41:10  15  the Court's consideration at this juncture, and then we'd

16  fully brief that later in the context of summary judgment,

17  if we may.

18             MR. EDWARDS:  No objection from the plaintiffs,

19  Your Honor.

00:41:19  20             THE COURT:  Which one is that, now?

21             MS. HANEY:  The Adams -- UTMB's motion to

22  dismiss in the Adams case on the ADA and rehabilitation.

23             THE COURT:  Okay.  You want to defer that?

24             MS. HANEY:  Yes, Your Honor.

00:41:28  25             THE COURT:  So are you withdrawing that for

1  now?

2          MS. HANEY:  Yes, Your Honor.

3          THE COURT:  Okay.  We'll consider that

4  withdrawn and now moot.  Okay.

00:41:37   5          MS. HANEY:  I mean, we do the same thing with

6  respect to the individual defendants in Webb, right?  And

7  Adams, with Betts and Fields.

8          MR. EDWARDS:  Plaintiffs have no objection to

9  the withdrawal of any of these motions.

00:41:52   10          THE COURT:  To all three of them?

11          MS. HANEY:  Yes, Your Honor.

12          THE COURT:  Okay.  All right.  So all four

13  motions to dismiss are gone now?

14          MS. HANEY:  Yes, Your Honor.

00:41:59   15          THE COURT:  Okay.  All right.

16              Okay.  Is it -- how do you pronounce this?

17  Togonidze?  How do you pronounce that?

18          MR. MEDLOCK:  It's Togonidze, Your Honor.

19          THE COURT:  Togonidze.  As far as I know, there

00:42:20   20  are no pending motions.  Discovery stay should be lifted

21  because of Webb, and we don't currently have any qualified

22  immunity issues pending before me, do we?

23          MR. EDWARDS:  No, Your Honor.

24          THE COURT:  Okay.  All right.

00:42:37   25              Okay.  And then Hinojosa versus

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  Livingston, we're currently stayed for the Fifth Circuit,

2  and we don't have anything to do, I don't think, until we

3  hear from the Fifth Circuit on that.

4              Okay.  The Caddell case is different for a

00:42:52  5  couple of reasons.  Obviously, one, the plaintiff is

6  fortunately not -- is still living, and we have the issue

7  of whether or not qualified immunity is established because

8  the defendants were following the edict of a previous

9  Court.

00:43:18  10             There are a good many motions pending.

11  Has there been any progress on any of these?  We have the

12  motion -- plaintiffs' motions that would require defendants

13  to replead, plaintiffs' motion for judicial notice, motion

14  based on -- judgment on the pleadings based on qualified

00:43:39  15  immunity, defendants' motion to strike the complaint.  I

16  mean, any progress at all?

17             MR. MEDLOCK:  It would be the plaintiffs'

18  position that all those motions are ripe to be ruled on,

19  Your Honor.

00:43:57  20             THE COURT:  Okay.  I'm not going to -- I think

21  I'm going to have to have a separate hearing on the Caddell

22  motion for judgment on the pleadings based on qualified

23  immunity.  That's a lot.

24             And in terms of defendants' motion to

00:44:16  25  strike allegations in 30 of the complaint's paragraphs,

1  Rule 12 does give me authority to strike pleadings that are

2  redundant, immaterial, impertinent or scandalous.  I don't

3  know that I think they meet that severe standard.

4              Paragraph 94, for example, says that all

5  the defendants knew about the shockingly high number of

6  deaths due to heat stroke but made misrepresentations,

7  denied people had died.  I mean, it may be that because

8  plaintiffs identify all defendants as having known these

9  facts, and in truth, it was only some of the defendants who

10 had been deposed at that point, probably -- that paragraph

11 probably could be re-pleaded.

12             On paragraph 17 to 25, 27, 28, 33, 27

13 through 41, 62, 80, 85, 87 and 88, the argument is that

14 those allegations -- or the allegations of those paragraphs

15 are immaterial and will confuse the issues to the prejudice

16 of the defendants.  Most of this information is just from

17 the National Weather Service, the American Medical

18 Association, the National Institute for Occupational,

19 Safety and Health.  They've appeared in a number of other

20 prison heat cases.  I don't think there's a basis for

21 striking those.

22             And in paragraph 35 and 38 -- I think

23 these are misnumbered in the complaint.  The allegations

24 that are in question are ones found on pages 9 and 10 and

25 in the first paragraph on page 11.  These are paragraphs

00:44:42

00:45:14

00:45:48

00:46:10

00:46:31

1 contained in charts of prisoners who have died in TDCJ

2 prisons since 1998 of heat-related causes.

3          I mean, this is the kind of information

4 that's appeared in other prison cases.  I don't think it

00:46:55  5 rises to the level that it should be stricken.  So except

6 for the one -- the first paragraph we discussed, I don't

7 think I'm going to require re-pleading.  I will ask that

8 that one paragraph be re-pleaded.

9          Okay.  And I think maybe now that I've

00:47:18  10 ruled on the motion to strike, perhaps after plaintiffs

11 file their renewed complaint, maybe you can then rule on --

12 file a response.

13          MS. BURTON:  Yes, Your Honor.

14          THE COURT:  I mean, I think -- I think it's --

00:47:39  15 I think defendants are primarily doing what plaintiffs did.

16 Both the complaint and the answer seem to include some

17 extraneous detail, but I don't think it, again, meets the

18 standards for motion to strike.  But I -- anyway, I'll

19 assume that defendant will file a new answer in response to

00:48:03  20 the new complaint.

21          Okay.  On the plaintiffs' motion for

22 judicial notice of government documents -- you know, I'm

23 used to taking judicial notice of certain facts.  When I'm

24 taking judicial notice of certain documents, I'm not sure

00:48:18  25 what facts are wrapped up in that.

1          Does somebody want to speak to that?

2          MR. SINGLEY:  Yes, Your Honor.  Mike Singley

3   for the plaintiff.

4          We are not asking you to take judicial

5   notice of the entirety of those documents.  There are

6   certain portions of each document that form the basis for

7   allegations in the complaint, some of the ones Your Honor

8   was just talking about, the National Weather Service and

9   government websites.

10         And so they're just specific facts, for

11  example, risks of heat, what is the heat index and matters

12  like that.  So we're not asking for the entire document.

13  There's certain subportions that support the allegations in

14  our complaint that we've listed in the motion for judicial

15  notice.

16         THE COURT:  Have you -- can you make that more

17  precise, then, in another filing and tell them exactly what

18  facts you want me to take notice of?

19         MR. SINGLEY:  And I wanted to apologize to the

20  Court.  We had intended to mark those up on the exhibits

21  that didn't get done, and so I would request that we submit

22  what specifically we're asking for, the exact wording, if

23  Your Honor would permit it.

24         THE COURT:  Leave is granted at this time.

25         MR. SINGLEY:  Thank you, Your Honor.

1          THE COURT:  There is no discovery stay in

2     Caddell, so I'll just -- it's for me to set that for

3     another hearing.

4               Okay.  Then having discussed the cases

00:49:34   5     except for Bailey, there are four global issues that I

6     think we need to address:  Discovery progress; secondly, if

7     we haven't already discovered it, discovery stays; third,

8     setting schedules for dispositive motions in trial; and

9     fourth, I just want to make sure the parties continue to

00:49:56  10     oppose all motions to intervene.

11               Let me just start with discovery progress.

12     Tell me how things have been going and what might need

13     attention from the Court.

14          MR. EDWARDS:  Cynthia, would you like to do

00:50:13  15     this jointly?

16          MS. BURTON:  Sure.

17          MR. EDWARDS:  You know, I think I describe it

18     as, you know, tentatively progressing with an -- with an

19     eye towards the Fifth Circuit rulings in Webb and perhaps

00:50:28  20     in Hinojosa.  I think now that the Webb court has ruled, I

21     think we need to get together, and I think we need to

22     decide --

23          MS. HANEY:  I thought you were speaking to

24     Caddell, but if you're speaking to all of them, then

00:50:41  25     include UTMB.

1          THE COURT:  I invited global response.

2          MR. EDWARDS:  Would you like me to go case by

3  case?  I'm happy to do that.

4          THE COURT:  No, I want just global.

5          MR. EDWARDS:  I think we need to decide on a

6  schedule and a progress, and we will likely probably have

7  to come back to court on that.  But in terms of the

8  lower-level witnesses, some progress has been made, not

9  enough.  I think in terms of the timing of the cases, I

10  think what would be appropriate -- and, again, we ought

11  to -- I think we ought to confer about this before the

12  Court rules or -- but I'm happy to have the Court rule.

13          My preference would be to treat the

14  wrongful death cases -- even though the MDL panel did not

15  choose to call it an MDL, that -- that we could coordinate

16  it as a type of MDL in terms of, you know, plaintiffs would

17  select a case to be tried first.  Defendants would select a

18  case to be tried next, and we would develop coordinated

19  discovery schedules with that, with the one caveat I think

20  that given the amount of -- I think everyone's in agreement

21  that McCollum should go first, given all the discovery

22  that's been taken.

23          And there are some -- there are some

24  individual issues in the McCollum case that may need the

25  Court's attention in terms of deadlines.  You know, when

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  McCollum was stayed, the discovery period had ended.

2  Experts had been designated, and all the discovery that was

3  technically left to be done before the motion for sanctions

4  and all the electronic discovery was finally produced was

00:52:13  5  some outstanding depositions that the plaintiffs were going

6  to take of defendants' experts when they produced their

7  reports.

