UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA | § | |
| McCOLLUM, individually, and STEPHANIE | § | |
| KINGREY, individually and as independent | § | |
| administrator of the Estate of LARRY GENE | § | |
| McCOLLUM, | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-03253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, | § | |
| RICHARD CLARK, KAREN TATE, | § | |
| SANDREA SANDERS, ROBERT EASON, the | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH and the TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |

**TDCJ DEFENDANTS' ANSWER TO
PLAINTIFFS' SECOND AMENDED COMPLAINT**

NOW COME Defendant TDCJ and individual Defendants, Brad Livingston, Jeff Pringle,

Richard Clark, Karen Tate, Sandrea Sanders, and Robert Eason in their individual capacities, by

and through their attorneys, the Office of the Attorney General of Texas and file their Answer to

Plaintiffs' Second Amended Complaint and answer as follows:

**I.
STATEMENT OF THE CASE**

Larry McCollum ("McCollum") was an inmate housed at the Hutchins State Jail of the

Texas Department of Criminal Justice ("TDCJ"). Plaintiff Stephanie Kingrey purports to be the

independent administrator of the estate of Larry McCollum. Plaintiff Stephen McCollum purports

to be the son of Larry McCollum. Plaintiff Sandra McCollum purports to be the wife of Larry

McCollum. Plaintiffs' allege McCollum was disabled because he suffered hypertension, diabetes,

and/or obesity, and was prescribed medications to treat such conditions. Doc. No. 119 at ¶¶ 148-155. Plaintiffs' allege that TDCJ discriminated against McCollum by denying McCollum reasonable accommodations necessary to allow him access to TDCJ's programs and services. *Id.* at ¶5. On July 28, 2011, McCollum died while assigned to the Hutchins State Jail. Plaintiffs' brought suit based on McCollum's death.

Plaintiffs' sue TDCJ for damages and injunctive and declaratory relief pursuant to Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act ("ADAAA"), and §504 of the Rehabilitation Act ("RA"). *Id.* at ¶¶148-155. Plaintiffs' also sue a number of individual TDCJ defendants pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. *Id.* at ¶¶ 144-147, 156-159.

## II.
## GENERAL DENIAL

Pursuant to Fed. R. Civ. P. 8(b) and for the express purpose of requiring Plaintiffs to meet their burden of proof herein, Defendants deny each and every allegation contained in Plaintiffs' Second Amended Complaint except those expressly admitted herein.

## II.
## DEFENDANTS' ANSWER TO
## PLAINTIFFS' SECOND AMENDED COMPLAINT

1.      Plaintiff Stephen McCollum, individually, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of his beloved father, which occurred at the Hutchins State Jail in Dallas, Texas.

ANSWER:

Defendants admit Plaintiff Stephen McCollum brings this lawsuit. Defendants admit Larry Gene McCollum died while incarcerated at the Hutchins State Jail in Dallas, Texas. Defendants deny the remaining allegations set forth in ¶1 of Plaintiffs' Second Amended Complaint.

2.      Plaintiff Stephanie Kingrey, individually, and as the independent administrator of Mr. McCollum's estate, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved father, which occurred at the at the Hutchins State Jail in Dallas, Texas.

ANSWER;

Defendants admit Plaintiff Stephanie Kingrey brings this lawsuit. Defendants admit Larry Gene McCollum died while incarcerated at the Hutchins State Jail in Dallas, Texas. Defendants deny the remaining allegations set forth in ¶2 of Plaintiffs' Second Amended Complaint.

3.      Plaintiff Sandra McCollum, individually, brings this civil action for declaratory, injunctive, and monetary relief, seeking redress from Defendants for the death of her beloved spouse, which occurred at the Hutchins State Jail in Dallas, Texas.

ANSWER:

Defendants admit Plaintiff Sandra McCollum brings this lawsuit. Defendants admit Larry Gene McCollum died while incarcerated at the Hutchins State Jail in Dallas, Texas. Defendants deny the remaining allegations set forth in ¶3 of Plaintiffs' Second Amended Complaint.

4.      Defendants Livingston, Eason, Clark, Tate, Sanders and Pringle are liable for violating Mr. McCollum's constitutional rights under the Eighth and/or Fourteenth Amendment right to protection from cruel and unusual punishment under 42 U.S.C. § 1983 ("Section 1983").

ANSWER:

Defendants deny the allegations set forth in ¶4 of Plaintiffs' Second Amended Complaint.

5.      Further, Defendants University of Texas Medical Branch and Texas Department of Criminal Justice are liable for the deprivation of Mr. McCollum's rights under Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments

Act, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), which requires public facilities, like the prison, to make reasonable accommodations for people with disabilities, like Mr. McCollum.

ANSWER:

Defendant TDCJ denies the allegations set forth in ¶5 of Plaintiffs' Second Amended Complaint.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

ANSWER:

Defendants admit that this Court has federal question jurisdiction. Defendants assert Eleventh Amendment Immunity to all applicable claims. Defendants deny that the facts and circumstances of this case give rise to the relief requested.

7.      Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district and division.

ANSWER:

Defendants admit that venue is proper in this Court.

8.      Plaintiff Stephen McCollum is the son of Mr. McCollum.  He sues in his individual capacity.  He is a resident of McLennan County, Texas.

ANSWER:

Defendants admit that Plaintiff Stephen McCollum has asserted claims, but are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶8 of Plaintiffs' Second Amended Complaint.

4

9.     Plaintiff Stephanie Kingrey is the daughter of Mr. McCollum.  She sues in her individual capacity, and as the independent administrator of Mr. McCollum's estate, as appointed by the probate court in McLennan County.  She is a resident of McLennan County, Texas.

ANSWER:

Defendants admit that Plaintiff Stephanie Kingrey has asserted claims, but are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶9 of Plaintiffs' Second Amended Complaint.

10.     Plaintiff Sandra McCollum is the surviving spouse of Mr. McCollum.  She sues in her individual capacity.  She is a resident of McLennan County, Texas.

ANSWER:

Defendants admit that Plaintiff Sandra McCollum has asserted claims, but are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶10 of Plaintiffs' Second Amended Complaint.

11.     At the time of his death, Mr. McCollum had a surviving spouse, Sandra, and two adult children, Stephen and Stephanie. He died intestate. Ms. Kingrey was appointed independent administrator of the estate by the probate court in McLennan County.

ANSWER:

Defendants admit that Sandra McCollum has asserted claims, but are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶11 of Plaintiffs' Second Amended Complaint.

12.     Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ).  As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training,

supervision, and conduct.  By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody.  At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for damages. Livingston has appeared in this litigation.

ANSWER:

Defendants admit that Brad Livingston is the Executive Director of the TDCJ. Defendants deny that Livingston is the "commanding officer." Defendants admit that under TEX. GOV'T CODE §493.006, the executive director is responsible for the administration and enforcement of all laws relating to the department including rules, implemented by the department; but, the executive director may delegate those responsibilities as permitted by board rule or general law. Defendants are unable to admit in what capacity Livingston is sued.

13.    Defendant Robert Eason was the regional director for TDCJ, and supervised the wardens at eleven prisons, including the Hutchins State Jail, at all relevant times. At all relevant times, Eason was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity only for damages.  Eason has appeared in this litigation.

ANSWER:

Defendant Eason admits that he was the Regional Director of Region II which encompasses the Hutchins State Jail at all relevant times herein. Eason admits his responsibilities included supervising unit administration, but that he may delegate this responsibility as permitted by board rule or general law. Defendants are unable to admit in what capacity Eason is sued.

14.    Defendant Jeff Pringle was the warden at the Hutchins State Jail at all relevant times.  At all relevant times, Pringle was acting under color of law and as the agent, and, as a

matter of law, the official representative of TDCJ.  He is sued in his individual capacity for damages.  Pringle has appeared in this litigation.

ANSWER:

Defendant Pringle admits that he was the Warden at the Hutchins State Jail at all relevant times herein. Defendants are unable to admit in what capacity Pringle is sued.

15.     Defendant Richard Clark was a correctional officer at the Hutchins State Jail at all relevant times.  At all relevant times, Clark was acting under color of law. He is sued in his individual capacity for damages. Clark has appeared in this litigation.

ANSWER:

Defendant Clark admits that he was a correctional officer at the Hutchins State Jail at all relevant times herein. Defendants are unable to admit in what capacity Clark is sued.

16.     Defendant Karen Tate was a sergeant at the Hutchins State Jail at all relevant times. At all relevant times, Tate was acting under color of law. She is sued in her individual capacity for damages. Tate has appeared in this litigation.

ANSWER:

Defendant Tate admits that she was a sergeant at the Hutchins State Jail and supervised correctional staff and inmates at the prison. Defendants are unable to admit in what capacity Tate is sued.

17.     Defendant Sandrea Sanders was a lieutenant at the Hutchins State Jail at all relevant times.  At all relevant times, Sanders was acting under color of law. She is sued in her individual capacity for damages. Sanders has appeared in this litigation.

ANSWER:

Defendant Sanders admits that she was a lieutenant at the Hutchins State Jail and supervised correctional staff and inmates at the prison. Defendants are unable to admit in what capacity Sanders is sued.

18.    The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. At all relevant times, UTMB was the medical provider at the Hutchins State Jail, services Mr. McCollum was otherwise qualified for. UTMB is a recipient of federal funds.  UTMB is sued for declaratory, injunctive, and compensatory relief under federal law. UTMB has appeared in this litigation.

ANSWER:

Defendants admit that University of Texas Medical Branch, located in Galveston, is a component of the University of Texas system. Defendants admit that UTMB has a contract with TDCJ to provide health care to offenders in TDCJ custody. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in ¶18 of Plaintiff's Second Amended Complaint.

19.    The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas.  At all relevant times, it operated the Hutchins State Jail, a public facility with programs and services Mr. McCollum was otherwise qualified for.  TDCJ is a recipient of federal funds.  TDCJ is sued for declaratory, injunctive, and compensatory relief under federal law.  TDCJ has appeared in this litigation.

ANSWER:

Defendant TDCJ admits it is an agency of the State of Texas. TDCJ admits it operates the Hutchins State Jail and receives federal funds. TDCJ denies that that Hutchins State Jail is a public facility. TDCJ is unable to admit or deny at this time what programs and services Plaintiffs'

decedent, Larry McCollum, was "otherwise qualified for" and, therefore, denies same and demands strict proof thereof.  TDCJ admits that it is being sued but is unable to admit or deny whether it is sued for compensatory relief. TDCJ admits it has been served and has appeared in this litigation.  TDCJ denies that there has been a valid abrogation of Eleventh Amendment immunity under the ADA, ADAAA, or Rehabilitation Act giving this Court jurisdiction over these claims.

20.     According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year."  On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." In July 2011, one of those victims was Larry McCollum.

ANSWER:

Defendants deny "heat is the number one weather-related killer in the United States." Defendants admit Larry McCollum died in July 2011 while in TDCJ custody.

21.     On the day Mr. McCollum died, the Dallas area had endured 25 consecutive days where the temperature exceeded 100 degrees Fahrenheit.

ANSWER:

Defendants admit that the temperature reached over 100 degrees Fahrenheit during portions of the 25 days before July 28, 2011.

22.     Defendants Pringle, Eason, Clark, Tate, Sanders, and Livingston, as well as numerous other TDCJ and UTMB officials, were well aware of this heat wave Dallas was experiencing and knew inmates were at risk of heat related death and illness at area prisons – especially prisoners with heat-sensitive disabilities like Mr. McCollum. Moreover, Defendants Livingston, Pringle, Eason, Clark, Tate, and Sanders all knew that the temperature inside the dorm

where Mr. McCollum was housed was well over 100 degrees, and that the heat combined with the humidity (the "heat index") made it feel like the temperature exceeded 120 degrees.

ANSWER:

Defendants deny the allegations in ¶22 of Plaintiffs' Second Amended Complaint.

23. At the time of his death, Larry Gene McCollum was fifty-eight years old. TDCJ and UTMB knew he was overweight and morbidly obese, and suffering from hypertension and diabetes.

ANSWER:

Defendant TDCJ admits that, at the time of his death, Larry McCollum was fifty-eight years old. Defendant TDCJ admits records indicate McCollum was overweight and had been prescribed medication for hypertension. Defendant TDCJ denies the remaining allegations contained in ¶ 23 of Plaintiffs' Second Amended Complaint. Defendants lack knowledge or information sufficient to admit or deny allegations directed to UTMB.

