## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN McCOLLUM, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:14-cv-03253** |
| | § | |
| **BRAD LIVINGSTON, et al.,** | § | |
| **Defendants.** | § | |

## THE UNIVERSITY OF TEXAS MEDICAL BRANCH'S
## MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

KAREN D. MATLOCK
Chief, Law Enforcement Defense Division

J. LEE HANEY*
Assistant Attorney General

HEATHER RHEA
Assistant Attorney General

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080
(512) 936-2109

FERNELIUS ALVAREZ SIMON PLLC

STEPHEN M. FERNELIUS
GRAIG J. ALVAREZ
KARA STAUFFER PHILBIN

1221 McKinney Street, Suite 3200
Houston, Texas  77010
(713) 654-1200
(713) 654-4039 (fax)

### ATTORNEYS FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH
**\* Counsel of Record**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................iii

I. NATURE AND STAGE OF THE PROCEEDINGS ...................................1

II. STANDARD OF REVIEW .........................................................................2

III. ISSUES PRESENTED.................................................................................2

IV. SUMMARY OF THE ARGUMENT ...........................................................2

V. STATEMENT OF UNDISPUTED MATERIAL FACTS .............................3

    A. Management and Control of Texas Correctional Facilities ...................3

    B. Correctional Managed Health Care Policies.........................................5

    C. Intake at the Hutchins Unit in 2011 ......................................................7

    D. Larry McCollum's 2011 Incarceration ..................................................9

        1. McLennan County Jail Records..........................................................9

        2. Transfer to the Hutchins Unit ..........................................................11

        3. McCollum's Death and Autopsy Results..........................................14

VI. ARGUMENT & AUTHORITIES..............................................................15

    A. The ADA, ADAAA and RA prohibit discrimination against disabled individuals, and ensure a qualified individual with a disability is afforded equal opportunity and participation in the services, programs, and activities of a public entity ...................................................................................15

    B. McCollum was not a qualified individual under the ADA; he was not excluded from participation in, or denied benefits, services, programs, or other activities for which UTMB was responsible, and he was not discriminated against by UTMB.........................................................17

        1. McCollum was not a qualified individual as defined by the ADA..................18

a.  McCollum did not suffer any disability that "substantially limited" him or one or more major life activities....................................................18

   1)  McCollum was not substantially limited in the major life activities of walking and standing........................................................22

   2)  McCollum's respiratory system, circulatory system, endocrine system, digestive system, or nervous system functions were not substantially limited..............................................................22

   3)  McCollum's cardiovascular system was not substantially limited......................................................................................23

   4)  McCollum's ability to climb was not substantially limited................24

   5)  No evidence exists that McCollum's abilities to sweat, cool, or thermoregulate were substantially impaired .........................................25

b.  McCollum did not have a record of impairment........................................26

c.  McCollum was not regarded as having an impairment ............................28

2.  McCollum was not excluded from participating in, or denied the benefits of, services, programs, or activities provided by UTMB ..................29

   a.  UTMB is not responsible for the conditions of offender housing and climate control at Hutchins, or any TDCJ prison, and even if it were, McCollum was not excluded from receiving that service or benefit because climate controlled housing is not a service or benefit provided to inmates in the general population ...........................................31

   b.  UTMB does not assign which bunk McCollum received at Hutchins, and did not deny him the benefit of a bottom bunk ...................................32

   c.  McCollum was not denied the benefit or program to receive a cup or fan because providing cups or fans was not a function of UTMB ........33

   d.  UTMB did not exclude McCollum from receiving medical treatment or an intake physical by UTMB ................................................................34

3.  No evidence exists that UTMB intentionally discriminated against McCollum due to his alleged disability .........................................................35

C.  Sovereign immunity of the University of Texas Medical Branch should not be abrogated where its conduct did not violate Title II of the Americans with Disabilities Act or § 504 of the Rehabilitation Act................................................37

VII.    CONCLUSION...........................................................................................................39

CERTIFICATE OF SERVICE ..............................................................................................42

# TABLE OF AUTHORITIES

**CASES**          **PAGE No.**

*Baker v. McCollan*,
    443 U.S. 137 (1979).................................................................................38

*Ball v. LeBlanc*,
    792 F.3d 584 (5th Cir. 2015) ..............................................................25, 26

*Bennett-Nelson v. Louisiana Board of Regents*,
    431 F.3d 448 (5th Cir. 2005) ...............................................................16

*Borum v. Swisher County*,
    No. 2:14-CV-127-J, 2015 WL 327508 (N.D.Tex – Amarillo 2015).................29, 32, 36

*Burton v. Freescale Semiconductor, Inc.*,
    798 F.3d 222 (5th Cir. 2015) ..............................................................28

*Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996) ...........................................35

*Cardenas v. Lee County, Texas*,
    569 Fed. Appx. 252 (5th Cir. 2014)......................................................35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................2

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)..........................................................................37

*Delano-Pyle v. Victoria Cnty., Tex.*,
    302 F.3d 567 (5th Cir. 2002) ..............................................................35

*Domino v. Texas Dep't of Criminal Justice*,
    239 F.3d 752 (5th Cir. 2001) ..............................................................38, 39

*Dupre v. Charter Behavioral Health Systems of Lafayette Inc.*,
    242 F.3d 610 (5th Cir. 2001) ..............................................................27

*EEOC v. Chevron Phillips Chem. Co.*,
    570 F.3d 606 (5th Cir. 2009) ..............................................................19

*Exxon Corp. v. U.S. Dept. of Labor*,
    No. 3:96-CV-3405-H, 2002 U.S. Dist. WL 356517 (N.D. Tex. 2002) ............19

*Farmer v. Brennan*,
    511 U.S. 825 (1994)..........................................................................38

*Frame v. City of Arlington*,
    657 F.3d 215 (5th Cir. 2011) ........................................................15, 16, 29, 36

*Gammage v. West Jasper School Bd* .,
    179 F.3d 952 (5th Cir. 1999) ....................................................................36

*Gobert v. Caldwell*,
    463 F.3d 339 (5th Cir. 2006) ..............................................................38, 39

*Griffin v. United Parcel Service, Inc.*,
    661 F.3d 216 (5th Cir. 2011) ....................................................................24

*Hale v. King*,
    642 F.3d 492 (5th Cir. 2011) ..............................................19, 20, 24, 28, 37

*Hinojosa v. Livingston*,
    807 F.3d 657 (5th Cir. 2015) ....................................................................38

*Kemp v. Holder*,
    610 F.3d 231 (5th Cir. 2010) ....................................................................16

*Lawrence v. National Westminster Bank New Jersey*,
    98 F.3d 61 (3rd Cir. 1996) ........................................................................36

*Lottinger v. Shell Oil Co.*,
    143 F.Supp.2d 743 (S.D.Tex. 2001) ..........................................................27

*McCoy v. Tex. Dep't of Crim. Justice*,
    C.A. No. C-05370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) ....................36

*McGarthy v. Ridge*,
    2004 WL 1542161 (N.D. Tex. 2004) ..........................................................19

*McInnis v. Alamo Community College District*,
    207 F.3d 276 (5th Cir. 2000) ....................................................................20

*Melton v. Dallas Area Rapid Transit*,
    391 F.3d 669 (5th Cir. 2004) ..............................................................16, 17

*Mendoza v. Lynaugh*,
    989 F.2d 191 (5th Cir. 1993) ....................................................................39

*Mora v. Univ. of Tex. Southwestern Medical Center*,
    469 F. App'x 295 (5th Cir. 2012) ..............................................................19

*Mzyk v. North East Ind. Sch. Dist.*,
    397 Fed.Appx. 13 (5th Cir. 2010) .................................................................27

*Neely v. PSEG Texas, Ltd. P'ship.*,
    735 F.3d 242 (5th Cir. 2013) .......................................................................18

*Pennsylvania Dept. of Corrections v. Yeskey*,
    524 U.S. 206 (1998) ............................................................................16, 29

*Randolph v. Rodgers*,
    170 F.3d 850 (8th Cir. 1999) .......................................................................36

*Reed v. LePage Bakeries, Inc.*,
    244 F.3d 254 (1st Cir. 2001) .......................................................................37

*Sherrod v. American Airlines, Inc.*,
    132 F.3d 1112 (5th Cir. 1998) .....................................................................27

*Sutton v. United Air Lines, Inc.*,
    527 U.S. 471 (1999) ....................................................................................19

*Tips v. Regents of Texas Tech University*,
    921 F.Supp. 1515 (N.D. Tex. 1996) ............................................................18

*Tennessee v. Lane*,
    541 U.S. 509 (2004) ....................................................................................37

*Thayer v. Adams*,
    364 Fed. Appx. 883 (5th Cir. 2010) ............................................................38

*Tolan v. Cotton*,
    134 S.Ct. 1861 (2014) ...................................................................................2

*U.S. v. Georgia*,
    546 U.S. 151 (2006) ...............................................................15, 16, 29, 37

## STATUTES, RULES, CODES

FED. R. CIV. P. 56 ...............................................................................................1, 2

28 C.F.R. §35.101 (2010) ....................................................................................15

28 C.F.R. §35.104 (2011) ....................................................................................28

28 C.F.R. §35.130 (2011) ...........................................................15, 17, 29, 30, 32

28 C.F.R. §35.152 (2011) ...........................................................................17, 30, 32

29 C.F.R. §1630.2 (2012) .............................................................17, 20, 24, 26, 27

29 U.S.C. §794 (2014) ...................................................................................16, 29

42 U.S.C. §1983 ...................................................................................................38

42 U.S.C. §12101 (2009) ...............................................................................15, 32

42 U.S.C. §12102 (2009) .......................................................................18, 20, 28

42 U.S.C. §12112 (2009) ...............................................................................17

42 U.S.C. §12131 (1990) ...............................................................................16, 17

42 U.S.C. §12132 (1990) ...............................................................................15, 29

TEX. GOV'T CODE §499.055 ................................................................................30

TEX. GOV'T CODE §501.131 *et seq.* ....................................................................4

TEX. GOV'T CODE §501.146 ................................................................................4

TEX. GOV'T CODE §501.148 ................................................................................5

TEX. GOV'T CODE §501.150(a) ............................................................................5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN McCOLLUM, et al.,** | § | |
|     **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:14-cv-03253** |
| | § | |
| **BRAD LIVINGSTON, et al.,** | § | |
|     **Defendants.** | § | |

**THE UNIVERSITY OF TEXAS MEDICAL BRANCH'S**
**MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT**

The University of Texas Medical Branch at Galveston moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Stephen McCollum and Sandra McCollum, individually, and Stephanie Kingrey, individually and as the independent administrator of the Estate of Larry Gene McCollum (collectively "Plaintiffs"), sue The University of Texas Medical Branch at Galveston ("UTMB" or "Defendant") for violations of the Americans with Disabilities Act of 1990 ("ADA"), the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), and the Rehabilitation Act of 1973 ("RA") for allegedly failing to provide reasonable accommodations to Larry McCollum while he was incarcerated at the Hutchins State Jail. D.E. 119 at ¶¶148-155.

