**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN McCOLLUM, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:14-cv-03253** |
| | § | |
| **BRAD LIVINGSTON, et al.,** | § | |
| **Defendants.** | § | |

---

**APPENDIX TO THE UNIVERSITY OF TEXAS MEDICAL BRANCH'S MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT**

---

Tab 1, 1-34 — Contract between TDCJ and The University of Texas Medical Branch at Galveston for Correctional Health Services FY 2010-2011 Biennium, Correctional Managed Care Health Care Committee at Art. I, 1.15 ("CMHCC-UTMB Agreement"), Article II.A and Exhibit A, Offender Health Services Plan; Article II.D.-E. and Exhibit A; Article II.F.5; Article II.G.13; Article VIII.A. and D.

Tab 2, 35-47 — Deposition of Brad Livingston, October 1, 2015; Deposition of Brad Livingston, October 2, 2015.

Tab 3, 48-59 — Deposition of William Stephens, October 18, 2013.

Tab 4, 60-71 — Deposition of Lannette Linthicum, January 13, 2016.

Tab 5, 72-78 — Deposition of Glenda Adams, March 2014.

Tab 6, 79-92 — Correctional Managed Health Care Committee website last visited on June 15, 2016.

Tab 7, 93-122 — Deposition of Dr. Glenda Adams, November 19, 2013.

Tab 8, 123-157 — Dr. Glenda Adams Expert Report Affidavit with exhibits attached.

Tab 9, 158-165 — Deposition of Owen Murray, November 20, 2013.

Tab 10, 166-173 — CMHC Policy B-15.2 Heat Stress Effective (11/2007 and attachments).

Tab 11, 174-191 Heat Precaution reminder email 2011; TDCJ Administrative Directive AD 10.64, (rev. 6); TDCJ Operation Procedure/Hutchins Unit SOP (06/2011); TDCJ Memorandum "Heat Related Illness" (05/2011).

Tab 12, 192-202 Deposition of Dr. Charles D. Adams, May 18, 2016.

Tab 13, 203-208 Deposition of Jerri Denee Robison, April 27, 2016.

Tab 14, 209 Hutchins Unit American Correctional Association certificates for years 2010-2013 and 2013-2016.

Tab 15, 210-211 TDCJ website for the Unit Directory for Hutchins Unit.

Tab 16, 212-216 Deposition of Gary Eubank, May 6, 2016.[1]

Tab 17, 251-262 Deposition of Pringle, February 15, 2013.

Tab 18, 263-271 Deposition of Bryan Collier, March 30, 2016.

Tab 19, 272-276 CMHC Policy E-32.1, (3/2011) Receiving, Transfer and Continuity of Care Screening and HSM-13 form (blank).

Tab 20, 277-278 TDCJ Administrative Directive AD-06.07 Access to Health Services, (01/2007) rev.4.

Tab 21, 279-294 TDCJ Offender Orientation Handbook.

Tab 22, 295 CMHC Policy E-34.1, Health Appraisal of Incoming Offenders (01/2007).

Tab 23, 296-301 CMHC Policy A-08.4, Offender Medical and Mental Classification (04/2007) and attachments.

Tab 24, 302-309 CMHC Policy A-08.7, PULHES System of Offender Medical and Mental Health Classification (10/1998).

Tab 25, 310-311 CMHC Policy A-08.8, Medical Passes (09/2008).

Tab 26, 312-329 McLennan County Sheriff Office Jail records for Larry McCollum.

Tab 27, 330-342 Hillcrest Hospital Medical Records for Larry McCollum (Plaintiff's Disclosure 11/2013).

Tab 28, 343-349 Parkland Hospital Records for Larry McCollum (Plaintiff's Disclosure 11/2012).

[1] There is an inadvertent gap in the Appendix, page numbers 217-250.

Tab 29, 350-359    Deposition of Stephanie Kingrey, November 22, 2013.

Tab 30, 360        Email from Ananda Babbili dated February 23, 2012.

Tab 31, 361-381    CMC-TDCJ Health Services Medical Records for Larry McCollum (07/2011).

Tab 32, 382-386    TDCJ Pen Packet for Offender Larry McCollum.

Tab 33, 387-388    TDCJ-Office of Inspector General (OIG) File.

Tab 34, 389-393    CMHC Policy E-27.1, Daily Processing of Health Complaints and Sick Call (11/2011).

Tab 35, 394        TDCJ Offender Grievance Records for Larry McCollum.

Tab 36, 395        TDCJ Inter-Office Communication (IOC) to Warden Pringle from P. Escobedo.

Tab 37, 396-398    Letter from Larry McCollum to his wife dated 7-19.

Tab 38, 399-403    Deposition of Karen Sue Tate, February 7, 2013.

Tab 39, 404-409    Hutchins Fire Department –EMS records.

Tab 40, 410-415    Autopsy of Larry McCollum.

Tab 41, 416-417    TDCJ Classification Records, Cost of Confinement.

Tab 42, 418-422    Deposition of Stephen Michael McCollum, November 22, 2013.

Tab 43, 423-426    Deposition of Sandra Sue McCollum, November 22, 2013.

Tab 44, 427        CMHC Policy G-52.1, Infirmary Care (11/2011).

Tab 45, 428-434    Deposition of Richard J. Clark, February 7, 2013.

Tab 46, 435        S. Parker On Call Schedule –Hutchins Unit Medical Department.

Tab 47, 436-441    UTMB-CMC Nursing Services Policy E-37.2, Telephone Triage Protocols for Registered Nurses (03/2008).

Tab 48, 442        CMHC Policy E-41.1, Emergency Services (03/2009).

Tab 49, 443-450    *Borum v. Swisher County*, No. 2:14-CV-127-J, 2015 WL 327508 (N.D.Tex – Amarillo 2015).

Tab 50, 451-455 *Cardenas v. Lee County*, 569 Fed. Appx. 252 (5th Cir. 2014).

Tab 51, 456-464 *McCoy v. Texas Department of Criminal Justice*, C.A. No. C-05-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006).

Tab 52, 465-468 *Mora v. University of Texas Southwestern Medical Center*, 469 F. App'x 295 (5th Cir. 2012).

Tab 53, 469-471 *Mzyk v. North East Independent School District*, 397 Fed.Appx. 13 (5th Cir. 2010).

Tab 54, 472-478 *Thayer v. Adams*, 364 Fed. Appx. 883 (5th Cir. 2010).

# FY 2010 – 2011
# Correctional Health Care Master Contracts

*Correctional Managed*

*Health Care*

UTMB

TEXAS TECH UNIVERSITY
HEALTH SCIENCES CENTER

**Appendix 1** TDCJ - 04826

CMHC2010.001
TDCJ Contract #696-HS-10-11-A030

CMHCC-TDCJ Master
FY 2010-2011

# AGREEMENT BETWEEN CORRECTIONAL MANAGED HEALTH CARE COMMITTEE and TEXAS DEPARTMENT OF CRIMINAL JUSTICE FOR CORRECTIONAL HEALTH SERVICES FY 2010-2011 Biennium

1
**Appendix 2**
TDCJ - 04831

# AGREEMENT BETWEEN CORRECTIONAL MANAGED HEALTH CARE COMMITTEE and TEXAS DEPARTMENT OF CRIMINAL JUSTICE FOR CORRECTIONAL HEALTH SERVICES FY 2010-2011

## PREAMBLE

This Agreement is entered into by and between the CORRECTIONAL MANAGED HEALTH CARE COMMITTEE ("CMHCC") and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE ("TDCJ"), pursuant to the authority granted by and in compliance with the provisions of Chapter 501, Subchapter E, Texas Government Code and any applicable provisions of the Appropriations Act. The terms, conditions, obligations and responsibilities agreed to by the parties are set forth below:

WHEREAS, Chapter 501, Subchapter E, Texas Government Code, establishes the Correctional Managed Health Care Committee, the CMHCC, and directs them to develop a managed health care plan for the provision of health care to offenders for and on behalf of, the TDCJ;

WHEREAS, the TDCJ has received appropriations intended to fund health care services for offenders incarcerated in its facilities and recognizes the CMHCC's authority to contract for healthcare services for and on behalf of the TDCJ;

WHEREAS, the CMHCC intends to contract with the University of Texas Medical Branch at Galveston ("UTMB") and with Texas Tech University Health Sciences Center ("TTUHSC") to furnish medical and psychiatric care to offenders, hereinafter referred to collectively as "University Providers"; and,

WHEREAS, to the extent possible, the University Providers, at the direction of the CMHCC shall provide such services through their own capabilities, through a sub-contract between UTMB and TTUHSC, the capabilities of UTMB or TTUHSC components or affiliates, or by further subcontracting;

NOW, therefore, for and in consideration of the foregoing and in further consideration of the mutual benefits, the parties hereto agree as follows:

# Article I
# DEFINITIONS

1.1 Capital Assets: State property that has an estimated life of greater than one year and are recorded as capital assets in the State Property Accounting ("SPA") system.

1.2 Correctional Managed Health Care Committee ("CMHCC"): A committee established by Chapter 501, Subchapter E, Texas Government Code, consisting of two members each, at least one of whom is a physician, from the TDCJ, the University of Texas Medical Branch at Galveston, and Texas Tech University Health Sciences Center, and three members appointed by the Governor, two of whom must be physicians, responsible for developing, implementing, and monitoring the correctional managed health care services for offenders confined in institutions operated by TDCJ that are covered by this contract.

1.3 Correctional Managed Health Care Policies and Procedures: Those policies and procedures promulgated for the correctional health care program pursuant to the joint committee process outlined in Article II.F.5.

1.4 Health Care: Health related actions taken, both preventive and Medically Necessary, to provide for the physical and mental well-being of the offender populations. Health Care, among other aspects, includes medical services, dental services, and mental health services. For the purposes of this Agreement the definition does not include inpatient/outpatient substance abuse or sex offender treatment.

1.5 Hospital Medical Records: All records pertaining to the history, diagnosis, treatment or prognosis of a person treated pursuant to the terms of this Agreement which are generated and maintained by the treating hospitals, including subcontractors, except for the discharge summary made a part of the offender's medical file.

1.6 Medically Necessary: Services, equipment, or supplies furnished by a Participating Provider which, under the provisions of this Agreement, are determined to be:

(1) Appropriate and necessary for the symptoms, diagnosis or treatment of the medical condition; and

    (2)      Provided for the diagnosis or direct care and treatment of the medical condition; and

    (3)      Within standards of good medical practice within the organized medical community; and

    (4)      Not primarily for the convenience of the TDCJ Offender Patient, the physician or another provider, or the TDCJ Offender Patient's legal counsel whether or not for or in anticipation of litigation; and

    (5)      The most appropriate provision or level of service which can safely be provided. For Inpatient Services, this means acute care necessary due to the kind of services the TDCJ Offender Patient is receiving or the severity of the condition, and that safe and adequate care cannot be received as an outpatient or in an infirmary setting (or similarly less-intensified medical setting).

1.7      Medical Records: All records, to include electronic, pertaining to the history, diagnosis, treatment or prognosis of a person treated which are generated at TDCJ owned or operated facilities or private contractor owned and / or operated facilities that house incarcerated offenders for the benefit of TDCJ and regardless as to whether maintained by the University Providers in accordance with this Agreement. The definition includes but is not limited to privately operated state jails, prison units, Intermediate Sanction Facilities, Pre-Parole Transfer Facilities or other secure Facilities in which TDCJ offenders are incarcerated. The definition does not include hospital records maintained by the treating hospital except for the discharge summary made a part of the offender's medical file. Medical records for the purpose of this Agreement, do not include substance abuse treatment information and sex offender treatment program records generated and maintained by TDCJ. However, this term does include any substance abuse and sex offender treatment information and records collected or originated in connection with the health care services provided pursuant to this Agreement.

1.8      Natural or Manmade Catastrophe: An unanticipated event, including but not limited to, major riot, explosion, fire, earthquake, hurricane, tornado, flood, plague, poison, terrorist act, war, hazardous substances, and any other natural disaster,

which, in the opinion of the CMHCC, requires the provision of medical services to TDCJ offenders in excess of those services within the routine anticipation of this Agreement's Article II and therefore require reimbursement beyond the payment provisions of this Agreement.

1.9 Offsite Services: All Health Care provided to TDCJ offender patients outside of the TDCJ Unit including outpatient services, emergency services, hospitalization, and inpatient services.

1.10 Onsite Services: Health Care provided for TDCJ offenders "onsite" at those TDCJ Units, including infirmary care at those TDCJ Units with infirmary care and those pharmacy services provided to TDCJ Units for medically necessary prescription and over the counter drugs.

1.11 Participating Provider: All of the Health Care providers who provide covered services to TDCJ's offender patients.

1.12 Practitioner Subcontractor: A physician, dentist, optometrist, nurse practitioner, or physician assistant providing Health Care to TDCJ offenders.

1.13 TDCJ Employee: Individual who is an employee of the Texas Department of Criminal Justice.

1.14 TDCJ Offender: Those individuals confined by appropriate legal processes and incarcerated in the TDCJ's state owned facilities.

1.15 Texas Department of Criminal Justice ("TDCJ"): An agency of the State of Texas responsible for the incarceration of convicted felons.

1.16 Texas Tech University Health Sciences Center ("TTUHSC"): An institution of higher education of the State of Texas responsible for the education of health professionals in the delivering of professional health services, contracting with CMHCC as a University Provider for the delivery of Health Care to TDCJ offenders.

1.17 The University of Texas Medical Branch at Galveston ("UTMB"): A component institution of higher education of the University of

Texas System responsible for the education of health care professionals in the delivering of professional health services, contracting with the CMHCC as a University Provider for the delivery of Health Care to TDCJ offenders.

1.18 University Provider: The University of Texas Medical Branch at Galveston and Texas Tech University Health Sciences Center contracting with CMHCC to provide Health Care for TDCJ Offenders housed in facilities covered by this Agreement.

## Article II
## SERVICES

A. **Scope and Intent:** To implement the managed health care plan consistent with the requirements of Chapter 501, Subchapter E, Texas Government Code, the CMHCC shall provide for the delivery of Health Care as defined in the Offender Health Services Plan (hereby incorporated as Exhibit A) and as further defined herein to those TDCJ offenders in units covered by this Agreement and listed in Exhibit D. This Agreement is intended to define the roles and responsibilities of the TDCJ, the CMHCC and the University Providers and incorporates the description of functional responsibilities found in Exhibit B.

B. **Uniform Level of Care**: It is the intent of the parties, in exchange for the payments herein defined, that the CMHCC provide a uniform level of Health Care to all TDCJ offenders.

C. **Offender Health Services Plan**: The Offender Health Services Plan (Exhibit A) as approved by the CMHCC, and subsequent revisions to that Plan that are approved by the CMHCC shall describe the services provided to TDCJ offenders under this Agreement. All services are subject to a determination of medical necessity. Changes to the Offender Health Services Plan will be considered and approved by the CMHCC only after approval of the changes by each of the Medical Directors through a joint committee process similar to that utilized for approval of health services policies and procedures.

D. **Onsite Services:** Health Care Onsite Services include, in addition to the services detailed in the Offender Health Services Plan:

1. Unit level Health Care Services, including sick call and nursing coverage at a level required for maintaining accreditation or meeting access to care standards.

2.        Medical record services with the exception of substance abuse and sex offender records, to include duplication of medical records as required by policy.

3.        Health education/training for offenders, health care providers and correctional officers.

4.        Health care-related administrative management services.

5.        First aid kits, spill kits and violence kits as specified in health services policy.

6.        Supplies, sterile packs, and gloves for the medical department only.

7.        Bio-hazardous waste disposal.

8.        Certified or licensed personnel to dispense medication at all units.

9.        Diagnostic services at designated facilities.

10.       Collection of samples for purposes of DNA analysis as required by state law.

11.       HIV testing as required by state law.

12.       Emergency preparedness and response.

13.       Hepatitis B vaccinations.

14.       Dialysis services.

15.       Pharmacy Services, subject to the requirement that all medications must be approved by and prescribed by legally authorized providers contracting with the CMHCC or its University Providers.

16.       University Providers will ensure that unit security personnel have immediate access to Automated External Defibrillators (AED's) at times when the unit is not staffed with licensed healthcare personnel.

E. **Offsite Services**: Health Care Offsite Services include in addition to the services detailed in the Offender Health Services Plan:

1. Emergency services at community hospitals, TDCJ hospitals or CMHCC's University Provider hospitals.

2. Inpatient services at community hospitals, TDCJ hospitals or CMHCC's University Provider hospitals

3. Outpatient services at community hospitals, TDCJ hospitals or CMHCC's University Provider hospitals (including infirmary and observation room services).

4. Specialty physician consults, surgeries, and treatment.

.

F. **Centralized Statewide Services**: The CMHCC shall provide for delivery of the following centralized services statewide by UTMB on behalf of the TDCJ:

1. Medical Records: maintain paper and electronic medical records archives, manage electronic medical records, provide technical support, and maintain forms control and death records.

2. Radiology: liaison with the Bureau of Radiation Control, provide radiation safety services, equipment registration with Bureau of Radiation Control and coordinate related policy and procedure development or revision.

3. Medical Training: provide health-related training required for security staff during pre-service (Exhibit C) and in-service training academies, including CPR instructor's training for TDCJ academy staff and annual AIDS education for TDCJ staff, according to the schedule and locations found in the schedule published by TDCJ.

4. Burial/Autopsies: coordinate and pay for burials and autopsies on a statewide basis for deceased offenders in units covered by this Agreement and listed in Exhibit D... A copy of the autopsy report shall be provided to the University Provider within 30 days of receipt of the final report. The TDCJ Office of Inspector General, after conducting a custodial death investigation, may

request that a deceased offender's body be sent to a Medical Examiner for autopsy. UTMB's financial responsibility for the costs of an independent autopsy requested by the Office of Inspector General shall be limited to UTMB's current contracted rate for an autopsy examination. The disposition of remains will be conducted in accordance with TDCJ policy AD-03.29 (Procedures for Offender Deaths).

5.   Policy/Procedures:  provide TDCJ with staff and clerical support for initiation of new policies, annual revision of current policies and distribution of same. All statewide Health Services policies and procedures will be developed through a joint policy and procedure committee process that includes representatives of TDCJ, UTMB, TTUHSC and the CMHCC.  All policies approved by the joint policy and procedure committee shall be submitted for review and approval by each Medical Director.  The TDCJ Medical Director shall retain final approval authority for all statewide policies.

G.   **Services Provided by TDCJ**:  The TDCJ shall provide the following services which shall be financed directly by TDCJ including, but not limited to:

1.   Utilities, housekeeping, medical office trash removal, housekeeping supplies (including paper towels, toilet tissue, trash bags, floor buffers and pads,  soap, wax, etc.) and maintenance of TDCJ facilities, to include good faith efforts to maintain necessary HVAC systems for medical clinic service areas in operable condition.

2.   Administrative support services, including but not limited to, access and use of agency motor pool resources to include such items as fuel, tires, batteries, routine servicing for vehicles used solely for the provision of services to TDCJ offenders; access to and use of agency mail systems; and, use of agency mainframe computer applications and basic telephone services. Administrative support services shall be used solely for TDCJ offender care.  The TDCJ shall continue to provide, at no additional cost, the CMHCC with two vehicles, including fuel and maintenance, to be used by the CMHCC for official purposes.

3.   All capital equipment customarily included as part of the construction of any new TDCJ Unit Clinics occupied after the effective date of this Agreement.  Prior written approval of TDCJ

is required for the addition of major capital equipment items which require additional facility infrastructure support such as power, water, wastewater, air conditioning, etc. to ensure sufficient support is available. Requests should be sent to the Facilities Division, Planning and Programming Branch for written approval and coordination.

4. General and security orientation.

5. Routine and scheduled offender transportation services that do not require the presence of attending medical staff during transportation (e.g., EMS ambulance runs). It is the intent of the parties to develop mutually acceptable schedules for routine transportation services provided by the TDCJ in order to maximize transportation efficiency to the extent practical.

6. All necessary TDCJ forms/medical records used on site.

7. TDCJ policy and procedure manuals and guides, and appropriate revisions.

8. Printing of bilingual educational materials.

9. Computerized pharmacy system mainframe and peripheral equipment, maintenance and servicing. An interagency contract will be entered into between TDCJ and UTMB for the lease of the pharmacy.

10. Diagnostic II services performed as part of the initial or follow-up classification process.

11. Substance Abuse and Sex Offender Treatment programs and counseling.

12. Communication and coordination between the parties for TDCJ Unit completion and offender arrival schedules, with notification of offender occupancy a minimum of thirty (30) days prior to scheduled openings.

13. Requesting, in consultation with the CMHCC, appropriations for funding of the correctional managed health care program from the Legislature.

contained herein shall be construed as creating the relationship of employer and employee between the CMHCC, the University Providers, the Practitioner Subcontractors, and other subcontractors.   The CMHCC, the University Providers and the Participating Providers shall each be deemed at all times to be independent contractors.  In carrying out the terms of this Agreement, the CMHCC and the University Providers shall select their own employees and Participating Providers.

## Article VIII
## QUALITY OF CARE MONITORING

A.   **Cooperation in Quality of Care Monitoring:**   The parties hereby acknowledge that pursuant to Section 501, Subchapter E, Texas Government Code, the CMHCC is responsible for establishing procedures for monitoring the quality of care delivered by the health care providers and for enforcing compliance with contract provisions, including requiring corrective action if care does not meet expectations as determined by quality of care monitoring activities as required by Section 501.148 (a) (7) and Section 501.150. The parties further acknowledge and agree that the delivery and monitoring of health care within the Texas correctional system requires coordinated and cooperative efforts from all parties, including subcontractors.

1.   The TDCJ and the CMHCC's medical care providers shall cooperate in monitoring quality of care.

2.   The TDCJ shall monitor the quality of care delivered by the health care providers, including investigating medical grievances, ensuring access to medical care and conducting periodic operational reviews of medical care provided at its units.

3.   The clinical and professional resources of the health care providers shall be used to the greatest extent feasible for clinical oversight of quality of care issues. The TDCJ may require the health care providers to take corrective action if the care provided does not meet expectations as determined by quality of care monitoring.

4.   The TDCJ and the CMHCC's medical care providers shall communicate the results of their monitoring activities, including a list of and the status of any corrective actions to the CMHCC and to the Texas Board of Criminal Justice.

5. To ensure the effectiveness and efficiency of such efforts, the CMHCC, in coordination with and in consideration of input from TDCJ and its University Providers, have agreed to key principles involved in monitoring the correctional health care system, including monitoring operational results to determine overall performance or compliance. These agreements include:

   a. definitions of the roles and responsibilities of the CMHCC, TDCJ and the University Providers in regard to monitoring activities;

   b. designation of formal notification mechanisms for communicating and sharing information related to monitoring activities, results and trends;

   c. formal reporting mechanisms for communicating the results of monitoring activities to the CMHCC and to the parties;

   d. delineation of the timeframes for review and comment on monitoring reports and for filing corrective action plans in response to those reports;

   e. identification of specific self-monitoring activities intended to maximize the clinical oversight of quality of care issues through the clinical and professional resources of the health care providers and the appropriate means of sharing the results of those activities among the parties;

   f. requirements that the CMHCC's University Providers monitor all subcontractors with whom the University Providers contract for service and report the results of such monitoring to the CMHCC. Performance standards and monitoring criteria shall meet as a minimum, performance standards set forth in this Agreement for the CMHCC's University Providers. Performance standards and monitoring criteria shall be included in each subcontract executed by the CMHCC's University Providers under this Agreement, and provisions for damages and cancellation of the subcontract if the performance measures are not attained by the subcontractor;

   g. definition of the roles of the CMHCC's University Providers in assisting TDCJ and responding to TDCJ's responsibilities

related to the investigation of medical grievances, ensuring access to medical care and conducting periodic operational reviews of medical care provided at its units; and,

h. provisions for follow-up reporting, verification and enforcement of corrective actions.

B. **Accreditation**: TDCJ and the CMHCC's University Providers agree to obtain and maintain ACA accreditation as required in Article IX.A in accordance with Exhibit E. The TDCJ and applicable CMHCC University Provider further agree to share the cost of accreditations and reaccreditations for these facilities on an equal basis. The TDCJ agrees to pay the entire ACA accreditation or re-accreditation fee for the facility and bill the University Providers as the facilities are accredited or re-accredited for their portion per Exhibit E. Copies of accreditation reports will be provided to the CMHCC and the TDCJ Health Services Division by the University Providers upon request.

C. **Health Care Provider Credentials:** All health care providers must have and maintain appropriate licensure or certification as outlined in Article II.O of this Agreement. Verification of current credentials must be maintained and made available upon request of the CMHCC or the TDCJ Health Services Division.

D. **Operational Review**: All unit health care facilities are subject to routine or special Operational Review inspections conducted to ascertain compliance with health care policies. TDCJ's Health Services Division will develop and implement a system-wide assessment mechanism for Operational Review results and perform trend analyses of these results to identify recurring issues and to identify at risk units for special review. Such assessment mechanisms shall define tolerable error rates and performance standards. Following each Operational Review, the status of compliance with the policies shall be documented in a written report provided to the University Provider. Corrective action plans shall be developed for any identified deficiencies and submitted to the TDCJ Health Services Division Director for approval in accordance with established procedures.

E. **Access to Care Reporting**: Access to care shall be afforded by TDCJ and the CMHCC's University Providers in accordance with approved health services policies and procedures. All unit health care facilities shall monitor access to care indicators monthly in accordance with approved methodologies. A rate of compliance below 80% for any indicator shall be cause for the University Provider Medical Director to

**Correctional Managed Health Care Committee**

94217-9
CMHCC-TTUHSC Master
EXHIBIT A

# Offender Health Services Plan

## Adopted September 2003

(Reviewed August 2005)

(Reviewed and Updated June 2007)

(Reviewed and Updated August 2009)

## Contents

Contents ........ 1
*Introduction* ........ *3*
*Definition of Health Care Services* ........ *4*
*Access to Care* ........ *4*
*Classification of Levels of Care* ........ *4*
*Utilization Management and Review* ........ *5*
*Formulary and Disease Management Guidelines* ........ *5*
*Complaints and Grievances About Health Care* ........ *6*
*Offender Copayment Requirements* ........ *6*
*Medical Services And Supplies Provided By Physicians And Other Health Care Professionals* ........ *7*
Diagnostic and treatment services ........ 7
Laboratory, X-ray and other diagnostic tests ........ 7
Treatment Therapies ........ 8
Physical and Occupational Therapies ........ 8
Hearing Services ........ 8
Vision Services ........ 9
Foot Care ........ 9
Orthopedic and prosthetic devices ........ 9
Durable Medical Equipment ........ 9
Educational Material, Classes or Programs ........ 10
*Preventive Health Care Services* ........ *11*
Routine Immunizations ........ 11
Medically Indicated Immunizations ........ 11
Hepatitis A or B vaccination for Occupational Risk ........ 11
Post-exposure testing and prophylaxis for offender non-occupational bloodborne pathogen exposure ........ 11
TB Related Services ........ 11
HIV Related Services ........ 12
Partner elicitation and referral for Sexually Transmitted Diseases, including HIV ........ 12
Syphilis screening upon intake ........ 12
Testing for communicable diseases when clinically indicated ........ 12

Treatment of chronic Hepatitis B and C according to Correctional Managed Health Care policies and protocols ..... 12

Hepatitis C antibody testing upon Request ..... 12

Post-exposure prophylaxis for varicella when medically indicated ..... 12

Post-exposure Prophylaxis for meningitis when clinically indicated ..... 12

Periodic medical assessments as required for certain job assignments involving excessive noise exposure or use of a respirator ..... 12

Access to personal hygiene supplies as described in policy ..... 12

Periodic physical examination, according to frequency designated in policy ..... 12

Annual fecal occult blood test over age 50 ..... 12

Health education services ..... 12

Mammogram Services for Females ..... 13

For females, annual pelvic exam and Pap smear ..... 13

Maternity Services ..... 13

*Surgical and Anesthesia Services provided by Providers and other Health Care Professionals* ..... *14*

Surgical Procedures ..... 14

*Services Provided by an Infirmary, Hospital or Other Facility and Ambulance Services* .. *15*

Infirmary Care ..... 15

Inpatient Hospital ..... 15

Hospice Care ..... 16

Ambulance ..... 16

Medical Emergency Services ..... 16

*Mental Health Services* ..... *17*

Mental Health Care ..... 17

*Pharmacy Services* ..... *18*

*Dental Services* ..... *19*

Diagnostic/Preventive Dentistry by Primary Dentist ..... 19

Dental X-rays ..... 19

Prophylaxis ..... 20

Restorative (fillings) by Primary Dentist ..... 20

Endodontics (Root Canal Therapy) by Primary Dentist ..... 20

Oral Surgery by Primary Dentist ..... 20

Periodontics (Gum treatment) by Primary Dentist ..... 20

Major restorative dentistry by Primary Dentist ..... 20

Prosthodontics (dentures) by Primary Dentist ..... 21

# Offender Health Services Plan

## Correctional Managed Health Care Committee

## Introduction

The Offender Health Services Plan describes the level, type and variety of health care services made available to offenders incarcerated within the Texas Department of Criminal Justice. This Plan is adopted pursuant to Section 501.146 of the Texas Government Code. In this Plan health care services are delivered through a cooperative arrangement between TDCJ, the University of Texas Medical Branch at Galveston and the Texas Tech University Health Sciences Center under the direction of the Correctional Managed Health Care Committee.

The Offender Health Services Plan is intended to serve as a guide for determining the health care services provided to offenders. It is not intended to represent an all-inclusive list of services to be provided nor to replace sound clinical judgment of the health care providers. In addition, the Plan is intended to work in conjunction with other tools provided to health care providers such as the approved formulary and disease management guidelines adopted by the program.

The Plan should also be considered a work in progress. As necessary and at least annually, the Plan will be updated to reflect changes in policy, practice, and standards of care. The Plan was developed in a cooperative effort of the three medical directors involved in the correctional managed health care program, along with the input of management in various health care disciplines. The Plan also draws heavily on a number of reference documents, most notably, the Oregon Department of Corrections Health Care Plan and the HMO Blue Texas Plan.

## Definition of Health Care Services

Health Care, for the purposes of this Plan, is defined as health-related actions taken, both preventive and medically necessary, to provide for the physical and mental well-being of the offender population. Health care, among other aspects, includes medical services, dental services, and mental health services.

## Access to Care

All offenders shall have equal access to health care services. Each facility within TDCJ has written procedures which describe the process for offenders to gain access to the care needed to meet their medical, dental and mental health needs. Offenders are provided information at intake and upon receipt at their unit of assignment on the procedures for obtaining health care services.

## Classification of Levels of Care

For purposes of this Plan, health care services can be prioritized into the following classifications:

**Level I Medically Mandatory:** Care that is essential to life and health and without which rapid deterioration is expected. The recommended treatment intervention is expected to make a significant difference or is very cost effective. Examples include: appendectomy, repair of deep wounds, burn treatment, heart attacks, treatment of severe head injury, and prenatal care. Examples of mental health services in this classification include: schizophrenia, other psychotic disorders, delirium, bipolar disorder, suicide risk, or any psychiatric condition requiring hospitalization.

- ***Care at Level I is authorized and provided to all inmates.***

**Level II Medically Necessary:** Care that is not immediately life threatening, but without which the patient could not be maintained without significant risk of serious deterioration or where there is a significant reduction in the possibility of repair later without treatment. Examples include: diabetes, asthma, hypertension, heart disease, treatable cancers, immunizations, and comfort care such as end stage care of terminal illness. Examples of mental health include: dementia, major depression, anxiety disorders, adjustment disorder, and severe personality disorder.

- ***Care and treatment of conditions at Level II is provided to all inmates but evolving community standard and practice guidelines controls the extent of service.***

**Level III Medically Acceptable:** Care for non-fatal conditions where treatment may improve the quality of life but will not in general affect the length of life. Examples include treatment of non-cancerous skin lesions, cataract removal, hip replacement, and routine hernia repair. Examples of mental health include: mental retardation, dysthmic disorder, and moderate personality disorder.

- ***Level III conditions are considered on a case-by-case basis by a review process.***

**Level IV Limited Medical Value:** These are treatments that may be valuable to certain individuals but are significantly less cost effective or produce no long-term gain. This category includes treatment of minor conditions where treatment merely speeds recovery or offers minimal reduction in symptoms or is for the convenience of the individual. Examples include tattoo removal, nasal reconstruction, cosmetic or plastic surgery and treatment of diseases that resolve on their own such as the common cold. Examples of mental health include: pedophilia, sleep disorder, and conduct disorder.

- ***Treatment of Level IV conditions is not generally authorized; however, a review process may consider exceptional individual cases.***

## Utilization Management and Review

Utilization management and review is a physician-driven system for making individual evaluations as to medical necessity. The review process entails consulting national accepted standards of care and comparing the individual circumstances of each case. Referrals for certain types of care require prior authorization through the utilization review process. Determinations made through the utilization management and review process may be appealed by the referring provider for additional review and decision in accordance with established procedures.

## Formulary and Disease Management Guidelines

A standard statewide formulary is maintained by the Pharmacy and Therapeutics Committee and updated as needed and at least annually. This committee meets regularly to review the use of drugs within the health care system, evaluate agents on the formulary and consider changes to the available medications. All medications prescribed for offenders must be listed in the formulary, unless specific medical necessity exists for authorizing a non-formulary medication. In such circumstances, a request for non-formulary approval will be processed and evaluated. Non-formulary determinations may be appealed by the referring provider for additional review and decision in accordance with established procedures.

In addition to the formulary, the Pharmacy and Therapeutics Committee develops and maintains disease management guidelines that outline recommended treatment approaches for management of a variety of illnesses and chronic diseases. These guidelines are reviewed regularly and updated as necessary. Disease management guidelines focus on disease-based drug therapy and outline a recommended therapeutic approach to specific diseases. They are typically developed for high risk, high volume, or problem prone diseases encountered in the patient population. The goal is to improve patient outcomes and provide consistent, cost-effective care, which is based on national guidelines, current medical literature, and has been tailored to meet the specific needs of the patient population served.

Disease management guidelines are just that. They are guidelines. They represent pathways that will help practitioners provide care for the majority of patients in the middle portion of a bell shaped curve. Pathways do not replace sound clinical judgment nor or they intended to strictly apply to all patients.

## Complaints and Grievances About Health Care

If an offender believes that he/she has not received medical care that is necessary and appropriate for his/her medical condition, the following mechanisms are available:

- First, asking questions of the treating professionals in the medical department in order to understand what is being done to address the issue;
- If the issue remains unresolved, the next step is to complete an I-60 Request to Official form and send it to the facility medical complaints coordinator at the medical department for informal resolution;
- An offender also has the right to file a grievance in accordance with the appropriate offender grievance procedures.

## Offender Copayment Requirements

In accordance with state law, if a visit to a health care provider meets offender health care co-payment criteria, the offender may be assessed a $3.00 co-payment fee. Offenders will be afforded access to health care services regardless of their ability to pay this fee.

# Offender Health Services Plan

***All services are subject to a determination of medical necessity.***

## Medical Services And Supplies Provided By Physicians And Other Health Care Professionals

| Service Description |
|---|
| **Diagnostic and treatment services** |
| Professional services of providers |
| ■ In provider's office or department |
| ■ Consultations by specialists when indicated |
| ■ Office medical consultations |
| ■ During a hospital stay |
| ■ During an infirmary stay |
| **Laboratory, X-ray and other diagnostic tests** |
| Tests, including but not limited to: |
| ■ Blood tests |
| ■ Urinalysis |
| ■ Pathology |
| ■ X-rays |
| ■ Mammograms |
| ■ Cat Scans/MRI |
| ■ Ultra sound |
| ■ Electrocardiogram and EEG |

**Treatment Therapies**

- Chemotherapy and radiation therapy
- Respiratory and inhalation therapy
- Dialysis–hemodialysis and peritoneal dialysis
- Intravenous (IV)/Infusion therapy

**Physical and Occupational Therapies**

Services for each of the following:

- Qualified physical therapists
- Occupational therapists
- Rehabilitation therapy and exercise

Notes: Physical and occupational therapy is limited to services that assist the member to achieve and maintain self-care and improved functioning in other activities of daily living.

Cardiac rehabilitation is provided subject to the limitations below.

Therapy to restore bodily function is provided only when there has been a total or partial loss of bodily function due to injury or illness.

Services are limited to those that continue to meet or exceed the treatment goals established by the provider. For the physically disabled–maintenance of functioning or prevention of or slowing of further deterioration.

**Hearing Services**

- Audiogram if medically indicated
- Placement of hearing aid when medically necessary

**Vision Services**

- Eye examination (vision screening) to determine the need for vision correction
- Ocular prosthesis if medically indicated
- Optometry services
- Corrective lenses as medically indicated

**Foot Care**

- Corrective orthopedic shoes, arch supports, braces, splints or other foot care items if medically indicated

**Orthopedic and prosthetic devices**

- Artificial limbs and eyes; stump hose
- Terminal devices
- Braces for arms, legs, back or neck
- External cardiac pacemaker
- Internal prosthetic devices, such as artificial joints, pacemakers
- Foot orthotics when medically necessary

**Durable Medical Equipment**

Provision of necessary durable medical equipment, including repair and adjustment, as prescribed by the provider, such as:

- Hospital beds
- Standard wheelchairs
- Crutches
- Walkers
- Blood glucose monitors
- Suction machines
- Oxygen

**Educational Material, Classes or Programs**

Health education material, classes or programs for the following conditions:

- Diabetes
- Asthma
- Congestive heart failure
- Diet and nutritional counseling services by health care staff

## Preventive Health Care Services

| Service Description |
|---|
| **Routine Immunizations**<br>Limited to Td, MMR, influenza (over age 54), pneumococcal vaccine (over age 64) |
| **Medically Indicated Immunizations**<br>Such as influenza when medically indicated, meningococcal vaccine, etc. |
| **Hepatitis A vaccination for Occupational Risk** |
| **Hepatitis B vaccinations** |
| **Post-exposure testing and prophylaxis for offender non-occupational bloodborne pathogen exposure** |
| **TB Related Services**<br>▪ Annual TB screening tests<br>▪ Treatment of Latent TB infection<br>▪ Directly observed therapy for TB disease<br>▪ Treatment for TB, including respiratory isolation when indicated<br>▪ Contact investigation around active TB cases<br>▪ Specialty Consultation for drug-resistant TB cases |

| **HIV Related Services**<br>▪ HIV testing and counseling upon intake and prior to release as required by state law<br>▪ HIV testing and counseling upon request (no more than every 6 months)<br>▪ Antiretroviral therapy for HIV according to Correctional Managed Health Care policy and protocols<br>▪ Opportunistic infection prophylaxis<br>▪ Infectious disease consultation for HIV infection |
| --- |
| **Partner elicitation and referral for Sexually Transmitted Diseases, including HIV** |
| **Syphilis screening upon intake** |
| **Testing for communicable diseases when clinically indicated** |
| **Treatment of chronic Hepatitis B and C according to Correctional Managed Health Care policies and protocols** |
| **Hepatitis C antibody testing upon Request**<br>No more often than once per year |
| **Post-exposure prophylaxis for varicella when medically indicated** |
| **Post-exposure Prophylaxis for meningitis when clinically indicated** |
| **Periodic medical assessments as required for certain job assignments involving excessive noise exposure or use of a respirator** |
| **Access to personal hygiene supplies as described in policy** |
| **Periodic physical examination, according to frequency designated in policy** |
| **Annual fecal occult blood test over age 50** |
| **Health education services** |

| **Mammogram Services for Females** |
|---|
| ▪ Baseline mammogram at age 40<br>▪ Mammogram every 1-2 years for ages 40-49; annually from age 50 and higher |
| **For females, annual pelvic exam and Pap smear** |
| Frequency may be adjusted by the provider when clinically indicated |
| **Maternity Services** |
| ▪ Prenatal and postnatal care, including medically indicated vitamins and nutritional care<br>▪ Delivery and complications of pregnancy<br>Note: Elective termination of pregnancy is not covered. Medical care of the newborn infant is not covered. |

## Surgical and Anesthesia Services provided by Providers and other Health Care Professionals

***Facility Providers must obtain precertification of all offsite surgery procedures.***

| Service Description |
| --- |
| **Surgical Procedures**<br><br>A comprehensive range of services, such as:<br><br>■ Operative procedures<br>■ Treatment of fractures, including casting<br>■ Normal pre- and post-operative care by the surgeon<br>■ Endoscopy procedures<br>■ Biopsy procedures<br>■ Removal of tumors and cysts<br>■ Insertion of internal prosthetic devices |

## Services Provided by an Infirmary, Hospital or Other Facility and Ambulance Services

***Facility physicians must obtain precertification of hospital stays. All services are subject to a finding of medical necessity.***

| Service Description |
|---|
| **Infirmary Care** |
| Health care services at TDCJ facilities with infirmaries for an illness or diagnosis that requires limited observation and/or management by a registered nurse, but does not require admission to a licensed hospital. |
| **Inpatient Hospital** |
| Room and Board |
| ■ General Nursing Care |
| ■ Meals and Special Diets |
| Other Hospital Services, such as: |
| ■ Operating, recovery, obstetrical and other treatment rooms |
| ■ Prescribed drugs and medicines |
| ■ Diagnostic laboratory tests and X-rays |
| ■ Administration of blood and blood products |
| ■ Blood or blood plasma |
| ■ Dressings, splints, casts and sterile tray services |
| ■ Medical supplies and equipment, including oxygen |
| ■ Anesthetic services as necessary |

**Hospice Care**

Supportive and palliative care for the terminally ill is provided in a designated hospice facility. Services include inpatient and outpatient care. These services are provided by a multidisciplinary team under the direction of the facility provider who certifies the terminal stages of illness, with a life expectancy of approximately six months or less. Services include appropriate support services at the correctional unit for the offender's family as outlined in policy.

**Ambulance**

Local professional ambulance service when medically appropriate

**Medical Emergency Services**

A medical emergency is the sudden and unexpected onset of a condition or an injury that your facility provider believes endangers your life or could result in serious injury or disability, and requires immediate medical or surgical care.

## Mental Health Services

| Service Description |
|---|
| **Mental Health Care**<br><br>Diagnostic and treatment services recommended by a qualified mental health provider, including:<br><br>■ Professional services such as medication monitoring and management<br>■ Outpatient services<br>■ Psycho-social services as indicated<br>■ Inpatient services provided by a correctional health care approved facility, including as necessary, diagnostic evaluation, acute care, transitional care and extended care<br>■ Crisis management/Suicide Prevention<br>■ Continuity of care services<br>■ Specialized mental health programs<br>    ■ Program for the Aggressive Mentally-Ill Offender<br>    ■ Mentally Retarded Offender Program<br>    ■ Administrative Segregation step-down program<br>    ■ Program for the chronic self-injurious<br>■ Emergency mental health services are available 24 hours a day, seven days per week.. |
| |

**Prophylaxis**

- Oral hygiene instruction
- Fluoride treatment
- Sealant treatment (per tooth)
- Infection control

**Restorative (fillings) by Primary Dentist**

- Amalgram (silver) restorations: primary or permanent (1, 2, 3 or more surfaces)
- Composite resin (white) restorations on anterior teeth only (1, 2, 3 or more surfaces)
- Acid etch bonding for repair of incisal edge

**Endodontics (Root Canal Therapy) by Primary Dentist**

**Oral Surgery by Primary Dentist**

- Single tooth extraction
- Surgical extraction-erupted tooth
- Surgical extraction-soft tissue impaction
- Surgical extraction-partial bony impaction
- Surgical extraction-full bony impaction

**Periodontics (Gum treatment) by Primary Dentist**

- Occlusal Adjustment-Limited
- Occlusal Adjustment-Complete
- Periodontal scaling and root planing (per quadrant)

**Major restorative dentistry by Primary Dentist**

- Re-cement crown/bridge
- Post for crown
- Stainless steel crown

**Prosthodontics (dentures) by Primary Dentist**

- Complete dentures (upper or lower)
- Partial denture
- TMJ Appliance
- University Providers will demonstrate best effort to comply with a 30-90 day time frame for delivery of those qualifying for oral prosthetics.

1 (Pages 1-4)
Brad Livingston - 10/1/2015

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM
PLAINTIFFS

VS.

CIVIL ACTION NO. 4:14-cv-3253
JURY DEMAND

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT FASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE
DEFENDANTS

****************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
BRAD LIVINGSTON
October 1, 2015
Volume 1

****************************************************************

2

ORAL AND VIDEOTAPED DEPOSITION OF BRAD LIVINGSTON, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 1st day of October, 2015, from 11:31 a.m. to 5:39 p.m., before Abigail Guerra, CSR, in and for the State of Texas, reported by machine shorthand, before Honorable Keith Ellison, at the United States District Courthouse, 515 Rusk, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

3

A P P E A R A N C E S

FOR THE PLAINTIFF:
STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM

Mr. Jeff Edwards
Mr. Scott Medlock
EDWARDS LAW
1101 East 11th Street
Austin, Texas 78702
Phone: (512) 623-7727

- and -

Mr. Michael Singley
Mr. David James
THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Road
Suite O-3
Austin, Texas 78759
Phone: (512) 334-4302

FOR THE DEFENDANT:
TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Ms. Cynthia L. Burton
Mr. Matthew Greer
OFFICE OF ATTORNEY GENERAL
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: Phone: (512) 463-2080

- and -

Ms. Sharon Felfe Howell
TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
209 West 14th Street
Suite 500
Austin, Texas 78711
Phone: (512) 463-9899

4

A P P E A R A N C E S (cont'd)

FOR THE WITNESS:
UTMB
Ms. J. Lee Haney
Ms. Shanna Molinare
Office of Attorney General
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: (512) 463-2080

- and -

Mr. Graig J. Alvarez
Ms. Kara Stauffer Philbin
FERNELIUS ALVAREZ SIMON, PLLC
Lyondell Basell Tower
1221 McKinney Street
Suite 3200
Houston, Texas 77010
Phone: (713) 654-1200

ALSO PRESENT:
Mr. Kevin Schaeffer, Videographer
Ms. Jennifer Osteen
Ms. Kamilla L. Stokes
Ms. Ashley Palermo
Ms. Carolanda Bremond, JD
Judge Keith P. Ellison
Rebbeca Vogel
Stephanie Loewe

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5
Appendix 35

testimony you give today should you testify inconsistently at the time of trial can be played to the jury or Judge Ellison?

**A. Yes, sir.**

Q. To point out any inconsistencies?

**A. Yes, sir.**

Q. Have you ever given a deposition before, sir?

**A. Yes.**

Q. How many depositions have you given, sir?

**A. This will be my second.**

Q. What is the last deposition that you gave?

**A. I don't know the exact date, but it was either late calendar year February 2014 or January/February 2015. It was not a federal deposition.**

Q. What was the subject matter of that deposition?

**A. I believe it was -- I won't get the correct legal term of art -- but it was related to open records.**

Q. Would you tell me a little bit more about what the allegations were and what the testimony you gave was just generally?

**A. The lawsuit was -- as I understand it, again, I will not likely use the proper legal terms of art --**

Q. Sure.

**A. -- but had to do with providing information relative to the procurement of execution drugs.**

Q. And that was in January of this year?

**A. As I said a moment ago, I don't recall the exact date. It would have been, to the best of my recollection, December of 2014, January or February of 2015.**

Q. Do you remember the lawyers that -- that defended you at that deposition. And by that I mean, the lawyers for the -- I assume it's for the Attorney general's office, or it was a private lawyer?

**A. The Attorney General's office. I don't -- I apologize. I don't recall off the top of my head who the leading attorney was.**

Q. Do you remember the name of the lawyer who was asking you the questions?

**A. I do not.**

Q. I assume that that suit was against you in your official capacity. And by that I mean, essentially against the State of Texas, but as the head of the agency; is -- is that true?

**A. I don't recall exactly, but to the best of my recollection, yes.**

Q. I understand that you are now the head of the Texas Department of Criminal Justice; is that correct?

**A. I serve as the executive director. That's correct.**

Q. What is the job of the executive director, sir?

**A. As the executive director of TDCJ, I lead and manage a group of division directors. We have 17 divisions within the**

**Texas Department of Criminal Justice, 15 of those divisions and division directors report to me; the other two report to a nine-member governing board.**

**We have overall jurisdiction over the entire adult criminal justice system in the State of Texas, which is comprised of probation. There are roughly 250,000 probationers who are in direct supervision throughout the course of -- throughout the State, 122 local probation departments receive standards and funding from TDCJ. So one of our divisions is specifically aimed and geared towards the probation function within the State of Texas.**

**We operate the incarceration system within the State of Texas. We have 109 --**

THE COURT: Slow you down just a little bit. She's got to stay with every word.

THE WITNESS: Okay.

**A. We have 109 facilities scattered across the state. We're housing 148,000 offenders roughly within the incarceration function. A number of other divisions provide ongoing support, functions, and activities within -- within the incarceration function with respect to treatment, education, and other support functions.**

**We also have jurisdiction over the State's parole supervision function. We have roughly 88,000 offenders under parole -- direct parole supervision in the State of**

**Texas. We provide that street supervision with roughly 1300 parole officers in 67, I believe, offices across the stat as it relates to my direct responsibilities. We have, again, with respect to that overall responsibility, our primary mission is public safety and rehabilitating offenders.**

**We have, I believe, over the last several years an effective -- an effective result with respect to recidivism. The recidivism rates in the State of Texas are one of the best in the nation. Our recidivism rates for prison offenders is roughly 21 percent for offenders.**

THE COURT: I can tell you really know your subject, but you may be going a little bit fast.

THE WITNESS: Okay. Yes, Your Honor.

THE COURT: Ms. Guerra, is that...

THE REPORTER: Yes, Your Honor.

THE COURT: Okay. Please carry on.

**A. Our recidivism rate for offenders within the prison is roughly 21 percent. It's one of the best in the country. That recidivism rate has continue to decline over the course of the last decade.**

**We have also reduced parole revocations pretty significantly over the last several years ago. I believe that's six-and-a-half percent in the most recent fiscal year. One of the results has manifested itself in reduction in incarceration population. We recently had 156,000 offenders as**

**recently as 2008; and, now, as I pointed, it's roughly 148,000. Given that trend downward, the State was able to close three prisons in the last two legislative -- or three legislative sessions. And that certainly one -- one indicator, I believe, of -- of the effectiveness that we've been able to bring to bear.**

**In terms of the treatment diversion programs that we have in our state, we have a very fairly, and ongoing fluid dynamic reentry program. We have begun issuing identification documents, social security cards and birth certificates for a significant number of offenders who are released from TDCJ that increases their likelihood of -- of housing successfully and finding jobs and diminishing the likelihood of their revocation. We have very extensive mental health treatment diversion programs geared towards providing mental health services to offenders who are -- are in the community, such that they can remain in the community.**

**Just in terms of the incarceration function, we have over 10,500 treatment beds within the system. We spend over a $100 million or roughly $100 million providing that several treatment or substance abuse treatment. Again, that -- that collection of resources has served to pretty significantly refuse recidivism and revocations within our system.**

**TDCJ, also, incarceration function has very -- very expansive and extensive support to include our industry**

**function. Our Health Services function is an extremely important function. They partner with our two medical partners, UTMB and Texas Tech. We send roughly $537 million a year for offender healthcare. I've only touched on -- although a pretty significant range of our -- of our operations, it's still, nonetheless, just a partial list.**

**The scope and breadth of our -- of our organization is very extensive. Many people think in terms of TDCJ as being just a prison system. We are, in fact, not -- we are, as a pointed out, responsible for the entirety of the criminal justice system to include probation and treatment and so forth. We're $3.4 billion a year enterprise with all the complexities associated with that.**

**In terms of my responsibility is, frankly, to put the right people in the right position in terms of division directors who I rely on. They have tremendous backgrounds and expertise and experience in their fields of responsibility, and I -- I rely extensively on day-to-day operational responsibilities. As the executive director, my primary function is to put the right people in the right positions and then delegate appropriately.**

Q. (BY MR. EDWARDS) Would it be fair to say that -- but when say that you rely on the people that you put in these right positions that you're in constant communication with them in case problems arise that you can deal with them effectively?

**A. I certainly have ongoing dialogue and discussion with those division directors, as well others, but, certainly, I have more ongoing dialogue and discussion with some than others; but it's fair to say that I manage and lead very extensively through verbal communication with those who work for me.**

Q. Would another way to say that be that as the head of the agency, you rely on the people that you appoint to positions, but that you do so by getting information from them about particular problems that they notice and are trying to solve?

**A. I would ask you to clarify the question a little bit, please, or repeat it at least.**

MR. EDWARDS: Would you mind repeating the question to Mr. Livingston, please.

(Requested portion read back.)

**A. I would say, yes, with this context and caveat: With the size and scope and breadth of our operations. I also expect those individuals who work for me to use their best judgment about, you know, what level of operational detail they feel is important to bring to my attention. Certainly, it's -- it would not be effective at all for -- for an executive director of this large enterprise to expect those division directors to keep me informed of everything that's going on, on our facilities or in our parole offices or probation**

**departments or any of one of our departments. But, clearly, my expectation and part of the way manage is to have not just one way of discussions, but two-way discussions when they inform me as well.**

Q. (BY MR. EDWARDS) Sure.

As I hear you talking, it sounds like major problems would be brought to your attention then. Is that fair?

**A. I think it's accurate to say that major problems would be brought to my attention.**

Q. For instance, not every fight or assault that happens in the prison would be brought to your attention, correct?

**A. Correct.**

Q. I assume not every death in a prison would be brought to your attention; is that correct?

**A. That's correct.**

Q. Okay. But a pattern of deaths or -- well, strike that.

Would you a pattern of death identified by some of these people that you've put in charge be brought to your charge, at least according to your expectation?

**A. I think with respect to a pattern, certainly to the extent that they are aware of the pattern and have identified it as such as, it would be my expectation, yes.**

Q. Ultimately, you're responsible for training at the

you've been offered, you would not approve such a prison, would you, sir? Would that narrow the hypothetical? You wouldn't approve that?

THE WITNESS: Thank you, Your Honor.

I would not.

Q. (BY MR. EDWARDS) Okay. And why not?

MS. BURTON: Same objection.

THE COURT: Okay. I'm going to allow -- I'm going to allow the question.

**A. I think a couple of -- couple of things, but primarily, it would very much depend on the location of the facility; but it's also consistent with all of our other facilities are heated.**

Q. (BY MR. EDWARDS) Do you know why they're heated?

THE COURT: I presume there's some kind of prison standards. You try to be in compliance with, are they not?

THE WITNESS: I'm not personally familiar with all the standards that are Facilities division and our Correctional Institutions division would have to adhere to. Certainly, there are lots and lots building standards and building code in general, and there are some specific standards as it relates to prisons and -- and prison construction as well. I'm not personally familiar with all of those standards.

THE COURT: Okay.

THE WITNESS: I have staff who are; however, it is very likely that -- that heating is one of those standards.

Q. (BY MR. EDWARDS) Well, okay. Do -- do you know -- I mean, I thought you told me, look, absent something to do with temperature, you'd not approve a new construction of a prison that did not have heating. Did I understand that correctly?

**A. Say your -- repeat your question, please.**

Q. Yeah.

I think you said well, leaving aside -- absent location, you wouldn't approve, as a general matter, a facility that lacked heating. Did I hear you correctly?

**A. I think, again, that was based upon your narrow hypothetical where you structured your question to suggest that my staff presented me with a plan to build a prison without it; and then you posed a hypothetical decision point for me with respect to that item.**

**Backing upstream, I feel certain that, again, by relying on the expertise of my staff and -- and all of the totality of factors they are required to consider and would consider just based upon judgment, I find it extremely unlikely that there would be even that decision point.**

Q. It probably would be unlikely, but I'm trying to -- I'm trying to find -- do you know why having heat in a -- in a prison is important, if you think it is?

**A. Well, again, I think it's an issue of -- I'm not**

**personally familiar with all of the standards. Again, it's likely to be a construction standard for -- for new facilities.**

Q. Well, do you know if -- if it's a construction standard for new facilities?

**A. I do not know specifically. My staff, who would be in charge of developing plans and proposals, are and would be aware of that.**

Q. If it wasn't within a construction standard, can you think of any reasons why heat would be important for somebody managing -- or why heat would be important in the prisons that you oversee?

**A. Well, as I pointed out all of our 109 facilities have heat. So it would never be a consideration to not heat a new facility.**

Q. But why is -- do you know why the all of 109 facilities have heat in the State of Texas?

**A. I can't speak to that. Certainly, most of those facilities were built before I started working for the agency, and all of them were built before I assumed this role.**

Q. Do you think it has to do -- well, do you know if it has to do with the allegation to treat prisoners humanely?

**A. I wouldn't speculate as to if that was the reason why heat was included.**

Q. Do you agree that one aspect of your job is to make sure that prisons are humane for the inmates who live there?

**A. We certainly have an obligation to run a constitution system and for it to be -- for conditions of confinement to be humane.**

Q. If you were to build a prison today, do you know if air-conditioning would be required according to building codes?

**A. I don't know. I don't know.**

Q. Okay. Do you know if the Texas prison system was supposed to follow building codes in place in the 90s when these prisons -- when prisons were built?

**A. Again, I -- I didn't work for the agency until the late 90s. I -- I don't know the answer to that.**

Q. Is there an amount of money that -- well, my understanding is that for expenditures of $1 million or less, the agency -- the agency can do that without board approval; is that correct?

**A. What you're referring to is a requirement that we have in policy that requires procurements and contracts in excess of a million dollars to be approved by our board. The Texas legislature recently -- and that provision, that practice has been in place within TDCJ for between 15 and 18 years. The legislature recently enacted similar requirements for all state agencies to present contracts and procurements of $1 million to their governs boards.**

**That is one -- that is -- that is one parameter that agencies must follow with respect to procurement and**

contracts. That, by no means, represents all of the complexities of limitation on expenditures of state funds that an agency has to operate within.

Q. Okay. I -- you have a greater than $3 billion budget at Department of Criminal Justice, correct?

A. That's correct. I won't give the exact amount, but it's roughly $3.4 billion a year.

Q. Expenditures under $1 million, at least, I'll represent to you that there's been testimony in this case that if the expenditures is under $1 million it does not need to go to the department's board for approval; is that correct?

A. Given the parameters of your question, that's -- that is correct. Although as I pointed out a moment ago, the General Appropriations Act establishes parameters that agencies must adhere to in the expenditures of funds, and I -- they certainly wouldn't conflict with the provision that you've cited, but would need to be factored in and handled in concert with that.

Q. Okay. And that would be something that you would work with your CFO, Jerry McGinty to make sure there wasn't any conflict?

A. Absolutely.

My baseline expectation would be that those issues and those parameters are dealt with at his level, but to the extent that we needed to, we would have a discussion but

more than likely we wouldn't.

Q. What I want at it, though, is if -- let's say there's an expenditures that cost $600,000. For instance, let's air-conditioning at a particular housing unit at a particular prison. Okay. Assume that that's the cost; I'm not saying it is, but just for this hypothetical assume that it is. Assume that there's $600,000 cost associated with air-conditioning a portion of a prison that's not air-conditioning. You with me?

A. I believe so.

Q. My understanding is that you could make that happen; is that correct?

A. Can you define for me what you mean by "I can make that happen."

Q. You can authorize the $600,000 to be spent and accomplish the goal of air-conditioning a housing area assuming that that price is accurate?

A. Well, frankly, I don't think we have enough information for me to answer that question and let me explain why.

Q. Sure.

A. The type of expenditures you're referencing is a capital construction item. The rules and the parameters around expenditure of dollars related to capital construction are more restrictive and different than -- than just an ordinary purchase of -- of an item. That's -- that's one -- that's one

issue.

Q. How so?

A. That's one issue. The other -- another issue would be the overall -- the overall ability within the scope of the budget to handle and unanticipated and unbudgeted item of that or any magnitude. Sometimes individuals suffer from the impression that simply because we have $3.4 billion budget some large or even small portion of that is somehow unallocated or that simply because the -- the grand total budget is big that that there's some large or small pot of money hanging around.

The reality of it is resource allocation within the Texas Department of Criminal Justice, and I would argue frankly in any organization; but resource allocation of the Texas Department of Criminal Justice is an ongoing balance of operational necessity and priorities and risk assessment. And, frankly, one simple way to put it is if you spend money on item A, you may not be able to spend it on item B.

And to go even further into that, the Texas Department of Criminal Justice has over the course of many, many years, most of the time we go in front of the legislature -- for the upcoming biennial period, not only are we seeking funding for the upcoming biennial, we have a supplemental appropriation need, and that is a term of art used when an agency has a shortfall in the current biennium.

And certainly if an agency had a shortfall

multiple times because of fiscal mismanagement, I would expect the legislature to react strongly to that, and that agency team not to be in place very long. But in the case of TDCJ, our supplemental appropriation needs are almost always associated with correctional managed health care and our funding for healthcare delivery within our system.

As I pointed out, our funding for healthcare is roughly $537 million a fiscal year. When we do have a shortfall, the legislature has every right to expect, and they do, that TDCJ will be good fiscal stewards and utilize any moneys that we might have that were, for some reason or another available because they would be potentially unspent to shrink that shortfall.

And I'll give you an example, last legislative session, the legislature -- we asked the legislature, and they provided funding for -- and I won't get the amount exactly, but roughly $42 million in supplemental appropriations to finish out the current -- the then current appropriation cycle for correctional managed healthcare. And at the same time, they expected and we did -- shrink what would have been $63 million shortfall or -- I believe $63 million shortfall by using $21 million of TDCJ funds to shrink that short fall. And so that is an example of, I believe, fiscal stewardship and managing the balance between priorities and operationally necessary items.

MR. EDWARDS: Your Honor, I have no problem breaking for the day, but I -- this is a limited two-day deposition and we have 14 hours and we've got a lot to go through, but I don't want to have an argument.

THE COURT: We'll give you an extra 25 minutes, if you want? Is that okay with everybody?

MR. EDWARDS: That's fair.

MS. BURTON: Yes.

THE COURT: Okay. See you tomorrow at 9:00 a.m.; is that right?

MS. BURTON: Yes, Your Honor.

(Proceedings concluded at 5:39 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: BRAD LIVINGSTON

DATE OF DEPOSITION: October 1, 2015

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA )
McCOLLUM, individually, and )
STEPHANIE KINGREY, )
individually and independent )
administrator of the Estate )
of LARRY GENE McCOLLUM )
) CIVIL ACTION NO.
VS. ) 4:14-cv-3253
) JURY DEMAND
)
BRAD LIVINGSTON, JEFF )
PRINGLE, RICHARD CLARK, )
KAREN TATE, SANDREA SANDERS, )
ROBERT FASON, the UNIVERSITY )
OF TEXAS MEDICAL BRANCH and )
the TEXAS DEPARTMENT OF )
CRIMINAL JUSTICE )

* * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
DEPOSITION OF BRAD LIVINGSTON
October 1, 2015
VOLUME 1

* * * * * * * * * * * * * * * * * * * * *

I, ABIGAIL L. GUERRA, Certified Shorthand Reporter, in and for the State of Texas, hereby certify to the following:

That the witness, BRAD LIVINGSTON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to Federal Rules of Civil Procedure (30)(e)(1)(A) and (B) as well as Rule (30)(e)(2) that the signature of the deponent:

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__X_ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript.

If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

____ was not requested by the deponent or a party before the completion of the deposition.

That $___________________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE

KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM, individually and on behalf of those similarly situated;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

FOR THE PLAINTIFFS:
STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM

Mr. Jeff Edwards
Mr. Scott Medlock
EDWARDS LAW
1101 East 11th Street
Austin, Texas 78702
Phone: (512) 623-7727

- and -

Mr. Michael Singley
Mr. David James
THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Road
Suite O-3
Austin, Texas 78759
Phone: (512) 334-4302

FOR THE DEFENDANT:
TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Ms. Cynthia L. Burton
Mr. Matthew Greer
OFFICE OF ATTORNEY GENERAL
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: Phone: (512) 463-2080

- and -

Ms. Sharon Felfe Howell
TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
209 West 14th Street
Suite 500
Austin, Texas 78711
Phone: (512) 463-9899

FOR THE WITNESS:
UTMB

Ms. J. Lee Haney
Ms. Shanna Molinare
Office of Attorney General
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: (512) 463-2080

- and -

Mr. Graig J. Alvarez
Ms. Kara Stauffer Philbin
FERNELIUS ALVAREZ SIMON, PLLC
Lyondell Basell Tower
1221 McKinney Street
Suite 3200
Houston, Texas 77010
Phone: (713) 654-1200

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties or attorneys to the action in which this deposition was taken;

Further, I am not a relative, nor an employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Certified to by me this 16th day of October, 2015.

ABIGAIL GUERRA, Texas CSR 9059
Expiration Date: 12/31/15
WRIGHT WATSON & ASSOCIATES
Firm Registration No. 225
Expiration Date: 12-31-15
1250 S. Capital of Texas Highway
Building 3, Suite 400
Austin, Texas 78746
512-474-4363/512-474-8802 (fax)
www.wrightwatson.com

Job No. 151001AG

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM | ) | |
| VS. | ) | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT FASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE | ) | |

*****************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

BRAD LIVINGSTON

October 2, 2015

Volume 2

*****************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF BRAD LIVINGSTON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 2nd day of October, 2015, from 9:01 a.m. to 4:37 p.m., before Abigail Guerra, CSR, in and for the State of Texas, reported by machine shorthand, before Honorable Keith Ellison, at the United States District Courthouse, 515 Rusk, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFF:
STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM
Mr. Jeff Edwards
Mr. Scott Medlock
EDWARDS LAW
1101 East 11th Street
Austin, Texas 78702
Phone: Phone: (512) 623-7727

FOR THE DEFENDANTS:
TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Ms. Cynthia L. Burton
Office of Attorney General
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: Phone: (512) 463-2080
ALSO PRESENT:
Mr. Kevin Schaefer
Ms. Ashley Palermo
Ms. Kamilla L. Stokes
Judge Keith P. Ellison

INDEX

Appearances........................................... 3
BRAD LIVINGSTON
Examination by Mr. Edwards........................ 6
Signature and Changes................................. 207
Reporter's Certificate................................ 209

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 6 | Correctional Managed Health Care Policy Manual Bates No. TDCJ030446 to 449 | 8 |
| 7 | "Comorbidities That May Affect Heat Tolerance Bates No. TDCJ030458 | 9 |
| 8 | Correctional Managed Health Care Policy Manual Effective Date: 10/30/2013 Bates Nos. TDCJ05530 to 537 | 9 |
| 9 | Document Dated June 26, 2009 Bates Nos. TDCJ013583 to 84 | 52 |
| 10 | Guidelines for Completing the Health Summary for Classification Form Bates Nos. TDCJ019152 to 55 | 71 |
| 11 | Health Summary for Classification | 71 |
| 12 | "Deadly Heat in Texas Prison" | 112 |
| 13 | ACA Standard Comment | 126 |
| 14 | Letter Dated August 12, 2011 Bates No. 000008 | 165 |
| 15 | Letter Dated August 16, 2011 Bates Nos. 000026 to 27 | 165 |

BRAD LIVINGSTON,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. EDWARDS:

Q. Thank you for being patient, Mr. Livingston.

THE COURT: You ready to proceed?

MR. EDWARDS: Thank you, Your Honor. I'm trying to gather some thoughts.

THE COURT: Okay.

Q. (BY MR. EDWARDS) Sir, TDCJ operates in accordance with heat stress policies, is that your understanding? Or -- strike that.

Does TDCJ operate in accordance with heat stress policies?

**A. We have a number of policies regarding heat stress, both in terms of agency operating procedures and correctional managed healthcare policies. In addition to that, we utilize the heat message in practice on our units.**

Q. Okay. All right. In those policies, do you identify numerous risk factors that render inmates or prisoners particularly vulnerable to heat stress. I think it does, but is that a "yes"?

**A. If I could take a look at the policy you're referencing, I would appreciate it.**

Q. Sure. Before you do, though, are you aware if a

your -- was a state jail facility. State jail populations within the state have continued to decline over the last several years. That particular facility is a facility that a number of local leaders and members of the legislature were interested in closing, and that particular facility was operated by a private prison operator, and the totality of circumstances with respect to that facility caused us to inform the legislature that if they close that one, we would -- we would be able to make that operational or implement that operational decision.

Q. So did you recommend closing it?

A. I didn't specifically recommend closing it. The decision was theirs. The idea was not ours specifically as it relates to which facility to close.

Q. Okay. You didn't disagree with closing that one; is that correct?

A. That's correct.

Q. Is Hutchins a state jail facility?

A. Yes, sir.

Q. Has -- now, that the Dawson State Jail has been closed, did -- is that a jail that you guy's owned -- I mean, did TDCJ own that jail and own that property?

A. The Dawson State Jail?

Q. Yeah.

A. Yeah.

Q. Has it been sold?

A. No, sir.

Q. Are there plans to sell?

A. No active plans to my knowledge. I believe, and I won't remember the details of it, but if I'm not mistaken, the legislature passed a bill that would allow us to have discussions with Dallas as it relates to the sale of that facility.

Q. That's a pretty valuable piece of property; isn't it that correct?

A. I'm not a real estate expert, but I think it probably is.

Q. It's in the City of Dallas, and it's around the City Centre?

A. Yes, sir.

Q. Was it air-conditioned in the housing areas?

A. I don't know for certain. Given the style of construction and the infrastructure in place, it likely was, but I would need to defer to --

Q. I'll represent --

A. -- prior list. It would be consistent with my understanding that it was.

Q. Okay. It was, in fact, air conditioned in the housing areas, sir. I'll represent that to you.

It would seem that that would be a place that

you could place at-risk offenders if you wanted; isn't that correct? Now that it's closed and empty?

A. We -- I believe we are not at liberty to open and operationalize that facility. The legislature made it very clear that that facility should be and was closed, and as it stands now, there is an expectation at some point that it will be sold. I know that the sale of properties that agencies that the state owns, the general land office handles the sale and the details surrounding the elimination or the sale of properties. So from a practical standpoint, that's -- that unit is no longer on our inventory.

Q. Well, I mean, did anybody say, "Why on earth are we closing an air-conditioned facility that would protect inmates instead of a non air-conditioned facility?" Anyone say that? Let's start with: Did you say that?

A. I was not involved in all the discussions that the legislature had and members of their staff, but primarily the members of legislature, I don't recall anyone saying that. I didn't specifically say it, and, again, we didn't recommend that facility for closure, but when asked if we could logistically and operationalize their decision to close the facility -- if we could make it happen, and our response was yes.

Q. All right. Going back to the list at the Pack Unit, we -- we got -- 212 people at the Pack Unit at the time of that

deposition were diabetics. Anything preventing -- anything preventing the agency from transferring the 212 or some-odd diabetics from the Pack Unit to a safe, air-conditioned space that you're aware of?

A. As I pointed out a while ago, we have a very extensive process for classifying offenders and specifying what they're housing needs and their facility needs are. I'm not in a position to sit here today and tell you what subset, if any, of a cohort of offenders that were in place at a given time, whenever that deposition was taken, I can't sit here and represent to you today that we could have placed those offenders, either together or separately, in other facilities in the state. Nor can I represent what impediments there may have -- specific impediments there may have been. I'm not sure exactly if that's how you phrased it, but I think that captures --

Q. Well, sir --

A. -- your intent.

Q. As the head of agency -- well -- strike that. I believe you told me that this classification system is bit like a Rubik's cube. Do you recall that?

A. That's not -- that's not a bad way to visualize it.

Q. Would you agree that a Rubik's cube can be solved?

A. I don't have any experience solving it, but I --

Q. Neither do I. I've got a ten year old who has, but

would you agree that while it might not be a simplest thing in the world to do, that with a little bit planning and a little bit acumen, it's something that you can actually solve?

**A. A Rubik's cube, yes.**

Q. Well, would you agree with me that moving 200 some-odd prisoners to air conditioned housing areas is something that you also could do and solve with a little bit effort and some acumen?

**A. I'm not sure I would use your choice of words, but without knowing the details of those 200 offenders, I -- I wouldn't represent to you whether we could or could not do that.**

Q. Okay. Do you agree that the number one housing need that you factor into your decisions is the safety of prisoners?

**A. I'm not sure I would characterize it exactly like that. I think our classification process takes into consideration a wide variety of factors to include safety and security.**

Q. Well, I'm asking you as the head of agency, do you agree that the number one housing when factoring into -- strike that. I'm asking you, Brad Livingston, do you believe that the most important factor when determining where to house someone is the inmate's safety?

**A. It's one of the most important factors.**

Q. What is on par with an inmate's safety?

**A. Again, there are a variety of factors that are very closely related. Safety and security are both extraordinarily important and go hand-in-hand.**

Q. Okay. When you say the word "security," what do you mean?

**A. One of our fundamental parts of our mission is to appropriately provide for the public safety which includes the safety of the offenders. It includes the safety of the general public. It includes the safety of our staff, and to accomplish that mission, we have a wide variety -- if you want to focus on classification -- a wide variety of elements to that classification which would include making sure that the offender is in the right facility with respect to their custody needs, with respect to security, with respect to their safety generally.**

**But with respect to their medical needs is one factor, with respect to training needs is another factor, because we have a wide variety of both treatment and training programs with respect to their educational needs. So that is just a very narrow and small subset of the factors that we consider when determining what housing is needed for a given inmate.**

Q. My question is: What do you consider security? I know there are lots of factors, and you told me that on par with inmate safety is security, and I want to know what you're

talking about because I don't understand, and if you could help me, explain what you personally, Brad Livingston, mean when you use the word "security"?

**A. Part of that is security that they're -- that the offender is in the facility that is consistent with their risk of escape, with their variety of risks associated with housing an offender safely in an appropriate facilities that, again, keeps the public safe, keeps them safe, and keeps the staff safe.**

Q. So does that mean, for instance, a 23-year-old person who's, I don't know, committed multiple murders, would be housed at higher classification than say someone who, I don't know, like a 57-year-old person who was guilty of forgery?

**A. Based upon that general example, yes, although there are significant nuances within that.**

Q. All right. There were 188 people over 65 at the -- at the Pack Unit. Would you agree with me that you would -- you would be capable -- that the agency would be capable of moving those 188 people to air-conditioned housing if they so choose -- chose?

**A. Absent additional detail and the caveat that it would displace an equal number of offenders that we would also have to ensure that their housing -- their new housing assignment met all the needs and requirements that factor into their classification.**

Q. Okay. Well, would you agree that it's easier to move someone who is considered by the agency at a lower classification level?

**A. It depends. It depends on their medical needs. It depends on their educational needs. It depends on their training needs. It depends on a variety of things, but, generally, all else being equal, a lower classification, if not for specific medical needs, would -- would in some ways be easier, but I will say this: We have had a dramatic reduction in offenders who are in administrative segregation. That's our highest classification and custody level. So that we actually have some -- maybe in that sense more flexibility, with respect to moving those offenders than we would have in the past.**

Q. And just so the Court is aware, administrative segregation, that's a pretty serious punishment?

**A. It's a custody classification, not specified as punishment.**

Q. Okay. Do the people in administrative segregation live in air-conditioning?

**A. Generally speaking, they are in air-conditioned housing. It's -- I don't believe you could make an across-the-board statement to that effect, but generally speaking, the offenders in administrative segregation are in facilities that were built -- oftentimes the Michael Unit, for example, and that particular prototype, as well as the**

in existence at the Pack Unit?

**A. I can't speak to the way they -- specifically how they were implemented at the Pack Unit.**

Q. Sir, I want thank you very much for your time.

MR. EDWARDS: We'll pass the witness.

THE COURT: No questions, I assume.

MS. BURTON: No questions, Your Honor. Reserve for trial.

MR. ALVAREZ: Same.

THE COURT: You may step down.

You know there's some things Courts are really good at. We're really good at settling boundary disputes between land owners, and we're good about breach of contract and awarding damages. This is a different kind of case. I think the best solution is not going to come from the Court. It's going to come from a legislative source or an executive source, but it's going to be very difficult for the judiciary to deal with this question.

I'm here for as long as you need me, but I think -- I think both sides are looking at more creative solutions. The end game has to be the welfare of the inmates, of course.

Okay. Well, thank you very much.

(Proceedings concluded at 4:37 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: BRAD LIVINGSTON

DATE OF DEPOSITION: October 15, 2015

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |

I, BRAD LIVINGSTON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____________________________

BRAD LIVINGSTON

THE STATE OF____________)
COUNTY OF ______________)

Before me, ___________________________, on this day personally appeared BRAD LIVINGSTON, known to me (or proved to me under oath or through ____________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of ____________________, 2015.

________________________________

NOTARY PUBLIC IN AND FOR
THE STATE OF ____________________
Commission Expires: ______________

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA )
McCOLLUM, individually, and )
STEPHANIE KINGREY, )
individually and independent )
administrator of the Estate )
of LARRY GENE McCOLLUM )
) CIVIL ACTION NO.
VS. ) 4:14-cv-3253
) JURY DEMAND
)
BRAD LIVINGSTON, JEFF )
PRINGLE, RICHARD CLARK, )
KAREN TATE, SANDREA SANDERS, )
ROBERT FASON, the UNIVERSITY )
OF TEXAS MEDICAL BRANCH and )
the TEXAS DEPARTMENT OF )
CRIMINAL JUSTICE )

* * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
DEPOSITION OF BRAD LIVINGSTON
October 2, 2015
VOLUME 2

* * * * * * * * * * * * * * * * * * * * * *

I, ABIGAIL L. GUERRA, Certified Shorthand Reporter, in and for the State of Texas, hereby certify to the following:

That the witness, BRAD LIVINGSTON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to Federal Rules of Civil Procedure (30)(e)(1)(A) and (B) as well as Rule (30)(e)(2) that the signature of the deponent:

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

____ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript.

If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

____ was not requested by the deponent or a party before the completion of the deposition.

That $___________________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE

KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM, individually and on behalf of those similarly situated;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

FOR THE PLAINTIFFS:
STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM

Mr. Jeff Edwards
Mr. Scott Medlock
EDWARDS LAW
1101 East 11th Street
Austin, Texas 78702
Phone: (512) 623-7727

- and -

Mr. Michael Singley
Mr. David James
THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Road
Suite O-3
Austin, Texas 78759
Phone: (512) 334-4302

FOR THE DEFENDANT:
TEXAS DEPARTMENT OF CRIMINAL JUSTICE
Ms. Cynthia L. Burton
Mr. Matthew Greer
OFFICE OF ATTORNEY GENERAL
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: Phone: (512) 463-2080

- and -

Ms. Sharon Felfe Howell
TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
209 West 14th Street
Suite 500
Austin, Texas 78711
Phone: (512) 463-9899

FOR THE WITNESS:
UTMB

Ms. J. Lee Haney
Ms. Shanna Molinare
Office of Attorney General
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: (512) 463-2080

- and -

Mr. Graig J. Alvarez
Ms. Kara Stauffer Philbin
FERNELIUS ALVAREZ SIMON, PLLC
Lyondell Basell Tower
1221 McKinney Street
Suite 3200
Houston, Texas 77010
Phone: (713) 654-1200

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties or attorneys to the action in which this deposition was taken; Further, I am not a relative, nor an employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Certified to by me this ____ day of ________, 2015.

______________________________
ABIGAIL GUERRA, Texas CSR 9059
Expiration Date: 12/31/15
WRIGHT WATSON & ASSOCIATES
Firm Registration No. 225
Expiration Date: 12-31-15
1250 S. Capital of Texas Highway
Building 3, Suite 400
Austin, Texas 78746
512-474-4363/512-474-8802 (fax)
www.wrightwatson.com

Job No. 151002AG

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, §
STEPHANIE KINGREY, AND §
SANDRA McCOLLU, §
INDIVIDUALLY AND AS §
HEIRS AT LAW TO THE §
ESTATE OF LARRY GENE §
McCOLLUM, § CIVIL ACTION NO.
Plaintiffs, § 3:12-CV-02037
§
VS. §
§
BRAD LIVINGSTON, JEFF §
PRINGLE, RICHARD CLARK, §
KAREN TATE, SANDREA §
SANDERS, ROBERT EASON, §
THE UNIVERSITY OF TEXAS §
MEDICAL BRANCH AND THE §
TEXAS DEPARTMENT OF §
CRIMINAL JUSTICE, §
Defendants. §

* * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF
WILLIAM L. STEPHENS
VOLUME 1

October 18, 2013

* * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L. STEPHENS, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on October 18, 2013, from 4:50 p.m. to 8:05 p.m., before Brenda J. Wright, RPR, CSR in and for the State of Texas, reported by machine shorthand, at the Office of the Attorney General, 300 West 15th Street, Suite 1200, Austin,

1 (Pages 1-4)

Stephen McCollum, et al. v. Brad Livingston, et al.

William L. Stephens
October 18, 2013

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE KINGREY, AND SANDRA McCOLLU, INDIVIDUALLY AND AS HEIRS AT LAW TO THE ESTATE OF LARRY GENE McCOLLUM, Plaintiffs, § CIVIL ACTION NO. 3:12-CV-02037

VS.

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH AND THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants.

* * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF
WILLIAM L. STEPHENS
VOLUME 1

October 18, 2013

* * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L. STEPHENS, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on October 18, 2013, from 4:50 p.m. to 8:05 p.m., before Brenda J. Wright, RPR, CSR in and for the State of Texas, reported by machine shorthand, at the Office of the Attorney General, 300 West 15th Street, Suite 1200, Austin,

2

Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached herein.

APPEARANCES

For the Plaintiffs:
Mr. Jeff Edwards
THE EDWARDS LAW FIRM
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
512-623-7727/512-623-7729 (fax)
jeff@edwards-law.com
-and-
Mr. Scott Medlock
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
512-474-5073/512-474-0726 (fax)

For the Defendants Jeff Pringle, Richard Clark, Karen Tate, Sandrea Sanders, Robert Eason and Texas Department of Criminal Justice:
Mr. Bruce R. Garcia
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Law Enforcement Defense Division 012
Post Office Box 12548
300 West 15th Street
Austin, Texas 78711-2548
512-463-2080/512-495-9139 (fax)
bruce.garcia@texasattorneygeneral.gov

For the Defendants Brad Livingston, William Stephens and Richard Thaler:
Mr. Demetri Anastasidis
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Law Enforcement Defense Division 012
Post Office Box 12548
300 West 15th Street
Austin, Texas 78711-2548
512-463-2153/ 512-495-9139 (fax)
demetri.anastasidis@texasattorneygeneral.gov

3

APPEARANCES - CONTINUED

For the Defendant University of Texas Medical Branch:
Ms. Kim Coogan
-and-
Ms. Erika Hime
-and-
Ms. Lacey Mase
Assistant Attorney General
Law Enforcement Defense Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Post Office Box 12548
Austin, Texas 78711-2548
512-463-2080/512-495-9139 (fax)
kim.coogan@texasattorneygeneral.gov

Videographer:
Mr. Patrick Knapick

Also Appearing:
Ms. Deborah Woltersdorf
Paralegal, OFFICE OF THE ATTORNEY GENERAL
deborah.woltersdorf@texasattorneygeneral.gov

Mr. Josh Barron

Mr. Tobias D. Hunziker
TEXAS DEPARTMENT OF CRIMINAL JUSTICE
Mr. Richard Thaler
Mr. Neal Spradlin
Mr. Kyle Smith

4

STIPULATIONS

The attorneys for all parties present stipulate and agree to the following items:

That the deposition of WILLIAM L. STEPHENS is being taken pursuant to Notice;

That the deposition is being taken pursuant to the Federal Rules of Civil Procedure;

That the original transcript will be submitted to the witness' attorney, MR. DEMETRI ANASTASIDIS;

That the witness or the witness' attorney will return the signed transcript to the court reporter within 30 days of the date the transcript is provided to the witness' attorney. If not returned, the witness may be deemed to have waived the right to make the changes, and an unsigned copy may be used as though signed.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

Appendix 49

Odneil. And I'm sorry, I don't remember the other one's name, but there were several of them in the Tyler courthouse that I testified in and one in Austin.

Q. It sounds -- from your memory, it sounds like you testified in one case where a prisoner was injured, and the other cases you remember testifying in were all related to prisoners' ability to practice their religious belief in prison. Is that accurate?

A. I need to add one more. I'm sorry.

Q. Uh-huh.

A. There was also one in the late '80s, early '90s that dealt with -- it was a failure to protect. One offender assaulted another one.

Q. Is it Mr. Sheets?

A. Yeah. Sheets, and I'm trying to remember the other one's name. Jenks.

Q. And just like you -- just now you remembered something else and went back and corrected your answer.

A. Yes, sir. I'm sorry about that, too.

Q. No, that's fine. Could you go -- just anytime during --

A. I just remembered another one. His name was Gooden. He was actually a religious accommodation.

MS. COOGAN: What about Mr. McBride?

A. McBride was another one, I'm sorry. And there was a girl named Arrington.

Q. (BY MR. MEDLOCK) Did you testify in Ms. Arrington's case?

A. Yes, I sure did.

Q. You did? I should remember that one.

A. Arrington was a deaf offender.

Q. Okay. Whether or not you get any assistance from these folks in this room who have represented you over the years, if you remember something else to add to an answer, can you just speak up and --

A. I will. I'm sorry.

Q. That's okay. The other thing that it looks like you and I are already doing is, I'll try and ask the question completely, and if you could wait for me to ask the question, then I'll wait for you to give the entire answer. Because we've already given the court reporter a long day here and that just makes her life more difficult.

A. Yes, sir.

Q. Does that sound like something we can agree on?

A. Yes, sir.

Q. Okay. All right. Now, you've got in front

of you what is marked as Exhibit 64. Is that right?

A. That's correct.

Q. And this is a -- a copy of your biography, essentially. Is that right?

A. Yes, sir.

Q. Is this -- there is a number of different prison facilities in the Texas Department of Criminal Justice listed on here where you've worked.

A. Yes, sir.

Q. Beginning in 1981 with the Wynne Unit up until the point where you were -- where you became the position you have today. Is that approximately right?

A. Yes. But as a correction -- from the period I was correctional officer to the period in 1992 at the Robertson Unit, I worked at several other facilities.

Q. What other facilities did you work at during that '81 to '92 period?

A. I worked at the Pack 2 Unit, which is the Luther Unit now. I worked at the -- the Diagnostic Unit, which is the Byrd Unit now. I worked at the Cotulla Unit, which is in Cotulla, Texas. Those are the three that weren't listed.

Q. Okay. You said the Byrd Unit. It was called the Diagnostic Unit when you worked there?

A. Yes, sir.

Q. Is that what we would call a transfer facility in the TDCJ?

A. No, sir. It would be a diagnostic and intake facility. Now, you know, our typical transfer facilities are your Gurneys and Middletons and Garzas and those. Now, some of the same processes that go on on those facilities go on at the Diagnostic or the Byrd Unit, yes, sir.

Q. Is the -- the same functions that were performed at the Byrd Unit today, were they also performed when you worked there in -- what year were you at the Byrd Unit? Let me state that.

A. I was at the Byrd Unit for a few months in 1990. I worked in the back of the kitchen as a correctional officer. I really didn't get out of the kitchen much, so I wasn't real familiar with all of the operations going on.

Q. Okay. But now you are the director of the Correctional Institutions Division. Is that right?

A. That's correct.

Q. What do you understand that goes on at Byrd Unit today?

A. I understand that there is still diagnostic intake processing, preparing that offender, trying --

4 (Pages 13-16)

Stephen McCollum, et al. v. Brad Livingston, et al.

William L. Stephens October 18, 2013

13

the testing that we take to properly classify and to properly assign that offender to a facility in this state.

Q. Basically, at the Byrd Unit they would decide which of the various TDCJ facilities a prisoner goes to to do the majority of their sentence. Is that fair?

A. Right. They -- they obtain all of that information. I think the final assignment is by the State Classification Committee members and the group that's at the -- another location in Huntsville. But the Byrd Unit does provide all of that processing that goes on.

Q. And how -- you said there is some sort of distinction between a facility like Gurney or Hutchins and the Byrd Unit. Could you explain that to me?

A. Yeah. I just got caught up in the prison slang when you said, a transfer facility, and I apologize for that. But, typically, there -- their responsibilities and duties are similar.

Q. Okay. So the -- functionally, there is not a whole lot of difference?

A. Yes. That's correct. Functionally, there is not.

Q. Okay. So just to go through this, you

14

worked at the Pack 2 Unit, the Byrd Unit in approximately 1990, and the Cotulla Unit. And then in 1992 you became a major at the Robertson Unit?

A. Yes, sir. That's correct.

Q. And then an assistant warden at the Allred Unit?

A. Yes, sir. That's correct.

Q. And then you were the senior warden at the Montford Unit?

A. And again, I made a mistake there, too. I forgot to tell you about some other units I was an assistant warden at.

Q. All right. Where else were you an assistant warden?

A. He was an assistant warden at the Stevenson Unit in Cuero, and the Garza East Unit in Beeville.

Q. And is the Garza East Unit also a transfer facility?

A. The Garza East Unit is a transfer facility.

Q. Okay. So then you became a senior warden at the Montford Unit?

A. That's correct.

Q. Then you were the warden at the Telford Unit?

15

A. That's correct.

Q. Then the McConnell Unit?

A. Yes, sir.

Q. And then you became the Regional II director in 2005. Is that right?

A. Yes, sir. That's correct.

Q. What facilities are in Region II?

A. Okay. You -- the Hutchins Unit is in Region II, the Boyd Unit, the Buster Cole, the Choice Moore, the Telford, Johnston, Skyview Hodge, Coffield, Michael, Beto, Powledge, and Gurney.

Q. And that's the region where Mr. Eason was also formerly the regional director. Is that right?

A. That's correct. He was a regional director in Region II.

Q. In Region II. Okay. And as of Mr. Thaler's retirement, you are the Correctional Institutions Division director?

A. That's correct.

Q. Okay. And your educational background, you have a bachelors degree from criminology and corrections from Sam Houston. Is that right?

A. That's correct.

Q. And do you have any additional education beyond the bachelors degree?

16

A. No, sir. That's all I got.

Q. Okay. Have you taken any courses towards a masters or anything like that?

A. No, sir.

Q. Okay. Mr. Stephens, have you ever been a party to a lawsuit before?

A. I believe I was on that Sheets and Jenks, I believe I was a defendant. I'm not sure. I may not have been, but I do not believe I've ever been a -- defendant. I'm not sure.

Q. Before these suits about the --

A. Now, I could have been -- when you say a lawsuit, some of them might have got dismissed before trial or something that I don't remember or aware of, so, I'm -- I really don't recall.

Q. To the best of your recollection, you remember the Sheets and the Jenks case?

A. Yeah. Buy I -- as I think about it, I remember Officer Brickell and Officer Spillar were the actual defendants. I happened to be the supervisor on duty that night and I think I was just a witness.

Q. Okay. None of these cases that you've testified in, you were a defendant. Is that fair?

A. Yeah. I'm not sure about Brown, but -- I could have been in Brown.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

Appendix 51

6 (Pages 21-24)
Stephen McCollum, et al. v. Brad Livingston, et al.
William L. Stephens October 18, 2013

21

A. It was a discussion, yes, sir.
Q. What did you -- what do you remember about that discussion?
A. I remember him saying that he was beat up pretty hard in his deposition about it.
Q. Was that because --
A. He took it personal. I mean, he took the incidents and the occurrences in his region personally, even when they occurred.
Q. That's because he is responsible for --
A. Absolutely. He holds himself accountable.
Q. Would you say that he thought that the staff in his region could have done better in those situations?
A. I don't remember that specifically being said about any of the cases, other than specifically he felt like the staff -- he commented that he felt like they acted appropriately in McCollum -- McCollum case, I'm sorry.
Q. Have you had a chance to review the administrative review and the Emergency Action Center report for the McCollum case?
A. I have reviewed it.
Q. Are you critical of the performance of the correctional officers in that case?

22

A. Do you have the report available so I could look at it? If you're going to ask me questions about a specific report, I'd like to have a chance to look at it.
Q. And, you know, I don't think I have a copy of that with me right now.
A. Okay.
Q. But do you remember having any criticism of those officers?
A. Me personally having criticism of the officers? Difficult to say. I wasn't there in the entire situation. Certainly, in retrospect, looking back on the incident, I wish we would have called 911 sooner.
Q. You would agree with Mr. Thaler that the delay in calling 911 was too long in that situation. Is that fair?
A. I agree there was a significant delay and I wish they would have called 911 sooner, yes, sir.
Q. Okay. And would you agree that it wasn't -- that in a situation like Mr. McCollum, where the inmate is having a seizure, is convulsing, is unresponsive, that that would -- it would be inappropriate to wait for the sergeant and then wait for the lieutenant and cause an hour delay before

23

calling 911?
A. Yeah. As I understand, reading it, the first officer on the scene approached Mr. McCollum on the bed and witnessed what he did, and he initially called the supervisor to report to the scene, as well as a video camera. He initiated -- our terminology is ICS, Incident Command System. That is certainly a standard protocol.
I certainly think that at some point when there was a delay for the supervisor to get there, I wish the officer would have took some initiative, notified his -- whoever he contacted the first time that I'm calling 911.
Q. So maybe after ten minutes when the supervisor doesn't --
A. I really can't put a time on it, I'm sorry.
Q. Such just as an example --
A. Yes, sir.
Q. -- at some point, you think that he should have stepped up and said, I'm going to call 911 now, or I'm going to tell the person who has access to the telephone, we need 911?
A. Not having the report in front of me, okay, I believe the officer -- there was an radio down there on the wing. I do believe they had the opportunity to

24

tell whomever, their supervisor on the radio, we need 911 and let's call it.
Q. And you think that would have been appropriate in this situation?
A. Yes, sir.
Q. Okay. If the officer who -- the correctional officer who first arrived, if he believed it was an emergency at that point, should he have waited any time before calling 911? Or making sure 911 was called?
A. The message that I have put out all along has been, if you feel like you need Emergency Medical Services and they're not on the unit, call 911.
Q. Okay. So you would agree, if the officer thought that it was an emergency and there was no medical services available at the unit, that he should have immediately called 911?
A. If the officer makes a -- an ascertation that it needs -- that this is an emergent medical, serious life-causing situation, then the officer should call 911.
Q. Okay.
A. Or excuse me, the officer doesn't have the ability in the housing area. The officer could make a request, either by phone or by the radio, and I

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

Appendix 52

believe in this situation the officer had a radio. I'm not positive, though.
Q. You -- and just to make the record clear. The officer doesn't have a phone on him, he would need to tell someone else to call 911?
A. Right. Even our phones on the housing area do not have access to call a number outside the institution.
Q. Okay. But you think the officer should have taken that step when he ascertained it was an emergency?
A. If he ascertained it was an emergency, then, yes.
Q. Okay. We talked with Mr. Thaler some about how policies are made for TDCJ. Do you remember that discussion?
A. Yes, sir.
Q. I'm going to ask you some questions that we asked Mr. Thaler, because since you're in Mr. Thaler's position now, I just want to see if you have any different understanding than he does or maybe you know or remember something that he didn't. Okay?
A. Okay.
Q. We talked about whether Mr. Livingston, what his level of involvement is with the policies that are

made for the Correctional Institutions Division. Do you remember that?
A. Yes.
Q. And some of the administrative directives or policies that Mr. Livingston has to sign off on and approve. Is that right?
A. As I understand it, yes.
Q. Okay. Do you know if Mr. Livingston reads those policies before he signs off on them?
A. No, I do not know what Mr. Livingston does in this.
Q. Has Mr. Livingston ever asked you any questions about one of these policies before his signature --
A. No, sir.
Q. Okay. Have you ever consulted with him about a policy before he approves it to tell him, like, you know, Mr. Livingston, this is a new policy we're proposing, this is why we think it's necessary, or anything like that?
A. About a policy, no.
Q. Okay. When have you talked with Mr. Livingston?
A. Well, after taking on this job and becoming a -- the director for the Correctional Institutions

Division, I've had several conversations with Mr. Livingston about different operational type issues. You know, right now, the Prison Rape Elimination Act is a tremendous issue going on in our agency. The implementation of some current legislation that we're trying to put out is a -- is a tedious task, so I've had conversations with him about those issues.
Q. Can you recall any other issues you've talked with Mr. Livingston about besides Prison Rape Elimination Act implementation and the implementation of some new legislation?
A. There is issues, yes, sir, I've talked to him about.
Q. What else do you remember talking with him about?
A. Do you want me to name everything that I've talked to Mr. Livingston about?
Q. How -- well, let's -- how often do you talk with Mr. Livingston?
A. I would say, daily.
Q. Daily. Fair enough. Does he work in the same office as you?
A. Excuse me?
Q. Does he work in the same physical office

as --
A. No, sir, not in the same office. He's down the hallway.
Q. Okay. The same office building?
A. The same building, that's correct.
Q. Have you ever talked with Mr. Livingston about the temperatures inside the housing areas?
A. I have not had that conversation with him, no, sir.
Q. Have you ever approached him about that?
A. No, sir, I have not.
Q. You've never told him that you think that's an important issue that you need to talk about with him?
A. I have not had the conversation with Mr. Livingston about temperatures in the dorms.
Q. Why not? Why haven't you ever talked with him about that?
A. Because I feel we are doing a good job of mitigating the circumstances and the -- the effects that the temperature in the dorms has on the offenders.
Q. So you -- because you think that you're doing a good job, you don't see any need to involve Mr. Livingston. Is that --

13 (Pages 49-52)
Stephen McCollum, et al. v. Brad Livingston, et al.
William L. Stephens October 18, 2013

49

Q. Did you ever become sick or ill from the temperatures in the -- when you were working in those areas?

**A. I can't remember ever becoming sick or ill, no, sir.**

Q. Do you remember seeing any other prison staff who became sick or ill?

**A. At what period?**

Q. At any period when you were working in the -- on the actual prison facilities.

**A. I would have to say, yes. Specific incidents, I don't remember. But there has been occurrences where I've seen staff get sick. I've seen offenders get sick in the summer months. Usually they had overexerted theirselves or had some sort of existing medical condition that really didn't adapt well to the heat.**

Q. So you were aware that some people have medical conditions that make it more dangerous for them to be in areas where the temperature is very hot?

MS. COOGAN: Objection. Calls for speculation.

**A. Yes, sir. I just wasn't sure whether I was supposed to answer after that.**

Q. (BY MR. MEDLOCK) Unless your lawyer tells

50

you not to answer --

**A. Okay.**

Q. -- if you could go ahead and answer the question.

**A. Okay.**

Q. She's just making the objection for the record and the judge may or may not sustain that later on. Okay?

MR. ANASTASIDIS: You can go ahead and answer.

THE WITNESS: I did, sir.

Q. (BY MR. MEDLOCK) And you're also aware that it's very hot outside at these prison units. Is that fair?

**A. Hot outside? Yes, sir.**

Q. Are you aware that sometimes there is not much of a -- a difference between the indoor temperature and the outdoor temperature at these facilities?

**A. Yes, sir.**

Q. Okay. Have you reviewed any of the temperature documents at the Hutchins Unit?

**A. Unless they were -- I believe some of them might have been attached to a -- a deposition or something that I might have read. It seems like I did**

51

**go across them.**

Q. Do you remember seeing an e-mail that said that it's maybe two to three degrees cooler indoors than outdoors at the Hutchins Unit in the summer of 2011?

**A. No, sir.**

Q. We've talked a little today about personal fans for prisoners. Do you remember that conversation?

**A. Yes, sir.**

Q. Now, there are some prison facilities where there are plug outlets so they can have -- the inmate can have a personal fan, and there are some where there is no plug outlet. Is that basically the distinction where a personal fan is available and when one is not?

**A. Yes, sir.**

Q. Is there any commonality that the areas that don't have the plug outlet have? Like what types of areas would not have a plug outlet available --

**A. I don't understand your question.**

Q. Okay. Well, it seems that a number of these situations where the prisoners didn't have personal fans was in a dormitory style setting. Does that seem fair?

52

**A. Yes, sir. I believe that -- I believe that's fair, yes, sir.**

Q. Typically, in the dormitory style housing in TDCJ, are there outlets for personal fans?

**A. Please repeat your question.**

Q. Sure. I'm just trying to determine if that is kind of a -- a -- like a commonality between the dorms or if, you know, at the Hutchins Unit maybe they don't have -- they have dorms, but they don't have plug outlets, but at the Gurney Unit they have dorms, but they do have plug outlets, or is that kind of a part of the design of the dorms? Does that make sense?

**A. Yeah, I believe it's more the design of the dorm. I don't believe -- I don't remember Gurney having plugs and -- in the dorm.**

Q. And I'm just using Gurney as an example.

**A. Oh, okay.**

Q. I haven't been in there, and I couldn't tell you if they do or not --

**A. I don't believe they do.**

Q. But your understanding, generally, is that the dormitory style housing typically would not have a plug outlet?

**A. We have some dorms that do, but the -- the**

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
b339ddc5-72c1-4350-a49e-946a9deb2499

Appendix 54

14 (Pages 53-56)

Stephen McCollum, et al. v. Brad Livingston, et al.

William L. Stephens
October 18, 2013

53

ones constructed like Hutchins, Gurney, do not.
Q. Okay. What -- are Hutchins and Gurney the same design style?
A. No, sir. Now, I will tell you they are similar, then they are different. But, you know, when you talk about a structure that is one building that has four dorms that stretch to the outside and a central housing control picket with windows that you can see in the dorms, then that is similar. But there are some slight differences.
Q. So the housing buildings at the Hutchins and the Gurney Unit are very similar?
A. I would say they're similar, yes, sir.
Q. Maybe the design of the entire unit is different?
A. That's true as well.
Q. Okay. Has there ever been a study or a cost estimate done to determine what the cost would be of installing additional plug outlets to allow more people to have personal fans?
A. I don't recall one being made.
Q. Have you ever asked for that to be done?
A. No, sir.
Q. Have you ever considered that that is something that should be looked into?

54

A. Well, I will tell you, as an assistant warden of the Garza East Unit in 1998, as you walked around and looked, I considered, yes, looked at. But as far as a study or any kind of official -- I didn't do that. I haven't done that.
Q. When you were at Garza East, you just kind of noticed, like, hey, it might be possible to do this?
A. I don't know that I said it would be possible, no, sir. I guess I looked around and just to see if it would be possible. With my lack of any kind of engineering skill or -- I did do that.
Q. It just kind of crossed your mind, this might be something --
A. Yes, sir.
Q. -- we could do. But you never followed up on that to --
A. No, sir.
Q. Let's talk about the Emergency Action Center reports, briefly. Those identify injuries to employees and to prisoners. Is that fair?
A. Well, the Emergency Action Center, there is a large number of different types of incidents that are reported there, not just injuries to employees and offenders.

55

Q. Among the many things that are identified would be injuries to employees, injuries to offenders?
A. That's correct.
Q. And is it your understanding that a kind of separate category that the Emergency Action Center reports generate is -- or that some way, when those reports are generated, that it identifies specifically heat as a category?
A. I don't know that heat is a category. I'm not aware of that.
Q. Okay.
A. I don't know how they code -- code their data.
Q. Okay. So you don't know, if you went back to the Emergency Action Center and said, hey, run me all of the heat-related incidents in the past six months, if they could just do that based on the data, or if they would need to go and review the reports individually, or how they would do that?
A. That's a long question. Could you repeat it, please?
Q. Sure. Is there some -- do you know if, when the Emergency Action Center report is generated, is there any sub category that would include heat that would make it more easy to identify?

56

A. There could be, but I don't work over there, so I don't know how they track it.
Q. No one has ever given you a report saying, here are all of the heat-related incidents?
A. I've received a report that says that.
Q. Okay.
A. I don't know -- I don't remember if I received it from EAC or health services, but I've received a report that said that.
Q. When did you receive that?
A. Oh, 2012, 2013, in that general area.
Q. Was that the first time you had ever seen a report like that?
A. That I'm -- that I remember today, yes, sir.
Q. Do you remember how many incidents were listed on that report?
A. I believe the report I saw had 14 of them.
Q. Do you remember what month that report came out?
A. No, sir.
Q. Those 14 incidents, do you remember if those were to -- incidents involving staff, or prisoners or some combination --
A. Oh, I'm sorry. I thought you were talking about offender deaths due to hyperthermia. That's the

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

Appendix 55

coordinate health services?

A. Yeah. It doesn't say a list, but it certainly tells me that you need to be coordinating and those inmates that are at higher risk, make sure you're coordinating and letting medical know about them. But it could have been referencing a list, I don't know.

Q. You don't know what that was --

A. No, sir.

Q. Okay. And make referrals to health services as needed. What does that mean to you?

A. It means, get the monkey off your back. Put the quality of care to medical. It means -- that means access to care. That's what that means.

Q. To make sure that prisoners who appear to need medical attention for a heat issue get to medical?

A. That's correct.

Q. And would you expect the officers to rely on their training to determine when that type of referral needed to be made?

A. Yes, sir.

Q. Then it looks like, at the bottom of the page, there is a number six.

A. I see it.

Q. Do you see where it says, rotate staff assignments --

A. Yes, sir.

Q. -- where heat is issue. What does that mean to you?

A. Keep a rotation if you have an officer -- and this -- it works well in some situations where you have an officer that works in a control center that's in a housing unit. Control center, they're allowed to sit down, they're allowed to be comfortable where they're out walking around and going in and out of dorms and real active, and you try to rotate them out. If you have an officer that's out there working on the sidewalk, escorting inmates, you have an officer that's working in administrative segregation, running up and down the stairs all day long, you try to rotate officers to difference positions that allow some sedentary work.

Q. And I assume here it's also talking about where heat is an issue, to keep officers, like an officer who is working in a housing area where it's not air conditioned, maybe rotate them out with an officer who is working in an air conditioned --

A. That could be one, yes, sir.

Q. Would that sound like a good idea to you?

A. Yes, sir. That could be one.

Q. And that's something you would do --

A. When it's available.

Q. Sure. That's something you would do to protect the officer's health and safety from the heat?

A. Sure.

Q. Okay. And in here it says, any concerns should be made known to administration. Do you see that?

A. Yes, sir.

Q. What does that mean to you?

A. I didn't write it. I'm sorry, I don't know what that means. But Mr. Thaler was always preaching -- I used the word preaching -- directing, instructing the staff out in the field to let us know if there is concerns and issues out there. So, you know, we want to be a resource, we want to help them.

Q. So would that mean that if -- you would expect people actually working day to day at the prisons to communicate up to the administration if they were having heat-related issues?

A. I wouldn't only say it if the people at the institutions weren't in the meeting, this message was getting out to the staff that was in the meetings.

Q. Okay. So you would expect the regional

directors to communicate that down the chain of command to report things like that back up?

A. That is --

Q. When there is a heat-related issue?

A. Yes, sir.

Q. If there were correctional officers who testify they were discouraged from making heat-related workers' compensation claims, what would you say to that?

A. I would say that that's -- that's not appropriate, for one. I don't know who would discourage them. But all employees have avenues on how to report problems, complaints, grievances, issues. I mean, those avenues are there.

Q. Would one of those avenues be through their union?

A. Could they talk to a union representative? Sure. They have that access.

Q. Do you ever communicate with the union representatives about concerns that employees have?

A. Yes, sir.

Q. Is heat ever a concern that --

A. I can't remember any of the meetings I sat in that heat was an issue, no, sir.

Q. Okay. Let's move on to the March 2012. Do

113

you see that, Mr. Stephens?
A. Yes, sir. I'm sorry. 58?
Q. Yes, Exhibit 58. Yes. If I could refer you to page 649. The first page, I'm sorry.
A. These start with seven.
Q. 749.
A. Okay. All right. 749.
Q. It looks like you discuss security reviews at this meeting and had a handout?
A. Yes, sir.
Q. And then on page 750, it looks like you -- excuse me. It looks like, on page 751, it indicates you discussed heat preparations?
A. Yes, sir.
Q. Given that this is the March minutes, what would it mean that you were discussing heat preparations?
A. Getting ready, preparing for the upcoming summer months.
Q. And what would that include?
A. Make sure they have sufficient water coolers, make sure the fans are in operational order, make sure that we're starting to reemphasize training and having an awareness out there in the field.
Q. Anything else?

114

A. I can't think of it right now.
Q. Okay. You see page 754?
A. Yes, sir.
Q. Do you see where it says Heat-Related Illness at the bottom?
A. Yes, sir.
Q. Do you see where it says, talk about every month?
A. Yes, sir.
Q. Is that, again, part of emphasizing --
A. I make that assumption, yes, sir. Based upon -- I didn't write these notes either.
Q. And you don't have any direct memory of this meeting?
A. No, sir.
Q. You see page 757?
A. Yes, sir.
Q. You see on that first line all the way on the right, it says, B. Livingston?
A. I see that, yes, sir.
Q. I assume that is Brad Livingston?
A. Yes, sir.
Q. Do you remember if he was at this meeting?
A. I don't remember if he was at the meeting, but my assumption is, based upon these notes, he

115

probably was.
Q. How often does Mr. Livingston attend one of these meetings?
A. Not very often. He has been known to stick his head in there, though, and if he -- I don't know. Not often. I couldn't guess.
Q. From your point of view, how involved is Mr. Livingston with the day-to-day operations of the actual prison units as opposed to the other things that TDCJ does?
A. Well, my experience dealing directly with Mr. Livingston has started in the last four months, and I can tell you, he is involved.
Q. Do you ever send e-mails to Mr. Livingston?
A. I can't think of a time I've sent him an e-mail, no, sir.
Q. I'll refer you to page 760.
A. Yes, sir.
Q. Do you see that? Do you see where it says Heat-Related Illness in the middle?
A. Yes, sir.
Q. On the side there is an asterisk, then it says, talk to WS. I assume that's you?
A. I make that assumption, too. Again, I didn't write the note, so...

116

Q. Do you have any recollection of this meeting?
A. No, sir, no direct recollection.
Q. Do you remember anybody specifically coming up to talk to you after this meeting about heat precautions?
A. No, sir.
Q. Do you have any recollection why it would say, talk to WS, there?
A. No, sir.
Q. You would agree that it appears that at this meeting there were -- it was discussed that ten men had died last year, relating to heat?
A. I agree.
Q. Okay. And that the other things that were checked -- discussed were fans, training, and wellness checks?
A. Yes, sir.
Q. Would it be fair to say that around this time period was when the change was made to create the wellness checks system that we've talked about earlier?
A. I think it -- not -- not being able to remember exactly when it happened, I would say, generally, around this time, yes, sir.

37 (Pages 145-148)

Stephen McCollum, et al. v. Brad Livingston, et al.

William L. Stephens
October 18, 2013

145

Q. Is that Mr. Clark, Jason Clark?

**A. Jason Clark. That's correct.**

Q. Thank you for your time, Mr. Stephens. I appreciate you staying. I passed when I promised Mr. Garcia that we would be done tonight. Appreciate it.

THE WITNESS: Yes, sir.

MS. COOGAN: I have no questions for Mr. Stephens.

MR. GARCIA: I have no questions at this time.

MR. ANASTASIDIS: No questions.

THE VIDEOGRAPHER: That concludes the deposition. We're off the record at 8:01 p.m.

146

CHANGES AND CORRECTIONS

WILLIAM L. STEPHENS - October 18, 2013 VOLUME 1

[DISREGARD IF WAIVED]

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE/LINE CHANGE REASON CODE

____________________________________

JOB NO. 131018BJW

147

SIGNATURE

I, WILLIAM L. STEPHENS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________

WILLIAM L. STEPHENS

JOB NO. 131018BJW

148

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, §
STEPHANIE KINGREY, AND §
SANDRA McCOLLU, §
INDIVIDUALLY AND AS §
HEIRS AT LAW TO THE §
ESTATE OF LARRY GENE §
McCOLLUM, § CIVIL ACTION NO.
Plaintiffs, § 3:12-CV-02037
§
VS. §
§
BRAD LIVINGSTON, JEFF §
PRINGLE, RICHARD CLARK, §
KAREN TATE, SANDREA §
SANDERS, ROBERT EASON, §
THE UNIVERSITY OF TEXAS §
MEDICAL BRANCH AND THE §
TEXAS DEPARTMENT OF §
CRIMINAL JUSTICE, §
Defendants. §

* * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
WILLIAM L. STEPHENS
VOLUME 1
October 18, 2013

* * * * * * * * * * * * * * * * * *

I, BRENDA J. WRIGHT, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, WILLIAM L. STEPHENS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to Federal Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

Appendix 58

38 (Pages 149-151)

Stephen McCollum, et al. v. Brad Livingston, et al.

William L. Stephens
October 18, 2013

149

well as Rule 30(e)(2) that the signature of the deponent:

__X__ was requested by the deponent and/or a party before completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Corrections and Signature pages contain any changes and the reasons therefor;

_____ was not requested by the deponent and/or a party before the completion of the deposition.

That $_______________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to PLAINTIFFS;

That pursuant to information given to the deposition officer at the time said testimony as taken, the following includes all parties of record:

For the Plaintiffs:
Mr. Jeff Edwards
THE EDWARDS LAW FIRM
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
512-623-7727/512-623-7729 (fax)
jeff@edwards-law.com
-and-
Mr. Scott Medlock
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
512-474-5073/512-474-0726 (fax)

150

For the Defendants Jeff Pringle, Richard Clark, Karen Tate, Sandrea Sanders, Robert Eason and Texas Department of Criminal Justice:
Mr. Bruce R. Garcia
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Law Enforcement Defense Division 012
Post Office Box 12548
300 West 15th Street
Austin, Texas 78711-2548
512-463-2080/512-495-9139 (fax)
bruce.garcia@texasattorneygeneral.gov

For the Defendants Brad Livingston, William Stephens and Richard Thaler:
Mr. Demetri Anastasidis
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Law Enforcement Defense Division 012
Post Office Box 12548
300 West 15th Street
Austin, Texas 78711-2548
512-463-2153/ 512-495-9139 (fax)
demetri.anastasidis@texasattorneygeneral.gov

For the Defendant University of Texas Medical Branch:
Ms. Kim Coogan
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Law Enforcement Defense Division
Post Office Box 12548
Austin, Texas 78711-2548
512-463-2080/512-495-9139 (fax)
kim.coogan@texasattorneygeneral.gov

I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken;

Further, I am not a relative nor an employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of

151

the action.

Certified to by me this 1ST day of NOVEMBER, 2013.

[signature]

BRENDA J. WRIGHT, Texas CSR No. 1780
Expiration Date: 12-31-14
WRIGHT WATSON & ASSOCIATES
Firm Registration No. 225
Expiration Date: 12-31-13
3307 Northland Drive
Suite 185
Austin, Texas 78731
512-474-4363/51-474-8802 (fax)
www.wrightwatson.com
JOB NO. 131018BJW

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
b339ddc5-72e1-4350-a49e-946a9deb2499

Appendix 59

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM
PLAINTIFFS

v.

LANNETTE LINTHICUM, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT FASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE
DEFENDANTS

CIVIL ACTION NO. 4:14-cv-3253
JURY DEMAND

KEITH COLE, JACKIE BRANNUM, RICHARD KING, DEAN ANTHONY MOJICA, RAY WILSON, FRED WALLACE, and MARVIN RAY YATES, individually and on behalf of those similarly situated,
Plaintiffs,

v.

LANNETTE LINTHICUM, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

CIVIL ACTION NO. 4:14-cv-1698

* * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
DEPOSITION OF LANNETTE LINTHICUM
January 13, 2016
VOLUME 1

* * * * * * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF LANNETTE LINTHICUM, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 13th day of January, 2016, from 9:18 a.m. to 3:59 p.m., before Abigail Guerra, CSR, in and for the State of Texas, reported by machine shorthand, before Honorable Keith Ellison, at the United States District Courthouse, 515 Rusk, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFF:
STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM
Mr. Jeff Edwards
Mr. Scott Medlock
EDWARDS LAW
1101 East 11th Street
Austin, Texas 78702
Phone: (512) 623-7727

- and -

Mr. Michael Singley
Mr. David James
THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Road
Suite O-3
Austin, Texas 78759
Phone: (512) 334-4302

FOR THE DEFENDANT:
TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Ms. Cynthia L. Burton
Mr. Matthew Greer
OFFICE OF ATTORNEY GENERAL
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: Phone: (512) 463-2080

- and -

Ms. Sharon Felfe Howell
TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
209 West 14th Street
Suite 500
Austin, Texas 78711
Phone: (512) 463-9899

A P P E A R A N C E S (cont'd)

FOR UTMB:

Ms. J. Lee Haney
Ms. Shanna Molinare
Office of Attorney General
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: (512) 463-2080

- and -

Mr. Graig J. Alvarez
Ms. Kara Stauffer Philbin
FERNELIUS ALVAREZ SIMON, PLLC
Lyondell Basell Tower
1221 McKinney Street
Suite 3200
Houston, Texas 77010
Phone: (713) 654-1200

ALSO PRESENT:
Mr. Kevin Schaeffer, Videographer
Ms. Jennifer Osteen
Ms. Kamilla L. Stokes
Ms. Ashley Palermo
Ms. Brian M. Sears
Mr. Daniel C. Neuhoff
Ms. Heather Rhea
Ms. Lori K. Erwin
Ms. Glenda Adams
Ms. Ariel Wiley
Mr. Phillip Boyd
Mr. Derek Kammerlacher
Dr. Owen Murray
Judge Keith P. Ellison
Ms. Rebbeca Vogel

2d32d627-930d-45a8-92e3-94b44101e0f1

10 (Pages 37-40)
Lannette Linthicum - 1/13/2016

37

and I think you told me, look, it gets more dangerous. The potential for danger increases as the temperature goes up. Did I understand your testimony correctly?
**A. I don't know that I said that specifically. I said that it depends on the individual and their individual circumstance and medical condition.**
Q. Okay. Same individual, okay, is it more dangerous at 100 degrees than 90 degrees?
**A. Not necessarily.**
Q. Is it more dangerous at 110 degrees than 90 degrees?
**A. It depends on the individual.**
Q. That same exact individual, okay? Take that "depends" out of it. Are you with me?
**A. No, not exactly. What type of individual are you talking about?**
Q. Any type of individual. Any type of individual. You can describe the individual if you'd like, okay? Does it general, as a matter of science, get more dangerous at 110 than it does at 90 degrees?
**A. Here's what we know. The high environmental or elemental temperatures can be a danger to all people. There are certain categories of people that -- that may be at higher risk, the very old, the very young. I mean, some of this is common sense. We see on television commercials, don't leave your child alone in a hot car. The elderly needs to be brought**

38

**in and stay in well ventilated areas. I mean, your question is so general that it's kind of difficult.**
THE COURT: But you can't think of patients who would be better off, whatever their condition, at 110 degrees than they would be at 90 degrees, can you?
**A. I think -- I think everybody would be better off, yes.**
Q. (BY MR. EDWARDS) Okay.
**A. Irrespective.**
THE COURT: Okay.
Q. (BY MR. EDWARDS) All right. How many people are you aware of that have died -- that TDCJ believes have died due to hyperthermia -- strike that. How many people does TDCJ believe that died due -- died from heatstroke or hyperthermia due to conditions in the prison system?
**A. Well, I would answer that, we -- we keep mortality stats on offender deaths, and most offenders are sent for a postmortem examination and autopsy. And TDCJ has a responsibility to file death records with the Bureau of Vital Statistics, death certificates, et cetera. What we file is a legal record, and it's based on autopsy results, and I believe I gave you those numbers previously.**
MR. EDWARDS: Objection. Nonresponsive.
Q. (BY MR. EDWARDS) How many people, ma'am, does TDCJ consider to have died from heatstroke or hyperthermia in the

39

Texas prison system? Do you know?
MS. BURTON: Objection. Vague as to time period he's asking about.
THE COURT: Okay. Time period specified.
Q. (BY MR. EDWARDS) Since you started working there, ma'am.
**A. Well, as I told you previously, Mr. Edwards, from 1986 through 1993, I was a unit-based physician, and I did not have access to that data until I came into the central office.**
Q. Okay.
**A. I became the director of the Health Services Division in 1998, and that would have been my first opportunity to get central reporting as a director. I believe there were a couple of deaths in 2007, and then we had the ten deaths in 2011, and then the two deaths in 2012.**
Q. Those are the only deaths you're aware of due to heatstroke in the Texas prison system?
**A. Those are the only deaths that have been verified by autopsy findings as due to hyperthermia and filed with the department of State Health Services and such.**
Q. Are you aware other deaths in which hyperthermia was noted on an autopsy?
**A. No.**
Q. And that is your job, to be aware of how many people have died due to hyperthermia in the Texas prison system,

40

right? That's one of your jobs to know that, right?
**A. No.**
Q. Why not?
**A. Because the healthcare system is a collaborative partnership between the TDCJ and two state university health sciences' center. And then on top of that is the legislatively-established committee called the Correctional Managed Healthcare Committee that acts as board over the healthcare system. The Correctional Managed Healthcare Committee is statutorily empowered to have oversight of the healthcare systems in TDCJ.**
Q. You're on that committee, right?
**A. I'm appointed to that committee, I and Mr. Livingston, yes.**
Q. You're the chairperson of that committee, correct?
**A. Not correct. The chairperson of the committee is appointed by the governor of the State of Texas, and that person has to be a physician that is not affiliated with either the UTMB, Texas Tech, or TDCJ.**
Q. Regardless, is it your position that because other entities may be involved in the provision of healthcare in the prison system, that it's not your responsibility to know the numbers of deaths due to hyperthermia inside the prison system?
**A. I told you the number of deaths that were verified by autopsy findings as the cause of death being hyperthermia.**

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 61

Q. You told me you were aware of 14, correct?

**A. I told you that I was aware of a couple prior to 2011. I believe they occurred in 2007. I told you of ten that occurred in 2011, and two that occurred in 2012. That is my knowledge of hyperthermia deaths.**

Q. Does that add up to 14, ma'am?

**A. Yes.**

Q. Okay. So you're only aware of 14 deaths in the Texas prison system in which hyperthermia was a diagnosed -- diagnosed at autopsy, correct?

**A. Yes.**

Q. Is it your responsibility as the Texas Department of Criminal Justice head of Health Services to know that number correctly?

**A. It's a collective responsibility. Health Services and TDCJ is a collective responsibility that statutorily has been charged to three state agencies.**

Q. It seems to me that if you're running the Healthcare System for TDCJ and one of the problems is people dying of heatstroke inside your prisons, that you would want to investigate how many there were and why they happened?

**A. That's where I disagree with you, Mr. Edwards. I am not running the Healthcare System in TDCJ. The Healthcare Systems in TDCJ are operated collaboratively by three state agencies as we're charged be the legislature.**

Q. Do you --

**A. Excuse me. I'm in not finished.**

Q. I'm sorry.

**A. Policy -- the oversight of our healthcare delivery system is done through the Correctional Managed Healthcare Committee. There are ten members on the Correctional Managed Healthcare Committee, six of whom are gubernatorial appointees, and then the other three are appointed by the -- each of the partner agencies -- UTMB, Texas Tech, and TDCJ. The Health and Human Services Commission also appoints a member, the tenth member, who is a nonvoting member. And statutorily through the positions of the Texas Government Code, the Correctional Managed Healthcare Committee has responsibility for the offender healthcare plan, for the policies and procedures that govern how we deliver healthcare.**

Q. Well, do you believe that you personally in your role at TDCJ have a responsibility to investigate the how and why of deaths by heatstroke occur?

**A. I believe that in my role as a medical director, along with my partner medical directors from UTMB and Texas Tech, that we jointly have a responsibility to investigate every offender death, irrespective of the cause. And this is done through a joint committee, a joint morbidity and mortality committee. As the medical director of TDCJ, I am afforded the opportunity to appoint members on that committee.**

Q. Ma'am, do you have a responsibility to investigate deaths based on your position at TDCJ?

**A. No, I do not.**

Q. Okay. Do you believe that you should in your -- please let me finish, ma'am.

**A. I haven't said anything.**

Q. Do you believe -- do you believe in your role at TDCJ that you ought to be investigating -- you, Dr. Linthicum, ought to be investigating how and why people died of hyperthermia inside your prisons?

**A. I believe that I should have adequate staff or sufficient staff to perform that function. Whether or not I personally have to do it, I don't think that's necessary as long as I have qualified healthcare professionals to perform that function.**

Q. How you choose to investigate it would be up to your executive capacity, fair?

**A. I don't understand that question.**

Q. How you choose to investigate why and how people died of heatstroke in your prison system is up to you, but that it gets investigated is mandatory 100 percent of the time, right?

**A. That's not exactly, correct.**

Q. Why not?

**A. There is -- because there is a federal act, a federal law called the Death and Custody Act that governs how offenders**

**who die or how people who die in custody, how those deaths are investigated. There is a whole branch of TDCJ called the Office of the Inspector General. The acronym is OIG. They are policy-wise responsible for investigating every offender death. They obtain the last 72 hours of the medical records. The death and custody reports are filed with the state's Attorney General. So there are multiple people involved in investigation of offender deaths.**

Q. Has anybody investigated how and why people die from hyperthermia in Texas prison system in 2007, 2011 and 2012?

**A. Yes.**

Q. Who?

**A. The Office of Inspector General does their investigation. For most deaths, the Justice of the Peace or medical examiner is called out to do an inquest. The unit doctor prepares a death summary of the offender's clinical course and the events that transpired surrounding the offender's death. Then those records are all forwarded over to a joint committee of representatives from UTMB, Texas Tech, and TDCJ Health Services. They are called the Joint Morbidity and Mortality Committee, and those representatives review in detail every clinical death from a clinical point of view.**

Q. Well, has -- do you agree that there were a pattern of heat stroke deaths in 2010 -- excuse me, 2011?

**A. Yes.**

13 (Pages 49-52)
Lannette Linthicum - 1/13/2016

49

your policies use the term extreme heat, correct?

MS. BURTON: Your Honor.

**A. We have one --**

MS. BURTON: Could he show her where it says that and what he's referring to? Because there are multiple policies.

MR. EDWARDS: I should not be required to show policies to a witness when there are multiple policies with the word in it, just when I'm trying to get a clear definition --

THE COURT: I'm going to allow the question. I'm going to allow the question.

THE WITNESS: Can you repeat the question, please.

Q. (BY MR. EDWARDS) Sure. There are multiple policies at TDCJ that reference to term "extreme heat," correct?

**A. There are several policies. One is an administrative directive that uses the term in the title, extreme heat.**

Q. Okay.

**A. The Correctional Managed Healthcare Policies does that use that term.**

Q. Regardless. When the term is used by you, "extreme heat," you generally mean above 90 degrees, correct?

**A. I would have to see the policy to see if that what it states, because I -- quite frankly, Mr. Edwards, I do not have a policies memorized in memory.**

50

Q. Notwithstanding your lawyers view of this, okay, what do you mean when you use the term in conversation throughout this deposition, when you use the term extreme heat, what do you understand it to mean?

**A. I understand it to me environmental temperatures are high, and people are hot.**

Q. And what -- is there a particular temperature that you believe that registers with?

**A. No. I believe it could be a range of temperatures.**

Q. From what to what?

**A. I don't know. It depends upon what the weather report for that particular day. Usually, when we're in triple digit figures, that's extreme heat in my mind.**

Q. Okay. So as the chief policy maker, for TDCJ --

**A. No. I have to correct you. I mean not the chief policy maker for TDCJ. That's not correct.**

Q. With regards to healthcare services?

**A. No. The Correctional Managed Healthcare committee promulgates all the healthcare policies in TDCJ.**

Q. Okay. Is it your position that Lannette Linthicum believes that extreme heat begins at 100 degrees?

**A. My position is that extreme heat is what the weather service says, we're in extreme heat days. When there is a weather prediction saying, we're in extreme heat, either heat alert or heat precautions, then I take that as extreme heat.**

51

Q. Do you know if the organization follows a heat or humidity matrix?

**A. Yes, I do know that in the AD, there is a matrix that they adopted from the National Weather Service.**

Q. Do you know at what temperature that heat or humidity matrix indicates that heat injury is possible? Do you know it?

**A. I wouldn't know it by heart. I'd have to look the at matrix.**

Q. Just so we're clear --

**A. By memory.**

Q. -- without looking at document, you have no way of knowing what temperature the potential dangers that are in your policies begin, fair?

**A. I'm going to --**

MS. BURTON: Objection. Argumentative, Your Honor.

THE COURT: I'm going to allow it. This is an important question, and it needs to be answered.

**A. I need to know -- I am an administrator. The people that are responsible for unit operations need to know the answer to that question so that they can implement their heating procedures.**

Q. (BY MR. EDWARDS) Regardless of who may need to know, do you know?

**A. I personally do not know.**

52

Q. Okay. You are -- what you is job again at TDCJ?

**A. Director of Health Services Division.**

Q. And as you testify here in today in preparation, in part as a 30(b)(6) witness, about the dangers of heat and the training that your people get, you do not know the number -- the temperature at which the heat and humidity matrix indicates potential danger due to heat?

MS. BURTON: She has to review the policy, Your Honor.

**A. First of all --**

Q. (BY MR. EDWARDS) She can say she doesn't know if she doesn't know.

**A. I need clarification. What is 30(b)(6)?**

THE COURT: That means -- the question posed to you as a 30(b)(6) mean the questions with your answers will bind the corporation or bind the agency or bind the department.

THE WITNESS: Okay. Let me explain a little bit about how we're organized --

Q. (BY MR. EDWARDS) Could you first answer my question?

**A. Well, in order to answer it, I need to explain the organization. My position as director of Health Services has no responsibility for direct patient-care services that are provided at the TDCJ units. The medical staff on the units are not employees of the Texas Department of Criminal Justice. They are employees of the University of Texas, Medical Branch,**

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 63

responsibility because they're not responsible for having somebody run a 5K race, right?

**A. Well, but we have exercise yards, and offenders go out and they exercise on the yard. They use training equipment and lift weights. I mean, they exercise.**

Q. Sure.

**A. It's important that they have access to exercise.**

Q. And I'll concede that it's possible that some people suffer from heat cramps due to exercise outside. That's not what I'm talking about.

You know that there have been heat-related illnesses in the prison units in the housing areas for people that aren't exercising; they're just living there, right?

**A. Yeah, but again, I'm just saying I need to qualify my answer. Heat-related illnesses is on the spectrum, Mr. Edwards. Heat craps is one spectrum, heat exhaustion, and then the only true medical emergency heat-related illness is heatstroke.**

Q. Got you.

But you do understand that if the condition of confinement, the extreme heat inside the prison, okay, if that causes someone to die of heatstroke, that's a problem on a policy level and on a constitutional level. That's your understanding, right?

**A. My understanding is that from -- is that heatstroke**

**or hyperthermia is rarely the only causative factors. There are other factors involved besides heatstroke. There are other illnesses involved.**

Q. Do you believe if the conditions of confinement, extremely hot temperatures, cause somebody to die from heatstroke, do you personally believe that is unconstitutional?

**A. No, I don't. Without individually examining the case, I think each case has to be examined on its own merit and on its own basis, but to blanketly and universally say that that's the case for every case, then, no, I don't agree with that.**

THE COURT: Okay. Let's move on.

Q. (BY MR. EDWARDS) All right. But you are aware, ma'am, that if a condition of confinement causes any injury -- well -- strike that.

Is it your position -- what are -- the heat illnesses that you talked about on your spectrum, heat cramps, heat exhaustion, if those are caused by something TDCJ is doing, TDCJ ought to stop doing that, right?

**A. It's caused by environment, not by something TDCJ is doing.**

Q. Who's responsible for temperature environment inside the housing areas at TDCJ facilities?

**A. Well, most of the heat cramps are occurring outside. People are engaging in activity and exercise outside. So I**

**would answer who's responsible for that is the Lord. I mean, the Lord the controls the weather. TDCJ doesn't control the weather.**

MR. EDWARDS: Let me object as nonresponsive.

Q. (BY MR. EDWARDS) Who controls the temperatures inside the prison?

**A. I'm not qualified to answer that. I'm not -- I don't specifically know who on the unit is responsible for the fans and the exhaust and the ventilation system. I would assume all of it falls under the jurisdiction of the unit warden, and they have facility maintenance people on the units. So I'm sure there's a schedule of things that they do to regulate temperatures.**

Q. Okay.

**A. But that falls outside of Health Services responsibility.**

Q. You understand that the Texas Department of Criminal Justice controls the temperatures inside its prison units, right?

**A. Yes.**

Q. That means that the Texas Department of Criminal Justice, if it chose, could mechanically raise or lower the temperatures if it decided it wanted to, right?

**A. I would assume so.**

Q. And you're -- well, you would assume so or you know

so?

**A. I don't literally know so, because I'm not on the units. I'm not housed on the unit. I'm in an administrative office. So it would have to be an assumption on my part. I can't testify that I literally know what happens on the unit.**

Q. Has anybody ever asked you whether the unit should be air-conditioned?

**A. No.**

Q. No one from TDCJ -- no one from TDCJ has ever asked you, "Should we air-conditioned areas"?

**A. No.**

Q. Have you ever volunteered an opinion, not to your lawyers, but to administrators at TDCJ as to whether or not housing units -- well, I guess if you're never asked, you're never asked.

Did you ever discuss the need for air-conditioning at anyone from UTMB?

**A. Yes.**

Q. Who?

**A. With my medical colleagues.**

Q. Who?

**A. Do you want specific names when you say "who," or specifics or what?**

Q. Yes. I want specific names.

**A. We have a Joint Medical Directors working group.**

31 (Pages 121-124)
Lannette Linthicum - 1/13/2016

121

is a very serious question --

MS. BURTON: Objection, Your Honor. He's arguing, and she answered the question he asked, and I would ask that you rule against his objection that it was nonresponsive.

THE COURT: Okay. I'm not going to hold it nonresponsive. I'll let you ask the question one more time.

Q. (BY MR. EDWARDS) Do you know care about the health and wellbeing of inmates with heat-sensitive vulnerabilities in custody at TDCJ facilities?

**A. Yes.**

THE COURT: Okay. Let's move on.

Q. (BY MR. EDWARDS) Because you care, isn't it your obligation as someone that is in part of a policy making role at TDCJ to do the most you can to protect inmates from dangerous conditions that you know about?

**A. Yes.**

Q. You know that housing areas are extremely hot in the summer and have known for probably 25 years; is that correct, ma'am?

**A. No, that's not correct. I don't know what the temperatures are those housing areas every single day. I am not unit based. It is not reported in to me as the director of Health Services what the temperatures are on the individual TDCJ units.**

122

MR. EDWARDS: Objection. Nonresponsive.

Q. (BY MR. EDWARDS) I didn't ask you what the temperatures were. I asked you whether you've known for last 25 years that's it's extremely hot inside the prisons?

**A. It's depends on how you define "extremely hot." I know in the summer it's hot.**

THE COURT: Okay. I think we've covered that. Let's move on.

Q. (BY MR. EDWARDS) Are you aware of any nursing homes in the State of Texas that aren't air conditioned?

**A. I've never worked in the nursing-home system in Texas. I can't comment on that.**

Q. Ma'am --

**A. I don't know.**

Q. Okay. You've never bothered -- well -- strike that.

Have you ever called the nursing homes in Texas, asked employees that work for you, to find out if nursing homes are all air-conditioned in the State of Texas?

**A. No.**

Q. Have you ever called -- do you know whether or not assisted-living centers where older people live on their own, whether those centers are all air-conditioned in the State of Texas?

**A. No. I don't know if all assisted-living centers in the State of Texas are air-conditioned.**

123

Q. Do you know if public housing units in the City of Houston have access to air-conditioning?

**A. I do not know if all public housing in the City of Houston is air-conditioned.**

Q. As a policy maker, isn't it your responsibility to find these things out to determine whether or not you're humanely confining prisoners?

**A. No. It's not my responsibility.**

Q. Who's responsibility is it?

**A. It's the responsibility -- confinement, as I testified to before, lies with the corrections side of the house. On the Health Services side, we have a nursing home unit in the Estelle Regional Medical facility that's 60s beds. We have another 60-bed nursing-home unit in the Carole Young Regional Medical Facility. And at the Montford, the Western Regional Medical facility, there are 90 nursing-home beds, all of which are air conditioned.**

Q. Why are they air conditioned?

**A. Because of the level of care that the patients require, they need to be in long-term care.**

Q. Why do you air condition places that require long-term care?

**A. All --**

Q. Is that a medical decision that you're making or a comfort decision?

124

**A. The construction of the medical units were constructed -- all of those units that I just named for you, were constructed as part of the Ruiz healthcare reforms under Judge Justice. All of those facilities were built under the Ruiz lawsuit. The design and architecture and whether or not air-conditioning went in preceded my tenure as medical director.**

Q. So you don't know why the places you choose to place long-term people with healthcare needs, why those are air-conditioned?

THE COURT: Okay. I think we've already covered this. Why don't we move on?

MR. EDWARDS: All right.

THE COURT: I think the doctor has not done an inquiry as to what other places around the state are air-conditioned. Is that fair?

THE WITNESS: Yes, Your Honor.

Q. (BY MR. EDWARDS) Who makes the criteria as to what HSM -- well -- strike that.

Do you know what an HSM-18 form is?

**A. Yes.**

Q. What is it?

**A. It's the Health Summary for Medical Classification.**

Q. What does that mean?

**A. It's a medical form that's completed by the unit**

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 65

32 (Pages 125-128)
Lannette Linthicum - 1/13/2016

125

**medical staff, and it's a form that's used by the Corrections Institution Division, specifically their classification and records department, to make decisions about unit of assignments for offenders and work assignments and other restrictions.**

Q. Do you have any input into criteria that go on the HSM-18?

**A. There is a joint committee called the Joint Policy and Procedure Committee which consists of representatives from the three partner agencies, UTMB, Texas Tech, and TDCJ Health Services staff. They work together collaboratively, and they review all of the Correctional Managed Healthcare policies and make decisions about those forms and whether any changes that's necessary to those forms.**

Q. So, yes, you do have a role in the criteria of HSM-18?

**A. I don't have a direct role. The committee does the work. After the committee does its work, that work is forwarded on to the university medical directors.**

Q. You're on the committee, right?

**A. No, I'm not.**

Q. Who's on the committee?

**A. I appoint people on committee out of the Health Services Division.**

Q. You could appoint yourself if you wanted to?

**A. No. The medical directors don't serve on the joint**

126

**committees.**

Q. If you wanted a separate criteria on the HSM-18 and you instructed your employee that that was what you wanted, are you telling the Court and the jury that that wouldn't happen?

**A. Yes, I am, because I -- we have equal authority. No one medical director has more authority than the other. I can't say, "I want this to happen," and Dr. Murray and Dr. Deshields does not concur with it. We're on legislative mandates to work collaboratively.**

Q. They work for different organizations, right?

**A. So do I, yes.**

Q. You work for the Texas Department of Criminal Justice, right?

**A. Correct.**

Q. And they are responsible for housing inmates safely, right?

**A. They are the state agency charged with housing convicted felons, yes.**

Q. Safely, right?

**A. Yes. Yes.**

Q. Is that too fine a point?

**A. No.**

Q. Don't you think that's important?

**A. We want to have a safe operating prison system. I don't think anybody would argue that, Mr. Edwards.**

127

Q. Did you have a safe operating prison system in 2011?

**A. Yes.**

Q. Even for the men who died from heatstroke in 2011? Do you believe your prison system was safe for them?

**A. Yes. It was very unfortunate that those 11 offenders lost their lives, but you can't use that to say the entire system is unsafe. There were far for offender that died from cardiovascular disease and cancer and liver disease than the 11 that succumbed to heat.**

Q. Okay. When someone responds to you with the following words: "So what?" What do you mean by that? What is the significance to you that more people died from heart attacks or cancer than heatstroke in 2011? What is it that you as a policy making person draw from that?

**A. What I'm saying is that you're implying that those offenders who died from heatstroke, that in some way they counted more than the other offenders that died from all the other diseases.**

THE COURT: Hold on. I don't think that's his import. I think what he's asking indirectly, isn't it easier to deal the problems caused by intensive heat than it is to deal with the problems caused by cancer or heart disease?

Is that right?

MR. EDWARDS: Yes.

THE COURT: So that's the question. The fact

128

that there are heart disease deaths and cancer deaths is tragic. Every life is precious.

THE WITNESS: Yes.

THE COURT: But isn't there fix at hand for heat-related deaths that's not available for other kinds of deaths?

THE WITNESS: Yes, it is, Your Honor. For those offenders that we feel are the greatest risk, we bring into our impatient areas, those 738 infirmary beds. Probably 70 percent of those beds are filled with offenders who are permanently assigned to those beds because of coexisting comorbidities, that we feel they cannot survive in general population. It's unsafe. Some of them are on oxygen. Some of them have what we call "multiorgan system disease." They may have asthma. They may have cardiovascular disease. They may have --

THE REPORTER: Slow down, please.

THE WITNESS: Sorry.

THE COURT: I think I understand now.

THE WITNESS: They may have, you know, disease in multiple systems.

THE COURT: But the existence of these other diseases doesn't really bear on the question of how we deal with people who have heat sensitivity, does it?

THE WITNESS: It does because some of these other diseases make people more susceptible to heat illnesses.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 66

**And by the way, Director Thaler is retired. He is no longer at the Texas Department of Criminal Justice.**

Q. And I understand that. And so I guess, would this be another way to say what you're telling me? You may not personally know for certain what Director Livingston, former Director Thaler, and Director Stevens do know, but based on your meetings with them, your conversations, the policies of which you're aware, you would expect them to know and to have at least known since '05 that TDCJ should be taking every step it can to be reducing the heat-index temperatures inside its housing areas?

**A. Yes.**

Q. Okay. And you'd expect the same of Owen Murray and Dr. Deshields, right?

**A. No.**

Q. Okay.

**A. Dr. Murray, Dr. Deshields have no responsibility for Texas prison units. They're owned and operated by the Texas Department of Criminal Justice.**

Q. Okay. If a University of Texas Medical Branch doctor prescribes, "Transfer to a unit with air-conditioning," then would you agree that it's TDCJ's responsibility to find an air-conditioned unit or bed for that patient?

**A. I would agree that it's collectively both of our responsibilities to find an air-conditioned bed if it's based**

**on medical necessity.**

Q. Have you ever considered adding a designation on the HSM-18 form for inmates prescribed psychotropic medications for housing assignments?

**A. I do not formulate the HSM-18 form. It's done through that joint committee with policy procedure committee members, and that question really would have to go to the chair of the Joint Policy and Procedure Committee.**

MR. EDWARDS: And I don't mean to be rude, but I'm going to have to object as nonresponsive.

Q. (BY MR. EDWARDS) Ma'am, have you ever -- have you, Dr. Linthicum, ever considered adding a designation on the HSM-18 form for inmates prescribed psychotropic medications for housing assignments?

**A. It's not my job duty to do that.**

Q. Have you ever considered it?

**A. No, because it's not my function.**

Q. Are you certain?

**A. I'm positive it's not my function.**

Q. All right. Do you agree that that's something that could be done easily by the agency?

**A. Well, the agency doesn't formulate the HSM-18. It's the university providers that complete the HSM-18. So no one in TDCJ completes the HSM-18.**

Q. Would you agree that adding a line to the HSM-18 is

something that could be achieved by the Texas Department of Criminal Justice if it wanted to?

**A. Well, the HSM-18 would not be modified by the Texas Department of Criminal Justice. It would be modified by the Correctional Managed Healthcare program, and if Correctional Managed Healthcare program chose to modify the form, they could do so.**

Q. And the -- just so I'm -- this -- seems like a bit of a shell game between the different entities that are created. You understand that the Texas Department of Criminal Justice has an obligation to provide adequate healthcare to the inmates, right?

**A. I understand that fundamentally from my discussions about constitutionality, and it doesn't matter whether we provide it directly or whether we contract it out.**

Q. But --

**A. We are also under state mandate from the Texas legislature that requires the Texas Department of Criminal Justice to contract with two state university medical schools. In fact, a rider was put on our appropriations that mandates, that says, "we small," not "can" or "may," but "we shall contract with the University of Texas Medical branch and the Texas Tech University Health Science Center. So the -- although, cumbersome as it may appear, this partnership of three state entities was put in place by the Texas legislature**

**and codified in the Texas government code and statute. 501.131 is the statute citation.**

Q. So this committee that's made up of UTMB, Texas Tech, and TDCJ, are you telling me they create the HSM-18?

**A. A subcommittee -- first of all, the committee is not just UTMB and Texas Tech and the TDCJ. There is a physician on the committee from Texas A & M, a physician on the committee from Baylor College of Medicine, both of whom are appointed by the governor. There is a free-world physician, community practicing physician from Dallas, also appointed by the governor. There is a free-world physician from Tyler, Texas, also appointed by the governor. And that physician chairs the committee, which the chair of the committee is appointed by the governor.**

**So collectively, there are nine members, six physician members and two mental health physicians; and both of them are at doctoral levels; and then the Health and Human Services commissioner appoints a nonvoting member as the tenth member.**

Q. Are you aware of any Court holdings stating that inmates who are taking psychotropic medications should not be housed in temperatures greater than 85 degrees?

**A. What do you mean by "Court holdings"? I don't know what that means.**

Q. Well, are you aware of any Court issuing a ruling

41 (Pages 161-164)
Lannette Linthicum - 1/13/2016

161

Q. Well, let's just -- we'll limit it to anybody in TDCJ who has a constitutional obligation to care for inmates?
**A. Yes. We all knew it was a very hot summer.**
Q. Okay.
**A. As it progressed.**
Q. It wasn't just hot for the inmates. It was brutally hot for the correctional officers, right?
**A. It was hot for everybody in Texas.**
Q. There were -- there were -- strike that.
Were there more heat-related injuries that summer than the summer before?
**A. I would assume that there were.**
Q. Do you know?
**A. No, I don't know.**
Q. Have you ever made a comparison?
**A. A comparison with what?**
Q. Have you ever looked at injuries, the heat-related injuries, in 2010 and 2009 to compare them to 2011?
**A. That was delegated to another physician position in my division.**
Q. Who?
**A. Dr. Kathryn Buskirk.**
Q. What did she tell you?
**A. She would periodically report to the TDCJ Quality Assurance Committee on heat, on the number of heat illnesses.**

162

**We were -- what we were particularly interested in was heatstroke, because that was the real medical emergency and life-threatening condition. The heat cramps and heat exhaustion, they could be managed adequately and fine. The inmates recovered at the unit level. But when what we wanted to make -- wanted to prevent was the development of heatstroke, which was a life-threatening situation.**
Q. Okay. So you knew that -- and this is something that Dr. Buskirk began in 2009? In 2010?
**A. Yes. When we started -- this was a -- this was a work in progress. I mean, when you're working on issues, you continue to make improvements and changes.**
Q. Well, let me -- when did you first delegate to Dr. Buskirk or Dr. Means I guess -- let's call her Dr. Buskirk because that's how the documents read -- looking at the numbers of heat-related illnesses?
**A. I would have to go back and check my file, but somewhere between 2009 and '10.**
Q. Okay.
**A. Somewhere in that area. I cannot give you a specific date without looking. I've got a great memory, but it's not that great.**
Q. I appreciate that, but you're certain it's before these deaths happened in 2011, fair?
**A. We -- we -- Health Services Division has always been**

163

**the monitoring arm of the healthcare program, and the legislature amended our statute, the Correctional Managed Healthcare statute, to give me additional positions. It's relevant to your question, Mr. Edwards.**
Q. All right.
**A. When they amended the statute, they give me 12 additional FTEs to do quality-of-care monitoring. At that time Dr. Buskirk and another physician was hired in the Health Services to assist with that task.**
Q. When was that?
**A. That's it. I would have to look, but I think it was -- don't hold me to it, but I think it was 2009.**
Q. Well, you're going to be here for a deposition tomorrow. If it's not 2009, would you do me the courtesy of telling me?
**A. My files are in Huntsville. I don't know if I can access them, but I'll try.**
Q. All right. So to the best of your recollection, you had this monitoring done of heat-related illnesses in 2009, fair?
**A. We've been monitoring long before that, but Dr. Buskirk came in that role somewhere around 2009, '10. I'm not sure of the date.**
Q. All right. Was any analysis done to see if there was a higher number of heat-related incidents in the summer of 2011

164

than 2010?
**A. Yes. There is another office in the Health Services division called the office of Health Services Liaison, and it is an office of all of our district nurses, and they were charged with monitoring heat-related illnesses system wide. The units had a special heat-related illness reporting form that they had to send in to the office of Health Services Liaison, and annually that office would compile the data and show year over year the number of heat-related illnesses.**
Q. Do you know when that form was created?
**A. I would know it if I had access to my file folder, but I can't tell you off the top of my head the exact date.**
Q. Do you know if it was created before or after --
**A. I know.**
Q. -- June, 2011?
**A. I believe the form -- the heat-related reporting existed in 2010. I know it existed in 2011.**
Q. Okay. So you would have been made aware through your staff of the numbers of people suffering heat-related illnesses in the housing areas, then, prior to, let's say, July of 2011?
**A. Well, not just in the housing areas. They could have been out in the fields, on their jobs, in the factories, on the rec yard. It's just heat-related illness. It didn't specify by location.**
Q. That's an important point. One thing you need to do

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 68

42 (Pages 165-168)
Lannette Linthicum - 1/13/2016

165

as a -- as someone's who's charged with quality monitoring is to analyze, you know, the differences between heat strokes or heat illnesses that are coming in, right?

**A. We are collectively charged with monitoring quality-of-care statutorily.**

Q. Are you only charged with monitoring, or are you also charged with monitoring and fixing?

**A. The statute says that the department, meaning the Texas Department of Criminal Justice, shall do four things: One, ensure access to care; conduct periodic operation review audits at its units; investigate medical grievances; and monitor quality care. It goes on to say that department and university departments shall cooperate in monitoring quality of care, but the expertise of the university providers shall be used to greatest extent feasible for oversight of quality care monitoring.**

**What does that mean? That means that the universities, UTMB and Texas Tech as state university medical schools, were brought into this partnership because of their expertise in healthcare. So that they could focus on the healthcare aspects of this agency, and TDCJ could focus on its core mission of public safety.**

Q. I'm sorry. What is the core mission of UTMB and Texas Tech you just said?

**A. They are academic, state university medical schools.**

166

Q. Well, I know what they are.

**A. They're involved in medical education, and they're also involved in delivering healthcare services to the citizens of Texas.**

Q. Okay. There's -- I just suffered heatstroke, and I need to be treated. UTMB handles that, right?

**A. Or Texas Tech.**

Q. Assume for right we're an UTMB facility.

**A. Okay.**

Q. Then there's public safety. The Texas Department of Criminal Justice, they handle that, right?

**A. Yes. They handle the custody part of incarceration.**

Q. Who -- who handles the analysis of potential, you know, epidemics that have health consequences for inmates?

**A. All of us collectively together.**

Q. And --

**A. It's also statutorily outlined that the Correctional Managed Healthcare Committee has to report those issues up to the Board of Criminal Justice.**

Q. Do you understand that the statute that -- that the Constitution is what we're here for and not what whether or not your fulfilling some statutory obligation? Do you understand that?

**A. Well, isn't the constitution statutory as well? We have federal and state laws that we are obligated to abide by.**

167

Q. Okay. If it's true that -- that you and Dr. Buskirk were aware of the higher incidents than normal of heatstrokes -- I'm sorry -- heat-related illnesses before, let's say, July of 2011, would it be your obligation to be communicating with the correctional institutional people, like Director Thaler and then Assistant Director Stephens?

**A. The heat-related illnesses, as I explained before, are nonlife threatening illnesses. The heat cramps is, basically, first aid. Heat exhaustion may be more than that, but they can handle on the unit. Director Thaler and Director Stephens, they were already aware, as I was, of these illnesses because on every unit, there is what we call the unit safety officer that work under the ARMS division, Administrative Review and Risk Management, and they receive reports on all of these that go up to the Corrections Institution's division director.**

Q. And those reports are done in realtime?

**A. Yes.**

Q. They're not like a year-and-a-half later they're sent. Their just -- the way the reports happen is that--

**A. Well, they're done in realtime, but they're also quarterly, summary reports that are sent so that people can see trends and various things.**

Q. So they're done in realtime, and then they're also done quarterly because that's a way that you can identify --

168

**A. They're statistical reports, yes.**

**Can we take a break?**

Q. Absolutely.

THE COURT: Yes.

(A break was taken from 2:08 p.m. to 2:22 p.m.)

Q. (BY MR. EDWARDS) Do you know who Ricky Robertson is, ma'am?

**A. No.**

MR. EDWARDS: May I approach, Your Honor.

THE COURT: Yes, you may.

(Exhibit 1 marked.)

Q. (BY MR. EDWARDS) Let me hand you what's been marked as Exhibit 1. Would you identify that document for the Court and the jury, ma'am?

**A. The document I've just been handed is an interoffice communication to Dennis Rhoten, a director then of the Office of Inspector General, from myself. It's dated May 3rd, 2005.**

Q. Would you like to take a moment to read it?

**A. Yes.**

Q. Or do you know what it is?

**A. No. I need to read it.**

Q. Okay.

**A. I'm finished, Mr. Edwards.**

Q. Does that jog your memory with who Ricky Robertson is?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 69

57 (Pages 225-228)
Lannette Linthicum - 1/13/2016

225

CHANGES AND SIGNATURE

WITNESS NAME: LANNETTE LINTHICUM

DATE OF DEPOSITION: January 13, 2016

PAGE LINE CHANGE REASON

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

226

I, LANNETTE LINTHICUM, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
LANNETTE LINTHICUM

THE STATE OF____________)
COUNTY OF ______________)

Before me, __________________________, on this day personally appeared LANNETTE LINTHICUM, known to me (or proved to me under oath or through ____________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of ____________________, 2016.

_________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF _________________
Commission Expires: ______________

227

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA )
McCOLLUM, individually, and )
STEPHANIE KINGREY, )
individually and independent )
administrator of the Estate )
of LARRY GENE McCOLLUM )
PLAINTIFFS ) CIVIL ACTION NO.
) 4:14-cv-3253
v. ) JURY DEMAND
)
)
LANNETTE LINTHICUM, JEFF )
PRINGLE, RICHARD CLARK, )
KAREN TATE, SANDREA SANDERS, )
ROBERT FASON, the UNIVERSITY )
OF TEXAS MEDICAL BRANCH and )
the TEXAS DEPARTMENT OF )
CRIMINAL JUSTICE )
DEFENDANTS )
_________________________ ) _______________________
KEITH COLE, JACKIE BRANNUM, )
RICHARD KING, DEAN ANTHONY )
MOJICA, RAY WILSON, FRED )
WALLACE, and MARVIN RAY )
YATES, individually and on )
behalf of those similarly )
situated, )
) CIVIL ACTION NO.
Plaintiffs, ) 4:14-cv-1698
)
v. )
)
LANNETTE LINTHICUM, in his )
official capacity, ROBERTO )
HERRERA, in his official )
capacity, and TEXAS )
DEPARTMENT OF CRIMINAL )
JUSTICE, )
Defendants. )

228

* * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
DEPOSITION OF LANNETTE LINTHICUM
January 13, 2016
VOLUME 1

* * * * * * * * * * * * * * * * * * * * * *

I, ABIGAIL L. GUERRA, Certified Shorthand Reporter, in and for the State of Texas, hereby certify to the following:

That the witness, LANNETTE LINTHICUM, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to Federal Rules of Civil Procedure (30)(e)(1)(A) and (B) as well as Rule (30)(e)(2) that the signature of the deponent:

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_X__ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript.

If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 70

58 (Pages 229-231)
Lannette Linthicum - 1/13/2016

229

____ was not requested by the deponent or a party before the completion of the deposition.

That $____________________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM, individually and on behalf of those similarly situated;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

FOR THE PLAINTIFFS:
STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and independent administrator of the Estate of LARRY GENE McCOLLUM

Mr. Jeff Edwards
Mr. Scott Medlock
EDWARDS LAW
1101 East 11th Street
Austin, Texas 78702
Phone: (512) 623-7727
- and -
Mr. Michael Singley
Mr. David James
THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Road
Suite O-3
Austin, Texas 78759
Phone: (512) 334-4302

230

FOR THE DEFENDANT:
TEXAS DEPARTMENT OF CRIMINAL JUSTICE
Ms. Cynthia L. Burton
Mr. Matthew Greer
OFFICE OF ATTORNEY GENERAL
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: Phone: (512) 463-2080
- and -
Ms. Sharon Felfe Howell
TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
209 West 14th Street
Suite 500
Austin, Texas 78711
Phone: (512) 463-9899

FOR THE WITNESS:
UTMB

Ms. J. Lee Haney
Ms. Shanna Molinare
Office of Attorney General
300 W. 15th Street
7th Floor
Austin, Texas 78701
Phone: (512) 463-2080

- and -

Mr. Graig J. Alvarez
Ms. Kara Stauffer Philbin
FERNELIUS ALVAREZ SIMON, PLLC
Lyondell Basell Tower
1221 McKinney Street
Suite 3200
Houston, Texas 77010
Phone: (713) 654-1200

231

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties or attorneys to the action in which this deposition was taken;

Further, I am not a relative, nor an employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Certified to by me this 28th day of January, 2016.

ABIGAIL GUERRA, Texas CSR 9059
Expiration Date: 12/31/17
WRIGHT WATSON & ASSOCIATES
Firm Registration No. 225
Expiration Date: 12-31-17
1250 S. Capital of Texas Highway
Building 3, Suite 400
Austin, Texas 78746
512-474-4363/512-474-8802 (fax)
www.wrightwatson.com

Job No. 160113AG

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400 Austin, Texas 78746 (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1
Appendix 71

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM,
Plaintiffs,

Â§ CIVIL ACTION NO.
VS. Â§ 3:12-cv-02037
Â§ JURY DEMAND

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

*******************************************************

ORAL & VIDEOTAPED DEPOSITION OF
GLENDA M. ADAMS, M.D.
MARCH 7, 2014

*******************************************************

ORAL & VIDEOTAPED DEPOSITION OF GLENDA M. ADAMS, M.D., produced as a witness at the instance of PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 7th day of March, 2014, from 10:14 a.m. to 3:48 p.m., before LORI A. BELVIN, CSR, and Notary Public in and for the State of Texas, reported by videographic and stenographic means, at the offices of Glenda M. Adams, M.D., 200 River Pointe, Suite 200, Conroe, Texas, 77304, pursuant to the Federal Rules of Civil Procedure.

A P P E A R A N C E S:

COUNSEL FOR THE PLAINTIFFS, STEPHEN McCOLLUM, ET AL.:
Mr. Jeff Edwards
THE EDWARDS LAW FIRM
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
Telephone: (512) 623.7727
Facsimile: (512) 623.7729
Email: Jeff@edwards-law.com

COUNSEL FOR DEFENDANT, UNIVERSITY OF TEXAS MEDICAL BRANCH, ET AL.:

Ms. Kim Coogan
Ms. Shanna Elizabeth Molinare
ATTORNEY GENERAL OF TEXAS - GREG ABBOTT
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463.2080
Facsimile: (512) 495.9139
Email: Kim.coogan@texasattorneygeneral.gov
Email: Shanna.molinare@texasattorneygeneral.gov

COUNSEL FOR DEFENDANT, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ET AL.:

Mr. Seth Dennis
ATTORNEY GENERAL OF TEXAS - GREG ABBOTT
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463.2080
Facsimile: (512) 495.9139
Email: Seth.dennis@texasattorneygeneral.gov

ALSO PRESENT:

Ms. Jennifer Osteen, UTMB Representative

Mr. Glen Tune, Videographer

Ms. Lori A. Belvin, Texas CSR No. 2572

INDEX

| | PAGE |
|---|---|
| Stipulations.................................... | 1 |
| Appearances..................................... | 2 |
| WITNESS: GLENDA M. ADAMS, M.D. | |
| Examination by MR. EDWARDS.................. | 7 |
| Examination by MS. COOGAN................... | 314 |
| Further Examination by MR. EDWARDS........... | 319 |
| Witness Changes and/or Amendments Page........... | 324 |
| Witness Signature Page.......................... | 325 |
| Reporter's Certificate Page...................... | 326 |

EXHIBITS

| NO. DESCRIPTION | PAGE REFERRED |
|---|---|
| 1 - Affidavit of Glenda M. Adams.............. | 9 |
| 2 - Affidavit of Glenda M. Adams - List of Exhibits (attached Exhibits 1 - 10)........ | 10 |
| 2A - Texas Uniform Health Status Update from McLennan County Jail for Larry Gene McCollum | 315 |
| 3 - Plaintiff's Second Amended Notice of Intention To Take Oral and Videotaped Deposition of Glenda Adams, M.D. And Subpoena Duces Tecum...................... | 19 |
| 4 - Requests For Production................... | 23 |
| 4A - Statistical Compilations for Texas Prison Units for Obesity, Hypertension, Diabetes for the Years 2011, 2012 & 2013........... | 75 |

EXHIBITS

| NO. DESCRIPTION | PAGE REFERRED |
|---|---|
| 5 - Medical File of Larry Gene McCollum........ | 26 |
| 6 - Requests For Admission with attachments.... | 26 |
| 7 - TDCJ Offender Intake Processing Psychological Screening Interview of Larry Gene McCollum dated 7/18/2011........................... | 161 |
| 8 - Guidelines For Completing The Health Summary For Classification Form................... | 189 |
| 9 - McLennan County Sheriff's Office - Health Services Division - Physician Assessment/ Orders for Larry McCollum for June/July 2011 | 234 |
| 10 - Texas Department of Criminal Justice Health Summary For Classification for Larry Gene McCollum dated 7/20/2011.................. (Bates-labeled McCollum 015) | 309 |
| 11 - Correctional Managed Healthcare Policy Manual Offender Medical And Mental Health Classification Number A-08.4.............. | 313 |
| 12 - McLennan County Sheriff's Office - Health Services Division - Physician Assessment/ Orders for Larry McCollum for June/July 2011 and other attachments..................... (Bates-labeled 002931-003010) | 316 |

UNANSWERED QUESTIONS

QUESTIONS BY MR. EDWARDS:

1)Q. Okay. Did they discuss or did you discuss documents that you should bring to your deposition? PAGE 20 LINE 16

2)Q. Just to be clear, Dr. Adams, if I ask you any questions concerning what you spoke about with Ms. Coogan or Ms. Molinare, is it -- are you going to answer them or are you on the advice of Counsel are you going to refuse answer them? PAGE 21 LINE 23

3)Q. Okay. When was -- when was the last time you corresponded with your attorneys concerning this case? PAGE 27 LINE 9

4)Q. So just to be clear, if I ask you for all -- to describe any correspondence or provide any correspondence, even though you didn't object to it, after you were designated in this case, on the advice of Counsel, are you going to refuse to provide that to me? PAGE 27 LINE 18

5)Q. Okay. Now, do you spend time talking about offender deaths that where the actual death happened three or four days later in a hospital, but the cause was related to stuff that happened in a prison? PAGE 41 LINE 8

6)Q. Do you think it's 100 degrees in here? PAGE 42 LINE 7

7)Q. Okay. Did any of the mortality or morbidity review meetings discuss the temperatures inside the Texas prisons? PAGE 68 LINE 3

8)Q. So, there may very well be documents pertaining to the Mortality Review Committee that discuss the temperatures inside the prison? PAGE 68 LINE 11

9)Q. Did you make those wording changes after talking with your Counsel? PAGE 98 LINE 21

MS. COOGAN: Objection, vague.
Q. (BY MR. EDWARDS) In your experience?
**A. In my experience, my personal experience, their duty is to draw the blood. But, yes, phlebotomists usually do chit-chat with whoever they're drawing blood on.**
Q. Right, they're trying to make the person feel comfortable so that they can draw the blood and get the vein, right?
**A. Correct.**
Q. Okay. Not usually targeted medical questions based on your experience watching phlebotomists, right?
**A. Not targeted medical questions --**
Q. Okay. All right.
**A. -- but an opportunity to complain if you're having problems.**
Q. Sure, sure, sure. And, I guess, an opportunity to notify a doctor that a morbidly obese person is having trouble, right?
**A. I wouldn't expect a phlebotomist to know "morbidly obese" versus "obese."**
Q. Would you expect a phlebotomist to be able to tell if somebody's looking sick?
**A. As much as anybody -- any layperson.**
Q. Sure. It's not rocket science, right?

**A. Correct.**
Q. I mean, you mentioned kind of "Hey, that's an opportunity for Larry McCollum to explain what he needs," okay? But, by the same token, it's also for a UTMB employee, a medical provider to ask questions to help a patient in need; and he was in need at this time, right?
**A. His blood work shows that he was, but that doesn't mean that he looked sick.**
Q. It doesn't -- it may mean -- look, the lab results just indicate he was sick, right?
**A. The lab results indicate he was becoming sick, yes.**
Q. He had an infection on July 20th, right?
**A. He possibly had an infection.**
Q. Okay. He had elevated white blood cell counts, right?
**A. Slightly elevated.**
Q. Okay. Is it fair to say that he was probably sick?
MS. COOGAN: Objection, repetitive.
**A. A slight -- you don't necessarily show anything because you have a slightly elevated white blood count. You can have a urinary tract infection and not appear ill.**

Q. (BY MR. EDWARDS) Okay. He was suffering depression, right?
**A. He said he was depressed, yes.**
Q. Okay. He smelled bad, right?
MS. COOGAN: Objection, repetitive.
**A. I don't know if he smelled bad on the 20th, okay? The -- at his mental health screen, a body odor was noted.**
Q. (BY MR. EDWARDS) If he smelled particularly bad on the 20th, it would have been an opportunity for the phlebotomist to, you know, notify somebody about it, right?
**A. We don't know if she noticed that he smelled bad. We don't know that he smelled bad on the 20th.**
Q. We don't. We just know that the opportunity was there, right?
**A. Opportunity for what?**
Q. To intervene and help?
**A. And, also, the opportunity to express a request for help.**
Q. Sure. Mr. McCollum had countless opportunities to request help. That's what you're saying, right?
**A. Yes.**
Q. Okay. Do you know if he requested help from correctional officers?

**A. I don't know that for sure; but I know that the OIG report, some of the offenders suggested that he did.**
Q. Any reason to disbelieve those offenders?
**A. Not any more than what I've already told you.**
Q. Okay. Well, when you ask for help from one portion of the prison and you don't get it, do you think it makes it less likely that you're going to keep asking for help?
MS. COOGAN: Objection, calls for speculation.
**A. My personal opinion is if you're going to ask anybody for help, it would be medical personnel.**
Q. (BY MR. EDWARDS) Hmm -- okay. All right. So, on the blood drawing, no record of any questioning or conversation, agree -- correct?
**A. Correct.**
Q. So when you write "no overt indication of" -- what do you write there? "No overt functional limitation or complaints of difficulty," you wrote that, right?
**A. Can you show me exactly where you're talking about?**
Q. Yes. Well, I guess it's on the 18th with McKinney who did the TB test.
**A. Tell me the page number that you're on, please,**

298

Do you have any idea why he used the words the lack of air-conditioning may have contributed to Mr. McCollum's death?

MS. COOGAN: Objection, calls for speculation.

Q. (BY MR. EDWARDS) Do you know?

**A. Okay. Where exactly is the wording where he says this? Based on the autopsy, hyperthermia -- this says "he was in a hot environment without air conditioning, and he may have been further predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorothiazide) for hypertension."**

So I don't think there's any debate that he was in a hot environment. I think TDCJ's given you the records.

Q. Right. Okay. Do you know -- if that environment had been 85 degrees, do you think Mr. McCollum would have died of hyperthermia?

MS. COOGAN: Objection, calls for speculation.

**A. It calls for speculation; but --**

Q. (BY MR. EDWARDS) Really?

**A. -- yes, he could have, okay? It's much less likely, but people can die of hyperthermia at 85 degrees.**

299

Q. Okay. It's theoretically possible for someone to die of hyperthermia if the temperature is at all times below 85 degrees. Is that what you're telling the jury?

**A. It's hypothetically if it's all -- remember that you're looking at heat index, temperature plus humidity, okay?**

Q. Right.

**A. It's less likely; but, yes, it is possible to die of hyperthermia at lower temperatures.**

Q. Okay. Are you aware of any studies to suggest how much more less likely it is?

**A. No.**

Q. Have any offenders died of heat stroke in December at TDCJ facilities?

**A. No.**

Q. Have any offenders died in January of heat stroke in TDCJ facilities?

**A. No.**

Q. Have any offenders died in February in TDCJ facilities?

**A. No. Almost all deaths, particularly those in 2011, were within a 30-day period in July and August.**

Q. Okay. Any offenders died in March of heat stroke?

**A. Not that I'm aware of, no.**

300

Q. April?

**A. No.**

Q. May?

**A. I don't know -- not that I know of.**

Q. June?

**A. I -- I don't know the exact dates of deaths of those from 2007 and 2012.**

Q. July?

MS. COOGAN: Objection --

**A. Mr. McCollum died in July.**

Q. (BY MR. EDWARDS) Lots of people died in July, right?

**A. Lots more -- certainly more than usual.**

Q. August as well, right?

**A. Certainly more than usual, yes.**

Q. Okay. Those are -- how long have you lived in Texas?

**A. All my life.**

Q. Okay. Is it fair to say that July and August are the two hottest months in Texas?

**A. As far as my memory can go back, yes.**

Q. Okay. Not to say that June and September can't be brutal, but July and August --

**A. Are usually our two hottest months.**

Q. Right. Other than the temperature, is there any

301

difference in the facilities that you're aware of between, say, February or March and July and August?

**A. Not that I know of right off the top of my head.**

Q. Is coronary arthrosclerosis always found in hypertensive, diabetic individuals?

**A. It's coronary arthrosclerosis.**

Q. Thank you, Doctor.

**A. And it is not always found if those two conditions are of short duration. It's almost always found when those conditions are of long durations, particularly in older individuals.**

THE VIDEOGRAPHER: One minute.

**A. As a matter of fact, it's been found in 20-year-olds.**

MR. EDWARDS: Okay. Let's change the tape and, then, I think, maybe a couple of minutes, if that.

THE VIDEOGRAPHER: Off the record. The time is 5:07.

(Whereupon, a recess was taken from 5:07 p.m. to 5:08 p.m.)

THE VIDEOGRAPHER: Beginning of Tape 7, back on the record. The time is 5:08.

Q. (BY MR. EDWARDS) In your report -- I just want to -- the only TDCJ facility that UTMB has complete control over is the prison hospital in Galveston, Texas;

is that correct?
**A. Well, I don't know if you could characterize it as "complete control" because there are still security issues and security limitations; but UTMB provides, you know, the maintenance of the building is my understanding.**
Q. So, at least as far as the prison hospital in Galveston, Texas goes, that would be the one facility that you would acknowledge UTMB has control over, I guess, the temperature of the building?
**A. Correct, as far as I understand.**
Q. Okay. You're not aware of any other TDCJ facilities that UTMB has the ability to control the temperature?
**A. That's correct.**
Q. Okay. Why did you reduce medical hours -- or do you know why TDCJ -- strike that.
Do you know why UTMB reduced its hours from 16 to 12 in September of 2011 at the Hutchins Unit?
MS. COOGAN: Objection, repetitive.
**A. Yes, it was related to the reduction-in-force.**
Q. (BY MR. EDWARDS) What -- when you say "reduction-in-force," do you mean that UTMB employees were fired or laid off?
**A. Yeah -- throughout the system, yes, in 2011.**

That was during the State budget crisis.
Q. Have they been rehired now?
**A. A large number of them have been.**
Q. Have you had any discussions with anybody at TDCJ or UTMB about policies relating to pigs at TDCJ and heat?
**A. No.**
Q. Have you seen newspaper articles concerning TDCJ's decision to purchase pig barns for its swine operation?
**A. No.**
Q. You haven't seen any newspaper articles about -- about TDCJ's decision to provide cooling for swine?
**A. No, but I don't read the newspaper regularly.**
Q. Do you ever read Texas Monthly?
**A. Not -- no. That's a sin in the State of Texas, isn't it?**
Q. No, no, no.
So I guess -- and I think I know the answer, but you're not aware of TDCJ or any administrator of TDCJ being awarded an Bum Steer award for its decision to provide cooling to pigs, but not humans.
**A. No, I don't -- I don't read Texas Monthly.**
Q. Okay. Do you know if there are policies in place relating to temperatures that are believed to be

critical in terms of heat for pigs?
MS. COOGAN: Repetitive, objection. Go ahead.
**A. I'm sorry, but I know absolutely nothing about pigs, except bacon's tasty, not good for you, but tasty.**
MR. EDWARDS: Fair enough.
Doctor, I think that that's all. But if we could just go off the record, just to let me take a look at my notes. I appreciate you being here a long time. I appreciate it.
Let's go off the record for just a minute and give me a second.
THE VIDEOGRAPHER: Off the record. The time now is 5:13.
(Whereupon, a recess was taken from 5:13 p.m. to 5:20 p.m.)
THE VIDEOGRAPHER: Back on the record. The time now is 5:20.
Q. (BY MR. EDWARDS) Okay. Doctor, real quickly, just about the pigs. Have you had conversations with anyone about the amount of money that TDCJ makes from its swine operation or pigs, ever?
**A. No.**
Q. You've never had any conversations?
**A. No.**

Q. Are you familiar with whether or not TDCJ makes money off of its pig operation?
**A. Long, long ago, I was told during tours that** TDCJ made money off of their swine operation and their dog operations and -- but I was never told any amount; and I haven't heard anything about that since.
Q. Okay. Since the records indicate that officers were involved with holding Mr. McCollum on the top bunk while he was seizing and doing that, is it your opinion that that caused some delay in getting him medical care?
MS. COOGAN: Objection, vague.
Do you understand the question?
**A. I guess -- I don't know if it caused any delay or** not.
Q. (BY MR. EDWARDS) Okay. All right. Has anyone ever made any court opinion concerning -- concerning the responsibilities with regards to protecting offenders from the dangers of extreme heat? Has anyone ever brought a court opinion to your attention?
**A. Are you --**
MS. COOGAN: Objection, repetitive. Go ahead.
**A. Are you talking about the Fifth Circuit -- or I don't know if it was the Fifth Circuit.**
Q. (BY MR. EDWARDS) Sure -- well, yes. I'm not

to implement that for security reasons?

**A. I don't recall cooling centers. I don't -- I have not been in any specific conversations where that has occurred, okay, just in general conversation -- actually from you, from legal and stuff, I've been informed of that.**

Q. Okay. But not in any, like, policy-making meetings, just in terms of this lawsuit, correct?

**A. Not in any policy meetings, correct.**

Q. Okay. Now, you've never visited the C-7 dorm correct?

**A. At --**

Q. At Hutchins?

**A. At Hutchins, no, I have not -- not that I recall.**

Q. Okay. If there was a room that was about the size of this room that was air-conditioned within, you know, a spitting distance of the C-7 dorm, are you aware of any reason why that couldn't be utilized as a respit area to offer a break from intense heat inside?

**A. I know that TDCJ, generally, if offenders are unclassified, such as a lot of the intake individuals are, such as Mr. McCollum, or if there are gang associations that they would not mix these individuals.**

I don't know the specifics of security's reasons for not doing that. I do know that certain

offender classes cannot be mixed.

Q. Okay. Do you know if offenders now are given bands to denote whether or not they are heat -- well, they are particularly susceptible to extreme heat?

**A. Only by rumor I've heard that that's being done in some units. I don't know which units. I don't know if it's all units.**

Q. But, to your knowledge, that was a TDCJ decision that was not implemented with UTMB's consultation?

**A. That was a TDCJ -- project leadership was -- UTMB leadership was not notified. TDCJ did that on the units and requested certain things from the medical departments at the unit level.**

MR. EDWARDS: Gotcha. Anyway, thank you very much for your time, Dr. Adams. I'll let you go. Thank you.

THE WITNESS: Okay. Thank you.

MS. COOGAN: You're free.

THE VIDEOGRAPHER: This concludes the deposition of Dr. Glenda Davis [sic]. The time now is 5:48.

THE WITNESS: Davis?

MS. COOGAN: Glenda Adams.

(Deposition concluded at 5:48 p.m.)

-- SIGNATURE REQUIRED --

CHANGES AND SIGNATURE

WITNESS NAME: GLENDA M. ADAMS, M.D.

DATE OF DEPOSITION: MARCH 7, 2014

PAGE LINE CHANGE REASON

I, GLENDA M. ADAMS, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________

GLENDA M. ADAMS, M.D.

THE STATE OF TEXAS )

COUNTY OF ________ )

Before me, ______________, on this day personally appeared GLENDA M. ADAMS, M.D., known to me (or proved to me under oath or through _____________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this ______ day of ________________, __________.

____________________

NOTARY PUBLIC IN AND FOR

THE STATE OF __________

My commission expires: ______________________

____ No Changes Made ____ Amendment Sheet(s) Attached

STEPHEN McCOLLUM ET AL. VS. BRAD LIVINGSTON, ET AL.

Page 326

GLENDA M. ADAMS, M.D. - March 07, 2014

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, Plaintiffs, §

VS. §

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants. §

CIVIL ACTION NO. 3:12-cv-02037
JURY DEMAND

REPORTER'S CERTIFICATION OF THE ORAL & VIDEOTAPED DEPOSITION OF GLENDA M. ADAMS, M.D.
MARCH 7, 2014

I, Lori A. Belvin, a Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, GLENDA M. ADAMS, M.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to MR. JEFF EDWARDS.

That a copy of this certificate was served on

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

Page 327

GLENDA M. ADAMS, M.D. - March 07, 2014

all parties and/or the witness shown herein on March 14, 2013.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me on this, the 14th day of March, 2014.

Lori A. Belvin, CSR No. 2572
Firm Registration No. 225
Expiration Date: 12-31-2013
7800 North Mopac, Suite 120
Austin, Texas 78759
(512) 474-4363

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

Page 328

GLENDA M. ADAMS, M.D. - March 07, 2014

COUNTY OF HARRIS )
STATE OF TEXAS )

I hereby certify that the witness was notified on March 14, 2014 that the witness has 30 days or (______ days per agreement of counsel) after being notified by the officer that the transcript is available for review by the witness and if there are changes in the form or substance to be made, then the witness shall sign a statement reciting such changes and the reasons given by the witness for making them;

That the witness' signature was/was not returned as of ____________________.

Subscribed and sworn to on this, the ________ day of ____________________, 2014.

Lori A. Belvin, Texas CSR No. 2572
Firm Registration No. 225
Expiration Date: 12-31-2015
7800 North Mopac, Suite 120
Austin, Texas 78759
(512) 474-4363

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

Appendix 78

Skip to Main Content

Employee Resources TDCJ Intranet Contact Us Información en Español

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

TDCJ Home Public Resources TDCJ Employment About TDCJ Online Services Search TDCJ Search CMHC

HOME | DIVISIONS | Correctional Managed Health Care Committee

- CMHCC Home
- Operating Policies
- Partner Agencies
- Services
- Clinical Performance
- Financial Performance
- Complaint Process
- Publications
- News - Links
- Employment
- Business Opportunities
- Contact CMHCC

# *Correctional Managed Health Care Committee (CMHCC)*

## *Welcome to the Texas Correctional Managed Health Care Committee*

The Correctional Managed Health Care Committee (CMHCC) is authorized by Chapter 501, Subchapter E of the Texas Government Code. The CMHCC was originally established by the 73rd Legislature in 1993 to address the rising costs and operational challenges involved in providing health care to prisoners confined in the Texas Department of Criminal Justice (TDCJ).

Organizationally, the CMHCC is composed of nine voting members and one nonvoting member as follows:

- one member employed full-time by the department, and appointed by the executive director;
- one member who is a physician and employed full-time by the UTMB at Galveston, appointed by the president of the medical branch;
- one member who is a physician and employed full-time by the TTUHSC, appointed by the president of the university;
- two public members who are physicians, each of who is employed full-time by a medical school other than UTMB or TTUHSC, appointed by the governor;
- two members appointed by the governor who are licensed mental health professionals;
- two members appointed by the governor who are not affiliated with the department or with any contracting entity, at least one of whom is licensed to practice medicine in this state, and
- the state Medicaid director or a person employed full-time by the Health and Human Services

Commission and appointed by the Medicaid director, is to serve as an ex officio non-voting member.

The CMHCC coordinates the development of statewide policies for the delivery of correctional health care and serves as a representative forum for decision making in terms of overall health care policy. CMHCC representatives are empowered by their respective organizations to represent them on health care matters and make decisions that are binding on their organizations. The shared communication, coordination, decision making, and dispute resolution roles performed by the committee are key elements to the ongoing success of the correctional health care partnership.

The correctional health care system represents a unique collaboration between the state's prison system and two of its leading health sciences centers. This health care partnership between the Texas Department of Criminal Justice (TDCJ), Texas Tech University Health Sciences Center (TTUHSC) and the University of Texas Medical Branch (UTMB) is operated under the guidance and direction of the CMHCC. The primary purpose of the CMHCC partnership is to ensure that TDCJ offenders have access to quality health care while managing costs.

This material is designed to acquaint new CMHCC members with the operations of the CMHCC. In addition, educational material relating to the requirements of the open meetings, and ethics laws of the State are included. This material is intended to be a ready reference which will be updated periodically as necessary.

Each member of the Committee is required by the CMHCC's enabling legislation to review and achieve an understanding of the information included in this reference prior to participating in CMHCC meetings (Section 501.140, Texas Government Code).

The correctional health care system represents a partnership between Texas Tech University Health Sciences Center, The University of Texas Medical Branch at Galveston and the Texas Department of Criminal Justice. Through the leadership of the CMHCC, the following shared mission, vision, values and goals are set for this partnership:

## *Mission*

*The mission of the Correctional Managed Health Care Committee is to develop a statewide managed health care plan that provides TDCJ offenders with timely access to quality health care while also controlling costs.*

## *Vision*

The CMHCC is an organization that is committed to excellence; strives to set national standards in correctional medicine; focuses on building and maintaining open communications; and, serves as a model for inter-governmental cooperation.

## *Core Values*

**Quality:** The CMHCC strives to provide health care services of recognized high quality and deliver them uniformly, promptly and efficiently within the limits of appropriated resources.

**Integrity:** The CMHCC strives to uphold the public's trust through ethical and accountable personal and professional behavior.

**Commitment:** The CMHCC is dedicated to restoring and preserving the health of TDCJ offenders.

**Teamwork:** The CMHCC recognizes that our mission and goals are achieved through teamwork, with each partner fully participating and contributing to the organization and sharing in its success.

## *Organizational Goals*

**Ensure Access to Care:**

The CMHCC recognizes that a key challenge for correctional health care is to maintain appropriate levels of access to medically necessary health care for offenders, in the face of an unprecedented growth of the criminal justice system.

**Ensure and Maintain Quality of Care:**

The CMHCC is committed to a program of continuous improvement that assures the services delivered are of high quality and consistent with community standards.

**Manage Costs:**

The CMHCC is dedicated to the development of initiatives to control the cost of delivering health care, to the extent possible, while remaining loyal to the goals of ensuring access to quality health care. The CMHCC works to anticipate changes in standards of care or demographics which may modify resource needs.

## *Background*

The Texas Correctional Managed Health Care innovative partnership exemplifies the success possible by redefining traditional roles. It represents a unique collaboration between the state's prison system, two leading health science centers, and a number of community hospitals.

In 1993, the Texas Department of Criminal Justice (TDCJ), the University of Texas Medical Branch (UTMB) at Galveston and the Texas Tech University Health Sciences Center (TTUHSC) joined forces to form the Correctional Managed Health Care Advisory Committee (CMHCAC). Subsequently amended

through refinement of its legislative authority as the Correctional Managed Health Care Committee (CMHCC), the CMHCC has developed a statewide provider network to provide medical services to TDCJ offenders. Its primary purpose is to improve access to quality health care while containing cost by maximizing the use of the state's medical schools, securing efficiencies through improved intergovernmental collaboration and using managed care tools.

In Texas prior to the implementation of the program, costs for prison medical care had been increasing at a rate of 6% per year and represented 10 – 14% of the state prison system's operating costs. Additionally, in response to overcrowding, Texas had embarked upon an aggressive prison construction program that would soon confine nearly 150,000 offenders. Since many new prison locations were in rural areas, the economic problems faced by rural hospitals further impacted upon the state's ability to provide cost-effective health care. Traditional delivery systems were also strained by increased rates of infectious diseases such as HIV, Hepatitis C and tuberculosis.

## *Development/Design*

From its inception the Correctional Managed Health Care program has operated as a cooperative partnership between TDCJ, UTMB and Texas Tech. This partnership is embodied in the legislation that formed the committee and included equal representation from each entity. The Correctional Managed Health Care Committee (CMHCC) is established by the provisions of Section 501, Subchapter E of the Texas Government Code. This legislation originally enacted by the 73rd Legislature and amended and re-authorized by the 76th and 83rd Legislatures in response to Sunset reviews provides the structure for the correctional health care system now in place.

## *Implementation*

This partnership significantly changed how medical care is delivered in the TDCJ. Traditionally offender health care was provided by employees of the prison system and through fee-for-service arrangements with hospital providers. These arrangements offered little incentive to control costs. Under the managed health care plan, complete medical services are provided through contracts with state medical school universities. TDCJ contracts with the UTMB and TTUHSC for the provision of health care services. The offenders for which UTMB and TTUHSC receive payment are determined by the geographic location of the prison units. TTUHSC contracts with the TDCJ for defined regions in West Texas, approximately 22% of the offenders. UTMB contracts for nearly all the remaining defined geographic regions; approximately 78% of the offenders. The TDCJ Health Services Division retains the functions of preventive medicine, offender Step II medical grievances, health services operational reviews, health services quality monitoring, and coordination of offender medical transfers.

UTMB and Texas Tech are responsible for the provision of medically necessary health care services. Responsibilities include recruiting and hiring health care personnel to staff the prison medical departments, diagnosing prisoners' health problems, and providing treatment or making referrals to specialists. These services include unit primary care services, all specialty care services, all pharmaceuticals, community provider outpatient and ancillary services, and all in-patient hospital

services. Both UTMB and TTUHSC enter into subcontracts with community providers to provide locally based services when they determine such action is warranted.

Beginning January 1, 1996, UTMB and TTUHSC assumed operational responsibilities for all TDCJ mental health services in their respective university sectors. All psychiatrists and former TDCJ mental health staff were transitioned to the university systems.

These arrangements provide incentives for controlling utilization and generate an increased interest in preventative care. Use of telemedicine and most recently, electronic medical record technologies also enable cost-effective access to specialty care.

## *Historical Outcomes/Results*

The CMHC partnership has resulted in lower medical costs. It has also resulted in the establishment of a statewide network of health care providers and a uniform standard of care. While maintaining a commitment to accreditation and significantly improving access to care, the Texas State Comptroller has estimated that the correctional health care partnership saved the taxpayers of Texas at least $125 million over its first five years. It also serves as a model of intergovernmental collaboration for other states to use to manage access, quality and cost of correctional health care.

In fiscal year 2005, medical costs were about $6.80 per offender per day. In FY 1993, prior to the implementation of the managed health care system, those costs were $5.99 per offender per day. On a per capita basis this represents an increase of about 1% per year over that time frame, compared to the 6% a year increase experienced prior to implementing the program. An independent actuarial review conducted in October 2002 found that correctional health care costs are approximately 44% lower than comparably adjusted public sector HMO's in Texas (when age, population and patient acuity factors are taken into account).

At the same time, health care provider vacancy rates dropped significantly; the average number of days spent waiting for a specialty clinic appointment dropped by over 50%; access to care indicators show marked improvement and every TDCJ health care facility has received national accreditation. Since the implementation of the managed care system, and based on an independent review of medical records conducted by the Texas State Auditor in 1998, access to care compliance improved 27.7%, clinical encounter compliance increased by 35.7% and most dramatically, chronic care compliance rose 158%. In all, twenty-two individual performance indicators showed statistically significant gains.

The managed care partnership has also implemented a series of disease management guidelines. A retrospective review conducted in FY2002 indicates that overall compliance with key disease indicators rose from 40.1% in 1995 to 91.3% in 2001. That same review noted improvements in health outcomes including a 17% decrease in fasting glucose values among insulin dependent diabetics, a 19% decrease in the LDL cholesterol values of patients with hyperlipidemia and a 114% increase in the number of hypertensive patients with controlled blood pressures.

It is also important to note that these positive results were obtained at the same time that the correctional population served more than doubled.

## *Program Recognitions*

In 1995, the CMHCAC partnership was awarded Special Mention by the National Managed Health Care Congress in their annual Astra Merck/NMHCC Partnership Award program. Even though the program traditionally focused on private sector partnerships, the judges noted that the TDCJ-CMHCAC partnership "does reflect the innovative spirit celebrated by the awards, and therefore grabbed our attention as deserving of a special mention."

In 1996, the correctional pharmacy program was awarded the "Innovative Practice Award" by the Texas Society of Health-Systems Pharmacists.

In 1997, the James Byrd Diagnostic Unit in Huntsville was selected from over 400 nationally accredited facilities nationwide as the National Commission on Correctional Health Care's "Facility of the Year." Four of the top five finalists selected for the award were Texas facilities.

In 1998, the Texas correctional health care program was recognized by the American Correctional Association as one of the nation's "Best Practices."

In 1999, the federal court that for years had oversight of Texas prisons released the medical care issues from federal supervision recognizing that "there can be no doubt that the vast improvements in TDC's provision of medical and psychiatric care to inmates have been made…there are now two of the state's finest medical teaching institutions, The University of Texas Medical Branch at Galveston and Texas Tech University Health Sciences Center, giving treatment to inmates."

In June of 2001, the federal court relinquished the State of Texas from all remaining federal oversight, including the issue of providing mental health care services to offenders in administrative segregation.

## *Conclusion*

The CMHCC partners believe that the results of their cooperative venture represent long-term benefits to the state and each respective partner. The partnership emphasizes "win-win" scenarios where the motivations for the participation of each partner are recognized and addressed. The criminal justice agency is seeking quality, cost-effective health services. The universities are seeking teaching and placement opportunities as well as financial support. The participating hospitals are seeking financial stability. By understanding these motivating factors and integrating them into the work of the partnership, a successful venture has been formed.

## *Historical Key Events In Committee History*

Key events relating to the development of the CMHCC are summarized by the timeline below:

- "Against the Grain", January 1993 – Texas Performance Review recommends formation of managed health care structure for TDCJ health care system.

- 73rd Legislature, 1993 – Senate Bill 378 passed establishing the Managed Health Care Advisory Committee (MHCAC).
- "Health Services Review", September 1993 – State Auditor releases report on TDCJ Health Care Services that endorses managed health care concepts.
- August 1993 – Organizational meeting of the MHCAC is held.
- September 1993 – February 1994 – MHCAC and university providers develop transition plans.
- February 1994 – September 1994 – Transition to university managed system under the MHCAC authority begins.
- "Behind the Walls", April 1994 – Texas Performance Review, in a comprehensive review of TDCJ, recommends that MHCAC conduct a staffing analysis.
- September 1994 – Transition to university management completed.
- December 1994 – MHCAC adopts staffing analysis guidelines.
- December 1994 – House Corrections Committee completes interim charge study of implementation of the correctional managed health care system and reports positively to the 74th Legislature, recommending continuing monitoring.
- 74th Legislature, 1995 – HB 1567 amends MHCAC statutory authority, charging name to reflect correctional mission (becoming the Correctional Managed Health Care Advisory Committee, CMHCAC), extending authority of the committee to contract with other jurisdictions and authorizing the universities to report ERS benefits in accordance with intent to protect transitioned employee benefits.
- 74th Legislature, 1995 - General Appropriations Act consolidates prison hospital and prison health services budgets into one strategy for managed health care. University appropriations include rider prohibiting other funds to be used for offender health care.
- January 1996 – CMHCAC and TDCJ agree to proceed with transition of psychiatric services to the correctional managed care program.
- March 1996 – The State of Texas files a motion to vacate the provisions of the Final Judgment in the Ruiz litigation. (The Final Judgment was entered into by the State and the Ruiz plaintiffs in August of 1992 which vacated hundreds of earlier specific requirements and replaced it with continuing permanent injunctive orders on eight substantive areas, including health care).
- The U.S. Congress passes the Prison Litigation Reform Act (PLRA).
- October 1996 – Office of the State Auditor initiates a comprehensive review of the correctional health

care system (estimated completion October 1997).

- December 1996 – House Corrections Committee completes second interim charge study continuing its review of the implementation process and reports positive finding to the 75th Legislature.
- May 1997 – CMHCAC added to Sunset Advisory Commission review cycle to coincide with review of the Texas Department of Criminal Justice.
- July 1997 – The Fifth Circuit rules on motions and discovery issues in pending motion to vacate the Final Judgment. Plaintiffs attorneys and experts afforded access to prison facilities and records for various inspection and discovery purposes.
- Fall 1997 – CMHCAC and TDCJ conduct comprehensive review and updating of HIV related policies and practices.
- January 1998-1998 – Office of the State Auditor issues SAO Report Number 98-013 noting that the system had achieved the overall objective of controlling the increasing costs of providing health care to offenders and recommended a number of areas of potential improvement/and or legislative clarification for consideration.
- December 1998 – CMHCAC initiates comprehensive examination of issues related to the management of Hepatitis C.
- January 1999 – Federal District Judge William W. Justice begins hearing on State's motion to vacate the Ruiz Final Judgment. Extensive medical and mental health testimony and evidence is presented before the court.
- March 1999 – Judge Justice issues Memorandum Opinion and Order on Motion to Vacate, denying State's Motion due to findings in the areas of conditions of confinement in administrative segregation, safety for assaulted and abused inmates, and excessive use of force. The Court's Orders did however relieve the State of the obligation under the Final Judgment relating to health services. These findings and orders have been appealed.
- May 1999 – Recommendations of the Sunset Advisory Commission are adopted by the Legislature in Senate Bill 371. Name of the Committee is changed to the Correctional Managed Health Care Committee and public member participation is added.
- May 2001 – The CMHCC enabling legislation was amended to require reasonable efforts to participate in the purchase of prescription drugs under Section 340B, Public Health Services Act (42 USC Section 256b)
- April 2002 – UTMB becomes certified by the federal authorities to access 340B drug pricing for prison inmates confined in facilities operated by UTMB, resulting in significant reductions in overall CMHCC drug costs.

- February 2003 – All agencies are asked to develop budget reductions geared to address State's projected overall funding shortfall. During FY 2003, the CMHCC, in conjunction with the university providers, implement budget reductions totaling $8.1M. To implement these measures, a statewide reduction in force of almost 400 health care staff takes place and resulted in significant changes in the hours of health care coverage at many facilities.

- May 2003 – Sunset date for CMHCC was extended to 2011 to coincide with the Sunset Commission evaluation of TDCJ.

- November 2004 – The State Auditor's Office released a report on the management of contracts by the CMHCC calling for significant improvements in financial reporting and monitoring of the contracts with the university providers.

- January-May 2005 – 79th Legislature: Working with the Legislative appropriations process and the SAO, strategies are developed to address concerns raised by the audit report on management of contracts. Additionally, supplemental appropriations for FY 2004-2005 are approved and appropriations for the FY 2006-2007 biennium are increased. The Sunset review date for TDCJ and the CMHCC are moved forward to 2007.

- October 2006 – Sunset Commission Staff Report issued following a comprehensive review by the Sunset staff outlining recommendations to update CMHCC's enabling legislation and improve public access to information about the program.

- October 2006 – The State Auditor releases a report on the costs of the State's Correctional Managed Health Care program finding that the university provider financial reports are supported by each institutions accounting system, that the methods used to account for and report the cost of care are reasonable and that the CMHCC had made changes in its operations to address issues raised in the November 2004 SAO report.

- December 2006 – Sunset Advisory Commission formally adopts staff recommendations relating to the correctional health care program.

- March 2007 – The State Auditor issues an audit report on Correctional Managed Health Care Funding Requirements noting that the projected deficit reported by the CMHCC had been reduced since originally projected; that UTMB's projected deficit should be adjusted to account for discrepancies identified by the auditors; and that the CMHCC properly complied with two appropriation riders reviewed by the State Auditor's Office.

- May 2007 – The 80th Legislature adopts SB 909 reauthorizing the CMHCC and enacting the recommendations of the Sunset Advisory Commission.

- February 2011 – State Audit Report on correctional Managed Health Care at the University of Texas Medical Branch at Galveston, SAO Report #11-019.

- February 2011 – State Audit Report on the Correctional Managed Health Care at the Texas Tech University Health Sciences Center, SAO Report #11-019.

- May 2013 – The 83rd Legislature adopts SB 213 reauthorizing the CMHCC and enacting the recommendations of the Sunset Advisory Commission.

- May 2013 – Senate Bill 1, 83rd Legislature, Regular Session, Article V, Rider 50 prohibits any of the funds appropriated for correctional managed health care to be used for payment of salaries, operating expenses or travel expenses for staff of the CMHCC.

## *Description of Functional Responsibilities*

To accomplish the mission of the Correctional Managed Health Care Committee (CMHCC), the partners have agreed to the assignment of various functional responsibilities to each of the partner agencies. The following narrative descriptions are intended to further clarify the roles and responsibilities of the Correctional Managed Health Care partners. The mission of the Correctional Managed Health Care Committee is to develop a statewide managed health care plan that provides TDCJ offenders with timely access to quality health care while also controlling costs.

By sharing functional duties, the expertise of each partner contributes to a stronger delivery system and avoids unnecessary duplication of resources. Delineation of these responsibilities facilitates information sharing and increases understanding of the lines of communication. The fulfillment of individual responsibilities is assigned to the individual partner's management team and remains under the oversight of the respective Executive Director or University President and that partner's governing board.Collectively, the CMHCC, like TDCJ and the universities are responsible to the Legislature and Governor's Office.The CMHCC is also subject to the same oversight from the State Comptroller, State Auditor, and the Legislative and Governor's Budget Offices.

Each assigned function is briefly described below.

**CMHCC Responsibilities**

- **Statutory Duties:**The CMHCC performs specific duties as outlined in Chapter 501, Subchapter E, Texas Government Code.

- **Legislative and Legal Coordination:** The TDCJ and the CMHCC both serve as points of contact for legislative matters and coordination of statewide legal issues.

- **Monitoring Coordination:** The CMHCC ensures that monitoring processes are in place to measure, evaluate, and report on activities of the health care system.

- **Cost Containment Initiatives:** In conjunction with each of the partners, the CMHCC coordinates individual and joint initiatives for cost reduction strategies.A key element of the CMHCC role in this area is to facilitate sharing of innovations developed within each sector.

- **Coordination of Joint Committees:** The CMHCC ensures central coordination, partner representation and direction to a number of standing and ad hoc joint committees that provide coordination of necessary services on a statewide basis. Joint committees address such issues as statewide policy development, review and approval; joint peer review activities; statewide pharmacy and therapeutics issues; and coordination of specialized clinical focus groups.

- **Alternative Dispute Resolution:** The CMHCC serves as a dispute resolution forum in the event of a disagreement relating to inmate health care services between the department and the health care providers or contracting entities.

- **Public Accessibility:** The CMHCC maintains a formal website to make CMHCC information more accessible to the public (http://www.tdcj.texas.gov/divisions/cmhc/index.html).

- **Development of Services / Benefit Plan:** the CMHCC serves as the final authority on determination of services to be provided to the offender population.These services are generally outlined in the contractual documents and in policy statements approved by the CMHCC.

**TDCJ Business and Finance Division Responsibilities**

- **Fiscal Oversight:**The TDCJ's Business and Finance Division's staff monitor the overall financial status of the correctional health care program, work cooperatively with each partner agency in developing system-wide reporting mechanisms, track and evaluate cost trends and project future needs.

- **Budget Formulation / Submission:** The TDCJ Business and Finance Division staff work cooperatively with each partner agency to formulate budget submissions for the health care program.

- **Financial Monitoring:**The TDCJ Business and Finance Division conducts financial monitoring of the correctional managed health care program; and may contract with an individual for financial consulting services including actuarially studies.

**TDCJ Health Services Division Responsibilities**

- **Monitoring / Central Reporting:** TDCJ Health Services staff provides monitoring activities related to investigating medical grievances, ensuring access to medical care, conducting periodic operational reviews of medical care provide at its units and cooperating with the university providers in monitoring quality of care. Staff also report on the results of those monitoring activities.

- **Accreditation Tracking:** TDCJ staff track the progress of each unit through the accreditation process and provide that information to management for follow-up necessary.

- **Policies / Standards:** the TDCJ Division Director for Health Services serves as the final approval authority on all statewide health care policies. Such policies are developed in accordance with procedures implemented by the Joint Health Services Policy and Procedure Committee and are approved by the respective university medical directors.

- **Operational Reviews:**As a part of the monitoring program, TDCJ staff conduct operational reviews to evaluate the health care delivery systems in place at each facility.This process is based on

assessing compliance with the accreditation standards of the American Correctional Association (ACA), statewide policies and applicable laws. A review and corrective action plan process is required from the provider management team in response to indentified deficiencies.

- **Public Health:** the Office of Public Health section in the Health Services Division is responsible for coordination of the statewide Infection Control Committee. The Office of Public Health staff provide education, orientation and training programs to CID nurses (i.e., public health) statewide. This staff establishes, maintains and monitors statewide offender data bases for HIV/AIDS, TB, hepatitis, syphilis, and sexually transmitted infections. It serves as the central point of contact for reporting purposes to the Texas Department of State Health Services (DSHS) and other applicable state and federal agencies.
- **Grievance and Correspondence Tracking:** the Patient Liaison Office provides tracking, investigation and response to all correspondence regarding patient care issues. The Office of Professional Standards tracks, conducts inquiries and responds to Step 2, Division-level offender medical grievances.
- **Research Approval:** The TDCJ Director of Health Services or designee shall have the final approval for all biomedical research involving TDCJ offenders. All medical research projects will be reviewed by the Director of Health Services or designee in accordance with TDCJ Administrative Directive 02.28 (rev. 2) “TDCJ Research” and Correctional Managed Health Care Policy I-72.1 “Medical Research”. Depending on its nature and proposed methodology, such research may also be subject to review and approval through one or more of the university institutional review boards.
- **Quality Improvement/Quality Management (QI/QM) Coordination:** the TDCJ Health Services Division provides statewide coordination of the QI/QM program. Registered Nurses provide technical assistance, collect reports of QI/QM results, analyze for trends and communicate those results systemwide.
- **Liaison Activities:** The TDCJ Health Services Division functions as TDCJ's single point of contact for communications related to offender health care. This enables TDCJ departments, the CMHCC, the university providers and other contracting entities to work with a single point of contact.

**TDCJ Responsibilities Involving Multiple Divisions**

- **Legislative Coordination:** The TDCJ in coordination with the CMHCC and the universities, serves as the central point of contact for legislative matters including communications with the legislature regarding the financial needs of the correctional health care system.
- **Contracting/Provider Network Coordination:** The TDCJ develops, maintains and administers the master contracts between TDCJ and UTMB; and TDCJ and TTUHSC that establish responsibilities for the statewide provider network. The TDCJ also has statutory authority to contract with any entity to fully implement the managed health care plan.
- **Classification/Transportation Coordination:** TDCJ Health Services Liaison staff coordinate with TDCJ classification and transportation staff to assist in ensuring that offender patients are

appropriately classified, assigned to facilities and transported consistent with their medical needs.

- **Emergency Coordination:** the TDCJ Correctional Institutions Division, in conjunction with TDCJ Health Services, provides statewide coordination and liaison between the health care providers and TDCJ in the event of an emergency.

**University Providers Responsibilities:**

- **Utilization Management:** establishing and maintaining a system for review and authorization of care to ensure that services are provided in a timely appropriate and cost-effective manner.
- **Provider Network Management:** each university, either through its own staff, through its component or affiliated hospitals or through contractors retained by the university must ensure that a comprehensive network or providers is in place to efficiently serve the system.
- **Credentialing:** Each university provider is responsible for ensuring that all health care providers have and maintain appropriate credentials in accordance with state and federal requirements and that processes are in place to verify and document the credentials of its staff.
- **Regional Operations:** Each university provider is responsible for providing the management and operation of regionalized facilities and services as appropriate.
- **Health Care Services:** Each university is responsible for providing nursing, medical, dental, and mental health services at contracted TDCJ units:
  - **Onsite Services:** may include sick call, chronic care, infirmary care, medical record management, medication administration, health education/training and related ancillary services.
  - **Offsite Services:** Emergency care, hospitalization, specialty physician consults, diagnostic procedures, surgeries, and emergency medical transportation.
  - **Pharmacy Services:** medications, as prescribed by authorized providers and pharmaceutical management.
- **Institutional Committees/Peer Reviews:** Each university provider is responsible for maintaining its own institutional committees and conducting its own internal peer review actions.
- **TDCJ Employee Health Services:** Each university provider is responsible for providing employee health care services specified by contract including immediate medical attention to TDCJ employees injured in the line of duty, TB screening, treatment and immunizations as clinically indicated for bonafide occupational exposures.
- **Research Coordination:** For research involving TDCJ offenders, the university providers are required to receive approval from the TDCJ Director of Health Services or designee in accordance with applicable TDCJ policies. The university providers are also responsible for obtaining approval through an Institutional Review Board which meets requirements as set forth in 45 CFR 46, revised October 1, 1999. The university providers are responsible for maintaining accurate, current and accessible records on all protocols involving offenders. The university providers are required to provide access to

such records to the TDCJ Director of Health Services or designee on request.

- **Telemedicine:** the university providers are individually responsible for the operation and implementation of telemedicine within their sectors.
- **Emergency Preparedness:** each university provider is responsible for ensuring an emergency preparedness program is in place at each facility consistent with the ACA standards. Statewide coordination during emergencies will be provided by the TDCJ staff.

**Centralized Statewide Services Provided by UTMB:**

- **Medical Records Coordination:** UTMB provides statewide technical support, policy development and forms control services related to the medical records system, to include the maintenance of the medical records archives and death records.
- **Radiology:** UTMB provides statewide liaison with the Bureau of Radiation Control, provides radiation safety services, equipment registration and coordination of related policy and procedures.
- **Funerals / Autopsy Services:** UTMB coordinates offender funeral/autopsy services on a statewide basis.
- **Medical Training:** UTMB provides health-related training required for security staff during pre-service and in-service training academies for TDCJ staff. Topics include HIV (AIDS), Hepatitis, Suicide Prevention, CPR, etc.
- **Clinical Services:** The following clinical services are provided by UTMB on a statewide basis:
  - all female offender health services
  - dialysis
  - management of offenders with solid organ transplants
  - management of offenders with hemophilia
  - triple drug therapy Hepatitis C management

*This icon displays beside links that take you to sites outside the TDCJ site.*

Employee Resources | Report Waste, Fraud, and Abuse of TDCJ Resources | State Agency Energy Savings Program | TDCJ Intranet
Site Policies | Texas Correctional Industries | TexasOnline | Texas Veterans Portal | Texas Homeland Security | TRAIL Statewide Search | Adobe Reader
Texas Department of Criminal Justice | P.O. Box 99 | Huntsville, Texas 77342-0099 | (936) 295-6371

Appendix 92

1 (Pages 1-4)

Stephen McCollum, et al v. Brad Livingston, et al

Glenda Adams, M.D. November 19, 2013

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law in the Estate of LARRY GENE McCOLLUM,
Plaintiffs,

VS.

CIVIL ACTION NO. 3:12-cv-02037

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

ORAL AND VIDEOTAPED DEPOSITION OF
THE DESIGNATED REPRESENTATIVE OF
THE UNIVERSITY OF TEXAS MEDICAL BRANCH
BY AND THROUGH
GLENDA ADAMS, M.D.

NOVEMBER 19, 2013

ORAL AND VIDEOTAPED DEPOSITION OF THE DESIGNATED REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH BY AND THROUGH GLENDA ADAMS, M.D., produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on Tuesday, November 19, 2013, from 11:11 a.m. to 6:03 p.m., before Mary C. Dopico, Certified Shorthand Reporter No. 463 and Notary Public in and for the State of Texas, reported by machine shorthand and audio/video recording at the offices of Rebecca Sealy Hospital, 404 8th Street, Room, 4.204, Galveston, Houston, Texas, pursuant to Notice and the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

A P P E A R A N C E S

COUNSEL FOR PLAINTIFFS:
Mr. Jeff Edwards
The Edwards Law Firm
The Hachnel Building
1101 East 11th Street
Austin, Texas 78702
Tel: 512/623-7727 Fax: 512/623-7729
E-mail: jeff@edwards-law.com

COUNSEL FOR DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
Ms. Kim Coogan
Ms. Shanna Molinare
Assistant Attorneys General
P.O. Box 12548
Austin, Texas 78711-2548
Tel: 512/463-2080 Fax: 512/495-9139
E-mail: kim.coogan@texasattorneygeneral.gov
shanna.molinare@texasattorneygeneral.gov

COUNSEL FOR DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE AND INDIVIDUAL TDCJ DEFENDANTS:
Mr. Bruce R. Garcia
Mr. Jonathan Stone
Assistant Attorneys General
P.O. Box 12548
Austin, Texas 78711-2548
Tel: 512/463-2080 Fax: 512/495-9139
E-mail: bruce.garcia@texasattorneygeneral.gov
jonathan.stone@texasattorneygeneral.gov

ALSO PRESENT:
Dr. Owen Murray    Karen Matlock
Jennifer Osteen    Carol Londa Bremmond

REPORTED BY: Mary C. Dopico, CSR, RPR, CRR, Wright Watson & Associates
VIDEO BY: Tim Bishop

3

INDEX
ORAL AND VIDEOTAPED DEPOSITION OF
THE DESIGNATED REPRESENTATIVE OF
THE UNIVERSITY OF TEXAS MEDICAL BRANCH
BY AND THROUGH
GLENDA ADAMS, M.D.
NOVEMBER 20, 2013

PAGE
Appearances........................................ 2
Proceedings/Stipulations............................ 7
Changes and Signature Page.......................... 299
Reporter's Certification............................ 301

GLENDA ADAMS, M.D.
Examination, by Mr. Edwards.................... 7

ADAMS EXHIBITS
Exhibit 1........................................... 12
Plaintiffs' First Amended Notice of Intention to Take Oral and Videotaped Deposition of University of Texas Medical Branch and Subpoena Duces Tecum (7 pages)

Exhibit 2........................................... 14
Curriculum Vitae (2 pages)

Exhibit 3........................................... 14
Dr. Adams' annotated copy of Exhibit 1 (11 pages)

Exhibit 4........................................... 42
Mr. McCollum's medical file and Dr. Adams notes reviewed (File copied for Mr. Edwards but not attached hereto)

Exhibit 5........................................... 61
12-15-2012 Correctional Managed Health Care Policy Manual, Number D-27.2 with attachments (8 pages)

4

ADAMS EXHIBITS (CONT'D.) PAGE
Exhibit 6.......................................... 61
10-99 Hutchins Unit Facility Process Manual, Number B-15-2 with attachments (8 pages)

Exhibit 7.......................................... 61
11-10-2008 TDCJ Administrative Directive Number AD-10.64 (rev. 6) with attachment (12 pages)

Exhibit 8.......................................... 81
7-15-11 Correctional Managed Care Intake History and Health Screening of Larry Gene McCollum (2 pgs)

Exhibit 9.......................................... 93
7-20-11 TDCJ Health Summary for Classification of Larry Gene McCollum (HSM 18) (1 page)

Exhibit 10......................................... 184
May 2010 TDCJ Risk Management's Training Circular (TDCJ-RFP #4-13 - 16)

Exhibit 11......................................... 290
TDCJ Administrative Review & Risk Management Division Review & Standards (3 pages)

Exhibit 12......................................... 292
August Medication Administration Record of Larry McCollum (MCCOLLUM 659)

Exhibit 13...........(Number omitted in the numbering)

Exhibit 14......................................... 204
04-07 Correctional Managed Health Care Policy Manual Number A-08.4 (MCCOLLUM 046 - 051)

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 93

5 (Pages 17-20)

Stephen McCollum, et al v. Brad Livingston, et al

Glenda Adams, M.D. November 19, 2013

17

MS. COOGAN: You filed a motion -- You filed this, you served this, I filed objections. You find a motion to compel. The Court granted your motion to compel except for with regard to 23, 24, 25. She granted my objections on the basis that this witness is here to testify about the things on this list except 23, 24 and 25.

MR. EDWARDS: Okay. Well, if you're --

MS. COOGAN: Hang on. Let me just make my record.

She's not here to testify as an expert on the effects of these medical conditions. That's not why she's here, and so she won't be doing that.

MR. EDWARDS: Okay. Well, I just asked if you have a copy of the order, since we're in the UTMB law department. I'd appreciate seeing it just to -- just to verify that. But if --

MS. COOGAN: Maybe your office can fax you a copy. I don't have a copy with me.

MR. EDWARDS: Again, I mean -- Okay. If you're -- Okay. That's fine.

MS. COOGAN: Or if somebody else has one, or maybe we can get one at the break or whatever, but...

MR. EDWARDS: I'm just asking.

MS. COOGAN: Okay.

18

MR. EDWARDS: I'm just asking.

Q. (By Mr. Edwards) As I read your resume -- Well, why don't you tell me. How long have you worked in correctional care?

**A. Since 1987.**

Q. Okay.

**A. To the present, so I guess that's, what, 13, plus 14, about 27 years.**

Q. About 27 years. Have you ever worked in a particular prison?

**A. Yes. I worked eight years at the Diagnostic Unit, which is now called the Byrd Unit, which is an intake unit.**

Q. Did the Byrd Unit have air-conditioned housing?

**A. No.**

Q. Did you work in any other facilities?

**A. I've -- I've worked for short periods of time at multiple facilities, when I was filling in for an absent medical director or somebody was shorthanded somewhere.**

Q. Would you mind telling me what facilities you worked at?

**A. Oh, when Gurney first opened, I assisted with the initial intake physicals for a couple of days.**

19

**I've worked at most of the units in the Huntsville area, because that's where I live and where I've been housed.**

**I'm sure there are others, but I don't recall the specifics.**

Q. Okay. You did work at Gurney; correct?

**A. For two days doing intake physicals, back in -- I think it opened in '94, '95.**

Q. Do you recall if it was the summer?

**A. No, I do not.**

Q. Okay. And then the various Huntsville units, you're pretty confident that you worked inside those?

**A. Yes.**

Q. Would you tell me the names of them, just so that the -- it's clear for the jury?

**A. All right. There is the Huntsville Unit, there is the Byrd Unit, there is Eastham, Ellis, Estelle, Ferguson, Wynne, Holliday. Let's see. Who am I forgetting? I think there's about 14 of them all together. I'm not sure which ones I've -- I've given you.**

Q. Okay. You're confident that you've worked in all of those over the course of your career?

**A. That are in the Huntsville area, yes.**

Q. Okay. All right. Who provides medical care

20

at the Hutchins Unit?

**A. UTMB.**

Q. Okay. How many other prisons does UTMB provide medical care for?

**A. I think the number is close to -- to 80, but I'm not sure.**

Q. Do you know how correctional care managed policies are made?

**A. Yes.**

Q. How are they made?

**A. There is a Policy and Procedure Committee. Anyone can submit suggestions to that Policy and Procedure Committee. It originates, reviews all policies at least annually; and after the committee approves the policies, they go to the university medical directors; and Dr. Linthicum has final approval on all health care policies.**

Q. I just want to make sure that I -- that I fully understand that. There is a Policy and Procedure Committee that anyone can make recommendations to?

**A. In -- Right.**

Q. Is that your understanding?

**A. Yes.**

Q. Okay. When these recommendations or -- or issues are raised, is it your understanding that the

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 94

Policy and Procedure Committee will review them?
**A. Recommendations usually come from other health care providers, because these are health care policies. Okay?**
Q. Okay.
**A. And individuals in the health care departments on the units can make recommendations. I'm not sure who else you would want to know about making recommendations. If security wanted to make recommendations to Dr. Linthicum, I assume that they could, but I would have no knowledge of that.**
Q. Well, I'm just trying to figure out -- I mean, there's a Policy and Procedure Committee and that's part of the Correctional Managed Care committee?
**A. It's a joint committee, yes.**
Q. A joint committee made up of whom?
**A. UTMB, Texas Tech and TDCJ physicians, nurses, clinical pharmacists.**
Q. Okay.
MS. COOGAN: And, Jeff, if I may just interject, Dr. Murray is actually --
MR. EDWARDS: Yeah.
MS. COOGAN: -- prepared to give deposition tomorrow on the committees and how that works. Dr. Adams is really here pursuant to the

30(b)(6) and prepared to answer questions related to the 30(b)(6).
MR. EDWARDS: Well, I'm pretty sure that 30(b)(6) covers policies so --
MS. COOGAN: So --
MR. EDWARDS: -- I'm going to be asking questions about them.
MS. COOGAN: I don't object to you asking questions --
MR. EDWARDS: Okay.
MS. COOGAN: -- and if she knows answers to them, then she'll answer them. I just want -- Don't --
MR. EDWARDS: I'm not going to be --
MS. COOGAN: May I please just make a record?
MR. EDWARDS: -- denied my 30(b)(6) witness questions.
MS. COOGAN: May I please just make a record? May I please just finish making my record?
MR. EDWARDS: All right.
MS. COOGAN: And so I am going to make objections to any testimony and questions that are outside of the 30(b)(6).
MR. EDWARDS: Great.

MS. COOGAN: Okay.
Q. (By Mr. Edwards) All right. Tell me more about the UTMB, Texas Tech, TDCJ Policy and Procedure Committee.
**A. Okay. By contract, TDCJ has UTMB and Texas Tech participate on these committees. Okay?**
Q. Okay.
**A. Most of the policies have been around for a long time, when there was only TDCJ. Those policies are reviewed annually and policies are added. Some may be deleted. There are quarterly meetings where this is accomplished.**
Q. Okay. You mentioned that anyone can submit recommendations, and I want -- and then you followed up with that -- Well, I took it maybe only individual medical providers could.
I want to know who can make recommendations to this Policy and Procedure Committee that you're speaking about.
MS. COOGAN: Objections, calls for spec -- Objection calls for speculation.
**A. Okay. Who can actually -- I think there is a policy that outlines who -- who can make recommendations.**
Q. (By Mr. Edwards) So -- So was your testimony

that anyone can make recommendations, is that -- is that inaccurate?
**A. I don't think that it's inaccurate. I -- I'm not sure that most people -- that there are a lot of people that don't participate. Health care providers can participate and send in something to their supervisors who can send something to members of the committee for consideration.**
Q. Okay. So as I understand your testimony, any -- any health care provider at UTMB, any supervisor, can submit a recommendation to this Policy and Procedure Committee, and they will take it up --
MS. COOGAN: Okay. Calls --
Q. (By Mr. Edwards) -- and review it?
MS. COOGAN: Calls for speculation.
Go ahead.
**A. Okay. They don't necessary -- Not everything needs to go to the committee. You usually submit it to a supervisor and the supervisor determines if it has merit and should go to the committee.**
Q. (By Mr. Edwards) And so let's say, Doctor -- All right. Let's say P.A. Babbilli submitted a recommendation that, you know, there's air-conditioning for, you know, climate controls in prisons for people with diabetes.

What would -- He would submit it to his supervisor, and then a supervisor would -- would decide whether or not that gets submitted to this Policy and Procedure Committee?

**A. In general. But as far as that sort of recommendation, air-conditioning in the housing areas isn't under the purview of -- of medical.**

Q. Okay. But anything medical that any doctor, any P.A., any L.V.N., wants to make a recommendation to, it's your testimony that they can submit it to their supervisors?

**A. And it would go up the chain to somebody who's on the committee.**

Q. If the supervisor deemed it worthy of going up the chain; correct?

**A. If the supervisor -- Yes.**

Q. Okay. Now, what I -- what I really want to know is the chain. So, you know, supervisor's a very broad word; and I'd like to know the chain up through this Policy and Procedure Committee that can make suggestions and recommendations?

MS. COOGAN: Objection, calls for speculation.

THE WITNESS: Am I to answer?

MS. COOGAN: If you can.

Q. (By Mr. Edwards) Yes.

**A. Okay. Anyone can make a recommendation to their unit management team, who can then make a rec -- recommendation to their regional management team, who can then make a recommendation to currently inpatient or outpatient services who knows -- who are on these various committees; and the recommendations can be carried to the Policy and Procedure Committee or just about any committee in the system.**

Q. So just so I understand, we've got anybody on the unit can make a recommendation, suggestion, question to the unit management team?

**A. They can.**

Q. Is that true?

**A. That's true.**

Q. Okay. Who is the unit management team at Hutchins?

**A. The unit management --**

Q. In 2011, when Mr. McCollum was there?

**A. Dr. Oreg was the medical director. I think Mrs. Gilford was the nurse manager, and I think the practice manager was a Ms. Murphy.**

Q. Ms. -- Okay.

**A. She's no longer with us.**

Q. Deceased or -- or just not --

**A. Oh, no. She just left the system.**

Q. Okay. Okay. So then the unit management team, they decided: Hey, that's a good idea. We ought to do -- I don't know -- make sure people are drinking lots of water if they have hypertension in super hot conditions. They would send that recommendation up to the regional team?

**A. Eventually it could go to the regional team and then to a member of the Policy and Procedure Committee, yes.**

Q. Okay. In this example, the "anybody" could be any L.V.N., any registered nurse that's working on the facility; correct?

**A. Correct.**

Q. Okay. Could it also be a correctional officer?

**A. Correctional officers usually go through their chain of commands. They wouldn't contact the UTMB medical management teams.**

Q. Got you. So medical providers could contact the unit management team and then if the unit management team thought that this was a good suggestion or good idea, they would contact the regional -- regional teams?

**A. They could contact the regional teams. Regional teams can contact, like I said, the -- the divisional teams or whatever we are at the time; and then, of course, it would probably be discussed informally with TDCJ medical, and it would -- a decision would be made as to whether or not it goes on the agenda.**

Q. Okay. And I -- I probably don't understand this properly, so please feel free to -- to educate me.

**A. Okay.**

Q. What I had written down was anybody can make a recommendation to the unit management team; and then there's a regional team, if the unit management thinks it's worthy; and then I had written down then they would get together or contact outpatient services, and then it would be brought to the Policy and Procedure Committee. Is that accurate? Did I correctly do that?

**A. If the idea was thought to have merit on up the chain. Okay?**

**Now, of course, in UTMB, we make rounds on our units. I mean, people can speak directly to me. They can speak directly to Dr. Murray. The formal procedure is the one that I've outlined for you.**

Q. So you don't have to go through this formal procedure in order to make suggestions and get -- get things on an agenda for the policy and practices committee; right?

**A. No, it can be an informal suggestion, too.**

Q. Okay. Fair to say that if you or Dr. Murray believed something of a medical nature should be done, you can either have it implemented or have it discussed at the Policy and Procedure Committee meeting?

**A. Yes.**

Q. And if you're not the best person to talk about these things, let me know. But what is your understanding of what Dr. Murray's role is in correctional managed care policy?

MS. COOGAN: Objection, calls for speculation.

Go ahead.

**A. I agree that -- you know, about the speculation part.**

**Dr. Murray is our -- our chief executive medical person. He interfaces with TDCJ, Texas Tech, and UTMB campus individuals. He also provides direction to his associate vice presidents and to his senior medical directors. He also is -- is very conscientious about holding town halls and meeting directly with the people on the units.**

Q. (By Mr. Edwards) Have you ever been to one of those town halls?

**A. Sure. I've been to quite a few of them.**

Q. Have you ever been to one at the Hutchins Unit?

**A. No. I don't know if one's ever been held at the Hutchins Unit. I've been to the ones in the Huntsville area.**

Q. Ever had a town hall about the dangers of heat in these jails?

**A. No.**

Q. What have you been to town halls about?

**A. Town halls are usually updates about the employees and the, you know, legislative sessions, things that are discussed, things that are decided, changes in -- in operations. But heat issues in the housing areas, again, I'd like to emphasize, it's not something that UTMB would be addressing. That's a TDCJ security function.**

Q. Is that UTMB's position, that it doesn't have a responsibility to address heat issues in the housing area because that's a TDCJ security issue?

**A. T -- TDCJ does address that in that we provide education and training to the security officers. TDCJ has a -- I mean, UTMB has a contract with UTMB to provide health care. Okay?**

**We also provide the annual training to the security officers, as far as the additional water,**

**you know, keeping the temperature, you know, as cool as possible, frequent breaks, those sort of things.**

**As far as preventive medicine issues, the training is the prevention. There is no pill or vaccine or prescription or medical procedure that UTMB can do to prevent heat illness, okay, except educate the security and through them the offenders.**

**After that, we take care of heat illness, hopefully intervening early before it progresses to a more serious condition such as heatstroke, but --**

MS. COOGAN: He doesn't have a question on the table.

**A. Okay.**

Q. (By Mr. Edwards) Excuse me. Please continue.

**A. But we -- we don't tell security. We don't -- They are responsible for conditions of confinement and daily necessities, such as housing, food, clothing.**

Q. If there is a dangerous condition at a prison, and it's a housing condition, even if it relates to people's medical care, do you feel obligated to talk about it with them?

MS. COOGAN: Objection, vague.

MR. GARCIA: Objection, speculation.

Q. (By Mr. Edwards) Let me ask that again. If it's a dangerous housing condition at a TDCJ facility --

Well, strike that.

Would you agree with me that temperatures of 125 degrees -- a heat index of 125 degrees inside -- poses a danger to inmates with vulnerabilities like hypertension?

**A. It can be if prolonged.**

Q. What do you mean by that, when you say "it can be if prolonged"?

**A. Okay. Temperature -- When you're considering heat illness, okay, and the dangers of heat illness, you have to consider the environmental conditions, okay, the actual temperature, the humidity. You also have to consider the individual, okay, and his medical conditions.**

**Some young, healthy person who's drinking plenty of water may be perfectly okay. There are other individuals who will have varying risk for an adverse event or a heat illness of some type.**

Q. Right.

**A. (Nods head affirmatively.)**

Q. Okay. What I heard you say was: Look, a young, healthy kid might be able to do just fine in 125 heat index temperatures because he's young and healthy; right?

**A. Correct.**

9 (Pages 33-36)

Stephen McCollum, et al v. Brad Livingston, et al

Glenda Adams, M.D. November 19, 2013

33

Q. Okay. Doesn't mean he's necessarily going to do just fine; but by and large, when you're comparing a young, healthy 20-year-old to a 55-year-old person who's overweight with hypertension, the -- the older person's going to be at much greater risk of heat illness in hot temperatures; right?

**A. He's at increased risks; but particularly in this state, there are quite a few people who are over 40, over 50 who work in -- in construction jobs and other jobs that exposes them to heat, and a lot of those are hypertensive and diabetic.**

Q. 24/7?

**A. 24/7?**

Q. Yeah. The people you talked about in -- who have to work in extremely hot conditions, do they live in extremely hot conditions, to your knowledge?

**A. Probably some of them do in this area.**

Q. Okay. Does UTMB think it has an obligation to protect inmates or prisoners who are vulnerable to extreme heat?

MS. COOGAN: Objection, vague. And to the extent it calls for a legal conclusion, I object.

Answer it if you can.

**A. I think UTMB has an obligation to practice the best medicine possible. Okay? And I will tell you that**

34

**your physician in the community, okay, will advise and educate you about the -- the dangers of heat.**

**They are not going to write you a prescription for air-conditioning. They can't call up your landlord and tell them: You know, you need to air-condition your building. Okay?**

**So when we identify someone who is -- for whom air-conditioning is medically necessary -- not just medically acceptable or medically appropriate, okay, because actually it's appropriate for just about anybody. Okay?**

Q. Explain that?

**A. Medically appropriate versus medically necessary?**

Q. Yes.

**A. Okay.**

Q. You said it was medically appropriate for just about anybody. I don't understand what you mean.

**A. Okay. Air-conditioning is -- increases comfort. Okay. There is no reason medically why someone should not have air-condition, medically.**

**When it becomes medically necessary, then UTMB places individuals at high risk in one of our infirmaries, which are air-conditioned; but there are only 471 infirmary beds.**

35

**If you look at the UTMB --**

MS. COOGAN: Dr. Adams --

THE WITNESS: Okay.

MR. EDWARDS: Excuse me, Ms. Coogan --

MS. COOGAN: -- there is not a question.

MR. EDWARDS: -- do not interrupt your witness and do not do that any more.

MS. COOGAN: It is not --

MR. EDWARDS: It is so inappropriate and -- and it cannot continue.

THE WITNESS: I understand.

MS. COOGAN: Do you have a question for the witness?

MR. EDWARDS: Do not interrupt your witness when she's in the middle of answering a question.

MS. COOGAN: Do you have a question for the witness, Mr. --

MR. EDWARDS: No. You just interrupted my question. Please don't do that again. It is the second or third time you've done it in this deposition. It's inappropriate. It can't continue.

MS. COOGAN: Please ask the witness a question if you have one.

MR. EDWARDS: Would you repeat my last

36

question, please.

THE REPORTER: The actual last question was: "Explain that." Which the question before that --

MR. EDWARDS: I'll take it from there.

Q. (By Mr. Edwards) Explain the difference between medically necessary and medically appropriate, ma'am.

**A. Medically necessary usually deals with chronic conditions that if not treated are expected to progress, okay, to the adverse of the patient.**

**Medically appropriate or medically acceptable conditions are such things as like repairing a hernia, that's not incarcerated, or -- That's one of the major ones. There are -- There are other things that you treat that is not medically necessary.**

**It's medically necessary to treat diabetes. It's medically necessary to treat hypertension.**

**People can go for years with it -- a hernia, that's not incarcerated, and not require treatment.**

**There are other conditions, certain skin conditions, benign skin conditions, that don't necessarily require treatment.**

Q. (By Mr. Edwards) Okay. So when you talk

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 98

about medical necessity, the failure to provide medical care for a condition like diabetes or hypertension, that's off the charts unacceptable; correct?

**A. Could you repeat that, please?**

Q. Yes. When you talk about medical necessary --

**A. Uh-huh.**

Q. -- the failure to provide medical care for diabetes or hypertension, that's off the charts unacceptable according to UTMB; right?

MR. GARCIA: Objection, vague, as to "off the charts."

**A. Well, I know what you're quoting from; but, yes, we do treat diabetes. Okay? And it is medically necessary to treat diabetes.**

Q. (By Mr. Edwards) What am I quoting from?

**A. Mr. Babbilli's deposition.**

Q. He thought it was off the charts unacceptable to not treat diabetes; right?

**A. Correct.**

Q. Do you agree with him?

**A. Correct. But Mr. McCollum didn't have diabetes.**

MR. EDWARDS: Objection, non-responsive.

Q. (By Mr. Edwards) How do you know that?

**A. Because his laboratory study, he doesn't meet the criteria for being diagnosed as a diabetic.**

Q. What document are you referring to?

**A. What document?**

Q. Yeah.

**A. No document. It's the standard definition for diagnosing diabetes.**

Q. What lab study are you referring to? Show me?

**A. What --**

Q. What lab study are you referring to?

**A. Oh, in -- It would be in Mr. McCollum's medical record. He had a hemoglobin A1c of 6.2. It requires a 6.5 to be diagnosed as a diabetic.**

Q. When was that A1c taken?

**A. I believe the blood was drawn on the 20th and reported on the 21st.**

Q. Explain what an A1c test is and how you do that.

**A. It's a blood test. Okay? And what it does is it measures your hemoglobin A1c, which is essentially an average of what your blood sugars have been running over the previous three, possibly six months.**

Q. So it's an average over how many months?

**A. Usually three, is what we consider.**

Q. Okay. Do you know if it was reported that Mr. McCollum had diabetes to people at UTMB, based on your review of the records?

MS. COOGAN: Objection, calls for speculation.

Answer it if you can.

**A. On his intake screening, he stated that he had had a history of diabetes.**

Q. (By Mr. Edwards) Was that evaluated right away by people at UTMB?

MS. COOGAN: Objection, vague.

**A. It was evaluated in that he did not come in on any medicines for diabetes.**

**When asked about his current problems, I think he said he had problems with a tooth and depression, but he did not mention diabetes.**

**The blood work was drawn.**

Q. (By Mr. Edwards) When you say -- When you say that, was that day one that he was in the -- in the prison?

**A. Yeah. As soon as he came in the back door, the intake screening.**

Q. Who drew the blood?

**A. The blood was drawn by the lab tech on the -- on the 20th.**

Q. Did he arrive on the 20th?

**A. No. He arrived on the 15th.**

Q. Okay. Was his blood drawn on the 15th?

**A. There was no indication that his blood needed to be drawn immediately.**

Q. Wouldn't a diabetic need to have their blood drawn immediately?

**A. No.**

Q. They wouldn't?

**A. No.**

Q. Okay. Would a diabetic, someone who has reported diabetes, be treated over the five days before you draw blood?

**A. He wouldn't be given any medications if he didn't come in on medications; otherwise, you would endanger him that he could become hypoglycemic, okay, which would be dangerous. Did he not claim to currently be a diabetic.**

Q. How do you know that?

**A. Because I looked at his intake screening form.**

Q. That's the intake screening form that Nurse Conover performed?

**A. No. I believe it was performed by a certified medical assistant.**

Q. Who?

**A. Her name was McKinney, I believe.**

Q. Okay.

11 (Pages 41-44)

Stephen McCollum, et al v. Brad Livingston, et al

Glenda Adams, M.D. November 19, 2013

41

**A. Or was that the -- No. I think L.V.N. McKinney was the CID nurse.**
Q. You've got the documents --
**A. I don't recall.**
Q. -- right?
**A. I would need to look at the form.**
**I don't have the medical record in front of me, no.**
Q. Let's go through all the documents that I would like to -- So you've not brought all the materials you reviewed in preparation for this deposition, ma'am?
MS. COOGAN: We have the medical record.
MR. EDWARDS: Excuse me. I'm not talking to you.
**A. I don't have the medical record. She does. I gave it to her.**
Q. (By Mr. Edwards) You gave your med -- your chart to Ms. Coogan?
**A. Yeah.**
Q. Okay. Can I see it?
**A. (Witness complies.)**
Q. Thanks.
**A. Let me see if I made a note of the --**
Q. Ma'am, is this what I'm holding --

42

**A. Oh, the C.M.A. was Ms. Haywood. It's in the notes.**
Q. Okay. Is what I'm handing you the medical records that you reviewed in preparation --
**A. Yes.**
Q. -- for your testimony today?
**A. Yes.**
Q. Do you want to flip through them and make sure?
**A. Correct.**
(Adams Exb. No. 4 was marked.)
Q. (By Mr. Edwards) Okay. Did you review any other medical records?
**A. I reviewed his county jail medical records and I read through his Parkland Hospital records.**
Q. Did you review his autopsy?
**A. Yes, I did.**
Q. Why did Mr. McCollum die in the Hutchins Unit?
MS. COOGAN: Objection, calls for speculation.
Q. (By Mr. Edwards) Based on your review of the records, and as the regional director and UTMB representative for health care, why did he die?
MS. COOGAN: Objection, calls for speculation.

43

Go ahead.
**A. The autopsy report states that he died of hyperthermia.**
Q. (By Mr. Edwards) What is that?
**A. Generally the definition of "hyperthermia" requires a body temperature -- different definitions give different ones -- somewhere between 103 and 105 degrees, with neurological deficits. You may have other findings such as DIC.**
Q. What do you -- What does UTMB contract hyperthermia? You were the director, right, for medical care?
MS. COOGAN: Objection, she is not here to give you medical opinions, and she's not going to do it pursuant to the Court's order.
Q. (By Mr. Edwards) Well, that's -- that's inaccurate. Okay?
Because the question was: Why did he die?
You said: He died from hyperthermia.
And I'm asking you what you consider hyperthermia to be?
MS. COOGAN: I'm going to ask you not to answer that question.
MR. EDWARDS: You're instructing --

44

MS. COOGAN: I'm going to tell you again --
MR. EDWARDS: -- Dr. Adams not to answer the question of -- the question of what the definition of hyperthermia is, according to UTMB?
MS. COOGAN: Let me tell you one more time. And we can argue about it or we can not argue about it.
MR. EDWARDS: Okay.
MS. COOGAN: We can go to the Court or we can not go to the Court.
MR. EDWARDS: Okay.
MS. COOGAN: She is not here in any capacity to be an expert on medical issues for you. She is here pursuant to a 30(b)(6) --
MR. EDWARDS: Right.
MS. COOGAN: -- and that's what she's going to testify about, and all she's going to testify about.
MR. EDWARDS: Okay.
MS. COOGAN: So you can ask her if you would like, and I'm going to continue to instruct.
MR. EDWARDS: All right. Well, that's fine.
Q. (By Mr. Edwards) Why, according to the

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 100

18 (Pages 69-72)

Stephen McCollum, et al v. Brad Livingston, et al

Glenda Adams, M.D. November 19, 2013

69

**stresses. There's even been studies where divorce, incarceration, increases death rates.**

MR. EDWARDS: Let me object as non-responsive after "yes."

**A. Okay.**

Q. (By Mr. Edwards) But I just want to be crystal clear, that it's your position that there was no need to review any policies because you're unaware of hyperthermia findings in 2008, 2009 and 2010?

**A. I don't believe I said that there was no need. There was no recognized need.**

Q. Was there, in fact, a need to -- Well, this report -- this -- this call to report all heat-related illnesses, were there heat-related illnesses in 2010, 2009 and 2008?

**A. I don't know for a fact; but I think you could reasonably assume that, yes, there were.**

Q. Okay. Do -- Do you think it would be good policies to report those illnesses to UTMB and TDCJ?

MS. COOGAN: Objection, vague and calls for speculation.

Q. (By Mr. Edwards) Well, let -- let's go back. You -- You told me that you thought that the reason for the change was that there were deaths of -- the deaths that occurred in 2011; is that correct?

70

**A. Yes. Deaths will get your attention --**

Q. Did they --

**A. -- as to a need.**

Q. Okay. Now, there were deaths in 2007; correct?

MS. COOGAN: Objection, vague.

**A. I believe there were two.**

Q. (By Mr. Edwards) Do you know anything about the circumstances behind John Cardwell's death?

**A. No. Was that one of the 2007?**

Q. Do you know?

**A. No, I don't.**

Q. Okay. Do you know anything about the details or circumstances behind Ricky Robertson's death?

**A. No.**

Q. Do you know the age of the prison -- prison Mr. Cardwell was at when he died?

**A. No.**

Q. Do you know anything about his underlying medical conditions?

**A. No.**

Q. Do you know anything about any changes that were made to UTMB policy or TDCJ policy as a result of his death by hyperthermia?

**A. No. I don't even know the cause of his**

71

**death --**

Q. Okay.

**A. -- that, in fact, it was for hyperthermia.**

Q. Well, let me ask you, do you know of any changes made to UTMB policy as a result of Mr. Cardwell's death?

**A. UTMB policy -- health services policy is the same as TDCJ's. We're obligated by contract to follow the policies they put forth.**

Q. Do you know of any changes being made as a result of Mr. Cardwell's death?

MS. COOGAN: Objection, vague.

Go ahead.

**A. No.**

Q. (By Mr. Edwards) Okay.

**A. No.**

Q. Did UTMB make any changes as a result of Mr. Cardwell's death --

MS. COOGAN: Objection, calls for speculation.

Q. (By Mr. Edwards) -- to its policies?

MS. COOGAN: Same objection.

**A. As I previously said, UTMB doesn't have separate policies.**

Q. (By Mr. Edwards) Did UTMB or TDCJ make any

72

changes or recommend any changes to policies based on John Cardwell's death?

MS. COOGAN: Objection, calls for speculation.

**A. Actually, I would like to retract the last few answers, because I don't know anything about these deaths. Okay? When they occurred, I don't know of any policy changes that were made.**

**So my answers of saying no are -- aren't accurate. I don't know --**

Q. (By Mr. Edwards) Okay.

**A. -- is the answer.**

Q. Well, you're University of Texas Medical Branch. Do you know -- You don't know any of the circumstances behind John Cardwell's death; correct?

MS. COOGAN: Okay. Objection, speculation. This witness is here pursuant to a 30(b)(6); and Mr. Cardwell's death is not an item that is listed on the 30(b)(6) and, therefore, not an item that UTMB would be bound to go back and to investigate in preparation for answering. So I would ask you not to argue and harass the witness on that.

MR. EDWARDS: I'm not arguing, and it is directly relevant to the creation and enforcement of UTMB's policies related to temperature, heat and inmate

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 101

health and welfare in the Texas Department of Criminal Justice, which is category 4.

Q. (By Mr. Edwards) Ma'am, I'm not arguing -- I'm not meaning to argue with you at all.

As you sit here today, as the director of -- What is your position?

**A. I'm the Senior Medical Director for Inpatient Services.**

Q. Okay. You don't have any idea how John Cardwell died; correct?

**A. At this moment, no.**

Q. Okay. Do you have any idea how Ricky Robertson died?

**A. At this moment, no.**

Q. Do you know -- Do you know of any changes or any policy that UTMB or TDCJ were made with regard to Ricky Robertson's deaths?

**A. At this moment, I do not know.**

Q. So, no, you don't know?

**A. That's a double negative.**

**I don't know.**

Q. You don't know. Okay.

Do you know who Dionicio Robles is?

**A. At this moment, no.**

**Are you reading me the list of deaths?**

MS. COOGAN: Yes, he is.

**A. At this point in time, I'm only familiar with Mr. McCollum.**

Q. (By Mr. Edwards) You don't know any of the other people who died of hyperthermia in the -- in the TDCJ system?

MS. COOGAN: Okay. Mr. Edwards, she's here pursuant to your 30(b)(6), asking questions about Mr. McCollum. You can ask her and she's going to answer, but please don't harass her about it.

MR. EDWARDS: I don't view that as harassment. You can -- you can -- you can view it as harassment. I don't think that is.

MS. COOGAN: All right.

Q. (By Mr. Edwards) Do you know any of the names of the other people that died in the Texas prison system due to hyperthermia?

**A. I've -- I have not reviewed all of those cases at this time. I -- I re --**

MR. EDWARDS: Let me object as --

**A. I remember a name called Adams. I don't know any of the details.**

Q. (By Mr. Edwards) Okay.

**A. I have seen the list of names.**

Q. Okay. As you testify here today as the

corporate representative for UTMB, you don't know anything about the facts or circumstances of Dionic -- Dionicio, D-I-O-N-I-C-I-O, Robles' death?

**A. I have not reviewed his medical records. At this point in time, I do not know.**

Q. Okay. Do you know anything about James Shriver's death?

**A. At this point in time, no.**

Q. Okay. Do you know anything about deaths in 2007 at the Byrd Unit by hyperthermia?

**A. I know that they were both psych patients and --**

Q. You just don't know their names or the facts or circumstances behind their deaths?

**A. I don't. That's correct.**

Q. Okay. Would you agree that hyperthermia is an underreported cause of death?

MS. COOGAN: Objection, calls for speculation.

**A. Are you talking about within TDCJ or in general throughout the world?**

Q. (By Mr. Edwards) That's a good point. Let's start with in general throughout the world.

Is hyperthermia, to your knowledge, an underreported cause of death?

MS. COOGAN: Objection, calls for speculation.

**A. I think it may be the contributing factor in more deaths than there are reported as hyperthermia.**

Q. (By Mr. Edwards) Okay.

**A. But they don't meet the definitions of "hyperthermia" by autopsy. That's why that's not what's on the autopsy report, and that's why they're not reported as deaths due to hyperthermia.**

Q. Okay.

MR. EDWARDS: Let me object as non-responsive after "yes."

Q. (By Mr. Edwards) Let me ask the same question.

Would you agree that within the TDCJ system or the UTMB Correctional Managed Care system, that hyperthermia is an underreported cause of death?

MS. COOGAN: Object --

MR. GARCIA: Objection, speculation.

MS. COOGAN: Objection, calls for speculation and is vague as to the reporter.

Q. (By Mr. Edwards) You can answer it.

**A. Okay. It's not underreported according to what's on the autopsy reports.**

Q. Okay. Are you familiar with the manner in

20 (Pages 77-80)

Stephen McCollum, et al v. Brad Livingston, et al
Glenda Adams, M.D. November 19, 2013

77

which housing restrictions are placed on inmates?
**A. Yes.**
Q. Would you tell the jury generally how housing restrictions are made for prisoners who come to the prison?
**A. Okay.**
Q. Is that an okay question? I can repeat it if --
MS. COOGAN: Objection, vague.
Q. (By Mr. Edwards) Okay. Would you tell me how housing restrictions are placed -- are put into place for inmates when they come to the prison?
MS. COOGAN: Same objection.
Go ahead, Dr. Adams.
**A. During intake, if they have a medical -- an immediate medical need for housing other than general population, they will be removed to the appropriate unit. For example, somebody in a wheelchair would be moved to a wheelchair facility.**
Q. (By Mr. Edwards) I -- I don't mean to interrupt, but I -- but right now this is the one time where I really am very interested in the process of what happens, and then I'm going to ask -- then I'll follow up with questions like: Okay. You've mentioned the wheelchair example. Tell me how that really -- really

78

works.
**A. Okay.**
Q. But you mentioned -- and I want to make sure that I -- that I -- that I have a full understanding of it, because this is my one chance to talk to the person that -- that knows here.
At intake, there is some sort of assessment?
**A. At -- As soon as they arrive, they're assessed if -- for any urgent or immediate medical needs.**
Q. Okay. So first thing, they get off the bus or however they're transported, there is some sort of assessment by some sort of medical provider at UTMB that's not TDCJ; is that correct?
**A. Correct.**
Q. Okay. And is that -- is that a -- a particular type of professional in the UTMB system? Is that a licensed vocational nurse? Is that something more than that? Is it --
**A. At one time it was primarily E.M.T.s. Now it can be an L.V.N. or a certified medical assistant.**
Q. Now, is -- is another way of saying it, now it has to be an L.V.N. or a certified medical assistant?
**A. Generally, the screen, yes, that's who does**

79

**them.**
Q. Okay. And was that -- To the best of your knowledge, that was the first pros-- that process was in place when Mr. McCollum was transferred from McLennan County to the Hutchins Unit?
**A. Yes.**
Q. Okay. All right. So there is this initial intake where immediate urgent medical needs are dealt with?
**A. Correct.**
Q. Okay. Now, I put the word "urgent" in there. Should I not have? It's just -- just immediate medical needs are dealt with by this person, this medical provider, right away?
**A. Correct.**
Q. Okay. And is there a record of that intake? Is that -- Should there be a document reflecting that?
**A. Correct.**
Q. Okay. And in the course of your review, do you know who it was that performed that -- that initial intake with regards to Mr. McCollum?
**A. I believe we determined earlier that it was a C.M.A. by the name of Holloway.**
Q. C.M.A. Holloway. Okay.
**A. Do you want to give me back the medical**

80

**record?**
Q. Sure.
**A. I can make certain.**
Q. Thank you.
**A. I also have notes here on Mr. McCollum.**
Q. Okay. And where --
**A. So --**
Q. Let me see the document.
**A. Yes. It -- No. I'm sorry. It wasn't Holloway. It was Haywood, H-A-Y-W-O-O-D.**
Q. Okay.
**A. C.M.A. Haywood.**
Q. Okay. Do you have the -- the record that you got that from, so I can know which one is this first one?
**A. Intake screen -- Do I need to take it out of the medical record?**
Q. No, no, no. No. Please -- Please don't.
I'll -- I -- Let me just -- I think I know which one it is. So let me just make sure --
**A. It's this one right here. Yes, you've got --**
Q. Is that the one? Okay.
**A. Yes.**
MR. EDWARDS: We'll just make that an exhibit. And we'll have a global copy, but we'll have

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 103

it -- just so we're talking about the same thing here.
(Adams Exb. No. 8 was marked.)
Q. (By Mr. Edwards) Okay. That's that initial --
**A. Yes, sir.**
Q. Okay. All right. Now, we'll -- we'll probably talk about that in a minute, but I want to know -- Okay.
From that, what housing restriction -- I mean, that's a way that UTMB can accommodate people with needs by making sure that there's a restriction in place right away; is that fair?
MS. COOGAN: Objection, legal conclusion and terms included and vague.
Q. (By Mr. Edwards) Okay. Can you -- You can answer that.
**A. Okay. If it was determined immediately that a -- a special accommodation was needed for housing, there wouldn't be an HSM-18 to complete at that time because this patient isn't in the electronic medical record. He could have been given a pass, a medical pass.**
Q. Okay. So is that something that the initial person, though, this C.M.A. Haywood, is empowered to do?
**A. No.**

Q. Who does that?
**A. The medical provider.**
Q. So in that situation, where there is a need for an accommodation, how does that happen?
**A. If there is a recognized need for accommodation, the offender is referred to the medical department.**
Q. Right away?
**A. As soon as the form is completed.**
Q. Okay.
**A. Before he goes to his housing, yes.**
Q. Okay. What I'm -- What I'm trying to -- What I'm trying to make sure is that there doesn't have to be like a six- or seven-day wait before, you know, one of these needs for accommodation are -- are dealt with.
It can happen very quickly; right?
(Cell phone ringing.)
THE WITNESS: Pardon me.
MR. EDWARDS: Okay.
THE WITNESS: I thought I had turned it off.
MR. EDWARDS: It's a very -- very skillful tactic. Just kidding.
MS. COOGAN: And if it's a call you need

to take --
THE WITNESS: Is it me?
MS. COOGAN: It's not me.
THE WITNESS: I think it's me. I can't even find my phone right now.
MS. COOGAN: It sounded like it was kind of --
MR. EDWARDS: Well, I've had that happen --
MS. COOGAN: Yeah.
MR. EDWARDS: -- before a federal judge in Marshall. So --
MS. COOGAN: Yeah. I have.
THE WITNESS: Well, it sounds like me ring; but I can't seem to find my phone. Can we go off the record until I do?
MS. COOGAN: Sure.
MR. EDWARDS: Let's go off the record and find it.
THE VIDEOGRAPHER: We're off the record.
(Off the record from 12:58 - 12:59.)
THE VIDEOGRAPHER: On the record.
MR. EDWARDS: Would you repeat the question before the -- the phone maker?
(The record was read back by the reporter

as follows:
QUESTION: "What I'm trying to make sure is that there doesn't have to be like a six- or seven-day wait before, you know, one of these needs for accommodation are dealt with. It can happen very quickly; right?")
**A. Correct.**
Q. (By Mr. Edwards) Okay. All right. So, is there any formal policy that you're aware of that directs C.M.A.s or -- or L.V.N.s to, you know, deal with these, you know, accommodations right away?
MS. COOGAN: Objection, vague.
**A. There is an intake screening policy. Let's see if I can find that number for you.**
**I think it's like 8.1.**
Q. (By Mr. Edwards) Okay.
**A. I don't know if that's accessed here. I will do it off the top of my head.**
**There is a -- an intake screening policy that if urgent care, including special accommodations, are needed, they will be referred to the medical department.**
Q. Okay. So give me some examples of things that would -- that you understand are referred to the medical department right away.

difference between mild dehydra -- What do you -- What do you mean "mild dehydration?" Why do you consider HTZ -- HCTZ to be a mild dehydrater?
A. **Okay. Because it's a mild diuretic. Okay? Which it de -- One of the way to -- ways to lower blood pressure is to decrease the intravascular volume.**
Q. Okay.
A. **And that's the way HCTZ works.**
Q. It takes water away from, like, the kidneys; right?
A. **Actually, it forces more water through the kidneys.**
Q. Forces -- Forces more water through the kidneys --
A. **Kidneys and acts -- out of the body --**
Q. -- and then it expels and it --
A. **Right.**
Q. Then you become dehydrated; correct?
A. **Right.**
Q. Okay.
A. **Well, most people more than compensate with oral intake of fluids.**
Q. And that depends on -- Whether or not you're able to compensate depends on your age, your condition and the heat; right?

A. **Hydrochlorothiazide is first-line treatment for mild to moderate hypertension, no matter your age.**
Q. Whether or not you can acclimate and compensate for the dehydration would depend on the heat, your medical condition, your age, things like that; right?
MR. GARCIA: Objection, speculation.
Q. (By Mr. Edwards) If you know.
A. **It would vary from individual situations and the patient, yes. And those are some of the factors that would be included, yes.**
Q. Okay. All right. So I -- I guess -- Would it be your position that UTMB has in place a way to place housing restrictions or suggest housing restrictions on -- on inmates right away when they come in?
A. **For --**
Q. For medical conditions?
A. **Okay. If a special accommodation is needed, yes, they can write a pass.**
Q. So if Mr. McCollum needed to be on a bottom bunk as opposed to a top bunk because of his medical condition and weight, should that have happened at this initial intake?
A. **Only if that need was recognized, okay, either**

**by the screener or Mr. McCollum himself.**
Q. Is it UTMB's position that the -- the prisoners are supposed to know what conditions enable them to accommodations?
MS. COOGAN: Objection, vague and speculation. And vague.
A. **Okay. Mr. McCollum -- Okay. Initially, in general population, security decides what bunks are going to be assigned -- assigned to inmates.**
Q. (By Mr. Edwards) Okay. Did I -- I didn't mean to cut you off.
A. **Okay. If the offender has problems with that assignment, okay, he's given verbal instructions and a handbook and writ -- written instructions on how to ac -- access medical.**
**There is also something in that handbook about if he thinks he needs an ADA accommodation, to contact the warden.**
Q. UTB -- UTMB instructs inmates or prisoners to contact the warden if they want an ADA accommodation?
A. **UTMB does not. That's in the offender's handbook.**
Q. Okay. Let's go back to kind of just this initial intake. Okay?
A. **Okay.**

Q. This -- This Haywood, who was the -- the first person that saw Mr. McCollum --
A. **Yes.**
Q. -- is it your understanding that they could have placed a housing restriction on Mr. McCollum if they had wanted to?
A. **No. They would have had to have sent him to the medical provider for any sort of restriction.**
Q. And they would do that by giving Mr. McCollum or whomever they wished to do so a medical -- a pass to go see the -- the medical department?
A. **They could just send him to the medical department.**
Q. They don't need to give him a pass?
A. **Not to go to the medical department, no.**
Q. All right. So any housing restrict -- any -- any housing restrictions are -- play -- you know, that happens with the medical department?
MS. COOGAN: Objection, vague.
Q. (By Mr. Edwards) Does the first person that sees them, they don't have the power to place a -- a restriction on -- on someone's housing; correct?
A. **Correct.**
Q. Okay. But the medical department does; correct?

24 (Pages 93-96)

Stephen McCollum, et al v. Brad Livingston, et al

Glenda Adams, M.D. November 19, 2013

93

**A. They can send him to the clinic, to the medical provider.**

Q. Okay. Please listen to my question. Okay? Does the medical department have the ability to restrict someone's housing?

MS. COOGAN: Objection, vague.

**A. Within certain limitations.**

Q. (By Mr. Edwards) What are those limitations?

**A. If you look at the HSM-18, it lists the very -- various housing restrictions that are -- that are possible in general population.**

Q. Who creates HSM-18, to your knowledge?

**A. The Policy and Procedure Committee.**

Q. Okay. I wrote E-34 by mistake. Let me see if I can... I'm sorry.

**A. I think you want E-30 --**

Q. Is this -- Is this what you're -- Is this what you're talking about?

**A. Yes. That's the HSM-18.**

Q. Okay. Let's make that an exhibit.

(Adams Exb. No. 9 was marked.)

Q. (By Mr. Edwards) All right. There you go, in case you need to look at it.

All right. Just so I understand the process, though, okay, it's -- there's an initial --

94

some sort of initial intake. Okay. And that person has the power to send the inmate to the medical department for further review; correct?

**A. Correct.**

Q. Okay. And then the medical department has the ability -- and, in fact, the responsibility -- to place appropriate restrictions on that person so that they're safe and that their medical needs are taken care of; fair?

MS. COOGAN: Objection, vague.

But go ahead.

**A. At the initial intake, they take care of any urgent or immediate needs, correct.**

Q. (By Mr. Edwards) Well, okay. At the initial intake, we're talking about a certified medical assistant or an L.V.N.; right?

**A. Correct. I'm talking about even in the medical department with the provider.**

Q. Okay. Well, I want to just -- just -- My understanding was that the first -- They identify the needs, and then they send the person to the medical department for them to be dealt with.

Have I misunderstood that?

**A. If it's a need that a C.M.A. can identify, yes.**

95

Q. So, for instance, if it's a need that's obvious to a C.M.A., they -- they can do it themselves?

MS. COOGAN: Objection, vague.

**A. No.**

Q. (By Mr. Edwards) Okay. Well, okay. I -- then excuse me, because this is going to take -- I'm -- Maybe I'm dense.

If somebody comes in in a wheelchair and needs a housing accommodation, which obviously would place them on a need to be on a -- a lower bunk; would you agree with that?

**A. If they come in in a wheelchair, they're going to be transferred to a -- a wheelchair accommodating unit.**

Q. Okay. And that's a decision that can be made by the -- the C.M.A.; right?

**A. No. It has to be made by the medical provider.**

Q. So how does that happen, ma'am?

**A. Okay. The C.M.A. would refer the -- the offender to the medical department. Okay?**

Q. Okay.

**A. And either nursing or the provider would evaluate the patient. Okay. The provider, if he sees the patient, he will make his own recommendation and**

96

**contact health services liaison to transfer the patient to another unit that can accommodate his needs.**

Q. Okay.

**A. Or the nurse can give a verbal -- get a verbal order from the provider to initiate that process.**

Q. Okay. So either the provider can see them or they can get an order, but the medical department has to handle it in order to make the change or to place any sort of restriction on somebody's housing; is that correct?

**A. Correct.**

Q. Okay. For instance, the L.V.N. or the C.M.A. doing that initial intake, they can't say: Hey, this guy needs to be in an air-conditioned environment or this guy needs a lower bunk. They don't do that. The medical department does that; correct?

**A. Correct.**

Q. Okay. And in this case, that would be Dr. Bab -- or P.A. Babbilli, at least for Mr. McCollum?

**A. Babbilli, yes.**

Q. Babbilli. Excuse me. Okay.

All right. And then is it U -- Is it UTMB's testimony that the restrictions that they can place on housing are limited to the document you've called HSM-18, which is Exhibit No. -- ma'am, is it 9?

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 106

25 (Pages 97-100)

Stephen McCollum, et al v. Brad Livingston, et al
Glenda Adams, M.D. November 19, 2013

97

A. **Correct.**
Q. They can't -- They can't make any other restrictions. That's your understanding?
A. **They can give a temporary pass for some restrictions. If TDCJ is accom -- able to accommodate. Otherwise, they have to send the patient to a medical facility.**
Q. Okay. What does that mean?
A. **Tell me which part isn't clear, and I'll try to explain.**
Q. Yeah. You told me if they can't accommodate, then they'll send them to a medical facility.
A. **Okay. The Hutchins Unit can't accommodate wheelchair patients. It can't accommodate people with acute mental or medical conditions. It can't accommodate somebody who has an inability to complete their activities of daily living independently.**
**There are some people who come in with acute medical conditions that they have to go to the hospital; and, of course, the Hutchins Unit wouldn't be able to accommodate that.**
Q. Okay. So in those situations, they would just say: Look, the Hutchins Unit is inappropriate for them?
A. **Correct.**
Q. Okay. And they would send -- They would --

98

They would, I guess, make an accommodations and send them to another facility; correct?
MS. COOGAN: Objection, vague. They, they, they. And vague.
Q. (By Mr. Edwards) The UTMB providers who are looking at him or reviewing his record; correct?
A. **They would either contact utilization review -- UTMB utilization review for a medical bed or they might could call -- contact TDCJ Health Services liaison for non-medical beds.**
Q. They would make the determination, and then they'd contact one of -- they'd contact someone to facilitate a move; correct?
A. **Correct.**
Q. Okay. And that would be -- TDCJ would be responsible for helping assist in that move?
A. **In some ins -- yes. They have to provide transportation and such. So, yes.**
Q. But who kind of makes the call as to whether or not that move is necessary?
A. **Medically necessary?**
Q. Yes.
A. **The medical provider.**
Q. And if the -- and if the medical provider makes the decision that it is, in fact, medically

99

necessary, TDCJ is obligated to follow that; correct?
To you -- to your -- you would expect them to follow it; correct?
A. **Well, they will contact the -- the provider on the unit will contact either utilization review or TDCJ health services liaison, and they will discuss with the provider whether or not his opinion is appropriate or whatever alternatives there may be.**
Q. So --
A. **Just because the provider says: I think the patient needs this, there can be further discussion.**
Q. So -- Okay. This -- You mentioned TDCJ liaison?
A. **Health services liaison, yes, sir.**
Q. And what was the other committee that you mentioned?
A. **I don't think I mentioned a committee. I think I said utilization review.**
Q. Okay. Is utilization review a TDCJ entity or a UTMB entity?
A. **UTMB.**
Q. What is the point or purpose of the utilization group at UTMB?
A. **Utilization review is to make certain that we're utilizing the medical beds that we have most**

100

**efficiently.**
Q. And if you don't have a medical bed for someone who, I don't know, needs chemotherapy or has a -- you know, an acute mental health need, can you just leave them in the inappropriate facility?
A. **They may remain there for a short period of time; but like in the mental health situation, they would be put under direct and constant observation by security with medical checking on the patients until they could be moved.**
**If it was an acute medical need that required hospitalization, they would be transferred to the nearest emergency room.**
Q. Okay. Well, that make -- that seems to make sense. It seems like, look, you get the people to the appropriate places; and if by some chance you're unable to, for no fault -- or for whatever reason, you take whatever steps you can to make sure that the prisoner or patient is cared for; is that correct?
A. **That's correct.**
Q. Okay. Is the people that you talk to -- or the people that you anticipate the medical department talking to with health services, are they doctors or -- or trained medical providers, or are they --
A. **It is an R.N. iner -- initially.**

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 107

101

Q. It's an R.N. And is -- is it your understanding that they could overrule recommendations by the medical providers at the units?

**A. The R.N. will always contact another physician.**

Q. Okay.

MS. COOGAN: Can we take a quick bathroom break?

MR. EDWARDS: Sure.

THE VIDEOGRAPHER: Off the record at 1:22.

(Off the record from 1:22 - 1:32.)

THE VIDEOGRAPHER: Videotape 3, 1:32, on the record.

Q. (By Mr. Edwards) I believe we were talking about housing restrictions. Is Exhibit 9, is -- is that your understanding of the manner in which UTMB can place housing restrictions or can encourage TDCJ to follow its recommendation relating to housing restrictions?

**A. For general population, yes. The HSM-18 is what is used.**

Q. Okay. Is just the -- You have me at a bit of disadvantage, and maybe I should know these cold.

**A. Oh, really? I wish you had told me that earlier.**

102

Q. That's right. Yeah. I thought it was obvious.

HSM-18 is Exhibit 9; is that correct?

**A. Correct.**

Q. Okay.

**A. This was the HSM-18 as it was in 2011.**

Q. Has it been changed?

**A. Yes, it has.**

Q. How has it been changed?

**A. I believe instead of -- It's been changed to where the housing assignments -- I believe this one has no restriction -- no -- barrier-free, single level, suitable for trustee camp.**

**I need to find my notes on the -- the current HSM-18. Instead of -- I think we did away -- I think barrier-free is gone, and now we have extended hours as one of the choices.**

Q. Okay. Point me to -- You're talking about facility assignment?

**A. Yes. That was --**

Q. Number 1?

**A. -- number 1, yes.**

Q. The old DSM -- or -- is it D or HSM? Or --

**A. HSM-18.**

Q. HSM-18. Too much of a medical malpractice

103

lawyer.

HSM-18, you're talking about Roman numeral I?

**A. Right.**

Q. Okay. You've gotten -- you now have gotten rid of barrier-free facility?

**A. And replace -- yes, and replaced it to a unit with extended hours.**

Q. What does that mean, "extended hours"?

**A. It means that they have at least 12 to 16 hours of operation that the medical staff is there.**

Q. What are normal hours?

**A. It depends on the -- the unit and its mission.**

Q. Normally, what are normal hours?

MS. COOGAN: Objection, vague.

Go ahead.

Q. (By Mr. Edwards) How many -- If you've got 35 missions, I mean, I just -- you know...

**A. Okay. There are some medical -- some facilities are open 24/7. Medical staff are onsite 24/7.**

Q. Right. You wouldn't need the --

**A. Okay.**

Q. Okay.

**A. Other facilities, they're on -- they may be**

104

**open, you know, 12 to 16 hours.**

Q. Those are the extended-hour facilities; correct?

**A. Correct. There may be -- still be a few eight-hour facilities in operation.**

Q. Is that like 9:00 to 5:00 medical care?

**A. Usually 6:00 to 6:00.**

Q. Forgive me. That's 12 hours.

**A. Oh, I'm sorry. Excuse me.**

**Some -- Some -- They can be -- They all get there before, you know, 9:00 to 5:00. On -- on -- most people on the units, they work earlier, okay, because breakfast starts for the offenders at 3:00 in the morning.**

Q. But were --

**A. So the -- the eight-hour units, they may have varying hours. Okay. But they're only open eight hours.**

Q. So it could be 6:00 to 2:00?

**A. It could be.**

Q. I can go through all of them, but I won't.

I mean, if -- if you're -- eight hours, you're -- you're only there eight hours; correct?

**A. Correct.**

Q. Okay. Do you know how many facilities are

only eight-hour facilities?
**A. No. I don't know the exact number now.**
Q. Can you give --
**A. Eight hour --**
Q. -- me your best approximation? And I apologize for cutting you off.
**A. I don't think there's very many eight-hour facilities left. We -- That was done during the budget crisis, and we have slowly restored ex -- longer hours to as many facilities as possible.**
Q. What budget crisis are you talking about, time frame?
**A. I believe that was in 2010/2011. There was a state budget crisis.**
Q. So in 2010 and 2011 there was a state budget crisis which required you to reduce the hours in which you provided medical care at most of the facilities?
**A. At many of the facilities, yes.**
Q. Would most of the facil -- facilities be a incorrect statement?
**A. I don't know the exact number. It was pri -- It's primarily based on nursing, okay, because it's nursing that's there for the extended hours.**
**I suspect Dr. Murray can help you more with that.**

Q. Okay. But just so I'm clear, in 2010 and 2011, numerous facilities reduced the hours in which they operated medical care; correct?
**A. Correct.**
Q. Okay. Do you know if Hutchins is one of those units?
**A. Hutchins, they were still a 12-hour facility.**
Q. Are you sure?
**A. Yes.**
Q. Okay.
**A. They started out a 16-hour when they opened --**
Q. Hutchins --
**A. -- originally.**
Q. Sorry. I -- Hutchins was reduced in 2010 from a 16-hour facility to a 12-hour facility, to the best of your knowledge?
MS. COOGAN: Objection, speculation on the date.
**A. That is correct. I don't have the exact date.**
**That was when -- Do you know which one of your questions that was? Because I talked directly to -- with the nurse manager to confirm what hours Hutchins was reduced to.**
MS. COOGAN: 17, maybe?
Q. (By Mr. Edwards) 17 would be generally.

**A. No. There was a specific --**
MS. COOGAN: 21?
**A. There was a specific question about Hutchins.**
Q. (By Mr. Edwards) 21.
**A. Yes, 21. It opened in April '95 as a 16-hour facility, and it was reduced in 2011 to being a 12-hour facility.**
Q. When in 2011?
**A. I can't tell you for sure. Usually, it's September 1st that those kind of changes occur.**
Q. I need to know that one. I mean, you -- you don't know whether that happened in September 1 of 2011 or earlier?
**A. I don't know the exact date. No, I do not.**
Q. All right. Could you find that out?
**A. I -- Yes. I suspect I can.**
Q. Could you find that out so that Dr. Murray knows tomorrow?
MS. COOGAN: We'll try.
**A. We will try.**
Q. (By Mr. Edwards) Okay. All right.
Okay. In any event, the new -- the new form, rather than barrier-free -- What -- What was barrier-free? What did that mean?
**A. That was primarily for wheelchair patients.**

Q. And so you no longer have that as a criteria on the facility assignment?
**A. We attempt to send all wheelchair patients to special wheelchair units rather than just units in general.**
Q. Other than that change where you added extended hours, are there any other changes you're aware of to this policy?
**A. I believe that was the -- there's been some changings on -- on number 3 as to, you know, the numbers that -- that apply, but I don't believe there's been any major changes.**
Q. Do you have a copy of the new document?
**A. The new document -- Okay. Yes. It was just recently changed on 10-30-2013. I don't have the HSM-18. I have the guidelines for completing it.**
Q. Were there guidelines for completing the HM 18 prior to October of 2013?
**A. Yes.**
Q. Do you have those?
**A. Let me see. I have to look back. What was that policy number again? Yes.**
Q. 8.4.
**A. Okay. What I have, here's the -- I have -- Here's the one from 2011, and here's one from 2012.**

**A. There just aren't enough beds that are air-conditioned.**

Q. Well, how do you think that change -- how do you think that changes?

MS. COOGAN: Objection, vague.

**A. I -- I don't understand the question.**

Q. (By Mr. Edwards) Okay.

**A. I'm sorry.**

Q. Is there anything that prevents you from saying: You know what? His medical condition, we would recommend an air-conditioned facility?

**A. No. T -- TDCJ and the committee isn't going to allow us to put a -- a medical requirement or accommodation that simply is not available.**

Q. Well, is there anything that would -- would sug -- would prevent you from putting on an accommodation like: Need to place this inmate in an air-conditioned environment for four hours a day?

**A. Same thing. I don't know if there's air-conditioning four hours a day available. Okay? Unless TDCJ Health Services agrees for such a restriction to go on there, no, it's not -- it's not going to go on there until whatever you're recommending is actually available.**

Q. Well, is it your -- Is it UTMB's

understanding that -- that air-conditioned spaces in the Hutchins Unit are not available to be used by inmates?

**A. Okay. K dorms are edu -- are air-conditioned at the Hutchins Unit. Okay? But you don't have that at all the intake units. And even at Hutchins, those are security utilizations. It's ad seg. It's protective custody. Those aren't medic -- cells that medical normally has an opportunity to use.**

Q. If -- If there were -- I mean, assume with me that there were spaces that were air-conditioned that could be utilized. Okay? Would it then be a good idea to place inmates who are vulnerable to these high temperatures at least in these air-conditioned spaces for sometime during the day?

MS. COOGAN: Objection, speculation and incomplete hypothetical.

**A. I -- I think that you're talking about cooling centers; correct?**

Q. (By Mr. Edwards) Or just spaces in the -- in the prison that are air-conditioned that could be utilized.

**A. Partic --**

MR. GARCIA: Objection, vague.

**A. There could be security reasons that that would not be possible.**

Q. (By Mr. Edwards) And how do you find out if there are security reasons to make that not possible?

**A. Well, it wouldn't be possible at the Hutchins Unit because new intakes, until they're classified, both by security, they're kept pretty much separate from -- from the other offenders.**

**As to whether or not security could do that, I don't know. Usually TDCJ is at capacity and UTMB really doesn't know most of the time what air-conditioned facilities they have available.**

**We're expected -- if someone medically requires air-conditioning, we have to find them a medical bed.**

Q. (By Mr. Edwards) Mr. McCollum needed air-conditioning; right?

MR. GARCIA: Objection, speculation.

**A. Mr. Mc --**

Q. (By Mr. Edwards) Or cooler --

**A. Perhaps, perhaps not.**

Q. -- cooler temperatures.

**A. Perhaps, perhaps not. Okay? He did not meet criteria for a medical air-conditioned bed.**

Q. Okay. UTMB's criteria for a medical air-conditioned bed is -- is exactly what?

**A. Okay. I've told you. We have about 1700 beds**

**that we manage for UTM -- for TDCJ, I'm sorry. 1100 of those are inpatient psych beds.**

**Something like 62 of those are inpatient air-conditioned wheelchair beds that medical necessity can involve a lot of things, but offenders with T6 cord lesions and above are automatically -- are -- it's medically necessary, and they are placed in one of those. Okay?**

**We have 80 hospital acute care beds that are air-conditioned. Okay? And we have 471 infirmary beds.**

**If you look at all the conditions that you're talking about, I think what -- the population was 156,000?**

MS. COOGAN: Please let -- please --

**A. You don't want that?**

Q. (By Mr. Edwards) I want you to just answer my question, what the criteria was. That's what I really want.

**A. The criteria is --**

Q. You -- You'll have a chance --

**A. -- medical necessity.**

Q. What is -- What do you consider medically necessary for air-conditioning? Not how many beds there are, not how hard it is for you to do your job. What is

the medical criteria UTMB is using to make this decision?

**A. That -- The medical criteria to -- to make the decision as to whether or not they go into a -- a medical air-conditioned bed is medical necessity. They are at not only increased but high risk for a heat-related adverse outcome.**

**Would you like me to describe what kind of patients have been put --**

Q. No. I want -- I want to know what you mean -- what you mean by a high risk of a heat-related outcome.

**A. Okay.**

Q. Because that's what happened to Mr. McCollum. Don't you agree?

**A. Mr. McCollum was at risk. He was not considered at high risk.**

Q. How can you make that -- How can you say that, not knowing how hot it was at the Hutchins Unit?

**A. Well, the only way I can say it is there was -- in that building there was, what, seven or eight dorms, 56 people each; and Mr. McCollum was the only one who died. Okay? And --**

Q. Okay.

**A. Okay. So he was at increased risk, but so**

**were a whole lot of other people, and they did not die.**

**As it turned out, Mr. McCollum -- you know, air-condition may have benefited him. If he had been eat --**

Q. May have benefited him?

**A. If he -- If he had been eating and drinking, he may have done better.**

Q. Is it your understanding he wasn't eating or drinking?

**A. The OIG reports several of the offenders said that he wasn't eating and drinking. Okay? His -- His blood studies also suggest that -- that he wasn't taking in adequate fluids.**

Q. So he was -- In that situation he was at high risk of heat death; right?

**A. Well, that -- that lab report didn't come back until the day before he died.**

Q. I -- I understand that. Okay. But you've looked at the lab report.

**A. Right.**

Q. You've looked at the OIG report. Fair to say he was at high risk; right?

MS. COOGAN: Objection, vague, "high."

Q. (By Mr. Edwards) It's not my word.

**A. He was at increased risk. Okay?**

**However, his laboratory work, that -- that -- no one was aware of that. He did not complain. He did not submit a sick call request.**

Q. (By Mr. Edwards) Now, those are two different things; aren't they? He didn't complain and he didn't submit a sick call request; correct?

**A. He didn't complain to medical. Let me correct that.**

Q. Thank you. Okay.

You don't know if inmates were asking guards to help him; do you?

**A. I do not.**

Q. Okay. You don't know if he -- he was able to walk to the cafeteria; do you?

**A. I do not know that.**

Q. Okay. You don't know if he could get up or down out of the top bunk that he was placed in; do you?

**A. Well, he evidently could get in -- in and -- in and out of it a couple of times because he came to medical on a couple of occasions.**

Q. Okay. Do you -- Do you know if it impacted his ability to go get water?

**A. I do not know that. I just know that he did not complain to medical.**

Q. Do you know -- Oh, wait.

Do you know that he should -- Well, strike that.

He should not have been placed in a top bunk; correct?

MS. COOGAN: Objection, speculation.

**A. I don't think you can definitely say that.**

Q. (By Mr. Edwards) Was he morbidly obese?

**A. He was mor -- He was obviously obese. He weighed anywhere from 320 -- I think at his death, he was 345 pounds.**

Q. Do you know the definition of "morbidly obese"?

**A. Yes.**

Q. What is it?

**A. A BMI greater than 40, I believe.**

Q. Okay. Would it surprise you to learn that he did have --

**A. This was --**

Q. Are you sure that's the -- that that's the definition of "morbid obesity," a BMI over 40?

**A. As best I recall.**

Q. Okay.

**A. I could be incorrect. I haven't looked it up recently.**

Q. Regardless, if he meets the criteria for

149

**We don't know -- We know that the ambient temperature, the temperature in the area is going to be high. We don't know -- we are not informed of the heat indexes in the living areas; so we don't know exactly what they're exposed to in the living areas. Those -- Those numbers aren't shared with us.**

Q. Should they be?

**A. I'm not sure exactly what we could do about it.**

MR. EDWARDS: Let me object as non-responsive.

Q. (By Mr. Edwards) I mean, if -- Well, no. I'll withdraw that objection.

Wouldn't it be helpful for you to know, since you're doing training, what the reported heat index temperatures are outside and inside?

**A. Well, the training's done in May.**

**The high temperatures -- the high heat indexes usually occur at the end of July and in early August. So when we do the training in May, we know they're going to be high. We don't know how high because we don't -- we assume security is doing their job in the housing areas to keep them reasonable.**

Q. To keep what reasonable?

**A. The heat index.**

150

Q. Well, what is your understanding of what security is doing to keep the heat index reasonable inside the housing areas?

**A. All the things that they list each year.**

Q. Like what?

**A. Well, their fans, the increased water, the increased showers, wearing minimal clothing, shorts, providing ice, the things that they list that they do each year.**

Q. If the heat index temperatures were 130 degrees, is there any medical recommendation that you would give to TDCJ?

MS. COOGAN: Objection, incomplete hypothetical, speculation and vague.

Q. (By Mr. Edwards) Let me withdraw that. I'm trying -- it seems to me that the temperature would be important in terms of analyzing how you would go about trying to help the inmates protect themselves. Is that fair?

**A. Ask the question again, please.**

Q. It would seem to me that the actual temperature that the inmates are dealing with would be important information for the medical staff to know about so that they can assess how to help the vulnerable population. Is that fair?

151

**A. How to help the vulnerable population.**

**I still don't quite understand what you're expecting medical to do besides provide care when they present with a heat illness or to instruct and educate security on -- on how to recognize and manage heat illness.**

Q. Well, let's talk about -- I mean, the actual temperature that -- that they're dealing with, it -- it would seem to me that that wouldn't have much of an impact on how you would provide care. Is that fair? Is that accurate?

MS. COOGAN: Objection, vague.

**A. The actual --**

Q. (By Mr. Edwards) Well, let me -- let me -- let me take it back. Okay?

Basically you said, look, you're confused or you -- you indicated to me some confusion as to like what do you -- how would that impact kind of how we would pro -- how we, UTMB, would provide care to this vulnerable population or how we would instruct and manage the situation.

Did I -- Did I understand kind of your concerns with the last question?

**A. (No response.)**

Q. I'm just trying to figure out where you are, so that I can ask a couple of follow-ups.

152

**A. What I'm essentially saying, if they pre -- present with a heat illness, we treat that heat illness.**

Q. And that --

**A. Okay?**

Q. And that --

**A. The preventive part is to educate security about the risks, how to identify it, and things that can possibly be done.**

Q. Okay. I think I understand, but let me just clarify.

If it were 82 degrees and somebody presented with a heat illness, you would have to treat that person for heat illness; right?

**A. Correct.**

Q. That's your obligation. You do it whether it's 82 degrees or 146 degrees; correct?

**A. Correct.**

Q. Okay. So in those situations, it might be interesting to know for causation purposes what led to the heat illness, but the treatment's not going to differ based on the temperature; right?

**A. That's correct.**

Q. Okay. All right. Now, with regard to instructing people about, you know, training them to be

39 (Pages 153-156)

Stephen McCollum, et al v. Brad Livingston, et al
Glenda Adams, M.D. November 19, 2013

153

on the lookout for this, okay, that's another one of your jobs at UTMB; right?

**A. Yes. We do the annual training.**

Q. Okay. And I think you told me that you do the annual training in May before the summer because you know that in June, July and August, you know, you've got really hot temperatures, so you've got to prepare people; is that fair?

**A. Correct.**

Q. Okay. Now, is there -- is there anything that would prevent UTMB from doing training in June and July and August in addition to the annual training in May?

**A. If there was funding that we had enough staff to do it, we could do additional training; but usually we train the trainers. Okay? We train the security rank, and they do the training for the rest of the officers on the various shifts.**

Q. Okay.

**A. And the offenders.**

Q. All right. Let me -- Let -- Let me ask you a few questions about that.

Is there any reason why you couldn't do training -- and I'm talking UTMB. I'm not talking about correctional officer or anything like that right now.

**A. Uh-huh.**

154

Q. Is there any reason why UTMB itself couldn't have trained P.A.s, nurses, doctors, do training at all of these facilities May, June, July and August?

**A. There's ins -- insufficient staff.**

Q. Okay. So you don't have the staff to do that, from your perspective?

**A. I -- correct.**

Q. Okay. So if there was more staff hired, would it be feasible for UTMB to provide training on a monthly basis during the summers?

**A. If TDCJ funded it so that we could hire more staff, yes, we could do that.**

Q. Is it your understanding -- Is it UTMB's understanding right now that TDCJ -- that TDCJ is only willing to find the one-time annual training?

MR. GARCIA: Objection, speculation.

Q. (By Mr. Edwards) Is that your understanding? I'm not asking you to speculate. I want to know. Is that what you understand?

**A. No. They only fund the amount of staff that -- that we're able to place on a unit. Okay?**

Q. Okay.

**A. We can take the time out to do that one-time training; but to do it repeatedly, you're going to fall behind in providing other necessary care to offenders.**

155

Q. So you would view that decision, if we provide additional training, as kind of a very hard choice for UTMB to make; because you'd be making a decision whether or not to take an hour or two away from providing medical care to people who need it to do this training. Is that kind of the -- the dilemma that you -- that I'm hearing?

**A. Well, yes; but I'd like -- There is one other thing.**

**There isn't that -- At the higher ranks of officers in TDCJ, the turnover isn't that great. It is for the lower officers. So, you know, if -- if TDCJ funds it and wants us to do it, then, yes, we could indict. I'm not sure that it's necessary for medical to do that. TDCJ would need to decide.**

Q. Have you ever heard discussions about recommending something like that to increase the amount of training?

**A. No.**

Q. Do you think it would be a good idea?

**A. Honestly?**

Q. Sure.

**A. I -- I don't think it would -- med -- medical needs to do it. I think TDCJ could do it on their own.**

Q. Okay. Tell me why -- I mean, is -- is it fair

156

for me to say that base -- based on that answer, here's how I'm taking it.

Look, this training does not require, you know, medical personnel to do. You know, correctional officers can do it. Is that what -- Is that what you're saying to me?

**A. Yes, they do do most of it.**

Q. Okay. So UTMB's role, then, is only to -- Well, does UTMB train -- bring in a bunch of correctional officers who are then going to do the training system-wide?

**A. On -- On each unit, medical trains the officers who are going to train the -- the other staff on the various shifts.**

Q. Okay. So, for instance, do you know who at the Hutchins Unit would be responsible for making sure that the correctional officer that's going to give this annual training knows what they're talking about?

**A. It would be the medical staff -- primarily nursing staff would do that training.**

Q. Okay. Now, you did say this training is really important in order for the correctional officers to understand the problem of heat; right?

**A. Yes, I believe the training's important.**

Q. Okay. Do you -- Do you think that -- that --

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 113

are taking diuretics, people on psychotropic meds, people with diabetes -- is that it's very hard for them to acclimate to the new hot temperature; correct?

**A. There are increased difficulties acclimating.**

Q. Okay. That's a problem that -- that UTMB knows about and knew about before Mr. McCollum came into the Hutchins Unit; correct? Or an issue?

MS. COOGAN: Objection, vague and speculation.

**A. I -- I believe that everyone knows that there could possibly be a problem with going from an air-conditioned environment into a non-air-conditioned environment, yes.**

Q. (By Mr. Edwards) In light of that problem, isn't it really important to monitor the people who are coming in for, you know, four or five days to make sure they're not having problems acclimating?

MS. COOGAN: Objection, vague, "monitor."

**A. They are monitored by the se -- security staff that's in the -- in the housing areas.**

Q. (By Mr. Edwards) And -- And your training talks about the problems of -- of acclimating and the need to monitor these -- the people who just come in?

**A. That -- that just come in?**

Q. From air-conditioned county jails?

**A. The training emphasizes on -- on work, but I -- I -- I'm sure that people realize that when people are coming into a non-air-conditioned environment, that, yes, they need to be watched. But security makes rounds on these people regularly.**

**I -- I mean, I'm having trouble understanding. Are you suggesting that medical should be making rounds?**

Q. Unfortunately, this is kind of my deposition; and I get to ask you the questions, not the other way around.

**A. Okay.**

Q. But Ms. Coogan will have ample time to ask you whatever questions.

**A. Okay.**

Q. I'm just -- You know, part of -- part -- I hope part of your job and part of Dr. Murray's job is -- is that you correct flaws in a system. Okay? And one gigantic flaw in the system, as I see it, is that you have this period of time where people who are vulnerable, okay, who have hypertension, who have diabetes or who are on medications which dehydrate them are going to be at great risk -- a greater risk of being able to acclimate and may not be able to acclimate and so they are -- are at greater risk in suffering

heatstroke or heat exhaustion unless they're really monitored in a way that's different.

And I'll withdraw all that. That's just the preface. Okay? All right?

You've got -- You've got an intake that happens where you do it right away; right? Right off the bus, people get intakes; right -- or not intake.

MR. GARCIA: Objection, asked and answered.

Q. (By Mr. Edwards) You've got a system where there's -- there's some -- some -- some anal -- some -- some evaluation of a patient by a certified medical assistant or a -- or an L.V.N.; right?

MR. GARCIA: Objection, asked and answered.

**A. Okay. Yes, they are screened. They're also given information on how to access medical care should they have any problems.**

Q. (By Mr. Edwards) To your knowledge, are they told about the dangers of acclimating from cold to hot temperatures?

MS. COOGAN: Objection, calls for speculation.

**A. I'm un -- unsure of what they're told.**

Q. (By Mr. Edwards) Is it the policy of UTMB to

tell inmates who are coming in about the dangers of acclimation from cold temperatures or cool temperatures to the hotter temperatures in the summer?

**A. They are not told -- told at intake, that I'm aware of; but they are -- there is annual training for the offenders at -- at the -- to where they're -- they're also included, if you look in the sign-in list.**

**So there are other offenders there who are -- are aware.**

Q. Do you know if Mr. McCollum was given any training by UTMB or TDCJ on this issue?

**A. No, but I don't think it takes training to know if you're feeling bad.**

Q. Well, that's not my question, though; is it?

My question is: Was he given any training about the dangers of acclimation that you talked about?

**A. I do not know.**

Q. Okay. Would it be -- And there's no policy from UTMB or TDCJ or anybody else instructing these first-line medical providers what to tell inmates; is there?

**A. No policy.**

Q. Okay.

**A. Actually, any time at intake or as they move**

46 (Pages 181-184)
Stephen McCollum, et al v. Brad Livingston, et al
Glenda Adams, M.D. November 19, 2013

181

**from one unit to another unit, they're given the information over and over as to how to access medical care.**

Q. They're told that they can get -- they can write a sick call; right?

**A. They can write a sick call. They can come directly to the medical department if they're feeling ill.**

Q. Be very easy to have -- have the medical provider instruct them about how much water they need to drink; correct?

**A. I believe they actually -- they started in 2011 actually putting out signs throughout the unit.**

Q. You think they put out signs throughout the unit about water intake before Mr. McCollum died?

**A. I don't know that it was before Mr. McCollum died, no.**

Q. That was a change that -- that -- that was implemented after Mr. McCollum died; isn't that true?

MS. COOGAN: Objection, calls for speculation.

**A. I don't remember the exact time that those were put out, but I do know that it was in 2011.**

Q. (By Mr. Edwards) Did you put them out -- UTMB -- or did TDCJ put them out?

182

**A. Actually, the -- I believe the signs were developed by UTMB. I know that the other Dr. Adams was involved with that. But they are actually put out, I believe, by TDCJ.**

Q. Okay. Yes or no, it would be very easy to instruct your certified medical assistants or L.V.N.s when they do this initial assessment to explain to offenders who are coming in from air-conditioned jails about the dangers of accli -- acclimation?

MS. COOGAN: Objection, calls for speculation.

**A. I -- I'm not sure that you -- it would be easy for them to explain to each individual patient, because of the time involved and the number of people being brought in at a single time.**

**I'm sure that there could be some sort of education somewhere.**

Q. (By Mr. Edwards) Guys, you're coming in from an air-conditioned jail. It's really hot in here, and you have to protect yourself. You've got to drink a lot of water. You've got to -- You're really at danger of heatstroke if you don't, and you need to con -- contact us right away. This is a real big problem.

MS. COOGAN: That's not a question.

Q. (By Mr. Edwards) Does it take longer than

183

that?

**A. The -- The signs are posted. Yes, it could take longer than that.**

Q. Why?

**A. Because the various offenders coming in, each one may have medical problems that it's more time-consuming than that little spiel.**

**Also, not all offenders could speak English; and not all of them, you know, would understand or probably even listen to that little spiel as they first come in.**

Q. Is that an excuse not to do it? I mean, seriously?

MR. GARCIA: Objection, argumentative.

MS. COOGAN: Joined.

Q. (By Mr. Edwards) I mean, they're all on a bus before they get in. How does somebody pop up on the bus and tell them about the dangers?

Okay. Do it in English. Do it in Spanish. It's possible; isn't it?

**A. Well, I wouldn't want to leave them on the bus in the heat while that was done. Okay? I don't see why --**

Q. This isn't a game.

**A. -- what you're saying couldn't be done, but I**

184

**don't know that the way you're suggesting it is the most efficient method to do that.**

Q. You would know a more efficient method to do that; right?

**A. I would think it would take a group who actually do intake, security and the others, TDCJ Health Services working with security, to determine the most efficient way to do that.**

Q. Okay. Has that been done by UTMB?

**A. Not by UTMB.**

Q. Has it been done by --

**A. Not that I know of.**

Q. Has it been done by TDCJ?

**A. I don't know.**

Q. Have you ever given the -- the training to correctional officers?

**A. No, sir.**

Q. You've not?

Are you familiar with what the training is?

**A. It's the information -- I do know -- Yes, I'm familiar with what the training is.**

(Adams Exb. No. 10 was marked.)

Q. (By Mr. Edwards) There's been testimony in this case that this is the training that was provided to

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 115

Q. Okay.
**A. I'd have to have it in front of me, but they do put out posters and --**
Q. Who is "they"?
**A. They -- UTMB developed it and TDCJ post it.**
Q. Okay. And we don't know when that exactly happened; right?
**A. No. Correct.**
Q. Okay. So --
THE WITNESS: I think he took mine.
Q. (By Mr. Edwards) So 16 ounces, is that about -- No. That's 23 ounces. Darn-it.
MS. COOGAN: Are you looking for something in here?
Q. (By Mr. Edwards) Is that about 16 ounces of water? That's what you're supposed to drink every hour? Full bottle of that?
**A. What does it say?**
Q. It says 16.9, I think.
**A. Yeah.**
Q. A little bit less than that? Okay.
**A. At least that much.**
Q. Why do you say "at least"?
**A. Well, under some strenuous conditions, you may need to drink more.**

Q. Does it depend how hot it is?
**A. It depends on how fast you're losing fluids through sweating.**
Q. And if you're not capable of sweating, is it even more important to drink water?
**A. You're not going to be able -- If you're not capable of sweating, you're going to get into problems.**
Q. What kind of problems?
**A. Well, heatstroke is -- is one of them. Okay?**
Q. Okay.
**A. What other problems do you want to know?**
Q. I -- I don't know. I mean, whatever problems that there are. I mean -- difficult --
**A. If you're not sweating and you're not losing fluids in other ways, okay, such as urinating or having diarrhea or something along those lines, then, no, you don't require as much water.**
Q. So somebody on a diuretic who's losing water would need even more water than 16 ounces a -- an hour?
**A. Depends on the conditions.**
Q. Okay. How so?
**A. Well, besides the temperature, like I said, the other ways that you may be losing water, eventually, after you've been on a diuretic for a while, your -- your body adjusts to a certain degree, and you can get**

**by with less water.**
Q. Would that apply to Mr. McCollum?
**A. In -- In what way?**
Q. Was he on a diuretic for a while?
**A. I couldn't find any indication that he ever took the diuretic.**
Q. Did you see any indication that he took a diuretic in August after he died?
**A. There -- There was an -- I saw an MAR; but, obviously, it was in error, because he wasn't there in August to take the water.**
Q. How do you think it got filled out then?
**A. I -- I -- I don't know.**
Q. Do you know who filled it out?
**A. I did not recognize those initials.**
Q. Okay. Well, can we draw -- can we draw the conclusion then that we have no idea whether or not he received a diuretic or not, from UTMB's perspective?
**A. When? He certainly didn't in August.**
Q. Definitely. We know he didn't do it in August because he was dead.
**A. Correct.**
Q. Okay.
**A. Sadly.**
Q. Yes. What about July? I mean, since we have

a medical record that is obviously wrong, do you think it's equally possible that it's wrong for July?
**A. Certainly that is a possibility, but looking at his -- you know, the statements from the other offenders that he wasn't going to meals -- the pill window time is just before or just after meals. So it's unlikely that he was taking the diuretic then.**
Q. Is there any mechanism in place -- is there any mechanism in place to check to see if people are getting their medications?
**A. Yes. Initially, they will sign the back of the prescription; and later that information -- they keep the medication administration record; and later that administration record is entered into the EMR.**
Q. When? When you say "EMR," what do you mean?
**A. Electronic medical record.**
Q. So within a couple of days, we would have known whether or not he was taking a diuretic?
**A. Once -- Once the EMR was populated with his information, the information from the EMR should have been entered into it.**
Q. So -- Okay. All right. That's helpful.
Would it matter if it was, you know, 117 degrees, plus or minus two or three, in -- at the Hutchins Unit?

MS. COOGAN: Objection, vague. Would what have mattered?

Q. (By Mr. Edwards) His need for additional water.

**A. Higher temperatures require additional water, yes.**

Q. Have you ever had any conversation with any -- anyone at UTMB -- Well, strike that.

Have you ever had any conversation with anyone at TDCJ about: Look. If the temperature's 130 degrees, the heat index, we need to do more than we're doing if the temperature's only 95?

**A. Well, of course, particularly with the heat deaths, you know, I -- I discussed with -- with, you know, Dr. Williams the possibility that, you know, more should be done.**

**But, again, we can all express opinions but it's still going to boil down to the legislature as to whether or not TDCJ's going to be able to do more.**

Q. You mean like bring in air-conditioners?

**A. That, among other options.**

Q. Okay. Well, there are -- there are other options that you could do that might be less expensive.

But why do you say it's going to be up to the legislature?

**A. They have to fund, you know, TDCJ.**

Q. Okay.

**A. And then depending on -- on the -- on the cost, it's my understanding that the criminal justice board has to approve, I think, you know, certain expenses over a certain amount. I'm really not an expert in that area --**

Q. No.

**A. -- as to tell you --**

Q. No, no.

**A. -- what needs to be done.**

Q. Well, those are -- those are two different -- whether -- whether -- whether TDCJ chooses to do it and whether UTMB chooses to do it are different from whether it needs to be done. Would you agree with that?

MS. COOGAN: Objection, vague and argumentative.

**A. Well, whether it needs to be done or not, not only -- you know, that's going to vary from one individual to another.**

Q. (By Mr. Edwards) How many people died from hyperthermia in the Texas Department of Criminal Justice in 2011 --

**A. Ten.**

Q. -- to your knowledge?

**A. Ten.**

Q. Is that an incredibly high number of hyper -- deaths by hyperthermia?

**A. It is much higher than the zero the three years before, yes.**

Q. I mean, it's -- it's a lot higher; right?

**A. Yes. Ten's a lot higher than zero, yes.**

Q. Well, it -- Is it so high that as a -- from a public health standpoint, you need to ask yourself why that happened?

**A. Well, yes. From a public health standpoint, throughout the nation, I think there was increased number of deaths.**

Q. Well, yeah; but there were ten -- and how -- Do you -- Do you know, as you testify here today, how many deaths in controlled settings where people are in the custody of -- of someone caring for them where hyperthermia happened?

**A. No, sir, I do not.**

Q. Okay. Are there any policies about: Look, when the temperature gets to be this hot, we need to take, you know, ap -- steps and we need to get the temperature down or we're endangering the lives of inmates?

**A. Not that I am aware of.**

Q. Do you know if there are any such protocols at the University of Texas Medical Branch if the temperature were to reach a certain level where they would need to start moving people out?

**A. On campus?**

Q. Sure.

**A. No, I do not. I'm not aware of those policies if they're there.**

Q. Are you aware of any policies or practices at -- at nursing homes where they're caring for elderly people where they would move people out if the temperature reached a certain level?

**A. No, I'm not.**

Q. Do you think that that would be a -- you know, figuring out what a nursing home who has custody of -- of people who might be vulnerable to extreme heat, what they do, might that be relevant to UTMB's analysis of what needs to be done to solve this problem?

MS. COOGAN: Objection, calls for speculation.

**A. I'm -- I'm not sure. When you say "move them out," are you suggesting they move them out of prison or possibly to -- I -- What -- What are you -- What do you mean by "move them out"?**

Q. (By Mr. Edwards) I'm asking you, in a nursing

and traits to be housed in climate-controlled facilities.

**A. Prior to him actually experiencing a heat illness or a heatstroke?**

Q. Prior to him dying from heatstroke, yes.

MR. GARCIA: Objection, mis -- Well, never mind.

**A. If he had had a heatstroke and survived, he would have been placed in medical housing.**

Q. (By Mr. Edwards) Okay. What if he'd -- had suffered heat exhaustion before?

**A. He would have been -- hedra -- A single episode, he would have been rehydrated. If he had multiple occurrences or other complications, he would have been put in medical housing most likely. There's a certain amount of medical judgment --**

Q. Sure.

**A. -- that's involved.**

Q. But if you have multiple episodes of prior heat illnesses, heat exhaustions, heatstrokes, then -- then you would say: Look, UTMB, then it's medically necessary to get -- get that person into -- into a climate-controlled environment?

**A. Yes. I don't remember us putting anyone with that, but there are certain conditions --**

Q. Sure.

**A. -- repeated sickle cell crisis and stuff, they're put in medical.**

Q. Okay. No, no. I -- I under -- I -- That may be relevant here. I -- I don't know, but -- but my question to you is: Look, you know, you've made this determination that people with symptoms like Mr. McCollum had when he presented, okay, when he first got in the jail, it's not medically necessary for there to be air-conditioned housing.

If -- Are you aware that other medical providers in the field disagree with that, that they do believe it's medically needed?

**A. I can't understand -- Are you talking about within UTMB/TDCJ, a certain expert somewhere or just -- Who -- Who is "them"?**

Q. Well, let -- let's start with medical providers outside of the UTMB or TDCJ system.

Do you know of people that do not agree with UTMB's practices and policies?

**A. These aren't UTMB's-- the lack of air-conditioning in the regular housing --**

Q. Well, that's --

**A. -- facilities is not UTMB's decision.**

Q. That's TDCJ's decision; right?

**A. Probably the state legislature.**

Q. It's not your decision.

**A. It's not UTMB's.**

Q. You -- You guys just have to provide medical care dealing with that situation; right?

**A. (Nods head affirmatively.)**

Q. Right?

**A. And those that where -- that it's obvious it's medically necessary, we provide medical housing.**

Q. When it's -- When you've determined that it meets the criteria for medical necessity, you know such as prior heat exhaustion episodes or whatever conditions we talked about in this deposition, then you say: Look, we have an obligation. We'll get them into air-conditioned housing.

In this -- But what I'm asking you is: Are you aware that not everyone shares the opinion about medical necessity that -- that you have, that people with Mr. McCollum's symptoms and traits and vulnerabilities, that other medical providers do believe it's medically necessary for them to be in climate-controlled housing? Are you aware of that?

**A. Yes.**

Q. Okay. Help me out. Tell me who -- who has espoused those opinions that you're aware of.

**A. On -- on the outside, I -- I've -- I've --**

Q. And inside, both.

**A. I've seen those -- I've seen those opinions that people think it's appropriate. Okay? I do not specifically remember anyone telling me that it's absolutely medically necessary. Okay?**

Q. Okay.

**A. But there are differences of opinions as to whether or not the prisons need to be, you know, air-conditioned or if there's something else.**

**In the community I go back to the fact that UTMB has a limited number of beds.**

Q. Right.

**A. We make the -- We manage for TDCJ. They're still TDCJ's beds. Okay?**

**As far as other air-conditioning, TDCJ controls that. There are some places that have some air-conditioned cells. Okay? U -- UTMB doesn't order those cells. TDCJ and their health services liaison determine who will be in those cells. They determine who goes to the geriatric center and other air-conditioned cells. Most of us in UTMB don't even know where these cells are.**

Q. Within the UTMB system, have you ever talked with anybody who, you know, has said: Look, we ought to

64 (Pages 253-256)

Stephen McCollum, et al v. Brad Livingston, et al

Glenda Adams, M.D. November 19, 2013

253

**with UTMB leadership.**
Q. Okay. Well, is there anything medically inappropriate about identifying people who are vulnerable to extreme heat and monitoring them?
**A. No.**
Q. Would it even be medically beneficial?
**A. As long as you're not waking them up every 30 minutes.**
Q. So do you think it's a bad idea to have this heat list --
**A. I have --**
Q. -- and actually monitor people --
**A. I have --**
Q. -- for a heat-related illness?
**A. I have no problems at all with the -- with the heat list; and if TDCJ believes that it is helping them check on these patients, medical will certainly be happy to, you know, provide them those lists.**
**Although from what I've seen thus far, they're lists that actually they already have.**
Q. And now they're checking on them? Is that your --
**A. It's --**
Q. -- understanding?
**A. It's my understanding that, yes, TDCJ is doing**

254

**wellness checks.**
Q. Okay. And UTMB has no involvement whatsoever with that?
**A. On the unit level, the unit wardens have asked UTMB medical to help prepare these lists.**
**What I'm saying is that UTMB leadership, as far as I know -- and I've checked with most folks -- weren't involved in the -- in the -- the decision or the implementation of the plan.**
Q. Okay. So I guess you don't -- Do you know the purpose of the heat lists?
MS. COOGAN: Do you know?
**A. As -- Nobody's ever told me the purpose of the heat list.**
Q. (By Mr. Edwards) Okay. And do you know what criteria the UTMB medical provid -- the providers at the -- at the units are using to put someone on this list?
MS. COOGAN: Objection. UTMB isn't putting anybody on the list. Vague.
Q. (By Mr. Edwards) Okay. Is UT -- or is UTMB involved at all with identifying people who are vulnerable to extreme heat which then TDCJ places on a heat list?
**A. It's my understanding from -- I haven't talked**

255

**with all units.**
Q. If you don't know --
**A. Okay.**
Q. -- that's okay.
**A. I'll just say I don't know then.**
Q. All right. Okay.
Do you know if there's, like, an actual list at each unit of the individuals that are on the heat list?
**A. I have seen where the lists are being done in different ways; but essentially the list consists of everyone with HSM-18 restriction number 20, no temperature extremes. Okay?**
Q. Okay.
**A. And a list of all the new intakes to that facility.**
Q. So all the new intakes and anyone with number 20 temperature extremes?
**A. Right. Some units are using -- also using 19 and 21 that I've seen.**
Q. And what is 19, again?
**A. 19 is no direct exposure to sunlight, and 21's no humidity extremes.**
Q. And that is decided in -- on an isolated basis, to your knowledge, at each unit?

256

MS. COOGAN: Objection, calls for speculation.
Q. (By Mr. Edwards) If you know.
**A. As -- As I -- I've only seen a few samples. Okay? The samp -- There was -- Each one was done a little bit differently. I as --**
Q. Do you --
**A. -- assume the warden and medical -- warden told medical what it was he needed.**
Q. Okay. Do you know the reason why all people who come to the facility from a -- an air-conditioned facility are initially placed on the list?
**A. All the intakes?**
Q. You told me that your understanding was it was category 20, sometimes 19 or 21, and then people who were new to the facility; correct?
**A. That's what -- from the -- from the three or four units I've checked with, that's what's going on the list, yes.**
Q. Do you know why that individuals who are new to the units are placed on this heat list?
**A. I have not been told why.**
Q. The -- I'll call it a triage form. It's that initial intake form.
**A. Yes, sir.**

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c
Appendix 119

257

Q. Is it important for the person doing the intake -- and I forget if it was Ms. Haywood or Ms. McKinney. It's important for those -- those people to accurately take notes as to people's conditions; correct?

**A. Yes. It's important that that document is correct.**

Q. Okay. Now, I don't -- Did that form indicate that Mr. McCollum had a history of diabetes?

**A. He indicated he had a history of diabetes. He did not indicate that diabetes was a current problem.**

Q. Okay.

MR. EDWARDS: Let me object as non-responsive.

Q. (By Mr. Edwards) Just on this -- That form indicated he had a history of diabetes; is that correct?

**A. Correct.**

Q. Did that form indicate he had high blood pressure?

**A. I need to look at it. I be -- I believe that it did.**

Q. Okay.

**A. But his form from the county jail definitely indicated he had high blood pressure.**

Q. Okay.

258

**A. I believe he did list hypertension, yes. I'm pretty sure.**

Q. Is high blood pressure the same thing as hypertension?

**A. Yes. It's a layman's term for hypertension.**

Q. And depression, is that on that form?

**A. I believe that, yes, he did list depression.**

Q. Is there any reason you know of why you couldn't use this particular form to identify people with heat-sensitive conditions?

**A. Actually, we do.**

Q. So no reason you couldn't have done it forever; right?

MS. COOGAN: Objection, vague.

**A. I -- I don't -- I -- I don't understand.**

Q. (By Mr. Edwards) You know --

**A. What do you mean "done it forever"?**

Q. Well, you -- you just told me you do use that form to identify people with heat-sensitive conditions; right?

**A. Correct.**

Q. Okay. Okay. Do you -- Do you know that Mr. Mc -- have you reviewed records that indicate that Mr. McCollum's cellmate said that he was a diabetic?

**A. In the OI -- OIG report, I believe there is a**

259

**cellmate that -- or -- well, actually, it's a dormitory mate.**

Q. Okay. Have you ever been to the Hutchins Unit?

**A. Yes.**

Q. When were -- Have you ever been to the Hutchins Unit in the summer?

**A. I'm sure that I have, but not since 2009.**

Q. Okay. Do you recall it being -- I mean, if you -- Well, you may not be able to answer this question. But was it hot when -- Were you ever inside the non-air-conditioned spaces in the Hutchins Unit?

**A. I don't recall being in the non-air-conditioned areas of the Hutchins Unit.**

Q. Because the infirmary is air-conditioned; right?

**A. Yes.**

Q. Okay. But you -- doctor -- the doctors and P.A.s, they go home at night; right?

**A. That's correct.**

Q. Okay. So you couldn't house somebody in that air-conditioned space, or could you?

**A. What air-conditioned space?**

Q. Well, let's say you have somebody who suffered heat exhaustion at 3:00 o'clock in the afternoon and

260

they were brought to the infirmary and they were properly cared for. What would happened at 6:00 o'clock at night?

**A. If he wasn't stable enough to go back, he would be -- either someone would stay over -- a nurse -- and be paid overtime, or he would be sent to one of our hubs where we have 24-hour medical for further observation.**

Q. Where is the nearest hub to the Hutchins Unit?

**A. For the Hutchins Unit, Dallas, it would probably be Beto, in the Palestine area.**

Q. So if someone had suffered heat -- heat -- heat exhaustion or is really suffering from heat illness and the infirmary kind of shuts down, they should never be sent back to the general pop -- gen -- back to their -- their cell area if they're not stabilized; correct?

**A. If they're not stabilized, they wouldn't be sent back; that's correct.**

Q. Well, they may be sent back; but they certainly shouldn't be sent back; correct?

**A. No, they shouldn't be if they're unstable.**

Q. Okay. Got you.

Do you know that it's regularly above 90 degrees inside the housing area at the Hutchins

cost to keeping the housing areas not climate-controlled then.

MS. COOGAN: Objection, vague and calls for speculation.

Q. (By Mr. Edwards) Strike that.

Do you -- I mean, it -- That cost associated with Mr. McCollum, do you think that would have occurred had the housing areas been air-conditioned?

MR. GARCIA: Objection, speculation.

MS. COOGAN: Join.

**A. I don't know that this cost -- there would be less likelihood of heatstroke if the air-conditioning possibly had been working better. As to whether there would be a cost savings, TDCJ would have to determine --**

Q. (By Mr. Edwards) Sure.

**A. -- what -- which is most -- most cost effective. I don't know.**

Q. Fair enough.

But in -- in analyzing that issue of cost, would it be fair, when you're -- when you're putting all the variables in -- into the equation, to factor in: Look, you know, when you have a heatstroke, you've got to go to the emergency room; and that -- that's a real cost to UTMB in terms of the care that

they provide; correct?

**A. Yes.**

Q. It -- and just so I'm clear, like in situations where there's a heatstroke in a TDCJ facility like Hutchins and they go to a private ER and there's a bill, that bill gets paid -- that gets -- bill gets funneled to UTMB, not TDCJ?

**A. Yes.**

Q. Okay. All right.

MR. EDWARDS: I want to thank you very much for your time. And I know it's been a long day; but I very much appreciate it, Doctor.

Counsel may have some questions, although...

MS. COOGAN: I do not have any questions at this time.

MR. GARCIA: I've got about an hour. I'm just kidding. I'm done.

MR. EDWARDS: Thank you very much.

THE WITNESS: Okay. Thank you.

THE VIDEOGRAPHER: 6:03. Off the record.

(The deposition concluded at 6:03 p.m.)

(Signature requested.)

(-o0o-)

CHANGES AND SIGNATURE

WITNESS: THE DESIGNATED REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH BY AND THROUGH GLENDA ADAMS, M.D.

DATE: NOVEMBER 19, 2013

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |
| ____ | ____ | ________________ | __________ |

I, GLENDA ADAMS, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________
GLENDA ADAMS, M.D.

THE STATE OF _______________:
COUNTY OF __________________:

Before me, ____________________________, on this day personally appeared GLENDA ADAMS, M.D., known to me or proved to me on the oath of _________________ or through __________________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he\she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of __________________, _______.

__________________________
NOTARY PUBLIC IN AND FOR

THE STATE OF _____________

My Commission Expires: ______

301

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law in the Estate of LARRY GENE McCOLLUM,
Plaintiffs,

VS.

CIVIL ACTION NO. 3:12-cv-02037

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

REPORTER'S CERTIFICATION
TO THE
ORAL AND VIDEOTAPED DEPOSITION OF
THE DESIGNATED REPRESENTATIVE OF
THE UNIVERSITY OF TEXAS MEDICAL BRANCH
BY AND THROUGH
GLENDA ADAMS, M.D.
NOVEMBER 19, 2013

I, Mary C. Dopico, Certified Shorthand. Reporter in and for the State of Texas, do hereby certify that the facts stated by me in the caption hereto are true; that the foregoing deposition of THE DESIGNATED REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH BY AND THROUGH GLENDA ADAMS, M.D., the witness hereinbefore named, was taken by me in machine shorthand, the said witness having been by me first duly cautioned and sworn to tell the truth, the whole truth, and nothing but the truth, and later transcribed from my machine shorthand notes to typewritten form by me.

I further certify that the above and foregoing

302

deposition, as set forth in typewriting, is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Pages contain any changes and the reasons therefor;

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that charges for the preparation of the foregoing completed deposition were $ _________ for the original thereof, charged to Attorney(s) for Plaintiffs.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd day of December, 2013.

______________________________
Mary C. Dopico, CSR, RPR, CRR
CSR No. 463, Exp. 12-31-2014
Notary Public, State of Texas
Commission Expires 1-31-2017

Independent Contractor To:
Wright, Watson & Associates
Firm Registration No. 225
Expires 12-31-2013
3307 Northland Drive, Suite 185
Austin, Texas 78731
512/474-4363 Fax 512/474-8802

**UNITED STATES DISTRICT COURT**
**NORHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM, PLAINTIFFS | § | |
| v. | § | CIVIL ACTION NO. 3:12 cv 02037 |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH, and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE DEFENDENTS | § | |

**AFFIDAVIT OF GLENDA M. ADAMS**

STATE OF TEXAS §
§
COUNTY OF WALKER §

BEFORE ME, the undersigned authority, personally appeared Glenda M. Adams, M.D., M.P.H., known to me personally, who after being duly sworn, deposed and stated as follows:

"My name is Glenda M. Adams. I am over the age of 18, competent to make this affidavit, and have personal knowledge of the facts herein stated. I am making this affidavit in connection with the cause of action entitled Stephen McCollum, Stephanie Kingrey, and Sandra McCollum v. Brad Livingston, Jeff Pringle, Richard Clark, Karen Tate, Sandrea Sanders, Robert Eason, the University of Texas Medical Branch, and the Texas Department of Criminal Justice, Civil Action No. 3:12 cv 02037.

I earned my Doctor of Medicine in 1976 from the University of Texas Medical Branch at Galveston (UTMB), and received my Masters of Public Health in 1993 from the University of Texas School of Public Health in Houston. I am a physician in good standing, having been licensed by the Texas State Board of Medical Examiners since 1976.

I am currently the Senior Medical Director of Inpatient Operations for The University of Texas Medical Branch Correctional Managed Care (UTMB CMC). I have been with UTMB CMC since June 1995. My current duties involve 1) supervising the physicians, advanced practice nurses, and physician assistants at infirmaries within TDCJ that are contracted to be staffed by UTMB employees, 2) assisting UTMB CMC Utilization Review with infirmary bed placements and patient flow, and 3) serving on multiple Correctional Managed Care (MC) joint healthcare committees. MC healthcare committees are composed of physician, nurse, pharmacy, mental health, and dental representatives from TDCJ, UTMB, and Texas Tech universities.[1] Of note is that the TDCJ Health Service Division determines the chairperson for each joint committee, including the CMC Health Services Policy and Procedure Committee. The TDCJ Division Director of Health Services has final approval of all CMC Health Service policies. The University providers (UTMB and Texas Tech) are required by contract to follow TDCJ and CMC policies and procedures.

Prior to 1995, I was employed for eight years by the Texas Department of Criminal Justice (TDCJ) as a physician at the Diagnostic Unit, now renamed the Byrd Unit. The Diagnostic/Byrd Unit is a TDCJ reception unit with 'intake' operations very similar to those at the Hutchins Unit. Hence, I have many years of experience in correctional medicine and I am personally familiar with intake processing of TDCJ offenders, the CMC Policy and Procedure Committee, and the medical housing available to TDCJ offenders in the TDCJ units that are contracted to be staffed by UTMB employees.

In preparing this affidavit, I have reviewed the following documents provided by the Office of the Attorney General of Texas:

1. Plaintiffs' *First Amended Complaint*
2. Mr. Larry Gene McCollum's medical records from McLennan County Jail, the TDCJ Hutchins Unit, and Parkland Hospital in Dallas, Texas
3. The TDCJ Office of Inspector General (OIG) Investigative Report #2011.03006
4. The February 7, 2013 deposition of physician assistant Ananda Babbili and the October 18, 2013 depositions of Richard Thaler and William L. Stephens.
5. The TDCJ Offender Orientation Handbook(2004) in effect in 2011
6. The TDCJ Statistical Report for Fiscal Year 2011 (September 1, 2010 through August 31, 2011)
7. The 2010 - 2011 UTMB / Correctional Managed Health Care Committee Contract

Plaintiffs' *Complaint* alleges UTMB deprived Mr. Larry Gene McCollum of his rights under 'Title II of the Americans with Disabilities Act (ADA), and the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131, *et. seq.*, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Rehabilitation Act).' More specifically, it is my understanding Plaintiffs allege -

1. Mr. McCollum was 58 years old, obese and had hypertension and diabetes.
2. UTMB inappropriately treated Mr. McCollum for hypertension by placing him on the diuretic hydrochlorothiazide (HCTZ) rather than continuing the drug clonidine (a non-diuretic).'

---

1 TDCJ is represented by its own Health Services Division on CMC joint *healthcare* committees. In general, CMC joint healthcare committees, UTMB, and Texas Tech communicate with TDCJ Security and/or Classification leadership through the TDCJ Health Services Division.

3. Mr. McCollum would likely have lived had the UTMB physician assistant Babbili prescribed clonidine rather than HCTZ.
4. UTMB never evaluated or provided treatment to Mr. McCollum for diabetes.
5. UTMB, through policy made in Galveston, makes housing recommendations to TDCJ based upon prisoners' medical conditions. UTMB violated Mr. McCollum's ADA rights by not ordering a bottom bunk and air conditioned housing for Mr. McCollum.
6. In 2011 UTMB knew but failed (and continues to fail) to take action to reduce 'extremely dangerous' temperatures in the Hutchins Unit offender housing areas.
7. UTMB is negligent for not performing complete physical exams on offenders upon arrival to TDCJ from county jails to fully identify disabilities and make accommodations.
8. UTMB made the decision to not staff the Hutchins unit with medical personnel 24/7 for 'financial reasons' and this decision placed Mr. McCollum and other offenders at 'grave' risk.
9. UTMB 'discriminated against Mr. McCollum due to his disability, hypertension and/or diabetes, by denying him reasonable accommodations necessary to allow him access [to] TDCJ and UTMB's programs and services.'

***Fact Findings from Medical Records***

The medical records indicate Mr. McCollum entered TDCJ at the Hutchins State Jail on Friday, July 15, 2011. The only medical information accompanying him from the McLennan County Jail was the standard Texas Uniform Health Status Update (TUHSU) which indicated he was 5 foot 10 inches tall, weighed 330 pounds, had no special housing or transportation needs, no pending specialty clinic appointments, no known allergies, and a negative Tuberculosis (TB) Skin Test on June 27, 2011. However, the TUHSU did indicate that Mr. McCollum had been prescribed the medication 'clonidine 0.1 mg orally as needed' for hypertension. There was no mention of Mr. McCollum having diabetes or receiving medication for diabetes.[2] [Exhibit 1, TUHSU for Mr. McCollum from McLennan County Jail]

Standard operating procedures for all new offenders arriving to TDCJ include screening for urgent or emergent medical, dental, and/or mental health conditions requiring immediate attention. Mr. McCollum's Correctional Managed Care Intake History and Health Screening form, completed and signed on July 15, 2011, indicates he reported a personal *history* of a back injury, cavities, depression, diabetes, glasses, gum disease, high blood pressure, mental illness, and rheumatism/arthritis. However, he indicated his only 'current' problems were needing a tooth pulled and depression. He specifically denied thoughts of self injury and symptoms of psychosis. The screener noted no obvious injuries, deformities, or impaired motor activity. [Exhibit 2, Correctional Managed Care Intake History and Health Screening form for Mr. McCollum]

2 Post mortem review of Mr. McCollum's McLennan County Jail medical records indicate 1) Mr. McCollum entered the jail June 23, 2011 and provided a medical history of *only* 'arthritis in back and knee' – he did not claim hypertension or diabetes, 2) he was prescribed clonidine for an elevated blood pressure discovered upon entry into the jail but only required the medication on June 24, 26, 27, and 28. His blood pressure readings did not require medication from June 30th through July 7th, and no blood pressures were recorded after July7, 2011.

After completing his initial medical screen on the morning July 15, 2011, Mr. McCollum was seen by two licensed vocational nurses (LVN's). The first LVN (Ms. McKinney) took Mr. McCollum's history for infectious diseases, gave him a tetanus vaccination, applied a Tuberculosis skin test, acquired his verbal consent for laboratory testing, and provided HIV pre-test counseling. Later the same day, a second LVN (Ms. Connell) informed the physician assistant (PA Babbili) of Mr. McCollum's history of hypertension from the McLennan County Jail and prior treatment with clonidine 'prn' (as needed). Mr. Babbili gave a verbal order to substitute low dose hydrochlorothiazide (HCTZ) 25 mg to be taken every morning in place of the 'prn' clonidine.

Mr. McCollum was seen in the medical department by LVN McKinney on Monday, July 18, 2011 to have his TB skin test read. The test was negative. He was interviewed that same day to complete his routine mental health screening.[3] He was again seen in the medical department on Wednesday, July 20, 2013 to have his blood drawn for laboratory studies. There is no indication Mr. McCollum exhibited overt functional limitations or offered any complaints of difficulty completing his activities of daily living at any of these encounters with medical personnel. Nor is there documentation that he requested any special accommodation during these medical department visits. Similarly, there is no documentation that Mr. McCollum exhibited a physical or mental impairment that substantially limited one or more of his daily life activities.

Mr. McCollum's laboratory results were routinely reported in the EMR on the morning of Thursday, July 21, 2011. While several results were abnormal requiring clinical correlation and follow up, none of the results were of such a significant or critical nature that the reference laboratory, LabCorp, notified the Hutchins medical department of a need for immediate review or intervention. Non-critical intake laboratory results are routinely reviewed by a physician or midlevel provider during the intake physical exam or sooner if a patient requests or requires a medical appointment prior to the scheduled physical exam. In this case, Mr. McCollum would have had his intake physical exam within seven business days of arrival at Hutchins pursuant Correctional Managed Care policy, and his lab results would have been reviewed by a physician or midlevel provider at that time, unless Mr. McCollum requested an appointment sooner.

Here, prior to his intake physical exam, in the early morning of July 22, Mr. McCollum was found by TDCJ security staff unconscious in his bed having a seizure. After an unclear amount of time TDCJ staff contacted UTMB Nursing Triage via telephone at approximately 03:16 AM. UTMB nursing advised that Mr. McCollum should be transferred 911 to Parkland Hospital in Dallas.

Upon arrival at Parkland Hospital Mr. McCollum was comatose with a temperature greater than 109 degrees. He suffered rhabdomyolysis (muscle cell breakdown) with multi-organ failure and anoxic brain injury from his high body temperature and prolonged seizures. His differential diagnoses were hyperthermia due to environmental exposure v. neuroleptic malignant syndrome v serotonin

---

3 Mr. McCollum was scheduled for further mental health evaluation based upon his history and complaint of depression. This evaluation never occurred due to Mr. McCollum's transfer to Parkland Hospital on July 22, 2011 and eventual death on July 28, 2011.

syndrome v hypothalamic stroke v meningitis v sepsis. At one point it was suggested that he might have a genetic predisposition for environmental heat stroke.[4]

Mr. McCollum's body temperature was returned to normal with treatment but his neurological condition continued to deteriorate and he developed extensive brain damage. On July 28, 2011 after consultation with the treating physician, the family decided to withdraw artificial life support and Mr. McCollum was pronounced deceased at 11:35 PM.

At autopsy, the pathologist concluded 'Based on the autopsy and the history available to me, it is my opinion that Larry Gene McCollum, a 58 year-old white male, died as the result of hyperthermia. The decedent was in a hot environment without air conditioning, and he may have been further predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorothiazide) for hypertension.' The manner of death was 'accident.' Of note is that the Autopsy Report states Mr. McCollum had a history of hypertension with cardiac hypertrophy as an associated finding. However, the Autopsy Report makes *no* mention of diabetes and Mr. McCollum had *no* significant coronary atherosclerosis (thickening of the arteries with plaque formation) typically found in long standing hypertensive and diabetic individuals. [Exhibit 3, Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner Autopsy Report on Larry Gene McCollum]

***Discussion of Plaintiffs' Allegations***

Mr. Larry Gene McCollum's various medical records confirm he was a 58 year old, obese white male. The Texas Uniform Health Status Update sent by the McLennan County Jail reported Mr. McCollum had a diagnosis of hypertension.[5] However, 'prn clonidine' is not appropriate first line or even second line treatment for hypertension. According to the National Institutes of Health (NIH) *Seventh Report of the Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure* (JNC 7), the initial drug for the treatment of hypertension should be a thiazide diuretic - e.g. hydrochlorothiazide (HCTZ). In accordance with JNC 7, the CMC Disease Management Guideline (DMG) for Hypertension recommends HCTZ as initial treatment for hypertension.[6] Physician Assistant Babbili followed the CMC DMG and the national standard of care for the treatment of hypertension when he prescribed HCTZ instead of clonidine for Mr. McCollum.[7]

4 Parkland Hospital Medical Records, page 12.

5 Recorded blood pressures at McLennan County Jail (not available to UTMB during Mr. McCollum's time at the Hutchins Unit) indicate probable Stage 1 hypertension.

6 The Correctional Managed Care Pharmacy and Therapeutics Committee is a joint CMC committee comprised of physician, nurse, and pharmacy representatives from TDCJ, UTMB, and Texas Tech. This committee develops Disease Management Guidelines (DMG's) for CMC providers to follow based upon National Guidelines and evidence based medicine in the literature.

7 Due to a high potential for abuse and the risk of serious hypotension and/or rebound hypertension resulting in stroke, clonidine is not used in TDCJ except in closely monitored, urgent situations where a very elevated blood pressure must be reduced within an hour or two

According to Mr. McCollum's TDCJ medical record and medication compliance records, he never took the prescribed HCTZ in July 2011. But even assuming he did, the mild dehydration caused by HCTZ could have been corrected with adequate oral hydration. Reports from offenders in Mr. McCollum's housing area indicate he was not drinking adequate amounts of fluids prior to his death.[8] Many antihypertensive medications, including clonidine, have the potential to increase an individual's risk for a heat related illness.[9] Thus, Plaintiffs' assertion that 'Mr. McCollum would likely have lived had the UTMB physician assistant Babbili prescribed clonidine rather than HCTZ' is highly speculative, without basis in fact, and without merit.

Mr. McCollum was obese and certainly at increased risk for developing diabetes. On July 15, 2011 he noted a *history* of diabetes on his TDCJ Intake History and Health Screening form[10]; however, he did not claim diabetes as a *current* medical problem. McLennan County Jail did not identify him as a diabetic. He was on no medication for diabetes and he never requested or complained of a need for diabetes medication during his time at the Hutchins Unit.

Contrary to Plaintiffs' allegation, UTMB did, in fact, evaluate Mr. McCollum for diabetes with laboratory studies drawn on July 20, 2011. Mr. McCollum did not meet criteria for a diagnosis of diabetes. 'In 2009, an International Expert Committee that included representatives of the ADA (American Diabetes Association), the International Diabetes Federation (IDF), and the European Association for the Study of Diabetes (EASD) recommended the use of the A1C to diagnose diabetes, with a threshold of 6.5% or greater, and ADA adopted this criterion in 2010.'[11] Mr. McCollum's A1C was 6.2% (An A1C of 5.7% to 6.4% indicates increased risk for future diabetes). Further, as previously noted, Mr. McCollum's autopsy does not identify him as diabetic.

During the TDCJ 'intake' screening process offenders are instructed verbally and in writing how to access healthcare.[12] [Exhibit 4, *TDCJ Administrative Directive AD-06.07*] They are also provided a copy of the *Offender Orientation Handbook*. [Exhibit 5] A description of the general 'Receiving and Screening' process (pages 1-4) along with instructions on how to access healthcare services (pages 33–36) are included in the *Handbook*. Page 34 of the *Handbook* states 'All offenders may access the medical department by submitting a sick call request slip or by direct request to a security officer or supervisor.' Mr. McCollum would also have been aware of how to access healthcare services due to his previous incarceration from 2002 to 2004.

Offenders arriving to TDCJ are 'housed according to security needs.' [*Offender Orientation Handbook*, page 1] No housing restrictions were ordered for Mr. McCollum during his initial intake screening because he had no restrictions at McLennan County Jail and it was not apparent to

---

8   TDCJ Office of Inspector General (OIG) Investigative Report #2011.03006, page 167, 176, etc.
9   Animal studies suggest clonidine may impede thirst regulation and decrease fluid intake.
10  Mr. McCollum did not report having hypertension or diabetes upon entry to the McLennan County Jail.
11  Position Statement of the American Diabetes Association, *Standards of Medical Care in Diabetes – 2011*, Diabetes Care: January 2011, vol. 34, page S12.
12  TDCJ Administrative Directive AD – 06.07 states "The Texas Department of Criminal Justice (TDCJ) shall provided all incarcerated offenders with full access to health services. These procedures must be communicated orally and in writing to offenders upon arrival to the unit."

screeners any were required.

UTMB does not monitor bunk assignments or general population living areas and was unaware Mr. McCollum was assigned a top bunk by TDCJ or that he was having any difficulty with his housing assignment. The TDCJ *Offender Orientation Handbook* states on page 2, 'Offenders are hereby advised of their responsibility to report a disability.' Also, 'It is the responsibility of the security staff to facilitate access to health services.' [Exhibit 4, *TDCJ Administrative Directive AD-06.07*] If Mr. McCollum complained of problems climbing in and out of his bunk to TDCJ security staff[13], neither he nor security notified UTMB. Mr. McCollum never submitted a sick call request while at the Hutchins Unit or otherwise requested assistance or accommodation from medical staff. Had UTMB been made aware, Mr. McCollum could have been provided a medical 'pass' for a lower bunk pending his intake physical exam and completion of his Health Summary for Classification (HSM-18).[14]

While it is true that there are policies allowing, even requiring, UTMB to identify housing restrictions for offenders – these are not UTMB policies 'made in Galveston' but rather Correctional Managed Health Care policies made by the joint TDCJ, UTMB, and Texas Tech Policy and Procedure Committee.[15] As previously noted, TDCJ through its Health Services Division has final approval of all CMC Health Care policies. Importantly, the policy dealing with housing restrictions does *not* have 'air conditioning' or 'climate controlled housing' as a choice for UTMB to recommend. [Exhibit 6, *CMC Policy A-08.4 Offender Medical and Mental Health Classification*, Attachment A] Further, per TDCJ Health Services Liaison (HSL)[16], 'HSL cannot request reassignment of an offender to an air conditioned or climate-controlled facility. Providers requesting reassignment of offenders to this type of environment should be referred to their Utilization Review/Management Department for inpatient placement.' [Exhibit 7, TDCJ Health Services Liaison Facility Types List, page 2] Hence, if determined that air conditioned housing is medically necessary for an offender, UTMB must find the offender an 'inpatient' bed.

There are approximately 1700 air conditioned 'inpatient' beds that UTMB Inpatient Operations and Utilization Review manage for TDCJ (1100 inpatient mental health beds, 60 wheelchair dorm beds, 80 acute care hospital beds, and 471 infirmary beds). Due to being a limited resource, in general, 'inpatient' beds are reserved for offender patients requiring close medical or mental health

13 According to the TDCJ Office of Inspector General (OIG) Investigative Report #2011.03006, several offenders reported Mr. McCollum complained to security officers about difficulty getting in and out of his upper bunk.

14 The Health Summary for Classification (HSM-18) is a standard computer form completed during the intake physical exam and updated thereafter as needed which is used to provide medical and mental health information on each offender to TDCJ Classification to assist TDCJ in assigning the offender appropriate housing, work, transportation, disciplinary, and program restrictions.

15 The joint Correctional Managed Care Health Care Policy and Procedure Committee is composed of physician, nurse, dentist, mental health, and healthcare administration representatives from TDCJ, UTMB, and Texas Tech. TDCJ Classification and Security do not participate on this committee but are represented by the TDCJ Health Services Division.

16 Health Services Liaison (HSL) is a department within the TDCJ Health Services Division responsible for coordinating the "transfer of offenders who require intake and/or reassignment for medical purposes." From TDCJ Online, Health Services Division, Office of Health Services Liaison.

monitoring or who cannot complete their activities of daily living without assistance from medical staff. At the time of his entry into TDCJ, Mr. McCollum did not require an 'inpatient' bed.

In 2011 UTMB was under contract to the Correctional Managed Health Care Committee (CMHCC) to provide medical, dental and psychiatric care to offenders in the custody of TDCJ.[17] As part of the healthcare services provided, UTMB offered and continues to offer multiple special programs for offenders with disabilities. These include programs such as the Developmental Disabilities Program, Chronically Mentally Ill Program, Program for the Aggressive Mentally Ill Offender, Physically Handicapped Offender Program, Assistive Disability Services, American Sign Language Interpreter Services, Chronic Care Services, Terminally Ill Services, and Elder Care. However, unless the offender requires a 'regional medical facility, infirmary, or hospital' bed, the TDCJ State Classification Committee determines an offender's unit placement. Article VI of UTMB's contract with CMHCC/TDCJ states[18] -

**Article VI**
**OFFENDER POPULATION**

> **The Texas Department of Criminal Justice shall have responsibility for placement of offenders. This will be accomplished in conformity with the governing statute, Chapter 494, the Texas Government Code, and existing classification criteria. The Texas Department of Criminal Justice State Classification Committee shall have sole responsibility for the placement of offenders in the units, provided however, that the decision to admit or discharge an offender patient to/from a regional medical facility, infirmary or hospital is the sole responsibility of the treating physician. TDCJ shall make a good faith effort to initiate the review, classification and transfer of offender patients from infirmary beds upon notification that the offender patient is able to return to the population. Concerns about delays in transfer of discharged patients from an infirmary shall be communicated to the TDCJ Division Director for Health Services.**

Hence, except under <u>very</u> limited circumstances, UTMB does not determine an offender's unit of assignment. Further, while assigned to a particular unit, TDCJ Security and the Unit Classification Committee determine an offender's housing assignment with input from healthcare staff as appropriate when a disability or condition that interferes with activities of daily living is identified. Again, neither TDCJ nor Mr. McCollum made known to UTMB that Mr. McCollum needed or desired any accommodation, or that he had a physical or mental impairment that substantially limited one or more of his daily life activities.

Offenders are in the *custody* of TDCJ. Conditions of confinement such as housing, food, potable water, clothing, and other necessities of daily living are the responsibility of TDCJ. Maintenance of

17 Starting in 2012-2013 biennium, UTMB began contracting directly with TDCJ rather than the Correctional Managed Health Care Committee.

18 2010 – 2011 UTMB / Correctional Managed Health Care Committee Contract, page 32. See Exhibit 8.

physical structures, utilities, etc. is also the responsibility of TDCJ.[19] Monitoring and control of temperatures in the TDCJ offender housing areas are solely under the purview of TDCJ security administration. Plaintiffs' allegation that UTMB knew but failed (and continues to fail) to take action to reduce 'extremely dangerous' temperatures in the Hutchins Unit offender housing areas is untrue and unfair. UTMB provides medical care. UTMB does not monitor and is not made aware of the temperatures in the TDCJ offender housing areas. But even if TDCJ shared this information with UTMB, as an independent contractor UTMB has no control over the heating and cooling of TDCJ facilities except at the prison hospital in Galveston, Texas.

Plaintiffs' allegation that UTMB is negligent for not performing a physical exam immediately upon an offender's arrival to TDC is not valid. While offenders entering county jails often come 'off the street' and may be unable to adequately communicate their medical problems due to recent trauma, drug and/or alcohol intoxication, unidentified and untreated medical conditions, etc. - by the time these offenders arrive to TDCJ they have had medical evaluations and treatment. County jails are required to provide a Uniform Health Status Update on each offender transferred to TDCJ. This Health Status Update plus the TDCJ Intake Screening process identifies offenders with immediate healthcare needs and allows for prompt evaluation by appropriate healthcare staff. Offenders who require special housing due to a disability are identified and when necessary transferred either through TDCJ Health Services Liaison or UTMB Utilization Review.[20] If the Intake Screening misses a need for accommodation, offenders are made aware upon arrival to TDCJ both verbally and in writing on how to make their needs known. The short delay prior to the intake physical exam is necessary to populate an offender's electronic medical record (EMR) which can occur only after Security confirms the offender's identity and assigns a TDCJ number. This delay of 2 to 7 days[21] is shorter than the average wait for a healthcare appointment in the community. Contrary to Plaintiffs' assertions 1) a physical exam immediately upon arrival to TDCJ is not medically necessary and would offer little, if any, increased protection against a heat related illness, 2) the lack of an immediate physical exam does not deny prisoners any accommodation, and 3) UTMB has not 'purposely left (Mr. McCollum or any offender) in danger.'

Similarly, Plaintiffs' claim that – 'UTMB made the decision to not staff the Hutchins unit with medical personnel 24/7 for financial reasons and this decision placed Mr. McCollum and continues to place other offenders at grave risk' is contrary to fact. Hutchins has never been a unit with 24/7 medical staffing. Hutchins was a 16 hour medical facility when it opened in April 1995 and remained a 16 hour unit until September 2011 when medical hours were reduced to 12 hours per day. Medical hours of operation on any particular TDCJ unit are determined primarily by the acuity or medical needs of the offenders housed on that unit. If an offender requires close medical monitoring he is immediately transferred to a facility with 24 hour on site nursing services. Mr. McCollum did

19 2010 - 2011 UTMB / Correctional Managed Health Care Committee Contract, page 11, Section G, Item #1, "maintenance of TDCJ facilities." See Exhibit 9.

20 Offenders do not receive work assignments until after their intake physical exams so the need for work restrictions upon arrival to TDCJ is not an issue.

21 Correctional Managed Health Care Policy E-34.1 states 'A comprehensive medical evaluation will be completed on all new incoming offenders within seven days of their arrival in the system.'

not have a medical condition requiring 24 hour nursing availability. Further, the decision to reduce clinic hours at Hutchins had no impact on Mr. McCollum as his demise was prior to implementation of the reduced clinic hours. Of note is that most correctional institutions including Texas jails, TDCJ units, and even Federal Bureau of Prisons facilities do *not* have providers (physicians, physician assistants, advanced practice nurses) on site after the usual 8 hour work day. While providers are 'on call' and available for consultation electronically, true emergencies such as heat stroke must be transferred 911 to the nearest hospital emergency room – the same as in community, non-correctional settings (e.g. nursing homes).

In conclusion, except for the 1700 'inpatient' beds that UTMB manages for TDCJ, UTMB has no ability to provide air conditioned housing for offenders incarcerated in Texas prisons. In 2011, TDCJ received almost 74, 000 new intakes and had an average population of about 156,000.[22] At least half of these offenders had health conditions or took medications that *potentially* placed them at increased risk for a heat related illness.[23] Currently there are 7,600 offenders on diabetes medications and 39,484 offenders on antihypertensive meds in TDCJ.[24] The numbers alone make it very clear UTMB cannot place everyone with risk factors for a heat related illness in air conditioned housing. UTMB does place those at highest risk (e.g. T6 and above spinal cord lesions, 70 percent and above total body burn scars, congenital inability to sweat, etc.) in permanent 'inpatient' climate controlled housing. UTMB also places offenders who experience symptoms of heat stroke and/or significant heat related worsening of their disease symptoms (e.g. severe asthmatics, some multiple sclerosis and sickle cell disease patients, etc.) in 'inpatient' housing during the summer months. However, Mr. McCollum never complained to medical staff of feeling ill. He never complained to medical about his bunk assignment or reported any problems with completing his activities of daily living. He never sought medical assistance or requested accommodation. UTMB never discriminated against Mr. McCollum or denied him access to any TDCJ or UTMB program or service.

The above opinions are based upon my review of the materials provided, my knowledge of UTMB, CMC, and TDCJ policies and procedures, and reasonable medical probability. I reserve the right to amend this affidavit should additional information become available.

Further affiant sayeth not."

Glenda Adams, M.D., M.P.H.

Given under my hand and seal of office this 9th of January, 2014, A.D.

PHOEBE M. LANGLEY
Notary Public, State of Texas
My Commission Expires
December 30, 2015

Notary Public in and for the State of Texas

22 TDCJ Statistical Report for Fiscal Year 2011, page 1 indicates total population of Prison, State Jail, and SAFP offenders on August 31, 2011 was 156,522. Page 2 shows total TDCJ new receives for 2011was 73,988.

23 Estimate computed from data provided by UTMB CMC Quality & Outcomes Analyst Earl King. See Exhibit 10.

24 Data provided by CMC Pharmacy Director, Dr. Stephanie Zepeda.

**AFFIDAVIT OF GLENDA M. ADAMS**
**List of Exhibits**

**Exhibit 1 –** **Texas Uniform Health Summary Update from McLennan County Jail for Larry Gene McCollum**

**Exhibit 2 -** **Correctional Managed Care Intake History and Health Screening form for Larry Gene McCollum**

**Exhibit 3 -** **Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner Autopsy Report on Larry Gene McCollum**

**Exhibit 4 -** **Texas Department of Criminal Justice Administrative Directive (AD) – 06.07, Access to Health Services**

**Exhibit 5 -** **Texas Department of Criminal Justice Offender Orientation Handbook**

**Exhibit 6 -** **Correctional Managed Health Care Policy A-08.4, Attachment A – Guidelines for Completing the Health Summary for Classification Form**

**Exhibit 7 -** **TDCJ Health Services Liaison Facility Types List**

**Exhibit 8 -** **Page 32, Agreement between Correctional Managed Health Care Committee and the University of Texas Medical Branch for Correctional Health Services, FY 2010 – 2011 Biennium**

**Exhibit 9 -** **Page 11, Agreement between Correctional Managed Health Care Committee and the University of Texas Medical Branch for Correctional Health Services, FY 2010 – 2011 Biennium**

**Exhibit 10 -** **Data from the UTMB CMC Office of Quality and Outcomes Management - Earl King**

Scanned by HICKS, STEPHANIE K CCA in facility HUTCHINS (HJ) on 07/20/2011 13:32

EXHIBIT: 3A
NAME: Babbili
DATE: 9-17-13
Tina Terrell Bunney CSR0903

## TEXAS UNIFORM HEALTH STATUS UPDATE

I. NAME: McCollum (Last) Larry (First) G. (MI) DOB: 4/04/53 AGE: 58
STATE ID# 9950494 RACE: W SEX: Male ✓ Female ____
COUNTY/TDCJ# 34610 WT. 330 HT: 5'10

II. CURRENT/CHRONIC HEALTH PROBLEMS

A. Health Problems

- ___ 1. None
- ___ 2. Asthma
- ___ 3. Pregnancy
- ___ 4. Dental Priority
- ___ 5. Diabetes
- ___ 6. Drug Abuse
- ___ 7. Alcoholism
- ___ 8. Orthopedic Problems
- ___ 9. Cardiovascular/Heart Trouble
- ___ 10. Suicidal
- ___ 11. Mental Retardation
- ___ 12. Mental Illness (Specify diagnosis) ________
- ___ 13. Recent Surgery
- ___ 14. Seizures
- ___ 15. Dialysis
- X 16. Hypertension
- ✓ 17. CARE System Y/N

*NOTE When screening substance abuse facility clients, please contact the TDCJ-ID Health Services Liaison at (936)437-3589 for clients with any chronic disease symptoms deemed unstable.*

III. SPECIAL NEEDS (Check all that apply)

A. Housing Restrictions

- X 1. None
- ___ 2. Skilled Nursing Facility
- ___ 3. Extended Care Facility
- ___ 4. Psychiatric Inpatient Facility
- ___ 5. Respiratory Isolation
- ___ 6. Other.

B. Transportation

- X 1. Routine
- ___ 2. Crutches/Cane
- ___ 3. Ambulance
- ___ 4. Wheelchair/Wheelchair Van
- ___ 5. Prosthesis: ________

C. Pending Specialty Clinic Appointment
None X Type ________

D. ALLERGIES NKA

NKA ________

B. Preventive Medicine

✓ 1. Tuberculosis Status
Skin Test: Date Given: 6/24/11 Date Read: 6/27/11 Results 0 ________ mm*
X-Ray: Date* __/__/__ Normal ___ Abnormal ___* Anti-TB Treatment? No ___ Yes ___*
___ 2. Hepatitis: A __ B __ C __ Other: ________
___ 3. HIV Antibody: Test Date: __/__/__ Results: Neg ____ Pos ____ CD4: ____ Date __/__/__
___ 4. Syphilis: Date: __/__/__ Type: ___ Treatment Completed: ___Yes ___No

**NOTE: If any treatment has been recommended, the X-Ray was abnormal, or skin test indicates infection please attach tuberculosis record.*

C. Other Health Care Problems: none

IV. CURRENT PRESCRIBED MEDICATIONS None ____

| Medication | Dosage | Frequency |
|---|---|---|
| Clonidine | 0.1mg ÷ tab P.O | PRN / BP |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

THIS FORM MUST ACCOMPANY ALL OFFENDERS TRANSFERRED TO AND FROM ALL TEXAS CRIMINAL JUSTICE ENTITIES

COMPLETED BY: [signature] (Signature/Title) DATE: 7/15/11
PHONE NUMBER: 254-757-2555 FACILITY: McLennan County Jail

c:\documents and settings\mong\local settings\temp\164744117.tif printed by mlvap (Page 1 of 2)

EXHIBIT: 3
NAME: Balbi li
DATE: 2-7-13
Tina Tarrell Burney CSR2305

Scanned by HICKS, STEPHANIE K. CCA in facility HUTCHINS (HJ) on 07/20/2011 13:31

# CORRECTIONAL MANAGED CARE
# INTAKE HISTORY AND HEALTH SCREENING

1721640

**I. IDENTIFICATION**

NAME: McCollum Larry  OCCUPATION: Driver  EDUCATION: High School

DOB: 04/04/53  COUNTY: McLennan  PREVIOUS TDCJ #(s): ____________

**II FAMILY HISTORY**

| # | Item | YES | NO | # | Item | YES | NO |
|---|---|---|---|---|---|---|---|
| 1 | Blood disease (sickle cell anemia, hemophilia) | YES | NO (circled) | 18 | INH Prophylaxis | YES | NO (circled) |
| 2 | Cancer | YES (circled) | NO | 19 | Intravenous Drug Abuse | YES | NO (circled) |
| 3 | Diabetes | YES (circled) | NO | 20 | Kidney Disease | YES | NO (circled) |
| 4 | Heart Disease | YES (circled) | NO | 21 | Liver Disease | YES | NO (circled) |
| 5 | High Blood Pressure | YES (circled) | NO | 22 | Mental Illness | YES (circled) | NO |
| 6 | Tuberculosis | YES | NO (circled) | 23 | Non Intravenous Drug Abuse/Alcoholism | YES | NO (circled) |

**III PERSONAL HISTORY**

| # | Item | YES | NO | # | Item | YES | NO |
|---|---|---|---|---|---|---|---|
| 11 D 1 | Asthma/Emphysema | YES | NO (circled) | 24 | Peptic Ulcers | YES | NO (circled) |
| 2 | Back Injury | YES (circled) | NO | 25 | Rheumatic Fever | YES | NO (circled) |
| 3 | Blood Disease (sickle cell anemia, hemophilia) | YES | NO (circled) | 26 | Rheumatism/Arthritis | YES (circled) | NO |
| 4 | Cancer | YES | NO (circled) | 27 | Seasonal Allergies | YES | NO (circled) |
| 5 | Cardiac | YES (circled) | NO | 28 | Sexually Transmitted Diseases | YES | NO (circled) |
| 6 | Depression/Suicide Attempt | YES (circled) | NO | 29 | Smoker | YES | NO (circled) |
| 7 | Diabetes | YES (circled) | NO | 30 | Tetanus Immunization Date | YES | NO (circled) |
| | | | | 31 | Tuberculosis | YES | NO (circled) |
| 8 | Drug/ Food Allergies | YES | NO (circled) | 32 | Unprotected Sex w/Multiple Partners | YES | NO (circled) |
| 9 | Epilepsy/Seizures | YES | NO (circled) | 33 | Other | | |
| 10 | Glasses/Hearing Aid | YES (circled) | | IV | OBSTETRIC/GYNECOLOGICAL HX | X | N/A |
| 11 | Gum disease | YES (circled) | NO | 1 | Date of last menstrual period | | |
| 12 | Head Injury | YES | NO (circled) | 2 | Number of pregnancies/live births | | |
| 13 | Heart Disease/Angina | YES | NO (circled) | 3 | History of Problem pregnancy | | |
| 14 | Hepatitis | YES | NO (circled) | 4 | Date of last pap smear | | |
| 15 | High Blood Pressure | YES (circled) | NO | 5 | Date of last mammogram | | |
| 16 | HIV +/AIDS | YES | NO (circled) | 6 | History of birth control methods (IUD, pills, etc) | | |
| | Prev HIV Test Date | | N/O | | | | |
| 17 | Homosexual/Bisexual Activities | | N/O | | | | |

**A.** If YES to any of the above indicate family member or self, give date and treatment received
(illegible circled) Father, Brother

**B** History of hospitalization? YES (circled) NO — Please list the DATE, HOSPITAL, CONDITION: Hillcrest Hospital

**C.** Do you have any current medical, mental health or dental complaints? YES (circled) NO
If yes, what: tooth pull, Depression

**D.** Have you experienced any of these symptoms cough, weakness, weight loss, fevers, night sweats, loss of appetite or lethargy?
YES (NO circled) If YES, when?

**E.** What illegal drugs have you used? No
What was the mode(s) of use? (Please circle) Smoking Injection Inhaled Ingested
What amount and how often did you use drugs and alcohol?
When was the last time you used drugs or alcohol?
Have you ever had withdrawal or seizures when you stopped using drugs or alcohol? YES NO

**F** Are you presently taking or supposed to be taking any prescribed medications? YES (circled) NO
If YES, what: See Med Sheet

HSM-13 (6/06)

DEFENDANT'S
EXHIBIT
2
tabbies

c:\documents and settings\...\local settings\temp\... printed by ... (Page 2 of 2)

Scanned by HICKS, STEPHANIE K. CCA in facility HUTCHINS (HJ) on 07/20/2011 13:32

CORRECTIONAL MANAGED CARE
INTAKE HISTORY AND HEALTH SCREENING

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Reason for taking medications | | | | | | | |
| G | Observations | Tremor | YES | NO (circled) | Sweating | YES | NO (circled) | Other |
| | Condition of skin | Cuts | YES | NO (circled) | Bruises | YES | NO (circled) | |
| | | Sores | YES | NO (circled) | Other | | | |
| | Body & Movement | Deformities | YES | NO (circled) | Impaired Motor Activity | YES | NO (circled) | |
| | | Other | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| H | BEHAVIOR AND MENTAL STATUS | | | | | | | | | | |
| | Hygiene & Appearance | ✓ | Clean, neat | | Dirty, sloppy | | Other | | | | |
| | Orientation (ask questions and document response) | | | | | | | | | | |
| | What is today's date? | 7/15/11 | | | | | | | | | |
| | What time is it? | Morning | | | | | | | | | |
| | What place is this? | Kitchen | | | | | | | | | |
| | Speech | ✓ | Normal | | Loud | | Soft | | Mumbling | | Other |
| | Attitude | ✓ | Appropriate | | Laughing | | Crying | | Cursing | | Quiet / Other |

| | | | |
|---|---|---|---|
| I | THOUGHT CONTENT (Please circle YES or NO) | | |
| | Are you having current thoughts about suicide or self-injury? | YES | NO (circled) |
| | Do you see or hear things that others do not see or hear? | YES | NO (circled) |
| | Do you have any special powers abilities? | YES | NO (circled) |
| | Do you receive personal messages from the TV or radio? | YES | NO (circled) |
| | Do you have any phobias or excessive fears? | YES | NO (circled) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| J | DISPOSITION | | | | | | | | |
| | Routine referral to | ✓ | Medical | ✓ | Mental Health | ✓ | Dental | ✓ | CID |
| | Immediate referral to | | Medical | | Mental Health | | Dental | | CID |
| | Release to general population | ✓ | YES | | NO | | Other | | |

| | | | |
|---|---|---|---|
| Offender Signature | [signature] | Date | 7-15-11 |
| Reviewer Signature | D. Haywood | Date | 7/15/11 |

[signature] RN 7/18/11

HSM-13 (6/08)

c:\documents and settings\tmorig\local settings\temp\170186431.tif printed by mivap. (Page 1 of 6)

EXHIBIT: 6
NAME: Bobbili
DATE: 2-7-13
Tina Terrell Barry CSR2005

SOUTHWESTERN
INSTITUTE OF FORENSIC SCIENCES
AT DALLAS

Office of the Medical Examiner

Autopsy Report

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

Case: IFS-11-10161 - ME
1721640

Decedent: McCollum, Larry Gene 58 years White Male DOB: 04/04/1953

Date of Death: 07/28/2011 (Actual)

Time of Death: 11:35 PM (Actual)

Examination Performed: 07/29/2011 09:30 AM

---

**ORGAN WEIGHTS:**

| | | | | | |
|---|---|---|---|---|---|
| Brain: | 1,600 g | Right Lung | 700 g | Right Kidney: | 260 g |
| Heart: | 550 g | Left Lung: | 500 g | Left Kidney: | 280 g |
| Liver: | 2,590 g | Spleen: | 250 g | | |

---

EXTERNAL EXAMINATION

The body is identified by tags. Photographs and fingerprints are taken.

The body is received nude. No personal effects or jewelry are present on the body.

The body is that of a normally-developed white male which appears consistent with the recorded age of 58 years. When nude, it measures 70 inches in length and weighs 345 pounds. There is good preservation in the absence of embalming. Rigor mortis is present. Lividity is located on the posterior body surfaces and blanches with pressure. The body is room temperature in the presence of minimal refrigeration.

The hairline is receding and there is short gray hair that is cut very close to the scalp. Mustache and beard stubble are on the face. The irides are brown and there are no petechiae of the bulbar or palpebral surface of the conjunctivae. The ears, nose, and lips are unremarkable. The mouth has natural dentition. The neck is without masses or unusual mobility. The chest and back are unremarkable. The abdomen is protuberant. The extremities are symmetric. The external genitalia, perineum, and anus are unremarkable.

A 1 inch area of indentation and red discoloration is on the right side of the forehead.

IDENTIFYING MARKS AND SCARS

A 3 inch linear scar is obliquely oriented on the right side of the abdomen.

A 2 inch linear scar is on the right temporal scalp.

EVIDENCE OF TREATMENT

RECEIVED
NOV 02 2010
CORED AND SENT

Accredited by The National Association of Medical Examiners

DEFENDANT'S
EXHIBIT
3
tabbies

Appendix 137

c:\documents and settings\tmorig\local settings\temp\170186431.tif printed by mivap. (Page 2 of 6)

IFS-11-10161
McCollum, Larry Gene

Page 2 of 6

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

- Cardiac monitor pads affixed to the chest
- Intravascular catheter in upper right arm
- Hospital band encircling left wrist
- Foley catheter
- Rectal catheter connected to plastic bag containing fecal material
- Needle puncture surrounded by ecchymosis in the left inguinal region
- Needle punctures in the right inguinal region, with extravasated blood within the soft tissue and musculature surrounding the right inguinal canal

EVIDENCE OF INJURY

A 1/4 inch purple contusion is on the superior aspect of the bridge of the nose.

Reflection of the scalp reveals a 3 cm area of hemorrhage in the left temporalis muscle along the parietal bone. A 1 inch purple contusion with central abrasion is immediately inferior to the left external ear. Deep to this is a 4 cm area of hemorrhage within the underlying soft tissue.

A 2 cm purple contusion is on the left supraclavicular region. A 2 inch purple to yellow contusion is on the right upper abdomen near the subcostal margin. A few purple contusions measuring between 1 and 2 cm each are on the left side of the chest. A 1/2 inch red abrasion is on the front of the proximal left forearm. A 2 inch purple contusion is on the posterior aspect of the left thigh.

INTERNAL EXAMINATION

BODY CAVITIES: Approximately 300 cc of tan clear fluid are within each pleural cavity. The pericardial and peritoneal cavities contain no adhesions or abnormal collections of blood or other fluid.

HEAD: See EVIDENCE OF INJURY. The dura and dural sinuses are unremarkable. There are no epidural, subdural or subarachnoid hemorrhages. The leptomeninges are thin and delicate. The cerebral hemispheres are symmetrical, with flattened gyri and effaced sulci. There is mild notching of the parahippocampal gyri. The cerebellar tonsils are soft; sections reveal friable, tan-red necrotic parenchyma. The cranial nerves and blood vessels are unremarkable. Sections through the brainstem are unremarkable. Sections through the cerebral hemispheres exhibit diffuse blurring of the gray-white matter junctions. There are no hemorrhages in the deep white matter or the basal ganglia. The cerebral ventricles contain no blood. The spinal cord, as viewed from the cranial cavity, is unremarkable.

NECK: The soft tissues and prevertebral fascia are unremarkable. The hyoid bone and laryngeal cartilages are intact. The lumen of the larynx is not obstructed.

CARDIOVASCULAR SYSTEM: The intimal surface of the abdominal aorta is free of significant atherosclerosis. The aorta and its major branches and the great veins are normally distributed and unremarkable. The pulmonary arteries contain no thromboemboli. The heart is markedly enlarged, with normal contours. The pericardium, epicardium, and endocardium are smooth, glistening, and unremarkable. There are no thrombi in the atria or ventricles. The foramen ovale is closed. The coronary arterial system is free of significant atherosclerosis. The atrial and ventricular septa are intact. The cardiac valves are unremarkable. The myocardium is dark red-brown and firm, and there are no focal

Accredited by The National Association of Medical Examiners

Appendix 138

c:\documents and settings\tmorig\local settings\temp\170188431.tif printed by mivap. (Page 3 of 6)

IFS-11-10161
McCollum, Larry Gene

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

Page 3 of 6

abnormalities.

RESPIRATORY SYSTEM: The upper airway is unobstructed. The laryngeal mucosa is smooth and unremarkable, without petechiae. The pleural surfaces are smooth and glistening. The major bronchi are unremarkable. Sectioning of the lungs discloses a dark red-blue, moderately congested parenchyma.

HEPATOBILIARY SYSTEM: The liver is covered by a smooth, glistening capsule. The parenchyma is dark red-brown and moderately congested. The gallbladder contains approximately 10 cc of dark green bile, and one dark green cholesterol stone measuring approximately 2 inches in greatest dimension.

GASTROINTESTINAL SYSTEM: The tongue is grossly normal both externally and upon sectioning. The esophageal mucosa is gray, smooth, and unremarkable. The stomach is empty. There are no tablets or capsules. The gastric mucosa has normal rugal folds, and there are no ulcers. The small and large intestines are externally unremarkable. The appendix is absent. The pancreas is unremarkable externally and upon sectioning.

GENITOURINARY SYSTEM: The capsules of both kidneys strip with ease to reveal smooth and slightly lobulated surfaces. The cortices are of normal thickness, with well-demarcated corticomedullary junctions. The calyces, pelves, and ureters are unremarkable. The urinary bladder is empty. The mucosa is gray, smooth, and unremarkable. The prostate gland is unremarkable both externally and upon sectioning.

ENDOCRINE SYSTEM: The thyroid and adrenal glands are unremarkable externally and upon sectioning.

LYMPHORETICULAR SYSTEM: The spleen is covered by a smooth, blue-gray, intact capsule. The parenchyma is dark red. The cervical, hilar, and peritoneal lymph nodes are unremarkable.

MUSCULOSKELETAL SYSTEM: The clavicles, ribs, sternum, pelvis, and vertebral column have no fractures. The diaphragm is intact.

MICROSCOPIC EXAMINATION:

Heart: myocyte hypertrophy; increased interstitial and perivascular fibrosis.

Lung: vascular congestion.

Liver: moderate macrovesicular steatosis, mild focal centrilobular necrosis.

Kidney: No significant pathologic alteration is identified.

Spleen: diffuse hypocellularity with depletion of both the red and white pulp.

Accredited by The National Association of Medical Examiners

Appendix 139

c:\documents and settings\tmorig\local settings\temp\170186431.tif printed by mivap. (Page 4 of 6)

IFS-11-10161

McCollum, Larry Gene

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

Page 4 of 6

TOXICOLOGY:

Evidence Submitted:

The following items were received by the Laboratory from the Office of the Medical Examiner:

004: Biohazard Bag
004-001: Blood, femoral - gray top tube
004-002: Blood, femoral - gray top tube
004-003: Blood, femoral - gray top tube
004-004: Blood, femoral - gray top tube
004-005: Blood, femoral - red top tube
004-006: Vitreous - red top tube
004-007: Skeletal muscle - plastic tube

Blood, postmortem

Acid/Neutral Screen (GC/MS)
negative (004-001)

Alcohols/Acetone (GC)
negative (004-002)

Alkaline Quantitation (GC, GC/MS)
negative (004-001)

Opiate Narcotics (GC/MS)
0.107 mg/L morphine (004-002)

Vitreous

Alcohols/Acetone (GC)
negative (004-006)

Opiate Narcotics (GC/MS)
0.045 mg/L morphine (004-006)

Accredited by The National Association of Medical Examiners

Appendix 140



c:\documents and settings\tmorig\local settings\temp\170186431.tif printed by mivap. (Page 5 of 6)

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCE

**FINDINGS:**

1. Hyperthermia

a. History that the decedent was in a hot environment without air conditioning, and was witnessed to collapse with seizure activity.

b. History that the decedent presented to the Emergency Department unresponsive, with a body temperature of 109.4 degrees Fahrenheit.

c. Hospital course complicated by
   1. hypoxic-ischemic encephalopathy
   2. disseminated intravascular coagulation
   3. shock
   4. multi-system organ failure

d. Brain swelling
   1. transtentorial herniation
   2. cerebellar tonsillar herniation and acute necrosis
   3. hypoxic-ischemic encephalopathy

2. History of hypertension

a. Cardiac hypertrophy (heart weight = 550 grams)

b. History of treatment with hydrochlorthiazide

3. Morbid obesity (Body mass index = 49.5)

4. Contusions of scalp and face

5. Subgaleal hemorrhage

6. No significant injuries

**CONCLUSIONS:**

Based on the autopsy and the history available to me, it is my opinion that Larry Gene McCollum, a 58-year-old white male, died as the result of hyperthermia. The decedent was in a hot environment without air conditioning, and he may have been further predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension.

**MANNER OF DEATH:** Accident



c:\documents and settings\tmorig\local settings\temp\170186431.tif printed by mivap. (Page 6 of 6)

IFS-11-10161
McCollum, Larry Gene

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

Page 6 of 6

10/26/2011
Keith Pinckard, M.D., Ph.D.
Medical Examiner

Accredited by The National Association of Medical Examiners

Appendix 142



TEXAS DEPARTMENT

OF

CRIMINAL JUSTICE

**NUMBER:** AD-06.07 (rev. 4)

**DATE:** January 30, 2007

**PAGE:** 1 of 2

**SUPERSEDES:** AD-06.07 (rev. 3) February 21, 2003

# ADMINISTRATIVE DIRECTIVE

**SUBJECT:** ACCESS TO HEALTH SERVICES

**AUTHORITY:** Sections 499.102(a)(7) and (8), 501.051 and 501.059, Texas Government Code

Reference: American Correctional Association (ACA) Standard 4-4344

**APPLICABILITY:** Correctional Institutions Division (CID) and Parole Division

**POLICY:**

The Texas Department of Criminal Justice (TDCJ) shall provide all incarcerated offenders with full access to health services. These procedures must be communicated orally and in writing to offenders upon arrival on the unit.

Incarcerated offenders are to be provided access to health services daily. Medical departments on the units have procedures that are to be followed to provide sick call, routine appointments, chronic disease appointments, specialty clinics, medical treatment, diagnostic appointments, and emergency services.

**PROCEDURES:**

I. Each unit must have written procedures addressing health care matters.

II. It is the responsibility of the security staff to facilitate access to health services. Staff shall not block or hinder access to health services.

III. During regular medical department working hours, incarcerated offenders shall have health-related complaints and requests addressed by health care professionals. It is the responsibility of the health care professional to determine whether the complaint or request requires immediate attention. Health care professionals may arrange subsequent evaluations if indicated.

DEFENDANT'S
EXHIBIT
4
tabbies

IV. All urgent requests and complaints must be addressed by health care professionals immediately.

A. Each unit shall post procedures for contacting health care personnel 24 hours per day.

B. Incarcerated offenders with conditions such as asthma, epilepsy, diabetes, attempted suicide, chest pains, shortness of breath, labored breathing or similar conditions, should be afforded immediate access to health services.

C. Institutional operations such as count, feeding, work schedules, or similar routine operations, may not be used as reason to delay access to health services staff for urgent or emergency complaints.

V. The judgment of health care professionals regarding health-related conditions takes precedence over unit operations.

Ed Owens *
Deputy Executive Director

* Signature on File



THE STATE OF TEXAS

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

# OFFENDER ORIENTATION HANDBOOK

as

Approved by the

Director of the Texas Department of Criminal Justice, Correctional Institutions Division

Printed
November, 2004

I-202 (rev.11/04)

DEFENDANT'S
EXHIBIT
5
tabbies

Appendix 145

# CHAPTER 1

# OFFENDER ACCESS TO SERVICES AND STANDARDS FOR BEHAVIOR

## I. RECEPTION AND DIAGNOSTIC PROCESS

All offenders in the TDCJ are received either at a transfer facility, a reception diagnostic facility, a state jail intake facility or a SAFP intake facility. These facilities are equipped to receive and process offenders admitted to the agency's custody. Offenders who speak little or no English will be identified and will receive the necessary type of language assistance while in the Diagnostic Process and later when assigned to a unit.

### A. Receiving and Screening

Offenders will be searched upon arriving at a TDCJ facility. A receipt will be completed for each offender's money and property. Medical care will be given, if considered urgent. Offenders will be housed according to security needs. State clothing will be issued; haircuts and showers provided.

### B. Photographs and Fingerprints

Each offender will go to the Photograph and Identification Department where he will be:

1. photographed,
2. fingerprinted,
3. examined for any identifying scars, marks, or tattoos, and
4. interviewed to obtain basic information.

The fingerprints will be sent to the FBI and the Texas Department of Public Safety (DPS). The Photograph and Identification process helps identify every offender to make sure no one is admitted or released illegally, and creates the state-issued identification card that each offender is required to carry.

### C. Physical Examination

Offenders will be given a physical examination by medical and dental staff. The medical and dental staff will ask each offender about his medical history. The medical and dental staff will use the results of the examination to determine the special needs, if any, of an offender. The special medical needs of an offender will be taken into consideration during the classification process.

### D. Mental Health Screening

Each offender will undergo an initial psychological screening. If during this process it is determined there may be special needs, the offender will be referred for further evaluation. (This process is not used on SAFP intake facilities.)

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 04/07<br>Replaces: 08/97<br>Formulated: 8/87<br>Reviewed: 04/11 | NUMBER: A-08.4<br>Page 1 of 2 |
|---|---|---|
| **OFFENDER MEDICAL AND MENTAL HEALTH CLASSIFICATION** | | |

**PURPOSE:** To provide a standardized system of classifying medical and/or mental health limitations for the offender population incarcerated within the Texas Department of Criminal Justice (TDCJ).

**POLICY:** Offenders incarcerated within TDCJ will be assessed for medical and/or mental impairments by qualified healthcare personnel (see Attachment A) who will assign each offender appropriate restrictions related to (1) housing, (2) physical activities and work, (3) disciplinary process, (4) individual treatment plan, and (5) transportation. Restrictions will be indicated on the Health Summary for Classification (HSM-18).

**PROCESS:**

I. Each offender will undergo medical and mental health assessments by trained health services personnel during the intake process and appropriate limitations/restrictions will be assigned and entered on the Health Summary for Classification (HSM-18) screen.

II. The HSM-18 will be reviewed and, if indicated, updated whenever an offender is newly assigned to a facility or returns from an off-site specialty clinic, infirmary, or hospital.

III. Recognizing that an offender's condition may change and/or opinions may differ among health care professionals, an offender's HSM-18 may be reviewed and revised at the discretion of a physician, dentist, psychiatrist, mid-level provider, or Master's Level or higher Psychologist. HSM-18 review with appropriate updating is *required* whenever there is a *significant* change in the offender's medical or mental status.

IV. All changes in the Health Summary for Classification will include documentation of the reason(s) or rationale for the change. Changes may be based upon chart review alone but if challenged, an examination of the offender must be conducted. This examination/evaluation will be made at no charge to the offender. Pertinent findings (both positive and negative) to support the examiner's HSM-18 decision(s) will be documented in the medical record.

V. The final authority as to whether an offender's HSM-18 limitations/restrictions are correct will be the facility Medical Director or psychiatrist (as appropriate) at the offender's current facility of assignment. Higher level intervention (Regional/District/Division Medical Director) will occur only on a case by case basis in unusual or extraordinary situations.

VI. All limitations/restrictions regarding an offender's housing, work, disciplinary process, transportation, and individual treatment plan requirements will be documented in his/her medical record. Should discrepancies exist between the Health Summary for Classification

DEFENDANT'S
EXHIBIT
6

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 04/07<br>Replaces: 08/97<br>Formulated: 8/87<br>Reviewed: 04/11 | NUMBER: A-08.4<br>Page 2 of 2 |
|---|---|---|

**OFFENDER MEDICAL AND MENTAL HEALTH CLASSIFICATION**

(HSM-18) screen and the medical record, the medical record is the prevailing authority pending clarification from an appropriate healthcare provider.

VII. Medical and psychiatric diagnoses will be assigned appropriate Alert Codes and the Alert Codes entered into the TDCJ data processing system within 5 working days. (Reference: Health Services Data Processing Manual)

Reference: 2008 NCCHC Standard P-A-08, Communication on Patients' Health Needs (essential)
ACA Standard 4-4396 (Ref 3-4377)
ACA Standard 4-4399 (Ref 3-4369)

Appendix 148

# Health Services Liaison Facility Types List

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Single-Level Units** | | | | | | | |
| **Type 1** | AH AJ B1 B2 BA BB BJ BH BL BX BY CL CM CY DB DL DW E2 GC GG GL HB HF HI HJ HM J3 JH LH LJ LM LN LT MI ML N2 N5 N6 NE NF NH NI P1 P2 R3 RB RL RZ SB SM ST TE TH TI TL TO WI WL WM WR XQ | | | | | | |
| **Type 2** | AJ B2 BA BB BH BL BY CL CM DB DL DW GC GG GL HB HF HI HM J3 JH LH LM LN LT N2 N5 N6 P1 P2 R3 RL RZ SB SM TE TI WI WL WM | | | | | | |
| **Type 3** | B2 CL DW GC GG HF HM J3 LT N2 N5 N6 P1 P2 R3 TI WM | | | | | | |
| **Chronic Care Facilities and Units with Extended Hours** | | | | | | | |
| **Type 1** | AH B1 B2 BC CO CY DA DU E2 GC GL(HS) GV HD J3 J4 JA JM MI ML MV P1 P2 R3 RB ST SV TL TO XQ | | | | | | |
| **Type 2** | ST | **Type 3A** | E2 GR | **Type 3B** | E1 | **Type 4** | DA GC |
| **Extended hours** | AJ BA BB BH BJ BL BX BY CL CM CN DB DH DL E1 EA EN FB FE GL(GP) GR HB HI HJ HT HV J1 J2 JH JN JT KN KY LC LH LJ LM LN LT N1 N2 ND NE NF NH R1 R2 RH RL RV SB SM T1 TI WL WM WY | | | | | | |
| **Geriatric Units** | | | | | | | |
| **Type 1** | B2 GC HI JM MI P1 R3 TL | | | **Type 2** | E2 | | |
| **Special Services and Accommodations** | | | | | | | |
| **Serviced by Hub** | B1 B2 BA BJ BY CO DO DU E1 E2 EA FE GL GR GV J1 J2 J3 HT HV LM MI ML MV N6 ND NF NH NI R1 R2 R3 ST WM WY | | | | | | |
| **Wheelchair beds** | BA BJ BY B2 E2 HS GC GL (HS) HI (4 SOEP beds) J3 LM N6 P1 ST | | | | | | |
| **CPAP** | AH B1 B2 BA BC BX BY CN CO CY DA DB DH DL DU E1 E2 EA FB FE GC GL GR GV HB HD HF HG HI HT HV J1 J2 J3 J4 JA JM JN JT KN LH LJ LM LT MI ML MV P1 P2 R1 R2 R3 RB RH RV SB SM ST SV TE TL TO WL WR WY | | | | | | |
| **Daily access to HG** | BJ CN DA DU E1 E2 GC GR J1 J2 J3 J4 LJ LT R1 R2 R3 ST TL(Death Row) WY | | | **Daily access to UMC** | BC JM KN RB | | |
| **ADA showers** | AJ B2 BA BX BY DU E2 (HS) GC GL (HS) HD HI J3 LT P1 RB ST SY | | | **Medical showers** | BJ JA LJ LM N1 N6 NF R3 SM TH TI WM WY | | |
| **Type 1 ADS** | TL (vision) | **Type 2 ADS** | E2 LM (vision and hearing) | **Hemophilia** | J3 | | |
| **Dialysis** | E2 JM GC | | | | | | |
| **Mental Health Services** | | | | | | | |
| **Outpatient mental health** | **ALL UNITS *EXCEPT*** BB BR CM CV DB DH DO DW EN FB GG HF HM J2 JN JT KY LC N1 N2 N3 N4 N5 N6 NJ RD RH RZ SB SO SY TE TH VS WL WR (GR and HI for SOTP/SOEP offenders only.) | | | | | | |
| **TARPP** | AH B1 B2 BA BJ BY CL CN CO CY DA E1 E2 EA FE GC GL GV HB HI HT HV J3 JH LJ LM LN MI ML MV ND P1 P2 R1 R2 R3 RV ST TI TL TO WI WM WY | | | | | | |
| **Therapy Services** | | | | | | | |
| **Physical** | B1 E2 GC J3 JM LM (B2 if o/f can ride chain) | | | **Occupational** | E2 J3 LM | | |
| **Respiratory** | E2 GC JM | | | **Speech** | Daily access to HG | | |
| **Ultraviolet Light** | E2 | | | | | | |
| **Correctional Managed Health Care University Service Areas** | | | | | | | |
| **TTUHSC** | BC DH DL DW FB JA JM JN KN LH N3 N5 NE NJ TH RB RD RH RZ SM SY WL WR | | | | | | |
| **UTMB** | AH AJ B1 B2 BA BB BH BJ BL BM BX BY CN CL CM CO CV CY DB DU DA DO EA EN E1 E2 FE GC GG GL GR GV HB HD HI HF HJ HT HV J1 J2 J3 J4 JH JT LJ LM LN LT MI ML MV ND NF NH NI N1 N2 N4 N6 P1 P2 R1 R2 RL RV SB SO ST SV TE TI TL TO VS WI WM WY | | | | | | |

**Key:**
ADS – Assistive disability services
HG – Hospital Galveston
HS – High Security
SOEP – Sex Offender Education Program
SOTP – Sex Offender Treatment Program
TARPP – Treatment and Relapse Prevention Program
TTUHSC – Texas Tech University Health Sciences Center
UMC – University Medical Center
UTMB – University of Texas Medical Branch

Updated October 21, 2013

DEFENDANT'S EXHIBIT
7
tabbies

# TDCJ Health Services Liaison Facility Types List
## Definitions

| | |
|---|---|
| Administrative Segregation Intermediate Care Program | Abbreviated ASICP, the program is designed for offenders who have been in administrative segregation with long-term behavior problems. Currently Gib Lewis is the only facility providing this program. |
| Air-Conditioned/Climate Controlled Facilities | Some facilities have some housing areas with air conditioning, tempered air or climate controlled. Not all offenders meet the security criteria to be in the climate-controlled cells/dorms on the facility. **HSL *cannot* request reassignment of an offender to an air-conditioned or climate-controlled facility.** Providers requesting reassignment of offenders to this type of environment should be referred to their Utilization Review/Management Department for inpatient placement. |
| Chronic Care Facilities | The term **Type 1 Chronic Care Facility** is used to describe units that have healthcare available to offenders 24 hours per day, seven days per week. Some of these units also have inpatient care facilities. This category is beneficial because of the easy accessibility of healthcare providers. The establishment of this category was also intended to reduce the need for trips to off-site hospitals. A **Type 2 Chronic Care Facility** houses offenders who have infectious diseases, multiple secondary health issues and those offenders requested to be housed there by UTMB Infectious Disease Clinic staff in Galveston. Presently the only unit in this category is **Stiles**. A **Type 3A Chronic Care Facility** houses male oncology patients, offenders who are undergoing paracentesis, chemotherapy, radiation therapy or are recipients of solid organ transplants. The term **Type 3B Chronic Care Facility** was created in the aftermath of Hurricane Ike when oncology services were contracted through private vendors in the Huntsville area and was designed to house houses male offenders undergoing work-up and oncology disease staging. The term, while not currently used, was retained in case it became necessary to revert to in the future. A **Type 4 Chronic Care Facility** houses offenders undergoing triple drug therapy for Hepatitis C virus. |
| Units with Extended Hours | Offenders taking psychotropic medications, tricyclic antidepressants, lithium or insulin are housed on units with extended hours. These units are staffed 12 to 16 hours per day, seven days a week. |
| CPAP Housing | Offenders who require use of a continuous positive airway pressure (CPAP) machine at night can be housed in general population. |
| Daily Access to Hospital Galveston (HG) | In order to prevent large numbers of offenders being housed in transient status on various units, those with frequent (at least monthly) specialty clinic appointments at Hospital Galveston are housed at units with daily access. |
| Daily Access to University Medical Center (UMC) | In order to prevent large numbers of offenders being housed in transient status on various units, those with frequent (at least monthly) specialty clinic appointments at University Medical Center are housed at units with daily access. |
| Dialysis | Male offenders receive dialysis at **Estelle Unit** and **Montford Unit** and as inpatients at **Carole Young Infirmary**. Per the CMHC contract seventy-eight percent of the offenders requiring dialysis should dialyze at Estelle and 22 percent at Montford; however due to security and medical restrictions at Montford (which houses dialysis patients in a trusty camp) it has never been possible to attain this percentile. Agreements between the university medical directors state that HIV-positive and wheelchair-dependent offenders are housed on the UTMB side of the state to accommodate their specific needs. All female offenders are dialyzed at **Carole Young**. |
| Geriatric Facilities | Units which have designated sleeping areas and accommodations for pill and diet lines are classified as **Type 1 Geriatric Facilities.** The "Type 1" designator reflects the offender's ability to function on units of fairly large size. A **Type 2 Geriatric Facility** meets the same criteria as a type one, but additionally offers access to multiple ancillary services and accommodations (physical and occupational therapy, respiratory therapy, limited wheelchair accommodations and air-controlled environment). Currently the **Estelle Unit** is the only facility that is designated a Type 2 Geriatric Facility. |
| Hemophiliac Program | Hemophiliacs requiring frequent administration of Factor VII are housed at **Jester 3**, provided they meet security criteria. |

# TDCJ Health Services Liaison Facility Types List
## Definitions (Continued)

| | |
|---|---|
| Mental Health Services | Outpatient mental health services are available at all state jails and many Institutional Division units throughout the system. Intake facilities are non-caseload units. Offenders on these units who require outpatient mental health services are brought into the Institutional Division and assigned to a unit with TARPP. ***Goree and Hightower Unit have outpatient mental health services for SOTP and SOEP offenders only. **Treatment and Relapse Prevention Program (TARPP)** is a mental health program offered in the UTMB Sector offered on selected units throughout the system. |
| Region I/Huntsville Area assigned for appointment | This category is for male offenders who require Remicade injections. These offenders will be reassigned to a unit within Huntsville. They will have recurring appointments at Estelle, which will appear in the MSRS system. They will ride the chain bus to Estelle on the day of their appointments and return to their units of assignment on the next available chain. Female offenders requiring Remicade will be housed at **Carole Young**. HSL will request CRO reassign the offender to a Type 1 Chronic Care facility with daily access to Hospital Galveston. |
| Showers | **ADA-Accommodating** showers meet specifications of the Americans with Disabilities Act. This restriction should be requested for offenders who are wheelchair-dependent or have significant mobility restrictions. **Medical** showers have some, but not all, aspects of an ADA-accommodating shower. For example, they may have a seat and handrails, but the handrails are not placed to meet specific ADA requirements. They are appropriate for offenders who use crutches or need to sit while showering. |
| Single-Level Units | A single-level unit is one in which the court stipulated facilities (i.e., dining hall, law library, medical and education departments and showers) are on the ground floor. A single-level unit designator does not necessarily denote that the facility has only one floor. Offenders can always be housed on a smaller single-level unit than requested. Single-level units are provided designators based upon the distance offenders must be able to walk in order to function on the unit. A **Type 1 Single-Level** Unit is the largest of the single-level units. A **Type 2 Single-Level Unit** is a midsized single-level units, usually referring to the 1000-man prototype facilities. A **Type 3 Single-Level Unit** is the smallest of the unit prototypes, and all are located within the UTMB service area. |
| Speech Therapy | Speech therapy referrals are made by the unit medical staff to Kimberly Cotton, Director of the Assistive Disability Services Program (ADS). If approved, the service is provided at UTMB Hospital-Galveston. |
| TARPP | Treatment and Relapse Prevention Program, a mental health program provided to offenders in the UTMB sector. Once an offender has been identified as requiring TARPP, this restriction remains in place for the duration of his incarceration. |
| Ultraviolet (UV) Light Therapy | This is a clinic at **Estelle** that treats offenders who require UV Light Therapy. Offenders require treatment three times per week for several months at a time. |
| Units Supported by Medical Hubs | Offenders who do not require assignment at a Type 1 Chronic Care facility, but may need access to a facility that offers medical services 24-hours per day, can be assigned to a unit serviced by UTMB's medical hubs, or the Hub unit itself. |
| Wheelchair Facilities | All male ID offenders are received at Byrd Unit and, immediately after in-processing (within a few days) are transferred to Jester 3 for evaluation by a physiatrist. All offenders with T-6 and higher level injuries will require housing in a climate-controlled environment. Dorms 15 and 16 at Jester 3 are air-conditioned. The high security cells at Estelle and Lewis have been approved to accommodate higher level injuries by Dr. G. Williams. All wheelchair-dependent offenders must be able to perform all activities of daily living (ADLs) in order to be in general population. Offenders unable to perform their own ADLs are housed in infirmary beds (coordinated through UTMB Utilization Review). If a state jail confinee requires physical or occupational therapy services, he/she will be temporarily assigned to the Jester 3 (male) or Murray (female) while undergoing treatment; otherwise he/she will be housed on a state jail that is ADA-accommodating. At this time the only state jail that accommodates male offenders is Gist. The Plane State Jail is under renovation for female offender and they are housed at Lane Murray. |

# Hours of Operation

## Type I Chronic Care Units (30)

(Staffed 24 hours per day, seven days a week)

| Texas Tech | | | | | |
|---|---|---|---|---|---|
| Allred | Clements | Montford | Robertson | | |
| **UTMB** | | | | | |
| Beto | Byrd | Coffield | Connally | Crain | Darrington |
| Estelle | Hodge | Hughes | Jester 3 | Jester 4 | Lewis HS |
| Luther | McConnell | Michael | Mt. View | Pack | Polunsky |
| Powledge | Skyview | Stiles | Telford | Terrell | Young |
| **Private** | | | | | |
| East Texas Treatment Facility | | | | | |

## Units with Extended Hours (54)

(Staffed 12-16 hours per day, seven days a week)

| 12-13 Hour Shifts 7 Days a Week | | | | | |
|---|---|---|---|---|---|
| **Texas Tech** | | | | | |
| Dalhart | Daniel | Formby | Jordan | Lynaugh | Middleton |
| Neal | Roach | Smith | Wallace | | |
| **UTMB** | | | | | |
| Bartlett | Boyd | Bradshaw | Briscoe | Clemens | Cole |
| Dominguez | Gist | Halbert | Henley | Hutchins | Jester 1 |
| Johnston | LeBlanc | Lewis (GP) | Lindsey | Lockhart | Lopez |
| Marlin | C. Moore | Murray | San Saba | Scott | Segovia |
| Stevenson | Travis | Vance | Woodman | | |
| **Private** | | | | | |
| Bridgeport (T1-female) | | Kyle | | | |
| **14-15 Hour Shifts Weekdays/12-Hour Shifts Weekends (All UTMB)** | | | | | |
| Eastham | Ellis | Ferguson | Goree | Hamilton | Hightower |
| Hilltop | Hobby | Holliday | Huntsville | Lychner | Plane |
| Ramsey 1 | Stringfellow | Wynne | | | |
| **16-Hour Shifts Weekdays/12-Hour Shifts Weekends (All UTMB)** | | | | | |
| Garza | Gurney | | | | |

## Eight-Hour Units (27)

(Staffed 8 hours per day, seven days a week)

| Texas Tech | | | | | |
|---|---|---|---|---|---|
| Baten | Ft. Stockton | Havins | Rudd | Sanchez | Sayle |
| Tulia | Ware | Wheeler | | | |
| **UTMB** | | | | | |
| Bridgeport (BR) | Cleveland | Cotulla | Diboll | Duncan | Estes |
| Glossbrenner | Goodman | Kegans | B. Moore | Ney | Torres |
| Willacy | | | | | |

CMHC2010.002

CMHCC-UTMB Master
FY 2010-2011

# AGREEMENT BETWEEN
# CORRECTIONAL MANAGED HEALTH
# CARE COMMITTEE
# and
# THE UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON
# FOR
# CORRECTIONAL HEALTH SERVICES
# FY 2010-2011 Biennium

DEFENDANT'S
EXHIBIT
8
tabbies

1

Appendix 153

## Article V
## CONTRACT AMOUNT

In the absence of a Natural or Manmade Catastrophe, or unless provided otherwise in this Agreement, the amount of this Agreement shall not exceed $734,077,668 for the FY 2010-2011 biennium.

## Article VI
## OFFENDER POPULATION

The Texas Department of Criminal Justice shall have responsibility for placement of offenders. This will be accomplished in conformity with the governing statute, Chapter 494, the Texas Government Code, and existing classification criteria. The Texas Department of Criminal Justice State Classification Committee shall have sole responsibility for the placement of offenders in the units, provided however, that the decision to admit or discharge an offender patient to/from a regional medical facility, infirmary or hospital is the sole responsibility of the treating physician. TDCJ shall make a good faith effort to initiate the review, classification and transfer of offender patients from infirmary beds upon notification that the offender patient is able to return to the population. Concerns about delays in transfer of discharged patients from an infirmary shall be communicated to the TDCJ Division Director for Health Services.

## Article VII
## INDEPENDENT CONTRACTORS

Nothing contained herein shall be construed as creating the relationship of employer and employee between the CMHCC, its employees, agents and contractors and UTMB, its employees, agents and contractors. In carrying out the terms of this Agreement, UTMB shall select their own employees and Participating Providers.

## Article VIII
## QUALITY OF CARE MONITORING

CMHC2010.002

CMHCC-UTMB Master
FY 2010-2011

# AGREEMENT BETWEEN CORRECTIONAL MANAGED HEALTH CARE COMMITTEE and THE UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON FOR CORRECTIONAL HEALTH SERVICES

FY 2010-2011 Biennium

DEFENDANT'S
EXHIBIT
9
tabbies

be conducted in accordance with TDCJ policy AD-03.29 (Procedures for Offender Deaths).

5. Policy/Procedures: provide TDCJ with staff and clerical support for initiation of new policies, annual revision of current policies and distribution of same. All statewide Health Services policies and procedures will be developed through a joint policy and procedure committee process that includes representatives of TDCJ, UTMB, TTUHSC and the CMHCC. All policies approved by the joint policy and procedure committee shall be submitted for review and approval by each Medical Director. The TDCJ Medical Director shall retain final approval authority for all statewide policies.

G. **Services Provided by TDCJ**: The TDCJ shall provide the following services which shall be financed directly by TDCJ including, but not limited to:

1. Utilities, housekeeping, medical office trash removal, housekeeping supplies (including paper towels, toilet tissue, trash bags, floor buffers and pads, soap, wax, etc.) and maintenance of TDCJ facilities, to include good faith efforts to maintain necessary HVAC systems for medical clinic service areas in operable condition.

2. Administrative support services, including but not limited to, access and use of agency motor pool resources to include such items as fuel, tires, batteries, routine servicing for vehicles used solely for the provision of services to TDCJ offenders; access to and use of agency mail systems; and, use of agency mainframe computer applications and basic telephone services. Administrative support services shall be used solely for TDCJ offender care. .

3. All capital equipment customarily included as part of the construction of any new TDCJ Unit Clinics occupied after the effective date of this Agreement. Prior written approval of TDCJ is required for the addition of major capital equipment items which require additional facility infrastructure support such as power, water, wastewater, air conditioning, etc. to ensure sufficient support is available. Requests should be sent to the Facilities Division, Planning and Programming Branch for written approval and coordination.

4. General and security orientation.

**EXHIBIT 10 – Data used to *estimate* percent of TDCJ offenders with conditions associated with *potential* increased risk of heat illness.**

**From:** King, Earl S.
**Sent:** Wednesday, July 03, 2013 3:15 PM
**To:** Adams, Glenda M.
**Subject:** RE: Legal Case Data Request

Dr. Adams,

Here is the data you requested:

Total Population: 160919
Cardiovascular Disease: 5040
Liver Disease: 4699
Chronic Obstructive Pulmonary Disease/Asthma: 9334
Cystic fibrosis: 148
Diabetes: 8071
Psychiatric conditions: 35975
Sjogren's syndrome: 1
Sweat gland dysfunction: 644
Thyroid dysfunction: 5721
Age >= 65: 2572
Age >= 55: 13520

Some of this data was retrieved from old reports. Some of it had to be reconstructed and may not be as accurate. However, if there are any errors, it is that the numbers for liver disease, cystic fibrosis, sweat gland disorders, Sjorgren's Syndrome, thyroid dysfunction, and psychiatric conditions is too low.

Please let me know if you need anything else.

Earl King
Programmer/Analyst II
Quality and Outcomes Management-Correctional Managed Care
University of Texas Medical Branch
301 University Boulevard - Galveston, Texas 77555-1008
Phone: (832) 684-6027

DEFENDANT'S
EXHIBIT
10
tabbies

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law in the Estate of LARRY GENE McCOLLUM,
Plaintiffs,

VS.

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

CIVIL ACTION NO.
3:12-cv-02037

ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY, M.D.

NOVEMBER 20, 2013

ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY, M.D., produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on Wednesday, November 20, 2013, from 9:07 a.m. to 12:58 p.m., before Mary C. Dopico, Certified Shorthand Reporter No. 463 and Notary Public in and for the State of Texas, reported by machine shorthand and audio/video recording at the offices of Rebecca Sealy Hospital, 404 8th Street, Room, 4.204, Galveston, Texas, pursuant to Notice and the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

A P P E A R A N C E S

COUNSEL FOR PLAINTIFFS:
Mr. Jeff Edwards
The Edwards Law Firm
The Hachnel Building
1101 East 11th Street
Austin, Texas 78702
Tel: 512/623-7727 Fax: 512/623-7729
E-mail: jeff@edwards-law.com

COUNSEL FOR DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
Ms. Shanna Molinare
Ms. Kim Coogan
Assistant Attorneys General
P.O. Box 12548
Austin, Texas 78711-2548
Tel: 512/463-2080 Fax: 512/495-9139
E-mail: shanna.molinare@texasattorneygeneral.gov
kim.coogan@texasattorneygeneral.gov

COUNSEL FOR DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE AND INDIVIDUAL TDCJ DEFENDANTS:
Mr. Jonathan Stone
Mr. Bruce R. Garcia
Assistant Attorneys General
P.O. Box 12548
Austin, Texas 78711-2548
Tel: 512/463-2080 Fax: 512/495-9139
E-mail: jonathan.stone@texasattorneygeneral.gov
bruce.garcia@texasattorneygeneral.gov

ALSO PRESENT:
Dr. Glenda Adams Karen Matlock
Jennifer Osteen Carol Londa Bremmond

REPORTED BY: Mary C. Dopico, CSR, RPR, CRR, Wright Watson & Associates
VIDEO BY: Tim Bishop

3

INDEX
ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY, M.D.
NOVEMBER 20, 2013

| | PAGE |
|---|---|
| Appearances | 2 |
| Proceedings/Stipulations | 4 |
| Changes and Signature Page | 156 |
| Reporter's Certification | 158 |
| OWEN MURRAY, M.D. | |
| Examination, by Mr. Edwards | 4 |
| MURRAY EXHIBITS | |
| Exhibit 1 — Plaintiffs' First Amended Notice of Intention to Take Oral and Videotaped Deposition of Dr. Owen Murray and Subpoena Duces Tecum (6 pages) | 4 |
| Exhibit 2 — Winter 2010 UTMB Magazine article titled "Big House Health Care: Why and how UTMB treats the incarcerated (6 pages) | 108 |
| Exhibit 3 — 06-14-13 chart titled Texas Department of Criminal Justice Offender Hyperthermia Deaths CY2001 - CY2013 (YTD June) (1 page) | 151 |
| Exhibit 4 — Texas Department of Criminal Justice Temperature Logs (001488-001495) | 151 |
| VIDEOTAPES | |
| Tape 1 | 4 |
| Tape 2 | 55 |
| Tape 3 | 95 |
| Tape 4 | 149 |

4

P R O C E E D I N G S

(Murray Exb. No. 1 was premarked.)

THE VIDEOGRAPHER: This is the deposition of Dr. Owen Murray. The date is November 20, 2013. The time is 9:07. You may swear in the witness.

(The witness was sworn.)

OWEN MURRAY, M.D.,
having first been duly sworn, testified as follows:

EXAMINATION

BY MR. EDWARDS:
Q. Good morning.
**A. Good morning.**
Q. Would you kindly state your name for the record?
**A. Sure. Owen Joseph Murray.**
Q. And what type of doctor are you, Dr. Murray?
**A. Family practice.**
Q. Let me hand you what's been marked as Exhibit 1. Have you ever seen that before, sir?
**A. Hold on. Yes.**
Q. What is it?

**covered quite a few facilities, but...**

Q. (By Mr. Edwards) Do you know of another public building in the state of Texas other than the housing areas for prisoners that is not air-conditioned?

MR. STONE: Objection, calls for speculation.

Q. (By Mr. Edwards) Do you know?

**A. I wouldn't know.**

Q. Are you aware of any?

**A. I am -- I don't know.**

Q. Have you been in public buildings in the City of Houston?

MS. MOLINARE: Objection, vague.

**A. Yes. I have been in buildings -- public buildings in Houston.**

Q. (By Mr. Edwards) Ever been in one that's not air-conditioned?

**A. I can't remember.**

Q. Ever been -- Ever been to public buildings in the City of Dallas?

MS. MOLINARE: Objection, vague.

**A. Again, I can't remember. I -- I don't know if every building that I've been in has been climate-controlled.**

Q. (By Mr. Edwards) You don't know or you

don't --

**A. I don't know. I --**

Q. Have you been to the courthouse?

MS. MOLINARE: Objection, vague.

**A. I have been to the courthouse.**

Q. (By Mr. Edwards) Was it climate-controlled?

MS. MOLINARE: Objection, vague.

Q. (By Mr. Edwards) Did it have air-conditioning?

MS. MOLINARE: Objection, vague.

**A. I believe it did.**

Q. (By Mr. Edwards) I believe Dr. Adams testified yesterday that she believed having climate control or air-conditioning would be medically beneficial for the prisoners. Do you agree with her?

**A. Beneficial, I would agree.**

Q. Okay. I apologize in advance, because I just don't know the answer to these and maybe -- maybe I should, but policies relating to medical care, do you know if Director Livingston or Director Stephens or Thaler have any role in those?

**A. Related to medical care?**

Q. Yes.

**A. No.**

Q. That would be the three people that you

mentioned?

MR. STONE: Objection, vague.

Q. (By Mr. Edwards) I'm sorry, yourself, Dr. DeShields and Dr. Linthicum? Linthicum, excuse me.

**A. You're talking about met -- the policies from which we operate clinically?**

Q. Yes.

**A. Those policies -- and I don't mean to be --**

Q. No, no.

**A. I forgot what your question is. Who is responsible for those?**

Q. Who is responsible for policies ralting to clinical care medicine?

**A. The policies from which we operate came from what we inherited through -- in 1995 that existed with TDCJ. Over the years we have modified those policies. We have deleted some policies, we've added policies, as care has changed; and that Policy and Procedure Committee is the vehicle by which that process happens; and then ultimately those policies are reviewed by Dr. Linthicum, myself, and Dr. DeShields or the medical directors of the institutions; and then Dr. Linthicum ultimately signs off as TDCJ.**

Q. Okay. So it's kind of a joint process, the creation and review of them?

**A. That is correct.**

Q. Does Dr. Raimer play any role today in review of those policies?

**A. Directly, no.**

Q. I'm a lawyer. So I hear that, and I hear "directly no." I mean, is there an indirect way in which he --

**A. Indirectly he -- Dr. Raimer retains not a relationship with UTMB Correctional Managed Care. He is on the Correctional Managed Health Care Committee. And to the extent that they are aware of the policies under which health care operates, he could have knowledge of those policies; and certainly in his prior role, in my role, would have been aware of those policies.**

Q. Got you. Okay. You may have dealt with this earlier, but let's say a nurse wasn't following particular medical care policies. How would that get reported or how would she be supervised? I mean, what's the chain of command with that?

MS. MOLINARE: Objection, vague.

**A. I was going to say, can you be a little bit more specific?**

Q. Yeah. Let's say you're supposed to do the initial intake and report to a doctor conditions like diabetes or hypertension, and they're not being -- that

37

nurse is just not doing that. She's making a mistake or for whatever reason.

What's the process that UTMB has in place to remedy that or supervise that or make sure these policies are actually being followed?

**A. At most facilities, we have a director of nurses and the nursing organization flows under that with our R.N., L.V.N., C.M.A. level care.**

**If there is an issue with anyone's performance, it is -- it works up the chain within that facility. And if that care practice needs to be modified, then the appropriate level individual does that remedial discussion and...**

Q. Okay. Oh, do you know if there are policies in place with UTMB relating to accommodations and modifications that need to be made with regards to work when dealing with extreme temperatures?

**A. Again, there are no UTMB specific policies -- policies. These are all Correctional Managed Health Care policies; and there is a policy to which we do -- provide work restrictions using that HSM 18.**

Q. Do you know if there are any policies relating to handling extreme temperatures in the housing areas --

MS. MOLINARE: Objection, speculation.

Q. (By Mr. Edwards) -- at the state prison

38

facilities in which they're not -- there is not air-conditioning or climate control for the housing for the prisoners?

**A. And when you say "policies," you're talking about health care policies or --**

Q. Well --

**A. -- TDC policies?**

Q. Okay. Well, let's start with health care policies.

**A. I don't be -- There is not a health care policy as it relates to -- that I'm aware of -- that relates to the conditions in the actual living facilities. We have a health care policy that relates to the work restrictions in regard to heat.**

Q. And when you say health care policy, you're talking about the CM -- the correctional managed care policy?

**A. That is correct.**

Q. So there is a correctional managed care policy that deals with work and the heat; correct?

**A. Correct.**

Q. But there is no such correctional managed care policy or UTMB policy for that matter that deals with extreme heat inside -- inside the prison?

**A. Not that I am aware of, right.**

39

Q. Certainly you knew that back in -- when you began your job; correct?

MS. MOLINARE: Objection, vague.

Q. (By Mr. Edwards) Well, did you know that in 2008?

**A. I believe I probably did know that.**

Q. Likewise, I -- you would have known that from 2008 until the present?

**A. Correct.**

Q. Do you think there should -- Well, strike that.

Do you know if there are any TDCJ policies concerning protecting inmates from the dangers of extreme heat indoors?

**A. That I don't know.**

Q. Who in your -- Who should be respon -- If there were policy -- If there was to be a policy relating to indoor -- the dangers of indoor heat, who would be responsible for enacting such a policy?

MS. MOLINARE: Objection, speculation.

MR. STONE: Join.

**A. I --**

Q. (By Mr. Edwards) Don't know?

**A. I wouldn't -- I wouldn't know.**

Q. Very important for you to be familiar with the

40

Texas Department of Criminal Justice policies so that you can determine whether or not UTMB needs to encourage others to be made and created; correct?

MS. MOLINARE: Objection, vague.

**A. It's certainly important for me to know the health care policies.**

Q. (By Mr. Edwards) Is it not also important for you to know security policies that could overlap and run into issues relating to health care?

**A. That's what TDCJ Health Services' responsibility is.**

Q. Is it also UTMB's responsibility or no?

**A. No.**

Q. Okay. Do you consider the Center for Disease Control to be a reliable organization?

MR. STONE: Objection, vague.

Q. (By Mr. Edwards) As the chief policymaker for the University of Texas Medical Branch correctional division?

**A. When you --**

MS. MOLINARE: Object --

**A. -- say reliable -- I'm sorry.**

MS. MOLINARE: Objection, misstates his testimony.

MR. STONE: Objection, vague as to what

**said, I can't remember if I did.**

Q. Okay. Do you know if UTMB tracks inmates who suffer heat illness?

**A. We --**

Q. And I'm not talking about people who die from heatstroke. I'm talking about people who suffer any form of heat illness, heat exhaustion, heatstroke, where they don't die, any sort of heat illness. Is that tracked by UTMB?

**A. It is something that gets reported to Health Services. It is now -- now a reportable diagnosis that gets sent into TDCJ Health Services.**

Q. And we talked about that a little bit yesterday. That was a new change that happened after --

**A. Correct.**

Q. -- all these deaths; right?

**A. Correct.**

Q. After the deaths that occurred in -- Actually, do you recall when that happened? Was that -- That was October 2012; right?

**A. I couldn't -- I have not --**

Q. Prior to that time, and Dr. Adams told us, and I confess, I don't remember the exact date.

**A. Yeah.**

Q. Prior to that time, are you aware of any sort

of tracking mechanism by UTMB to assess the numbers of heat-related illnesses?

**A. Heat-related illnesses, that I -- that I don't know if we tracked. I know that we did look at -- And we trend all of our deaths. So if there were heat-related deaths, we would have trended those.**

Q. Do you know how many of the deaths that occurred in the summer of 2011 went through your peer review process?

**A. That I don't know.**

Q. Do you know if transfer -- Do you know what a transfer facility is, sir?

**A. In general, yes.**

Q. What is it?

**A. It's a facility that -- I mean, again, that would accept facility -- or offenders as they're moving through the TDCJ process.**

Q. Do you know how many there are in the -- that UTMB manages their health care?

**A. I don't know specifically the number.**

Q. Do you know if these are the facilities that people from air-conditioned climate-controlled county jails would be coming to?

**A. We have intake facilities, and typically our intake facilities are servicing the county jails. So**

**where we would do intake would be a facility where we would receive offenders who are coming from county jails.**

Q. Did you do any sort of analysis as to whether or not a high percentage of the deaths by heatstroke were occurring at transfer facilities?

MS. MOLINARE: Objection, vague.

Q. (By Mr. Edwards) You personally, sir.

MS. MOLINARE: Objection, vague.

**A. And I've ans -- As I've answered before, no, I have not personally looked into that relationship.**

Q. (By Mr. Edwards) Do you know if UT -- UTMB has looked into that relationship between the number of deaths by heatstroke in facilities, and transfer facilities in particular?

**A. I don't know if --**

Q. Okay.

**A. I know I have not looked into that specifically. To the extent that that has been looked at collectively through the Mortality and Morbidity Committee in its relation -- related to those specific deaths, that I -- that I couldn't count on.**

Q. Well, I'm not asking you to the extent something may have happened, a possibility.

I'm asking: Do you know if there's been

an analysis done by anybody at UTMB relating to deaths by heatstroke at transfer facilities?

**A. As I said, I don't know --**

Q. Okay.

**A. -- what occurred in that Morbidity and Mortality Committee as it -- as it relates to those specific parameters that you just layed out.**

Q. Okay. Well, do you know if the Mortality and Morbidity Committee reviewed the death -- each death individually or collectively to assess a potential global statewide problem?

**A. They looked at them individually.**

Q. Do you know if UTMB has done any analysis to assess whether or not there was a system-wide problem as opposed to whether or not -- whether or -- as opposed to the circumstances behind each death?

MS. MOLINARE: Objection, vague.

Q. (By Mr. Edwards) Do you understand what I'm asking you?

**A. I -- Well, no. Go ahead.**

Q. Okay.

**A. You could reask the question.**

Q. Sure. Do you know if UTMB has ever done any analysis as to whether or not the heat deaths that occurred in 2011 were due to a system-wide problem or

helped?

MS. MOLINARE: Objection, argumentative; objection, vague; objection, foundation; objection, speculation.

**A. Again, our facilities, irrespective of the staffing, aren't set up to do emergency medical care; and so having a mid-level provider would have only allowed us to call 9-1-1 and get that patient transferred to a higher level of care.**

Q. (By Mr. Edwards) Okay. Now, we talked a little bit about this yesterday; but the DMS system, are you familiar with that?

**A. Uh-huh.**

Q. Do you think that that's an appropriate and effective means of providing health care to inmates?

**A. I do.**

Q. Okay. Now, at night, who is that staffed by?

MR. STONE: Objection, vague.

**A. Well --**

Q. (By Mr. Edwards) Well, is it vague because there are many DMS units? Is that -- or is it vague?

**A. It is -- It is vague.**

Q. Then let me -- Let me try -- Let me try and re-ask it --

**A. Right.**

Q. -- because I want to --

**A. Right.**

Q. How do you staff DMS units at night? Generally. Then we'll get a little more specific.

**A. And the only reason I'm pausing is that the way you're asking the question, it --**

Q. Tell me how to ask the question maybe.

**A. I don't want --**

Q. This is not a zinger type thing.

**A. I know. I mean --**

MS. MOLINARE: Don't tell him how to ask the question. Only answer questions that are asked.

**A. All right.**

Q. (By Mr. Edwards) How are DMS systems staffed?

**A. DMS.**

Q. You need to help me out, please.

**A. DMS -- DMS is telemedicine equipment; and it is at every facility.**

Q. Okay. So DMS is just like a telephone or a videoconferencing system?

**A. But there are also -- There are peripherals, medical peripherals, so that you can listen to the heart, the lungs, ears, eyes, mouth. So it is beyond just a teleconference system.**

Q. Who is doing the analysis is important in

utilizing the system; right?

**A. We have trained facilitators at the -- at each facility when they're making present -- patient presentations.**

Q. I'm a lawyer. If I was the person at the DMS facility and a call came in, I would be an inappropriate person to be doing that; right?

**A. (No response.)**

Q. Unless I was a doctor.

**A. No.**

MS. MOLINARE: If you can't answer the question, you can't answer.

**A. I can't really answer the question you're -- The way it's being asked, I can't answer the question.**

Q. (By Mr. Edwards) Okay. Explain the DMS process then to me.

**A. DMS is a process by which we provide primary care, mental health care, and subspecialty care. That is typically done through the course of a day when our facilities are staffed.**

**We have a trained facilitator who sits with the patient and assists the provider on the other end with the evaluation. We also have hub facilities that are open 24/7, and they have DMS equipment as well that allows them to participate in what I originally**

**just talked about, but also for facilities that are not open 24/7 or may have a nurse, an L.V.N., by themselves, that is an option we give to that facility to be able to contact the hub and put the patient in front of DMS or just have a discussion with an R.N. at a 24-hour facility.**

Q. Okay. So the -- Thank you for that. I'm sorry it was so difficult. I'm sure it was my fault.

After hours at the hub, is the person who is there to provide advice a registered nurse? Do I -- Did I hear you correctly?

**A. That is correct.**

Q. So that's not someone who can provide actual medical care or medical diagnostic assistance; correct?

MS. MOLINARE: Objection, compound.

**A. They cannot make a diagnosis; but in certain cases, they can provide treatment and assessment and give the officer or the L.V.N. at the other facility direction in how to care for the patient.**

Q. (By Mr. Edwards) In an emergency situation, they're really just going to say call 9-1-1; right?

**A. If they're even contacted.**

Q. Are they ap -- Is the hub appropriate for emergency situations to be contacted before 9-1-1?

MR. STONE: Objection, speculation.

36 (Pages 141-144)

Stephen McCollum, et al v. Brad Livingston, et al

Owen Murray, M.D. November 20, 2013

141

MS. MOLINARE: Objection, vague.
**A. Again, not knowing --**
Q. (By Mr. Edwards) Well, no. Let me ask -- Let me ask it again. I'll withdraw that question.
From a policy standpoint, is it your expectation that hubs will fulfill a role, the same role as like a 9-1-1 operator, to deal with emergency problems?
**A. No.**
Q. That is not an accommodation that UTMB has set up for the prisons to take advantage of in emergency situations. Or is it?
**A. Again, in the global context of trying to assist officers and health care staff make the best decision for the patient, we have those services available that they can contact if they have a question.**
**And our fall-back position and philosophy has always -- if there's any questions or concerns, dial 9-1-1 first. Then contact the hub if you think that that's necessary, just to let someone know what's going on.**
Q. How is that communicated to TDCJ correctional officers or -- or wardens or whomever?
**A. Well, again, through Health Services, they work with the wardens and the TDCJ administration to**

142

**ensure that everyone is familiar with that process.**
Q. And that is -- that is your expectation and confirmed by Dr. Linthicum?
**A. And that's my experience with --**
Q. Fair.
**A. -- our system.**
Q. Do you know why the Beto Unit has a 24-hour/ seven-day-a-week infirmary?
**A. Why?**
Q. Yeah. Do you know why it has an infirmary that is open seven days a week at all hours?
**A. Do you mean beyond having the infirmary there, we have -- we have patients there that require 24-hour care, so we -- it is open 24 hours.**
Q. Okay.
(Soto voce discussion between counsel and the witness.)
Q. (By Mr. Edwards) Have you ever seen a cost estimate for cooling TDCJ inmate housing areas?
**A. I have not.**
Q. Have you ever asked to see one?
**A. No.**
Q. Anyone ever told you they're going to analyze that issue?
**A. I -- It's possible I might have heard someone**

143

**talk about it, but I -- I couldn't remember when.**
Q. Do you ever talk with Dr. Linthicum or anybody else about the cost associated -- cost incurred by UTMB with dealing with people who suffer heatstroke and have to get taken to the hospital?
**A. Not specifically.**
Q. There is a cost to UTMB though; correct?
**A. There is a cost to the state.**
Q. UTMB pays that cost and then obviously it's -- UTMB has a budget; correct?
**A. No. TDCJ, in our current contract, pays UTMB's costs. So the State funds TDC, and then they pay both university partners.**
Q. So your understanding is that TDCJ, the cost would be to TDCJ for hospitalizations?
**A. Ultimately through -- UTMB makes the payment, which we're reimbursed by TDC.**
Q. Is there any line item on the budget for that, for those types of expenses, or is there just a contractual understanding that you will be reimbursed?
**A. Well, the -- No. In the contract it says that we're going to be reimbursed for our costs, and those costs are related to three -- our onsite strategy, our offsite strategy, and our pharmacy. That's how TDC's funded.**

144

Q. All right. You did a little bit -- there's stuff I've got to ask you about that.
Tell me what you mean by "onsite strategy" and "offsite strategy"?
**A. So it's just -- It is funding for facility, staff and operations; so what we -- what -- what we provide out in all of their facilities, that's one strategy of funding.**
Q. Is that the onsite strategy?
**A. That's onsite.**
Q. Okay. Thank you.
**A. So that would include all of our staff, radiology equipment, everything, maintenance operation, everything that goes with our facilities.**
Q. Okay.
**A. Pharmacy speaks for itself, but also includes our pharmacy operations up in Huntsville and the staff that goes to run that.**
**And then offsite is everything else in terms of hospital care done in the community or down at Hospital Galveston to include hospitalizations and subspecialty consultations, diagnostics, etcetera.**
Q. Okay. So there is a cost to send people to the hospital at Galveston as well --
**A. Sure.**

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
6435e48d-47ea-4ab9-b843-01a742fd09bd
Appendix 163

39 (Pages 153-156)

Stephen McCollum, et al v. Brad Livingston, et al

Owen Murray, M.D. November 20, 2013

153

to TDCJ in assessing dangers if you were provided with real-time information?

MS. MOLINARE: Objection, vague; objection, speculation.

Q. (By Mr. Edwards) I'll re-ask it. Do you feel that you or your senior staff could be of any benefit to -- to TDCJ by being provided real-time information about extreme temperatures?

**A. I think that we have -- we, through our policy and practices, to the extent that -- As I said, I don't know if the facility staff is made aware of those detailed logs; but our practices and our education and what we've done, I think, is -- is acceptable; and to the extent that that's incorporated directly, I don't necessarily know that that's necessary.**

Q. Well, for being provide -- Having senior staff who are competent and knowledgeable about the dangers of extreme heat assess real-time temperatures would let them get on the phone and say: Hey, are you guys taking the steps you need to be taking to protect these prisoners; right?

**A. And I --**

MS. MOLINARE: Objection, speculation.

**A. And I believe -- I believe that's the reason they're taking those, is so that they can make everyone**

154

**aware at the facility that, yes, indeed, they are having extremes in temperatures and that everyone needs to fall back on their education; and from a health care perspective, understand the patients that are coming into the facility, make sure that you're exceedingly cautious about looking for patients who might have heat-related illness.**

Q. (By Mr. Edwards) And if that's not just not happening, I guess you would say that at least it should; right?

**A. I have no reason to think it's not happening.**

Q. Were you ever made aware of temperatures documented by TDCJ of 149 degrees --

**A. No.**

Q. -- at a prison facility?

**A. No.**

Q. That's not a safe temperature, right, for anybody; is it?

**A. It's certainly hot.**

Q. All right. Thank you very much, Dr. Murray.

**A. Thank you.**

MR. EDWARDS: Do you guys have any questions?

MS. MOLINARE: I have no questions.

MR. STONE: None.

155

MR. EDWARDS: Again, thanks a lot.

THE VIDEOGRAPHER: 12:58, off the record.

THE REPORTER: And for the record, what are we doing about the original?

MS. COOGAN: Read and sign.

(The proceedings concluded at 12:58 p.m.)

(Signature requested.)

(-o0o-)

156

CHANGES AND SIGNATURE

WITNESS: OWEN MURRAY, M.D.

DATE: NOVEMBER 20, 2013

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |
| ____ | ____ | ____________________ | ____________ |

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
6435e48d-47ea-4ab9-b843-01a742fd09bd
Appendix 164

40 (Pages 157-159)

Stephen McCollum, et al v. Brad Livingston, et al

Owen Murray, M.D. November 20, 2013

157

I, OWEN MURRAY, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________
OWEN MURRAY, M.D.

THE STATE OF _______________:
COUNTY OF __________________:

Before me, ____________________________, on this day personally appeared OWEN MURRAY, M.D., known to me or proved to me on the oath of _________________ or through __________________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he\she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of __________________, _______.

__________________________
NOTARY PUBLIC IN AND FOR

THE STATE OF _____________

My Commission Expires: ______

158

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law in the Estate of LARRY GENE McCOLLUM,
Plaintiffs,

VS. CIVIL ACTION NO. 3:12-cv-02037

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

REPORTER'S CERTIFICATION
TO THE
ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY, M.D.
NOVEMBER 20, 2013

I, Mary C. Dopico, Certified Shorthand. Reporter in and for the State of Texas, do hereby certify that the facts stated by me in the caption hereto are true; that the foregoing deposition of OWEN MURRAY, M.D., the witness hereinbefore named, was taken by me in machine shorthand, the said witness having been by me first duly cautioned and sworn to tell the truth, the whole truth, and nothing but the truth, and later transcribed from my machine shorthand notes to typewritten form by me.

I further certify that the above and foregoing deposition, as set forth in typewriting, is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent was requested by the deponent or a party before the

159

completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Pages contain any changes and the reasons therefor.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that charges for the preparation of the foregoing completed deposition were $ _________ for the original thereof, charged to Attorney(s) for Plaintiffs.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd day of December, 2013.

______________________________
Mary C. Dopico, CSR, RPR, CRR
CSR No. 463, Exp. 12-31-2014
Notary Public, State of Texas
Commission Expires 1-31-2017

Independent Contractor To:
Wright, Watson & Associates
Firm Registration No. 225
Expires 12-31-2013
3307 Northland Drive, Suite 185
Austin, Texas 78731
512/474-4363 Fax 512/474-8802

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
6435e48d-47ea-4ab9-b843-01a742fd09bd
Appendix 165

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: | Number: B-15.2<br><br>Page 1 of 8 |
|---|---|---|
| | Revised: 11/07 | |
| | Replaces: Pharmacy 55-05 & Infection Control 14.32 | |
| | Formulated: 8/97 | |

**HEAT STRESS**

**POLICY:** To establish guidelines for preventing and monitoring heat stress illness.

**DISCUSSION:**

It is the **responsibility of the facility medical staff** to provide guidelines to assist the facility administration in the determination of safe and healthful work conditions. Every reasonable effort shall be made in the interest of preventing heat-related injuries in the workplace. Problems of heat stress are more common than those prevented by very cold environments. Heat stress is best prevented by acclimatizing staff and offenders to working under hot and humid climate conditions, assuring adequate fluid intake and, to a lesser extent, assuring adequate salt intake. Proper treatment of heat stress should begin at the work site, but severe heat stress is a medical emergency which must be treated in a medical facility**. Salt tablets should not be used in the treatment or prevention of heat stress**.

DEFINITIONS:

I. **Heat Cramps**: usually develop following strenuous exercise, in muscles that have been subjected to extensive work. The pain is brief, intermittent and crampy, and may be quite severe. Heat cramps usually occur after several hours of work, and may occur even at low ambient temperatures. The cause is inadequate replacement of electrolytes (sodium and potassium). **Treatment** consists of rest in a cool place and replacement of fluids and electrolytes, by drinking cool, caffeine-free fluids and eating a meal. **Prevention** is accomplished by ample fluid intake during and after work, and salting of food during meals if not medically contraindicated. Use of electrolyte replacement drinks or lightly salted fruit drinks at the work site may also be beneficial.

II. **Heat Exhaustion (Heat Prostration)**: the most common form of heat stress, caused by depletion of water and salt. Symptoms include weakness, anxiety, fatigue, thirst, dizziness, headache, nausea and urge to defecate. Signs include profuse perspiration, rapid pulse, incoordination and confusion. Heat prostration may lead to **heat syncope**, a sudden onset of collapse that is usually of brief duration. During heat syncope the patient appears ashen gray and skin is cool and clammy. Failure to treat heat exhaustion may result in progression to heat stroke. Risk factors include failure to maintain adequate fluid intake during exertion, and taking diuretics. **Treatment** is to remove the person to a cool area, having them lie down, remove shirt and shoes, begin oral rehydration. Some cases may require

intravenous fluid replacement. **Prevention** is accomplished by ample fluid intake during work, proper work-rest cycles, and salting of food during meals if not medically contraindicated.

III. **Heat Stroke**: is a medical emergency. While it may be preceded by signs of heat exhaustion, the onset is often sudden. In heat stroke the body has lost its ability to dissipate heat and maintain a normal body temperature. Body temperature is often elevated over 106° F. Exertional heat stroke occurs in young, healthy people who maintain inadequate fluid intake during exertion. Signs include headache, chills, gooseflesh, weakness, incoordination, nausea and vomiting, progressing to unconsciousness. Classical heat stroke is seen in the elderly, those with predisposing medical conditions such as congestive heart failure, diabetes and alcoholism, and those on medications which cause fluid depletion, interfere with sweating or interfere with the body's thermoregulatory system. Classical heat stroke has few premonitory signs. Collapse may be among the first symptoms. Skin is hot and dry, and pulse is rapid and weak. Shock and death may occur in either type of heat stroke. **Treatment** is a medical emergency. The patient must be removed to a cool, air-conditioned place, stripped and cooled rapidly using a water spray and cooling fans. **Prevention** includes ample fluid intake during work, proper work-rest cycles, excluding people at high risk from working under conditions of extreme heat and humidity, and maintaining adequate indoor conditions, such as access to cool fluids and use of cooling fans, for persons at increased risk for heat stroke.

IV. **Anhidrotics** are drugs that inhibit perspiration.

V. **Poikilothermics** are drugs that disrupt the body's normal temperature regulating mechanisms.

VI. **Potentiators** are drugs which potentiate the effects of anhidrotics or poikilothermics.

**PROCEDURES:**

I. Whenever the temperature is 85° F or higher, the Warden (or designee) will use the Heat and Humidity Index (Table 1) to **determine safe hot weather working conditions**. Prior to exposing workers to extremely hot working conditions, the Warden or designee should consult with medical staff to evaluate the hazard of the effective temperature.

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: | Number: B-15.2 |
|---|---|---|
| | Revised: 11/07 | Page 3 of 8 |
| | Replaces: Pharmacy 55-05 & Infection Control 14.32 | |
| | Formulated: 8/97 | |
| **HEAT STRESS** | | |

II. **Acclimatization**. Offenders newly assigned to jobs which require strenuous work under conditions with an apparent air temperature of 90° F or greater (see Table 1) must be acclimatized before assuming a full workload. They should work no more than 3-4 hours at a time, separated by at least one hour rest in a cooler environment for the first week. After the first week, they may assume a normal work schedule. Acclimatization can be lost in as little as two weeks, so anybody who has been away from a hot work environment for more than two weeks should be reacclimatized. Acclimatization is not necessary for persons assigned to the same job when temperatures vary with seasonal changes.

III. **Fluid Intake**. Offenders and staff working at apparent air temperatures over 90° F should maintain an intake of at least 16 oz of fluids per hour of work. Under extreme conditions, work should be interrupted every 15 - 20 minutes and offenders instructed to drink fluids even if they are not thirsty. Drinking water will always be available to workers in hot weather conditions.

IV. **Work-rest Cycle**. Whenever the apparent temperature (see Table 1) is 90 - 95° F, a 5-minute rest break should be given every hour. If the apparent temperature is 96 - 120° F, a 5-minute rest break should be given every 30 minutes, and work intensity be reduced by 1/3. If the apparent temperature is over 120° F, work should be curtailed, or, if work must continue, a 10-minute rest period should follow every 20 minutes of work, and work intensity should be decreased by 1/2 to 2/3.

V. **Newly-assigned workers** who are not acclimatized to the heat should be evaluated by the medical staff before being subjected to significant heat stress, and should be monitored by supervisors for signs of heat stress during the acclimatization period.

VI. **Offenders on Medications**. Work assignments for offenders on medications classified as anhidrotics, poikilothermics or potentiators (see Attachment A) should be considered carefully. In general, offenders on antipsychotic drugs should not be allowed to work or recreate in environments where the apparent air temperature is 95° F or higher. This restriction should also be considered for offenders who are on other drugs classified as anhydrotics or poikilothermics or potentiators if they are on more than one such drug or if they also have an underlying medical condition that places them at increased risk (see Attachment B), particularly at higher dosage levels of the drugs. Decisions about suitability of work assignments for these offenders will be made by facility medical staff. Documentation shall be made in the patient's health record on the HSM-18, *Health Summary for Classification*, form.

MCCOLLUM 029 **Appendix 168**

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: | Number: B-15.2 |
|---|---|---|
| | Revised: 11/07 | Page 4 of 8 |
| | Replaces: Pharmacy 55-05 & Infection Control 14.32 | |
| | Formulated: 8/97 | |

**HEAT STRESS**

Infopac Report #IMS042 lists all offenders with heat sensitive medical restrictions, including offenders on psychotropic medications. This list is to be reviewed at least once a week during the summer months of May through September and a determination made that the listed offenders have appropriate HSM-18 restrictions.

VII. **Transportation.** Units are to refrain from transporting psychiatric inpatients to another facility via chain bus. Offenders on the Infopac medication list should be transported during the coolest hours of the day. Outgoing chain screens should be reviewed against the unit Infopac Report to ensure that the offenders on medication are traveling on the appropriate mode of transportation. Please note that the Transportation Department adjusts their schedule during the summer months so that routes are run during the coolest part of the day.

VIII. **Training**. Facility medical staff shall provide initial and annual training in the prevention of temperature extreme injury to all supervisory personnel who manage employees and offenders. Documentation of completed training shall be maintained by the Facility Health Administrator. Training should generally be accomplished in March or April of each year.

References

- TDCJ Administrative Directive 10.64, rev.1, Temperature Extremes in the TDCJ-ID Workplace (Cold/Hot).

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: | Number: B-15.2 |
|---|---|---|
| | Revised: 11/07 | Page 5 of 8 |
| | Replaces: Pharmacy 55-05 & Infection Control 14.32 | |
| | Formulated: 8/97 | |

**HEAT STRESS**

TABLE 1

## HEAT AND HUMIDITY INDEX

ACTUAL AIR TEMPERATURE (°F)

| Relative Humidity | 80° | 85° | 90° | 95° | 100° | 105° | 110° | 115° | 120° |
|---|---|---|---|---|---|---|---|---|---|
| 0% | 73 | 78 | 83 | 87 | 91 | 95 | 99 | 103 | *107* |
| 10% | 75 | 80 | 85 | 90 | 95 | 100 | *105* | *111* | *116* |
| 20% | 77 | 82 | 87 | 93 | 99 | *105* | *112* | *120* | **130** |
| 30% | 78 | 84 | 90 | 96 | 104 | *113* | *123* | **135** | **148** |
| 40% | 79 | 86 | 93 | 101 | *110* | *123* | **137** | **151** | |
| 50% | 81 | 88 | 96 | *107* | *120* | **135** | **150** | | |
| 60% | 82 | 90 | 100 | *114* | **132** | **149** | | | |
| 70% | 85 | 93 | *106* | *124* | **144** | | | | |
| 80% | 86 | 97 | *113* | **136** | | | | | |
| 90% | 88 | 102 | *122* | | | | | | |
| 100% | 91 | *108* | | | | | | | |

{Apparent Air Temperature}

| | |
|---|---|
| XX | Heat exhaustion possible |
| *XX* | Heat stroke possible |
| **XX** | Heat stroke imminent |

Source: US National Weather Service

## ATTACHMENT A
## DRUGS ASSOCIATED WITH HEAT STRESS*

| | Anhydrotic | Poikilothermic | Potentiator |
|---|---|---|---|
| Anticonvulsants | | | |
| Topiramate (Topamax®)** | + | | |
| Anticholinergics** | | | |
| Benztropine (Cogentin®) | + | | |
| Biperiden (Akineton®) | + | | |
| Hyoscyamine (Levbid®) | + | | |
| Oxybutynin (Ditropan®) | + | | |
| Trihexyphenidyl (Artane®) | + | | |
| Antihistamines | | | |
| Cyproheptadine (Periactin®) | | + | |
| Diphenhydramine (Benadryl®) | | + | |
| Hydroxyzine (Atarax®) | | + | |
| Promethazine (Phenergan®) | | + | |
| Antipsychotics** | | | |
| ALL | | + | |
| Antidepressants | | | |
| Clomipramine (Anafranil®) | | + | |
| Desipramine (Norpramin®) | | + | |
| Doxepin (Sinequan®) | | + | |
| Imipramine (Tofranil®) | | + | |
| Nortriptyline (Pamelor®) | | + | |
| Beta Blockers | | | |
| Atenolol (Tenormin®) | | + | + |
| Metoprolol (Lopressor®) | | + | + |
| Propranolol (Inderal®) | | + | + |
| Diuretics | | | |
| Furosemide (Lasix®) | | + | + |
| Hydrochlorothiazide (Hydrodiuril®) | | + | + |

* This list only includes some of the more common medications associated with heat stress
** These drugs have specific warnings from the manufacturer to avoid excessive heat and dehydration.

In general, offenders on antipsychotic drugs should not be allowed to work or recreate in environments where the apparent air temperature is 95° F or higher. This restriction should also be considered for offenders who are on other drugs classified as anhydrotics or poikilothermics or potentiators if they are on more than one such drug or if they also have an underlying medical condition that places them at increased risk, particularly at higher dosage levels of the drugs. Decisions about suitability of work assignments and recreation areas for these offenders will be made by facility medical staff.

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: | Number: B-15.2 |
|---|---|---|
| | Revised: 11/07 | Page 7 of 8 |
| | Replaces: Pharmacy 55-05 & Infection Control 14.32 | |
| | Formulated: 8/97 | |
| HEAT STRESS | | |

References:

1. Cuddy, MLS. The Effects of Drugs on Thermoregulation. *AACN Clinical Issues* 2005;15(2): 236-253.
2. Glazer JL. Management of Heatstroke and Heat Exhaustion. *American Family Physician* 2005;11(71): 2133-2140.
3. Kwok J and Chan T. Recurrent Heat Related Illnesses during Antipsychotic Treatment. *Ann of Pharmacotheapy* 2005;39:1940-1942.
4. Martinez M, Davenport L, Saussy J, Martinez J. Drug-Associated Heat Stroke. *Southern Medical Journal* 2002; 95(8):799-802.
5. OSHA Protecting workers in Hot Environments Fact Sheet 1995. Accessed via the internet at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=167.
6. Pluth PY. Heat Stroke: A Comprehensive Review. *AACN Clinical Issues* 2004;15(2): 280-293.
7. Prevention and Treatment of Sunburn. Med Lett Drugs Ther 2004;46:45-46.
8. Reily TH, Kirk MA. Atypical Antipsychotics asn Newer Antidepressants. *Emerg Med Clin N Am* 2007:477-497.
9. Clinical Pharmacology. Accessed via internet www.clinicalpharmacology.com
10. Medication Package Inserts. Accessed via internet

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: | Number: B-15.2<br><br>Page 8 of 8 |
|---|---|---|
| | Revised: 11/07 | |
| | Replaces: Pharmacy 55-05 & Infection Control 14.32 | |
| | Formulated: 8/97 | |
| HEAT STRESS | | |

**ATTACHMENT B**

## COMORBIDITIES THAT MAY AFFECT HEAT TOLERANCE

Cardiovascular Disease
Cirrhosis of the Liver
Chronic Obstructive Pulmonary Disease/Asthma
Cystic fibrosis
Diabetes
Psychiatric conditions
Sjogren's syndrome
Sweat gland dysfunction
Thyroid dysfunction
Age > 65

References:

1. Bailes BK, Reeve K. Prevention of Heat-Related Illness. *JNP* 2007:161-168.
2. Luber GE. Heat-Related Deaths-United States, 1999-2003. *MMWR* 2006;55(29):796-798.
3. Reily TH, Kirk MA. Atypical Antipsychotics and Newer Antidepressants. *Emerg Med Clin N Am* 2007:477-497.
4. Sucholeiki R. Heatstroke. *Semin Neurol* 2005;25(3): 307-314.

******************************************************************************
*** REQUESTOR: AK00002 - ANDERSON, KATIE PLANS AND OPERATIONS ***
******************************************************************************
*** S Y S M O U T B A S K E T P R I N T ***

MESSAGE ID: 443924 DATE: 05/06/11 TIME: 12:34pm PRIORITY: 000

SUBJECT: HEAT PRECAUTION 2011

HEAT PRECAUTION 2011 - REMINDER
***************************************************************

IT IS THAT TIME OF YEAR AGAIN, WHEN EMPLOYEES WILL BE AFFECTED BY EXTREME HEAT CONDITIONS. AS A REMINDER, DUE TO THE POTENTIAL FOR EXTREME HEAT CONDITIONS IN THE COMING MONTHS, IT IS IMPERATIVE THAT EVERYONE TAKE PRECAUTIONS TO HELP REDUCE HEAT-RELATED ILLNESSES. ADMINISTRATIVE DIRECTIVE AD-10.64, "TEMPERATURE EXTREMES IN THE TDCJ WORK PLACE," AND HEALTH SERVICES POLICY B15.2, "HEAT STRESS," SHOULD BE REVIEWED BY JUNE 1, 2011, OR THE FIRST AVAILABLE DATE AN EMPLOYEE RETURNS TO WORK, AND ENSURE TRAINING IS DOCUMENTED IN THE EMPLOYEES' FILE. POCKET CARDS THAT INCLUDE TIPS FOR RECOGNITION, TREATMENT, AND PREVENTION OF HEAT RELATED ILLNESSES ARE AVAILABLE FOR UNITS TO ORDER FROM THE PRISON STORE. WARDENS SHALL ENSURE ALL EMPLOYEES ARE PROVIDED WITH OR CURRENTLY HAVE POCKET CARDS (PRISON STORE STOCK#700-01-060-527).

ON APRIL 25, 2011, STAFF FROM VARIOUS DEPARTMENTS SUCH AS, OFFENDER TRANSPORTATION, HEALTH SERVICES, RISK MANAGEMENT, LAUNDRY AND FOOD SERVICE, AND PLANS AND OPERATIONS MET TO REVIEW PRECAUTIONS AND ACTIONS TAKEN LAST SUMMER AND TO DISCUSS ACTIONS FOR THE UPCOMING SUMMER. BELOW IS A LIST OF PRECAUTIONS AND ACTIONS TO BE IMPLEMENTED STARTING JUNE 1, 2011, AND ENDING OCTOBER 1, 2011. IF THE NEED ARISES, IMPLEMENTATION MAY BEGIN PRIOR TO JUNE 1, 2011.

- ENSURE EMPLOYEES AND OFFENDERS ARE AWARE OF THE SIGNS AND TREATMENT FOR HEAT RELATED ILLNESSES BY CONDUCTING TRAINING.
- PROVIDE ADDITIONAL WATER; ICE SHOULD BE PROVIDED, IF AVAILABLE TO EMPLOYEES AND OFFENDERS IN WORK AND HOUSING AREAS, AND SHALL BE COORDINATED WITH MAINTENANCE AND LAUNDRY AND FOOD SERVICE.
- RESTRICT OUTSIDE ACTIVITY (WORK HOURS) IN ACCORDANCE WITH AD-10.64, "TEMPERATURE EXTREMES IN THE TDCJ WORK PLACE."
- ENSURE ALL STAFF AND OFFENDERS WORKING IN AREAS OF EXTREME HEAT SUCH AS, FIELD, MAINTENANCE, AND YARD SQUADS ARE PROVIDED FREQUENT WATER BREAKS.
- REFRAIN FROM TRANSPORTING PSYCHIATRIC INPATIENT OFFENDERS TO ANOTHER FACILITY VIA CHAIN BUS.
- TRANSPORT OFFENDERS DURING THE COOLEST HOURS OF THE DAY.
- SCREEN OUTGOING CHAIN TO ENSURE THE SELECTED MODE OF TRANSPORTATION IS APPROPRIATE.
- ALLOW OFFENDERS TO TAKE FANS WHEN BEING TRANSPORTED OFF THE UNIT FOR A MEDICAL APPOINTMENT.
- UTILIZE INFO PAC REPORT (IMS042), IMF MEDICAL SCREEN, OR HSIN SENSITIVE MEDICAL RESTRICTIONS (INCLUDING BUT NOT LIMITED TO AN OFFENDER ON PSYCHOTROPIC MEDICATIONS) TO DETERMINE APPROPRIATE TRANSPORTATION METHOD.
- LOAD AND UNLOAD TRANSFER VEHICLES AS QUICKLY AS POSSIBLE (SECURITY IS THE FIRST PRIORITY AT EVERY BACKGATE, BUT WE MUST ALWAYS BE

AWARE OF HEAT RELATED ISSUES WHEN BUSES OCCUPIED BY OFFENDERS SIT FOR
ANY LENGTH OF TIME (BUSES MAY CIRCLE THE PERIMETER IF THE UNIT
FORESEES AN EXTENDED WAIT TIME). EVERY REASONABLE EFFORT SHALL BE

MADE TO ENSURE BUSES GET IN AND OUT OF THE BACKGATE IN A SAFE AND EXPEDIENT MATTER.

- TRANSFER VEHICLES PARKED FOR MORE THAN 15 MINUTES ARE REQUIRED TO PLACE A PREVIOUSLY PURCHASED FAN ON THE VEHICLE. UNITS SHALL ENSURE FANS, EXTENSION CORDS, ETC., ARE IN PLACE AND AVAILABLE WHEN NEEDED.
- STORE PAPER TOWELS FOR USE WHEN SATURATED WITH WATER DURING EMERGENCY SITUATIONS WHEN TRANSPORTING OFFENDERS.
- WATER COOLERS ON BUSES SHALL BE REFILLED AT VARIOUS TIMES DURING THE TRIP TO ENSURE WATER REMAINS AT THE APPROPRIATE TEMPERATURE (TRANSPORTATION).
- WHEN USING FANS, AIR SHOULD BE DRAWN THROUGH THE STRUCTURE AND EXHAUSTED OUTSIDE. TAKE FULL ADVANTAGE OF THE FRESH AIR EXCHANGE SYSTEM OR PREVAILING WINDS TO ASSIST IN THE MOVEMENT OF AIR AS APPLICABLE.
- INCREASE AIR FLOW BY USING BLOWERS, NORMALLY USED TO MOVE HOT AIR IN THE WINTER, WHEN APPROPRIATE. ATTACH RIBBONS TO VENTS TO ENSURE BLOWERS ARE USED APPROPRIATELY. ENSURE ALL NEEDED MAINTENANCE TO BLOWERS HAS BEEN COMPLETED.
- ALLOW ADDITIONAL SHOWERS FOR OFFENDERS WHEN FEASIBLE.
- ALLOW OFFENDERS TO WEAR SHORTS IN DAYROOMS AND RECREATIONAL AREAS.
- MAKE WATER AVAILABLE DURING MEAL TIMES.
- MAKE SURE WINDOW SCREENS ARE CLEAN SO AS NOT TO RESTRICT AIR FLOW.
- REMEMBER, OFFENDER FANS SHOULD NOT BE CONFISCATED DUE TO PROPERTY RESTRICTION DURING THIS TIME. FANS SHALL BE CONFISCATED ONLY IF THEY ARE ALTERED.
- FANS SHALL BE ALLOWED TO ALL CUSTODY LEVELS (TO INCLUDE ADMINISTRATIVE SEGREGATION AND DISCIPLINARY STATUS). OFFENDERS WITH FANS STORED BASED ON THESE RESTRICTIONS SHALL HAVE THEIR FANS RE-ISSUED FOR THE TIME PERIOD SPECIFIED IN THIS POSTING.
- ALL OFFENDERS SHALL BE PERMITTED TO PURCHASE A FAN IF THEY DO NOT HAVE ONE.
- ENSURE THE FAN PROGRAM IS IN PLACE ALLOWING THE PERMANENT ISSUE OF A FAN TO AN OFFENDER WHO HAS BEEN INDIGENT FOR THE PREVIOUS SIX MONTHS, ON A FIRST COME FIRST SERVE BASIS. OFFENDERS WHO HAVE SIGNIFICANT MEDICAL NEEDS, BASED ON A CONDITION OR MEDICATION THAT IS NEGATIVELY IMPACTED BY THE HEAT, SHALL BE GIVEN PRIORITY.
- WARDENS ARE ENCOURAGED TO COORDINATE WITH THEIR FOOD SERVICE AND MAINTENANCE DEPARTMENTS TO ENSURE ICE-MACHINES ARE WORKING PROPERLY.

IT IS REQUIRED THAT EACH DEPARTMENT POSTS THIS NOTICE IN COMMON AREAS ON THE FACILITY. YOUR ATTENTION TO THIS MATTER IS GREATLY APPRECIATED.

AUTHORITY: WILLIAM STEPHENS, DEPUTY DIRECTOR
PRISON AND JAIL OPERATIONS

| Sent to: | | | |
|---|---|---|---|
| | UNTS | <list> | (to) |
| | ADMN | <list> | (to) |
| | GCR9820 | CRIPPEN, GEORGE RN, MSN, PHDC | (to) |
| | MBR2736 | BRUMLEY, MARSHA | (to) |



TEXAS DEPARTMENT

OF

CRIMINAL JUSTICE

**NUMBER:** AD-10.64 (rev. 6)

**DATE:** November 10, 2008

**PAGE:** 1 of 11

**SUPERSEDES:** AD-10.64 (rev. 5) September 19, 2006

# ADMINISTRATIVE DIRECTIVE

**SUBJECT:** TEMPERATURE EXTREMES IN THE TDCJ WORKPLACE

**AUTHORITY:** Texas Government Code §493.006

Reference: American Correctional Association (ACA) Standards: 4-4153 and 4-4337

**APPLICABILITY:** Texas Department of Criminal Justice (TDCJ or Agency)

## POLICY:

The TDCJ shall establish guidelines to assist unit administration in adapting offender work assignments to temperatures in the work environment that cannot be controlled by the Agency. Guidelines for outside recreation are found in the TDCJ *Recreation Department Policy Manual*.

Every reasonable effort shall be made to prevent extreme temperature-related injuries in the workplace. Since the TDCJ has units throughout the State of Texas, the decision to expose offenders to extreme temperature (i.e., cold/heat) shall be made by the appropriate on-site staff.

TDCJ offenders are, at times, required to work in conditions of extreme cold or extreme heat. Frequently, situations may occur requiring specific work be completed regardless of the temperature or weather conditions.

## PROCEDURES:

Prior to exposing offenders to extreme temperature conditions (i.e., cold/heat), the Warden and involved Department Supervisors shall ensure appropriate measures are instituted which prevent extreme temperature-related injuries. The Warden and involved Department Supervisors are encouraged to consult medical staff to ascertain specific hazards. In all cases of temperature-related incidents or injuries, the unit medical staff and the unit Risk Manager shall be notified immediately. Upon arrival on the scene, medical staff shall take control of the individual's medical care. The injured offender shall be removed from the environment by the most expeditious means available to receive proper medical treatment.

I. Procedures and exposure charts (Wind Chill Index [Attachment A] and Heat and Humidity Matrix [Attachment B]) are provided to assist unit officials in determining safe working conditions in extreme temperature conditions.

A. During work assignments, offenders shall be exposed to no more than three (3) or four (4) hours at a time, until acclimated to existing weather conditions. Work periods may then be extended as the offender physically adjusts to the weather conditions. Appropriate clothing shall be worn to protect the offender from extreme temperature conditions at all times.

B. Unit staff shall monitor the temperature once every hour between 6:30 a.m. and 6:30 p.m. The temperature shall be announced over the radio and documented on the Temperature Log (Attachment C). If conditions warrant, the Warden may also request additional readings.

C. Temperature Log

1. The Warden shall designate a central location to maintain the Temperature Log.

2. The Temperature Log shall indicate the wind chill or heat index.

3. Temperature information is available through the following:

a. The National Oceanic and Atmospheric Administration (NOAA) website (www.noaa.gov);

b. NOAA Weather Radio;

c. Local weather radio and television stations; or

d. Onsite weather instrumentation (if available).

4. Temperature Logs shall be maintained in accordance with the TDCJ *Records Retention Schedule*.

II. Extreme Cold Conditions

A. Determination

1. The Warden shall use the Wind Chill Index, the local news/weather media and/or weather conditions recorded by instruments located at the unit/picket in determining the safety of cold weather working conditions.

    2. Clothing considered appropriate for offenders working in cold weather shall include: thermal underwear, insulated jackets, cotton or leather gloves, insulated hoods, work shoes and socks. The Wind Chill Index shall be used to determine the need for insulated hoods and leather gloves. Appropriate clothing shall be issued even when the index indicates little danger of exposure injury.

3. If guidance is needed, medical staff shall be contacted to determine appropriate clothing and footwear needed to prevent cold injury.

4. Care shall be taken to prevent perspiration which could soak clothing and thus compromise the clothing's insulating value.

5. Layers of clothing shall be removed or added according to the effective temperature and level of physical activity.

B. Symptoms

1. Hypothermia is a condition occurring when the body loses heat faster than the body can produce it. With the onset of this condition, blood vessels in the skin constrict (i.e., tighten) in an attempt to conserve vital internal body heat, thus affecting the hands and feet first.

2. If one's body continues to lose heat, involuntary shivers begin. This reaction is the body's way to produce more heat and is usually the first real warning sign of hypothermia.

3. Further heat loss produces speech difficulty, forgetfulness, loss of manual dexterity, collapse and finally death.

C. Types of Hypothermia

Hypothermics are divided into the following three (3) categories, depending on the degree of injury.

1. Category One

   Injured individuals are conscious, but cold, with a rectal temperature above 90 degrees Fahrenheit (°F). These individuals shall be handled carefully, insulated and transported to medical care.

2. Category Two

   Injured individuals are unconscious and with a rectal temperature of 90°F or below. These individuals shall be handled carefully and insulated from further heat loss. The individual shall be transported to the unit Medical Department for additional care.

3.　　Category Three

Injured individuals are comatose with no palpable pulse and no visible respiration.　Although these individuals appear to be deceased, the injured individual may have a slight chance of recovery if the rectal temperature is 60.8°F or higher.　If possible, medical staff shall proceed as follows:

a.　　Apply positive pressure ventilation with oxygen.

b.　　Judge the possibility of administering successful cardiopulmonary resuscitation (CPR). Consideration shall be given to the following prior to administering CPR:

(1)　　The difficulty in verifying that the heart has stopped without medical equipment;

(2)　　The compromise of rescuers to administer procedure during evacuation;

(3)　　The ability to continue CPR during rescue;

(4)　　The probability of chest compressions fibrillating or stopping a slow-beating, sensitive heart; and

(5)　　Continuing circulation by compressing a cold, stiff chest and heart muscle is unlikely.

c.　　The injured individual shall be insulated and transported to a medical care facility.

III.　Extreme Heat Conditions

A.　Determination

1.　　Guidelines assisting the Warden in making the determination can be found in the Heat and Humidity Matrix.　Weather conditions recorded by instruments on the unit/picket or reports by the local news media shall be used confirming specific temperature and humidity conditions. When the temperature is over 85°F, the Warden shall use the Heat and Humidity Matrix to determine the heat index.　The heat index shall be used as an indicator of the risk for heat-related injury.

2.　　At any point when the Heat and Humidity Matrix indicates the possibility of heat exhaustion or heatstroke, the Warden shall instruct

the appropriate staff to immediately initiate the precautionary measures identified in the Heat and Humidity Matrix.

3.    If guidance is needed, medical staff shall be contacted prior to exposing offenders to extremely hot working conditions to evaluate the hazards of the current temperatures and humidity, including indoor work areas (e.g., boiler room).  The hazard of sunburn and other results of ultraviolet (UV) radiation shall also be closely monitored.

4.    Offenders shall be provided and required to wear clothing appropriate for the effective temperatures and the hazards imposed by UV radiation (e.g., light-colored hats can be used to an advantage in high heat and direct sunlight).

5.    Drinking water shall always be available to offenders in conditions of hot weather. According to individual medical advice, liquids containing sodium may be used depending on an offender's state of acclimatization to hot weather conditions.

6.    Newly assigned offenders, who may not be acclimated to the heat, shall be medically evaluated prior to exposure to significant heat stress and closely monitored by supervisors for early evidence of heat intolerance.

7.    High water intake, according to the Heat and Humidity Matrix, shall be enforced.

8.    Offenders under treatment with diuretics or drugs inhibiting sweating require special medical evaluation prior to assignment to work in extreme heat.

B.    Symptoms

1.    Heat stroke symptoms include:

a.    Diminished or absent perspiration (sweating);

b.    Hot, dry and flushed skin; and

c.    Increased body temperatures, which if uncontrolled may lead to delirium, convulsions and even death.  Medical care is urgently needed.

    2.      Heat cramp symptoms include:

         a.      Painful, intermittent spasms of the voluntary muscles following hard physical work in a hot environment; and

         b.      Cramps usually occurring after heavy perspiring, and often beginning at the end of a work shift.

    3.      Heat exhaustion symptoms include:

         a.      Profuse perspiring, weakness, rapid pulse, dizziness and headaches;

         b.      Cool skin, sometimes pale and clammy, with perspiration;

         c.      Normal or subnormal body temperature; and

         d.      Nausea, vomiting and unconsciousness may occur.

IV.    Emergency Treatment

    A.    In all cases of temperature-related incidents or injuries:

        1.      The first aid process shall be initiated immediately by security or other unit staff.

        2.      Medical staff and the unit Risk Manager shall be notified immediately.

    B.    In extreme cold conditions, staff shall:

        1.      Bring the injured offender out of the cold and remove wet clothing;

        2.      Wrap the injured offender in warm blankets or clothing;

        3.      If frostbite exists, gently heat the affected area with warm water or warm towels. Do not rub the affected area; a heating pad or hot water bottles may also be used to treat the affected area;

        4.      Continue the treatment upon arrival at the site or when the offender is delivered to medical staff's care;

        5.      Apply the "ABC" of life support (open Airway, assist Breathing and restore Circulation), if necessary; and

        6.      If cold injury is sustained, the following first aid procedures shall be administered immediately:

    a.    Restrict the offender from further duties or activities until severity is evaluated;

    b.    Remove all constricting items of clothing and footgear from injured areas;

    c.    Remove wet clothing and insulate the offender with dry clothing and blankets, ensuring the injured area is covered;

    d.    Do not rupture blisters;

    e.    Encourage consumption of warm, sweetened liquids;

    f.    If a lower extremity is affected, treat as a stretcher patient by slightly elevating the affected lower extremity;

    g.    If evacuation from cold requires travel on foot, do not thaw the affected area until the offender reaches medical help; and

    h.    Transport the offender to medical care as soon as possible.

C.    In extreme heat conditions, staff shall:

    1.    Immediately begin an attempt to decrease the offender's temperature by placing the offender in a cool area;

    2.    Only force oral fluid intake if the offender is conscious and able to safely swallow;

    3.    Remove heavy clothing or excess layers of clothing; saturate remaining lightweight clothing with water.  Position the offender in the shade with air movement past the offender. Fan the offender if necessary to create air movement;

    4.    If ice is available, place ice packs in armpit and groin areas;

    5.    Take all of these measures while moving the offender in the most expeditious means available to continue with and obtain proper medical treatment; and

    6.    Ensure, whenever medical staff are on-site, to continue treatment as directed by the physician or medical staff.

V. Training

A. Each Warden shall ensure training in the prevention of temperature extreme injury is provided by unit medical staff to all supervisors designated by the Warden. Cold Training shall be completed in September, and Heat Training shall be completed in May of each year.

1. Supervisors shall be responsible for training employees and work assigned offenders.

2. Non-work assigned offenders shall be notified of heat awareness via the dayroom bulletin boards and/or other common use areas (i.e., *The Echo*, *Offender Orientation Handbook*).

B. A copy of all training rosters shall be provided to the unit Risk Manager and Human Resources Representative (staff training). The unit Risk Manager shall forward a copy of the training roster to the respective Regional Risk Manager. The Regional Risk Manager shall forward the total number of employees and offenders trained to the Risk Management Central Office.

C. A standardized training program shall be developed by the TDCJ Department of Preventive Medicine in conjunction with the University of Texas Medical Branch (UTMB) Department of Education and Professional Development.

1. The initial extreme temperature conditions training is provided in the Pre-Service Training sessions, and additional training shall be provided in annual In-Service Training sessions.

2. The training is given in a group setting.

3. All units are responsible for conducting an annual standardized training program utilizing unit-based medical staff.

4. Requests for selected unit training shall be submitted to the Director for Preventive Medicine.

Brad Livingston[1]
Executive Director

[1] Signature on file.

# WIND CHILL INDEX

| Wind Speed in MPH | ACTUAL THERMOMETER READING (°F) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| | EQUIVALENT TEMPERATURE (°F) | | | | | | | | | |
| CALM | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| 5 | 48 | 37 | 27 | 16 | 6 | -5 | -15 | -26 | -36 | -47 |
| 10 | 40 | 28 | 16 | 4 | -9 | -21 | -33 | -46 | -58 | -70 |
| 15 | 36 | 22 | 9 | -5 | -18 | -36 | -45 | -58 | -72 | -85 |
| 20 | 32 | 18 | 4 | -10 | -25 | -39 | -53 | -67 | -82 | -96 |
| 25 | 30 | 16 | 0 | -15 | -29 | -44 | -59 | -74 | -88 | -104 |
| 30 | 28 | 13 | -2 | -18 | -33 | -48 | -63 | -79 | -94 | -109 |
| 35 | 27 | 11 | -4 | -20 | -35 | -49 | -67 | -82 | -98 | -113 |
| 40 | 26 | 10 | -6 | -21 | -37 | -53 | -69 | -85 | -100 | -116 |
| Over 40 MPH (little added effect) | LITTLE DANGER (for properly clothed person) | | | | INCREASING DANGER (Danger from freezing or exposed flesh) | | | GREAT DANGER | | |

The human body senses "cold" as a result of both the air temperature and wind velocity. Cooling of exposed flesh increases rapidly as the wind velocity increases. Frostbite can occur at relatively mild temperatures if wind penetrates the body insulation. For example, when the actual air temperature of the wind is 40°F and its velocity is 30 mph (48 km/h), the exposed skin would perceive this situation as an equivalent still air temperature of 13°F.

Clothing considered appropriate and currently available in the inventory is thermal underwear, insulated jackets, cotton and leather gloves, insulated hoods, work shoes and socks. Again, caution shall be taken when exposure occurs for longer periods of time.

## HEAT AND HUMIDITY MATRIX

| | AIR TEMPERATURE (°F) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 70 | 75 | 80 | 85 | 90 | 95 | 100 | 105 | 110 | 115 | 120 |
| Relative Humidity | Apparent Temperature | | | | | | | | | | |
| 0% | 64 | 69 | 73 | 78 | 83 | 87 | *91 | *95 | *99 | *103 | **107 |
| 10% | 65 | 70 | 75 | 80 | 85 | *90 | *95 | *100 | **105 | **111 | **116 |
| 20% | 66 | 72 | 77 | 82 | 87 | *93 | *99 | **105 | **112 | **120 | ***130 |
| 30% | 67 | 73 | 78 | 84 | *90 | *96 | *104 | **113 | **123 | ***135 | ***148 |
| 40% | 68 | 74 | 79 | 86 | *93 | *101 | **110 | **123 | ***137 | ***151 | |
| 50% | 69 | 75 | 81 | 88 | *96 | **107 | **120 | ***135 | ***150 | | |
| 60% | 70 | 76 | 82 | *90 | *100 | **114 | ***132 | ***149 | | | |
| 70% | 70 | 77 | 85 | *93 | **106 | **124 | ***144 | | | | |
| 80% | 71 | 78 | 86 | *97 | **113 | ***136 | | | | | |
| 90% | 71 | 79 | 88 | *102 | **122 | | | | | | |
| 100% | 72 | 80 | *91 | **108 | | | | | | | |

* Heat exhaustion possible
** Heatstroke possible
*** Heatstroke imminent

Heat Exhaustion: Staff shall ensure adequacy of water intake, look for signs of exhaustion. Five (5) minute rest breaks every hour.

Heatstroke Possible: Staff shall promote high water intake, five (5) minute rest breaks every one-half (1/2) hour; lay down, feet up. Reduce work by one-third (1/3).

Heatstroke Imminent: Secure outside work or reduce work pace by one-half (1/2) to two-thirds (2/3). Ten (10) minute break every one-half (1/2) hour; lay down, feet up. Insist on excessive water intake.

Heat and Humidity: At high temperatures, the human body normally cools itself through the evaporation of perspiration, but humidity interferes with this process. The above table, from the National Weather Service, shows how discomfort and health risks grow as heat and humidity increase. Remember: Apparent temperatures may run 15 to 30 degrees higher in urban areas with their vast expanses of concrete and asphalt.

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Temperature Log

**Unit:** ________________

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill | Person Recording |
|---|---|---|---|---|
| 6:30 a.m. | | | | |
| | | | | |
| 7:30 a.m. | | | | |
| | | | | |
| 8:30 a.m. | | | | |
| | | | | |
| 9:30 a.m. | | | | |
| | | | | |
| 10:30 a.m. | | | | |
| | | | | |
| 11:30 a.m. | | | | |
| | | | | |
| 12:30 p.m. | | | | |
| | | | | |
| 1:30 a.m. | | | | |
| | | | | |
| 2:30 p.m. | | | | |
| | | | | |
| 3:30 p.m. | | | | |
| | | | | |
| 4:30 p.m. | | | | |
| | | | | |
| 5:30 p.m. | | | | |
| | | | | |
| 6:30 p.m. | | | | |



# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Extreme Heat Precautions

OPERATIONAL PROCEDURE/HUTCHINS UNIT June 1,2011

**SUBJECT:** EXTREME HEAT PRECAUTIONS

**AUTHORITY:** Administrative Directive 10.64, Health Services Policy B-15.5, ACA Standard #4318

**PURPOSE:** To establish procedures to be followed by the staff of the Hutchins Unit during extreme heat situations

**INTRODUCTION:** In an effort to reduce heat related injuries and Illnesses the Hutchins Unit will follow the aforementioned procedures for the staff and offenders assigned to the Hutchins Unit. This Standard Operating Procedure will be in addition to and In accordance with A.D. 10.64 "Temperature Extremes in the Workplace" and Health Services policy B-15.5 "Heat Stress".

**PROCEDURES:**

I. Hutchins Unit Staff

1. All Staff members newly assigned to the Hutchins Unit will receive annual training for Heat Related illnesses as required by TDCJ.

2. The Unit Risk Management Coordinator will issue each employee who is newly assigned to the Hutchins Unit a "Recognition of Heat Illness card". The card will be carried on the employee's person while they are on duty. Staff members will read the card and familiarize themselves with the signs of Heat .Exhaustion, Heat Collapse, and Heat Stroke.

3. Staff members assigned to outside duty positions (i.e. gates, outside recreation yards, utility officers, escort officers) will be rotated out of the heat at least every two (2) hours and allowed to work an inside position.

   A. The time limits may be changed by the Unit Risk Management Coordinator or a security supervisor as deemed appropriate. Staff should monitor each other for signs of heat distress.

   B. Staff are encouraged to wear agency approved hats for coverage when outside in the summer months.

4. Cool drinking water will be provided at regular intervals to the staff assigned to outside positions who cannot leave their immediate area.

   A. All water coolers will be picked up and cleaned and inspected with a fresh supply of water and ice on daily. Staff members will immediately contact their supervisor if the exchange is not conducted.

   B. Officers will have a fresh supply of ice once each shift to place cold drinks only in daily, no food items of any kind will be placed in the coolers. Staff members will immediately contact their supervisor if the exchange is not conducted.

5. Frequent water breaks will be provided to staff members working Field Squads, Yard Squads, Community Service Squads and Maintenance Squads.

   A. Staff members will immediately contact their supervisor if they experience symptoms of Heat related illness/injury or if they witness another staff member witness these symptoms.

   B. Upon notification by a staff member, supervisors are to take action as per A.D. 10-64 and B-15.5 in resolving these types of issues.

II. Hutchins Unit Offenders

1. Offenders working outside in extreme heat will be provided frequent water breaks A.

   Offenders will be allowed to take breaks in shaded areas when possible

   B. Offenders with work restrictions of 20 (no temperature extremes) and 21 (no humidity extremes) shall be removed from rosters where these conditions exist.

2. Offenders will be allowed to wear commissary purchased gym shorts and commissary purchased T-shirts in the housing areas and on the recreation yards.

3. Offenders will have free and frequent access to the dorm showers while the dayrooms are open, dorm lights will remain off during daylight hours, unless there is an incident or emergency situation.

4. Air handlers are in operation to ensure good circulation of fresh air circulation.

5. At the Warden's Discretion, the purge fans may be turned on to allow for more fresh air circulation. Note: To turn a purge fan on or off access the electrical room for the building. To engage the fan turn the switch to manual. Turn the switch to the off position to stop.

6. Offenders will be provided cool drinking water during meal times.

   A. Additional cool drinking water may be delivered to the housing areas during the day. The coolers will be placed inside the living areas and also will be picked up and cleaned with an inspection done by the officer on duty and the food service department. All coolers will be picked up and also filled with a fresh supply of water on second shift daily.

   B. Water fountains are in place on the recreation yards for cool water during outside recreation periods.

III. Unit Transport Procedures during extreme heat

1. Certain types of offenders transported off the unit will depart during the cooler parts of the day when possible. These include but are not limited to:

   A. Offenders taking psychotropic medications

   B. Offenders with health issues deemed by the Unit Medical Department to be too severe to travel with in extreme heat situations.

IV. Back Gate Procedures

1. The building Major shall be responsible for monitoring all Back Gate waiting times for vehicles entering and exiting the unit.

2. Vehicles entering the unit will be immediately sent to their destination to be unloaded.

3. When a vehicle is not unloaded within fifteen (15) minutes a fan will be placed in the front entrance and if possible the rear of the vehicle to allow for fresh air circulation.

V. Heat Advisories

1. Updates on extreme temperatures and heat conditions such as heat exhaustion, heat collapse or heat stroke will be announced via radio on an hourly schedule.

*Senior Warden* [signature]



# Texas Department of Criminal Justice

**Brad Livingston**
Executive Director

**To:** Health Services Division
TDCJ, TTUHSC, and UTMB Employees

**Date:** May 12, 2011

**From:** George Crippen, RN, MSN, PhDc
Chief Nursing Officer
Director, Clinical Administration
TDCJ Health Services Division

**Subject:** Heat Related Illness

During the summer months, the incident of Heat Related Illnesses rise dramatically. During pre-service and inservice training, many of you were introduced to heat emergencies and instructed on how to recognize signs and symptoms of illnesses and to correctly describe what you see. Someone might be ill, it is important for you to let medical staff know what you have observed. This is also true with respect to recognize the symptoms of heat related illness and respond to the danger signals. It is imperative that supervisors are able to recognize the symptoms of heat related illness and respond to the danger signals. The symptoms are:

**1.** Heat Stroke

A. Perspiring (sweating) is diminished or absent.

B. Skin is hot, dry, and flushed.

C. Increased body temperature, which if uncontrolled, may lead to delirium, convulsions, and even death.

**2.** Heat cramp symptoms include the following:

Painful intermittent spasms of the voluntary muscles following hard physical work in a hot environment.

**3.** Heat exhaustion symptoms are as follows:

A. Profuse perspiring, weakness, rapid pulse, dizziness, and headaches.

B. Skin is cool and sometimes pale and clammy with perspiration.

C. Body temperature is normal or subnormal.

D. Nausea, vomiting, and unconsciousness may occur.

Supervisors should be sensitive to work assignment areas and be watchful of extensive exposure to extreme heat conditions. Employees and offenders should be provided access to water and encouraged to

*Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.*

Two Financial Plaza, Ste. 625
Huntsville, Texas 77340
(936) 437-3531
www.tdcj.state.tx.us
**Heat Related Illness 2011, Page 1 of 2**

**Appendix 190**

UTMBEMails000031828

consume water prior to their work assignment and as needed during the workday. Carbonated beverages do not provide the same benefit as water and should be discouraged as a replacement. If symptoms of heat related illness are observed you should:

1. Contact medical.
2. Place patient in a cool area.
3. Remove shirt and hat, then wet head and torso with water. Have the patient drink water or isotonic beverage if they are conscious and alert.
4. All of these measures are to be taken while moving patient in the most expeditious means available to continue with and obtain proper medical treatment.

Recognition and treatment of heat related injuries should be stressed at shift meetings on a regular basis.

Authority:  Lannette Linthicum, MD, CCHP-A, FACP
            Director, Health Services Division
            Texas Department of Criminal Justice

*Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.*

Two Financial Plaza, Ste. 625
Huntsville, Texas 77340
(936) 437-3531
www.tdcj.state.tx.us
**Heat Related Illness 2011, Page 2 of 2**

**Appendix 191**

UTMBEMails000031829

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM and SANDRA McCOLLUM, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | Civil Action Number 4:14-CV-3253 |
| Plaintiffs, | § | |
| vs. | § | |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § | |
| Defendants. | § | |

---

ORAL AND VIDEOTAPED DEPOSITION OF

CHARLES ADAMS, M.D.

MAY 18, 2016

---

ORAL AND VIDEOTAPED DEPOSITION OF CHARLES ADAMS, M.D., produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on MAY 18, 2016, from 8:22 a.m. to 4:54 p.m., before Melody Reneé Campbell, CSR in and for the State of Texas, reported by method of machine shorthand, at the offices of the Attorney General, 300 West 15th Street, Austin, Texas, pursuant to Notice and Court Order and the Federal Rules of Civil Procedure.

A P P E A R A N C E S

FOR THE PLAINTIFFS:
Mr. Jeff Edwards, Esq.
Mr. Scott Medlock, Esq.
The Edwards Law Firm
1101 East Eleventh Street
Austin, Texas 78702
512.623.7727
512.727.3365 (Fax)
Jeff@edwards-law.com
Scott@edwards-law.com

FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
Mr. Graig J. Alvarez, Esq.
Ms. Kara Philbin, Esq.
Fernelius Alvarez Simon
1221 McKinney Street, Suite 3200
Houston, Texas 77010
713.654.1200
GAlvarez@fa-lawfirm.com
KPhilbin@f-alawfirm.com
-and-
Ms. J. Lee Haney, Esq.
Assistant Attorney General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711
512.463.2080
512.963.2109 (Fax)
Lee.Haney@texasattorneygeneral.gov

OR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
Mr. Derek Kammerlocher, Esq.
Mr. Phillip Boyd, Esq.
Assistant Attorney General
Post Office Box 12548
Austin, Texas 78711
512.463.2080
512.936.2109
Derek.Kammerlocher@texasattorneygeneral.gov
Phillip.Boyd@texasattorneygeneral.gov

ALSO PRESENT:
Dr. Glenda Adams
Ms. Shanna Molanre
Ms. Ashley Palermo
Ms. Jennifer Osteen
Ms. Jennifer Daniel
Ms. Deborah M. Woltersdorf
Mr. Kevin J. Schaefer (Videographer)

I N D E X

| | PAGE |
|---|---|
| EXAMINATION | |
| By Mr. Edwards: ............................ | 7 |
| CHANGES AND SIGNATURE............................ | 308 |
| REPORTER'S CERTIFICATE........................... | 308 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Documents Reviewed by Witness | 7 |
| 2 | 08/31/12 E-mail from C. Adams to Cobo re: Heat-related Deaths/Illnesses (Bates TDCJ017513) | 37 |
| 3 | 06/14/13 E-mail from Davis to Linthicum re: Possible Heat-Related Deaths 2011-Report, with attachment (Bates TDCJ024845-6) | 39 |
| 4 | 05/06/14 E-mail from C. Adams to Thompson, with Attachments (Bates UTMBemails1806-25) | 113 |
| 5 | E-mail String Ending 08/09/11 from Wright to Pace, et al re: Reporting Deaths Related to Heat (BatesUTMBEmails15135-6) | 192 |
| 6 | E-mail String Ending 07/06/12 from C. Adams to Linthicum re: June 2012 Heat-Related Illness, with attachments (Bates TDCJ333088-89) | 196 |
| 7 | E-mail String from C. Adams to Brown, re: June 2012 Heat-Related Illness (BatesUTMBEmails5970-1) | 197 |
| 8 | E-mail String Ending 0/15/12 from C. Adams to Linthicum re: Heat-Related Concerns (BatesTDCJ33084-6) | 203 |
| 9 | E-mail String Ending 08/09/11 from C. Adams to Wright re:Details of Possible heat-Related Issue | 308 |

the Texas prison system in 2001?
**A. I don't remember.**
Q. Okay. Were you aware of heatstroke deaths inside the Texas prison system in 2004?
**A. I don't remember.**
Q. Were you aware of heatstroke deaths inside the Texas prison system in 2007?
**A. Nope. I don't remember that, either.**
Q. Were you aware of heatstroke deaths in the Texas prison system in 2009?
**A. No.**
Q. Were you aware of heatstroke deaths in the Texas prison system in 2011?
**A. Yes.**
Q. Were you aware of heatstroke deaths in the Texas prison system in 2012?
**A. Yes.**
Q. Now, I'll represent to you that there were two heatstroke deaths at the Byrd Unit in 2007 and that a memo was prepared to Dr. -- to or from Dr. Linthicum regarding this. Is that something that you should have been made aware of?
**A. No.**
Q. Even though it's a heatstroke death inside the Texas prison system?

**A. Well, if you'll recall, we were north and south at that time, and that was not in my area.**
Q. Okay. So Dr. Glenda Adams should have been made aware of that?
**A. I'm sure -- yes, I would think.**
Q. Okay. Isn't it important for y'all to coordinate?
MR. ALVAREZ: Objection; vague.
**A. In many ways, we do.**
Q. (BY MR. EDWARDS) So is that, yes, it would be important to coordinate in many ways?
**A. When appropriate, yes.**
Q. Okay. And one of the things that you would want to coordinate is concerns about inmates' health. Right?
**A. Yes.**
Q. One of the things that you ought to coordinate is concerns about conditions, like housing conditions. That could lead to bad health outcomes. Right?
MR. ALVAREZ: Objection; calls for speculation.
**A. That's not a medical -- I'm sorry.**
MR. ALVAREZ: Go ahead.
**A. That's not a medical issue, and that's not**

**something we have any control over.**
Q. (BY MR. EDWARDS) You don't think that housing conditions is something that you have any control over?
**A. Yes, pretty much.**
Q. Okay. So even if you -- even if you acknowledge that air-conditioning would be better for the inmates and make them healthier and better for virtually all aspects of inmate medical care, you couldn't really do anything about it because you don't have any control over the housing?
MR. ALVAREZ: Objection; calls for speculation and vague and compound.
MR. KAMMERLOCHER: Join the objection.
**A. Yeah. Let's repeat the question, please.**
Q. (BY MR. EDWARDS) Sure. I'll break it down.
**A. Thank you.**
Q. You're telling me that you, as a director at UTMB, had no personal control over anything to do with housing conditions inside any of the Texas prisons. Is that correct?
**A. That's correct.**
Q. Okay. Do you consider cooling down the

temperature or the heat index inside a Texas prison to be a housing condition over which you had no control?
**A. True.**
Q. Okay. So does that mean that even if you wanted to or recommended that cooling occur, you'd have no control and you -- you personally would have no control over making that happen. Fair?
**A. That's fair.**
Q. And I guess it would be your position that UTMB, as a system, also would have no control over cooling down the housing areas?
**A. No. We're contracted to deliver medical care.**
Q. Okay. Now, with the understanding that you can't force TDCJ to cool down the housing areas, isn't it something that you need to be aware of because there are health concerns that come from TDCJ's intentional decision not to cool down the housing areas?
**A. Would you run that by me again, please?**
Q. I will. And I appreciate that.
Would you repeat the question? Oh, I can do it, actually.
Here's what I said, sir. With the

understanding that you can't force TDCJ to cool down the housing areas, isn't it something that you need to be aware of because there are health concerns that come from TDCJ's intentional decision not to cool down the housing areas?

**A. I am aware that the housing areas are not cooled, that they do not have climate control.**

Q. Right. And isn't it important for you to be aware of that because there are health concerns that stem from the decision not to cool them or provide climate control?

MR. ALVAREZ: Objection; calls for speculation.

**A. Yeah. That's -- repeat that again.**

Q. (BY MR. EDWARDS) Well, sure. I mean, aren't there health concerns that stem from the decision not to cool down the housing areas, like people dying en masse of heatstroke?

MR. ALVAREZ: Objection; calls for speculation and vague. I think it's the decision part that I'm having a problem with, the decision not to --

MR. EDWARDS: Hey, Graig, please.

Q. (BY MR. EDWARDS) Could you answer my question, sir?

**A. Okay. Repeat it one more time.**

Q. Sure. Aren't there health concerns that stem from the decision not to cool down the housing areas, in the example I gave you, like, for instance, a group of people dying from heatstroke?

**A. Yes, that's a concern.**

Q. Right. And aren't there other health concerns that stem from the decision, which is undeniably intentional on the part of TDCJ, not to cool down the areas? Aren't there health concerns that you, as the director at UTMB, need to be aware of and train your people about?

MR. ALVAREZ: Objection; compound.

MR. KAMMERLOCHER: Join the objection.

**A. Repeat that, please.**

Q. (BY MR. EDWARDS) Sure. Aren't there other health concerns, besides people dying from heatstroke, that stem from the decision, which is made apparently by TDCJ, I would say it's intentionally made, not to cool down the areas, aren't there health concerns that you, as the director of UTMB, need to be aware of and provide training to providers at the prisons about?

MR. KAMMERLOCHER: Objection; calls

for speculation.

**A. There could be.**

Q. (BY MR. EDWARDS) Well, there are, aren't there? For instance, you need to be made aware of inmates taking medications that are -- that render them heat sensitive. Right?

**A. Correct.**

Q. Okay. That's something you need to train your people about. Right?

**A. Correct.**

Q. Okay. The fact that it's 100 or 105 degrees in a housing area and somebody is taking a diuretic, that might be something that would be of concern. Right?

**A. Uh-huh.**

MR. ALVAREZ: Objection; assumes facts not in evidence.

Q. (BY MR. EDWARDS) Hypothetically. You kind of said uh-huh, and that's one of those deposition things that I've got to say, is it yes, no.

**A. Yeah.**

Q. And if you could do your best to answer that.

**A. Most people wouldn't have trouble with**

**that.**

Q. Okay. What if they were on an antipsychotic medication?

**A. The -- that could be a concern.**

Q. Okay. Well, and when it could be a concern in medicine, it should be a concern. Right?

**A. Yeah.**

Q. And you have specific policies and procedures to help deal with that, right, or do you not?

**A. We have some policies that deal with that.**

Q. Okay. What are the other concerns? I mentioned -- or you kind of agreed, look, people dying of heatstroke, people on medications that render them, I guess, vulnerable to the heat. What are other concerns that stem from living in extremely hot conditions?

**A. Well, we encouraged hydration, altering work hours, transporting in the early morning hours versus midday. There were some things that we could have some input that we did.**

Q. Sure. And we'll get into kind of things that UTMB did or you recommended, sir.

But I'm -- right now, I'm just trying to figure out the health concerns that you guys need

particularly impressed by the distribution of the deaths. All but one was located in the Huntsville-Palestine corridor."

What did you mean by that?

**A. The -- between Huntsville and Palestine and points east and west, there's just a group of -- there's an area, a geographic area where a lot of the early prisons were built and newer prisons, too, in the '60s and '70s.**

Q. Do you know when the Hodge Unit was built?

**A. No.**

Q. Do you know when the Gurney Unit was built?

**A. Uh-huh. '92.**

Q. '92?

**A. I opened it.**

Q. Do you know why they decided not to -- you were aware that air-conditioning was pretty prevalent in 1992. Right?

**A. Correct.**

Q. Are you aware of any public building in the State of Texas that doesn't have air-conditioning that was built after, let's say, 1980?

**A. No.**

Q. Are you aware of any public building in the State of Texas that doesn't have air-conditioning? And when I say "public," I mean open to the public or the public can come in.

**A. No.**

Q. Any library?

**A. No.**

Q. Any school?

**A. No.**

Q. Okay. So do you -- do you ever -- when you say you opened the Gurney Unit in 1992, what does that mean?

**A. I went up there and did intake physicals for about two weeks.**

Q. So like the first set of inmates that came in, you were the person who was --

**A. Correct.**

Q. -- in the role of giving them an intake physical and making sure they were okay and getting them their drugs or whatever? Yes?

**A. Myself, a PA and a -- a new employee we were orienting.**

Q. Okay. Now, the intake physical, that's an important -- that's an important function that UTMB performs for TDCJ. Right?

**A. That's one of our jobs, yes.**

Q. Yeah. And what is the point of performing intake physicals for TDCJ, with particular reference to transfer facilities or intake facilities, like the Hutchins Unit or the Gurney Unit?

**A. Well, it gives you an opportunity to evaluate the offender.**

Q. And what's the point of that, evaluating the offender?

**A. Determine what his needs might be.**

Q. Okay. And so that's a time when UTMB has the opportunity to identify particular needs and address particular medication concerns and, frankly, protect the inmate if there's a danger that they know about. Right?

**A. In general, yes.**

Q. Okay. Do you know when -- and now I'm asking particularly about the summer of 2011 -- when those intake physicals occurred? Like, did they occur day one of the inmate arriving at the prison? Did they occur, you know, within the first couple of days of an inmate arriving at the intake facility? Did they occur, like, within a month?

**A. No. As I recall, the target was day three or four.**

Q. Do you know what the policy was then?

**A. No, I don't.**

Q. Okay. If I were to tell you that there's been testimony in this case that the policy was to do it within seven days, would that be consistent with your memory?

**A. Yep. That seems reasonable.**

Q. Well, I didn't ask you if it was reasonable. We'll agree to disagree about that, sir.

**A. My understanding of the policies, existing policies, that sounds about right.**

Q. Oh, fair enough. Okay. So when you say "the target was day three or four," does that mean that the goal from the hierarchy at UTMB was, you know, Let's do our best to get people in within three or four days, with our understanding that the deadline being it has to be by -- and I'll represent to you that day seven is what the testimony has been.

**A. Okay.**

Q. Is that kind of what your understanding of it was?

**A. Pretty much.**

Q. Why was there a target of three or four

medications, they ought not be housed on the second floor, right, during the summer months?
**A. I agree with that.**
Q. At the Pack and Luther Unit, do you recall talking to Warden Herrera? He would be the Pack warden, to my understanding.
**A. I think you're right. Yes.**
Q. Do you know if the Gurney Unit was, prior to you getting there, making water and ice available at all times?
**A. I don't know that.**
Q. Do you know if they were doing that at the Hodge Unit?
**A. To a limited degree. But I thought it could be improved.**
Q. Okay. The same with the other units?
**A. Oh, I was tickled to death with Coffield. They were the ones that were passing out ice and water to the seg patients five or six times a day. And I don't know the circumstances about the death there. I don't remember. I don't think he was a seg inmate.**
Q. So they were doing a good job at Coffield, from your perspective?
**A. I was impressed.**

Q. Okay. And you thought that everybody else could be doing that, too. Right?
**A. I thought it would be an improvement.**
Q. Yeah.
**A. And I think it's mentioned in one of my e-mails that you have.**
Q. I do. And we'll probably get to that.
All right. Were you involved in the budget cuts at all in 2009 or '10?
**A. Well, I knew it was happening.**
Q. On-site medical care, that's something that is of tremendous value to inmates. Right? On-site medical care, that's something that's a benefit and of tremendous value to inmates. True?
**A. True.**
Q. I would assume that if cost was wasn't an issue, you would recommend to all the facilities that they have on-site medical care 24 hours a day. Right?
**A. Yeah. That would be my preference.**
Q. When the cuts were made it did you play any role in deciding which facilities reduced their hours, their clinic hours?
**A. No.**
Q. Or their on-site role?

**A. No.**
Q. Do you know who did? And if you don't, that's okay.
**A. I don't, really.**
Q. Do you know if the -- the Hutchins Unit was reduced in terms of the number of hours. Do you know --
**A. I don't know.**
Q. Do you know if that had on-site medical care during the early morning hours?
**A. I honestly don't know what hours they had, what hours they were staffed.**
Q. Well, I'll represent to you that the evidence in the McCollum case suggests that there was not on-site -- no one on-site of even -- not even a licensed vocational nurse was on site when Mr. McCollum began seizing and had his heatstroke. Okay?
**A. Okay.**
Q. Would you agree with me that -- well, do all the UTMB medical providers get training that heatstroke is a life-threatening medical emergency?
**A. Not specific training, not -- they -- again, what we do is, in the quarterly -- or the monthly provider meetings we talk to the regional**

**medical directors. They have monthly meetings with their providers, and they're told -- I'm telling them that they need to -- hey, you know, it's that time of the year again, you really need to do this. And there are -- there are sites on the CMC website that discuss these issues and treatment.**
Q. Okay. So UTMB doesn't provide any specific training to the providers but it does make websites available to them and encourage them to look at them?
**A. Well, and it raises the awareness in the pre-summer months that, hey, this is coming, this is what you've got to do.**
Q. Okay. After the summer of 2011 did special training get done for every UTMB provider?
**A. I don't think so.**
Q. Can you think of a reason why not?
MR. ALVAREZ: Objection; misstates his testimony. Actually it doesn't misstate his testimony. It assumes facts not in evidence and -- go ahead.
**A. Do you want me to answer the question?**
Q. (BY MR. EDWARDS) Sure.
**A. And would you repeat the question, please?**
Q. Sure. My question was, can you think of a

Do you think it's sufficient, in order to protect the inmates from the dangers of extreme heat, to pass out ice twice a day?
**A. Personally, I think it should be more often.**
Q. Okay. And I appreciate that. And I am asking you personally. So personally, Dr. Adams believes that you should pass out ice more than twice a day. Correct?
**A. Yes.**
Q. Did anybody at UTMB, to your knowledge, disagree with you?
**A. No one directly did, no.**
Q. Okay. Did anybody, indirectly, at UTMB disagree with you that you needed to -- disagree with the supposition or the suggestion that you should pass out ice more than twice a day to inmates?
MR. KAMMERLOCHER: Objection; calls for speculation.
**A. Repeat that question, please.**
Q. (BY MR. EDWARDS) Sure. Did anybody, directly or indirectly at UTMB, disagree with your position that you ought to pass out ice more than twice a day to protect the inmates from the dangers

of extreme heat?
MR. KAMMERLOCHER: Objection --
**A. I don't recall anybody disagreeing.**
Q. Anybody from TDCJ disagree with that suggestion, sir?
**A. I didn't have many conversations with TDCJ or any -- other than discussing that with the warden and assistant warden.**
Q. Who is Jane Moultrie?
**A. She's -- at that time she was a regional medical director. And she may have had those in her region. I think she did.**
Q. Well, did you ever talk with Dr. Linthicum or Dr. Williams about the insufficiency of ice distribution?
**A. I think I shared that or a later e-mail with them on that very topic.**
**(Exhibit Number 8 marked.)**
Q. (BY MR. EDWARDS) Is this the e-mail you're talking about? Or at least does it reference the e-mail that you're talking about? And I'm really much more concerned with the first page of that document.
**A. I'm still trying to finish reading this, please.**

**Okay. What was your question, please?**
Q. Are you sure you've read it thoroughly enough?
**A. I read it.**
Q. Why don't you flip to the first page, sir.
**A. You want to start at the first page?**
Q. I want you to look at the first page because I'm going to ask you some questions about the first page and the first page only.
**A. Okay.**
Q. Okay. Did you send an e-mail to Owen Murray and Lannette Linthicum?
**A. Well, I copied Owen on it. Yes.**
Q. You notice it says that there's a wide variance in ice distribution at the units. Correct?
**A. That's why I copied -- that's why I sent it to Dr. Linthicum and Dr. Williams.**
Q. Because that's a problem. Right?
**A. There appeared to be some variances that I didn't agree with.**
Q. Right. Some units didn't distribute ice at all. Right?
**A. It seems like a couple of them didn't. Just ice water.**

Q. Well, Hutchins didn't distribute ice. You're aware of that?
**A. No.**
Q. Okay. Do you know if Hutchins distributed ice?
**A. No, I don't.**
Q. Do you know if Hutchins distributed ice water in the summer of 2011?
**A. No, I don't.**
Q. Okay. Do you know how many people lived in the housing dorms at the Hutchins Unit?
**A. No. It's a 2,000-man facility.**
Q. That's not my question, though, was it?
Do you have any idea how many people lived in a housing dorm?
**A. No.**
Q. Do you know how many times water was even brought into the housing dorm where Mr. McCollum lived on a daily basis?
**A. No.**
Q. No reason that you couldn't have alerted Dr. Linthicum and Doctor -- well, strike that.
Your expect -- you were surprised to learn that not everybody was passing out ice on a regular basis, right, as of August 2012? Correct?

the heat, that's something that you would expect any competent doctor to agree with. Right?
**A. Right.**
Q. Okay. Do you know if any warden has ever been criticized or disciplined by anyone TDCJ for not providing ice or even not providing ice water?
**A. No, I don't.**
Q. Do you know who Pinkee Patel is?
**A. I think she is the administrative assistant for Dr. Jane Moultrie.**
Q. Okay. And Jason Chavers?
**A. He is the practice manager, the regional practice manager in that -- in the region, Region III that Jane Moultrie was medical director for.**
Q. All right. Now, earlier we were talking about intake physicals. Do you recall that somewhat?
**A. I do.**
Q. Okay. You've actually done intake physicals at the units. Right?
**A. Uh-huh, yes.**
Q. Would you -- the way I imagine an intake physical is kind of like if I might get a physical from my doctor. Is it similar to that?

**A. Uh-huh, similar.**
Q. Well, then why don't you just describe generally what's supposed to happen at an intake physical.
**A. Well, you have a form where they have vital signs on it and they -- the offender comes in, you undress him to his shorts, assuming it's a male unit.**
Q. Sure.
**A. And you'd go through and -- it's got several sections: head, eyes, ears, nose, throat neck, chest, abdomen, heart. And you just do a physical. You check them for a hernia. If they're age appropriate, a rectal exam and a stool guaiac, check their extremities.**
**And then start basing their overall -- and then you'd -- you do what's called a PULHES, which is an overall assessment of their health. And then you'd fill out the HSM-18 at that point and then you'd go on to the next one.**
Q. Okay. What is the HSM-18? I know I mentioned it earlier.
**A. That's a thing you showed me about lower-level housing. It describes some general housing things: They can't climb stairs; they can**

**live on the lower level, that sort of thing. And then any specific restrictions as far as what their activities can be, what they can do: no climbing, no stooping, no bending, that sort of thing.**
**And then you fill out an over -- you assess a transportation to what they can do and what -- whether they can go on a chain bus, whether they need a van, whether they need a wheelchair van and that sort of stuff.**
Q. Okay. Do you know who is responsible for providing an upper bunk or a lower bunk restriction?
**A. The provider will make that decision based -- that is done at the same time.**
Q. So the first time that an inmate would have the opportunity from UTMB to get a lower bunk restriction would be at the intake physical?
**A. For the most part.**
Q. What about not for the most part, the rare exception?
**A. If they -- again, if the patient had an emergent or urgent problem and he was brought into the clinic, it could be -- the HSM-18 could be changed.**
Q. Got you.
**A. Any time the patient is seen, it can be**

**updated.**
Q. Okay. So if there is an emergency where the inmate needs to see a doctor and the doctor notices, hey, we need to put this guy on the lower bunk, that would be an opportunity to provide a lower bunk restriction. Correct?
**A. Correct.**
Q. But absent a medical emergency, the first opportunity that UTMB has to provide a lower bunk restriction is when they do the intake physical. Right?
**A. Generally, yes.**
Q. And generally morbidly obese people receive lower bunk restrictions. Right?
**A. In most cases, yes.**
Q. And that's a benefit or an accommodation, of sorts, that UTMB would provide a morbidly obese person to help them sleep and live. Right?
**A. Correct.**
Q. Do you believe that the word "vital" before vital signs is important for doctors or medical providers?
**A. Yes.**
Q. Why?
**A. Well, it's a basic assessment of part of**

**your health: blood pressure, pulse, respiration.**

Q. I don't want to oversimplify it because obviously an intake physical is far more than vital signs. Right?

**A. I'm sorry?**

Q. An intake physical, as you've described it, is far more thorough than just taking vital signs. Right?

**A. Correct.**

Q. Nevertheless, if vital signs are out of whack, that's something that's very important for any medical provider to know. Right?

**A. Yes.**

Q. Okay. And blood pressure is one of the four vital signs?

**A. Uh-huh.**

Q. Blood pressure, respiration, temperature --

**A. Pulse.**

Q. -- and pulse. Okay.

If Mr. McCollum wasn't provided an intake physical for the period that he was there, July 15th through July 22nd, does that mean that his vital signs were not taken?

**A. Probably not.**

Q. Now, I'll represent to you that he was -- well, are you familiar with the initial process where some sort of, I guess, LVN or maybe medical assistant does some sort of triage when inmates get off the bus and they're coming from county jail to the prison?

**A. That's done at some units, yes.**

Q. Okay. That's not -- I mean, that's not an opportunity for the real medical provider to see the inmate or patient. Right?

**A. No.**

Q. Okay. I'll represent to you that Mr. McCollum was seen by some form of nurse, I think -- I think the licensed vocational nurse, I think and Dr. Babbili or PA Babbili --

**A. PA Babbili, yeah.**

Q. -- switched a medication. Aware of that?

**A. Yes, I remember reading that.**

Q. I think he switched clonidine for -- I think you called it HCTZ?

**A. Hydrochlorothiazide, correct.**

Q. And I believe that was -- I think that was for his hypertension. Does that make sense?

**A. Yeah.**

Q. Okay. Now, before a medical provider

makes a medication switch like that, ought they to take vital signs?

**A. I can't explain his action. Now, one thing, clonidine is not available in our system except for hypertensive emergencies. It's very effective in that. But treating a patient long-term with that or regularly with that, it's not a good drug.**

Q. Okay. And I'm not -- I'm not suggesting any particular criticism, necessarily, of Mr. Babbili or Dr. Babbili. But I'm just -- switching drugs like that, is it generally the best practice to get vital signs before doing that?

**A. Best practice, except -- and I'll qualify it in that he wasn't going to get the clonidine and he didn't want to stop all of his medicines completely. But it would have been good to have gotten vital signs on him.**

Q. And that's immediately. Right?

**A. I would think so.**

Q. Well, was there anything preventing Dr. Babbili from having Mr. McCollum into the clinic that first day?

**A. I have no idea.**

Q. Well, you were -- you've done these intake

physicals. Right?

**A. I don't know what the -- what was going on in the clinic that day. I don't know what time the man came in. I don't know anything about that.**

Q. Okay. Diabetes. Is it your understanding that diabetes is a medical condition that is one of the -- on one of the lists of potentially heat vulnerable?

**A. Yes.**

Q. Are you aware -- if you're not, please tell me. But are you aware that Mr. McCollum reported that he had diabetes?

**A. Am I going to get to see that, please?**

Q. This is just a --

**A. Oh, I'm sorry.**

MR. ALVAREZ: Can I have a copy of that, too?

MR. EDWARDS: Sure. Someone should read it.

MR. ALVAREZ: Get more use out of it than he is.

Q. (BY MR. EDWARDS) I don't have -- I'm not asking specific questions about Mr. McCollum, but if I do, I -- I can get it.

Did you review his chart? Is that

CHANGES AND SIGNATURE

RE: McCOLLUM v. LIVINGSTON

WITNESS: CHARLES ADAMS, M.D.

PAGE/LINE CHANGE REASON

I, CHARLES ADAMS, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________

CHARLES ADAMS, M.D.

REPORTER'S CERTIFICATE

STATE OF TEXAS §

McLENNAN COUNTY §

I, Melody Reneé Campbell, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the foregoing deposition is a full, true and correct transcript;

That CHARLES ADAMS, M.D., the witness hereinbefore named, was duly sworn by the officer and that the oral deposition was taken by the officer in machine shorthand on MAY 18, 2016, and is a true record of the testimony given by the witness;

I further certify that the signature of the deponent was requested and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

That $ _______________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to PLAINTIFFS;

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken,

and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 26TH day of MAY 2016.

______________________________

MELODY RENEE CAMPBELL, RMR, CRR, #38267

DepoTexas - Firm Reg. No. 17

1016 La Posada, Suite 294

Austin, Texas 78752

512.465.9100

512.465.9132 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM and SANDRA McCOLLUM, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | Civil Action |
| | § | Number 4:14-CV-3253 |
| Plaintiffs, | § | |
| vs. | § | |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § | |
| Defendants. | § | |

---

ORAL AND VIDEOTAPED DEPOSITION OF

JERRI DENEÉ ROBISON

APRIL 27, 2016

---

ORAL AND VIDEOTAPED DEPOSITION OF JERRI DENEÉ ROBISON, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on APRIL 27, 2016, from 9:37 a.m. to 6:11 p.m., before Melody Reneé Campbell, CSR in and for the State of Texas, reported by method of machine shorthand, at the offices of the Attorney General, 300 West 15th Street, Austin, Texas, pursuant to Notice and Court Order and the Federal Rules of Civil Procedure.

APPEARANCES

FOR THE PLAINTIFFS:
Mr. Scott Medlock, Esq.
The Edwards Law Firm
1101 East Eleventh Street
Austin, Texas 78702
512.623.7727
Scott@edwards-law.com

FOR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
Mr. Daniel Neuhoff, Esq.
Assistant Attorney General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711
512.463.2080
512.963.2109 (Fax)
Daniel.Neuhoff@texasattorneygeneral.gov

FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
Mr. Graig J. Alvarez, Esq.
Ms. Kara Philbin, Esq.
Fernelius Alvarez Simon
1221 McKinney Street, Suite 3200
Houston, Texas 77010
713.654.1200
GAlvarez@fa-lawfirm.com
KPhilbin@f-alawfirm.com
-and-
Ms. J. Lee Haney, Esq.
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711
512.463.2080
512.963.2109 (Fax)
Daniel.Neuhoff@texasattorneygeneral.gov
Lee.Haney@texasattorneygeneral.gov

ALSO PRESENT:
Ms. Shanna Molanre
Ms. Ashley Palermo
Ms. Kimberly Kauffman
Mr. Richard Huntpalmer
Ms. Caroland Bremond
Ms. Heather Rhea
Ms. Jennifer Osteen
Ms. Deborah M. Woltersdorf

INDEX

| | PAGE |
|---|---|
| EXAMINATION | |
| By Mr. Medlock................................ | 7 |
| CHANGES AND SIGNATURE............................ | 240 |
| REPORTER'S CERTIFICATE........................... | 241 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Deneé Robison's Objections and Responses to Plaintiffs' Subpoena Duces Tecum Attached as Exhibit A to their April 14, 2016 Notice to Take Deneé Robison's Deposition | 12 |
| 2 | 06/16/11 E-mail from Virginia Robinson to Samual Hallman re: Psych Meds and the Heat | 133 |
| 3 | E-mail String Ending 08/04/11 from Kelly Maxwell to Lisa Blalack, et al, re: Reporting Heat-Related Illnesses | 144 |
| 4 | E-mail String Ending 08/05/11 from George Crippen to Robert Williams re: Heat | 161 |
| 5 | E-mail String Ending 08/05/11 from Charles Adams to Robert Williams re : Bradshaw | 176 |
| 6 | E-mail String ending 08/05/11 from Maximiliano Herrera to Avrian Mendez, et al, re: Heat Stroke or NMS/Serotonin Syndrome | 178 |
| 7 | E-mail String Ending 08/09/11 from Jewel Archie to William Raney, et al. Re: Heat Stroke or NMS/Serotonin Syndrome | 199 |
| 8 | E-mail String ending 08/10/11 from Robert Williams to George Crippen re: Heat Illness | 203 |
| 9 | E-mail String Ending 04/15/14 from Jerri Robison to Gary Eubank re: Huntsville Area Transient Unit Concerns | 210 |

**A. I mean, it's hot. It -- it is hot in the housing area. It's warm, yeah.**

Q. (BY MR. MEDLOCK) Do you remember it being hotter in the housing areas in 2011 than in other summers when you had been in the housing areas at other --

MR. NEUHOFF: Objection; speculation.

**A. I don't know if I remember being hotter in 2011. I don't know if it's something that I thought about at that time.**

Q. (BY MR. MEDLOCK) What brought you to the Huntsville Unit in the summer of 2011?

**A. My office is there at the Huntsville Unit. That's where my office was.**

Q. And so fair to say that you were in the housing areas at the Huntsville Unit more often than the other prisons that you supervised?

**A. That would be a fair assessment, yeah.**

Q. Did you ever provide patient care at the Huntsville Unit in the summer of 2011?

**A. I don't recall.**

Q. Do you recall treating any patients at the Huntsville Unit for any heat-related illness in the summer of 2011?

**A. I don't -- directly treating them, no.**

Q. Do you remember ever getting any report that inmates at the Huntsville Unit had been treated for a heat-related illness in the summer of 2011?

**A. I do remember.**

Q. What do you recall about that?

**A. I remember getting a report from the nurse manager that they had treated -- or they had been treating several offenders for heat-related illness.**

Q. When did -- and how did that come up? Did you get like a formal report, like we were talking about earlier, or was it other --

**A. It was an e-mail. It was an e-mail. And I may have gotten some formal reports as well.**

Q. Okay. So you may have also gotten those reports to the senior leadership we discussed, but you also probably got some less formal e-mails from nurses --

**A. The nurse manager, uh-huh.**

Q. -- medical --

From the nurse manager?

**A. Yes.**

Q. Who was the nurse manager at the Huntsville Unit?

**A. Marybeth Pipkin.**

Q. When do you recall first learning that

patients at the Huntsville Unit had suffered heat-related illnesses in the summer of 2011?

**A. I don't remember the date.**

Q. Do you recall a patient named Michael Martone dying of heatstroke at the Huntsville Unit in 2011?

**A. I do recall that patient.**

Q. Do you recall receiving reports about patients suffering heat-related illnesses at the Huntsville Unit before Michael Martone's death?

**A. I don't know if it was before or after his death.**

Q. Tell me about the first report of a heat-related illness that you recall at the Huntsville Unit in the summer of 2011.

**A. They're normally just your typical reports that just tell, you know, who the patient was and where they were working or if they weren't working or, you know, what they were doing when they reported the illness or complained about it, and what their housing is. And it's just a pretty generic report. And then the severity of their illness.**

Q. Was that the first time you remember someone had suffered a heat-related illness at the Huntsville Unit in 2011, through an e-mail, like I

assume is what you're describing? Or was there conversation you had before that? Or what do you recall?

**A. I mean, I know I had an e-mail. And there could have been some conversation, but I don't recall if there was or when.**

Q. Do you recall doing anything to prepare for the summer at the Huntsville Unit in 2011?

**A. We prepare -- like prepare for the summer for what?**

Q. For heat-related issues.

**A. Okay. Yes. We do heat training every year in preparation for the summer. We -- part of that training is just telling our staff what to expect, how to identify, you know, those patients that could be suffering from a heat-related illness, what to do when they -- when a patient presents that way, and how to prevent those types of illnesses for -- for themselves, working, or for the patient population and the other employees working.**

Q. When do you first recall learning that Mr. Martone had died of heatstroke at the Huntsville Unit?

**A. I don't remember when I first knew. I do remember that it happened but I don't remember when**

**that system yet.**

Q. Okay. So that kind of relies on the provider seeing the patient and making the evaluation and inputting that information into the HSM-18. Right?

**A. Well, prior to them seeing the patient, when they come in -- when they come in, we can get just hard copy lists initially. When the patient arrives, just based on their medication, the provider will say, yes, you need to put them on the hard copy list. And then when their provider does see them, then they will update the HSM-18 because by that time they will be in the system.**

Q. Was that the process that was taking place in summer of 2011, or was there a different process in the summer of 2011? Were people taking that hard copy list you mentioned and adding inmates to a heat restriction list before they were seen by a provider?

**A. I don't know if that was happening consistently back then.**

Q. Do you know if that was happening at all, or was it just not happening consistently?

**A. I don't know.**

Q. Okay. You would agree that when a patient comes into the system, that there is a gap between

when they are brought in at intake and when they see a provider and have the HSM-18 filled out. Right?

**A. Yes. That's usually...**

Q. And it's my understanding that that gap can be up to ten days. Is that right?

**A. By policy, it's up to seven days.**

Q. Okay. And that was the same policy UTMB was operating under in 2011?

**A. I believe so.**

Q. Okay. Now, when a patient first comes off the bus and ends up in one of the TDCJ facilities, a kind of triage assessment is done pretty soon after they arrive, like the same day they arrive. Right?

**A. Yes, the same day, we do an intake assessment.**

Q. And that's frequently an LVN that's doing that kind of first assessment. Right?

**A. Could be an LVN or it could be a CCA, which is a correctional care associate. They -- that particular form does not -- or that -- that does not require a licensed person to do.**

Q. In looking at those forms, that kind of looks like the kind of form that I might go fill out when I first go see a new doctor, because it has like check for family history, check for personal history,

things like that.

**A. Uh-huh.**

Q. Is that fair?

**A. Yes.**

Q. Okay.

**A. There's a lot of -- there's history, but there's also -- you also ask questions about what's going on with them right then as well.**

Q. Is most of the -- what's going on with you right then, is that focused on kind of their mental health, to check for suicide risk, or is there any additional thing that they're kind of looking for in the talk-to-them portion, as opposed to the give them the form, fill it out portion?

**A. There is. If they have any medical complaints at that time, anything -- you know, are they in pain, is there anything bothering them at that particular time.**

Q. That would be an opportunity for the patient to say, hey, I'm diabetic, I need to make sure I get my insulin, for example?

**A. Well, and we would generally know that, anyway, just using their Texas uniform health status update. That's required for every patient that comes into our system or out of our system. Everybody has**

**to complete one of those on every patient, so...**

Q. And that uniform health update would be a form that's completed by the county jail and sent with the patient to TDCJ. Right?

**A. That's correct.**

Q. Okay. Part of the intake assessment that y'all do, that initial assessment -- well, first, a CCA, that person doesn't have to have the level of education and credential that a licensed vocational nurse does. Is that a fair description?

**A. That's correct.**

Q. What kind of background, educational background is required to be a CCA?

**A. You must have a high school education.**

Q. Okay.

**A. And I believe you must have two years' experience, but don't quote me on that. That's admin, so...**

Q. Okay. At least a high school diploma is the credential?

**A. Yes.**

Q. Okay. And the reason you get that self-report from the inmate is because you need to know what the inmate identifies as his own medical problems are until a provider can actually see them.

Is that a fair description?
**A. Well, whatever they identify and also whatever they tell us and what we -- what we see as well.**
Q. Okay. Until a patient is actually seen by a provider, you kind of have to accept that the problems that they're telling you are the actual problems that they have?
**A. You do. But you also have that Texas uniform health status update that, you know, lists their medications, will list their TB status, TB --**
Q. Tuberculosis?
**A. Tuberculosis status. And there's a few more items on there I can't remember. But anyway, so...**
Q. But part of -- generally, you -- the reason you ask is, we've got to kind of treat this person as having these conditions until we can determine otherwise. Is that fair?
**A. That's true.**
Q. Okay.
MR. ALVAREZ: Scott, when you get to a breaking point, if you're at a stopping point --
MR. MEDLOCK: Yeah. No. This would actually be a good spot.

THE VIDEOGRAPHER: Off the record at 4:20.
(Recess.)
THE VIDEOGRAPHER: We are back on record at 4:37 with the start of DVD Number 5.
(Exhibit Number 7 marked.)
Q. (BY MR. MEDLOCK) And, ma'am, you've had the opportunity to look over Exhibit 7.
**A. Okay.**
Q. And so you know, the part that I'm interested in is 3217 and 3218.
**A. Okay.**
Q. If you -- I think if you look at the rest of it, it will look awfully familiar to Exhibit 6.
**A. Yes. Okay.**
Q. Ready?
**A. Yes.**
Q. Okay. Let's start with page 3218. Who is Tara Patton?
**A. Tara Patton was the nurse manager for the Michael Unit at that time.**
Q. Was the Michael Unit one of the units you supervised in the summer of 2011?
**A. It was one of the units that I was transitioning into.**

Q. One of the ones you were taking on in September, officially?
**A. Yes.**
Q. Okay. And this e-mail from Ms. Patton on 3218, this is her responding back to you after you forwarded her the e-mail from Dr. Zepeda that we talked about a minute ago. Is that right?
**A. Yes.**
Q. Okay. And it looks like she sent this to you on August 5, 2011. Right?
**A. That's correct.**
Q. And then she's listed a list of seven steps that they were doing at the Michael Unit. Right?
**A. That's correct.**
Q. Okay. One of the things that she says they have done is printed and checked all med lists. Is that kind of the process that we were talking about a moment ago, running the report of which patients are on which medications and then to determine who was taking heat sensitive medications?
**A. Yes, to the best of my recollection.**
Q. Okay. And then she says that for patients on those lists, the following accommodations are being made. Do you see that?
**A. Yes, I do.**

Q. And then she lists these seven accommodations?
**A. That's correct.**
Q. Okay. Number 6 there is, "All patients on psychotropic meds have been moved to lower rows." Do you see that?
**A. I do.**
Q. And, again, that's the accommodation we talked about earlier that -- bringing people to a lower row because heat rises. Right?
**A. Correct.**
Q. Okay. You'd agree that -- do you see any reason why those seven steps couldn't have been done in all of the facilities where UTMB provides healthcare?
MR. ALVAREZ: Objection; calls for speculation.
MR. NEUHOFF: Same objection.
**A. I don't have any -- the only thing would be the offenders in solitary. I don't know how often security makes their rounds on those offenders.**
Q. (BY MR. MEDLOCK) Okay. Other than that, Number 3 for the -- and offenders in solitary, that would be the administrative segregation that we've been talking about today. Right?

**A. No, I don't recall.**
Q. Were you aware that Mr. McCollum weighed over 300 pounds?
**A. I saw that on his status update.**
Q. Should a patient who weighs over 300 pounds be assigned to a bottom bunk in the TDCJ system?
MR. NEUHOFF: Objection; speculation.
**A. Yeah. I'm not sure what the weight limit is. And the providers generally -- they do those assignments and make those restrictions, so I don't remember.**
Q. (BY MR. MEDLOCK) If you were reviewing -- if you were -- encountered a patient who weighed over 300 pounds, would you be concerned if that patient was assigned to a top bunk?
**A. Personally I would.**
Q. And it's because of obvious reasons, a person who weighs over 300 pounds is going to have quite some difficulty getting up to a top bunk. Fair?
**A. That's a fair assessment.**
Q. And if there was any sort of medical emergency, getting that person off of a top bunk when they weigh over 300 pounds would also be a problem. Right?

**A. It could be.**
MR. MEDLOCK: How much time do I have left, Kenneth?
THE VIDEOGRAPHER: Eight minutes.
MR. MEDLOCK: In that case, I'll pass the witness.
MR. ALVAREZ: We'll reserve our questions.
MR. NEUHOFF: We'll reserve our questions.
THE VIDEOGRAPHER: Off the record at 6:11.
(Deposition concluded.)
-oOo-

CHANGES AND SIGNATURE
RE: McCOLLUM v. LIVINGSTON
WITNESS: JERRI DENEÉ ROBISON
PAGE/LINE CHANGE REASON
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________

I, JERRI DENEÉ ROBISON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_________________________________
JERRI DENEÉ ROBISON

REPORTER'S CERTIFICATE
STATE OF TEXAS §
McLENNAN COUNTY §

I, Melody Reneé Campbell, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the foregoing deposition is a full, true and correct transcript;

That JERRI DENEÉ ROBISON, the witness hereinbefore named, was duly sworn by the officer and that the oral deposition was taken by the officer in machine shorthand on APRIL 27, 2016, and is a true record of the testimony given by the witness;

I further certify that the signature of the deponent was requested and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

That $ _______________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to PLAINTIFFS;

I further certify that I am neither counsel for, related to, nor employed by any of the parties

in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 10th day of May, 2016.

MELODY RENEE CAMPBELL, RMR, CRR, #38267
DepoTexas
Firm Registration No. 17
1016 La Posada, Suite 294
Austin, Texas 78752
512.465.9100



The American Correctional Association
and the
Commission on Accreditation for Corrections
awards
ACCREDITATION
to
Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas
2010-2013
in recognition of the attainment of excellence in the operation of
an Adult Correctional Institution
presented this 2nd day of May 2010

MCCOLLUM 073

The American Correctional Association
and the
Commission on Accreditation for Corrections
awards
ACCREDITATION
to
Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas
2013 - 2016
in recognition of the attainment of excellence in the operation of
an Adult Correctional Institution
presented this 5th day of May 2013
ACA PRESIDENT
ACA EXECUTIVE DIRECTOR
COMMISSION CHAIR
DIRECTOR, STANDARDS AND ACCREDITATION
AMERICAN CORRECTIONAL ASSOCIATION
FOUNDED 1870

MCCOLLUM 074

Appendix 209

Skip to Main Content

Employee Resources TDCJ Intranet Contact Us Información en Español

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

Home Public Resources Employment About TDCJ Online Services Search

HOME | UNIT DIRECTORY | Unit Directory

# *Hutchins (HJ)*

## *Correctional Institutions Division – State Operated State Jail*

ACA Accredited Unit Since August 2007

| | |
|---|---|
| **Unit Full Name:** | Hutchins State Jail |
| **Unit Address and Phone Number:** | 1500 East Langdon Road, Dallas, TX 75241<br>(972) 225-1304 (**099) |
| **Unit Location:** | 11.4 miles south of Dallas at the intersection of IH-45 and IH-20 in Dallas County |
| **Senior Warden:** | Michael Mackey |
| **Regional Director:** | Kelvin Scott, Region II |
| **CI Division Deputy Director:** | Robert "Jay" Eason |
| **Date Unit Established or On Line:** | April 1995 |
| **Total Employees *:** | 399 |
| **Security Employees *:** | 280 |
| **Non-Security Employees *:** | 71 |
| **Windham Education Employees *:** | 19 |
| **Contract Medical and Mental Health Employees *:** | Medical = 24; Mental Health = 4 |
| **Offender Gender:** | Male |

**Appendix 210**

**Maximum Capacity *:** 2,276

**Custody Levels Housed:** J1-J5
G1, G2, Transient

**Approximate Acreage:** 70

**Agricultural Operations:** Unit Garden, Texas Fresh Approach Food Bank Program

**Manufacturing and Logistics Op.:** None

**Facility Operations:** Unit Maintenance

**Additional Operations:** Regional Release Site

**Medical Capabilities:** Ambulatory medical, dental, and mental health services. All services on a single level. Managed by UTMB.

**Special Treatment Programs:** State Jail Substance Abuse Treatment Program

**Educational Programs:** Literacy (Adult Basic Education/GED), Title I, CHANGES/Pre-Release, Cognitive Intervention

Career and Technology Programs: Business Computer Information Systems I; Introduction to Computer Aided Drafting

**Additional Programs/Services:** Faith Based Dormitory, Prisoner Reentry Initiative (PRI), Adult Education Program (upon availability), Reentry Planning, Chaplaincy Services, Community Tours, Crime Stoppers, GO KIDS Initiative

**Community Work Projects:** Services provided to city and county agencies, the area food bank, Habitat for Humanity, local organizations, the Texas Department of Transportation, and Texas Parks and Wildlife.

**Volunteer Initiatives:** Employment/Job Skills, Substance Abuse Education, Life Skills, Support Groups, Victims Awareness, Religious/Faith Based Studies and Activities, Post-Release Housing

* Data as of August 31, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA McCOLLUM, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, § Civil Action § Number 4:14-CV-3253

Plaintiffs,

vs.

BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE,

Defendants.

---

ORAL AND VIDEOTAPED DEPOSITION OF

GARY EUBANK

MAY 6, 2016

---

ORAL AND VIDEOTAPED DEPOSITION OF **GARY EUBANK,** produced as a witness at the instance of the **PLAINTIFFS**, and duly sworn, was taken in the above-styled and numbered cause on MAY 6, 2016, from 8:37 a.m. to 5:20 p.m., before Melody Reneé Campbell, CSR in and for the State of Texas, reported by method of machine shorthand, at the offices of the Attorney General, 300 West 15th Street, Austin, Texas, pursuant to Notice and Court Order and the Federal Rules of Civil Procedure.

A P P E A R A N C E S

FOR THE PLAINTIFFS:
Mr. Jeff Edwards, Esq.
Mr. Scott Medlock, Esq.
The Edwards Law Firm
1101 East Eleventh Street
Austin, Texas 78702
512.623.7727
512.727.3365 (Fax)
Jeff@edwards-law.com
Scott@edwards-law.com

FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
Mr. Graig J. Alvarez, Esq.
Ms. Kara Philbin, Esq.
Fernelius Alvarez Simon
1221 McKinney Street, Suite 3200
Houston, Texas 77010
713.654.1200
GAlvarez@fa-lawfirm.com
KPhilbin@f-alawfirm.com
-and-
Ms. J. Lee Haney, Esq.
Assistant Attorney General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711
512.463.2080
512.963.2109 (Fax)
Lee.Haney@texasattorneygeneral.gov

OR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
Mr. Phillip Boyd, Esq.
Mr. Derek Kammerlocher, Esq.
Assistant Attorneys General
Post Office Box 12548
Austin, Texas 78711
512.463.2080
512.936.2109
Phillip.Boyd@texasattorneygeneral.gov
Derek.Kammerlocher@texasattorneygeneral.gov

ALSO PRESENT:
Dr. Glenda Adams
Ms. Deborah M. Woltersdorf
Ms. Shanna Molanre
Ms. Ashley Palermo
Ms. Jennifer Osteen
Ms. Ashley Palermo
Mr. Derek Kammerlocher
Ms. Amanda Kates
Ms. Jennifer Daniel
Mr. Kevin J. Schaefer (Videographer)

facilities into these non-air-conditioned environments?

A. I personally have not.

Q. Has anybody, to your knowledge, any UTMB nurse, ever been trained that there is an acclimation period for these inmates who are coming from air-conditioned environments into these non-air-conditioned housing areas?

MR. BOYD: Objection; calls for speculation.

A. You know, I don't recall all the stuff that's in that educational program.

Q. (BY MR. EDWARDS) That's fair. But you are in charge of making sure the nurses are adequately trained. Right?

A. I am.

Q. And that would include licensed vocational nurses, registered nurses. Right?

A. Yes.

Q. Okay. And so as you testify here today, can you recall any nurse ever -- and I'm talking about UTMB nurse -- ever being trained about acclimation and the potential dangers to inmates coming from air-conditioned environments into non-air-conditioned environments during the summer

months?

MR. BOYD: Objection; vague and calls for speculation.

A. They go through a training module every single year. And, you know, honestly, I cannot remember all the elements of that educational program.

Q. (BY MR. EDWARDS) Okay. If it's in there, you just don't recall it. Right?

A. That's correct.

Q. Okay. Are you aware that during -- do you know how long it takes an average human being to acclimate to temperatures of 90 or 100 degrees when they come from an air-conditioned environment?

MR. ALVAREZ: Objection; calls for speculation, incomplete hypothetical.

MR. EDWARDS: First of all --

Q. (BY MR. EDWARDS) Can you answer my question, before I address that?

A. I don't know.

MR. EDWARDS: If I ask a question that begins, "Do you know," it's not asking for speculation. Okay?

MR. BOYD: Objection to the side-bar.

MR. EDWARDS: So please listen to my

questions. All right?

MR. BOYD: Objection to the sidebar.

Q. (BY MR. EDWARDS) Sir, would it be -- assuming that there is a danger period in terms of acclimating to high levels of heat from cooler environments, isn't that something that you think would be important for your nurses to know and be trained about?

A. We respond to the complaints the patients have. They are not located in or around our medical facility. And if someone has -- drops a sick call or has a complaint, then we respond to that. And I'm comfortable with that.

Q. Okay. You know that many people have died of hyperthermia, right, in the prison system?

A. What's many?

Q. Well, let's say ten people died the summer of 2011. You know that. Right?

A. (Nods head.)

Q. Do you?

MR. BOYD: Objection; vague.

A. I really don't concentrate on that, I mean, the numbers. I know we had an issue that year.

Q. (BY MR. EDWARDS) Did you have an issue in

2012?

A. Yes.

Q. Okay. Do you know how many people died in 2012 of hyperthermia?

A. 30 something, I believe.

Q. To be fair to you, sir, my understanding is that two people died of hyperthermia, at least that were reported to us as of now. 30 sounds high to me. And if that actually is true, I'll be jumping over the table. But I don't think it is.

But when you said 30, did you maybe mean like heat-related illnesses?

A. Yeah.

Q. Not necessarily just deaths, but all heat-related illnesses? Is that what kind of you probably meant?

A. (Nods head.)

Q. Is that yes?

A. Yes.

Q. Okay. Here's my -- what role do you play in kind of formulating, you know, policies that your nurses should be following? Aren't you kind of in charge of making sure that the policies are safe?

A. Safe?

Q. Yeah.

A. Yes.

Q. Okay. And when I say safe, I mean safe for inmates who are your patients. Right?

A. That's right.

Q. Okay. Have you ever had a conversation with Dr. Murray about acclimation periods in transfer facilities?

A. I don't recall.

Q. Okay. Do you know what a transfer facility is?

A. Do you mean an intake facility?

Q. Okay. Well, I -- yes, I -- yes. An intake or a transfer facility. Do you know what an intake or transfer facility is?

A. Yes.

Q. Do you know if Hutchins was an intake or a transfer facility?

A. Yes.

Q. Okay. The Plane Unit, that's an intake or a transfer facility. Correct?

A. Yes, sir.

Q. The Gurney Unit, that's an intake or transfer facility. Correct?

A. Yes, sir.

Q. Garza West and Garza East, those are

intake and transfer facilities. Correct?

A. That's correct.

Q. Okay. Those are all facilities where people died of heatstroke. Are you aware of that?

MR. BOYD: Objection; mischaracterizes the evidence.

A. I couldn't say.

Q. (BY MR. EDWARDS) Okay. I appreciate that you can't say that. But do you have any reason to dispute the fact that at these intake or transfer facilities, several people died in the summer of 2011?

MR. BOYD: Objection; calls for speculation.

A. I really can't remember all -- the particulars that go on in 82 facilities.

Q. (BY MR. EDWARDS) Okay. All right. Well, tell the jury -- are you aware of any additional danger to inmates who are coming from county jails to these intake or transfer facilities?

MR. BOYD: Objection; vague.

MR. ALVAREZ: Yeah, objection; vague.

A. Could you restate that, please?

Q. (BY MR. EDWARDS) Sure. Do you know of any danger or have you ever been trained about any

danger that a person coming from an air-conditioned county jail would have when they come into one of these hot environments at these intake or transfer facilities?

MR. BOYD: Same objection.

MR. ALVAREZ: And I'm going to object to -- on vague because it's not specifically related to the heat issue or something else, as far as the danger goes.

Q. (BY MR. EDWARDS) Okay.

A. I couldn't say.

Q. Other than heat, are you aware of any dangers, additional dangers that inmates face at these intake or transfer facilities?

MR. BOYD: Objection; vague.

A. I'm not aware.

Q. (BY MR. EDWARDS) Okay. Are you aware that the heat inside the intake or transfer facilities does pose a potential danger to the inmates that are coming to them?

MR. BOYD: Objection; vague.

A. I'm not aware of all of that.

Q. (BY MR. EDWARDS) Listen to my question, now.

Are you aware that the heat inside

the intake or transfer facilities can pose a potential danger to inmates?

MR. BOYD: Same objection.

A. I think that depends on many factors of a person as they -- in an environment. I don't think it affects everyone the same.

Q. (BY MR. EDWARDS) And I'm not asking if it affects everybody the same, sir. But I'm asking you if you've ever been trained or do you know if inmates face a potential danger from the heat inside the intake/transfer facilities?

MR. BOYD: Objection; vague, asked and answered.

A. That's not ever been brought to my attention.

Q. (BY MR. EDWARDS) No one has ever told you that the temperatures inside intake or transfer facilities pose a potential danger to inmates?

A. I really don't understand your question.

Q. Let me ask it again.

Has anyone ever told you that temperatures inside intake or transfer facilities pose a potential danger to the inmates that are coming there?

MR. BOYD: Objection; vague.

subcommittee and discuss it. I think that's how those subcommittees were put together.

Q. During the discussion, was there any discussion about the people that died of heatstroke?

MR. BOYD: Objection; vague.

A. We -- we focused on the policy and not -- we did not review medical records or -- that I recall.

Q. (BY MR. EDWARDS) Any discussion of air conditioning?

MR. BOYD: Objection; vague.

A. Not that I recall.

Q. (BY MR. EDWARDS) Any discussion of lawsuits?

MR. BOYD: Objection; vague.

A. Not that I recall.

Q. (BY MR. EDWARDS) Were there any minutes taken of these meetings?

A. That would have -- Dr. Buskirk was the chair of this subcommittee so if there was, she would have taken those.

Q. Were there e-mails exchanged about different policy changes or revisions?

A. We -- the committee members -- I will speak for myself. I, as a committee member,

received a copy of suggested revisions to that policy.

Q. And those suggested revisions came from --

A. Dr. Buskirk.

Q. -- Dr. Buskirk?

A. Uh-huh, as the Chair of the committee.

Q. Okay. Just a couple more questions.

Despite the length, would you agree that I've treated you in a courteous, bordering on pleasant manner, sir?

A. Yes, sir.

Q. All right. Would you tell me who your favorite quarterback and running back are?

A. If they ever sported an OU Sooner jersey, they were my favorite.

Q. Okay.

A. Although I do have signed footballs of the Heisman Trophy winners in my home, personally signed and given to me.

Q. And who were they, Billy Sims?

A. He was not a quarterback. Sammy, Sammy, Sammy Bradford. Oh, yeah. Oh, don't forget Sammy. He's with the Eagles now. Right?

MR. ALVAREZ: Maybe, maybe not.

A. Today.

Q. (BY MR. EDWARDS) -- too much about Bradford.

A. 50 million to begin with, right, in his pocket and then didn't the Eagles give him 22 million. So who cares? $72 million dollars in the bank and he did not have to take a snap.

Q. Maybe we should give him a call.

A. Hey, you talk about a favorite $72 million and you do nothing? That's my favorite.

MR. EDWARDS: All right. I want to thank you very much for your time, sir. And you get to go home.

THE WITNESS: Okay. Thank you.

MR. ALVAREZ: Reserve questions?

MR. BOYD: Yeah.

THE VIDEOGRAPHER: Off the record at 5:20.

(Deposition concluded.)

-oOo-

CHANGES AND SIGNATURE

RE: McCOLLUM v. LIVINGSTON

WITNESS: GARY EUBANK

<u>PAGE/LINE</u> <u>CHANGE</u> <u>REASON</u>

_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________

I, GARY EUBANK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_________________________________
GARY EUBANK

REPORTER'S CERTIFICATE

STATE OF TEXAS §

McLENNAN COUNTY §

I, Melody Reneé Campbell, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the foregoing deposition is a full, true and correct transcript;

That GARY EUBANK, the witness hereinbefore named, was duly sworn by the officer and that the oral deposition was taken by the officer in machine shorthand on MAY 6, 2017, and is a true record of the testimony given by the witness;

I further certify that the signature of the deponent was requested and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

That $ ______________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to PLAINTIFFS;

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken,

and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 20TH day of MAY 2016.

________________________________________
MELODY RENEÉ CAMPBELL, RMR, CRR, #38267
DepoTexas - Firm Reg. No. 17
1016 La Posada, Suite 294
Austin, Texas 78752
512.465.9100
512.465.9132 (Fax)

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM,
Plaintiffs,

V. § CIVIL ACTION NO. 3:12-CV-2037-L

BRAD LIVINGSTON, JEFF PRINGLE, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
Defendants.

*****************************************************************

ORAL DEPOSITION OF
JEFFERY PRINGLE
FEBRUARY 15, 2013

*****************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF JEFFERY PRINGLE, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 15TH of FEBRUARY 2013, from 9:51 a.m. to 4:48 p.m., before Suzanne Villa, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the Office of the Attorney General, 300 W. 15th Street, 7th Floor, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

APPEARANCES

For the Plaintiffs:
Mr. Jeff Edwards
THE EDWARDS LAW FIRM
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701
(512) 623-7727
jeff@edwards-law.com

For the Texas Civil Rights Project
Mr. Scott Medlock
Ms. Michelle Smith
1405 Montopolis Drive
Austin, Texas 78741-3438
(512) 474-5073 X105
scott@texascivilrightsproject.org

For the Defendants:
Mr. Bruce R. Garcia
OFFICE OF THE ATTORNEY GENERAL
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2080
bruce.garcia@oag.state.tx.us

Also Present:

Jerry Mohn, videographer

Texas Department of Criminal Justice Office of the General Counsel
Tobias D. Hunziker

Attorney General's Office:
Christin A. Cobe
Rachael Osaze-Ediae
Erika Hime
Craig Jacobs
Lacey Mase
Leah O'Leary
Patrick Pope
Michael Ritter
Johnathan Stone

3

INDEX

Appearances........................................ 2
JEFFERY PRINGLE
Examination by Mr. Edwards................... 4
Changes and Signature............................. 237
Reporter's Certificate............................ 239

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 23 | Correctional Managed Care Intake History and Health Screening | 81 |
| 24 | Texas Uniform Health Status Update; Bates Nos. TDCJ-RFP #25-71 - #25-74 | 91 |
| 25 | Health Care Outcomes | 107 |
| 26 | Hand drawn diagram | 119 |
| 27 | Crain Triage note | 135 |
| 28 | Texas Department of Criminal Justice Temperature Log; Bates Nos. 001488 - 001495 | 151 |
| 29 | Heat and Humidity Matrix; Bates No. TDCJ-RFP #3-15 | 153 |
| 30 | SKIPPED | |
| 31 | Southwestern Institute of Forensic Sciences at Dallas Autopsy; Bates Nos. EAC-36 - EAC-42 | 159 |
| 32 | Interoffice Communication; Bates No. 001383 | 165 |
| 33 | E-mail; Bates Nos. TDCJ-RFP #3-3 - 3-5 | 176 |
| 34 | Administrative Incident Review; Bates Nos. EAC-02 - EAC-09 | 198 |
| 35 | E-mail; Bates No. 001414 | 232 |
| 36 | Interoffice Communication; Bates Nos. 001395 - 001397 | 233 |

4

THE VIDEOGRAPHER: Today is February 15th, 2013. The time is 9:51.
Will the reporter please swear in the witness.
JEFFERY PRINGLE,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. EDWARDS:
Q Good morning. Would you kindly state your name for the record?
**A My birth name is Jeffery Pringle.**
Q Okay. And what is your job currently, sir?
**A I'm considered -- job title is Warden of the Hutchins State Jail.**
Q Okay. And at the time that Larry Gene McCollum was in the Hutchins Unit, were you the acting warden?
**A I was the highest-ranking administrator for security on that facility.**
Q Okay. And when you say "highest-ranking administrator," does that mean kind of colloquially you run the show at the Hutchins Unit? Is that fair?
**A I make all the security decisions for the facility and the safety of the offenders and staff.**
Q Okay. Before we get started, I want to thank you for your flexibility in coming down to Austin,

18 (Pages 69-72)

Stephen McCollum, et al v. Brad Livingston, et al.

Jeffery Pringle February 15, 2013

69

A **Yes, he did.**
Q Okay.
MR. EDWARDS: Let's go off the record.
THE VIDEOGRAPHER: Going off the record at 11:31.
(Off the record)
THE VIDEOGRAPHER: Back on the record at 11:32.
Q (BY MR. EDWARDS) I don't mean to invade your privacy or put you in a awkward spot, so I'll be circumspect. But do you recall the type of drug that your doctor prescribed for your hypertension, sir?
A **I believe one of them is tramazine [sic] HTZ [sic] or something of that nature.**
Q Okay.
A **And another one is lotensin or lotonsin [phonetic].**
Q All righty. Do you know anything about the side effects of HCTZ?
A **Yes. I receive a medical sheet every time I get my prescription filled.**
Q Is one of the side effects that you're personally aware of that it dehydrates you?
A **Yes, that's on there.**
Q Is that your personal experience with taking

70

the drug, that it does in -- does, in fact, dehydrate you, sir, cause you to, I guess, drink more water?
A **I don't have no way of engaging whether it does or doesn't.**
Q Okay. You just know it's a side effect. Right?
A **Yes.**
Q Okay. Is it reasonable for me to assume that the medical staff that work at the -- well, strike that.
About how long have you been taking medication for hypertension?
A **I would guess since about the age of 30 or 31, and that would make about 15 years.**
Q All right. About how many prisoners are housed at the Hutchins Unit on any given day?
A **Any given day is between 1,970 up to 2,200.**
Q Would that have been about the number in July of 2011?
A **I could only speculate that that was it then.**
Q Within the range that you're talking about now, is it fair to say somewhere between 1,900 and 2,200 is about how many people the Hutchins Unit had back in July of 2011?
A **That would -- that would be a good assumption of the average.**

71

Q Okay. Do you know -- I mean, the inmates are divided into what you call state jail inmates and transfer inmates?
A **Correct.**
Q Okay. Do you have any idea of the breakdown?
A **I have an average of the breakdown, but not any exact numbers.**
Q Would you give me the average, to the best of your recollection? And if you're off by some percentage points that's okay.
A **The state jail is about 1,200, and the ID offenders is around 800.**
Q What was the expression you used, "ID offenders"?
A **ID.**
Q ID, institutional division.
A **Institutional division.**
Q Gotcha. Okay.
Now we touched on this earlier, but what is the purpose of a transfer facility?
A **The transfer facility would take offenders in directly from county jails and complete a basic processing into the agency and temporarily house them for up to two years before they're sent to a permanent unit of assignment.**

72

Q What does that basic processing take -- entail? What does the basic processing entail?
A **I could only give you what I know about the processing.**
Q Sure.
A **Because that's done but within a different department, some of it.**
Q What's done in a different department?
A **We have intake receiving and an intake processing.**
Q Okay. Intake receiving and intake processing. Now I'm going to confess, I don't know the difference between those two. So if you could do your best to explain those to me, I think that would help me a lot.
A **At the intake processing, that's when the deputies arrive with the offender. Sometimes they bring documents from the county with them, and they go through a security search and a property inventory and assessments during the intake process.**
Q When you say "assessments," could you be a little more specific? What are you talking about?
A **The intake processing has a staff member that will confirm and review the court documents to ensure that everything's been complete by the courts prior to them -- or upon their arrival and to make sure that the**

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88
Appendix 252

20 (Pages 77-80)
Stephen McCollum, et al v. Brad Livingston, et al.
Jeffery Pringle February 15, 2013

77

Q Okay. We'll get back to that in a second.
But the people who do the prison rape elimination, is that somebody under your direct control, a TDCJ employee or no?
A **It would be a sergeant or correctional officer.**
Q With TDCJ. Fair?
A **Yes.**
Q Okay. Same with the gang tattoos?
A **Yes.**
Q Okay. Is it your understanding that a prisoner receives an intake physical the day they arrive at the Hutchins Unit Jail -- or Prison?
A **I do not know that they receive an intake physical upon arrival, no.**
Q Do you know if they're supposed to?
A **Upon arrival, no. The intake procedures are within the first ten days, usually.**
Q Who decides that practice or policy?
A **I do not know.**
Q Is it you?
A **No, it is not me.**
Q Okay. Do you know if -- I mean, do you know when inmates have had inmate physicals completed?
A **We would know that a physical's completed because he's usually ready for classification, which is**

78

**UCC for the housing and job.**
Q And it's your expectation that that gets completed in ten days?
A **From my recollection with the policy, it's a ten-day period.**
Q Okay. And what policy are you referring to? Is there a written policy about the ten days of classification?
A **It would be under intake receiving.**
Q Is that a TDCJ policy?
A **Yes, it would be.**
Q Would you do your best to describe the inmate intake and receiving policy that you operate under?
A **From?**
Q Or that you operated under in July of 2011.
A **I would not be able to describe the policy in 2011. I can only describe it from my -- my personal experience.**
Q Is there anything that would be different from your personal experience as opposed to the policy that was in place in 2011?
A **I'm not familiar enough with the policy to know of what the differences would be, if there are any.**
Q All right. Well, why don't you tell me what your experience is with the intake receiving policy.

79

A **I've described the intake receiving and the duties that they do there. During that intake receiving, also the offenders are given showers, haircuts. If they're identified with any injuries, we would take pictures and document it. So that way we can show they came in from the county with them. From that point, they're housed in the facility and then they go through an intake processing; and intake processing consists of EA testing to determine their education level. They would receive a photo, fingerprints. They would receive a intake interview.**
Q With whom?
A **With the intake processing staff.**
Q Is that your staff or is that...
A **That's TDCJ staff.**
Q Okay. Do you know if Mr. McCollum received an intake processing interview?
A **I do not know.**
Q Okay. Should he have?
A **I do not know where they were at in the processing days or procedures.**
Q Okay. With regards to the intake processing, would that include medical issues?
A **The medical would do their evaluation within the first ten days, which would be part of the**

80

**processing.**
Q Okay. Would you do -- would TDCJ do its intake processing before medical completed it's intake physical?
A **It's kind of a dual schedule based upon different days on different locations they go to.**
Q Help me out. Elaborate a little bit more on that, please.
A **Depending on the number of offenders that came in on what day, the intake processing staff may get the offenders from a specific county that came in on a specific day, and the medical staff would get a different group that came in together on a different day. And at times, they've been known to switch out days within that ten-day process.**
Q Okay. Who makes the decision like whether a particular type of drug is permitted at the Hutchins Unit? Would that be UTMB or would that be TDCJ?
A **I do not know.**
Q Okay. Do you have any role in whether or not medications are allowed at the Hutchins Unit?
A **I have limited role based upon whether the offender does a KOP, keep on person, or whether he goes to the window.**
Q Okay. What exactly does that mean?

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88
Appendix 253

26 (Pages 101-104)

Stephen McCollum, et al v. Brad Livingston, et al.

Jeffery Pringle
February 15, 2013

101

A **I do not know.**
Q Have you -- you haven't asked him?
A **No, I have not.**
Q Have you reported that to your supervisors?
A **Yes, I have.**
Q Okay. What supervisors did you report that to?
A **It would have been the regional director, Mr. Eason.**
Q Anybody else?
A **Not that I reported it to.**
Q Okay. Do you know if it involves any sort of employee misconduct?
A **No, I do not.**
Q Okay. Did Mr. Eason act -- what did you tell Mr. Eason?
A **That I received a phone call from Warden Polk saying that they have requested him down at the jail on a specific date to turn himself in, that there had been and indictment for official oppression.**
Q Have you seen the indictment?
A **No, I have not.**
Q To your knowledge, do you know if Mr. Eason or anyone at the Texas Department of Criminal Justice has seen the criminal indictment?
MR. GARCIA: If you know?

102

MR. EDWARDS: Again, that's what I asked him.
A **I don't know if they would know.**
Q (BY MR. EDWARDS) Do you consider official oppression a serious charge against a supervisory official in a -- in a prison?
A **In my opinion?**
Q Yeah.
A **I'm not sure what was taken to the grand jury for the indictment, so I don't know the circumstances.**
Q Okay. Is he still working at the -- at the Hutchins Unit?
A **Yes, he is.**
Q He hasn't been suspended?
A **No, he has not.**
Q Okay. Do you know who his lawyer is?
A **No, I do not.**
Q Okay. What property is issued to a prisoner upon entering the Hutchins Unit? I'm asking you about the July time period of 2011.
A **I could only speculate or guess about the property.**
Q Let me ask you about that. Why is it you wouldn't know what type of property would be issued?
A **Because I don't do the job day in and day out,**

103

**so it's not something that I would have to recall based on the policies or the form.**
Q As the senior-most ranking official at the Hutchins Unit, isn't it your responsibility to know that?
A **No, it's not.**
Q Okay. Do you know if cups were issued to inmates upon arrival at the Hutchins Unit?
A **During the 2011, cups were not issued and they're not on the item to be issued list.**
Q Do you agree with me that a cup is an important part of assisting someone to drink water?
A **In that terminology to obtain water, yes.**
Q Okay. You knew in July 2011, that many inmates suffered from hypertension, correct, at the Hutchins Unit?
A **No, I did not know that.**
Q Should you have known that?
A **No, I should not.**
Q Tell me why.
A **Because that's a medical process that the offender would go through medical for his medical needs and it's not available to correctional staff.**
Q And the choice to not make it available to correctional staff, again, is whose?

104

A **The choice to not make it available? I don't know who would that choice would be.**
Q Well, you certainly have the ability to find out which of your inmates are hypertensive. Correct?
A **No, not --**
Q You don't have the ability?
A **Not on a have to know or need to know.**
MR. EDWARDS: Let me object as nonresponsive.
Q (BY MR. EDWARDS) My question is, do you have the ability to determine which inmates are suffering from hypertension?
A **I have the ability to convey with medical if there comes to my office a need to convey with medical in that respect.**
Q Okay. Is it fair to say you've made a choice not to confer with medical about the issue relating to --
MR. GARCIA: Objection.
Q (BY MR. EDWARDS) -- whether or not inmates are hypertensive?
MR. GARCIA: Objection; mischaracterizes his testimony.
Q (BY MR. EDWARDS) You can answer my question, sir.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88
Appendix 254

113

**be actions that I take.**

Q What actions would you take?

**A First thing I would do is verify through medical whether he is or isn't a diabetic. And then I would identify whether or not he's been seen and whether he's been complying with treatment that's been referred to him by medical. And based upon those particular question and answers I have with the medical staff, would depend on whether or not I would ask them to see them, or whether or not I would give a response back to the offender, that he's not utilizing or he is utilizing the system process.**

Q What if they said, we don't have enough money to provide this medication right now, what would -- what, if anything, could you do?

**A I do not know because they've never told me that.**

Q Okay. If they did, sir, what could you do, if anything?

**A That's never been an issue come up. They've always provided some type of medications.**

Q It's coming up right now. Okay? What, if anything, could you do if you were told by UTMB that the facility, medical people on staff, look, we don't have the money to provide these medications? What could you

114

do, if anything?

MR. GARCIA: Objection; speculation.

**A The only thing that I could do as the highest-ranking official would be to ask them to get with their pharmacist department and research an alternative medical process or medical treatment for the offender.**

Q Couldn't you report it to Mr. Eason?

**A Could I, yes.**

Q Okay. Couldn't you report it to Mr. Livingston?

**A No.**

Q You could not pick up the phone and call Mr. Livingston?

**A I do not have a direct line. We have a process that we go through.**

Q Okay. Would it concern you greatly if medical staff wasn't providing appropriate treatment for your inmates?

**A If that would be the case, which I haven't been brought aware that that is an issue.**

Q Okay. Do you know if Mr. McCollum was receiving treatment for diabetes?

**A No, I do not.**

Q Okay. If you learned that he wasn't would that

115

concern you?

**A I would do the process that I mentioned earlier to identify whether he is or isn't, and then whether he needed medical or not needed medical.**

Q Have you had that conversation with the UTMB medical staff?

**A About Mr. McCollum?**

Q Yeah.

**A No, I have not.**

Q Why not?

**A Because it was never an issue that was brought to me or a question for myself or communicated to me.**

Q Okay. Well, all right.

Now that you know that Mr. McCollum was, in fact, a diabetic, is that a question --

MR. GARCIA: Objection --

Q (BY MR. EDWARDS) -- that you intend to have?

MR. GARCIA: -- speculation. Assumes facts not in evidence.

MR. EDWARDS: It doesn't assume facts not in evidence.

MR. GARCIA: Show me where he's diabetic. Show him where he's diabetic. This, where it says, family history of diabetes?

MR. EDWARDS: Yeah.

116

MR. GARCIA: That doesn't make Mr. McCollum diabetic.

MR. EDWARDS: Good point.

MR. MEDLOCK: It's personal history.

MR. GARCIA: It's family history above it, where diabetes is circled.

Q (BY MR. EDWARDS) Do you know whether or not Mr. McCollum was diabetic?

**A I do not know.**

Q If you learned throughout this litigation that Mr. McCollum was, in fact, diabetic and wasn't treated for it, what steps would you take after the fact now that Mr. McCollum is dead, if any?

**A It would be the same steps I would take as mentioned before. I would call the medical, have them either verify it, find out if he's following doctor's orders, and then whether or not it's an issue of him getting to medical or if it's just his choice for not following doctor's orders.**

Q Okay. When are -- when are prisoners first allowed to go to commissary, sir?

**A Offenders that are newly arrived or offenders that are transferred in?**

Q Well, what type of offender was Mr. McCollum?

**A He was a intake, newly received from county.**

and the TV cameras.
A I don't know exactly which direction the cameras are at. I can -- in relationship to a scale -- as you mentioned earlier, this is not a scale model, so I cannot draw to scale.
Q Okay. Well, would it be better for you to go back to the jail and do a diagram for us where you can go check it and show me where you can see and can't see from the picket?
A If that's something requested through my counsel.
Q Okay.
MR. EDWARDS: Could we do that?
MR. GARCIA: We'll talk about it off the record. Think about what you're asking him to produce. And we'll talk about it --
MR. EDWARDS: It's all --
MR. GARCIA: -- off the record. It might be better to go actually in it and let you two look, as opposed to creating a document which show the blind spots in a prison.
(Simultaneous discussion)
MR. MEDLOCK: Fair enough.
MR. GARCIA: Do you understand the...
Q (BY MR. EDWARDS) Speaking of that, though, are

there blind spots in the C7 dorm?
A Yes, there would be.
Q Okay. Are there blind spots in all of the dorms?
A All the dorm housings on the unit do have those same general blind spots.
Q Okay. Do you find that to be less than optimal?
A No, I do not.
Q You don't find that that might endanger inmates?
A No, I do not.
Q Have there been any rapes in the dorms at the Hutchins Unit in the last five years?
A Not to my knowledge.
Q Have there been any fights in the dorms at the Hutchins Unit in the last five years?
A Yes, there have been fights.
Q Do the fights tend to happen in the blind spots?
A They do at times.
Q Do you see any problems with having blind spots in the dorms, sir?
A No, I do not.
Q Okay. All right. Does the dorm have -- oh,

how many men are in each dorm? Like in C7, how many men are in there?
A This particular dorm, I do not know how many men are in there in, but there are 58 bunks.
Q Okay. So up to 58 people?
A Yes.
Q Okay. Are there windows in the C7 dorm?
A Yes, there will be windows in the dorm.
Q Will you show me where the windows are?
A (Complies).
Q And would you just label them "W" so we know what you're doing.
A (Complies).
Q Thank you.
Are they open?
A These windows do not open.
Q Are they sealed shut?
A They are by design sealed shut.
Q Why are they by design sealed shut?
A I do not know.
Q Have you ever asked anyone if you could open them?
A I have not.
Q Do you believe that if you opened them it would increase airflow into C7?

A The windows are not designed to be opened.
Q I didn't ask you that, sir.
MR. EDWARDS: Let me object as nonresponsive.
Q (BY MR. EDWARDS) If they could be opened, do you believe they would increase airflow into the C7 dorm?
MR. GARCIA: Objection; speculation.
A That would be ones' assumption, is that it would allow airflow into the dorm if the window is open.
Q (BY MR. EDWARDS) Is that an assumption that you would agree with?
A Yes, it is.
Q All right. Do you know how much it would cost to unseal those windows?
A I do not know.
Q Have you ever looked into that?
A I have not.
Q Okay. Are there personal -- in the facilities that you've worked at, the prisons, are personal fans made available to people?
A There were fans on a couple of facilities. Majority of the facilities I've been on, no.
Q Okay. What facilities allowed fans that you worked at?

sure that all the inmates are actually drinking water. Do you -- you don't think so?

**A I don't think so.**

Q Okay. Tell me why you couldn't have like a sheet next to the jug, posted on the wall where inmates check their name or a guard checks their name and so you know everybody who's drinking so you can spot people who aren't? Tell me why you couldn't do that?

**A Because a lot of them don't always partake in the water that's brought into the dorm because they have other liquids or other means of obtaining drinks.**

Q People may not drink the water, I understand that. I'm asking you, why couldn't you have a system in place that determines, that lets you know if people aren't drinking the water?

**A To have a system in place like that with almost 40-plus housing areas, 2,000 inmates would be ridiculous.**

Q Why would it be ridiculous? It could potentially --

**A Because you don't --**

Q -- save lives.

**A You don't have the time, you don't have the staff. And it's the individual's responsibility to maintain the hydration.**

Q Well, aren't you taking steps that indicates it's partly your responsibility as well?

MR. GARCIA: Objection; speculation.

Q (BY MR. EDWARDS) I'm not asking you to speculate. Isn't that what you're doing?

**A I've taken steps to reduce and ensure that the offenders have those abilities to partake in water. It's still their choice.**

Q Okay. Would you agree that some people, it may be harder to access the water than for others?

**A No, I do not.**

Q Okay. You don't think it would have been harder for Mr. McCollum to access the water than for, say, other people --

MR. GARCIA: Objection; speculation.

Q (BY MR. EDWARDS) -- back in July of 2012, based on what you know about Mr. McCollum?

MR. GARCIA: Same objection.

MR. EDWARDS: That's fine.

**A No. The waters are equally placed in there, plus there's water within the sinks and water in the showers.**

Q (BY MR. EDWARDS) Right.

**A There's plenty of water for an offender, partake if they choose.**

Q Okay. But you just think it would be ridiculous to have a form where you could check to see, to ensure that people are getting hydrated in the intensely hot summer months, where you're telling me there's extreme heat conditions? You think it would be ridiculous?

**A It would be impossible, and they're grown adults and they know when they need their own hydration. They don't need somebody supervising their water consumption.**

Q Well, so you're making it -- is it impossible or you're making a choice because they're grown adults and they don't need somebody to supervise them?

**A I'm making assumption that it would not be practical within a prison setting to put a measure in place to do that.**

Q Okay. Just so -- water's not passed out then, it's just available in the jugs when you bring it in, this extra water. Right?

**A The jug water would be made available.**

Q Okay. Do you know if there are any cups with the jugs?

**A Before that there were not cups.**

Q Okay. Can you at least agree with me that Mr. McCollum, who didn't have a cup, would have had a

tougher time drinking out of a Gatorade jug than, say, someone who had a cup?

**A From my experience, I've noticed that offenders have found ways to obtain plastic bottles. And from the time I've been in the building, there's been a community cup.**

Q Do you know if there was a community cup in C7 dorm between July 15th and July 22nd?

**A I do not.**

Q Okay. And isn't that the point of handing out the cone cups, to make sure people have access to cups and can actually access the water?

**A That would be the purpose.**

Q Okay. And you certainly knew about that problem before Mr. McCollum died. Right?

**A No, I did not.**

Q You didn't know that jugs were being passed out without cups?

**A I knew that they were not -- did not have cups accompanying the jugs, yes.**

Q And you knew that an inmate couldn't get a cup until he was able to buy it from the commissary. Right?

**A The offender could request a cone cup or they would have to wait till they go to commissary to purchase one, yes.**

237

CHANGES AND CORRECTIONS

Page/Line Correction Reason for Correction

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

I, JEFFERY PRINGLE, have read the foregoing deposition and hereby affix my signature that same is

238

true and correct, except as noted above.

_____________________________
JEFFERY PRINGLE

THE STATE OF _________________ )
COUNTY OF ____________________ )

Before me, ________________________, on this day personally appeared, JEFFERY PRINGLE, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _________ day of ___________________________, ___________.

_________________________________
NOTARY PUBLIC IN AND FOR

THE STATE OF _______________________

239

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, §
STEPHANIE KINGREY, and §
SANDRA McCOLLUM, §
individually and as heirs §
at law to the Estate of §
LARRY GENE McCOLLUM, §
Plaintiffs, §
§
V. § CIVIL ACTION NO.
§ 3:12-CV-2037-L
§
BRAD LIVINGSTON, JEFF §
PRINGLE, and TEXAS §
DEPARTMENT OF CRIMINAL §
JUSTICE, §
Defendants. §

*******************************************************

REPORTER'S CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF
JEFFERY PRINGLE
VOLUME 1
FEBRUARY 15, 2013

*******************************************************

I, SUZANNE VILLA, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JEFFERY PRINGLE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____________, 2013 to the witness or to the attorney for the witness for examination, signature and

240

return to MR. JEFF EDWARDS by ______________, 2013;

That the amount of time used by each party at the deposition is as follows:

MR. JEFF EDWARDS - 5 HRS. 5 MINS.
MR. BRUCE R. GARCIA - NO TIME

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

For the Plaintiffs:
Mr. Jeff Edwards
THE EDWARDS LAW FIRM
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701
(512) 623-7727
jeff@edwards-law.com

For the Texas Civil Rights Project
Mr. Scott Medlock
Ms. Michelle Smith
1405 Montopolis Drive
Austin, Texas 78741-3438
(512) 474-5073 X105
scott@texascivilrightsproject.org

For the Defendants:
Mr. Bruce R. Garcia
OFFICE OF THE ATTORNEY GENERAL
PO Box 12548
Austin, Texas 78711-2548
(512) 463-2080
bruce.garcia@oag.state.tx.us

That $_________ is the deposition officer's charges to the PLAINTIFFS for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel

61 (Pages 241-241)

Stephen McCollum, et al v. Brad Livingston, et al.

Jeffery Pringle
February 15, 2013

241

for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this __________________ day of _______________________, 2013.

SUZANNE VILLA, Texas CSR No. 8323
Expiration Date: 12-31-14
WRIGHT WATSON & ASSOCIATES
Registration No. 225
Expiration Date: 12-31-13
3307 Northland Drive
Suite 185
Austin, Texas 78731-4946
(512) 474-4363

JOB NO. 130215SV

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88
Appendix 259

A It would have been Beto 1 and Michael.
Q Do you recall Michael being a particularly hot jail during the summer -- hot prison during the summer?
A No, I don't recall that.
Q Okay. Why don't you allow personal fans at the Hutchins Unit, sir?
A There's a number of reasons that the fans are not sold there, because that's additional property. The design of the facility does not accommodate for electrical outlets, and the personal living space does not accommodate for additional items to be in that area because it's shared by four offenders.
Q No electrical outlets and the personal spaces are shared by four offenders, and that's why you don't allow fans?
A That's why these facilities, such as the Hutchins, don't allow fans.
Q Okay. Is that a decision that you, as warden, get to make or is that higher up than you?
A That is not my decision.
Q Whose decision is it?
A I do not know.
Q Could you make an executive decision to allow fans in the Hutchins Unit if you wanted to?
A I could not.

Q Okay. Do you know who you would begin the pro- -- if you decided, hey, we need to get fans in here, it's just too hot in here during the summer, who would you contact?
A I do not have a procedure that says here's how you contact. But it would involve several entities. One would be Mr. Eason, facilities divisions, risk management.
Q Giving prisoners fans would enable them to cool off a little bit. Is that true?
A No, it's not.
Q Tell me why that's not true?
A Because you're pushing the same heat index or the same heat that you would have inside the housing area.
Q Okay. So even giving fans in a really hot area would just be blowing more hot air on people?
A From my perception, yes.
Q Okay. Is there air-conditioning in the C7 unit?
A C7, no air-conditioning.
Q Are there air handlers or anything like that or fans?
A There are air handlers which produce outside air, and then there are large mounted fans.

Q I guess the outside air coming in is pretty hot?
A It would be whatever the outside temperature is.
Q So if it's 115 outside -- if it's 115 outside, it's 115 coming inside?
A That would be the air, possibly.
Q Okay. These fans, I guess, they also would blow hot air around?
A The ones mounted or --
Q Yeah, the ones mounted.
A Yes, they would circulate the air within the dorm.
Q Okay. Do you know if that fan -- those fans were working back in July of 2011?
A I do not have firsthand knowledge.
Q Okay. Do you know if they've ever been broken?
A Those particular fans for that housing area, I do not if they've been broken.
Q When a fan in a unit breaks, what's the -- well, how long does it usually take to get fixed?
A Those particular fans, the time frames could always vary.
Q Could it be more than a month?
A Could it be?

Q Yeah.
A It could be, depending on the parts and the problem with the fan.
Q Have you ever had one of these fans break during your tenure as warden at the Hutchins Unit, in any of the dorms?
A There have been fans that have gone out, yes.
Q Has -- do you recall how long it took you to get those things repaired?
A No, I do not.
Q Do you recall if any inmates filed grievances about the fans being broken at any time during your tenure at the Hutchins Unit?
A I do not recall firsthand.
Q Is it your responsibility to review grievances?
A Periodically, I do review grievances.
Q Is it your responsibility to do that or is that just something you do because you're -- you want to?
A It's not my responsibility.
Q Whose responsibility is it?
A It would be, normally, my assistant warden.
(Telephone disruption)
MR. EDWARDS: I apologize for that.
Q (BY MR. EDWARDS) Okay. Sir, are some parts of the dorm area hotter than others? And I'm asking

117

Q Was he in the state jail system or the institutional division?
**A He would have been state jail system.**
Q Okay. How long would it take him to get access to the commissary?
**A Those days are different for different offenders.**
Q What would your expectation be, sir?
**A Within 30 to 45 days.**
Q Thirty to 45 days.
So is that -- does that mean that Mr. McCollum would not have the ability to buy a cup for 30 to 45 days at the Hutchins Unit?
**A That would be true.**
Q Do you see any problems with that in the summer when it's extremely hot?
**A Offenders have to have money on the commissary account before they can go and buy a cup.**
MR. EDWARDS: Let me object as nonresponsive.
Q (BY MR. EDWARDS) Do you see any problems with delaying 30 to 45 days a prisoner's ability to buy a cup in the extremely hot summer months?
**A I do not see a problem with it.**
Q You don't think it would be harder for that

118

individual to drink water?
**A No, it would not be.**
Q Okay. Why -- why do you have that opinion?
**A Because there's water available in there that they have access to for drinking without the use of a cup.**
Q Okay. You don't think the use of a cup makes it easier?
**A No.**
Q Okay. Would you do me a favor, sir, and draw me a diagram of the unit on which Mr. McCollum was housed, and I'll represent to you it's C7, if you don't know that.
**A (Complies).**
MR. GARCIA: You're right. I'm thinking of something else. I sounded so sure, though, didn't I?
MR. EDWARDS: You did.
Let's go off the record while the warden does the...
MR. GARCIA: Yeah.
THE VIDEOGRAPHER: Going off the record at 1:55 p.m.
(Brief pause)
THE VIDEOGRAPHER: We're back on the record at 1:56.

119

MR. EDWARDS: Let's mark that. What number are we on?
THE REPORTER: Twenty-six.
MR. EDWARDS: Twenty-six.
THE REPORTER: Yes.
MR. EDWARDS: Thank you.
(Deposition Exhibit No. 26 marked)
Q (BY MR. EDWARDS) Thank you, sir. And we will of course agree that it's not necessarily to scale, but I appreciate that.
Okay. Sir, I'm looking at -- would you label this C7 drawing up top?
**A (Complies).**
Q There you go.
The shapes in the middle here, what do these represent?
**A Tables and benches.**
Q Okay. The -- would you just do a line that says "tables" and "benches," please, sir?
**A (Complies).**
Q Okay. And these lines across the -- along the walls, what are they?
**A They would represent bunks.**
Q Okay. Would you just write -- stretch a line that says, kind of, "bunks."

120

**A (Complies).**
Q Yeah. Perfect.
Would you tell me where bed 4- -- or bunk 46 is, and if you could label, just write 46 in a circle where that bunk would be.
**A (Complies).**
Q Do you know how we would find out the information about what inmates were in C7 from July 15th to July 22nd?
**A The most-closest document was provided to Counsel already.**
MR. EDWARDS: Do you have that, Bruce?
MR. GARCIA: I thought we turned it over.
MR. MEDLOCK: You did.
MR. EDWARDS: Okay.
MR. MEDLOCK: We've got that.
MR. EDWARDS: Okay. Good. Thank you.
MR. GARCIA: Thanks for putting me on the spot, though.
(Laughter)
MR. GARCIA: I'm pretty sure we turned it over.
MR. EDWARDS: You're doing fine.
Q (BY MR. EDWARDS) Do you know how we would determine who was underneath -- well, are you aware --

19 (Pages 73-76)

Stephen McCollum, et al v. Brad Livingston, et al.
Jeffery Pringle February 15, 2013

73

**commitment documents are for him to be committed to the to the agency.**

Q For instance, if the county just dropped -- the county picked me up and there weren't any documents, they just wanted to teach me a lesson, they dropped me off at the Hutchins facility, someone would say, wait a second, there aren't -- I would hope -- there aren't court commitment papers here. Come on, we're not -- we can't put him in the jail. Is that, albeit --

MR. GARCIA: Probably --

Q (BY MR. EDWARDS) -- somewhat farcical --

MR. GARCIA: Probably speculation as to him.

Q (BY MR. EDWARDS) Let's say Mr. Medlock. Let's use Mr. Medlock. He's the nice one.

**A They would have to show up with the commitment papers before we would take them into the processing.**

Q Okay. Anything else that they do before the processing -- before you take over the processing?

**A I don't take over any processing.**

Q Who handles the processing? What...

**A I have -- intake processing is a sergeant.**

Q A sergeant at the Hutchins Unit, though. Correct?

**A Yes, at the Hutchins Unit.**

74

Q Okay. All right. Okay. So people arrive. They go through some processing. They make sure the documents are in order, the property, they look over whatever records are brought and then a sergeant takes over. Is that -- do I have the system sort of okay?

**A Not necessarily. The sergeant is the supervisor and supervises, when she's on duty, the group coming in from the counties.**

Q Okay. When you say "assessments," what are you talking about?

**A Not only the commitment documents are reviewed for accuracy, and make sure he's supposed to be there, but there's a medical representative present, too. And there's also -- we -- we had the Safe Prisons Act, which is prison rape elimination. A staff member does a intake safe prison inquiry upon arrival. And then we also assess them for any known gang tattoos or any precautions that cannot be identified by security at the time they arrive.**

Q Okay. I've got, in terms of assessments, you know, a medical representative does something, then there's the Safe Prisons rape elimination aspect of it. And then there's any assessment for any gang related or unknown tattoos or marks. Did I get all of that correctly?

75

**A Yes.**

Q Okay. The medical representative, does that person work for TDCJ?

**A No, they do not.**

Q Okay. Who do they work for?

**A University of Texas Medical Branch.**

Q Do you know what the medical representative is supposed to do?

**A No, I do not.**

Q Do you have any idea what the medical representative does?

**A No, I do not.**

Q Okay. I don't mean to be difficult here but, you know, I want to -- do you believe you should know what the medical representative does upon the intake processing?

**A Being the highest-ranking security, it wouldn't be my position to know specific job functions such as that or many others that are on the unit.**

Q Okay. So in terms of evaluating whether that medical representative is doing their job accurately, do you have any control or supervisory responsibility over that person?

**A No, I do not.**

Q Who does?

76

**A A supervisor within the University of Texas Medical Branch.**

Q Do you know who that person would be at your Hutchins facility?

**A I know the three people that I communicate with, and I'm not sure about their organization and who their area of responsibilities report to.**

Q Okay. Well, let's discuss the three people you were -- you deal with or communicate with, I believe, was your word. Who are they?

**A One of them is a Doctor Babbili, periodically.**

Q Now, he's not a doctor. Right? He's a physician's assistant?

**A I do not know.**

Q You call him Doctor Babbili?

**A That's the way I refer to him.**

Q Fair enough. Okay.

Anybody else?

**A Ms. Gilford. She oversees the nursing staff.**

Q Do you know if -- is she a nurse?

**A I do not know what her credentials are.**

Q Okay. Who's the other person?

**A Ms. Brady. I know that she's administrative.**

Q Do you deal at all with a medical doctor?

**A Not directly, no.**

WRIGHT WATSON & ASSOCIATES
(800) 375-4363 3307 Northland Dr., Ste. 185 Austin, TX 78731-4946 (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88
Appendix 262

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM and SANDRA McCOLLUM, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | ) Civil Action |
| | ) Number 4:14-CV-3253 |
| Plaintiffs, | ) |
| vs. | ) |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH and THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | ) |
| Defendants. | ) |

---

ORAL AND VIDEOTAPED DEPOSITION OF

BRYAN COLLIER

MARCH 30, 2016

---

ORAL AND VIDEOTAPED DEPOSITION OF BRYAN COLLIER, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on MARCH 30, 2016, from 9:39 a.m. to 6:29 p.m., before Melody Renee Campbell, CSR in and for the State of Texas, reported by method of machine shorthand, at the offices of the Attorney General, 300 West 15th Street, Austin, Texas, pursuant to Notice and Court Order and the Federal Rules of Civil Procedure.

A P P E A R A N C E S

FOR THE PLAINTIFFS:
Mr. Jeff Edwards, Esq.
The Edwards Law Firm
1101 East Eleventh Street
Austin, Texas 78702
512.623.7727
Jeff@edwards-law.com
-and-
Mr. Michael Singley, Esq.
The Singley Law Firm
4131 Spicewood Springs Road, Suite O-3
Austin, Texas 78759
512.334.4302
Mike@Singleylawfirm.com

FOR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
Ms. Cynthia L. Burton, Esq.
Mr. Matthew J. Greer, Esq.
Ms. Karen Matlock, Esq.
Ms. Kamilla L. Stokes, Esq.
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711
512.463.2080
512.963.2109 (Fax)
Cynthia.Burton@texasattorneygeneral.gov
Karen.Matlock@texasattorneygeneral.gov
Matthew.Greer@texasattorneygeneral.gov
-and-
Ms. Sharon Felfe Howell, Esq.
Ms. Kamilla L. Stokes, Esq.
Texas Department of Criminal Justice
Post Office Box 13084, Capitol Station
Austin, Texas 78711
512.463.9693
512.936.2159 (Fax)
Sharon.Howell@tdcj.state.tx.us
Kamilla.Stokes@tdcj.texas.gov

FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
Mr. Graig J. Alvarez
Fernelius Alvarez Simon
1221 McKinney Street, Suite 3200
Houston, Texas 77010
713.654.1200
GAlvarez@fa-lawfirm.com
-and-
Ms. J. Lee Haney, Esq.
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711
512.463.2080
512.963.2109 (Fax)

ALSO PRESENT:
Ms. Shanna Molanre
Ms. Ashley Palermo
Mr. James Rheams
Mr. Cody Ginsel

I N D E X

| | PAGE |
|---|---|
| EXAMINATION | |
| By Mr. Edwards................................ | 7 |
| CHANGES AND SIGNATURE........................... | 356 |
| REPORTER'S CERTIFICATE.......................... | 357 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Bryan Collier's Response and Objections to Plaintiffs' Subpoena Duces Tecum | 7 |
| 2 | TDCJ Daily Executive Summary Report as of 07/16/13 | 93 |
| 3 | Resume | 127 |
| 4 | 08/01/11 E-mail from Michelle Lyons to Media Run re: Media Contacts for monday Aug. 1 | 128 |
| 5 | E-mail String Ending 08/10/11 from Hollis Murray to Kathy Cleere re: Clip No. 1 - Texas Inmates Complain of Sweltering Prison Conditions | 133 |
| 6 | 08/12/11 Letter from Sylvester Turner to Brad Livingston | 177 |
| 7 | 08/19/111 TBCJ 156th Meeting Minutes | 222 |
| 8 | 06/26/09 Memo from Linthicum to Livingston re: Heat Related Deaths 2007 to Present | 228 |
| 9 | 08/16/13 Texas Tribune Article: "Climate-Controlled Swine Buildings Dismay Inmates' Advocates" | 261 |
| 10 | PQA Plus Cert Excerpt | 273 |
| 11 | 03/08/07 TDCJ Swine Program management Procedures | 286 |
| 12 | E-mail String Ending 09/04/13 from Cherie Miller obo Oscar Mendoza to William Stephens re: Temperature Information | 327 |

62

because we had suspected deaths in the summer that were suspected to be heat related.
Q. Sure.
MS. BURTON: It's been an hour so could we take a break now?
MR. EDWARDS: Sure. Would you like a break?
THE WITNESS: Yes, sir, that would be --
MR. EDWARDS: Sure, let's take a break.
THE VIDEOGRAPHER: Off the record at 10:41.
(Recess.)
THE VIDEOGRAPHER: We are back on record at 10:51, with the start of DVD Number 2.
Q. (BY MR. EDWARDS) Mr. Collier, you've had a chance to take a break. Are you refreshed?
A. Yes, sir.
Q. Okay. As part of your job, have you been in any of the facilities where the deaths by heatstroke occurred in 2011, 2012, 2000 -- and 2007?
A. Yes, sir.
Q. Okay. You know, and have known for a while, I would imagine, that the housing areas in

63

those locations are not air-conditioned. Correct?
A. I know that we have -- I'm trying to answer what you're asking, I believe. I haven't been to probably -- and I would need to look at a list -- but every one --
Q. Do you want me to go through the list? Have you been to the Hutchins Unit?
A. No, sir.
Q. Okay. You do know that the Hutchins Unit housing areas are not air-conditioned. Correct?
A. Yes, sir.
Q. Did you know that back before the summer of 2011?
A. Yes, sir.
Q. Okay. You also knew before the summer of 2011 that that was a transfer facility. Right?
A. Yes, sir.
Q. Okay. And by transfer facility what -- I want to make sure we're on the same page. That was a facility where people would come from county jails to be put into the TDCJ system. Right?
A. Yes, sir. The Hutchins facility is a -- would also be an intake facility and labeled a transfer facility.
Q. Okay. And there are many other. But that

64

would -- that would be an intake/transfer facility. Right?
A. Correct.
Q. Okay. And one significant thing that you knew back before the summer of 2011 was that people who came from county jails came from air-conditioned housing environments. Right?
A. Could you -- are you asking what I knew in 2011?
Q. Uh-huh.
A. I don't know if, in 2011, I would have been aware of every county that received -- that we received offenders from, would be air-conditioned.
Q. Did you know that most of the counties were -- had air-conditioned facilities?
A. Yes, sir. I would know a large number of facilities would be --
Q. Were you personally aware of the statute that requires them to be air-conditioned to a certain temperature level?
A. No, sir.
Q. Okay. As the person at the number two level, shouldn't -- isn't that something that you should be aware of as someone who is charged with protecting inmates from potential dangers?

65

A. What exactly are you asking that I should be aware of?
Q. Are you aware now that there's an actual law that requires counties to keep their -- to air-condition their facilities?
A. I'm not aware of --
MS. BURTON: Objection; calls for a legal conclusion.
Q. (BY MR. EDWARDS) You're still not aware, even now, in 2016, whether or not there's a statute or a law requiring counties to air-condition their facilities?
A. I'm not aware of a statute or law. What I do understand as it relates to county facilities is that there is a temperature range that they try to abide within.
Q. Okay. Do you know what that temperature range is?
A. No, sir.
Q. Do you know if it's 65 to 85 degrees?
A. I do not.
Q. Let's assume that that's what the temperature range is. Do you know of any way to achieve that temperature range without using air-conditioning in the summer?

difficulty dealing with the extreme heat that you purposefully subject them to in the housing areas. Are you with me?
A. Yes, sir.
Q. Okay. Do you disagree with anything I said? You do purposefully subject your inmates to extremely hot temperatures in the -- in the housing areas. Right?
A. TDCJ operates a prison system. Within that prison system there are units that do not have air-conditioning. And offenders in that environment are given a series of protocols of how to address being in that heat, the same as our staff, same as other individuals who are in high temperature areas.
Q. Okay. Well, you do subject your employees to these potentially dangerous conditions, too. I'll grant you that. But this is not some mistake that TDCJ made. This is an intentional decision by you to subject these prisoners to these conditions. Right?
A. No, sir.
Q. Is it a mistake?
A. It's not an intentional decision I have or haven't made, as you characterize.
Q. Not you personally.

A. That's what you said.
Q. TDCJ. The you is TDCJ, sir.
A. TDCJ --
Q. Has intentionally decided to house prisoners in housing dorms that lack air-conditioning and that, during the summer, are extremely hot. Right?
A. TDCJ houses offenders that have been sentenced to prison within the state of Texas --
Q. Right.
A. -- within the facilities as they were designed and built.
Q. By -- okay. And they intentionally do this. Right?
A. We house the offenders. That's our obligation. Yes, sir.
Q. And you intentionally house them in dorms that lack air-conditioning or climate control. Right?
A. We house them in the facilities that we have within the Texas Department of Criminal Justice.
Q. Why are you denying that you intentionally do this?
A. I guess it's the word intentional.

Q. Okay. What do you think intentional means?
A. That there's some alternative available, and I'm choosing not to use that alternative.
Q. Well, there is an alternative available?
A. What would that be?
Q. Well, don't you have 20,000 spaces that you could house inmates in with air-conditioning?
A. There are 30,000 offenders in the system that are housed in air-conditioning.
Q. And do you evaluate, by medical vulnerability, every single one so that you make sure to get everybody with COPD or asthma or diabetes into those -- into those housing areas, or do you not do that?
A. Those facilities are not designed in a way that any offender can just go to that facility. Their specific design may limit the ability for certain offenders to be placed in that environment.
Q. Or it may not --
A. We have environmental -- excuse me. We have infirmary beds on most units within the system. We also have hospital beds in Galveston that if a provider identified that an offender needed to be kept in a lower temperature setting, we would do our

best to accomplish that and see to it that it got done.
The facilities that are air-conditioned, again, the security level of those facilities, the design of those facilities is not such that they are an apple-to-apple comparison for any unit in the system.
Q. Okay. How many people over the age of 65 do you have in the Texas prison system?
A. I don't know that exact number over 65.
Q. How many over 80?
A. Don't know that number.
Q. Less than a thousand?
A. I don't know.
Q. Okay. Well, has any -- you are aware that your own policies state that people over the age of 65 are medically -- are vulnerable to the heat. Right?
A. Specifically which policy are you talking about?
Q. I think it's your heat stress policy. Doesn't your heat stress policy or AD 10.64 make it clear that there are some groups that are more susceptible to heat-related illness?
A. I think the policy would say -- and I'm

not arguing that 65 is or isn't the number.
Q. Okay.
A. I believe it does speak to the fact that elderly offenders may be in that population.
Q. And I'm using -- I think it says greater than 65 in your -- in your policy. But we can say elderly.
A. I can look at it if you'd like, but I'm not going to argue that point.
Q. Okay. Well, assume that I'm representing that it's true, that in the factors that, you know, potentially can cause someone to suffer heat illness, one of the factors associated with that is age. You're aware of that. Right?
A. I'm aware that age can be one of the risk factors that may make you more vulnerable during high temperatures.
Q. Anyone ever --
A. That's why we take the mitigation efforts that we do.
Q. Well, one -- you could put all 65 and above in air-conditioned housing if you wanted to. Right?
A. No, sir, I don't think I could do that.
Q. Well, you could put all 80-year-olds in

air-conditioning if you felt like it. Right?
A. Again, I don't know that I could do that. Based on the classification needs of each offender, the housing has to be appropriate for their security level, their classification level.
So I don't know, in every instance that you're speaking of, that we have an offender who we don't have an air-conditioned bed for or we do have an air-conditioned bed for that --
Q. Not bed. Just a dorm, housing dorm. You've got 20 to 30 thousand spaces with air-conditioning. Right?
A. We have 30,000 beds that are air-conditioned on facilities.
Q. Okay. So when you use the term bed, you mean -- you don't mean infirmary bed --
A. I'm speaking --
Q. -- of which there are very limited amounts. Correct?
A. 30,000 is related to facilities where the housing areas are air-conditioned.
Q. Yeah. Okay.
A. Yes, sir.
Q. If you wanted to, you could create an over-80 dorm, if you wanted to. Right?

A. We have offenders that are geriatric. I don't know if it draws the line at 80 or if it draws the line at a medical provider -- at the Duncan Unit, where I believe it is air-conditioned. We do have offenders that are geriatric at that location. We also, at the Estelle Unit, have a geriatric dorm, which I believe is temperature controlled.
I'm not aware of, outside those bounds or if they include all the ones you're speaking of, but I know they're based upon discussions with our medical providers on what those offenders may need.
Q. It would just seem to me, sir, that if you felt like it and you wanted to take the 75-year-olds or the 72-year-olds at the Pack Unit and you felt like putting them in air-conditioned housing, it doesn't seem like it would be that difficult for TDCJ to do.
A. It doesn't seem from -- potentially an outside view, I can understand that it might not seem to be complicated.
From an internal view, I can tell you it can be very complicated, because, again, the beds that we're talking about that are air-conditioned may be on units where the security level of that

facility is very low, they're low risk, prerelease-type facilities.
The offender you may be talking about may have a higher security designator. The medical needs of that facility may or may not be able to address the needs of that offender. There are lots of pieces of that that have to be reviewed.
Q. Has anybody reviewed those pieces to determine whether or not -- you know, let's say 72 and up, whether or not -- how many 72-year-olds there and whether or not you could do that? Has anybody at your level or just below your level taken on that analysis?
A. I'm not aware of any specific review as it relates to an age range of offenders as you're speaking.
Q. Okay. Let's see here. Let me give you the next one.
(Exhibit Number 10 marked.)
Q. (BY MR. EDWARDS) Let me hand you Exhibit 10. We'll stay on the pigs for a little while longer.
Do you know what that document is?
A. No, sir.
Q. Okay. It looks like it says, PQA plus,

our responsibility, our promise.
A. Yes, sir.
Q. It looks like it's pork.org down below. Right?
A. Yes, sir.
Q. Okay. And I'll represent to you that this was provided to us by TDCJ.
A. Okay.
Q. Okay? If you look at the second page where it says, ventilation -- do you see that?
A. Yes, sir.
Q. Okay. It says, "Both air temperature control and air quality can impact the well-being of the pigs on the operation." You understand that to be true. Right?
A. As it relates to sows that have recently given birth, I understand that to be potentially an issue.
Q. And similarly, air temperature control and air quality can also impact the well-being of human beings in the Texas prison system. Right?
A. Is that in -- okay.
Q. I'm just asking you as one of the --
A. Okay. Could you ask it --
Q. -- the number two guy in the entire

system.
A. Could you ask it again?
Q. Sure. Both air temperature control and air quality can impact the well-being of the human beings housed in the Texas prison system. Right?
A. You're asking me to answer that as a matter of fact. I would say can air temperature make it more comfortable in Texas prisons? Yes. Air quality has wide range of what you're talking about.
Q. Can it impact the well-being of human beings?
A. It might can.
Q. Of course it can. And you would agree with that. Of course it can. Right?
A. I was -- I said it might can. I'm not a medical provider and I'm saying it certainly would make it more comfortable.
Q. Okay. Then we keep going down here in this ventilation. It says, "Every type of housing system must provide conditions that are conducive to good health, growth, and performance at all stages of the pig's life." I guess do you agree with that?
A. This is -- you're asking me do I agree with that statement?

Q. For the pigs.
A. I don't know that that statement is accurate or inaccurate. It looks to be part of a either sales brochure or other information packet on this -- potentially maybe even type of building that we bought.
What I can tell you is, all stages of a pig's life, I'm not understanding that that's required for all stages of a pig's life.
Q. Okay. Well, all right. Let's go to temperature control.
A. Okay.
Q. Well, would you agree that housing systems must provide conditions that are conducive to good health for human beings in the Texas prison system?
A. Would -- okay. Let's -- you're either reading from the document or you're just asking me a question.
So could you repeat the question and that's not from the document?
Q. Sure. Would you agree that housing systems must provide conditions that are conducive to good health to human beings inside the Texas prison system?
A. I don't refer to anything in Texas prisons

as housing systems. I'm not disagreeing with what you're saying. I'm just saying I don't -- housing systems is not a term that we use in prison.
Q. Fair enough.
A. If you're asking -- and I'm not getting all of your question. But...
Q. The housing that TDCJ provides to inmates --
A. Yes, sir.
Q. -- you would agree it must be conducive to the inmate's good health. Right?
A. I would agree that the housing environment, combined with other factors such as medical care, mitigation efforts, that's what we do to try to make sure that that is occurring.
Q. Okay. Here it says for the pigs -- and you can look on page 2 there, under temperature control.
A. Yes, sir.
Q. "Provisions for heating and/or cooling should be present and in working order during extremes in the weather. The facilities should provide for moderating temperature, enough to prevent the pigs from displaying extreme thermoregulatory behaviors." Do you agree with

that?
A. That's what it says. I agree with you that that's what it says. I'm not a pig expert.
Q. Oh, okay. Well, you know that pigs can't sweat, for some reason.
A. I do. I do, because I've asked that question.
Q. Okay. Well, let me ask it this way.
Do you believe that you have an obligation at TDCJ to provide heating and/or cooling during extremes in the weather, enough to prevent the human beings in your custody from having problems thermoregulating?
A. I believe that we have an obligation to ensure that offenders that live in the environment of TDCJ take steps to be within that environment and to be able to deal with extreme temperatures.
Q. Does TDCJ give prisoners the choice to avoid the extreme temperatures?
A. I'm not sure I understand your question.
Q. Does TDCJ give prisoners, especially its more vulnerable prisoners, the choice to be housed in, you know, safer, cooler climate-controlled facilities, or is that a choice that TDCJ makes on its own?

A. Housing assignments are made based upon TDCJ -- based upon TDCJ evaluating what the offender's needs may be. Also the security concerns for that offender. Could also include program involvement, program activity, medical need, medical care. Those would all be parts of the consideration of where they're housed.
Q. Are you familiar with the HSM 18 form? Do you know what that is? If you don't, that's fine, but...
A. I've had general discussions about the form.
Q. With who?
A. Our attorneys.
Q. Other than -- I don't want to know about the discussions you've had with your attorneys about the forms.
Have you ever had discussions about the forms with anybody -- any division directors, Mr. Livingston, anybody like that?
A. I don't specifically recall that form being something specifically discussed. I can't say it wasn't, but I can't say that it was.
Q. Okay. And have you seen a copy of the form, where it says, no temperature extremes or it

says, you know, wheelchair access, things like that?
A. Yes, sir.
Q. Okay. Can you tell me any reason why there couldn't be a line on there for a recommendation to be -- for inmates to be placed in air-conditioned housing, if available?
A. Could I look at the form?
Q. I don't have it right with me, so...
A. Okay. I don't know what other categories the form has that would help carry out a request from a medical provider. I know that if a medical provider made a recommendation that an offender be kept in a bed or housing area with lower temperatures, they would process that through their utilization review and then we would -- if utilization review and the doctor or the provider felt that was required, we would help make that happen.
It could happen at the unit of assignment for that offender in the unit infirmary or it could happen at another location if we needed to move the offender to accomplish that.
Q. Okay. Well, you would agree with me that if a medical provider in a unit says that an inmate requires climate-controlled or air-conditioned

housing, then TDCJ ought to place that inmate in climate-controlled or air-conditioned housing. Right?
A. If a medical provider told us that this offender needed to be in climate-controlled housing, I believe -- and that was processed through their utilization review and then determined to be the approach they want to take with that offender, I believe we would make that -- try to make that happen.
Q. And you would have an obligation to make that happen. Correct?
A. Yes, sir. We would do everything we could to make it happen.
Q. Are you aware of whether that has happened -- strike that.
Do you know who Bradley Kadel is?
A. No, sir.
Q. Do you know what the upper critical limit is, temperature-wise, for the pigs?
A. No, sir.
Q. Okay. Would you flip to page 2 of that document.
A. Yes, sir.
Q. It looks like it's 95 degrees.

REPORTER'S CERTIFICATE

STATE OF TEXAS )
McLENNAN COUNTY )

I, Melody Renee Campbell, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the foregoing deposition is a full, true and correct transcript;

That BRYAN COLLIER, the witness hereinbefore named, was duly sworn by the officer and that the oral deposition was taken by the officer in machine shorthand on MARCH 30, 2016, and is a true record of the testimony given by the witness;

I further certify that the signature of the deponent was requested and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

That $ 2732.60 is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to PLAINTIFFS;

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken,

and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 13TH day of APRIL 2016.

MELODY RENEE CAMPBELL
Integrity Legal Support Solutions
3100 W. Slaughter Lane, Suite A-101
Austin, Texas 78748
512.320.8690
512.320.8692 (Fax)

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 3-21-2011 | NUMBER: E-32.1 |
|---|---|---|
| | Replaces: 9-15-2010 | |
| | Formulated: 10/85<br>Reviewed: 03/11 | Page 1 of 3 |

**RECEIVING, TRANSFER AND CONTINUITY OF CARE SCREENING**

PURPOSE: To establish guidelines for the immediate identification and treatment of the health care needs of offenders through receiving/transfer screening and to provide continuity of care. These guidelines include:

1. offenders transferred from another correctional system (i.e. county jail) into TDCJ
2. offenders transferred from one TDCJ facility to another
3. offenders who remain at the same facility but who have had a specialty clinic/telemedicine/Digital Medical System (DMS) visit or discharge from inpatient.

POLICY:

I. **Receiving Screening At Intake Facility**

A. An initial health screening will be completed upon arrival at all intake facilities by a member of the health services staff.
B. The screening will be completed on the HSM-13 form. The completed HSM-13 will be filed or electronically stored in the offender's health record
C. The initial screening identifies any acute or current health-related conditions or requirements.
D. Offenders with immediate health care needs, or those taking medications, will be referred to the facility medical department for further evaluation and treatment on the day of arrival.
E. Offenders reporting current suicidal ideation, urgent complaints, or who exhibit severely disturbed behavior will immediately be evaluated by a qualified mental health professional.
F. A review based on the HSM-13 and the health record by mental health staff will take place within 24 hours of the offender's arrival at the facility. This review will result in one of the following dispositions.
   1. Offenders reporting current suicidal ideation, urgent complaints, or who exhibit disturbed behavior will be immediately evaluated by a mental health professional. If no qualified mental health professional is available, the on-call psychiatrist/mid-level practitioner will be contacted for a disposition.
   2. Offenders identified as having current treatment, including psychotropic medications, or a history of mental health treatment, history of suicide attempts, or other potential but non-urgent mental health needs or complaints will be assessed by a qualified mental health professional within 14 days of arrival.
   3. If none of the above listed conditions is present, no referral to mental health is required.

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 3-21-2011 | NUMBER: E-32.1 |
|---|---|---|
| | Replaces: 9-15-2010 | |
| | Formulated: 10/85<br>Reviewed: 03/11 | Page 2 of 3 |

**RECEIVING, TRANSFER AND CONTINUITY OF CARE SCREENING**

II. **Transfer Screening:**

**A. For patients being transferred from Inpatient Services and Developmental Disabilities program:**

1. **An Offender's health record will be reviewed and the review documented on the HSN 1, Part 1 (Inpatient Facility Discharge/Transfer Form). The completed section of the Inpatient Facility Discharge/Transfer Form will be placed in the medical record prior to transfer to another facility.**
2. The individual performing the review will sign, date, and time the HSN 1 Section I.
3. The purpose of the review is to determine and document the following:
   a. that the offenders' health care needs can be met at the receiving facility;
   b. the suitability of the offender for travel and the appropriateness of the mode of transportation;
   c. the need for any medication or therapy on route; and
   d. any special instructions to be given to transporting personnel.
4. The transfer of patient may be stopped if the patient's condition is not suitable for Transfer

**B. Receiving Facility: En Route (In transit):**

1. Offenders received from a facility, as en route (in transit) and staying more than 12 hours, must have, at a minimum, his/her health record reviewed by licensed nursing staff.
2. This review must be completed within 24 hours of arrival to the facility and documented on the HSN-1 Section II, (Nurses Chain Review).
3. The individual performing the review will sign, date, and time the HSN-1 Section II.
4. Medications are continued as ordered at the en route (in transit) facility unless changed by unit provider.

**C. Receiving Facility: Unit of Assignment**

1. Licensed health care staff will physically screen offenders upon their arrival to his/her facility during the hours of operation of the medical facility..
2. All arriving offenders must have his/her health record reviewed by licensed staff within 24 hours. Health care staff will document the health screening findings on the

**Appendix 273**

TDCJ011990

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 3-21-2011 | NUMBER: E-32.1 |
|---|---|---|
| | Replaces: 9-15-2010 | Page 3 of 3 |
| | Formulated: 10/85<br>Reviewed: 03/11 | |

**RECEIVING, TRANSFER AND CONTINUITY OF CARE SCREENING**

MEDICAL & MENTAL HEALTH TRANSFER SCREENING Form Section III & IV (sign, date, time).

3. To provide continuity of care the review will include:
   a. housing assignment
   b. work and disciplinary restrictions
   c. treatments
   d. medications
   e. mental health status
   f. pending appointments and referrals, etc.
4. An offender returning from an inpatient psychiatric facility must be seen by a qualified mental health professional within 48 hours Sunday through Thursday and 72 hours Friday through Saturday.
5. An offender discharged from an inpatient services will require a health record review by a physician or mid-level provider's review and signature within 48 hours Sunday through Thursday and 72 hours Friday through Saturday).

**D. On site (Medical) specialty clinic/telemedicine/DMS visit**

1. Following the appointment the specialty clinic/telemedicine/DMS "presenter" will promptly forward the orders to the facility physician/MLP for review and disposition.

Index:
Receive screen
Admission history/physical
Assessment, intake

Reference:
2008 NCCHC Standard P-E-02, Receiving Screening (essential)
2008 NCCHC Standard P-E-03, Transfer Screening (essential)
ACA Standard (New) Mandatory
ACA Standard 4-4362 (Ref. 3-4343) Health Screens (Mandatory)
ACA Standard 4-4363 (Ref. 3-4344) Health Screens (Mandatory)
ACA Standard 4-4364 (New) Health Screens (Non-Mandatory)
ACA Standard 4-4356 (New) Communicable Disease and Infection Control Program (Mandatory)
ACA Standard 4-4414 (Ref. 3-4378) Transfers (Non-Mandatory)

# CORRECTIONAL MANAGED CARE
# INTAKE HISTORY AND HEALTH SCREENING

**I. IDENTIFICATION** DATE: ____________________

NAME: ____________________ OCCUPATION: ____________ EDUCATION: ____________

DOB: ____________ COUNTY: __________ **TEXAS UNIFORM HEALTH STATUS UPDATE RECEIVED: Y ____ N ____**

PREVIOUS TDCJ #(s): ____________ DOI: ____________

| II. FAMILY HISTORY | | | | | |
|---|---|---|---|---|---|
| 1. Blood disease (sickle cell anemia, hemophilia) | YES | NO | 4. Heart Disease | YES | NO |
| 2. Cancer | YES | NO | 5. High Blood Pressure | YES | NO |
| 3. Diabetes | YES | NO | 6. Tuberculosis | YES | NO |

| III. PERSONAL HISTORY | | | | | |
|---|---|---|---|---|---|
| 1. Asthma/Emphysema | YES | NO | 17. Liver Disease | YES | NO |
| 2. Back Injury | YES | NO | 18. Mental Illness | YES | NO |
| 3. Blood Disease (sickle cell anemia, hemophilia) | YES | NO | 19. Non Intravenous Drug Abuse/Alcoholism | YES | NO |
| 4. Cancer | YES | NO | 20. Peptic Ulcers | YES | NO |
| 5. Cavities | YES | NO | 21. Smoker | YES | NO |
| 6. Depression/Suicide Attempt | YES | NO | 22. Tetanus Immunization Date | YES | NO |
| 7. Diabetes | YES | NO | 23. Unprotected Sex with Multiple Partners? | YES | NO |
| 8. Drug/ Food Allergies | YES | NO | 24. Other | | |
| 9. Epilepsy/Seizures | YES | NO | | | |
| 10. Glasses/Hearing Aid | YES | NO | **IV. OBSTETRIC/GYNECOLOGICAL HX** | | **N/A** |
| 11. Gum disease | YES | NO | 1. Date of last menstrual period: | | |
| 12. Head Injury | YES | NO | 2. Number of pregnancies/live births: | | |
| 13. Heart Disease/Angina | YES | NO | 3. History of Problem pregnancy: | | |
| 14. High Blood Pressure | YES | NO | 4. Date of last pap smear: | | |
| 15. Intravenous Drug Abuse | YES | NO | 5. Date of last mammogram: | | |
| 16. Kidney Disease | YES | NO | 6. History of birth control methods (IUD, pills, etc.) | | |

| V. INFECTIOUS DISEASE CONSIDERATIONS (Personal History) | | | COMMENTS |
|---|---|---|---|
| 1. HIV + / AIDS | YES | NO | |
| Prior HIV Test Date? | | | |
| 2. Homosexual /Bisexual Activities | YES | NO | |
| 3. Hepatitis, Type | YES | NO | |
| 4. Were you born between1945-1965? | YES | NO | |
| 5. Tuberculosis | YES | NO | |
| 6. INH Prophylaxis | YES | NO | |
| 7. Sexually Transmitted Infection | YES | NO | |
| 8. Have you ever had a Transplant? | YES | NO | |
| 8. B. Have you ever taken transplant medications or are you taking them now? | YES | NO | |
| 8 C. If YES, what? | | | |
| 9. Have you ever received hemodialysis? | YES | NO | |
| 10. Do you have tattoos or body piercings | YES | NO | |
| 11. Did you utilize clotting factors prior to 1987? | YES | NO | |

| | | |
|---|---|---|
| 12. Have you shared any personal items lately contaminated with blood such as razors, needles, or toothbrushes? | YES | NO |
| 13. Have you received any blood transfusions prior to 1992? | YES | NO |

A. If **YES** to any of the above indicate family member or self, give date and treatment received:

B. History of hospitalization? YES NO

Please list the date, hospital & condition

C. Do you have any **current** medical, mental health or dental complaints? YES NO

If yes, what?

HSM-13 (4/14)

**Appendix 275**

UTMBEMails000032019

## CORRECTIONAL MANAGED CARE
## INTAKE HISTORY AND HEALTH SCREENING

| | | | | |
|---|---|---|---|---|
| D. | Have you experienced any of these symptoms: cough, weakness, weight loss, fevers, night sweats, loss of appetite or lethargy? | | | |
| | YES NO If YES, when? | | | |
| | | | | |
| E. | What illegal drugs have you used? | | | |
| | What was the mode(s) of use? (Please circle) Smoking Injection Inhaled Ingested | | | |
| | What amount and how often did you use drugs and alcohol? | | | |
| | When was the last time you used drugs or alcohol? | | | |
| | Have you ever had withdrawal or seizures when you stopped using drugs or alcohol? | YES | NO | |
| | If you injected drugs, did you share needles, syringes, or intranasal devices | YES | NO | |
| F. | Are you presently taking or supposed to be taking prescribed medications? | YES | NO | |
| | If YES, what: | | | |
| | | | | |
| | Reason for taking medications: | | | |
| | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| G. | Observations: | Tremor | YES | NO | Sweating | YES | NO | Other: |
| | | Cuts | YES | NO | Bruises | YES | NO | |
| | Condition of skin: | Sores | YES | NO | Other: | | | |
| | | Deformities | YES | NO | Impaired Motor Activity YES NO | | | |
| | Body & Movement: | Other: | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| H. | **BEHAVIOR AND MENTAL STATUS** | | | | | | | | | | | | |
| | Hygiene & Appearance: | | Clean, Neat | | Dirty, sloppy | | Other | | | | | | |
| | Orientation (ask questions and document response): | | | | | | | | | | | | |
| | What is today's date? | | | | | | | | | | | | |
| | What time is it? | | | | | | | | | | | | |
| | What place is this? | | | | | | | | | | | | |
| | Speech: | | Normal | | Loud | | Soft | | Mumbling | | Other | | |
| | Attitude: | | Appropriate | | Laughing | | Crying | | Cursing | | Quiet | | Other |

| | | | |
|---|---|---|---|
| I. | **THOUGHT CONTENT** (Please circle YES or NO) | | |
| | Are you having current thoughts about suicide or self-injury? | YES | NO |
| | Do you see or hear things that others do not see or hear? | YES | NO |
| | Do you have any special powers or abilities? | YES | NO |
| | Do you receive personal messages from the TV or radio? | YES | NO |
| | Do you have any phobias or excessive fears? | YES | NO |
| J. | **DISPOSITION** | | |
| | Routine referral to: | | |
| | Immediate referral to: | | |
| | Release to general population: | | |
| K. | **ORGAN AND TISSUE DONOR** | | |
| | Do you wish to be an organ/tissue donor? | YES | NO |
| | If YES, complete the Uniform Donor Card (CMC Polidy E-31.2 Att. A) | | |

**Offender's Signature:** **Date:**

**Screener's Signature:** **Date:**

**Nurse's Signature:** **Date:**



| TEXAS DEPARTMENT OF CRIMINAL JUSTICE | | |
|---|---|---|
| | **NUMBER:** | **AD-06.07 (rev. 4)** |
| | **DATE:** | **January 30, 2007** |
| | **PAGE:** | **1 of 2** |
| | **SUPERSEDES:** | **AD-06.07 (rev. 3) February 21, 2003** |

# ADMINISTRATIVE DIRECTIVE

**SUBJECT:** **ACCESS TO HEALTH SERVICES**

**AUTHORITY:** Sections 499.102(a)(7) and (8), 501.051 and 501.059, Texas Government Code

Reference: American Correctional Association (ACA) Standard 4-4344

**APPLICABILITY:** Correctional Institutions Division (CID) and Parole Division

**POLICY:**

The Texas Department of Criminal Justice (TDCJ) shall provide all incarcerated offenders with full access to health services. These procedures must be communicated orally and in writing to offenders upon arrival on the unit.

Incarcerated offenders are to be provided access to health services daily. Medical departments on the units have procedures that are to be followed to provide sick call, routine appointments, chronic disease appointments, specialty clinics, medical treatment, diagnostic appointments, and emergency services.

**PROCEDURES:**

I. Each unit must have written procedures addressing health care matters.

II. It is the responsibility of the security staff to facilitate access to health services. Staff shall not block or hinder access to health services.

III. During regular medical department working hours, incarcerated offenders shall have health-related complaints and requests addressed by health care professionals. It is the responsibility of the health care professional to determine whether the complaint or request requires immediate attention. Health care professionals may arrange subsequent evaluations if indicated.

IV. All urgent requests and complaints must be addressed by health care professionals immediately.

A. Each unit shall post procedures for contacting health care personnel 24 hours per day.

B. Incarcerated offenders with conditions such as asthma, epilepsy, diabetes, attempted suicide, chest pains, shortness of breath, labored breathing or similar conditions, should be afforded immediate access to health services.

C. Institutional operations such as count, feeding, work schedules, or similar routine operations, may not be used as reason to delay access to health services staff for urgent or emergency complaints.

V. The judgment of health care professionals regarding health-related conditions takes precedence over unit operations.

Ed Owens *
Deputy Executive Director

* Signature on File



TEXAS DEPARTMENT OF CRIMINAL JUSTICE

# OFFENDER ORIENTATION HANDBOOK

as

Approved by the

Director of the Texas Department of Criminal Justice, Correctional Institutions Division

Printed
November, 2004

I-202 (rev.11/04)

## TABLE OF CONTENTS

**Chapter 1: Offender Access to Services and Standards for Behavior....................1**
**Reception and Diagnostic Process ......................................................................1**
Receiving and Screening ....................................................................................1
Photographs and Fingerprints..............................................................................1
Physical Examination ..........................................................................................1
Mental Health Screening......................................................................................1
Americans with Disabilities Act (ADA) ................................................................2
Orientation...........................................................................................................2
Testing and Assessment......................................................................................2
Sociological I and II Interviews.............................................................................2
Segregative Classification....................................................................................3
Institutional Offenders .........................................................................................3
State Jail Offenders..............................................................................................3
Transfer Offenders ..............................................................................................4
SAFPF Offenders.................................................................................................4
Foreign Nationals .................................................................................................4
**Unit Classification ..................................................................................................5**
Custody Levels.....................................................................................................5
Administrative Segregation or Special Management.............................5
General Population Level 5.....................................................................5
General Population Level 4.....................................................................5
General Population Level 3.....................................................................5
General Population Level 2.....................................................................5
General Population Level 1.....................................................................6
Committees ...........................................................................................................6
Unit Classification Committee ...............................................................6
Administrative Segregation Committee/Special Management Committee..............................................................................................6
State Classification Committee .............................................................6
Security Precaution Designator Review Committee .............................6
Inter-Unit Transfers ...............................................................................................6
Good Conduct Time ..............................................................................................7
Time Credit Dispute Resolution Process ...............................................................9
Individualized Treatment Plan...............................................................................9
Collection of DNA Blood Samples .......................................................................10
**Standards of Behavior ..........................................................................................10**
Personal Cleanliness and Grooming ...................................................................10
Clothing and Necessities ....................................................................................11
Clothing ...............................................................................................11
Towels..................................................................................................11
Linens...................................................................................................12
Exchange Procedures for Necessities Items ......................................12
Living Areas ........................................................................................................12
Dining Hall...........................................................................................................14
Shower Rules.......................................................................................................15
Dayroom Rules ...................................................................................................15
Recreation Yard Rules.........................................................................................16
Commissary Rules...............................................................................................16
Hall Rules.............................................................................................................17
Offender Property.................................................................................................17
Contraband ..........................................................................................................20
Tobacco Policy.....................................................................................................21
Safety Regulations...............................................................................................21
General Rules ......................................................................................................22

**Safe Prison Programs** ..... **24**
Offender Protection ..... 24
Sexual Assaults ..... 24
Prevention ..... 24
If The Attack Has Just Happened ..... 25
Perpetrator ..... 25
General Appropriations Act 2002-2003 Biennium Conference Committee Report on Senate Bill 1 ..... 26
**Security Threat Groups** ..... **26**
**Programs and Services** ..... **27**
Education ..... 27
Testing and Assessment ..... 27
Counseling ..... 27
Adult Literacy, Basic Skills and GED Preparation ..... 27
Special Education ..... 28
English as a Second Language (ESL) ..... 28
Reintegration Skills ..... 28
Cognitive Intervention ..... 28
Career and Technology Education ..... 29
College Classes ..... 29
Job Placement - Project RIO ..... 30
Libraries ..... 31
School Rules ..... 31
Information on Education Programs ..... 32
Recreation and Non-Programmatic Activity ..... 32
Recreation and Non-Programmatic Activities ..... 32
Out-Of-Cell Time Requirements for Non-Programmatic and Recreational Activity ..... 32
Offender Craft Shop and Piddling ..... 32
In-Cell Art ..... 33
Health Services ..... 33
Medical Services ..... 33
Dental Services ..... 34
Pharmacy Services ..... 35
Psychiatric and Psychological Services ..... 35
Mentally Retarded Offender Program ..... 35
Complaints about Medical Staff ..... 36
Substance Abuse Treatment ..... 36
Religious Services ..... 37
State Counsel for Offenders ..... 37
Language Assistance ..... 39
Correspondence Rules ..... 40
Visitation ..... 41
Telephone Calls ..... 41
Emergency Absences ..... 42
Emergency Absence ..... 42
Emergency Absence Eligibility Requirements ..... 43
Inmate Trust Fund ..... 44
ID Cards ..... 46
Commissary ..... 47
Voter Registration ..... 48
Offender Request To Official (I-60) Form ..... 49
Administrative Segregation Plan ..... 49
Institutional Lockdowns ..... 49
Impermissible Conduct ..... 50

**Disciplinary Procedures and Rules** .......... **50**
General Procedures .......... 50
Solitary Confinement .......... 51
Counsel Substitute Program .......... 51
Appeal Process .......... 52
**Grievance Procedures for Offenders** .......... **52**
**Parole Information** .......... **54**
Parole Information .......... 54
The Parole Interview .......... 55
Parole Eligibility Requirements .......... 56
70th Legislature Requirements .......... 56
72nd Legislature Requirements .......... 57
73rd Legislature Requirements .......... 58
74th Legislature Requirements .......... 59
75th Legislature Requirements .......... 60
Offenders with Detainers Pending .......... 60
Parole and Mandatory Supervision Violators .......... 60
Offenders who commit offenses while in custody .......... 60
Questions about Parole-related issues .......... 61
**Sex Offender Treatment Program Information** .......... **61**
Sex Offender Treatment Program (SOTP) and Evaluation .......... 61
Civil Commitment of Sexually Violent Predators .......... 61
Sex Offender Treatment Program Information .......... 62
Offense Codes Requiring Registration .......... 62
Orchiectomy .......... 63
**TDCJ Crime Stoppers "Behind the Walls"** .......... **64**
**Chapter 2: Offender Visitation Rules** .......... ***65***
Introduction .......... 65
1.0 General Information .......... 65
Visitation Schedule .......... 65
Frequency and Length of Visits .......... 66
Frequency of Contact Visits .......... 66
Eligibility Criteria for Contact Visits .......... 67
Number of Visitors Allowed .......... 67
2.0 Who Can Visit With Offenders .......... 67
Approved Visitors List .......... 67
Visitors Approved for Contact Visits .......... 68
Visitor Notification .......... 69
3.0 Rules for Visits .......... 70
Visitor Identification .......... 70
Searches of Visitors and Vehicles .......... 71
Contraband Items .......... 71
Supervision of Visits .......... 72
Rules for Offenders .......... 72
Rules for Visitors .......... 72
Denial of Visits/Visitors .......... 74
Termination of Visits in Progress .......... 74
4.0 Visits for Special Offender Categories .......... 75
MROP (Mentally Retarded Offender Program) and Psychiatric In-Patient Offenders .......... 75
Psychiatric Out-Patient Offenders .......... 75
Transient Status Offenders .......... 75
Safekeeping Status .......... 75
Pre-Hearing Detention .......... 75
Lockdown Status .......... 76
Administrative Segregation/Special Management .......... 76
Death Row Offenders .......... 76
G5J5 Offenders .......... 76

5.0 Suspension of Visits ..... 77
General Visits ..... 77
Contact Visits ..... 77
6.0 Special Visits ..... 78
Three Hundred (300) Miles ..... 78
Spiritual Advisors ..... 78
Prospective Employers ..... 78
Critical/Serious Illness List ..... 78
Hospice Offenders ..... 79
Visits Between Offenders (Non-Legal) ..... 79
Current/Former TDCJ Employees ..... 80
Attorney Visits ..... 81
Legal Visits Between Offenders ..... 81
**Chapter 3: Uniform Offender Correspondence Rules ..... 82**
General Rules and Instructions Regarding General Correspondence ..... 82
Permissible Correspondents ..... 82
Restricted Correspondents ..... 82
How to Correspond ..... 83
Publications ..... 85
Special and Media Correspondence ..... 85
Permissible Correspondence ..... 85
Exceptions ..... 85
Legal Correspondence ..... 85
Handling Offender Correspondence ..... 86
Content Inspection of General Correspondence ..... 86
Contraband in General Correspondence ..... 86
Contraband in Legal, Media, or Special Correspondence ..... 87
Record of Legal, Special, or Media Correspondence ..... 87
Content of Inspection of Publications ..... 87
Processing Incoming and Outgoing Offender Mail ..... 88
Forwarding of Mail ..... 88
Mailrooms ..... 89
Treatment Programs ..... 89
Review Procedures for Denied Items ..... 89
Handling of Denied Items ..... 89
Correspondence Appeal Procedure ..... 89
**Chapter 4: Offender Access to the Courts, Counsel and Public Officials Rules ..91**
**Law Libraries ..... 91**
Law Library Collections, Conditions, and Supplies ..... 91
General Population Offender Access to the Law Library ..... 92
Administration Segregation, Lockdown, G5, Medical Segregation, Temporary Detention, Trusty Camp, Work Camp, and Death Row Offender Access to the Law Library ..... 92
**Offender Personal Legal Material ..... 93**
Storage and Access ..... 93
Searches and Shakedowns of Offender Legal Materials ..... 93
**When and Where Legal Work May Be Performed ..... 93**
Locations and Times ..... 93
Offenders Assisting Other Offenders on Legal Matters ..... 93
**Notary Public Services ..... 94**
Documents ..... 94
Scheduling ..... 94
**Attorney Visitation ..... 94**
Periods of Visitation ..... 94
Notice ..... 95
Identification ..... 95
Designated Representative's Application to Visit ..... 95
Limits on Number, Persons, and Type of Visit ..... 96

Rejection by Offender of Visitation Request .... 96
Procedures During Visit .... 96
Rejection of Visitation Request or Termination of Visit .... 98
Suspension of Visitation Privileges .... 98
Attorney Visitation Review Procedure .... 98
Consular Officials .... 99
**Attorney/Offender Telephone Calls .... 99**
General Guidelines .... 99
Telephone Call Approval .... 100
**Court Conference Calls .... 101**

# CHAPTER 1

## OFFENDER ACCESS TO SERVICES AND STANDARDS FOR BEHAVIOR

### I. RECEPTION AND DIAGNOSTIC PROCESS

All offenders in the TDCJ are received either at a transfer facility, a reception diagnostic facility, a state jail intake facility or a SAFP intake facility. These facilities are equipped to receive and process offenders admitted to the agency's custody. Offenders who speak little or no English will be identified and will receive the necessary type of language assistance while in the Diagnostic Process and later when assigned to a unit.

#### A. Receiving and Screening

Offenders will be searched upon arriving at a TDCJ facility. A receipt will be completed for each offender's money and property. Medical care will be given, if considered urgent. Offenders will be housed according to security needs. State clothing will be issued; haircuts and showers provided.

#### B. Photographs and Fingerprints

Each offender will go to the Photograph and Identification Department where he will be:

1. photographed,
2. fingerprinted,
3. examined for any identifying scars, marks, or tattoos, and
4. interviewed to obtain basic information.

The fingerprints will be sent to the FBI and the Texas Department of Public Safety (DPS). The Photograph and Identification process helps identify every offender to make sure no one is admitted or released illegally, and creates the state-issued identification card that each offender is required to carry.

#### C. Physical Examination

Offenders will be given a physical examination by medical and dental staff. The medical and dental staff will ask each offender about his medical history. The medical and dental staff will use the results of the examination to determine the special needs, if any, of an offender. The special medical needs of an offender will be taken into consideration during the classification process.

#### D. Mental Health Screening

Each offender will undergo an initial psychological screening. If during this process it is determined there may be special needs, the offender will be referred for further evaluation. (This process is not used on SAFP intake facilities.)

**E. Americans with Disabilities Act (ADA)**

It is the intent of the Texas Department of Criminal Justice to comply with the Americans with Disabilities Act (ADA). Offenders are hereby advised of their responsibility to report a disability. ADA related complaints should be addressed through the Offender Grievance Procedure. ADA related complaints could also be voiced on an I-60 to the Unit Warden.

**F. Orientation**

An orientation is provided to all new offenders and is provided in Spanish to those offenders who require it. The orientation will cover the following:

1. Policies, rules, and standards of behavior
2. Programs
3. Educational services
4. Offender grievance procedures
5. Classification procedures
6. Disciplinary procedures
7. Food service
8. Offender records
9. Commissary and offender accounts
10. Mail and visitation rules
11. Recreation and leisure activities
12. Medical, dental and psychological services
13. Access to courts, counsel and public officials rules
14. Safe prisons program
15. Orchiectomy services
16. Other offender activities and programs

**G. Testing and Assessment**

All offenders will be tested to determine educational, psychological, and substance abuse treatment needs, except on SAFP intake facilities.

**H. Sociological I and II Interviews**

During sociological interviews, offenders will be asked questions about their:

1. criminal history
2. social history
3. institutional history
4. educational history
5. employment history
6. family history
7. military history
8. drug and/or alcohol histories
9. any other pertinent information.

Offenders will be interviewed to verify information in their records. Offenders may be punished through the disciplinary process for giving false information during interviews. A summary of all information collected on each offender will be used to help in the classification process.

Sociology II interviews are not completed on SAFP intake facilities.

**I. Segregative Classification**

A Segregative classification is assigned to every offender based on the offender's age and previous incarceration. The Segregative classes are:

| | | |
|---|---|---|
| I | First Offender | 21 years of age or less |
| IA | First Offender | 22-25 years of age |
| IB | First Offender | 26 years of age or older |
| II | Second Offender | 21 years of age or less |
| IIA | Second Offender | 22-25 years of age |
| IIB | Second Offender | 26 years of age or older |
| IIC | Multi-Offender | 26 years of age or older |

**J. Institutional Offenders**

The State Classification Committee (SCC) and designated staff of the Classification and Records Office (CRO) will determine the first unit to which each Institutional offender will be sent. Offenders do not have the right to choose their unit of assignment. Offenders are assigned to units by the SCC after their interviews and testing are completed.

Offenders spend the first few weeks going through the diagnostic process. Data is collected on each offender. The SCC and CRO staff uses this data to place offenders with similar characteristics on units or facilities together. The SCC and CRO staff will make its decision based on:

1. all information collected,
2. the offender's safety needs,
3. the offender's security needs, and
4. the offender's treatment needs.

Based on 1-4 above, the SCC may also recommend the offender's:

1. level of supervision (custody level),
2. housing assignment, and
3. job assignment.

**K. State Jail Offenders**

Under legislation that established the State Jail felony, state jail offenders are housed in facilities closest to their county of conviction.

1. Offenders convicted of a fourth degree (or state jail) felony and sentenced by a court to serve a sentence of up to 24 months in one of TDCJ State Jail facilities designated to serve the county (or counties) in which their conviction occurred.

2 There are nine (9) designated state jail service regions served by one or more state jail facilities; created to provide cost effective, community based incarceration enabling offenders to connect to services in their home communities.

**L. Transfer Offenders**

Transfer Offenders are convicted of 1st, 2nd or 3rd degree offenses and are awaiting assignment to a permanent facility and subject to the classification procedures as stated above. Offenders can be detained in a transfer facility for up to two (2) years before being moved into a permanent facility.

**M. SAFPF Offenders**

Substance Abuse Felony Punishment Facility (SAFPF) offenders are normally assigned to units closest to their county of residence in order to facilitate family visits, family counseling, and continued contact with the offender's community supervision officer (CSO).

**N. Foreign Nationals**

If you are a non-U.S. citizen, you are entitled to have TDCJ notify your country's consular representatives here in the United States. A consular official from your country may be able to help you obtain legal counsel, and may contact your family and visit you in detention, among other things. If you want TDCJ to notify your country's consular officials, you can request this notification now by advising an intake staff member or at any time in the future by contacting the classification office on your unit.

If you are a non-U.S. citizen and are a citizen of one of the following countries you MUST advise TDCJ immediately. It is mandatory that your country's consular representatives in the United States be notified that you have been detained. After your consular officials are notified, they may call or visit you. You are not required to accept their assistance, but they may be able to help you obtain legal counsel and may contact your family and visit you in detention, among other things.

Algeria
Antigua and Barbuda
Armenia
Azerbaijan
Bahamas, The
Barbados
Belarus
Belize
Brunei
Bulgaria
China
Costa Rica
Cyprus
Czech Republic
Dominica
Fiji
Gambia,
Georgia
Ghana
Grenada
Guyana
Hong Kong
Hungary
Jamaica
Kazakhstan
Kiribati
Kuwait
Kyrgyzstan
Malaysia
Malta
Mauritius
Moldova
Nigeria
Philippines
Poland (non-permanent Residents Only)
Romania
The Russia
Saint Kitts and Nevis
Saint Lucia
Saint Vincent and the Grenadines
Seychelles
Sierra Leone
Singapore
Slovakia
Tajikistan
Tazania
Tonga
Trinidad & Tobago
Tunisia
Turkmenistan
Tuvalu
Ukraine
United Kingdom
U.S.S.R.
Uzbekistan
Zambia
Zimbabwe

SAFPF offenders are under unique guidelines related to early release and/or parole, and should check with unit administrators for assistance in understanding which, if any, apply to their individual situation.

**E. Time Credit Dispute Resolution Process**

The TDCJ has established a dispute resolution process for offenders who allege their time credits are in error. Complaints regarding time credits cannot be resolved through the Offender Grievance Process.

Institutional Offenders

Offenders must contact the Classification and Records Office (CRO) by submitting an Offender Time Credit Dispute Resolution Form (CL-147) to the CRO.

State Jail Offenders

Offenders must submit the CL-147 form to the Unit Intake Coordinator for resolution.

Upon receipt of correspondence, the CRO or Intake Coordinator_will investigate the allegations. If a correction to time is made, the offender will be provided a new time slip or a commitment data form after the correction. If the CRO finds no error in the time-served credits, the offender will be provided a written statement from the Custodian of Offender Records, certifying the credits to be correct based upon documents received by TDCJ.

Offenders may not file a time-credit error in an application of a Writ of Habeas Corpus until:

1. A final certification decision from the CRO has been received by the offender; or,
2. More than 180 days has passed since offender filed the complaint with the Custodian of Offender Records, and no response has been received.
3. Offenders who are within 180 days of their presumptive parole date, date of release to mandatory supervision, or date of discharge may use either this internal time credit dispute resolution procedure, or submit their application directly to the court, if the Writ of Habeas Corpus is not otherwise barred.

**F. Individualized Treatment Plan**

The Individualized Treatment Plan (ITP) is a plan of treatment for an individual offender. The plan outlines programmatic activities and services for an offender and prioritizes his participation in recommended programs based on the offender's needs, program availability and applicable parole or discharge date. An offender's needs for programs are ranked and prioritized to assess the immediacy for placement. Treatment department professionals develop the ITP, interview the offender, assess all available information and record their judgments concerning specific programming needs. Treatment department professionals will be responsible for tracking and reviewing all offenders newly assigned to TDCJ for ITP reviews within two weeks of the offender's arrival on the unit. Any conflicts or problems that may arise from ITP recommendations concerning program or job scheduling will be referred to the UCC for resolution.

The ITP serves to establish institutional conditions required by statute for an offender to be considered for release on parole as defined by Texas Government Code, Section 508.152. Some of these programs are mandatory and non-attendance can result in disciplinary action, loss of good conduct time or negative parole consideration.

**G. Collection of DNA Blood Samples**

All offenders received by the TDCJ at a diagnostic and reception unit shall be reviewed to determine if they are subject to DNA specimen collection. TDCJ is required by law to collect a DNA blood sample from all offenders who are received on or after 4-01-04 with a new 1st, 2nd or 3rd degree felony conviction. Those offenders returning as a technical violator only may or may not be required to submit to a DNA test, dependant upon criteria established by law.

Offenders received prior to 4-01-04 who have present or prior convictions for Murder, Capital Murder, Aggravated Assault, Burglary of a Habitation and offenses for which sex offender registration is required will also be required to submit to a DNA test if a sample has not previously been obtained. This determination will be based on the criteria established by law.

If an offender refuses to be tested, the Unit Health Administrator will inform the Building Major and the Chief of Classification, who will instruct security staff to charge the offender with the appropriate disciplinary offense for refusing to submit to DNA specimen collection. The disciplinary report will be brought before a major disciplinary hearing. If found guilty and if the offender has still not provided the blood sample, the offender shall be assessed progressive disciplinary sanctions for the level two offense. Cases may be filed at a rate of one per month until compliance is achieved, unless an offender's projected release date is imminent and may be delayed through disciplinary action, in which case another disciplinary report may be filed during the month.

**III. STANDARDS OF BEHAVIOR**

The standards of behavior outlined below apply to G1/J1, G2/J2, G3 and G4/J4 custody general population offenders. The conditions in disciplinary status, administrative segregation/special management, lockdown or G5/J5 custody may vary from the following:

**A. Personal Cleanliness and Grooming**

1. Offenders will be given the opportunity to shower. Offenders will maintain good personal hygiene.

2. Offenders will brush their teeth daily.

3. Male offenders must be clean-shaven. No beards, mustaches or hair under the lip will be allowed.

4. Male offenders must keep their hair trimmed up the back of their neck and head. Hair must be neatly cut. Hair must be cut around the ears. Sideburns will not extend below the middle of the ears. No block style, afro, natural or shag haircuts will be permitted. No fad or extreme hairstyles/haircuts are allowed. No mohawks, tails, or designs cut into the hair are allowed.

- Be assigned to TDCJ at least six (6) months prior to submitting a request for craft shop participation,
- Have a clear disciplinary record for the prior six (6) month period (no major or minor disciplinary case convictions),
- Have a job assignment (except for offenders who are medically unassigned), and
- Have sufficient funds on deposit with the Offender Trust Fund to make initial purchase of supplies/materials as follows:

*Required start-up funds:*

| | |
|---|---|
| ▪ Basic Arts: | Minimum of $ 25.00 |
| ▪ Woodworking: | Minimum of $ 50.00 |
| ▪ Leather working: | Minimum of $100.00 |
| ▪ Jewelry: | Minimum of $100.00 |
| ▪ Other crafts: | Minimum of $ 25.00 |

Offenders must satisfy the above criteria before submitting an I-60 request to participate in the unit craft shop program and be approved by the Warden or his designee.

Advanced in-cell piddling programs exist at the Warden's discretion. Advanced in-cell offenders must meet the above rules in order to participate in the craft shop program.

The Craft shop program is a privilege. The Warden may take away an offender's piddling privileges at any time.

**4. In-Cell Art**

All offenders who are eligible for commissary purchases may purchase basic art supplies from the commissary for use in their cells. Once purchased, basic art items shall be considered personal property with the appropriate restrictions applied regarding storage and use. The following provisions also apply:

- The sale of any artwork from the in-cell basic art program is prohibited.
- Basic art items purchased by an offender for in-cell artwork shall be used for recreational purposes only.
- When an offender has abused the privileges extended with the in-cell basic art program, his privileges may be restricted in accordance with TDCJ disciplinary rules and procedures.

**C. Health Services**

Health care is provided for offenders who have medical, dental, psychiatric and psychological problems. Also, physically handicapped offenders receive services through the Physically Handicapped Offender Program.

**1. Medical Services**

The health needs of each offender are assessed when he/she enters prison. Basic medical services including emergency care, sick call and ongoing care for chronic illness are offered at each unit. Licensed medical professionals provide health care. Offenders who need special care may be sent to a unit, which

provides the specific service(s), needed. Offenders needing hospital care are sent to the TDCJ Hospital at Galveston or to other hospitals which serve TDCJ.

Offenders who have trouble seeing, hearing, speaking or walking can get help from Medical Services. Their problems are assessed and care is provided if needed. All offenders may access the medical department by submitting a sick call request slip or by direct request to a security officer or supervisor. In accordance with state law, if a visit to a TDCJ facility health clinic meets offender health care co-payment criteria, a $3.00 co-payment fee will be charged. Access to health services will be provided regardless of the offenders' ability to pay this fee. Specific details on unit procedures will be provided at unit orientations and will also be provided in writing. In the event of an emergency, offenders may request a correctional officer or supervisor to contact the medical department on their behalf. The medical department staff will provide direction as to disposition based on their clinical judgment.

**2. Dental Services**

All offenders may ask for dental care. Offenders can use the Sick Call Request form to ask for an appointment. The Sick call request slip can be found in the housing areas. The dentist decides who needs treatment and when treatment should be given. The most pressing needs are treated first. Swelling, pain, or infection is urgent. Filling a small cavity or just cleaning teeth is not urgent. An offender with these problems may have to wait to be treated.

Offenders are given a toothbrush and tooth powder at the Reception and Diagnostic Centers. When they get to their unit of assignment, they will be given information about oral hygiene aids available. Offenders will get instructions on how to keep their teeth and gums in healthy condition. Offenders must be able to demonstrate that they can keep their teeth and gums healthy before receiving dental care other than emergency or urgent dental care.

The type of dental care offered includes:

a. examination
b. X-ray
c. cleaning
d. dental care and health education
e. silver and tooth-colored fillings
f. stainless steel temporary crowns
g. pulling of teeth and oral surgery

Dental services **NOT** provided include:

a. gold or porcelain crowns or bridges
b. braces
c. dentures (unless there is a severe medical condition requiring them)

### 3. Pharmacy Services

Medicine may be obtained at the pill window or the commissary. Prescriptions may be picked up at the pill window after 24 hours. The offender will need his ID card to get medicine at the pill window. Some prescriptions may take longer to arrive. The person at the pill window can answer questions about the medication.

Offenders are allowed to carry some medications on their persons, as determined by the prescribing doctor. The offender may be given the entire card of medication to be locked up with his personal belongings.

Medication such as vitamins and some over-the-counter medicine can be purchased in the commissary. The commissary officer can help offenders to know what medicines are sold there.

### 4. Psychiatric and Psychological Services

Psychiatrists, psychologists, nurses, and other trained professionals are available to help with mental health issues. Offenders can use form I-60 to ask for mental health services. For immediate assistance, offenders may contact a correctional officer or supervisor who will notify the mental health or medical department.

An offender may be sent to a special Psychiatric Center unit if his problems are severe. Trained staff can help an offender with these problems to get well.

**Mental Health Services provides the following:**

- Evaluates offenders for potential mental health problems.
- Diagnoses mental illness and determines which method(s) of treatment will be most effective and beneficial to offenders.
- Provides access to mental health services for offenders who send a sick call request (SCR) or an I-60. Access to services will include crisis intervention. Access to services may include "follow-up" appointments.
- Provides treatment to mentally ill offenders. This may or may not include medication.
- Ensures confidentiality, but recognizes its limits within the prison.

**Mental Health Staff cannot:**

- Approve, authorize or make telephone calls for offenders.
- Change custody levels, line classes, etc.
- Run the unit or judge unit operations or employees.
- Tolerate threats. Offenders are responsible for their own behavior.

### 5. Mentally Retarded Offender Program

The Mentally Retarded Offender Program helps offenders with severe learning problems. Test scores and other information help staff decide who needs this special help. Offenders learn to read and do math. They learn to work and to live with other people. Services include:

    a. case management
b. basic school work
c. job training
d. psychological help
e. counseling
f. recreation and
g. work opportunities

Offenders who need this type of help are also assisted with finding these services in the freeworld when they are released.

**6. Complaints about Medical Services**

Any offender who feels that he/she did not receive medical care that is necessary and appropriate should contact the treating professional at their unit of assignment. If the offender is unsatisfied with the response from the treating professional, each facility has an informal complaints process in place. The offender should submit an I-60 and/or letter to the facility based complaint coordinator, who is the facility Health Administrator. If the offender continues to be dissatisfied with the response from this process, the offender has the option of filing a grievance (I-27) through the Offender Grievance Process.

*As of September 1, 2004, the Patient Liaison Program was removed as an avenue for offenders to contact concerning their dissatisfaction with medical services.

**D. Substance Abuse Treatment**

The Substance Abuse Treatment Program provides assessment and chemical dependency treatment service to offenders incarcerated in both state prisons and state jails.

1. Intensive treatment is provided on prison units located strategically throughout the state. Intensive treatment is facilitated by the Therapeutic Communities that include cognitive and behavior therapy, twelve step programs, and secular recovery programs. These are available to assist offenders in living a sober and responsible lifestyle.

   a. There are two types of intensive therapeutic community programs.

      (1) LeBlanc and Hamilton Units offer programs that are approximately 6 months in duration. These are pre-release programs designed to help chemically dependent offenders with their recovery and reentry to the community. The Parole Board determines which offenders attend these programs.

      (2) There is also an In-Prison Therapeutic Community Program for males at the Kyle Unit and for females at the Halbert Unit. These use the same treatment principles as the pre-release programs. Offenders with a FI-5 vote from the Parole Board may be placed in these programs.

2. Offenders in State Jail or State Prison units generally may attend self-help groups such as Alcoholics Anonymous, Narcotics Anonymous, or Secular Organization for Sobriety.

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 01/07 | NUMBER: E-34.1 |
|---|---|---|
| | Replaces: 3-10 | Page 1 of 1 |
| | Formulated: 10/85<br>Reviewed: 02/11 | |

**HEALTH APPRAISAL OF INCOMING OFFENDERS**

PURPOSE: To describe a mechanism for assessing the health status of incoming offenders.

POLICY: A comprehensive medical evaluation will be completed on all new incoming offenders within seven days of their arrival in the system. Offenders who have had a health appraisal in TDCJ within the previous ninety (90) days are evaluated at the discretion of the facility health authority/medical director.

PROCEDURE:

I. Reception and Diagnostic Facilities (New Offenders)

A. Appraisal of new offenders consists of obtaining personal and medical baseline data; medical, mental health and dental histories; physical, dental and mental health assessments; and diagnostic procedures as needed.

B. Offenders are screened for communicable diseases and pregnancy.

C. Offenders are provided with appropriate inoculations.

D. Offenders' health records are requested from free-world physicians as needed.

E. Offenders identified as requiring further mental health assessment are interviewed, tested and evaluated by a qualified mental health professional. (See Health Services Policy E-35).

F. The automated "Health Summary for Classification" screen is updated as needed for each new arrival (see Health Services Policy A-08.4).

G. Medications, appointments and referrals are scheduled as appropriate, based on the results of the health appraisal.

Index: Diagnostic, health appraisal
Health assessment

Reference: 2008 NCCHC Standard P-E-03, Transfer Screening (essential)
ACA Standard 4-4362 (Ref. 3-4343), Health Screens (Mandatory)
ACA Standard 4-4365 (Ref. 3-4345) Health Appraisal (Mandatory)

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 04/07 | NUMBER: A-08.4 |
|---|---|---|
| | Replaces: 08/97 | |
| | Formulated: 8/87<br>Reviewed: 04/11 | Page 1 of 2 |
| **OFFENDER MEDICAL AND MENTAL HEALTH CLASSIFICATION** | | |

**PURPOSE:** To provide a standardized system of classifying medical and/or mental health limitations for the offender population incarcerated within the Texas Department of Criminal Justice (TDCJ).

**POLICY:** Offenders incarcerated within TDCJ will be assessed for medical and/or mental impairments by qualified healthcare personnel (see Attachment A) who will assign each offender appropriate restrictions related to (1) housing, (2) physical activities and work, (3) disciplinary process, (4) individual treatment plan, and (5) transportation. Restrictions will be indicated on the Health Summary for Classification (HSM-18).

**PROCESS:**

I. Each offender will undergo medical and mental health assessments by trained health services personnel during the intake process and appropriate limitations/restrictions will be assigned and entered on the Health Summary for Classification (HSM-18) screen.

II. The HSM-18 will be reviewed and, if indicated, updated whenever an offender is newly assigned to a facility or returns from an off-site specialty clinic, infirmary, or hospital.

III. Recognizing that an offender's condition may change and/or opinions may differ among health care professionals, an offender's HSM-18 may be reviewed and revised at the discretion of a physician, dentist, psychiatrist, mid-level provider, or Master's Level or higher Psychologist. HSM-18 review with appropriate updating is *required* whenever there is a *significant* change in the offender's medical or mental status.

IV. All changes in the Health Summary for Classification will include documentation of the reason(s) or rationale for the change. Changes may be based upon chart review alone but if challenged, an examination of the offender must be conducted. This examination/evaluation will be made at no charge to the offender. Pertinent findings (both positive and negative) to support the examiner's HSM-18 decision(s) will be documented in the medical record.

V. The final authority as to whether an offender's HSM-18 limitations/restrictions are correct will be the facility Medical Director or psychiatrist (as appropriate) at the offender's current facility of assignment. Higher level intervention (Regional/District/Division Medical Director) will occur only on a case by case basis in unusual or extraordinary situations.

VI. All limitations/restrictions regarding an offender's housing, work, disciplinary process, transportation, and individual treatment plan requirements will be documented in his/her medical record. Should discrepancies exist between the Health Summary for Classification

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 04/07<br>Replaces: 08/97<br>Formulated: 8/87<br>Reviewed: 04/11 | NUMBER: A-08.4<br>Page 2 of 2 |
|---|---|---|
| **OFFENDER MEDICAL AND MENTAL HEALTH CLASSIFICATION** | | |

(HSM-18) screen and the medical record, the medical record is the prevailing authority pending clarification from an appropriate healthcare provider.

VII. Medical and psychiatric diagnoses will be assigned appropriate Alert Codes and the Alert Codes entered into the TDCJ data processing system within 5 working days. (Reference: Health Services Data Processing Manual)

Reference: 2008 NCCHC Standard P-A-08, Communication on Patients' Health Needs (essential)
ACA Standard 4-4396 (Ref 3-4377)
ACA Standard 4-4399 (Ref 3-4369)

A-08.4 Attachment A
Effective: 2-15-2011 Reviewed: 02/11

# GUIDELINES FOR COMPLETING THE HEALTH SUMMARY FOR CLASSIFICATION FORM

The purpose of the "Health Summary" form is to provide medical and mental health information for each offender to assist the classification committee in making appropriate assignments. Facility housing, work and transportation restrictions must be based upon orders by a physician, mid-level provider, dentist, or psychiatrist and are entered into the HSM-18 computer program. Disciplinary and ITP restrictions may be based upon recommendation of a qualified mental health provider, nurse, physician or mid-level provider. Reference the HSM-18 users guide for data entry instructions.

The specific information to be placed in each item of the form is described below:

I. **Facility Assignment** -- The following facility assignments are requested by E-form through the office of the TDCJ Health Services Liaison.
   A. **No Restrictions** -- In terms of health consideration, the offender can be placed on any facility in the system. (This is the default selection).
   B. **Barrier-Free Facility** -- This category is intended for wheelchair bound out-patient offenders and must be approved by the Clinical Director of Assistive Disability Services (ADS).
   C. **Single Level Facility** -- This category is for offenders who are physically unable to climb stairs and are therefore unable to access approved programs on a multi-level facility.

II. **Housing Assignments** - Information to complete these categories should be obtained from the physical exam, doctor's orders, and/or the Individualized Treatment Plan.
   A. **Basic Housing**
      1. **No restrictions** -- This means that from a health standpoint, the offender can be assigned to any available housing.
      2. **Single Cell Only** -- The following types of offenders must be single celled:
         a. physically handicapped offenders as recommended by their Individualized Treatment Plan;
         b. mental health patients at the recommendation of the treating psychiatrist or psychiatric mid-level provider.
      3. **Special Housing** -- (Housing with patient with like medical condition). See Infection Control Manual. This designation must be entered on all patients who meet the criteria contained in the Infection Control Manual. This is not a housing type (cell block vs. dorm) instruction to classification. This notifies unit classification that if for security reasons an offender must be housed on a cell block and he/she meets specific classification guidelines, that a suitable housing partner must be located by communicating with Health Services.
      4. **Cell Block Only** -- For offenders who are psychiatrically inappropriate for dormitory housing.
   B. **Bunk Assignment**
      1. **No Restrictions** -- This means the offender can be assigned either the upper or lower bunk.
      2. **Lower Only** -- This category should be used for anyone whose medical condition creates major difficulties with climbing into an upper bunk. Examples include anyone who is feeble or infirm due to age, conditions such as disabling arthritis, amputation, paraplegia, epilepsy, sensory disturbances, morbid obesity, or significant back pathology (e.g. grade 2 or > spondylolisthesis), significant CV or Respiratory Disease, etc. (This restriction impacts heavily on facility operations and should be used judiciously).

C. **Row Assignments**

1. **No Restrictions** -- This means the offender can be placed on any row.
2. **Ground Floor Only** -- This category should be used for individuals whose medical or mental health (secondary to heat) condition contraindicates climbing stairs or living on a higher row. Examples include offenders whose condition requires a wheelchair (Omitted space between "wheel" and "chair), walker, or two crutches; bilateral lower extremity prostheses; severe lower extremity instability without prescription brace; severe CHF and/or CAD with moderate to severe angina; and/or severe COPD (requires respiratory consultation).

D. **Wheelchair Use** – Please mark appropriately:

1. No restriction: Check this box for offenders who are not wheelchair dependent.
2. Provider ordered: Check this box for offenders who have been approved for wheelchair use by the Clinical Director of Assistive Disability Services; or indicate number of days wheelchair pass is issued to offenders who are temporarily wheelchair dependent (i.e. post-operative conditions)
3. Utility Use: Check this box for offenders who the provider feels are appropriate for minimal wheelchair use on the unit only. (i.e. offenders who experience weakness or are unable to walk long distances) due to a temporary condition. The provider should indicate the number of days for which the wheelchair pass is issued.

**III. Work Assignment/Restrictions**

A. These categories are intended to reflect restrictions of six days or longer.

B. Indicate all of the following work restrictions that apply:

1. **Medically Unassigned** - This means the offender should not be given a regular work assignment due to a medical condition. (Offender may attend school or pre-release programs if approved by HSL.)
2. **Psychiatrically Unassigned** - This means the offender should not be given a regular work assignment due to mental illness. (Offender may attend school or programs).
3. **Sedentary Work Only** - Assign to work that is limited to a seating position and that does not require strenuous activity.
4. **Four Hour Work Restriction** - May be assigned to any job commensurate with HSM-18 work restrictions for four hours only.
6. **Excuse From School/Programming** - May not attend regular schooling due to medical or mental health conditions
7. **Limited Standing** – Assign to work where offender may elevate lower extremities for 10 minutes each hour. If this is too restrictive, consider "Sedentary Work Only".
8. **No Walking > ____ yards** – Indicate general distances (50, 100, 1000, etc.) which an offender should not exceed on the job due to physical limitations. This number should not be less than the distance required to sustain activities of daily living (distance to chow hall, shower, medical department.)
9. **No Lifting > ____ lbs.** – Indicate the number of pounds the offender can safely lift in light of an existing impairment.
10. **No Repetitive Bending at Waist** - Assign to work not requiring repetitive or frequent bending at waist. This applies to individuals with severe obesity, back problems, vertigo, etc
11. **No Repetitive Squatting** - Assign to work not requiring *repetitive* or frequent bending of the knees. This applies to individuals with moderate to severe lower extremity arthritis, internal derangements of the knee, etc.

12. **No Climbing** - Assign to work not requiring the use of ladders and/or scaffolding. This applies to individuals with unstable cardiovascular or pulmonary disease, severe joint problems, seizure disorders, etc. If lower row housing is medically necessary as indicated under II.C. #2 Ground Floor Only, then work assignment should also exclude jobs requiring the use of stairs, step stools, and/or steep inclines.
13. **Limited Sitting** - Assign to work where prolonged sitting is not required or where standing for at least 10 minutes every hour is allowed. This applies to individuals with severe hemorrhoidal disease, fractured coccyx, etc.
14. **No Reaching Over Shoulders** - This applies to individuals with shoulder functional restrictions.
15. **No Food Service** - This applies to individuals with diseases that could be transmitted via food products. See Infection Control Manual. Consult the office of Preventive Medicine as needed.
16. **No Repetitive Use of Hands** - Restrict from work requiring hand dexterity or grip strength and/or work, which causes or aggravates cumulative trauma syndromes of the hand. This applies to individuals with thumb or multiple finger amputations, carpal tunnel syndrome, severe hand or wrist joint problems, etc.
17. **No Walking on Wet, Uneven Surfaces** - Restrict from work routinely or frequently requiring walking on slippery, sticky, or uneven surfaces.
18. **Do Not Assign to Medical** - This applies to individuals who could be compromised by working around medically contaminated matter.
19. **No Work in Direct Sunlight** - This applies to individuals with conditions significantly aggravated by exposure to direct sunlight for which sunscreen and/or other protective clothing or equipment is inadequate. Also included are individuals on medications that predispose to serious sunlight reactions.
20. **No Temperature Extremes** - This applies to individuals with a history of heat stroke, Reynaud's Phenomenon, medication sensitivities, etc.
21. **No Humidity Extremes** - Restrict from work requiring exposure to very dry or very moist air. This applies to individuals with moderate to severe asthma. See Infection Control Manual.
22. **No Exposure to Environmental Pollutants** - Restrict from work in areas of high concentrations of pollen or dust. This applies to individuals with severe allergic rhinitis with recurrent sinusitis or conjunctivitis and/or moderate to severe reactive airway disease. This restriction is to be individualized and is not intended for all asthmatics or individuals with allergic rhinitis. See Infection Control Manual.
23. **No Work With Chemicals or Irritants** - Restrict from work exposure to identified irritants such as poison ivy, detergents and irritating fumes, smoke or chemicals. (Water is considered an irritant if prolonged exposure produces extreme skin reaction or disease.)
24. **No Work Requiring Safety Boots.**
25. **No Work Around Machines With Moving Parts** - This applies to individuals with seizure disorder or any condition (disease or pharmaceutically induced), which could impair alertness.
26. **No Work Exposure to Loud Noises** - This applies to individuals who require strict hearing conservation measures, individuals with severe anxiety disorders, etc.

**IV. Disciplinary Process:**

A. **No restrictions** - This means that no special consideration needs to be made for health reasons prior to a disciplinary action being taken.

B. **Consult representative of mental health department before taking disciplinary action** - This category should be checked for diagnosed psychiatric patients, mentally retarded offenders and for

individuals with certain psychological problems such as suicidal offenders at the discretion of the mental health team.

C. **Consult representative of the medical department before taking disciplinary action**. Certain medical conditions (e.g. patients on dialysis, mobility impairments) may require special consideration prior to disciplinary actions. In these cases, the physician must note this in the health record.

V. **Individualized Treatment Plan** - This is the classification committee process which identifies areas of treatment, schooling, vocational training and job plan best suited to the individual rehabilitative effort. This treatment plan can be greatly impacted for offenders with significant physical or mental limitations (e.g., mobility, endurance, environmental or cognitive impairments).

A. **No Restriction** - having no medical or mental health conditions requiring planning input.

B. **Medical Representative Required** - due to significant medical restrictions, input is required.

C. **Mental Health Representative Required** - due to significant mental illness, input is required.

VI. **Routine Transportation Restrictions**

A. **No Restriction** - In terms of physical limitations, the offender may be transported routinely.

B. **EMS Ambulance** - This applies to offenders with chronic medical/physical conditions that require skilled medical attendants during routine transport. This does not apply to all infirmary patients.

C. **Wheelchair Van** - This applies to offenders who are wheelchair confined and can sit up unattended during routine transfers.

D. **Multi-Patient Vehicle (MPV)** – The offender is not medically appropriate for chain bus, ambulance, unit van or wheelchair van. (MPV transportation is scheduled by UTMB clerical staff contacting UTMB Patient Evacuation Command Center.)

| Hutchins Unit<br>Facility Process Manual | Effective Date: 10/98<br>Reviewed: 11/09<br>Replaces: 3-11a<br>Formulated: 4/91 | NUMBER: A-08.7<br>Page 1 of 1 |
|---|---|---|
| PULHES SYSTEM OF OFFENDER MEDICAL AND MENTAL HEALTH CLASSIFICATION | | |

**FACILITY POLICY:**

To provide medical information to the authorized users in the form of a medical classification system and to provide the capability for systemic tracking of the medical and mental health status of the Texas Department of Criminal Justice (TDCJ) offender population.

TDCJ is committed to standardized classification process of medical and mental health illnesses, which will facilitate the assignment of housing, work, and programs that are compatible with each offender's health conditions.

**FACILITY PROCESS:**

I. Following the health appraisal of new arrivals to the TDCJ system the diagnoses and limitations will be documented on the Report of Physical Examination (HSM-4) form. Based on the qualified provider's assessment of the offender's medical and/or mental health condition the offender will be assigned diagnostic designators, codes for limitations, and modifiers for indicating prognosis (see Attachment A). This medical profile serial system is known as the PULHES system.

II. The offender's diagnoses will be abstracted from the HSM-4, assigned the appropriate Medical Alert Code, and entered into the Medical Information --- Profile Entry screen of the Health Summary for Classification System. (Reference: Health Summary for Classification User Manual)

III. When the examining facility clinician makes a medical/psychiatric judgment about an offender's current health status and subsequent level of ability or disability, the clinician reviews the medical/psychiatric classification for appropriateness and if indicated includes an order in the offender's medical record on an HSM-1 or Physician Order Sheet, indicating the current prescribed designators, codes, modifiers, and diagnostic justifications for each PULHES factor. An order that reflects review of the entire PULHES form is required with every change. The PULHES order is processed as described in Section II of the policy.

IV. The Health Summary for Classification (see Health Services Policy and Procedure A-08.4) should be reviewed and checked for congruity with the Offender's PULHES.

Reference:

Attachment C
A-08.7 (04/07)

## GUIDELINES FOR CODING PULHES

*Physical Capability*. This factor concerns general physical capacity. It includes conditions of the cardiovascular system, respiratory system, gastrointestinal system, genitourinary system, nervous system, hemopoietic system allergic, endocrine, metabolic and nutritional disease, dental conditions, diseases of the breast, and other defects and diseases which do not fall under other specific factors of the system. In arriving at a profile under this factor, it is appropriate to consider physique and age.

U. *Upper Extremities*. This factor concerns the hands, arms, shoulder girdle, and spine (cervical and thoracic) in regard to strength, range of motion and general efficiency.

L. *Lower Extremities*. This factor concerns the feet, legs, pelvic, girdle, lower back, and lower spine (lumbar and sacral) in regard to strength, range of motion, and general efficiency.

H. *Ears and Hearing*. This factor concerns auditory acuity.

E. *Eyes and Vision*. This factor concerns visual acuity.

S. *Psychiatric*. This factor concerns personality, emotional stability, intellectual functioning and psychiatric disorders.

| Designators | Code | Limitations | Examples |
|---|---|---|---|
| 1. | A. | No assignment limitations | *No significant functional or physiological impairment. Mental disorder in full remission. |
| 2. | B. | Minor limitations in assignment | *Loss of single digit, except thumb or index, mild visual deficits, mild to moderate hearing loss, obesity, age: 40-49, small physique. |
| 3. | C. | No prolonged walking. No lifting more than specified pounds, Restricted physical activity. | *Cardiovascular disease, poorly controlled hypertension, poorly controlled diabetes, severe arthritis, severe spinal column pathology, shoulder pathology, amputations of upper or lower extremities, disabling hands. Ulnar and radial nerve palsies, age: 55 and above. |
| 3. | D. | No exposure to heavy air pollutants. Restricted physical activity. | *Asthma, emphysema, active tuberculosis or other pulmonary diseases. |
| 3. | E. | Restricted to lighter, slower activities. | *Well controlled hypertension, chronic back problems, cirrhosis, controlled diabetes, gross obesity, multiple finger amputations, Age: 50-54. |
| 3. | G. | No work assignment where sudden loss of consciousness would be dangerous or where awareness of environment is required in order to avoid injury. | *Seizure disorders, disorders producing syncopal episodes or vertigo, severe hearing loss, poor vision or blindness (one eye), loss of coordination. |
| 3. | K. | No work assignment requiring excessive exposure to sunlight or high environmental temperatures. | *History of heat strokes; extensive burn scars, history of skin malignancy or other skin disease aggravated by sunlight, which may potentiate chronic use of medication. |
| 3. | M. | Multiple codes. | *Example: An inmate with organic heart disease and epilepsy will be classified as: P3MP.M=C&G. (Please put this notation under REMARKS). |
| 3. | N. | No jobs requiring understanding of complex instructions. | * Moderate mental disorders (non-psychotic depressive disorders, or schizophrenic disorders, organic brain syndrome, psychosomatic disorders, retardation. |
| 4. | P. | Assignment only where secondary level medical care is available. Strict limitations to work assignment. | *Seriously ill or disabled. Those requiring continuous medical or psychiatric supervision. Deaf mutes, wheelchair confinement (paraplegia), blindness (both eyes). Severe mental disorders (psychosis retardation, organic brain syndrome). |

R. Remediable. This modifier indicates that correction or treatment of the condition is possible and medically advisable. An individual with this modifier will be re-evaluated at least every three months with revision of the profile recorded.

T. Temporary. This modifier indicates that with further healing or convalescence, a higher physical capacity is expected to prevail. An individual with this modifier will be medically re-evaluated every three months with revision of the profile recorded. Do not apply modifier to chronic disease entities.

P. Permanent. This modifier indicates that no significant change in condition is expected.

H. History. This modifier indicates a history of mental illness identified during the intake process or former classification as a psychiatric patient while incarcerated, but patient is in full remission. An individual with this modifier will be screened at least annually. Anyone classified as a psychiatric patient can NEVER revert to S1AP classification.

**HEALTH SERVICES POLICY #A-08.7**
**ATTACHMENT A** (Page 1 of 3)

**BACKGROUND:** The Medical Classification notice is designed as a medical profile serial system indicating the current health problems, physical limitations, psychiatric status, and prognosis of TDCJ-ID offender patients. This system focuses attention on medical problems, treatment programs, and continuity of care, and enhances identification of special needs offenders whose mental and/or physical condition requires special handling or treatment by staff.

## A. PROCEDURE FOR INTERPRETING PULHES CLASSIFICATION OF BODY FUNCTIONS

The reverse side of the Report of Physical Examination (HSM-4) describes the factors of PULHES and gives guidelines pertaining to the use of appropriate designators, codes for limitations, and modifiers indicating prognosis.

In structuring the PULHES system, the following key components are included: (1) Body functions, mental capabilities, and organs are expressed as alphabetic factors (P-U-L-H-E-S) [P=Physical Capability, U=Upper Extremities, L=Lower Extremities, H=Ears and Hearing, E=Eyes and Vision, S=Psychiatric], (2) levels of functional capacities are described as numerical (1,2,3,4) designators with "1" denoting a high degree of physical or mental fitness, "2" reflecting a condition which may require minor limitations in work assignment, "3" reflecting restrictions of work or housing assignments which are further specified by the attendant alphabetic code, and "4" which designates strict limitations in work, housing, and unit assignment, (3) limiting factors are noted as alphabetical codes (A,B,C,D,E,G,K,M,N,P), and (4) individual prognoses are noted as alphabetical modifiers (R,H,T,P).

Note that the designator "1" requires a code "A" and modifier "P" when under a body functions category but may have a "P" or "H" modifier under the psychiatric factor. The designator "2" requires a code "B" but may have a "P", "R", or "T" modifier as deemed appropriate. The designator "4" requires a code "P" but may have a "P", "R", or "T" modifier. Note that the code "M" is used when an individual has more than one limitation code within one body or psychiatric factor category. A notation explaining the multiple codes should be included in the medical record notes.

**HEALTH SERVICES POLICY #A-08.7**
**ATTACHMENT A** (Page 2 of 3)

## B. PROCEDURE FOR INTERPRETING PULHES CLASSIFICATION OF OFFENDERS WITH PHYSICAL HANDICAPS OR HEARING, SPEECH, AND VISUAL ACUITY DEFICITS

Offender patients who are paraplegic, hemiplegic, or quadriplegic and require wheelchair confinement and/or continuous medical supervision should be classified as U-4-P and/or L-4-P as appropriate.

Offender patients who have evidence of antibodies to human immunodeficiency virus should have "chronic infectious disease" as a diagnosis in the notes section and should be coded as follows:

P-2-B-P — *A1 and A2 under the 1993 revised classification system for HIV infections

P-3-E-P — Persistent generalized Lymphadenopathy: (B1, B2) symptomatic but not AIDS defining illness.

P-3-C-P — T-4 lymphocyte count below 200 and/or evidence or history of opportunistic infection in a patient not requiring infirmary care. (*A3, B3, C1, C2, C3)

P-4-P-P — C1, C2 or C3 that may require infirmary care.

The following guidelines should be followed when classifying offenders with hearing and visual acuity deficits:

H-1-A-P — Category 1: hearing is within normal limits and the offender has a normal audiogram.

H-2-B-P — Category 2 and 3: this denotes inmates with mild hearing deficit at higher frequencies and/or at "speech frequencies".

H-2-B-T — this denotes offenders who are suspected of having a mild hearing deficit and require retesting.

H-3-G-P — Category 6 (unilateral loss or unreliable results) and 5a (corrected with hearing aid): this denotes moderate to severe hearing deficits.

H-4-P-P — Category 5b: this signifies profound hearing deficit and requires facility assignment where the services of an interpreter for the deaf are available.

E-2-B-P — This signifies mild visual deficits, which are correctable.

E-3-G-P — This signifies blindness in one eye.

E-4-P-P — This signifies total or legal blindness requiring facility assignment where services of the Physically Handicapped Offender Program for visually impaired offenders are available.

**HEALTH SERVICES POLICY #A-08.7**
**ATTACHMENT A** (Page 3 of 3)

## CODING SYSTEM FOR MENTAL HEALTH FACTOR

**The designator S-3-N-P is not an acceptable code. All mental health inpatients and patients in a sheltered facility for the mentally retarded (MR) will be coded S4--.**

| | |
|---|---|
| S-1-A-P | No diagnosis of mental disorder or history of mental illness |
| S-1-A-H | History of mental disorder, resolved; no history of serious mental illness |
| S-2-B-R | Currently receiving ongoing counseling or monitoring for a mental disorder, behavior problem or emotional condition; not on psychotropic medications |
| S-2-B-T | Currently receiving psychotropic medication for a mental disorder or emotional condition |
| S-2-B-P | DELETED |
| S-3-N-R | Currently receiving ongoing counseling or monitoring for a serious mental illness or history of serious mental illness; not on psychotropic medications |
| S-3-N-T | Currently receiving psychotropic medication for a serious mental illness |
| S-4-P-R | DELETED |
| S-4-P-T | Currently admitted to inpatient mental health care |
| S-4-P-P | DELETED |
| S-4-M-R | (NEW) Currently housed in an MROP facility |

**HEALTH SERVICES POLICY AND PROCEDURE #A-08.7**
**ATTACHMENT B**

## PULHES AND MEDICAL ALERT CODES ENTRY ON FACILITY TERMINALS

The PULHES Classification and the medical alerts are entered on the facility terminal according to the following directions.

### ENTERING PULHES

1. To perform PULHES data entry, depress <PF2> from any of the update screens found in the Health Summary for Classification System (HS01).

2. Enter the "Date Examined" only if a care provider examined the patient. Using the <TAB> function key, move from field to field to enter or change the PULHES Designators, Codes, Modifiers and Medical Alert codes. Do not enter a "P" in the modifier column for the 1AP. 1AP is a default function. To remove a medical alert code, enter "0000" over the code to be deleted. On the top portion of the screen display for the PULHES are designators for Hearing problems, Dentures, Prostheses, Tuberculosis, Hepatitis and if DNA. All default to "N" for the initial receiving patient. Hearing problems, dentures, and prostheses field should be changed to "Y" as required. Tuberculosis and Hepatitis fields should be changed to "Y" if the patient has a history of any, as well last active date recorded. The DNA field should be changed to "Y" if the patient was tested and entry of the date of the test, or "R" to denote refusal of testing and the date he/she refused. Once the data in each field is entered correctly, press <ENTER>. ENTRY COMPLETED ENTER NEXT TDCJ NO. will appear. If changes were made without an exam date, "EXAM DATE NOT MODIFIED" will appear. Press <ENTER> again to accept change. Any time the PULHES screen is changed or updated, a revised Health Summary for Classification (HSM-18) must be printed. Select option "PR" from the main menu of the HS01 screen. Enter "T" and the complete TDCJ # or "S" and the complete State Identification number (SID#, Authority name and title). Press <ENTER> for HSM-18 print job. This will also "cue" the HSM-18 to print at the countroom for their information.

3. All R&T modifiers must have a corresponding Health Summary for Classification restriction for 90 days. * **Non-permanent restrictions do not automatically "fall off". Restrictions must be deleted or changed as they expire.**

   PU - Report PU will list all restrictions that counted down to zero (0) days and were not deleted in the system. The care provider will determine the appropriateness of the R&T modifier. The user must enter "D" and press <SPACE BAR> on the restriction number to delete, or "X" and the number of days to extend the restriction.

   PE - Report PE will list all restrictions due to expire within 6 days. It is the responsibility of the care provider to review/exam for changes or deletions. The user must enter "D" and press <SPACE BAR> to delete restriction on the appropriate day, or change the number of days if the restriction is to be extended.

A-08.7 Attachment B
Effective: 8/7/2013
Reviewed: 07/13

Guidelines for Coding PUHLES

**P=*Physical Capability*** This factor describes general physical capacity. It includes conditions of the cardiovascular system, respiratory system, gastrointestinal system, genitourinary system, nervous system, hemopoietic system allergic, endocrine, metabolic and nutritional disease, dental conditions, diseases of the breast, and other defects and diseases which do not fall under other specific factors of the system. In arriving at a health classification under this factor, it is appropriate to consider physique and age.
**U=*Upper Extremities*** This factor describes function of the hands, arms, shoulder girdle, and spine (cervical and thoracic) in regard to strength, range of motion and general efficiency.
**L=*Lower Extremities*** This factor describes function the feet, legs, pelvic, girdle, lower back, and lower spine (lumbar and sacral) in regard to strength, range of motion, and general efficiency.
**H=*Ears and Hearing*** This factor describes hearing acuity, diseases and defects of the ear.
**E=*Eyes and Vision*** This factor describes visual acuity, diseases and defects of the eye
**S=*Mental Health*** This factor concerns personality, emotional stability, intellectual functioning and psychiatric disorders.

| Designators | Code | Limitations | Examples |
|---|---|---|---|
| 1 | A | No assignment limitations | No significant functional or physiological impairment. Mental disorder in full remission. |
| 2 | B | Minor limitations in assignment | Loss of single digit, except thumb or index, mild visual deficits, mild to moderate hearing loss, obesity, age 40-49, small physique, non-serious mental disorder (i.e., depressive disorder, anxiety disorder). |
| 3 | C | No prolonged walking. No lifting more than specified pounds, Restricted physical activity. | Cardiovascular disease, poorly controlled hypertension, poorly controlled diabetes, severe arthritis, severe spinal column pathology, shoulder pathology, amputations of upper or lower extremities, disabling hands ulnar and radial nerve palsies, age 55 and older. |
| 3 | D | No exposure to heavy air pollutants. Restricted physical activity. | Asthma, emphysema, active tuberculosis or other pulmonary diseases. |
| 3 | E | Restricted to lighter, slower activities. | Well controlled hypertension, chronic back problems, cirrhosis, controlled diabetes, gross obesity, multiple finger amputations, Age: 50-54. |
| 3 | G | No work assignment where sudden loss of consciousness would be dangerous or where awareness of environment is required in order to avoid injury. | Seizure disorders, disorders producing syncopal episodes or vertigo, severe hearing loss, poor vision or blindness (one eye), loss of coordination. |
| 3 | K | No work assignment requiring excessive exposure to sunlight or high environmental temperatures. | History of heat strokes; extensive burn scars, history of skin malignancy or other skin disease aggravated by sunlight, which may potentiate chronic use of medication. |

A-08.7 Attachment B
Effective: 8/7/2013
Reviewed: 07/13

| | | | |
|---|---|---|---|
| 3 | M | Multiple codes | Example: An inmate with organic heart disease and epilepsy will be classified as: P3MP. M=C&G. (The medical record should be noted to identify the codes.) |
| 3 | N | No jobs requiring understanding of complex instructions. | Serious mental disorders (depressive disorders with psychosis, psychotic disorders, organic brain syndrome) |
| 4 | P | Assignment only where secondary level medical care is available. Strict limitations to work assignment. | Seriously ill or disabled. Those requiring continuous medical or psychiatric supervision. Deaf mutes, wheelchair confinement (paraplegia), blindness (both eyes). Inpatient mental health care. Infirmary, extended care or assisted living inpatient offenders shall have PULHES designating P=4PT (temporary) or P=4PP (permanent). Offenders in inpatient mental health facilities shall have PULHES designating S=4PT. |
| 4 | I | Use only with modifier "D" | Currently housed in a Developmental Disabilities Program (DDP). Offender is without additional mental health treatment issues. |
| 4 | I | Use only with modifier "R" | Currently housed in a Developmental Disabilities Program (DDP). Offender has mental health treatment issues and is receiving counseling only. |
| 4 | I | Use only with modifier "T" | Currently housed in a Developmental Disabilities Program (DDP). Offender has mental health treatment issues and is receiving counseling and medication. |

**R=Remediable** This modifier indicates that correction or treatment of the condition is possible and medically advisable. An individual with this modifier will be re-evaluated at least every three months with revision of the health classification recorded. In mental health PULHES the R designator indicates the patient is receiving counseling but no psychiatric medication. History of mental disorder, resolved. No history of serious mental illness.
**T=Temporary** This modifier indicates that with further healing or convalescence, a higher physical capacity is expected to prevail. An offender with this modifier will be medically re-evaluated every three months with revision of the health classification recorded. Temporary modifiers are not used to reflect chronic disease. In mental health PULHES the T designator indicates the patient is receiving psychiatric medication.
**P=Permanent** This modifier indicates that no significant change in condition is expected.
**H=History** This modifier indicates a history of mental illness identified during the intake process or the offender was classified as a mental health patient during a previous incarceration. This type of offender is in full remission. Offenders classified as mental health patients NEVER revert to S1AP classification.

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 9-24-2008 | NUMBER: A-08.8 |
|---|---|---|
| | Replaces: 04/07 | Page 1 of 2 |
| | Formulated: 4/02<br>Reviewed: 04/11 | |

## MEDICAL PASSES

**PURPOSE:** To provide guidelines for medical "passes" issued to offenders to meet short or long term medical needs.

**POLICY:** A healthcare provider may issue a medical "pass" to any offender with medical needs which cannot be met without the special accommodation(s) outlined in the pass. Such passes are to be based *strictly* on medical need and should not alter or interfere with security operations except as absolutely necessary for the patient's health and safety.

**PROCESS:**

I. Each offender will undergo medical and mental health assessments by trained health services personnel during the intake process and appropriate limitations/restrictions will be assigned and entered on the Health Summary for Classification (HSM-18) screen. Offenders with medical needs not adequately met by HSM-18 restrictions may be issued a medical "pass" authorizing special accommodation(s). The pass must contain the following information:

A. Offender's name
B. Offender's TDCJ number
C. Date pass issued
D. Items to be allowed or type of accommodation to be made
E. Duration of pass
F. Name and title of healthcare person authorizing pass
G. Signature of healthcare provider (or designee) authorizing pass

II. Only physicians, dentists, psychiatrists, mid-level practitioner, and clinical pharmacists may authorize a pass for longer than three (3) days. Licensed nurses may authorize passes for up to three (3) days.

III. Appropriate medical record documentation will accompany all decisions to issue or discontinue a medical pass. Pertinent findings (both positive and negative) to support pass decision(s) will be documented in the medical record.

IV. If a medical pass is to be issued which alters or interferes with routine security operations, the accommodation should be given in a manner that causes the least interference but still meets the medical need. Any pass that is to be issued which results in the inability to restrain an offender in the usual manner must be approved by the facility Medical Director in consultation with the facility Warden or his designee. The Medical Director will have the final authority. Examples are "no handcuff pass", "must be handcuffed alone", or "front handcuff only".

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 9-24.2008 | NUMBER: A-08.8 |
|---|---|---|
| | Replaces: 04/07 | Page 2 of 2 |
| | Formulated: 04/02<br>Reviewed: 04/11 | |

**MEDICAL PASSES**

V. A medical pass log will be kept on every facility and updated as passes are issued or discontinued prior to expiration date. Each unit with less than 24 hour medical staff coverage will develop a process to ensure the necessary information regarding medical passes will be conveyed to security.

VI. Medical passes will be issued only by facility based staff. Recommendations by a consulting specialist will be reviewed by the facility medical staff and issued if approved. ~~at that level~~.

VII. There are no "permanent" passes. The need for passes must be reevaluated at least every six (6) months. Passes may be reissued at that time.

VIII. Upon arrival at a new facility, an offender's passes will expire as indicated on the pass or automatically thirty (30) days after arrival to the facility, whichever is shorter. Offenders will be provided verbal and written notification during the facility orientation that if they wish a pass to be continued, it is their responsibility to submit a sick call request for evaluation and/or renewal of the pass. Requests for pass renewal will be referred to the appropriate healthcare provider (physician, mid-level practitioner, dentist, psychiatrist, or clinical pharmacist). Pass renewal or discontinuation may be accomplished by chart review alone or in conjunction with physical examination of the offender. If an offender contests a decision made by chart review alone, the offender may request a physical examination. ~~In this case offenders will not be charged co-pay for examination to determine if continuation of a pass is medically indicated.~~

IX. Recognizing that an offender's condition may change and/or opinions may differ among healthcare professionals, an offender's pass(es) may be renewed or discontinued at the discretion of a physician, dentist, psychiatrist, mid-level practitioner, or clinical pharmacist. The offender will be notified (either verbally or in writing) if a pass is discontinued prior to expiration. The offender will be asked to voluntarily relinquish the pass. Notification of the offender and the attempt to retrieve the pass will be documented in the medical record. The "pass" log will be updated to reflect the change in status of the medical pass.

X. The final authority as to whether a pass is medically necessary will be the facility Medical Director or Psychiatrist (as appropriate) at the offender's current facility of assignment. Higher level (Regional/Senior ~~District/Divisional~~ Medical Director) intervention will occur only on a case-by-case basis in unusual or extraordinary situations.

STYLE OF CASE : **STEPHEN MCCULLOM, ET AL**

**vs**

**BRAD LIVINGSTON, ET AL**

CASE NO. : **3:12-CV-02037**

PERTAIN TO : **PLEASE REFER TO ATTACHED EXHIBIT "A"**

FROM : **MCLENNAN COUNTY JAIL**
**Please Refer To Exhibit "A"**

DELIVER TO : **Lacey E. Mase**
**OFFICE OF THE ATTORNEY GENERAL**
**Law Enforcement Defense Division**
**300 West 15th Street, 7th floor**
**Austin, TX 78701**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

**The taxable cost of $ 70.00 was charged to Attorney for Defendant, TBA # 24074662**

**COPY**

Sunbelt Reporting & Litigation Services

**CORPORATE OFFICE**
6575 West Loop South, Ste. 580
Houston / Bellaire, Texas 77401
713•667•0763

Order No. **13967.002**

DALLAS/FORT WORTH
15150 Preston, Ste. 300
Dallas, Texas 75248
214•747•0763

BRYAN / COLLEGE STATION
1716 Briarcrest Dr., Ste. 300
Bryan, Texas 77802
979•774•4000

SAN ANTONIO
8000 IH-10 West, Ste. 1500
San Antonio, Texas 78230
210•342•0763

CORPUS CHRISTI
711 N. Carancahua, Ste. 700
Corpus Christi, Texas 78475
361•882•0763

AUSTIN
1016 La Posada Dr., Ste. 294
Austin, Texas 78752
512•465•9100

EAST TEXAS
100 E. Ferguson, Suite 917
Tyler, Texas 75702
903•593•3213

1•800•666•0763 • www.sunbeltreporting.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DIVISION**

| | | |
|---|---|---|
| **STEPHEN MCCULLOM, ET AL** | : | |
| | : | |
| | : | |
| **vs** | : | CIVIL ACTION NO. **3:12-CV-02037** |
| | : | |
| | : | |
| **BRAD LIVINGSTON, ET AL** | : | |

# NOTICE OF INTENTION TO TAKE DEPOSITION BY WRITTEN QUESTIONS

To Plaintiff by and through their attorney(s) of record: **Jeff Edwards**
To other party/parties by and through their attorney(s) of record:

You will please take notice that fourteen (14) days from the service of a copy hereof with attached questions, a deposition by written questions will be taken of Custodian of Records for:

**MCLENNAN COUNTY JAIL (Please Refer To Exhibit "A")**
**3201 E. State Hwy 6**
**Waco, TX 76705**

before a Notary Public for **SUNBELT REPORTING & LITIGATION SERVICES**
**6575 West Loop South, Suite 580**
**Bellaire, TX 77401**
**713-667-0763 Fax 713-661-4785**

or its designated agent, which deposition with attached questions may be used in evidence upon the trial of the above-styled and numbered cause pending in the above named court. Notice is further given that request is hereby made as authorized under Rule 45, Federal Rules of Civil Procedure, to the officer taking this deposition to issue a subpoena duces tecum and cause it to be served on the witness to produce any and all records as described on the attached questions and/or Exhibit(s) and any other such record in the possession, custody or control of the said witness, and every such record to which the witness may have access, pertaining to:

**PLEASE REFER TO ATTACHED EXHIBIT "A"**

and to turn all such records over to the officer authorized to take this deposition so that photographic reproductions of the same may be made and attached to said deposition.

**Lacey E. Mase**
**OFFICE OF THE ATTORNEY GENERAL**
**Law Enforcement Defense Division**
**300 West 15th Street, 7th floor**
**Austin, TX 78701**
**713-463-2120 Fax 512.397.1645**
Attorney for Defendant
SBA # 24074662

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all Counsel of Record by hand delivery, FAX, and/or certified mail, return receipt requested, on this day.

Dated: August 26, 2013

by Lacey E. Mase /LB

Order No. **13967**

# EXHIBIT "A"

Pursuant to Texas Rules of Civil Procedure 205 and 176, and pursuant to Texas Health and Safety Code, Chapter 241, §241.153(20)(A), (Vernon's 1997), please respond to the following request:

Please produce any and all medical records or file materials on the above named individual. "Medical records" and "file materials" include, but are not limited to, medical records, doctor's notes, nurse's notes, reports, x-rays, cat scans, MRIs, laboratory results, admittance and discharge records, patient information forms, insurance documents, telephone messages, worker's compensation records, correspondence with other doctors, correspondence with attorneys, correspondence with insurance carriers, correspondence with the patient, correspondence with the Social Security Administration or any other governmental entity, letters of guaranty, letters of credit, and any other document, paper, report or correspondence which relates to the care and treatment of the patient, as well as to the patient's payment for services. This subpoena also requires you to print out any and all computer screens the contents of which are responsive to this subpoena.

REGARDING: Larry G. McCollom

DOB: April 4, 1953

SS#: XXX-XX-3517

No. 3:12-CV-02037

| STEPHEN MCCULLOM, ET AL | : | IN THE UNITED STATES DISTRICT COURT |
|---|---|---|
| VS | : | FOR THE NORTHERN DISTRICT OF TEXAS |
| BRAD LIVINGSTON, ET AL | : | |

## DIRECT QUESTIONS TO BE PROPOUNDED TO THE WITNESS

Custodian of Records for: **MCLENNAN COUNTY JAIL**
Records Pertaining To: **PLEASE REFER TO ATTACHED EXHIBIT "A"**
Type of Records: **Please refer to Exhibit "A" for a complete description of any and all files, business records, photographs and any other tangible items of any kind**

1. Please state your full name.

   Answer: Alfredo E. Martiz

2. Please state by whom you are employed and the business address.

   Answer: McLennan County, Jail Division. 3201 E. Hwy 6, Waco TX 76705

3. What is the title of your position or job?

   Answer: Medical Office Manager

4. Are these memoranda, reports, records, or data compilations, outlined in the subpoena duces tecum, pertaining to the above-named person, in your custody or subject to your control, supervision or direction?

   Answer: Yes

5. Are you able to identify these aforementioned records as the originals or true and correct copies of the originals?

   Answer: Yes

6. Please hand to the Officer/Notary taking this deposition copies of the memoranda, reports, records, or data compilations, mentioned in Question No. 4. Have you complied? If not, why?

   Answer: Yes

Order No. **13967.002**

7. Are the copies which you have handed to the Officer taking this deposition true and correct copies of such memoranda, reports, records, or data compilations?

Answer: Yes

8. Were such memoranda, reports, records, or data compilations kept in the regular course of business of this facility?

Answer: Yes

9. Was it in the regular course of business of this facility for a person with knowledge of the acts, events, conditions, opinion, or diagnoses recorded to make the record or to transmit information thereof to be included in such record?

Answer: Yes

10. Were the entries on these records made at or shortly after the time of the transaction recorded?

Answer: Yes

11. Was the method of preparation of these records trustworthy?

Answer: Yes

WITNESS (Custodian of Records)

Before me, the undersigned authority, on this day personally appeared Alfredo E Martinez, known to me to be the person whose name is subscribed to the foregoing instrument in the capacity therein stated, who being first duly sworn, stated upon his/her oath that the answers to the foregoing questions are true and correct. I hereby authorize Sunbelt Reporting & Litigation Services to prepare and deliver the Written Deposition transcript in accordance with Rule 200.4

SWORN TO AND SUBSCRIBED before me this 10 day of September, 2013.

LEWIS LEE BURKS
MY COMMISSION EXPIRES
October 21, 2014

NOTARY PUBLIC / OFFICER

My Commission Expires: 10-21-14

Order No. 13967.002

AO 88 (Rev. 11/91) Subpoena in a Civil Case

# United States District Court

## FOR THE NORTHERN DISTRICT OF TEXAS DIVISION

STEPHEN MCCULLOM, ET AL

**SUBPOENA IN A CIVIL CASE**

vs

BRAD LIVINGSTON, ET AL

**CASE NUMBER:** 3:12-CV-02037

TO: Custodian of Records for: MCLENNAN COUNTY JAIL
3201 E. State Hwy 6
Waco, TX 76705

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| MCLENNAN COUNTY JAIL<br>3201 E. State Hwy 6<br>Waco, TX 76705 | SEPTEMBER 16, 2013 @ 10:00 A.M. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Please refer to Exhibit "A" for a complete description of any and all files, business records, photographs and any other tangible items of any kind

| PLACE | DATE AN TIME |
| --- | --- |
| MCLENNAN COUNTY JAIL<br>3201 E. State Hwy 6<br>Waco, TX 76705 | SEPTEMBER 16, 2013 @ 10:00 A.M. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b) (6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| Lacey E. Mase / LS | August 26, 2013 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Lacey E. Mase
OFFICE OF THE ATTORNEY GENERAL
Attorney for Brad Livingston, et al
Law Enforcement Defense Division
300 West 15th Street, 7th floor, Austin, TX 78701 713-463-2120

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

Order No. 13967.002

AO 88 (Rev. 11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 8·28·2013 8:52 A.M. | McLennan County Sheriff's Office 901 Washington Avenue, Waco, Texas 76701 |

SERVED ON (PRINT NAME): Tamma Willis: Custodian Of Records

MANNER OF SERVICE: Personal Delivery, by identifying herself as: Custodian Of Records

SERVED BY (PRINT NAME): Lewis L. Burks SCH #3404 EXP: 12·31·2013

TITLE: Certified Process Server

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on 8·29·2013
DATE

[signature]
SIGNATURE OF SERVER

7215 Bosque Blvd.
ADDRESS OF SERVER

Waco, Texas 76710

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel the production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clauses (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and not exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of an party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or thins not produced that is sufficient to enable the demanding party to contest the claim.

CID: 34610

McLennan County Sheriff's Office - Health Services Division
PHYSICIAN ASSESSMENT / ORDERS

| Name | DOB | Allergies |
|---|---|---|
| McCollum, Larry | 4/4/53 | NKA |

| Order | Date | Time | |
|---|---|---|---|
| 1 | 6/24/11 | 0621 | Initial intake: BP 152/110 |
| | | | ① BP ✓ Q day per protocol |
| | | | ② Clonidine 0.1mg PO PRN ↑BP |
| | | | R/O DR Wells / [signature], LVN |
| | | | [signature], MD |
| | | | 7-5-11 |
| | | | Noted 7/5/11 [initials] |
| | ATTN | | 7/6/11 [initials] |
| | | | [signature], MD |
| | 7-22-11 | | Spoke c̄ Major May @ Hutchins State Jail Regarding Inmate Health Status @ Their Facility. Inmate has been hospitalized for Hyperthermia |
| | | | [signature], MD |
| | ATTN | | 7/15/11 Rw. |

Form 11 PA/O Rev. 3-30-11

MCLENNAN COUNTY JAIL 00001

CID: 34666

McLennan County Sheriff's Office – Health Services Division

**PHYSICIAN ASSESSMENT / ORDERS**

| McCollum, Larry | 4-4-53 | NKA |
|---|---|---|
| **Name** | **DOB** | **Allergies** |

RO Dr Browder/ Howard Om per protocol — Bactrium DS 2 tabs PO BID X 10 Days Dressing Changes QT/H

Rev. 04/11/07

MCLENNAN COUNTY JAIL 00002

CID# 34610

ATW JC OIC

5 6 7 8 9 10 11

LARRY MCCOLLUM W M 04-04-195 Pic: Jun 23 2011 CID: 0034610 McLennan Co. Sheriffs Office

McLennan County Sheriff's Office
Health Services - Jail Intake
**Medical Screening**

**SECTION III** COMPLETED BY MEDICAL STAFF **Side 2 of 2**

Name (Last) McCollum First Larry Initial G Date Admitted: 6/23/11

Accepted? [x] Yes [ ] No *If no, (see below)* Allergies: NKDA

Denies SI/HI

Any Current Medical Problems, Recent Hospitalization, Injuries, or concerns of Alcohol Withdrawal? (Diabetes, Seizures, Blood Pressure, etc.) Arthritis in back & knee

Medication in Property? [ ] Yes [x] No

| | Current Medication | Dosage | Frequency | | Current Medication | Dosage | Frequency |
|---|---|---|---|---|---|---|---|
| 1. | IBU | 800mg | Q6 PRN | 2. | | | |
| 3. | | | | 4. | | | |
| 5. | | | | 6. | | | |
| 7. | | | | 8. | | | |

Were you treated at a hospital before you were brought to this facility? [ ] Yes [x] No

Type of Treatment? [ ] Injury [ ] Illness Name of Hospital: N/A Treating Physician: N/A

Completed By Nurse: Print Name J Byrd Signature [signature] Date: 6/23/11 Time 13:09

Revised 01/06/11

McLennan County Sheriff's Office
Health Services - Jail Intake
**Mental Disability / Suicide Screening**

**SECTION I** COMPLETED BY ARRESTING /TRANSPORTING OFFICER **Side 1 of 2**

| Name (Last) McCollum | First LARRY | M.I. G. | Date Admitted 6-23-11 |
|---|---|---|---|
| State I.D. Number (ID02 Screen-DPS#) 3950494 / SSN 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 | Race W / Sex M | DOB 4-4-53 | Charge# FORGERY |

1. Was arrestee a risk during any prior contact or confinement with this department? ☐ Yes ☑ No
   If so, check the appropriate box. ☐ Medical ☐ Mental Health ☐ Suicide ☐ Other
2. Do you or anyone else believe that the inmate is at risk due to ☐ medical condition, ☐ mental illness, ☐ mental retardation, or ☐ suicide concern? (CHECK all that apply) ☑ none apply Comments:
3. Location of Arrest: 501 WASHINGTON
   * If inmate was arrested at a medical facility, nursing home, or TDC, give name of facility:
4. Did inmate receive prior medical treatment during or after the arrest? ☐ Yes ☑ No
   If yes, Name of Facility: ☐ Received Treatment ☐ Refused Treatment

K. FLEISCHHAUER — Arresting Officer; [signature] — Signature; Date: 6/23/11 Time 11AM

**SECTION II** COMPLETED BY JAILER IMMEDIATELY UPON ADMISSION (Required by Jail Commission, elaborate as needed)

1. Any current medical problems, recent hospitalizations or serious injuries or concerns about withdrawal? ☒ Yes ☐ No
   If so, explain: Arthritis
2. Are you pregnant? ☐ Yes ☒ No ☐ Not Sure
3. Medications? ☒ Yes ☐ No (listed on page 2)
4. Have you ever received services for mental health or mental retardation? ☒ Yes ☐ No
5. Do you receive a social security check? ☐ Yes ☒ No
6. Have you ever been in special education? ☐ Yes ☒ No
7. Do you have any previous military service? ☐ Yes ☒ No
   If yes, branch?
8. Do you hear any noises or voices that other people don't seem to hear? ☐ Yes ☒ No
9. Have you ever been very depressed? ☒ Yes ☐ No
10. Do you feel depressed now? ☐ Yes ☒ No
11. Have you ever thought about killing yourself in the last year? ☐ Yes ☒ No
12. Are you thinking about killing yourself today? ☐ Yes ☒ No
    If yes, Why? How?
13. Have you ever attempted suicide? ☐ Yes ☒ No
    If yes, When? How? Why?
14. Have you experienced a recent loss? (family, friend, etc.) ☐ Yes ☒ No If so, who? When?
15. Does the individual seem (CHECK all that apply) ☐ confused ☐ pre-occupied ☐ hopeless ☐ sad ☐ paranoid ☐ in an unusually good mood, or ☐ believes he/she is someone else ☒ none apply
16. Is this person's speech (CHECK all that apply) ☐ rapid ☐ hard to understand ☐ hesitant, or ☐ childlike ☒ none apply
17. Observed to be under the influence of ☐ Alcohol ☐ Drugs ☐ Withdrawals ☒ none apply
18. Observed to have visible signs of self-harm (i.e. cuts on arms, etc.) ☐ Yes ☒ No
19. Does the screener suspect mental illness/mental retardation? ☒ Yes ☐ No
    If yes, when was a magistrate notified? Date: 6/23/2011 Time 13:20 How? ☐ Written ☑ Electronic

Additional comments: None

Print Name Cpl Coltvariol Signature [signature] Date: 6/23/2011 Time 13:00

Note* Yes to #12 shall be immediately directed to the medical staff.

Revised 01/06/11

MCLENNAN COUNTY JAIL 00004

### Intake – Medication List / Tuberculosis Screen

| | Medication | Dose | Route | Frequency | Time | Last taken |
|---|---|---|---|---|---|---|
| 1) | IBU | 800mg | PO | Q6° PRN | | |
| 2) | | | | | | |
| 3) | | | | | | |
| 4) | | | | | | |

### Pharmacy Information

Name: Not current medical record.  Verification requested: ______

Location: ______  Verification received: ______

Phone: ______  Message left: ______

Release of Information obtained? (Y) N

### Tuberculosis Screen

Have you ever tested positive for TB? ☐ Yes ☑ No | If yes, Date: N/A | Where? N/a

Do you have any of the following symptoms, productive cough, chills, fever, night sweats, spitting up blood? Yes (No) If yes, which one and when? Ø

PPD Given? ☑ Yes ☐ No | Date: 6/24/11 | Location: (RFA) / LFA | Given By: Holli Lehman, LVN

PPD Read? ☑ Yes ☐ No | Date: 6-27-11 | Results: 0 mm | Read By: TC

If PPD Not given check reason: Ø

☐ Up to Date (Date: ______) ☐ History of Positive PPD ☐ Completed Medication (Date: ______)

☐ X-Ray Ordered: ______ ☐ Inmate refused **NOTE: If Inmate refuses, place in separate cell w/mask until cleared.**

Consent To Treat

☑ Yes ☐ No (explanation): ______

The Health department provides free HIV and RPR testing. Service requested: ☐ Yes ☑ No

### Suicide Screening

Do you have thoughts of suicide? Y / (N)

Are they related to current stressors going on in your life, or have you had such thoughts before? Current / Prior

Do you have a plan for this? Tell me. Ø

### Level of Risk

- (None – No suicidal ideation)
- Mild – Some ideation, no plan
- Moderate – Ideation, vague plan, low-lethality plan, wouldn't do it
- Severe – Ideation, specific and lethal plan, wouldn't do it
- Extreme – Ideation, specific and lethal plan, will do it

If Severe or Extreme, actions taken: None

Nurse Name: Holli Lehman  Signature: Holli Lehman, LVN  Date: 6/24/11  Time: 03:56

Revised 12-03-10

Date: 10 / 24 / 11 Inmate Name: McCollum, Larry CID#: 34616 Allergies: NKA
Height (in): 71 Weight (lb): 333 Race: W Sex: M / F

| Vital Signs: | Temp: — | Pulse: 83 | Resp: 16 | Blood Pressure: 152/110 | Pain (0-10/10): — | O2 sats: — | Time: 0356 |
|---|---|---|---|---|---|---|---|
| | Temp: ____ | Pulse: ____ | Resp: ____ | Blood Pressure: ___/___ | Pain (0-10/10): ____ | O2 sats: ____ | Time: ____ |

☐ Hypertension ☐ COPD ☐ Diabetes ☐ Cancer ☐ Asthma ☐ Hepatitis ☐ Heart Disease
☐ Seizures ☐ Stroke ☐ TB ☐ HIV / AIDS ☐ CHF ☐ Mental Illness ☐ Kidney Disease
☐ ETOH use ☐ Substance use ☐ Tobacco use ☐ Blood disorder ☐ Pregnant
☑ Other: Arthritis in back & knee
☐ Inmate denies any pertinent medical history at this time
☐ See back for prescribed medications

**NEUROLOGIC**
Level of Consciousness: (Alert) — Lethargic / Obtunded / Stuporous / Comatose
Level of Orientation: (Oriented x 4) — Person / Place / Time / Events

**SKIN**
Color / Quality: (Pink) — Pale / Jaundice / Cyanotic / Other: ____
Temp / Texture / Moisture: (Warm / Smooth / Dry) — Cool / Rough / Moist / Sweating / Oily / Itching
Rashes: (Absent) — Present (Location): ____
Bruising: (Absent) — Present / Hematoma (location & appearance): ____
Lacerations: (Absent) — Present (Location): ____

**HEAD, EYES, NOSE, & THROAT (HEENT)**
Eyes: Vision (Normal) — Cataracts / Glaucoma / Blind / Glasses / Contacts / Prosthesis
Pupils (PERRL) — Unequal / Non-reactive / Ø Consensual / Pinpoint
Ears: Hearing (Normal) — HOH / Hearing Aids / Deaf: AD / AS / AU
Nose: (Normal) — Epistaxis / Rhinorrhea / Congestion
Mouth: Lips/Mucous Membranes (Normal / Moist) — Cracked / Dry / Cyanotic / Swollen
Dentition (Good) — Poor / None / Dentures / Partial Plate: Upper / Lower
Speech / Swallowing (Clear / Smooth) — Aphasia / Dysphagia

**RESPIRATORY**
Rhythm / Effort: (Regular) — Irregular / Shallow / Deep / Retractions
Lung Sounds: A/P (Clear) — Not – Auscultated / Crackles / Wheeze /Rhonchi / Stridor

**CARDIOVASCULAR**
Heart: Rhythm / Quality (Regular / Strong) — Irregular / Weak / Muffled / Dextrocardia / Murmur
Peripheral Pulses: (Present / Equal / Strong) — Absent / Unequal / Weak / Doppler used: (location): ____
Cap. Refill: (Normal (<3 sec)) — Delayed (> 3 sec): ____
Edema: (None) — Dependent / Non-Pitting / Pitting (+1-4 & location): ____

**GASTROINTESTINAL**
Abdomen: Size / Shape (Normal / Flat / Non-tender / Soft) — Large / Round / Distended / Taut / Tender
Bowel sounds: Active x 4 Quadrants — Hypoactive / Hyperactive / Absent (which quadrant): ____
Bowel Movement: Normal / Regular N/A — Liquid / Loose / Constipated / Date last BM: ____

**GENITOURINARY**
Bladder: (Non-distended / Non-tender) — Distended / Tender
Urine: ~~Clear / Yellow~~ N/A — Cloudy / Dysuria / Polyuria / Oliguria / Incontinent / Self-cath

**MUSCULOSKELETAL**
Muscle Tone / Bones: (Normal) — Flaccid / Atrophy / Contractures / Fracture: ____
Strength: UE / LE (Strong / Equal) — Weak / Paralysis or Paraplegias: B / R / L / Upper / Lower
Range of Motion (ROM): (AROM) — PROM / Limited (location): ____
Gait: (Steady) — Unsteady / Staggering / Limp / Other: ____

**PSYCHOSOCIAL**
Behavior: (Cooperative) — Uncooperative / Withdrawn / Combative / Depressed / Manic
Affect: (Appropriate) — Flat / Animated / Evasive / Anxious / Agitated / Inappropriate

Revised 12-03-10



OFFICE OF LARRY LYNCH
SHERIFF, McLENNAN COUNTY

JAIL DIVISION
3201 E. Hwy. 6
Waco, Texas 76705
(254) 757-2555
(254) 754-4048 Fax

# Inmate Mental Health/Mental Retardation Magistrate Notification Form

Date Notified 06/23/2011 Time Notified: 1320

Magistrate Notified: Judge Raymond Britton Fax #/email

Corporal Signature: [signature]

Inmate Name: McCollum,Larry CID #: 34610

DOB: 04041953 SSN: 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 Housing Location: Holdover

Charges: (check all that apply) ☐ Misdemeanor ☒ Felony

Narrative/Synopsis: [Explain the information and/or observations which lead the officer to suspect that there may be reasonable cause to believe that the inmate has a mental illness or is a person with mental retardation.]

Stated he has received services for mental health or mental retardation.

Attachment: Page 1, Intake form [mental health screening].

10-07-09

MCLENNAN COUNTY JAIL 00007

MCLENNAN COUNTY SHERIFF'S OFFICE
HEALTH SERVICES DIVISION DES4 CLASSIFICATION FORM

Inmate Name: McCollum, Larry CID#: 34610

**WORK ASSIGNMENT**

- ✓ NO RESTRICTION
- ___ DO NOT ASSIGN
- ___ DO NOT ASSIGN KITCHEN DUTY

**DIETARY ORDER** (check all that apply)

- ✓ REGULAR
- ___ DOUBLE PORTIONS
- ___ DIABETIC w/HS SNACK (2500 Cal)
  - ___ 2500 Calorie (standard)
  - ___ 1800 Calorie
- ___ RENAL
- ___ HEPATIC FAILURE
- ___ PRENATAL w/ HS SNACK
- ___ BLAND
- ___ LOW SALT
- ___ NO SALT
- ___ SOFT MECHANICAL
- ___ PURED
- ___ CLEAR LIQUID

**FOOD ALLERGIES:** Ø

- ✓ HX MENTAL ILLNESS
- Ø HX SUBSTANCE WITHDRAWAL
- ___ INHALER

NURSE SIGNATURE: [signature], LVN Date: 6/24/11

ENTERED ON DES4 BY: [signature], LVN Date: 6/24/11

Revised 01-20-10

MC LENNAN COUNTY SHERIFF'S OFFICE - HEALTH SERVICES DIVISION
TREATMENT & DIABETIC FLOW SHEET

Name McCollum, Larry Allergies NKA CID # 34610 LOC D3

MD Orders: Start Date: ______ Exp Date: ______
Insulin Type ______ # Units ______ q am
Insulin Type ______ # Units ______ q am
Insulin Type ______ # Units ______ q Noon
Insulin Type ______ # Units ______ q Noon
Insulin Type ______ # Units ______ q Pm
Insulin Type ______ # Units ______ q pm

Fingerstick Orders: ______
Sliding Scale Formula: 200 - 250 = 2 units; 251 - 300 = 4 units; 301 - 350 = 6 units; 351 - 400 = 8 units; 401 - 450 = 10 units; 451 – 500 = 12 units
New Fingerstick Orders: ______
Start Date ______ Exp Date ______

New Orders Date: ______ Exp Date: ______
Insulin Type ______ # Units ______ q am
Insulin Type ______ # Units ______ q am
Insulin Type ______ # Units ______ q Noon
Insulin Type ______ # Units ______ q Noon
Insulin Type ______ # Units ______ q pm
Insulin Type ______ # Units ______ q pm

B P Check Orders: BP ✓ Q day per protocol
Start Date: 6/24/11 Exp Date: 6/23/12
New BP Check Orders: Qweek
Start Date: 06-05-11 Exp Date 07-04-12
Treatment Orders: ______
Start Date: ______ Exp Date ______

| Date | Time | FSBS | Insulin Type | Dose | Route | Site | BP | Pulse | Comments/Treatment | Nurse Initial |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/24/11 | 0356 | | | | | | 152/110 | 83 | Clonidine 0.1mg | [illegible] |
| 6-24 | [illegible] | | | | | | 141/87 | 86 | | PA |
| 6-25 | 2220 | | | | | | 149/97 | 46 | | PA |
| 6-26 | 2038 | | | | | | 171/116 | 120 | Clonidine 0.2mg | [illegible] |
| 6-27 | 2100 | | | | | | 154/100 | 125 | Clonidine 0.1mg | [illegible] |
| 6-28 | 2100 | | | | | | 168/108 | 100 | Clonidine 0.1mg | PA |
| 6/29/11 | 21:00 | | | | | | 130/82 | | | [illegible] |
| 6/30/11 | 20:00 | | | | | | 160/88 | | | [illegible] |
| 7/1/11 | 2126 | | | | | | 140/92 | 112 | | Ng |
| 7/2/11 | 2317 | Ng | | | | | 139/80 | 128 | | Ng |
| 07/03/11 | 2040 | | | | | | 140/92 | 128 | | [illegible] |
| 7/4/11 | 20:30 | | | | | | 126/74 | | | [illegible] |
| 7/7/11 | 2000 | | | | | | 140/94 | 119 | | MW |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Site Codes: LT =Left Thigh / RT =Right Thigh / RAB =Right Abdomen / LAB =Left abdomen / LA =Left Arm / RA =Right Arm

| NURSE SIGNATURE | INITIAL | NURSE SIGNATURE | INITIAL | NURSE SIGNATURE | INITIAL |
|---|---|---|---|---|---|
| [illegible], LVN | Ng | Patricia [illegible] | PA | [illegible] | MW |
| | | | | [illegible], LVN | Ng |

Facility Name: McLennan County Jail

Month/Year of Charting: 7/11

| Medication | Hour | Days 1–31 |
|---|---|---|
| Clonidine 0.1mg ī Tab PO PRN ↑ B/P | [illegible] | |
| | | |
| | R | |
| | N | |
| Initials: D | Start Date: 6/24/11 / Stop Date: 6/23/12 | Prescriber: Dr. Wells / RX #: |

Initials | Start Date: | Stop Date: | Prescriber: | RX #:

Initials | Start Date: | Stop Date: | Prescriber: | RX #:

Initials | Start Date: | Stop Date: | Prescriber: | RX #:

Initials | Start Date: | Stop Date: | Prescriber: | RX #:

Initials | Start Date: | Stop Date: | Prescriber: | RX #:

Diagnosis

Allergies: NKA

Housing Unit: D3

Patient ID Number: 34610

Patient Name: McCollum, Larry

| Nurse's Signature | Initial | Nurse's Signature | Initial |
|---|---|---|---|
| Sheila Smith RN | D | Marcella Hernandez | MH |

Date of Birth: 4/4/83

Documentation Codes
1. Discontinued Order
2. Refused
3. Patient out of facility
4. Charted in Error
5. Lock Down
6. Self Administered
7. Medication out of Stock
8. Medication Held
9. No Show
10. Other

MCLENNAN COUNTY JAIL 00013

Facility Name: MCJ

Month/Year of Charting: 6/11

| Medication | Hour | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Clonidine 0.1mg PO PRN ↑BP | PRN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Initials: MY | Start Date: 6/24/11 | Stop Date: 6/23/12 | Prescriber: Wells | RX #:

Initials: | Start Date: | Stop Date: | Prescriber: | RX #:

Initials: | Start Date: | Stop Date: | Prescriber: | RX #:

Initials: | Start Date: | Stop Date: | Prescriber: | RX #:

Initials: | Start Date: | Stop Date: | Prescriber: | RX #:

Initials: | Start Date: | Stop Date: | Prescriber: | RX #:

Diagnosis:

Allergies: NKA

Housing Unit: D3

Patient ID Number: 34610

Patient Name: McCollum, Larry

| Nurse's Signature | Initial | Nurse's Signature | Initial |
|---|---|---|---|
| Molli [illegible], LVN | MY | Sheila Smith LVN | [illegible] |

Date of Birth: 4/4/53

Documentation Codes

1. Discontinued Order
2. Refused
3. Patient out of facility
4. Charted in Error
5. Lock Down
6. Self Administered
7. Medication out of Stock
8. Medication Held
9. No Show
10. Other

MCLENNAN COUNTY JAIL 00014