UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE | § | |
| KINGREY, and SANDRA McCOLLUM, | § | |
| individually and as heirs at law to the Estate of | § | |
| LARRY GENE McCOLLUM, | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:12-cv-02037 |
| | § | |
| BRAD LIVINGSTON, JEFF PRINGLE, | § | |
| RICHARD CLARK, KAREN TATE, | § | |
| SANDREA SANDERS, ROBERT EASON, the | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH and the TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |

## PLAINTIFFS' SUPPLEMENTAL DISCLOSURE

Plaintiffs submit the following disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1):

1. A copy of all documents the disclosing party has in its possession, custody or control:

    a). Hillcrest Hospital Medical Records – Bates Nos. 003240 – 003273.

Dated: November 18, 2013.

Respectfully Submitted,

The Edwards Law Firm
The Haehnel Building
1101 East Street
Austin, Texas 78702
Tel.     512-623-7727
Fax.    512-623-7729

By____/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

**Appendix 330**

/s/Scott Medlock
Scott Medlock
State Bar No. 24044783
James C. Harrington
State Bar No. 09048500
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

I certify that on November 18, 2013, I sent the foregoing to Defendants' counsels, Bruce Garcia, Jonathon Stone, Kim Coogan, Erika Hime, Lacey Mase, and Demetri Anastasiadis, PO Box 12548, Capitol Station, Austin, TX 78711 *via facsimile:* *(512) 495-9139*

/s/ Scott Medlock
Scott Medlock

2

**Appendix 331**

STATE OF TEXAS                    §

COUNTY OF MCLENNAN              §


### AFFIDAVIT
### HILLCREST BAPTIST MEDICAL CENTER -- MEDICAL RECORDS

BEFORE      ME,      the      undersigned      authority,      personally      appeared
(1) *Dorothy V. Uptmor* _____, who being by me duly sworn, deposed as
follows:

"My name is (2) *Dorothy V. Uptmor* _____. I am over eighteen (18)
years of age, of sound mind, capable of making this Affidavit and personally acquainted
with the facts herein stated:

I am the custodian of the Medical Records of **HILLCREST BAPTIST MEDICAL CENTER**,
located at 100 Hillcrest Medical Blvd., Waco, Texas 76712.

Attached  hereto  are  (3) *33*  pages  of  records  from  the  medical  records  of
(4) *McCollum, Larry* ____, MRN: (5) *51-42-00* ____. These said
records are kept by HILLCREST BAPTIST MEDICAL CENTER in the regular course of their
business, and it was in the regular course of business of said HILLCREST BAPTIST
MEDICAL CENTER, for an employee, representative, or a doctor, with knowledge of the
act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit
information thereof to be included in such records; and the records were made at or
near the time or reasonably soon there after. The medical records attached hereto are
the exact duplicates of the original records".

(6) *Dorothy V. Uptmor*
AFFIANT


SWORN TO AND SUBSCRIBED before me on the *15* day of *November* 2013 .

*Susan M. Berg Bennett*
SIGNATURE OF NOTARY PUBLIC
** This document must be signed by the notary and
imprinted with the notary's stamp.

Notary Name: *Susan M. Berg-Bennett*

Commission Exp. *August 6, 2014*

Susan M. Berg Bennett
Notary Public
STATE OF TEXAS
My Comm. Exp. August 6, 2014

003240

**Appendix 332**

003242

# ⅢILLCREST
Hillcrest Baptist Medical Center

**EMERGENCY DEPARTMENT NURSING RECORD**

PCP: Ø                                    Notified: Y N

**PMH:** _Systemic:_ HTN DM Cancer HIV Thyroid Anemia ↑Lipids _Neuro:_ CVA Seizures Dementia
_Heart:_ MI Angina CHF CAD AFib _Lungs:_ COPD Asthma _GI:_ PUD GERD Liver
_GU:_ UTI's Stones _MS:_ Arthritis _Psych:_ Depression Anxiety Schizophrenia (None)
Recent hospitalization for: _____
Other: _____                          LMP: _____
Surgeries: _____
Medications (None) See Medication Reconciliation Form   Pneumococcal vaccine: _____ Flu vaccination: _____
Allergies: None Latex Iodine See Medication Reconciliation Form _____

**CC:** FOOT PROBLEM

**Triage Vital Signs**

| Temp | P | RR | BP |
|---|---|---|---|
| 98.3 | 70 | 18 | 156/85 |

| O2 Sat | Pain | TS (GCS) | Wt lb kg |
|---|---|---|---|
| 100 | 8/10 | 15 | |

**TRIAGE:**          Arrival: ___ Actual 20:40

Source: (Patient) Family Friend Guardian Nursing home Paramedic Police Interpreter
Mode of arrival: (Walk in) Carried W/C Friends Attendant Ambulance Helicopter Police
Location: R (L) Rt (Foot) Great 2 3 4 5 toe
Timing: Onset ___3___ Minutes Hours Days (Weeks) Months ago
Context: Mechanism: Inversion Eversion Hyperflexion Hyperextension (Blunt trauma) Crush
Unknown                                                              No injury
Circumstances: (MVA) Altercation Work-related Sporting Fall Gout Arthritis
Unknown                                                              none
_Last tetanus:_ UTD > 5 years Unknown
_Severity:_ Able to bear weight: (YES) NO  _Pain:_ Mild Moderate Severe _None_
Other history:
MVC 3 wks ago. Still having "shooting"
pain to (R) foot.
Nurse: ↓ Camiao

**Orthostatics/Tilt Test**

|  | BP | P | Time |
|---|---|---|---|
| Lying | | | |



**FLACC**

| | 0 | 1 | 2 |
|---|---|---|---|
| Face | No expression or smile | Occ. frown, withdrawn | Freq quiver chin |
| Legs | Nml pos or relaxed | Uneasy, restless | Kicking, legs drawn up |
| Act. | Nml pos, moves easy | Squirming, tense | Arched or jerking |
| Cry | No cry | Whimpers, moans | Crying, sobs or screams |
| Cons. | Content, relaxed | Reassured with touch | Difficult to console |

Total FLACC score ____

**Triage Acuity**

1   2   3   (4)   5

**Triaged to:**

Major   (Intermediate)   Minor

**NURSING ASSESSMENT:**   Room: 29   20:55
_Nursing history:_ ☑ Triage assessment reviewed
Source: (Patient) Family Friend Guardian Nursing home Paramedic Police Interpreter
Prehospital: CPR Intubation O2 IV C-collar Backboard Splints Meds _____ None
Associated signs and symptoms: None
Abrasion Avulsion Laceration Subungual hematoma Numbness Weakness
_Pain in:_ Ankle Leg Knee
Other history:
States large toe (R) foot was
dislocated in accident

_Nursing exam:_
Constitutional: (Alert) (Cooperative) In distress No distress ETOH
Musculoskeletal:
Digit R L (Great) 2 3 4 Little Prox Mid Distal PIP DIP
Swelling Deformity Limited ROM Tenderness: Mild Moderate Severe ___normal
Foot R L Lateral Medial Mid Anterior Posterior Dorsum Heel
Swelling Deformity Limited ROM Tenderness: Mild Moderate Severe ___normal
_Distal function:_ Deficit: Motor Pulse Capillary refill                normal
Skin: _See Skin Assessment Worksheet_
Diaphoretic Pale Abrasion Ecchymosis Erythema Warm Open fracture (normal)
Laceration: ___ cm Type: Avulsion Flap Linear Jagged Stellate
Other exam:
Has been taking 3000 mg of Tylenol
at a time for the pain.

**NURSING DIAGNOSIS:** Altered comfort: Pain   Impaired physical mobility

**NURSING PLAN:** To appropriate area   Elevate   Apply ice

**EXPECTED OUTCOME:** Pain control/Absent   Maintain/Increase mobility

RN _Alichery RN_                    LVN _____

**Smoker:** Yes (No)
**Cessation advised:** Yes No

_Domestic Violence Screening_
Are you in a relationship in which you have
been physically hurt or threatened by your
partner?    Y  N   Unwilling to answer
Do you feel safe in your current environment?
Y   N   Unwilling to answer

_Functional Screening_
Do you have trouble taking care of yourself—
with feeding, dressing?
Y   N   Unwilling to answer

_Suicide Assessment Screening_
Have you had thoughts of harming/injuring
yourself?    Y (N)  Unwilling to answer
Have you harmed/injured yourself in the last
6 months?   Y   N   Unwilling to answer

V00066756974   MR M000514200   OERMAJ
MCCOLLUM, LARRY                          W
04/04/1953   57/M                    01/25/11

© 1996-2009 EPOWERdoc, Inc   pg 1 of 2

003243

| Time | T | P | RR | BP | O2 Sat/amt | Pain | GCS | Time | T | P | RR | BP | O2 Sat/amt | Pain | GCS |
|------|---|---|----|----|-----------|------|-----|------|---|---|----|----|-----------|------|-----|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

## NURSES NOTES

| Time | Notes | Ini |
|------|-------|-----|
| 2058 | Pt ambulatory to exam room with | AR |
|  | stated complaint + assessment as | |
|  | noted. | |
| 2146 | Pt awaiting MD evaluation. | AR |
| 2200 | X-ray ordered | AR |
| 2215 | X-ray done. | AR |
| 0210 | Pt not received from angio PN care rounds | |
| 0212 | Walking boot applied to (R) foot. | |
| 0213 | awaiting d/c instructions (from MD) | |
| 0220 | Pt instructed & able to ∇ c̄ | |
|  | verbalized understanding. Pt ambulate | |
|  | out pt c̄ walking boot in place & | |
|  | stability. NAD | BD |

### NOTIFICATIONS

Family: _____
Nursing home: _____
Pastoral care: _____
PCP: _____
Police: _____
Social services: _____

### PATIENT SUPPORT

☑ Emotional support given
☑ Learning needs addressed
☐ Translation services provided
☐ Post mortem care provided
☑ Plan of care discussed

☐ Universal Time Out Form completed

### I & O's

| Oral | | Urine | |
|------|--|-------|--|
| IV | | NG | |
| Blood | | Blood | |
| Other | | Other | |
| **Total** | | **Total** | |

### COMMENTS

Caregiver # 1 _____ Ini AR   Caregiver # 3 _____ Ini BD
Caregiver # 2 _____ Ini    Caregiver # 4 _____ Ini

## DISPOSITION

Discharged  LWBS  AMA  Expired  Admitted  Transferred to: _____  ☐ Transfer form completed
Valuables with: Patient  Family  Friends  Security  Envelope # _____  Other _____
Mode of departure: Walking  Carry  Wheelchair  Cart  Auto  Ambulance  MediVan  Stretcher  c̄ boot
Condition on discharge: Pain scale _____  Improved  Worsened  Good  Fair  Poor  Stable  Unstable  Crit
Assumptions given: # _____
☑ Verbalizes understanding of discharge instructions   ☐ Barriers to understanding or learning _____
☑ Written  Verbal  instructions given to: _____  Report called by. _____
Patient  Parent  Caregiver   Report called to _____
☑ Referred to: Dr. _____  PRN/instructions TAKE HOME  Discharged by _____

© 1999-2009 HPO W2Soft, Inc.  p 2 of 2

V000667569974    MR M000514200
MCCOLLUM, LARRY           OERMAJ
04/04/1953    57/M            W
                              01/25/11

11/15/2013 15 9:25AV
From: Jeff Edwards
Case 4:14-cv-03253   Document 288-12 Filed on 06/17/16 in TXSD   Page 6 of 149

## HILLCREST

### FOOT PROBLEM

**PMH:** **Systemic:** HTN  DM  Cancer  HIV  Thyroid  Anemia  ↑Lipids  **Neuro:** CVA  Seizures  Dementia
**Heart:** MI  Angina  CHF  CAD  AFib  **Lungs:** COPD  Asthma  **GI:** PUD  GERD  Liver
**GU:** UTI's  Stones  **MS:** Arthritis  **Psych:** Depression  Anxiety  Schizophrenia  None
**Operations:** Appendectomy  BTL  CABG  Cholecystectomy  Hyst  PTCA  Stent x ___  None

Other: TBC AB ___ Thoracab ___

**FH:** Stroke  Heart  Lung  Liver  **SH:** Smokes: Current  Past ___ ppd x ___ yrs  Never
Kidney  HTN  DM  Cancer    ETOH: Social  Abuse  Alcoholic  None
None ___    Illicit drugs: ___ None
    Lives with: Mom  Dad  Spouse  Family  SO  Alone
    Lives in: Home  Assisted care  Homeless

Allergies: ___    Time seen 2201

**CC:** Foot: Pain / Swelling / Deformity  Pt dislocated (R) great toe 4 wks
ago: he is still having pain

**Reason for visit:** Acute symptoms  Exacerbation chronic symptoms  Doctor sent  Work sent  From out of town
    PCP ___

**HPI:**
Source: Patient  Family  Friend  Guardian  Nursing home  Paramedic  Police  Interpreter
Mode of arrival: Walk-in  Carried  W/C  Friends  Attendant  Ambulance  Helicopter  Police
Location: R  L  Bil  Foot  Great  2  3  4  5  Toe
Timing: Onset ___  a.m.  p.m.  or  Minutes  Hours  Days  Weeks  Months ___ ago
Severity: Able to bear weight: Fully  Limited  No  Pain: Mild  Moderate  Severe  None
Context:
    Mechanism: Inversion  Eversion  Hyperflexion  Hyperextension  Blunt trauma  Crush
    Unknown ___  No injury
    Circumstances: MVA  Altercation  Work-related  Sporting  Fall  Gout  Arthritis
    Spontaneous  Unknown ___  None
    Last tetanus: UTD  > 5 years  Unknown
Associated signs and symptoms: None
    Abrasion  Avulsion  Swelling  Laceration  Subungual hematoma  Numbness  Weakness
    Pain in: Ankle  Leg  Knee
Other history: Prehospital orders given by ED Physician: ___
    See NN

**PE:** T ___  P ___  BP ___  RR ___  °O2 Sat ___ on RA or ___ L/min
    Pulse oximetry interpretation: Normal  Mild  Moderate  Severe  desaturation
**Constitutional:** Alert  ETOH  Ill-appearing  Distress: None  Mild  Moderate  Severe
**EENT:** PERRLA  Hearing intact  Membranes moist ___
**Neck:** ROM: Good  Restricted  Tender  C 1  2  3  4  5  6  7 ___
**Respiratory:** Breath Sounds: Clear  Diminished ___
    R  L  Bil  Generalized  Superior  Inferior  Wheezes  Rales  Rhonchi ___
**CV:** Regular rate/rhythm  Tachycardia  Bradycardia  Irregular  S3  S4 ___ /VI Sys  Dia  Murmur ___
**Musculoskeletal:**
    Nail: R  L  Great  2  3  4  Little ___
    Avulsed  Lacerated  ingrown ___
    Nailbed: Avulsed  Lacerated  Subungual hematoma ___
    Digit: R  L  Great  2  3  4  Little  Prox  Mid  Distal  PIP  DIP ___
    Swelling  Deformity  Limited ROM  Tenderness: Mild  Moderate  Severe ___
    Strength: MP  PIP  DIP  Flexion  Extension: Decreased  Absent ___
    Foot: R  L  Lateral  Medial  Mid  Anterior  Posterior  Dorsum  Heel ___
    Swelling  Deformity  Limited ROM  Tenderness: Mild  Moderate  Severe ___
    Ankle: R  L  Medial  Lateral  Anterior  Posterior ___
    Swelling  Deformity  Limited ROM  Tenderness: Mild  Moderate  Severe ___
    Achilles tendon: Tender  Defect  Absent ___
    Distal function: Deficit: Motor  Pulse  Capillary refill ___
Neurologic: Sensory deficit ___
Skin: Abrasion  Ecchymosis  Erythema  Warm  Open fracture ___
    Laceration: ___ cm  Type: Avulsion  Flap  Linear  Jagged  Stellate ___
    Through To: Skin  Nail  Nailbed  SQ  Tendon  Bone  No obvious abnormalities ___
Psychiatric: Oriented X ___  Memory: Intact  Impaired ___
Other exam: ___


Left    Right

© 1999-2006 EPOWERdoc, Inc. FORM #1371 (10/07)

Circled = positive  Not circled or / = negative  Lined out or section completely blank = not assessed

---

Triage nurse's notes reviewed ☐

**HISTORY / EXAM LIMITED BY:**
Altered mental status  Dementia  Medical urgency
Intubated  Other ___

### REVIEW OF SYSTEMS

**ALL OTHER SYSTEMS NEGATIVE**
**EXCEPT AS NOTED** ☐

**CONSTITUTIONAL:**
    Fever  Chills  Fatigue

**EYES:**
    Blurred vision  Discharge  Pain

**ENT:**
    Ears: Pain  Hearing loss
    Nose: Congestion  Bleeding
    Throat: Pain  Swelling

**RESPIRATORY:**
    Cough  SOB  Wheeze  Hemoptysis

**CV:**
    Chest pain  Palpitations  Syncope

**GI:**
    Abdominal pain  Nausea  Vomiting

**GU:**
    Dysuria  Hematuria  Frequency
    Male: Discharge  Testicular pain
    Female: Discharge  Bleeding  Pregnant

**NEUROLOGICAL:**
    Headache  Dizziness  Weakness

**MUSCULOSKELETAL:**
    Pain or swelling in: R great toe.

**INTEGUMENTARY:**
    Itching  Rash  Bruises  Wounds

**ALLERGIC/IMMUNOLOGIC:**
    Hives  Itching

**HEMATOLOGIC:**
    Lymphadenopathy
    Easy Bruising  Bleeding

**ENDOCRINE:**
    Recent weight changes: Gain  Loss
    ___ lb

**PSYCHIATRIC:**
    Anxiety  Depression  Hallucinations

Level 1=0  Level 2, 3=1  Level 4=2-9  Level 5=10+

V00066756974    MR M000514200
MCCOLLUM, LARRY    OERMAJ
04/04/1953   57/M    W
    01/25/11

003245

## MEDICAL DECISION MAKING

1. Additional information obtained from:
   Old records  Family  Caretaker  PCP _____ (findings):
   _____
   _____

2. Differential Diagnosis: Considerations may include:

| | | |
|---|---|---|
| Abrasion | Contusion | Hematoma | Puncture |
| Arthritis | Dislocation | Ingrown toenail | Sprain |
| DJD | Fracture | Laceration | Subungual hematoma |
| Gout | Metatarsal | Neurovascular injury | |
| Rheumatoid | Phalynx | Open fracture | |
| Septic | Tarsal | Paronychia | |

3. Summary of Treatment in ED:
   _To_ _from Heisenreich_ _P + c_
   _pursistant pain_ _x-ray shows_
   _why_ → _fracture._
   _walking boot, podiatry f/u._

   Reevaluation:  1ˢᵗ _____ : Resolved  Worsened  Improved  Unchanged
   2ⁿᵈ _____ : Resolved  Worsened  Improved  Unchanged
   3ʳᵈ _____ : Resolved  Worsened  Improved  Unchanged

   Consultation: PCP  Orthopedic surgery  Other _____
   Called: _____ a.m. p.m.  Call returned: _____ a.m. p.m.
   Findings: See consult _or_ Summary: _____

   Patient  Family  Education  Counseling  regarding:
   Diagnosis  Treatment  Prognosis  Need for follow-up

## PROCEDURES  (Unless otherwise indicated, all procedures were done or directly supervised by ED attending)

Risks, benefits, and alternatives described.  Informed consent obtained: YES  NO    Time Out performed: YES  NO

☐ **IV sedation** was performed under my direct supervision. See procedural note and flow sheet for documentation

☐ **Digital  Metatarsal** _____ nerve block with **Lidocaine  Bupivacaine**

☐ **Reduction** was performed by: _Orthopedic staff_  _Myself_  with resultant
   **Reduction** _or_ **Good  Acceptable  Poor** alignment

☐ **Splint: Posterior  AO  Stirrup** splint applied by: _Ortho._  _Nurse  Tech._  _Myself_
   Examined post splint application:  **NV Intact**  Alignment good

☐ **See procedure note** on attached page for details and/or additional procedures

## IMPRESSION
_Toe_ _c_ _fracture_ _(distal phalanx,_
_(R) 1st metatarsal, (R) sesamoid)_

☐ **Critical Care time** _____ minutes  _or_  ☐ 30 – 74 minutes  ☐ 74+ minutes
   (Time spent performing separately billable procedures is excluded)

## DISCHARGE INSTRUCTIONS
☐ See separate Discharge Instruction sheet
   · _Podiatry_ _f/u_ _2 week_
   · _Norco_ _c_ _NSAIDs._ _ortho boot._

**Disposition: Discharge**  F/U to: _____  ☐ > 24 hrs  ☐ < 24 hrs  with Dr.: _____
   **Admit  Observation** to: Floor  ICU  Time: _____ to Dr.: _____

p 1 of 1
© 1999-2009 T2QOWER.doc, Inc.
www.cpqowerdoc.com
Foot problem

PA _____    MD / DO _____  _Jr. Peter Richerson M.D._
                                               PVID# 31159

## REVIEW of RESULTS
Meditech reviewed

| | | | |
|---|---|---|---|
| WBC | ____ | NA | ____ | FIO2 | ____ |
| HBG | ____ | K | ____ | pH | ____ |
| HCT | ____ | CL | ____ | pCO2 | ____ |
| PLT | ____ | CO2 | ____ | pO2 | ____ |
| Segs | ____ | Glu | ____ | HCO3 | ____ |
| Bands | ____ | BUN | ____ | | |
| Lymph | ____ | Cr | ____ | O2 Sat | ____ |
| Mono | ____ | Ca | ____ | | |

URINALYSIS                          MICRO
SpG ____   Ketones ____            WBC ____
pH ____    Blood ____              RBC ____
Prot ____  Nitrite ____            EPI ____
Glu ____   Leuk ____               Bact ____

☐ All labs reviewed

OTHER

XR    Interpreted by: Radiologist  Self  Both
Foot:  ☺

*EKG    Interpreted by ED Physician
Compared to prior EKG dated ___ / ___ / ___
Rate _____ bpm    Axis: Normal  LAD  RAD
Rhythm: NSR  SB  ST  PACs  Afib  Aflutter  PSVT
   MAT  Junctional  Junct T  PVCs  VT  VF  Paced
Block: None  1  2  3  AVB  BBB: R  L  IVCD
Hypertrophy: None  LAE  RAE  LVH  RVH
ST-T changes: None  New  Old  Inf  Ant  Lat
   Ischemia  Infarct  Nonspecific
Other: _____

Monitor/Rhythm strip interp: Rate _____  Ectopy: Y  N
NSR  SB  ST  PACs  AF  PSVT  MAT  PVCs  VT  VF

## ADDITIONAL NOTES

☐ Patient history was reviewed and I agree with the Resident /
NP / PA findings, unless otherwise stated. Relevant findings of
the HPI are _____

My personal exam shows _____
I agree with the Assessment and care plan and confirm the
diagnosis(es) listed with the following exceptions: _____

Please see Resident / MLP note for further details

☐ See dictated addendum
☐ Reviewed with Dr. _____ wku
   assumed care at _____
   Pending: _____

V00066756974    MR M000514200
MCCOLLUM, LARRY           DERMAJ
04/04/1953   57/M         W
                          01/25X11

**\*If patient answers yes to any of the below questions, please place a yellow armband to their wrist.**

1. Do you fall unexpectedly or frequently?
   Yes ___ No (circled)

2. Do you use any assistive devices to help walk?
   Yes ___ No (circled)
   If yes, cane_____ walker_____ wheelchair_____ other_____

3. Do you feel dizzy when you get up from a bed or chair?
   Yes ___ No (circled)

4. Do you have any problem with your feet (like pain, numbness)?
   Yes ___ No (circled)

_____     1-25-11
Nurses Signature                     Date

F771-438(05-09)

HILLCREST BAPTIST MEDICAL CENTER
Waco, Texas

**FALL RISK ASSESSMENT
ER QUESTIONNAIRE**

```
V00066756974      MR M000514200
MCCOLLUM, LARRY              OERMAJ
04/04/1953    57/M            W
                           01/25/11
```

**Appendix 337**

003256

**HILLCREST**
Hillcrest Baptist Medical Center

**EMERGENCY DEPARTMENT NURSING RECORD**

PMH: *Systemic:* HTN DM Cancer HIV Thyroid Anemia ↑Lipids  *Neuro:* CVA Seizures Dementia
*Heart:* MI Angina CHF CAD AFib  *Lungs:* COPD Asthma  *GI:* PUD GERD Liver
*GU:* UTI's Stones  *MS:* Arthritis  *Psych:* Depression Anxiety Schizophrenia None
Recent hospitalization for: _____
Other: _____ LMP: _____
Surgeries: _____
Medications: (None) See Medication Reconciliation Form  Pneumococcal vaccine: ___  Flu vaccination: ___
Allergies: (None) Latex Iodine  See Medication Reconciliation Form _____

| Triage Vital Signs | | | |
|---|---|---|---|
| T° | P | RR | BP |
| 98 | | 17 | 174/90 |
| O2 Sat | Pain | TS / GCS | Wt  lb  kg |
| 9/d | 12/15 | | |

PCP: _____ Notified: Y  N

**CC: MOTOR VEHICULAR COLLISION (Minor)**

| | Arrival | 0  : 20 |
|---|---|---|
| | Actual | 02 : 20 |

**TRIAGE:**
Source: (Patient) Family Friend Guardian Nursing home (Paramedic) Police Interpreter
Mode of arrival: Walk in Carried W/C Friends Attendant (Ambulance) Helicopter Police
Timing: Injury occurred _____ Minutes Hours ago
Context: Patient: (Driver) Passenger Pedestrian Front seat Rear seat
Restrained Unrestrained Helmeted Ambulated at scene
Vehicle: (Motor vehicle) Motorcycle Bicycle Other _____
Last tetanus: UTD  > 5 years  Unknown
Location (of pain or injury): None

Head Neck Back Face Mouth Eye Ear Nose Chest Abdominal Pelvis
(R) Shoulder Arm Elbow Forearm Wrist Hand Hip Thigh Knee Leg (Ankle) (Foot)
L Shoulder Arm Elbow Forearm Wrist Hand Hip Thigh Knee Leg Ankle Foot
Other history: (R) Wimber Head on collision
① (R) Foot pain, (Neg) deficit

Nurse: Emi Nang

**Orthostatics/Tilt Test**

| | BP | P | Time |
|---|---|---|---|
| ↑ | | | : |
| | | | : |

**FLACC**

| | 0 | 1 | 2 |
|---|---|---|---|
| Face | No expression or smile | Occ frown, withdrawn | Freq quiver chin |
| Legs | Nml pos or relaxed | Uneasy, restless | Kicking, legs drawn up |
| Act. | Nml pos, moves easy | Squirming, tense | Arched or jerking |
| Cry | No cry | Whimpers, moans | Crying, sobs or screams |
| Cons. | Content, relaxed | Reassured with touch | Difficult to console |

Total FLACC score _____

**NURSING ASSESSMENT:** Room: 8

| | 0  : 22 |
|---|---|

☐ Triage assessment reviewed
*Nursing history:*
Source: (Patient) Family Friend Guardian Nursing home (Paramedic) Police Interpreter
Prehospital: CPR Intubation O2 IV (C-collar) (Backboard) Splints Meds _____ None
Context: *Mechanism:* Struck Struck by Motor vehicle Motorcycle Bicycle Stationary object
Rear-ended (Head-on) Broadside _____
Associated signs and symptoms: None
ETOH Confusion Headache Paralysis Numbness N V
Other history: ① HA

Nursing exam:
Constitutional: (Alert) Cooperative Confused Somnolent Comatose In distress ETOH
Respiratory: R L Bil Generalized Superior Inferior Wheezes Rales Rhonchi _____ normal
CV: Tachycardia Bradycardia Irregular _____ normal
Musculoskeletal:
(R) L Shoulder Clavicle Arm Elbow Forearm Wrist Hand Hip Thigh Knee Leg Ankle (Foot)
Tender Swelling Deformity Pulse deficit Sensory deficit Motor deficit _____ normal
R L Back: Thoracic Lumbar Midline Paraspinous Tender Swelling _____ normal
Skin: See Skin Assessment Worksheet Diaphoretic Pale _____ normal
Lacerations: Location: R L _____ (none)
Other exam: GCS  15
① Abrasion to (R) elbow

| Eye Opening | | Best Motor | | Verbal | |
|---|---|---|---|---|---|
| | | Obeys | 6 | | |
| | | Localizes | 5 | Oriented | 5 |
| Spontaneous | 4 | Nml flexion | 4 | Confused | 4 |
| To speak | 3 | Abn Flexion | 3 | Inappr. words | 3 |
| To pain | 2 | Extension | 2 | Incomprehen. | 2 |
| None | 1 | None | 1 | None | 1 |

**Triage Acuity**

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|

**Triaged to:**

| Major | Intermediate | Minor |
|---|---|---|

Smoker: Yes (No)
Cessation advised: Yes (No)

*Domestic Violence Screening*
Are you in a relationship in which you are
been physically hurt or threatened by your
partner?  Y (N) Unwilling to answer
Do you feel safe in your current environment?
(Y) N  Unwilling to answer

*Functional Screening*
Do you have trouble taking care of yourself —
with feeding, dressing?
(Y) N  Unwilling to answer

*Suicide Assessment Screening*
Have you had thoughts of harming/injuring
yourself?  (Y) N  Unwilling to answer
Have you harmed/injured yourself in the last
6 months?  Y /N  Unwilling to answer

**NURSING DIAGNOSIS:** Potential impaired airway  Altered comfort: Pain  Potential hemorrhage
**NURSING PLAN:** To appropriate area  Stabilize airway  Immobilize C-spine  IV acc
**EXPECTED OUTCOME:** Airway maintained  Pain control/Absent  Hemodynamically _____
RN _____  LVN _____

© 1999-2008 EPOWERlines Inc  p 1 of 2

V00066625294
MCCOLLUM, LARRY
04/04/1953  57/M

MR M000514200
OERMAJ

12/24/10

**Appendix 338**

From: Jeff Edwards    Fax: (888) 528-5977    To: 9124959199@efax.con Fax: +19124959199    Page 2 of 3 11/18/2015 3:35

003257

| Time | T | P | RR | BP | O2 Sat /amt | Pain | GCS | Time | T | P | RR | BP | O2 Sat /amt | Pain | GCS |
|------|---|---|-----|------|------------|------|-----|------|---|---|-----|------|------------|------|-----|
| 0500 | | | | | | | | | | | | | | | |
| 0513 | | 76 | 16 | RFD | 100 RA | 2-3 | 15 | | | | | | | | |

## NURSES NOTES

| Time | | Ini |
|------|--|-----|

0513 *[illegible handwritten nursing notes]*

0220 *[illegible handwritten nursing notes]*

0300 *[illegible handwritten nursing notes]*

0330 *[illegible handwritten nursing notes]*

0450 Report rec'd from ER Ramos RN Care assumed. Alert Resp even, unlabored — No distress

0513 post-op shoe applied (R) foot via — Deferred to RN D/C instructions, RX & medication handouts explained Pt & meds prescribed given, verbalized understanding D/C'd to ER waiting via wheelchair

### NOTIFICATIONS
Family: _____
Nursing home: _____
Pastoral care: _____
PCP: _____
Police: _____
Social services: _____

### PATIENT SUPPORT
☐ Emotional support given
☐ Learning needs addressed
☐ Translation services provided
☐ Post mortem care provided
☐ Plan of care discussed

☐ Universal Time Out Form completed

### I & O's

| Oral | | Urine | |
|------|--|-------|--|
| IV | | NG | |
| Blood | | Blood | |
| Other | | Other | |
| Total | | Total | |

### COMMENTS

Caregiver # 1 _____ Ini ___   Caregiver # 3 _____ Ini ___
Caregiver # 2 *Parsee RN* Ini ___   Caregiver # 4 _____ Ini ___

## DISPOSITION

☑ Discharged  LWBS  AMA  Expired  Admitted  Transferred to: _____  ☐ Transfer form completed
Valuables with: Patient  Family  Friends  Security  Envelope # _____  Other _____
Mode of departure: Walking  Carry  Wheelchair  Cart  Auto  Ambulance  MediVan  Stretcher
Condition on discharge: Pain scale: 2-3  NA  Improved  Worsened  Good  Fair  Poor  Stable  Unstable  Critical
Prescriptions given: # 1  2 new

☑ Verbalizes understanding of discharge instructions  ☐ Barriers to understanding or learning _____
Written  Verbal  instructions given to.  Report called by. _____
Patient  Parent  Caregiver  Report called to: _____
Referred to: PCP _____ PRN /in _____ days  Discharged by *Parsee RN* 0513

© 1999-2009 EPOWERdoc Inc.  p 3 of 3

V00066625294    MR M000514200
MCCOLLUM, LARRY    GERMAJ
04/04/1953    57/M

12/24/10

**Appendix 339**

# MVA

003258
EMERGENCY DEPARTMENT
PHYSICIAN RECORD

**HILLCREST**
Hillcrest Baptist Medical Center

Triage nurse's notes reviewed ☑

**PMH:** *Systemic:* HTN  DM  Cancer  HIV  Thyroid  Anemia  ↑Lipids  *Neuro:* CVA  Seizures  Dementia
*Heart:* MI  Angina  CHF  CAD  AFib   *Lungs:* COPD  Asthma   *GI:* PUD  GERD  Liver
*GU:* UTI's  Stones  *MS:* Arthritis   *Psych:* Depression  Anxiety  Schizophrenia   None
Operations: Appendectomy  BTL  CABG  Cholecystectomy  Hyst  PTCA  Stent ___   None

Other: TBCAB  Thoracab  **Edema**

**FH:** Stroke  Heart  Lung  Liver   **SH:** Smokes: Current  Past ___ ppd x ___ yrs  Never
Kidney  HTN  DM  Cancer   ETOH: Social  Abuse  Alcoholic   None
None ___   Illicit drugs: ___   None
___   Lives with: Mom  Dad  Spouse  Family, SO  Alone
___   Lives in: Home  Assisted care  Homeless

**HISTORY / EXAM LIMITED BY:**
Altered mental status  Dementia  Medical urgency
Intubated  Other ___

**REVIEW OF SYSTEMS**

**ALL OTHER SYSTEMS NEGATIVE**
**EXCEPT AS NOTED** ☐

Allergies: ∅   Time seen ___
CC: MVA with complaints of: (R) Foot  (L) Knee, Forehead

**Reason for visit:** Acute symptoms  Exacerbation chronic symptoms  Doctor sent  Work sent  From out of town
PCP ___

**HPI:**
**Source:** Patient  Family  Friend  Guardian  Nursing home  Paramedic  Police  Interpreter
**Mode of arrival:** Walk in  Carried  W/C  Friends  Attendant  Ambulance  Helicopter  Police
**Timing:** Occurred ___ a.m.  p.m. or  Minutes  Hours  Days  Weeks  Months  ago
**Severity:** Code  1  2  3  4   *Pain:* Mild  Moderate  Severe  or ___ /10
**Duration:** LOC for ___ Minutes  Hours  Unknown  None
**Context:**
*Patient:* Driver  Passenger  Pedestrian  Front seat  Rear seat
Restrained  Unrestrained  Helmeted  Ambulated at scene
Last tetanus: UTD  > 5 years  Unknown
*Vehicle:* Motor vehicle  Motorcycle  Bicycle  Other ___
*Speed:* Slow  Moderate  High  Unk   *Damage:* None  Mild  Moderate  Severe
*Windshield:* Intact  Broken  Unk   *Steering wheel:* Intact  Collapsed  Unk
*Airbag:* Inflated  Noninflated  Unk
*Mechanism:* Struck  Struck by: Motor vehicle  Motorcycle  Bicycle  Stationary object
Rear-ended  Head-on  Broadside   730 mph
**Prehospital:** *Who:* EMT  Paramedic  Helicopter  Another hospital  None
*What:* CPR  Intubation  O collar  Backboard  Splints  IV  None
**Location** (of pain or injury): Specify  Foot, Knee, Head   None
**Associated signs and symptoms:** ETOH  Confusion  Headache ___   None
**Other history:** Prehospital orders given by ED Physician: ___

**PE:** T 98°   P 154   BP 50/__   RR 17   *O2 Sat* 100 (RA or ___) L/min
Pulse oximetry interpretation: Normal  Mild  Moderate  Severe  desaturation
**Constitutional:** Alert  ETOH  Ill-appearing  Distress: None  Mild  Moderate  Severe
**Head:** NC/AT  R  L  Frontal  Temporal  Parietal  Occipital  Vertex ___
Swelling  Ecchymosis  Deformity  Tender  Abrasion  Laceration ___
**Neck:** WNL  C collar  Tender  Step off  Tracheal deviation  JVD  Adenopathy ___
**Face:** Swelling  Abrasion  Tender: Periorbital  Zygoma  Arch  Maxilla  Mandible ___
**Eyes:** PEERL  Unequal od ___ mm os ___  Subconjunctival hemorrhage ___
**Ears:** Normal  R  L  Swelling  Ecchymosis  Hemotympanum  Abrasion  Laceration ___
**Nose:** Normal  Swelling  Ecchymosis  Deformity  Tender  Abrasion  Laceration ___
*Intranasal:* Blood  Abrasion  Laceration  *Septum:* Hematoma  Deviation ___
**Mouth:** Swelling  Ecchymosis  Tender  Abrasion  Laceration ___
**Respiratory:** *Breath Sounds:* Clear  Diminished ___
R  L  BP  Generalized  Superior  Inferior  Wheezes  Rales  Rhonchi ___
**CV:** Regular rate/rhythm  Tachycardia  Bradycardia  Irregular  S3  S4 ___ /VI Sys Dia  Murmur ___
**Chest:** R  L  Ant  Post  Lat or # ___  Abr  Tender  Swelling  Crepitance ___
**GI:** *Auscultation:* Bruit  Bowel sounds: Present  Absent  Increased  Decreased  High-pitched
*Tenderness:* None  Diffuse  RUQ  RLQ  LUQ  LLQ  Epigastric  Periumbilical  Suprapubic
Mild  Moderate  Severe  Rebound  Guarding  Rigidity ___
**Extremities:** Normal ROM all joints  Pain on motion ___
**Musculoskeletal:**
R  Shoulder  Clavicle  Arm  Elbow  Forearm  Wrist  Hand  Hip  Thigh  Knee  Leg
Ankle  Foot  Tender  Swelling  Deformity  Deficit: Pulse  Sensory  Motor ___
L  Shoulder  Clavicle  Arm  Elbow  Forearm  Wrist  Hand  Hip  Thigh  Knee  Leg
Ankle  Foot  Tender  Swelling  Deformity  Deficit: Pulse  Sensory  Motor ___
R  L  Back: Thoracic  Lumbar  Midline  Paraspinous  Tender  Swelling ___
R  L  Pelvis: Tender  Swelling  Deformity  Instability  Crepitance ___
**Neurologic:** *Oriented to:* Time  Person  Place  Not oriented  Unable to test ___
*Motor function:* R  L  Arm  Leg  Face  Weak  Unable to test  Mae all 4
(see next page)

**CONSTITUTIONAL:**
Fever  Chills  Fatigue

**EYES:**
Blurred vision  Discharge  Pain

**ENT:**
Ears: Pain  Hearing loss
Nose: Congestion  Bleeding
Throat: Pain  Swelling

**RESPIRATORY:**
Cough  SOB  Wheeze  Hemoptysis

**CV:**
Chest pain  Palpitations  Syncope

**GI:**
Abdominal pain  Nausea  Vomiting

**GU:**
Dysuria  Hematuria  Frequency
Male: Discharge  Testicular pain
Female: Discharge  Bleeding  Pregnant

**NEUROLOGICAL:**
Headache  Dizziness  Weakness

**MUSCULOSKELETAL:**
Pain or swelling in: Knee, Foot

**INTEGUMENTARY:**
Itching  Rash  Bruises  Wound

**ALLERGIC/IMMUNOLOGIC:**
Hives  Itching

**HEMATOLOGIC:**
Lymphadenopathy
Easy Bruising  Bleeding

**ENDOCRINE:**
Recent weight changes: Gain  Loss
___ lb

**PSYCHIATRIC:**
Anxiety  Depression  Hallucinations

Level 1=0  Level 2, 3=1  Level 4-2-9  Level 5=10+

© 1995-2009 iPOWER/DOC Inc.   p 1 of 3   Circled = positive  Not circled or / = negative  Lined out or written comment/initials = not reviewed

V00066625294
MCCOLLUM, LARRY
04/04/1953  57/M

MR M000514200
CERMAJ

12/24/10

⑧

003259

**Skin:** (See drawing) Abrasion _____ normal
**Laceration: Location:** R   L _____ cm
**Type:** Avulsion   Flap   Linear   Jagged   Stellate   Irregular
**Through   To   T & T:** Skin   Mucosa   SQ   Muscle   Tendon
Fascia   Joint   Bone   Vermilion border
**Foreign body:** _____ None
**Distal function:** Deficits: Motor   Sensory   Pulse   normal
**Other exam:**

Abrasion (A)
Ecchymosis (E)
Lacerative (X)
Swelling (S)

## MEDICAL DECISION MAKING

1. Additional Information obtained from:
   Old records   Family   Caretaker   PCP _____ (findings) _____

2. Differential Diagnosis:  Considerations may include:

| Trauma | | Skin |
|---|---|---|
| Closed head injury | Pulmonary contusion | Abrasion (s) |
| Cardiac injury | Spine injury | Contusion (s) |
| Fracture (s) | Tracheal injury | Foreign body (s) |
| Intraabdominal injury | Urological injury | Hematoma (s) |
| Pneumothorax | Vascular injury | Laceration (s) |

3. Summary of Treatment in ED:

**Reevaluation:** 1ˢᵗ _____ : Resolved   Worsened   Improved   Unchanged
2ⁿᵈ _____ : Resolved   Worsened   Improved   Unchanged
3ʳᵈ _____ : Resolved   Worsened   Improved   Unchanged

**Consultation:** PCP   Surgery   Other _____
Called: _____ a.m. _____ p.m.   Call returned: _____ a.m. p.m.
Findings: See consult *or* Summary: _____

Patient   Family   Education   Counseling regarding:
Diagnosis   Treatment   Prognosis   Need for follow-up

## PROCEDURES (Unless otherwise indicated, all procedures were done or directly supervised by ED attending)

Risks, benefits, and alternatives described.   Informed consent obtained: YES   NO      Time Out performed: YES   NO

☐ Wound care: No closure   Area of repair _____   Wound length _____ cm
**Anesthetic:** Local   Topical with _____ Lidocaine   Bupivacaine   Epinephrine
**Prep:** Saline   Betadine   Shur-Clens _____ by Irrigation   Manual scrub
**Debridement:** Minimal   Moderate   Extensive   Foreign bodies   Identified   Removed
**Repair:** Skin # _____ -0 Nylon   Prolene   Wound adhesive   Staples   Steri-strips
Subcu. # _____ -0 Chromic   Vicryl

☐ **Splint:** Velcro   Aluminum-foam   Sugartong   Cock-up   Volar   Stirrup   ACE _____
splint applied by: *Orthopedic staff*   Nurse   Tech.   Myself
Examined post splint application: NV intact   Alignment good

☐ See procedure note on attached page for additional procedures

**IMPRESSION**
① Right first toe proximal phalanx dislocation
② Mild closed head injury

☐ **Critical Care time** _____ minutes   or   ☐ 30   74 minutes   ☐ 74+ minutes
(Time spent performing separately billable procedures is excluded)

**DISCHARGE INSTRUCTIONS**
☐ See separate Discharge Instruction sheet
- post-op shoe ® foot   4-6 wks
- Ice + Elevate foot over next 48°

**Disposition:** Discharge   F/U in: ☐ > 24 hrs   ☐ < 24 hrs   with Dr.: _____
Admit   Observation to: Floor   ICU   Time: _____ to Dr.: _____

MVC, minor

_____ PA _____ MD / DO

V00066625294        MR M000514200
MCCOLLUM, LARRY
04/04/1953   57/M        OERMAJ

12/24/10

## REVIEW of RESULTS

Meditech reviewed

| | | | |
|---|---|---|---|
| WBC | ____ | NA | ____ | FIO2 | ____ |
| HGB | ____ | K | ____ | pH | ____ |
| HCT | ____ | CL | ____ | pCO2 | ____ |
| PLT | ____ | CO2 | ____ | pO2 | ____ |
| Segs | ____ | Glu | ____ | HCO3 | ____ |
| Bands | ____ | BUN | ____ | | |
| Lymph | ____ | Cr | ____ | O2 Sat | ____ |
| Mono | ____ | Ca | ____ | | |

**URINALYSIS**                                 MICRO
SpG ____   Ketones ____          WBC ____
pH ____    Blood ____            RBC ____
Prot ____  Nitrite ____          EPI ____
Glu ____   Leuk ____             Bact ____
☐ All labs reviewed

**OTHER**

PT ____   PTT ____   INR ____

**XR**   Interpreted by: Radiologist   Self   Both
C spine:   Foot: 1ˢᵗ toe prox. phalanx distn...
Xray: ⊖
Pelvis:   C-Spine: ⊖
CT:   CT Head: ⊖

**EKG**   Interpreted by: ED Physician
Compared to prior EKG dated ___ / ___ / ___
Rate ____ bpm   Axis: Normal   LAD   RAD
Rhythm: NSR   SB   ST   PACs   Afib   Aflutter   PSVT
MAT   Junctional   Junct T   PVCs   VT   VF   Paced
Block None   1   2   3   AVB   BBB   R   L   IVCD
Hypertrophy: None   LAE   RAE   LVH   RVH
ST-T changes: None   New   Old   inf   Ant   Lat
Ischemia   Infarct   Nonspecific
Other:

Monitor/Rhythm strip Interp: Rare ____   Ectopy: Y   N
NSR   SB   ST   PACs   AF   PSVT   MAT   PVCs   VT   VF

## ADDITIONAL NOTES

☐ Patient history was reviewed and I agree with the Resident /
NP / PA findings, unless otherwise stated. Relevant findings of
the HPI are _____
My personal exam shows _____
I agree with the assessment and care plan and confirm the
diagnosis(es) listed with the following exceptions. _____
Please see Resident / MLP note for further details
- See attached procedure note.
- C-Spine: cleared clinically.

☐ See dictated addendum
☐ Reviewed with Dr. _____ who
assumed care as _____
Pending _____

003269

**\*If patient answers yes to any of the below questions, please place a yellow armband to their wrist.**

1. Do you fall unexpectedly or frequently?
   Yes  (No)

2. Do you use any assistive devices to help walk?
   Yes  (No)
   If yes, cane_____  walker_____  wheelchair_____  other_____

3. Do you feel dizzy when you get up from a bed or chair?
   Yes  (No)

4. Do you have any problem with your feet (like pain, numbness)?
   (Yes)  No

_CParseeRN_____        _12/24/10_____
Nurses Signature                           Date

FT71-438(05/06)

HILLCREST BAPTIST MEDICAL CENTER
Waco, Texas

**FALL RISK ASSESSMENT
ER QUESTIONNAIRE**

V00066625294      MR M00051420O
MCCOLLUM, LARRY              CERMAJ
04/04/1953   57/M
                              12/24/10

**Appendix 342**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM, | § § § § § § § § | |
| PLAINTIFFS | | |
| v. | § § | CIVIL ACTION NO. 3:12-cv-02037 |
| BRAD LIVINGSTON, JEFF PRINGLE, and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § | |
| DEFENDANTS | § § | |

**PLAINTIFF'S INITIAL DISCLOSURES**

Plaintiffs make these initial disclosures as required by Fed. R. Civ. P. 26(a)(1)(A). Plaintiffs reserves the right to supplement these initial disclosures at any time.

1. **The names and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;**

For every person Plaintiffs identify, they provide the individual's last known mailing address, business address, phone number, or unit.

Sandra McCollum
c/o Jeff Edwards
The Edwards Law Firm
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701
Tel. 512-623-7727

**Appendix 343**

Patient Name: McCollum, Larry Gene (MRN: 4493765)

**All Notes (continued)**
**MRN:** 4493765

Focus of Care: Patient


Faith Community: Baptist
Who Initiated Visit: Chaplain
Date Referral Received:
Time Received:
Length of Contact:
Response Category: Routine

Reason For Visit: Follow Up;Length of Stay

Assessment: Patient/Family Unavailable for Care

Goals: Experience Supportive Presence

**Plan of Care:**
Follow Up Required?: Yes (24 hour ICU goal)
A. Follow Up Time Frame: Other (Comment) (24 hour ICU goal)
    Refer to:
    Or
    Discharge Refer to:
    Date:                    Time:

B. Interventions: Sacraments/Ritual;Prayer



**Electronically signed by:**
ROSS PRATER
7/28/2011 1523


Electronically Signed by Ross Prater at 07/28/11 1523
**Progress Notes signed by Kevin Ross Davidson, MD at 07/28/11 1538**

| Author: | Kevin Ross Davidson, MD | Service: | Pulmonary Diseases | Author Type: | PGY 3 |
|---|---|---|---|---|---|
| Filed: | 07/28/11 1538 | Note Time: | 07/28/11 1531 | | |

Brief MICU Note

I have spoken with the family including Mr. McCollum's wife, daughter, and sons. They understand the patient's critical condition and extensive neurologic injury. We have discussed the results of the MRI including his diffuse anoxic brain injury and compressive hydrocephalus. After discussion of treatment options, the wife and family have decided to pursue comfort measures only and to withdraw care. This decision is in keeping with the patient's previous expressed beliefs to not want life support or live in a manner where he did not have his full faculties. We are awaiting additional family members to arrive at bedside and join the wife, son, and daughters who are here. The police officers guarding the patient have been notified as well.

Davidson x4099

Electronically Signed by Kevin Ross Davidson, MD at 07/28/11 1538
**Progress Notes signed by Lance S. Terada, MD at 07/28/11 1541**

Mon Sep 12, 2011  4:08 PM                                    Page 46

**Appendix 344**                                    000205

Patient Name: McCollum, Larry Gene (MRN: 4493765)

## All Notes (continued)

**Progress Notes signed by Lance S. Terada, MD at 07/28/11 1541 (continued)**

| | | | |
|---|---|---|---|
| Author: | Lance S. Terada, MD | Service: Internal Medicine | Author Type: Attending |
| Filed: | 07/28/11 1541 | Note Time: 07/28/11 1140 | |
| Related Notes: | Original Note by: Kevin Ross Davidson, MD filed at 07/28/11 1205 | | |

**MICU / Pulmonary Team III Note:**

Had MRI/MRA done this morning showing extensive global strokes as well as acute compressive hydrocephalus. Neurosurgery and neurology both consulted. Patient less responsive on exam. Remains hypernatremic.

Hospital Day:  7
Drips:      None
Lines:     Rt radial A-line 7/22
           Right brachial PICC 7/25
           Foley, rectal, OG
Antibiotics:  None

Vent Day:    7
AC: Vt 500 / 16 / 40% / +5
VS: Tc 38.2  70-115  95-160/50-90   18-22 71  93/50 20  96% Vent
I/O: +2.9 | -3.8 | -0.9

General: unresponsive, vented
Chest: diminished on right, symmetric chest rise, no wheezes, coarse
Cardiac:Distant, unable to appreciate
Abd: Obese, soft, +foley/rectal tube
Neuro: Pupils no longer reactive, no longer withdrawing from pain.
Ext: Nonpitting edema of bilat UE, warm, good cap refill, no petechiae

Medicines:

| | | |
|---|---|---|
| • sterile water injection for medication reconstitution 5 mL | 5 mL | BID (DIURETIC) |
| • ranitidine (ZANTAC) syrup    DOSE: 150 mg | 150 mg | BID |
| • insulin regular sliding scale injection 2-14 Units | 2-14 Units | Q6H |
| • insulin NPH (HUMULIN N;NOVOLIN N) injection 5 Units | 5 Units | BID |
| • acetaminophen (TYLENOL) oral solution   DOSE: 650 mg | 650 mg | Q4HR PRN |
| • multivitamin oral solution    DOSE: 5 mL | 5 mL | DAILY |
| • lidocaine injection 1% | 10 mL | PRN |
| • hydroxypropyl methylcellulose (ISOPTO TEARS) 0.5 % ophthalmic solution | 1 Drop | PRN |
| • sodium chloride 0.9% infusion | | CONTINUOUS |

| | |
|---|---|
| Na | 149 |
| K | 3.8 |
| Cl | 113 |
| CO2 | 32 |
| BUN | 47 |
| Cr | 1.44 (1.62) |
| | |
| WBC | 2.62 |
| Hgb | 8.8 |
| Hct | 26.4 |
| Plat | 75 |
| | |
| AST | 340 |
| ALT | 172 |

7/22 Neuron specific enolase Pending

Micro:  7/22 Blood NG
        7/22 Urine NG

Mon Sep 12, 2011  4:08 PM

**Appendix 345**

000206

Patient Name: McCollum, Larry Gene (MRN: 4493765)

**All Notes (continued)**
7/22 C Diff NG
7/22 Fecal WBC Neg

Problem List:
10. Unresponsiveness
11. Resolving multi-organ dysfunction
12. Azotemia
13. Acute renal failure
14. Rhabdomyolysis
15. Anemia
16. Shock liver
17. Hyperthermia, resolved
18. Unwitnessed single seizure

Assessment & Plan:
58 yo M presenting from prison after report of generalized seizure and marked hyperthermia. The patient was intubated in the ER for unrepsonsiveness and developed acute renal failure, rhabdomyolysis, and circulatory shock which are now nearly resolved.  Overnight he had MRI/MRA which shows extensive bilateral anoxic brain injury as well as acute compressive hydrocephalus.  Family is en route to the hospital to discuss MR findings and decide upon ventriculostomy.

**Extensive global CVA:**
-Neurosurg consulted for possible ventriculostomy given compressive hydrocephalus
-Neurology consulted as well given findings.
-Decreased neuro exam today, no longer responsive pupils
-Maintaining hypernatremia, head of bed elevated, considering for ventriculostomy
-All sedation remains held
-NSE pending.
-EEG was neg for subclinical status
-Remains unresponsive.

**Resolving shock with Multiorgan Dysfunction:**
-Supportive hemodynamics, TTE shows right sided dysfunction, holding boluses
-Renal function improving with downtrending creatinine and increased UOP
-Liver enzymes also downtrending.  NAC protocol stopped 2 days ago.

**Rhabdomyolysis:** Rebounded slightly today along with AST.  Creatinine remains downtrending
**Anemia:** H&H stable.  Remains on acid suppression
**ATN:** Improving. Cr downtrending
**Prophylaxis:** PPI, SCD's
**Code Status: DNR**

Davidson x4099

Pulmonary Attending
I reviewed and examined Mr McCollum with Dr. Davidson and I concur with the findings and plans recorded.  His pupils are unreactive.  CT shows diffuse brain edema and obstructive hydrocephalus from 4th ventricle compression.  This was not present on first 2 scans.  Prognosis remains very poor even with ventriculostomy.  Family to decide about withdrawal of care.  Not extubation candidate unless we opt for comfort care.

Lance Terada, MD

Electronically Signed by Lance S. Terada, MD at 07/28/11 1541
**Progress Notes signed by Hai Chen, MD,PHD at 07/28/11 1543**

| Author: | Hai Chen, MD,PHD | Service: | Neurology | Author Type: | PGY 2 |
|---------|------------------|----------|-----------|--------------|-------|
| Filed: | 07/28/11 1543 | Note Time: | 07/28/11 1542 | | |

Mon Sep 12, 2011  4:08 PM

**Appendix 346**

000207

Patient Name: McCollum, Larry Gene (MRN: 4493765)

## All Notes (continued)

Discussed with primary team Dr. Davidson. Family wishes to withdraw care. Consult cancelled.
Call with any additional Qs.

Electronically Signed by Hai Chen, MD,PHD at 07/28/11 1543

**Progress Notes signed by Ana Marie Wilson at 07/28/11 1811**

| Author: | Ana Marie Wilson | Service: | (none) | Author Type: | Pastoral Care |
|---|---|---|---|---|---|
| Filed: | 07/28/11 1811 | Note Time: | 07/28/11 1809 | | |

### Spiritual Care Note

**Patient's Name:** Larry Gene McCollum
**MRN:** 4493765

Focus of Care: Family Member(s)

Helped other chaplain during withdraw of support and answering questions for the family regarding autopsy and jail involvement/payment from here. Officer Sessions stated the family would only be responsible for the funeral home/burial expenses.

Faith Community: Baptist
Who Initiated Visit: Chaplain

Length of Contact:35 min
Response Category: Urgent

Reason For Visit: End of Life Care

Assessment: Religious/Spiritual Support

Goals: Experience Supportive Presence

### Plan of Care:
Follow Up Required?: Yes
A. Follow Up Time Frame: Other (Comment) (through the dying process)

B. Interventions: Supportive Dialogue/Empathic Listening;Grief Facilitation/Education

**Electronically signed by:**
Ana Marie  Wilson
7/28/2011 1809

Electronically Signed by Ana Marie Wilson at 07/28/11 1811

**Progress Notes signed by Kevin Ross Davidson, MD at 07/28/11 1908**

| Author: | Kevin Ross Davidson, MD | Service: | Pulmonary Diseases | Author Type: | PGY 3 |
|---|---|---|---|---|---|
| Filed: | 07/28/11 1908 | Note Time: | 07/28/11 1824 | | |
| Related Notes: | Original Note by: Kevin Ross Davidson, MD filed at 07/28/11 1825 | | | | |

Brief MICU Note:

Patient extubated in accordance with family and patient's own prior wishes.  He is on morphine GTT titrated to air hunger

Mon Sep 12, 2011  4:08 PM

**Appendix 347**

000208

Patient Name: McCollum, Larry Gene (MRN: 4493765)

**All Notes (continued)**

and signs of any suffering. Transfer orders are in place for a private room outside of the MICU.

Davidson x4099

Electronically Signed by Kevin Ross Davidson, MD at 07/28/11 1908

**Nurses Notes signed by Tina Marie Harris, RN at 07/28/11 1924**

| Author: | Tina Marie Harris, RN | Service: | (none) | Author Type: | Registered Nurse |
|---|---|---|---|---|---|
| Filed: | 07/28/11 1924 | Note Time: | 07/28/11 0911 | | |
| Related Notes: | Original Note by: Tina Marie Harris, RN filed at 07/28/11 1810 | | | | |

July 28, 2011, 0911
0800 Is unresponsive. See flowsheet for complete assessment. POC reviewed. No changes made. Is unresponsive. No family at bedside. No nonverbal indicators of pain.
July 28, 2011, 1224
1200 No changes in assessment. No nonverbal indicators of pain.
July 28, 2011, 1653
1500 Family in conference room with Dr. Davidson discussing plan of care.
1600 Family wishes to withdraw care when other family members arrive. Pupils are nonreactive. No other changes in assessment. No nonverbal indicators of pain.
July 28, 2011, 1710
1708 Morphine 4 mg IV given. PCA morphine gtt started at 5 mg/h. Family at bedside.
July 28, 2011, 1730
1724 ETT pulled (care withdrawn) by Dr. Davidson. Family at bedside.
July 28, 2011, 1809
1800 Okay per Dr. Davidson to not get BP. Family at bedside praying. Is comfort care only. Transfer to floor orders written.
July 28, 2011, 1923
1920 VS stable. Report given to oncoming RN.

Electronically Signed by Tina Marie Harris, RN at 07/28/11 1924

**Progress Notes signed by Charles Taylor Owens, MD at 07/28/11 2356**

| Author: | Charles Taylor Owens, MD | Service: | Internal Medicine | Author Type: | PGY 3 |
|---|---|---|---|---|---|
| Filed: | 07/28/11 2356 | Note Time: | 07/28/11 2356 | | |

**Death Note:**

This entry is clinical documentation by Charles Taylor Owens, MD regarding Patient
Larry Gene McCollum, 4493765. Mr. McCollum was examined by me and has no detectable
pulse, blood pressure, respirations, gag and corneal reflexes are absent and is deceased. The time of death was recorded
at 11:35 pm on 7/28/2011

The time of this examination is 2356 on 7/28/2011.

The Family has/have been notified.

**Electronically Signed by:**
Charles Taylor Owens, MD

Electronically Signed by Charles Taylor Owens, MD at 07/28/11 2356

**Appendix 348**

000209

State Bar No. 24014406
Lead Counsel

_/s/Scott Medlock_____
Scott Medlock
State Bar No. 24044783
James C. Harrington
State Bar No. 09048500
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

I certify that on November 2, 2012, I sent the foregoing to Defendants' counsel, Bruce Garcia, PO Box 12548, Capitol Station, Austin, TX 78711 via CMRRR *7011 2000 0002 6120 0590*.


/s/ Scott Medlock
Scott Medlock

11

**Appendix 349**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN MCCOLLUM, et al,            )
      Plaintiffs,                 )
                            )
V.                                  )   C.A. No. 3:12-CV-02037
                            )
                            )
BRAD LIVINGSTON, et al,             )
      Defendants.                 )

*******************************************************

ORAL DEPOSITION OF

STEPHANIE KINGREY

November 22, 2013

*******************************************************

ORAL DEPOSITION OF STEPHANIE KINGREY, produced as a

witness at the instance of the Defendant University of

Texas Medical Branch and duly sworn, was taken in the

above-styled and numbered cause on the 22nd of

November, 2013, from 12:09 p.m. to 3:25 p.m., before

DEBRA L. McGREW, CSR in and for the State of Texas,

reported by machine shorthand at the offices of

Edwards Law, 1101 E. 11th Street, Austin, Texas,

pursuant to the Federal Rules of Civil Procedure.

ORAL DEPOSITION OF STEPHANIE KINGREY

**2**

APPEARANCES

FOR THE PLAINTIFFS:

Mr. Scott Medlock
Edwards Law
1101 E. 11th Street
Austin, Texas 78702
Phone: 512-623-7727

FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:

Ms. Kim Coogan
Ms. Shanna Elizabeth Molinare
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

FOR THE DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ROBERT EASON AND JEFF PRINGLE:

Mr. Jonathan Stone
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

FOR THE DEFENDANTS BRAD LIVINGSTON, RICK THALER AND BILL STEPHENS:

Mr. Kyle M. Smith
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

ALSO PRESENT:

Jennifer Osteen
Sandra Sue McCollum
Stephen Michael McCollum

-*-*-*-*-*

**3**

INDEX

Appearances.................................. 2

STEPHANIE KINGREY
Examination by Ms. Coogan.................. 4
Examination by Mr. Stone.................. 55
Examination by Mr. Smith.................. 90

Reporter's Certificate........................ 94

EXHIBITS

NO.   DESCRIPTION                         PAGE

1   ...........................................   5
    Six Photographs Labeled A, B, D, D, E, F
2   ...........................................   42
    Handwritten Notes

3   ...........................................   43
    Photograph of Davalene Lying Under Table
4   ...........................................
    Photograph of Brain Scan

5   ...........................................   52
    Photograph of Stephanie and Father
6   ...........................................   52
    Photograph of Stephanie's Parents and Brother

7   ...........................................   52
    Senior Photograph of Stephanie's Father
8   ...........................................   52
    Photograph of Stephanie's Father and Sandra
    at WinStar Entrance

**4**

STEPHANIE KINGREY,
having been first duly sworn, testified as follows:
EXAMINATION
BY MS. COOGAN:

Q.  Can you please state your full name for the record?

**A.  Stephanie Jo Kingrey.**

Q.  And where do you live?

**A.  West, Texas.**

Q.  Oh, my goodness.

And are you married?

**A.  Yes.**

Q.  What is your husband's name?

**A.  Jason.**

Q.  What's his last name?

**A.  Kingrey.**

Q.  Can you spell that for us?

**A.  J-A-S-O-N K-I-N-G-R-E-Y.**

Q.  What's your street address there in West?

**A.**

Q.  And your social security number?

**A.**

Q.  Date of birth?

**A.**

Q.  How long have you been married?

**5**

**A.  13 years.**

MR. MEDLOCK:  Counsel, just to make sure, we'll have the same agreement about redacting the social security number.

MS. COOGAN:  Absolutely.  And what I'd like to do on that regard is just have the court reporter print it out regular and then, if for some reason, those -- those depositions were to be used or leave the office, redact them at that point.

MR. MEDLOCK:  That sounds fine to me.

Q.  (BY MS. COOGAN)  And what year did you get married?  You said 13 years?

**A.  Uh-huh.  2000.**

Q.  Do you have any children?

**A.  We have two kids.**

Q.  And how old are they?

**A.  Shelbi is 12, and Lexi is fixing to turn 11.**

**(Exhibit 1 marked).**

Q.  (BY MS. COOGAN)  Let me show you what's been marked as Exhibit 1 and ask you to identify who those people are.

**A.  This is my daughter, Shelbi --**

Q.  Let me interrupt you for a second.  What I'm going to do is say A, B, C, D -- okay.

Exhibit 1, Photograph A, who is that?

**2 (Pages 2 to 5)**

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

**Appendix 351**

ORAL DEPOSITION OF STEPHANIE KINGREY

6

1   A.  My daughter Shelbi, S-H-E-L-B-I.
2   Q.  Anybody else in that picture?
3   A.  Shrek.
4   Q.  Shrek.  Okay.
5       How about Picture B?
6   A.  Picture B is also Shelbi.
7   Q.  C?
8   A.  My husband Jason, myself, Shelbi and Lexi,
9   L-E-X-I.
10  Q.  D?
11  A.  D is my brother, Steve, and his first wife,
12  Nicole.
13  Q.  E?
14  A.  E is my daughter Shelbi, my daughter Lexi and
15  my niece Hailey.
16  Q.  And F?
17  A.  My husband, myself and Shelbi.
18  Q.  What is your understanding of where the
19  photographs in Exhibit A came from?
20  A.  My father's wallet.
21  Q.  What is your mother's name?
22  A.  Brenda Atteberry.
23  Q.  And was your father married anytime in addition
24  to -- to your mother and to Sandra McCollum?
25  A.  No.

7

1   Q.  Tell me who your siblings are.
2   A.  My brother, Stephen.
3   Q.  Is he your only biological sibling?
4   A.  Yes, ma'am.
5   Q.  Did your father adopt any children?
6   A.  No.
7   Q.  And are you pretty sure he doesn't have any
8   other biological children out there?
9   A.  Yes.
10  Q.  How long were your parents married?
11  A.  I think around 16 years.
12  Q.  Did they ever formally divorce, as far as you
13  know?
14  A.  Yes.
15  Q.  Do you recall what year that would have been?
16  A.  No.
17  Q.  How old were you at that time?
18  A.  I was six.
19  Q.  And where did you go -- did you live with?
20  A.  My mother.
21  Q.  And did your brother do that as well?
22  A.  Yes.
23  Q.  And what -- where did your father go to live at
24  that time, when your parents divorced?
25  A.  With his parents.

8

1   Q.  When you -- when -- okay.  When you and your
2   brother and your parents were married, where did you
3   live?
4   A.  We lived in Waco.
5   Q.  Do you remember the street address?
6   A.  McKenzie, I believe.
7   Q.  Do you remember if that house had
8   air-conditioning?
9   A.  Yes.
10  Q.  Yes, you remember?
11  A.  Yes, I remember it did.
12  Q.  And did you ever live anywhere else with both
13  of your parents?
14  A.  Yes.
15  Q.  Where?
16  A.  China Spring.
17  Q.  Do you remember the street address?
18  A.  No.
19  Q.  Do you remember if that house had
20  air-conditioning?
21  A.  Yes, it did.
22  Q.  Did you ever work -- live anywhere else with
23  them?
24  A.  Not that I can recall.
25  Q.  And when your parents divorced and you and your

9

1   brother lived with your mom, do you remember where you
2   lived?
3   A.  Mostly in Waco.
4   Q.  Did your mom own a home?
5   A.  No.
6   Q.  And tell me, to the extent that you can, where
7   you lived in Waco.
8   A.  There was a lot.  I don't recall all of the
9   addresses.
10  Q.  Was there any one particular place where you
11  lived for the longest or that you consider your
12  childhood home?
13  A.  We lived with my grandparents for a while, her
14  parents.
15  Q.  And what were their names?
16  A.  Mary and Elmer Donaldson.
17  Q.  And did that home have air-conditioning?
18  A.  Yes.
19  Q.  Where did you go to high school?
20  A.  I went to Midway High School and Riesel High
21  School.
22  Q.  And where -- can you spell the second one?
23  A.  R-I-E-S-E-L.
24  Q.  Where is that?
25  A.  Right outside of Waco.

3 (Pages 6 to 9)

ORAL DEPOSITION OF STEPHANIE KINGREY

**10**

1   Q.  In Midway?
2   **A.  Midway is in Hewitt, which is outside of Waco.**
3   Q.  Did you graduate from high school?
4   **A.  Yes.**
5   Q.  Did you go to any college?
6   **A.  In 2006 I took some classes at MCC.**
7   Q.  Did you ever complete a college degree?
8   **A.  No.**
9   Q.  What do you do for a living?
10  **A.  I am a accounts payable clerk.**
11  Q.  For whom?
12  **A.  Equipment Depot.**
13  Q.  And how long have you been doing that?
14  **A.  Two years.**
15  Q.  What did you do before that?
16  **A.  I worked at Automatic Chef.**
17  Q.  And what did you do for them?
18  **A.  Office clerk for two and a half years.**
19  Q.  And let's go back one more prior to that.
20  **A.  Safety-Kleen, K-L-E-E-N.  I worked there for,**
21  all together, 12 years.
22  Q.  Okay.  And what is your husband's name?
23  **A.  Jason.**
24  Q.  What does he do for a living?
25  **A.  He's an auto body paint technician.**

**11**

1   Q.  And where does he work?
2   **A.  Currently at Sykora's in West, S-Y-K-O-R-A-S.**
3   Q.  Good job.
4       And how long has he been doing that kind
5   of work?
6   **A.  Since he was 15.**
7   Q.  Do they have air-conditioning at his shop?
8   **A.  Yes.**
9   Q.  Did your mom work outside the home when you
10  were growing up?
11  **A.  Yes.**
12  Q.  What did she do?
13  **A.  She was an office clerk and then she became**
14  **a -- a legal assistant.**
15  Q.  Do you know who she worked for?
16  **A.  Naman, Howell, Smith & Lee.**
17  Q.  Oh, my.  I know a lot of people that work
18  there.
19      Is she still living?
20  **A.  Yes.**
21  Q.  Does she still work?
22  **A.  Yes.**
23  Q.  For Naman Howell?
24  **A.  No.**
25  Q.  Who does she work for now?

**12**

1   **A.  I can't remember the name.**
2   Q.  Okay.  Where did your father go and live when
3   your parents divorced?
4   **A.  With his parents.**
5   Q.  And -- and I'm sorry.  Did you tell me their
6   name or no?
7   **A.  No.**
8   Q.  What is -- what are their names?
9   **A.  Charles and Margaret.**
10  Q.  McCollum?
11  **A.  McCollum.**
12  Q.  And in what city did they live?
13  **A.  Bellmead.**
14  Q.  Have they since passed?
15  **A.  Yes.**
16  Q.  Did their home have air-conditioning?
17  **A.  Yes.**
18  Q.  And when you were growing up, what was your
19  understanding of what your father did for a living?
20  **A.  He did not work when I was growing up.**
21  Q.  Do you know why?
22  **A.  He took care of his parents.**
23  Q.  What was wrong with them?
24  **A.  They were just older, so he -- he just took**
25  care of them.

**13**

1   Q.  And when is the first time you recall your
2   father ever working?
3   **A.  When he was married to my mother, he worked for**
4   **Dr. Pepper.**
5   Q.  Do you remember what he did for them?
6   **A.  He was a driver.**
7   Q.  Okay.  And at some point did -- he stopped
8   working for Dr. Pepper, I guess?
9   **A.  Yes.  I don't remember when.**
10  Q.  When did his parents pass?
11  **A.  My grandmother passed in 2002, I believe, and**
12  **my grandpa passed in 2003.**
13  Q.  And when they passed away, did -- did your
14  father begin working again?
15  **A.  No.**
16  Q.  What is your understanding of why not?
17  **A.  I don't know.**
18  Q.  What is your recollection of the next time that
19  your dad actually worked?
20  **A.  For the Yellow Cab company.**
21  Q.  And when do you think, ballpark, he started
22  doing that?
23  **A.  Around 2008 or 2009.**
24  Q.  Well, did you ever ask your dad why he didn't
25  work?

**4 (Pages 10 to 13)**

ORAL DEPOSITION OF STEPHANIE KINGREY

26

1   whether -- what kind of financial burden your dad might
2   have been on him?
3   **A.   No.**
4   Q.   Did you ever give any money to your Uncle Terry
5   to sort of help pay for your dad's food or lodging?
6   **A.   That's when I gave him the hundred dollars to**
7   **help out.**
8   Q.   Do you think that's -- that hundred dollars was
9   the only financial contribution that you made for your
10  dad's --
11  **A.   That I can remember.**
12  Q.   Up until the time he died?
13  **A.   Right.**
14  Q.   Did you ever take your dad any clothing or buy
15  him a car or anything like that?
16  **A.   He still had his clothing from when he lived**
17  **with his parents.**
18  Q.   And so you didn't buy him any clothing because
19  he didn't need any clothes?
20  **A.   Right.**
21  Q.   What about an automobile, gas money?
22  **A.   No.**
23  Q.   How come?
24  **A.   Because he didn't drive.**
25  Q.   And so you had no idea how he could care for

27

1   himself financially and didn't ask?
2   **A.   Right.**
3   Q.   Did you -- did you become aware -- did he ever
4   become homeless?
5   **A.   No.   Well, right after my grandparents died, I**
6   **guess you could say he was but --**
7   Q.   After he got out of Bonham but before he went
8   to prison at Hutchins, is it your understanding he lived
9   with your Uncle Terry that whole time?
10  **A.   Right.   He stayed with me a few nights, also.**
11  Q.   But basically just lived with your Uncle Terry?
12  **A.   Uh-huh, yes.**
13  Q.   And so if he was ever homeless, it's not
14  something that you were aware of?
15  **A.   Right.**
16  Q.   Did you ever talk to him about whether he had
17  any psychological problems while he was at Bonham?
18  **A.   No.**
19  Q.   Psychiatric problems?
20  **A.   Not that I remember.**
21  Q.   Do you know whether he was discharged from
22  Bonham -- let me ask you this.
23      Do you know whether he was ever
24  transferred to a different facility, during that first
25  incarceration, from Bonham to somewhere else?

28

1   **A.   I believe he was in the hospital there for a**
2   **while.**
3   Q.   What -- what kind of hospital?
4   **A.   Whatever's associated with Bonham.   I'm not --**
5   **I'm not sure.**
6   Q.   Do you know whether he ever was admitted to a
7   psychiatric hospital?
8   **A.   Not unless that was a psychiatric hospital.   I**
9   **don't know.   He just told me he went into the hospital.**
10  Q.   Are you aware of whether your father ever spent
11  any time admitted in a psychiatric hospital?
12  **A.   No.**
13  Q.   That would be news to you?
14  **A.   Yes.**
15  Q.   As far as you know, did your dad ever suffer
16  from depression or any other psychiatric problems?
17  **A.   After my grandparents died, he was depressed.**
18  Q.   Okay.   Let me -- let me just ask you questions
19  about after his first incarceration.   So after he was
20  released from prison the first time, are you aware of
21  him ever being on any medications for any psychiatric
22  problems?
23  **A.   No.**
24  Q.   Are you aware of him ever being depressed at
25  that point?

29

1   **A.   Not at that point, no.**
2   Q.   As far as you know, did he ever take any
3   medications for diabetes?
4   **A.   Not that I know of.**
5   Q.   Do you know -- are you aware of him ever being
6   diagnosed with diabetes?
7   **A.   He told me before he went in to Waco that he**
8   **was a diabetic.**
9   Q.   And was that a surprise to you?
10  **A.   No, because it runs in the family.**
11  Q.   Okay.   And did you ask him whether he was
12  taking any medication for that?
13  **A.   No.**
14  Q.   Did you have any concerns about how he might
15  pay for medication for that diabetes?
16  **A.   My guess?**
17  Q.   Uh-huh.
18  **A.   Yeah.**
19  Q.   I'm sorry?
20  **A.   Yes.**
21  Q.   You --
22  **A.   I didn't know how he would pay for it if he had**
23  **to.**
24  Q.   Okay.   And did you ever ask him, Hey, Dad,
25  you're not working, how are you paying for your diabetes

**8  (Pages 26 to 29)**

ORAL DEPOSITION OF STEPHANIE KINGREY

30

1  medication?
2  **A.  I'm not aware of him being on any medication**
3  **so --**
4  Q.  Okay.
5  **A.  -- I don't know.**
6  Q.  Did you ever ask him about it?
7  **A.  No.**
8  Q.  What did y'all talk about?
9  **A.  My kids.**
10  Q.  Do you know whether he was ever diagnosed with
11  high blood pressure?
12  **A.  Not that I'm aware of.**
13  Q.  And are you aware of him ever taking any
14  medication for high blood pressure?
15  **A.  No.**
16  Q.  Did you ever call any State services and ask
17  for help on your dad's behalf?
18  **A.  No.**
19  Q.  What about MHMR in McLennan County?
20  **A.  No.**
21  Q.  Does he have -- does your father have any
22  daughters besides you?
23  **A.  No.**
24  Q.  Did you ever become aware of whether your dad
25  had any hallucinations relating either to mental illness

31

1  or to medications?
2  **A.  No.**
3  Q.  Who is Sandra Holder?
4  **A.  I believe that was a lady he was dating before**
5  **his wife, Sandra.**
6  Q.  Okay.  Do you think he dated Sandra Holder
7  after he got out of Bonham but before he went to
8  Hutchins?
9  **A.  Yes.**
10  Q.  What makes you think that?
11  **A.  Because I met her.**
12  Q.  Okay.  So you're pretty sure that's who she
13  was?
14  **A.  Yes.**
15  Q.  Okay.  And where -- did they ever live
16  together?
17  **A.  I believe so.**
18  Q.  At her home --
19  **A.  Yes.**
20  Q.  -- or at Terry's home?
21  **A.  At hers.**
22  Q.  Do you know where she lived?
23  **A.  Fort Worth.**
24  Q.  So did he move to Fort Worth during that time?
25  **A.  Yes.**

32

1  Q.  So he didn't just live with your Uncle Terry
2  the whole time?
3  **A.  After he got out of the program, he moved in**
4  **with her.**
5  Q.  Okay.  Well, let's back up a little bit, then.
6  So he gets out of prison the first time
7  and he goes to the ministry program, right?
8  **A.  He lived with Terry before we -- we took him**
9  **there.**
10  Q.  Okay.  So he got out of the prison, moved in
11  with Terry, right?
12  **A.  Uh-huh, yes.**
13  Q.  And then what happened that caused him to leave
14  Terry's and move into the program?
15  **A.  We needed to find a program to get him back on**
16  **his feet --**
17  Q.  What do you mean?
18  **A.  -- and that was the closest place.**
19  Q.  Okay.  What -- what did you think they were
20  going to offer him to help him get back on his feet?
21  **A.  A job.  I mean they helped him look for a job**
22  **and gave him a place to stay and was -- I mean it was**
23  **good for him because it was a ministry so --**
24  Q.  Okay.  Was there any other ministry services
25  that they offered him?

33

1  **A.  No.**
2  Q.  I -- what I'm really trying to -- one of the
3  things I'm trying to ask is:  Why did he have to move
4  out of your Uncle Terry's house just to look for a job?
5  **A.  At that time, I mean, they had, you know, done**
6  **all they could for him, so they decided he needed to**
7  **start looking for a job.**
8  Q.  They, the ministry or, they, your Uncle Terry?
9  **A.  My Uncle Terry.**
10  Q.  Did he and your dad have some kind of a falling
11  out or argument?
12  **A.  No.  My dad was ready to start looking for a**
13  **job, also.**
14  Q.  Okay.  So how long did he live at the ministry?
15  **A.  He went through the whole program, so I don't**
16  **know how long that took.  About a year, maybe.**
17  Q.  And he finished with the program, and then
18  where he go live?
19  **A.  Salvation Army.  He went through that program**
20  **as well.**
21  Q.  So there were two different programs?
22  **A.  Yes.**
23  Q.  And during -- and do you know how long the
24  Salvation Army program was?
25  **A.  I believe it was also about a year.**

9 (Pages 30 to 33)

ORAL DEPOSITION OF STEPHANIE KINGREY

54

1  A.  We already have.
2  Q.  Okay.  I'm almost done.  Sorry.  Hang on.
3      (Discussion off the record).
4  Q.  (BY MS. COOGAN)  Do you know how much money
5  your dad made working for Yellow Cab?
6  A.  No.
7  Q.  Do you know the name of your dad's primary care
8  physician?
9  A.  No.
10  Q.  Do you know the name of any of the doctors that
11  might have seen or treated your dad in, let's say,
12  the years in between Bonham and Hutchins?
13  A.  If anybody, it would have been Hillcrest.
14  Q.  And probably the emergency room?
15  A.  Or one of their clinics.
16  Q.  Okay.  But in the Hillcrest system?
17  A.  Yes.
18  Q.  What makes you say that?
19  A.  Because they're all tied together.
20  Q.  And that was sort of his place of choice?
21  A.  Right.
22  Q.  Did you ever make any request for records under
23  the Open Records Act, do you know?
24  A.  Not that I'm aware of.
25  Q.  Did you consider your dad to be disabled?

55

1  A.  No.
2      MS. COOGAN:  I'm going to pass the
3  witness.
4      MR. STONE:  Do you want to take lunch
5  right now?  Do you mind if we take a lunch break?
6      MR. MEDLOCK:  If that's what y'all would
7  prefer.
8      MS. COOGAN:  Okay.
9      (Lunch recess from 1:24 to 2:43).
10      EXAMINATION
11  BY MR. STONE:
12  Q.  Hi, Ms. McCollum.
13  A.  Hello.
14  Q.  Do you understand that you're under oath today?
15  A.  Yes.
16  Q.  Is this your first deposition?
17  A.  No.
18  Q.  How many depositions have you participated in
19  before?
20  A.  One other.
21  Q.  What was that deposition about?
22  A.  The wreck my dad was in.
23  Q.  And when was that?
24  A.  When was --
25  Q.  What year was that?

56

1  A.  2010.  We just did the deposition, though, a
2  few weeks ago.
3  Q.  Okay.  So you've already kind of got a little
4  bit of experience going through this, especially
5  recently, right?
6  A.  Uh-huh, yes.
7  Q.  So you understand that you've sworn an oath to
8  tell the truth today --
9  A.  Yes.
10  Q.  -- and that any testimony you give that's not
11  honest you could be subject to sanctions for?
12  A.  Right, yes.
13  Q.  Consequences if you lie?
14  A.  Yes.
15  Q.  Okay.  You mentioned earlier in your
16  testimony -- well, before I ask that -- strike that.
17      Is there any testimony that you've given
18  so far that you'd like to change right now --
19  A.  No.
20  Q.  -- during this deposition?
21      No.  Okay.
22      You testified earlier that diabetes runs
23  in your family, right?
24  A.  Yes.
25  Q.  Do you have diabetes?

57

1  A.  No.
2  Q.  Do your children have diabetes?
3  A.  No.
4  Q.  Do your siblings, to your knowledge, have
5  diabetes?
6  A.  No.
7  Q.  Did your grandparents have diabetes?
8  A.  My grandfather did, yes.
9  Q.  Okay.  Did your great --
10  A.  And my uncle does.
11  Q.  And your uncle.
12      Do you know of anyone else in the family
13  who has diabetes?
14  A.  No.
15  Q.  Have you ever been tested for diabetes?
16  A.  Yes.
17  Q.  Is that because you know that it runs in the
18  family?
19  A.  Yes.
20  Q.  Do you know if your father was ever tested for
21  diabetes?
22  A.  Not to my knowledge, not that I know of.
23  Q.  Did you ever have conversations with him about
24  the fact that diabetes runs in the family?
25  A.  Yes.

15 (Pages 54 to 57)

ORAL DEPOSITION OF STEPHANIE KINGREY

---

**58**

Q. What did he say?  Do you remember?

A. He just -- you know, he's the one that told me that my grandpa had it and that my uncle did.

Q. So he was aware that there was a family history of diabetes?

A. Yes.

Q. Okay.  Something that you would expect him to get tested for?

A. Right.

Q. What about a history of alcoholism?  Is there a history of alcoholism in your family?

A. I mean, my dad was when he was married to my mother.

Q. Is there anyone else in your family that's an alcoholic?

A. Not that I know of.

Q. Okay.  What about mental illness?  Are you aware if that runs in the family?

A. Not that I know of.

Q. Okay.  Do you smoke?

A. No.

Q. Does your husband smoke?

A. No.

Q. Have you ever seen your father smoke?

A. No.

---

**59**

Q. Have you ever seen your stepmother, Sandra, smoke?

A. No.

Q. Do you have -- have you ever been diagnosed with a mental illness?

A. Depression.

Q. When?

A. In 2003 and then again whenever I started going to the counselor.  She put me on depression medicine.

Q. And when was that?

A. November 6th or 8th.  I can't remember.

Q. Of 2013?

A. Yes.

Q. And how long were you treated for depression beginning in 2003?

A. A few months.

Q. Was that because of the death of your grandparents?

A. No.  It was -- my best friend was murdered by her husband.

Q. Are you currently taking any medication to treat mental illness?

A. Yes.

Q. And what are you taking now?

A. I don't remember the name of it.  I took a

---

**60**

picture of the bottle.

It's B-U-S-P-I-R-O-N-E.

Q. Can you spell it one more time?

A. B-U-S-P-I-R-O-N-E.

Q. Okay.  And do you have any reason to believe that that would interfere with your ability to testify today?

A. No.

Q. And you started taking that as of when, what date?

A. November 6th.

Q. Are you aware of anyone else in your family that's been diagnosed with a mental illness?

A. Not that -- not to my knowledge, no.

Q. Just you and your father?

A. Right.

Q. Do you know if your father was taking any medications during any of the time period that you knew him?

A. Not that I know of.

Q. You never saw your father take any medication --

A. No.

Q. -- ever?

A. An aspirin every now and then, but I never saw

---

**61**

anything other than that.

Q. I want to ask you a couple questions about the living arrangements that your father made when he came out of prison before he went into the Hutchins unit.  Okay?

A. Okay.

Q. You testified earlier that the reason you didn't want your father to live with you when he got out of jail was because everything was kind of hectic with the kids being young and there wasn't enough room for him --

A. Right.

Q. -- is that right?

A. Yes.

Q. Was -- was that the only reason you didn't want your father to live with you?

A. Yes.

Q. Did you discuss your father living with you with your husband?

A. Yes.

Q. Was your husband aware that your dad was a felon?

A. Yes.

Q. Was he aware that your father had been physically abusive to your mother?

---

**16  (Pages 58 to 61)**

Sunbelt Reporting & Litigation Services
Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   Houston   San Antonio

Appendix 357

ORAL DEPOSITION OF STEPHANIE KINGREY

90

1    Q.  What do you mean by that?
2    A.  My mom and I don't -- I mean we have a
3    relationship, but it's not like a normal -- we have
4    issues, too.
5    Q.  Why?
6    A.  Different things growing up.
7    Q.  A little bit of anger at both parents, not just
8    him.
9    A.  Yes.
10       MR. STONE:  I'll pass the witness.
11          EXAMINATION
12   BY MR. SMITH:
13   Q.  Good afternoon, Ms. Kingrey.  I just have a few
14   more questions for you before we move on.
15       You saw your father at the hospital after
16   he was taken from the Hutchins unit; isn't that right?
17   A.  Yes.
18   Q.  When was the last time before then that you
19   spoke with him?
20   A.  A couple of days before he went into Waco.
21   Q.  Okay.  Do you recall what you talked about?
22   A.  We just talked about the kids and -- my kids
23   and me and how everything was going and, of course, take
24   care of ourselves while he was in and he'll see us when
25   he gets out.

91

1    Q.  Did he talk about his situation at all?
2    A.  He told me about what happened.  That was about
3    it.
4    Q.  Did he talk about prison life --
5    A.  No.
6    Q.  -- prison guards --
7    A.  No.
8    Q.  -- the warden, prison policies?
9    A.  No.
10   Q.  Are you familiar with the name Brad Livingston?
11   A.  Just from the case.
12   Q.  And what do you -- what do you know about him?
13   A.  I've just seen his name on the case.  I don't
14   know anything else.
15   Q.  Do you know his position within the Texas
16   Department of Criminal Justice?
17   A.  I couldn't tell you what it is.
18   Q.  So do you feel that he contributed to your
19   father's death?
20   A.  I don't know who he is, so I don't know.
21   Q.  Okay.  What about the name William Stephens?
22   A.  I don't know who that is either.
23   Q.  So your answer would be the same, that you
24   don't know if he contributed to your father's death?
25   A.  Yes.

92

1    Q.  How about Rick Thaler?  Do you know him or know
2    his name?
3    A.  No.
4    Q.  And do you feel that he contributed to your
5    father's death?
6    A.  I don't know him.
7    Q.  Is there anything you believe that these three
8    individuals could have done to prevent your father's
9    death?
10   A.  Again, I don't know who they are.
11       MR. SMITH:  Okay.  I'll pass the witness.
12       MS. COOGAN:  I have nothing further.
13       MR. MEDLOCK:  We'll reserve for trial.
14       (End of deposition).
15
16
17
18
19
20
21
22
23
24
25

93

1           CHANGES AND SIGNATURE
2    WITNESS NAME: STEPHANIE KINGREY        DATE: 11-22-13
3    PAGE LINE CHANGE              REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20       I, STEPHANIE KINGREY, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted herein.
23
24       _____
24       STEPHANIE KINGREY
25       Job No. 113925

24  (Pages 90 to 93)

ORAL DEPOSITION OF STEPHANIE KINGREY

94

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION
3    STEPHEN MCCOLLUM, et al,      )
          Plaintiffs,         )
4                              )
     V.                  ) C.A. No. 3:12-CV-02037
5                              )
                               )
6    BRAD LIVINGSTON, et al,      )
          Defendants.        )
7
8
9          REPORTER'S CERTIFICATION
            ORAL DEPOSITION OF
10           STEPHANIE KINGREY
            November 22, 2013
11
12       I, Debra L. McGrew, Certified Shorthand
13   Reporter in and for the State of Texas, hereby certify
14   to the following:
15       That the witness, STEPHANIE KINGREY, was duly
16   sworn by the officer and that the transcript of the oral
17   deposition is a true record of the testimony given by
18   the witness;
19       I further certify that pursuant to FRCP Rule
20   30(f)(1) that the signature of the deponent:
21       ____ was requested by the deponent or a party
22   before the completion of the deposition and returned
23   within 30 days from date of receipt of the transcript.
24   If returned, the attached Changes and Signature page
25   contains any changes and the reasons therefor;

95

1        __X__ was not requested by the deponent or a
2    party before the completion of the deposition.
3        I further certify that I am neither attorney
4    nor counsel for, related to, nor employed by any of the
5    parties to the action in which this testimony was taken.
6    Further, I am not a relative or employee of any attorney
7    of record in this case, nor am I financially or
8    otherwise interested in the outcome of the action.
9        Subscribed and sworn to on this the 9th day of
10   December, 2013.
11
12
13
14       _____
         Debra L. McGrew, Texas CSR #1573
15       Expiration Date:  12/31/2014
         Sunbelt Reporting & Litigation Services
16       Firm Registration No. 87
         1016 La Posada Drive, Suite 294
17       Austin, Texas 78752
         512-465-9100
18
         Job No. 113925
19
20
21
22
23
24
25

25 (Pages 94 to 95)

Page 1 of 1

**From:**          Babbili, Ananda D.
**Sent:**          Thursday, February 23, 2012 2:25 PM
**To:**             Jamison, Gizelle A.
**Subject:**       RE: #1721640-McCollum,Larry

Good afternoon,
This is in response to the concerns brought up by the Physicians Peer Review Comm.
Mr.LM arrived at Hutchins Jail on 7/15/11.
He intake process was conducted on arrival back door by nursing staff around 12:30 pm on 7/15/11.
He arrived with Clonidine from Mclennan county,which was discontinued because unit does not routinely use this medication except in serious hypertensive crisis,and do not automatically continue until medical staff does the intake physical exam and initiate appropriate medication.pt.was given Hydrochlorothiazide(a routine process to discontinue county order for prn clonidine)and start using our formulary available medications.
Bp's were not ordered because his county medication order reflected clonidine given only as needed(if and when bp is high).and hctz given daily to stabilize bp,to avoid fluctuating readings, until intake completed by the medical staff.
The pt.unfortunately was not seen by any of our medical staff as the new arrivals have a routine initial security formalities,before all new intake pts.seen in medical on the 4 th day.
I hope I answered all the concerns,and if you have any further questions ,do not hesitate to get in touch with me at your earliest convenience
Thankyou,
andy Babbili PA-C

**From:** Jamison, Gizelle A.
**Sent:** Thursday, February 23, 2012 11:18 AM
**To:** Babbili, Ananda D.
**Subject:**

Hello: Please see the attached correspondence from UTMB CMC Physician Peer Review. Thank you.

*Gizelle (Gigi) Jamison  MPA, RN, LNC-Csp*
Quality Services and Risk Management
UTMB - CMC
301 University Blvd.
Galveston, Texas 77511-1007
Work: 409-747-2715

All communications fall under the protection and limitations of the UTMB confidentiality policy, and other protective statutes, pursuant to Sections 161 of the Texas Health & Safety Code, And Chapters 160 and 303 of the Texas Occupations Code. The contents of this message is deemed confidential. If you are not the intended recipient, you are hereby notified that any use, dissemination, forwarding, printing or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately.

file://C:\Users\josteen\AppData\Local\Microsoft\Windows\Temp...  3/17/2014

**Appendix 360**

**AFFIDAVIT**

THE STATE OF TEXAS

§
§
§

COUNTY OF WALKER

BEFORE ME, the undersigned authority, personally appeared **Lisa Lopez,** who, being by me duly sworn, deposed as follows:

"My name is **Lisa Lopez**, and I am over the age of eighteen (18), of sound mind, competent and capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the Custodian of Records at The University of Texas Medical Branch - Correctional Managed Care, Health Services Archives and my office is located in Huntsville, Texas. In this capacity, I am the individual who can authenticate and certify as official, copies of medical records at the **TDCJ Health Services Archives**. Attached hereto are **21** pages of records, time period **July 15, 2011** to **July 22, 2011** from the medical records of **Larry McCollum, TDCJ # 1721640**. These said records are kept in the regular course of business by an employee or representative of UTMB-Correctional Managed with knowledge of the act, event, condition, opinion or diagnosis, recorded or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original and no other documents exist in the files on the above named person at **TDCJ Health Services Archives**".

_____
Lisa Lopez

State of Texas,
County of Walker
Before Me _Paula K. Ticknor_____ on this day personally appeared ___Lisa Lopez_____, known to me through her Texas Driver's License to be the person whose name is subscribed to the foregoing instrument and acknowledge to me that she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office this ____22nd____ day of ___Feb___,
A.D., _2013_

PAULA K. TICKNOR
Notary Public State of Texas
My Commission Expires
May 19, 2013

MCCOLLUM 003                    Appendix 361

**Date:** 07/22/2011 03:27
**From:** GINA STOKES
**To:** HUTCHINS NURSING STAFF(E); HUTCHINS ALL PROVIDERS(E);
**Subject:**
**Re:** LARRY MCCOLLUM

**PATIENT: MCCOLLUM, LARRY        TDCJ #:  1721640           FACILITY: HUTCHINS (HJ)**

HE WAS SENT OUT 911. HE WAS HAVING A SEIZURE ON TOP BUNK AND SECURITY COULD NOT GET HIM DOWN SAFELY. NO HISTORY SEEN OF SEIZURES.
FOLLOW UP ON HIS RETURN.HE WAS SENT TO ER AT PARKLAND HOSPITAL.

THANKS,
CRAIN TRIAGE

**CORRECTIONAL MANAGED CARE
CLINIC NOTES - NURSING**

**Patient Name:** MCCOLLUM, LARRY G  **TDCJ#:** 1721640  **Date:** 07/22/2011 03:16  **Facility:** HUTCHINS (HJ)
**Age:** 58 year  **Race:** W  **Sex:** male
**Most recent vitals from 11/13/2003:** BP: 112 / 87 (Standing) ; Wt: 192 Lbs.; Height: ; Pulse: 107 (Standing) ; Resp: 18 / min; Temp: 97 (Oral)
**Allergies:** NO KNOWN ALLERGIES

| Patient Language: | Name of interpreter, if required: |
|---|---|

**Current Medications:**

| SCR INITIATED? | | YES | Date Received: |
|---|---|---|---|
| | X | NO | |

# Nursing Triage Form

Name of Security Officer Calling _____LT SANDERS_____
Presenting Problems/Symptoms ___HE IS ON THE TOP BUNK HAVING A SEIZURE THAT
HAS LASTED FOR 5 MINUTES,SECURITY CAN NOT GET HIM OFF THE TOP BUNK,
THEY ARE STANDING UP AGAINST THE  TOP BUNK TO KEEP HIM FROM FALLING.
THEY CALLED 911.HE HAS NO HISTORY OF SEIZURE DISORDER. HIS CELL MATE
SAYS HE IS DIABETIC. NO HX OF THIS SEEN IN CHART.___
_____NO MEDICAL ON THE UNIT___
_____
Protocol used:  (List protocol name, and page number):
1.SEIZURE  PG 471___
2. ____
3. ____
4. ____
5. Other_____
Problem:  ___X___ Emergent  _____ Urgent  _____ Non-Urgent
        **(Immediately)**           **(2 hrs)**           **(Pass Issued / Fill out Sick Call Request)**

Circle/Mark "X" Correct Information
**Telephone Triage**
_X___1. Instructions given to security officer to call 911 and transport offender patient to nearest local community hospital ED.
_____2. Instructions given to security officer to transport the offender patient to the designated HUB for a full assessment and further care.  (applicable only if the facility is within a designated HUB area)
_____3. Instructed the Security officer to issue a pass to the offender patient to come to medical the next day.
_____4. Other as ordered by a provider:_____
_____
_____5. Instructions given to security officer to place offender patient in front of the **DMS** equipment in medical for assessment / interview.

Additional Comments___UR NOTIFIED. CONTACT ANN. PRECERT NO 776845___

1 of 2

Patient Name: MCCOLLUM,LARRY G Patient DOB: 04/04/1953      Patient ID: 1716091 Service Date: 07/20/2011 08:42:00

```
                        Lab Data Imported From and Tests Performed By:
LabCorp  1-800-292-4021

Patient Name  : MCCOLLUM, LARRY G
Patient Id    : 1721640
Patient Phone :
Date of Birth : 04/04/1953
SS#           :              Sex   : Male


Ordering
Physician     : ORIG, TITO
Facility      : HUTCHINS (HJ)
                1500 E. LANGDON RD
                HUTCHINS TX  75241


Test Name                    Result          ABN   Unit      Reference Range
                                             Flag

Accession: 32858464          Requistion: 32858464
Drawn:07/20/11 08:42    Received:07/20/11 23:40    Reported: 07/21/11 08:43

Procedure: CBC With Differential/Platelet
WBC                          13.1            H     x10E3/uL  4.0-10.5
RBC                          4.63                  x10E6/uL  4.10-5.60
Hemoglobin                   14.8                  g/dL      12.5-17.0
Hematocrit                   43.4                  %         36.0-50.0
MCV                          94                    fL        80-98
MCH                          32.0                  pg        27.0-34.0
MCHC                         34.1                  g/dL      32.0-36.0
RDW                          15.2            H     %         11.7-15.0
Platelets                    204                   x10E3/uL  140-415
Neutrophils                  60                    %         40-74
Lymphs                       32                    %         14-46
Monocytes                    8                     %         4-13
Eos                          0                     %         0-7
Basos                        0                     %         0-3
Immature Cells
Neutrophils (Absolute)       7.7                   x10E3/uL  1.8-7.8
Lymphs (Absolute)            4.3                   x10E3/uL  0.7-4.5
Monocytes(Absolute)          1.1            H      x10E3/uL  0.1-1.0
Eos (Absolute)               0.0                   x10E3/uL  0.0-0.4
Baso (Absolute)              0.0                   x10E3/uL  0.0-0.2
Immature Granulocytes        0                     %         0-2
                         **Please note reference interval change**
Immature Grans (Abs)         0.0                   x10E3/uL  0.0-0.1
NRBC
Hematology Comments:


Procedure: Comp. Metabolic Panel (14)
Glucose, Serum               130            H      mg/dL     65-99
BUN                          31             H      mg/dL     6-24
Creatinine, Serum            1.67           H      mg/dL     0.76-1.27
eGFR If NonAfricn Am         44             L      mL/min/1  >59
eGFR If Africn Am            51             L      mL/min/1  >59
Note: A persistent eGFR <60 mL/min/1.73 m2 (3 months or more) may
indicate chronic kidney disease. An eGFR >59 mL/min/1.73 m2 with an
elevated urine protein also may indicate chronic kidney disease.
Print Date: 07/21/2011 07:53                       Page: 1/4
Data Imported From and Tests Performed By:
LabCorp  1-800-292-4021

Patient Name  : MCCOLLUM, LARRY G
Patient Id    : 1721640
Patient Phone :
Date of Birth : 04/04/1953
SS#           :              Sex   : Male


Ordering
```

**MCCOLLUM 006**                **Appendix 364**

Patient Name: MCCOLLUM,LARRY G Patient DOB: 04/04/1953      Patient ID: 1716091 Service Date: 07/20/2011 08:42:00

```
Physician   : ORIG, TITO
Facility    : HUTCHINS (HJ)
              1500 E. LANGDON RD
              HUTCHINS  TX  75241
```

| Test Name | Result | ABN Flag | Unit | Reference Range |
|---|---|---|---|---|
| Calculated using CKD-EPI formula. | | | | |
| BUN/Creatinine Ratio | 19 | | | 9-20 |
| Sodium, Serum | 133 | L | mmol/L | 135-145 |
| Potassium, Serum | 3.5 | | mmol/L | 3.5-5.2 |
| Chloride, Serum | 91 | L | mmol/L | 97-108 |
| Carbon Dioxide, Total | 18 | L | mmol/L | 20-32 |
| **Verified by repeat analysis** | | | | |
| Calcium, Serum | 8.8 | | mg/dL | 8.7-10.2 |
| Protein, Total, Serum | 7.8 | | g/dL | 6.0-8.5 |
| Albumin, Serum | 4.0 | | g/dL | 3.5-5.5 |
| Globulin, Total | 3.8 | | g/dL | 1.5-4.5 |
| A/G Ratio | 1.1 | | | 1.1-2.5 |
| Bilirubin, Total | 0.8 | | mg/dL | 0.0-1.2 |
| Alkaline Phosphatase, S | 56 | | IU/L | 25-150 |
| AST (SGOT) | 34 | | IU/L | 0-40 |
| ALT (SGPT) | 21 | | IU/L | 0-55 |
| | | | | |
| Procedure: Urinalysis, Complete | | | | |
| Specific Gravity | 1.028 | | | 1.005-1.030 |
| pH | 5.5 | | | 5.0-7.5 |
| Urine-Color | Yellow | | | Yellow |
| Appearance | Cloudy | A | | Clear |
| WBC Esterase | 1+ | A | | Negative |
| Protein | 1+ | A | | Negative/Trace |
| Glucose | Negative | | | Negative |
| Glucose Reflex | | | | |
| Ketones | Trace | A | | Negative |
| Occult Blood | Negative | | | Negative |
| Bilirubin | Negative | | | Negative |
| Urobilinogen,Semi-Qn | 0.2 | | mg/dL | 0.0-1.9 |
| Nitrite, Urine | Negative | | | Negative |
| Microscopic Examination | See below: | | | |
| | | | | |
| Procedure: Microscopic Examination | | | | |
| WBC | >30 | A | /hpf | 0 - 5 |
| RBC | 0-3 | | /hpf | 0 - 3 |
| Epithelial Cells (non renal) | 0-10 | | /hpf | 0 - 10 |
| Epithelial Cells (renal) | | | | |
| Casts | Present | A | /lpf | None seen |
| Cast Type | Hyaline casts | | | N/A |

```
Print Date: 07/21/2011 07:53                     Page: 2/4
Data Imported From and Tests Performed By:
LabCorp  1-800-292-4021
```

```
Patient Name  : MCCOLLUM, LARRY G
Patient Id    : 1721640
Patient Phone :
Date of Birth : 04/04/1953
SS#           : 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    Sex   : Male
```

```
Ordering
Physician   : ORIG, TITO
Facility    : HUTCHINS (HJ)
              1500 E. LANGDON RD
              HUTCHINS  TX  75241
```

| Test Name | Result | ABN Flag | Unit | Reference Range |
|---|---|---|---|---|

MCCOLLUM 007                              Appendix 365

Patient Name: MCCOLLUM,LARRY G Patient DOB: 04/04/1953          Patient ID: 1716091 Service Date: 07/20/2011 08:42:00

```
Crystals
Crystal Type
Mucus Threads          Present              Not Estab.
Bacteria               Few                  None seen/Few
Yeast
Trichomonas
Comment

Procedure: Urinalysis, Complete
Microscopic Examination

Procedure: Lipid Panel
Cholesterol, Total     157          mg/dL   100-199
Triglycerides          195      H   mg/dL   0-149
HDL Cholesterol        16       L   mg/dL   >39
According to ATP-III Guidelines, HDL-C >59 mg/dL is considered a
negative risk factor for CHD.
VLDL Cholesterol Cal   39           mg/dL   5-40
LDL Cholesterol Calc   102      H   mg/dL   0-99

Procedure: Panel 083824
HIV 1/O/2 Abs-Index Value   <1.00              <1.00
Index Value: Specimen reactivity relative to the negative cutoff.
HIV 1/O/2 Abs, Qual    Non Reactive          Non Reactive

Procedure: Hgb A1c with eAG Estimation
Hemoglobin A1c         6.2      H   %       4.8-5.6
          Increased risk for diabetes:       5.7 - 6.4
          Diabetes:                          >6.4
          Glycemic control for adults with diabetes:  <7.0
Estim. Avg Glu (eAG)   131          mg/dL

Procedure: TSH
TSH                    2.860        uIU/mL  0.450-4.500

Procedure: RPR
RPR                    Non Reactive          Non Reactive
```

```
L   Low, H   High, C   Critical, *   Abnormal Alpha
Print Date: 07/21/2011 07:53                    Page: 3/4
Data Imported From and Tests Performed By:
LabCorp  1-800-292-4021
```

```
Patient Name  : MCCOLLUM, LARRY G
Patient Id    : 1721640
Patient Phone :
Date of Birth : 04/04/1953
SS#           : 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   Sex  : Male
```

```
Ordering
Physician    : ORIG, TITO
Facility     : HUTCHINS (HJ)
               1500 E. LANGDON RD
               HUTCHINS  TX  75241
```

| Test Name | Result | ABN Flag | Unit | Reference Range |
|-----------|--------|----------|------|-----------------|

MCCOLLUM 008                    Appendix 366

Patient Name: MCCOLLUM,LARRY G Patient DOB: 04/04/1953          Patient ID: 1716091 Service Date: 07/20/2011 08:42:00

```
Print Date: 07/21/2011 07:53                          Page: 4/4
Electronically Signed by ORIG, TITO M. M.D. on 08/03/2011.
##And No Others##
```

**MCCOLLUM 009**                              **Appendix 367**

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/25/2011 09:45



SG01726 /HJ01/HS06          TEXAS DEPARTMENT OF CRIMINAL JUSTICE          09:09:17
                            HEALTH SUMMARY FOR CLASSIFICATION             07/20/2011

NAME: MCCOLLUM, LARRY GENE              DOB: 04/04/1953         P U L H E S
TDCJ#: 01721640   SID#: 03950494        WGT: 330 LBS
UNIT: HJ             HOUSING: C7-046T   HGT: 5'10"            | 1 | 1 | 1 | 1 | 1 | 1 |
JOB: TRANSIENT PEND DIAG PROCESSING                          | A | A | A | A | A | A |
                                                             |   |   |   |   |   | H |

I. FACILITY ASSIGNMENT (CHECK ONE)
X  A. NO RESTRICTION
   B. BARRIER-FREE FACILITY
   C. SINGLE LEVEL FACILITY
   D. SUITABLE FOR TRUSTEE CAMP?    X YES __NO

II. HOUSING ASSIGNMENT
A. BASIC HOUSING (CHECK ONE)              B. BUNK ASSIGNMENT (CHECK ONE)
X  1. NO RESTRICTION                    X  1. NO RESTRICTION
   2. SINGLE CELL ONLY                  __ 2. LOWER ONLY
   3. SPECIAL HOUSING (HOUSING WITH
      LIKE MEDICAL CONDITION
   4. CELL BLOCK ONLY
C. ROW ASSIGNMENT (CHECK ONE)             D. WHEELCHAIR USE (CHECK ONE)
X  1. NO RESTRICTION                    __ 1. NO RESTRICTION
   2. GROUND FLOOR ONLY                 __ 2. PHOP ORDERED
                                        __ 3. UTILITY USE

III. WORK ASSIGNMENT/RESTRICTIONS (CHECK ALL THAT APPLY)
__ 1. MEDICALLY UNASSIGNED            __ 15. NO FOOD SERVICE
__ 2. PSYCHIATRICALLY UNASSIGNED      __ 16. NO REPETITIVE USE OF HANDS
__ 3. SEDENTARY WORK ONLY             __ 17. NO WALK WET/UNEVEN SURFACES
__ 4. FOUR HOUR WORK RESTRICTION      __ 18. DO NOT ASSIGN TO MEDICAL
__ 6. EXCUSE FROM SCHOOL              __ 19. NO WORK IN DIRECT SUNLIGHT
__ 7. LIMITED STANDING                __ 20. NO TEMPERATURE EXTREMES
__ 8. NO WALKING > __ YARDS           __ 21. NO HUMIDITY EXTREMES
__ 9. NO LIFTING > __ LBS.            __ 22. NO EXPOSURE TO ENVIRONMENT POLLUTANTS
__ 10. NO BENDING AT WAIST            __ 23. NO WORK WITH CHEMICALS OR IRRITANTS
__ 11. NO REPETITIVE SQUATTING        __ 24. NO WORK REQUIRING SAFETY BOOTS
__ 12. NO CLIMBING                    __ 25. NO WORK AROUND MACHINE WITH MOVING PART
__ 13. LIMITED SITTING                __ 26. NO WORK EXPOSURE TO LOUD NOISES
__ 14. NO REACHING OVER SHOULDER

IV. DISCIPLINARY PROCESS (CHECK ONE)
X  A. NO RESTRICTIONS
   B. CONSULT REP OF MENTAL HEALTH DEPT BEFORE TAKING DISCIPLINARY ACTION
   C. CONSULT REP OF MEDICAL DEPARTMENT BEFORE TAKING DISCIPLINARY ACTION

V. INDIVIDUALIZED TREATMENT PLAN (CHECK ALL THAT APPLY)
X  A. NO RESTRICTION          C. MENTAL HEALTH REPRESENTATIVE REQUIRED
   B. MEDICAL REPRESENTATIVE REQUIRED

VI. TRANSPORTATION RESTRICTIONS (CHECK ONE)
X  A. NO RESTRICTION          __ C. WHEELCHAIR VAN
   B. EMS AMBULANCE           __ D. MULTI-PATIENT VEHICLE(MPV)

REDDY/SMITH          MD/MHC      07/20/2011
PRINTED NAME AND TITLE OF REVIEWER    DATE          SIGNATURE OF REVIEWER

MCCOLLUM 010                         Appendix 368

Patient Name: MCCOLLUM,LARRY G Patient DOB: 04/04/1953        Patient ID: 1716091  Service Date: 07/18/2011 12:35:00

```
                         HUTCHINS (HJ)
                             CID
                              ,

                     LABORATORY DIRECTOR

                          TB SKIN TEST
MRN        : 1721640    Accession:33015661      Age  :58 Years
Patient Name: MCCOLLUM, LARRY G               Sex  :Male
Home Phone  :                                 Work :(   )  -
Admitting MD: UNKNOWN   UNKNOWN               Phone:
Attending MD: UNKNOWN   UNKNOWN               Phone:
Referring MD:                                 Phone:
Ordering MD :                                 Phone:


Tech        : VELVA L MCKINNEY L.V.N.    Verifier:VELVA L MCKINNEY L.V.N.
Collection Time: 07/18/2011 12:35
Result Time  : 08/01/2011 12:35
Report Time  : 08/01/2011 12:35
Comment:


Test                  Result        Abn     Normal Range    Units
-----------------------------------------------------------------------
MFG                                           -
LOT #                                         -
DOSE                                          -
SITE                                          -
ROUTE                                         -
PPD READ              0 mm                     -
REFUS SIGN                                     -



This document has been sent for signature, but has not yet been reviewed
```

**MCCOLLUM 011**                    **Appendix 369**

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/21/2011 14:00



DATE INTERVIEWED: 7 / 18 / 11          7-15

SCREENER'S INITIALS: _SKB_

## TDCJ OFFENDER INTAKE PROCESSING
## PSYCHOLOGICAL SCREENING INTERVIEW

NAME: _McCollum, Larry Gene_          TDCJ #: _1721640_

DOB: _4 / 4 / 53_          AGE: _58_          GENDER: ☑ MALE   ☐ FEMALE

PLACE OF BIRTH: _Enid, OK_          RACE: ☑ CAUCASIAN

PRIOR TDCJ #: _110 5534_                   ☐ AFRICAN AMERICAN

PRIOR TDCJ INCARCERATIONS: ☑ YES   ☐ NO          ☐ HISPANIC

PRIOR ASSIGNMENT TO CTC: ☐ YES   ☐ NO          ☐ OTHER: _____

PRIOR ASSIGNMENT TO DDP: ☐ YES   ☐ NO

ON PSYCH. SERVICES CASELOAD: ☐ YES   ☐ NO

CURRENT OFFENSE: _Forgery    (1) (12 mos.)_

SPECIAL CONSIDERATIONS FOR INTERVIEWS:

☑ NONE

☐ SPANISH-SPEAKING ONLY

☐ HEARING/VISUAL IMPAIRED

☐ WHEEL-CHAIR/OTHER SIGNIFICANT MOBILITY PROBLEM

☐ SECURITY RISK: _____

☐ OTHER: _____

OTHER GENERAL COMMENTS:

_____

_____

_____

_____

_____

_____

CL-69 (Rev 3/10)                                        Page 1

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/21/2011 14:00

| YES | NO | |
|---|---|---|

**1. HOW ARE YOU FEELING?** *Rough. adjusting.*

☑ ☐ **2. HAVE YOU EVER HAD ANY KIND OF MENTAL, EMOTIONAL, OR NERVE PROBLEMS?**

**DID YOU GET ANY TYPE OF COUNSELING?** *yes*

**FROM WHOM? (IF APPLICABLE)** _____

**WHAT WAS IT FOR?** _____

**WHEN WAS IT?** _____

**WHERE WAS IT?** *Buster Cole — transferred to See
Skyview #4 below*

☑ ☐ **3. HAVE YOU EVER TAKEN MEDICINE(S) PRESCRIBED FOR YOUR:**

☐ **NERVES**   ☐ **MENTAL PROBLEMS**   ☐ **EMOTIONAL PROBLEMS?**

**SPECIFY THE MEDICATION:** *Zoloft, etc.*

**WHEN DID YOU TAKE THIS MEDICATION?** *2009*

**BY WHOM WAS IT PRESCRIBED?**   ☐ **PSYCHIATRIST**

☐ **PHYSICIAN**

☐ **OTHER:** _____ *thinks*

**CURRENT PSYCHOTROPIC MEDICATION:** *— 0 — nothing*

*needed @*

☑ ☐ **4. HAVE YOU EVER BEEN A PATIENT IN A MENTAL HOSPITAL?** *present*

**WHY?** *Depression — Loss of family*

**WHEN?** *members*

**WHERE?** *Skyview — 2002-04*

**WAS IT:**   ☐ **COURT COMMITMENT**   OR   ☐ **VOLUNTARY?**

☐ ☑ **5. HAS ANY MEMBER OF YOUR FAMILY EVER HAD MENTAL OR EMOTIONAL PROBLEMS?**

**WHAT TYPE?** _____

☐ ☑ **6. HAVE YOU EVER HAD A HEAD INJURY OR SEIZURE?**

**SPECIFY:** _____

☐ ☑ **7. HAVE YOU EVER TRIED TO HURT YOURSELF OR COMMIT SUICIDE?**

**HOW MANY TIMES?** _____

**HOW?**   ☐ **CUT ARM / WRIST**   ☐ **HANGING**

☐ **OD'ed ON**   ☐ **OTHER** _____

**WHEN?** _____

**WHY?** _____

**WAS MEDICAL ATTENTION REQUIRED?**   ☐ **YES**   ☐ **NO**

☐ ☑ **8. HAVE YOU EVER HURT YOURSELF ON PURPOSE WHEN YOU WERE NOT TRYING TO COMMIT SUICIDE?**

**HOW?** _____

☐ ☑ **9. ARE YOU THINKING ABOUT HURTING OR KILLING YOURSELF NOW?**

☐ ☑ **10. DO YOU HEAR THINGS THAT OTHER PEOPLE DO NOT HEAR?**

**SPECIFY:** _____

CL-69 (Rev 3/10)                                                                                 Page 2

MCCOLLUM 013                    Appendix 371

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/21/2011 14:00

**YES   NO**

☐   ☑   **11. DO YOU SEE THINGS THAT OTHER PEOPLE DO NOT SEE?**

SPECIFY: _____

☐   ☑   **12. DO YOU BELIEVE THAT YOU HAVE ANY SPECIAL GIFTS OR SUPER POWERS THAT OTHERS DO NOT HAVE?**

WHAT KIND? _____

**13. WHAT KIND OF DRUGS DID YOU EXPERIMENT WITH OR USE ON A REGULAR BASIS?**

☐ NONE            ☐ BARBITURATES       ☐ METHAMPHETAMINE (SPEED)
☐ HEROIN          ☐ ACID               ☐ INHALANTS _____
☐ COCAINE         ☐ HASH               ☐ ALCOHOL *quit 10 yrs. ago*
☐ MARIJUANA       ☐ PCP                ☐ OTHER _____

**14. WHAT WAS THE LAST GRADE YOU COMPLETED IN SCHOOL?   GRADE _____**

WHERE    ☑ USA        ☐ MEXICO   ☐ OTHER: _____
DO YOU HAVE A.       ☑ HIGH SCHOOL DIPLOMA   ☐ GED

☑   ☐   **15. WHILE IN SCHOOL, WERE YOU EVER IN SPECIAL CLASSES?**

WHY? _____ *D. E.) Worked 1/2 day,*
WHAT GRADE(S)? _____ *12*

☐   ☑   **16. WERE YOU EVER PLACED IN A JUVENILE DETENTION CENTER, BOY'S HOME OR OTHER GROUP HOME?**

WHY? _____

☐   ☑   **17. HAVE YOU EVER BEEN CONVICTED OF AN OFFENSE COMMONLY CONSIDERED TO BE IN THE CATEGORY OF SEXUAL OFFENSES?**

IF YES, SPECIFY: _____

_____

☐   ☑   **18. HAVE YOU EVER, WITH LITTLE OR NO PROVOCATION, EXPERIENCED LOSS OF CONTROL OF YOURSELF THAT RESULTED IN SERIOUS ASSAULT TO SOMEONE OR DESTRUCTION OF PROPERTY?**

☐   ☑   **19. HAVE YOU EVER BEEN A VICTIM OF CRIMINAL VIOLENCE?   IF YES, SPECIFY:**

_____

_____

CL-69 (Rev 3/10)                                                                    Page 3

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/21/2011 14:00

# BEHAVIORAL OBSERVATIONS

| | | | |
|---|---|---|---|
| **APPEARANCE:** | ☑ UNREMARKABLE | ☐ DISHEVELED | ☐ ODD |
| **HYGIENE:** | ☐ GOOD | ☐ FAIR | ☑ POOR B.O. |
| **INTERACTION:** | ☑ COOPERATIVE | ☐ LIMITED | ☐ UNCOOPERATIVE |
| **MOTOR BEHAVIOR:** | ☑ WITHIN NORMAL LIMITS | ☐ RESTLESS | ☐ DID NOT MOVE |
| | ☐ _____ | | |

| | | | |
|---|---|---|---|
| **SPEECH:** | ☐ CLEAR | ☐ MUMBLES | ☐ SPEECH IMPEDIMENT |
| **RATE:** | ☑ SPONTANEOUS | ☐ FAST | ☐ _____ |
| **MOOD:** | ☐ WITHIN NORMAL LIMITS | ☑ SAD *teary-eyed* | ☐ IRRITABLE |
| | ☐ UNUSUALLY HAPPY | ☑ ANXIOUS | ☐ FRIGHTENED |
| | ☐ SILLY | ☐ _____ | |
| **ALERTNESS:** | ☑ ALERT | ☐ CONFUSED | ☐ DAZED   ☐ DISTRACTED |

---

## ▼ This section must be completed by a Qualified Mental Health Professional ▼

**DISPOSITION -- REFERRED FOR FURTHER EVALUATION**   ☑ YES   ☐ NO

**REASON FOR REFERRAL:**

- ☐ DISPLAYED SYMPTOMS OF PSYCHIATRIC ILLNESS
- ☑ HISTORY OF MENTAL HEALTH TREATMENT
- ☐ CURRENT SUICIDAL IDEATION
- ☐ PRIOR SUICIDAL GESTURE(S)
- ☐ DISPLAYED UNUSUAL BEHAVIOR
- ☐ AFFECTIVE DISTRESS NOTED
- ☐ UNUSUAL NATURE OF OFFENSE
- ☐ HIGH RISK FOR ADJUSTMENT PROBLEMS
- ☐ OTHER: _____

**MENTAL HEALTH APPRAISAL COMPLETED BY:**
I. Smith, MA
Mental Health Clinician

_____
**PRINTED NAME**

_____          7/19/11
**SIGNATURE**                                   **DATE**

CL-69 (Rev 3/10)                                          **Page 4**

Scanned by HICKS, STEPHANIE K. CCA in facility HUTCHINS (HJ) on 07/20/2011 13:32

## TEXAS UNIFORM HEALTH STATUS UPDATE

I.   NAME: *McCollum*     *Larry*     *G*      DOB: *4/04/53* AGE: *58*
     Last        First        MI
     STATE ID# *3950 494*          RACE: *W*  SEX: Male ✓ Female ___

     COUNTY/TDCJ# *3461D*                    WT. *330* HT: *5'10*

II.  CURRENT/CHRONIC HEALTH PROBLEMS
     A  Health Problems
     ___ 1. None
     ___ 2. Asthma
     ___ 3. Pregnancy
     ___ 4. Dental Priority
     ___ 5. Diabetes
     ___ 6. Drug Abuse
     ___ 7. Alcoholism
     ___ 8. Orthopedic Problems
     ___ 9. Cardiovascular/Heart Trouble
     ___10. Suicidal
     ___11. Mental Retardation
     ___12. Mental Illness (Specify diagnosis) _____
     ___13. Recent Surgery
     ___14. Seizures
     ___15. Dialysis
     X 16. Hypertension
     ✓17. CARE System  Y/(N)

     *NOTE  When screening substance abuse facility clients,
     please contact the TDCJ-ID Health Services Liaison at
     (936)437-3589 for clients with any chronic disease
     symptoms deemed unstable.*

     B. Preventive Medicine
     ✓ 1. Tuberculosis Status
        Skin Test:  Date Given: *6/24/11*   Date Read: *6/27/11*   Results *∅* _____mm*
        X-Ray:  Date: ___/___/___  Normal ___  Abnormal ___*  Anti-TB Treatment? No ___ Yes ___*
     ___ 2. Hepatitis: A ___ B ___ C ___  Other: _____
     ___ 3. HIV Antibody:  Test Date: ___/___/___  Results: Neg _____ Pos _____ CD4 ____ Date ___/___/___
     ___ 4. Syphilis: Date: ___/___/___  Type: ____  Treatment Completed: ___Yes ___No

     *NOTE: If any treatment has been recommended, the X-Ray was abnormal, or skin test indicates infection
     please attach tuberculosis record.*

     C. Other Health Care Problems: *none*

III. SPECIAL NEEDS (Check all that apply)
     A  Housing Restrictions
        X 1. None
        ___ 2. Skilled Nursing Facility
        ___ 3. Extended Care Facility
        ___ 4. Psychiatric Inpatient Facility
        ___ 5  Respiratory Isolation
        ___ 6. Other.

     B  Transportation
        X 1. Routine
        ___ 2  Crutches/Cane
        ___ 3. Ambulance
        ___ 4. Wheelchair/Wheelchair Van
        ___ 5  Prosthesis:

     C. Pending Specialty Clinic Appointment
        None  X   Type _____

     D. ALLERGIES  *NKA*
        _____
        _____
        NKA _____

IV.  CURRENT PRESCRIBED MEDICATIONS     None ____

| Medication | Dosage | Frequency |
|---|---|---|
| *Clonidine* | *0.1mg ÷ tab P.O* | *PRN ↑BP* |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

THIS FORM <u>MUST ACCOMPANY</u> ALL OFFENDERS TRANSFERRED TO AND FROM ALL TEXAS CRIMINAL JUSTICE ENTITIES

COMPLETED BY: *Sheila Smith Lu*                DATE: *7 / 15 / 11*
              Signature/Title
PHONE NUMBER: *254-757-2555*   FACILITY: *McLennan County Jail*

MCCOLLUM 016                              **Appendix 374**

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/28/2011 08:48

**aged Care**
## CID CLINIC NOTE
## HIV PRE-TEST COUNSELING

Patient Name  *McCollum, Larry*                    TDCJ #  *1721640*

Date 07/15/2011_____     Facility HUTCHINS (HJ)_____

Vitals   BP _____   Wt _____   Height _____   Pulse _____   Resp _____   Temp _____

| Patient Language: | | Name of interpreter, if required: NA | |
|---|---|---|---|
| **S:** | Chief Complaint: | X | Patient offered HIV testing per policy 14 11 |
| | | X | Pre-release HIV test |
| | | | Patient requesting HIV test |
| | | | Patient reported history of previous positive HIV test |
| | | | Other  (specify) |

| **O:** | Yes | No | Mark "Yes" or "No" for the following: |
|---|---|---|---|
| | | X | Patient is symptomatic (list symptoms) |
| | | X | The patient requests HIV testing and gave a history of the following risk factors |
| | | X | Injected nonprescription drugs |
| | | X | Unprotected sexual activity with multiple sex partners (male and/or female) |
| | | X | Tattoo |
| | | X | Patient received blood transfusions or blood products |
| | | X | The patient's TB skin test was positive |
| | | X | Exposed staff to blood or other potentially infectious body fluids |
| | | X | Patient was potentially exposed to blood and/or body fluids |
| | X | | Patient offered HIV testing per policy 14 11 |
| **A:** | X | | Knowledge deficit |
| | X | | High risk |

| **P:** | Yes | No | Mark "Yes" or "No" for the following: |
|---|---|---|---|
| | X | | HIV pre-test counseling and HIV antibody testing is offered |
| | X | | Discuss HIV prevention recommendations<br>1  Behave as if positive<br>2  Abstinence from sex, drugs and tattooing<br>3  Mutually monogamous relationships |
| | X | | Review partner notification procedures should the patient test positive |
| | X | | The patient gave their verbal consent for HIV antibody testing (If consent given, obtain provider order for HIV testing) |
| | | X | The patient refused HIV antibody testing   Obtain their signature on a **Refusal of Treatment** form (HSM-82) |
| | X | | Health teaching offered stressing the importance of plan of care compliance |
| | X | | If potential exposure, report incident to Preventive Medicine department |
| | X | | Patient verbalized level of understanding of the testing procedure, confidentiality and that they would not be rescheduled to receive negative test results, but only for positive or equivocal indeterminate results |

Nurse Signature. *VMcKinney LVN*_____     Date / Time 07/15/2011 @ 0900_____

05/01/2009

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/28/2011 08:48aged Care
## CID ABSTRACT OF IMMUNIZATIONS
### Tuberculin Skin Tests

Patient Name  McCollum, Larry                TDCJ #  1721641

Date  07/15/2011                    Facility  HUTCHINS (HJ)

Vitals   BP _____   Wt _____   Height _____   Pulse _____   Resp _____   Temp _____

| Patient Language: | Name of interpreter, if required: NA |
|---|---|

**MANTOUX PPD**

| DATE/TIME GIVEN | MFG/LOT # | LFA | RFA | ROUTE |
|---|---|---|---|---|
| 07/15/2011 | JHP PHARM 148613 | | | Intradermally |

**IMMUNIZATIONS**

| DATE/TIME GIVEN | MFG/ LOT # | DOSE | ROUTE | TYPE OF VACCINE | SITE | REACTION | SIGNATURE/ TITLE |
|---|---|---|---|---|---|---|---|
| 07/15/2011 | SANOFI-PAST U3399AA | 0 5 MI | IM | Td Booster | _X_ L Deltoid ___ R Deltoid | NARN | *VMcRig LVN* |
| | | 0.5 mL | ___ Sub Q ___ IM | Pneumococcal Vaccine | ___ L Deltoid ___ R Deltoid ___ Outer aspect of L or R upper arm | | |
| | | 0 5 mL | IM | Influenza | ___ L Deltoid ___ R Deltoid | | |
| | | 1.0 mL | IM | Hepatitis A #1 Vaccine | ___ L Deltoid ___ R Deltoid | | |
| | | 1 0 mL | IM | Hepatitis A #2 Vaccine | ___ L Deltoid ___ R Deltoid | | |
| | | 0 5 mL | Sub Q | Meningococcal | ___ Outer aspect of L or R upper arm | | |
| | | 0 5 mL | Sub Q | Varicella #1 | ___ Outer aspect of L or R upper arm | | |
| | | 0 5 mL | Sub Q | Varicella #2 | ___ Outer aspect of L or R upper arm | | |
| | | 1 0 mL | IM | Hepatitis B #1 Vaccine | ___ L Deltoid ___ R Deltoid | | |
| | | 1 0 mL | IM | Hepatitis B #2 Vaccine | ___ L Deltoid ___ R Deltoid | | |
| | | 1 0 mL | IM | Hepatitis B #3 Vaccine | ___ L Deltoid ___ R Deltoid | | |
| | | 0.5 mL | Sub Q | Measles/Mumps Rubella (MMR) | ___ Outer aspect of L or R upper arm | | |

Nurse Signature  *VMcRig LVN*            Date / Time  07/15/2011 @0900

HSM-2
05/01/2009

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/28/2011 08:48

58

## Correctional Managed Care
## CID INTAKE INTERVIEW

Patient Name: McCdlum, Larry          TDCJ #: 1721640

Date: 07/15/2011          Facility: HUTCHINS (HJ)

Vitals   BP: _____   Wt: _____   Height: _____   Pulse: _____   Resp: _____   Temp: _____

| Patient Language: | Name of interpreter, if required: NA |
|---|---|

| **S:** | **CHIEF COMPLAINT:** | | | | CID intake processing including pre-test HIV counseling |
|---|---|---|---|---|---|
| **O:** | YES | NO | REFUSED | N/A | **Mark "Yes", "No" or "Refused" for the following:** |
| | x | | | | **HIV** - Patient verbally agrees to HIV testing per state law (If yes mark Plan line 1a, if no or refused obtain HSM-82 **and** mark Plan line 10) |
| | x | | | | **RPR** - RPR test is required by state and policy/procedure #14 12 (if yes mark Plan line 1b, if no or refused obtain HSM-82) |
| | | X | | | **MMR** - Born after 1956 — *1953* |
| | X | | | | **MMR** - Attended Texas Schools (if no mark Plan line 2, or obtain refusal HSM-82)(If pregnant, mark N/A) |
| | | X | | | **HBV** - Allergic to yeast |
| | | X | | | **HBV** - Hepatitis B vaccine available – If no skip next two lines |
| | | | | | **HBV** - Agrees to Hepatitis B vaccine (if yes mark Plan line 3, if no obtain "Refusal of HBV Vaccine" HSM-98) |
| | | | | | **HBV** - Consent for hepatitis B vaccine signed (form 100E) or refusal signed |
| | | X | | | **TB** - History of positive TB skin test – written documentation (if no and less than 45 years of age mark Plan line 4, if yes or refused mark Plan line 5) |
| | | | | | **TB** - If yes – date _____ CPX _____ months (if CPX taken less than 6 months or currently taking CPX mark Plan line 6) |
| | | | | | **TB** - Patient 45 years of age or older and no documentation available to verify a previous positive Mantoux skin test (if yes, mark Plan line 11) |
| | X | | | | **Tetanus & Diphtheria** - Verbally agrees to Tetanus and Diphtheria Toxoid Booster _____ (mark Plan line 7 if yes, if no or refused obtain HSM-82) |

| | YES | NO | UNKNOWN | | |
|---|---|---|---|---|---|
| | X | | | | History of varicella (if yes mark Plan line 9 to add alert code 5290 to MPL/Problem list, if no mark MPL/Problem list for possibly susceptible) |
| | | | | | If female, is patient pregnant? If yes how many weeks: _____ (if yes or unknown mark Plan line 8) |

| **A:** | | | Alteration Health Maintenance |
|---|---|---|---|

CID Intake Interview
05/01/2009

Page 1 of 2

MCCOLLUM 019          Appendix 377

Scanned by GUZMAN, SANDRA in facility HUTCHINS (HJ) on 07/28/2011 08:48

**Correctional Managed Care**
**CID INTAKE INTERVIEW**

| P: | PLAN: | |
|---|---|---|
| | X | 1a  Obtain order for lab to draw HIV |
| | X | 1b  Obtain order for lab to draw RPR |
| | | 2  Obtain order for MMR 0 5cc vaccine sub q |
| | | 3  Obtain order for Hepatitis B vaccine 20mcg/1ml – administer hep B vaccine at 0, 1 and 6 months if indicated per TDCJ policy |
| | X | 4  Obtain order for PPD 0 1cc ID (L) forearm and will check within 48-72 hours |
| | | 5  Obtain order for CXR single view |
| | | 6. Refer to provider to schedule for ITP/TB Chronic Clinic |
| | X | 7  Obtain order for Tetanus and Diphtheria Toxoid Booster 0 5cc vaccine IM |
| | X | 8. Refer to provider to schedule appointment |
| | X | 9  Add alert code 5290 to MPL/Problem List |
| | X | 10  Add alert code 1112 to MPL/Problem List (indicates HIV high risk screening completed) |
| | X | 11  Obtain order for two-step Mantoux skin test (PPD 0 1cc ID (L) forearm and will check within 48-72 hours  If the reaction is lesser than 10 mm of induration, the second step is administered one to two weeks later) |
| | **REFER TO PROVIDER:** | |
| | X | 1a  Order for lab to draw HIV |
| | X | 1b  Order for lab to draw RPR |
| | | 2.  Order for MMR 0 5cc vaccine sub q |
| | | 3  Order for Hepatitis B vaccine 20mcg/1ml – administer hep B vaccine at 0, 1 and 6 months if indicated   per TDCJ policy |
| | X | 4  Order for PPD 0 1cc ID (L) forearm and will check within 48-72 hours |
| | | 5. Order for CXR single view |
| | | 6  Schedule appointment for ITP/TB Chronic Clinic |
| | X | 7  Order for Tetanus & Diphtheria Toxoid 0 5cc vaccine IM |
| | X | 8  Schedule appointment with provider |
| | | 9. Administer flu vaccine 0 5 CC IM x 1 if indicated per TDCJ policy |
| | X | 10  Order for two-step Mantoux skin test (PPD 0 1cc ID (L) forearm and will check within 48-72 hours.  If the reaction is lesser than 10 mm of induration, the second step is administered one to two weeks later) |

Nurse Signature: _V McKinney LVN_          Date / Time:  07/15/2011 @ 0900

**CID Intake Interview**
05/01/2009

Page 2 of 2

MCCOLLUM 020          **Appendix 378**

Scanned by HICKS, STEPHANIE K. CCA in facility HUTCHINS (HJ) on 07/20/2011 13:32

**CLINIC NOTES**
**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**INSTITUTIONAL DIVISION**

Name  *McCollum Larry*

TDCJ No  Intake

Unit· HUTCHINS STATE JAIL   *NKA*

| Date & Time | | NOTES |
|---|---|---|
| 7-15-11 | S | Offenders received from·  *Mclennan* |
| 1230 | | With history of·  *HTN* |
| | OA | See HSM-13 and Texas Health Status Updated for  current orders from county |
| | P | Current medication orders as per HJ providers. |
| | V O | T Orig, MD  A  Babbili, PA-C / N. Beckstrom, NP |

*D/c Clonidine*
*Start HcTZ 25 mg X 1 PO*
*9 Am X 30 d*      *Babbili· M*

Medication Pass issued to Offender  YES / NO

Please sign each entry with status
HSM – 1 (Rev 5/92)

Scanned by HICKS, STEPHANIE K. CCA in facility HUTCHINS (HJ) on 07/20/2011 13:31

## CORRECTIONAL MANAGED CARE
## INTAKE HISTORY AND HEALTH SCREENING

17216410

**I. IDENTIFICATION**

NAME: McCollum Larry          OCCUPATION: Driver          EDUCATION: High School

DOB: 04/04/53          COUNTY: McLennan          PREVIOUS TDCJ #(s): _____

**II. FAMILY HISTORY**

| | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|
| 1 Blood Disease (sickle cell anemia, hemophilia) | YES | NO | 18 INH Prophylaxis | YES | NO |
| 2 Cancer | YES | NO | 19 Intravenous Drug Abuse | YES | NO |
| 3 Diabetes | YES | NO | 20 Kidney Disease | YES | NO |
| 4 Heart Disease | YES | NO | 21 Liver Disease | YES | NO |
| 5 High Blood Pressure | YES | NO | 22 Mental Illness | YES | NO |
| | | | 23 Non Intravenous Drug Abuse/Alcoholism | YES | NO |
| 6 Tuberculosis | YES | NO | 24 Peptic Ulcers | YES | NO |
| **III PERSONAL HISTORY** | | | 25 Rheumatic Fever | YES | NO |
| 11 D 1 Asthma/Emphysema | YES | NO | 26 Rheumatism/Arthritis | YES | NO |
| 2 Back Injury | YES | NO | 27 Seasonal Allergies | YES | NO |
| 3 Blood Disease (sickle cell anemia, hemophilia) | YES | NO | 28 Sexually Transmitted Diseases | YES | NO |
| 4 Cancer | YES | NO | 29 Smoker | YES | NO |
| 5 Cavities | YES | NO | 30 Tetanus Immunization Date | YES | NO |
| 6 Depression/Suicide Attempt | YES | NO | 31 Tuberculosis | YES | NO |
| 7 Diabetes | YES | NO | 32 Unprotected Sex w/Multiple Partners | YES | |
| 8 Drug/ Food Allergies | YES | NO | 33 Other | | |
| 9 Epilepsy/Seizures | YES | NO | **IV OBSTETRIC/GYNECOLOGICAL HX** | X | N/A |
| 10 Glasses/Hearing Aid | YES | NO | 1 Date of last menstrual period | | |
| 11 Gum disease | YES | NO | 2 Number of pregnancies/live births | | |
| 12 Head Injury | YES | NO | 3 History of Problem pregnancy | | |
| 13 Heart Disease/Angina | YES | NO | 4 Date of last pap smear | | |
| 14 Hepatitis | YES | NO | 5 Date of last mammogram | | |
| 15 High Blood Pressure | YES | NO | 6 History of birth control methods (IUD, pills, etc ) | | |
| 16 HIV + / AIDS | YES | NO | | | |
| Prior HIV Test Date | | NO | | | |
| 17 Homosexual/Bisexual Activities | | NO | | | |

| | |
|---|---|
| **A.** | If YES to any of the above indicate family member or self, give date and treatment received |
| | BP Father, Brother |
| **B.** | History of hospitalization? YES NO |
| | Please list the DATE, HOSPITAL, CONDITION  Hillcrest Hospital |
| **C.** | Do you have any current medical, mental health or dental complaints? YES NO |
| | If yes, what  tooth fill, depression |
| **D.** | Have you experienced any of these symptoms  cough, weakness, weight loss, fevers, night sweats, loss of appetite or lethargy? |
| | YES NO  If YES, when? |
| **E.** | What illegal drugs have you used?  No |
| | What was the mode(s) of use? (Please circle)   Smoking    Injection    Inhaled    Ingested |
| | What amount and how often did you use drugs and alcohol? |
| | When was the last time you used drugs or alcohol? |
| | Have you ever had withdrawal or seizures when you stopped using drugs or alcohol?   YES   NO |
| **F.** | Are you presently taking or supposed to be taking any prescribed medications?  YES NO |
| | If YES, what   See Med Sheet |

HSM-13 (6/06)

Scanned by HICKS, STEPHANIE K. CCA in facility HUTCHINS (HJ) on 07/20/2011 13:32

**CORRECTIONAL MANAGED CARE**
**INTAKE HISTORY AND HEALTH SCREENING**

| | Reason for taking medications | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **G** | Observations | Tremor | YES | NO | Sweating | YES | NO | Other | |
| | Condition of skin | Cuts | YES | NO | Bruises | YES | NO | | |
| | | Sores | YES | NO | Other | | | | |
| | Body & Movement | Deformities | YES | NO | Impaired Motor Activity | YES | NO | | |
| | | Other | | | | | | | |

| | |
|---|---|
| **H** | BEHAVIOR AND MENTAL STATUS |

| Hygiene & Appearance | ✓ Clean, neat | | Dirty, sloppy | Other | |
|---|---|---|---|---|---|
| Orientation (ask questions and document response) | | | | | |
| | What is today's date? | 7/15/11 | | | |
| | What time is it? | Morning | | | |
| | What place is this? | Hutchins | | | |
| Speech | ✓ Normal | Loud | Soft | Mumbling | Other |
| Attitude | ✓ Appropriate | Laughing | Crying | Cursing | Quiet | Other |

| | |
|---|---|
| **I** | THOUGHT CONTENT (Please circle YES or NO) |

| | YES | NO |
|---|---|---|
| Are you having current thoughts about suicide or self-injury? | YES | NO |
| Do you see or hear things that others do not see or hear? | YES | NO |
| Do you have any special powers abilities? | YES | NO |
| Do you receive personal messages from the TV or radio? | YES | NO |
| Do you have any phobias or excessive fears? | YES | NO |

| | |
|---|---|
| **J.** | DISPOSITION |

| | | | | | |
|---|---|---|---|---|---|
| Routine referral to | ✓ Medical | ✓ Mental Health | ✓ Dental | CID | |
| Immediate referral to | Medical | Mental Health | Dental | CID | |
| Release to general population | YES | NO | Other | | |

| Offender Signature: | _Larry McCollum_ | Date: | 7-15-11 |
|---|---|---|---|

| Reviewer Signature | _W. Kingwood_ | Date. | 7/15/11 |
|---|---|---|---|

_approved RN_
_7/18/11_

HSM-13 (6/06)

MCCOLLUM 023          Appendix 381

## AFFIDAVIT

THE STATE OF TEXAS         §
                                  §

COUNTY OF <u>DALLAS</u>         §

BEFORE ME, the undersigned authority, personally appeared <u>Jeffery Pringle</u>, known to me to be a credible person over the age of 18 years, who, being duly sworn by me, did depose and say that the following is true and correct:

"My name is <u>Jeffery Pringle</u>. I am of sound mind; capable of making this affidavit; and I am authorized to make this affidavit in the capacity herein stated. I am personally acquainted with the facts herein stated.

"I am employed as <u>Warden</u> for the Texas Department of Criminal Justice ("TDCJ") <u>Hutchins Unit</u> located in Dallas, Texas, and do hereby certify that I am the custodian of records maintained in the regular course of business of the TDCJ.

"I have reviewed the records you have requested; and hereby certify that the attached copies of documents are true and correct copies of the original records now on file in my custody. I further certify that the records attached hereto are maintained in the usual and regular course of business at the TDCJ. The entries made and/or documents created were created at or about the time of the occurrence, or reasonable soon thereafter, by an employee or representative of TDCJ with knowledge of the act, event, condition, opinion, or diagnosis reflected in the records, and that such records are maintained on each and every offender confined here.

"Attached are copies of the records requested of Offender McCollum, Larry Gene #1721640 consisting of 19 pages and described as Pen Packet; which, were requested.

_____
Jeffery Pringle, Affiant

SWORN TO AND SUBSCRIBED BEFORE ME on _August 22, 2013_, by the said, _Jeff Pringle_ to certify which, witness my hand and seal of office.

_____
Notary Public in and for the State of Texas



DEBRA A. JACKSON
MY COMMISSION EXPIRES
JANUARY 17, 2017
Notary without Bond

**MCCOLLUM 638**                      **Appendix 382**



CASE NO. 2011-531-C2    COUNT N/A

INCIDENT NO./TRN: 9025469582    ~~FILED~~

| | | |
|---|---|---|
| E STATE OF TEXAS | § | IN THE 54TH DISTRICT |
| | § | 2011 |
| | § | COURT |
| | § | KAREN C. MATKIN |
| | § | DISTRICT CLERK |
| RRY GENE MCCOLLUM | § | MCLENNAN COUNTY, TEXAS |
| | § | DEPUTY |
| TE ID No.: TX3950494 | § | |

## JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL

| | | |
|---|---|---|
| ge Presiding: **HON. MATT JOHNSON** | Date Judgment Entered: | 6/23/2011 |
| rney for State: **ROBERT MOODY** | Attorney for Defendant: | **DOUG HENAGER** |

nse for which Defendant Convicted:

**RGERY**

| | | |
|---|---|---|
| rging Instrument: | Statute for Offense: | |
| **DICTMENT** | **32.21 Penal Code** | |

| | | |
|---|---|---|
| e of Offense: | | |
| **3/2009** | | |
| ce of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
| **TE JAIL FELONY** | **GUILTY** | **N/A** |

ns of Plea Bargain:

**MONTHS IN A STATE JAIL FACILITY AND A FINE OF $0.00**

| | | | |
|---|---|---|---|
| to 1st Enhancement graph: | **N/A** | Plea to 2nd Enhancement/Habitual Paragraph: | **N/A** |
| lings on 1st Enhancement graph: | **N/A** | Findings on 2nd Enhancement/Habitual Paragraph: | **N/A** |

| | | | |
|---|---|---|---|
| Sentence osed: | **6/23/2011** | Date Sentence to Commence: | **6/23/2011** |

| | |
|---|---|
| ishment and Place onfinement: | **12 MONTHS STATE JAIL DIVISION, TDCJ** |

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A** .

| | | | |
|---|---|---|---|
| | Court Costs: | Restitution/Reparation: | Restitution/Reparation Payable to the McLennan County District Clerk for the benefit of: |
| | | | ☐ **VICTIM** (listed in the Restitution Exhibit incorporated in this Judgment by reference.) |
| .00 | $ 425.00 | $ N/A | ☐ **AGENCY/AGENT** (listed in the Restitution Exhibit incorporated in this Judgment by reference.) |

Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

**Offender Registration Requirements do not apply to the Defendant.** TEX. CODE CRIM. PROC. chapter 62

age of the victim at the time of the offense was **N/A** .

If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order.

From 8/26/2010 to 8/27/2010 From 3/13/2011 to 3/13/2011 From      to

| | | | | | |
|---|---|---|---|---|---|
| c | From | to | From | to | From to |

If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below.

**N/A DAYS**   NOTES: N/A

Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated
ve. The Court then admonished Defendant as required by law. It appeared to the Court that Defendant was mentally
petent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court
ived the plea and entered it of record. Having heard the evidence submitted, the Court found Defendant guilty of the
1se indicated above. In the presence of Defendant, the Court pronounced sentence against Defendant.

The Court **FINDS** Defendant committed the above offense and **ORDERS, ADJUDGES AND DECREES** that Defendant is
LTY of the above offense. The Court **FINDS** the Presentence Investigation, if so ordered, was done according to the
icable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court **ORDERS** Defendant punished as indicated above. The Court **ORDERS** Defendant to pay all fines, court costs,
restitution as indicated above.

**Punishment Options  (select one)**
**Confinement in State Jail or Institutional Division.** The Court **ORDERS** the authorized agent of the State of Texas or the
iff of this County to take, safely convey, and deliver Defendant to the **Director, State Jail Division, TDCJ**. The Court
ers Defendant to be confined for the period and in the manner indicated above. The Court **ORDERS** Defendant remanded
1e custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court **ORDERS** that
1 release from confinement, Defendant proceed immediately to the MCLENNAN COUNTY DISTRICT CLERK'S OFFICE.
1e there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and
tution as ordered by the Court above.
**County Jail—Confinement / Confinement in Lieu of Payment.** The Court **ORDERS** Defendant immediately committed
1e custody of the Sheriff of         County, Texas on the date the sentence is to commence. Defendant shall be confined in
 County Jail for the period indicated above. The Court **ORDERS** that upon release from confinement, Defendant shall
ced immediately to the         . Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any
aining unpaid fines, court costs, and restitution as ordered by the Court above.
**Fine Only Payment.** The punishment assessed against Defendant is for a **FINE ONLY**. The Court **ORDERS** Defendant to
ced immediately to the Office of the         County  . Once there, the Court **ORDERS** Defendant to pay or make
ngements to pay all fines and court costs as ordered by the Court in this cause.

**Execution / Suspension of Sentence  (select one)**
The Court **ORDERS** Defendant's sentence **EXECUTED**.
The Court **ORDERS** Defendant's sentence of confinement **SUSPENDED**. The Court **ORDERS** Defendant placed on community
rvision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of
munity supervision. The order setting forth the terms and conditions of community supervision is incorporated into this
ment by reference.
The Court **ORDERS** that Defendant is given credit noted above on this sentence for the time spent incarcerated.

**Furthermore, the following special findings or orders apply:**
Court assesses all court appointed attorney's fees, investigator's fees, and interpreter's fees as costs in this cause and Orders the
1dant to pay the same.
The Restitution Exhibit is incorporated in this Judgment by reference.
1e Court **FINDS** that, with the consent of the State's attorney, Defendant admitted guilt as to the following unadjudicated offense(s),
1e Court agreed to take the unadjudicated offense(s) into account in determining the sentence for the offense of which Defendant was
dged guilty. Accordingly, the Court **FINDS** prosecution is barred for the following unadjudicated offense(s):     TEX. PENAL
E §12.45.

ned **and entered on June 23, 2011**

MATT JOHNSON
JUDGE PRESIDING

IGHT THUMBPRINT | Defendant's signature

Officer's signature

MCCOLLUM 647

Appendix 384

CAUSE NO. 2011-331-C2

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 54TH JUDICIAL |
| VS | § | DISTRICT COURT OF |
| LARRY GENE MCCOLLUM | § | McLENNAN COUNTY, TEXAS |

FILED
2011 JUN 24 PM
KAREN C. MATKIN
DISTRICT CLERK
McLENNAN CO. TX.
DEPUTY

## WAIVER OF APPEAL

I, LARRY GENE MCCOLLUM, the Defendant, after complete consultation with DOUG HENAGER, my Attorney of Record, in Open Court, and being fully aware of the sentence heretofore pronounced against me by the Court, would state:

That I, LARRY GENE MCCOLLUM, understand that I have the right to file a Motion for New Trial and an Amended Motion for New Trial within thirty (30) days of the entry of a Judgment and Sentence, or Order Granting Community Supervision Probation, or other Order of the Court;

That I, LARRY GENE MCCOLLUM, understand that I have the right to request the Court's permission to Appeal if the punishment assessed against me did not exceed the recommendation of the State, if any, and that I have the right to Appeal matters raised by written motion and presented to the Court prior to my trial;

That I, LARRY GENE MCCOLLUM, understand that I have the right to give Notice of Appeal and to Appeal from the Judgment, Sentence or Order of this Court, unless otherwise prohibited from doing so by law;

That I, LARRY GENE MCCOLLUM, understand that if I appeal, and I am indigent, I have the right to a free record and transcript and an appointed attorney to prosecute my appeal.

I, LARRY GENE MCCOLLUM, state that I desire to **WAIVE** each and all of my rights to Appeal, including the filing a Motion for New Trial, requesting permission to appeal, appealing matters raised by written motion prior to trial, giving Notice of Appeal, appealing the Judgment, Sentence or Order of the Court, and a free record, transcript and attorney on appeal. I make this WAIVER freely, intelligently and voluntarily. I desire to accept the Sentence or Order of the Court, and ask the Court to allow me to **WAIVE ALL RIGHTS I HAVE TO APPEAL.** I ask the Court to approve this Waiver, which will render the Judgment, Sentence or Order of the Court **FINAL** in all respects.

Date: June 23, 2011

LARRY GENE MCCOLLUM

APPROVED:

JUDGE PRESIDING
54th District Court

DOUG HENAGER

**MCCOLLUM 651**

**Appendix 385**

THE STATE OF TEXAS

COUNTY OF McLENNAN

      I, KAREN C. MATKIN, Clerk, District Courts in and for McLennan County, Texas, do hereby certify that the above and foregoing are true and correct copies of the following instruments, to-wit:

1.      **INDICTMENT**

2.      **JUDGMENT & SENTENCE**

3.      **WAIVER OF APPEAL**

in Cause Number <u>**2011-531-C2**</u> in the <u>**54**</u>th Judicial District Court of McLennan County, Texas, styled:

**THE STATE OF TEXAS**

**VS.**

**LARRY GENE MCCOLLUM**

as same appear from original instruments now on file in this office of which I have legal custody.

      TO CERTIFY WHICH WITNESS MY HAND AND SEAL OF SAID COURT, at my office, in the City of Waco, County of McLennan, Texas this the <u>**29TH**</u> day of <u>**JUNE**</u>, <u>**2011**</u>.

                            KAREN C. MATKIN
                            Clerk, District Courts
                            McLennan County, Texas

(seal)

                            By _____, Deputy

## BUSINESS RECORDS AFFIDAVIT

STATE OF TEXAS

COUNTY OF Walker

RE: 3:12-CV-02037; Stephen McCollum, et al v. V. Livingston, et al

BEFORE ME, the undersigned authority, personally appeared Nathan Ward, who, being duly sworn by me, deposed as follows:

"My name is Nathan Ward. I am over 18 years of age, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

"I am employed as a Regional Manager with the Office of the Inspector General (OIG) – Texas Department of Criminal Justice. I am the custodian of the attached records of the OIG. These records are kept by the OIG in the regular course of business, and it was the regular course of business of the OIG for an employee or representative of the OIG, with knowledge of the act, event, condition, or opinion, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The attached record is an exact duplicate of the record on file with the Office of the Inspector General in Criminal Case File No. 2011.03006 concerning Offender Larry McCollum, TDCJ No. 01721640, as of the date of this affidavit.

_Nathan Ward_
Nathan Ward
Regional Manager
Office of the Inspector General

SWORN TO AND SUBSCRIBED before me on this the 14th day of December 2012.

_____
NOTARY PUBLIC in and for
The State of Texas
Printed Name: Celia A Eastham
My commission expires: January 31, 2016

Celia A Eastham
Notary Public - State of Texas
My Commission Expires 1-31-2016

1

**Appendix 387**                    McCollum 01452



# Texas Department of Criminal Justice

**Brad Livingston**
Executive Director

Administrative Incident Review

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## HUTCHINS STATE JAIL

**Incident Number:** I-10671-07-11

**TO:** Emergency Action Center

**THRU:** Robert Eason
Region II Director

**SUBJECT:** Natural Attended Death

**PERSONS INVOLVED:** Offender McCollum, Larry #1721640; W/M; DOB – 04/04/53; Age 58; NR custody; Serving a 12 month sentence for Forgery from McClennan County; Sentence Begin Date 06/21/11; TDCJ Received Date 07/15/11.

**SUMMARY:** On Thursday July 28, 2011 at approximately 2335 hours Offender Larry McCollum was pronounced deceased by the attending Doctor Charles Owens and Inter-Physician Rigoberto Ramirez at Parkland Hospital in Dallas, Texas. The preliminary cause of death is listed as Respiratory Failure/Neurological Failure. The offender's next of kin, Mrs. Sharon McCollum (wife) was contacted and advised of the offender's death.

On Friday July 22, 2011 at approximately 0300 hours, offender McCollum was transported via ambulance to Parkland Hospital after being found in his assigned bunk (C7-46) with what appeared to be a seizure. Staff were able to take the offender to the medical department were a triage nurse at the Crain Unit was contacted and recommended the offender be sent to the hospital via 911 due to no medical notes in the computer for offender McCollum. Offender McCollum had been received on the Hutchins State Jail on July 15, 2011, from McClennan County. The offender was assessed at Parkland Hospital and placed on a ventilator. The offender's condition at that time was listed as critical and he was assigned to the 9th floor Intensive Care unit.

On July 22, 2011 the next of Kin was contacted and advised by Warden Polk of offender McCollum's condition and to obtain his medical history. Offender McCollum's immediate family was allowed visitation. Offender McCollum received many test to determine if he had any neurological response/s and to determine the original cause of his seizure. Offender McCollum remained on a ventilator until Thursday July 28, 2011, as Mrs. Sharon McCollum and family members were provided information concerning offender McCollum's care and health status by the attending Physician at Parkland Hospital. The family at that time chose to remove the offender from the ventilator and cease all life saving

---

*Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.*

1500 E. Langdon Road
Dallas, Texas 75241-7136

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**Appendix 388**

McCollum 01589

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 11/17/2011 | NUMBER:   E-37.1 |
| | Replaces: 12/3/2009 (E37.1)         6/1/2009 (E38.1) | Page 1 of 5 |
| | Formulated: 10/85 Reviewed: 11/11 | |

## DAILY PROCESSING OF HEALTH COMPLAINTS AND SICK CALL

PURPOSE:   To describe procedures for processing offender health complaints and establish guidelines for offender sick call services.

POLICY:   Each facility within the Texas Department of Criminal Justice provides daily processing of offender health complaints and has a sick call system for the treatment of routine, non-emergent illness or injury.

Sick call services by qualified health care personnel are offered a minimum of five days each week.

It is the responsibility of each facility Director of Nursing (TTHUSC)/Nurse Manager (UTMB-CMC) to develop a nursing sick call schedule that is approved by the facility health authority/management team.

DEFINITIONS:

**Sick Call Request (SCR)** - Any written expression of a health related complaint or request to access health services (dental, mental health or medical).

**Sick Call Visit -** An initial in person assessment of an offender who has submitted a SCR performed by a licensed health care professional and conducted in a clinical setting.

**Mental Health Staff** – Individuals with special training and education to work in the mental health field. These individuals may or may not have a Master's level or above mental health degree

**Qualified Mental Health Professional (QMHP)** – physician, midlevel provider, psychologist, Master's level psychotherapist, or Master's level social worker.

**Walk-in** – an offender who presents to the clinic in person during hours of operation requesting to be seen by a licensed health care professional

**Written Response Only**- Written instruction or information that is the sole response to the SCR that completely addresses the issues in the SCR.

**Licensed Healthcare Worker** – a licensed vocational nurse, registered nurse. midlevel provider, physician, psychiatrist, psychologist, Master's level psychotherapist, Master's level social worker, or dentist,

**Appendix 389**

TDCJ019177

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 11/17/2011 | NUMBER:   E-37.1 |
|---|---|---|
| | Replaces: 12/3/2009 (E37.1) 6/1/2009 (E38.1) | Page 2 of 5 |
| | Formulated: 10/85 Reviewed: 11/11 | |

## DAILY PROCESSING OF HEALTH COMPLAINTS AND SICK CALL

PROCEDURE:

I.   At a minimum, Sick Call Request forms (HSA-9) must be available and accessible in offender housing areas.

II.   Written offender requests for health care services (medical, dental and mental health) are to be placed in the container (s) designated for that purpose. All written offender requests for health care services will be processed as sick call requests even if they are not written on the HSA- 9 form.

III.   For offenders unable to write, the procedures listed in Attachment A must be followed. Medical staff will collaborate with security rank to assure all security staff is aware of this process.

IV.   Sick Call Request forms are collected daily by health services staff. All Sick Call requests will be date stamped and initialed upon receipt in the health services department the same day as collected.

V.   Sick call requests will be screened within 24 hours of receipt in the health services department. The individual responsible for screening the sick call requests will assess each request for emergent needs. The screener will sign each request. The signature will indicate the screener's professional title or license. Designated screeners are as follows:
   - Medical complaints:  Licensed vocational nurse, registered nurse, midlevel provider, or physician
   - Dental complaints:  dentist, dental hygienist, licensed vocational nurse, or registered nurse
   - Mental Health complaints: mental health staff, qualified mental health professional, licensed vocational nurse, or registered nurse

VI.   Offenders with complaints of recent seizure, altered mental status, suicidal ideation, chest pain, shortness of breath, difficulty breathing, abdominal pain, or other possible emergent or urgent conditions, will be afforded immediate access to health services for assessment. Offenders found to not require emergent or urgent care may be advised to continue with the routine sick call process.

VII.   Each facility may institute special Routine or Maintenance Care Clinics to be held

**Appendix 390**

TDCJ019178

| | Effective Date: 11/17/2011 | NUMBER:   E-37.1 |
|---|---|---|
| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Replaces: 12/3/2009 (E37.1)                6/1/2009 (E38.1) | Page 3 of 5 |
| | Formulated: 10/85 Reviewed: 11/11 | |

## DAILY PROCESSING OF HEALTH COMPLAINTS AND SICK CALL

periodically based upon volume and need to address specific offender requests for routine services such as nail clipping, visual acuity checks, PAP smears, etc. These special Clinics will not be held to Access to Care timelines but must be held at least every 30 days.

VIII.  Each facility will have a process to ensure all sick call requests are documented in the health care record with all complaints listed and the date and time the Sick Call Request was received in the health care services department noted.   Sick Call Requests will be scanned into the electronic medical record (EMR) - or placed in the physical medical chart if there is no EMR available - within 72 hours of the receipt of the Sick Call Request.

IX.  The original SCR must be returned to the offender.

X.  A copy of each SCR must be filed chronologically by discipline and retained in the medical department until authorization is received for destruction.

XI.  A "Written Response Only" is acceptable for certain sick call requests.
- A "Written Response Only" should be delivered to the offender within 2 business days of receipt of the SCR.
- A "Written Response Only" is never acceptable for any Sick Call Request communicating possible emergent or urgent signs or symptoms.
- SCRs may be answered with a "Written Response Only" in situations including but not limited to the following:
  - Administrative questions – e.g. "When is my appointment?", "What are my restrictions?" etc.
  - Requests for services that are scheduled for the next available Routine or Maintenance Clinic. Appointment date should not exceed 30 days from receipt of the SCR.
  - Requests for medication refills, but the provider must determine if the offender needs to be evaluated or if clinical or laboratory monitoring is indicated.
  - Complaints evaluated by a provider within the prior 7 days. However, the provider must review the sick call request and document his/her clinical decision that the offender does not need to be seen.
- More than one complaint for the same non-emergent/non-urgent condition within 14 days that has not been physically examined must be scheduled for a nursing or provider sick call visit within

**Appendix 391**

TDCJ019179

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 11/17/2011 | NUMBER:   E-37.1 |
|---|---|---|
| | Replaces: 12/3/2009 (E37.1)<br> 6/1/2009 (E38.1) | Page 4 of 5 |
| | Formulated: 10/85<br>Reviewed: 11/11 | |

## DAILY PROCESSING OF HEALTH COMPLAINTS AND SICK CALL

72 hours of receipt of the second SCR

- Offenders are not to be sent Written Responses in the form of a question.  If additional information is required, the offender must be seen in person.

XII.   An offender complaining of clinical signs or symptoms or specifically requesting to be seen in the SCR must be seen by a licensed healthcare worker within 72 hours of receipt of the SCR.

- For dental complaints, the sick call visit is to be a face-to-face or telemedicine encounter performed by a nurse, medical/dental provider, or dental hygienist.
- For medical complaints, the sick call visit is to be a face to face or telemedicine encounter performed by a nurse or medical provider.

XIII.   When necessary, the offender is referred to a midlevel provider, physician, or dentist. The time frame for an appointment with a midlevel provider, physician, or dentist is based upon the acuity of the presenting symptoms but the offender must be seen within **10 business** days of receipt of the original SCR.

- Offenders referred to Dental Services by nursing sick call will be seen by a dentist within **10 business** days of the original complaint.
- Offenders referred to a medical provider by nursing sick call will be seen by a provider within **10 business** days of the original complaint.

XIV.   If an offender reports to nursing sick call more than two times over a 14 day period with the same complaint and has not seen a midlevel provider or physician, he/she will receive an appointment to do so within 7 days.

XV.   Offenders requesting or referred for mental health services will be interviewed within 72 hours of receipt of the SCR or notification by mental health staff, nurse, midlevel provider, or physician to determine urgency of need as follows:

- **Urgent Mental Health needs** – refer immediately to Qualified Mental Health Professional (QMHP).  A qualified mental health professional is a person qualified to evaluate and treat mental disorders consistent with state law.

  Urgent complaints include but are not limited to risk of suicide or injury to self or others, acute distress or agitation and **certain** medication side effects.

- **Non-urgent Mental Health needs** – refer to QMHP within 10 business days.

**Appendix 392**

TDCJ019180

| | Effective Date: 11/17/2011 | NUMBER:   E-37.1 |
|---|---|---|
| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Replaces: 12/3/2009 (E37.1)          6/1/2009 (E38.1) | Page 5 of 5 |
| | Formulated: 10/85 Reviewed: 11/11 | |

## DAILY PROCESSING OF HEALTH COMPLAINTS AND SICK CALL

- **Request/complaint not mental health related** – refer patient to the appropriate department and follow-up on further requests or referrals.

- Offenders already on the Mental Health caseload need not be referred to a QMHP if other Mental Health Staff can resolve the offender's issues.

XVI. Referrals for Mental Health Services from outside the health services department (i.e. security, chaplain, or educator) will be acted upon in the same manner as a Sick Call Request received from the offender.

XVII. If an offender reports to sick call for a mental health complaint more than two times over a 14 day period with the same complaint and has not seen a Qualified Mental Health Professional, he/she will receive an appointment to do so within 7 days.

Index:       Sick call
             Access to Care

Reference:   2010 ACA Standard 4-4346 (Ref. 3-4353) Clinical Services
             TDCJ Administrative Directive AD-06.07 (rev 3) Feb 3, 2003, Access to Health Services
             Occupations Code Title 3, Health Professions, Subtitle B. Physicians, Ch 157 Authority of
             Physician to Delegate Certain Medical Acts

**Appendix 393**

TDCJ019181

## BUSINESS RECORDS AFFIDAVIT

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF WALKER** | § |

BEFORE ME, the undersigned authority, personally appeared, Kelli Ward, who, being duly sworn by me, deposed as follows:

"My name is Kelli Ward. I am over 18 years of age, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

I am employed as the Manager of Offender Grievance for the Texas Department of Criminal Justice (TDCJ). I am the custodian of the Offender Grievance Records for the TDCJ, and these records were kept in the regular course of business, and it is the regular course of business for an employee or representative of the TDCJ, with knowledge of the act, event, condition, or opinion, recorded to make the record or to transmit information thereof to be included in such record. The record was made at or near the time or reasonably soon thereafter. I have reviewed the grievance records for Offender **McCollum, Larry Gene**, TDCJ #1721640, Cause Number 3:12CV2037, for the specified time period of July 2011 to the present and found no records on file."

Kelli Ward
Manager, Offender Grievance
Texas Department of Criminal Justice

SWORN TO AND SUBSCRIBED before me on this the 6th day of August, 2013.

Deborah K Hoke
Notary Public
State of Texas
My Comm. Exp. 08/08/16

NOTARY PUBLIC in and for
The State of Texas

MCCOLLUM 077                    **Appendix 394**

Texas Department of Criminal Justice

INSTITUTIONAL DIVISION

Inter–Office Communications

To  <u>Warden Pringle</u>                              Date <u>December 11, 2012</u>

From <u>P Escobedo/Chief of Classification</u>   Subject <u>McCollum, Larry #1721640</u>

Be advised offender McCollum, Larry #1721640 arrived at Hutchins State Jail on July 18, 2011. When offenders arrive from the county jails they are housed in the next available bunk in our transient housing for processing. The offender was placed in C4–1 housing, which is a lower bunk. Offender McCollum was then moved to C6–34 bunk, which is a top bunk on July 18, 2011. Also on July 18, 2011 offender McCollum was moved to C7–46, a top bunk, where he remained for the rest of his stay. The offender only maintains a bottom bunk if the medical personnel checking in the incoming chain notifies count room staff the offender will require a bottom bunk while in processing. Mrs. P. Lopez, Admin Tech II Count Room, made the moves with the authorization of P. Meshack, Chief of Unit Classification at the time.

Thank you,

P. Escobedo

**Appendix 395**          McCollum 00444

Larry McCollum #1721640
Hutchins State Jail
1500 E. LANGDON RD.
Dallas. Tx 75241

22 JUL 2011

Sandra McCollum
4022 E. Harris #9
Waco, Tx 76705

76705310109



## TEXAS DEPARTMENT
## OF CRIMINAL JUSTICE
### OFFICE OF THE INSPECTOR GENERAL

**Michael Keck**
Investigator

Hutchins State Jail
1500 East Langdon Road
Dallas, Texas 75241

Office: (972) 225-1304 x 6342
Fax: (469) 941-3909
State Cell: (972) 207-6826
michael.keck@tdcj.state.tx.us



Parkland

Kristi

Pastoral Care Department



**Appendix 396**

5201 Harry Hines Blvd.  |  Dallas, TX  75235
214-590-8512  |  214-590-2620 fax

Wed 7-19

Hello Baby!

I Love You, good to write you
again Sorry this will be short
Send Names Address with Zips on
who wants to come See me. You
already on list, I put Dee down
But got wrong name they told me
to put our address Send them
soon. I Love You. Hold ups on
Your letters they are moving me
all the time. I will write again
when I get settled looking forward
to 42 hour Contact visit. can't
wait you will have to bring ds ing
marrige License. We got out the Van
Fri and they said we can to Hold
They are right. Love You Baby

Larry

Ps I set up a phone ded in some
folks the pronto OK Talk to you soon

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM,
STEPHANIE KINGREY, and
SANDRA McCOLLUM,
individually and as
heirs at law to the
Estate of LARRY GENE
McCOLLUM,
            Plaintiffs,

VS                              §      CIVIL ACTION NO.
                                §      3:12-cv-02037
BRAD LIVINGSTON, JEFF
PRINGLE, and the TEXAS
DEPARTMENT OF CRIMINAL
JUSTICE,
            Defendants.


-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

KAREN SUE TATE

FEBRUARY 7, 2013
-----------------------------------


          ORAL AND VIDEOTAPED DEPOSITION OF KAREN

SUE TATE, produced as a witness at the instance of the

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

February, 2013, from 3:57 p.m. to 5:49 p.m., before TINA

TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

**2**

A P P E A R A N C E S

FOR THE PLAINTIFFS:
   Mr. Scott Medlock
   Mr. Jeff Edwards
   THE EDWARDS LAW FIRM
   The Bremond Houston House
   706 Guadalupe
   Austin, Texas  78701
   jeff@edwards-law.com
   scott@edwards-law.com

FOR THE DEFENDANTS:
   Mr. David A. Harris
   Mr. Bruce R. Garcia
   OFFICE OF THE ATTORNEY GENERAL
   P.O. Box 12548
   Austin, Texas 78711-2548
   512.463.2080 Fax 512.495.9139
   bruce.garcia@oag.state.tx.us
   david.harris@oag.state.tx.us

ALSO PRESENT:
   Mr. Jeremy Gilliam (Videographer)
   512.565.4799
   Warden Pringle

**3**

I N D E X

                                                    PAGE
Appearances.................................... 2
WITNESS:  KAREN SUE TATE
Examination by Mr. Medlock.................... 4
Signature and Changes......................... 78
Reporter's Certificate........................ 80


E X H I B I T S

NO.  DESCRIPTION                            PAGE
17   Risk Management Training on Heat-Related
     Incidents 5/11/11....................... 19

18   7/19/111 Temperature Logs................ 33

**4**

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are going on the record February 7, 2013.  The time is approximately 3:57 p.m.  Will the court reporter please swear in the witness?

KAREN SUE TATE,
having been first duly sworn, testified as follows:

BY MR. MEDLOCK:

Q.  Sergeant Tate --

A.  Yes.

Q.  -- my name is Scott Medlock.  I am an attorney, and I represent the family of Larry Gene McCollum.  Do you understand that?

A.  Yes.

Q.  Okay.  And you understand that Mr. McCollum's family has brought a lawsuit against TDCJ and the State of -- some officials of the State of Texas?

A.  Yes.

Q.  Okay.  Have you ever been deposed before or testified --

A.  No, I have not.

Q.  -- before.  Okay.

MR. HARRIS:  Let him finish his question. I know it's been a long day, but let him finish his question.  It will go a lot quicker.

**5**

THE WITNESS:  Yes, sir.

Q.  Let -- I'm just -- just like your attorney was, I'm going to go over some kind of ground rules for the deposition with you first.  Please do let me finish my question before you give your answer.  I'll try and let you finish your answer before I ask the next question.  That's as much for the court reporter as for anybody else, because she needs to be able to take down everything that's being said in here.

Do you understand that?

A.  Yes.

Q.  Okay.  Your -- thank you for saying yes aloud. Because she's taking everything down, she can't record things like uh-huh or huh-uh, or they look ambiguous on the transcript that she's going to produce.  So if you could keep your answers to something audible and yes or no instead of uh-huh or huh-uh.

A.  Okay.

Q.  Does that make sense?

A.  Yes.

Q.  Okay.  If you don't hear my question, will you say so?

A.  Yes, sir.

Q.  And if you don't understand my question, will you say so?

**2 (Pages 2 to 5)**

512-474-4363          WRIGHT WATSON & ASSOCIATES          (fax) 512-474-8802
1250 S. Capital of Texas Highway, Building 3, Suite 400, Austin, Texas 78746

**Appendix 400**

**26**

1  of 2011?
2      A.  Yes, sir.
3      Q.  And you see that there's a little picture of
4  an ambulance under the description of heat stroke where
5  it says, again, that it's a -- do you see -- see the
6  picture of the ambulance?
7      A.  Yes, sir.
8      Q.  Does that imply to you that, again, this is a
9  medical emergency, and someone needs to be put in an
10  ambulance?
11      A.  Yes, sir.
12      Q.  And in the top of the third column at the end
13  of that first paragraph it says, "Always transfer heat
14  stroke victims to a medical facility."  Do you see that?
15      A.  Yes, sir.
16      Q.  At the Hutchins Unit, there are no medical
17  staff during the night shift; is that right -- or there
18  were not in the summer of 2011?
19      A.  On site, no, sir.
20      Q.  So you would have known in July of 2011 that
21  if someone was going to get to a medical facility to get
22  any medical attention at all, it would have to be off of
23  the Hutchins Unit; is that right?
24      A.  Yes, sir.
25      Q.  Okay.  Is there still no medical staff at the

**27**

1  Hutchins Unit during the night shift?
2      A.  No, sir.
3      Q.  So it's -- it would still be true today that
4  if someone was going to get medical attention during the
5  night shift, it would have to be off of the Hutchins
6  Unit?
7      A.  We do have DMS where we contact the Crain
8  Unit.
9      Q.  What -- for the jury, what's DMS?
10      A.  I'm not real sure what the DMS stands for,
11  Medical System, I know that, Direct Medical System or...
12          MR. HARRIS:  If you don't know, just say
13  you don't know.
14      A.  I don't know exactly, no.
15      Q.  How does it work?  From what you do know, what
16  is it?
17      A.  The offender, if able, is taken before --
18  taken into medical, and the Crain Unit is notified, and
19  they come on a television and actually look and talk to
20  the offender.
21      Q.  So it's like a telemedicine?
22      A.  Yes, sir.
23      Q.  Okay.  Would you always use the DMS for
24  someone who was having a -- would you have -- let me
25  start over.  Would you use DMS for someone who is having

**28**

1  an emergency?
2      A.  If applicable, yes, sir.
3      Q.  When would you use it?  Like if someone is
4  found collapsed having a seizure and is nonresponsive,
5  would you take him to DMS?
6      A.  It depends -- not necessarily, sir.
7      Q.  What would it depend on?
8      A.  The extent of the seizure, sir.
9      Q.  If they remained unresponsive, would you take
10  them to DMS?
11      A.  Yes, and notify them by phone immediately.
12      Q.  Okay.  So you would call -- why would you do
13  that?
14      A.  To notify them.  They have access to the
15  medical records if they have medical records built.
16      Q.  Okay.  So you would do that to see what
17  information the Crain Unit had on them?
18      A.  And see what treatment they wanted us to go
19  with.
20      Q.  Okay.  Would you always do that before calling
21  911?
22      A.  Not necessarily, sir.
23      Q.  Okay.  Well, let's take a step back.  As a
24  sergeant, could you call 911?
25      A.  I would notify my immediate supervisor first.

**29**

1      Q.  That would be the lieutenant?
2      A.  Yes, sir.
3      Q.  Would you -- according to the policies here at
4  the Hutchins Unit, and the practice and procedure that
5  you follow, can you, as a sergeant, pick up the phone
6  and call 911?
7      A.  I would notify my lieutenant.
8      Q.  You have to notify your lieutenant before
9  calling 911?
10      A.  I would notify my lieutenant.
11      Q.  You would.  Okay.  Is there a policy or
12  procedure that says you have to notify your lieutenant
13  before calling 911?
14      A.  No, sir, I don't believe so.
15      Q.  Is that how you've been instructed to contact
16  911, that you go through the lieutenant first?
17      A.  I go through -- I mean, we've always called
18  ranking officers.  I would call the lieutenant.
19      Q.  Who told you that you needed to call a ranking
20  officer before you called 911?
21      A.  No one.
22      Q.  That's just the way things are done here at
23  the Hutchins Unit?
24      A.  Through the chain of command, I would contact
25  my lieutenant.

**8  (Pages 26 to 29)**

30

1    Q.  Okay.  Officer Clark had similar testimony,
2  that he would go through the chain of command before
3  calling 911.  Is that how things are done here at the
4  Hutchins Unit, you go through your chain of command
5  before you call 911?
6    A.  I would.
7    Q.  You would.  Do you know if everybody would
8  here at the Hutchins Unit?
9    A.  I can't speak for everyone.
10   Q.  Is that the way things are supposed to be done
11  at the Hutchins Unit?
12   A.  That's the way I do it.
13   Q.  Okay.  And you do things the ways things are
14  supposed to be done?
15   A.  I try to, sir.
16   Q.  Okay.  Is there anything that you know of that
17  would prevent you from using the DMS system and calling
18  911 at the same time?
19   A.  No, sir.
20   Q.  So you could do that?  You could call DMS and
21  call 911 at the same time?
22   A.  Yes, sir.
23   Q.  And just to be clear, did the DMS system exist
24  in the -- in July of 2011?
25   A.  I believe so, sir.

31

1    Q.  Okay.  Do you know -- the DMS would just
2  connect you with who?  How -- do you know who the DMS
3  system would connect you with?  Would it be a doctor or
4  a registered nurse?
5    A.  A registered nurse.
6    Q.  A registered nurse.  Okay.  So would you ever
7  see a doctor through the DMS system?
8    A.  I have not, sir.
9    Q.  Okay.  So then you were aware in July of 2011
10  that if someone was going to see a doctor, it would have
11  to -- it wouldn't be through DMS?
12   A.  Yes, sir.
13   Q.  Okay.  I want you to go back to your -- the
14  training roster, Exhibit 17.  Can you look and see if
15  Officer Clark attended that training?
16   A.  Yes, sir.
17   Q.  Officer Clark did attend?
18   A.  Yes, sir.
19   Q.  How about Officer Jolayemi?
20   A.  Yes, sir.
21   Q.  She did as well?
22   A.  Yes, sir.
23   Q.  Okay.  Do you -- when you do the training, do
24  you do anything to make sure that the officers are
25  actually paying attention?

32

1    A.  Yes, sir.
2    Q.  What do you do?
3    A.  I ask them questions referring to the training
4  material.
5    Q.  Okay.  So you'll ask -- you'll say, Officer
6  Clark, do you know whatever training material you just
7  explained and see if he was paying attention?
8    A.  Yes, sir.
9    Q.  Something like that.  Okay.  Do you do
10  anything else?  Do they have like an exam that they have
11  to take or...
12   A.  No, sir.
13   Q.  Anything else that you do to make sure that
14  the officers are paying attention?
15   A.  Just go over the material, sir.
16   Q.  Have you ever seen this document or a document
17  like it before, Sergeant?
18   A.  This is from the back gate.
19   Q.  Is that from the -- what you call G Control?
20   A.  No, sir.
21   Q.  Okay.
22     MR. MEDLOCK:  Let's go ahead and mark --
23  we haven't marked this one yet, have we, guys?
24     MR. HARRIS:  I think you marked something
25  similar to that in the officer's deposition, but I don't

33

1  know if it was that one or not.
2     MR. MEDLOCK:  I only would have used one.
3     MR. GARCIA:  No, you didn't mark it
4  because he didn't recognize it.
5     MR. MEDLOCK:  That's what I thought.
6  Okay.
7     (Exhibit 18 marked.)
8     MR. HARRIS:  Is it 18?
9     THE WITNESS:  Yes, sir.
10   Q.  How do you know this record was made at the
11  back -- from the back gate, Sergeant?
12   A.  I recognize the officers' names, as well as
13  this is from the time the gate is manned.
14   Q.  Okay.  Do you know if the temperatures at the
15  Hutchins Unit were being recorded at the back gate?
16   A.  At what time?
17   Q.  At the times listed.  Let's read -- let me ask
18  a different question.  Do you know -- from the officers
19  working that are listed here, it's your understanding
20  that they would have been working at the back gate, so
21  the temperatures would have been recorded there at the
22  back gate; is that right?
23   A.  Yes, sir.
24   Q.  Okay.  And from your understanding, is this
25  the document that the temperatures are recorded on and

**9  (Pages 30 to 33)**

**78**

CHANGES AND SIGNATURE

1  CHANGES AND SIGNATURE
2  WITNESS: KAREN SUE TATE
3  DATE OF DEPOSITION: FEBRUARY 7, 2013
4  PAGE LINE    CHANGE              REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**79**

1  _____
2      I, KAREN SUE TATE, have read the foregoing
3  deposition and hereby affix my signature that same is
4  true and correct, except as noted above.
5
6      _____
7          KAREN SUE TATE
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**80**

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3  STEPHEN McCOLLUM,
   STEPHANIE KINGREY, and
4  SANDRA McCOLLUM,
   individually and as
5  heirs at law to the
   Estate of LARRY GENE
6  McCOLLUM,
       Plaintiffs,
7
8  VS           Â§   CIVIL ACTION NO.
                Â§   3:12-cv-02037
9  BRAD LIVINGSTON, JEFF
   PRINGLE, and the TEXAS
10 DEPARTMENT OF CRIMINAL
   JUSTICE,
11     Defendants.
12 --------------------------------------
13      REPORTER'S CERTIFICATION
14     ORAL AND VIDEOTAPED DEPOSITION OF
15            KAREN SUE TATE
16           FEBRUARY 7, 2013
17 --------------------------------------
18
19      I, Tina Terrell Burney, Certified Shorthand
20 Reporter in and for the State of Texas, hereby certify
21 to the following:
22      That the witness, KAREN SUE TATE, was duly
23 sworn by the officer and that the transcript of the oral
24 deposition is a true record of the testimony given by
25 the witness;

**81**

1      I further certify that pursuant to FRCP Rule
2  30(f)(1) that the signature of the deponent:
3      _____ was requested by the deponent or a
4  party before the completion of the deposition and is to
5  Be returned within 30 days from date of receipt of the
6  transcript.  If returned, the attached Changes and
7  Signature Page contains any changes and the reasons
8  therefor;
9      _____ was not requested by the deponent or a
10 party before the completion of the deposition.
11     I further certify that I am neither attorney
12 or counsel for, nor related to or employed by, any of
13 the parties or attorneys to the action in which this
14 deposition was taken.  Further, I am not a relative or
15 employee of any attorney of record in this case, nor am
16 I financially interested in the outcome of the action.
17     Subscribed and sworn to on this the _____
18 day of February, 2013.
19
20
21 _____
       TINA TERRELL BURNEY
22     Texas CSR No. 2908
       Expiration Date: 12/31/14
23     WRIGHT WATSON & ASSOCIATES, L.L.C.
       3307 Northland Drive, Suite 185
24     Austin, Texas  78731
       800.375.4363  Fax 512.474.8802
25     Firm Registration No. 225

**21 (Pages 78 to 81)**

512-474-4363        WRIGHT WATSON & ASSOCIATES        (fax) 512-474-8802
1250 S. Capital of Texas Highway, Building 3, Suite 400, Austin, Texas 78746

Appendix 403

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE           §
KINGREY, and SANDRA McCOLLUM,          §
individually and as heirs at law to the Estate of   §
LARRY GENE McCOLLUM,                    §
                         PLAINTIFFS     §
                                        §
v.                                      §     CIVIL ACTION NO. 3:12-CV-2037-L
                                        §
BRAD LIVINGSTON, JEFF PRINGLE, and      §
TEXAS DEPARTMENT OF CRIMINAL            §
JUSTICE,                                §
                         DEFENDANTS     §

### AFFIDAVIT FOR AUTHENTICATION OF MEDICAL RECORDS

RECORDS PERTAINING TO:   Larry McCollum; DOB: 04/04/1953

RECORDS REQUESTED:       ANY & ALL MEDICAL RECORDS, including but not limited to,
                         history & physical, diagnoses, prognoses, any and all radiological
                         reports, consultations, operative reports, office records, clinic records,
                         therapy records, E.R. records, progress notes, narratives, discharge
                         summary, notes (including handwritten notes by doctors or other staff
                         member), tests, test results, rehabilitation records, memoranda and
                         correspondence pertaining to:

Before me, the undersigned authority, personally appeared **ELLA ROMANO**____, who
being by me duly sworn, deposed as follows:

"My name is **ELLA ROMANO**_____. I am over 18 years of age, of sound mind,
capable of making this affidavit, and personally acquainted with the facts herein stated.

I am the custodian of records, and as such, I am the custodian of the records of Hutchins Fire
Department - EMS.

The records attached to this affidavit, consisting of __5__ pages __0__ films were made and
kept by Hutchins Fire Department - EMS in the regular course of business. It was in the regular course
of that business, for an employee, or representative, with knowledge of the acts, events, conditions,
opinions, or diagnoses recorded to make the record or to transmit information thereof to be included in such
record; and the record was made at or near the time or reasonably soon thereafter. The records attached
hereto are exact duplicates of the originals."

                         _____
                         AFFIANT (Custodian of Records)

Sworn to and subscribed before me this __18__ day of ____JUNE____, 2013.

My commission expires: 5/15/15          _____
                                        Notary Public

                                        NOTARY PUBLIC-STATE OF FLORIDA
                                        Marisol Bridgemohan
                                        Commission # EE094079
                                        Expires:   MAY 15, 2015
                                        BONDED THRU ATLANTIC BONDING CO, INC

McCollum - 660                          **Appendix 404**



## City of Hutchins
321 North Main St.
HUTCHINS, TX 75141
972-225-3311

## AMBULANCE RECORD
6778032 (wpharvill)
Page 1 of 5

### Trip Information

| Incident#: | Date | Station | Responding Unit |
|---|---|---|---|
| 11-573 | 07-22-2011 | Station 1 | Medic 701 |

**Branch**

| Dispatched As | Found To Be | Patient Disposition |
|---|---|---|
| Convulsions/Seizure | Convulsions/Seizure | Transport and treatment |

### Department Directive

| Dispatched | Enroute | Amb On Loc | Pt Contact | Depart Loc | Arrive Hosp | In Service |
|---|---|---|---|---|---|---|
| 03:05 | 03:09 | 03:12 | 03:23 | 03:36 | 03:54 | 04:21 |

| Pickup | Destination |
|---|---|
| Hutchins State Jail<br>1101 E. Langdon<br>HUTCHINS, TX 75141 | Parkland Hospital East ER<br>5201 Harry Hines<br>DALLAS, TX 75235 |

| Response To Scene | | Response From Scene | Lights & Sirens |
|---|---|---|---|
| Map Page | | Miles Transported | 15.00 |
| County | DALLAS | County | DALLAS |
| | | Number of Patients Transported | 1 |

### Patient Information

| Patient Name | TDCJ # | Gender | Ethnicity |
|---|---|---|---|
| McCollum, Larry | 1721640 | Male | |

| Patient Residence | Date of Birth | DL |
|---|---|---|
| 1101 E. Langdon<br>HUTCHINS TX 75141 | 01-01-1900<br>(111 YO) | TEXAS |

| Phone (H) | Phone (W) | Height | Weight | SSN |
|---|---|---|---|---|
| | | 6' 0" | 400.00 lbs | |

### Patient Information

| Allergies | Unknown |
|---|---|
| Medications | Unknown |
| History | Unknown |
| Chief Complaint | Convulsions/Seizure |

### Cardiac

| Cardiac Arrest | Etiology | Resuscitation Attempt |
|---|---|---|
| No | | |

### Initial Patient Assessment
An ALS Assessment was Performed and Warranted

| LOC | BP | SpO2 | ETCO2 |
|---|---|---|---|
| AAOx1 | 136/108 | 80% RA | |

| Breath Sounds Upper | Breath Sounds Lower | | Resp Rate | Pulses |
|---|---|---|---|---|
| Left: Clear<br>Right: Clear | Left: Clear<br>Right: Clear | | 14 | Left: Radial<br>Right: Radial |

| Pulse Rate | Pupils | Capillary Refill | | |
|---|---|---|---|---|
| 127 | Left: PERRL<br>Right: PERRL | Instant | | |

| Skin Color | Skin Moisture | Skin Temp | Skin Appearance | |
|---|---|---|---|---|
| Pale | Wet | Hot | | |

| Blood Glucose | | | | |
|---|---|---|---|---|
| 200 mg/dL | | | | |

### Glasgow Coma Score

| GCS Total | Eye Opening | Verbal Response | Motor Response | RTS |
|---|---|---|---|---|
| 8 | | | | 10 |

Electronically Signed

Harvill, William P (EMT-P)     Pressler, Terry D (EMT-P)
Crew #1                        Crew #2

Patient Name: McCollum, Larry | Incident Date: 07-22-2011



**City of Hutchins**
321 North Main St.
HUTCHINS, TX 75141
972-225-3311

**AMBULANCE RECORD**

6778032 (wpharvill)
Page 2 of 5

## Sequence Chart

| Date | Time | Event | By | Description |
|------|------|-------|-----|-------------|
| 07-22-2011 | 03:05 | Dispatched | | |
| 07-22-2011 | 03:09 | Enroute | | |
| 07-22-2011 | 03:12 | On Location | | |
| 07-22-2011 | 03:23 | Patient Contact | | |
| 07-22-2011 | 03:25 | Other Event | | Moved patient out of cell |
| 07-22-2011 | 03:30 | Vitals | TDP | BP 136/108, Pulse 127, Respirations 12, SPO2 80% on RA taken by Pressler, Terry D. |
| 07-22-2011 | 03:31 | Oxygen | WPH | 15.00 LPM per on Scene medical direction. The Patient's condition was . |
| 07-22-2011 | 03:33 | Vitals | WPH | BP 134/106, Pulse 124, Respirations 12, SPO2 96% on O2 taken by Harvill, William P. |
| 07-22-2011 | 03:33 | Blood Sugar Level | TDP | Blood Sugar monitoring was performed by Pressler, Terry D and found to be 200 mg/dL. |
| 07-22-2011 | 03:33 | Other Event | WPH | Temp 106 Degree F |
| 07-22-2011 | 03:34 | EKG | WPH | Sinus Tachycardia. |
| 07-22-2011 | 03:35 | IV/IO | TDP | A 18g was attempted by Pressler, Terry D without success. Blood was not drawn. |
| 07-22-2011 | 03:36 | Departed Location | | |
| 07-22-2011 | 03:37 | Cold Pack | WPH | Neck and under arms |
| 07-22-2011 | 03:40 | Report Called | WPH | Report Called to RN via Phone. |
| 07-22-2011 | 03:54 | Arrived Destination | | |
| 07-22-2011 | 03:54 | Assessment | WPH | Patient never changed condition |
| 07-22-2011 | 03:54 | Vitals | WPH | BP 134/106, Pulse 122, Respirations 12, SPO2 97% on O2 taken by Harvill, William P. |
| 07-22-2011 | 04:21 | In Service | | |

## Patient Assessment at Destination

| LOC | BP | SpO2 | ETCO2 | | |
|-----|-----|------|-------|---|---|
| AAOx1 | 132/106 | 97% O2 | | | |
| **Breath Sounds Upper** | **Breath Sounds Lower** | | **Resp Rate** | **Pulses** | |
| Left: Clear Right: Clear | Left: Clear Right: Clear | | 12 | Left: Radial Right: Radial | |
| **Pulse Rate** | **Pupils** | **Capillary Refill** | | | |
| 122 | Left: Fixed,Dilated Right: Fixed,Dilated | 1-2 seconds | | | |
| **Skin Color** | **Skin Moisture** | **Skin Temp** | **Skin Appearance** | | |
| Pale | Moist | Hot | | | |
| **Blood Glucose** | | | | | |
| 200 mg/dL | | | | | |

---

**Electronically Signed**

Harvill, William P (EMT-P)   Pressler, Terry D (EMT-P)
Crew #1                      Crew #2

Patient Name: McCollum, Larry | Incident Date: 07-22-2011



**City of Hutchins**
321 North Main St.
HUTCHINS, TX 75141
972-225-3311

**AMBULANCE RECORD**

6778032 (wpharvill)
Page 3 of 5

### Narrative

**Subjective:**
Medic 701 dispatched to convulsions/seizure call and found male patient complaining of Convulsions/Seizure. Bystander states loss of consciousness. Bystander witnessed seizure activity.

**Objective:**
Patient offered no communication. Upon EMS arrival, patient was lying supine. Patient had an irregular gait. Patient was unconscious.

Systemic Information - Assessment
Skin: Hot Wet
Head / Neck: Temp 106 degree F
Chest: Clear
Abdomen: Soft
Extremities: FULL ROM
Head/Face: Normal
Neck: Normal
Heart: Normal
Abdomen Left Upper: Normal
Abdomen Left Lower: Normal
Abdomen Right Upper: Normal
Abdomen Right Lower: Normal
GU Assessment: Normal
Back Cervical: Normal
Back Thoracic: Normal
Back Lumbar/Sacral: Normal
Extremities-Right Upper: Normal
Extremities-Right Lower: Normal
Extremities-Left Upper: Normal
Extremities-Left Lower: Normal

General: AAOx1, Initial BP 136/108, Pulse 127, Respirations 14 and snoring
Monitors: SPO2 80% RA

**Assessment:**

**Plan:**
Male patient found complaining of Convulsions/Seizure postictal. Initial assessment as indicated. Pulse rate was 127. Respirations were 14 and snoring. Initial blood pressure was 136/108. Initial SpO2 was 80% RA. Patient contact made at time indicated above. Oxygen was applied at 15 LPM via Re-breather mask. The patient's condition Improved. Blood Sugar monitoring was performed by Pressler, Terry D (EMT-P) and found to be 200 mg/dL. An EKG was performed by Harvill, William P (EMT-P). The patient's rhythm was Sinus Tachycardia in lead ILA 18g Ante cubital-Left IV was attempted by Pressler, Terry D (EMT-P) without success. Cold pack applied to Neck and under arms. A patient report was called in to the receiving facility. An additional assessment was performed, as indicated. Patient was transported lights & sirens to Parkland Hospital East ER and released to staff. Upon transfer of patient care to ED staff, the patient's symptoms remained unchanged.

Electronically Signed

Harvill, William P (EMT-P)     Pressler, Terry D (EMT-P)
Crew #1                        Crew #2

Patient Name: McCollum, Larry \ Incident Date: 07-22-2011

**Appendix 407**



**City of Hutchins**
321 North Main St.
HUTCHINS, TX 75141
972-225-3311

**AMBULANCE RECORD**

6778032 (wpharvill)
Page 4 of 5

**Image 1/1**

### Assignment of Benefits/HIPAA Acknowledgement Form

I understand that I am financially responsible for the services provided to me by City of Hutchins I request that payment of authorized Medicare, Medicaid, or other insurance benefits be made on my behalf to City of Hutchins for any services provided to me by City of Hutchins now or in the future. I agree to immediately remit to City of Hutchins any payments that I receive directly from any source whatsoever for the services provided to me now or in the future. I assign all rights and/or benefits to such payments to City of Hutchins for compensation of services provided to me now or in the future.

I authorize and direct any holder of medical information or documentation about me to release such information to the Centers for Medicare and Medicaid Services and its carriers and agents, and/or City of Hutchins and its billing agents, and/or any other payers or insurers, as may be necessary to determine these benefits or other benefits payable for services provided to me by:

✓ Yes, I acknowledge that I have received a copy of City of Hutchins Notice of Privacy Practices.

A copy of this form is as valid as the original.

### Patient Release of Responsibility

_____ (Patient's initials) I have been informed of the reason the emergency medical personnel feel that I should go to the emergency center for further evaluation.

_____ (Patient's initials) I have been informed of the evaluation and/or treatment that may/will occur at the emergency center.

_____ (Patient's initials) I have been informed of the consequences and/or complications that may result due to my refusal to go to the emergency center for further evaluation.

_Initial one of the following:_

_____ I, the undersigned, have been advised that emergency medical treatment on my/the patient's behalf is necessary, and that refusal of recommended treatment and transport to an emergency center may result in death, or imperil my/the patient's health by increasing the opportunity for morbidity. Nevertheless, and understanding all of the above, I refuse to accept further emergency medical treatment and/or transportation to an emergency center, assume all risks and consequences resulting from my decision and release Provider Name and its member(s) from any and all liability which may occur from my decision not to accept their recommendation.

_____ I accept transport only and refuse all treatment and/or specific treatments which they may render. I have been advised of the possible consequences that may result from the decision not to accept further treatment, and release City of Hutchins and its member(s) from any and all liability that may occur. (Note treatment refused in narrative.)

_As a competent adult, I fully understand all of the above, and I am capable of making a rational decision on my behalf._

Witness: _____     Date: _____

**EMS Assessment**

_____ Patient was AAO x 3

_____ Patient denied ETOH or drug use

_____ Patient denied suicidal/homicidal ideation

Crew Signature: _____

---

**Electronically Signed**

Harvill, William P (EMT-P)          Pressler, Terry D (EMT-P)
Crew #1                                        Crew #2

Patient Name: McCollum, Larry | Incident Date: 07-22-2011

| | City of Hutchins | AMBULANCE RECORD |
|---|---|---|
| HUTCHINS FIRE | 321 North Main St.<br>HUTCHINS, TX 75141<br>972-225-3311 | 6778032 (wpharvill)<br>Page 5 of 5 |

**Signatures**

| | Patient Representative<br>In Custody<br>Law Enforcement |
|---|---|

**Signatures**

| | Facility Representative |
|---|---|

**Electronically Signed**

Harvill, William P (EMT-P)    Pressler, Terry D (EMT-P)
Crew #1                          Crew #2

Patient Name: McCollum, Larry | Incident Date: 07-22-2011

McCollum - 665                                    **Appendix 409**

**AFFIDAVIT**

|                        |   |
|------------------------|---|
| **THE STATE OF TEXAS** | § |
|                        | § |
|                        | § |
| **COUNTY OF WALKER**   |   |

BEFORE ME, the undersigned authority, personally appeared **Devoriah Nauls,** who, being by me duly sworn, deposed as follows:

"My name is **Devoriah Nauls**, and I am over the age of eighteen (18), of sound mind, competent and capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the Correctional Clinical Associate at The University of Texas Medical Branch - Correctional Managed Care, Health Services Archives and my office is located in Huntsville, Texas. In this capacity, I am the individual who can authenticate and certify as official, copies of medical records at the **TDCJ Health Services Archives**. Attached hereto are **443** pages of records, time period **July 1, 2002** to **January 12, 2004** and **July 15, 2011** to **July 28, 2011** from the medical records of **Larry McCollum, TDCJ # 1721640, 1105538**. These said records are kept in the regular course of business by an employee or representative of UTMB-Correctional Managed with knowledge of the act, event, condition, opinion or diagnosis, recorded or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original medical records maintained by **TDCJ Health Services Archives**".

**Devoriah Nauls**

State of Texas,
County of Walker
Before Me _Paula K. Ticknor_ on this day personally
appeared _Devoriah Nauls_, known to me through her
Texas Driver's License to be the person whose name is subscribed to the foregoing
instrument and acknowledge to me that she executed the same for the purpose and
consideration therein expressed.

Given under my hand and seal of office this _14th_ day of _Aug._
A.D., _2013_

PAULA K. TICKNOR
Notary Public, State of Texas
My Commission Expires
May 09, 2017

**MCCOLLUM 084**

**Appendix 410**

**SOUTHWESTERN**
**INSTITUTE OF FORENSIC SCIENCES**
**AT DALLAS**

**Office of the Medical Examiner**

**Autopsy Report**

COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

**Case: IFS-11-10161 - ME**

172 1640

**Decedent: McCollum, Larry Gene**   58 years White Male   DOB: 04/04/1953

Date of Death: 07/28/2011 (Actual)

Time of Death: 11:35 PM (Actual)

Examination Performed: 07/29/2011 09:30 AM

---

**ORGAN WEIGHTS:**

| | | | |
|---|---|---|---|
| Brain: | 1,600 g | Right Lung | 700 g | Right Kidney: | 260 g |
| Heart: | 550 g | Left Lung: | 500 g | Left Kidney: | 280 g |
| Liver: | 2,590 g | Spleen: | 250 g | | |

---

EXTERNAL EXAMINATION

The body is identified by tags. Photographs and fingerprints are taken.

The body is received nude. No personal effects or jewelry are present on the body.

The body is that of a normally-developed white male which appears consistent with the recorded age of 58 years. When nude, it measures 70 inches in length and weighs 345 pounds. There is good preservation in the absence of embalming. Rigor mortis is present. Lividity is located on the posterior body surfaces and blanches with pressure. The body is room temperature in the presence of minimal refrigeration.

The hairline is receding and there is short gray hair that is cut very close to the scalp. Mustache and beard stubble are on the face. The irides are brown and there are no petechiae of the bulbar or palpebral surface of the conjunctivae. The ears, nose, and lips are unremarkable. The mouth has natural dentition. The neck is without masses or unusual mobility. The chest and back are unremarkable. The abdomen is protuberant. The extremities are symmetric. The external genitalia, perineum, and anus are unremarkable.

A 1 inch area of indentation and red discoloration is on the right side of the forehead.

IDENTIFYING MARKS AND SCARS

A 3 inch linear scar is obliquely oriented on the right side of the abdomen.

A 2 inch linear scar is on the right temporal scalp.

EVIDENCE OF TREATMENT

*Accredited by The National Association of Medical Examiners*

RECEIVED

NOV 02 2011

COPIED AND SENT

**MCCOLLUM 336**

Appendix 411

IFS-11-10161                                                                          Page 2 of 6

McCollum, Larry Gene



- Cardiac monitor pads affixed to the chest
- Intravascular catheter in upper right arm
- Hospital band encircling left wrist
- Foley catheter
- Rectal catheter connected to plastic bag containing fecal material
- Needle puncture surrounded by ecchymosis in the left inguinal region
- Needle punctures in the right inguinal region, with extravasated blood within the soft tissue and musculature surrounding the right inguinal canal


EVIDENCE OF INJURY

A 1/4 inch purple contusion is on the superior aspect of the bridge of the nose.

Reflection of the scalp reveals a 3 cm area of hemorrhage in the left temporalis muscle along the parietal bone. A 1 inch purple contusion with central abrasion is immediately inferior to the left external ear. Deep to this is a 4 cm area of hemorrhage within the underlying soft tissue.

A 2 cm purple contusion is on the left supraclavicular region. A 2 inch purple to yellow contusion is on the right upper abdomen near the subcostal margin. A few purple contusions measuring between 1 and 2 cm each are on the left side of the chest. A 1/2 inch red abrasion is on the front of the proximal left forearm. A 2 inch purple contusion is on the posterior aspect of the left thigh.

INTERNAL EXAMINATION

BODY CAVITIES: Approximately 300 cc of tan clear fluid are within each pleural cavity. The pericardial and peritoneal cavities contain no adhesions or abnormal collections of blood or other fluid.

HEAD: See EVIDENCE OF INJURY. The dura and dural sinuses are unremarkable. There are no epidural, subdural or subarachnoid hemorrhages. The leptomeninges are thin and delicate. The cerebral hemispheres are symmetrical, with flattened gyri and effaced sulci. There is mild notching of the parahippocampal gyri. The cerebellar tonsils are soft; sections reveal friable, tan-red necrotic parenchyma. The cranial nerves and blood vessels are unremarkable. Sections through the brainstem are unremarkable. Sections through the cerebral hemispheres exhibit diffuse blurring of the gray-white matter junctions. There are no hemorrhages in the deep white matter or the basal ganglia. The cerebral ventricles contain no blood. The spinal cord, as viewed from the cranial cavity, is unremarkable.

NECK: The soft tissues and prevertebral fascia are unremarkable. The hyoid bone and laryngeal cartilages are intact. The lumen of the larynx is not obstructed.

CARDIOVASCULAR SYSTEM: The intimal surface of the abdominal aorta is free of significant atherosclerosis. The aorta and its major branches and the great veins are normally distributed and unremarkable. The pulmonary arteries contain no thromboemboli. The heart is markedly enlarged, with normal contours. The pericardium, epicardium, and endocardium are smooth, glistening, and unremarkable. There are no thrombi in the atria or ventricles. The foramen ovale is closed. The coronary arterial system is free of significant atherosclerosis. The atrial and ventricular septa are intact. The cardiac valves are unremarkable. The myocardium is dark red-brown and firm, and there are no focal



*Accredited by The National Association of Medical Examiners*

IFS-11-10161
McCollum, Larry Gene



**COPY**
**DALLAS COUNTY**
**INSTITUTE OF FORENSIC SCIENCES**

Page 3 of 6

abnormalities.

RESPIRATORY SYSTEM: The upper airway is unobstructed. The laryngeal mucosa is smooth and unremarkable, without petechiae. The pleural surfaces are smooth and glistening. The major bronchi are unremarkable. Sectioning of the lungs discloses a dark red-blue, moderately congested parenchyma.

HEPATOBILIARY SYSTEM: The liver is covered by a smooth, glistening capsule. The parenchyma is dark red-brown and moderately congested. The gallbladder contains approximately 10 cc of dark green bile, and one dark green cholesterol stone measuring approximately 2 inches in greatest dimension.

GASTROINTESTINAL SYSTEM: The tongue is grossly normal both externally and upon sectioning. The esophageal mucosa is gray, smooth, and unremarkable. The stomach is empty. There are no tablets or capsules. The gastric mucosa has normal rugal folds, and there are no ulcers. The small and large intestines are externally unremarkable. The appendix is absent. The pancreas is unremarkable externally and upon sectioning.

GENITOURINARY SYSTEM: The capsules of both kidneys strip with ease to reveal smooth and slightly lobulated surfaces. The cortices are of normal thickness, with well-demarcated corticomedullary junctions. The calyces, pelves, and ureters are unremarkable. The urinary bladder is empty. The mucosa is gray, smooth, and unremarkable. The prostate gland is unremarkable both externally and upon sectioning.

ENDOCRINE SYSTEM: The thyroid and adrenal glands are unremarkable externally and upon sectioning.

LYMPHORETICULAR SYSTEM: The spleen is covered by a smooth, blue-gray, intact capsule. The parenchyma is dark red. The cervical, hilar, and peritoneal lymph nodes are unremarkable.

MUSCULOSKELETAL SYSTEM: The clavicles, ribs, sternum, pelvis, and vertebral column have no fractures. The diaphragm is intact.

**MICROSCOPIC EXAMINATION:**

Heart: myocyte hypertrophy; increased interstitial and perivascular fibrosis.

Lung: vascular congestion.

Liver: moderate macrovesicular steatosis, mild focal centrilobular necrosis.

Kidney: No significant pathologic alteration is identified.

Spleen: diffuse hypocellularity with depletion of both the red and white pulp.



*Accredited by The National Association of Medical Examiners*

IFS-11-10161

McCollum, Larry Gene



DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

Page 4 of 6

**TOXICOLOGY:**

**Evidence Submitted:**
The following items were received by the Laboratory from the Office of the Medical Examiner:
004: Biohazard Bag
004-001: Blood, femoral - gray top tube
004-002: Blood, femoral - gray top tube
004-003: Blood, femoral - gray top tube
004-004: Blood, femoral - gray top tube
004-005: Blood, femoral - red top tube
004-006: Vitreous - red top tube
004-007: Skeletal muscle - plastic tube

**Blood, postmortem**

**Acid/Neutral Screen (GC/MS)**
negative (004-001)

**Alcohols/Acetone (GC)**
negative (004-002)

**Alkaline Quantitation (GC, GC/MS)**
negative (004-001)

**Opiate Narcotics (GC/MS)**
0.107 mg/L morphine (004-002)

**Vitreous**

**Alcohols/Acetone (GC)**
negative (004-006)

**Opiate Narcotics (GC/MS)**
0.046 mg/L morphine (004-006)



*Accredited by The National Association of Medical Examiners*

IFS-11-10161
McCollum, Larry Gene


**DALLAS COUNTY**
**INSTITUTE OF FORENSIC SCIENCE**

## FINDINGS:

1. Hyperthermia

    a. History that the decedent was in a hot environment without air conditioning, and was witnessed to collapse with seizure activity.
    b. History that the decedent presented to the Emergency Department unresponsive, with a body temperature of 109.4 degrees Fahrenheit.
    c. Hospital course complicated by
        1. hypoxic-ischemic encephalopathy
        2. disseminated intravascular coagulation
        3. shock
        4. multi-system organ failure

    d. Brain swelling
        1. transtentorial herniation
        2. cerebellar tonsillar herniation and acute necrosis
        3. hypoxic-ischemic encephalopathy

2. History of hypertension

    a. Cardiac hypertrophy (heart weight = 550 grams)
    b. History of treatment with hydrochlorthiazide

3. Morbid obesity (Body mass index = 49.5)

4. Contusions of scalp and face

5. Subgaleal hemorrhage

6. No significant injuries

## CONCLUSIONS:

Based on the autopsy and the history available to me, it is my opinion that Larry Gene McCollum, a 58-year-old white male, died as the result of hyperthermia. The decedent was in a hot environment without air conditioning, and he may have been further predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension.

**MANNER OF DEATH:**    Accident



*Accredited by The National Association of Medical Examiners*

AFFIDAVIT

STATE OF TEXAS     §
                     §
                     §

BEFORE ME, the undersigned authority personally appeared Charley Valdez, who, being by me duly sworn, deposes as follows:

"My name is Charley Valdez.   I am over twenty-one years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am employed as a Program Supervisor III for Classification and Records for the Texas Department of Criminal Justice, and my office is located in Huntsville, Texas.  I do hereby certify that the attached **five pages** of records on offender, **Larry Gene McCollum, TDCJ# 1105538 and TDCJ# 1721640**, are **true** and correct copies of the original records now on file within Classification and Records of the Texas Department of Criminal Justice.

These attached **five pages** of records are maintained in the usual and regular course of business in Classification and Records of the Texas Department of Criminal Justice, and that such records are maintained on each and every inmate confined here.  All memoranda, reports, records or data compilations kept therein are made at or near the time by, or from information transmitted by, a person with knowledge of the events, acts, conditions, opinions or diagnoses described. These records are kept in the course of a regularly conducted business activity, and it is the regular practice of this institution to make such memoranda, reports, records or data compilations.

In witness whereof, I have hereto set my hand this 11th day of February, 2014.


_____

Charley Valdez
Program Supervisor III
Classification and Records


SUBSCRIBED AND SWORN TO before me, the said Notary Public on this the 11th day of February, 2014, to certify which witness my hand and seal of office.


_____
Notary Public in and for
The State of Texas



LADONDRA D ADAMS
Notary Public, State of Texas
My Commission Expires
OCTOBER 28, 2014

Notary without Bond

**McCollum1545**                                      **Appendix 416**



# T e x a s   D e p a r t m e n t   o f   C r i m i n a l   J u s t i c e

**Brad Livingston**
**Executive Director**

February 11, 2014

Tricia Rowe
Accounting Services
Financial Operations
Room 224
P.O. Box 4015
Huntsville, Tx. 77342

RE: McCollum, Larry Gene  TDCJ# 1105538 and TDCJ# 1721640

The files of this Agency have been reviewed on Offender Larry Gene McCollum, TDCJ# 1105538, TDCJ# 1721640, pursuant to the request of the Office of General Counsel.

### State Jail TDCJ# 1105538

Offender McCollum was received into the TDCJ-Hutchins State Jail on 7-1-2002 from McLennan County, on a 20-month sentence. Offender McCollum was convicted by the 54th District Court for the following:

> Theft <1500>20K, under cause number 2000-207-C. Offender McCollum was convicted for an offense occurring on 10-18-1997, with sentencing on 6-13-2002, and sentence to begin on 5-18-2002.

Offender McCollum was released from TDCJ custody by discharge of sentence on 1-12-2004, without further obligation.

Offender McCollum spent 1-year, 7-months, and 24-days incarcerated in TDCJ under TDCJ# 1105538.

### State Jail TDCJ# 1721640

Offender McCollum was received into TDCJ- Hutchins State Jail on 7-15-2011 from McLennan County, on a 1-year sentence. Offender McCollum was convicted by the 80th District Court for the following:

> Forgery, under cause number 2011-531-C2. Offender McCollum was convicted for an offense occurring on 1-23-2009, with sentencing on 6-23-2011, and sentence to begin on 6-21-2011.

Offender McCollum died on 7-28-2011, while at the TDCJ-Hutchins Unit.

Offender McCollum spent 1-month and 7-days incarcerated in TDCJ under TDCJ# 1721640.

Offender McCollum spent a combined total of 1-year, 9-months, and 1-day incarcerated in TDCJ, under TDCJ# 1105538 and TDCJ# 1721640. This time is inclusive of jail time credits regarding the cases indicated in TDCJ records.

The cause entitled Stephen McCollum, et al v. Brad Livingston, et al, under cause number #3:12-CV-2037 is not a case that Offender McCollum was serving in TDCJ custody.

Sincerely,

Charley Valdez

Charley Valdez
Program Supervisor III
Offender Time Management
Classification and Records
cc: file

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN MCCOLLUM, et al,          )
          Plaintiffs,             )
                                  )
V.                                )   C.A. No. 3:12-CV-02037
                                  )
                                  )
BRAD LIVINGSTON, et al,           )
          Defendants.             )


**************************************************

ORAL DEPOSITION OF

STEPHEN MICHAEL MCCOLLUM

November 22, 2013

**************************************************



     ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM,

produced as a witness at the instance of the Defendant

University of Texas Medical Branch and duly sworn, was

taken in the above-styled and numbered cause on the 22nd

of November, 2013, from 3:35 p.m. to 5:22 p.m., before

DEBRA L. McGREW, CSR in and for the State of Texas,

reported by machine shorthand at the offices of Edwards

Law, 1101 E. 11th Street, Austin, Texas, pursuant to the

Federal Rules of Civil Procedure.

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

## 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Mr. Scott Medlock
Edwards Law
1101 E. 11th Street
Austin, Texas 78702
Phone: 512-623-7727

FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:

Ms. Kim Coogan
Ms. Shanna Elizabeth Molinare
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

FOR THE DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ROBERT EASON AND JEFF PRINGLE:

Mr. Jonathan Stone
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

FOR THE DEFENDANTS BRAD LIVINGSTON, RICK THALER AND BILL STEPHENS:

Mr. Kyle M. Smith
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

ALSO PRESENT:

Jennifer Osteen
Stephanie Kingrey
Sandra Sue McCollum

\*-\*-\*-\*-\*

## 3

### INDEX

Appearances.................................... 2

STEPHEN MICHAEL MCCOLLUM
     Examination by Ms. Coogan................. 4
     Examination by Mr. Stone.................. 41
     Examination by Mr. Smith.................. 74

Reporter's Certificate........................ 84

(No exhibits were marked during this deposition).

## 4

STEPHEN MICHAEL MCCOLLUM,
having been first duly sworn, testified as follows:

EXAMINATION

BY MS. COOGAN:

Q.   Sir, would you please state your full name for the record.

A.   Yes.  It's Stephen Michael McCollum, Stephen with a P-H, M-I-C-H-A-E-L, Stephen Michael.

Q.   Sorry.  It took me a minute.  I'm sorry.

     Can you tell us your birthday?

A.   It's

Q.   And your social security number?

A.

     MR. MEDLOCK:  And counsel, again, just to clarify, we'll redact that if it's ever filed with the court.

     MS. COOGAN:  Definitely.

Q.   (BY MS. COOGAN)  Can you tell me where your -- you physically live?

A.   I live in Woodway Texas.  It's inside of central Texas, right next to Waco.

Q.   And what's your home address?

A.

Q.   How long have you lived there?

A.   Two years.

## 5

Q.   Do you have air-conditioning there?

A.   Yes, ma'am.

Q.   And where did you live before that?

A.   I lived on Speegleville Road in Speegleville, right outside of Waco.

Q.   And did you have air-conditioning at that home?

A.   Yes, ma'am.

Q.   Does anybody live with you there in Woodway?

A.   Yes.  My wife and my daughter.

Q.   And what are their names?

A.   Wife's name is Ashley Satli-McCollum, S-A-T-L-I hyphen McCollum.

Q.   And what's your daughter's name?

A.   Hailey, H-A-I-L-E-Y, McCollum.

Q.   And how old is Hailey?

A.   She's ten.

Q.   Okay.  Can you tell us how far you went in school?

A.   I graduated high school.  After that, just at -- I went straight into working and just did certifications for different areas of work that I've had over the years.

Q.   Can you give me some examples?

A.   Certified process server, certified legal videographer, and I've taken a lot of graphic design

2 (Pages 2 to 5)

Sunbelt Reporting & Litigation Services
Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   Houston   San Antonio

Appendix 419

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

**6**

1  courses as well.
2      Q.  And I -- I thought you -- I heard you say
3  earlier that your family owns or operates a
4  litigation-type business, services.
5      A.  Yeah.  It's Central Texas Litigation in Waco.
6  They do process service, and we have meeting rooms for
7  mediations and depositions, video-conferencing, virtual
8  offices, things like that.
9      Q.  And who is in that business with you?
10     A.  I'm -- I'm no longer with that company.  My
11  aunt, Kathy Burrow, owns it, and my mother worked for
12  there -- worked there several years as a -- kind of like
13  a legal aide doing -- helping out attorneys and things
14  like that, doing scan jobs and things like that.
15     Q.  And this is the lady that had worked at Naman
16  Howell?
17     A.  Yes.  And I think now she's working for Haley &
18  Olson.
19     Q.  And, then, is that her sister or your dad's
20  sister?
21     A.  It's her sister.
22     Q.  Have you ever been married to anyone else?
23     A.  Yes, I was.  First marriage was in 2002 and
24  lasted three years.  That's the mother of my child.
25     Q.  And what was that lady's name?

**7**

1      A.  Her name was Nicole, NICOLE, maiden name
2  Jorgenson, and now it's -- she's remarried.
3      Q.  And were you ever married to anybody else?
4      A.  No.  Just that and my current wife.
5      Q.  Okay.  I want to ask you some questions
6  primarily about your father.
7      A.  Yes, ma'am.
8      Q.  Many of them are going to be the same.
9      A.  I understand.
10     Q.  Do you know whether your father was ever
11  diagnosed with diabetes?
12     A.  I do not.  I only know what he told my sister
13  as -- as far as like them saying that he had diabetes
14  while he was in -- in jail because of his blood sugar
15  and things like that and them putting him on medicine
16  for diabetes while in jail.
17     Q.  Okay.  So you -- you just told me a lot of
18  stuff in that one little sentence.
19     A.  Okay.  Sorry.
20     Q.  That's okay.  Did -- is it -- okay.
21         What is your understanding of who told
22  your dad that he had diabetes?
23     A.  I'm --
24     Q.  Or tell me that again.
25     A.  Okay.  I would say whenever he went to jail in

**8**

1  Bonham, that's whenever, to my understanding, he was
2  told that he had diabetes, because of his blood sugar
3  and his heart -- blood pressure.
4      Q.  And that was by somebody at the prison the
5  first time he went when he went to the Bonham unit or
6  the --
7      A.  Yes, ma'am.
8      Q.  -- unit that's in Bonham?
9      A.  Yes, ma'am.
10     Q.  Okay.
11     A.  And that was mainly just, you know, hearing
12  what he said they made him take while he was in prison.
13     Q.  And what did you hear him say they made him
14  take?
15     A.  Diabetic medication, not -- not insulin.  I do
16  not know the name of the medication, though.
17     Q.  Okay.  And did your dad tell you that, or did
18  your sister tell you that?
19     A.  It's just a combination of things I've heard
20  over the years.  You know, his brother Terry and I went
21  and picked him up from that prison and so, you know, his
22  brother knew a lot more about his condition because he
23  lived with his brother for a while, and I just remember
24  hearing that over the years.  I couldn't tell you
25  exactly when.

**9**

1      Q.  Did you ever see your dad take any medication
2  that you understood was for diabetes?
3      A.  I have not, and as -- to my understanding, he
4  did not take any outside of prison.
5      Q.  Okay.  I was just about to ask you that.
6      A.  Uh-huh.
7      Q.  Do you have an understanding as to why?
8      A.  I -- I really do not.  I -- you know, he maybe
9  didn't go to the doctor enough.  He might be kind of
10  like myself.  You know, if I'm not sick, I don't go to
11  the doctor and, if I don't hurt, I just stay away, but
12  I -- I -- that's what I would pretty much say as far as
13  that.  He -- I know he didn't like doctors.  He would
14  take aspirin if he had a headache or if he hurt.  That's
15  about it.
16     Q.  Okay.  Did you ever see him appear to be ill
17  and hear your Uncle Terry or somebody else say, He's
18  having a diabetes problem right now?
19     A.  No, I've never seen that.
20     Q.  What about when he went into jail the second
21  time?  Did you ever learn anything about whether he was
22  treated for diabetes either at the McLennan County Jail
23  or at the Texas prison?
24     A.  I did ask, because my uncle on my mother's side
25  works at the jail in McLennan County.  I asked if he

Sunbelt Reporting & Litigation Services
Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   Houston   San Antonio

**Appendix 420**

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

10

1  knew anything about the records as far as how he was
2  doing, you know, did he have diabetes, things like that,
3  but I -- I never got a straight answer and I did not see
4  the medical reports, so I do not know.
5      Q.  What's your uncle's name?
6      A.  Randy Donaldson.  He was just a jailer.
7      Q.  Okay.  Do you remember whether he was going to
8  make -- keep a special eye on your dad or anything?
9      A.  He -- he probably would, but he was just intake
10  so he -- he never went beyond that.
11      Q.  Didn't have a lot of power at the jail or
12  anything?
13      A.  Yes, ma'am, yes, ma'am.
14      Q.  Okay.  What about for hypertension or high
15  blood pressure?  Did you ever know whether your dad had
16  been diagnosed with that?
17      A.  I did not, no.
18      Q.  Did you ever hear either your Uncle Terry or
19  your mom say, you know, Watch his salt, he's got that
20  high blood pressure, anything like that?
21      A.  I've never heard that.  I mean I -- my personal
22  knowledge is that several people on that side of the
23  family do deal with that, but I -- I've never heard it
24  specifically told about my father until after, you know,
25  we heard everything during this trial or --

11

1      Q.  Okay.  After he passed away.
2      A.  Yes, ma'am.  Yes, ma'am.
3      Q.  Okay.  What about any other medical conditions,
4  you know -- I don't know, migraine headaches, asthma?
5  Did you ever hear about him having anything -- anything?
6      A.  No, nothing more than sore knees, but that's
7  just because he had -- he was overweight.
8      Q.  And one more time.  Did you ever see medical or
9  prescription bottles by his nightstand or anything like
10  that?
11      A.  No, ma'am.  I -- I never saw him take anything
12  other than aspirin.
13      Q.  How often -- how old were you when your parents
14  got divorced?
15      A.  One.
16      Q.  Okay.
17      A.  My sister is five years older than me so --
18      Q.  Would -- would you go and visit your dad at
19  your grandparents house, then?
20      A.  Yes.  I would -- I would go there every other
21  weekend, and I did so until high school.  I mean I
22  always enjoyed my time with my father.
23      Q.  Was there ever a time when you -- when that
24  started -- that you remember that started, or you think
25  you did that ever since you were a little baby?

12

1      A.  I think I did it ever since I was a little
2  baby.  I always got used to spending those weekends with
3  my father and having two Christmases.
4      Q.  Okay.  When -- when is the -- do you ever
5  remember Christmas when you didn't spend it with your
6  dad?
7      A.  It would probably be, you know, later
8  teen-aged years after, you know, I was in high school
9  and my --
10      Q.  That it -- that it stopped?
11      A.  Yeah, much like my sister, but it was further
12  on, you know.  Once she stopped going but I continued
13  because I was still younger so, you know, I had more
14  bonding time with my father.
15      Q.  Well, maybe I misunderstood.  I thought she had
16  said -- and I -- tell me if I'm wrong -- that there
17  were years when y'all didn't see him at Christmastime.
18      A.  Not during the time that we were still going
19  regularly, we -- we pretty much saw them every
20  Christmas.
21      Q.  Okay.
22      A.  Other holidays maybe not so much, like
23  Thanksgiving and things like that, because our mother's
24  side of the family has a large family and it's -- they
25  take up a lot of our time.

13

1      Q.  Okay.  And then what about on your birthday?
2  Would you see your dad on your birthday every year,
3  every other year, never?
4      A.  Probably every year until I was 12.
5      Q.  Would you get a present from him?
6      A.  Yes.
7      Q.  How old were you, do you think, when -- the
8  first time he went to prison?
9      A.  Let's see.  I was early 20's.
10      Q.  Okay.  During the time before your dad went to
11  prison the first time, do you remember ever seeing him
12  be abusive towards your mom?
13      A.  The only time I ever saw that is there was a --
14  a time whenever my father tried to be back with my
15  mother whenever I was a little bit older, when they
16  divorced, and, you know, I was present for maybe one
17  time that there was physical abuse and, you know, my
18  sister took me out of the house and we went to my
19  grandparents.
20      Q.  And did you see him strike her?
21      A.  Yes, ma'am.
22      Q.  Did she have to go to the hospital?
23      A.  No, ma'am.  He ran off, because he knew my
24  grandpa would probably hurt him.
25      Q.  Your grandpa on his side or --

4 (Pages 10 to 13)

Sunbelt Reporting & Litigation Services
Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   Houston   San Antonio

Appendix 421

**82**

1    A.  No.
2    Q.  Was there anything that he did to contribute to
3  your father's death?
4    A.  No.
5        MR. SMITH:  I'll pass the witness.
6        MR. MEDLOCK:  I'll pass the witness.
7        MS. COOGAN:  Nothing from me.
8        MR. MEDLOCK:  We'll reserve.
9        MR. STONE:  We'll reserve.
10       (End of deposition).

**83**

1        CHANGES AND SIGNATURE
2  WITNESS NAME: STEPHEN MICHAEL MCCOLLUM  DATE: 11-22-13
3  PAGE  LINE  CHANGE            REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20     I, STEPHEN MICHAEL MCCOLLUM, have read the foregoing
21  deposition and hereby affix my signature that same is
22  true and correct, except as noted herein.
23
24     _____
25       STEPHEN MICHAEL MCCOLLUM
         Job No. 113925

**84**

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3  STEPHEN MCCOLLUM, et al,    )
       Plaintiffs,        )
4                          )
   V.                      )  C.A. No. 3:12-CV-02037
5                          )
                           )
6  BRAD LIVINGSTON, et al,    )
       Defendants.      )
7
8
9        REPORTER'S CERTIFICATION
         ORAL DEPOSITION OF
10       STEPHEN MICHAEL MCCOLLUM
         November 22, 2013
11
12     I, Debra L. McGrew, Certified Shorthand
13 Reporter in and for the State of Texas, hereby certify
14 to the following:
15     That the witness, STEPHEN MICHAEL MCCOLLUM, was
16 duly sworn by the officer and that the transcript of the
17 oral deposition is a true record of the testimony given
18 by the witness;
19     I further certify that pursuant to FRCP Rule
20 30(f)(1) that the signature of the deponent:
21     ____ was requested by the deponent or a party
22 before the completion of the deposition and returned
23 within 30 days from date of receipt of the transcript.
24 If returned, the attached Changes and Signature page
25 contains any changes and the reasons therefor;

**85**

1    __X__ was not requested by the deponent or a
2  party before the completion of the deposition.
3     I further certify that I am neither attorney
4  nor counsel for, related to, nor employed by any of the
5  parties to the action in which this testimony was taken.
6  Further, I am not a relative or employee of any attorney
7  of record in this case, nor am I financially or
8  otherwise interested in the outcome of the action.
9     Subscribed and sworn to on this the 9th day of
10 December, 2013.
11
12
13
14
   _____
15 Debra L. McGrew, Texas CSR #1573
   Expiration Date:  12/31/2014
16 Sunbelt Reporting & Litigation Services
   Firm Registration No. 87
17 1016 La Posada Drive, Suite 294
   Austin, Texas 78752
18 512-465-9100

19 Job No. 113925
20
21
22
23
24
25

**22  (Pages 82 to 85)**

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN MCCOLLUM, et al,          )
          Plaintiffs,             )
                                  )
V.                                )   C.A. No. 3:12-CV-02037
                                  )
                                  )
BRAD LIVINGSTON, et al,           )
          Defendants.             )


**********************************************************

ORAL DEPOSITION OF

SANDRA SUE MCCOLLUM

November 22, 2013

**********************************************************



     ORAL DEPOSITION OF SANDRA SUE MCCOLLUM, produced as

a witness at the instance of the Defendant University of

Texas Medical Branch and duly sworn, was taken in the

above-styled and numbered cause on the 22nd of

November, 2013, from 10:35 a.m. to 11:58 a.m., before

DEBRA L. McGREW, CSR in and for the State of Texas,

reported by machine shorthand at the offices of

Edwards Law, 1101 E. 11th Street, Austin, Texas,

pursuant to the Federal Rules of Civil Procedure.

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

**2**

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Mr. Scott Medlock
Edwards Law
1101 E. 11th Street
Austin, Texas 78702
Phone: 512-623-7727

FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:

Ms. Kim Coogan
Ms. Shanna Elizabeth Molinare
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

FOR THE DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ROBERT EASON AND JEFF PRINGLE:

Mr. Jonathan Stone
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

FOR THE DEFENDANTS BRAD LIVINGSTON, RICK THALER AND BILL STEPHENS:

Mr. Kyle M. Smith
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Phone: 512-463-2080

ALSO PRESENT:

Jennifer Osteen
Stephanie Kingrey
Stephen Michael McCollum

-*-*-*-*-*

**3**

# INDEX

Appearances.................................   2

SANDRA SUE MCCOLLUM
    Examination by Ms. Coogan..................   4
    Examination by Mr. Stone...................  39
    Examination by Mr. Smith..................  50
    Examination by Ms. Coogan.................  53
Reporter's Certificate.......................  55

(No exhibits were marked during this deposition).

**4**

SANDRA SUE MCCOLLUM,
having been first duly sworn, testified as follows:
EXAMINATION
BY MS. COOGAN:

Q.   Ms. McCollum, my name is Kim Coogan, and I represent UTMB.  We are here today to ask you some questions because of the lawsuit that you have filed.

Do you understand that?

A.   Yes, ma'am.

Q.   It's possible that today may be very unpleasant for you, just because of the memories that it brings back and, if you need to take a break because of that, please feel free to do that.  I am not here to make you feel bad.  I'm just here to ask you some questions because that's my job because of the lawsuit.  Okay?

I need you to answer yes or no or -- or whatever the answer is.

A.   Yes.

Q.   If I put my hand by my ear, that means I can't here you.

A.   Okay.

MR. MEDLOCK:  And, Sandra, you might want to speak up a little bit, too, just so the court reporter can hear your answer --

THE WITNESS:  Yes.

**5**

MR. MEDLOCK:  -- and make sure she gets it down.

Q.   (BY MS. COOGAN)  If I ask you a question that you don't understand, please just tell me, and I'll rephrase it.  Okay?

A.   Yes.

Q.   If you want to take a break to go to the bathroom or make a phone call or smoke or talk to your lawyer, you are absolutely allowed to do that and all you have to do is tell me.

A.   Yes, ma'am.

Q.   I drink a lot of coffee and water and so sometimes I like to take a lot of breaks myself, so don't feel guilty if you want to do that.  Okay?

A.   Okay.

Q.   Can you please state your full name?

A.   Sandra Sue McCollum.

Q.   And what was your maiden name?

A.   My maiden name was Lawson.

Q.   L-A-W-S-O-N?

A.   Yes, ma'am.

Q.   Have you ever gone by any other names?

A.   Yes, ma'am.

Q.   What other --

A.   I was married twice previous to Dalton Kidd and

2 (Pages 2 to 5)

Sunbelt Reporting & Litigation Services
Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   Houston   San Antonio

Appendix 424

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

**18**

1  A.  When we had gone for his hearing and he was --
2  we was there, and he was -- they took him to the jail in
3  Waco and said he would be transferred there, to the
4  Hutchinson prison there.
5  Q.  Okay.  And then he was there for about a month
6  or so --
7  A.  Yes, ma'am.
8  Q.  -- you think?
9  And then did you go visit him one day and
10  he said, Hey, they're shipping me out later, or how did
11  that work?
12  A.  Yes, ma'am.  He said he would write me a letter
13  the day before or so when he found out he was going to
14  be sent off to let me know that he was going to be
15  transferred off.
16  Q.  And did he do that?
17  A.  Yes, ma'am, he did.
18  Q.  Do you happen -- do you have anything in
19  response to the subpoena, by the way?
20  MR. MEDLOCK:  We have these documents,
21  Ms. Coogan.  There are some additional documents that my
22  assistant is making a copy of.  I can go get those if
23  you'd like.  It's mostly photographs that she was
24  copying when we --
25  Q.  (BY MS. COOGAN)  Okay.  Did you -- one of the

**19**

1  things I wanted to ask you about is whether you had any
2  of the letters or cards or anything that you and he may
3  have exchanged.
4  A.  Yes, ma'am.  I don't have them with me, I
5  didn't know to bring them, but I do have my -- save my
6  letters.
7  Q.  Okay.  Let me just ask you what this -- what
8  this is.
9  A.  I had come home from work that morning.
10  Q.  Uh-huh.
11  A.  I work night shifts and, when I got home, I had
12  gotten a call from the warden stating my husband had
13  been transferred to the hospital, he was critically ill,
14  that none of us could really go see him right now until
15  they found out how critical he was and for me to hold
16  on, they would get back in touch with me to let me know
17  if any of us could go down there to see him.
18  Q.  And what is this -- it's -- your lawyer gave it
19  to me in response to my subpoena.  It says -- looks like
20  a notebook, copies of a -- from a notebook, maybe, with
21  some handwritten notes.
22  A.  I did not do this, ma'am.
23  Q.  Okay.  Do you know who did?
24  A.  His daughter.
25  Q.  While you were married, did your husband have

**20**

1  any medical problems?
2  A.  Ma'am, all that I know of -- he -- he didn't
3  take no medication or nothing while we were together.
4  He did not go see a doctor while we were together.  Only
5  thing he took was maybe Tylenol if he had a headache or
6  something.  That's the only medication I knew of.
7  Q.  Did he ever mention whether he had ever been
8  diabetic in the past?
9  A.  Not in the past, but while he was in the -- the
10  jail there in Waco, he had told me that they had done
11  some blood work and it showed his blood sugar was up and
12  they were going to give him medication for it.
13  Q.  For diabetes?
14  A.  For diabetes, yes, ma'am.
15  Q.  But during the time that you were married, you
16  don't recall him ever being diagnosed with diabetes?
17  A.  No medication that I knew of.
18  Q.  And he didn't take any shots of insulin or --
19  A.  No, ma'am.
20  Q.  Okay.  What about high blood pressure?  When
21  y'all were living together, did he ever take any high
22  blood pressure medicine?
23  A.  No, ma'am.
24  Q.  And when he was at the McLennan County Jail, do
25  you remember if he told you about any --

**21**

1  A.  Blood pressure?  They checked his blood
2  pressure.  It was up.  They didn't know whether it was
3  because he just got put in jail or why it was raised,
4  but they did give him medication for blood pressure.
5  Q.  Do you know what they gave him?
6  A.  I'm not for sure of the type of medicine they
7  gave him, no, ma'am.
8  Q.  Okay.  Do you know how often he took it?
9  A.  I don't know how often, but he was taking it
10  every day.  They were giving it to him every day while
11  he was there.
12  Q.  Okay.  And -- and do you know while he was in
13  McLennan County Jail what -- what medicine, if any, that
14  he got for diabetes?
15  A.  I'm not for sure the type of medicine, ma'am.
16  Q.  Okay.  Do you know if he was even getting any?
17  Sometimes --
18  A.  He told me hisself that they were giving him
19  the medication for the diabetes and for the high blood
20  pressure.  They had started him on it.
21  Q.  Okay.  Did he say anything about whether he was
22  feeling better because of that?
23  A.  No, ma'am, he didn't say.
24  Q.  Were there any other conditions that he told
25  you they had found while he was in the McLennan County

**6 (Pages 18 to 21)**

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

54

1
2       CHANGES AND SIGNATURE
2   WITNESS NAME: SANDRA SUE MCCOLLUM       DATE: 11-22-13
3   PAGE  LINE  CHANGE          REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20      I, SANDRA SUE MCCOLLUM, have read the foregoing
21  deposition and hereby affix my signature that same is
22  true and correct, except as noted herein.
23  _____
24          SANDRA SUE MCCOLLUM
25          Job No. 113925

55

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2               DALLAS DIVISION
3   STEPHEN MCCOLLUM, et al,     )
            Plaintiffs,      )
4                            )
    V.                       )  C.A. No. 3:12-CV-02037
5                            )
                             )
6   BRAD LIVINGSTON, et al,      )
            Defendants.      )
7
8
9       REPORTER'S CERTIFICATION
        ORAL DEPOSITION OF
10      SANDRA SUE MCCOLLUM
        November 22, 2013
11
12      I, Debra L. McGrew, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15      That the witness, SANDRA SUE MCCOLLUM, was duly
16  sworn by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19      I further certify that pursuant to FRCP Rule
20  30(f)(1) that the signature of the deponent:
21      ____ was requested by the deponent or a party
22  before the completion of the deposition and returned
23  within 30 days from date of receipt of the transcript.
24  If returned, the attached Changes and Signature page
25  contains any changes and the reasons therefor;

56

1       __X__ was not requested by the deponent or a
2   party before the completion of the deposition.
3       I further certify that I am neither attorney
4   nor counsel for, related to, nor employed by any of the
5   parties to the action in which this testimony was taken.
6   Further, I am not a relative or employee of any attorney
7   of record in this case, nor am I financially or
8   otherwise interested in the outcome of the action.
9       Subscribed and sworn to on this the 9th day of
10  December, 2013.
11
12
13
14
        _____
15      Debra L. McGrew, Texas CSR #1573
        Expiration Date:  12/31/2014
16      Sunbelt Reporting & Litigation Services
        Firm Registration No. 87
17      1016 La Posada Drive, Suite 294
        Austin, Texas 78752
18      512-465-9100
19      Job No. 113925
20
21
22
23
24
25

15 (Pages 54 to 56)

Sunbelt Reporting & Litigation Services
Austin   Bryan/College Station  Corpus Christi  Dallas/Fort Worth   East Texas  Houston  San Antonio

**Appendix 426**

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 11/1/2011 | NUMBER: G-52.1 |
| | Replaces: 10/95 | |
| | Formulated: 7/85 Reviewed: 07/13 | Page 1 of 1 |

## INFIRMARY CARE

PURPOSE:   To outline the scope of infirmary care for offenders of the Texas Department of Criminal Justice.

POLICY:

I.   Infirmary care within the Texas Department of Criminal Justice is provided at designated sites. Each facility maintains written or electronic documentation of the scope of medical and nursing care provided at the infirmary.

II.   Infirmary beds are utilized for offenders who need inpatient care for an illness, injury or diagnosis that requires observation and/or medical management but does not require admission to an acute care hospital.

III.   Admission to and discharge from said facilities are by physician or mid-level practitioner only. All inpatient admission and discharge orders must be co-signed by a physician.

IV.   Each infirmary meets the following criteria:

A.   a physician or mid-level practitioner is available on a 24 hour basis. Mid-level practitioner practices and procedures are consistent with approved clinical protocols

B.   nursing services are under the direction of a full-time registered nurse who is on-site daily

C.   qualified health care personnel are on duty 24 hours per day

D.   specific nursing care procedures are dictated by a manual of nursing care that is current

E.   offenders are within sight or sound of a qualified health care provider at all times

V.   A separate inpatient record is maintained on all individuals admitted to the infirmaries.

VI.   Admission to and discharge from infirmary health care is coordinated through the Utilization Review/Utilization Management Department.

VII.   The required frequency of evaluations/assessments and documentation will be included in the facility process manual/addendum.

Index: Inpatient care

Reference:  NCCHC Standard P-52, Infirmary Care (essential)
            ACA Standard 4-4352 (Ref. 3-4354)

1

                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION

STEPHEN McCOLLUM,
STEPHANIE KINGREY, and
SANDRA McCOLLUM,
individually and as
heirs at law to the
Estate of LARRY GENE
McCOLLUM,
             Plaintiffs,

VS                            §      CIVIL ACTION NO.
                              §      3:12-cv-02037
BRAD LIVINGSTON, JEFF
PRINGLE, and the TEXAS
DEPARTMENT OF CRIMINAL
JUSTICE,
             Defendants.


          ------------------------------------
          ORAL AND VIDEOTAPED DEPOSITION OF

                 RICHARD J. CLARK

               FEBRUARY 7, 2013
          ------------------------------------


            ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD J. CLARK, produced as a witness at the instance

of the PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

February, 2013, from 1:55 p.m. to 3:50 p.m., before TINA

TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

**2**

A P P E A R A N C E S

FOR THE PLAINTIFFS:
 Mr. Scott Medlock
 Mr. Jeff Edwards
 THE EDWARDS LAW FIRM
 The Bremond Houston House
 706 Guadalupe
 Austin, Texas  78701
 jeff@edwards-law.com
 scott@edwards-law.com

FOR THE DEFENDANTS:
 Mr. Bruce R. Garcia
 Mr. David A. Harris
 OFFICE OF THE ATTORNEY GENERAL
 P.O. Box 12548
 Austin, Texas 78711-2548
 512.463.2080 Fax 512.495.9139
 bruce.garcia@oag.state.tx.us
 david.harris@oag.state.tx.us

ALSO PRESENT:
 Mr. Jeremy Gilliam (Videographer)
 512.565.4799
 Warden Pringle

**3**

INDEX

PAGE

Appearances.................................   2
WITNESS:  RICHARD J. CLARK
Examination by Mr. Medlock....................   4
Signature and Changes.........................  79
Reporter's Certificate........................  81

EXHIBITS

NO.  DESCRIPTION                          PAGE
11   Training Circular on Heat................  16
12   Sergeant Tate's Statement 7/22/11.........  34
13   Lieutenant Sanders' Statement 7/22/11.....  34
14   Mr. Clark's Statement 7/22/11.............  34
15   Anonymous Letter Written to Mr. Edwards...  77
16   Mr. Clark's Diagram of Dorms..............  78

**4**

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are going on record.  The time is 1:55 p.m.  Will the reporter please swear in the witness?

RICHARD J. CLARK,
having been first duly sworn, testified as follows:

BY MR. MEDLOCK:

Q.  Good afternoon, Mr. Clark.  Could you please state your full name for the record?

A.  Richard J. Clark.

Q.  Mr. Clark, my name is Scott Medlock.  Do you understand that I'm an attorney and that I represent the family of Larry Gene McCollum in this case?

A.  Yes.

Q.  And you understand that a suit has been brought against TDJC and various officials in the State of Texas about Mr. McCollum's death?

A.  Yes.

Q.  Have you ever been deposed or testified before, Mr. Clark?

A.  No.

Q.  Okay.  I'm going to go over some kind of ground rules.  If you don't hear my question, will you say so?

A.  (Nods head.)

**5**

Q.  And you just nodded yes there.

A.  Yes.

Q.  Even though we're putting this on videotape, if you can make sure --

A.  Yes.

Q.  -- to speak your answers audibly so that the court reporter can take them down, and, again, for the sake of the court reporter, make sure that I've completed asking my question before you answer, and I'll try to let you complete your answer before I ask another question, again, just so the court reporter has an easier time.

A.  Yes.

Q.  Does that make sense?

A.  Yes.

Q.  Okay.  Now, if you don't know the answer to a question that I ask, will you tell me so?

A.  Yes.

Q.  Okay.  And if you need to change an answer or add anything to an answer, will you say so?

A.  Yes.

Q.  Okay.  And you understand that everything being said in this room this afternoon is being taken down by the court reporter and being recorded on the video?

2 (Pages 2 to 5)

512-474-4363          WRIGHT WATSON & ASSOCIATES          (fax) 512-474-8802
1250 S. Capital of Texas Highway, Building 3, Suite 400, Austin, Texas 78746

**Appendix 429**

**22**

1   MR. MEDLOCK:  No.
2   Q.  Mr. Clark, the document I just had you look at
3   is a list of temperatures with heat index values; is
4   that right?
5   A.  Yes.
6   Q.  Okay.  And you've never seen -- it's never
7   been one of the duties you've had at TDCJ --
8   A.  No.
9   Q.  -- to put together a document like this?
10   Okay.  Do you know whose job it is to put together that
11   document?
12   A.  No, I don't.
13   Q.  Okay.  Mr. Clark, some of the -- some of the
14   time you're here working at TDCJ, it's your job to
15   supervise the prisoners in the dorms; is that right?
16   A.  Yes.
17   Q.  When you're doing that, were you ever given a
18   list of prisoners who have medical conditions that are
19   adversely affected by heat or high temperature?
20   A.  Not -- not during this specific time.
21   Q.  Not prior to Mr. McCollum's death?
22   A.  Right.
23   Q.  Have you ever seen a list like that now?
24   A.  Yes, during the summertime we do.
25   Q.  Did that start last summer in 2012?

**23**

1   A.  I think it started the year before that.
2   Q.  But after Mr. McCollum's death?
3   A.  Yes.
4   Q.  Okay.  Can you tell me about the list, like
5   what -- where is it posted?
6   A.  It was given -- it was given to us in our --
7   our turnout folder that we have with the rest of our
8   paperwork, and sometimes it's left on the building.
9   Q.  When you say it's in your turnout folder, can
10   you describe for the jury what that means?
11   A.  It's a folder where we have all -- all of our
12   paperwork that we need for the night.  It has a roster,
13   and some of the other -- other paperwork that we use
14   during the night.
15   Q.  Would the roster be like a list of the
16   prisoners that you're --
17   A.  Yes.
18   Q.  -- supervising that night?  And is the -- the
19   heat list, is this -- is there just something on the
20   roster indicating that these guys have this condition,
21   or is it a separate document?
22   A.  No.  It's on a -- it's on another -- it's on
23   another paper with the list of offenders, their bunk
24   number, their name, TDC number.
25   Q.  When you see that list, as a correctional

**24**

1   officer, what do you do with it?
2   A.  We use that to check on the offender during
3   the night.
4   Q.  What do you mean when you say you check on the
5   offender during the night?
6   A.  Well, if he's alive, we ask him if he's doing
7   all right.  If he's asleep, we just check to make sure
8   that they're breathing.
9   Q.  So do you walk past the guys in the dorms
10   and --
11   A.  Yes.
12   Q.  -- either talk to them or --
13   A.  Yes.
14   Q.  -- verify that you can see their chest moving
15   up and down?
16   A.  Yes.
17   Q.  Okay.  Do you do that for everybody or just
18   for the guys who are on the heat list?
19   A.  We do that for everybody.  If they're
20   sleeping, we usually make sure that they're
21   breathing.  If they're up, we can tell -- we can tell
22   that they're all right.
23   Q.  What do you differently for the guys on the
24   heat list?
25   A.  We just ask -- if they're up, we ask them if

**25**

1   they're feeling all right.  If they're sleeping, we do
2   the same.  We just check to make sure that they're
3   breathing.
4   Q.  Okay.  Is there anything else that you're
5   supposed to do as a correctional officer when the --
6   when you see a name on that list?
7   A.  In what way?
8   Q.  Well, you've said that when you're doing your
9   rounds, you -- you check to make sure they're breathing
10   or ask them a couple of questions when they're on the
11   extreme heat list.  Do you do anything else, or is that
12   the total extent of what you use the extreme heat list
13   for?
14   A.  Well, we -- we check every -- everyone when we
15   go in.  Our first -- first count usually is a roster
16   count where we check -- check everyone's ID, their TDC
17   number and check their face.
18   Q.  And you do that when you first come on duty?
19   A.  Our first count.
20   Q.  And when -- when does the first count happen?
21   A.  We had a -- a change of our -- of what -- all
22   the time the counts and everything are, but usually that
23   count is -- is within an hour of when we get on the
24   building.
25   Q.  Okay.  Now, you spend a lot of time working in

**7 (Pages 22 to 25)**

**26**

1  the dorms, right?
2     A.  Yes.
3     Q.  And there's no air conditioning in those
4  dorms, correct?
5     A.  No.
6     Q.  You'd agree with me that it gets pretty hot
7  back in those dorms, right?
8     **A.  Well, it's Texas.  It's supposed to be hot**
9  **during the summertime.**
10     Q.  And you'd agree that there's not much
11  difference inside in the dorm and outside in the Texas
12  heat, right?
13     **A.  Well, in the dorms, we have -- we have big**
14  **fans that are going 24 hours a day.**
15     Q.  Do the fans make much of a difference, as far
16  as you can tell?
17     **A.  Quite a bit.**
18     Q.  Are you ever uncomfortable when you're working
19  back in the dorms in the summer?
20     **A.  Like I said, it's Texas.  It's supposed to be**
21  **hot.**
22     Q.  It's supposed to be hot.  Does staff ever
23  complain about the heat in the summer?
24     **A.  In what way?**
25     Q.  Well, do they ever say, it's really hot in

**27**

1  here, I'm having a hard time doing my job because it's
2  so hot?
3     **A.  Well, we all know it's going to be hot.**
4     Q.  But does staff complain about that?
5     **A.  No, not really.**
6     Q.  No?
7     **A.  No.**
8     Q.  You've never heard staff complain to their
9  supervisor that it's really hot?
10     **A.  No.**
11     Q.  Do you ever hear prisoners complain about the
12  heat in the summer?
13     **A.  Yes.**
14     Q.  Is that a fairly regular complaint that you
15  hear from prisoners in the summer?
16     **A.  Yes.**
17     Q.  It's probably fair to say that every summer
18  you've worked here, you've probably heard that complaint
19  from prisoners?
20     **A.  Yes.**
21     Q.  When you worked at -- you worked at the
22  Powledge Unit, you said, from January to March; is that
23  right?
24     **A.  Yes.**
25     Q.  Now, there are parts of the Hutchins Unit that

**28**

1  are air conditioned, right?
2     **A.  Yes.**
3     Q.  The picket is a place that's air conditioned;
4  is that right?
5     **A.  If it works.**
6     Q.  If it works.  Okay.  Do they work most of the
7  time?
8     **A.  Not during the summertime.**
9     Q.  There are other parts in the Hutchins Unit
10  where the air conditioning does work pretty regularly
11  during the summer, though, right?
12     **A.  On and off.**
13     Q.  Like the warden's office is probably -- the
14  air conditioning is probably working there most days,
15  right?
16        MR. GARCIA:  Objection to the extent it
17  calls for speculation.
18     Q.  To the extent that you know.
19     **A.  I -- I wouldn't know.**
20     Q.  When the A/C is working, do some officers
21  spend more time in the picket?
22     **A.  We can't do much work from the picket.  We**
23  **have -- we have to do most of the work we have from the**
24  **dorms.**
25     Q.  Well, some officers take a break in the picket

**29**

1  where it's air conditioned?
2     **A.  Yes.**
3     Q.  Okay.  You'd agree that that air conditioning
4  makes a big difference between -- for how you feel,
5  wouldn't you?
6     **A.  It's cool.**
7     Q.  It's much more comfortable, right?
8     **A.  Yes.**
9     Q.  And have you ever felt overheated while you
10  were working here at the Hutchins Unit?
11     **A.  No.**
12     Q.  Have you ever seen other prison staff go to
13  take a break somewhere where it's air conditioned
14  because it's too hot?
15     **A.  Yes.**
16     Q.  Is that something you see fairly regularly in
17  the summer?
18     **A.  It depends on what building I'm on and who I'm**
19  **working with.**
20     Q.  But that's something you see happen during the
21  summer?
22     **A.  Occasionally.  I do occasionally.**
23     Q.  You do occasionally.  Okay.  Like, would you
24  say you do that at least once a shift or...
25     **A.  It depends on how much work I got.**

**8 (Pages 26 to 29)**

512-474-4363      WRIGHT WATSON & ASSOCIATES      (fax) 512-474-8802
1250 S. Capital of Texas Highway, Building 3, Suite 400, Austin, Texas 78746

**Appendix 431**

**30**

1  Q.  Okay.  Does it depend on where you're working?
2  A.  Yes.
3  Q.  Sometimes you will only be working in a place
4  where it's air conditioned, right?
5  A.  No.
6  Q.  No.  Like if -- you wouldn't just work the
7  front door where you come in?
8  A.  No.
9  Q.  You'd work somewhere else.  You'd rotate with
10 somebody who's working the front door if working at the
11 front door was part of your duty that night?
12 **A.  Well, we only -- we only have the front door**
13 **for an hour in the -- in the morning.**
14 Q.  Okay.  I see, because you work the night
15 shift?
16 A.  Yes.
17 Q.  Okay.  Have you always worked the night shift?
18 A.  Yes.
19 Q.  Okay.  So when you say that people are taking
20 breaks in air-conditioned spots, officers are taking
21 these breaks, they're even doing that during the night
22 shift, right?
23 A.  Yes.
24 Q.  Okay.  Because it's still hot in the middle of
25 the night when you're working?

**31**

1  A.  Yes.
2  Q.  Now, the dorms, the windows to those dorms
3  don't open; is that right?
4  A.  No.
5  Q.  And you said there are fans.  How many fans
6  are there?
7  **A.  There are two big fans that are up on the**
8  **wall.**
9  Q.  Okay.  Were there only two fans there in July
10 of 2011 when Mr. McCollum was here?
11 **A.  Yes.**
12 Q.  Prisoners don't have personal fans here at
13 the --
14 **A.  No.**
15     MR. GARCIA:  Let him finish his question.
16 Okay?
17 Q.  They don't have personal fans here at the
18 Hutchins Unit?
19 A.  No.
20 Q.  Is that because there's no plug outlets in the
21 dorms?
22 A.  Yes.
23 Q.  As far as you know, there's no security reason
24 that inmates living in the dorms here at the Hutchins
25 Unit couldn't have a personal fan?

**32**

1  **A.  That's -- that's not my area.  Whenever they**
2  **built this thing, that's the way it was built.**
3  Q.  Okay.  Have you ever felt dizzy or nauseous
4  while working here during the summer?
5  A.  No.
6  Q.  Do you drink more water when you're working
7  here during this summer?
8  **A.  I drink -- I usually bring a bottle of**
9  **Gatorade with me to work.**
10 Q.  Do you do that every day or just during the
11 summer?
12 **A.  Every day.**
13 Q.  And do you -- do you just drink the Gatorade
14 that's in there, or do you sometimes fill it up with
15 additional water after you finish the Gatorade?
16 **A.  I just drink the Gatorade that's in the**
17 **bottle.**
18 Q.  Okay.  Is there air conditioning in your home,
19 Mr. Clark?
20 A.  Yes.
21 Q.  Is there air conditioning in your car?
22 A.  Yes.
23 Q.  I see you have a document in front of you on
24 your left there.
25 A.  Yes.

**33**

1  Q.  Is that what you reviewed in preparation for
2  your deposition today?
3  **A.  That was -- that was the -- the statement I**
4  **had to make after -- after it happened.**
5  Q.  Okay.  Did you review anything else before
6  your deposition today?
7  **A.  Some of what the lieutenant wrote and the**
8  **sergeant.**
9  Q.  Those would be the statements that Sergeant
10 Tate and Lieutenant Sanders wrote?
11 **A.  Yes.**
12 Q.  And those are kind of formatted the same as
13 your statement, they're just different content?
14 **A.  Yes.**
15 Q.  Okay.  I'll come back to your statement in a
16 second.  Is this the statement from Sergeant Tate that
17 you reviewed?
18 **A.  I just wrote -- read over it once or twice.  I**
19 **didn't -- I didn't look at it all that -- all that much.**
20 Q.  Okay.  But you read it a few times --
21 **A.  Yes.**
22 Q.  -- before your deposition today?
23     MR. MEDLOCK:  Okay.  Let's go ahead and
24 mark this as...
25     (Exhibit 12 marked.)

**9  (Pages 30 to 33)**

**78**

1    A.  Like I said, it's gossip.
2    Q.  Let's say that you had actually seen an
3  officer sleeping on the job.  Would you make a complaint
4  then?
5    A.  I might tell the sergeant.
6    Q.  Would you be concerned that you -- you might
7  be fired if --
8    A.  No.
9    Q.  -- you made a complaint like that?  Okay.
10  Have you heard about any criminal charges being brought
11  against Warden Polk?
12    A.  No.
13    Q.  Okay.  You don't know anything about that?
14    A.  No.
15    Q.  Okay.
16        MR. MEDLOCK:  Pass the witness.
17        MR. GARCIA:  We'll reserve until trial.
18        THE VIDEOGRAPHER:  Going off the record
19  at 3:50 p.m.
20        (Exhibit 16 marked.)
21        (Deposition concluded at 3:50 p.m.)
22
23
24
25

**80**

1
2       I, RICHARD J. CLARK, have read the foregoing
3  deposition and hereby affix my signature that same is
4  true and correct, except as noted above.
5
6       _____
        RICHARD J. CLARK
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**79**

1       CHANGES AND SIGNATURE
2  WITNESS:  RICHARD J. CLARK
3  DATE OF DEPOSITION:  FEBRUARY 7, 2013
4  PAGE LINE    CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

**81**

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3  STEPHEN McCOLLUM,
   STEPHANIE KINGREY, and
4  SANDRA McCOLLUM,
   individually and as
5  heirs at law to the
   Estate of LARRY GENE
6  McCOLLUM,
        Plaintiffs,
7
   VS              Â§   CIVIL ACTION NO.
8                  Â§   3:12-cv-02037
   BRAD LIVINGSTON, JEFF
9  PRINGLE, and the TEXAS
   DEPARTMENT OF CRIMINAL
10  JUSTICE,
        Defendants.
11
12
13  ----------------------------------------
14       REPORTER'S CERTIFICATION
15  ORAL AND VIDEOTAPED DEPOSITION OF
16          RICHARD J. CLARK
17          FEBRUARY 7, 2013
18  ----------------------------------------
19
20       I, Tina Terrell Burney, Certified Shorthand
21  Reporter in and for the State of Texas, hereby certify
22  to the following:
23       That the witness, RICHARD J. CLARK, was duly
24  sworn by the officer and that the transcript of the oral
25  deposition is a true record of the testimony given by

**21  (Pages 78 to 81)**

82

1   the witness;
2       I further certify that pursuant to FRCP Rule
3   30(f)(1) that the signature of the deponent:
4       _____ was requested by the deponent or a
5   party before the completion of the deposition and is to
6   Be returned within 30 days from date of receipt of the
7   transcript.  If returned, the attached Changes and
8   Signature Page contains any changes and the reasons
9   therefor;
10       _____ was not requested by the deponent or a
11   party before the completion of the deposition.
12       I further certify that I am neither attorney
13   or counsel for, nor related to or employed by, any of
14   the parties or attorneys to the action in which this
15   deposition was taken.  Further, I am not a relative or
16   employee of any attorney of record in this case, nor am
17   I financially interested in the outcome of the action.
18       Subscribed and sworn to on this the _____
19   day of February, 2013.
20
21       _____
        TINA TERRELL BURNEY
22      Texas CSR No. 2908
        Expiration Date:  12/31/14
23      WRIGHT WATSON & ASSOCIATES, L.L.C.
        3307 Northland Drive, Suite 185
24      Austin, Texas  78731
        800.375.4363  Fax 512.474.8802
25      Firm Registration No. 225

**Appendix 434**

| | Evening (1700-midnight) | A. Okoro |
|---|---|---|
| **Wednesday, July 20** | Early morning (midnight – 0800) | A. Okoro |
| | Daytime (0800 – 1700) | None – Call assigned facility psychiatrist/mlp |
| | Evening (1700-midnight) | J. Oliver |
| **Thursday, July 21** | Early morning (midnight – 0800) | J. Oliver |
| | Daytime (0800 – 1700) | None – Call assigned facility psychiatrist/mlp |
| | Evening (1700-midnight) | S. Parker |
| **Friday, July 22** | Early morning (midnight – 0800) | S. Parker |
| | Daytime (0800 – 1700) | None – Call assigned facility psychiatrist/mlp |
| | Evening (1700-midnight) | S. Reddy |
| **Saturday, July 23** | Early morning (midnight – 0800) | S. Reddy |
| | Daytime (0800 – 1700) | J. Tennison |
| | Evening (1700-midnight) | J. Tennison |
| **Sunday, July 24** | Early morning (midnight – 0800) | J. Tennison |
| | Daytime (0800 – 1700) | J. Wang |

| UTMB/CMC NURSING SERVICES POLICY MANUAL | Effective Date: 03/08 | Number: E-37.2 |
| | Reviewed: 10/12 | Page 1 of 3 |
| | Revised: 10/12 | |
| | Formulated: 03/08 | |

## TELEPHONE TRIAGE PROTOCOLS FOR REGISTERED NURSES

### Purpose:

To provide telephone triage guidelines to the Registered Nurse (RN) providing direction to Security Staff for patients with medical complaints at facilities where medical personnel are not on-site.

### Audience:

This policy applies to all CMC RNs at designated facilities providing 24 hour on-site nurse staffing.

### Policy:

The book entitled, *Telephone Triage Protocols for Nurses*, third edition, by Julie K. Briggs, published by Lippincott, will serve as a guideline for nurses assuming on-call responsibilities and/or assessing patients in the clinical setting.

*Telephone Triage Protocols for Nurses* assists health care professionals in asking appropriate questions to quickly assess the severity of a problem. The protocols ARE NOT DESIGNED to diagnose the caller's medical condition. The book contains more than 200 protocols that cover a wide range of the most common symptoms, disorders, and medical emergencies.

According to the author, "Telephone triage and advice lines have become a rapidly growing industry and show all the signs of continued growth. It is also the newest medical-legal threat. Although there is virtually nothing in the health care field that is risk-free, there are a variety of ways to reduce the risk when giving telephone advice. Experts in the telephone triage business agree that the use of approved protocols substantially reduces the risk in giving advice over the phone. Protocols establish a standard of care. They provide a mechanism to address potentially serious conditions in a consistent manner when you cannot see or touch the person."

All registered nurses at designated facilities providing 24 hour on-site nurse staffing will receive telephone triage training The Nurse Manager is responsible for placing the following in the nurse's personnel file which is co-signed by the RN and the nurse manager:

- ♦ Documentation stating that the RN has received telephone triage training
- ♦ Documentation stating that the RN understands and acknowledges that once telephone contact is established with the offender patient, a

| **UTMB/CMC NURSING SERVICES POLICY MANUAL** | Effective Date: 03/08 | Number:  E-37.2 |
| | Reviewed: 10/12 | Page  2  of  3 |
| | Revised: 10/12 | |
| | Formulated: 03/08 | |

### TELEPHONE TRIAGE PROTOCOLS FOR REGISTERED NURSES

patient-nurse relationship has been established.  Failure to adhere to the protocols in this book, and the policies and procedures of UTMB CMC and TDCJ Health Services may lead to discipline up to and including termination.

♦ Documentation stating that the RN understands that when in doubt always err on the side of patient safety.

Each protocol follows a standard design, which helps the RN to efficiently utilize information:

- **Key Questions** prompts the RN to address key areas before proceeding through the protocol.  This always includes asking and recording the offender patient's name, TDCJ #, age, onset and frequency of symptoms.
- **Assessment** contains the questions listing the symptoms, conditions, or combination of factors that should be assessed to determine urgency.
- **Action** is organized around yes and no answers to the assessment questions.  If the offender patient answers "no" to the questions, the RN is directed to the next category of assessment questions.  If the offender patient answers "yes", concrete advice is given regarding when and where to receive care.  This advice is prioritized so that emergency actions always appear first.  Actions the nurse should take appear in *italicized* type.  Instructions to the offender patient appear in "quotation marks".
- **Action options** are explained as follows:
  ➢ "Call an ambulance" Security or LVN is directed by the RN to send the offender patient to the nearest local community hospital ED 911.
  ➢ "Seek Emergency Care Now" Security is directed by the RN to send the offender patient to the nearest local community hospital ED 911.
  ➢ "Seek Medical Care within 2-4 hours" A. If the facility being consulted is within a designated HUB area, the RN will instruct Security staff to bring the patient to the HUB for a full assessment.  B. If the facility being consulted is NOT within a designated HUB and a licensed nurse or provider will not be on the facility within 2 hours, Security will be instructed to transport the patient to the nearest local community hospital ED . "Seek Medical Care Within 24-48 hours" The RN will instruct the Security officer to issue the patient a pass to come to the medical clinic the next day.
  ➢ "Call Back or Call PCP for Appointment if No Improvement" The RN will instruct the Security officer to issue the patient a pass to come to the medical clinic the next day.
  ➢ "The Home Care Instructions" explain care that should be given in the home before emergency help arrives, while waiting for an appointment, or if the

| UTMB/CMC NURSING SERVICES POLICY MANUAL | Effective Date: | 03/08 | Number:  E-37.2 |
|---|---|---|---|
| | Reviewed: | 10/12 | Page  3 of 3 |
| | Revised: | 10/12 | |
| | Formulated: | 03/08 | |

## TELEPHONE TRIAGE PROTOCOLS FOR REGISTERED NURSES

problem can be managed at home.  In many instances these instructions DO NOT apply to a correctional setting.  The RN will use discretion when and when not to use these instructions based on the correctional environment the offender is housed and TDCJ Heath Services Policies.

### Procedure

1.  When the RN receives a call, the RN will ask Security to place the patient in front of the Digital Medical System (DMS) monitor.  The RN will connect to the facility.  If the patient cannot be placed in front of the DMS monitor, the RN MUST ask security to place the offender patient on the telephone and speak DIRECTLY to the offender patient before proceeding with the telephone triage protocols.  If this is NOT possible, or if the offender patient is unconscious or unresponsive which is preventing the offender patient from talking on the telephone, the nurse will direct security to call 911 and transport the offender patient to the nearest hospital ED.  If medical department is closed and no medical staff onsite, TDCJ staff will complete and send the FORVUS email notification form. Refer to CMCHC Policy A-08.2

2.  While speaking directly with the offender patient, the RN will utilize the appropriate protocol (s) associated with the offender patient's complaints or symptomatology and follow the steps as outlined in the protocol.

3.  The RN will complete the Telephone Triage Documentation Form for each call received.

4.  The RN will contact the provider on call for the facility where the patient is assigned for questions or concerns regarding the disposition of the patient or for further orders if the patient is transported to a designated HUB facility.

5.  At the conclusion of the shift, each triage form will be scanned and emailed via UTMB Web-Mail to the responsible Nurse Manager of the patient's unit of assignment (UOA). NMs should always designate who is covering for them in their absence and alert their HUB or 24 call center to avoid missing an overnight triage.

6.  The Nurse Manager of the patient's UOA will:
    a.  ensure appropriate patient follow up the following day
    b.  forward the triage form to Mental Health if any self-injurious behavior is documented.
    c.  have the form scanned into the patient's medical record

| UTMB/CMC NURSING SERVICES POLICY MANUAL | Effective Date: 03/08 | Number: E-37.2 |
|---|---|---|
| | Reviewed: 05/12 | Attachment A |
| | Revised: 03/12 | Page 1 of 2 |
| | Formulated: 03/08 | |

## TELEPHONE TRIAGE DOCUMENTATION FORM

### NURSING TRIAGE FORM

Date/Time: Facility: _____

Name of offender Patient: _____

TDCJ #:_____

Name of Security Officer Calling _____

Patient's Age Sex:_____

Presenting Problems/Symptoms_____
_____
_____

Protocol used: (List protocol name and page number):
Briggs, J. K. (2007). Telephone Triage Protocols for Nurses 3rd ed. Philadelphia: Lippincott Williams & Wilkins.

1._____

2. _____

3. _____

4. _____

5. Other_____

Problem: _____ Emergent _____ Urgent _____ Non-Urgent
      (Immediately)    (2 hrs)   (Pass Issued)

Circle Correct Information

Telephone Triage

1. Instructions given to security officer to call 911 and transport offender patient to nearest local community hospital ED.

2. Instructions given to security officer to transport the offender patient to the designated HUB for a full assessment and further care. (applicable only if the facility is within a designated HUB area)

3. Instructed the Security officer to issue a pass to the offender patient to come to medical the next day.

4. Other as ordered by a provider:_____
_____

Additional Comments_____

| UTMB/CMC NURSING SERVICES POLICY MANUAL | Effective Date: 03/08 | Number: E-37.2 |
|---|---|---|
| | Reviewed: 05/12 | Attachment A |
| | Revised: 03/12 | Page 2 of 2 |
| | Formulated: 03/08 | |

## TELEPHONE TRIAGE DOCUMENTATION FORM

Signature of nurse

_____

E-37.2, Attachment B

# The University of Texas Medical Branch

School of Medicine
School of Biomedical Services
School of Allied Health Sciences
School of Nursing

Marine Biomedical Institute Graduate
Institute for the Medical Humanities
UTMB Hospitals and Clinics



## TELEPHONE TRIAGE PROTOCOLS FOR REGISTERED NURSES

All Registered Nurses:

In an effort to ensure the highest quality health care services possible the Telephone Triage Protocols policy was developed.  As part of the implementation of this policy and our commitment to life-long learning, all Registered Nurses will complete a structured inservice training program.

The following standards are noteworthy:

- I understand and acknowledge that once telephone contact has been initiated with the offender patient, a patient-nurse relationship has been established.  Failure to adhere to protocols in the Lippincott "Telephone Triage Protocols for Nurses" and the policies and procedures of UTMB CMC / TJJD, FBOP, and TDCJ Health Services may lead to disciplinary action up to and including termination.
- I understand that when in doubt on how to proceed, as a patient advocate, it is my responsibility to always err on the side of patient safety.

Telephone Triage Protocol Inservice Completed this Date: _____

**I have reviewed these standards and I understand that I am responsible for ensuring that my practice complies with these standards while employed by UTMB Correctional Managed Care.**


_____     _____
*Employee Signature*                                          *Date*

_____     _____
*Nurse Manager Signature*                                   *Date*


Retain in employee file

1

Revised 05/2012

| CORRECTIONAL MANAGED HEALTH CARE POLICY MANUAL | Effective Date: 3-11-2009 | NUMBER: E-41.1 |
|---|---|---|
| | Replaces: 01/07 | |
| | Formulated: 5/95<br>Reviewed: 01/11 09/11 | Page _1_ of _1_ |

### EMERGENCY SERVICES

PURPOSE: To provide a mechanism by which offenders will receive 24 hour emergency health care for acute illnesses or unexpected health needs that cannot be deferred until the next scheduled sick call or clinic.

POLICY:

I.  All members of the Health Services and security staff will be familiar and comply with the procedures for obtaining emergency medical care and responding to emergencies. Ambulance transportation for the movement of any offender whose medical condition requires this mode of travel will be provided.

II. During hours of operation, emergency room services will be available on every facility and will be documented on an appropriate Emergency Room Record form (HSM-16). A plan for emergency services will be in place to cover off hours and for levels of services not available on the facilities.

PROCEDURE:

I.   Each facility health administrator (TTUHSC)/practice manager (UTMB) or his/her designee will maintain in a secure, readily accessible location, the procedure for activating the appropriate emergency medical services to include names and telephone numbers of people to be notified and/or services such as ambulance and hospital. This information will be readily accessible to all personnel (health care and correctional staff).

II.  The decision to transfer a patient for further medical care, choice of appropriate facility, and mode of transportation are determined by the physician or senior Health Services provider in compliance with Utilization Review protocols. See Health Services Policy A-08.2 for notification of transfer procedures.

III. Emergency drugs, medical supplies and equipment will be regularly maintained and accessible in the event of an emergency. All Regional Medical Facilities (RMF) and Infirmary Crash Carts as well as Facilities with Infirmaries will maintain emergency drugs as required in Pharmacy Policy 60-05 Attachment A. All facility clinics will maintain emergency drugs as defined in Pharmacy Policy 60-05 Attachment B. Facilities performing invasive procedures or administering contrast medium should keep at a minimum the medication defined in Pharmacy Policy 60-05 Attachment C.

IV.  Acute illness, for mental health conditions, includes significant hallucinations/delusions, bizarre behavior or appearance, or risk of self-injury.

V.   First Responders will be trained to respond to emergency situations within 4 minutes after notification.

Index:      Emergency health care
Reference:  2008 NCCHC Standard P-E-08, Emergency Services (essential)
            Correctional Managed Health Care Pharmacy Policy 60-05
            ACA Standard 4-4389 (Mandatory)

**Appendix 442**

TDCJ011885

2015 WL 327508
United States District Court,
N.D. Texas,
Amarillo Division.

Justin BORUM, and Chelsea Rushing,
individually and as heirs-at-law to the Estate
of Terry Borum, and Grady Borum, Plaintiffs,
v.
SWISHER COUNTY, Defendant.

No. 2:14–CV–127–J.
|
Signed Jan. 26, 2015.

**Attorneys and Law Firms**

Jeff Edwards, Scott Medlock, The Edwards Law Firm, Austin, TX, Kevin A. Isern, Timothy D. Newsom, Kevin A. Isern, Lovell Lovell Newsom & Isern, Amarillo, TX, Jeff Edwards, The Edwards Law Firm, Austin, TX, for Plaintiffs.

Mark D. White, Malerie T. Anderson, Sprouse Shrader Smith P.C., Amarillo, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

MARY LOU ROBINSON, District Judge.

 **\*1** On December 29, 2014, Defendant filed a *Partial No Evidence Motion for Summary Judgment* and supporting brief, seeking dismissal of Plaintiffs' claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Defendant's Motion did not address Plaintiffs' separate claims under 42 U.S.C. § 1983. Plaintiffs filed a response on January 7, 2015. Defendant did not file a reply. Defendant's motion is DENIED.

### BACKGROUND

On February 1, 2013, Terry Borum-a fifty-three-year-old pre-trial detainee at the Swisher County jail-collapsed in his cell, struck his head, and was knocked unconscious. Approximately two to three hours later, Mr. Borum died at the Northwest Texas Hospital in Amarillo. According to the autopsy, the cause of death was blunt force trauma to the head, caused by Mr. Borum's fall.

Plaintiffs-the son, daughter, and father of Terry Borum, and the heirs-at-law to the Estate of Terry Borum-filed their complaint in this Court on May 28, 2014 against Defendant Swisher County, Texas. In their complaint, Plaintiffs assert causes of action under the ADA, the RA, and 42 U.S.C. § 1983. Plaintiffs also assert a survival claim and a wrongful death claim, pursuant to § 1983 and the ADA/RA. Defendant filed a *Rule 12(b)(6) Motion to Dismiss* on June 20, 2014, which the Court denied on September 29, 2014.

Terry Borum suffered from alcoholism and severe depression. In 2011, Mr. Borum attempted to commit suicide with a shotgun. The suicide attempt was unsuccessful and left Mr. Borum permanently disfigured-the shotgun blast destroyed significant portions of Mr. Borum's face. As a result, Mr. Borum could not speak clearly, had difficulty breathing, and was blind in one eye. He also could not eat solid food and instead required a liquid diet, which was administered through a feeding tube sewn inside his stomach. County Sheriff Cody Grubb was aware of Mr. Borum's physical disabilities, suicide attempt, and alcoholism prior to his detention in the Swisher County jail. Likewise, jail staffers Jason Irwin and Mark Sanchez were aware that Mr. Borum was an alcoholic.

On January 28, 2013, Mr. Borum was arrested on an outstanding warrant and was detained in the Swisher County jail. The official who booked Mr. Borum noted his physical deformities, past suicide attempt, and unique feeding requirements. At the time of the booking, jail administrators were concerned about their ability to properly care for a detainee like Mr. Borum:

> "Q: When you saw the mug shot, did you think there was going to be a problem with housing Mr. Borum safely in the jail?
>
> A: Yeah.
>
> Q: Tell me why you thought that.
>
> A: You could obviously tell he was a medical risk. I mean, we couldn't-we couldn't take care of him."

Pointer Dep. 17:13–20 (App.59). Members of the jail staff were also aware that Mr. Borum was experiencing symptoms of alcohol withdrawal, including hallucinations, at the time of his detention.

**\*2** During the course of Mr. Borum's three-plus days in the Swisher County jail, he received no medical care of any kind, despite the fact that he began hallucinating, behaved erratically, and was likely suffering from delirium tremens ("DTs")-a severe form of alcohol withdrawal that causes tremors and other changes to the nervous system. Indeed, jail staffer Martin Sanchez expressly stated that Mr. Borum's serious medical conditions were ignored by the jail staff:

> "Q: Did you ever ignore something that Mr. Borum needed?
>
> A: Yes.
>
> Q: What'd you ignore?
>
> A: His medical condition."

Sanchez Dep. 217:5–9 (App.17). Jail staffers did not receive training on providing medical care to prisoners or on accommodating prisoners with disabilities. Although the jail administrator had requested such training in the past, those requests were denied because there wasn't room in the budget. As a result, jail staffers admitted that "we were understaffed and not really medically qualified to take care of someone in [Mr. Borum's] condition." Irwin Dep. 15:18–20 (App.50).

The only food Mr. Borum received during his three days of confinement was a mixture of honey and orange juice, which was the County's standard method of "treating" inmates experiencing alcohol withdrawal symptoms. Sheriff Grubb stated his belief that the County should continue to use the honey and orange juice treatment because the cost of providing actual medical care to inmates experiencing alcohol withdrawal was too expensive. The County also failed to provide Mr. Borum with the type of liquid diet necessitated by his disability and feeding tube.

Eventually, because Mr. Borum's physical and mental condition continued to deteriorate, jail officials placed him in a detox cell, where he spent the night screaming incoherently, talking to invisible friends, and trying to pull an imaginary person out of the toilet. Despite this erratic behavior, no member of the jail staff called a hospital, a doctor, or 911. However, Mr. Sanchez did discuss the situation with Sheriff Grubb and recommended that Mr. Borum be removed from the jail and transferred to a hospital, due to his unique physical deformities. Mr. Sanchez expressed reservations about the jail's ability to properly care for Mr. Borum:

> "Q: Did you [try to get Mr. Borum transferred out of the jail] because you were concerned about Mr. Borum?
>
> A: I just-I just didn't want somebody to die in our jail.... That was like a mistake waiting to happen. And, no, I didn't want it happening on my shift."

Sanchez Dep. 225:16–22 (App.21). However, Sheriff Grubb declined to transfer Mr. Borum to a hospital, basing his decision, at least in part, on financial concerns and budgetary constraints-the Swisher County jail's budget for medical care was just $7,500 annually.

Mr. Borum collapsed in his cell at approximately 8:00 A.M. on February 1, 2013, struck his head, and was knocked unconscious. After the jail administrator called 911, EMS arrived and transported Mr. Borum to Swisher Memorial Hospital. He arrived at 8:30 A.M. and was given a CT scan, which revealed a subdural hematoma-a collection or pooling of blood outside of the brain. The doctors at Swisher Memorial Hospital determined that Mr. Borum needed medical care that the hospital could not provide and decided to transfer him to Northwest Texas Hospital in Amarillo. Upon his arrival at Northwest Texas Hospital, doctors examined Mr. Borum and determined that it was too late to save him. Mr. Borum died at the hospital.

## STANDARD FOR SUMMARY JUDGMENT MOTIONS

**\*3** This Court may grant summary judgment on a claim if the record shows that there is no genuine issue of material fact and that "the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the nonmovant bears the burden of proof at trial, the movant may either offer evidence that undermines one or more of the essential elements of the nonmovant's claim, or point out the absence of evidence supporting an essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (where there is an absence of evidence supporting an essential element of the nonmovant's claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

If the movant successfully carries this burden at the summary judgment stage, the burden then shifts to the nonmovant to show that the court should not grant summary judgment. *Id.* at 324. The nonmovant must set forth specific facts that show a genuine issue for trial-only a genuine dispute over a material fact will preclude summary judgment. *Anderson,* 477 U.S. at 248, 256. The nonmovant cannot rely on conclusory allegations, improbable inferences, or unsupported speculation. *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir.1993). In ruling on a summary judgment motion, the court must review the facts and draw all reasonable inferences in favor of the nonmoving party-here, the Plaintiffs. *See Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).

## DISCUSSION

Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under the RA, "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The RA is operationally identical to the ADA in that both statutes prohibit discrimination against disabled persons; however, the ADA applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private. *See Kemp v. Holder,* 610 F.3d 231, 234 (5th Cir.2010). Claims under both acts are analyzed using the same legal standards. *See Frame v. City of Arlington,* 657 F.3d 215, 223 (5th Cir.2011); *McPherson v. MHSAA,* 119 F.3d 453, 460 (6th Cir.1997) ("[b]ecause the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other"). Thus, the Court will treat Plaintiffs' ADA and RA claims coextensively and will analyze them together, as though they were a single claim.

**\*4** Establishing a prima facie case of disability-based discrimination under Title II of the ADA requires the plaintiff to prove (1) that he is a qualified individual under the ADA;

(2) that he is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *See Melton v. Dall. Area Rapid Transit,* 391 F.3d 669, 671–72 (5th Cir.2004).

In addition to a disability-based discrimination *prohibition,* the ADA also imposes on public entities an affirmative *obligation* to make reasonable accommodations for disabled individuals-including prisoners-who take advantage of a public entity's services or programs. *See Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 213, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *Bennett–Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 (5th Cir.2005); 28 C.F.R. § 35.130(b) (7) ("[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity"). An accommodation is considered reasonable if it is sufficient to provide a disabled person "meaningful access to the benefit" offered by a public entity. *See Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

This "reasonable accommodation" theory of discrimination is different from, yet related to, the prima facie case of disability-based discrimination discussed above. Specifically, a plaintiff can satisfy the second and third prongs of the prima facie case of disability discrimination by establishing that the public entity has failed to make reasonable accommodations for a disabled person who uses the services provided by the public entity. *See Garrett v. Thaler,* 560 F. App'x 375, 382 (5th Cir.2014) (holding that a prison's failure to satisfy the reasonable accommodation requirement may constitute a denial of services and intentional discrimination sufficient to satisfy the second and third prongs of the Title II ADA inquiry).

Defendant's summary judgment motion seeks dismissal of Plaintiffs' ADA and RA claims under Fed.R.Civ.P. 56. In its motion, Defendant challenges Plaintiffs to produce three categories of evidence: (A) evidence that Defendant excluded Mr. Borum from participating in, or denied Mr. Borum the benefits of, services, programs, or activities for which Defendant was responsible; (B) evidence that Defendant's actions were motivated by discriminatory animus or ill will;

*A EVIDENCE THAT DEFENDANT EXCLUDED MR. BORUM FROM PARTICIPATING IN OR DENIED MR. BORUM THE BENEFITS OF, SERVICES, PROGRAMS, OR ACTIVITIES FOR WHICH DEFENDANT WAS RESPONSIBLE*

**\*5** To satisfy the second element of the prima facie case of discrimination under Title II of the ADA, a plaintiff must establish that he is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible. *See Melton v. Dall. Area Rapid Transit,* 391 F.3d 669, 671 (5th Cir.2004). The Supreme Court, in a unanimous opinion authored by Justice Scalia, held that confinement in a jail is a program or service under the ADA and RA because "[m]odern prisons provide inmates with many recreational 'activities,' *medical 'services,'* and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be excluded from participation in)." *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (emphasis added); *see also United States v. Georgia,* 546 U.S. 151, 157, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) ( "it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, [and] medical care ... constituted 'exclu[sion] from participation in or ... deni[al of] the benefits of the prison's 'services, programs, or activities' ").

In its partial Motion for Summary Judgment, Defendant asserts that after seven months of discovery "there is no evidence Swisher County excluded Terry Borum from participating in, or denied Terry Borum the benefits of, services, programs, or activities, for which the County was responsible." However, depositions of several Swisher County officials provide ample evidence that Defendant denied Mr. Borum access to both (1) food and (2) medical care while he was confined in the Swisher County jail.

*1. Evidence that Defendant Denied Mr. Borum Access to Food*

First, Plaintiffs produced evidence that Defendant denied Mr. Borum access to basic sustenance for at least three days. Because of Mr. Borum's disfigured face, he used a feeding tube sewn into his stomach to eat. Throughout his confinement, jail officials failed to provide Mr. Borum with the nutritional supplements required by his feeding tube:

"Q: Was anything done to try and buy new [feeding supplements] for Mr. Borum?

A: No, sir."

Pointer Dep. 40:19–21 (App.60). Instead of providing him nutrition through his feeding tube, jail officials periodically fed Mr. Borum a mixture of honey and orange juice:

"Q: And just so I'm clear, the decision to give him honey and orange juice, that was an intentional choice you made?

A: Yes."

Grubb Dep. 114:2–5 (App.40).

"Q: Other than-the honey and orange juice was the major thing that he consumed in the jail; is that fair?

A: To my knowledge, yes, sir."

Irwin Dep. 38:4–7 (App.56).

"Q: Did you tell Sheriff Grubb you were concerned that [Mr. Borum] hadn't eaten anything?

A: Yes, sir"

Irwin Dep. 38:11–13 (App.56).

*2. Evidence that Defendant Denied Mr. Borum Access to Medical Care*

**\*6** Second, Plaintiffs produced evidence that Defendant denied Mr. Borum access to medical care for the severe alcohol withdrawal and DTs he was experiencing. Jail administrators were aware that Mr. Borum was an alcoholic, was experiencing hallucinations, was at risk of injury, and needed medical care:

"Q: Okay. That-that night before, you know, the symptoms, now that you know about alcohol withdrawal and DTs, were pretty severe; correct?

A. Yes."

Sanchez Dep. 158:4–7 (App.12).

2015 WL 327508, 51 NDLR P 80

"Q: Do you agree with Mr. Sanchez that Mr. Borum needed to be placed in another facility for his own medical benefit?

A: Yes."

Grubb Dep. 116:22–25 (App.41).

"Q: And what did you tell Mr. Sanchez?

A: That-that due to [Mr. Borum's] conditions and we were understaffed and not really medically qualified to take care of someone in his condition, that we needed to either transfer him to somewhere else or give him a [personal recognizance] out."

Irwin Dep. 15:17–22 (App.50). "You could obviously tell [Mr. Borum] was a medical risk. I mean, we couldn't-we couldn't take care of him." Pointer Dep. 17:18–20 (App.59).

Despite awareness of this medical risk, Swisher County officials consciously chose not to call a doctor or a hospital because they were concerned about exceeding their limited budget for prison medical care:

"Q: Did you ever ignore something that Mr. Borum needed?

A: Yes.

Q: What'd you ignore?

A: His medical condition."

Sanchez Dep. 217:5–9 (App.17). "We didn't have the manpower, like I said, to send somebody up there every day around the clock. You know, yes, you know, his hospital bills were incurring. We have a budget, you know. I mean, I had to try to keep it within the scope of the budget." Grubb Dep. 56:15–19 (App.32).

"Q: Okay. Similarly, you intentionally chose not to take him to a hospital, correct?

A: Correct.

Q: Intentionally chose not to call a doctor, correct?

A: Correct."

Grubb Dep. 114:12–17 (App.40).

Indeed, Swisher County's only attempt to "treat" Mr. Borum's alcohol withdrawal and DTs involved feeding him honey and orange juice:

"Q: Now, when you were told that Mr. Borum was going through detox, were you aware of anything that was being done for him?

A: Yes.

Q: What was the county doing for Mr. Borum?

A: We were giving him orange juice and honey.

...

Q: You didn't think that was an appropriate medical treatment?

A: No."

Pointer Dep. 42:20–25, 43:23–25 (App.62–63).

The Swisher County jail also did not have anyone on staff with the knowledge required to treat alcohol withdrawal and DTs, or to properly care for disabled prisoners:

"Q: And had-had you arranged for or seen to it that anybody at the jail had any specialized training on this condition known as DTs or delirium tremens?

A: No, sir."

Grubb Dep. 34:6–9 (App.30).

"Q: At any point while you were at Swisher County, do you recall receiving any training about the need to accommodate people's disabilities while at the jail?

*7 A: No, sir, no training."

Grubb Dep. 171:24–25, 172:1–3 (App.45–46).

Defendant asserts that even if it did deny Mr. Borum access to certain services or programs, there is no evidence that it was actually *responsible* for those programs and services. However, providing food and medical care to prisoners is undoubtedly a program or service for which Defendant was responsible. State and county jails have a constitutional obligation under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to "tend to essentials of [prisoners'] well-being," including food and medical care.

*Hare v. City of Corinth,* 74 F.3d 633, 638–39 (5th Cir.1996); *Colle v. Brazos Cnty., Tex.,* 981 F.2d 237, 244 (5th Cir.1993).

Viewing this evidence in the light most favorable to the Plaintiffs, a jury could find that Swisher County was responsible for providing food and medical care to Mr. Borum, yet denied Mr. Borum those services by feeding him nothing more than honey and orange juice for three days and by failing to call a doctor, hospital, or otherwise provide medical care for Mr. Borum when it was clear that he was experiencing severe symptoms of alcohol withdrawal and DTs. Defendant's partial Motion for Summary Judgment is denied as to Defendant's argument that Plaintiffs have failed to put forth evidence showing that Defendant excluded Mr. Borum from participation in, or otherwise denied Mr. Borum benefits, services, programs, or other activities for which Defendant was responsible.

## B. EVIDENCE THAT DEFENDANT'S ACTIONS WERE MOTIVATED BY DISCRIMINATORY ANIMUS OR ILL WILL

To satisfy the third element of the prima facie case of discrimination under Title II of the ADA, a plaintiff must establish that the exclusion, denial of benefits, or discrimination was by reason of plaintiff's disability. *See Melton v. Dall. Area Rapid Transit,* 391 F.3d 669, 671–72 (5th Cir.2004). Courts have universally interpreted this element of an ADA claim to require a showing of intentional discrimination on the part of the defendant. *See, e.g., Delano–Pyle v. Victoria Cnty., Tex.,* 302 F.3d 567, 574 (5th Cir.2002); *Meagley v. City of Little Rock,* 639 F.3d 384, 390 (8th Cir.2011) ("[e]very circuit court to address the issue ... has reaffirmed that intentional discrimination must be shown to recover compensatory damages").

Here, Defendant asserts that there is no evidence that Swisher County's actions were motivated by discriminatory animus or ill will. However, as this Court previously explained in its September 29, 2014 opinion denying Defendant's Motion to Dismiss, neither the Fifth Circuit nor any other circuit court requires a showing of animus or ill will in order to establish intentional discrimination under the ADA. A majority of circuits have held that intentional discrimination can be proved by showing that the defendant acted with deliberate indifference to the strong likelihood of a violation of the ADA or RA. *See, e.g., Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 275 (2d Cir.2009); *A.G. v. Lower Merion*

*Sch. Dist.,* 542 F. App'x 194, 198 (3d Cir.2013); *Meagley,* 639 F.3d at 389; *Duvall v. Cnty. of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.2001); *Barber ex rel. Barber v. Colo. Dep't of Revenue,* 562 F.3d 1222, 1228–29 (10th Cir.2009); *Liese v. Indian River Cnty. Hosp. Dist.,* 701 F.3d 334, 345 (11th Cir.2012). Although the Fifth Circuit has explicitly declined to adopt this widely-accepted deliberate indifference standard for intentional discrimination under the ADA, it has also declined to establish a definition of intentional discrimination that would require a showing of animus or ill will. *See Delano–Pyle v. Victoria Cnty., Tex.,* 302 F.3d 567, 575 (5th Cir.2002); *Frame v. City of Arlington,* 657 F.3d 215, 231 n. 71 (5th Cir.2011). Thus, Plaintiffs are not required to produce evidence that Defendant's actions were motivated by discriminatory animus or ill will in order to satisfy the third element of the prima facie case of disability discrimination.

**\*8** Although Plaintiffs do not have to show discriminatory animus or ill will, they must still come forward with evidence at the summary judgment stage that creates a genuine issue of material fact as to whether Defendant intentionally discriminated against Mr. Borum. The Fifth Circuit has held that a defendant's failure to make reasonable accommodations to the needs of disabled persons can constitute intentional discrimination under the ADA and RA. *See Melton v. D all. Area Rapid Transit,* 391 F.3d 669, 672 (5th Cir.2004); *Garrett v. Thaler,* 560 F. App'x 375, 382 (5th Cir.2014) (holding that a prison's failure to provide reasonable accommodations to disabled inmates may constitute intentional discrimination sufficient to satisfy the second and third prongs of the Title II ADA inquiry); *see also Tennessee v. Lane,* 541 U.S. 509, 531, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (noting that Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion").

Here, Plaintiffs have introduced evidence sufficient to create a genuine issue of material fact as to whether Defendant failed to make reasonable accommodations for Mr. Borum-thus discriminating against him by reason of his disability under the third prong of the Title II ADA inquiry. Because a discussion of the evidence establishing Defendant's failure to make reasonable accommodations is presented in section (C), *infra,* the Court will not repeat that analysis here. Defendant's partial Motion for Summary Judgment is denied as to Defendant's argument that Plaintiffs have failed to put forth evidence showing that Defendant's actions were motivated by discriminatory animus or ill will.

2015 WL 327508, 51 NDLR P 80

## C. EVIDENCE THAT DEFENDANT REFUSED TO PROVIDE MR. BORUM AN ACCOMMODATION

Under the "reasonable accommodation" theory of disability-based discrimination, Title II of the ADA imposes an affirmative obligation on public entities to make reasonable accommodations for disabled individuals who utilize their services or programs. *See Tennessee v. Lane,* 541 U.S. 509, 531–32, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); *Bennett–Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 (5th Cir.2005). A public entity's failure to abide by this reasonable accommodation obligation may constitute a denial of services and intentional discrimination sufficient to satisfy the second and third prongs of the prima facie case of discrimination under the ADA. *See Garrett v. Thaler,* 560 F. App'x 375, 382 (5th Cir.2014). This principle has been extended to ADA claims in the prison context, where the "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCoy v. Tex. Dep't of Criminal Justice,* C.A. No. C–05–370, 2006 WL 2331055, at *7 (S.D.Tex. Aug.9, 2006). The reasonable accommodation obligation arises when the defendant (1) knows of the individual's disability and (2) knows of the physical or mental limitations resulting from the disability. *See Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir.1999). An accommodation is considered reasonable when it is sufficient to provide a disabled person "meaningful access to the benefit" offered by a public entity. *See Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

**\*9** Here, Defendant argues that "there is no evidence Swisher County failed or refused to provide Terry Borum an accommodation due to disability." Defendant also argues that to survive summary judgment, Plaintiffs must "identify accommodations that were already available and not made for Terry Borum." In support of this argument, Defendant cites *Douglas v. Gusman,* 567 F.Supp.2d 877, 889 (E.D.La.2008) and *Owens v. O'Dea,* No. 97–5517, 1998 WL 344063, at *3 (6th Cir. May 27, 1998).

In *Douglas,* the court adopted a report and recommendation from a magistrate judge, which held that Title II "does not ... create a right for a disabled inmate to demand that the prison implement a specific type of service, program, or activity that

is not already available." *Douglas,* 567 F.Supp.2d at 889.[1] And in *Owens,* the Sixth Circuit held that Title II of the ADA requires " 'reasonable modifications' to public services and programs that discriminate on the basis of disability." *Owens,* 1998 WL 344063, at *3. Contrary to Defendant's argument, these cases do not support the proposition that Plaintiffs must "identify accommodations that were already available" for other inmates. *Douglas* merely holds that the ADA does not require prisons to provide *new* services or programs for a disabled prisoner. *Douglas,* 567 F.Supp.2d at 889. But, as the Sixth Circuit made clear in *Owens,* public entities do have an affirmative obligation to make reasonable modifications or accommodations so that a disabled prisoner can have meaningful access to *existing* public services or programs. *Owens,* 1998 WL 344063, at *3; *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

As discussed in section (A), *supra,* Plaintiffs have produced sufficient evidence to create a genuine issue of material fact as to whether Defendant refused to provide Mr. Borum with a reasonable "accommodation" or "modification" that would allow Mr. Borum to access two *existing* public services or programs: prison food services and prison medical care. **First,** Plaintiffs presented evidence that Defendant knew of Mr. Borum's disability and the physical and mental limitations resulting from that disability. *See Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir.1999). Deposition testimony indicates that jail officials were aware of Mr. Borum's unique feeding requirements-including a feeding tube and special nutritional supplements. Jail officials were also aware that Mr. Borum was suffering from substantial medical problems during his detention-including severe alcohol withdrawal, DTs, and hallucinations. And Sheriff Grubb was aware that people suffering from alcohol withdrawal, like Mr. Borum, might "stumble and hurt themselves." Grubb Dep. 113:23 (App.39).

**Second,** deposition testimony indicates that Defendant failed to provide Mr. Borum with a reasonable accommodation or modification that would give him meaningful access to food and medical care. *See Alexander,* 469 U.S. at 301. Defendant failed to provide Mr. Borum with the nutritional supplements required by his feeding tube and instead fed him nothing but honey and orange juice for three days. Defendant also failed to call a doctor, hospital, or otherwise provide medical care to Mr. Borum despite full awareness of Mr. Borum's urgent need for medical attention.

**\*10** Viewing this evidence in the light most favorable to the Plaintiffs, a jury could find that Swisher County refused to provide Mr. Borum with a reasonable accommodation for his disabilities. Defendant's partial Motion for Summary Judgment is denied as to Defendant's argument that Plaintiffs have failed to put forth evidence showing that Defendant refused to provide Mr. Borum with a reasonable accommodation.

### CONCLUSION

Defendant's *Partial No Evidence Motion for Summary Judgment* is DENIED.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 327508, 51 NDLR P 80

Footnotes

1    The court in *Douglas* also held that "Title II does not require a prison to make reasonable accommodations for inmates with disabilities." *Douglas,* 567 F.Supp.2d at 889. However, the Fifth Circuit has clearly held that the ADA'S reasonable accommodation theory *does* apply in the prison context. *See Garrett v. Thaler,* 560 F. App'x 375, 382 (5th Cir.2014) ("Title II imposes an obligation on public entities to make reasonable accommodations or modifications for disabled persons, including prisoners"); *see also McCoy v. Tex. Dep't of Criminal Justice,* C.A. No. C–05–370, 2006 WL 2331055, at \*7 (S.D.Tex. Aug.9, 2006).

---

**End of Document**                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

569 Fed.Appx. 252
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Cynthia CARDENAS, Individually, and as Next
Friend for A.C. and N.C.; Andres Cardenas;
Sabina Cardenas, Plaintiffs–Appellants

v.

LEE COUNTY, TEXAS, Defendant–Appellee.

No. 13–50631.
|
May 28, 2014.

**Synopsis**
**Background:** Wife of inmate who died from multiple drug
toxicity brought § 1983 action against county, as well as state
wrongful death claims. The United States District Court for
the Western District of Texas granted summary judgment to
county. Wife appealed.

**Holdings:** The Court of Appeals held that:

[1] wife failed to establish deliberate indifference claim based
on a single episode;

[2] wife failed to establish that county had a policy of
denying medical care to inmates, so as to support deliberate
indifference claim;

[3] wife failed to establish that county provided inadequate
training in how to deal with medical emergencies in violation
of inmate's constitutional rights; and

[4] trial court's refusal to impose sanction for alleged
discovery violation was not an abuse of discretion.

Affirmed.

**Attorneys and Law Firms**

**\*253** Lloyd H. Robles, Esq., Robles & Associates, Austin,
TX, for Plaintiffs–Appellants.

Jason Eric Magee, Allison, Bass & Associates, L.L.P., Austin,
TX, for Defendant–Appellee.

Appeal from the United States District Court for the Western
District of Texas, USDC No. 1:12–CV–85.

Before JOLLY, GARZA, and HIGGINSON, Circuit Judges.

**Opinion**

PER CURIAM: [*]

Cynthia Cardenas appeals the district court's granting of
summary judgment to the defendant, Lee County (the
"County"), on Cardenas's 42 U.S.C. § 1983 and state
wrongful death claims. Cardenas alleges that the County
violated the constitutional rights of her deceased husband,
Cesar Cardenas ("Cesar"), by either denying him medical
care, maintaining a policy of denying medical care to inmates,
or by failing to adequately train prison guards in the provision
of emergency medical care. Cardenas also argues that the
district court erred in granting summary judgment before the
County had produced responsive documents. Because taking
the evidence in the light most favorable to Cardenas, she
cannot prove her claims, we **\*254** AFFIRM the judgment of
the district court.

I.

Cesar was placed in the custody of the Lee County Sheriff's
Office in November 2011. On December 3, he became ill and
was transported to a nearby hospital, but was subsequently
returned to the jail. Two days later, Cesar fell ill again. A
prison officer took Cesar's blood pressure and pulse, and both
were elevated. The officer also noted that Cesar was shaking.
No further action was taken at that time, except that the
incoming prison officers were told to keep an eye on Cesar's
condition. At some point during the night, the prison officers
were informed by Cesar's cellmates that Cesar had vomited
a white substance into the cell toilet. The officials checked
on Cesar again near midnight, but they were unable to wake
Cesar and thus did not check his vital signs. Cesar was not
checked on again until the next morning, around 6:00 a.m.,

when Cesar was found dead in his cell. [1] An autopsy revealed that Cesar had died of multiple drug toxicity.

Cardenas filed suit against the County on behalf of herself and her minor children. In the district court, Cardenas, in support of her claim that the County had a policy and practice of denying medical care to its prisoners, introduced the affidavit of another inmate, Michael Sanders. In his affidavit, Sanders indicated that he had been an inmate in the Lee County jail. During his time in custody, he became ill, and a prison officer summoned an ambulance to take Sanders to the hospital. When the ambulance arrived, Sanders states that Lee County Sheriff Rodney Meyer ("Sheriff Meyer") turned it away because he believed that Sanders was faking his illness. Cardenas argues that these two incidents—the turning away of the ambulance for Sanders and the failure to summon medical care for Cesar—are evidence of a policy of denying medical care to inmates.

The district court granted summary judgment to the County. The district court held that, even taking Sanders's affidavit as completely true, these two incidents could not support Cardenas's claim of a County policy because they were isolated incidents as evidenced by both Sanders and Cesar receiving medical care during their time in the County jail. The district court held that the failure to get timely medical care in these cases was a failure in judgment as opposed to a policy of denying medical care. The district court also rejected Cardenas's failure-to-train theory. After recognizing that the County's medical care training was inadequate, the district court nonetheless held that under the high standard the Supreme Court has imposed for failure-to-train liability, Cardenas could not recover. The district court accordingly granted summary judgment to the County and entered final judgment in the County's favor.

Cardenas now appeals arguing that the district court was incorrect on the merits, and that the district court should not have granted summary judgment because the County had failed to produce records related to the Sanders incident despite Cardenas's request for their production.

## II.

We review a grant of summary judgment de novo. **\*255** *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir.2013). Summary judgment is improper if there is a genuine dispute of material fact such that a reasonable jury could return a verdict for the nonmoving party. *Id.* At the summary judgment stage, we view the evidence in the light most favorable to the nonmoving party—Cardenas. *Id.; see also Tolan v. Cotton,* —— U.S. ——, 134 S.Ct. 1861, 1863, 188 L.Ed.2d 895 (2014) (per curiam) ("[Courts must] adhere to the axiom that in ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' ").

Cardenas attempts to demonstrate a § 1983 violation by the County in three alternative ways: (1) showing that prison officials were deliberately indifferent to Cesar's medical needs in this single individual case; (2) demonstrating that the County had a policy or custom of denying medical care to prisoners; or (3) demonstrating that the County's training for prison officials was inadequate. To establish liability for the County, Cardenas must satisfy the "high standard of proof" that this court requires for imposing liability on a municipality. *Snyder v. Trepagnier,* 142 F.3d 791, 796 (5th Cir.1998). We now turn to address whether Cardenas has satisfied this standard with respect to any of these theories.

### A.

Cardenas first argues that the County was deliberately indifferent to Cesar's medical needs specifically on the night he died, and that the County directly, by this single incident, violated Cesar's constitutional rights. *See Thompson v. Upshur Cnty., Tex.,* 245 F.3d 447, 457 (5th Cir.2001) ( "[P]retrial detainees have a constitutional right ... not to have their serious medical needs met with deliberate indifference on the part of the confining officials."). To establish deliberate indifference against a County or other municipality based on a single episode, Cardenas must show that a prison officer was aware of facts from which an inference of substantial risk of harm could be drawn, the officer drew that inference, and the officer subjectively intended that harm occur. *Id.* at 458–59.

**[1]** Before the district court, Cardenas conceded that no prison officer had subjective knowledge of a substantial risk of harm to Cesar. Specifically, Cardenas "[did] not deny that a jail or detention official did not have subjective knowledge of the substantial risk of serious harm to [Cesar]...." Accordingly, Cardenas cannot establish deliberate indifference based on a single episode; the district court was correct to dismiss Cardenas's claims based on this theory.

B.

Cardenas next attempts to show that Cesar's death was a result of a County policy of denying medical care to inmates. This policy can be an (1) express policy of violating the Constitution, (2) a widespread practice or custom—even if that custom has not received formal approval by an official decision-making body—or (3) a decision by an individual with express policy-making authority. *Monell v. Dept. of Social Services of N.Y.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). We now look at each of these possibilities.

1.

 **[2]**  It is immediately clear that Cardenas cannot establish that the County has an express policy of refusing medical care to inmates. Just the opposite is true.  **\*256**  The County policy is that "[e]mergency medical care is available twenty-four (24) hours a day." If an emergency exists, the prisoner is to be transported to a local hospital via ambulance. Thus, Cardenas cannot establish that the County has an express policy of denying medical care to inmates.

2.

Cardenas next argues that, despite the express policy to the contrary, the County has a widespread custom amounting to a policy of denying medical care to inmates. *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018 (recognizing that a municipality may be liable for deprivations caused by a government custom "even though such a custom has not received formal approval through the body's official decisionmaking channels"). For support, Cardenas points to the circumstances surrounding Cesar's death, as well as the affidavit of Sanders.

In his affidavit, Sanders states that while he was in the custody of the County, he became ill. After one prison officer summoned an ambulance, Sheriff Meyer turned the ambulance away. As a result, Sanders was not taken to the hospital until the following day; he required emergency surgery and a lengthy hospital stay. Cardenas argues that this denial of timely medical care to Sanders, combined with the similar circumstances surrounding Cesar's death—i.e. the failure to procure timely medical care for Cesar—indicate that

the County has a custom or policy of denying medical care to inmates.

 **[3]**  Even taking all of Cardenas's claims as true, there is not sufficient evidence to demonstrate that the County had a custom of denying medical care. The undisputed facts indicate the opposite. Both Sanders and Cesar *did* receive medical care during their time in County custody. Sanders was taken to the hospital the day after the ambulance was turned away by Sheriff Meyer. Cesar was taken to the hospital several days prior to his death. Thus, in both cases, the prisoners received medical care. That they received it either too early or too late may indicate, as the district court suggested, a failure in judgment by the prison officials. These two isolated failures in judgment cannot, however, establish a custom or policy of denying medical care to inmates. *See, e.g., Arshad v. Congemi,* No. 08–30061, ——Fed.Appx. ——, ——, 2009 WL 585633, *8 (5th Cir. Mar. 9, 2009) (unpublished) (dismissing *Monell* claim for failure to show a "custom" where plaintiffs "point to only one similar previous incident").

3.

Cardenas next argues that Cesar's constitutional deprivation was caused by the decision of an individual with express policy-making authority: Sheriff Meyer. *See Pembaur,* 475 U.S. at 481–83, 106 S.Ct. 1292. Cardenas to some extent conflates this theory with the custom or policy theory from above. Cardenas alleges that by turning the ambulance away in Sanders's case, Sheriff Meyer created a policy or custom of denying medical care to inmates. As discussed above, the two isolated incidents are not enough to establish a policy or custom. Similarly, Cardenas's argument on this theory fails because Cardenas does not allege that Sheriff Meyer himself had any part in the denial of medical care to Cesar.

 **[4]**  Here, taking Cardenas's allegations as true, Sheriff Meyer made a decision in Sanders's case to take a particular course of action. And although, under *Pembaur,* that could be interpreted as "an act of official government policy" in Sanders's case, it does not support Cardenas's claim because Sheriff Meyer was not involved in Cesar's case. *See*  **\*257**  *Thompson,* 245 F.3d at 459 (recognizing that a sheriff "not personally involved in the acts that deprived the plaintiff of his constitutional rights" is liable under § 1983 only under a failure-to-train theory). Thus, Cardenas cannot establish that

Cesar's alleged constitutional injury was caused by an official with policy-making authority.

#### C.

Finally, Cardenas argues that she can recover under § 1983 based on the County's inadequate training of prison officials. In short, Cardenas alleges that the County provided inadequate training in how to deal with medical emergencies, and this failure led to Cesar's death.

In determining municipal liability based on inadequate training, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Establishing municipal liability for a failure to train is a difficult task. *See Connick v. Thompson,* ––– U.S. ––––, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). Cardenas must establish that the County's failure to train was deliberately indifferent to the constitutional rights of inmates. *Id.*

#### 1.

Establishing deliberate indifference generally requires a showing that the municipality failed to change its training methods in the face of several incidents in which the training methods caused constitutional deprivations. *Cousin v. Small,* 325 F.3d 627, 637 (5th Cir.2003); *Connick,* 131 S.Ct. at 1360 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failures to train.").

 **[5]**    Here, Cardenas again relies on the cases of Cesar and Sanders and alleges that these two occurrences demonstrate the inadequacy of the County's training methods. Cardenas cannot clear the high bar that exists for establishing a failure to train by pointing only to these two claims. These claims undoubtedly represent a small proportion of the inmates that the County has held over the relevant time period. Additionally, these events are contrasted by the times that these exact two inmates did receive medical care while in County custody. Thus, these facts cannot establish the "pattern of similar constitutional violations by untrained employees" that is necessary to demonstrate deliberate

indifference on the part of the County. *Connick,* 131 S.Ct. at 1360.

#### 2.

It is also possible, in limited circumstances, to establish a failure-to-train claim based on a single incident. *See id.* at 1361 (recognizing that the Court has left open the possibility of failure-to-train liability based on a single incident when the unconstitutional consequences of the failure are "patently obvious"). In *Harris,* the Supreme Court provided an example of a training failure that would be "so obvious" to support liability based on a single incident:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as **\*258** "deliberate indifference" to constitutional rights.

489 U.S. at 390 & n. 10, 109 S.Ct. 1197 (internal citation omitted). The Supreme Court has subsequently made clear that this language applies to a narrow set of cases. *Connick,* 131 S.Ct. at 1366 ("We conclude that this case does not fall within the narrow range of 'single-incident' liability....").

 **[6]**    The district court stated that the County's training "is inadequate by any reasonable measure." Although the County disputes this characterization, we see no need to pass judgment on the County's training program. Even assuming that the training is inadequate, a constitutional violation via inadequate training was not "so obvious" as to establish liability. Cardenas needed to demonstrate that, absent further training, it was "highly predictable" that prison officials would be "confounded" by decisions about whether to summon emergency medical care. *See id.* at 1365. Cardenas had to demonstrate that this was "so predictable that failing to train the [prison officials] amounted to *conscious disregard* " for a prisoner's right to medical care. *Id.* (emphasis in original). Cardenas did not satisfy this burden.

In sum, the Supreme Court has made clear that failure-to-train liability for municipalities is only appropriate in the most egregiously apparent cases. Even accepting that the district court was correct that the County's training was inadequate, this case does not fit within that narrow band of circumstances where a failure to train is so obvious as to result in liability. [2]

III.

[7]     Finally, Cardenas argues that the district court erred in granting summary judgment to the County in the light of the County's failure to produce responsive documents related to Sanders's incarceration and affidavit. The district court rejected this request for production as well as Cardenas's motion for sanctions for spoliation of evidence. We review this decision on a discovery motion for abuse of discretion. *Turnage v. Gen. Elec. Co.,* 953 F.2d 206, 208 (5th Cir.1992).

[8]     We hold that the district court did not abuse its discretion in refusing to sanction the County and in granting summary judgment despite Cardenas's discovery complaints. Cardenas has not shown that she was prejudiced by any failure to produce evidence. *See Marshall v. Norwood,* 741 F.2d 761, 764 (5th Cir.1984). At this stage in the proceedings, we take Sanders's affidavit as wholly true, so it is unclear what would be added to Cardenas's case by evidence that merely

affirms the affidavit. Thus, we cannot say that the district court abused its discretion in denying this discovery motion. *See Greer v. Bramhall,* 77 Fed.Appx. 254, 255 (5th Cir.2003) (unpublished) ("As Greer suffered no prejudice, Greer has not shown that the district court abused its discretion....").

IV.

In this opinion, we hold that Cardenas has not established that the County violated § 1983. Specifically, the evidence, taken in the light most favorable to Cardenas, does not create an issue of material fact as to whether the County was deliberately indifferent to Cesar's medical needs, whether Cesar's deprivation was a result of a County policy, or whether the deprivation resulted from inadequate **\*259** training. Similarly, the district court did not abuse its discretion in denying Cardenas's discovery motion presented in Cardenas's response to the County's motion for summary judgment. The judgment of the district court is therefore

AFFIRMED.

**All Citations**

569 Fed.Appx. 252

Footnotes

*        Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1        As noted by the district court, the County argues that the prison officials visually checked on Cesar throughout the night. Consistent with taking the facts in the light most favorable to Cardenas at the summary judgment stage, we ignore this argument.

2        Cardenas also brought a state law survivorship action. This allows for an individual's § 1983 claim to survive to his heirs. As we have held that there is no viable § 1983 claim, the district court was correct in dismissing the state law survivorship claim.

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:14-cv-03253 Document 285-2 Filed on 06/17/16 in TXSD Page 127 of 149
McCoy v. Texas Dept. of Criminal Justice, Not Reported in F.Supp.2d (2006)
2006 WL 2331055

2006 WL 2331055
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Corpus Christi Division.

L.J. McCOY and Antonio V. Thompson, Plaintiffs,
v.
TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, et al, Defendants.

C.A. No. C-05-370.
|
Aug. 9, 2006.

**Attorneys and Law Firms**

James C. Harrington, Attorney at Law, Scott Medlock, Sheri Joy Nasya Tolliver, Wayne Nicholas Krause, Texas Civil Rights Project, Austin, TX, for Plaintiffs.

Kim J. Coogan, Lindsay Ayres Todd, Office of the Atty. Gen. of Texas, Capitol Station, Craig H. Russell, Assistant Atty. Gen., General Litigation Div., Capitol Station, Austin, TX, for Defendants.

*ORDER DENYING PLAINTIFFS' AND DEFENDANT'S CROSS-MOTIONS FOR SUMMARY JUDGMENT*

JANIS GRAHAM JACK, District Judge.

**\*1** On this day came on to be considered Defendant Texas Department of Criminal Justice's "Motion for Summary Judgment on Plaintiffs' Americans with Disabilities Act and Rehabilitation Act Claims" (D.E.47), and Plaintiffs' "Motion for Partial Summary Judgment Against TDCJ on ADA and Rehabilitation Act Claims" (D.E.88, 90). For the reasons discussed below, the Court DENIES both Plaintiffs' and Defendant's motions for summary judgment.

**I. JURISDICTION**

The Court has federal question jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331.

**II. BACKGROUND**

On July 27, 2005, Plaintiffs L.J. McCoy and Antonio Thompson (collectively "Plaintiffs") filed suit in this Court against the Texas Department of Criminal Justice ("TDCJ"), TDCJ's executive director Brad Livingston, and several individual TDCJ officers and employees. (D.E.1, 8, 17, 31.) Plaintiffs sued on behalf of Micah Burrell, deceased, alleging that Defendants caused Burrell's death and violated his rights under the Eighth Amendment, the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and Chapter 121 of the Texas Human Resources Code.[1] (Pls.' Sec. Am. Compl. ("SAC") at ¶¶ 1-9.) On April 14, 2006, TDCJ filed a Motion for Summary Judgment on Plaintiffs' ADA and Rehabilitation Act claims (D.E.47), to which Plaintiffs filed a response (D.E.64). On July 14, 2006, Plaintiffs filed a Motion for Partial Summary Judgment against TDCJ on these same claims. (D.E.88, 90.) The following facts are not in dispute:

In August 2004, Micah Burrell ("Burrell") was a prisoner in the custody of Defendant TDCJ and incarcerated in "Administrative Segregation" at the McConnell Unit in Beeville, Texas. (Pls.' Ex. ("PE") 1 at ¶ 5; Q at 1.)[2] Burrell suffered from asthma and, on August 1, 2004, he experienced an asthma attack in his cell. (*See* PE H at 1; M at ¶¶ 2-3; Def.'s Ex. ("DE1") D at 1-3.)[3] Several inmates in neighboring cells began to yell to the prison guards for help. (PE M at ¶¶ 3-4; O at ¶ 3.) Officer Juan Benavides eventually arrived at Burrell's cell and Burrell informed him that he was having an asthma attack. (PE 14 at 20; M at ¶ 4; O at ¶ 4.) Officer Benavides then instructed other guards to call for a supervisor. (PE 14 at 22; 15 at 1.) At some point, medical help was also summoned. (*See* PE 15 at 1.) By the time Lt. Annmarie De La Rosa and Nurse Rhonda Cubbage arrived at the cell, Burrell was lying on his bunk and not responding to verbal calls from the officers. (*See* PE P at 1-2; Q at 1-2; DE2 C at 39-41; D at 54.) Upon opening the cell door, the officers restrained Burrell and transported him to the prison medical center by stretcher. (PE Q at 1.) At the prison medical center, Burrell was not breathing and did not have a pulse. (PE Q at 1; R.) An ambulance was called and transported Burrell to Christus Spohn Hospital in Bee County, Texas, where he was pronounced dead. (PE Q at 1-2; R.) An autopsy conducted by Pathologist Gerald A. Campbell concluded that "the immediate cause of death ... [was] respiratory failure secondary to a combination of asthmatic episode and aspiration of gastric material." (PE Q at 3.)

**III. DISCUSSION**

**A. Summary Judgment Standard**

McCoy v. Texas Dept. of Criminal Justice, Not Reported in F.Supp.2d (2006)
2006 WL 2331055

**\*2** Federal Rule of Civil Procedure 56 states that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The substantive law identifies which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 189 (5th Cir.1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *Judwin Props., Inc. v. U.S. Fire Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1046-47 (5th Cir.1996). If the movant bears the burden of proof on a claim or defense on which she is moving for summary judgment, she must come forward with evidence that establishes "beyond peradventure *all* the essential elements of the claim or defense to warrant judgment in [her] favor." *See, e.g., Fontenot v. UpJohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis in original). If, however, the nonmovant bears the burden of proof on a claim, the moving party may discharge her burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex Corp.,* 477 U.S. at 325; *see also Ocean Energy II, Inc. v. Alexander & Alexander, Inc.,* 868 F.2d 740, 747 (5th Cir.1989).

Once the moving party has carried her burden, the nonmovant "may not rest upon the mere allegations or denials of [her] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 270 (1968); *see also Schaefer v. Gulf Coast Reg'l Blood Ctr.,* 10 F.3d 327, 330 (5th Cir.1994) (stating that nonmoving party must "produce affirmative and specific facts" demonstrating a genuine issue). The nonmovant's burden is not satisfied by conclusory allegations, unsubstantiated assertions, or some metaphysical doubt as to the material facts. *Willis v. Roche Biomedical Labs., Inc.,* 61 F.3d 313, 315 (5th Cir.1995); *see also Brown v. Houston,* 337 F.3d 539, 541 (5th Cir.2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment"). Similarly, the "mere existence of a scintilla of evidence in support of

the [nonmovant's] position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for [that party]." *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 215 (5th Cir.1998) (internal quotes omitted).

**\*3** When the parties have submitted evidence of conflicting facts, however, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Willis,* 61 F.3d at 315. Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the nonmoving party, no reasonable jury could return a verdict for that party. *See, e.g., Rubinstein v. Adm'rs of the Tulane Educ. Fund,* 218 F.3d 392, 399 (5th Cir.2000). "That the movant appears more likely to prevail at trial is no reason to grant summary judgment; it is not the province of the court on a motion for summary judgment to weigh the evidence, assess its probative value, or decide factual issues." *Byrd v. Roadway Exp., Inc.,* 687 F.2d 85, 87 (5th Cir.1982); *Aubrey v. Sch. Bd. of Lafayette,* 92 F.3d 316, 318 (5th Cir.1996). If, however, the nonmovant's "evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50.

**B. Defendant TDCJ's Motion for Summary Judgment**
According to TDCJ, its motion for summary judgment raises only three discrete issues for consideration by this Court. (Def.'s Reply ("Reply") at 2.) First, TDCJ claims that it is entitled to immunity from Plaintiffs' claims under § 504 of the Rehabilitation Act ("RA") and Title II of the Americans with Disabilities Act ("ADA"). (*Id.;* Def.'s Mot. for Sum. Judg. ("DMSJ") at 4-6, 10-13.) Second, TDCJ claims that Plaintiffs do not have "standing" to assert Burrell's rights under the ADA and RA. (DMSJ at 3.) Finally, TDCJ argues that Plaintiffs' claims under the ADA and RA cannot succeed because Burrell did not "request an accommodation" for his disability from TDCJ. (Reply at 2; DMSJ at 8-10.) The Court will discuss each of TDCJ's three arguments in turn.

**1. Sovereign Immunity**
Defendant TDCJ claims that summary judgment is appropriate in this case because its "Eleventh Amendment immunity has not been abrogated." (DMSJ at 2.) The doctrine of sovereign immunity "bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity." *See, e.g., Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 326 (5th Cir.2002); *Kimel v.*

2006 WL 2331055

*Florida Bd. of Regents,* 528 U.S. 62, 72-73 (2000) (stating that "for over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States"); *Bd. of Trustees of Univ. of Alabama v. Garrett,* 531 U .S. 356, 363 (2001) (stating that "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court"). Congress, however, has the power to "single-handedly strip the states of their Eleventh Amendment immunity and thereby authorize federal court suits by individuals against the states." *Pace v. Bogalusa City School Bd .,* 403 F.3d 272, 277 (5th Cir.2005). "When Congress does this, it is exercising its power to abrogate Eleventh Amendment immunity." *Id.* In addition to Congress' power to abrogate immunity, a state can also be sued if it has "waive[d] its Eleventh Amendment protection and allow[ed] a federal court to hear and decide a case" by consent. *See Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997). In this case, it is undisputed that TDCJ is an arm of the State of Texas and can assert sovereign immunity as a defense from suit. *Sherwinski v. Peterson,* 98 F.3d 849, 851 (5th Cir.1996). Therefore, the only remaining question is whether Congress has abrogated TDCJ' s immunity, or whether TDCJ has consented to suit under the ADA and RA.

### a. Rehabilitation Act Claim

**\*4** With respect to Plaintiffs' claim under the RA, it is clear that TDCJ is not entitled to sovereign immunity. As this Court noted in a previous order (D.E.23), § 504 of the RA prohibits discrimination against qualified individuals with disabilities by recipients of federal financial assistance. 29 U.S.C. § 794 *et seq.* Pursuant to 42 U.S.C. § 2000d-7, States and public entities receiving federal financial assistance *specifically waive* their Eleventh Amendment immunity from claims under § 504 of the RA:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

*Id.* at (a)(1). That is, a state, or state agency, consents to be sued under the RA when it accepts federal funds. *See Miller v. Texas Tech Univ. Health Scis. Ctr.,* 421 F.3d 342

(5th Cir.2005) (en banc); *Bennett-Nelson v. Louisiana Bd. of Regents,* 431 F.3d 448, 453 (5th Cir.2005) (finding that a state entity's "receipt of federal education funds constituted a knowing and voluntary waiver of sovereign immunity as to claims under § 504 [of the RA]"); *Pace,* 403 F.3d at 282 (5th Cir.2005) (en banc) (stating that § 2000d-7 "clearly, unambiguously, and unequivocally conditions receipt of federal funds ... on the State's waiver of Eleventh Amendment Immunity"); *Thomas v. Univ. of Houston,* 2005 WL 2902207 (5th Cir. Nov. 4, 2005) (unpublished); *Espinoza v. Texas Dept. of Public Safety,* 2005 WL 2044547 (5th Cir. Aug., 25, 2005) (unpublished). In this case, Plaintiff has provided the Court with evidence that TDCJ is a recipient of federal financial assistance, and TDCJ does not dispute this fact in its Motion for Summary Judgment. (PE 1 at ¶ 9; SAC at ¶ 20; *see also* DMSJ at 3-6.) Therefore, TDCJ is not entitled to immunity on Plaintiffs' Rehabilitation Act claim.

### b. Americans With Disabilities Act Claim

Although TDCJ does not contest that it has waived its immunity from Plaintiffs' RA claim, TDCJ does maintain that it is entitled to immunity on Plaintiffs' claim under Title II of the ADA. Plaintiffs, on the other hand, argue that summary judgment is inappropriate on this ground because Congress has abrogated TDCJ's immunity from claims under the ADA. (Pls.' Resp. at 10.)

In this case, however, it is unnecessary to decide whether TDCJ is entitled to immunity from Plaintiff's ADA claim because the Fifth Circuit has held that Plaintiffs' ADA claim is identical to, and duplicative of, their RA claim. *See Bennett-Nelson v. Louisiana Bd. of Regents,* 431 F.3d 448, 455 (5th Cir.2005). In *Bennet-Nelson,* the Fifth Circuit addressed a case where, as here, several plaintiffs brought claims under both the RA and ADA, alleging that the defendant, a university, had failed to provide them "reasonable accommodations" as required by the two Acts. *Id* . at 450, 455. After determining that the defendant had "waived its immunity from suit under § 504 of the Rehabilitation Act by accepting federal funding," the *Bennet-Nelson* court turned to the question of whether Congress had validly abrogated defendant's immunity under the ADA. *Id.* at 449, 453-54. The court concluded that "[b]ecause Louisiana has waived its sovereign immunity from actions under § 504 of the Rehabilitation Act, we need not address that question today." *Id.* at 454. The court explained that "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Id.; see also Pace,* 403 F.3d at 287;

Case 4:14-cv-03253 Document 285-2 Filed on 06/17/16 in TXSD Page 130 of 149
McCoy v. Texas Dept. of Criminal Justice, Not Reported in F.Supp.2d (2006)
2006 WL 2331055

*Hainze v. Richards,* 207 F.3d 795, 799 (5th Cir.2000) (stating that the "language of Title II generally tracks the language of Section 504 ... and Congress' intent was that Title II ... work in the same manner as Section 504"); *see also* 42 U.S.C. § 12133 (stating that the "remedies, procedures, and rights" of Title II of the ADA are the same as those set forth in the Rehabilitation Act).

**\*5** As the *Bennett-Nelson* court noted, "[t]he only material difference between the two [statutes] lies in their respective causation requirements." *Bennett-Nelson,* 431 F.3d at 454. The court held, however, that this difference between the statutes is "immaterial" where the plaintiff's claim is based on the defendant's alleged-failure "to make reasonable accommodations for disabled individuals" because "[w]here a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant ." *Id.* at 454-55. The court elaborated:

> In the instant case, there is no question that the complaint claims the University's failure to provide the demanded accommodations is the sole cause of the alleged denial of benefits to the plaintiffs. That is to say, the plaintiffs claim that they were excluded from participation in their classes precisely to the extent that they were not accommodated with interpreters or note takers. The question here is not whether or to what extent the plaintiffs suffer a disability under the ADA; nor is the question whether the denial of the accommodation to that disability was caused solely or only in part by the animus of the defendants. The question is whether the failure to accommodate the disability violates the ADA; and the existence of a violation depends on whether, under both the Rehabilitation Act and the ADA, the demanded accommodation is in fact reasonable and therefore required. If the accommodation is required the defendants are liable simply by denying it. In short, causation is not the issue in the appeal presented today.

*Id.* at 455. Therefore, the *Bennett-Nelson* court concluded that, "having already held that sovereign immunity does not bar the appellants' claim under § 504, we need not address at this juncture the issue of abrogation under Title II of the ADA, because the rights and remedies under either are the same for purposes of this case." *Id.*

The holding of *Bennett-Nelson* applies with equal force to the instant case. As in *Bennett-Nelson,* Plaintiffs here are alleging that TDCJ violated the ADA and RA solely by "refus[ing] to reasonably accommodate Mr. Burrell's disability" in a number of ways. (SAC at ¶¶ 23-25; Pls.' Mot. Sum. Judg. ("PMSJ") at 1-2 .) Where a claim is based on the failure to provide reasonable accommodations, the ADA and RA are identical in scope. Therefore, the question of whether Congress has abrogated TDCJ's immunity from Plaintiffs' ADA claim is moot. Accordingly, Defendant TDCJ's motion for summary judgment based on immunity is DENIED.

**2. Standing**

Defendant TDCJ claims that summary judgment is also appropriate because Plaintiffs L.J. McCoy and Antonio Thompson do not have "standing" to bring this action for the alleged-violation of Burrell's rights under the ADA and RA. (DMSJ at 3; *see also* D.E. 77.) [4] In support of its argument, TDCJ cites 42 U.S.C. § 1988, which incorporates state law "to fill the gaps in administration of civil rights suits" so long as state law is "not inconsistent with the Constitution and laws of the United States." *See Pluet v. Frasier,* 355 F.3d 381, 383 (5th Cir.2004); 42 U.S.C. § 1988(a). If 42 U.S.C. § 1988 applies, then "a party must have standing under the [Texas] state wrongful death or survival statutes" in order to bring a claim asserting the rights of a deceased person. *See Pluet,* 355 F.3d at 383-84; *see also Rhyne v. Henderson County,* 973 F.2d 386, 390-91 (5th Cir.1992) (finding that standing under Texas wrongful death and survival statutes is incorporated into the Federal Civil Rights Statutes). TDCJ contends that neither L.J. McCoy (Burrell's grandmother) or Antonio Thompson (Burrell's brother) are entitled to bring a claim regarding Burrell's death under the Texas survival or wrongful death statutes and, therefore, this action must be dismissed for lack of standing. *See* Tex. Civ. Prac. & Rem.Code § 71.004(a) (limiting wrongful death actions to the "surviving spouse, children, and parents of the deceased"); Tex. Civ. Prac. & Rem.Code § 71.021 (stating that a survival cause of action exists only "in favor of the heirs, legal representatives, and estate of the [deceased] person").

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:14-cv-03253 Document 285-2 Filed on 06/17/16 in TXSD Page 131 of 149
McCoy v. Texas Dept. of Criminal Justice, Not Reported in F.Supp.2d (2006)
2006 WL 2331055

**\*6** TDCJ's standing argument is unpersuasive, however, because the issue of "standing" under the ADA and RA is not governed by the terms of § 1988 or Texas law. Although § 1988 incorporates state law on the issue of standing for suits under 42 U.S.C. §§ 1981 and 1983, *see Pluet,* 355 F.3d at 383, the Fifth Circuit has never applied § 1988 to impose state law standing requirements to suits under the ADA and RA. Rather, courts have held that the ADA and RA contain their own, much broader, standing provisions:

> § 12133, [the] ADA's public entity enforcement provision, states that the statute extends its remedies to *any person* alleging discrimination on the basis of disability. Similarly, the Rehabilitation Act protects any person aggrieved by the discrimination of a person on the basis of his or her disability.... [S]uch broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action as broadly as is permitted by Article III of the Constitution.

*MX Group, Inc. v. City of Covington,* 293 F.3d 326, 334 (6th Cir.2002) (emphasis supplied) (citations and internal quotes omitted) (citing *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 43 (2d Cir.1997)); *see also Liberty Res., Inc. v. Se. Pennsylvania Transp. Auth.,* 155 F.Supp.2d 242, 249 (E .D.Pa.2001) ("[T]he enforcement provision of the ADA ... broadly refers to any person, not solely [the] disabled individual [ ]"). In defining standing as broadly as permitted by the Constitution, the statutes thus eliminate any prudential barriers to standing and allow plaintiffs to assert the rights of third-parties, such as Burrell, regardless of whether the plaintiffs meet the requirements of the Texas survival and wrongful death statutes. *See MX Group,* 293 F.3d at 332-35; *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 209 (D.N.J.2003) (stating that the statutory language "evince[s] a congressional intention to define standing to bring a private action as broadly as is permitted by Article III of the Constitution, thus removing prudential barriers to standing"); *Ass' n of Cmty Orgs. for Reform Now v. Fowler,* 178 F.3d 350, 363 (5th Cir.1999) (stating that Congress "can modify or even abrogate prudential standing requirements" such as the general bar on plaintiffs asserting "the legal rights and interests of third parties"). Because the ADA and RA contain these broad standing provisions, § 1988's residual

incorporation of state law does not apply, and TDCJ's motion for summary judgment based on standing is DENIED. [5]

### 3. Duties Under the Rehabilitation Act and ADA

Defendant TDCJ's final argument in support of summary judgment is that it cannot be held liable under the ADA or RA because Burrell did not "request an accommodation" for his alleged-disability. (*See* DMSJ at 8-10; Reply at 2-3.) In particular, TDCJ argues that, under the statutes, "[p]rison officials need not anticipate an inmate's unarticulated need for [an] accommodation or ... offer an accommodation sua sponte; the inmate must provide evidence of his disability and the severity of the physical limitations resulting from it, and he must request an accommodation." (DMSJ at 9.) Plaintiffs, on the other hand, argue that the ADA and RA do not require a specific request for an accommodation and, in any case, Burrell did request accommodations from TDCJ. (Pls.' Resp. at 8-10.)

**\*7** The ADA and RA provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a). Disability "discrimination" under the statutes, however, "differs from discrimination in the constitutional sense" because the ADA and RA statutes contain their own definitions of discrimination. *Melton v. Dallas Area Rapid Transit,* 391 F.3d 669, 672 (5th Cir.2004). For example, discrimination may include a defendant's failure to make reasonable accommodations to the needs of a disabled person. *See Id.* (under Title II of the ADA "public entities generally are required ... to make reasonable modifications to avoid discrimination on the basis of disability"); *see also Tennessee v. Lane,* 541 U.S. 509, 531 (2004) (Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion" or discrimination); *Henrietta D. v. Bloomberg,* 331 F.3d 261, 273 (2d Cir.2003) (discussing claims of discrimination based on failure to make a "reasonable accommodation"); *Swenson v. Lincoln County School Dist. No. 2,* 260 F.Supp.2d 1136, 1144 (D.Wyo.2003) (stating that the "[t]hree theories of discrimination" under the statutes are "(1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable modification"). In the prison context, for example, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of

discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.[6] *See United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 880-81 (2006) (allegations, if true, that defendant refused to provide reasonable accommodations to a paraplegic inmate, "in such fundamentals as mobility, hygiene, medical care," resulted in the disabled inmate suffering serious punishment "without penal justification").

Defendant TDCJ is correct, however, that the accommodation provisions of the ADA and RA do not require public entities to "guess" an individual's need for an accommodation. *See, e.g., Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir.1999); *Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 69 (3d Cir.1996) (stating that a defendant is not "expected to accommodate disabilities of which it is unaware"); *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 934 (7th Cir.1995) (stating that the "ADA does not require clairvoyance"). Rather, the general rule in cases under the RA, and both Titles I and II of the ADA, is that a plaintiff must show "that the [defendant] knew not only of the [individual's] disability, but also of the physical or mental limitations resulting therefrom." *See Seaman v. CPSH, Inc.,* 179 F.3d 297, 300 (5th Cir.1999); *Gammage v. West Jasper School Bd .,* 179 F.3d 952, 954 (5th Cir.1999). "Because an [individual's] disability and concomitant need for accommodation are often not known to the [defendant] until the [individual] requests an accommodation, the ADA's reasonable accommodation requirement *usually* does not apply unless triggered by a request from the [individual]." *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 261 (1st Cir.2001) (emphasis supplied). A disabled person's failure to expressly "request" an accommodation, however, is not fatal to an ADA claim where the defendant otherwise had knowledge of an individual's disability and needs, but took no action. *See, e.g., Id.* at 261 n. 7 (noting that a request for accommodation may be not required, for example, where the disabled individual's needs are "obvious"); *Chisolm v. McManimon,* 275 F.3d 315, 330 (3d Cir.2001) (reversing a district court's holding that a request for accommodation was necessary, where the public entity "had knowledge of [plaintiff's] hearing disability but failed to discuss related issues with him") (citing *Randolph,* 170 F.3d at 858-59); *Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996) (noting that the disabled individual's burden to request an accommodation applies "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent");

*Felix v. New York City Transit Authority,* 154 F.Supp.2d 640, 657 (S.D.N.Y.2001) (the general requirement of a request "is rooted in common sense. Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability ... [but this] concern[ is] not relevant when an employer has independent knowledge of an [individual's] disability. The rule requiring a request for accommodation can be ignored in such circumstances"); *Walsted v. Woodbury County,* 113 F.Supp.2d 1318, 1336 (N.D.Iowa 2000) ("if an [individual's] disability and the need to accommodate it are obvious, [the individual] is not required to expressly request reasonable accommodation"); *Campbell v. Wal-Mart Stores, Inc.,* 272 F.Supp.2d 1276, 1289 (N.D . Okla.2003) (same); *Rosso v. PI Management Associates, L.L.C.,* 2005 WL 3535060 at *11 (S.D.N.Y. Dec. 23, 2005) (unpublished) (the requirement of a request "may be waived where the plaintiff's disability is obvious or otherwise known to the [defendant] without notice from the [plaintiff]").

*8 In this case, Burrell was not necessarily required to request an accommodation because Plaintiffs have evidence tending to show that TDCJ was on notice of Burrell's alleged disability and that Burrell's need for an accommodation was obvious. For example, Plaintiffs have evidence that TDCJ and its officials were aware of Burrell's asthmatic condition. (PE 3 at 1; *see also* DE1 A; PE A; B; H.) Courts have held that "[i]t is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening." *See, e.g., Whitley v. westchester County,* 1997 WL 659100 at *4 (S.D.N.Y. Oct. 22, 1997) (unpublished) (quoting *Garvin v. Armstrong,* 1998 WL 547117 at *2 (N.D.Ill. Aug. 20, 1998) (unpublished)); *see also Board v. Farnham,* 394 F.3d 469, 484 (7th Cir.2005) ("asthma can be, and frequently is, a serious medical condition, depending on the severity of the attacks"); *Felton v. Godinez,* 1996 WL 137645 at *4 (N.D.Ill. Mar. 25, 1996) (unpublished) ("Attacks of asthma ... are rarely fatal, but they can possibly result in serious injury or death"); *Ware v. Fairman,* 884 F.Supp. 1201, 1206 (N.D.Ill.1995) (stating that "asthma is a serious illness which requires an inhaler"). Plaintiffs also have evidence tending to show that TDCJ knew that Burrell had been prescribed asthma medications and that he required two different types of inhalers to control his asthma. (PE 3 at 1; 4 at 1; 5 at 1-2; 27 at ¶¶ 10, 12-13; *see also* DE1 A.) Finally, Plaintiffs have evidence that TDCJ and its officers knew that the conditions of administrative segregation might pose risks to asthmatic inmates because prison officials had received complaints from Burrell and other inmates that the

Case 4:14-cv-03253   Document 285-2   Filed on 06/17/16 in TXSD   Page 133 of 149
McCoy v. Texas Dept. of Criminal Justice, Not Reported in F.Supp.2d (2006)
2006 WL 2331055

administrative segregation unit was excessively hot and had poor ventilation. (PE 1 at ¶ 6; 7 at 1-2; M at ¶ 15.) In fact, there is evidence that Burrell himself advised TDCJ officers that he was having trouble breathing while housed in administrative segregation. (PE M at ¶ 15.) Burrell also complained of suffering at least one asthma attack, and was observed wheezing, in the month before his death. (DE1 A.) Viewing this evidence in the light most favorable to the Plaintiffs, a jury could find that TDCJ had sufficient knowledge of Burrell's disability, and the dangers posed by housing him in the administrative segregation unit, that it was required to take steps to accommodate him regardless of whether Burrell expressly requested a specific accommodation.

Furthermore, even if TDCJ is correct that Burrell was required to request an accommodation in order to invoke the ADA and RA, it still is not entitled to summary judgment. Plaintiffs have some evidence from which a jury could find that Burrell *did* in fact request certain accommodations from TDCJ and its officials. For example, on July 23, 2004, nine days before Burrell's death, prison officials noted that he had "requested [an] asthma inhaler." [7] (PE D; Q at 2; DE1 D at 2.) Similarly, Plaintiffs have evidence that, on July 25, 2005, seven days before Burrell's death, he "told [Capt. Ambriz] that he was having trouble breathing because of his asthma. Capt. Ambriz told Mr. Burrell that he would go try to improve the ventilation." (PE M at ¶ 15.) Finally, a reasonable jury could also find that Burrell "requested" immediate medical attention or immediate transportation to a medical facility when, on the day of his death, he informed prison guards that he was having an asthma attack. (PE 14 at 20, 39; M at ¶¶ 3-4.) Viewing this evidence in the light most favorable to the Plaintiff, a jury could find that Burrell requested certain accommodations for his disability from TDCJ. Therefore, TDCJ's motion for summary judgment on Plaintiffs' ADA and RA claims is DENIED.

### C. Plaintiffs' Motion for Summary Judgment

**\*9** In their motion for partial summary judgment, Plaintiffs claim that there is no genuine issue of material fact regarding Defendant TDCJ's liability under the RA and ADA. (PMSJ at 1.) Because Plaintiffs are moving for summary judgment on claims for which they bear the burden of proof, they must establish "beyond peradventure" every element of their claims in order for summary judgment in their favor to be appropriate. *See Fontenot,* 780 F.2d at 1194. In other words, a plaintiff "cannot attain summary judgment unless the evidence that [she] provides on [her claims] is *conclusive.*"

*Torres Vargas v. Santiago Cummings,* 149 F.3d 29, 35 (1st Cir.1998) (emphasis supplied). A plaintiff's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the [plaintiff]," otherwise summary judgment cannot be granted. *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986). Plaintiffs have not met this heavy burden in this case, however, because the Court finds that they have not *conclusively* established that TDCJ failed to provide Burrell with "reasonable accommodations." [8]

Assuming, without deciding, that Plaintiffs could conclusively establish all the other elements of their ADA and RA claims, they still must prove that TDCJ failed to provide Burrell with reasonable accommodations. Whether an accommodation is "reasonable" requires a balancing of all the relevant facts, including: (1) the size, facilities, and resources of the defendant, (2) the nature and cost of an accommodation, (3) the extent to which the accommodation is effective in overcoming the effects of the disability, and (4) whether the accommodation would require a fundamental alteration in the nature of the defendant's program. *See, e.g.,* 45 C.F.R. § 84.12(c)(1-3); *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288 n. 17 (1987); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1386 (3d Cir.1991). As such, the reasonableness of an accommodation is generally a question of fact inappropriate for resolution on summary judgment. *See, e.g., Buskirk v. Apollo Metals,* 307 F.3d 160, 170-71 (3d Cir.2002) ("Generally, the question of whether a proposed accommodation is reasonable is a question of fact"); *Chisolm,* 275 F.3d at 327 ("[g]enerally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment"); *Kennedy v. Dresser Rand Co.,* 193 F.3d 120, 122 (2d Cir.1999) ("the question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis"); *Oconomowoc Residential Programs v. City of Milwaukee,* 300 F.3d 775, 784 (7th Cir.2002) ("Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties"); *Niece v. Fitzner,* 922 F.Supp. 1208, 1218 (E.D . Mich.1996) (the "reasonableness of an accommodation under the ADA is a question of fact appropriate for resolution by the trier of fact"); *EEOC v. Dresser-Rand Co.,* 2006 WL 1994792 at \*3 (W.D.N.Y. July 14, 2006) (unpublished) ( "Whether or not an accommodation is reasonable, however, is generally a question of fact for the trier of fact ... [because t]he trier of fact is in the best position to weigh [all the relevant] considerations").

**\*10** Summary judgment is particularly inappropriate where, as here, Defendant TDCJ has some evidence that the accommodations cited by Plaintiffs are unreasonable. For example, Plaintiffs allege that TDCJ should have accommodated Burrell with housing outside of the Administrative Segregation unit. (PMSJ at 1.) TDCJ, however, has evidence that alternative housing would not have been appropriate. The Administrative Segregation unit is a special unit of the prison used to house inmates who are particularly dangerous or believed to be a security risk. (DE1 C at 1-32.) Prisoners in Level III administrative segregation, for example, have "a very extensive assaultive history" and are deemed a threat to other offenders or TDCJ officers. (DE2 B at 78.) With respect to Burrell in particular, Defendant has evidence that he was a known gang member. (*See* DE2 B at 79.) Plaintiffs have not conclusively shown that there was a reasonable alternative to housing Burrell in Administrative Segregation, taking into account TDCJ's security concerns. Similarly, Plaintiffs allege that prison guards should have accommodated Burrell by transporting him out of his cell immediately upon being informed of his asthma attack. (PMSJ at 1.) Defendant TDCJ, however, has provided evidence that transporting Burrell out of his cell immediately would not have been reasonable. TDCJ has evidence that it is a "usual occurrence" for prisoners in administrative segregation to fake an illness in order to trick the guards. (DE2 F at 2; B at 78-79.) Furthermore, Defendants have evidence showing they had reason to believe, albeit erroneously, that Burrell might be faking his illness because he appeared to be breathing and was lying in way that he could be hiding a weapon. (DE2 C at 39-41 D at 54-55.) In sum, Plaintiffs have not proven that the accommodations they request are such that the fact-finder would be compelled to find them reasonable. Therefore, Plaintiffs' motion for partial summary judgment against TDCJ must be DENIED. Because the Plaintiffs have not conclusively established an essential element of their claim, the Court need not address whether Plaintiffs have met the other elements of their ADA and RA claims, such as whether Burrell had a "disability" within the meaning of the statutes, and whether TDCJ knew of Burrell's need for particular accommodations.

## IV. CONCLUSION

For the reasons discussed above, Defendant TDCJ's Motion for Summary Judgment (D.E.47) and Plaintiffs' Motion for Partial Summary Judgment (D.E.88, 90) are both DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2331055

Footnotes

1    On December 1, 2005, this Court dismissed Plaintiffs' claims against TDCJ under the Texas Human Resources Code and 42 U.S.C. § 1983. (*See* D.E. 23, 24, 33.) The Court also dismissed Plaintiffs' § 1983 claims for money damages against TDCJ employees in their official capacities. (D.E.23, 24.)

2    Plaintiffs' Exhibits "A" through "T" are attached to Docket Entry 58. Plaintiffs' Exhibits "1" through "28" are attached to Docket Entry 90.

3    For the purposes of this summary judgment order, the Court will use "DE1" to refer to the Defendant TDCJ's exhibits attached to Docket Entry 47. The Court will use "DE2" to refer to Defendant TDCJ's exhibits attached to Docket Entry 67.

4    On June 27, 2006, TDCJ filed a "Motion to Submit Additional Briefing on the Issue of Standing." (*See* D.E. 77, 82.) Because TDCJ raised the issue of standing in their original motion for summary judgment (DMSJ at 3), TDCJ's motion to submit additional briefing on this issue (D.E.82) is GRANTED and the Court will consider the arguments raised in the additional briefing. Plaintiffs' Motion to Strike (D.E.87) the additional briefing is DENIED.

5    TDCJ's standing argument might have merit with respect to claims brought under 42 U.S.C. § 1983. TDCJ's motion for summary judgment, however, did not address any of Plaintiffs' § 1983 claims. Rather, the motion was brought only "on [Plaintiffs'] ADA and Rehabilitation Act Claims." (*See* DMSJ at 1.)

6    As one commentator noted: "[t]o provide reasonable accommodation to prevent prisoners with disabilities from enduring more punishment than non-disabled prisoners is not special treatment. For example, a bilateral amputee inmate claimed that because there were no handrails in the shower and toilet area, he repeatedly fell and hurt himself while trying to use the facilities. To provide accommodations to remedy this problem only ensures that the disabled prisoner does not suffer psychologically or physically more than non-disabled prisoners." Emily Alexander, *The Americans With Disabilities Act and State Prisons: A Question of Statutory Interpretation,* 66 Fordham L.Rev. 2233, 2283 (1998).

7    It is unclear from this evidence whether Burrell was requesting a "rescue" (Albuterol) inhaler or a "controller" (Azmacort) inhaler when he made this request from prison officials. There is evidence that Burrell had been issued a "rescue" inhaler

2006 WL 2331055

by prison officials approximately two weeks earlier (DE1 A), and TDCJ also has evidence that a "rescue" inhaler was found in Burrell's cell after his death. (DE1 D at 2.) Because there is evidence suggesting that Burrell already had a "rescue" inhaler in his possession, a jury could reasonably infer that Burrell was requesting a "controller" inhaler.

8    Plaintiffs, in their motion for partial summary judgment, read *United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877 (2006) to mean that "Defendants violate the ADA and Rehabilitation Act when their actions would also violate the Eighth Amendment right to be free of cruel and unusual punishment." (PMSJ at 4.) Thus, Plaintiffs argue that, if they "can prove that Mr. Burrell's Eighth Amendment rights were violated, they have also proved that a violation of the ADA took place." (PMSJ at 4.) Plaintiffs argument is unpersuasive, however, because it rests on a fundamental misreading of the *Georgia* case. The *Georgia* case stands only for the proposition that a state is *not immune* under the ADA when the conduct which violates the ADA also violates the Eighth Amendment. *Id.* at 882. *Georgia* does not stand for the proposition that every Eighth Amendment violation is also a *per se* violation of the ADA. Although there may be some overlap between the requirements of the Eighth Amendment and the ADA, the substantive standards of each are different. *See, e.g., Delano-Pyle v. Victoria County,* 302 F.3d 567, 575 (5th Cir.2002) (noting differences between constitutional claims and the ADA, including the fact that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA"). Therefore, Plaintiffs cannot establish an ADA and RA violation merely by showing that the Eighth Amendment was violated. Accordingly, Plaintiffs' discussion of the Eighth Amendment in their motion for partial summary judgment is largely immaterial.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:14-cv-03253 Document 285-2 Filed on 06/17/16 in TXSD Page 136 of 149
Mora v. University of Texas Southwestern Medical Center, 469 Fed.Appx. 295 (2012)
44 NDLR P 233

469 Fed.Appx. 295
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Melinda MORA, Plaintiff–Appellant

v.

UNIVERSITY OF TEXAS SOUTHWESTERN
MEDICAL CENTER, Defendant–Appellee.

No. 11–10279.
|
March 8, 2012.

**Synopsis**

**Background:** Employee of Texas state entity who was fired, in part, for being intoxicated on the job after her supervisors were aware she had been receiving treatment for alcoholism brought lawsuit alleging employment discrimination and retaliation under the Americans with Disabilities Act (ADA). Employer moved to dismiss for failure to state a claim. The United States District Court for the Northern District of Texas granted motion. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] employee failed to adequately plead she had a "disability" as required for discrimination claim;

[2] employee failed to allege facts showing that she was "qualified" to receive Employee Assistance Program (EAP) services even after her termination; and

[3] employee failed to adequately plead claim of unlawful retaliation under the ADA.

Affirmed.

**Attorneys and Law Firms**

**\*296** Thad D. Spalding, Esq., Law Office of Marc Richman, Dallas, TX, for Plaintiff–Appellant.

Jonathan Franklin Mitchell, Esq., Office of the Solicitor General, Angela Veronica Colmenero, Esq., Assistant Attorney General, Office of the Attorney General, Austin, TX, for Defendant–Appellee.

Appeals from the United States District Court for the Northern District of Texas, USDC No. 3:09–CV–927.

Before STEWART, CLEMENT, and GRAVES, Circuit Judges.

**Opinion**

PER CURIAM: [*]

**\*\*1** Melinda Mora appeals the district court's dismissal of her lawsuit against her former employer, the University of Texas Southwestern Medical Center ("UTSMC"), under Titles II and V of the Americans with Disabilities Act ("ADA"). Because the district court correctly determined that Mora's amended complaint failed to state a claim for which relief can be granted, *see* FED.R.CIV.P. 12(b)(6), we AFFIRM.

### FACTS AND PROCEEDINGS

Mora was employed by UTSMC, a state entity, as a program manager from 1996 until 2007. Mora alleges that she was fired from her job for being an alcoholic. Before being fired, Mora had received treatment for alcoholism from UTSMC's Employee Assistance Program ("EAP"). Mora was fired, in part, for being intoxicated on the job during February of 2007, after her supervisors were aware that she had been receiving treatment for alcoholism.

After her termination, Mora filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), then brought a lawsuit against UTSMC alleging (1) employment discrimination on the basis of a disability under Title I of the ADA and (2) retaliation under Title V of the ADA. UTSMC moved to dismiss the Title I claims on the now-uncontroverted ground that, as the Supreme Court has directly held, Title I of the ADA does not validly abrogate the states' sovereign immunity, meaning that Title I claims cannot be

heard by the federal courts. *See Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 374, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). The district court granted UTSMC's motion, but permitted Mora to replead her claim under Title II of the ADA, which prohibits discrimination on **\*297** the basis of disability in the provision of government services and programs. Mora's amended complaint alleged that (1) her removal from the EAP following her dismissal constituted wrongful exclusion from a government service or program on the basis of a disability in violation of Title II of the ADA, and (2) after her firing, UTSMC retaliated against her in violation of Title V of the ADA by "disparaging" her to prospective employers. The district court dismissed all of Mora's claims with prejudice pursuant to Rule 12(b)(6) and entered final judgment against her. This timely appeal followed.

## STANDARD OF REVIEW

We review a district court's ruling on a 12(b)(6) motion to dismiss *de novo. Randall D. Wolcott, M.D., P.A. v. Sebelius,* 635 F.3d 757, 763 (5th Cir.2011). We accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff, but "we are not bound to accept as true a legal conclusion couched as factual allegation." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

## DISCUSSION

*1. Title II Claims*

 **\*\*2** Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Mora contends that her removal from the EAP constituted a violation of this provision and argues that her amended complaint pled sufficient facts to support her Title II claim. However, Mora's amended complaint was deficient for at least two reasons: (1) it failed to plead adequate facts to show that she has a "disability" within the meaning of the ADA, and (2) it failed to allege facts showing that

she was "qualified" to receive EAP services even after her termination.

*a. "Disability"*

 **[1]**   Mora's complaint failed to adequately plead that she has a "disability" for purposes of the ADA. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Although Mora alleged that she is an alcoholic and recited that her alcoholism impairs a major life activity, she did not specify which of her "life activities" is substantially limited. This is fatal to stating a valid claim for relief. As the Supreme Court has explained, a valid complaint must do more than give "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

At best, Mora's complaint alleges only that she was (or was regarded as being) substantially impaired in her ability to do her job with UTSMC, but "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). **\*298**  Because her complaint, even liberally construed, alleged only that she was, or was regarded as being, impaired in the performance of her specific job with UTSMC, her pleadings are legally insufficient. *See Kemp v. Holder,* 610 F.3d 231 (5th Cir.2010).

*b. "Qualified"*

 **[2]**   Mora's complaint also failed to allege facts that, if true, would establish that she was relevantly "qualified" to receive continued treatment in the EAP. A "qualified individual with a disability" is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, *meets the essential eligibility requirements* for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2) (emphasis added). At the time she was denied EAP services, Mora no longer met the "essential eligibility requirements" for the receipt of such services because UTSMC understandably provides EAP services only to its employees, and *Mora was no longer employed by UTSMC.*

**\*\*3** Mora argues that her claim should be permitted because the reason for her ineligibility was her discriminatory termination. But the language of Title II does not permit Mora's attempt to shoehorn what is essentially a Title I claim into Title II. Title II forbids denying services to a person with a disability "by reason of such disability." UTSMC did not deny Mora alcohol treatment "by reason of" her alcoholism. As the state correctly argues,

> Title II does not require public entities to investigate the reasons behind an individual's ineligibility, nor does it contain an exception that makes an [sic] person "eligible" if the reason for their [sic] ineligibility is a discriminatory act. Instead, Title II requires that the denial of state services itself be "by reason of such disability."

The language of Title II simply does not encompass Mora's claim that she was wrongly fired for being an alcoholic.

*2. Title v. Claims*

**[3]** Mora's complaint also failed to adequately plead a claim under Title V. A claim of unlawful retaliation under the ADA requires a showing that (1) the plaintiff engaged in an activity protected by the ADA, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action. *Seaman v. CSPH,* 179 F.3d 297, 301 (5th Cir.1999). The allegations in Mora's amended complaint relating to her Title V claim stated, in their entirety:

> [UTSMC] retaliated against Mora for exercising her rights under the ADA in violation of 42 U.S.C. § 12203(a). These Title V retaliation claims are based on actions taken by [UTSMC] in violation of Title II of the ADA.

[UTSMC] has disparaged and continues to disparage Mora to potential employers for whom Mora has sought to gain employment, and thereby prevented Mora from gaining employment with a Fort Worth hospital. Furthermore, [UTSMC's] decision to terminate Mora was based in part on her complaints about [UTSMC's] unwillingness to accommodate her disability limitations.

These allegations fail to state a claim under Article V. With respect to her allegation that UTSMC "disparaged" her to potential employers after she was fired, Mora's complaint does not identify any "protected activity" for which UTSMC was **\*299** supposedly retaliating against her. On appeal, Mora argues that UTSMC's disparagement of her was retaliation against her filing of a charge with the Texas Workforce Commission and the EEOC, but her complaint in the district court alleged no facts that indicate a "causal connection" between these filings and UTSMC's alleged disparagement of her.

Mora's complaint can be read as asserting that UTSMC retaliated against her by firing her for complaining about its unwillingness to accommodate her disability. But this allegation is contradicted by the other facts alleged in the complaint, making the claim implausible on its face. The complaint sets forth no facts suggesting that Mora ever complained about any "unwillingness to accommodate her disability." Mora only complained *after* she was fired and removed from the EAP. Indeed, before she was fired, UTSMC *was* accommodating her disability by providing her with treatment for alcoholism through the EAP. Thus, Mora failed to plead a valid claim under Title V.[1]

### CONCLUSION

**\*\*4** For the reasons set forth above, the judgment of the district court is AFFIRMED.

### All Citations

469 Fed.Appx. 295, 2012 WL 745101, 44 NDLR P 233

Footnotes

\*    Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

44 NDLR P 233

1     Because we agree with the district court's determination that Mora failed to state a valid claim under the ADA, we need not address UTSMC's argument that Mora's claims under Title II and Title V are barred by state sovereign immunity.

---

**End of Document**             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

397 Fed.Appx. 13
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

Annie L. MZYK, Plaintiff–Appellant

v.

NORTH EAST INDEPENDENT SCHOOL
DISTRICT, Defendant–Appellee.

No. 10–50037
|
Summary Calendar.
|
Sept. 30, 2010.

**Synopsis**

**Background:** School district employee brought action
against her employer, alleging that she was subject to
discrimination and retaliation under Age Discrimination
in Employment Act (ADEA), Americans with Disabilities
Act (ADA), and Title VII. The United States District Court for
the Western District of Texas granted employer's motion for
summary judgment. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] employee failed to state adverse action element of age
discrimination claim under ADEA;

[2] other employees with whom employee compared herself
were not truly comparable, for purposes of ADEA claim;

[3] employee's various physical ailments and stress did not
constitute "disabilities" within meaning of ADA; and

[4] employer did not make any employment decisions about
employee that would not have been made "but for" her
protected activity, as required to sustain retaliation claims.

Affirmed.

**Attorneys and Law Firms**

**\*14** Annie L. Mzyk, San Antonio, TX, pro se.

Ricardo Rene Lopez, Joseph E. Hoffer, Esq., Feldman,
Rogers, Morris & Grover, L.L.P., San Antonio, TX, for
Defendant–Appellee.

Appeal from the United States District Court for the Western
District of Texas, No. 5:08–CV–00344.

Before DAVIS, SMITH, and SOUTHWICK, Circuit Judges.

**Opinion**

PER CURIAM: [*]

**\*\*1** Plaintiff–Appellant Annie L. Mzyk appeals the district
court's entry of summary judgment dismissing all of Mzyk's
claims against her employer. For the reasons stated herein, we
affirm the district court's judgment.

I.

Mzyk filed pro se various discrimination claims against
her employer, Defendant–Appellee North East Independent
School District ("NEISD"), in the district court. Specifically,
she has raised claims pursuant to Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title
VII") for discrimination based on her national origin (Polish
American), a hostile work environment, and retaliation;
claims pursuant to the Age Discrimination in Employment
Act, 29 U.S.C. §§ 621, et seq. ("ADEA"), for age
discrimination and retaliation; and claims pursuant to the
Americans with Disabilities Act, 42 U.S.C. §§ 12102,
et seq. ("ADA") for disability discrimination, failure to
accommodate, and retaliation.

Mzyk is employed as an administrative assistant by NEISD.
Construing her pro se complaint and other documents in
the record in a favorable light, Mzyk generally asserts the
following facts: that NEISD refused her repeated requests
to increase the pay grade of her position to compensate
her for increases in duties and work load—primarily the
responsibility given to her for answering the NEISD main
telephone line—which is purportedly inconsistent with
NEISD's treatment of other similarly situated employees
who have received pay increases and reduced work loads;

that such actions are allegedly due to her Polish national origin and her age, as well as retaliation for previous charges of discrimination; and that NEISD has allegedly refused to accommodate her requests for changes in work duties that she has made due to her various physical ailments. As relief, Mzyk seeks back wages and benefits, various kinds of injunctive relief related to the distribution of her work duties, other compensatory damages, and litigation costs and fees.

The district court assigned all pre-trial proceedings to a magistrate judge, including NEISD's motion for summary judgment. The magistrate judge issued a report to the district court recommending **\*15** that all of Mzyk's claims should be dismissed upon NEISD's motion for summary judgment (the "Report"). The magistrate judge noted that subsequent to filing her complaint, Mzyk expressly waived her Title VII claims of national origin discrimination and hostile work environment, while choosing to maintain her other claims: (1) ADEA discrimination and retaliation; (2) ADA discrimination, failure to accommodate, and retaliation; and (3) Title VII retaliation.

 **[1]**  **[2]**  Reciting the undisputed facts, the magistrate judge determined that Mzyk failed to prove two elements of her prima facie age discrimination claim under ADEA: (1) that she suffered an adverse employment action; and (2) that others similarly situated but outside the protected group received more favorable treatment. [1] The magistrate judge concluded that Plaintiff had not stated an adverse employment action because she had simply alleged that the salary level for the administrative assistant position that she held was inadequate and discriminatory. She did not allege that failure to increase her pay as compared to other employees who held the same position was discriminatory. [2] The magistrate judge determined that Plaintiff failed to prove the second prima facie element of her age discrimination claim, noted above, because she failed to provide any competent summary judgment evidence that other employees with whom she compared herself were truly comparable. *See Lee v. Kansas City S. Ry. Co.,* 574 F.3d 253, 260 (5th Cir.2009) ("[A]n employee who proffers a fellow employee as a comparator" must "demonstrate that the employment actions at issue were taken under nearly identical circumstances.") (internal quotation marks omitted).

 **\*\*2**  **[3]**  With regard to Mzyk's claims under the ADA (disparate treatment and failure to accommodate), the magistrate judge determined on the basis of the undisputed facts that Plaintiff could not meet the prima facie

requirements for either ADA claim because she presented no evidence that she suffered from a "disability," as defined by the ADA. [3] Relying on the testimony of Mzyk's doctor, the magistrate judge noted that the physician had diagnosed Plaintiff with various physical ailments **\*16** and with stress, but not with any condition substantially impairing one or more of her major life activities, as generally required to meet the ADA's definition of "disability." *See Pryor v. Trane Co.,* 138 F.3d 1024, 1026 (5th Cir.1998) ("Temporary, non-chronic impairments of short duration, with little or no longer term or permanent impact, are usually not disabilities."); *Dupre v. Charter Behavioral Health Sys. of Lafayette, Inc.,* 242 F.3d 610, 614 (5th Cir.2001) ( "[N]ot all impairments are serious enough to be considered disabilities under the statute."). The magistrate judge concluded that Plaintiff had presented no evidence from which a reasonable jury could conclude that she had a disability under the ADA definition.

 **[4]**  Finally, regarding Plaintiff's retaliation claims under ADEA and ADA, [4] the magistrate judge concluded on the basis of the undisputed facts that, even assuming Plaintiff had established prima facie retaliation claims, she failed to provide evidence sufficient to raise a genuine issue of material fact regarding the causation element of the retaliation claims. Specifically, the magistrate judge determined that Mzyk did not present evidence capable of showing that NEISD made any employment decisions concerning her that would not have been made "but for" her protected activity, as required to sustain such claims. *See, e.g., Septimus v. Univ. of Houston,* 399 F.3d 601, 608 (5th Cir.2005).

The district court reviewed the magistrate judge's Report and conducted an independent review of the entire record and a de novo review of those matters in the Report to which the Plaintiff objected. [5] The district court then accepted the magistrate judge's recommendations in its Order Accepting Report and Recommendation of the United States Magistrate Judge, dated December 10, 2009, thereby dismissing all of Plaintiff's claims on summary judgment.

## II.

This court reviews the district court's grant of summary judgment de novo, applying the same legal standard as the district court. *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir.2007). Summary judgment is appropriate when the record reveals that "there is no genuine

issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." FED.R.CIV.P. 56(c)(2). In making this determination, the court considers the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. *Turner,* 476 F.3d at 343 (citing *Wyatt v. Hunt Plywood Co., Inc.,* 297 F.3d 405, 408 (5th Cir.2002)). But a nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.' " *Turner,* 476 F.3d at 343 (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc)).

III.

**\*\*3** In seeking to challenge the district court's grant of summary judgment on this pro se appeal, the Appellant makes no more than conclusory allegations and assertions. *See* Plaintiff–Appellant's Brief at 13–17. In her brief, Appellant does not raise any material doubts about the legal or factual accuracy of the magistrate judge's Report. After reviewing the record and considering the briefing of the **\*17** parties, we conclude that the magistrate judge and the district court correctly read the record and applied the correct legal standards with respect to all of Mzyk's claims. Accordingly, we affirm the district court's judgment.

**All Citations**

397 Fed.Appx. 13, 2010 WL 3926853, 263 Ed. Law Rep. 529

Footnotes

| | |
|---|---|
| \* | Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4. |
| 1 | The Report recites the prima facie requirements for an age discrimination claim based on disparate treatment that the magistrate judge applied. The Plaintiff was required to show: (1) that she belongs to a protected group of persons over the age of forty; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; and (4) that others similarly situated but outside the protected group received more favorable treatment. *See Willis v. Coca Cola Enters., Inc.,* 445 F.3d 413, 420 (5th Cir.2006); *Rutherford v. Harris County Tex.,* 197 F.3d 173, 184 (5th Cir.1999). |
| 2 | Mzyk does not deny having received annual within-pay-grade increases or an actual pay-grade increase in July 2008. |
| 3 | The magistrate judge recited the prima facie elements that she applied to Plaintiff's ADA claims. To establish a prima facie case of disparate treatment due to disability, Plaintiff was required to show: (1) she is disabled; (2) she was nonetheless qualified to do the job; (3) an adverse employment action was taken against her; and (4) she was replaced by or treated less favorably than non-disabled employees. *See Aldrup v. Caldera,* 274 F.3d 282, 286 (5th Cir.2001); *McInnis v. Alamo Cmty. Coll. Dist.,* 207 F.3d 276, 279–80 (5th Cir.2000). To establish a prima facie case of discrimination based on failure to accommodate a disability, Plaintiff was required to show: (1) the employer is covered by the statute; (2) she is an individual with a disability; (3) she can perform the essential functions of the job with or without reasonable accommodation; and (4) the employer had notice of the disability and failed to provide accommodation. *See, e.g., Bridges v. Dep't of Soc. Serv.,* 2001 WL 502797, \*1 (5th Cir. Apr.27, 2001) (citing *Lyons v. Legal Aid Soc'y,* 68 F.3d 1512, 1515 (2d Cir.1995)). |
| 4 | The magistrate judge determined that Mzyk abandoned her Title VII retaliation claim by failing to present evidence in support thereof. |
| 5 | Plaintiff filed objections to various elements of the Report's recitations of fact and conclusions of law. |

**End of Document**　　　　　　　　　　　　　　　　© 2016 Thomson Reuters. No claim to original U.S. Government Works.

364 Fed.Appx. 883
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

William James THAYER, Plaintiff-Appellant

v.

Mary ADAMS, Nurse Manager; Kristi
Flisowski, LVN; Margie Gonzales, LVN;
Kathleen A. Rogers, Defendants-Appellees.

No. 08-20817.
|
Feb. 4, 2010.

**Synopsis**

**Background:** Inmate sued nurses under § 1983, claiming
that they inflicted wanton and unjustifiable pain and suffering
upon him by failing to respond to his serious medical needs,
in violation of the Eighth Amendment. The United States
District Court for the Southern District of Texas granted
summary judgment against the inmate, and he appealed.

**Holdings:** The Court of Appeals held that:

[1] nurses were not deliberately indifferent to the inmate's
serious medical needs;

[2] inmate's complaint did not make allegations sufficient to
overcome the defense of qualified immunity, and thus, the
inmate was not entitled to discovery; and

[3] inmate was not entitled to appointed counsel.

Affirmed

**Attorneys and Law Firms**

**\*884**  William James Thayer, Tennessee Colony, TX, pro se.

Christina Ann Denmark, Segal, McCambridge, Singer &
Mahoney, Jennifer Jean Wells, Grady L. Williamson, Office
of the Attorney General, Austin, TX, for Defendants-
Appellees.

Appeal from the United States District Court for the Southern
District of Texas, USDC No. 4:07-CV-920.

Before GARZA, DeMOSS, and CLEMENT, Circuit Judges.

**Opinion**

PER CURIAM: [*]

 **\*\*1**  Plaintiff William James Thayer appeals the district
court's entry of summary judgment in favor of Defendants
Mary Adams, Kristi Flisowski and Margie Gonzales on
Thayer's deliberate indifference claim arising under 42
U.S.C. § 1983. Thayer is an inmate in the custody of the
Texas Department of Criminal Justice (TDCJ). He alleges
that defendants inflicted wanton and unjustifiable pain and
suffering upon him by failing to respond to his serious
medical needs in violation of the Eighth Amendment to the
U.S. Constitution. For the reasons stated herein, we affirm the
district court's decision.

## I. FACTS AND PROCEDURE

*Thayer's Allegations*

Thayer was scheduled to have knee replacement surgery on
March 28, 2005, while in custody of TDCJ. The procedure
was halted and Thayer was discharged from the University
of Texas Medical Branch (UTMB) because he had an
anaphylactic response to a medication. Thayer received 23
staples in his knee and was  **\*885**  remanded to the Ellis Unit
of TDCJ. Upon arriving at Ellis Unit on the evening of March
28, Thayer was assigned to a cell up a flight of stairs and
was given no blankets or sheets. He required the assistance
of other inmates to reach his cell because he could not climb
stairs alone. He could not sleep because he was cold and in
pain. The next day, March 29, Thayer went to the infirmary
for "emergency treatment," but stated that he was denied
treatment by defendants Flisowski and Gonzales, who were
nurses employed by TDCJ. Thayer was able to receive pain
medication from the pill window. Thayer alleged, however,
that he received inadequate treatment or no treatment at
all between March 29, 2005, and April 2, 2005. He says
his pain medication was discontinued at the direction of

defendant Adams. He sued, alleging that Flisowski, Gonzales, and Adams acted with deliberate indifference to his pain and legitimate medical needs. Thayer sought declaratory and injunctive relief, as well as punitive damages. He moved for appointment of counsel, which the district court denied.

The Attorney General advised the court that defendants Flisowski and Gonzales were no longer employed by UTMB. Adams answered, denied wrongdoing, and asserted her entitlement to official immunity, immunity under the Eleventh Amendment, and qualified immunity. Adams moved for summary judgment, stating that she was not the nurse manager of the Ellis Unit while Thayer was housed there. Rather, she was manager of the Estelle Unit, and had no responsibility over the Ellis Unit until she was transferred there on August 1, 2005. She also stated that she never received Thayer's emergency grievances. Adams submitted personnel records and a sworn affidavit in support of these assertions.

*Declarations by Thayer and Other Inmates*
In response to Adams's motion, Thayer filed a declaration reiterating the assertions from his complaint. Thayer stated that, on the morning of March 29, 2005, he presented himself, with the help of fellow inmates, to the infirmary, where Flisowski and Gonzales were working. After Thayer explained to them his condition, including his return from the hospital, his cell assignment, and "being in severe pain," both said that they were too busy to help, even though "all they were doing was sitting at the desk talking." Thayer then filed emergency grievances. The next day, March 30, 2005, Thayer went to the pill window, "and was told [his] medication had been discontinued." He went to the infirmary, where Flisowski told him Adams had ordered his medication discontinued. Thayer explained his situation once more to Flisowski and asked her to look into his file. She did so, but said she could do nothing for him at that time. Thayer next states: "I was helped back to my cell which I stayed in because I couldn't get around and the pain I was in was so severe. Inmates gave me food because I couldn't make it to the chow hall." Finally, Thayer was examined on April 2, 2005, by a nurse Connell, who is not a defendant. Connell called a doctor, who reinstated Thayer's pain medication. Thayer's dressing was changed for the first time on April 2, 2005. He had swelling and bruises on his leg, but no infection.

**2  Thayer also submitted the declaration of Marc Ashbrook, a fellow TDCJ inmate, who repeated many of Thayer's assertions. Ashbrook said that on March 29,

Flisowski and Gonzales were too busy to help Thayer, even though both were just "sitting at the desk at the infirmary." On March 30, Ashbrook overheard Flisowski tell Thayer that Adams had discontinued Thayer's *886 pain medication. Ashbrook stated: "Plaintiff was in so much pain he couldn't understand why they, the nurses and medical staff, were doing this to him when it was so obvious that he needed medical attention." Thayer also submitted medical records to the district court, which confirmed that he was scheduled for a knee replacement at UTMB. The operation was halted because Thayer had a "possible anaphylactic reaction" and became "severely hypotensive" after he was placed under general anesthesia and an incision was made on his leg. The records also show that Thayer was prescribed Tylenol with Codeine when he was discharged from UTMB. Notes from his April 2, 2005, examination reflect his assertion that "pain medication was discontinued and motrin ordered." The records also show that Thayer's surgery was rescheduled for the following week, and reflect his assertion that he "ha[d] been told not to take anything with motrin and aspirin prior to surgery." His "[i]ncision line [was] clean and dry," but he had swelling and bruises from the knee to the ankle.

The district court considered Adams's motion and Thayer's response, and held that summary judgment was inappropriate. The court concluded that "a fact issue remains about whether Nurse Adams had any personal involvement in the discontinuation of Thayer's pain medication or in the supervision of others who were charged with providing him with medical care." The court also noted that Flisowski and Gonzales had not been served and that neither had filed an answer. Because they no longer worked for TDCJ, these defendants could not be represented by the Attorney General without their express consent. The court stated it would order service on Flisowski and Gonzales separately. Finally, the court allowed Thayer to correspond with three inmates who had witnessed Thayer's treatment for the purpose of obtaining a declaration or affidavit.

Thayer then filed a request for production of documents. He asked to be provided with copies of grievances, complaints, and related documents filed against the defendants, their work histories, policies, a health care manual, "[a]ny and all orders Medical Supervisor Mary Adams made during her employment with UTMB & TDCJ," the grievance manual, and several other similar documents. Adams opposed the motion. The district court denied the motion because Thayer had not requested leave to conduct additional discovery, because he had not shown how his requests related to his

claims, and because Adams had asserted the defense of qualified immunity.

Flisowski answered. She denied refusing to treat Thayer, or that she had any role in discontinuing his pain medication. She raised, inter alia, the defenses of sovereign immunity under the Eleventh Amendment and qualified immunity.

**3** Thayer then filed declarations by Michael Hooks and William E. Hancock, Jr. Hooks said he helped Thayer to the pill window, where "the pill window nurse" told him that his medication had been discontinued. Hooks then repeated many of the same assertions that Thayer and Ashbrook made, including that Flisowski and Gonzales did not treat Thayer on March 29, despite not being busy at the time; that Flisowski stated on March 30 that Adams had ordered Thayer's pain medication discontinued; and that Thayer was in obvious pain. Hancock's declaration provided general assertions that Flisowski and Gonzales did not provide adequate medical treatment to inmates. Hancock stated that he once spoke with Thayer while Thayer was in the infirmary; Thayer told Hancock that "his knee was always hurting him badly and she would give him Ibuprofin for the pain, but refused to give **887** him anything stronger." Hancock did not state when this conversation took place.

The district court then ordered the office of the Attorney General of Texas, counsel for defendants Adams and Flisowski, to file a report under *Martinez v. Aaron,* 570 F.2d 317 (10th Cir.1978), or in the alternative, to file a motion for summary judgment within 60 days.

*Defendants' Summary Judgment Motion and Thayer's Response*

Adams and Flisowski then moved for summary judgment. [1] They submitted Thayer's medical records and an affidavit from Nurse Mary Gotcher in support of the motion. Defendants asserted that Thayer was prescribed Tylenol # 3 with Codeine when he was discharged from UTMB, and that this drug must be picked up from the pill window. When Thayer arrived at the Ellis Unit on March 28, 2005, UTMB physician Dr. Glenda Adams changed his medication from Tylenol # 3 to Motrin. Inmates are allowed to keep Motrin with them and are not required to go to the pill window to get this drug. Medical personnel examined Thayer on April 2, 2005, and noted that his incision was "clean and dry." Thayer complained about the change in medication. A member of the nursing staff contacted a doctor, who ordered

that the prescription for Tylenol # 3 be reinstated. Thayer underwent surgery on April 15, 2005, and was discharged with prescriptions for Tylenol # 3 and a blood thinner. He received these medications. The defendants argued that they were entitled to qualified immunity because they were not personally involved with changing Thayer's prescription, his assignment to a certain cell, or his not receiving blankets and sheets. They alternatively argued that these actions did not amount to deliberate indifference. They contended that Thayer's suit was barred by Eleventh Amendment immunity to the extent he sought to recover against them in their official capacities.

The documents submitted by the defendants supported their factual assertions. Medical records show that Thayer was admitted to UTMB on March 21, 2005, and was discharged on March 28, 2005, with a prescription for Tylenol with Codeine (Tylenol # 3). Dr. Adams prescribed Motrin for him when he arrived at the Ellis Unit and discontinued the Tylenol # 3. Thayer had surgery in April 2005 and was discharged with prescriptions for Tylenol # 3 and injections of Lovenox, an anticoagulant.

**4** Gotcher was the Nursing Director at UTMB, Correctional Managed Care, and she supervised nursing personnel at 43 TDCJ facilities. She reviewed Thayer's records before giving her affidavit, and she was familiar with UTMB policies and procedures concerning nursing care. Gotcher confirmed that "Adams did not work at the Ellis Unit during the time frame of this lawsuit and would have had no personal involvement in the medical care of an inmate at the Ellis Unit." Rather, Adams was the Cluster Nurse Manager of the Estelle Unit at this time. Because Flisowski and Gonzales were LVNs, their "scope of practice" did not include ordering "any treatment or medication for any patient." Gotcher noted that Dr. Adams changed Thayer's prescription from Tylenol # 3 four times a day to Motrin as needed, and Dr. Adams's order specified that Thayer was to be permitted to keep Motrin on his **888** person. This change allowed Thayer to keep his medication with him, rather than having to ambulate to the pill window. "The Dr. Adams referred to in Thayer's medical record is Dr. Glenda Adams, not Cluster Nurse Manager Mary Adams." Thus, "[i]f someone informed Mr. Thayer that his medications had been changed by 'Adams,' that reference would be to Dr. Glenda Adams, who did change his Tylenol # 3 prescription to Motrin." Due to the change in medications ordered by Dr. Adams, Flisowski and Gonzales could not have given Thayer Tylenol # 3.

Thayer responded to the motion for summary judgment and offered his own declaration and medical records in support of the response as well as declarations from Ashbrook, Hooks, Hancock, and inmate Daniel Straw. Thayer insisted that the defendants "refused [him] all and any kind of medical treatment" and thus acted with deliberate indifference.

*The District Court's Ruling*

The district court granted defendants' motion for summary judgment and dismissed Thayer's suit. The district court first determined that the defendants were entitled to Eleventh Amendment immunity insofar as Thayer sought damages against them in their official capacities. The court next concluded that the defendants were entitled to qualified immunity. The district court noted that Thayer's "chief complaint" was that Nurse Adams denied him pain medication by changing his prescription from Tylenol # 3 to Motrin, and that Thayer also complained that Nurses Flisowski and Gonzales "denied him care for pain after his prescription was changed" and did not give him fresh bandages. The court concluded that "the record shows that none of the defendants named in the complaint were involved in the decision to change Thayer's medication." Rather, the decision was made by Dr. Glenda Adams. The district court noted that Thayer had submitted a copy of a grievance that he filed on March 31, 2005. In this grievance, he averred that someone in the infirmary told him that "Dr. Adams at U.T.M.B. discontinued medication." The court held that Thayer's claim concerning the defendants' alleged interference with his "prescribed medication regime" failed because the evidence showed that the defendants were not personally involved with that decision.

**5** The district court recounted that Thayer's records showed that, upon discharge from UTMB on March 28, 2005, he was to use crutches, follow up with UTMB in two weeks, maintain a regular diet, and get Tylenol # 3. No orders were given for any particular follow up care at Ellis Unit; no restrictions were placed upon Thayer's cell assignment; no order was made for a dressing or bandage change; and no order was given for an anticoagulant. Dr. Adams then changed the pain medication to Motrin. The court concluded that the defendants did not have the power to override Dr. Adams's orders and that they did not act with deliberate indifference to Thayer's serious medical needs with respect to his medication.

Insofar as Thayer complained that his wound was not examined and his bandages were not changed, the district court concluded that he had not shown that the defendants were deliberately indifferent. Thayer's wound was clean and dry on April 2, 2005, and his surgery was successfully performed that same month. Thayer did not show that he suffered any harm due to the defendants' failure to change his bandages or examine his wound. The court also concluded that the evidence did not show that defendants' actions were objectively unreasonable. Rather, "the medical records reflect that Thayer was treated according to the discharge instructions issued by UTMB on March 28, 2005."

**889** The district court further noted that, although Gonzales was not served and had not answered, the same analysis that applied to Thayer's claims against the other defendants likewise applied to Thayer's claims against her. *See Lewis v. Lynn,* 236 F.3d 766, 768 (5th Cir.2001) (allowing non-answering defendants to benefit from grant of appearing defendants' summary judgment motion). The district court thus dismissed Thayer's claims against Gonzales. Thayer filed a timely notice of appeal.

## II. DELIBERATE INDIFFERENCE CLAIMS

We review the grant of a motion for summary judgment de novo. *Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 226 (5th Cir.2009). Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c)(2). The proponent of the motion typically bears the burden of showing a lack of evidence to support his opponent's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant meets his initial burden, the burden shifts to the nonmovant to set forth specific facts showing the existence of an issue for trial. *Id.* at 324, 106 S.Ct. 2548. The nonmovant cannot satisfy his summary judgment burden "with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Hathaway v. Bazany,* 507 F.3d 312, 319 (5th Cir.2007) (internal quotation marks and citations omitted).

We approach summary judgment differently when qualified immunity is at issue. *See id.* In this context, "[t]he moving party is not required to meet its summary judgment burden for a claim of immunity." *Id.* (internal quotation marks and citation omitted). Rather, the movant need only plead her good-faith entitlement to qualified immunity, whereupon "the burden shifts to the plaintiff to rebut it." *Id.* (internal quotation

marks, citation, and emphasis omitted); *see also Gates v. Texas Dep't of Protective & Regulatory Servs.,* 537 F.3d 404, 419 (5th Cir.2008) (noting that, when a government official pleads qualified immunity, the plaintiff must "rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct").

### A.

**\*\*6** Thayer argues that the evidence shows that the defendants were personally involved in denying him care and acted with deliberate indifference by "refusing any kind of medical treatment." He reiterates his contention that Adams did not respond to his emergency grievance and discontinued his Tylenol # 3. The defendants contend that the district court properly granted judgment in their favor.

Thayer does not address, and has thus abandoned, the issue whether the district court erred by determining that the defendants were entitled to Eleventh Amendment immunity. *See Longoria v. Dretke,* 507 F.3d 898, 901 (5th Cir.2007) (noting that even pro se litigants must brief arguments in order to preserve them). Thayer thus has shown no error in connection with the district court's determinations that the defendants were entitled to immunity with respect to his claims against them in their official capacities and that their motion for summary judgment should have been granted as to these claims. *See id.*

### B.

To determine whether officials are entitled to qualified immunity for a constitutional violation, we conduct a familiar two-step analysis. *See* **\*890** *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part by Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 813, 172 L.Ed.2d 565 (2009); *see also Collier v. Montgomery,* 569 F.3d 214, 217 (5th Cir.2009). We first determine whether the plaintiff has alleged a violation of a constitutional right; "if so, we turn to whether the officers' conduct was objectively reasonable in light of clearly established law at the time the challenged conduct occurred." *Tarver v. City of Edna,* 410 F.3d 745, 750 (5th Cir.2005) (citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). We apply an objective standard, "based on the viewpoint of

a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Freeman v. Gore,* 483 F.3d 404, 411 (5th Cir.2007). We have the discretion to decide which qualified immunity prong to address first, "in light of the circumstances in the particular case at hand." *Collier,* 569 F.3d at 217.

Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they demonstrate deliberate indifference to a prisoner's serious medical needs, constituting an "unnecessary and wanton infliction of pain." *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (internal quotation marks, citation, and emphasis omitted). A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir.2006). Failed treatments, negligence, and medical malpractice are insufficient to give rise to a successful claim of deliberate indifference to serious medical needs. *Gobert,* 463 F.3d at 346. A prisoner who merely disagrees with the course of treatment provided, or contends that he should have received additional treatment, likewise does not raise a viable deliberate indifference claim. *Id.*; *see also Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir.2001).

**\*\*7** To prevail on a claim of deliberate indifference to medical needs, the plaintiff must establish that the defendant denied him treatment, purposefully gave him improper treatment, or ignored his medical complaints. *Gobert,* 463 F.3d at 346; *Domino,* 239 F.3d at 756. "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Gobert,* 463 F.3d at 346 n. 24 (quoting *Banuelos v. McFarland,* 41 F.3d 232, 235 (5th Cir.1995)). "Deliberate indifference is an extremely high standard to meet." *Id.* at 346 (internal quotation marks and citation omitted). In a situation where the deficiencies in medical treatment were minimal, continuing pain alone does not constitute a constitutional violation. *Mayweather v. Foti,* 958 F.2d 91, 91 (5th Cir.1992). A delay in treatment likewise does not violate the Eighth Amendment unless there has been deliberate indifference that results in substantial harm. *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir.1993). Nevertheless, if a prisoner

establishes deliberate indifference to his serious medical needs, he may recover damages for pain he suffered during the delay of treatment. *See Easter v. Powell,* 467 F.3d 459, 464-65 (5th Cir.2006).

### C.

**[1]** Thayer has not shown that the defendants acted with deliberate indifference to his serious medical needs concerning his **\*891** cell assignment, lack of blankets, lack of Tylenol # 3, lack of anticoagulant injections, or lack of bandage changes. A review of the record establishes that Nurse Mary Adams never saw Thayer and took no actions in relation to his treatment. Adams was not assigned to the Ellis Unit and had no supervisory authority to respond to Thayer's complaints or grievance forms, which would not have been submitted to her. To the extent that Thayer argues that a change to his medication was ordered by Nurse Adams, rather than Dr. Adams, the record refutes this assertion.[2] *See Gobert,* 463 F.3d at 346 n. 24. Thayer has not demonstrated that the district court erred in dismissing his claims against Adams.

**[2]** There was likewise no error in the district court's dismissal of Thayer's claims that Flisowski and Gonzales failed to treat him. We must conclude, after carefully reviewing the record, that Flisowski's and Gonzales's actions did not show deliberate indifference, and were not "objectively unreasonable in light of clearly established law at the time of the conduct in question." *See Freeman,* 483 F.3d at 411. Thayer says Flisowski and Gonzales denied him treatment and ignored his complaints of pain. However, they had no authority to prescribe drugs or embark on a different course of treatment. Moreover, Thayer's assertions are belied in part by his statement that Flisowski examined his records on March 30, 2005, and concluded that she could not give him Tylenol # 3 in light of Dr. Adams's orders. Thayer has never asserted that he asked the defendants for Motrin, that they refused to give him this drug, or that they otherwise hampered his receipt of this medication. While Thayer complains that his dressing was not changed, this was not prescribed, and Thayer suffered no infection or lasting harm. Because Gonzales and Flisowski were not empowered to take action contrary to doctor's orders, their inability to alleviate Thayer's pain is not a grievance of constitutional magnitude. *See Gobert,* 463 F.3d at 346; *cf. Easter,* 467 F.3d at 464-65 (denying qualified immunity where nurse failed to follow a prescribed course of treatment

that called for the administration of nitroglycerin to inmate when he experienced chest pain); *Harris v. Hegmann,* 198 F.3d 153, 159-60 (5th Cir.1999) (denying qualified immunity to doctor and nurses who ignored inmate's "urgent and repeated requests for immediate medical treatment for his broken jaw and his complaints of excruciating pain").

### III. DISCOVERY MATTERS

**\*\*8** **[3]** Thayer says the district court hamstrung his ability to prove his case by denying his discovery request on the basis that defendants had invoked qualified immunity. "We review the district court's decision to preclude further discovery prior to granting summary judgment for abuse of discretion." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1441 (5th Cir.1993) (citations omitted). Thayer has shown no error in connection with the district court's discovery ruling. The defense of qualified immunity protects officials "from the concerns of litigation, including avoidance of disruptive discovery." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) **\*892** (quotation omitted). In accordance with this principle, a defendant who invokes qualified immunity "is entitled to dismissal before the commencement of discovery" if the plaintiff's assertions fail to "state a claim of violation of clearly established law." *Vander Zee v. Reno,* 73 F.3d 1365, 1368 (5th Cir.1996) (internal quotation marks and citation omitted). Even limited discovery on the issue of qualified immunity "must not proceed until the district court first finds that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Wicks v. Miss. State Employment Servs.,* 41 F.3d 991, 994 (5th Cir.1995) (emphasis omitted). Thayer does not identify, and a review of his complaint does not reveal, allegations sufficient to raise a specific factual issue concerning the legality of the defendants' behavior such that he would be entitled to discovery. Thayer has shown no error in connection with the district court's discovery decision.

### IV. APPOINTMENT OF COUNSEL

**[4]** Finally, Thayer argues that he should have received appointed counsel because his case is complex and he is ignorant of the law. Indigent plaintiffs proceeding under § 1983 are not entitled to appointed counsel absent exceptional circumstances, and we review the denial of such a motion for a clear abuse of discretion. *Baranowski v. Hart,* 486 F.3d 112, 126 (5th Cir.), *cert. denied,* 552 U.S. 1062, 128 S.Ct. 707,

169 L.Ed.2d 553 (2007); *Williams v. Ballard,* 466 F.3d 330, 335 (5th Cir.2006). Factors used to determine whether the appointment of counsel is appropriate in a civil case include "the type and complexity of the case," the plaintiff's ability to present his case, the plaintiff's ability to investigate his case, and the level of skill needed to present evidence and cross-examine witnesses. *Baranowski,* 486 F.3d at 126 (quotation omitted). Thayer has not shown that his case is exceptional. He has investigated and presented the facts of his case well, and has ably identified the controlling legal standards. The district court did not abuse its discretion by declining to appoint counsel to represent Thayer. *See id.*; *Williams,* 466 F.3d at 335.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**All Citations**

364 Fed.Appx. 883, 2010 WL 445601

## Footnotes

\*  Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1  Gonzales did not join in this motion. The Attorney General's office stated that "this office has not been in contact with Margie Gonzales, despite our efforts to do so. She has not requested representation, and to our knowledge, has not been served with process." The Attorney General reiterated these assertions in its letter brief on behalf of Appellees Adams and Flisowski.

2  To the extent Thayer avers that his declarations, when coupled with those of other inmates, raise a genuine issue of material fact as to his claim against Nurse Adams, he is mistaken. None of these individuals claims to have heard or otherwise witnessed Nurse Adams change Thayer's medication. They either allege that they heard someone else aver that Nurse Adams had taken this action or assert that Nurse Adams took this action without explaining how they learned of Nurse Adams's involvement. Thayer thus offers only hearsay and assertions lacking any indicia of personal knowledge.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.