## Case No. 4:14-cv-03253
_____

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION
_____

*Stephen McCollum, et al.*
*Plaintiffs*,

*v.*

*Brad Livingston, et al.*
*Defendants.*

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

**KEN PAXTON**
Attorney General of Texas

**CHARLES E. ROY**
First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General
For Civil Litigation

**KAREN D. MATLOCK**
Chief, Law Enforcement Defense Division

**MATTHEW J. GREER**
Assistant Attorney General

**CYNTHIA LEE BURTON\***
Assistant Attorney General

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
P.O. Box 12548, Capitol Station
Austin TX 78711
(512) 463-2080/Fax (512) 495-9139
COUNSEL FOR DEFENDANTS

*Attorney in Charge

TABLE OF CONTENTS

I. NATURE AND STAGE OF THE PROCEEDINGS ................................................ - 1 -

II.  ISSUES TO BE RULED UPON BY THE COURT .................................. - 2 -

　　1.  Whether Defendants are entitled to Qualified Immunity, where their conduct was objectively reasonable and in accordance with clearly established law .......... - 2 -

　　2.  Whether the Plaintiffs have met the "extremely high bar" of deliberate indifference. .............................................................................. - 2 -

　　3.  Whether Plaintiffs' claim of "intentional discrimination" under the ADA and RA can be squared with either the evidence or existing binding precedent ............ - 2 -

　　4.  Whether Plaintiffs are entitled to proceed with their punitive damages claims. ..... - 2 -

　　5.  Whether Plaintiffs have standing to assert a claim for injunctive relief where they are not, and have never been, inmates in the custody of TDCJ ................................ - 2 -

III.  STANDARD OF REVIEW ................................................................ - 2 -

IV.  SUMMARY OF THE ARGUMENT .................................................. - 3 -

V.  STATEMENT OF FACTS ................................................................ - 7 -

　　A.  Statement of each defendants' role and title in the summer of 2011. ....................... - 7 -

　　B.  A brief history of the *Ruiz* litigation and the TDCJ ................................................. - 8 -

　　C.  The University of Texas Medical Branch and Texas Tech University provide direct patient care to the TDCJ offenders. ................................................................. - 10 -

　　D.  Development and evolution of the TDCJ's summer heat mitigation protocols leading up to the summer of 2011 ................................................................................ - 11 -

　　E.  TDCJ's leadership, including Director Livingston, believed the TDCJ's heat mitigation strategy was effective and appropriate prior to the start of 2011. ............................................................................................................... - 18 -

　　F.  Larry McCollum's status at the Hutchins Unit in July 2011 .................................. - 23 -

　　　　1. A description of Officer Clark's participation in the events at issue. ................. - 28 -

　　　　2. A description of Sergeant Tate's participation in the events at issue. ............... - 30 -

　　　　3. A description of Lieutenant Sanders' participation in the events at issue. ........ - 32 -

**VI.    ARGUMENT** ............................................................................................- 34 -

   **A. Brief In Support Of Defendants' Entitlement to Qualified Immunity** .................- 34 -

      **1.All Defendants are entitled to qualified immunity as their actions were objectively reasonable in light of the clearly established law** ....................................................- 35 -

      **2. Fifth Circuit precedent was not clearly established that prison officials could violate the Eighth Amendment by housing inmates in a high temperature environment when court approved mitigation measures were implemented.** .........................................- 39 -

            **i. No Fifth Circuit precedent prior to the summer of 2011 clearly established that the Eighth Amendment required air conditioned prisons or any other protective measures that had not been implemented by the TDCJ.** ..............................- 40 -

            **ii. The *Webb* and *Hinojosa* opinions are not dispositive here as they were predicated on facts already disproven by undisputed evidence and erred regarding the law of qualified immunity** .......................................................- 44 -

   **B. Director Livingston's conduct was objectively reasonable because the TDCJ's policies and directives implemented measures based upon clearly established law.** ..........- 49 -

      **1. The TDCJ implemented *Gates*-plus measures.** ....................................................- 49 -

      **2. The operation of prison facilities without air conditioning was well known to Federal Courts overseeing the Texas Prison system during the *Ruiz* litigation, which, along with counsel representing the Texas inmates, approved of the design and construction of facilities without air conditioning.** ....................................................- 51 -

      **3. The two lone hypothermia deaths between 2007 and 2011 occurred under extremely unique circumstances and did not suggest to Director Livingston, or any like situated correctional official, a systemic problem that required changes to current facilities, measures, or operations.** .........................................................................................- 53 -

      **4. Director Livingston reasonably relied upon well-qualified officials to whom he delegated certain matters.** .........................................................................................- 55 -

      **5. No law required 24 hour medical care, and Director Livingston reasonably relied on the judgment of qualified medical professionals, who asserted that appropriate medical care could be provided at the Hutchins Unit despite staffing reductions..** - 55

      **6. Director Livingston could not take unilateral action to air condition Texas prison facilities, and members of the Texas Legislature, even after learning of hyperthermia deaths, have not suggested that the TDCJ should air condition its facilities.** .......- 56 -

**7. Numerous prison systems throughout the south, including the Federal prison system, operate prisons without air conditioning, and national prison standards do not call for air conditioned housing areas**................................................................- 59 -

**8. Public policy overwhelmingly favors finding Livingston entitled to qualified immunity.**..........................................................................................................- 60 -

**C. Public policy overwhelmingly favors finding Livingston entitled to qualified immunity.**..........................................................................................................- 63 -

**1. Eason and Pringle relied on orders through the chain of command to implement mitigation measures with the full expectation that they would be effective.**..........- 63 -

**2. Neither Eason nor Pringle held the authority to order the installation of air conditioning.**............................................................................................- 65 -

**3. No case law required that 911 be summoned any time an inmate suffers a seizure.**..................................................................................................................- 66 -

**D. Defendants Clark, Tate, and Sanders are entitled to qualified immunity where the law was not clearly established that security staff who believe an inmate is suffering a serious—but not emergent—condition that most often does not require emergency medical care violated the Eighth Amendment by not immediately calling 911.**....- 67 -

**1. Consistent with decades of Fifth Circuit precedent, Plaintiffs' attempts to frame their negligence claims as deliberate indifference claims should be rejected**........- 69 -

**2. A brief history of the *Ruiz* litigation and the TDCJ**............................................- 71 -

**i. Plaintiffs lack evidence of a pattern of violations to establish supervisory liability against Director Livingston.**................................................- 72 -

**ii. Livingston appropriately delegated to and relied upon qualified subordinates.**......................................................................................- 76 -

**iii. Livingston had no knowledge of deficient implementation of the TDCJ's summer mitigation measures.**..................................................................- 77 -

**iv. Plaintiffs' claims negate the notion that any policy decision by Director Livingston was the "moving force" behind the death of Larry McCollum**......................................................................................- 78 -

**3. Plaintiffs cannot prove a set of facts which would justify holding Eason and Pringle liable as supervisors.**..........................................................................................- 79 -

**i. Pattern of violations**........................................................................- 80 -

iv

**ii. Eason and Pringle are not policy makers.** ...................................................- 80 -

**iii. Eason and Pringle met their Constitutional obligations by ordering that summer mitigation measures be implemented.** ..........................................- 81 -

**iv. Supervisory liability cannot be imposed where Eason and Pringle had no knowledge of a pattern of violations with regard to summoning medical personnel during seizures** ..........................................................................- 82 -

**4. Plaintiffs' claims against the security staff defendants, Clark, Tate, or Sanders, fail due to their appropriate responses and their lack of subjective knowledge that McCollum was suffering a heat stroke** .....................................................................- 84 -

**i. Clark, Tate, and Sanders were not subjectively aware that Larry McCollum was having a heat stroke** ..........................................................................- 86 -

**a. Officer Clark was not deliberately indifferent to McCollum's needs.** - 86 -

**b. Sergeant Tate was not deliberately indifferent to McCollum's needs** - 87 -

**c. Lieutenant Sanders was not deliberately indifferent to McCollum's needs** ..........................................................................................................- 90 -

**ii.   The alleged delay by Clark, Tate, or Sanders did not cause McCollum's death.** ...........................................................................................................- 91 -

**5. The obviousness of the danger will not suffice to establish the subjective awareness requirement for any defendant** ........................................................................- 92 -

**6. The absence of air conditioning at the Hutchins Unit did not violate the Eighth Amendment.** ....................................................................................................- 93 -

**7. All Defendants are entitled to dismissal of the claims for punitive damages where the material facts not capable of dispute demonstrate that none of the defendants** ...........................................................................................................- 99 -

**E. Plaintiffs' ADA and RA claims improperly expand the ADA and RA in a way that squarely conflicts with established Fifth Circuit precedent** ..................................- 100 -

**1. Plaintiffs cannot meet the high burden to prove intentional discrimination by allegations sounding in negligence** .......................................................................- 102 -

**2. McCollum's medical conditions do not demonstrate that McCollum was disabled within the meaning of the ADA.** ..........................................................................- 104 -

**3. The TDCJ's lack of knowledge of McCollum's inability to thermoregulate demonstrates the TDCJ could not have "intentionally discriminated" against McCollum.** ................................................................................**- 106 -**

**4. The TDCJ provided reasonable accommodations to mitigate the effects of the heat and there is no evidence that the TDCJ had knowledge that the measures would not suffice for McCollum.** ............................................................**- 108 -**

**5. Plaintiffs have failed to prove McCollum was denied access to a program or service which imposed more pain and punishment on him than other similarly situated offenders** .................................................................................**- 110 -**

**6. The TDCJ is immune from Plaintiffs' ADA claims.** ...........................**- 113 -**

**7. Plaintiffs failed to prove the alleged discrimination was solely by reason of disability under the RA.** ...................................................................**- 113 -**

**8. No high-level TDCJ official with the ability to remedy the alleged violation had the requisite knowledge for Plaintiff to demonstrate agency *respondeat superior* liability under the ADA or RA** ..........................................................**- 114 -**

**F. Plaintiffs lack standing to seek injunctive relief** .....................................**- 116-**

**VI.    PRAYER FOR RELIEF** ..............................................................**- 117 -**

TABLE OF AUTHORITIES

## Cases

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ..................................................- 35 -

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) .........................................- 2 -

*Ashcroft v. al-Kidd*, ––– U.S. ––––, 131 S.Ct. 2074, 2084 (2011) ................... - 35 -, - 47 -, - 60 -

*Ashley v. U. S.*; 3:14-CV-02654-D (Northern District of Texas)..............................- 60 -

*Austin v. Johnson*, 328 F.3d 204 (5th Cir.2003) .....................................................- 68 -

*Bailey* v. *Livingston*, 4:14-cv-1698, (S.D. T.X.) (D.E. 326, 327 at 62-64)..............................- 46 -

*Ball v. LeBlanc*, 792 F.3d 584, 592–93 (5th Cir.2015)..........................................*passim*

*Barkes v. First Corr. Med., Inc.,* 766 F.3d 307, 328–29 (3d Cir.2014)...................................- 39 -

*Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 488 (5th Cir.2001) ........................................- 34 -

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)..........................................................................................- 73 -

*Bennett-Nelson*, 431 F.3d 448 (5th Cir.2005) ......................................................- 114 -

*Bias v. Woods*, 288 Fed.Appx. 158 (5th Cir.2008) .................................................- 67 -

*Blackmon v. Garza*, 484 F. App'x 866 (5th Cir. July 30, 2012) ..................................- 40 -, -92-

*Blank v. Eavenson*, 530 Fed.Appx. 364, 370-71 (5th Cir.2013)..................................- 72 -

*Blanks v. Southwestern Bell Communications*, 310 F.3d 398, 400 (5th Cir.2002).................- 100 -

*Boyd v. Grooms*, 2009 WL 3151341  (S.D.Tex.,2009) ...........................................- 67 -

*Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996) ............................................- 111 -

*Burch v. Coca–Cola Co.*, 119 F.3d 305, 316 (5th Cir.1997)....................................- 106 -

*Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir.2003) .............................- 73 -

*Carrion v. Wilkinson,* 309 F.Supp.2d 1007, 1016 (N.D. Ohio 2004).....................................- 111 -

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .......................................................- 2 -

*Cheek v. Nueces County Tex.*, 2013 WL 4017132 at * 18 (S.D.Tex. 2013)................- 101 -, -110-

*Childers v. Bates*, 2010 WL 1268139 (S.D.Tex.,2010)............................................- 67 -

*City & Cty. of San Francisco, Calif. V. Sheehan*, 135 S. Ct. 1765, 1771, 1774-78 (2015) .................................................................................................. - 36 -,-37-, - 38 -

*City of Canton v. Harris*, 489 U.S. 378, 390 n. 10, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).- 74 -

*City of Los Angeles v. Lyons*, 461 U.S. 95, 102-104 (1983) (citing *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974)................................................................................- 118 -

*Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000).................................................- 71 -

*Connick v. Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1363, 179 L.Ed.2d 417 (2011) ..................... .................................................................................. - 73 -, - 74 -,- 82 -

*Cooper v. Hung*, 485 Fed.Appx. 680, 684 (5th Cir.2012) .......................................................- 67 -

*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)........................................................- 94 -

*D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.,* 629 F.3d 450, 455 (5th Cir.2010).......- 102 -

*Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004)..........- 110 -

*Delano–Pyle v. Victoria County*, 302 F.3d 567, 575 (5th Cir.2002) ..................................... *passim*

*Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir.2001).................- 71 -, - 102 -

*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) ..........................- 101 -

*Elder v. Holloway* 510 U.S. 510 (1994)................................................................................- 34 -

*Elliott v. Perez*, 751 F.2d 1472, 1476-79 (5th Cir.1985) ........................................................- 34 -

*Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363, 365 (5th Cir.2013)........................................- 101 -

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir.2005) ..................................................................................................- 73 -

*Estate of Henson v. Krajca*, 440 Fed.Appx. 341, 346 (5th Cir.2011)......................................- 86 -

*Estelle v. Gamble*, 429 U.S. 97, 104, (1976) ........................................................................- 84 -

*Farmer v. Brennan*, 511 U.S. 825, 845 (1994) .................................................................. *passim*

*Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir.2011)..............................................- 116 -

*Galvin v. Cook,* No. CV 00-29-ST, 2000 WL 1520231, at *6 (D.Or. Oct.3, 2000)...............- 111 -

*Garner v. Chevron Phillips Chem. Co., L.P.,* 834 F.Supp.2d 528, 529 (S.D.Tex. 2011).......- 105 -

*Gates v. Cook*, 376 F.3d 323, 333 (5th Cir.2004).....................................- 39 -, - 41 -, - 56 -, - 59 -

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) ................................................................................................................- 116 -

*Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir.2001) ..........................................- 71 -

*Griffin v. United Parcel Serv., Inc.,* 661 F.3d 216, 223 (5th Cir.2011) .................- 105 -

*Griffin,* 661 F.3d at 222..........................................................................................- 105 -

*Hale v. King*, 642 F.3d 492, 500 (5th Cir.2011) ............................ - 71 -, - 105 -, - 110 -

*Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009)..........- 100 -, - 104 -

*Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 (5th Cir.1996)...........................- 86 -

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983) ......................................................- 34 -

*Harper v. Showers*, 174 F.3d 716, 719–20 (5th Cir.1999) .......................................- 70 -

*Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir.1999) ...........................................- 84 -

*Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir.2012)...............................................- 110 -

*Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993)...................................................- 94 -

*Hermosillo v. Hudson*, 2012 WL 4097735, *10 (S.D.Tex. 2012) ...........................- 67 -

*Hinojosa v. Livingston*, 807 F.3d 657, 683 (5th Cir.2015) .....................- 43 -, - 44 -, - 46 -, - 93 -

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) .............................................................- 37 -

*House v. Simmon*, 2013 WL 2391680, *5 (E.D.Tex. May 29, 2013) ......................- 67 -

*Huff v. Thaler*, 2012 WL 2120569, *9 (S.D.Tex. 2012)........................................- 67 -

*Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007)..............- 100 -, - 104 -

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir.2004) ................................................................................................................- 73 -

*Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) .....................- 55 -, - 77 -, - 93 -

*Johnson v. Texas Bd. of Criminal Justice*, 281 F. App'x 319, 321 (5th Cir. 2008)- 40 -, - 43 -, - 48

*Kaufman v. Carter*, 952 F. Supp. 520, 523-24 (W.D. Mich. 1996)........................- 112 -

*Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002) .................................- 70 -

*Lee v. Valdez*, 2009 U.S. Dist. LEXIS 43381, 2009 WL 1406244 at *13 (N.D. Tex. May 20, 2009) ................................................................................................................- 110 -

*Legate v. Livingston*, Appeal No. 15-40079 (5th Cir. May 18, 2016) ...................................- 94 -

*Lewis v. Evans*, 440 F. App'x 263, 265 (5th Cir.2011) ...........................................- 84 -

*Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334 (11th Cir.2012) ...................- 116 -

*Long v. Collins,* 917 F.2d 3, 5 (5th Cir.1990) .......................................................- 99 -

*Lujan v. Defenders of Wildlife*, 504 U.S. 560-1 (1992) .........................................- 117 -

*Malley v. Briggs*, 475 U.S. 335, 341 (1986) ........................................................- 34 -

*Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 410 (5th Cir. 2013).......................- 105 -

*Martone v. Livingston*, 2014 WL 3534696, at *8 (S.D. Tex. July 16, 2014) ...........................- 37 -

*McCoy v. Tex. Dep't of Crim. Justice*, 2007 WL 2331055, at *7 (S.D.Tex. 2006) ...............- 112 -

*Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir.1993)..............................................- 85 -, - 92 -

*Morgan v. Swanson*, 659 F.3d 359, 378–79 (5th Cir.2011)..........................................- 36 -, - 37 -

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).......................................... - 36 -, - 37 -, - 47 -

*Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir.2013)......................................- 105 -

*Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012)............... - 103 -,- 109 -, - 110 -

*Okla. City v. Tuttle*, 471 U.S. 808, 822–23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ..............- 73 -

*Oswalt v. Sara Lee Corp.,* 74 F.2d 91, 92 (5th Cir. 1996)...........................................- 105 -

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ......................................................- 61 -

*Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).....................................................- 35 -

*Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) ..................................................- 36 -

*Pinkerton v. Spellings*, 529 F.3d 513, 516–17 (5th Cir.2008) ...............................................- 116 -

*Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (2014)..................................................- 38 -

*Plumley v. Landmark Chrevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir.1997)............................- 118 -

*Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) .................................................- 73 -

*Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012) .................................................- 49 -

*Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir.1992)......................................- 71 -, - 73 -

*Rodriguez v. Muzyka*, 543 Fed.Appx. 363 (5th Cir.2013) .................................................- 103 -

*Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996)..............................- 106 -

*Ruiz v. Estelle, et al.*, 503 F.Supp. 1265 (S.D. Tex.1980) .................................... - 9 -, - 40 -, - 51 -

*Ruiz v. Johnson*, 154 F. Supp. 2d 975, 996 (S.D. Tex. 2001)...................................................- 52 -

*Ruiz v. Johnson*, 37 F. Supp. 2d 855, 904 (S.D. Tex. 1999).........................................- 14 -, - 52 -

*Russell v. Johnson*, 2003 WL 22208029, at *5 (N.D. Miss. 2003)..........................................- 41 -

*Salas v. Carpenter*, 980 F.2d 299 (5th Cir.1992).....................................................................- 34 -

*Saucier v. Katz*, 533 U.S. 194, 201 (2001) ..............................................................................- 34 -

*Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 704 (N.D. Tex.2014)................- 114 -

*Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir.2010) .............................- 101 -, - 110 -

*Slaughter v Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir.1986) .................................................- 3 -

*Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)...............................- 99 -

*Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)........................................................- 73 -

*Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002)...........................................- 114 -

*Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir.1988) ......................................- 2 -

*Stanton v. Sims*, 134 S. Ct. 3, 7 (2013) ...................................................................................- 38 -

*Stewart v. Guzman*, 555 Fed.Appx. 425 (5th Cir.2014) ...........................................................- 85 -

*Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) .................................................................*passim*

*Taylor v. Richmond State Supported Living Ctr.*, 2012 WL 6020372, n.2 (S.D. Tex. 2012).- 102 -

*Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir.1987)..................................................- 72 -, - 78 -

*Tuft v. Texas*, 410 Fed.Appx. 770, 775 (5th Cir.2011) .............................................- 104 -, - 110 -

*United States v. Georgia*, 546 U.S. 151 (2006) ....................................................................- 113 -

*Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir. 2008) ...............................- 42 -, - 47 -, - 48 -

*Walker v. Upshaw*, 515 Fed.Appx. 334 (5th Cir.2013) ...........................................................- 74 -

*Webb v. Livingston*, 618 F. App'x 201, 208 (5th Cir. 2015) .................................................*passim*

*Whitt v. Stephens Cty.*, 529 F.3d 278, 284 (5th Cir.2008) .......................................................- 72 -

*Williams v. Certain Individual Emp. of the Tex. Dep't of Criminal Justice–Institutional Div. at the Jester III Unit*, 480 F. App'x 251, 256 (5th Cir.2010) ................................................. - 84 -, - 85 -

*Wilson v. Layne*, 526 U.S. 603, 614 (1999) ...................................................... - 34 -

*Wolff v. McDonnell*, 418 U.S. 539, 566, (1974) ................................................ - 61 -

*Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995)............................................ - 70 -

*Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir.2013)............................................ - 36 -

## Statutes

29 U.S.C. §794(a) ........................................................................ - 114 -

42 U.S.C. § 12102(1) ...................................................... - 100 -, - 104 -

42 U.S.C. § 1983........................................................................... - 1 -

42 U.S.C. § 2000d–1 ..................................................................... - 116 -

Fed. R. Civ. P. 56(c) ..................................................................... - 2 -

Tex. Gov't Code § 2261.254 ........................................................... - 57 -

Tex. Gov't Code § 492.013(b), (e). .................................................. - 57 -

Tex. Gov't Code § 501.133 ............................................................. - 10 -

Tex. Gov't Code § 501.148 ............................................................. - 11 -

Tex. Gov't Code § 501.150 ............................................................. - 10 -, - 20 -

Tex. Gov't Code §§ 492.013(c), 492.017 ........................................... - 57 -

Tex. Util. Code § 39.903 ............................................................... - 97 -

**Other Authorities**

*Ahead of Second Special Session, Alabama's Prisons in Crisis*, ALABAMA NEWS (Sep. 7, 2015, 5:05 PM), http://www.alabamanews.net/home/top-stories/Ahead-of-the-Second-Special-Session-Alabamas-Prisons-in-Crisis-325492141.html .......................................................- 59 -

Tex. S.B. 7, 76th Leg., R.S. (1999) ...........................................................................................- 97 -

*The Americans With Disabilities Act and State Prisons: A Question of Statutory Interpretation,* 66 Fordham L.Rev. 2233, 2283 (1998) ....................................................................................- 112 -

**RULES**

FED. R. EVID. 802 ...................................................................................................................- 115 -

**TABLE OF CONTENTS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**NOW COME** Brad Livingston, Robert Eason, Jeffery Pringle, Sandrea Sanders, Karen Tate, Richard Clark and the Texas Department of Criminal Justice and submit Defendants' Motion for Summary Judgment with attached Appendix.

### I.  NATURE AND STAGE OF PROCEEDING

This case concerns the death of Larry McCollum, an inmate confined to custody with the Texas Department of Criminal Justice (TDCJ) at the Hutchins Unit near Dallas, Texas.  Plaintiffs, McCollum's survivors, filed this suit under 42 U.S.C. § 1983 claiming that Defendants were deliberately indifferent to a serious risk to McCollum's health due to the conditions of confinement at the Hutchins Unit.  Plaintiffs also allege that Defendants responded inadequately when McCollum was found to be in distress.  Plaintiffs further claim that the TDCJ intentionally discriminated against McCollum in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").  Plaintiffs allege McCollum died due to the lack of air conditioning in the housing areas at the TDCJ Hutchins Unit.  Plaintiffs seek compensatory and punitive damages as well as injunctive relief.  Defendants deny these claims, and assert that under Rule 56, summary judgement is warranted.  The parties have completed discovery and this matter is ripe for summary judgment.

## II.      ISSUES TO BE RULED UPON BY THE COURT

I.      **Whether Defendants are entitled to Qualified Immunity, where their conduct was objectively reasonable and in accordance with clearly established law.**

II.     **Whether the Plaintiffs have met the "extremely high bar" of deliberate indifference.**

III.    **Whether Plaintiffs' claim of "intentional discrimination" under the ADA and RA can be squared with either the evidence or existing binding precedent.**

IV.     **Whether Plaintiffs are entitled to proceed with their punitive damages claims.**

V.      **Whether Plaintiffs have standing to assert a claim for injunctive relief where they are not, and have never been, inmates in the custody of TDCJ.**

## III.     STANDARD OF REVIEW

The role of a court or judge in summary judgment proceedings is to make the "threshold inquiry of determining whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If this inquiry reveals that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," judgment should be entered in his favor. FED. R. CIV. P. 56(c). Disagreement among the parties as to the facts will not prevent summary judgment. *Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2511. On the contrary, summary judgment is precluded under Rule 56(c) only when the dispute is genuine and the disputed facts might affect the outcome of the suit. *Anderson*, 477 U.S. at 248; *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir.1988).

When petitioning a court for summary judgment, the movant need not disprove the non-moving party's claims; but, instead, must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); accord *Slaughter v Allstate*

- 2 -

*Ins. Co.,* 803 F.2d 857, 860 (5th Cir.1986).  If the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff] will bear the burden of proof at trial," then the defendant is entitled to judgment in his favor. *Celotex*, 477 U.S. at 322.

### IV.    SUMMARY OF THE ARGUMENT

From the Executive Director of the Texas Department of Criminal Justice, down to the unit level correctional officers, the Defendants in this case are entitled to summary judgment based on their entitlement to qualified immunity.  The case at bar demonstrates with abundant clarity the rationale and need for qualified immunity protections for individuals at all levels of the organizational structure of a state prison system faced with the difficult task of administering, supervising, and executing the unenviable task of running a prison.  As shown below, every Defendant acted reasonably and in good faith, and in accordance with clearly established law. Further, the uncontroverted evidence shows that Defendants conduct simply cannot be characterized as deliberate indifference or intentional discrimination.  McCollum's death, though tragic, was not the product of Eighth Amendment or ADA violations at the policy making level (Livingston), the management level (Eason and Pringle), or by the officers on the ground (Clark, Tate and Sanders).

In July of 2011, the clearly established law did not require the installation of air conditioning in the housing areas of state prisons.  In 1980, as part of sweeping *Ruiz* litigation challenging the Constitutionality of nearly every aspect of the Texas prison system, Judge Justice denied the inmate-plaintiffs' claims regarding the temperatures inside the prisons.  As part of the broad judicial oversight that followed over the next two decades, issues related to indoor temperatures and ventilation were negotiated, agreed, and approved by Judge Justice.  At no time

did the parties in *Ruiz* or the Court require as part of the major prison construction ordered in *Ruiz*, that the TDCJ install air conditioning in the new prisons or as part of the repairs made to older prisons in the Texas prison system.  At no point in the following years, has a Fifth Circuit court held that the Eighth Amendment mandates air conditioning, and in 2008, the Fifth Circuit explicitly rejected the notion.  Instead, the Fifth Circuit held that summer temperatures nearly identical to those in Texas could be mitigated by providing ice water, fans, ventilation, and access to showers.  The TDCJ's heat mitigation plan exceeds these minimums.  Top officials from several departments within TDCJ meet yearly and review the agency's existing heat mitigation practices.  Following the annual meeting, the Correctional Institution's Director issues a written directive containing the measures the executives expect to be carried at the prison units during the summer.  Correctional Institution Division's Director is accompanied by yearly and daily training for correctional staff and offenders on the dangers of the heat, and how to keep safe during the summer.  The TDCJ and the Hutchins Unit implemented measures that exceeded the measures required by clearly established law.

