## CORRECTIONAL INSTITUTIONS DIVISION
### Inter-Office Communications

| | | | |
|---|---|---|---|
| **To:** | All concerned | **Date:** | July 22, 2011 |
| **From:** | Lieutenant Sandrea Sanders | **Subject:** | McCollum, Larry #1721640 |

On Friday July 22, 2011, at approximately 0230 hours, Officer Richard Clark, COV, was in C7 dorm conducting count. An unidentified offender approached the officer and stated that his cellie was shaking. At that time, Officer Clark went to the bunk in question, C7-46 and found offender McCollum, Larry TDCJ# 1721640, a White, male, JZ, 58 years-old, serving a 1-year sentence out of McLennan County for Forgery, having a seizure. Officer Adeotun Jolayemi, COIV, was assigned to C5-8 building as well. When she came to the dorm to count, she was notified by Officer Clark that the offender needed medical assistance. Officer Jolayemi initiated ICS, calling for additional staff, a video camera and a supervisor. Sergeant Karen Tate arrived on the scene and attempted to talk and calm the offender in an effort to get a response from offender McCollum. This was to no avail. Offender McCollum continued to seize for several more minutes. At approximately 0240 hours, I, Lieutenant Sandrea Sanders, arrived at C7 dorm to make an assessment. Offender McCollum was still seizing and I then contacted the Crain Unit and spoke with triage nurse. The nurse could not find any medical information in the system that verified the offender having any seizure disorder therefore she recommended that the offender be transported to the hospital via ambulance. At approximately 0300 hours, offender McCollum was transported via ambulance from the Hutchins Unit to Parkland Hospital. Officer T. Cain, CO5 and Officer T. Inniss, CO4 served as the transport officers. Duty Warden Balden Polk was notified of the incident and the transport at approximately 0330 hours. Warden Jeff Pringle was notified at approximately 0500 hours.

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

McCollum 01657

## Texas Department of Criminal Justice
## CORRECTIONAL INSTITUTIONS DIVISION
## Inter-Office Communications

**To:** Emergency Action Center

**Date:** July 29, 2011

**From:** Lieutenant Sandrea Sanders

**Subject:** I-10671-07-11 Offender Death

On Thursday, July 28, 2011, at 2335 hours, Officer Tashawna Bowser, CO4, who was assigned as a Hospital/ Transport Officer at Parkland Hospital, notified me, Lieutenant Sandrea Sanders, that offender McCollum, Larry TDCJ# 1721640 was pronounced deceased. Offender McCollum was a 58 year-old, White, male offender, Processing status; standing 5'10" and weighing 320 pounds; serving a 12 month sentence for Forgery out of McLennan County.

Offender McCollum was transported to Parkland Hospital on July 22, 2011 at approximately 0400 hours following what appeared to be a seizure. Offender McCollum was admitted and placed in MICU Room 911. On July 28, 2011, at approximately 1725 hours, the breathing tube was removed from the offender and at 2335 hours offender McCollum was pronounced deceased by Dr. Charles Owens and Intern Physician Rigoberto Ramirez. The preliminary Cause of Death is listed as Respiratory Failure/ Neurological Failure. Mr. Michael Keck of the Office of the Inspector General took possession of the remains and upon completion of his investigation, the remains were taken to the Parkland Hospital morgue. Carnes Funeral Home in Texas City, Texas was contacted at 0000 hours. Offender McCollum's next of kin was present at the time of death and an autopsy was requested. Arrangements with Connely-Compton Funeral Home in Waco, Texas through Carnes Funeral Home were made by the family concerning the disposition of the remains.

Duty Warden Major Terry May was notified of the incident at 2340 hours. Mr. Michael Keck of the Office of the Inspector General was notified at 2345 hours. Senior Warden Jeff Pringle was notified at

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
**APPENDIX 264**

McCollum 01658

2346 hours. Hutchins Unit Chaplain Gene Barltoff was notified at 2351 hours. Regional Director Robert Eason was notified at 0006 hours. Ms. Crumbley of the Emergency Action Center was notified at 0101 hours and issued an incident number of I-10671-07-11.

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

McCollum 01659

```
          HEALTH SUMMARY FOR CLASSIFICATION SYSTEM    TIME: 07:05:12
                            INQUIRY
TDCJ-ID #: 01721640  SID #: 03950494          P   U   L   H   E   S
NAME: MCCOLLUM,LARRY GENE             -------------------------
HT 5'10"   WT 000                     | 1 | 1 | 1 | 1 | 1 | 1 |
DOB: 04 04 1953                       |---|---|---|---|---|---|
UNIT:        HOUSING:                 | A | A | A | A | A | A |
JOB:                                  |---|---|---|---|---|---|
                                      |   |   |   |   |   | H |
RESTRICTIONS                          -------------------------
UNIT: NO RESTRICTION              TRUSTY CAMP SUITABLE: Y
HOUSING: NO RESTRICTION           WHEELCHAIR USE: NO RESTRICTI
BUNK: NO RESTRICTIONS       ROW: NO RESTRICTIONS
WORK: NO RESTRICTIONS
DISCIPLINARY PROCESS: NO RESTRICTION


INDIVIDUALIZED TREATMENT PLAN:


TRANSPORTATION RESTRICTIONS: NO RESTRICTION
REVISED BY: REDDY/SMITH                REVISED DATE: 07 20 2011
PF1 -HELP  PF3 -MENU  PF4 -ADDITIONAL INFO  PF7 -UP  PF8 -DOWN
ENTER NEXT REQUEST:/TDCNO: _____  OR SIDNO: _____
```

Copy of OIG case to Support Litigation on 12.17.2012 by ce
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
**APPENDIX 266**

McCollum 01660



Carnes
Funeral Home

3100 Gulf Freeway
Texas City, TX 77591
888.822.7637
409.986.9900

tdcj@CarnesFuneralHome.com



24-Hour Toll Free

Voice
1.855.262.8325
1 855 CMC TDCJ

FAX
1.855.262.8323
1 855 CMC TDCF

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
**APPENDIX 267**

McCollum 01661

```
INMTCICS/JPR6236 /1307                    FOR

TDC 01721640 SID 03950494 NAME: MCCOLLUM,LARRY GENE            RACE: W SEX: M


                          UNIT REASON FOR    DATE      TYPE     TDCJID
                               ASSIGNMENT
CURRENT UNIT:                  DQ          07 22 11    JC      01721640
DATE ASSIGNED: 07 22 11   HJ   RA          07 15 11    JC      01721640
RSN. ASSIGNED: TEMPORARY
REC/DEP CODE:  DQ




                                              END OF DATA



PF1:HELP PF8:FORWARD PF7:BACK PF11:NEXT-INQ PF12:MENU PF5:ENTIRE HISTORY
OR NEXT REQUEST/OR TDCNO _____ OR SIDNO _____
```

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
**APPENDIX 268**

McCollum 01662

```
****************************************************************************
*** REQUESTOR: JPR6236 - PRINGLE, JEFF        HUTCHINS JAIL FACILITY     ***
****************************************************************************
***                S Y S M   I N B A S K E T   P R I N T                ***
```

MESSAGE ID: 924916      DATE: 07/29/11  TIME: 02:19pm  PRIORITY: 000

TO:        JPR6236 - PRINGLE, JEFF
           WARDEN
           HUTCHINS JAIL FACILITY
           1500 LANGDON RD.
           DALLAS, TX. 75241


FROM:      HJUNT06 - WILLIAMS, SANDRA
           RECORDS SUPERVISOR
           HUTCHINS JAIL FACILITY
           1500 EAST LANGDON ROAD
           DALLAS, TX 75241


SUBJECT:   "EXPIRED" OFFENDER

MS BLACK, PER WARDEN PRINGLE'S REQUEST, ACCORDING TO POLICY THE
HUTCHINS UNIT IS REPORTING THE FOLLOWING INFORMATION TO "INMATE
TRUST FUND DEPARTMENT" ON THE EXPIRED OFFENDER LISTED BELOW.

                   NAME:      LARRY GENE MCCOLLUM
                   TDC#:      1721640-SID# 03950494
          DATE OF DEATH:      JULY 28, 2011
          TIME OF DEATH:      23:35 P M
           NEXT OF KIN:       STEPHANIE KINGREY
                              947 WHISKEY HOLLOW ROAD
                              WEST, TEXAS  76691
                              PHONE # 254-733-5844

IF THERE ARE ANY "FUND" REMAINING, THEY SHOULD BE SENT TO THE NEXT
OF KIN LISTED ABOVE.

THANKS,


MS S R WILLIAMS, SUPERVISOR
INMATE RECORDS HUTCHINS UNIT


AUTHORITY:     WARDEN J PRINGLE
               SENIOR WARDEN

Sent to:   DBL6009              BLACK, DEBBIE            (to)
```

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
APPENDIX 269                        McCollum 01663

| TMA5594 | | MAY, TERRY | | (to) |
| KSE6744 | | SESSION, KYRON | | (to) |
| TTO7751 | | TOWERY, TEDRAL | | (to) |
| PME0294 | | MESHACK, PAMELA | | (to) |

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**APPENDIX 270**

McCollum 01664

```
****************************************************************
*** REQUESTOR: JPR6236 - PRINGLE, JEFF        HUTCHINS JAIL FACILITY   ***
****************************************************************
***                 S Y S M   I N B A S K E T   P R I N T              ***
```

MESSAGE ID: 927549      DATE: 07/29/11  TIME: 03:23pm  PRIORITY: 000

TO:        JPR6236 - PRINGLE, JEFF
           WARDEN
           HUTCHINS JAIL FACILITY
           1500 LANGDON RD.
           DALLAS, TX. 75241


FROM:      HJUNT06 - WILLIAMS, SANDRA
           RECORDS SUPERVISOR
           HUTCHINS JAIL FACILITY
           1500 EAST LANGDON ROAD
           DALLAS, TX 75241


SUBJECT:    "EXPIRED" OFFENDER

MS ASHWORTH, ENCLOSED IN YOUR COMING "FAX" IS INFORMATION THAT I
HAVE, THAT I HOPE WILL BE HELPFUL CONSIDERING THE CIRCUMSTANCES
OF THIS OFFENDER.

                NAME:       LARRY GENE MCCOLLUM
                TDC#:       01721640-SID# 03950494
        DATE OF DEATH:      JULY 28, 2011
        TIME OF DEATH:      23:35 P M
         NEXT OF KIN:       STEPHANIE KINGREY-DAUGHTER
                            947 WHISKEY HOLLOW ROAD
                            WEST,TEXAS  76691
                            PHONE# - 254-733-5844

THANKS,


MS S R WILLIAMS, SUPERVISOR
INMATE RECORDS HUTHCHINS UNIT


AUTHORITY:    WARDEN J PRINGLE
              SENIOR WARDEN

Sent to:    CAS7772          ASHWORTH, CARISE        (to)
            JPR6236          PRINGLE, JEFF           (to)
            BPO0613          POLK, BALLEN            (to)
            TMA5594          MAY, TERRY              (to)
```

