Whenever possible, the drafters have tried to use denominators that reflect the *volume* of activity. Therefore, it is preferable to divide by the average daily population rather than simply counting the number of events per month. The total numbers of hours worked by inmate workers during the past twelve months is used, whenever appropriate. In a few instances, other denominators have been used. What do the numbers mean after the math is done? They provide a *starting point* for analyzing and assessing the organization.

The first time you generate outcome measures, they may not mean much to you but their value grows every time you measure. The second time you measure outcomes, you will be able to compare current outcomes to those that you measured in the past. In this way, outcome measures become a valuable management tool. Over time, the series of outcome measures that you calculate can provide invaluable insight into many aspects of your operation. Sometimes, they will provide you with important "red flags" that identify troubling trends.

## WHAT DOES THIS MEAN FOR ACCREDITATION?

Agencies applying for accreditation under the performance-based format now will be required not only to submit the data from the outcome measures at the time of their audit, they also will be required to submit the data *yearly* in conjunction with their annual certification report. The original outcome measures will be used to establish baseline data and each year's ensuing report will be added to the database. As each agency is considered for reaccreditation, the Commission on Accreditation for Corrections will review the historical data over the three-year period as well as the data generated by the most recent audit. When the Commission renders an accreditation decision, the outcome measures as well as levels of compliance with the expected practices will be considered as part of the *totality of conditions* of the system.

**APPENDIX 1548**                    **TDCJ 107449**

# Adult Correctional Institutions Conversion Chart

**Third Edition to Fourth Edition and Performance-Based Health Care for ACI**

| | | | | | |
|---|---|---|---|---|---|
| 3-4001 | 4-4001 | 3-4043 | 4-4043 | 3-4084 | 4-4087 |
| 3-4002 | 4-4002 | 3-4044 | 4-4044 | 3-4085 | 4-4088 |
| 3-4003 | 4-4003 | 3-4045 | 4-4045 | 3-4086 | 4-4089 |
| 3-4004 | 4-4004 | 3-4046 | 4-4046 | 3-4087 | 4-4090 |
| 3-4005 | 4-4005 | 3-4047 | 4-4047 | 3-4088 | 4-4091 |
| 3-4006 | 4-4006 | 3-4048 | 4-4048 | 3-4089 | 4-4092 |
| 3-4007 | 4-4007 | 3-4049 | 4-4049 | 3-4090 | 4-4093 |
| 3-4008 | 4-4008 | 3-4050 | 4-4050 | 3-4091 | 4-4094 |
| 3-4009 | 4-4009 | 3-4051 | 4-4051 | 3-4092 | 4-4095 |
| 3-4010 | Deleted | 3-4052 | 4-4052 | 3-4093 | 4-4096 |
| 3-4011 | 4-4010 | 3-4053 | 4-4053 | 3-4094 | 4-4097 |
| 3-4012 | 4-4011 | 3-4053-1 | 4-4054 | 3-4095 | 4-4098 |
| 3-4013 | 4-4012 | 3-4054 | 4-4055 | 3-4096 | 4-4099 |
| 3-4014 | 4-4013 | 3-4054-1 | 4-4056 | 3-4097 | 4-4100 |
| 3-4015 | 4-4014 | 3-4055 | 4-4057 | 3-4098 | 4-4101 |
| 3-4016 | 4-4015 | 3-4056 | 4-4058 | 3-4099 | 4-4102 |
| 3-4017 | 4-4016 | 3-4057 | 4-4059 | 3-4100 | 4-4103 |
| 3-4018 | 4-4017 | 3-4058 | 4-4060 | 3-4101 | 4-4104 |
| 3-4019 | 4-4018 | 3-4059 | 4-4061 | 3-4102 | 4-4105 |
| 3-4020 | 4-4019 | 3-4060 | 4-4062 | 3-4103 | 4-4106 |
| 3-4021 | 4-4020 | 3-4061 | 4-4063 | 3-4104 | 4-4107 |
| 3-4021-1 | 4-4021 | 3-4062 | 4-4064 | 3-4105 | 4-4108 |
| 3-4022 | 4-4022 | 3-4063 | 4-4065 | 3-4106 | 4-4109 |
| 3-4023 | 4-4023 | 3-4064 | 4-4066 | 3-4107 | 4-4110 |
| 3-4024 | 4-4024 | 3-4065 | 4-4067 | 3-4108 | 4-4111 |
| 3-4025 | 4-4025 | 3-4066 | 4-4068 | 3-4109 | 4-4112 |
| 3-4026 | 4-4026 | 3-4067 | 4-4069 | 3-4110 | 4-4113 |
| 3-4027 | 4-4027 | 3-4068 | 4-4070 | 3-4111 | 4-4114 |
| 3-4028 | 4-4028 | 3-4069 | 4-4071 | 3-4112 | 4-4115 |
| 3-4029 | 4-4029 | 3-4070 | 4-4073 | 3-4113 | 4-4116 |
| 3-4030 | 4-4030 | 3-4071 | 4-4074 | 3-4114 | 4-4117 |
| 3-4031 | 4-4031 | 3-4072 | 4-4075 | 3-4115 | 4-4118 |
| 3-4032 | 4-4032 | 3-4073 | 4-4076 | 3-4116 | 4-4119 |
| 3-4033 | 4-4033 | 3-4074 | 4-4077 | 3-4117 | 4-4120 |
| 3-4034 | 4-4034 | 3-4075 | 4-4078 | 3-4118 | 4-4121 |
| 3-4035 | 4-4035 | 3-4076 | 4-4079 | 3-4119 | 4-4122 |
| 3-4036 | 4-4036 | 3-4077 | 4-4080 | 3-4120 | 4-4123 |
| 3-4037 | 4-4037 | 3-4078 | 4-4081 | 3-4121 | 4-4124 |
| 3-4038 | 4-4038 | 3-4079 | 4-4082 | 3-4122 | 4-4125 |
| 3-4039 | 4-4039 | 3-4080 | 4-4083 | 3-4123 | 4-4126 |
| 3-4040 | 4-4040 | 3-4081 | 4-4084 | 3-4124 | 4-4127 |
| 3-4041 | 4-4041 | 3-4082 | 4-4085, 4-4385 | 3-4125 | 4-4128 |
| 3-4042 | 4-4042 | 3-4083 | 4-4086 | 3-4126 | 4-4129 |

**APPENDIX 1549**                              **TDCJ 107450**

## Adult Correctional Institutions Conversion Chart (continued)

| | | | | | |
|---|---|---|---|---|---|
| 3-4127 | 4-4130 | 3-4170 | 4-4177 | 3-4212 | 4-4224 |
| 3-4128 | 4-4131 | 3-4171 | 4-4178 | 3-4213 | 4-4225 |
| 3-4128-1 | 4-4132 | 3-4172 | 4-4179 | 3-4214 | 4-4226 |
| 3-4128-2 | 4-4133 | 3-4173 | 4-4180 | 3-4215 | 4-4227 |
| 3-4129 | 4-4134 | 3-4174 | 4-4181 | 3-4216 | 4-4228 |
| 3-4130 | 4-4135 | 3-4175 | 4-4182 | 3-4217 | 4-4229 |
| 3-4131 | 4-4136 | 3-4176 | 4-4183 | 3-4218 | 4-4230 |
| 3-4132 | 4-4137 | 3-4177 | 4-4184 | 3-4219 | 4-4231 |
| 3-4133 | 4-4138 | 3-4178 | 4-4185 | 3-4220 | 4-4232 |
| 3-4134 | 4-4139 | 3-4179 | 4-4186 | 3-4221 | 4-4233 |
| 3-4135 | 4-4140 | 3-4180 | 4-4187 | 3-4222 | 4-4234 |
| 3-4136 | 4-4141 | 3-4181 | 4-4188 | 3-4223 | 4-4235 |
| 3-4137 | 4-4142 | 3-4182 | 4-4189 | 3-4224 | 4-4236 |
| New | 4-4143 | 3-4183 | 4-4190 | 3-4225 | 4-4237 |
| New | 4-4144 | 3-4183-1 | 4-4191 | 3-4226 | 4-4238 |
| 3-4138 | 4-4145 | 3-4184 | 4-4192 | 3-4227 | 4-4239 |
| 3-4139 | 4-4146 | 3-4185 | 4-4193 | 3-4228 | 4-4240 |
| 3-4140 | 4-4147 | 3-4186 | 4-4194 | 3-4229 | 4-4241 |
| 3-4141 | 4-4148 | 3-4187 | 4-4195 | 3-4230 | 4-4242 |
| 3-4142 | 4-4149 | 3-4188 | 4-4196, 4-4421 | 3-4231 | 4-4243 |
| 3-4143 | 4-4150 | 3-4189 | 4-4197 | 3-4232 | 4-4244 |
| 3-4144 | 4-4151 | 3-4190 | 4-4198 | 3-4233 | 4-4245 |
| 3-4145 | 4-4152 | 3-4191 | 4-4199 | 3-4234 | 4-4246 |
| 3-4146 | 4-4153 | 3-4192 | 4-4200 | 3-4235 | 4-4247 |
| 3-4147 | 4-4154 | 3-4193 | 4-4201 | 3-4236 | 4-4248 |
| 3-4148 | 4-4155 | 3-4194 | 4-4202 | 3-4237 | 4-4249 |
| 3-4149 | 4-4156 | 3-4195 | 4-4203 | 3-42438 | 4-4250 |
| 3-4150 | 4-4157 | 3-4196 | 4-4204 | 3-4239 | 4-4251 |
| 3-4151 | 4-4158 | 3-4197 | 4-4205 | 3-4240 | 4-4252 |
| 3-4152 | 4-4159 | 3-4198 | 4-4206 | 3-4241 | 4-4253 |
| 3-4153 | 4-4160 | 3-4198-1 | 4-4207 | 3-4242 | 4-4254 |
| 3-4154 | 4-4161 | 3-4198-2 | 4-4208 | 3-4243 | 4-4255 |
| 3-4155 | 4-4162 | 3-4198-3 | 4-4209 | 3-4244 | 4-4256 |
| 3-4156 | 4-4163 | 3-4198-4 | 4-4210 | 3-4245 | 4-4257 |
| 3-4157 | 4-4164 | 3-4199 | 4-4211 | 3-4246 | 4-4258, 4-4400 |
| 3-4158 | 4-4165 | 3-4200 | 4-4212 | 3-4247 | 4-4259 |
| 3-4159 | 4-4166 | 3-4201 | 4-4213 | 3-4248 | 4-4260 |
| 3-4160 | 4-4167 | 3-4202 | 4-4214 | 3-4249 | 4-4261 |
| 3-4161 | 4-4168 | 3-4203 | 4-4215 | 3-4250 | 4-4262 |
| 3-4162 | 4-4169 | 3-4204 | 4-4216 | 3-4251 | 4-4263 |
| 3-4163 | 4-4170 | 3-4205 | 4-4217 | 3-4252 | 4-4264 |
| 3-4164 | 4-4171 | 3-4206 | 4-4218 | 3-4253 | 4-4265 |
| 3-4165 | 4-4172 | 3-4207 | 4-4219 | 3-4254 | 4-4266 |
| 3-4166 | 4-4173 | 3-4208 | 4-4220, 4-4388 | 3-4255 | 4-4267 |
| 3-4167 | 4-4174 | 3-4209 | 4-4221 | 3-4256 | 4-4268 |
| 3-4168 | 4-4175 | 3-4210 | 4-4222 | 3-4257 | 4-4269 |
| 3-4169 | 4-4176 | 3-4211 | 4-4223 | 3-4258 | 4-4270 |

**APPENDIX 1550**                    **TDCJ 107451**

## Adult Correctional Institutions Conversion Chart (continued)

| | | | | | |
|---|---|---|---|---|---|
| 3-4259 | 4-4271 | 3-4299 | 4-4318 | 3-4344 | 4-4363 |
| 3-4260 | 4-4272 | 3-4300 | 4-4319 | 3-4344-1 | 4-4363-1 |
| 3-4261 | 4-4273 | 3-4301 | 4-4320 | 3-4345 | 4-4365 |
| 3-4262 | 4-4274 | 3-4302 | 4-4321 | 3-4346 | 4-4366 |
| 3-4263 | 4-4275 | 3-4303 | 4-4322 | 3-4347 | 4-4360 |
| 3-4264 | 4-4276 | 3-4304 | 4-4323 | 3-4348 | 4-4367 |
| 3-4265 | 4-4277 | 3-4305 | 4-4324 | 3-4349 | 4-4372 |
| 3-4266 | 4-4278 | 3-4306 | 4-4325, 4-4380 | 3-4350 | 4-4351 |
| 3-4267 | 4-4279 | 3-4307 | 4-4326 | 3-4351 | 4-4389 |
| 3-4267-1 | 4-4280 | 3-4308 | 4-4327 | 3-4352 | 4-4390 |
| 3-4268 | 4-4281 | 3-4309 | 4-4328 | 3-4353 | 4-4346 |
| 3-4269 | 4-4282 | 3-4310 | 4-4329 | 3-4354 | 4-4352 |
| 3-4270 | 4-4283 | 3-4311 | 4-4330 | 3-4355 | 4-4350 |
| 3-4271 | 4-4284 | 3-4312 | 4-4331 | 3-4356 | 4-4348 |
| 3-4272 | 4-4285 | 3-4313 | 4-4332 | 3-4357 | 4-4359 |
| 3-4273 | 4-4286 | 3-4314 | 4-4333 | 3-4358 | 4-4375 |
| 3-4274 | 4-4287 | 3-4315 | 4-4334 | 3-4359 | 4-4398 |
| 3-4275 | 4-4288 | 3-4316 | 4-4335 | 3-4360 | 4-4348 |
| 3-4276 | 4-4289 | 3-4317 | 4-4336 | 3-4361 | 4-4414 |
| 3-4277 | 4-4290 | 3-4318 | 4-4337 | 3-4362 | 4-4405 |
| 3-4278 | 4-4291 | 3-4319 | 4-4338 | 3-4363 | 4-4361 |
| 3-4279 | 4-4292 | 3-4320 | 4-4339 | 3-4364 | 4-4373 |
| 3-4280 | 4-4293 | 3-4321 | 4-4340 | 3-4365 | 4-4355 |
| 3-4281 | 4-4294 | 3-4322 | 4-4341 | 3-4366 | 4-4354 |
| 3-4282 | 4-4295 | 3-4324 | 4-4342 | 3-4367 | 4-4374 |
| 3-4283 | 4-4296 | 3-4325 | 4-4343 | 3-4368 | 4-4404 |
| 3-4284 | 4-4297 | 3-4326 | 4-4380 | 3-4369 | 4-4399 |
| 3-4285 | 4-4298 | 3-4327 | 4-4381 | 3-4370 | 4-4376 |
| 3-4286 | 4-4299 | 3-4328 | 4-4408 | 3-4371 | 4-4377 |
| 3-4287 | 4-4300 | 3-4328 | 4-4409 | 3-4372 | 4-4397 |
| 3-4288 | 4-4301 | 3-4329 | 4-4424 | 3-4373 | 4-4402 |
| 3-4289 | 4-4302 | 3-4330 | 4-4347 | 3-4374 | 4-4395 |
| 3-4290 | 4-4303 | 3-4331 | 4-4344 | 3-4375 | 4-4425 |
| 3-4291 | 4-4304 | 3-4332 | Deleted | 3-4376 | 4-4413 |
| 3-4292 | 4-4305 | 3-4333 | 4-4427 | 3-4377 | 4-4396 |
| 3-4293 | 4-4306 | 3-4334 | 4-4384 | 3-4378 | 4-4414 |
| 3-4393-1 | 4-4307 | 3-4335 | 4-4382 | 3-4379 | 4-4415 |
| 3-4293-2 | 4-4308 | 3-4336 | 4-4368 | New | 4-4345 |
| 3-4293-3 | 4-4309 | 3-4337 | 4-4369 | New | 4-4349 |
| 3-4293-4 | 4-4310 | 3-4338 | 4-4383 | New | 4-4356 |
| 3-4293-5 | 4-4311 | 3-4339 | 4-4392 | New | 4-4357 |
| 3-4293-6 | 4-4312 | 3-4340 | 4-4393 | New | 4-4358 |
| 3-4294 | 4-4313 | 3-4341 | 4-4378 | New | 4-4359 |
| 3-4295 | 4-4314 | 3-4342 | 4-4378 | New | 4-4364 |
| 3-4296 | 4-4315 | 3-4342-1 | 4-4401 | New | 4-4370 |
| 3-4297 | 4-4316 | 3-4343 | 4-4362 | New | 4-4371 |
| 3-4298 | 4-4317 | 3-4343-1 | 4-4353 | New | 4-4379 |

**APPENDIX 1551**                    **TDCJ 107452**

## Adult Correctional Institutions Conversion Chart (continued)

| | | | | | |
|---|---|---|---|---|---|
| New | 4-4382 | 3-4402 | 4-4456 | 3-4444 | 4-4502 |
| New | 4-4386 | 3-4403 | 4-4457 | 3-4445 | 4-4503 |
| New | 4-4387 | 3-4404 | 4-4458 | 3-4446 | 4-4504 |
| New | 4-4391 | 3-4405 | 4-4459 | 3-4447 | 4-4505 |
| New | 4-4394 | 3-4406 | 4-4460 | 3-4448 | 4-4506 |
| New | 4-4403 | 3-4407 | 4-4461 | 3-4449 | 4-4507 |
| New | 4-4406 | 3-4408 | 4-4462 | 3-4450 | 4-4508 |
| New | 4-4407 | 3-4409 | 4-4463 | 3-4451 | 4-4509 |
| New | 4-4410 | 3-4410 | 4-4464 | 3-4452 | 4-4510 |
| New | 4-4411 | 3-4410-1 | 4-4465 | 3-4453 | 4-4511 |
| New | 4-4412 | 3-4411 | 4-4466 | 3-4454 | 4-4512 |
| New | 4-4416 | 3-4412 | 4-4467 | 3-4455 | 4-4513 |
| New | 4-4417 | 3-4412-1 | 4-4468 | 3-4456 | 4-4514 |
| New | 4-4418 | 3-4413 | 4-4469 | 3-4457 | 4-4515 |
| New | 4-4419 | 3-4414 | 4-4470 | 3-4458 | 4-4516 |
| New | 4-4420 | 3-4415 | 4-4471 | 3-4459 | 4-4517 |
| New | 4-4422 | 3-4416 | 4-4472 | 3-4460 | 4-4518 |
| New | 4-4423 | 3-4417 | 4-4473 | 3-4461 | 4-4519 |
| New | 4-4426 | 3-4418 | 4-4474 | 3-4462 | 4-4520 |
| 3-4380 | 4-4428 | 3-4418-1 | 4-4475 | 3-4463 | 4-4521 |
| 3-4380-1 | 4-4429 | 3-4419 | 4-4476 | | |
| 3-4381 | 4-4430 | 3-4420 | 4-4477 | | |
| 3-4382 | 4-4431 | 3-4421 | 4-4478 | | |
| 3-4383 | 4-4432 | 3-4422 | 4-4479 | | |
| 3-4384 | 4-4433 | 3-4422-1 | 4-4480 | | |
| 3-4385 | 4-4434 | 3-4423 | 4-4481 | | |
| 3-4386 | 4-4435 | 3-4424 | 4-4482 | | |
| 3-4387 | 4-4436 | 3-4425 | 4-4483 | | |
| 3-4388 | 4-4437 | 3-4426 | 4-4484 | | |
| 3-4388-1 | 4-4438 | 3-4427 | 4-4485 | | |
| 3-4388-2 | 4-4439 | 3-4428 | 4-4486 | | |
| 3-4388-3 | 4-4440 | 3-4429 | 4-4487 | | |
| 3-4388-4 | 4-4441 | 3-4430 | 4-4488 | | |
| 3-4389 | 4-4442 | 3-4431 | 4-4489 | | |
| 3-4390 | 4-4443 | 3-4432 | 4-4490 | | |
| 3-4391 | 4-4444 | 3-4433 | 4-4491 | | |
| 3-4392 | 4-4445 | 3-4434 | 4-4492 | | |
| 3-4393 | 4-4446 | 3-4435 | 4-4493 | | |
| 3-4393-1 | 4-4447 | 3-4436 | 4-4494 | | |
| 3-4394 | 4-4448 | 3-4437 | 4-4495 | | |
| 3-4395 | 4-4449 | 3-4438 | 4-4496 | | |
| 3-4396 | 4-4450 | 3-4439 | 4-4497 | | |
| 3-4397 | 4-4451 | 3-4440 | 4-4498 | | |
| 3-4398 | 4-4452 | 3-4441-1 | 4-4499 | | |
| 3-4399 | 4-4453 | 3-4441 | 4-4499-1 | | |
| 3-4400 | 4-4454 | 3-4442 | 4-4500 | | |
| 3-4401 | 4-4455 | 3-4443 | 4-4501 | | |

