UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| PLAINTIFFS | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... II

TABLE OF AUTHORITIES .............................................................................................. V

I.   INTRODUCTION ...................................................................................................... 1

II.  FACT ISSUES PRECLUDING SUMMARY JUDGMENT ................................ 3

III. STANDARD OF REVIEW ........................................................................................ 5

IV.  FACTUAL BACKGROUND .................................................................................... 6

   A.  TDCJ Prisons Become Dangerously Hot Indoors, and Texas Inmates Die. ................ 6

   B.  Inmate Living Areas at the Hutchins Unit are Dangerously Hot Every Summer. .... 14

   C.  The Hutchins Unit Supervisors, Defendants Eason and Pringle, Knew it had
   Obviously Inadequate Protections Against the Heat ................................................. 18

   D.  TDCJ and UTMB Knew Mr. McCollum was a Person with a Disability .................. 22

   E.  TDCJ and UTMB Denied Mr. McCollum Reasonable Accommodations for his
   Disabilities ................................................................................................................ 25

   F.  Clark, Tate, and Sanders Watched Mr. McCollum Die of a Heat Stroke. ................ 33

V. ARGUMENT AND AUTHORITIES ......................................................................... 40

   A.  Eighth Amendment Claims ...................................................................................... 40

     1.   *Defendants Clark, Tate, and Sanders Violated Mr. McCollum's Eighth Amendment
     Right to Access Medical Care.* ................................................................................ 40

       i.   Clark, Tate, and Sanders were Deliberately Indifferent to Mr. McCollum's Serious
       Medical Need. ...................................................................................................... 40

       ii.  Defendants Clark, Tate and Sanders are Not Entitled to Qualified Immunity ........... 44

       iii. A Fact Dispute Exists as to Whether Clark, Tate, and Sanders' Delay Injured
       McCollum. .......................................................................................................... 47

     2.   *Defendants Eason and Pringle Violated Mr. McCollum's Eighth Amendment Rights.* . 48

       i.   Pringle and Eason Operated the Hutchins Unit in Unconstitutional Conditions. ....... 48

       ii.  Conditions at the Hutchins Unit Violate Contemporary Standards of Decency. ........ 52

a.   In the South, Air Conditioning Has Become the Norm for All Housing. ............... 53

b.   Numerous Prisons and Jail Systems Mandate Air Conditioning. .......................... 55

c.   Free-World Industry Standards Require Air Conditioning at Far Lower Heat
Indexes. ................................................................................................................. 58

iii.  Pringle and Eason Failed to Supervise Officers at the Hutchins Unit. ...................... 61

a.   Warden Pringle was Deliberately Indifferent to Dangerous Conditions at the
Hutchins Unit. ...................................................................................................... 62

b.   Failure to Implement Gates v. Cook Measures .................................................... 62

c.   Failure to Implement Necessary 911 Call Procedures and Training to Obtain
Emergency Medical Care for Inmates Suffering Heat Stroke ............................... 63

d.   Defendant Pringle Deliberately Did Not Take Adequate Steps to Protect Mr.
McCollum from the Heat ...................................................................................... 64

iv.  Regional Director Eason Violated Mr. McCollum's Eighth Amendment Rights ....... 67

v.   Eason was Deliberately Indifferent to the Risks Posed to Mr. McCollum ................ 70

**B.   Pringle and Eason are Not Entitled to Qualified Immunity ......................................... 76**

**C.   Defendant Livingston Violated Mr. McCollum's Eighth Amendment Rights. ........... 78**

1.   *Livingston was Deliberately Indifferent to the Inadequate Heat Mitigation Measures in
his Prison System* ......................................................................................................... 78

2.   *Livingston is Not Entitled to Qualified Immunity.* ......................................................... 91

**VI.  DEFENDANTS TDCJ AND UTMB VIOLATED MR. MCCOLLUM'S AMERICANS
WITH DISABILITIES ACT AND REHABILITATION ACT RIGHTS. ............................ 93**

**A.   Mr. McCollum Suffered from Multiple Substantially Limiting Disabilities. .............. 94**

1.   *Mr. McCollum was Obese. ........................................................................................ 95*

2.   *Mr. McCollum had Diabetes. ..................................................................................... 96*

3.   *Mr. McCollum had Hypertension. ............................................................................... 97*

4.   *Mr. McCollum had Depression. ................................................................................... 98*

5.   *Mr. McCollum's Thermoregulation was Substantially Impaired. .................................. 98*

**B.   Safe Confinement at the Prison was a Program or Service. .......................................... 100**

III

**C. Lack of a Reasonable Accommodation Excluded Mr. McCollum from the Prisons. .... ..................................................................................................................... 102**

**D. Denying Mr. McCollum a Reasonable Accommodation was Discrimination By Reason of his Disability. ..................................................................................... 103**

**E. TDCJ and UTMB Intentionally Discriminated Against Mr. McCollum by Failing to Provide Him Reasonable Accommodations. ....................................... 108**

**F. TDCJ and UTMB are not Immune Under the ADA or Rehabilitation Act. ............ 112**

**G. TDCJ and UTMB's Failure to Accommodate Mr. McCollum is the Sole Cause of his Injuries Under the Rehabilitation Act. .................................................. 114**

**H. The Fifth Circuit has Repeatedly Upheld Respondeat Superior Liability Under the ADA and Rehabilitation Act. .......................................................... 115**

**I. The ADA and Rehabilitation Act Provide Expanded Standing for Injunctive Relief... ..................................................................................................................... 116**

**VII. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES AS THE FACT ISSUES PRECLUDING SUMMARY JUDGMENT ALSO SUPPORT CLAIMS FOR PUNITIVE DAMAGES ............................................................................................. 118**

**VIII.  THE TDCJ DEFENDANTS ASSERT OBJECTIONABLE EVIDENCE IN SUPPORT OF THEIR MOTION. ..................................................................... 119**

**A. The Ruiz Stipulations, Cody Ginsel's Testimony in Cole, and Adolfo Banda's death are irrelevant to this case. .................................................................... 119**

**B. Defendants did not disclose John Nielsen-Gammon as an expert in this case. ......... 121**

**C. The Facts Timeline is improper summary judgment evidence by reason of hearsay and unreliability. ............................................................................................ 121**

**D. Defendants did not append complete versions of the document provided as Exhibit 74. ....................................................................................................... 122**

**IX. CONCLUSION .......................................................................................... 122**

## TABLE OF AUTHORITIES

# CASES

*A.G. v. Lower Merian School Dist.*, 542 Fed. Appx. 194  (3rd Cir. 2013) ................................. 101

*Alexander v. Choate*, 469 U.S. 287 (1985) ...................................................... 100

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 5

*Arnold v. United Parcel Serv.*, 136 F.3d 854 (1st Cir. 1998) ....................................... 89

*Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................................... 48

*Austin v. Johnson*, 328 F.3d 204 (5th Cir. 2003) .............................. 37, 39, 40, 41

*Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015).................................................... passim

*Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222 (10th Cir. 2009) ..................................... 101

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................... 53

*Bennett- Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005)........................... 106

*Bishop v. Arcuri*, 674 F.3d 456 (5th Cir. 2012) ..................................................... 41

*Blackmon v. Garza*, 484 Fed. Appx. 866 (5th Cir. 2012)........................................... passim

*Borum v. Swisher Cty.*, 2015 WL 327508 (N.D. Tex. Jan. 26, 2015) ........................................ 97

*Bruce v. Little*, 568 Fed. Appx. 283 (5th Cir. 2014) ............................................... 36

*Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996) .................................................... 99

*Burch v. Coca-Cola Co.*, 119 F.3d 305 (5th Cir. 1997)........................................... 103

*Bustos v. Martini Club, Inc.,* 599 F.3d 458 (5th Cir. 2010) ........................................ 55

*Carey v. Piphus*, 435 U.S. 247 (1978) .............................................................. 86

*City Nat'l Bank v. Unites States*, 907 F.2d 536 (5th Cir. 1990)........................................ 15

*Clark v. McDonald's Corp.*, 213 F.R.D. 198 (D. N.J. 2003).......................................... 108

*Cole v. Livingston*, No. 4:14-v-01698 (S.D. Tex.)............................................... 68, 109

*Coleman v. Dretke*, 409 F.3d 665 (5th Cir. 2005) .................................................. 16

*Cook v. Rhode Island*, 10 F.3d 17 (1st Cir. 1993) ................................................. 89

*Cooper v. Dyke*, 814 F.2d 941 (4th Cir. 1987) ..................................................... 110

*Delano-Pyle v. Victoria Co.*, 302 F.3d 567 (5th Cir. 2002)................................... 102, 107

*Durrenberger v. Tex. Dep't of Crim. Justice*, 757 F.Supp.2d 640 (S.D. Tex. 2010)................. 105

*Duvall v. Co. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001)............................................ 101

*E.E.O.C. v. Resources for Human Development, Inc.*, 827 F.Supp.2d 688 (E.D. La. 2011)........ 89

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006) ............................................. 36, 38, 40

*Erjavac v. Holy Family Health Plus*, 13 F.Supp.2d 737 (N.D. Ill. July 13, 1998)...................... 89

*Estate of A.R. v. Muzyka*, 543 Fed. Appx. 363 (5th Cir. Oct. 16, 2013)........................... 101, 103

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005)........ 56

*Estate of Pollard v. Hood Cty.*, 579 F. App'x 260 (5th Cir. 2014) ............................... 56

*Estelle v. Gamble*, 429 U.S. 97 (1976) .......................................................... 39, 41

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................ 37, 44, 47, 52

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007) ........................ 109

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) ............................................................ passim

*Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404 (5th Cir. 2008) ................................ 56

*Gaudreault v. Municipality of Salem*, 923 F.2d 203 (1st Cir. 1990) .............................. 38

*Gibbs v. Lynn*, 30 F.3d 1490 (5th Cir. 1994) ...................................................... 50

*Gonzalez v. Cecil Co., Md.*, 221 F.Supp.2d 611 (D. Md. 2002) ............................... 37, 42

*Goodman v. Harris Cty.*, 571 F.3d 388 (5th Cir. 2009) ........................................ 56

*Graham v. Florida*, 560 U.S. 48 (2010) .................................................... 43, 47, 48

*Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010) ............................................ 51

*Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875 (5th Cir. 2004)........................... 113

*Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir. 2012), ........................................ 98

*HDRE Business Partners Ltd. Group, L.L.C. v. Rare Hospitality Intern., Inc.*, 484 Fed. Appx.
  875 (5th Cir. 2012) ...................................................................... 104

*Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992) ............................................ 110

*Hinojosa v. Livingston,* 807 F.3d 657 (5th Cir. 2015) ............................... 56, 57, 70, 104

*Hinojosa v. Livingston,* Civil Action No. 2:13-CV-319 (S.D. Tex. 2014) ...................... 97, 105

*Hope v. Pelzer*, 536 U.S. 730 (2002) ....................................................... 47

*Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37 (2nd Cir. 1997) ................. 108

*Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667 (7th Cir. 2012) .............................. 99, 100

*Johnson v. Texas Bd. of Criminal Justice*, 281 F. Appx 319 (5th Cir. 2008) .............................. 70

*Jones El v. Berge*, 374 F.3d 541 (7th Cir. 2004) ........................................... 51

*Kennedy v. City of Cincinnati*, 595 F.3d 327 (6th Cir. 2010) .................................. 41

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ............................................... 48

*Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274 (1st Cir. 2006).................................. 100

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) ......................................... 37, 41

*Kitchens v. Dallas Cty.*, 759 F.3d 468 (5th Cir. 2014) ..................................... 40

*Knapper v. Safety Kleen Sys., Inc.*, 2009 WL 909479 (E.D. Tex. Apr. 3, 2009)........................ 34

*Lamb v. Mendoza*, 478 Fed. Appx. 854 (5th Cir. 2012) .................................... 110

*Lewis v. Evans*, 440 Fed. Appx. 263 (5th Cir. 2011) ....................................... 39

*Liberty Res. Inc. v. Se. Penn. Transp. Auth.*, 155 F.Supp.2d 242 (E.D. Pa. 2001) ................... 108

*Liese v. Indian River Co. Hospital*, 701 F.3d 334 (11th Cir. 2012)............................. 101

*Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421 (5th Cir. 1997)............................... 87

*Loeffler v. Staten Island Univ. Hospital*, 582 F.3d 268 (2nd Cir. 2009)......................... 101

*Lollar v. Baker*, 163 F.3d 603 (5th Cir. 1999) ............................................ 108

*MacEntee v. IBM*, 783 F.Supp.2d 434 (S.D. N.Y. 2011) ................................... 91

*Martinez v. Klevenhagen*, 52 F.3d 1068 (5th Cir. 1995) ................................... 65

*Martone v. Livingston*, 2014 WL 3534696 (S.D. Tex. July 16, 2014) ..................... 44, 96, 106

*Martone v. Livingston*, No. 4:13-cv-03369, Doc. 72 (S.D. Tex. 2014) ....................... 97

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................ 5

*McCoy v. Tex. Dep't of Crim. Justice*, 2006 WL 2331055 (S.D. Tex. 2006)...................... passim

*McNally v. Prison Health Services*, 46 F.Supp.2d 49 (D. Me. Apr. 27, 1999)......................... 100

*Meagley v. Little Rock*, 639 F.3d 384 (8th Cir. 2011) ................................................ 101

*Melton v. Dallas Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004)........................................... 96

*Michaels v. Avitech, Inc.*, 202 F.3d 746 (5th Cir. 2000) ...................................................... 5, 43

*Miller v. Chapman*, 2014 WL 2949287 (M.D. La. June 30, 2014) ........................................ 98

*Miller v. Tex. Tech Univ. Health Sci. Ctr.*, 421 F.3d 342 (5th Cir. 2005). ............................... 104

*Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326 (3rd Cir. 1987) . 39

*Munoz v. Echosphere, L.L.C.*, 2010 WL 2838356........................................................ 89

*MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)................................ 108, 109

*Norfleet v. Walker*, 684 F.3d 688 (7th Cir. 2012) ...................................................... 99

*Nottingham v. Richardson*, 499 Fed. Appx. 368 (5th Cir. 2012),........................................ 98

*O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532 (N.D. Tex. Apr. 7, 2011) ........... 96, 97

*O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004)................................................... 42

*Osburn v. Anchor Labs., Inc.*, 825 F.d2 908 (5th Cir. 1987). ......................................... 5, 43

*Paine v. Bergland*, 2012 WL 6727243 (N.D. Ill. Dec. 28, 2012) ................................. 100

*Paine v. Johnson*, 2010 WL 785397 (N.D. Ill. Feb. 26, 2010)................................. 100

*Palacios v. Continental Airlines, Inc.*, 2013 WL 499866 (S.D. Tex. Feb. 11, 2013)................... 91

*Payne v. Arizona*, 2012 WL 1151957 (D. Ariz. Apr. 5, 2012) ............................... 100

*Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998) ............................ 90, 93, 99

*Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 Fed. Appx. 180 (5th Cir. 2015) .......... 102, 103

*Porter v. Epps*, 659 F.3d 440 (5th Cir. 2011) ...................................................... 56

*Purgess v. Sharrock*, 33 F.3d 134 (2nd Cir. 1994) .................................................. 15

*Quatroy v. Jefferson Parish Sheriff's Office*, 2009 WL 1380196 (E.D. La. May 14, 2009)........ 37

*Rhyne v. Henderson Cty.*, 973 F.2d 386 (5th Cir. 1992)......................................... 56

*Richardson v. McKnight*, 521 U.S. 399 (1997)..................................................... 86

*Roper v. Simmons*, 543 U.S. 551 (2005)........................................................... 48

*Rouse v. Plantier*, 997 F.Supp. 575 (D. N.J. 1998) ............................................. 100

*Ruiz v. Estelle, et al.*, No. 4:78-cv-00987 (S.D. Tex.) ...................................... 85

*Ruiz v. Johnson*, 37 F.Supp.2d 855 (S.D. Tex. 1999).......................................... 77

*Ruiz v. U.S.*, 243 F.3d 941 (5th Cir. 2001).................................................... 77

*Smith v. Sullivan*, 553 F.3d 373 (5th Cir. 1977) ............................................... 70

*Stewart v. Guzman*, 555 Fed. Appx. 425 (5th Cir. 2014) ............................... 38, 39, 42

*Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623 (S.D. Tex. 2009) 15

*Tennessee v. Lane*, 541 U.S. 509 (2004).......................................................... 105

*Terry v. LeBlanc,* 479 F. Appx 644 (5th Cir. 2012).......................................... 55

*Thompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987)............................................. 55

*Togonidze v. Livingston*, No. 6:14-cv-00093-JDL (E.D. Tex. 2014) ....................... 97

*Trevino v. United Parcel Serv.*, 2009 WL 3423039 (N.D. Tex. Oct. 23, 2009) ................. 91

*Tuft v. Texas*, 410 Fed. Appx. 770 (5th Cir. 2011) .......................................... 98

*United States v. Freeman*, 434 F.3d 369 (5th Cir. 2005)...................................... 78

*United States v. Georgia*, 546 U.S. 151 (2006) ......................................... 94, 105

*Valigura v. Mendoza*, 265 Fed. Appx. 232 (5th Cir. 2008) ...................................................... 70

*Walsh v. Mellas*, 837 F.2d 789 (7th Cir. 1988) ......................................................................... 110

*Webb v. Livingston*, 2015 WL 4385287 (5th Cir. 2015) ............................................................ 84

*Webb v. Livingston*, 618 Fed.Appx. 201 (5th Cir. 2015) ..................................................... passim

*Webb v. Livingston*, No. 6:13-cv-00711-JDL (E.D. Tex. 2014) ......................................... 97, 105

*Whitley v. Albers*, 475 U.S. 312 (1986) ....................................................................... 36, 47, 101

*Williams v. Kaufman County*, 352 F.3d 994 (5th Cir. 2003) .................................................... 110

*Wilson v. Lynaugh*, 878 F.2d 846 (5th Cir. 1989) ...................................................................... 85

*Wilson v. Seiter*, 501 U.S. 294 (1991) ........................................................................................ 74

*Wolfe v. Fla. Dep't of Corr.*, 2012 WL4052334 (M.D. Fla. Sept. 14, 2012) ............................ 98

*Wooley v. City of Baton Rouge*, 211 F.3d 913 (5th Cir. 2000) ................................................... 40

*Wright v. Tex. Dep't Crim. Justice*, 2013 WL 6578994 (N.D. Tex. Dec. 16, 2013) ................... 97

## STATUTES

22 ILL. REG. 19227 § 720.40 (2013). ......................................................................................... 51

28 C.F.R. § 35.130 ..................................................................................................................... 93

29 U.S.C. § 794 ................................................................................................................ 104, 108

3 TEX. REG. 897, 902 ................................................................................................................. 15

37 TEX. ADMIN. CODE § 259.160 ......................................................................................... 15, 51

42 U.S.C. § 12102 .......................................................................................................... 87, 88, 90, 91

42 U.S.C.A. § 12133 ................................................................................................................ 108

Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325 (Sept. 25, 2008)

.................................................................................................................................................. 87

FED. R. CIV. PROC. 56(c) .............................................................................................................. 5

FED. R. EVID. 201 ...................................................................................................................... 34

N.C. ADMIN. CODE § 14J.1217 (2013) ...................................................................................... 51

U.S. CONST. Amd. XIV, § 5 ...................................................................................................... 105

TEX. CIV. PRAC. & REM. CODE §101.101 ................................................................................. 67

U.S. CONST. Amd. XIV, § 5 ...................................................................................................... 105

The obviously dangerous conditions at the Defendant Texas Department of Criminal Justice's Hutchins Unit prison killed Plaintiffs' decedent, Larry McCollum. He suffered a heat stroke while confined indoors with no air conditioning during a dangerous heat wave.  Because conditions in TDCJ's prison, at minimum, raise a number of material fact disputes, Defendants' motions for summary judgment should be denied.

## I.    INTRODUCTION

The extremely hot, and obviously dangerous, conditions at the Texas Department of Criminal Justice Hutchins Unit killed Plaintiffs' husband and father, Larry McCollum. One week after he had been transferred from an air conditioned county jail to serve a two-year sentence in TDCJ custody, he suffered a heat stroke because TDCJ confined him indoors with no air conditioning during a lengthy, alarming heat wave. Despite the fact that Mr. McCollum's death was entirely preventable, TDCJ and UTMB move for summary judgment. Their motions should be denied for five principal reasons.

First, Defendant Brad Livingston, the TDCJ executive director, knew extremely hot indoor conditions had killed prisoners before. He knew these previous deaths involved prisoners with medical conditions that make them more susceptible to heat (like Mr. McCollum). He knew TDCJ prisons were extremely hot inside, and that previously heat stroke deaths occurred at "transfer facilities" where newly convicted inmates (like Mr. McCollum) are processed into the system. Despite knowing this obviously life-threatening risk killed people, Livingston kept following the same perilous course, and made no changes to TDCJ policy or procedure.

Second, Defendant Robert Eason, the regional director supervising the Hutchins Unit, knew conditions in the prison were dangerous and that TDCJ's heat countermeasures were obviously inadequate. Yet after eight men died of heat stroke in prisons he supervised in the

summer of 2011, he callously testified on behalf of the agency that TDCJ did a "wonderful job" of protecting prisoners from the heat that summer.

Third, Defendant Jeffrey Pringle, the Hutchins Unit's warden, knew indoor heat indexes at his prison were extremely high – reportedly as high as "150+" – but did not even provide common sense protections like opening windows or giving inmates cups to drink water from. Instead, he told officers at his prison to delay calling 911 if an inmate needed medical care, even in the face of weeks of dangerous indoor temperatures.

Fourth, when Defendants Officer Richard Clark, Sgt. Karen Tate, and Lt. Sandrea Sanders learned Mr. McCollum was suffering convulsions and was unresponsive in an extremely hot environment – because he was enduring a fatal heat stroke – instead of helping Mr. McCollum immediately, they followed Pringle's 911 directive and delayed calling an ambulance for almost an hour. As a result, Mr. McCollum died when he suffered permanent brain and organ damage.

Finally, both TDCJ and the University of Texas Medical Branch, the prison's medical provider, could have saved Mr. McCollum's life by providing him simple accommodations for his heat-sensitive disabilities. Mr. McCollum was obese, diabetic, hypertensive, and suffered from chronic depression – conditions both agencies knew for years made prisoners more susceptible to heat stroke. But both agencies failed to reasonably accommodate these disabilities – from steps as simple as providing a cup for drinking water, to timely evaluating his medical conditions to assess him for necessary heat protections, to transferring him to one of the 23,000 beds in TDCJ prisons that was air conditioned, or simply by providing on-site medical care during a prolonged, dangerous heat wave when inmates with heat-sensitive disabilities were likely to need emergency medical care.

As there are material fact disputes involving each of these Defendants' culpability in Mr. McCollum's death, the Court should deny Defendants' motions for summary judgment.

## II.    FACT ISSUES PRECLUDING SUMMARY JUDGMENT

The record raises numerous material fact issues precluding summary judgment, including, but not limited to, the following:

- Did Defendants Livingston, Eason, and Pringle know about the obviously dangerous conditions at the Hutchins Unit and other TDCJ prisons?

- In light of the known and obviously dangerous temperatures inside TDCJ prisons, and his knowledge of previous heat stroke deaths, were the heat "mitigation" measures Brad Livingston implemented adequate to protect inmates like Mr. McCollum?

- In light of the obviously dangerous conditions inside the Hutchins Unit, were the heat "mitigation" measures Livingston, Eason and Pringle implemented adequate to protect inmates like Mr. McCollum?

- Did Pringle and Eason implement the measures required by the Fifth Circuit in *Gates v. Cook* when they knew the Hutchins Unit did not have windows that opened or electrical outlets to run fans, and witnesses testified they failed to supply cold drinking water – and even cups – during an incredibly hot summer?

- Did Pringle maintain a policy and practice at the Hutchins Unit for ice water to be distributed only sporadically including during a time of known, dangerous temperatures inside?

- Did Eason and Pringle maintain a policy and practice at the Hutchins Unit for officers to delay calling 911, even when an inmate was suffering a known medical emergency, until an unqualified correctional supervisor could observe the suffering inmate?

- Did the delay in calling 911 when Clark, Tate, and Sanders found Mr. McCollum convulsing and unresponsive in his bunk proximately cause his death?

- Did Clark, Tate, and Sanders subjectively know Mr. McCollum was suffering from a serious medical need when they found him convulsing and unresponsive, and he did not recover for almost an hour?

- Did Eason and Pringle maintain a policy and practice at the Hutchins Unit for inmates not to be provided a cup necessary to drink the large quantities of water TDCJ recommends to "mitigate" the heat?

- Did Livingston, Eason, and Pringle maintain a policy and practice at the Hutchins Unit to refuse to provide personal fans to inmates even during times of known, dangerous temperatures inside?

- Did Livingston, Eason, and Pringle maintain a policy and practice at the Hutchins Unit to not monitor inmates, except to record their presence, including those known to be susceptible to illness during times of known, dangerous temperatures inside?

- Was Mr. McCollum a "person with a disability" entitled to the protections of federal disability law?

- Did TDCJ and UTMB reasonably accommodate Mr. McCollum's disabilities to allow him to safely access the programs and services available to inmates at the Hutchins Unit?

- Did TDCJ and UTMB intentionally maintain a policy and practice at the Hutchins Unit to not evaluate inmates with a physical for seven days, including for inmates known to be especially susceptible to illness during times of known, dangerous temperatures inside?

- Did Livingston, TDCJ and UTMB intentionally maintain a policy and practice at the Hutchins Unit to inhibit unit-level providers from granting their patients increased or permanent access to areas free from known, dangerous temperatures?

- Did Livingston, TDCJ, and UTMB intentionally maintain a policy and practice at the Hutchins Unit to not provide inmates with obesity access to lower bunks when available?

### III.   STANDARD OF REVIEW

Summary judgment is only proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(c). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party – here, the Plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court may not weigh the evidence or determine its truthfulness. The Court is only to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if a reasonable fact finder, viewing all the evidence in favor of the plaintiff, could reasonably find for the plaintiff. *Id*.

This case is particularly inapt for summary judgment dismissal, as the ultimate factual issues – such as whether the heat mitigation strategies in place at the Hutchins Unit in 2011 were adequate[1] – will require weighing a large body of documentary evidence, contradicting testimony, and a "battle of the experts." When resolution of an issue involves a "battle of the experts," summary judgment is inappropriate because the expert dispute must be resolved by the fact-finder at trial. *See, e.g., Michaels v. Avitech, Inc.*, 202 F.3d 746, 752 (5th Cir. 2000) ("The record evidence, however, reveals a 'battle of the experts' as to whether the weather conditions made it unreasonable for a pilot to take off that morning. Thus, summary judgment is precluded as to the pilot's decision to fly."); *Osburn v. Anchor Labs., Inc.*, 825 F.2d 908, 916 (5th Cir. 1987).

---

[1] And, if the measures were inadequate, whether or not TDCJ, UTMB, and the individual

## IV.   FACTUAL BACKGROUND

### A.   TDCJ Prisons Become Dangerously Hot Indoors, and Texas Inmates Die.

TDCJ imprisons approximately 120,000 people in cells that lack air conditioning. Though more than 23,000 TDCJ beds have air conditioning, the large remainder house inmates who suffer without this modern necessity each summer.[2] Instead, TDCJ and UTMB's official heat stress policies incorporated a graded warning system, similar to the National Weather Service, long before McCollum's death. Both TDCJ policy and the Correctional Managed Health Care Policy Manual warned that when the heat index exceeds 90 °F "Heat exhaustion [is] possible;" at above 105 °F, "Heatstroke [is] possible;" and when above 125 °F, "Heatstroke [is] imminent."[3]

---

[2] Ex. 278, Eason Depo., p. 184:21, Appx 6550 (TDCJ houses 150,000 total inmates); Ex. 83, TDCJ Air Conditioned Housing Areas Spreadsheet, TDCJ 882858, Appx 1402. A comparison of the spreadsheet's list of fully air-conditioned housing areas and TDCJ's online directory of units arrives at a capacity of 23,000, which is conservative because it excludes units with an unspecified range of un-air-conditioned housing areas – for example, the Hutchins Unit's housing is not air conditioned (except for a small number of administrative segregation cells,), while many units have multiple sub-buildings with air conditioned housing, but the actual number of inmates housed in each cannot be gleaned from this document. Ex. 79, TDCJ "Unit Directory," Appx 1387 (last accessed Sept. 1, 2016), http://tdcj.state.tx.us/unit_directory/ (navigating to each unit displays capacity).

[3] *See* Ex. 95, TDCJ AD 10.64, "Temperature Extremes in the TDCJ Workplace (2008), Appx. 1479; Ex. 96, CMHC Policy B-15.2 "Heat Stress" (2007), Appx. 1491. These versions of the policies were effective in 2011. *See also* Ex. 117, National Weather Service Chart, Appx. 1700. *Id.*

Thus, unsurprisingly, inmates in TDCJ's custody periodically die of heat stroke: At least 20 inmates have died of heat stroke in TDCJ custody since 1998.[4] Every one of these prisoners died indoors – not working or exercising outside like heat stroke victims in the free world. Indeed, it is highly likely that the heat contributed to many other deaths: TDCJ initially believed six other deaths were heat related in 2011[5] — and hyperthermia (heat stroke) is well known to be an underreported cause of death.[6] As such, TDCJ's training materials advise correctional officers

_____

[4] *See* Ex. 2, Autopsy of Archie White, Appx 4; Ex. 3, Autopsy of Anselmo Lopez, Appx 11; Ex. 4, Autopsy of James Moore, Appx 21; Ex. 5, Autopsy of Charles Finke, Jr., Appx 31; Ex. 6, Autopsy of John Cardwell, Appx 42; Ex. 13, Autopsy of Thomas Meyers, Apx 119; Ex. 15, Autopsy of Charles Cook, Appx 143; Ex. 19, Autopsy of Kelly Marcus, Appx 193; Ex. 20, Autopsy of Daniel Alvarado, Appx 206; Ex. 14, Autopsy of Robert Webb, Appx 130; Ex. 7, Autopsy of Ricky Robertson, Appx 50; Ex. 8, Autopsy of James Shriver, Appx 64; Ex. 9, Autopsy of Dionicia Robles, Appx 7; Ex. 10, Autopsy of Douglas Hudson, Appx 90; Ex. 17, Autopsy of Alexander Togonidze, Appx 166; Ex. 16, Autopsy of Michael Martone, Appx 154; Ex. 18, Autopsy of Kenneth James, Appx 179; Ex. 21, Autopsy of Rodney Adams, Appx 219; Ex. 22, Autopsy of Albert Hinojosa, Appx 228. A summary of the deaths and autopsy findings is Ex. 1, Summary of Undisputed Heat-Related Deaths in TDCJ (1998-2012), Appx 2.

