UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 30

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 1 of 15)

Patient Account:  20005972-517
Med. Rec. No.: (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:  60 YRS  DOB:  ▅▅▅▅  Sex: M  Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted :   09/02/11   0753
Copies to :

**UTMB**
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-0504
Fax (409) 772-5883

**Pathology Report**

159  3395

**FINAL AUTOPSY REPORT**
Autopsy Office (409)772-2858

**Autopsy No.:  AU-11-00184**

**AUTOPSY INFORMATION:**
Occupation: INMATE       Birthplace: UNKNOWN       Residence: TEXAS
Date/Time of Death: 9/1/2011  03:59       Date/Time of Autopsy: 9/2/2011
Pathologist/Resident: ARONSON/MANGLIK       Service: TDC CONTRACT
Restriction: NONE

***
The on-line version of the final autopsy report is abbreviated.  If you would
like a copy of the complete final report, or if you have any questions
regarding this report, please contact the Autopsy Division Office,
(409)772-2858.
***

### FINAL AUTOPSY DIAGNOSIS

I.   Heart:  Arrhythmogenic right ventricular cardiomyopathy       A1,A2
     A.   Lungs:  Congestion and edema                             A4
     B.   Brain:  Cerebral edema, mild                             A4
     C.   Head and neck:  Congestion, marked                       A4
     D.   Ribs:  Multiple fractures (status post CPR)              A4

II.  Cardiovascular system:  Atherosclerosis                       A5
     A.   Heart:  Cardiomegaly due to left ventricular hypertrophy A5
     B.   Kidneys:  Benign nephrosclerosis                         A5
     C.   Brain, basal ganglia:  Small vessel disease (arteriolosclerosis) A5
     D.   Aorta: Atherosclerosis, mild                             A5
     E.   Coronary arteries:  Mild calcific atherosclerosis        A5
     F.   Cerebral arteries:  Mild focal atherosclerosis           A4

III. Other findings:
     A. Liver: Cirrhosis (hepatitis C)                             A5
     B. Prostate:  Chronic prostatitis                             A5
     C. Ileum:  Meckel diverticulum                                A5
     D. Cerebral ventricles:  Moderate dilation


CAUSE OF DEATH:  Arrhythmogenic right ventricular dysplasia
MANNER OF DEATH:  Natural


RECEIVED

DEC 2 8 2011 C~

COPIED AND SENT
***TYPE:  Anatomic(A) or Clinical(C) Diagnosis.
IMPORTANCE:  1-immediate cause of death (COD); 2-underlying COD;
3-contributory COD; 4-concomitant, significant; 5-incidental ***

Patient Name:    **BOGGUS, JAMES**
Patient Location:  **AUTOPSY**
Room/Bed:
Printed Date / Time:   12/21/11 - 1542

Page: 1

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif <u>printed by mivap.</u> (Page 2 of 15)

Patient Account: 20005972-517
Med. Rec. No.: (0150)519447P
Patient Name: **BOGGUS, JAMES**
Age: 60 YRS   DOB:   ▮▮▮   Sex: M   Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 09/02/11   0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5883

**Pathology Report**



FINAL AUTOPSY REPORT
Autopsy Office (409)772-2858

Autopsy No.: AU-11-00184

### CLINICAL SUMMARY:

The following summary is based on information obtained from medical records
and provided by Investigator Slater, OIG.   Photographs of the scene
and of re-enactments of the position of the decedent were also reviewed.

The decedent is a 60 year old Caucasian male with history of hepatitis C,
gastroesophageal reflux disease (GERD),  hypothyroidism, hypertension, and
bipolar disorder. His medications were fluoxetine, Nortriptyline, Ranitidine
and Diphenhydramine. He had past social history of alcoholism, drug abuse and
smoking.

Approximately one week prior to his death, he was admitted to Palestine
Regional Hospital on 8/24 for treatment of heat exhaustion.

On 8/31/2011, the day prior to death, he had an episode of dizziness and
weakness during medical examination.  Vital signs at that time included BP
156/90, rectal temperature 101F. He was given water and his usual
medications. Later that evening, between 12:30 and 1:00 am, the offender
complained of being hot and he took a shower.  After the shower, he was noted
to be talking incoherently and acting strangely.  Body temperature was not
recorded at this time.  Per telephone triage at 03:00, the nurse practitioner
instructed the officer to bring the patient to Beto unit for further
evaluation.  The patient was placed in a van, handcuffed, seated on a bench,
with an upright mattress separating him from the wire cage wall in the back of
the van.  After a short ride to the gate of Beto unit, he was seen at 03:50 to
be lying on his back on the bench with his feet toward the door, breathing,
but not responding to questions.  The gate was closed, the van proceeded 400
yards, and the back of the van was opened. At this time (03:51), the officers
that first opened the door noted that the offender was unresponsive, not
breathing, on his back on the bench with his left shoulder against the
mattress.  As the officer entered the back of the van to extract the patient,
the body slid  downward toward the floor and became wedged between the bench
and the mattress.  When the nurse arrived he was wedged between the bench and
the mattress, and it took about 7 minutes to remove him from the van.  CPR was
started at 03:58 and no shock was advised as per AED. EMS arrived at 04:37.
CPR was stopped and he was pronounced dead at 04:41 on 9/1/2011.  A complete
autopsy was performed on 9/2/2011.

NM /da
09/12/11

Patient Name:  **BOGGUS, JAMES**
Patient Location: **AUTOPSY**
Room/Bed:            -
Printed Date / Time:  12/21/11 - 1542           Page:  2

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 3 of 15)

Patient Account: 20005972-517
Med. Rec. No.: (0150)519447P
Patient Name: **BOGGUS, JAMES**
Age: 60 YRS  DOB: ▮▮▮▮  Sex: M  Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted:  09/02/11  0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5583

**Pathology Report**


FINAL AUTOPSY REPORT

Autopsy Office (409)772-2858

**Autopsy No.:  AU-11-00184**

### GROSS DESCRIPTION:

EXTERNAL EXAMINATION:  The decedent, identified by wrist bracelets as "Boggus James", is an obese, well-developed, Caucasian/ white male, measuring 178 cm in length. The general appearance is consistent with the reported age of 60 years.   The body is clad in drawers only. There is no personal belonging accompanying the body. Rigor mortis is present in the legs, arms.  The head, face, neck, and upper chest show pronounced purple congestion.   Skin turgor appears normal.

The head is normocephalic with short black hair. The irides are brown with equal pupils measuring 0.3 cm in diameter.  The corneas are transparent, the conjunctivae and the sclerae are normal. Bilateral arcus senilis is present. The nares are patent.  Dentition is poor and buccal membranes are unremarkable. The trachea is midline.  Palpation of the neck reveals no lymphadenopathy or thyromegaly.

