UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 33

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3   DAVID BAILEY, ET AL        )        No. 4:14-CV-1698
                                )
 4                              )
     VS.                        )        Houston, Texas
 5                              )        1:31 p.m.
                                )
 6   BRAD LIVINGSTON, ET AL     )        February 12, 2016

 7


 8      *******************************************************

 9                      TELEPHONIC HEARING

10           BEFORE THE HONORABLE KEITH P. ELLISON

11               UNITED STATES DISTRICT JUDGE

12

13      *******************************************************

14   APPEARANCES:

15   (All counsel appearing telephonically.)

16   FOR THE PLAINTIFFS:

17        Mr. Jeffrey S. Edwards
          The Edwards Law Firm
18        1101 East 11th Street
          Austin, Texas  78702
19        Tel:  512-623-7727

20        Mr. Michael Singley
          The Singley Law Firm, PLLC
21        4131 Spicewood Springs Road
          Suite O-3
22        Austin, Texas  78759
          Tel:  512-917-7129
23

24

25
```

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 APPEARANCES: (CONTINUED)

2 FOR THE DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE:

3     Ms. Cynthia Burton
      Mr. Matthew J. Greer
4     Office of the Attorney General
      PO Box 12548
5     Austin, Texas  78711
      Tel:  713-463-2080
6
   FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
7
      Mr. Graig J. Alvarez
8     Fernelius Alvarez, PLLC
      1221 McKinney, Suite 3200
9     Houston, Texas  77010
      Tel:  713-654-1200
10
      Ms. J. Lee Haney
11    Ms. Shanna Elizabeth Molinare
      Office of Texas Attorney General
12    PO Box 12548
      Austin, Texas  78711
13    Tel:  512-463-2080

14
   The Court Reporter:
15
      Ms. Kathleen Miller, CSR, RMR, CRR
16    515 Rusk, Room 8004
      Houston, Texas  77002
17    Tel:  713-250-5087

18
   Proceedings recorded by mechanical stenography.
19
   Transcript produced by computer-assisted transcription.
20

21

22

23

24

25

1          MR. EDWARDS:  Your Honor, this is Jeff Edwards.

2   Could we make it clear that discovery can proceed up

3   through the class-certification hearing on the record so

4   there's no debate between TDCJ and the Plaintiffs?

01:00:15    5          THE COURT:  Well, yeah.  I thought the debate

6   was only because you thought there was going to be an

7   interlocutory appeal.

8          MR. EDWARDS:  Your Honor, with respect, if we

9   could have an order on that so there's no misunderstanding

01:00:28   10   by any party, I would appreciate it.

11          THE COURT:  Let me hear from the Defendants.

12              Any objection to that?  Discovery can go

13   forward prior to the certification hearing?

14          MS. BURTON:  Yes, Your Honor.  There's no

01:00:41   15   objection to that.

16          THE COURT:  Okay.  It's so ordered.

17              Now, don't we have to talk about McCollum

18   versus Livingston a little bit?  The Defendant is asking

19   for additional time on that.

01:00:56   20          MR. ALVAREZ:  Yes, Your Honor.  This is Greg

21   Alvarez, on behalf of UTMB.  And that is a motion that the

22   Defendants jointly filed earlier, in the last several days,

23   and that is something we have on tap as well.

24          THE COURT:  Okay.  You need to give -- I didn't

01:01:16   25   understand why Defendants need to designate new experts.

1   It's been two years since the deadline to designate.

2            MR. ALVAREZ:  Right.  And honestly, counsel for

3   UTMB were not in the case either from the Attorney

4   General's office or myself.  The same counsel were not

01:01:36   5   involved at the time.  But I think, you know, one of the

6   most, I think, logical reasons that I can see is that we

7   will want to have a full and complete trial of these

8   matters.  And one thing I do know is we will be designating

9   some additional experts in some of these other death cases.

01:02:02   10            I know that Mr. Edwards and I spoke about

11  the McCollum case and that that case could be somewhat of

12  a template for the cases to come and may be able to assist

13  in resolving everything.  So I'm saying that because what I

14  would like to try to be able to do is have a full and

01:02:27   15  complete trial of the matter, including the designation of

16  another set of experts and --

17            THE COURT:  What is the area of commonality of

18  these experts?

19            MR. ALVAREZ:  One of them is on the ADA, and

01:02:45   20  the other would be a financial or economic one, if

21  necessary.  And I can't speak for TDCJ, but that's what

22  we're looking at on behalf of UTMB.

23            And the other thing, too, is, Your Honor,

24  in this particular case, on McCollum, we've got a discovery

01:03:01   25  deadline that's just about to pass, February 19th, I

1  should have, and reinvent this case; or should it go to

2  trial as is?

3             I can't do anything about an interlocutory

4  appeal on some of the Defendants, but that doesn't mean I

01:14:11   5  can't proceed to trial on the Defendants that they don't

6  move for summary judgment on or on the ADA claims.  There

7  are some issues there, but one is the issue of new experts.

8  They've known for years.  There's no justifiable basis for

9  allowing that.

01:14:29   10             The second issue is the trial date.  We

11  think we can get it done, you know, but that is a very

12  different issue for you to decide upon.  But what would be

13  brutally unfair in light of the conduct and in light of the

14  delays would be to reset expert deadlines.

01:14:47   15             Final point as to the value of using

16  McCollum as some sort of bellwether.  I very much doubt

17  that there will be any incentive on either side to use that

18  as a bellwether, and I don't have any confidence in that

19  approach as of now, and it shouldn't be used as a

01:15:10   20  justification to delay the McCollums' day in court.

21             THE COURT:  Okay.  I'm going to take a short

22  break.  I'll be right back.

23             (Break taken from 2:38 to 2:40.)

24             THE COURT:  Okay.  I'm going to extend the

01:16:30   25  deadline for depositions by 60 days, the deadline for

1  dispositive motions by 60 days.  There will be no new

2  designation of experts.  We'll set the trial date after we

3  have a ruling on the dispositive motions.

4              Anything else we can take up today?

01:16:49  5              MR. EDWARDS:  No, Your Honor.  Thank you very

6  much.

7              THE COURT:  Let's see.  And one of you would

8  notify the appellate court that I have withdrawn?

9              MS. BURTON:  Your Honor, we will do that.  Yes,

01:17:02  10  Your Honor.

11             THE COURT:  Thank you very much.  Thank

12  you-all.

13             (Concluded at 2:40 p.m.)

14                COURT REPORTER'S CERTIFICATE

15

16     I, Kathleen K. Miller, certify that the foregoing is a

17  correct transcript from the record of proceedings in the

18  above-entitled matter.

19

20                /s/_____

21                Kathleen K. Miller, RPR, RMR, CRR

22

23

24

25

KATHLEEN MILLER, RMR, CRR  -  kathy@miller-reporting.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § |
| PLAINTIFFS | § § |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated, Plaintiffs, | § § § § § § | |
| v. | § § | No. 4:14-cv-1698 |
| BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants. | § § § § § § § | |

**DEFENDANTS' ORIGINAL ANSWER
TO PLAINTIFFS' FIRST AMENDED
CLASS ACTION COMPLAINT**

**NOW COME** Brad Livingston in his Official Capacity as the Executive Director, Robert Herrera in his Official Capacity as the Warden of Pack Unit, and the Texas Department of Criminal Justice by and through their attorneys, the Office of the Attorney General of Texas. Defendants incorporate herein by this reference and re-urge, Defendants' Motion to Dismiss Warden Herrera (Doc. No. 158) as if fully set forth herein. Defendants submit the following Original Answer to Plaintiffs' First Amended Class Action Complaint.

**I. GENERAL DENIAL**

Pursuant to FED. R. CIV. P. 8(b) and for the express purpose of requiring Plaintiffs to meet their burden of proof herein, Defendants deny each and every allegation contained in Plaintiffs' First Amended Class Action Complaint except those expressly admitted herein.

## II. DEFENDANTS' ANSWER TO
## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

1.      Plaintiffs, on behalf of themselves and those similarly situated, bring this lawsuit because the Texas Department of Criminal Justice (TDCJ) refuses to cool inmate housing areas, despite the cruel and dangerously hot indoor temperatures prisoners are forced to live in.

 **ANSWER:**

 **Defendants admit Plaintiffs bring this lawsuit but deny the remainder of the allegations set forth in ¶1 of Plaintiffs' First Amended Class Action Complaint.**

2.      TDCJ operates the Wallace Pack Unit ("Pack Unit"). The Pack Unit is a medical and geriatric prison where the indoor inmate housing areas are not climate controlled with refrigerated air (commonly called "air conditioning"). As a result, during the hot Texas summers the apparent temperatures routinely exceed 100 degrees inside inmate housing areas, threatening the health and welfare of all inmates living there, especially the elderly, sick, and disabled.

 **ANSWER:**

 **Defendants admit the TDCJ operates the Pack Unit.  Defendants deny that the Pack Unit is a "medical" prison but admit it is a Type I Geriatric facility.  Defendants admit that the indoor inmate housing areas, with the exception of the administrative segregation and infirmary housing are not air conditioned.  Defendants deny the remainder of the allegations set forth in ¶2 of Plaintiffs' First Amended Class Action Complaint.**

3.      TDCJ knowingly subjects Plaintiffs and the Class to extremely hot apparent temperatures inside prisoners' housing areas in violation of the Eighth and Fourteenth Amendments to the Constitution.

Plaintiffs' MSJ Appx. 336

**ANSWER:**

**Defendants deny the allegations set forth in ¶3 of Plaintiffs' First Amended Class Action Complaint.**

4.     TDCJ is acutely aware of the health risk that extreme heat poses, especially to prisoners with heat-sensitive medical conditions and disabilities. Nevertheless, TDCJ refuses to make reasonable accommodations for these prisoners with disabilities, in violation of the Americans with Disabilities Act and Rehabilitation Act.

**ANSWER:**

**Defendants admit that they are aware of summer heat conditions and that the TDCJ has policies, procedures, and practices related to summer heat conditions.  Defendants deny the remainder of the allegations set forth in ¶4 of Plaintiffs' First Amended Class Action Complaint.**

5.     Injunctive and declaratory relief are the only means to address TDCJ's studied indifference to the fact that extremely hot, indoor apparent temperatures constitute cruel and unusual punishment to prisoners. Plaintiffs ask the Court to order Defendants to keep indoor apparent temperatures below dangerous levels, and mechanically lower the indoor apparent temperatures to a safe level (such as 88 degrees or lower).

**ANSWER:**

**Defendants deny the allegations set forth in ¶5 of Plaintiffs' First Amended Class Action Complaint and ask the Court to deny the Plaintiffs' requested relief.**

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act).

3

**ANSWER:**

**Defendants admit that this Court has federal question jurisdiction. Defendants assert Eleventh Amendment Immunity to all applicable claims. Defendants deny that the facts and circumstances of this case give rise to the relief requested.**

7.      Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**ANSWER:**

**Defendants admit that venue is proper in this Court.**

8.      Keith Cole is a 61-year-old prisoner incarcerated at the Pack Unit. He is not expected to be released from custody.

**ANSWER:**

**Defendants admit that Plaintiff Keith Cole is a 61-year-old prisoner. Defendants admit that Cole is incarcerated at the Pack Unit. Defendants admit Keith Cole is an offender serving a life sentence and is not parole eligible until 1-26-2024.**

9.      Jackie Brannum is a 61-year-old prisoner incarcerated at the Pack Unit. He will not be eligible for parole until 2017.

**ANSWER:**

**Defendants admit that Plaintiff Jackie Brannum is a 61-year-old prisoner. Defendants admit that Brannum is incarcerated at the Pack Unit. Defendants admit that Brannum is currently eligible for parole on 4-25-2017.**

10.      Richard Elvin King is a 68-year-old prisoner incarcerated at the Pack Unit. He is not expected to be released from custody.

**ANSWER:**

**Defendants admit that Plaintiff Richard Elven King is a 69-year-old prisoner. Defendants admit that King is incarcerated at the Pack Unit. Defendants can neither admit nor deny whether he is not expected to be released from custody.**

11.     Dean Anthony Mojica is a 48-year-old prisoner incarcerated at the Pack Unit. He is not expected to be released from custody until 2017.

**ANSWER:**

**Defendants admit that Plaintiff Dean Anthony Mojica is a 48-year-old prisoner. Defendants admit that Mojica is incarcerated at the Pack Unit. Defendants can neither admit nor deny whether he is not expected to be released from custody until 2017 because he is currently parole eligible and has a discretionary mandatory eligibility date of 3-26-2017 with a current maximum discharge date of 2-22-2025.**

12.     Ray Wilson is a 78-year-old prisoner incarcerated at the Pack Unit. He is not expected to be released from custody.

**ANSWER:**

**Defendants admit that Plaintiff Ray Wilson is a 78-year-old prisoner. Defendants admit that Wilson is incarcerated at the Pack Unit. Defendants can neither admit nor deny whether he is not expected to be released from custody.**

13.     Fred Wallace is a 72-year-old prisoner incarcerated at the Pack Unit. He is not expected to be released from custody.

**ANSWER:**

**Defendants admit that Plaintiff Fred Wallace is a 72-year-old prisoner. Defendants admit that Wallace is incarcerated at the Pack Unit. Defendants can neither admit nor deny whether he is not expected to be released from custody.**

14.     Marvin Ray Yates is a 69-year-old prisoner incarcerated at the Pack Unit. He is not expected to be released from custody until 2019.

**ANSWER:**

**Defendants admit that Plaintiff Marvin Ray Yates is 69 years old. Defendants admit that Yates is incarcerated at the Pack Unit. Defendants can neither admit nor deny that Yates is not expected to be released from custody until 2019 because he has a mandatory eligibility date of May 16, 2019 with a maximum date of October 28, 2033.**

15.     Brad Livingston is the executive director of the Texas Department of Criminal Justice. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

**ANSWER:**

**Defendants admit that Brad Livingston is the executive director of the TDCJ. Defendants deny that Livingston is the "commanding officer." Defendants admit that under TEX. GOV'T CODE §493.006, the executive director is responsible for the administration and enforcement of all laws relating to the department including rules, implemented by the department; but, the executive director may delegate those responsibilities as permitted by**

6

board rule or general law. Defendants admit that Livingston is sued in his official capacity for declaratory and injunctive relief.

16.    Robert Herrera is the warden of the TDCJ Pack Unit. At all times described herein, he was acting under color of state law. As the warden of the Pack Unit, he is responsible for ensuring constitutional conditions of confinement exist at the Pack Unit. He is sued in his official capacity for declaratory and injunctive relief.

**ANSWER:**

**Defendants admit Defendant Robert Herrera is the Warden of the Pack Unit. Defendants admit that Plaintiffs sue Herrera in his official capacity for declaratory and injunctive relief.**

17.    Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TEX. GOV'T CODE § 493.004. At all relevant times, it operated the Pack Unit, a public facility with programs and services Plaintiffs and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds.

**ANSWER:**

**Defendants admit that the TDCJ is an agency of the State of Texas. The TDCJ admits it operates the Pack Unit and receives federal funds. Defendants deny that the Pack Unit is a public facility. Defendants are unable to admit or deny at this time what programs and services Plaintiffs and other prisoners with disabilities were "otherwise qualified for." Defendants deny all remaining allegations contained in ¶17 of Plaintiffs' First Amended Class Action Complaint.**

18.    The Pack Unit is a TDCJ prison complex located in Navasota, Texas, in Grimes County.

7

**ANSWER:** **Defendants admit that the Pack Unit is a TDCJ prison located in Navasota, Texas, in Grimes County.**

19.     Most prisoners assigned to the Pack Unit are minimum-custody inmates.

**ANSWER:**

**Defendants object to the term "minimum custody" as ambiguous, and admit that usually the prisoners assigned to Pack Unit must have a custody level of G-1, G-2, or G-3.**

20.     The Pack Unit began operating in September 1983. It presently has the capacity to house 1,478 inmates. The prison typically operates at or near capacity.

**ANSWER:**

**Defendants admit the Pack Unit began operating in September 1983. Defendants admit the Pack Unit has the capacity to house 1,478 inmates. Defendants admit that as of July 30, 2015 the Pack Unit housed a total of 1,412 inmates.**

21.     Like most prisons, the population of the Pack Unit is fluid, as new prisoners arrive and prisoners who have completed their sentences are released. Likewise, prisoners are frequently transferred between TDCJ prisons.

**ANSWER:**

**Defendants admit that there are some new prisoners who arrive and some who leave. Similarly, the TDCJ admits that prisoners are transferred among the TDCJ prisons for reasons related to prison management.**

22.     Despite the frequent transfer of prisoners in to and out of the Pack Unit, the population's general characteristics (such as average age, percentage with disabilities, and percentage with heat-sensitive medical conditions) remains fairly consistent.

**ANSWER:**

8

Defendants deny that they have analyzed statistically whether the percentages alleged "remain fairly consistent." Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶22 of Plaintiffs' First Amended Class Action Complaint.

23.     The Pack Unit is a medical facility, and houses many geriatric prisoners, prisoners with disabilities, and prisoners with chronic medical problems.

**ANSWER:**

**Defendants deny that the Pack Unit is a medical facility; it is a Type I Geriatric facility. Defendants admit that the Pack Unit houses some geriatric patients. Defendants admit that the Pack Unit houses some prisoners with disabilities and that it is wheel-chair accessible. Defendants admit that the Pack Unit houses some prisoners with chronic medical problems.**

24.     The Pack Unit is one of the few TDCJ facilities that has wheelchair-accessible housing.

**ANSWER:**

**Defendants admit that the Pack Unit has wheel-chair accessible housing.**

25.     As of October 2014, the Pack Unit housed 188 men over the age of 65, 335 men over the age of 60, and 514 men over the age of 55.  Approximately half the men at the Pack Unit are over the age of 50. These numbers are a typical age distribution for the Pack Unit.

**ANSWER:**

**Defendants admit that the statistics cited for the dates in question but deny that Plaintiffs can demonstrate the element of "typicality" for the purposes of class certification.**

Plaintiffs' MSJ Appx. 343

26.     The majority of prisoners at the Pack Unit, including Plaintiffs, are housed in inmate dormitories. The dorms do not have air conditioning, or any other form of climate control technology that mechanically lowers the indoor temperatures or humidity during the summer.

**ANSWER:**

**Defendants admit the majority of prisoners at the Pack Unit are housed in inmate dormitories, with the remainder housed at the trusty camp. Defendants admit the dormitories do not operate with refrigerated air conditioning. Defendants deny the remainder of the allegations set forth ¶26 of Plaintiffs' First Amended Class Action Complaint.**

27.     The ventilation system at the Pack Unit cannot lower the indoor heat index below the outdoor heat index, and cannot ensure that temperatures inside the housing areas are safe and do not exacerbate numerous prisoners' serious medical conditions. Rather, the ventilation system just brings in "fresh" hot air from outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning.

**ANSWER:**

**Defendants admit that the inmate housing areas do not have refrigerated air conditioning. Defendants lack knowledge or information sufficient to admit or deny statements regarding a vague and hypothetical car. Defendants deny the remaining allegations contained in ¶27 of Plaintiffs' First Amended Class Action Complaint.**

28.     Upon information and belief, TDCJ chose not to air condition the Pack Unit with refrigerated air for political and financial reasons.

**ANSWER:**

**Defendants deny the allegations contained in ¶28 of Plaintiffs' First Amended Class Action Complaint.**

29.     As a consequence of the lack of air conditioning, TDCJ Executive Director Brad Livingston has admitted "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

**ANSWER:**

**Defendant Livingston admits ¶29 of Plaintiff's First Amended Class Action Complaint.**

30.     TDCJ's top physicians have noted that indoor apparent temperatures can actually be dramatically higher than the outdoor temperatures: "A few years ago, [a top TDCJ executive] found that when the temperature was 98 degrees outside, we had dorms with temps up to 110 inside. It seems like the [prisoners] in that case were better off outside."

**ANSWER:**

**Defendants admit that an email written by a TDCJ employee states "A few years ago, Mr. Quarterman found that when the outdoor temperature was 98 outside, we had dorms with temps up to 110 inside. It seems like the offenders in that case were better off outside." Defendants are unable admit or deny the substance of the quote, including where or when such an observation was made, whether it was accurately measured, or accurately quoted in the email.  Defendants deny that such conditions exist at the Pack Unit.**

31.     Upon information and belief, Dr. Lannette Linthicum, M.D., the head of TDCJ's Health Services Division, and Brad Livingston were aware of this at the time the observation was made. Moreover, they are certainly aware the indoor summer temperatures can be hotter than the outdoor summer temperatures now.

11

**ANSWER:**

**As a matter of common knowledge, Defendants admit that it is possible for indoor summer temperatures to be hotter than outdoor summer temperatures, but deny specific knowledge of any specific instances within TDCJ prisons where this is so. The remainder of the allegation is so ambiguous and confusing, it is not capable of answer.**

32.     Some inmates routinely sleep on the concrete floor because the concrete is marginally cooler than laying in their bunks.

**ANSWER:**

**Defendants deny the allegations contained in ¶32 of Plaintiffs' First Amended Class Action Complaint.**

33.     The windows in some of the inmate dormitories are sealed shut.

**ANSWER:**

**Defendants admit that windows in the expansion dorm are sealed shut as part of the ventilation and fan system in the expansion dorm. Defendants deny windows in the other dormitory areas are sealed shut.**

34.     In the dorms where the windows do open, the temperature is not appreciably cooler when the windows are open in the summer.

**ANSWER:**

**Defendants object to the allegation as overbroad and vague as to time and place. Further, Defendants object to being required to answer argumentative, subjective, and conclusory opinions. Subject to these objections, Defendants deny the allegations contained in ¶34 of Plaintiff's First Amended Class Action Complaint, please see unit description set forth above.**

Plaintiffs' MSJ Appx. 346

35.     Moreover, in the dormitories where the windows do open, opening the windows allows biting insects, like mosquitos, into the dormitories. Thus, as a practical matter, they often remain closed.

**ANSWER:**

**Defendants admit that prisoners who live in a cubicle closest to the windows sometimes close or open windows and staff will have to make sure the windows are in proper position depending on weather conditions. Defendants are unable to admit or deny the reason an offender might open or close a particular window at any given time. Defendants admit that the window screens are designed for air flow and security and could let insects like mosquitoes into the facility; however, there are other ways that these insects might enter. Defendants deny that there is a major mosquito problem inside the facility.**

36.     As a result, and as TDCJ and its officials well know, there is little difference between the indoor and outdoor temperatures at the Pack Unit.

**ANSWER:**

**Defendants admit that at times the indoor temperatures at the Pack Unit are similar to the outdoor temperatures. Defendants deny the remainder of ¶36 of Plaintiffs' First Amended Class Action Complaint.**

37.     Defendants also know very few parts of the prison accessible to prisoners have air conditioning, and inmates' time in these places is strictly limited. The law library, for example, has air conditioning, but inmates can only go there a few times per week, and the law library is only large enough to hold a few dozen inmates. The education building has air conditioning, but only inmates enrolled in educational programming can go there, and it is only large enough to accommodate 25-30 prisoners at any time. The visitation building is also air conditioned, but

inmates can only go to visitation one time per week, and only if they have a visitor there to see them, and only if they are eligible to receive visitors.

**ANSWER:**

**Defendants admit that the locations listed above have air conditioning with refrigerated air. Defendants admit access to the locations listed above is not unlimited. Defendants deny the remaining allegations contained in ¶37 of Plaintiffs' First Amended Class Action Complaint.**

38.     Thus, Plaintiffs are rarely allowed to go to air-conditioned portions of the prison during the summer.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶38 of Plaintiffs' First Amended Class Action Complaint.**

39.     In stark contrast, Warden Herrera's office is air conditioned, as are all the administrative offices in the prison, and even the prison's armory.

**ANSWER:**

**Except for the term "stark contrast," which Defendants deny; Defendants admit the remainder of the allegations contained in ¶39 of Plaintiffs' First Amended Class Action Complaint.**

40.     In fact, though TDCJ imprisons over 150,000 prisoners system-wide, there are only 551 beds available with air conditioning for inmates with medical conditions system-wide. These extremely limited beds are reserved for the patients at the most extreme risk of heat-related illness (such as advanced-stage cancer patients), and are not available even for patients with multiple conditions that make them more susceptible to heat-related illness, injury, or death – like Plaintiffs

Plaintiffs' MSJ Appx. 348

Cole, Wilson, King, Brannum, Wallace, and Yates. TDCJ's medical providers have testified before the Texas Legislature that these beds are filled by inmates who are so sick that they will never recover, and will likely die in them.

**ANSWER:**

**Defendants object to allegations being directed to them that require the specific knowledge and experience of the TDCJ's prisoner medical providers, UTMB and Texas Tech. Defendants admit that there are approximately 150,000 prisoners at the TDCJ system-wide. Defendants admit that there is a limited number of refrigerated air conditioned prisoner infirmary beds available system-wide. After a reasonable inquiry, Defendants lack knowledge and information sufficient to admit or deny that the TDCJ's medical providers have testified before the Texas Legislature and, therefore, deny same. Defendants deny the remaining allegations to the extent any of the remaining allegations are properly directed to Defendants in ¶40 of Plaintiffs' First Amended Class Action Complaint.**

41.    TDCJ's medical provider, the University of Texas Medical Branch, has testified there simply are not enough beds system-wide to accommodate even the prisoners with serious medical conditions who are at greater risk of heat-related illness, injury, or death.

**ANSWER:**

**Defendants deny the characterization and substance of prior testimony.**

42.    Dr. Glenda Adams, one of the senior medical providers at UTMB who has been designated as an expert witness in the heat stroke wrongful death litigation, testified as follows:

Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?

A: Pretty much. That's a fair description.

15

Q: Do you know how many of those triage beds or cells you're talking about?

A: How many are there?

Q: Yeah.

A: Absolutely … there were 471 [in 2011]. We now have 481.[1]

Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?

A: No, but it's all we have.

Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?

A: Essentially, yes.

**ANSWER:**

**Defendant TDCJ admits that the quoted testimony is from the deposition of Dr. Glenda Adams who was testifying regarding the number of beds available to the University of Texas Medical Branch within the TDCJ's prison buildings. Defendants deny that those are the only medical beds located in areas with refrigerated air-conditioning available to UTMB's medical providers. Defendants further admit that Dr. Adams was a senior medical provider at UTMB and that she has been designated as an expert witness for University of Texas Medical Branch in other litigation. Defendants deny that Dr. Adams is an employee of the TDCJ.**

43.     In other words, TDCJ knows it does not have enough air-conditioned beds to safely house prisoners at risk of heat-related illness, injury or death.

---

[1] Dr. Adams testified about the beds available to the University of Texas Medical Branch, which

16

**ANSWER:**

**Defendants deny the allegations contained in ¶43 of Plaintiffs' First Amended Class Action Complaint.**

44.     At the Pack Unit, there are only twelve air-conditioned beds available for prisoners with serious medical conditions. These beds are located in the infirmary, and are typically reserved for inmates who are very sick.

**ANSWER:**

**Defendants admit that there are 14 refrigerated air-conditioned beds available in the Pack Unit infirmary; according to Dr. Avila these beds are assigned on a permanent or non-permanent basis as determined by the medical treatment providers.**

45.     In other litigation, TDCJ has admitted it "knows of the high temperatures within its prisons and regard[s] it as a potential risk to the health and safety" of prisoners.

**ANSWER:**

**TDCJ admits it "knows of the high temperatures within its prisons and regard[s] it as a potential risk to the health and safety" of prisoners; however, TDCJ denies that such risk is a substantial risk within the meaning of the Eighth Amendment of the Constitution of the United States.**

46.     Likewise, Livingston has admitted knowing "TDCJ ha[s] no written [policy] to address high temperatures in prisoner housing areas."

**ANSWER:**

**In other litigation, Livingston responded "admit" to a request for admission which stated: "You knew in 2011 TDCJ had no written *administrative directive* to address high temperatures in housing areas." (emphasis added)  Defendant Livingston objects the term**

17

"administrative directive," (a specific type of policy at TDCJ) being replaced by Plaintiffs with the term "policy." Defendants admit that witnesses have testified that a directive is sent each summer regarding mitigation measures. Defendants deny that there is no written policy to address high temperatures and mitigating measures in prisoner housing areas, please see Exs. A-D.

47. There is no penological purpose behind refusing to provide prisoners with climate controlled housing.

**ANSWER:**

**Defendants admit that the lack of refrigerated air conditioning in certain of the living areas of TDCJ prisons is not a punishment for non-compliant offenders, but are unable to admit or deny the remainder of the allegations contained in ¶47 of Plaintiffs' First Amended Class Action Complaint.**

48. In fact, the State of Texas requires county jails to keep indoor temperatures between 65 and 85 degrees. *See* 37 TEX. ADMIN. CODE § 259.160.

**ANSWER:**

**Defendants admit that county jails are regulated under a different statute.**

49. Indeed, TDCJ even air conditions limited portions of inmate housing areas – including administrative segregation and solitary confinement cells, including Death Row, at other TDCJ prisons. In fact, the 22 administrative segregation cells at the Pack Unit (which are mostly used for protective custody) are air conditioned. But decisions to place prisoners in these cells are made for security, not medical, reasons.

**ANSWER:**

18

Defendants admit the allegations contained in ¶49 of Plaintiffs' First Amended Class Action Complaint subject to the qualification that decisions to place prisoners in administrative segregation are generally made for security, not medical reasons.

50.     The only doctor who works at the Pack Unit has testified that air conditioning inmate living areas "would be beneficial" to protect inmates from the dangers of extreme temperatures.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.      Okay. If - - and I know they don't, but if the housing areas in the prison was all air-conditioned, that would be beneficial for the prisoners, especially the prisoners with heat-sensitive medical conditions, right?**

**A.      It would be beneficial, yes, sir.**

**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 85 ln. 14-18)**

51.     The doctor also specifically acknowledged that extreme heat – like that commonly experienced at the Pack Unit – placed Plaintiffs Cole and Yates (as well as former Plaintiffs David Bailey and Nicholas Diaz)[2] at increased risk of harm. It is anticipated Dr. Avila will testify consistently as to all the Plaintiffs.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.      Do you agree with this policy, that these types of medications listed in Attachment A put a person at increased risk for heat-related illness?**

**A.      That's correct.**

**Q.      Do you agree that the types of conditions listed in Attachment B to that exhibit put a person at increased risk for heat-related illness?**

_____

[2] Bailey and Diaz have been released from TDCJ custody during the pendency of this case.

A.      Yes, I am.

Q.      Does morbid obesity also put a person at risk for heat-related illness during extremely high temperatures?

A.      Yes, it does.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 98 ln. 5-15)

**Defendants deny the remainder of allegations contained in ¶51 of Plaintiffs' First Amended Class Action Complaint.**

52.     Most maximum-security federal prisons in hot climates, like Texas, are routinely air conditioned. Even the prison housing terrorism suspects in Guantanamo Bay, Cuba, is air conditioned.

**ANSWER:**

**Defendants lack sufficient knowledge or information regarding the federal prisons and Guantanamo Bay, Cuba with which to admit or deny the allegations in ¶52 of Plaintiffs' First Amended Class Action Complaint.**

53.     In fact, the comment to the American Correctional Association standards instructs prisons to be able to "mechanically lower" temperatures in inmate housing areas. TDCJ deliberately violates this instruction as indoor apparent temperatures at the Pack Unit cannot be mechanically lowered.

**ANSWER:**

**Defendants deny that Pack Unit is in violation of applicable, *mandatory* ACA standards regarding air flow. Defendants, therefore, deny the remainder of the allegations in ¶53.**

54.     Most TDCJ prisons, including the Pack Unit, were built after air conditioning became common in public buildings in Texas.

Plaintiffs' MSJ Appx. 354

**ANSWER:**

**Defendants deny that the Pack Unit is properly characterized as a building meant for the "public." Rather, the Pack Unit is a prison which has met or exceeded mandatory ACA accreditation standards for air-flow and ventilation since 2007.**

55.     Indeed, TDCJ officials made an intentional decision not to air condition the prisoner housing areas at the Pack Unit. And, upon information and belief, they did so for political and financial reasons.

**ANSWER:**

**The Pack Unit has met or exceeded mandatory ACA accreditation standards for air-flow and ventilation since 2007 and was specifically included in the standards established in the *Ruiz* litigation; therefore, Defendants deny that the decision not to provide refrigerated air conditioning was based upon "political and financial reasons."**

56.     Moreover, despite their knowledge of numerous heat-related injuries occurring indoors, all of which would be prevented with air conditioning, TDCJ, including Brad Livingston and the Texas Board of Criminal Justice, has intentionally decided to continue exposing prisoners to extremely high indoor apparent temperatures at the Pack Unit despite acknowledging these high indoor apparent temperatures put inmates at risk of heat-related illness, injury, and death.

**ANSWER:**

**Defendants deny the allegations contained in ¶56 of Plaintiff's First Amended Class Action complaint.**

57.     TDCJ routinely records the outdoor apparent temperatures at the Pack Unit during the summer. According to TDCJ's own records, the outdoor apparent temperatures at the Pack Unit routinely exceed 100 degrees during the summer.

Plaintiffs' MSJ Appx. 355

| Year | # Days: High Over 100 | # Days: High 90-99 | # Days: High 80-89 | # Days: High Below 80 |
|------|----------------------|--------------------|--------------------|----------------------|
| 2011 | 75 | 16 | 1 | 0 |
| 2012 | 45 | 43 | 2 | 0 |
| 2013 | 73 | 16 | 3 | 0 |
| 2014 | 34 | 47 | 9 | 2 |

**ANSWER:**

**Defendants admit that the employees at the Pack Unit routinely record the outdoor temperatures at the Pack Unit during the summer months. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in ¶57 of Plaintiffs' Amended Class Action Complaint because the chart sets forth a summary compiled by Plaintiffs.**

58. This comes as no surprise to Texans, given the brutal summer temperatures and high humidity in the Houston area.

**ANSWER:**

**Paragraph 58 of Plaintiffs' Amended Class Action Complaint contains conclusory and opinion allegations. Defendants, therefore, deny the allegations contained in ¶58 of Plaintiffs' First Amended Class Action Complaint.**

59. Pursuant to TDCJ policy and practice, Warden Herrera reviews this data daily during the summer, and knows that apparent temperatures at the Pack Unit are dangerous.

Plaintiffs' MSJ Appx. 356

**ANSWER:**

**Defendants admit that during the summer months the outdoor temperature readings are monitored and recorded at the Pack Unit on a daily basis in accordance with the TDCJ's policies, practices and procedures. Defendants deny the remainder of the allegations in ¶59 of Plaintiffs' First Amended Class Action Complaint.**

60.     Despite this, Warden Herrera has not even looked into costs associated with ways to cool even a single indoor housing area.

**ANSWER:**

**Defendants admit the allegations contained in ¶60 of Plaintiffs' First Amended Class Action Complaint; however, Defendants deny that Warden Herrera has authority to purchase or install the equipment necessary to provide refrigerated air conditioning to the indoor housing areas, please see Defendants' (re-urged) Motion to Dismiss Warden Herrera at Doc. No. 158.**

61.     Likewise, Director Livingston is aware that apparent temperatures inside TDCJ prisons are hazardous during the summer. Even so, Director Livingston and the Health Services Division took no steps to bring the dangerous temperatures down in any TDCJ facility. They did not even order a study to determine the cost before several heat-related deaths in 2011 and 2012, and being sued for injunctive and declaratory relief in this case.

**ANSWER:**

**Defendants admit that no cost study was ordered prior to 2011. Defendants deny the remaining allegations in paragraph 61.**

Plaintiffs' MSJ Appx. 357

62.     According to the National Weather Service (NWS), summer temperatures in the future will not be lower than temperatures from 2011–2014. In fact, temperatures will likely increase in the future.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶62 of Plaintiffs' First Amended Class Action Complaint.**

63.     According to the NWS, "heat is the number one weather-related killer in the United States." Over a hundred people die from exposure to extreme heat each year, and thousands are injured. On average, heat kills more people in the United States each year than hurricanes, tornadoes, floods, or lightning combined.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶63 of Plaintiffs' First Amended Class Action Complaint.**

64.     According to the NWS, the American Medical Association, the Environmental Protection Agency (EPA), and the Center for Disease Control and Prevention (CDC), "[m]aintaining a consistent internal body temperature, generally 98.6° [Fahrenheit], is essential to normal physical functioning." Excessive heat can "stress the body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to

24

experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶64 of Plaintiffs' First Amended Class Action Complaint.**

65. When exposed to heat, the heart will beat faster to increase blood flow to the skin, in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶65 of Plaintiffs' Amended Class Action Complaint.**

66. Likewise, the body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, the sweat cannot evaporate, preventing the body from cooling. In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶66 of Plaintiffs' Amended Class Action Complaint.**

67.     Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat-related illnesses may develop.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶67 of Plaintiffs' Amended Class Action Complaint.**

68.     Indeed, the doctor who cares for all prisoners at the Pack Unit has testified that ambient temperatures above 85 degrees Fahrenheit can be hazardous to prisoners' health.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.      Do you agree that ambient temperatures of 85 degrees can be hazardous at times?**

**A.      Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 101 ln. 7-9)**

69.     Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

Plaintiffs' MSJ Appx. 360

**ANSWER:**

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death, but deny that there is substantial risk of this occurring at the Pack Unit with the implementation of mitigation measures. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

70. **Heat Exhaustion:** Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health (NIOSH), include fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶70 of Plaintiffs' Amended Class Action Complaint with regard to NIOSH. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A" which states the symptoms of heat exhaustion are: profuse perspiration, weakness, rapid pulse, dizziness, and headaches; cool skin, sometimes pale and clammy, with perspiration; normal or subnormal body temperature;

27

and possible nausea, vomiting, and unconsciousness. **Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

71. According to the Mayo Clinic and TDCJ's own training materials, heat exhaustion can quickly progress to heat stroke if the person does not cool down quickly.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny allegations regarding information in the knowledge or experience of the Mayo Clinic. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendant TDCJ admits that TDCJ training materials do indicate that heat stroke can be preceded by heat exhaustion and its onset can be sudden. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

72. The doctor who cares for all prisoners at the Pack Unit has testified that heat exhaustion by itself is a serious health condition that puts prisoners at a serious health risk.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.     Do you agree that heat exhaustion is a serious medical condition?**

**A.     Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 100 ln. 11-13)**

**Q.     Do you agree that heat exhaustion puts prisoners at a serious health risk?**

28

A.      Yes.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 100 ln. 21-23)

73.     **Heat Cramps:** Heat cramps can consist of "[m]uscle pain or spasms usually in the abdomen, arms, or legs," according to NIOSH.

**ANSWER:**

**Although, the information in this allegation is from a third party, Defendants admit that the information is contained in TDCJ's policies, please see Exs. A-D. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

74.     Heat cramps are extremely painful. The doctor who cares for all prisoners at the Pack Unit has testified that heat cramps can result in severe pain.

**ANSWER:**

**Defendants deny the allegation that "heat cramps are extremely painful" as over-inclusive in that they can be minor or just uncomfortable for brief periods. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.     Do you agree that heat cramps, frankly, is a serious medical condition that you need to provide treatment for?**

**A.     Well, it's not a serious medical condition. You need to provide treatment and prevent the exhaustion.**
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 100 ln. 14-17)

**Q.     Do you agree that heat cramps can result in severe pain?**

**A.     Can? Yes.**
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 99 ln. 10-12)

Plaintiffs' MSJ Appx. 363

75.     Even TDCJ's own medical policy recognizes that pain from heat cramps "may be quite severe."

**ANSWER:**

**Defendants admit that the allegation contained in ¶75 of Plaintiffs' Amended Class Action Complaint contains a quote from TDCJ's policies. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

76.     **Heat Stroke:** NIOSH describes heat stroke as "the most serious heat-related disorder," in which "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms often include hot, dry skin; hallucinations; chills; headaches; confusion; and slurred speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given." According to resources published online by the Mayo Clinic, "[i]n a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles."

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations from NIOSH and Mayo Clinic contained in ¶76 of Plaintiffs' Amended Class Action Complaint. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

77.     In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "[t]he different forms of heat-related illness … increase in severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶77 of Plaintiffs' Amended Class Action Complaint with regard to NIOSH.  Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D."  Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

78.     The doctor who cares for all prisoners at the Pack Unit has testified that heat stroke can come on suddenly, and heat stroke is possible at apparent temperatures as low as 90 degrees.

**ANSWER:**

**Defendants admit the allegation set forth in ¶78 of Plaintiffs' First Amended Class Action Complaint.**

79.     Indeed, even TDCJ's own medical policies and training materials recognize heat stroke is "a medical emergency," that "the onset is often sudden," and that "death may occur."

**ANSWER:**

31

Defendants admit that TDCJ policies and procedures recognize heat stroke as a serious condition. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

80. Upon information and belief, virtually all prisoners at the Pack Unit, regardless of underlying medical conditions, suffer at least some symptoms of heat-related illness or injury caused by or exacerbated by the high indoor apparent temperatures each summer. Typical symptoms include: headaches, dizziness, nausea, lightheadedness, elevated temperature, and heavy sweating.

ANSWER:

Defendants deny the allegations in ¶80 of Plaintiffs' First Amended Class Action Complaint.

B. *People with Medical Conditions that Impair Cooling are at Additional Risk*

81. Though all people suffer in the heat, people with physiological conditions that impair their bodies' ability to cool are at increased risk of suffering heat-related illness, injury, or death.

ANSWER:

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015

32

Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D."  Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

82.     TDCJ policy recognizes inmates with certain "underlying medical condition[s] … place them at increased risk," including: "cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, asthma, cystic fibrosis, diabetes, psychiatric conditions, Sjogren's syndrome, sweat gland dysfunction, [and] thyroid dysfunction." Heat tolerance weakens, and the risk of heat-related illness increases, for people who suffer from these conditions. TDCJ policies and procedures recognize prisoners with these conditions are at greater risk of heat-related illness, injury, and death.

**ANSWER:**

**Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D."  Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

83.     Similarly, TDCJ's policies state the risk of heat-related illness increases for individuals who use "anticonvulsants, anticholinergics, antihistamines, antipsychotics, antidepressants, beta blockers, [and] diuretics." Typically, these drugs impair the body's ability to cool itself. These medications are used to treat a wide range of illnesses and disabilities common to prisoners at the Pack Unit, including hypertension, allergies, depression, and bipolar disorder. TDCJ policies and procedures also recognize these medications increase prisoners' risk of heat

33

related illness and death, and that these prisoners "should not be allowed to work or recreate in environments where the apparent temperature is 95 degrees or higher." Brad Livingston and Lannette Linthicum are actually aware of these policies and the risks they identify.

**ANSWER:**

**Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants admit they are aware of the policies attached as Exhibits A-D. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

84.     TDCJ also acknowledges people with the following medical conditions and disabilities are at heightened risk of heat-related illness: obesity, diabetes, hypertension, cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction.

**ANSWER:**

**Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants admit they are aware of the policies attached as Exhibits A-D. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

Plaintiffs' MSJ Appx. 368

85.     UTMB, the medical provider at the Pack Unit, has informed TDCJ of this dangerous on numerous occasions.

**ANSWER:**

**Defendants deny the allegation contained in ¶85 of Plaintiffs' First Amended Class Action Complaint.**

86.     TDCJ identifies approximately 418 prisoners at the Pack Unit as having medical conditions that prohibit them from working in "extreme temperatures." The prisoners' medical conditions place them at increased risk of heat-related illness, injury, or death, or are prescribed the medications TDCJ identifies as putting people at increased risk of heat-related illness, injury, or death.

**ANSWER:**

**Defendants admit that as of September 17, 2014, approximately 418 inmates at the Pack Unit were listed on the Medical Heat Restriction List for the Pack I Unit. Defendants deny the remaining allegations contained in ¶86 of Plaintiffs' First Amended Class Action Complaint as to the specifics of each inmate.**

87.     This list is under-inclusive, as it does not include Plaintiffs Cole, King, and Wilson, even though they also take many of the medications and suffer from heat-related disabilities TDCJ recognizes put inmates at increased risk of heat-related injury. Likewise, upon information and belief, it does not include other prisoners who suffer from heat-sensitive medical conditions, or take prescription medications that increase their risk of heat-related illness, injury, or death.

**ANSWER:**

**Defendants admit that Keith Cole's classification restriction include "no temperature extremes," "no work in direct sunlight," and "no humidity extremes" and that he is**

35

medically unassigned. **Defendants admit that King and Wilson's classification restrictions do not include heat restrictions. Defendants admit that decisions about suitability of work assignments and recreation areas are made by facility medical staff. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶87 of Plaintiffs' First Amended Class Action Complaint. Please see Defendants Ex. A-D.**

88. TDCJ also acknowledges other factors that increase the risk of heat-related illness, such as age (particularly for people over 65).

**ANSWER:**

**Defendants admit the allegations contained in ¶88 of Plaintiffs' First Amended Class Action Complaint, please see Ex. A-D.**

89. According to the CDC, heat stroke mortality rate increases with age. For example, the rate of heat stroke deaths doubles between ages 35 and 55. The CDC also recognizes that people over the age of 65 are more prone to heat stress.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶89 of Plaintiffs' First Amended Class Action Complaint.**

90. Yet no accommodations are made relating to the extreme heat for prisoners based on age, even though it is known to be associated with increased risk of heat-related illness, injury, and death.

**ANSWER:**

Plaintiffs' MSJ Appx. 370

Defendants deny the allegations in ¶90 of Plaintiffs' First Amended Class Action Complaint.

91.     TDCJ is well-aware that it houses inmates with disabilities (like Plaintiffs Cole, Wallace, Brannum, King, Wilson, and Yates) who require reasonable accommodations because their disabilities are impacted by exposure to extremely high indoor apparent temperatures. As TDCJ's policies identify these prisoners as being at additional risk of heat-related illness, injury, or death, their need for an accommodation is obvious.

ANSWER;

Defendants admit that TDCJ houses inmates with disabilities; but deny the remaining allegations set forth in ¶90 of Plaintiffs' First Amended Class Action Complaint.

92.     Upon information and belief, prisoners at the Pack Unit with these heat-sensitive disabilities experience symptoms of heat-related illness more frequently or more intensely than able-bodied prisoners. These prisoners with disabilities are also at greater risk of heat-related illness, including heat exhaustion, heat cramps, and heat stroke.

ANSWER:

After a reasonable inquiry Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶92 of Plaintiffs' First Amended Class Action Complaint.

C.     *Heat in Texas Prisons is Deadly*

93.     Since 1998, at least twenty TDCJ prisoners in facilities around Texas have died of hyperthermia, or heat stroke, as set forth in the table below.

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|--------|---------------|------------|-------------|-------|

Plaintiffs' MSJ Appx. 371

| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | V | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |
|---|---|---|---|---|---|---|
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications for schizophrenia |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | I | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | V | Prescribed diurectics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | III | Bipolar with depression, prescribed psychtropic medications |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | II | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |

Plaintiffs' MSJ Appx. 372

| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

**ANSWER:**

**Defendants admit that records show that the prisoners listed on Plaintiffs' chart died while in custody and the autopsies indicated hyperthermia. With regard to the column titled "facts," the "facts" column is a summary of medical opinions and records prepared by Plaintiffs and lacks complete information. Defendants, therefore, based upon information and belief, deny the "fact" summary on the chart in ¶93 of Plaintiffs' First Amended Class Action Complaint.**

94.  Moreover, it is likely far more TDCJ prisoners were actually killed by heat because hyperthermia is an underreported cause of death by medical examiners.

**ANSWER:**

**After a reasonable inquiry Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶94 of Plaintiffs' First Amended Class Action Complaint.**

95.  The twenty men in the chart above all shared certain characteristics. As TDCJ knew, they all suffered underlying medical conditions and heat-sensitive disabilities that put them at much greater risk of heat stroke, including taking psychotropic drugs to treat a mental illness, suffering from diabetes or hypertension, or taking diuretics to treat hypertension.[3]

---

[3] Six wrongful death lawsuits brought by the families of eight of these men are currently pending. *See McCollum v. Livingston*, No. 4:14-cv-3253 (S.D. Tex.); *Adams v. Livingston*, 4:14-cv-3326 (S.D. Tex.); *Webb v. Livingston*, 4:14-cv-3302 (S.D. Tex.); *Togonidze v. Livingston*, 4:14-cv-3324 (S.D. Tex.); *Martone v. Livingston*, 4:13-CV-3369 (S.D. Tex.); *Hinojosa v. Livingston*, 4:14-cv3311 (S.D. Tex.).

39

**ANSWER:**

**Defendants deny that it can be demonstrated that the characteristics alleged would put every individual at "much greater risk." Defendants do admit, however, that some of the underlying medical conditions alleged might place certain individuals, under certain conditions, at greater risk for heat related illness or injury and that such a determination requires an individualized review of each offender's medical condition and records. Defendants deny the remainder of the allegations contained in ¶95 of Plaintiffs' First Amended Class Action Complaint.**

96.     Unsurprisingly, in a 2012 email, two of TDCJ's top physicians discussed how "the majority of heat-related deaths involve prescription drugs known to increase the risk."

**ANSWER:**

**Defendants admit that this statement was made to the recipient, Dr. Adams (who is not a TDCJ doctor), in the context of an email chain discussing, *inter alia*, that offender HSM-18's be kept up to date so as to better identify and protect offenders taking those medications.**

97.     Many prisoners at the Pack Unit, including each of the Plaintiffs (except for Mojica) suffer from one or more of the above conditions, or take one or more of the heat-sensitive medications.

**ANSWER:**

**The Plaintiffs and their medical records would have to be evaluated by a medical expert which is beyond the scope of Defendants' knowledge at this time; therefore, Defendants lack sufficient knowledge or information with which to admit or deny that**

"**Plaintiffs suffer from one or more of the above conditions, or take one or more of the heat-sensitive medications.**" **Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶97 of Plaintiffs' First Amended Class Action Complaint.**

98.     Heat can also cause or aggravate other illnesses, even triggering medical emergencies such as heart attacks. According to the World Health Organization (WHO), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶98 of Plaintiffs' First Amended Class Action Complaint.**

99.     The CDC, NWS, and EPA recognize that sudden exposure to heat contributes to a variety of illnesses, including cardiovascular disease, and increases the likelihood of illness and death.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶99 of Plaintiffs' First Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 375

100.    As all Texans know, however, it is not just the temperature but also the humidity that contributes to heat. The heat index is a measure of "apparent temperature," based on ambient temperature and humidity, which the NWS says closely approximates how air temperature is "felt" by the human body. The NWS publishes a chart which illustrates how exposure to high heat indexes increases the risk of heat-related illnesses:

**ANSWER:**

**After a reasonable inquiry, Defendants lack knowledge or information sufficient to admit or deny whether the heat index or "apparent temperature" closely approximates how air temperature is "felt" in the human body. Defendants admit the NWS publishes a chart. Defendants admit the chart shows heat index with temperatures that rate the level of "danger." The Defendants deny the remaining allegations with regard to what "all Texans know" in ¶100 of Plaintiffs' First Amended Class Action Complaint.**



**NOAA's National Weather Service**

**Heat Index**

**Temperature (°F)**

|  | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

Relative Humidity (%)

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

☐ Caution    ☐ Extreme Caution    ☐ Danger    ☐ Extreme Danger

42

101. The NWS correlates heat index ranges to risk levels:

a. Caution (light yellow; heat index 80-90º F) - "Fatigue possible with prolonged exposure and/or physical activity."

b. Extreme Caution (mustard yellow; heat index 91-104º F) - "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

c. Danger (orange; heat index 105-125º F) - "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

d. Extreme Danger (red; heat index >126º F) - "Heat stroke likely."

**ANSWER:**

**Defendants admit the NWS chart shows heat index with temperatures that rate the level of "danger."**

102. The NWS warns that exposure to heat index greater than 105º F "may cause increasingly severe heat disorders with continued exposure or physical activity."

**ANSWER:**

**Defendants admit that the NWS publishes a chart. Defendants admit the NWS chart shows heat index with temperatures that rate the level of "danger."**

103. TDCJ incorporates a version of the NWS chart into its policies and training materials, and is well aware of the facts described by the NWS. That chart is included as an Appendix to the TDCJ policy entitled "Temperature Extremes in the TDCJ Workplace," dated November 10, 2008. The policy and chart are made available to every TDCJ warden, including Warden Herrera.

43

**ANSWER:**

**Defendants admit that a version of the NWS chart is used in TDCJ documents, please see Exhibit A. Defendants admit that Warden Herrera has access to the policy and chart.**

104.    Like the NWS chart, TDCJ's version recognizes that as the heat index increases, the risk of increasingly severe heat-related illnesses goes up. When the heat index exceeds 90 degrees (a typical occurrence inside the Pack Unit during the summer), according to TDCJ, "heat exhaustion" becomes "possible." Above 105 degrees, "heat stroke" becomes "possible." Above 130 degrees, heat stroke is "imminent."

**ANSWER:**

**Defendants admit that a version of the NWS chart is used in TDCJ policy, see Exhibit A. Defendants admit Exhibit A is an official policy of TDCJ.**

105.    Importantly, the NWS and TDCJ charts are designed to predict the risk to people who *do not* suffer from medical conditions that increase their susceptibility to heat-related injuries. These charts predict the risk to "healthy" people (like Plaintiff Mojica), not people who have an increased risk of heat-related illness or injury due to medical conditions, medications or age.

**ANSWER:**

**Defendants admit that a version of the NWS chart is used in TDCJ documents, please see Exhibit A. Defendants admit Exhibit A is an official policy of TDCJ.**

106.    Both the NWS and TDCJ charts show that prisoners living in the Pack Unit are exposed to indoor heat indexes that put inmates at risk of heat exhaustion, and heat cramps virtually every day of the summer.

**ANSWER:**

Plaintiffs' MSJ Appx. 378

**Defendants deny the allegations contained in ¶106 of Plaintiffs' First Amended Class Action Complaint.**

107.     Though TDCJ's policies recognize that escalating extreme temperatures put prisoners at increased danger, TDCJ's policies do nothing to provide additional protections to inmates in the extremely hot housing areas as apparent temperatures go up.

**ANSWER:**

**Defendants deny the allegations contained in ¶107 of Plaintiffs' First Amended Class Action Complaint.**

108.     In fact, TDCJ has no formal, written policy to protect prisoners from extreme temperatures in the indoor inmate housing areas.

**ANSWER:**

**Defendants deny the allegations contained in ¶108 of Plaintiffs' First Amended Class Action Complaint.**

109.     TDCJ has no policy to lower indoor temperatures in inmate housing areas.

**ANSWER:**

**Defendants deny the allegations contained in ¶109 of Plaintiffs' First Amended Class Action Complaint, please see Exhibits A-D.**

110.     No mitigation measures short of climate control or a policy to re-locate inmates to cooler housing areas can adequately protect people from these extreme temperatures. So long as housing areas are dangerously hot, prisoners will inevitably suffer heat-related illnesses and injuries, and be placed at increased risk of death.

**ANSWER;**

Plaintiffs' MSJ Appx. 379

**Defendants deny the allegations contained in ¶110 of Plaintiffs' First Amended Class Action Complaint.**

111.     Indeed, TDCJ's primary mitigation measure – water intake – creates a new hazard at the Pack Unit. The Environmental Protection Agency has found the arsenic levels in the water at the Pack Unit are more than twice the recommended level under federal law and regulations. The doctor treating inmates at the Pack Unit testified arsenic in drinking water can cause bladder cancer, skin cancer, and harm the nervous system.

**ANSWER:**

**Defendants deny the allegation that the water at Pack Unit creates a new hazard. (See generally, Doc. Index no. 166, Bailey Case Document Index) In January 2006, the EPA changed standards for the allowed arsenic levels from 50 parts to 10 parts per billion. *Id.* The TDCJ has entered into a contract to install a new water filtration system to meet the new standard. *Id.* In a notice dated Jan. 18, 2014, the Texas Commission on Environmental Quality sent a public notice that Pack Unit must display which states, *inter alia*, that that the status of the water is "not an emergency" and that "you do not need to use an alternative water supply." (*Id.* at Bates no. 50930.)**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.     Do you know if arsenic in drinking water can cause bladder cancer?**

**A.     Yes.**

**Q.     It can, can't it?**

**A.     Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 186 ln. 8-12)**

**Q.     Okay. Do you know if arsenic in drinking water can cause skin cancer?**

**A.     Yes.**

Plaintiffs' MSJ Appx. 380

**Q.      It can, correct?**

**A.      That's correct.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 186 ln. 18-22)**

**Q.      Okay. Do you know if arsenic in drinking water can harm the central nervous and peripheral nervous systems?**

**A.      Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 187 ln. 8-10)**

112.    Dr. Charles Adams, M.D., the medical director supervising medical care provided at multiple TDCJ prisons, stated what should be obvious to anyone: "they need cooling."

**ANSWER:**

**Defendants admit that Dr. Adams wrote an email which contained the quoted language set forth in ¶112 of Plaintiffs' First Amended Class Action Complaint.**

113.    TDCJ ignored this observation, and still has not provided any "cooling" at the Pack Unit.

**ANSWER:**

**Defendants deny the allegations contained in ¶113 of Plaintiffs' First Amended Class Action Complaint.**

114.    Every summer, inmates at the Pack Unit suffer heat-related injuries.

**ANSWER:**

**Defendants admit that on occasion a limited number of offenders have sought medical treatment for heat conditions at the unit infirmary at Pack Unit. Defendants lack sufficient information or knowledge as to whether this has happened "every summer" or how many have sought treatment from the infirmary "every summer."**

Plaintiffs' MSJ Appx. 381

115.     Internal emails from July 2012 state that, at the Pack Unit, "the trend has been noted that the [inmates suffering from heat-related illness] are primarily in housing" – as opposed to prisoners working outside.

**ANSWER:**

**Defendants admit that the quoted language appears in an email authored by a UTMB employee.  Defendants deny the substance of the quote as it was made in 2012, and deny the substance of the quote as applied to the summers of 2013 and 2014.**

116.     TDCJ's medical provider has admitted being "particularly concerned" about the conditions at the Pack Unit. In a four-day period in 2012, twelve prisoners were seen in the prison's infirmary for heat-related illnesses. Seven of these prisoners were taking medications that placed them at increased risk of heat-related illnesses.

**ANSWER:**

**Defendants admit that a UTMB employee sent an email with the quoted language, but deny that his comment was only directed at the Pack Unit.  Defendants admit that 12 offenders received medical treatment during a four day period in 2012, but deny that all were diagnosed with heat related illness, and deny that any offenders diagnosed with a heat related illness required treatment beyond a brief period of rest and hydration.  Defendants are unable to admit or deny the remainder of the allegations contained in ¶116 of Plaintiffs' First Amended Class Action Complaint.**

117.     Upon information and belief, three of the prisoners treated for heat-related illness in June 2012 at the Pack Unit were *not* taking any medication that put them at increased risk, and did *not* have any medical condition that put them at increased risk of heat-related illness. Despite

48

the absence of any additional heat-related risk factors, these prisoners were still injured by the high apparent temperatures.

**ANSWER:**

**At this time, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶117 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

118.    Each summer, inmates at the Pack Unit are treated by medical staff for heat-related illnesses and injuries caused by the hot indoor apparent temperatures.

**ANSWER:**

**Defendants admit that on occasion offenders have sought medical treatment for heat conditions at the unit infirmary at Pack Unit. Defendants lack sufficient information or knowledge as to whether this happened "each summer" or how many have sought treatment from the infirmary "each summer." Defendants lack sufficient information or knowledge as to whether this was "caused by the hot indoor apparent temperatures." Defendants admit that offenders receive treatment by medical staff at the Pack Unit.**

119.    Upon information and belief, it is likely that many additional prisoners are not reporting their heat-related illnesses.

**ANSWER:**

**This allegation is based upon pure speculation and opinion and, therefore, Defendants obviously lack sufficient knowledge and information with which to admit or deny the allegation contained in ¶119 and, as such, should not be required to answer.**

120.    Because of the miserable conditions created by the heat, many prisoners simply languish during the summer. Many spend their summer days avoiding any exertion that could bring

Plaintiffs' MSJ Appx. 383

on heat-related illness (including walking to the chow hall for meals), drinking arsenic-laced water, and spraying themselves with water to endure the incessant heat.

**ANSWER:**

**Defendants deny the allegations contained in ¶120 of Plaintiffs' First Amended Class Action Complaint.**

121.    Even prisoners without medical conditions that make them more vulnerable to the heat, like Mojica, suffer intensely during the summer because of the high indoor apparent temperatures.

**ANSWER:**

**Defendants deny the allegations contained in ¶121 of Plaintiffs' First Amended Class Action Complaint.**

122.    Likewise, correctional officers who work in the inmate housing areas also routinely suffer in the heat. Officers routinely sweat through their uniforms, and have to towel sweat off their faces when leaving the inmate dormitories.

**ANSWER:**

**Defendants admit that correctional officers sweat but deny that "correctional officers" as a group "routinely" suffer in the heat.**

123.    In fact, during a recent summer a 57-year-old correctional officer at the Pack Unit was taken to the emergency room after becoming dizzy. She was diagnosed with heat exhaustion and dehydration.

Plaintiffs' MSJ Appx. 384

**ANSWER:**

**Defendants admit that, during the summer of 2013, a 57-year old correctional officer at the Pack Unit was taken to the emergency room for being hot, dizzy, and sweaty. Defendants admit that the officer was treated for heat exhaustion and dehydration. Defendants admit that the temperature in her assigned area was 80.4 degrees Fahrenheit at the time of the incident. Defendants admit the officer was able to return to work the next day without any restrictions.**

124.   Thus, in a rare development, the correctional officer's union has found common cause with the prisoners, and publicly supported the extreme temperature lawsuits brought against TDCJ.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by Defendants and is incomplete; and, therefore, it is improper and incapable of answer. Defendants admit that the correctional officers' union has supported refrigerated air conditioning. Defendants deny the remaining allegations contained in ¶124 of Plaintiffs' First Amended Class Action Complaint.**

125.   The correctional officer's union has made numerous public requests for the prison housing areas to be air conditioned, but TDCJ routinely ignores these requests for safe working conditions.

**ANSWER:**

Plaintiffs' MSJ Appx. 385

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by Defendants and is incomplete; and, therefore, it is improper and incapable of answer. Defendants admit that the correctional officers' union has supported refrigerated air conditioning. Defendants deny that TDCJ routinely ignores their requests for safe working conditions. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶125 of Plaintiffs' First Amended Class Action Complaint.

126. Major newspapers, including the *New York Times*, *Houston Chronicle*, and *Austin American-Statesman*, have editorialized that TDCJ should end the practice of failing to air condition inmate housing areas.

**ANSWER:**

Defendants object to allegations that contain hearsay information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶126 of Plaintiffs' First Amended Class Action Complaint.

127. While TDCJ knows about and ignores the hazards to prisoners and correctional officers, TDCJ officials (including Brad Livingston) approved installing climate controlled hog barns to protect the welfare of TDCJ's agricultural products. TDCJ's detailed policies require that pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires

52

temperatures be kept no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs' "health," and "some form of cooling" is required above this "critical limit." High-ranking TDCJ officials even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke. TDCJ has no similar policies to protect humans.

**ANSWER:**

**TDCJ admits that it operates six single-wide trailer swine farrowing barns at the Eastham Unit that have some measure of mechanical cooling. This mechanical cooling comes from a fan system that passes air over a wet cardboard grate. These structures are used for approximately nine weeks after the pigs are born, and the remainder of the pigs' lives are spent in open air structures. No other parts of the swine operation have mechanical cooling, but instead utilize air flow and water. TDCJ admits that its agricultural program has policies governing swine husbandry. Defendants deny the remaining allegations contained in ¶127 of Plaintiffs' First Amended Class Action Complaint.**

128. Even former TDCJ Institutional Division Director Rick Thaler acknowledged this is unacceptable, and that human prisoners deserve more protections than swine raised for slaughter.

**ANSWER:**

**Defendants deny the characterization of previous testimony.**

129. Keith Cole suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he suffers from diabetes and hypertension. He also has a history of chronic cardiovascular disease, and has had two stents placed in his body.

**ANSWER:**

Plaintiffs' MSJ Appx. 387

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶129 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

130. Cole's diabetes requires treatment with Glipizide. He takes a diuretic (hydrochlorothiazide), a beta blocker (Metoprolol), a calcium channel blocker (Amlodipine), an angiotensin receptor blocker (Losartan), and a statin (Atorvastatin), to control his hypertension and cardiovascular disease. He is also prescribed Nitrostat tablets to use "as needed" should he feel any chest pains.

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶130 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

131. These disabilities and medications impair Cole's thermoregulatory system.

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶131 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

54

132. Cole's diabetes causes his body to constantly fight to stay hydrated. He cannot pump enough blood to his skin to cool his body, and his ability to sweat is extremely limited.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶132 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

133. Cole has other major life activities that are impaired as well by his disabilities, and which become more severely limited by heat. He cannot stand, walk, lift, or otherwise exert himself physically without feeling chest pain and fatigue, especially during the summer when the indoor apparent temperatures are very high.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶133 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

134. Because of his diabetes, the heat will make Cole feel dizzy and he cannot walk or stand properly—on some days, he can have difficulty concentrating, thinking, or reading. His diabetes also interferes with the operation of several of his major bodily systems, including his circulatory system, endocrine system and digestive system.

**ANSWER:**

55

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶134 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

135. When his cardiovascular disease is uncontrolled, Cole suffers from difficulty breathing and chest pains in the high temperatures. His cardiovascular disease and hypertension impair his respiratory, circulatory, and cardiovascular systems.

**ANSWER:**

This Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶135 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

136. Cole has been treated for heat exhaustion at the Pack Unit. Officers have had to take Cole to the infirmary in a wheelchair because heat illness prevented him from walking there on his own to receive treatment during the heart of the summer.

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶136 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

Plaintiffs' MSJ Appx. 390

137.     During previous summers, Cole has tried to spend extra time in the air-conditioned infirmary after receiving treatment for his disabilities. On at least one occasion, although nurses encouraged him to spend extra time in the infirmary, Warden Herrera ordered him out of the infirmary and to return to his blazing hot dormitory.

**ANSWER:**

**Defendants deny the characterization of the dormitory as "blazing hot." Defendant Herrera denies evicting any offenders from the medical department who had not been released by the medical providers to return to their housing locations. Defendants are unable to admit or deny the remainder of the allegations contained in ¶137 of Plaintiffs' First Amended Class Action Complaint.**

138.     Jackie Brannum suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension and diabetes, and is prescribed antidepressant and psychotropic drugs to treat schizoaffective disorder, a serious mental illness.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶138 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

139.     Brannum takes Amlodipine (a calcium channel blocker), Lisinopril (an ACE inhibitor), Pravastatin (a statin), and Propranolol (a beta blocker) to treat his hypertension and coronary artery disease.

Plaintiffs' MSJ Appx. 391

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶139 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

140. Brannum is an insulin-dependent diabetic, and receives insulin injections twice a day to control his blood sugar levels.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶140 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

141. Brannum suffers from chronic back pain, and takes Carbamazepine and Nortriptyline to treat his pain. (Nortriptyline is an antidepressant that also has pain-relieving properties.) He uses a walker to assist with mobility.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶141 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

58

142.    To control his schizoaffective disorder, Brannum takes Prozac (an antidepressant), and Risperidone (a psychotropic drug). When he is not taking his psychiatric medications, Brannum hears voices, and has thoughts of hurting himself. In the summer, his psychiatric medications make him feel dizzy and lightheaded because of the heat.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records.   Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶142 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

143.    These disabilities impair Brannum's thermoregulatory system. Heat aggravates hypertension, and has caused Brannum to experience extreme fatigue and dizziness in the past during the summer. He often feels fatigue and nausea over the summers, and he has become lightheaded many times. Brannum has also felt his heart race and had difficulty breathing when he has to move in the heat.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records.   Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶143 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

144.    On more than one occasion during the summer, Brannum has told medical providers at the Pack Unit he fell due to dizziness.

59

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶144 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

145.    Brannum has been treated in the infirmary at the Pack Unit during the summer for symptoms like severe dizziness. In September 2014, for example, Brannum had to be taken to the infirmary in a wheelchair when he "over did it" while "cleaning his dorm." A physician at the Pack Unit stopped his prescription for a diuretic medication used to treat his hypertension because it caused him to become dizzy during the summer.

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶145 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

146.    In May 2015, Brannum was taken to the infirmary in a wheelchair after experiencing dizziness and shortness of breath.

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations

Plaintiffs' MSJ Appx. 394

contained in ¶146 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

147. Brannum has also experienced blurred vision and "excessive sweating" during the summer, requiring treatment in the infirmary.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶147 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

148. On several occasions, Brannum has experienced severe headaches during the summer months, and been treated in the infirmary.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶148 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

149. Though Brannum tries to stay hydrated by drinking extra water during the summer, he has required treatment in the infirmary due to dehydration. In May 2014, he became painfully constipated and suffered from serious dizziness because he could not stay hydrated in the extreme indoor temperatures at the Pack Unit.

**ANSWER:**

Plaintiffs' MSJ Appx. 395

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶149 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

150.     During the summer, Brannum has great difficulty sleeping due to the heat and his disabilities. The headaches caused by the heat and his disabilities cause him to have problems concentrating and thinking. Though he used to perform forced labor in the prison's kitchen, due to his heat-sensitive disabilities, he is no longer allowed to work in the prison.

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶150 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

151.     Richard King suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. King has hypertension, obesity, and diabetes.

**ANSWER:**

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶151 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

Plaintiffs' MSJ Appx. 396

152. King takes hydrochlorothiazide (a diuretic), Atenolol (a beta blocker), Lisinopril (an ACE inhibitor), and Terozsin to treat his hypertension. He receives insulin injections twice a day and takes Metformin to control his diabetes.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶152 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

153. King's conditions impair his ability to regulate his body temperature, which, in turn, interferes with his basic, everyday activities. The heat makes it difficult for King to sleep; specifically, he gets so hot at night that his mattress always seems soaked through with sweat. Compounding the strain from sleepless nights, the oppressive daytime heat taxes his body even further, leaving him exhausted. King feels so exhausted in the heat that he is unable to perform simple tasks like standing or walking for long periods of time. The short walk to the chow hall becomes so unbearable he will skip meals.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶153 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

154.     The heat will make King feel dizzy. He has difficulty walking during the summer, and feels like he will lose his coordination and fall over.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶154 of Plaintiffs' First Amended Class Action Complaint.**

155.     King also feels he is unable to perform basic tasks during the summer due to exhaustion from the heat and discomfort from excessive sweating. In fact, TDCJ's medical provider has determined that King cannot perform forced labor at the prison due to his medical conditions. Yet he gets no protection from the indoor heat or humidity.

**ANSWER:**

**Defendants admit that King's Health Summary for Classification lists that he has a restriction for sedentary work only. Defendants deny that King gets not protection from the heat. Defendants lack knowledge or information sufficient to admit or deny that King suffers from the heat and experiences discomfort from excessive sweating.  Defendants deny the remaining allegations contained in ¶155 of Plaintiffs' Amended Class Action Complaint.**

156.     Ray Wilson suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death including chronic obstructive pulmonary disease (COPD), emphysema, chronic bronchitis, coronary artery disease, and hypertension. In addition, Wilson has a hip replacement due to severe arthritis, and requires the use of a walker or wheelchair to move about.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records.   Subject to further investigation by Defendants' medical experts,**

64

Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶156 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

157.    Wilson takes hydrochlorothiazide (a diuretic), Pravastatin (a statin), Isosorbide (a nitrate), and Metoprolol (a beta blocker), to control his hypertension. He takes Atrovent (an anticholinergic), and uses inhalers to treat his asthma.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records.   Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶157 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

158.    Wilson's medications are a necessity for normal respiratory function, especially in hot and humid weather. During the summer, he uses his "rescue" inhaler much more frequently due to the heat and humidity. His medications are also needed to prevent heart failure. However, his conditions and medications make him more sensitive to the heat.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records.   Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶158 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

Plaintiffs' MSJ Appx. 399

159.    On hot summer days, Wilson often feels that he can barely move. His COPD especially makes breathing difficult in the heat.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny that Wilson often feels that he can barely move and that his COPD especially makes breathing difficult in the heat.**

160.    In past summers, Wilson has developed an itchy and unpleasant heat rash due to the extreme temperatures in the inmate housing areas.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶160 of Plaintiffs' First Amended Class Action Complaint.**

161.    During previous summers, Wilson has also been seen in the infirmary for spotty vision.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records.  Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶161 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

162.    Although Wilson tries to drink as much water as he can during each summer day, he still feels dehydrated from the heat.

**ANSWER:**

66

Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶162 of Plaintiffs' First Amended Class Action Complaint.

163.     Fred Wallace suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension, obesity, and major depression.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶163 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

164.     Wallace takes an antidepressant (Prozac) to treat his major depression, an antihistamine (Diphenhydramine), and several medications to treat his hypertension (Gemfibrozil, Lisinopril (an ACE inhibitor), and Terazosin (an alpha blocker)).

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶164 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

165.     These disabilities and medications impair the function of Wallace's thermoregulatory system. TDCJ's medical provider determined Wallace cannot perform forced labor in "extreme temperatures" or "direct sunlight" due to his disabilities and/or prescriptions.

Plaintiffs' MSJ Appx. 401

**ANSWER:**

**Defendants admit that Wallace's Health Summary for Classification lists his restrictions as "no work in direct sunlight," "no temperature extremes," and he is "medically unassigned." Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶165 of Plaintiffs' Amended Class Action Complaint.**

166.     Likewise, Wallace's depression prevents him from engaging in multiple major life activities. Before he went to prison (and began taking Prozac), he would not leave his house or go to work when he was depressed. His depression prevents him from sleeping, causes him to have "low energy," and suffer from thoughts like "I'd be better off dead." Thus, his depression impaired his major life activities or working, thinking, concentrating, and caring for himself.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶166 of Plaintiffs' First Amended Class Action Complaint.**

167.     His obesity and hypertension also interfere with major life activities. Wallace cannot climb into a top bunk due to his obesity, and TDCJ has been instructed by doctors to only assign him a lower bunk. He has been seen in TDCJ's sleep clinic for chronic insomnia related to his obesity and depression.

**ANSWER:**

**Defendants admit that Wallace's Health Summary for Classification lists his restrictions as lower bunk only. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶167 of Plaintiffs' Amended Class Action Complaint.**

168.    During previous summers, Wallace has been taken to the infirmary in a wheelchair when suffering from dizziness and dehydration.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶168 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

169.    Marvin Yates suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension, chronic obstructive pulmonary disease (COPD), coronary artery disease, asthma, diabetes, arthritis, and is a cancer survivor. His body mass index is also over thirty, making him medically obese.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶169 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

170.    Yates takes a calcium channel blocker (Amlodipine), a blood thinner (Clopidogrel), an ACE inhibitor (Enalapril), a diuretic (Furosemide), a statin (Pravastain), and a beta blocker (Metoprolol) to treat his hypertension. His COPD requires treatment with albuterol, a steroid inhaler, and a nebulizer treatment for infections. His coronary artery disease requires treatment with a beta blocker, pravastatin, Plavix, and stents in his heart. Finally, his asthma requires

Plaintiffs' MSJ Appx. 403

treatment with medications including albuterol and a nebulizer for severe attacks, and antihistamines to control his allergies (which exacerbate his asthma).

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶170 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

171. These disabilities and medications impair Yates's thermoregulatory system. He cannot sweat normally to cool himself down, and the blood flow to his skin is limited. It is also difficult for Yates to perform any manual task. He cannot lift objects, perform work, walk, or even stand for an extended period of time. Yates's blood sugar regulation is impaired by his diabetes. He needs to carry candy with him at all times to treat himself when his blood sugar level drops, and his diabetes ultimately impairs his ability to stay hydrated. His breathing is impaired: he becomes short of breath after walking short distances, like from his dormitory to the chow hall. He avoids outdoor recreation because his arthritis makes it too painful to undress and dress as fast as the guards require for the "shakedown" before he can go outside. Yates's medications also impair his ability to think and concentrate, because they cause him to get nervous very easily. Anxiety, exhaustion, or sometimes lying down to sleep cause his bronchial tubes to constrict, making it hard to breathe. Yates's breathing problems generally make it more difficult to get food, recreate, and sleep at the prison—and they are worsened by hot temperatures.

**ANSWER:**

Plaintiffs' MSJ Appx. 404

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts and further investigation in discovery, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶171 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

172. These impairments are aggravated in the summer due to high indoor apparent temperatures at the Pack Unit. During previous summers at the Pack Unit, he has experienced several symptoms of heat-related illnesses, including dizziness, painful muscle cramps, fatigue, blurred vision, and headaches. He has trouble sleeping in the extreme heat because he cannot catch his breath.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts and further investigation in discovery, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶172 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

173. Cole, Wallace, Brannum, King, Wilson, and Yates's medical conditions are typical of other inmates at the Pack Unit. Like these Plaintiffs, many other prisoners at the Pack Unit suffer from physiological conditions that place them at increased risk of heat-related illness, injury, or death. Like these Plaintiffs, many other prisoners at the Pack Unit are prescribed anticonvulsants, anticholinergics, antipsychotics, antihistamines, antidepressants, beta blockers, and diuretics. And, like King, Wilson, and Yates, many other prisoners at the Pack Unit are over age 65.

Plaintiffs' MSJ Appx. 405

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny that "many" other prisoners at the Pack Unit are prescribed anticonvulsants, anticholinergics, antipsychotics, antihistamines, antidepressants, beta blockers, and diuretics. Defendants admit that other prisoners are over age 65. Defendants deny the remainder of the allegations contained in ¶173 of Plaintiffs' First Amended Class Action Complaint.**

174. Because TDCJ classifies the Pack Unit as a "Chronic Care I" facility, the Unit houses a disproportionate number of prisoners with chronic health needs. There are more than 700 prisoners housed there who suffer from physiological conditions or take medications that increase their risk of heat-related illness.

**ANSWER:**

**Defendants admit the Pack Unit is a Type I geriatric facility, see unit description above. Defendants object to the use of the term "disproportionate" as the term is vague, mischaracterizes and is undefined. Since this statistical allegation was prepared by Plaintiffs and contains incomplete information, Defendants lack sufficient knowledge or information to admit or deny the remaining allegations contained in ¶174 of Plaintiffs' First Amended Class Action Complaint.**

175. Plaintiffs take their medications because the prescriptions are necessary to protect their health from their disabilities.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶175 of Plaintiffs' Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 406

176. There are hundreds of otherwise-qualified prisoners with heat-sensitive disabilities housed at the Pack Unit, including the following:

**ANSWER:**

**Defendants deny the allegations contained in ¶176 of Plaintiffs' First Amended Class Action Complaint.**

177.    Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated or exacerbated.

**ANSWER:**

**This allegation is not directed to any specific Defendant. Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶177 of Plaintiffs' First Amended Class Action Complaint.**

178.    Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

**ANSWER:**

Plaintiffs' MSJ Appx. 407

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶178 of Plaintiffs' First Amended Class Action Complaint.

179.    As a consequence, TDCJ policy recognizes patients taking diuretics or beta blockers to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

**ANSWER:**

**Defendants admit that TDCJ has a policy which recognizes patients taking diuretics or beta blockers to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."**

180.    Hypertension can substantially limit a patient's ability to walk, stand, and breathe, and limit the operation of his respiratory, circulatory, and cardiovascular systems, especially when the patient is exposed to extreme temperatures.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore,**

74

it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶180 of Plaintiffs' First Amended Class Action Complaint.

181.     Hypertension itself also increases a patient's susceptibility to heat stress, and, combined with extreme heat, diminishes the body's ability to regulate internal temperature. Thus, a patient with hypertension will be at additional risk of heat-related injuries, and suffer additional pain and punishment above and beyond what an able-bodied inmate at the Pack Unit experiences.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶181 of Plaintiffs' First Amended Class Action Complaint.**

182.     The doctor who cares for all prisoners at the Pack Unit has testified that hypertension increases the risk of heat-related illness.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.     Okay. All right. So those are all medical conditions - - obesity, hypertension, hypothyroidism - - that render you more vulnerable to extreme heat, right?**

**A. That's correct.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 195 ln. 7-11)**

75

183.    TDCJ is aware that hypertension increases patients' risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that hypertension can increase a patient's risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

184.    Approximately 728 prisoners at the Pack Unit suffer from hypertension.

**ANSWER:**

**Defendants admit that statistics provided by UTMB listed approximately 728 offenders at the Pack Unit with hypertension at the time the statistics were provided.**

185.    Asthma is a chronic lung disease that inflames and narrows the airways. It substantially limits sufferers' ability to breathe, causing recurring periods of wheezing, chest tightness, shortness of breath, and coughing. Asthma also substantially limits the operation of the respiratory system.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case.  These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer.  Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information.  Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶185 of Plaintiffs' First Amended Class Action Complaint.**

186.    Heat and humid air can trigger asthma symptoms, causing asthma patients to suffer more pain and punishment in hot environments than people without asthma.

76

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶186 of Plaintiffs' First Amended Class Action Complaint.

187.    TDCJ's medical provider recognizes that asthma is a condition that places patients at increased risk of heat-related illnesses.  The doctor who cares for all prisoners at the Pack Unit has testified that asthma increases the risk of heat-related illness.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants admit that Dr. Fausto Avila has previously testified as follows:

Q.    And asthma's also something that the heat affects, correct?

A.    Yes.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 115 ln. 13-15)

Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶187 of Plaintiffs' Amended Class Action Complaint.

188.    TDCJ is aware that asthma places patients at increased risk of heat-related illness.

Plaintiffs' MSJ Appx. 411

**ANSWER:**

**Defendant TDCJ admits that asthma under certain circumstances *can* place patients at an increased risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

189.    Approximately 113 prisoners at the Pack Unit suffer from asthma.

**ANSWER:**

**Defendants admit that UTMB provided statistics listing approximately 113 prisoners at the Pack Unit as having asthma at the time the statistics were prepared.**

190.    Diabetes is a chronic disease caused by an insulin imbalance. Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶190 of Plaintiffs' First Amended Class Action Complaint.**

191.    Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat.  Sweating is critical to cool the body in extreme heat. An

inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶191 of Plaintiffs' First Amended Class Action Complaint.**

192.    Diabetes also reduces blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶192 of Plaintiffs' First Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 413

193.    The doctor who cares for all prisoners at the Pack Unit has testified that diabetes increases the risk of heat-related illness.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.    Tell the jury - - tell the Court why - - or how diabetes renders you more vulnerable to the heat because of what happens.**

**A.    Diabetes is a condition in which the autonomic nervous system starts deteriorating beside the metabolic problems they have. The regulation of temperature as well as other vital functions gets diminished. The person will develop a neuropathy and the patient will develop a poor response to any kind of autonomic condition. (Deposition of Fausto Avila, M.D., 3/5/2015, pg. 129 ln. 2-10)**

194.    TDCJ is aware that diabetes increases the risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that diabetes *can* increase the risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

195.    Approximately 212 prisoners at the Pack Unit suffer from diabetes.

**ANSWER:**

**Defendants admit that UTMB provided statistics listing approximately 212 offenders at the Pack Unit as having diabetes at the time the statistics were prepared.**

196.    COPD is a disease that makes it difficult to breathe. It includes chronic bronchitis and emphysema.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical**

80

providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶196 of Plaintiffs' First Amended Class Action Complaint.

197.    COPD causes frequent coughing, shortness of breath, and tightness in the chest, among other symptoms.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶197 of Plaintiffs' First Amended Class Action Complaint.**

198.    COPD impairs the operation of the respiratory, circulatory, and cardiovascular systems.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert**

testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶198 of Plaintiffs' First Amended Class Action Complaint.

199. Heat exacerbates COPD, because the body needs to breathe in additional oxygen to help cope with the heat. This requires additional breathing, which is impaired by COPD.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶199 of Plaintiffs' First Amended Class Action Complaint.**

200. The doctor who cares for all prisoners at the Pack Unit has testified that COPD increases the risk of heat-related illness.

**ANSWER:**

**Defendants admit Dr. Fausto Avila has previously testified as follows:**

**A.      Yes, the heat will affect the people with COPD.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 115 ln. 7)**

201. TDCJ is aware that COPD increases the risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that COPD *can* increase the risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

202.     Approximately 84 prisoners at the Pack Unit suffer from COPD.

**ANSWER:**

**Defendants admit that UTMB provided statistics listing approximately 84 offenders at the Pack Unit with COPD at the time the statistics were prepared.**

203.     Schizoaffective disorder is a chronic mental illness in which a person suffers from both symptoms of schizophrenia and a mood disorder (such as major depression or bipolar disorder). Symptoms include paranoia, delusions, hallucinations, severe depression, mania, and thoughts of suicide.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶203 of Plaintiffs' First Amended Class Action Complaint.**

204.     Schizoaffective disorder requires treatment with psychotropic drugs.

Plaintiffs' MSJ Appx. 417

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶204 of Plaintiffs' First Amended Class Action Complaint.

205.    Schizoaffective disorder impairs the operation of the brain.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶205 of Plaintiffs' Amended Class Action Complaint.

206.    Schizoaffective disorder limits patients' ability to think, concentrate, work, care for themselves, see, hear, and sleep.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require

Plaintiffs' MSJ Appx. 418

an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶206 of Plaintiffs' First Amended Class Action Complaint.

207.    According to TDCJ's medical policies, psychotropic drugs increase a patient's vulnerability to heat-related medical conditions, like heat exhaustion, and heat stroke.

**ANSWER:**

**Defendant TDCJ admits that TDCJ policies list that psychotropic drugs *can* increase a patient's vulnerability to heat-related medical conditions, but such risk or possible risk requires an individual assessment for each offender.**

208.    TDCJ is aware that schizoaffective disorder (and the medications used to treat it) increase the risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that schizoaffective disorder and the medications used to treat it *can* increase the risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

209.    Approximately 66 prisoners at the Pack Unit take some type of psychotropic drug.

**ANSWER:**

**Defendants deny the allegation set forth in ¶209 of Plaintiffs' First Amended Class Action Complaint.**

85

210.     Major depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, and problems concentrating.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶210 of Plaintiffs' First Amended Class Action Complaint.**

211.     Depression is a physiological condition affecting body systems, including the brain.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶211 of Plaintiffs' First Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 420

212.     The doctor treating patients at the Pack Unit testified patients with depression may experience difficulty caring for themselves. TDCJ does not dispute this.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has testified regarding this subject; however, objections were raised to this line of questioning. Defendants cannot admit or deny this allegation pending a ruling on the objections asserted during the deposition referenced in paragraph 212. Defendants, therefore, lack knowledge or information sufficient to admit or deny whether there are offenders at the Pack Unit who suffer depression that renders them unable to care for themselves that the health care providers at Pack Unit have not identified.**

213.     TDCJ's medical provider identifies antidepressant medications, like Prozac, as putting patients at much higher risk of heat-related illness. In fact, when a patient is prescribed an antidepressant, the physician informs the patient that these medications "can affect the manner in which the body relates to excessive heat especially in the summer." The patient is told to "contact nursing/security if they [feel] dizzy, confused, or over heated" so their vital signs can be checked. The patient is warned "excessive heat can cause life threatening conditions" and told to "drink plenty of water when the heat is extreme." Despite this explicit warning, TDCJ does nothing to protect inmates taking such medications from the extreme temperatures inside the housing areas.

**ANSWER:**

**Defendant TDCJ denies that it does nothing to protect inmates taking such medications from the heat. Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they**

87

will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶213 of Plaintiffs' First Amended Class Action Complaint.

214.    TDCJ is aware that depression (and the medications used to treat it) increase the risk of heat-related illness.

**ANSWER:**

**Defendants object that allegations are vague and undefined. Defendants admit that certain medications used to treat depression *can* potentially increase the risk of heat-related illness, but is individual to each offender.**

215.    Dean Mojica has not been diagnosed with any medical conditions that make him sensitive to the heat. He also does not take any medications.

**ANSWER:**

**Defendants object to allegations that require an interpretation of an offenders' medical records.   Subject to further investigation by Defendants' medical experts, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶215 of Plaintiffs' First Amended Class Action Complaint, investigation continues.**

216.    Nevertheless, Mojica consistently suffers from headaches, fatigue, and excessive sweating when he is inside his dorm during summers at the Pack Unit. On the worst days, he has the sensation that it is difficult to breathe, as if there is pressure on his chest. Sometimes, he feels his heart beating much harder than normal.

**ANSWER:**

Plaintiffs' MSJ Appx. 422

Defendants object to allegations that require an interpretation of an offenders' medical records. Subject to further investigation by Defendants' medical experts and further discovery, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶216 of Plaintiffs' First Amended Class Action Complaint, investigation continues.

217. Mojica has suffered from painful heat cramps in the back of his legs and in his feet while incarcerated at the Pack Unit.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶217 of Plaintiffs' Amended Class Action Complaint.**

218. Thus, even prisoners without heat-sensitive medical conditions suffer at the Pack Unit due to the high indoor apparent temperatures and cruel conditions.

**ANSWER:**

**Defendants deny that the conditions at Pack Unit are "cruel." Defendants lack knowledge or information sufficient to admit or deny the remainder of the allegations contained in ¶218 of Plaintiffs' First Amended Class Action Complaint.**

219. Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

**ANSWER:**

**Defendants admit that Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(a) and (b)(2), but deny that the requisites for class certification are met in the this case.**

Plaintiffs' MSJ Appx. 423

220.    Plaintiffs propose to represent a class composed of all inmates who currently are, or who in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas. Each Plaintiff is typical of class members.

**ANSWER:**

**Based upon information and belief, Defendants deny that each named Plaintiff is typical and incorporate the Answer at ¶219 as if fully set forth.**

221.    Plaintiffs also seek to represent the following sub-classes of people who 1) are currently incarcerated at the Pack Unit (or will be in the future), 2) are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas, and either:

**ANSWER:**

**Defendants incorporate the Answer at ¶219 as if fully set forth.**

3a. **Heat-Sensitive Subclass:** (i) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction); or, (ii) are prescribed an anticonvulsant, anticholinergic, antipsychotics, antihistamines, antidepressants, beta blockers, or diuretic; or, (iii) are over age 65. Cole, Wallace, Brannum, Wilson, King, and Yates are typical members of this subclass.

**ANSWER:**

90

**Defendants incorporate the Answer at ¶219 as if fully set forth.**

3b. **Disability Subclass:** suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability. Cole, Wallace, Brannum, Wilson, King, and Yates are typical members of this subclass.

**ANSWER:**

**Defendants incorporate the Answer at ¶219 as if fully set forth.**

222.     **Numerosity**: The joinder of each class member would be impracticable because each class is so numerous. The approximate number of class members exceeds 1,400 as the Pack Unit houses over 1,400 inmates and many other inmates could potentially be housed at the Pack Unit during some point during this litigation, or in the future. Joining all members of the class is impracticable due to the minimum 1,400 person size and the fluctuating population of the Pack Unit.

**ANSWER:**

**Defendants incorporate the Answer at ¶219 as if fully set forth. Based upon the lack of a significant number of grievances from offenders and the necessity for an individual review of each offender's medical records, Defendants deny that individual lawsuits would be impracticable; but, rather, would be necessary.**

223.     The subclasses are also sufficiently numerous to satisfy Rule 23(a). Because the Pack Unit is a "Chronic Care I" facility, more than 700 inmates incarcerated there suffer from at least one medical condition or disability that would make them a class member. TDCJ itself identifies over 400 inmates who have "heat restrictions" on their forced labor assignments due to

their vulnerability to "extreme temperatures," though this number is under-inclusive. Likewise, upon information and belief, TDCJ houses a high number of inmates with qualifying disabilities at the Pack Unit.

**ANSWER:**

**Defendants deny the allegations set forth in ¶223 and incorporate their Answers at ¶219 to ¶223 as if fully set forth.**

224. Approximately 200 prisoners over age 65 live at the Pack Unit. Joining all 200 prisoners over age 65 would be impracticable.

**ANSWER:**

**Defendants deny the allegations set forth in ¶224 and incorporate the Answers at ¶219-223 as if fully set forth.**

225. Identifying every inmate at the Pack Unit who is a subclass member would require interviewing hundreds of prisoners, and reviewing each of their medical records. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

**Defendants deny the allegations set forth in ¶225 and incorporate the Answers at ¶219-224 as if fully set forth.**

226. **Commonality**: Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class. A. The common questions of law and fact for the proposed **General Class** are:

     1)   Are all prisoners at the Pack Unit exposed to high apparent temperatures inside the inmate housing areas?

     2)   Does exposing prisoners to the high apparent temperatures in the housing areas

92

at the Pack Unit violate the Eighth Amendment, by denying prisoners safe housing and shelter from the elements?

    3)    Are the members of the General Class entitled to declaratory and injunctive relief?

B.       Further, the common questions of law and fact for the subclasses are:

1)    For the **Heat-Sensitive Subclass**:

    a)    Is the risk of heat-related injuries for the Heat-Sensitive Subclass increased when members are exposed to the high apparent temperatures in housing areas of the Pack Unit?

    b)    Does exposing members of the Heat-Sensitive Subclass to the high apparent temperatures in the housing areas at the Pack Unit violate their Eighth Amendment rights to safe housing conditions and shelter from the elements?

    c)    Are the members of the Heat-Sensitive Subclass entitled to declaratory and injunctive relief?

2)    For the **Disability Subclass**:

    a)    Do the members of the Disability Subclass a) suffer from a disability that substantially limits one or more of their major life activities and b) *either* suffer from a disability that increases the risk of heat-related illness, injury, or death *or* receive any medical treatment necessary to treat their disability that increases the risk of heat-related illness, injury or death?

    b)    Does TDCJ provide reasonable accommodations to prisoners with heat-related disabilities exposed to high apparent temperatures in the housing areas at the Pack Unit?

Plaintiffs' MSJ Appx. 427

      c)      Is TDCJ immune from claims for injunctive and declaratory relief brought under the ADA and Rehabilitation Act?

      d)      Are members of the Disability Subclass entitled to declaratory and injunctive relief?

**ANSWER:**

**Defendants deny the allegations set forth in ¶226 and incorporate the Answers at ¶219-225 as if fully set forth.**

227.    **Typicality:** Plaintiffs' claims are typical and representative of each class and subclass member's claims against Defendants, as identified above. The claims of Plaintiffs and the Class all arise from the same conduct by Defendants (exposing them to unsafe temperatures in the housing areas at the Pack Unit), are based not only on identical legal theories, and also seek identical remedies (injunctive and declaratory relief requiring Defendants to lower the temperatures at the Pack Unit to safe levels). The Pack Unit's housing areas all reach roughly the same temperature levels; the high indoor apparent temperatures threaten all inmates' wellbeing. Plaintiffs' interest in reducing the danger of heat-related illness, injury, or death is identical to every other inmate's interest. All members of the class are similarly injured by Defendants' wrongful conduct.

**ANSWER:**

**Defendants deny the allegations set forth in ¶226 and incorporate the Answers at ¶219-226 as if fully set forth.**

228.    **Adequacy of Class Counsel:** Plaintiffs and their counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interests contrary to those of class members. Plaintiffs' counsel includes a non-profit law firm, the Texas Civil Rights Project (TCRP), whose

mission is to protect the civil rights of low-income Texans. TCRP has prosecuted many class actions, or multi-plaintiff cases that obtained class-like injunctive and declaratory relief. Likewise, Plaintiffs' class counsel, Edwards Law, has litigated complex commercial and civil rights cases, including class actions against multinational corporations and governmental entities. Edwards Law has extensive experience in heat-related temperature litigation against TDCJ, as Plaintiffs' counsel represent the families of eight men who died of heat stroke in TDCJ prisons, and one other man who suffered a non-fatal heat stroke.

**ANSWER:**

**Defendants incorporate the Answers at ¶219-227 as if fully set forth and further state that Defendants do not have sufficient information to admit or deny these allegations. Defendants have previously sought this information in interrogatories to Plaintiffs' attorneys on May 13, 2015 and received nonresponsive answers on June 15, 2015. Defendants were unable to investigate these allegations because Plaintiffs have refused to provide answers to Defendants' First Set of Interrogatories to Plaintiffs' attorneys. Defendants will be unable to investigate these allegations until Plaintiffs provide the facts underpinning these conclusory allegations. Additionally, Plaintiffs have failed to allege the totality of the requirements for adequacy of class counsel, specifically, the work counsel has done in identifying or investigating potential claims in the action and the resources that counsel will commit to representing the class.**

229. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all Class members is impracticable. Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating this

Plaintiffs' MSJ Appx. 429

case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct.

**ANSWER:**

**Defendants deny the allegations set forth in ¶229 and incorporate the Answers at ¶219-228 as if fully set forth.**

230.    Plaintiffs do not seek damages, except as may be incidental to declaratory or injunctive relief.

**ANSWER:**

**Defendants admit that it has been stipulated and pled by Plaintiffs that Plaintiffs are proceeding under Rule 23(b)2 and are not seeking damages in this lawsuit.**

231.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

**ANSWER:**

**Defendants incorporate their Answers at ¶1-230 as if fully set forth.**

232.    Pursuant to 42 U.S.C. § 1983, Livingston and Herrera, in their official capacities, are deliberately indifferent to the substantial risk of serious harm to prisoners at the Pack Unit caused by their choice to expose prisoners to high apparent temperatures inside the housing areas, and unnecessarily and wantonly cause the Plaintiffs pain.

**ANSWER:**

**Defendants deny the allegations contained in ¶232 of Plaintiffs' First Amended Class Action Complaint.**

233.    The high indoor apparent temperatures at the Pack Unit pose an unreasonable risk to prisoners' health.

Plaintiffs' MSJ Appx. 430

**ANSWER:**

**Defendants deny the allegations contained in ¶233 of Plaintiffs' First Amended Class Action Complaint.**

234.    Defendants are aware that extreme heat in their facilities' housing areas poses substantial risk of serious injury to inmates, including Plaintiffs. Defendants' knowledge is demonstrated by TDCJ policies and practices, as well as the well-documented history of injuries to inmates and employees at the Pack Unit. Defendants remain indifferent to the risk, failing to take obvious steps to mitigate it.

**ANSWER:**

**Defendants deny the allegations contained in ¶234 of Plaintiffs' First Amended Class Action Complaint.**

235.    In light of the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within TDCJ's own policy, knowledge of TDCJ's medical providers, and the history of inmate and staff injuries, Defendants know of the risk of heat-related illness, injury, or death that exists at the Pack Unit.

**ANSWER:**

**Based upon the implementation of remedial and mitigations measures during the summer months, as well as the offenders' access to medical care, Defendants deny that the conditions, services, and programs within the Pack Unit violate the Constitution or laws of the United States.**

236.    Defendants are acting with deliberate indifference to Plaintiffs' constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that protect inmates from exposure to extreme heat, and which annually cause injuries to prisoners.

Plaintiffs' MSJ Appx. 431

**ANSWER:**

**Based upon the implementation of remedial and mitigations measures during the summer months, as well as the offenders' access to medical care, Defendants deny the allegations contained in ¶236 of Plaintiffs' First Amended Class Action Complaint.**

237.    Defendants' deliberate indifference to Plaintiffs' risk of serious medical problems puts Plaintiffs at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions.

**ANSWER:**

**Defendants deny the allegations contained in ¶237 of Plaintiffs' First Amended Class Action Complaint.**

238.    Defendants' policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the Eighth Amendments, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

**ANSWER:**

**Defendants deny the allegations contained in ¶238 of Plaintiffs' First Amended Class Action Complaint. Defendants deny that the conditions, services, and programs within the Pack Unit violate the Constitution or laws of the United States.**

239.    As a proximate result of Defendants' unconstitutional policies, practices, acts, and omissions, Plaintiffs and class members have suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

Plaintiffs' MSJ Appx. 432

**ANSWER:**

**Defendants deny the allegations contained in ¶239 of Plaintiffs' First Amended Class Action Complaint.**

240.     For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Plaintiffs Wilson, Wallace, Brannum, King, Yates, and Cole, and other similarly situated prisoners, are qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities.

**ANSWER:**

**Defendant TDCJ lacks sufficient information at the time of this Answer to admit or deny whether the named Plaintiffs are qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities for purposes of the ADA, ADA Amendments Act, and Rehabilitation Act.  Defendant TDCJ asserts that if such impairments are determined to make the named Plaintiffs qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities, that the remedy of refrigerated air-conditioning on a class-wide basis may not be medically necessary, overbroad and an undue burden.  Defendant TDCJ denies that any such determinations can be made on a class-wide basis as urged by Plaintiffs.**

241.     TDCJ fails to reasonably accommodate prisoners with heat-sensitive disabilities. These disabilities (such as asthma, COPD, hypertension, obesity, diabetes, depression, and mental illnesses treated with psychotropic medications) place prisoners at increased risk of heat-related illness, injury, or death, and cause them to suffer more pain and punishment than able-bodied prisoners.

Plaintiffs' MSJ Appx. 433

ANSWER:

**Defendant TDCJ denies the allegations contained in ¶241 of Plaintiffs' First Amended Class Action Complaint.**

242. TDCJ acknowledges in internal documents that people with certain disabilities (like diabetes, hypertension or cardiovascular disease), or who take certain medications to treat their disabilities (like psychotropics, antihistamines, antidepressants, or diuretics), are much more vulnerable to extreme temperatures. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death from heat.

ANSWER:

**Defendant TDCJ admits its polices at Ex. A-D, indicate that people with certain medical conditions like diabetes, hypertension or cardiovascular disease, or who take certain medications to treat their medical or psychiatric conditions (like psychotropics, antihistamines, or diuretics), may be more vulnerable to extreme temperatures and that such a determination requires an individual review of each person's medical and psychiatric records and an individual treatment plan. Defendant TDCJ, therefore, denies that such alleged conditions are disabilities which are capable of class-wide proof for suits brought pursuant to the ADA, ADA Amendments Act, and Rehabilitation Act. Defendant TDCJ denies the remainder of ¶242 of Plaintiffs' First Amended Class Action Complaint.**

243. Plaintiffs Cole, Wallace, Brannum, Wilson, Yates, and King, as well as other similarly situated prisoners, suffer from these heat-sensitive disabilities.

ANSWER:

**Defendant TDCJ admits that its policies at Exs. A-D indicate that people with certain medical conditions like diabetes, hypertension or cardiovascular disease, or who take certain**

Plaintiffs' MSJ Appx. 434

medications to treat their medical or psychiatric conditions (like psychotropics, antihistamines, or diuretics), may be more vulnerable to extreme temperatures and that such a determination requires an individual review of each person's medical and psychiatric records and an individual treatment plan. Defendant TDCJ, therefore, denies that such alleged conditions are disabilities which are capable of class-wide proof for suits brought pursuant to the ADA, ADA Amendments Act, and Rehabilitation Act. Defendant TDCJ denies the remainder of ¶243 of Plaintiffs' First Amended Class Action Complaint.

244.    TDCJ has been, and is, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

**ANSWER:**

**Defendant TDCJ admits the allegations contained in ¶244 of Plaintiffs' First Amended Class Action Complaint and asserts its entitlement to all defenses under the Act.**

245.    Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and has the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq.*

**ANSWER:**

**Defendant TDCJ asserts all of its defenses, including Eleventh Amendment and sovereign immunity, and admits that under certain circumstances, Title II of the ADA and the ADA Amendments Act may apply to the TDCJ, and that if they do apply, the ADA and ADAAA have the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq.***

Plaintiffs' MSJ Appx. 435

246.    Title II of the ADA and the ADA Amendments Act protects prisoners with disabilities because exposure to extreme temperatures also actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

**ANSWER:**

**Paragraph 246 sets forth a legal conclusion which does not require an answer. To the extent it does require an answer, Defendants deny the allegations contained in ¶246 of Plaintiffs' First Amended Class Action Complaint.**

247.    The Pack Unit and other TDCJ units are facilities, and their operation comprises a program and service for Rehabilitation Act, ADA, and ADAAA purposes. Plaintiffs Cole, Wallace, Brannum, King, Wilson, and Yates, and similarly situated prisoners with disabilities, are presently qualified to participate in programs, activities and services in TDCJ facilities at the Pack Unit, such as incarceration in the inmate housing areas.

**ANSWER:**

**Defendant TDCJ denies that all the operations at Pack Unit and other TDCJ facilities, comprise a program and service for Rehabilitation Act, ADA, and ADAAA purposes. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

248.    Defendants know that Brannum, Wallace, Wilson, King, Yates, and Cole, and other similarly situated prisoners with disabilities, suffer from heat-sensitive disabilities, and were prescribed medications to treat their disabilities. Despite their knowledge, TDCJ's officers intentionally discriminated against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures.

**ANSWER:**

Plaintiffs' MSJ Appx. 436

**Defendant TDCJ denies the allegations contained in ¶248 of Plaintiffs' First Amended Class Action Complaint. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

249.    As alleged above, TDCJ fails and refuses to reasonably accommodate Brannum, Wilson, Wallace, King, Yates, and Cole, and other similarly-situated prisoners with disabilities, while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.

**ANSWER:**

**Defendant TDCJ denies the allegations contained in ¶249 of Plaintiffs' First Amended Class Action Complaint. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

250.    As shown above, TDCJ failed, and refused, to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Brannum, Wallace, Wilson, King, Yates, and Cole's disabilities, as well as similarly situated prisoners.

**ANSWER:**

**Defendant TDCJ denies the allegations contained in ¶250 of Plaintiffs' First Amended Class Action Complaint. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

251.    Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983, the ADA, ADAAA, and Rehabilitation Act against Defendants, for themselves and the class, to require TDCJ to provide safe housing conditions at the Pack Unit.

**ANSWER:**

**Defendants incorporate their responses set forth in ¶¶1-250. Defendants admit that Plaintiffs seek injunctive and declaratory relief against Defendants for themselves and the**

103

**class. Defendants deny the allegation that the TDCJ does not provide safe housing conditions at the Pack Unit.**

252.     Without permanent injunctive relief, Defendants will continue their same perilous practices and conduct, disregarding federal legal mandates, and endangering the lives and the welfare of current and future prisoners at the Pack Unit, causing every prisoner to suffer each summer.

**ANSWER:**

**Defendants incorporate their responses set forth in ¶¶1-251.  Defendants admit that Plaintiffs seek injunctive and declaratory relief against Defendants for themselves and the class.  Defendants deny the allegations contained in ¶252 of Plaintiffs' First Amended Class Action Complaint.**

253.     Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein.

**ANSWER:**

**Defendants deny the allegations contained in ¶253 of Plaintiffs' First Amended Class Action Complaint.**

254.     Plaintiffs ask that the Court enjoin Defendants to maintain a safe indoor apparent temperature (e.g. maintaining a heat index of 88 degrees or lower) inside each of the Pack Unit's housing areas (calculated using the NWS heat index table), or enter other injunctive relief sufficient to protect the health and safety of the prisoners at the Pack Unit.

**ANSWER:**

**Defendants deny that an injunction to enjoin Defendants to maintain a heat index of 88°F or lower inside each of the Pack Unit's housing areas is appropriate in this case or that**

Plaintiffs' MSJ Appx. 438

it is established that such a temperature would eliminate all risk of heat-related illnesses or injuries about which Plaintiffs complain.  Further, such a resolution would impose an undue burden and cost on Defendant TDCJ.

255.    Plaintiffs request an order declaring the conditions under which they are housed are unconstitutional.

**ANSWER:**

**Defendants move the Court to deny the relief requested in ¶255 of Plaintiffs' First Amended Class Action Complaint.**

256.    Plaintiffs Cole, Yates, King, Wilson, and Brannum request an order declaring TDCJ violates the Americans with Disabilities Act and Rehabilitation Act by failing to reasonably accommodate inmates with disabilities.

**ANSWER:**

**Defendants move the Court to deny the relief requested in ¶256 of Plaintiffs' First Amended Class Action Complaint.**

257.    Plaintiffs and members of the class are entitled to injunctive and declaratory relief to end this unlawful discrimination.

**ANSWER:**

**Defendants deny the allegations contained in ¶257 of Plaintiffs' First Amended Class Action Complaint.**

258.    Plaintiffs do not seek damages.

**ANSWER:**

**Defendants admit that Plaintiffs do not seek damages as stipulated and pled by the Plaintiffs.**

Plaintiffs' MSJ Appx. 439

259.     259. Pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205 Plaintiffs are entitled to recover attorneys' fees, litigation expenses, and court costs, including expert costs.

**ANSWER:**

**Defendants move the Court to deny the relief requested in ¶259 of Plaintiffs' First Amended Class Action Complaint.**

### III. DEFENDANTS' OTHER DENIALS AND DEFENSES

1.     Defendants deny that the conditions, services, and programs within the Pack Unit violate the Constitution or the laws of the United States.

2.     The Plaintiffs have not stated a claim upon which relief can be granted under 42 U.S.C. §12131 (ADA and ADAAA) or 29 U.S.C. §794 (RA) or under any other statute, constitutional theory, or legal authority.

3.     The Defendants admit that causes of action may be stated under certain circumstances pursuant to 42 U.S.C. §1983, 42 U.S.C. §12131 or 29 U.S.C. §794 but deny that such circumstances are present in this case.

4.     The Defendants invoke all limitations, defenses, and exclusions set forth in the PLRA (Prison Litigation Reform Act) and any other applicable statutes.

5.     The Defendant TDCJ denies that it violated any of Plaintiffs' rights under ADA, ADAAA, or RA or any other law or statute under which Plaintiffs sue or may be suing.

6.     The Defendant TDCJ denies that its employees were motivated by any discriminatory intent of any kind.

7.     The Defendants assert that actions taken relative to Plaintiff(s), concerning any claim alleged by Plaintiff(s) in this lawsuit, were based on a good faith belief that such actions

Plaintiffs' MSJ Appx. 440

were taken in accordance with agency policy, applicable law, and were taken without any discriminatory intent.

8.      The Defendants assert that each alleged challenged action, of which Plaintiffs complain in this lawsuit, was taken for valid and legitimate, non-discriminatory reasons in the context of a prison facility.

9.      The Defendants deny that Plaintiffs are entitled to injunctive, declaratory, or any other relief demanded in the Plaintiffs' Complaint and further deny that Plaintiffs are entitled to attorney's fees or costs in any amount whatsoever.

10.     Defendant TDCJ denies that Congress has abrogated Texas' sovereign immunity for purposes of the ADA, ADAAA or RA.

11.     Defendant TDCJ denies that Plaintiffs requested an accommodation under the ADA, ADAAA, or RA that defendant knew or believed any or all needed an accommodation, or that defendant denied him a reasonable accommodation.

12.     Defendant TDCJ claims that the accommodations now requested by Plaintiffs would impose an undue hardship on Defendant.

13.     Defendant TDCJ asserts that Plaintiff(s) were not a qualified individual with a disability who, by reason of such disability, was excluded from participation in or was denied the benefits of services, programs, or activities of a public entity.

14.     Defendant TDCJ denies that Plaintiffs were subjected to discrimination in violation of the ADA, ADAAA, or RA.

15.     Defendant TDCJ denies that any employee of TDCJ intentionally discriminated against Plaintiffs by reason of or solely because of their alleged disability.

16.      The Defendants assert the defenses of res judicata, statute of limitations, laches,

Plaintiffs' MSJ Appx. 441

estoppel, waiver and lack of jurisdiction to Plaintiffs' claims in this lawsuit.

17.     The Defendants assert that some, and perhaps all, of Plaintiff(s)' complaints may be barred by the applicable statute of limitations and/or by the Plaintiff(s)' failure to exhaust administrative remedies under applicable law; and, thus, the Defendants assert such defenses to the extent these defenses may be applicable.

18.     The Defendants specifically invoke entitlement to Eleventh Amendment Immunity and sovereign immunity as to any of Plaintiff's claims which are not expressly and unambiguously included within the limited waivers of sovereign immunity found in any statute under which Plaintiffs make claims.

19.     The Defendants assert, based upon and information and belief, that Plaintiff(s) failed to mitigate or avoid injury or to take advantage of the remedial measures for the conditions alleged, and that none of such alleged conditions or risk of harm, if any, have been the result of any discriminatory or unconstitutional act by the Defendants, all acts of which the Defendants deny.

20.     The Defendants assert entitlement to the after-acquired evidence defense.

21.     The Defendants assert their right to raise additional defenses that become apparent throughout the factual development of the case.

## JURY DEMAND

The Plaintiffs do not seek money damages; however, in an abundance of caution, in the event any new claims are asserted or the pending claims amended, Defendants demand a trial by jury for all issues so triable.

Plaintiffs' MSJ Appx. 442

## PRAYER FOR RELIEF

For the foregoing reasons, Defendants move the Court to deny all relief requested by Plaintiffs, to enter judgment in Defendants' favor as to all claims asserted by Plaintiffs and to enter an order awarding Defendants all costs, including attorney's fees incurred in the litigation of this matter, and to be granted all such other and further legal and equitable relief to which they may be entitled.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**CHARLES E. ROY**
First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

*/s/ Cynthia L. Burton*
**CYNTHIA L. BURTON**
Assistant Attorney General
Attorney in charge
Texas Bar No. 24035455
Southern ID No. 35273
Cynthia.burton@texasattorneygeneral.gov

**MATTHEW GREER**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24069825
Southern ID No.1171775
Matthew.greer@texasattorneygeneral.gov

Plaintiffs' MSJ Appx. 443

**DANIEL C. NEUHOFF**
Assistant Attorney General
Co-counsel
Texas Bar No. 24088123
Southern ID No.2374885
Daniel.neuhoff@texasattorneygeneral.gov


Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin TX  78711
(512) 463-2080/Fax (512) 936-2109

**ATTORNEYS FOR BRAD LIVINGSTON,
ROBERTO HERRERA, and the TEXAS
DEPARTMENT OF CRIMINAL JUSTICE**

Plaintiffs' MSJ Appx. 444

## NOTICE OF ELECTRONIC FILING

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have electronically submitted for filing **Defendants' Original Answer to Plaintiffs First Amended Class Action Complaint** in accordance with the Electronic Case Files system of the Southern District of Texas on this day August 3, 2015.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that a true and correct copy of the above and foregoing **Defendants' Original Answer to Plaintiffs First Amended Class Action Complaint** has been served electronically to all counsel or *pro se* parties of record as authorized by FED. R. CIV. P. 5 (b)(2) on August 3, 2015.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General

111

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 35

Case No. 4:14-cv-1698
_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
_____

DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ,
individually and on behalf of those similarly situated,
*Plaintiffs*,

*v.*

BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official
capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
*Defendants*.
_____

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

**KEN PAXTON**
Attorney General of Texas

**CHARLES E. ROY**
First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General
For Civil Litigation

**KAREN D. MATLOCK**
Chief, Law Enforcement Defense Division

**CYNTHIA L. BURTON***
Assistant Attorney General

**MATTHEW J. GREER**
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Capitol Station
Austin TX 78711
(512) 463-2080/Fax (512) 495-9139
COUNSEL FOR DEFENDANTS

*Attorney in Charge

I.      NATURE AND STAGE OF PROCEEDING...........................................- 1 -

II.     ISSUES TO BE RULED UPON BY THE COURT ............................- 2 -

III.    STANDARD OF REVIEW .................................................................- 2 -

IV.     SUMMARY OF THE ARGUMENT ...................................................- 3 -

V.      STATEMENT OF FACTS..................................................................- 5 -

    A.  Description of the Pack Unit ........................................................- 5 -

    B.  Pack Unit Staff Fully Implement the TDCJ's Comprehensive Summer Mitigation
        Strategies.....................................................................................- 7 -

        1.  Ice water is provided. ..........................................................- 8 -

        2.  Fans are provided. ...............................................................- 9 -

        3.  Showers are available...........................................................- 11 -

        4.  Ventilation is adequate. .......................................................- 12 -

        5.  Respite areas are provided and accessible. .........................- 13 -

        6.  Wellness-checks are conducted and effective......................- 15 -

        7.  Training and education are provided to both offenders and officers..............- 17 -

        8.  Medical Care is accessible....................................................- 19 -

        9.  Work restrictions help protect the offenders.......................- 20 -

        10. Light clothing and chill towels are allowed. ......................- 22 -

    C.  The named Plaintiffs and their medical histories..........................- 23 -

VI.     ARGUMENT......................................................................................- 23 -

I.      The Fifth Circuit has repeatedly rejected the notion that the Eighth Amendment
        requires air-conditioned prisons...........................................................- 23 -

II.     TDCJ implements a compressive plan to protect offenders from heat, and
        multiple levels of analysis demonstrate the effectiveness of those measures...................- 30 -

    A.  TDCJ and the Pack Unit implement effective mitigation measures that exceed
        those required by the Fifth Circuit. ..............................................- 31 -

        1.  Acclimatization ....................................................................- 31 -

2. Water .................................................................................................. - 33 -

3. Fans .................................................................................................... - 34 -

4. Showers .............................................................................................. - 35 -

5. Ventilation ......................................................................................... - 35 -

6. Respite ............................................................................................... - 36 -

7. Wellness-checks ................................................................................. - 37 -

8. Training and education ...................................................................... - 37 -

9. Medical care & Monitoring ............................................................... - 38 -

10. Work restrictions ............................................................................... - 39 -

11. Light clothing and chill towels ......................................................... - 39 -

B. The TDCJ's current mitigation measures are proving effective on multiple levels. - 39 -

1. Remedial measures are proving successful throughout TDCJ ......... - 39 -

2. Remedial measures are working at the Pack Unit ............................ - 40 -

3. Plaintiffs' experts offer no explanation for the lack of heat-related incidents at the Pack Unit. ................................................................................. - 42 -

4. The named Plaintiffs are not at a substantial risk of harm from heat. ...... - 46 -

III.    The Court should decline to order any injunctive relief. .................................. - 50 -

IV.    Evolving standards of decency do not mandate air-conditioned prisons. .......... - 55 -

A. Air conditioned living quarters is not recognized by the federal or state governments as a necessity or universal right. ................................................. - 56 -

B. Air-conditioned prisons are not the societal norm. ........................................ - 59 -

C. TDCJ's purchase of pig barns has been factually misrepresented by Plaintiffs, and is irrelevant to the issues here. ................................................................... - 62 -

D. Pack Unit's Building Structure Comports with *Ruiz* and Contemporary Standards. ....................................................................................................... - 64 -

V.    Plaintiffs' ADA and Rehabilitation Act claims fail as a matter of law. ............. - 65 -

A. Plaintiffs have not shown that they cannot thermo-regulate. ......................... - 67 -

**B.**     **Plaintiffs have not identified a program or service from which they have been excluded.** ........................................................................................................ - 68 -

**C.**     **Plaintiffs receive reasonable accommodations.** ............................................ - 72 -

**D.**     **TDCJ is immune from Plaintiffs' ADA claims.** .......................................... - 73 -

**E.**     **Plaintiffs' RA claims fail because they fail to show that they are excluded *solely* by reason of their disability.** ........................................................................... - 73 -

**VII.**     **PRAYER FOR RELIEF** ............................................................................... - 75 -

Plaintiffs' MSJ Appx. 450

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240 (1999) .................................................- 50 -

*Althouse v. Roe*, 542 F. Supp. 2d 543, 573 (E.D. Tex. 2008) ...................................- 49 -

*Alton v. Texas A&M Univ.,* 168 F.3d 196, 201 (5th Cir. 1999) .................................- 25 -

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ..................................- 2 -

*Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2511 ..................................................- 2 -

*Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir.1995) ...............................................- 49 -

*Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015)..................................................- 25 -

*Ball*, 792 F.3d at 590 ...................................................................................................- 28 -

*Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir.2005).............- 66 -, - 73 -

*Benson v. Godinez*, 919 F. Supp. 285, 289 (N.D. Ill. 1996) ....................................- 47 -

*Blackmon v. Garza*, 484 Fed.Appx. 866, 872, fn. 6 (5th Cir. 2012)........................- 25 -

*Blackmon*, 484 Fed.Appx. at 872.................................................................................- 27 -

*Blanks v. Swn. Bell Comm'ns*, 310 F.3d 398, 400 (5th Cir.2002) ...........................- 65 -

*Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996) ...............................................- 71 -

Carrion v. Wilkinson, 309 F.Supp.2d 1007, 1016 (N.D.Ohio 2004)........................- 71 -

*Cheek v. Nueces County Tex.*, 2013 WL 4017132 at *18 (S.D.Tex., 2013)............- 70 -

*Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000) ...................................- 25 -

*Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 879 (S.D. Ill. 2009)........................- 47 -

*Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004)............- 70 -

*Decker v. Dunbar*, 633 F.Supp.2d 317, 343 (E.D.Tex.2008) ..................................- 47 -

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001) .......................- 24 -

*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) *(en banc)*..............- 67 -

*eBay-Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ...............................- 51 -

*Edelman v. Jordan*, 415 U.S. 651, 666-68 (1974) ....................................................- 50 -

*Edelman v. Jordan*, 415 U.S. 651, 668-669 (1974) ..................................................- 51 -

*Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363 (5th Cir.2013)..................................- 68 -

*Estelle v. Gamble*, 429 U.S. 97, 102 (1976) ..............................................................- 55 -

*Ex Parte Young*, 209 U.S. 123, 159-60 (1908) .........................................................- 50 -

*Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1976 (1994) ..................- 23 -, - 24 -

*Farmer*, 511 U.S. at 834 ...............................................................................................- 24 -

*Farmer*, 511 U.S. at 844 ...................................................................................- 24 -, - 26 -

Galvin v. Cook, No. CV 00-29-ST, 2000 WL 1520231, at *6 (D.Or. Oct.3, 2000)..................- 71 -

*Garner v. Chevron Phillips Chem. Co., L.P.,* 834 F.Supp.2d 528, 529 (S.D.Tex. 2011).........- 67 -

*Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) ....................................................- 25 -

*Gates*, 376 F.3d at 339 ........................................................................................- 26 -, - 27 -

*Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir.2001) ...........................................- 24 -

*Gibbs*, at 617–18 ..........................................................................................................- 25 -

*Gladden v. Roach*, 864 F.2d 1196, 1200 (5th Cir.1989)...........................................- 49 -

*Griffin v. United Parcel Serv., Inc.,* 661 F.3d 216, 223 (5th Cir.2011) ...................- 66 -

*Hale v. King*, 642 F.3d 492, 500 (5th Cir.2011) ........................................................- 67 -

*Hall*, 190 F.3d at 697 ...................................................................................................- 24 -

*Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009)........................- 66 -

*Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir.2012)..................................................- 70 -

*Hernandez ex rel. Hernandez v. Texas Dep't. Of Protective and Regulatory Services*, 380 F.3d 872, 883 (5th Cir. 2004)..................................................- 25 -

*Hoffman v. Baylor Health Care System*, 2014 WL 772672 (N.D.Tex. 2014)..........................- 67 -

*ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) ..........................................- 51 -

*Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007).......................................- 66 -

*Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir.1994) .............................................................- 49 -

*Kentucky v. Graham*, 473 U.S. 159, 165 (1985)..................................................................- 50 -

*Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir.2002) ..............................................- 24 -

*Lee v. Valdez*, 2009 U.S. Dist. LEXIS 43381, 2009 WL 1406244 at *13 (N.D. Tex. May 20, 2009) .............................................................................................................................- 71 -

*Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 410 (5th Cir. 2013).........................- 67 -

*Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir.2009).......................................................- 47 -

*McCoy v. Tex. Dep't of Crim. Justice*, 2007 WL 2331055, at *7 (S.D.Tex. 2006) .................- 72 -

*Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir.2013).......................................- 66 -

*Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012)........................................- 69 -

*Oswalt v. Sara Lee Corp.*, 74 F.2d 91, 92 (5th Cir. 1996) ..................................................- 67 -

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ................................................................- 53 -

*PCI Transportation Inc. v. Fort Worth & Western Railroad Co.,* 418 F.3d 535, 545 (5th Cir.2005) ............................................................................................................................- 51 -

*Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 63 F.3d 690, 693 (5th Cir.1995) ...- 50 -

*Penry v. Lynaugh*, 492 U.S. 302, 331 (1989) .....................................................................- 56 -

*Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992)..........................................- 25 -

*Ruiz v. Estelle, et al.*, 503 F.Supp. 1265, 1274 (S.D. Tex.1980) .........................................- 64 -

*Ruiz v. Johnson*, 154 F. Supp. 2d 975, 996 (S.D. Tex. 2001) ..............................................- 65 -

*Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 704 (N.D. Tex.2014)..................- 74 -

*Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir.2010) ........................................- 71 -

*Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002)...............................- 66 -, - 73 -

*Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir.1988) .................................- 2 -

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, (1999) .......................................................- 67 -

*Tamayo v. Perry*, 553 F. App'x 395, 400-01 (5th Cir. 2014)...............................................- 56 -

*Trop v. Dulles*, 356 U.S. 86, 100-101 (1958) ....................................................................- 55 -

*Tuft v. Texas*, 410 Fed.Appx. 770, 775 (5th Cir.2011) .......................................................- 70 -

*United States v. Georgia*, 546 U.S. 151 (2006) ................................................................- 73 -

*Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir.2008) ...................................................- 28 -

*Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645-46, 122 S.Ct. 1753, 1760 (2002) ...........................................................................................................- 51 -

*Wolff v. McDonnell*, 418 U.S. 539, 566, (1974) ...............................................................- 53 -

*Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir.1996) ...............................- 66 -, - 74 -

*Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995).........................................................- 23 -

*Woods*, 51 F.3d at 581...................................................................................................- 25 -

## Statutes

18 U.S.C. § 3626(a)(1)....................................................................................................- 52 -

18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2) .............................................................................- 52 -

18 U.S.C. §3626(a)(1)(A) ................................................................................... - 52 -

42 U.S.C. § 12102(1) ......................................................................................... - 66 -

Tex. Govt. Code § 501 ........................................................................................ - 61 -

Tex. Govt. Code §§ 2002.051- 2002.056............................................................ - 61 -

Tex. Util. Code § 39.903..................................................................................... - 59 -

**Other Authorities**

*Correctional Institutions Division—Prison*, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
http://www.tdcj.state.tx.us/unit_directory/p1.html (last visited Nov. 15, 2015) ................... - 5 -

*Ahead of Second Special Session, Alabama's Prisons in Crisis*, ALABAMA NEWS (Sep. 7,
2015, 5:05 PM), http://www.alabamanews.net/home/top-stories/Ahead-of-the-Second-Special-
Session-Alabamas-Prisons-in-Crisis-325492141.html ....................................................... - 60 -

John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment As A Bar to
Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1741 (2008)................................................... - 55 -

www.sos.state.tx.us/tac/ ..................................................................................... - 61 -

**Rules**

Tex. S.B. 7, 76th Leg., R.S. (1999).................................................................... - 59 -

**Treatises**

1B Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 16.08 (4th ed. 2006)- 49

**Regulations**

Admin. Code §259.160 ....................................................................................... - 61 -

Admin. Code Title 7 ........................................................................................... - 61 -

Plaintiffs' MSJ Appx. 453

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID BAILEY, MARVIN RAY YATES, KEITH COLE, and NICHOLAS DIAZ, individually and on behalf of those similarly situated, Plaintiffs, | § § § § § § | |
| v. | § § | No. 4:14-cv-1698 |
| BRAD LIVINGSTON, in his official capacity, ROBERTO HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants. | § § § § § § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**NOW COME** Brad Livingston in his Official Capacity as the Executive Director, Robert Herrera in his Official Capacity as the Warden of Pack Unit, and the Texas Department of Criminal Justice and submit Defendants' Motion for Summary Judgment and attached Appendix.

## I.     NATURE AND STAGE OF PROCEEDING

Plaintiffs initially moved for class certification immediately after filing their original complaint. (D.E. 5)  Rather than take up the issue prior to discovery, the Court deferred ruling until after discovery and after the motion was re-urged.  In the intervening months, the parties have conducted wide-ranging discovery including hundreds of thousands of pages of disclosures and numerous depositions.  This Court opted against bifurcated discovery and Plaintiffs were afforded several months to complete any necessary discovery for their motion.   After informing the Court that they did not intend to request or obtain any medical records from the putative class members (D.E. 281), Plaintiffs filed their Amended Motion for Class Certification. (D.E. 272)  Defendants have offered their response, and resolution of the issues is still pending before the Court. (D.E.

307) After disclosure of Defendants' expert reports, Plaintiffs were afforded the opportunity to submit rebuttal expert reports, but chose not to do so. (D.E. 295) Defendants now move for summary judgment on the claims asserted on behalf of the named Plaintiffs.

## II.   ISSUES TO BE RULED UPON BY THE COURT

**I.**   **Whether, in light of TDCJ's comprehensive heat-mitigation strategy and track record of success, Defendants have been deliberately indifferent to a substantial risk of serious harm to the named Plaintiffs due to the indoor temperatures at the Pack Unit.**

**II.**   **Whether injunctive is relief is warranted where no Constitutional violation has been established and where Plaintiffs request for injunctive relief is overbroad.**

**III.**   **Whether contemporary standards of decency require air-conditioned prisons where society has not adopted air-conditioning as a universal right.**

**IV.**   **Whether Plaintiffs ADA and Rehabilitation Act claims can be squared with controlling law.**

## III.   STANDARD OF REVIEW

The role of a court or judge in summary judgment proceedings is to make the "threshold inquiry of determining whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). If this inquiry reveals that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," judgment should be entered in his favor. FED. R. CIV. P. 56(c). Disagreement among the parties as to the facts will not prevent summary judgment. *Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2511. On the contrary, summary judgment is precluded under Rule 56(c) only when the dispute is genuine and the disputed facts might affect the outcome of the suit. *Anderson*, 477 U.S. at 248; *Speaks v. Trikora Lloyd P.T*., 838 F.2d 1436, 1438-39 (5th Cir.1988).

- 2 -

When petitioning a court for summary judgment the movant need not disprove the non-moving party's claims. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); accord *Slaughter v Allstate Ins. Co.,* 803 F.2d 857, 860 (5th Cir.1986). Thus, if the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff] will bear the burden of proof at trial" the defendant is entitled to judgment in his favor. *Celotex*, 477 U.S. at 322.

## IV.    SUMMARY OF THE ARGUMENT

In view of the undisputed facts, the named Plaintiffs' Eighth Amendment and disability claims fail as a matter of law. Under the Eighth Amendment, Plaintiffs have failed to show that TDCJ officials have ignored a serious risk of harm posed to their health or safety due to the indoor temperatures at the Pack Unit. TDCJ has designed, implemented, and improved upon a comprehensive heat mitigation strategy that includes protective mitigation measures, thorough training and education, and close monitoring to ensure the well-being of offenders during the summer months. These measures meet and exceed those previously required by the Fifth Circuit to meet the Eighth Amendment, which does not require air conditioned prisons. Undisputed evidence confirms that these measures are robustly implemented at the Pack Unit, and, combined with the physiological health benefits of acclimatization, that they are effective. As shown below, their efficacy is demonstrated on multiple levels, including expert medical testimony describing the appropriateness and utility of TDCJ's measures, system-wide macro-level analysis that shows the remarkable rarity of heat-related illness throughout TDCJ, and on the micro-level by analyzing the health effects (or the lack thereof) of the heat on each of the named Plaintiffs. Taken together,

- 3 -

this evidence shows that the indoor temperatures at the Pack Unit do not pose a substantial risk of serious harm to the named Plaintiffs. Though the temperatures are uncomfortable and at times unpleasant, this does not state an Eighth Amendment claim under binding precedent.

Injunctive relief would be inappropriate here for multiple reasons. First, an injunction could only stand on a finding of a Constitutional violation, which is not present here. Second, an order to air-condition the entire Pack Unit would be overbroad within the meaning of the Prison Litigation Reform Act, as recently interpreted by the Fifth Circuit.

Further, evolving standards of decency do not require air conditioned prisons. At both federal, state, and local levels, our society has not defined air conditioning as a necessity, but instead as a luxury. This is seen through census data, public housing requirements, and Medicare rules. Further, across the southeastern United States, state prison systems operate without air conditioning. In Texas, both the Pack Unit and numerous other facilities were designed and constructed under close federal judicial oversight following *Ruiz*. The stipulations include detailed specifications on heating and ventilation, but do not require air-conditioning, even though the feature was widely used at the time.

Finally, Plaintiffs' ADA and Rehabilitation Act claims also fail as a matter of law. Each of the named Plaintiffs are able to maintain their thermoregulation, which is the operative question under the disability inquiry. Plaintiffs also have been provided a host of reasonable accommodations in the form of mitigation measures, and Plaintiffs have failed to identify a program or service they are unable to access. Finally, Plaintiffs ADA claims fail because TDCJ is immune under the Eleventh Amendment as the alleged conditions do not rise to a Constitutional violation, and Plaintiffs' RA claims fail under the more stringent causation standards applicable to

- 4 -

the RA.

## V.    STATEMENT OF FACTS

### A.    Description of the Pack Unit

The Wallace Pack Unit is a prison operated by the Texas Department of Criminal Justice. It is one of 109 custodial facilities operated by TDCJ across the state. (Appx. 1091:17-19[1]) Located in Navasota, Texas, it was brought on line in September 1983. The Pack Unit is a type I Geriatric facility, which means it is a single level facility that affords offenders sheltered sleeping areas, shorter distance to the pill window for medication administration, and longer times for meal consumption. (Appx. 222)    Seventy (70) wheelchair accommodations compliant with the Americans with Disabilities Act (ADA) are also available at the Pack Unit. (Appx. 222) The Pack Unit is not a "nursing home." Offenders over the age of 65 years are assigned to the Pack Unit if and only if they are independent in activities of daily living, such as bathing, grooming, feeding, toileting, etc. (Appx. 222) Elderly offenders who are not capable of managing their independence in the activities of daily living are assigned to assisted living and/or long term inpatient care. (Appx. 222)

The Pack Unit houses approximately 1450 offenders with approximately 334 employees. Pack (*P1): Correctional Institutions Division—Prison*, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/unit_directory/p1.html (last visited Nov. 15, 2015). All services are on a single level, including assisted disability services showers and CPAP accommodating housing. (Appx. 793-98) The Pack Unit and the Luther Unit work in cooperation to operate cow/calf production; edible and field crops, farm shop, security horses; security pack

---

[1] Depositions are referred to by their Appendix page number, followed by the line numbers (Appx. __:__).

- 5 -

canines, swine finishing, and grain storage.  There are sixty (60) wheelchair accommodated cells and a 12-bed infirmary.  Medical care is available 24 hours a day, seven days a week.  Digital Medical Services, electronic specialty clinics and chronic care clinics are available.  In addition to the medical services provided, there are several educational programs, a faith-based dormitory, Protective Safekeeping, Adult Education Program, Life Decisions Program, Peer Education, Reentry Planning, Chaplaincy Services, Community Tours and GO KIDS Initiative.

The Pack Unit has three separate housing areas: the main building, expansion dorm, and the trusty camp.  In each of these areas, the offenders are not housed in individual cells, but instead, the unit is set in a dormitory style setting.  Each offender is assigned their own cubicle in an open room.  As has been alleged, the housing areas at the Pack Unit do not contain refrigerated air.  Like many TDCJ facilities, the environmental conditions within the Pack Unit were specified in minute detail during the *Ruiz* litigation. (Appx. 630-666)

Though not air conditioned in the housing areas, the Pack Unit has several areas with air conditioning that offenders are able to access: the education department, lower administration, infirmary, laundry captain office, food service captain office, lieutenant's office, regular visitation room, barber shop, trusty camp office for the sergeant and lieutenant, the trusty camp visitation, trusty camp food service office, agriculture office, farm shop office, kennel office, unit maintenance office, warehouse office, and the BOQ dayroom. (Appx. 747; Appx. 1137:22 to 1138:3; Appx. 1125:5-18; Appx. 1145:20 to 1146:3)  Many of the named Plaintiffs regularly spend significant amounts of time in these areas.  For example, Plaintiffs Cole, King, and Brannum all voluntarily work in the offender craft shop all day Monday-Thursday, which has an area where there is a window A/C unit they are allowed to access.  (Appx. 1176:19 to 1178:2; Appx. 1193:4

- 6 -

to 1194:10; Appx. 1216:14 to 1217:8)  Plaintiff Yates, regularly attends the law library, which is also air conditioned. (Appx. 1286:13 to 1287:2)

**B.**     **Pack Unit Staff Fully Implement the TDCJ's Comprehensive Summer Mitigation Strategies.**

TDCJ recognizes the potential for danger that comes with housing offenders in an un-air-conditioned environment, and has devised, implemented, and continuously reviewed and improved upon a series of measures designed to protect offenders from effects of heat.  (Appx. 582-624)  Officials from multiple disciplines meet yearly, and TDCJ's mitigation measures, training and education, and formal policies have evolved over the years as TDCJ has built on its successes and improved on its practices.  (Appx. 674-76; Appx. 1102:11-25 to 1103:1-3)  The TDCJ's practices are reflected in formal policies and procedures and in a yearly directive from the administration to all TDCJ employees to specifically address heat-illness prevention.  (Appx. 582-624)

The TDCJ's mitigation strategy includes protective measures made available to offenders, training and education for both offenders and staff, and active monitoring and medical care to ensure the well-being of offenders.  These measures meet and exceed those required by binding precedent.  The record is undisputed that each measure is in place at the Pack Unit.  Even under the extreme conditions of 2011, no heat-related illnesses were reported from the Pack Unit to TDCJ Health Services. (Appx. 811)  Following a report of heat-related illnesses at the Pack Unit in late June of 2012, officials from within TDCJ and the Pack Unit administration met to discuss the mitigation measures at the unit and ways to enhance them. (Appx. 777-788, 791-92)  Today, the Pack Unit aggressively implements TDCJ's mitigation measures, and the results have led to the near elimination of indoor heat-related illness over the last three summers.  (Appx. 948-1038)

- 7 -

### 1. Ice water is provided.

The provision of ice water is an important remedial measure implemented by TDCJ and the Pack Unit. TDCJ Administrative Directive 10.64 establishes that drinking water and cups shall always be available to offenders in conditions of hot weather. (Appx. 587) Furthermore, when the outdoor heat index is over 90 degrees, units will provide additional water and cups in offender dorms and housing areas and during meal times, along with ice, if possible. (Appx. 589)

At the Pack Unit, ice water is available and passed out to the offenders 24 hours a day, seven days a week. (Appx. 1129:19-22; 1134:20-21; Appx. 1106:5-11; Appx. 1150:23-24). Seven offenders are assigned to ice and water distribution at the Pack Unit. (Appx. 626-629). These designated offenders are assigned to a water and ice wagon, which they take on a pushcart to make sure the jugs in the housing dormitories are full of ice and water. (Appx. 1113:1-25; 1114:1-7). These offenders walk up and down the hallway constantly checking and refilling the water jugs. (Appx. 1115:14-17). The expansion dorm also has push button water fountains with cold water. (Appx. 790) Offenders at the Pack Unit are provided access to ice water and regular water constantly throughout the summer months.

From a medical perspective, access to ice water and regular water is the number one remedial measure that can be implemented during times of high temperatures because hydration is the single most important factor in the prevention of heat related injury and effectiveness of thermoregulation. (Appx. 31, 178) Water is four times more efficient at transferring heat than air. (Appx. 12) Dehydration, the loss of water, impairs thermoregulation independent of environmental temperatures. *Id.* Access to ice water and regular water is one of the actions taken by TDCJ and the Pack Unit that has largely mitigated the risk of heat illness at the Pack Unit. (Appx. 214)

- 8 -

Plaintiffs' deposition testimony confirms they all have regular access to ice water and drink quite a bit of water every day. (Appx. 1179:2-17; Appx. 1198:3-19; Appx. 1289:10-16; Appx. 1249:4-10; Appx. 1213:15-24; Appx. 1236:12-17; Appx. 1269:7-17) Several named Plaintiffs testified when the ice jug runs out, it generally doesn't take very long before it is refilled and the officers and offenders tasked with refilling them do a good job. (Appx. 1180:17-19; Appx. 1213:25 to 1214:2; 24 to 1215:24; Appx. 1267:17-22, 1268:15-24; Appx. 1292:3 to 1293:5)[2] In addition, the expansion dorms have push button water fountains and the offenders are served an iced beverage 3 times a day with meals. (Appx. 1212:3-6; Appx. 1198:15-19). Even in the instances where the refill crew has not yet refilled a jug, there is always water available from sinks in the dorm area. (Appx. 1249:8 to 1250:12; Appx. 1196:2-14). The evidence is undisputed that iced water is available nearly all of the time, and there is never a time when the offenders are entirely without water from sinks and fountains.

### 2. Fans are provided.

Every offender at the Pack Unit has access to a personal fan and large fans in their housing areas. TDCJ Administrative Directive 10.64 establishes that in situations where the outdoor heat index is over 90 degrees Fahrenheit, units must ensure maintenance of fans, blowers, and showers in offender housing areas. (Appx. 589) Furthermore, when the outdoor heat index is over 90 degrees, units will allow fans for offenders in all custody levels, to include administrative segregation and disciplinary status. (Appx. 590) Units also should ensure a fan program is in place

---

[2] Curiously, only one of the Plaintiffs testified that he filed a grievance about the water coolers running out of water regularly and not being refilled. (Appx. 1195:7-24). Despite this, his evidence is not corroborated by the other named Plaintiffs' testimony nor by Pack Unit staff. However, Cole did testify that he drinks at least 10, 14 or 16 oz. bottles of water every day, drinks at least half a pitcher of ice water every single meal he goes to, and also has ice water in the craft shop and air conditioning that he utilizes. (Appx. 1194: 8-19; 1206a:5-22; 1198:3-19).

allowing the permanent issue of fans to indigent offenders. *Id*. Also, personal fans shall only be confiscated if altered or stolen. *Id*.

Offenders either purchase their own personal fans or they are given them if they are indigent. The Pack Unit has taken aggressive steps to ensure that each and every offender has a personal fan. (Appx. 1131:13-23;1132:16 to 1133:16; Appx. 1118: 15-19; Appx. 1143:25 to 1144:3). At the Pack Unit, offenders are allowed to have personal fans and these fans are not confiscated unless they have been manipulated or tampered with or are stolen. But as a rule of thumb, the Pack Unit does not confiscate fans. (*Id.*)

In addition to personal fans, there are large fans positioned in the housing areas. There are four big fans in each dorm area, one in the front and one in the back and two mounted fans to blow into the cubes. (Appx. 790-791; 1118:20 to 1119:8; Appx. 1144:5). The Pack Unit also has at least eight backup fans on standby when their fans go out. (Appx. 1120:14-19). The Pack Unit also has four "Big Ass Fans" in the Expansion Dorm. (Appx. 1121:20-24).

From a medical perspective, the use of fans increases air flow across the skin, which increases the evaporation of sweat, and helps cool the skin. (Appx. 032) A new study published in the Journal of the American Medical Association found electric fans can make at least a six degree difference in the ambient temperature our bodies can cope with before we start to overheat. *Id*. The study found that you experience a lower amount of physiological strain at 42 degrees Celsius (107.6 degrees Fahrenheit) with a fan than you do at 36 degrees Celsius (96.8 degrees Fahrenheit) without a fan. (Appx. 032) This remedial measure is effective because it helps increase the evaporation of sweat on the skin. (Appx. 032)

- 10 -

Plaintiffs' deposition testimony reveals that they all have personal fans. (Appx. 1181:15-16; Appx. 1199:1-3; Appx. 1224:4-18; Appx. 1234:4-6; Appx. 1246:17-23; Appx. 1263:16-17; 1291:8-24)  Plaintiffs also confirm that there are large fans in each dorm. (Appx. 1182:4-21; Appx. 1205:1-5 & 1197:16-21; Appx. 1246:17 to 1247:1; Appx. 1264:20-24; Appx. 1290:11-25; Appx. 1222:2-13)  The fans do help.  (Appx. 1223:20-21; Appx. 1181:22-23; Appx. 1263:20 to 1264:6)  The implementation of this measure is undisputed.

### 3. Showers are available.

Offenders are afforded access to three showers every day, with afternoon and evening showers utilizing cold water for its cooling effect. (Appx. 790-91)  While the provision of showers has always been part of TDCJ mitigation strategy, it is incorporated into the extreme temperature conditions policy during the summer. (*See* Appx. 584-595). If the outdoor heat index is over 90 degrees, TDCJ units offer additional showers to offenders if possible, and drop the water temperature in housing areas where a temperature adjustment is possible. (Appx. 589)  Following the issuance of the *Ball* opinion, TDCJ administrators took action to ensure that the temperatures were lowered in showers to ensure their cooling effect. (Appx. 796-98)

At the Pack Unit, offenders are given several opportunities to shower daily. Additional showers have been allowed at the Pack Unit for some time.  (Appx. 1116:25 to 1117:8)  The water temperature for the extra showers is lowered. (Appx. 1156:14-20)  For Offenders housed in the main building, showers are available up to three times per day, with afternoon and evening cool down showers supplementing the always scheduled morning showers. (Appx. 29; Appx. 1201:8 - 19; Appx. 1262:1 to 1263:15). For offenders housed in the expansion dorm and trusty camp, access to showers is even more generous—unlimited shower access is available from 6:00 AM to 11:00

Plaintiffs' MSJ Appx. 464

PM. (Appx. 1135:23 to 1136:4; Appx. 1218:25 to 1221:7; Appx. 1232:16-20). Both the expansion dorm and the trusty camp showers allow for cold water shower. (Appx. 790-91) If an offender needs to take a shower to cool down between 11:00 PM and 6:00 AM, the officers of the Pack Unit have been trained to allow them to do so. (Appx. 1135:23 to 1136:4)

Medically, showers are an effective remedial measure to take when combating warm temperatures because water helps transfer heat away from the body. Showers facilitate thermoregulation by artificially facilitating the transfer of heat from the body into the environment, effectively lowering body temperature. (Appx. 209). All of the named Plaintiffs in this lawsuit confirmed in their depositions that they have access to cool down showers. (Appx. 1179:3-15; Appx. 1192:9-12; Appx. 1218:25 to 1221:7; Appx. 1232:12 to 1233:20; Appx. 1245:3- 23; Appx. 1262:1 to 1263:15; Appx. 1245:3-23; Appx. 1282:21 to 1286:12). Most testified that they take advantage of the opportunity to take a cool down shower and find that the showers effectively cool them down for some period of time. (Appx. 1179:3-15; Appx. 1201:8-19; Appx. 1218:25 to 1221:7; Appx. 1232:12 to 1233:20; Appx. 1262:1 to 1263:15; Appx. 1282:21to 1286:12). It is undisputed fact, therefore, that the offenders at Pack Unit are provided the opportunity to shower multiple times per day in cool water.

### 4. Ventilation is adequate.

The TDCJ has long understood and supported the importance of air exchange. Since the early 1990's TDCJ has worked diligently to maintain its facilities, including extensive updates to the ventilation systems present at prison units. (Appx. 645-653) In regards to housing areas, the 2015 yearly heat precaution email stated: "When using fans, air should be drawn through the

- 12 -

structure and exhausted outside. Take full advantage of the fresh air exchange system or prevailing winds to assist in the movement of air as applicable." (Appx. 609-614)

At Pack, adequate ventilation is provided throughout offender housing areas. Certain sections of offender housing at Pack are equipped with operable windows for ventilation. Though the expansion dorms are not equipped with operable windows, air exchange is supported by a robust ventilation system. (Appx. 1126:11- 19). Data from a 2012 TDCJ Filed Report indicates that the ventilation at Pack supports air exchange, as no offender housing area had an average air movement rate of lower than 297.2 cubic feet per minute per occupant, well above the average amount of 15 cubic feet per minute per occupant. (Appx. 671). The unit Risk Manager, Debra Allison, testified that steps are undertaken to ensure that the ventilation system is functioning properly. (Appx. 1141:23 to 1142:5). The deposition testimony of the Plaintiffs supports the TDCJ's position that the ventilation at the Pack Unit is not only constitutionally adequate, but also plays a role in mitigating the chances of heat-related illness. (Appx. 1241:11- 19).

### 5. Respite areas are provided and accessible.

TDCJ and the Pack Unit provide on demand access to air conditioned areas should an offender request to access one. On July 24, 2015, an email sent by Deputy Director Eason memorialized the use of air conditioned respite areas as a remedial measure implemented at Pack Unit. (Appx. 533) Though respite areas were being used throughout the TDCJ system, the directive sought to formalize the practice and ensure offender awareness of how to access a respite area. (Appx. 796-97) This email directed each Unit Warden to designate air-conditioned areas on the facility as respite areas and send a memorandum to all unit staff listing the locations. (Appx. 533) Furthermore, the email also required a notice posted in common areas to notify all offenders

- 13 -

of the locations of respite areas on the unit, as well as instructions for requesting the use of a respite areas. (Appx. 533)  In the event that an offender notifies staff of a heat-related illness, staff is required to allow the offender to be evaluated by medical staff, and if appropriate, provided immediate access to a respite area. (Appx. 533)

At the Pack Unit, these respite areas are: the education department, lower administration, officers dining hall, infirmary, laundry captain office, food service captain office, lieutenants office, regular visitation room, barber shop, trusty camp office for the sergeant and lieutenant, the trusty camp visitation, trusty camp food service office, agriculture office, farm shop office, kennel office, unit maintenance office, warehouse office, and the BOQ dayroom. (Appx. 747; Appx. 1137:22 to 1138:3; Appx. 11255-18; Appx. 1145:20 to 1146:3). The notice also says that if an offender is experiencing difficulty due to the heat, please notify a staff member immediately. (Appx. 747). All an offender has to do to get respite in an air conditioned area is to ask for it, and if they ask for a respite area from the heat the medical department is going to be notified.  (Appx. 1147:15 to 1149:12; Appx. 1138:4-15).  Offenders are evaluated by medical if they request respite from the heat because both officers and the medical staff need to know if there is anything else that needs to be done to protect the offender. (Appx. 537-38)  Offenders are not charged any fee for this service. (Appx. 537-38)

From a medical perspective, the use of air conditioned respite areas is important because it is a helpful back-up system to the other measures already in place to help mitigate the heat. (Appx. 29-30). These areas are where an offender can be placed when necessary to aid in cooling and reducing core body temperature. (Appx 29).  Respite areas are a preventative measure and can be

- 14 -

used as part of an initial response to an offender who feels symptoms which might be related to heat. *Id*.

Plaintiffs' deposition testimony reveals that they all know of the notice identifying potential air conditioned respite areas. (Appx. 1183:14 to 1184:3; Appx. 1203:25 to 1204:3; Appx. 1225:22 to 1226:25; Appx. 1237:14 to 1238:6; Appx. 1251:6-15; Appx. 1271:11-21; Appx. 1297:8-11) Curiously, only one of the named Plaintiffs, Dean Mojica, has requested to go to one of the respite areas. (Appx. 1184:4-6; Appx. 1203:25 to 1204:3; Appx. 1238:7-25; Appx. 1251:16 to 1253:8[3]; Appx. 1271:22 to 1272:23)

### 6. Wellness-checks are conducted and effective.

TDCJ performs wellness checks on heat-sensitive offenders to ensure their well-being and identify any heat-related issues before they escalate into a more serious condition. (Appx. 583). Upon an offender arriving at a TDCJ facility, medical staff tracks the medical history and medication intake of offenders to determine if they may be susceptible to heat-related illness. (Appx. 587). Subsequently, during times of potential heat extremes, TDCJ performs "Wellness Checks" on these offenders, a process during which correctional officers check on offenders who are potentially predisposed to temperature-related issues because of current medication or medical history. (Appx. 583). This measure was strengthened following the events of the summer of 2011, as TDCJ officials felt that earlier intervention would ensure that heat sensitive offenders were treated before heat stress escalated into more serious symptoms. (Appx. 673-76)

---

[3] Plaintiff Wallace did say that he was refused access to a respite area at one point, when he was waiting in a line and asked to go to the barbershop; however, when he asked to go into the area he did not tell the officer he needed respite from the heat. After 10 to 15 minutes the officer directed all of the waiting offenders into the respite area anyway. (Appx. 1252:1- 25).

- 15 -

At the Pack Unit, a wellness check-list is generated to identify offenders who may be susceptible to heat-related illness. (Appx. 1108:17 to1109:11) The individual offenders identified on the wellness list are then checked on during times of potential heat illness to ensure they are not exhibiting signs of heat related illness, which they are trained to identify. (Appx. 1109:25 to 1110:23) During wellness checks, correctional officers are trained to go through the dorm, observe heat sensitive offenders, and to take immediate action if they see something wrong or the offender voices a complaint. (Appx. 1111:20 to 1112:5) The performance of wellness checks is documented so as to ensure compliance with TDCJ policy. (Appx. 1111:15- 19)

TDCJ "Wellness Check" policies work with Correctional Managed Health Care ("CMHC") polices to mitigate the potential for heat related illness. (Appx. 172-173) Medical providers at the unit are responsible to diagnose offender medical conditions and monitor offender medication. (Appx. 597-607) Medical providers place work restrictions on offenders who are heat sensitive and, therefore, excluded from certain work assignments. (Appx. 172-173) These work restrictions are noted on the Pack Unit well-check list and the heat sensitive offenders are monitored to ensure their safety during warmer weather. (Appx. 172-173) Wellness checks are an important measure TDCJ, in conjunction with its medical providers, takes to monitor, treat, and combat heat related illness.

The monitoring process also takes place system-wide. CMHC policies require that all heat-related illness be reported to TDCJ Health Services. (Appx. 240) Those reports are collected and complied by a registered nurse, Phyllis McWhorter. (Appx. 240-41) When she receives a report, she reviews the offender's current HSM-18 data to ensure that the offender has the proper heat-

- 16 -

related restrictions. (Appx. 241) If he/she does not, she contacts the unit provider to bring this to their attention for review.[4] (Appx. 241)

      The named Plaintiffs confirmed in their depositions that Pack Unit staff are being diligent in their performance of wellness checks. (Appx. 1188:22 to 1189:6; Appx. 1206:15- 20; Appx. 1259:9-14; Appx. 78, Ln. 1277:17- 25) Plaintiff Ray Wilson would not confirm an exact time frame for the wellness checks, but Plaintiff Fred Wallace confirmed the checks happen about every 30 minutes. (Appx. 1277:17- 25; Appx. 1259:9-14)

### 7. Training and education are provided to both offenders and officers.

      Training and education of offenders and staff is another important component of TDCJs mitigation strategy. TDCJ Administrative Directive 10.64 establishes that each warden shall ensure training for the prevention of injuries due to extreme temperatures is provided by unit medical staff to all supervisors designated by the warden. (Appx. 591). Supervisors shall then be responsible for training employees and work assigned offenders. (*Id*.) Also, non-work assigned offenders shall be notified of heat awareness via the dayroom bulletin boards and other common use areas, or through publications such as *The Echo* or the TDCJ *Offender Orientation Handbook*. (*Id*. at 9) Each summer a heat precaution reminder is sent to every unit. (Appx. 609-624) This heat precaution reminder outlines that training includes ensuring employees and offenders are aware of the signs of and treatment for heat-related illnesses by conducting training. (Appx. 609) The reminder also requires all employees carry an information (pocket) card which lists the signs of heat-related illness. (*Id*.)

---

[4] It should be noted that it's the health care provider, not TDCJ Health Services or correctional staff, who assesses and decides what restrictions based on medical conditions are appropriate for each offender.

At the Pack Unit, the pocket card carried by all officers and staff lists the symptoms of various heat illnesses and treatment for those illnesses. (Appx. 749-750) Posters are put up in offender housing instructing offenders to: drink water often, rest in the shade, report heat symptoms early, and know what to do in an emergency. (Appx. 752) Another poster titled "Refresh. Rehydrate. Replenish" provides offenders with a urine color chart so that they can monitor whether they may be dehydrated or not. (Appx. 753) Officers are provided with training on heat related illnesses and prevention through: a video provided by UTMB; a leaflet provided by UTMB; a training packet consisting of the yearly heat reminder email, medical policy CMHC 27.2; the unit policy, Pack Unit SOP Temperature Extremes Hot and Cold Weather; AD 10.64; and a training circular.  (Appx. 757; Appx. 609-624; Appx. 759-763; Appx. 583-595; Appx. 597-607; Appx. 805-808; Appx. 1151:16 to 1152:5, 21 to 1153:5; Appx. 1122:1-11)  Officers are also trained on drugs and co-morbidities that may affect heat tolerance; and to provide 24/7 access to water at all times.  (Appx. 1159:1 to 1160:25; 1161:19-21; 1162:4-10)  Offenders also are trained on the leaflet from UTMB and on the risk management training circular. (Appx. 757; Appx.1154:19 to 1155:5). Offenders also are trained by their work supervisors, if they have a job assignment, or through the newsletter, posters, through the offender orientation handbook.  (Appx. 1163:11-20; Appx. 800-803)  Offenders also receive counsel from medical staff on heat stress. (*See e.g*., Appx. 100-01, 121)

From a medical perspective, training and education about heat illness treatment and prevention, including proper hydration is very important because it is up to each individual to drink the available water. (Appx. 031) Offenders are instructed to be aware of the signs and symptoms of heat illness, including urine color which might indicate dehydration, and to report symptoms of

- 18 -

possible heat-related illnesses immediately so proper medical attention can be obtained. (*Id.*) Heat related injury and stroke are preventable given access to water, medical care, resident education and offenders taking personal responsibility for health related behaviors. (Appx. 177)

Plaintiffs' deposition testimony confirms they all have received training about heat-related illness prevention and treatment whether through posters in the housing areas, through work training, or through training in the offender craft shop. (Appx.1185:16 to 1187:6; Appx. 1206:4-14; Appx. 1209:11 to 1211:15; Appx.1239:12 to Pg. 78, Ln. 1240:10; Appx. 1257:15 to 1258:11; Appx. 1278:6 to 1279:21; Appx. 1297:8 to 1298:11). Wilson also had significant training on heat illnesses outside of TDCJ. (Appx. 1273:21 to 1274:11). Not only is this an undisputed fact, it is a remedial measure that is important in reducing the incidents of heat related illnesses at the Pack Unit.

### 8. Medical Care is accessible.

Minor incidents of headaches, dizziness, or shortness of breath are part of the experience of summer for free and imprisoned people alike. These sorts of symptoms do not cause lasting impact, and can be appropriately treated by medical staff. (Appx. 162)

Any offender who reports to a staff member that he is not feeling well due to the heat, or if he requests to access a respite area, staff will either take the offender to the medical department for evaluation or he will be taken directly to a respite area and medical staff are summoned for triage. (Appx. 537-39) Offenders are not charged a co-pay for this service. (Appx. 537-39) This allows potential heat stress to be addressed early, and before it escalates into a heat-related illness.

In addition to care at the unit level, TDCJ also monitors heat-related illness system-wide. Healthcare staff at the unit report all potential heat related illnesses to the TDCJ Health Services.

- 19 -

(Appx. 240-41) This data has been used to identify trends, and facilitate corrective action, including at the Pack Unit. (Appx. 777-788, 791-92)

Medical care is also an important component in the management of conditions that can affect heat tolerance. Many offenders who have risk factors for heat injury are acclimatized to heat and will suffer no heat-related illness or injury. (Appx. 56, 65, 72, 81, 86-87, 95-96, 103 and 115; also Appx. 163, 174, 178-179) The elevated risk posed by conditions such as diabetes, obesity, hypertension, and cardiovascular disease (among others) is reduced by care and management for that condition. (Appx. 22; *also* Appx. 168-170) There is no dispute that each of the named Plaintiffs know how to access medical care, and have done so in the past. (Appx. 41-132)

### 9. Work restrictions help protect the offenders.

TDCJ and the Pack Unit also take steps to reduce offender activity in times of high temperatures to reduce the possibility of heat stress. TDCJ Administrative Directive 10.64 and CMHC 27.2 establish at apparent outdoor temperatures of approximately 90 degrees: staff are to ensure adequacy of water intake; look for signs of heat exhaustion; and provide five minute rest breaks every hour. (Appx. 594; Appx. 599). When the apparent outdoor temperature reaches approximately 105 degrees: staff are to promote high water intake; provide five minute rest breaks every one-half hour, lying down with feet up; and are to reduce work by one-third. *Id*. When the apparent outdoor temperature reaches approximately 130 degrees: staff are to secure outside work or reduce work pace by one-half to two-thirds; provide 10 minute rest breaks every one-half hour, lying down with feet up; and insist on increased water intake. *Id*. The annual heat precaution email reminder reiterates that Wardens and Units are to restrict outside activity in accordance with AD-

- 20 -

10.64. (Appx. 610). Staff are also to ensure that anyone working in areas of extreme heat such as, field, maintenance, and yard squads are provided frequent water breaks. *Id*. Staff are also to provide additional water, including ice if available, to employees and offenders in work areas. *Id*.

The Pack Unit has a unit specific standard operating procedure ("SOP") for extreme temperature conditions. (Appx. 759-763) Not only does the Pack Unit SOP restrict outside activity in accordance with AD-10.64, it also provides other specific work restrictions. (Appx. 760 & 762) For example, all officers assigned to supervise outside work squads must: be fully cognizant of the SOP and AD 10.64; and be trained to recognize signs of heat & cold stress and must know emergency procedures for treating any weather related physical trauma as well as basic first aid. (Appx. 762) There are also certain restrictions placed on certain types of work squads. Maintenance squads may turn out in any weather for emergency repairs or inside work. *Id*. Community Work Squads may turn out in any weather, if working indoors, out of the weather. *Id*. The Line Force will not turn out when the Heat Index is 105 degrees Fahrenheit, without a warden's approval. *Id*. The Outside Yard Squad also will not turn out when the Heat Index is 105 degrees Fahrenheit or above; except, they may be turned out to address safety/security issues outside the Unit or in emergency situations. *Id*. The Trash Crew, Inside/Outside Yard Squad, Farm Shop, Buffalo Ranch, and Livestock Handlers/Kennel Workers may be turned out in any weather based on the senior security supervisor's discretion. *Id*. This is because these jobs are critical to the safe and sanitary operation of the unit and are critical to the operations of each area. *Id*. The Pack Unit also follows AD-10.64 with regard to outdoor work restrictions. (Appx. 1157:12 to 1158:3; Appx. 1107:5-12). The Pack Unit restricts outdoor work based on certain temperature criteria, which is important in preventing heat-related injuries.

- 21 -

### 10. Light clothing and chill towels are allowed.

The ability to wear lighter clothing and the availability of special cool down towels are additional measures implemented by TDCJ and the Pack Unit. TDCJ Administrative Directive 10.64 establishes that offenders shall be provided and required to wear clothing appropriate for the temperatures and hazards imposed by UV radiation. (Appx. 587) Furthermore, when the outdoor heat index is over 90 degrees, offenders are allowed to wear shorts in dayrooms and recreational areas. *Id.* at 7. Each summer a heat precaution reminder is sent to every unit. (Appx. 609-624) This heat precaution reminder lists allowing offenders to wear t-shirts and shorts in dayrooms and recreational areas as a precaution to be taken in housing areas. (Appx. 611) In addition to lighter clothing, offenders frequently will wet a towel or cloth and wrap it around their neck or other areas to keep cool. (Appx.1130:17-21, Appx.1131:1-5)

At the Pack Unit, offenders are allowed to wear shorts and t-shirts in their dorms, dayrooms and recreational areas. (Appx. 1123:1-1124:8; Appx. 1150:19-25; Appx.1156:14-20) From a medical perspective, allowing offenders to wear lighter clothing in their dorm, dayrooms and recreation areas is one of the important prevention measures that is working. (Appx. 173, 177) Plaintiffs' own expert, lists wearing light clothing as a personal adaptation that can help lower the risk of heat-related illness. (D.E. 272-4 at 19)

Offenders also can purchase a "chill towel" from the commissary which can be used in the housing area or brought to their work assignment. (Appx. 1130: 17-21; Appx. 1131: 1-5, Appx. 771, 790-91) When wet, the towel begins to evaporate and cool, providing cool, soft comfort to the user. When it stops cooling, simply re-wet the towel in hot or cold water and wring it out. Within minutes, it's cool again. (Appx. 790-91, see also *Chilly Pad*, FROGG TOGGS,

- 22 -

http://www.froggtoggs.com/cooling/the-chilly-pad/chilly-pad.html (last visited Nov. 15, 2015).

The towels are sold to offenders at just over half the cost the manufacture charges the general

public. (Appx. 771, 790-91, *Chilly Pad*, FROGG TOGGS,

http://www.froggtoggs.com/cooling/the-chilly-pad/chilly-pad.html (last visited Nov. 15, 2015).

Plaintiffs testified that they are allowed to wear lighter clothing, such as shorts and t-shirts,

in their dorms and dayrooms, and some of the Plaintiffs testified that this helps them during the

summer. (Appx. 1185: 9-18; Appx. 1200:7-18; Appx. 1227:16-18; Appx. 1239: 3-8; Appx. 1248:

8-14; Appx. 1265:15- Appx. 1266: 6; Appx. 1288: 7-11)

    **C.**    **The named Plaintiffs and their medical histories.**
           **(Please see attachment filed under seal.) [5]**

## VI.    <u>ARGUMENT</u>[6]

    **I.**    **The Fifth Circuit has repeatedly rejected the notion that the Eighth Amendment requires air-conditioned prisons.**

Offenders are protected from cruel and unusual punishment under the Eighth Amendment

of the United States Constitution. *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995). The

Constitution does not mandate comfortable prisons, but, the Eighth Amendment's prohibition

against cruel and unusual punishment does require that offenders be afforded "humane conditions

of confinement." *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1976 (1994). The resulting

---

[5] In order to avoid the necessity of filing Defendants' Motion for Summary Judgment under seal, this section of Defendants' statement of facts is provided in a separate document, but should be read and incorporated as Section C of Defendants' Statement of Facts.

[6] In addition to the arguments and authorities cited below, Defendants adopt and incorporate by reference the argument and authorities contained in Defendants' Response to Plaintiffs' Amended Motion for Class Certification as applicable to the issues here. (D.E. 307, 309)

inquiry, deliberate indifference, is an "extremely high" standard. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001).

A two-part test determines whether a prisoner has established a constitutional violation. *Woods*, 51 F.3d at 581. First, he must demonstrate the objective component of conditions "so serious as to deprive prisoners of the minimal measure of life's necessities, as when it denies the prisoner some basic human need." *Id.* (quotation omitted). This requires a showing of an "unnecessary and wanton infliction of pain ...." *Farmer*, 511 U.S. at 834.

The second part of the inquiry focuses on the subjective state of mind of the defendants. "The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the ... officials were actually aware of the risk, yet consciously disregarded it." *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir.2002). "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants." *Hall*, 190 F.3d at 697 (*quoting Farmer*, 511 U.S. at 834). Thus, the "'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838). Further, a prison official cannot be held liable even if he "responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety. *Farmer*, 511 U.S. at 844.

As well established as the legal principles may be, plaintiffs have continuously sought to lower the applicable standard to negligence. It is clear that the deliberate indifference requirement is more than mere negligence. *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir.2001). Deliberate indifference "is a degree of culpability beyond mere negligence or even gross negligence; it must

- 24 -

amount to an intentional choice, not merely an unintentionally negligent oversight." *Gibbs*, at 617–18 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992); *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir.2000)). "[A]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Hernandez ex rel. Hernandez v. Texas Dep't. Of Protective and Regulatory Services*, 380 F.3d 872, 883 (5th Cir.2004) (quoting *Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir.1999)).

In the specific context of risks posed by indoor temperatures, the Fifth Circuit has specifically defined the Constitutional inquiry which should drive the Courts' analysis here. The bright line for when heat amounts to a Constitutional violation is when heat goes from being not just uncomfortable, but, rather to the level of posing "an unreasonable risk of serious damage to a prisoner's health." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015). Stated more succinctly, to be un-Constitutional, the indoor temperatures must pose a "substantial risk of serious harm." *Id*. The Court reaffirmed that "merely uncomfortable" heat in a prisoner's cell does not reflect "a basic human need that the prison has failed to meet" and is not constitutionally suspect." *Id*. (*quoting Woods*, 51 F.3d at 581). The Fifth Circuit has for over a decade, repeatedly rejected the notion that the Eighth Amendment requires air-conditioned prisons. *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir.2004); *Blackmon v. Garza*, 484 Fed.Appx. 866, 872, fn. 6 (5th Cir.2012); *Ball*, 792 F.3d at 599. Instead, prison officials may discharge their Constitutional obligations by implementing measures designed to mitigate the health risks posed by the heat, but have declined to establish any maximum temperature levels. These measures need not remove any and all risk of a heat-related injury, they only need to lower that risk "to a socially acceptable level. Some risk is

- 25 -

permissible and perhaps unavoidable." *Ball*, 792 F.3d at 599; (*accord*, *Farmer*, 511 U.S. at 844 (holding that a prison official's duty under the Eighth Amendment is to ensure "reasonable safety")).

The Fifth Circuit first defined the Constitutional test regarding heat in prisons in 1995 in *Woods*, 51 F.3d at 581. In *Woods*, the offender Plaintiff in the Louisiana prison system claimed he was being housed in extended lockdown in a cell that was inadequately cooled in the high temperatures. *Id.* While he claimed that this aggravated a sinus condition, there was no medical evidence of any adverse health affect. *Id.* The Court held that an uncomfortable temperature alone does not violate the Eighth Amendment, first establishing the principle that cooling is not a basic human need that prisons must provide. *Id.*

In *Gates*, the Fifth Circuit affirmed a district court's injunction that required the Mississippi Department of Corrections to "provide fans, ice water, and daily showers when the heat index is 90 degrees or above, or alternatively to make such provisions during the months of May through September." *Gates*, 376 F.3d at 339. In the Mississippi Delta, the summer temperatures average in the nineties with high humidity, and the plaintiff's expert testified that that heat index in the housing areas reached as high as 127-140°F. *Id.* at 334. *Gates*, 376 F.3d at 334. (Appx. 812- 815) Death Row primarily was not an air-conditioned facility, but did have industrial sized fans in the hallways to help with circulation. *Id.* Most offenders had smaller fans. *Id.* Although the windows could be opened, holes in the cell window screens allowed mosquitoes into the cells. The court found that "ventilation is inadequate to afford prisoners a minimal level of comfort during the summer months." *Id.* The court further found that "the probability of heat-related illness is extreme on Death Row, and is dramatically more so for mentally ill offenders who often do not take

- 26 -

appropriate behavioral steps to deal with the heat. Also, the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature." *Id.* Importantly, after making these findings, the Fifth Circuit affirmed the *remedial measures* of fans, extra showers, ice water, and ventilation---not cooling of death row. *Gates,* 376 F.3d at 339. This ruling forms the baseline measures that Fifth Circuit prison systems must implement to mitigate the heat.

Subsequently, the Fifth Circuit declined to hold that an offender (Blackmon) who was 63-64 years old, had pre-existing high blood pressure, and was taking medications that could have interfered with his body's ability to dissipate heat, had demonstrated as a matter of law required by the Eighth Amendment that the "remedial measures required by the *Gates* court are insufficient to address the risks of high heat and humidity, particularly with regard to prisoners who are younger and healthier than Blackmon." *Blackmon*, 484 Fed.Appx. at 872. Even though Blackmon's expert testified that there were 51 days where the heat index was 103 degrees or higher, the Fifth Circuit specifically noted that "like the *Gates* court, we do not suggest that air conditioning is mandatory to meet the requirements of the Eighth Amendment." *Id.* at 871-72, fn. 6. In reversing and remanding the case for a new trial, the Fifth Circuit held the district court erred by granting judgment as a matter of law in favor of the defendants where the "evidence did not militate so strongly in Defendants' favor that a reasonable jury could not have reached a verdict in Blackmon's favor." *Id.* at 874. The fact questions for the new trial included (1) whether prison officials provided enough cool water; (2) whether the remedial measures at the Garza West Unit were inadequate to satisfy the Eighth Amendment's demands in summer heat where there was an industrial fan as well as an air handler but no air conditioning; offenders were not able to use

- 27 -

personal fans because of a lack of electrical outlets; the windows were sealed; the only water came from dirty sinks; and Blackmon alleged he had to wait an hour to take a shower because two of the four showers were broken; and (3) whether, despite remedial measures implemented by prison officials, Blackmon was exposed to serious health risks while incarcerated at Garza. *Id.* at 871-872. *Blackmon*, therefore, stands for the proposition that to demonstrate deliberate indifference in a summer heat living conditions case, the plaintiff must show either that remedial measures are not being implemented, or if they are being implemented, the measures are inadequate to eliminate the health risks posed by summer heat. *See also, Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir.2008) (holding that high temperatures combined with alleged prohibition on leaving bunk to drink water and only periodic access to showers constituted a cognizable Eighth Amendment claim).[7]  But, in either case, cooling by "air conditioning" is not suggested by the Fifth Circuit to meet the requirements of the Eighth Amendment.

The Fifth Circuit's previous precedent recently culminated in *Ball v. LeBlanc*, in which the Court again rejected the notion that the Eighth Amendment requires air-conditioned prisons. *Ball* involved a similar suit filed by three offenders housed in the particular section of the Angola State Prison designed for death row.  *Ball*, 792 F.3d at 590.  They claimed the lack of air-conditioning in light of their medical conditions placed them at substantial risk of harm in violation of their Eighth Amendment rights.  *Id.* The plaintiffs sought an injunction that the prison be air-conditioned to the heat index at or below 88° F, the same relief sought here.  *Id.* at 589.  The District Court granted their request for injunctive relief by finding a Constitutional violation and ordering the state to lower the temperatures to 88° F, a measure that only could be accomplished through air-

---

[7] It should be noted that at trial, the offender-plaintiff's claims were proven false, and the jury returned a verdict in favor of the defendants.

conditioning. *Id*. at 598. The Fifth Circuit reversed.

In holding that the District Court did not abuse its discretion in finding a substantial risk of harm, the Fifth Circuit specifically noted that such a finding was predicated on the fact that the district court held that the *Gates* measures had not been fully and adequately implemented. *Id*. at 595-96. The offenders did not possess person fans and the existing fans were positioned in a way that did not provide air flow to each cell, nor [do] the fans provide "a detectable cooling effect." *Id*. at 595. Ice was only available once per day when the offender was permitted to leave his cell. *Id*. at 595-96. The showers temperatures were between 100-120 degrees, which meant they provided little relief from the heat. *Id*. at 596.

Despite finding a plausible Eighth Amendment violation, the Fifth Circuit held that the injunctive relief ordered by the District Court was impermissible under the PLRA for three reasons. First, the goal of the injunction was too broad: "[A]ir conditioning… is unnecessary to correct the Eighth Amendment violation. Under the PLRA, Plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Id*. at 599. Importantly, the Fifth Circuit explained that the Constitution does not require the elimination of <u>all</u> risk of heat illness as the injunction was designed to create. The Fifth Circuit held the Constitution requires only that the risk be lowered "to a socially acceptable level. Some risk is permissible and perhaps unavoidable." *Id*.

Second, the injunction was overbroad in its scope. By ordering the entire facility air conditioned, the District Court provided an overbroad remedy, where a more appropriately tailored remedy would be targeted to the Plaintiffs specifically. Coupled with an order to keep the Plaintiffs in the appropriately accommodated cell, a narrower means was available, and had to be utilized

- 29 -

under the PLRA. *Id.* at 599-600.

Finally, the injunction also was held overbroad because the court failed to consider or order remedial measures of the type ordered in *Gates*, 376 F.3d at 336. Even if those measures needed enhancement or more robust implementation, the PLRA mandates that these types of measures be implemented before air-conditioning could be deemed necessary. Air conditioning, therefore, is not the appropriate remedy until all of these steps have been considered. *Ball*, 792 F.3d at 600 ("…assuming that air conditioning is an acceptable remedy here—and it is not…") *Gates*.

As shown fully below, TDCJ's comprehensive response to the dangers of heat negates both the objective and subjective components of the deliberate indifference inquiry. No one within TDCJ disputes that, absent protective mitigation measures, the heat in the Pack Unit housing area can create a risk of harm to offenders who live there. The TDCJ devised, implemented and continuously reviewed and improved upon summer mitigation measures. (Appx. 674-76; Appx. 1098:1- Appx.1100:1) With the mitigation measures in place at the Pack Unit, the named Plaintiffs are not denied a minimal measure of life's necessities or basic human need under the objective prong of the deliberate indifference inquiry. In addition, under the subjective prong, TDCJ's implementation of a comprehensive strategy that includes mitigation measures, education, and monitoring along with TDCJ's belief in their efficacy, negate any notion that TDCJ's executives or staff are consciously disregarding a substantial risk posed by the heat.

## II.    TDCJ implements a compressive plan to protect offenders from heat, and multiple levels of analysis demonstrate the effectiveness of those measures.

In light of the standards set forth in *Ball* and *Gates*, the appropriate inquiry should focus on the measures actually in place at the Pack Unit, and the extent to whether those measures are effective. Plaintiffs failed to dispute that TDCJ implements its mitigation measures. The measures

- 30 -

implemented exceed those required by the Fifth Circuit. That these measures have proven effective can be demonstrated on multiple levels. The medical testimony explains the utility of each measure along with the protective health effects of acclimatization. A macro-level analysis shows the remarkable rarity of heat-related illness at the Pack Unit and throughout TDCJ. A micro-level analysis of the medical history of each named Plaintiff demonstrates that while the conditions at the Pack Unit might be uncomfortable at times, none are at substantial risk of harm from the heat. Together, this evidentiary record shows that the named Plaintiffs cannot meet their burden to show that they are at a socially unacceptable risk of serious harm or that Defendants are deliberately indifferent to such risk.

### A. TDCJ and the Pack Unit implement effective mitigation measures that exceed those required by the Fifth Circuit.

TDCJ has devised, implemented, and continuously reviewed and improved upon a series of measures designed to protect offenders from the effects of heat. These measures were created and are reviewed by prison officials from multiple disciplines within the complex field of prison administration. These officials meet yearly, and TDCJ's mitigation measures, training and education, and formal policies have evolved over the years as TDCJ has built on its successes and made improvements where appropriate. (Appx. 673-76; Appx. 1102:11- Appx. 1103:3) The result is a comprehensive strategy that meets and exceeds the measures established by the Fifth Circuit.

#### 1. Acclimatization

The human body is a compilation of complex, interconnecting biochemical pathways with redundancy, feedback loops and layers of backup systems. If one process fails, then another process is triggered to compensate and accomplish the function. (Appx. 22) Such a process is acclimatization, which is a major factor in protection from heat related illness. Acclimatization

- 31 -

increases the body's capacity to handle high temperatures in a number of ways. (Appx. 10-14) The human body generates "heat shock proteins" which protect vital system functions from damage and protect our body at the cellular level. (Appx. 11, 13-14) Acclimatization takes place over the course of several days after the body is exposed to higher temperatures. (Appx. 13) The body's multiple and redundant cooling systems and their enhancement through acclimatization explain why a person may have an impairment or take a medication that might affect one or more of these systems, but are nonetheless safe and will not suffer a heat-related injury. (Appx. 56, 65, 72, 81, 86-87, 95-96, 103 and 115; *also* Appx. 163, 174, 178-179)

Both TDCJ and Correctional Managed Healthcare Committee policies recognize the importance of acclimatization. It is listed as the best preventative measure for heat stress. (Appendix. 597) Newly received offenders are screened upon arrival for conditions that might affect heat tolerance, and the necessary individuals are added to the well-check procedure. (Appendix 587; See also, section 7, *supra*) Beverages with sodium added can be considered based on the offender's level of acclimation. (*Id.*) When any new offender receives a work assignment, his workload is reduced and separated by mandatory rest periods as he becomes acclimated. (*Id.*)

At the Pack Unit specifically, the vast majority of the offenders are acclimated to the heat as it is a unit of assignment and not an intake or transfer facility, and the offenders have lived in an un-air-conditioned environment for some time. This is true for each of the named Plaintiffs, whose medical records indicate that they are acclimated to the heat, even though they may find the conditions to be uncomfortable. (Appx. 56, 65, 81, 86-87, 95, 103, 115) The health benefits of acclimation combined with aggressively implemented mitigation measures provide an explanation why, despite the fact that the Pack Unit houses many older offenders and offenders with complex

- 32 -

medical conditions and medications, indoor heat-related injuries have been nearly eliminated.

      2.    **Water**

As outlined above, the record is undisputed that the Pack Unit provides ice water and water from sinks and fountains to the offenders. (See *Statement of Facts,* Section B. 1.) The availability of water is an important remedial measure implemented by TDCJ and recognized in *Gates and Ball* as a method of combating the effects of heat. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. In *Gates* and *Ball*, Plaintiffs' own expert opined that, short of providing air conditioning, the remedial measure of providing an ample supply of drinking water at all times and ice several times a day, among other measures, is adequate for cooling the human body when the temperature or heat index exceeds 88 degrees F. (Appendix 514; Appendix 521).[8]  Defense experts concur that this is an appropriate and effective measure. (Appx. 12, 31, 178, 214).

Plaintiffs' concerns that arsenic in the drinking water poses a threat to offenders safely drinking the water during summer months are greatly overstated.  First, a new arsenic water treatment system should be initiated and fully operational no later than January 18, 2017. (Appx. 578).  This is the culmination of a multi-year process in conjunction with the Texas Commission on Environmental Quality. (Appx. 570-79).  Second, Dr. Bojes, a manager and unit director at the Texas Department of State Health Services ("DSHC"), wrote a detailed report. (Appx. 540-48). She noted that even when overestimating water consumption, that "DSHS concludes that drinking elevated levels of arsenic in water at the Pack Unit is not likely to cause non-cancer health effects. Even assuming nine year uninterrupted and high year-round consumption rates, drinking elevated levels of arsenic in water at the Pack Unit would theoretically produce 0.13 additional cases of

---

[8] Dr. Vassallo's reports in *Gates* and *Ball* are attached for convenience of the Court but not adopted.

Plaintiffs' MSJ Appx. 486

cancer than would otherwise occur in a population of 1,478. (Appx. 544-45) For these reasons, the data supports the message that TCEQ has posted for the offenders: "This is not an emergency…You do not need to use an alternate water supply." (Appx. 581) Offenders and staff at the Pack Unit, therefore, can safely drink the water pending the installation of the new water treatment facility.

>    **3.     Fans**

The use and availability of fans is an important remedial measure implemented by TDCJ and recognized in *Gates and Ball* as a method of combating the effects of heat. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. As shown above, the record is undisputed that the Pack Unit diligently implements the use of fans. (See *Statement of Facts,* Section B. 2.)

From a medical perspective, the use of fans increases air flow across the skin, which increases the evaporation of sweat, and helps cool the skin. (Appx. 032) A new study published in the Journal of the American Medical Association found electric fans can make at least a six degree difference in the ambient temperature our bodies can cope with before we start to overheat. (Appx. 032) The study found that you experience a lower amount of physiological strain at 42 degrees Celsius (107.6 degrees Fahrenheit) with a fan than you do at 36 degrees Celsius (96.8 degrees Fahrenheit) without a fan. (Appx. 032)

In *Gates* and *Ball*, Plaintiffs' expert opined that, short of providing air conditioning, the remedial measure of providing an electrical fan to all offenders, among other measures, is an important remedial measure for cooling the human body when the temperature or heat index

- 34 -

exceeds 88 degrees F. (Appx. 511, 514, 522).[9] In both cases, the Fifth Circuit agreed. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. Its use at the Pack Unit is undisputed, effective and appropriate.

### 4. Showers

The Pack Unit exceeds the number of daily showers that were considered a significant remedial measure by the *Gates* and *Ball* Courts. (See *Statement of Facts,* Section B. 3.) *See Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. The *Ball* court specifically pointed out that the showers should have a lowered temperature to facilitate cooling. With three showers per day, including afternoon and evening cold showers in the main building, and unlimited cold showers in the expansion dorm and trusty camp, the Pack Unit is providing frequent access to this cooling measure. (Appx. 790-91)

Both the CDC and Plaintiffs' expert endorse the use of this measure. Dr. Vassallo, has previously stated that "[Offenders] must be allowed access to showers at least once a day; the CDC recommends frequent cool showers, if exposure to heat cannot be avoided." (Appx. 514; Appx. 521. Subsequently, the *Gates* and *Ball* opinions incorporated daily showers into their requirements. *Gates*, 376 F.3d at 339; *Ball* 792 F.3d at 600. There is no dispute regarding the implementation of this measure or its effectiveness.

### 5. Ventilation

Though the *Gates* measures specifically reference adequate screen covering over windows, the intent of the measure was to ensure that each cell had adequate air flow with the outside air. (See *Statement of Facts,* Section B. 4.) Plaintiffs' expert report from the *Gates* case confirms this fact. (Appx. 515-23) Within the main dorm and trusty camp, there are both operable windows and

---

[9] Dr. Vassallo's reports in *Gates* and *Ball* are attached for convenience of the Court but not adopted.

- 35 -

a ventilation system. While the expansion dorm does not have operable windows, the *Gates'* measure of ventilation is achieved through a robust ventilation system that moves 425 cubic feet of air per minute, satisfying the intent of the *Gates* court through an alternate means. (Appx. 669)

**6. Respite**

Air-conditioned respite areas are an important remedial measure implemented by TDCJ beyond what was required in *Gates*, suggested in *Ball*, and identified by Plaintiffs' experts as the most effective mitigation measure. (See *Statement of Facts,* Section B. 5.) Though the *Ball* court did not require access to air conditioning at the Louisiana facility in question, it suggested that such access is an appropriate mitigation measure the lower court should consider as opposed to facility-wide air conditioning. *Ball*, 792 F.3d at 600. TDCJ took note of the Court's comments and took action to formalize its use of respite areas. (Appx. 533) This action ensured for both staff and offenders that instructions were clear on how to access the respite areas. Further, the Pack Unit provides that medical staff will evaluate the offender to ensure there are no additional health concerns. Offenders are not charged any fee for this service. (Appx. 537-38)

In this measure, Plaintiffs' experts and TDCJ are in agreement. Both Drs. McGeehin and Vassallo point out that spending time in air conditioning is the most important preventative measure. "Increasing access to air conditioning is the central aspect of any heat response plan." (D.E. 272-4 at 19, ¶81) "[The ability to sit in air-conditioning when needed] is by far the most effective measure for preventing heat-related disorders." (D.E. 272-3 at 12, ¶54) TDCJ is implementing this important heat-mitigation measure. Both the named Plaintiffs and the Pack Unit staff agree that each offender has seen or been given notice that these air-conditioned respite areas are available. The testimony and evidence shows this is an undisputed fact.

- 36 -

### 7. Wellness-checks

Though not a measure specifically required by the *Gates* or *Ball* Courts, TDCJ's use of well-checks helps to prevent heat stress from escalating into more serious conditions. As documented above, it is undisputed that the Pack Unit diligently implements this measure by checking on heat-sensitive offenders every half hour. (See *Statement of Facts,* Section B. 6.) Further, the systemic oversight through TDCJ Health Services further helps to ensure that the heat-sensitive offenders are closely monitored. Plaintiffs' expert, Dr. McGheehin (D.E. 272-4 at 19, ¶79) opines that personal contact with high risk individuals is an important part of a heat response plan. Dr. Vassallo points out how heat stress causes "an inflammatory progression." (D.E. 272-3 at 8, ¶31) The well-check process is designed to ensure that heat-sensitive offenders are regularly monitored to allow for early and preventative intervention should symptoms arise. There is no factual dispute regarding this measure's implementation at the Pack Unit, its importance, or its effectiveness.

### 8. Training and education

Training and education of offenders and staff is a component of TDCJ's mitigation strategy beyond measures required in *Gates* or *Ball*, but of no less importance. (See *Statement of Facts*, Section B. 7). In *Gates* and *Ball*, Dr. Vassallo opined that, medical staff and correctional staff should receive training in prevention, symptoms, and emergency treatment of heat-related illness. (Appx 522)[10] Here, Plaintiffs' expert Dr. McGeehin, recognizes that a societal adaptation to reduce heat-related illness and death includes increased awareness of heat-related signs and

---

[10] Dr. Vassallo's reports in *Gates* and *Ball* are attached for convenience of the Court but not adopted.

- 37 -

symptoms among emergency medical service units and other health care personnel. (D.E. 272-4 at 19, ¶79).

Both the named Plaintiffs and the Pack Unit staff agree that offenders are trained on heat related illness signs, symptoms, treatment and prevention through a number of means. The testimony and evidence shows this is an undisputed fact.

### 9.    Medical care & Monitoring

The provision of medical care is an important and appropriate component to TDCJ's mitigation efforts.  TDCJ spends $537 million on offender medical care every year. (Appx. 1092: 7-8)  For any offender who reports to a staff member that they are not feeling well due to the heat or  requests access to a respite area, staff will either take the offender to the medical department for evaluation or he will be taken directly to a respite area and medical staff summoned for triage. (Appx. 537-39) Offenders are not charged a co-pay for this service. (Appx. 537-39)  This allows potential heat stress to be addressed early and before it escalates into a heat-related illness.

In addition to care at the unit level, TDCJ also monitors heat-related illness system-wide. Healthcare staff at the unit report all potential heat-related illnesses to the TDCJ Health Services. (Appx. 240-41)  This data has been used to identify trends and facilitate corrective action, including at the Pack Unit. (Appx. 777-788, 791-92)

Medical care is also an important component in the management of conditions that can affect heat tolerance.  Many offenders who have risk factors for heat injury are acclimatized to heat and will suffer no heat-related illness or injury.  (Appx. 56, 65, 72, 81, 86-87, 95-96, 103 and 115; also Appx. 163, 174, 178-179).  This is in part because these offenders receive care for the chronic conditions.  The elevated risk posed by conditions such as diabetes, obesity, hypertension,

- 38 -

and cardiovascular disease (among others) is reduced by care and management for that condition. (Appx. 22; *also* Appx. 168-170) In addition to system-wide monitoring, the medical care provided at the unit level both as responsive care for heat-illness and preventative care for the management of chronic illness, forms an import part of TDCJ's preventative and remedial efforts.

### 10.      Work restrictions

As outlined above, TDCJ and the Pack Unit also take steps to reduce offender activity in times of high temperatures to reduce the possibility of heat stress. (See Statement of Fact, B. 9) Once, again the TDCJ takes the extra steps to protect offenders from heat illnesses.

### 11.      Light clothing and chill towels

The ability to wear lighter clothing and the availability of special cool down towels are additional measures implemented by TDCJ and the Pack Unit. (See *Statement of Facts*, B. 10) Plaintiffs' expert lists wearing light clothing as a personal adaptation that can help lower the risk of heat-related illness. (D.E. 272-4 at 19) Further, by providing the Frogg Togg cooling towel for half the cost charged to the general public, the TDCJ is providing yet another means of seasonal comfort.

### B.      The TDCJ's current mitigation measures are proving effective on multiple levels.

#### 1. Remedial measures are proving successful throughout TDCJ.

The combined effects of acclimatization along with TDCJ's training, monitoring, and mitigation measures also demonstrate their effectiveness in reducing the risk of heat-related illness to a socially acceptable level. Following the events of 2011 and 2012, the agency's strengthened efforts with regard to training, monitoring, and mitigation measures, the number of heat related illness has steadily declined in each and every summer. (Appx. 239- Appx. 244: Appx. 673- Appx.

- 39 -

676; Appx. 1102:11- Appx. 1103:3)  The summer of 2015 set a new low of 54 heat related incidents.[11] (Appx. 240-42)  This number is not limited to incidents requiring significant medical intervention. (Appx. 831-1038)  It includes incidents of heat exhaustion where nothing more than rest in a respite area and cool water were necessary. (*Id.*)  When reduced further to include heat related incidents that occurred indoors as opposed to outdoor incidents that could not be prevented through air conditioning, the TDCJ has only experienced an average of 23 incidents per summer over the last three years. (Appx. 240-42)  In a system of nearly 150,000 offenders, 99.98% of those offenders pass through the summer without suffering an indoor heat-related illness. Considering that the summer period of June – September consists of 122 days, each presenting its own unique possibility that the day's temperatures will cause an illness, the odds of an offender having an indoor heat-related illness on a given day is 1 in 795,652.[12]

### 2. Remedial measures are working at the Pack Unit.

The experience at the Pack Unit and the administration's response to heat-related illness demonstrates the responsiveness of the TDCJ administrators and the efficacy of remedial measures.  In late June, 2012, the medical staff responded to several offenders reporting symptoms of heat-related illness. (Appx. 777-788, 791-92)  UTMB tracked and compiled monthly reports regarding possible heat related illness system-wide. (Appx. 777-788)  A preliminary report for the month of June 2012 was distributed on July 6, 2012, a Friday. (Appx. 777-788)  That same day, a senior official in the TDCJ health services and a senior official in UTMB correctional managed care reviewed the report and noticed the increase in reports of heat-related illnesses from the Pack

---

[11] This number alone is testament to the effectiveness of TDCJ's measures given the fact that it maintains an outdoor workforce of tens of thousands of offenders.
[12] 122 days x 150,000 offenders = 18,300,000 chances per year for an offender to have a heat-related illness.  23 incidents / 18,300,000 chances = 1 / 765,652.

- 40 -

Unit. (Appx. 777-788, 791-92)  The TDCJ officials forwarded the report to the director of training to make him aware of the situation. (Appx. 777-788, 791-92)  A meeting was scheduled for the next business day (Monday, July 9, 2012). (Appx. 777-788, 791-92)  The meeting included representatives from the medical staff at the Pack Unit and the unit administration, including Warden Herrera. (Appx. 777-788, 791-92)  The group reviewed the current unit practices and made recommendations to enhance the mitigation measures in place. (Appx. 777-788, 791-92)  At the time, ice water was distributed to the housing areas twice per day. (Appx. 777-788, 791-92)  Ice production was at times falling behind demand on hot days. (Appx. 777-788, 791-92)  The medical staff felt offenders were not drinking sufficient amounts of water, and additional advisories were created and posted in the housing areas. (Appx. 777-788, 791-92)

In the time following the July 2012 meeting, the Pack Unit has bolstered its heat mitigation measures.  Both ice production and distribution has increased. (Appx. 791-92)  The unit received a new ice machine and continued to use its previous ice machine. (*See generally, Statement of Facts*, Section B.)  Pack Unit increased its ice water distribution, and specifically assigned offender-workers to the task of ice water distribution. (*Id.*)  Twenty-four hours a day and seven days a week, these offender workers are tasked with constantly filling and refilling water coolers in the housing areas. (*Id.*)  Additional fans have been purchased and the loaner fan program has ensured that every offender at the facility has a personal fan. (*Id.*) An additional cooldown shower was added so there are now three showers per day available for offenders in the main housing areas.[13] (*Id.*) The water temperatures have been lowered to make the cool showers as beneficial as possible. (*Id.*)  Maintenance has been increased on the ventilation system to ensure maximum

---

[13] Offenders in the trusty camp and expansion dorms have on demand access to the showers throughout the day.

Plaintiffs' MSJ Appx. 494

airflow. (*Id.*) Second floor fire escape doors are now opened in the summer time to allow for even more airflow into the dorms. (*Id.*) Respite areas have been identified and notices posted for the offenders on how to access them. (*Id.*) Staff are committed to providing respite when an offender asks for it. (*Id.*) This includes a precautionary evaluation by medical staff, for which they do not pay a co-pay. (Appx. 536-39) Additional offender training has taken place. (*See generally, Statement of Facts*, B. 7)

The results at the Pack Unit after the changes made in 2012 demonstrate the efficacy of these measures. There have been eight incidents reported as *potential* heat related illness to TDCJ Health Services in 2013, 2014, and 2015. (Appx. 948-1038) Nearly all were caused by work or activities taking place outdoors, and required nothing more than a few hours of rest and hydration in the medical department. (*Id.*) All of the documented incidents were offenders who were working the fields or outdoors, or participating in recreation. This is so for all offenders at the Pack Unit, including those that are "heat-sensitive" by Plaintiffs' definition. While Plaintiffs' experts have repeatedly opined that without air conditioning, offenders are at extreme risk of harm, they offer no explanation for why this is *not* happening at the Pack Unit. This success demonstrates what Defendants' medical experts advise: the benefits of acclimation plus the aggressive implementation of mitigation measures are sufficient to protect Pack Unit offenders from a *substantial or excessive* risk of harm during the summer heat.

### 3. Plaintiffs' experts offer no explanation for the lack of heat-related incidents at the Pack Unit.

Plaintiffs' experts offer thinly supported statements for their conclusion that Pack Unit offenders are at substantial risk of harm, but do not seem to have any explanation for why, if the

- 42 -

risk of harm is as dire as they claim, heat-related illness happens so rarely in the Texas prison system or at the Pack Unit.[14]

The basis for Dr. Vassallo's opinion is tenuous at best, and in some instances, factually incorrect. First, Dr. Vasallo cites to (unspecified) studies that "have shown that the incidence of heat-related illnesses and deaths increase starting at heat index numbers in the mid to high 80s." Dr. Vassallo also points toward studies that show an overall increase in mortality rates during high temperatures. Most studies involving heat-related illness have been limited primarily to athletes training or competing outdoors, military personnel outdoors and heat waves in large cities outside of Texas involving populations that are not acclimatized and that are affected by the "urban heat island" effect. (Appx. 20) Likewise, most articles citing mortality from heat-related illness are based on a population that is not acclimatized and, therefore, would not apply to a population that is protected by acclimatization, like TDCJ offenders. (Appx. 21) Defendants' experts' findings regarding mortality and the protective effects of acclimatization manifests itself in the undisputed fact that overall mortality *decreases* in TDCJ during the summer months. (Appx. 27 and 33)

Finally, Dr. Vassallo's report contains false assumptions. She stated "they do not have the ability to sit in air conditioning whenever they need it. This is by far the most effective measure for preventing heat-related disorders." In fact, the offenders do have that ability. (Appx. 533; *also* Appx. 766-775) She opines that offenders are reluctant to seek medical attention if they are feeling the effects of the heat because they will be charged $100 if they do. As noted in UTMB's affidavit, this is also false. (Appx. 537-539)

---

[14] It should be noted here that Plaintiffs were afforded an opportunity to submit rebuttal expert testimony, but did not.

Plaintiffs' MSJ Appx. 496

Dr. McGeehin's report suffers from many of the same flaws. (See D.E. 272-4) Dr. McGeehin offers no accounting for the protections provided by acclimatization and how it factors into the studied heat waves in northern cities and Europe. (Appx. 21) Though he has opined TDCJ's mitigation measures are insufficient, he has not interviewed the Plaintiffs or any other Pack Unit offenders. (See Note 8 at 26-27) He also relied on the false assumption that Pack Unit offenders are unable to access an air conditioned space if they request to do so. (See D.E. 272-4 at 18)

In fact, Dr. McGeehin's comments demonstrate the appropriateness of the TDCJ's heat mitigation strategy. In discussing municipal policies and action plans, Dr. McGeehin states:

> The best of these plans are activated by an early warning system based on a National Weather System advisory and contain elements that provide for effective communication with high-risk groups; coordination among government and private agencies; multiple personal contacts with elderly and ill people living alone; increased availability of, and transportation to, air conditioned safe areas; and increased awareness of heat-related signs and symptoms among emergency medical service units and other health care personnel. Every major city in the United States that has suffered the impacts of an extreme heat event has a societal adaption in the form of an emergency heat response plan. Every such plan includes a sufficient number air conditioned cooling centers, and measures to transport vulnerable community members to those cooling centers during an extreme heat event. (D.E. 272-4 at 19, para. 79-80)

Perhaps without realizing it, Dr. McGeehin described many of the components of the TDCJ's heat mitigation efforts. "Coordination among…agencies" occurs in the coordination between TDCJ and the medical providers to identify vulnerable offenders, provide evaluation, triage, and care (if needed) for offenders who request access to a respite area, and is also captured in the coordination that occurs at the higher levels of administration to evaluate and review the efficacy of the measures provided. "Multiple personal contacts with elderly and ill people living alone" is accomplished through the well-check procedures where TDCJ staff check on heat-sensitive

- 44 -

offenders every 30 minutes. "Increased availability of, and transportation to, air conditioned safe areas" is accomplished through access to respite areas identified on the unit, including the notice to the offenders of their availability and how to access them. The Pack Unit has provided "sufficient number air conditioned cooling centers" by identifying multiple respite areas, and have not had any issues with not being able to accommodate a request for respite. Finally, "increased awareness of heat-related signs and symptoms among emergency medical service units and other health care personnel" is accomplished by the formal training provided to both officers and offenders alike, and the near constant emphasis placed on that training in daily shift briefings. The lone variance between Dr. McGeehin's ideal response and TDCJ's mitigation activities is that TDCJ's actions are not triggered by "a National Weather System advisory." While TDCJ closely monitors temperatures and conditions to provide additional protections when and where needed, the core of its mitigation measures remain in full effect each and every day of the summer months, regardless of any weather advisories. By Dr. McGeehin's standards, TDCJ is taking appropriate action.

While Dr. Vassallo's and Dr. McGeehin's reports contain explanations of the precise mechanism for heat-related injury, and physiological descriptions of how certain conditions and medications can lead to susceptibility, they offer no analysis that would explain why this occurs so rarely in the Texas prison system, specifically at the Pack Unit. Defendants' experts provide the answers. The benefits of acclimatization when combined with education, monitoring and remedial measures effectively protect the offender population from heat-related illness. (See generally, Appx. 1-238) Further, Drs. Vassallo and McGeehin's reports rely heavily on theoretical knowledge derived from scholarly studies, but much of the scientific literature comes from studies

- 45 -

done on the results of heat waves on non-acclimated populations. (Appx. 21-22)  The fundamental difference between acclimated and un-acclimated populations as well as the efficacy of TDCJ's mitigation measures demonstrates why Plaintiffs' experts dire predictions fail to materialize in reality at the Pack Unit.

**4.**  **The named Plaintiffs are not at a substantial risk of harm from heat.**

Minor incidents of headaches, dizziness, or shortness of breath are part of the experience of summer for free and imprisoned people alike.  These sorts of symptoms do not cause lasting impact, and can be appropriately treated by medical staff. (Appx. 162)  In addition to prompt treatment for heat-related illness, medical care is an important component in managing and controlling certain medical conditions that can affect heat tolerance.

The Eighth Amendment does not require perfect prisons, nor prisons where no offender ever suffers minor heat-related symptoms.  While the Fifth Circuit held in *Blackmon* that the plaintiff's claims of headaches, nausea, shortness of breath, and blurred and dimmed vision would constitute more than a *de minimis* physical injury, this holding should be limited to the facts at issue in *Blackmon v. Garza*, 484 F. App'x 866, 874 (5th Cir. 2012).  Blackmon contended the temperatures and the *lack of mitigation measures* affected him on daily basis for a long period of time.  *Id.* at 871-72.  He claimed his headaches and dizziness were "almost constant," he was light headed and nauseated "often," his vision blurred and dimmed "frequently," and he "often" had difficulty catching his breath.  *Id.* at 872.  The Court's holding that this stated a Constitutional injury must factor in not just the severity of the symptoms, but, also, their duration.

This is consistent with Eighth Amendment jurisprudence, where the severity of a particular condition is considered along with its duration, and discomfort and minor physical symptoms

- 46 -

common to the season will not state a Constitutional claim. *See e.g., Decker v. Dunbar*, 633 F.Supp.2d 317, 343 (E.D.Tex. 2008), aff'd 358 Fed.Appx. 509, 2009 WL 5095139 (5th Cir. December 21, 2009), cert. denied, ––– U.S. ––––, 131 S.Ct. 96, 178 L.Ed.2d 60 (2010) (dehydration and lightheadedness after being placed in a hot holding cell did not state a constitutional claim); *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (hurt ears and numb hands, feelings of frostbite do not state a claim because they are the nothing more than "the usual discomforts of winter."); *Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 879 (S.D. Ill.2009) (cold because of low cell temperatures was insufficient to state a claim where the offender received medical treatment for the cold); *Benson v. Godinez*, 919 F. Supp. 285, 289 (N.D. Ill.1996) (holding the absence of any ailment other than colds or sore throats militates against characterizing the cold conditions in the plaintiff's cell as objectively serious).

*Blackmon* must not be misinterpreted to hold that *any* time an offender suffers symptoms like dizziness, lightheadedness, headaches or nausea, a Constitutional claim is stated. While symptoms such as these can be caused or exacerbated by heat, the training provided to officers and offenders, wellness checks, and ultimately the provision of respite care and medical care are sufficient to remedy the instances in which they occur. Indeed, nearly all of the heat-related incidents that have been reported at the Pack Unit required nothing more than the offender to spend time resting in the air-conditioned medical department and drinking cool water. (Appx. 831 to 1038) Part of any appropriate mitigation effort includes the provision of medical care for the few instances in which the temperatures cause ill effects. The Eighth Amendment does not mandate a prison where these kinds of symptoms never occur. So long as the prison provides education to offenders and officers to identify them, takes measures to mitigate the effect of the heat, and

- 47 -

provides appropriate medical care in the few instances when they occur, the prison system meets its Constitutional obligations. TDCJ and the Pack Unit do so.

Each of the named Plaintiffs is acclimatized to the summer temperatures. Despite having many comorbidities and/or taking many of the medications that can effect heat tolerance, the named Plaintiffs continue to pass summer after summer without significant heat incident. (See Attachment 1) None have had an incident in which their temperatures were measured above normal levels, indicating that they are able to maintain thermoregulation. (*Id.*)

Plaintiffs' expert, Dr. Vassallo, who reviewed the medical records of each Plaintiff, confirms this and can point to very little in terms of actual, or even possible, heat related illness in the named Plaintiffs. (D.E. 272-3 at 18-25) For Plaintiffs King, Wilson, and Mojica, she identified no particular incident. (D.E. 272-3 at 20-21, 23) For Plaintiffs Brannum and Wallace, she identified an incident where Brannum had "lightheadedness" on a 90 degree day, and an instance in 2011 where Wallace appeared "physically exhausted," but nothing more. (D.E. 272-3 at 21-22) For Plaintiffs Cole and Yates, she was able to identify certain instances where minor symptoms such as shortness of breath, "sweating a lot," lightheadedness, or nausea and vomiting, but nothing that she defined as a definitive heat-related illness.[15] Further, where Dr. Vassallo claimed an offender's chronic condition such as asthma or hypertension was exacerbated during the summer months, this has been affirmatively disproven by Dr. Means. (Appx. 41-132)

As for the named Plaintiffs' medical claims, when an offender alleges a serious medical need either for treatment or to avoid certain conditions, the offender's bare assertion of a serious medical condition is insufficient without medical evidence verifying that the condition exists.

---

[15] Many of these non-descript symptoms can be caused by other issues or medications regardless of the season. (*See* Appx. 41-132)

- 48 -

*Althouse v. Roe*, 542 F. Supp. 2d 543, 573 (E.D. Tex.2008) (citing *Aswegan v. Henry,* 49 F.3d 461, 465 (8th Cir.1995); *accord, Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir.1994) (prisoner's self-diagnosis alone will not support a medical conclusion)). *See also*, *Decker*, 633 F.Supp.2d at 342. While it is certainly within the offender's capacity to testify about the discomforts of the heat or the way it makes them feel, their self-diagnosis of either their own health conditions or their cause will not suffice to create a fact issue, nor will testimony that they witnessed some other offender suffer what they believe to be a heat-related illness.

Even if Plaintiffs' claims could be considered to raise fact questions, their admitted non-compliance with the available heat mitigation measures also negates their claim for relief here. Like common-law tort plaintiffs, §1983 plaintiffs are required to take reasonable steps to mitigate their damages. *See Gladden v. Roach*, 864 F.2d 1196, 1200 (5th Cir.1989); *See also,* 1B Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 16.08 (4th ed. 2006) "Whether an injured person has mitigated [her] damages requires a factual assessment of the reasonableness of his conduct." *Hill v. City of Pontotoc, Miss.*, 993 F.2d 422, 427 (5th Cir.1993). To be entitled to summary judgment, the Defendants must establish beyond peradventure that the Plaintiff failed to use reasonable diligence. *Barrow v. Greenville Indep. Sch. Dist.*, 2005 WL 39086, at *6 (N.D. Tex. Jan. 7, 2005) aff'd, 2007 WL 3085028 (5th Cir. Oct. 23, 2007). Defendants have timely raised this defense. (D.E. 265 at 108)

To the extent the named Plaintiffs are alleged to have suffered heat-related injuries, their records show they have failed to appropriately mitigate any harm caused by the heat by their failure to seek medical care (e.g. Mojica), their failure to request access to respite areas (all named Plaintiffs except Mojica) and differing levels of compliance with medical advice. Protection from

- 49 -

the heat does involve a certain level of personal responsibility. (Appx. 167-68, 214) To the extent that the Court finds that any named Plaintiff has suffered a cognizable injury, the Court should also find each has in some way failed to use reasonable diligence to prevent it.

## III.    The Court should decline to order any injunctive relief.

Plaintiffs seek to reform the law rather than to redress actual ongoing constitutional violations at the Pack Unit. But, the desire to reform must be accompanied by sufficient evidence to demonstrate a constitutional violation. Here, the conditions of confinement at Pack Unit are constitutional: mitigation measures are being implemented, the measures are effective, and medical care is readily available to all offenders at Pack Unit. (See Section II.A., *infra*) Air conditioning, therefore, is not required to meet the minimal necessities of human life nor evolving standards of decency. (*See* Section IV., *supra*)

A district court's injunctive relief is reviewed for an abuse of discretion. *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 63 F.3d 690, 693 (5th Cir.1995) . Demands for injunctive relief present mixed questions of law and fact. *Id.* Findings of fact are reviewed for clear error and the conclusions of law are subject to *de novo* review. *Id.* It is well-settled that a suit against a state employee in his official capacity is the same as a suit against the state agency. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In general, state agencies are entitled to Eleventh Amendment immunity from suits brought under §1983. *See generally Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240 (1999). An exception to a state official's Eleventh Amendment immunity exists, however, for prospective injunctive relief. *Ex Parte Young*, 209 U.S. 123, 159-60 (1908); *Kentucky*, 473 U.S. at 167 n.14; *Edelman v. Jordan*, 415 U.S. 651, 666-68 (1974). Before granting injunctive relief against a state official, however, the court must make a straightforward inquiry into whether

- 50 -

there is an ongoing violation of federal law.  *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645-46, 122 S.Ct. 1753, 1760 (2002). The past breach of a legal duty on the part of a defendant state official does not fall under the *Ex Parte Young* exception to the Eleventh Amendment.  *Edelman v. Jordan*, 415 U.S. 651, 668-669 (1974).

Since there is no ongoing violation of federal law and the TDCJ has not implemented unconstitutional policies, this Court cannot properly grant any injunctive relief, much less the overbroad relief of requiring air conditioning.  Additionally, the Fifth Circuit has pointed out that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place.  *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001). Plaintiffs' request for injunctive relief seeks relief which is in excess of their authority. *See Response to Motion for Class Certification* at D.E. 307 at 10-11 (incorporated herein as if fully set forth by this reference).

If there is the necessary finding of an ongoing violation of Federal law,  "[A] plaintiff seeking a permanent injunction must ... demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay-Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  A plaintiff must allege "specific facts" to support a finding of irreparable injury.  *See ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008).  The Fifth Circuit has cautioned that an injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."  *PCI Transportation Inc. v. Fort Worth & Western Railroad Co.*, 418 F.3d 535, 545 (5th Cir.2005) (citations omitted).  In a case like this that raises prison conditions, the

- 51 -

Prison Litigation Reform Act (the "PLRA") imposes additional restrictions on the authority to grant an injunction. The PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). In particular, the PLRA prohibits an order granting prospective relief or a preliminary injunction unless the court first finds that such relief is: (1) narrowly drawn; (2) extends no further than necessary to correct the harm; and (3) is the least intrusive means necessary to correct that harm. *See* 18 U.S.C. §§ 3626(a)(1)(A), 3626(a)(2). In considering a prisoner's request for prospective relief, the reviewing court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" caused by the relief and shall respect the certain principles of comity where state or local law is concerned. *See* 18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2).

At the outset, Plaintiffs' primary request for relief – air conditioning the entire unit – is overbroad within the meaning of the PLRA as specifically applied to climate control in *Ball*.[16] Such an order would be overbroad in goal, scope, and method for the very reasons explained in *Ball*. 18 U.S.C. §3626(a)(1)(A); *also see Defendants' Response to the Motion for Class Certification* at D.E. 307 at 6-11 (incorporated herein as if fully set forth). Uncontroverted evidence establishes that each of the named Plaintiffs have acclimated to the summertime temperatures and can thermo-regulate. Under the PLRA and *Ball*, it would be overbroad to order protective measures (beyond those already in place) for offenders absent a demonstration they are,

---

[16] While semantically phrased as a request to lower the heat index to 88 degrees, Plaintiffs' request for relief is a request for air-conditioning. The *Ball* court recognized this at oral argument and the *Ball* opinion reflects this reality. Further, while there are vast differences in their detail and cost analysis, both the Defendants' and Plaintiffs' experts have opined that air conditioning would be required to meet this proposed maximum indoor apparent temperature. (Appx. 245-386)

indeed, at substantial risk of harm. Should this Court believe that further intervention is necessary, that analysis must begin with mitigation remedies as opposed to air-conditioning.

The policy decision on whether to make the Pack Unit more "comfortable" with air conditioning is a policy determination better left to the state legislature and prison administrators. "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Broad discretionary authority is afforded to prison administrators because the administration of a prison is "at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566, (1974). Here, prison administrators have determined that the costs of retrofitting Pack Unit with air conditioning (see Appx. 245- 386) and the substantial hardship in moving prisoners out of Pack Unit for the construction are not justified by the medical needs of the offenders. (Appx. 793-798). The state legislature has chosen not to require TDCJ to maintain a specific temperature in its prisons. (*See* Section IV, *infra*) An order to air condition the entire Pack Unit, therefore, is not justified under the PLRA's mandated deference to state prison administrators, nor the public interest prong of the test for injunctive relief.

With regard to the Plaintiffs' chart of offender deaths pled in every pending heat case, none are alleged by Plaintiffs as having occurred at the Pack Unit. (D.E. 245, p. 18) The TDCJ acknowledges each one has been determined by autopsy to be correlated with hyperthermia. (D.E. 265, para. 93) Mr. Livingston testified that the leaders of the TDCJ have continued to make changes to their procedures and the concerns about these incidents have not been ignored. (Appx.

- 53 -

673-76; Appx. 1102:11-25 to 1103:1-3)  Further, the 10 mortalities in 2011 occurred during an extremely unusual and unexpected heat event which is likely not to be repeated.  (Appx. 411-414)

Plaintiffs' climatologist, Dr. Mearns, acknowledged the Defendants' climatologist, Dr. Neilson-Gammon, likely has more expertise in looking at observational data and the observations related to Texas as the State Climatologist.  (Appx. 1172:9 to 1173:9)   As such this Court can properly rely on his report.  Dr. Mearns also admitted there are many different meanings of extreme heat.  (Appx. 1166:20-23, 1167:11-16)  She agreed, that under certain definitions, historical temperature records are required to determine what actually constitutes extreme heat in a specific location. (Appx. 1168:13 to 1169:17; 1170:5-17)  The heat index chart cited by Plaintiffs (D.E. 245, p. 20) is only one of many definitions of extreme heat.  (Appx. 1167:11-16)  And this is important, because by any standard, what Texans experienced in 2011 was "very extreme." (Appx. 1171:13-15;)  And, such an event was not predicted in advance.  (Appx. 409- 411)  Nor is it an event with a high likelihood of occurring again.  (Appx. 409- 413)  It is further worth noting that even under the extreme conditions of 2011, no heat-related illnesses were reported from the Pack Unit to TDCJ Health Services.  (Appx. 811)  Under these circumstances, expensive infrastructure changes to the Pack Unit is not warranted where the Unit has a good record of maintaining the safety of its offender population and an event like 2011 is very unlikely to re-occur.

The parties have stipulated that the Court should deny any petitions to intervene by offenders who are not housed at the Pack Unit. This Court, accordingly, has entered orders denying the petitions of all proposed intervenors. (*See e.g.* D.E. 147 noting that "[t]he Court is also persuaded by Plaintiffs and Defendants that permitting intervention would cause undue delay and prejudice to the existing parties.")  As such, operational issues at other units with regard to the

- 54 -

other pending heat cases are well outside the scope of this litigation, which by stipulation, is limited to the Pack Unit.  Further, this litigation involves a request only for injunctive relief and not damages.  (*See generally Plaintiffs' Amended Complaint*, D.E. 245)  Due to operational differences and location, such an inquiry into the details and defenses of every pending heat case within the confines of the Pack Unit case would greatly expand this litigation, possibly prejudice the progress and outcome of the other heat cases (especially for the Defendants), and add complexity to this case.  For these reasons, the Court should decline to consider the chart in its resolution of the issues presented in this case.

## IV.    Evolving standards of decency do not mandate air-conditioned prisons.

The text of the Eighth Amendment states "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII. However, no definition or explanation of the meaning or extent of those terms is provided in the Constitution. As a result, the requirements of the Eighth Amendment have largely been shaped by the courts for more than two hundred years. Specifically, the Eighth Amendment definition of "cruel and unusual punishment" in the prison context has evolved overtime—it is a progressive prohibition which for more than the past half-century has looked to the "evolving standards of human decency that mark the progress of a maturing society" to determine whether a constitutional violation has occurred.  *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) . Thus, the standards of the Eighth Amendment change with the moral and social consciousness of society.  John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment As A Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1741 (2008).

- 55 -

While courts rely on several indicators in making an Eighth Amendment determination, the primary indicators of evolving standards of decency are objective indicators of national consensus on the social acceptability of a given punishment, best evidenced by the actions taken by State and Federal legislatures. *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989). Furthermore, though this creates some fluidity in the law, a Court may not simply overrule binding precedent because it may believe that evolving standards have changed. *Tamayo v. Perry*, 553 F. App'x 395, 400-01 (5th Cir.2014). "Evolving standards of decency" is not a ground upon which a Court can disregard prior precedent unless or until a higher (or *en banc*) Court overrules that existing precedent. *Id.*

## A. Air conditioned living quarters is not recognized by the federal or state governments as a necessity or universal right.

Many people within the United States, including within the State of Texas, do not have or do not use the luxury of air conditioning. According to recent United States Census data, 55,000 new homes were built in 2014 that did not have air conditioning of any kind. (Appx. 681) While most of the un-air conditioned homes were sold outside of Texas or the Southern Census region, a considerable number of Texas homes do not have, or choose not to use, air conditioning. Approximately 100,000 Texas homes are not equipped with air conditioning of any kind (Appx. 710) An additional 200,000 "have but do not use Air Conditioning." (Appx. 710) 1,200,000 Texans with central air conditioning, and an additional 400,000 Texans with wall or window units air condition their living spaces "only a few times when needed." (Appx. 710, 713) According to these numbers, 300,000 Texans currently go without air conditioning, and an additional 1,600,000 use their air conditioning units sparingly, presumably during the peak of the summer. (Appx. 710,

- 56 -

713)  This data demonstrates that any consensus about the use of air conditioning, even in hot climates, comes from a desire for comfort rather than any moral or social principle.

There is no law at the state or federal level requiring air conditioning. The United States has a long standing national ethic of providing at least the minimum amount of support necessary to ensure the wellbeing of its citizens.  Examples of this national belief include Food Stamps or the Federal Housing Choice Voucher Program (formerly the "Section 8" housing program).  As the Food Stamps program ensures low-income individuals have the sustenance necessary to live their lives, the Housing Choice Voucher Program, administered through the United States Department of Housing and Urban Development ("HUD"), ensures low income individuals are adequately housed.  (Appx. 717- 718)  HUD has developed minimum housing quality standards, designed to ensure "decent, safe, and sanitary housing."  (Appx. 719)  Many elements of a housing situation play a role in determining if housing is "decent, safe, and sanitary," including the "Thermal Environment."    (Appx. 719- 721)    The "Thermal Environment" performance requirement for the housing choice voucher program housing is "the dwelling must be able to provide a thermal environment that is healthy for the human body," a standard which does not require air conditioning.[17]  (Appx. 720)  Defining "a healthy living environment" for the local climate is left up to the local Public Housing Authority—air conditioning is not mandated in Public Housing at the Federal level.  (Appx. 720)

---

[17] "Minimum Criteria for meeting this standard include 1) There must be a safe system for heating the dwelling unit, such as electric baseboard, radiator, or forced air systems. In order to ensure a healthy living environment appropriate for the climate the system must be able to provide adequate heat either directly or indirectly to each room, and 2) *if* present, the air conditioning system or evaporative cooler, must safely provide adequate cooling to each room (emphasis added)." (Appx. 720)

Plaintiffs' MSJ Appx. 510

Public Housing Authorities ("PHAs") in Texas do not consider air conditioning as a requirement for "decent, safe, and sanitary housing," or a "healthy living environment. Through the power delegated to them by HUD, Texas PHAs could require air conditioning in Housing Choice Voucher Choice Program eligible properties, as they are charged with determining a thermal environment that is healthy for the local climate. (Appx. 720) However, a significant number of PHA's in Texas do not require air conditioning, and thus do not consider climate control as necessary for a healthy living environment. The Houston Housing Authority and the Housing Authority of the City of Austin require a "safe cooling system *where* present."[18] (Appx. 769; Appx. 729) The Housing Inspection checklist for the Public Housing Authority with jurisdiction in Harlingen, Texas requires "[T] he unit has adequate ventilation and cooling by means of either openable windows *or* a working cooling system (emphasis added) (Appx. 739) Similarly, the Housing Authority of Bexar County, with jurisdiction in San Antonio requires "Some windows that open, *or* some working ventilation system (emphasis added). (Appx. 735) These standards demonstrate that air conditioning is not seen as a moral or social imperative by those charged with ensuring a decent, safe, sanitary, and healthy living environment to low income Texans.

The Federal Government not only does not require air conditioning in low income housing, it also does not subsidize any of the cost associated with operating an air conditioner. To help lessen the cost of living, HUD provides a utility allowance to low income individuals, determined by the local PHA as the reasonable cost of utilities for the area. (Appx. 741- 742) The cost of operating an air conditioner, however, is explicitly excluded from the utility allowance. (Appx. 741- 742) If air conditioning is present in a Housing Choice Voucher Program Home and the air

---

[18] Note that this clearly tracks the minimum requirement on the Federal level—air conditioning systems must be functional *if* present. (Appx. 720)

Plaintiffs' MSJ Appx. 511

conditioning unit use is metered, the resident is required to pay for the cost of using air conditioning. (Appx. 741- 742) If the air conditioning present in a program home is not metered, the resident is surcharged for the cost of using the air conditioner. (Appx. 741- 742) Similarly on the State level, the Texas Legislature recently significantly curtailed the State's utility subsidy to low income individuals. The System Benefit Fund was a legislative creation, designed to fund significant portions of low income families' utility bills. Tex. S.B. 7, 76th Leg., R.S. (1999). The program, however, was defunded and marked for termination no later than September 1, 2017. *See* Tex. Util. Code § 39.903 (m); Tex. Util. Code § 39.903.

The Federal Government does not subsidize the cost of air conditioning for the elderly. Air conditioning is not a covered cost by Medicare, the social insurance program for the health of the elderly, because Medicare only covers "Durable Medical Equipment." (Appx. 744- 745) In order to be considered "durable medical equipment," the equipment must be primarily medical in nature. (Appx. 744- 745) The Centers for Medicare & Medicaid Services has stated that if someone sought to have the cost of air conditioning covered by Medicare, coverage would be denied, as air conditioning is not considered primarily medical in nature. (Appx. 744- 745)

The lengths that Federal and State Government have gone to in ensure they do not subsidize the cost associated with using an air conditioner demonstrates the proposition that air conditioning is a luxury, not a moral or social imperative. Evolving standards of decency, therefore, do not require this Court to impose air conditioning as the living standard for Texas prisoners.

**B.  Air-conditioned prisons are not the societal norm.**

Prison systems throughout the south do not have air conditioning, yet continue to house offenders in constitutionally sound facilities.  This includes every southern Gulf-Coast state.

- 59 -

Plaintiffs state: "In the modern South, 'contemporary standards require air conditioning.' " (D.E. 321 at 11). This is false. In Alabama, there is no air conditioning in offender housing areas according to Department of Corrections Commissioner Jefferson Dunn.[19] The Florida Department of Corrections has made an effort to correct the misconception that its prisons are air conditioned, stating only ten of the more than seventy state-managed prisons have any air conditioning in offender housing areas.[20] Both Mississippi and Louisiana, respectively, have been sued for a lack of air conditioning in offender housing areas, and, in both cases, the Fifth Circuit declared air conditioning was not constitutionally required. *Gates*, 376 F.3d at 339; *Ball*, 792 F.3d at 600. The same is true of Guantanamo Bay, which, despite Plaintiffs' misleading claims, air-conditioning is not universally provided.[21]

Within Texas, Defendants admit that county jails are regulated by the Texas Commission on Jail Standards ("TCJS"), a state agency created by the Texas Legislature. The policies adopted by the TCJS, however, are not "legislative enactments" which set a standard to be implemented by the TDCJ. Plaintiffs cite, in their First Amended Complaint, 37 TEX. ADMIN. CODE § 259.160 (D.E. 245, para. 45) This is a cite not to a "legislative enactment," but, rather to the policies of the TCJS filed with the Secretary of State. Unlike most other sections of the Texas Code, the Administrative Code does not reflect the actions of the State legislature. The

---

[19] Ashley Thompson, *Ahead of Second Special Session, Alabama's Prisons in Crisis*, ALABAMA NEWS (Sep. 7, 2015, 5:05 PM), http://www.alabamanews.net/home/top-stories/Ahead-of-the-Second-Special-Session-Alabamas-Prisons-in-Crisis-325492141.html (last visited Nov. 15, 2015).

[20] *Misconceptions About Florida Prisons*, FLORIDA DEPARTMENT OF CORRECTIONS, http://www.dc.state.fl.us/oth/myths.html (last visited Nov. 15, 2015).

[21] Plaintiffs statement "[e]ven prisons that primarily house the most dangerous offenders—such as the Federal Super-max facility in Florence, Colorado, or the military prison for terrorism suspects in Guantanamo Bay, Cuba—have air conditioning" is misleading. (Doc. No. 321, p.12). Guantanamo Bay is not entirely air conditioned. (Doc. No. 51-4, p. 17- 18). Guantanamo Bay has air conditioning for "*some* of the most compliant detainees," while other portions of the facilities are not air conditioned. (Doc. No. 51-4, p. 18).

Administrative Code, instead, was designed by the legislature to require the Secretary of State to compile and publish in one place, an organized set of agency policy for various state agencies. (www.sos.state.tx.us/tac/; Tex. Govt. Code §§ 2002.051- 2002.056). Within the Texas Administrative Code, both the TDCJ and the TCJS have filed certain of each agency's policies under the title "Public Safety and Corrections." (*See* Admin. Code Title 7 part 6; Admin. Code Title 7 part 9). The TCJS did file its policies that requires temperature levels to be maintained between 65 degrees and 85 degrees Fahrenheit within pretrial detainee housing areas in the Administrative Code because the TCJS adopted such a policy in 1994. (See e.g., Admin. Code §259.160)

The state legislature has passed, however, specific legislative enactments governing the TDCJ. In fact, the Government Code has a subchapter devoted to "Inmate Welfare." *See* Tex. Govt. Code § 501. Several changes have been made to this section of the Code within the past several years, including changes to how lost or damaged offender property is dealt, disclosure of volunteer organizations operating within each individual prison, and verification of offender veteran status. (Acts 2011, 82nd Leg., R.S., Ch. 1083 (S.B. 1179), Sec. 8, eff. June 17, 2011; Acts 2013, 83rd Leg., R.S., Ch. 1406 (S.B. 345), Sec. 1, eff. September 2013; Acts 2013, 83rd Leg., R.S., Ch. 261 (H.B. 634), Sec. 1, eff. June 14, 2013). Further, within the "Inmate Housing" subchapter, no legislation has been enacted or amended since 1993, which is a date before the TCJS adopted its policy of climate control within pretrial detainee housing. (See. Admin. Code §259.160; Govt. Code §§501.111- 501.113). The fact that the legislature has not enacted a statutory requirement of climate control within the State's prisons, despite multiple legislative changes and despite the policies filed in the Administrative Code by the TCJS, demonstrates that the state

Plaintiffs' MSJ Appx. 514

legislature has chosen not to adopt the jail standards on temperature control as the standards applicable to the TDCJ prisons. (*See* Appx. 1096:4- Pg. 89, Ln. 1097:17) This is not to say, however, that the Legislature could not require the TDCJ to provide climate control within the State's prisons. The Legislature has the authority to require certain actions be undertaken by the TDCJ by passing legislation and codifying that legislation within the Government Code. This, the Legislature has not done. The policies adopted by the TCJS for jail facilities should not be considered a proper comparison as to actual statutory standards applicable to the TDCJ prisons.

### C. TDCJ's purchase of pig barns has been factually misrepresented by Plaintiffs, and is irrelevant to the issues here.

Upon examination, Plaintiffs' repeated references to TDCJ's purchase of swine barns is shown to be rife with misstatements, hyperbole, and, ultimately, irrelevant to the issues here. TDCJ operates one of the largest integrated agricultural operations in the country. (Appx. 1040) The production of swine is but one component of that operation. The process is entirely integrated within TDCJ, from growing and processing of corn for feed, to the shipment of finished pork to the units where it is prepared and served to the inmates. (Appx. 1040, 1087-88) The Eastham Unit is one of the units that participates in the raising of baby pigs. (Appx. 1041)

In reality, the alleged "air conditioned pig barns" do not contain "air conditioning" as the term is commonly used. (Appx. 1041, 1077, 1080) Further, the barns at issue are a tiny fraction of TDCJ's massive state-wide swine production operation. (Appx. 1040-41) They are simply 8 single-wide trailers that contain an evaporative cooler on one end, which Plaintiffs' expert explicitly rejected as a viable cooling option for offenders. (Appx. 1081; D.E. 272-10 at 11-12) They do not contain an HVAC system, an a/c compressor, or a chiller system. (Appx. 1041) At the rear of the trailer is a cardboard grate. (Appx. 1077, 1080) Water drips over the grate and a

- 62 -

fan blows air over the wet grate. (*Id.*) The air blows into a small room at the back of the trailer. Outward blowing fans at the front of the trailer create a negative air flow from the back to the front, which draws the air from the back room through a vent and distributes it throughout the trailer. (Appx. 1079) This type of system is commonly referred to as an evaporative cooler or swamp cooler. Pursuant to state law procurement procedures, the cheapest option proved to be a purchase of modular barns manufactured by Art's Way. (Appx. 1042-72) The barns are single wide trailer facilities designed to be transported to their site in one piece and put into use with little construction required. TDCJ has eight such barns, and they represent only nine weeks of the pig rearing process, and a very small part of the facilities in use at the Eastham unit. (Appx. 1073-76, 1085-86)

Moreover, the trailers were not selected because of the evaporative cooler system. When considering different alternatives, these trailers proved to be cheapest and most cost effective option. (Appx. 1041) The project could have been completed with new brick and mortar buildings that continued to use water, air flow, and fans, but it would have been more expensive, and disruptive to unit operations. (Appx. 1055, 1075-76, 1085-86) One of the benefits of the Art's Way trailers is that they could be transported to the site, put into place and be made operational with far less effort that traditional construction. (Appx. 1041, 1045) These factors led to their selection. (*Id.*) Regardless of any other emotional considerations, state procurement regulations require state agencies to select the most cost effective solution when purchasing capital equipment. Given the cost of buying pork on the open market as opposed to raising their own, the cost savings to TDCJ means that the trailers will pay for themselves in approximately 2.25 years. (Appx. 774-776)

- 63 -

Finally, and perhaps most importantly, the cooling mechanism the trailers use was explicitly rejected by Plaintiffs' expert as a viable cooling mechanism for the offender housing areas. (D.E. 272-10 at 11-12)  Installing evaporative coolers would be "futile" at the Pack Unit according to Plaintiffs' experts' report.  (*Id.*)  Upon examination, this issue has been misrepresented and distorted wildly beyond its reality, and in the end, was entirely about a cooling system that the Plaintiffs have explicitly rejected.

### D.  Pack Unit's Building Structure Comports with *Ruiz* and Contemporary Standards.

In accordance with the *Ruiz* stipulations, the Pack Unit does not have refrigerated air conditioning supplied to the dorm areas. (Appx. 632, 653, 648-654, 665)  Plaintiffs' contention, however, that the stipulation only "incidentally" discusses ventilation is demonstrably false.  While the document's title unartfully references "crowding," the stipulation goes well beyond this topic. (See *Bailey v. Livingston*, 4:14-cv-01698, Appx. 645-656). The stipulations specify a host of matters in minute detail.  Among these are the amount of cubic feet of fresh air exchange per hour (Appx. 649; 12.5 cfm per prisoner and 15 complete air exchanges per hour), the spacing of the grill vents which provide the fresh air (*Id.*; one grill per 20 feet of width), the use of alternate air supply measures if windows are not available (Appx. 649), and the specific temperature at which the ventilation system must be activated. (Appx. 653; any time the temperature is over 78 degrees). And this system has been improved over time. (Appx. 667- 672).

The Pack Unit renovations were intended to exist long after the completion of the *Ruiz* litigation for the benefit of "past, present, and future inmates."  *Ruiz v. Estelle, et al.*, 503 F.Supp. 1265, 1274 (S.D. Tex.1980).   To that end, the *Ruiz* court retained jurisdiction to enforce the 1985

- 64 -

*Ruiz* crowding stipulations[22] until 2001. *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 996 (S.D. Tex. 2001) (terminating its jurisdiction of continued oversight over these provisions).

Not only did *Ruiz* set the constitutional minimum standard for building air-flow design, but, it also set the standard for the reasonable duties that can be expected of prison officials in this deliberate indifference analysis related to summer heat conditions and building design. Renovations and building structures were determined under *Ruiz* by the court, plaintiffs, defendants, and special master --- not just the TDCJ. And, the renovations and newly built prisons were intended to last beyond the 2001 date when the *Ruiz* court relinquished jurisdiction. The lack of cooling in the prisoner housing areas of Pack Unit in light of *Ruiz*, *Gates*, and *Ball* cannot be deemed "deliberate indifference" in this case. Further, taking into account the *Ruiz* stipulations, the ACA standards on ventilation, Federal and State standards on public housing, air conditioning is not required to meet the community standards for the minimum necessities of life. The building design at Pack Unit, therefore, meets constitutional standards.

## V.   Plaintiffs' ADA and Rehabilitation Act claims fail as a matter of law.

Undisputed facts and Plaintiffs' pleading negate their claims under the Americans' with Disabilities Act and Section 504 of the Rehabilitation Act. To state a claim under the ADA, a plaintiff must allege that (1) he is a qualified individual; (2) who was excluded from participation in or denied the benefits of services, programs, or activities of a public entity; and (3) that the exclusion, denial, or discrimination was because of his disability. *See Blanks v. Swn. Bell Comm'ns*, 310 F.3d 398, 400 (5th Cir.2002). One difference between the ADA and the RA lies in their respective causation requirements. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th

---

[22] Please see D.E. 23-1.

- 65 -

Cir.2005) (citing *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002)).  Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ."  29 U.S.C. §794(a) (emphasis added). By contrast, under Title II of the ADA, "discrimination need not be the sole reason" for the exclusion of or denial of benefits to the plaintiff. *Soledad*, 304 F.3d at 503–04 (quoting *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir.1996)).

A disability is "a physical or mental impairment that substantially limits one or more major life activities; a record of such an impairment; or . . . being regarded as having such an impairment." *Haralson v. Campuzano*, 356 F. App'x 692, 697–98 (5th Cir.2009) (citing 42 U.S.C. § 12102(1)).  Major life activities are "those activities that are of central importance to most people's everyday lives."  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir.2007).  Although the current definition of disability expresses the intention of Congress to broaden the definition and coverage of the term 'disability,' to include major bodily functions, it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination."  *Ball*, 792 F.3d at 598 (*citing Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir.2013). ).  "[N]either the Supreme Court nor [the Fifth Circuit] have recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff must adduce evidence of an impairment that has actually and substantially limited the major life activity on which [s]he relies." *Griffin v. United Parcel Serv., Inc.,* 661 F.3d 216, 223 (5th Cir.2011).  Standing alone, the diagnosis of a condition such as high blood pressure, without any evidence

Plaintiffs' MSJ Appx. 519

that it substantially affects one or more major life activities, is insufficient to trigger the protections of the ADA. *Oswalt v. Sara Lee Corp.,* 74 F.2d 91, 92 (5th Cir.1996) (quotation omitted). "[C]ourts are to make an individualized determination of whether an individual's impairment constitutes a disability, taking into consideration measures taken by the individual to mitigate the effects of the impairment." *Griffin,* 661 F.3d at 222 (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, (1999)). Courts should consider " '(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.' " *Hale v. King*, 642 F.3d 492, 500 (5th Cir.2011). The ADA Amendments Act of 2008 ("ADAAA") "directs that 'substantially limits' should not be as strictly construed as some courts have required in the past and should not require 'extensive analysis.' " *Garner v. Chevron Phillips Chem. Co., L.P.,* 834 F.Supp.2d 528, 529 (S.D.Tex.2011). But "a plaintiff must still show substantial limitation" under the ADAAA. *Mann v. La. High Sch. Athletic Ass'n,* 535 F. App'x 405, 410 (5th Cir. 2013). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Hoffman v. Baylor Health Care System*, 2014 WL 772672 (N.D.Tex. 2014) (*quoting Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (*en banc*) (citations omitted)).

### A.   Plaintiffs have not shown that they cannot thermo-regulate.

The Court's opinion in *Ball* provides significant insight and clarification as to what must be proven in the particular subject of heat-related illness. The operative inquiry looks to whether the individual, due to their particular health conditions actually has difficulty maintaining thermoregulation; that is, maintaining a body temperature within "half a degree or so" of 98.6° F.

- 67 -

Evidence of some other health limitation does not suffice to establish a heat related disability unless that limitation actually affects the individual's ability to thermoregulate. *Ball*, 792 F.3d at 597-598. Further, the evidence adduced at trial in *Ball* exclusively focused on the risk that plaintiffs might, at some point in the future, have elevated body temperature, but no evidence was presented that they ever actually had difficulty maintaining thermoregulation. *Id.* This was fatal to their claim, the Court held. It is not enough to prove that person's major bodily function *could be* impaired at some time in the future to establish that they are disabled in the present. In this case, the Plaintiffs each have documented ability to perform all other major bodily functions and complete all basic tasks of daily living. (Appx. 47-48, 64, 80-81, 86, 94-95, 101-102, 110-114) Though they may have diagnoses of certain medical conditions, none of the named Plaintiffs have ever had an issue maintaining normal thermoregulation, which is the operative inquiry under the ADA or RA as set out in *Ball*. (Appx. 41-132)

**B.** **Plaintiffs have not identified a program or service from which they have been excluded.**

Plaintiffs fail to identify any programs or services, from which their clients are excluded, but, instead, generally refer to the Pack Unit and its housing areas as a service. Only they do not claim they are excluded from this service. Their claims are predicated on an inclusion, not exclusion from this service. Laid bare, the claims are based on TDCJ's alleged failure to make its housing safe for, not available to, Plaintiffs.

Plaintiffs' claims fail for the precise reason articulated by the Fifth Circuit in its recent holding in *Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363 (5th Cir.2013). In *Estate of A.R.*, a child was enrolled in a public school-operated enrichment program that included swimming activities. The child suffered from hearing impairment as well as a seizure disorder. *Id.* The child suffered a

- 68 -

seizure during the pool activities, fell into the pool, and drowned. *Id.* The parents filed an ADA claim asserting intentional discrimination. *Id.* They argued that "[the child]'s safe and meaningful access to the program was interrupted because of her disability" and "pointed out many things the school could have done to make the situation safer for her in the pool area: additional lifeguards, different types of alarm devices, and so on." *Id.* The Fifth Circuit held that this failed to state an ADA claim. *Id.* Though there were measures the school *could have* implemented, this only stated a claim for negligence. *Id.* This was so even where there were fact issues with regard to extent and level of the knowledge of the supervising teachers as to the child's level of impairment and medical issues, as well as fact issues with regard to how long the child was in the water and how fast the supervising safety personnel responded. *Id.* The Court held that the child was in no way denied access to services, programs, and activities of the school, and the parents' claim that program was not made safe, sounded in negligence, not discrimination. *Id.*

In the correctional context, the Fifth Circuit has been likewise reluctant to extend ADA and RA liability to claims where offenders claim poor treatment or inadequate facilities, but where they fail to show discrimination by reason of the offender's disability. The ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012). In, *Nottingham*, the Plaintiff, a TDCJ offender had a weakened right side that limited his ability to walk. *Id.* He claimed that while he was being transported in a TDCJ van, he was not transported in a van that was handicapped-accessible and that he fell off the bench on which he was seated. *Id.* He claimed that he was unable to get up and was left on the floor for the fourteen-hour drive, even when the officers

- 69 -

stopped to eat and use the restrooms. *Id.* The Court rejected these facts as stating an ADA claim

that he was discriminated against and not given safe transit as a disabled person. The Court held:

> That claim, however, does not establish discrimination based on disability: The
> ADA is not violated by "a prison's simply failing to attend to the medical needs of
> its disabled prisoners." (internal citations omitted) There is no evidence that the
> allegedly improper action of leaving Nottingham on the floor of the transit van had
> any connection to his alleged disability. There is no indication that he was treated
> differently because of his disability. He thus has not established a claim under the
> ADA."

*Id.* at 377; *see also, Tuft v. Texas*, 410 Fed.Appx. 770, 775 (5th Cir.2011) (disabled offender

Plaintiff failed to show "by reason of" discrimination in claim regarding overcrowding in the

showers where all offenders were subjected to the same conditions).

Also, in *Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir.2012), the plaintiff filed suit under the

ADA and RA against the TDCJ, among others, alleging that he had several disabilities and chronic

diseases, as well as a lack of natural teeth, and that he had been denied the provision of dentures

by the TDCJ. *Id.* at 413, 418. The Fifth Circuit held that the district court properly dismissed the

plaintiff's claims under the Rehabilitation Act and the ADA because he failed to claim "that this

alleged discrimination was by reason of his disabilities, and such a claim [was] not supported by

any evidence in the record." *Id.* at 418 (*citing Hale*, 642 F.3d at 499; *Tuft*, 410 Fed. Appx. at 775).

*See also*, *Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004)

(rejecting an ADA regarding treatment for Hepatitis because the complained of treatment decision

were not made *because of* any alleged disability). Texas Courts also have cited approvingly to

other jurisdictions that have reached identical conclusions: "The ADA prohibits discrimination

*because of* disability, not *inadequate treatment for* disability." *Cheek v. Nueces County Tex.*, 2013

WL 4017132 at *18 (S.D.Tex.2013); (quoting *Simmons v. Navajo County*, 609 F.3d 1011, 1022

- 70 -

(9th Cir. 2010)); *See also*, *Lee v. Valdez*, 2009 U.S. Dist. LEXIS 43381, 2009 WL 1406244 at *13 (N.D. Tex. May 20, 2009).

Here, Plaintiffs' claims are not based on differential treatment or access. Indeed, the very nature of their claim is that they are *not* treated differently from other offenders by being housed in the same conditions. As held by the Court in *Tuft*, where disabled and non-disabled offenders are subjected to the same conditions, an ADA or RA claim is not stated.

Several sister circuits have also addressed these issues and reached the same conclusions as the Fifth Circuit and Texas Courts. As the United States Court of Appeals for the Seventh Circuit, speaking through the eminent Judge Posner explained,

> [T]he Act [i.e., the ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled. His complaint is that he was not given special accommodation…[H]e is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. The ADA does not create a remedy for medical malpractice…Even apart from the prison setting it would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim by virtue of the Americans With Disabilities Act, whereas a sick or injured but not disabled person-a person suffering from an acute viral infection, perhaps, or who has broken his leg, or who has a hernia or an inflamed gall bladder-must be content with the remedy that the state law of medical malpractice provides. Moreover, the courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners. We would be exceedingly surprised to discover that Congress had made an end run around these decisions in the Americans with Disabilities Act.

*Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.1996). Several other Courts have found similarly. *See Carrion v. Wilkinson,* 309 F.Supp.2d 1007, 1016 (N.D.Ohio 2004) (dismissing diabetic prisoner's ADA claim based upon the denial of a diabetic diet); *see also Galvin v. Cook,* No. CV 00-29-ST, 2000 WL 1520231, at *6 (D.Or. Oct.3, 2000) (granting summary judgment on diabetic

Plaintiffs' MSJ Appx. 524

prisoner's ADA claim where prisoner alleged that he was given improper doses of medication and given inadequate treatment).

Finally, the "more pain and punishment than non-disabled prisoners" standard created in *McCoy v. Tex. Dep't of Crim. Justice*, 2007 WL 2331055, at *7 (S.D.Tex.2006) is not a viable legal standard. The Fifth Circuit has not adopted this language, or the test that it implies.[23] The *McCoy* court appears to have been relying on *United States v. Georgia* for the "suffer more pain and punishment" language, but in so doing, took the comments by *United States v. Georgia* Court out of context. A close reading of the *US v. Georgia* Court's comments reveals that the liability under the ADA stems from the fact that the provision of services like hygiene and medical care are *"services, programs, or activities"* within the meaning of the ADA. The potential liability under the ADA stems from the denial of access to those *services and programs*, not based on a comparison of the lives of disabled with non-disabled offenders. The ADA does not mandate — nor could any government provide — an environment that will pose absolutely no challenges to a disabled person compared to a non-disabled person. The purported "more pain and punishment" standard seeks to do just that, which is far more than is required under the language of Title II or any other Court's interpretation of it.

### C. Plaintiffs receive reasonable accommodations.

Plaintiffs' ADA and RA claims fail for the additional reason that TDCJ has provided them with reasonable accommodation to mitigate the effects of the heat. TDCJ's education, monitoring and mitigation activities are all "accommodations" within the meaning of the ADA. Both their

---

[23] Defendants recognize, and Plaintiffs will no doubt argue, that this Court and others in the related heat cases have upheld the language pulled from *McCoy* when ruling on motions to dismiss under Rule 12, but assert this argument in order to preserve it for appeal to the Fifth Circuit, which has not yet addressed this issue.

Plaintiffs' MSJ Appx. 525

reasonableness and sufficiency for the named Plaintiffs is demonstrated by the fact that none of the named Plaintiffs have ever had a problem with thermoregulation. These measures are appropriate within the correctional context and effective for the named Plaintiffs. Further, these measures are reasonable by Plaintiffs' experts' own measure because they mirror measures implemented by major cities. (D.E. 272-4 at 79-80) In this regard, they are reasonable accommodations as a matter of law.

### D.    TDCJ is immune from Plaintiffs' ADA claims.

Because Plaintiffs failed to show a Constitutional violation, TDCJ is immune from their ADA claims. The ADA abrogates the states' Eleventh Amendment immunity to extent that the condition challenged is also a violation of Constitutional rights. *United States v. Georgia*, 546 U.S. 151 (2006). Because the ADA was passed pursuant to Congress' remedial power under Section 5 of the Fourteenth Amendment, states' eleventh amendment immunity remains intact except where a Constitutional violation has been shown. *Id.* In the Eighth Amendment context, a plaintiff must show that his ADA claim is predicated on an actual violation of the Eighth Amendment. For the numerous reasons listed above, the named Plaintiffs have failed to establish that they are at a substantial risk of harm, or that any defendant is deliberately indifferent to such a risk. Under *United States v. Georgia*, TDCJ is immune under the Eleventh Amendment.

### E.    Plaintiffs' RA claims fail because they fail to show that they are excluded *solely* by reason of their disability.

Plaintiffs' pleadings show the inapplicability of the Rehabilitation Act claims. As noted above, the chief difference between the ADA and the RA lies in their respective causation requirements. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir.2005) (citing *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir.2002)). Section 504 of the Rehabilitation Act

- 73 -

provides that "[n]o otherwise qualified individual with a disability in the United States shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. §794(a) (emphasis added). By contrast, under Title II of the ADA, "discrimination need not be the sole reason" for the exclusion of or denial of benefits to the plaintiff. *Soledad*, 304 F.3d at 503–04 (quoting *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir.1996)). If the plaintiff's disability was not the sole factor behind his exclusion from a program that receives federal benefits, the RA claim fails. *Id.* A plaintiffs' RA claim can be dismissed where his own pleadings negate the notion that his exclusion from a program was based "solely" on his disability. *See Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 704 (N.D. Tex.2014) (dismissing RA claim where Plaintiff claimed he was fired due to animus toward his "disability and ethnicity" because by its terms, his claim failed to establish that his disability was the sole reason for his termination).

Here, Plaintiffs claims are asserted based on conditions applicable to every offender at the Pack Unit. They further claim that every offender is housed in conditions subjecting them to substantial risk of harm. If the "program" to which they are denied access is to be defined as "safe housing," by the terms of Plaintiffs' complaint, every offender is denied "safe housing" regardless of their disability status. Under the RA, Plaintiffs must show that they were denied access to federally funded programs "solely" on the basis of their disability. Plaintiffs' allegations negate their RA claims and summary judgment is warranted.

# VII.    PRAYER FOR RELIEF

For the foregoing reasons, the Court should dismiss Plaintiffs' lawsuit in its entirety with prejudice.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**CHARLES E. ROY**
First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General
Attorney in Charge
Texas Bar No. 24035455
Southern District ID No. 35273
cynthia.burton@texasattorneygeneral.gov

 /s/Matthew J. Greer
**MATTHEW J. GREER**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24069825
Southern District ID No. 1171775
matthew.greer@texasattorneygeneral.gov

**DANIEL C. NEUHOFF**
Assistant Attorney General
Co-counsel
Texas Bar No. 24088123
Southern ID No. 2374885
Daniel.neuhoff@texasattorneygeneral.gov

- 75 -

Case 4:14-cv-03253 Document 300-10 Filed in TXSD on 09/08/16 Page 203 of 344
Case 4:14-cv-01698 Document 26 Filed in TXSD on 11/16/15 Page 89 of 64

**NADINE PHILLPOTTS**
Assistant Attorney General
Co-Counsel
State Bar No. 24058045
Southern Dist. ID No. 939905
Nadine.Phillpotts@texasattorneygeneral.gov


Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin TX  78711
(512) 463-2080/Fax (512) 936-2109

**ATTORNEYS FOR BRAD LIVINGSTON,
ROBERT HERRERA, and the TEXAS
DEPARTMENT OF CRIMINAL JUSTICE**

- 76 -

### NOTICE OF ELECTRONIC FILING

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have

electronically submitted for a copy of the foregoing for filing in accordance with the Electronic

Case Files system of the Southern District of Texas on November 16, 2015.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General


### CERTIFICATE OF SERVICE

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have served

all counsel or *pro se* parties of record electronically or by another manner authorized by FED. R.

CIV. P. 5 (b)(2).

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General

- 77 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 36

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COLE, JACKIE BRANNUM | § | |
| RICHARD KING, LAVAR SANTEE, | § | |
| FRED WALLACE, MARVIN RAY | § | |
| YATES, individually and on behalf | § | |
| of those similarly situated, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 4:14-cv-1698 |
| | § | |
| BRAD LIVINGSTON, in his official | § | |
| capacity, ROBERTO HERRERA, in his | § | |
| official capacity, and TEXAS | § | |
| DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, | § | |
|     Defendants. | § | |

## DEFENDANTS' ORIGINAL ANSWER
## TO PLAINTIFFS' SECOND AMENDED
## CLASS ACTION COMPLAINT

**NOW COME** Brad Livingston in his Official Capacity as the Executive Director, Robert Herrera in his Official Capacity as the Warden of Pack Unit, and the Texas Department of Criminal Justice by and through their attorneys, the Office of the Attorney General of Texas. Defendants incorporate herein by this reference and re-urge, Defendants' Motion to Dismiss Warden Herrera (Doc. No. 158) as if fully set forth herein. Defendants submit the following Original Answer to Plaintiffs' Second Amended Class Action Complaint.

## I. GENERAL DENIAL

Pursuant to FED. R. CIV. P. 8(b) and for the express purpose of requiring Plaintiffs to meet their burden of proof herein, Defendants deny each and every allegation contained in Plaintiffs' Second Amended Class Action Complaint except those expressly admitted herein.

## II. DEFENDANTS' ANSWER TO
## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

1.      Plaintiffs, on behalf of themselves and those similarly situated, bring this lawsuit because the Texas Department of Criminal Justice (TDCJ) refuses to cool inmate housing areas, despite the cruel and dangerously hot indoor temperatures prisoners are forced to live in.

**ANSWER:**

**Defendants admit Plaintiffs bring this lawsuit but deny the remainder of the allegations set forth in ¶1 of Plaintiffs' Second Amended Class Action Complaint.**

2.      TDCJ operates the Wallace Pack Unit ("Pack Unit"). The Pack Unit is a medical and geriatric prison where the indoor inmate housing areas are not climate controlled with refrigerated air (commonly called "air conditioning"). As a result, during the hot Texas summers the apparent temperatures routinely exceed 100 degrees inside inmate housing areas, threatening the health and welfare of all inmates living there, especially the elderly, sick, and disabled.

**ANSWER:**

**Defendants admit the TDCJ operates the Pack Unit. Defendants deny that the Pack Unit is a "medical" prison but admit it is a Type I Geriatric facility. Defendants admit that the indoor inmate housing areas, with the exception of the administrative segregation and infirmary housing are not air conditioned. Defendants deny the remainder of the allegations set forth in ¶2 of Plaintiffs' Second Amended Class Action Complaint.**

3.      TDCJ knowingly subjects Plaintiffs and the Class to extremely hot apparent temperatures inside prisoners' housing areas in violation of the Eighth and Fourteenth Amendments to the Constitution.

Plaintiffs' MSJ Appx. 533

**ANSWER:**

**Defendants deny the allegations set forth in ¶3 of Plaintiffs' Second Amended Class Action Complaint.**

4. TDCJ is acutely aware of the health risk that extreme heat poses, especially to prisoners with heat-sensitive medical conditions and disabilities. Nevertheless, TDCJ refuses to make reasonable accommodations for these prisoners with disabilities, in violation of the Americans with Disabilities Act and Rehabilitation Act.

**ANSWER:**

**Defendants admit that they are aware of summer heat conditions and that the TDCJ has policies, procedures, and practices related to summer heat conditions. Defendants deny the remainder of the allegations set forth in ¶4 of Plaintiffs' Second Amended Class Action Complaint.**

5. Injunctive and declaratory relief are the only means to address TDCJ's studied indifference to the fact that extremely hot, indoor apparent temperatures constitute cruel and unusual punishment to prisoners. Plaintiffs ask the Court to order Defendants to keep indoor apparent temperatures below dangerous levels, and mechanically lower the indoor apparent temperatures to a safe level (such as 88 degrees or lower).

**ANSWER:**

**Defendants deny the allegations set forth in ¶5 of Plaintiffs' Second Amended Class Action Complaint and ask the Court to deny the Plaintiffs' requested relief.**

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act).

Plaintiffs' MSJ Appx. 534

**ANSWER:**

**Defendants admit that this Court has federal question jurisdiction. Defendants assert Eleventh Amendment Immunity to all applicable claims. Defendants deny that the facts and circumstances of this case give rise to the relief requested.**

7.       Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**ANSWER:**

**Defendants admit that venue is proper in this Court.**

8.       Keith Cole is 61 years old and incarcerated at the Pack Unit. He is not expected to be released from custody.

**ANSWER:**

**Defendants admit that Plaintiff Keith Cole is a 61-year-old prisoner. Defendants admit that Cole is incarcerated at the Pack Unit. Defendants admit Keith Cole is an offender serving a life sentence and is not parole eligible until 1-26-2024.**

9.       Jackie Brannum is 61 years old and incarcerated at the Pack Unit. He will not be eligible for parole until 2017.

**ANSWER:**

**Defendants admit that Plaintiff Jackie Brannum is a 61-year-old prisoner. Defendants admit that Brannum is incarcerated at the Pack Unit. Defendants admit that Brannum is currently eligible for parole on 4-25-2017.**

10.       Richard Elvin King is 68 years old and incarcerated at the Pack Unit. He is not expected to be released from custody.

**ANSWER:**

**Defendants admit that Plaintiff Richard Elvin King is a 68-year-old prisoner. Defendants admit that King is incarcerated at the Pack Unit. Defendants can neither admit nor deny whether he is not expected to be released from custody.**

11.     Lavar Santee is 34 years old and incarcerated at the Pack Unit. He will not be eligible for parole until 2017, and is not expected to be released from custody until 2027.

**ANSWER:**

**Defendants admit that Plaintiff Lavar Santee is a 34-year-old prisoner. Defendants admit that Santee is incarcerated at the Pack Unit. Defendants can neither admit nor deny whether he is not expected to be released from custody until 2027 because he will be parole eligible in 2017.**

12.     Fred Wallace is 72 years old and incarcerated at the Pack Unit. He is not expected to be released from custody.

**ANSWER:**

**Defendants admit that Plaintiff Fred Wallace is a 72-year-old prisoner. Defendants admit that Wallace is incarcerated at the Pack Unit. Defendants can neither admit nor deny whether he is not expected to be released from custody.**

13.     Marvin Ray Yates is 69 years old and incarcerated at the Pack Unit. He is not expected to be released from custody until 2019.

**ANSWER:**

**Defendants admit that Plaintiff Marvin Ray Yates is 69 years old. Defendants admit that Yates is incarcerated at the Pack Unit. Defendants can neither admit nor deny that Yates is not expected to be released from custody until 2019 because he has a mandatory eligibility date of May 16, 2019 with a maximum date of October 28, 2033.**

5

14.     Brad Livingston is the executive director of the Texas Department of Criminal Justice. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

**ANSWER:**

**Defendants admit that Brad Livingston is the executive director of the TDCJ. Defendants deny that Livingston is the "commanding officer." Defendants admit that under TEX. GOV'T CODE §493.006, the executive director is responsible for the administration and enforcement of all laws relating to the department including rules, implemented by the department; but, the executive director may delegate those responsibilities as permitted by board rule or general law. Defendants admit that Livingston is sued in his official capacity for declaratory and injunctive relief.**

15.     Robert Herrera is the warden of the TDCJ Pack Unit. At all times described herein, he was acting under color of state law. As the warden of the Pack Unit, he is responsible for ensuring constitutional conditions of confinement exist at the Pack Unit. He is sued in his official capacity for declaratory and injunctive relief.

**ANSWER:**

**Defendants admit Defendant Robert Herrera is the Warden of the Pack Unit. Defendants admit that Plaintiffs sue Herrera in his official capacity for declaratory and injunctive relief.**

6

16.     Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TEX. GOV'T CODE § 493.004. At all relevant times, it operated the Pack Unit, a public facility with programs and services Plaintiffs and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds.

**ANSWER:**

**Defendants admit that the TDCJ is an agency of the State of Texas. The TDCJ admits it operates the Pack Unit and receives federal funds. Defendants deny that the Pack Unit is a public facility. Defendants are unable to admit or deny at this time what programs and services Plaintiffs and other prisoners with disabilities were "otherwise qualified for." Defendants deny all remaining allegations contained in ¶16 of Plaintiffs' Second Amended Class Action Complaint.**

17.     The Pack Unit is a TDCJ prison complex located in Navasota, Texas, in Grimes County.

**ANSWER:  Defendants admit that the Pack Unit is a TDCJ prison located in Navasota, Texas, in Grimes County.**

18.     Most prisoners assigned to the Pack Unit are minimum-custody inmates.

**ANSWER:**

**Defendants object to the term "minimum custody" as ambiguous, and admit that usually the prisoners assigned to Pack Unit must have a custody level of G-1, G-2, or G-3.**

19.     The Pack Unit began operating in September 1983. It presently has the capacity to house 1,478 inmates. The prison typically operates at or near capacity.

**ANSWER:**

7

**Defendants admit the Pack Unit began operating in September 1983. Defendants admit the Pack Unit has the capacity to house 1,478 inmates. Defendants admit that as of July 30, 2015 the Pack Unit housed a total of 1,412 inmates.**

20.     Like most prisons, the population of the Pack Unit is fluid, as new prisoners arrive and prisoners who have completed their sentences are released. Likewise, prisoners are frequently transferred between TDCJ prisons.

**ANSWER:**

**Defendants admit that there are some new prisoners who arrive and some who leave. Similarly, the TDCJ admits that prisoners are transferred among the TDCJ prisons for reasons related to prison management.**

21.     Despite the frequent transfer of prisoners in to and out of the Pack Unit, the population's general characteristics (such as average age, percentage with disabilities, and percentage with heat-sensitive medical conditions) remains fairly consistent.

**ANSWER:**

**Defendants deny that they have analyzed statistically whether the percentages alleged "remain fairly consistent." Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶21 of Plaintiffs' Second Amended Class Action Complaint.**

22.     The Pack Unit is a medical facility, and houses many geriatric prisoners, prisoners with disabilities, and prisoners with chronic medical problems.

**ANSWER:**

**Defendants deny that the Pack Unit is a medical facility; it is a Type I Geriatric facility. Defendants admit that the Pack Unit houses some geriatric offenders. Defendants**

8

admit that the Pack Unit houses some prisoners with disabilities and that it is wheel-chair accessible. Defendants admit that the Pack Unit houses some prisoners with chronic medical problems.

23.     The Pack Unit is one of the few TDCJ facilities that has wheelchair-accessible housing.

**ANSWER:**

**Defendants admit that the Pack Unit has wheel-chair accessible housing.**

24.     As of October 2014, the Pack Unit housed 188 men over the age of 65, 335 men over the age of 60, and 514 men over the age of 55.  Approximately half the men at the Pack Unit are over the age of 50. These numbers are a typical age distribution for the Pack Unit.

**ANSWER:**

**Defendants admit that the statistics cited for the dates in question but deny that Plaintiffs can demonstrate the element of "typicality" for the purposes of class certification.**

25.     The majority of prisoners at the Pack Unit, including Plaintiffs, are housed in inmate dormitories. The dorms do not have air conditioning, or any other form of climate control technology that mechanically lowers the indoor temperatures or humidity during the summer.

**ANSWER:**

**Defendants admit the majority of prisoners at the Pack Unit are housed in inmate dormitories, with the remainder housed at the trusty camp.  Defendants admit the dormitories do not operate with refrigerated air conditioning. Defendants deny the remainder of the allegations set forth ¶25 of Plaintiffs' Second Amended Class Action Complaint.**

9

26.     The ventilation system at the Pack Unit cannot lower the indoor heat index below the outdoor heat index, and cannot ensure that temperatures inside the housing areas are safe and do not exacerbate numerous prisoners' serious medical conditions. Rather, the ventilation system just brings in "fresh" hot air from outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning.

**ANSWER:**

**Defendants admit that the inmate housing areas do not have refrigerated air conditioning. Defendants lack knowledge or information sufficient to admit or deny statements regarding a vague and hypothetical car. Defendants deny the remaining allegations contained in ¶26 of Plaintiffs' Second Amended Class Action Complaint.**

27.     Upon information and belief, TDCJ chose not to air condition the Pack Unit with refrigerated air for political and financial reasons.

**ANSWER:**

**Defendants deny the allegations contained in ¶27 of Plaintiffs' Second Amended Class Action Complaint.**

28.     As a consequence of the lack of air conditioning, TDCJ Executive Director Brad Livingston has admitted "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

**ANSWER:**

**Defendant Livingston admits ¶28 of Plaintiff's Second Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 541

29.    TDCJ's top physicians have noted that indoor apparent temperatures can actually be dramatically higher than the outdoor temperatures: "A few years ago, [a top TDCJ executive] found that when the temperature was 98 degrees outside, we had dorms with temps up to 110 inside. It seems like the [prisoners] in that case were better off outside."

**ANSWER:**

**Defendants admit that an email written by a TDCJ employee states "A few years ago, Mr. Quarterman found that when the outdoor temperature was 98 outside, we had dorms with temps up to 110 inside. It seems like the offenders in that case were better off outside." Defendants are unable admit or deny the substance of the quote, including where or when such an observation was made, whether it was accurately measured, or accurately quoted in the email. Defendants deny that such conditions exist at the Pack Unit.**

30.    Upon information and belief, Dr. Lannette Linthicum, M.D., the head of TDCJ's Health Services Division, and Brad Livingston were aware of this at the time the observation was made. Moreover, they are certainly aware the indoor summer temperatures can be hotter than the outdoor summer temperatures now.

**ANSWER:**

**As a matter of common knowledge, Defendants admit that it is possible for indoor summer temperatures to be hotter than outdoor summer temperatures, but deny specific knowledge of any specific instances within TDCJ prisons where this is so. The remainder of the allegation is so ambiguous and confusing, it is not capable of answer.**

31.    Some inmates routinely sleep on the concrete floor because the concrete is marginally cooler than laying in their bunks.

**ANSWER:**

11

Defendants deny the allegations contained in ¶31 of Plaintiffs' Second Amended Class Action Complaint.

32.     The windows in some of the inmate dormitories are sealed shut.

**ANSWER:**

**Defendants admit that windows in the expansion dorm are sealed shut as part of the ventilation and fan system in the expansion dorm. Defendants deny windows in the other dormitory areas are sealed shut.**

33.     In the dorms where the windows do open, the temperature is not appreciably cooler when the windows are open in the summer.

**ANSWER:**

**Defendants object to the allegation as overbroad and vague as to time and place and the term "appreciably cooler" which is vague and calls for speculation.  Further, Defendants object to being required to answer argumentative, subjective, and conclusory opinions. Subject to these objections, Defendants deny the allegations contained in ¶33 of Plaintiff's Second Amended Class Action Complaint.**

34.     Moreover, in the dormitories where the windows do open, opening the windows allows biting insects, like mosquitos, into the dormitories. Thus, as a practical matter, they often remain closed.

**ANSWER:**

**Defendants admit that prisoners who live in a cubicle closest to the windows sometimes close or open windows and staff will have to make sure the windows are in proper position depending on weather conditions.  Defendants are unable to admit or deny the reason an offender might open or close a particular window at any given time.  Defendants**

12

admit that the window screens are designed for air flow and security and could let insects like mosquitoes into the facility; however, there are other ways that these insects might enter. Defendants deny that there is a major mosquito problem inside the facility.

35.     As a result, and as TDCJ and its officials well know, there is little difference between the indoor and outdoor temperatures at the Pack Unit.

**ANSWER:**

**Defendants admit that at times the indoor temperatures at the Pack Unit are similar to the outdoor temperatures. Defendants deny the remainder of ¶35 of Plaintiffs' Second Amended Class Action Complaint.**

36.     Defendants also know very few parts of the prison accessible to prisoners have air conditioning, and inmates' time in these places is strictly limited. The law library, for example, has air conditioning, but inmates can only go there a few times per week, and the law library is only large enough to hold a few dozen inmates. The education building has air conditioning, but only inmates enrolled in educational programming can go there, and it is only large enough to accommodate 25-30 prisoners at any time. The visitation building is also air conditioned, but inmates can only go to visitation one time per week, and only if they have a visitor there to see them, and only if they are eligible to receive visitors.

**ANSWER:**

**Defendants admit that the locations listed above have air conditioning with refrigerated air. Defendants admit access to the locations listed above is not unlimited. Defendants deny the remaining allegations contained in ¶36 of Plaintiffs' Second Amended Class Action Complaint.**

13

37.     Thus, Plaintiffs are rarely allowed to go to air-conditioned portions of the prison during the summer.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶37 of Plaintiffs' Second Amended Class Action Complaint.**

38.     In stark contrast, Warden Herrera's office is air conditioned, as are all the administrative offices in the prison, and even the prison's armory.

**ANSWER:**

**Except for the term "stark contrast," which Defendants deny; Defendants admit the remainder of the allegations contained in ¶38 of Plaintiffs' Second Amended Class Action Complaint.**

39.     In fact, though TDCJ imprisons over 150,000 prisoners system-wide, there are only 551 beds available with air conditioning for inmates with medical conditions system-wide. These extremely limited beds are reserved for the patients at the most extreme risk of heat-related illness (such as advanced-stage cancer patients), and are not available even for patients with multiple conditions that make them more susceptible to heat-related illness, injury, or death – like Plaintiffs Cole, King, Brannum, Wallace, and Yates. TDCJ's medical providers have testified before the Texas Legislature that these beds are filled by inmates who are so sick that they will never recover, and will likely die in them.

**ANSWER:**

**Defendants object to allegations being directed to them that require the specific knowledge and experience of the TDCJ's prisoner medical providers, UTMB and Texas Tech. Defendants admit that there are approximately 150,000 prisoners at the TDCJ system-**

**wide. Defendants admit that there is a limited number of refrigerated air conditioned prisoner infirmary beds available system-wide. After a reasonable inquiry, Defendants lack knowledge and information sufficient to admit or deny that the TDCJ's medical providers have testified before the Texas Legislature and, therefore, deny same. Defendants deny the remaining allegations to the extent any of the remaining allegations are properly directed to Defendants in ¶39 of Plaintiffs' Second Amended Class Action Complaint.**

40.     TDCJ's medical provider, the University of Texas Medical Branch, has testified there simply are not enough beds system-wide to accommodate even the prisoners with serious medical conditions who are at greater risk of heat-related illness, injury, or death.

**ANSWER:**

**Defendants deny the characterization and substance of prior testimony.**

41.     Dr. Glenda Adams, one of the senior medical providers at UTMB who has been designated as an expert witness in the heat stroke wrongful death litigation, testified as follows:

Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?

A: Pretty much. That's a fair description.

Q: Do you know how many of those triage beds or cells you're talking about?

A: How many are there?

Q: Yeah.

A: Absolutely … there were 471 [in 2011]. We now have 481.

Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?

A: No, but it's all we have.

15

Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?

A: Essentially, yes.

**ANSWER:**

**Defendant TDCJ admits that the quoted testimony is from the deposition of Dr. Glenda Adams who was testifying regarding the number of infirmary beds available to the University of Texas Medical Branch within the TDCJ's prison buildings at the time. Defendants deny that those are the only medical beds located in areas with refrigerated air-conditioning available to UTMB's medical providers. Defendants further admit that Dr. Adams was a senior medical provider at UTMB and that she has been designated as an expert witness for University of Texas Medical Branch in other litigation. Defendants deny that Dr. Adams is an employee of the TDCJ.**

42.     In other words, TDCJ knows it does not have enough air-conditioned beds to safely house prisoners at risk of heat-related illness, injury or death.

**ANSWER:**

**Defendants deny the allegations contained in ¶42 of Plaintiffs' Second Amended Class Action Complaint.**

43.     At the Pack Unit, there are only twelve air-conditioned beds available for prisoners with serious medical conditions. These beds are located in the infirmary, and are typically reserved for inmates who are very sick.

**ANSWER:**

16

**Defendants admit that there are 14 refrigerated air-conditioned beds available in the Pack Unit infirmary; according to Dr. Avila these beds are assigned on a permanent or non-permanent basis as determined by the medical treatment providers.**

44.     In other litigation, TDCJ has admitted it "knows of the high temperatures within its prisons and regard[s] it as a potential risk to the health and safety" of prisoners.

**ANSWER:**

**TDCJ admits it "knows of the high temperatures within its prisons and regard[s] it as a potential risk to the health and safety" of prisoners; however, TDCJ denies that such risk is a substantial risk within the meaning of the Eighth Amendment of the Constitution of the United States.**

45.     Likewise, Livingston has admitted knowing "TDCJ ha[s] no written [policy] to address high temperatures in prisoner housing areas."

**ANSWER:**

**In other litigation, Livingston responded "admit" to a request for admission which stated: "You knew in 2011 TDCJ had no written *administrative directive* to address high temperatures in housing areas." (emphasis added)  Defendant Livingston objects the term "administrative directive," (a specific type of policy at TDCJ) being replaced by Plaintiffs with the term "policy." Defendants admit that witnesses have testified that a directive is sent each summer regarding mitigation measures.  Defendants deny that there is no written policy to address high temperatures and mitigating measures in prisoner housing areas, please see Exs. A-D.**

46.     There is no penological purpose behind refusing to provide prisoners with climate controlled housing.

17

**ANSWER:**

**Defendants admit that the lack of refrigerated air conditioning in certain of the living areas of TDCJ prisons is not a punishment for non-compliant offenders, but are unable to admit or deny the remainder of the allegations contained in ¶46 of Plaintiffs' Second Amended Class Action Complaint.**

47.     In fact, the State of Texas requires county jails to keep indoor temperatures between 65 and 85 degrees. *See* 37 TEX. ADMIN. CODE § 259.160.

**ANSWER:**

**Defendants admit that county jails are regulated under a different statute.**

48.     Indeed, TDCJ even air conditions limited portions of inmate housing areas – such as administrative segregation and solitary confinement cells, including Death Row – at other TDCJ prisons. But decisions to place prisoners in these cells are made for security, not medical, reasons.

**ANSWER:**

**Defendants admit the allegations contained in ¶48 of Plaintiffs' Second Amended Class Action Complaint subject to the qualification that decisions to place prisoners in administrative segregation are generally made for security, not medical reasons.**

49.     The only doctor who works at the Pack Unit has testified that air conditioning inmate living areas "would be beneficial" to protect inmates from the dangers of extreme temperatures.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

18

**Q.      Okay. If - - and I know they don't, but if the housing areas in the prison was all air-conditioned, that would be beneficial for the prisoners, especially the prisoners with heat-sensitive medical conditions, right?**

**A.      It would be beneficial, yes, sir.**

**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 85 ln. 14-18)**

50.     The doctor also specifically acknowledged that extreme heat – like that commonly experienced at the Pack Unit – placed Plaintiffs at increased risk of harm.

        **ANSWER:**

        **Defendants admit that Dr. Fausto Avila has previously testified in this case; however, Defendants object to ¶50 of Plaintiffs' Second Amended Class Action Complaint because it mischaracterizes Dr. Fausto Avila's previous testimony. Therefore, Defendants deny the allegations contained in ¶50 of Plaintiffs' Second Amended Class Action Complaint.**

51.     Most maximum-security federal prisons in hot climates, like Texas, are routinely air conditioned. Even the prison housing terrorism suspects in Guantanamo Bay, Cuba, is air conditioned.

        **ANSWER:**

        **Defendants lack sufficient knowledge or information regarding the federal prisons and Guantanamo Bay, Cuba with which to admit or deny the allegations in ¶51 of Plaintiffs' Second Amended Class Action Complaint.**

52.     In fact, the comment to the American Correctional Association standards instructs prisons to be able to "mechanically lower" temperatures in inmate housing areas. TDCJ deliberately violates this instruction as indoor apparent temperatures at the Pack Unit cannot be mechanically lowered.

        **ANSWER:**

Defendants deny that Pack Unit is in violation of applicable, *mandatory* ACA standards regarding air flow. Defendants, therefore, deny the remainder of the allegations in ¶52.

53.     Most TDCJ prisons, including the Pack Unit, were built after air conditioning became common in public buildings in Texas.

**ANSWER:**

**Defendants deny that the Pack Unit is properly characterized as a building meant for the "public." Rather, the Pack Unit is a prison which has met or exceeded mandatory ACA accreditation standards for air-flow and ventilation since 2007.**

54.     Indeed, TDCJ officials made an intentional decision not to air condition the prisoner housing areas at the Pack Unit. And, upon information and belief, they did so for political and financial reasons.

**ANSWER:**

**The Pack Unit has met or exceeded mandatory ACA accreditation standards for air-flow and ventilation since 2007 and was specifically included in the standards established in the *Ruiz* litigation; therefore, Defendants deny that the decision not to provide refrigerated air conditioning was based upon "political and financial reasons."**

55.     Moreover, despite their knowledge of numerous heat-related injuries occurring indoors, all of which would be prevented with air conditioning, TDCJ, including Brad Livingston and the Texas Board of Criminal Justice, has intentionally decided to continue exposing prisoners to extremely high indoor apparent temperatures at the Pack Unit despite acknowledging these high indoor apparent temperatures put inmates at risk of heat-related illness, injury, and death.

Plaintiffs' MSJ Appx. 551

**ANSWER:**

**Defendants deny the allegations contained in ¶55 of Plaintiff's Second Amended Class Action Complaint.**

56.     TDCJ routinely records the outdoor apparent temperatures at the Pack Unit during the summer. According to TDCJ's own records, the outdoor apparent temperatures at the Pack Unit routinely exceed 100 degrees during the summer.

| Year | # Days: High Over 100 | # Days: High 90-99 | # Days: High 80-89 | # Days: High Below 80 |
|------|------------------------|---------------------|---------------------|------------------------|
| 2011 | 75 | 16 | 1 | 0 |
| 2012 | 45 | 43 | 2 | 0 |
| 2013 | 73 | 16 | 3 | 0 |
| 2014 | 34 | 47 | 9 | 2 |

**ANSWER:**

**Defendants admit that the employees at the Pack Unit routinely record the outdoor temperatures at the Pack Unit during the summer months. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in ¶56 of Plaintiffs' Amended Class Action Complaint because the chart sets forth a summary compiled by Plaintiffs.**

57.     This comes as no surprise to Texans, given the brutal summer temperatures and high humidity in the Houston area.

**ANSWER:**

**Paragraph 57 of Plaintiffs' Amended Class Action Complaint contains conclusory and opinion allegations. Defendants, therefore, deny the allegations contained in ¶57 of Plaintiffs' Second Amended Class Action Complaint.**

21

58.     Pursuant to TDCJ policy and practice, Warden Herrera reviews this data daily during the summer, and knows that apparent temperatures at the Pack Unit are dangerous.

**ANSWER:**

**Defendants admit that during the summer months the outdoor temperature readings are monitored and recorded at the Pack Unit on a daily basis in accordance with the TDCJ's policies, practices and procedures. Defendants deny the remainder of the allegations in ¶58 of Plaintiffs' Second Amended Class Action Complaint.**

59.     Despite this, Warden Herrera has not even looked into costs associated with ways to cool even a single indoor housing area.

**ANSWER:**

**Defendants admit the allegations contained in ¶59 of Plaintiffs' Second Amended Class Action Complaint; however, Defendants deny that Warden Herrera has authority to purchase or install the equipment necessary to provide refrigerated air conditioning to the indoor housing areas, please see Defendants' (re-urged) Motion to Dismiss Warden Herrera at Doc. No. 158.**

60.     Likewise, Director Livingston is aware that apparent temperatures inside TDCJ prisons are hazardous during the summer. Even so, Director Livingston and the Health Services Division took no steps to bring the dangerous temperatures down in any TDCJ facility. They did not even order a study to determine the cost before several heat-related deaths in 2011 and 2012, and being sued for injunctive and declaratory relief in this case.

**ANSWER:**

**Defendants admit that no cost study was ordered prior to 2011. Defendants deny the remaining allegations in paragraph 60.**

Plaintiffs' MSJ Appx. 553

61.     According to the National Weather Service (NWS), summer temperatures in the future will not be lower than temperatures from 2011–2014. In fact, temperatures will likely increase in the future.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶61 of Plaintiffs' Second Amended Class Action Complaint.**

62.     According to the NWS, "heat is the number one weather-related killer in the United States." Over a hundred people die from exposure to extreme heat each year, and thousands are injured.  On average, heat kills more people in the United States each year than hurricanes, tornadoes, floods, or lightning combined.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶62 of Plaintiffs' Second Amended Class Action Complaint.**

63.     According to the NWS, the American Medical Association, the Environmental Protection Agency (EPA), and the Center for Disease Control and Prevention (CDC), "[m]aintaining a consistent internal body temperature, generally 98.6° [Fahrenheit], is essential to normal physical functioning." Excessive heat can "stress the body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to

23

experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶63 of Plaintiffs' Second Amended Class Action Complaint.**

64.    High temperatures and humidity prevent the human body from regulating its temperature. When exposed to heat, the heart will beat faster to increase blood flow to the skin, in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶64 of Plaintiffs' Amended Class Action Complaint.**

65.    Likewise, the body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, the sweat cannot evaporate, preventing the body from cooling. In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

**ANSWER:**

24

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶65 of Plaintiffs' Amended Class Action Complaint.

66.     Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat-related illnesses may develop.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶66 of Plaintiffs' Amended Class Action Complaint.

67.     Indeed, the doctor who cares for all prisoners at the Pack Unit has testified that ambient temperatures above 85 degrees Fahrenheit can be hazardous to prisoners' health.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.     Do you agree that ambient temperatures of 85 degrees can be hazardous at times?**

**A.     Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 101 ln. 7-9)**

68.     Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

**ANSWER:**

Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." In accordance with its policies, Defendants admit that continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death, but deny that there is substantial risk of this occurring at the Pack Unit with the implementation of mitigation measures. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

69.     **Heat Exhaustion:** Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health (NIOSH), include fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶70 of Plaintiffs' Amended Class Action Complaint with regard to NIOSH. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A" which states the symptoms of heat exhaustion are: profuse perspiration, weakness, rapid pulse, dizziness, and headaches; cool skin, sometimes pale and clammy, with perspiration; normal or subnormal body temperature; and possible nausea, vomiting, and unconsciousness. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

Plaintiffs' MSJ Appx. 557

70. According to the Mayo Clinic and TDCJ's own training materials, heat exhaustion can quickly progress to heat stroke if the person does not cool down quickly.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny allegations regarding information in the knowledge or experience of the Mayo Clinic. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendant TDCJ admits that TDCJ training materials do indicate that heat stroke can be preceded by heat exhaustion and its onset can be sudden. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

71. The doctor who cares for all prisoners at the Pack Unit has testified that heat exhaustion by itself is a serious health condition that puts prisoners at a serious health risk.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q. Do you agree that heat exhaustion is a serious medical condition?**

**A. Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 100 ln. 11-13)**

**Q. Do you agree that heat exhaustion puts prisoners at a serious health risk?**

**A. Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 100 ln. 21-23)**

Plaintiffs' MSJ Appx. 558

72.    **Heat Cramps:** Heat cramps can consist of "[m]uscle pain or spasms usually in the abdomen, arms, or legs," according to NIOSH.

**ANSWER:**

**Although, the information in this allegation is from a third party, Defendants admit that the information is contained in TDCJ's policies, please see Exs. A-D. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

73.    Heat cramps are extremely painful. The doctor who cares for all prisoners at the Pack Unit has testified that heat cramps can result in severe pain.

**ANSWER:**

**Defendants deny the allegation that "heat cramps are extremely painful" as over-inclusive in that they can be minor or just uncomfortable for brief periods. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.    Do you agree that heat cramps, frankly, is a serious medical condition that you need to provide treatment for?**

**A.    Well, it's not a serious medical condition. You need to provide treatment and prevent the exhaustion.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 100 ln. 14-17)**

**Q.    Do you agree that heat cramps can result in severe pain?**
**A.    Can? Yes.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 99 ln. 10-12)**

74.    Even TDCJ's own medical policy recognizes that pain from heat cramps "may be quite severe."

**ANSWER:**

28

Defendants admit that the allegation contained in ¶74 of Plaintiffs' Amended Class Action Complaint contains a quote from TDCJ's policies. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.

75.    **Heat Stroke:** NIOSH describes heat stroke as "the most serious heat-related disorder," in which "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms often include hot, dry skin; hallucinations; chills; headaches; confusion; and slurred speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given." According to resources published online by the Mayo Clinic, "[i]n a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles."

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations from NIOSH and Mayo Clinic contained in ¶75 of Plaintiffs' Amended Class Action Complaint. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

76.    In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "[t]he different forms of heat-related illness … increase in

severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶76 of Plaintiffs' Amended Class Action Complaint with regard to NIOSH. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

77.     The doctor who cares for all prisoners at the Pack Unit has testified that heat stroke can come on suddenly, and heat stroke is possible at apparent temperatures as low as 90 degrees.

**ANSWER:**

**Defendants admit the allegation set forth in ¶77 of Plaintiffs' Second Amended Class Action Complaint.**

78.     Indeed, even TDCJ's own medical policies and training materials recognize heat stroke is "a medical emergency," that "the onset is often sudden," and that "death may occur."

**ANSWER:**

**Defendants admit that TDCJ policies and procedures recognize heat stroke as a serious condition. Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit**

30

A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B";
2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as
"Exhibit D." Defendants deny any portion of the allegation that does not comport with the
language in TDCJ's polices, Ex. A-D.

79.     Upon information and belief, virtually all prisoners at the Pack Unit, regardless of
underlying medical conditions, suffer at least some symptoms of heat-related illness or injury
caused by or exacerbated by the high indoor apparent temperatures each summer. Typical
symptoms include: headaches, dizziness, nausea, lightheadedness, elevated temperature, and
heavy sweating.

        **ANSWER:**

        **Defendants deny the allegations in ¶79 of Plaintiffs' Second Amended Class Action
Complaint.**

        B.      *People with Medical Conditions that Impair Cooling are at Additional Risk*

80.     Though all people suffer in the heat, people with physiological conditions that
impair their bodies' ability to cool are at increased risk of suffering heat-related illness, injury, or
death.

        **ANSWER:**

        **Defendants admit and incorporate by this reference TDCJ's Administrative
Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A,"
Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015
Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit
D." Defendants deny any portion of the allegation that does not comport with the language
in TDCJ's polices, Ex. A-D.**

Plaintiffs' MSJ Appx. 562

81.     TDCJ policy recognizes inmates with certain "underlying medical condition[s] … place them at increased risk," including: "cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, asthma, cystic fibrosis, diabetes, psychiatric conditions, Sjogren's syndrome, sweat gland dysfunction, [and] thyroid dysfunction." Heat tolerance weakens, and the risk of heat-related illness increases, for people who suffer from these conditions. TDCJ policies and procedures recognize prisoners with these conditions are at greater risk of heat-related illness, injury, and death.

**ANSWER:**

**Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

82.     Similarly, TDCJ's policies state the risk of heat-related illness increases for individuals who use "anticonvulsants, anticholinergics, antihistamines, antipsychotics, antidepressants, beta blockers, [and] diuretics." Typically, these drugs impair the body's ability to cool itself. These medications are used to treat a wide range of illnesses and disabilities common to prisoners at the Pack Unit, including hypertension, allergies, depression, and bipolar disorder. TDCJ policies and procedures also recognize these medications increase prisoners' risk of heat related illness and death, and that these prisoners "should not be allowed to work or recreate in environments where the apparent temperature is 95 degrees or higher." Brad Livingston and Lannette Linthicum are actually aware of these policies and the risks they identify.

Plaintiffs' MSJ Appx. 563

**ANSWER:**

**Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants admit they are aware of the policies attached as Exhibits A-D. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

83.     TDCJ also acknowledges people with the following medical conditions and disabilities are at heightened risk of heat-related illness: obesity, diabetes, hypertension, cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction.

**ANSWER:**

**Defendants admit and incorporate by this reference TDCJ's Administrative Directive, AD-10.64 (Rev. 7) dated Mar. 17, 2015 attached hereto as "Exhibit A," Correctional Health Care Policy Manual "Heat Stress," Number 27.2 as "Exhibit B"; 2015 Heat Precaution Email as "Exhibit C"; and Heat Precaution 2015 – Reminder as "Exhibit D." Defendants admit they are aware of the policies attached as Exhibits A-D. Defendants deny any portion of the allegation that does not comport with the language in TDCJ's polices, Ex. A-D.**

84.     UTMB, the medical provider at the Pack Unit, has informed TDCJ of this dangerous on numerous occasions.

**ANSWER:**

33

Defendants deny the allegation contained in ¶84 of Plaintiffs' Second Amended Class
Action Complaint.

85.     TDCJ identifies approximately 448 prisoners at the Pack Unit as having medical
conditions that prohibit them from working in "extreme temperatures." The prisoners' medical
conditions place them at increased risk of heat-related illness, injury, or death, or are prescribed
the medications TDCJ identifies as putting people at increased risk of heat-related illness, injury,
or death.

**ANSWER:**

**Defendants admit that as of September 17, 2014, approximately 418 inmates at the
Pack Unit were listed on the Medical Heat Restriction List for the Pack I Unit. Defendants
deny the remaining allegations contained in ¶85 of Plaintiffs' Second Amended Class Action
Complaint as to the specifics of each inmate.**

86.     This list is under-inclusive, as it does not include Plaintiffs Cole, King, or former
Plaintiff Wilson, as recently as the summer of 2015 even though they also take many of the
medications and suffer from heat-related disabilities TDCJ recognizes put inmates at increased
risk of heat-related injury. Likewise, upon information and belief, it does not include other
prisoners who suffer from heat-sensitive medical conditions, or take prescription medications that
increase their risk of heat-related illness, injury, or death.

**ANSWER:**

**Defendants admit that Keith Cole's classification restriction include "no temperature
extremes," "no work in direct sunlight," and "no humidity extremes" and that he is
medically unassigned.  Defendants admit that King and Wilson's classification restrictions
do not include heat restrictions.  Defendants admit that decisions about suitability of work**

34

assignments and recreation areas are made by facility medical staff. **Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶87 of Plaintiffs' Second Amended Class Action Complaint. Please see Defendants Ex. A-D.**

87.     TDCJ also acknowledges other factors that increase the risk of heat-related illness, such as age (particularly for people over 65).

**ANSWER:**

**Defendants admit the allegations contained in ¶87 of Plaintiffs' Second Amended Class Action Complaint, please see Ex. A-D.**

88.     According to the CDC, heat stroke mortality rate increases with age. For example, the rate of heat stroke deaths doubles between ages 35 and 55. The CDC also recognizes that people over the age of 65 are more prone to heat stress.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶88 of Plaintiffs' Second Amended Class Action Complaint.**

89.     Yet no accommodations are made relating to the extreme heat for prisoners based on age, even though it is known to be associated with increased risk of heat-related illness, injury, and death.

**ANSWER:**

**Defendants deny the allegations in ¶89 of Plaintiffs' Second Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 566

90.     TDCJ is well-aware that it houses inmates with disabilities (like Plaintiffs Cole, Wallace, Brannum, King, Wilson, and Yates) who require reasonable accommodations because their disabilities are impacted by exposure to extremely high indoor apparent temperatures. As TDCJ's policies identify these prisoners as being at additional risk of heat-related illness, injury, or death, their need for an accommodation is obvious.

**ANSWER;**

**Defendants admit that TDCJ houses inmates with disabilities; but deny the remaining allegations set forth in ¶90 of Plaintiffs' Second Amended Class Action Complaint.**

91.     Upon information and belief, prisoners at the Pack Unit with these heat-sensitive disabilities experience symptoms of heat-related illness more frequently or more intensely than able-bodied prisoners. These prisoners with disabilities are also at greater risk of heat-related illness, including heat exhaustion, heat cramps, and heat stroke.

**ANSWER:**

**After a reasonable inquiry Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶91 of Plaintiffs' Second Amended Class Action Complaint.**

C.      *Heat in Texas Prisons is Deadly*

92.     Since 1998, at least twenty TDCJ prisoners in facilities around Texas have died of hyperthermia, or heat stroke, as set forth in the table below.

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|--------|---------------|------------|-------------|-------|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | V | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |

36

| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications for schizophrenia |
|---|---|---|---|---|---|---|
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | I | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | V | Prescribed diurectics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | III | Bipolar with depression, prescribed psychtropic medications |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | II | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |

37

Plaintiffs' MSJ Appx. 568

| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

**ANSWER:**

**Defendants admit that records show that the prisoners listed on Plaintiffs' chart died while in custody and the autopsies indicated hyperthermia. With regard to the column titled "facts," the "facts" column is a summary of medical opinions and records prepared by Plaintiffs and lacks complete information. Defendants, therefore, based upon information and belief, deny the "fact" summary on the chart in ¶92 of Plaintiffs' Second Amended Class Action Complaint.**

93. Moreover, it is likely far more TDCJ prisoners were actually killed by heat because hyperthermia is an underreported cause of death by medical examiners.

**ANSWER:**

**After a reasonable inquiry Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶93 of Plaintiffs' Second Amended Class Action Complaint.**

94. The twenty men in the chart above all shared certain characteristics. As TDCJ knew, they all suffered underlying medical conditions and heat-sensitive disabilities that put them at much greater risk of heat stroke, including taking psychotropic drugs to treat a mental illness, suffering from diabetes or hypertension, or taking diuretics to treat hypertension.[1]

---

[1] Six wrongful death lawsuits brought by the families of eight of these men are currently pending. *See McCollum v. Livingston*, No. 4:14-cv-3253 (S.D. Tex.); *Adams v. Livingston*, 4:14-cv-3326 (S.D. Tex.); *Webb v. Livingston*, 4:14-cv-3302 (S.D. Tex.); *Togonidze v. Livingston*, 4:14-cv-3324 (S.D. Tex.); *Martone v. Livingston*, 4:13-CV-3369 (S.D. Tex.); *Hinojosa v. Livingston*, 4:14-cv3311 (S.D. Tex.).

38

**ANSWER:**

**Defendants deny that it can be demonstrated that the characteristics alleged would put every individual at "much greater risk." Defendants do admit, however, that some of the underlying medical conditions alleged might place certain individuals, under certain conditions, at greater risk for heat related illness or injury and that such a determination requires an individualized review of each offender's medical condition and records. Defendants deny the remainder of the allegations contained in ¶94 of Plaintiffs' Second Amended Class Action Complaint.**

95.     Unsurprisingly, in a 2012 email, two of TDCJ's top physicians discussed how "the majority of heat-related deaths involve prescription drugs known to increase the risk."

**ANSWER:**

**Defendants admit that this statement was made to the recipient, Dr. Adams (who is not a TDCJ doctor), in the context of an email chain discussing, *inter alia*, that offender HSM-18's be kept up to date so as to better identify and protect offenders taking those medications.**

96.     Many prisoners at the Pack Unit, including Plaintiffs Cole, Brannum, King, Wallace, and Yates suffer from one or more of the above conditions, or take one or more of the heat-sensitive medications.

**ANSWER:**

**The Plaintiffs' and other offenders medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information**

with which to admit or deny the remaining allegations contained in ¶96 of Plaintiffs' Second Amended Class Action Complaint.

97.     Heat can also cause or aggravate other illnesses, even triggering medical emergencies such as heart attacks. According to the World Health Organization (WHO), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶97 of Plaintiffs' Second Amended Class Action Complaint.**

98.     The CDC, NWS, and EPA recognize that sudden exposure to heat contributes to a variety of illnesses, including cardiovascular disease, and increases the likelihood of illness and death.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack knowledge or information sufficient to admit or deny the allegations contained in ¶98 of Plaintiffs' Second Amended Class Action Complaint.**

99.     As all Texans know, however, it is not just the temperature but also the humidity that contributes to heat. The heat index is a measure of "apparent temperature," based on ambient temperature and humidity, which the NWS says closely approximates how air temperature is "felt"

40

by the human body. The NWS publishes a chart which illustrates how exposure to high heat indexes increases the risk of heat-related illnesses:

**ANSWER:**

**After a reasonable inquiry, Defendants lack knowledge or information sufficient to admit or deny whether the heat index or "apparent temperature" closely approximates how air temperature is "felt" in the human body. Defendants admit the NWS publishes a chart. Defendants admit the chart shows heat index with temperatures that rate the level of "danger." The Defendants deny the remaining allegations with regard to what "all Texans know" in ¶99 of Plaintiffs' Second Amended Class Action Complaint.**

## NOAA's National Weather Service
### Heat Index
#### Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**



☐ Caution    ☐ Extreme Caution    ☐ Danger    ☐ Extreme Danger

100.    The NWS correlates heat index ranges to risk levels:

    a.    Caution (light yellow; heat index 80-90° F) - "Fatigue possible with prolonged exposure and/or physical activity."

41

    b.       Extreme Caution (mustard yellow; heat index 91-104º F) - "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

    c.       Danger (orange; heat index 105-125º F) - "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

    d.       Extreme Danger (red; heat index >126º F) - "Heat stroke likely."

**ANSWER:**

**Defendants admit the NWS chart shows heat index with temperatures that rate the level of "danger."**

101.    The NWS warns that exposure to heat index greater than 105º F "may cause increasingly severe heat disorders with continued exposure or physical activity."

**ANSWER:**

**Defendants admit that the NWS publishes a chart. Defendants admit the NWS chart shows heat index with temperatures that rate the level of "danger."**

102.    TDCJ incorporates a version of the NWS chart into its policies and training materials, and is well aware of the facts described by the NWS. That chart is included as an Appendix to the TDCJ policy entitled "Temperature Extremes in the TDCJ Workplace," dated November 10, 2008. The policy and chart are made available to every TDCJ warden, including Warden Herrera.

**ANSWER:**

**Defendants admit that a version of the NWS chart is used in TDCJ documents, please see Exhibit A. Defendants admit that Warden Herrera has access to the policy and chart.**

103.    Like the NWS chart, TDCJ's version recognizes that as the heat index increases, the risk of increasingly severe heat-related illnesses goes up. When the heat index exceeds 90 degrees (a typical occurrence inside the Pack Unit during the summer), according to TDCJ, "heat

exhaustion" becomes "possible." Above 105 degrees, "heat stroke" becomes "possible." Above 130 degrees, heat stroke is "imminent."

**ANSWER:**

**Defendants admit that a version of the NWS chart is used in TDCJ policy, see Exhibit A. Defendants admit Exhibit A is an official policy of TDCJ.**

104.    Importantly, the NWS and TDCJ charts are designed to predict the risk to people who *do not* suffer from medical conditions that increase their susceptibility to heat-related injuries. These charts predict the risk to "healthy" people (like Plaintiff Santee), not people who have an increased risk of heat-related illness or injury due to medical conditions, medications or age.

**ANSWER:**

**Defendants admit that a version of the NWS chart is used in TDCJ documents, please see Exhibit A. Defendants admit Exhibit A is an official policy of TDCJ.**

105.    Both the NWS and TDCJ charts show that prisoners living in the Pack Unit are exposed to indoor heat indexes that put inmates at risk of heat exhaustion, and heat cramps virtually every day of the summer.

**ANSWER:**

**Defendants deny the allegations contained in ¶105 of Plaintiffs' Second Amended Class Action Complaint.**

106.    Though TDCJ's policies recognize that escalating extreme temperatures put prisoners at increased danger, TDCJ's policies do nothing to provide additional protections to inmates in the extremely hot housing areas as apparent temperatures go up.

**ANSWER:**

43

Defendants deny the allegations contained in ¶106 of Plaintiffs' Second Amended Class Action Complaint.

107.    In fact, TDCJ has no formal, written policy to protect prisoners from extreme temperatures in the indoor inmate housing areas.

**ANSWER:**

**Defendants deny the allegations contained in ¶107 of Plaintiffs' Second Amended Class Action Complaint.**

108.    TDCJ has no policy to lower indoor temperatures in inmate housing areas.

**ANSWER:**

**Defendants deny the allegations contained in ¶108 of Plaintiffs' Second Amended Class Action Complaint, please see Exhibits A-D.**

109.    No mitigation measures short of climate control or a policy to re-locate inmates to cooler housing areas can adequately protect people from these extreme temperatures. So long as housing areas are dangerously hot, prisoners will inevitably suffer heat-related illnesses and injuries, and be placed at increased risk of death.

**ANSWER;**

**Defendants deny the allegations contained in ¶109 of Plaintiffs' Second Amended Class Action Complaint.**

110.    Indeed, TDCJ's primary mitigation measure – water intake – creates a new hazard at the Pack Unit. The Environmental Protection Agency has found the arsenic and fecal coliform levels in the water at the Pack Unit are more than twice the recommended level under federal law and regulations. The doctor treating inmates at the Pack Unit testified arsenic in drinking water can cause bladder cancer, skin cancer, and harm the nervous system.

44

**ANSWER:**

Defendants deny the allegation that the water at Pack Unit creates a new hazard. (See generally, Doc. Index no. 166, Bailey Case Document Index) In January 2006, the EPA changed standards for the allowed arsenic levels from 50 parts to 10 parts per billion. *Id.* The TDCJ has entered into a contract to install a new water filtration system to meet the new standard. *Id.* In a notice dated Jan. 18, 2014, the Texas Commission on Environmental Quality sent a public notice that Pack Unit must display which states, *inter alia*, that that the status of the water is "not an emergency" and that "you do not need to use an alternative water supply." (*Id.* at Bates no. 50930.)

Defendants admit that Dr. Fausto Avila has previously testified as follows:

Q.      Do you know if arsenic in drinking water can cause bladder cancer?

A.      Yes.

Q.      It can, can't it?

A.      Yes.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 186 ln. 8-12)

Q.      Okay. Do you know if arsenic in drinking water can cause skin cancer?

A.      Yes.

Q.      It can, correct?

A.      That's correct.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 186 ln. 18-22)

Q.      Okay. Do you know if arsenic in drinking water can harm the central nervous and peripheral nervous systems?

A.      Yes.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 187 ln. 8-10)

45

111.     Dr. Charles Adams, M.D., the medical director supervising medical care provided at multiple TDCJ prisons, stated what should be obvious to anyone: "they need cooling."

**ANSWER:**

**Defendants admit that Dr. Adams wrote an email which contained the quoted language set forth in ¶111 of Plaintiffs' Second Amended Class Action Complaint.**

112.     TDCJ ignored this observation, and still has not provided any "cooling" at the Pack Unit.

**ANSWER:**

**Defendants deny the allegations contained in ¶112 of Plaintiffs' Second Amended Class Action Complaint.**

114.     Every summer, inmates at the Pack Unit suffer heat-related injuries.

**ANSWER:**

**Defendants admit that on occasion a limited number of offenders have sought medical treatment for heat conditions at the unit infirmary at Pack Unit. Defendants lack sufficient information or knowledge as to whether this has happened "every summer" or how many have sought treatment from the infirmary "every summer."**

115.     Internal emails from July 2012 state that, at the Pack Unit, "the trend has been noted that the [inmates suffering from heat-related illness] are primarily in housing" – as opposed to prisoners working outside.

**ANSWER:**

**Defendants admit that the quoted language appears in an email authored by a UTMB employee.  Defendants deny the substance of the quote as it was made in 2012, and deny the substance of the quote as applied to the summers of 2013 and 2014.**

46

116.    TDCJ's medical provider has admitted being "particularly concerned" about the conditions at the Pack Unit. In a four-day period in 2012, twelve prisoners were seen in the prison's infirmary for heat-related illnesses. Seven of these prisoners were taking medications that placed them at increased risk of heat-related illnesses.

**ANSWER:**

**Defendants admit that a UTMB employee sent an email with the quoted language, but deny that his comment was only directed at the Pack Unit. Defendants admit that 12 offenders received medical treatment during a four day period in 2012, but deny that all were diagnosed with heat related illness, and deny that any offenders diagnosed with a heat related illness required treatment beyond a brief period of rest and hydration. Defendants are unable to admit or deny the remainder of the allegations contained in ¶116 of Plaintiffs' Second Amended Class Action Complaint.**

117.    Upon information and belief, three of the prisoners treated for heat-related illness in June 2012 at the Pack Unit were *not* taking any medication that put them at increased risk, and did *not* have any medical condition that put them at increased risk of heat-related illness. Despite the absence of any additional heat-related risk factors, these prisoners were still injured by the high apparent temperatures.

**ANSWER:**

**At this time, Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶117 of Plaintiffs' Second Amended Class Action Complaint, investigation continues.**

118.    Each summer, inmates at the Pack Unit are treated by medical staff for heat-related illnesses and injuries caused by the hot indoor apparent temperatures.

Plaintiffs' MSJ Appx. 578

**ANSWER:**

**Defendants admit that on occasion offenders have sought medical treatment for heat conditions at the unit infirmary at Pack Unit. Defendants lack sufficient information or knowledge as to whether this happened "each summer" or how many have sought treatment from the infirmary "each summer." Defendants lack sufficient information or knowledge as to whether this was "caused by the hot indoor apparent temperatures." Defendants admit that offenders receive treatment by medical staff at the Pack Unit.**

119.    Upon information and belief, it is likely that many additional prisoners are not reporting their heat-related illnesses.

**ANSWER:**

**This allegation is based upon pure speculation and opinion and, therefore, Defendants obviously lack sufficient knowledge and information with which to admit or deny the allegation contained in ¶119 and, as such, should not be required to answer.**

120.    Because of the miserable conditions created by the heat, many prisoners simply languish during the summer. Many spend their summer days avoiding any exertion that could bring on heat-related illness (including walking to the chow hall for meals), drinking arsenic-laced water, and spraying themselves with water to endure the incessant heat.

**ANSWER:**

**Defendants deny the allegations contained in ¶120 of Plaintiffs' Second Amended Class Action Complaint.**

121.    Even prisoners without medical conditions that make them more vulnerable to the heat, like Santee, suffer intensely during the summer because of the high indoor apparent temperatures.

48

**ANSWER:**

**Defendants deny the allegations contained in ¶121 of Plaintiffs' Second Amended Class Action Complaint.**

122.     Likewise, correctional officers who work in the inmate housing areas also routinely suffer in the heat. Officers routinely sweat through their uniforms, and have to towel sweat off their faces when leaving the inmate dormitories.

**ANSWER:**

**Defendants admit that correctional officers sweat but deny that "correctional officers" as a group "routinely" suffer in the heat.**

123.     In fact, during a recent summer a 57-year-old correctional officer at the Pack Unit was taken to the emergency room after becoming dizzy. She was diagnosed with heat exhaustion and dehydration.

**ANSWER:**

**Defendants admit that, during the summer of 2013, a 57-year old correctional officer at the Pack Unit was taken to the emergency room for being hot, dizzy, and sweaty. Defendants admit that the officer was treated for heat exhaustion and dehydration. Defendants admit that the temperature in her assigned area was 80.4 degrees Fahrenheit at the time of the incident. Defendants admit the officer was able to return to work the next day without any restrictions.**

124.     Thus, in a rare development, the correctional officer's union has found common cause with the prisoners, and publicly supported the extreme temperature lawsuits brought against TDCJ.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by Defendants and is incomplete; and, therefore, it is improper and incapable of answer. Defendants admit that the correctional officers' union has supported refrigerated air conditioning. Defendants deny the remaining allegations contained in ¶124 of Plaintiffs' Second Amended Class Action Complaint.**

125.    The correctional officer's union has made numerous public requests for the prison housing areas to be air conditioned, but TDCJ routinely ignores these requests for safe working conditions.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by Defendants and is incomplete; and, therefore, it is improper and incapable of answer. Defendants admit that the correctional officers' union has supported refrigerated air conditioning. Defendants deny that TDCJ routinely ignores their requests for safe working conditions. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶125 of Plaintiffs' Second Amended Class Action Complaint.**

126.    Major newspapers, including the *New York Times*, *Houston Chronicle*, and *Austin American-Statesman*, have editorialized that TDCJ should end the practice of failing to air condition inmate housing areas.

**ANSWER:**

50

Defendants object to allegations that contain hearsay information in the knowledge and experience of entities or persons who are not parties to this case. Defendants, therefore, lack personal knowledge or information sufficient to admit or deny the allegations contained in ¶126 of Plaintiffs' Second Amended Class Action Complaint.

127.    While TDCJ knows about and ignores the hazards to prisoners and correctional officers, TDCJ officials (including Brad Livingston) approved installing climate controlled hog barns to protect the welfare of TDCJ's agricultural products. TDCJ's detailed policies require that pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs' "health," and "some form of cooling" is required above this "critical limit." High-ranking TDCJ officials even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke. TDCJ has no similar policies to protect humans.

ANSWER:

TDCJ admits that it operates six single-wide trailer swine farrowing barns at the Eastham Unit that have some measure of mechanical cooling. This mechanical cooling comes from a fan system that passes air over a wet cardboard grate. These structures are used for approximately nine weeks after the pigs are born, and the remainder of the pigs' lives are spent in open air structures. No other parts of the swine operation have mechanical cooling, but instead utilize air flow and water. TDCJ admits that its agricultural program

has policies governing swine husbandry. **Defendants deny the remaining allegations contained in ¶127 of Plaintiffs' Second Amended Class Action Complaint.**

128.   Even former TDCJ Institutional Division Director Rick Thaler acknowledged this is unacceptable, and that human prisoners deserve more protections than swine raised for slaughter.

**ANSWER:**

**Defendants deny the characterization of previous testimony.**

129.   Keith Cole suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he suffers from diabetes and hypertension. He also has a history of chronic cardiovascular disease, and has had two stents placed in his body.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto.   Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶129 of Plaintiffs' Second Amended Class Action Complaint.**

130.   Cole's diabetes requires treatment with Glipizide. He takes a diuretic (hydrochlorothiazide), a beta blocker (Metoprolol), a calcium channel blocker (Amlodipine), an angiotensin receptor blocker (Losartan), and a statin (Atorvastatin), to control his hypertension and cardiovascular disease. He is also prescribed Nitrostat tablets to use "as needed" should he feel any chest pains.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report,**

52

supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶130 of Plaintiffs' Second Amended Class Action Complaint.

131. These disabilities and medications impair Cole's thermoregulatory system.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶131 of Plaintiffs' Second Amended Class Action Complaint.**

132. Cole's diabetes causes his body to constantly fight to stay hydrated. He cannot pump enough blood to his skin to cool his body, and his ability to sweat is extremely limited.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶132 of Plaintiffs' Second Amended Class Action Complaint.**

133. Cole has other major life activities that are impaired as well by his disabilities, and which become more severely limited by heat. He cannot stand, walk, lift, or otherwise exert himself physically without feeling chest pain and fatigue, especially during the summer when the indoor apparent temperatures are very high.

**ANSWER:**

The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶133 of Plaintiffs' Second Amended Class Action Complaint.

134.    Because of his diabetes, the heat will make Cole feel dizzy and he cannot walk or stand properly—on some days, he can have difficulty concentrating, thinking, or reading. His diabetes also interferes with the operation of several of his major bodily systems, including his circulatory system, endocrine system and digestive system.

**ANSWER:**

The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶134 of Plaintiffs' Second Amended Class Action Complaint.

135.    When his cardiovascular disease is uncontrolled, Cole suffers from difficulty breathing and chest pains in the high temperatures. His cardiovascular disease and hypertension impair his respiratory, circulatory, and cardiovascular systems.

**ANSWER:**

The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information

54

with which to admit or deny the remaining allegations contained in ¶135 of Plaintiffs' Second Amended Class Action Complaint.

136.    Cole has been treated for heat exhaustion at the Pack Unit. Officers have had to take Cole to the infirmary in a wheelchair because heat illness prevented him from walking there on his own to receive treatment during the heart of the summer.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto.  Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶136 of Plaintiffs' Second Amended Class Action Complaint.**

137.    During previous summers, Cole has tried to spend extra time in the air-conditioned infirmary after receiving treatment for his disabilities. On at least one occasion, although nurses encouraged him to spend extra time in the infirmary, Warden Herrera ordered him out of the infirmary and to return to his blazing hot dormitory.

**ANSWER:**

**Defendants deny the characterization of the dormitory as "blazing hot."  Defendant Herrera denies evicting any offenders from the medical department who had not been released by the medical providers to return to their housing locations.  Defendants are unable to admit or deny the remainder of the allegations contained in ¶137 of Plaintiffs' Second Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 586

138.     Jackie Brannum suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension and diabetes, and is prescribed antidepressant and psychotropic drugs to treat schizoaffective disorder, a serious mental illness.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶138 of Plaintiffs' Second Amended Class Action Complaint.**

139.     Brannum takes Amlodipine (a calcium channel blocker), Lisinopril (an ACE inhibitor), Pravastatin (a statin), and Propranolol (a beta blocker) to treat his hypertension and coronary artery disease.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶139 of Plaintiffs' Second Amended Class Action Complaint.**

140.     Brannum is an insulin-dependent diabetic, and receives insulin injections twice a day to control his blood sugar levels.

**ANSWER:**

The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto.  Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶140 of Plaintiffs' Second Amended Class Action Complaint.

141.    Brannum suffers from chronic back pain, and takes Carbamazepine and Nortriptyline to treat his pain. (Nortriptyline is an antidepressant that also has pain-relieving properties.) He uses a walker to assist with mobility.

**ANSWER:**

The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto.  Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶141 of Plaintiffs' Second Amended Class Action Complaint.

142.    To control his schizoaffective disorder, Brannum takes Prozac (an antidepressant), and Risperidone (a psychotropic drug). When he is not taking his psychiatric medications, Brannum hears voices, and has thoughts of hurting himself. In the summer, his psychiatric medications make him feel dizzy and lightheaded because of the heat.

**ANSWER:**

The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto.  Defendants lack sufficient knowledge or information

with which to admit or deny the remaining allegations contained in ¶142 of Plaintiffs' Second Amended Class Action Complaint.

143.    These disabilities impair Brannum's thermoregulatory system. Heat aggravates hypertension, and has caused Brannum to experience extreme fatigue and dizziness in the past during the summer. He often feels fatigue and nausea over the summers, and he has become lightheaded many times. Brannum has also felt his heart race and had difficulty breathing when he has to move in the heat.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶143 of Plaintiffs' Second Amended Class Action Complaint.**

144.    On more than one occasion during the summer, Brannum has told medical providers at the Pack Unit he fell due to dizziness.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶144 of Plaintiffs' Second Amended Class Action Complaint.**

145.    Brannum has been treated in the infirmary at the Pack Unit during the summer for symptoms like severe dizziness. In September 2014, for example, Brannum had to be taken to the

infirmary in a wheelchair when he "over did it" while "cleaning his dorm." A physician at the Pack Unit stopped his prescription for a diuretic medication used to treat his hypertension because it caused him to become dizzy during the summer.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶145 of Plaintiffs' Second Amended Class Action Complaint.**

146.    In May 2015, Brannum was taken to the infirmary in a wheelchair after experiencing dizziness and shortness of breath.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶146 of Plaintiffs' Second Amended Class Action Complaint.**

147.    Brannum has also experienced blurred vision and "excessive sweating" during the summer, requiring treatment in the infirmary.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information**

Plaintiffs' MSJ Appx. 590

with which to admit or deny the remaining allegations contained in ¶147 of Plaintiffs' Second
Amended Class Action Complaint.

148.    On several occasions, Brannum has experienced severe headaches during the
summer months, and been treated in the infirmary.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by
Defendants' medical expert, Dr. Means, and incorporate by this reference her report,
supplements or amendments, thereto.  Defendants lack sufficient knowledge or information
with which to admit or deny the remaining allegations contained in ¶148 of Plaintiffs' Second
Amended Class Action Complaint.**

149.    Though Brannum tries to stay hydrated by drinking extra water during the summer,
he has required treatment in the infirmary due to dehydration. In May 2014, he became painfully
constipated and suffered from serious dizziness because he could not stay hydrated in the extreme
indoor temperatures at the Pack Unit.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by
Defendants' medical expert, Dr. Means, and incorporate by this reference her report,
supplements or amendments, thereto.  Defendants lack sufficient knowledge or information
with which to admit or deny the remaining allegations contained in ¶149 of Plaintiffs' Second
Amended Class Action Complaint.**

150.    During the summer, Brannum has great difficulty sleeping due to the heat and his
disabilities. The headaches caused by the heat and his disabilities cause him to have problems

concentrating and thinking. Though he used to perform forced labor in the prison's kitchen, due to his heat-sensitive disabilities, he is no longer allowed to work in the prison.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶150 of Plaintiffs' Second Amended Class Action Complaint.**

151. Richard King suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. King has hypertension, obesity, and diabetes.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶151 of Plaintiffs' Second Amended Class Action Complaint.**

152. King takes hydrochlorothiazide (a diuretic), Atenolol (a beta blocker), Lisinopril (an ACE inhibitor), and Terozsin to treat his hypertension. He receives insulin injections twice a day and takes Metformin to control his diabetes.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information**

Plaintiffs' MSJ Appx. 592

with which to admit or deny the remaining allegations contained in ¶152 of Plaintiffs' Second Amended Class Action Complaint.

153.    King's conditions impair his ability to regulate his body temperature, which, in turn, interferes with his basic, everyday activities. The heat makes it difficult for King to sleep; specifically, he gets so hot at night that his mattress always seems soaked through with sweat. Compounding the strain from sleepless nights, the oppressive daytime heat taxes his body even further, leaving him exhausted. King feels so exhausted in the heat that he is unable to perform simple tasks like standing or walking for long periods of time. The short walk to the chow hall becomes so unbearable he will skip meals.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶153 of Plaintiffs' Second Amended Class Action Complaint.**

154.    The heat will make King feel dizzy. He has difficulty walking during the summer, and feels like he will lose his coordination and fall over.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶154 of Plaintiffs' Second Amended Class Action Complaint.**

155.    King also feels he is unable to perform basic tasks during the summer due to exhaustion from the heat and discomfort from excessive sweating. In fact, TDCJ's medical

provider has determined that King cannot perform forced labor at the prison due to his medical conditions. Yet he gets no protection from the indoor heat or humidity.

**ANSWER:**

**Defendants admit that King's Health Summary for Classification lists that he has a restriction for sedentary work only. Defendants deny that King gets no protection from the heat. Defendants lack knowledge or information sufficient to admit or deny that King suffers from the heat and experiences discomfort from excessive sweating. Defendants deny the remaining allegations contained in ¶155 of Plaintiffs' Amended Class Action Complaint.**

156.    Fred Wallace suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension, obesity, and major depression.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶156 of Plaintiffs' Second Amended Class Action Complaint.**

157.    Wallace takes an antidepressant (Prozac) to treat his major depression, an antihistamine (Diphenhydramine), and several medications to treat his hypertension (Gemfibrozil, Lisinopril (an ACE inhibitor), and Terazosin (an alpha blocker)).

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report,**

supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶157 of Plaintiffs' Second Amended Class Action Complaint.

158. These disabilities and medications impair the function of Wallace's thermoregulatory system. TDCJ's medical provider determined Wallace cannot perform forced labor in "extreme temperatures" or "direct sunlight" due to his disabilities and/or prescriptions.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶158 of Plaintiffs' Second Amended Class Action Complaint.**

159. Likewise, Wallace's depression prevents him from engaging in multiple major life activities. Before he went to prison (and began taking Prozac), he would not leave his house or go to work when he was depressed. His depression prevents him from sleeping, causes him to have "low energy," and suffer from thoughts like "I'd be better off dead." Thus, his depression impaired his major life activities or working, thinking, concentrating, and caring for himself.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶159 of Plaintiffs' Second Amended Class Action Complaint.**

160. His obesity and hypertension also interfere with major life activities. Wallace cannot climb into a top bunk due to his obesity, and TDCJ has been instructed by doctors to only

assign him a lower bunk. He has been seen in TDCJ's sleep clinic for chronic insomnia related to his obesity and depression.

**ANSWER:**

**Defendants admit that Wallace's Health Summary for Classification lists his restrictions as lower bunk only. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶160 of Plaintiffs' Amended Class Action Complaint.**

161.    During previous summers, Wallace has been taken to the infirmary in a wheelchair when suffering from dizziness and dehydration.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶161 of Plaintiffs' Second Amended Class Action Complaint.**

162.    Marvin Yates suffers from several medical conditions and/or disabilities that increase his risk of heat-related injury or death. For example, he has hypertension, chronic obstructive pulmonary disease (COPD), coronary artery disease, asthma, diabetes, arthritis, and is a cancer survivor. His body mass index is also over thirty, making him medically obese.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information**

65

with which to admit or deny the remaining allegations contained in ¶162 of Plaintiffs' Second Amended Class Action Complaint.

163.    Yates takes a calcium channel blocker (Amlodipine), a blood thinner (Clopidogrel), an ACE inhibitor (Enalapril), a diuretic (Furosemide), a statin (Pravastain), and a beta blocker (Metoprolol) to treat his hypertension. His COPD requires treatment with albuterol, a steroid inhaler, and a nebulizer treatment for infections.  His coronary artery disease requires treatment with a beta blocker, pravastatin, Plavix, and stents in his heart. Finally, his asthma requires treatment with medications including albuterol and a nebulizer for severe attacks, and antihistamines to control his allergies (which exacerbate his asthma).

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto.  Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶163 of Plaintiffs' Second Amended Class Action Complaint.**

164.    These disabilities and medications impair Yates's thermoregulatory system. He cannot sweat normally to cool himself down, and the blood flow to his skin is limited. It is also difficult for Yates to perform any manual task. He cannot lift objects, perform work, walk, or even stand for an extended period of time. Yates's blood sugar regulation is impaired by his diabetes. He needs to carry candy with him at all times to treat himself when his blood sugar level drops, and his diabetes ultimately impairs his ability to stay hydrated. His breathing is impaired: he becomes short of breath after walking short distances, like from his dormitory to the chow hall. He avoids outdoor recreation because his arthritis makes it too painful to undress and dress as fast

66

as the guards require for the "shakedown" before he can go outside. Yates's medications also impair his ability to think and concentrate, because they cause him to get nervous very easily. Anxiety, exhaustion, or sometimes lying down to sleep cause his bronchial tubes to constrict, making it hard to breathe. Yates's breathing problems generally make it more difficult to get food, recreate, and sleep at the prison—and they are worsened by hot temperatures.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶164 of Plaintiffs' Second Amended Class Action Complaint.**

165. These impairments are aggravated in the summer due to high indoor apparent temperatures at the Pack Unit. During previous summers at the Pack Unit, he has experienced several symptoms of heat-related illnesses, including dizziness, painful muscle cramps, fatigue, blurred vision, and headaches. He has trouble sleeping in the extreme heat because he cannot catch his breath.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶165 of Plaintiffs' Second Amended Class Action Complaint.**

166.     Cole, Wallace, Brannum, King, and Yates's medical conditions are typical of other inmates at the Pack Unit. Like these Plaintiffs, many other prisoners at the Pack Unit suffer from physiological conditions that place them at increased risk of heat-related illness, injury, or death. Like these Plaintiffs, many other prisoners at the Pack Unit are prescribed anticonvulsants, anticholinergics, antipsychotics, antihistamines, antidepressants, beta blockers, and diuretics. And, like King and Yates, many other prisoners at the Pack Unit are over age 65.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny that "many" other prisoners at the Pack Unit are prescribed anticonvulsants, anticholinergics, antipsychotics, antihistamines, antidepressants, beta blockers, and diuretics. Defendants admit that other prisoners are over age 65. Defendants deny the remainder of the allegations contained in ¶166 of Plaintiffs' Second Amended Class Action Complaint.**

167.     Because TDCJ classifies the Pack Unit as a "Chronic Care I" facility, the Unit houses a disproportionate number of prisoners with chronic health needs. There are more than 700 prisoners housed there who suffer from physiological conditions or take medications that increase their risk of heat-related illness.

**ANSWER:**

**Defendants admit the Pack Unit is a Type I geriatric facility. Defendants object to the use of the term "disproportionate" as the term is vague, mischaracterizes and is undefined. Since this statistical allegation was prepared by Plaintiffs and contains incomplete information, Defendants lack sufficient knowledge or information to admit or deny the remaining allegations contained in ¶167 of Plaintiffs' Second Amended Class Action Complaint.**

68

168.     Plaintiffs take their medications because the prescriptions are necessary to protect their health from their disabilities.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶168 of Plaintiffs' Amended Class Action Complaint.**

169. There are hundreds of otherwise-qualified prisoners with heat-sensitive disabilities housed at the Pack Unit, including the following:

**ANSWER:**

**Defendants deny the allegations contained in ¶169 of Plaintiffs' Second Amended Class Action Complaint.**

170.     Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated or exacerbated.

**ANSWER:**

**This allegation is not directed to any specific Defendant. Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶170 of Plaintiffs' Second Amended Class Action Complaint.**

69

171.    Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶171 of Plaintiffs' Second Amended Class Action Complaint.**

172.    As a consequence, TDCJ policy recognizes patients taking diuretics or beta blockers to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

**ANSWER:**

**Defendants admit that TDCJ has a policy which recognizes patients taking diuretics or beta blockers to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."**

173.    Hypertension can substantially limit a patient's ability to walk, stand, and breathe, and limit the operation of his respiratory, circulatory, and cardiovascular systems, especially when the patient is exposed to extreme temperatures.

70

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶173 of Plaintiffs' Second Amended Class Action Complaint.**

174.   Hypertension itself also increases a patient's susceptibility to heat stress, and, combined with extreme heat, diminishes the body's ability to regulate internal temperature. Thus, a patient with hypertension will be at additional risk of heat-related injuries, and suffer additional pain and punishment above and beyond what an able-bodied inmate at the Pack Unit experiences.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack personal knowledge or information sufficient to admit or deny the remaining allegations contained in ¶174 of Plaintiffs' Second Amended Class Action Complaint.**

175.   The doctor who cares for all prisoners at the Pack Unit has testified that hypertension increases the risk of heat-related illness.

**ANSWER:**

Plaintiffs' MSJ Appx. 602

Defendants admit that Dr. Fausto Avila has previously testified as follows:

Q.      Okay. All right. So those are all medical conditions - - obesity, hypertension, hypothyroidism - - that render you more vulnerable to extreme heat, right?

A. That's correct.
(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 195 ln. 7-11)

176.    TDCJ is aware that hypertension increases patients' risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that hypertension can increase a patient's risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

177.    Approximately 728 prisoners at the Pack Unit suffer from hypertension.

**ANSWER:**

**Defendants admit that statistics provided by UTMB listed approximately 728 offenders at the Pack Unit with hypertension at the time the statistics were provided.**

178.    Asthma is a chronic lung disease that inflames and narrows the airways. It substantially limits sufferers' ability to breathe, causing recurring periods of wheezing, chest tightness, shortness of breath, and coughing. Asthma also substantially limits the operation of the respiratory system.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case.  These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer.  Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information.  Defendants lack personal**

72

knowledge or information sufficient to admit or deny the remaining allegations contained in ¶178 of Plaintiffs' Second Amended Class Action Complaint.

179.    Heat and humid air can trigger asthma symptoms, causing asthma patients to suffer more pain and punishment in hot environments than people without asthma.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶179 of Plaintiffs' Second Amended Class Action Complaint.**

180.    TDCJ's medical provider recognizes that asthma is a condition that places patients at increased risk of heat-related illnesses.  The doctor who cares for all prisoners at the Pack Unit has testified that asthma increases the risk of heat-related illness.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they rely on the medical providers for TDCJ to advise them regarding this type of information. Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.    And asthma's also something that the heat affects, correct?**

73

A.      Yes.
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 115 ln. 13-15)**

**Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶180 of Plaintiffs' Amended Class Action Complaint.**

181.    TDCJ is aware that asthma places patients at increased risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that asthma under certain circumstances _can_ place patients at an increased risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

182.    Approximately 113 prisoners at the Pack Unit suffer from asthma.

**ANSWER:**

**Defendants admit that UTMB provided statistics listing approximately 113 prisoners at the Pack Unit as having asthma at the time the statistics were prepared.**

183.    Diabetes is a chronic disease caused by an insulin imbalance. Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the**

74

remaining allegations contained in ¶183 of Plaintiffs' Second Amended Class Action Complaint.

184.    Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat.  Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶184 of Plaintiffs' Second Amended Class Action Complaint.**

185.    Diabetes also reduces blood circulation by impairing the action of the heart and by decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical**

Plaintiffs' MSJ Appx. 606

providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶185 of Plaintiffs' Second Amended Class Action Complaint.

186. The doctor who cares for all prisoners at the Pack Unit has testified that diabetes increases the risk of heat-related illness.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has previously testified as follows:**

**Q.     Tell the jury - - tell the Court why - - or how diabetes renders you more vulnerable to the heat because of what happens.**

**A.     Diabetes is a condition in which the autonomic nervous system starts deteriorating beside the metabolic problems they have. The regulation of temperature as well as other vital functions gets diminished. The person will develop a neuropathy and the patient will develop a poor response to any kind of autonomic condition. (Deposition of Fausto Avila, M.D., 3/5/2015, pg. 129 ln. 2-10)**

187. TDCJ is aware that diabetes increases the risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that diabetes *can* increase the risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

188. Approximately 212 prisoners at the Pack Unit suffer from diabetes.

**ANSWER:**

**Defendants admit that UTMB provided statistics listing approximately 212 offenders at the Pack Unit as having diabetes at the time the statistics were prepared.**

189. COPD is a disease that makes it difficult to breathe. It includes chronic bronchitis and emphysema.

**ANSWER:**

Plaintiffs' MSJ Appx. 607

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶189 of Plaintiffs' Second Amended Class Action Complaint.

190. COPD causes frequent coughing, shortness of breath, and tightness in the chest, among other symptoms.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶190 of Plaintiffs' Second Amended Class Action Complaint.

191. COPD impairs the operation of the respiratory, circulatory, and cardiovascular systems.

**ANSWER:**

Plaintiffs' MSJ Appx. 608

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶191 of Plaintiffs' Second Amended Class Action Complaint.

192. Heat exacerbates COPD, because the body needs to breathe in additional oxygen to help cope with the heat. This requires additional breathing, which is impaired by COPD.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶192 of Plaintiffs' Second Amended Class Action Complaint.

193. The doctor who cares for all prisoners at the Pack Unit has testified that COPD increases the risk of heat-related illness.

**ANSWER:**

**Defendants admit Dr. Fausto Avila has previously testified as follows:**

78

**A.    Yes, the heat will affect the people with COPD.**
**(Deposition of Fausto Avila, M.D., 3/5/2015, pg. 115 ln. 7)**

194.    TDCJ is aware that COPD increases the risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that COPD *can* increase the risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

195.    Approximately 84 prisoners at the Pack Unit suffer from COPD.

**ANSWER:**

**Defendants admit that UTMB provided statistics listing approximately 84 offenders at the Pack Unit with COPD at the time the statistics were prepared.**

196.    Schizoaffective disorder is a chronic mental illness in which a person suffers from both symptoms of schizophrenia and a mood disorder (such as major depression or bipolar disorder). Symptoms include paranoia, delusions, hallucinations, severe depression, mania, and thoughts of suicide.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶196 of Plaintiffs' Second Amended Class Action Complaint.**

197.    Schizoaffective disorder requires treatment with psychotropic drugs.

Plaintiffs' MSJ Appx. 610

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶197 of Plaintiffs' Second Amended Class Action Complaint.

198.    Schizoaffective disorder impairs the operation of the brain.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶198 of Plaintiffs' Amended Class Action Complaint.

199.    Schizoaffective disorder limits patients' ability to think, concentrate, work, care for themselves, see, hear, and sleep.

**ANSWER:**

Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require

80

an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information.  Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶199 of Plaintiffs' Second Amended Class Action Complaint.

200.    According to TDCJ's medical policies, psychotropic drugs increase a patient's vulnerability to heat-related medical conditions, like heat exhaustion, and heat stroke.

**ANSWER:**

**Defendant TDCJ admits that TDCJ policies list that psychotropic drugs *can* increase a patient's vulnerability to heat-related medical conditions, but such risk or possible risk requires an individual assessment for each offender.**

201.    TDCJ is aware that schizoaffective disorder (and the medications used to treat it) increase the risk of heat-related illness.

**ANSWER:**

**Defendant TDCJ admits that schizoaffective disorder and the medications used to treat it *can* increase the risk of heat-related illness, but such risk or possible risk requires an individual assessment for each offender.**

202.    Approximately 66 prisoners at the Pack Unit take some type of psychotropic drug.

**ANSWER:**

**Defendants admit that on Sept. 18, 2014, electronic medical records indicated that 66 offenders had a code associated with taking antipsychotics.**

81

203. Major depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, and problems concentrating.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶203 of Plaintiffs' Second Amended Class Action Complaint.**

204. Depression is a physiological condition affecting body systems, including the brain.

**ANSWER:**

**Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶204 of Plaintiffs' Second Amended Class Action Complaint.**

Plaintiffs' MSJ Appx. 613

205.    The doctor treating patients at the Pack Unit testified patients with depression may experience difficulty caring for themselves. TDCJ does not dispute this.

**ANSWER:**

**Defendants admit that Dr. Fausto Avila has testified regarding this subject; however, objections were raised to this line of questioning.  Defendants cannot admit or deny this allegation pending a ruling on the objections asserted during the deposition referenced in paragraph 212.  Defendants, therefore, lack knowledge or information sufficient to admit or deny whether there are offenders at the Pack Unit who suffer depression that renders them unable to care for themselves that the health care providers at Pack Unit have not identified.**

206.    TDCJ's medical provider identifies antidepressant medications, like Prozac, as putting patients at much higher risk of heat-related illness. In fact, when a patient is prescribed an antidepressant, the physician informs the patient that these medications "can affect the manner in which the body relates to excessive heat especially in the summer." The patient is told to "contact nursing/security if they [feel] dizzy, confused, or over heated" so their vital signs can be checked. The patient is warned "excessive heat can cause life threatening conditions" and told to "drink plenty of water when the heat is extreme." Despite this explicit warning, TDCJ does nothing to protect inmates taking such medications from the extreme temperatures inside the housing areas.

**ANSWER:**

**Defendant TDCJ denies that it does nothing to protect inmates taking such medications from the heat.  Defendants object to allegations that contain information in the knowledge and experience of entities or persons who are not parties to this case. These allegations require an interpretation of information which was not prepared by the Defendants; and, therefore, it is improper and incapable of answer. Defendants admit they**

83

will rely on their medical providers and experts regarding this type of information. Absent medical or expert testimony, Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in ¶206 of Plaintiffs' Second Amended Class Action Complaint.

207.    TDCJ is aware that depression (and the medications used to treat it) increase the risk of heat-related illness.

**ANSWER:**

**Defendants object that allegations are vague and undefined. Defendants admit that certain medications used to treat depression *can* potentially increase the risk of heat-related illness, but is individual to each offender.**

208.    Lavar Santee has not been diagnosed with any medical conditions that make him sensitive to the heat. He also does not take any "heat-sensitive" medications.

**ANSWER:**

**The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶208 of Plaintiffs' Second Amended Class Action Complaint.**

209.    Nevertheless, Santee suffers from the heat inside his dorm during summers at the Pack Unit. He reports sweating excessively during most summers, even at rest. He also reports feeling exhausted far more easily, and difficulty sleeping, during the summer.

**ANSWER:**

Plaintiffs' MSJ Appx. 615

The Plaintiffs' and some other offenders' medical records have been evaluated by Defendants' medical expert, Dr. Means, and incorporate by this reference her report, supplements or amendments, thereto. Defendants lack sufficient knowledge or information with which to admit or deny the remaining allegations contained in ¶209 of Plaintiffs' Second Amended Class Action Complaint.

210.    Santee has suffered from painful heat cramps in the back of his legs and in his feet while incarcerated at the Pack Unit.

**ANSWER:**

**Defendants lack knowledge or information sufficient to admit or deny the allegations contained in ¶210 of Plaintiffs' Amended Class Action Complaint.**

211.    Thus, even prisoners without heat-sensitive medical conditions suffer at the Pack Unit due to the high indoor apparent temperatures and cruel conditions.

**ANSWER:**

**Defendants deny that the conditions at Pack Unit are "cruel." Defendants lack knowledge or information sufficient to admit or deny the remainder of the allegations contained in ¶211 of Plaintiffs' Second Amended Class Action Complaint.**

212.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

**ANSWER:**

**Defendants admit that Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(a) and (b)(2), but deny that the requisites for class certification are met in the this case.**

213.    Plaintiffs propose to represent a class composed of all inmates who currently are, or who in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas. Each Plaintiff is typical of class members.

**ANSWER:**

**Based upon information and belief, Defendants deny that each named Plaintiff is typical and incorporate the Answer at ¶212 as if fully set forth.**

214.    Plaintiffs also seek to represent the following sub-classes of people who 1) are currently incarcerated at the Pack Unit (or will be in the future), 2) are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas, and either:

**ANSWER:**

**Defendants incorporate the Answer at ¶212 as if fully set forth.**

3a.  **Heat-Sensitive Subclass:** (i) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction); or, (ii) are prescribed an anticonvulsant, anticholinergic, antipsychotics, antihistamines, antidepressants, beta blockers, or diuretic; or, (iii) are over age 65. Cole, Wallace, Brannum, Wilson, King, and Yates are typical members of this subclass.

**ANSWER:**

86

Defendants incorporate the Answer at ¶212 as if fully set forth.

3b. **Disability Subclass:** suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability. Cole, Wallace, Brannum, Wilson, King, and Yates are typical members of this subclass.

**ANSWER:**

**Defendants incorporate the Answer at ¶212 as if fully set forth.**

215.     **Numerosity**: The joinder of each class member would be impracticable because each class is so numerous. The approximate number of class members exceeds 1,400 as the Pack Unit houses over 1,400 inmates and many other inmates could potentially be housed at the Pack Unit during some point during this litigation, or in the future. Joining all members of the class is impracticable due to the minimum 1,400 person size and the fluctuating population of the Pack Unit.

**ANSWER:**

**Defendants incorporate the Answer at ¶212 as if fully set forth. Based upon the lack of a significant number of grievances from offenders and the necessity for an individual review of each offender's medical records, Defendants deny that individual lawsuits would be impracticable; but, rather, would be necessary.**

216.     The subclasses are also sufficiently numerous to satisfy Rule 23(a). Because the Pack Unit is a "Chronic Care I" facility, more than 700 inmates incarcerated there suffer from at least one medical condition or disability that would make them a class member. TDCJ itself identifies over 400 inmates who have "heat restrictions" on their forced labor assignments due to

their vulnerability to "extreme temperatures," though this number is under-inclusive. Likewise, upon information and belief, TDCJ houses a high number of inmates with qualifying disabilities at the Pack Unit.

**ANSWER:**

**Defendants deny the allegations set forth in ¶216 and incorporate their Answers at ¶212 to ¶216 as if fully set forth.**

217.    Approximately 200 prisoners over age 65 live at the Pack Unit. Joining all 200 prisoners over age 65 would be impracticable.

**ANSWER:**

**Defendants deny the allegations set forth in ¶217 and incorporate the Answers at ¶212-217 as if fully set forth.**

218.    Identifying every inmate at the Pack Unit who is a subclass member would require interviewing hundreds of prisoners, and reviewing each of their medical records. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

**Defendants deny the allegations set forth in ¶218 and incorporate the Answers at ¶212-218 as if fully set forth.**

219.    **Commonality**: Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.

A. The common questions of law and fact for the proposed **General Class** are:

      1)    Are all prisoners at the Pack Unit exposed to high apparent temperatures inside the inmate housing areas?

      2)    Does exposing prisoners to the high apparent temperatures in the housing areas

88

at the Pack Unit violate the Eighth Amendment, by denying prisoners safe housing and shelter from the elements?

   3)   Are the members of the General Class entitled to declaratory and injunctive relief?

B.  Further, the common questions of law and fact for the subclasses are:

1)     For the **Heat-Sensitive Subclass**:

  a)    Is the risk of heat-related injuries for the Heat-Sensitive Subclass increased when members are exposed to the high apparent temperatures in housing areas of the Pack Unit?

  b)    Does exposing members of the Heat-Sensitive Subclass to the high apparent temperatures in the housing areas at the Pack Unit violate their Eighth Amendment rights to safe housing conditions and shelter from the elements?

  c)    Are the members of the Heat-Sensitive Subclass entitled to declaratory and injunctive relief?

2)     For the **Disability Subclass**:

  a)    Do the members of the Disability Subclass a) suffer from a disability that substantially limits one or more of their major life activities and b) *either* suffer from a disability that increases the risk of heat-related illness, injury, or death *or* receive any medical treatment necessary to treat their disability that increases the risk of heat-related illness, injury or death?

  b)    Does TDCJ provide reasonable accommodations to prisoners with heat-related disabilities exposed to high apparent temperatures in the housing areas at the Pack Unit?

     c)     Is TDCJ immune from claims for injunctive and declaratory relief brought under the ADA and Rehabilitation Act?

     d)     Are members of the Disability Subclass entitled to declaratory and injunctive relief?

**ANSWER:**

**Defendants deny the allegations set forth in ¶219 and incorporate the Answers at ¶212-219 as if fully set forth.**

220.   **Typicality:** Plaintiffs' claims are typical and representative of each class and subclass member's claims against Defendants, as identified above. The claims of Plaintiffs and the Class all arise from the same conduct by Defendants (exposing them to unsafe temperatures in the housing areas at the Pack Unit), are based not only on identical legal theories, and also seek identical remedies (injunctive and declaratory relief requiring Defendants to lower the temperatures at the Pack Unit to safe levels). The Pack Unit's housing areas all reach roughly the same temperature levels; the high indoor apparent temperatures threaten all inmates' wellbeing. Plaintiffs' interest in reducing the danger of heat-related illness, injury, or death is identical to every other inmate's interest. All members of the class are similarly injured by Defendants' wrongful conduct.

**ANSWER:**

**Defendants deny the allegations set forth in ¶220 and incorporate the Answers at ¶212-220 as if fully set forth.**

221.   **Adequacy of Class Counsel:** Plaintiffs and their counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interests contrary to those of class members. Plaintiffs' counsel includes a non-profit law firm, the Texas Civil Rights Project (TCRP), whose

Plaintiffs' MSJ Appx. 621

mission is to protect the civil rights of low-income Texans. TCRP has prosecuted many class actions, or multi-plaintiff cases that obtained class-like injunctive and declaratory relief. Likewise, Plaintiffs' class counsel, Edwards Law, has litigated complex commercial and civil rights cases, including class actions against multinational corporations and governmental entities. Edwards Law has extensive experience in heat-related temperature litigation against TDCJ, as Plaintiffs' counsel represent the families of eight men who died of heat stroke in TDCJ prisons, and one other man who suffered a non-fatal heat stroke.

**ANSWER:**

**Defendants incorporate the Answers at ¶212-221 as if fully set forth and further state that Defendants do not have sufficient information to admit or deny these allegations. Defendants have previously sought this information in interrogatories to Plaintiffs' attorneys on May 13, 2015 and received nonresponsive answers on June 15, 2015. Defendants were unable to investigate these allegations because Plaintiffs have refused to provide answers to Defendants' First Set of Interrogatories to Plaintiffs' attorneys. Defendants will be unable to investigate these allegations until Plaintiffs provide the facts underpinning these conclusory allegations. Additionally, Plaintiffs have failed to allege the totality of the requirements for adequacy of class counsel, specifically, the work counsel has done in identifying or investigating potential claims in the action and the resources that counsel will commit to representing the class.**

222.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all Class members is impracticable. Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating this

case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct.

**ANSWER:**

**Defendants deny the allegations set forth in ¶222 and incorporate the Answers at ¶212-222 as if fully set forth.**

223.    Plaintiffs do not seek damages, except as may be incidental to declaratory or injunctive relief.

**ANSWER:**

**Defendants admit that it has been stipulated and pled by Plaintiffs that Plaintiffs are proceeding under Rule 23(b)2 and are not seeking damages in this lawsuit.**

224.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

**ANSWER:**

**Defendants incorporate their Answers at ¶212-224 as if fully set forth.**

225.    Pursuant to 42 U.S.C. § 1983, Livingston and Herrera, in their official capacities, are deliberately indifferent to the substantial risk of serious harm to prisoners at the Pack Unit caused by their choice to expose prisoners to high apparent temperatures inside the housing areas, and unnecessarily and wantonly cause the Plaintiffs pain.

**ANSWER:**

**Defendants deny the allegations contained in ¶225 of Plaintiffs' Second Amended Class Action Complaint.**

226.    The high indoor apparent temperatures at the Pack Unit pose an unreasonable risk to prisoners' health.

Plaintiffs' MSJ Appx. 623

**ANSWER:**

**Defendants deny the allegations contained in ¶226 of Plaintiffs' Second Amended Class Action Complaint.**

227.    Defendants are aware that extreme heat in their facilities' housing areas poses substantial risk of serious injury to inmates, including Plaintiffs. Defendants' knowledge is demonstrated by TDCJ policies and practices, as well as the well-documented history of injuries to inmates and employees at the Pack Unit. Defendants remain indifferent to the risk, failing to take obvious steps to mitigate it.

**ANSWER:**

**Defendants deny the allegations contained in ¶227 of Plaintiffs' Second Amended Class Action Complaint.**

228.    In light of the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within TDCJ's own policy, knowledge of TDCJ's medical providers, and the history of inmate and staff injuries, Defendants know of the risk of heat-related illness, injury, or death that exists at the Pack Unit.

**ANSWER:**

**Based upon the implementation of remedial and mitigations measures during the summer months, as well as the offenders' access to medical care, Defendants deny that the conditions, services, and programs within the Pack Unit violate the Constitution or laws of the United States.**

229.    Defendants are acting with deliberate indifference to Plaintiffs' constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that protect inmates from exposure to extreme heat, and which annually cause injuries to prisoners.

**ANSWER:**

**Based upon the implementation of remedial and mitigations measures during the summer months, as well as the offenders' access to medical care, Defendants deny the allegations contained in ¶229 of Plaintiffs' Second Amended Class Action Complaint.**

230. Defendants' deliberate indifference to Plaintiffs' risk of serious medical problems puts Plaintiffs at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions.

**ANSWER:**

**Defendants deny the allegations contained in ¶230 of Plaintiffs' Second Amended Class Action Complaint.**

231. Defendants' policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the Eighth Amendments, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

**ANSWER:**

**Defendants deny the allegations contained in ¶231 of Plaintiffs' Second Amended Class Action Complaint. Defendants deny that the conditions, services, and programs within the Pack Unit violate the Constitution or laws of the United States.**

232. As a proximate result of Defendants' unconstitutional policies, practices, acts, and omissions, Plaintiffs and class members have suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

**ANSWER:**

94

**Defendants deny the allegations contained in ¶232 of Plaintiffs' Second Amended Class Action Complaint.**

240.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Plaintiffs Wilson, Wallace, Brannum, King, Yates, and Cole, and other similarly situated prisoners, are qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities.

**ANSWER:**

**Defendant TDCJ lacks sufficient information at the time of this Answer to admit or deny whether the named Plaintiffs are qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities for purposes of the ADA, ADA Amendments Act, and Rehabilitation Act.  Defendant TDCJ asserts that if such impairments are determined to make the named Plaintiffs qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities, that the remedy of refrigerated air-conditioning on a class-wide basis may not be medically necessary, overbroad and an undue burden.  Defendant TDCJ denies that any such determinations can be made on a class-wide basis as urged by Plaintiffs.**

241.    TDCJ fails to reasonably accommodate prisoners with heat-sensitive disabilities. These disabilities (such as asthma, COPD, hypertension, obesity, diabetes, depression, and mental illnesses treated with psychotropic medications) place prisoners at increased risk of heat-related illness, injury, or death, and cause them to suffer more pain and punishment than able-bodied prisoners.

**ANSWER:**

**Defendant TDCJ denies the allegations contained in ¶241 of Plaintiffs' Second Amended Class Action Complaint.**

242.     TDCJ acknowledges in internal documents that people with certain disabilities (like diabetes, hypertension or cardiovascular disease), or who take certain medications to treat their disabilities (like psychotropics, antihistamines, antidepressants, or diuretics), are much more vulnerable to extreme temperatures. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death from heat.

**ANSWER:**

**Defendant TDCJ admits its polices at Ex. A-D, indicate that people with certain medical conditions like diabetes, hypertension or cardiovascular disease, or who take certain medications to treat their medical or psychiatric conditions (like psychotropics, antihistamines, or diuretics), may be more vulnerable to extreme temperatures and that such a determination requires an individual review of each person's medical and psychiatric records and an individual treatment plan.  Defendant TDCJ, therefore, denies that such alleged conditions are disabilities which are capable of class-wide proof for suits brought pursuant to the ADA, ADA Amendments Act, and Rehabilitation Act.  Defendant TDCJ denies the remainder of ¶242 of Plaintiffs' Second Amended Class Action Complaint.**

243.     Plaintiffs Cole, Wallace, Brannum, Yates, and King, as well as other similarly situated prisoners, suffer from these heat-sensitive disabilities.

**ANSWER:**

**Defendant TDCJ admits that its policies at Exs. A-D indicate that people with certain medical conditions like diabetes, hypertension or cardiovascular disease, or who take certain medications to treat their medical or psychiatric conditions (like psychotropics,**

antihistamines, or diuretics), **may be more vulnerable to extreme temperatures and that such a determination requires an individual review of each person's medical and psychiatric records and an individual treatment plan. Defendant TDCJ, therefore, denies that such alleged conditions are disabilities which are capable of class-wide proof for suits brought pursuant to the ADA, ADA Amendments Act, and Rehabilitation Act. Defendant TDCJ denies the remainder of ¶243 of Plaintiffs' Second Amended Class Action Complaint.**

244.    TDCJ has been, and is, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

**ANSWER:**

**Defendant TDCJ admits the allegations contained in ¶244 of Plaintiffs' Second Amended Class Action Complaint and asserts its entitlement to all defenses under the Act.**

245.    Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and has the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq.*

**ANSWER:**

**Defendant TDCJ asserts all of its defenses, including Eleventh Amendment and sovereign immunity, and admits that under certain circumstances, Title II of the ADA and the ADA Amendments Act may apply to the TDCJ, and that if they do apply, the ADA and ADAAA have the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq.***

246.    Title II of the ADA and the ADA Amendments Act protects prisoners with disabilities because exposure to extreme temperatures also actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

**ANSWER:**

**Paragraph 246 sets forth a legal conclusion which does not require an answer. To the extent it does require an answer, Defendants deny the allegations contained in ¶246 of Plaintiffs' Second Amended Class Action Complaint.**

247.    The Pack Unit and other TDCJ units are facilities, and their operation comprises a program and service for Rehabilitation Act, ADA, and ADAAA purposes. Plaintiffs Cole, Wallace, Brannum, King, and Yates, and similarly situated prisoners with disabilities, are presently qualified to participate in programs, activities and services in TDCJ facilities at the Pack Unit, such as incarceration in the inmate housing areas.

**ANSWER:**

**Defendant TDCJ denies that all the operations at Pack Unit and other TDCJ facilities, comprise a program and service for Rehabilitation Act, ADA, and ADAAA purposes. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

248.    Defendants know that Brannum, Wallace, King, Yates, and Cole, and other similarly situated prisoners with disabilities, suffer from heat-sensitive disabilities, and were prescribed medications to treat their disabilities. Despite their knowledge, TDCJ's officers intentionally discriminated against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures.

**ANSWER:**

**Defendant TDCJ denies the allegations contained in ¶248 of Plaintiffs' Second Amended Class Action Complaint. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

98

249.     As alleged above, TDCJ fails and refuses to reasonably accommodate Brannum, Wilson, Wallace, King, Yates, and Cole, and other similarly-situated prisoners with disabilities, while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.

**ANSWER:**

**Defendant TDCJ denies the allegations contained in ¶249 of Plaintiffs' Second Amended Class Action Complaint. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

250.     As shown above, TDCJ failed, and refused, to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Brannum, Wallace, Wilson, King, Yates, and Cole's disabilities, as well as similarly situated prisoners.

**ANSWER:**

**Defendant TDCJ denies the allegations contained in ¶250 of Plaintiffs' Second Amended Class Action Complaint. Defendant TDCJ incorporates its answer at ¶243 as if fully set forth.**

251.     Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983, the ADA, ADAAA, and Rehabilitation Act against Defendants, for themselves and the class, to require TDCJ to provide safe housing conditions at the Pack Unit.

**ANSWER:**

**Defendants incorporate their responses set forth in ¶¶1-250. Defendants admit that Plaintiffs seek injunctive and declaratory relief against Defendants for themselves and the class. Defendants deny the allegation that the TDCJ does not provide safe housing conditions at the Pack Unit.**

252.    Without permanent injunctive relief, Defendants will continue their same perilous practices and conduct, disregarding federal legal mandates, and endangering the lives and the welfare of current and future prisoners at the Pack Unit, causing every prisoner to suffer each summer.

**ANSWER:**

**Defendants incorporate their responses set forth in ¶¶1-251.  Defendants admit that Plaintiffs seek injunctive and declaratory relief against Defendants for themselves and the class.  Defendants deny the allegations contained in ¶252 of Plaintiffs' Second Amended Class Action Complaint.**

253.    Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein.

**ANSWER:**

**Defendants deny the allegations contained in ¶253 of Plaintiffs' Second Amended Class Action Complaint.**

254.    Plaintiffs ask that the Court enjoin Defendants to maintain a safe indoor apparent temperature (e.g. maintaining a heat index of 88 degrees or lower) inside each of the Pack Unit's housing areas (calculated using the NWS heat index table), or enter other injunctive relief sufficient to protect the health and safety of the prisoners at the Pack Unit.

**ANSWER:**

**Defendants deny that an injunction to enjoin Defendants to maintain a heat index of 88°F or lower inside each of the Pack Unit's housing areas is appropriate in this case or that it is established that such a temperature would eliminate all risk of heat-related illnesses or**

Plaintiffs' MSJ Appx. 631

injuries about which Plaintiffs complain. Further, such a resolution would impose an undue burden and cost on Defendant TDCJ.

255.    Plaintiffs request an order declaring the conditions under which they are housed are unconstitutional.

**ANSWER:**

**Defendants move the Court to deny the relief requested in ¶255 of Plaintiffs' Second Amended Class Action Complaint.**

256.    Plaintiffs Cole, Yates, King, and Brannum request an order declaring TDCJ violates the Americans with Disabilities Act and Rehabilitation Act by failing to reasonably accommodate inmates with disabilities.

**ANSWER:**

**Defendants move the Court to deny the relief requested in ¶256 of Plaintiffs' Second Amended Class Action Complaint.**

257.    Plaintiffs and members of the class are entitled to injunctive and declaratory relief to end this unlawful discrimination.

**ANSWER:**

**Defendants deny the allegations contained in ¶257 of Plaintiffs' Second Amended Class Action Complaint.**

258.    Plaintiffs do not seek damages.

**ANSWER:**

**Defendants admit that Plaintiffs do not seek damages as stipulated and pled by the Plaintiffs.**

Plaintiffs' MSJ Appx. 632

259.     259. Pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205 Plaintiffs are entitled to recover attorneys' fees, litigation expenses, and court costs, including expert costs.

**ANSWER:**

**Defendants move the Court to deny the relief requested in ¶259 of Plaintiffs' Second Amended Class Action Complaint.**

### III. DEFENDANTS' OTHER DENIALS AND DEFENSES

1.     Defendants deny that the conditions, services, and programs within the Pack Unit violate the Constitution or the laws of the United States.

2.     The Plaintiffs have not stated a claim upon which relief can be granted under 42 U.S.C. §12131 (ADA and ADAAA) or 29 U.S.C. §794 (RA) or under any other statute, constitutional theory, or legal authority.

3.     The Defendants admit that causes of action may be stated under certain circumstances pursuant to 42 U.S.C. §1983, 42 U.S.C. §12131 or 29 U.S.C. §794 but deny that such circumstances are present in this case.

4.     The Defendants invoke all limitations, defenses, and exclusions set forth in the PLRA (Prison Litigation Reform Act) and any other applicable statutes.

5.     The Defendant TDCJ denies that it violated any of Plaintiffs' rights under ADA, ADAAA, or RA or any other law or statute under which Plaintiffs sue or may be suing.

6.     The Defendant TDCJ denies that its employees were motivated by any discriminatory intent of any kind.

7.     The Defendants assert that actions taken relative to Plaintiff(s), concerning any claim alleged by Plaintiff(s) in this lawsuit, were based on a good faith belief that such actions

Plaintiffs' MSJ Appx. 633

were taken in accordance with agency policy, applicable law, and were taken without any discriminatory intent.

8.      The Defendants assert that each alleged challenged action, of which Plaintiffs complain in this lawsuit, was taken for valid and legitimate, non-discriminatory reasons in the context of a prison facility.

9.      The Defendants deny that Plaintiffs are entitled to injunctive, declaratory, or any other relief demanded in the Plaintiffs' Complaint and further deny that Plaintiffs are entitled to attorney's fees or costs in any amount whatsoever.

10.      Defendant TDCJ denies that Congress has abrogated Texas' sovereign immunity for purposes of the ADA, ADAAA or RA.

11.      Defendant TDCJ denies that Plaintiffs requested an accommodation under the ADA, ADAAA, or RA that defendant knew or believed any or all needed an accommodation, or that defendant denied him a reasonable accommodation.

12.      Defendant TDCJ claims that the accommodations now requested by Plaintiffs would impose an undue hardship on Defendant.

13.      Defendant TDCJ asserts that Plaintiff(s) were not a qualified individual with a disability who, by reason of such disability, was excluded from participation in or was denied the benefits of services, programs, or activities of a public entity.

14.      Defendant TDCJ denies that Plaintiffs were subjected to discrimination in violation of the ADA, ADAAA, or RA.

15.      Defendant TDCJ denies that any employee of TDCJ intentionally discriminated against Plaintiffs by reason of or solely because of their alleged disability.

16.       The Defendants assert the defenses of res judicata, statute of limitations, laches,

Plaintiffs' MSJ Appx. 634

estoppel, waiver and lack of jurisdiction to Plaintiffs' claims in this lawsuit.

17.     The Defendants assert that some, and perhaps all, of Plaintiff(s)' complaints may be barred by the applicable statute of limitations and/or by the Plaintiff(s)' failure to exhaust administrative remedies under applicable law; and, thus, the Defendants assert such defenses to the extent these defenses may be applicable.

18.     The Defendants specifically invoke entitlement to Eleventh Amendment Immunity and sovereign immunity as to any of Plaintiff's claims which are not expressly and unambiguously included within the limited waivers of sovereign immunity found in any statute under which Plaintiffs make claims.

19.     The Defendants assert, based upon and information and belief, that Plaintiff(s) failed to mitigate or avoid injury or to take advantage of the remedial measures for the conditions alleged, and that none of such alleged conditions or risk of harm, if any, have been the result of any discriminatory or unconstitutional act by the Defendants, all acts of which the Defendants deny.

20.     The Defendants assert entitlement to the after-acquired evidence defense.

21.     The Defendants assert their right to raise additional defenses that become apparent throughout the factual development of the case.

## JURY DEMAND

The Plaintiffs do not seek money damages; however, in an abundance of caution, in the event any new claims are asserted or the pending claims amended, Defendants demand a trial by jury for all issues so triable.

Plaintiffs' MSJ Appx. 635

## PRAYER FOR RELIEF

For the foregoing reasons, Defendants move the Court to deny all relief requested by Plaintiffs, to enter judgment in Defendants' favor as to all claims asserted by Plaintiffs and to enter an order awarding Defendants all costs, including attorney's fees incurred in the litigation of this matter, and to be granted all such other and further legal and equitable relief to which they may be entitled.

Respectfully submitted,


**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**BRANTLEY STARR**
Deputy First Assistant Attorney General for Civil Litigation

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division


*/s/ Cynthia L. Burton*
**CYNTHIA L. BURTON**
Assistant Attorney General
Attorney in charge
Texas Bar No. 24035455
Southern ID No. 35273
Cynthia.burton@texasattorneygeneral.gov

Plaintiffs' MSJ Appx. 636

**MATTHEW GREER**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24069825
Southern ID No.1171775
Matthew.greer@texasattorneygeneral.gov


**DANIEL C. NEUHOFF**
Assistant Attorney General
Co-counsel
Texas Bar No. 24088123
Southern ID No.2374885
Daniel.neuhoff@texasattorneygeneral.gov


Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin TX  78711
(512) 463-2080/Fax (512) 936-2109

**ATTORNEYS FOR BRAD LIVINGSTON,
ROBERTO HERRERA, and the TEXAS
DEPARTMENT OF CRIMINAL JUSTICE**

Plaintiffs' MSJ Appx. 637

## NOTICE OF ELECTRONIC FILING

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that I have electronically submitted for filing **Defendants' Original Answer to Plaintiffs Second Amended Class Action Complaint** in accordance with the Electronic Case Files system of the Southern District of Texas on this day May 20, 2016.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, **CYNTHIA L. BURTON**, Assistant Attorney General of Texas, certify that a true and correct copy of the above and foregoing **Defendants' Original Answer to Plaintiffs Second Amended Class Action Complaint** has been served electronically to all counsel or *pro se* parties of record as authorized by Fed. R. Civ. P. 5 (b)(2) on May 20, 2016.

/s/ Cynthia L. Burton
**CYNTHIA L. BURTON**
Assistant Attorney General

Plaintiffs' MSJ Appx. 638

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 37

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| **PLAINTIFFS** | § § | |
| v. | § § § | CIVIL ACTION NO. 3:12-cv-02037 |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § § | |
| **DEFENDANTS** | § | |

## DECLARATION OF STEPHANIE KINGREY

Pursuant to 28 U.S.C. § 1746, I declare, certify, verify, and state, on this day, under penalty of perjury, that the foregoing is true and correct. The facts to which I attest herein are from my personal knowledge.

1. My name is Stephanie Kingrey. I am over 18 years of age, of sound mind, capable of making this declaration, and personally acquainted with the facts stated in it. The facts stated herein are true to the best of my knowledge, and I am competent to testify as to the same.

2. My father was Larry Gene McCollum.

3. My dad was visibly overweight and obese.

4. My dad's weight made it difficult for him to move compared to an average person.

5.  My dad had to move slowly when walking short distances, standing, climbing, and bending over, and he walked with a limp.

6.  Even going slowly, activities such as walking short distances, standing, bending over, and climbing would tire him more quickly than they would a normal person.

Pursuant to 28 U.S.C. § 1746, I declare, certify, verify, and state, on this day, September 6, 2016, under penalty of perjury, that the foregoing is true and correct.

Stephanie Kingrey

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 38

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, STEPHANIE KINGREY, and SANDRA McCOLLUM, individually and as heirs at law to the Estate of LARRY GENE McCOLLUM, | § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 3:12-cv-02037 |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

## DECLARATION OF SANTOS RODRIGUEZ III

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state, on this day, under penalty of perjury, that the foregoing is true and correct. The facts to which I attest herein are from my personal knowledge.

1. My name is Santos Rodriguez III. I am over 18 years of age, of sound mind, capable of making this declaration, and personally acquainted with the facts stated in it. The facts stated herein are true to the best of my knowledge, and I am competent to testify as to the same.

2. I was incarcerated at the Hutchins State Jail on July 21, 2011 and July 22, 2011 in the C-7 dorm.

3. I was assigned to bunk 49B, a bottom bunk. My bunk was very close to bunk 46T, a top bunk. The very large inmate I later learned was Mr. McCollum was assigned to bunk 46T.

4. It did not look safe for Mr. McCollum to be in a top bunk. I remember him climbing up to the bunk one time, and it was very difficult for him. There were empty bottom bunks that he could have been assigned to, but we were told by officers that we were required to stay in the bunk that TDCJ gives you.

5. One time, when the officer came to count us, the officer told Mr. McCollum that he had to get up into the bunk. Mr. McCollum asked the officer "can I stay on the bottom?" and told the officer "I can't get up there." The officer refused and said "well that's your problem." He also threatened to write Mr. McCollum up for not being in his bunk during the count.

6. It was extremely hot inside the dorm in July 2011. It felt like it was over 100 degrees indoors.

7. I would feel weak physically all day due to the heat.

8. The windows in the C-7 dorm do not open.

9. Inmates living in the C-7 dorm were not allowed to have personal electric fans. None of the bunks in the dorm had electric outlets for a fan to run on.

10. The officers were supposed to bring in water two times per day in large jugs, once in the morning and once in the evening. Sometimes they only brought the water in once per day. The water in the jugs was not cold. I rarely remember ever seeing any ice in the jugs. Inmates would ask officers for ice all the time. One officer told us "we don't have enough ice to give some to all the offenders."

11. When you arrive at the Hutchins Unit, you are not given a cup or anything to drink water with. I would use a disposable plastic cereal bowl I took from the chow hall to hold water from the jugs. You were not supposed to have these

2

cereal bowls though, and officers would take them away if they caught you with one.

12. The water in the showers was warm during the summer.

13. I do not remember seeing Mr. McCollum go to the chow hall. Other inmates and I were worried about him on July 21, 2011 because he did not look well, and he was not getting up to eat.

14. I told officers ~~the day~~ *SLW* before he died that Mr. McCollum wasn't eating. The officer told me "that's his problem," and "if he's hungry, he'll go to chow." The officers did not seem to care that Mr. McCollum was in bad shape.

15. One time, Mr. McCollum asked me to help get some water to drink. I brought him warm water from the jug in my cereal bowl.

16. The prison never gave us any instructions about how to be safe in the heat. I never got any training from TDCJ about heat safety.

17. The officers suffered in the heat too. I would see them sweat through their uniforms while going around the dorm counting the inmates. When they left the dorm after finishing the count they would have to wipe the sweat off their faces with a towel.

18. Some officers would not even come into the dorm to count us because it was so hot. Instead they would call all the prisoners to come up to the glass wall and show our identification cards so we could be counted.

19. Early on July 22, 2011, around 2:00 am, I woke up when an officer was talking to Mr. McCollum. The officer was saying "hey, wake up," but Mr. McCollum was

3

not responding. It was obvious that Mr. McCollum was very sick and needed medical attention right away.

20. It was obvious that Mr. McCollum needed to go to the hospital. Instead of calling 911, the officer called his supervisor, a sergeant. I told her that this man needed an ambulance, but she said that she was not allowed to call 911. I argued with her, telling her that she needed to call 911 right away. She kept talking on the radio, but was not calling for 911.

21. Later, a lieutenant came to Mr. McCollum's bunk. I told her that he needed to go to a hospital too.

22. Finally, EMS came and took Mr. McCollum away.

23. Because Mr. McCollum was on the top bunk, it took three guards to lift him down onto the gurney. The EMTs told the guards that the officers would have to lift Mr. McCollum down off the top bunk because he was so big and the EMTs did not want to liable if they dropped him.

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state, on this day, July 19, 2016, under penalty of perjury, that the foregoing is true and correct.

Santos Rodriguez III

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 39

STATE OF TEXAS          §
                        §
COUNTY OF WALKER        §

### DECLARATION OF RONALD CHASE

1. "My name is Ronald Chase, I am of sound mind, capable of making this declaration, and personally acquainted with the facts stated in it, which are true and correct.

2. I am an inmate in the Texas Department of Criminal Justice. I am currently housed in the Ellis Unit, in Huntsville, Texas. I am incarcerated for burglary.

3. Before coming to the Ellis Unit, I was housed at the Hutchins State Jail, in Dallas. I was there from November 2010 until August 2012.

4. At Hutchins, I lived first in the B dormitory, then in the F dormitory, and finally in the A-6 dormitory. None of the dormitories were air-conditioned. The A-6 dormitory housed 58 people.

5. During the summers of 2011 and 2012, it was extremely hot. It felt like a roast turkey. For weeks at a time, the temperature inside was probably over 90 degrees.

6. There was little drinking water available. Officers only brought in drinking water for the inmates twice a day. It was brought in around 8 am or 9 am, and then again in the afternoon while I was at work at my job in the prison. The water was in a 10 gallon jug, and it went very quickly because people would rush to get as much as they could. It wouldn't last more than an hour or two. Sometimes the water in the jug was room-temperature, and sometimes it was cooler.

Plaintiffs' MSJ Appx. 648

003274

7.  In July 2012, the water jugs came with 2 one-gallon bottles inside. I think they were syrup bottles. The bottles were frozen, and put inside the cooler to try to cool the water down. Because of the syrup bottles, the water jugs had less than 10 gallons of water in them. They probably had about 8 gallons instead.

8.  There would be a long line to get water from the jug. The amount of water each inmate got depended on if he was at the beginning of the line, or the end, and it depended on what he put the water in. The people at the beginning of the line got more water because they knew it would run out, and sometimes the people at the end of the line did not get any. Sometimes people got in fights over how much water they got. The people who filled peanut butter jars, or larger containers like bowls, got more water than those who used cups.

9.  Cups had to be bought from the commissary. All the containers people used for water had to be bought at the commissary. If you couldn't buy anything from the commissary, you wouldn't have anything to drink from. TDCJ never gave us any paper cups to get water from the jugs in the dormitory.

10. The only other water available for us to drink was out of the sink, but that water was warm. There were 4 sinks in the dormitory, and most of the time only 2 of them worked. There were no water fountains in the dormitory.

11. During a lockdown in June 2012, we did not get any water coolers brought to the dormitory at all. The lockdown was approximately five days, from about June 6, 2012 to June 11, 2012.

Page **2** of 4

12. We did not have much access to cold water in the dining hall. When eating, inmates would sit four to a table, with two pitchers of liquid on it. One pitcher usually had tea or Kool-Aid, and the other had tap water with no ice. There was no air-conditioning in the dining hall. We did not have very much time to eat and drink before we had to return to the dorms.

13. We were allowed to shower to try to cool off, but not after 10:00 at night. There were 4 showers in A-6. We couldn't adjust the temperature of the water very well. Maintenance turned off the hot water, so all that ran was supposed to be cold, but it was not very cold.

14. I used to work at my job in the prison from 2:30 pm until 10:30 pm. I was a janitor, which involved physical activity in the hot dormitories. Because I worked so late, I was not allowed to shower to try to cool off after work.

15. We were also allowed to wear shorts, but only if we could afford to buy them from commissary. You could not get any shorts until you could buy them from the commissary. If you couldn't buy shorts from the commissary, you had to wear the pants the prison issued you.

16. There were also three wall-mounted fans in A-6, that were over 10 feet off the ground, but they did not rotate. In summer 2011, there were only two fans. The fans did nothing to cool down the dormitory, and just blew around the hot air. Even at 2:00 or 3:00 in the morning, it did not really cool down, and was probably in the 90s.

17. Most inmates slept all day in the summer because it was so hot and uncomfortable. Most of us were drenched in sweat all day. Some were so desperate to get out of the heat, they would start fights to get in trouble and get moved to solitary confinement, where it was

Plaintiffs' MSJ Appx. 650

air-conditioned. The officers would stay in the picket, where it was air-conditioned, and only go in the dorm when it was necessary. They went into the dorms even less frequently on really hot days.

18. In the summer of 2011, prisoners were not allowed to go into the multi-purpose rooms in the dorms to cool down. I never remember anyone in my dorm being allowed to go into the multi-purpose room to cool down. Prisoners were never told we could ask to go to a cooler place. The multipurpose rooms were being used to store mattresses, coats, and blankets.

19. I, Ronald Chase, under pains and penalties of perjury under the laws of the United States of America, swear I am capable of making this declaration and that the foregoing statement is true and correct to the best of my knowledge."

_Ronald Chase_

Ronald Chase

_4-3-13_

Date

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 40

STATE OF TEXAS        §
                      §
COUNTY OF DALLAS      §

### DECLARATION OF DAVID RAY DEATON

1. "My name is David Ray Deaton, I am of sound mind, capable of making this declaration, and personally acquainted with the facts stated in it, which are true and correct.

2. I am an inmate in the Texas Department of Criminal Justice. I am currently housed in the Dawson State Jail, in Dallas, Texas.

3. I have take medication for high blood pressure, bipolar disorder, and Hepatitis C. During my time at the Hutchins Unit, I had frequent headaches, dizziness, anxiety and dehydration during the hot summer months.

4. Before coming to Dawson, I was housed at the Hutchins State Jail. I was there from December 2011 until August 2012. At Hutchins, I lived in the A7 dormitory, which was not air-conditioned.

5. It was extremely hot at Hutchins in the summer time. I worked as a janitor in the dormitory, and requested a schedule change because I thought I was at risk of heat exhaustion. The only time I visited air conditioned parts of the prison were when I had attorney visits.

6. The multipurpose room in A building was air-conditioned, but we couldn't go in there because it was being used for storage. There were mattresses stored in there.

7. I once tried to go in the multipurpose room to cool down. I was seeing spots and feeling light-headed and dizzy. I told the officers in the picket I didn't feel well, and asked if I

could go into the multipurpose room, where it was air conditioned. The officers did not let me into the multipurpose room, and instead wrote me a disciplinary case for "being out place."

8.  I heard the segregation building had air conditioning. I saw some people try to get in trouble on purpose so they would be moved. For example, I remember one inmate who cursed at an officer so he could get relief from the heat.

9.  There were showers available for us to try to cool down, but we were not allowed to use them whenever we wanted. We could use them from morning to bedtime, but the availability was not increased during the summer.

10. During the summer of 2012, we sometimes got extra drinking water brought to our dormitory.  The water was in a 10 gallon jug, and officers usually brought it twice a day. They would bring it once in the morning, and once in the afternoon. Occasionally, officers would not bring the water jug, though. I remember an incident in June 2012 when one prisoner was acting out and 'smarted-off' to an officer. The officer did not bring us water that day.

11. We also did not get extra drinking water on the weekends, when the officers were working visitation.

12. The prison did not give us any cups to use to be able to get water from the jugs. You had to buy cups from commissary. If you didn't have money to buy a cup, you couldn't get water from the jugs.

13. You couldn't get much water from those jugs. If other inmates thought you were getting too much water, they would threaten you or start a fight.

14. There were two fans in my dorm, but they didn't do much to cool us down in the summer. They only blew in certain areas, and the ventilation in the dorm was bad. There were often fights over which way the fans were pointing.

15. We were not allowed to go without a shirt. You could buy shorts or T-shirts from commissary. They each cost $5 or $6. If you didn't have money, you suffered and had to wear the prison-issued pants. I once got a disciplinary case for cutting the sleeves off my shirt because it was so hot.

16. I, David Ray Deaton, under pains and penalties of perjury under the laws of the United States of America, swear I am capable of making this declaration and that the foregoing statement is true and correct to the best of my knowledge."

_____
David Ray Deaton

4-25-13
_____
Date

Plaintiffs' MSJ Appx. 655

003280

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § |
| PLAINTIFFS | § § |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 41

STATE OF TEXAS             §
                           §
COUNTY OF DALLAS           §

### DECLARATION OF EDWARD CROCKETT

1. "My name is Edward Crockett, I am of sound mind, capable of making this declaration, and personally acquainted with the facts stated in it, which are true and correct.

2. I am an inmate in the Texas Department of Criminal Justice. I am currently housed in the Dawson State Jail, in Dallas, Texas. I am incarcerated for violating parole by burglarizing a vehicle. I was on a parole after serving time for possession of a controlled substance.

3. Before coming to the Dawson State Jail, I was housed at the Hutchins State Jail. I was there from January 2012 until August 2012.

4. At Hutchins, I lived in the B-2 dormitory, which was not air-conditioned. The dormitory housed 58 people.

5. During the summer of 2012, it was very hot, and there was not much the inmates could do to keep cool. It felt like it didn't really get below 100 degrees until around 1:00 in the morning.

6. In the B-2 dormitory, there were 4 showers, but only 3 worked during the summer of 2012. The broken shower was not working for about 16 weeks, from May to August 2012.

7. The showers were available from 7:00 am to 10:00 pm, but we sometimes had to wait to use them because they were occupied. The water in the showers was not very cold. We were not given extra time to shower in the summer time.

Plaintiffs' MSJ Appx. 657

003281

8. There were 8 sinks, but only 6 worked during the summer of 2012. The sinks broke in early June 2012, and weren't fixed for about 2 weeks.  The water from the sink was warm, so drinking it did not help me cool down.

9. There were no water fountains in the dormitories. The only other way inmates got water in the dormitory was when it was brought to us in water jugs. The jugs were brought in around 9:00 am. I would not always get water from the jug at that time because I had class around that time and was not always in the dorm when the water came.

10. They brought the water jug back in the afternoon, around 3:00 pm. The jug would be empty by 4:00 pm. That was the last time cool water was available in the dorms each day.

11. When I went to the water jug, I would fill a water bottle. I bought my bottle from the commissary. It held about 16 ounces of water. I was able to fill it once, sometimes twice, before the jug ran out of water. If I had not bought the bottle from the commissary, I would not have had anything to put water in. The prison never provided us with cups.

12. There was rarely ice in the water jug.

13. Sometimes we did not get drinking water brought to the dorms on the weekends. Security officers were responsible for bringing the water jugs to us. Since they had to work visitation on the weekends, they did not bring us water.

14. We did not get cold water in the cafeteria. At each table of four people, there were two pitchers of beverages. One was water, and the other was tea or juice. The pitchers did not have ice. We would have less than 20 minutes to eat our food and drink as much from the pitchers as we could.

Plaintiffs' MSJ Appx. 658                                                           003282

15. The only times I was able to get out of the heat and go to places with air conditioning, was when I went to the infirmary for medical attention, when I went to class, twice a week for a couple hours when I went to church, or when I went to AA meetings, which were once a week for a couple of hours. I was in class for three hours a day on weekdays, from 9:00 am until 12 noon.

16. We were not allowed to go to the multipurpose rooms to cool down. I do not remember any prisoners living in my dorm doing that. The multipurpose rooms in my building were being used to store mattresses.

17. In the summers, we were allowed to wear shorts. You had to buy shorts from the commissary, though. If you couldn't afford shorts, you had to wear prison-issued pants.

18. There were four fans in the dormitory. They made very little difference to the heat, though, because they just blew around hot air.

19. The ventilation in the dormitory was bad, and did not improve the hot conditions. There were windows very high up that didn't open. The windows were not covered, so the sun shone in and made it hotter.

20. I, Edward Crockett, under pains and penalties of perjury under the laws of the United States of America, swear I am capable of making this declaration and that the foregoing statement is true and correct to the best of my knowledge."

Edward Crockett

Date: April 23, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 42

STATE OF TEXAS          §
                        §
COUNTY OF WALKER        §

## DECLARATION OF DAVID GLEASON

1. "My name is David Gleason, I am of sound mind, capable of making this declaration, and personally acquainted with the facts stated in it, which are true and correct.

2. I am an inmate in the Texas Department of Criminal Justice. I am currently housed in the Ellis Unit, in Huntsville, Texas. I am incarcerated for driving under the influence, assault, and evading arrest.

3. Before coming to Ellis, I was housed at the Hutchins State Jail. I was there from August 2011 until September 2012. At Hutchins, I lived in the F-3 dormitory, which housed 58 people and was not air-conditioned. The F-3 dormitory is part of the F building, where eight 58-man dorms share a picket and a multipurpose room.

4. The dormitories in the Hutchins State Jail were unbearably hot in the summer time. I think the inside felt hotter than the outside temperature. The vents in the dormitories pulled in hot air coming off the metal roofs, which were heating up in the sun all day. The dormitories were like a metal warehouse.

5. In the dormitory, the exhaust fans weren't working. That meant that the air circulation was bad. The louvers were only half open, so not much air could go through. That made the dorm even hotter.

6. I remember two different times when the temperature was taken. Once, in August 2011, Ms. Lenhart, the law librarian, measured the surface temperature, which was 116 degrees.

Then, in September 2011, Mr. Storie, the Safety Coordinator, took the ambient temperature, which was 105 degrees.

7. The temperatures in the summer time would frequently hit 100 degrees by 11:00 am, and would not get to the low 90s until 2:00 am or 3:00 am.

8. I worked as a kitchen clerk in the prison, where one of my responsibilities was to prepare water jugs for the inmates. When I first got to the Hutchins State Jail in August 2011, inmates were not getting water jugs in the dormitories every day. When they did get a jug, it was never cold.

9. On June 14, 2012, the kitchen started providing water jugs twice a day. A water jug would come to the dormitory around 8:00 am or 9:00 am, and then again in the afternoon.

10. As a kitchen clerk, at 1:30 pm every day, I would put water into 10 gallon jugs to be sent to the dormitories. We started out putting in 1-3 shovels of ice. The ice would all melt by the time the jug got to dorm, though. In mid-June 2012 the ice machine broke, and we would put frozen syrup bottles in the jug to cool the water down.

11. While the bottle would cool the water down, it meant there was less than 10 gallons of water in the container. About 2 gallons of water was displaced from the jug because of the syrup bottles. The dormitories got about 8 gallons of water for 58 people.

12. Sometimes the dormitories would get even less than 8 gallons of water. The jugs were very heavy, and I saw officers dump water out to try to make them lighter and easier to transport.

13. One of the water jugs had a broken spigot, and would allow water to leak out. By the time that jug reached the dorm, it was empty. That means at least one dorm every day was not actually getting any cool drinking water in either the morning or the afternoon.

14. The Hutchins State Jail was also short about 3 or 4 water jugs in June 2012. Therefore, 3 or 4 dormitories did not get a jug either in the morning or in the afternoon.

15. When the jugs were in the dormitory, the water would go very quickly. In the morning, when it was not very hot, the jugs would be emptied within 2 hours. In the afternoon, when the temperature was over 100 degrees, the jugs would be emptied within 30 minutes.

16. A large number of inmates in the dormitory wouldn't get any water at all. In my dormitory, there were gang members who bullied people and made sure people who were not members of the gang did not get cool drinking water. They kept the water to themselves.

17. The jugs were rarely available on weekends. Security was responsible for bringing them to the dorms, and since they worked visitation on weekends, they would not bring us cool drinking water during that time.

18. At Hutchins, I never saw the prison provide paper cups to use for getting water from the water jugs. We could only use containers we bought from commissary. If someone did not have money to buy a cup or other container, he could not drink water from the water jug.

Plaintiffs' MSJ Appx. 663

003286

19. There were a few parts of the prison I knew about that had air conditioning. Those places included the pickets where the officers worked, the administration buildings, the education rooms, and the administrative segregation building. Another place was the multipurpose rooms on my dormitory.

20. I saw people try to get in trouble on purpose to try to get placed in administrative segregation just so they could be in a cooler place.

21. The multipurpose rooms were not available to us to cool off on hot days in 2011. They were used to store mattresses. In the summer of 2011, I was never told that cooling off in the air conditioned multipurpose rooms was even an option. I never saw TDCJ officials give anyone in the building I lived in this opportunity in 2011.

22. In summer 2012, TDCJ officials only made the multipurpose room available twice. In July 2012, they moved office furniture into it and someone was using it as an office space. We were not able to go into a multipurpose room after that to cool off.

23. We were also not allowed to wear sleeveless shirts or boxers, or go without a shirt in order to try to cool off. I saw someone get in trouble for cutting sleeves off his shirt. You could buy shorts or a T-shirt from commissary. Each cost $5.50, but if you did not have money, you had to wear the prison-issued uniforms, which were made from heavier materials and were hotter.

24. In summer 2012, TDCJ added floor fans to the dormitory. People got in fights about which direction the fans were pointed. I remember one man got knocked out and was bleeding from his head because someone beat him with a broom handle over the fan. The

fans did not help much because they just blew around the hot air, and there were only a few.

25. The sinks in the dormitory weren't always working, either. Typically, about 3 or 4 of the sinks weren't working. The ones that were working only trickled because the water pressure was so low. Because of that, we couldn't really use the sinks to get extra water.

26. I, David Gleason, under pains and penalties of perjury under the laws of the United States of America, swear I am capable of making this declaration and that the foregoing statement is true and correct to the best of my knowledge."

_David Gleason_
David Gleason

4-3-13
Date

Plaintiffs' MSJ Appx. 665

003288

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 43

STATE OF TEXAS        §
                      §
COUNTY OF DALLAS      §

## DECLARATION OF LEONARD RUSSELL

1. "My name is Leonard Russell, I am of sound mind, capable of making this declaration, and personally acquainted with the facts stated in it, which are true and correct.

2. I am an inmate in the Texas Department of Criminal Justice. I am currently housed in the Dawson State Jail, in Dallas, Texas. I am incarcerated for burglary. ~~parole~~ parole Violation

3. Before coming to the Dawson State Jail, I was housed at the Hutchins State Jail. I was there from August 2011 until August 2012. At Hutchins, I lived in the F4 dormitory, which was not air-conditioned.

4. The heat at the Hutchins State Jail in the summer time was awful. There weren't many ways we could cool down.

5. In the summer of 2012, the officers used to bring 10 gallon jugs of water to the dormitory twice a day. The water jug was similar to one you would see on the sidelines of a football game. They would bring it once in the morning, around 8:00 am. The water would usually last less than an hour, and the officers would take the empty jug away at around 10:00 am. They would bring it back around 4:00 pm, and take it away around 5:00 pm.

6. The water jug did not actually have 10 gallons of water in it. I used to work in the kitchen, and was working there when the ice machine broke. Since it broke, they started to put a frozen bottle inside the 10 gallon jug, which was supposed to cool the water down. By them putting the frozen bottle in the jug, it meant they couldn't fill the water jug up all the way.

Plaintiffs' MSJ Appx. 667

003289

7. When the jug got empty, some inmates would try to fill it back up with tap water from the sink, so the frozen bottle could cool down the tap water and we'd have more cool water to drink. They weren't allowed to refill the cooler, though, and those inmates who tried to do that would get in trouble.

8. The water jug was held in a stand with a metal rail on the top of it. They put the rail over the top of the water jug to stop us from opening it and adding more water.

9. There were a lot of arguments and shoving over the water. I remember there once was an actual fight that broke out over the water jug. It was so hot and everyone was desperate to try to get cool water.

10. The prison never provided us with any cups to get water from the jugs. We were never given paper cups of any type. We had to buy cups or other containers from commissary. If you didn't have money to buy anything from commissary to put water in, you couldn't get water from the jugs.

11. There were only 4 working showers for 58 men. The water coming out of the showers wasn't very cold. We were allowed to shower anytime between 7:00 am and 10:00 or 10:30 pm, but we could get written up for being "out of place" if we tried to shower any other time.

12. Sometimes there was a long line for the shower. It was too hot to stand and wait for the shower, so people would just call "next" from their bunk, and keep track of the order we were supposed to go in.

13. When the Hutchins State Jail was on lockdown, we were only allowed to shower every 3 or 4 days. In December 2011 or January 2012, we could only shower every 4 days. Then

Plaintiffs' MSJ Appx. 668                                003290

in March 2012, when it just started to get hot, we were only allowed to shower every 72 hours during lockdowns.

14. We were allowed to wear shorts in the summer of 2012, instead of the long pants that are part of the prison uniform. You had to buy shorts from the commissary, and if you didn't have any money, you had to wear the long pants.

15. We were not allowed to walk around without a shirt to try to cool off. We also weren't allowed to walk around in boxers, even if there were no female officers around.

16. Also, in summer 2011 when I first got to Hutchins, there were no fans in my dorm. In summer 2012, they added one fan that was supposed to cool the entire dorm down. It wasn't effective.

17. There weren't any windows to provide ventilation in the dorm. There was a very small window high up that we couldn't reach. It did not open and it wasn't covered, so the hot sun shined through.

18. I was aware of a few places at the prison that had air conditioning. The education building, where I had classes from 12:30 pm to 3:30 pm on weekdays, was sometimes air-conditioned. Sometimes the air conditioning there didn't work. For example, on July 20, 2012, it wasn't working, and there were two box fans in the classroom. The box fans didn't cool the room down very much. When the air conditioning was working was the only time I got to be in an air-conditioned room in the prison. The other places that had air conditioning were the pickets, the infirmary, and administrative segregation.

19. The multipurpose rooms had air conditioning, but we were not allowed to go in there and cool off. The prison was using those rooms to store mattresses.

20. The dining area didn't have air conditioning. We couldn't even get cold water when we went to eat. There were no pitchers with ice water at the tables.

21. I, Leonard Russell, under pains and penalties of perjury under the laws of the United States of America, swear I am capable of making this declaration and that the foregoing statement is true and correct to the best of my knowledge."


_Leonard Russell_
Leonard Russell

_4/23/13_
Date

Plaintiffs' MSJ Appx. 670                                    003292