8            Now, that was, boy, a long -- a

9  year-and-a-half ago, and we still have not received the

00:52:27  10  expert reports in the McCollum case.  And so I think the

11  Court has a choice to make, or we just need some direction.

12  Our position is, look, the deadlines have passed.  Let's

13  set the case for trial and let prior agreements be in

14  effect.  If the Court's inclined to re-open discovery, then

00:52:47  15  I think we need to get together and decide on schedules and

16  have trial as expeditiously as possible.

17            I mean, that's -- that's where we are on

18  the McCollum case.  All the other cases, you know, whether

19  they've proceeded quickly enough or not, I think now we can

00:53:06  20  take steps to coordinate the scheduling, the discovery, and

21  go from a low level, top level down.  The one kind of

22  elephant in the room is simply, you know, the scope of some

23  of these depositions on the qualified immunity front.

24            And then it would be helpful to know

00:53:24  25  whether, you know, TDCJ, perhaps UTMB, plan on, you know,

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  appealing the next qualified immunity summary judgment

2  motion.  Because if that's the intent, then it makes no

3  sense to spend ten months in discovery only to have a

4  motion for summary judgment up to the Fifth Circuit,

00:53:46   5  another year-and-a-half goes by, and more plaintiffs, you

6  know -- and it's not just the delay for the sake of delay.

7  We've had two plaintiffs die --

8              THE COURT:  I understand.

9              MR. EDWARDS:  -- while we've waited.  I don't

00:54:01   10  cite that for any high effect.  I just mean -- I'd like us

11  to be up front.  If the strategy on the defense part is

12  we're going to be appealing the next motion for summary

13  judgment, let's do everything we can on discovery in that,

14  get that back up to the Fifth Circuit as fast as possible.

00:54:13   15  That would be our preference.

16              Now, we ought to be able to work that out.

17  We ought to be able to do that together.  As a

18  professional, I wish I could say I'm certain that that's

19  going to happen, but we've been here probably too often for

00:54:24   20  me to have confidence in that.  So I think guidance from

21  the Court as to what you think the best approach would be,

22  would be helpful, with the one McCollum much further down

23  the road, much more involved, and we'd like to try that as

24  fast as possible.

00:54:38   25              THE COURT:  Okay.  Which one of you wants to go

1  next?  Ms. Burton?

2              MS. HANEY:  Go ahead.

3              MS. BURTON:  Okay.

4              Yes, Your Honor.  We both believe that the

00:54:47   5  McCollum case does require further discovery, and we don't

6  believe that that case should be stayed for discovery.

7  There's been a significant amount of ESI discovery, as you

8  know, that has been done that has been provided in a global

9  sense that's applicable to all the pending cases.

00:55:08   10             We also believe that with regard to the

11  Bailey case, it has a substantial influence on how fast

12  these cases can progress.  The Bailey case 30(b)(6)

13  requests are, as you know, TDCJ generally, and I'm -- I

14  would imagine that there will be those kind of requests

00:55:32   15  submitted to UTMB also, now that these stays are lifted.

16  So those -- those are not two different kinds of requests.

17  They apply to all the cases, and a great deal of the --

18  both the death cases and the class action.

19             So part of our problem is what are we

00:55:54   20  doing in the class action?  We're presenting -- are working

21  on presenting witnesses in the Bailey class action, and how

22  does that coordinate, tie in or streamline with the same

23  kind of evidence -- evidentiary questions that are

24  applicable to the death cases.

00:56:14   25             So to the extent that we can streamline

1  those requests to be applicable to all the cases, then

2  we're going to make progress on all the cases at the same

3  time.

4          So that -- that's -- we had discussed this

00:56:29  5  with UTMB prior to the hearing, that part of the

6  consideration for setting trials or deadlines in the death

7  cases is exactly what kind of discovery in Bailey is going

8  to be happening right now and how much of that is going to

9  be applicable to the heat cases -- to the heat death cases.

00:56:54  10  So that was one of our questions.

11          And also to a certain extent with the

12  schedules of everyone, it is difficult to move all of these

13  things along at one time.  We had submitted, for instance,

14  a list of witnesses to plaintiffs in February with March

00:57:21  15  dates for the 30(b)(6) depositions, and we didn't even get

16  to start scheduling those or know the names of the specific

17  witnesses on a pretty lengthy list that they wanted to

18  depose until mid to late June.

19          So things are very time-consuming to

00:57:40  20  accomplish.

21          THE COURT:  I don't doubt that.  But, I mean,

22  do we think now that we've heard from the -- what the

23  Fifth Circuit thinks about qualified immunity, so we won't

24  have any more interlocutory appeals?

00:57:50  25          MS. BURTON:  Well, I can't guarantee it.  I

1  don't know about UTMB.  We don't know what the summary

2  judgment motions -- how those will be ruled on, what the

3  evidence will show right now as far as what we can include

4  in those summary judgment motions.  But I would answer that

00:58:07  5  if we disagreed with a ruling, for instance, on

6  Mr. Livingston's qualified immunity, that it would be

7  appealed at the summary judgment stage, yes, Your Honor.

8          MS. HANEY:  And, Your Honor, if I may respond

9  to that as well, but going back to your original question

00:58:22  10  on progress, I just want to seek clarification from the

11  Court.  As I understand it, it's the Court's ruling that

12  the stays are lifted in every one of the wrongful death

13  cases with the exception of Hinojosa; is that correct?

14          THE COURT:  That's what I meant to say, I

00:58:34  15  think.

16          MS. HANEY:  I just want to make sure.

17          THE COURT:  Do you disagree?

18          MS. HANEY:  No, no.  That was what I

19  understood, and I just wanted to make sure that that was --

00:58:40  20  I understood correctly.

21          THE COURT:  Yeah.  Yes.

22          MS. HANEY:  Okay.  And then with respect to

23  your question regarding any further interlocutory appeals,

24  I can foresee that, you know, we're going to have a number

00:58:52  25  of summary judgments with individuals with qualified

1  immunity issues, and depending on the rulings of this Court

2  and the evidence presented, we may very well have a need

3  to --

4          THE COURT:  Is that pretty well stretched -- I

00:59:04  5  mean, not that I'm confident I get everything right, but

6  that really will involve a lot more time.

7          MS. HANEY:  I understand, Your Honor, but, you

8  know, certainly our clients would be entitled --

9          THE COURT:  Yeah.

00:59:16  10         MS. HANEY:  -- to pursue that if need be.

11         THE COURT:  But I -- I'm just thinking that

12  with the benefit of some of these rulings we've gotten from

13  the Fifth Circuit, we -- we might be able to extrapolate

14  those, what the outcome would be, to a slightly different

00:59:31  15  set of facts.

16         MR. EDWARDS:  And I think, Your Honor, one

17  solution might be, if the Court is inclined, as they did in

18  Martone, not to stay the case.  Pending any interlocutory

19  appeal, we could go forward to trial.

00:59:44  20             And so --

21         THE COURT:  I think -- I think the court of

22  appeals might mandamus me on that, though, if we --

23         MS. BURTON:  Well, we were suggesting, if I

24  may --

00:59:54  25             Excuse me, Mr. Edwards.

1          MR. EDWARDS:  Absolutely.  Sure.  Sure.

2          MS. BURTON:  What we had been discussing among

3 the defendants is that we would stagger the briefing on the

4 summary judgments for the cases, and this, we would discuss

01:00:09  5 with the plaintiffs, but that the Court, in essence, would

6 rule on all of them at the same time.  In other words, we

7 don't have eight summary judgments due on the same day.

8          THE COURT:  Yeah, I understand that.

9          MS. BURTON:  But that way, when we go up on

01:00:22 10 appeal, it all goes up on appeal at the same time, you

11 know, with the same questions if they exist.

12              Now, we -- right now, we can't say that

13 for sure we will have an appealable issue.  You might grant

14 our motions for summary judgment for some of the

01:00:38 15 executives, once we have a more robust record in front of

16 the Court.

17          THE COURT:  Well, I'm -- certainly these

18 judicial immunity -- I mean, official immunity questions

19 are important.  I just -- I mean, it's -- Mr. Edwards and

01:01:00 20 others have said there is time sensitivity to these cases,

21 and I --

22          MR. EDWARDS:  One of the particular dilemmas

23 here, Your Honor, is that given the Americans with

24 Disabilities Act claim that is brought, I mean, there

01:01:17 25 really is a strong argument that had we just brought the

1  ADA claim and not brought 1983 actions, that there is no

2  immunity and we could just simply go -- proceed to trial,

3  provided the claim was amply stated.

4          The fact that it's -- that this claim that

01:01:33  5  we could simply go to trial with is also coupled with

6  claims where immunity is at issue, I think might give you

7  some flexibility in terms of tailoring.

8          Now, I think a better solution, frankly,

9  would be for us to get together and try to work it out.

01:01:47  10  We've been unsuccessful for a long period of time at doing

11  that.  Maybe it's worth one more try.  These are

12  different -- I mean, there are a lot of different lawyers

13  in the room now than when we began and then, frankly, when

14  most of these motions were briefed.  I'm certainly willing

01:02:02  15  to do that, but I do think that that would require,

16  unfortunately -- maybe we could schedule -- that would

17  require probably another status conference sooner rather

18  than later, to keep us -- to keep us going.

19          My real concern, though, is just McCollum

01:02:16  20  was within a couple of months of a trial setting, and then,

21  boom.  And with regard to -- well, with regard to the

22  streamlining issue that keeps getting discussed, I want

23  to -- I want to make sure that the Court understands our

24  position.

01:02:32  25          We're all for efficiency.  We're all for

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  streamlining.  But with regards to the McCollum case, the

2  fact that 70,000 documents were produced when they weren't

3  disclosed, as a result -- and these aren't my words --

4  Judge Toliver's finding of bad faith, our position would be

01:02:51  5  simply, it would be unfair for the defendants to benefit

6  from an act of bad faith.