24.     Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated or exacerbated.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient

to admit or deny the remaining allegations contained in ¶24 of Plaintiffs' Second Amended Complaint.

25.     Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶25 of Plaintiffs' Second Amended Complaint.

26.     As a consequence, UTMB and TDCJ policy recognizes patients taking diuretics to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

ANSWER:

Defendants admit that TDCJ has a policy which recognizes patients taking diuretics or beta blockers to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

27.     As one would expect, hypertension, combined with Mr. McCollum's history of diabetes and obesity, substantially limited his ability to climb, walk, stand, cool, sweat, and

11

breathe, and limited the operation of his respiratory, circulatory, and cardiovascular systems. His medication was necessary to protect his health from his disability.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶27 of Plaintiffs' Second Amended Complaint.

28.    As was well known to each of the Defendants through training, prior to Mr. McCollum's death, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with extreme heat, diminishes the body's ability to regulate internal temperature.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants admit that certain medical conditions may affect heat tolerance. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

29.    Diabetes is a chronic disease caused by an insulin imbalance.  Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels.

Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶29 of Plaintiffs' Second Amended Complaint**.**

30.    Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶30 of Plaintiffs' Second Amended Complaint.

31.     Diabetes also reduces blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶31 of Plaintiffs' Second Amended Complaint.

32.     As noted previously, Mr. McCollum's diabetic condition, in conjunction with his obesity and hypertension, substantially limited his ability to climb, walk, stand, sweat, cool, breathe, and limited the operation of his respiratory, circulatory, endocrine, nervous, cardiovascular, and digestive systems.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶32 of Plaintiffs' Second Amended Complaint.

33.     UTMB's policies and medical providers identify diabetes as a condition that affects heat tolerance and that renders inmates susceptible to significant injury and/or death from extremely high temperatures – like those at the Hutchins State Jail in July 2011.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D."  Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

34.     The American Diabetes Association suggests people with diabetes "stay indoors as much as possible and drink plenty of fluids" and "seek shelter if you do not have air conditioning and the heat is beginning to make you feel ill."

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶34 of Plaintiffs' Second Amended Complaint.

35.     Moreover, failing to provide treatment and monitoring of diabetes is "off the charts unacceptable" according to the medical providers at Hutchins, including Ananda Babbali, the

physician's assistant supervising Mr. McCollum's care at the prison. Despite this, Mr. McCollum received no treatment whatsoever for his diabetes. The condition was entirely ignored.

ANSWER:

Defendants deny that medical providers at Hutchins State Jail, including Ananda Babbali stated that failing to provide treatment and monitoring of diabetes is "off the charts unacceptable." Defendants admit that Ananda Babbali is a physician's assistant. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶35 of Plaintiffs' Second Amended Complaint.

36.    Mr. McCollum was 5' 10" tall, and weighed 330 pounds when he arrived at the Hutchins State Jail. Medically, he was morbidly obese. His weight was clearly outside the normal range for someone of his height.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendant TDCJ admits that records indicate McCollum was 5'10'' and 330 pounds when he arrived at the Hutchins State Jail. Defendant TDCJ admits McCollum was obese. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in ¶36 of Plaintiffs' Second Amended Complaint.

37.    His body mass index was greater than 40, and he was twice his ideal weight, according to the Centers for Disease Control.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and

incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶37 of Plaintiffs' Second Amended Complaint.

38.     Mr. McCollum's obesity likely contributed to, or was a cause of, his hypertension and diabetes, and thus affected his digestive, cardiovascular, nervous, and endocrine systems.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶38 of Plaintiffs' Second Amended Complaint.

39.     Mr. McCollum's obesity also substantially limited his ability to cool, sweat, walk, stand, breathe, and climb.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient

to admit or deny the remaining allegations contained in ¶39 of Plaintiffs' Second Amended Complaint.

40.     More specifically, it limited his ability to climb in and out of the top bunk UTMB and TDCJ assigned him, limiting his ability to access food and water at the prison.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendant TDCJ admits records show McCollum was assigned to a top bunk, but deny that McCollum advised any one that he could not climb in and out of the bunk. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶40 of Plaintiffs' Second Amended Complaint.

41.     Yet despite the fact that Mr. McCollum informed TDCJ and UTMB personnel of his hypertension and diabetes, and that his obesity was obvious to even a layperson, no one from the prison (neither TDCJ nor UTMB personnel) took any steps to evaluate or monitor McCollum's hypertension or diabetes, or provide him any accommodation for his obesity, or provide any accommodation to protect him from the extreme heat they knew he would have to endure. Instead, they ignored his disabilities altogether.

ANSWER:

Defendant TDCJ denies the allegations regarding evaluation, monitoring, and/or accommodations for McCollum's hypertension, alleged diabetes, and obesity. Defendant TDCJ is

unable to admit or deny UTMB's evaluation, monitoring, or provision of accommodations. Defendant TDCJ denies the allegation that McCollum's disabilities, if any, were ignored.

42.     Mr. McCollum was convicted of a minor property offense, and sentenced to serve two years at the Hutchins State Jail outside Dallas. Because he would receive some time credit for weeks he spent at the McLennan County Jail in Waco, Mr. McCollum was supposed to spend less than two years in prison.

ANSWER:

Defendant TDCJ admits that records indicate McCollum was convicted of forgery, a state jail felony. Defendant TDCJ admits that records indicate McCollum was sentenced to be confined and imprisoned in a state jail facility for a term of twelve months.

43.     On or about July 15, 2011, Mr. McCollum arrived at the Hutchins facility. Officers told him and other new prisoners "welcome to Hell."

ANSWER:

Defendants admit McCollum arrived at the Hutchins State Jail on or about July 15, 2011. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in ¶43 of Plaintiffs' Second Amended Complaint.

44.     Soon after his arrival, a UTMB vocational nurse performed what was apparently a triage or "self assessment" of Mr. McCollum and other newly arrived prisoners. Mr. McCollum told the nurse he suffered from diabetes (which she recorded in his chart), and was taking a prescription medication, Clonidine, for hypertension. The nurse also reviewed forms sent with him by the McLennan County jail that showed he weighed 330 pounds and was 5' 10" tall.  Thus, his obesity was not only documented, it was also obvious.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants lack knowledge or information sufficient to admit or deny the allegations directed at UTMB. Defendant TDCJ admits that it is recorded in McCollum's intake history and health screening that he has a history of diabetes. Defendant TDCJ admits that it is recorded in McCollum's clinic notes that he was taking a prescription medication, Clonidine, for hypertension. Defendant TDCJ admits that the form sent with him by the McLennan County Jail showed he weighed 330 pounds and was 5'10'' tall. The individual Defendants lack knowledge or information sufficient to admit or deny the allegations in ¶44 of Plaintiffs' Second Amended Complaint.

45.     In light of these conditions, the nurse referred Mr. McCollum and his triage record to the physician's assistant at the prison, Ananda Babbili. Without examining or questioning him, Babbili ignored his diabetes altogether, but noted his hypertension, and changed his prescription from Clonidine to hydrochlorothiazide (HCTZ), a diuretic, to treat his hypertension. Importantly, Clonidine is not a diuretic. Because TDCJ and UTMB policies are completely silent on how to house prisoners taking diuretics during periods of extreme heat, Babbili did nothing to accommodate him.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendant TDCJ lacks knowledge or information sufficient to admit or deny allegations related to UTMB. Defendant TDCJ admits records indicate McCollum's prescription was changed from Clonidine to hydrochlorothiazide ("HCTZ"), a diuretic. Defendant TDCJ denies the remaining allegations in ¶45 of Plaintiffs'

Second Amended Complaint. The individual TDCJ defendants lack personal knowledge sufficient to admit or deny the allegations in ¶45 of Plaintiffs' Second Amended Complaint.

46.     Diuretics remove water from the blood to decrease blood pressure. Diuretics thus increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance. This was all known to UTMB and Babbili. Yet Babbili never informed McCollum of the drug's consequences and prescribed it knowing the prison – inside and outside – was well over 100° and Mr. McCollum would have great difficulty living in the extreme heat.

ANSWER:

These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶46 of Plaintiffs' Second Amended Complaint.

47.     Moreover, despite his need for treatment for his diabetes, which also placed him in danger from the high temperatures inside the unit, Mr. McCollum was not monitored or given any treatment for his disability – or even given any accommodations to protect him from the extreme heat in light of his diabetes.

ANSWER:

Defendants deny the allegations contained in ¶47 of Plaintiffs' Second Amended Complaint.

48.     Though Mr. McCollum was obviously obese, and had great difficulty walking short distances, TDCJ and UTMB assigned him to a top bunk. In prison, a bunk assignment is very important because when prisoners are counted to make sure everyone is present, they must be in

21

their bunk when they live in a dormitory setting, like at the Hutchins State Jail. Thus, prisoners are required to get in and out of their bunk several times a day.

ANSWER:

Defendant TDCJ admits records indicate McCollum was assigned to a top bunk. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants admit offenders at the Hutchins State Jail need to be in their bunk for Unit count. Defendants admit that offenders may get in and out of their bunk several times a day.

49.     But UTMB and TDCJ's practice at the time was to ignore obesity when making bunk assignments. UTMB did not routinely recommend TDCJ assign even morbidly obese prisoners to bottom bunks. And TDCJ officers testified that it was not unusual to see extremely overweight prisoners, like Mr. McCollum, housed in a top bunk, even though housing people weighing over 300 pounds on a bunk they are required to climb on and off of several times each day is an obvious hazard and both TDCJ and UTMB knew they were disregarding a disability. Tellingly, UTMB and TDCJ have since changed this policy, and now assign obese prisoners to bottom bunks.

ANSWER:

Defendant TDCJ lacks sufficient knowledge or information to admit or deny allegations relating to UTMB. Defendant TDCJ denies the allegation that its practice at the time was to ignore obesity when making bunk assignments. Defendant TDCJ denies the allegation that it knew it was disregarding a disability. Defendant TDCJ asserts that the allegations in ¶49 mischaracterize previous depositions and/or TDCJ records; therefore, Defendant TDCJ denies the remaining allegations in ¶49 of Plaintiffs' Second Amended Complaint.

50.     Although UTMB makes recommendations for housing and bunk assignments based on prisoners' medical conditions, UTMB and TDCJ had no policies or procedures to prevent housing 300 pound men in top bunks, and made no such recommendation to protect Mr. McCollum. Moreover, even if UTMB did recommend TDCJ assign obese prisoners to bottom bunks, this recommendation would not be made until after the prisoner received an intake physical, even though the triage nurse could obviously see a newly arrived prisoner was obese and would need a lower bunk. Of course, a 330 pound man's need for a lower bunk would be obvious even to a layperson.

ANSWER:

Defendant TDCJ admits that UTMB can make recommendations for housing and bunk assignments based on an offender's medical conditions. Defendant TDCJ admits that housing recommendations are made after each prisoner receives an intake physical. Defendant TDCJ denies that a nurse or layperson can determine whether a prisoner is obese based upon sight only. Defendants lack knowledge or information sufficient to admit or deny allegations directed to UTMB. Defendant TDCJ denies the remaining allegations in ¶50 of Plaintiffs' Second Amended Complaint.

51.     Additionally, despite his medical conditions, TDCJ housed Mr. McCollum in a dormitory area that was not air conditioned or climate controlled in any way. Even though state law requires county jails to keep indoor temperatures between 65 and 85 degrees, there is no similar regulation for state prisons. *See* 37 Tex. Admin. Code § 259.160.

ANSWER:

37 TEX. ADMIN. CODE § 259.160 contains a provision related to cooling Texas County jails. The TDCJ denies that these regulations have any application to the Hutchins Unit. Defendants admit that certain portions of the housing areas at the Hutchins Unit do not receive refrigerated air.

52.     As a consequence, it was brutally hot in his dormitory at all times while Mr. McCollum was in the Hutchins State Jail. In fact, the heat index regularly exceeded 120° inside the dorm where McCollum lived and TDCJ records document heat indexes exceeding 130° on multiple occasions, and even reaching 150° – all of which were known to Defendants. Despite this, Defendants failed to provide Mr. McCollum adequate shelter from this extreme heat.

ANSWER:

Defendants deny the allegations in ¶52 of Plaintiffs' Second Amended Complaint.