UTMB denies that it discriminated against McCollum by reason of any alleged disability or that it otherwise violated McCollum's rights under the ADA, the ADAAA, the RA or any federal or state constitutional or statutory provision. The deadline for discovery has passed. Despite extensive discovery, the evidence fails to support Plaintiffs' ADA, ADAAA and RA claims against

1

UTMB. Because there are no genuine disputes of material fact, UTMB requests this Court grant summary judgment.

## II.    STANDARD OF REVIEW

UTMB moves for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment is proper if the movant shows that no genuine disputes of material fact exist and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## III.    ISSUES PRESENTED

A. Is UTMB entitled to summary judgment where McCollum was not a qualified individual under the ADA; where he was not excluded from participation in, or denied benefits, services, programs, or other activities for which UTMB was responsible, or was otherwise being discriminated against by UTMB; and where any exclusion, denial of benefits, or discrimination was not by reason of his alleged disability?

B. Is UTMB entitled to summary judgment where its sovereign immunity to claims brought pursuant to Title II of the ADA has not been validly abrogated?

## IV.    SUMMARY OF THE ARGUMENT

McCollum cannot be a qualified individual under the ADA, ADAAA and RA because he did not suffer from a disability that substantially limited a major life activity. Plaintiffs' allegations that McCollum suffered from obesity, hypertension and had a self-reported history of diabetes, without establishing that such ailments substantially limited a major life activity, are dispositive.

Even if McCollum was a qualified individual under the ADA, Plaintiffs cannot establish a service, program, or activity of UTMB that McCollum was excluded from participating in or was denied the benefit of, by reason of his disability. The undisputed evidence confirms that UTMB provides medical services to offenders incarcerated at TDCJ. Plaintiffs cannot raise a genuine issue of material fact that UTMB intentionally discriminated against McCollum with respect to the

provision of these medical services. To the contrary, UTMB submitted competent summary judgment evidence to conclusively establish that it did not deny any benefit to McCollum.

Finally, because UTMB's conduct did not violate the Fourteenth Amendment or Eighth Amendment, there has been no valid waiver of Texas' sovereign immunity. First, UTMB did not violate Title II of the ADA so the waiver of sovereign immunity under the ADA does not apply. Second, UTMB's conduct did not constitute a separate violation of the Fourteenth Amendment or Eighth Amendment because UTMB has neither the authority or responsibility to provide air conditioning in the housing dorms or other accommodations as alleged by Plaintiffs. Moreover, McCollum's ailments were such that UTMB's treatment of those ailments did not rise to a level that it acted with deliberate indifference to an excessive risk of harm to the health and safety of McCollum.

## V.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  Management and Control of Texas Correctional Facilities

The Texas Department of Criminal Justice ("TDCJ") has the responsibility and authority for management and control of correctional facilities in the State of Texas. *See, e.g.,* App. Tab 1 at 1-34 (Art. I, 1.15, defining TDCJ) (hereinafter referred to as "CMHCC-UTMB Agreement"); App. Tab 2 at 36-37 (19:23-22:21) (describing the functions of TDCJ). Through this authority, TDCJ makes the determination of where and how offenders are housed within the prison system. *See, e.g.,* App. Tab 3 at 50-51 (12:22-13:13); App. Tab 4 at 66 (126:12-19). Housing, security, and management of the living conditions of the offender population are under the sole authority and control of TDCJ. *See, e.g.,* App. Tab 1 at 6 (Art. 1, 1.15, defining TDCJ); App. Tab 5 at 75-76 (301:23-302:15) (UTMB has no control over maintenance or temperature control issues, except at

Hospital Galveston); App. Tab 4 at 64 (71:17-20); App. Tab 2 at 38 (43:24-44:3); App. Tab 18 at 266 (267:4-22), 269 (278:21-279:7).

As it relates to healthcare for offenders, however, the Texas Legislature created the Correctional Managed Health Care Committee ("CMHCC") in 1993 to develop a plan for the provision of health care to TDCJ offenders, as reflected by its Mission:

> *The mission of the Correctional Managed Health Care Committee is to develop a statewide managed health care plan that provides TDCJ offenders with timely access to quality health care while also controlling costs.*

*See* TEX. GOV'T CODE § 501.131 *et seq*.; App. Tab 6 at 79-92 (explaining CMHCC's history and organization) (hereinafter referred to as CMHCC Overview).

Pursuant to legislative authority, CMHCC was tasked with developing and approving a plan for all persons confined by the department (TDCJ) that:

> (1) specifies the type and general level of care to be provided to persons confined by the department; and

> (2) ensures the continued access to needed care in the correctional health care system.

TEX. GOV'T CODE § 501.146. This statewide correctional health care system is effectuated through a collaborative effort between TDCJ, UTMB, and Texas Tech University Health Sciences Center ("TTHSC") and is operated under the guidance and direction of CMHCC. App. Tab 4 at 61-62 (40:3-19, 41:18-42:15, 147:10-148:19); App. Tab 6 at 79-92 (CMHCC Overview).

Under this health care plan, UTMB provides health care to approximately 78% of the offenders incarcerated in TDCJ, including the Hutchins Unit where McCollum was assigned. *See* CMHCC Overview.

4

TDCJ maintains responsibility for monitoring the quality of care by the health care providers, including investigation of medical grievances, ensuring access to medical care, and conducting health services operational reviews (audits) at the units. TEX. GOV'T CODE § 501.150(a); App. Tab 1 at 12-14 (Art. VIII.A. and D.); *see also* App. Tab 4 at 68-69 (164:25-165:22). According to the CMHCC-UTMB Agreement, TDCJ shall also request, in consultation with CMHCC, appropriations for the funding of the correctional managed health care program from the Legislature. App. Tab 1 at 11 (Art. II.G.13); *see also* App. Tab 7 at 117 (221:24-222:1).

UTMB is tasked with the provision of medically necessary health care services, as defined by the contract. *See* App. Tab 1 at 7, 15-34 (Art. II.A. and Ex. A)[1]; App. Tab 9 at 163 (143:11-12). Services provided to the offender population are defined and detailed in the CMHCC-UTMB Agreement, which includes reference to the Offender Health Services Plan.  App. Tab 1 at 7-9, 15-34 (Art. II.D.-E. and Ex. A).

### B.  Correctional Managed Health Care Policies

CMHCC is statutorily responsible for the development of statewide policies for the delivery of correctional health care. *See* TEX. GOV'T CODE § 501.148; *see also* App. Tab 9 at 159-60 (35:12-37:14-21) ("These are all Correctional Managed Health Care policies."); *see also* App. Tab 6 at 79-92 (CMHCC Overview).

The Correctional Managed Healthcare Policy and Procedures Committee (hereinafter "P&P Committee") is a joint committee among UTMB, TTHSC, and TDCJ physicians, nurses, and pharmacists. App. Tab 7 at 94-95 (20:7-21:18); App. Tab 4 at 66 (125:5-18). The P&P

---

[1] During the fiscal years 2010-2011, UTMB contracted with CMHCC for Correctional Health Services to provide medical, psychiatric, and dental care to offenders in the custody of TDCJ. App. Tab 1; App. Tab 8 at 130.

Committee makes, reviews, and revises correctional managed care policies that govern the health care services provided to offenders. App. Tab 7 at 94-95 (20:7-21:18); App. Tab 4 at 66 (125:5-18). Policies are reviewed at least annually.  App. Tab 7 at 94 (20:7-17). After the P&P Committee creates a new policy, or revises an existing one, the policy goes to university medical directors for approval. *Id.*; App. Tab 9 at 159 (35:12-23); *see also* App. Tab 1 at 10 (Art. II.F.5). Dr. Lannette Linthicum, TDCJ's Health Services Division Director, has final approval. App. Tab 7 at 94 (20:7-17); App. Tab 9 at 159 (35:12-23); *see also* App. Tab 1 at 10 (Art.II.F.5); App. Tab 4 at 63 (50:18-19).

One policy developed by CMHCC addresses Heat Stress and was in effect in July 2011. *See* App. Tab 10 at 166-73 (applicable in 2011). The policy covers signs and symptoms of heat cramps, heat exhaustion, and heat stroke, and it details a treatment response. *See id.* The Heat Stress policy complements Administrative Directive 10.64 "Temperature Extremes in the TDCJ Workplace," the Heat Precaution annual reminder distributed by TDCJ, and TDCJ Health Services Division notifications. App. Tab 11 at 174-87, 190-91; *see also* App. Tab 11 at 188-89.  The Heat Precaution details various measures implemented by TDCJ to mitigate the effects of heat, including provision of additional water, ice, and cups; provision of and access to fans; additional showers; restrictions on outside activity, work schedules, and transportation; and relaxation of clothing requirements. *Id.* at 174-75 (TDCJ's Heat Precaution 2011).

UTMB conducts annual training on the signs and symptoms of heat related illnesses for both medical staff and supervisory correctional officers. App. Tab 7 at 97 (30:17-31:10), 112-13 (152:25-153:19); App. Tab 12 at 197 (152:23-153:11); App. Tab 13 at 204 (81:7-20). In turn,

6

supervisory correctional staff train the remaining correctional staff as well as the working offender

population. App. Tab 7 at 113 (153:10-19, 155:25-156:14); App. Tab 3 at 56-57 (112:25-114:12).