The rationale behind qualified immunity applies no more squarely than to Plaintiffs' claims against Director Livingston.  Long recognized as one of the nations' top correctional administrators, Director Livingston oversees a massive and complex agency that manages every aspect of the daily lives of 150,000 individuals, all of them convicted felons, requiring 24/7 supervision and secure confinement in over 100 facilities across the state.  As does any executive of such a large enterprise, he delegates matters to well qualified professionals who are experts in their respective fields.  With regard to TDCJ's summer heat mitigation measures, Director Livingston believed that the TDCJ's practices were sufficient to protect all inmates in the system, including McCollum.  His belief in the effectiveness and legality of TDCJ's practices was

bolstered by the fact that numerous prisons systems, throughout the south, operate within the Constitution without air conditioning. Director Livingston also relied on well qualified experts in the field of medical care, facilities management and design, as well as independent inspectors from the American Correctional Association to ensure that the health care staffing, facilities and the TDCJ's policies and practices met Constitutional guidelines. In sum, Director Livingston appropriately and in good faith discharged his duties as a correctional administrator. He had no reason to believe the TDCJ practices related to heat would be insufficient to reasonably protect the inmates in TDCJ's care. Even had he believed the TDCJ should air condition its facilities—likely a billion dollar proposition for 70+ facilities without air conditioning in offender living areas—he lacked the power to implement the necessary major construction without action from the Texas Board of Criminal Justice and the Texas Legislature. To hold him liable would countermand existing and very recent Supreme Court precedent. It would discourage any well qualified management executive from ever agreeing to manage a state prison system, which Courts have long recognized are inherently dangerous places despite the best efforts of well-intentioned professionals who, like Livingston, constantly strive, but will never achieve, complete safety.

Likewise, Regional Director Eason and Warden Pringle also are entitled to qualified immunity. Regional Director Eason ensured that all of the facilities in his region, which included the Hutchins Unit, implemented and adhered to the TDCJ's heat mitigation protocols. Warden Pringle ensured they were implemented at the Hutchins Unit and devised specific procedures to tailor them to the Hutchins Unit's physical plant. Again, these measures exceeded those previously held Constitutional. Eason and Pringle both believed the measures would be effective in protecting inmates from the summer temperatures. They based their belief in the effectiveness of the measures based upon their decades of experience working in un-air-conditioned prisons. Both

testified that they rarely, if ever, witnessed or experienced heat-related illness to inmates or staff.

Defendants Clark, Tate, and Sanders also are entitled to qualified immunity because each acted in good faith in responding to McCollum on the night he became ill.  Clark first found McCollum in distress after an inmate alerted staff that McCollum was having a seizure.  Seizures are common in the correctional setting.  Clark followed established emergency procedures and contacted his supervisor, Sgt. Tate and reported the situation.  Tate responded directly, and found McCollum in the midst of what she too believed to be a seizure.  Based on the fact that the incident occurred during the night when the temperatures were coolest and after McCollum had been sedentary for several hours, neither realized he was in the midst of a heat stroke.  The officers checked McCollum's air way, breathing, and pulse and made sure he remained in safe position while the seizure ran its course. Sgt. Tate reported on the situation to her supervisor, Lt. Sanders.  All of them expected McCollum to emerge from what they all thought was a seizure.  As time elapsed and he did not recover as expected, Lt. Sanders arrived on the scene and contacted the off-site medical provider for further instructions.  In so doing, she acted in accordance with the UTMB procedure established on the Hutchins Unit that required medical staff to determine what emergency response was appropriate.  Finding no records indicating McCollum had a history of seizures, the medical providers instructed Lt. Sanders to call 911.  She did so immediately.  At no point did any of the officers recognize that McCollum was having a heat stroke and all would have initiated the process to call 911 immediately had they known.  No existing case law suggests that the officers' actions were unlawful, nor does existing law suggest that officers must call 911 any time an inmate suffers a seizure.

The reasonableness of each Defendants' actions also shows they were not deliberately indifferent to the dangers of heat in the TDCJ system or at the Hutchins Unit, nor were they

deliberately indifferent to McCollum's condition on the night he was taken ill.  As for Livingston, Eason, and Pringle, none were aware of a pattern of past Constitutional violations that alerted them that the TDCJ's mitigation measures either in general or at the Hutchins Unit would be insufficient to protect the inmates from the summer temperatures.  The summer of 2011 proved to be the hottest summer ever recorded and was not predicted in advance.  The deliberate indifference claims against Clark, Tate, and Sanders also fail, as none were subjectively aware that McCollum was suffering a heat stroke and none simply ignored his condition.  Finally, medical evidence shows that even had 911 been summoned immediately, the outcome would have remained unchanged.

Under these circumstances, Plaintiffs' claims for punitive damages must be dismissed.

Plaintiffs' ADA and RA claims against the TDCJ fail for similar reasons, as there is no evidence that McCollum actually met the definition of being disabled within the meaning of the ADA or RA.  There is no evidence that the TDCJ was aware of this disability or that McCollum was being excluded from any program or service.  There is no evidence that the TDCJ knew he needed a specific accommodation but intentionally refused to provide it.  Plaintiffs' attempts to utilize the ADA and RA as a general liability statute, while tactically clever to skirt the protections of qualified immunity, cannot be squared with binding precedent.

Further, the Plaintiffs' claim for injunctive relief is frivolous due the Plaintiffs' lack of standing to assert the relief under well-settled law.

## V.     STATEMENT OF FACTS[1]

**A.  Statement of each defendants' role and title in the summer of 2011.**

---

[1] For ease of reference, Defendants also have created a fact timeline at Appx. 1830 to 1835.

Defendant Brad Livingston is the Executive Director of TDCJ. As the Executive Director of TDCJ, he oversees one of the nations' largest prison systems. The TDCJ has overall jurisdiction over the entire adult criminal justice system in the State of Texas, including probation and parole.

The TDCJ has six regions.   In the summer of 2011, Defendant Robert Eason was the Regional Director for Region II of the TDCJ. Regional Director Eason supervised 11 wardens and 13 facilities, including the TDCJ Hutchins Unit.

Defendant Jeff Pringle was the senior warden at the Hutchins State Jail in 2011. Warden Pringle was the highest-ranking administrator for security at the Hutchins State Jail which houses approximately 1970 to 2200 inmates at any given time.

Defendant Richard Clark was a Correctional Officer V at the Hutchins State Jail during the summer of 2011. Officer Clark was employed at TDCJ for over 18 years at the time of this incident. On the night of July 21, 2011 and continuing into the early morning of July 22, 2011, Officer Clark was on duty and assigned as the second rover for C building at the Hutchins Unit, where McCollum was housed.

Defendant Karen Tate was a Sergeant of Correctional Officers at the Hutchins State Jail during the summer of 2011. On the night of July 21, 2011 and continuing into the early morning of July 22, 2011, Sergeant Tate was on duty as a Sergeant at the Hutchins Unit. Sergeant Tate's duties included supervising Correctional Officers at the Hutchins State Jail.

Defendant Sandrea Sanders was a Lieutenant of Correctional Officers at the Hutchins State Jail during the summer of 2011. On the night of July 21, 2011 and continuing into the early morning of July 22, 2011, Lieutenant Sanders was on duty as a Lieutenant at the Hutchins State Jail. She was the highest ranking officer on the Hutchins Facility during the overnight hours.

**B. A brief history of the *Ruiz* litigation and the TDCJ.**

- 8 -

First established in 1848, the Texas prison system houses approximately 150,000 inmates and operates over 100 facilities across the state. (Appx. 1615:17 to 19; Appx. 1616-1617:25, 1 to 2)  Since its inception, the TDCJ has operated facilities that do not contain refrigerated air or air conditioning in the inmate housing areas.  Many of the prisons operated by the TDCJ predate the feature of air conditioning.[2]  Despite this, the oldest available records on offender mortality do not indicate that any indoor offender deaths, due to hyperthermia from lack of air conditioning in the housing areas, occurred between 1984 and 1997.[3] (Appx. 1479-1480)

Beginning in 1980, the Texas prison system came under federal judicial oversight following the Court's ruling in *Ruiz v. Estelle, et al.*, 503 F.Supp. 1265 (S.D. Tex.1980).  This expansive litigation and the ensuing reforms covered virtually every aspect of the Texas prison system.  Among the claims in *Ruiz*, the plaintiffs asserted that the housing areas were not adequately heated or cooled, and did not have sufficient ventilation or lighting. *Id.* at 1374. At trial, however, the Court held that the evidence did not demonstrate that "these conditions are so severe as to contribute to the existence of serious threats to the inmates' health and safety."  *Id.*

The *Ruiz* stipulations regarding building standards, negotiated by able counsel for plaintiffs and approved by the Court, specify a host of matters related to temperature and ventilation in minute detail.  Among these are the amount of cubic feet of fresh air exchange per hour at 12.5 cfm per prisoner and 15 complete air exchanges per hour (Appx. 476-484), the spacing of the grill vents which provide the fresh air (Appx. 480; one grill per 20 feet of width), the use of alternate air supply measures if windows are not available (Appx. 479), and the specific temperature at

---

[2] See http://tdcj.state.tx.us/unit_directory/index.html// (listing TDCJ facilities, at least eight of which first came on line prior to 1917)

[3] The lone hyperthermic death identified during these 14 years was the death of 30 year old offender who was working outdoors. (Appx. 1483-1484)

which the ventilation system must be activated. (Appx. 484; any time the temperature is over 78 degrees).   Though air conditioning existed long before these matters were determined, both plaintiffs' counsel and Judge Justice approved them without requiring the installation of air-conditioning.  (Appx. 484)

### C.  The University of Texas Medical Branch and Texas Tech University provide direct patient care to the TDCJ offenders.

Direct patient care for Texas inmates is provided through contracts between the University of Texas Medical Branch and Texas Tech University Health Science Center. (Appx. 316-318; Appx. 1607:12 to 21)  The TDCJ Health Services Division ("TDCJ-HSD") does not provide direct patient care, but, instead, primarily serves to "monitor the quality of care delivered by the health care providers, including investigating medical grievances, ensuring access to medical care, and conducting periodic operational reviews of medical care provided at its units."  TEX. GOV'T CODE § 501.150.

The development of health care policies and procedures related to offenders is governed by a statutorily created committee, the Correctional Managed Health Care Committee ("CMHCC").  TEX. GOV'T CODE § 501.133.   The CMHCC consists of ten (10) members: six members are appointed by the Governor, one physician member is appointed by the president of Texas Tech University Health Sciences Center, one physician member is appointed by the president of UTMB, one member is appointed by the Executive Director of TDCJ, and one ad hoc member is appointed by the Health and Human Services Commissioner.  *Id*.

The CMHCC duties are codified in the Texas Government Code, Chapter 501.148.  The committee may: 1) develop statewide policies for the delivery of correctional health care; 2) serve as a dispute resolution forum in the event of a disagreement relating to inmate health care services between the department and the health care providers or contracting entitles and 3) report to the

Texas Board of Criminal Justice ("TBCJ") at the board's regularly scheduled meeting each quarter on the Committee's policy recommendations. TEX. GOV'T CODE § 501.148. The Committee shall advise the Texas Department of Criminal Justice (TDCJ) and the TBCJ as necessary, including providing medical expertise and assisting the Department and the Board in identifying system needs and resolving contract disputes. *Id.*

In 2011, Texas suffered a budget shortfall. A legislative directive instructed all state agencies to make budget reductions and to plan for further cuts in the upcoming legislative session. (Appx. 1653-1654: 19 to 25, 1 to 12) This included the TDCJ, UTMB, and TTHSC. (Appx. 1655:15 to 24) Part of these required budget cuts required reductions in medical staff. (Appx. 1655:15 to 24) Working together, the TDCJ-HSD, UTMB, and TTHSC crafted a plan to reduce the workforce of medical providers, while still maintaining appropriate levels of care. (Appx. 1656-1657:19 to 25, 1 to 6) Director Livingston testified that officials from these entities gave testimony to the legislature indicating that the system would continue to meet their obligations to provide access to care and meet the inmates' medical needs despite these cuts and he relied on this advice. *Id.*

### D. Development and evolution of the TDCJ's summer heat mitigation protocols leading up to the summer of 2011.

The TDCJ operates over 100 prison across the State of Texas, the majority of which do not have air-conditioning in the housing areas where the inmates reside. In recognition of the potential for danger that comes with housing offenders in an un-air-conditioned environment, the TDCJ devised, implemented, and continuously reviewed and improved upon a comprehensive series of mitigation measures designed to protect offenders from effects of summer heat. The TDCJ's heat mitigation policies and directives are contained in three different documents: Administrative Directive 10.64, the Correctional Managed Health Care Policy Manual, and the Heat Precaution

reminders sent yearly from the TDCJ administration throughout the system. (Appx. 498-515, 516-525, 601-609)

The TDCJ promulgated the first version of A.D. 10.64 in September of 1986.[4] (Appx. 499-503)  The policy defines procedures and safety measures to be implemented to protect offenders and staff working in hot and cold environments.  Prior to the summer of 2011, the policy was in its sixth revision. (Appx. 505)  A.D. 10.64 provides for several protective measures related to heat, with special emphasis on offenders engaging in work assignments. (Appx. 498-515)

First, the policy instructs unit staff to monitor and log outdoor temperatures each hour from 6:30 a.m. to 6:30 p.m. (Appx. 506)  When temperatures rise to levels identified in the policy, unit staff is instructed to modify or curtail work assignments while ensuring frequent breaks and water consumption. (Appx. 514)  Medical staff are to be consulted prior to engaging in work assignments in high heat to evaluate the potential hazards. (Appx. 509)  Offenders are provided with additional clothing items, such as hats, to block direct sunlight. *Id*.  Drinking water is mandated, with sodium added depending on an offender's state of acclimatization.  *Id*.  Newly assigned offenders not yet acclimatized to the heat must be medically evaluated and are closely monitored for early signs of heat intolerance. *Id*.  Caution is urged with offenders taking particular medications. *Id*.  The policy also defines stages and symptoms of heat related illness, and prescribes emergency procedures, should they occur. (Appx. 509-511)  Finally, training is mandated for staff and offenders in work assignments. (Appx. 512)  Non-work assigned offenders are notified of heat awareness through bulletin boards in the offender housing areas, and through information published in *The Echo* (an offender newspaper). (Appx. 1558:12 to 17; Appx. 1598-1599:21 to 25, 1 to 2)

---

[4] While it isn't clear whether this policy was the product of the death of Adolpho Banda and the offender work dispute at the Pack Unit that followed it, its timing certainly suggests that it was the product of TDCJ responsiveness to inmate safety issues. (Appx. 1483-1484)

New offenders are given an orientation on how to access medical, dental and psychological services; a process outlined in the Offender Orientation Handbook. (Appx. 1167-1182)   The handbook instructs offenders that they may access the medical department by submitting a sick call request slip or by direct request to a security officer or supervisor. (Appx. 1179)  Also, specific details on unit procedures are provided at unit orientation.  (Appx. 1172 - 1183)  In the event of an emergency, offenders may request a correctional officer or supervisor to contact the medical department on their behalf and the medical department staff will provide direction as to disposition based on their clinical judgment.  *Id.*

The second policy document that pertains to heat is the Correctional Managed Health Care policy B-15.2.[5] (Appx. 518-525)   This policy governs the efforts made by medical staff in conjunction with security staff to prevent, recognize, and address heat related illness. *Id.* The policy speaks to the importance of acclimatizing offenders to working in high temperatures, the importance of fluid intake, work-rest cycles, and other protective measures. *Id.*   It also lists medications that have an association with heat stress and medical conditions that may affect heat tolerance.[6]  Finally, the policy requires that medical staff provide training to security each summer on the topic of heat prevention. (Appx. 518)

Finally, and most importantly, in addition to the protective measures in A.D. 10.64 and CMHC B 15.2, the TDCJ administration sends out two yearly directives to all units regarding protective measures to be implemented during the summer months: one directive from the Correctional Institutions Division ("TDCJ-CID") and the other from the TDCJ-HSD.  (Appx. 602-605, 607-609)  The earliest version of these types of communications date back to 1997, and have

---

[5] The current version of this policy is contained in CHMC Policy D-27.2.
[6] The policy includes these lists as a guide for medical staff regarding medication or conditions that may affect heat tolerance.  Each individual's reaction to a specific medication or medical condition is unique with varying levels of risk and tolerance. (Appx. 1609:1 to 5; Appx. 1610-1611:21 to 25, 1 to 5)

evolved over the years. (Appx. 533-534)  In 1998, three offenders died from hyperthermia.  This triggered a number of changes within the TDCJ as they sought to address this issue.  Some immediate changes at the time came in the area of offender transportation after an offender death occurred while an offender was being transported in a vehicle. (Appx. 1486-1492; Appx. 535-545) Within two days of this incident, new directives were issued for the transport of offenders during the summer.  *Id*.  Also in 1998, the TDCJ made an emergency purchase of 1,422 fans, additional email precautions were sent, and each region submitted reports to the administration of steps being taken to reduce the risk from the heat.  (Appx. 546, 535-545)  While this occurred, two additional offenders died from hyperthermia in July of 1998.  *See Ruiz v. Johnson*, 37 F. Supp. 2d 855, 904 (S.D. Tex. 1999).

Prior to the summer of 1999, the TDCJ leadership sought to re-double its efforts with regard to protecting offenders and staff from the risks of summer temperatures.  A working group was established to that end. (Appx. 531)  The group consisted of representatives from several departments within the TDCJ. *Id.*  It included multiple unit level wardens, a regional director, a division director involved with facility administration, representatives from Environmental Affairs, Facilities, Health Services, Offender Grievance, Risk Management, Transportation, and Plans and Operations.  *Id*.  The group met to review the TDCJ's existing protocols and to discuss ways to improve them.  *Id.*  This process remained in place prior to the summer of 2011 and continues today.  (Appx. 601-605; Appx. 1560; Appx. 1561:2 to 24; Appx. 1601-1602:24 to 25, 1 to 17)

The product of the annual meeting is a yearly message distributed throughout the agency. (Appx. 603-605) It is issued on the authority of the director of the TDCJ-CID, which is the division of the TDCJ that directly oversees and operates security staff in its facilities. (Appx. 605) The

email directive constitutes an order given by the TDCJ administration to all units and staff. (Appx. 1707-1709:23 to 25, 1 to 25, 1 to 3; Appx. 1601:1 to 21; Appx. 1399; Appx. 1383)  Importance of these measures is demonstrated by the fact that the message is issued every year as a direct order to staff.  (Appx. 1707-1709:23 to 25, 1 to 25, 1 to 3)  The message contains heat-mitigation protocols that the units are expected to implement during the summer months, June 1st to October 1st regardless of temperature, and if the need arises implementation may begin prior to June 1st. (Appx. 603-605)  It complements the provisions of A.D. 10.64 and CMHC 15.2.

The 2011 annual heat message mandated 24 individual measures:

- Ensure employees and offenders are aware of the signs and treatment for heat related illnesses by conducting training.

- Provide additional water; ice should be provided, if available to employees and offenders in work and housing areas, and shall be coordinated with maintenance and laundry and food service.

- Restrict outside activity (work hours) in accordance with AD-10.64, "Temperature Extremes in the TDCJ Work Place."

- Ensure all staff and offenders working in areas of extreme heat such as, field, maintenance, and yard squads are provided frequent water breaks.

- Refrain from transporting psychiatric inpatient offenders to another facility via chain bus.

- Transport offenders during the coolest hours of the day.

- Screen outgoing chain to ensure the selected mode of transportation is appropriate.

- Allow offenders to take fans when being transported off the unit for a medical appointment.

- Utilize info pac report (ims042), imf medical screen, or hsn sensitive medical restrictions (including but not limited to an offender on psychotropic medications) to determine appropriate transportation method.

- 15 -

- Load and unload transfer vehicles as quickly as possible (security is the first priority at every back gate, but we must always be aware of heat related issues when buses occupied by offenders sit for any length of time (buses may circle the perimeter if the unit foresees an extended wait time). Every reasonable effort shall be made to ensure buses get in and out of the back gate in a safe and expedient matter.

- Transfer vehicles parked for more than 15 minutes are required to place a previously purchased fan on the vehicle. Units shall ensure fans, extension cords, etc., are in place and available when needed.

- Store paper towels for use when saturated with water during emergency situations when transporting offenders.

- Water coolers on buses shall be refilled at various times during the trip to ensure water remains at the appropriate temperature (transportation).

- When using fans, air should be drawn through the structure and exhausted outside. Take full advantage of the fresh air exchange system or prevailing winds to assist in the movement of air as applicable.

- Increase air flow by using blowers, normally used to move hot air in the winter, when appropriate. Attach ribbons to vents to ensure blowers are used appropriately. Ensure all needed maintenance to blowers has been completed.

- Allow additional showers for offenders when feasible.

- Allow offenders to wear shorts in dayrooms and recreational areas.

- Make water available during meal times.

- Make sure window screens are clean so as not to restrict air flow.

- Remember, offender fans should not be confiscated due to property restriction during this time. Fans shall be confiscated only if they are altered.

- Fans shall be allowed to all custody levels (to include administrative segregation and disciplinary status). Offenders with fans stored based on these restrictions shall have their fans re-issued for the time period specified in this posting.

- All offenders shall be permitted to purchase a fan if they do not have one.

- Ensure the fan program is in place allowing the permanent issue of a fan to an offender who has been indigent for the previous six months, on a first come first serve basis. Offenders who have significant medical needs, based on a condition or medication that is negatively impacted by the heat, shall be given priority.

- Wardens are encouraged to coordinate with their food service and maintenance departments to ensure ice-machines are working properly. (Appx. 602-605)

By issuing these orders in a yearly message (as opposed to it being another of its many written policies), the administration seeks to emphasize the importance of summer heat mitigation measures throughout the system and allow for evolving improvements to be added as they learn of better measures over time. (Appx. 1604:12 to 15; Appx. 1630:1 to 10)  In addition to this message, a message is sent from the TDCJ-HSD with a specific reminder on the signs, symptoms, and treatment of heat-related illness. (Appx. 607-609)

As outlined above, the TDCJ's heat mitigation strategy comes from three sources: A.D. 10.64, CMHC B 15.2 (now known as CMHC 27.2), and the 2011 Heat Precaution Messages from the Correctional Institution Division and Health Services. (Appx. 498-515, 516-525, 601-609) Together, these documents require over 30 protective measures to be carried out every summer from June 1st to October 1st, and sooner (or later) if hot temperatures occurred out of season. *Id.*

In addition to these measures, security staff are trained on the dangers of heat issues. (Appx. 1723-1724:13 to 25, 1 to 13; Appx. 1596:15 to 25; Appx. 1660-1661:19 to 25, 1 to 22)  This training arises from multiple sources.  First, all new officers receive training on heat-related issues during their preservice academy. *Id.*  In addition, they receive additional training each summer from the TDCJ risk management department and UTMB medical staff. (Appx. 1666-1669:17 to 25, 1 to 25, 1 to 25, 1 to 14)  Furthermore, this training has been frequently reinforced and re-emphasized during daily shift meetings. (Appx. 291; Appx. 1723-1724:13 to 25, 1 to 13; Appx. 1660-1661:23 to 25, 1 to 22; Appx. 1597:3 to 9)  In fact, not only is the training reinforced, staff

are even required to sign off on yearly heat training information to verify that they have reviewed it.  (Appx. 732-760)  Finally, each officer is issued and required to carry a pocket card that lists the different levels of heat-related illness, their signs, symptoms, and treatment. (Appx. 765-767)

### E.  TDCJ's leadership, including Director Livingston, believed the TDCJ's heat mitigation strategy was effective and appropriate prior to the start of 2011.

As the Executive Director of the Texas Department of Criminal Justice, Brad Livingston oversees a massive and complex operation that involves 38,000 employees, 17 divisions, and 109 prisons which house approximately 150,000 inmates across the state. (Appx. 1614-1618:23 to 25, 1 to 25, 1 to 25, 1 to 25, 1 to 21; Appx. 1639:22)  Its operations are immeasurably complex in order to manage every aspect of the daily lives of 150,000 individuals, all of them convicted felons, requiring 24/7 supervision and secure confinement.  *Id.*  As an example, the TDCJ operates one the United States' largest integrated agricultural operations which raises food from seed to plate. (Appx. 1649:6 to 24)  Despite the size of the agricultural operation, it is only a minor part of the TDCJ's overall operations.  (Appx. 1649:6 to 24; Appx. 1650:3 to 13)

As does any leader of such a large and complex organization, one of Director Livingston's primary functions is to appoint well-qualified individuals with expertise and experience in a specific field to serve as division directors to oversee day-to-day operational and management tasks. (Appx. 1618:7 to 21)  He maintains direct oversight over these division directors, which includes ongoing dialog and communication. (Appx. 1618-1619:22 to 25, 1 to 6)  With the size and scope of TDCJ's operations, Director Livingston relies on his division directors and subordinates to handle many managerial functions on their own, and relies on these individuals to use their judgment in deciding which matters are of particular importance to bring to his attention. (Appx. 1619-1620:7 to 25, 1 to 4)  This is a part of effective leadership, as it would be impossible and ineffective for any executive director to be personally involved in the minutia of every

operational function.  *Id.*  Director Livingston is widely regarded as one of the top prison administrators in the country, and his achievements in managing TDCJ have been recognized nationally.[7]

Among the many matters delegated to subordinates is the review of and management of the TDCJ's heat mitigation protocols.  (Appx. 1631-1632:1 to 25, 1 to 3)  Though he is aware that heat mitigation is an important safety issue for inmates and staff, he is not personally involved in their review, nor does he directly oversee their implementation, but, instead, he relies upon the expert leaders he has put in place to ensure all the proper measures are identified and carried out. *Id.*  Director Livingston is kept apprised of these efforts and measures and prior to 2011 had never seen cause to question their appropriateness, sufficiency, or efficacy. Appx. 1633:1 to 25)  His practice is to encourage open discussion with his division directors, but none has suggested or recommended that the TDCJ needed to install air conditioning in all of its facilities. (Appx. 1623-1624:9 to 25, 1 to 19)  He believes the TDCJ's mitigation measures are appropriate and sufficient to protect the inmates. (Appx. 1622-1623:21 to 25, 1 to 8)

In addition to the group that meets annually to review the Heat Precaution Message, Director Livingston also relies on several other processes in place to ensure that the TDCJ operates safe and constitutionally sound prisons.  All the TDCJ facilities go through yearly inspections by multiple levels of officials.  (Appx. 1575-1576:24 to 25, 1 to 6; Appx. 1374-1378; Appx. 768-802; Appx. 806-1165)

In the area of healthcare, Director Livingston relies directly on the TDCJ-HSD.  This division does not provide direct patient care, but, instead, is the arm of the TDCJ that is tasked

---

[7] Cody Stark, *TDCJ Director Livingston Receives Third State Award*, The Huntsville Item, (Sept. 30, 2015) *available at* http://www.itemonline.com/news/local_news/tdcj-director-livingston-receives-third-state-award/article_a8eeadc9-f1c8-5945-b9a6-f8404a250bba.html

with monitoring and assessing the healthcare provided by the UTMB and TTHSC.  TEX. GOV'T CODE § 501.150.  In addition, members of the TDCJ-HSD serve on a joint committee comprised of other health care providers and administrators from UTMB and TTHSC, the Joint Morbidity and Mortality Committee.  (Appx. 1753:1 to 12; Appx. 1754:10 to 23)  This committee reviews the facts, circumstances and medical care given for almost every offender who dies while in TDCJ custody. (Appx. 1751-1752:14 to 25, 1 to 11)  The committee can recommend that any death be referred for further review should systemic issues be noted in any individual cases.  *Id*.  One of the reasons a case can be referred for further review is security or facilities issues that warrant review. *Id*.