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
**APPENDIX 271**

McCollum 01665

PME0294                          MESHACK,  PAMELA                    (to)

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
**APPENDIX 272**                          McCollum 01666

| | |
|---|---|
| **From:** | Sandrea Sand___/Institutional/TDCJ |
| **To:** | Robert Eason/Institutional/TDCJ@TDCJ, Jeff Pringle/Institutional/TDCJ@TDCJ, Balden Polk/Institutional/TDCJ@TDCJ, Terry May/Institutional/TDCJ@TDCJ, Kyron Session/Institutional/TDCJ@TDCJ, Tedral Towery/Institutional/TDCJ |
| **cc:** | Delia Hale/Institutional/TDCJ@TDCJ, Christopher Hernandez/Institutional/TDCJ@TDCJ, Kevin Brown/Institutional/TDCJ@TDCJ, Johnny Roberts/Institutional/TDCJ@TDCJ, Sandrea Sanders/Institutional/TDCJ@TDCJ |

| | |
|---|---|
| **Date:** | Friday, July 22, 2011 07:57AM |
| **Subject:** | Off-site Medical Transport (McCollum, Larry #1721640) |

To All Concerned:

On Friday July 22, 2011 and at approximately 0400 hours, offender McCollum, Larry TDCJ# 1721640 was transported from Hutchins State Jail to Parkland Hospital via 911 Ambulance Service. The following information is provided:

1. Region: Region II
2. Offender Name: McCollum, Larry # 1721640
3. Custody Level: Unassigned Processing
4. Security Precaution Designators: None
5. Unit of Assignment: Hutchins State Jail
6. Offsite Medical Center: Parkland Hospital 5200 Harry Hines Blvd., Dallas, Tx. 75246
7. Mode of Transportation: 911 Ambulance Service
8. Escorting Officers: T. Cain, CO4; T. Inniss, CO4
9. Departure Time From The Unit: 0400 hours
10. Return Time To the Unit: Unknown at this time.

Be advised that on the above date and at approximately 0330, during a security check, offender McCollum was found on his bunk having what appeared to be a seizure. ICS was initiated and a supervisor arrived to the scene and assessed the situation. Offender McCollum continued to sieze for several minutes. The triage nurse at the Crain Unit was contacted and because the offender had no medical notes in the computer, she recommended that 911 be called and the offender transported to the hospital. At approximately 0400 hours, offender McCollum departed the unit to Parkland Hospital. All further information will be forwarded.

Lt. Sanders

```
********************************************************************
*** REQUESTOR: CHE6577 - HERNANDEZ, CHRISTOPHE HUTCHINS JAIL FACILITY
********************       ********************       ********************
***               S Y S M   O U T B A S K E T   P R I N T
```

MESSAGE ID: 382410C      DATE: 07/22/11  TIME: 09:03am  PRIORITY: 000

SUBJECT:    OFF SITE MEDICAL TRANSPORT


UPDATE ON OFFENDER MCCOLLUM, LARRY TDCJ# 1721640

TO ALL CONCERNED,

OFFENDER MCCOLLUM, LARRY TDCJ# 1721640 WAS ADMITTED TO PARKLAND
HOSPITAL DALLAS AND IS NOW IN MICU-911.

LIEUTENANT C. C. HERNANDEZ
HUTCHINS STATE JAIL
------------------------------------------------------------------G

 GENTLEMEN,

ON FRIDAY, JULY 22, 2011 AND AT APPROXIMATELY 0400 HOURS, OFFENDER
MCCOLLUM, LARRY TDCJ#1721640 WAS TRANSPORTED FROM HUTCHINS STATE JAIL
TO PARKLAND HOSPITAL VIA 911 AMBULANCE SERVICE, THE FOLLOWING
INFORMATION IS PROVIDED:

1.   REGION: REGION II
2.   OFFENDER NAME: MCCOLLUM, LARRY TDCJ# 1721640
3.   CUSTODY LEVEL: UNASSIGNED PROCESSING
4.   SECURITY PRECAUTION DESIGNATORS: NONE
5.   UNIT OF ASSIGNMENT: HUTCHINS STATE JAIL
6.   OFFSITE MEDICAL CENTER: PARKLAND HOSPITAL 5200 HARRY HINES BLVD
     DALLAS, TX 75246
7.   MODE OF TRANSPORTATION: 911 AMBULANCE SERVICE
8.   ESCORTING OFFICERS: OFFICER(S) T. CAIN, C04/ T. INNISS C03
9.   DEPARTURE TIME FROM THE UNIT: 0400 HOURS
10.  RETURN TIME TO THE UNIT: UNKNOWN AT THIS TIME


L.C. SANDERS

Sent to:    HJO47                    (list)                    (to)

Copy of OIG case to Support Litigation on 12 17 2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**APPENDIX 274**                    McCollum 01668

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Temperature Log

Unit: AJ 7-22-11

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill | Person Recording |
|---|---|---|---|---|
| 6:30 a.m. | 81' | 69% | 84' | Baguio C04 |
| 7:30 a.m. | 81' | 62% | 84' | Baguio C04 |
| 8:30 a.m. | 84 | 68% | 87° | Baguio C04 |
| 9:30 a.m. | 85° | 66% | 90° | Baguio C04 |
| 10:30 a.m. | 88' | 61% | 96° | Baguio C04 |
| 11:30 a.m. | 93° | 60% | 100° | Baguio C04 |
| 12:30 p.m. | 98° | 59% | 105° | Baguio C04 |
| 1:30 a.m. | 101° | 50% | 110° | Echus C05 |
| 2:30 p.m. | 108° | 49% | 110° | Echus C05 |
| 3:30 p.m. | 108° | 48% | 110° | Echus C05 |
| 4:30 p.m. | 104° | 45% | 113° | Echus C05 |
| 5:30 p.m. | 103° | 37% | 109° | Echus C05 |
| 6:30 p.m. | 112° | 35% | 108° | Echus C05 |

Copy of OIG case to Support Litigation on 12.17.2012 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
APPENDIX 275

McCollum 01669

http://10.236.154.1:8180/casemgmt/pages/CriminalCasePrint.js

**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL

# CRIMINAL CASE INFORMATION WORKSHEET

| 2011.03006 | Hutchins | Jul 22, 2011 | Jul 29, 2011 |
|---|---|---|---|
| Case Number | Unit or Location | Date of Offense | Date Case Opening |

| Victim , Complainant or Witness | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Last Name | First Name | Party Type | Person Type | TDCJ Number | Statutes | Rank | DOB | Race | Sex | SSN |
| MCCOLLUM | LARRY | Victim | Offender / Parolee | 01721640 | CCP49.18 | | Apr 4, 1953 | White | Male | ▇▇▇ |
| SANDERS | SANDREA | Named | Employee | | | Lieutenant of Correctional Officers | Jan 10, 1977 | Black / African | Female | ▇▇▇ |
| BOWSER | TASHAWNA | Witness | Employee | | | | May 20, 1987 | Black / African | Female | ▇▇▇ |

| Suspects | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Last Name | First Name | Person Type | TDCJ Number | Statutes | Rank | DOB | Race | Sex | SSN |

## SUMMARY OF OFFENSE

On July 22, 2011 at 3:30 a.m. Offender McCollum, Larry, TDCJ # 1721640 was found during a security check by Hutchins State Jail security staff having a seizure. Crane Unit medical staff was contacted and recommended that 911 be called. McCollum was transported to Parkland Hospital, Dallas, Texas, by ambulance. It was determined by Parkland Hospital Staff that McCollum had a 109 degree fever and was placed on life support with brain damage. McCollum remained on life support and his condition worsened until he died at 1130 p.m. on July 28, 2011. An Autopsy was ordered.

Exact Location of Incident : Hutchins State Jail.
Investigator Initials : MRK    Opened By : MRK
OIG Region : Region-A

Copy of OIG case to Support Litigation on 12.17.2012 by ce
UNAUTHORIZED COPYING OR VIEWING PROHIBITED
**APPENDIX 276**

McCollum 01670

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL NO. 4:14-CV-3253 |
| | § | |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN McCOLLUM**, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 4:14-cv-03253** |
| **BRAD LIVINGSTON**, *et al.*, | § | |
| *Defendants.* | § | |
| | § | |

**AFFIDAVIT OF RICHARD J. CLARK**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF** Dallas | § |

BEFORE ME, the undersigned authority, personally appeared Richard J. Clark known to me personally, who after being duly sworn, deposed and stated as follows:

"My name is Richard J. Clark. I am over the age of 18; competent to make this affidavit and have personal knowledge of the facts stated herein. I am making this affidavit in connection with the cause of action entitled, *Stephen McCollum, et al. v. Brad Livingston, et al.*, Civil Action No. **4:14-cv-03253** now pending in the Southern District of Texas, Houston Division.

At the time relevant to this case, I was a Correctional Officer at the Hutchins Unit in Dallas, Texas. I am familiar with the claims alleged by the Plaintiffs against me regarding the death of Offender McCollum in July of 2011.

On the night of July 21, 2011 and continuing into the early morning of July 22, 2011, I was on duty at the Hutchins Unit. I was assigned as the second rover for C building.

Sometime after 2 a.m. I began conducting a scheduled roster count in the C building. There are four dorms in the area I was assigned to monitor. Each dorm houses approximately 58 people. I entered the C-7 to conduct the count. When I did so, an offender got my attention and said the offender in the bunk above him was shaking. When I checked on him, the offender (Mr. McCollum) looked like he was having a seizure. During my career at TDCJ I have witnessed a few other offenders suffering a seizure, and the way Mr. McCollum was shaking generally fit my understanding of what a seizure looks like. I tried to get a response from Mr. McCollum but he

Page **1** of 4

didn't respond.  I immediately left the dorm and ran directly to the picket and told the picket officer to call for a supervisor because an offender was having a seizure.  I did not delay in any way.