**APPENDIX 1552**                **TDCJ 107453**

# Adult Correctional Institutions Conversion Chart

**Performance-Based Health Care for ACI**

| PBHC | 3rd Edition | 4th Edition |
|------|-------------|-------------|
| 1-HC-1A-01 | 3-4331 | 4-4344 |
| 1-HC-1A-02 | New | 4-4345 |
| 1-HC-1A-03 | 3-4353 | 4-4346 |
| 1-HC-1A-04 | 3-4330 | 4-4347 |
| 1-HC-1A-05 | 3-4356, 3-4360 | 4-4348 |
| 1-HC-1A-06 | New | 4-4349 |
| 1-HC-1A-07 | 3-4355 | 4-4350 |
| 1-HC-1A-08 | 3-4350 | 4-4351 |
| 1-HC-1A-09 | 3-4354 | 4-4352 |
| 1-HC-1A-10 | 3-4343-1 | 4-4353 |
| 1-HC-1A-11 | 3-4366 | 4-4354 |
| 1-HC-1A-12 | 3-4365 | 4-4355 |
| 1-HC-1A-13 | New | 4-4356 |
| 1-HC-1A-14 | New | 4-4357 |
| 1-HC-1A-15 | New | 4-4358 |
| 1-HC-1A-16 | 3-4357 | 4-4359 |
| 1-HC-1A-17 | 3-4347 | 4-4360 |
| 1-HC-1A-18 | 3-4363 | 4-4361 |
| 1-HC-1A-19 | 3-4343 | 4-4362 |
| 1-HC-1A-20 | 3-4344 | 4-4363 |
| 1-HC-1A-21 | New | 4-4364 |
| 1-HC-1A-22 | 3-4345 | 4-4365 |
| 1-HC-1A-23 | 3-4346 | 4-4366 |
| 1-HC-1A-24 | 3-4348 | 4-4367 |
| 1-HC-1A-25 | 3-4336 | 4-4368 |
| 1-HC-1A-26 | 3-4337 | 4-4369 |
| 1-HC-1A-27 | New | 4-4370 |
| 1-HC-1A-28 | New | 4-4371 |
| 1-HC-1A-29 | 3-4349 | 4-4372 |
| 1-HC-1A-30 | 3-4364 | 4-4373 |
| 1-HC-1A-31 | 3-4367 | 4-4374 |
| 1-HC-1A-32 | 3-4358 | 4-4375 |
| 1-HC-1A-33 | 3-4370 | 4-4376 |
| 1-HC-1A-34 | 3-4371 | 4-4377 |
| 1-HC-1A-35 | 3-4341, 3-4342 | 4-4378 |
| 1-HC-1A-36 | New | 4-4379 |
| 1-HC-2A-01 | 3-4326 | 4-4380 |
| 1-HC-2A-02 | 3-4327 | 4-4381 |
| 1-HC-2A-03 | 3-4335 | 4-4382 |
| 1-HC-2A-04 | 3-4338 | 4-4383 |
| 1-HC-2A-05 | 3-4334 | 4-4384 |
| 1-HC-2A-08 | 3-4082 | 4-4385 |
| 1-HC-2A-09 | New | 4-4386 |
| 1-HC-2A-10 | New | 4-4387 |
| 1-HC-2A-13 | 3-4208 | 4-4388 |

**APPENDIX 1553**                                      **TDCJ 107454**

## Adult Correctional Institutions Conversion Chart (continued)

| | | |
|---|---|---|
| 1-HC-2A-14 | 3-4351 | 4-4389 |
| 1-HC-2A-15 | 3-4352 | 4-4390 |
| 1-HC-2A-16 | New | 4-4391 |
| 1-HC-2A-17 | 3-4339 | 4-4392 |
| 1-HC-2A-18 | 3-4340 | 4-4393 |
| 1-HC-3A-01 | New | 4-4394 |
| 1-HC-3A-02 | 3-4374 | 4-4395 |
| 1-HC-3A-03 | 3-4377 | 4-4396 |
| 1-HC-3A-04 | 3-4372 | 4-4397 |
| 1-HC-3A-05 | 3-4359 | 4-4398 |
| 1-HC-3A-06 | 3-4369 | 4-4399 |
| 1-HC-3A-07 | 3-4246 | 4-4400 |
| 1-HC-3A-08 | 3-4342-1 | 4-4401 |
| 1-HC-3A-09 | 3-4373 | 4-4402 |
| 1-HC-3A-10 | New | 4-4403 |
| 1-HC-3A-11 | 3-4368 | 4-4404 |
| 1-HC-3A-12 | 3-4362 | 4-4405 |
| 1-HC-3A-13 | New | 4-4406 |
| 1-HC-3A-14 | New | 4-4407 |
| 1-HC-4A-01 | 3-4328 | 4-4408 |
| 1-HC-4A-02 | 3-4328 | 4-4409 |
| 1-HC-4A-03 | New | 4-4410 |
| 1-HC-4A-04 | New | 4-4411 |
| 1-HC-4A-05 | New | 4-4412 |
| 1-HC-4A-06 | 3-4376 | 4-4413 |
| 1-HC-4A-07 | 3-4361, 3-4378 | 4-4414 |
| 1-HC-4A-08 | 3-4379 | 4-4415 |
| 1-HC-5A-04 | New | 4-4416 |
| 1-HC-5A-07 | New | 4-4417 |
| 1-HC-5A-06 | New | 4-4418 |
| 1-HC-5A-10 | New | 4-4419 |
| 1-HC-6A-01 | New | 4-4420 |
| 1-HC-6A-02 | 3-4188 | 4-4421 |
| 1-HC-7A-01 | New | 4-4422 |
| 1-HC-7A-02 | New | 4-4423 |
| 1-HC-7A-03 | 3-4329 | 4-4424 |
| 1-HC-7A-05 | 3-4375 | 4-4425 |
| 1-HC-7A-08 | New | 4-4426 |
| 1-HC-7A-09 | 3-4333 | 4-4427 |

**APPENDIX 1554**                    **TDCJ 107455**

# Summary of Mandatory Expected Practices

**Totals of Weights**

| Category | Number |
|---|---|
| Mandatory Standards/Expected Practices | 63 |
| Nonmandatory Expected Practices | 458 |

**Summary of Mandatory Standards/Expected Practices**

| | | | | |
|---|---|---|---|---|
| • 4-4091 | • 4-4214 | • 4-4329 | • 4-4363 | • 4-4389 |
| • 4-4092 | • 4-4215 | • 4-4330 | • 4-4365 | • 4-4396 |
| • 4-4124 | • 4-4220 | • 4-4331 | • 4-4368 | • 4-4397 |
| • 4-4191 | • 4-4221 | • 4-4332 | • 4-4370 | • 4-4400 |
| • 4-4195 | • 4-4222 | • 4-4344 | • 4-4371 | • 4-4401 |
| • 4-4196 | • 4-4224 | • 4-4351 | • 4-4373 | • 4-4402 |
| • 4-4203 | • 4-4281 | • 4-4353 | • 4-4376 | • 4-4405 |
| • 4-4204 | • 4-4306 | • 4-4354 | • 4-4378 | • 4-4410 |
| • 4-4205 | • 4-4316 | • 4-4356 | • 4-4380 | • 4-4411 |
| • 4-4206 | • 4-4318 | • 4-4357 | • 4-4381 | • 4-4421 |
| • 4-4211 | • 4-4321 | • 4-4358 | • 4-4382 | • 4-4455 |
| • 4-4212 | • 4-4322 | • 4-4359 | • 4-4384 | |
| • 4-4213 | • 4-4324 | • 4-4362 | • 4-4388 | |

**APPENDIX 1555**                    **TDCJ 107456**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 57

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and          )
SANDRA McCOLLUM,              )
individually and as          )
independent administrator    )
of the Estate of LARRY       ) Civil Action
GENE McCOLLUM,               )
                             ) Number 4:14-CV-3253
                             )
          Plaintiffs,        )
                             )
vs.                          )
                             )
                             )
BRAD LIVINGSTON, JEFF        )
PRINGLE, RICHARD CLARK,      )
KAREN TATE, SANDREA          )
SANDERS, ROBERT EASON,       )
THE UNIVERSITY OF TEXAS      )
MEDICAL BRANCH and THE       )
TEXAS DEPARTMENT OF          )
CRIMINAL JUSTICE,            )
                             )
          Defendants.        )


-----------------------------------------------------


ORAL AND VIDEOTAPED DEPOSITION OF

BRYAN COLLIER

MARCH 30, 2016


-----------------------------------------------------

Bryan Collier - 3/30/2016

11

1   CMHCC, I would look to AD 10.64 at the relevant

2   time, and I would look to whatever training was done

3   with the staff and then whatever posters were put up

4   for the inmates?

5       A.   I think -- if you're looking for -- and I

6   think what you're describing would be specific

7   written materials related to it.  And I believe that

8   answer would be yes.

9       Q.   Okay.  Why don't you insist that the

10  inmates at the units receive actual personalized

11  training every summer?

12      A.   We provide for offenders -- we do provide

13  written notice for offenders, not only in the ECHO,

14  which is the prison newspaper, but also posted

15  within housing areas and other areas of the unit,

16  things that they need to be reminded about about

17  heat protocol.

18              In addition to that, we are -- we

19  have a heat video that is provided to offenders as

20  they are arriving at units, that they watch as part

21  of their orientation to the intake process.

22              We also are in the process now of

23  developing a peer-education component that will be

24  delivered this summer specifically for offenders by

25  peer educators within the system.

Bryan Collier - 3/30/2016

24

1      A.    Level of effort.

2      Q.    **What does -- that's not what easy means.**

3  **Easy means that you can do it.  Okay?  Or you can do**

4  **it with little to no effort on your part.  You with**

5  **me?**

6      A.    Yes, sir.

7      Q.    **Okay.  Would it have been easy to have**

8  **instituted the wellness check program prior to 2012?**

9      A.    It could have been done earlier prior to

10  2012.

11      Q.    **Why wasn't it?**

12      A.    I don't think we identified the gap until

13  2011.

14      Q.    **What gap are you talking about?**

15      A.    The gap specifically that an officer on a

16  wing in a housing area would know they have

17  offenders who may be vulnerable, but at the same

18  time they did not necessarily know which specific

19  offenders that they may need to be doing additional

20  checks on.

21      Q.    **What happened that enabled you to see this**

22  **gap in 2012?**

23      A.    In August of 2011, we began to see

24  suspected heat-related deaths.  At the same time we

25  saw an unprecedented number of consecutive hot days

Bryan Collier - 3/30/2016

25

1   in the midst of a very hot summer and drought.

2                    Based upon all that essentially

3   coming at one time, in August, Mr. Livingston asked

4   if we would collectively get together, me, several

5   key division directors, and try to identify, are we

6   doing everything we possibly can to address this

7   issue.

8        Q.   Who were the division directors?

9        A.   Would have been Mr. Thaler; would have

10   been Dr. Linthicum; I believe Frank Inmon, the

11   facilities division director.

12        Q.   That meeting, to the best of your recall,

13   happened in early August 2011?

14        A.   In August of 2011.

15        Q.   Do you know when in August 2011?

16        A.   I've seen the e-mail and I believe -- I

17   can't remember the exact date.

18        Q.   Okay.  Did Mr. Livingston -- well, do you

19   know if Mr. Livingston, prior to that meeting,

20   believed that TDCJ was doing all it could to deal

21   with the extreme heat that was going on that summer?

22        A.   I believe we all felt that our mitigation

23   efforts were providing the level of cover that we

24   needed based upon past history.

25        Q.   The level of cover you needed based on

1      Q.   Okay.  Have you ever -- has the agency

2   ever collectively reviewed all of the heat-related

3   illnesses and deaths in any manner and put together

4   a report?

5      A.   I'm not aware of a specific report.  I am

6   aware of -- that several components of the agency

7   may review specific information related to

8   heat-related incidents.  I'm also aware that in 2011

9   we looked at incidents that were occurring in 2011

10  so that we could try to take some immediate steps if

11  we needed to.

12            We also do a heat protocol meeting.

13  We do several steps that may be based on a review or

14  include portions of a review.

15     Q.   Okay.  So what I heard you say was, you

16  know, after a meeting in -- sometime in August 2011,

17  you took some immediate steps?

18     A.   In --

19     Q.   And that could constitute a review of

20  sorts.  Is that what you're saying?

21     A.   I would say what we did in 2011 was

22  absolutely a review of what was occurring at that

23  time.  What I'm --

24     Q.   Did you produce a report about that

25  review?

Bryan Collier - 3/30/2016

102

1    housing area?

2         A.   I believe it can, yes, sir.

3         Q.   Okay.  It can or it can't, right,

4    depending on the outside temperature?

5         A.   I don't know if it can or can't.  I know

6    that --

7         Q.   Tell me how it can.

8         A.   By taking warmer air, if there's warmer

9    air within the dorm, exhausting that air out and

10   bringing in fresh air.

11        Q.   And if the fresh air is as hot or hotter

12   than the air that's being exhausted, do you believe

13   that that somehow reduces the temperature?

14        A.   I'm not a temperature expert, but yes --

15        Q.   No, but you're partially running a Texas

16   prison system where lots of people have died.

17        A.   The mitigation --

18        Q.   So maybe you ought to know this one.

19                  MS. BURTON:  Objection to the

20   side-bar.  Argumentative question.

21                  MR. EDWARDS:  It's not a side-bar.

22        Q.   (BY MR. EDWARDS)  Don't you think you

23   should know the answer to this question, sir?

24        A.   The mitigation efforts that we have in

25   place are targeting the individual's temperature.

Bryan Collier - 3/30/2016

103

1   So we're trying to cool the offender's temperature.

2                   You're talking specifically about the

3   housing area, and I understand that.  And I'm not,

4   again, a temperature expert.  But the efforts that

5   we have in place are trying to lower the offender's

6   temperature, so their individual temperature is what

7   could help them deal with that temperature.

8        Q.   Okay.  Is it your testimony that the Texas

9   Department of Criminal Justice's mitigation measures

10  are designed to lower individual people's

11  temperatures during the summer months?

12       A.   I think that staying --

13       Q.   That's what you said, so I just want to be

14  crystal clear.  Is that what you meant?

15       A.   Staying hydrated, taking breaks, dealing

16  with extreme temperatures, the things we have

17  outlined within those protocols, target trying to

18  ensure that offenders can adequately deal with the

19  temperatures that they're addressed with.

20                  That would include things that help

21  lower their temperature, help make them more

22  comfortable and more able to tolerate the heat

23  within the facility.

24       Q.   What measures do you contend on behalf of

25  TDCJ lower offenders' temperatures?

Bryan Collier - 3/30/2016

104

1    A.    Respite areas would be one of the most

2  obvious, wearing shorts in dayroom and housing

3  areas.

4    **Q.    Okay.**

5    A.    Being able to consume ice water, being

6  able to take frequent showers, being able to stand

7  in front of a fan if they're perspiring, which will

8  help lower their body temperature.

9    **Q.    Okay.  So just so I'm clear, before we get**

10 **back to the reducing the temperature, your**

11 **understanding is that respite areas actually lower**

12 **the temperature of the inmates?**

13   A.    Yes, sir, I would believe that's fair.  I

14 would say it makes them more comfortable.  I haven't

15 taken a temperature reading of that specific

16 offender.  But it would be something to help ensure

17 that they can address the heat.  Getting out of that

18 is one of the ways you would do that.  The respite

19 area provides them a cooler environment to rest

20 before they go back into that area.

21   **Q.    Is it your testimony that wearing shorts**

22 **reduces the temperature of inmates?**

23   A.    Wearing shorts is one of the things you

24 can do to help be more comfortable and potentially

25 lower your body temperature.

Bryan Collier - 3/30/2016

105

1      Q.   Okay.  So we've got respite areas and

2  shorts lowering the body temperature.  Ice --

3  drinking water and ice water, that would also lower

4  the body temperature, according to the TDCJ?

5      A.   Those are measures --

6               MS. BURTON:  Objection.  If --

7  misstates his capacity.

8      Q.   (BY MR. EDWARDS)  According to you?

9      A.   Staying hydrated would be one of the steps

10  you take to mitigate high temperature.

11      Q.   That's not my question, though.

12               Do you believe that drinking water or

13  ice water lowers a person's temperature?

14      A.   I believe that drinking ice water is one

15  of the steps you can take to help mitigate your body

16  temperature.

17      Q.   So does that mean, yes, it would lower

18  your body temperature?

19      A.   I'm not saying if it lowers it.  I'm

20  saying it may prevent it from raising.  But I'm

21  saying it is one of the ways you try to be

22  comfortable within that heat.  Staying hydrated is

23  important.

24      Q.   Is it your understanding that taking

25  showers reduces a person's temperature?

Bryan Collier - 3/30/2016

180

1    Right?

2         A.   Yes, sir.

3         Q.   Okay.  Do you know what the word

4    "imminent" means?

5         A.   Yes, sir.

6         Q.   What does it mean?

7         A.   Immediate.

8         Q.   Okay.  Would it concern you if a warden

9    thought it meant possible?

10        A.   It would depend on the context of the

11   warden's discussion.

12        Q.   What do you mean by heatstroke imminent?

13             It means that it's possible.

14             Would that concern you?

15        A.   No, sir.

16        Q.   Oh, okay.  Wouldn't concern you that a

17   warden had a just totally incorrect interpretation

18   of the word imminent?

19        A.   The policy and the language that you're

20   talking about talks about steps we take when

21   temperatures get to that level.  It certainly

22   doesn't mean that anyone exposed to that temperature

23   immediately has a heatstroke.  If that's the context

24   of the warden's response, then, no, I wouldn't have

25   an issue with that.

Bryan Collier - 3/30/2016

245

1   Legislature and list that item as an item that we

2   needed to have funding for.

3        Q.   Anything preventing you from doing that?

4        A.   We identify as we go into legislative

5   session, our request for maintenance dollars.  We

6   also identify the request for maintenance projects.

7             I'm not aware of a project being

8   involved in -- currently, that includes

9   air-conditioning a facility where that doesn't

10  exist.

11       Q.   Okay.  But it's certainly possible.  All

12  you have to do is tell the Legislature you'd like to

13  do it and then get board approval.  Right?

14       A.   No, sir.  Not nearly that simple.

15       Q.   Help me out, because it sure seems that

16  simple.

17       A.   Certainly is not that simple.  What would

18  happen is, if we identified a maintenance need to

19  add air-conditioning to an existing facility, we

20  have a list of maintenance projects that probably

21  total in the neighborhood of three to four hundred

22  million dollars at any given time.

23       Q.   Okay.

24       A.   We get and typically have gotten between

25  40 and 80 million dollars a biennium to do as many

Bryan Collier - 3/30/2016

246

1   of those projects as that money will go.

2        Q.   Okay.

3        A.   So we're certainly not funded for all of

4   those items.

5        Q.   But you're --

6        A.   They are prioritized based on what we see

7   as the most imminent need items that we're facing.

8             MS. BURTON:   Wait.  Let him finish.

9        Q.   (BY MR. EDWARDS)  Are you telling me that

10  you're funded for 40 million to 80 million dollars a

11  biennium for maintenance projects?

12       A.   Typically, yes, sir.

13       Q.   Okay.  How many people died, to your

14  knowledge, as a consequence of the less than

15  adequate kitchen floor at the Pack Unit?

16       A.   I'm not aware of any offender dying

17  specifically related to the floor.  But I do know if

18  we weren't able to feed at the Pack Unit, that would

19  become an immediate operational issue for the entire

20  unit population.

21       Q.   Right.  So how many people died as a

22  consequence of this less than adequate kitchen floor

23  at the Pack Unit?

24       A.   Less than adequate oversimplifies the

25  issues with the floor.  You're talking about a floor

1    say, you know what, if we could do it for this, then

2    I would consider it?

3        A.   If the collective -- if the agency felt

4    that air-conditioning was what we felt like we had

5    to do, and we felt like that's the only way we can

6    address this issue, regardless of the cost, we could

7    move that issue forward with a discussion with the

8    Legislature.  That may or may not lead to a

9    discussion further if it's funded.

10        Q.   So cost, really, from -- from what you're

11    telling me, the cost, whether it's one dollar or a

12    billion dollars, really is irrelevant; it's just a

13    question of is it needed and is it beneficial?

14        A.   No, sir.  It's a -- what I'm trying to get

15    across -- and I may not be doing it very well.

16        Q.   Fair enough.  I may not be listening well.

17        A.   Is that the cost being likely very, very

18    high, puts it out of solutions that we could easily

19    add, change within the agency.

20                 It's a much more complex issue than

21    just TDCJ wants to air-condition a unit.

22                 If we chose, as an agency, based on

23    our collective discussions, evaluations, felt like

24    that's what we needed to do, then we could have that

25    discussion further, outside of the agency, is what

Bryan Collier - 3/30/2016

253

1    I'm saying.

2         Q.   Okay.  If you chose to just air-condition,

3    say, half the Gurney Unit, that's not a

4    billion-dollar project.  Right?

5         A.   I doubt it.

6         Q.   Well, okay.  That's where three people

7    have died.  You are aware of that.  Right?

8         A.   I am aware, based on our discussion, yes,

9    sir.

10        Q.   Okay.  $10 million, which I think is much

11   higher than it probably would be, but let's just use

12   $10 million.  That's something that could fit within

13   your 40 to 80 million dollar stuff.  Right?

14        A.   If it were an item -- every project that

15   we have that we get funding for, in other words, the

16   40 or 80 million we receive from the Legislature, is

17   tied back to, specifically, items that we have

18   provided information to the Legislature on needing

19   to be funded.

20        Q.   Got you.

21        A.   So we would have to have told the

22   Legislature that we want that item funded and then

23   have that item be funded before we could proceed.