[5] Ex. 26, Email from Sandra Cacciatore, "close call" (Jul. 11, 2011), Appx 254 (describing William Roberts found unresponsive, "most likely heat stroke"); Ex. 23, Mortality and Morbidity Review of William Roberts, TDCJ014706, Appx 242 (noting committee consensus cause of death unknown, listing environmental hyperthermia as a possibility); Ex. 24, Email from R. Williams to C. Adams, "Re: details of possible heat-related issues" (Aug. 9, 2011) TDCJ014809, Appx 246 (showing earlier listing of Adam Swanson's death as possibly heat-related); Ex. 25, Possible Heat-Related Deaths 2011 (Sept. 2, 2011), TDCJ024846, Appx 251 (listing James Boggus, Curtis Jackson, Emma Johnson, and Jeffrey Jones as possible heat-related deaths).

[6] *See, e.g.*, Ex. 18, Autopsy of Kenneth James, P005787, Appx 179 ("many heat-related illnesses and deaths are unrecognized as such"); Ex. 19, Autopsy of Kelly Marcus, P005800, Appx 193 (same); Ex. 151, Bruce Wenger, "Human Adaptation to Hot Environments," MEDICAL ASPECTS OF HARSH ENVIRONMENTS VOLUME 2, Borden Institute (Medical Department of the Army 2002) TDCJ 85889, Appx 2620 ("heat illness is probably underreported") *available at* http://www.dtic.mil/dtic/tr/fulltext/u2/a433963.pdf; Ex. 150, Lisa Leon and Abderrezak Bouchama, *Heat Stroke*, 5 Comprehensive Physiology 611, 634 (April 2015), Appx 2582; Ex. 124, Fowler et al., *Heat-Related Deaths After an Extreme Heat Event—Four States, 2012, and*

"during prolonged heat waves, the risk of heat related illnesses, injuries, and deaths climb dramatically."[7]

Likewise, many other inmates (as well as correctional officers) are injured by the heat each year, but survive. TDCJ's highest ranking officials have known about these injuries for decades, and, in fact, specifically began assembling a database of them in 2010.[8] As early as 2005, high-level TDCJ executives discussed that there were "169 employee and [inmate] weather-related injuries."[9] The possibility of heat-related illnesses and deaths was regularly discussed at high-level meetings of TDCJ's top prison administrators for many summers before 2011 (including by Defendant Eason).[10]

---

*United States, 1999-2009*, 62 MMWR 433 (CDC June 7, 2013), appx 1742 *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6222a1.htm; Ex. 125, Luber et al., *Heat-Related Deaths—United States, 1999-2003*, 55 MMWR 796, 797 (CDC July 28, 2006), Appx 1747 *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5529a2.htm; Ex. 152, Greenberg et al., *The Epidemiology of Heat-Related Deaths, Texas—1950, 1970-79, and 1980*, 73 Am. J. of Pub. Health 803 (July 1983), Appx 2657.

[7] Ex. 112, TDCJ Risk Management Training Circular, May 2010, Appx 1582. Officers testified that these circulars were routinely read aloud to "train" them about the risks posed by high temperatures. Ex. 292, Sanders Depo., pp. 62:12-63:9, Appx 6834; Ex. 82, TDCJ Hutchins In-Service Safety Training (May 11, 2011), Appx 1397 (showing Clark received training supervised by Sanders and Tate regarding heat).

[8] Ex. 265.2, TDCJ Temperature Extreme Query, TDCJ033141, Appx 6279.

[9] Ex. 116, Non-Concurrences to Revisions to Temperature Extremes in the Workplace Policy, Appx 1698.

[10] Ex. 70, Directors' Meeting Minutes (July 14, 2011), Appx 1323; Ex. 293, Stephens Depo., Appx 6874, p. 118:7-18 (Eason either attended directors' meetings or sent a representative); Ex. 296, Thaler Depo., pp. 95:9-97:20, 121:19-123:11, 124:18-25, Appx 6952, 6955, 6958; .Ex. 71, Exhibit 58 to Thaler's Depo., Appx 1335; Ex. 72, Exhibit 59 to Thaler's Depo., Appx 1355.

Thus, heat-related deaths and injuries are (and were at the time) well known to TDCJ's highest-ranking officials. For example, in 2009, TDCJ's executive director, Defendant Brad Livingston, received a memo discussing two heat stroke deaths in the summer of 2007 – Dionicio Robles and James Shriver.[11] Livingston knew TDCJ only provided these men protections like water, showers, and fans, and that their housing areas were not air conditioned.[12] They both died indoors.[13] As the memo prepared by TDCJ's top doctor, Lannette Linthicum, summarized, both men had common medical conditions that were well-known to make patients more susceptible to heat illness.  Despite knowing these two men died of heat stroke – and that TDCJ housed thousands of men like them – Livingston and other TDCJ officials failed to take

---

[11] Ex. 218, Memo from Linthicum to Livingston (June 26, 2009), Appx 6033. Though Livingston now argues that these men's deaths were complete aberrations due to their unique medical conditions that he could not have reasonably believed would recur, there is absolutely no documentary evidence that Livingston knew anything more about their medical problems than the information in the memo. In fact, when asked about these men at his deposition, he could not recall the details he now claims distinguished them so critically from all the other 150,000 men in his care. *See* Ex. 283, Oct. 2, 2015 Livingston Depo., 52:6-24, Appx 6680, 6682, 6691-2, 6696, 6697 (agreeing that he read the memo), 55:7-10 (agreeing that he was "actually made aware of the type of individual who was vulnerable to heat death" in 2009), 85:4-5 ("they appeared to be isolated incidents"), 86:21-25 (agreeing that inmates are vulnerable when acclimating, as Shriver, Robles, and McCollum were), 102:4-11 (does not recall if 2007 was unusually hot), 125:8-12 ("I don't recall specifically having a discussion about the 2007 deaths at the Byrd Unit"); Ex. 278, Eason Depo., p. 184:21, Appx 6550 (TDCJ houses 150,000 total inmates).

[12] *See*, *e.g.*, Ex. 99, TDCJ Annual Heat Message (2007), Appx 1508.

[13] Ex. 320, Administrative Incident Review of James Shriver's Death (August 21, 2007), JS-01, Appx 7182; Ex. 321, Administrative Incident Review of Dionicio Robles' Death (August 23, 2007), DR-01, Appx 7257.

any additional action to protect prisoners from heat stroke.[14] Notably, though TDCJ's own training materials advise officers to "rest in a cool place" and "stay in an air conditioned area" to avoid being injured by the heat, no such locations were available to the vast majority of TDCJ inmates, and there was no system-wide procedure to instruct officers to take inmates to air-conditioned portions of the prisons to cool off.[15]

Despite these well-known deaths and injuries, TDCJ has no policy to address a heat wave – weather conditions where temperatures become hotter than normal for the location for an extended period of time.[16] Likewise, TDCJ's 2011 heat policies and practices provided no increased protections as temperatures escalate. TDCJ's practices are the same at 90 degrees as at 110 degrees.[17] In fact, TDCJ's policy did not even address temperature extremes in the housing

---

[14] *Compare* Ex. 99, "Summer Heat Precautions 2007," Appx 1508 *and* Ex. 94, TDCJ AD-10.64, Temperature Extremes in the TDCJ Workplace" (v. 2006), Appx 1468 *with* Ex. 103, "Heat Precaution 2011," Appx 1479 *and* Ex. 95, TDCJ AD-10.64, "Temperature Extremes in the TDCJ Workplace" (v. 2008), Appx 1479; *see also* Ex. 294, Storie Depo., p. 41:5-13, Appx 6895.

[15] Ex. 112, TDCJ Risk Management Training Circular, May 2010, Appx 1582.

[16] Although TDCJ's representative claimed that the emergency plan for unusual weather events addressed heat waves in a different case before this Court, the only such policy known to Plaintiffs does not provide specific guidance applicable to heat waves or define a heat wave. Ex. 32, Tr. of Hearing in *Cole v. Livingston*, Testimony of Cody Ginsel, p. 72:13-73:3, Appx 324-5; Ex. 88, TDCJ SM-06.07, "Inclement Weather" (Nov. 4, 2011), Appx 1414 (advising that various outside activities may be curtailed depending on the weather). *See also* Ex. 131, Environmental Protection Agency, Excessive Heat Events Guidebook (June 2006), p. 5, Appx 2023, (defining heat waves, "excessive heat events," or "EHEs," and stating "EHE conditions can increase the incidence of mortality and morbidity in affected populations").

[17] *See* Ex. 103, "Heat Precaution 2011", Appx 1522; Ex. 95, TDCJ AD-10.64, "Temperature Extremes in the TDCJ Workplace" (v. 2008) Appx 1479; Ex 288, Aug. 12, 2013 Pringle Depo., pp. 93:4-94:2, Appx 6763; Ex. 68, Livingston's Responses to Requests for Admission in *Webb v. Livingston*, (May 5, 2014), pp. 10 #23, 12 #29, Appx 1278

areas – it only applied to outdoor forced labor.[18] Instead, TDCJ relied on an informal email to staff to address the risks in the housing areas.[19] Livingston approved the formal policy, which was prepared for his signature.

Though TDCJ's highest ranking executives – including Livingston – knew about these deaths, the agency denied there was any problem protecting inmates from the heat. The agency's representative, Robert Eason, testified the prisons did a "wonderful job" protecting inmates from heat, even when inmates died.

Q:      Whether or not there's a need to air-condition the prisons that TDCJ administers, it's your opinion that there's not, right?

A:      Yes, sir.

. . .

Q:      Would a certain number of deaths due to extreme heat be something that would cause you to change your opinion?

A:      Again, we're assuming that something might happen. I mean, you haven't showed me any documentation to show that we've had 11 deaths, and no, my stance is we do not need to air-condition our institutions.

Q:      What if I was able to show you documents indicating that 11 people died in the summer of 2011 due to hyperthermia? Would your opinion change?[20]

A:      No, it would not.

Q:      Why not?

--------

[18] Ex. 95, TDCJ AD-10.64, "Temperature Extremes in the TDCJ Workplace" (v. 2008), Appx 1479.

[19] *See*, *e.g.*, Ex. 103, TDCJ Annual Heat Message (2011), Appx 1522.

[20] Though TDCJ would later admit ten men died of heat stroke in the summer of 2011, the agency suspected as many as sixteen inmates perished because of the heat. *See supra*,  p.  6, n.5.

A:      Because we are taking all the steps that we can take to mitigate the heat. We're doing that every summer, and when you look how vast our operation is throughout the state, and how many offenders that we move through our institutions every summer, how many employees we have working in our institutions every summer, we have very little problems with heat-related illness when you look at the numbers.

Q:      Was that true in the summer of 2011, that you had very little problems with heat-related illnesses?

A:      **In my opinion, yes**. When you look at the numbers, **I think we do a wonderful job** at taking those steps, taking it very seriously and mitigating the heat on our facility.

Q:      **Just to be crystal clear, it's your testimony, as the Texas Department of Criminal Justice representative, that you do a wonderful job mitigating the heat at your facilities?**

**A:      Yes.**

Q:      **Do you believe you did a wonderful job at the Hutchins Unit with regard to Larry [] McCollum?**

A:      **Yes, we do – we did a – a good job.**

Ex. 278, Eason Depo. (as TDCJ Rule 30(b)(6) Representative), 109:6-110:23, Appx

6529-6530.

Indeed, TDCJ provides greater protections against the heat to pigs the agency raises for

slaughter than to human beings. TDCJ's agricultural policies – but not its policies related to

inmate living conditions – mandate housing pigs raised for slaughter in a "comfortable and

humane environment."[21] Hog barns are kept, by TDCJ policy, "around 85 degrees for baby pig

---

[21] Ex. 333, TDCJ Swine Program Management Procedures, p. 1, Appx 7397.

comfort."[22] During "hot weather" "foggers" are used to cool TDCJ's pigs "when temperatures reach over 80 degrees Fahrenheit."[23] TDCJ officials[24] told the press this was necessary to be "consistent with any swine operation."[25]  Livingston was aware of these pig protection policies.[26]

Likewise, the training materials TDCJ provided to its correctional officers in 2010 focused as much on officers' pets as inmates' health and safety. Ex. 112, TDCJ Risk Management Training Circular, pp. 1582. Fully one-eighth of the training circular provided advice like "be aware of ways that your pet could accidentally be caught without shade" and "consider installing an automatic pet waterer," while posing questions like "if your pet is left indoors, is air conditioning available? Will the house stay cool through the heat of the day?"

The "comfort" of the swine and pets is not TDCJ's only misplaced priority – the agency also air conditions the weapons at the Hutchins Unit and at other prisons.[27] "[W]ith our guns that we store, we try to have that placed with some sort of AC to make sure it doesn't overheat or get

---

[22] *Id*. at p. 8.

[23] *Id*. at p. 13.

[24] Bryan Collier, who was recently promoted to replace Livingston as executive director.

[25] Ex. 157, Elizabeth Koh, "Climate Controlled Swine Buildings Dismay Inmates' Advocates," TEXAS TRIBUNE, Aug. 16, 2013, Appx 2693, *available at* http://www.texastribune.org/2013/08/16/cooling-tdcj-swine-units-dismays-inmate-/16 (quoting TDCJ deputy director Bryan Collier).

[26] Ex. 68, Livingston's Response to Requests for Admissions in *Webb v. Livingston*, (May 5, 2014), p. 28 ##97, 98, Appx 1278.

[27] Ex. 289, Feb. 15, 2013 Pringle Depo., p. 227:3-5, Appx 6800.

too hot."[28] As one senior UTMB physician "reasoned," the weapons must be air conditioned because, "[w]ell, there's really nothing the bullets can do for themselves." Ex. 270, C. Adams Depo., 6313:11-21. High-ranking UTMB and TDCJ officials have expressed similar concerns about storage of medications that – like human bodies – deteriorate at high temperatures.[29] Unlike the human being prisoners, however, TDCJ keeps its bullets and pills in climate controlled locations.

### B. Inmate Living Areas at the Hutchins Unit are Dangerously Hot Every Summer.

TDCJ's Hutchins Unit near Dallas is one of the agency's many facilities that lacks air conditioned inmate living areas. At the Hutchins Unit, there is little difference between the indoor and outdoor temperatures during the summer.[30] During previous summers, even correctional officers had been injured by the extreme temperatures.[31]

_____

[28] Ex. 284, McClarin Depo., p. 6712:11-13.

[29] _See, e.g._, Ex. 254, Email from Morris to C. Adams, "Re: Air Conditioner at McConnell" (Jul. 24, 2013), Appx 6199 (showing earlier message from Crippen that "the temperature was over 90 degrees . . . This is a serious issue because the integrity of the medications can be affected when they are stored in such high temperatures and the staff members cannot function properly in heat such as this.").; Ex. 263, Email from Linthicum to Inmon and Farguson, "Re: Fw: A/C/ Work in Progress" (Jun. 18, 2014), Appx 6265 (showing earlier message from Justin Robison that "We are approaching the upper threshold of medication storage temperature requirements (59f to 86f)."); Ex. 264, Email from Crippen to Farguson and Clyde, "FW: Valley and Riverside Air Condition units" (July 8, 2014), Appx 6273 ("Having healthcare areas at 90 degrees or above needs to be corrected as soon as possible as it can affect the integrity of the medications, etc."). Concerns about the integrity of the medications most often occur when the air conditioning malfunctions at the various prisons. _Id_.

[30] Ex. 225, July 13, 2011 Inter-office communication from Storie to Pringle, 001383, Appx 6057; Ex. 226, Aug. 13, 2010 Inter-office communication from Storie to May, Appx 6057; Ex 289, Feb. 15, 2013 Pringle Depo., pp. 6786:9-6787:4; Ex. 46, Expert Report of James Balsamo,

Thus, inmates at the Hutchins Unit were enduring consecutive weeks of heat indexes exceeding 100° F leading up to McCollum's death – indeed, two days before McCollum's arrival on the unit, Defendant Warden Pringle was advised that the indoor housing areas were only two degrees cooler than the outdoors, and that indoor temperatures alone (not the heat index) were over 100° F.[32] TDCJ's own heat index records during McCollum's stay indicate that the outside heat index exceeded the 125° F "Extreme Danger" benchmark – where heatstroke is "imminent" – for several hours every day.[33] Less than 48 hours before Mr. McCollum's death, officers at the prison had recorded heat indexes of "150+" – which Pringle would have been aware of as the

---

Ph.D., p. 4, Appx 694. Notably, the temperatures in K building, where the prison's solitary confinement cells are located, are significantly lower than the other inmate housing areas because the solitary confinement cells are air conditioned. Ex. 292, Sanders Depo., 72:17-24, Appx 6838.

[31] *See* Ex. 177, Hutchins heat-related injuries (showing employee injuries), Appx 2927.

[32] *See supra*, p. 12,13, n. 30; TDCJ Defendants' Answer, Doc. 255, pp. 9 ¶ 21, 27 ¶ 59.

[33] Ex. 64, TDCJ Temperature Log (Jul. 15-21, 2011), Appx 1249; Ex. 117, National Weather Service Heat Index Chart, Appx 1700. The unit's risk manager explained that these temperatures and humidities are recorded on site by the unit's security staff and he monitors the process in the course of his duties. Ex. 294, Storie Depo., pp. 21:13-21, 100:17-101:3, Appx. 6620. Plaintiffs' calculation of the heat index can be repeated using the recorded temperature and humidity with the NWS online calculator. *Compare* Ex. 64, TDCJ Temperature Log (Jul. 15-21, 2011) *with* National Weather Service. "Heat Index Calculator,", Appx 1249 (last accessed Sept. 1, 2016) http://www.wpc.ncep.noaa.gov/html/heatindex.shtml.

Screenshots of this calculation have been included for the high heat index for each day, Ex. 120, Appx. 1707: 129 °F on July 15; 172 °F on July 16; 134 °F on July 17; 132 °F on July 18; 134 °F on July 19; 129 °F on July 20; 135 °F on July 21. The heat index entered on the log by TDCJ's officers does not appear to correspond exactly to the NWS calculator results, although these numbers are higher than 105 °F each day and, for July 19, exceed 150° F. In any case, if Defendants dispute their own temperature and humidity records, that is simply another fact issue for trial.

15

heat index is announced over the prison radios.[34] In the days before Mr. McCollum's death, on

July 21 and 22, 2011, the heat index at the Hutchins Unit reached between 114-118 on July 21,

and between 101-104 on July 22. Warden Pringle was aware the inmates at the prison –

including Mr. McCollum – were exposed to these extreme heat conditions.[35] Livingston and

Eason – as residents of the state – also knew Texas was experiencing a serious heat wave.[36]   .

In these temperatures, Defendants also knew the Hutchins Unit was especially dangerous

for vulnerable inmates like Larry McCollum because it was a "transfer facility" – a way station

for newly convicted inmates. First, inmates arrived at Hutchins from county jails that Texas law

has required be air conditioned since 1978.[37] As such, these newly-arrived inmates were not

acclimated to the extreme temperatures – though TDCJ relies heavily on "acclimation" to protect

---

[34] *See* Ex. 64, Hutchins Unit Temperature Log July 19, 2011, Appx 1253. Storie, the prison's risk manager, testified this reading was accurate. Ex. 294, Storie Depo., pp. 21:13-21, 100:17-101:3, Appx 6888-6889; Ex 289, Feb. 15, 2013 Pringle Depo., p. 151:5-152:4, Appx 6790-1; Ex. 64, Pringle Depo. Ex. 28, Appx.1253.

Even if no reasonable jury could believe the heat index actually reached "150+", the essential inquiry is the prison officials' subjective knowledge of an excessive risk. *See, e.g., Blackmon v. Garza*, 484 Fed. Appx. 866, 869 (5th Cir. 2012) (citing *Farmer v. Brennan*, 511 U.S. 834, 825 (1994)). Whether or not the officers recorded the information correctly, the "150+" measure alerted Pringle to a dramatic risk of heat injury.

[35] Ex 289, Feb. 15, 2013 Pringle Depo., pp. 170:12-171:16, Appx 6793-6794.

[36] *See* Ex. 278, Eason Depo., 44:8-9 (worked as TDCJ's "Region II" director since 2010), Appx 6501; Ex. 282, Livingston Depo., 115:1-13, Appx 6656.

[37] *See* 37 TEX. ADMIN. CODE § 259.160 (requiring indoor air temperatures in county jails remain between 65° F and 85° F); Ex. 288, Aug. 12, 2013 Pringle Depo., pp. 53:24-54:4 (explaining that Hutchins is a transfer facility), Appx 6752-6753. *See also* 3 TEX. REG. 897, 902 (adopted Mar. 14, 1978).

inmates from the heat.[38] Second, during the first week inmates spend at intake facilities they have not had an initial physical where their medical conditions and disabilities are identified by UTMB providers. Mr. McCollum had just arrived on July 15, 2011 from the air-conditioned McLennan County Jail.[39] Until an inmate receives an intake physical, they do not receive certain protections from the heat, such as "restrictions" on their activities.[40] Indeed, both Robles and Shriver died at another intake facility (the Byrd Unit) in 2007.[41] Despite these obvious additional

---

[38] *See* Ex. 35, *Cole v. Livingston*, No. 4:14-cv-01698, Doc. 326, pp. 38-39 (TDCJ's Motion for Summary Judgment), Appx 447; Ex. 95, TDCJ AD-10.64, "Temperature Extremes in the TDCJ Workplace" (v. 2008), Appx 1479. This Court has discretion to treat as judicial admissions statements of fact Defendants have made in summary judgment briefing from related cases.  The Fifth Circuit has indicated that statements of fact made in summary judgment briefing are particularly appropriate for treatment as judicial admissions.  *City Nat'l Bank v. Unites States*, 907 F.2d 536, 544 (5th Cir. 1990) (contrasting appellate briefing with summary judgment briefing); *see Purgess v. Sharrock*, 33 F.3d 134, 143-4 (2nd Cir. 1994) (statement in motion to dismiss treated as judicial admission, citing City Nat'l Bank); *but see Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623, 656 (S.D. Tex. 2009) (Rosenthal, J.) (no discussion of or citation to *City Nat'l Bank*).

[39] Doc. 285, UTMB's Motion for Summary Judgment, p. 18; Ex. 289, Feb. 15, 2013 Pringle Depo., p. 77:10-17, Appx 6778 (explaining intake physical is usually within the first ten days); Ex. 271, Mar. 7, 2014 G. Adams Depo. (expert), pp. 264:23-265:19, Appx 6328-9 (explaining that in 2011, policy required intake physical within seven business days, but was later extended to ten); Ex. 175, Administrative Incident Review from Pringle to Eason (received Jul. 25, 2012), EAC-04, Appx 2973 ("McCollum was received from McLennan County on July 15, 2011[].").  Doc. 285, UTMB's Motion for Summary Judgment, p. 18.

[40] *See* Ex. 271, Mar. 7, 2014 G. Adams Depo. (expert), p. 264:14-22, Appx 6328.

[41] Ex. 9, Robles Autopsy Report, Appx 78; Ex. 8, Shriver Autopsy Report, Appx 65; Ex. 77, TDCJ Unit Directory, Byrd (DU) Unit, available at https://www.tdcj.state.tx.us/unit_directory/du.html (identifying Byrd Unit as a "diagnostic intake facility"), Appx 1381. Plaintiffs request the Court take judicial notice of the contents of this government website pursuant to Federal Rule of Evidence 201; *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (denying rehearing en banc) (judicial notice of government websites).

vulnerabilities, Eason and Pringle operated the Hutchins Unit prison without any additional safeguards compared to facilities with more permanent populations.[42]

### C.  The Hutchins Unit Supervisors, Defendants Eason and Pringle, Knew it had Obviously Inadequate Protections Against the Heat

At the time of Mr. McCollum's death, the Hutchins Unit took shockingly deficient measures to mitigate the heat. Even if the Hutchins Unit had followed the system-wide email "precautions," – thought it did not – those measures had barely changed even after Defendant Livingston was personally notified of two inmate deaths from heat stroke indoors in 2007.[43] Moreover, unlike inmates at other TDCJ prisons, due to the design and construction of the prison, Hutchins Unit inmates did not have electrical outlets to run personal fans on their bunks, and could not open a window in their dormitories for extra ventilation (because the windows are sealed shut).[44] As such, the Hutchins Unit inmates could not benefit from five of the "specific measures" identified in the annual email message.[45]

---

[42] *Compare* Ex. 107, Hutchins Unit Heat Procedure (April 15, 2012), Appx 1543, *with* Ex. 103, "Heat Precaution 2011," Appx 1523.

[43] *Compare* Ex. 99, "Summer Heat Precautions 2007," Appx 1509 *with* Ex. 103, "Heat Precaution 2011," Appx 1523. Ex. 218, Letter from Linthicum to Livingston, "Heat Related Deaths 2007 to Present" (June 26, 2009), TDCJ013583, Appx 6037. The email's only substantive change was to "encourage[]" wardens "to ensure ice machines are working properly."

[44] Ex 289, Feb. 15, 2013 Pringle Depo., pp. 38:5-7, 39:10-17, 127:7-23.

[45] Ex. 288, Aug. 12, 2013 Pringle Depo. pp. 38:5-7, 127:7-23; Doc. 288, p. 45, Appx 6747. Eleven of the paragraphs in the precaution email, included in Defendants' count of "specific measures," do not apply to housing areas at all (such as measures to protect inmates while being transported on non-air conditioned buses). *See* Ex. 103, Heat Precaution Email 2011, Appx 1523.

Those measures from the email that were implemented were done so haphazardly: Inmate dormitories were brought ice water in a 10-gallon jug, but only three times a day for an entire dormitory of 58 men – and frequently without ice.[46]

Worse, drinking cups were only available for purchase, making the ice water unavailable for a newly arrived inmate like Mr. McCollum who had not yet been processed to use the commissary. Ex. 289, Feb. 14, 2013 Pringle Depo., pp. 116:20-117:14, Appx 6782;  Ex. 38, Declaration of Rodriguez, Appx 644-45 ("when you arrive at the Hutchins Unit, you are not given a cup or anything to drink water with."). Without a cup, it was much more difficult for any inmate to access the drinking water – TDCJ's "number one remedial measure." Ex. 35 *Cole v. Livingston*, Doc. 326, p. 8 (TDCJ's Motion for Summary Judgment), Appx 337; Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 212:15-213:13, Appx 6383.[47] Without a cup, Mr. McCollum was left to drink the two gallons daily that TDCJ recommends from the sink in the dormitory bathroom with his hands.[48]

---

[46] Ex. 288, Aug. 12, 2013 Pringle Depo., pp. 84:10-13, 88:18-21, Appx. 6758, 6759; Ex. 289, Feb. 15, 2013 Pringle Depo., 126:25-127:6; Ex. 38, Declaration of Santos Rodriguez, p. 2, Appx 644.

[47] A cup would be especially necessary for an obese inmate housed on a top bunk like Mr. McCollum – he could not take water back to his bunk with him, but instead would have to drink from the sink with his hands, and get on and off his bunk each time he needed to do so.

[48] Ex. 289, Feb. 15, 2013 Pringle Depo., p. 103:7-10; p. 117:4-14, Appx 6781, Appx 6783. *See also* Ex. 38, Declaration of Rodriguez, Appx 645 (describing attempts to bring water to McCollum without a cup); Ex. 307, Photo TDCJ Water Consumption Poster, Appx 6859; Ex. 308, Photo of Water Jug Appx 6882; Ex. 314, Photo from McCollum's bunk to the sink, Appx 314.

These practices, along with the freedom to wear shorts and take showers, were the only relief available to Mr. McCollum, despite the extreme heat. The unit's risk manager testified that the agency does not provide additional protection as the heat index increases. Ex. 294, Storie Depo., p. 41:5-13, Appx 6895. Even Defendant Tate, a sergeant at the Hutchins Unit, testified that all she would do if she heard that the heat index was 150°F would be to encourage inmates to stay hydrated and take a shower, and she "would be checking on them." Ex. 295 Tate Depo., p. 36:3-14, Appx 6916.

Despite being an intake facility that housed many inmates with unknown medical conditions, UTMB and TDCJ chose not to provide 24-hour medical coverage at the prison – even during periods of dangerously high temperatures.[49] Indeed, all medical staff would typically have left by 6:30 pm.[50] Despite knowing the high temperatures were making the inmate housing areas dangerous, TDCJ and UTMB did nothing to even temporarily address this problem – like offering overtime to nurses, or temporarily restructuring schedules.[51] Thus, if a prisoner were to suffer any emergency in the middle of the night, there would be no medical staff present to treat him.

Instead, Warden Pringle and his officers compounded this risk by implementing a policy that required officers to have their supervisors examine inmates before calling 911. Warden

---

[49] Ex. 1272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), pp. 106:1-107:10, Appx 6351-52 (explaining that Hutchins' medical department was open 16 hours per day initially, but was reduced to 12 hours in either 2010 or 2011).

[50] Ex. 273, Babbili Depo., p. 101:19-25, Appx. 6414.

[51] *See* Ex. 275, Lt. Roger Clark (ret.) Depo., 162:17-163:14, Appx 6448-9.

Pringle trained his officers to only call 911 immediately when: (1) an inmate had stopped breathing (or had a blocked airway), (2) an inmate had no pulse, or (3) an inmate had lost a limb (or suffered similar extreme physical trauma). Ex 289, Feb. 15, 2013 Pringle Depo., pp. 45:10-47:21, Appx 6772. Essentially, Warden Pringle did not want his officers calling for an ambulance until after a supervisor saw the inmate, or the inmate was near death.

Warden Pringle (along with his officers, *see supra* 17 testified officers were prohibited from immediately calling an ambulance for an inmate having heat stroke symptoms such as the ones exhibited by Mr. McCollum:

> Q:   Do you consider a person going through convulsions, seizing, nonresponsive, and unable to communicate, the type of situation where an ambulance needs to be called?
>
> A:   No, I do not.
>
> Q:   Why not?
>
> A:   Because as long as he's got an airway, he's breathing and circulation, and there's not a life [sic] of limbs, then it's triage by first aid for the first responders on the facility.