Body hair distribution is normal male.  The chest diameters are normally proportioned. The abdomen is protuberant.  Lymph nodes in the supraclavicular, axillary and inguinal regions are not palpable. The genitalia are normal uncircumcised male for the age. The back is normal. The finger and toe nails are unremarkable. There are abrasions around bilateral elbows, right shin and medial side of left great toe.

The following evidence of medical intervention is present:  An oropharyngeal airway, EKG pads and defibrillator pads are identified in proper locations.

The following marks and scars are present:  A 8 cm well healed scar on right lower abdomen is identified.

INTERNAL EXAMINATION:  The body is opened using a standard Y incision, to reveal a 3.4 cm thick panniculus and the thoracic and abdominal organs in the normal anatomic positions. The left and right pleural cavities contain approximately 7-10 cc of fluid.  The pericardial sac contains 5 cc of fluid. No thromboemboli are found in the large pulmonary arteries.

The abdominal cavity contains 50 cc of fluid. Umbilical hernia with omentum in hernia sac is noted. There are no peritoneal adhesions.

There are fractures of ribs 6, 7, 8 on the right and 5, 6, 7 ribs on the left, anteriorly.

CARDIOVASCULAR SYSTEM:  Heart:  The heart weighs 590 gm (normal male 270-360). The pericardium is smooth and glistening. The coronary arteries show some calcifications. The heart is examined by cross sections through the ventricles and opened following the flow of blood. The endocardium is normal. The left ventricular wall is 1.6 cm thick (normal 1.0-1.8 cm) at the junction of the

Patient Name:  **BOGGUS, JAMES**
Patient Location:  **AUTOPSY**
Room/Bed:  -
Printed Date / Time:  12/21/11 - 1542

Page:  3

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 4 of 15)

Patient Account: 20005972-517
Med. Rec. No.: (0150)519447P
Patient Name: **BOGGUS, JAMES**
Age:  60 YRS   DOB:  ███████  Sex: M   Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted:   09/02/11   0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5883

**Pathology Report**


**FINAL AUTOPSY REPORT**

Autopsy Office (409)772-2858

Autopsy No.: AU-11-00184

## GROSS DESCRIPTION:

posterior papillary muscle and free wall. The right ventricle wall is 0.4 cm thick (normal 0.25-0.3 cm) 2 cm below the pulmonic valve annulus. There is extensive infiltration of the right ventricular free wall by adipose tissue, with nearly full thickness replacement by fat in areas, especially near the apex, where the myocardium measures less than 0.1 cm in thickness.

The valves are all grossly unremarkable.  Valve circumferences measured on the fresh heart are: tricuspid valve 13.5 cm (normal 12-13 cm), pulmonic valve 10 cm (normal 8.5-9.0 cm), mitral valve 11.5 cm (normal 10.5-11.0 cm), and aortic valve 8.0 cm (normal 7.7-8.0 cm).  The foramen ovale is closed.

Blood vessels:  The coronary circulation is left dominant (based on the origin of the posterior descending artery).  The coronary arteries reveals mild to moderate 3 vessels atherosclerosis with up to 30-40% stenosis in right coronary artery (RCA) 1cm from origin, 50-60% stenosis in left anterior descending (LAD) 2.5 cm from the origin and up to 30% stenosis in left circumflex 0.5 cm from origin.  There is no evidence of hemorrhage or rupture of the plaques.

The aorta exhibits mild atherosclerosis. The celiac, superior and inferior mesenteric, renal arteries are normal. The superior and inferior vena cavae and their branches are normal. The portal vein is normal.

RESPIRATORY SYSTEM:  Larynx and trachea:  The tracheal mucosa shows a demarcated area of congestion.   The laryngeal mucosa and the vocal cords are normal.

Lungs:  The right lung weighs 690 gm (normal male 435), and the left 600 gm (normal male 385). The pleural surfaces are normal. The left lung is distended with formalin before sectioning and right lung is examined unfixed.   The bronchial and vascular trees are normal. The lung parenchyma is normal with slight congestion. The hilar nodes are normal.

GASTROINTESTINAL TRACT: Esophagus:  The mucosa is unremarkable. The esophagus is firmly anchored to the diaphragm.

Tongue:  The tongue has a finely granular surface and show small areas of hemorrhage anteriorly.

Stomach and duodenum:  The stomach mucosa is unremarkable with normal rugosity. Stomach and duodenum contain 500 ml of chyme.

The duodenal mucosa is unremarkable.

Pancreas: The pancreas has a normal conformation. It is gray-pink, normally

Patient Name:  *BOGGUS, JAMES*
Patient Location: *AUTOPSY*
Room/Bed:   -
Printed Date / Time:   *12/21/11 - 1542*

Continued....

Page:  4

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 5 of 15)

Patient Account:  20005972-517
Med. Rec. No.: (0150)519447P
Patient :  **BOGGUS, JAMES**
Age:  60 YRS  DOB: ▊▊▊▊  Sex: M   Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted :  09/02/11   0753
Copies to :

**UTMB**
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5883

**Pathology Report**


**FINAL AUTOPSY REPORT**
Autopsy Office (409)772-2858

Autopsy No.:  **AU-11-00184**

### GROSS DESCRIPTION:

lobulated and firm.  The pancreatic duct is patent.

Biliary tract:   The gallbladder serosa is gray-green and glistening.  The gallbladder contains 30 ml of green bile. The mucosa is green. The wall measures up to 0.1 mm thick, and is unremarkable.  The cystic duct, hepatic duct, and common duct are normal, and bile is expressed freely from the ampulla on compressing the gallbladder.

Liver:  The liver weighs 1300 gm (normal male 1400-1900).  The liver surface is nodular. Glisson's capsule is opaque and glistening.  The liver is serially sliced to reveal diffuse macro- and micro - nodularity.  No masses are seen. Small Bowel: The serosa is smooth, transparent with no adhesions.  The bowel is normal throughout.  The lumen contains fecal material.  The wall is 0.1 cm thick.  The mucosa is normal. There is a Meckel's diverticulum  located 165 cm proximal to the ileocecal valve.  The mucosa within the diverticulum is normal, with no solid areas or nodules present.

Large bowel:  The serosa is transparent. The wall is 0.2 cm thick.

Rectum and anus:   The rectum and anus are normal.

Reticulo-Endothelial System:  Spleen:  The spleen weighs 190 gm (normal 125-195 gm). The cut surface showed unremarkable parenchyma.

Lymph nodes:  Lymph nodes in the mediastinum, abdomen and retroperitoneum are unremarkable.

Spine:  The spine is normal.

Bone marrow: The thoracic and lumbar spine marrow is grossly normal. The trabeculae and cortical bone are normal density.