7             Now, there -- they've effectively

8  benefited by being able to delay them.  And, again, I'm not

9  casting dispersions on the attorneys in this room, but the

01:03:06  10  fact of the matter is Judge Toliver found those issues.

11  And we had deadlines in place.  We had a schedule going.

12  I'd urge you to take -- just simply take a look at where we

13  were in that case, and then perhaps we can go back and try

14  to incorporate -- incorporate a schedule.

01:03:25  15             THE COURT:  Well, you -- one suggestion was

16  particularly interesting.  I mean, could we sever the ADA

17  claim and try it?

18             MR. EDWARDS:  Yes.  There are a lot of creative

19  solutions that we could possibly engage in.  We could

01:03:43  20  perhaps sever the executive-level defendants and try them

21  all as one case, and then go forward individually on the

22  ADA claims and the low -- lower-level defendants.  There's

23  a lot of creative approaches that we could explore here,

24  but I -- I -- this is not Ms. Burton, and it's certainly

01:03:59  25  not Ms. Haney.

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          What's been told to me before by other

2   counsel, admittedly, is that, look, we're going to take

3   every bite at that apple, and if delay is what we get,

4   then --

01:04:08    5          THE COURT:  Well, I understand.

6          MR. EDWARDS:  And that going forward, that's

7   not what I see here at all.  But I'm open to creative

8   solutions, and maybe we can -- maybe we can talk about

9   those.

01:04:17   10          MS. HANEY:  Well, Your Honor, I think -- I

11  think the key is -- when he was talking about the fact that

12  McCollum is certainly the closest to being ready for trial,

13  and while I absolutely agree with that, we had not had an

14  opportunity to file summary judgments in that case and for

01:04:30   15  the Court to entertain those motions.

16          I think there actually was one filed at

17  the last minute, actually, in McCollum, but we had

18  withdrawn that when the case was transferred for you, with

19  the presumption that there would be a new scheduling order.

01:04:41   20  And I think we certainly need an opportunity to advance a

21  dispositive motion.  I'm sure TDCJ would agree with that.

22          MR. EDWARDS:  We don't disagree with that at

23  all.  That's true.

24          MS. HANEY:  I think that's true, really, in

01:04:52   25  every case.  We just have, you know, obviously complete

1  discovery and have an opportunity to brief the Court

2  through dispositive motions.

3         THE COURT:  Do we have any assurance that all

4  these appeals will go to the same panel?  I guess not.

01:05:08  5         MR. EDWARDS:  No, Your Honor.

6         MS. BURTON:  Not unless we -- that's why we're

7  suggesting that all the briefing be staggered.

8         MS. HANEY:  That ruling be at one time.

9         MS. BURTON:  That the ruling will be at one

01:05:21  10  time in the hopes it would go before the same panel,

11  Your Honor.

12         MR. EDWARDS:  We attempted to coordinate that

13  the last time, and we got two panels.  And so I think we

14  can attempt to stagger.  I mean, I suppose if there's one

01:05:35  15  ruling on all the motions, that would be a way, but that's

16  going to be --

17         THE COURT:  That's going to slow it down.

18         MR. EDWARDS:  I think that's going to slow

19  things down quite a bit and make it much harder on -- I

01:05:44  20  think it would make it harder on everybody.

21         MS. BURTON:  I think we would have to move to

22  consolidate them at the Fifth Circuit and say, you know, in

23  each of these, there is a similar question, if there is.

24  We may not even be taking all of them up.

01:05:58  25         MR. EDWARDS:  And, again, Your Honor, I think

1  we can talk about this, but the issue of consolidation is

2  an important one.  There are five cases that are

3  consolidated at the current time.  All of them are not

4  consolidated.  I mean, if TDCJ or UTMB wishes them to be

01:06:18  5  consolidated, I mean, that's something that we could -- we

6  would consider, but that's not where the -- the current

7  posture is.  And so --

8           MS. BURTON:  Well, let's be careful.  They're

9  consolidated for purposes of discovery but not for trial,

01:06:29  10  and that's part of why we're in one courtroom is so that we

11  can work through all of the heat cases, including Bailey,

12  for purposes of discovery and dispositive motions in a

13  consolidated and organized manner.  That's exactly what

14  we're trying to accomplish.  But each case would still be

01:06:48  15  separately tried.

16           THE COURT:  We'll take a ten-minute break.

17           (Break taken from 3:38 to 3:52.)

18           THE COURT:  Okay.  My law clerk says I didn't

19  make one thing clear.  In McCollum, I am going to defer

01:20:57  20  ruling on qualified immunity and allow limited discovery.

21  On McCollum, defendants seem to think more discovery is

22  appropriate.  What -- what more does need to be done in

23  that case?

24           MR. GARCIA:  Your Honor, the plaintiffs'

01:21:24  25  experts need to be -- there's a couple of plaintiffs'

1  experts that need to be deposed.  There are a couple of

2  defendants' experts that still need to be deposed.  And in

3  addition, in light of the sanctions order from

4  Judge Toliver, there were other depositions ordered to be

01:21:37  5  reconvened with the new information that was given.  And

6  there were approximately, I think, five or six that had to

7  be redone.

8             MR. EDWARDS:  There were -- there were six --

9  up to six depositions at plaintiffs' discretion were

01:21:52  10  ordered to be retaken.  And so everything Mr. Garcia told

11  you is accurate.  The issue is, what comes about as a

12  result of the additional depositions that were the result

13  of sanctions.

14             So if it's new information and we all

01:22:07  15  should use this new information, then we would probably

16  have to set a plaintiffs' expert deadline and a defendants'

17  expert deadline.  If, however, it's -- you're more of the

18  viewpoint that whatever conduct Judge Toliver found should

19  not be rewarded, then it's we would take the six

01:22:25  20  depositions, and then we would have a dispositive motion

21  hearing and set a trial date and come from -- from what

22  there.

23             We need -- I suppose we need your guidance

24  on that as to what you want to do so that we can

01:22:37  25  incorporate a schedule.  But if -- if the --

1          THE COURT:  Well, all I need is -- short-term,

2  is for you to do enough discovery that would allow me to

3  decide qualified immunity, right?

4          MR. EDWARDS:  Yes, exactly.

01:22:49   5          THE COURT:  Well, can we do that and give that

6  priority and then --

7          MR. GARCIA:  Yes, sir.

8          THE COURT:  -- then --

9          MS. BURTON:  Yes, Your Honor, subject to what

01:22:57  10  we were talking about with regard to Mr. Livingston and

11  Mr. Stephens.

12          THE COURT:  Well, don't let my availability

13  delay things.  I'll make myself available.  I really will.

14              See, I thought one thing that plaintiffs

01:23:16  15  were saying was that McCollum was nearly done.  It doesn't

16  sound like it's all that close to being done.

17          MR. EDWARDS:  Plaintiffs' position is in light

18  of the sanctions order, we have additional discovery that

19  we can do.

01:23:29  20          THE COURT:  All right.

21          MR. EDWARDS:  But it is within four to six

22  months of being ready.  That's plaintiffs' position.

23          MR. GARCIA:  I would think that is a little

24  optimistic but probably dead-on, pretty close, with the

01:23:43  25  summary judgment deadline somewhere in those six months as

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    well, Your Honor.

2                    MR. EDWARDS:  Absolutely.

3                    THE COURT:  Well, should we pick a summary

4    judgment deadline right now?  I mean, are you close enough

01:23:55    5    to the end that we can do that?

6                    MS. HANEY:  Well, I think, Your Honor --

7                    MR. EDWARDS:  Yes.

8                    MS. HANEY:  Well, Your Honor, I think UTMB

9    would ask the Court for clarification on whether -- on just

01:24:04    10    how much discovery would be allowed in terms of -- I mean,

11    are we opening it for the limited purpose of qualified

12    immunity, or are we opening it for expert deadlines on

13    behalf of plaintiff and defendant and an opportunity to

14    depose those experts before the dispositive motion?

01:24:19    15                    THE COURT:  Well, I think defendants are

16    entitled to a ruling on qualified immunity.  That comes

17    first.  The theory is that officials are to be spared not

18    just the trial but everything else.  So I'd like you-all to

19    tee that one up as quickly as possible.

01:24:38    20                    Now, I don't see any reason that you can't

21    simultaneously be working on the expert testimony.  I mean,

22    am I missing something?

23                    MS. HANEY:  No.  I just think that we would go

24    to the Court for new expert deadlines and as part of the

01:24:53    25    scheduling order and a close -- a definitive close date for

1  discovery.

2          THE COURT:  What if we set a summary judgment

3  deadline for qualified immunity, just do that for starts?

4          MS. BURTON:  Will it apply across all those

01:25:06  5  cases?

6          THE COURT:  No, no.

7          MS. BURTON:  Just for McCollum?

8          MS. HANEY:  Just McCollum, I think.

9          MR. EDWARDS:  Three months?  I mean, I think

01:25:18  10  the fight is going to be the deposition of Mr. Livingston,

11  and do they want to do it over two days as to everyone.

12          THE COURT:  Yeah.  Yeah.

13          MR. EDWARDS:  But there's going to be a

14  separate issue there.

01:25:26  15          THE COURT:  Okay.

16          MR. EDWARDS:  But just so Your Honor knows,

17  we -- the time we would need would be to schedule five to

18  six depositions, take Brad Livingston, his deposition,

19  because he's the only one who really is -- is at issue for

01:25:43  20  qualified immunity.