53.     Air-conditioned housing is available at some TDCJ prisons, but not for minimum custody prisoners (like Mr. McCollum) at the Hutchins State Jail. Of the 97 state-operated TDCJ prisons, 56 have some air conditioning in inmate living areas. Ironically, solitary confinement cells (including death row) are routinely air-conditioned – at the Hutchins State Jail, summer temperatures in the solitary confinement cells are routinely 20 to 30 degrees cooler than the minimum custody dorms where Mr. McCollum lived. While inhumane heat conditions are never justified, it is ironic, and as these facts illustrate, tragic, that prisoners obediently serving their time for non-violent property offenses do not receive relief from the extreme heat, while prisoners who are allegedly combative, assault staff, or are sentenced to death live in safe conditions.

ANSWER:

This allegation is not directed to any specific Defendant; is overbroad in scope in that it refers generally to "TDCJ prisons" and "solitary confinement"; it is vague in the terms "living areas", "solitary confinement" and date and time.  The allegation is not a short and plain statement

and is compound.  Subject to and without waiving these objections, the TDCJ admits the Hutchins Unit has some areas that are air conditioned and that the dormitory areas are not air conditioned; but, affirmatively states there are ventilation, fans, and other mitigating measures employed by the TDCJ and its staff during summer months, and medical care provided for the inmates.

54.     TDCJ and UTMB officials, including but not limited to Eason, Pringle, Clark, Tate, Sanders, and Livingston, were aware many TDCJ prisoners live with obesity, diabetes and hypertension, and are housed in non-air-conditioned TDCJ facilities, including the Hutchins State Jail.

ANSWER:

Defendants admit that there are offenders in TDCJ custody who have obesity, diabetes and hypertension. Defendants admit that certain TDCJ facilities, including the Hutchins State Jail, have areas of the prisons that are not air-conditioned with refrigerated air.

55.     During the seven days Mr. McCollum spent in the Hutchins Unit, the outdoor temperatures reached 102 degrees Fahrenheit. The outdoor heat index¸ the combination of temperature and humidity, made the air temperature feel like it was over 150 degrees Fahrenheit, according to official TDCJ records. The National Oceanic and Atmospheric Administration's heat index chart (below) is incorporated into UTMB and TDCJ training materials, and shows a heat index over 130 degrees makes heat stroke "likely with continued exposure," and is "extremely dangerous." TDCJ documents describe heat stroke at such temperatures as "imminent."

ANSWER:

Defendant TDCJ admits that a TDCJ document reflects the temperatures contained in paragraph ¶55, but based on local weather station data, deny this was the actual temperature present.



**Temperature (°F)**

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

☐ Caution ☐ Extreme Caution ☐ Danger ☐ Extreme Danger

56.     Despite these extremely high reported heat indexes, no one at the Hutchins State Jail, including staff from TDCJ and UTMB, did a single thing differently or made any attempt to get prisoners to cooler, safe temperatures.

ANSWER:

Defendants deny the allegations contained in ¶56 of Plaintiffs' Second Amended Complaint.

57.     People with heat-sensitive disabilities, like Mr. McCollum, are put at even greater risk at these extremely high temperatures. TDCJ and UTMB acknowledge this chart is an accurate predictor of heat-related illnesses in prisoners.

ANSWER:

Defendants deny the allegations contained in ¶57 of Plaintiffs' Second Amended Complaint.

58.     But even though TDCJ and UTMB's own internal policies and documents acknowledge the incredible danger extreme heat indexes pose to prisoners with heat-sensitive medical conditions (like Mr. McCollum), none of the Defendants did anything differently when the heat index reached the "extreme danger" category. Sadly, even today no changes have been made to protect prisoners when heat indexes reach these "extremely dangerous" levels.

ANSWER:

Defendants deny the allegations contained in ¶58 of Plaintiffs' Second Amended Complaint.

59.     Shortly before Mr. McCollum's death, an email from the Hutchins facility's safety officer advised Warden Pringle that "random samplings of temperatures taken in the [prisoner] housing areas reflect a 2 to 3 degree difference from the outside Unit temperature. These temperature readings in the [prisoner] living areas are 2 to 3 degrees lower than the outside temperature."

ANSWER:

Defendant Pringle admits that the Hutchins Unit Risk Manager sent him an inter-office communication containing the above quoted text.

60.     The email went on to inform Pringle that on July 13, 2011, two days before Mr. McCollum arrived at the prison, indoor air temperatures exceeded 100 degrees Fahrenheit (without accounting for humidity). The email even told Pringle that in the dorm Mr. McCollum was housed in the temperature was 101 degrees, a mere three degrees cooler than the outside temperature. At the same time, the outdoor heat index, according to the email, was 123 degrees – the high end of

27

the "danger zone" according to NOAA and the TDCJ and UTMB policies. Thus, the heat index indoors was at least 120 degrees – and well within the NOAA "danger zone."

ANSWER:

Defendant Pringle admits that an inter-office communication was sent to him on July 13, 2011. Defendant Pringle admits that this was two days before Mr. McCollum arrived at the prison. Defendant Pringle admits that the inter-office communication says that at approximately 2:00 p.m. on July 13, 2011 the indoor air temperatures taken from different areas of the Unit were over 100 degrees Fahrenheit. Defendant Pringle admits that the inter-office communication says that at approximately 2:00 p.m. on July 13, 2011, when McCollum was not at the Hutchins Unit, the indoor temperature in the C-7 dorm was 101 degrees. Defendant Pringle admits that the inter-office communication says the outside temperature on July 13, 2011 was 104 degrees with 48% humidity at 2:00 p.m. and that the heat index for outside was 123. Defendants lack knowledge or information sufficient to admit or deny the remainder of the allegations contained in ¶60 of Plaintiffs' Second Amended Complaint.

61.    Prisoners complained the metal tables inside the dormitories were too hot to touch, and inmates would routinely sleep on the concrete floor (including during the time when Mr. McCollum was exposed to these dangerous temperatures).

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶61 of Plaintiffs' Second Amended Complaint.

62.     Despite this, Defendants took no steps to reduce the heat levels inside the housing dorms. They did not bring in temporary cooling devices (like misters, foggers, or portable air conditioners) and they did not move prisoners with disabilities rendering them dangerously susceptible to extreme heat – like Mr. McCollum – to air-conditioned portions of the prison or to other prisons with air-conditioned housing areas. They did not even ensure prisoners had cool water to drink.

ANSWER:

Defendants deny the allegations contained in ¶62 of Plaintiffs' Second Amended Complaint.

63.     TDCJ advises its employees an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

64.     All these conditions describe Mr. McCollum, and were well known to the Defendants.

ANSWER:

Defendants admit they are familiar with the policies listed in their answer to ¶63 but deny they have personal knowledge of every medical condition listed with regard to McCollum.

65.     Thus, inmates like Mr. McCollum were in grave danger, and as the areas remain non-air-conditioned, current inmates with similar conditions, remain in danger.

ANSWER:

Defendants deny the allegations contained in ¶65 of Plaintiffs' Second Amended Complaint.

66.     Such intense heat is and was known to be harmful by Defendants, and is cruel and unusual punishment serving no legitimate penal purpose.

ANSWER:

Defendants deny the allegations in ¶66 of Plaintiffs' Second Amended Complaint.

67.     Moreover, the Hutchins Unit, has no medical staff at the facility after 6:00 p.m., even though over 2,200 men are housed there every night and significant numbers (greater than 10%) suffer from obesity, hypertension, or diabetes and are at greater risk from the extreme heat. High-level TDCJ and UTMB officials, such as Livingston, and UTMB director Owen Murray, made this decision for financial reasons despite knowing it placed inmates at risk after 6:00 p.m., and at grave risk in emergency situations where medical care was immediately needed, such as when a prisoner suffered a heat stroke.

ANSWER:

Defendants admit that there is no medical staff at the Hutchins Unit after 6:00 p.m. Defendants admit that the Hutchins Unit has a maximum capacity to house over 2,200 men. Defendants TDCJ and Livingston deny that staffing decisions are made for financial reasons.

Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶67 of Plaintiffs' Second Amended Complaint.

68.     Likewise, the TDCJ employees at the Hutchins Unit, including Pringle, Clark, Tate and Sanders knew there was no medical staff at the facility after 6:00 p.m., and that for a prisoner to receive immediate medical attention they would have to be transported to a hospital by ambulance.

ANSWER:

Defendants Pringle, Clark, Tate, and Sanders admit that there is no medical staff at the Hutchins Unit after 6:00 p.m. Defendants Pringle, Clark, Tate, and Sanders admit that at any time of day offenders can consult through the Digital Medical Systems ("DMS") and for emergencies be transported to a hospital. Defendants Pringle, Clark, Tate, and Sanders admit that for an offender to receive immediate medical attention after 6:00 p.m. they would have to be transported to a hospital by ambulance.

69.     On the night of July 22, 2011, the Dallas area experienced temperatures over 90 degrees until after 1 a.m. That day, the heat in Dallas was sweltering – 98 degrees Fahrenheit, with 79 percent humidity. The heat index exceeded 134 degrees Fahrenheit, meaning the heat index inside the housing areas was more than 131 degrees.

ANSWER:

Defendant TDCJ admits that on July 22, 2011, Dallas Redbird recorded a maximum high temperature of 100.4 degrees, a minimum low temperature of 80.96 degrees and an average temperature of 91.5 degrees. Defendant TDCJ admits that on July 22, 2011, Dallas Redbird recorded a temperature of 87.98 degrees at 1:00 a.m. and 86 degrees at 2:00 a.m. Defendants admit that on July 22, 2011, Dallas Redbird recorded 71.9909 percent humidity at 6:00 a.m. and 71.65028

at 7:00 a.m. Defendant TDCJ admits that Dallas Redbird did not record any other humidity measurements above 70 % on July 22, 2011. Defendant TDCJ admits that on July 22, 2011, Dallas Redbird recorded a maximum heat index of 103.6193 degrees at 5:00 p.m. Defendant TDCJ denies the remaining allegations in ¶69 of Plaintiffs' Second Amended Complaint. The individual defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶69.

70.     That night, around 2:00 or 2:10 a.m., Mr. McCollum began suffering convulsions.

ANSWER:

Defendant TDCJ admits TDCJ records show that at approximately 2:10 a.m. on July 22, 2011 McCollum was observed to be shaking.

71.     Another prisoner quickly notified Officer Clark, who was patrolling the dormitories in Mr. McCollum's building at the time. Officer Clark arrived at Mr. McCollum's bedside, and observed him unconscious, unresponsive, and convulsing. Clark believed Mr. McCollum was having a seizure and in need of immediate care. Clark knew this was a medical emergency.

ANSWER:

Defendant Clark admits that he was a dorm rover patrolling the C building dormitories at approximately 2:10 a.m. on July 22, 2011. Defendant Clark admits that an offender notified him that McCollum was shaking. Defendant Clark admits he observed McCollum shaking in his bunk and believed that he was having a seizure. Defendant Clark admits that he knew McCollum needed medical help. Defendant Clark denies the remaining allegations in ¶71 of Plaintiffs' Second Amended Complaint.

72.     Rather than immediately calling for an ambulance – as McCollum's condition plainly called for and which could have been accomplished in a matter of seconds – Clark instead

called for his supervisor to come observe McCollum. Clark did this despite acknowledging that he subjectively believed McCollum's condition was a medical emergency, that medical care was urgently needed, and that his supervisors had no medical training or expertise.

ANSWER:

Defendant Clark admits that shortly after observing that McCollum wasn't responding and was shaking he called for additional staff and a supervisor. Defendant Clark admits that shortly after additional staff arrived he was assigned to other duties. Defendant Clark denies the remainder of the allegations in ¶72 of Plaintiffs' Second Amended Complaint.

73.     Just as incredible, this decision not to have 911 called or an ambulance dispatched before a supervisor observed the emergency was par for the course at the Hutchins Unit and remains the way things are done even today. Regional Director Eason also agreed this was the proper procedure – that a supervisor must observe a prisoner in person before she can call 911. When Eason and Pringle reviewed Mr. McCollum's death, they found no problem with the individual officers' actions, and ratified their decisions to delay treatment for Mr. McCollum.

ANSWER:

Defendants assert the allegations in ¶73 mischaracterize previous depositions and/or TDCJ records; therefore, Defendants deny the allegations in ¶73 of Plaintiffs' Second Amended Complaint.

74.     Yet, instead of immediately taking Mr. McCollum to a cool place, or packing his body with ice, as could have easily been done and Clark knew needed to happen immediately, he just notified his direct supervisor, Sgt. Tate. Sgt. Tate arrived at Mr. McCollum's bunk between 2:15 and 2:20 a.m.