While providing health care to TDCJ offenders, UTMB is obligated to follow CMHCC

policies. *See* App. Tab 7 at 101 (71:4-9); App. Tab 8 at 124.

### C.  Intake at the Hutchins Unit in 2011

Pursuant to its contract with CMHCC, UTMB provided the medical care to offenders

incarcerated at the Hutchins Unit during 2011.[2]  UTMB operated the medical department at the

Hutchins Unit 16 hours per day in July 2011. App. Tab 7 at 94 (19:25-20:2), 109 (107:4-10).

The Hutchins Unit is an intake unit of TDCJ, located south of Dallas, Texas with housing

capacity for over 2,000 offenders. *See* App. Tab 15 at 210-11; App. Tab 16 at 215 (49:16-18);

App. Tab 12 at 198 (205:10-12). Intake units process offenders newly assigned to TDCJ's custody.

App. Tab 12 at 200 (215:1-7). An intake unit is typically the first unit an offender will be assigned

to after being processed through county jail.[3] App. Tab 9 at 161 (122:24-123:3); App. Tab 18 at

265 (63:15-24).

Upon arrival at an intake unit, offenders are screened for any acute or current medical,

dental, and/or psychiatric conditions that may require immediate assessment. App. Tab 7 at 103

(77:15-19, 78:7-16, 79:7-10); App. Tab. 12 at 196 (84:2-16), 199 (211:2, 212:12); *see also* App.

---

[2] The Hutchins Unit has been accredited by the American Correctional Association since May 2010. App. Tab 14 at 209.
[3] Intake units handle initial intake receiving and intake processing of offenders.  This process initially involves receiving the offender from county and performing a security search and property inventory, assessing court documents, performing initial assessments (including the medical screening), and giving offenders haircuts and showers.  App. Tab 17 at 252 (71:25-74:25). Once these are complete, TDJC houses the offender for intake processing, which includes EA (educational) testing, fingerprinting, a processing interview with TDCJ staff, and the intake physical by medical staff.  *Id.* at 253 (77:9-79:14). The process is typically completed within ten days.  *Id.* (77:21-78:8).

Tab 19 at 272-76. Screening results are recorded on the HSM-13 form.[4]  *See* App. Tab 7 at 103 (79:16-18), 104 (84:8-22); *see also* App. Tab 19. Offenders with health care needs that require urgent or immediate attention, or those taking medications will be treated or assessed further on the day of arrival. App. Tab 7 at 103-04 (77:10-78:16, 81:9-82:7); *see also* App. Tab 19.

As part of TDCJ's intake process, offenders receive information instructing them how to access healthcare.  App. Tab 8 at 127; App. Tab 20 at 277-78; App. Tab 7 at 105 (91:2-22), 114 (179:10-18, 180:24-181:8).  Offenders also receive the Offender Orientation Handbook, which provides a description of the intake process, including the physical examination and reporting of disabilities, as well as instructions on accessing health services (i.e. submitting a sick call request slip or directing a request to security).  App. Tab 8 at 127; App. Tab 7 at 105 (91:2-22); *see also* App. Tab 21 at 285-94.

Within a week after arrival to TDCJ, an offender typically receives an intake physical. App. Tab 22 at 295. As part of an offender's physical, medical staff complete an HSM-18 form, which allows health care staff to make certain housing, work or other recommendations to TDCJ based on an offender's health. *See* App. Tab 23; App. Tab 7 at 106-07 (96:22-97:7), 108 (101:15-21); App. Tab 24.  The purpose of the Offender Medical and Mental Health Classification is to "provide a standardized system of classifying medical and/or mental health limitations for the offender population." App. Tab 23. Healthcare personnel assess offenders and assign appropriate

---

[4] Intake assessments are recorded on the Correctional Managed Care Intake History and Health Screening form. See, e.g., App. Tab 19; App. Tab 31 at 380-81. The Intake History form is completed through an interview process with the offender, which allows the offender to provide information regarding their family and personal medical history, and includes the observations of the "Reviewer." The form requests additional information, such as date and treatment received for "yes" answers. Additionally, the screening is an opportunity for offenders to notify the medical department of prescribed medications currently being taken or that are "supposed to be" taken. *Id.*; App. Tab 13 at 205 (195:10-197:1).

restrictions based on housing, work, disciplinary process, transportation, and individual treatment plan requirements, all of which are documented in the medical record and provided to classification to assist in making appropriate assignments. *Id.*; App. Tab 8 at 129 (FN 14); App. Tab 7 at 106 (93:4-13, 96:22-97:1). Notably, the HSM-18 contains no option for UTMB to recommend air conditioned or climate controlled housing. App. Tab 8 at 129; App. Tab 23 (listing "No Restrictions," "Barrier-Free Facility," and "Single Level Facility" as facility options). Beyond the options allowed by the HSM-18, medical is limited to issuing temporary passes where TDCJ can accommodate them, or sending an offender to a medical facility if they meet the criteria. App. Tab 7 at 106-08 (96:22-101:21); App. Tab 25.

### D. Larry McCollum's 2011 Incarceration

#### 1. McLennan County Jail Records

McCollum entered McLennan County Jail in Waco, Texas on or about June 24, 2011. App. Tab 26 at 319. On June 24, 2011, the medical department at McLennan County assessed McCollum. *Id.* at 323-24. He appeared alert and oriented, with clear speech and swallowing. *Id.* at 324. McLennan County medical staff observed normal muscle and bones, strong and equal strength, an active range of motion, a steady gait, regular and strong heart rhythm and quality, equal and strong peripheral pulses, normal capillary refill, and clear and normal urine. *Id.* McCollum's respiratory rhythm was regular and his lungs clear.[5] *Id.* He reported no difficulty walking or falls. *Id.* McLennan County placed no work restrictions on McCollum. *Id.* at 326. The

---

[5] The lack of any limitation on his respiratory functions is further supported by the records from McCollum's medical treatment at Hillcrest Medical Center in December 2010 and January 2011. During these visits, McCollum's breathing sounds were clear and bilateral. App. Tab 27 at 333-35, 338-41.

9

County placed him on a regular diet. *Id.* The McLennan County medical records contain no mention of diabetes or prior hypertension.  *Id.* at 321, 324.

Because of McCollum's slightly elevated blood pressure, McLennan County prescribed clonidine prn, meaning it would be given as needed when his blood pressure reading – taken daily – was high.[6] App. Tab 26 at 319, 327; *see also* App. Tab 30. Between June 24, 2011 and July 15, 2011, McCollum's blood pressure was checked daily, and he required only four doses of clonidine. App. Tab 26 at 327.

Prior to McCollum's transfer to the Hutchins Unit, medical staff at McLennan County completed the Texas Uniform Health Status Update ("Uniform Update").[7] This one-page form is dated July 15, 2011, the same day of McCollum's transfer. App. Tab 31 at 374.  The Uniform Update included details on McCollum's height (5'10"), weight (330 pounds), lack of special housing or transportation needs, absence of pending specialty clinic appointments, lack of known allergies, and recent negative Tuberculosis Skin Test. App. Tab 31 at 374, 376; App. Tab 8 at 125. According to the Uniform Update, McCollum had been prescribed "clonidine 0.1 mg orally as needed" for hypertension. App. Tab 31 at 374. Clonidine was the only prescribed medication reported by McLennan County. *Id.* The Uniform Update includes no mention of diabetes or McCollum receiving any medication for diabetes. *Id.* at 379.

---

[6] This is the first documented treatment for hypertension in McCollum.  He was not treated for hypertension during his previous incarceration, and family members reported no awareness of an earlier diagnosis.  App. Tab 29 at 352 (10:14-7).

[7] The Texas Uniform Health Status Update is a one-page form that accompanies any offender when they are transferred to TDCJ. The Uniform Update compiles information about the offender including basic identification information, health problems, the status of certain preventative medicine efforts, housing restrictions, transportation, known medications, and known allergies.

## 2.   Transfer to the Hutchins Unit

On Friday, July 15, 2011, McLennan County Jail transferred McCollum to TDCJ custody at the Hutchins State Jail.[8]  App. Tab 32 at 383-86; App. Tab 33; App. Tab 31 at 374, 379. Upon arrival, the *only* medical information available concerning McCollum's medical condition(s) and medication(s) was the Uniform Update. App. Tab 31 at 374.

Upon his arrival, UTMB employee Helen Haywood, a certified medication aide, performed an intake screening. *Id.* at 380-81.  She assessed McCollum's medical history and current medical condition(s), noting that he had no obvious injuries, tremors, deformities, or impaired motor activity.[9] App. Tab 8 at 125; App. Tab 31 at 380-81.  As part of the process, McCollum *self-reported* that he had a *history* of a back injury, cavities, depression, diabetes, glasses, gum disease, high blood pressure, mental illness, and rheumatism/arthritis. App. Tab 31 at 380-81; App. Tab 7 at 99 (40:1-18), 120 (257:1-12); App. Tab 8 at 128. He reported no issues with fevers, night sweats, loss of appetite, or lethargy. App. Tab 31 at 380-81.  McCollum's only current complaints were "tooth pain" and "depression." *Id.* at 380.  He denied thoughts of self-injury and symptoms of psychosis. *Id.* at 381. Based on the Uniform Update and intake screening, there was no indication that McCollum required immediate medical care. App. Tab 7 at 99 (38:24-40:18); App. Tab 31 at 379-81.

---

[8] McCollum was serving a twelve month sentence for forgery. App. Tab 32 at 383-86; App. Tab 33 at 388.

[9] McCollum's lack of reported or observed impairment at intake is consistent with McCollum's McLennan County records as well as medical records from Hillcrest Medical Center, dating approximately six-seven months earlier, where normal range of motion was observed in all joints after McCollum was involved in a motor vehicle collision. In December 2010, McCollum visited Hillcrest, complaining of pain to his foot, knee, and head.  App. Tab 27 at 338-41. He returned to Hillcrest in January 2011, where it was observed that McCollum could *fully bear his weight*.  *Id.* at 335 (emphasis added). At both visits, he completed a "Fall Risk Assessment ER Questionnaire," stating he did not fall unexpectedly or frequently, or need any assistive devices to help walk, or feel dizzy when standing up from a bed or chair. *Id.* at 337, 342.