Finally, in addition to these internal departments, the TDCJ and Director Livingston voluntarily submit to outside inspections of all facilities by the American Correctional Association (ACA).  (Appx. 1647-1648:9 to 25, 1 to 3)  The ACA is a professional organization for all individuals and groups, both public and private that share a common goal of improving the justice system.[8]  It is comprised of the top leaders in the field of correctional management that shapes the future of corrections through strong, progressive leadership that brings together various voices and forges coalitions and partnerships.[9]

One of the many services the ACA provides is the promulgation of standards for the appropriate management and operation of a correctional facility.  (Appx. 1259)  The ACA provides an accreditation process in which virtually every aspect of a facility is inspected and evaluated by ACA inspectors to review operations, management, facilities, and other areas to ensure that the

---

[8] See:http://www.aca.org/ACA_Prod_IMIS/ACA_Member/About_Us/Our_Mission/ACA_Member/AboutUs/MissionStatement_home.aspx?hkey=7a39e689-8de2-47d4-a7d4-93cce9442142

[9] See:http://www.aca.org/ACA_Prod_IMIS/ACA_Member/About_Us/Declaration_of_Principles/ACA_Member/AboutUs/Dec.aspx?hkey=a975cbd5-9788-4705-9b39-fcb6ddc048e0

facility adheres to ACA standards.  *Id.*  ACA standards do not require air conditioned housing areas.[10]  (Appx. 1515, 1520-1555)  Every TDCJ facility goes through the accreditation process every three years. (Appx 1276; Appx. 1577:10 to 19)   Director Livingston relies on this independent evaluation and measurement as one of the many ways he ensures that the TDCJ operates safe, secure, and properly managed facilities that are within Constitutional mandates. (Appx. 1647-1648:9 to 25, 1 to 3)

Prior to the summer of 2011, Director Livingston believed the facilities he oversaw met Constitutional standards and that the TDCJ's heat mitigation protocols would serve to keep offenders reasonably safe from the summer temperatures.  (Appx. 1628-1629:12 to 25, 1 to 10) Director Livingston believed in the soundness of the heat mitigation measures because they had proved effective for several consecutive years prior to 2011. (Appx. 1633:18 to 25)   After being appointed Executive Director of TDCJ in November 2004, between 2005 and 2010, the TDCJ recorded two deaths where heat was identified as a cause. (Appx. 710-716)  Both occurred in 2007 at a single facility, the Byrd Unit. *Id.*  No hyperthermia deaths were noted at any of the other 100 plus units or 150,000 offenders across the state, and each involved very specific and uncommon medical facts.

One of the deceased offenders, Dionicio Robles, had his sweat glands removed in the free-world prior to his entry into the TDCJ. (Appx. 625)  He entered the TDCJ on July 16, 2007. (Appx. 625)  His intake form completed by UTMB indicated that Mr. Robles stated he "has a sweating problem," but no other details were noted. (Appx. 625)  The TDCJ officials did not learn that

---

[10] While the ACA standard related to temperature has comment that states they should capable of being mechanically raised or lowered, these comments are not mandatory to meet the standards. The comments are included only to clarify the intent of the standard and may provide examples of documentation sources to support compliance. The items addressed in the comment that go beyond the standard are not binding on the agency and should not be audited. (Appx. 1516)

Robles' sweat glands had been removed until after his death, when his wife reported that fact to the unit warden. (Appx. 625)

Similarly, the second deceased offender, James Shriver, had a particularly high concentration of risk factors, uncommon to the offender population in the TDCJ. (Appx. 610-622) He was taking a significant number of medications, suffered complicated medical conditions, and lacked acclimatization. (Appx. 613)  Even still, his autopsy indicated that his death was not just caused by heat, but likely a combination of all of those factors, noting that his hepatitis c led to liver dysfunction which caused a sodium imbalance. (Appx. 621-622)  Further, his ultimate cause of death was cardiac arrhythmia, an issue that was not immediately apparent at the time as it was only noted in an EKG occurring three years before his ultimate death . (Appx. 621-622)

Director Livingston was not even made personally aware of these deaths until two years later, after an inquiry from a state legislator. (Appx. 1644:5 to 16)  Nevertheless, the unique circumstances did not lead him to question the efficacy or appropriateness of the TDCJ's heat mitigation protocols as being a system-wide issue since these two unusual deaths both occurred at a single facility under unique circumstances.  (Appx. 1645-1646:12 to 25, 1 to 10)

Director Livingston's belief in the Constitutionality of TDCJ's facilities was also strengthened by his knowledge of other prison systems throughout the country that operate without air conditioning. (Appx. 1648:11 to 24)  Every state along the Gulf Coast, including Louisiana, Mississippi, Alabama, Florida, and Federal Bureau of Prisons operate prisons without air conditioning.  (See Section IV., B., 7., *infra*.)  This knowledge, combined with the multiple layers of oversight, internal and independent inspections, and knowledgeable and professional subordinates, led Director Livingston to reasonably believe that the TDCJ's summer heat mitigation measures were effective and its facilities constitutionally sound despite their lack of air

conditioning. (Appx. 1628-1629:18 to 25, 1 to 5)  The summer of 2011 later proved to be the hottest summer ever recorded in any state. (Appx. 1334-1336)  Prior to the start of the summer, meteorologists had not predicted a summer extreme heat event of the magnitude experienced in 2011. *Id.*  All of these factors combined further exemplify that no one, least of all Director Livingston, could have predicted such an event.

### F.  Larry McCollum's status at the Hutchins Unit in July 2011.

The Hutchins Unit was constructed and came online in 1995.[11]  It is located just southwest of the city of Dallas. (See fn. 11) It is a State Jail and intake and transfer facility that houses between 1,900 and 2,200 offenders.  (Appx. 1664:20 to 25)  The Hutchins Unit serves as an intake and transfer facility for all manner of felony offenders as well as permanent housing for offenders convicted of lower level state jail felony offenses that carry sentences of under two years. (Appx. 1664-1665:20 to 25, 1 to 4)  It primarily has dormitory style housing. (Appx. 1401-1404) Defendant Pringle was the Senior Warden of the facility in 2011.  (Appx. 294) His direct supervisor was Defendant Eason, the Regional Director of Region II, which includes 11 different prison units in Northeast Texas. (Appx. 1363)

Like all TDCJ facilities, the Hutchins Unit employed the TDCJ prescribed mitigation measures to protect offenders and staff from the summer temperatures.  Warden Pringle ordered the implementation of the heat mitigation protocols by instituting operational procedures at the Hutchins Unit that specifically tracked TDCJ's heat mitigation protocols that were specifically tailored to the facility.  (Appx. 723-725)  These included, but were not limited to, the provision of ice water to the dorms, access to showers in the dorm areas with lowered water temperatures,

---

[11] *See* http://www.tdcj.state.tx.us/unit_directory/hj.html

lessened clothing restrictions, modified work schedules to avoid the heat of the day, and dorm lights were kept off during the day to reduce heat. (Appx. 723-725)

Because the Hutchins facility is a dormitory style unit rather than an individual cell type unit, the housing areas are not equipped with individual electrical outlets and thus do not allow for personal fans. (Appx. 1662-1663:10 to 25, 1 to 2) Since the use of personal fans is not possible, large industrial fans are positioned in the dorms to provide airflow throughout. *Id.* Likewise, because the dorms are not equipped with operable windows, an industrial air handler provides ventilation throughout the dorm at a rate of over 200 cubic feet per minute per occupant, well above the 15 cubic feet / min. established in ACA Standard 4-4151 in 1995. (Appx. 1290; Appx. 1376 – 1378) This equipment is periodically inspected to ensure proper function. These measures were not considered optional by Warden Pringle.

In addition, competent evidence documents the efforts made on the unit level to ensure inmate safety in 2011. Water temperatures were lowered in the showers below body temperature to provide a cooling effect. (Appx. 1670-1671:14 to 25, 1; Appx. 1494-1496) The provision of water coolers was inspected and water temperatures measured to ensure they contained cool water. (Appx. 805) The water temperature from the sinks was measured to ensure that even if a water cooler was empty, there was access to water from the sinks in the dorm area. *Id.* In addition, iced beverages were served at meal times. (Appx. 1499)

Additionally, prior to 2011, Regional Director Eason also ensured that the heat mitigation protocols were followed at all of the units within his region. He held meetings with the eleven wardens in the region he supervised where heat issues were stressed and discussed. (Appx. 1583-1584:19 to 25, 1 to 2; Appx. 1585:2 to 11) To his knowledge, all of the facilities in his region were following the directive and doing everything possible to mitigate the heat. (Appx. 1579:2 to

9)  Regional Director Eason would inspect the facilities in his region any time he was present to ensure that the heat mitigation measures were in place.  (Appx. 1581:6 to 14)   Had he learned that one of the facilities in his region was not following the directive, he would have stepped in as a regional director to correct the situation.  (Appx. 1579-1580:22 to 25, 1 to 3)

Both Eason and Pringle believed the heat mitigation protocols were being carried out per their instructions.  (Appx. 295, 1364)  There is no evidence that they ever had knowledge that they were not.  No grievances were filed by any inmates that suggested that they were not. (Appx. 1221-1256)[12]  Neither Warden Pringle nor Regional Director Eason had any specific knowledge of McCollum prior to his death.  (Appx. 297, 1364)

Larry McCollum arrived at the Hutchins Unit on July 15, 2011. (Appx. 1370)  He had spent the previous three weeks in the McClennan County jail.  (Appx. 1373)  His sentence to TDCJ was not his first time in TDCJ custody.  (Appx. 1217-1218)  Mr. McCollum served a 20 month sentence ending in his release in 2004.  (Appx. 1411)  During his previous stay, documentation shows he knew how to access medical care, including acute mental health care.  (Appx. 1217-1218)  In fact, he submitted written requests to receive (and did receive) health care for matters as routine as athletes foot, to request glasses, to request an increase in his antacid medication, or to complain of muscle strain in his back due to over exertion while lifting weights.  *Id.*  Most importantly records from his previous incarceration show that McCollum understood that housing restrictions were made by the medical staff, and that knew how to contact the medical department to request an appointment.  The records from his previous incarceration indicate that at one point the medical

---

[12] Of the grievances at the Hutchins Unit relating to heat, high temperature, or heat index for the time period of July 2010 to July 22, 2011, there are four grievances about the same one instance of a fan being turned off and one instance of the ventilation in Dorm B4 not working. (Appx. 1239-1240, 1243-1244, 1245-1246, 1247-1248, 1253-1254) The one grievance about the ventilation not working was submitted on April 7, 2011. (Appx. 1245-1246) The response to this complaint was "A maintenance work order (#3726) is currently open concerning the air unit in B4 dorm. This issue will be addressed as soon as possible." *Id.* There are no grievances other than these two incidents; and, as no offenders filed Step Two grievances on these issues, as they had been appropriately addressed. Furthermore, none of these grievances are about C7 Dorm, where Mr. McCollum was housed.

provider had entered a housing restriction to ensure McCollum was assigned only to a lower bunk (Appx. 1419), but that restriction was removed by the medical provider noting that there was good evidence on improvement of McCollum's lower back pain.  (Appx. 1427, 1418)  A few months later, McCollum submitted requests to the medical department to inquire about certain restrictions on his housing and work assignment form.  (Appx. 1425-26)  This evidence shows McCollum knew that the medical department made determinations regarding bunk restrictions and that he knew how to contact the medical department to his restrictions reviewed, added, or changed.

Upon arrival at the Hutchins Unit, per CMHC policy, McCollum received an intake screening.  (Appx. 1202-1203, 1207 - 1208)  The purpose of the screening is to identify any immediate medical needs upon arrival pending a detailed physical examination to occur at some point over the next seven days.  (Appx. 317-318, 1501)  Unlike county jails, who intake arrestees off the street, the TDCJ receives offenders from county jails who have been under care for some period of time and much less frequently have acute medical needs.

The only medical information accompanying him from the McLennan County Jail was the standard Texas Uniform Health Status Update (TUHSU), which indicated McCollum was 5 foot 10 inches tall, weighed 330 pounds, had no special housing or transportation needs, no pending specialty clinic appointments, no known allergies, and a negative Tuberculosis (TB) Skin Test on June 27, 2011. (Appx. 302, 1200)  However, the TUHSU did indicate that Mr. McCollum had been prescribed the medication 'clonidine 0.1 mg orally as needed' for hypertension. *Id*. There was no mention of McCollum having diabetes or receiving medication for diabetes. *Id*.

McCollum's Correctional Managed Care Intake History and Health Screening form, completed and signed by the UTMB provider on July 15, 2011, indicated that he reported a personal history of a back injury, cavities, depression, diabetes, glasses, gum disease, high blood

pressure, mental illness, and rheumatism/arthritis.  (Appx. 1207-1208)  However, he indicated his only "current" problems were needing a tooth pulled and depression.   (Appx. 1207)   He specifically denied thoughts of self-injury and symptoms of psychosis. (Appx. 1208) The screener noted no obvious injuries, deformities, or impaired motor activity.  *Id*.  His chart was later reviewed by the UTMB physician assistant (PA Babbili), who changed his blood pressure medication from Clonodine to Hydroclorothiazine. (Appx. 1206)  A diuretic such as hydrochlorothiazide (HCTZ) in the dose prescribed, 25 mg daily, would have a very mild effect on net water loss from the kidneys into the urine.  (Appx. 305)  It would be impossible to become dehydrated from the effects of HCTZ alone.  *Id*.  Further, there is no evidence that McCollum ever went to the pill window to receive a dose of HCTZ.  *Id*.  Even if he had, at most, he would have received a total of six doses over as many days which would have just begun to achieve a therapeutic level in his bloodstream. *Id*.

Despite his weight, neither the documentation from the McClennan county jail nor the medical screen at the Hutchins Unit indicated a need for a lower bunk. (Appx. 302-303, 731) In fact the Texas Uniform Health Status Update completed at the McClennan County Jail indicates no housing restrictions were given to McCollum at the McClennan County Jail. (Appx. 302, 1200) While it is common for overweight inmates to need a lower bunk, there are often inmates who do not require this accommodation.  (Appx. 1686:13 to 25; Appx. 1701-1702:21 to 25, 1 to 3)  The individual on the unit who makes bunk assignments is the classification department, and this occurs in the unit count room.  (Appx. 316-317; Appx. 731; Appx. 1590-1591:14 to 19, 4 to 6) This officer does not physically inspect or view the inmate before making an assignment, but simply makes the assignment based on the documentation contained in the forms completed by the medical providers.  *Id*.  McCollum was initially assigned to a lower bunk but was later re-

- 27 -

assigned to 46 bunk in the C-7 dorm. (Appx. 730-731)  This assignment was made with no knowledge of McCollum's health or alleged disability status. (Appx. 316-317; 731)

During McCollum's time at the Hutchins Unit, he was face to face with medical providers on at least 4 different occasions.  (Appx. 302-303; 1201-1216)  This indicates that he was able to traverse up and down from his bunk on at least these four occasions.  *Id*.  If, as Plaintiffs claim, he took his daily dose of HCTZ, he would have traversed on and off his bunk and seen a member of the medical staff every day.  (Appx. 307)  There is no indication that he voiced any concern in these encounters about the heat, his ability to make use of the mitigation measures, or his bunk assignment during these medical encounters.  (Appx. 302-303; 1201-1216)  There is documentation of the possibility that he was depressed and sick. (Appx. 302-308; 1207–1208, 1213-1216)  A mental health screening prior to his death indicates McCollum had a history of depression, his current mood was sad and anxious, his hygiene was poor, and he was having difficulty adjusting.  *Id*.  This information would not have been shared with correctional staff, as policy and patient privacy rights prohibit sharing this information.  (Appx. 317)

Moreover, the results from a blood test just prior to his death show a high white blood cell count, indicating that he was fighting an infection.  (Appx. 1209-1212; Appx. 1735-1736:15 to 25, 1)  These facts were not communicated from the UTMB health care providers to the TDCJ security staff.  (Appx. 1209-1212)  According to policy and medical privacy protections, this information is only communicated under specific circumstances not present here. (Appx. 317)

### 1.   A description of Officer Clark's participation in the events at issue.

The night of July 21 and the morning of July 22 proceeded like any other summer night at the Hutchins Unit.  The offenders were ordered to their bunks at approximately 10:30 p.m. for the evening and the lights were turned out for sleeping. (Appx. 1699-1700:22 to 25, 1 to 2)  The

previous day had been a hot summer day at the Hutchins Unit, but none of the defendants noted anything unusual about the heat or conditions on this day as compared to the days before it. (Appx. 277-280)

Clark was assigned as a rover in C Building. (Appx. 277)  This position required him to make regular rounds in the housing area and to conduct counts at designated times. (Appx. 1677:8 to 24; Appx. 1678:4 to 20)  He heard no report that McCollum or any other offenders were suffering from heat-related illness.  (Appx. 277-280)  Clark encountered McCollum during a count at some point in the evening, but since McCollum appeared to be sleeping, another inmate showed Clark McCollum's ID. (Appx. 279-280)  This is not uncommon, and so long as Clark could identify the inmate and ensure he was in the proper bunk, there was no need to wake a sleeping inmate unless there appeared to be some sign of distress.  (Appx. 280)  Clark did not observe any signs of distress because McCollum appeared to be sleeping peacefully. (Appx. 280)  Clark testified that had he observed signs of distress, he would have awoken him to speak with him. (Appx. 280-281)

The first sign of distress came sometime after 2:00 am.[13]  While performing a count, an offender informed Clark the McCollum was shaking. (Appx. 277)  This was the first time the officer knew that McCollum was in distress.  *Id*. Clark assumed that McCollum was having a seizure.  *Id*.  He immediately ran to the picket with instructions to initiate ICS (incident command system) and to call for a supervisor. (Appx. 278) In doing so, he acted entirely according to policy and the established procedures for any emergency.  He delayed in no way.  In the few minutes it took Sgt. Tate to arrive on the scene, he monitored McCollum and made sure he remained in a safe position so as not to injure himself while the seizure ran its course. *Id*.  Shortly after Sgt. Tate

---

[13] Though his statement lists the time as 2:10 am, Officer Clark testified that he hadn't checked his watch and the times listed were merely approximations. (Appx. 1679:8 to 12)

arrived, Clark left the scene to respond to another emergency situation on another building. *Id*.  His participation lasted approximately 10 minutes.

During the time he was on the scene, Clark believed McCollum to be having a seizure. (Appx. 277)  Heat stroke did not occur to him as the cause of the problem. (Appx. 278)  This was due to the fact that this occurred at 2 a.m., during the cooler part of the night, and hours after McCollum could have possibly been engaged in any physical activity.   In his 16 years of experience in the TDCJ, he had never heard of an offender having heat stroke during the nighttime hours. (Appx. 278-279)  No offenders nearby said anything that suggested McCollum was having a heat stroke. (Appx. 279-280) While Clark knew McCollum needed some level of medical attention, he did not know whether he required an immediate ambulance, or whether the situation could be addressed by medical staff in the morning.  (Appx. 278) This is a decision made by the on-call medical provider in coordination with the supervisor on the unit.  (Appx. 278)  This was consistent with policies established by the unit medical providers.  (Appx. 1503-1508)  Nothing about the situation suggested that he needed to circumvent the chain of command and immediately call 911, something he has never done in his 16 years of experience. (Appx. 279-280)

## 2.      A description of Sergeant Tate's participation in the events at issue.

Sergeant Tate did not delay when she responded to the C-7 dorm.   She proceeded there directly after receiving the radio call that an offender was having a seizure. (Appx. 283) She testified this took (a few minutes).  (Appx. 1703:15 to 24)  Her duties were to assess the situation and report to Lt. Sanders.  *Id*.  When she arrived, it appeared to her that McCollum was having a seizure.  *Id*.

Seizures are quite common in the correctional setting, and t Tate initiated first aid measures for a person having a seizure.  (Appx. 284)  She then checked to make sure his airway was open,

he was breathing, and that he had a pulse. *Id*. She ensured that he was in safe area and/or position so that he was safe while the seizure ran its course as she waited for him to come back to consciousness. *Id*. In her experience in dealing with offender seizures, there is a period of time when the muscle activity stops but before the inmate returns to being fully coherent. *Id*. Sometimes this takes several minutes. *Id*. After Mr. McCollum's muscle activity subsided, she attempted to revive him back to consciousness. *Id*. She applied a cold cloth to his face, and dribbled water on his lips. *Id*. She didn't want to give him more water because she feared he might choke. *Id*. She was in frequent contact with Lt. Sanders, keeping her apprised of the situation. *Id*. As time progressed, McCollum did not respond to efforts to bring him back to consciousness as expected, and Lt. Sanders arrived on the scene. *Id*. After Lt. Sanders contacted the medical department and an ambulance was called, Tate went to unlock all of the doors the EMS crew would need to reach McCollum, so they could get there as quickly as possible. *Id*.

During this time, heat stroke never entered Tate's mind as a possible cause for McCollum's condition. (Appx. 285) The night of July 21, 2011 was not particularly different from any other summer night in her experience working for TDCJ. *Id*. She did not receive complaints about the heat from either inmates or staff beyond those generally voiced during the summer as this night did not seem any hotter or cooler than a typical July night at the Hutchins Unit. *Id*.

As with Clark, the circumstances present weren't those where one would typically expect a heat stroke. This occurred after 2 a.m., during the cooler part of the night, and hours after McCollum could have possibly been engaged in any physical activity. *Id*. Tate also had never heard of an offender having heat stroke during the nighttime hours. *Id*. During the time she was at McCollum's bunk, none of the offenders nearby said anything regarding McCollum not drinking water, missing several meals, or any other information that would have led her to believe that heat

- 31 -

stroke or dehydration was the cause of the problem.  (Appx. 286)  Had this possibility crossed her

mind, she would have reported to Lt. Sanders that an ambulance needed to be called immediately,

and she would have taken steps to cool McCollum.  (Appx. 285)

Moreover, Tate's response was consistent with the measures ordinarily taken when an

offender suffers a seizure. *Id*. At the time of McCollum's seizure, she could not recall an instance

when the on-call medical staff advised a TDCJ officer to immediately call an ambulance because

an offender was having a seizure.  *Id*.  In her training and experience, the decision to call 911

would typically be made by a superior officer, though if the need for emergency medical attention

was obvious, a Sergeant could inform a superior of the situation and initiate the procedure to call

911.  *Id*.  In her experience, a superior would be informed if an officer was planning to call 911.

*Id*.  This is also consistent with unit procedures authored by medical staff, which instructed staff

to call the off-site medical provider, who would determine whether 911 was necessary.  (Appx.

1503-1508)  In her experience, a seizure would not usually warrant a departure from the chain of

command before calling 911.  *Id*.

### 3.    A description of Lieutenant Sanders' participation in the events at issue.

At the time the call went over the radio reporting a seizure on the C-7 dorm, Lt. Sanders

was completing the processing of the 2 a.m. count. (Appx. 289) Like Tate, she testified that

seizures are quite common. (Appx. 1687:15 to 22)  As per standard procedure, she sent Tate to the

scene to assess the situation and report back.  *Id*. Like Tate, she fully expected that once McCollum

stopped seizing, he would return to consciousness.  *Id*.  In her experience this can take several

minutes. (Appx. 289-290)  She received frequent updates from Tate during this time.  (Appx. 290)

During this same time, another emergency situation occurred on another building where an

offender had collapsed, hit his head and was bleeding.  (Appx. 290)  Sanders was responding to

both incidents.  As the minutes passed, while Tate reported that McCollum was not responding, Sanders became concerned and reported to the scene.  *Id.*  She contacted the on-call medical provider, who, after consulting the medical records, advised that an ambulance should be called. *Id.*  She did so immediately. *Id.*

Like Tate, Sanders frequently dealt with inmate seizures, and even had experience in dealing with them in a previous job where she provided child care.  *Id.*  She had never been instructed by medical staff that it was always necessary to call for an ambulance if a seizure occurred afterhours.  *Id.*  Like Tate, she fully expected that McCollum's seizure would eventually subside and, he would come back to consciousness.  (Appx. 284-285)  It was only until this did not occur that she began to be concerned that something else was may be the cause. *Id.*

At no time did she suspect heat stroke as the cause of the problem.  *Id.* Like Tate and Clark, the temperature, time of day, and lack of activity, seemed to her to be inconsistent with heat stroke. *Id.*  She also had never heard of an inmate suffering a heat stroke during the overnight hours, and no offenders reported anything to her to suggest that McCollum had not been drinking water or missing meals.  *Id.*  In addition, she had not heard complaints that the inmates in the C-7 dorm had not received or could not access ice water, could not access the showers, or that the fans or ventilation were not working properly.  *Id.*

The central control officer called for an ambulance at approximately 3:04 a.m. and EMS was dispatched at 3:05 a.m. (Appx. 1186).  Tate facilitated the quick response of the ambulance crew by opening the relevant doors prior to their arrival.  (Appx. 284)  McCollum was transported to Parkland Hospital. (Appx. 1186-1187)  Warden Pringle, Regional Director Eason, and Director Livingston were not notified of the incident until after McCollum had left the Hutchins Unit. (Appx. 297; Appx. 1365; Appx. 1619-1620:7 to 25, 1 to 4)

- 33 -

## VI.    ARGUMENT

### A.    Brief In Support Of Defendants' Entitlement to Qualified Immunity

Defendants Livingston, Eason, Pringle, Sanders, Tate, and Clark are all entitled summary judgment based on the doctrine of qualified immunity.  As they are sued in their individual capacities, Defendants are protected by the doctrine of qualified immunity.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983).  "The doctrine of qualified immunity shields public officials like the respondents from damages actions unless their conduct was unreasonable in light of clearly established law." *Elder v. Holloway* 510 U.S. 510 (1994).

Qualified immunity balances two important interests:  the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. "[O]fficials who reasonably but mistakenly commit a constitutional violation are entitled to immunity." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 488 (5th Cir.2001). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

It is Plaintiffs' burden to overcome Defendants' right to qualified immunity. *Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992); *Elliott v. Perez*, 751 F.2d 1472, 1476-79 (5th Cir.1985). "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "[I]f a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." *Id.* at 201.  "Ultimately, a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions." *Wilson v. Layne*, 526 U.S. 603, 614 (1999).  The Supreme Court

has held that the sequence of the steps is not mandatory. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

The case at bar demonstrates with abundant clarity the rationale and need for qualified immunity protections for individuals at all levels of the organizational structure of a state prison system faced with the difficult task of administering, implementing, and executing the unenviable task of running a prison. As shown below, at all levels, the Defendants acted reasonably and in good faith, and within the bounds of the clearly established law. As shown below, Plaintiffs fail meet their burden to establish either a constitutional violation or that any Defendants' conduct was objectively unreasonable in light of clearly established law.

### 1.   All Defendants are entitled to qualified immunity as their actions were objectively reasonable in light of the clearly established law.[14]

Each of the Defendants are entitled to qualified immunity because their actions were objectively reasonable in light of the clearly established law. The Supreme Court recently, and with some exasperation, re-admonished Courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S.Ct. 2074, 2084 (2011). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right ... in the light of pre-existing law the unlawfulness must be apparent to the point that it is beyond debate whether the specific conduct is unlawful." *Id*. at 2085; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A trilogy of cases from the Supreme Court in 2015 further the clarified the precision with which lower courts must assess the clearly establish law in order to overcome qualified immunity. On three separate occasions, the Supreme Court reversed the lower courts—including the Fifth

---

[14] Pursuant to *Pearson*, 129 S.Ct. at 818, because Courts may take the qualified immunity analysis in any order, Defendants present their arguments regarding the objective reasonableness of their actions in light of the clearly established law prior to the analysis of the deliberate indifference standard.

Circuit—for defining clearly established law with too high a level of generality. *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).  It is to be an "exacting standard." *Sheehan*, 135 S. Ct. at 1774.  The dispositive question is "whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Mullenix*, 136 S. Ct. at 308. (emphasis in original) (internal citations omitted). This does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Taylor*, 135 S. Ct. at 2044.

The Fifth Circuit, likewise, has recently reaffirmed and re-emphasized that "[the clearly established law inquiry] establishes a high bar."  *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir.2013); *see also, Morgan v. Swanson*, 659 F.3d 359, 378–79 (5th Cir.2011) (en banc). When deciding whether the right allegedly violated was "clearly established," the court asks "whether the law so clearly and unambiguously prohibited the conduct that *every* reasonable official would understand that what he is doing violates the law." *Wyatt*, 718 F.3d at 503 (emphasis contained in original) (*citing Morgan*, 659 F.3d at 371); *See also*, *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997).   Answering in the affirmative requires the court to be able to point to "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.*  When there is no controlling authority *specifically prohibiting* a defendant's conduct, the law is not clearly established for the purposes of defeating qualified immunity. *Id.* at 372.  Courts must not waver from holding to these "clearly drawn bright lines as rigorous background principles of qualified immunity." *Id.*; *Morgan*, 659 F.3d at 371.