I went back to Mr. McCollum's bunk to monitor him while the supervisor was on her way. During the time between when I called for the supervisor and when the supervisor arrived, I monitored the inmate to make he sure remained in a safe position until additional staff could arrive. Sergeant Tate arrived within a few minutes and took command.  I don't recall exactly how long it took Sergeant Tate to arrive, but it was a short amount of time.  Very soon after Sergeant Tate arrived, a call went out over the radio that there was another medical situation in a different building and additional staff was needed.  Sergeant Tate ordered me to respond to the other situation and I did so.  I had no further involvement with Mr. McCollum.

Prior to this incident, I cannot recall an instance when the on-call medical staff advised a TDCJ officer to immediately call an ambulance simply because an offender is having a seizure. Though a seizure is certainly not a condition that I would take lightly, I do not recall a seizure where immediate emergency care was ordered.  I have never been instructed by a superior officer, or informed by medical staff, that an ambulance should be immediately called the instant an offender has a seizure.  In my experience, the decision to call 911 is typically made by a superior officer.  However, in certain situations where it is obvious that an ambulance is required, it was my understanding that the situation could be radioed to a supervisor.  On the night of July 21, 2011 and continuing on into the early morning of July 22, 2011, my responsibility was to report the situation to my superior officer, who would decide how to proceed.  Though I had received training on the signs of heat stroke, on the night of July 21/22, when I responded to Mr. McCollum, I did not realize he was having a heat stroke.  While I knew he needed some level medical attention, I did not know whether he required an immediate ambulance, or whether the situation could be addressed by medical staff in the morning.  It is my understanding that this type of determination is made by a supervisor in contact with off-site medical staff.

The night of July 21, 2011 was not particularly different from any other summer night in my experience working for TDCJ.  I do not recall that the temperatures were particularly hotter than the days prior.  I did not receive complaints about the heat from either inmates or staff beyond those generally voiced during the summer.

During my sixteen years working in TDCJ at the time of this incident, I have never witnessed a heat stroke, nor have I ever suffered a heat related illness while working in TDCJ.

Page **2** of **4**

Though it is generally hot in the summer time at the Hutchins Unit, and though it is hot in the dorm area, this incident occurred between 2 a.m. and 3 a. m.  The sun had been down for several hours and the offenders had been in their bunks for approximately four hours, meaning physical activity would have been extremely limited for several hours.  When I think of incidents of heat stroke, I usually think of situations where the person has been physically active or subject to long exposures in the sun.  During my sixteen years working as a correctional officer, I have never heard of an inmate or officer suffering a heat stoke during an overnight period, or during a period where they have been inactive for several hours.  Had I realized that Mr. McCollum was having a heat stroke, I would have reported the situation to my supervisor.  I also would have taken steps to cool Mr. McCollum including applying additional wet cloths, fanning the offender, or other actions to try and cool him down.

I understand that offenders have written statements indicating that Mr. McCollum was having trouble entering his top bunk, and  when he reported this to an officer, the officer refused to help him.  I also understand that the Plaintiffs claim that TDCJ officers intentionally discriminated against him by failing to provide him with an assessable housing assignment.  At no time did I ever speak with Mr. McCollum about his bunk assignment, nor was it ever brought to my attention that he was having trouble accessing his bunk.  I have on multiple occasions seen offenders as large as Mr. McCollum assigned to top bunks.

I also understand that the Plaintiffs have obtained inmate testimony that the water brought by correctional staff to the dorms was infrequent and insufficient.  At no time did any offenders, including Mr. McCollum, report to me that they had not received water or that other offenders were preventing them from accessing the water.  I also understand that the Plaintiffs have claimed that Mr. McCollum could not drink water due to the fact that he had no cup.  Even if this is true, Mr. McCollum had unlimited access to water fountains built into the sinks in the housing area.  The sinks are equipped with bubblers to dispense water similar to a water fountain to allow the inmates to drink water.

I also understand that the Plaintiffs claim that during the eleven o'clock count on July 21, 2011, Mr. McCollum was unresponsive and another inmate had to show his ID to  me while I was performing the count.  Though I do not specifically recall these events, it is extremely common for inmates to be asleep during night-time counts.  When an inmate is asleep, it is acceptable for the officer taking the count to view the offender's ID card, verify his identity and generally check for

signs of distress.  It is preferable to leave a sleeping offender asleep as long there are no signs of distress, rather than wake him to complete the count.   Had I observed signs of distress, or if other offenders reported to me that there was something wrong with Mr. McCollum, I would have checked further into his well-being.  At no time prior to my discovering him at the 2 a.m. count did I have any indication that he was under any distress.

      Further the affiant sayeth not."

The above statements are true and accurate to the best of my knowledge.

In witness thereof, I hereto set my hand this ___ day of _May___ 2016.


_____
Richard J. Clark


THE STATE OF TEXAS

COUNTY OF _Dallas_____


      BEFORE ME on this day personally appeared Richard J. Clark known to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of this office this _17th_ day of _May_____, 2016.

_____
Notary Public for the State of Texas
Printed Name: _Pandora Cauley____
My Commission Expires: _02/24/2017_

PANDORA CAULEY
MY COMMISSION EXPIRES
FEBRUARY 24, 2017
Notary without Bond

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN McCOLLUM,** *et al.,* | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 4:14-cv-03253** |
| **BRAD LIVINGSTON,** *et al.,* | § | |
| *Defendants.* | § | |
| | § | |

**AFFIDAVIT OF KAREN SUE TATE**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF** _Dallas_ | § |

BEFORE ME, the undersigned authority, personally appeared Karen Sue Tate known to me personally, who after being duly sworn, deposed and stated as follows:

"My name is Karen Sue Tate. I am over the age of 18; competent to make this affidavit and have personal knowledge of the facts stated herein. I am making this affidavit in connection with the cause of action entitled, *Stephen McCollum, et al. v. Brad Livingston, et al.*, Civil Action No. **4:14-cv-03253** now pending in the Southern District of Texas, Houston Division.

At the time relevant to this case, I was a Sergeant of Correctional Officers at the Hutchins Unit in Dallas, Texas. I am familiar with the claims alleged by the Plaintiffs against me regarding the death of Offender McCollum in July of 2011.

On the night of July 21, 2011 and continuing into the early morning of July 22, 2011, I was on duty as a Sergeant at the Hutchins Unit. I received a call over the radio requesting that a supervisor report to the C-7 dorm. As best I can recall, the situation as reported that an offender was having a seizure.

When I arrived at the C-7 dorm, Mr. McCollum was in his bunk and was being attended to by other correctional officers. Mr. McCollum was shaking and unresponsive. At that time, my primary focus was on evaluating the situation, and notifying my supervisor, Lt. Sanders. At some point I felt Mr. McCollum's skin and he felt warm. At this time he was unresponsive. I got a wet cloth and applied it to his neck. I did this because I thought it might help him come back to

consciousness as he was coming out of what I thought was seizure. I also applied a few drops of water to his lips in order to see that might help revive him. I didn't want to give any significant amount of water at that point as I was concerned that doing so might cause him to choke as he was not yet fully conscious. At some point after I had responded to the scene, Mr. McCollum's shaking subsided. I recall that at some point it seemed like Mr. McCollum made a noise as we attempted to revive him back to consciousness. During this time I monitored his breathing, pulse and ensured his airway was open. In addition, as we often do for inmates who are under a seizure, officers will ensure the offender is in safe area and/or position so that the offender is safe while the seizure runs its course and the offender comes back to consciousness. I took those same measures with Mr. McCollum. During the time I was with Mr. McCollum, I was in contact with Lt. Sanders, keeping her apprised of the situation.

During this time, a second emergency medical situation occurred on the unit with another offender in another building. As time progressed, Mr. McCollum did not respond to our efforts to bring him back to consciousness, as I expected he would after his seizure subsided. Shortly thereafter, Lt. Sanders arrived on the scene and took command. She made a phone call (I'm not sure who exactly she spoke to) and an ambulance was called. When the ambulance was called, I responded to the back gate and unlocked the doors for the route from where the ambulance would arrive to where Mr. McCollum was located.

In my experience as a correctional officer, and particularly as a Sergeant, I have responded to an inmate having a seizure on multiple occasions. Typically when an inmate is having a seizure, the inmate will shake or tremble and be unresponsive for a period of time. Though there are many similarities, each offender reacts differently while under a seizure. In my experience, when a seizure occurs there is a period of time when the muscle activity stops but before the inmate returns to being fully coherent. In my experience this can happen quickly or sometimes this is more gradual and takes an extended period of time. I have also experienced seizure activity where the seizure may stop, then start again.

Seizures are somewhat common in the correctional setting. Prior to this incident, I cannot recall an instance when the on-call medical staff advised a TDCJ officer to immediately call an ambulance simply because an offender is having a seizure. Though a seizure is certainly not a condition that I would take lightly, I do not recall a seizure where immediate emergency care was ordered. I have never been instructed by a superior officer or informed by medical staff that an

ambulance should be immediately called the instant an offender has a seizure. In my training and experience, the decision to call 911 is typically made by a superior officer. On the night of July 21 and continuing into the early morning of July 22, 2011, my responsibility was to report the situation to my superior officer who would decide how to proceed. This is not to say that Sergeants are forbidden or do not have authority to call 911. In certain situations where the need for emergency medical attention is obvious, a Sergeant could possibly inform a superior of the situation and initiate the procedure to call 911. However, this would never be done without at least notifying a supervisor in the chain of command. An offender suffering a seizure who was breathing with a pulse did not present the sort of medical emergency where it was immediately obvious that an ambulance was needed such that I felt it was necessary to call an ambulance directly rather than following the established chain of command.

Though I had received training on the signs of heat stroke, on the night of July 21/22, when I responded to Mr. McCollum, heat stroke did not enter my mind as a possible cause for his condition. The night of July 21, 2011 was not particularly different from any other summer night in my experience working for TDCJ. I do not recall that the temperatures were particularly hotter than the days prior. I did not receive complaints about the heat from either inmates or staff beyond those generally voiced during the summer as this night did not seem any hotter or cooler than a typical July night at the Hutchins Unit.