24        Q.   And if it's under a million dollars, Brad

25   Livingston can okay it on his own.  Right?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL NO. 4:14-CV-3253 |
| | § | |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 58

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION


STEPHEN MCCOLLUM, STEPHANIE    )

KINGREY, and SANDRA McCOLLUM,  )

individually and as heirs at   )

law to the Estate of LARRY GENE)

McCOLLUM,                       )

    Plaintiffs,                 )

                           )

vs.                             )    CIVIL ACTION NO.

                           )    3:12-CV-02037

BRAD LIVINGSTON, JEFF PRINGLE, )

AND THE TEXAS DEPARTMENT OF    )

CRIMINAL JUSTICE,               )

    Defendants.                 )

**********************************************************

    ORAL AND VIDEOTAPED RULE 30(B)(6) DEPOSITION OF

 THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE (ROBERT EASON)

MARCH 26, 2013

**********************************************************

    ORAL RULE 30(B)(6) DEPOSITION OF THE TEXAS

DEPARTMENT OF CRIMINAL JUSTICE (ROBERT EASON), produced as

a witness at the instance of the Plaintiffs and duly

sworn, was taken in the above-styled and numbered cause on

the 26th day of March, 2013, from 9:42 a.m. to 12:00 noon

and 1:05 p.m. to 6:39 p.m., before Kathleen Nevils,

Certified Shorthand Reporter in and for the State of

Texas, reported by computerized stenotype machine at the

offices of the Attorney General, 300 West 15th St.,

Austin, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                            March 26, 2013

```
 1  night --
 2      Q.    I understand that.  My question, sir, is:  Do
 3  you think, as the corporate representative of Texas
 4  Department of Criminal Justice, that it is okay to not
 5  call 911 or get an ambulance -- the process started for a
 6  half hour after it has been determined that an inmate is
 7  in need of emergency medical care?
 8      A.    I tell you this:  They -- again, I wasn't there.
 9  I can't testify to what they were dealing with, what they
10  were assessing at the time.  My understanding of the
11  situation is is that Mr. McCollum, when he was discovered,
12  was having a seizure.  And of course I wasn't here during
13  the depositions of the sergeant and the lieutenant, but my
14  understanding is they said he was having a seizure.  He
15  had an open airway; he was breathing; he had a pulse.
16           And seizures are very common in an
17  institutional setting.  They occur all the time.  When
18  I -- I started as a CO, came up through the ranks.  Every
19  facility I've worked on have a lot of offenders that have
20  seizures, and at some point they'll come out of that
21  seizure and we take them to medical.  Sometimes they stay
22  in the medical department, they're observed for a while
23  and they don't leave the facility by 911.
24           And at the Hutchins Unit, they deal with
25  seizures quite often, and that's -- that's -- that's
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1573**

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                   February 15, 2013

1      A      Being at the Hutchins Unit, yes.

2      Q      Okay.  All right.  Does anyone have

3   responsibility for monitoring the inmates in the dorm

4   areas to see how they're doing?

5      A      The officers have a responsibility for

6   monitoring dorm areas; and during their inspections,

7   they would observe the dorm activity.

8      Q      Okay.  So I want to present you with a

9   situation.  I want -- I just want to figure out how --

10  let's say there's an inmate who's not eating and just

11  staying in bed all the time.  Should the correctional

12  officers recognize that?  Or what should happen based on

13  your experience as a supervisor at the Hutchins Unit?

14             MR. GARCIA:  Objection; speculation and

15  incomplete hypothetical.

16             Answer if you can.

17     A      The officers work eight hours and 45-minute

18  shifts.  Each shift only has one mealtime during their

19  activities, so they wouldn't be aware of which offenders

20  go or not go that I'd -- that I would assume.

21     Q      (BY MR. EDWARDS)  So is there -- if an inmate

22  is continually not eating, is there any policy or

23  practice in place to try to determine why an inmate's

24  not eating?

25     A      There's not a policy in place, per se, that

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

**APPENDIX 1574**

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                 March 26, 2013

 1 | at Robertson from September of '05 until September of '09.

 2 |            I was promoted to regional director in

 3 | Region IV in Beeville.  Was regional director -- so I was

 4 | regional director down there for approximately a year.

 5 | The regional director in Region II retired and I called

 6 | and asked my director if I could transfer to Region II to

 7 | live a little closer to home.  He said "Absolutely."

 8 |            I transferred to Region II as the regional

 9 | director and I've been the Region II director since end of

10 | September of 2010.

11 |    Q.    How long have you been in the position of

12 | regional director, though, sir?

13 |    A.    Let's see.  Would be four years in September,

14 | so...

15 |    Q.    Okay.  Tell me or tell the jury basically what

16 | the -- what the responsibilities and duties of a regional

17 | director are.

18 |    A.    Okay.  Basically I'm responsible for managing a

19 | regional budget of $30 million.  I have 11 wardens and 13

20 | facilities I'm responsible for.  I have approximately

21 | almost 900 non-security employees in the region and I have

22 | somewhere around 5400 correctional officers.  That's COs

23 | and ranking officers that work in my region.  I'm

24 | responsible for conducting employee mediations.  I'm

25 | responsible for the general operations of the regional

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1575**

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   office.  I'm responsible for visiting the facilities as

2   much as -- much as I can.  I'm responsible for

3   coordinating all our security audits in the region, and

4   there are some facilities that require a security audit

5   every year, and there are some facilities that require

6   security audits every two years.

7        Q.    Tell the jury -- and I don't mean to interrupt

8   you, but tell the jury, when you say "security audit," I

9   know you know what that means, and I may even sort of know

10  what it means, but if you could tell the jury what you're

11  talking about so they get a fuller understanding of your

12  job.

13       A.    It's a -- it's a very comprehensive in-depth

14  audit in every part of our facility, whether perimeter

15  security, back-gate procedures, cell block procedures,

16  count procedures or security procedures in our food

17  service departments, laundry departments.  There's a check

18  list that we use to make sure that we're following our

19  security policies and procedures, all the security

20  memorandums and that the officers are following their post

21  orders.

22       Q.    And is that generally to make -- to make

23  everybody feel safer, that, look, everybody is doing the

24  job to make sure that people aren't escaping from prisons?

25       A.    Absolutely.  It's to make sure that we're

**WRIGHT WATSON & ASSOCIATES**

(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1576**

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                        March 26, 2013

1  following our security procedures, that we're providing

2  the public safety that we're -- so we can say, "Hey, we're

3  doing what we're supposed to be doing.  We're following

4  our policies and procedures in our security memorandum."

5      Q.   Okay.  I kind of may have cut you off when you

6  were going through a bit of a list, but when you said

7  conducting employee mediations, visiting facilities,

8  coordinating security audits, please continue if there's

9  any other big aspect to your job.

10      A.   We -- of course, all of our facilities go

11  through the American Correctional Association audit

12  process, and that process is conducted every three years

13  on my facilities, and I'm responsible for making sure the

14  units get ready or they're prepared for that -- that

15  in-depth audit process because the auditors are

16  correctional professionals from all over the nation that

17  would come in and audit what we're doing on our facility.

18  And so it's my responsibility to make sure that the warden

19  has got the facility ready.

20            I put teams together and we conduct

21  walk-throughs on the facility to check, you know, security

22  operations, food service operations.  I've got a

23  monitoring and standards employee that works for me in the

24  office.  He goes in and looks at all the ACA standards

25  that we have to meet on the facility, to make sure the

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1577**

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                     March 26, 2013

1      A.    I believe I'm right on that.

2      Q.    Why do -- what's the point of having formal

3  policies like 10.64?  Why not just shoot off an e-mail?

4      A.    The policy for 10.64 is just to make sure

5  that -- that we are taking all the steps to mitigate the

6  heat in a working environment, and it's the same thing

7  as -- as an e-mail.  An e-mail is -- we consider an e-mail

8  a policy, instructions, and we follow an e-mail from the

9  director just like we'd follow any other policy.

10     Q.    Got you.  Who does the -- who does the e-mail

11 come from?  Is that Director Livingston or Director Thaler

12 or Director Stephens or --

13     A.    It comes from Mr. Stephens and Mr. Thaler.

14     Q.    So is it your testimony that, yes, we have a

15 formal policy, 10.64, for dealing with heat temperatures

16 in the workplace and we also have a policy for dealing

17 with extreme heat temperatures inside?  It just comes in

18 the form of an administrative e-mail once a year?

19     A.    Yes, sir.

20     Q.    And is it your testimony on behalf of TDCJ that

21 that e-mail instructs wardens that they have a duty to

22 take all steps necessary to mitigates extreme heat inside

23 their facilities?

24     A.    Yes, sir, within --

25     Q.    And if --

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                         March 26, 2013

1        A.     I'm sorry.

2        Q.     If wardens do not take all steps necessary to

3   mitigate heat inside their facilities, in particular their

4   housing areas, what are the consequences?

5        A.     If I may ask a question, can you -- what steps

6   are we talking about that the wardens are not taking?

7   Because to my knowledge, all the wardens in my region and

8   across the state are following that directive and they're

9   doing everything absolutely possible to mitigate the heat.

10       Q.     Okay.  There seems -- let me -- there seems to

11  be some confusion, and if your lawyer thinks I'm speaking

12  out of turn, I'm sure he'll tell me.  But when I am asking

13  you questions, I'm doing my best to just try and figure

14  out what it is is the policy, the practice at TDCJ, okay?

15  Some of my questions will be, well, what if this.  It

16  doesn't mean that it's going on.  It doesn't mean that I'm

17  asking a specific question about the Hutchins Unit or some

18  other unit.  Okay?  So if you could -- and, sir, I say

19  this respectfully -- try to do your best to just answer

20  the particular question I'm asking.  The depo will go, I

21  think -- I think, more quickly, I think.

22              And so my question is basically:  Well, if

23  the wardens aren't taking all the steps necessary to

24  mitigate extreme heat inside the facilities -- okay? --

25  that I suppose are delineated on that administrative

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1579**

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   e-mail?  What would the consequences be?

2        A.    The consequences would be as regional director

3   stepping in and correcting the issue.

4        Q.    Okay.  Well, then I guess what steps does -- has

5   that administrative e-mail been going out since 2009?

6        A.    Yes, sir.

7        Q.    Okay.  Has it changed at all since 2009?

8        A.    Not much.  I can't -- I can't sit here and tell

9   you every little change on the e-mail, but it's -- I can't

10  remember any huge changes.

11       Q.    Okay.  Since 2009, when you stepped into your

12  job as regional director, it's your -- it's your

13  understanding that, look, TDCJ has considered extreme heat

14  temperatures inside its facilities, inside its housing

15  areas to be something that it needs to take steps to

16  mitigate the heat during the summer months; is that fair?

17       A.    Yes.

18       Q.    Okay.  Roughly, since 2009, maybe -- maybe

19  earlier, but you know from 2009 an administrative e-mail

20  has gone out instructing all wardens that they do in fact

21  need to take steps to mitigate the heat inside the housing

22  areas, correct?

23       A.    Yes.

24       Q.    Okay.  That administrative e-mail, has that

25  given specific instructions as to what they need to do in

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1580**

59

Stephen McCollum, et al v.                            Robert Eason
Brad Livingston, et al.                            March 26, 2013

1   order to mitigate the heat or is that left to the

2   discretion of the individual wardens?

3        A.    Of course, the wardens review the e-mail and

4   they do the best they can to make sure we're carrying out

5   every one of those steps.

6        Q.    How do you know they do the best they can?

7        A.    Because when I visit my facilities in the

8   summertime, I personally walk housing areas and review

9   those -- look at those heat-related or those steps to

10  mitigate the heat.  I personally go look at those housing

11  areas.  I personally walk in a housing area and I look to

12  make sure that offenders are wearing their shorts in the

13  dayroom, that their fans are operational.  All those

14  different steps, I personally look at those issues.

15       Q.    Okay.  Let's -- let's go through -- what are the

16  steps?  Since the same e-mail has been going out roughly

17  since 2009 and it's gone out every year and you're the

18  person responsible for make sure that happens, what are

19  the steps that are -- that are supposed to be taken to

20  mitigate the heat inside the housing areas?

21       A.    Number one -- without looking at the document,

22  but number one, when we have transportation buses coming

23  on our unit, if they're sitting still for a certain period

24  of time, we have fans at the back gate we put on the bus,

25  just to keep the air moving through the bus.  We have to

**WRIGHT WATSON & ASSOCIATES**

(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1581**

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                      March 26, 2013

1  heat, right?

2      A.    It's possible, yes, sir.

3      Q.    And that's inside the facility as well as

4  outside the facility, right?

5      A.    It's possible, yes, sir, and that's why we take

6  the steps.

7      Q.    What -- what steps are you -- what -- strike

8  that.  Let's see here.  What does the expression "heat

9  stroke imminent" mean to you?  And by "you," I mean the

10  Texas Department of Criminal Justice.

11     A.    "Heat stroke imminent."  That, I believe, is

12  part of the policy that we have as 10.64 temperature

13  extremes in the workplace, and it talks about, I believe,

14  if I'm not mistaken, "heat stroke imminent" when the

15  temperature range gets between -- or gets in a certain

16  range that if you continue to work offenders outside in

17  those temperatures and you're not taking those steps to

18  mitigate the heat, that it's possible that an offender

19  could possibly have a heat stroke or a staff member could

20  have a heat stroke.

21     Q.    Okay.  Does "imminent" to you mean possible?

22     A.    Yes, it does.

23     Q.    Okay.  Now, you mentioned fans.  I want to -- I

24  think I may be helping you out here.  I think that in the

25  -- in that e-mail it mentioned that even indigent

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

**APPENDIX 1582**

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                         March 26, 2013

1    Q.    Do you know if it's more than 10?

2    A.    No, sir.

3    Q.    Would it surprise you that it is more than 10?

4    A.    Like I said, I haven't received a document from

5  my leadership or from anyone about confirmed heat-related

6  deaths that you're talking about, so I couldn't talk about

7  that.

8    Q.    Does the Texas Department of Criminal Justice

9  know how many deaths from heat-related illnesses there

10 have been since 2010 at the prisons it oversees?

11   A.    I'm responsible for the prisons in my region,

12 and I'm --

13   Q.    I'm not asking you as Regional Director Eason.

14 I'm asking you as the representative of the Texas

15 Department of Criminal Justice.  As you testify here

16 today, do you know how many individuals, inmates inside

17 your prisons, have died due to heat-related illnesses?

18   A.    No, I do not know that.

19   Q.    Okay.  Have you had any conversations with

20 anybody at UTMB about the need to document people who are

21 susceptible to extreme heat from a medical standpoint?

22 Have you had any conversations with anybody at UTMB about

23 that?

24   A.    I've had not really one-on-one conversations,

25 but when I have my wardens' meetings, personnel from UTMB

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1583**

Stephen McCollum, et al v.                      Robert Eason
Brad Livingston, et al.                         March 26, 2013

1  attend my meetings, most of my meetings, and we talk about

2  all the steps that we -- that we do to mitigate the heat.

3      Q.    Anybody ever said, hey, why are we not -- why do

4  we have the seven-day windows?  Actually, strike that.  Is

5  it your -- do you know, the wellness check policy you were

6  talking about earlier, is that written down anywhere?

7      A.    A policy?  It's part of the e-mail that the

8  director puts out about wellness checks.  It's part of --

9  part of that directive.

10     Q.    Other than -- was it Mr. Stephens who authors

11 that directive?  Did I get that right or was it

12 Mr. Thaler?

13     A.    Mr. Thaler and Mr. Stephens put out through --

14     Q.    Okay.

15     A.    -- the CID leadership.

16     Q.    Okay.  Other than that administrative e-mail, is

17 that policy or practice at the department -- is that

18 written down anywhere else?

19     A.    To my knowledge, no.

20     Q.    Is there any sort of follow-up to make sure that

21 those wellness checks are being done by your office, the

22 regional director?

23     A.    Can you repeat the question, please?  I'm sorry.

24     Q.    Is there any sort of follow-up to make sure

25 those wellness checks are being done at -- at the prisons

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

**APPENDIX 1584**

Case 4:14-cv-03253   Document 288-38   Filed on 06/17/16 in TXSD   Page 38 of 142

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

 1  by your office, the regional director's office?

 2      A.    Of course, during the summer months, at each one

 3  of my meetings, we talk about these wellness checks.  I

 4  tell the wardens to make sure you're engaged in all those

 5  heat issues where we take those steps to mitigate the heat

 6  and make sure that these wellness checks are being done.

 7  That's talked about during the summer months at our CID

 8  leadership meetings.  And when I walk facilities, I check

 9  for those -- those heat restrictions.  That's part of --

10  that I check for.  I'll ask the officer questions and I

11  look for those procedures.

12      Q.    Okay.  Has anyone, during any of these meetings,

13  ever said -- ever discussed the need to get these

14  restrictions or these wellness place -- wellness checks in

15  place day one as opposed to day six, day seven, day eight?

16      A.    To my knowledge, no, I haven't been part of that

17  conversation, but CID leadership has a lot of meetings

18  that I'm not a part of with --

19      Q.    Sure.

20      A.    -- UTMB, Texas Tech, and so I can't comment on

21  if that's been discussed by my leadership or not.  I don't

22  know.

23      Q.    Would you agree with me that certainly people

24  who have diabetes, hypertension, on diuretics, people that

25  TDCJ and UTMB categorize as susceptible to extreme heat

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                     March 26, 2013

```
 1  death and the circumstances that surrounded it?
 2       A.    Not that I'm aware of.  We still implement
 3  our -- our mitigation -- or all the steps that we take to
 4  reduce heat issues on our facilities.  We've been doing
 5  that, conducting our heat training, and we continue to
 6  stay focused on that during the summer months as we always
 7  have.
 8       Q.    Where do you office out of again, sir?
 9       A.    Palestine, Texas.
10       Q.    Okay.  Is there like a -- is it just your -- is
11  there like an administrative office that you and maybe
12  your secretary are in, other people?
13       A.    Yes, yes.  We have a regional office there in
14  Palestine.  It's on one of the facilities.
15       Q.    Is it air-conditioned?
16       A.    Yes, it is.
17       Q.    Okay.  Is Warden Pringle's office
18  air-conditioned?
19       A.    Yes.
20       Q.    Is every warden's office that you oversee
21  air-conditioned?
22       A.    Yes.
23       Q.    It's possible to provide air-conditioning if you
24  want to, right?
25                 MR. GARCIA:  Objection:  Vague.
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1586**