Ex 289, Feb. 15, 2013 Pringle Depo., p. 45:10-19, Appx 6772. The reason: Warden Pringle's definition of a life-threatening medical emergency is limited to those very narrow circumstances:

> Q:   Now, how would you know if he's in life-threatening danger being a warden and not a doctor?
>
> A:   Because he's breathing and he has circulation. He has no blunt trauma and he has no loss of limbs.

*Id.* p. 53:13-16, Appx. 6777; *see also* 137:9-20, Appx. 6788. TDCJ's training materials (and common sense) show Pringle was obviously wrong – the circular read aloud to officers states "heat stroke is a true medical emergency. …….. Coma, paralysis, and death can follow if emergency treatment is not immediately given." Ex. 112, TDCJ Risk Management Training

Circular (2010), p. 2, Appx 1584.[52] As a result, the Hutchins staff, including the Defendant officers, routinely failed to contact medical providers when inmates suffered obviously serious medical conditions – like seizures – in the middle of the night.[53]

### D.  TDCJ and UTMB Knew Mr. McCollum was a Person with a Disability

From the moment Mr. McCollum arrived in TDCJ custody on July 15, 2011, the agencies knew he suffered from several disabilities. When a prisoner arrives "off the bus" and is taken into TDCJ custody at the Hutchins Unit, he completes an intake screening with a UTMB nurse.[54] Mr. McCollum's screening identified several disabilities.

First, there is no dispute that Mr. McCollum was morbidly obese. Defendants' experts concede that, at 5' 10" tall and weighing 345 pounds, Mr. McCollum was obese. Doc. 288-6, Expert Report of Leeah, TDCJ Appx. 305; McCollum Autopsy Report, p. 1; Ex. 272, 19, 2013

---

[52] The training document even features clip art of an ambulance, and instructs officers to "transport[] to an emergency room" and "[a]lways transfer heat stroke victims to a medical facility." Ex. 112, TDCJ Risk Management Training Circular (2010), Appx. 1383.

[53] Ex. 292, Sanders Depo., p. 31:25-32:4, Appx. 6828-9 (explaining that "[w]e dealt with [seizures] on such a large scale basis, that we would wait for it to resolve itself"); Ex. 295, Tate Depo., Appx. 6910 (would "not necessarily" even use telemedicine in a medical emergency, including a seizure, but would do so before deciding to call 911 if a seizing inmate remained unresponsive).

[54] Ex. 279, Eubank Depo., p. 75:12-16, Appx 6687 (explaining that the screening is not a full-fledged physical); Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6) Representative), 78:7-16; 257:1:258-7, Appx. 6346, Appx. 6393-94; Ex. 57, McCollum Intake Screening Form, Appx. 795; *see also* Doc. 285, UTMB's Motion for Summary Judgment, p. 34.

G. Adams Depo. (30(b)(6)), pp. 136:8-15, 141:2-8.  His body mass index was 49.5 – "extremely obese" according to the National Institute of Health.[55]

Second, TDCJ's medical provider, UTMB, prescribed Mr. McCollum a daily diuretic medication, hydrochlorothiazide, to treat his hypertension. Ex. 273, Babbili Depo., 10:21-11:4, Appx 6408-9; Ex. 56, McCollum Clinic Notes by Babbili, Appx 794. Before arriving at the Hutchins Unit, the McLennan County jail's medical provider had prescribed an even stronger anti-hypertensive medication, Clonidine. Ex. 54, McCollum Texas Uniform Health Status Update from McClennan County Jail, Appx 787.

Third, Mr. McCollum told the UTMB triage nurse he was diabetic when she spoke with him the day he arrived at the Hutchins Unit. Ex. 61, McCollum Intake Screening Form, Appx. 1213. The Plaintiffs remember Mr. McCollum discussing his diabetes with them before his death. Ex. 285, Sandra McCollum Depo., p. 20:7-14, Appx. 6721; Ex. 286, Stephen McCollum Depo., pp. 7:10-8:16, Appx. 6727-8; Ex. 280, Stephanie Kingrey Depo., p. 29:5-10, Appx. 6622. Plaintiffs' medical expert, Dr. Susanne Vassallo, testified that based on his self-report, his serious obesity, and his a1c levels, Mr. McCollum suffered from diabetes. Ex. 53, Dr. Susanne

---

[55] Ex. 134, NATIONAL INSTITUTE OF HEALTH, BODY MASS INDEX TABLE, Appx. 2170, *available at* http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_tbl.pdf.http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_tbl.pdf.

Vassallo Expert Report, pp. 2-3, Appx. 776-7; Ex. 298, Vassallo Depo., 67:2-70:25, Appx 7004-7007.[56]

Finally, Mr. McCollum was clinically depressed, and TDCJ's expert agrees. Doc. 288-6, Dr. Leeah Expert Report, TDCJ 306. During his prior incarceration in TDCJ, UTMB psychiatrists treated him for depression and placed him on suicide watch. Ex. 62, McCollum UTMB Medical Records, 1216.[57]

TDCJ and UTMB recognized that each of these disabilities – alone or certainly in combination – markedly increased Mr. McCollum's risk of heat-related illness.[58] Notably, TDCJ's expert, Dr. Leeah, opined that Mr. McCollum's depression actually killed him because it "blunted" his survival instincts, preventing him from accessing TDCJ's "mitigation" measures,

---

[56] Defendants and TDCJ's expert disagree about this fact. UTMB's Motion, Doc. 285, p. 22; TDCJ's Motion, Doc. 288, p. 106; Doc. 288-6, TDCJ Appx. 305. This is a material fact dispute that cannot be resolved on summary judgment.

[57] Though Plaintiffs have not pleaded Mr. McCollum suffered from depression, this should not be a surprise to the Defendants. Dr. Leeah's report, first disclosed in May 2014, determined Mr. McCollum's depression was so serious he could not access TDCJ's mitigation measures at the prison. UTMB, of course, had access to Mr. McCollum's psychiatric records from his previous TDCJ incarceration, which show he received significant treatment for depression.

[58] Ex. 96, CMHC Policy B-15.2, "Heat Stress" (Nov. 2007), at TDCJ030435, TDCJ030437, Appx. 1496-8 ("cardiovascular disease," "diabetes," "psychiatric conditions," and treatment with hydrochlorothiazide increase patient's risk); Ex. 112, TDCJ Heat Safety Training Circular (2010), Appx. 1582; Ex. 272, Nov. 19, 2013  G. Adams Depo. (as Rule 30(b)(6) Representative of UTMB), 124:4-125:11, 171:1-8 (hypertension), 68:6-25, 88:12-22 (treatment with diuretic), 164:14-25, 166:19-167:22 (explaining that UTMB knew, and any competent medical provider would know, that the conditions in CMHCC policy "can negatively impact heat tolerance") Appx. 6343, 6349, 6356-7, 6364-6, 6389; Ex. 281, Linthicum Depo., pp. 207:2-9 (diabetes), 207:24-208:5 (obesity and medications for hypertension), Appx. 6633.

and compounding his other disabilities. *See* Doc. 288-6, Dr. Leeah Expert Report, TDCJ Appx. 306.

### E. TDCJ and UTMB Denied Mr. McCollum Reasonable Accommodations for his Disabilities

Several reasonable accommodations were feasible to protect Mr. McCollum from the dangerously high temperatures inside the Hutchins Unit.

- Climate-controlled housing;

- Wellness checks;

- Respite areas;

- Access to portable coolers;

- Timely intake physicals;

- Heat-safety training;

- 24-hour medical care;

- Access to existing commissary items – a cup and fan; and/or,

- A bottom bunk.

First, most obviously, Mr. McCollum could have been housed in a climate-controlled prison. TDCJ incarcerates approximately 23,000 people in climate-controlled housing areas, although TDCJ does not permit[59] medical providers to assign housing on the basis of heat

_____

[59] Instead, UTMB can only assign inmates in need of climate-controlled housing to a very small number of "infirmary" beds – which are typically reserved for extremely ill inmates. Ex. 271, Mar. 7, 2014 G. Adams Depo. (expert), 272:5-273:12, Appx. 6330-1 (UTMB makes triage decisions for climate controlled beds "like a MASH unit would in war"); *see also* Ex. 281,

sensitive disabilities for almost all of these beds.[60] TDCJ and UTMB frequently transport prisoners to specialized units to accommodate other disabilities.[61] TDCJ had sufficient climate-controlled beds to house inmates with Mr. McCollum's disabilities safely. In 2011, according to statistics produced by UTMB, TDCJ housed 13,988 obese inmates, and 8,092 diabetic inmates.[62] Even if there was zero overlap between these two disabilities, which is extremely unlikely given the clinical realities of both conditions, TDCJ could have provided climate-controlled housing for every single diabetic and obese inmate. TDCJ and UTMB simply do not accommodate inmates with heat-sensitive disabilities by assigning appropriate housing. Ex. 272, Deposition of G. Adams (30(b)(6)), 236:12-238:18, Appx. 6387-8.

Indeed, even after twelve men died in 2011 and 2012, UTMB and TDCJ expressly decided not to even give physicians *the option* of assigning climate controlled housing. During the intake physical, UTMB assesses each inmate and completes a "health summary for classification" that prevents TDCJ from assigning medically vulnerable inmates certain housing and forced labor (such as preventing inmates who use wheelchairs from being assigned to a top bunk). In September 2011, TDCJ and UTMB considered adding an "air conditioned housing only" line to the form. But, as Dr. Glenda Adams explained:

---

Linthicum Depo., pp. 127:19-128:25, Appx. 6631-2 (stating that there are 738 infirmary beds in the TDCJ system).

[60] Ex. 83, TDCJ Air Conditioned Housing Areas Spreadsheet, Appx. 1402. *See supra* p. 55 n.2.

[61] Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 77:10-19, Appx. 6345 (inmates using wheelchairs).

[62] *See* Ex. 271, Mar. 7, 2013 G. Adams Depo. (expert), 76:9-77:10, Appx. 6326-7; Ex. 331, Exhibit 4.A. to G. Adams' deposition, Appx. 7386.

> [A]n addition to the HSM18 for Air Conditioned Housing . . . available to all providers would result in numerous such classifications by unit staff (especially with the recent summer heat issue) and would far exceed the ability of the system to meet such a restriction.[63]

This was a joint decision by both agencies – TDCJ and UTMB – as members of the Correctional Managed Healthcare Committee.[64]

Second, TDCJ or UTMB could have implemented wellness checks at the Hutchins Unit to monitor inmates with heat-sensitive disabilities. Using the same "health summary for classification" form, UTMB and TDCJ have generated "restrictions" that prevent inmates with certain disabilities from performing certain types of forced labor in prison, or living in certain conditions where their disabilities place them at increased risk of harm. For many years, two such labor (but not housing) "restrictions" have been "no temperature extremes" and "no humidity extremes." Ex. 28, McCollum's HSM-18 form, Appx. 1385; Ex. 105, CMHC Policy A-08.4, Offender Medical and Mental Health Classification (April 2007), Appx. 1531. The restrictions are assigned by a UTMB medical provider, and, theoretically, implemented by TDCJ. *Id.*; Ex. 106, TDCJ AD-06.17, Health Summary for Classification (June 2007), Appx. 1538; Ex. 281, Linthicum Depo., pp. 124:22-125:4, Appx. 6629-30. For decades, TDCJ has used these "restrictions" to generate lists of inmates who cannot perform certain jobs – like in the boiler room. Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 248:11-20, 6390. "The lists

---

[63] Ex. 245, Sep. 24, 2011 Email from Moultrie, TDCH017646, Appx. 6126 (showing earlier email from Dr. G. Adams). *See also* Ex. 271, Mar. 7, 2014 G. Adams Depo. (expert), p. 285:9-18 Appx. 6333; Ex. 283, Oct. 2, 2015 Livingston Depo., p. 69:5-8, Appx. 6687; Ex. 281, Linthicum Depo., pp. 124:20-13, Appx. 6629.

[64] Ex. 283, Oct. 2, 2015 Livingston Depo., p. 69:5-8, Appx. 6687; Ex. 281, Linthicum Depo., pp. 124:20-13, Appx. 6629.

were essentially information TDCJ already had." Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 249:22-250:2, Appx. 6391. TDCJ and UTMB could have easily generated a list of inmates with "heat restrictions" for officers or nurses to monitor inmates with heat-related disabilities.[65] In fact, after Mr. McCollum's death, TDCJ implemented these wellness checks system-wide. *Compare* Ex. 103, Heat Precaution 2011, TDCJ – 04807, Appx. 1522 *with* Ex. 104, Heat Precaution 2014, TDCJ – 04818, Appx. 1526. While wellness checks would not prevent inmates from suffering heat-related illnesses, for Mr. McCollum it likely would have prevented his death because, at an absolute minimum, the officers would have been aware of the possibility of a heat stroke instead of a "mere seizure" and acted quickly to hospitalize him.

Third, during Mr. McCollum's short time at the Hutchins Unit, TDCJ was not providing inmates the opportunity to access air conditioned "respite" areas when they began to feel the effects of the heat. TDCJ's training materials instruct officers that "stay[ing] in an air conditioned area" is necessary to "avoid a heat illness," but no such areas were available to inmates in 2011.[66] Though there are many air-conditioned spaces available at the Hutchins Unit that could be used as respite areas – including a multipurpose room adjacent to Mr. McCollum's dormitory that was being used for storage in 2011 and occasional meetings in 2011.[67] TDCJ did

---

[65] Ex. 67, TDCJ's Responses to Plaintiffs' Requests for Admission (July 17, 2013) Nos. 2, 3, 4, Appx. 1272 ("TDCJ admits that no non-existent lists were distributed to corrections officers who personally monitored the dorms in the Hutchins Unit before Mr. McCollum's death.").

[66] Ex. 112, TDCJ Risk Management Training Circular, May 2010, Appx. 1582.

[67] Ex. 288, Aug. 12, 2013 Pringle Depo., pp. 75:4-76:5, Appx. 6746.

not provide any opportunity for prisoners to temporarily cool down. TDCJ began implementing respite areas system-wide only after the Plaintiffs sued.[68]

Likewise, after Mr. McCollum's death, TDCJ purchased portable air-conditioning units for use at the Hutchins Unit (and other intake facilities). *See* Ex. 304, Photographs from Garza West Unit (Aug. 30, 2016), Appx. 1156. These portable units cool a small area around them, at a much lower cost than air conditioning the entire dormitory.

UTMB's failure to timely provide intake physicals – especially for people identified with disabilities – denied Mr. McCollum access to any benefit of the heat restrictions. Only a physician assistant, nurse practitioner, or doctor – not a triage nurse – can assign an inmate a "restriction." Ex. 105, CMHC Policy A-08.4 April 2007, Appx. 1531. "Restrictions" are first assigned during an inmate's intake physical, which occurs within the first seven days of incarceration. Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), Appx. 6379:8-17. Until the physical takes place, there are no "restrictions" on the inmate's housing or labor. *Id*. Because Mr. McCollum had been at the prison less than a week when he suffered the heat stroke, he had not received his intake physical, even though UTMB and TDCJ identified he suffered from heat-sensitive disabilities when he arrived at the Hutchins Unit. Ex. 61, Intake Triage Form, Appx. 1213; Ex. 273, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 208:15-17, Appx. 6380:15-17. Thus, to the extent TDCJ contends it was conducting wellness checks at Hutchins in 2011, Mr.

---

[68] Ex. 269, Email from Eason to Wardens regarding respite locations (Aug. 5, 2015), Appx. 6305. TDCJ agreed to establish respite areas for inmates to settle Plaintiffs' claims for injunctive relief in this case. *See* Ex. 44, Mediation Agreement, Appx. 672.

McCollum was still denied this accommodation as his name would not be on the list until after his physical.[69]

UTMB and TDCJ compounded this problem by not providing 24-hour medical coverage at the Hutchins Unit. Especially at an intake facility (where many inmates have unknown medical conditions), and especially during a period where the heat made conditions at the facility very dangerous such that inmates could require immediate medical treatment, 24-hour coverage was an essential accommodation. *See*, *e.g.*, Ex. 35, *Cole v. Livingston*, Doc. 326, Appx. 459. (TDCJ's Motion for Summary Judgment – touting availability of 24-hour medical care). Having a nurse (or better yet, a doctor) onsite to address medical emergencies would significantly mitigate the consequences of housing inmates with heat-sensitive disabilities in dangerous conditions.[70]

Fourth, TDCJ and UTMB could have easily trained newly arrived inmates, like Mr. McCollum, about the dangers of extreme temperatures inside the housing areas, and the need to utilize TDCJ's mitigation measures (like drinking copious amounts of water). This did not happen. Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), Appx. 6372:19-6373:23;  Ex. 38, Declaration of Santos Rodriguez III, Appx. 645. If TDCJ and UTMB intend to merely rely on

---

[69] Notably, UTMB executives testified the only change they made after four inmates died of heatstroke at transfer facilities in 2011 and 2012 was to push back the deadline to complete a physical from seven to ten days. Ex. 271, Mar. 7, 2014 G. Adams Depo. (expert), Appx. 6328:23-6329:19.

[70] Mr. McCollum's situation is illustrative – had Clark, Tate, and Sanders been able to actually call a nurse to his bunk when he began convulsing and was unresponsive, it is very unlikely that someone with actual medical training would have chosen to delay calling 911 for almost an hour. *See supra* at pp. 40-42, *infra* 35.

the agencies' mitigation measures, they – at an absolute minimum – must instruct inmates about the necessity of protecting themselves from the heat.

Fifth, TDCJ could have provided commissary items necessary to utilize mitigation measures – like cups for drinking water – to newly arrived inmates with heat-sensitive disabilities during the summer. In 2011, the Hutchins Unit did not automatically issue inmates drinking cups: cups could only be purchased from the prison commissary after an inmate's account was set up. *See supra* at p. 17. Even if McCollum had been given commissary access, TDCJ chooses not to provide personal fans, battery-powered or otherwise, at the Hutchins Unit commissary. Ex. 288, Aug. 12, 2013 Pringle Depo., 6748:10-6749:8.

Finally, TDCJ and UTMB should have assigned Mr. McCollum a bottom bunk. When an inmate arrives at the Hutchins Unit, UTMB makes an immediate assessment for obvious housing needs. Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 6345:15-19, 6348:9-6349:11; 6350:12-20. Like "no temperatures extremes," "lower bunk only" is a restriction assigned by UTMB during the intake physical. Ex.105, CMHC Policy A-08.4 (April 2007), Appx. 1531, 1534. UTMB concedes a morbidly obese inmate, like Mr. McCollum, should have been assigned a bottom bunk. Ex. 272,  Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 5362:4-7. Though it was TDCJ that assigned the top bunk, Mr. McCollum could not have been assigned a top bunk if UTMB had given him a "lower bunk only" restriction during an intake physical (or, given the obviousness of his need, after triage). *Id*.; *see also* Doc. 285, UTMB Motion for Summary

Judgment, p. 14.[71] Indeed, the entire purpose of the "restrictions" is for UTMB medical providers to prevent TDCJ correctional administrators from requiring inmates to perform tasks their medical conditions make dangerous. Likewise, multiple officers saw Mr. McCollum struggle to get on and off the top bunk. Ex. 38, Declaration of Rodriguez, Appx. 644 ("Mr. McCollum asked the officer 'can I stay on the bottom?' and told the officer 'I can't get up there.' The officer refused and said 'well, that's your problem'").[72] Forcing Mr. McCollum to labor on and off his top bunk numerous times during the day prevented him from utilizing TDCJ's scant "mitigation measures" available at the Hutchins Unit – drinking water and showers. Ex. 38, Declaration of Rodriguez, Appx. 644 ("very difficult" for Mr. McCollum to climb on to his top bunk).[73] Likewise, when EMS finally arrived, lifting Mr. McCollum off the bunk further delayed his access to the emergency room.[74]

---

[71] Though the L.V.N. who performed Mr. McCollum's triage could not enter the "lower bunk" restriction herself, she could have referred Mr. McCollum to the provider for that purpose – just like she did to change his prescription from Clonidine to hydrochlorothiazide.

[72] *See also* Ex. 170, Statement of Melton,Appx. 2921; Ex. 170, Statement of Walden, Appx. 2916 ("He asked me to get him some water cause it was hard to get down").

[73] While Mr. McCollum's alleged "illness" may have also contributed to his difficulty getting on and off his bunk, a jury would be free to believe the fact he weighed 345 pounds played a substantial role as well. *See*, *e.g.*, Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), Appx. 6363:2-8 (a person who is "morbidly obese" should not be assigned a top bunk, unless the person is "an offensive lineman" playing for the Dallas Cowboys). *See*); *see also* Ex. 84-87, Photographs of Larry McCollum.., Appx. 1405-1412. Dr. Adams' testimony demonstrates it is simply not true that "every witness" testified housing morbidly obese inmates in top bunks was common (Doc. 288, TDCJ's Motion, p. 120; Doc. 285, UTMB's Motion, p. 120) – though if it were, it suggests that TDCJ and UTMB routinely fail to make this obvious accommodation.

[74] Ex. 294,   Tate Depo., 7070Appx. 6928:10-18 (took five officers and EMTs to move McCollum off the top bunk); Ex. 169, Statement of Tate ("Additional staff was called to assist in

### F.  Clark, Tate, and Sanders Watched Mr. McCollum Die of a Heat Stroke.

Apparent temperatures were between 116 and 117 when Defendant Lt. Sandrea Sanders arrived at the prison at 6:00 pm to begin her overnight shift on July 21, 2011.[75] Correctional Officer Clark and Sgt. Karen Tate arrived at 10:30 pm.[76] The officers knew there was little difference between the incredibly hot indoor and outdoor temperatures at the prison.[77]

TDCJ claims the officers had extensive training about the dangers of extremely high temperature and humidity, and knew these conditions could result in fatal heat strokes.[78] Each officer had been issued a "heat card" carried in their pockets, which listed symptoms of heat

---

removing him from the bunk.");.");.") Appx. 2737; Ex. 57, Nursing Triage Form ("Security can not get him off the top bunk");");") Appx. 796; Ex. 170, Statement of Isbell, Appx. 2905 ("it was several minutes before [the officers] quit tryin[g] to move him & called paramedics").

[75] Ex. 64, Hutchins Temperature Logs, Appx. 1249-1256; Ex. 299, Sanders Depo., p. 2424Appx. 6827:2-6.

[76] Ex. 274, Clark Depo., 3434Appx. 6427:15-20; Ex. 295, Tate Depo., 3535Appx. 6915:2-14.

[77] Ex. 292, Sanders Depo.,81 Appx. 6841:24-6842:3. *See also* Ex. 274, Clark Depo., 3030Appx. 6425:24-31316426:1; Ex. 295, Tate Depo., 4040Appx. 6917:1-19, 42426918:20-24; Ex. 292, Sanders Depo., 8080Appx. 6840:23-25, 85856844:13-15. That it was an "unprecedented" hot summer is of little relevance to the officers' liability – they, like everyone else living in the state at the time, knew temperatures were incredibly hot. Likewise, they, like everyone else who has ever had the extreme misfortune of having their air conditioning go out in the summer, they obviously knew how hot the indoor environment could become during a Texas summer.

[78] Ex. 295, Tate Depo., Appx. 24:15-20; Ex. 292, Sanders Depo., Appx. 6837:9-13; *see also* Ex. 112, TDCJ Hot Weather Training Circular Appx. 1582.

stroke, under the title "*EMERGENCY!* Death is Imminent!"[79] The card instructs officers that for "all types" of heat related illness to "get medical attention ASAP."[80]

In addition to the obviously dangerous indoor conditions, the officers also knew there was no medical staff at the prison overnight,[81] and inmates could only receive medical care by calling 911 and transporting the prisoner to an emergency room.[82]

Despite these facts, Defendants Clark, Tate, and Sanders chose not to call 911 for nearly an hour while Larry McCollum was seizing and unresponsive in the throes of a life-threatening heat stroke.

Shortly after 2:00 am on July 22, 2011,[83] Larry McCollum began suffering a heat stroke on his top bunk. A fellow inmate testified, "[i]t was obvious that Mr. McCollum was very sick and needed medical attention right away."[84]

Mr. McCollum's bunkmate knew he needed medical help and called an officer. Clark, the officer supervising the dorm, responded to Mr. McCollum's bedside. Clark found Mr.

---

[79] Ex. 113, TDCJ Heat Awareness Pocket Card, Appx. 1587 (emphasis in original); Ex. 274, Clark Depo., 1919Appx. 6423:22-20206424:13 (purpose of card, according to the officers, is "if we come up to someone, we're not sure what's wrong with them, if they're exhibiting some symptoms, we can take it out and kind of look and see what kind of symptoms"). In other words, they knew Mr. McCollum's heat stroke was an emergency.

[80] Ex. 113, TDCJ Heat Awareness Pocket Card, Appx. 1587.

[81] Ex. 292, Sanders Depo., 37:1-11.

[82] Ex. 292, Sanders Depo., 126:12-22.

[83] Ex. 274, Clark Depo., 6464Appx. 6440:4-20; Ex. 292, Sanders Depo., 119119Appx. 6850:17-23.

[84] Ex. 38, Declaration of Rodriguez, Appx. 643.

McCollum's "whole body" "shaking," unresponsive, and hot to the touch.[85] Clark claims he believed Mr. McCollum was "having a seizure" and needed medical attention.[86]

> Q:     Did you think he was in pretty bad shape when you saw him?
>
> A:     Yes.
>
> . . .
>
> Q:     . . . [F]rom looking at him, you knew that he was having a medical problem, and that it was beyond your ability to help him because . . . you've only had basic first-aid training, right?
>
> A:     Yes.
>
> Q:     So you knew he needed medical help at that time?
>
> A:     Yes.[87]

But, instead of calling 911, Clark followed Hutchins Unit procedure and called his supervisor, Sgt. Tate.[88]

Tate arrived shortly thereafter and found Mr. McCollum "trembling" – his whole body still shaking.[89] He remained unresponsive.[90] She found his body was warm to the touch: "like he

---

[85] Ex. 274, Clark Depo., 5050Appx. 6429:21-23, 51516430:1-2, 53536433:14-15, 54546434:11-55556435:2,.

[86] Ex. 274, Clark Depo., 5151Appx. 6430:14.

[87] Ex. 274, Clark Depo., 5252Appx. 6431:3-20.

[88] Ex. 274, Clark Depo., pp. 5959Appx. 6437:1-10, 60606438:8-17.

[89] Ex. 295, Tate Depo., 6060Appx. 6922:12-22.

[90] Ex. 295, Tate Depo., 6464Appx. 6925:8-15.

could be running a fever."[91] Concerned, she sprinkled water on his face – a "treatment for heat illness" listed on her card – but it was not effective.[92] She also claims she thought he suffered a "seizure," and needed medical attention.[93]

> Q: You'd agree that he looked like he was in pretty bad shape, that he needed medical attention when you got there, right?
>
> A: I would agree that he was in a little distress. I'm not medically trained as far as the severity of the need.
>
> Q: Would you agree that someone from medical needed to see him at that point?
>
> A: I would have liked for them to.
>
> Q: Okay. So you thought that he needed medical attention at that point?
>
> A: I wanted to get him the proper attention.[94]

But she did no such thing. Instead, roughly twenty minutes after Mr. McCollum began suffering a life-threatening heat stroke, at approximately 2:30 am, Tate, a "stickler" for procedure,[95] followed the Hutchins Unit's policy, and called Lt. Sanders instead of 911.[96] The nearby inmate

---

[91] Ex. 295, Tate Depo., 6262Appx. 6924:14.

[92] Ex. 113, TDCJ Heat Awareness Pocket Card, Appx. 1587; Ex. 295,  Tate Depo., 64Appx. 6925:1-15.

[93] Ex. 295, Tate Depo., 6060Appx. 6922:14-22.

[94] Ex. 295, Tate Depo., 6161Appx. 6923:8-22.

[95] Ex. 292, Sanders Depo., 100100Appx. 6845:11-18.

[96] Ex. 295, Tate Depo., 2929Appx. 6912:3-10, 29296912:15-21, 30306913:1-15, 36366916:3-14, 66666926:16-24; Ex. 274, Clark Depo., Appx. 6437:12-20, 60606438:10-17; Ex. 292, Sanders Depo., 111111Appx. 6846:20-1121126847:5.

told Tate "this man need[s] an ambulance," and she responded "she was not allowed to call 911."[97]

From the moment Tate arrived at Mr. McCollum's bunk, Sanders had been in "constant contact" with her via the prison's radios.[98] Even before arriving herself, Sanders had been told Mr. McCollum was hot, seizing, and unresponsive.[99] Yet despite knowing Mr. McCollum had been non-responsive for at least the 20 minutes until Tate arrived, and knowing of the danger of the heat to prisoners, Sanders did not call for an ambulance. Instead, she went to see for herself despite lacking any medical training beyond first aid.[100] Upon arriving and observing him, Sanders claimed she believed Mr. McCollum might be diabetic, and suffering complications of diabetes.[101] Inmates told her Mr. McCollum "needed to go to a hospital."[102]

> Q:    [W]hen you eventually got to his bunk, you thought this man obviously has a medical problem that we can't take care of here, he needs to go to the emergency room?
>
> A:    I mean, I thought, well, something's going on, I don't know what it is, but he's going to the emergency room.[103]

---

[97] Ex. 38, Declaration of Santos Rodriguez, 44Appx. 647.

[98] Ex. 169,  Tate Written Statement, Appx. 2737; Ex. 295,  Deposition of Tate, 6666Appx. 6926:16-24.

[99] Ex. 292, Sanders Depo., 118118Appx. 6849:3-8, 1181186849:18-22; *see also id.* 123123Appx. 6851:23-1241246852:20 (knew Mr. McCollum unresponsive to sternum rub).

[100] Ex. 292, Sanders Depo., ppAppx. 6829:18-20.

[101] Ex. 292, Sanders Depo.,117 Appx 6848:7-6849:25.

[102] Ex. 38, Declaration of Rodriguez, 44Appx. 647.

[103] Ex. 292, Sanders Depo., 119119Appx. 6850:2-8.