GENITO-URINARY SYSTEM:  Kidneys:  The right kidney weighs 170 gm and the left 190 gm (normal male 125-170 gm).  The capsules strip with ease to reveal shallow ill-defined cortical scarring.  Serial slicing reveals poorly demarcated cortico-medullary junctions. The cortices are 0.3-0.8 cm thick; the medullas 1.2-1.8 cm thick.  The pelves and calyces are normal. Renal pelvic mucosa is normal.

Ureters:  The ureters are normal throughout their length, measuring 0.2 mm in maximal external diameter.   They are probe-patent into the bladder.

Bladder:  The bladder is mildly trabeculated. The trigone is normal.

Prostate:  The prostate is normal in size with some calculi in the parenchyma

Patient Name:  **BOGGUS, JAMES**
Patient Location:  **AUTOPSY**
Room/Bed:   .
Printed Date / Time:  12/21/11 - 1542

Page:  5

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 6 of 15)

Patient Account:  20005972-517
Med. Rec. No.:  (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:  60 YRS   DOB: ▆▆▆   Sex: M   Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted:   09/02/11   0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5883

**Pathology Report**


FINAL AUTOPSY REPORT
Autopsy Office (409)772-2858

Autopsy No.:  **AU-11-00184**

**GROSS DESCRIPTION:**
ranging in size from 0.1 to 0.2 cm. The seminal vesicles are normal.

Testes:  The right testis weighs  23 gm, and the left 29 gm (normal 20-25 gm).  The tunica albuginea are tan-white, smooth and glistening.  The cut surfaces are soft and tan-yellow, with tubules which string with ease.

ENDOCRINE SYSTEM:  Thyroid:  The thyroid weighs 27 gm (normal 10-22 gm), and is red-brown, bosselated and glistening.  The cut surface is homogenous red brown.

Adrenals:  The right adrenal weighs 7.0 gm and the left 11 gm (normal 5-6 gm).  The adrenals have a normal conformation and position.  Serial slicing in the transverse plane reveals autolyzed golden cortices, with gray soft medullae. Serial slicing in the transverse plane reveals no lesion.

BRAIN AND SPINAL CORD:   The scalp, calvarium, base of the skull and dura mater are normal. The brain weighs 1450 gm (normal male 1200-1400). The gyri and sulci display a normal pattern without edema or atrophy. The circle of Willis, basilar and vertebral arteries show mild atherosclerosis.  No indentation/herniation of the cingulate gyri, unci or molding of the cerebellar tonsils is noted. The brain is fixed in formalin for later examination by a neuropathologist (see neuropathology report).

SPINAL CORD:   The grossly normal spinal cord is fixed in formalin for later examination by a neuropathologist.

PITUITARY GLAND:   The grossly normal pituitary gland is fixed in formalin for subsequent examination by a neuropathologist.

Samples of liver, kidney, heart, lung, spleen were frozen for potential further examination.


NM /da
09/12/11

Patient Name:  *BOGGUS, JAMES*
Patient Location: *AUTOPSY*
Room/Bed:              -
Printed Date / Time:  *12/21/11 - 1542*        *Page:  6*

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 7 of 15)

Patient Account:  20005972-517
Med. Rec. No.:  (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:  60 YRS  DOB:  ▮▮▮▮  Sex: M  Race: C
Admitting Dr.:  OUTSIDE TDCJ
Attending Dr.:  OUTSIDE TDCJ
Date/Time Admitted:  09/02/11  0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**


FINAL AUTOPSY REPORT
Autopsy Office (409)772-2858

Autopsy No.:  AU-11-00184

**MICROSCOPIC DESCRIPTION:**

HEART, Ventricles left and right, Slides 15- 17(left), 18 (septum), 19, 20, 21(Right), (7 H & E, 2 Masson trichrome): The sections from heart show replacement of myocardial cells with fibrofatty tissue starting from subepicardium and extending to the endocardium in few areas in right ventricle.The left ventricle and interventricular septum showed similar fibrofatty replacement without full wall thickness. No inflammatory infiltrate is seen. The finding are consistent with arrythmogenic right ventricular dysplasia / cardiomyopathy.

HEART, Conduction system, SA (slides 28-33) and AV (slides 34-37) node, (10 H&E): The SA and AV node fibers show normal histology without significant infiltration by fat, inflammation or acute changes.

CORONARY ARTERY, left anterior descending, Slide 2, (1 H&E): Sections show up to 60% stenosis by an eccentric atheromatous plaque. No acute plaque changes, such as rupture of or hemorrhage into the plaque, are seen.

CORONARY ARTERY, left circumflex, Slide 3, (1 H&E): Sections show up to 30% stenosis by a concentric atheromatous plaque. No acute plaque changes, such as rupture of or hemorrhage into the plaque, are seen.

CORONARY ARTERY, right, Slide 1, (1 H&E): Sections show 50% stenosis by an eccentric atheromatous plaque. No acute plaque changes, such as rupture of or hemorrhage into the plaque, are seen.

LIVER, slide 4 (1 H&E): The tissue is poorly preserved. Advanced autolytic changes include gas bubbles due to post-mortem bacterial action. There is micro and macro nodular cirrhosis with moderately dense lympho-plasmacytic infiltrate in fibrous septa and extensive macrovesicular steatosis., SPLEEN, Slide 5, (1H&E): There is extensive autolysis but no discernible pathologic change.

KIDNEY, left (slides 8-9) and right (slides 6-7) (4 H&E): Sections show areas with  globally sclerosed glomeruli, tubular atrophy, thyroidization of tubules, moderate chronic interstitial inflammation corresponding to overlying cortical scars. Intimal thickening of arteries is prominent and hyaline arteriolosclerosis is noted.

ADRENAL GLANDS, Slides 10, (1H&E): No pathologic change is identified.

PANCREAS, Slide 11, (1 H&E): Extensive autolysis precludes microscopic evaluation.

THYROID, Slide 12, (1 H&E): No pathologic change is identified.

Patient Name:  *BOGGUS, JAMES*
Patient Location:  *AUTOPSY*
Room/Bed:
Printed Date/Time:  12/21/11 - 1542

Page:  7

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 8 of 15)

Patient Account: 20005972-517
Med. Rec. No.: (0150)519447P
Patient Name: **BOGGUS, JAMES**
Age: 60 YRS  DOB:          Sex: M    Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted : 09/02/11  0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**


FINAL AUTOPSY REPORT
Autopsy Office (409)772-2858

Autopsy No.: AU-11-00184

## MICROSCOPIC DESCRIPTION:

TESTIS, right, Slide 13, (1 H&E): No pathologic change is identified.  Active spermatogenesis is present.

PROSTATE, Slide 14, (1 H&E): Patchy periglandular chronic inflammatory cell infiltration is seen.

LUNGS, left and right, respectively, Slides 22, 23 and 24, (3 H&E): Sections show alveolar hemorrhage and edema.