21          Mr. Garcia or Ms. Burton, if you disagree

22  with that in that particular --

23          MR. GREER:  Yeah.  Yes.

24          MR. EDWARDS:  Okay.

01:25:50  25          MR. GREER:  I'll speak to that.  Yes.

1          THE COURT:  Okay.  How about November 2nd

2    as a -- as a summary judgment motion deadline, on at least

3    qualified immunity?

4          MR. EDWARDS:  That's fine with plaintiffs,

01:26:01   5    Your Honor.

6          MS. BURTON:  We will work towards that.  We

7    have to check with Mr. Livingston for his schedule.

8          THE COURT:  I understand.

9          MS. BURTON:  Okay.

01:26:09   10          MR. GREER:  Not to muddy the waters, Your

11   Honor, but I'm just looking at my calendar, and what we've

12   seen already is that's going -- the class action will be

13   hot and heavy at that point.  The dispositive motion in the

14   class action is November 6th.  The -- October, I think,

01:26:26   15   is -- late September and October is class cert briefing, so

16   I -- some of that may get stacked up in terms of getting

17   that done while the Bailey litigation is going on as well.

18   So I think that's worth considering if we're setting it up.

19          THE COURT:  Well, of course, the other

01:26:43   20   deadlines might bend too.  So why don't we -- why don't we

21   keep marching as if November 2nd is going to be our

22   qualified immunity summary judgment deadline.

23              Let's go back to what I was saying the

24   global issues were.  We've talked now about -- we've talked

01:27:11   25   about discovery progress, discovery stays.  We've talked a

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  little bit about a schedule -- scheduling and dispositive

2  motions.  I don't see we need to set a trial date yet.

3  That's too optimistic.  Motions to intervene, do you still

4  want me to deny all those?

01:27:30    5            MS. BURTON:  Yes, Your Honor.

6            MR. EDWARDS:  Yes.

7            THE COURT:  Okay.  Okay.  Unless there's

8  anything else, I propose we turn to Bailey now.

9              Okay.  Defendants have filed a motion to

01:27:45   10  limit the number of medical records, have an issue of

11  scheduling a hearing on class certification and discussing

12  the impact, if any, of the Fifth Circuit's decision in *Ball*

13  *versus LeBlanc*.  LeBlanc is L-E, capital B-L-A-N-C, all one

14  word.

01:28:04   15              On the medical records, I -- I would

16  appreciate your thoughts.  I really don't feel at all

17  confident to know how much is enough on that.

18              I mean, I -- I appreciate that there's --

19  there are manageability issues.  I don't know enough about

01:28:46   20  whether random selection of medical records is appropriate

21  or whether non-random, but nonetheless, individualized

22  production makes sense.  We have a Pack Unit average

23  population of 1460 offenders.  I don't know if that's the

24  right number to start with, or are we talking about number

01:29:11   25  of people who are at Pack Unit who are heat sensitive?

1  Give me some help.  Give me some help on this.

2          MS. BURTON:  Your Honor, I believe that this

3  discussion would be more useful after we determine the

4  effect of the Ball case on the Bailey class action and what

5  the scope of the class action is going to be.

6          THE COURT:  Okay.  All right.

7          MS. BURTON:  And --

8          THE COURT:  That's fine.  You want to turn to

9  that?

10          MS. BURTON:  Yes, but there is one housekeeping

11  matter, if I may just take a --

12          THE COURT:  Yes.

13          MS. BURTON:  -- digression.

14          THE COURT:  Yes.

15          MS. BURTON:  Okay.  We recently had 30(b)(6)

16  depositions in the Bailey case, and a UTMB attorney

17  attended to observe the depositions.  Part of it is with

18  regard to the streamlining process and also because they

19  are our contract medical provider for TDCJ.

20          The plaintiffs have objected to UTMB being

21  allowed to attend the TDCJ 30(b)(6) depositions in the

22  Bailey case, and we would like to ask that they be allowed

23  to do that.  And I think the plaintiffs might have some

24  reasons why they don't want you to allow that.

25          THE COURT:  Okay.  Let me hear from plaintiffs.

1          MR. EDWARDS:  I think that should be addressed

2    on a case-by-case basis and with proper notice to the

3    plaintiff, to the plaintiffs, the same way any deposition

4    is run.  The issue --

01:30:36    5          THE COURT:  Well, I take your point, but just

6    is there a policy argument for them not being allowed to

7    attend?  I mean, I'm for whatever makes this thing go

8    quicker, and if that will help things -- move things along,

9    I'm for it.

01:30:50    10          MR. EDWARDS:  If there's an agreement that

11   anything that can be used -- if their -- if their presence

12   is necessary for us to utilize those depositions in other

13   cases, then I suppose there'd be a policy argument for them

14   being present.

01:31:03    15          If that is not the issue, then there's no

16   policy argument for them being present other than if

17   there's a particular need that -- that they could move the

18   Court, ask the plaintiffs.  I can't articulate a -- you

19   know, a huge prejudice to the plaintiffs if they're -- if

01:31:22    20   it is known in advance that they are merely observing and

21   not participating, you know.

22          THE COURT:  Yeah, I see the issue.  I mean, if

23   they're there for that purpose, we have one kind of

24   deposition.  If they're there to participate, then we may

01:31:38    25   end up they're asking questions and could make the

1  depositions a lot longer, right?

2            MS. BURTON:  Well, and that -- that's the

3  problem, Your Honor, is that many of these issues do

4  overlap into the heat-related cases.  And if these were

01:31:51  5  30(b)(6) depositions on the very same question and they

6  were presented in the heat re -- death-related cases, then

7  UTMB would definitely be entitled to participate and ask

8  questions.

9            But, you know, that's part of why we're

01:32:06  10  arguing that the Bailey case 30(b)(6) depositions where it

11  was ordered, that they discuss TDCJ generally, the health

12  and welfare of inmates generally at the Pack Unit.  They're

13  30(b)(6) questions, official position.  That's why we're

14  saying that these need to be streamlined with regard to all

01:32:32  15  the heat-death cases rather than having multiple

16  depositions.

17            Now, at this point, UTMB simply observed

18  for the deposition they attended.  They did not

19  participate.  But there are subjects in which UTMB may want

01:32:50  20  to participate because the depositions are being used in

21  pleadings across the board, as I'm sure you've seen.

22  Depositions from McCollum are pled in Caddell.

23            THE COURT:  I understand.  I understand.  Let

24  me hear from Ms. Haney.

01:33:05  25            MS. HANEY:  Certainly, Your Honor.  And with

1 respect to the deposition, it was one that transpired last

2 week, and we did send one of the lawyers on our team.  And

3 it turned out that the deposition that she had been sent to

4 observe, which was that of a risk manager, which would have

01:33:18 5 had a bearing on -- potentially on medical issues, did not

6 actually take place, and so she just sat through a security

7 deposition, which really didn't have any bearing on

8 medical.

9 But the whole purpose and the reason that

01:33:32 10 we sent her was you had asked us at the last status

11 conference to try to streamline to the extent we could.

12 And since, you know, the practice thus far has been -- of

13 what we've observed, is that plaintiff tries to utilize

14 information from Bailey in these other cases.  Obviously,

01:33:48 15 that was simply our intent in sending someone to observe.

16 Now, if anything elicited in Bailey is not

17 going to be used in the wrongful death cases, we certainly

18 have no reason to attend.  But --

19 THE COURT:  Are you asking just to observe, or

01:34:00 20 are you asking to question also?

21 MS. HANEY:  Well, I mean, we were -- we had

22 sent someone simply to observe, but if there's a chance

23 that this information is going to be potentially utilized

24 against UTMB matters, information from Bailey, then we

01:34:14 25 would certainly ask for the opportunity to defend.

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1     MR. EDWARDS:  Again, I don't -- I don't

2  disagree with what Ms. Haney says in terms of our

3  affirmative use.  I'm unaware of anything in the Bailey

4  case being affirmatively used beyond -- as evidence.

01:34:30    5          It's -- it hasn't come up.  We have

6  specifically -- we had specific agreements relating to

7  depositions in the other cases to quote/unquote streamline,

8  but this word "streamline" keeps being thrown about as if

9  the Court has issued a ruling.  I frankly think the process

01:34:47   10  that -- that we would like to undergo is if Ms. Haney or

11  any counsel for UTMB wishes to attend a particular

12  deposition, send me an e-mail, draft me a letter, explain

13  why.  Let me address it.  If I'm unreasonable, file a

14  motion with the Court as a process.

01:35:02   15          THE COURT:  Well, we can do that.  I was hoping

16  we would make some progress today, though, while we're all

17  together.  And I think -- think she has said if you don't

18  want to use it outside of Bailey, he won't need to attend.

19          MR. EDWARDS:  That's fine.

01:35:15   20          MS. HANEY:  That's fine.

21          THE COURT:  All right.

22          MS. BURTON:  Okay.

23          MR. EDWARDS:  And, Your Honor, if we -- if we

24  wish to use it in some other capacity, I suppose we would

01:35:24   25  just give notice to them and they can participate?

1          MS. BURTON:  That's the problem.

2          THE COURT:  Well, you have to give notice in

3  advance to the deposition that you're going to use.

4          MR. EDWARDS:  Sure.

01:35:32   5          MS. BURTON:  Okay.  Well, Your Honor, that is

6  very concerning to me, because the subjects are not Bailey

7  specific, and I think you remember we spent hours in this

8  court going through each and every 30(b)(6) request.  The

9  requests talk about --

01:35:49  10          THE COURT:  Tell me what you want me to do.

11          MS. BURTON:  Okay.  I want you to allow UTMB to

12  go to those depositions.