ANSWER:

Defendant Clark admits that shortly after observing that McCollum wasn't responding and was shaking he called for additional staff and a supervisor. Defendant Clark admits that shortly after additional staff arrived he was assigned to other duties. Defendant Clark denies the remainder of the allegations in ¶72 of Plaintiffs' Second Amended Complaint.

75.     When Sgt. Tate arrived, the situation remained an obvious medical emergency requiring actual medical intervention. Sgt. Tate observed Mr. McCollum's entire body shaking and "trembling," and assumed he continued to seize. She noted his skin was "flushed" and warm to the touch, as if he were running a fever. Tate tried to speak to Mr. McCollum, and dripped water on his face, but he did not respond. Thus, Tate knew McCollum was unresponsive, convulsing, and needed immediate care.

ANSWER:

Defendant Tate admits she observed McCollum shaking and then the shaking stopped and assumed that he was having a seizure. Defendant Tate admits she observed that McCollum's skin was flushed, warm and felt like he could be running a fever. Defendant Tate admits she tried to speak to McCollum and dripped water on his face. Defendant Tate also admits that she applied a cool cloth to McCollum. Defendant Tate denies the remaining allegations in ¶75 of Plaintiffs' Second Amended Complaint.

76.     Incredibly, despite believing McCollum's condition was a medical emergency and despite being able to ask that 911 be contacted and an ambulance dispatched, Tate did not do this. Tate also did not take McCollum to one of the many air-conditioned places in the prison, or use ice to cool his body, as she knew she should have done. Instead, she called her supervisor, Lieutenant Sanders, a woman she knew had no specialized medical training and would not be able

to provide immediate help. And Tate made this decision knowing that medical care for McCollum would be further delayed.

ANSWER:

Defendant Tate admits she did not call 911. Defendant Tate admits she called Lieutenant Sanders over her radio. Defendant Tate admits she applied a cool cloth to McCollum's neck. Defendant Tate admits she did not take McCollum to one of the air-conditioned areas of the Hutchins Unit. Defendant Tate admits she did not use ice to cool McCollum's body. Defendant Tate assert ¶76 mischaracterizes previous depositions and/or TDCJ records; therefore, Defendants deny the remaining allegations in ¶76 of Plaintiffs' Second Amended Complaint.

77.     According to Tate, she was following standard practice at the Hutchins Unit.

ANSWER:

Defendant Tate admits that through the chain of command, she would contact her lieutenant. Defendant Tate asserts ¶77 mischaracterizes previous depositions and/or TDCJ records; therefore, Defendants deny the allegations in ¶77 of Plaintiffs' Second Amended Complaint.

78.     Lt. Sanders did not arrive at Mr. McCollum's bedside until around 2:40 a.m., at least thirty minutes after Clark first found him. Though Mr. McCollum was still intermittently seizing, unconscious and unresponsive, Sanders, who also recognized that McCollum was a diabetic, still did not immediately call 911. Rather, she delayed what was obviously needed, an ambulance, and contacted an off-site medical unit she knew did not have doctors.

ANSWER:

Defendant Sanders admits that at approximately 2:40 a.m. she arrived at C7 dorm to make an assessment. Defendant Sanders admits McCollum was still seizing and unresponsive. Defendant Sanders admits she remembers thinking McCollum was probably diabetic. Defendant

35

Sanders admits she called the triage nurse at the Crain Unit. Defendant Sanders admits she called 911. Defendant Sanders asserts the allegations in ¶78 are a mischaracterization of depositions and/or TDCJ records; therefore, Defendant Sanders denies the remaining allegations in ¶78 of Plaintiffs' Second Amended Complaint.

79.     After delaying further by conferring with an off-site nurse (an utterly worthless exercise as, by law, nurses are incapable of providing a medical diagnosis) at another prison over 130 miles away, Sanders finally had an ambulance called. She delayed despite knowing that Mr. McCollum needed immediate medical attention that no one at the Hutchins Unit at that time was qualified to provide. Her decision to call 911 did not occur until 3:05 a.m., almost an hour after Clark first found Mr. McCollum convulsing.

ANSWER:

Defendant Sanders admits that at approximately 3:00 a.m. on July 22, 2011, McCollum was transported via ambulance to Parkland Hospital. Defendant Sanders admits she conferred with an off-site triage nurse. Defendant Sanders admits there was no medical personnel at the Hutchins Unit after approximately 6:00 p.m. Defendant Sanders asserts that the allegations in ¶79 mischaracterize previous depositions and/or TDCJ records; therefore, Defendant Sanders denies the remaining allegations in ¶79 of Plaintiffs' Second Amended Complaint.

80.     Even while contacting the off-site nurse, though she knew Mr. McCollum needed medical attention, Sanders did not have him taken to a cool place in the prison, or pack his body with ice, as she knew she should have done.

ANSWER:

Defendant Sanders admits she did not have McCollum taken to an air conditioned area of the Hutchins Unit. Defendant Sanders admits she did not have McCollum's body packed with ice.

Defendant Sanders asserts the allegations in ¶80 mischaracterize previous depositions and/or TDCJ records; therefore, Defendant Sanders denies the remaining allegations in ¶80 of Plaintiffs' Second Amended Complaint.

81.    At no point did Mr. McCollum respond to any of the officers. He remained unconscious and intermittently convulsing from the "seizure."

ANSWER:

Defendants Clark, Tate and Sanders admit the allegations in ¶81 of Plaintiffs' Second Amended Complaint.

82.    In fact, the general practice at the Hutchins State Jail, as was well known to Warden Pringle, Lt. Sanders, and Sgt. Clark, was to let patients experience seizures in the middle of the night, and just refer them to the infirmary the next morning. Letting Mr. McCollum experience a "seizure" without immediately calling for medical help was standard practice at the Hutchins Unit, and known to Pringle, Sanders, Tate and Clark. Other TDCJ executives, however, recognized this practice was highly inappropriate and dangerous.

ANSWER:

Defendants Pringle, Sanders, Tate and Clark assert that the allegations in ¶82 mischaracterize previous depositions and/or TDCJ records; therefore, Defendants deny the allegations in ¶82 of Plaintiffs' Second Amended Complaint.

83.    Though TDCJ training materials repeatedly state that when someone is suffering heat exhaustion, let alone a heat stroke, they need to be immediately moved to an air-conditioned area, and provided ice packs for their body. This basic first aid did not happen here, however, because Mr. McCollum had inexplicably been placed on a top bunk. Because Clark, Tate, and Sanders could not lift a 330 pound man off a top bunk, they left him convulsing and unresponsive

on the bunk even after 911 was finally called. Even after 911 was called, they did not bring ice packs to his body, as they easily could have done.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D. Defendant TDCJ admits that training materials do list some of the treatment for heat stroke as moving the patient to a cool, air-conditioned place, and place ice packs in the armpit and groin areas. Defendants Clark, Tate, and Sanders assert the remaining allegations mischaracterize previous depositions and/or TDCJ records; therefore, Defendants Clark, Tate, and Sanders deny the remaining allegations in ¶83 of Plaintiffs' Second Amended Complaint.

84.    When Mr. McCollum finally arrived at the hospital, his body temperature was 109.4 degrees Fahrenheit.  The extreme heat caused him to suffer multi-system organ failure.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient

to admit or deny the remaining allegations contained in ¶84 of Plaintiffs' Second Amended Complaint.

85.    Mr. McCollum slipped into a coma, and died after spending six days in the intensive care unit, as a consequence of Sanders, Tate, and Clark's total lack of care, and senseless and unconscionable delay.

ANSWER:

Defendants admit McCollum died on July 28, 2011. Defendants Sanders, Tate, and Clark deny the remaining allegations contained in ¶85 of Plaintiffs' Second Amended Complaint.

86.    An autopsy conducted by the Southwestern Institute of Forensic Sciences concluded he died of hyperthermia, due to housing "in a hot environment without air conditioning."

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendant TDCJ admits some records show that the autopsy indicated the allegations in ¶86. The individual TDCJ Defendants lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶86 of Plaintiffs' Second Amended Complaint.

87.    The autopsy found Mr. McCollum was "predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension."

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendant TDCJ admits records show that the autopsy indicated the quoted material. The individual TDCJ Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶87 of Plaintiffs' Second Amended Complaint.

88.     High-ranking TDCJ officials, including Richard Thaler, the deputy director, testified Clark, Tate, and Sanders should not have delayed calling 911, and they should have called 911 immediately, and acknowledged that if a practice existed to the contrary, it would endanger prisoners and be unacceptable. Despite Thaler's negative assessment of the lengthy delay, and obvious indifference it shows, Pringle and Eason did not believe the officers did anything wrong. Instead, Pringle and Eason ratified and ignored the officers' indifference by incredibly concluding the officers acted appropriately though they delayed emergency medical care for over an hour to a man they knew was convulsing and unresponsive, allowing McCollum to suffer a painful heat stroke.

ANSWER:

Defendants assert that the allegations in ¶88 mischaracterize previous depositions and/or TDCJ records; therefore, Defendants deny the allegations in ¶88 of Plaintiffs' Second Amended Complaint.

*D. TDCJ and UTMB's Polices Deliberately Ignored Conditions Causing Death*

40

89.     In addition to the indifference shown by individuals to McCollum's hypertension, diabetes, obesity, and "seizures"/heatstroke, serious deficiencies in TDCJ and UTMB policies and procedures, which were approved by and known to TDCJ and UTMB's highest-ranking officials, including but not limited to Eason, and Livingston, proximately caused Mr. McCollum's death.

ANSWER:

Defendants deny the allegations contained in ¶89 of Plaintiffs' Second Amended Complaint.

90.     TDCJ officers report all heat related illnesses to TDCJ headquarters to inform high-ranking officials, including Eason and Livingston, when prisoners or TDCJ employees become ill. Eason regularly reviewed emails and correspondence showing prisoners were dying from heat stroke, and that employees were suffering heat-related injuries. Of course, similar reports are made to Pringle about his own facility, the Hutchins State Jail.

ANSWER:

Defendant Eason objects to the term "regularly reviewed" as vague and ambiguous. Defendant Eason further objects that this allegation is vague as to time, place, identity, and overbroad. Defendants admit that the Emergency Action Center generates reports that track most offender injuries and deaths. Defendants admit that the Emergency Action Center Reports show some heat related incidents. Defendant Eason admits that he reviews Emergency Action Center Reports for the Units in his region.

91.     As the conditions at the Hutchins State Jail are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Mr. McCollum, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk. Yet, rather than seek to have the housing areas cooled, or to

make sure inmates with medical conditions that render them particularly vulnerable to extreme heat (such as diabetes, obesity, or hypertension) were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat, a decision, of course they made from the comfort of their own air conditioned offices.

ANSWER:

Defendants deny the allegations contained in ¶91 of Plaintiffs' Second Amended Complaint.

92.    Though indoor temperatures at TDCJ prisons routinely exceed 100 degrees and the heat indexes in July and August exceeded 130 degrees, the prisons are not air-conditioned or otherwise cooled, and TDCJ makes no effort to lower the indoor temperatures for its human prisoners with other technologies like portable air conditioners, foggers, or misters.

ANSWER:

Defendant TDCJ is unable to admit or deny the allegations related to "indoor temperatures" as they are vague as to time and place. Defendant TDCJ admits that certain prison units are not air-conditioned with refrigerated air. Defendant TDCJ admits that the agency entered into a series of stipulations relating to numerous prison conditions in the *Ruiz* litigation, including specific stipulations relating to prison environmental conditions, prison building structures, and indoor summer ventilation systems for the prisons which were implemented in accordance with the *Ruiz* stipulations. Defendants Livingston, Eason, and TDCJ deny they implemented unconstitutional policies or failed to change policies, procedures, and practices related to the safety and security of TDCJ inmates. Defendants deny that the conditions, services, and programs within the Hutchins State Jail violate the Constitution or law of the United States.

93.     Moreover, TDCJ and UTMB officials, including Defendants Livingston, Eason, Owen and Pringle, took no steps to remedy this despite knowing and informing their employees that extreme heat could and would cause serious injury or death, even after ten people died from heat stroke in the summer of 2011.

ANSWER:

Defendants TDCJ, Livingston, Eason and Pringle deny the allegations contained in ¶93 of Plaintiffs' Second Amended Complaint. Defendants lack knowledge or information sufficient to admit or deny allegations directed to UTMB.