11

McCollum was referred to the Coordinator of Infectious Disease ("CID") in the medical department that same day (July 15, 2011) to be screened for communicable diseases and receive appropriate inoculations. App. Tab 31 at 379; App. Tab 22.  Licensed Vocational Nurse ("LVN") Velva McKinney took McCollum's history for infectious diseases, gave him a tetanus vaccination, applied a Tuberculosis skin test, acquired his verbal consent for laboratory testing, and provided HIV pre-test counseling. App. Tab 31 at 375-78; *see also* App. Tab 8 at 126.

Later that day, LVN Laura Connell informed Physician Assistant ("PA") Ananda Babbili about McCollum's history of hypertension and current prescription for clonidine "prn" (as needed) from McLennan County Jail. App. Tab 31 at 374, 379-81; App. Tab 19. PA Babbili gave a verbal order to substitute 25 mg of hydrochlorothiazide (also referred to as HCTZ) to be taken every morning in place of the clonidine.[10] App. Tab 31 at 379; App. Tab 30.  Blood pressure checks were not ordered because the Uniform Update reflected that clonidine was given only as needed, when McCollum's blood pressure was high, while hydrochlorothiazide is given daily to stabilize blood pressure and avoid fluctuating readings. App. Tab 30.

Medical records do not indicate that McCollum ever went to the pill window to receive his prescribed dosage of hydrochlorothiazide in July 2011.[11] App. Tab 8 at 128.

On July 18, 2011, LVN McKinney saw McCollum to read his TB skin test. App. Tab 31 at 374 (result negative). A mental health clinician also interviewed McCollum to complete his routine mental health screening, giving him an opportunity to directly address any health

---

[10] Hutchins did not routinely use clonidine except in serious hypertensive crises. App. Tab 30. The prescription of hydrochlorothiazide was based on routine process to discontinue county jail orders for clonidine, and to start using Hutchins' formulary available medications. *Id.*; *see also* App. Tab 8 at 127 (explaining initial treatment for hypertension).

[11] Offenders pick up prescribed medications at the pill window. Prescriptions may be obtained at the pill window after 24 hours.  App. Tab 21 at 293.

concerns.[12] App. Tab 31 at 370-73. The notes indicate McCollum discussed his medical history and current state of health. *Id.* (McCollum reported that he was feeling rough and adjusting, discussed his past history of depression, but did not think he needed psychotropic medication). Ian Smith, MA, referred McCollum for further evaluation based on his prior history of mental health treatment. *Id.*

On July 20, 2011, McCollum again visited the medical department to have blood drawn for laboratory studies per physician orders. *Id.* at 364-67. During these multiple interactions with medical personnel, McCollum neither voiced additional health concerns nor complained about his bunk assignment. App. Tab 7 at 111 (134:24-135:24); *see generally* App. Tab 31.

McCollum's laboratory results were reported on July 21, 2011. App. Tab 31 at 364-67. The report indicated a hemoglobin A1C level of 6.2%.[13] *Id.* McCollum did not meet the criteria to be diagnosed as diabetic. App. Tab 7 at 99 (37:20-38:23) ("It requires a 6.5 to be diagnosed as a diabetic."). McCollum's white blood cell count was slightly elevated, which indicated a possible infection. App. Tab 31 at 364-67; App. Tab 5 at 74 (195:10-18).

Pursuant to CMHCC policy, McCollum should have had comprehensive medical evaluation within seven days of his arrival at the Hutchins Unit; and his lab results would have been reviewed by a physician or midlevel provider – either a physician assistant or nurse practitioner – at that time, unless McCollum requested an appointment sooner. App. Tab 19; App. Tab 34; App. Tab 8 at 126.

---

[12] According to CMC Policy, each offender's HSM-13 and health record are reviewed. Based on this review, an offender may or may not be referred to mental health for an assessment. App. Tab 19.

[13] An A1C test measures an individual's hemoglobin A1C, which is essentially a blood sugar average over the past three to six months. App. Tab 31 at 364-67; App. Tab 7 at 99 (37:20-38:23).

Other than the medical interactions described above, McCollum never lodged a sick call request or filed a medical grievance after arriving at the Hutchins Unit.  App. Tab 35; *see generally* App. Tab 31.  Although TDCJ initially assigned McCollum to a lower bunk, he was assigned a top bunk on July 18, 2011.  App. Tab 36 (TDCJ authorized the move to the top bunk). Despite returning to the medical department after the move, McCollum never complained about his bunk assignment or made a request to be moved to a lower bunk to any medical personnel.  *See generally* App. Tab 31; App. Tab 35; *see also* App. Tab 21 at 286.  Likewise, McCollum failed to mention any issues with his bunk assignment or his need for any accommodation in a letter written to his wife, dated July 19, 2011. App. Tab 37 at 398.

### 3.  McCollum's Death and Autopsy Results

In the early morning of July 22, 2011, TDCJ correctional staff discovered McCollum unconscious in his bed having what correctional officers believed to be a seizure. App. Tab 31 at 362-63. In response, TDCJ correctional staff initiated UTMB's Nursing Triage process and telephoned a UTMB registered nurse at the Crain Unit, which is the HUB[14] for the Hutchins Unit. *Id.*; App. Tab 47. The registered nurse immediately advised the officer to contact 911.[15] App. Tab 31 at 362-63.  EMS personnel were dispatched to the Hutchins Unit at approximately 3:05 AM and transferred McCollum to the emergency room at Parkland Memorial Hospital in Dallas, Texas at 3:54 AM. *Id.*; App. Tab 39 at 405.  On July 28, 2011, life support was withdrawn, and McCollum died shortly thereafter. App. Tab 28 at 344-48.

---

[14] Medical staff at the Hutchins Unit were not on site at the time.  Security called the HUB facility, which are facilities that are staffed 24/7 and allow security officers the opportunity and/or resources to contact a registered nurse at a nearby facility for triage assessment and direction about acute offender medical needs.  *See generally* App. Tab 9 at 162-63 (139:15-142:6).

[15] TDCJ does not require security officers to contact the medical department prior to calling 911.  App. Tab 3 at 52-53 (24:6-25:13); App. Tab 38 at 401-02 (27:3 -30:22); *see also* App. Tab 9 at 163 (141:5-21).

14

The Dallas County Medical Examiner's office performed an autopsy. The Medical Examiner determined that hyperthermia was the cause of death. App. Tab 40. The manner of death was ruled an accident. *Id.* at 415. Autopsy results revealed that McCollum had an enlarged heart. *Id.* at 412. The Medical Examiner found no other abnormalities in his cardiovascular or endocrine systems.  *Id.* at 412-13.  McCollum lacked any significant coronary atherosclerosis that would typically be found in hypertensive and diabetic individuals.  App. Tab 8 at 127-28.  Moreover, the autopsy does not report that McCollum was diabetic.  App. Tab 40.

According to McCollum's Hutchins Unit medical records, there is no evidence that he exhibited overt functional limitations or complained about any difficulty completing his activities of daily living at any of his encounters with medical personnel. *See generally* App. Tab 31. Nor is there evidence that he ever requested any special accommodation during his medical department visits. *Id.*

## VI.    ARGUMENT & AUTHORITIES

### A. The ADA, ADAAA, and RA prohibit discrimination against disabled individuals and ensure a qualified individual with a disability is afforded equal opportunity and participation in the services, programs, and activities of a public entity.

The ADA was enacted to ensure equality of opportunity, full participation, and independent living for disabled individuals. 42 U.S.C. § 12101(a)(7) (2009). Title II of the ADA "prohibits discrimination on the basis of disability by public entities." 28 C.F.R. § 35.101 (2010); *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011). Specifically, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1990); 28 C.F.R. § 35.130(b)(1)(i) (2011). A "public

15

entity" is defined as "any State or local government" and "any department, agency…or other instrumentality of a State." 42 U.S.C. § 12131(1) (1990); *U.S. v. Georgia*, 546 U.S. 151, 154 (2006). State prisons are subject to Title II of the ADA. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998) (citing 42 U.S.C. § 12132).

The parallel provision of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."[16] 29 U.S.C. § 794(a) (2014). Although the statutes are often analyzed identically, § 504 of the Rehabilitation Act requires that the denial of benefits be based "solely by reason of her or his disability," whereas Title II does not require that discrimination be the sole reason for the exclusion or denial of benefits to the plaintiff. *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454-455 (5th Cir. 2005).

To obtain relief under the ADA, a plaintiff must establish a prima facie case by demonstrating …:

> (1) that he is a qualified individual within the meaning of the ADA;
>
> (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and
>
> (3) that such exclusion, denial of benefits or discrimination is by reason of his disability.

---

[16] The RA is functionally identical to the ADA insofar as both statutes prohibit discrimination against disabled persons; the ADA, however, applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private. *See Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). Claims under both acts are analyzed using the same legal standards. *See Frame*, 657 F.3d at 223. The Court may therefore analyze Plaintiffs' ADA and RA claims as a single claim.

*Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004). A "qualified individual with a disability" meets the essential eligibility requirements for the receipt of services, or the participation in programs or activities, provided by a public entity, with or without reasonable modifications to rules, policies, practices or barriers. 42 U.S.C. § 12131(2) (1990). A qualified individual with a disability, however, may not be afforded "an opportunity to participate in or benefit from the aid, benefit, or service *that is not equal to that afforded others*." 28 C.F.R. § 35.130(b)(1)(ii) (2011) (emphasis added). With regard to correctional facilities, "[p]ublic entities shall ensure that inmates…with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2) (2011); 28 C.F.R § 35.130(d) (2011). Inmates with disabilities shall not be placed in medical areas unless they are actually receiving medical care or treatment. 28 C.F.R. § 35.152(b)(2)(ii) (2011).

> **B. McCollum was not a qualified individual under the ADA; he was not excluded from participation in, or denied benefits, services, programs, or other activities for which UTMB was responsible; and he was not discriminated against by UTMB.**

It is undisputed that failing to make reasonable accommodations to the *known* physical or mental limitations of a qualified individual constitutes discrimination under the ADA unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[17] 42 U.S.C. § 12112(b)(5)(A) (2009) (emphasis added).