Courts that seek to deny qualified immunity (and the plaintiffs' bar) will frequently cite to *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). for the proposition that the clearly established law inquiry need only provide "fair warning" that their acts *might* be unconstitutional. *See e.g.*, *Webb v. Livingston*, 618 F. App'x 201, 208 (5th Cir. 2015); *Martone v. Livingston*, 2014 WL 3534696, at *8 (S.D. Tex. July 16, 2014); *Mullenix*, 136 S. Ct. at 314 (Sotomayor dissenting). The Fifth Circuit in *Morgan* recognized that "fair warning" as used in *Hope* suggested a lower standard and appeared to be at odds with language used in subsequent rulings and questioned whether "fair warning" was still an appropriate standard. *Morgan*, 659 F.3d at 373 (comparing "fair warning" with "squarely governed" and "beyond debate" language used in subsequent qualified immunity rulings).

While the Supreme Court cases on qualified immunity in 2015 did not specifically address this concern, the three cases explain that the case law must contain a high level of factual specificity to be considered "fair" warning. *Mullinex*, 136 S. Ct. at 308 (emphasis in original) (internal citations omitted) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."); *Taylor*, 135 S. Ct. at 2045 *(*holding that the existing precedent must have placed the constitutional question "beyond debate" that the defendants' prison administrators were "overseeing a system that violated the Constitution.").

*Sheehan* provides a useful illustration of how close the existing precedent must fall to the facts at issue to overcome qualified immunity. In a police shooting case involving a mentally ill individual in apartment who had threatened the officers with a knife, the Court analyzed the existing law the lower court used to hold that the officers' actions were unlawful. *Sheehan*, 135 S. Ct. at 1771, 1774-78. They included two panel decisions involving police deadly force on

mentally ill or emotionally disturbed suspects in which the courts had held the force unlawful. *Id.* at 1776-77. Yet even within that framework, the dissimilarities between the existing precedent and the officers' conduct was such that this Court held they did not violate clearly established law. *Sheehan*, 135 S. Ct. at 1777. The Court concluded: "No matter how carefully a reasonable officer read [the case law] beforehand, that officer could not know that reopening Sheehan's door to prevent her from escaping or gathering more weapons would violate the Ninth Circuit's test. Without that 'fair notice,' an officer is entitled to qualified immunity." *Id.* (citing *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (2014)); s*ee also Stanton v. Sims*, 134 S. Ct. 3, 7 (2013) (holding that though the lower courts were divided on whether the defendant officer's conduct was unlawful, the issue was not "beyond debate" and the officers were therefore entitled to immunity.) The Court's reference to the "fair notice" (or "fair warning") contained in prior precedent demonstrates that it is not overruled *per se* as suggested by the Fifth Circuit in *Morgan*, but, rather, clarifies just how specific the prior precedent must be to constitute a warning that is "fair" within the meaning of qualified immunity. The *Sheehan* court required the warning to be so specific that the matter is "beyond debate." *Sheehan*, 135 S. Ct. at 1774.

Finally, *Taylor* provides an apt demonstration of these principles particularly in the area of correctional administrators being sued over alleged deficient policies. 135 S. Ct. at 2044. *Taylor* also originated in tragedy: a jail suicide. 135 S.Ct. at 2043. The plaintiffs sued the head of the Delaware Department of Corrections and the prison warden for failing to prevent the suicide by not properly supervising the medical personnel who administered the suicide screening protocol. *Id.* Denying summary judgment, the Third Circuit found it clearly established that a "particular vulnerability to suicide" was a serious medical need encompassed within the Eighth Amendment. *Barkes v. First Corr. Med., Inc.,* 766 F.3d 307, 328–29 (3d Cir.2014), *rev'd sub nom., Taylor,* 135

S.Ct. at 2044.  A unanimous Supreme Court summarily reversed and granted qualified immunity as a matter of law. *Id.* at 2044.  The Court held that even under Third Circuit precedent, a right "to the proper implementation of adequate suicide prevention protocols" was not clearly established. *Id.*  The Court recognized that though Third Circuit's cases may establish a general duty to protect inmates known to be suicidal, such cases *did not* clearly establish "that detention facilities must implement particular procedures to identify such vulnerable inmates, let alone specify what procedures would suffice" or "identify any minimum screening procedures or prevention protocols that facilities must use." *Id.* at 2045.  In this light, the Court concluded, *"even if the [jail's] suicide screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books ... would have made clear to petitioners that they were overseeing a system that violated the Constitution." Id.* (emphasis added).  *Taylor* illustrates the high degree of clarity and particularity with which existing precedent must define Constitutional minima in order to be clearly established for the purposes of holding correctional policymakers liable.

> **2.**    **Fifth Circuit precedent was not clearly established that prison officials could violate the Eighth Amendment by housing inmates in a high temperature environment when court approved mitigation measures were implemented.**

In July of 2011, the legal landscape with regard to heat as a potential Eighth Amendment violation was limited and somewhat sparse.  While Defendants concede that the law was clearly established that subjecting inmates to high temperatures with *no* mitigation measures could violate the Eighth Amendment, the law was equally clearly established that the provision of ice water, daily showers, fans in the housing areas, and ventilation were constitutionally adequate mitigation measures.  *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir.2004).  Indeed, in 2008, the Fifth Circuit rejected a claim that the lack of air conditioning in Texas prisons violated the Eighth Amendment. *See Johnson v. Texas Bd. of Criminal Justice*, 281 F. App'x 319, 321 (5th Cir. 2008).

- 39 -

      **i.**     **No Fifth Circuit precedent prior to the summer of 2011 clearly established that the Eighth Amendment required air conditioned prisons or any other protective measures that had not been implemented by the TDCJ.**

In the Fifth Circuit, four cases comprise the legal landscape in regard to excessive heat as an Eighth Amendment violation in July of 2011.[15]  None mandated air conditioned prisons, or any protective measures that TDCJ did not implement in its system.

A discussion of the issue with regard to climate control and Texas prisons must begin with the sweeping federal judicial oversight initiated in  *Ruiz v. Estelle, et al.*, 503 F.Supp. 1265 (S.D. Tex.1980).  In a case that covered nearly every aspect of the conditions within Texas prisons, the issue of temperatures in the housing areas was also considered by the Court.  Indeed, the Court received expert testimony on the heating and ventilation in the housing areas but the evidence was insufficient to convince Judge Justice that the temperatures rose the level of an Eighth Amendment violation.  *Ruiz*, 503 F. Supp. at 1374.

Nevertheless, as part of the sweeping reforms implemented, the subject of temperature and ventilation were stipulated between the parties in a consent decree negotiated by counsel for the inmates and approved by the Courts.  These measures did not call for the air conditioning of the TDCJ facilities, though air conditioning was widely used at the time.  Moreover, the Hutchins unit was constructed while the TDCJ was under federal judicial oversight, yet neither the Plaintiffs' counsel nor Judge Justice considered the use of ventilation measures, and not air conditioning, to be constitutionally suspect.

In *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir.2004) the Fifth Circuit established measures that when implemented by prison officials would cure Eighth Amendment violations due to high

---

[15] It must be noted that to the extent *Blackmon* can be read as further establishing the law in the area, it must be noted that the *Blackmon* decision was not issued until long after McCollum died. *Blackmon v. Garza*, 484 F. App'x 866 (5th Cir. July 30, 2012)

heat.  The Court considered an appeal from a grant of injunctive relief regarding the conditions of confinement in a particular section of a death row housing facility in Mississippi in the middle of the Mississippi River delta. *Id.*  The Plaintiffs claimed that conditions in their housing area were unbearably hot and posed a health risk.  In fact, the *Gates* plaintiffs submitted evidence and testimony from the very same experts Plaintiffs' counsel has designated here – Dr. Susi Vassallo and Dr. James Balsamo.  Dr. Vassallo opined that every single inmate housed in the area at issue had a condition that made him susceptible to heat-related illness.[16]  Dr. Balsamo conducted his temperature extrapolation and opined that the heat-index in the cells reached temperatures into the 140s.[17] There was no outside ventilation fans in the housing area, but the inmates could open windows in their cells, though this caused problems with mosquitos because the screens were too large.  The inmates were not provided with ice water, and only allowed one shower per week. Some had fans in their cells.  The District Court rejected the Plaintiffs' request for climate controlled housing, but ordered three remedial measures: 1) that a fan be provided for each cell; 2) ice water be provided to the offenders; and 3) the offenders be permitted to shower once per day. *Russell v. Johnson*, 2003 WL 22208029, at *5 (N.D. Miss. 2003).  The Court also ordered that screens with a smaller gauge be supplied for each window so it could be opened for ventilation without letting in mosquitos. *Id.* The Fifth Circuit upheld these measures finding that the District Court's finding of an Eighth Amendment violation was not clearly erroneous, and that these corrective measures were reasonable to cure it. *Gates*, 376 F.3d at 333.  Together, these measures—1) fans; 2) showers; 3) ice water; and 4) ventilation form the core remedial measures required in the Fifth Circuit.

---

[16] Available at: https://www.aclu.org/files/pdfs/prison/vassallo_report.pdf
[17] Available at: https://www.aclu.org/files/pdfs/prison/balsamo_report.pdf

*Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir. 2008) represents the only other instance where the Fifth Circuit found heat issues to be a potential Eighth Amendment violation, but only where the inmate was further (allegedly) subjected to other alleged harms such as restrictive conditions, and lack of access to food, showers, or water. As such, *Valigura* presented a dramatically different context than at issue in *Gates* or here. In *Valigura*, the Plaintiff claimed during lockdown periods he was confined to his bunk for 24 hours a day for stretches as long as 10 to 15 days at a time. *Id.* at 234-35. He claimed he only was allowed to use the restroom or shower if another offender was not already using it. *Id.* He claimed this meant he was forced to go significant periods of time when he was not able to shower. *Id.* He also claimed he was not permitted to access water and that his housing area had poor ventilation in his bunk area. *Id.* In regard to the qualified immunity analysis, the Court specifically cited to the *Gates* holding for the proposition that the law was clearly established that the alleged living conditions were unconstitutional. *Id.* at n.15. In sum, the Court was presented with a situation where there was (allegedly) little to no access to showers, no access to water, no fans and poor ventilation.[18] This, the Court held, presented a potential Eighth Amendment violation. *Id.* at 235-36. Combined, these cases established that unmitigated heat can be unconstitutional, but heat mitigated with water, showers, fans, and ventilation, is not.

Just four months after the *Valigura* opinion, the Fifth Circuit upheld dismissal of an inmate's claim that the lack of air conditioning in the Texas prison system violated the Eighth Amendment. *Johnson*, 281 F. App'x at 321. In *Johnson*, the Plaintiff raised a claim almost identical to the one the Plaintiffs asserted here. He claimed that the lack of air conditioning at the

---

[18] It should be noted that in the ensuing trial, the jury rejected the plaintiff's claims regarding the conditions and restrictions in the housing area and entered a verdict for the defendants.

TDCJ Wynne Unit created a danger for all the inmates and a heightened danger to those who were heat sensitive due to age or medical conditions. (4:05-cv-02701, D.E. 8 at 16.)  He further claimed that the windows did not open sufficiently and that the building had no way of mechanically lowering the indoor temperatures.  This caused the building to absorb and radiate heat which caused the indoor temperature to rise above 100 degrees.  The Plaintiff claimed this violated modern building standards and the civilized standards of decency imposed by the Eighth Amendment.  He also appeared to claim that he had been denied access to ice and "extra" showers but couldn't identify specifics.  The complaint even named many of the same high level defendants as named here, including the Executive Director (Brad Livingston), the Director of the Custodial Institutions Division, the Regional Director, and the Warden of the Wynne Unit.  Both the District Court and the Fifth Circuit rejected these claims, holding that they stated nothing more than claims of discomfort, which did not rise to the level of Constitutional violations.  In so doing, the Fifth Circuit rejected the notion that the evolving standards of decency under the Eighth Amendment had evolved to require the installation of air conditioning.  *Johnson*, 281 F. App'x at 321.

Taken together, these cases provide no holdings prior to the summer of 2011 that clearly established that the Eighth Amendment mandated air-conditioned prisons.  As pointed out by Judge Jones, the parallels between *Taylor* and the case at bar are obvious.  *Hinojosa v. Livingston*, 807 F.3d 657, 683 (5th Cir.2015) (Jones dissenting).  Merely substituting "heat stroke" for "suicide" in the Supreme Courts' language illustrates the point. *See id.* (quoting *Taylor* but with "heat stroke" instead of "suicide").  At a minimum, the matter was litigated during the *Ruiz* case, and it was held that the temperatures and ventilation in TDCJ facilities did not violate the Constitution, and the Fifth Circuit reached the same conclusion in 2008.  No intervening case law

in the years following suggested otherwise.  Instead, the case law mandated the very protective measures TDCJ used to protect inmates within its facilities.

> ## ii.    The *Webb* and *Hinojosa* opinions are not dispositive here as they were predicated on facts already disproven by undisputed evidence and erred regarding the law of qualified immunity.

Plaintiffs will no doubt argue that the Fifth Circuit's rulings in *Webb* and *Hinojosa*, which were based solely on the contents of Plaintiffs' complaint, are dispositive on the qualified immunity issues.  They plainly are not.  As an initial matter, the *Hinojosa* panel expressly disclaimed any precedential value in ultimately resolving qualified immunity issue.  *Hinojosa*, 807 F.3d at 675 ("We express no opinion on how the district court should rule on Defendants' qualified immunity defense.")  Further, in accordance with Fed. R. Civ. P. 12, both opinions rely on the information contained within the four corners of Plaintiffs' complaints.  Many of the allegations within the complaints upon which the Fifth Circuit relied already have been demonstrated to be false by uncontroverted evidence.  Principally, the *Webb* panel relied on the demonstrably false allegation that the Defendants knew temperatures within the TDCJ facilities made "[heat stroke] 'imminent' even for those in good health."  *Webb*, 618 Fed.Appx. at 204.  The panel also relied on the allegation that Defendants' only responsive to high temperatures entailed "sen[ding] out an informal email warning of the risk, and provided (inadequate) training to correctional officers highlighting the warning signs of heat-related illness."  *Webb*, 618 Fed.Appx. at 208.

On both points, the panel operated under inaccurate and incomplete information.  First, the temperatures within TDCJ facilities do not make heat stroke "imminent" for all persons or even persons with certain medical conditions or taking certain medications.  Although, this phrase was lifted from TDCJ policies, the allegations omit necessary information; that is, the intent and message behind the TDCJ's policy stresses the dangers of heat *if protective measures are not*

*observed.* (Appx. 1582: 11-20; Appx. 1566: 19-25; Appx. 1383, Appx. 1399)  The very notion that heat stroke is imminent for all persons merely because the temperatures reach summertime levels is belied by the fact that well over 100,000 inmates – including those with medical conditions and medications – regularly live and work in those temperatures every summer without incident, and have done so for over century.  More importantly, the Courts' understanding of the TDCJ's mitigation efforts was non-existent thanks to Plaintiffs' artful pleading.  Even a cursory examination of the annual heat message reveals that it is far more than "an informal email warning of the risk, and provided (inadequate) training to correctional officers highlighting the warning signs of heat-related illness." (Appx. 603-605)  In reality, the annual directive is the yearly product of a collective multi-disciplinary team from multiple TDCJ divisions including CID, maintenance, facilities, health services, classification, and other division leaders.  (*See* Section V, *Statement of Facts*) The message contains 24 specific measures to be implemented, all designed to mitigate the risk of the summer temperatures, and many steps which go beyond what is required by the Fifth Circuit in *Gates*. (*Id.*)  In addition, Plaintiffs misled the courts into finding that the message was somehow "informal."   Uncontroverted testimony received prior to the filing of amended complaints at issue in *Webb* and *Hinojosa* shows that the message constitutes a non-optional order from the TDCJ chain of command.  (Appx. 1708-1709: 13-25, 1-3; Appx. 1601-1602: 1-25, 1-17)  Indeed, TDCJ reviews the directive annually to add any new measures based on experience in the prior year and then disseminates the directive every year, which demonstrates the special, mandatory emphasis of the annual directive.  (Appx. 1708-1709: 13-25, 1-3; Appx. 1601-1602: 1-25, 1-17; Appx. 603-605)  These facts, and many others[19] not before the district courts and the

---

[19] Numerous other examples of disproved allegations can be found throughout both opinions. *Compare Hinojosa*, 807 F.3d at 675, "The complaint also alleges that inmates are provided "grossly inadequate amounts of water" to cope with the heat" *with* uncontroverted testimony that all prisoners always have access to clean running water from water fountains in the dormitory areas (Appx. 1719-1720: 6-25, 1-15; Appx. 1672: 2-11); *Compare Hinojosa*, 807 F.3d at 667 (noting that the complaint alleges that Defendants Thaler and Stephens do not emphasize the importance of heat-safety precautions) *with* uncontroverted deposition

Fifth Circuit at the time they ruled on the motions to dismiss, substantially change the qualified immunity analysis for summary judgment purposes.

In addition, both the *Webb* and *Hinojosa* panels erred in their analysis of the qualified immunity issues.[20]   First, both Courts failed to articulate the proper inquiry as it pertains to deliberate indifference.  When considering the objective and subjective prongs, both Courts merely looked to whether heat is or is not dangerous and whether the Defendants had subjective knowledge that this is so. *Hinojosa*, 807 F.3d at 667; *Webb,* 618 Fed.Appx. at 208.  This is not the correct inquiry, nor is it a material fact in dispute.  As the evidence is undisputed that the TDCJ had ordered and continues to order the implementation of numerous well-considered mitigation measures, the proper inquiry is whether the heat, *notwithstanding or in spite of the TDCJ's mitigation measures*, still posed an objectively unreasonable and substantial risk of harm to the safety of the offenders, and whether any Defendants had the subjective knowledge or belief that this was so. *See Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (holding prison officials are free from liability if they responded reasonably to a risk, even if the harm ultimately was not averted).

Second, the panels (and in particular the *Webb* panel) defined the qualified immunity standard in impermissibly over-broad and generalized terms.  The *Webb* panel defined the inquiry as simply whether an inmate has the right to be free from high temperatures. *Webb*, 618 F. App'x at 209. This runs afoul of the Supreme Court's forceful and repeated admonition that courts must

---

testimony and documents showing the matter was routinely emphasized.  (Appx. 601-605, Appx. 1707-1708: 10-25, 1-7; Appx. 1727-1728: 5-25, 1-17; Appx. 1695: 12-20); *Compare Hinojosa*, 807 F.3d at 667 (noting that the complaint alleges that Defendant Livingston personally approved cooling measures for swine) *with* uncontroverted testimony that he did not become aware of the purchase of swine barn trailers that came with an evaporative coolers until long after they were purchased, and had no knowledge of agricultural policies, facilities or practices, and was not involved in their purchase. (Appx. 1650: 5-13) Further, Defendants adopt and incorporate by reference the evidence, argument and authorities cited in Defendants' Motion for Summary Judgment in the related case  *Bailey* v. *Livingston*, 4:14-cv-1698, (S.D. T.X. 2014) (D.E. 326, 327 at 62-64) affirmatively dispelling the notion that TDCJ operates air-conditioned pig barns.

[20] While Defendants contend that these issues were ripe for review via an *en banc* panel or a petition for *writ of certiorari* to the Supreme Court, for reasons of judicial economy, Defendants chose to provide evidence adduced during discovery at summary judgment so that the courts would have the benefit of a full record on appeal as opposed to having to rely on misleading allegations that are proved untrue by Defendants' facts which are not capable of dispute at summary judgment.

"not define clearly established law at a high level of generality." *Ashcroft*, 131 S.Ct. at 2084; *Taylor*, 135 S. Ct. at 2044; *Mullenix*, 136 S. Ct. at 308.   The panel rejected the notion that the inquiry should be more narrowly defined and cited to *Valigura v. Mendoza*, 265 Fed.Appx. 232, 236 (5th Cir.2008) for the proposition that their interpretation of the standard was not overbroad. *Webb*, 618 F. App'x at n.7.   Based on the *Valigura* citation, the *Webb* panel incorrectly framed the qualified immunity inquiry as: "whether the Eighth Amendment prohibits exposure to high temperatures."   *Webb*, 618 F. App'x at 209. Yet, even a cursory review of the cited portion of *Valigura*, reveals the case does not stand for the proposition for which the *Webb* panel cited it:

> For a right to be clearly established "for purposes of qualified immunity, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" In September 2004—the earliest point in time of Valigura's allegations—it was clearly established that Valigura had a right to be free from cruel and unusual punishment. As discussed above, requiring an inmate to remain on his bunk almost twenty-four hours a day for several days in a row in temperatures into the nineties and hundreds are allegations that are sufficiently serious to implicate the minimal civilized measure of life's necessities. Additionally, the contours of these rights were sufficiently clear at the time of the alleged deprivation. Accordingly, we reject appellants' argument that their actions were objectively reasonable.

*Valigura*, 265 F. App'x at 236.   The *Valigura* case did not, as the *Webb* panel suggests, hold, or even suggest, that mere exposure to high temperatures violates the Eighth Amendment. *Id.*   Read properly, the *Valigura* case actually held that exposing an inmate to high summer temperatures while at the same time denying his access to food, water, and showers is what actually violated clearly established law.[21]   *Valigura*, 265 F. App'x at 235 ("Here, Valigura presents evidence that he was not permitted to get up from his bunk to stretch his legs or to get a drink of water.")  Indeed, the *Valigura* panel recognized that providing remedial measures which mitigate the dangers from heat is a constitutionally sufficient response to high temperatures. *Id.* ("We have held that

---

[21] It should again be noted that the jury ultimately rejected Valigura's claim that this was ever the case.

temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment.").  Any ambiguity in this position is resolved by the fact that just four months after the *Valigura* opinion, the Fifth Circuit upheld dismissal of an inmate's claim that the lack of air conditioning in the Texas prison system violated the Eighth Amendment. *Johnson*, 281 F. App'x 319, 321 (5th Cir. 2008).

In *Johnson*, the inmate-plaintiff did not claim that he had actually been injured due to the heat or that he had been denied access to fans, showers, water, or ventilation, but instead simply claimed that the conditions were extremely uncomfortable and posed a health risk to those who are heat sensitive. *Id.*  The Fifth Circuit upheld the dismissal of the claim. *Id.*  Particularly in light of *Johnson*, a close reading of *Valigura* shows it does not stand for the proposition for which the *Webb* panel cited it.

Finally, and perhaps most glaringly, the *Webb* panel erred by defining clearly established law with decisions that were handed down *after* the operative events at issue in the *Webb* lawsuit. In rejecting the Defendants' position that the TDCJ followed clearly established law by implementing the *Gates* mitigation measures, the *Webb* panel improperly held: "Indeed, we have affirmed determinations that prison officials violated the Eighth Amendment despite evidence that the officials implemented the remedial measures approved in *Gates*, where such measures proved inadequate to protect inmates from the extreme heat. *See Ball v. LeBlanc*, 792 F.3d 584, 592–93 (5th Cir.2015); *Blackmon v. Garza*, 484 Fed.Appx. 866, 871–72 (5th Cir.2012) (per curiam)." *Webb*, 618 Fed.Appx. at n.7.  Yet the *Webb* panel failed to explain why or how these cases could or would have clearly established the law prior to their issuance in 2011, when the events for the

basis of this suit actually took place.[22]  *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). ("Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established *at the time of the challenged conduct.*") (emphasis added).  By seeking to define the clearly established law through judicial opinions that post-date the official conduct, the *Webb* panel inexplicably diverged from decades of Fifth Circuit and Supreme Court precedent that forbid such a holding.

### B.   Director Livingston's conduct was objectively reasonable because the TDCJ's policies and directives implemented measures based upon clearly established law.

At least eight reasons justify holding that Director Livingston's conduct prior to and during the summer of 2011 was objectively reasonable in light of clearly established law at the time.

### 1.   The TDCJ implemented *Gates*-plus measures.

The heat mitigation measures implemented by  the TDCJ precisely mirror those that the Court established in *Gates* and even included additional measures beyond those the Fifth Circuit approved.  Facts not capable of dispute demonstrate that the TDCJ supplied ice water to the dorms multiple times daily, provided offenders with unlimited access to showers with lowered water temperatures, and installed large industrial fans which ran nonstop in the dorm areas.[23]  While there were no operable windows in the C-7 dorm as there were in *Gates*, the industrial air handler which provided ventilation to the area served this same purpose, and actually provided a robust

---

[22] It should be noted that the only case in the *Webb* consolidated appeal that theoretically could be impacted by the *Blackmon* holding are the claims involving the death of Rodney Adams, who died three days after the *Blackmon* opinion was issued, but long before the opinion was final, and long before any sort of systemic change could have been implemented.

[23] Though the *Gates* court spoke of providing each cell with a fan, the situation is somewhat different in a dorm housing area, where the offenders share one common area as opposed to individual cells.  It is undisputed that in the C-7 dorm there are large industrial fans mounted on the walls to cover the bunk areas.  This is roughly equivalent to the provision of a fan in each cell on a row because the fans provide air flow to the housing area.  To be sure, the law was in no way clearly established that this was insufficient under *Gates*.

amount of air flow at a rate of over 200 feet per minute that meet national standards and those adopted in *Ruiz*.[24]  (Appx. 1378, 1312)

In addition, the TDCJ implemented more measures than those set forth in *Gates*.  For example, the TDCJ loosened clothing restrictions in the housing areas, lowered the water temperatures in the showers so the offenders could take cool showers, reduced work hours, and implemented safer summer transportation.  Though Director Livingston did not personally participate in the development the TDCJ's heat mitigation measures, he reasonably relied on his subordinates, all experts in their particular areas of responsibility, to devise and implement the heat mitigation strategy.  These leaders ensured, through their formal chain of command, that the measures they ordered were implemented at individual units.  (Appx. 1708-1709: 13-25, 1-3; Appx. 601-605) At the start of the summer of 2011, Director Livingston's full (and correct) expectation was that the TDCJ would operate well within the boundaries of the Eighth Amendment in terms of summer heat safety measures.

To the extent Plaintiffs asserted that there are issues of fact regarding whether these measures were being implemented either at all or insufficiently, the undisputed facts show that no grievances or other types of complaints placed any defendant, much less Director Livingston, on notice that the Warden or officers failed to implement the measures.  (Appx. 1221-1256)[25]  In short, there is no evidence that the TDCJ's *Gates*-plus measures were not in place in the C-7 dorm

---

[24] Similarly, there is no court holding to suggest that ventilation via air handlers, as opposed to open windows, is legally insufficient to satisfy *Gates*.

[25] Of the grievances at the Hutchins Unit relating to heat, high temperature, or heat index for the time period of July 2010 to July 22, 2011, there are four grievances about the same one instance of a fan being turned off and one instance of the ventilation in Dorm B4 not working. (Appx. 1239-1240, 1243-1244, 1245-1246, 1247-1248, 1253-1254) The one grievance about the ventilation not working was submitted on April 7, 2011. (Appx. 1245-1246) The response to this complaint was "A maintenance work order (#3726) is currently open concerning the air unit in B4 dorm. This issue will be addressed as soon as possible." *Id.* There are no grievances other than these two incidents, and as there are no Step Two grievances on the incidents, there is no evidence to show these issues were not addressed. Furthermore, none of these grievances are about C7 Dorm, where McCollum was housed.

- 50 -

at the time McCollum resided there.  Nor do Plaintiffs offer any evidence that Defendants had any reason to believe the measures were not being implemented.[26] As for Director Livingston specifically, he is not personally involved in day-to-day unit operations and has no knowledge of or any reason to know of the specific implementation of the TDCJ's *Gates*-plus measures at the Hutchins Unit.  (Appx. 1618: 14-21)  To the extent that Plaintiffs believe more or greater mitigation measures were required, the law in 2011 did not clearly establish this to the level and specificity required under *Sheehan, Taylor,* and *Mullinex* to overcome Director Livingston's qualified immunity, and he is entitled to summary judgment.

### 2. The operation of prison facilities without air conditioning was well known to Federal Courts overseeing the Texas Prison system during the *Ruiz* litigation, which, along with counsel representing the Texas inmates, approved of the design and construction of facilities without air conditioning.

Director Livingston's actions are also objectively reasonable in light of the fact that the absence of air conditioning was approved by the Federal Courts as well as attorneys representing all the inmates in the Texas system.  Numerous aspects of the design and operation of Texas prisons were scrutinized and overseen by Federal Courts during the 1980's and 1990's, pursuant to the order of Judge Justice in *Ruiz v. Estelle, et al.*, 503 F.Supp. 1265 (S.D. Tex.1980).  Even though Judge Justice held there to be insufficient evidence of a Constitutional violation in the area of temperature extremes, matters of temperature and ventilation were stipulated between the parties in the consent decree approved by the Courts.  These measures did not call for the air conditioning of TDCJ facilities.  In addition, during proceedings in 1998, the Court heard testimony on the particular topic of heat related illness, and, in particular, expert testimony that included the expert's belief that three inmates had died in 1998 due to heat related causes, and 16 had been injured.