During my thirteen years working in TDCJ I have never witnessed a heat stroke, nor have I experienced a heat related illness. This incident occurred between 2 a.m. and 3 a. m. The sun had been down for several hours and the offenders had been in their bunks for approximately four hours, meaning physical activity would have been extremely limited for several hours. When I think of incidents of heat stroke, I usually think of situations where the person has been physically active or subject to long exposures in the sun. During my thirteen years working as correctional officer, I have never heard of an inmate or officer suffering a heat stoke during an overnight period, or during a period where they have been inactive for several hours. Had I realized that Mr. McCollum was having a heat stroke, I would have told Lt. Sanders to immediately call an ambulance and I would have taken any available steps to cool Mr. McCollum.

I cannot say exactly how long after I arrived that Lt. Sanders arrived. Situations like this are, in my experience, moment-to-moment, and I did not make note of specific times. However,

at no time before Lt. Sanders arrived was I, nor were other officers, not attending to Mr. McCollum, or not attempting to revive him.

I understand that offenders have written statements indicating that Mr. McCollum was having trouble entering his top bunk, and that when he reported this to an officer, the officer refused to help him. I also understand that the Plaintiffs claim that TDCJ officers intentionally discriminated against him by failing to provide him with an accessible housing assignment. At no time did I ever speak with Mr. McCollum about his bunk assignment, nor was it ever brought to my attention that he was having trouble accessing his bunk. I have on many occasions seen offenders as large as Mr. McCollum assigned to top bunks.

I also understand that the Plaintiffs have obtained inmate testimony that the water brought by correctional staff to the dorms was infrequent and insufficient. At no time did any offenders, including Mr. McCollum, report to me that they had not received water or that other offenders were preventing them from accessing the water. I also understand that the Plaintiffs have claimed that Mr. McCollum could not drink water due to the fact that he had no cup. Even if this is true, Mr. McCollum had unlimited access to water fountains built into the sinks in the housing area. The sinks are equipped with bubblers to dispense water similar to a water fountain in order to allow the inmates to drink water.

In my career at TDCJ, I am aware of the many mitigation measures used to help inmates cope with the summer temperatures. This includes ice water, the availability of showers with lowered water temperature, fans in dorm area, and ventilation through air handlers. To the best of my knowledge, these measures were in place in the C-7 dorm. In my experience, these measures have proved effective in helping the offenders cope with the summer temperatures. In addition, during my time at the Hutchins Unit, I assisted with the ACA inspections and accreditation process. It is my understanding that the Hutchins Unit was accredited by the ACA.

I had no desire to see Mr. McCollum suffer or die. I take the health and safety of offenders very seriously.   As correctional staff, we rely on inmates to perform basic life functions such as eating and drinking necessary to keep themselves safe during hot months.

Further the affiant sayeth not."

The above statements are true and accurate to the best of my knowledge.

In witness thereof, I hereto set my hand this _17_ day of _May_ 2016.

Page **4** of **5**

**APPENDIX 286**

_Karen Sue Tate_

THE STATE OF TEXAS

COUNTY OF _Dallas_

      BEFORE ME on this day personally appeared Karen Sue Tate known to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of this office this _17th_ day of _May_____, 2016.

_Pandora Cauley_

PANDORA CAULEY
MY COMMISSION EXPIRES
FEBRUARY 24, 2017
Notary without Bond

Notary Public for the State of Texas
Printed Name: _Pandora Cauley_
My Commission Expires: _2/24/2017_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:14-cv-03253 |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants.* | § | |
| | § | |

**AFFIDAVIT OF SANDREA SANDERS**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF Dallas | § |

BEFORE ME, the undersigned authority, personally appeared Sandrea Sanders known to me personally, who after being duly sworn, deposed and stated as follows:

"My name is Sandrea Sanders. I am over the age of 18; competent to make this affidavit and have personal knowledge of the facts stated herein. I am making this affidavit in connection with the cause of action entitled, *Stephen McCollum, et al. v. Brad Livingston, et al.*, Civil Action No. **4:14-cv-03253** now pending in the Southern District of Texas, Houston Division.

At the time relevant to this case, I was a Lieutenant of Correctional Officers at the Hutchins Unit in Dallas, Texas. I am familiar with the claims alleged by the Plaintiffs against me regarding the death of Offender McCollum in July of 2011.

On the night of July 21, 2011 and continuing into the early morning of July 22, 2011, I was on duty as a Lieutenant at the Hutchins Unit. I received a call over the radio requesting that a supervisor report to the C-7 dorm. At the time the call went over the radio, I was completing the processing of the 2 a.m. count. This is a critical part of unit operations. As best I can recall, the situation was reported that an offender was having a seizure.

When the Incident Command System (ICS) is initiated, the first step is for a ranking supervisor to report to the scene. Per this procedure, I sent Sergeant Tate to the scene to assess the situation and report back. Seizures are not uncommon in the correctional setting. I expected that once McCollum stopped seizing, he would regain consciousness. In my experience this can take

Page **1** of 4

several minutes. I have handled seizures not just in my duties with TDCJ, but in a previous job involving childcare. While a seizure is a serious medical event, in my experience in dealing with them, I had never been instructed that 911 should be called each time a seizure occurs. My most immediate concern was making sure that Mr. McCollum was safe while the seizure ran its course, and it was my understanding that Sgt. Tate and the officers on the scene were doing so.

I received frequent updates from Sergeant Tate during this time. During this same time, another emergency situation occurred on another building where an offender had collapsed, his head, and was bleeding. I was responding to both incidents. As the minutes passed and Sergeant Tate reported that Mr. McCollum was not responding, I became concerned and reported to the scene. I contacted the on-call medical provider. This is consistent with the unit procedures I believe were established by medical staff, which instruct supervising officers to contact the off-site medical provider to determine the appropriate course of action. I contacted the appropriate off-site medical provider, who, after consulting the medical records, advised me that an ambulance should be called. At that time, I instructed the officer in central control to call for an ambulance.

At the time, heat stroke did not occur to me as the cause of Mr. McCollum's seizure. By that time of night, the temperatures had cooled off significantly from the daytime hours, and the offenders would have been sedentary in their bunks for several hours. I had never heard of an inmate suffering a heat stroke during the overnight hours or while sedentary for some time. Had I believed that Mr. McCollum was suffering a heat stroke, I would have informed the on-call medical provider, and would have instructed the officers responding to take whatever measures available to cool Mr. McCollum.

I had no specific knowledge of Mr. McCollum until I received the radio call advising of a seizure. I had no knowledge or reports that he had been skipping meals, not drinking water, not being able to get in and out of his bunk, or that he was having trouble with the temperatures. Security staff are not advised of an offender's particular medical conditions absent specific circumstances requiring it.

In addition, I had heard no complaints that the inmates in the C-7 dorm or any other dorm had not received or could not access cool water, could not access the showers, or that the fans or ventilation were not working properly. At the time, the Hutchins Unit employed several heat mitigation measures including providing coolers with cool water, large fans to circulate air in the dorms, access to showers in the dorm area with lowered water temperature, ventilation through air

handlers, lessened clothing restrictions in the dayrooms, and adjustments to the offender work schedule. In my experience, these measures have proved effective in helping the offenders cope with the summer temperatures.

I understand that the Plaintiffs in the case have claimed that Mr. McCollum could not drink water because he did not have access to a cup. Had Mr. McCollum alerted a staff member he could not drink water because he didn't have a cup, it is my expectation that staff would have appropriately addressed the matter. In any event, all dorms, including the C-7 dorm are equipped with sinks that have a feature called a bubbler that specifically allows the user to divert the water flow upwards like a water fountain to allow the user to drink, with or without a cup.

I understand that offenders have written statements indicating that Mr. McCollum was having trouble entering his top bunk, and that when he reported this to an officer, the officer refused to help him. I also understand that the Plaintiffs claim that TDCJ officers intentionally discriminated against him by failing to provide him with an accessible housing assignment. At no time did I ever speak with Mr. McCollum about his bunk assignment, nor was it ever brought to my attention that he was having trouble accessing his bunk. I have, on multiple occasions, seen offenders as large as Mr. McCollum assigned to top bunks.

It is my understanding that all officers are trained on the signs, symptoms, and first aid for heat-related illnesses during their pre-service academy training. This training is also repeated yearly. This includes training from the risk management department as well as training from the UTMB medical providers. In addition, this topic was continuously stressed during daily "shift briefings" which are meetings that take place before the start of each shift.

In my career at TDCJ, I am aware of the many mitigation measures used to help inmates cope with the summer temperatures. This includes ice water, the availability of showers with lowered water temperature, fans in dorm area, and ventilation through air handlers. To the best of my knowledge, these measures were in place in the C-7 dorm. In my experience, these measures have proved effective in helping the offenders cope with the summer temperatures. In addition, during my time at the Hutchins Unit, I assisted with the ACA inspections and accreditation process. It is my understanding that the Hutchins Unit was accredited by the ACA.

I had no desire to see Mr. McCollum suffer or die. I take the health and safety of offenders very seriously. As correctional staff, we rely on inmates to perform basic life functions such as eating and drinking what is necessary to keep themselves safe during hot months.

APPENDIX 291

Further the affiant sayeth not."

The above statements are true and accurate to the best of my knowledge.


In witness thereof, I hereto set my hand this 17th day of May 2016.




Sandrea Sanders


THE STATE OF TEXAS

COUNTY OF Dallas



BEFORE ME on this day personally appeared Sandrea Sanders known to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of this office this 17th day of May , 2016.


PANDORA CAULEY
MY COMMISSION EXPIRES
FEBRUARY 24, 2017
Notary without Bond

Notary Public for the State of Texas
Printed Name: Pandora Cauley
My Commission Expires: 02/24/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:14-cv-03253 |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |

### AFFIDAVIT OF JEFFERY PRINGLE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF Dallas | § |

BEFORE ME, the undersigned authority, personally appeared Jeffery Pringle known to me personally, who after being duly sworn, deposed and stated as follows:

"My name is Jeffery Pringle. I am over the age of 18; competent to make this affidavit and have personal knowledge of the facts stated herein. I am making this affidavit in connection with the cause of action entitled, *Stephen McCollum, et al. v. Brad Livingston, et al.*, Civil Action No. **4:14-cv-03253** now pending in the Southern District of Texas, Houston Division.