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                    March 26, 2013

```
 1            THE WITNESS:  To provide air-conditioning
 2  on our institutions, that would be a board decision.  That
 3  would be a legislative issue to -- for a vote to
 4  appropriate the money, and I have no knowledge whatsoever
 5  as far as what it would take to air-condition our
 6  institutions.  I'm not an expert on that, how much money
 7  it would take to air-condition our institutions.
 8            And my stance is that we don't need to
 9  air-condition our institutions because we're taking
10  all the steps that we can to mitigate -- mitigate the
11  heat.
12      Q.   (By MR. EDWARDS) Except for air-conditioning,
13  right?
14      A.   I said before there's not a -- there's not a
15  need for air-conditioning.
16      Q.   Okay.  Do you know -- you just told me you have
17  no knowledge about whether air-conditioning would cost a
18  lot of money or not, right?
19      A.   I'm not a -- I'm not an HVAC technician.  I
20  don't really know a lot about air-conditioning, how much
21  money it would take.
22      Q.   Okay.  You're here partly to testify about, you
23  know, policy decisions by the Texas Department of Criminal
24  Justice.  One just policy decision that I wanted to talk
25  about was air-conditioning, and I want to be crystal clear
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1587**

Stephen McCollum, et al v.                                  Robert Eason
Brad Livingston, et al.                                 March 26, 2013

1      Q.    You're now providing cups; is that what you

2   said?

3      A.    Yes, sir.

4      Q.    Okay.  What about before, when you weren't

5   providing cups?  Do you see any problems with that?

6      A.    I don't know for sure that we weren't providing

7   cups.  I've worked in the system, you know, quite a while,

8   and never worked anywhere where we provided a cup when an

9   offender came into the system because the offenders in the

10  housing areas, they have different avenues of how to stay

11  hydrated.  There's -- there's water fountains in the

12  dormitories.  They don't need a cup for that.  There's --

13  there's different avenues to stay hydrated.  When they

14  go -- when they go eat at the dining hall, there's --

15  there's ice water provided in the dining halls.  They're

16  given a cup at their meal or a glass to drink water during

17  the meal, so...

18     Q.    Are there water fountains at the Hutchins Unit?

19     A.    Yes, sir.

20     Q.    In -- in the dorms?

21     A.    Yes, sir.

22     Q.    In C-7, your understanding is that there is a

23  water fountain?

24     A.    Yes, sir.  A sink/water fountain.  It's a water

25  fountain.

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1       Q.    Okay.  When I say "water fountain," I mean like
 2   the kind at school, where I push the button and water
 3   comes out.  Is there that kind of water fountain?
 4       A.    You push a button and water comes up, yes, sir.
 5       Q.    In a sink?
 6       A.    Yes, sir.
 7       Q.    Okay.  So when you say there's water fountains
 8   in the Hutchins Unit, you mean there's sinks in the
 9   Hutchins Unit that you could conceivably drink out of,
10   right?
11       A.    Yes, sir.  There --
12       Q.    Okay.
13       A.    You can drink out of the sink.
14       Q.    Wouldn't it be easier to drink out of the sink
15   with a cup?
16       A.    No, I wouldn't say it would be easier.  I've
17   taken a drink out of those sinks.
18       Q.    You don't think it's easier to drink out of --
19   to drink water with a cup than with your hands?
20       A.    Well, you don't need to drink with your hands.
21   The water comes up, you bend down and you take a drink
22   like you're drinking out of a water fountain here in the
23   office.
24       Q.    Why do you issue cups then?  Why bother?
25       A.    Why bother?
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1589**

332

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    from UTMB?  If you don't know, I understand.

2         A.    I don't know, sir.

3         Q.    Okay.  With regard to housing assignments, do

4    you know if Mr. McCollum was placed on any sort of

5    restriction?

6         A.    Are you talking about a housing restriction?

7         Q.    Yeah, like a bed restriction.

8         A.    I reviewed -- as part of the admin review,

9    getting ready for the deposition, I reviewed the HSM 18,

10   and I don't recall seeing any housing restrictions.

11        Q.    Should he have -- that means -- he was placed on

12   a -- do you understand that he was placed in a top bunk?

13        A.    Yes, sir, I understand that.

14        Q.    And assume that he's five ten, 300 plus pounds.

15   Should he have been placed on a top bunk?

16        A.    I don't make that decision.  That's -- that's

17   the doctor's decision, whoever evaluates the offender,

18   because there's specific restrictions for lower and --

19   lower bunk only, lower level only.

20        Q.    Let me ask you about that because he gets off

21   the bus, a nurse does some sort of basic triage and then

22   he gets into the facility, right?  He hasn't seen the P.A.

23   or the doctor, right?

24        A.    Yes, sir.

25        Q.    Okay.  So is it the -- the nurse that does that

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1590**

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1  initial triage, to your understanding, is supposed to do

2  bunk restrictions?

3       A.    No.

4       Q.    Who does bunk restrictions?

5       A.    That's -- that's a housing restriction just like

6  a work restriction.  The doctor would do that or P.A.

7       Q.    Okay.  So that would be part of that initial

8  intake physical?

9       A.    Yes, sir.

10      Q.    Okay.  So just like the -- well, so there's --

11  it appears to be then there would be a window of time when

12  someone might be improperly placed in a top bunk when they

13  should have a lower bunk restriction; is that fair?

14      A.    I don't know that to be accurate.  Like I said,

15  I don't know which particular inmates we're talking about.

16      Q.    Larry McCollum.

17      A.    Okay.

18      Q.    Larry McCollum shouldn't have been placed on a

19  top bunk, right?

20            MR. GARCIA:  Objection:  Speculation.

21            THE WITNESS:  I don't know that, sir.  I'm

22  not a medical professional.  I didn't evaluate him.

23      Q.    (By MR. EDWARDS) Today, if Larry McCollum went to

24  the Hutchins Unit, are policies in place to make sure that

25  a person of his size and stature would not be placed on

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

**APPENDIX 1591**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 59

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3    DAVID BAILEY, ET AL            *    4:14-CV-01698
                                    *
4    VS.                            *    9:16 a.m.
                                    *
5    BRAD LIVINGSTON, ET AL         *    MAY 26, 2016

6    HEARING ON PRELIMINARY INJUNCTION AND CLASS CERTIFICATION
               BEFORE THE HONORABLE KEITH P. ELLISON
7                     Volume 1 of 4 Volumes

8    APPEARANCES:

9    FOR THE PLAINTIFFS:
     Mr. Jeffrey S. Edwards
10   Mr. Scott Charles Medlock
     Mr. David James
11   The Edwards Law Firm
     1101 East 11th Street
12   Austin, Texas 78702
     (512) 623-7727
13
     Mr. Michael Singley
14   The Singley Law Firm, PLLC
     4131 Spicewood Springs Road
15   Suite O-3
     Austin, Texas  78759
16   (512) 334-4302

17   Mr. Nathan M. Smith
     Reynolds Frizzell, LLP
18   1100 Louisiana
     Suite 3500
19   Houston, Texas  77002
     (713) 485-7212
20
     Ms. Wallis Anne Nader
21   Texas Civil Rights Project-Houston
     2006 Wheeler Avenue
22   Houston, Texas  77004
     (832) 767-3650
23
     Mr. Sean Flammer
24   Texas Attorney General
     P.O. Box 12548
25   Austin, Texas  78711-2548
     (512) 475-4071
```

Laura Wells, CRR, RDR

1                   **APPEARANCES (continued)**

2    **FOR THE DEFENDANTS:**
     Ms. Cynthia Burton
3    Mr. Matthew J. Greer
     Ms. Amanda M. Kates
4    Mr. Phillip P. Boyd
     Office of the Attorney General
5    Capitol Station
     P.O. Box 12548
6    Austin, Texas 78711-2548
     (512) 463-2080
7

8    Court Reporter:
     Laura Wells, RPR, RMR, CRR
9    515 Rusk, Suite 8004
     Houston, Texas 77002
10

     Proceedings recorded by mechanical stenography.
11   Transcript produced by computer-assisted transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          *Laura Wells, CRR, RDR*

                        **APPENDIX 1594**

```
 1                        VOLUME 1
    (Hearing on Preliminary Injunction and Class Certification)
 2                                                      Page
    May 26, 2016
 3
    WITNESSES                                           Page
 4
    CODY GINSEL
 5      Direct Examination By Ms. Burton                 14
        Cross-Examination By Mr. Edwards                 72
 6
    MICHAEL HONEYCUTT
 7      Direct Examination By Mr. Greer                 133
        Cross-Examination By Mr. Edwards               168
 8      Redirect Examination By Mr. Greer              182
        Recross-Examination By Mr. Edwards             183
 9
    HEIDI BOJES
10      Direct Examination By Mr. Greer                187
        Cross-Examination By Mr. Edwards               213
11
    BRIAN CARNEY
12      Direct Examination By Mr. Kammerlocher          239
        Cross-Examination By Mr. Edwards               244
13
                                                       Page
14  Court Reporter's Certificate....................    250

15

16

17

18

19

20

21

22

23

24

25
```

**APPENDIX 1595**

1          THE WITNESS:  That's a very, very low number.

2          THE COURT:  Okay.

3          THE WITNESS:  It would -- each year is different,

4     but generally less than three.

09:41:40    5          THE COURT:  Okay.

6     Q.   (By Ms. Burton)  And you would be able to find that

7     information for the Court on a break?

8     A.   Yes.

9     Q.   Okay.  Thank you.

09:41:49   10          Now, you mentioned that you are in -- were in charge

11     of training and now training reports to you.

12          Could you please explain to the Court what kind of

13     training is in place for the officers of TDCJ with regard

14     to summer heat precautions?

09:42:08   15     A.   Sure.  Every new cadet that comes in our preservice

16     academy watches the American Heart Association video as

17     well as a UTMB-prepared video on heat and cold weather

18     training.  We prepare every single officer.  We also give

19     them what we consider an employee information card, and I

09:42:25   20     actually carry one myself.

21     Q.   Let the record reflect he's pulling his information

22     card out of his pocket.

23          MS. BURTON:  And if I may approach the witness,

24     Your, Honor?

09:42:36   25          THE COURT:  Yes, you may.

*Laura Wells, CRR, RDR*

**APPENDIX 1596**

1    heat-related illnesses, heat-related symptoms so that they

2    are able to recognize those when they get to a facility.

3        This card just provides a reminder to the employee on

4    a daily basis as if they review them.  We do training and

09:44:31  5    daily turnouts and daily shift meetings in food service

6    and daily shift meetings in laundry during the hot summer

7    months to review -- a little reminder to review the card

8    so that they are familiar with the signs and symptoms of

9    heat illnesses.

09:44:45  10   **Q.**   So if I -- I think I heard you say they have classroom

11   training in-service --

12   **A.**   We do.

13   **Q.**   -- and then they have shift meeting training.  It's an

14   ongoing effort, correct?

09:44:55  15   **A.**   That's correct.  That's correct.  Yearly, annually,

16   every uniformed employee is required to go through annual

17   in-service, which is 40 hours.  We also conduct training

18   on heat-related and cold weather-related issues and

19   training during that time.

09:45:11  20   **Q.**   All right.  As an additional part, would you please

21   look at the first part of Exhibit 1.

22   **A.**   Okay.

23   **Q.**   It says, "E-mail Message" on top.  Do you recognize

24   that document?

09:45:20  25   **A.**   I do.

*Laura Wells, CRR, RDR*

**APPENDIX 1597**

                1   videos that is provided by University of Texas Medical

                2   Branch.

                3       They also -- they also receive training, which just

                4   began this -- prior to this summer, on peer educator

    09:48:32    5   groups.  In other words, offenders train other

                6   offenders -- it's part of peer educators -- on heat and

                7   cold weather training.  We just initiated that.  I believe

                8   it was around March or April.  The reason for that is many

                9   times other offenders will listen to other offenders

    09:48:50   10   sometimes before they will listen to staff.

               11       And then, when they are assigned a job assignment, the

               12   supervisor in charge of that job assignment will conduct

               13   heat and cold weather training during those summer and

               14   winter months for those offenders prior to them beginning

    09:49:04   15   their work assignment.

               16       For those offenders that do not work, we provide

               17   training by posting information on bulletin boards in our

               18   housing areas and in common areas concerning our heat

               19   directive, training circulars in regards to heat-related

    09:49:19   20   illnesses.  We use our posters as training.

               21       We also have a system-wide kind of a newsletter that

               22   goes out called the Echo where we post heat-related signs

               23   and symptoms to recognize for offender population and the

               24   need to report.  And then, in addition to that, we provide

    09:49:42   25   information in our orientation handbook that every new

                            *Laura Wells, CRR, RDR*

                            **APPENDIX 1598**

 1  offender coming into TDCJ receives and that offenders on

 2  current existing facilities can receive if requested.

 3  **Q.**   And when they come into a unit, like if they are

 4  transferred from one unit to the next unit, are they

 5  advised of anything in particular when they enter a new

 6  unit?

 7  **A.**   Absolutely.  When they enter into a new facility, we

 8  are going back over the respite areas with those

 9  offenders, including all the new offenders that are coming

10  in.  We make sure they understand what respite areas are,

11  what respite means, how to access a respite area.

12           MS. BURTON:  Your Honor, I would like to offer

13  Defendants' Exhibit No. 1.

14           THE COURT:  Any objection?

15           MR. EDWARDS:  Are the blank pages are they blank

16  on everybody's?

17           MS. BURTON:  Yes.

18           MR. EDWARDS:  Is there a reason they are blank?

19           MS. BURTON:  I don't know.  It might have printed

20  out; and then, when it got Bates numbered, there was a

21  blank page on it.

22           MR. EDWARDS:  I don't believe I would have an

23  objection.

24           THE COURT:  Well, let's tentatively admit it; and

25  if we can later read into the record the explanation for

*Laura Wells, CRR, RDR*

**APPENDIX 1599**

1    85-degree temperatures?

2            MS. BURTON:  And, Your Honor, if I may, I will

3    offer Exhibit 3; and I believe he already said he's not

4    objected to that.

10:14:36    5            MR. EDWARDS:  No objection.

6            THE COURT:  Admitted without objection.

7            MS. BURTON:  And I would present Defendants'

8    Exhibit -- I'm approaching with the Defendants' Exhibit

9    No. 4.

10:14:48   10            THE COURT:  Very well.

11   **Q.**   (By Ms. Burton)  All right.  So does Administrative

12   Directive 10.64 work with any other directives that TDCJ

13   provides for temperatures when they reach over 85 degrees?

14   **A.**   Can you repeat your question?

10:15:31   15   **Q.**   Yes.  Is there -- well, okay.

16        If you could please look at Exhibit 4 that I just

17   handed you.  What is that?

18   **A.**   This is our Heat Directive of 2016, both in Spanish

19   and in English.

10:15:43   20   **Q.**   All right.  And the first part of it is the Spanish

21   version; is that right?

22   **A.**   That's correct.

23   **Q.**   And if you could turn to Bates number page

24   TDCJ-108327.  Would you please explain to the Court what

10:16:03   25   that is.

*Laura Wells, CRR, RDR*

1    **A.**   This is a mainframe e-mail that is sent out to all

2    facilities and staff of our heat directive that's put out

3    in 2016 concerning precautionary measures that should be

4    taken in all facilities and work areas that involve

10:16:22   5    offenders and staff.

6    **Q.**   All right.  And so when the warden is looking at the

7    heat matrix chart that's listed on AD 10.64, Defendants'

8    Exhibit No. 3, are these some of the measures that the

9    warden is also supposed to implement?

10:16:43   10   **A.**   Yes.

11   **Q.**   Okay.  And what authority does a directive have with

12   regard to what TDCJ employees have to do?

13   **A.**   This heat directive is put out by our correctional

14   institutions division director, and it is considered a

10:17:00   15   standing order that is considered policy because it is a

16   directive.

17   **Q.**   And so what does that mean as far as what people have

18   to -- or employees of TDCJ, what does that mean in terms

19   of what they are supposed to do?

10:17:12   20   **A.**   That these precautionary steps to reduce heat illness

21   amongst offenders and staff must be followed.

22   **Q.**   And how is this directive determined?  Who determines

23   what it is going to say?

24   **A.**   Well, we meet annually prior to the summer months from

10:17:31   25   various departments; and we meet about what can we do to

*Laura Wells, CRR, RDR*

1    reduce heat illnesses within TDCJ.  On Bates number 77232,

2    No. C, on page 7 of 13, it outlines that we --

3    **Q.**   On Exhibit 3 you are talking about?

4    **A.**   Yes.

10:17:50    5    **Q.**   Okay.  Go ahead.

6    **A.**   It outlines representatives from various divisions

7    shall meet annually to review best practices concerning

8    preventive care and precautions with extreme temperatures.

9    And so, we do meet annually.  I believe it was March the

10:18:07   10    24th we met this year of 2016, and those divisions met.

11    We can see on the heat directive it outlines -- on

12    Bates number 108324 it outlines which departments were

13    present at that meeting, and we reviewed best practices.

14    I was there personally.  We reviewed best practices.  We

10:18:35   15    enhanced the heat directive message from the year previous

16    by adding a few areas to the precautions to take for the

17    staff.

18    **Q.**   And what were those enhancements?

19    **A.**   Well, on the first one, we added from wellness --

10:18:52   20    instead of wellness checks, we added respite areas to that

21    in that first category.

22    **Q.**   All right.  Why would you use an annual heat message

23    instead of just an administrative directive?  Why does

24    TDCJ do it this way?

10:19:14   25    **A.**   Well, it gives us an opportunity to bring in all of

*Laura Wells, CRR, RDR*

**APPENDIX 1602**

1    those departments to have a solid discussion about what

2    are some of the best practices out in the field, what can

3    we do better each year and then put that out as a

4    directive each year because this is a fluid document that

10:19:29    5    changes each year as we enhance our protocols and

6    mitigating steps to reduce heat-related illnesses.

7    **Q.**   All right.  And so, does Administrative Directive

8    10.64 then work in conjunction with this message or not?

9    **A.**   Yes.

10:19:47   10    **Q.**   And do both of them carry the same significance in

11    terms of what the policies and practices of TDCJ are?

12    **A.**   Yes.

13    **Q.**   Now, we were still going through Exhibit 3, the

14    administrative directive.  You had started to explain what

10:20:07   15    some of the changes were for the 2015 version.  You told

16    us about two.

17         Were there any other changes that come to mind that

18    this policy has?

19    **A.**   Yes.  We specifically outlined, if my memory serves me

10:20:23   20    right, the training section that we will provide

21    preservice and that we provide additional heat-related

22    training in preservice and in-service training sessions.

23         We added an annual review of deaths occurring during

24    periods of extreme temperatures.  Basically, during the

10:20:45   25    summer months, from June 1st through September the 30th,

1   heat wave is the type of emergency condition that is

2   similar to a tornado or a hurricane in that it can kill

3   many people?

4   **A.**   Well, I wouldn't -- I wouldn't agree with that

11:09:45   5   characterization.

6   **Q.**   Why not?

7   **A.**   Well, because we have mitigating factors in place that

8   we believe have been successful since 2013 and to this

9   date.

11:10:01   10   **Q.**   How has the incident command structure changed since

11   2013?

12   **A.**   Well, we have gotten better at what we do.  Our

13   policies have evolved.  Our heat directive has evolved.

14   You can see a change in 10.64 has evolved.  We have better

11:10:16   15   practices in place, and we did learn from 2011.

16   **Q.**   Well, what do you -- do you know what a heat wave is,

17   sir?

18   **A.**   Well, I would consider a heat wave in my personal

19   opinion to be --

11:10:27   20   **Q.**   I'm not asking -- I'm not asking for your personal

21   opinion, sir.  What does TDCJ consider a heat wave to be?

22   **A.**   What does TDCJ consider a heat wave to be?

23   **Q.**   Yeah.

24   **A.**   Well, it would come from -- the heat advisory would

11:10:43   25   come from our SOC, state operation center in Austin,

*Laura Wells, CRR, RDR*

**APPENDIX 1604**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL NO. 4:14-CV-3253 |
| | § | |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 60

1

Lannette Linthicum - 1/13/2016

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA    )
McCOLLUM, individually, and    )
STEPHANIE KINGREY,             )
individually and independent   )
administrator of the Estate    )
of LARRY GENE McCOLLUM         )
            PLAINTIFFS          )    CIVIL ACTION NO.
                               )      4:14-cv-3253
v.                             )    JURY DEMAND
                               )
                               )
LANNETTE LINTHICUM, JEFF       )
PRINGLE, RICHARD CLARK,        )
KAREN TATE, SANDREA SANDERS,   )
ROBERT FASON, the UNIVERSITY   )
OF TEXAS MEDICAL BRANCH and    )
the TEXAS DEPARTMENT OF        )
CRIMINAL JUSTICE               )
            DEFENDANTS          )
_____)    _____
KEITH COLE, JACKIE BRANNUM,    )
RICHARD KING, DEAN ANTHONY     )
MOJICA, RAY WILSON, FRED       )
WALLACE, and MARVIN RAY        )
YATES, individually and on     )
behalf of those similarly      )
situated,                      )
                               )    CIVIL ACTION NO.
            Plaintiffs,        )      4:14-cv-1698
                               )
v.                             )
                               )
LANNETTE LINTHICUM, in his     )
official capacity, ROBERTO     )
HERRERA, in his official       )
capacity, and TEXAS            )
DEPARTMENT OF CRIMINAL         )
JUSTICE,                       )
            Defendants.        )
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

**APPENDIX 1606**

Lannette Linthicum - 1/13/2016

1      Q.   So is your answer "yes"?

2      A.   Yes.  Not ought to, but we do.  That's what I want to

3  change about your question.

4      Q.   Let me help you then.

5           Not only ought you to, you're telling the Court

6  and the jury, "That's what we do.  We operate our prison system

7  with regard to providing healthcare the same way that anybody

8  in the community would go to.  We don't discriminate against

9  inmates just because they're housed in prison," fair?

10     A.   You're putting words in my mouth.  What I'm saying is

11  we operate our healthcare system according to community

12  standards of care and national standards of care.  The

13  University of Texas medical branch in Galveston provides

14  healthcare to over 120,000, roughly, prisoners in the criminal

15  justice system.  The Texas University Health Sciences Center

16  provides healthcare to the remainder in the western sector of

17  the state.

18           Not only that, Texas Tech contracts with seven

19  community hospitals, and it is those community hospitals that

20  actually provide the care on our prison units, and I'll give

21  you an example.

22     Q.   Sure.

23     A.   The Robertson Unit in Abilene, Texas; the Havins Unit

24  and the Middleton Unit in West Texas.

25           The medical staff on those prison units are

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1

**APPENDIX 1607**

```
 1       Q    As the director of TDCJ's Health Service Division,

 2  it's your understanding that there would be a coding mechanism

 3  in the electronic medical record that could tell you this is

 4  how many prisoners we're treating for diabetes?

 5       A    That would be my -- that's my assumption, yes.

 6       Q    Okay.  Or how many prisoners are diabetics?

 7       A    Yes.

 8       Q    Now, at the Pack Unit, according to these

 9  interrogatory responses, there are 728 inmates who have been

10  diagnosed with hypertension?

11       A    Yes.

12       Q    And that was -- that number was derived the same way

13  we just talked about; it came from Dr. -- from Ms. Osteen at

14  UTMB?

15       A    Well, Ms. Osteen, I'm sure, didn't do it, but it came

16  from UTMB.

17       Q    It came to you --

18       A    From --

19       Q    -- from Ms. Osteen at UTMB?

20       A    Correct.  Correct.

21       Q    Okay.  Now, one of the questions that we had asked is

22  how many inmates at the Pack Unit have been diagnosed with

23  cardiovascular disease.  Is that the coronary artery disease

24  that we just talked about, the CAD?

25       A    Yes.
```

Lannette Linthicum - 1/13/2016

1  universally applies to all asthmatics.  That's why we do

2  individualized care and therapy.  People don't fit into a

3  recipe book.  Unfortunately, you have to look at the individual

4  and the individual's need and develop a treatment plan based on

5  that individual.