But Sanders still did not call 911: she chose to leave the bunk and call a different prison's nurse, at a location more than 100 miles away.[104] She left the scene where a man was non-responsive and convulsing from a heat stroke, for 10 to 15 minutes to do so.[105] Only after confirming the obvious with the nurse – despite testifying she knew in her own mind that McCollum was seizing and unresponsive – did Sanders finally call 911.[106]

Shockingly, Sanders finally called EMS at 3:05 am – almost a full hour after Clark first found Mr. McCollum convulsing and unresponsive, and roughly forty to fifty minutes after she and Tate knew he was convulsing, non-responsive, and needed medical attention. Rather, she and the multiple other officers watched Mr. McCollum convulse the entire time without calling for an ambulance.[107]

---

[104] Ex. 292, Sanders Depo., 124124Appx. 6852:6-8, 6853:12-22; Ex. 140, Google Map Route from Hutchins Unit to Crain Unit, Appx. 2374 (showing linear distance measurement) *available at* https://www.google.com/maps/. Plaintiffs respectfully request that the Court take judicial notice of the distance between the two facilities. FED. R. EVID. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see, e.g.*, *Knapper v. Safety Kleen Sys., Inc.*, No. CIV A 908-CV-84-TH, 2009 WL 909479, at *6 (E.D. Tex. Apr. 3, 2009) ("The Court takes judicial notice (with the help of Google Maps) of the distances between the defendants' headquarters and Lufkin and Houston, respectively.").

[105] Ex. 295, Tate Depo., 6868Appx. 6927:3-10.

[106] Ex. 292, Sanders Depo., 117117Appx. 6848:25-1181186849:222.

[107] Ex.59, Hutchins Fire Department – EMS records, 33Appx. 1152.

When the EMTs finally arrived at 3:23 am, it took five people five minutes to lift Mr. McCollum's "extremely" obese body off the top bunk.[108]

When Mr. McCollum arrived at the emergency room, his body temperature was 109.4 °F.[109] He died of heat stroke.  Ex. 11, McCollum Autopsy Report, Appx. 104.

Clark, Tate, and Sanders were acting pursuant to the procedures and training Warden Pringle implemented at the Hutchins Unit. Pringle specifically testified that he had no criticism of the conduct of Officers Tate and Sanders, including the near hour-long delay in calling 911 for Mr. McCollum. Ex 288, Aug. 12, 2013 Pringle Depo., Appx. 6744:1-6745:2. "They took the right actions." *Id.*, Appx. 6744:10. Pringle's supervisor, Eason, concurred. Ex. 278, Eason Depo., Appx. 6494:3-6495:6.

In Mr. McCollum's case, Pringle's 911 policy caused an hour-long delay in obtaining medical treatment. That unjustified delay was the difference between life and death.[110]

---

[108] Ex. 295, Tate Depo., 7070Appx. 6928:11-18, 70706928:25-71716929:1. EMS arrived at the prison at 3:12 am, only seven minutes after being dispatched, but the prison delayed their arrival at Mr. McCollum's dormitory until 3:23 am. *See* Ex. 59, Hutchins Fire Department - EMS Records.., Appx. 1190.

[109] Ex. 60, McCollum Parkland Medical Records, Appx. 1166.

[110] Ex. 53,  Report of Dr. Vassallo, 77Appx. 775; Ex. 50, Report of Lt. Roger Clark (ret.), ppAppx. 726; *see also* Ex. 273, Babbili Depo., pp.Appx. 6410:7-36366411:10 (agreeing correctional officers should have called for medical assistance immediately); Ex. 271, Mar. 7, 2014 G. Adams Depo., 289289Appx. 6334:18-22, 2962966336:1-7 (same).; Ex. 277, Crippen Depo., Appx. 6468:13-1451456469:5 (agreeing that the delayed 911 call leading to Mr. McCollum's death "sounds pretty egregious"); Ex. 279, Eubank Depo., 161161Appx. 6610:22, 1631636612:23-1641646613:14 ("seizures" should lead to a 911 call); Ex. 291, Robison Depo., 208208Appx. 6822:6-17 (same); Ex. 300, Williams Depo., 225225Appx. 7043:24-2262267044:3 (same); Ex. 258, Oct. 31, 2013 Email from Robert Williams, Appx. 6214.

V.    ARGUMENT AND AUTHORITIES

Because there are multiple material factual disputes when the evidence is viewed in the light most favorable to the Plaintiffs, the Court must deny Defendants' motion for summary judgment.

### A.  Eighth Amendment Claims

*1.  Defendants Clark, Tate, and Sanders Violated Mr. McCollum's Eighth Amendment Right to Access Medical Care.*

When Clark, Tate, and Sanders found Mr. McCollum suffering a heat stroke in his bunk, they delayed providing him medical care for almost an hour – vital time that could have saved his life. This denial of access to medical care violated Mr. McCollum's Eighth Amendment rights.

i.  <u>Clark, Tate, and Sanders were Deliberately Indifferent to Mr. McCollum's Serious Medical Need.</u>

The Eighth Amendment protects inmates, like Mr. McCollum, from jailers' deliberate indifference to their serious medical needs. *See Bruce v. Little*, 568 Fed. Appx. 283, 285-86 (5th Cir. 2014) (unpublished) (reversing district court's grant of Rule 12(b)(6) motion to dismiss). "Deliberate indifference" requires the jail official must both (1) know about the inmate's serious medical condition, and (2) disregard a substantial risk to the inmate. *See*, *e.g.*, *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). "An express intent to inflict unnecessary pain is not required." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

There is no factual dispute that the officers knew Mr. McCollum was convulsing and non-responsive.[111] Their own testimony, and TDCJ's training, shows that they knew he needed medical attention beyond the first aid available at the Hutchins Unit in the middle of the night.[112] Thus, the evidence establishes their subjective awareness of his condition.

In their Motion, Defendants only dispute whether the officers knew Mr. McCollum was merely "having a seizure," or was in the throes of a life-threatening heat stroke. But neither can excuse the officers' indifference – both heat strokes *and* seizures are "serious medical conditions" requiring immediate medical attention. *See*, *e.g.*, *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (heat stroke);[113] *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("medical conditions much less serious than seizures have satisfied the [serious medical condition] standard"); *Quatroy v. Jefferson Parish Sheriff's Office*, 2009 WL 1380196, *10 (E.D. La. May 14, 2009) ("nontreatment of seizures" is indifferent to serious medical need). That an inmate, like Mr. McCollum, died from the condition is certainly evidence his medical problem

---

[111] Ex. 274, Clark Depo., 5050Appx. 6429:21-23, 51516430:1-2, 54546434:11-55556435:2; Ex. 165, Clark Statement, Appx. 2726; Ex. 295, Tate Depo., 6060Appx. 6922:12-22 ; Ex. 169, Tate Statement, Appx. 2737; Ex. 292, Sanders Depo., 118118Appx. 6849:3-8; Ex. 168, Sanders Statement, Appx. 2736.

[112] Ex. 274, Clark Depo., 5252Appx. 6432:3-20 ; Ex.295, Tate Depo., 6161Appx. 6923:8-22; Ex. 292, Sanders Depo., 119119Appx. 6850:2-8; Ex. 113, TDCJ Heat Awareness Pocket Card, Appx. 1587; Ex. 112, TDCJ Heat Safety Training Circular (v. 2010), Appx. 1582.

[113] Defendants attempt to distinguish *Austin* by insisting the officers in that case delayed medical care for two hours instead of one hour. But the length of the delay is not the linchpin of indifference. Indeed, the Fifth Circuit specifically noted that the *Austin* officers' conduct was "perhaps only negligent" until the prisoner lost consciousness and began vomiting. 328 F.3d at 210. When the prisoner became unresponsive – like Mr. McCollum was all along – the officers became indifferent. *Id*.

was objectively "serious." *Gonzalez v. Cecil Co., Md.*, 221 F.Supp.2d 611, 616 (D. Md. 2002). At a minimum, the officers' knowledge of the severity of Mr. McCollum's condition is a fact issue for the jury to decide. *Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

Ultimately, the jury is not required to believe the officers' self-serving statements that they did not believe Mr. McCollum suffered a heat stroke. "If the risk is obvious . . . we may infer knowledge." *Stewart v. Guzman*, 555 Fed. Appx. 425, 431 (5th Cir. 2014) (citing *Easter*, 467 F.3d at 463). The allegedly extensive training the officers received taught them heat stroke is a "true medical emergency": "a sudden change in the level of consciousness in a setting of heat exposure suggests the possibility of a heat stroke."[114] Symptoms include "hot and dry" skin, and "rapid and weak" respirations – symptoms the officers witnessed.[115] Likewise, the heat card in each officer's pocket lists symptoms of heat stroke, including "coma," "rapid pulse," and "skin hot and dry."[116] The card likewise warned of a "higher risk of heat illness" due to "high temperature and humidity conditions." Tate even followed some of the advice on her card – "sprinkle water on them" to provide treatment.[117] The officers stood around with their cards – which they were trained to refer to when "we're not sure what's wrong with them" – for almost

---

[114] Ex. 112, TDCJ Heat Safety Training Circular (v. 2010).).), Appx. 1582.

[115] Ex. 274,  Clark Depo., 5353Appx. 6433:14-16; Ex. 295, Tate, Depo., 6262Appx. 6924:2-14; Ex. 292, Sander Depo., 118118Appx. 6849:18-22.

[116] Ex. 113, TDCJ Heat Awareness Pocket Card, Appx. 1587.

[117] Ex. 113, TDCJ Heat Awareness Pocket Card, Appx. 1587; Ex. 295, Tate Depo., 6464Appx. 6925:1-15. Notably, however, she did not "get medical attention ASAP."

an hour. Now, the officers ask the Court to disregard everything they learned in their alleged training when assessing their subjective knowledge. Doc. 288, p. 98. The Fifth Circuit disagrees with this approach: "training making [officers] aware of the potential danger of heat to prisoners" can establish the risk of heat-related illness was obvious. *Blackmon*, 484 Fed. Appx. at 873.

Likewise, a "serious medical need" includes any condition "so obvious that even a lay person would easily recognize the necessity of a doctor's attention." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (citing *Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326, 247 (3rd Cir. 1987))*;see also Stewart*, 555 Fed. Appx. at 431 (citing *Lewis v. Evans*, 440 Fed. Appx. 263, 264 (5th Cir. 2011)).

Here, the officers watched Mr. McCollum convulse and remain unresponsive in a "very hot" environment for almost an hour – the jury should decide if the officers knew he faced a "serious medical need." *See Austin*, 328 F.3d at 210 (denying qualified immunity: officers' "failure to call an ambulance for almost two hours while [a prisoner] lay unconscious and vomiting rises to the level of deliberate indifference").

Indeed, the officers' choice not to call 911 and to "let me talk with my supervisor" is textbook indifference. As the Supreme Court makes clear, deliberate indifference to an inmate's serious medical need is manifest when "prison guards . . . intentionally deny[] or delay[] access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). Both Clark and Tate believed, in their own minds, that Mr. McCollum needed medical attention. Both did nothing more than call another officer they knew could not provide medical care. Sanders, in the face of being told Mr. McCollum was convulsing and unresponsive long before she even before she arrived at the dormitory, decided to observe the situation herself before calling 911. And when she arrived, she called an offsite nurse (not even a doctor who could actually help) over 100 miles away for a

consult before calling EMS. Clark – the first officer on the scene – testified he quickly knew Mr. McCollum "needed medical help." Ex. 274, Clark Depo. Appx. 6432:3-20.

The officers contend their actions were not deliberate because they "fully expected" Mr. McCollum's "seizure" to quickly resolve itself. Doc. 288, p. 102. But they also subjectively knew that Mr. McCollum *continued* seizing, without regaining consciousness, for almost an hour.[118] From the moment she arrived, Sgt. Tate was at his bedside providing "frequent updates" to Lt. Sanders. *Id*. The officers knew that every minute after Clark responded to Mr. McCollum's bedside was another minute the seizure did not "resolve [it]self." Doc. 288, p. 102. Even assuming that seizures are not "serious medical conditions" – though they obviously are – Clark, Tate, and Sanders knew that Mr. McCollum's "seizure" continued for almost an hour, and still did nothing.[119]  A jury could conclude the officers were more concerned about following protocol than caring for a man dying before their eyes.

> ii. Defendants Clark, Tate and Sanders are Not Entitled to Qualified Immunity.

---

[118] This is not a situation, like Dr. Vassallo was asked about at her deposition, where a patient has brief seizures, and the patient regains consciousness. Indeed, Dr. Vassallo unequivocally testified that, even though she is a physician, "if I came out on the street and I saw someone having a seizure, I would call 911." Ex. 298, Vassallo Depo. Appx. 7009:9-11. *See also id*. 7010:11-15 (every seizure is life threatening), 7011:4-21, 7012:23-7013:16.

[119] Indeed, Clark and Tate's conduct also justifies liability under a bystander theory. "Bystander liability may be established where an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Kitchens v. Dallas Cty.*, 759 F.3d 468, 480 (5th Cir. 2014). The evidence plainly shows they (1) knew Mr. McCollum needed to access medical care for a serious medical need, but was denied that care due to Sanders' unreasonable delay; (2) they each had significant time to call 911 before Sanders' arrival to obtain care for Mr. McCollum, and (3) each chose not to act. (For purposes of the qualified immunity analysis, the law regarding bystander liability was clearly established before 2010. *Kitchens*, 759 F.3d at 480).

To defeat qualified immunity, Plaintiffs must show 1) the prison official violated a clearly established constitutional right, and 2) the official's conduct was not objectively reasonable. *See Easter v. Powell*, 467 F.3d 459, 462 (5th Cir. 2006). Qualified immunity does not protect the "plainly incompetent or those who knowingly violate the law." *Austin*, 328 F.3d at 207 (citing *Wooley v. City of Baton Rouge*, 211 F.3d 913, 918-19 (5th Cir. 2000)). Here, the defendant officers meet both of these standards.

Prisoners, like Mr. McCollum, have a clearly-established Eighth Amendment right to receive medical care. *See*, *e.g.*, *Estelle*, 429 U.S. at 104; *Austin*, 328 F.3d at 210 (denying qualified immunity when inmate suffered heat stroke); *King*, 680 F.3d at 1019 (denying summary judgment to nurse who ignored inmate's seizures).

Once a right is clearly established, a decision violating that right is objectively unreasonable. "If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable." *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012) (internal citations omitted).

Indeed, the officers' high-ranking superiors – TDCJ Correctional Institutions Division director Rick Thaler and his deputy, William Stephens – both conceded the obvious, that a near hour-long delay in obtaining medical care for a prisoner suffering a "seizure" was unacceptable. Ex. 296, Thaler Depo., Appx. 6960:21-6962:18; Ex. 293, Stephens Depo., Appx. 6864:15-6866:5; *see also* Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), Appx. 6376:22-6378:20 (seizures a serious medical condition incapable of diagnosis by correctional officers).

Likewise, officers cannot seek the protection of qualified immunity for "just following orders."[120] "[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (denying qualified immunity to police officer "following orders" when he excluded citizen from public swimming pools without due process). "[T]hough [defendants] [were] not the mastermind[s] behind the violation of constitutional rights that occurred here, [they] must take responsibility for [their] actions, and may be held accountable in a court of law." *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004)*;see also Gonzalez v. Cecil Cty.,* 221 F.Supp.2d 611, 616 (D. Md. 2002).

For these reasons, the Fifth Circuit recently denied qualified immunity to TDCJ officers who responded in virtually the same manner as Clark, Tate, and Sanders. In *Stewart v. Guzman*, the plaintiff suffered an asthma attack, but rather than take him to the on-site medical facility immediately, officers initiated TDCJ's "incident command system" protocol[121] – the same procedure the officers followed at the Hutchins Unit – delaying the inmate's access to care.[122] The Fifth Circuit determined officers could not be granted qualified immunity at summary

---

[120] Doc. 288 at 99 (Clark "acted entirely according to policy"), 101-102 (Tate's "response was consistent with the measures ordinarily taken when [a prisoner] suffers a seizure").

[121] *See* Ex. 289, Feb. 15, 2013 Pringle Depo., pp. 4848Appx. 6775:24-49496776:8;. Ex. 278, Eason Depo., p. 205205Appx. 6558:14-2062066559:25.).

[122] Fortunately, the inmate survived the experience, unlike Mr. McCollum.

judgment on these virtually identical facts. 555 Fed. Appx. 425, 432 (5th Cir. 2014) (reversing summary judgment granted based on qualified immunity).

In sum, Clark, Tate, and Sanders each knew Mr. McCollum was seizing, unconscious, non-responsive, in a very hot environment, and needed medical care. But they did not seek medical attention for nearly an hour as he lay dying before their eyes. Their actions epitomize indifference to a serious medical need and they are not entitled to qualified immunity.

### iii. A Fact Dispute Exists as to Whether Clark, Tate, and Sanders' Delay Injured McCollum.

Clark, Tate, and Sanders next offer the classic "so what?" – arguing that even if they responded promptly, Mr. McCollum would have died anyway. Doc. 288, p. 104. But a fact dispute exists regarding whether Mr. McCollum would have survived. Dr. Vassallo, an emergency room physician with decades of experience treating heat-stroke victims, believes Mr. McCollum would have lived had he been treated sooner. Ex. 53, Expert Report, Dr. Susanne Vassallo, Appx. 766-767. Defendants' expert, Dr. Benjamin Leeah, a family practice physician providing care to TDCJ prisoners, abandons all hope. Doc. 288-6, Appx. pp. 305-308.[123] This disputed expert testimony must be resolved by a jury, not on summary judgment. *See, e.g., Michaels*, 202 F.3d at 752; *Osburn*, 825 F.2d at 916.

_____

[123] Even Dr. Leeah, however, notes that between when EMS began treating Mr. McCollum at 3:23 am and when he arrived at Parkland his body temperature increased from 104 to 109.4. Doc. 288-6, Appx. p. 304. And another doctor contracted for TDCJ, Glenda Adams, concedes that "emergency measures need to be taken as soon as possible" when a patient suffers a heat stroke. Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), Appx. 6374:21-6375:3; 6396:3-19.

2. *Defendants Eason and Pringle Violated Mr. McCollum's Eighth Amendment Rights.*

Warden Pringle and his supervisor, Regional Director Eason, violated Mr. McCollum's Eighth Amendment rights by both (1) maintaining obviously dangerous conditions at the Hutchins Unit, and (2) dangerously failing to supervise officers at the prison by training them to delay calling 911 (including Clark, Tate, and Sanders).

i. Pringle and Eason Operated the Hutchins Unit in Unconstitutional Conditions.

Prison conditions violate the Eighth Amendment when the condition either (1) poses a substantial risk of serious harm (*Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015)), or (2) violates contemporary standards of decency (*Graham v. Florida*, 560 U.S. 48 (2010)). The evidence shows both violations occurred at the Hutchins Unit.

First, the Fifth Circuit recently held "[e]xtreme cell temperatures … can violate the Eighth Amendment. To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose 'an unreasonable risk of serious damage' to a prisoner's health — an objective test — and prison officials must have acted with deliberate indifference to the risk posed — a subjective test." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015).

A fact-finder can determine a prison official knew about an obviously dangerous risk. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (emphasis added). Failure to abate extreme temperatures is an "obvious" risk, as the Fifth Circuit and this Court have previously held. *Blackmon v. Garza*, 484 Fed. Appx. 866, 873 (5th Cir. 2012); *Martone v. Livingston*, 2014 WL 3534696, *6 (S.D. Tex. July 16, 2014) (Ellison, J.).

In *Gates v. Cook*, the Fifth Circuit held that a prison's exposure of inmates to temperatures in the nineties and high humidity "presents a substantial risk of serious harm to the

inmates." 376 F.3d 323, 334, 340 (5th Cir. 2004). *Gates* was brought by death row inmates in the Mississippi State Penitentiary in Parchman, Mississippi. *Gates*, 376 F.3d at 327. Even though the facility had large hallway fans, inmates often had their own small fans, and the windows could be opened during the summer, the fact remained that "ventilation is inadequate to afford prisons a minimal level of comfort" and "[t]he probability of heat-related illness is extreme," requiring additional precautions were needed above a 90° F heat index. *Id.* at 334, 339-340. Moreover, the Fifth Circuit noted that "the medications often given to deal with various medical problems" – like the hydrochlorothiazide prescribed Mr. McCollum – "interferes with the body's ability to maintain a normal temperature." *Id.* at 334. *Gates* held that deliberate indifference was shown "based on the open and obvious nature of these conditions." *Id.* at 340.

There is no real dispute that the temperatures inside the Hutchins Unit's housing areas become objectively dangerous, posing a substantial risk of serious harm – officers at the prison believed the heat index was "150+." Similarly, there is no real argument that any steps Defendants take actually reduce the heat index inside the prison's housing areas—they obviously do not.

To the extent there is any fact dispute, it centers on what mitigation steps Defendant Eason and Pringle actually took to protect inmates in general (and Mr. McCollum specifically) in 2011, and whether those steps were "adequate" given the significant dangers that each Defendant knew of at the time. Even if Pringle and Eason instructed the officers to implement all the *Gates* measures – though they did not (*see infra* at p. 57-58) – like in *Blackmon*, "a reasonable jury could nonetheless conclude that such measures were inadequate to satisfy the Eighth Amendment's demands." 484 Fed. Appx. at 871. As the parties' evidence is in conflict, this dispute precludes summary judgment.

In *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004), the Fifth Circuit held that a prison that exposed inmates to extreme heat violated the Eighth Amendment. In *Gates*, a class of prisoners at the Parchman State Prison in Mississippi alleged a variety of Eighth Amendment violations arising from their conditions of confinement, including excessive temperatures in their housing areas. *Id.* at 327. The Fifth Circuit affirmed the following injunctive relief entered by the trial court as mandatory heat mitigation measures:

> If the heat index reaches 90 degrees or above, the defendants will insure that each cell is [1] equipped with a fan, [2] that ice water is available to each inmate, and [3] that each inmate may take one shower during each day when the heat index is 90 degrees or above. As an alternative, the defendants may provide fans, ice water, and daily showers during the months of May through September.

*Id.* at 336, 339 (numbering inserted). Other mitigation measures were also built-in to the Parchman prison – cells had windows that open, for example. *See id.* at 334. Thus, the Circuit has ruled that the provision of ice water, personal fans, showers, and windows that open are a minimum requirement of the Eighth Amendment. *See also Ball* , 792 F.3d at 595-6 (discussing *Gates*). However, protections from the heat must ultimately be "adequate," and a jury is free to decide prison administrators were not providing adequate protections even when they comply with the *Gates* measures. *See Webb v. Livingston*, 618 Fed. Appx. 201, 209 n. 7 (5th Cir. 2015); *Blackmon*, 484 Fed. Appx. at 871 ("Although prison officials implemented several measures to combat the heat within the [plaintiff's] dorm, a reasonable jury could nonetheless conclude that such measures were inadequate to satisfy the Eighth Amendment's demands.").

First, it is undisputed that Hutchins Unit inmates did not have personal fans at the time of Mr. McCollum's death. Ex 288, Aug. 12, 2013 Pringle Depo. Appx. 6747:5-7. The lack of fans at Hutchins was especially egregious because TDCJ's annual heat measures email relied on

inmate access to personal fans. *Id.* Appx. 6746:7-25, 6747:8-15; Ex. 103, "Heat Precaution" 2011," Appx. 1502 ("Fans shall be allowed to all custody levels").[124]

Second, the windows do not open at the Hutchins Unit. Ex 289,  Feb. 15, 2013 Pringle Depo., Appx. 6785:7-23. The *Gates* court affirmed the trial court's injunction requiring insect-proof screens on the windows at Parchman so they could be opened as a heat-mitigation measures. *Gates*, 376 F.3d at 340.[125]

Third, the inmates at Hutchins did not have minimally adequate access to ice water at the time of Mr. McCollum's death. Warden Pringle conceded that the policy at Hutchins at the time was to bring in ice water in ten-gallon jugs for 54 inmates only three times per day. Ex. 288, Aug. 12, 2013 Pringle Depo., Appx. 6758:10-13. TDCJ recommended inmates drink 2 gallons per day to protect themselves from the heat. Ex. 305-306, Photographs of posters at Hutchins, Appx. 7151-7153; Ex. 261, Hydration poster, Appx. 6259. Moreover, the record contains evidence from other inmates that the water brought into McCollum's dorm in the days before his death was not iced.[126] And the problem posed by the lack of ice water was even more serious for

---

[124] That the Hutchins Unit had large fans in the dayroom is irrelevant, as Parchman also had large fans in common areas like hallways. *Gates*, 376 F.3d at 334.

[125] Even if Pringle could not unilaterally ensure the windows open at Hutchins, *Gates* provided him clear warning that closed windows would violate inmates' constitutional rights absent other effective heat-mitigation measures.

[126] Ex. 38, Declaration of Santos Rodriguez, 22Appx. 644; *see also* Ex. 41, Declaration of Crockett, 22Appx. 658; Ex. 40, Declaration of Deaton, Appx. 654; Ex. 42,  Declaration of Gleason, 22Appx. 662; Ex. 43, Declaration of Russell, Appx. 667-668; Ex. 39, Declaration of Chase, Appx. 648-649. Warden Pringle stated he would not dispute that testimony. Warden Pringle stated he would not dispute that testimony. Ex 288, Aug. 12, 2013 Pringle Depo., 8888Appx. 6759:18-21.

Mr. McCollum because he did not have a cup to drink the ice water, and would have had to consume the recommended two gallons each day from the sink with his bare hands. Ex. 289, Feb. 15, 2013 Pringle Depo., Appx. 6781:7-10; 6783:4-14.[127]

           ii.   <u>Conditions at the Hutchins Unit Violate Contemporary Standards of Decency.</u>

Second, conditions at the Hutchins Unit violated contemporary standards of decency. "The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 58 (2010) (Kennedy, J.) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hope*, 536 U.S. at  737 (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "Prison conditions may be restrictive and even harsh," but must comply with "evolving standards of decency." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (internal citations omitted).

Thus, an Eighth Amendment violation occurs when prison conditions fail to provide a "minimal civilized measure of life's necessities." *Blackmon*, 484 Fed. Appx. at 869 (citing *Farmer*, 511 U.S. at 834 (1994)). "[D]eprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 9.

---

[127] This could have easily been remedied by providing Mr. McCollum with disposable cone cups on intake at the Hutchins Unit, as is now the practice during the summer. Ex. 289, Pringle Depo., Appx. 6798:12-25.

"[T]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Graham*, 560 U.S. at 58 (citing *Kennedy v. Louisiana*, 554 U.S. 407 (2008)). A "sufficient national consensus" can "label a particular punishment cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 562 (2005). Courts should not only consider the absolute number of states prohibiting a practice, but also "the consistency of the direction of change." *Id.* at 566 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002)). The Court should look to "measures of consensus other than legislation," including actual correctional practices. *Graham*, 560 U.S. at 62. "Evidence of consensus is not undermined by the fact that many jurisdictions do not prohibit" a practice. *Graham*, 560 U.S. at 66. Ultimately, however, "the judicial exercise of independent judgment" requires a court to evaluate for itself whether a practice is cruel and unusual. *Graham*, 560 U.S. at 67.

a.   In the South, Air Conditioning Has Become the Norm for All Housing.

In the modern South, "contemporary standards of decency" require air conditioning. That is the "socially acceptable level" of risk. *See*, *e.g.*, *Ball*, 792 F.3d at 599. Air conditioning is a near-universal feature of housing in the South. According to the U.S. Department of Housing and Urban Development, over 98 percent of housing units in the South have some form of air conditioning.[128]  Nationwide, including many more temperate climates, over 87 percent of homes

---

[128] Ex. 129, U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, AMERICAN HOUSING SURVEY FOR THE UNITED STATES: 2011, Appx. 1797 (2013) (*available at*: http://www.census.gov/content/dam/Census/programs-surveys/ahs/data/2011/h150-11.pdf) (last accessed Sept. 3, 2014). According to Census Department data, there are 42,584,000 total housing units in "the South." 36,677,000 have central air conditioning, 1,537,000 have one

have air conditioning.[129] Over ninety-five percent of new homes nationwide are built with air conditioning.[130] Defendants' engineering expert was not aware of anywhere, aside from the prisons, where people live and sleep without air conditioning in Texas. Ex. 297, Traknyak Depo., Appx. 6978:9-16. In the South, air conditioning is as ubiquitous as running water.[131]  No one would argue a toilet and sink are "luxury" or "comfort" items unavailable to prisoners.

---

window unit, 1,986,000 have two window units, and 1,666,000 have three or more window units. Therefore, over 98.3 percent of housing units have some form of air conditioning.

[129] Ex. 292, U.S. ENERGY INFORMATION ADMINISTRATION, *Residential Energy Consumption Surveys*, (Aug. 19, 2011), Appx. 2084 (*available at*: http://www.eia.gov/consumption/residential/reports/2009/air-conditioning.cfm) (last accessed Sept. 3, 2014). Defendants play up that 55,000 homes somewhere in the United States were built without air conditioning in 2014. Doc. 288, p. 107. They provide no information about where these homes are located – Alaskan homes that would never likely use air conditioning are irrelevant to the inquiry. But, even more tellingly, these 55,000 homes are a very small percentage of the total new home construction. In 2014, there were 1,052,100 new homes built in the United States, making these 55,000 homes just 5% of the total new homes built. *See* Ex. 128, U.S. Census Bureau, New Residential Construction in July 2016, Appx. 1779 (available at: https://www.census.gov/construction/nrc/pdf/newresconst.pdf).

[130] *Id*. Defendants play up that 55,000 homes were built somewhere in the U.S. without air conditioning in 2014. Doc. 288, p. 107. But they provide no information about where these homes are located – Alaskan homes, cabins in the Rockies, beach houses on the coast of Maine, and other homes that would never likely use air conditioning are irrelevant to the inquiry. But, even more tellingly, these 55,000 homes are a very small percentage of the total new home construction. In 2014, there were 1,052,100 new homes built in the United States, making these 55,000 homes just 5% of the total new homes built. *See* Ex. 128, U.S. Census Bureau, New Residential Construction in July 2016, 22Appx. 1779 (available at: https://www.census.gov/construction/nrc/pdf/newresconst.pdf). Ninety-five percent of new construction is a significant consensus.

[131] Ex. 129, U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, AMERICAN HOUSING SURVEY FOR THE UNITED STATES: 2011, Appx. 1797 (2013) (*available at*: http://www.census.gov/content/dam/Census/programs-surveys/ahs/data/2011/h150-11.pdf) (last accessed Sept. 3, 2014). Over 98.7 percent of U.S. homes have running water. (113,472,000 of 114,907,000 total homes have "all plumbing facilities").