STOMACH AND ESOPHAGUS, Slide 25, (1 H&E): No pathologic change.

JEJUNUM AND COLON, Slide 26, (1 H&E): Extensive autolysis with no pathologic change.

VERTEBRA, Slide 27, (1 H&E): Trilineage hematopoiesis is present.  The overall cellularity is 40-50% with a normal myeloid to erythroid ratio (3:1) and normal maturation in all three lineage.

SKELETAL MUSCLE, slide 38 (1 H&E): There is no evidence of myofiber degeneration or necrosis.

POST-MORTEM LABORATORY TESTS:

TOXICOLOGY, performed on post-mortem heart blood by Aegis Sciences Corp.
Alcohol, volatiles: Negative
Acetaminophen:  None detected
Amphetamines:  None detected
CNS stimulants:  None detected
Barbiturates:  None detected
Carisoprodol/meprobamate:  None detected
 Methodone:  None detected
Benzodiazepines:  None detected
Cannabinoids:  None detected
Cocaine metabolites:  None detected
Opiates:  None detected
Meperidine:  None detected
Fentanyl analogues:  None detected
Pentazocine:  None detected
Phenothiazines:  None detected
Salicylates:  None detected
Tricyclic antidepressants:  Positive
     Nortryptiline:  Positive, 791 ng/mL
Atypical antidepressants:  Positive
     Fluoxetine:  Positive, 810 ng/mL

Patient Name: **BOGGUS, JAMES**
Patient Location: **AUTOPSY**
Room/Bed: -
Printed Date / Time: 12/21/11 - 1542

Page: 8

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 9 of 15)

Patient Account: 20005972-517
Med. Rec. No.: (0150)519447P
Patient Name: **BOGGUS, JAMES**
Age: 60 YRS   DOB:        Sex: M    Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 09/02/11  0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**


Autopsy Office (409)772-2858

Autopsy No.: AU-11-00184

**MICROSCOPIC DESCRIPTION:**
    Desmethylfluoxetine:  Positive, 740 ng/mL
    Antipsychotics:  None detected
    Diphenhydramine:  Cancelled due to insufficient sample quantity


    VITREOUS ELECTROLYTES (performed at UTMB Laboratories):
    291 mOsm/kg
    Na, K, Cl, Urea nitrogen:  Cancelled due to inadequate sample quality

    NM /da
    11/07/11

Patient Name: **BOGGUS, JAMES**
Patient Location: **AUTOPSY**
Room/Bed:     .
Printed Date / Time: **12/21/11 - 1542**

Page: 9

Continued....

c:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 10 of 15)

Patient Account:  20005972-517
Med. Rec. No.:  (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:  60 YRS   DOB: ▓▓▓▓   Sex: M   Race: C
Admitting Dr.:  OUTSIDE TDCJ
Attending Dr.:  OUTSIDE TDCJ
Date/Time Admitted:  09/02/11  0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**



Neuropath Office  (409)772-2881

Autopsy No.: AU-11-00184

**CLINICAL HISTORY:**
   The decedent is a 60 year old man with past medical history of hepatitis C,
hypothyroidism, and hypertension.  In the days prior to his death, he suffered
episodes of hyperthermia and was briefly admitted to Palestine Regional
Hospital on 8/24 for treatment of heat exhaustion.  On 9/1/2011 at 03:00, he
was noted by guards to be "acting strange" and somewhat sluggish.  There were
no notations about his temperature.  He was transferred to a van for transport,
and en route he suffered an arrest at 03:58.  CPR was initiated and no shock
was advised per AED.  He could not be resuscitated and was pronounced dead
after approximately an hour of CPR.  A complete autopsy was performed on
9/2/2011.

   Autopsy revealed an enlarged heart with fatty infiltration of the right and
left ventricular myocardium and a very thin right ventricle.  The coronary
arteries showed only mild to moderate atherosclerosis.  There was no acute
myocardial infarct noted. Determination of the cause and manner of death are
pending additional studies, including toxicology, biochemistry,  (to evaluate
for possible heat related death), histologic examination, and additional scene
information.

   Pathologist/Resident: Aronson/Manglik


**GROSS DESCRIPTION:**
   Submitted for neuropathologic examination are brain (unfixed weight 1450 g),
convexity and posterior fossa dura, spinal cord with spinal dura (length 33
cm, conus medullaris and filum terminale present), and pituitary gland.

   The dura is grossly unremarkable. There is no evidence of significant jaundice
staining. There is no evidence of acute hemorrhages, subdural membranes, or
masses. There is no evidence of thrombosis of the superior sagittal sinus.

   External examination reveals the brain to be intact and normally developed
with transparent convexity leptomeninges. There is no evidence of arachnoid
hemorrhage, exudate, focal softening, discoloration, atrophy, swelling or
herniation. The major cerebral arteries have mild focal atherosclerosis. The
circle of Willis has a normal symmetric pattern, and no aneurysms or other
malformations are identified.

   The hemispheres are sliced coronally, revealing normal anatomic development
and moderately dilated cerebral ventricles. The cortical ribbon is normal in
thickness and appearance, the cerebral white matter is normally myelinated,
but central structures are pink and poorly fixed. The gray-white junction is
distinct throughout. No focal lesions are identified in the hemispheres.

   The brainstem and cerebellum are separated through the cerebellar peduncles,
and the cerebellum is sliced sagittally and the brainstem transversely. Both

Patient Name:
Patient Location:
Room/Bed:
Printed Date / Ti  BOGGUS, JAMES
                   AUTOPSY                Page:

12/21/11 - 1542

:\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 11 of 15)

Patient Account: 20005972-517
Med. Rec. No.: (0150)519447P
Patient Name: **BOGGUS, JAMES**
Age: 60 YRS    DOB: ███    Sex: M    Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted : 09/02/11  0753
Copies to :

**UTMB**
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5883

**Pathology Report**


NEUROPATHOLOGY CONSULTATION
Neuropath Office (409)772-2881

Autopsy No.:  AU-11-00184

### GROSS DESCRIPTION:
structures are normally developed, and have normal pigmentation of substantia nigra and locus ceruleus. There is no evidence of gross lesions.

The spinal dura is opened anteriorly, revealing no evidence of extradural, subdural or arachnoid hemorrhage. The spinal cord is sliced transversely at 0.5 to 1 cm intervals, revealing normal development and no evidence of parenchymal lesions.

The pituitary gland is intact and normally developed, without external hemorrhages or other lesions. The horizontal cut surface reveals normal anterior and  posterior lobes, and no evidence of internal lesions.

Photographs made during gross brain examination: none.

DICTATED BY: GERALD A. CAMPBELL, M.D., PATHOLOGIST
09/16/11

### SECTIONS TAKEN:
B1: Pituitary gland; B2: Right frontal, area 8; B3: Right basal ganglia; B4: Right hippocampus; B5: Right cerebellum.