13          THE COURT:  Well, she says she doesn't even

14  want to attend, though, if -- if it's not going to be used

01:35:59  15  outside of Bailey.

16          MS. BURTON:  Okay.  But then do I present the

17  very same people a second and third time on the very same

18  subjects for the cases that UTMB --

19          THE COURT:  You're talking about her not just

01:36:11  20  observing?  You're talking about her getting an opportunity

21  to question them?

22          MS. BURTON:  If that subject is relevant to

23  stuff related to UTMB, because there is a contract between

24  TDCJ and UTMB.

01:36:21  25          THE COURT:  Well, you make good points.  That's

1  going to make for a longer deposition and a longer

2  discovery schedule, generally, I think.

3          MS. BURTON:  Well, that's why we are asking

4  that we not treat these cases as so completely separate

01:36:36  5  because --

6          THE COURT:  Well, I --

7          MS. BURTON:  -- some of the 30(b)(6) questions

8  were already deposed upon in the prior cases.  We're trying

9  to avoid presenting, for instance --

01:36:48  10          THE COURT:  It sounds like your --

11          MS. BURTON:  Yeah, Mr. Stephens multiple times.

12          THE COURT:  -- your colleagues may need a

13  minute on this.

14               Do you need a minute to confer?

01:36:59  15          MS. BURTON:  Yes, we may.

16          MS. HANEY:  Sorry.

17          THE COURT:  I just need to know if I need to

18  get you a five-minute break or something.

19          MS. HANEY:  No, Your Honor.

01:37:08  20          THE COURT:  Tell me what you want to do.  I

21  don't have a strong view on this.  I just wanted to try to

22  accommodate all the different interests.

23          MS. HANEY:  I think for the moment, I think

24  actually what Jeff proposed is reasonable, that if he does

01:37:18  25  have the intent and he anticipates -- I mean, if he

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  realizes before he takes a deposition that it's an issue

2  that's going to bear on medical and it might be something

3  that has -- that he's -- where he's getting evidence that

4  he might utilize in the wrongful death cases, then he would

01:37:35  5  give us notice ahead of time.

6           This opportunity not only --

7           THE COURT:  But Ms. Burton is raising a

8  different point.  She's saying that she doesn't want to

9  present these witnesses twice.

01:37:44  10           MR. ALVAREZ:  Your Honor, if we could have just

11  a five-minute break to just discuss amongst ourselves.

12           THE COURT:  Okay.

13           (Break taken from 4:09 to 4:21.)

14           THE COURT:  Okay.

01:50:01  15           MR. ALVAREZ:  Yes, Your Honor, Graig Alvarez

16  here for UTMB, and I think we have -- we can fashion an

17  agreement along these lines.  If we can get an order that

18  states that if plaintiffs want to take the depositions in

19  Bailey, as long as those are not going to be used in the

01:50:20  20  heat-related death cases, then that's fine.  To the extent

21  that they want to use any depositions in the Bailey case

22  for these -- the death cases, that UTMB get 14 days' notice

23  prior to those depositions so they can participate.

24           Would that be agreeable?

01:50:38  25           MR. EDWARDS:  Yes, provided the 14-day is not

1 some hard and fast rule, if we can -- if people's

2 availability and like -- because some of these times, we're

3 rescheduling in the last second.  So...

4          THE COURT:  The thing, I would guess, would be

01:50:52  5 difficult for you, Mr. Edwards, is I suspect it's going to

6 depend part on what you get out of these depositions

7 whether you're going to use them or not.

8          MR. EDWARDS:  Yes, I suppose -- I suppose

9 that's true, and here the dilemma, I think, falls on both

01:51:06 10 sides.

11          THE COURT:  I agree.

12          MR. EDWARDS:  What I want to make certain

13 happens, though, is if we choose to use -- say, no, we're

14 only going to go forward in Bailey and get some gold, that

01:51:16 15 we can re-depose, giving people proper notice and there's

16 not some objection.

17          THE COURT:  That's what Ms. Burton wants to

18 avoid, I think.

19          MR. EDWARDS:  Which is fine.

01:51:25 20          MS. BURTON:  I realize that was pointed out to

21 me by co-counsel, that I haven't been exactly clear about

22 what I'm envisioning, and so what I would like to point out

23 is that we get kind of two categories of 30(b)(6)

24 depositions in Bailey right now.  Some of them are Pack

01:51:43 25 Unit specific, and I can see why those would be limited to

1  the Bailey case.

2            But we have others, and I'll just give one

3  example, the creation and enforcement of policies related

4  to temperature, heat and inmate health and welfare in TDCJ

01:51:59  5  prisons, that is applicable to all the cases, how we create

6  these policies, how they're enforced, which policies apply.

7  Now, what I would propose is that when we're dealing with a

8  question like this, that the plaintiffs be allowed, because

9  I'm presenting at least two top people, Mr. Stephens and

01:52:19  10  Dr. Linthicum, to answer those questions.

11            THE COURT:  What's the second name?

12            MS. BURTON:  She is the head of health

13  services.

14            THE COURT:  Why don't you spell it.

01:52:26  15            MS. BURTON:  Pardon me.  L-I-N-T-H-I-C-U-M.

16            So these are two top executives at TDCJ.

17  So I would propose that the plaintiffs be allowed to ask

18  all the questions they want with regard to the Bailey case

19  and the heat cases so that I do not have to schedule these

01:52:46  20  people two times or three times, and that UTMB be allowed

21  to attend those depositions.

22            THE COURT:  And question?

23            MS. BURTON:  Yes, because Dr. Linthicum will be

24  talking about policy that --

01:53:00  25            THE COURT:  No, I understand.  What that means,

1  though, I would wager for your witnesses, is the

2  depositions are going to be a little bit longer.

3          MS. BURTON:  Correct.  We understand that.

4          THE COURT:  Okay.

01:53:10  5          MS. BURTON:  But we really do have -- because

6  Dr. Linthicum, for instance, and Mr. Stephens are both --

7          THE COURT:  Very busy, I'm sure.

8          MS. BURTON:  -- very hard to schedule

9  time-wise, and that's why we're -- we would really like for

01:53:24  10  these to not have to be --

11          THE COURT:  I understand.  And I do applaud

12  everyone.  It sounds like to me you're all trying to be

13  sensitive to one another's needs, and I appreciate that.

14          MR. EDWARDS:  And I think the -- I think the

01:53:36  15  mistaken assumption here is before the Court ruled in Webb,

16  there were stays in effect which effectively meant we could

17  only proceed in Bailey as to 30(b)(6).

18             Now, you know, for that particular topic,

19  what I would -- what I think I would do is designate the

01:53:53  20  witness across a number of cases so that it would -- so

21  that UTMB would actually be a defendant in one of the

22  cases.  I don't mind including Bailey occasionally, but

23  what I -- what I do mind is if we take a deposition in

24  Bailey without some sort of prior agreement, that there is

01:54:09  25  some King's X down the road, because that will be the

1 argument.

2                THE COURT:  I think we better get everybody in

3 the deposition.  I really do.  I think we better.

4                MS. BURTON:  Okay.

01:54:20   5                THE COURT:  I know it's additional attorney

6 expense to UTMB, but I just -- I can just foresee something

7 unexpected being said.  You very properly want to use it

8 somewhere else.  They very properly say we were not given

9 the authorized notice.  I just -- I think it's a recipe for

01:54:37  10 mischief.  I really do.

11                MR. EDWARDS:  Well, then we have no objection

12 to having UTMB in the room.  The issue is whether or not

13 they're going to be questioning in the Bailey case.

14                THE COURT:  Well, I think we've got to allow

01:54:49  15 them to question, because I don't think they've had

16 their -- their procedural protections if they have to sit

17 there mute.

18                MR. EDWARDS:  Well, then in light of that,

19 Your Honor, would you also agree that there needs to be

01:55:01  20 additional time?

21                THE COURT:  Yeah, I do.  I do agree to that,

22 yeah.

23                MR. EDWARDS:  Okay.

24                THE COURT:  Okay.  Ms. Burton, I think you were

01:55:16  25 the one who said we should discuss *Ball versus LeBlanc*

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 next.

2                    MS. BURTON:  That would be Mr. Greer.

3                    MR. GREER:  Your Honor, the Fifth Circuit has

4 given us quite a bit of direction, I feel, on this.

01:55:33   5                    THE COURT:  I think so, too.

6                    MR. GREER:  I'm not going to go in

7 chronological order as the opinion is written, but I'll go

8 with what I think is most important and is actually kind of

9 in reverse order.

01:55:43  10                    With regard to the injunctive relief, I

11 think what we see quite clearly is that *Gates versus Cook*

12 is still good law.  Air conditioning is not the remedy,

13 that mitigation measures can be implemented, ought to be

14 implemented, and that should be the remedy for heat.

01:55:57  15 That's what the clear message from this Court is.

16                    One of the important things that they

17 decline to hold -- or that they felt they could not do

18 under the PLRA was set some sort of max temperature at

19 which a prison can be.

01:56:11  20                    The question isn't about that.  It's a

21 question about mitigation; and I think that's where this

22 case is headed, in light of that.  And actually, I think we

23 were headed that way to begin with.  Actually two days

24 before this, the plaintiffs filed an amended complaint, and

01:56:27  25 though there wasn't much fanfare, actually, their request

1  for injunctive relief changed.  It changed from previously

2  when they were asking for 88 degrees heat index to some

3  heat index or whatever the Court thinks is appropriate to

4  mitigate that.

01:56:42  5              So I think we're already opening and going

6  down the road of mitigation is what the answer is going to

7  be here.