94.     In fact, TDCJ trains all its employees that "heat stroke occurs when the body is subjected to more heat than the body can possibly handle. Heat stroke is a serious medical condition and may lead to death without immediate emergency medical attention. In heat stroke, body temperature rises too quickly resulting in the death of body tissue." TDCJ officials, like Livingston, Eason, Clark, Tate, Sanders, and Pringle, knew "victims of prolonged or high heat can develop heat cramps or heat exhaustion.  If heating continues, the condition can progress to a heat stroke and death."

ANSWER:

Defendants admit the allegations in ¶94 of Plaintiffs' Second Amended Complaint. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

95.     And this is exactly what happened in 2011.

ANSWER:

Defendants are unable to admit or deny this allegation because it is vague.

96.     System-wide, at least ten people in TDCJ custody, including Mr. McCollum, died of heat-related causes in the summer of 2011. Two men died before that, in 2007. All were, or should have been, known to UTMB and TDCJ, including Livingston and Eason. Seven of these deaths happened in the region Eason supervises in a three-week period.

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |

| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

ANSWER:

There are records that show the prisoners listed on Plaintiffs' chart died while in custody and the autopsies indicated hyperthermia, but Defendants lack personal knowledge or information sufficient to admit or deny the information listed in the chart. With regard to the column titled "facts," the "facts" column is a summary of medical opinions and records prepared by Plaintiffs and lacks complete information. Defendants lack personal knowledge or information sufficient to

admit or deny the allegations in ¶96; however, based upon information and belief, deny the "fact" summary on the chart in ¶ 96 of Plaintiffs' Second Amended Complaint.

97.     These men were not the first to die from hyperthermia in TDCJ custody. One man died in 2004, and another in 2001. As far back as 1999, Judge William Wayne Justice expressly noted and warned TDCJ officials that prisoners were dying of heat-related illnesses in TDCJ custody. *Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

ANSWER:

Defendant TDCJ admits that John Cardwell died while in TDCJ custody in 2001. Defendant TDCJ admits that Ricky Robertson died while in TDCJ custody in 2004. Defendant TDCJ admits records show the autopsies for John Cardwell and Ricky Robertson indicated hyperthermia.  Defendant TDCJ admits that the agency entered into a series of stipulations relating to numerous prison conditions in the *Ruiz* litigation, including specific stipulations relating to prison environmental conditions, prison building structures, and indoor summer ventilation systems for the prisons which were implemented in accordance with the *Ruiz* stipulations. Defendants Livingston, Eason, and TDCJ deny they implemented unconstitutional policies or failed to change policies, procedures, and practices related to the safety and security of TDCJ inmates. Defendants deny that the conditions, services, and programs within the Hutchins State Jail violate the Constitution or law of the United States. The individual defendants lack personal knowledge or information sufficient to admit or deny the allegations in ¶97 of Plaintiffs' Second Amended Complaint.

98.     Despite Judge Justice's warning, John Cardwell died of hyperthermia in TDCJ custody in 2001. And Ricky Robertson died in custody of hyperthermia in 2004. But TDCJ and UTMB made no changes to protect other men in the future.

ANSWER:

Defendant TDCJ admits that John Cardwell died while in TDCJ custody in 2001. Defendant TDCJ admits that Ricky Robertson died while in TDCJ custody in 2004. Defendant TDCJ admits records show the autopsies for John Cardwell and Ricky Robertson indicated hyperthermia. Defendant TDCJ admits that the agency entered into a series of stipulations relating to numerous prison conditions in the *Ruiz* litigation, including specific stipulations relating to prison environmental conditions, prison building structures, and indoor summer ventilation systems for the prisons which were implemented in accordance with the *Ruiz* stipulations. Defendants deny the remaining allegations in ¶98 of Plaintiffs' Second Amended Complaint. The individual defendants lack personal knowledge or information sufficient to admit or deny the allegations in ¶97 of Plaintiffs' Second Amended Complaint.

99.     It is likely that there were more heat-related injuries and deaths as hypertension is known to be an underreported cause of death by medical examiners and pathologists.

ANSWER:

After a reasonable inquiry, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶99 of Plaintiffs' Second Amended Complaint.

100.     Moreover, this is a uniquely TDCJ problem. Large county jails in Texas are almost uniformly air conditioned, as the Texas Commission on Jail Standards <u>requires</u> county jails keep temperatures between 65 and 85 degrees Fahrenheit. Yet despite the fact that the state requires counties to protect inmates in jails from extreme heat, TDCJ refuses to provide adequate, safe shelter from the blistering Texas summers to prisoners.  *See* 37 Tex. Admin. Code § 259.160. Despite his knowledge of this policy, and his knowledge of the extremely hot conditions in TDCJ facilities in the summer of 2011, Livingston and Eason and, at least at the Hutchins State Jail,

Warden Pringle, took no action to cool down these exceptionally dangerous and hot conditions. Livingston's refusal to cool inmate living areas was a moving force causing Mr. McCollum's death.  Likewise, Livingston and Eason's failure to cool these areas or move inmates with heat-sensitive disabilities to air-conditioned areas was a cause of McCollum's death.

ANSWER:

Defendants TDCJ admits that 37 TEX. ADMIN. CODE §259.160 contains a provision related to cooling Texas County jails. Defendant TDCJ denies that these regulations have any application to the Hutchins Unit. Defendants Livingston, Eason, Pringle and TDCJ deny the remaining allegations contained in ¶100 of Plaintiffs' Second Amended Complaint.

101.    Moreover, these conditions also put TDCJ and UTMB employees at risk. In fact, before Mr. McCollum's death, an officer at the Hutchins Unit had to be hospitalized after suffering a heat stroke while working at the prison, and TDCJ and UTMB employees were regularly injured by high temperatures each summer at the Hutchins Unit. TDCJ executives, including Eason and Livingston, frequently review workers compensation complaints where employees were injured by extreme temperatures. The officers' union has repeatedly raised these concerns with Livingston and other high-level TDCJ staff, but no changes have been made to protect the health and safety of TDCJ and UTMB's own employees.

ANSWER:

Defendants object to the term "regularly injured" as vague. Defendants object to the allegations as vague as to time and place. Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by Defendants and is incomplete; and, therefore, it is improper and incapable of answer. There are records that show the

49

correctional officers' union has supported refrigerated air conditioning. Defendants deny the remaining allegations contained in ¶101 of Plaintiffs' Second Amended Complaint.

102.    In fact, the union representing many TDCJ employees has spoken out publicly in favor of Plaintiffs' lawsuit, and in favor of cooling the housing areas where officers work and prisoners live to protect the correctional officers and other employees from the dangerous heat.

ANSWER:

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by Defendants and is incomplete; and, therefore, it is improper and incapable of answer. There are records that show the correctional officers' union has supported refrigerated air conditioning. Defendants deny the remaining allegations contained in ¶102 of Plaintiffs' Second Amended Complaint.

103.    Approving air conditioning or other cooling mechanisms in TDCJ prisons would require action at the highest levels of the agency, including authorization and approval from Livingston – approval he has to date refused to provide. TDCJ has a $3 billion annual budget, but it would cost less than $1 million to air condition all the housing areas at the Hutchins State Jail, and less than $150,000 to air condition the housing area in which Mr. McCollum was housed.

ANSWER:

Defendant Livingston admits his approval would be required to institute system-wide air conditioning, but denies that only his approval would be necessary for such action. Defendant Livingston admits he has not ordered the implementation of air conditioning system-wide in TDCJ prisons, but denies the characterization that such a measure has been recommended and denies the characterization that he can unilaterally order its implementation. Defendant Livingston admits that there are air-conditioned prisons within the TDCJ system. Defendant TDCJ admits that the

total operating budget for the entire Texas Department of Criminal Justice for fiscal year 2015 was approximately $3 billion. Defendants deny the remaining allegations contained in ¶103 of Plaintiffs' Second Amended Complaint.

104.    Perversely, TDCJ, with Executive Director Livingston's full blessing and authorization, does provide climate-controlled conditions for the pigs its agricultural programs raise for slaughter – at the cost of $750,000 per pig barn.

ANSWER:

TDCJ objects to the use of the term "cooling" as it is vague and misleading. TDCJ admits only that in order to maintain a productive environment, the TDCJ swine facilities are "climate controlled" throughout the year to the extent that they have roofs and walls that protect the animals from the elements and that the TDCJ also uses a variety of devices to manipulate the interior environment using heaters, heat lamps, heat mats, windows, curtains, fans, misters, drippers, and evaporative coolers, as follows:

1. Farrowing Barns use all methods of climate control mentioned above to keep sows cool and baby pigs warm.  As well as heaters in the winter.
2. Nurseries use heaters, curtains, fans, and evaporative coolers.
3. Feeder Slabs use curtains and misters.
4. Breeding Barns use curtains, fans, misters, and heaters.
5. Gestation Barns use curtains and misters.

TDCJ admits that TDCJ policy provides that, during the care of the farrowing sow and her litter, the farrowing houses should be managed to keep the pigs dry and warm and the sows cool. The drip-system timers for sows should be set to activate at 74-78 degrees during the warmer months and run for several minutes before shutting off. The barns should be kept around 85 degrees for baby pig comfort. Ventilation and heaters can achieve this. TDCJ admits that TDCJ policy provides that the best way to monitor heat stress is to closely observe pigs when temperatures reach 90+ degrees. TDCJ further admits that TDCJ policy provides that foggers should be used to keep

51

hogs cool with a water mist. The foggers should be turned on when temperatures reach over 80 degrees Fahrenheit. Ideally, the foggers should be on a thermostat/timer system with water flow cutting on and off intermittently. Foggers should not be left running at night when temperatures drop below 80 degrees. TDCJ admits that TDCJ policy provides that pigs live in a "comfortable environment with ventilation." TDCJ asserts the well-known fact that pigs have few sweat glands and comparisons between humans and pigs as it relates to thermoregulation are entirely irrelevant to this action.  TDCJ denies the remaining allegations contained in ¶106 of Plaintiffs' Second Amended Complaint.

105.    Livingston, as TDCJ's chief financial officer, approved purchasing additional "climate controlled swine barns" even *after* this suit was filed and *after* he knew human beings were dying at alarming rates from heat stroke. Livingston's deputy even told the press that these climate-controlled barns were necessary to protect the lives of vulnerable pigs.  He has made no attempt, however, to cool the temperatures inside inmate housing areas.

ANSWER:

Defendants incorporate their answer to ¶104 set forth above. Defendant Livingston denies that he had any personal involvement in the purchase of the pig barns.

106.    In fact, TDCJ policies Livingston improved for implementation require the pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort."

ANSWER:

Defendants incorporate their answer to ¶104 set forth above.

107.   TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees. Temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit."

ANSWER:

Defendants incorporate their answer to ¶104 set forth above.

108.   Upon information and belief, the inmate housing areas at the Hutchins Unit, including the dormitory where Mr. McCollum was incarcerated, could be "climate controlled" at a similar – or lower – cost than the climate controlled pig barns.

ANSWER:

Defendants deny the allegations contained in ¶108 of Plaintiffs' Second Amended Complaint.

109.   And Director Livingston has made no effort to cool the brutally hot temperatures despite knowing that top UTMB officials testified that air-conditioned housing areas would be medically beneficial for prisoners with disabilities like Mr. McCollum – just like it is for the pigs.

ANSWER:

Defendant Livingston denies the allegations contained in ¶109 of Plaintiffs' Second Amended Complaint.

110.   TDCJ's formal, written policies applicable at all facilities only address how to accommodate prisoners assigned to perform convict labor at the prisons during periods of extreme heat. For example, work outside may be curtailed when it is very hot outside. TDCJ and UTMB policies require certain additional precautions be taken to protect all prisoners (even those without medical conditions) before they can work in temperatures exceeding 85 degrees. But despite their actual knowledge of the extreme temperatures, their knowledge of the dangers of such heat, and

the punitive nature of exposing prisoners to such heat, there is <u>no</u> corresponding policy to protect prisoners from extreme temperatures in housing areas. No corresponding policy addresses *indoor* temperatures, even though temperatures inside are virtually identical to outdoor temperatures.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

111.    UTMB policy states "it is the responsibility of [the prison] medical staff to provide guidelines to assist the facility administration in the determination of safe and healthful *work* conditions. Every reasonable effort shall be made in the interest of preventing heat-related injuries *in the workplace*." (emphasis added). The policy is completely silent on housing assignments for prisoners, like McCollum, likely to suffer heat-related injuries even though temperatures inside are virtually identical to outdoor temperatures.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

112.    Moreover, though UTMB and TDCJ policy and training recognize extreme temperatures can be deadly, and at least nineteen people died from hypertension in non-air conditioned housing units since 1999, TDCJ and UTMB policies have never and still do not address protecting prisoners from heat in housing areas.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D. Defendants deny that the term "workplace" does not include housing.