---

[17] UTMB would face an undue burden to fundamentally alter UTMB services, programs or activities to include the accommodations Plaintiffs claim were necessary for McCollum's alleged disabilities.  29 C.F.R. §1630.2(k)(3). As discussed herein, TDCJ maintains management and control of Texas correctional facilities, including the Hutchins Unit. *See, e.g.,* App. Tab 1 at 4-7 (Art. I., 1.15); App. Tab 2 at 36-37 (19:23-22:21) (describing TDCJ functions and authority). TDCJ controls housing, security, and management of the living conditions of the offender population. *See, e.g.,* App. Tab 1 at 4-7 (Art. I., 1.15); App. Tab 12 at 194 (23:17-25:14); App. Tab 7 at 95 (24:21-7), 118 (242:19-243:3); App. Tab 5 at 75-76 (301:23-302:15); App. Tab 4 at 64 (71:17-20); App. Tab 2 at 38 (43:24-44:3); App. Tab 3 at 50-51 (12:22-13:13). TDCJ requests the necessary funding from the Texas State Legislature. App. Tab 1 (Art. II.G.13); *see also* App. Tab 7 at 117 (221:24-222:1).

17

Nevertheless, to prevail on a disability discrimination claim, a plaintiff must first establish that he is fact disabled.  To be sure, "[a]lthough the text of the ADAAA expresses Congress's intention to broaden the definition and coverage of the term "disability," it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination." *Neely v. PSEG Texas, Ltd. P'ship.,* 735 F.3d 242, 245 (5th Cir. 2013).

The term "disability" within the meaning of the ADA means: (1) "a physical or mental impairment that *substantially limits* one or more major life activities of such individual," (2) "a record of impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C) (2009) (emphasis added).  Thus, to prevail in the present matter, Plaintiffs must first establish that McCollum in fact had a disability as defined by the ADA.  Additionally, Plaintiffs must establish that McCollum was denied the benefit of or excluded from participation in a covered program under circumstances which infer that such exclusion was based solely on the basis of his alleged disability.

If Plaintiffs establish their *prima facie* case as set forth above, the burden shifts to UTMB to produce evidence either (1) that McCollum was not a "qualified individual with a disability" under the ADA or the RA, or (2) that McCollum was not denied a benefit of or excluded from participation in a program UTMB was responsible for, solely because of his disability. *Tips v. Regents of Tex. Tech Univ.*, 921 F. Supp. 1515, 1517 (N.D. Tex. 1996).  As detailed herein, the record lacks evidence sufficient to demonstrate McCollum was a qualified individual with a disability.

> **1. McCollum was not a qualified individual as defined by the ADA.**
>
> **a. McCollum did not suffer any disability that "substantially limited" him in one or more major life activities.**

18

Plaintiffs mistakenly assume that McCollum was a qualified individual based solely on his obesity, hypertension, and self-reported diabetes. D.E. 119 at ¶151. McCollum, however, cannot be a qualified individual under the ADA because he did not suffer from a disability[18] that substantially limited a major life activity. Plaintiffs allege that UTMB knew McCollum had hypertension, for which he received medication, had diabetes, and was morbidly obese. *Id.* Plaintiffs state that "[e]ach of these conditions, alone or in combination, made McCollum a qualified individual with a disability." *Id.* Merely having an impairment, however, does not make an individual disabled under the ADA; there must also be a showing that McCollum's ailments substantially limited him in the performance of a major life activity. *Mora v. Univ. of Tex. Sw. Med. Ctr.*, 469 F. App'x 295, 297-98 (5th Cir. 2012) (holding that the plaintiff's ADA claim failed because she failed to specify which of her major life activities were substantially limited)[19]; *Hale v. King*, 642 F.3d 492, 501 (5th Cir. 2011); *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009); *see also Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999) ("The determination of whether an individual has a disability is not necessarily based on the . . . impairment the person has, but rather on the *effect* of that impairment on the life of the individual.") (emphasis added).

A "major life activity" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §

---

[18] The ADA definition of "disability" is exactly the same as that in the Rehabilitation Act. *McGarthy v. Ridge*, 2004 WL 1542161, 3 (N.D. Tex. 2004), (citing *Exxon Corp. v. U.S. Dep't of Labor*, No. 3:96-CV-3405-H, 2002 U.S. Dist. WL 356517, *5 (N.D. Tex. 2002)). As such, determining whether an ADA plaintiff is an individual with a disability is the same under the Rehabilitation Act or the ADA. *Exxon*, 2002 WL 356517 at *5.
[19] *See* App. Tab 52 (unpublished opinion).

12102(2)(A) (2009). It also contemplates "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B) (2009). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures . . . ." 42 U.S.C. § 12102(4)(E)(i) (2009).

A "substantial limitation" means the inability, or being significantly restricted in the ability, to perform a major life activity that a normal person in the general population can perform. *Hale*, 642 F.3d at 500 (citing 29 C.F.R. § 1630.2(j) (2010)). In determining whether there is a substantial limitation, a court should consider: (1) the nature and severity of the impairment, (2) the duration, or expected duration, of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact, from the impairment. *Id.* at 500; *see also McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 281 (5th Cir. 2000) (analysis of whether a plaintiff's impairment interferes with or substantially limits a major life activity requires individual inquiry).

In other words, evidence must exist that McCollum was unable to perform major life activities. *Hale*, 642 F.3d at 501 (medical records providing information of ailments but not containing facts regarding the impact of those ailments to perform major life activities insufficient). Plaintiffs allege that McCollum's hypertension, obesity, and diabetes substantially limited his ability to climb, walk, stand, cool, sweat, and breathe, as well as limited the operation of his respiratory, circulatory, endocrine, nervous, cardiovascular, and digestive systems.[20] D.E.

---

[20] Plaintiffs claim hypertension is a cardiovascular disease which causes damage when blood flow exerts high pressure on artery walls, which can cause breathing problems, organ damage, severe headaches, fatigue, obesity, visual problems, as well as affect other body systems and the use of diuretics to treat hypertension increases the risk of a heat

119 at ¶¶27, 32, 39. According to Plaintiffs, these conditions increased McCollum's susceptibility to heat stress and diminished his ability to thermoregulate. *Id.* at ¶28, ¶32, ¶¶38-39.

UTMB agrees McCollum was obese, had a history of mild hypertension, which was controlled with medication, and had self-reported a history of diabetes. But the undisputed material facts fail to establish that, because of any of these conditions, he was substantially limited in his ability to perform any specific major life activities. Plaintiffs cannot rely on McCollum's death after entering the Hutchins Unit as conclusory proof that his physical impairments substantially limited major life activities, where the evidence simply does not support that a finding that he was a qualified individual.

McCollum's Hutchins Unit medical records contain no documentation of functional limitations or complaints about any difficulties completing the activities of daily living in any of his encounters with medical personnel. *See generally* App. Tab 31. Moreover, McCollum never requested any special accommodation during his medical department visits in order to perform any specific major life activity. *Id.* at 368-81. Instead, the undisputed material facts demonstrate that McCollum's purported disability had little or no effect on the "major life activities" of his life as he returned to prison.[21] Plaintiffs cannot meet their *prima facie* burden that McCollum was a qualified individual under the ADA. Accordingly, summary judgment must be granted in favor of UTMB on Plaintiffs' ADA and RA claims.

---

illness. D.E. ¶¶24-26. They also allege that diabetes is a chronic disease caused by an insulin imbalance, effecting the endocrine, digestive, circulatory, and nervous system, as well as impairs the body's ability to sweat and adjust to increased temperatures and dissipate body heat to prevent heat stroke. *Id.* at ¶¶29-31. Plaintiffs claim McCollum was 5' 10" tall and weighed 330 pounds when he arrived at Hutchins State Jail; therefore he was morbidly obese. *Id.* at ¶36. They allege his body mass index was greater than 40, and was twice his ideal weight, according to the Centers for Disease Control. *Id.* at ¶37.

[21] McCollum was previously incarcerated from 2002 to 2004. App. Tab 41 at 417.

**1) McCollum was not substantially limited in the major life activities of walking and standing.**

Despite Plaintiffs' contentions, the evidence demonstrates that McCollum's morbid obesity, hypertension, or self-reported diabetes did not substantially limit his ability to walk or stand. *See* D.E. 119 at ¶27; *see also* D.E. 119 at ¶48 (alleging McCollum was obviously obese and had great difficulty walking short distances). McCollum never reported any concerns regarding his ability to walk or stand to either McLennan County Jail or UTMB medical staff. App. Tab 25 at 319-24; App. Tab 31 at 380. UTMB medical staff noted no impaired motor activity, weakness or lethargy at intake or during subsequent interactions with McCollum.[22] App. Tab 31 at 373, 380-81.  Neither McLennan County Jail nor Hutchins placed any restrictions on McCollum. App. Tab 26 at 326 (McCollum was not restricted from work); App. Tab 31 at 368 (no restriction on walking in "Health Summary for Classification").

**2) McCollum's respiratory system, circulatory system, endocrine system, digestive system, or nervous system functions were not substantially limited.**

Similarly, no evidence exists that McCollum's respiratory, circulatory, endocrine, digestive, or nervous system functions were impaired due to any alleged disability. The medical evidence available to UTMB does not support a finding that McCollum actually suffered from or required treatment for diabetes. App. Tab 8 at 128 (explaining the American Diabetes Associated adopted the criterion of 6.5% or greater to diagnose diabetes in 2010); App. Tab 31 at 366 (The range for an increased risk of diabetes is 5.7 to 6.4%, while a diagnosis of diabetes necessitates a reading greater than 6.4 %.); *see also* App. Tab 29 at 354 (29:2-30:7), 356 (57:20-22), 357 (60:17-

---

[22] This is consistent with his McLennan County Jail records, and previous medical records from Hillcrest Medical Center where no problems were reported or observed.  App. Tab 26 at 324; App. Tab 27.

24); App. Tab 42 at 420 (7:10-8:16, 9:1-19). Clearly, McCollum cannot be considered a qualified individual based on this ailment.