---

[26] To the extent that Plaintiffs claim that the heat mitigation techniques were in effect but ineffective as applied to McCollum in his condition, liability only can arise if Defendants are found to be subjectively aware that McCollum himself was unable to take advantage of these measures.  This evidence is fatally lacking against any named Defendant.

*Ruiz*, 37 F.Supp.2d at 904-05.  Despite this, the Court declined to find the measures the TDCJ had previously implemented as unconstitutional. *Id.* at 907.  Ultimately, the TDCJ was discharged from further Federal judicial oversight, and did so without disturbing the provisions related to ventilation, despite testimony in the District Court regarding heat related issues.  *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 996 (S.D. Tex. 2001).

Notably, the TDCJ Hutchins Unit was built and came online in 1995, during the time when the TDCJ continued to be under Federal Judicial oversight.  Air conditioning was not a novel nor rarely utilized building feature at the time.  Nevertheless, the TDCJ was not required to install it in its facilities.  The *Ruiz* stipulations, negotiated by able counsel for the class of plaintiffs, and approved by the Court, specify a host of matters in minute detail. (Appx. 462-497)  Among these are the amount of cubic feet of fresh air exchange per hour at 12.5 cfm per prisoner and 15 complete air exchanges per hour  (Appx. 480); the spacing of the grill vents which provide the fresh air at one grill per 20 feet of width (Appx. 481); the use of alternate air supply measures if windows are not available (Appx. 484); and the specific temperature at which the ventilation system must be activated at any time the temperature is over 78 degrees.   Under these circumstances, the Plaintiffs' allegations regarding Director Livingston do not rise to violations of clearly established law with regard to the design of the TDCJ's prison buildings and ventilation systems  – on the contrary, the building design and ventilation systems were overseen by the Court and approved even though the Court heard testimony of deaths in 1998.  It remains entirely unclear at what point a reasonable administrator could have determined that the Hutchins Unit possibly did not meet Eighth Amendment norms.   It was entirely reasonable for any like-situated prison administrator to conclude a facility was Constitutional when nearly all of the features of its physical plant that relate

to temperatures were approved by advocates for inmates and the federal judiciary.  As such Director Livingston is entitled to qualified immunity for this additional reason.

> **3.   The two lone hypothermia deaths between 2007 and 2011 occurred under extremely unique circumstances and did not suggest to Director Livingston, or any like situated correctional official, a systemic problem that required changes to current facilities, measures, or operations.**

The 2007 deaths of James Shriver and Dionicio Robles did not involve facts or circumstances that would have lead a reasonable prison administrator to conclude that a system-wide problem existed from the dangers of summer heat, nor did they suggest the TDCJ's heat mitigation measures were *per se* inadequate to provide a reasonable degree of safety for the offender population. The circumstances of both of these deaths were highly unique and extremely uncommon compared to the general offender population.

First, both deaths occurred at a single facility, the TDCJ Byrd Unit, a diagnostic and intake unit in Huntsville, Texas.  No hyperthermia deaths had been experienced at any of the other 100 plus units or 150,000 offenders across the state in 2007.  Second, each involved very specific and uncommon medical facts that negated the notion that the TDCJ's mitigation measures were insufficient to keep the offenders in its custody reasonably safe from the effects of the summer temperatures.  Finally, every premature death is reviewed by a joint morbidity and mortality committee of the correctional managed health-care committee.  The reviewer can recommend that any death be referred for further review should systemic issues be noted in any individual cases, including issues related to security or facilities.  With full view of the medical facts, the committee did not find any systemic issues relating to facilities or security that warranted further review. (Appx. 711-716)

Robles had his sweat glands removed in the free-world prior to his entry into the TDCJ. He entered the TDCJ on July 16, 2007. (Appx. 625)  His intake form completed by UTMB

indicates that Robles stated he "has a sweating problem," but no other details are noted. (Appx. 699) The TDCJ records lack any indication that Mr. Robles' sweat glands had been removed until after his death, when his wife reported that fact to the unit warden. (Appx. 625)  At most, a reasonable correctional administrator could conclude that this case may present issues regarding communication between patient and health-care provider, but not that the TDCJ needed to air condition all of its prisons, or that all offenders who did not have their sweat glands removed were at a similar risk.

Similarly, Shriver had a particularly high concentration of risk factors uncommon to the offender population in TDCJ. He was taking a significant number of medications for several complicated medical conditions.  (Appx. 613)  His autopsy, however, indicated that his death was likely a combination of all of those factors and noted that his hepatitis c led to liver dysfunction which caused a sodium imbalance.  (Appx. 621-622)  Further, his ultimate cause of death was cardiac arrhythmia, an issue that was not immediately apparent since the condition was only noted in an EKG occurring three years before his ultimate death.  (Appx. 622)  Since the deaths occurred at single unit with no deaths at that unit subsequently, a reasonable correctional official could view both deaths as an unusual confluence of known and unknown risk factors that were particular to one single, and very unusual prisoner.  Further, a reasonable correctional administrator presented with this information would likely not have concluded that a systemic deficiency existed which required either a major revision of policy[27] or installation of expensive temperature control changes to facilities.

### 4.  Director Livingston reasonably relied upon well-qualified officials to whom he delegated certain matters.

---

[27] Nevertheless, a revision to AD 10.64 was issued in 2008 after these deaths.

The Fifth Circuit and Texas courts acknowledge that the complexity of running a prison system of the size of the TDCJ is a massive undertaking with innumerable layers of complexity. As such, top level executives, such as the Executive Director, cannot be expected to personally intervene in every issue. *Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004). In many instances, supervisory officials discharge their duty to ensure inmate safety by referring matters to well-qualified subordinates for further investigation or action. *Id.* To require otherwise on pain of their own personal liability would create a burden on supervisory officials that no prison administrator could meet. Director Livingston's involvement with the TDCJ heat mitigation strategies, which were developed through years of experience by professional with expertise in areas of offender transportation, health services, risk management, laundry and food service, and prison plans and operations, did not present a compelling reason to make substantial changes. Absent a clear reason to question their collective expertise and judgments, Director Livingston was objectively reasonable in relying on them.

5.      **No law required 24 hour medical care, and Director Livingston reasonably relied on the judgment of qualified medical professionals, who asserted that appropriate medical care could be provided at the Hutchins Unit despite staffing reductions.**

Plaintiffs' claims asserted against Director Livingston regarding medical staffing decisions fail for at least three reasons. First, despite several invitations to do so, the Plaintiffs have yet to identify any authority for the proposition that the Eighth Amendment requires 24 hour on-site medical care. Defendants remain unable to locate any such authority. In this regard it cannot be argued that the lack of overnight on-site medical care was in contravention of any clearly established law.

Second, as noted above, Director Livingston appropriately delegates the task of distribution of resources in the area of medical care to qualified individuals, both within the TDCJ, UTMB,

- 55 -

and the Correctional Managed Healthcare Committee.  In fact, policies were implemented for the provision of medical care during times where no medical provider was present on a given facility. Director Livingston appropriately relied on these knowledgeable individuals.

Finally, the distribution of medical care at the Hutchins Unit was found to be compliant with standards promulgated by the American Correctional Association.  Plaintiffs' expert opined that both the officials who promulgate the ACA standards[28] and those who complete the ACA inspection process are all experts in the field of corrections and are well trained and reliable.  ACA standards require that prisons form staffing plans appropriate to meet the medical needs of the facility. (Appx. 1683-1684: 11-25, 1-19)  The TDCJ and Hutchins Unit did just that, and an ACA official approved of that plan in their inspection of all facets of the facility.  Director Livingston's reliance on his subordinates as well as an independent review of the medical staffing at the Hutchins Unit is objectively reasonable, particularly in light of the complete absence of clearly established law to the contrary.[29]

**6.    Director Livingston could not take unilateral action to air condition Texas prison facilities, and members of the Texas Legislature, even after learning of hyperthermia deaths, have not suggested that the TDCJ should air condition its facilities.**

Director Livingston is further entitled to qualified immunity because Plaintiffs' claims against him stem from his alleged failure to provide a remedy (air-conditioned prisons) that he could not unilaterally provide without exceeding his authority under state law.  Director Livingston serves at the pleasure of the Texas Board of Criminal Justice ("TBCJ"), who appoints him, supervises his administration of the TDCJ, and develops and implements policies that clearly

---

[28] Incidentally, this includes Director Livingston, who was the head of the standards committee.
[29] Defendants acknowledge that Courts have held that ACA accreditation does not constitute *per se* compliance with the Eighth Amendment, and Defendants do not offer it as such. *Gates*, 376 F.3d at 337. (citing *Ruiz v. Johnson*, 37 F.Supp.2d 855 924–25 (S.D.Tex.1999)).  Defendants merely offer this evidence as but one of the many reasons why Director Livingston reasonably believed the medical staffing plans in place were Constitutionally adequate for the purposes of qualified immunity.

separate the policymaking responsibilities of the board and the management responsibilities of the executive director. TEX. GOV'T CODE § 492.013(b), (e). The board also has final approval over annual operating budgets and the submission of the TDCJ's requests for appropriations from the legislature. TEX. GOV'T CODE §§ 492.013(c), 492.017. Further, contracts over one million dollars must be approved by the governing body of the contracting state agency; here, the TBCJ. TEX. GOV'T CODE § 2261.254. A project to retrofit every TDCJ facility to include air conditioning in the housing areas—likely a multi-billion dollar proposition—would require a legislative appropriation.[30] Neither the appropriation request nor the expenditure are within the authority of Director Livingston. Both would require the approval of the TBCJ and specific funding from state leadership. In the legislative appropriation for the TDCJ, Article IX, section 14.03, capital budgets, requires that if an agency requires more money for capital expenditures (as opposed to general operating expenses), there is a strict, formal process to be followed. (Appx. 1569-1570: 10-25, 1)

It also should be noted that members of the legislature have rejected the notion of installing air conditioning in the Texas prisons. For example, Representative Sylvester Turner, who chaired the House Criminal Justice Appropriations Committee, was informed in 2009 of the two heat-related deaths that occurred in 2007, which Plaintiffs chiefly rely upon to claim Director Livingston should have air conditioned the TDCJ facilities. Yet, despite this knowledge, he did not introduce legislation or state that these two incidents necessitated major changes to the TDCJ's operations or physical plant. John Whitmire, a Democrat, and the longtime chair of the Senate Criminal Justice Committee, also publically commented that, despite the events of 2011, air-

---

[30] TRAK Engineering, Inc. estimates the total probable cost to retrofit the Hutchins State Jail with air conditioning to be $79,113,899. (Appx. 325) This cost is further broken down into four separate costs for the various components of the retrofit: (1) $61,854,929 to modify and upgrade the building envelopes of the existing dormitories; (2) $13,627,205 to purchase and install the mechanical HVAC components; (3) $1,587,684 to upgrade the electrical system to handle the new equipment; and (4) $2,044,081 for the structural additions to support the new HVAC equipment. *Id.* This is the estimate for the Hutchins State Jail Only.

conditioned prisons are not a legislative priority.[31] The Legislature has not amended the Texas Government Code to require air conditioning in TDCJ facilities, despite the fact that an entire chapter is devoted to inmate welfare. TEX. GOV'T CODE Chapter 501.  Director Livingston's belief that the TDCJ operates constitutionally sound prisons without air conditioning is shared by knowledgeable legislators and further demonstrates the reasonableness of his conduct.

Even if Director Livingston could have somehow ordered the installation of air conditioning in all the TDCJ facilities prior to the summer of 2011, he could not have done so without jeopardizing the TDCJ operations in number of other key areas.   The TDCJ necessarily operates within the budget constraints imposed by the Texas Legislature which, as testified to by Mr. Collier, allocates $40 million to $80 million when there are maintenance needs of $300 to 400 million dollars.  (Appx. 1567-1568: 15-25, 1-12)  Though its budget seems large, so is its mission: the provision of medical care, supervision of parolees, implementation of rehabilitation, education, agricultural management to feed the offenders, and actually securing 150,000 felons on any given day.[32]  Director Livingston could not have, acting in good faith, diverted funds for the installation of air conditioning without jeopardizing other operational necessities. His conduct was objectively reasonable. He, therefore, is entitled to dismissal of these claims based upon the doctrine of qualified immunity.

> **7.**     **Numerous prison systems throughout the south, including the Federal prison system, operate prisons without air conditioning, and national prison standards do not call for air conditioned housing areas.**

---

[31] Mike Ward, *Lawmakers, Prison Agency Defend Lack of AC in Texas Prisons*, The Houston Chronicle, April 22, 2014 (http://www.houstonchronicle.com/news/politics/texas/article/Lawmakers-prison-agency-defend-lack-of-AC-in-5422737.php?t=f2248b48a3b2e7d3f0)

[32] The TDCJ also has one of the lowest recidivism rates of any prison system in the country. (Appx. 1616: 8-10)

Director Livingston further reasonably believed that the TDCJ could operate within the bounds of the Eighth Amendment without air-conditioned housing areas, because numerous prison systems, including the Federal Bureau of Prisons, operate prisons without air conditioning throughout the Southern United States.  In Alabama, there is no air conditioning in offender housing areas according to Department of Corrections Commissioner Jefferson Dunn.[33]  The Florida Department of Corrections has made an effort to correct the misconception that its prisons are air conditioned, stating only ten of the more than seventy state-managed prisons have any air conditioning in offender housing areas.[34]  Both Mississippi and Louisiana, respectively, have been sued for a lack of air conditioning in offender housing areas, and, in both cases, the Fifth Circuit declared air conditioning was not constitutionally required.  *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 599.  The same is true of Guantanamo Bay, where, despite Plaintiffs' misleading claims, air conditioning is not universally provided.[35]  Finally, and perhaps most tellingly, the Federal Bureau of Prisons operates facilities in Texas that have un-air-conditioned housing areas. *See Ashley v. U. S.*; 3:14-CV-02654-D (Northern District of Texas) (federal inmate claiming he suffered a heat related injury because he was housed in area of FCI-Seagoville that did not have air conditioning).

In addition, Texas follows the standards promulgated by the American Correctional Association for adult correctional institutions.  Even Plaintiffs' purported correctional expert Rodger Clark acknowledges that these standards are the golden standard for correctional

---

[33] Ashley Thompson, *Ahead of Second Special Session, Alabama's Prisons in Crisis*, ALABAMA NEWS (Sep. 7, 2015, 5:05 PM), http://www.alabamanews.net/home/top-stories/Ahead-of-the-Second-Special-Session-Alabamas-Prisons-in-Crisis-325492141.html (last visited Nov. 15, 2015).

[34]  *Misconceptions   About   Florida   Prisons*,   FLORIDA   DEPARTMENT   OF   CORRECTIONS, http://www.dc.state.fl.us/oth/myths.html (last visited Nov. 15, 2015).

[35] Plaintiffs' statement "[e]ven prisons that primarily house the most dangerous offenders—such as the Federal Super-max facility in Florence, Colorado, or the military prison for terrorism suspects in Guantanamo Bay, Cuba—have air conditioning" is misleading. Guantanamo Bay is not entirely air conditioned.  Guantanamo Bay has air conditioning for "*some* of the most compliant detainees," while other portions of the facilities are not air conditioned.

operations.  (Appx. 1682-1683: 11-25, 1-19)  He opined that the experts who create those standards are the top level national experts in correctional management. *Id*. Yet, the ACA does not mandate climate controlled housing areas in adult correctional facilities, but merely requires that temperatures be appropriate for the climatic conditions.  (Appx. 1515; 1520-1555)  Moreover, all the TDCJ facilities go through an extensive ACA accreditation process every three years.  The accreditation process is lengthy and comprehensive. The ACA members inspect the engineering and physical plant. (Appx. 1288-1297)  In 2010, the ACA inspectors accredited the Hutchins Unit as a unit meeting ACA standards. (Appx. 1256-1329)  In addition to the triennial accreditation process, every TDCJ facility goes through yearly internal reviews by the facilities division of TDCJ. (Appx. 806-1165)  While ACA accreditation is not conclusive of compliance with the Eighth Amendment, correctional administrators like Livingston, could reasonably rely on the receipt of accreditation by the ACA absent clearly established law to the contrary, especially where numerous state and federal prisons operate without air conditioning throughout the south.

### 8. Public policy overwhelmingly favors finding Livingston entitled to qualified immunity.

The policy basis behind qualified immunity is illustrated no more squarely than in the claims here asserted against Director Livingston. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. *Ashcroft*, 563 U.S. at 743.  This notion especially applies to prison administrators like Director Livingston since over time, the courts have deferred to prison leadership due to the near impossibility of the task they undertake: "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Broad discretionary authority is afforded to prison

administrators because the administration of a prison is "at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566, (1974).

Prison administrators, like Livingston, take on the difficult task of allocating and maximizing limited resources to operate prison facilities that are safe for the inmates, the officers who work in them, and the public at large.  Despite their best efforts, every prison system in existence operates with budgetary and operational trade-offs, and no prison in existence could ever operate with complete safety, as prisons are inherently dangerous places, despite the best efforts of correctional administrators. The TDCJ is no different.

Qualified immunity protects correctional executives like Director Livingston, who has been recognized numerous times by multiple professional organization as one of the top correctional administrators in the county.[36]  Acting in good faith, Livingston oversees the TDCJ with every intention of making it as safe as possible for all within the budgetary and resource constraints imposed by the Texas Legislature.  The TDCJ's heat mitigation strategy was formed and implemented in good faith with the expectation that it would keep all inmates, including McCollum, reasonably safe from summer temperatures.  To divest Director Livingston of his qualified immunity here would make virtually untenable for any citizen, especially those with Director Livingston's expertise in correctional management, to ever take on the task of managing a prison system.

Tragedies of many causes will occur in every prison system, despite executive officials' good faith efforts.  Were courts to hold executives personally liable even where they have acted in good faith to mitigate a known risk with the resources they have been allocated, every prison

---

[36] Cody Stark, *TDCJ Director Livingston Receives Third State Award*, The Huntsville Item, (Sept. 30, 2015) *available at* http://www.itemonline.com/news/local_news/tdcj-director-livingston-receives-third-state-award/article_a8eeadc9-f1c8-5945-b9a6-f8404a250bba.html

official would face untenable and unending personal liability.  This court should not allow a claim based on the executive's alleged failure to implement a very costly protective measure, like air conditioning, which has not been approved by the legislature with adequate appropriations to carry it out. And, more importantly, where the agency's past mitigation efforts without air conditioning had been very effective until an unprecedented and unpredicted heat wave. (Appx. 1334-1337)[37]

In these circumstances, Livingston, and other executives in his same position, lack the ability to provide the Plaintiffs' proposed measure without legislative appropriation and approval. To be sure, every prison system has seen tragedies that were theoretically preventable if the system had unlimited resources, but none do. Qualified immunity has always protected prison officials who discharge their duties in good faith with the resources they are allocated.  If it did not, it would be impossible to find individuals, particularly those with Director Livingston's qualifications, to ever take on the unenviable, but necessary task of administering prison system.   Qualified immunity recognizes this public policy concern, and though it may lead to scenarios where injured individuals may be left with no financial recovery, courts have long held that the public policy concerns that allow prison officials the necessary latitude to perform their duties without the distraction of protracted litigated should be paramount.  This principle is no better illustrated than in the case at bar.  This Court, therefore, should uphold Director Livingston's entitlement to qualified immunity.

**C.      Defendants Eason and Pringle are also entitled to qualified immunity where they ordered the implementation of Court approved mitigation measures with the belief, based on prior experience, that the measures would be effective.**

Regional Director Eason and Warden Pringle also are entitled to qualified immunity since it is uncontroverted they implemented *Gates*-plus measures which they expected would make

---

[37] Not only was the summer of 2011 weather not predicted, it is unlikely to occur again (50/50 chance within next 1000 years). (Appx. 1335-1337)

inmates reasonably safe from the summer temperatures based on past experience.  Their conduct, therefore, was objectively reasonable and they are entitled to qualified immunity.

> **1.    Eason and Pringle relied on orders through the chain of command to implement mitigation measures with the full expectation that they would be effective.**

Defendants Eason and Pringle both ordered the implementation of the *Gates*-plus measures at the Hutchins Unit.  As noted throughout, the TDCJ leadership issued a yearly directive ordering the implementation of heat mitigation measures that met and exceeded those required in *Gates*. These facts are uncontroverted and not capable of dispute.  Defendants Eason and Pringle did not participate in the formulation of those measures, but, instead, were responsible for ensuring their implementation.  There is no disputed issue of fact that each ordered their implementation at the Hutchins Unit and had no knowledge that any measures were not being provided.  As such, their conduct was objectively reasonable.

Eason testified that the annual message directs the administrators of the TDCJ units to implement heat mitigation measures and carries the same force as policy. (Appx. 1578: 2-9; Appx. 1600-1603: 23-25, 1-25, 1-25, 1-12)  He held meetings with the eleven wardens in the region he supervised to stress and discuss summer heat issues and mitigation measures. (Appx. 295) To his knowledge, all of the facilities in his region followed the policies and annual directive and did everything possible to provide the mitigation measures for summer heat in the units. (Appx. 1579: 2-9)  Regional Director Eason inspected the facilities in his region, including verifying that the summer heat mitigation measures were in place. (Appx. 1581: 6-14)  Had he learned that one of the facilities in his region was not following the directive, he would have stepped in as a regional director to correct the situation. (Appx. 1579-1580: 22-25, 1-3)  Plaintiffs have identified no

evidence to support the proposition that Regional Director Eason ever had knowledge that the TDCJ's *Gates*-plus summer mitigation protocols were not being implemented at the Hutchins Unit.

Likewise, Warden Pringle ordered the implementation of the *Gates*-plus heat mitigation protocols at the Hutchins Unit.  At the unit level, Warden Pringle instituted operational procedures at the Hutchins Unit that specifically tracked TDCJ's heat mitigation protocols and included and exceeded all of the *Gates* measures.  (Appx. 723-725)  The TDCJ's policies and annual directive exceeded the *Gates* measures in that units are required to provide frequent water breaks for inmate workers, lessened clothing restrictions, special procedures for inmate transport to prevent an over exposure to heat, and both annual training and training during shift meetings for correctional officers.  (Appx. 295; 601-605; 723-725)  At Hutchins, the lack of individual outlets did not allow for personal fans and the windows in the dorm areas do not open.  For these reasons, the TDCJ positioned large industrial fans in the dorms and provided additional ventilation with industrial air handlers.  Maintenance staff, ACA auditors, and other TDCJ inspectors periodically audited the air handlers to ensure their proper function.  Warden Pringle considered these measures mandatory, not optional.  (Appx. 295)  In addition, competent evidence also documents the efforts made on the unit level to ensure inmate safety.  Staff at Hutchins lowered water temperatures in the showers below body temperature to provide an individual cooling effect. These measures target the individual offender's personal temperatures.  (Appx. 1562-1565: 24-25, 1-25, 1-25, 1-25)

Inspectors verified the provision of water coolers and measured water temperatures to ensure they contained cool water.  They measured the water temperature in the sink water fountains to ensure that even if a water cooler was empty, the offenders could access cool water from the sinks in the dorm area.  Prior to McCollum's death, Warden Pringle reasonably believed these measures were in place per his orders through the chain of command.  (Appx. 293-297)  He

received no grievances indicating that any of these measures were not in place. (Appx. 1221-1256) Though he was aware of the temperatures, acting in good faith, he took all the steps he reasonably believed were necessary to maintain a reasonably safe environment. Hutchins had not experienced any summer hyperthermia deaths prior to 2011.  As such, this Court should find his conduct was objectively reasonable.

**2.      Neither Eason nor Pringle held the authority to order the installation of air conditioning.**

Even if Eason or Pringle identified a need to provide air conditioning in the housing areas at the Hutchins Unit, neither had the authority to unilaterally purchase or install air conditioning in the housing areas.  Regional Director Eason correctly testified that the decision to install air conditioning in inmate housing areas would be a decision that would have to be made by the Texas Board of Criminal Justice, and also would require a legislative appropriation of funds to do so. (Appx. 1586-1587: 22-25, 1-7)  Likewise, Warden Pringle could not have unilaterally decided to install air conditioning on his facility.  (Appx. 296)

Further, both then CID Director Richard Thaler and Warden Pringle testified that if an inmate required air-conditioned housing for medical reasons, this assessment would be made by medical staff.  (Appx. 1674: 7-18; Appx. 1721: Appx. 1722: 8-24)  If such an assessment was made and communicated to the TDCJ, unit classification would find the appropriate housing. (Appx. 1721: 19-25; Appx. 1722: 8-24)  No such assessment was made of McCollum by medical staffing, and no information regarding McCollum was ever communicated to Eason or Pringle prior to his death.  In sum, neither had the ability to unilaterally decide to air condition the housing areas at the Hutchins Unit, nor were any medical orders given indicating a need to place him in air-conditioned housing.   The conduct of a state official cannot be held to be objectively unreasonable if it required him to exceed or violate his authority or if he was not advised of the

specific risk.  As such, Regional Director Eason and Warden Pringle are both entitled to qualified immunity.

### 3. No case law required that 911 be summoned any time an inmate suffers a seizure.

No clearly established law prior to McCollum's death established that officers must call 911 anytime an inmate suffers a seizure.  Plaintiffs specifically claim that Defendants Eason and Pringle's ratification of the policy that officers follow the chain of command when responding to emergencies, and their alleged failure to train officers to immediately call 911 when discovering an inmate having a seizure, violates the Eighth Amendment.  Absolutely no case law supports such a theory, or could be remotely argued to clearly establish that Defendants Eason and Pringle's practices or training for their officers was unquestionably unconstitutional.  Even Plaintiffs' expert agreed that in the correctional setting, 911 need not be called any and every time an offender has a seizure.  (Appx. 1746: 16-17; Appx. 1747: 14-15)  The TDCJ chain of command has been in place for decades, if not over a century.  Moreover, because no comparable case law establishes that officers commit Eighth Amendment violations when they do not immediately call 911 after discovering an inmate having seizure, it cannot be said that any training in this area was clearly unconstitutionally deficient to the level and specificity required under *Mullinex*, *Taylor*, *Sheehan*, *Wyatt* and *Morgan* to overcome qualified immunity.

**D.  Defendants Clark, Tate, and Sanders are entitled to qualified immunity where the law was not clearly established that security staff who believe an inmate is suffering a serious—but not emergent—condition that most often does not require emergency medical care violated the Eighth Amendment by not immediately calling 911.**

The law regarding deliberate indifference and the constitutional duty imposed on prison security to staff to afford inmates access to health care is well established and not in dispute.  However, a survey of case law in the Fifth Circuit fails show any case law that would compel the

conclusion that, as Plaintiffs have alleged, Officers Clark, Tate, and Sanders violated the Eighth Amendment by not immediately calling 911 upon the discovery of McCollum in this midst of seizure.  The Fifth Circuit has long held that prison officials are entitled to rely on the judgment of medical professionals. *Cooper v. Hung*, 485 Fed.Appx. 680, 684 (5th Cir.2012). *See also*, *House v. Simmon*, 2013 WL 2391680, *5 (E.D.Tex. May 29, 2013); *Hermosillo v. Hudson*, 2012 WL 4097735, *10 (S.D.Tex. 2012); *Huff v. Thaler*, 2012 WL 2120569, *9 (S.D.Tex. 2012).

In July of 2011, cases where liability was imposed on correctional staff for their failure to summon medical staff was predicated on facts not remotely similar to those at issue here.  A claim was stated where the plaintiff claimed that officers left an unresponsive and seizing inmate on the floor of his cell for *days* while other offenders repeatedly told them to summon medical staff.  *Boyd v. Grooms*, 2009 WL 3151341  (S.D.Tex.,2009).  Liability was possible where the delay in care for an unconscious offender was left in his cell for over three hours before a nurse arrived despite several officers being notified of the situation. *Childers v. Bates*, 2010 WL 1268139 (S.D.Tex.,2010).  Allegations that correctional officers (and a medical provider) loaded an unresponsive inmate onto the floor of a transport van for a three hour trip rather than immediately summoning emergency care stated a claim for deliberate indifference.  *Bias v. Woods*, 288 Fed.Appx. 158 (5th Cir.2008).