At the time relevant to this case, I was the Senior Warden at the Hutchins Unit in Dallas, Texas. I am familiar with the claims alleged by the Plaintiffs against me regarding the death of Offender McCollum in July of 2011.

During the summer months, the Hutchins Unit employed TDCJ's prescribed heat mitigation measures to protect offenders and staff from the summer temperatures. These measures are specified in the annual heat reminder sent each year from the TDCJ-CID administration. As Senior Warden, I ordered the implementation of the TDCJ heat mitigation protocols at the Hutchins unit with certain modifications to fit the operations and physical plant at the Hutchins Unit. These were specified in written operational procedures.

Because the Hutchins facility is arrayed in dormitories, rather than individual cells, the housing areas are not equipped with individual electrical outlets and did not allow for personal fans. Since there could be no personal fans, large industrial fans were positioned in the dorms to

Page **1** of **4**

provide airflow.  Likewise, because the dorms were not equipped with operable windows, an industrial air handler provided ventilation throughout the dorm areas.  This equipment was periodically inspected to ensure proper function.  I did not consider these measures to be optional.

I understand that the Plaintiffs in this case have claimed that the Hutchins Unit should have housed Mr. McCollum on a lower bunk.  The bunk assignments are made by officers working in the classification department in the count room.  This officer does not physically inspect or view the inmate before making an assignment, but simply makes the assignment based on the documentation contained in the forms completed by the medical providers.  Without any restrictions from the medical department, the officers working in the count room would not know that an offender needed a bottom bunk.  McCollum was initially assigned to a lower bunk but was later re-assigned to 46 bunk in the C-7 dorm.  This assignment was made with no knowledge of any health or disability status of Mr. McCollum.

Throughout my career I have known the importance of implementing heat mitigation measures during the summer.  This topic was stressed during our Wardens' meetings with our leadership, including Mr. Eason.  Heat precautions were also stressed with unit level staff during shift-briefings in addition to the annual training that was provided from the Risk Management department and medical staff.

As Senior Warden, I did not personally participate in the formulation of heat mitigation protocols as found in A.D. 10.64, the annual heat message, or any correctional managed healthcare policies.  My responsibility as Senior Warden was to ensure that protocols were implemented at the Hutchins Unit, and modified as necessary to fit the physical plant or operations of the unit.  It was my understanding and expectation that they were in place in the summer of 2011.  I cannot recall having any reason to believe they were not in place during the summer of 2011.

It was also my expectation that these measures would be effective in reducing the risk of heat-related illness for the offenders on the unit.  I first began to work in TDCJ in 1987 as a correctional officer through the ranks until I reached the level of Senior Warden.  I served at several different facilities of varying types across the state.  I worked in the summer temperatures present in the housing areas.  While these temperatures were at times uncomfortable, it was my experience prior to 2011 that both offenders and staff would use various methods to cope with the heat.  In my experience, TDCJ's mitigation measures helped both offenders and staff do so.  In my 24 year career prior to the summer of 2011, I cannot recall any serious issues with regard to heat-related

Page **2** of **4**

illness. If any heat-related illnesses occurred on a unit or housing area where I worked, they were very rare. This experience led me to believe that the offenders at the Hutchins Unit would be reasonably safe during the summer temperatures. I had never heard of offenders dying from heat stroke in TDCJ prior to Mr. McCollum's death.

I understand that the Plaintiffs claim air conditioning should have been installed at the Hutchins Unit. Even as the Senior Warden, I did not have the authority to unilaterally order the installation of air conditioning. Such an action would have had to be approved by my superiors on multiple levels. I did not see the need to recommend installing air conditioning based on my experience in observing the effectiveness of the mitigation measures.

It is my understanding that when Mr. McCollum was first found to be in distress, the responding officers thought he was having a seizure. It is further my understanding that the Plaintiffs in this case claim that even if they believed him to be having a seizure, that they should have called 911 immediately based on the fact that he was convulsing and non-responsive. Plaintiffs fail to acknowledge that within TDCJ, there is a chain of command which is customarily followed. This includes contacting the off-site medical provider prior to contacting 911. In 2011, I was unaware of any policy, training, or instructions that stated that 911 should be summoned immediately if an offender has a seizure. I was further unaware of any instance in which the process carried out by the responding officers - ensuring the safety of the seizing offender, monitoring airway, breathing, and circulation - and then contacting the off-site for further instructions – led to any harm to any offender due to a delay in care.

I have reviewed temperature measurements from weather stations located near the Hutchins Unit and compared them with measurements recorded in the Hutchins Unit temperature logs. I cannot explain why there is such a wide discrepancy between the measurements recorded on the unit, or the nearby weather stations. However, in my experience, the Hutchins Unit did not feel significantly warmer or cooler than surrounding areas.

I am also aware that Hutchins Unit temperature logs show temperatures that rise to levels listed as "heat stroke possible" or "heat stroke imminent" within the Heat and Humidity Matrix found in A.D. 10.64. It has always been my understanding that this policy uses those terms to indicate the level of danger to offenders who are working TDCJ's heat mitigation protocols are not observed. It was never my understanding that simply reaching a temperature designated as

Page 3 of 4

"heat stroke imminent" meant that a heat stroke was imminent for all inmates. This would be entirely inconsistent with my experience.

I did not have any personal knowledge of Larry McCollum until after he died. I did not meet him during his time on the unit, and I had no knowledge of health status or personal history until after he died.

Further the affiant sayeth not."

The above statements are true and accurate to the best of my knowledge.

In witness thereof, I hereto set my hand this _16_ day of _June_ 2016.

_____
Jeffery Pringle

THE STATE OF TEXAS

COUNTY OF _Dallas_

BEFORE ME on this day personally appeared Jeffery Pringle known to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.
Given under my hand and seal of this office this _16_ day of _June_, 2016.

_Pdwilson_
Notary Public for the State of Texas
Printed Name: _PL Wilson_
My Commission Expires: _9.24.2019_


PETRA L WILSON
Notary Public
STATE OF TEXAS
My Comm. Exp. Sept 24, 2019

Page 4 of 4

**APPENDIX 297**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 7

# EXPERT REPORT
## OF
# DR. BENJAMIN J. LEEAH

TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER
CORRECTIONAL MANAGED HEALTH CARE – NORTHERN REGIONAL MEDICAL DIRECTOR
BEN.LEEAH@TTUHSC.EDU
(806) 381-7080

**APPENDIX 299**

**Table of Contents**

Introduction ............................................................................................................. 1

Background and Professional Experience ................................................................ 1

Basis for this Report ................................................................................................ 2

Review of Mr. McCollum's Medical Records .......................................................... 2

Review of Plaintiffs' Allegations ............................................................................ 4

    **Allegation One**: Officers Ignored Mr. McCollum's Life-Threatening Heat Stroke and Delayed Life-Saving Treatment or Transport to a Hospital for More Than an Hour ............................... 4

    **Allegation Two:** Mr. McCollum was at Markedly Increased Risk of Heat Stroke Due to his Medical Conditions ........................................................................................... 5

    **Allegation Three:** Diuretics such as Hydrochlorothiazide Also Increased the Risk of Heat Stroke ..................................................................................................... 5

    **Allegation Four:** The Measures TDCJ and UTMB take to Protect Prisoners from Heat Stroke are Obviously Medical Inadequate and Endanger the Lives of People Like Mr. McCollum ..... 5

Opinions .................................................................................................................. 6

    **Opinion One:** Mr. McCollum Died Due to His Depression ................................... 6

    **Opinion Two**: Mr. McCollum was a Hearty and Robust Man ............................... 6

    **Opinion Three:** Mr. McCollum Could Have Asked for Help .................................. 7

    **Opinion Four:** Mr. McCollum's Depression Blunted His Survival Instincts ............. 7

Conclusion .............................................................................................................. 7

**Introduction**

      My name is Dr. Benjamin J. Leeah.  I have been asked to offer an expert opinion in the case of *Stephen McCollum, et al. v. Brad Livingston, et al.* in the United States District Court for the Northern District of Texas – Dallas Division.  I am over 18 years of age, competent to make this report, and have personal knowledge of the facts stated herein.  Other than my salary, I am paid no additional compensation for my expert testimony in this case.  In the past four years, I have testified as an expert in one case: *Taurus Brown v. Steven Page, et al.* in the United States District Court for the Northern District of Texas – Wichita Falls Division, cause number 7:07-CV-00123.  I have neither published nor authored any articles.

**Background and Professional Experience**

      I graduated from the Texas Tech University School of Medicine in 2000 and thereafter began a residency program in Family and Community Medicine at the Texas Tech University Health Sciences Center School of Medicine.  I was named Chief Resident of my program in 2002 and completed my residency training in June 2003. Following completion of my residency, I entered private practice as a family physician.  The specialty of family medicine is centered on lasting, caring relationships with patients and their families.  Family physicians provide continuing and comprehensive care to all ages of patients and family medicine encompasses each organ system and every disease entity.

      In 2008, I left private practice and was hired as the Northern Regional Medical Director for the Texas Tech University Health Sciences Center, Correctional Managed Health Care (TTUHSC CMHC).   As a Regional Medical Director, I am responsible for providing supervision and direction to the Facility Medical Directors of ten Texas Department of Criminal Justice (TDCJ) facilities in the northern panhandle of Texas.  I also provide direct patient care at the TDCJ Clements Unit.  I participate in monthly statewide meetings with partner agencies and remain available to the unit medical staff of all facilities for instruction and direction as needed.

**APPENDIX 301**

**Basis for this Report**

I understand that the family of deceased offender Larry Gene McCollum has filed suit against TDCJ, Executive Director Brad Livingston, Warden Jeffery Pringle, Deputy Director Robert Eason and Correctional Officers Richard Clark, Karen Tate, and Sandrea Sanders alleging that defendants wrongfully caused the death of Mr. McCollum by violating his Eighth and Fourteenth Amendment rights and failing to accommodate his alleged disabilities.   In preparation for offering my expert opinion in this case, I reviewed the following documents: the Plaintiffs' Second Amended Complaint; Mr. McCollum's medical records from the Hutchins Unit and Parkland Hospital in Dallas; the TDCJ Emergency Action Center Report related to Mr. McCollum; the TDCJ Office of Inspector General report related to Mr. McCollum; Warden Jeffery Pringle's deposition testimony; P.A. Ananda Babilli's deposition testimony; Dr. Glenda Adams' expert report and deposition testimony; and Dr. Susi Vassalo's expert report.  I am also familiar with TDCJ's policies and procedures as they relate to the provision of health care to offenders and the CMHC policies related to offender health care.  Finally, I am familiar with best practices in medicine.