6           So we talked about our asthmatic and COPD

7  population and whether or not during the period where the

8  temperatures are hot, whether we need to bring them into

9  infirmary beds for the -- for the portion of summer when its

10 hot.

11     Q.   When would these conversations -- it sounds to me,

12 correct me if I'm wrong, it sounds to me like since you've been

13 working there, you've been part of this Joint Medical Group

14 dealing with heat precautions from May to October; is that

15 fair?

16     A.   Yes.

17     Q.   Okay.

18     A.   Well, not since I've been working there.  Since I've

19 been the director in 1998.

20     Q.   1998ish?

21     A.   Yes.  1998 is when I was appointed.

22     Q.   And I don't recall when Dr. Murray -- I know he's

23 been there a while, but 2004ish maybe?

24     A.   I don't know.

25     Q.   It is what it is.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1

**APPENDIX 1609**

| | | |
|---|---|---|
| 11:24 | 1 | acclimation process much more difficult, you wouldn't |
| 11:24 | 2 | dispute that as a doctor? |
| 11:24 | 3 | A.  It would depend on what she said. |
| 11:24 | 4 | Q.  Well, what if she said that diabetes prevents |
| 11:24 | 5 | the body from acclimatizing or it makes it more |
| 11:24 | 6 | difficult for the body acclimatizing? |
| 11:24 | 7 | A.  I would, I would probably dispute that.  I |
| 11:24 | 8 | would probably say there is a subset of diabetics who |
| 11:24 | 9 | have end-stage organ disease that may be susceptible to |
| 11:24 | 10 | that.  But not all diabetics in the course of their |
| 11:24 | 11 | diabetes or end-stage and manifest arteriopathy which |
| 11:25 | 12 | is, you know, dysfunction of the blood vessels. |
| 11:25 | 13 | Q.  Well, what, what support do you have for the, |
| 11:25 | 14 | for the statement that not all diabetics have problems |
| 11:25 | 15 | acclimating to high temperatures? |
| 11:25 | 16 | A.  Well, I'm basting -- basing that statement on |
| 11:25 | 17 | what I see.  We have 9,000 diabetics statewide.  And not |
| 11:25 | 18 | all 9,000 diabetics are having heat-related illness. |
| 11:25 | 19 | Q.  All right.  Do you know if hypertension makes |
| 11:25 | 20 | it more difficult for the body to acclimate? |
| 11:25 | 21 | A.  Again, hypertension is just like diabetes.  Not |
| 11:25 | 22 | all persons with hypertension have in-organ effects from |
| 11:25 | 23 | hypertension.  It depends on how long hypertension has |
| 11:25 | 24 | been present, if it's long standing, if there's in-organ |
| 11:26 | 25 | damage.  It depends on the type of medications you use |

| | | |
|---|---|---|
| 11:26 | 1 | to treat the hypertension.  So there are multifactorial |
| 11:26 | 2 | issues so that again, and I've, and I've testified to |
| 11:26 | 3 | this, you know, for the past two days.  Patients don't |
| 11:26 | 4 | fit in a cookbook.  Everybody's individualized and your |
| 11:26 | 5 | treatment plans have to be individualized. |
| 11:26 | 6 | Q.  Do, do you know whether or not the elderly |
| 11:26 | 7 | population is at greater risk of heat-related illness |
| 11:26 | 8 | than the non-elderly population? |
| 11:26 | 9 | A.  The elderly population risk is primarily due to |
| 11:26 | 10 | the chronic disease present in that population.  And |
| 11:26 | 11 | many of the elderly have multi-system disease.  So they |
| 11:26 | 12 | could be diabetic, they could have cardiovascular |
| 11:26 | 13 | disease, they could have renal disease.  I mean, they |
| 11:26 | 14 | have multiple chronic comorbidities. |
| 11:27 | 15 | Q.  Okay.  What policies are you aware of, or do |
| 11:27 | 16 | you know, that TDCJ implemented following the deaths in |
| 11:27 | 17 | 2011 were specifically because of the deaths in 2011 |
| 11:27 | 18 | that it began prior to the summer of 2012. |
| 11:27 | 19 | A.  We continued the policies in place. |
| 11:27 | 20 | Q.  Okay. |
| 11:27 | 21 | A.  We met on an annual basis to see if there |
| 11:27 | 22 | needed to be any adjustments or changes to current |
| 11:27 | 23 | policy. |
| 11:27 | 24 | Q.  Well, what -- |
| 11:27 | 25 | A.  And we reviewed disease management guidelines |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL NO. 4:14-CV-3253 |
| | § | |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 61

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA      )
McCOLLUM, individually, and      )
STEPHANIE KINGREY,               )
individually and independent     )
administrator of the Estate      )
of LARRY GENE McCOLLUM           )
                PLAINTIFFS       )
                                 )
                                 )
VS.                              )       CIVIL ACTION NO.
                                 )        4:14-cv-3253
                                 )        JURY DEMAND
BRAD LIVINGSTON, JEFF            )
PRINGLE, RICHARD CLARK,          )
KAREN TATE, SANDREA SANDERS,     )
ROBERT FASON, the UNIVERSITY     )
OF TEXAS MEDICAL BRANCH and      )
the TEXAS DEPARTMENT OF          )
CRIMINAL JUSTICE                 )
                DEFENDANTS       )

**************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

BRAD LIVINGSTON

October 1, 2015

Volume 1

**************************************************************

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

**APPENDIX 1613**

Brad Livingston - 10/1/2015

1     A.   As I said a moment ago, I don't recall the exact

2  date.  It would have been, to the best of my recollection,

3  December of 2014, January or February of 2015.

4     Q.   Do you remember the lawyers that -- that defended you

5  at that deposition.  And by that I mean, the lawyers for the --

6  I assume it's for the Attorney general's office, or it was a

7  private lawyer?

8     A.   The Attorney General's office.  I don't -- I

9  apologize.  I don't recall off the top of my head who the

10  leading attorney was.

11     Q.   Do you remember the name of the lawyer who was asking

12  you the questions?

13     A.   I do not.

14     Q.   I assume that that suit was against you in your

15  official capacity.  And by that I mean, essentially against the

16  State of Texas, but as the head of the agency; is -- is that

17  true?

18     A.   I don't recall exactly, but to the best of my

19  recollection, yes.

20     Q.   I understand that you are now the head of the Texas

21  Department of Criminal Justice; is that correct?

22     A.   I serve as the executive director.  That's correct.

23     Q.   What is the job of the executive director, sir?

24     A.   As the executive director of TDCJ, I lead and manage

25  a group of division directors.  We have 17 divisions within the

Brad Livingston - 10/1/2015

```
 1  Texas Department of Criminal Justice, 15 of those divisions and
 2  division directors report to me; the other two report to a
 3  nine-member governing board.
 4           We have overall jurisdiction over the entire
 5  adult criminal justice system in the State of Texas, which is
 6  comprised of probation.  There are roughly 250,000 probationers
 7  who are in direct supervision throughout the course of --
 8  throughout the State, 122 local probation departments receive
 9  standards and funding from TDCJ.  So one of our divisions is
10  specifically aimed and geared towards the probation function
11  within the State of Texas.
12           We operate the incarceration system within the
13  State of Texas.  We have 109 --
14           THE COURT:  Slow you down just a little bit.
15  She's got to stay with every word.
16           THE WITNESS:  Okay.
17    A.   We have 109 facilities scattered across the state.
18  We're housing 148,000 offenders roughly within the
19  incarceration function.  A number of other divisions provide
20  ongoing support, functions, and activities within -- within the
21  incarceration function with respect to treatment, education,
22  and other support functions.
23           We also have jurisdiction over the State's
24  parole supervision function.  We have roughly 88,000 offenders
25  under parole -- direct parole supervision in the State of
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1615**

Brad Livingston - 10/1/2015

```
 1  Texas.  We provide that street supervision with roughly 1300
 2  parole officers in 67, I believe, offices across the stat as it
 3  relates to my direct responsibilities.  We have, again, with
 4  respect to that overall responsibility, our primary mission is
 5  public safety and rehabilitating offenders.
 6              We have, I believe, over the last several years
 7  an effective -- an effective result with respect to recidivism.
 8  The recidivism rates in the State of Texas are one of the best
 9  in the nation.  Our recidivism rates for prison offenders is
10  roughly 21 percent for offenders.
11              THE COURT:  I can tell you really know your
12  subject, but you may be going a little bit fast.
13              THE WITNESS:  Okay.  Yes, Your Honor.
14              THE COURT:  Ms. Guerra, is that...
15              THE REPORTER:  Yes, Your Honor.
16              THE COURT:  Okay.  Please carry on.
17  A.   Our recidivism rate for offenders within the prison
18  is roughly 21 percent.  It's one of the best in the country.
19  That recidivism rate has continue to decline over the course of
20  the last decade.
21              We have also reduced parole revocations pretty
22  significantly over the last several years ago.  I believe
23  that's six-and-a-half percent in the most recent fiscal year.
24  One of the results has manifested itself in reduction in
25  incarceration population.  We recently had 156,000 offenders as
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1616**

Brad Livingston - 10/1/2015

1  recently as 2008; and, now, as I pointed, it's roughly 148,000.

2  Given that trend downward, the State was able to close three

3  prisons in the last two legislative -- or three legislative

4  sessions.  And that certainly one -- one indicator, I believe,

5  of -- of the effectiveness that we've been able to bring to

6  bear.

7           In terms of the treatment diversion programs

8  that we have in our state, we have a very fairly, and ongoing

9  fluid dynamic reentry program.  We have begun issuing

10  identification documents, social security cards and birth

11  certificates for a significant number of offenders who are

12  released from TDCJ that increases their likelihood of -- of

13  housing successfully and finding jobs and diminishing the

14  likelihood of their revocation.  We have very extensive mental

15  health treatment diversion programs geared towards providing

16  mental health services to offenders who are -- are in the

17  community, such that they can remain in the community.

18           Just in terms of the incarceration function, we

19  have over 10,500 treatment beds within the system.  We spend

20  over a $100 million or roughly $100 million providing that

21  several treatment or substance abuse treatment.  Again, that --

22  that collection of resources has served to pretty significantly

23  refuse recidivism and revocations within our system.

24           TDCJ, also, incarceration function has very --

25  very expansive and extensive support to include our industry

Brad Livingston - 10/1/2015

```
 1  function.  Our Health Services function is an extremely
 2  important function.  They partner with our two medical
 3  partners, UTMB and Texas Tech.  We send roughly $537 million a
 4  year for offender healthcare.  I've only touched on -- although
 5  a pretty significant range of our -- of our operations, it's
 6  still, nonetheless, just a partial list.
 7              The scope and breadth of our -- of our
 8  organization is very extensive.  Many people think in terms of
 9  TDCJ as being just a prison system.  We are, in fact, not -- we
10  are, as a pointed out, responsible for the entirety of the
11  criminal justice system to include probation and treatment and
12  so forth.  We're $3.4 billion a year enterprise with all the
13  complexities associated with that.
14              In terms of my responsibility is, frankly, to
15  put the right people in the right position in terms of division
16  directors who I rely on.  They have tremendous backgrounds and
17  expertise and experience in their fields of responsibility,
18  and I -- I rely extensively on day-to-day operational
19  responsibilities.  As the executive director, my primary
20  function is to put the right people in the right positions and
21  then delegate appropriately.
22  Q.   (BY MR. EDWARDS)  Would it be fair to say that -- but
23  when say that you rely on the people that you put in these
24  right positions that you're in constant communication with them
25  in case problems arise that you can deal with them effectively?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1618**

Brad Livingston - 10/1/2015

```
 1      A.    I certainly have ongoing dialogue and discussion with

 2   those division directors, as well others, but, certainly, I

 3   have more ongoing dialogue and discussion with some than

 4   others; but it's fair to say that I manage and lead very

 5   extensively through verbal communication with those who work

 6   for me.

 7      Q.    Would another way to say that be that as the head of

 8   the agency, you rely on the people that you appoint to

 9   positions, but that you do so by getting information from them

10   about particular problems that they notice and are trying to

11   solve?

12      A.    I would ask you to clarify the question a little bit,

13   please, or repeat it at least.

14           MR. EDWARDS:  Would you mind repeating the

15   question to Mr. Livingston, please.

16           (Requested portion read back.)

17      A.    I would say, yes, with this context and caveat:  With

18   the size and scope and breadth of our operations.  I also

19   expect those individuals who work for me to use their best

20   judgment about, you know, what level of operational detail they

21   feel is important to bring to my attention.  Certainly, it's --

22   it would not be effective at all for -- for an executive

23   director of this large enterprise to expect those division

24   directors to keep me informed of everything that's going on, on

25   our facilities or in our parole offices or probation
```

Brad Livingston - 10/1/2015

1  departments or any of one of our departments.  But, clearly, my

2  expectation and part of the way manage is to have not just one

3  way of discussions, but two-way discussions when they inform me

4  as well.

5      Q.   (BY MR. EDWARDS)  Sure.

6           As I hear you talking, it sounds like major

7  problems would be brought to your attention then.  Is that

8  fair?

9      A.   I think it's accurate to say that major problems

10  would be brought to my attention.

11      Q.   For instance, not every fight or assault that happens

12  in the prison would be brought to your attention, correct?

13      A.   Correct.

14      Q.   I assume not every death in a prison would be brought

15  to your attention; is that correct?

16      A.   That's correct.

17      Q.   Okay.  But a pattern of deaths or -- well, strike

18  that.

19           Would you a pattern of death identified by some

20  of these people that you've put in charge be brought to your

21  charge, at least according to your expectation?

22      A.   I think with respect to a pattern, certainly to the

23  extent that they are aware of the pattern and have identified

24  it as such as, it would be my expectation, yes.

25      Q.   Ultimately, you're responsible for training at the

Brad Livingston - 10/1/2015

 1      Q.   Okay.

 2      A.   And just -- and just to clarify, you -- you reference

 3 that me -- that I specifically recommend to them.  The nature

 4 of the agenda item isn't structured as a project the executive

 5 director is recommending for their approval.  The agency and I

 6 recognize I'm the executive direct of TDCJ, but as the

 7 executive director I'm obviously not, although I'm not

 8 officially able to review any document and every report that

 9 the agency produces as an individual, Brad Livingston, I do not

10 and cannot review every document and report that we have.

11           So it's fair to say that the agency presents

12 projects for board approval; but, again, more specifically, I

13 do not recall whether they've denied one.

14      Q.   If you were specifically against one of your

15 director's ideas/reports that was greater than $1 million,

16 would it be presented to the Board of Criminal Justice?

17      A.   Could you repeat the question, please?

18      Q.   If you were specifically against a plan for any sort

19 of construction project that was greater than $1 million -- you

20 didn't want it to do.  It didn't have your backing -- would it

21 be presented to the Board of Criminal Justice?

22      A.   That's a hypothetical that has never dropped up.

23 I'm -- I'm not sure I could answer that.

24      Q.   Well, have you ever been opposed to any of the ideas

25 of your directors that may cost more than a million dollars

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1621**

Brad Livingston - 10/1/2015

```
 1  administrative function who has do his or her job without
 2  air-conditioning, right?
 3       A.   I'm unaware of a situation or circumstance where
 4  they're not.
 5       Q.   Well, do you know why that situation continues to
 6  exist in the Texas prison system?
 7                MS. BURTON:  Objection.  Vague.
 8                THE COURT:  He's asking him why.
 9                I don't think that's necessarily vague, but I'm
10  going to allow him to answer it.
11       A.   Could you repeat the question, please?
12       Q.   (BY MR. EDWARDS)  Do you know why that condition
13  continues to exist in the Texas prison system?
14       A.   If I understand your question, the facilities that we
15  operate across the state have, as you know, some of the
16  facilities are air-conditioned in housing areas and some are
17  not.  We have a very extensive set of protocols in place to
18  make sure that we mitigate the impacts of heat in our system,
19  across the state, and the facilities that aren't in place were
20  constructed as they're -- as they currently exist.
21       Q.   So is the reason why the distinction between inmate's
22  housing areas and administrative areas simply because that's
23  the way they were done, and you believe the mitigation issue
24  measures you have in place are sufficient to protect the
25  prisoners?
```

Brad Livingston - 10/1/2015

1        A.    I believe our mitigation efforts are both extensive

2   and appropriate for mitigation efforts across the board that

3   have wide range of -- of subparts and -- and everything from

4   training to the mitigation efforts with respect to fans and

5   water and training medical identification of offenders that are

6   -- have certain medical conditions.  I think in totality the

7   mitigation efforts that we have in place provide the -- the

8   necessary mitigation.

9        Q.    Is that why you have -- well, have you ever

10  considered installing or retrofitting any area of any

11  nonair-conditioned housing area?

12       A.    Can you repeat the question, please?

13            MR. EDWARDS:  Sure.  Abby, would you mind

14  repeating that to Mr. Livingston, please.

15            THE REPORTER:  Sure.

16            (Requested portion read back).

17       Q.    (BY MR. EDWARDS)  Do you understand the question,

18  sir?

19       A.    I believe so.

20            None of my division staff, who I rely on and

21  trust their expertise, have ever recommended that we

22  air-conditioned the housing units in our facilities that would

23  include Dr. Lannette Linthicum, our Health Services division

24  director; Bill Stephens, Correctional Institutions director;

25  and those that served in that role prior to him in my tenure;

Brad Livingston - 10/1/2015

```
 1  neither has a facilities division director.  I would rely
 2  certain on their judgment and expertise to -- to put forward a
 3  recommendation such as that.
 4             I think also to the extent that -- to the extent
 5  that a consideration was ever made on the part of the dialogue
 6  and discussion and consideration would have to include what
 7  funding or what expenditures you would have to forego to move
 8  -- to move down that path, which also, again, as I said a few
 9  minutes ago, we don't have extra money laying around; and we
10  typically are required and have reduced medical shortfalls in
11  -- in our agency's budget as a matter -- as a matter of course.
12  So I think there would be a lot of things that would have to be
13  considered, but none of my staff have recommended that we do
14  so.
15             Certainly, if that occurred, we would look at --
16  we would look at every aspect of the -- of the request.  We
17  would also factor in the overall history of our mitigation
18  efforts and the steps we have taken in the last few years to
19  enhance those mitigation efforts and make a judgment.
20     Q.    I'm going to ask the question that I asked you one
21  more time, but I appreciate the -- the response nevertheless.
22             Have you ever considered adding air-conditioning
23  or retrofitting any aspect of any nonair-conditioned housing
24  area ever?  You, Mr. Livingston?
25     A.    No.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1624**

Brad Livingston - 10/1/2015

```
1   the Texas prison system?
2               MS. BURTON:  Objection to the argumentative
3   nature of that question, Your Honor.
4               MR. EDWARDS:  This is a deliberative
5   indifference case.  I'd ask for some --
6               THE COURT:  I'll allow it.
7               MR. EDWARDS:  Abby, would you --
8       A.  No, sir.
9       Q.  (BY MR. EDWARDS)  Have you been informed that 20
10  people have died with a diagnosis of hypothermia while housing
11  in Texas Department of Criminal Justice facilities since 1998?
12      A.  I don't recall the exact number being 20, but
13  certainly in 2011, I'm aware of ten.  I'm aware of two in 2012,
14  and I believe two in 2007, if I'm not mistaken; and I know
15  there may have been in the early years prior to that, I don't
16  recall the exact number.
17      Q.  Okay.  I'll represent to you that there was
18  heatstrokes -- let me -- is that all the heatstroke deaths that
19  you think there could in the Texas prison system during that
20  time frame?
21      A.  Could you repeat the question?
22      Q.  Do you know that hypothermia is a notoriously
23  underreported cause of death?
24      A.  I don't know that.
25      Q.  Have you ever asked Dr. Linthicum if that's, in fact,
```

**WRIGHT WATSON & ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1625**

Brad Livingston - 10/1/2015

1   hottest -- hottest summer on record.  2011 was an

2   extraordinarily hot summer.  It was a record-heat event that we

3   could not have anticipated, did not anticipate.  And during the

4   course of that summer, ten offenders died.  And, in fact, if

5   I'm not mistaken, roughly within a span of 10 days, seven of

6   those ten died within that time frame.  Again, that was -- that

7   was a heat event; that was not anticipated.  It was not

8   predicted.  It was not one that we would have been in a

9   position to expect.

10          Our mitigation efforts had worked in the past.

11  We had every reason to believe that they would work in the

12  present and moving forward.  In an abundance of caution before

13  we knew specifically that those deaths occurred to heat, we

14  pulled staff together and made sure that we were all

15  comfortable that we were taking every step and mitigation

16  effort and doing everything we needed to take and do during the

17  course of the summer.

18          And staff reemphasized our mitigation efforts.

19  They coordinated more closely with Health Service division to

20  identify offenders that might have and do have specific

21  conditions that would lead to heat illness and really redouble

22  the efforts during the midst of a very hot summer.  That's the

23  dialogue and discussion that -- that I specifically had at that

24  time with my staff.

25      Q.   Okay.  So you've lived through the summer of 2011,

Brad Livingston - 10/1/2015

1      Q.   Do you recall during the summer of 2011 there being a

2  prolonged heat wave?

3      A.   As I pointed out in the previous answer, it was a

4  record-heat event, a record-heat summer with -- with a

5  prolonged high temperatures.  So both the duration and

6  intensity of the heat was greater than had been the case in

7  prior summers or subsequent summers.