Even the data Defendants cite shows failing to air condition the Hutchins Unit violates contemporary decency. Only 100,000 homes in Texas, according to the Defendants, "are not equipped with air conditioning of any kind" – the best comparison to the housing areas at the Hutchins Unit.[132] Doc. 288, p. 107. But according to the same data, there are 8,500,000 homes in Texas – meaning just 1.2% of Texas homes do not have air conditioning. Doc. 288-39, TDCJ Appx. 1788. Accepting Defendants' figures, if "300,000 Texans currently go without air conditioning," that is only 1.2% of the state's population.[133] *Id*. Even if air conditioning is not required by minimum standards for public housing, as a factual matter, housing without air conditioning simply barely exists in Texas. At a minimum, this is a factual dispute for a jury to resolve. *Gibbs v. Lynn*, 30 F.3d 1490 (5th Cir. 1994) ("Summary judgment on this issue turns on whether a reasonable person would find that the conditions of [confinement] violated contemporary standards of decency").

> b.   Numerous Prisons and Jail Systems Mandate Air Conditioning.

Indeed, many state prison systems in the South and Southwest are air-conditioned. Arkansas requires temperatures inside prisons stay between 74° F and 78° F, and has air-

---

[132] Homes that "use their air conditioning sparingly" are not comparable to the Hutchins Unit, when, as Defendants speculate, these homes likely use their air conditioners "during the peak of the summer." Doc. 288, at 107. The relevant measure is the number of people who live in non-air conditioned housing, and do not have the option of even using air conditioning "sparingly."

[133] *See* Ex. 127, State and County QuickFacts: Texas, U.S. Census Bureau, Appx. 1774, *available at*: http://quickfacts.census.gov/qfd/states/48000.html. And while it is unclear where TDCJ located the 300,000 number, the Census' population totals do include prisoners, and TDCJ houses approximately 150,000 inmates. Ex. 278, Eason Depo., 184184Appx. 6550:21 (TDCJ houses 150,000 total inmates).

conditioned all its facilities since the 1970s.[134] Arizona prisons prohibit indoor temperatures over 78° F.[135] New Mexico and Oklahoma mandate indoor temperatures "appropriate to both summer and winter comfort zones."[136] Tennessee (like Texas)[137] requires local jails to keep temperatures between 65° F and 80° F.[138] North Carolina prohibits temperatures above 85° F in jails.[139]

Courts and regulators in other states have also required air conditioning in prisons. *See Jones El v. Berge*, 374 F.3d 541 (7th Cir. 2004) (affirming injunction requiring maximum heat index); *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010) (affirming injunction prohibiting housing above 85). Illinois requires municipal jails to keep indoor temperatures between 67° F and 85° F.[140]

---

[134]Ex. 164, Mike Ward, Guards to join convict litigation over hot state prisons, AUSTIN AMERICAN-STATESMAN (Aug. 29, 2013), Appx. 2721 http://www.statesman.com/news/news/guards-to-join-convict-litigation-over-hot-state-p/nZgSD/ (last visited Sep. 6, 2016).

[135] Ex. 135, PHYSICAL PLANT STANDARDS TECHNICAL MANUAL 1.5.1.3.2.1, Appx. 2172 (Ariz. Dep't of Corrections 2012).

[136] Ex. 136, PHYSICAL PLANT REQUIREMENTS CD-163000 FF, Appx. 2304 (N.M. Dep't of Corrections 2011); STANDARDS FOR INSPECTIONS OP-130107.IV.B.16 (Okla. Dep't of Corrections 2012).

[137] 37 TEX. ADMIN. CODE § 259.160. *See also* Exhibit 139, 3 Tex. Reg. 897, 902 (adopted Mar. 14, 1978).).), Appx. 2367.

[138] EX. 137, RULES OF THE TENNESSEE CORRECTIONS INSTITUTE CORRECTIONAL FACILITIES INSPECTION 1400-1.04(1)(D) (TENNESSEE CORRECTIONS INSTITUTE 2004).), Appx. 2312.

[139] N.C. ADMIN. CODE § 14J.1217 (2013).

[140] *Id.* at 20. *See also* 22 ILL. REG. 19227 § 720.40 (2013).

Though TDCJ cites to the complaint in a pending Federal Tort Claims Act lawsuit to claim federal prisons are not air conditioned, this is simply untrue. In fact, the suit alleges that the Bureau of Prisons was negligent because despite a plethora of available air-conditioned housing options, FCI Seagoville housed the inmate in one of the few non-air-conditioned locations. *See* Ex. ___, Affidavit of Scott Gray ("most of the buildings that housed inmates were climate controlled with full air conditioning" and "I have personally visited several prisons under the Bureau of Prisons control and every single one of them I visited have been climate controlled and air conditioned").

Even the prison for terrorism suspects at Guantanamo Bay is air conditioned.[141]

Likewise, the American Bar Association's Standards on the Treatment of Prisoners suggests prisons must provide "cooling . . . appropriate to maintain humane comfort and safety in all living and working areas."[142] The American Correctional Association's standards – which the Hutchins Unit allegedly complies with – requires "temperature should be capable of being mechanically raised *or lowered* to an *acceptable comfort level*."[143]

But this is not an argument about comfort. Conditions in the Hutchins Unit are not just "*uncomfortable*" – they are *unconstitutional*. Though the Constitution "does not mandate comfortable prisons, neither does it permit inhumane ones." *Ball*, 792 F.3d at 592 (citing

---

[141] Ex. 133, Department of Defense, Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement, p. 11.

[142] AMERICAN BAR ASSOCIATION, STANDARDS FOR CRIMINAL JUSTICE: TREATMENT OF PRISONERS (3rd Ed.), p. 69.

[143] Ex. 142, Amer. Correctional Association Std. 4-4153, Appx. 2381 (emphasis added).

*Farmer*, 511 U.S. at 832). As Mr. McCollum's experience illustrates, the heat inside the Hutchins Unit is *dangerous*, not just "uncomfortable" or "unpleasant."

   c.   Free-World Industry Standards Require Air Conditioning at Far Lower Heat Indexes.

The Defendants' own expert engineer, Frank Traknyak, testified in this case that he would refuse to build the Hutchins Unit without air conditioning, and he would have "walked away" if asked to build it without air conditioning in 1995, because the lack of air conditioning was so outside the norm for his industry even before the unit was built. Ex. __, Traknyak Depo., p. 212:2-14. Mr. Traknyak elaborated that the American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) has developed, through rigorous polling and testing, a uniform standard for "Thermal Conditions for Human Occupancy," Standard 55.[144] Converted to NWS heat index, Standard 55 prescribes indoor spaces be kept between approximately 75° F to 82° Fahrenheit to be acceptable for comfortable human occupancy in the HVAC industry.[145]

_____

[144] Ex. 148, American Society of Heating, Refrigeration and Air-Conditioning Engineers (ASHRAE) Thermal Conditions for Human Occupancy, Standard 55-2004, 525505 (summer range for operative temperature is 74-83° F); *see also* Ex. 48, Brown, P.E.'s Expert Report, Appx. 713.

[145] Ex. 48, Brown, P.E.'s Expert Report, Appx. 713;  Ex. 146 American Society of Heating, Refrigeration and Air-Conditioning Engineers (ASHRAE) Thermal Conditions for Human Occupancy, Standard 55-200413, 57.  (summer "comfort" range for HVAC systems is 77-82° F). While industry standards are not dispositive by themselves of a "contemporary standard of decency," they are "instructive." *Bell v. Wolfish*, 441 U.S. 520, 543 n. 27 (1979). Most significantly, these industry standards assist in defining "comfortable" temperature ranges. As the constitution does not require "comfortable" prisons, defining "comfort" will assist the fact-finder in determining the line between "comfortable" and "inhumane." *See*, *e.g.*, *Ball*, 792 F.3d at 592 (citing *Farmer*, 511 U.S. at 832).

According to Traknyak, ASHRAE standards, including Standard 55, form the "the bible of HVAC."[146]

For days at a time during the summer, including during McCollum's time there, temperatures soar above the ASHRAE comfort standard prescriptions inside the Hutchins Unit, and on many days even night-time temperatures inside will not drop into the high-end of "comfortable."[147]

In contrast, according to the NWS heat index chart and Defendants' own policies, the *danger* begins at 90 degrees heat index – significantly hotter than merely "uncomfortable."[148] The Fifth Circuit has repeatedly held temperatures above 90° F become unconstitutional. *See*, *e.g.*, *Gates*, 376 F.3d at 340 (affirming injunctive relief as "justified by an Eighth Amendment violation" when heat indexes exceed 90° F); *Blackmon*, 484 Fed. Appx. at 870; *Hinojosa*, 807 F.3d at 665; *Webb*, 618 Fed. Appx. at 207-208; *Ball* , 792 F.3d at 596.[149]

---

[146] Ex. 297, Traknyak Depo., Appx. 7714:13-24.

[147] *See supra*, n.13 and accompanying text.

[148] *See supra*, n. 3 and accompanying text.

[149] Notably, however, even the American Correctional Association pegs acceptable indoor prison temperatures to a "comfort" range. Ex. 25t6, Email to William Stephens with "ACA Temperature Standards," TDCJ0137276208-9TDCJ013727.

For these reasons, the NEW YORK TIMES,[150] HOUSTON CHRONICLE,[151] AUSTIN AMERICAN-STATESMAN,[152] FT. WORTH STAR-TELEGRAM,[153] and other newspapers[154] have editorialized that Texas prisoners must be protected from the heat.

Given these facts, Eason and Pringle knew conditions at the Hutchins Unit violated Mr. McCollum's constitutional protection from conditions of confinement that violate contemporary standards of decency. They knew the conditions inside the prison were intolerable, and inflicted suffering on numerous inmates every day. Wardens are responsible for the conditions in their

---

[150] Ex. 159, NEW YORK TIMES, *Heat Exhaustion in a Texas Prison*, Aug. 8, 2012 (available at: http://www.nytimes.com/2012/08/09/opinion/heat-exhaustion-in-a-texas-prison.html?_r=0)  (last accessed Sept. 3, 2014).), Appx. 2705.).

[151] Ex. 158,, HOUSTON CHRONICLE, *Failure to Communicate*, Apr. 25, 2014, 2698 (available at: http://www.chron.com/opinion/editorials/article/Failure-to-communicate-5430794.php)  (last accessed Sept. 3, 2014) (noting failing to protect inmates is "not how a humane society works"), Appx. 2702.

[152] Ex. 163, AUSTIN AMERICAN-STATESMAN, *There's a Difference Between Tough and Brutal*, June 14, 2013, 2722 (*available at*: http://www.mystatesman.com/news/news/opinion/theres-a-difference-between-tough-and-brutal/nYLg7/#dd1ae25d.3718042.735480) (last accessed Sept. 4, 2014) ("[E]ven the most violent [inmates] are accorded constitutional protection from cruel and unusual punishment").

[153] Ex. 161, FT. WORTH STAR-TELEGRAM, *TDCJ Takes Small Step to Address the Heat Problems in State Prisons* (June 24, 2014), 2712) (available at: http://www.star-telegram.com/opinion/editorials/article3862985.html) (last visited Sept. 7, 2016)

[154] Even editorial boards that oppose air conditioning prisons concede "a safe limit might be reached some day, a point at which temperatures get so high and remain so that it becomes cruel and unusual punishment" to not air condition the prisons. Ex. 160, MARSHALL NEWS MESSENGER, *Neither Prisoners Nor Pigs Should Get Air Conditioning*, Aug. 23, 2013, 2709 (*available at*: http://www.marshallnewsmessenger.com/opinion/editorials/neither-prisoners-nor-pigs-should-get-air-conditioning/article_e6b05278-e1d5-5bb8-9924-c7903793b7f6.html)  (last accessed Sept. 4, 2014). The *News Messenger* editorial is the only one counsel could locate taking this position.

facilities. *Blackmon*, 484 Fed. Appx. at 873 (wardens aware of and indifferent to high temperatures at prison). But Pringle and Eason continued to operate the prison, and even failed to implement the minimal "mitigation" measures the Fifth Circuit had previously required in *Gates*.

### iii. Pringle and Eason Failed to Supervise Officers at the Hutchins Unit.

Under well-settled law in the Fifth Circuit, Defendants Pringle and Eason may also be held liable for Mr. McCollum's death as supervisors who failed to implement adequate protections from heat related injuries at the Hutchins Unit, and creating a policy that required supervisors to observe inmates before calling 911.

"Supervisory liability [may exist] even without overt personal participation in [an] offensive act if supervisory officials implement a [constitutionally deficient] policy." *Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir. 1987); *see also Bustos v. Martini Club, Inc.,* 599 F.3d 458, 468 (5th Cir. 2010); *Terry v. LeBlanc,* 479 F. App'x 644, 646 (5th Cir. 2012).

"A supervisory official may be held liable . . . if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Texas Dep't of Prot. & Reg. Servs.,* 537 F.3d 404, 435 (5th Cir. 2008). "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.* (internal quotation marks and citation omitted, alterations and emphasis in original). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cty.,* 973 F.2d 386, 392 (5th Cir. 1992); *see also Hinojosa v. Livingston,*

807 F.3d 657, 668 (5th Cir. 2015) (heat in TDCJ prisons); *Webb v. Livingston*, 618 Fed.Appx.

201, 207-8 (5th Cir. 2015) (same); *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

A supervisor may also be liable for failure to supervise or train if: "(1) the supervisor

either failed to supervise or train the subordinate official; (2) a causal link exists between the

failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or

supervise amounts to deliberate indifference." *Goodman v. Harris Cty.,* 571 F.3d 388, 395 (5th

Cir. 2009); *see Estate of Pollard v. Hood Cty.*, 579 F. App'x 260, 266 (5th Cir. 2014); *Estate of*

*Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).

> a.   Warden Pringle was Deliberately Indifferent to Dangerous Conditions
>      at the Hutchins Unit.

Defendant Pringle was the Warden at the Hutchins Unit at the time of Mr. McCollum's

death, with ultimate responsibility to oversee all security personnel at the Unit. Ex. 289, Feb. 15,

2013 Pringle Depo., p. 6770:9-23. The record raises fact issues regarding two different types of

Eighth Amendment violations at the Hutchins Unit for which Warden Pringle "make[s] all the

security decisions for the facility and the safety of the offenders and staff:" (1) his own personal

conduct in failing to implement even the *Gates* measures to deal with extreme heat and (2)

supervisory liability for failure to implement procedures and provide training requiring 911 to be

called immediately for inmates suffering emergency medical conditions – like symptoms of heat

stroke that befell Mr. McCollum.

> b.   Failure to Implement Gates v. Cook Measures

Pringle directly failed to implement the minimal measures the Fifth Circuit had

previously required at extremely hot prisons. He personally participated in this violation of Mr.

McCollum's constitutional rights, in addition to his separate supervisory liability discussed

below. *See Hinojosa,* 807 F.3d at 668; *Webb*, 618 Fed. Appx. at 207-8; *Blackmon*, 484 Fed. Appx. at 871-2. *See supra* at pp. 44-56.

As the ultimate supervisor over the TDCJ security personnel at the Hutchins Unit, it was Warden Pringle's responsibility to at least ensure the *Gates* measures were being implemented, because he knew that his facility exposed inmates to the very same (if not greater) substantial risk of heat illness. However, the *Gates* measures were not being implemented at the Hutchins Unit at the time of Mr. McCollum's death – even after Pringle was informed indoor temperatures were over 100° F – or at a minimum there is a fact issue regarding this question.

Nor did Pringle make any air-conditioned respite areas available for inmates like Mr. McCollum. TDCJ's training materials tell officers that people should "stay in an air conditioned area" to "avoid a heat illness." Ex. 112, TDCJ Risk Management Training Circular, (May 2010), Appx. 1583. Putting aside the question whether any respite area policy has in fact been subsequently implemented at the Hutchins Unit (as TDCJ claims), Warden Pringle testified that Hutchins Unit staff did not begin informing inmates about the option to go to air conditioned respite areas until after Mr. McCollum's death – despite an unused, air-conditioned multipurpose room being just feet away from Mr. McCollum's dorm. Ex. 289, Feb. 15, 2013 Pringle Depo., 6797:21-6798:11; Ex. 289, Aug. 12, 2013 Pringle Depo., 6756:4-6757:5. If officers wanted to implement their training, there was no "air conditioned area" for inmates to go to.

          c.   Failure to Implement Necessary 911 Call Procedures and Training to Obtain Emergency Medical Care for Inmates Suffering Heat Stroke

Warden Pringle also violated the Eighth Amendment by implementing a policy and procedure that required supervising officers to observe a prisoner before anyone could call 911, even when the first officers on the scene believed the condition was an emergency. *See*, *e.g.*, Doc. 288, p. 99 (Clark, Tate, and Sanders "acted entirely according to policy"). The obvious

consequence of the failure to have such a policy is precisely what happened to Mr. McCollum – death following a lengthy delay in medical treatment. Warden Pringle's own description of the policy – set forth above - is consistent with what the officers did in this case that caused the delay. Ex. 289, Feb. 15, 2013 Pringle Depo., Appx. 6772:10-6774:21. Given the known dangers of the heat in the housing units at the Hutchins Unit, the procedures and training implemented by Warden Pringle regarding 911 calls were obviously deficient as heat stroke is a potentially lethal medical emergency requiring immediate medical treatment, which Warden Pringle knew at the time due to training regarding heat-related illnesses. Ex. 289, Feb. 15, 2013 Pringle Depo., pp. 6795:4-16, 6796:8-13. As Warden Pringle admitted, the result is a procedure under which an ambulance would not be called even though correctional officers know an inmate needs immediate medical treatment. *Id.* 6771:2-21 (Correctional officers "probably would not call for an ambulance just because [an] offender needs medical attention . . . immediate medical attention they wouldn't call."). But TDCJ's own training materials, complete with illustrations of ambulances, instructed that heat stroke is a "true medical emergency" requiring "immediate" treatment. Ex. 112, TDCJ Training Circular (May 2010), Appx. 1583. Instructing his staff to effectively ignore this training was a proximate cause of McCollum's death. *See supra* pp. 43-44 n.123.

> ### d.  Defendant Pringle Deliberately Did Not Take Adequate Steps to Protect Mr. McCollum from the Heat

Warden Pringle was deliberately indifferent to the danger posed to inmates like Mr. McCollum from the above conditions he implemented, and the training and supervision he provided to his correctional officers. Warden Pringle was, of course, well aware of the high summer temperatures in the housing areas at Hutchins. *See supra* at p. 14.

Shockingly, Warden Pringle testified he took no responsibility for protecting inmates from heat stroke. Ex 288, Aug. 12, 2013 Pringle Depo., Appx. 6750:5-23. Warden Pringle also testified as follows:

> Q.   Protecting inmates who are vulnerable to heat from heat stroke is a job duty of yours, correct?
>
> A.   No, it is not.
>
> Q.   Is protecting inmates who are vulnerable to extreme heat from heat stroke one of the duties of your correctional officers?
>
> A.   I am not familiar with their job postings and procedures.

Ex 288, Aug. 12, 2013 Pringle Depo., Appx. 6751:16-23.

Indeed, Pringle claimed ignorance of whether his prison even housed inmates at increased risk of heat-illness.

> Q:   So some of [the people in the Hutchins Unit] are going to be vulnerable to heat, right?
>
> A:   I do not know.
>
> …
>
> Q:   Do you suspect that some of the people that come into your facility are going to be, I don't know, older than 60?
>
> A:   I don't know.
>
> Q:   Do you suspect that some of the people that come into your facility are going to be older than 40?
>
> A:   I do not know.

Ex. 288, Aug. 12, 2013 Pringle Depo., p. 6753:5-6754:14.

Warden Pringle's failure to implement additional heat mitigation measures in the face of an obviously dangerous heat wave also amounted to deliberate indifference to the constitutional rights of Mr. McCollum and other inmates at the Hutchins Unit. For example, the failure to

65

provide – or even explore options – for personal fans is particularly egregious, as the provision of personal fans was one of the remedial measures ordered in *Gates*, and was one of the measures listed on TDCJ's annual heat precaution email. Ex. 288, Aug. 12, 2013 Pringle Depo., p. 6747:5-23. His failure to do so epitomizes indifference: Warden Pringle simply ignored that part of the heat precaution email due to the lack of electrical outlets next to inmate bunks at Hutchins; he did not have any conversation with any superiors about the prospect of battery operated fans or other personal fans for the Hutchins inmates, nor did he even have any idea who would be responsible for making such decisions. Ex. 288, Aug. 12, 2013 Pringle Depo., pp. 6747:5-23; 6748:21-6749:23.

Likewise, despite knowing of the importance of ice water, Warden Pringle did not provide constant access to iced drinking water to the inmates at the Hutchins Unit, and only had 10 gallon jugs of ice water brought in three times a day to serve 58 men. In related litigation, TDCJ described the provision of drinking water as the agency's "number one remedial measure."[155] Warden Pringle admitted he could have provided jugs of water all day long to the inmates, but did not do so. Ex 299, Aug. 12, 2013 Pringle Depo., p. 90:15-25, Appx. 6760.

More egregiously, Pringle knew that a newly arrived inmate would not have a cup. Ex. 289, Feb. 15, 2013 Pringle Depo., p. 103:7-10; p. 117:4-14, Appx. 6781, 6783. Whatever limited

---

[155] Ex. 38, Declaration of Santos Rodriguez, 22Appx. 643; *see also* Ex. 41, Declaration of Crockett, 22Appx. 656; Ex. 40, Declaration of Deaton, 22Appx. 651; Ex. 42, Declaration of Gleason, 22Appx. 658; Ex. 43, Declaration of Russell, 22Appx. 663; Ex. 39, Declaration of Chase, 22Appx. 645. Warden Pringle stated he would not dispute that testimony. Ex 288, Aug. 12, 2013 Pringle Depo., p. 88:18-21, Appx. 6759. Ex 288, Aug. 12, 2013 Pringle Depo., pp. 91:21-92:13, Appx. 6761; Ex. 289, Feb. 15, 2013 Pringle Depo., p. 127:3-6, Appx. 6785; *Cole v. Livingston*, No. 4:14-cv-1698, Docket entry 326, p. 8; *see also supra* p. 45, n.140.

water was available to inmates, it would be extremely difficult for Mr. McCollum to drink it (especially as he would have to labor on and off his top bunk to obtain every drink of water from the sink). *See supra* p. 19 n.47, p. 24.

And Warden Pringle's attitude throughout his deposition repeatedly reflected an indifference to the risk of heat. For example, Warden Pringle testified he would do nothing different today if the heat index at the Hutchins Unit rose to 135° F or even 149° F. Ex 288, Aug. 12, 2013 Pringle Depo., pp. 93:4-94:2, Appx. 6763.

In short, Warden Pringle knew about the risks of the heat, but turned a blind eye to them and failed to implement adequate procedures to protect inmates, in the face of an obvious danger. Therefore, Warden Pringle was deliberately indifferent to the heat risk posed to the inmates at Hutchins by his deficient procedures and training.

    iv. <u>Regional Director Eason Violated Mr. McCollum's Eighth Amendment Rights</u>

Defendant Robert Eason, at the time of Mr. McCollum's death, was Pringle's direct supervisor. Ex 278, Eason Depo., pp. 44:8-45:6; 34:4-12, Appx. 6501, Appx. 6499. In addition to the Hutchins Unit, Eason supervised four other prisons where eight other men died of heat stroke in 2011.[156] Defendant Eason's liability flows from the unconstitutional procedures at the

---

[156] Ex. 278, Eason Depo., p. 44:8-10, Appx. 6501 (explaining that he supervises Region II). In addition to the Hutchins Unit, Eason supervised the Gurney Unit (where Kenneth James and Douglas Hudson died in 2011, and where Rodney Adams died in 2012), the Hodge Unit (where Robert Webb and Charles Cook died in 2011), the Michael Unit (where Alexander Togonidze died in 2011), and the Beto Unit (where Daniel Alvarado died in 2011), the Coffield Unit (where Thomas Meyers died in 2011). *See* Ex. 25, Possible Heat-Related Deaths 2011 (Oct. 20, 2011) (showing unit of assignment for 2011 deaths), Appx. 252; Ex. 79, TDCJ Unit Directory

Hutchins Unit that caused Mr. McCollum's death, described above, because the procedures resulted from his failure to implement minimal heat protections in his region, including at the Hutchins Unit, and his failure to properly supervise or train Warden Pringle (and his subordinates) with respect to these procedures.

                      i.   *Failure to Implement Adequate Procedures and Failure to Supervise or Train Warden Pringle*

Eason's testimony establishes Pringle was following his directions in prohibiting officers from calling 911 until a supervisor had observed an inmate's medical condition. Echoing Warden Pringle, Eason concurred Clark, Tate, and Sanders should not have called 911 immediately because Mr. McCollum was breathing and had a pulse. Ex 278, Eason Depo., pp. 29:3-30:6, Appx. 6494. He also testified that even in the case of a medical emergency (such as an inmate not breathing), a supervisor would have to be called to assess the inmate before an officer could call 911. *Id.*, p. 200:23-201:20, Appx. 6556. Incredibly, Eason testified that TDCJ did a "wonderful job" in the way they handled Mr. McCollum's situation, *Id.,* p. 110:13, Appx. 6530, despite conceding that Mr. McCollum was suffering a medical emergency, *Id.*, p. 298:2-3, Appx. 6585, and that an inmate who had a seizure and is unresponsive requires immediate medical care and intervention. *Id.*, pp. 228:20-229:2, Appx. 6567.

Eason likewise failed to ensure that all the minimally required *Gates* measures were implemented at the Hutchins Unit. With respect to fans, Eason testified that it was important for inmates to have personal fans as a heat mitigation measure. *Id.*, p. 68:23-69:11, Appx. 6515-6.

---

(accessed Sept. 6, 2016), Appx. 1386, *available at* http://tdcj.state.tx.us/unit_directory/ (showing region for each unit); *supra* p. 6, n. 2 (listing autopsies, which show cause of death).

However, he was aware that the inmates at the Hutchins Unit did not – and could not – have personal fans. *Id.*, p. 214:5-23, Appx. 6561. He characterized it as "impossible" to provide fans due to the absence of outlets at the inmate bunks. *Id.* However, he never had a discussion with Warden Pringle about the prospect of providing battery-operated fans or other options to provide personal fans to the inmates. Ex 288, Aug. 12, 2013 Pringle Depo., pp. 39:21-40:18, Appx. 6748-6749. With respect to ice in the drinking water, Eason testified: "There's no policy and there's no specific timeline on how often ice is supposed to be brought out." Ex. 278, p. 312:19-22, Appx. 6586. Therefore, Eason knew there was no policy in place to make sure that Hutchins inmates had constant access to ice water, but he failed to take any steps to correct that problem.

Though Eason testified that he believed TDCJ is doing "everything it can" to mitigate the heat, that was plainly not the case for Mr. McCollum. *Id.*, pp. 139:24-140:1, Appx. 6538-9. Without any capital expenditures, TDCJ easily could have implemented a minimally adequate procedure regarding 911 calls during a medical emergency. Indeed, such a policy is in place now, requiring that 911 be called immediately when inmates suffer certain "life-threatening" conditions, including seizures, when medical personnel have left for the night.[157] Eason should have made sure a coherent 911 policy was in place at Hutchins at the time of Mr. McCollum's death – especially given the dangerous conditions created by the extreme heat.

Similarly, Eason should have ensured that wellness checks were implemented for heat-sensitive inmates like Mr. McCollum, who was especially vulnerable due to his recent transfer

---

[157] Ex. 259, Nov. 4, 2013 Email from Williams to Morris, Appx. 6219. It should not have taken this litigation to cause TDCJ to implement that procedure – but it did.. Ex. 260, Feb. 25, 2014 Email from Dalecki, Appx. 6223 (showing an earlier email from Dr. Glenda Adams, "This has come about because of the 2011 heat deaths litigation.").

from an air-conditioned county jail, as soon as they arrived at the Hutchins Unit. Wellness checks for heat-sensitive inmates did not begin at the Hutchins Unit until after Mr. McCollum died. Ex. 293, Stephens Depo., pp. 30:19-31:6, Appx. 6867-8; Ex. 289, Feb. 15, 2013 Pringle Depo., p. 208:7-12, Appx. 6799. And even at the time of Eason's deposition, new inmates arriving at transfer units could not be placed on a wellness checklist until after their initial UTMB physical. *See supra* at p. 23; Ex 278, Eason Depo., pp. 323:5-25, Appx. 6587; Ex 289, Feb. 15, 2013 Pringle Depo., pp. 79:22-80:1, Appx. 6779-80. At the time of his deposition, Eason was not aware of any discussion within TDCJ regarding implementing wellness checks for heat-sensitive inmates during their initial days in custody. Ex 278, Eason Depo., pp. 324:24-325:7, Appx. 6588-9.

### v.   Eason was Deliberately Indifferent to the Risks Posed to Mr. McCollum

Eason's deposition testimony displays a shocking indifference to the heat risk faced by inmates like Mr. McCollum. His knowledge of the hazard is not in dispute: Eason testified that he knows the summer heat in un-air conditioned TDCJ housing areas is dangerous absent adequate mitigation measures. Ex. 278, Eason Depo., p. 52:2-24, Appx. 6505-6. But he has turned a blind eye to the severity of the risks, and the actual deadly consequences, of the high temperatures in the TDCJ housing areas.

For example, Eason disregards the very risks described in TDCJ's own heat policies. TDCJ "Temperature Extremes in the Workplace" policy incorporates a heat index chart prepared by the National Weather Service (NWS). Ex. 95, AD 10.64, Rev. 6 (Nov. 10, 2008), TDCJ017179, Appx. 1479. At certain heat index levels, TDCJ's own policy describes heat stroke

as "imminent." Ex. 95, AD 10.64, Rev. 6 (Nov. 10, 2008), Appx. 1479. Incredibly, Eason testified that the phrase "heat stroke imminent" only means "it's *possible* that an offender could *possibly* have a heat stroke or a staff member could have a heat stroke," and even then, only if "you continue to work offenders outside in those temperatures and you're not taking those steps to mitigate the heat." Ex 278, Eason Depo., Appx. 6515:16-20 (emphasis added). This was sharply contradicted by the testimony of Thaler, Eason's superior, who stated unequivocally that the word "imminent" in this chart means "immediate" and he would expect others to interpret it the same way. Ex. 296, Thaler Depo., Appx. 6950:20-6951:15. Regardless, the NWS Chart used as a basis for the TDCJ policy is labeled "Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity," so there is no doubt that these heat indices are, in fact, obviously dangerous. Ex. 115, NWS Heat Index Chart, Appx. 1700.