### FINAL DIAGNOSES:
A. Brain and cranial dura (weight 1450 g):
   1. Cerebral arteries, major: Mild focal atherosclerosis
   2. Basal ganglia: Small vessel disease (arteriolosclerosis), moderate
   2. Cerebral ventricles: Moderate dilation
   3. Deep white and gray structures: Poor fixation, suggestive of mild edema

  B. Spinal cord and spinal dura (33 cm caudal segment): No abnormalities

  C. Pituitary gland: No abnormalities

### COMMENTS:
Small vessel disease in this context refers to medial thickening and/or hyalinization of small parenchymal arteries and arterioles, and in some cases increased adventitial collagen of small veins and venules.

\*\*\*
The on-line version of the final autopsy report is abbreviated.  If you would like a copy of the complete final report, or if you have any questions regarding this report, please contact the Autopsy Division Office, (409)772-2858.

Patient Name:
Patient Location:
Room/Bed:
Printed Date / Time: BOGGUS, JAMES
       AUTOPSY       Page:

12/21/11 - 1542

::\documents and settings\dcmcmill\local settings\temp\172402750.tif printed by mivap. (Page 12 of 15)

Patient Account:  20005972-517
Med. Rec. No.: (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:   60 YRS   *DOB:* ▮▮▮▮▮▮   *Sex:* M   *Race:* C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted :   09/02/11  0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**

NEUROPATHOLOGY CONSULTATION
Neuropath Office (409)772-2881

Autopsy No.:  AU-11-00184

**COMMENTS:**
 ***

GERALD A. CAMPBELL, M.D., PATHOLOGIST
Division of Neuropathology .

Patient Name:
Patient Location:
Room/Bed:
Printed Date / Time: BOGGUS, JAMES
                    *AUTOPSY*          Page:
                       ▪
                    *12/21/11 - 1542*

Patient Account:   20005972-517
Med. Rec. No.: (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:   60 YRS   DOB:             Sex: M      Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted :   09/02/11   0753
Copies to :

**UTMB**
**University of Texas Medical Branch**
Galveston, Texas   77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**

(Electronic Signature).

**Gross:**  09/16/11
**Final:**   09/23/11

Patient Name:
Patient Location:
Room/Bed:
Printed Date / Time: *BOGGUS, JAMES*
                     *AUTOPSY*        Page:

*12/21/11 - 1542*

Patient Account:  20005972-517
Med. Rec. No.: (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:   60 YRS   DOB:                 Sex: M     Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted :    09/02/11   0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5663

**Pathology Report**


FINAL AUTOPSY REPORT
Autopsy Office (409)772-2858

Autopsy No.:  AU-11-00184

### CLINICOPATHOLOGIC CORRELATION:

This 60 year old offender with a history of bipolar disease, chronic hepatitis C and hypertension, died suddenly while en route to a medical unit for treatment of altered mental status. A few days prior to death, he had been hospitalized for heat exhaustion.

Autopsy revealed a major unexpected finding in the heart; there was extensive infiltration of the right ventricular myocardium by adipose tissue, with focal full thickness replacement of the ventricular free wall by fat. The pattern and distribution of fat infiltration is characteristic of arrythmogenic right ventricular cardiomyopathy. This pathologic picture is thought to represent a progressive degeneration of myofibers with replacement by fat and scar. The cause of ARVC is not known, but genetic studies suggest that abnormalities of proteins associated with desmosomes may be responsible in some kindreds. The most typical clinical manifestation is arrhythmia; ARVC is a known cause of sudden death in athletes. In the present case, we believe ARVC to be the underlying cause of death.

Post-mortem toxicology was negative for drugs of abuse. Levels of tricyclic antidepressants and atypical antidepressants were not in the lethal range, especially when accounting for post-mortem redistribution of drug. These medications were prescribed to the decedent.

The initial descriptions of the scene suggested the possibility of positional asphyxia, however, further investigative information weighs against this. We also considered the possibility of environmental hyperthermia; however, analysis of osmolality of the vitreous fluid did not suggest dehydration, and in the absence of information regarding body temperature, there is insufficient suport for this diagnosis.

It is our judgment that it is the underlying heart disease (ARVC) that caused his death. The additional factors of heat stress and treatment with antidepressants (drugs that can affect cardiac conduction and heat dissipation) cannot be ruled out.

Incidental findings included cirrhosis due to chronic hepatitis C, and vascular changes in various organs attributed to hypertension.

In summary, it is our opinion that the cause of death is arrhythmia due to arrhythmogenic right ventricular cardiomyopathy. The manner of death is natural. Family members should be aware that this condition can be hereditary.

Patient Name:  BOGGUS, JAMES
Patient Location: AUTOPSY
Room/Bed:            -
Printed Date / Time:  12/21/11 - 1542

Page:  10

Continued....

Patient Account:  20005972-517
Med. Rec. No.: (0150)519447P
Patient Name:  **BOGGUS, JAMES**
Age:   60 YRS   DOB: ███████   Sex: M   Race: C
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted :   09/02/11   0753
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas  77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**

**FINAL AUTOPSY REPORT**
Autopsy Office (409)772-2858

Autopsy No.:  AU-11-00184

**CLINICOPATHOLOGIC CORRELATION:**
Reference:

Thiene G, Corrado D, and C Basso.  Arrhythmogenic right ventricular
cardiomyopathy/dysplasia.  Orphanet Journal of Rare Diseases, 2007 2:45

JA /JA
12/21/11

JUDITH F. ARONSON, M.D., PATHOLOGIST          (Electronic Signature)

12/21/11

Patient Name:  *BOGGUS, JAMES*
Patient Location: AUTOPSY
Room/Bed:          -
Printed Date / Time:   *12/21/11 - 1542*

Page:  11

**END OF REPORT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 31

<pre>
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION

 3   DAVID BAILEY, ET AL          *    4:14-CV-01698
                                  *
 4   VS.                          *    9:05 A.M.
                                  *
 5   BRAD LIVINGSTON, ET AL       *    JUNE 2, 2016

 6   HEARING ON PRELIMINARY INJUNCTION AND CLASS CERTIFICATION
            BEFORE THE HONORABLE KEITH P. ELLISON
 7               Volume 4 of 4 Volumes

 8   APPEARANCES:

 9   FOR THE PLAINTIFFS:
     Mr. Jeffrey S. Edwards
10   Mr. Scott Charles Medlock
     Mr. David James
11   The Edwards Law Firm
     1101 East 11th Street
12   Austin, Texas 78702
     (512) 623-7727
13
     Mr. Michael Singley
14   The Singley Law Firm, PLLC
     4131 Spicewood Springs Road
15   Suite O-3
     Austin, Texas  78759
16   (512) 334-4302