8              The Court also said some very important

9  things in the section about the injunction, and the first

01:56:57  10  is actually, and I think speaks to something we've been

11  hearing a great deal about from the plaintiffs, and that

12  has to do with the idea of preventability.  What we've

13  heard a number of times from the plaintiffs is heat death

14  is entirely preventable, and therefore if there is one,

01:57:11  15  they're liable.  There's a violation.  And what the panel

16  held, it specifically said that standard does not know

17  risk.  The standard is some reasonably -- socially

18  reasonable amount of risk, and some risk is inevitable.

19              So in terms of designing a system, it's

01:57:33  20  going to be based on mitigation measures.  Anything beyond

21  that is going to be overbroad, and that's the most

22  important point from the injunction.

23              Now, there's a very important point, I

24  think, about the ADA that affects these cases.  And I know

01:57:48  25  that's sort of in the middle and maybe not as prominent,

1  but what the Court held with regard to the ADA is -- well,

2  they didn't hold it.  They actually left the question open

3  as to whether thermoregulation is a major life activity;

4  but they said even if it is, thermoregulation is a major

01:58:07   5  life activity, the standard is not whether there's some

6  degree of risk.  The standard is to whether -- there is

7  evidence that they are actually being -- they are actually

8  having trouble thermoregulating.

9           So in that regard, what the plaintiffs are

01:58:26   10  going to have to prove, and I think it's important for the

11  Court to keep in mind, is that thermoregulation is the

12  activity in question, and there has to be evidence that

13  they're really not able to do it, not just that they might

14  be at some point.  And that was what the flaw was that the

01:58:41   15  Fifth Circuit found.

16           So I think that does shift the inquiry,

17  and I think most importantly -- it comes in Footnote 12

18  where they -- the Court discussed the offender named Ball.

19  They discussed how he was a diabetic, and the plaintiffs

01:58:57   20  discussed how that affected his endocrine system and his

21  sight.  And the Court said that may be well and good and

22  that may be so, but the issue here is thermoregulation.

23  And he may have other health issues, but unless those

24  affect his body to cool itself, then the ADA isn't met.

01:59:17   25           So I think that is some very good guidance

1  for us going forward on that issue.

2              Finally, I would like to address the --

3  the first half, which is -- the first portion, which is the

4  8th Amendment violation.  And I think the Court said some

01:59:35   5  things here that are particularly relevant to us in terms

6  of class certification.  And I would point the Court to

7  Footnote 6 which appears on page 10, I believe it is, and

8  the Court wrote, "We emphasize, however, that the findings

9  of substantial risk regarding a heat-related injury is tied

02:00:00   10  to the individual health conditions of these inmates."

11              And I think that --

12              THE COURT:  That's certainly an unexceptional

13  statement.

14              MR. GREER:  I'm sorry?

02:00:13   15              THE COURT:  That's an unexceptional statement.

16  I think we all would agree that -- substantial risk, but

17  how do you deal with that when you've got 1400 people in

18  the unit?

19              MR. GREER:  I think that's the exact problem

02:00:25   20  that we have in determining commonality and typicality.  In

21  other words, what the Court is saying, you cannot decide

22  with one fell swoop every single person here is at a

23  substantial risk.  It all turns on the individual --

24              THE COURT:  Then that takes us back to

02:00:37   25  availability of medical records and how many will be

1 produced and all that, I think.

2          MR. GREER:  I think -- and that -- it does,

3 Judge.  And that's exactly why this -- we cannot meet

4 commonality here.

02:00:49   5          The 8th Amendment in terms of deliberate

6 indifference turns on a quantum of risk, a threshold of

7 risk at which a bad event gets so likely that -- the

8 possibility of it happening, that the 8th Amendment is

9 violated.  And that's different for every single person.

02:01:06  10          So for us to just take a whole class of

11 people at one prison and say they are at a constitutionally

12 high level of risk, it's just impossible.

13          THE COURT:  Well, lawyers, you're always told

14 that because a question is hard doesn't mean we shouldn't

02:01:21  15 even try.  I mean, do you have an approach you'd like to

16 recommend to the Court?

17          MR. GREER:  In terms of meeting that, I think

18 the best way to start is by looking at the individual

19 plaintiffs.

02:01:31  20          THE COURT:  Well, I agree that's a starting

21 point, but where does that take us?  I mean, you don't want

22 1400 lawsuits.

23          MR. GREER:  We don't, Your Honor, but at the

24 same time, the remedy for each individual person may be

02:01:46  25 different, and PLRA mandates we choose the narrowest means

1    to solve this problem.  And a blanket order to say

2    air condition the whole prison is going to be overbroad

3    because everyone is different.

4                THE COURT:  Well, I think LeBlanc made clear

02:02:01    5    that that's going to be reversed.  The holding that we have

6    to air condition everything, I think that's going to be

7    reversed.  But I'm not sure Ball was saying -- because each

8    individual's -- each individual's health is different,

9    therefore all class-based remedies are inappropriate, I'm

02:02:25   10    not sure it's saying that.

11                MR. GREER:  It goes to the element of

12    commonality and typicality, and the challenges that we're

13    going to have -- that the plaintiffs will have, quite

14    frankly, which they're going to have to establish, that we

02:02:37   15    can certify a class.  And that's what they're going to have

16    to meet initially to go forward; otherwise, we're

17    proceeding under five individuals.

18                    So in that regard, I think it's important

19    for us to heed that advice when we're considering the

02:02:49   20    commonality and typicality elements when we're getting to

21    class certification.  The individual nature of this makes

22    it such.  It's not a one-fell-swoop issue that we can just

23    decide for all these people.  I realize in some ways, that

24    makes it more cumbersome, but that is the plaintiffs'

02:03:04   25    burden to meet.

1          The one last thing I wanted to turn to in

2 terms of the 8th Amendment section has to do with the Gates

3 remedies.  And I'm -- I'm sure where we're headed here is

4 where the plaintiffs will want to make the first half of

02:03:20   5 this opinion portable to this case.  They're going to want

6 to say they held there was an 8th Amendment violation in

7 Louisiana; there should be one here as well.

8          And so I'd like to point out the

9 differences, first and foremost, that I think the evidence

02:03:37  10 is going to show in this case, based on the Texas -- the

11 situation at the Pack Unit and the situation in Louisiana

12 that the Fifth Circuit was -- was examining.  And that has

13 to do with things that Your Honor has seen personally, the

14 distribution of ice water which is taking place 24 hours a

02:03:52  15 day, not just seven -- not just once a day like in

16 Louisiana, the distribution of individual fans, the use of

17 the showers, the ventilation.  So in terms of the

18 portability of finding an 8th Amendment violation there

19 means there's one here, there's different circumstances

02:04:08  20 here, and the evidence is going to show that.

21          Finally, Judge, I wanted to point out --

22 in terms of imposing the same decision on this case, I

23 wanted to point out that -- that I think our evidence is

24 going to be different in terms of what we present to the

02:04:26  25 Court.  Dr. Vassallo, I think, went in some ways unrebutted

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  here, and I think that's one of the issues the Fifth

2  Circuit had.  In other words, Louisiana's position was,

3  they took these three inmates.  They looked at their

4  history.  They said they didn't have an incident in the

02:04:41  5  past, therefore, they're unlikely to have one in the

6  future.  And that was the essence of their defense.

7           While that will be an element of what

8  we're going to be presenting, it will actually be a lot

9  more.  In terms of experts opining on matters like

02:04:57  10  acclimatization and some of the issues that the Court went

11  with here and that Dr. Vassallo said, we'll have a much

12  clearer and more robust record on those.

13           So in terms of just importing that

14  decision saying there's an 8th Amendment violation in

02:05:13  15  Louisiana, therefore there must be one here, I think the

16  Court's going to have to wait and see the evidence and the

17  facts that we present.  I think they're going to be very

18  different.

19           I think that's all I have on that.

02:05:24  20           THE COURT:  Okay.  Thank you very much.

21           Does UTMB want to say anything about this

22  issue?

23           MS. HANEY:  No, Your Honor.

24           THE COURT:  Okay.  Yes, sir.

02:05:34  25           MR. EDWARDS:  This will not come as a surprise

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  to you, but we read the case quite differently.

2                    The first thing I want to make clear --

3  and obviously, we'll argue certification at the appropriate

4  time, but I'll address some of that because Mr. Greer

02:05:52   5  brought it up, but first and foremost, nothing in the Ball

6  decision forecloses the remedy of air conditioning.  What

7  the Ball decision holds is that you need to award the least

8  restrictive means of remedying the danger, and the danger

9  is the substantial likelihood of a heat injury, and that is

02:06:13  10  the 8th Amendment violation that they upheld in the Ball

11  case.

12                    So while -- while we are under, I suppose,

13  an increased burden to show you via evidence that that may

14  be the only means if that is -- if that's the way that --

02:06:28  15  that we choose to try our case, if there are less

16  restrictive means which eliminate the problem, then I think

17  Ball is directly on point and would suggest that those are

18  the remedies.  However, if there aren't, nothing about Ball

19  says that with the appropriate evidence, that that

02:06:48  20  air conditioning is foreclosed.

21                    And the reason is quite simple.  The Ball

22  case involved three plaintiffs.  Replete within the -- the

23  briefing is the notion, this is not a class action.  This

24  is not brought on behalf of everyone.  Yet the relief was

02:07:06  25  so broadly drawn, that applied to everyone.

1                Here, this is a class action and one of

2 the -- one of the issues that the Court will have to spend

3 some significant time on, and I assure you that our

4 evidence will go to, is substantiating why this is an

02:07:21    5 appropriate vehicle for a -- for a class action.