113.    Incredibly, TDCJ policies do ensure safe living conditions for the pigs raised for slaughter by requiring use of foggers at 80 degrees, and identifying 95 degrees as the "upper critical limit" temperature pigs should be exposed to.

ANSWER:

Defendants incorporate their answer to ¶104 set forth above. Defendants deny the remaining allegations in ¶113 of Plaintiffs' Second Amended Complaint.

114.    Prisoners also do not receive a physical examination from a doctor or physician's assistant when they arrive at a TDCJ prison, including the Hutchins State Jail. Many prisoners wait a week to ten days to receive their physical. Thus, prisoners like McCollum who are sick and particularly susceptible to danger from extreme hear, are purposefully left in danger.

ANSWER:

Defendants deny the allegations in ¶114 of Plaintiffs' Second Amended Complaint.

115.    Though Mr. McCollum's blood was drawn for labwork, his labs were never evaluated before his heat stroke. If a doctor looked at the labwork available to UTMB, they would have seen that he was already dehydrated and likely fighting the early stages of heat exhaustion when the blood was drawn.

ANSWER:

Defendants lack knowledge or information sufficient to admit or deny the allegations in ¶115 as they relate to UTMB.

116.    The intake physical is critical to protecting prisoners from extreme temperatures, because it is the first opportunity for medical staff to identify medical conditions and disabilities that require accommodations to protect prisoners from heat. Any delay in this physical denies prisoners this accommodation, and leaves them in danger. Indeed, three of the men who died of hyperthermia in 2011 (and at least one of the men who died in 2012) had been incarcerated less than a week and had disabilities similar to Mr. McCollum.

ANSWER:

These allegations are not directed to any particular Defendant. Defendants object to the use of the term "similar" as it is vague and requires expert medical analysis and is therefore improper and incapable of answer. Defendant TDCJ admits records indicate that three offenders on Plaintiffs' chart at ¶93 died within three days of being in TDCJ custody. The individual TDCJ Defendants lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶116. Defendants deny the remaining allegations in ¶116 of Plaintiffs' Second Amended Complaint.

117.    The intake physical is also the first time a prisoner can have his housing assignment restricted by UTMB. Thus, until the intake physical conducted by a UTMB doctor or physician's assistant took place, UTMB effectively chose not to protect Mr. McCollum, and virtually guaranteed he would be exposed to dangerous temperatures.

ANSWER:

Defendant TDCJ denies the allegations in ¶117. The individual TDCJ Defendants lack personal knowledge or information sufficient to admit or deny allegations in ¶117 of Plaintiffs' Second Amended Complaint.

118.    When UTMB finally does perform the physical, medical staff make housing recommendations for prisoners. UTMB, among other things, can prohibit prisoners with certain medical conditions from working in prison jobs where they would be exposed to high temperatures. For a prisoner with asthma, for example, UTMB may prohibit TDCJ from assigning that prisoner to work in dusty environments. The form UTMB staff complete, which Babbili and other staff was familiar with, can also require prisoners be housed: 1) in "single level" facilities or on the ground floor (for prisoner using wheelchairs, for example); 2) with prisoners who have similar medical conditions; or 3) in a single cell. TDCJ and UTMB's housing decisions, however, do not contemplate special housing for people with disabilities adversely affected by extreme temperature, even though they are well aware of the risk to vulnerable prisoners and the previous deaths caused by heat strokes.

ANSWER:

Defendants lack knowledge or information sufficient to admit or deny allegations that relate only to UTMB.  Defendant TDCJ denies the remaining allegations contained in ¶118 of Plaintiffs' Second Amended Complaint.

119.    UTMB also recommends bunk assignments for prisoners during the intake physical. But – incredibly – obesity is not a factor that would cause UTMB to issue a lower-bunk restriction.

ANSWER:

Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶119 of Plaintiffs' Second Amended Complaint.

120.    UTMB officials, including Babbili, were aware many TDCJ prisoners live with hypertension, diabetes, or are obese, but are housed in non-air-conditioned, non-climate-controlled TDCJ facilities, including the Hutchins State Jail. While these housing decisions are ultimately made by TDCJ, Warden Pringle acknowledged following recommendations made by UTMB, and confirmed that he would have moved prisoners to air conditioned facilities if told to do so by UTMB.

ANSWER:

Defendants lack knowledge or information sufficient to admit or deny allegations related to UTMB. Defendant TDCJ admits that it is involved in housing decisions for offenders. Defendant Pringle admits he is not involved in decisions to transfer offenders to facilities that have air-conditioning.

121.    UTMB decision-makers are aware of the serious risks extreme heat poses to prisoners with heat-sensitive disabilities like Mr. McCollum, and knew about all of the deaths mentioned herein.

ANSWER:

This allegation is directed to UTMB; therefore, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶121 of Plaintiffs' Second Amended Complaint.

122.    For example, UTMB policy prohibits prisoners taking certain drugs, including hydrochlorothiazide, from "work[ing] or recreat[ing] in environments where the apparent air temperature is 95 [degrees] or higher." Though prisoners taking hydrochlorothiazide are prohibited from "recreating" in areas where the temperature exceeds 95 degrees, no one from UTMB made a recommendation to *house* Mr. McCollum safely – guaranteeing he would spend 24 hours a day in extremely hot conditions. And this was not an oversight – UTMB and TDCJ policy did not even contemplate protecting prisoners with heat-sensitive disabilities from extreme temperatures.

ANSWER:

Defendant TDCJ denies the allegations "TDCJ policy did not even contemplate protecting prisoners with heat-sensitive disabilities from extreme temperatures." This allegations is directed to UTMB; therefore, Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in ¶122 of Plaintiffs' Second Amended Complaint.

123.    Of the 97 state-operated TDCJ facilities, 56 have some air conditioning in inmate living areas.  And there were air conditioned rooms right next to the housing area where Mr. McCollum had to endure the extreme heat. Yet Livingston, Eason, Owen and Pringle took no steps to house prisoners with known medical conditions complicated by heat, such as those suffering from diabetes, hypertension, obesity, or prescribed diuretics, in locations that were air conditioned.

ANSWER:

Defendant TDCJ admits that the Hutchins Unit has some areas that are air conditioned and that the dormitory areas are not air conditioned; but affirmatively states there are ventilation, fans,

and other mitigating measures employed by the TDCJ and its staff during summer months, and medical care provided for the inmates. Defendants Livingston, Eason, and Pringle deny the remaining allegations in ¶123 of Plaintiffs' Second Amended Complaint.

124.    TDCJ trains its employees that during hot months they should "spend more time in air conditioned places.  Air conditioning in homes and other buildings markedly reduces danger from the heat.  If you cannot afford an air conditioner, spending some time each day during hot weather in an air-conditioned environment affords some protection." Employees are advised to "stay in an air conditioned area if possible," and are only allowed to work outside for two hours at a time.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D. Defendant TDCJ admits that the quoted allegations in ¶124 are contained in some of TDCJ's training materials.

125.    Indeed, several areas where TDCJ employees work at the Hutchins State Jail, including Pringle's office, are air conditioned.

ANSWER:

Defendant TDCJ admits that there are areas at the Hutchins State Jail, including Defendant Pringle's office, that are air conditioned.

126.    TDCJ even chose to air condition the armory, rather than prisoner housing areas, because of concerns the prison's weapons could be damaged by the heat.

ANSWER:

Defendant TDCJ admits that the agency entered into a series of stipulations relating to numerous prison conditions in the *Ruiz* litigation, including specific stipulations relating to prison environmental conditions, prison building structures, and indoor summer ventilations systems for the prisons which were implemented in accordance with the *Ruiz* stipulations. Defendant TDCJ admits that the armory at the Hutchins Unit is climate controlled, but deny the remaining allegations in ¶126 of Plaintiffs' Second Amended Complaint. Defendants assert that comparisons between weapon storage and maintenance and offender housing are entirely irrelevant to this action and these allegations are meant to embarrass.

127.    In these parts of the prison, the temperatures were a comfortable, and livable, 70 to 75 degrees.

ANSWER:

Defendants admit that certain areas of the Hutchins Unit are air conditioned, but deny the remaining allegations in ¶127 of Plaintiffs' Second Amended Complaint.

128.    And, of course, TDCJ provides "climate controlled" conditions for the pigs it raises for slaughter.

ANSWER:

Defendants incorporate their answer to ¶104 set forth above.

129.    Significantly, Defendants chose not to provide prisoners, like Mr. McCollum, these opportunities to cool off in an air-conditioned environment at the Hutchins State Jail.  Nor did

anyone at TDCJ, including Defendants, ever notify McCollum of any other prisoner when they arrived that they could spend time in air conditioned parts of the prison.

ANSWER:

Defendants deny the allegations in ¶129 of Plaintiffs' Second Amended Complaint.

130.    Hutchins State Jail officials, including Pringle and Sanders, failed to provide or ensure adequate additional drinking water was provided to prisoners. No formal policy governed the provision of water. Officers allegedly only brought one large jug per fifty-eight prisoners to the prisoner living areas three times a day. The jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and were frequently filled with lukewarm water in July 2011, rather than ice water. According to Director Eason, the provision of ice water was to occur as much as possible and should not have been so limited – though there was no policy requiring anyone to follow Eason's suggestion. At the Hutchins State Jail, however, the provision of additional water to stay hydrated did not occur, and even today the prison does not document when water is provided to prisoners.

ANSWER:

This allegations is speculative, argumentative, and compound. Defendant Eason admits that ice water is provided as much as possible during the summer months. Subject to and without waiving these objections, Defendants Pringle and Sanders deny the remaining allegations contained in ¶130 of Plaintiffs' Second Amended Complaint.

131.    Even if adequate water were brought to Mr. McCollum's dorm, he would have had to get on and off his top bunk to get to it – a hardship not placed on able-bodied, non-obese prisoners.

ANSWER:

Defendants deny the allegations in ¶131 of Plaintiffs' Second Amended Complaint.

132.    Moreover, pursuant to TDCJ policy, which was known to Directors Livingston and Eason, as well as Warden Pringle, Mr. McCollum was not issued a cup when he entered prison, shortly before his death. Without a cup, Mr. McCollum could not drink any of the water provided in the water jugs (much less a sufficient amount of water to counteract the extreme temperatures), whether or not adequate water was provided, and whether or not the water was cold. Livingston, Eason and Pringle knew this policy denied this basic accommodation to prisoners like Mr. McCollum, yet chose not to remedy it.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D. Defendant Pringle admits that cups were not issued to offenders upon arrival at the Hutchins Unit. Defendants assert the allegations in ¶132 mischaracterize previous depositions and/or TDCJ records; therefore, Defendants Livingston, Pringle and Eason deny the remaining allegations in ¶132 of Plaintiffs' Second Amended Complaint.

133.    TDCJ officials, including Eason, Pringle and Livingston, prohibit new prisoners at the Hutchins Unit, like Mr. McCollum, from owning personal fans to cool themselves, though personal fans are available to other prisoners convicted of more serious crimes in other TDCJ prisons and are part of TDCJ's alleged plan to combat the heat inside its non-air conditioned unites.

ANSWER:

Defendants Eason, Pringle and Livingston admit that not all areas of the Hutchins State Jail have electrical outlets for offenders' personal fans but affirmatively state that other fans and a ventilation system are available at the unit to move air and bring in fresh air and certain areas have conditioned air. Defendant TDCJ admits that the agency entered into a series of stipulations relating to numerous prison conditions in the *Ruiz* litigation, including specific stipulations relating to prison environmental conditions, prison building structures, and indoor summer ventilation systems for the prisons which were implemented in accordance with the *Ruiz* stipulations. Defendants Livingston, Eason, and TDCJ deny they implemented unconstitutional policies or failed to change policies, procedures, and practices related to the safety and security of TDCJ inmates. Defendants deny that the conditions, services, and programs within the Hutchins State Jail violate the Constitution or law of the United States.

134.    Eason and Pringle, moreover, knew the windows in the areas at Hutchins where prisoners live are sealed shut, and cannot be opened.