Even assuming McCollum was diabetic, along with his hypertension and obesity, Plaintiffs still failed to show that his respiratory, circulatory, endocrine, and digestive functions were substantially impaired. At intake, McCollum specifically denied experiencing cough, weakness, loss of appetite, or lethargy and was not observed to have tremors or sweating. App. Tab 31 at 380-81. McCollum's interactions with medical personnel at both McLennan County and Hutchins indicated no current or past limitations of these functions due to any impairment. App. Tab 26 at 324-26; App. Tab 31 at 368, 380-81.  His autopsy results supported these findings. App. Tab 40 at 411-415 (McCollum's autopsy revealed that his respiratory, gastrointestinal, genitourinary, and endocrine systems were unremarkable). The evidence regarding these bodily functions indicate they were not substantially impaired, therefore Plaintiffs are unable to meet their *prima facie* burden.

### 3)  McCollum's cardiovascular system was not substantially limited.

Although the records indicate McCollum had a history of hypertension, obesity, and self-reported diabetes, any alleged effects of those did not substantially limit his cardiovascular function.

Prior to his incarceration, McCollum took no medication for hypertension. App. Tab 26 at 321; App. Tab 31 at 380-81; App. Tab 27 at 333, 338 (indicating no medications); App. Tab 29 at 357 (60:17-24); App. Tab 42 at 421 (10:14-17); App. Tab 43 at 425 (20:20-23). He was first prescribed medication for hypertension when he arrived at McLennan County Jail when clonidine was prescribed "as needed" when (and if) his blood pressure reading was high. App. Tab 30; App.

23

Tab 26 at 319; *see also* App. Tab 43 at 425 (20:24-21:4). McCollum received only four doses of clonidine. App. Tab 26 at 327. After the clonidine was discontinued at Hutchins, McCollum was prescribed hydrochlorothiazide, although there is no record of him ever going to the pill window to receive that medication in July 2011. App. Tab 30; App. Tab 8 at 128.

His medical records otherwise indicated good cardiovascular health. App. Tab 26 at 324; *see generally* App. Tab 31. McCollum's elevated blood pressure was an intermittent ailment upon incarceration, and not severe. Nothing indicates McCollum relied on medication to regulate his cardiovascular function. Any limitation McCollum may have had was not severe and had intermittent impact at most. *See Hale*, 642 F.3d at 499 (quoting 29 C.F.R. § 1630.2(j) (2010)); *see also* App. Tab 40 at 412 (McCollum's autopsy found no abnormalities with his cardiovascular system other than an enlarged heart).

Moderate impairment is not enough to be regarded as a qualified individual for purposes of the ADA. *See Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (finding a diabetic plaintiff's treatment regimen did not substantially limit his ability to eat because it required only modest dietary and lifestyle changes).

Based on the facts above, McCollum cannot be a qualified individual under the ADA.

### 4)  McCollum's ability to climb was not substantially limited.

Plaintiffs also attempt to claim that McCollum's alleged disability of obesity substantially limited his major life activity of climbing. Specifically, Plaintiffs allege that McCollum's morbid obesity created a hazard for him to climb in and out of a top bunk, and UTMB knew it was disregarding his alleged disability. D.E. 119 at ¶40, 49. In support of this allegation, Plaintiffs claim, with no supporting evidence, that it was UTMB and TDCJ's practice to ignore obesity when

24

making bunk assignments, and UTMB did not routinely recommend that TDCJ assign even morbidly obese prisoners to bottom bunks. *Id.* at ¶¶49, 118. These allegations lack support.  First, no proper summary judgment evidence exists to establish that McCollum was substantially limited from climbing. The Hutchins Unit medical records contain no indication that McCollum reported any difficulties with climbing upon intake or that climbing into or out of a top bunk substantially limited him from performing any major life activities. App. Tab 31 at 368, 380-81; App. Tab 35 (McCollum did not file any grievances or sick call requests at Hutchins).   Once more, merely having a physical impairment is not enough to be a qualified individual.

Moreover, no evidence exists that UTMB knew McCollum had been assigned to a top bunk. App. Tab 36 (TDCJ authorized the move to the top bunk). And after this assignment, even if McCollum had difficulties, UTMB was not made aware of his limitations or any interference with his performance of major life activities, despite McCollum having multiple opportunities to inform UTMB staff.   App. Tab 26 at 324; App. Tab 27 at 333-42 (evidencing a strong musculoskeletal system and active range of motion). To be clear, at no time did McCollum ever request the accommodation of a lower bunk from any UTMB employee.  Based on these facts, Plaintiffs' allegations fail to meet their *prima facie* burden to show he was a qualified individual under the ADA.

### 5)   No evidence exists that McCollum's abilities to sweat, cool, or thermoregulate were substantially impaired.

While diabetes is a comorbidity that may affect heat tolerance, no evidence exists demonstrating McCollum's ability to thermoregulate was actually impaired making him susceptible to heat stroke. *See* App. Tab 10 at 173. In *Ball v. LeBlanc*, the inmate-plaintiffs had hypertension, as well as a combination of obesity, diabetes, hepatitis, and high cholesterol. 792

F.3d 584, 590 (5th Cir. 2015). There, the inmate-plaintiffs argued that thermoregulation was a major life activity, and ample evidence existed in the record showing their ability to thermoregulate was substantially limited. *Id*. at 597 (while there is no post-ADAAA finding that thermoregulation is a major life activity, the court assumed, without deciding, that it is a major life activity).

The Fifth Circuit, however, found that even if thermoregulation was a major life activity, there was *no evidence* that these inmates' thermoregulatory systems were *actually* impaired. *Id*. at 597 (emphasis added) (explaining no evidence the inmates' ailments caused their bodies' temperatures to rise above 98.6 degrees Fahrenheit).

Plaintiffs likewise claim McCollum was unable to thermoregulate, making him susceptible to heat stroke without alleging any facts that actually demonstrate his hypertension, morbid obesity, or alleged diabetes actually caused his body's temperature to rise above 98.6 degrees prior to July 22, 2011. To the contrary, the Uniform Update, Intake Screening, and all other Hutchins medical records fail to identify any reported or observed symptoms of heat stress. App. Tab 31 at 380-81; *see* App. Tab 10 at 166-67 (Heat Stress Policy B-15.2 listing potential symptoms). Just as in *Ball*, this absence of evidence to support Plaintiffs' allegations is fatal to their disability claims. *See Ball*, 792 F.3d at 597-598.

### b.  McCollum did not have a record of impairment.

Plaintiffs claim UTMB knew McCollum had hypertension, for which he was prescribed medication, . . . "was also known to have diabetes," . . . was morbidly obese, and "[e]ach of these conditions, alone or in combination, made Mr. McCollum a qualified individual with a disability." D.E. 119 at ¶151. Merely alleging McCollum had "a record of impairment," however, is

insufficient. As fully briefed above, Plaintiffs also must show that one or more of McCollum's major life activities were substantially limited. *See* 29 C.F.R. § 1630.2(k)(1) (2012).

Likewise, an ADA plaintiff must do more than show he has an adverse medical diagnosis. *See Mzyk v. N. E. Indep. Sch. Dist.*, 397 F.App'x 13, 16 (5th Cir. 2010) (affirming district court finding that a physician diagnosed plaintiff with various physical ailments, but not with any condition substantially impairing a major life activity) (citing *Dupre v. Charter Behavioral Health Sys. of Lafayette, Inc.*, 242 F.3d 610, 614 (5th Cir. 2001) (plaintiff's screening form only mentioned of a prior back problem, but lacked evidence that the problem substantially limited any major life activity))[23]; *see also Lottinger v. Shell Oil Co.*, 143 F. Supp. 2d 743, 765-66 (S.D. Tex. 2001) (consultation with a provider and prescription for anti-depressants failed to establish a record of impairment). An individual will be considered to have a record of impairment that substantially limits one or more major life activities "when compared to most people in the general population." 29 C.F.R. § 1630.2(k)(2) (2012). "An individual with a record of a substantially limiting impairment may be entitled, absent undue hardship, to a reasonable accommodation if needed and related to the past disability." 29 C.F.R. § 1630.2(k)(3) (2012).

Plaintiffs, therefore, must show that at some point in the past, McCollum was classified, or misclassified, as having a physical impairment that substantially limits a major life activity. *See Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120-21 (5th Cir. 1998) (plaintiff's prior back surgery, absent evidence of a record of impairment, failed to show that the impairment limited a major life activity) (citing *Burch v. Coca-Cola Co.*, 119 F.3d 305, 321 (5th Cir. 1997)). Plaintiffs cannot do so.

---

[23] *See* App. Tab 53 (unpublished opinion).

The record contains no evidence to support that McCollum was classified, or misclassified, of having a physical or mental impairment that substantially limited a major life activity. App. Tab 29 at 356 (54:25-55:1). As discussed in length above, Plaintiffs cannot meet their *prima facie* burden of showing McCollum's hypertension, obesity, and alleged diabetes substantially limited a major life activity with mere conclusory allegations of a disability.

### c. McCollum was not regarded as having an impairment.

An individual may also be "regarded as having such an impairment" if he has an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A) (2009); 28 C.F.R. § 35.104(4) (2011); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015). This prong allows a court to consider whether a plaintiff, though not actually disabled under § 12102(2)(A), is nonetheless "regarded as" having an impairment. *Hale*, 642 F.3d at 502 (citing *Kemp v. Holder,* 610 F.3d 231, 237 (5th Cir. 2010)).

To meet this standard, a plaintiff must show that either (1) the public entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) the public entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *Id*. This prong does not apply, however, to impairments that are transitory, with an actual or expected duration of six months or less. 42 U.S.C. § 12102(3)(B) (2009). The record contains no evidence that any UTMB employee perceived or mistakenly perceived McCollum as having any impairment that substantially limited one of his major life activities.

Plaintiffs cannot establish the first element of their prima facie case by showing that McCollum was a "qualified individual" entitled to the protections of Title II of the Americans with Disabilities Act. Accordingly, UTMB is entitled to summary judgment.

### 2. McCollum was not excluded from participating in, or denied the benefits of, services, programs, or activities provided by UTMB.