*Austin v. Johnson*, 328 F.3d 204 (5th Cir.2003) provides a relevant comparison in the context of heat illness.  In *Austin*, a youth offender was assigned to a county operated boot camp as punishment following a theft conviction. *Id.* at 206.  The camp required strenuous outdoor exercises during late June. *Id.*  Camp administrators noted that Austin fell several times after 2 p.m. during exercises and began vomiting. *Id.*  He was taken into a building and first aid was rendered but at some point around 3 p.m., the officials noted that he was dehydrated, and he lost

consciousness. *Id.*  An ambulance was not called until 4:42 p.m. *Id.*  The Court drew a distinction between the time frame in which the officials' failure to call 911 was merely negligent and when it became deliberate indifference.  The Court held that the failure to call an ambulance prior to 3p.m. was perhaps only negligent, but a deliberate indifference claim could be stated after the officials knew he was dehydrated and had lost consciousness, because at that point the administrators would have had subjective knowledge of the cause of his ailment. *Id.* at 210.

Here, the actions by the Defendants are not remotely akin to those which Fifth Circuit Courts have held to present potential violations based on a delay in summoning medical assistance. The officers' actions were consistent with what they had done in the past for inmates suffering a seizure.  They had never been informed by their superiors or a medical provider that 911 must be called immediately whenever they encountered a seizure.   None could recall having done so in the past. (Appx. 277-281, 282-287, 288-292)  As security officers, they are entitled to rely on the advice of medical providers, who, in the past, had not instructed Sanders or Tate that an ambulance must be called for a seizing inmate. (Appx. 282-287, 288-292)  Officers Sanders and Tate provided care and monitoring as they attempted to revive McCollum from his seizure and consulted with medical staff when McCollum appeared to be suffering from something more than an ordinary seizure.  Plaintiffs' expert testified that a seizure and a convulsion would appear identical. (Appx. 1746: 3-6)  She also testified that in her extensive emergency medical experience, she had, on hundreds of occasions, seen patients undergo a seizure and emerge from the state without any medical complications. (Appx. 1748: 17-19)  This echoes each Defendant's experience with seizures by inmates and shows they cannot be argued to be "plainly incompetent" as would need to be shown to divest them of qualified immunity.

All of the officers testified that heat stroke did not enter their minds as a possible cause, in part, because the event occurred late at night, during a time of cooler temperatures, and after all of the inmates had been in their bunks for several hours. (Appx. 277-281, 282-287, 288-292)  None had even heard of an inmate suffering from heat illness in these circumstances.   The very facts that *stated* a deliberate indifference claim in *Austin* — exercise during the heat of the day, passing out, and vomiting — as well as the subjective knowledge of the cause of McCollum's ailment are entirely missing here.  This shows they did not "knowingly violate the law" as would need to be shown to divest them of qualified immunity.

In sum, Defendants Clark, Tate and Sanders did not delay in responding to the situation, leave McCollum in an unconscious state, or realize he was suffering from heat stroke; all facts the existing Fifth Circuit case law requires to overcome qualified immunity.  Each formed a reasonable belief that McCollum was suffering a seizure and each formed a reasonable initial belief based on their experience in dealing with seizures that emergency care was not immediately needed.  There is no dispute that these judgments were mistaken.  There is also no dispute that qualified immunity protects such mistaken judgments where officers act in good faith.  For these reasons, all of the officers are entitled to the protection of qualified immunity.

> 1. **Consistent with decades of Fifth Circuit precedent, Plaintiffs' attempts to frame their negligence claims as deliberate indifference claims should be rejected.**

Fifth Circuit precedent is filled with examples of plaintiffs seeking to lower the standard of deliberate indifference to a lesser standard akin to negligence.  It is equally filled with the Fifth Circuit's refusals to do so.  Plaintiffs' claims here present yet another invitation.  Undisputed evidence reveals that Plaintiffs' claims simply do not rise to the "extremely high" standard of

deliberate indifference.   Plaintiffs' attempts to frame their negligence claims as deliberate indifference claims should be rejected consistent with decades of Fifth Circuit precedent.

Inmates are protected from cruel and unusual punishment under the Eighth Amendment of the United States Constitution. *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995).   The Constitution does not mandate comfortable prisons, but the Eighth Amendment's prohibition against cruel and unusual punishment does require that inmates be afforded "humane conditions of confinement."   *Farmer*, 114 S.Ct. at 1976.   Prison officials are to ensure inmates receive adequate food, shelter, clothing, and medical care. *Id*.   A two-part test determines whether a prisoner has established a constitutional violation. *Woods*, 51 F.3d at 581.   First, he must demonstrate the objective component of conditions "so serious as to deprive prisoners of the minimal measure of life's necessities, as when it denies the prisoner some basic human need." *Id*. (quotation omitted).   Second, under a subjective standard, the prisoner must establish that the responsible prison officials acted with deliberate indifference to his conditions of confinement. *Harper v. Showers*, 174 F.3d 716, 719–20 (5th Cir.1999) (footnotes omitted).   The deliberate indifference standard requires a showing of "unnecessary and wanton infliction of pain ...." *Farmer*, 511 U.S. at 834.

"The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the . . . officials were actually aware of the risk, yet consciously disregarded it." *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002).   "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants." *Hall*, 190 F.3d at 697 (*quoting Farmer*, 511 U.S. at 834).   Thus, the "failure to alleviate a significant risk that [the official] should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th

Cir.2001) (quoting *Farmer*, 511 U.S. at 838).   Just as important, prison officials who actually knew of a substantial risk to inmate health or safety are not liable if they responded reasonably to the risk, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844-45.  "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id*.

As well established as the legal principles may be, many plaintiffs have sought to lower the applicable standard to negligence.  The deliberate indifference inquiry, however, requires more than mere negligence. *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir.2001).   Deliberate indifference "is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Id.* at 617–18 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992); *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000)).

As shown below, Plaintiffs have failed to establish a claim of deliberate indifference against any of the named defendants.  Their claims fail at the supervisory level and at the unit level.  Undisputed evidence shows that McCollum's death, though tragic, was not the product of deliberate indifference either at the policy making level (Livingston), the management level (Eason and Pringle), or by the officers on the ground (Clark, Tate and Sanders).

**2.   The TDCJ's policies and practices show Director Livingston acted reasonably thereby negating Plaintiffs' allegations of deliberate indifference.**

It is undisputed that neither Director Livingston, Regional Director Eason, nor Warden Pringle had any interaction with McCollum or any knowledge of his presence at the Hutchins Unit. Plaintiffs' claims against them are twofold: 1) by the policies they implemented, they subjected McCollum to Eighth Amendment violations due to the high heat at the Hutchins Unit (D.E. 119 at 30); and 2) they failed to train their staff to summon emergency medical assistance immediately

- 71 -

upon discovering an offender having a seizure. (D.E. 119 at 32-33).  Even when resolving all factual inferences in favor of Plaintiffs, their claims against Director Livingston fail.

    **i.**    **Plaintiffs lack evidence of a pattern of violations to establish supervisory liability against Director Livingston.**

The Supreme Court recently held that in a civil rights lawsuit "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1943 (2009).  "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of [a] constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir.1987) (citations omitted).  In order to be liable on such a theory of deliberate indifference, the supervisory officials must have had actual or constructive knowledge of the deficient policy at issue and overt participation in it. *Blank v. Eavenson*, 530 Fed.Appx. 364, 370-71 (5th Cir.2013); *Cf. Thompkins*, 828 F.2d at 304.

A plaintiff's mere dissatisfaction with the specificity and breadth of policy and training does not render the policies objectively unreasonable for the purposes of qualified immunity. *See, e.g., Whitt v. Stephens Cty.,* 529 F.3d 278, 284 (5th Cir.2008).  The Supreme Court has cautioned against second-guessing the specificity and coverage of existing policy and training in the context of §1983 damages actions because every time a state actor violates a constitutional right, "a §1983 plaintiff will be able to point to something the [state] 'could have done' to prevent the unfortunate incident." *Connick v. Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1363, 179 L.Ed.2d 417 (2011) (quoting *City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989)).

For a plaintiff to demonstrate that a policy reflects deliberate indifference, the proof "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Johnson v.*

*Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir.2004) (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir.2003)) (internal quotation marks omitted).  "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."  *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Rhyne,* 973 F.2d at 392).

Culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  *Connick*, 131 S.Ct. at 1360 (citing *Okla. City v. Tuttle*, 471 U.S. 808, 822–23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion)).  "[A] showing of deliberate indifference requires that the Plaintiffs 'show that the failure to train reflects a deliberate or conscious choice to endanger constitutional rights.'"  *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir.2005) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)).  It is well accepted that a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 131 S.Ct. at 1360 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).  "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id*.  In *Connick*, the Supreme Court held that a history of four violations of *Brady v. Maryland* by a prosecutor over a ten-year period was insufficient to establish a claim for failure to train or supervise.  *Connick*, 563 U.S. at 1360.

Liability can be predicated on a single incident, but only under extraordinary circumstances.  The Supreme Court has offered a single example of the sort of rare circumstances under which single-incident liability for a failure to train or supervise would be viable.  Single-incident liability would be available against "a city that arms its police force with firearms and

- 73 -

deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Connick*, 131 S.Ct. at 1360 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n. 10, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

The Fifth Circuit has limited, if not foreclosed, any notion of liability of administrators for alleged deficient policies without specific knowledge of the facts or circumstances in a particular case, or knowledge of a pattern of constitutional violations stemming from a particular policy. In *Walker v. Upshaw*, 515 Fed.Appx. 334 (5th Cir.2013), the Fifth Circuit held that a TDCJ regional director could not be held liable for allegedly deficient policies regarding the issuance of boots to violent inmates and the housing of violent inmates after one inmate killed his cellmate by kicking him while he slept. This was so even where the regional director had testified that he oversaw the unit where the incident took place, and that he knew that violent inmates had used boots to injure and kill other inmates in the past. *Id.* The Fifth Circuit held that this alone was insufficient to establish liability because it did not show a pattern of constitutional violations or that the regional director had maintained a policy with deliberate indifference to its known or obvious consequences. *Id.* at 341.

The evidence is undisputed that Livingston was not aware of a pattern of Constitutional violations related to heat such that his failure to alter the TDCJ's policies constitutes deliberate indifference. Evidence is lacking that such a pattern has ever existed. Director Livingston testified that he was aware of two deaths in 2007, but of no others in the four years prior to 2011.[38] (Appx. 1625: 12 to 16)

---

[38] McCollum's death was the first of ten deaths during the summer of 2011 in TDCJ where heat was determined to be a factor. This was unprecedented, just as the summer temperatures experienced in Texas during 2011 were unprecedented and not expected to recur. (Appx. 1337) Evidence gathered in related litigation shows the response at high levels within TDCJ, who responded promptly to these incidents. As McCollum's death was the first of 2011, TDCJ's actions and response are not directly relevant here, and will not be explored in depth.

Further, Plaintiffs also cannot rely on Director Livingston's notice of heat related injuries as constituting a pattern of Constitutional violations.  Director Livingston testified he generally receives and reviews reports indicating statistics on varying types of injuries suffered by inmates and officers. (Appx. 1621: 2 to 10; Appx. 1640: 8 to 21; Appx. 1643: 17 to 23)  First, the relevant category is only titled "weather related" injuries, and includes not just "indoor" injuries, but, also includes outdoor injuries such as sunburns and exertion. (Appx. 1394) Even if these statistics showed a pattern of injuries, there is no evidence that those injuries were the result of unconstitutional conditions.

More importantly, Livingston testified that, as an agency that deploys a massive outdoor workforce of over 100,000 officers and inmates operating one the nations' largest integrated agricultural operations, a certain number of heat-related incidents are to be expected as with any large-scale outdoor labor operation. (Appx. 1649: 9 to 24)  He testified that he relies on subordinates to call it to his attention if the number of injuries suffered was somehow beyond what could be reasonably expected. (Appx. 1651: 11 to 18; Appx. 1652: 9 to 19)  No such information was ever conveyed to Livingston, and any attempt to establish knowledge of a pattern of violation based on knowledge of "weather-related" injuries fails as a matter of law.

Finally, Plaintiffs cannot rely on the mere knowledge of the heat in Texas, the lack of air conditioning in most units of the TDCJ, and the knowledge that TDCJ houses men with conditions that *might* make them susceptible to heat stroke, in order to establish the requisite knowledge to establish deliberate indifference.  This is akin to what the Fifth Circuit rejected in *Walker*, where knowledge by an administrator that the TDCJ houses violent offenders and issues them boots knowing that those boots have been used to kill in the past, was insufficient.

- 75 -

This theory further fails because the TDCJ took steps to mitigate this risk, and was, therefore, not deliberately indifferent to it.  The TDCJ's heat mitigation policies and directives are contained in three different documents:  Administrative Directive 10.64, Correctional Managed Health Care Policy Manual, and the Heat Precaution reminders sent yearly from the TDCJ administration through the system. (Appx. 498-515, 516-525, 601-609)  The first version of A.D. 10.64 was promulgated in September of 1986.[39] (Appx. 499-503)  The policy defines procedures and safety measures to be implemented to protect offenders and staff working in hot and cold environments.

Prior to the summer of 2011, the policy was in its sixth revision. (Appx. 505)  A.D. 10.64 provides for several protective measures related to heat, with special emphasis on offenders engaging in work assignments.   Absent here is any evidence that a pattern of constitutional violations occurred in the years 2008, 2009, and 2010 or that Livingston had knowledge of any pattern of deaths.  One or both of these requisite pieces of evidence are necessary to hold him liable based on his supervisory role.  Both, however, are missing, especially in light of policies that were adopted and revised to address heat mitigation.

ii.     **Livingston appropriately delegated to and relied upon qualified subordinates.**

Plaintiffs' claims further fail against Director Livingston because the evidence is undisputed that he was not deliberately indifferent to the risks posed by the Texas heat.  Instead, acting as the Executive Director of one of the largest and most complex agencies of the State of Texas, he acted in a manner entirely consistent with the Fifth Circuit's expectation for prison executives:  he appointed qualified individuals as his subordinates, each of them assigned with supervisory oversight over specific areas of correctional management. *Johnson v. Johnson*, 385

---

[39] While it isn't clear whether this policy was the product of the death of Adolpho Banda and the offender work dispute at the Pack Unit that followed it, its timing certainly suggests that it was the product of TDCJ responsiveness to inmate safety issues.

F.3d 503, 526 (5th Cir. 2004) (holding that high-level officials cannot be expected to personally be involved in every minutia of prison administration)

The TDCJ's officials with expertise in areas of offender transportation, health services, risk management, laundry and food service, and prison plans and operations developed heat mitigation measures based upon years of experience safely managing the offenders during Texas summers. Additionally, qualified officials developed appropriate training standards for officers in the area of emergency response and medical staffing plans, all of which were crafted by professionals in these areas, including the contracted medical providers.  Furthermore, it should be noted that Director Livingston discharged his supervisory duty of ensuring the constitutionality of the TDCJ's facilities by requiring ACA accreditation for its facilities.  As acknowledged above, ACA accreditation does not amount to *per se* Constitutionality, but it does provide a level of assurance to administrators that the facility is operating under appropriate standards and in accordance with agency policies.

### iii.    Livingston had no knowledge of deficient implementation of the TDCJ's summer mitigation measures.

Having established that Director Livingston appropriately discharged his duties by assigning well-qualified professionals to oversee the development of measures designed to protect inmates from the dangers of summer temperatures, there is also a lack of any evidence he was made aware of any insufficiencies in TDCJ's measures prior to McCollum's death or that the measures were not fully implemented at the Hutchins Unit for McCollum.  Until August of 2011, Director Livingston believed the measures put in place by the TDCJ would reasonably and sufficiently protect all of the inmates in the care of the TDCJ. (Appx. 1623: 1 to 8; Appx. 1626: 10 to 17; Appx. 1627: 3 to 13)  This belief was shared by CID Director Thaler, and CID Deputy Director Stephens, who have decades of experience working in un-air-conditioned TDCJ facilities

supervising thousands of inmates and staff, but had very little experience observing heat-related illnesses spread out over a such long period of time. (Appx. 1380-1382, 1396-1399)  Once he was informed of suspicious heat-related deaths, even though not confirmed, he promptly responded to this change in circumstances and ordered his subordinates to take steps.  (Appx. 1559-1560: 1 to 25, 1 to 25)  Plaintiffs have identified no evidence suggesting otherwise.  Further, Plaintiffs have identified no evidence that Director Livingston had any personal knowledge that the TDCJ's measures were not being implemented at the Hutchins Unit; and, in fact, the measures were being implemented.  The lack of this evidence is fatal to their claim.

iv.     **Plaintiffs' claims negate the notion that any policy decision by Director Livingston was the "moving force" behind the death of Larry McCollum.**

Plaintiffs' claims negate significant portions of their allegations against Director Livingston.  As noted above, "supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of [a] constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir.1987).

Here, Plaintiffs present two differing theories of causation behind McCollum's death.  On the one hand, they claim that his death was caused due to unconstitutional conditions of confinement due to the lack of climate control.  On the other hand, they claim that McCollum died due to the alleged delay in summoning an ambulance by the officers on the scene.  These competing causation theories cannot be wholly reconciled to one another because the lack of air conditioning cannot be the "*moving force*" if, also per the Plaintiffs, McCollum's death was ultimately caused by a delay in summoning an ambulance.

Further, there is no reasonable dispute that Director Livingston did not personally oversee the emergency response procedures in place at the Hutchins Unit.  Even if the lack of air

conditioning in most of the TDCJ facilities could be imputed to Director Livingston's own policy decision (which it cannot, *see Section V., B., 2., supra*), such a claim only accounts for a portion of the alleged causation of his death.  Also absent is evidence that the lack of air conditioning was a "policy" that was "the moving force" behind McCollum's death.

The policies and procedures at issue here are contained in four different documents:  AD-10.64, CMHCC 27.2 (formerly B15.2), the Correctional Institution Division Director's annual heat directive, and the Health Services director's annual reminder message. (Appx. 504-515, 516-525, 601-605, 606-609) These policies did not fail in a significant manner for several years before the summer of 2011.  As discussed above, the measures in these policies had proved effective in all but the rarest incidents.  And, since these policies and directives encompass the *Gates*-plus measures and had proved effective, they cannot serve as the unconstitutional moving force which "caused" McCollum's death.

### 3. Plaintiffs cannot prove a set of facts which would justify holding Eason and Pringle liable as supervisors.

Plaintiffs' claims against Regional Director Eason and Warden Pringle also fail for similar reasons.  Regardless of the fact that Eason and Pringle occupy a management, rather than policy making role, neither were aware of any pattern of constitutional violations at the units they oversaw, nor was there such a pattern prior to the record heat wave in the summer of 2011.  Each one ordered the implementation of the TDCJ's mitigation measures at the Hutchins Unit.  There is no evidence that either official was made aware that the mitigation measures (or their functional equivalents) were not being implemented at the Hutchins Unit during the summer of 2011.

### i.     Pattern of violations

Eason and Pringle also had no knowledge of a pattern of constitutional violations due to indoor temperatures.  Prior to McCollum's death, no inmates housed in the facilities they

supervised died from heat stroke, including the Hutchins Unit. (Appx. 295-296, 1364)  No major changes to heat mitigation policy had been implemented during the years leading to McCollum's death, based on experience, due to the effectiveness of the measures.  (Appx. 295-296, 1363-1364)  Each believed in good faith that the mitigation measures in place would be sufficient to protect the inmates at the Hutchins Unit. (*Id*.)  Plaintiffs have adduced no evidence to the contrary.

### ii.     Eason and Pringle are not policy makers.

Eason did not participate in formulating the heat mitigation measures.  He was responsible only for ensuring that the wardens he supervised implemented these measures.  Likewise, Pringle was responsible for ensuring they were implemented at the Hutchins Unit.  It is undisputed that the measures outlined (or their functional equivalents) were implemented and in place at the Hutchins Unit.  It is undisputed that these measures went beyond those mandated by *Gates* to mitigate heat in prison housing areas.  In this regard, the policies at issue cannot be argued to violate the Eighth Amendment on their face. Indeed they comport directly with existing Fifth Circuit law.  *See generally, Gates*.  Even if argued to be insufficient on their face, liability cannot attach to Eason or Pringle because they did not formulate the policies and therefore had insufficient personal involvement.  Indeed, Plaintiffs' primary complaints – the lack of air conditioning and the lack of 24 hour on site medical care – were matters that were beyond the purview of either Eason or Pringle to provide or change.

### iii.    Eason and Pringle met their Constitutional obligations by ordering that summer mitigation measures be implemented.

The record is undisputed that Eason and Pringle ordered the implementation of TDCJ's heat mitigation measures at the Hutchins Unit.  Though Plaintiffs claim that some of the heat mitigation measures were not effectively implemented at the Hutchins Unit, the record is devoid

of any indication that any offender (including McCollum) or staff member brought this to the attention of either Eason or Pringle.  One area where this is relevant is the area of cold water. Plaintiffs' claim that the water brought to the dorm areas was "luke warm" instead of iced and was in insufficient amounts to serve the needs of all 58 offenders in a dorm area.  As an initial matter, this claim ignores that water was available in unlimited quantities all day and all night from several water fountains in the dorm area. (Appx. 1673: 3 to 9; Appx. 1588- 1589: 6 to 25, 1 to 23; Appx. 1718: 9 to 16)  Even if this claim were taken as entirely true, no grievances were filed regarding the temperature or amount of the water provided.  The same is true for the cool shower access, air handlers, and wall mounted fans in the housing area, or the additional mitigation measures that extend beyond those ordered in *Gates*.  There is reason to believe if there were such deficiencies, they would manifest themselves in the grievance filed by inmates, who filed multiple grievances when an officer temporarily turned off a fan in a housing areas in the months prior to McCollum's arrival at the unit. (Appx. 1239-1240, 1243-1244, 1247-1248, 1253-1254)  Neither Eason nor Pringle had any reason to believe these measures were not being implemented.

Finally, to the extent that Plaintiffs claim that the heat mitigation measures in place at the Hutchins Unit were unavailable to McCollum due either to his disabilities, his status as a new offender, or any other factor specific to his situation, liability can only extend if Eason or Pringle had knowledge of McCollum's circumstances.  The record is undisputed that they had no knowledge of McCollum's specific circumstances. (Appx. 293-297, 1362-1367)  The record is undisputed that McCollum filed no grievances, I-60s, or sick call requests to alert anyone, including Eason or Pringle, that he was in any sort of distress, in need of medical care, or that he could not utilize any of the heat mitigation measures already in place.  Even though he had seen multiple members of the medical staff prior to his illness and death, he did not communicate his

problems to the medical staff, either. (Appx. 302-303, 307, 1201-1216)   The medical staff, therefore, could not have notified Pringle or Eason about McCollum's specific needs. Without the necessary evidence to demonstrate subjective awareness, Plaintiffs' deliberate indifference claims against Pringle and Eason must fail.

> **iv.    Supervisory liability cannot be imposed where Eason and Pringle had no knowledge of a pattern of violations with regard to summoning medical personnel during seizures**

Plaintiffs also claim that Eason and Pringle are liable for their failure to supervise officer training regarding summoning medical assistance for offenders suffering a seizure.  This claim also fails under the stringent test for failure to supervise / train claims under § 1983.  As noted above, culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  *Connick*, ⸻ U.S. ⸻, 131 S.Ct. at 1359.

Plaintiffs' claim regarding the failure to train with regard to summoning emergency medical personnel during seizures fails due to the lack of a pattern of violations.  Both the supervisory defendants and the unit level defendants testified that seizures are common in the correctional setting. (Appx. 278-279; Appx. 284; Appx. 289-290; Appx. 1573: 16 to 23) The officers also testified that when a seizure occurs afterhours, their practice is to monitor the offender suffering the seizure to ensure his safety and to ensure that his airway, breathing and circulation remain intact.  Then, they will contact offsite medical staff for further instructions.  The officers testified that they have never been informed by medical staff that their procedures when they observe a seizure is somehow insufficient and have never heard of an instance where 911 was immediately summoned because an offender was having a seizure. (Appx. 277-281, 282-287, 288-292)  More importantly however, neither Eason nor Pringle were aware of a "pattern" of violations out of this practice.  Neither could their supervisors in the CID leadership. (Appx. 1379-1384,

Appx. 1398)  Plaintiffs have identified no evidence that this response had produced negative outcomes in the past, much less a "pattern of violations" upon which to hold Eason and Pringle liable.  Indeed, Plaintiffs' expert testified that 911 need not be called any and every time someone suffers a seizure.  She testified he had seen, on hundreds of occasions, a person suffer a seizure, come back to consciousness, and not require any further medical care. (Appx. 1748: 17 to 19) These procedures, therefore, meet constitutional minima.

Plaintiffs also cannot rely on "single incident liability" here.  This theory perhaps could be argued if the officers were trained to *not* call 911 or *never* to contact medical staff when an inmate suffers a seizure. But that is not the case, here.  The steps taken to ensure McCollum's breathing and circulation with continued monitoring of him after the seizure, followed by contact with the medical department, demonstrate a complete lack of deliberate indifference. These procedures are not so "obviously deficient" that the "extremely rare" circumstance to establish liability based on a single incident should be allowed here.  Based on the uncontroverted evidence, this Court must reject any such inference.

In both areas of heat mitigation and seizure response, no history or pattern of violations existed at the time of McCollum's death.  These practices were not so patently unconstitutional that they warrant single incident liability.  As such, Plaintiffs have failed to establish a claim for failure to supervise or train against Eason or Pringle.

**4.  Plaintiffs' claims against the security staff defendants, Clark, Tate, or Sanders, fail due to their appropriate responses and their lack of subjective knowledge that McCollum was suffering a heat stroke.**

Correctional officers like Clark, Tate and Sanders are not medical providers.  One of correctional officers' primary duties is to provide first aid and facilitate access to health care professionals when needed.  The Eighth Amendment is violated only when prison correctional

officers are deliberately indifferent to the serious medical needs of prisoners they encounter. *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir.1999).   Since security staff are not medical providers, in order to be liable, a plaintiff must show that an officer "intentionally denied or delayed access to medical care or intentionally interfered with a treatment once prescribed." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, (1976)); *see also, Williams v. Certain Individual Emp. of the Tex. Dep't of Criminal Justice–Institutional Div. at the Jester III Unit*, 480 F. App'x 251, 256 (5th Cir.2010) (unpublished) (per curiam).   Plaintiffs therefore must prove "that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Lewis v. Evans*, 440 F. App'x 263, 265 (5th Cir.2011) (per curiam) (unpublished) (citation and internal quotation marks omitted). Gross negligence, however, does not equal deliberate indifference. *Id.* A delay in medical care violates the Eighth Amendment only if it is *due to* deliberate indifference and the delay results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir.1993).   Even if ultimately unsuccessful, where an officer attempts to facilitate care, he has cannot be said to be deliberately indifferent. *Williams*, 480 F. App'x at 256.