**Review of Mr. McCollum's Medical Records**

Mr. McCollum was transferred from the McLennan County Jail to the TDCJ Hutchins State Jail (HSJ) on July 15, 2011.  At that time, a Texas Uniform Health Status Update was also transferred with Mr. McCollum.  That update showed him to be 58 years old with a weight of 330 pounds and a height of five feet, ten inches.  The health problems section of the update had hypertension checked as a health problem but there were no housing or transportation restrictions indicated.  The McLennan County Jail health care providers had prescribed Clonidine 0.1mg to be taken by mouth as needed for increased blood pressure.

Upon arrival to TDCJ, Mr. McCollum completed a Correctional Managed Care Intake History and Health Screening.  Mr. McCollum listed a personal history of back injury, cavities, depression, diabetes, glasses, gum disease, high blood pressure, mental illness, and rheumatism/arthritis.  He stated he had current dental complaints of needing a tooth pulled and a current mental health complaint of depression.  His hygiene and appearance were observed to be clean and neat.  His speech was described as normal and his attitude was noted to be appropriate.

Expert Report of Dr. Leeah                                                                 Page 2

He denied any current thoughts of suicide or self-injury. Routine referrals were made for him to see staff in the medical, mental health, dental, and Chronic Infectious Disease (CID) departments. He was released to general population. Also on July 15, 2011, Mr. McCollum was seen by a nurse and received a tetanus booster vaccine and had a tuberculosis skin test placed. Orders were placed for blood work. The unit health care provider, P.A. Ananda Babbili placed an order for Mr. McCollum to discontinue the Clonidine that had been prescribed by the county jail. P.A. Babbili prescribed Hydrochlorothiazide 25mg to be taken by mouth once each morning for 30 days. McCollum was instructed to pick up a medication pass at the HSJ pill window.

On July 18, 2011, McCollum was seen for a TDCJ Offender Intake Processing Psychological Screening Interview. He was found to have had prior TDCJ incarcerations and there were no special considerations noted for the interview. He stated he was feeling "rough" and was "adjusting." He stated he had a history of counseling for mental problems while incarcerated in the Buster Cole unit. He stated he had been on "Zoloft, etc." in 2009. Mr. McCollum stated he was not currently on any psychotropic medication and did not believe he needed any such medication. Mr. McCollum reported a history of treatment at the Skyview mental hospital during his previous incarceration for depression as a result of a loss of family members. Mr. McCollum denied any history of suicide attempts or acts of self-harm and denied any current thoughts of self-harm or suicide. His appearance was described as unremarkable and his hygiene was poor with "B.O." handwritten to the side. His mood was described as anxious and sad and "teary-eyed" was handwritten to the side. He was referred for further evaluation by the mental health department for a history of mental health treatment.

On Wednesday morning July 20, 2011, Mr. McCollum had blood drawn for routine intake labs. The results were complete the next morning, July 21, 2011. His Complete Blood Count (CBC) was remarkable for a slight elevation in the white blood cell count, 13.1 (normal range 4.0-10.5) and was otherwise grossly normal. His Comprehensive Metabolic Panel (CMP) showed his glucose to be 130, BUN elevated at 31 and creatinine elevated at 1.67. Also, sodium, chloride and carbon dioxide were mildly decreased. His urinalysis showed a cloudy sample with White Blood Cell esterase and protein present at "1+". There was also a trace of ketones in his urine. The microscopic examination of his urine showed greater than thirty white blood cells per

Expert Report of Dr. Leeah                                                          Page 3

high-powered field and hyaline casts present along with mucous threads. His hemoglobin a1c was 6.2% and thyroid stimulating hormone was normal.

In the early morning hours of Friday, July 22, 2011 at approximately 2:10 a.m. an offender notified an officer during count that Mr. McCollum was shaking in his bunk. The officer went to Mr. McCollum's bunk and thought he was having a seizure. The officer notified the picket officer, requested a supervisor and a camera, and then returned to Mr. McCollum's bunk to make sure he did not fall out of the bunk. Other officers arrived to Mr. McCollum's bunk and attempted to rouse him and get him to respond. Sometime between 2:15 a.m. and 2:40 a.m. Mr. McCollum stopped shaking. A ranking officer called the nurse on call at the Crain Unit who checked the patient's electronic medical record and could find no record of him having a seizure disorder and recommended the officers call for an ambulance. An ambulance was called and the EMS crew arrived and transported the patient to Parkland Hospital sometime between 3:30 a.m. and 3:45 a.m. The EMS crew recorded Mr. McCollum's temperature as 104 degrees Fahrenheit. Upon arrival to the Parkland Hospital Emergency Room, Mr. McCollum's temperature was found to be 109 degrees Fahrenheit and Mr. McCollum was admitted for treatment. He seemed to improve over the first two to three days of his hospitalization, but it became clear that he had sustained significant damage to his brain and his prognosis was grim. His family opted for no additional interventions and he was removed from the ventilator and died on July 28, 2011.

**Review of Plaintiffs' Allegations**

**Allegation One**: Officers Ignored Mr. McCollum's Life-Threatening Heat Stroke and Delayed Life-Saving Treatment or Transport to a Hospital for More Than an Hour

The facts presented show the officers attending Mr. McCollum believed he was having a seizure. What the officers described was "shaking" and it was reasonable for them to think it was a seizure. However, at some point Mr. McCollum was noted to "stop shaking". This was sometime between 2:15 and 2:40 am. The officers had rolled Mr. McCollum to his side in the bunk and noted him to be breathing and having a pulse, but he was unresponsive. It would not be unreasonable to believe the seizure was over and the patient was going to recover consciousness soon. So, they applied cold compresses and fanned the patient to keep him

comfortable.   The ranking officer called the nurse on call who could find no record of Mr. McCollum having a seizure disorder.   The nurse advised the officer to call EMS and that was done immediately.   If there was a delay in calling an ambulance, it did not make a difference. When Mr. McCollum stopped shaking, that was because the upper motor neurons in his brain were irreversibly damaged.   No current level of technology exists that would have cooled his body and brain quickly enough to stop the damage.   The time for realistic intervention had passed well before Mr. McCollum was found to be in distress.

**Allegation Two:** Mr. McCollum was at Markedly Increased Risk of Heat Stroke Due to his Medical Conditions

The only medical condition that posed an increased risk of heat stroke for Mr. McCollum was his obesity.   Uncontrolled hypertension is a condition that would increase one's risk of heat stroke but Mr. McCollum did not have uncontrolled hypertension.   Rather, at the county jail he only required an occasional dose of the lowest strength available for Clonidine.   Uncontrolled diabetes is another condition that would increase a person's risk for heat stroke.   However, Mr. McCollum simply did not have diabetes.   His hemoglobin a1c level was 6.2%.   All national guidelines require a hemoglobin a1c of 6.5% or higher to confer a diagnosis of diabetes.   There is no evidence that Mr. McCollum's alleged physical ailments posed any impediments with any activities of daily living.

**Allegation Three:** Diuretics such as Hydrochlorothiazide Also Increased the Risk of Heat Stroke

A diuretic such as hydrochlorothiazide (HCTZ) in the dose prescribed, 25 mg daily, would have a very mild effect on net water loss from the kidneys into the urine.   It would be impossible to become dehydrated from the effects of HCTZ alone.   Further, there is no evidence that Mr. McCollum ever went to the pill window to receive a dose of HCTZ.   Even if he had, at most he would have received a total of six doses over as many days which would have just begin to achieve a therapeutic level in his bloodstream.

**Allegation Four:** The Measures TDCJ and UTMB take to Protect Prisoners from Heat Stroke are Obviously Medically Inadequate and Endanger the Lives of People Like Mr. McCollum

The heat mitigation techniques employed by TDCJ are consistent with those recommended by the National Weather Service and the Centers for Disease Control and

Prevention.  TDCJ provides cold water several times throughout the day.  Inmates are allowed unrestricted access to showers with water temperatures decreased during the summer.  Inmates are given lessened clothing restrictions while in the housing areas.  Fans and air handlers are used to provide venting of hot air and provide increased air flow to facilitate greater evaporative cooling.  Despite the plaintiff's expert opinion, a Cochrane Database review of the medical literature in 2012 concluded, "Our review does not support or refute the use of electric fans during a heat wave."

## Opinions

**Opinion One:** Mr. McCollum Died Due to His Depression

It is my opinion that Larry Gene McCollum died of heat stroke due to his depression.  It is apparent from the records available that he was suffering from major depressive disorder with vegetative symptoms.  These include not eating, sleeping more than usual and having very little energy.  On intake he was described as appearing clean and neat.  Just three days later, during his mental health screening, his hygiene was neglected and he was anxious, teary-eyed, and was having a difficult time adjusting.  Yet, at that interview he stated he did not think he needed to be on any medication.  He seemed to downplay the seriousness of his condition.  Nonetheless, the screener referred him for a full mental health evaluation.  The same day as the mental health screening, he saw the CID nurse to check his TB skin test.  Two days after that he had his blood drawn and gave a urine sample for the routine intake laboratory studies.  Those studies show he was already mildly volume depleted and possibly had a bladder infection likely related to not drinking enough water and not related to HCTZ.  The results were not available until the next day and were not so abnormal as to trigger an immediate review.

**Opinion Two:** Mr. McCollum was a Hearty and Robust Man

Mr. McCollum was a hearty and robust man.  This is evidenced by the fact that except for the brain damage, every other organ affected by the heat stroke steadily improved during his hospitalization with supportive care.  His kidneys recovered with IV fluids and electrolytes, never requiring dialysis.  His liver recovered with minimal intervention.  His heart was enlarged from his obesity but did not suffer a myocardial infarction.   His lungs, pancreas, and

Expert Report of Dr. Leeah

Page 6

gastrointestinal tract remained healthy.  His temperature even normalized and he only had two days of IV antibiotics.