8            And, again, as I understand it, that was not

9  predicted to be an unusually different summer that what had

10  typically been the case.  And as I pointed out, our mitigation

11  efforts had for the most part worked over the years.  We relied

12  on those, and we had no reason to believe that they wouldn't

13  work in -- in the summer of 2011.

14      Q.   So let me just make sure I understand what you're

15  saying.  You're saying, look, it was a really, really hot

16  summer.  It was record-breaking summer.  It could not have been

17  anticipated and was not predicted that such a summer like this

18  was coming or could come; and we did the best we could; and we

19  had no indication based on our prior mitigation measures that

20  the inmates were at risk even given these record-setting

21  temperatures; is that correct?

22      A.   I'm not sure I would frame it exactly as you have.

23  Clearly, our objective is to mitigate that risk and to reduce

24  the risk and take every step and measure we can to mitigate the

25  impacts of the heat and to pay very close attention to those

Brad Livingston - 10/1/2015

1   steps we need to take.

2       Q.   Okay.  You threw a lot at me right there, but I want

3   to be certain I understand what you're saying.  Are you saying

4   that the agency could not have predicted a summer as hot as

5   2011 and the consequences that flowed from that?

6       A.   I think based upon past history and looking at the

7   system as a whole, there was no way for us to know that the

8   summer would produce the results that it did, and specifically,

9   the duration of -- and the temperatures during the course of

10  that summer, specifically in July and August.  They were in

11  excess of what is typical.

12              THE COURT:  Let me interrupt.  I think the

13  question is more:  Do you have a plan in place for response in

14  the event that there was a hot summer?  Not necessarily 2011.

15  Not necessarily any one year, but did you have a plan in place

16  for a summer, the temperatures in which were well above

17  average.

18              THE WITNESS:  Your Honor, again, our protocols

19  that we had to that point utilized for many years were -- had a

20  track record of -- of being effective system-wide.  That's not

21  to suggest that -- that you never have a bad result.  Any death

22  is one too many.

23              But, systematically, the protocols and the

24  safety precautions and the procedures that we had in place

25  worked.  And as we moved into 2011, we put all those same

Brad Livingston - 10/1/2015

 1  protocols in place.  And during the course of the summer as,
 2  again, when it -- in late July/early August, when we had had
 3  some deaths that were apparent -- apparently heat related,
 4  staff pulled together and identified things that we could do to
 5  enhance in the short run -- very short run.
 6            Again, as I pointed out, in the span of ten
 7  days, seven of those ten offenders passed away.  And during
 8  that short time frame, staff worked extraordinarily hard to
 9  make sure that we were doing everything that we could and
10  should do as an agency during a hot summer.
11       Q.   (BY MR. EDWARDS)  So, no, you didn't have a plan in
12  case the temperature went up higher than normal?
13       A.   I'm not sure I understand the question.
14       Q.   Did you have a different plan when the temperature
15  went up higher than normal?
16       A.   We -- I wouldn't say that the -- that there was a
17  separate or different plan, but we have always emphasized to
18  our unit administrators, our wardens, medical staff to use
19  their judgment as -- as needed when circumstances and
20  environment changes.  And so, my expectation is that staff out
21  there worked extremely hard, used every -- sought to use their
22  judgment in a way that would mitigate the heat.  And,
23  certainly, the baseline or the foundation of that is the series
24  of steps and protocols that we had in place and subsequent to
25  that we've built on those, but those are still foundational.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1629**

Brad Livingston - 10/1/2015

1      A.   Well, we built upon the heat precaution email, and we

2 built upon the policies that we have.  We didn't scrap them.

3 We enhanced them.

4      Q.   How did you enhance them after the summer -- you

5 didn't enhance them until after the summer of the 2011,

6 correct?

7      A.   Again, we took some mitigation measures during the

8 course of -- some additional mitigation steps during the course

9 of 2011 and then we took more steps during 2012 and we've

10 continue build on that.

11      Q.   Okay.

12      A.   As I understand it, we have put together a list that

13 you should have that -- that outlines those steps that we've

14 taken.

15      Q.   Tell me what you did differently after all those

16 deaths in 2011, if you know.

17      A.   Well, I -- I don't know them all by memory.

18      Q.   Tell me anything that you do know.

19      A.   But I've got a list, and you have this list as well.

20      Q.   Sir, just so we're clear, I'm not asking you to read

21 a list.  I want to know what you did differently, what you,

22 Brad Livingston, did differently, or what you know the agency

23 did differently after those deaths.  Could you please tell me?

24      A.   Yes.  In April of 2012, prior to the summer of 2012,

25 our regional directors were specifically directed to discuss

Brad Livingston - 10/1/2015

1      A.    "Heat Precaution 2011 Reminder."

2      Q.    And is that an email that is sent out system-wide?

3      A.    I believe it's -- it's sent out to all of -- in fact,

4  I know it's sent out to all of our correctional facilities.

5  Whether everybody in the agency gets it, I don't know; but I

6  know everybody in our Correctional Institutions and our

7  facilities and everybody get it.

8      Q.    Got you.

9      A.    Everybody that needs to get it from that standpoint.

10     Q.    And if you wanted to add items to this reminder, you

11 certainly could, if you wanted to, correct?

12     A.    I mean, are you asking collective you or individual

13 you.

14     Q.    Individual you, Brad Livingston.  If you wanted to

15 add something to this heat precaution, you certainly could,

16 correct?

17     A.    I would certainly have a discussion with staff if I

18 felt it necessary to add an item, but, again I rely on their

19 judgment, their years of expertise, and their hard work, their

20 collective groups judgment, again, our group of senior staff

21 pull together, identify what needs to be included in this, and

22 I trust their judgment; but to answer their judgment, I feel I

23 could add an item if I sought to.

24     Q.    Sure.

25              My understanding is that this type of email has

Brad Livingston - 10/1/2015

```
 1  been sent out in the same or similar format beginning in the,
 2  like, the late 1990s; is that your understanding as well?
 3      A.   That's my understanding.
 4      Q.   You didn't change that process when you became head
 5  of the agency in 2004; is that right?
 6      A.   That's correct.
 7      Q.   From 2004 until this -- this 2011 heat precaution
 8  email before you, do you know of any changes to the email --
 9      A.   I'll --
10      Q.   And I'll represent to you that I think there were
11  very few, if any, changes.
12      A.   I don't recall.
13      Q.   But I want to ask you --
14      A.   I don't recall.  I couldn't answer this question.
15      Q.   So as you testify here today, you have no idea if
16  there were any changes?
17      A.   I do not know.
18      Q.   Okay.  Well, again, feel free to take a look at it.
19  But one thing that I'd like to know is whether any of the steps
20  that are on this heat precaution email have anything to do with
21  reducing the temperatures inside the housing areas?
22      A.   Give me a just a moment to read it.
23      Q.   Sure.
24      A.   Okay.  There are several references to air flow and
25  fans in our list of precautions and our instructions to staff.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1632**

Brad Livingston - 10/1/2015

1  95 degrees?

2      A.   I have not posed specific question as you've

3  articulated it.  I've had ongoing discussions with all those

4  experts within the agency as to what they believe the best

5  course of action is for operating our system during the summer

6  months, and they pull together in -- in -- frankly, they meet

7  year round.

8            The key players in this agency have multiple

9  occasions to meet on a variety of topics, but they meet very

10 specifically on this topic in the spring.

11           And it's my judgment, as the executive director,

12 not to second guess their more specific and targeted skill sets

13 and expertise on these areas than mine.  That's why I've hired

14 them.  That's why I put them this place.  That's why I rely on

15 them.  And to me it would be shortsighted and potentially

16 problematic to, without more specific expertise myself, go in

17 and strike out items or add items.

18           I rely on their judgment.  And I would say,

19 again, come back to is that the protocols this agency has had

20 in place for many, many years, although we have built upon

21 them, have worked systematically before 2011.  We had every

22 reason to expect that they would work during 2011 and could not

23 have anticipated and did not anticipate a heat event with

24 record temperatures, both in terms of duration and intensity

25 during the 2011.

Brad Livingston - 10/1/2015

1  offenders and move them to another facility while you were in

2  process of that renovation and retrofit.

3          So there are -- there are considerable

4  operational and logistical challenges to deal, separate and

5  apart from the funding consideration; but I also believe that

6  given the likely high price tag of doing those retrofits, it's

7  clearly not just simply in my purview to decide to do that or

8  not do it.

9  Q.   Okay.  Well, whether it is or isn't -- whether you

10 decide to or not, sir, you're making an intentional choice not

11 to seek or try to get these facilities retrofitted with

12 cooling, right?

13 A.   As I pointed out earlier, the resource allocation is

14 an extremely important and ongoing balancing act of current

15 operational necessities, priorities, and risk assessment

16 evaluation.  The unfortunate series of deaths in 2011 were

17 certainly -- and our agency position is that we did everything

18 we could to learn how to improve even beyond the -- the effects

19 of that record breaking heat, okay.

20          Our protocols and practices had worked up to

21 that point.  We made changes and continue to make changes to

22 those protocols and we haven't seen that kind of heat event

23 where those adverse results and those numbers since that time.

24          And so, part of what we have to balance is

25 whether it makes sense to spend what would be extraordinary

Brad Livingston - 10/1/2015

```
 1  sums at the expense of other operating necessities like just
 2  any range of our functions as we move forward.
 3            I think, also, it would be gratuitous, I think,
 4  for someone in my position to make a request to the legislative
 5  that is not credible from the standpoint of overall costs and
 6  the ongoing necessity of it.  I don't think anyone would argue
 7  that air-conditioning is beneficial.  I think the issue is, is
 8  it absolutely necessary to keep them safe and -- and secure.
 9            Our mitigation efforts are and have been
10  designed to mitigate the impact of heat.  2011 was a very
11  unusual year, and one death is one too many.  We had ten
12  heat-related deaths in 2011.  We had two more in 2012.  We
13  continued to learn and -- and identify ways to improve our
14  protocols.  We've not had a reoccurrence in 2013, '14 or '15.
15  I'm not sure I could justify making a request for
16  air-conditioning in our units.
17     Q.   Okay.  I'm going to try one more time.  Sir, whether
18  you think it's the right thing to do, whether I think it's the
19  right thing to do, whether your defense lawyer's think it's the
20  right thing to do or the wrong thing to do is irrelevant.  I
21  need you to acknowledge that you're making an intentional
22  choice not to seek to retrofit or install air-conditioning in
23  any of the housing areas, and that you're doing it
24  intentionally, sir.  Isn't that the case?
25            MS. BURTON:  Objection.  Your Honor, it's
```

Brad Livingston - 10/1/2015

```
 1  argumentative.
 2              THE COURT:  No.  I think it goes to the question
 3  at the very least.
 4              MR. EDWARDS:  Your Honor, can I get a "yes" or
 5  "no" to the question?
 6              THE COURT:  Well, I never -- I never insist that
 7  a witness answer yes or no.  So I think the question's a fair
 8  one, and all he's asking is it's not a product -- the decision
 9  of inadvertence.  It's not a matter of a decision that is made
10  simply because no decision is made.  Surely, it is a decision
11  made by someone, and I would think that the someone would
12  include you as to whether or not air-conditioning should be
13  installed.
14      Q.   (BY MR. EDWARDS)  And that that decision is an
15  intentional?
16              THE COURT:  I tried to capture that in my
17  question.  It's not a decision made by inertia.  It's a
18  decision made intentionally that air-conditioning would not be
19  installed.
20              THE WITNESS:  Your Honor, with the caveats that
21  you provided and also a reminder that no one has ever
22  recommended to me that -- that our units be air conditioned,
23  the answer's yes.
24              THE COURT:  Okay.  Let's move on.
25              MR. EDWARDS:  Okay.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1636**

Brad Livingston - 10/1/2015

```
 1      Q.   (BY MR. EDWARDS)  You acknowledge that
 2  air-conditioning would be beneficial for all the prisoners?
 3      A.   I acknowledge that generally air-conditioning would
 4  be beneficial.
 5      Q.   Do you acknowledge that it would be much, much, much,
 6  much more beneficial for the inmates or prisoners that are
 7  particularly susceptible to heat illness?
 8      A.   Again, I think I answered that question.  I don't
 9  know that it's necessary.  I can't gauge what you mean by three
10  muches.
11      Q.   Fair enough.  Let me reask it.
12           Would you agree that air-conditioning would be
13  exceptionally beneficial if you were in a population of people
14  that TDCJ considers to be particularly vulnerable to extreme
15  heat and puts on its heat illness wellness list?
16      A.   Again, I think it would be beneficial.
17      Q.   Now, I trust you would acknowledge that it would also
18  be beneficial for your correctional officers who have to work
19  in these temperatures?
20      A.   Sure.
21      Q.   Have correctional -- are you aware of any
22  correctional officers ever complaining of having to work in
23  theses temperatures inside these housing areas during your
24  tenure from '04 to presently?
25      A.   I have not had a correctional officer complain to me.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

**APPENDIX 1637**

Brad Livingston - 10/1/2015

 1  I have heard that there's one individual who has complained.

 2  There may be one, but I'm not aware of one.

 3       Q.   You're aware of one officer that has complained to

 4  work --

 5       A.   In this context, they would not typically complain to

 6  me.  So as I said, my -- my recollection is I'm aware of one

 7  who has made that known in the newspaper.  That's the only

 8  reason I know about it.

 9       Q.   Okay.  Is that Mr. Lawry who has written editorials

10  about the dangers and the problems with not air-conditioning

11  the housing areas for correctional officers?

12       A.   That's correct.

13       Q.   And did you ever have a conversation with Mr. Lawry

14  about his complaints?

15       A.   No.

16       Q.   Did you ever instruct any of your staff to

17  communicate with Mr. Lawry with his complaints?

18       A.   I did contemporaneously, but I did, yes.

19       Q.   Did they relay it back to you?

20       A.   They have indicated to me generally the nature of

21  their discussion, yes.

22       Q.   Are you aware of workers' compensation claims or

23  employee-heat-related illnesses throughout the summer?

24       A.   Can you be more specific?  I'm not sure I understand

25  the question.

Brad Livingston - 10/1/2015

1        Q.    Sure.

2              You know your employees are injured due to

3  heat-related illnesses during the summer, right?

4        A.    I know we track any and all workers' compensation

5  claims to include illness or injuries related to heat, and that

6  there would be -- there would be a number.

7        Q.    And we spoke about the uptake during the summer.  Did

8  you -- have you ever reached out to any of the individual

9  employees injured by the heat or hot weather to find out what

10  their perspective was?

11        A.    No, I haven't.

12        Q.    Did you ever instruct Mr. Thaler or Mr. Stephens,

13  hey, I noticed there were 30 heat-related injuries in July.

14  Why don't we talk to these people to find out what's going on

15  with them?

16        A.    I'm not aware of 30 heat-related-employees injuries

17  in July.

18        Q.    How ever many they were, sir.

19        A.    Well, I didn't think --

20        Q.    Let's go talk to them and find out what's going on?

21        A.    I think the number is relevant because my

22  understanding of the number is relative to 38,000 employees, 32

23  of whom work on our units.  It's a very, very small number.  So

24  from that standpoint, I understand you were using a

25  hypothetical example, but I think it's -- it's relevant.

Brad Livingston - 10/1/2015

```
 1              THE COURT:  I'm going to overrule the objection
 2   and allow the question.
 3        Q.   (BY MR. EDWARDS)  And I'll just ask -- I understand
 4   that you're not an expert in workers' compensation and perhaps
 5   not an expert in other industries, but shouldn't you be
 6   inquiring about this as the head of the agency or making sure
 7   your directors are?
 8        A.   This is a report that is utilized by our unit-based
 9   staff, by our Correctional Institutions division staff and by
10   our Administrative Review and Risk Management staff, among
11   others.  Those divisions review these numbers.  They review the
12   documents that this agency produces.  And as a follow up to a
13   point I made earlier, as the executive director, I officially
14   have access to what I personally utilize or review every one of
15   these reports.
16              My expectation is that the agency have at the
17   appropriate level of leadership and management staff who review
18   these numbers.  And to the extent that that there was a trend
19   that was problematic and outside of the norm that they would
20   call it to my attention.  No one has called this to my
21   attention.
22        Q.   Okay.
23        A.   I think another relevant, although you didn't think
24   so, was the number of injuries in total.  I think another
25   factor that's relevant is the fact that we have 38,000
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants.* | § | |
| | § | |

# Exhibit 62

Brad Livingston - 10/2/2015

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA      )
McCOLLUM, individually, and      )
STEPHANIE KINGREY,               )
individually and independent     )
administrator of the Estate      )
of LARRY GENE McCOLLUM           )
                                 )          CIVIL ACTION NO.
VS.                              )           4:14-cv-3253
                                 )           JURY DEMAND
                                 )
BRAD LIVINGSTON, JEFF            )
PRINGLE, RICHARD CLARK,          )
KAREN TATE, SANDREA SANDERS,     )
ROBERT FASON, the UNIVERSITY     )
OF TEXAS MEDICAL BRANCH and      )
the TEXAS DEPARTMENT OF          )
CRIMINAL JUSTICE                 )

*************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

BRAD LIVINGSTON

October 2, 2015

Volume 2

*************************************************************

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

**APPENDIX 1642**

Brad Livingston - 10/2/2015

1      A.    Yes.

2      Q.    Do you understand as -- I'm asking as Brad

3  Livingston, personally, that this has been part of your policy

4  for years?

5      A.    I couldn't tell you when it was added to this policy.

6      Q.    Do you know how long you've had a heat stress policy,

7  sir?

8      A.    I -- I couldn't tell you exactly how long a policy

9  with respect to heat stress has been in place.

10      Q.    Okay.  Well, do you agree that you should be aware of

11  all of these comorbidities that affect heat tolerance if

12  they're in your policies or correctional managed heat policies?

13            MS. BURTON:  Objection.

14      A.    Can you clarify what you mean by "you" in this case?

15  "You" agency or "you" Brad Livingston?

16      Q.    (BY MR. EDWARDS)  I mean you, Brad Livingston.

17      A.    I don't think it's operationally imperative that I

18  know every detail or even the list of morbidities on heatstroke

19  in Attachment B.  I have, again, as the executive director of

20  TDCJ, I have official access to every policy and document that

21  we produce.  I do not as an individual have -- as a matter of

22  course, read and review and memorize and know exactly what's in

23  every document and report that we produce.

24            As -- as you know, TDCJ has 38,000 employees.

25  We have 500,000 offenders in our care in one portion of the

54

Brad Livingston - 10/2/2015

 1      A.    Karen Hall is an employee within the Texas Department

 2   of Criminal Justice.  I don't know her exact title.  She

 3   oversees a number of functions to include many of our

 4   statistical reports.

 5      Q.    Do you know who Sylvester Turner is?

 6      A.    Yes, sir, I do.

 7      Q.    Who is he?

 8      A.    He is a representative -- Sylvester Turner is a

 9   current member of the Texas House of Representatives

10   representing the district in Houston.

11      Q.    Do you recall his office asking you about heat deaths

12   back in 2009?

13      A.    I do, and it would certainly refresh my memory

14   preparing for this -- for this deposition, but I -- keep in

15   mind, over the years, I have had many discussions with

16   Representative Turner and his office on any number of topics.

17      Q.    Sure.

18      A.    So I -- again, didn't recall specifically that --

19   that particular inquiry prior to preparing for this deposition,

20   but it would not at all be inconsistent for his office to ask

21   any number of questions.

22      Q.    Well, I'm not concerned about the "any number of

23   questions," but I am very concerned about the questions

24   directly related to heat deaths in the Texas prison system.  So

25   that's what I want to focus on.

Brad Livingston - 10/2/2015

1  died inside of hypothermia in 2009, 2010, or 2011?

2      A.   I don't recall what changed between those three

3  years.

4      Q.   Well, did you change anything about your policies

5  between 2007 and 2011?

6      A.   I can't recall specifically what changes may or may

7  not have occurred on those policies and practices during that

8  time frame.

9      Q.   Okay.  Well, you were made aware that two -- every

10  death is serious, right?  That's what you told me?

11      A.   Yes, sir.

12      Q.   Okay.  And Lannette Linthicum alerted you to a

13  problem that these people died because it was really hot inside

14  the prison system, right?

15      A.   I'm not sure this memo directly states that.  Let me

16  read it again.

17      Q.   Or to that effect?  I'm not asking you for a verbatim

18  recitation, but as the chief policy maker for the agency, isn't

19  that what this memo is telling you and the point of the memo?

20      A.   I would not immediately conclude that that was the

21  point of memo.

22      Q.   All right.  Well, what did you conclude was the point

23  of memo, sir?

24      A.   She was -- again, I don't recall the exact specifics

25  as to why this was memo was generated, whether I asked for it

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

**APPENDIX 1645**

Brad Livingston - 10/2/2015

1  or whether she provided it, but I do recall -- again, what I

2  often do and what I did in this instance, anytime we've talked

3  about heat-related illness within our system is to ask a series

4  of questions to include:  Are we doing everything we can and

5  should do to manage our offender population with respect to

6  heat in the summer months?  Are there other things that we

7  ought to be doing that we're not doing?  And I don't recall

8  specifically if I asked her this, but it's very common for me

9  during any and every meeting that I have, is to seek -- ask

10  them for their recommendation.