Thus, Eason both downplays the heat risk, and also ignores the NWS advisory that the risk of heat stroke can come simply from prolonged exposure, not just from working outdoors. Eason's testimony is strong evidence of willful blindness regarding the heat risk and its consequences. *See, e.g.*, *Martinez v. Klevenhagen*, 52 F.3d 1068 (5th Cir. 1995) ("To demonstrate deliberate indifference on the part of an official, a plaintiff must show the following: (1) an unusually serious risk of harm. . . , (2) defendant's actual knowledge of (or at least willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk.") (internal quotation marks omitted).

This willful blindness to the inadequacy of TDCJ's "protective" measures is apparent throughout Eason's deposition. Especially shocking is Eason's testimony assessing the manner in which TDCJ handled Mr. McCollum's situation. Astoundingly, he testified that TDCJ did a "wonderful job" mitigating the effect of the heat at the Hutchins Unit "with regard to Larry

McCollum" – even though Mr. McCollum *died* because of the extremely hot indoor conditions. Ex. 278, Eason Depo., 6530:13. And though TDCJ acknowledges that Mr. McCollum died of heat stroke at the Hutchins Unit, Eason also testified as follows:

> Q.    As the agency, I mean your desire would be to have conditions that aren't responsible for killing people, right?
>
> A.    We don't have conditions responsible for killing people.
>
> Q.    Okay.
>
> A.    And that's what all these heat steps are about.
>
> Q.    Okay. It would be important to -- well, all right. You don't have conditions that are responsible for killing people? Is that what you just told me?
>
> A.    Yes.
>
> Q.    Okay. And that's at the Hutchins Unit, all the units, there are no conditions that you consider to be contributory to the cause of any deaths?
>
> A.    No.

*Id.*, p. 6503:8-22. *See also id.*, p. 6530:10-21.

Eason's assessment that TDCJ did a "wonderful job" for Mr. McCollum is belied by his own superiors. At the time of Mr. McCollum's death, Eason's immediate superiors were Stephens and Thaler. Ex. 296, Thaler Depo., Appx. 6942:4-6944:2, 6966:15-6967:17. Both Stephens and Thaler confirmed the obvious and testified that Officers Clark, Tate and Sanders should have called 911 for Mr. McCollum much sooner. Ex. 296, Thaler Depo., Appx. 6960:21-6962:18; Ex. 293, Stephens Depo., Appx. 6864:15-6866:5. Stephens testified that the officers should have called 911 without waiting for a supervisor, and characterized the situation as a "significant delay." Ex. 293, Stephens Depo., Appx. 6864:15-19; 6865:19-6866:5. Far from opining that those officers did a "wonderful job," Thaler testified that they should have

undergone retraining and that Warden Pringle should have informed them they did not handle the situation correctly. Ex. 296, Thaler Depo., Appx. 6963:19-6965:2. This is powerful evidence of Eason's deliberate indifference, as his own superiors were critical of his procedure for calling 911 in emergency situations (like Mr. McCollum's).

And as discussed above, even though Eason claims TDCJ was doing everything possible to mitigate the heat, that was obviously not the case – the measures were wholly inadequate in light of the extremely high temperatures. Many additional steps could and should have been taken prior to Mr. McCollum's death to mitigate the heat risk. *See*, *e.g.*, *supra* at pp. 44-46. Moreover, Eason testifying on behalf of TDCJ, swore he never had any conversations with anyone regarding the cost of (or potential need for) air conditioning in TDCJ housing units, nor was he aware of any such conversations occurring. Ex 278, Eason Depo., pp. 6532:6-6533:4, 6534:18-6535:13. The fact that Eason was willing to testify that TDCJ does everything financially possible to mitigate heat risk – when there had been *zero* investigation of the costs – simply illustrates the depth and breadth of his indifference. As discussed above, the Hutchins Unit was not even taking all the low-cost steps mandated by *Gates*.

Also especially shocking was Mr. Eason's testimony regarding his knowledge (or purported lack thereof), of heat stroke deaths in the TDCJ housing areas. At the time of his deposition, as TDCJ now admits, and plainly was aware at the time, that at least 20 people had died from heat while incarcerated inside, and eight of those 2011 deaths were at facilities under

Eason's direct supervision.[158] Incredibly, however, Mr. Eason testified he did not know of **any** heat-related deaths in TDCJ's prisons other than Mr. McCollum and Rodney Adams.[159]

> Q: Okay, other than Mr. Adams and Mr. McCollum, as you testify here today, are you aware of any other heat-related illness/deaths at any of the Texas Department of Criminal Justice facilities you oversee?
>
> A: To my knowledge, those are the only two that have been ruled heat-related to my knowledge.

*Id.*, 6563:23-6564:3, 6524:13-18 (not aware of system-wide number either). Eason testified that he was only aware of one death (Adams) from heat-related causes at the Gurney Unit (though TDCJ later admitted at least three men died there). *Compare id.*, 6562:15-6564:3 *with* Ex. 36, Docket entry 432 to *Cole v. Livingston*, No. 4:14-v-01698, Appx. 539-41.

Despite TDCJ's later concession that ten inmates died of heat stroke in the housing area in the summer of 2011, Eason offered the jaw-dropping (and clearly false) testimony that he wasn't aware of that fact, nor would the fact of eleven deaths in one summer make him concerned that TDCJ had a problem with the heat:

> Q. I understand that. Nobody ever told you that 11 people died in the summer of 2011 from hyperthermia, right?
>
> A. No, sir.
>
> Q. Okay. Assume that that's the case. If – if that's the case, does that suggest to you a pretty serious problem at TDCJ?
>
> A. No, it does not.

---

[158] *See supra* n.156.

[159] In what is surely simply a coincidence, Mr. Adams' surviving family had provided notice as required by the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE §101.101, of intent to bring a claim shortly before Mr. Eason's deposition.

Q.      Okay.  Why not?

A.      Because we are doing everything possible to mitigate the heat in our institutions.

*Id.*, 6526:5-16 (objections of counsel omitted).

Q.      But it still remains the conclusion of the Texas Department of Criminal Justice that they're taking all the steps that are necessary to mitigate the heat and that they're doing a wonderful job with relation to protecting inmates from heat-related illnesses?

A.      Yes, sir.

*Id.*, 6565:12-17.

Eason's testimony about his and TDCJ's knowledge of heat stroke deaths raises a substantial question about his own credibility. Thaler testified that the dangers of heat stroke were routinely discussed during high-level meetings Eason would have attended well before his deposition, and that he would have received reports about each heat stroke death that occurred in his region because it is important to know about and discuss such deaths. Ex. 296, Thaler Depo., Appx. 6952:9-6954:20, 6955:19-6957:11, 6958:18-25. Moreover, Eason actually reviewed investigations of these other inmates' deaths. When asked about particular inmates, Eason denied knowing Alexander Togonidze had a body temperature of 106 degrees and died of heat stroke at the Michael Unit. Ex. 278, Eason Depo., Appx. 6592:16-6593:1. But Eason forwarded the report of Togonidze's death by email on August 8, 2011, then initialed a memo he received on September 6, 2011 stating Togonidze's "provisional autopsy" indicated the "cause of death" was "hyperthermia." Ex. 238, Email from Stephens to Thaler (Aug. 8, 2011), Appx. 611; Ex. 195, Memo "thru" Robert Eason from Todd Foxworth (Aug. 8, 2011), Appx. 3455. Eason then *wrote a memo* stating Togonidze died of "hyperthermia" and his body temperature was 106 degrees° F. Ex. 195, Regional Director/Assistant Director's Comments (Sep. 6, 2011), Appx. 3459.

In short, the record is replete with evidence that Eason knew about the heat risk at the Hutchins Unit, and knew that different and additional procedures and training were needed to protect inmates from that risk and ensure timely access to emergency medical care for inmates suffering heat stroke. However, Eason failed to implement minimally adequate measures at the Hutchins Unit and failed to supervise or train Warden Pringle to ensure such adequate procedures were implemented. Therefore, at a minimum the record raises a fact issue regarding his deliberate indifference and liability as a supervisor for the death of Mr. McCollum.

### B.  Pringle and Eason are Not Entitled to Qualified Immunity

First, the Fifth Circuit's "precedent clearly establishes that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." *Hinojosa*, 807 F.3d at 669 (5th Cir. 2015) (citing *Gates*, 376 F.3d at 339-40; *Blackmon*, 484 Fed. Appx. at 869; *Smith v. Sullivan*, 553 F.3d 373, 381 (5th Cir. 1977)). *See also Webb*, 618 Fed. Appx. 201 (5th Cir. 2015) (unpublished).[160] Indeed, Oscar Mendoza, the former director of the Correctional Institutions Division and Robert Eason's supervisor at the time, was denied the pre-trial protections of qualified immunity arising from

---

[160] Though TDCJ claims in its brief that the Fifth Circuit in *Johnson v. Texas Bd. of Criminal Justice*, 281 F. App'x 319, 321 (5th Cir. 2008), rejected an argument that lack of air conditioning in a prison endangers the inmates, that is a misreading of the opinion.  *See* Doc. 288, TDCJ's Brief pp. 42-43.  A quick examination of the opinion makes short shrift of TDCJ's argument, as the Fifth Circuit explicitly based its holding solely on the fact that the *pro se* Plaintiff in Johnson had not alleged any heat-related injury: "While Johnson alleged that the temperatures were sometimes uncomfortably hot, he did not allege that he suffered from any heat-related injuries despite being subjected to these conditions numerous times; this is not sufficient to state a constitutional claim."  *Id.* at 321.  The Court nowhere addressed the question whether the lack of air conditioning can pose a substantial risk of heat to inmates.  And here, of course, Mr. McCollum's death furnishes an adequate basis for the Eighth Amendment claim, by contrast to *Johnson*.

exposing another inmate to the heat inside TDCJ prisons before Mr. McCollum's death. *Valigura v. Mendoza*, 265 Fed. Appx. 232 (5th Cir. 2008). In *Valigura*, the plaintiff showed evidence of exposure to "temperatures above the eighties and into the hundreds" in his bunk area. *Id*. at 235. The Fifth Circuit noted the precedent in *Gates* and held that in light of the excessive heat, in combination with other potential denials of necessities and restricted movement, the district court correctly denied summary judgment. *Id.*

Second, there is significant evidence Pringle and Eason's actions were not objectively reasonable in light of their obligation to provide adequate protections from the heat. They did not ensure the *Gates* measures were implemented at the Hutchins Unit. Though they knew at the time that temperatures throughout the state were obviously "very high" in July 2011 – what they now describe as "unprecedented" (Doc. 288, p. 75)[161] – they did nothing other than follow the existing heat-mitigation measures. They did not do anything to implement measures identified in TDCJ's own training materials – like providing access to "air conditioned areas." In light of the "unprecedented" temperatures – that everyone living in the state was aware of at the time – they continued to follow the existing measures that were obviously inadequate and did not address

---

[161] The Defendants wield the "unprecedented" hot summer as if it is something they could never have anticipated or prepared for. But one can see a heat wave coming – days (if not weeks) in advance, weather forecasts would tell officials they needed to prepare for exceedingly hot temperatures. A heat wave is like a hurricane – it comes in slowly, with significant time to prepare. It is not like a tornado – quickly descending, striking, and departing, with little notice. And, of course, July 22 (when Mr. McCollum suffered the heat stroke) was not "day 1" of the "unprecedentedly" hot summer. The heat wave enveloping Texas had already persisted for weeks. *See* Ex. 119, National Weather Service, Dallas/Ft. Worth – Annual and Consecutive 100° Days, Appx. 1708 (available at http://www.srh.noaa.gov/fwd/?n=danncon10) (last visited Sept. 7, 2016) (Dallas area experienced 40 consecutive days of temperatures above 100° F, beginning on July 2, 2011).

these extremely high temperatures. Finally, even their own supervisors, Thaler and Stephens, criticized the 911 policy in place at the Hutchins Unit. In light of the ongoing, obviously dangerous conditions, it was obvious that delaying calling 911 could (and would) be hazardous to inmates.

### C.   Defendant Livingston Violated Mr. McCollum's Eighth Amendment Rights.

Livingston supervised the entire TDCJ system. He could authorize spending large sums of money[162] and changing agency policy. Instead, he did nothing in the face of extremely hot temperatures in 2011 when he knew men had died in his facilities of heat stroke before. Indeed, even after ten men died that summer, he made no substantive changes, and two more men died in the summer of 2012 (at intake facilities, under circumstances remarkably similar to Mr. McCollum).

### 1.   Livingston was Deliberately Indifferent to the Inadequate Heat Mitigation Measures in his Prison System

TDCJ's very motion shows Livingston's deliberate indifference towards the extreme temperatures that took Mr. McCollum's life. TDCJ and Director Livingston tacitly argue that only heat-related deaths should prompt policy changes, ignoring the non-fatal heat illnesses suffered by TDCJ inmates and correctional officers every summer.[163] But Director Livingston's deliberate indifference can be shown even if just heat stroke deaths are considered: shockingly, eight TDCJ inmates undisputedly died of heat stroke *before* the summer of 2011, while

---

[162] Ex. 299, Vian Depo., Appx. 7025:18-7026:5 (explaining that Livingston can approve capital expenditures up to $1 million).
[163] *See, e.g.*, Ex. 178, EAC Executive Summary for Fiscal Year 2011.

Livingston was employed at high-level positions by TDCJ.[164] TDCJ's expert in related litigation, Dr. Dean Rieger, M.D., testified that these eight deaths were a significant number of deaths justifying a review of TDCJ's heat policies, and in the wake of such deaths a response is required: "Administrators need to respond and reduce the risk of recurrence." Ex. 31, Hearing of June 2, 2016 in *Cole v. Livingston*, Rieger testimony, Appx. 317:11-318:18; Ex. 290, Rieger Depo., Appx. 6811:8-6812:6.

By contrast, in arguing for qualified immunity, Defendants' motion states the following with respect to TDCJ's heat mitigation measures: "Director Livingston is kept apprised of these efforts and prior to 2011 had never seen cause to question their appropriateness, sufficiency, or efficacy." Doc. 288, p. 19. And despite those eight deaths before 2011, Director Livingston in his motion characterizes TDCJ's heat mitigation measures before 2011 as "very effective." *Id.*, p. 62. Similarly, he testified at his deposition:

> I would say, again, come back to is that the protocols this agency has had for many years, although we have built upon them, ***have worked systematically before 2011***. We had every reason to expect that they would work during 2011 …

---

[164] Although Defendants denied knowledge of the prior deaths in their answer filed September 2015 in this case, Doc. 255, pp. 45-46, TDCJ and Brad Livingston admitted that autopsies showed eight prior deaths were due to heat in separate litigation, both in August of 2015 and in May of 2016. *See* Ex. 1, Summary of Undisputed Heat-Related Deaths at TDCJ Facilities, Appx. 2; Ex. 36, Docket entry 432 to *Cole v. Livingston*, No. 4:14-v-01698, Appx. 567-569 (listing eight inmate deaths due to heat prior to 2011: Archie White, Anselmo Lopez, James Moore, Charles Finke, Jr., John Cardwell, Ricky Robertson, James Shriver, and Dionicia Robles); Ex. 34, Docket entry 265 to *Cole v. Livingston*, No. 4:14-cv-01698, Appx. 371-373 (same). Moreover, the autopsies clearly substantiate the allegation. Ex. 2, Autopsy of White, Appx. 5; Ex. 3, Autopsy of Lopez, Appx. 12; Ex. 4, Autopsy of Moore, Appx. 22; Ex. 5, Autopsy of Finke, Jr.;., Appx. 32;.; Ex. 6, Autopsy of Cardwell, Appx. 43; Ex. 7, Autopsy of Robertson, Appx. 31; Ex. 8, Autopsy of Shriver, Appx. 63; Ex. 9, Autopsy of Robles, Appx. 78. *See also* Ex. 1, Chart Summarizing Acknowledged Heat Stroke Deaths, Appx. 2.

Ex. 282, Oct. 1, 2015 Livingston Depo., Appx. 6660:18-21. This attitude represents the essence of deliberate indifference: turning a blind eye to a known serious health risk that has caused a significant number of deaths, even when ignoring ongoing illness and suffering.

Director Livingston knew all of the following things prior to Mr. McCollum's death in 2011: 1) summertime heat in TDCJ housing areas can pose an obvious danger to the inmates, 2) that TDCJ inmates with disabilities similar to Mr. McCollum had died from heat stroke in the housing areas before, despite TDCJ's purported mitigation measures, and 3) TDCJ inmates and correctional officers suffered heat illnesses from the temperatures in the housing areas each year. He discussed heat injury reports regularly with TDCJ's division directors, who report to him.[165] Despite this knowledge, prior to Mr. McCollum's death, Director Livingston failed to reduce the indoor temperatures at all, chose not to make any significant changes to TDCJ policy regarding heat in the housing areas, or even meaningfully investigate whether such changes should be made – at his deposition, he could not identify any changes made to heat precaution procedures between the 2007 deaths and 2011.[166]  Ex. 283, Livingston Oct. 2, 2015 depo., pp. 6683:4-8, 6684:9-21. And, despite knowing since at least 2009 that inmates like Mr. McCollum acclimating to the heat are especially heat vulnerable, he could not recall a single policy measure

---

[165] Ex. 282, Livingston Oct. 1, 2015 Depo., Appx. 6643:10-6266:25, 6658:3-23; 6661:2-6; Ex. 283, Livingston Oct. 2, 2015 Depo., Appx. 6680:6-6681:9, 6700:11-22; *see also* Ex. 218, Letter from Linthicum to Livingston, "Heat Related Deaths 2007 to Present" (June 26, 2009), Appx. 6038.

[166] Ex. 283, Livingston Oct. 2, 2015 depo., Appx. 6683:4-8, 6684:9-21;  Ex. 218, Letter from Linthicum to Livingston, "Heat Related Deaths 2007 to Present" (June 26, 2009), Appx. 6038.

taken prior to Mr. McCollum's death to specifically protect inmates at transfer facilities from the heat while they were acclimating.[167] Ex. 283, Livingston Oct. 2, 2015 depo., pp. 6693:2-6694:20.

Likewise, the combination of conditions at the Hutchins Unit obviously reinforced each other to make the facility even more dangerous for Mr. McCollum. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets."). The extreme indoor temperatures made the prison dangerous. This danger was compounded by the failure to have 24-hour medical coverage, which would have provided timely access to medical care for Mr. McCollum. Both these dangers were compounded because the Hutchins Unit is a transfer facility – newly arrived inmates (like Mr. McCollum) were not acclimated to the heat, and had not received intake physicals to identify heat-sensitive medical conditions. Livingston knew this combination of conditions markedly increased the danger at the facility – especially as he knew two men had died at a similar facility, under similar conditions, in 2007.

Director Livingston concedes that in 2009, he learned two TDCJ inmates (Mr. Shriver and Mr. Robles) had died of heat stroke in their housing areas at the Byrd Unit.[168] But in his motion, he strenuously endeavors to excuse his deliberate failure to take any action to revise heat

---

[167] Ex. 283, Livingston Oct. 2, 2015 depo., Appx. 6693:2-6694:20.
[168] Ex. 283, Livingston Oct. 2, 2015 depo., Appx. 6680:6-6681:9; Ex. 218, 2009 Letter from Linthicum to Livingston, Appx. 6038.

policies or protection measures for inmates after learning about these adequate steps to prevent future deaths, instead suggesting that the two inmates had such esoteric medical conditions that their deaths in no way suggested any need to do anything differently. Motion, pp. 21-22, 53-54. Notably, however, there is no documentation in the record that Director Livingston actually considered these two deaths unique and inapplicable to other inmates, before his summary judgment motion was filed.

On the contrary, the circumstances of Mr. Shriver and Mr. Robles were similar to those of Mr. McCollum. All three died of heat stroke in the housing areas of their transfer facilities, not while working or outside. Ex. 283, Livingston Oct. 2, 2015 depo., Appx. 6681:6-9; Ex. 218, Letter from Linthicum to Livingston, "Heat Related Deaths 2007 to Present" (June 26, 2009), Appx. 6038; Ex. 165, Statement by Clark, Appx. 2726. All three suffered fatal heat strokes at night, not during the daylight hours. Ex. 218, 2009 Letter from Linthicum to Livingston, Appx. 6033; *supra* at pp. 30-36 (describing circumstances of Mr. McCollum's death). And each man had medical conditions or took medication making him especially vulnerable to the heat, so each was considered heat sensitive as recognized in TDCJ's policies.[170] Indeed, like Mr. McCollum, Mr. Shriver had been diagnosed with hypertension.[171] And Mr. McCollum died at the Hutchins

---

[170] *Compare* Ex. 218, 2009 Letter from Linthicum to Livingston, Appx. 6033 *and* Ex. 247, 2011 Letter from Dr. Coglianese to Dr. C. Adams, Appx. 6135 *with* Ex. 96, CMHCC No. B-15.2 Nov. 2007, Attach. A, Appx. 1596 (listing medications) *and* Ex. 96, CMHCC No. B-15.2 Nov. 2007, Attach B,  Appx. 1498 (listing conditions).

[171] Ex. 218, 2009 Letter from Linthicum to Livingston; Ex. 247, 2011 Letter from Dr. Coglianese to Dr. C. Adams., Appx. 6135.

Unit which, like the Byrd Unit, is a transfer unit.[172] There is simply no evidence or testimony that Livingston considered the "unique" facts of Mr. Shriver and Mr. Robles' deaths and concluded these were extreme "outliers" that did not justify policy changes.[173]

TDCJ's expert in separate litigation, Dr. Rieger, testified that a pattern stood out in 1998 with the deaths of 3 heat sensitive inmates who had psychiatric conditions and died of heat stroke:

> Q.    Okay. And what is significant about that is anybody who took the time to look at this with any sort of acumen or policymaking knowledge would look at that list and say, look, we have a potential problem with inmates with psychosis and heat, right?
>
> A.    I think that's fair.

Ex. 31, Hearing of June 2, 2016 in *Cole v. Livingston*, Rieger testimony, Appx. 316:5-10; *see also* pp. 122:18-123:4. Director Livingston claims that he never took action to analyze this problem, as recommended by Dr. Rieger, because he was unaware of the deaths prior to 2007 until the death of Mr. McCollum died. Ex. 283, Livingston Oct. 2, 2015 depo., Appx. 6672:14-6674:12. But, in fact, before becoming Executive Director, Livingston worked on the policy review of the AD 10.64 "Temperature Extremes in the TDCJ Workplace" in 1999, just one year after the 1998 heat wave, so he likely did know of the documented heat stroke deaths indoors

---

[172] Ex. 282, Livingston Oct. 2, 2015 depo., Appx. 6646:23-6647:5, 6648:8-12.

[173] Indeed, when resisting appearing for a deposition in this litigation, the magistrate judge found Livingston's interrogatory responses "could be viewed as evasive." Doc. 129, p. 6.

that year.[174] Notably, the policy remained fundamentally the same before and after the deaths in 1998; Livingston's recommended changes were to style, not substance.[175]

But even if it is true that Livingston did not subjectively know about the earlier deaths (which were discussed in a published opinion of this Court, in massive class action litigation that defined the agency for decades),[176] such failure to know about a documented pattern of heat stroke deaths through 1998 can only be by choice. Mr. Livingston had no explanation at his deposition why he had been unaware, prior to 2011, of any heat stroke deaths in the housing areas other than the two deaths in 2007.[177] Livingston was undisputedly aware of the 2007 deaths, and yet, according to his own testimony, he did nothing more than read a memo to investigate the risks of heat stroke death, amounting to deliberate indifference due to willful blindness even if the jury believes his testimony. *See, e.g.*, *United States v. Freeman*, 434 F.3d 369, 378 (5th Cir. 2005) ("We have previously upheld the deliberate indifference instruction, . . . if the record supports inferences that "(1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct."). Either way, this is the essence of deliberate indifference. Either 1) Livingston learned about a lethal heat risk in 1999 – (when he was reviewing TDCJ's

---

[174] *See* Ex. 213, Memorandum from McNutt and Livingston re: AD 10.64, Appx. 6022.

[175] *Compare* Ex. 90, AD 10.64 rev. 1 (1993), Appx. 1424) *with* Ex. 91, AD 10.64 rev. 2 (1998), 1434) *and* Ex. 92, AD 10.64 rev. 3 (1999), Appx. 1446.

[176] *Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999), *reversed by Ruiz v. U.S.*, 243 F.3d 941 (5th Cir. 2001).

[177] Ex. 283, Livingston Oct. 2, 2015 depo., pp. 6680:13-6681:24.

the hazards of heat shortly after the deaths of three inmates had died (and were noted by a federal judge discussed their deaths), then assessing the prison system's compliance with the Constitution) and did nothing about it, or 2) he learned about two deaths in 2009 (at the latest), and then did nothing to investigate further. As a result, by the time of his deposition, Livingston still claims not to know how many deaths heat inside TDCJ prisons has actually caused, the circumstances of those deaths, or how to save lives in the future.

Livingston cannot fall back on the refrain that he delegated everything to his subordinates, who, in turn, never raised any concerns to him, because he deliberately shirked his responsibility to elicit any such concerns.[178] When faced with a known danger causing death and illness, a top executive and policymaker like Director Livingston has the duty to at least ask the question whether existing policies are adequate and consider the costs and benefits of alternatives. Director Livingston failed to do so. In particular, Director Livingston never considered whether TDCJ should add air conditioning to any part of any facility.

> [Q.]   Have you ever considered adding air-conditioning or retrofitting any aspect of any nonair-conditioned housing area ever? You, Mr. Livingston?
>
> A.   No.

Ex. 282, Livingston Oct. 1, 2015 depo., p. 74:22-25, Appx. 6645.

Nor did Livingston ever ask his key subordinates whether TDCJ should consider doing so. *Id.*, pp. 76:1-77:5, Appx. 6646. He has never sought an outside study to consider a need to reduce temperatures in the TDCJ housing areas—in fact, he has not even had a conversation with

---

[178] And, of course, this is not true. Dr. Linthicum advised Livingston of the 2007 deaths.

his subordinates to consider such a study. *Id.,* pp. 86:15-87:22, Appx. 6648-49. Nor, prior to

being sued, did he ever request a study to consider the cost of reducing the temperatures in the

TDCJ housing areas, even while his staff told the press it would be too expensive. *Id.*, pp. 91:22-

92:8, Appx. 6650-51.[179] He never asked if TDCJ could eliminate heat stroke inside by

eliminating the extreme heat in the housing areas, or how effective air conditioning would be in

doing so. Ex. 283, Livingston Oct. 2, 2015 depo., pp. 32:11-15, 35:15-19, Appx. 6677-78. He

never asked if it would be a good idea to place everyone over age 65 (and heat sensitive per

TDCJ policy) on a wellness check list, and more alarmingly said he didn't know whether it was

his job to ask that question. *Id.*, p. 28:11-23, Appx. 6676. Director Livingston admitted that he

could have changed the housing recommendation "health summary for classification" form to

include a line recommending air-conditioned housing, but chose not to do so. *Id.*, pp. 67:7-68:3,

69:5-8, Appx. 6685, 6686, 6687.

The following testimony from Director Livingston sums up the extent to which he has

decided he need not involve himself in questions of heat risk:

> Q.    You have the ability, don't you, sir, to keep the offender population safe
>        from the dangers of extreme heat if you move them out of the heat, right?
> . . .
> A.    Again, it would certainly be a mitigation step.  I wouldn't disagree with
>        that.

---

[179] *See*, *e.g.*, FT. WORTH STAR-TELEGRAM, *TDCJ Takes Small Step to Address the Heat Problems in State Prisons* (June 24, 2014) (available at: http://www.star-telegram.com/opinion/editorials/article3862985.html) (last visited Sept. 7, 2016) (repeating TDCJ's estimate "it will cost $55 million to air-condition state prison facilities"). *See also* Email from Jason Clark, "Clip#2 – Texas Prisons are Super Hot This Time of Year" (Jul. 16, 2014) ("The state says air conditioning prison units, . . . would cost in the billions of dollars").

Q.     Would it be a more effective and better mitigation step than what you've got currently?

A.     I don't know.

*Id.*, p. 99:8-19 Appx. 6695 (repeated question omitted). Indeed, at his deposition he appeared to disclaim any personal role in ensuring that TDCJ heat policies were effective. *Id.*, p. 21:5-16, Appx.6675.

Director Livingston's deliberate indifference to the heat risk is also shown by the nature of the policies, or lack thereof, in effect regarding heat in the housing areas prior to Mr. McCollum's death. The version of TDCJ's heat stress "Extreme Temperatures in the Workplace" policy (known as AD 10.64) in effect at the time of Mr. McCollum's death bore Director Livingston's signature. Ex. 95, AD 10.64 rev. 6, 2008, Appx. 1479. However, the policy was titled "Temperature Extremes in the TDCJ Workplace," and dealt almost exclusively with heat in connection with officer and policy's title suggested it's limited scope – the "workplace" not inmate work assignments, and not heat in the housing areas. *Id.* Only two provisions appear applicable to the housing areas: provision of water in hot temperatures (which was not followed in the case of Mr. McCollum, as described above), and the need for acclimation: "Newly assigned offenders, who may not be acclimated to the heat, shall be medically evaluated prior to significant heat stress and closely monitored by supervisors for early evidence of heat intolerance." *Id.* p. 5 para. 5-6,1483.

Defendants would have the Court believe that TDCJ did have a formal policy implementing heat mitigation measures in the housing areas prior to Mr. McCollum's death; however, as the Court noted in the *Cole* class certification order, the record raises serious doubts about this claim based on the testimony of TDCJ's own expert, Dr. Rieger. In 2011, as in prior years, TDCJ sent out a "Heat Precaution" email at the beginning of the summer, but it was never

adopted as a formal policy in the TDCJ policy manual. This is by stark contrast to the formal policy AD 10.64 titled "Temperature Extremes in the TDCJ Workplace" policy. Defendants' expert Dr. Rieger testified that the Heat Precaution email cannot be considered a policy. Ex. 31, Hearing of June 2, 2016 in *Cole v. Livingston*, Rieger testimony, pp. 92:13-95:13, Appx. 312-315. At a minimum, this question poses a fact issue for resolution by the jury that is highly relevant to Livingston's deliberate indifference to the heat risk. A policymaker who truly takes the heat risk in the housing areas seriously, and accords it the attention it deserves, would promulgate a formal policy – as Livingston did with respect to heat in the workplace. Relegating the matter to an email rather than a formal policy signals diminished importance of the issue to the entire organization. TDCJ's own expert, Dr. Rieger, testified that in his opinion any heat mitigation measures for the housing areas should be promulgated as a formal policy in the usual manner, rather than simply in an annual email which obviously does not constitute a formal policy. Ex. 31, Hearing of June 2, 2016 in *Cole v. Livingston*, Rieger testimony, pp. 92:13-95:13, Appx.312-15.