17   Mr. Nathan M. Smith
     Reynolds Frizzell, LLP
18   1100 Louisiana, Suite 3500
     Houston, Texas  77002
19   (713) 485-7212

20   Ms. Wallis Anne Nader
     Texas Civil Rights Project-Houston
21   2006 Wheeler Avenue
     Houston, Texas  77004
22   (832) 767-3650

23   Mr. Sean Flammer
     Texas Attorney General
24   P.O. Box 12548
     Austin, Texas  78711-2548
25   (512) 475-4071
</pre>

```
 1                    APPEARANCES  (continued)

 2    FOR THE DEFENDANTS:
      Ms. Cynthia Burton
 3    Mr. Matthew J. Greer
      Mr. Phillip Boyd
 4    Ms. Amanda Kates
      Ms. Pat Tulinski
 5    Office of the Attorney General
      Capitol Station
 6    P.O. Box 12548
      Austin, Texas 78711-2548
 7    (512) 463-2080

 8    Ms. Sharon Felfe Howell
      Texas Department of Criminal Justice
 9    P.O. Box 4004
      Huntsville, Texas 77342-4004
10    (936) 437-2141

11    Court Reporter:
      Laura Wells, RPR, RMR, CRR
12    515 Rusk, Suite 8004
      Houston, Texas 77002
13
      Proceedings recorded by mechanical stenography.
14    Transcript produced by computer-assisted transcription.

15

16

17

18

19

20

21

22

23

24

25
```

*Laura Wells, CRR, RDR*

1                              **VOLUME 4**
     **(Hearing on Preliminary Injunction and Class Certification)**
2                                                              Page
   June 2, 2016
3
   WITNESSES                                                   Page
4
   **DEAN PAUL RIEGER, M.D., MPH**
5       Direct Examination By Mr. Boyd                           4
        Cross-Examination By Mr. Edwards                         82
6
   **KATHRYN MEANS, M.D.**
7       Direct Examination By Mr. Greer                        135
        Voir Dire Examination By Mr. Edwards                   200
8       Direct Examination By Mr. Greer                        203
        Cross-Examination By Mr. Edwards                       217
9       Redirect Examination By Mr. Greer                      257

10                                                            Page

11 Closing Statements.............................    258

12 Court Reporter's Certificate...................    261

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **PROCEEDINGS**

2                THE COURT:  Sit down everyone.

3        Okay.  It's defendants' turn to call a witness.

4                MR. BOYD:  Defendants call Dr. Dean Rieger to the

09:04:47    5    stand.

6                THE COURT:  All right.  Yes, sir.  Can you make

7    your way up here.  You probably know the drill by now.  We

8    are going to have you in the seat near me.

9        (Witness sworn by the case manager.)

09:05:01   10                THE WITNESS:  Yes.

11                THE COURT:  Please adjust the mic and speak

12    directly into it.

13        All right.  You may inquire.

14                MR. BOYD:  Thank you, Your Honor.

15                    **DEAN PAUL RIEGER, M.D., MPH**

16    having been first duly sworn, testified as follows:

17                      **DIRECT EXAMINATION**

18    BY MR. BOYD:

19    **Q.**   Doctor, could you please introduce yourself to the

09:05:37   20    Court?

21    **A.**   I'm Dean Rieger, MD, MPH.

22    **Q.**   Where are you currently employed, Dr. Rieger?

23    **A.**   I retired approximately three weeks ago.

24    **Q.**   From where did you retire?

09:05:47   25    **A.**   I retired from Correct Care Solutions.

*Laura Wells, CRR, RDR*

1    was a significant risk in TDCJ prior to 2011-2012.

2         The question of the deaths that occurred during the

3    summer of 2011 is a different issue.  So I didn't want

4    to -- I didn't want to link one to the next with such a

11:33:02  5    sequential -- with those two questions being so

6    sequential.

7    **Q.**  (By Mr. Edwards)  Then I'll just ask:  You would tell

8    me that clearly, in your opinion, TDCJ would have

9    recognized a serious risk from the heat inside its prisons

11:33:16  10   at the time in which they enacted practices or policies to

11   deal with that risk?  Is that a fair statement?

12   **A.**  Yes.

13   **Q.**  Okay.  And so, I have heard a lot throughout this case

14   about, you know, an e-mail going out with precautions.

11:33:29  15   And you have seen that, right?

16   **A.**  Yes.

17   **Q.**  And you consider that to be a practice that TDCJ has

18   had in place to deal with the risks from extreme heat,

19   right?

11:33:40  20   **A.**  I would consider that to be part of a process.  It's

21   not -- it's not a freestanding thing.  That's a reminder

22   e-mail that goes out.

23   **Q.**  I'll represent to you that Cynthia Burton, lead

24   counsel for the defendants, stated unequivocally in a

11:33:57  25   preliminary injunction hearing that that e-mail precaution

*Laura Wells, CRR, RDR*

Cross-Examination of Dean Paul Rieger

1   going out was the exact same thing for TDCJ as a policy.

2         MR. EDWARDS:  Did I misspeak, Ms. Burton?

3   **Q.**  (By Mr. Edwards)  If that's the case, would you agree

4   that -- that when those e-mail messages started going out

11:34:17   5   TDCJ would have been aware of the significant risk in its

6   facilities from heat inside?

7         MR. BOYD:  Your Honor, I'm just going to object

8   to the extent that this calls -- that he is trying to

9   elicit any sort of a legal conclusion about the

11:34:29   10   distinction between practice and policy in the law and

11   trying to get Dr. Rieger to make -- to tie him to any --

12         MR. EDWARDS:  No, I am not.

13         THE COURT:  His question is on the concept of

14   risk, which I think his attorney can speak to.  I

11:34:41   15   understand.  Obviously, I understand he is not a lawyer.

16   I do understand that.

17   **A.**   I think TDCJ was aware of the risk before they ever

18   sent an e-mail out.  The e-mail -- I haven't done a

19   side-by-side comparison between the e-mail and the policy

11:34:55   20   or between the e-mail and the UTMB policy.  I haven't done

21   any side-by-sides.

22         Accepting your representation that those e-mails

23   word-for-word match one or the other, the policy still

24   would have had to pre -- the existence of the policies

11:35:13   25   still would have preceded the e-mails.