6                The standard that Mr. Greer and that TDCJ

7 wish to amount to is us showing, well, look, not everybody

8 is affected by heat in exactly the same way, and a

9 68-year-old diabetic may be slightly different from a

02:07:38   10 52-year-old diabetic, but that -- that's a red hearing,

11 really.  Because, you know, that would -- that would imply

12 that, hey, sewage is running up through the bathrooms, but

13 you know what, a 27-year-old kid can handle it.  He's not

14 going to die of dysentery, but a 65-year-old man is.

02:07:55   15                Cruel and inhumane treatment, conditions

16 that violate the minimal necessities of life, that's --

17 that's the standard.  And here, there will be ample

18 evidence to show that we need them.  And, yes, we will take

19 the findings in Ball and make an argument that they're

02:08:13   20 entirely consistent, because it's very important that the

21 Fifth Circuit found that temperatures that high, exactly

22 the same temperatures that you experience personally, that

23 independent verified recordings show, are present at the

24 Pack Unit.

02:08:32   25                Now, as to common issues of law and fact,

1   there are going to be common issues of law and fact.  And

2   we will present cases.  We will give you all the support

3   that we think you need to find that this is appropriate as

4   a class action.  What Ball really means is, look, if you're

02:08:49   5   going to go for such an important dramatic remedy as

6   air conditioning, a system, then you need to do so as a

7   class action.

8               Otherwise, there are too many ways to

9   divert -- or too many remedial measures which could, in

02:09:08   10   theory, help the particularly aggrieved plaintiffs.  Where

11   I don't disagree with Mr. Greer is we will need to show

12   that diabetics under the ADA are impacted, but we will.

13   Diabetics, all diabetics, have great difficulty

14   thermoregulating.  That is a consequence of the disease.

02:09:32   15   Okay?  All 65-year-olds and up, according to

16   epidemiological standards, are at higher risk.

17               Now, unless the Fifth Circuit is ready to

18   do away with the science of epidemiology, then a class

19   action will be appropriate in this case, provided we -- we

02:09:52   20   show you the evidence.  And on that, there's very little,

21   very little disagreement.  I think Footnote 7 in the Webb

22   appeal is the footnote that we ought to be focusing on,

23   because it lays to rest the notion of what risk is.  And

24   this notion that no one has died before is some sort of

02:10:14   25   King's X, it puts an end to that argument, at least from

1 the Fifth Circuit.

2           And so, you know, Ball is very important

3 in that it found an 8th Amendment violation.  It is very

4 important in terms of giving you a guide map to what will

02:10:29  5 need to be done under the ADA for the particular

6 disabilities at issue.  And very significantly in the Ball

7 case, though they made some last-minute attempt to brief

8 the issue, there was no evidence, and the justices point

9 this out.  Not even a question was asked as to how the

02:10:48  10 disease is impacted by the cruel condition of extreme heat.

11           So that will be on the lawyers to provide

12 you with the evidence.  But I think Ball is clear.  There

13 can be an 8th Amendment violation.  Ball is clear that

14 that -- that air conditioning is not the correct focus.

02:11:07  15 What the correct focus is, is how to eliminate the risk

16 that is the constitutional violation.  And if they put

17 forward evidence that suggests a cup of water does it, and

18 you believe them, and you find their experts more credible,

19 then I suppose we won't prevail.

02:11:28  20           But if you find our experts more credible

21 on the issues of who is at risk, why they're at risk, how

22 their bodies are affected, there is a reason that diabetics

23 and hypertensive people and people on diuretics died, and

24 it is because of their medical conditions.  Everyone is at

02:11:51  25 risk.  Everyone -- everyone is affected in a grossly

1  negative way by the extreme heat, but -- but we'll put

2  forth that evidence.

3              And that's -- that's really what we think

4  Ball -- Ball illustrates, and it does give you some

02:12:07  5  contours to work with, and I assure you that we will do our

6  very best to provide you the evidence to fashion whatever

7  remedy you feel is appropriate.

8              Thank you.

9              THE COURT:  Okay.  Okay.  At some point, we

02:12:26  10  need to talk about the medical records issue.  And it's my

11  understanding that 29 complete sets of records have been

12  produced, approximately 34,000.  Defendants want me to

13  limit the number of offender medical records to be produced

14  to a total of 70, and defendants say that's a recommended

02:12:59  15  sample size for the Pack Unit.  I'm not a statistician.  I

16  don't know what the appropriate sample size would be, and I

17  don't know how -- I don't know if the appropriate

18  methodology would be to do it absolutely by random or to do

19  it by age bracket or some other way.

02:13:20  20              But let me -- it's defendants' motion, so

21  let me hear from you on that, please.

22              MS. BURTON:  Okay.  Your Honor, the reason that

23  motion was filed is because all medical records were being

24  requested.  As we've pointed out, we had a huge discovery

02:13:38  25  request, and in the response, the plaintiffs indicated that

1  they weren't seeking records.  So I -- I have to admit, I'm

2  very confused about what it is the plaintiffs want.  We've

3  got discovery requests and yet we've got a motion that says

4  they're not actually seeking all of that.

02:13:56  5  So in an abundance of caution, I sought

6  information from our medical doctors in health services

7  about what would kind of be an appropriate number in the

8  situation that we're in.  But it's really not defendants'

9  burden to determine the proper statistical sampling that's

02:14:16  10  necessary for plaintiffs to test and use records in order

11  to demonstrate commonality and typicality.

12  What I was trying to say to the Court is,

13  we do have a number here, and this is the most that we feel

14  we should have to produce just because of the size of the

02:14:35  15  records, some proposals made by health services doctors and

16  also with time for the experts to review.  But we're coming

17  into a stage now where we are getting ready for the

18  briefing on the class certification.  We have five new

19  plaintiffs that have been added in the amended complaint

02:14:58  20  whose medical records will now have to be obtained, and so

21  we're running into deadlines now that it would not really

22  even be possible for us within the deadlines, to obtain and

23  review an additional 40 to 50 medical records in time for a

24  proper statistical study to be done on whether, indeed, you

02:15:20  25  have commonality and typicality.

1                   Now, we assert that you can't have

2    commonality and typicality because each of the offenders

3    has multiple types of conditions.

4                   So at this point, I think that the medical

02:15:37   5    records that we have are the medical records that we're

6    going to have to work with, including the new plaintiffs.

7                   THE COURT:  Well, would the 70 records, would

8    they be just totally random, or would --

9                   MS. BURTON:  No.  We had -- there's a couple of

02:15:51   10   ways that we can do it, but we can, for instance, choose

11   randomly the -- from the 400 heat-sensitive offenders.  We

12   could choose a certain number randomly from the

13   approximately 60 wheelchair offenders, or we could take the

14   whole list of 1400 offenders and choose randomly --

02:16:12   15                   THE COURT:  Okay.

16                   MS. BURTON:  -- you know, a certain number.

17                   THE COURT:  Okay.

18                   MS. HANEY:  Your Honor --

19                   THE COURT:  Yeah, you can.

02:16:20   20                   MS. HANEY:  Yes, I need to speak on behalf of

21   my client, since obviously UTMB is the custodian of

22   records, and we would just ask that the Court be sensitive

23   to the fact that it -- they have a limited number of people

24   to produce these records, and if there are a large number

02:16:33   25   to be produced, we would just ask to be given consideration

1  and time.

2            THE COURT:  Yeah.  Do you have a limiting

3  principle that's proposed?

4            MS. HANEY:  It really just depends on the

02:16:46  5  volume per plaintiff.  I mean, because this is a geriatric

6  facility, most of these people have extensive medical

7  records sort of beyond the norm.  I think the smallest set

8  I've seen in this is several hundred pages for one

9  offender.  So...

02:17:02  10            THE COURT:  Okay.  Yes, sir.

11            MR. EDWARDS:  I do think we're putting the cart

12  a little bit before the horse.  You know, the burden is on

13  us to show why these individual disabilities or diseases

14  place people at risk.  And it is not our position that we

02:17:22  15  need a certain amount of medical records at all.  It is our

16  position, and it will be substantiated with expert

17  testimony, that the very diseases, whether their

18  comorbidity, such as having hypertension and diabetes, or

19  simply diabetes, there are certain risk groups that

02:17:38  20  epidemiological studies associate with greater risk to heat

21  injury.  It is not necessary to go through 78 -- 378

22  medical records, at least that's our position.  If the

23  Court -- if the Court disagrees after seeing our -- our

24  brief on that, then I suppose we could --

02:17:56  25            THE COURT:  No, I'm not sure I'm going to

1  disagree with that, but tell me what you were -- ask for

2  now.

3              MR. EDWARDS:  I don't ask for anything.  I

4  mean, that's why -- I mean, they picked a number, limit

02:18:07  5  this to 40 records, and we said, what are you talking

6  about?  We'll request the records we want to request,

7  and --

8              THE COURT:  Are you going to sharp-shoot by

9  individual patient?  Is that what you're going to do?

02:18:18  10              MR. EDWARDS:  Well, our experts will review the

11  individual plaintiffs' records to make sure that their

12  diseases are supposed -- are not outliers, but -- but the

13  commonality comes from the disease.  The commonality comes

14  from the age of over 65.  The commonality comes from that.

02:18:35  15  But, again, I don't think it's appropriate for us to be

16  arguing the certification issues.

17              THE COURT:  No, I --

18              MR. EDWARDS:  In terms of the limit of 40, I

19  have a number of problems --

02:18:45  20              THE COURT:  70.  70 is what they're proposing,

21  which means 41 more.