ANSWER:

Defendants Eason and Pringle admit that some windows do not open at Hutchins State Jail and affirmatively state that there are fans and a ventilations system which are available at the unit to move air and bring in fresh air.

135.    The ability to open windows and use personal fans, while it does nothing to decrease the temperature inside, at least would increase comfort in the Hutchins State Jail's housing areas in a minimal way. But prisoners at Hutchins did not even receive this accommodation.

ANSWER:

64

This allegation is not directed to any particular Defendant. Defendants admit that not all areas of the Hutchins State Jail have electrical outlets for offenders' personal fans but affirmatively state that other fans and a ventilation system are available at the unit to move air and bring in fresh air and certain areas have conditioned air. Defendants admit that some windows do not open at the Hutchins Unit. Defendant TDCJ admits that the agency entered into a series of stipulations relating to numerous prison conditions in the *Ruiz* litigation, including specific stipulations relating to prison environmental conditions, prison building structures, and indoor summer ventilation systems for the prisons which were implemented in accordance with the *Ruiz* stipulations. Defendants Livingston, Eason, and TDCJ deny they implemented unconstitutional policies or failed to change policies, procedures, and practices related to the safety and security of TDCJ inmates. Defendants deny that the conditions, services, and programs within the Hutchins State Jail violate the Constitution or law of the United States.

136.    After Mr. McCollum's death, brutal indoor temperatures continued at the Hutchins State Jail.  Indoor air temperatures as high as 106 degrees Fahrenheit were recorded weeks later, and a prisoner was hospitalized due to heat stroke in the summer of 2012.

ANSWER:

These allegations are not directed to any Defendant. Defendants object that these allegations are vague as to time and place. These allegations require an interpretation of information which was not prepared by Defendants and is incomplete; and, therefore, it is improper and incapable of answer. This allegation involves medical care provided by a hospital. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶136 of Plaintiffs' Second Amended Complaint.

137.     While Livingston, Eason, and Pringle were aware of the brutal heat in the Dallas area, including inside the Hutchins Unit in the weeks preceding Mr. McCollum's injuries and death, and Eason and Livingston were notified of numerous other deaths, they took no steps to remedy the situation and provided no reasonable accommodations for prisoners like Mr. McCollum whose disabilities made them more susceptible to heat stroke.

ANSWER:

Defendants Livingston, Eason, and Pringle deny the allegations contained in ¶137 of Plaintiffs' Second Amended Complaint.

138.     Likewise, Livingston, Eason, Pringle, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees, and failed to take reasonable steps to protect the health and safety of prisoners.

ANSWER:

Defendants Livingston, Eason, Pringle, and TDCJ deny the allegations contained in ¶138 of Plaintiffs' Second Amended Complaint.

139.     Livingston, Eason, and Pringle as well as TDCJ and UTMB also knew TDCJ routinely housed people with obesity, hypertension and diabetes in extremely hot facilities like the Hutchins State Jail. TDCJ's policies and practices, which Livingston, Eason, UTMB director Owen and Pringle knew about, make no accommodation for people with hypertension or diabetes during periods of extreme temperatures.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C";

and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that Correctional Staff at TDCJ Units are trained in these documents. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D. Defendants Livingston, Eason, Pringle, and TDCJ admit that there are offenders with obesity, hypertension and diabetes housed in TDCJ facilities. Defendants Livingston, Eason, Pringle, and TDCJ deny the remaining allegations contained in ¶139 of Plaintiffs' Second Amended Complaint.

140.    UTMB, TDCJ, Livingston, Eason, and Pringle – at a minimum – failed  to take reasonable steps to safely house Mr. McCollum and protect him from heat stroke, a risk they were well aware of at the time. Livingston, Eason, and Pringle were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

ANSWER:

Defendants TDCJ, Livingston, Eason, and Pringle deny the allegations contained in ¶140 of Plaintiffs' Second Amended Complaint.

141.    At the time of Mr. McCollum's death, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Eason, and Pringle are not entitled to qualified immunity.

ANSWER:

Defendants deny the allegations contained in ¶141 of Plaintiffs' Second Amended Complaint.

142.    Plainly, the conditions at Hutchins State Jail result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Mr.

McCollum, as well as others with heat-sensitive disabilities. These conditions are not reasonably related to any penological interest.

ANSWER:

Defendants are unable to admit or deny that "these conditions are not reasonably related to any penological interest" because the term "penological interest" is vague, undefined and calls for a legal conclusion. Defendants deny the remaining allegations in ¶142 of Plaintiffs' Second Amended Complaint.

143.    TDCJ and UTMB discriminated against Mr. McCollum due to his disabilities – obesity, hypertension and/or diabetes – by denying him reasonable accommodations necessary to allow him access TDCJ and UTMB's programs and services, including safe housing. The extreme heat in TDCJ facilities denies people like Mr. McCollum access to TDCJ facilities.

ANSWER:

Defendant TDCJ denies the allegations contained in ¶143 of Plaintiffs' Second Amended Complaint.

CAUSES OF ACTION

I.    <u>EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT</u>
(As to Defendants Livingston, Eason and Pringle Only, in Their Individual Capacities)

144.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

ANSWER:

Defendants incorporate their responses to the previous paragraphs as if fully set out here.

145.    By subjecting Mr. McCollum to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions,

Defendants Livingston, Eason and Pringle acted with deliberate indifference to Mr. McCollum's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

ANSWER:

Defendants Livingston, Eason, and Pringle deny any deliberate indifference or any constitutional violation as alleged in ¶ 145.

146.   The extreme temperatures Defendants tolerated at the Hutchins State Jail proximately caused Mr. McCollum's untimely death.

ANSWER:

Defendants Livingston, Eason, and Pringle deny the allegations contained in ¶ 146.

147.   Plaintiff brings these claims through 42 U.S.C. § 1983.

ANSWER:

Defendants Livingston, Eason, and Pringle admit Plaintiff alleges he sues in accordance with 42 U.S.C. § 1983 but deny that the facts and circumstances of the incidents in this suit give rise to a Constitutional violation.  Defendants Livingston, Eason, and Pringle asserts the defense of qualified immunity.

II.   AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT
(As to Defendant TDCJ and UTMB Only)

148.   TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

ANSWER:

Defendant TDCJ admits it receives federal funds. Defendant TDCJ denies that Plaintiffs' decedent was a person with a disability as contemplated by the ADA, the ADAAA or the RA. Defendant TDCJ further denies that it discriminated against Plaintiffs' decedent because of his alleged disability and further denies that he was denied access to any services or access to any programs or activities provided by TDCJ. Defendant TDCJ denies that any alleged failure to accommodate Plaintiffs' decedent proximately caused his injuries. Finally, Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

149.    Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act apply to TDCJ and to UTMB, and have the same mandate as the Rehabilitation Act.  42 U.S.C. § 12131 *et seq.* (2008).

ANSWER:

Defendant TDCJ denies that Title II of the ADA and ADAAA apply to TDCJ in the facts and circumstances alleged. TDCJ denies that the ADA and ADAAA have the "same mandate" as the RA.  Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

150.    The Hutchins State Jail is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes.  Mr. McCollum was otherwise qualified to participate in the programs and services at the Hutchins State Jail provided by TDCJ and/or UTMB.

ANSWER:

Defendant TDCJ denies that the Hutchins State Jail and other TDCJ units' operation comprises a program and/or service for purposes of the ADA, ADAAA, and/or RA. TDCJ denies that Plaintiffs' decedent was qualified to receive the services of and participate in the programs or activities at the Hutchins State Jail.  Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

151.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Mr. McCollum was a qualified individual regarded as having a physiological impairment that substantially limited one or more of his major life activities. Defendant TDCJ and UTMB knew Mr. McCollum suffered from hypertension, and was prescribed diuretic medications. He was also known to have diabetes, and to have been morbidly obese. Each of these conditions, alone or in combination, made Mr. McCollum a qualified individual with a disability. Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAAA and Rehabilitation Act, by failing and refusing to protect him from the extreme temperatures that took his life and make reasonable accommodations to safely house him.

ANSWER:

Defendant TDCJ denies that Plaintiffs' decedent was a qualified individual for purposes of the ADA, ADAAA, and/or RA and otherwise denies these allegations.  Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

152.    As alleged above and herein, TDCJ and UTMB failed to and refused to reasonably accommodate Mr. McCollum's disability while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.  That failure and refusal caused his death.

ANSWER:

Defendant TDCJ denies that Plaintiffs' decedent was a qualified individual for purposes of the ADA, ADAAA, and/or RA and otherwise denies these allegations.  Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

153.    As alleged above, TDCJ and/or UTMB failed, and refused to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Mr. McCollum's disability.  These failures and refusals caused his death.

ANSWER:

Defendant TDCJ denies that Plaintiffs' decedent was a qualified individual for purposes of the ADA, ADAAA, and/or RA and otherwise denies these allegations.  Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

154.    Among other things, UTMB and TDCJ failed to:

   a. Provide safe housing;

   b.  Provide access to climate-controlled housing;

   c.  Assign Mr. McCollum to a bottom bunk;

   d.  Provide Mr. McCollum with a fan or cup;

   e.  Assign Mr. McCollum to a climate-controlled facility;

   f.  Provide medical treatment; and,

   g.  Provide an intake physical.

ANSWER:

Defendant TDCJ denies the allegations contained in ¶154 of Plaintiffs' amended complaint and denies that to the extent Plaintiffs' decedent was not provided the provisions listed above, such denial was not the product of any intent by TDCJ to discriminate against Plaintiffs' decedent. Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

155.    As Mr. McCollum died as a direct and proximate result of TDCJ and UTMB's intentional discrimination against him, Plaintiffs are entitled to all damages allowed by law.

ANSWER:

Defendant TDCJ denies the allegations contained in ¶ 155 of Plaintiffs' amended complaint.   Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity in cases brought pursuant to RA or Title II of the ADA or ADAAA.

III.    EIGHTH AND FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE
(As to Defendants Livingston, Eason, Pringle, Clark, Tate and Sanders Only, in Their Individual Capacities)

156.    Defendants Clark, Tate and Sanders denied Mr. McCollum health care for a serious medical need when they found him unresponsive and suffering from convulsions, and delayed calling an ambulance for almost an hour. Clark, Tate and Sanders knew from observing Mr. McCollum that he needed medical attention that could not be provided at the prison, but delayed his access to care until it was too late. Their deliberate indifference to Mr. McCollum's serious medical need proximately caused his death and additional suffering.

ANSWER:

Defendants Clark, Tate and Sanders incorporate their responses set forth in ¶ 1-147 and deny any deliberate indifference or any constitutional violation as alleged in ¶ 156 of the amended complaint. Defendants Clark, Tate and Sanders assert the defense of qualified immunity.

157.    Eason, Livingston, and Pringle knew about and ratified the decision to delay prisoners access to medical care. Eason and Pringle knew requiring officers to go through the chain of command and consult with an off-site nurse before calling an ambulance would seriously delay access to medical care. Their deliberate indifference to prisoners suffering from emergent medical conditions was a proximate cause of Mr. McCollum's death.

ANSWER:

Defendants Eason, Livingston, and Pringle incorporate their responses set forth in ¶ 1-147 and deny any deliberate indifference or any constitutional violation as alleged in ¶ 157 of the amended complaint. Defendants Eason, Livingston and Pringle assert the defense of qualified immunity.

158.    Eason, Pringle, and Livingston also knew about and effectively ratified an informal TDCJ policy of failing to provide immediate medical attention to non-responsive prisoners suffering seizures at prisons where there was no available medical staff. Their deliberate indifference to prisoners suffering from emergent medical conditions contributed to Mr. McCollum's death.

ANSWER:

Defendants Eason, Livingston, and Pringle incorporate their responses set forth in ¶ 1-147 and deny any deliberate indifference or any constitutional violation as alleged in ¶ 158 of the amended complaint. Defendants Eason, Livingston and Pringle assert the defense of qualified immunity.

159.    Eason, Pringle, and Livingston failed to adequately train and supervise Clark, Tate and Sanders. Their failure and refusal to instruct officers who find unresponsive inmates suffering

74

convulsions to immediately seek emergency medical treatment proximately caused Mr. McCollum's death.

ANSWER:

Defendants Eason, Livingston, and Pringle incorporate their responses set forth in ¶ 1-147 and deny any deliberate indifference or any constitutional violation as alleged in ¶ 159 of the amended complaint. Defendants Eason, Livingston and Pringle assert the defense of qualified immunity.