Even if McCollum was a qualified individual under the ADA, Plaintiffs cannot establish a service, program, or activity of UTMB that McCollum was excluded from participating in or was denied the benefits of, by reason of his disability.[24] *See* 42 U.S.C. § 12132 (1990); *see also* D.E. 119 at ¶153-154. The Rehabilitation Act defines a "program or activity" as "all of the operations of…a local government." *Frame*, 657 F.3d at 225 (citing 29 U.S.C. § 794(b)(1)(A) (2014)). As it relates to prisons, "[t]he Supreme Court considered the text of Title II as it is 'ordinarily understood,' and reasoned that 'prisons provide inmates with recreational 'activities,' medical 'services,' and education and vocations 'programs,' all of which at least theoretically 'benefit' the prisoners." *Frame*, 657 F.3d at 225.

Significantly, while a public entity may not deny a qualified individual the opportunity to participate in, or benefit from, an aid, benefit, or service, it also cannot afford a qualified individual with an opportunity to participate in, or benefit from, an aid, benefit, or service that is not equally afforded to others. 28 C.F.R. §35.130(b)(1)(i)-(ii) (2011); *see also Borum v. Swisher Cty*, No. 2:14-CV-127-J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) (finding prisons not required to

---

[24] Confinement in jail is a program or service under the ADA and RA because "[m]odern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be excluded from participation in)." *Yeskey*, 524 U.S. at 210; *see also Georgia*, 546 U.S. at 157 ("it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, [and] medical care . . . constituted 'exclu[sion] from participation in or . . . deni[al of] the benefits of the prison's 'services, programs, or activities'").

provide *new* services or programs for a disabled prisoner, but only that a disabled prisoner have meaningful access to *existing* services and programs) (emphasis in original).[25] Furthermore, public entities responsible for the operation or management of correctional facilities shall ensure offenders are housed in the most integrated setting appropriate to their needs, and not be designated to a medical area unless actually receiving in-patient medical care or treatment while at the Hutchins Unit. 28 C.F.R. § 35.152(b)(2)(ii) (2011); 28 C.F.R § 35.130(d) (2011); *see also* TEX. GOV'T CODE § 499.055, Population Management Based on Inmate Health; *see generally* App. Tab 31.

Plaintiffs claim that both Defendants UTMB and TDCJ failed to (1) provide McCollum with safe housing; (2) provide McCollum with access to climate-controlled housing or assign him to a climate-controlled facility; (3) assign McCollum to a bottom bunk; (4) provide McCollum with a fan or cup; (5) provide McCollum with medical treatment; and (6) provide McCollum with an intake physical. D.E. 119 at ¶154.  Plaintiffs' complaints are misplaced.

 The undisputed material facts demonstrate that UTMB has neither the responsibility nor the authority for most of these "accommodations:"  To be sure, TDCJ assigned McCollum to general population housing at Hutchins State Jail, in a housing assignment no less "safe" than the housing afforded other offenders assigned to the general population at Hutchins.  Additionally, TDCJ's assigned McCollum to an upper bunk, which was not unusual. No evidence exists to establish that UTMB ever denied McCollum a fan or a cup. Similarly, no evidence exists to establish that UTMB ever denied McCollum any requested medical treatment. Finally, McCollum was not physically present at the Hutchins State Jail long enough to receive an intake physical as

---

[25] *See* App. Tab 49 (case not reported).

provided per policy. Read in the light most favorable to Plaintiffs, no reasonable factfinder could conclude that UTMB denied benefits, services, programs, or other activities to McCollum that it provided to other offenders housed at the Hutchins State Jail, by reason of any alleged disability.

Based on these undisputed facts, UTMB is entitled to summary judgment because Plaintiffs cannot establish the second element of their *prima facie* case.

> **a. UTMB is not responsible for the conditions of offender housing and climate control at Hutchins, or any TDCJ prison, and even if it were, McCollum was not excluded from receiving that service or benefit because climate controlled housing is not a service or benefit provided to inmates in the general population.**

Plaintiffs claim UTMB failed to properly house McCollum due to his alleged heat sensitivities. D.E. 119 at ¶45, 47, 51-52, 112. Plaintiffs also claim UTMB did not seek to have the housing areas cooled, and deliberately chose to subject *all* inmates to extreme heat. *Id.* at ¶91. Plaintiffs are simply painting with too broad a brush.  UTMB did not, nor could it, deny McCollum the "benefit" of being housed in a climate controlled dormitory because UTMB does not have the authority to provide such a "benefit" to offenders such as McCollum or any offender. In fact, in making their conclusory allegations, Plaintiffs completely fail to acknowledge that UTMB does not manage or control which areas of TDCJ prisons are climate controlled or air-conditioned.[26] App. Tab 12 at 194 (23:17-25:14); App. Tab 7 at 95-96 (24:21-25:7), 118 (242:19-243:3). Therefore, where the offenders are housed is left almost entirely within the discretion of TDCJ.

---

[26] In July 2011, TDCJ allocated space to UTMB for 1,100 inpatient mental health beds, 62 wheelchair dorm beds, 80 acute care hospital beds, and 471 infirmary beds, which were climate controlled.  App. Tab 7 at 110 (131:23-132:14); App. Tab 8 at 129. TDCJ had some additional climate controlled facilities designated for inmates with certain needs outside the general population of Texas inmates. *See, e.g.,* App. Tab 18 at 267 (271:10-21). But, UTMB is unable to provide for more air-conditioned or climate controlled space, or assign additional inmates when those beds or facilities are full, without TDCJ providing the facilities.

31

*See* D.E. 119 at ¶120 (Plaintiffs concede housing decisions are ultimately made by TDCJ.). Based on these undisputed facts, Plaintiffs' ADA and RA claims against UTMB cannot survive.

Even if UTMB did have influence or control over climate controlled housing, which it clearly does not, Plaintiffs' argument suggests that McCollum should have received a benefit or service greater than that provided for other general population inmates. The ADA's goal is to ensure McCollum had equal access to the programs and services compared with other inmates in the general population. 42 U.S.C. § 12101(a)(7) (2009); *see* 28 C.F.R. § 35.130(b)(1)(ii) (2011). Assuming McCollum was a qualified individual, to receive an air-conditioned or climate controlled bed to the exclusion of the general population of inmates would have been contrary to the purpose of the ADA. *See* 42 U.S.C. § 12101(a)(7); *see also* 28 C.F.R. §35.130(b)(1)(ii); *see also Borum*, 2015 WL 327508, at *9.[27]

Furthermore, UTMB lacked authorization under CMHC policies to recommend McCollum be moved to a climate controlled infirmary bed or medical facility because his alleged conditions, including hypertension, self-reported diabetes, or obesity did not meet the criteria for such housing. *See* 28 C.F.R. §35.152(b)(2)(ii) (2011); App. Tab 7 at 106-08 (96:22-101:21), 110 (131:14-22); *see generally* App. Tab 31; App. Tab 44.

### b. UTMB does not assign which bunk McCollum received at Hutchins, and did not deny him the benefit of a bottom bunk.

Contrary to Plaintiffs' allegations, UTMB did not deny McCollum a bottom bunk. *See* D.E. 119 at ¶¶48-49. Plaintiffs claim UTMB and TDCJ knowingly disregarded McCollum's disability because it was their practice to ignore obesity when making bunk assignments. *Id.* at ¶49. CMHC

---

[27] *See* App. Tab 49.

policy in July 2011, however, was to assign morbidly obese inmates to a lower bunk when their
"medical condition create[ed] major difficulties with climbing into an upper bunk." App. Tab 23
at 298 (Section B.2., "Bunk Assignment").

Upon intake, the TDCJ assigned McCollum to the next bed available in transient housing,
which was a lower bunk. App. Tab 36. He was then moved to a top bunk on July 18, 2011 for the
rest of his time at Hutchins. *Id.* McCollum never requested a lower bunk at any time. McCollum
had the opportunity to notify medical staff on multiple occasions that he needed a bottom bunk.
He never did so.  McCollum also never filed a grievance or submitted a sick call request to UTMB
or TDCJ staff requesting the accommodation. App. Tab 35. On July 19, 2011 he wrote a letter to
his wife, but did not mention any issues with his bunk or conditions of confinement. App. Tab 37
at 398. Plaintiffs fail to meet their *prima facie* burden of showing that UTMB excluded McCollum
from requesting, or receiving, a bottom bunk restriction.

### c.  McCollum was not denied the benefit or program to receive a cup or fan because providing cups or fans was not a function of UTMB.

UTMB did not deny McCollum a fan or cup. D.E. 119 at ¶154. To be clear, providing cups
and fans to any offenders is outside of the scope of medical services that UTMB provides to TDCJ
facilities. Thus, Plaintiffs' ADA and RA discrimination claims against UTMB based on this
allegation are improper.

Moreover, no evidence exists to establish that personal fans or cups were being provided
to all offenders, but that McCollum was excluded from receiving either. App. Tab 17 at 254 (103:6-
9). In fact, personal fans are not permissible at the Hutchins Unit for any offenders because the
facilities are not equipped with multiple electrical outlets for personal use. App. Tab 3 at 54-55
(51:7-53:1); App. Tab 17 at 260 (129:5-17). Because of this limitation, large industrial fans are

33

placed around the dormitories for all offenders' use. App. Tab 17 at 260 (130:22-25); App. Tab 45 at 431 (26:10-17), 432 (31:2-11).  Similarly, cups are available for all offenders at the commissary, and drinking water is available for all offenders via water fountains. App. Tab 17 at 257 (218:4-25), 261 (117:25-118:6). Simply put, at all time, McCollum, and other offenders, had access to fans, cups, and drinking water at the Hutchins Unit.

### d.  UTMB did not exclude McCollum from receiving medical treatment or an intake physical by UTMB.

UTMB did not exclude McCollum from the benefit or service of medical treatment or an intake physical. Plaintiffs claim that the fact that McCollum did not receive his physical examination within a week to ten days after arriving on the Hutchins Unit equates to UTMB denying McCollum medical treatment. D.E. 119 at ¶¶114-7. Plaintiffs also allege that UTMB ignored McCollum's self-reported history of diabetes, received no treatment for his alleged disability, and was placed on hydrochlorothiazide by Babbili without examination. *Id.* at ¶¶45, 47. Although McCollum did not receive his intake physical immediately, the evidence is undisputed that at all times while he was at the Hutchins Unit he had access to medical services equal to that of the rest of the prison population.