The Fifth Circuit's recent holding in *Stewart v. Guzman*, 555 Fed.Appx. 425 (5th Cir.2014) provides an illustration of the type of facts necessary to impose liability on correctional officers for medical claims based on denials or delays.   In *Stewart*, the inmate-plaintiff claimed that several officers stood and watched as he lay on the ground gasping for breath due to an asthma attack. *Id.* at 426-29.   Inmates testified that they told the officers that the plaintiff had recently been hospitalized due to asthma, but one of the officers just laughed at the plaintiff's predicament. *Id.* The officers did *not* immediately initialize an ICS emergency call or attempt to take the plaintiff the medical department. *Id.*  Instead, they waited around for a wheelchair to be brought to the area,

which took an inordinate amount of time. *Id.*  The plaintiff also complained of several other incidents in which he suffered asthma attacks in which officers refused to allow him to go to the infirmary to receive treatment despite the plaintiff gasping for breath, pressing the emergency call button, showing officers his medical pass to receive oxygen treatments, and the protestations of other inmates who implored the officers to give the plaintiff care. *Id.*  The Court held that this inmate-plaintiff had stated a prima facie case against the officers because there was evidence that the officers were aware that the plaintiff was suffering from an asthma attack due his own statements, the other inmates' protestations, and the officers' knowledge that he suffered frequent asthma attacks, which they did not dispute.  *Id.* at 432.  The Court also held that they intentionally disregarded an established treatment plan and for these reasons, remanded the case for trial.  *Id.*  Absent here is any evidence of the subjective knowledge of the cause of McCollum's medical condition, subjective knowledge of the needed treatment, or a knowing failure to respond by the Clark, Tate or Sanders to take protective or helpful action.

i.     **Clark, Tate, and Sanders were not subjectively aware that Larry McCollum was having a heat stroke.**

In a general sense, Plaintiffs' theory of liability against the officers rests on the argument that because the officers had received training on the symptoms of heat illness, because McCollum's skin was warm to the touch, and because it was hot on the night in question, the subjective awareness necessary for deliberate indifference is met.  This theory flies in the face of Fifth Circuit precedent holding directly to the contrary:  "If deliberate indifference could be inferred solely from [a] failure to act in a manner consistent with training, 'the standard applied would be more akin to negligence than deliberate indifference.'"  *Estate of Henson v. Krajca*, 440 Fed.Appx. 341, 346 (5th Cir.2011) (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 (5th Cir.1996) (en banc)).  As shown below, the facts here represent a sharp departure from cases where

- 85 -

liability on security staff has been imposed.   Each officer's involvement is addressed in chronological order.

### a. Officer Clark was not deliberately indifferent to McCollum's needs

The claims against Officer Clark are the most tenuous as his participation lasted only a few minutes.  Upon his discovery of McCollum having a seizure, he immediately ran to the picket with instructions to initiate ICS (incident command system) and to call for a supervisor. (See *Supra* Section V.A) In doing so, he acted entirely according to policy and the established procedures for any emergency.  He delayed in no way.  In the few minutes it took Sgt. Tate to arrive on the scene, he returned to McCollum's bunk and made sure he remained in a safe position and did not harm himself.  Shortly after Sgt. Tate arrived, he left the scene to respond to another emergency situation on another building.   His participation lasted approximately 10 minutes.

During the time he was on the scene, Officer Clark believed McCollum to be having a seizure.  However, heat stroke did not occur to him as the cause of the problem.  This was due to the fact that this occurred at 2 a.m., during the cooler part of the night, and hours after McCollum could have possibly been engaged in any physical activity.  In his sixteen years of experience in TDCJ, he had never heard of an offender having heat stroke during the night-time hours.  No offenders nearby said anything that suggested McCollum was having a heat stroke.  Nothing about the situation suggested that he needed to circumvent the chain of command and immediately call 911, something he has never done in his many years of experience.

Similarly, Officer Clark's actions during the first count of the evening were in line with policy and established procedures.  Plaintiffs claim that during the first count of the night, McCollum was unresponsive and another offender had to show Officer Clark his TDCJ ID card.  Nothing about this was unusual or uncommon.  Officers taking a count frequently do not wake

sleeping offenders if there are no signs of distress, and if the officer can verify the offender's identity by looking at his ID.

Officer Clark testified that had he believed there was something wrong with McCollum at that time, he would have investigated further.  Plaintiffs' medical expert testified that if an offender appeared asleep with no signs of distress, there would be no medical reason why an officer should need to wake the offender, nor any reason to realize he was in distress. (Vassallo McCollum Dep 168: 8-25, 169, Ln. 1-22)  No other evidence suggests that Clark was subjectively aware that McCollum was in need of medical attention at that time.

**b.  Sergeant Tate was not deliberately indifferent to McCollum's needs**

Sergeant Tate did not delay when she responded to the C-7 dorm on the night of McCollum's death. (See *Supra* Section V.B)  She proceeded there directly after receiving the radio call that an offender was having a seizure.  Her duties were to assess the situation and report to Lt. Sanders.  When she arrived, it appeared to her that McCollum was having a seizure.  She immediately checked to make sure his airway was open, he was breathing, and that he had a pulse. She ensured that he was in safe area and/or position while the seizure ran its course as she waited for him to come back to consciousness.  In her experience in dealing with offender seizures, there is a period of time when the muscle activity stops but before the inmate returns to being fully coherent.  Sometimes this takes several minutes.

After McCollum's muscle activity subsided, she attempted to revive him back to consciousness.  She applied a cold cloth to his face and dribbled water on his lips.  She did not want to give him more water because she feared he might choke.  She was in frequent contact with Lt. Sanders, keeping her apprised of the situation.  However, as time progressed, McCollum did not respond to efforts to bring him back to consciousness as expected, and Lt. Sanders arrived on

the scene.  After Lt. Sanders contacted the medical department and an ambulance was called, Sgt. Tate went to unlock all of the doors the EMS crew would need to get to McCollum, so they could get there quickly.

During this time, heat stroke never entered her mind as a possible cause for McCollum's condition.  The night of July 21, 2011 was not particularly different from any other summer night in her experience working for TDCJ.  She did not receive complaints about the heat from either inmates or staff beyond those generally voiced during the summer.  Like Officer Clark, the circumstances were not those where one would expect a heat stroke since the seizure occurred at 2 a.m., during the cooler part of the night, and hours after McCollum could have possibly been engaged in any physical activity.  She also had never heard of an offender having heat stroke during the night-time hours.  During the time she was at McCollum's bunk, none of the offenders nearby said anything regarding McCollum not drinking water, missing several meals, or any other information that would have led her to believe that heat stroke or dehydration was the cause of the problem.  Had this possibility crossed her mind, she would have reported the situation to Lt. Sanders so that an ambulance could be called immediately and she would have taken steps to cool McCollum.

Moreover, her response was consistent with the measures ordinarily taken when an offender suffers a seizure.  She cannot recall an instance when the on-call medical staff advised a TDCJ officer to immediately call an ambulance because an offender is having a seizure.  In her training and experience, the decision to call 911 is typically made by a superior officer, though if the need for emergency medical attention is obvious, a Sergeant could inform a superior of the situation and initiate the procedure to call 911.  This, however, would not be done without at least notifying a supervisor in the chain of command.  A seizure is not usually the sort of medical

emergency that would warrant a departure from the chain of command. Even Plaintiffs' expert agrees that seizures frequently resolve themselves without any serious medical complications to the patient.

Plaintiffs contend that a deliberate indifference claim is stated against Sgt. Tate because she had been trained on the signs of heat stroke, and McCollum was unresponsive and his skin was warm to the touch, a sign that can be present during heat stroke. She does not dispute these facts, nor does she dispute that she was the officer on the scene for the longest period of time. However, this, without more, is insufficient to show the requisite subjective awareness. At most, it shows negligence and an arguable failure to follow her training. The Fifth Circuit has expressly rejected these as stating claims for deliberate indifference. Also, absent is any evidence of the sort that is necessary to state a claim based on her delay in summoning medical assistance, as was present in *Stewart*. Further, her testimony that she did not realize McCollum was having a heat stroke is uncontroverted by any evidence. The absence of these facts is fatal to Plaintiffs' meeting "the extremely high burden" of deliberate indifference.

### c. Lieutenant Sanders was not deliberately indifferent to McCollum's needs

Plaintiffs' claims against Lt. Sanders fail for similar reasons. At the time the call went over the radio reporting a seizure on the C-7 dorm, she was completing the processing of the 2 a.m. count, a critical part of unit operations. (See *Supra* Section V.C) As per standard procedure, she sent Sgt. Tate to the scene to assess the situation and report back. Like Sgt. Tate, she fully expected that once McCollum stopped seizing, he would come back consciousness. In her experience this can take several minutes. She received frequent updates from Sgt. Tate during this time. During this same time, another emergency situation occurred on another building where an offender had collapsed, hit his head and was bleeding. Lt. Sanders was responding to both incidents. As the minutes passed and Sgt. Tate reported that McCollum was not responding, Lt. Sanders became

concerned and reported to the scene. She contacted the on-call medical provider, who, after consulting the medical records, advised that an ambulance should be called. She did so immediately.

Like Sgt. Tate, Lt. Sanders frequently dealt with inmate seizures, and even had experience in dealing with them in a previous job providing child care. She had never been instructed by medical staff to call for an ambulance if a seizure occurred afterhours. Like Sgt. Tate, she fully expected that once McCollum stopped seizing, he would emerge from his seizure. It was only until this did not occur that she began to be concerned that something else was the cause.

As for heat stroke as a cause, at no time did she suspect heat stroke as the cause of the problem. Like Tate and Clark, the temperature, time of day, and lack of activity, were inconsistent with heat stroke. She also had never heard of an inmate suffering a heat stroke during the overnight hours, and no offenders reported anything to her to suggest that McCollum had not been drinking water or missing meals. In addition, she had heard no complaints that the inmates in the C-7 dorm had not received or could not access ice water, could not access the showers, or that the fans or ventilation were not working properly.

Similar to Sgt. Tate, Plaintiffs' can point to nothing more than their suggestions that Lt. Sanders *could* or *should* have recognized that McCollum was suffering a heat stroke and immediately summoned medical help. Plaintiffs fail to point to anything that suggests that she actually drew the inference that McCollum was suffering a heat stroke. Also absent are facts showing that the delay in summoning medical assistance was similar to the facts in *Stewart* where officers blatantly delayed and disregarded a known need.

Again, Plaintiffs' inferences do not rise to the extremely high burden of deliberate indifference.

**ii.      The alleged delay by Clark, Tate, or Sanders did not cause McCollum's death.**

None of three officers who responded to McCollum maliciously waited to summon 911 due to purposeful indifference. The parties do not dispute that when an offender told Clark that McCollum was having a seizure, the shaking he exhibited already had begun at some time *before* Clark entered the dorm to conduct the count. (Appx. 304-305) The medical evidence shows that once the shaking began, McCollum was in the midst of cerebral edema which caused oxygen deprivation to the brain. (Appx. 299-308) McCollum's death was caused by the irreparable damage to his brain, as his other bodily organs responded well to treatment. (Appx. 306-307) By the time McCollum *began* convulsing, his condition already had advanced beyond that where brain damage was imminent. (Appx. 304-305, 307-308) Once the shaking began, no current technology exists that could have cooled him fast enough to prevent the brain damage. (*Id.*) Even if the ambulance had been summoned immediately by Clark, Tate, or Sanders, it would not have made a difference in preventing McCollum's death. (*Id.*) In this regard, under *Mendoza*, the harm suffered to McCollum was not a product of any alleged "malicious" delay by Clark, Tate, or Sanders in calling 911. *Mendoza*, 989 F.2d at 195 (A delay in medical care violates the Eighth Amendment only if it is due to deliberate indifference and the delay results in substantial harm). Clark, Tate, and Sanders are entitled to summary judgment on this additional ground.

**5. The obviousness of the danger will not suffice to establish the subjective awareness requirement for any defendant.**

In limited circumstances, the subjective awareness inquiry of the deliberate indifference analysis can be satisfied where the risk is of such an obvious nature that subjective awareness can be inferred. *Farmer*, 511 U.S. at 842 (stating that the fact that a risk is obvious supports the conclusion that a prison official was aware of the risk). Such is not the case with regard to heat, and case law to the contrary rests on flawed logic.

While every defendant is aware of the risks posed by the heat, they are equally aware that the TDCJ has deployed mitigation measures to mitigate those risks, and those measures have been effective largely effective for the population of 150,000 prisoners.  As with the clearly established law, the proper inquiry is not simply whether the existence of the heat was obvious, but whether the heat posed a danger *notwithstanding or in spite of* the TDCJ's mitigation measures.

To the extent that *Gates, Webb,* or *Hinojosa* hold the opposite, these cases did not take into account the risk reducing effect of mitigation measures, either because there were little to none (*Gates*) or because the Court was restricted to the four-corners of the complaints, which ever-so-artfully exclude these facts despite counsel's knowledge of them (*Webb* and *Hinojosa*). *See n. 6, supra.*  While *Blackmon* held that knowledge of the dangers of the heat could be held open and obvious, it did so based on dubious logic.  *Blackmon*, 484 F. App'x at 873.  The Court held this could be inferred because the Warden had testified that the heat was "intense" and because the officers had received training on its dangers. *Id.*

First, the notion that subjective awareness is open and obvious because officers are trained on its dangers would virtually eliminate the need for such proof in any deliberate indifference case.  Officers are trained on all manner of risks from which they protect inmates ranging from assault, self-harm, or safety precautions.  Indeed, such training is one of the ways those risks are abated, which is what prison systems do to meet their Eighth Amendment obligations.  Holding that receipt of training satisfies subjective awareness of a particular risk to a particular inmate from a given cause turns the concept of deliberate indifference on its head.

Further, mere knowledge of heat, or its intensity, fails for similar reasons.  To be sure, prison officials and staff are aware of many risks within the walls of prison.  Yet, just as ubiquitous as the risks are prison policies and practices designed to prevent their occurrence.  Contrary to the

Court's holding in *Blackmon*, subjective awareness cannot be held "open and obvious" just by general knowledge of risk, but must be accompanied by evidence that the measures taken to prevent that risk were openly and obviously insufficient. *See also*, *Hinojosa*, 807 F.3d at 688 (Jones dissenting) ("And reasonable measures, even if ultimately inadequate to prevent the injury, do not support a finding of deliberate indifference." Citing *Johnson*, 385 F.3d at 526). As shown throughout, all Defendants reasonably believed that the mitigation measures deployed throughout the TDCJ and specifically at the Hutchins Unit would keep the offenders, including McCollum, reasonably safe. As such, holding that the subjective awareness is satisfied by the open and obviousness of the risk would be in error.

### 6. The absence of air conditioning at the Hutchins Unit did not violate the Eighth Amendment.

The Eighth Amendment encompasses a right to "reasonable safety," including protection against unsafe conditions that pose "an unreasonable risk of serious damage to [the inmate's] future health." *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993). Moreover, in order to assess whether the alleged unconstitutional condition rises to the level of a "substantial risk of harm," the court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone unwillingly* to such a risk." *Helling*, 509 U.S. at 36 (emphasis added). An official's duty to protect against such unsafe conditions arises where the inmate has been placed "under a regime that incapacitates [him] to exercise ordinary responsibility for his own welfare." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998); *see also, Legate v. Livingston*, Appeal No. 15-40079 (5th Cir. May 18, 2016) (holding that inmate failed to state an Eighth Amendment claim where his own voluntary conduct led to the alleged injury forming the basis of his Eighth Amendment claim).

While risks of exposure to heat have always carried a level of risk—even a grave one—our society has not determined that contemporary standards of decency are such that the Eighth Amendment requires the complete elimination of this risk by installing air conditioning.  In a number of different ways outside the correctional context, our society has opted to expose individuals to risks associated with un-air-conditioned housing, regardless of their willingness.

Many people within the United States, including within the State of Texas, do not have, or do not use, the luxury of air conditioning. According to recent United States Census data, 55,000 new homes were built in 2014 that did not have air conditioning of any kind.  (Appx. 1759)  While most of the un-air conditioned homes were sold outside of Texas or the Southern Census region, a considerable number of Texas homes do not have, or choose not to use, air conditioning. Approximately 100,000 Texas homes are not equipped with air conditioning of any kind; (Appx. 1788) an additional 200,000 "have but do not use Air Conditioning."  (Appx. 1788) 1,200,000 Texans with central air conditioning, and an additional 400,000 Texans with wall or window units air condition their living spaces "only a few times when needed."  (Appx. 1788; Appx. 1791) According to these numbers, 300,000 Texans currently go without air conditioning, and an additional 1,600,000 use their air conditioning units sparingly, presumably during the peak of the summer.  (Appx. 1788; Appx. 1791)  This data demonstrates that any consensus about the use of air conditioning, even in hot climates, comes from a desire for comfort rather than any moral or social principle.

There is no law at the state or federal level requiring air conditioning. The United States has a long standing national ethic of providing at least the minimum amount of support necessary to ensure the wellbeing of its citizens.  Examples of this national belief include Food Stamps or the Federal Housing Choice Voucher Program (formerly the "Section 8" housing program).  As

the Food Stamps program ensures low-income individuals have the sustenance necessary to live their lives, the Housing Choice Voucher Program, administered through the United States Department of Housing and Urban Development ("HUD"), ensures low income individuals are adequately housed.  (Appx. 1795-1796)

HUD has developed minimum housing quality standards, designed to ensure "decent, safe, and sanitary housing."  (Appx. 1797)  Many elements of a housing situation play a role in determining if housing is "decent, safe, and sanitary," including the "Thermal Environment." (Appx. 1797-1799)  The "Thermal Environment" performance requirement for the housing choice voucher program housing is "the dwelling must be able to provide a thermal environment that is healthy for the human body," a standard which does not require air conditioning.[40]  (Appx. 1798) Defining "a healthy living environment" for the local climate is left up to the local Public Housing Authority—air conditioning is not mandated in Public Housing at the Federal level.  (Appx. 1798)

Public Housing Authorities ("PHAs") in Texas do not consider air conditioning as a requirement for "decent, safe, and sanitary housing," or a "healthy living environment." Through the power delegated to them by HUD, Texas PHAs could require air conditioning in Housing Choice Voucher Choice Program eligible properties, as they are charged with determining a thermal environment that is healthy for the local climate.  (Appx. 1798)  However, a significant number of PHA's in Texas do not require air conditioning, and thus do not consider climate control as necessary for a healthy living environment. The Houston Housing Authority and the Housing Authority of the City of Austin require a "safe cooling system *where* present."[41]  (Appx. 1807;

---

[40] "Minimum Criteria for meeting this standard include: 1) there must be a safe system for heating the dwelling unit, such as electric baseboard, radiator, or forced air systems. In order to ensure a healthy living environment appropriate for the climate the system must be able to provide adequate heat either directly or indirectly to each room, and 2) *if* present, the air conditioning system or evaporative cooler, must safely provide adequate cooling to each room." (Appx. 1798, emphasis added).

[41] Note that this clearly tracks the minimum requirement on the Federal level—air conditioning systems must be functional *if* present. (Appx. 1798)

Appx. 1829)  The Housing Inspection checklist for the Public Housing Authority with jurisdiction in Harlingen, Texas requires "[T] he unit has adequate ventilation and cooling by means of either openable windows *or* a working cooling system." (emphasis added) (Appx. 1817)  Similarly, the Housing Authority of Bexar County, with jurisdiction in San Antonio requires "Some windows that open, *or* some working ventilation system." (emphasis added).  (Appx. 1813)  These standards demonstrate that air conditioning is not seen as a moral or social imperative by those charged with ensuring a decent, safe, sanitary, and healthy living environment to low income Texans.

The Federal Government not only does not require air conditioning in low income housing, it also does not subsidize any of the cost associated with operating an air conditioner. To help lessen the cost of living, HUD provides a utility allowance to low income individuals, determined by the local PHA as the reasonable cost of utilities for the area.  (Appx. 1819-1820) The cost of operating an air conditioner, however, is explicitly excluded from the utility allowance.  (Appx. 1819-1820)  If air conditioning is present in a Housing Choice Voucher Program Home and the air conditioning unit use is metered, the resident is required to pay for the cost of using air conditioning.  (Appx. 1819-1820)  If the air conditioning present in a program home is not metered, the resident is surcharged for the cost of using the air conditioner.  (Appx. 1819-1820)  Similarly, on the State level, the Texas Legislature recently significantly curtailed the State's utility subsidy to low income individuals.  The System Benefit Fund was a legislative creation, designed to fund significant portions of low income families' utility bills.  Tex. S.B. 7, 76th Leg., R.S. (1999).  The program, however, was defunded and marked for termination no later than September 1, 2017. *See* Tex. Util. Code § 39.903.

The Federal Government does not subsidize the cost of air conditioning for the elderly. Air conditioning is not a covered cost by Medicare, the social insurance program for the health of the

elderly, because Medicare only covers "Durable Medical Equipment." (Appx. 1822-1823) In order to be considered "durable medical equipment," the equipment must be primarily medical in nature. (Appx. 1822-1823) The Centers for Medicare & Medicaid Services have stated that if someone sought to have the cost of air conditioning covered by Medicare, coverage would be denied, as air conditioning is not considered primarily medical in nature. (Appx. 1822-1823) The lengths that Federal and State Government have gone to ensure they do not subsidize the cost associated with using an air conditioner demonstrates the proposition that air conditioning is a luxury, not a moral or social imperative. In addition, as noted above, prisons throughout the south, including the federal prison system, operate facilities that do not have air-conditioning in the housing areas. *See Section IV., 16., supra.*

Finally, Plaintiffs' repeated references to TDCJ's purchase of swine barns is shown to be rife with misstatements, hyperbole, and, ultimately, irrelevant to the issues here. TDCJ operates one of the largest integrated agricultural operations in the country. (Appx. 1430) The production of swine is but one component of that operation. The Eastham Unit is one of the units that participates in the raising of baby pigs. (Appx. 1430) In reality, the alleged "air conditioned pig barns" do not contain "air conditioning" as the term is commonly used. (Appx. 1430; Appx. 1466; Appx. 1469) They are simply 8 single-wide trailers that contain an evaporative cooler on one end, which Plaintiffs' expert explicitly rejected as a viable cooling option for offenders. (Appx. 1470; See, *Bailey v. Livingston*, 4:14-cv-1698, D.E. 272-10 at 11-12) They do not contain an HVAC system, an a/c compressor, or a chiller system. (Appx. 1430) Needing to replace facilities destroyed by fire (Appx. 1430) when considering different alternatives, these trailers proved to be cheapest and most cost effective option. (Appx. 1430) TDCJ has eight such barns, and they represent only nine weeks of the pig rearing process, and a very small part of the facilities in use

at the Eastham unit, or TDCJ's state-wide agricultural program. (BAILEY APPX 1462-65; Appx. 1474-75)  Upon examination, this issue has been misrepresented and distorted wildly beyond its reality, and in the end, was about a cooling system that the Plaintiffs expert explicitly rejected.

Even assuming the notion that air conditioning would have eliminated the risk of heat stroke in the TDCJ, standards of decency have not evolved to the point where our society is unwilling to require anyone to live without it.  The TDCJ was not required under the Eighth Amendment to entirely eliminate this risk, even if installing air conditioning would have done so. *See Ball*, 792 F.3d at 599; (accord, *Farmer*, 511 U.S. at 844) (holding that a prison official's duty under the Eighth Amendment is to ensure "reasonable safety")).  Instead, the TDCJ was to provide for "reasonable safety."  Moreover, the Supreme Court and Fifth Circuit case law incorporate the notion of inmates' assumption of a certain level of personal responsibility in ensuring their own safety.  The evidence here fails to show that McCollum made an effort to do so but was refused care or that that any defendants were aware he was unable to care for himself.  As such, all defendants are entitled to summary judgment on this independent ground.

**7.   All Defendants are entitled to dismissal of the claims for punitive damages where the material facts not capable of dispute demonstrate that none of the defendants were motivated by evil intent or that any defendant acted with reckless indifference.**

In order to be entitled to punitive damages, the Plaintiffs must show that the TDCJ Defendants "maliciously, wantonly, or oppressively" violated McCollum's constitutional rights. *Long v. Collins,* 917 F.2d 3, 5 (5th Cir.1990), *citing Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.")  As discussed *supra*, the Defendants are entitled to dismissal based upon their entitlement to qualified immunity, which then entitles each

to dismissal of the punitive damages claims.  But, assuming that the claims are not dismissed on the basis of qualified immunity, the punitive damages claims still must be dismissed.  In this case, the executive defendants implemented policies that exceeded *Gates* and had been highly effective in the previous years, as well as effective for the vast majority of offenders in the TDCJ custody during the record heat of the summer of 2011 despite the tragic circumstances that occurred that summer.  In light of the extreme heat in the summer of 2011, the Plaintiffs cannot show that the TDCJ Defendants' actions, either in the implementation of policies or in the attempts to assist McCollum when he fell ill, were actions that were motivated by evil intent or that any TDCJ defendant acted with reckless indifference. This Court, therefore, must dismiss all claims for punitive damages asserted against the TDCJ Defendants.

## E. Plaintiffs' ADA and RA claims improperly expand the ADA and RA in a way that squarely conflicts with established Fifth Circuit precedent.

Plaintiffs' ADA and RA claims are an improper attempt to expand the ADA and RA's coverage far beyond that which Congress intended, and in a way that squarely conflicts with established Fifth Circuit precedent.  Plaintiffs' theories impermissibly seek to convert these laws into general liability statutes and to lower the intent requirement from intentional discrimination to mere negligence.[42]   The Fifth Circuit has recently unequivocally held contrary to Plaintiffs' asserted theories.

Plaintiffs have failed to establish that the TDCJ and its officials intentionally discriminated against McCollum.  To state a claim under the ADA, a plaintiff must allege that (1) he is a qualified

---

[42] Their reasons for doing so are not a mystery.  Plaintiffs' counsel has specifically written on the benefits of contorting the ADA into a general liability statute.  Doing so would vitiate the protection of sovereign and qualified immunity and impermissibly allow access to deep agency pockets.   *See, e.g.*, James C. Harrington, *Back to the Future the ADA Strengthens Section 1983, but More Work Is Needed to Improve Compliance*, 78 Tex. B.J. 537 (2015); James C. Harrington, *The ADA and Section 1983: Walking Hand in Hand*, 19 Rev. Litig. 435, 437 (2000); James C. Harrington, *A Re-Birth for Civil Rights Litigation: Using the Americans with Disabilities Act to Overcome Section 1983 Hurdles and Hold Government and Police Accountable*, (July, 2007) available at: https://www.researchgate.net/publication/228206445_A_ReBirth_for_Civil_Rights_Litigation_Using_the_Americans_with_Disabilities_Act_to_Overcome_Section_1983_Hurdles_and_Hold_Government_and_Police_Accountable

individual; (2) who was excluded from participation in or denied the benefits of services, programs, or activities of a public entity; and (3) that the exclusion, denial, or discrimination was because of his disability. *See Blanks v. Southwestern Bell Communications*, 310 F.3d 398, 400 (5th Cir.2002).

A disability is "a physical or mental impairment that substantially limits one or more major life activities; ... a record of such an impairment; or ... being regard[ed] as having such an impairment." *Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009) (citing 42 U.S.C. § 12102(1)). Major life activities are "those activities that are of central importance to most people's everyday lives." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007). In order to survive summary judgment on an ADA claim, "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Hoffman v. Baylor Health Care System*, 2014 WL 772672 * 15 (N.D.Tex. 2014) (*quoting Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc) (citations omitted).

The ADA provides for damages only upon a showing of *intentional* discrimination on the basis of disability. *See Delano–Pyle v. Victoria County*, 302 F.3d 567, 575 (5th Cir.2002). "The ADA prohibits discrimination *because of* disability, not *inadequate treatment for* disability." *Cheek v. Nueces County Tex.*, 2013 WL 4017132 at * 18 (S.D.Tex. 2013) (quoting *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir.2010)). Congress did not intend § 504 or ADA claims to create general tort liability for the government. *Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363, 365 (5th Cir.2013).

The Fifth Circuit already specifically addressed the operative inquiry for when the ADA claim is related to high environmental temperatures. The Court's opinion in *Ball* provides significant insight and clarification as to what must be proven in the particular subject of heat-

related illness.  The operative inquiry looks to whether the individual, due to their particular health conditions, actually has difficulty maintaining thermoregulation; that is, maintaining a body temperature within "half a degree or so" of 98.6° F.  Evidence of some other health limitation does not suffice to establish a heat related disability unless that limitation affects the individual's ability to thermoregulate.  *Ball*, 792 F.3d at 597-598.  Further, the evidence adduced at trial in *Ball* exclusively focused on the risk that plaintiffs might, at some point in the future, have elevated body temperature, but no evidence was presented that they ever actually had difficulty maintaining thermoregulation.  *Id.*  The Fifth Circuit held that this was fatal to their claim.  It is not enough to prove that a person's major bodily function *could be* impaired at some time in the future to establish that they are disabled in the present.