**Opinion Three:** Mr. McCollum Could Have Asked for Help

Mr. McCollum was previously incarcerated in TDCJ.  He knew the process by which he could get help.  He knew care was available for his medical, mental health, and dental needs.  He could submit a written sick call complaining of the heat and not feeling well.  He could go to the pill window to receive medication and ask for help.  He could speak to a ranking officer at any time and express his concerns.  He could have asked for immediate consultation with a qualified mental health professional during his intake screening.  He could have asked the CID nurse for help during intake screening or three days later when she read his TB skin test.  He could have asked the nurse or lab technician for help two days after that while giving blood and urine samples.  He never asked for help.

**Opinion Four:** Mr. McCollum's Depression Blunted His Survival Instincts

Mr. McCollum could take frequent cool showers and drink cold water provided during the day.  He could move around the housing area and day room with lessened clothing restrictions.  He could drink water from the sinks in the bathroom area without a cup as they are equipped with "bubblers" that function like a water fountain.  There is no evidence he took advantage of any of these effective mitigation techniques.  In fact, there is specific testimony he did not.

His severe depression blunted his survival instincts.  His vegetative symptoms crippled the normal psychological response to stress.  There were no alarm bells or sirens for anyone to hear.  There were no unmistakable and obvious signs of distress for anyone to see.  During the days leading up to his heat stroke he simply became more lethargic and stayed in his bed.  His body compensated in extraordinary ways but when those mechanisms failed, he crashed quickly.  No one could know how fast or serious the consequences could be.

**Conclusion**

Mr. McCollum's death was ruled as accidental by the medical examiner that performed the autopsy.  I agree with that assessment.  In my professional medical opinion, his severe

depression and vegetative symptoms were the ultimate risk factors for death in his case. Without a cry for help when intervention would have made a difference, all the resources in the world would not have saved Mr. McCollum from this tragic accident.

Signed this the 4th day of March, 2014 in Potter County, Texas.

Dr. Benjamin J. Leeah
Northern Regional Medical Director
TTUHSC CMC

**APPENDIX 308**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL NO. 4:14-CV-3253 |
| | § | |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 8

# EXPERT REPORT OF OSCAR MENDOZA

## DIRECTOR, ADMINISTRATIVE REVIEW AND RISK MANAGEMENT

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE

P.O. BOX 99

HUNTSVILLE, TEXAS 77342-0099

(936) 437-4839

OSCAR.MENDOZA@TDCJ.STATE.TX.US

**APPENDIX 310**

**Table of Contents**

Introduction .................................................................................................................. 1

Background and Qualifications ...................................................................................... 1

    Table: Summary of Positions Held .......................................................................... 1

Basis for this Report ..................................................................................................... 3

Training of Correctional Officers ................................................................................. 3

    Training for All Correctional Officers ..................................................................... 4

    Specific Needs: Hot Weather Training ..................................................................... 4

    Summer 2011 Heat Precautions ................................................................................ 5

Offender Access to Health Care ................................................................................... 5

    TDCJ Health Services Division and Health Care Provider Contracts ..................... 5

    The Relationship between TDCJ and UTMB: Housing Assignments ...................... 5

    The Relationship between TDCJ and UTMB: Offender Medical Information .......... 6

    How Offenders Access Health Care Services ........................................................... 6

TDCJ Chain of Command ............................................................................................. 7

Offender Medical Emergencies .................................................................................... 7

    The Incident Command System ................................................................................ 7

    Calling for Emergency Medical Assistance from a TDCJ Unit ................................ 8

Review of the Emergency Action Center Report .......................................................... 8

Conclusion .................................................................................................................... 9

## Introduction

My name is Oscar Mendoza. I have been asked to offer an expert opinion in connection with the case of *McCollum v. Livingston* in the United States District Court of the Northern District of Texas, Dallas Division. I am over 18 years of age, competent to make this report, and have personal knowledge of the facts stated herein and they are all true and correct. Other than my salary, I am paid no additional compensation for my expert testimony in this case. I have not published nor authored any articles.

## Background and Qualifications

I have been employed by the Texas Department of Criminal Justice (TDCJ) for approximately thirty-five years. During that time I have held a series of progressively responsible positions from Correctional Officer to Division Director. Below is a synopsis of positions I have held within TDCJ and I have attached, as Attachment 1, my curriculum vitae.

Table: Summary of Positions Held

| Position Held | Dates | Unit or Department of Assignment |
|---|---|---|
| Director | 2012 – Present | Administrative Review and Risk Management Division |
| Deputy Director, Management Operations | 2009 – 2012 | Correctional Institutions Division |
| Regional Director | 2008 – 2009 | Region IV, Correctional Institutions Division |
| Senior Warden | 2006 – 2008 | McConnell Unit |
| Senior Warden | 2004 – 2006 | Garza East and West Units |
| Senior Warden | 2001 – 2004 | Connally Unit |
| Senior Warden | 2000 – 2001 | Briscoe Unit |
| Senior Warden | 2000 – 2000 | Cotulla Unit |
| Assistant Warden | 1999 – 2000 | Connally Unit |
| Assistant Warden | 1992 – 1999 | Torres Unit |
| Major of Correctional Officers | 1992 – 1992 | Eastham Unit |

Expert Report of Oscar Mendoza

**APPENDIX 312**

| Captain of Correctional Officers | 1991 – 1992 | Ferguson Unit |
|---|---|---|
| Captain, Staff Assistant to Deputy Director | 1990 – 1991 | Central Region Director's Office |
| Captain, Training Academy Supervisor | 1987 – 1990 | Pre-Service Training Division |
| Captain, Training Academy Instructor | 1985 – 1987 | In-Service Training Division |
| Lieutenant of Correctional Officers | 1983 – 1985 | Huntsville Unit |
| Sergeant of Correctional Officers | 1981 – 1983 | Goree Unit |
| Correctional Officer | 1979 – 1981 | Eastham Unit |

During my thirty-five year career with TDCJ, I have worked in a variety of departments and have been responsible for supervising correctional officers, training correctional officers, overseeing the operations of an entire TDCJ region, overseeing management operations for a division, and now overseeing the operations of an entire division. As the Deputy Director for Management Operations within the Correctional Institutions Division, I oversaw the operations of several departments, including the Correctional Training and Staff Development Department. The Correctional Training and Staff Development Department is responsible for training all correctional staff to ensure that correctional staff has the information and skills necessary to perform their duties safely and effectively.

Currently, I am the director of the Administrative Review and Risk Management Division (ARRM). ARRM's mission is to promote excellence in correctional practice through policy development, monitoring, identifying areas of potential risk of liability, and facilitating action to maintain safety, accountability, efficiency, and professionalism. ARRM is made up of two departments or sections: the Review and Standards Department and the Resolution Support Section. The Review and Standards Department of ARRM is responsible for monitoring adherence to rules, regulations, policies and correctional practices required for certification by the American Correctional Association, which focuses on public safety, humane treatment of offenders and the effective operation of correctional units.

I hold a Bachelor of Science Degree in Criminal Justice from Kaplan University. I also received a Master of Science Degree in Criminal Justice Corrections from Kaplan University. I graduated summa

cum laude and also successfully defended a Master's thesis entitled *An Analysis of Prison Rape and Sexual Assaults in Prisons after the Prison Rape Elimination Act of 2003*. I am a member of the Texas Gang Investigators Association, the American Correctional Association, and the Texas Correctional Association. Further, I have served as both a member and the chair of the TDCJ Advisory Council on Ethics. I have presented a workshop at the Texas Correctional Association annual meeting for leaders in corrections titled "The 360 Degree Leader." I have received training in a variety of areas including: Gang Intelligence and Investigation, First Level Management Development, Basic Incident Command, Conducting Prison Security Audits, Control and Restraint Tactics, Executive Training for New Wardens, Disturbance Management, and Hostage Negotiation. I have also provided training to other correctional officers and corrections professionals for TDCJ, the National Institute of Corrections, the American Correctional Association and Federal Bureau of Investigations, and the United States Department of Justice.

**Basis for this Report**

I understand that the family of deceased offender Larry Gene McCollum has filed suit against TDCJ, Executive Director Brad Livingston, Warden Jeffery Pringle, Deputy Director Robert Eason and Correctional Officers Richard Clark, Karen Tate, and Sandrea Sanders alleging that defendants wrongfully caused the death of Mr. McCollum by violating his Eighth and Fourteenth Amendment rights and failing to accommodate his alleged disabilities. I base this report on my years of employment with TDCJ, my training and education, my thirty-five years of experience in prison security and operations, my knowledge of Agency management and procedures, my knowledge of the correctional officer training process and my review of documents related to this case. I am familiar with the standard operating procedures of TDCJ and the manner in which correctional officers are trained to respond to situations which develop on a prison unit. Finally, I am familiar with best practices in corrections and correctional training.

**Training of Correctional Officers**

Plaintiffs allege that Defendants Robert Eason, Jeffery Pringle, and Brad Livingston failed to adequately train and supervise Defendants Richard Clark, Karen Tate, and Sandrea Sanders. However,

TDCJ provides extensive training to its correctional staff on a number of topics, including heat and hot weather awareness.

Training for All Correctional Officers

The American Correctional Association (ACA) is an international correctional association which is dedicated to excellence in the field of corrections and provides standards for accreditation which reflect best practices in corrections. The ACA standard regarding training requires that all newly hired correctional officers receive 120 hours of training during their first year of employment. TDCJ goes above and beyond this training requirement and provides more than 200 hours of training to newly-hired correctional officers. Newly-hired TDCJ correctional officers are required to attend a six-week, 200 hour training program at one of TDCJ's six regional training academies which is then followed by on the job training at the officer's unit of assignment. Every year thereafter, TDCJ requires each correctional staff member to complete a full 40-hour week of annual in-service training at one of the six regional training academies or one of 25 unit-based training locations. In addition to the pre-service and in-service training that is provided to correctional officers, there is additional training offered throughout the year on TDCJ units that covers a variety of specific topics including seasonal training.