11      Q.   I would hope that's what you do, but is it really

12  your testimony that the agency in 2008, 2009, 2010, and 2011

13  was doing everything it can and should do with regards to

14  protecting inmates from the dangers of extreme heat?

15      A.   What I'm -- what I'm suggesting and what I'm

16  testifying to is that our heat protocols that the agency have

17  in place have a long track record of effectively managing the

18  offender population with respect to heat illness.

19  Unfortunately, certainly in 2011, we had an unprecedented heat

20  event, and we had ten offenders die of heat-related illness,

21  and the deaths that we're referencing here occurred prior to

22  that time.  We have, and will continue to always seek to

23  improve our practices within the agency.  I will say that

24  despite our best efforts and best intentions, that it's -- it's

25  possible, and in this case it occurred that bad results happen.

Brad Livingston - 10/2/2015

1  Correctional Association.

2      Q.   Who is the president of American Correctional

3  Association currently?

4      A.   I believe it's Mary Livers.

5      Q.   Okay.  Has Dr. Linthicum ever been president of the

6  American Correctional Association?

7      A.   I believe Dr. Linthicum is the president elect of the

8  American Correctional Association.

9      Q.   Are ASA standards important for the Texas Department

10  of Criminal Justice to follow?

11      A.   We have as an agency in our -- been engaged in the

12  ASA accreditation process for a number of years.  So, yes we,

13  believe that it's an important additional outside review

14  process that's -- that augments our operations and our internal

15  oversight.

16      Q.   So are the standards adopted by the ACA important for

17  the department to follow?

18      A.   Again, I think the overall accreditation process and

19  the standards in their entirety is -- is a very useful and

20  effective process for us to engage in.

21      Q.   Why is that?

22      A.   Again, because those standards are promulgated within

23  the context of multiple disciplinary teams and a very rigorous

24  process as it relates to best practices within corrections, and

25  it represents -- it represents an outside mechanism that

Brad Livingston - 10/2/2015

 1  agencies, including ours, can and do utilize to gauge their

 2  operations from those standardized lists of correctional

 3  standards.

 4       Q.   Do you know if the State of Arkansas follows ACA

 5  standards with regards to temperature control?  Inside its

 6  housing units?

 7       A.   I do not.

 8       Q.   Do you know if the State of Arkansas prisons are

 9  air-conditioned?

10       A.   I don't -- I don't know.

11            THE COURT:  Do you know with respect to any

12  state besides Texas what facilities are, by category,

13  air-conditioned, like Florida or Arizona, or other hot states?

14            THE WITNESS:  Your Honor, I can answer in this

15  way:  I wouldn't know the totality of any of the given prison

16  systems across the country.  It's my understanding, generally,

17  that the vast majority of prison systems in this country do not

18  have all of their facilities air conditioned.

19       Q.   (BY MR. EDWARDS)  Where does that understanding come

20  from, sir?

21       A.    It comes from, primarily, interaction over the years

22  with my peers who are the head of their systems over the years

23  and, again, having dialogue and discussion about a variety of

24  operational issues over the years.

25            THE COURT:  Do you know whether there is

Brad Livingston - 10/2/2015

1    Q.   Why not?

2    A.   Neither -- none of the three of us have a direct

3 involvement in the procurement of our agricultural equipment or

4 items.  So there wouldn't have been a context or a reason for

5 us to discuss that.

6    Q.   Were you aware that the agency had purchased,

7 essentially, some sort of cooling system for pigs at the cost

8 of, you know, $700,000 or something like that?

9    A.   After the procurement was made, I became aware that

10 our agricultural function purchased modular buildings that are

11 consistent with agricultural standards for raising swine, and

12 that came to my attention after the purchase.  Our agricultural

13 function is an extremely large function operated and managed by

14 an individual who has a responsibility for a -- even though --

15 even though agricultural function is fairly small part of the

16 overall TDCJ mission, it representatives the largest

17 agricultural enterprise, probably in the nation, with 15,000 --

18 over 15,000 head of cattle, over 140,000 hogs, several hundred

19 thousand chickens, 1500 horses.  It's a very large enterprise.

20 I'm not -- I'm not involved in the acquisition of equipment

21 within that function, unless of course it would have exceeded

22 the million dollar threshold that requires approval by our

23 board, and certainly Mr. Stephens, nor Mr. Thaler, are in that

24 part of our agency operations.

25    Q.   Who was the individual who made this purchase?

Brad Livingston - 10/2/2015

1      A.   I've been told that it may lower the temperature, but
2  I don't know that it does.
3      Q.   Well, isn't that something you should learn about,
4  sir?
5      A.   Again, TDCJ is a $3.4 billion enterprise that has a
6  vast number of activities and departments and the functions
7  within it.  Our agricultural function is a relatively small
8  function within the overall TDCJ enterprise.  We -- it's a
9  small part of TDCJ's overall function, but as agricultural
10  enterprise, it's large.  But I don't, frankly, believe that as
11  executive director of TDCJ, I need to familiarize with the
12  details of equipment purchases necessary to run our -- our
13  agricultural operations.
14      Q.   I thought you told me earlier that these budgetary
15  decisions reflect priorities and tradeoffs that the agency has
16  to make; isn't that correct?
17      A.   I think in a global sense, that's absolutely correct.
18      Q.   Now, don't hold me to this, but my understanding is
19  it's roughly $700,000.  So it's something between 600,000 and
20  $800,000 to purchase these swine barns to provide lower
21  temperatures for the pigs.  Is that your understanding as well?
22      A.   My understanding is that your dollar amount is
23  correct.  I would characterize it differently.  I would suggest
24  that the purchase was made to -- as the most cost effective way
25  to replace buildings that were rendered unusable, and that was

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

**APPENDIX 1650**

Brad Livingston - 10/2/2015

 1      Q.   Do you know if any of those injuries are you describe

 2   as serious injuries requiring hospitalization?

 3      A.   I would have to look at the details on the entirety

 4   of that list.

 5      Q.   Well, you made a statement that effectively said,

 6   "Look, there haven't been any documented deaths -- heatstroke

 7   deaths as far as you're aware," and I'd like to know if you've

 8   had the occasion to asked about people who just suffered

 9   illnesses or near-death experiences with your medical staff.

10   Have you ever had that conversation, sir?

11      A.   I've made my expectation clear that -- to the extent

12   that we have a heat-related death to be aware when we

13   collectively as an agency are made aware that it is a

14   heat-related death.  So I feel certain that if we have a case

15   that is within those parameters and life threatening, that one

16   or both of my chief staff on this topic, Dr. Linthicum or Bill

17   Stephens, would inform me of such.  I don't recall being

18   informed during the years that you're referencing.

19      Q.   Okay.  Sir, I'm going to provide you a letter that

20   you wrote back to -- well, it's a letter to Mr. Turner and ask

21   you a couple of questions about it.  Okay?

22      A.   Sure.

23              (Exhibit 14 marked.)

24              (Exhibit 15 marked.)

25      Q.   (BY MR. EDWARDS)  Take a moment to look at that, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

08989e93-e7a6-40ed-b160-1071899ffbb3

**APPENDIX 1651**

Brad Livingston - 10/2/2015

1  lengthy discussions about during the course of this deposition.

2  My expectation is that my staff inform me of heat-related

3  deaths, and I have every reason to believe that they do so.

4       Q.   Now, I appreciate that, sir.  What I'm suggesting to

5  you is:  Don't you think that it might be a better approach to

6  get notifications of, not just deaths, but all heat-related

7  illnesses, particularly heatstrokes, since you know they can

8  lead to death?

9       A.   As I pointed out, my staff have made a practice of

10  informing me of heatstrokes, even if they fall short of death,

11  in the recent past summers.  That -- in addition to that, and I

12  know you have this document, in addition to that are unit-based

13  staff and the corrections institution leaders and staff pay

14  very close attention to all illnesses, all offender injuries

15  and employee injuries, and the staff who are operationally

16  involved in those -- in the operation of our units, are very

17  much in tune with and aware of both the analysis and review of

18  those documents and those injuries and illnesses.  As I pointed

19  out, my staff does inform me of heatstroke.

20       Q.   Okay.

21       A.   In addition to heatstroke deaths.

22       Q.   All right.  And is that staff Dr. Linthicum?  Is that

23  the staff that's informing you about heatstrokes?

24       A.   In combination with the correctional institution

25  division director.  One or both of them would do so.

Brad Livingston - 10/2/2015

1  we took additional steps, and we will continue to take

2  additional steps if we believe that they are operationally

3  effective and can improve our mitigation efforts.

4      Q.   In the summer of -- prior to summer of 2011, did you

5  reduce the medical staff at TDCJ facilities?

6      A.   Could you repeat that question, please.

7      Q.   Prior to the summer of 2011, did you reduce the

8  number of people and hours at facility clinics system-wide,

9  sir?

10     A.   Describe what you mean by "you."  Is this the

11  collective you or the Brad Livingston you?

12     Q.   I assume Mr. Livingston that you didn't personally

13  reduce a work force, but your agency did?

14     A.   Can you repeat that.

15     Q.   So I'm asking:  Did your agency reduce the number of

16  medical providers it had and the hours at the facilities prior

17  to the summer of 2011?

18     A.   In response to a legislative directive, yes.

19     Q.   Okay.  The legislative directive you're talking about

20  is to lower your budget, right?

21     A.   The legislative directive to all state entities to

22  include UTMB and Texas Tech and TDCJ, was to make specific

23  budget reductions during fiscal years 2011 and '12 and '13.

24     Q.   You had to reduce your budget by a certain

25  percentage, correct?

Brad Livingston - 10/2/2015

```
 1      A.   As I recall that time frame, there were specific --
 2 let me back up.
 3           During that time frame, agencies were generally
 4 directed on a percentage basis, but more specifically, agencies
 5 provided information about the items of reduction to include
 6 fiscal years '11, '12, and '13 for legislative discussion and
 7 dialogue during the course of that section, which included
 8 specific items of discussion.
 9           If I'm not mistaken, some of the reductions were
10 required in advance of the 2011 session.  I don't recall the
11 exact time frames, but it would have been before -- some of the
12 reductions before calendar year 2011 began.
13      Q.   Do you recall the percentage reduction that you were
14 instructed to reduce your agency's budget by?
15      A.   Off top of my head, no.
16      Q.   Does five percent ring a bell?
17      A.   Not specifically at that time.  And the reason why,
18 my memory is not probably not as good as it ought to be is
19 because there were a variety of different steps to that budget
20 reduction that state leaders were faced with.  So there were
21 parameters around budget reductions for fiscal year 2011 and
22 somewhat different parameters around budget reductions in
23 fiscal years 2012 and '13.  So I'm not sure of the exact
24 parameters --
25      Q.   Okay.
```

Brad Livingston - 10/2/2015

1    A.   -- or the percentage that was --

2    Q.   Okay --

3    A.   -- required.

4    Q.   Despite the -- the instruction to reduce your budget,

5  you'd agree with me that nothing in terms of reducing the

6  budget would have warranted jeopardizing the health and safety

7  and medical care that inmates need, right?

8    A.   Could you repeat the question.

9    Q.   Whatever the rational for trying to reduce your

10 budget, you'd agree with me that nothing would warrant placing

11 the prisoners in your care's medical needs in jeopardy, right?

12    A.   I believe certainly within the context of your

13 question, we have an obligation to deliver the healthcare to

14 our offender populations that is required.

15    Q.   Okay.  And one of the -- one of the things you chose

16 to do was to reduce the clinic hours at certain prisons, right?

17    A.   The --

18    Q.   And I believe that's a fact, but is that correct?

19    A.   That's correct.

20    Q.   Okay.  And several of those prisons where you reduced

21 clinic hours and didn't have a trained medical provider, who

22 could actually diagnosis, included the Hutchins facility; isn't

23 that correct?

24    A.   I believe that's correct.

25    Q.   And it also included the Gurney facility; isn't that

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

**APPENDIX 1655**

Brad Livingston - 10/2/2015

1  correct?

2      A.   I believe that's correct, although I don't have it at

3  my fingertips the full list clinics that had reduced clinic

4  hours.  I also know, though, that the Health Services Division

5  working in conjunction with our security teams on our unit and

6  UTMB and Texas Tech put in place a process whereby a staff on a

7  given unit, if they were -- if they had a medical emergency at

8  a time where the clinic was not open, there was specifically

9  delineated policies and procedures and steps for staff to take

10  when a medical emergency occurred, and there has been continued

11  training and emphasis on that.

12          Budget cuts are never easy, and the Health

13  Service Division and UTMB and Texas Tech made some very

14  difficult decision as it relates to staffing reductions within

15  the delivery of healthcare within TDCJ.  Those decisions,

16  again, are never easy, and the decisions they made were, in

17  some cases, reducing clinic hours and reducing staff on the

18  units.

19          I recall that after those reductions were put

20  into place, there have been at least one legislative hearing

21  that I can recall that Dr. Linthicum and I believe UTMB staff

22  Dr. Murray, and if my memory serves, I believe someone from

23  Texas Tech, Dr. Deshields would be the most likely person,

24  testified specifically about the cuts that were initiated and

25  operationalized within the healthcare system, and they

Brad Livingston - 10/2/2015

```
 1  responded to a series of questions in the committee about the
 2  ongoing levels of healthcare and access to care in our system.
 3              In listening to that testimony and having
 4  discussions the doctor required of us, I recall -- recollection
 5  both the discussions with her and UTMB and Texas Tech staff, is
 6  that we were and are in compliance with those requirements.
 7      Q.   Owen Murray told you that staffing requirements were
 8  in compliance with what exactly?
 9              MR. ALVAREZ:   Objection.
10      A.   That misstates what I said.
11      Q.   (BY MR. EDWARDS)   Who told you that you were in
12  compliance, and what did they tell you, you were in compliance
13  with?
14      A.   What I'm saying is that my recollection, testified in
15  a legislative hearing about their expert opinion about the
16  adequacy of the access to care in response to those budget
17  cuts.
18      Q.   So your understanding is that Owen Murray, Lannette
19  Linthicum, and Denise Deshields testified the budget cuts --
20  that the system would still be adequate even with the budget
21  cuts?  That's your understanding?
22      A.   I'm sure that wasn't their exact wording, but neither
23  of us would know that today, but I think the key point is that
24  the access to care that is required of us is and was still
25  being met.
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL NO. 4:14-CV-3253 |
| | § | |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 63

```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION


STEPHEN McCOLLUM,              §
STEPHANIE KINGREY, and         §
SANDRA McCOLLUM,               §
individually and as heirs      §
at law to the Estate of        §
LARRY GENE McCOLLUM,           §
     Plaintiffs,               §
                               §
V.                             §    CIVIL ACTION NO.
                               §    3:12-CV-2037-L
                               §
BRAD LIVINGSTON, JEFF          §
PRINGLE, and TEXAS             §
DEPARTMENT OF CRIMINAL         §
JUSTICE,                       §
     Defendants.               §

************************************************************
                  ORAL DEPOSITION OF
                    JEFFERY PRINGLE
                   FEBRUARY 15, 2013
************************************************************
```

        ORAL AND VIDEOTAPED DEPOSITION OF JEFFERY

PRINGLE, produced as a witness at the instance of the

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 15TH of FEBRUARY

2013, from 9:51 a.m. to 4:48 p.m., before Suzanne Villa,

Certified Shorthand Reporter in and for the State of

Texas, reported by machine shorthand, at the Office of

the Attorney General, 300 W. 15th Street, 7th Floor,

Austin, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                     February 15, 2013

1    Q    And would that give me a general idea of the

2  time that they were there within, say, an hour?

3    A    It should provide the general time.

4    Q    Okay.  And I assume -- well, sorry.

5         The correctional officers who were

6  responsible for the C7 dorm, they would also know if

7  inside it was extremely hot.  Is that fair?

8    A    Yes, it is.

9    Q    Okay.  All right.  You -- we're on to sergeant.

10  Oh, you mentioned a bunch of other things.  I got to ask

11  you, sorry.

12         "Field questions from security staff,"

13  what do you mean by that?

14    A    So while they're on the building, if they have

15  deficiencies, doors, lights, questions about dorm

16  operations, then they would ask their sergeant that.

17    Q    Okay.  So like if a light's not working, they

18  would say, Hey, sarge, let's get this fixed?

19    A    That would be correct.

20    Q    Okay.  Whose responsibility -- well, okay.

21         Make sure unit activities are operating,

22  what do you mean by that?

23    A    The unit follows a building schedule which is

24  based on the 24 hours.  And during that 24 hours,

25  there's specific duties that -- or operations that

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

**APPENDIX 1660**

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                   February 15, 2013

1   occur.

2       Q     Would you walk me through some of those,

3   please?

4       A     For instance, at 3:30 a.m. would be a mealtime,

5   so we begin feeding the meal.  And also about 3:45, we

6   begin on the opposite end of the unit to do a laundry

7   exchange within a housing area.  Approximately 5:30 a.m.

8   we have education; offenders attend education

9   programming.  And then they also have a DAP program that

10  it begins around 6:00 a.m.

11      Q     What is that?  What is the "DAP program"?

12      A     It's a drug and alcohol assessment program.

13      Q     Now is -- and I got -- I'm sure there's a good

14  reason for this.  So tell me, why does -- is mealtime

15  also referred to as "chow" by a lot of the inmates or

16  the guards or correctional officer?

17      A     Yes, it could be referred to as different

18  names.

19      Q     Okay.  Why does it start so early?  It seems

20  early from my perspective.  And I'm sure there's a great

21  reason for it, but I'd like to know.

22      A     The one reason we'd start early because of the

23  daily activities, because we have a lot of activities

24  that begin around 5:30.  So we don't just run one

25  session of education.  We run four sessions.  And they

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

**APPENDIX 1661**

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                  February 15, 2013

1   different from other facilities.

2       Q    Okay.  That's -- okay.  That -- that's

3   interesting to me.

4              When you say a transfer type of facility

5   or a transfer type of prison, tell the jury what -- what

6   you mean.

7       A    Back in 1993, during the legislation there was

8   a new law, fourth-degree felony.  And during that time

9   frame, there was a need to have more prison beds built.

10  So they built dormitory-style housing, such that as the

11  Hutchins Unit, and a group of them were called transfer

12  facilities and another group was called state jail

13  facilities.

14      Q    Okay.  So what's a transfer facility?

15      A    Transfer facility would be to take in inmates

16  directly from counties and temporarily house them for up

17  to two years before sending them over to an

18  institutional facility for permanent housing.

19      Q    Does that generally mean that inmates at

20  transfer facilities have been convicted of less serious

21  crimes than inmates at institutional divisions?

22      A    It would be on the person's definition of "less

23  serious."

24      Q    That -- that's fair.

25              Less violent?

**WRIGHT WATSON & ASSOCIATES**

40

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1       A    I do not know what the criteria exactly is for

2   assigning one to a transfer facility.  But if an

3   offender had been convicted of capital murder, they

4   would not go to one of those facilities.

5       Q    Okay.  Who would know what the criteria are for

6   putting an inmate into a transfer facility?  Would that

7   be Mr. Thaler?

8       A    That would -- that could be Mr. Thaler's level

9   or classification.

10      Q    Okay.  And who is the head of classifications?

11      A    My knowledge, I believe it's Joanie White.

12      Q    Joanie White.  Okay.

13              What is your understanding, if you know,

14  of what classification does?

15      A    I'm only involved with the unit classification

16  activities.  And what they do on the unit facility is,

17  we take the paperwork that's generated by medical and we

18  look at the offender's criminal history, and we assign

19  them -- they assign them to a housing and to a job.

20      Q    Sure.  Do sex offenders go to transfer

21  facilities?

22      A    Yes, they would.

23      Q    They would?  Do you know why?  And only if you

24  know, sir.

25      A    I would assume it was a lesser offense.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

**APPENDIX 1663**

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                     February 15, 2013

1   the drug, that it does in -- does, in fact, dehydrate

2   you, sir, cause you to, I guess, drink more water?

3       A    I don't have no way of engaging whether it does

4   or doesn't.

5       Q    Okay.  You just know it's a side effect.

6   Right?

7       A    Yes.

8       Q    Okay.  Is it reasonable for me to assume that

9   the medical staff that work at the -- well, strike that.

10              About how long have you been taking

11  medication for hypertension?

12      A    I would guess since about the age of 30 or 31,

13  and that would make about 15 years.

14      Q    All right.  About how many prisoners are housed

15  at the Hutchins Unit on any given day?

16      A    Any given day is between 1,970 up to 2,200.

17      Q    Would that have been about the number in July

18  of 2011?

19      A    I could only speculate that that was it then.

20      Q    Within the range that you're talking about now,

21  is it fair to say somewhere between 1,900 and 2,200 is

22  about how many people the Hutchins Unit had back in July

23  of 2011?

24      A    That would -- that would be a good assumption

25  of the average.

71

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                   February 15, 2013