Moreover, to this day, TDCJ still lacks any policy, practice, or even email to respond to a heat wave – even though the majority of documented heat deaths, including Mr. McCollum's, were during heat waves. This is an egregious deficiency highlighting Director Livingston and TDCJ's indifference to the heat risk. Every Texan obviously knows that Texas is periodically subject to heat waves.

But despite this known risk, TDCJ has never adopted a heat wave policy. And TDCJ not only lacks a formal heat wave policy, they never even instituted an informal practice regarding heat waves. Director Livingston conceded that TDCJ does nothing differently with respect to heat mitigation in the housing areas as the indoor temperatures rise, even to levels above 100

degrees. Ex. 282, Livingston Oct. 1, 2015 depo. pp. 100:4-101:7, 104:18-105:3, Appx. 6652-53, 6654-55.

Director Livingston also tries to shield himself by arguing that the Hutchins Unit was accredited by the American Correctional Association (ACA), and therefore he cannot be deemed deliberately indifferent to the heat risk. Motion, pp. 20-21. But the argument contains false premises. First, in fact, Livingston knew Hutchins did not meet all the ACA standards. Of note, it did not comply with ACA standard 4-4153 regarding indoor temperatures, which requires: "Temperatures in indoor living and work areas should be appropriate to the summer and winter comfort zones."[180] In addition, the standard included the following comment: "Temperatures should be capable of being mechanically raised or lowered to an acceptable comfort level."[181] It is undisputed that the Hutchins Unit, at the time of Mr. McCollum's death, did not comply with the comment, and that the summer indoor temperatures – measured at over 100° F – were well outside "summer … comfort zone." In fact, the auditors inspected the Hutchins Unit in *January* 2010 – hardly a time auditors would discover problems with extreme heat (even in Dallas).[182] Likewise, the ACA has *no* standard on what constitutes adequate protection from extreme heat – that the prison complies with standards regarding security, food service, and religious

---

[180] Ex. 283, Livingston Oct. 2, 2015 depo., pp. 126:8-22, Appx. 6698; Ex. 144, ACA 4-4153, 2012 Appx. 2537 (Exhibit 13 to Livingston's deposition); *see also* Ex. 256, Email compilation of AC-related standards, 2013, Appx. 6209.

[181] Ex. 283, Livingston Oct. 2, 2015 depo.,  pp. 126:23-127:4, Appx. 668, 6698; Ex. 144, ACA 4-4153, 2012; Appx. 2537.

[182] Ex. 143, Hutchins ACA Accreditation Report (2010), p. 32, Appx. 2414.

programming is irrelevant to protection from extreme temperatures.[183] And, of course, merely complying with ACA standards does not establish that conditions of confinement are constitutional. *Gates*, 376 F.3d at 337 ("it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards").

In their Motion, Defendants explain that they were justified in not complying with the comment to the ACA standard because it is not binding and was "included only to clarify the intent of the standard . . . ." Motion, p. 21 fn. 10. Defendants apparently believe this fact helps them, however, instead it further illustrates Livingston's indifference to the heat risk. On the one hand, Defendants make much of the ACA and Livingston extolls his reliance on the ACA standards to justify their lack of action, and particularly his inaction. Motion pp. 20-21; *see also* Ex. 257, Email from B. Collier to J. Clark, Sept. 10, 2013 Appx. 6196 (noting Livingston approves a statement to the press that "air conditioning is not required by the ACA for accreditation"). On the other hand, TDCJ and Director Livingston made a deliberate choice not to comply with the *intent* of the ACA indoor temperature standard, as TDCJ concedes that the intent of the standard was to have the capability to mechanically lower or raise the temperature in the housing areas, which was not the case at the Hutchins Unit when Mr. McCollum died. Motion, p. 21 n.10. In other words, TDCJ and Livingston knew the key industry association standard is to use *actual temperature controls*, but chose to ignore this because they could squeak by accreditation without it.

---

[183] Ex. 143, Hutchins ACA Accreditation Report (2010), Appx. 2383.

Finally, Director Livingston repeatedly argues that he cannot have been deliberately indifferent to the heat risk because he thought the Hutchins Unit had implemented all of the heat mitigation measures discussed in *Gates v Cook*.[184] Setting aside fact issues regarding the implementation of the *Gates* measures at Hutchins, the argument in any event lacks merit because the Fifth Circuit squarely and unequivocally rejected it in *Webb*:

> Moreover, even assuming *arguendo* that Appellants have offered a correct statement of the clearly established law, the mere presence of remedial measures would not end the inquiry, as such measures must be adequate. ***Indeed, we have affirmed determinations that prison officials violated the Eighth Amendment despite evidence that the officials implemented the remedial measures approved in* Gates*, where such measures proved inadequate to protect inmates from the extreme heat***. Appellees allege that Appellants' remedial measures were inadequate to protect decedents from the extreme heat. These allegations, which we must accept as true, can overcome Appellants' immunity defense.

*Webb v. Livingston*, 2015 WL 4385287 at *4 (5th Cir. 2015) (emphasis added and citations omitted). The same is true here: Defendants' heat measures were inadequate to protect Mr. McCollum (and many other inmates) from the extreme heat.

Under Fifth Circuit precedent, for the reasons set forth above, at a minimum Plaintiffs have raised a fact issue on the question of Director Livingston's qualified immunity due to his deliberate indifference to the heat risk in the TDCJ housing areas. *See, e.g.*, *Webb v. Livingston*, 618 Fed. Appx. 201, 208 (5th Cir. 2015); *Blackmon v. Garza*, 484 Fed. Appx. 866, 873 (5th Cir. 2012).

### 2. Livingston is Not Entitled to Qualified Immunity.

---

[184] While it is plausible Livingston could have been ignorant of Pringle and Eason's lackluster approach to cold drinking water, the Hutchins Unit's deficient physical plant – sealed windows and no electrical outlets to power personal fans – would necessarily be known to him.

As discussed above, prisoners' entitlement to adequate protections against extreme temperatures is clearly established. *See supra* at pp. 43-44, 71-72, 84.

In light of Mr. McCollum's right to adequate protections from extreme temperatures, Livingston's reaction was not objectively reasonable. In fact, Livingston did nothing at all to protect the inmates who died in 2011 after he learned two men had died under remarkably similar circumstances in 2007. His prisons do not comply with objectively reasonable measures to protect inmates from heat – like temperature controls that can "mechanically raise and lower" temperatures advocated by the ACA. His prisons lack the physical plant to comply with the *Gates* measures – an injunction approved by the Fifth Circuit in 2004. Instead, when finally faced with a crisis as ten men died due to the conditions in his prison, he relied on the bureaucrat's favorite tool – he called a meeting, and appears to have disavowed any responsibility rather than do his job. Ex. 282, Deposition of Livingston, Appx. 7424. And, unsurprisingly, nothing changed, and two more men died the following year.

Similarly, the *Ruiz* stipulations do not provide Livingston a qualified-immunity shield. Most simply, the *Ruiz* stipulations were negotiated in 1988 (Doc. 288-9, TDCJ Appx. p. 467), well before the Fifth Circuit clearly established that inmates had a right to be protected from extreme indoor temperatures in 2004. *See*, *Gates*, 376 F.3d 323 (5th Cir. 2004); *Ball v. LeBlanc*, 792, F.3d 584, 592 (5th Cir. 2015); *Blackmon v. Garza*, 484 Fed. Appx. 866 (5th Cir. 2012); *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015); *Webb v. Livingston*, 618 Fed. Appx. 201 (5th Cir. 2015). The *Ruiz* injunctions were terminated in 2002 – also before the Fifth Circuit began deciding the *Gates* line of cases. *See*, *e.g.*, *Ruiz v. Estelle, et al.*, No. 4:78-cv-00987 (S.D. Tex.) (case closed with expiration of injunction on June 17, 2002). The law has fundamentally changed since the end of the *Ruiz* litigation – Livingston cannot rely on the stipulations' outdated

provisions as the law has significantly evolved. *See Wilson v. Lynaugh*, 878 F.2d 846, 851-852 (5th Cir. 1989) ("[c]hanging mores can alter the constitutionality of conditions of confinement").

Likewise, though the *Ruiz* stipulations discuss ventilation and air flow, they are silent as to temperature. In light of the Fifth Circuit's subsequent decisions in *Gates* and its progeny, no objectively reasonable prison administrator could believe the *Ruiz* stipulations silence on high temperatures conclusively absolved TDCJ from liability for exposing inmates to dangerously high temperatures.

Finally, rather than epitomize the policy reasons for qualified immunity (as his motion contends), Livingston epitomizes the policy justifications for § 1983 liability. The purpose of § 1983 is to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide related relief." *Richardson v. McKnight*, 521 U.S. 399, 403 (1997). "Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). Livingston runs a prison system that disregards a known and obvious hazard, and he has known for years that people in his care and custody die as a result.


## VI.   DEFENDANTS TDCJ AND UTMB VIOLATED MR. MCCOLLUM'S AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT RIGHTS.

To allege a claim under the ADA and Rehabilitation Act, a plaintiff must show: (1) that he is a qualified individual within the meaning of the acts; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v.*

*County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).[185] Plaintiffs' evidence easily raises material fact issues on every element.

### A.  Mr. McCollum Suffered from Multiple Substantially Limiting Disabilities.

To qualify for protections under the ADA and Rehabilitation Act, a person with a disability must show they suffer from "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Major life activities" include "caring for oneself, performing manual tasks, . . . eating, sleeping, walking, standing, lifting, bending . . . and working." 42 U.S.C. § 12102(2)(A). "Major life activities" also include limitations on "the operation of a major bodily function," such as the brain, circulatory system, endocrine system, and respiration. 42 U.S.C. § 12102(2)(B).

The standard to qualify as a person with a disability under the Acts is expansive. Congress amended the ADA in 2008 specifically to broaden the definition of disability because some courts erroneously "narrowed the broad scope of protection intended to be afforded by the ADA" by "incorrectly f[inding] in individual cases that people with a range of substantially limiting impairments are not people with disabilities" and requiring "an inappropriately high

---

[185] The Rehabilitation Act follows the same standards, adding only the requirement that the entity also receive federal funding, as TDCJ and UTMB do. *Compare* First Amended Complaint, Doc. 39-2, p. 22 ¶ 115 (UTMB is a recipient of federal funds) *with* UTMB's Answer, Doc. 49, p. 7 ¶ 115 ("Admit."); TDCJ Defendants' Answer to Second Amended Complaint, Doc. 255, p. 8 ¶ 19 ("TDCJ admits it operates the Hutchins State Jail and receives federal funds."). Courts interpret the ADA and Rehabilitation Act under the same body of law. *See, e.g.*, *Bennett-Nelson*, 431 F.3d at 455. UTMB, though not TDCJ, concede the same body of law governs both claims. Doc. 285, UTMB Motion, p. 24, n. 16.

level of limitation necessary to obtain coverage under the ADA." Americans with Disabilities

Act Amendments Act of 2008, Pub. L. No. 110-325 (Sept. 25, 2008).

In regulations implementing the ADA amendments, the Department of Justice clarified

"[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to

the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be

a demanding standard." 29 C.F.R. § 1630.2(j)(1).

> The primary object of attention in cases brought under the ADA should be
> whether covered entities have complied with their obligations and whether
> discrimination has occurred, **not whether an individual's impairment**
> **substantially limits a major life activity**. Accordingly, the threshold issue of
> whether an impairment "substantially limits" a major life activity should not
> demand extensive analysis.

29 C.F.R. § 1630.2(j)(1)(iii) (emphasis added).

> 1. *Mr. McCollum was Obese.*

With a BMI of 49.5 – "extremely obese" according to the NIH – Mr. McCollum's obesity

substantially limited his major life activities. Due to his obesity, he had difficulty "performing

manual tasks," like "walking short distances, standing, climbing, and bending over." *See* Ex. 37,

Declaration of Stephanie Kingrey, p. 2, Appx. 641; 42 U.S.C. § 12102(2)(A); Ex. 38,

Declaration of Rodriguez, p. 2, Appx.644. His obesity made it more difficult for him to move

about than an average person. Ex. 37, Declaration of Kingrey, p. 2,641. UTMB physicians

concede obesity can obviously impair many major life activities. Ex. 272, Nov. 19, 2013 G.

Adams Depo. (30(b)(6)), 267:12-24, Appx. 6395; Murray Depo., pp. 119:4-120:18. Critically,

TDCJ recognizes obesity places sufferers at increased risk of heat-related illness.[186] TDCJ's own expert concedes Mr. McCollum was obese. Doc. 288-6, Expert Report of Leeah, TDCJ Appx. 305.

Thus, McCollum's obesity was a "disability" under the ADA and Rehabilitation Act. *See*, *e.g.*, *E.E.O.C. v. Resources for Human Dev., Inc.*, 827 F.Supp.2d 688, 693-94 (E.D. La. 2011); *Cook v. Rhode Island*, 10 F.3d 17, 25-26 (1st Cir. 1993).

### 2.  Mr. McCollum had Diabetes.

According to Mr. McCollum's intake triage form, and testimony of experts, he was diabetic. *See supra* 21. While TDCJ and UTMB's experts disagree, at a minimum, there is a fact issue about Mr. McCollum's diabetes, as all inferences must be drawn in his favor, and there is conflicting expert testimony about whether he was diabetic.

The EEOC's regulations expressly specify diabetes is a "disability." "[I]t should easily be concluded . . . diabetes substantially limits endocrine function" and is a qualifying disability. 29 C.F.R. § 1630.2(j)(3)(iii). As Mr. McCollum was diabetic, his endocrine function was substantially limited. *See also* Ex. 53, Dr. Vassallo Expert Report, p. 6,780 ("more likely than not, Mr. McCollum was diabetic based on his reported personal medical history, morbid obesity and lab results").

TDCJ and UTMB also long knew diabetes placed inmates at substantially increased risk of heat-related illness. Ex. 281, Linthicum Depo., p. 207:2-9, Appx.6633; Ex. 96, November 2007 CMHC Policy B-15.2 "Heat Stress,"1496-98.

---

[186] Ex. 296, Thaler Depo., p. 130:8-13, Appx.6959; Ex. 281, Linthicum Depo., pp. 207:24-208:1; Appx. 6633.

Thus, it is not surprising federal district courts in Texas and the Fifth Circuit have concluded diabetes is a qualifying disability. *Munoz v. Echosphere, L.L.C.*, 2010 WL 2838356, *11 (W.D. Tex. July 15, 2010); *E.E.O.C. v. Resources for Human Development, Inc.*, 827 F.Supp.2d 688, 694 (E.D. La. 2011) ("Diabetes is covered by the ADA because it substantially limits the endocrine system"); *see also Arnold v. United Parcel Serv.*, 136 F.3d 854, 866 (1st Cir. 1998); *Erjavac v. Holy Family Health Plus*, 13 F.Supp.2d 737, 746 (N.D. Ill. 1998).

### 3. *Mr. McCollum had Hypertension.*

Likewise, there is no dispute Mr. McCollum was prescribed medications to control his hypertension. *See supra* 23. Mr. McCollum's hypertension was significant enough to justify prescription medications intended to be taken daily.[187]

Hypertension, by definition, affects the operation of the circulatory system. *See* 42 U.S.C. § 12102(2)(B); Ex. 298, Vassallo Depo., 56:14-57:13, Appx. 7000-01.

Moreover, TDCJ and UTMB recognize that hypertension worsens susceptibility to the heat. Ex. 281, Linthicum Depo., p. 208:2-5, Appx. 6634; Ex. 96, November 2007 CMHC Policy B-15.2 "Heat Stress,", Appx.1496-98; Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 124:4-125:11, 171:1-8, Appx.6356-57, 6369. Likewise, UTMB identifies hydrochlorothiazide,

---

[187] The single page "Medication Administration Record" provided to Plaintiffs, which UTMB suspiciously did not include in its appendix, does indeed fail to say that Mr. McCollum took his pills during his incarceration at the Hutchins Unit. Ex. 63, McCollum Medication Administration Record, Appx. 1247. But the record also suggests that Mr. McCollum took doses of HCTZ on August 8, August 12, August 13, and August 14 – up to two weeks *after his death*. Thus, the record itself creates a fact question as to Mr. McCollum's hydrochlorothiazide intake – either the dates he received the drug were filled in incorrectly, or the record was falsified after Mr. McCollum's death. Neither explanation supports the conclusion in Dr. Glenda Adams' expert report, the "evidence" that UTMB submits to the Court. Doc. 285-1, UTMB Appx. 128. Instead, drawing all inferences in the Plaintiffs' favor, it is another fact issue for the jury to interpret.

the diuretic drug the UTMB physician assistant prescribed Mr. McCollum, as a drug that increases a patient's risk of heat-related illness. Ex. 96, UTMB Heat Stress Policy, Appx. 1499.

In the prison context, under previous (and more-rigorous) versions of the definition of "disability," the Supreme Court recognized hypertension is a "disability." *See*, *e.g.*, *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998).

### 4. *Mr. McCollum had Depression.*

TDCJ's expert concedes Mr. McCollum suffered from depression, and that his mental condition "blunted" his survival instincts such that he did not take advantage of TDCJ's "mitigation" measures at the Hutchins Unit. Doc. 288-6, Expert Report of Leeah, TDCJ Appx. 306-307; *see also* 42 U.S.C. § 12102(1)(A) & (2)(A) ("disability" can include "mental impairment" which substantially limits one's ability to "car[e] for oneself"). Thus, Mr. McCollum's depression was substantially limiting – in fact, TDCJ's own expert contends it contributed significantly to his death because it essentially deprived him of the will necessary to use TDCJ's mitigation measures.

Federal courts, including this court, have recognized depression can make a person a "qualified individual with a disability." *See*, *e.g.*, *Palacios v. Continental Airlines, Inc.*, 2013 WL 499866, *4 (S.D. Tex. Feb. 11, 2013) (Werlein, J.); *Trevino v. United Parcel Serv.*, 2009 WL 3423039, *7-8 (N.D. Tex. Oct. 23, 2009); *MacEntee v. IBM*, 783 F.Supp.2d 434, 443 (S.D. N.Y. 2011).

### 5. *Mr. McCollum's Thermoregulation was Substantially Impaired.*

Each of the above conditions, alone or especially in combination, impaired Mr. McCollum's ability to maintain a body temperature of 98.6° F – the major life activity of thermoregulation. *See*, *e.g.*, Ex. 53, Dr. Vassallo Expert Report, pp. 6-7,780-81. If the body's

ability to thermoregulate is inhibited or puts more strain on the body than normal, as happened with Mr. McCollum, a person is at much higher risk of heat-related illness, injury, or death.[188]

Mr. McCollum's disabilities plainly contributed to his death from heat stroke. Unlike the plaintiffs in *Ball v. LeBlanc* – which Defendants rely upon – Mr. McCollum *did* suffer substantially "impaired thermoregulation": the fatal heat stroke that killed him. *Compare Ball*, 792 F.3d at 597 ("there is no *evidence* that these prisoners' thermoregulatory systems are actually impaired") (emphasis in original) *with* Ex. 12, McCollum Autopsy (cause of death was "hyperthermia" "with a body temperature of 109.4° degrees Fahrenheit"), and Ex. 60, McCollum Parkland Medical Records, Appx. 1157 (body temperature 109.4° F). In *Ball*, there was no evidence the plaintiffs' thermoregulation was impaired because there was no evidence their body temperatures ever actually exceeded 98.6° F (though there was an otherwise substantial risk they could suffer a heat-related injury). Here, Mr. McCollum's body temperature *actually* reached 109.4° F. TDCJ and UTMB's policies and training materials recognize that Mr. McCollum's physical conditions – obesity, hypertension, and diabetes – increased his risk of thermoregulatory failure.[189] Though his risk of heat-related illness was obvious according to their own policies, TDCJ and UTMB exposed him to conditions where his thermoregulatory system collapsed.

---

[188] *Id.*; Ex. 96, November 2007 CMHC Policy B-15.2 "Heat Stress," at Appx. 1496-98TDCJ030435; Ex. 272, Nov. 19, 2013 G. Adams Depo. (30(b)(6)), 124:4-125:11, 171:1-8, 68:6-25, 88:12-22, 164:14-25, 166:19-167:22, Appx.6356-57, 6369, 6349, 6364, 6365-66; Ex. 281, Linthicum Depo., pp. 207:2-9, 207:24-208:1, 208:2-5, Appx. 6633.

[189] Ex. 96, CMHC Policy B-15.2 "Heat Stress" (Nov. 2007) at TDCJ030435, TDCJ030437; Ex. 106, AD-06.17, "Health Summary for Classification" (Jan. 30, 2007) Appx. 1538UTMBEmails000025596; Ex. 105, CMHC Policy A-08.4-A, "Guidelines for Completing the Health Summary for Classification Form" (Feb. 15, 2011) MCCOLLUM 048-050, Appx.

In short, the 2008 amendments to the ADA were "intended to provide for more generous coverage and application of the ADA's prohibition on discrimination." 29 C.F.R. § 1630.2(j)(i). Thus, Mr. McCollum was a qualified individual with a disability, and Defendants' argument to the contrary should be rejected.

### B.  Safe Confinement at the Prison was a Program or Service.

TDCJ and UTMB denied Mr. McCollum the services or programs needed to reasonably accommodate his disability so he could safely live in the prison.

Writing for a unanimous Supreme Court, Justice Scalia explained confinement in a jail or prison itself is a program or service for ADA/Rehabilitation Act purposes. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs.'"). Here, TDCJ and UTMB's own policies identified people with Mr. McCollum's disabilities – hypertension (being treated with a diuretic), obesity, diabetes, and depression – as placing him at elevated risk of heat-related illness. Failing to provide reasonable accommodations – housing in a climate controlled environment, wellness checks, access to respite areas, access to portable coolers, a timely intake physical, heat safety training, access to the commissary, and/or a bottom bunk (*see supra* at p. 6, n.3; p. 22, n. 9) – denied Mr. McCollum the ability to live safely in the prison.

Unlike other anti-discrimination statutes, the ADA and Rehabilitation Act create an "affirmative obligation" that requires public entities, like TDCJ and UTMB, to accommodate

1531; Ex. 115, "Heat Related Illness," McColum1329-1337, Appx. 1660; Ex. 114, UTMB "Safety Training, Heat & Cold Emergencies" (May 2010), McCollum 1596-1600, Appx. 1589.

people with disabilities – *not* simply treat people with disabilities the same as able-bodied people. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 533 (2004).

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility.

*Id.*, at 531; *see* 28 C.F.R. § 35.130 (b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"). Title II places an affirmative "duty to accommodate" on TDCJ and UTMB. *See Lane*, 541 U.S. at 532. Instead, TDCJ and UTMB "outright excluded" Mr. McCollum from programs and services at the prison by failing to accommodate his disabilities, tragically causing his death – even though TDCJ and UTMB's policies identified people like Mr. McCollum as being at greatly elevated risk.

Like the inmate in *U.S. v. Georgia*, Mr. McCollum could not safely access any programs and services in the prison without an accommodation from TDCJ and UTMB. In *Georgia*, a paraplegic inmate was "denied . . . access to virtually all prison programs and services on account of his disability." 546 U.S. 151, 155 (2006) (Scalia, J.). The *Georgia* inmate required accommodations for his inability to walk. Without accommodations, he could not leave his cell to access the prison's other programs and services. Likewise, Mr. McCollum could not safely access any programs or services at the prison without reasonable accommodations to protect him

from the heat – the brutally hot indoor temperatures made the prison itself so dangerous for him that he died.[190]

UTMB flatly misstates that Mr. McCollum's housing assignment was not "less safe" because of his disabilities. Doc. 285, UTMB Motion, p. 38. In numerous places, TDCJ and UTMB's policies and training materials recognize that high temperatures are *more dangerous* for people with heat-sensitive disabilities like obesity, hypertension, diabetes, and depression. *See supra* at p. 6, n.3, p. 22 n.59. Numerous witnesses have testified that high temperatures are significantly more dangerous for people with these disabilities. *See*, *supra* at § IV(E), pp. 23-24, 27. Though inmates with disabilities cannot be segregated to facilities that lack other programs and services available to non-disabled inmates, all of the accommodations proposed in this response could be achieved without such segregation *See infra* at p. 23.

### C. Lack of a Reasonable Accommodation Excluded Mr. McCollum from the Prisons.

When TDCJ and UTMB denied Mr. McCollum reasonable accommodations, he died. His death prevented him from accessing any other programs and services available to able-bodied prisoners.

Though TDCJ had climate-controlled housing available for inmates with heat-sensitive disabilities, it made the deliberate choice to house him in the incredibly hot Hutchins Unit

---

[190] Mr. McCollum and the *Georgia* inmate actually needed similar accommodations. In *Georgia*, the inmate needed a wheelchair-accessible cell because he could not "turn his wheelchair around" to leave the cell for prison programs and services. 546 U.S. at 155. Mr. McCollum also needed a specialized housing: one of the 23,000 TDCJ climate-controlled beds that do not expose prisoners with disabilities to dangerously high summer temperatures.

instead. *Supra* at § IV(D). UTMB and TDCJ together made the decision to not give unit-level providers the *option* of assigning inmates to climate-controlled housing. *See id*. Neither UTMB nor TDCJ provided inmates with heat-sensitive disabilities training about the hazards posed by the high temperatures. *Id*. UTMB did not provide timely intake physicals where "restrictions" that would protect heat-sensitive inmates would be assigned. *Id*. UTMB did not restrict Mr. McCollum from being given a top bunk despite his obvious obesity, then TDCJ actually assigned him to one. *Id*. And TDCJ did not conduct wellness checks for inmates with heat-sensitive disabilities, did not provide respite areas to inmates with heat-sensitive disabilities, install portable coolers for inmates with heat-sensitive disabilities to use, or even give heat-sensitive inmates basic commissary items – like a cup to drink and access the water. *See id*.

Under well-settled law, as this Court has recognized, a jury should be given the opportunity to decide if failing to provide these accommodations was unreasonable. *McCoy*, 2006 WL 2331055, *9 (S.D. Tex. Aug. 9, 2006) ("the reasonableness of an accommodation is generally a question of fact inappropriate for resolution on summary judgment") (collecting cases).

### D. Denying Mr. McCollum a Reasonable Accommodation was Discrimination By Reason of his Disability.

When a person has a disability, the ADA/Rehabilitation Act requires public entities to provide a "reasonable accommodation" to assist them in accessing public programs and services. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004). Accordingly, "Discrimination on the basis of disability differs from discrimination in the constitutional sense." *Id*. As this Court explained in *Martone*, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and

punishment than non-disabled prisoners." *Martone v. Livingston*, No. 4:13-CV-3369, 2014 WL 3534696, at *16 (S.D. Tex. July 16, 2014) *quoting McCoy v. Tex. Dep't of Crim. Justice*, C.A. No. C-05-370, 2006 WL 2331055, *22 (S.D. Tex. 2006) (citing *Melton*, 391 F.3d at 672 and *Georgia*, 546 U.S. at 156). "The discrimination prohibited . . . includes the failure to make reasonable accommodations for a [prisoner's] disability." *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532, 538 (N.D. Tex. 2011); *see also Hinojosa v. Livingston*, 994 F.Supp.2d 840 (S.D. Tex. 2014); Ex. 298, Vassallo Depo., 115:17-20, Appx. 7008 ("Do I think that this is a dangerous temperature for everybody [inside the Hutchins Unit]? Yes, I do. Is it more dangerous for some people than others? Yes.").

This is a question of law this Court already resolved in a related case, *Martone v. Livingston*, 2014 WL 3534696, *15-16 (S.D. Tex. July 16, 2014) (Ellison, J.). In short, when a prison denies an inmate a reasonable accommodation necessary to live in the prison, it is discriminating against him because of his disability.

Here, a jury could reasonably conclude TDCJ and UTMB each violated Mr. McCollum's rights under the Americans with Disabilities Act and Rehabilitation Act. In fact, the Northern District of Texas denied summary judgment in similar wrongful death cases brought under the ADA and Rehabilitation Act. *O'Neil*, 804 F.Supp.2d 532 (N.D. Tex. 2011) (asthmatic prisoner denied accommodations, including restricted housing); *Borum v. Swisher Co.*, 2015 WL 327508 (N.D. Tex. Jan. 26, 2015) (Robinson, J.) (alcoholic prisoner denied accommodations) and No. 2:14-cv-000127-BB, Doc. 158 (July 22, 2016) (Averitte, Mag. J.) (denying post-trial motion for judgment as matter of law, following a jury verdict that similar failures to accommodate a prisoner's disabilities violated the ADA and proximately caused an inmate's death) (attached as Ex. 155, Appx. 2667). Likewise, this Court and the Eastern District of Texas denied motions to

dismiss companion wrongful-death lawsuits brought under the ADA and Rehabilitation Act.[191]

*See also Wright v. Tex. Dep't Crim. Justice*, 2013 WL 6578994 (N.D. Tex. Dec. 16, 2013)

(O'Connor, J.) (denying motion to dismiss in wrongful death ADA/Rehabilitation Act suit).