*Laura Wells, CRR, RDR*

Cross-Examination of Dean Paul Rieger

```
         1    So I don't think it's a fair statement to say that the
         2    e-mail is the policy.  The e-mail may quote the policy;
         3    but the policy exists in advance of a reminder e-mail that
         4    goes out to say, "Wardens, it's that time of year again.
11:35:31 5    Make sure your staff is doing this.  You are expected to
         6    do this."
         7        And UTMB -- or if it goes to the UTMB people, I'm not
         8    sure.  I don't know all the recipients of the e-mails.  If
         9    that e-mail goes to UTMB and says, "Hey, remind your staff
11:35:48 10   this is going on and these are the things that you kind of
         11   expect and recognize as heat-stress injuries," do I think
         12   that's part of a heat-stress injury risk mitigation
         13   effort?  The answer is yes.
         14   Q.  (By Mr. Edwards)  Okay.  You touched on something.
11:36:01 15   You don't consider -- I guess if -- outside of the
         16   representations that Ms. Burton may have made or that have
         17   been made to this Court, you would consider the e-mail
         18   just part of an overall -- you wouldn't consider that
         19   e-mail in and of itself a policy; is that fair?
11:36:18 20   A.  To me a policy is a document which provides general
         21   directions, sometimes philosophical, sometimes
         22   informational, sometimes operational as to what a group --
         23   sometimes of facilities, sometimes a group of certain
         24   types of employees -- is expected to do in the course of
11:36:44 25   their duties.  It's a policy.
```

*Laura Wells, CRR, RDR*

1   **Q.**   Okay.  And that's important to have a policy in

2   writing that's applicable to the various facilities so

3   that everybody knows what they have to do and there isn't

4   discretion down below so that human error is minimized,

11:37:02   5   right?

6   **A.**   Well, the hope is that everyone will read,

7   incorporate, understand and apply the policy.  Policies

8   typically have associated procedures or practices

9   sometimes called in correctional environments post orders.

11:37:21   10   There are a host of types of processes for implementing

11   policy.  One would hope that whatever TDCJ uses to

12   implement policy was used in the course of implementing

13   the heat stress injury mitigation policy.

14   **Q.**   Do you know when the respite area idea was formalized

11:37:44   15   even into an e-mail?

16   **A.**   No.

17   **Q.**   You mentioned that I believe -- I want to make sure

18   I'm characterizing it correctly.  You said that the

19   inmates had testified and provided documents to you that

11:38:00   20   they had free access to these respite areas, right?

21   **A.**   No.  The inmates had given some sort of declaration

22   that I believe you guys filed.

23   **Q.**   Right.

24   **A.**   Not -- they didn't testify to me.

11:38:11   25   **Q.**   And I'm less concerned with the form of it than the

*Laura Wells, CRR, RDR*

Cross-Examination of Dean Paul Rieger

1   making the changes.  But I don't think one person would do

2   that.  I think it would be more than one person.

3   **Q.**   Sure.

4   **A.**   But in essence, yes.

01:06:09   5   **Q.**   However the system is designed, whoever is in charge,

6   whether they delegate that power or not, somebody needs to

7   look at these, investigate, evaluate, analyze and make

8   changes, if necessary, fair?

9   **A.**   That's fair.

01:06:21   10   **Q.**   Okay.  When we discussed -- I mean, this is a

11   staggering amount of heatstroke deaths, right?  These

12   are -- by the way, these are confirmed deaths by

13   hyperthermia of Texas inmates.

14   **A.**   I mean, I don't like the word "staggering."

01:06:39   15   **Q.**   That's fine.

16   **A.**   But this is certainly a significant amount of

17   heatstroke deaths during that 2011 heat wave.

18   **Q.**   I apologize.  That is the word you used in your

19   deposition.  So I will use "significant."  And I point you

01:06:50   20   to these deaths -- again, and these were -- you told me

21   that the deaths in 1998 stood out in your mind.  Do you

22   recall that?

23   **A.**   I don't recall saying that specifically, but as I look

24   at -- I see three 1998 deaths here.  I can't tell if there

01:07:12   25   is one above it, also.

*Laura Wells, CRR, RDR*

Cross-Examination of Dean Paul Rieger

1  **Q.**   I believe there are three in 1998, sir.

2  **A.**   As I look at them again, they stand out because I see

3  a psychosis-producing disorder in the diagnosis list for

4  each of the three.

01:07:33  5  **Q.**   Okay.  And what is significant about that is anybody

6  who took the time to look at this with any sort of acumen

7  or policymaking knowledge would look at that list and say,

8  look, we have a potential problem with inmates with

9  psychosis and heat, right?

01:07:53  10  **A.**   I think that's fair.

11  **Q.**   Okay.  And then if I was counting, before the summer

12  of 2011 I count eight heatstroke deaths; is that accurate?

13  **A.**   That's accurate.

14  **Q.**   Okay.  You would tell the Court that is a very

01:08:11  15  significant number of deaths that policymakers ought to be

16  looking at in evaluating and trying to make changes,

17  right?

18  **A.**   Let me say the same thing that I think I said during

19  deposition, which is that every death is significant.

01:08:24  20  Every death deserves careful examination.  So given that I

21  expect a careful mortality review to be performed after

22  each and every death, certainly the deaths are

23  significant.  I mean, I can't sit here and say, you know,

24  seven deaths aren't significant when I believe one is.

01:08:43  25  **Q.**   Okay.  And I'm not talking about kind of the tag line

Cross-Examination of Dean Paul Rieger

124

1   every death is tragic.  We care about everybody.  I assume

2   you believe that, right?

3   **A.**   I don't mean it because of that.  I mean it because

4   the reason that we do mortality reviews is very similar to

5   the reasons that hospitals used to do autopsies on almost

6   everyone.  We can learn from deaths.  We can learn how to

7   take care of our patients and improve what we do in the

8   future.  And that's why every death is important as a

9   clinician.

10   **Q.**   You are not just talking for moral reasons every death

11   is important?

12   **A.**   That's right.

13   **Q.**   You are talking about, look, every death is important

14   because -- and I quote, we -- "Administrators need to

15   respond and make changes to reduce the risk of

16   recurrence," right?

17   **A.**   That's correct.  Whoever said that must have been

18   extremely intelligent.

19   **Q.**   He was.

20   **A.**   Could you attribute that to someone?

21   **Q.**   Right now it's 50/50 which one.  So I've got a 50

22   percent chance that's it's somebody intelligent.  I think

23   you did say it.

24       And then, you also said, "It should be analyzed, the

25   deaths; and gaps in policy and practice need to be

01:08:57 (line 5)
01:09:12 (line 10)
01:09:22 (line 15)
01:09:31 (line 20)
01:09:47 (line 25)

*Laura Wells, CRR, RDR*

Proceedings

05:16:55

1        THE COURT:  It's not just that.  I'm worried

2   about you being prejudiced on appeal.

3        MR. GREER:  I think both sides want the record to

4   be clear.

5        MR. SINGLEY:  We'll get together and straighten

6   it out, Your Honor.

7        THE COURT:  All right.  Thank you very much.

8     (Proceedings concluded at 5:16 p.m.)