22              MR. EDWARDS:  Well, I guess, here's -- I mean,

23  the one thing that I agree with Ms. Burton about is that it

24  should be us coming to you saying we need a specific

02:18:57  25  statistical sample.  It is -- it shouldn't -- it's not the

1 defendants' place to, A, suggest a number and, B, let alone

2 suggest a number with absolutely no statistical

3 significance.  They didn't supply an affidavit saying that

4 this would be a statistically appropriate sample.

02:19:13  5             THE COURT:  And make --

6             MR. EDWARDS:  It seems to be all about

7 minimizing the burden on UTMB in terms of producing records

8 when we haven't even requested them.

9             THE COURT:  Okay.  I thought you had generally

02:19:22  10 said that you needed some medical records.  Is that not

11 right?  Have you not made any requests?

12             MR. EDWARDS:  Well, I suppose there could have

13 been a request early on that could be interpreted that way.

14 As of now and in terms of our experts which we're

02:19:35  15 designating on August 3rd, it is not our intent to have 150

16 medical records reviewed.  I think that issue may come down

17 the line if -- if the Court is of the opinion that the

18 disease in and of itself somehow destroys your ability to

19 certify.

02:19:49  20             But, you know, it's -- our position is not

21 that it's necessary to review 1,400 people's medical

22 records.  What's necessary is for us to know, look, does

23 the Pack Unit have a substantial number of diabetics?  Does

24 the Pack Unit have a substantial number of hypertensive

02:20:05  25 patients?  If they do, what risk, as a general matter, does

1  that place on the people, and is it a common enough risk

2  such that you can certify it?  We respectfully suggest that

3  that question won't be a close call, but it -- at the

4  current time, that's -- that's where we are with this.

02:20:26  5              So in our response, which may have been

6  confusing to Ms. Burton, was, look, you're arguing about

7  something that we're not seeking, at least at the current

8  time, Your Honor.

9              THE COURT:  So it's premature?

02:20:37  10             MR. EDWARDS:  I think it's premature, yes.

11             MS. BURTON:  If I -- Your Honor, this is what's

12 so confusing, because as I pointed out in our reply, we had

13 requests, multiple requests, by subpoena to UTMB for

14 hundreds of medical records, and some of them --

02:20:55  15             THE COURT:  Who were the subpoenas issued by?

16             MS. BURTON:  Pardon me?

17             THE COURT:  Who were the subpoenas issued by?

18             MS. BURTON:  Plaintiffs.

19             THE COURT:  Now I'm very confused.  You say

02:21:04  20 she's not asking for a particular number?

21             MS. BURTON:  That's why we're confused.

22             MR. EDWARDS:  They certainly haven't been

23 produced.

24             MS. BURTON:  That's right.

02:21:12  25             THE COURT:  One at a time.  One at a time.  You

1  go next.

2         MS. HANEY:  Jeff subpoenaed from UTMB 467

3  medical records, and I think this is part of TDCJ's

4  concern.  So...

02:21:24  5         MR. EDWARDS:  To the extent there's any

6  confusion, Your Honor, we are not seeking the medical

7  records of all heat-related -- all inmates who would be --

8         THE COURT:  What are you seeking?  What are you

9  seeking?

02:21:32  10        MR. EDWARDS:  I'm seeking nothing at the

11  current time other than the new plaintiffs.  I would

12  definitely want their medical records to the extent they

13  haven't already been provided.  However, at this time, we

14  are not seeking them.  I agree on the record that if we

02:21:43  15  decide that that is a route that we need to go down, we

16  will move the Court for that.

17        MS. BURTON:  So they're withdrawing their

18  subpoena, then?  Is that -- you're withdrawing all these

19  requests in the subpoena?

02:21:55  20        MR. EDWARDS:  Cynthia, you'll need to show me

21  exactly what it is, but I just on the record stated exactly

22  what I mean, and after the fact if you want to show me a

23  particular request, I will address it.

24        THE COURT:  Okay.  Well, I'm going to -- I'm

02:22:07  25  going to decide that there are no currently pending

1  requests for medical records.

2            We entered an order.  Do we want to --

3  about scheduling.  Do we want to try to set a date for

4  class certification argument?

02:22:39   5            MR. EDWARDS:  Yes, Your Honor.

6            MS. BURTON:  I think -- I think we will need a

7  date, but we haven't completed the 30(b)(6) depositions

8  that are pending right now, some of which go to the issues

9  of class certification.  And so I think that this -- we had

02:23:02   10  already had some informal discussions by letter that there

11  may be a change in the expert deadlines, because their

12  experts are needed or need the depositions that we're doing

13  right now.  So...

14            MR. EDWARDS:  Your Honor, we intend to move for

02:23:19   15  class certification on -- I think it's August 3rd.

16            MR. MEDLOCK:  August 12.

17            MR. EDWARDS:  August 12.

18            THE COURT:  Let me just raise one issue.  A lot

19  of parties who are in class action cases want the summary

02:23:36   20  judgment issue to be decided before class certification.

21  Excuse me.  Excuse me, want the class certification decided

22  before summary judgment.  The theory is people ought to opt

23  into the class before they know whether -- which way

24  summary judgment is going to be decided; otherwise, if

02:23:56   25  class certification is post summary judgment and summary

1  judgment goes against the plaintiffs, then nobody -- the

2  class is going to vanish.

3          So there is that -- maybe it's not a

4  concern here, but -- but it strikes me as it perhaps is a

02:24:11   5  concern, that the certification choice ought to be made

6  before summary judgment ruling.

7          MS. BURTON:  We had set up the schedule that

8  way, Your Honor.  We hadn't been able to make dates for the

9  class certification hearing or determine what kind of

02:24:27  10  hearing it was going to be.  The defendants had suggested

11  an evidentiary hearing with live witnesses.  The plaintiffs

12  are suggesting a decision on class certification based on

13  the briefing.

14          Is that correct?

02:24:40  15          MR. EDWARDS:  Yeah, I guess that -- that is

16  a -- that is a difference of opinion, which I think that

17  the Court would -- if the Court could give us guidance.

18  It's been my experience in class action litigation, that we

19  would brief the certification issues, and then we would

02:24:56  20  hold a hearing where the lawyers are arguing about what the

21  evidence in the brief says, not that we hold a five-day

22  trial or a three-day trial.

23          THE COURT:  It depends on what the issues are.

24  I mean, it's just hard to know.  It's hard to know in

02:25:09  25  advance.  I always prefer to decide things on the papers

1 because I know how expensive it is for all of you to come

2 here.

3             Okay.  Right now, we have plaintiffs'

4 reply on class certification October 9th, so we're talking

02:25:25   5 about sometime in October or November I'll try to decide

6 the class certification.

7             MS. BURTON:  Correct.

8             THE COURT:  Okay.

9             MR. EDWARDS:  And then, Your Honor, just in

02:25:35  10 terms of scheduling purposes, the month of October for my

11 particular law firm, we are set for trial October 19th in

12 federal court, October 26th in state court and then have

13 kind of a month-long October setting in a two-day trial.

14 So obviously, this case is going to take precedence in

02:25:57  15 terms of what we do.

16             THE COURT:  I'll try not to burden you in

17 October, then.  Okay?

18             MR. EDWARDS:  Thank you, Your Honor.

19             THE COURT:  Is there anything else we can try

02:26:05  20 to do today?

21             MR. EDWARDS:  The only other thing, Your Honor,

22 that I think would be helpful would be whether or not

23 you -- we would respectfully ask that you do set McCollum

24 for trial and would propose June or July of next year,

02:26:18  25 which we would hope would give everyone ample time to do

1 whatever briefing they need.

2        THE COURT:  June or July is then assuming that

3 there won't be an interlocutory appeal?

4        MR. EDWARDS:  I think we can address -- I would

02:26:31  5 think that the setting of June and July would be helpful to

6 everyone, and then depending on what the defendants do with

7 regards to interlocutory appeals, we could revisit the

8 issue with another status conference.

9        MS. BURTON:  I'm just -- I thought we were

02:26:49 10 working with McCollum solely on the limited issues of

11 qualified immunity, that we were starting with that.  I'm

12 not sure whether discovery is going to re-open then.

13 Because otherwise, we don't have a problem with a June or

14 July trial date, but there is other discovery to be done.

02:27:08 15        THE COURT:  Well, I guess -- I guess the issue

16 is whether it does us any good to set a trial date when we

17 don't have some of these other dates.  It wouldn't hurt

18 to -- let's get something on the record, and that way, we

19 can aim for that.  It may not work out.  Let's see what we

02:27:23 20 can do.

21        MS. HANEY:  That's what I was going to suggest,

22 Your Honor, is that I think we're fine with the June or

23 July date, provided we have these other deadlines, and we

24 can certainly be working with that.  We can always revisit

02:27:32 25 with the Court if we realize we need more time.

1          THE COURT:  Yeah, I don't care what date you

2  set for like close of discovery, as long as it doesn't

3  affect the trial date.  And normally, the dispositive

4  motion deadline is 90 days in advance of trial.  So other

02:27:46  5  than those dates, you can set what you want.

6          MS. HANEY:  I think it's fine, Your Honor.

7          THE COURT:  So what time?

8          MR. RIVERA:  Is June 6th available?

9          THE COURT:  June 6th of 1916 -- of 2016?

02:27:57  10          MS. HANEY:  I think that's fine, Your Honor.

11          THE COURT:  Okay.  Very good.  Thank you.

12              (Concluded at 4:59 p.m.)

13

14              COURT REPORTER'S CERTIFICATE

15

16      I, Kathleen K. Miller, certify that the foregoing is a

17  correct transcript from the record of proceedings in the

18  above-entitled matter.

19

20              /s/_____
                Kathleen K. Miller, RPR, RMR, CRR
21

22

23

24

25