DAMAGES

160.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of the wrongful death of Larry Gene McCollum, Deceased, Plaintiffs assert claims under 42 U.S.C. § 1983 and the wrongful death and survivorship statutes as specifically pled herein.

ANSWER:

Defendants deny that they, their agents, employees or representatives proximately caused any damage or injury to Plaintiffs and that Plaintiffs are therefore not entitled to any damages whatsoever for any alleged constitutional violation or for any damages whatsoever under the ADA, the ADAAA or the RA as demanded in ¶ 160 of the amended complaint.

161.    More particularly, Plaintiff Stephanie Kingrey, in her capacity as the independent administrator of the Estate of Larry Gene McCollum, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

•    past physical pain and suffering;

•    past mental anguish;

- loss of services and other economic damages (including loss of earning capacity);

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

ANSWER:

Defendants deny that Plaintiff (on behalf of the Estate of Larry Gene McCollum) has standing to assert a survival claim on behalf of the estate of Larry Gene McCollum. Defendants deny Plaintiff is entitled to any damages whatsoever for past physical pain and suffering, past mental anguish or attorney's fees and costs as demanded in ¶ 161 of the amended complaint.

162.    Plaintiffs Stephanie Kingrey, Stephen McCollum, and Sandra McCollum in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, and affection of Larry McCollum;

- loss of services and other economic or pecuniary damages, and;

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

ANSWER:

Defendants deny that Plaintiffs have any standing to assert any wrongful death claim on behalf for the alleged wrongful death of Larry Gene McCollum. Defendants further deny that Plaintiff is entitled to any damages whatsoever for past and future mental anguish, past loss of companionship, society, services, and affection of Larry McCollum, or attorney's fees and costs as demanded in ¶ 162 of the amended complaint.

INJUNCTIVE AND DECLARATORY RELIEF
(As to Defendant TDCJ Under the ADA, ADAAA and Rehabilitation Act)

163.    Pursuant to the ADA, ADAAA and Rehabilitation Act, the Plaintiffs seek appropriate injunctive and declaratory relief, including, but not limited to, the measures already adopted by TDCJ following the mediation before Magistrate Judge Andrew Austin in this case.

ANSWER:

Defendants deny that Plaintiffs are entitled to injunctive and declaratory relief alleged in ¶ 163 of the amended complaint.

164.    The mediated settlement agreement of the injunctive claims against TDCJ included:

a.  Placing incoming, non-medically assessed prisoners whose self-assessment indicates a heat-related risk upon a temporary wellness checklist, until medically evaluated with documentation;

b.  Development of a training video on the identification of and response to, apparent heat-related illness or injuries, in cooperation with appropriate medical experts;

c.  Review of the feasibility of respite areas for newly received prisoners or previously identified prisoners on the heat list along with development of appropriate documentation;

d.  Identification of prisoners at risk of heat injury in a manner visible to all staff;

e.  Development of a formal written policy that addresses excessive heat in prisoner housing areas; and,

f.  Providing a report to the warden, regional director, Correctional Institutions Division director, Executive Director, and TDCJ board whenever a prisoner dies in custody due to hyperthermia, or where heat, high temperatures, or the heat index is a cause or contributing cause of death.

Plaintiffs also seek any injunctive relief necessary to conform TDCJ's policies, practices, and procedures to those imposed by the ADA, ADAAA, Rehabilitation Act, and United States Constitution.

ANSWER:

Defendants admit that TDCJ has implemented heat relief measures and deny that Plaintiffs are entitled to injunctive relief to conform to TDCJ's policies, practices, and procedures alleged in ¶ 164 of the amended complaint.

## ATTORNEYS' FEES AND COSTS

165.    Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs.  Plaintiffs also request attorneys' fees, costs, and expenses against TDCJ and UTMB for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. § 12205.

ANSWER:

Defendants deny that Plaintiffs are entitled to recover attorney's fees and costs in any amount whatsoever as demanded in ¶ 165.

## DEFENDANTS' OTHER DEFENSES

1.    Plaintiff has not stated a claim upon which relief can be granted under the Americans with Disabilities Act or the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131; the Rehabilitation Act, 29 U.S.C. § 701 *et seq*. or under any constitutional theory, statutory authority or common-law theory for which relief may be sought pursuant to 42 U.S.C. § 1983.

2.    Defendants admit that causes of action may be stated under certain circumstances pursuant to the Constitution, the ADA, ADAAA, or RA but deny that such circumstances are present in this case.

3.      Defendants deny that Plaintiffs' decedent was deprived of any right, privilege, or immunity granted or secured by the Constitution and/or the laws of the United States or that they violated any of Plaintiffs' rights under the Constitution, the ADA, ADAAA, or RA or any other law or statute under which Plaintiff sues or may be suing.  Defendants deny that they were motivated by any discriminatory intent of any kind.

4.      Defendants assert that any actions taken regarding Plaintiffs' decedent concerning any claims alleged by Plaintiffs in this lawsuit were based on a good-faith belief that their actions were taken in accordance with agency policy, applicable law and were taken without any discriminatory intent.

5.      Defendants assert that each action about which Plaintiffs complain in this lawsuit were taken for valid and legitimate, non-discriminatory reasons in the unique context of operating a prison facility.

6.      Defendants deny that Plaintiffs are entitled to injunctive, declaratory, or any other relief as demanded in Plaintiffs' amended complaint; Defendants further deny that Plaintiffs are entitled to attorney's fees or costs in any amount whatsoever.

7.      Defendant TDCJ denies that Congress has validly abrogated Texas' sovereign immunity for purposes of the 42 U.S.C. §12131 (the ADA and ADAAA) or §794 (the RA).

8.      Defendants deny that Plaintiffs' decedent requested an accommodation under the ADA, ADAAA, or RA and further deny that they knew or believed Plaintiff's decedent required any accommodation, or that anyone denied the decedent any reasonable accommodation.

9.      Defendant TDCJ asserts that Plaintiffs' decedent was not a qualified individual with disabilities that, by reason of such disability, was excluded from participation in or was denied the benefits of services, programs, or activities of a public entity.

10.     Defendants deny that Plaintiffs' decedent was subjected to discrimination in violation of the ADA, ADAAA, or RA.

11.     Defendants deny that any employee of the Texas Department of Criminal Justice intentionally discriminated against Plaintiffs' decedent by reason of or solely because of his alleged disabilities, and further deny that they discriminated against Plaintiffs' decedent at all.

12.     Defendants assert the defenses of sovereign immunity, Eleventh Amendment immunity, lack of standing, *res judicata*, statute of limitations, laches, estoppel, waiver, qualified and official immunities, and lack of jurisdiction to Plaintiffs' claims in this lawsuit.

13.     Defendants specifically invoke the stipulations entered into relating to the *Ruiz* litigation.

14.     Defendants assert that some, and perhaps all, of Plaintiffs' complaints may be barred by the applicable statute of limitations or by Mr. McCollum's failure to exhaust administrative remedies under applicable law; and, thus, the Defendants assert such defenses to the extent these defenses may be applicable.

15.     Defendants assert the after-acquired evidence defense.

16.     Defendants specifically invoke entitlement to Eleventh Amendment immunity and sovereign immunity as to any of Plaintiffs' claims which are not expressly and unambiguously included within the limited waivers of sovereign immunity found in any statute under which Plaintiffs raise claims.

17.     Defendants Livingston, Eason, Clark, Tate, Sanders and Pringle are entitled to qualified and official immunity to Plaintiffs' claims where their actions did not violate Plaintiffs' decedent's constitutional rights and where their actions were objectively reasonable in light of

clearly established law at the time of the violation, including but not limited to the defense of no personal involvement where applicable.

18.     Defendants Livingston, Eason, Clark, Tate, Sanders and Pringle are entitled to qualified and official immunity to Plaintiffs' claims where all policies promulgated or enforced by them were consistent with constitutional minima.

19.     Defendants Livingston, Eason, Clark, Tate, Sanders and Pringle are entitled to dismissal of Plaintiff's claims where Defendants did not act with deliberate indifference to Plaintiffs' decedent's health or safety.

20.     Defendants assert, based upon information and belief, that Plaintiffs' decedent failed to mitigate or to avoid injury or to take advantage of the remedial measures for the conditions alleged, and that none of such alleged conditions or risk of harm, if any, have been the result of any discriminatory or unconstitutional act by Defendants, all acts of which Defendants deny.

21.     Defendants assert the limitations, exclusions and defenses of the Prison Litigation Reform Act, 42 U.S.C. § 1997e and 18 U.S.C. § 3626.

22.     Defendants assert that the estate of Larry McCollum does not have standing to bring a wrongful death claim for the alleged wrongful death of Plaintiffs' decedent and that this Court does not have subject-matter jurisdiction to adjudicate such claims.

23.     Defendants assert Plaintiffs have not met the conditions precedent to abrogate Eleventh Amendment and Sovereign Immunity under the Texas Tort Claims Act.

24.     TDCJ denies that it is a proper party to any claim brought against it under the Texas Survival Statute and hereby asserts sovereign immunity to any such claim.

25.     TDCJ denies that Congress abrogated sovereign immunity for purposes of 42 U.S.C. § 12131 (the ADA and ADAAA) or 42 U.S.C. § 794 (the RA).

26.     TDCJ denies that it failed to provide reasonable accommodations to Plaintiffs' decedent as alleged by Plaintiffs in the amended complaint.

27.     TDCJ denies that Plaintiffs' decedent was disabled because the alleged disabilities plead by Plaintiffs do not constitute a physical or mental impairment that substantially impairs a major life activity, as required for a valid cause of action pursuant to 42 U.S.C. § 12131 (the ADA and ADAAA) or 42 U.S.C. § 794 (the RA).

28.     TDCJ denies that Plaintiffs' decedent requested any accommodation, that Plaintiffs' decedent knew or believed he needed any accommodation, or that TDCJ denied him a reasonable accommodation pursuant to 42 U.S.C. § 12131 (the ADA and ADAAA) or 42 U.S.C. § 794 (the RA).

29.     The accommodations requested by Plaintiffs constitute fundamental alterations to TDCJ's policies, procedures, services, and/or facilities and do not constitute reasonable modifications.

30.     The accommodations requested by Plaintiffs constitute an undue burden.

31.     The accommodations requested by Plaintiffs would result in undue financial and administrative burdens on TDCJ.

32.     TDCJ asserts that Plaintiffs' decedent was not denied any benefits or services because of his alleged disability.

33.     Defendants assert their right to raise additional defenses as they become apparent throughout the factual development of the case.

## JURY DEMAND

Defendants demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

For the foregoing reasons, Defendants move the Court to deny all relief requested by Plaintiff, to enter judgment in Defendants' favor as to all claims asserted by Plaintiff and to enter an order awarding Defendants all costs, including attorney's fees incurred in the litigation of this matter, and to be granted all such other and further legal and equitable relief to which they may be entitled.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**CHARLES E. ROY**
First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division


_/s/ Cynthia L. Burton_
**CYNTHIA L. BURTON**
Assistant Attorney General
Attorney in charge
Texas Bar No. 24035455
Cynthia.burton@texasattorneygeneral.gov


**MATTHEW GREER**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24069825
Matthew.greer@texasattorneygeneral.gov


**DANIEL C. NEUHOFF**
Assistant Attorney General
Co-counsel
Texas Bar No. 24088123
Daniel.neuhoff@texasattorneygeneral.gov

**BRUCE R. GARCIA**
Assistant Attorney General
Co-counsel
Texas Bar No. 07631060
Bruce.garcia@texasattorneygeneral.gov

Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin TX  78711
(512) 463-2080/Fax (512) 936-209

**ATTORNEYS FOR DEFENDANTS**
**BRAD LIVINGSTON, JEFF PRINGLE,**
**RICHARD CLARK, KAREN TATE,**
**SANDREA SANDERS, ROBERT EASON**
**and the TEXAS DEPARTMENT OF**
**CRIMINAL JUSTICE.**

84

## NOTICE OF ELECTRONIC FILING

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have electronically submitted for filing **Defendants' Answer to Plaintiffs' Second Amended Complaint** in accordance with the Electronic Case Files system of the Southern District of Texas on this day September 29, 2015.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that a true and correct copy of the above and foregoing **Defendants' Answer to Plaintiffs' Second Amended Complaint** has been served electronically to all counsel or *pro se* parties of record as authorized by FED. R. CIV. P. 5 (b)(2) on September 29, 2015.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General