McCollum received an initial medical screening upon arrival at the Hutchins Unit on July 15, 2011, and he visited the medical department again on several other occasions. *See generally* App. Tab 31. An opportunity existed therefore, for him to directly address any health concerns with UTMB staff on at least July 15, July 18, and July 20, 2011, and he had the right to seek out medical consultation or treatment. *Id.* at 370-73.

Plaintiffs argue that medical care was unavailable after 6:00pm.  That is simply not true. Hutchins medical staff is on call and nursing triage is always available at the Crain Unit, which is

34

the assigned HUB Unit for Hutchins. D.E. 119 at ¶67; App. Tab 46 (S. Parker was on-call from

midnight to 8am on July 22, 2011); App. Tab 47. Emergency transportation to a hospital is also

available twenty-four hours a day at the Hutchins Unit. App. Tab 48; *see, e.g., Cardenas v. Lee

Cty., Tex.*, 569 F. App'x 252, 255-6 (5th Cir. 2014) (rejecting a claim that the county had a policy

of refusing inmates medical care because if an emergency existed a prisoner could be transported

to a local hospital by ambulance).[28] Plaintiffs merely take issue with how care is assessed and

provided by UTMB, but they fail to present any evidence to show McCollum was *excluded* from

receiving medical care. The ADA is not an appropriate cause of action to seek relief for a quality

of care complaint. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not

create a remedy for medical malpractice.").[29]

Plaintiffs fail to meet their *prima facie* burden showing McCollum was excluded from

receiving medical treatment or an intake physical by UTMB.

### 3. No evidence exists that UTMB intentionally discriminated against McCollum due to his alleged disability.

UTMB is entitled to summary judgment because there is no evidence that UTMB

intentionally discriminated against McCollum due to his alleged disability. "A plaintiff asserting

a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover

compensatory damages upon a showing of intentional discrimination." *Delano-Pyle v. Victoria

Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (citing *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d

261, 264 (5th Cir. 1984)).

---

[28] *See* App. Tab 50 (unpublished opinion).

[29] In *Bryant v. Madigan*, the Court found that plaintiff complained that he was not given a *special* accommodation of guardrails on his bed, but was not being treated worse because he was disabled. The Court dismissed plaintiff's ADA claim because he complained about incompetent treatment of his disability, and not that he was excluded from a prison service, program, or activity. 84 F.3d at 249 (emphasis added).

The Fifth Circuit has not defined "intentional discrimination" in the ADA context other than to say it is not deliberate indifference. *Borum*, 2014 WL 4814541, at *9 (citing *Frame,* 657 F.3d at 231 n. 71 ("[w]e express no opinion as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination")).[30]   Although   it has so far declined to define "intentional discrimination" in the ADA context, the Fifth Circuit's decision in *McCoy v. Tex. Dep't of Crim. Justice*[31] affirms the commonsense causation principle that prison officials must know of an individual's need for an accommodation before they can be held liable for failing to provide an accommodation. C.A. No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) (citing *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)); *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 69 (3d Cir. 1996) (defendant is not "expected to accommodate disabilities of which it is unaware"). Rather, the general rule in cases under the RA, and both Titles I and II of the ADA, is that a plaintiff must show "that the [defendant] knew not only of the [individual's] disability, but also of the physical or mental limitations resulting therefrom." *Id*. (citing *Seaman v. CPSH, Inc*., 179 F.3d 297, 300 (5th Cir. 1999)); *Gammage v. West Jasper School Bd*., 179 F.3d 952, 954 (5th Cir. 1999)). "Because an [individual'] disability and concomitant need for accommodation are often not known to the [defendant] until the [individual] requests an accommodation, the ADA's reasonable accommodation requirement usually does not apply unless triggered by a request from the [individual]." *Id*. (citing *Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 261 (1st Cir. 2001)).

---

[30] *See* App. Tab 49.
[31] *See* App. Tab 51 (case not reported).

A disabled person's failure to expressly "request" an accommodation, however, is not fatal to an ADA claim where the defendant otherwise had knowledge of an individual's disability and needs, but took no action. *See Reed*, 244 F.3d at 261 n. 7 (noting that a request for accommodation may not be required, for example, where the disabled individual's needs are "obvious").   This exception does not apply here.

McCollum's alleged disability as defined by the ADA was not known to UTMB nor was his alleged need for an accommodation obvious. McCollum never asked for any accommodation from UTMB. In sum, McCollum was not denied UTMB services, programs, or activities *by reason of* his alleged disability. Plaintiffs' claims against UTMB should be dismissed with prejudice.

### C.  Sovereign immunity of the University of Texas Medical Branch should not be abrogated where its conduct did not violate Title II of the Americans with Disabilities Act or § 504 of the Rehabilitation Act.

The Supreme Court has held that Title II of the ADA validly abrogates state sovereign immunity under the Fourteenth Amendment in certain cases. *See Georgia*, 546 U.S. at 159. In *Georgia*, the Supreme Court established a three-part test for determining whether immunity is validly abrogated in a given case. *Id*. First, the Court must determine "which aspects of the State's alleged conduct violated Title II." *Id*. Second, the Court must determine "to what extent such misconduct also violated the Fourteenth Amendment." *Id*. Where the State's conduct violates both Title II and the Fourteenth Amendment, Title II abrogates sovereign immunity. *Id*. Where the conduct violates Title II but not the Fourteenth Amendment, the Court must then determine "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159; *Tennessee v. Lane*, 541 U.S. 509, 522–24 (2004); *City of Boerne v. Flores*, 521 U.S. 507, 529-36 (1997); *Hale*, 642 F.3d at 497-98.

Even if UTMB's conduct violated Title II, it is clear that they did not violate the Fourteenth Amendment. The Fourteenth Amendment extends the Eighth Amendment's protections against cruel and unusual punishment to the States. *See Hinojosa v. Livingston*, 807 F.3d 657, 665 n. 5 (5th Cir. 2015). The vehicle for vindicating rights secured by the Eighth Amendment is 42 U.S.C. § 1983. *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979) (Section 1983 creates no substantive or independent rights but is a vehicle for "vindicating rights elsewhere conferred by . . . the Constitution and federal statutes.").

Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they are deliberately indifferent to a prisoner's serious medical needs, constituting an "unnecessary and wanton infliction of pain." *Thayer v. Adams*, 364 F. App'x 883, 890 (5th Cir. 2010) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks, citation, and emphasis omitted)).[32] A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Absent exceptional circumstances, failed treatments, negligence, and medical malpractice are insufficient to give rise to a successful claim of deliberate indifference to serious medical needs. *Gobert*, 463 F.3d at 346. A prisoner who merely disagrees with the course of treatment provided, or contends that he should have received additional treatment, likewise does not raise a viable deliberate indifference claim. *Id*.; *see also Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). To prevail on a

---

[32] *See* App. Tab 54 (unpublished opinion).

claim of deliberate indifference to medical needs, the plaintiff must establish that the defendant denied him treatment, purposefully gave him improper treatment, or ignored his medical complaints. *Gobert*, 463 F.3d at 346; *Domino*, 239 F.3d at 756. "Deliberate indifference is an extremely high standard to meet." *Gobert*, 463 F.3d at 346 (internal quotation marks and citation omitted). A delay in treatment similarly does not violate the Eighth Amendment unless there has been deliberate indifference that results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

McCollum's claim that UTMB violated the Eighth Amendment by denying medical care cannot survive a motion for summary judgment because there is no evidence that UTMB medical staff knew of and disregarded an excessive risk to McCollum's health or safety.  Additionally, UTMB could not infer that a substantial risk of serious harm existed there was no evidence that anyone employed by UTMB at the Hutchins Unit drew any such inference. Even if UTMB violated Title II, it is clear that there was no violation of the Fourteenth Amendment and therefore Texas's sovereign immunity remains intact.

## VII.   CONCLUSION

The death of Larry McCollum was not the result of any discriminatory act based on McCollum's alleged disability or exclusion from any program by UTMB. For the reasons stated herein, UTMB respectfully requests that the Court grant summary judgment against all claims brought by Plaintiffs.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**BRANTLEY STARR**
Deputy First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/ J. Lee Haney
**J. LEE HANEY**
Attorney-in-Charge
Assistant Attorney General
Texas Bar No. 00784203
Federal I.D. No. 18544
Lee.haney@texasattorneygeneral.gov

**HEATHER RHEA**
Assistant Attorney General
Texas Bar No. 24085420
Federal I.D. No. 2399979

**SHANNA ELIZABETH MOLINARE**
Assistant Attorney General
Texas Bar No. 24041506
Federal I.D. No. 38632

**JENNIFER DANIEL**
Assistant Attorney General
Texas Bar No. 24090063
Federal I.D. No. 2451063


P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080
(512) 936-2109 (Fax)

**FERNELIUS ALVAREZ SIMON PLLC**

40

**GRAIG J. ALVAREZ**
State Bar No. 24001647
Federal I.D. No. 22596

**STEPHEN M. FERNELIUS**
State Bar No. 06934340
Federal I.D. No. 14121

**KARA STAUFFER PHILBIN**
State Bar No. 24056373
Federal I.D. No. 685342

1221 McKinney Street, Suite 3200
Houston, Texas  77010
(713) 654-1200
(713) 654-4039 (Fax)

**ATTORNEYS FOR DEFENDANT,
UNIVERSITY OF TEXAS MEDICAL
BRANCH AT GALVESTON**

## NOTICE OF ELECTRONIC FILING

I, J. LEE HANEY, Assistant Attorney General of Texas, certify that I have electronically submitted for filing the University of Texas Medical Branch at Galveston's Motion for Summary Judgment, on June 17, 2016, in the Southern District of Texas, Houston Division.

/s/ J. Lee Haney
**J. LEE HANEY**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, J. LEE HANEY, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing has been served on all counsel of record via electronic mail on June 17, 2016, as authorized by Fed. R. Civ. P. 5(b)(2) and in accordance with the electronic case filing procedures of the United States District Court for the Southern District of Texas.

/s/ J. Lee Haney
**J. LEE HANEY**
Assistant Attorney General