1.  **Plaintiffs cannot meet the high burden to prove intentional discrimination by allegations sounding in negligence.**

The Fifth Circuit defined the intentional discrimination standard to require proof *beyond* deliberate indifference.  In *Delano-Pyle*, 302 F.3d at 575-76, and held that the standard for "intentional discrimination" was actually *higher* than deliberate indifference.  *Id.* at 575.[43]  Several courts have reaffirmed the notion that intentional discrimination requires proof beyond mere deliberate indifference.  *Taylor v. Richmond State Supported Living Ctr.*, 2012 WL 6020372, n.2 (S.D. Tex. 2012) (noting that the Fifth Circuit requires more than "the lesser proof of deliberate indifference"); *Zaragoza v. Dallas County*, 2009 WL 2030436, at * 13 (N.D.Tex., July 13, 2009) ("(intentional discrimination) is a higher standard than deliberate indifference, which is not

---

[43] It's also important to note the procedural posture of the Court's review in *Delano-Pyle*. The Fifth Circuit conducted a *plain-error* review of a jury verdict rendered in favor of an ADA plaintiff.  The plaintiff, who was deaf, had been arrested by an officer who gave verbal instructions for a field sobriety test, and verbally gave *Miranda* warnings and other communications.  The officer admitted that his verbal communications were not effective and admitted that he knew that the law required that certain Constitutional warnings must be continued to be repeated until they are understood.  The Court held that, based on this record, "we cannot conclude that there was no evidence produced to support the verdict."  *Delano-Pyle*, 302 F.3d at 576.

"applicable to public entities for purposes of the ADA or RA.").[44]   As noted above, deliberate indifference itself is "*an extremely high* burden."   *Domino*, 239 F.3d at 756.   The expansive body of case law regarding this extremely high burden, coupled with the notion that an ADA intentional discrimination claim requires proof *beyond* this standard, forces these Plaintiffs to seek a modification in law to lower the current standard because the allegations, taken as a whole, fail the established test.

Plaintiffs' claims fail for the precise reason articulated by the Fifth Circuit in its recent holding in *Rodriguez v. Muzyka*, 543 Fed.Appx. 363 (5th Cir.2013).   In *Rodriguez*, a child was enrolled in a public school-operated enrichment program that included swimming activities. *Id.* at 364.   The child suffered from hearing impairment as well as a seizure disorder.   The child suffered a seizure during the pool activities, fell into the pool, and drowned. *Id.*   The parents filed an ADA claim asserting intentional discrimination. *Id.*   They argued that "[the child]'s safe and meaningful access to the program was interrupted because of her disability" and "pointed out many things the school could have done to make the situation safer for her in the pool area: additional lifeguards, different types of alarm devices, and so on." *Id.* at 365.   The Fifth Circuit held that this failed to state an ADA claim.   Though there were measures the school *could have* implemented, this only stated a claim for negligence even where there were fact issues with regard to the extent and level of the knowledge of the supervising teachers about the child's level of impairment and medical issues, as well as fact issues regarding how long the child was in the water and how fast the supervising safety personnel responded. *Id.*   The Fifth Circuit held that the child was in no way

---

[44] The Fifth Circuit, in holdings regarding intentional discrimination by school districts, held that "[f]acts creating an inference of professional bad faith or gross misjudgment are necessary to substantiate a cause of action for intentional discrimination under §504 or the ADA." *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 455 (5th Cir.2010).   In *Estate of A.R. v. Muzyka*, the parties disagreed over whether this was the applicable standard or if the standard was "deliberate indifference." 543 Fed.Appx. at 365.   The Fifth Circuit declined to explore the issue, noting that the plaintiff had failed to meet either standard. *Id.*

denied access to services, programs, and activities of the school, and the parents' claim that program was not made safe, sounded in negligence, not intentional discrimination. *Id.*

In the correctional context, the Fifth Circuit has been likewise reluctant to extend ADA liability to claims where inmates with a disability claim poor treatment or inadequate facilities, but where any "discrimination" is not "by reason of" that inmate's disability. The ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012). A disabled inmate failed to state an ADA claim when he fell off a bench while being transferred in a van that was not handicap accessible, and was left on the floor by officers while the van continued to make stops. *Id.* The Fifth Circuit rejected the claim that he had been denied the "service" of "safe transport" because "there is no evidence that the allegedly improper action of leaving [the plaintiff] on the floor of the transit van had any connection to his alleged disability. There is no indication that he was treated differently because of his disability. He thus has not established a claim under the ADA." *Id.*; *See also, Tuft v. Texas*, 410 Fed.Appx. 770, 775 (5th Cir.2011) (disabled inmate-plaintiff failed to show "by reason of" discrimination in claim regarding overcrowding in the showers where all inmates were subjected to the same conditions).

To meet this standard, Plaintiffs would have to prove far more than the fact that McCollum had diabetes, hypertension and obesity and was assigned to a top bunk in a dorm with no air conditioning. Plaintiffs must prove, at a minimum, that the TDCJ not only had knowledge of these facts, but also that they had knowledge that they *actually* affected McCollum to the extent that he could not function, that his conditions were actually interfering with his ability to thermoregulate, and then intentionally chose to continue to house him in his condition knowing its effects. Such evidence is fatally lacking.

**2. McCollum's medical conditions do not demonstrate that McCollum was disabled within the meaning of the ADA.**

Plaintiffs failed to prove that McCollum was disabled within the meaning of the ADA. A disability is "a physical or mental impairment that substantially limits one or more major life activities; a record of such an impairment; or . . . being regarded as having such an impairment." *Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009) (citing 42 U.S.C. § 12102(1)). Major life activities are "those activities that are of central importance to most people's everyday lives." *Jenkins*, 487 F.3d at 315. "Although the current definition of disability expresses the intention of Congress to broaden the definition and coverage of the term 'disability,' to include major bodily functions, it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination." *Ball*, 792 F.3d at 598 (*citing Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir.2013)).

"[N]either the Supreme Court nor [the Fifth Circuit] have recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies." *Griffin v. United Parcel Serv., Inc.,* 661 F.3d 216, 223 (5th Cir.2011). Standing alone, the diagnosis of a condition, such as high blood pressure, without any evidence that it substantially affects one or more major life activities, is insufficient to trigger the protections of the ADA. *Oswalt v. Sara Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996) (quotation omitted).

"[C]ourts are to make an individualized determination of whether an individual's impairment constitutes a disability, taking into consideration measures taken by the individual to mitigate the effects of the impairment." *Griffin,* 661 F.3d at 222. Courts should consider " '(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment;

and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.' " *Hale v. King*, 642 F.3d 492, 500 (5th Cir.2011).

The ADA Amendments Act of 2008 ("ADAAA") "directs that 'substantially limits' should not be as strictly construed as some courts have required in the past and should not require 'extensive analysis.' " *Garner v. Chevron Phillips Chem. Co., L.P.,* 834 F.Supp.2d 528, 529 (S.D.Tex.2011). But "a plaintiff must still show substantial limitation" under the ADAAA. *Mann v. La. High Sch. Athletic Ass'n,* 535 F. App'x 405, 410 (5th Cir. 2013). As noted above, in the context of heat intolerance, this means proof that his disabilities actually interfered with his ability to thermoregulate. *Ball*, 792 F.3d at 597-598.

Even if this Court were to accept Plaintiffs' unsupported allegation, medical evidence as interpreted by Plaintiffs' expert, Dr. Susi Vassallo, confirms that his purported inability to get on or off his bunk was due at least in part to a transitory illness. (Appx. 1742-1743: 18 to 25, 1 to 11) Plaintiffs' expert testified that based on lab reports taken from McCollum just prior to his death, he was suffering from some sort of sickness or infection due to a high white blood cell count. (Appx. 1735-1736: 10 to 25, 1) She testified that this high white blood cell count was unrelated to dehydration. (Appx. 1736: 3 to 6) She testified that based on her review of the lab results and the inmate statements, his difficulties began around the time in which he was becoming ill, and his *illness* contributed to his alleged inability to get up and down from the bunk. (Appx. 1742-1743: 18 to 25, 1 to 11) Transitory illness does not serve as a qualifying disability under the ADA. See *Burch v. Coca–Cola Co.*, 119 F.3d 305, 316 (5th Cir.1997); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996). Plaintiffs' expert's interpretation of the medical testimony and the inmate statements negates their ADA claim. Moreover, while there is no dispute that

McCollum ultimately suffered a loss of his ability to thermoregulate, there is no evidence that the medical providers discovered this condition and thereafter advised the TDCJ of the condition.

**3. The TDCJ's lack of knowledge of McCollum's inability to thermoregulate demonstrates the TDCJ could not have "intentionally discriminated" against McCollum.**

Even if McCollum was disabled within the meaning of the ADA in a way that actually affected thermoregulation under *Ball*, there is no evidence that the TDCJ was aware of this fact until death. In order for the TDCJ to have intentionally discriminated against McCollum, the agency must have first known he was disabled within the meaning of the Act. A diagnosis is not enough. The TDCJ must have known not just that he was diagnosed with certain conditions, but that these conditions actually—not just possibly—substantially limited his life functions, in particular, thermoregulation. This evidence is entirely lacking.

As for the diabetes and hypertension, it must be noted that McCollum did not suffer from these conditions at all, or at most was in borderline areas. The only evidence that McCollum had diabetes (if he did) was his checking a form indicating a history of the condition. (Appx. 1207) His blood tests confirmed that his A1C levels were below levels the American Diabetes Association, the International Diabetes Federation, and the European Association for the Study of Diabetes considers diabetic. (Appx. 305; Appx. 1737-1741: 20 to 25, 1 to 25, 1 to 25, 1 to 25, 1 to 12) He did not indicate that he was currently being treated for it or that he was having adverse effects. Even Plaintiffs' expert agreed that his diabetic condition was controlled without medication and it merely "could have been better controlled." (Appx. 1741: 3 to 12) The only other possible evidence was the blood test results which had not even been evaluated by UTMB officials or communicated to the TDCJ officials in charge of housing recommendations. (Appx. 1209-1212)

The same is true of McCollum's alleged hypertension.  His blood pressure was at worst on the boarders of hypertensive, even to the point where in the weeks prior he only needed his medication on an occasional basis. (Appx. 305)  There are no doubt thousands of people with such conditions in the TDCJ and the country at large. (Appx. 1608: 8 to 11)  This condition is not one where it is obvious that one who has it could not climb in and out of an upper bunk or required air conditioning without some sort of specific knowledge of the individual's circumstances.

Similarly, with McCollum's obesity, while the fact that he was significantly overweight was evident, evidence is lacking that the TDCJ knew this significantly affected his daily living to the point which states an ADA claim.  Every witness testified that it is not uncommon to see an offender as large as McCollum on a top bunk. (Appx. 280, 286, 291)  It is undisputed that McCollum got on and off his bunk on several occasions when he visited the medical department. (Appx. 302-303; 1201-1216)  Moreover, even when crediting the offender statements as true, it can be said only that Mr. McCollum found it *difficult* to get up and down from his bunk, but not that he was entirely unable to do so.

Furthermore, there is no evidence that the TDCJ was aware that McCollum's conditions were actually interfering with his ability to thermoregulate until long after he suffered his injury. As noted above, *Ball* requires proof of existing, on-going problems with thermoregulation, not just of possible future problems, to state an ADA claim.  There is no evidence McCollum brought his distress to the attention of any officers prior to his loss of consciousness or that his distress was obvious prior to the 2:00 am incident.

At most, Plaintiffs can attempt only to infer knowledge on the agency because the TDCJ training materials list obesity, hypertension, and diabetes as risk factors for heat stroke.  Even if this is so, as noted above, the fact that officials failed to follow training does not state a claim for

deliberate indifference, much less intentional discrimination. *See Section (D)(4)(i), supra.* Plaintiffs are attempting to convert the ADA into a general tort liability statute based on an alleged failure to take one course of action over another. The courts have already considered and rejected this approach. Regardless of what definition is used to define "intentional discrimination," it still requires subjective awareness of the disability and its impact on the disabled individual along with knowledge of a denial of access to a program or service, and a corresponding failure to accommodate. Again, such evidence is fatally lacking.

**4.  The TDCJ provided reasonable accommodations to mitigate the effects of the heat and there is no evidence that the TDCJ had knowledge that the measures would not suffice for McCollum.**

There is no reasonable dispute that the TDCJ enacted numerous protective measures for McCollum and all the other inmates from the dangers of summer temperatures. (Appx. 504-515, 516-525, 601-605, 606-609) Even assuming arguendo that: 1) McCollum was actually disabled and 2) the TDCJ was aware of an actual inhibition of his ability to thermoregulate, in order for the TDCJ to have intentionally discriminated against him by reason of his disabilities, it had to have actual knowledge that its mitigation measure would not suffice for McCollum. Again, there is no such evidence for several years preceding 2011.

Plaintiffs' claims falls squarely within the Fifth Circuit's holding in *Rodriguez* and fail for the same reason. In *Rodriguez*, the parties disputed the level of actual knowledge by the defendants of the child's disabilities, challenged the speed at which staff responded to the situation, and disputed the effectiveness of the safety measures in place at the pool facility. The claim failed because there was no denial of access to the pool or the education program. As the Court noted, the problem was not a *lack of* inclusion, it was actually *over* inclusion. The claim was predicated on the efficacies of the safety measures in place, which were essentially claims of negligence.

Case law from the correctional context is consistent with this result.  Plaintiffs' claims fall squarely within the Fifth Circuit's holding that "a prison's simply failing to attend to the medical needs of its disabled prisoners" does not state an ADA claim.  *Nottingham*, 499 F. App'x at 377.

To be sure, McCollum's death is no less tragic than the child in *Rodriguez*, but the ADA is no more applicable.  McCollum was not denied access to housing nor treated any differently than non-disabled offenders.  At most, the TDCJ might have been negligent in its failure to recognize that McCollum was at risk for heat stroke and implement the measures Plaintiffs claim were lacking.[45]  Allowing an ADA claim to proceed on this basis would transform the ADA into a general tort liability statute.

### 5.   Plaintiffs have failed to prove McCollum was denied access to a program or service which imposed more pain and punishment on him than other similarly situated offenders.

In addition to failing to prove the requisite level of intent, Plaintiffs have failed to prove that McCollum was denied access to any programs or services necessary to support an ADA claim. "The ADA prohibits discrimination *because of* disability, not *inadequate treatment for* disability." *Cheek*, 2013 WL 4017132 at *18; (quoting *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010)); *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012).

Also, in *Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir.2012), the plaintiff filed suit under the ADA and RA against the TDCJ, among others, alleging that he had several disabilities and chronic diseases, as well as a lack of natural teeth, and that he had been denied the provision of dentures by the TDCJ.  *Id.* at 413, 418.  The Fifth Circuit held that the district court properly dismissed the plaintiff's claims under the Rehabilitation Act and the ADA because he failed to claim "that this

---

[45] Plaintiffs claim the TDCJ violated McCollum's ADA rights in the following ways: 1) failing to provide safe housing, climate controlled housing or assignment to a climate controlled facility, 2) failing to assign him to a bottom bunk, and 4) failing to issue him a fan or cup.  The Complaint also lists failing to provide medical treatment or an intake physical, but these measures fall within duties of the medical provider (UTMB) and not TDCJ.

alleged discrimination was by reason of his disabilities, and such a claim [was] not supported by any evidence in the record." *Id.* at 418 (*citing Hale*, 642 F.3d at 499; *Tuft*, 410 Fed. Appx. at 775). *See also*, *Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004) (rejecting an ADA regarding treatment for Hepatitis because the complained of treatment decision were not made *because of* any alleged disability); *see also*, *Lee v. Valdez*, 2009 U.S. Dist. LEXIS 43381, 2009 WL 1406244 at *13 (N.D. Tex. May 20, 2009).

Here, Plaintiffs' claims are not based on differential treatment or access. Indeed, the very nature of their claim is that McCollum was *not* treated differently from other offenders by being housed in the same conditions. As held by the Court in *Tuft*, where disabled and non-disabled offenders are subjected to the same conditions, an ADA or RA claim is not stated.

Several sister circuits have also addressed these issues and reached the same conclusions as the Fifth Circuit and Texas courts. As the United States Court of Appeals for the Seventh Circuit, speaking through the eminent Judge Posner explained,

> [T]he Act [i.e., the ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled. His complaint is that he was not given special accommodation…[H]e is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. The ADA does not create a remedy for medical malpractice…Even apart from the prison setting it would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim by virtue of the Americans With Disabilities Act, whereas a sick or injured but not disabled person-a person suffering from an acute viral infection, perhaps, or who has broken his leg, or who has a hernia or an inflamed gall bladder-must be content with the remedy that the state law of medical malpractice provides. Moreover, the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners. We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act.

*Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996). Several other courts have found similarly. *See Carrion v. Wilkinson,* 309 F.Supp.2d 1007, 1016 (N.D. Ohio 2004) (dismissing diabetic prisoner's ADA claim based upon the denial of a diabetic diet); *see also Galvin v. Cook,* No. CV 00-29-ST, 2000 WL 1520231, at *6 (D.Or. Oct.3, 2000) (granting summary judgment on diabetic prisoner's ADA claim where prisoner alleged that he was given improper doses of medication and given inadequate treatment).

Finally, the "more pain and punishment than non-disabled prisoners" standard created in *McCoy v. Tex. Dep't of Crim. Justice*, 2006 WL 2331055, at *7 (S.D.Tex.2006) is not a viable legal standard. The Fifth Circuit has not adopted this language, nor the test that it implies. The *McCoy* court appears to have conjured this concept out of thin air. The *McCoy* Court specifically held: "In the prison context, for example, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." As support for this proposition, the Court noted to law review article, Emily Alexander, *The Americans With Disabilities Act and State Prisons: A Question of Statutory Interpretation,* 66 Fordham L.Rev. 2233, 2283 (1998). *See McCoy*, 2006 WL 2331055, at n.6. A review of this article, however, shows the "more pain and punishment" standard proposed by the author also had no legal basis whatsoever. The article cites *Kaufman v. Carter*, 952 F. Supp. 520, 523-24 (W.D. Mich. 1996), not for the legal standard, but, instead, for the facts. The *McCoy* court failed to properly address and justify the "more pain and punishment" argument or the test it implies.

The *McCoy* court also appears to have relied upon out of context statements contained in *United States v. Georgia* for the "suffer more pain and punishment" language. A close reading of

the language in *US v. Georgia* that the liability under the ADA stems from the fact that the provision of services like hygiene and medical care are *"services, programs, or activities"* within the meaning of the ADA.  The potential liability under the ADA stems from the denial of access to those *services and programs*.  This standard is not based upon a comparison of the lives of disabled with non-disabled offenders.  The ADA does not mandate — nor could any government provide — an environment that will pose absolutely no challenges to a disabled person compared to a non-disabled person.  The purported "more pain and punishment" standard seeks to do just that, which is far more than is required under the language of Title II or other courts' interpretation of it.

Here, Plaintiffs have failed to tie their claim to any programs or services to which McCollum was denied access.  To the extent Plaintiffs claim that the TDCJ failed to meet McCollum's medical needs, the ADA is not the appropriate vehicle to assert such a claim, as attractive as might be to the Plaintiffs' bar.

### 6.  The TDCJ is immune from Plaintiffs' ADA claims.

As set out above, McCollum's death, though tragic, was not the product of a Constitutional violation.  Because Plaintiffs failed to show a Constitutional violation, the TDCJ is immune from their ADA claims.  The ADA abrogates the states' Eleventh Amendment immunity to extent that the condition challenged is also a violation of Constitutional rights.  *United States v. Georgia*, 546 U.S. 151 (2006).  Because the ADA was passed pursuant to Congress' remedial power under Section 5 of the Fourteenth Amendment, states' eleventh amendment immunity remains intact except where a Constitutional violation has been shown.  *Id.*  In the Eighth Amendment context, a plaintiff must show that his ADA claim is predicated on an actual violation of the Eighth Amendment.  For the numerous reasons listed above, Plaintiffs have failed to establish that any defendant was deliberately indifferent to the potential risk of harm from summer temperatures.

Under *United States v. Georgia*, the TDCJ, therefore, retains its Eleventh Amendment and sovereign immunities.

**7. Plaintiffs failed to prove the alleged discrimination was solely by reason of disability under the RA.**

Plaintiffs' pleadings show the inapplicability of the Rehabilitation Act claims. As noted above, the chief difference between the ADA and the RA lies in their respective causation requirements. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir.2005) (citing *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002).[46] Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. §794(a) (emphasis added).

By contrast, under Title II of the ADA, "discrimination need not be the sole reason" for the exclusion of or denial of benefits to the plaintiff. *Soledad*, 304 F.3d at 503-04 (quoting *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir.1996)). If the plaintiff's disability was not the sole factor behind his exclusion from a program that receives federal benefits, the RA claim fails. *Id.* A plaintiffs' RA claim can be dismissed where his own pleadings negate the notion that his exclusion from a program was based "solely" on his disability. *See Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 704 (N.D. Tex.2014) (dismissing RA claim where plaintiff claimed he was fired due to animus toward his "disability and ethnicity" because by its terms, his claim failed to establish that his disability was the sole reason for his termination).

---

[46] Though *Bennett- Nelson* stands for the proposition that when the claim is predicated on a failure to accommodate, the causation differences between the ADA and RA can become immaterial, such is not the case here. Indeed, in *Bennett-Nelson*, the issue centered on a university's failure to provide interpreters and note takers to hearing disabled students. *Id.* at 455. They were excluded from their classes, but only to the extent they were not provided these accommodations. *Id.* This is inapplicable to the case at bar because Plaintiffs claim that *all* inmates were at risk of harm due to the heat at the Hutchins Unit.

Here, Plaintiffs' claims are asserted based on conditions applicable to every offender at the Hutchins Unit.  If the "program" to which they are denied access is to be defined as "safe housing," by the terms of Plaintiffs' complaint, which the TDCJ denies, every offender at the Hutchins Unit was denied "safe housing" regardless of their disability status.  As such, Plaintiffs cannot establish that McCollum suffered discrimination solely by reason of his disabilities.

**8.    No high-level TDCJ official with the ability to remedy the alleged violation had the requisite knowledge for Plaintiff to demonstrate agency *respondeat superior* liability under the ADA or RA.**

At most, Plaintiffs can point only to hearsay statements of offenders. This also fails to state an ADA or RA claim because it does not provide evidence that an official with the authority to remedy the situation was made aware.[47]  In *Delano-Pyle*, the Fifth Circuit rejected the notion that a Plaintiff must produce evidence of policies, customs, or practices that violate the ADA or the RA but instead that the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA.  *Delano-Pyle*, 302 F.3d at 574-75.  Congress, in enacting those statutes, "intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability." *Id.* However, the current state of the law in the Fifth Circuit should be modified to embrace the Eleventh Circuit's in-depth and reasoned approach in *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334 (11th Cir.2012).  The Eleventh Circuit's conclusions are applicable to the facts here.[48]  The Eleventh Circuit rejected a blanket rule of

---

[47] It should also be noted that fact issues cannot be predicated on hearsay evidence. (Fed. R. Evid. 802)  The inmate statements are hearsay of the most unreliable variety.  They contain hearsay within hearsay, from a witness who is not present regarding a statement made by an unidentified third party.  On top of this, Plaintiffs would attempt to impute *intentional conduct* on an entire agency based on such unreliable information.  This is well beyond the realm of facts which could create a fact issue regarding TDCJ's knowledge and intent.

[48] Though the Eleventh Circuit was considering the RA, as it often noted, the RA and the ADA are generally interpreted *in pari materia*, meaning they are construed together.  *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir.2011). The analysis applicable to an ADA claim is used when considering a claim brought pursuant to § 504 of the RA. *Pinkerton v. Spellings*, 529 F.3d 513, 516–17 (5th Cir.2008).

*respondeat superior* in all RA cases, and, instead, traced the roots of the RA's rights and remedies. In this way, the Eleventh Circuit determined that agency liability should only apply when an agency official with substantial supervisory authority within an organization's chain of command is informed of the issue, but fails remedy it.  *Liese*, 701 F.3d at 349.

The Eleventh Circuit's reasoning came from a careful tracing of the statutory remedies under the RA, which incorporates the remedies contained in Title VI.  The Court also looked to Title IX because Title VI's remedial scheme mirrors Title IX's. *See* 42 U.S.C. § 2000d–1.  In so doing, the Court considered the Supreme Court's ruling in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).  For an organization to be liable for damages due to intentional discrimination for Title IX purposes, *Gebser* requires proof of action by "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [organization's] behalf [and who] has actual knowledge of discrimination in the [organization's] programs and fails adequately to respond."  *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989 ("The premise, in other words, is an official decision by the recipient [of federal funds] not to remedy the violation.") In determining which administrators must be notified in order to impute agency liability, the *Liese* Court held the person should be "someone who enjoys substantial supervisory authority within an organization's chain of command" who had the power to remedy the situation. *Id.* at 350.

The Eleventh Circuit's approach is the proper legal result based on prior Supreme Court precedent.  As such, this Court should apply it here and hold that the TDCJ cannot be held liable under the ADA or RA on such scant evidence.  This is particularly important where Plaintiffs would attempt to impute *intentional conduct* on an entire agency based on such unreliable information.

Even assuming the evidence could be accepted as true, there is no indication that McCollum's purported voicing his difficulties was communicated to the proper individuals at the Hutchins Unit with the ability to remedy the situation, such as the medical providers, the classification personnel, or the unit administration.  Nor can be argued that he did not know how to do so.  Records from his previous incarceration indicate that at one point he had been assigned to a lower bunk (Appx. 1419), but that restriction was removed by the medical provider noting that there was good evidence on improvement of McCollum's lower back pain. (Appx. 1427, 1418)  A few months later, McCollum submitted requests to medical department to inquire about certain restrictions on his housing and work assignment form. (Appx. 1425-26)  This evidence shows McCollum knew that the medical department made determinations regarding bunk restriction, and he knew how to contact the medical department to seek to have his restrictions reviewed or changed.  This case presents scant to no evidence which creates a material issue of fact issue regarding the TDCJ's knowledge and intent regarding Mr. McCollum.

### F.  Plaintiffs lack standing to seek injunctive relief.

Plaintiffs cannot meet the constitutional threshold requirements of standing for the injunctive relief they seek. In order to have standing to seek injunctive relief, the Plaintiffs must demonstrate:  (1) injury in fact, (2) causation, and (3) redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 560-1 (1992).  The Supreme Court has held consistently that in order to state a claim capable of redress, there must be a likelihood of future harm to the plaintiff.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-104 (1983) (citing *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974)).  Since Plaintiffs are not incarcerated in a TDCJ facility, the TDCJ cannot cause the Plaintiffs any alleged harm in the future.  *See Plumley v. Landmark Chrevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir.1997) ("a plaintiff seeking injunctive relief based on an alleged past wrong must show

that there is a real or immediate threat that he will be wronged again.").  Accordingly, Plaintiffs'

injunctive relief claim lacks redressability.  The claim for injunctive relief, therefore, is frivolous

and must be dismissed.

## VII.    PRAYER FOR RELIEF

For the foregoing reasons, the Court should dismiss Plaintiffs' lawsuit in its entirety with

prejudice and award attorneys' fees and costs to abide the event.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**BRANTLEY STARR**
Deputy First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/Matthew J. Greer_____
**MATTHEW J. GREER**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24069825
Southern District ID No. 1171775
matthew.greer@texasattorneygeneral.gov

**CYNTHIA L. BURTON**
Assistant Attorney General
Attorney in Charge
Texas Bar No. 24035455
Southern District ID No. 35273
cynthia.burton@texasattorneygeneral.gov

**DANIEL C. NEUHOFF**

Assistant Attorney General
Co-counsel
Texas Bar No. 24088123
Southern ID No. 2374885
Daniel.neuhoff@texasattorneygeneral.gov

Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin TX  78711
(512) 463-2080/Fax (512) 936-2109

**ATTORNEYS FOR BRAD LIVINGSTON, ROBERT HERRERA, and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE**

## NOTICE OF ELECTRONIC FILING

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have electronically submitted for a copy of the foregoing for filing in accordance with the Electronic Case Files system of the Southern District of Texas on June 17, 2016.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General


## CERTIFICATE OF SERVICE

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above **TDCJ Defendants Motion for Summary Judgment** have served all lead counsel of record electronically in accordance with ECF system of the Southern District of Texas on this 17th day of June, 2016, addressed to:

Jeff Edwards
Scott Medlock
The Edwards Law Firm
1101 E. 11th Street
Austin, Texas  78702


Jacqueline Haney                                               *Via Hand-Delivery*
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas  78711


/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General