Specific Needs: Hot Weather Training

One of the seasonal specific-needs training topics covered by TDCJ is an training related to the hot Texas summers. Annual hot weather safety training is provided each spring to all correctional officers. This training has been developed in cooperation with TDCJ and the Correctional Managed Health Care Committee which is a committee tasked with developing a statewide health care plan for TDCJ offenders. Further, ARRM provides monthly safety training circulars which address hot weather each spring and has developed cards that are provided to all correctional staff which indicate how to recognize and prevent a heat-related illness. All correctional officers are required to carry their temperature extreme awareness cards on their person at all times while working on a TDCJ prison unit.

Further, TDCJ Administrative Directive AD-10.64 regarding "Temperature Extremes in the TDCJ Work Place" specifically addresses training and requires that each unit's administration ensure that the correctional officers on that unit are trained to prevent temperature related injuries. A standardized training program has been developed under AD-10.64 and a DVD created to illustrate that

training.   The DVD covers the topics of the recognition and prevention of heat-related illnesses. It is provided to all TDCJ units for staff training and is viewed by all unit-based staff at least once each year.

## Summer 2011 Heat Precautions

On May 6, 2011, prior to Mr. McCollum's arrival at the Hutchins State Jail, a written message was sent to all TDCJ units from (then) Correctional Institutions Division Deputy Director William Stephens titled "Heat Precaution 2011."   This message detailed precautions to be taken in order to protect TDCJ employees and offenders from high summer temperatures.   A similar message is issued each spring in preparation for the upcoming summer.   The annual heat precaution message required that each unit's administration ensure that correctional officers and offenders are trained to recognize the signs of heat-related illnesses. In 2011, the ARRM training circular was provided to offenders to review. Currently, the training of offenders is completed using the DVD that was developed under AD-10.64, as discussed above.

The message also required each unit's administration to take various precautionary measures in order to mitigate the effects of higher summer temperatures on offenders and staff.   Additional water and ice were provided for offenders.   Air flow was increased by using blowers.   Offenders were allowed additional showers and were permitted to wear shorts and a t-shirt in housing, recreation, and dayroom areas rather than the traditional offender uniform. Each department was required to post the annual heat precaution message in common areas on the unit.

## Offender Access to Health Care

### TDCJ Health Services Division and Health Care Provider Contracts

The TDCJ Health Services Division works with the Correctional Managed Health Care Committee and health care providers to ensure that health care services are provided to offenders in TDCJ custody.   However, the TDCJ Health Services Division does not provide medical care to offenders and does not employ those who do provide medical care to offenders.   Rather, TDCJ contracts with the University of Texas Medical Branch (UTMB) and Texas Tech University Health Science Center to provide medical care for offenders.   All medical care for offenders housed at the Hutchins State Jail is provided by the University of Texas Medical Branch through a contract with TDCJ.

### The Relationship between TDCJ and UTMB: Housing Assignments

UTMB is responsible for providing all medical care for offenders housed at the Hutchins State Jail; the medical providers on the unit are not TDCJ employees but rather UTMB employees. However, TDCJ relies upon the information communicated to TDCJ from the UTMB health care providers in order to make certain decisions regarding offenders. As an example, each unit's warden has the responsibility for offender housing assignments on that unit. However, housing assignments are made based on the offender's overall record, including any medical needs. The unit medical providers are required to complete a Health Summary for Classification (HSM-18) form for each offender and the medical providers are responsible for maintaining and updating this form as well as for notifying TDCJ with respect to any changes or updates in an offender's health status which may require a housing move. Unit-based classification staff reviews the HSM-18 when making housing assignments in order to ensure that each offender receives appropriate and adequate safety, supervision, and treatment. Accordingly, if medical providers do not place any housing restrictions on an offender's HSM-18 form, TDCJ classification would have no knowledge that the offender required a specific sort of housing assignment such as a lower bunk.

## The Relationship between TDCJ and UTMB: Offender Medical Information

Offenders, just as individuals who are not incarcerated, have a right to the privacy of their medical information. Accordingly, Correctional Managed Health Care Policy H-61.1 "Confidentiality and Release of Protected Health Information," provides guidelines for the release of offender health information in order to ensure that offender health information receives appropriate confidentiality safeguards. Any information that is individually identifiable and is created or maintained regarding the provision of health care to an offender is considered to be protected health information (PHI). PHI may only be released to authorized individuals. Only specified TDCJ employees or departments are permitted access to an offender's PHI, and only for approved purposes. The administrator of each facility must designate specified departments or individuals on that facility that are granted access to an offender's PHI. The majority of correctional staff would not have access to an offender's PHI and would not be aware of the specific health conditions with which an offender has been diagnosed.

## How Offenders Access Health Care Services

When offenders enter TDCJ custody, they speak with a nurse who takes a medical history and reviews any medical information or prescriptions that have come with the offender from a county jail facility. Following their initial intake interview, offenders receive a physical exam within

approximately seven days of their arrival on a unit.  However, in the interim if an offender has any medical issue that he feels needs attention he can access the unit's health care providers.  In order to access health care, an offender can submit a sick call request which is a form that an offender would fill out and submit stating the general nature of the medical problem and requesting that the offender be seen by a health care provider.  The Offender Orientation Handbook, which is provided to all incoming offenders, includes instructions regarding the sick call request process.  Moreover, offenders can submit I-60s or grievances if they are having an issue they need resolved.  In addition, these processes (grievances, I-60s, and sick call requests) are extraordinarily common and widely used by offenders on every TDCJ unit.  Mr. McCollum, having been previously incarcerated with TDCJ, would have already known how to use utilize these communication channels through his experience.  Further, these topics are all covered in the Offender Orientation Handbook.

**TDCJ Chain of Command**

As a paramilitary organization, TDCJ utilizes a distinct chain of command structure.  With well over 20,000 uniformed positions, this communication methodology is vital and necessary for relative information and necessary courses of action to take place.  The unique nature of corrections demands optimal use of limited resources, especially when emergency circumstances arise.  Correctional entities need a system to respond to both routine and emergency incidents in a consistent and confident manner to ensure the safety and welfare of all persons involved in incidents within or involving facilities.

**Offender Medical Emergencies**

In the event of an offender medical emergency, Administrative Directive AD-03.64, "Emergency Transportation of Offenders to Hospitals," provides that the decision whether to transport an offender to the emergency room shall be made by the contracted medical staff.  In the case of the Hutchins State Jail, the contracted medical staff would be UTMB staff.

<u>The Incident Command System</u>

It is the policy of TDCJ's Correctional Institutions Division that regional offices, prison and state jail units, and departments respond to daily minor or unusual incidents as well as major emergencies using the methodology outlined in the "Incident Command System (ICS) for corrections Operation

Manual." The primary concern of TDCJ in initiating ICS is the protection, safety, and security of the community, staff, visitors to the unit, and offenders. The actions of TDCJ staff are guided by a desire to safe lives, prevent injures, and resolve violent or potentially violent emergencies without force when possible and with minimal force when force is necessary.

The ICS requires each unit to adopt designated response teams which are deployed as necessary for routine and serious incidents. TDCJ's use of the ICS during medical emergencies, as with other correctional incidents to establish command in a correctional setting, is to provide a system for the effective management of personnel and resources during an incident. ICS is the basic management system used for any size or kind of correctional incident. Officers receive ICS training through Pre-Service, In-Service, and other specialized staff development training.

Calling for Emergency Medical Assistance from a TDCJ Unit

The telephone system in a prison environment must be tightly controlled so as to avoid offenders making or receiving unauthorized calls which can jeopardize the safety and security of the institution. Accordingly, each TDCJ unit has a switchboard that must be used to place outside calls. Individual officers on the unit do not have access to an outside phone line other than through the switchboard. After normal business hours or on weekends or holidays when the switchboard is not manned, a designated central control picket has access to the outside telephone lines and can place calls. The switchboard operator or central control picket officer is required to log the purpose for all outgoing calls. Therefore, any call to 911 for emergency medical assistance must be placed through the switchboard or central control picket and cannot be placed by an officer working in a housing area or offender dorm.

**Review of the Emergency Action Center Report**

I have reviewed the TDCJ Emergency Action Center report that was filed regarding the events leading up to Mr. McCollum's transfer off the unit and eventual death at Parkland Memorial Hospital.[1] Based on the Emergency Action Center report, it appears that Officer Clark was conducting count in the C7 dormitory when he was informed by an offender at 2:10 a.m. on July 22, 2011 that another offender appeared to be having a seizure. Officer Clark went to the bunk in question and saw Mr. McCollum having what appeared to be a seizure. Clark then contacted the picket officer, Officer Jolayemi, who

---

[1] The times listed are approximate times based on the officers' statements in the Emergency Action Center report.

initiated the ICS by calling for a supervisor, additional staff, and a video camera. Clark then returned to Mr. McCollum's bunk to make sure he did not fall. Within ten minutes of 2:10 a.m., additional staff had arrived and Clark was instructed to report to a different building on the unit. Sergeant Karen Tate was called to the building at 2:15 a.m. and responded to Mr. McCollum's bunk. She attempted to speak with Mr. McCollum, asking him if he was okay and applying a cool cloth to his skin. Sergeant Tate stated at her deposition that Mr. McCollum stopped shaking at one point and she attempted to give him some water to drink and also checked that he was breathing and had a pulse. Tate called for additional staff to attempt to move Mr. McCollum from his bunk and was also in contact with Lieutenant Sandrea Sanders via radio. At 2:40 a.m., Lt. Sanders arrived at Mr. McCollum's bunk and contacted the Crain Unit triage nurse. The triage nurse reviewed Mr. McCollum's medical records and stated that she could not locate any information indicating that Mr. McCollum suffered from a seizure disorder. Because Mr. McCollum's medical record did not indicate that he was prone to seizures, the triage nurse recommended that Mr. McCollum be transferred to the hospital. Accordingly, Lt. Sanders instructed the control picket to call 911 and an ambulance was called at 3:04 a.m. to transport McCollum to the hospital. The ambulance arrived on the unit at 3:12 a.m. and EMTs began working on Mr. McCollum.

**Conclusion**

Based on my review of the Emergency Action Center report filed regarding Mr. McCollum, my knowledge of agency policy, my training, and thirty-five plus years of experience in corrections, it is my professional opinion that the actions taken in this case were in accordance with agency protocols and staff responded accordingly and acted sufficiently for the situation at hand.

Signed this the 4th day of March, 2014 in Walker County, Texas.

Oscar Mendoza
Director, ARRM
TDCJ

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 9