```
 1      Q    Okay.  Do you know -- I mean, the inmates are
 2  divided into what you call state jail inmates and
 3  transfer inmates?
 4      A    Correct.
 5      Q    Okay.  Do you have any idea of the breakdown?
 6      A    I have an average of the breakdown, but not any
 7  exact numbers.
 8      Q    Would you give me the average, to the best of
 9  your recollection?  And if you're off by some percentage
10  points that's okay.
11      A    The state jail is about 1,200, and the ID
12  offenders is around 800.
13      Q    What was the expression you used, "ID
14  offenders"?
15      A    ID.
16      Q    ID, institutional division.
17      A    Institutional division.
18      Q    Gotcha.  Okay.
19              Now we touched on this earlier, but what
20  is the purpose of a transfer facility?
21      A    The transfer facility would take offenders in
22  directly from county jails and complete a basic
23  processing into the agency and temporarily house them
24  for up to two years before they're sent to a permanent
25  unit of assignment.
```

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

APPENDIX 1665

Stephen McCollum, et al v.                          Jeffery Pringle
Brad Livingston, et al.                          February 15, 2013

1    areas would be reviewed and required to take certain

2    breaks at certain temperature times.  And offenders

3    were -- in the housing area, if they made staff aware of

4    their struggling with the heat conditions, then the

5    staff were made aware that they could go to a cooler

6    area.  It could either be in that dorm housing area

7    within the multipurpose room or to another area where

8    they could be secured.

9        Q    And are you sure that those accommodations were

10   in place prior to Mr. McCollum's death?

11       A    Yes.

12       Q    Do you recall writing a memo contrary to that

13   at any point in your career?

14       A    A memo contrary to what?

15       Q    That would indicate that that wasn't accurate?

16       A    No.

17       Q    Okay.  Let's go through this one by one, sir.

18            This heat awareness training, when did

19   that occur?

20       A    That training occurs during the month of May.

21       Q    Why does it occur during the month of May, if

22   you know?

23       A    I guess preparing for the upcoming summer

24   temperatures.

25       Q    Okay.  To me that indicates that, you know,

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

APPENDIX 1666

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1   everybody -- well, to me that certainly indicates that

2   you, as the warden of the Hutchins facility, know that

3   the hot summer temperatures are something that you need

4   to deal with in order to make sure that inmates are

5   safe.  Is that fair?

6        A    No.

7        Q    Okay.  What does it indicate to you that you do

8   heat -- extreme heat awareness training in May of every

9   year?

10       A    It's the training for the whole unit to include

11  the first-line staff and security staff, to make sure

12  that they're aware of the extremes and temperatures and

13  what should be done in case there are issues.

14       Q    Is it done to protect inmates?

15       A    It's done to protect everybody on the facility.

16       Q    Are inmates on a facility?

17       A    Yes, they are.

18       Q    Okay.  So is the training done -- well, do you

19  do the training solely to make sure that office --

20  officers are protected or do you also do it to make sure

21  that inmates are protected?

22       A    I don't do the training.

23       Q    Do you ensure that it gets done?

24       A    The training's done for inmate workers and

25  staff, yes.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

**APPENDIX 1667**

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1      Q    Do you know why is it done?

2      A    The training?

3      Q    Yeah.

4      A    Why is it done?

5      Q    Yeah.

6      A    The training is done because there are factors

7  that could cause medical issues such as heatstroke or

8  heat problems.

9      Q    Is this the training that you're talking about,

10  this training circular?  Is this the training that

11  you're talking about, sir?

12              THE WITNESS:  (Indicating).

13              MR. GARCIA:  Oh, that's the exhibit

14  number.

15              THE WITNESS:  Okay.

16              MR. GARCIA:  From the last depo.

17              THE WITNESS:  So this is Exhibit 11?

18              MR. GARCIA:  I think from the last

19  deposition.

20              THE WITNESS:  Oh.

21              MR. MEDLOCK:  Yeah.

22      A    Yes, this would be part of the training that is

23  given.

24      Q    (BY MR. EDWARDS)  What other -- what else is --

25  what other training is given other than that document?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

**APPENDIX 1668**

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1      A     There would be a e-mail from the leadership --

2    not exactly who would have sent that out -- with

3    precaution identifiers.

4      Q     Would that be read -- well, did you receive

5    that train- -- did you receive this training?

6      A     From what I recall, yes, I did.

7      Q     Okay.  Would there be a log where you would

8    have checked in?

9      A     Yes, there would be.

10     Q     Okay.  Do you recall who gave the training in

11   May of 2011?

12     A     One part of the training would have been done

13   by UTMB, another part of training would have been done

14   by the admin, CDSO [sic].

15             (Deposition Exhibit No. 33 marked)

16     Q     (BY MR. EDWARDS)  Sir, let me hand you what's

17   been marked as Exhibit 33.  Is that the e-mail you

18   received relating to heat precautions?

19     A     Yes, it would have been.

20     Q     Okay.  Did you forward that on to your staff?

21     A     Yes, it would have been.

22     Q     Who is Katie Anderson?

23     A     I do not know.

24     Q     Okay.  You're positive that you forwarded this

25   on to your staff?

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

APPENDIX 1669

Stephen McCollum, et al v.                           Jeffery Pringle
Brad Livingston, et al.                           February 15, 2013

1      A     To alert us of the present danger, yes.

2      Q     Okay.  Okay.  So I want to go through that list

3  and if I've written it down incorrectly, please make

4  sure you tell me.  Okay?

5            We talked about the heat awareness

6  training that y'all received.  Right?

7      A     Correct.

8      Q     Okay.  And then I wrote down "heatstroke."  And

9  I believe you -- I believe we may have just talked about

10 that.  But during this training, it was explained to you

11 that, look, if not treated, this can lead to heatstroke

12 which can lead to death.  Is that correct?

13     A     Correct.

14     Q     And so accommodations that you made for

15 individuals were lowering the temperatures of water in

16 the showers?

17     A     Correct.

18     Q     Okay.  What did you lower them to?

19     A     The showers that I took temperature checks on

20 were, approximately, about 95 degrees.

21     Q     What were they before?

22     A     Policy requires them to stay around 107.

23     Q     Do you know why the number 95 was chosen?

24     A     The 95 would have been just chosen because of

25 the way the shower mixing valve and adjustments are

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

APPENDIX 1670

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                   February 15, 2013

1   done, and plus it's below the normal body temperature.

2       Q    Okay.  How is -- who explained that to you that

3   that was why the number 95 was chosen?

4       A    That was the number that I chose with my staff.

5       Q    Oh, you chose that with your staff.  Okay.  In

6   consult -- what staff did you make that decision?

7       A    Would have been with risk management and

8   maintenance.

9       Q    Who from risk management and who from

10  maintenance?

11      A    Would have been Mr. Storie.

12      Q    Okay.

13      A    And the maintenance would have been a Mr. Pugh.

14      Q    And are there -- would there be a log of

15  temperature checks to verify that the water was, in

16  fact, turned down?

17      A    No, no logs.

18      Q    Who's -- who was checking it?

19      A    I personally checked them.  And then Mr. Eason

20  had visit the unit and he personally checked them with

21  me.

22      Q    When did that happen?

23      A    I do not recall the exact date.

24      Q    Before or after Mr. McCollum's death?

25      A    I personally checked them before.

Stephen McCollum, et al v.                     Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1   shift.

2        Q     Does that mean there wasn't water available on

3   third shift?

4        A     No, that does not mean that.

5        Q     Okay.  What -- how would one get water on third

6   shift?

7        A     We have eight sinks that provide into a spigot

8   water fountain system and they could drink from it.

9        Q     Okay.  What temperature's that water?

10       A     I took that temperature.  It's 72 to 74

11  degrees.

12       Q     Is that about the temperature of the jugs of

13  water that you bring in?

14       A     I didn't take temperatures of the jug of water,

15  but I would assume they were probably cooler.

16       Q     Why would you assume that?

17       A     Because the ones -- when ice was available,

18  they were filled with ice.

19       Q     Okay.  Have you ever drank out of the sinks at

20  the Hutchins Unit?

21       A     Yes, I have.

22       Q     Okay.  Do you do so regularly?

23       A     No, I do not.

24       Q     Okay.  How do you generally hydrate at the

25  prison?

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

APPENDIX 1672

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                   February 15, 2013

1     Q     Okay.  Do you know why there's not a policy

2  similar to that for the dorms?

3     A     The inmates have several steps that they can

4  mitigate and they're not at work, so they can determine

5  their amount of activity that they want to do; movement.

6  They have access to showers and access unimpeded to

7  water.  And then they could also use the coolers if they

8  wanted to wet down any clothing items and help mitigate

9  the heat.  They monitor themselves.

10     Q     Well, that's a good way to put it.  When

11  they're at work, you monitor them.  Right?

12     A     They're supervised.

13     Q     And when they're in the dorms, I guess it's

14  TDCJ policy or at least policy at the Hutchins Unit that

15  they monitor themselves.  Is that fair?

16     A     Based upon their activities and what they do in

17  that housing area.

18     Q     Sure.  Do you see a flaw in -- in the system

19  that -- that's being implemented in the Hutchins Unit

20  with regard to policies for work, but no specific policy

21  for the dorms or the housing area?

22     A     That information of the list is most of the

23  housing area which is the policy.

24     Q     There's no written policy for housing.  Right?

25     A     Not from the leadership or agency other than

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

**APPENDIX 1673**

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                     February 15, 2013

1        Q     Okay.  Now are there more than two?  Now

2    that -- I think you said there are four, in the summer,

3    fans?

4        A     Three on the wall and then one on the floor.

5        Q     Okay.  And in July there were two on the wall?

6        A     Correct.

7        Q     Okay.  Would you ever be involved in the

8    decision to transfer a prisoner to a facility that had

9    air-conditioning?

10       A     No, I would not.

11       Q     Who would make that decision?

12       A     That decision, depending on the reasons, would

13   depend on the reason of the need.

14       Q     Would it -- would it be a medical department

15   decision always or could it be -- or would it -- could

16   it be a TDCJ decision or a Hutchins Unit decision?

17       A     They would be based on the medical need and

18   UTMB would make that decision.

19       Q     Okay.  So if I'm struggling with the heat and I

20   ask an officer, hey, can you transfer me to a facility

21   with air-conditioning, the process would be to consult

22   with UTMB and UTMB would ultimately make that decision?

23       A     Because they make medical accommodations.

24       Q     Okay.  And that would be considered a medical

25   accommodation, move me -- moving someone to an

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

APPENDIX 1674

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants.* | § | |
| | § | |

# Exhibit 64

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, | § | |
| STEPHANIE KINGREY, and | § | |
| SANDRA McCOLLUM, | § | |
| individually and as | § | |
| heirs at law to the | § | |
| Estate of LARRY GENE | § | |
| McCOLLUM, | § | |
|      Plaintiffs, | § | |
| | § | |
| VS | § | CIVIL ACTION NO. |
| | § | 3:12-cv-02037 |
| BRAD LIVINGSTON, JEFF | § | |
| PRINGLE, and the TEXAS | § | |
| DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, | § | |
|      Defendants. | § | |

-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD J. CLARK

FEBRUARY 7, 2013
-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD J. CLARK, produced as a witness at the instance

of the PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

February, 2013, from 1:55 p.m. to 3:50 p.m., before TINA

TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

 1   they're feeling all right.  If they're sleeping, we do
 2   the same.  We just check to make sure that they're
 3   breathing.
 4        Q.   Okay.  Is there anything else that you're
 5   supposed to do as a correctional officer when the --
 6   when you see a name on that list?
 7        A.   In what way?
 8        Q.   Well, you've said that when you're doing your
 9   rounds, you -- you check to make sure they're breathing
10   or ask them a couple of questions when they're on the
11   extreme heat list.  Do you do anything else, or is that
12   the total extent of what you use the extreme heat list
13   for?
14        A.   Well, we -- we check every -- everyone when we
15   go in.  Our first -- first count usually is a roster
16   count where we check -- check everyone's ID, their TDC
17   number and check their face.
18        Q.   And you do that when you first come on duty?
19        A.   Our first count.
20        Q.   And when -- when does the first count happen?
21        A.   We had a -- a change of our -- of what -- all
22   the time the counts and everything are, but usually that
23   count is -- is within an hour of when we get on the
24   building.
25        Q.   Okay.  Now, you spend a lot of time working in

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

APPENDIX 1677

Stephen McCollum, et al.                           Richard J. Clark
Brad Livingston, et al.                           February 07, 2013

1  make sure we can see their face so we can use the -- use

2  the picture in the ID card to make sure that the right

3  person is right.

4       Q.   And you do that, you said, within about an

5  hour of when you start?

6       A.   Yes.

7       Q.   So if -- that would have happened around 11:30

8  on July the 21st, 2011?

9       A.   Yes.

10      Q.   Okay.  You said that's the first count.  How

11  many counts do you do?

12      A.   I'm not sure at that time since we have

13  changed the 24 hour when everything is done, but we

14  usually do like four counts a night.

15      Q.   Would you space those evenly, like do them

16  every two hours on your eight-hour shift?

17      A.   The -- the roster count takes -- takes longer

18  than the other shifts, the other counts we have, so they

19  would be spaced approximately an hour to an hour and a

20  half, because at 3:00 o'clock, we have to run chow.

21      Q.   You said you also get people up and cleaning

22  the dorms.  Is that the trustees who were -- or the SSIs

23  who --

24      A.   Yes.

25      Q.   -- are responsible for that?  What time do you

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

**APPENDIX 1678**

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

```
1        Q.   Is it standard practice for when there's an
2   incident like this, for someone to bring a video camera?
3        A.   Yes.
4        Q.   Now, your statement says that you got there at
5   2:10 a.m.  That's the correct time?
6        A.   2 -- when -- that's when I was -- that's when
7   I was doing the count.
8        Q.   Okay.  So that's how you know it was 2:10 a.m.
9   when --
10       A.   Like I said, it -- it was approximately then.
11  I don't actually look at my watch to make sure what time
12  I'm taking the count.
13       Q.   Okay.  But you do the count at approximately
14  the same time every day, right?
15       A.   Yeah, approximately.
16       Q.   So it would have been around 2:10 a.m. when
17  you were there initially?
18       A.   (Nods head.)
19       Q.   That's a yes?
20       A.   Yes.
21       Q.   Okay.  And then you say that the -- in your
22  statement, that the -- whoever it was that told you to
23  go to this other problem got there in about 10 minutes;
24  is that right?
25       A.   I'm not sure when they got there.  They might
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM**, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON**, *et al.*, | § | |
| *Defendants.* | § | |
| | § | |

# Exhibit 65

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


STEPHEN McCOLLUM, et al.,         )
                                  )
                                  )
                    Plaintiffs,   ) Civil Action No.
vs.                               ) 4:14-CV-3253
                                  )
BRAD LIVINGSTON, et al.,          )
                                  )
                    Defendants.   )
_____)




VIDEOTAPED DEPOSITION OF ROGER CLARK

San Diego, California

Monday, April 18, 2016




Reported by:
Tricia Rosate, RDR, RMR, CRR, CCRR
CSR No. 10891
Job No. 123342214

2

**APPENDIX 1681**

Roger Clark - 4/18/2016

121

1          SAN DIEGO, CALIFORNIA; MONDAY, APRIL 18, 2016

2                    1:31 P.M. - 4:43 P.M.

3                         -  -  -  -

4          THE VIDEOGRAPHER:   Good afternoon.   We are

5   back on the record.

6          The time is 1:31 p.m.

7               EXAMINATION (Continued)

8   BY MR. GREER:

9      Q   Mr. Clark, are you ready to proceed?

10     A   Yes.

11     Q   Would you turn to page 7 of your report,

12  please, sir.

13     A   I have it.

14     Q   And in the paragraph that's numbered 6 here,

15  it says, "In my opinion, the ACA standards and

16  statements of best practices are among the best

17  expressions necessary in required custodial conduct to

18  be found anywhere."

19          Do you agree that the ACA is made up of

20  competent professionals?

21     A   Yes.

22     Q   Experts in their field?

23     A   Yes.

24     Q   Do you agree that the people who formulate

25  these standards are experts in their field?

Roger Clark - 4/18/2016

122

1          A    Yes.  As I understand your question, yes.

2          **Q    And you would rely on the standards and**

3    **definitions that are in there, and you would agree**

4    **with them wholeheartedly?**

5          A    I agree with them, and I've quoted them in my

6    report.

7          **Q    Right.**

8          A    So I would say yes.

9          **Q    And you said -- I think I asked you this**

10   **before, but you've never been trained as an -- an**

11   **auditor?  An ACA auditor?**

12         A    No.

13         **Q    But do you agree that the ACA auditors that**

14   **do go out and do these audits are well trained?**

15         A    I would expect.  I do not -- I've not seen

16   any of their training, but that's what I would expect.

17         **Q    And the people who take on the duties of**

18   **auditors are also correctional administration experts.**

19         A    That would be my expectation.

20         **Q    Okay.  Let's go ahead, then, and flip to**

21   **page 2, if you could.  And I'm looking at the last**

22   **paragraph on page 2.**

23         **It says, "Upon arriving at HSJ,"**

24   **Hutchins State Jail, I assume, "Mr. McCollum was given**

25   **a brief medical evaluation by the facility nurse..."**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 66

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
STEPHEN McCOLLUM,          §
STEPHANIE KINGREY, and     §
SANDRA McCOLLUM,           §
individually and as        §
heirs at law to the        §
Estate of LARRY GENE       §
McCOLLUM,                   §
          Plaintiffs,       §
                            §
VS                          §     CIVIL ACTION NO.
                            §     3:12-cv-02037
BRAD LIVINGSTON, JEFF      §
PRINGLE, and the TEXAS     §
DEPARTMENT OF CRIMINAL     §
JUSTICE,                    §
          Defendants.       §
```

-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

SANDREA YVONNE SANDERS

FEBRUARY 8, 2013
-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

SANDREA YVONNE SANDERS, produced as a witness at the

instance of the PLAINTIFFS, and duly sworn, was taken in

the above-styled and numbered cause on the 8th day of

February, 2013, from 10:08 a.m. to 1:35 p.m., before

TINA TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1      Q.   Okay.  When you -- that's kind of an optional
2  thing.  The prisoners can decide --
3      A.   Correct.
4      Q.   -- when it's chow time if they go or not?
5      A.   Yes.
6      Q.   Okay.  Is that done any differently for
7  prisoners who don't have access to commissary yet and
8  wouldn't have any other ability to eat?
9      A.   No, that's not done any differently.
10     Q.   Okay.  Mr. McCollum was a rather large
11 individual, right?
12     A.   Yes.
13     Q.   And he was on the top bunk, right?
14     A.   Yes.
15     Q.   Is it usual for a prisoner of that size to be
16 on the top bunk?
17     A.   It's not unusual.
18     Q.   You've seen prisoners that large on the top
19 bunk before?
20     A.   Yes.
21     Q.   Okay.  You wouldn't think anything of it when
22 you saw a prisoner that large on the top bunk?
23     A.   I might would if I actually witnessed them
24 struggling to get on the top bunk, you know.  Just in
25 general, no.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

**APPENDIX 1686**

Stephen McCollum, et al.                Sandrea Yvonne Sanders
Brad Livingston, et al.                      February 08, 2013

 1  and we could have discussed it later.

 2       Q.    Okay.  That's not what happened here, though.

 3       A.    Correct.

 4       Q.    She waited for you to arrive?

 5       A.    Correct.

 6       Q.    And then you talked to the nurse at the Crain

 7  Unit?

 8       A.    Right.

 9       Q.    And then you and the nurse at the Crain Unit

10  made the decision to call 911; is that right?

11       A.    Correct.

12       Q.    Okay.  What information did you feel you

13  needed from the nurse at the Crain Unit before deciding

14  to call 911?

15       A.    Like I said, it had been a situation where it

16  was called over the radio that the offender was having a

17  seizure.  We dealt with seizure issues quite often.  It

18  was only when -- I don't know -- like I said, I don't

19  know what the situation -- what triggered it, but we

20  would have called Crain anyway.  We would have called

21  the Crain Unit anyway to notify them that this offender

22  was having a seizure.

23            But what it was, he never was responding

24  to the things.  You know, we give the chest rub.  It --

25  it makes you, even if you're unconscious -- well, not

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

**APPENDIX 1687**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 4:14-CV-3253** |
| | § | |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants*. | § | |
| | § | |

# Exhibit 67

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION
STEPHEN McCOLLUM,              §
STEPHANIE KINGREY, AND         §
SANDRA McCOLLU,                §
INDIVIDUALLY AND AS            §
HEIRS AT LAW TO THE            §
ESTATE OF LARRY GENE           §
McCOLLUM,                      § CIVIL ACTION NO.
        Plaintiffs,            § 3:12-CV-02037
                               §
VS.                            §
                               §
BRAD LIVINGSTON, JEFF          §
PRINGLE, RICHARD CLARK,        §
KAREN TATE, SANDREA            §
SANDERS, ROBERT EASON,         §
THE UNIVERSITY OF TEXAS        §
MEDICAL BRANCH AND THE         §
TEXAS DEPARTMENT OF            §
CRIMINAL JUSTICE,              §
        Defendants.            §
```

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

            ORAL AND VIDEOTAPED DEPOSITION OF
                 WILLIAM L. STEPHENS
                     VOLUME 1

                  October 18, 2013

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

        ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L.
STEPHENS, produced as a witness at the instance of the
PLAINTIFFS, and duly sworn, was taken in the
above-styled and numbered cause on October 18, 2013,
from 4:50 p.m. to 8:05 p.m., before Brenda J. Wright,
RPR, CSR in and for the State of Texas, reported by
machine shorthand, at the Office of the Attorney
General, 300 West 15th Street, Suite 1200, Austin,