This is not an "improper expansion" of the ADA and Rehabilitation Act. *Contra* TDCJ's

Motion, Doc. 288, p. 112. Though TDCJ and UTMB disagree for obvious reasons, multiple

district courts confirm that this Court's "more pain and punishment" analysis relied on in

*Martone*, drawn from *McCoy*,  is a correct statement of the law. *See O'Neil*, 804 F.Supp.2d at

538; *Wright*, 2013 WL 6578994, *4; *Hinojosa*, 994 F.Supp.2d at 843; *Togonidze*, p. 6 [cite fill

in] (E.D. Tex.); *Webb*, [cite fill in] (E.D. Tex.); *Wolfe v. Fla. Dep't of Corr.*, 2012 WL4052334,

*4 (M.D. Fla. Sept. 14, 2012); *Miller v. Chapman*, 2014 WL 2949287, *3 (M.D. La. June 30,

2014); *Reeves v. LeBlanc*, 2014 WL 7150615, *4 (M.D. La. Dec. 15, 2014); *Hacker v. Cain*,

2016 WL 3167176, *13 (M.D. La. June 6, 2016). No courts have criticized *Martone*'s or

*McCoy*'s holdings. The reasoning simply makes sense – when the State controls every facet of an

inmate's life, if the State fails to make reasonable accommodations for inmates with disabilities

those prisoners will suffer disproportionately more than able-bodied prisoners who do not need

---

[191] *See Martone v. Livingston*, 2014 WL 3534696 (S.D. Tex. July 16, 2014) (Ellison, J.); *Togonidze v. Livingston*, No. 6:14-cv-00093-JDL, Doc. 52 (magistrate's April 9, 2014 recommendation) (E.D. Tex.) (Love, Mag. J.) and Doc. 56 (May 6, 2014 order adopting magistrate's recommendation) (Schneider, J.); *Webb v. Livingston*, No. 6:13-cv-00711-JDL, Doc. 98 (magistrate's report and recommendation, attached as Ex. 40, Appx. 372) (E.D. Tex.) (Love, Mag. J.) and Doc. 125 (May 5, 2014 order adopting magistrate's recommendation, attached as Ex. 41, Appx. 380) (Schneider, J.); *Hinojosa v. Livingston,* 994 F.Supp.2d 840 (S.D. Tex. 2014) (Gonzales Ramos, J.).

accommodations to live safely in the prisons. This is the "discrimination" the ADA and Rehabilitation Act were designed to combat.

Likewise, TDCJ relies on several authorities where *pro se* inmates' claims were dismissed because they failed to present summary judgment evidence of discrimination. In addition to effectively being restricted to hearing one side of the argument, these cases are procedurally distinct because there was no record evidence to support the inmates' claims. In *Nottingham v. Richardson*, 499 Fed. Appx. 368, 377 (5th Cir. 2012), the *pro se* inmate failed to present any summary judgment evidence that he was not accommodated during transit between prisons due to his disability.[192] In *Tuft v. Texas*, 410 Fed. Appx. 770, 774 (5th Cir. 2011) the district court (correctly) refused to consider the *pro se* inmate's unauthenticated summary judgment evidence, and the grant of summary judgment was unsurprisingly affirmed. *See also id.* at 775 (plaintiff "did not provide any summary-judgment evidence showing he and other prisoners with disabilities were treated differently from non-disabled prisoners"). Likewise, in *Hay v. Thaler*, 470 Fed. Appx. 411, 418 (5th Cir. 2012), the *pro se* inmate disagreed with decisions made by a prison dentist, but did "not allege, much less explain, how his alleged disabilities made it more difficult for him to access the benefits of TDCJ's services – namely, dentures – or gave him less meaningful access to those services." That is not the case here. These cases are of limited precedential value because of their procedural postures, the way they were litigated, and the fact that this case is distinctly different because it presents substantial evidence of discrimination.

──────────────────────

[192] The decision in *Nottingham* is also *dicta*, because the inmate failed to administratively exhaust his claims before filing suit. 499 Fed. Appx. at 375.

Defendants' reliance on *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996) is likewise misplaced for several reasons. First, *Bryant* – where a prisoner was not provided grab bars in his hospital bed – pre-dates the Supreme Court's decision in *Yeskey*, and thus erroneously concluded the ADA did not provide *any* protections to prisoners. *Compare Bryant*, 84 F.3d at 248 ("it is very far from clear that prisoners should be considered 'qualified individuals' within the meaning of the [ADA]") *with Yeskey*, 524 U.S. at 209 ("the statute's language unmistakably includes State prisons and prisoners within its coverage"). *Bryant*'s core teaching has been directly overruled,[193] and the remainder of the opinion is *dicta*. In fact, other recent Seventh Circuit decisions support Plaintiffs' position. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (prison inaccessible to inmate with mobility impairments who required grab bars in halls and restrooms – "Refusing to make reasonable accommodations is tantamount to denying access"). Second, numerous courts disagree with *Bryant*'s flawed conclusion that "the [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."[194] Finally, unlike *Bryant*, Plaintiffs' claims are not camouflaged "medical

---

[193] Notably, Judge Posner recently acknowledged the error of his earlier opinion, and reversed a district court decision dismissing a *pro se* inmate's Rehabilitation Act claims. *Norfleet v. Walker*, 684 F.3d 688 (7th Cir. 2012) (Posner, J.).

[194] *See, e.g., Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 287 (1st Cir. 2006) (prescription medication for ALS patient); *Rouse v. Plantier*, 997 F.Supp. 575, 582 (D. N.J. 1998) (insulin for diabetics) (reversed on other grounds); *McNally v. Prison Health Services*, 46 F.Supp.2d 49 (D. Me. Apr. 27, 1999) (anti-retroviral drugs to treat HIV-positive patients); *Payne v. Arizona*, 2012 WL 1151957, *7 (D. Ariz. Apr. 5, 2012) (diabetic denied various accommodations); *Paine v. Bergland*, 2012 WL 6727243, *11 (N.D. Ill. Dec. 28, 2012) (denying summary judgment to jail that failed to provide mental health evaluation before releasing mentally ill woman in dangerous part of Chicago). Notably, the Seventh Circuit cited *Kiman* affirmatively in *Jaros*. 684 F.3d at 672.

malpractice" allegations. Mr. McCollum, unlike Bryant, was denied the opportunity to even see a provider capable of committing malpractice until it was too late. One critical way TDCJ and UTMB failed to accommodate Mr. McCollum is their failure to ensure he timely *saw* a doctor who could assign the "heat restrictions" necessary for him to receive accommodations (including wellness checks, and a bottom bunk restriction). *See also Paine v. Johnson*, 2010 WL 785397, *8 (N.D. Ill. Feb. 26, 2010) (distinguishing *Bryant*).

### E. TDCJ and UTMB Intentionally Discriminated Against Mr. McCollum by Failing to Provide Him Reasonable Accommodations.

Despite TDCJ and UTMB's argument to the contrary, the ADA and Rehabilitation Act do not require a showing of animus or ill-will toward people with disabilities. The Supreme Court has expressly noted "discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). "[M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult, if not impossible to reach were the Act construed to proscribe only conduct fueled by discriminatory intent." *Id.*, at 296-97. It would be contrary to Congressional intent to require showing TDCJ and UTMB discriminated against Mr. McCollum because of an *animus* toward people with disabilities, rather than just "thoughtlessly" failing to accommodate him.

Nor does the "intentional discrimination" necessary to recover compensatory damages require animus or ill-will, as Defendants mistakenly claim. Though the Fifth Circuit has declined

to define "intentional discrimination,"[195] no Court of Appeal that has reached the issue has concluded animus is necessary. Every Circuit addressing the question has concluded "the standard for intentional violations is deliberate indifference to the strong likelihood of a violation" of the ADA or Rehabilitation Act. *See, e.g.*, *Loeffler v. Staten Island Univ. Hospital*, 582 F.3d 268, 275 (2nd Cir. 2009); *A.G. v. Lower Merian School Dist.*, 542 Fed. Appx. 194, 198 (3rd Cir. 2013); *Meagley v. Little Rock*, 639 F.3d 384 (8th Cir. 2011); *Duvall v. Co. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001); *Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009); *Liese v. Indian River Co. Hospital*, 701 F.3d 334, 345 (11th Cir. 2012). Deliberate indifference only requires officials to both (1) know about the inmate's disability, and (2) disregard the need for a reasonable accommodation. *See*, *supra* § V(A)(2)(iii)(a) p. 62.

Because Defendants were at least deliberately indifferent to Mr. McCollum's need for a reasonable accommodation (or there is a fact issue regarding their knowledge of his condition), Plaintiffs can recover compensatory damages. The Fifth Circuit has made clear ignoring "clear indications" that a person has a disability in need of accommodation is sufficient to establish intentional discrimination. *See Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 Fed. Appx. 180, 185 (5th Cir. 2015) (reversing summary judgment). Failure to provide an "effective" accommodation is "evidence of intentional discrimination." *Id*.

---

[195] *See Frame*, 657 F.3d at 231 n. 71 (5th Cir. 2011) ("We express no opinion as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination"); *Estate of A.R. v. Muzyka*, 543 Fed. Appx. 363, 365 (5th Cir. 2013) (unpublished) (declining to adopt competing "bad faith" or "deliberate indifference" standards for "intentional discrimination" advocated by the parties); *Perez*, 624 Fed. Appx. at 184 ("declin[ing] to make new law on the nature of intent").

The Fifth Circuit only previously cursorily discussed "intentional discrimination" under Title II of the ADA in one case – *Delano-Pyle v. Victoria Co.*, 302 F.3d 567 (5th Cir. 2002). There, the Circuit noted the texts of the ADA and Rehabilitation Act have "no deliberate indifference standard," but that plaintiffs must show "intentional discrimination" to recover compensatory damages. *Id*. at 575. While the Court did not discuss what "intentional discrimination" requires, it also did not, as Defendants mistakenly contend, imply it requires a showing *beyond* deliberate indifference. If anything, *Delano-Pyle* implies "intentional discrimination" requires a *less* demanding standard than "deliberate indifference." The defendant-county *advocated for* a deliberate indifference standard – Victoria County asserted the plaintiff "*failed* to establish deliberate indifference," and the district court's decision should be reversed. *Id.* at 575 (emphasis added). But the Circuit rejected the county's position, and found the facts supported a finding of "intentional discrimination."

Indeed, the facts in *Delano-Pyle* and its recent predecessor, *Perez*, suggest animus or ill-will is *not* required. In *Delano-Pyle*, the Circuit affirmed a jury verdict for a deaf plaintiff who was arrested after police refused to provide him a sign-language interpreter during a traffic stop. Though the Circuit reviewed the sufficiency of the evidence, it did not discuss any animus or ill-will toward the deaf, or any other proof "beyond" deliberate indifference, when upholding the district court's award of compensatory damages. That the officer knew the plaintiff was deaf, but chose not to provide a sign-language interpreter and arrested him anyway, was enough. Likewise, in *Perez*, the Circuit found sufficient evidence to deny summary judgment where a hospital repeatedly denied deaf customers an "effective" communication aide. Without deciding whether "deliberate indifference" was the correct standard, *Perez* found that mere failure to

provide an effective accommodation sufficed to demonstrate "intentional discrimination." *Perez*, 624 Fed. Appx. at 185.

TDCJ's reliance on *Estate of A.R. v. Muzyka* is equally misplaced. In *Estate of A.R.*, a deaf girl suffered a seizure during an afterschool swimming program for the deaf and drowned. 543 Fed. Appx. 363, 364 (5th Cir. 2013) (per curiam). Unlike *A.R.*, where the child was enrolled in a "school that was established to teach and serve disabled children," the Hutchins Unit was not designed to accommodate inmates with heat-sensitive disabilities. Unlike at the Hutchins Unit, "[t]here [was] no evidence of any exclusion of A.R. from the benefits, services, programs, and activities of the school." Here, there is copious evidence that Mr. McCollum could not safely access the Hutchins Unit, and that TDCJ knew the conditions at the prison increased the risk to people with heat-sensitive disabilities like him. The child's death was the product of a tragic accident – falling in the pool – a classic negligence claim. Mr. McCollum's death was caused by TDCJ's studied indifference to the danger of outrageously high indoor temperatures. It is the equivalent of placing a child with cerebral palsy in the pool, and hoping he can swim.

Moreover, when the Fifth Circuit has discussed the meaning of "intentional discrimination" in the context of the ADA's employment provisions (Title I), it likewise did not require animus to recover compensatory damages. In *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997), the Circuit concluded a plaintiff states a case for "intentional discrimination" by showing "(1) he or she suffers from a disability; (2) he or she is qualified for the job; (3) he or she was subject to an adverse employment action; and (4) he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees." Thus, animus is not only not required in the ADA employment context, "intentional discrimination" just requires a failure to accommodate. Title II should not be different.

Though TDCJ may not have investigated whether Mr. McCollum, specifically, would have difficulty thermoregulating in a 115° F environment,[196] it is beyond debate that the agency knew people with Mr. McCollum's disabilities were at substantially increased risk of heat-related illness. *See supra* at § IV(D). *See also Blackmon v. Garza*, 484 Fed. Appx. 866, 873 (5th Cir. 2012); *Webb v. Livingston*, 618 Fed. Appx. 201, 208 (5th Cir. 2015); *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015). Despite this knowledge that people with disabilities were particularly vulnerable to the heat, TDCJ and UTMB made no accommodations for them.

Finally, because "intent" is always a fact issue for a jury, the Court cannot grant summary judgment, even if Defendants had articulated the correct standard. *See, e.g.*, *HDRE Business Partners Ltd. Group, L.L.C. v. Rare Hospitality Intern., Inc.*, 484 Fed. Appx. 875, 877 (5th Cir. 2012).

### F.   TDCJ and UTMB are not Immune Under the ADA or Rehabilitation Act.

TDCJ does not contest the Rehabilitation Act undisputedly abrogates its sovereign immunity. In the Rehabilitation Act, Congress used the Constitution's spending power to condition receipt of federal funds on recipients accommodating people with disabilities. 29 U.S.C. § 794. TDCJ accepts federal funds. Doc. 255, Defendants' Amended Answer, p. 8. Accepting federal funds thus waives TDCJ's immunity. *See, e.g.*, *Miller v. Tex. Tech Univ. Health Sci. Ctr.*, 421 F.3d 342, 349 (5th Cir. 2005).

---

[196] Even though this does not seem to be a difficult logical inference for a jury to draw, as he suffered from known or obvious conditions that increased his susceptibility to heat-related illnesses.

When the Rehabilitation Act abrogates a state's immunity, courts need not decide whether the ADA also abrogates immunity. Because the Rehabilitation Act and the ADA are essentially identical, when a plaintiff has pleaded a claim under one, he or she has pleaded a claim under both. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005) ("having already held that sovereign immunity does not bar the [plaintiff's] claim under [the Rehabilitation Act], we need not address at this juncture the issue of abrogation under Title II of the ADA, because the rights and remedies under either are the same for purposes of this case"). *See also McCoy v. Tex. Dep't of Crim. Justice*, 2006 WL 2331055, *16 (S.D. Tex. Aug. 9, 2006) ("Where a claim is based on the failure to provide reasonable accommodations, the ADA and RA are identical in scope. Therefore, the question of whether Congress has abrogated [defendant prison system's] immunity from Plaintiff's ADA claim is moot."); *Durrenberger v. Tex. Dep't of Crim. Justice*, 757 F.Supp.2d 640, 648-49 (S.D. Tex. 2010).

Moreover, even if the Rehabilitation Act claims did not resolve the immunity question, Congress abrogated the states' sovereign immunity by enacting the ADA through its Fourteenth Amendment power to enforce constitutional rights. *See* U.S. CONST. Amd. XIV, § 5; *Tennessee v. Lane*, 541 U.S. 509 (2004); *U.S. v. Georgia*, 546 U.S. 151 (2006). Thus, to abrogate immunity under the Fourteenth Amendment, the claim must involve an actual violation of rights protected by the Constitution. *Id*. The Fifth Circuit consistently finds constitutional violations when inmates are subjected to extreme temperatures. *See*, *e.g.*, *Ball* , 792 F.3d at 592; *Blackmon* , 484 Fed. Appx. 866; *Hinojosa*, 807 F.3d at 665; *Webb* , 618 Fed. Appx. 201; *Gates*, 376 F.3d 323.

Thus, because inmates have a constitutional right to adequate protection from extreme temperatures, Congress successfully abrogated TDCJ's immunity by passing the ADA.[197]

### G. TDCJ and UTMB's Failure to Accommodate Mr. McCollum is the Sole Cause of his Injuries Under the Rehabilitation Act.

Defendants' argument regarding the different causation standards in the ADA and Rehabilitation Act is meritless because this is a "reasonable accommodation" case. Though the Rehabilitation Act requires an injury result from the "sole" cause of discrimination, as this Court noted in *Martone*, "[t]he different causation requirements . . . are irrelevant when a plaintiff's claim is premised on a defendant's failure to make reasonable accommodations for disabled individuals. Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." 2014 WL 3534696, *15, n. 6 (citing *Bennett- Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005)). Here, Mr. McCollum had heat-sensitive disabilities that required reasonable accommodations. TDCJ and UTMB did not make those accommodations, and he died.[198]

Likewise, though TDCJ *did* make the housing units unsafe and inhumane for all inmates during the hot summers, that does not change the fact that these dormitories were particularly unsafe for inmates with heat-sensitive disabilities. In fact, these heat-sensitive inmates needed additional accommodations above and beyond the pathetic "mitigation" measures adopted at the

---

[197] Likewise, the individual Defendants' deliberate indifference to Mr. McCollum's serious medical need would support abrogating immunity.

[198] Even the individual officers' actions denied Mr. McCollum reasonable accommodations – it was patently unreasonable to delay an hour while a person with a disability suffered a heat stroke. *See supra* at § IV(F) p. 33; *McCoy*, 2006 WL 2331055, *8 (officers failed to transport inmate to infirmary during fatal asthma attack).

Hutchins Unit to make the dormitories safe. That TDCJ treats inmates it knows suffer from heat-sensitive disabilities exactly the same way it treats inmates who are at less risk is the heart of the intentional discrimination against people with disabilities. It is the equivalent of opening the door to the library to the blind but neglecting to provide books in braille, because the library is "equally available" to everyone. TDCJ takes no affirmative steps to protect people it knows are at heightened risk.

### H. The Fifth Circuit has Repeatedly Upheld *Respondeat Superior* Liability Under the ADA and Rehabilitation Act.

TDCJ (but, tellingly, not UTMB) asks this Court to disregard binding Fifth Circuit precedent, and instead adopt an outlying decision of the Eleventh Circuit to shield it from its employees' discrimination. In fact, the Fifth Circuit has long held entities covered by the ADA are vicariously liable for discriminatory acts by their employees. *Delano-Pyle*, 302 F.3d at 574-75. And the Fifth Circuit is hardly an outlier – "The Fourth, Seventh, Ninth, and Eleventh circuits have all agreed … the public entity is liable for the vicarious acts of *any* of its employees." *Id*. at 574 (collecting cases). TDCJ asks this court to expressly overrule the Fifth Circuit.

Even if this Court were to disregard binding authority, however, this is a case where the disability discrimination is particularly the result of high-level policy decisions. If the prisons were climate controlled, disabled inmates like Mr. McCollum would still be alive. Though Clark, Tate, and Sanders failed to call an ambulance for an hour, and Pringle and Eason (high-level policymakers) approved local policies that put him at outrageously increased risk, TDCJ itself built and maintained the Hutchins Unit in a condition it knew put inmates with disabilities at heightened risk of heat-related injury. And despite that risk, TDCJ did not implement effective accommodations to protect inmates with disabilities like Mr. McCollum. If "no *respondeat*

*superior* liability" were the law – though it is emphatically not in the Fifth Circuit – the facts of this case are uniquely about the actions of "high level" TDCJ officials and policy decisions made by the agency. *See supra* at § V(C) (liability of Brad Livingston).

Finally, excising vicarious liability from the ADA/Rehabilitation Act would deprive plaintiffs of compensatory damages for illegal discrimination. When drafting the ADA/Rehabilitation Act, Congress made the intentional decision to *only* create liability for agencies, not individuals. *See Lollar v. Baker*, 163 F.3d 603, 609 (5th Cir. 1999) (no individual capacity cause of action created against individual defendants by ADA/Rehabilitation Act); 29 U.S.C. § 794a. Thus, under TDCJ's proposal, plaintiffs cannot sue an individual (like Clark, Tate, Sanders, Pringle, Eason, or even Livingston), and cannot sue the individual's employer (like TDCJ) – leaving people with a disability without a remedy for illegal discrimination. That cannot be the result Congress intended.

## I.   The ADA and Rehabilitation Act Provide Expanded Standing for Injunctive Relief.

The ADA and Rehabilitation Act contain broad enforcement provisions that allow "any person" – not only a person with a disability – to seek redress for illegal disability discrimination. 42 U.S.C.A. § 12133; *McCoy*, 2006 WL 2331055, *6 (citing *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2nd Cir. 1997); *Liberty Res. Inc. v. Se. Penn. Transp. Auth.*, 155 F.Supp.2d 242, 249 (E.D. Pa. 2001)).

In *McCoy*, this Court held the grandmother and brother of a deceased inmate (who had no other surviving family) had standing to bring wrongful death and survival claims, even though they were not beneficiaries under the Texas death and survival statutes. The ADA and Rehabilitation Act provide "standing as broadly permitted by the Constitution." *McCoy*, 2006

WL 2331055, *6 (citing *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 209 (D. N.J. 2003)). In *MX Group*, the Sixth Circuit found a methadone clinic had standing to challenge city regulations on behalf of its clients, because the city's discriminatory regulations effectively "discriminated against [the clinic] because of [the clinic's] association with its clients/potential clients." 293 F.3d at 327. "[T]he regulations implementing the ADA allow entities . . . to bring a right of action because of their association or dealings with disabled persons." *Id*. at 334.

Expanded standing is especially appropriate regarding the Hutchins Unit because it is designed to be a short-term facility where inmates are typically incarcerated less than two years. It would be difficult to litigate any case for injunctive relief to judgment in less than the time period any inmate would spend at the prison. *See*, *e.g.*, *Cole*, 4:14-cv-1698 (S.D. Tex.). Conditions at the Hutchins Unit are a classic situation where the injury is capable of repetition but evading review. *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007).

But most importantly, TDCJ has already agreed to implement injunctive relief in this case to settle Plaintiffs' claims. Plaintiffs' claims for injunctive relief were settled at a mediation conducted by a federal magistrate in 2013. Ex. 44, Mediation Agreement, Appx. 612. Thus, as Plaintiffs have already received the injunctive relief they sought, Defendants' request to dismiss their claims for injunctive relief is moot. Plaintiffs are already prevailing parties on the issue of injunctive relief. TDCJ, after participating in a mediation and agreeing to reforms, should be estopped from moving to dismiss Plaintiffs' claims on summary judgment as Plaintiffs have already prevailed on them.

VII.   **PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES AS THE FACT ISSUES PRECLUDING SUMMARY JUDGMENT ALSO SUPPORT CLAIMS FOR PUNITIVE DAMAGES**

A number of Circuits have held that a finding of deliberate indifference in a § 1983 case will support an award of punitive damages, as the standards for culpability in each instance are essentially the same:

> Defendants next criticize the district court's instructions regarding punitive damages. Such damages are available in §1983 actions for conduct that involves "reckless or callous indifference to the federally protected rights of others," as well as for conduct motivated by evil intent. Defendants' contention that there was insufficient evidence to establish willfulness or malice is thus irrelevant. The callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the §1983 claim; the propriety of a guilty verdict on the latter thus supports the punitive damage award as well.

*Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (citations omitted); *accord Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir. 1992); *Walsh v. Mellas*, 837 F.2d 789, 801-2 (7th Cir. 1988).

The Fifth Circuit appears to have reached the same conclusion. The Fifth Circuit applies the same "reckless or callous indifference" standard for punitive damages employed by the Circuits cited above. *See, e.g., Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir. 2003). In the recent case of *Lamb v. Mendoza*, 478 Fed. Appx. 854 (5th Cir. 2012), a civil rights plaintiff argued that he had met the evidentiary predicate for a punitive damage award because his evidence proved Defendants' deliberate indifference to constitutional rights – the rationale of the cases cited above. Though the Fifth Circuit ultimately decided the plaintiff failed to establish proximate cause (and thus was not entitled to any damages), the discussion of the punitive damage standard establishes the Fifth Circuit concurs conceptually with the Fourth, Sixth, and Seventh. *Id.* at 857. Although the Fifth Circuit did not address the question directly, the Court's tacit reasoning suggests that it would adopt the majority view of the Circuits cited above. And

even if the standards were different in the Fifth Circuit, Plaintiffs' evidence – at least at the summary judgment stage when viewed in the light most favorable to the Plaintiffs –satisfies the "callous or reckless indifference" standard under any reasonable interpretation of the phrase.

Therefore, the same fact issues above that preclude summary judgment with regard to the deliberate component of Plaintiffs' Eighth Amendment claims also preclude summary judgment on Plaintiffs' punitive damages claims against all Defendants.

### VIII.   THE TDCJ DEFENDANTS ASSERT OBJECTIONABLE EVIDENCE IN SUPPORT OF THEIR MOTION.

#### A.   The *Ruiz* Stipulations, Cody Ginsel's Testimony in *Cole*, and Adolfo Banda's death are irrelevant to this case.

The *Ruiz* Stipulations[199] are entirely irrelevant to the issues being litigated in this case. First, the *Ruiz* stipulations are not pertinent to this case in part because they include no discussion of heat, air conditioning, or heat illness, which is the primary focus of this litigation. *See also supra* at p. 93. Second, the *Ruiz* litigation was decided several decades ago and frankly has nothing to do with the scope or subject matter of this case. Third, this Court considered and rejected a motion for summary judgment made by TDCJ in *Cole v. Livingston*, Case No. 4:14-cv-01698 (*Cole*), which put forward a similar reliance on *Ruiz*. To the extent Defendants seek to use them for any evidentiary purpose, Plaintiffs therefore respectfully request this Court strike the *Ruiz* Stipulations from the record.

---

[199] Doc. 288-8, p. 103; Doc. 288-9, pp. 1-28.

Plaintiffs also object to TDCJ's Exhibit 59, Excerpts from Testimony of Cody Ginsel at the Hearing on Preliminary Injunction and Class Certification.[200] Ginsel's testimony at the Hearing in *Cole* largely pertains to TDCJ's purported heat-related protocol in 2016. Testimony regarding TDCJ's current policies have little bearing on Mr. McCollum's death at TDCJ's Hutchins Unit in 2011, and Ginsel himself testified that he had little insight into the basis for those prior policies. Consequently, Ginsel's Exhibit 59 lacks sufficient contextual basis to serve as evidence in this case.

Defendants cite to a newspaper article regarding the death of TDCJ inmate Adolfo Banda during a 1986 summer heat wave to suggest the 1986 iteration of A.D. 10.64 "was the product of TDCJ responsiveness to inmate safety issues." Doc. 288, p. 12, n.4. Defendants have provided no testimony to substantiate their supposition, nor any evidence that TDCJ was effectively tracking inmate illness at the time to provide any context. Whether or not TDCJ promulgated the "Temperature Extremes in the Workplace" policy in response to Mr. Banda's death, the article makes one thing certain: Defendants have known exposure to sweltering summer temperatures can kill Texas prisoners since at least 1986, which is over ten years before Defendants began building the Hutchins Unit, and a quarter-century before Mr. McCollum died as a result of Defendants' indifference to the danger such extreme temperatures posed to his life. But the isolation of the evidence, and the late date of its disclosure, mean it should not be considered by this Court.

---

[200] Doc. 288-38, pp. 46-57.

**B. Defendants did not disclose John Nielsen-Gammon as an expert in this case.**

Plaintiffs object to Exhibit 37, Affidavit of John Nielsen-Gammon,[201] a climatologist who is offering an expert opinion, because Defendants never disclosed him as an expert in this case. Under Rule 26(a)(2)(D), a party must disclose expert witnesses "at the times and in the sequence that the court orders." FED. R. CIV. P. 26(2)(D). Defendants were required to disclose their experts in this case years ago – on February 19, 2014 (Doc. 133) – and this Court rejected their attempts to move the deadline. *See* Ex. 33, *Cole v. Livingston*, Doc. 383, p. 47:1-2, Appx. 333 ("There will be no new designation of experts."). Nielsen-Gammon's report is therefore inadmissible because Defendants did not timely identify him as an expert or timely disclose his report, or the materials it relies upon and references, in relation to this case. *See Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004) (finding the trial court did not abuse its discretion in barring an expert witness because the plaintiff failed to timely identify her as required by Rule 26).

The Court should strike Nielsen-Gammon's late, unsupported declaration in its entirety.[202]

**C. The Facts Timeline is improper summary judgment evidence by reason of hearsay and unreliability.**

Similarly, Exhibit 77, Facts Timeline,[203] is not actual evidence but rather appears to be Defendants' counsel's own un-sworn creation. As a matter of substance, Exhibit 77 is at best a

---

[201] Doc. 288-24, pgs. 28-34.

[202] Plaintiffs reserve the right to seek full disclosures, designate rebuttal experts, and seek related written discovery if Nielsen-Gammon's untimely declaration is admitted.

biased summary. At worst, portions are misleading, vague, and incomplete. The person who produced the timeline presumably lacks personal knowledge of the events, and it is unauthenticated.

Consequently, the Facts Timeline is inadmissible as unauthenticated hearsay.

### D. Defendants did not append complete versions of the document provided as Exhibit 74.

Plaintiffs object to the incompleteness of Defendant's Exhibit 74, Relevant Data from the Department of Housing and Urban Development. Exhibit 74 is incomplete as to the section on Thermal Environment and appears to include an outdated version of the section on Air Quality Standards. Plaintiffs have included the complete and most up-to-date versions of the relevant attachments, and ask the Court to exclude Defendant's version of the exhibit under the rule of optional completeness. Ex. 130, HUD, HOUSING CHOICE VOUCHER PROGRAM GUIDEBOOK, Chapter 10 "Housing Quality Standards" (last accessed Sept. 6, 2016), *available at* http://www.hud.gov/offices/adm/hudclips/guidebooks/7420.10G/7420g10GUID.pdf, Appx. 1974-2021.

### IX.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions for summary judgment.

Dated: September 7, 2016.

---

[203] Doc. 288-39 to 288-40, pgs. 2-5.

Respectfully submitted,

EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
      Tel.   512-623-7727
      Fax.   512-623-7729

By     /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-Charge
Scott Medlock
State Bar No. 24044783
David James
State Bar No. 24092572
Federal ID No. 2496580

Michael Singley
Texas Bar No. 00794642

THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Rd., Ste. O-3
Austin, Texas 78759
      Tel.   (512) 334-4302
      Fax.   (512) 727-3365

Abigail Frank
Texas Bar No. 24069732
Southern District No. 1076613
Wayne Krause Yang
State Bar No. 24032644
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr.
Austin, TX 78751
      Tel.   (512) 474-5073
      Fax.   (512) 474-0726

Wallis Nader
Texas Bar No. 24092884
Southern District No. 2609150

TEXAS CIVIL RIGHTS PROJECT—
HOUSTON
2006 Wheeler Ave
Houston, TX 77004
      Tel.    (832) 767-3650
      Fax.   (832) 554-9981

Eliot Shavin
State Bar No. 18138200
2600 State Street
Dallas, Texas 75204
214-522-2010 (telephone)
214-720-9594 (fax)
Local Counsel

ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

By     /s/ Jeff Edwards
JEFF EDWARDS