9   *Date: June 10, 2016*

10              ***COURT REPORTER'S CERTIFICATE***

11     *I, Laura Wells, certify that the foregoing is a*

12  *correct transcript from the record of proceedings in the*

13  *above-entitled matter.*

14

15              _____/s/ Laura Wells_____

16              *Laura Wells, CRR, RMR*

17

18

19

20

21

22

23

24

25

*Laura Wells, CRR, RDR*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 32

1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3    DAVID BAILEY, ET AL              *    4:14-CV-01698
                                      *
4    VS.                              *    9:16 a.m.
                                      *
5    BRAD LIVINGSTON, ET AL           *    MAY 26, 2016

6    HEARING ON PRELIMINARY INJUNCTION AND CLASS CERTIFICATION
              BEFORE THE HONORABLE KEITH P. ELLISON
7                   Volume 1 of 4 Volumes

8    APPEARANCES:

9    FOR THE PLAINTIFFS:
     Mr. Jeffrey S. Edwards
10   Mr. Scott Charles Medlock
     Mr. David James
11   The Edwards Law Firm
     1101 East 11th Street
12   Austin, Texas 78702
     (512) 623-7727
13
     Mr. Michael Singley
14   The Singley Law Firm, PLLC
     4131 Spicewood Springs Road
15   Suite O-3
     Austin, Texas  78759
16   (512) 334-4302

17   Mr. Nathan M. Smith
     Reynolds Frizzell, LLP
18   1100 Louisiana
     Suite 3500
19   Houston, Texas  77002
     (713) 485-7212

20
     Ms. Wallis Anne Nader
21   Texas Civil Rights Project-Houston
     2006 Wheeler Avenue
22   Houston, Texas  77004
     (832) 767-3650

23
     Mr. Sean Flammer
24   Texas Attorney General
     P.O. Box 12548
25   Austin, Texas  78711-2548
     (512) 475-4071

Laura Wells, CRR, RDR

1              **APPEARANCES (continued)**

2   **FOR THE DEFENDANTS:**
    Ms. Cynthia Burton
3   Mr. Matthew J. Greer
    Ms. Amanda M. Kates
4   Mr. Phillip P. Boyd
    Office of the Attorney General
5   Capitol Station
    P.O. Box 12548
6   Austin, Texas 78711-2548
    (512) 463-2080
7

8   Court Reporter:
    Laura Wells, RPR, RMR, CRR
9   515 Rusk, Suite 8004
    Houston, Texas 77002
10

    Proceedings recorded by mechanical stenography.
11  Transcript produced by computer-assisted transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                      *Laura Wells, CRR, RDR*

1
        **VOLUME 1**
  **(Hearing on Preliminary Injunction and Class Certification)**
2
                   Page
 May 26, 2016
3

 WITNESSES                 Page
4

**CODY GINSEL**
5
  Direct Examination By Ms. Burton    14
  Cross-Examination By Mr. Edwards   72
6

**MICHAEL HONEYCUTT**
7
  Direct Examination By Mr. Greer    133
  Cross-Examination By Mr. Edwards   168
8
  Redirect Examination By Mr. Greer   182
  Recross-Examination By Mr. Edwards  183
9

**HEIDI BOJES**
10
  Direct Examination By Mr. Greer    187
  Cross-Examination By Mr. Edwards   213
11

**BRIAN CARNEY**
12
  Direct Examination By Mr. Kammerlocher 239
  Cross-Examination By Mr. Edwards   244
13
                   Page
14
Court Reporter's Certificate..................... 250

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 323

1          MS. BURTON:  I'll pass the witness, Your Honor.

2          THE COURT:  Thank you very much.  Thank you very

3    much.

4       Your inquiry, Mr. Edwards.

11:06:46   5          MR. EDWARDS:  Thank you, Your Honor.

6                    **CROSS-EXAMINATION**

7    BY MR. EDWARDS:

8    **Q.**   Just give me one moment, please, Mr. Ginsel.

9          THE COURT:  Okay.

11:07:08  10    **A.**   Okay.

11          MR. EDWARDS:  David, you may need to help me

12   figure this out.

13   **Q.**   (By Mr. Edwards)  True or false.  Is it correct that

14   there is no formal heat wave policy at TDCJ?

11:07:37  15    **A.**   I would not agree with that characterization.

16   **Q.**   Well, tell me the document that you contend is a

17   formal heat wave policy for TDCJ.

18   **A.**   We utilize our incident command system, which is a

19   document in our emergency plan for unusual weather events.

11:08:00  20   So that would be -- for TDCJ's purposes on how to handle

21   heat-related -- and I'm assuming you are talking about

22   extended periods of heat.  Then we're going to use our

23   incident command system to manage that particular

24   situation.

11:08:15  25   **Q.**   Okay.  Just so I am clear, you are here to talk on

*Laura Wells, CRR, RDR*

1  behalf of the Texas Department of Criminal Justice,

2  correct?

3  **A.**   I'm here in my official capacity.

4  **Q.**   As the deputy director of training and policy at the

11:08:27   5  Texas Department of Criminal Justice, correct?

6  **A.**   Now, plans and operations, which has the policies that

7  relate directly to the correctional institutions division,

8  we're a proponent.  Executive services is the maintainer

9  of all policies for the agency.

11:08:44  10  **Q.**   Does the incident command policy you are referring to,

11  is that a formal directive, like an AD, administrative

12  directive, with a number?

13  **A.**   It's considered our emergency management plan,

14  Volume 4 of our emergency -- of our policies and

11:09:02  15  procedures.

16  **Q.**   Does it give any specific directives to wardens what

17  to do if there is a heat wave?

18  **A.**   Does it give specific?  It gives you direction on what

19  to do in the event of weather-related events.  And those

11:09:17  20  weather-related events may be a tornado, hurricanes.  It

21  can vary in nature.

22  **Q.**   It makes no distinction between a hurricane, a tornado

23  or a heat wave; is that fair?

24  **A.**   That would be fair.

11:09:32  25  **Q.**   Is it fair to say, then, that TDCJ acknowledges that a

*Laura Wells, CRR, RDR*

1    this proceeding.

2          THE COURT:  Okay.  Take a moment to worry about

3    that, and I'll take it up when we start tomorrow morning.

4       Anything further before we recess?

03:49:28  5    (No response.)

6          THE COURT:  Thank you all very much.

7       (Proceedings adjourned at 3:49 p.m. and continued in

8    Volume 2.)

9    Date: June 7, 2016

10                   **COURT REPORTER'S CERTIFICATE**

11       I, Laura Wells, certify that the foregoing is a

12   correct transcript from the record of proceedings in the

13   above-entitled matter.

14

15                        /s/ Laura Wells
                    _____

16                   Laura Wells, CRR, RMR

17

18

19

20

21

22

23

24

25

*Laura Wells, CRR, RDR*