UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 130

**Table of Contents**

CHAPTER 10 ............................................................................................................ 10-1
**CHAPTER 10 HOUSING QUALITY STANDARDS.......................................... 10-1**
10.1   Chapter Overview ......................................................................................... 10-1
10.2   Housing Quality Standards General Requirements ..................................... 10-1
10.3   Performance Requirements  And Acceptability Standards ......................... 10-3
　　Sanitary Facilities........................................................................................... 10-3
　　Food Preparation and Refuse Disposal ......................................................... 10-4
　　Space and Security ........................................................................................ 10-6
　　Thermal Environment .................................................................................... 10-7
　　Illumination and Electricity........................................................................... 10-8
　　Structure and Materials ................................................................................. 10-9
　　Interior Air Quality ....................................................................................... 10-10
　　Water Supply................................................................................................. 10-11
　　Lead-Based Paint .......................................................................................... 10-11
　　Access ........................................................................................................... 10-12
　　Site and Neighborhood ................................................................................. 10-13
　　Sanitary Condition ........................................................................................ 10-13
　　Smoke Detectors ........................................................................................... 10-14
10.4   Lead-Based Paint Requirements And Responsibilities ............................... 10-15
　　Regulation Background .................................................................................. 10-15
　　Exempt Units ................................................................................................. 10-16
　　Basic Lead-Based Paint Requirements .......................................................... 10-16
10.5   Notification and Disclosure of Lead-based Paint Hazards Prior to Occupancy.... 10-17
　　Visual Assessment for Deteriorated Paint ..................................................... 10-17
　　Stabilization of Deteriorated Paint Surfaces ................................................. 10-18
　　Requirements for Children with Environmental Intervention Blood Lead Level........ 10-20
　　Ongoing Maintenance .................................................................................... 10-21
　　PHA Data Collection and Record Keeping .................................................... 10-22
10.6   HQS Inspection Processes and Procedures ................................................. 10-23
　　Overview........................................................................................................ 10-23
　　Scheduling Inspections .................................................................................. 10-23
　　Automated Inspection Systems ...................................................................... 10-24
　　Initial Inspection Process and Procedure ...................................................... 10-25
　　Annual Inspection Process and Procedure ..................................................... 10-27
10.7   Complaint Inspections................................................................................. 10-28
　　Abatement of Payments ................................................................................. 10-28
　　Termination of HAP Contract........................................................................ 10-29
　　Termination of Assistance ............................................................................. 10-30
　　Special Inspection Process and Procedure ..................................................... 10-30
10.8   PHA-Owned Units ....................................................................................... 10-30
10.9   SEMAP Indicators Related to Inspections and HQS .................................. 10-31
　　Introduction ................................................................................................... 10-31
　　Indicator 2, Rent Reasonableness ................................................................. 10-32
　　Indicator 5, HQS Quality Control Inspections .............................................. 10-32
　　Indicator 6, HQS Enforcement....................................................................... 10-33
　　Indicator 11, Pre-Contract Inspections.......................................................... 10-35

Indicator 12, Annual Inspections ................................................................. 10-35

Plaintiffs' MSJ Appx. 1973

# CHAPTER 10
# HOUSING QUALITY STANDARDS

## 10.1   CHAPTER OVERVIEW

The goal of the housing choice voucher program is to provide "decent, safe and sanitary" housing at an affordable cost to low-income families.  To accomplish this, program regulations set forth basic housing quality standards (HQS) which all units must meet before assistance can be paid on behalf of a family and at least annually throughout the term of the assisted tenancy. HQS defines "standard housing" and establishes the minimum criteria necessary for the health and safety of program participants.

HQS regulations provide performance requirements and acceptability criteria to meet each performance requirement.  HQS includes requirements for all housing types, including single and multi-family dwelling units, as well as specific requirements for special housing types such as manufactured homes, congregate housing, single room occupancy (SROs), shared housing and group residences (GRs).  Requirements for Special Housing Types are discussed in Chapter 17.

The HUD Housing Inspection Manual for Section 8 Housing, available through the HUD user at 800-245-2691, and the HUD Inspection Form, form HUD-52580 (3/01) and Inspection Checklist, form HUD 52580-A (9/00), available through HUDCLIPS website:  www.hudclips.org, provide guidance to PHAs in interpreting the standards, as well as HUD regulations.

## 10.2   HOUSING QUALITY STANDARDS GENERAL REQUIREMENTS

At least annually, it is the responsibility of the PHA to conduct inspections of units to determine compliance with HQS prior to the execution of the entire term of the assisted lease.  Inspections may be completed by PHA staff or by contract personnel.  HQS consists of the following thirteen (13) performance requirements:

- Sanitary facilities;
- Food preparation and refuse disposal;
- Space and security;
- Thermal environment;
- Illumination and electricity;
- Structure and materials;
- Interior air quality;
- Water supply;
- Lead-based paint;
- Access;
- Site and neighborhood;
- Sanitary condition; and
- Smoke Detectors.

Plaintiffs' MSJ Appx. 1974

Acceptability criteria for each performance requirement help PHAs determine if the unit meets mandatory minimum standards.  For some standard, specific guidance is provided to PHAs, but PHA's must rely upon inspector judgement in the areas.  In some instances, family preference should be considered in the determination of acceptability.

HUD may grant approval for a PHA to use acceptability criteria variations which apply standards contained in local housing codes or other codes adopted by the PHA or because of local climatic or geographic conditions.

Acceptability criteria variations may only be approved by HUD, if the variation meets or exceeds the performance requirement and does not unduly limit the amount and type of rental, housing available at or below the fair market rent .  HUD will not approve variations if the change is likely to adversely affect the health or safety of participant families or severely restrict housing choice.

PHAs should strive to ensure consistency among staff in areas requiring judgment.  Not all areas of HQS are exactly defined while acceptability criteria specifically state the minimum standards necessary to meet HQS, inspector judgment or tenant preference may also need to be considered in determining whether the unit meets minimum standards or desirable.  Staff can receive the tools to make sound decisions through training, access to written policy and procedures, and consistent written and oral instruction.

Potential safety hazards that are not specifically addressed in the acceptability criteria, such as damaged kitchen cabinet hardware, may present a cutting hazard to small children is an example of an area that requires judgement.  Less than optimal conditions, such as a water heater with a small capacity, is another example.  A good practice is to assess potential hazards based on the family residing in the unit.  Some potential hazards may only apply when small children are in occupancy.  Some less than perfect conditions, such as a water heater that appears too small for optimal use by the tenant, should be discussed with the tenant, but should not lead to denial of program assistance if the family is willing to accept the existing condition.

In order to keep assisted units from having to meet higher standard than units in the unassisted market, PHAs should be cautious and thoughtful when requesting HUD approval of a standard higher standard than HQS.  Though adopted into local law, local codes, are often not consistently enforced among all units, or are enforced only when complaints are made.  Sometimes, certain aspects of a local code are not enforced at all.  If the PHA adopts local code requirements, housing choice may be restricted in these instances.

The PHA administrative plan should include any HUD-approved variations to HQS acceptability criteria that will be used to judge the condition of the unit.  This practice formalizes the PHA's inspection standards for inspection staff, as well as for owners and tenants.  For example, if the PHA has received HUD approval to require that assisted units must have deadbolt locks on all doors leading from the unit to the exterior or public areas, the requirement should be included in the PHA administrative plan as an addition to HQS standards.

Plaintiffs' MSJ Appx. 1975

**10.3    PERFORMANCE REQUIREMENTS  AND ACCEPTABILITY STANDARDS**

Each of the 13 HQS performance requirements and acceptability criteria is identified below.  A discussion of how PHAs should interpret the requirements and tenant preference options follows. Refer to the inspection checklists contained in Form HUD-52580 and Form HUD-52580-A and the *Housing Inspection Manual for the Section 8 Existing Housing Program* for more detailed explanation and guidance.

**Sanitary Facilities**

*Performance Requirement*

- The dwelling unit must include sanitary facilities within the unit.

- The sanitary facilities must be in proper operating condition and adequate for personal cleanliness and disposal of human waste.

- The sanitary facilities must be usable in privacy.

*Acceptability Criteria*

- The bathroom must be located in a separate room and have a flush toilet in proper operating condition.

- The unit must have a fixed basin (lavatory) with a sink trap and hot and cold running water in proper operating condition.

- The unit must have a shower or tub with hot and cold running water in proper operating condition.

- The facilities must utilize an approved public or private disposal system, including a locally approved septic system.

The bathroom must be contained within the dwelling unit, afford privacy (usually meaning a door, although no lock is required), and be for the exclusive use of the occupants.

All public or private waste disposal systems servicing the unit or facilities must be either state or local agency approved.

The tub/shower, toilet, and basin/lavatory must have a proper sewer trap, drain, and vents to prevent the escape of sewer gases or severe leakage of water.  Drains must not be clogged and the toilet must flush.  Hot and cold water must be available at the tub, shower, and lavatory taps. The definition of hot water (temperature) required at the lavatory, tub, or shower should be determined from local health standards or applicable local code.

Plaintiffs' MSJ Appx. 1976

The PHA must determine if the bathroom facilities are free of hazards which may endanger the occupants such as damaged or broken fixtures and plumbing leaks.  Conditions which do not affect the acceptability of the bathroom include tenant preference items (listed below) and minor faucets drips.

---

EXAMPLE:

What are bathroom hazards that may endanger occupants?

- Broken ceramic, metal, or glass fixtures that may pose a hazard.  This includes towel racks, soap dishes, medicine cabinets, and mirrors as well

- A leaking hot water faucet may pose a scalding threat.

---

Only one bathroom is required to meet HQS.  Additional bathrooms do not have to contain all plumbing fixtures (tub/shower, toilet or lavatory), but if present, they must not create any unsanitary conditions, be properly plumbed, and be free of sewer gases.

Other room standards that apply to bathroom facilities, such as illumination and electricity, are discussed under those performance requirements.

*Tenant Preference*

The tenant may determine acceptability of the cosmetic condition and quality of the sanitary facilities, including the size of the lavatory, tub, or shower, condition of faucets, minor leaks, scratches, or worn enamel on fixtures, and the location of the sanitary facilities within the dwelling unit.

**Food Preparation and Refuse Disposal**

*Performance Requirement*

- The dwelling unit must have suitable space and equipment to store, prepare, and serve food in a sanitary manner.

*Acceptability Criteria*

- The dwelling unit must have an oven and a stove or range.  A microwave oven may be substituted for a tenant-supplied oven and stove or range.  A microwave may be substituted for an owner-supplied oven and stove or range if the tenant agrees and microwave ovens are furnished to both subsidized and unsubsidized tenants in the same building or premises.

- The dwelling unit must have a refrigerator of appropriate size for the family.

---

Plaintiffs' MSJ Appx. 1977

- All required equipment must be in proper operating condition.  According to the lease, equipment may be supplied by either the owner or the family.

- The dwelling unit must have a kitchen sink in proper operating condition, with a sink trap and hot and cold running water.  The sink must drain into an approved public or private system.

- The dwelling unit must have space for storage, preparation, and serving of food.

- Facilities and services for the sanitary disposal of food waste and refuse, including temporary storage facilities where necessary, are required.

Hot plates are not acceptable substitutes for stoves or ranges.  The oven must heat and all burners on the stove or range must work.  All stove or range knobs must be present.
The stove or range must be free of hazardous gas hook-ups, gas leaks, or electrical hazards.

The refrigerator must be of adequate size for the family and capable of maintaining a temperature low enough to keep food from spoiling.  The PHA may reject the size of the refrigerator only if it clearly cannot serve the needs of the family.  For example, a counter-top or compact type would not meet the needs of a family of four.  The freezer space must be present and working, and the equipment must present an electrical hazard.

---

EXAMPLE:

What temperature must a refrigerator maintain to keep food from spoiling?

- Above 32° F, but generally below 40° F.

- Consider how often the refrigerator will be opened.  Proper temperatures are difficult to maintain if the refrigerator is frequently opened during warm weather, door seals are removed or broken, or the door sits open.

---

The sink must have hot and cold running water from the faucets and a proper working sink drain with gas trap.  It must also be hooked to an approved water and sewer system.  The definition of hot water should be determined by the local health department or applicable local code.

Space for storage, preparation, and serving of food must be present.  Built-in space, equipment, table(s), or portable storage facilities are acceptable.

Waste and refuse storage facilities are determined by local practice and may include trash cans or dumpster facilities.

Other room standards apply to the food preparation area and are discussed under those specific requirements below.

Plaintiffs' MSJ Appx. 1978

*Tenant Preference*

The family selects a unit with the size and type of equipment it finds acceptable and may choose to accept a microwave oven in place of a conventional oven, stove, or range if the oven/stove/range are tenant supplied or if microwaves are furnished in both subsidized and unsubsidized units in the building or premises.  The amount and type of storage space, the cosmetic conditions of all equipment, and the size and location of the kitchen are all determined by the family.

## Space and Security

*Performance Requirement*

- The dwelling unit must provide adequate space and security for the family.

*Acceptability Criteria*

- At a minimum, the dwelling unit must have a living room, a kitchen and a bathroom.

- The dwelling unit must have a least one bedroom or living/sleeping room for every two persons.  Other than very young children, children of opposite sex, may not be required to occupy the same bedroom or living/sleeping room.

- Dwelling unit windows that are accessible from the outside must be lockable.

- Exterior doors to the unit must be lockable.

A living room may be used as sleeping (bedroom) space, but no more than two persons may occupy the space.

Unit windows located on the first floor, at the basement level, on a fire escape, porch, or other outside space that can be reached from the ground and that are designed to be opened must have a locking device.  (Windows with sills less than six feet off the ground are considered accessible.)  Traditional window locks, those provided by storm/screen combination windows, window pins, and nails are acceptable.  Windows leading to a fire escape or required to meet ventilation requirements may not be permanently nailed shut.

Doors leading to the outside and common hallways, fire escapes, and porches or otherwise accessible from the ground must have locks.  No specific type of lock is required.

Window and door surfaces (including the door frame) must be in sufficient condition to support the installation and proper operation of window and door locks.

**Plaintiffs' MSJ Appx. 1979**

*Tenant Preference*

The family may determine the adequacy of room sizes and room locations.  The family is also responsible for deciding the acceptability of the type of door and window locks.

**Thermal Environment**

*Performance Requirement*

- The dwelling unit must be able to provide a thermal environment that is healthy for the human body.

*Acceptability Criteria*

- There must be a safe system for heating the dwelling unit, such as electric baseboard, radiator, or forced air systems.  In order to ensure a healthy living environment appropriate for the climate the system must be able to provide adequate heat either directly or indirectly to each room.

- If present, the air conditioning system or evaporative cooler, must safely provide adequate cooling to each room.

- The heating and/or air conditioning system must be in proper operating condition.

- The dwelling unit must not contain unvented room heaters that burn gas, oil, or kerosene.  Electric heaters are acceptable.

The PHA must define "a healthy living environment" for the local climate.  Local or state codes will help the PHA determine when and how much heat is adequate.  For example, a PHA may define a heating system capable of maintaining an interior temperature of 65° between October 1 and May 1 as adequate.

Adequate heat is required in all rooms used for living; the heat source does not have to be located in each room as long as the heat can pass to the appropriate space and meet the definition of adequate.  Portable electric room heaters or kitchen stoves with built-in heating units are not acceptable as a primary source of heat for units located in climatic areas where permanent heat systems are required.

Improper operating conditions, including all conditions that may be unsafe, such as broken or damaged source vents, flues, exhausts, gas or oil lines that create a potential fire hazard or threats to health and safety are not permitted.  Heating unit safety devices must be present, and the heating equipment must have proper clearance from combustible materials and location of oil storage tanks.  There must be proper gas and oil connections.  Local plumbing, fire, or mechanical codes are instructive in providing details about acceptable materials for furnace and water heater hookups and required clearances appropriate to the jurisdiction where units are

Plaintiffs' MSJ Appx. 1980

located.  Seek assistance from local code enforcement offices to determine health and safety standards for equipment hook-up and clearance requirements.

Heating system inspections are often required by local or state authorities especially for large multi-family buildings.  If the heating system has passed inspection from the inspecting authority within the past two years, the PHA may accept this as proof of heating equipment safety.

Working cooling equipment refers to a central ventilation system, evaporative cooling system, room or central air conditioning.  These systems are not required by HQS, but if present, must be operating safely so as not to create a potential fire hazard or other threat to health and safety.

*Tenant Preference*

The PHA has no control over energy conservation measures, such as dwelling insulation or installation of storm windows and doors.  The family must assess whether a dwelling without these items is acceptable; the family must take into account the cost of utilities billed to the family and personal feelings about adequate heat.  Dwellings that are poorly insulated or lack storm windows are generally drafty and more difficult to heat and cool.

**Illumination and Electricity**

- Each room must have adequate natural or artificial illumination to permit normal indoor activities and to support the health and safety of occupants.

- The dwelling unit must have sufficient electrical sources so occupants can use essential electrical appliances.

- Electrical fixtures and wiring must not pose a fire hazard.

*Acceptability Criteria*

- There must be at least one window in both the living room and each sleeping room.

- The kitchen area and the bathroom must have a permanent ceiling or wall-mounted fixture in proper operating condition.

- The kitchen must have at least one electrical outlet in proper operating condition.

- The living room and each sleeping space must have at least two electrical outlets in proper operating condition.  Permanent overhead or wall-mounted light fixtures may count as one of the required electrical outlets.

The PHA must be satisfied that the electrical system is free of hazardous conditions, including: exposed, uninsulated, or frayed wires, improper connections, improper insulation or grounding of

Plaintiffs' MSJ Appx. 1981

any component of the system, overloading of capacity, or wires lying in or located near standing water or other unsafe places.

Outlets must be properly installed in the baseboard, wall, or floor.  Hanging light fixtures or outlets from electric wiring, missing cover plates on switches and outlets, badly cracked outlets or cover plates, exposed fuse box connections and, overloaded circuits are unacceptable.

*Tenant Preference*

The family may determine whether the location and the number of outlets and fixtures (over and above those required for acceptability standards) are acceptable or if the amount of electrical service is adequate for the use of appliances, computers, or stereo equipment.

**Structure and Materials**

*Performance Requirement*

- The dwelling unit must be structurally sound.

- The structure must not present any threat to the health and safety of the occupants and must protect the occupants from the environment.

*Acceptability Criteria*

- Ceilings, walls, and floors must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts, or other serious damage.

- The roof must be structurally sound and weather-proof.

- The foundation and exterior wall structure and surface must not have any serious defects such as serious leaning, buckling, sagging, large holes, or defects that may result in air infiltration or vermin infestation.

- The condition and equipment of interior and exterior stairs, halls, porches, and walkways must not present the danger of tripping and falling.

- Elevators must be working safely.

The PHA must examine each of the elements listed in the acceptability criteria to determine that each is structurally sound, will not collapse, and does not present a danger to residents through falling or missing parts, or tripping hazards.  The PHA must determine that the unit is free from water, excessive air, and vermin infiltration.

Plaintiffs' MSJ Appx. 1982

Handrails are required when four or more steps (risers) are present, and protective railings are required when porches, balconies, and stoops are thirty inches off the ground.

The elevator servicing the unit must be working.  A current city or state inspection certificate suffices to determine working condition of the elevator.

Manufactured homes must have proper tie-down devices capable of surviving wind loads common to the area.

*Tenant Preference*

Families may determine whether minor defects, such as lack of paint, or worn flooring or carpeting will affect the livability of the unit.

**Interior Air Quality**

*Performance Requirement*

- The dwelling unit must be free of air pollutant levels that threaten the occupants' health.

*Acceptability Criteria*

- The dwelling unit must be free from dangerous air pollution levels from carbon monoxide, sewer gas, fuel gas, dust, and other harmful pollutants.

- There must be adequate air circulation in the dwelling unit.

- Bathroom areas must have one openable window or other adequate ventilation.

- Any sleeping room must have at least one window.  If the window was designed to be opened, it must be in proper working order.

The PHA must be satisfied that air pollutants such as gas leaks, industrial outputs, and heavy traffic would not present a health hazard.

Air circulation should be checked to determine adequate ventilation.  Air conditioning (A/C) provides adequate circulation as do ceiling and vent fans.

The windows must adequately protect the unit's interior from the weather.  Windows designed to open must not be painted or nailed shut.  The ventilating bathroom fan in the bathroom must operate as intended.

Plaintiffs' MSJ Appx. 1983

*Tenant Preference*

Tenants may determine whether window and door screens, filters, fans, or other devices for proper ventilation are adequate to meet personal needs.

**Water Supply**

*Performance Requirement*

- The water supply must be free of contamination.

*Acceptability Criteria*

- The dwelling unit must be served by an approved public or private water supply that is sanitary and free from contamination.

The PHA should be satisfied that the water supply is approved by the State or local jurisdiction.

Clean water must be distributed to all unit fixtures and waste water must leave the unit to an approved area without presence of sewer gas and backups.

Plumbing fixtures and pipes must be free of leaks and threats to health and safety.

Water-heating equipment must be installed safely and must not any present safety hazards to families.  All water heaters must be free of leaks, have temperature/pressure relief valves, and a discharge line.  Unless safety dividers or shields are installed water heaters must not be located in bedrooms or living areas where safety hazards may exist.  Fuel burning equipment must have proper clearance from combustible materials and be properly vented.

*Tenant Preference*

The family may decide if the water heater has a large enough capacity for personal family use.

**Lead-Based Paint**

- The Lead-Based Paint Poisoning Prevention Act as amended (42 U.S.C. 4821 - 4846) and the Residential Lead-Based Paint Hazard Reduction Act of 1992 and implementing regulations 24 CFR Part 35 Subparts A, B, M, and R apply to the housing choice voucher program.

*Acceptability Criteria*

- The requirements apply to dwelling units built prior to 1978 that are occupied or can be occupied by families with children under six years of age, excluding zero bedroom dwellings.

Plaintiffs' MSJ Appx. 1984

- During initial and annual inspections of pre-1978 units that are occupied or will be occupied by families with children under 6 years of age, the inspector must conduct a visual assessment for deteriorated paint surfaces and the owner must stabilize deteriorated surfaces. Applicable areas include painted surfaces within the dwelling unit, exterior painted surfaces associated with the dwelling unit, and common areas of the building through which residents must pass to gain access to the unit and areas frequented by resident children under six years of age, including play areas and child care facilities.

- For units occupied by environmental intervention blood lead level (lead poisoned) children under six years of age, a risk assessment must be conducted (paid for by the PHA), and the owner must complete hazard reduction activities if lead hazards are identified during the risk assessment.

Section 10.4 of this Chapter discusses all PHA responsibilities.

*Tenant Preference*

Families with children under 6 years of age have no decision-making authority related to the presence of lead-based paint.

**Access**

- Use and maintenance of the unit must be possible without unauthorized use of other private properties.

- The building must provide an alternate means of exit in case of fire.

*Acceptability Criteria*

- The unit must have private access.

- In case of fire, the building must contain an alternate means of exit such as fire stairs, or windows, including use of a ladder for windows above the second floor.

The PHA must determine that the unit has private access without unauthorized passage through another dwelling unit or private property.

The emergency (alternate) exit from the building (not the unit) may consist of fire stairs, a second door, fire ladders, or exit through windows.   The emergency exit must not be blocked.  It must be appropriate for the family and considered adequate by local officials.  Guidance from the local fire agency is advisable.

Plaintiffs' MSJ Appx. 1985

*Tenant Preference*

The tenant should assist the PHA in determining if the type of emergency exit is acceptable.

**Site and Neighborhood**

*Performance Requirement*

- The site and neighborhood must be reasonably free from disturbing noises and reverberations or other dangers to the health, safety, and general welfare of the occupants.

*Acceptability Criteria*

- The site and neighborhood may not be subject to serious adverse natural or manmade environmental conditions, such as dangerous walks or steps, instability, flooding, poor drainage, septic tank back-ups or sewer hazards, mudslides, abnormal air pollution, smoke or dust, excessive noise, vibration, or vehicular traffic, excessive accumulations of trash, vermin, or rodent infestation, or fire hazards.

The PHA determines whether any of the above conditions seriously and continually affect the health or safety of the residents.  PHAs should be careful not to restrict housing choice in deciding acceptability.  Failing a unit because the neighborhood is considered "bad" is not appropriate.  Take into account whether private unassisted residents are living in the same neighborhood.

*Tenant Preference*

Taking into consideration the type of neighborhood, presence of drug activity, commercial enterprises, and convenience to shopping and other facilities, the family selects a unit.

**Sanitary Condition**

*Performance Requirement*

- The dwelling unit and its equipment must be in sanitary condition.

*Acceptability Criteria*

- The dwelling unit and its equipment must be free of vermin and rodent infestation.

The PHA must ensure that the unit is free of rodents and heavy accumulations of trash, garbage, or other debris that may harbor vermin.  Infestation by mice, roaches, or other vermin particular to the climate must also be considered.  The unit must have adequate barriers to prevent infestation.

Plaintiffs' MSJ Appx. 1986

---

EXAMPLE:

What is infestation of rodents or vermin?

- By definition infestation means more than one bug or mouse.  It is easily identified by observing mouse and/or rodent droppings or gnaw marks.  If no visible evidence exists, there is probably no infestation.  Based on the type of pest, PHAs must decide for themselves what the limits are for determining infestation and be consistent.  Is one rat or roach too much?

---

*Tenant Preference*

Provided the minimum standards required by the acceptability criteria have been met, the tenant must determine whether the unit is in an adequate sanitary condition.  Occasional mice and roaches may be acceptable to the tenant.

**Smoke Detectors**

- On each level of the dwelling unit including basements, but excluding spaces and unfinished attics at least one battery-operated or hard-wired smoke detector in proper operating condition must be present.

- Smoke detectors must be installed in accordance with and meet the requirements of the National Fire Protection Association Standards (NFPA) 74 or its successor standards.

- If a hearing-impaired person is occupying the dwelling unit, the smoke detectors must have an alarm system designed for hearing-impaired persons as specified in NFPA 74.

*Acceptability Criteria*

The PHA must insure that the location of smoke detectors conforms with local and/or State Fire Marshall's requirements.

The PHA must determine that smoke detectors are located and installed in accordance with NFPA Standards.  All smoke detectors must be in operating condition.

Local codes, such as housing or fire codes, often address responsibilities between owners and tenants for installation and maintenance of smoke detector batteries.  At initial, inspection smoke detectors must have good batteries and be operable.  PHAs may follow local codes to determine if missing or dead smoke detector batteries constitute a tenant or owner-caused failure in occupied units.

Consultation with the local fire officials is recommended regarding acceptable types and location of smoke detectors.

---

Plaintiffs' MSJ Appx. 1987

*Tenant Preference*

The family is not permitted to exercise any tenant preference regarding smoke detector requirements.

## 10.4   LEAD-BASED PAINT REQUIREMENTS AND RESPONSIBILITIES

**Regulation Background**

Lead-based paint requirements were originally written to implement Section 302 of the Lead-based Paint Poisoning and Prevention Act.   In the late 1970s, Code of Federal Regulations, Title 24, Part 35 was promulgated, setting forth the general procedures for inspection and treatment of defective paint surfaces in HUD assisted housing.

Under Part 35, Assistant Secretaries were given authority to develop regulations pertaining to their specific areas of responsibility, and varying program regulations were issued.   The regulations have been amended several times.  A major change that occurred in 1995 amended housing quality standards that applied to tenant-based programs.

New lead-based paint regulations effective September 15, 2000 have been implemented to incorporate Title X of the Housing and Community Development Act of 1992.  These regulations consolidate all lead-based paint requirements under one section of the Code of Federal Regulations (24 CFR Part 35), stress identification of lead-paint hazards, notification to occupants of the existence of these hazards, and control of lead-based paint hazards to reduce lead poisoning among young children.

Housing choice voucher program units are subject to the following subparts of 24 CFR Part 35:

- Subpart A, Disclosure;

- Subpart B, General Lead-Based Paint Requirements and Definitions for All Programs;

- Subpart M, Tenant-Based Rental Assistance; and

- Subpart R, Methods and Standards for Performing Lead Hazard Evaluation and Reduction Activities.

The Section 8 moderate rehabilitation program and the project-based housing choice voucher or certificate program units are subject to requirements under 24 CFR Subparts A, B, H, and R. Those requirements are not discussed in this Guidebook.

Plaintiffs' MSJ Appx. 1988

**Exempt Units**

Exempt housing includes:

- Units built after December 31, 1977;

- Zero (0) bedroom and SRO units;

- Housing built for the elderly or persons with disabilities, unless a child of under age six (6) resides or is expected to reside in such housing;

- Property for which a paint inspection was completed in accordance with the new regulations and certified to have no lead-based paint;

- Property in which all lead-based paint was identified, was removed, and received clearance in accordance with the new regulations.

For dwellings built before January 1, 1978, *and* occupied or to be occupied by assisted families with one or more children under age six, lead-based paint requirements apply to:

- The unit interior and exterior paint surfaces associated with the assisted unit; and

- The common areas servicing the unit, including those areas through which residents must pass to gain access to the unit, and other areas frequented by resident children less than six such as play areas, and child care facilities.  Common areas also include garages and fences on the assisted property.

**Basic Lead-Based Paint Requirements**

The PHA is the responsible party for the following activities:

- Visual assessment for deteriorated paint (i.e., peeling, chipping, flaking) surfaces at initial and annual inspections;

- Assuring that clearance examination is conducted when required;

- Carrying out special requirements for children under age six who have environmental intervention blood lead levels as verified by a medical health care provider;

- Collecting data from the local health department on program participants under age six who have identified environmental intervention blood lead levels; and

- Record keeping.

Unit owners have responsibilities to:

- Disclose known lead-based paint hazards to all potential residents prior to execution of a lease;

- The owner must also provide all prospective families with a copy of *Protect Your Family From Lead in Your Home* or other EPA approved document;

- When necessary, perform paint stabilization to correct deteriorated paint;

- Each time such an activity is performed, notify tenants about the conduct of lead hazard reduction activities and clearance (if required);

- Conduct lead hazard reduction activities when required by the PHA;

- Perform all work in accordance with HUD prescribed safe work practices and conduct clearance activities when required; and

- Perform ongoing maintenance.  As part of ongoing maintenance, the owner must provide written notice to each assisted family asking occupants to report deteriorated paint.  The notice must include the name, address, and phone number of the person responsible for accepting the occupant's complaint.

## 10.5   NOTIFICATION AND DISCLOSURE OF LEAD-BASED PAINT HAZARDS PRIOR TO OCCUPANCY

Before the execution of the lease the owner or owner's agent is required to disclose any knowledge of lead-based paint or lead-based paint hazards in housing built prior to 1978, to all prospective residents (See Exhibit 10-1, *Sample Disclosure Notice*.)  The PHA must keep a copy of the disclosure notice executed by the owner and tenant in the tenant file.  The owner should not send the PHA the original disclosure notice executed by the owner and tenant.

**Visual Assessment for Deteriorated Paint**

During the conduct of initial and annual inspections of pre-1978 units that are occupied or will be occupied by families with children under 6 years of age, the PHA must conduct a visual inspection for deteriorated paint surfaces at these locations:

- All unit interior and exterior painted surfaces associated with the assisted unit; and

- Common areas such as common hallways, access and egress areas, playgrounds, child-care facilities, or other areas including fences and garages frequented by children under age six.

Plaintiffs' MSJ Appx. 1990

Deteriorated paint surfaces are defined as interior or exterior paint or other coating that is peeling, chipping, flaking, cracking, is otherwise damaged or has separated from the substrate of the surface or fixture.

The inspection may be conducted by an HQS inspector or other party designated by the PHA, but all inspectors must be trained in visual assessment in accordance with procedures established by HUD.  A visual assessment training course is available on the Office of Healthy Homes and Lead Hazard Control's website.

**Stabilization of Deteriorated Paint Surfaces**

When the visual inspector identifies deteriorated paint surfaces, the PHA must notify and require the owner to perform stabilization of the surfaces within thirty (30) days of notification in occupied units and before commencement of an assisted tenancy.  When weather conditions prevent stabilization of deteriorated paint surfaces on exterior surfaces within 30-day period, stabilization may be delayed for a reasonable time.

Owner requirements for compliance with a PHA's paint stabilization notice differ, depending upon the amount of deteriorated paint surface to be corrected.  The use of lead-safe work practices during paint stabilization activities are characterized as above or below de minimis levels.  De minimis deteriorated paint surfaces are as follows:

- 20 square feet on exterior surfaces;

- 2 square feet on an interior surface in a single room or interior space; or

- 10 percent of individual small components (e.g., window skills) on the interior or exterior.

Owners must perform paint stabilization on all deteriorated paint surfaces *regardless of the size of the deteriorated surface.*  Paint stabilization is defined as:

- Repair of any physical defect in the substrate of the painted surface or building component. Examples of defective substrate conditions include dry-rot, rust, moisture-related defects, crumbling plaster, missing siding, or other components not securely fastened;

- Removal of all loose paint and other loose material from the surface being treated; and

- Application of a new protective coat of paint to the stabilized surface.

If the amount of deteriorated paint is <u>below the de minimis level</u>, the owner must  perform paint stabilization.  Owners are not required to perform lead-safe work practices and clearance.

Correction of deteriorated paint above de minimis levels requires owners to perform additional activities to gain compliance with HUD lead-based paint requirements, including:

- Conducting the stabilization activities with trained staff;

- Employing acceptable methods for preparing the surface to be treated, including wet scraping, wet sanding, and power sanding performed in conjunction with a HEPA filtered local exhaust attachment operated according to manufacturer's instruction;

- Dry sanding and dry scraping is not permitted except within one (1) square foot of electrical outlets.

- Protecting the occupants and their belongings from contamination;

- Notifying the occupants within fifteen (15) calendar days of the stabilization activity and providing the results of the clearance examination (See Exhibit 10-3, *Summary Notice of Completion of Lead-Based Paint Hazard Reduction Activity*); and

- HUD has provided funds to PHAs to cover the cost of the first clearance examination.  The owner covers funds for the cost of subsequent tests.

- The PHA is responsible for clearance activities.  Clearance examinations must be performed by persons who have EPA or state-approved training and are licensed or certified to perform clearance examinations.

In no instance may an owner employ any paint stabilization methods that are strictly prohibited by federal, state, or local law such as:

- Open flame burning and torching;

- Machine-sanding or grinding without a high-efficiency particulate air (HEPA) local exhaust control;

- Heat guns operating above 1,100 degrees Fahrenheit;

- Abrasive blasting or sandblasting without HEPA exhaust control;

- Dry sanding and scraping except limited conditions stated above for limited areas; and

- Paint stripping in poorly ventilated space using a volatile stripper or a hazardous chemical as defined by Occupational Safety and Health Administration (OSHA).

Failure to comply with paint stabilization requirements, regardless of the amount of deteriorated surface, results in disapproval of the tenancy, abatement of payment to the owner, and/or termination of the HAP contract.   The HQS violation for paint stabilization is considered closed when the PHA receives an executed copy of the Lead Based Paint Owner's Certification. (See Exhibit 10-2, *Sample Certification*.)

Plaintiffs' MSJ Appx. 1992

**Requirements for Children with Environmental Intervention Blood Lead Level**

HUD has defined environmental intervention blood lead level as a confirmed concentration of lead in whole blood equal or greater than 20 ug/dL (micrograms of lead per deciliter) for a single test or 15-19 ug/dL in two tests taken at least three (3) months apart in children under age six.

*Notification*

A medical health care provider, public health department, the family, owner, or outside source may notify the PHA of an environmental intervention blood lead level child living in a program unit.

When information regarding an environmental intervention blood lead level child under age six is received from the family, owner, or other sources not associated with the medical health community, the PHA must immediately verify the information with a public health department or other medical health care provider.

If either the public health department or a private medical health agency provides verification that the child has an environmental intervention blood lead level, the PHA must proceed to complete a risk assessment of the unit, common areas and exterior surfaces.  This requirement does not apply if the public health department has already conducted an evaluation between the date the child's blood was last sampled and the receipt of notification of the child's condition.

When a PHA receives a report of an environmental intervention blood lead level child from any source other than the public health department, the PHA must notify the health department within five (5) working days.

*Risk Assessment*

Within 15 days of notification by a public health department or medical health care provider, the PHA must complete a risk assessment of the dwelling unit, including common areas servicing the dwelling unit, if the child lived in the unit at the time the child's blood was sampled.  In most areas of the country, the local health department will complete the risk assessment free of charge to the PHA.  In areas where this is not possible, the PHA must hire and pay for a certified risk assessor and, upon completion of the risk assessment, the PHA must provide the report to the owner.

Persons trained and certified by an EPA or state-approved agency must complete risk assessments.

Risk assessments involve on-site investigations to determine the existence, nature, severity, and location of lead-based paint hazards.  The investigation includes dust and soil sampling, and visual evaluation, and may include paint inspections (tests for lead in paint).  The assessor issues a report explaining the results of the investigation, as well as options and requirements for reducing lead-based paint hazards.

Plaintiffs' MSJ Appx. 1993

The owner must notify the building residents of the results of the risk assessment within 15 days of receipt from the PHA. (See Exhibit 10-4, *Summary Notice of Lead-Based Paint Risk Assessment*.)

*Hazard Reduction*

The owner must complete reduction of identified lead-based paint hazards as identified in the risk assessment within 30 days (or date specified by PHA if an extension is granted for exterior surfaces).

Hazard reduction activities may include paint stabilization, abatement, interim controls, or dust and soil contamination control. The appropriate method of correction should be identified in the risk assessment.

Hazard reduction is considered complete when a clearance examination has been completed and the report indicates that all identified hazards have been treated and clearance has been achieved, or when the public health department certifies that the hazard reduction is complete.

The owner must notify all building residents of any hazard reduction activities within 15 days of completion of activities. (See Exhibit 10-3, *Summary Notice of Completion of Lead-Based Paint Hazard Reduction Activities*.)

Like paint stabilization compliance, PHA receipt of the owner's certification signals compliance with lead hazard reduction activities. (See Exhibit 10-2, *Owner's Certification.*)

Failure to complete hazard reduction activities (including clearance) within 30 days (or later if PHA grants an extension for exterior surfaces) of notification constitutes a violation of HQS, and appropriate action against the owner must be taken if a program family occupies the unit. If the unit is vacant when the PHA notifies the owner, the unit may not be reoccupied by another assisted family, regardless of the ages of children in the family, until compliance with the lead-based paint requirement.

**Ongoing Maintenance**

In addition to the visual assessment completed by the HQS inspector, the owner is required to conduct a visual assessment for deteriorated paint and failure of any hazard reduction measures at unit turnover and every 12 months of continued occupancy.

The owner is required to make corrections of deteriorated paint and any failed lead hazard reduction measures. Correction methods are the same as those for paint stabilization activities discussed earlier.

The owner must provide written notice to each assisted family asking occupants to report deteriorated paint. The notice must include the name, address, and phone number of the person responsible for accepting the occupant's complaint.

The owner certifies that this requirement is being met by presenting the owner's certification to the PHA before the execution of the lease and at annual inspection.  (See Exhibit 10-2, *Owner's Certification.*)

**PHA Data Collection and Record Keeping**

Quarterly, the PHA must attempt to obtain from the public health department having jurisdiction in the same area as the PHA, the names and addresses of children under age six with an identified environmental intervention blood lead level.

The PHA must match information received from the health department with information about program families.  If a match occurs, the PHA must follow all procedures for notifying owners and conducting risk assessments as stated above.

Quarterly, the PHA must report a list of addresses of units occupied by children under age six, receiving assistance to the public health department, unless the health department indicates that such a report is not necessary.

Staff should be thoroughly trained about the requirements for lead-based paint so inspection activities are properly done and questions from owners about processes and requirements can be adequately addressed.

The PHA is responsible to inform owners of lead-based paint regulations especially those related to prohibited and safe work practices, tenant protection during lead-based paint activities, and notification requirements.  Many owners do not know about the new regulations and requirements that were effective September 15, 2000.  The PHA may wish to include information about these requirements in HQS notices and other mailings to owners.  If the PHA routinely conducts owner workshops or owner meetings, lead-based paint is a good topic to place on the agenda.

Risk assessors and public health departments conducting risk assessments involving environmental intervention blood lead level children will issue a report on any needed corrections and appropriate methods to correct lead hazards.  The PHA must notify the owner of the deadline for completing the corrections.

To carry out its responsibilities for matching PHA and public health records, PHA staff may need to develop a closer working relationship with staff at the public health department.

PHAs should also develop a tracking report to track known environmental intervention blood lead level children until the child reaches age six.  This will assure that all PHA required activities are addressed in a timely manner and that inspections conducted on behalf of the family will include the inspection for deteriorated paint.  If the PHA is using a computerized inspection system with hand-held units, information about the child's condition should be entered into the system.

Plaintiffs' MSJ Appx. 1995

Units that have been certified to be clear of lead paint hazards may be placed on a list and affirmatively marketed to families with children under six.

## 10.6    HQS INSPECTION PROCESSES AND PROCEDURES

### Overview

The purpose of HQS inspections is to ensure that housing is decent, safe and sanitary.  This section discusses types of HQS program inspections PHAs are required to conduct, methods for conducting inspections, inspection scheduling, and HQS enforcement.  Sample letters and notices are provided to help PHAs carry out inspections.  (See Exhibit 10-4a, *Annual Inspection Appointment Letter*, and Exhibit 10-4b, *Second Notice of Inspection Appointment*.)

PHAs are required to conduct three types of inspections: initial, annual, and special inspections, including quality control inspections.  Inspections result in pass, fail, or inconclusive reports.  Pass inspections require no further action by the PHA.  Fail or inconclusive inspections require follow-up reinspections or PHA verification to confirm the correction of the HQS infractions.

Depending upon the nature of the item responsibility for correction of fail or inconclusive items may be the responsibility of the owner or tenant.  Failure to comply with correction notices results in owner or tenant sanctions.

### Scheduling Inspections

*Program Requirements*

The PHA must schedule initial inspections in accordance with program requirements.  Annual inspections, quality control inspections, and all resulting reinspections must be scheduled to comply with SEMAP requirements as discussed in Section 10.7 of this Chapter.  Other special inspections, such as complaint inspections, should be scheduled as quickly as possible after receipt of request.

Efficiently scheduling inspections that comply with SEMAP requirements can be challenging and complex, especially for PHAs with large programs.  PHAs are allowed to determine their own procedures for scheduling inspections and may choose to complete the task manually or use of computer programs.

PHAs should plan efficient and cost effective inspection procedures that produce the best results, as well as good customer service for both families and owners.  The size of the PHA's program plays a big part in determining scheduling details.

Annual inspections must be scheduled so that all units are inspected every 12 months.  Annual inspections are likely to be the largest part of the PHA's inspection workload, followed by reinspections of units that fail HQS.  Since many PHAs coordinate the scheduling of annual inspections with annual reexaminations, the number of inspections is not constant from month to

month, with more inspections required in the heavy leasing months (e.g., the summer months). This may also be the period with the greatest number of initial inspections.

The PHA should consider the following factors to determine how many total inspections will need to be scheduled and completed each year:

- Number of units under contract;

- Anticipated number of requests for expected tenancy approvals (new families and transfers) in the coming year;

- Unit fail rates for initial and annual inspections;

- Reinspection fail rates for annual inspections;

- Number of complaint inspections anticipated annually; and

- Number of quality control inspections required.

After estimating the number of required unit inspections, the PHA should determine the number of staff needed to complete required inspections.  The PHA should take into account the following factors:

- Number of days employees actually conduct inspections each year (exclude time in office, training days, vacation, sick days, and approximate number of days lost to weather conditions for the area); and

- Number of inspections each employee completes per day.

This analysis will indicate the number of inspections each inspector must have scheduled and completed each day.  The PHA should determine the amount of time required for an inspector to complete thorough inspections, taking into account the type of unit and the number of bedrooms. The PHA should also consider travel time.

**Automated Inspection Systems**

In order to meet all HQS requirements, inspections must be conducted and recorded using form HUD 52580-A or 52580.  If the PHA has received HUD approval to include additional requirements, these changes must be reflected on the inspection instrument.

PHAs may conduct inspections using paper forms, checklists, or computer devices.  Several automated HQS products are available on the private market.  The PHA's program size will dictate the most cost effective and efficient method.

Plaintiffs' MSJ Appx. 1997

Computer inspection hardware comes in many forms; most are Windows-based.  The computer, often referred to as a "hand-held," is available in various sizes and weights, and is available with printing devices that can be used in the field.  Data entry can also take many forms, including use of a stylus to enter comments on the computer screen, typing comments into the system, or using programmed codes to describe fail items.

Most hand-held systems can be connected to the office computer system.  Inspection results are then uploaded to the office computer to produce required letters to owners and/or tenants.  Some systems will allow for the inspections data to be "tied" to other PHA computer mainframe applications to fill in tenant data fields for date of inspection, record inspection results to track and monitor SEMAP requirements, and perform other tasks.

PHAs considering the use of hand-held systems should consult several companies to determine the best and most cost effective system.  Careful planning and programming of the hand-held system should occur.

**Initial Inspection Process and Procedure**

The PHA's established tenancy approval process triggers an initial inspection.  The PHA may deny a request to inspect a unit of behalf of a tenant as discussed in Chapter 6.  (See Exhibit 10-5, *Sample Notice Denying Request for Inspection*.)

*Program Requirements*

- The PHA is required to conduct an initial inspection for each unit as part of the tenancy approval process discussed in Chapter 6.  The family and owner must be notified of the inspection results.

- The unit must pass the HQS inspection before the execution of the assisted lease and housing assistance payments (HAP) contract and the initiation of payments.

- PHAs with up to 1,250 budgeted units must conduct the inspection within 15 days after the family or owner submits a request for tenancy approval.

- PHAs with more that 1,250 budgeted units must conduct the inspection within a reasonable time after the family submits a request for tenancy approval.  If possible, the inspection should be completed within 15 days.

- The 15-day period is suspended when the unit is not unavailable for inspection.  For example, if a family and owner submit a request for tenancy approval on the 15th of month but the owner indicates that unit will not be available until 1st of next month, the 15-day clock starts on the 1st of the next month.

A thorough unit inspection is required for the PHA to determine compliance with HQS and to determine the reasonableness of the rent. (Rent Reasonableness is discussed in Chapter 9.)

Plaintiffs' MSJ Appx. 1998

Regardless of how inspection results are recorded the PHA must produce and retain a facsimile that includes PHA-adopted standards.  Form HUD-52580, *Inspection Checklist*.

The family and the owner must relieve inspection results.  (See Exhibit 10-6, *Sample Notice, Initial Unit Inspection*.)  The owner must receive detailed information for all failed and inconclusive inspection items so that he or she is fully aware of the work necessary to pass the HQS inspection.

If the unit does not comply with HQS requirements within the PHA specified time frame, the PHA may cancel the tenancy approval and instruct the family to search for another unit.

The PHA is responsible for establishing a tenancy approval procedure.  The procedure should clearly describe the process for the tenant and owner to request an inspection, keeping in mind:

- The requirement to conduct inspections within 15 days or as quickly as possible.

- The PHA may set a deadline for completion of repairs which, if not met, will result in cancellation of the tenancy approval.

- If the time to complete repairs is expected to be lengthy, the tenant may wish to find another unit, or the PHA may decide that the unit is unacceptable for leasing because the owner is non-responsive or has failed to comply with HQS within a reasonable period of time.

The PHA should request that the owner disclose the date the unit will be ready for inspection, as well as all phone numbers where the owner can be reached.

The PHA may either ask the owner to schedule unit inspection or may accept this responsibility itself.  In either instance, the PHA should determine its policy and procedure for cases where owner requests are not timely, one or more appointments are cancelled, access is denied or the unit does not pass inspection after a reasonable time.

PHAs with a large number of tenancy approval requests may monitor their processing through a manual or computerized tracking system, which records actions from the time of the request through the execution of the HAP contract.  This lets the PHA know where each unit stands in the scheduling and approval process, and provides management data on time frames from request for tenancy approval to HAP execution.

Prior to inspection, PHAs can use several methods to inform owners about HQS requirements: owner briefing materials, telephone discussion, inclusion of HQS requirements in tenancy approval materials, monthly newsletters to owners in the program, owner workshops, and public meetings with current and prospective owners. It is advantageous to the PHA and the prospective tenant if the unit passes inspection on the first attempt.  The PHA should have a system to track units requiring reinspection to determine HQS compliance for all fail and inconclusive items.

**Annual Inspection Process and Procedure**

The annual inspection process includes scheduling the unit for inspection, notifying owners and tenants of the inspection date and time, conducting the inspection, enforcing HQS requirements, and when necessary, taking action to abate payments and terminate HAP contracts and program assistance.

- The unit must be in compliance with HQS requirements throughout the assisted tenancy.

- Each unit must be inspected annually during assisted tenancy to determine if the unit meets HQS.  The inspection must be conducted within twelve months of the previous inspection to meet SEMAP requirements discussed in Section 10.7.

- The PHA must notify owners and tenants of HQS deficiencies in writing, and indicate a time period in which to make HQS corrections of that the PHA complies with SEMAP requirements discussed in Section 10.7.

- The PHA must abate housing assistance payments to the owner for failure to correct an HQS violation under the following circumstances:

  - An emergency (life-threatening) violation is not corrected within 24 hours of inspection and the PHA did not extend the time for compliance;

  - A routine violation is not corrected within 30 days of the inspection and the PHA did not extend the time for compliance.

- Abatements must begin on the first of the month following the failure to comply.

- The PHA must terminate the HAP contract if repairs are not made.  The PHA must decide how long abatement will continue prior to contract termination.  The PHA should not terminate the contract until the family finds another unit provided the family does so in a reasonable time.

- The PHA must terminate program assistance to families who fail to correct HQS deficiencies that they caused.  The PHA should notify the owner of its intent to terminate the family's program assistance so the owner can begin eviction procedures.  The PHA should continue to pay the owner until the eviction is completed.

The PHA may set policy regarding tenant and owner presence at the inspection.

The inspector conducts the unit inspection.  Each item on the inspection checklist must receive a rating of pass, fail, or inconclusive.  The inspector should make clear notes about the nature of all fail and inconclusive items.  For the unit to receive a pass rating, no fail or inconclusive items can be noted on the inspection checklist.

Plaintiffs' MSJ Appx. 2000

Improvements which have occurred since the previous unit inspection, addition of amenities or services, and changes in type of or responsibility for utilities should be noted and reported to appropriate PHA staff.

The inspector may record recommended improvements or items that should be brought to the attention of the owner or tenant, but are not HQS deficiencies.

Written notification to the owner and/or tenant is required for all items for which fail or are inconclusive.  The notice must include a list of HQS deficiencies and the correcting deadline. (See Exhibit 10-7a and Exhibit 10-7b, *Sample Notice, Owner and Tenant HQS Deficiencies*.). Reinspection or PHA verification that failed and/or inconclusive items are corrected is required.

Any time an inspector is present in an assisted unit, the inspector has the right to conduct a full inspection.  If new HQS items are discovered during the time of a reinspection, the new items must be noted and the owner and/or tenant must be notified to correct the deficiencies.

Owners are responsible to the PHA for compliance with all HQS items except those specifically assigned to tenants.

Tenants are responsible to correct HQS fail and inconclusive items resulting from:

- Failure to pay for tenant-supplied utilities;

- Failure to supply appliance(s) required by the lease; or

- Damage to the unit.

## 10.7   COMPLAINT INSPECTIONS

The PHA must investigate complaints about HQS matters that are registered by tenants, owners or the general public.

Violations resulting from complaint inspections are treated in the same manner as annual inspection violations.  Failure to comply with violation notices issued from complaint inspections result in abatement of payment to owners and/or termination of program assistance for tenants.

PHAs should schedule complaint inspections based upon the nature of the complaint.  Staff that receive complaints should distinguish between emergency (life threatening) and routine matters and act accordingly.

**Abatement of Payments**

The PHA must abate HAP payments to owners who do not comply with notifications to correct HQS deficiencies within the specified time period:  24 hours or 30-days depending upon the

nature of the deficiency.  For valid reasons, the PHA may extend the time period.  Placement of abatement must occur by the first of the month following expiration of the notice.

Except in the case of life threatening violations requiring corrections within 24 hours, the owner must receive 30-day written notification of the abatement.  Therefore, it is important that PHAs include the 30-day notice to abate in the original violations notice.  (See sample notice, Sample Notice of HQS Deficiency; Exhibit 10-7b.)  If this does not occur, a separate Notice of Abatement, Sample Notice Exhibit 10-8, which delays the placement of abatement and has implications under SEMAP compliance, must be sent to the owner.  (See Section 10.7.3.)

Following a failure to comply with a notice of deficiency owners are not entitled to HAP payments from the first of the month until the day the unit passes HQS.  Examples include:

- The owner receives a notice of violation in May to correct deficiencies by June 20 or abatement of payment will occur on July 1.  The owner does not comply on June 20th.  An abatement is placed on July 1 unless the owner complies prior to July 1.  (The PHA may allow the owner to request a reinspection of the unit for compliance with HQS before or after the abatement has been placed.)  If the unit passes re-inspection, the PHA may reinstate HAP payments on the day the owner complies and reverse any notice of abatement or cancellation of HAP contract that may have been issued.

- The owner receives a notice of violation in May to correct deficiencies by June 20, but the notice does not contain language that abatement of payment will occur on July 1.  The owner must be given a 30-day notice before the abatement can occur.  Abatement may not be placed before August 1.

- In May, the owner receives a notice of violation requesting a correction of deficiencies by June 20 and the notice contains language that failure to comply will result in abatement of payment July 1.  The owner does not comply and abatement is placed on July 1.  The owner requests a re-inspection following abatement and passes the reinspection on July 10.  HAP payments may be re-instated on July 10, resulting in a nine-day sanction.  The PHA may not withhold HAP payments to recover the time the unit was out of compliance with HQS from June 20 through June 30.

**Termination of HAP Contract**

The PHA may terminate the HAP contract for an owner's failure to comply with its terms and conditions, including non-compliance with HQS.   Both the owner and the tenant must be notified of intent to terminate.  (See Exhibit 15-1, *Sample Notice of Termination*.)

The PHA may issue a voucher to the family to move, provided the family is eligible (not in violation of the terms of assistance, including HQS responsibilities).  The family should be reminded of its responsibility to the owner to give notice of intent to move, and must continue to pay its portion of the rent as long as the family remains in the unit.  Procedures for terminating

the HAP contract should be stated in the PHA administrative plan.  (See Guidebook Chapter 15, Termination of Assistance and Housing Assistance Payment Contracts.)

**Termination of Assistance**

Termination of program assistance is discussed in Chapter 15.  (See Exhibit 15-2, *Sample Notice of Termination of Program Assistance*.)

**Special Inspection Process and Procedure**

Special inspections include inspections in response to complaints registered with the PHA by families, owners or other sources regarding the unit's condition, quality control inspections, or any other inspection the PHA may deem appropriate to conduct.

PHAs are obligated to investigate complaints which may indicate non-compliance with HQS requirements.  When repeated complaints about an assisted property are received, the PHA may wish to conduct regular or routine inspections more often than annually.

Quality control inspections are a second type of special inspection and are required by program regulations.  See the discussion on quality control inspections in Section 10.7 of this Chapter.

Special inspections resulting in a fail or inconclusive HQS determination require the same notification actions and enforcement processes described above for annual inspections.

As discussed in Section 10.7 of this Chapter, the PHA should use tracking systems to monitor compliance with deadlines for correction of HQS violations, abatements, and terminations resulting from annual and special inspections.

The PHA should develop a procedure and tracking system to record, track, and schedule all unit inspections to ensure that inspection-related SEMAP requirements are met.  These methods will assist staff to schedule and conduct the unit inspection within the required time frames.  Frequent monitoring is necessary to assure that rescheduling of unit inspection is pursued diligently.

## 10.8   PHA-OWNED UNITS

A unit that is owned by the PHA that administers the housing choice voucher program (including a unit owned by an entity substantially controlled by the PHA) may not be inspected for HQS compliance by PHA staff.

- The PHA must obtain the services of an independent entity to perform HQS inspections and to communicate the results of these inspections to the family and the PHA.

- The independent agency must be approved by HUD.

- Administrative fee income may be used to compensate the independent agency.  Other program receipts may not be used.

- Neither the PHA nor the inspecting agency may charge the family any fee for the inspection service.

The PHA may select a government, nonprofit, or private group to conduct the independent HQS inspections.  The independent agency may be a unit of general local government, but it may not be the PHA.  Other local government agencies such as the local code enforcement agency, the Community Development Agency, or the Health Department may be acceptable.   A neighboring PHA or a consultant are also possibilities.

After the PHA receives HUD approval of an independent inspection entity, the PHA should establish a system to report addresses and inspections schedules, receive information from the inspection entity, and manage the information flow.  PHA owned units are also subject to SEMAP requirements.

## 10.9   SEMAP Indicators Related to Inspections and HQS

### Introduction

The following five SEMAP Indicators, totaling 50 points, are directly or indirectly related to PHA compliance with program inspection requirements:

- Indicator 2, Rent reasonableness;
- Indicator 5, HQS quality control inspections;
- Indicator 6, HQS enforcement;
- Indicator 11, Precontract HQS inspections; and
- Indicator 12, Annual HQS inspections.

SEMAP Certifications and Scoring are discussed in Chapter 1, Introduction.

Certification of  Indicators 2, 5, and 6 is audited by the PHA through quality control sampling.  Sample size varies depending upon the universe, as shown in Table 10-1, *Minimum Size of the PHA's Quality Control Sample*.  The scores resulting from the PHA quality control process and certified by the PHA to HUD will be verified by the PHA independent auditor.

**TABLE 10-1**
**MINIMUM SIZE OF THE PHA'S QUALITY CONTROL SAMPLE**

| Universe | Minimum number of files or records to be sampled |
|----------|--------------------------------------------------|
| 50 or less | 5 |
| 51-600 | 5 plus 1 for each 50 (or part of 50) over 50 |
| 601-2000 | 16 plus 1 for each 100 (or part of 100) over 600 |
| Over 2000 | 30 plus 1 for each 200 (or part of 200) over 2000 |

Plaintiffs' MSJ Appx. 2004

The universe is determined as follows:

- SEMAP Indictor 2, Rent reasonableness:  number of families assisted;

- SEMAP Indicator 5, HQS quality control inspections:  number of units under HAP contract during the last completed PHA fiscal year;

- SEMAP Indicator 6, HQS enforcement:  number of failed HQS inspections in the last year.

The scores for SEMAP Indicators 11 and 12 are determined by data submitted by the PHA to HUD through MTCS.

**Indicator 2, Rent Reasonableness**

Program requirements for this indicator are discussed in detail in Chapter 9, Rent Reasonableness.

When determining the rent to owner, data must be gathered on a variety of units in order to allow the PHA to make a comparability determination.  PHA staff conducting the initial pre-contract inspection are the most likely candidates to gather or verify the data, using the nine factors in the rent reasonableness procedure.

See Sample Data Collection Form for Program Unit provided in Chapter 9.

**Indicator 5, HQS Quality Control Inspections**

- A PHA supervisor or other qualified person must reinspect a sample of units under contract during the last PHA fiscal year.  The guidelines included in Table 10-1 determine the required sample size.

- The universe referred to in Table 10-1 is the number of units under HAP contract at the end of the PHA's previous fiscal year.  Example:  The PHA fiscal year ends December 31, 2000. The SEMAP 2000 rating year for this PHA is January 1- December 31, 2000.  The universe for this indicator is the number of units under HAP contract on December 31, 1999.

- Completed HQS inspections included in the sample must be no older than three months at the time of the reinspection.  The sample must represent a cross section of neighborhoods where program units are located and inspections completed by all HQS inspectors.  The sample should also include a cross-section of initial and annual inspections.

-  Quality control reinspections should be conducted by staff trained in the PHA's inspection standards and should receive the same guidance as other PHA inspectors on inspection policies and procedures.

Plaintiffs' MSJ Appx. 2005

In addition to monitoring SEMAP compliance, quality control inspections provide feedback on inspectors' work, which can be used to determine if individual performance or general HQS training issues need to be addressed.  For SEMAP purposes, an HQS deficiency found at the time of the quality control reinspection represents a "fail" quality control inspection.  When rating an individual inspector's performance, the quality control inspector should take into account whether the failed item occurred since the previous inspector was on site.  Often the tenant can describe when the deficiency occurred and will be helpful in making this determination. Deficiencies that occurred after the original inspection should not be held against the inspector's performance record.

The PHA should maintain a quality control tracking system for each SEMAP year, which indicates, the address of the units, date of original inspection and inspector, date of the quality control inspection, results of the quality control inspection, and location of the unit by neighborhood, zip code, census tract, etc.  (See Exhibit 10-9, *Documenting Quality Control Inspections.*)

**Indicator 6, HQS Enforcement**

- All life-threatening HQS deficiencies must be corrected within twenty-four (24) hours of inspection and all other cited HQS deficiencies must be corrected no more than 30 calendar days from the inspection unless the PHA approved an extension of time for correction.

- For HQS deficiencies that are the owner's responsibility and are not corrected within the prescribed time frames, the PHA must abate housing assistance payments beginning no later than the first of the month following expiration of the PHA violation notice.  Violation notices should contain language regarding abatement of payment for owner failure to make corrections.

- For HQS deficiencies that are the responsibility of the tenant and are not corrected within the prescribed time frames, the PHA must take prompt and vigorous action to enforce family obligations following program requirements.

- Compliance with this indicator is determined through quality control of files and records, in accordance with Table 10-1.  The number of failed units in the PHA's past fiscal year establishes the universe.

The PHA should establish the definition of deficiencies that will be considered emergency fail items and should put a procedure in place to record, track, and close violations within 24 hours of inspection or take abatement action.

Promptly following inspection, PHAs should issue violations letters for emergency fails to the responsible party.  This may be done by fax, courier, overnight mail, or regular mail and should be followed by personal contact.  PHAs should have a system to cover these circumstances on weekends and holidays when staff are not readily available to conduct reinspections.  Potential approaches include: phone calls to the tenant or owner within the 24 hour period to verbally

determine compliance, followed by a site reinspection the next business day; rotation of inspectors to cover holiday and Saturday reinspections; receipt by fax of owner/tenant certifications that corrections are made within the required time frame, or telephone confirmation to a voice mail system followed by a reinspection on the next business day.

Promptly following inspection, notices to correct routine violations should be issued and should state a date for compliance that allows time for corrections to be made and a reinspection to be conducted within the 30-day time frame.  Letters of violation should clearly state that failure to gain entry to the unit or failure to comply will result in abatement of assistance payments on the first of the month following the correction period.

Inspectors must identify the party responsible for each HQS violation listed on the inspection instrument so that proper notice can be sent to the owner and/or tenant for the appropriate items. This precludes abatement of owner rent when the violation(s) is the responsibility of the tenant. Housing assistance payments are never abated for tenant deficiencies.

The PHA must have a system to promptly identify units for which deficiencies have not been corrected within the required timeframe, in order to indicate abatement of rent and/or termination of assistance to the family.  (See Exhibit 10-10, *Sample Tracking Log for Emergency Inspections*.)  Termination of assistance procedures should be stated in the PHA administrative plan.  In order to meet the SEMAP requirement to "take prompt and vigorous action" for tenant violations the PHA should strictly follow these procedures when the family fails to correct HQS violations.

PHAs should monitor HQS enforcement on a regular basis (daily, weekly, or monthly) to guarantee that reinspections occur within the proper time frames.  PHAs may not penalize owners for PHA failure to conduct the reinspections on time.  However, if owners fail to comply or allow entry into the unit, the PHA should notify the owner that it will begin abatement in 30 days.

For fairness and consistency, PHAs should have an established policy and procedure for receiving and processing requests for HQS compliance deadline, including the conditions under which extensions will be granted.   It is not advisable to grant extensions without just cause, or to grant verbal extensions; this can be construed as circumvention of the SEMAP requirement.

The PHA must have a system to record the results of SEMAP quality control reviews of inspections.  At a minimum, the system should provide: the address of the unit, date of original failed inspection, responsibility for the deficiency (tenant or owner), date of reinspection, result(s) of the reinspection, date owner notified of abatement, actual date of abatement, any extensions to that date, and initiation and status of termination of tenancy.  The PHA should regularly monitor the tracking system to assure compliance.

Plaintiffs' MSJ Appx. 2007

**Indicator 11, Pre-Contract Inspections**

- PHAs must conduct initial inspections to determine that a unit passes HQS requirements on or before the effective date of the assisted lease and HAP contract.

- Scoring of this indicator is based upon the date of the passed inspection reported on the form HUD 50058 transmitted through MTCS.

The PHA should routinely ensure that all new units pass HQS inspection prior to lease and HAP execution. The staff person responsible for signing the HAP contract should review the file to determine whether the unit passed before the HAP contract effective date.

Monthly MTCS reports should be monitored by the PHA to ensure that the system accurately reflects the PHA's performance.

**Indicator 12, Annual Inspections**

- Each unit under HAP contract must be inspected at least annually and no more than 12 months following the most recent inspection.

- Scoring for this indicator is determined by data submitted to HUD for reporting in MTCS.

Following procedures described earlier in this chapter, the PHA should carefully determine the number of units to be scheduled for inspection in the upcoming SEMAP year.

Tracking systems and management reports should be in place to ensure that units are being inspected within the required 12-month period.

For purposes of this indicator, MTCS monitors the date of the last inspection of the unit to determine if it occurred within twelve months.  PHAs should exercise caution that the correct date is placed into the system.  The unit does not have to pass inspection within the time frame, but an inspection must occur.

Prompt scheduling is essential to getting all unit inspections conducted within required time frames.  PHAs should review their scheduling procedures to determine if other processes that may result in inspections not being completed on time, are linked to annual inspection, such as the recertification process or families that are searching for new units.  PHAs are also encouraged to streamline procedures and increase owner/tenant education to limit the number of units which are ready for inspection when scheduled.  This requires a rescheduled or follow-up inspection.

PHAs should consider decoupling inspection from recertifications to balance monthly inspector workload.  Annual inspections do not have to coincide with the recertification process. Inspections may be de-coupled from the recertification process and conducted by other methods such as by zip code, specific buildings or apartment complexes, census track or ownership.

**SAMPLE**

**EXHIBIT 10-1**

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Housing built before 1978 may contain lead-based paint.  Lead from paint, paint chips, and dust can pose health hazards if not managed properly.  Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling.  Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**

(a)   Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

     (i)   _____Known lead-based paint and/or lead-based paint hazards are present in the housing.  (Explain.)

     _____

     _____

     (ii)   _____Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)   Records and reports available to the lessor (check (i) or (ii) below):

     (i)   _____Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

     _____

     _____

     (ii)   _____Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgement** (initial)

(c)   _____Lessee has received copies of all information listed above.

(d)   _____Lessee has received the pamphlet *Protect Your Family from Lead in Your Home*.

**Agent's Acknowledgement** (initial)

(e)   _____Agent has informed the lessor of the lessee's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Lessor | Date | Lessor | Date |
| Lessee | Date | Lessee | Date |
| Agent | Date | Agent | Date |

**EXHIBIT 10-2**

## Sample Lead Paint Owner's Certification
## Housing Choice Voucher Program

The undersigned hereby certifies that the property located at: (give full address, include apartment number)

is in compliance with all housing quality standard (HQS) requirements related to lead-based paint as indicated below.

(Mark ALL appropriate boxes)

The described property, including dwelling units, common areas and exterior painted surfaces, has been found to be free of lead-based paint by a certified lead-based paint inspector.  The lead-based paint inspector's report is either attached or has already been provided to the PHA.

The described property was inspected by a certified lead-based paint inspector and lead-based paint was identified.  All identified lead-based paint has been removed from the property, and the reports of the lead-based paint inspector and the certified lead-based paint abatement supervisor are attached or have already been provided to the PHA.

Ongoing lead-based paint maintenance activities have been incorporated into regular building operations in accordance with 24 CFR 35.1355(a).

Corrective action to address lead-based paint hazards at the described property that were required by the PHA to meet HQS have been completed in accordance with all requirements established by 24 CFR Part 35, including:

The boxes below do not apply when paint stabilization is below de minimis levels.

The work was completed by person(s) trained to conduct lead-based reduction activities or was supervised by a certified lead-based paint abatement supervisor.

Occupants of the dwelling unit(s) and their belongings were protected during the course of the work.

The lead hazard worksite was properly prepared and maintained during the course of their work.

A person certified to conduct clearance examinations performed a clearance test and the results indicate that clearance was achieved.❑    Occupants have been properly notified of the results of any lead-based paint hazard evaluation and reduction, including the results of the clearance examination.

(Owner's Signature): _____

(Type or Print Name): _____

(Date): _____

Plaintiffs' MSJ Appx. 2010

**EXHIBIT 10-3**

**SAMPLE HAZARD REDUCTION NOTICE**
**(From Federal Register dated 9/15/99)**

**Summary Notice of Completion of Lead-Based Paint Hazard Reduction Activity**

Address/location of property or structure(s) this summary notice applies to:

_____

_____

Summary of hazard reduction activity:
Start and completion dates(s):_____

Activity locations and types:  List at least the housing unit numbers and common areas (for multi-family housing), bare soil locations, dust-lead locations, and/or building components (including type of room or space, and the material underneath the paint), and types of hazard reduction activities performed at the locations listed:

_____

_____

_____

Date(s) of clearance testing and/or soil analyses:_____

Locations of building components with lead-based paint remaining in the rooms, spaces or areas where activities were conducted:

_____

_____

Summary of results of clearance testing and soil analyses:
     (a)_____No clearance testing was performed.
     (b)_____Clearance testing showed clearance was achieved.
     (c)_____Clearance testing showed clearance was not achieved.

Contact person for more information about the hazard reduction:
     Printed name:_____
     Organization:_____
     Street and city:_____
     State:_____ZIP:_____Phone number:_____

Person who prepared this summary notice:
     Printed name:_____
     Signature:_____
     Date:_____
     Organization:_____
     Street and city:_____
     State:_____ZIP:_____Phone number:_____

Plaintiffs' MSJ Appx. 2011

**EXHIBIT 10-4**

### SUMMARY NOTICE OF LEAD-BASED PAINT RISK ASSESSMENT
### (From Federal Register dated 9/15/99)


Address/location of property or structures(s) this summary notice applies:

_____

_____

_____


Lead-based paint risk assessment description:

    Date(s) of risk assessment:_____

    Summary of risk assessment results:  (Check all that apply)

        (a)  _____No Lead-based hazards were found.

        (b)  _____Lead-based paint hazards were found.

        (c)  _____A brief summary of the findings of the assessment.


Summary of types and locations of lead-based paint hazards.   List at least the housing unit numbers and common areas (for multi-family housing), bare soil locations, dust-lead locations and/or building components (including type of room or space, and the material underneath the paint), and types of lead-based paint hazards found:


_____

_____

_____

_____


Contact person for more information about the risk assessment:


      Printed name:_____

      Organization:_____

      Street and City:_____

      State:_____ZIP:_____Phone number:_____


Person who prepared this Summary Notice:


      Printed name:_____

      Signature:_____

      Date:_____

      Organization:_____

      Street and city:_____

      State:_____ZIP:_____Phone number:_____

Plaintiffs' MSJ Appx. 2012

**EXHIBIT 10-4a**

**SAMPLE LETTER**

**ANNUAL INSPECTION APPOINTMENT LETTER**

Dear Owner:

In accordance with the housing choice voucher program requirements, the unit that you own at _____, <u>City and State</u>, must be inspected annually to continue participation in the program.

<u>Name of PHA</u> has scheduled this inspection for <u>date and time</u>.  It is your responsibility to make certain entry can be gained to the unit, common area spaces and heating facilities at the appointed time.   You or your tenant may be present for the inspection.

If you find it necessary to re-schedule this appointment, please do so <u>number of days,</u> in advance of the appointed date and notify your tenant of the changed date.  Please be advised that failure to allow the inspection or to reschedule the unit within a reasonable time period may result in the abatement of HAP payments and/or termination of the unit from the program.

It is very important that inspections be completed timely.  We recommend that you inspect your unit in advance of the scheduled inspection and correct any deficiencies which may cause the unit to fail inspection.

If you have any questions, please telephone _____at _____ during the hours of _____and _____ Monday through Friday.

Sincerely,


PHA Staff

cc:  Tenant

Plaintiffs' MSJ Appx. 2013

**EXHIBIT 10-4b**

**SAMPLE LETTER**

**SECOND NOTICE OF INSPECTION APPOINTMENT**

Dear Owner:

By letter of _____we notified you that the unit you own at _____was scheduled for the required annual inspection under the terms of your housing assistance payments (HAP) contract for the housing choice voucher program.

The inspection was not made for the following reasons:

_____No one was present to allow entry by the inspector.

_____You canceled the inspection, and have failed to re-schedule the unit.

You must contact _____at _____to reschedule the inspection of the unit by no later than _____.  Failure to re-schedule the unit or to allow entry on the appointed date will result in abatement of your HAP payments effective _____ and termination of the unit from the program on _____.

If you have any questions, please contact_____at_____during the hours of _____and _____, Monday through Friday.

Sincerely,

PHA Staff

cc:   Tenant
       Any other PHA staff needing this information

Plaintiffs' MSJ Appx. 2014

**EXHIBIT 10-5**

## SAMPLE LETTER

## DENYING REQUEST FOR INSPECTION

Dear Owner:

Name of Authority has received a request to inspect the unit you own at _____for participation in the housing choice voucher program. This request is denied for the following reasons:

_____Records indicate you have a repeated history of violations of program rules and regulations including repeated violations of HQS at properties you own.

_____Records indicate that you were notified to correct deficiencies related to lead-based paint at this unit and they were not made.  This unit may not be occupied by another assisted family until the terms of the previous notice have been met.

If you have questions, you may contact _____at_____during the hours of _____and _____Monday through Friday.

Sincerely,


PHA Staff

cc: Prospective tenant

**EXHIBIT 10-6**

## SAMPLE LETTER

## NOTICE - INITIAL INSPECTIONS

Dear Owner:

Please be advised that an inspection was made at the property that you own located at
_____.  The unit has been proposed for participation in the
housing choice voucher program.

The result of the inspection was:

_____The unit meets HQS and has been approved for inclusion in the program.  You will be
notified by _____shortly of the procedures which must be followed in order to
execute the lease and housing assistance payments contract.

_____The unit needs repairs to meet HQS.  A list of those repairs is attached.  We are unable to
process this unit for lease under the program until all HQS requirements have been met.

Please contact this office at _____when the unit is ready for reinspection or if
you have questions about this letter.

If we have not heard from you by _____, we will assume you do not
intend to make the needed repairs and we will notify the prospective tenant to locate another
suitable dwelling unit.

Sincerely,


PHA Staff

cc:  Prospective tenant

Plaintiffs' MSJ Appx. 2016

**EXHIBIT 10-7a**

## SAMPLE LETTER

### NOTICE OF HQS DEFICIENCIES - TENANT
### (Annual or Special Inspections)


Dear Tenant:

Please be advised that on _____an HQS inspection was made at the property where you reside.

The unit requires repairs to meet HQS.   A list of required repairs is attached.

These repairs must be completed by _____and you must telephone _____to schedule a re-inspection of the unit by _____. Failure to make the corrections and/or schedule a re-inspection within the required time frames will result in the termination of your program assistance effective _____.

NOTICE:   The PHA reserves the right to cite additional violations upon re-inspection of the unit should conditions at the time of re-inspection warrant this.

Thank you for your cooperation.

Sincerely,



PHA Staff

cc:  Owner
      (Other PHA staff needing to have this information)

Plaintiffs' MSJ Appx. 2017

**EXHIBIT 10-7b**

**SAMPLE LETTER**

**SAMPLE NOTICE OF HQS DEFICIENCY - Owner**
**(Annual, or Special Inspections)**

Dear Owner:

Please be advised that on _____an inspection was made at the property you own located at _____.

The unit needs repairs to correct HQS deficiencies.   A list of required repairs is attached. These repairs must be completed by_____.  You must telephone _____to schedule a re-inspection of the unit by_____.

Please be advised that failure to complete these repairs and/or have a re-inspection conducted by the specified time frames will result in abatement of your housing assistance payments on _____and termination of the HAP contract on _____.

NOTICE:   The PHA reserves the right to cite additional HQS violations upon re-inspection of the unit should conditions at the time of re-inspection warrant.

Thank you for your cooperation.

Sincerely,


PHA Staff

cc:  Tenant

**EXHIBIT 10-8**

### SAMPLE LETTER

### NOTICE OF ABATEMENT

Dear Owner:

On _____ you received a notice to correct HQS deficiencies at the unit you own located at _____.

To date, you have not complied with the terms of the notice of violation.   Effective _____ your housing assistance payments for this unit will be abated. Termination of the HAP contract will occur on _____.

If you have made the repairs and wish to have a re-inspection of the unit, you must do so by _____.   Provided the unit passes inspection by the date established in this paragraph, we will resume your payments on _____ and cancel the termination of the HAP contract.
If you have any questions or we can be of assistance, please telephone _____ between the hours of ____ and _____ Monday through Friday.

Sincerely,


PHA Staff

cc:  Tenant
       (PHA staff that need to know this).

Plaintiffs' MSJ Appx. 2019

**EXHIBIT 10-9**

### DOCUMENTING QUALITY CONTROL INSPECTIONS

| Address of Unit | Neighborhood or Zip Code | Date of Original Inspection | Original Inspector | Date of Quality Control Inspection | Inspections Result |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**EXHIBIT 10-10**

### EMERGENCY INSPECTION LOG

| Unit Address | Date of Inspection | Inspection Result | Tenant or Owner Violation | Date Written Notice Sent | Reinspection Date | Reinspection Result | Date of Abatement | Date Tenant Termination Processed |
|---|---|---|---|---|---|---|---|---|
| (These columns are necessary to track Emergency Inspection) | | | | | | | | |
| | | | | | | | | |

Optional columns include:

| Unit or Tenant ID # | Zip Code | Owner Name | Owner Address | Owner Telephone | Tenant Name | Tenant Telephone |
|---|---|---|---|---|---|---|
| | | | | | | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § |
| PLAINTIFFS | § § |
| v. | § § § |
| | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 131



# Excessive Heat Events Guidebook



EPA 430-B-06-005 | June 2006





United States Environmental Protection Agency
Office of Atmospheric Programs (6207J)
1200 Pennsylvania Avenue NW, Washington, DC 20460

Plaintiffs' MSJ Appx. 2023



### How to obtain copies

You can electronically download this document from EPA's Heat Island Site at http://www.epa.gov/heatisland/about/heatresponseprograms.html. To request free copies of this report, call the National Service Center for Environmental Publications (NSCEP) at 1-800-490-9198.

### For further information

For further information, contact Jason Samenow, 202-343-9327, samenow.jason@epa.gov, U.S. Environmental Protection Agency.

# Excessive Heat Events Guidebook



**EPA 430-B-06-005 | June 2006**

United States Environmental Protection Agency
Office of Atmospheric Programs (6207J)
1200 Pennsylvania Avenue NW, Washington, DC 20460

# Table of Contents

**Acknowledgments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**List of Acronyms and Abbreviations** . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Chapter 1   Overview** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.1   Why Care about EHEs? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.2   Guidebook Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.3   Guidebook Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Chapter 2   EHE Health Impacts and Risk Sources** . . . . . . . . . . . . . . 9
   2.1   Defining an EHE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   2.2   Health Risks Attributable to EHE Conditions . . . . . . . . . . . . . . . 10
   2.3   Quantifying the Health Impacts of EHEs . . . . . . . . . . . . . . . . . . . 11
       2.3.1   EHEs and U.S. mortality . . . . . . . . . . . . . . . . . . . . . . . . . 12
       2.3.2   EHEs and U.S. morbidity . . . . . . . . . . . . . . . . . . . . . . . . . 14
   2.4   Identifying Characteristics that Affect EHE Health Risks . . . . . . 16
       2.4.1   Meteorological conditions . . . . . . . . . . . . . . . . . . . . . . . . 16
       2.4.2   Demographic sensitivities . . . . . . . . . . . . . . . . . . . . . . . . 17
       2.4.3   Behavioral choices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
       2.4.4   Regional factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Chapter 3   Summary of Current EHE Notification and Response Programs** . . . . 21
   3.1   Elements in Select EHE Programs . . . . . . . . . . . . . . . . . . . . . . . . 21
       3.1.1   EHE prediction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
       3.1.2   EHE risk assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
       3.1.3   EHE notification and response . . . . . . . . . . . . . . . . . . . . 24
       3.1.4   EHE mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   3.2   Case Studies in the Development and Implementation of EHE Programs . . . . 26
       3.2.1   Philadelphia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
       3.2.2   Toronto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
       3.2.3   Phoenix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
   3.3   Evidence on the Performance of EHE Programs . . . . . . . . . . . . . 33

Plaintiffs' MSJ Appx. 2026

**Chapter 4**   **Recommendations for EHE Notification and Response Programs** . . .**35**

4.1   EHE Definition and Forecasting . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    4.1.1   EHE criteria must reflect local conditions . . . . . . . . . . . . . . . . . . . 35

    4.1.2   Ensure access to timely meteorological forecasts . . . . . . . . . . . . . . 36

4.2   Public Education and Awareness of EHE Risk Factors and Health Impacts . . . . . . 36

    4.2.1   Increase and improve EHE notification and public education . . . . . . . . 36

    4.2.2   Provide information on proper use of portable electric fans during EHEs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

4.3   EHE Response Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    4.3.1   Develop a clear plan of action identifying roles and responsibilities . . . . . 38

    4.3.2   Develop long-term urban planning programs to minimize heat island formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

4.4   EHE Response Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

4.5   Review EHE Programs to Address Changing Needs, Opportunities, and Constraints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

**Appendix A: Excessive Heat Event Resources Available on the Internet** . . . . . . . . **47**

**Appendix B: Use of Portable Electric Fans during Excessive Heat Events** . . . . . . . **49**

**Appendix C: Excessive Heat Events Guidebook in Brief** . . . . . . . . . . . . . . . . . **51**

Plaintiffs' MSJ Appx. 2027

Plaintiffs' MSJ Appx. 2028

# Acknowledgments

The primary agencies that partnered to support this guidebook's development are the U.S. Environmental Protection Agency (EPA), the Centers for Disease Control and Prevention (CDC), the National Oceanic and Atmospheric Administration's (NOAA's) National Weather Service (NWS), and the U.S. Department of Homeland Security (DHS).

This guidebook reflects the commitment of individuals who contributed their time and expertise to guide its development while evaluating a wide range of information. The key contacts at each of the partnering agencies were instrumental in the guidebook's development. Alan Perrin and Jason Samenow of EPA served as the guidebook's day-to-day project managers from its conceptualization through production. Jannie Ferrell and Mark Tew of NOAA's NWS, George Luber and Mike McGeehin of CDC, and Carl Adrianopoli of DHS similarly served as the principal guidebook contacts at their respective agencies, facilitating access to the respective staff and resources of those agencies. David Mills of Stratus Consulting managed the guidebook's technical development as the primary EPA consultant. He was greatly assisted in this work by Dr. Laurence Kalkstein of Applied Climatologists Inc. and the University of Delaware Center for Climatic Research. Dr. Kalkstein helped pioneer, and continues to lead, the development of integrated meteorological and human health models for forecasting excessive heat event (EHE) conditions. He also contributed a wealth of background information in the form of published articles about and insight into forecasting EHEs, quantifying their health impacts, and coordinating the development of EHE watch/warning systems.

Ultimately, though, this guidebook could not have been developed without the involvement of the members of the Technical Working Group (TWG) that was assembled to help identify and summarize essential information and to comment on drafts of the guidebook. Their collective experience designing, implementing, supporting, operating, and evaluating EHE notification and response programs throughout the United States and Canada was an invaluable resource. The members of the TWG are as follows:

- ► Nancy Day and Marco Vittiglio, *Toronto Public Health*
- ► Timothy Burroughs, Nikolaas Dietsch, Anne Grambsch, and Kathy Sykes, *EPA*
- ► Tony Haffer, Melinda Hinojosa, and Paul Trotter, *NOAA/NWS*
- ► Jerry Libby (retired) and Lawrence Robinson, *City of Philadelphia Department of Public Health*
- ► Christopher Payne, *Cincinnati Health Commissioner's Office*
- ► Liz Robinson, *Energy Coordinating Agency of Philadelphia*.

The TWG's guidance and perspective make this guidebook such a potentially useful resource. The members' enthusiasm and commitment of time to the guidebook's development are deeply appreciated by the partnering agencies and those involved with the guidebook's technical development.

Plaintiffs' MSJ Appx. 2029

Finally, extremely helpful comments were received on a final draft of the guidebook from colleagues and researchers contacted by members of the TWG. In addition to staff at the partnering agencies, these reviewers included:

Pamela Blixt, *City of Minneapolis Emergency Preparedness Coordinator*; Robert Davis and Chip Knappenberger, *New Hope Environmental Services*; Kristie Ebi, *Exponent Inc.*; Pat Finnegan, *Metropolitan Chicago Healthcare Council*; Robert French and Warren Leek, *Maricopa County*; Stephen Keach, *Perrin Quarles Associates*; Sari Kovats, *London School of Hygiene and Tropical Medicine*; Marc Rosenthal, *Yale University*; Jonathan Skindlov, *Salt River Project Water Resource Operations*; Steven Wallace, *University of California, Los Angeles Center for Health Policy Research*; and Scott Wright, *University of Utah*.

Plaintiffs' MSJ Appx. 2030

# List of Acronyms and Abbreviations

| | |
|---|---|
| CDC | Centers for Disease Control and Prevention |
| CSA | Canadian Standards Approved |
| DHS | U.S. Department of Homeland Security |
| EHE | excessive heat event |
| EMS | emergency medical service |
| EPA | U.S. Environmental Protection Agency |
| NOAA | National Oceanic and Atmospheric Administration |
| NWS | National Weather Service |
| PCA | Philadelphia Corporation for Aging |
| SMSA | standard metropolitan statistical area |
| SSC | spatial synoptic classification |
| TWG | Technical Working Group |
| UL | Underwriter Laboratories |

Plaintiffs' MSJ Appx. 2031

Plaintiffs' MSJ Appx. 2032

# Summary

## Introduction

Excessive heat events (EHEs) are and will continue to be a fact of life in the United States. These events are a public health threat because they often increase the number of daily deaths (mortality) and other nonfatal adverse health outcomes (morbidity) in affected populations. Distinct groups within the population, generally those who are older, very young, or poor, or have physical challenges or mental impairments, are at elevated risk for experiencing EHE-attributable health problems. However, because EHEs can be accurately forecasted and a number of low cost but effective responses are well understood, future health impacts of EHEs could be reduced. This guidebook provides critical information that local public health officials and others need to begin assessing their EHE vulnerability and developing and implementing EHE notification and response programs.

## Health impacts of EHEs

EHE conditions are defined by summertime weather that is substantially hotter and/or more humid than average for a location at that time of year. EHE conditions can increase the incidence of mortality and morbidity in affected populations. Recent examples of EHE health impacts include:

- More than 15,000 deaths in France alone (all of western Europe was affected) attributed to EHE conditions in August 2003

- More than 700 deaths attributed to EHE conditions in Cook County, Illinois, in July 1995

- Roughly 120 deaths attributed to EHE conditions in Philadelphia, Pennsylvania, in July 1993.

Concern over the potential future health impacts of EHEs follows research conclusions that EHEs may become more frequent, more severe, or both in the United States.

## Responding to EHE conditions

The potential for reducing future health impacts of EHEs in the United States is significant for several reasons.

First, meteorologists can accurately forecast EHE development and the severity of the associated conditions with several days of lead time. This provides an opportunity to activate established EHE notification and response plans or to implement short-term emergency response actions absent an existing plan.

Second, specific high-risk groups typically experience a disproportionate number of health impacts from EHE conditions. The populations that have physical, social, and economic factors and the specific actions that make them at high risk include:

- Older persons (age > 65)

- Infants (age < 1)

- The homeless

- The poor

- People who are socially isolated

Plaintiffs' MSJ Appx. 2033

➤ People with mobility restrictions or mental impairments

➤ People taking certain medications (e.g., for high blood pressure, depression, insomnia)

➤ People engaged in vigorous outdoor exercise or work or those under the influence of drugs or alcohol.

Identifying these high-risk groups in given locations allows public health officials to develop and implement targeted EHE notification and response actions that focus surveillance and relief efforts on those at greatest risk.

Third, broad consensus exists on the types of actions that will provide relief to those at risk during EHEs and help minimize associated health impacts. These actions include:

➤ Establishing and facilitating access to air-conditioned public shelters

➤ Ensuring real-time public access to information on the risks of the EHE conditions and appropriate responses through broadcast media, web sites, toll-free phone lines, and other means

➤ Establishing systems to alert public health officials about high-risk individuals or those in distress during an EHE (e.g., phone hotlines, high-risk lists)

➤ Directly assessing and, if needed, intervening on behalf of those at greatest risk (e.g., the homeless, older people, those with known medical conditions).

Experience in several North American cities has demonstrated that comprehensive and effective EHE notification and response programs can be developed and implemented at relatively low cost. These programs generally use available resources instead of creating EHE-specific institutions. This approach recognizes that short-term resource reallocations for EHEs are justified by the severity of their public health risks, the limited duration and frequency of the events, and the cost-effectiveness of the reallocations.

## Guidebook goals and next steps

This guidebook provides interested public health officials with enough background information on EHE risks and impacts to roughly assess potential local health risks from EHEs. In addition, it provides a menu of notification and response actions to consider when developing or enhancing a local EHE program.

The 2005 U.S. hurricane season was a stark reminder that inadequate public and private preparation and response to well-forecasted and well-understood extreme meteorological phenomena can have severe public health consequences.

The remaining public health challenge for EHEs is to develop and implement meaningful EHE notification and response programs that increase public awareness and lessen future adverse health impacts.

Plaintiffs' MSJ Appx. 2034

# Overview

EHEs can increase the number of deaths (mortality) and nonfatal outcomes (morbidity) in vulnerable populations, including older people, the very young, the homeless, and people with cognitive and physical impairments *(NOAA, 1995; American Medical Association Council on Scientific Affairs, 1997; Semenza et al., 1999)*. Climate research suggests that future health risks of EHEs could increase with an increase in EHE frequency and severity *(Meehl and Tebaldi, 2004)*. At the same time, demographic patterns including increasing urbanization will increase the size and percentage of the vulnerable U.S. population. To develop appropriate EHE responses, local officials need to understand the risks that these events pose to their populations and their response options. The intent of this guidebook is to address both needs.

## 1.1  Why Care about EHEs?

Studies estimate that the combined EHE-attributable summertime mortality for several vulnerable U.S. metropolitan areas is well above 1,000 deaths per year *(Kalkstein, 1997; Davis et al., 2003a)*. Although similar research to quantify EHE-attributable mortality in rural areas has not been completed, recent research *(Sheridan and Dolney, 2003)* found evidence of such an impact.

Despite the history of adverse health impacts, there is consensus that most of these outcomes are preventable *(CDC, 2004a)*. Lessening future adverse health outcomes from EHEs will require improving the awareness of public health officials and the general public about the health risks of EHEs while continuing to develop and implement effective EHE notification and response programs.

## 1.2  Guidebook Goals

This guidebook has two basic goals: first, to provide local health and public safety officials with the information they need to develop EHE criteria and evaluate the potential health impacts of EHEs, and second, to offer a menu of EHE notification and response actions to be considered.

To meet these goals, this guidebook is organized as follows.

**Chapter 2** provides information on EHE-attributable health impacts and sources of risk that affect the vulnerability of individuals and communities to EHEs. Specific information provided in the chapter includes:

- ➤ A general EHE definition

- ➤ Guidance on criteria for EHE forecasting and identifying EHE conditions

- ➤ Estimates of the number and rate of EHE-attributable summertime deaths for select U.S. metropolitan areas

- ➤ A review of the meteorological, demographic, behavioral, and regional characteristics that increase health risks from EHEs.

Plaintiffs' MSJ Appx. 2035

**Chapter 3** gives the menu of notification and response options that local officials can use as a starting point when considering whether to develop or enhance an EHE program. This menu consists of the following information:

- The components of current EHE notification and response programs

- Case studies of specific EHE response programs to understand their development and lessons learned

- A review of the efficacy of EHE response programs.

**Chapter 4** provides recommendations that should be considered when developing an EHE notification and response program. Specifically, this chapter contains:

- Guidance on specific actions to consider when planning to develop or enhance an EHE program

- Recommendations for coordinating EHE programs with other public health programs (e.g., ozone alert programs).

In addition, the guidebook includes a series of appendices with information that officials may want to incorporate in other materials or make available independent of the guidebook. This information includes:

- A partial list of resources for additional information on EHE-attributable health risks and impacts and details on EHE programs (**Appendix A**)

- Guidance on the personal use of portable electric fans during EHEs (**Appendix B**)

- A summary of specific actions people and communities can take in response to forecast EHE conditions to reduce the risk of experiencing heat-attributable health problems (**Appendix C**).

## 1.3  Guidebook Development

Other documents have summarized the health risks of EHEs, described the factors that increase an individual's health risk during these conditions, and recommended elements for EHE notification and response programs *(e.g., Basu and Samet, 2002; Bernard and McGeehin, 2004; CDC, 2004a,c; FEMA, 2005b; U.S. EPA, 2005)*.

This guidebook, however, is unique because it was developed as a collaborative effort among several of the principal federal agencies responsible for addressing EHEs: the Centers for Disease Control and Prevention (CDC), the National Oceanic and Atmospheric Administration's (NOAA's) National Weather Service (NWS), the U.S. Department of Homeland Security (DHS), and the U.S. Environmental Protection Agency (EPA) along with three other institutions with extensive experience developing and operating recognized EHE programs in the United States and abroad: the Philadelphia Health Department, Toronto Public Health, and the University of Delaware Center for Climatic Research.

Summarizing the collective insight and experience of the individuals from these organizations was facilitated through the participation of their staff in a Technical Working Group (TWG). The TWG helped shape the guidebook's content through regular group discussions and review of draft versions of the guidebook.

8                                    Excessive Heat Events Guidebook

**2**
# EHE Health Impacts and Risk Sources

This chapter first defines an EHE and reviews possible criteria for identifying EHE conditions, followed by a discussion of the range of EHE-attributable medical conditions, adverse health outcomes, and mortality estimates for several U.S. metropolitan areas. It also reviews the characteristics that can affect an individual's health risk and the incidence of adverse health outcomes in a population.

## 2.1 Defining an EHE

EHE conditions are defined by summertime weather that is substantially hotter and/or more humid than average for a location at that time of year. Because how hot it feels depends on the interaction of multiple meteorological variables (e.g., temperature, humidity, cloud cover), EHE criteria typically shift by location and time of year. In other words, Boston, Philadelphia, Miami, Dallas, Chicago, San Diego, and Seattle are likely to have different EHE criteria at any point in the summer to reflect different local standards for unusually hot summertime weather. In addition, these criteria are likely to change for each city over the summer. As a result, reliable fixed absolute criteria, e.g., a summer day with a maximum temperature of at least 90°F, are unlikely to be specified.

There are different ways to identify EHE conditions. Some locations evaluate current and forecast weather to identify EHE conditions with site-specific, weather-based mortality algorithms. Other locations identify and forecast EHE conditions based on statistical comparisons to historical meteorological baselines. For example, the criterion for EHE conditions could be an actual or forecast daily high temperature that is equal to or exceeds the 95TH percentile value from a historical distribution for a defined time period (e.g., the summer or a month-long window centered on the date).

*Figure 2.1* presents a hypothetical example that shows the difference in defining EHE conditions when using a seasonally adjusted relative temperature versus a fixed temperature criterion.

**Figure 2.1.**  An example illustrating the difference between a seasonally adjusted relative temperature threshold and a fixed absolute temperature threshold for defining EHE conditions. *Source: Personal communication, B. Davis, New Hope Environmental Services, August 2005.*



Plaintiffs' MSJ Appx. 2037

Representations of actual EHEs can help illustrate these conditions. During the summer of 2003, Western Europe experienced EHE conditions of unprecedented severity. *Figure 2.2* presents the June through August 2003 daily maximum temperature readings in Paris with the corresponding average daily maximum temperature from the historical record.

Although the June and July temperatures in *Figure 2.2* may not seem exceptional, the extent to which they generally exceeded the long-term average shows why Paris experienced EHE conditions. The period from August 3 to August 17, however, is notable for its absolute temperatures and its tremendous deviation from typical conditions. Reflecting the significant health risks of EHE conditions, France experienced roughly 15,000 heat-related deaths during this period *(Koppe et al., 2004)*.

**Figure 2.2.**   Actual (red line) vs. average (black line) daily maximum temperatures



### 2.2   Health Risks Attributable to EHE Conditions

Maintaining a consistent internal body temperature, generally 98.6°F, is essential to normal physical functioning *(American Medical Association Council on Scientific Affairs, 1997)*. EHE conditions stress the body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes.

*Table 2.1* lists some of the medical conditions directly attributable to excessive heat exposure, along with recommended responses.

EHE conditions can result in increases in the number of cases of other health problems as well. For example, EHEs can increase the number of patients experiencing circulatory system conditions. These additional problems come from the added strain on the heart, increasing circulation to regulate internal temperatures, or to overcome the effects of dehydration, which thickens the blood, making it harder for the heart to pump.

Plaintiffs' MSJ Appx. 2038

**Table 2.1.** Medical conditions directly attributable to excessive heat exposure

| Medical Condition | Symptoms | Responses |
|---|---|---|
| Heat cramps | Painful muscle cramps and spasms, usually in muscles of legs and abdomen. Heavy sweating. | Apply firm pressure on cramping muscles or gently massage to relieve spasm. Give sips of water; if nausea occurs, discontinue water intake. Consult with a clinician or physician if individual has fluid restrictions (e.g., dialysis patients). |
| Heat exhaustion | Heavy sweating, weakness, cool skin, pale, and clammy. Weak pulse. Normal temperature possible. Possible muscle cramps, dizziness, fainting, nausea, and vomiting. | Move individual out of sun, lay him or her down, and loosen clothing. Apply cool, wet cloths. Fan or move individual to air-conditioned room. Give sips of water; if nausea occurs, discontinue water intake. If vomiting continues, seek immediate medical attention. Consult with a clinician or physician if individual has fluid restrictions (e.g., dialysis patients). |
| Heat stroke (sunstroke) | Altered mental state. Possible throbbing headache, confusion, nausea, and dizziness. High body temperature (106°F or higher). Rapid and strong pulse. Possible unconsciousness. Skin may be hot and dry, or patient may be sweating. Sweating likely especially if patient was previously involved in vigorous activity. | Heat stroke is a severe medical emergency. Summon emergency medical assistance or get the individual to a hospital immediately. Delay can be fatal. Move individual to a cooler, preferably air-conditioned, environment. Reduce body temperature with a water mister and fan or sponging. Use air conditioners. Use fans if heat index temperatures are below the high 90s. Use extreme caution. Remove clothing. If temperature rises again, repeat process. Do not give fluids. |

*Sources: CDC, 2004a; Kunihiro and Foster, 2004; NWS, 2004.*

## 2.3 Quantifying the Health Impacts of EHEs

Quantifying the health impacts of EHEs is complicated by the differences in quantification methods and a lack of accurate data.

The most conservative quantification method counts only outcomes on EHE days where the attribution information (e.g., primary diagnosis, cause of death) lists excessive weather-related heat exposure or a condition unequivocally associated with excessive heat exposure, such as heat stroke. This approach underestimates the health impacts of EHEs because not all the heat-related cases will include an attribution that recognizes this impact. More inclusive methods quantify EHE health impacts based on increases in outcomes during EHE periods compared to long-term averages. But such approaches can be absolute and attribute all observed increases in outcomes to EHEs, overestimating the heat-related mortality. Alternatively, the approach can be partial and attribute only a portion of the observed increase in outcomes to EHEs based on professional judgment or the results of additional analyses such as regression.

Plaintiffs' MSJ Appx. 2039

### 2.3.1 EHEs and U.S. mortality

There are a number of methods for estimating the public health threat and impact of EHEs. Since these methods can have a significant impact on the resulting estimate, it is important to recognize their differences when reviewing information describing the public health burden of EHEs.

The most conservative estimate of EHE mortality counts only cases in which exposure to excessive heat is reported on a death certificate as a primary or contributing factor. Using this approach, it was estimated that extreme heat from weather conditions is, on average, responsible annually for 182 deaths in the United States *(CDC, 2002)*.

The conservative nature of this estimate due to the narrow criteria is recognized in the study itself *(CDC, 2002)*. The accuracy of this estimate would improve with widespread adoption of revised criteria for attributing a death to excessive heat exposure. Typically, medical examiners list heat exposure as a primary or contributing cause of death only if the core body temperature exceeds 105°F. In the revised criteria, a death also can be classified as heat-related if the person is "found in an enclosed environment with a high ambient temperature without adequate cooling devices and the individual had been known to be alive at the onset of the heat wave" *(Donoghue et al., 1997)*. Importantly, the National Association of Medical Examiners supports using these broader criteria, and medical examiners in several large cities (e.g., Philadelphia) have adopted them.

Alternative EHE mortality estimates come from analyses of daily urban summertime mortality patterns in the United States *(Kalkstein and Greene, 1997; Davis et al., 2003a)*. These studies first defined EHE conditions and then calculated the number of EHE-attributable deaths based on differences in daily deaths on EHE days compared to longer-term averages. Although differences in the time series, definitions of urban populations, and other analytical methods prevent an exact comparison of results from Kalkstein and Greene *(1997)* and Davis et al. *(2003a)*, their findings correspond closely [for details of the studies' methods and the comparison of results see accompanying background technical report *(Mills, 2005)*]. *Table 2.2* presents the estimates of heat-attributable excess deaths and mortality rates from these studies.

The results in *Table 2.2* are notable for several reasons. First, despite differences in methods and the locations evaluated, the studies' results fall in a narrow range of roughly 1,700-1,800 total heat-attributable deaths per summer. These estimates are roughly an order of magnitude greater than the comprehensive national annual average of 182 deaths with a listed cause of death of "excessive heat due to weather conditions" *(CDC, 2002)*. This difference highlights the importance of the method (i.e., excess incidence or attributed outcomes) used to quantify EHEs' health impacts. Although summing the results across different groups of locations minimizes some of the initial distinctions in the studies, some of the location-specific results in *Table 2.2* show that significant differences can result from applying different methods to essentially the same mortality and meteorological data.

Second, both studies' results show significant regional variation: EHEs have the greatest impact in the Northeast and Midwest and the least impact in the South and Southwest. This result is consistent with hypotheses that populations in the most vulnerable areas are not as acclimatized to elevated temperatures and that structures in less susceptible areas

Plaintiffs' MSJ Appx. 2040

**Table 2.2**   Estimates of heat-attributable deaths per summer and mortality rates in select U.S. metropolitan areas

| Standard Metropolitan Statistical Area (SMSA) | Deaths[1] (Estimated average summertime heat-attributable deaths from 1990 population) | Deaths[2] (Estimated average summertime heat-attributable deaths from 1990 population) | Mortality Rate[1] (Estimated heat-attributable deaths per 100,000, 1990s baseline) | Mortality Rate[2] (Estimated heat-attributable deaths per 100,000, 1990s baseline) |
|---|---|---|---|---|
| Birmingham | 42 | N/A | 5.00 | N/A |
| Providence | 47 | N/A | 4.14 | N/A |
| Hartford | 38 | N/A | 3.28 | N/A |
| St. Louis | 79 | 0 | 3.17 | 0.00 |
| Kansas City | 49 | 0 | 3.10 | 0.00 |
| Buffalo | 33 | 19 | 2.78 | 1.63 |
| Indianapolis | 36 | N/A | 2.61 | N/A |
| Memphis | 25 | N/A | 2.48 | N/A |
| Columbus | 33 | N/A | 2.45 | N/A |
| Minneapolis | 59 | 0 | 2.32 | 0.00 |
| Chicago | 191 | 193 | 2.32 | 2.34 |
| Philadelphia | 129 | 71 | 2.19 | 1.21 |
| Denver | 42 | 22 | 2.12 | 1.09 |
| Detroit | 110 | 124 | 2.12 | 2.39 |
| Greensboro | 22 | 0 | 2.10 | 0.00 |
| Nassau, New York City, Newark | 362 | 552 | 1.85 | 2.82 |
| Louisville | 17 | N/A | 1.79 | N/A |
| Boston | 96 | 56 | 1.76 | 1.03 |
| Pittsburgh | 39 | 40 | 1.63 | 1.69 |
| New Orleans | 20 | 30 | 1.56 | 2.31 |
| Tampa | 28 | 0 | 1.35 | 0.00 |
| Baltimore; Washington, D.C. | 84 | 40 | 1.25 | 0.59 |
| Cleveland | 29 | 23 | 1.01 | 0.80 |
| Dallas | 36 | 0 | 0.89 | 0.00 |
| Atlanta | 25 | 75 | 0.84 | 2.51 |
| Cincinnati | 14 | 0 | 0.77 | 0.00 |
| Portland | 9 | 32 | 0.50 | 1.76 |
| Los Angeles and Riverside | 72 | 216 | 0.50 | 1.50 |
| San Francisco | 28 | 138 | 0.45 | 2.21 |
| San Antonio | 4 | N/A | 0.30 | N/A |
| Houston | 7 | 0 | 0.19 | 0.00 |
| Seattle | 5 | 96 | 0.17 | 3.27 |
| Jacksonville | 0 | N/A | 0.00 | N/A |
| Miami, Fort Lauderdale | 0 | 0 | 0.00 | 0.00 |
| Phoenix | 0 | 6 | 0.00 | 0.30 |
| Salt Lake City | 0 | N/A | 0.00 | N/A |
| San Diego | 0 | N/A | 0.00 | N/A |
| Norfolk | N/A | 0 | N/A | 0.00 |
| Charlotte | N/A | 0 | N/A | 0.00 |
| **Total** | **1,810** | **1,733** | | |

Note: N/A, not applicable, refers to a metropolitan area not examined in one of the studies.

1. Kalkstein and Greene, 1997.

2. Davis et al., 2003a.

Plaintiffs' MSJ Appx. 2041

are better designed to accommodate elevated temperatures. However, fewer locations were evaluated in the South and Southwest because of the studies' population selection criteria, so support for these hypotheses remains qualified. This regional result is more evident in *Figure 2.3*, which presents the Kalkstein and Greene *(1997)* results along with a similar result for Toronto *(N. Day, personal communication, Toronto Public Health, 2005)*.

EHE-attributable mortality estimates from specific EHEs are also available:

➤ **Chicago, 1995, mid-July EHE:** The county coroner certified 465 heat-related deaths in Chicago (Cook County, Illinois) from July 11 to July 27, 1995 *(CDC, 1995)*. More than 700 deaths in Chicago were eventually attributed to this EHE *(e.g., Palecki et al., 2001)*. The difference reflects deaths directly attributed to heat by the medical examiner *(CDC, 1995)* and estimates of the total excess mortality attributable to the EHE based on studies of daily mortality patterns *(Palecki et al., 2001)*.

➤ **Philadelphia, 1993, early-July EHE:** The county coroner certified 118 heat-related deaths in Philadelphia from July 6 to July 14, 1993 *(CDC, 1994)*.

These estimates demonstrate that an EHE in the United States can easily be responsible for hundreds of deaths in a large metropolitan area.

### 2.3.2   EHEs and U.S. morbidity

EHE morbidity studies are relatively rare because of a lack of suitable daily time-series data. Further, when such studies are attempted, only the most severe morbidity outcomes (emergency room visits and hospitalizations) tend to be evaluated because of the limited number of locations where patients can be seen and be treated.

One of the few U.S. EHE morbidity studies examined Chicago hospital admissions during the July 1995 EHE. Semenza et al. *(1999)* calculated that this EHE was responsible for more than 1,000 hospital admissions, and anecdotal evidence strongly suggests that this EHE increased the incidence of Chicago emergency room visits. Specifically, the *Natural Disaster Survey Report: July 1995 Heat Wave (NOAA, 1995)* reported that on the second day of the EHE, only a few Chicago emergency rooms were directing ambulances to other facilities because of crowding (i.e., operating in bypass status), but by the fourth day, 18 city emergency rooms were doing so.

Plaintiffs' MSJ Appx. 2042

**Figure 2.3.** Estimated EHE-attributable mortality rates.



Note: Locations shown with a value of 0 may have deaths that are attributed to excessive heat exposure. This result simply means that there has not been a measurable increase in mortality from any cause during EHEs compared to other summertime periods.

Sources: Original mortality estimates from Kalkstein and Greene (1997). Converted to rates with the 1990 Census population estimates for the SMSAs. Toronto results from personal communication with N. Day, Toronto Public Health (2005).

Plaintiffs' MSJ Appx. 2043

In summary, available evidence suggests that EHEs increase morbidity incidence. More complete assessments of EHE impacts, including evaluations of EHE impacts on less severe outcomes, may require carefully designed retrospective surveys in affected populations.

## 2.4   Identifying Characteristics that Affect EHE Health Risks

Several factors can increase health risks during an EHE: the EHE's meteorological conditions, demographic characteristics, personal behavioral choices, and regional characteristics.

### 2.4.1   Meteorological conditions

When the weather gets hotter, the risk of losing control of one's internal temperature increases. Heat index tables such as the one in *Table 2.3* are commonly used to capture interactions among several meteorological variables to provide a measure of how hot it feels. Even heat index table results are sensitive, however, to the particular meteorological variables measured. For example, heat index results, including those in *Table 2.3*, often assume measurements are taken in a shaded location with light wind. As a result, most heat index tables also note that exposure to direct sunlight can increase heat index values by up to 15°F. These table notes may also state that exposure to hot dry winds can further increase health risks by promoting rapid dehydration, although a quantitative measure of these conditions' impact is not provided *(NWS Forecast Office, Pueblo, Colorado, 2004)*. Ultimately, a change in any meteorological variable that increases heat index values or promotes dehydration will increase the individual's health risk.

EHE conditions represent a "shock" that can overwhelm typical responses to elevated temperatures. All else being equal, the shock value and the health risks increase the earlier in the summer the EHE occurs *(Kalkstein and Davis, 1989; Sheridan and Kalkstein, 1998)* because residents adapt, to some degree, to warmer summer conditions over the season. Similarly, health risks increase with the duration of the EHE measured as the number of consecutive EHE days *(Greene and Kalkstein, 1996)* and the amount of time spent above minimum temperature thresholds *(Kalkstein and Davis, 1989)*.

**Table 2.3.**   Heat index values (°F)[3, 4]

| Temperature (°F) | Relative Humidity (%) | | | | | |
|---|---|---|---|---|---|---|
| | **90** | **80** | **70** | **60** | **50** | **40** |
| 80 | 85 | 84 | 82 | 81 | 80 | 79 |
| 85 | 101 | 96 | 92 | 90 | 86 | 84 |
| 90 | 121 | 113 | 105 | 99 | 94 | 90 |
| 95 | | 133 | 122 | 113 | 105 | 98 |
| 100 | | | 142 | 129 | 118 | 109 |
| 105 | | | | 148 | 133 | 121 |
| 110 | | | | | | 135 |

3. *Heat index values were not given for the temperature and relative humidity combinations that have blank cells.*

4. *Heat index values can be up to 15°F higher with exposure to direct sunlight. Heat index values assume calm wind conditions; hot dry winds can also increase heat index values.*

*Source: NWS Forecast Office, Pueblo, Colorado, 2004.*

Plaintiffs' MSJ Appx. 2044

### 2.4.2  Demographic sensitivities

Individuals possessing any combination of the following characteristics or conditions are at greater risk for experiencing an EHE-attributable adverse health outcome:

- **Physical constraints:** It is difficult for some people to increase their circulation and perspiration during an EHE to help them remain cool. This at-risk group includes infants, older people (age 65 and older, who may also be less likely to recognize symptoms of excessive heat exposure), the obese, the bedridden, those with underlying medical conditions (e.g., heart disease, diabetes), those taking certain medications (e.g., for high blood pressure, depression, insomnia), and individuals under the influence of drugs or alcohol.

- **Mobility constraints:** People with mobility constraints are at higher risk during EHEs if the constraints limit their ability to access appropriately cooled locations. This group includes the very young and the bedridden.

- **Cognitive impairments:** People with mental illnesses, with cognitive disorders, or under the influence of drugs or alcohol may be unable to make rational decisions that would help limit their exposure to excessive heat or to recognize symptoms of excessive heat exposure.

- **Economic constraints:** The poor may be disproportionately at risk during EHEs if their homes lack air conditioning or they are less likely to use available air conditioning because of the cost *(NWS, 2004)*. In addition, if the poor disproportionately reside in high crime areas, fear of crime can increase their risks by hindering their willingness to take appropriate responses [e.g., opening doors and windows for circulation, visiting cooling shelters *(American Medical Association Council on Scientific Affairs, 1997)*].

- **Social isolation:** Socially isolated individuals are less likely to recognize symptoms of excessive heat exposure. This can delay or prevent treatment and result in more serious health outcomes. Members of this group, which include the homeless and those living alone, may also be less willing or able to reach out to others for help.

### 2.4.3  Behavioral choices

In addition to demographic characteristics, the choices individuals make during an EHE can have a profound effect on the health risks they face. Examples of personal choices that can increase an individual's health risks during an EHE include the following *(American Medical Association Council on Scientific Affairs, 1997; CDC 2004a,c; NWS, 2004)*:

- **Wearing inappropriate clothing:** Heavy, dark clothing can keep the body hot and limit cooling from evaporation of perspiration. Clothing that exposes skin to the sun increases the risk of sunburn, which limits the potential for evaporative cooling.

- **Failing to stay adequately hydrated:** During EHE conditions, we rely heavily on perspiration to regulate our body temperature. Without enough water consumption, perspiration will be inadequate or even cease and body temperature will rise.

Plaintiffs' MSJ Appx. 2045

► **Consuming alcohol:** Alcohol is a diuretic and thus limits perspiration. It can also impair judgment and result in excessive exposure to the elevated temperatures.

► **Engaging in outdoor activities:** Any activities that increase exposure to the sun or generate additional body heat (e.g., attending outdoor events, exercising, outdoor labor) increase the amount of body heat that must be dissipated.

► **Eating inappropriate meals:** Eating hot and heavy (e.g., high-protein) foods will increase the metabolic rate and increase the amount of body heat that must be dissipated.

#### 2.4.4 Regional factors

Finally, regional characteristics can help determine an individual's health risks during EHEs. These characteristics include:

► **Geographic location:** Climate variability is largely a function of location, and increased variability has been associated with elevated heat-attributable mortality rates *(Chestnut et al., 1998)*.

► **Urbanization and urban design:** As buildings, especially those with dark roofs, and dark paving materials replace vegetation in urban areas, the heat absorbed during the day increases and cooling from shade and evaporation of water from soil and leaves is lost. Urban areas can also have reduced air flow because of tall buildings, and increased amounts of waste heat generated from vehicles, factories, and air conditioners. These factors can contribute to the development of an urban heat island, which has higher daytime maximum temperatures and less nighttime cooling than surrounding rural areas (see *Figure 2.4*). Urban heat islands can increase health risks during EHEs by increasing the potential maximum temperature residents are exposed to and the length of time that they are exposed to elevated temperatures.

► **Residential location:** Residents on the upper floors of buildings will feel the effects of rising heat. This can elevate room temperatures and make it more difficult to maintain a consistent internal temperature if air conditioning is not available or is not used, or if ventilation is restricted.



**Figure 2.4.** Impact of the urban heat island on ambient temperatures.

*Source: U.S. EPA, 2006.*

Plaintiffs' MSJ Appx. 2046

*Table 2.4* summarizes the factors that increase the risk of an individual getting sick or dying from an EHE.

**Table 2.4.**   Factors that increase an individual's risk of experiencing an EHE-attributable adverse health outcome

| Meteorological Characteristics |
| --- |

➤ Increased temperature

➤ Increased relative humidity

➤ Dry, hot winds

| Demographic Characteristics |
| --- |

➤ Physical constraints (including underlying medical conditions)

➤ Mobility constraints

➤ Cognitive impairments

➤ Economic constraints

➤ Social isolation

| Behavioral Choices |
| --- |

➤ Wearing inappropriate clothing

➤ Failing to stay adequately hydrated

➤ Consuming alcohol

➤ Engaging in outdoor activities

➤ Eating heavy and/or hot foods

| Regional Characteristics |
| --- |

➤ Living in an area with a variable climate

➤ Living in an urban area

➤ Living on the upper floors of buildings

Plaintiffs' MSJ Appx. 2047

Plaintiffs' MSJ Appx. 2048

# 3   EHE Notification & Response Programs

Effective EHE notification and response programs draw on available local resources and recognize local constraints to minimize increases in morbidity and mortality during EHEs. As a result, effective EHE notification and response programs can vary.

This chapter summarizes the current range of observed response actions to EHE conditions. Not all of these actions will be feasible or appropriate for every location. This summary is intended to provide parties wanting to develop or enhance an EHE notification and response program with a "menu" of possible actions to consider.

This summary has a number of caveats. First, the reviewed EHE programs were selected to provide an illustrative rather than all-inclusive set of notification and response actions. As a result, specific actions that are important components of other effective EHE programs may have been omitted. Second, our exclusion of specific actions in this summary is not a judgment on their potential benefit. In fact, developing and evaluating notification and response actions in response to local conditions is strongly encouraged.

This chapter first summarizes actions incorporated in the EHE programs we reviewed. This is followed by narratives that offer insight into how and why the reviewed programs were developed, and summarize critical lessons their administrators have learned over time. The chapter also describes several short-term responses that the city of Phoenix, Arizona, implemented during the EHE in the southwestern and central United States in July 2005. These Phoenix responses are included to highlight actions that can be taken with relatively short notice to address exceptional EHEs even if a formal EHE program has not been developed. Finally, the chapter reviews evidence from studies that have attempted to quantify the impact of EHE notification and response programs. Although limited, such studies provide some perspective on the potential benefits of EHE notification and response programs.

## 3.1   Elements in Select EHE Programs

On the following page, *Table 3.1* summarizes the actions Philadelphia and Toronto incorporated in their EHE notification and response programs. These programs were selected because they are widely recognized as benchmarks for those considering developing a comprehensive EHE program.

Following *Table 3.1*, the individual elements are described in greater detail.

Plaintiffs' MSJ Appx. 2049

**Table 3.1.** Summary of confirmed EHE program elements in Philadelphia and Toronto

| Program elements | Philadelphia[5] | Toronto[6] |
|---|:---:|:---:|
| **Prediction**   see 3.1.1, p. 23 ▶ | | |
| Ensure access to weather forecasts capable of predicting EHE conditions 1-5 days in advance | ✓ | ✓ |
| **Risk assessment**   see 3.1.2, p. 23 ▶ | | |
| Coordinate transfer and evaluation of weather forecasts by EHE program personnel | ✓ | ✓ |
| Develop quantitative estimates of the EHE's potential health impact | ✓ | ✓ |
| Use the broader criteria to identify heat-attributable deaths | ✓ | ✓ |
| Develop information on high-risk individuals | ✓ | |
| Develop an accessible record on facilities and locations with concentrations of high-risk individuals | ✓ | ✓ |
| **Notification and response**   see 3.1.3, p. 24 ▶ | | |
| Coordinate public broadcasts of information about the anticipated timing, severity, and duration of EHE conditions and availability and hours of any public cooling centers | ✓ | ✓ |
| Coordinate public distribution and broadcast of heat exposure symptoms and tips on how to stay cool during an EHE | ✓ | ✓ |
| Operate informational phone lines that can be used to report heat-related health concerns | ✓ | ✓ |
| Designate public buildings or specific private buildings with air conditioning as public cooling shelters and provide transportation | ✓ | ✓ |
| Extend hours of operation at community centers with air conditioning | ✓ | |
| Arrange for extra staffing of emergency support services | ✓ | |
| Directly contact and evaluate the environmental conditions and health status of known high-risk individuals and locations likely to have concentrations of these individuals | ✓ | ✓ |
| Increase outreach efforts to the homeless and establish provisions for their protective removal to cooling shelters | ✓ | ✓ |
| Suspend utility shutoffs | ✓ | ✓ |
| Reschedule public events to avoid large outdoor gatherings when possible | ✓ | |
| **Mitigation**   see 3.1.4, p. 26 ▶ | | |
| Develop and promote actions to reduce effects of urban heat islands | Not evaluated | |

5. *NOAA, 1995; Kalkstein, 2002.*

6. *Kalkstein, 2002; personal communications, M. Vittiglio and N. Day, Toronto Public Health, 2005.*

Plaintiffs' MSJ Appx. 2050

### 3.1.1  EHE prediction

▶ **Ensure access to weather forecasts capable of predicting EHE conditions 1-5 days in advance**

Forecasting the development and characteristics of an EHE is a critical element of both EHE risk assessment and notification and response activities. In the United States, NWS forecasts provide national coverage, so any location could incorporate this element into an EHE program. Toronto and Philadelphia both use a sophisticated, air mass-based heat health system developed by the Center for Climatic Research at the University of Delaware to evaluate meteorological forecast data in terms of the potential to increase the number of daily deaths above average levels *(Sheridan and Kalkstein, 2004)*.

### 3.1.2  EHE risk assessment

▶ **Coordinate transfer and evaluation of weather forecasts by EHE program personnel**

In some locations, EHE program personnel may need to review forecast data to determine whether location-specific criteria for EHE conditions are satisfied and, potentially, how the forecast conditions match with any established EHE severity criteria. Establishing forecast transfer and evaluation protocols involves specifying under what conditions forecasters (e.g., the NWS) forward information to local officials (and confirm receipt) and identifying who within the EHE program reviews and evaluates the information. Alternatively, electronic systems can be established to retrieve and review forecast data from meteorologists and notify EHE program personnel if certain criteria are satisfied.

▶ **Develop quantitative estimates of the EHE's potential health impacts**

Several locations with EHE notification and response programs, including Philadelphia and Toronto, have integrated heat health watch/warning systems that use meteorological forecast data as inputs to health impact models, which identify when forecast conditions could result in excess mortality and then estimate the potential number or probability of heat-attributable deaths *(Sheridan and Kalkstein, 2004)*. These quantitative health impact estimates are then used in both cities to determine if and what type of heat emergency is declared. These determinations affect the type and scope of notification and response activities that will be implemented.

▶ **Use the broader criteria to identify heat-attributable deaths**

Medical examiners can use the criteria in Donoghue et al. *(1997)* to define heat-attributable deaths and to provide the public with more accurate reporting of an EHE's health impacts. This information can increase public awareness and appreciation of the health risks of the conditions, which may improve compliance with recommended actions.

▶ **Develop information on high-risk individuals**

Recognizing that some individuals have an elevated risk facilitates notifying and responding to these individuals (e.g., older individuals, the homeless) to achieve the greatest public health benefit for a given resource commitment. Easily accessible contact information for these individuals during an EHE can help the program

Plaintiffs' MSJ Appx. 2051

prioritize assessment and intervention efforts. In some locations such as Chicago, the development of information on high-risk individuals has been expanded beyond persons known to public agencies. It includes people and organizations who can identify high-risk individuals so they can be a part of any active assessment and intervention program efforts.

▶ **Develop an accessible record of facilities and locations with concentrations of high-risk individuals**
A database or list of high-risk facilities and locations would complement a list of high-risk individuals. This list could help prioritize active assessment efforts during an EHE (e.g., visiting retirement homes) to coordinate EHE notification activities through combinations of fax, email, or telephone contact trees. For example, in Toronto, more than 800 community agencies are notified of EHE conditions through a fax/call-out tree.

### 3.1.3  EHE notification and response
Coordinate public broadcasts of information about the anticipated timing, severity, and duration of EHE conditions, and availability and hours of any public cooling centers

Effective public notification of forecast EHE conditions helps eliminate the risk of an EHE taking a population by surprise. More specifically, notifying the public of anticipated EHE conditions will enable many residents to prepare and will enable public assessment and intervention actions to concentrate on known high-risk individuals and locations. Likewise, advance public notification about the availability of cooling centers will increase the likelihood that at-risk individuals can take advantage of these services.

▶ **Coordinate public distribution and broadcast of heat exposure symptoms and tips on how to stay cool during EHEs**
Publicly broadcasting cooling tips and symptoms of excessive heat exposure will complement similar broadcasts about forecast EHE conditions and help residents develop appropriate EHE responses (e.g., seek air-conditioned locations, minimize direct sun exposure, reschedule outdoor gatherings). When possible, this action would include providing this information before and throughout the summer to public meeting areas (e.g., churches, recreation centers, libraries, schools), arranging periodic broadcasts through available media, and developing EHE Internet sites.

▶ **Operate informational phone lines that can be used to report heat-related health concerns**
Telephone help lines give real-time advice and information that can help people stay safe and avoid serious outcomes. This phone system either can be activated when an EHE is forecast (e.g., Philadelphia's or Toronto's Heat Lines), or can be a more general, full-time system (e.g., a 311 line) staffed during EHEs by personnel with the information and ability to access and direct other intervention resources (e.g., emergency medical staff) as needed.

Plaintiffs' MSJ Appx. 2052

▶ **Designate public buildings or specific private buildings with air conditioning (e.g., shopping malls, movie theaters) as public cooling shelters and provide transportation if necessary**

Spending time in an air-conditioned environment during an EHE is one of the most effective means of reducing one's risk of overheating. By designating specific public buildings with air conditioning as cooling shelters, and by providing information on large private buildings with air conditioning where the public can freely congregate (e.g., shopping malls and movie theaters), local officials can increase the awareness and use of these resources to minimize an EHE's health impacts. Providing free public transportation to those locations during an EHE also recognizes that many with the greatest need for the shelters may have limited access to personal transportation and limited financial resources.

▶ **Extend hours of operation at community centers with air conditioning**

Many of those at greatest risk during an EHE may already frequently visit specific air-conditioned public locations (e.g., child care and senior centers). Extending the hours of operation at these and other public locations with air conditioning during EHEs increases the opportunity for high-risk individuals to spend time in an air-conditioned environment.

▶ **Arrange for extra staffing of emergency support services**

EHEs will place additional burdens on emergency medical and social support services through increased activity focused on preventing adverse health outcomes and increased need for medical services. Increasing the staffing of emergency medical and social support services in response to an EHE forecast increases the opportunity to avert some outcomes with intervention and assessment activities or at least have them addressed at an earlier and less severe stage by preventing the emergency medical system from becoming overwhelmed.

▶ **Directly contact and evaluate the environmental conditions and health status of known high-risk individuals and locations likely to have concentrations of these individuals**

High-risk individuals need to be contacted directly and, preferably, observed several times a day during EHEs to ensure that cooling tips are being followed (e.g., fluids are being consumed, appropriate clothing is being worn) and that any symptoms of overexposure are recognized and alleviated as early as possible. This labor-intensive action is offset by a reduction in the number and severity of adverse health outcomes among the high-risk population. The individuals to be contacted and locations to be visited would be identified in the risk assessment component of the EHE program *(see Section 3.1.2)*.

▶ **Increase outreach efforts to the homeless and establish provisions for their protective removal to cooling shelters**

The homeless are vulnerable during EHEs, so additional effort must be devoted to homeless outreach and evaluation during an EHE, especially during the day. This increased outreach effort should be supported by authorization for officials to move individuals believed to be experiencing medical difficulties or at extreme risk to cooling shelters for observation and treatment.

Plaintiffs' MSJ Appx. 2053

▶ **Suspend utility shutoffs**

Suspending utility service during an EHE could significantly increase the risk of exposure to elevated temperatures. As a result, many local governments require local utilities to suspend shutoffs during EHEs if they do not already have their own shutoff suspension guidelines. However, suspending utility shutoffs during an EHE does not ensure that at-risk individuals with access to air conditioning will use it.

▶ **Reschedule public events to avoid large outdoor gatherings, when possible**

When an EHE is forecast, there are likely to be previously scheduled outdoor activities involving large gatherings of individuals (e.g., youth league games, outdoor camps, concerts). If these activities take place as scheduled, many people may experience significant heat exposure. To the extent that local officials have control over how these events proceed (e.g., through permits or use of facilities), efforts should be made to reschedule the event or, when rescheduling is not feasible, require more medical staff and "cool zones" for attendees.

#### 3.1.4 EHE mitigation

▶ **Develop and promote actions to reduce effects of urban heat islands**

Urban heat islands can increase daytime temperatures and limit nighttime cooling. This can increase the severity and duration of urban residents' exposure to high-heat conditions and increase their risk for experiencing a heat-attributable adverse health outcome. Programs and actions that increase urban vegetation and the reflectiveness of urban surfaces help address this problem.

## 3.2 Case Studies in the Development and Implementation of EHE Programs

This section uses case studies from Philadelphia, Toronto, and Phoenix to show how different forces can drive the development and implementation of EHE notification and response programs and summarizes the lessons learned over time in these locations. These insights are especially useful because these programs cover a broad geographic spectrum and reflect varying degrees of active program coordination.

### 3.2.1 Philadelphia

#### Overview

Philadelphia's EHE notification and response program is often viewed as a benchmark for integrated, urban EHE programs. Philadelphia has a long history of EHE impacts, with references to heat-attributable deaths recorded since colonial times. The development of this program demonstrates how an exceptional meteorological event can combine with seemingly minor bureaucratic adjustments to create significant public interest and support for an EHE notification and response program.

This EHE program's development also demonstrates the importance of institutional support and shows how response actions can be matched to program partners based on their areas of expertise. Finally, the program highlights the benefits of incorporating a system for active program review and adjustment to respond to needs, constraints, and opportunities as they arise.

Plaintiffs' MSJ Appx. 2054

**Development of Philadelphia's EHE program**

Philadelphia's EHE notification and response program is a direct response to observable public health impacts from specific EHEs combined with the public recognition of these risks and institutional support to develop an effective response to avoid similar outcomes in the future.

In the summer of 1991, more than 20 deaths in Philadelphia were attributed to excessive heat exposure. In response, the city established and began to convene meetings of a Heat Task Force under the direction of Health Department staff. The Health Department identified original task force participants by informally assessing public and private organizations that served at-risk individuals during an EHE or provided Philadelphia with critical infrastructure and medical services (e.g., electric and water utilities and emergency medical service providers).

The Heat Task Force continued to meet through the spring of 1993, but had made little progress in developing what would be recognized as an EHE notification and response program. Then, from July 4 to July 14, 1993, Philadelphia experienced EHE conditions characterized by minimum daily high temperatures of at least 90°F. By July 6, the risks were apparent and publicly recognized as the city health commissioner announced that people were dying because of EHE conditions.

At the same time, informal discussions between Health Department staff and Southeastern Pennsylvania Red Cross board members led to the establishment of the *Heatline*, a telephone hotline, to handle calls from residents with heat-related questions and concerns. The *Heatline*, which represented the extent of the city's direct response actions to the EHE, operated for five days, and its number was widely reported by local media.

Perhaps the most critical aspect of the July EHE, in terms of its contribution to the development of the current EHE program, was that the city medical examiner broke from requiring a core body temperature in excess of 105°F for listing a death as heat related. Instead, deaths were listed as heat related if the core temperature criterion was satisfied or if a body was "found in an enclosed environment with a high ambient temperature without adequate cooling devices and the individual had been known to be alive at the onset of the heat wave" *(Donoghue et al., 1997)*.

This change resulted in the medical examiner classifying 105 deaths during the July 1993 EHE as heat related. In contrast, for all of July, New York City and Washington, D.C., which had experienced similar meteorological conditions, reported three and two heat-related deaths, respectively, using solely the core temperature criterion.

This finding and its public reporting made the impact of excessive heat in Philadelphia a topic of considerable local and national media interest, including references to Philadelphia as the "Heat Death capital of the world." In addition, the contrast between the number of heat-related deaths reported in Philadelphia and the totals from surrounding counties and other urban centers led to a request by state and other officials for a CDC investigation into the appropriateness of the coding criterion the Philadelphia medical examiner used. The resulting investigation ultimately concluded that the criterion was appropriate and the associated estimates of heat-attributable mortality were accurate.

Plaintiffs' MSJ Appx. 2055

Following the CDC investigation, and with increased public attention on the health risks of EHE conditions, staff at Philadelphia's Health Department became aware of work under the direction of Dr. Laurence Kalkstein of the University of Delaware to develop a system that would identify weather conditions expected to increase daily mortality. Ultimately, this interest led to the development by the summer of 1995 of a computerized system capable of forecasting EHE conditions up to two days in advance.

Over this period, spurred by the events of 1993, the Philadelphia Heat Task Force began preparing EHE response plans that identified lead agencies, secured formal commitments of support from relevant departments, and worked on developing a system for integrated communications between program participants.

As the July 1995 EHE developed in the Midwest and the scope of its health impact began to emerge (eventually more than 700 deaths in Chicago would be classified as heat related), the Philadelphia Hot Weather–Health Watch/Warning System was announced at a meeting with EPA and Philadelphia Health Department officials. This system was initially implemented as the EHE moved eastward into Philadelphia.

**Philadelphia's Hot Weather-Health Watch/Warning System response actions**
Philadelphia's initial EHE program implemented combinations of the following actions depending on the predicted severity of the EHE *(NOAA, 1995; Kalkstein et al., 1996)*:

- ► **Media announcements:** Local news media were notified of any EHE notification made by the health commissioner. Media were also given background information on how to minimize exposure to heat during the event and encouraged to broadcast it as part of any heat-related stories.

- ► **Buddy system advocacy:** Media messages included recommendations for friends, relatives, neighbors, and block captains (see discussion below) to check on local high-risk residents (e.g., sick and older individuals) throughout the day during the event.

- ► **Heatline activation:** The same phone system staffed by the Red Cross that was developed for the 1993 EHE was part of the formal program rollout.

- ► **Home visits by Health Department staff** (currently a county sanitarian and nurse make up each field team)**:** Individuals were identified from calls received on the Heatline.

- ► **Halt to service shutoffs:** Agreements were reached with the respective utilities that electrical and water service would not be shut off for nonpayment during periods for which the Health Department issued a high heat warning.

- ► **Increased emergency medical service staffing:** Increased numbers of staff with the city's Fire Department and Emergency Medical Services were on duty for the duration of the high heat period.

- ► **Increased outreach to the homeless:** Activities that involved identifying homeless individuals and providing shelter were extended to daytime hours to minimize their exposure to the most severe conditions.

Plaintiffs' MSJ Appx. 2056

➤ **Cooling shelters/senior refuge:** Hours of operation at air-conditioned senior centers were extended to provide a refuge for those otherwise lacking access to air conditioning.

➤ **Outreach:** The Heatline phone number was displayed on the Crown Lights display in downtown Philadelphia (an electronic billboard on top of the Philadelphia Electric Company building that is visible over a large area).

Two notable aspects of the Philadelphia Watch/Warning System that warrant additional discussion are its use of block captains and its use of field assessment teams from the Health Department to evaluate high-risk individuals during EHEs.

Philadelphia's block captains are a critical point of interaction between the public and the Health Department during EHEs. Block captains are volunteers elected by residents of their block to help coordinate neighborhood improvement projects with the city. Philadelphia currently has about 5,000 block captains. They can both identify and evaluate the health status of high-risk and hard-to-reach individuals in their residential area during an EHE. Although block captains are not required to contact specific individuals during a declared EHE, anecdotal evidence suggests that many do. Their actions most likely benefit others and, during declared heat events, news crews frequently record and broadcast block captains checking on the status of high-risk individuals in their area, spreading the message to check on those at risk.

The second notable aspect of Philadelphia's program is its coordinated use of field teams composed of city Health Department staff in follow-up visits to at-risk individuals identified from *Heatline* calls. Teams assembled during a declared heat event currently consist of a sanitarian and a nurse who have been temporarily reassigned from their typical duties. This reallocation of staff reflects a belief that a more immediate and more significant public health risk is being addressed.

### Adjustments and lessons learned

Since 1995, a number of relatively minor changes have been made in the response elements of Philadelphia's EHE program, including the following:

➤ Transferring the *Heatline*'s operation from the Red Cross to the Philadelphia Corporation for Aging (PCA) and using the PCA's *Senior Line* number to double as the *Heatline*. When EHEs are announced, the hours of operation for the *Senior Line/Heatline* are expanded from between 8 A.M. and 5 P.M. to between 8 A.M. and midnight.

➤ Adding nurses to the on-call *Heatline* staff to handle calls with specific medical questions.

➤ Mailing heat information to block captains to distribute in their areas.

➤ Increasing the forecast period for the spatial synoptic classification (SSC)-based Heat Health Watch Warning System from 2.5 days (60 hours) to 5.0 days (120 hours).

Plaintiffs' MSJ Appx. 2057

Philadelphia's experience demonstrates the importance of public recognition of EHE health risks and of continued support from upper levels of government for developing an EHE notification and response program. The city's program also shows that matching responsibilities of program elements with program partners who already perform similar tasks is critical for achieving a wide range of response actions. Specific examples of this matching in the Philadelphia program include shifting the *Heatline* from the Red Cross to the PCA, staffing field teams with temporarily reassigned Health Department personnel, and incorporating the city's existing block captain program to create a community-based buddy system capable of evaluating the status of high-risk individuals.

### 3.2.2  Toronto

#### Overview

Toronto is one of several North American locations with an EHE notification and response program that is driven by calculations of potential excess mortality or mortality probability based on forecast meteorological conditions. Toronto Public Health's EHE program uses these results to determine when heat warnings should be issued and what type of message to communicate.

Toronto's EHE program is of special interest because it evolved primarily as a proactive, precautionary response to a perceived public health risk by local politicians. This is in contrast to most of the other highly active and integrated programs, which typically originated as responses to EHEs that triggered recognizable increases in daily mortality and morbidity. In addition, Toronto's program is an example of how an effective program can be developed by drawing general lessons from other locations and tailoring implementation to respond to local opportunities and challenges. Finally, the routine, structured process of performance review, needs assessment, and adjustment of the Toronto EHE program is noteworthy.

#### Development of the Toronto EHE program

The origins of Toronto's EHE program can be traced to 1998 and the Mayor's Task Force on Homelessness. This effort established a lead role for Toronto Public Health to identify and develop responses to the health issues faced by the city's homeless. In the spring of 1999, the Task Group asked Toronto Public Health to establish temperature thresholds that would be used to initiate health alerts and trigger additional homeless interventions (e.g., increasing daytime staff and efforts to get the homeless indoors).

To address this task, Toronto Public Health staff reviewed information from several EHE programs in the United States, including those in Philadelphia and Chicago. This review increased awareness of the demographic and physical characteristics that increase EHE vulnerability and highlighted the potential for an effective EHE program. Most importantly, this review increased awareness among officials that, although the homeless were especially vulnerable to EHE conditions, the presence of other high-risk subpopulations meant that EHEs should be recognized as a much larger threat to public health.

Plaintiffs' MSJ Appx. 2058

Development of an EHE prediction system similar to the one used in Philadelphia and several other U.S. cities began in 2000. The Toronto prediction system was completed and became active on June 18, 2001, in time to assist in forecasting the EHE that occurred in August of that year. Initial program elements focused on issuing a media release any time EHE conditions were forecast that contained information about the health risks of the conditions and appropriate responses. These announcements were also used to trigger increased intervention activities directed at the homeless population.

With the program's development, Toronto Public Health also established a Hot Weather Response Committee to develop, monitor, and update its Hot Weather Response Plan. The committee is a partnership of representatives from various city departments and agencies working with potentially vulnerable populations. Every year, before the hot season, the committee discusses and finalizes the contributions and roles each agency will assume during the coming summer. Using a call-out tree, Toronto Public Health coordinates the plan and notifies the committee and a list of more than 800 agencies of an EHE. Each agency and city department implements its part of the plan.

**Adjustments and lessons learned**

In the fall of each year, the Hot Weather Response Committee meets to assess the performance of the system and program. The focus of this meeting is on identifying areas and items that could be added or improved to enhance the program's performance. This active review process has resulted in these changes to the program:

- ► Having the Red Cross operate an informational heat-health telephone line during declared heat advisories

- ► Coordinating the city's emergency medical service (EMS) with the health line to address specific medical questions, conduct follow-up visits with all callers to evaluate conditions in their residences, and to take individuals to cooling centers when needed

- ► Providing functional drinking water fountains in city parks

- ► Extending the hours of operation of city pools

- ► Providing transit tokens to those who have been evaluated by street patrol teams and are found to be in need of a cooling center.

Less formal program adjustments over time have included coordinating with other city officials to evaluate and, when necessary, relax enforcement of certain ordinances to allow compliance with cooling tips provided during EHEs. For example, the city relaxes enforcement of late-night park closure rules, because many residents who lack air conditioning visit Toronto's parks at night during EHE conditions.

Finally, a critical component of the Toronto EHE program has involved working to increase public education and awareness of EHEs and their health risks. To this end, Toronto Public Health holds an annual media event in mid-May at which Health Department, Red Cross, and EMS staff members are available to answer EHE questions from the media.

Plaintiffs' MSJ Appx. 2059

### 3.2.3 Phoenix

Summer in Phoenix is, by any measure, hot. Daily high temperatures above 100°F are routine, temperatures up to 110°F are common, and temperatures above 120°F are possible. Although residents over time physically adapt to some extent to Phoenix's high heat, summer conditions can still be quite variable. Despite Phoenix routinely experiencing life-threatening summertime temperatures, studies of excess heat mortality there have consistently found little evidence of any major heat-attributable excess mortality impacts *(e.g., Kalkstein and Greene, 1997; Davis et al., 2003a,b).*[7]

Although definitive explanations for this result cannot yet be offered, it seems likely that this can be attributed to significant local experience in responding to elevated temperatures, relatively low humidity, extensive access to air conditioning, widespread public recognition of the health risks during EHE conditions, and a willingness to make appropriate adjustments to minimize heat exposure. These findings suggest the importance of having a public that understands the health risks inherent in EHEs and knows how to minimize their health impacts.

Still, in mid-July 2005, much of the southwestern and central United States experienced consecutive days of hot weather that broke all-time high temperature records in many locations. During this period, Phoenix was a focus of media attention because of the duration of the conditions (all but 3 days in the 2-week period through July 21 reached 110°F) and because several deaths were attributed to the heat *(Associated Press, 2005).* Extreme high temperatures like those experienced in July 2005, however, create potentially life-threatening conditions for anyone experiencing unmitigated exposure, regardless of adaptation. As a result, it is not surprising that the majority of deaths in Phoenix attributed to the heat were of homeless individuals. Phoenix's sudden increase in heat-attributable deaths in July 2005 should be viewed as a reflection of how an exceptionally severe and long-lasting EHE can overwhelm even highly adapted populations.

Before the 2005 summer, Phoenix's EHE program consisted mainly of relying on the local NWS forecast office to predict dangerous conditions and the local media to broadcast warnings and advice for limiting heat exposure. Although Phoenix is covered by an operating SSC-based EHE prediction system, developed with funding by NOAA's NWS and the local electrical utility to help guide utility shutoff decisions, there was minimal interest in incorporating this available information into a broader EHE notification and response program.

### Adjustments and lessons learned

Phoenix's public response to the July 2005 EHE conditions largely focused on opening homeless shelters during daytime hours, bringing homeless individuals to these and other locations with air conditioning, and providing donated bottled water. Given the general prevalence of air conditioning in Phoenix, this targeted action may be the most effective approach for limiting the health risks and impacts of an especially severe EHE.

---

7  *A lack of evidence of a heat-mortality relationship in these studies does not mean that excessive heat is not reported as a contributing factor in deaths in Phoenix during the summer; in fact, heat-related deaths are routinely reported. This finding simply means there has not previously been a measurable increase in all-cause mortality rates in Phoenix when the heat reaches exceptional levels.*

Plaintiffs' MSJ Appx. 2060

This action also demonstrates how a location that generally lacks a formal EHE program can take immediate steps to reduce the risks and health impacts of an especially severe EHE.

In addition, the July 2005 EHE in Phoenix triggered a review of the county's response plans to EHE warnings issued by the local NWS office. Although this review is ongoing, the revised plan is expected to clearly define a set of actions the county will take after an NWS announcement.

### 3.3 Evidence on the Performance of EHE Programs

Few studies have evaluated the efficacy of EHE notification and response programs. This reflects the difficulty of developing these studies (e.g., issues in identifying case and control locations and accounting for variation in populations and EHE conditions) and, in many cases, the brevity of existing operating EHE programs.

One study in Philadelphia *(Ebi et al., 2004)* used regression analysis to quantify the impact of publicly announcing forecast EHE conditions on EHE-attributable excess mortality from 1995 to 1998. This study was possible largely because, at the time, the city and the regional NWS forecast office independently evaluated forecast data for anticipated EHE conditions. As a result, during this period there were days when the city's criteria called for an EHE warning but the NWS would not issue one, days when the city's system would suggest a warning be issued and the NWS would issue one, and days when the NWS would issue a warning when the city's system did not call for a warning.

Ebi et al. *(2004)* found that for each day Philadelphia issued an EHE warning based on the SSC system recommendation, expected mortality was reduced by roughly 2.6 lives per day and this mortality reduction was experienced for the 3 days following the last issued heat warning. This result was statistically significant at the 8% level, which the authors note is equivalent to saying there was a 92% chance that the system saved at least one life during this period. It is estimated that the system saved 117 lives during the study period. To place this result in a cost-benefit framework, the authors report an estimated cost, primarily for wages of extra emergency medical staff, of $10,000 for each day a heat advisory is issued. In contrast, EPA routinely assumed a value per avoided statistical life year lost of $6 million in regulatory impact assessments at the time of the study.

The other formal study that examined the effectiveness of EHE programs, Palecki et al. *(2001)*, compared the health impacts of EHEs in 1995 and 1999 in Chicago and St. Louis. The basis for evaluating the effectiveness of EHE programs in this study is provided mainly by the contrast of the impacts of the events in Chicago, which lacked an EHE notification and response program in 1995 but then developed one, which became active in 1999. The authors take care to note that there were differences in the duration, intensity, and meteorological conditions preceding the two EHEs, but they focus primarily on the fact that 700 deaths were attributed to the 1995 EHE in Chicago compared to roughly 100 deaths from the 1999 event. The authors then argue that much of this sharp reduction in mortality can be attributed to the effectiveness of Chicago's EHE program, which, among other actions, included reminding the public of the toll the 1995 EHE had taken to convey the risks of the 1999 conditions.

Plaintiffs' MSJ Appx. 2061

Additional anecdotal evidence from Philadelphia supports the contention that the city's EHE program has had a beneficial public health impact. Specifically, although more than 100 deaths in Philadelphia were attributed to the July 1993 EHE, the 1995 EHE experienced in the city resulted in only 60-70 heat-attributable deaths after the city's EHE program was implemented that summer *[personal communication, Jerry Libby, Philadelphia Health Promotion Department (retired), September 27, 2005]*. This reduced mortality is even more notable given the higher temperatures and longer duration of the 1995 event.

These results provide limited quantitative evidence that EHE notification and response programs can demonstrably improve public health.

Plaintiffs' MSJ Appx. 2062

# 4 EHE Notification & Response Programs

A central theme of this guidebook is the importance of accounting for local conditions and populations when defining EHE conditions and developing and implementing EHE notification and response programs. Despite the recognized difficulty of addressing all combinations of program needs, opportunities, and constraints that users of this guidebook may encounter, general recommendations that draw on available data, research results, and experience with EHE programs can be made.

The foundation for these recommendations is the recognition that EHEs are but one of a much larger group of extreme meteorological events (e.g., blizzards, floods, hurricanes, tornadoes) and anthropogenic conditions (i.e., urban smog) that can adversely affect public health. These recommendations are organized according to data needs and actions that we believe an EHE notification and response program must address to provide public health benefits. Specifically, the recommendations are organized into the following general areas: EHE definition and forecasting, public education and awareness of EHE risk factors and health impacts, EHE response preparation, EHE response actions, and EHE program review and evolution.

Each area has two categories of recommendations. Strongly recommended actions address information or actions we believe an EHE notification and response program must address to help minimize heat-attributable public health impacts. The second category of recommendations offers guidance on additional actions or data development that could enhance the public health effectiveness of an EHE program once the program has addressed the strongly recommended actions.

## 4.1 EHE Definition and Forecasting

As with notification and response programs for other extreme meteorological events, the effectiveness of an EHE notification and response program will initially be constrained by its ability to define and accurately forecast the relevant meteorological conditions. The recommendations in this section are intended to ensure timely access to locally relevant EHE forecast information.

### 4.1.1 EHE criteria must reflect local conditions

Many established meteorological criteria are used to determine whether forecast or existing conditions can be labeled as a certain type of extreme meteorological event (e.g., using maximum sustained wind speeds to identify and categorize hurricane conditions). A distinguishing feature for most of these criteria is that they do not vary by location.

In contrast, this guidebook's Technical Working Group (TWG) strongly recommends that EHE criteria be defined based on a review of local meteorological data. For example, a criterion that defines anticipated EHE conditions on all days with a forecast maximum temperature of 100°F or greater would not be useful in locations where this temperature has never been observed or in areas where such temperatures are common. In contrast, a criterion that announces anticipated EHE conditions any time the forecast daily maximum temperature is greater than the 95th percentile value for that day from the past 30 years would allow for variation by location.

Plaintiffs' MSJ Appx. 2063

Incorporating evidence of heat-attributable adverse health impacts from analyses of health outcomes and weather conditions can enhance EHE criteria development. Thus analyses of historical meteorological conditions should incorporate available health outcome data (e.g., regression-based analyses of daily mortality as a function of meteorological variables or air masses). Adding additional control variables that have been identified as affecting the number of heat-attributable health outcomes (e.g., time of season, prior EHEs in the season) would enhance the results of these analyses. Further, the results of any enhanced weather-health outcome analyses could be used in a predictive fashion to calculate the potential health impact of forecast conditions. These predictive models could then provide a basis for defining EHE conditions based on predicted changes in health outcomes.

### 4.1.2  Ensure access to timely meteorological forecasts

An effective EHE notification and response program requires access to reliable meteorological forecasts to provide lead time for implementing program elements.

To forecast EHEs, we strongly recommend that local officials in the United States use and evaluate the meteorological data in the NWS' 5-day regional forecasts.

To enhance EHE forecasting, we recommend developing systems that electronically retrieve and evaluate revised NWS forecast data as they become available. For example, the University of Delaware's Center for Climatic Research has developed automated computer systems for existing EHE notification and response programs that retrieve NWS forecasts as they are updated, assess the forecast data against EHE criteria over the 5-day forecast period, and notify EHE program managers when EHE criteria are satisfied.

The TWG also recommends that cities not use surveillance-based systems as the primary means for identifying EHE conditions. Specifically, systems that rely on observable increases in the demand for medical services such as ambulance calls or demand for emergency room services to identify EHE conditions are not recommended. Although such systems may have a role in determining appropriate resource allocation during an EHE, they are of little value as a forecast tool because they do not provide the necessary lead time for implementing EHE responses.

## 4.2  Public Education and Awareness of EHE Risk Factors and Health Impacts

A significant source of the public health impacts of EHEs is that individuals either fail to adequately recognize the danger associated with EHE conditions or make poor response choices during EHEs. This is tragically reflected by conclusions that most EHE-attributable deaths are preventable *(CDC, 2004a,c)*. This conclusion also suggests that there is a significant need for continued and enhanced public education about the EHE-attributable risks and health impacts.

### 4.2.1  Increase and improve EHE notification and public education

The TWG strongly recommends there be a formal system for notifying the public when EHE conditions are forecast. At a minimum, announcements made using this system should include information on the anticipated arrival, duration, and severity of the forecast EHE. In addition, these announcements need to provide the public with information about critical EHE risk factors (e.g., being very young or old, using certain

Plaintiffs' MSJ Appx. 2064

medications, having physical or mental impairments that restrict mobility, or lacking the ability to respond to environmental changes), the symptoms of excessive heat exposure, and recommended response actions (e.g., seek air-conditioned locations, stay hydrated). These announcements can be conveyed to the public through usual methods such as television, radio, and newspapers, and by using established health alert networks such as those operated by some state health departments (e.g., Minnesota). EHE information could also be periodically distributed through other avenues such as fliers in newspapers, local magazines, and church and civic group literature at the start of and periodically throughout the EHE season. Announcements should describe basic precautionary steps individuals can take to limit the health risks: stay hydrated; spend time in air-conditioned environments; wear loose-fitting, light-colored clothing; check on individuals with high-risk characteristics *[see Rudnick (2002) and U.S. EPA Aging Initiative (2004) for more detailed information]*. The announcements should also suggest appropriate responses when symptoms of excessive heat exposure are observed.

One way to enhance the public education program for EHE risks, impacts, and personal response strategies is to repeatedly present a clear and consistent message to varied audiences. An example of such an effort is Toronto Public Health's hosting of an EHE media day each May before the start of the summer heat season. During this event, Toronto Public Health provides the media with information about the city's EHE notification and response program and answers questions about the health risks and impacts of EHEs. This event maintains media interest in the program and generally results in reporting that keeps EHEs in the public's eye.

An example of another broad-based educational activity that could be pursued is EHE education programs for schools. These programs would help inform a vulnerable segment of the population about risks and appropriate responses and could potentially provide an effective means of having central messages repeated and adopted by a range of households.

EHE education should also be specifically directed at first responders and local emergency management personnel as well as to those who care for older individuals, the very young, the homeless, and the physically and mentally challenged. This targeted education would inform critical response personnel and caregivers about the health risks EHEs pose to members of the vulnerable groups they look after and emphasize the need for active assessment and intervention to prevent adverse health outcomes.

### 4.2.2  Provide information on proper use of portable electric fans during EHEs

The TWG also strongly recommends that, as part of a public education program, cities emphasize that portable electric fans are not the simple cooling solution they appear to be. Because of the limits of conduction and convection, using a portable electric fan alone when heat index temperatures exceed 99°F actually increases the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface *(American Medical Association Council on Scientific Affairs, 1997; CDC, 2004c)*. In these conditions, portable electric fans provide a cooling effect by evaporating sweat. The increased circulation of hot air and increased sweat evaporation can, however, speed the onset of heat-attributable conditions (e.g., heat exhaustion).

Plaintiffs' MSJ Appx. 2065

Thus, portable electric fans need to be used with caution and under specific circumstances during an EHE, such as exhausting hot air from a room or drawing in cooler air through an open window. Generally, portable electric fans may not be a practical and safe cooling mechanism during an EHE in homes that are already hot and are not air-conditioned; their use should be discouraged unless the fans are bringing in significantly cooler air from outside the dwelling. If a resident must stay in these dwellings, and if they are unable to access an air-conditioned environment, safer cooling approaches would include taking frequent cool showers and drinking cool, nonalcoholic fluids (e.g., ice water). Because of the importance of this issue, and the contradictory messages people may have received about using portable electric fans during EHEs, Appendix B provides a series of guidelines for fan use during EHEs.

Finally, public officials should review the various educational messages about EHEs for consistency with other messages and information on other issues. For example, recommendations against letting cars idle to control ozone concentrations would be inconsistent with EHE recommendations to stay in air-conditioned environments whenever possible. Public officials can recognize any potentially conflicting messages and then make clear statements about which message should take precedence during an EHE.

## 4.3   EHE Response Preparation

Preparations for an EHE can be distinguished according to when they are initiated relative to the development of the EHE. Long-term preparations address actions that need to be initiated well before an EHE is forecast because of the time needed to reach necessary agreements, develop systems, or secure supplies and personnel. Short-term preparations are actions that need to be taken when a multiday forecast anticipates EHE conditions. This section focuses on long-term preparations; *Section 4.4* covers short-term preparation actions.

### 4.3.1   Develop a clear plan of action identifying roles and responsibilities

Defining the structure, relationships, and responsibilities for those supporting an EHE notification and response program (e.g., health departments, utilities, homeless advocates) is an essential long-term action. More generally, this action requires establishing a means for planning and communication among the program supporters so that available resources are used most efficiently and potentially conflicting messages from program participants are clarified.

To achieve this coordination, the TWG strongly recommends establishing periodic meetings among program participants, distributing materials electronically, and designating points of contact for each participating group or agency. Variations across locations in the structure and expertise of agencies and the presence of different private organizations make it problematic to offer specific recommendations about recommended organizational structures for an EHE program. However, because EHEs are a threat to public health, relevant public health agencies can and should play a significant, but not necessarily the lead, role in developing and managing an EHE program. In addition, local emergency management agencies, street and sanitation departments, and health code enforcement staff typically have significant contact with the public. As a result, their information distribution networks and staffs could, depending on local conditions, be a valuable resource to consider in EHE response planning.

Plaintiffs' MSJ Appx. 2066

Finally, nonprofits such as the Red Cross, homeless outreach programs, area agencies on aging, and senior centers should be actively recruited to become EHE program partners to incorporate their expertise in identifying, communicating with, and providing services to populations that are at high risk during EHEs.

When developing a plan of action, we also strongly recommend EHE program partners pay particular attention to the potential for public recommendations that could conflict during an EHE and provide clear guidance regarding priorities. For example, environmental organizations may generally recommend against idling cars for extended periods of time to improve air quality. This message could be modified to note that if idling is necessary to stay in an air-conditioned environment during an EHE, it is acceptable and preferable to exposing the occupants to the heat.

### 4.3.2   Develop long-term urban planning programs to minimize heat island formation

Although not the focus of this guidebook, the TWG strongly recommends urban design and development programs be reviewed with a goal of promoting actions that will help control the development of urban heat islands. The longer timeframes envisioned for implementing any actions result in these actions being viewed as part of the EHE preparation actions. However, effective implementation of specific actions designed to mitigate urban heat islands, such as programs to increase the reflectiveness of urban surfaces, increase urban vegetation, and modify behavior, is likely to require a significant public education component.

## 4.4   EHE Response Actions

This section covers activities that should be initiated after meteorological forecasts identify an impending EHE or EHE conditions have been announced. Four essential recommendations involve these short-term EHE response actions:

▶ The public should be encouraged to spend time in available air-conditioned buildings (e.g., shopping centers, movie theaters, senior centers, libraries). To the extent these types of buildings have air conditioning, they are also generally capable of accommodating sudden increases in public use for short periods of time (e.g., a few days) without significant difficulty.

▶ EHE program partners should reallocate resources to address critical short-term needs of the EHE that are likely to provide a significant public health benefit. For example, this could involve shifting some public health inspectors from inspecting dining facilities to visiting nursing homes or supporting home environment assessments for individuals who may call available non-911 help lines. Other examples could include having homeless agencies emphasize providing daytime services and interventions during the EHE instead of nighttime services when conditions will generally be cooler.

▶ Once a forecast for EHE conditions has been aired, the locality should prohibit the suspension of electric and water services. For this reason, all meetings related to the EHE program should include representatives from local utility companies who have been solicited as program partners.

Plaintiffs' MSJ Appx. 2067

➤ Local medical examiners should be directed to use the guidelines set forth by Donoghue et al. *(1997)* for classifying heat-related deaths. Although statistical analyses of total daily mortality can and should be used to identify and quantify increases in mortality attributable to the EHE, using the Donoghue et al. guidelines will improve the accuracy of estimates of heat-attributable deaths for those who base these estimates solely on the information from death certificates.

Additional recommendations for response actions that could provide additional public health benefits include:

➤ Conducting direct assessments of high-risk individuals during EHEs to check for signs of excessive heat exposure

➤ Increasing the extent and duration of public access to air-conditioned settings

➤ Increasing the capacity of the emergency medical system to respond to increased surveillance and treatment demands.

Each of these additional recommendations for enhancing short-term responses is discussed below.

EHE health risks are not equally distributed among the population. Therefore, the TWG recommends that enhanced program responses include direct assessments of the health and environments of those at greatest risk during the EHE. Increasing home visits, using telephone check-in systems, and operating toll-free lines to provide advice or receive reports of concerns can alert EHE program staff to individuals who may be at the greatest risk or experiencing health problems during the EHE and help avoid more serious health outcomes.

Spending time in an air-conditioned environment has long been recognized and advocated as the most effective means of preventing heat-attributable health impacts during an EHE. To increase the potential time spent in air-conditioned locations, we also recommend the hours of operation and number of air-conditioned locations (e.g., senior centers, libraries) made publicly available be increased during an EHE. Providing free transportation to these locations could also increase their use.

Finally, regardless of the extent of preparations and response implemented for an EHE, it is likely that the onset of EHE conditions will result in an increase in the demand for emergency medical services in the form of 911 calls, visits to emergency room facilities, and increased volume and need for medical examiner staff and services. The TWG therefore recommends additional staffing of emergency medical personnel to increase the number of people who can receive treatment at any given time, reduce waiting times for treatment, or both. Existing local and state mutual aid agreements and state emergency medical assistance compacts as well as the resources of state and local emergency management agencies, the Federal Emergency Management Agency, the Medical Reserve Corps, and the National Disaster Medical System may be available to help meet some of these needs. The applicability and availability of these resources need to be evaluated, however, and contacts must be established before the onset of EHE conditions.

Plaintiffs' MSJ Appx. 2068

*Appendix C* provides one-page summaries of the critical actions individuals and EHE program partners can and should take once EHE conditions are forecast or are being experienced.

### 4.5  Review EHE Programs to Address Changing Needs, Opportunities, and Constraints

Over time, the constraints and opportunities faced by an EHE notification and response program will shift and experience will be gained in developing working relationships between program partners and in responding to different types of meteorological conditions. Finally, the relative importance of EHEs as a public health threat could change over time.

As a result, the TWG strongly recommends establishing a regular and formal review of the program's performance. For example, in the fall, when the risk of an EHE has diminished, program partners should evaluate past performance and make recommendations to improve the notification and response program. Alternatively, hypothetical "table-top" exercises could be conducted that allow program partners to work through how they would respond to alternative EHE scenarios in order to identify problems with current preparation and response activities and develop solutions.

Plaintiffs' MSJ Appx. 2069

Plaintiffs' MSJ Appx. 2070

# References

AMA. 2005. Heat-Related Illness During Extreme Weather Emergencies. http://www.ama-assn.org/ama/pub/category/13637.html.

American Medical Association Council on Scientific Affairs. 1997. Heat-Related Illness During Extreme Weather Emergencies. Report 10 of the Council on Scientific Affairs (A-97). Presented at the 1997 AMA Annual Meeting.

American Red Cross. 2005. Heat Waves. http://www.redcross.org/services/disaster/0,1082,0_586_,00.html.

Associated Press. 2005. Weather: Homeless Hit Hard by Heat. http://www.cnn.com/2005/WEATHER/07/22/heat.deaths.ap/index.html. Accessed July 22, 2005.

Basu, R. and J.M. Samet. 2002. Relation between elevated ambient temperature and mortality: A review of the epidemiologic evidence. Epidemiologic Reviews 24(2):190-202.

Bernard, S.M. and M.A. McGeehin. 2004. Municipal heat wave response plans. American Journal of Public Health 94(9):1520-1522.

CDC. 1994. Heat-related deaths – Philadelphia and United States, 1993-1994. Centers for Disease Control. Morbidity and Mortality Weekly Report 43(25):453-455.

CDC. 1995. Heat-related mortality – Chicago, July 1995. Centers for Disease Control. Morbidity and Mortality Weekly Report 44(31):577-579.

CDC. 1996. Heat-wave-related mortality – Milwaukee, Wisconsin, July 1995. Morbidity and Mortality Weekly Report 45(24):505-507.

CDC. 1997. Heat-related-deaths – Dallas, Wichita, and Cooke counties, Texas, and United States, 1996. Morbidity and Mortality Weekly Report 46(23):528-530.

CDC. 1998. Heat-related mortality – United States, 1997. Morbidity and Mortality Weekly Report 47(23):473-476.

CDC. 1999. Heat-related-deaths – Missouri, 1998, and United States, 1979-1996. Morbidity and Mortality Weekly Report 48(22):469-472.

CDC. 2000. Heat-related illnesses, deaths, and risk factors – Cincinnati and Dayton, Ohio, 1999, and United States, 1979-1997. Morbidity and Mortality Weekly Report 49(21):470-473.

CDC. 2001. Heat-related-deaths – Los Angeles County, California, 1999-2000, and United States, 1979-1998. Morbidity and Mortality Weekly Report 50(29):623-626.

CDC. 2002. Heat-related deaths – four states, July-August 2001, and United States, 1979-1999. Morbidity and Mortality Weekly Report 51(26):567-570.

CDC. 2004A. Extreme Heat: A Prevention Guide to Promote Your Personal Health and Safety. http://www.bt.cdc.gov/disasters/extremeheat/heat_guide.asp. Accessed January 24, 2005.

CDC. 2004b. Extreme Heat Bibliography. http://www.bt.cdc.gov/disasters/extremeheat/bibliography.asp.

CDC. 2004c. Extreme Heat: Tips for Preventing Heat-Related Illness. http://www.bt.cdc.gov/disasters/extremeheat/heattips.asp. Accessed January 24, 2005.

Chestnut, L.G., W.S. Breffle, J.B. Smith, and L.S. Kalkstein. 1998. Analysis of differences in hot-weather-related mortality across 44 U.S. metropolitan areas. Environmental Science and Policy 1(1):59-70.

Davis, R.E., P.C. Knappenberger, P.J. Michaels, and W.M. Novicoff. 2003a. Changing heat-related mortality in the United States. Environmental Health Perspectives 111(14):1712-1718.

Davis, R.E., P.C. Knappenberger, W.M. Novicoff, and P.J. Michaels. 2003b. Decadal changes in summer mortality in U.S. cities. International Journal of Biometeorology 47(3):166-175.

Donoghue, E.R., M.A. Graham, J. Jentzen, B.D. Lifschultz, J.L. Luke, and H.G. Mirchandani. 1997. Criteria for the diagnosis of heat-related deaths: National Association of Medical Examiners: Position paper. American Journal of Forensic Medicine and Pathology 18(1):11-14.

Ebi, K.L., T.J. Teisberg, L.S. Kalkstein, L. Robinson, and R.F. Weiher. 2004. Heat watch/warning systems save lives. Bulletin of the American Meteorological Society 85(8):1067-1073.

FEMA. 2005a. Extreme Heat: Are You Ready? http://www.fema.gov/areyouready/heat.shtm.

FEMA. 2005b. Hazards Backgrounder: Extreme Heat. http://www.fema.gov/hazards/extremeheat/heat.shtm. Accessed February 8, 2005.

Greene, J.S. and L.S. Kalkstein. 1996. Quantitative analysis of summer air masses in the eastern United States and an application to human mortality. Climate Research 7:43-53.

Kalkstein, L.S. 1997. Climate and human mortality: Relationship and mitigating measures. Advances in Bioclimatology 5:161-177.

Kalkstein, L. 2002. Description of our Heat/Health Watch-Warning Systems: Their Nature Extent, and Required Resources. Prepared for Stratus Consulting, Boulder, CO.

Kalkstein, L.S. and R.E. Davis. 1989. Weather and human mortality: An evaluation of demographic and interregional responses in the United States. Annals of the Association of American Geographers 79(1):44-64.

Kalkstein, L.S. and J.S. Greene. 1997. An evaluation of climate/mortality relationships in large U.S. cities and the possible impacts of a climate change. Environmental Health Perspectives 105(1):84-93.

Kalkstein, L.S., P.F. Jamason, J.S. Greene, J. Libby, and L. Robinson. 1996. The Philadelphia Hot Weather-Health Watch/Warning System: Development and application: Summer 1995. Bulletin of the American Meteorological Society 77(7):1519-1528.

Koppe, C., S. Kovats, G. Jendritzky, and B. Menne. 2004. Heat-Waves: Risks and Responses. World Health Organization, Rome.

Kunihiro, A. and J. Foster. 2004. Heat Exhaustion and Heatstroke. http://www.emedicine.com/emerg/topic236.htm. Accessed November 28, 2005.

LBNL. 2000. Heat Island Group. http://eetd.lbl.gov/HeatIsland/.

Meehl, G.A. and C. Tebaldi. 2004. More intense, more frequent, and longer lasting heat waves in the 21st century. Science 305:994-997.

Mills, D.M. 2005. Excessive Heat Events: A Review of Evidence on Health Risks, Impacts, and Opportunities for Response. Prepared for U.S. Environmental Protection Agency, Office of Air and Radiation, Office of Atmospheric Programs, Climate Change Division. October, 27.

Milwaukee Health Department and Milwaukee Heat Task Force. 2005. Milwaukee Health Department and Milwaukee Heat Task Force: Plan for Excessive Heat Conditions 2005. http://www.city.milwaukee.gov/display/displayFile.asp?docid = 2689&filename = / Groups/healthAuthors/DCP/PDFs/Heat_Plan_2005_-_rev_6-17-05.pdf

NCAR. 2005. Heat Wave Awareness Homepage. http://www.isse.ucar.edu/heat/.

New York City Office of Emergency Management. 2005. Ready New York: Extreme Heat. http://www.nyc.gov/html/oem/html/readynewyork/hazard_heat.html.

NOAA. 1995. Natural Disaster Survey Report: July 1995 Heat Wave. National Oceanic and Atmospheric Administration, Silver Spring, MD.

NWS. 2004. Heat Wave: A Major Summer Killer. National Weather Service. http://www.nws.noaa.gov/om/brochures/heatwave.pdf. Accessed January 13, 2005.

NWS. 2005. Natural Hazard Statistics. http://www.nws.noaa.gov/om/hazstats.shtml.

NWS Forecast Office, Pueblo, Colorado. 2004. Heat Index. National Weather Service. http://www.crh.noaa.gov/pub/heat.htm. Accessed January 13, 2005.

Palecki, M.A., S.A. Changnon, and K.E. Kunkel. 2001. The nature and impacts of the July 1999 heat wave in the midwestern United States: Learning from the lessons of 1995. Bulletin of the American Meteorological Society 82(7):1353-1368.

Philadelphia Office of Mental Health & Mental Retardation. 2002. Fan Facts. Philadelphia, PA.

Rudnick, A. 2002. Reducing the Risk of Heat Stress Disorders for Consumers of Behavioral Health Services: Questions and Answers. Philadelphia Office of Mental Health & Mental Retardation, Philadelphia.

Semenza, J.C., J.E. McCullough, W.D. Flanders, M.A. McGeehin, and J.R. Lumpkin. 1999. Excess hospital admissions during the July 1995 heat wave in Chicago. American Journal of Preventive Medicine 16(4):269-277.

Plaintiffs' MSJ Appx. 2073

Sheridan, S.C. and T.J. Dolney. 2003. Heat, mortality, and level of urbanization: Measuring vulnerability across Ohio, USA. Climate Research 24:255-266.

Sheridan, S.C. and L.S. Kalkstein. 1998. Heat watch-warning systems in urban areas. World Resource Review 10(3):375-383.

Sheridan, S.C. and L.S. Kalkstein. 2004. Progress in heat watch-warning system technology. Bulletin of the American Meteorological Society 85:1931-1941.

Toronto Public Health. 2002. Summer Safety: Fan Facts. Toronto, Ontario, Canada.

U.S. EPA. 2005. Heat Wave Response Programs. U.S. Environmental Protection Agency. http://epa.gov/heatisland/about/heatresponseprograms.html. Accessed February 22, 2005.

U.S. EPA. 2006. Heat Island Effect. U.S. Environmental Protection Agency. http://www.epa.gov/heatisland/about/index.html. Accessed January 5, 2006.

U.S. EPA Aging Initiative. 2004. It's Too Darn Hot: Planning for Excessive Heat Events. September. U.S. Environmental Protection Agency. http://www.epa.gov/aging/resources/epareports.htm#itstoodarnhot. Available in English, low literacy, Spanish, Chinese, Vietnamese, Haitian Creole, Russian. Accessed August 3, 2005.

Plaintiffs' MSJ Appx. 2074

## Resources Available on the Internet

**Extreme Heat Bibliography**

Extreme Heat Bibliography. http://www.bt.cdc.gov/disasters/extremeheat/bibliography.asp. (CDC, 2004B)

**Heat Index Summaries**

Heat Index. http://www.crh.noaa.gov/pub/heat.htm. (NWS Forecast Office, Pueblo, Colorado, 2004)

**Summaries of the Health Risks and Tips for Minimizing Risk from Exposure to Elevated Temperatures**

Extreme Heat: A Prevention Guide to Promote Your Personal Health and Safety. http://www.bt.cdc.gov/disasters/extremeheat/heat_guide.asp. (CDC, 2004A)

Extreme Heat: Are You Ready? http://www.fema.gov/areyouready/heat.shtm. (FEMA, 2005A)

Extreme Heat: Tips for Preventing Heat-Related Illness. http://www.bt.cdc.gov/disasters/extremeheat/heattips.asp. (CDC, 2004C)

Hazards Backgrounder: Extreme Heat. http://www.fema.gov/hazards/extremeheat/heat.shtm. (FEMA, 2005B)

Heat-Related Illness During Extreme Weather Emergencies. http://www.ama-assn.org/ama/pub/category/13637.html. (AMA, 2005)

Heat Wave: A Major Summer Killer. http://www.nws.noaa.gov/om/brochures/heatwave.pdf. (NWS, 2004)

Heat Wave Awareness Homepage. http://www.isse.ucar.edu/heat/. (NCAR, 2005)

Heat Wave Response Programs. http://epa.gov/heatisland/about/heatresponseprograms.html. (U.S. EPA, 2005)

Heat Waves. http://www.redcross.org/services/disaster/0,1082,0_586_,00.html. (American Red Cross, 2005)

Natural Hazard Statistics. http://www.nws.noaa.gov/om/hazstats.shtml. (NWS, 2005)

Extreme Heat: Tips for Preventing Heat-Related Illness. http://www.bt.cdc.gov/disasters/extremeheat/heattips.asp. (CDC, 2004C)

**Summaries of Existing EHE Programs**

Milwaukee Health Department and Milwaukee Heat Task Force: Plan for Excessive Heat Conditions 2005. http://www.city.milwaukee.gov/display/displayFile.asp?docid = 2689&filename = /Groups/healthAuthors/DCP/PDFs/Heat_Plan_2005_-_rev_6-17-05.pdf. (Milwaukee Health Department and Milwaukee Heat Task Force, 2005)

Ready New York: Extreme Heat. http://www.nyc.gov/html/oem/html/readynewyork/hazard_heat.html. (New York City Office of Emergency Management, 2005)

Plaintiffs' MSJ Appx. 2075

Heat Island Effect: Heat Wave Response Programs. http://epa.gov/heatisland/about/heatresponseprograms.html. (U.S. EPA, 2005)

**Urban Heat Island Overview and Control Measures**

Heat Island Effect. http://www.epa.gov/heatisland/. (U.S. EPA, 2006)

Heat Island Group. http://eetd.lbl.gov/HeatIsland/. (LBNL, 2000)

**EHE Case Studies**

Natural Disaster Survey Report: July 1995 Heat Wave. ftp://ftp.nws.noaa.gov/om/assessments/heat95.pdf. (NOAA, 1995)

**Morbidity and Mortality Weekly Report. http://www.cdc.gov/mmwr/ (CDC). Examples:**

Heat-Wave-Related Mortality – Milwaukee, Wisconsin, July 1995. June 21, 1996. Vol. 45. No. 24. (CDC, 1996)

Heat-Related-Deaths – Dallas, Wichita, and Cooke Counties, Texas, and United States, 1996. June 13, 1997. Vol. 46. No. 23. (CDC, 1997)

Heat-Related Mortality – United States, 1997. June 19, 1998. Vol. 47. No. 23. (CDC, 1998)

Heat-Related Illnesses, Deaths, and Risk Factors – Cincinnati and Dayton, Ohio, 1999, and United States, 1979-1997. Vol. 49. No. 21. (CDC, 2000)

Heat-Related-Deaths – Four States, July-August 2001, and United States, 1979-1999. July 5, 2002. Vol. 51. No. 26. (CDC, 2002)

Heat-Related-Deaths – Los Angeles County, California, 1999-2000, and United States, 1979-1998. July 27, 2001. Vol. 50. No. 29. (CDC, 2001)

Heat-Related-Deaths – Missouri, 1998, and United States, 1979-1996. June 11, 1999. Vol. 48. No. 22. (CDC, 1999)

Plaintiffs' MSJ Appx. 2076

# Fans During Excessive Heat Events

The widespread availability and ease of using portable electric fans draw many people to use them for personal cooling during an EHE. Portable electric fans can, however, increase the circulation of hot air, which increases thermal stress and health risks during EHE conditions.

As a result, portable electric fans need to be used with caution and under specific circumstances during an EHE. Here is a list of Do's and Don't's for their use:

## Do

► Use a portable electric fan in or next to an open window so heat can exhaust to the outside (box fans are best).

► Use a portable electric fan to bring in cooler air from the outside.

► Plug your portable electric fan directly into a wall outlet. If you need an extension cord, check that it is UL (Underwriter Laboratories) approved in the United States or CSA (Canadian Standards Approved) approved in Canada.

## Don't

► Use a portable electric fan in a closed room without windows or doors open to the outside.

► Believe that portable electric fans cool air. They don't. They just move the air around and keep you cool by helping to evaporate your sweat.

► Use a portable electric fan to blow extremely hot air on yourself. This can accelerate the risk of heat exhaustion.

► Use a fan as a substitute for spending time in an air-conditioned facility during an EHE.

**If you are afraid to open your window to use a portable electric fan, choose other ways to keep cool (e.g., cool showers, spend time in an air-conditioned location).**

*Sources: Philadelphia Office of Mental Health & Mental Retardation, 2002; Toronto Public Health, 2002.*

Plaintiffs' MSJ Appx. 2077

Plaintiffs' MSJ Appx. 2078

**Guidebook in Brief**

# Quick Tips for Responding to Excessive Heat Events

### *For the Public*

## Do

► Use air conditioners or spend time in air-conditioned locations such as malls and libraries

► Use portable electric fans to exhaust hot air from rooms or draw in cooler air

► Take a cool bath or shower

► Minimize direct exposure to the sun

► Stay hydrated – regularly drink water or other nonalcoholic fluids

► Eat light, cool, easy-to-digest foods such as fruit or salads

► Wear loose fitting, light-colored clothes

► Check on older, sick, or frail people who may need help responding to the heat

► Know the symptoms of excessive heat exposure and the appropriate responses.

## Don't

► Direct the flow of portable electric fans toward yourself when room temperature is hotter than 90°F

► Leave children and pets alone in cars for any amount of time

► Drink alcohol to try to stay cool

► Eat heavy, hot, or hard-to-digest foods

► Wear heavy, dark clothing.

Plaintiffs' MSJ Appx. 2079

# Useful Community Interventions
## *For Public Officials*

### Send a clear public message

► Communicate that EHEs are dangerous and conditions can be life-threatening. In the event of conflicting environmental safety recommendations, emphasize that health protection should be the first priority.

### Inform the public of anticipated EHE conditions

► When will EHE conditions be dangerous?

► How long will EHE conditions last?

► How hot will it FEEL at specific times during the day (e.g., 8 A.M., 12 P.M., 4 P.M., 8 P.M.)?

### Assist those at greatest risk

► Assess locations with vulnerable populations, such as nursing homes and public housing

► Staff additional emergency medical personnel to address the anticipated increase in demand

► Shift/expand homeless intervention services to cover daytime hours

► Open cooling centers to offer relief for people without air conditioning and urge the public to use them.

### Provide access to additional sources of information

► Provide toll-free numbers and Web site addresses for heat exposure symptoms and responses

► Open hotlines to report concerns about individuals who may be at risk

► Coordinate broadcasts of EHE response information in newspapers and on television and radio.

Plaintiffs' MSJ Appx. 2080





# Excessive Heat Events Guidebook

United States Environmental Protection Agency
Office of Atmospheric Programs (6207J)
1200 Pennsylvania Avenue NW
Washington, DC 20460

Official Business
Penalty for Private Use: $300

Plaintiffs' MSJ Appx. 2082

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 132



U.S. Energy Information Administration

‹ Consumption & Efficiency

# Residential Energy Consumption Survey (RECS)

## Air conditioning in nearly 100 million U.S. homes

RECS 2009 — Release date: August 19, 2011



Figure 1. Steady rise in air conditioned homes in all regions of the U.S.
percent of homes with AC

Source: U.S. Energy Information Administration, 2009 Residential Energy Consumption Survey

figure data Except in the temperate climate regions along the West coast, air conditioners (AC) are now standard equipment in most U.S. homes (Figure 1). As recently as 1993, only 68% of all occupied housing units had AC. The latest results from the 2009 Residential Energy Consumption Survey (RECS) show that 87 percent of U.S. households are now equipped with AC. This growth occurred among all housing types and in every Census region. Wider use has coincided with much improved energy efficiency standards for AC equipment, a population shift to hotter and more humid regions, and a housing boom during which average housing sizes increased.

## Regional differences in type of air conditioning used

Cooled homes have either central AC systems or room air conditioners, which are individual window or wall units (room conditioning). The type of AC equipment used differs across regions. Central air systems are most common in the South, Midwest, and West, while room conditioners are most common in the Northeast (Table 1). Variation within regions can be dramatic: 69% of air conditioned homes in New Jersey use central equipment compared to 28% of homes in neighboring New York. This difference is largely due the different mix of housing types and age of housing stock between the two States.

### Table 1. Households in Northeast are most likely to use room air conditioning units

|  | Northeast | Midwest | South | West |
|---|---|---|---|---|
| **Of homes that use AC, percent that use.....** |  |  |  |  |
| Central AC equipment | 44% | 76% | 85% | 74% |
| Window/wall AC units | 58% | 26% | 16% | 27% |
| *Some homes have both central and window/wall AC, so totals will add to more than 100% | | | | |

## Increase in AC saturation is tempered by regional usage patterns

Regional differences are apparent in air conditioning usage. Southern households are almost twice as likely to use their central and room air conditioning equipment all summer as those in other regions (Table 2). Homes in the South are also least likely to have a programmable thermostat connected to the central air conditioner, while homes in the West are most likely. Programmable thermostats are designed to reduce consumption by automatically and routinely cycling down the unit when more intensive cooling is not needed. Consumers could reduce overall cooling costs by installing and setting a programmable thermostat.

Plaintiffs' MSJ Appx. 2084

12/18/15, 6:08 PM

**Table 2. Central air conditioning equipment usage varies by region**

| | Northeast | Midwest | South | West |
|---|---|---|---|---|
| **Of homes that use central AC, percent that have...** | | | | |
| Central equipment used all summer | 35% | 37% | 67% | 38% |
| A programmable thermostat | 60% | 47% | 38% | 65% |

## Housing type and age drives variation in air conditioning saturation

Housing type influences the type of air conditioning used as well as the overall saturation of air conditioning in U.S. homes. Air conditioning equipment is more common in single family homes (89%) than in housing units in apartment buildings (82%). While 84% of units in larger (5 or more unit) apartment buildings have air conditioning, in smaller (2 to 4 units) buildings that percentage drops to 77%.

While RECS data indicate that more older homes are adding window units or being retrofitted with central air conditioning, new construction is driving the saturation. Nearly 90% of new homes are built with central air conditioning (Figure 2). When central air conditioning is included at the time of construction, installation is easier and consumers can amortize costs over the life of a mortgage. In contrast, air conditioning retrofits or upgrades are often financed separately from a mortgage, over a much shorter time period at higher interest, and may require capital improvements such as the addition of ventilation systems and ductwork.



Figure 2. Increase in central air conditioning in newer homes

Source: U.S. Energy Information Administration, 2009 Residential Energy Consumption Survey

figure data

The rise of air conditioning systems has also influenced the type of home space heating systems found in newer construction. Central air conditioning and central space heating equipment often work in tandem or as a unified system. About 91% of homes built since 2000 have a main space heating system that includes central ducts; for homes built before 1940, that number is just 50%.

## Less efficient cooling alternatives are found in apartments and lower-income homes

Although structural and geographic characteristics such as climate, housing type and ownership influence where air conditioning appears, access to air conditioning by low income households is much lower relative to other households.

Overall, 18 percent of households below the poverty line do not have any air conditioning equipment at all. About a third of households below the poverty line use room air conditioning compared to 15% of households with an income above $100,000. In contrast, about 75% of households with incomes above $100,000 use central air conditioning compared to just 44% of households below the poverty line. The share of room air conditioners continues to drop as more households, especially higher income and owner occupied households, choose central air conditioning equipment.

Only 25% of all homes currently have room air conditioning units. Room air conditioning units can be a cost-effective alternative in climate regions with moderate summer temperatures. About 30% of households in the cold or very cold climate regions use room air conditioning compared to 19% in other regions. Households choose room air conditioning units in areas where cooling is only necessary a few times a year. Conversely, central air conditioning is more common in hotter climates because it can be used more intensively and efficiently relative to room air conditioning units.

Plaintiffs' MSJ Appx. 2085

Case 4:14-cv-03253   Document 301-13   Filed on 09/08/16 in TXSD   Page 116 of 380

There is a significant business opportunity to retrofit homes with new, more efficient air conditioning equipment that would reduce annual cooling costs to households. For example, 20% of the homes built during the 1980s have air conditioning equipment over 20 years old. Many U.S. homes could also benefit from regular maintenance, as only 42% of those using central air equipment service it annually.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § <br> § <br> § <br> § <br> § |
| PLAINTIFFS | § <br> § |
| v. | §    CIVIL ACTION NO. <br> §    4:14-cv-3253 <br> §    JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § <br> § <br> § <br> § <br> § <br> § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 133

**REVIEW OF DEPARTMENT COMPLIANCE WITH PRESIDENT'S EXECUTIVE ORDER ON DETAINEE CONDITIONS OF CONFINEMENT**

# Table of Contents

Table of Contents .................................................................................................................... 2
List of Appendices ................................................................................................................. 3
**Executive Summary** ............................................................................................................. 4
**Introduction** ........................................................................................................................ 6
**Methodology** ....................................................................................................................... 7
    *Authorities* ......................................................................................................................... 8
    *Guantánamo Detention Policy and Practice* .................................................................... 8
    *Input from External Sources* ........................................................................................... 9
    *Orientation to Camp Operations* .................................................................................. 10
    Joint Medical Group ....................................................................................................... 13
    Joint Intelligence Group ................................................................................................. 15
**Findings** ............................................................................................................................ 16
    *Shelter* ............................................................................................................................ 17
    *Hygiene* ......................................................................................................................... 20
    *Clothing and Bedding* .................................................................................................... 21
    *Food and Water* ............................................................................................................. 23
    *Religious Practice* .......................................................................................................... 25
    *Recreation* ..................................................................................................................... 27
    *Sleep* .............................................................................................................................. 29
    *Detainee Discipline System* ........................................................................................... 30
    *Detainee Compliance with Camp Rules and Vetting Criteria* ........................................ 32
    *Intellectual Stimulation* ................................................................................................. 34
    *Mail* ............................................................................................................................... 36
    *Protection from Violence* ................................................................................................ 38
    *Protection from Violence – Use of Force* ........................................................................ 40
    *Protection from Violence—Forced Cell Extractions* ....................................................... 42
    *Protection from Violence—Shackling* ............................................................................ 44
    *Protection from Sensory Deprivation—Solitary Confinement* ........................................ 45
    *Protection from Sensory Deprivation—Human-to-Human Contact* ................................ 47
    *Protection from Humiliation* .......................................................................................... 49
    *Healthcare Services—Quality of Care and Access* .......................................................... 51
    *Medical/Dental Confidentiality of Medical Records and Information* .............................. 54
    *Medical Ethics—Medical Treatment of Hunger Strikers* ................................................ 56
    *Healthcare Personnel Management—Behavioral Science Consultants (BSC)* ................. 59
    *Interrogation* ................................................................................................................. 61
    *Outside Access to Detainees* .......................................................................................... 64
    *Attorney Access to Detainee-Clients* .............................................................................. 66
    *Detainees Ordered or Approved for Release* ................................................................... 68
    *Repatriation/Transfer* ................................................................................................... 70
**Conclusions** ...................................................................................................................... 72
**Glossary** ........................................................................................................................... 75
**Bibliography** ..................................................................................................................... 78

Plaintiffs' MSJ Appx. 2089

List of Appendices

1. Common Article 3 of the Geneva Conventions
2. Executive Order, Review and Disposition of Individuals Detained at the Guantánamo Bay Naval Base and Closure of Detention Facilities, dated 22 January 2009
3. SECDEF Memo, Review of Department Compliance with Presidents Executive Order on Detainee Conditions of Confinement, dated 2 February 2009
4. Compliance Review Team Activity Log
5. American Civil Liberties Union/Amnesty International/Human Rights First/Human Rights Watch letter to President Obama dated 30 January 2009
6. Assistant Secretary of Defense Joseph A Benkert Draft Letter to: Anthony D Romero, Larry Cox, Elisa Massimino and Kenneth Roth
        Larry Cox letter
        Elisa Massimino letter
        Anthony Romero letter
        Kenneth Roth letter
7. HRW, *Locked Up Alone – Detention Conditions and Mental Health at Guantánamo*
8. Human Rights First, Elisa Massimino Letter to Joseph Benkert
9. Amnesty International Larry Cox Letter to Ms. Sandra Hodgkinson and Mr. Alan Liotta
10. ACLU Anthony D Romero Letter to Joseph Benkert
11. Letter from COL Masciola to VADM MacDonald
12. Photos Depicting Camps at Guantánamo
        Part 1
        Part 2
        Part 3
        Part 4
        Part 5
        Part 6
        Part 7
        Part 8
        Part 9
        Part 10
        Part 11
        Part 12
        Part 13
13. 30-2 Discipline Matrix
14. 30-3 BI-CI-Privileges
15. Detainee Diet Menu
16. 30-4 Detainee Camp Rules
17. 30-1 Detainee Offense Matrix
18. JTF-Guantánamo Graph, Population Incident Ratio

3

**Executive Summary**

The Secretary of Defense tasked a special DoD team to review the conditions of confinement at Guantánamo Bay Naval Base, to ensure all detainees there are being held "in conformity with all applicable laws governing the conditions of confinement, including Common Article 3 of the Geneva Conventions," pursuant to the President's Executive Order on Review and Disposition of Individuals Detained at the Guantánamo Bay Naval Base and Closure of Detention Facilities, dated January 22, 2009.  The Review Team conducted 13 days of investigation on site that included more than 100 interviews with JTF-Guantánamo leadership, support staff, interrogators, and guards, multiple announced and unannounced inspections of all camps during daylight and night operations, reviewed numerous reports, video, discipline records, and observed many aspects of daily operations.  Collectively, we talked to a number of detainees and observed detainee activities, including enteral feedings and interrogations.  The review Team also solicited a sampling of opinion, studies, and published works, which reflected the perspective of detainees and other concerned interest groups, many with recommendations to improve detention conditions.  This included our request for additional views from four organizations who wrote to the President concerning Guantánamo on January 30, 2009: Human Rights First, Human Rights Watch, the American Civil Liberties Union and Amnesty International. These organizations responded to that request on February 6, 2009, and their submissions were carefully considered.

After considerable deliberation and a comprehensive review, **it is our judgment that the conditions of confinement in Guantánamo are in conformity with Common Article 3 of the Geneva Conventions**.[1]

In our view, there are two components in the scope of the compliance review taken from Common Article 3: the first is the explicit prohibition against specified acts (at any time and at any place).  Any substantiated evidence of prohibited acts discovered in the course of the review would have warranted a finding of "non-compliance" with Common Article 3.  **We found no such evidence.**

Additionally, determining conformity with Common Article 3 requires examination of the directive aspect of the Article, this being that "Persons…shall in all circumstances be treated humanely."  This element of the effort demanded that the Review Team examine conditions of detention based upon our experience and professional backgrounds, informed and challenged by outside commentary.  As a result of that effort, **we find that the conditions of confinement in Guantánamo also meet the directive requirements of Common Article 3 of the Geneva Conventions.**

While we conclude that conditions at Guantánamo are in conformity with Common Article 3, from our review, it was apparent that the chain of command responsible for the detention mission at Guantánamo consistently seeks to go beyond a minimalist approach to compliance with Common Article 3, and endeavors to enhance conditions in a manner as humane as possible consistent with security concerns.  In this regard, in this report our team has identified a number of items which we recommend the Department of Defense continue to pursue consistent with that humane approach described above, or in several cases, items that we recommend for JTF-

---

[1] Text of Common Article 3 is attached at Appendix 1.

Plaintiffs' MSJ Appx. 2091

Guantánamo that are not now in place.  In this report, we do <u>not</u> intend to suggest that these recommendations are items that the Department must pursue to satisfy Common Article 3. Rather, they are items that we view as consistent with the approach of the Chain of Command to continually enhance conditions of detainment.

Broadly stated, among the things we recommend:

First, in our view, socialization, or interaction among the detainees, is important because of the length of time individuals at Guantánamo have been detained.  Current socialization practices are in conformity with Common Article 3.  However, the team believes that in certain camps, further socialization is essential to maintain humane treatment over time.  In our opinion, the key to socialization is providing more human-to-human contact, recreation opportunities with several detainees together, intellectual stimulation, and group prayer.

Second, the Review Team recognized that detainee access to high quality healthcare services is a fundamental aspect of humane treatment that is greatly enhanced by appropriate human-to-human contact and socialization between detainees and healthcare providers.  JTF-Guantánamo appreciates that delivery of quality healthcare requires trusting relationships between providers and their patients.  Although this type of trusting relationship is difficult to achieve in a custodial environment, the Review Team makes recommendations that can serve to enhance further the high quality of care delivered to detainees.

Third, as long as JTF-Guantánamo is operational, it will continue to require extensive resources. The most significant activity in this regard involves the continued support for camp improvement projects currently underway that affect the ability to provide socialization opportunities. Enhancement of humane treatment, as the operation continues, and as the detainee population spends more time under U.S. control, will also require strengthening of internal controls and continued dedication of both funds and personnel.  As a related matter, the Review Team recommends additional actions to maintain the firewall protections that separate current intelligence gathering and healthcare.

Fourth, we endorse the use of video recording in all camps and for all interrogations.  The use of video recordings to confirm humane treatment could be an important enabler for detainee operations.  Just as internal controls provide standardization, the use of video recordings provides the capability to monitor performance and maintain accountability.

Finally, the Review Team has also made several recommendations to sustain a humane treatment standard in the face of individual detainees' uncertainty and anxiety about their futures.   We conclude that certainty regarding the detainees' future has a direct correlation to detainee behavior and therefore, conditions inside the camp population.  There are still some detainees in Guantánamo despite court orders that the U.S. government has failed to meet its burden that they are enemy combatants.  Understandably, these detainees continue to express their extreme frustration with their continued detention.  This is a great concern to the Review Team because it complicates conditions of detention.  Therefore, the Review Team strongly endorses the continued interagency process to resolve these detainees' future.

Plaintiffs' MSJ Appx. 2092

## Introduction

On 22 January 2009, the President signed the Executive Order that directed the Secretary of Defense to immediately undertake a review of the conditions of detention at Guantánamo to ensure that no individual at Guantánamo is being held there, "except in conformity with all applicable laws governing the conditions of such confinement, including Common Article 3 of the Geneva Conventions." The President further directed that such review shall be completed within 30 days and any necessary corrections shall be implemented immediately thereafter."[2] Consequently, the Secretary of Defense directed the Vice Chief of Naval Operations to undertake a "Review of Department Compliance with [the] President's Executive Order on Detainee Conditions of Confinement"[3] with a team of experts from the Office of the Under Secretary of Defense for Policy, Office of the Assistant Secretary of Defense for Health Affairs, the Joint Staff, Department of the Navy, Department of the Army, and USSOUTHCOM[4] to review relevant documents, inspect all detention facilities at Guantánamo, and interview as appropriate USSOUTHCOM and JTF-Guantánamo personnel to ensure compliance with the Executive Order.

This report responds to tasking from the President and the Secretary of Defense and examines the present conditions of detention at Guantánamo, relying most principally upon the provisions of Common Article 3 of the Geneva Conventions to determine whether the conditions of confinement conform to the requirements outlined in the Executive Order.

There are two components in the scope of the compliance review taken from Common Article 3 of the Geneva Conventions: the first is the explicit prohibition against acts (at any time and at any place) that include:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensible by civilized peoples.

Substantiated evidence of prohibited acts discovered in the course of the review would warrant a finding of "non-compliance" with Common Article 3 and result in the requirement for immediate corrective action.

---

[2] Executive Order of 22 Jan 2009, Review and Disposition of Individuals Detained at the Guantánamo Bay Naval Base and Closure of Detention Facilities. See Appendix 2.

[3] SECDEF Memorandum, Review of Department Compliance with President's Executive Order on Detainee Conditions of Confinement, dated 2 Feb 2009. See Appendix 3.

[4] Team consisted of ADM Patrick Walsh, USN, Vice Chief of Naval Operations and representatives from: OSD Office of Detainee Affairs; OASD Health Affairs; Joint Staff Detainee Affairs, Health Services Support Division, and Office of Legal Counsel; Office of the Chief of Naval Operations; Department of the Army Office of the Judge Advocate General; Department of the Navy Office of the Judge Advocate General; Army Corrections Command; and HQ USSOUTHCOM.

Plaintiffs' MSJ Appx. 2093

The second component in the examination of compliance is directive in nature: "Persons taking no active part in the hostilities, including members of the armed forces, who have laid down their arms…shall in all circumstances be treated humanely." This area was open to the interpretation and judgment of the Review Team because there is no clear definition of "humane" treatment, in either U.S. or international law and the absence of prohibitive acts alone was an insufficient indicator of whether the conditions of detention would continue to be humane over time.

While we conclude that conditions at Guantánamo are in conformity with Common Article 3, from our review, it was apparent that the chain of command responsible for the detention mission at Guantánamo seeks to go beyond a minimalist approach to compliance with Common Article 3, and endeavors to enhance conditions in a manner as humane as possible consistent with security concerns. In this regard, in this report our team has identified a number of items which we recommend the Department of Defense continue to pursue consistent with that humane approach described above, or in several cases, items that we recommend for JTF-Guantánamo that are not now in place. In this report, we do <u>not</u> intend to suggest that these recommendations are items that the Department must pursue to satisfy Common Article 3. Rather, they are items that we view as consistent with the approach of the Chain of Command.

The needs of detainees are not static and therefore, require us to review the rationale for decisions and the expenditure of resources over the continuum of detention operations in Guantánamo. The compliance review includes not only an assessment of the physical structures that support detention operations and the physical health of the detainees, but importantly, the mental well-being of detainees after several years of camp operations…meaning that policies, programs, and structures put in place several years ago, while technically "humane" in their formative stages require review and adjustment over time.

Under the broad prescription for the obligation to be "humane" in the treatment of detainees, the team's findings are followed by prioritized recommendations[5] for new initiatives and continuation of existing practices that the team endorses as a means for assisting USSOUTHCOM in its efforts to enhance humane conditions of detention in Guantánamo. The team also includes a specific request that higher authority place increased emphasis on the transfer of detainees.

## Methodology

The report reviewed all aspects of detention conditions from detainee arrival to detainee transfer/repatriation. We looked across three areas: governing authorities, the Guantánamo detention policies and practices derived from those authorities, and views from outside groups critical of local operating procedures. From all of the above, the team drew conclusions and developed recommendations.

---

[5] The team's recommendations are divided between those of particular importance, which are indicated by the phrase, "strongly recommend," and those recommendations we deem important, but are of lesser priority.

Plaintiffs' MSJ Appx. 2094

*Authorities*

The review assessed current governing authorities and directives.  These included, but were not limited to the following applicable laws: Geneva Conventions Common Article 3; Torture Statute (18 USC 2340), DoD Appropriations Act of 2006, Title X, sections 1001-1006; War Crimes Statute (18 USC 2441); Detainee Treatment Act 2005; Military Commission Act 2006; Hamdan v. Rumsfeld; Rasul v. Bush; Hamdi v. Rumsfeld.

The review also included a review of following applicable regulations: DoDD 2310.01E (DoD Detainee Program); DoDD 2311.01E (DoD Law of War Program); DoDI 2310.08E (DoD Medical Program Support for Detainee Operations); DoDD 3115.09 (DoD Intelligence Interrogations, Detainee Debriefings, and Tactical Questioning); Army FM 2-22.3 (Human Intelligence Collector Operations).

Other guidance related to the conditions of detention included: DEPSECDEF memo of 07 Jul 06, "Applying Common Article 3;" COMSOUTHCOM memo of 22 Jan 07, "Implementing Guidance on Detainee Operations and Human Intelligence Collector Operations;" DEPCOS SOUTHCOM memo of 12 Feb 07, "Implementing Provision for Inspection in DoD Detainee Program."

Other reference material that the team reviewed included the following documents: Geneva Convention on Prisoners of War; Geneva Convention on Civilians; AR 190-8 (1997) (Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees); Joint Publication 3-63 (Joint Detainee Operations); FM 3-19.40, (Internment Resettlement Operations); "World Medical Association Malta Declaration on Treatment of Hunger Strikes;" "Bureau of Prisons Protocol on Forced Cell Extractions;" and "American Correctional Association Standards."

*Guantánamo Detention Policy and Practice*

The Review Team divided into the following teams: Detention Operations, Intelligence, Policy, Legal, and Medical.  They reviewed implementing guidance and directives from USSOUTHCOM, JTF-Guantánamo, the Joint Detention Group (JDG) Commander and the Joint Intelligence Group (JIG) Director.  The Review Team conducted more than 100 interviews with JDG and JIG leadership, support staff, interrogators, and guards.  They conducted announced and unannounced inspections of all camps during daylight and night operations.  They reviewed Inspector General reports, medical records, and inspection results from USSOUTHCOM. Additionally, they followed up on individual allegations of mistreatment.  Teams reviewed the Detainee Information Management System (DIMS), Joint Detainee Information Management System (JDIMS), and Forced Cell Extraction video.  Teams reviewed discipline records on the guard force and witnessed interrogations.  Collectively, teams talked to a number of detainees and observed detainee recreation, art classes, enteral feedings and interrogations.[6]

---

[6] See Appendix 4, Compliance Review Team activity log.

*Input from External Sources*

The Review Team identified numerous parties interested in detention conditions at Guantánamo among U.S. government interagency and Department of Defense entities, as well as other organizations outside of the U.S. government, recognized for their interest in detainee-related issues.  In the time available for the review, we solicited a sampling of opinions, studies, and published works, which reflected the perspective of detainees and other concerned interest groups who posed critical, contrary views, many with recommendations to improve detention conditions.  The Review Team assessed the individual contribution of each organization or entity and then applied it (anonymously, to give each assertion equal weight and value) to specific elements of the detention condition review.

To gain an appreciation for the broadest array of views that exist concerning the detention mission in Guantánamo and the evolution of the conditions of detention there, the Review Team first looked to historical documents and reports provided by the International Committee of the Red Cross (ICRC).  The ICRC has had access to the detention camps in Guantánamo since 2002 and has provided numerous reports on conditions of detention.  The ICRC enjoys unfettered access to detainees in Guantánamo, as well as detainee medical records.  They visit Guantánamo at least quarterly and provide the JTF-Guantánamo and USSOUTHCOM leadership feedback on their observations and recommendations.  Communications between the ICRC and the United States are treated as confidential communications, for the purposes of enhancing a candid sharing of observations and recommendations pertaining to conditions of detention.

In addition, the Review Team heard from many other external groups, including Human Rights Watch, Human Rights First, Amnesty International, and the American Civil Liberties Union, who have all expressed views on detention issues in Guantánamo matters, formally as well as informally.  Inputs received were candid, succinct, constructive, and representative of long-standing concerns.  We also reviewed documents and comments from the Military Commissions Defense Counsel, University of California, Berkeley and the Center for Constitutional Rights, Brookings Institute, American Psychological Association, American Psychiatric Association, Institute of Medicine, American Medical Association, Habeas Corpus Counsel, American Correctional Association, and American Bar Association.

The purpose of our work was to examine the conditions of detention at Guantánamo, in its current form, for compliance with applicable law, including Common Article 3 of the Geneva Conventions.  Therefore, we took the comments without challenge, debate, or any attempt to refute the assertions.  Their input represented a perspective that challenged prevailing views and practices.  We applied the merits of the arguments from outside groups, pitted them against prevailing practices, and then deliberated on findings and recommendations.[7]

In summary, the report provides a comprehensive, probative examination designed to challenge and test current operating policies and practices; it uses an interdisciplinary method that depicts a portrait of each element of detention conditions and identifies what specific issues of detention policy and practice stand in dispute.  The Review Team made two categories of recommendations: those we consider to be priorities, and those we consider to be of secondary

---

[7]See Appendices 5 through 11.  See also attached Bibliography for additional external community input considered.

Plaintiffs' MSJ Appx. 2096

importance.  It is the view of our team that all of these recommendations, if implemented, will assist USSOUTHCOM in its efforts to enhance humane conditions of detention in Guantánamo.

*Orientation to Camp Operations*

### Commander, Joint Task Force-Guantánamo

Commander, Joint Task Force-Guantánamo has operational command of detention operations in Guantánamo and reports directly to Commander, USSOUTHCOM.  Beneath the JTF are three separate and independent commands: the Joint Detention Group (JDG), Joint Medical Group (JMG), and Joint Intelligence Group (JIG).  The Commanders of the Detention Group and Medical Group, and the Director of the Intelligence Group report directly to the JTF Commander.

### Joint Detention Group

Detention operations fall under the cognizance of the Commander, Joint Detention Group (CJDG).  CJDG is directly responsible for the humane custody of detainees.  Detainees live in nine camps, built between 2002 and 2006, along the southeast portion of the U.S-controlled area of Guantánamo Bay, Cuba - separated from the Naval Station Guantánamo facilities – controlled and secured exclusively by JTF-Guantánamo.

With humane treatment as the baseline, the Joint Detention Group leadership organizes camp operations around a compliance model, through the means of incentive-based options to encourage compliance.  The options available to the CJDG only contribute to the quality of detention for the detainee; they cannot affect the length of detention.  Privileges vary from camp to camp, with the greatest number of privileges offered in the communal living camp (the camp preferred by detainees).  Unfortunately, the CJDG's housing options are limited to two.  The first is a communal-style living camp, with open bay barracks, a large recreation area, and relatively liberal privileges available to detainees there.  The second is maximum-security facilities, similar to maximum-security facilities used by prison systems throughout the United States, with single cell detention, smaller recreation areas, and fewer privileges.  Detainees considered to be a lesser risk, based upon compliance with camp rules, live in the former camp, while detainees considered to be a higher risk, based upon failure to comply with camp rules, live in the latter camps.  The challenge for the CJDG is to carefully assess risk when deciding whether a particular detainee is suitable for placement in the communal living camp.  In 2004, the communal living camp was the scene of a detainee plot to commandeer a food truck to be used to kill guards.[8]  In 2006, the same camp was the scene of a costly riot that almost resulted in the serious injury of guards.  However, to encourage compliance with camp rules, the CJDG is forced to continually seek to offer detainees the privilege of residing in the communal living camp, as a reward for complying with camp rules while they reside in the maximum security facilities.

---

[8] More than 10 detainees in Camp 4 attacked an FCE team using various items (e.g., pieces of large floor fans). Guards were forced to use non-lethal weapons for the first and only time in the history of detention operations in Guantánamo to quell the riot, protect themselves, and escape from the detainees.

Plaintiffs' MSJ Appx. 2097

The camps are numbered in the order in which they opened.  However, they can be categorized as follows:  Communal Living Camp – Camp 4; Maximum Security Camps - Camps 1 through 3, 5 (including Camp 5 Echo Block), 6, and 7; Pre-Release-Transfer –Camp Iguana; and, Limited Use – Camp Echo.  The following describe each camp.

<u>Communal Living Camp</u>

Camp 4, first occupied in February 2003, offers communal living, numerous recreation facilities, education and intellectual stimulation programs, and houses detainees considered the most compliant with camp rules.  Unlike other camps, Camp 4 offers communal living in open-bay barracks with open access to fresh air in outdoor recreation and communal facilities throughout the day.  It includes additional access to large recreation areas equipped with a basketball court, volleyball court, and soccer facility, during a specified four-hour period each day.  Camp 4 has a media center equipped with satellite television, bench seating, and a classroom used to teach literacy and art.

<u>Maximum Security</u>

Camp 1, which became operational in April 2002, is an open-air facility with approximately 200 steel mesh single cells.  Cells in this style camp offer the least unencumbered square feet of living space.  Cells face each other, arranged in rows, with an equal number of cells on each side of the block.  Camp 1 includes an outdoor exercise area for each block, equipped with a treadmill or elliptical machine.

Camp 2 and Camp 3 are adjoining facilities.  The cells are similar to Camp 1.  Camps 2 and 3 became operational in October 2002, with a current capacity of about 400 detainees.  Each Camp has 10 adjoining blocks of 24 to 48 cells each, and offer access to sunlit spaces throughout the day with the same sort of outdoor recreation facilities as Camp 1 for each block.  Two cells in Camp 3 are now available for use as a movie room for detainees.

Camp 5, a maximum-security facility built in April 2004, is a climate-controlled single cell facility with a capacity to hold 100 detainees.  All occupied cells have a clear window to permit entry of sunlight.  The facility resembles a hub and spoke design.  The hub consists of a centrally located automated control center that enables staff to control all operations throughout the building, including ingress/egress, opening and closing of doors and other operations.  The spokes consist of four, 2-story wings, each with two rows of adjoining cells that face each other, and one additional wing for administrative offices.  Three outdoor recreation facilities are accessible from adjacent wings.  The building has a climate controlled meeting room for legal representation and separate movie rooms on each tier for detainee use at specified periods throughout the day.

Camp 5 Echo (part of Camp 5), first occupied by detainees in April 2008, is an open air facility with 24 individual adjoining steel mesh cells arranged in two parallel and equal rows – similar to Camp 1.  The recreation facilities are similar to those found in Camps 1, 2, and 3, equipped with treadmills, elliptical machines and soccer balls; enabling a total of four detainees to participate in recreation simultaneously in four adjacent yards.

Plaintiffs' MSJ Appx. 2098

Camp 6, the newest facility, became operational in December 2006.  Although originally built as a medium security, climate-controlled facility, JTF leadership converted it to a maximum-security facility with an automated control center when, in June 2006, the risk of detainee suicide became acutely apparent.[9]  Camp 6 detainees reside in eight pods that are equipped with 22 cells each.  Each pod is a two-story wedge shaped wing attached to the main structure, with 11 cells on each story.  Each pod is equipped with skylights that permit the entry of natural sunlight, and includes a communal area equipped with tables and chairs used for recreation and entertainment activities throughout the day.  The tables and chairs are of steel construction and are fixed in place similar to detention facilities in use throughout the United States.

The JDG is presently in the process of converting areas of Camp 6 into a medium security facility, through expanded recreation areas, increased communal areas, and similar modifications.  A recently constructed outdoor recreation area can accommodate up to 22 detainees in a yard used for sports, exercise, reading, relaxation, prayer and meals.  Two additional recreation areas, each sub-divided with 11 standard-size recreation rooms, accommodate one-to-two detainees each; and two more recreation areas are sub-divided with five standard size recreation rooms each.  A newly constructed media building for Camp 6 includes a television and DVD player, and can accommodate up to 20 detainees for entertainment or classroom activities.  Construction is underway to transform four pods and provide detainees free access to communal and recreation areas throughout most of the day – similar to Camp 4.

Camp 7, occupied by detainees in September 2006, is a climate-controlled, single-cell facility currently used to house the High-Value Detainees.  Each tier includes a dual-cell recreation yard that is divided into two separate recreation areas that are enclosed by chain link fencing, enabling two detainees to participate simultaneously in four hours of recreation daily.  Recreation yards include elliptical machines and stationary bicycles, soccer balls, racquetballs, and an opportunity to read newspapers, magazines, and participate in prayer and meals.  Media rooms are available three times weekly for each detainee to watch movies of their choice, read newspapers, magazines, books and play hand-held electronic games.

Pre-Release/Transfer Facility

Detainees who occupy a special legal status (associated with court cases) reside in Camp Iguana.  All conditions at Camp Iguana are communal and provide detainees access to sunlight throughout the day.  Security conditions at Camp Iguana enable detainees to move freely within a fenced area comprised of several wooden, hut-like buildings – some used for sleeping, others for recreation, meals and prayer.  Detainees are free to move from living quarters – complete with bed, wooden dresser, desk, table and chair – to an outdoor recreation facility that overlooks the shore along Guantánamo Bay's southeastern coastline.  A treadmill, elliptical trainer, picnic table, and planted garden with garden hose are among the outdoor provisions for these detainees.  One building in the facility is available specifically for religious worship, with numerous rugs and a sound system that provides the daily call to prayer.  A second building includes a library with books in native languages and a reading area, along with access to satellite television, three

---

[9] Three detainees committed suicide by hanging in Camp 1 during the evening hours of 9 and 10 June 2006.

Plaintiffs' MSJ Appx. 2099

different newspaper publications that are updated routinely, art supplies, hand-held games, puzzles, and Sudoku.  A third building has a washer and dryer for detainee use.  Finally, the camp has a shower and hygiene building with running hot and cold water, sinks, mirror, toilets, and showers.  Because of the status of Camp Iguana detainees, this camp is not an option that is available to the CJDG for moves involving general population detainees.

Limited Use Facility

Camp Echo became operational in October 2004 for housing detainees and conducting attorney-detainee/client meetings.  Each detainee resides in a hut-like wooden structure, separated in half, with one-half for a meeting area and the other half being a cell area.  Each structure includes a table and chairs to facilitate meetings (these are not accessible to the detainee while he is in his cell).  Each detainee receives magazines, books, newspapers and similar items.  Detainees have access to natural light and fresh air through open front doors.

Joint Medical Group

The Joint Medical Group at JTF-Guantánamo provides extensive healthcare services to the detainee population.  Medical services are available 24 hours per day, without regard to disciplinary status or detainees' cooperation with intelligence gathering and legal processes.  The training curriculum prepares the guard force to recognize medical and dental emergencies and contact medical personnel for immediate response.  Routine medical and dental care is available as needed, with timing of medical care based upon the severity of the condition.  Medical specialty evaluation and treatment sub-specialists visit Guantánamo on a quarterly or semi-annual basis and as needed.  Specific facilities and services available include the following.

Medical Facilities: A Detainee Hospital,[10] opened on 4 September 2002, is located adjacent to Camp 4.  This facility has 17 inpatient beds (expandable to 30), an operating room, X-ray capabilities, pharmacy, central sterile supply, dental suite (2 chairs), physical therapy, optometry (with optical fabrication capability provided as a local resource through the Naval Hospital), audiology and several patient treatment areas.  It serves as the inpatient facility for all detainee camps.  The core medical team consists of five physicians, one physician assistant, two dentists, 17 nurses, and 84 Corpsmen.  The detainee hospital has minimum staffing of at least one nurse and four Corpsmen 24 hours per day.  For emergency care, Corpsmen and nurses can respond to every camp within minutes.  Physicians are present at the hospital during normal working hours and available on call after hours, no more than a few minutes away.  There are three ambulances available (at Camp 6, Camp 7 and at the Detainee Hospital) for emergency transport, and a recent appendectomy was started within an hour of diagnosis.  Physicians are present at the hospital during normal working hours and available on call, no more than a few minutes away (after hours).  A small medical treatment room, with a Corpsman on duty 24 hours per day, is located in Camp 5.[11]  Camp 6 has a larger medical space with treatment areas, a dental room, and administrative spaces.[12]  Camp 6 medical staff includes a physician, who is available during normal working hours and on call after hours.  There is also at least one nurse and five Corpsmen

---

[10] See Appendix 12, Figures 12-1 through 12-6.
[11] See Appendix 12, Figure 12-7.
[12] See Appendix 12, Figure 12-8.

13

in the Camp 6 medical area 24 hours per day who provide medical support for Camps 5, 6 and Echo.  Camp 7 has a dedicated medical treatment room and dental chair.  A physician is on site during normal working hours and on call after hours.  A Corpsman is present in Camp 7 on duty 24 hours per day.

The Naval Hospital on the main base provides support services for care beyond Detainee Hospital capabilities.  It has a Computerized Tomography (CT) Scanner and a cardiac catheterization laboratory, which requires 48-72 hours to activate for diagnostic procedures due to importation of appropriate supplies and specialty staff from mainland military medical facilities.

Routine Care:  Medical personnel (usually Hospital Corpsmen) make daily rounds in all camps to distribute prescribed medications.  Detainees may express medical complaints either to medical personnel making rounds or to the guards.  Corpsmen and guards relay detainee medical complaints either verbally or via the Detainee Information Management System (DIMS).  For minor ailments, Corpsmen may dispense over-the-counter medications to detainees.  Triage nurses review all care and assessments provided by Corpsmen.  Detainees may also request appointments with a physician assistant or physician.  These evaluations may occur either in the detainee's camp or at the medical facility, depending upon the nature of the complaint.  Routine appointments are available within a range of same-day to two weeks, but average a week or less.

Preventive Services:  Detainees receive a full medical assessment upon arrival at Guantánamo.  In addition to medical history, physical evaluation and mental health assessment, the JMG screens detainees for chronic disease and tests them for hepatitis, HIV and tuberculosis.  Detainees receive tetanus, diphtheria, measles, mumps and rubella (the basic immunization series) upon arrival, with the provision for additional clinically indicated immunizations in the future.  Detainees have been given a standing offer to receive the influenza immunization annually, but they have the option to refuse.  The JMG reviews detainee medical records and history on an annual basis; age-appropriate screening services are optional (e.g. Prostate Specific Antigen, colonoscopy).

Dental Care:  Dental services are available at the Detainee Hospital, in the Camp 6 Medical Facility and at Camp 7.  Detainees may request routine dental evaluations and cleanings; the clinic will respond to acute problems within 24 hours.  Dental sub-specialists visit Guantánamo periodically to provide periodontal and prosthodontics services.

Optometry:  The Naval Hospital Optometrist provides routine eye exams for detainees on a weekly basis.  Local fabrication of polycarbonate lenses is available on Guantánamo and permits detainees to receive eyeglasses within a day of their evaluation.  The optometrist also responds to urgent and emergent eye conditions on an on-call basis.  He maintains a listing of detainees with chronic eye conditions, and provides appropriate follow-up.  For example, he provides annual eye exams to all detainees with diabetes.

Mental Health:  Detainees receive a mental health assessment upon arrival at Guantánamo and as needed, thereafter.  The Behavioral Health Unit (BHU), completed in November 2005, has a capacity of 12 inpatients.  Mental health services are available both upon detainee request and by

consultation.  The BHU has a total staff of 17 personnel including a psychiatrist, a psychologist, behavioral health nurses, psychiatric technicians, with at least one nurse and two psychiatric technicians present at all times.

Medical Specialty Services:  The Naval Hospital has Orthopedic Surgery, General Surgery and Internal Medicine specialists who can provide consultations for detainee care, but other required medical specialists travel to Guantánamo.  Military medical specialists make periodic visits to Guantánamo to provide consultation and treatment for detainees and military beneficiaries. Dermatology, urology and cardiology appointments are available regularly.  Prosthetics services appointments are available periodically along with neurology; radiology; prosthodontics; gastroenterology; and ear, nose and throat consultants.  The hospital will facilitate the travel of other specialists to Guantánamo as necessary to provide medical care needed by detainees.  To date, one detainee has received an oncology evaluation and chemotherapy treatment for cancer, and another refused a recommendation for cardiac catheterization.  Eight detainees with amputations have received artificial limbs.  Patients with handicaps receive accommodative medical equipment (walkers, wheelchairs, handicapped toilets, etc.) as needed and ordered by their physicians.

Joint Intelligence Group

A civilian director, employed by the Defense Intelligence Agency, with an O-6 deputy director, leads the Joint Intelligence Group (JIG).  The JIG assigns personnel into functional branches, with interrogation being one of the functions, supported by analysts, linguists and information managers.  Interrogators work in the Interrogation Control Element (ICE), led by an ICE Chief and Deputy ICE Chief, assisted by subordinate Section Chief and Assistant Section Chief.

JTF-Guantánamo schedules interrogations daily, between the hours of 0800 and 2030.  All interrogations are voluntary; approximately one-third of the sessions are at detainees' request. Given the length of time that most detainees have spent at Guantánamo, the primary focus of interrogations is to gather security and force protection information related to the operations of the detention camps.  The current nature of the intelligence mission lends itself to the use of direct approaches and small incentive items to encourage detainees to volunteer information.

15

**Findings**

This section examines each element of conditions of detention from detainee arrival at Guantánamo to transfer/repatriation.  The analysis includes an assessment of governing authorities, a review of current procedures, a review of representative concerns expressed by groups outside the Department of Defense, and a list of recommended actions for the department, presented in an issue paper format.  The specific topic areas include:

Shelter
Hygiene
Clothing and Bedding
Food and Water
Religious Practice
Recreation
Sleep
Detainee Discipline System
Detainee Compliance with Camp Rules and Vetting Criteria
Intellectual Stimulation
Mail
Protection from Violence
Protection from Violence—Use of Force
Protection from Violence—Forced Cell Extractions
Protection from Violence—Shackling
Protection from Sensory Deprivation—Solitary Confinement
Protection from Sensory Deprivation—Human-to-Human Contact
Protection from Humiliation
Health Care Services—Quality of Care and Access
Medical/Dental Confidentiality of Medical Records and Information
Medical Ethics—Medical Treatment for Hunger Strikers
Healthcare Personnel Management—Behavioral Science Consultants (BSC)
Interrogation
Outside Access to Detainees
Attorney Access to Detainee-Clients
Detainees Ordered or Approved For Release
Repatriation/Transfer.

Plaintiffs' MSJ Appx. 2103

*Shelter*

A.  Legal/Policy Authority.  Under DoDD 2310.01E, detainees are entitled to "adequate shelter."
Additional amplifying reference material may be found in GPW (Art. 25), GCC (Art. 85), and
AR 190-8 (6-1), which provide for protection from dampness, adequately heated and lighted
quarters, spacious and well-ventilated, taking into account the climate and the age, sex, and
health of detainees.

B.  Detainee/NGO input.  Detainees should be afforded maximum access to natural light while
still providing them with safety measures against brightness and direct sunlight, including more
time outside.  Detainees should be able to see a clock in order to better gauge their time.
Detainees should be, as much as possible, grouped according to cultural and ethnic backgrounds.
Allow all detainees to live in Camp 4 or a Camp 4-like (collective living) environment.  In the
meantime, consider making Camp 6 a medium security facility.  Make the windows in the cells
of Camp 5 clear instead of opaque.  Prevent extremes of heat and cold in detainee cells.  Improve
detainee living areas to make them feel more comfortable.

C.  Practice/Implementation.  Detainee housing is managed through the operation of nine
different camps (Camps 1, 2, 3, 4, 5, 6, 7, Echo, and Iguana).  Each camp has multiple housing
options to enable grouping of detainees by cultural or ethnic backgrounds, and these are always
taken into consideration.  All detainees are housed in either individual cells or communal bays
that facilitate security for the safety of both staff and detainees.  Every cell is equipped with a
toilet, sink, and mirror, and communal bays offer free access to communal areas with toilets,
sinks, and mirrors.  The camps also include a mixture of closed climate-controlled facilities, or
open-air facilities with forced air and fans to provide comfort.  The closed climate-controlled
facilities maintain a temperature register between 75-80 degrees Fahrenheit and are always
monitored by the guard force.  All spaces provide ample access to daylight with either windows
in individual cells, skylights, and/or open air doors.  Recreation areas directly adjoin all detainee
housing units, and provide ample access to fresh air daily.  All detainees are allowed a minimum
of four hours outside recreation per day for compliant detainees, and no less than two hours for
non-compliant detainees.  All recreation areas have appropriate sun screening to provide shaded
areas.  Clocks are also placed in all housing units in the plain view of detainees.  The detainee
population does not include any juveniles or females.  All facilities have been greatly improved
since detainees first arrived in January 2002 at Camp X-Ray.[13]

Camps 1, 2, and 3 are open air modular facilities with steel-mesh single cells that offer access to
sunlight and fresh air throughout the day, as well as showers and recreation spaces directly
outside the end of each block.[14]  Unencumbered living space is approximately 25 square feet per
cell; overall cell size is approximately 45 square feet.

Camp 4 offers communal living in barracks-style, air conditioned bays for some of the most
compliant detainees.[15]  Detainees live communally in groups no larger than ten, and have 20
hours per day of access to fresh air and outdoor recreation.  There is a total of approximately 512

---

[13] Camp X-Ray in 2002 and in 2008 is depicted in photos attached at Appendix 12, Figures 0-1 and 0-2.
[14] See Appendix 12, Figures 1-1 through 1-9.
[15] See Appendix 12, Figures 2-1 through 2-7.

17

square feet of space in each building used for sleeping, with approximately 50 square feet per detainee.

Camp 5 is a maximum-security facility where detainees are housed in adjacent individual cells aligned in upper and lower tiers within four separate wings.[16]  Detainees are now housed only in cells with clear windows.  Unencumbered living space is approximately 56 square feet per cell; overall cell size is approximately 75 square feet.

Camp 6 is a climate controlled facility with detainees housed in eight pods – each comprised of 22 adjacent individual cells.  A detainee pod can be described as an open, two-story pie-shaped wing with sky lights, 11 cells on each story with the bottom floor cells opening directly to an indoor communal table/recreation area, and second floor cells connected by way of a catwalk and stairway.[17]  Renovations are ongoing in this camp to create more communal living opportunities and provide additional outdoor, fresh air recreation yards.  Unencumbered living space is approximately 54 square feet per cell; overall cell size is approximately 80 square feet.

Camp 7 is a climate-controlled, single-cell facility currently used to house the High-Value Detainees.  The cells in this facility are designed to limit communications between detainees.  However, all detainees are allowed up to 4 hours of paired outdoor, fresh air recreation per day.  Unencumbered living space is approximately 55 square feet per cell; overall cell size is approximately 86 square feet.

The interior temperature of Camps 5, 6, and 7, respectively, is kept at a comfortable level for detainees and staff (typically between 75 and 80 degrees Fahrenheit).

Camp Echo is separated into areas that are designated for housing of detainees, and attorney-detainee/client meetings.  Each detainee is housed in a hut-like wooden structure that is separated into two halves, with one half being a meeting area with a table and chairs, and the other half being a cell area with a shower, toilet, and sink.[18]  Detainees have access to natural light and fresh air through open front doors.  Unencumbered living space is approximately 90 square feet per cell; overall cell size is approximately 135 square feet.

Camp Iguana is a communal camp with wooden, hut-like living structures, which provide freedom to move about from different buildings designated for housing, prayer, library, laundry facilities, shower/bathroom, outdoor recreation, and lounge areas.[19]  Detainees also have free access to satellite television, books, newspapers, magazines, handheld games, puzzles, and art supplies.  Detainees have unfettered access outside their living facilities within the confines of the camp.  There is a total of approximately 250 square feet of space in each building used for sleeping, with approximately 35 square feet per detainee.  All camps, except Camps 1-3, are equipped with camera monitoring equipment; however, none are used currently to video record, except on demand in response to specific events.

---

[16] See Appendix 12, Figures 3-1 through 3-4.
[17] See Appendix 12, Figures 4-1 through 4-5.
[18] See Appendix 12, Figures 5-1 through 5-3.
[19] See Appendix 12, Figures 6-1 through 6-9.

18

D. <u>Team Analysis</u>.  Approximately sixty percent of the detainee population is housed in individual cells.  All cells in Camps 5, 6, 7 and Echo exceed those typical of medium and maximum-security detention facilities throughout the United States in terms of standard design and cell size; however, cells in Camp 2/3 should be modified to expand the unencumbered living space.

The physical camp design for all detention spaces facilitates personal contact and interaction between staff and detainees.

Renovations underway in Camp 6 are an initiative that we strongly endorse to improve detainee quality of life, with conditions that are closer to those in Camp 4.  Completion of Camp 6 construction will build upon the success of the Camp 4 model with classrooms and free access to communal areas and recreation facilities.  Engineers are currently transforming four Camp 6 pods by removing barriers to offer open access for detainees to roam freely from their cells, to indoor communal areas and to outdoor large recreation facilities for up to 20 hours each day.

E. <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Expedite improvements in Camp 6 to provide the JDG Commander the maximum number of options available to manage the detainee population.**

- **Continue to manage and maintain current structures as required to provide adequate shelter.**

- **Continue to house detainees in Camp 5 only in cells with clear windows.**

- **Continue to monitor environment in climate-controlled facilities to ensure temperatures remain comfortable.**

**Recommend:**

- **Modify an appropriate number of cells in Camp 2/3, in order to provide detainees housed there more living space.**

- **Video record all activities in detention camps.**

19

Plaintiffs' MSJ Appx. 2106

*Hygiene*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  Under DoDD 2310.01E, detainees are entitled to humane care and treatment.  Additional reference material may be found in GPW (Art. 29), GCC (Art. 85), and AR 190-8 (6-1), which provide for day and night access to sanitary conveniences that conform to the rules of hygiene and are clean, with water and soap for daily personal toilette, and showers and baths.  They also provide that necessary time should be set aside for washing and cleaning.

B. <u>Detainee/NGO Input</u>.  Frequent and extended shower periods should be allowed; personal hygiene items should be made readily available.  Detainees should be provided tools, within the limits of safety and security, so they can do their own grooming and trimming.  Ensure that detainees have privacy while using the toilet.  Detainees with disabilities need to be given the proper facilities so as to ensure their own personal hygiene.

C. <u>Practice/Implementation</u>.  All detainees are provided unlimited and direct access to potable water, sinks, and toilet facilities, and every detainee is given an opportunity to shower daily for 10 minutes.[20]  Cells are available for housing disabled detainees, and medical staff can provide a special toilet seat if required.  While using toilets, detainees are allowed to shield their lower bodies for privacy with a thin foam rubber mat, towel, sheet or other issued items.  All Camps provide direct access to running potable water, sinks, mirror, and toilets in cells or unlimited-access communal areas.  Showers are located in cells of Camps Echo and 7, in communal areas of Camps 4 and Iguana, and at individual shower stalls outside of cells in Camps 1, 2, 3, 5, and 6. Each detainee is provided with soap, toothpaste, toothbrush, shampoo, towels, and footwear suitable for showering.[21]  These items are considered basic issue items and detainees are never denied access to them, unless they are considered a self-harm risk or they use such items to threaten themselves, other detainees or guard staff.  In addition, electric trimmers and nail clippers are stored by the staff, and offered weekly.  Barber services are offered monthly.  Each detainee is also provided supplies to clean his own cell or bay.

D. <u>Team Analysis</u>.  Camp practices today exceed the standards for providing day and night access to all basic hygiene requirements.  Detainees are never denied access to basic hygiene items, except as discussed above.  In the past, showering was more limited; however, as of this date, detainees are permitted to shower daily.  Input from outside sources was considered and helpful as detention practices evolved in this area.

E. <u>Findings/Recommendation</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**
- **Continue to manage and maintain current facilities to provide all hygienic requirements.**
- **Continue daily access to showers, weekly access to hair trimming, and monthly access to a barber.**

---

[20] See Appendix 12, Figures 1-1, 1-9, 2-7, 3-1, 3-4, 4-1, 4-3, 5-2, and 6-2.
[21] See Appendix 12, Figures 7-1, 7-5 through 7-7, 7-9, and 7-11.

Plaintiffs' MSJ Appx. 2107

*Clothing and Bedding*

A. <u>Legal/Policy Authority</u>.  Under DoDD 2310.01E, detainees are entitled adequate clothing. Additional reference material may be found in GPW (Art. 27), GCC (Art. 85, 90), and AR 190-8 (6-1, 6-5), which provide for suitable bedding and sufficient blankets; necessary clothing, footwear, and changes of underwear; and adequate water and soap for washing personal laundry.

B. <u>Detainee/NGO input</u>.  Some criticisms include that staff ensure the right fit of clothing for detainees, and improve the efficiency and proper distribution of clothing.  Provide the means for detainees to wash their own clothes.

C. <u>Practice/Implementation</u>.  All detainees are provided one uniform top and bottom (three uniforms each in Camp 4), one pair of underwear (three in Camp 4), two pairs of socks, one pair of exercise shorts, one t-shirt, one pair of deck shoes or basketball shoes, and one pair of rubber shower shoes.  Highly compliant detainees are issued white and tan uniforms, compliant detainees are issued tan uniforms, and detainees in a disciplinary status are issued orange uniforms while they are in that status.[22]  Sizes of uniforms and other clothing items are provided in conformance with detainee requests.  Extra-large size uniforms are typically the most popular choice by detainees and are willingly provided by the JDG.

Laundry services for clothing are offered to all detainees weekly; underwear and exercise clothing may be exchanged upon request.  Detainees in Camp Iguana tend to do their own laundry, with all soap and supplies provided by the JDG.  During our team's review of Camps 5 and 6, we observed guard staff exchanging clothing for detainees and found procedures consistent with the stated SOP (detainees are provided clean clothes to change into before they give-up their dirty clothes).  Camp 7 guards launder all detainee clothing and bedding on-site weekly (blankets are laundered monthly), and store additional items for prompt replacement for those items found unserviceable.

For bedding, all detainees are given a thin foam mat, a thick foam mattress with built-in pillow, blanket and padded, rip-stop sheet.  Recently, an additional pillow was issued to detainees in all camps, since some detainees did not prefer the pillow built into the foam mattress.  Additional comfort items, such as padded blankets are provided to compliant detainees upon request.  Blankets are exchanged and laundered each month based on schedule for each camp.  Special anti-rip blankets and smocks are provided to those detainees determined by competent medical authority to be at risk for self-harm.  During our team's review of bedding in Camps 5, 6 and Echo, we observed occupied cells and found bedding materials to be appropriate and serviceable.

D. <u>Team Analysis</u>.  We reviewed the JDG SOP; Discipline Matrix (Appendix 13); [Table 30-3] Basic Issue and Comfort Items list (Appendix 14), and observed procedures for issuing, care, replacement, laundering and exchange of detainee clothing and bedding.  We saw clothing and bedding in cells within each camp and observed that issued items were serviceable.  Detainees in a discipline status lose privileges consistent with the standard procedures identified in the Discipline Matrix (Appendix 13) and Basic Issue and Comfort Items Privileges (Appendix 14). During routine cell inspections, guards record the contents of each detainee's cell/bay in the

---

[22] See Appendix 12, Figures 7-1, 7-5 through 7-9, 7-11, and 7-12.

21

Detainee Information Management System (DIMS), and include clothing and bedding in the report.  We observed a detainee in Camp 2 who refused to accept basic and comfort items, but declined to explain why, when asked.  Each exchange of serviceable, laundered clothing and bedding is recorded in DIMS for each detainee.  During our team's visit, we reviewed all procedures used to ensure detainees are provided with clothing and bedding material.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to manage the program and enforce the standards already established in the SOP for the proper care and handling of detainee clothing and bedding material.**

Plaintiffs' MSJ Appx. 2109

*Food and Water*

A. <u>Legal/Policy Authority</u>.  Under DoDD 2310.01E, detainees are to be provided adequate food and water.  Additional reference material may be found in GPW (Art. 26), GCC (Art. 89), and AR 190-8 (6-5), which provide for daily food rations sufficient in quality, quantity, and variety to keep detainees in a good state of health and prevent weight loss or nutritional deficiency.  They also provide that customary diet should be taken into account and sufficient water be made available.

B. <u>Detainee and NGO input</u>.  Past criticisms include claims that detainees should receive balanced meals according to their customs and cultures and ensure they receive meals in a timely matter.  Serve meals at a hotter temperature and rotate the menu more often.

C. <u>Practice/Implementation</u>.  Joint Detention Group SOP provides the implementing authority for the JDG.

Three hot halal meals per day – with 4500-5000 cal/day – are served to detainees in each camp, with six menus for detainees to choose from – specifically: regular, high fiber, vegetarian, vegetarian with fish, bland, and soft food.  (Note: halal is an Arabic term used to designate an object or an action that is permissible to use or engage, according to Islamic law and custom).  Bi-weekly, detainees in each camp have an opportunity to select new meals from the menu.  (See Appendix 15 for full list of meal choices provided to detainees).  A typical meal includes meat, starch (plus bread), vegetable, dessert, fruit, fruit juice or similar drink.[23]  The hospital nutritionist reviews and discusses meal selections with the CJDG, and adjusts diets in cases where medically warranted.  More than 40 individually prepared special diet meals, as prescribed by physician, are also provided.  Meal times, content, and delivery are adjusted during religious holidays to accommodate fasting.  Feast meals are provided bi-weekly in all camps, and include double portions of meat, starch and vegetable.  Additional break-the-fast snacks are offered during Ramadan.

Adherence to the SOP, coupled with routine preventative medicine inspections ensure that meals are delivered promptly without spoilage.  Our team reviewed the inspection results for 02 Dec 08, 29 Dec 08, and 14 Jan 09, and each inspection revealed a SATISFACTORY rating.[24]  However, two of those inspections recorded a small number of meals delivered to detainees in Camps 5 and Echo that were approximately five degrees under the optimal standard.  Detainee meal consumption is monitored constantly by guard force and medical staff for unsafe and unhealthy weight loss and to ensure adequate nutrition and hydration.

All detainees have unlimited access to potable water in their cells.  In addition, all detainees are provided bottled water upon request, unless they have been placed in a disciplinary status for using the bottle as a weapon (e.g., using the bottle to squirt or spray bodily fluids on guard staff or visitors).

---

[23] See Appendix 12, Figures 8-1 through 8-5.
[24] Possible outcomes are Satisfactory and Unsatisfactory.

23

In Camps 4, and Iguana, meals are taken communally and detainees are permitted to keep various non-perishable items following the meals.  Meals are taken in the cells and recreation areas in Camps 1, 2/3, 5, 6, 7, and Echo, and also offered in the communal area for detainees in Camp 6.  Detainees are provided a minimum of one hour to consume the meal.  In each of these camps, compliant detainees are permitted to retain three non-perishable items per meal.

In Camp Iguana, the detainees as a group are provided a $100 monthly supplement for snacks that are purchased by JDG personnel at the Naval Station exchange.  Snacks are stored in each detainee's personal living area at Camp Iguana.

D. <u>Team Analysis.</u>  We observed that hot meals were delivered – upon receipt at the Camp – by guards to detainees.  Detainees were allowed to take meals in recreation areas, living bays and communal pods, in accordance with the camp schedule.  All detainees were offered a meal.  Those detainees who took meals consumed them upon receipt.  Meal content matched the stated SOP for menu choices, with hearty portions.  In each cell, we saw the non-perishable items that detainees retained, including salt, pepper and olive oil.  A great deal of care and effort is placed into meal preparation and delivery by the entire staff.

E. <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Continue to manage the program and enforce the standards already established in the SOP for the proper preparation and distribution of detainee meals.**

24

*Religious Practice*

A.  Legal/Policy Authority.  Under DoDD 2310.01E, detainees are to be provided the opportunity for free exercise of their religion, consistent with requirements of detention. Additional reference material may be found in GPW (Art. 34), GCC (Art. 93), and AR 190-8 (6-7), which provide for complete latitude in the exercise of religious duties, including attendance at services, if they comply with the prescribed disciplinary routine.  In addition, ministers of religion who are detainees should be allowed to minister freely to members of the community.

B.  Detainee/NGO Input.  Use a Muslim Chaplain (when available) to train the guard force on how to be culturally and religiously sensitive to the detainees, including maintaining silence during prayer time.  Respect religious items and books and provide regular prayer times. Provide for group prayer at all camps.

C.  Practice/Implementation.  All detainees are provided one Koran in the language of their choice, in addition to an Arabic Koran and TafSeer.  All detainees are provided prayer beads, cap, rug, and current prayer schedule.[25]  These items are retained by all detainees regardless of disciplinary status, unless deliberately used for self-harm or as a weapon.  Guards and staff have received specialized cultural and religious sensitivity training.  Cultural and religious considerations are also taken into account when assigning detainees to housing areas.  Guards observe silence during all prayer times.

A monthly prayer schedule is published and call to prayer is sounded five times daily in all camps.  Prayer is led within each camp and block by a detainee-selected prayer leader.  In Camps 2, 3, 5, 6, and Echo group prayer is typically conducted by detainees from their individual cells. When this occurs, the food tray access doors of the prayer leaders are lowered to facilitate call to prayer on each block/tier.  At times when detainees are engaged in group or communal activities and prayer call sounds, prayer is led by prayer leaders in person.  In Camps 4 and Iguana, group prayer is conducted in communal areas of the camps.  At Camp 7, prayer is conducted individually in their cells.  Guard movement and activity is limited to only those actions required to maintain security.  Visual signals are placed on each block/tier signifying quiet time.  Each detainee cell and common area includes an arrow pointing towards Mecca.

The team observed that the Koran was respected at all times.  Guards followed applicable guidance and did not touch the Koran, unless specifically authorized to do so by CJDG.  We observed that the guards also took special precautions to respect the Koran when detainees would hold it and refuse to put it down before entry of an FCE team.

Due to cultural sensitivities, modified frisk searching procedures are in place that respect the detainee's groin area, and guards are not allowed to conduct frisk searches of this area.  Guards are limited to grasping the waistband of detainees' trousers, and shaking the pants.

D.  Team Analysis.  All detainees are given wide latitude in the exercise of their religious beliefs and they are able to retain religious items at all times.  Concerns raised in the early years of detention operations at Guantánamo highlighted the importance of respect for the religious

---

[25] See Appendix 12, Figures 7-2, 7-5 through 7-9, and 7-12.

traditions of the detainees.  In response, considerable efforts were undertaken to avoid actions that could be construed as disrespectful.  For example, guards are given awareness training and required to control noise and movement during prayer times.  Guards have been disciplined[26] for interfering with prayer time.  A full-time cultural advisor has been employed by the JTF for the past several years.  He provides a robust level of advice to leadership within the JTF, and most particularly, the JDG.  The CJDG recognizes that the SOP does not permit searching of the Koran or detainee groin areas, which is contrary to standard security procedures in most detention facility operations, and that it carries a level of risk.  However, he has accepted that risk out of an elevated respect for religious concerns of the detainees.

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Give detainees in Camp 7 opportunities for group prayer with three or more detainees, similar to practices in other camps.**

- **Continue to allow free exercise of religion to the maximum extent possible, within current security restrictions.**

- **Continue to avoid actions that are disrespectful of detainees.**

---

[26] The team reviewed a sampling of disciplinary records of guards disrupting prayer.  Of those, MPI investigated and found two substantiated.  One guard was given a written reprimand, and the other an oral reprimand.

26

*Recreation*

A.  Legal/Policy Authority.  Common Article 3.  Under DoDD 2310.01E, detainees will be treated humanely and respected as human beings.  Additional reference material may be found in GPW (Art. 38, 98), GCC (Art. 94, 125), and AR 190-8 (6-7), which provide that detainees are encouraged to participate in intellectual, educational, and recreational pursuits, as well as sports and games.  In addition, all possible facilities and equipment are to be provided for this purpose, including sufficient space for outdoor exercise and sports.  Detainees in a disciplinary status are to be allowed to exercise and stay in the open air at least two hours daily.

B.  Detainee/NGO input.  Some criticism include recommendations that detainees be provided more time to exercise and participate in recreation by providing a variety of sports and indoor activities, either by themselves or in group.  Recommendations include expansion of existing recreational areas for a wider variety of sports or activities.  Many have suggested detainees should be able to go outside during daylight hours and enjoy fresh air and natural light.

C.  Practice/Implementation.  The JDG SOP provides implementing instructions for all recreation procedures.  All camps have outdoor recreation facilities for detainees.  In all camps, access to shaded recreation areas is provided for daylight recreation periods.  Daylight recreation is the norm in every camp, but some recreation periods occur after dusk based on detainee request, daylight hours available, or limitations caused by the availability of recreation areas.

Recreation periods.  All compliant detainees are offered a minimum of four hours of outdoor recreation per day, and up to 20 hours per day (Camps 4 and Iguana).  All detainees in a discipline status are offered a minimum of two hours outdoor recreation daily.

Communal recreation.  All camps, except Camp 7, offer communal recreation – the opportunity for detainees to conduct exercise or social activities in a group of at least four – to as many as 22 detainees – simultaneously.  Detainees in Camps 4, 6 and Iguana recreate together while enclosed in a single, large recreation yard with facilities/equipment to support soccer, basketball, volleyball, jogging, table tennis, foosball, treadmill and elliptical machines – for up to 20 hours daily (limited to four hours daily in Camp 4 and Camp 6 large recreation facilities).[27]  In Camps 1, 2, 3, 5, and Echo, communal recreation is conducted via groups of two to eight in double-occupant recreation areas that enable interaction for four to 16 detainees outdoors simultaneously, depending on the camp.[28]  In Camp 7, each detainee is offered four hours recreation daily; however, there are limited opportunities for communal recreation, as detainees are limited to a single recreation partner (the same partner each day).

Camp 6 initiatives.  A large outdoor recreation area was recently constructed at Camp 6 and another is under construction.  A new classroom with TV and DVD player in Camp 6 offers movies and more learning opportunities with language classes for detainees.[29]

Communal Social Activities.  Detainees in Camp 4 and Iguana spend the entire day in a

---

[27] See Appendix 12, Figures 2-2, 2-4 through 2-6, 2-8, 6-5, 6-7 through 6-9.
[28] See Appendix 12, Figures 1-3, 1-7, 1-8, 3-2, 3-3, 4-2, and 5-3.
[29] See Appendix 12, Figures 4-4 through 4-6.

27

communal environment, with access to books, magazines, newspapers, games, and televisions with DVD players. In the communal pods of Camp 6, which are similar to a common dayroom equipped with fixed tables and chairs for group meeting, as many as nine compliant detainees are offered to meet approximately twice weekly in three-hour communal social activities. There, detainees are offered TV, three newspaper publications, detainee newsletter, books, magazines, art supplies, board games, handheld electronic games and puzzles. Detainees in Camp 3 are offered communal periods for viewing TV with DVD players, handheld games and newspapers for periods up to three hours, on an average of three times per week. All newspapers and magazines are redacted if necessary for security purposes.

D. <u>Team Analysis</u>. We reviewed all procedures used to ensure detainees are provided with adequate opportunity for outdoor recreation. Camps 4 and Iguana offer the most expansive recreation opportunities for detainees, and compliance with camp rules remains highest in these camps. In Camp 4, detainees violating camp rules and subject to discipline in accordance with established procedures are typically moved to another camp. In Camp Echo, detainees have access to recreation facilities for a minimum of four hours daily, and often more, subject to the availability of recreation facilities. To build upon the success of the Camp 4 model with classrooms, and free access to communal areas and recreation facilities, engineers are currently transforming four Camp 6 pods by removing barriers to offer open access for detainees to roam freely from cell, to indoor communal area, to an outdoor, large recreation facility for 20 hours each day. The modification will likely influence detainee compliance and entice more detainees to earn the privilege to enjoy its new benefits. The basic philosophy behind recreation is to maximize socialization and physical fitness opportunities among detainees for considerable periods of the day. In almost all cases, detainees are provided much more recreation than the minimum standard (the only exception is the two-hour limit for non-compliant detainees). Facilities and equipment are in good condition in all camps. In Camp 7, there are limited opportunities for communal recreation, as detainees are limited to a single recreation partner (the same partner each day).

E. <u>Findings/Recommendations</u>. **Conditions are in compliance with Common Article 3 of the Geneva Conventions. No prohibited acts were found and conditions are humane.**

**Strongly recommend:**
- **Accelerate the completion of Camp 6 recreation areas and facilities supporting enhancements for socialization.**
- **Expand recreation options in Camp 7, including allowing for greater communal recreation opportunities among detainees (e.g., three or more detainees in recreation together, different recreation partners, etc.).**
- **Continue to resource the Joint Task Force with assigned personnel, money and contracts necessary to keep pace with changes to operations and facilities deemed valuable in supporting compliant behavior and preparation for detainee transition from Guantánamo.**
- **Continue to manage the program and enforce the standards already established in the SOP enabling each detainee a minimum of four hours of recreation daily.**

Plaintiffs' MSJ Appx. 2115

*Sleep*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  Under DoDD 2310.01E, detainees are to be treated humanely and sensory deprivation is prohibited.  Additional reference material may be found in GPW (Art. 25), GCC (Art. 85), and AR 190-8 (6-1), which provide for quarters that are adequately heated and lighted, particularly between dusk and lights out, with suitable bedding and sufficient blankets.

B. <u>Detainee/NGO Input</u>.  Detainees should be allowed to have full sleep without interruption, noise or any other distractions.  Lights in the cells should be turned off or lowered at night.

C. <u>Practice/Implementation</u>.  All detainees are permitted an unlimited amount of sleep during day and night, and lights are dimmed from 2200 until first Morning Prayer call is held. Detainees are provided sufficient bedding, foam eye mask, and ear plugs for use during sleep unless they misuse these items in violation of camp rules or are a self harm risk.  Guard force and staff are required to respect quiet hours during the periods that lights are dimmed.

D. <u>Team Analysis</u>.  Detainees are provided proper bedding and no restrictions for when they can sleep.

E. <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to provide detainees ability to sleep as desired, and respect quiet hours during the period of time that lights are dimmed.**

Plaintiffs' MSJ Appx. 2116

*Detainee Discipline System*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  According to DoDD 2310.01E, detainees are protected from violence to life and person including threats or violence, rape, assault, bodily injury and reprisals.  The discipline system must be applied without regard to race, color, religion or faith, sex, birth or wealth, or any other similar criteria.  Available reference material includes GPW (Art. 13, 17, 82-98); GCC (Art 31-33, 100); AR 190-8 (3-6, 3-7, 6-10, 6-11, 6-12), which require that: camp rules must be posted; a responsible officer may be delegated to investigate and adjudicate offenses; and disciplinary punishments cannot exceed 30 days, nor may discontinuance of privileges exceed basic humane treatment requirements.

B. <u>Detainee/NGO Input</u>.  Make sure detainees fully understand the rules of the facilities; explain the penalty for breaking the rules and the rewards for abiding by the rules.  Do not use adjustments to the temperatures in the cells as a means of punishment.  Do not allow disciplinary punishments to affect use of hygiene issued items.  Do not exceed 30 consecutive days of discipline for one or a combination of rule infractions.  Any disciplinary measure should be performed in a legal and humane way abiding by all international humanitarian standards.  Avoid collective punishment.

C. <u>Practice/Implementation</u>.  The disciplinary system includes incentives designed to encourage compliance with camp rules, but its provisions never fall below the threshold of humane treatment.  Camp rules [Appendix 16], which are read to each detainee in his native language and posted in English and Arabic in every recreation yard[30]; and the discipline (consequence) matrix [Appendices 13, 14, and 17] offers a standardized regime of non-discriminatory disciplinary measures.  Disciplinary status is served in individual cells with reduced access to recreation, as discussed above.  The maximum time on disciplinary status is 30 consecutive days.  No detainees in a disciplinary status are permitted to be housed in Camp 4 or Iguana.  Disciplinary infractions are reported by guard chain of command and adjudicated by a discipline official appointed and responsible directly to CJDG.  Detainees are notified of their infractions and the consequences after the case is adjudicated.  A detainee may complain about mistreatment at any time, to the guard force, the Non-commissioned Officer in Charge, the Assistant Watch Commander, or the Watch Commander.  The guard force is instructed to note a complaint in the significant activities section of DIMS.  All of these complaints are subject, at least, to a preliminary inquiry, and if indicated, investigated by the JDG staff (refer to Protection Against Violence, below).  Detainees frequently violate camp rules, by assaulting the guard force, refusing to comply with orders, or by refusing to return from recreation.  Indiscipline has been steadily increasing since November of 2008; whether from frustration about their fate, or as an attempt to influence public opinion, is unclear.  But the empirical data shows that detainee misconduct is increasing [Appendix 18].  During the weekend of 13-15 February, for example, over 100 disciplinary reports were received and adjudicated each day.

D. <u>Team Analysis</u>.  The disciplinary system is a just and fair system without regard to race, color, religion or faith, sex, birth or wealth, or any other similar criteria.  Corporal and collective punishments are prohibited and not practiced.  Camp rules are published to all detainees.

---

[30] For one example, see Appendix 12, Figure 9-1.

Disciplinary status is limited to a maximum of 30 consecutive days.[31]  Disciplinary measures do not reduce basic issue comfort items, only additional comfort items and privileges.  Cell temperature manipulation is not an authorized disciplinary measure.  No disciplinary measures exceed the standards laid out in existing law and policy guidance.

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Continue to manage the program and enforce the standards already established in the SOP for the proper administration of discipline.**

---

[31] Currently, there is no policy in place to address serious misconduct, such as aggravated assault.  Although extraterritorial criminal jurisdiction is available for serious assaults, under 18 USC§ 113, policy limitations have prohibited exercise of that jurisdiction because it requires transfer of the detainee to the United States to stand trial.

Plaintiffs' MSJ Appx. 2118

*Detainee Compliance with Camp Rules and Vetting Criteria*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  According to DoDD 2310.01E, detainees will be treated humanely and respected as human beings.  Detainee "compliance criteria" are to be applied without regard to race, color, religion or faith, sex, birth or wealth, or any other similar criteria.  Available reference material includes: GPW (Art. 14, 16, 22, 25, 82-90), GCC (Art. 27, 33, 85), and AR 190-8 (3-3, 3-7, 6-1, 6-10, 6-11, 6-12), which provide: that communal living is the primary standard, but security concerns and disciplinary status may regulate the living conditions; disciplinary punishments cannot exceed 30 days (followed by three days off disciplinary status), nor may discontinuance of privileges fall below the threshold required for basic humane treatment; corporal and collective punishments are not authorized.

B. <u>Detainee/NGO Input</u>.  Increase opportunities for communal living and movement to Camp 4, or its equivalent.  Movement of detainees should take into account cultural, linguistic, or religious differences.  Do not move detainees based on cooperation with interrogators.

C. <u>Practice/Implementation</u>.  The JDG SOP compliance and vetting criteria are designed to incentivize compliance with camp rules, with a gradual increase of communal living arrangements being made available to compliant detainees.

The JDG convenes a board at least quarterly to review detainee conduct and status in the camps and determine whether detainees can be moved to camps with more communal living opportunities.  Board information packets include a list of recent reports, disciplinary infractions, security risk, and over-all compliance with camp rules.  Compliance with camp rules is the over-riding basis for deciding in which camp detainees will live.  Intelligence gathering considerations are not a motive for any camp assignment.  The vetting board that team members attended appropriately weighed the criteria in the SOP, in a non-discriminatory fashion.  The JDG Commander's intent was clearly to move as many detainees to communal living conditions as possible, consistent with the safety of the detainees and the guard force.

Detainees are also reassigned to camps and cells within camps for various reasons.  These include, but are not limited to, detainee behavior, detainee eligibility for increased privileges based on compliance, improvement of pod/cellblock dynamics, detainee language or ethnic background, force protection concerns, and detainee medical limitations.  The JDG commander, using the criteria discussed above, may also order cell or internal camp changes on the recommendation of the camp commanders and elements of the JDG Staff.  Where possible, these moves are discussed at the morning staff meeting, where input is provided by all board members discussed above.  The team observed this process at several morning updates and confirmed the movement/vetting process in camp visits over two weeks.

D. <u>Team Analysis</u>.  The compliance/vetting system is a just and fair system without regard to race, color, religion or faith, sex, birth or wealth, or any other similar criteria.  The camp leadership is making considerable effort to move detainees who are compliant into a more communal setting.  The current compliance and vetting system is effective, comprehensive, and fair, taking into account cultural, linguistic, and religious differences and balancing security concerns within the camp.  Although in the past, the impact on intelligence collection was a

32

consideration in camp assignments, cooperation with interrogators is no longer a factor in the movement of detainees.  However, intelligence input to the decision-making process is essential to maintain camp security.  The JDG is in compliance with all legal authorities and available guidance.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Properly resource the efforts of the JDG Commander to enhance conditions of detention, especially all socialization initiatives in Camp 6.**

- ▪ **Continue to manage the program and enforce the standards already established in the SOP for the proper vetting of compliant detainees.**

**Recommend:**

- ▪ **Conduct regular vetting, within reasonable security management practices, so that qualified detainees are expeditiously moved to communal living conditions.**

Plaintiffs' MSJ Appx. 2120

*Intellectual Stimulation*

A.  Legal/Policy Authority.  Common Article 3.  Under DoDD 2310.01E, detainees are to be treated humanely and respected as human beings.  Additional reference material may be found in GPW (Art. 38), GCC (Art. 94), and AR 190-8 (6-7), which encourage detainees to participate in intellectual and educational pursuits.

B.  Detainee/NGO Input.  Encourage the detainees to grow intellectually by providing them educational programs suitable to their age, language and educational level.  Teach the illiterate how to read and encourage learning several languages, such as English, Pashtu, and Arabic.  Train them in skills or trades to enable them to better reintegrate into their society.  Allow detainees to stimulate their minds through reading, distance learning or watching TV and to keep reading materials and other media in their cells.

C.  Practice/Implementation.  The JDG has provided programs for intellectual stimulation to detainees that include: access to library materials, movie program, access to newspapers (redacted for security purposes), board games, handheld games, puzzles, playing cards, art classes, reading and literacy classes (native language and second language), television and radio news, sports and entertainment programs (native languages), and family phone calls.  Note, detainees in Camp 7 are not authorized telephone calls; all other detainees are.

A detainee library provides all detainees with regular access to more than 13,000 books, 900 magazines, and 300 DVDs – all of which span 18 native languages of the population.  In addition, access to two Arabic newspapers and the USA Today is provided (certain articles are redacted for security reasons).[32]  Library staff distributes books weekly to detainees in all camps, and all detainees are permitted to maintain at least three books and one magazine at a time.  Compliant detainees in Camps 1, 2, 3, 5, 6 and 7 are allowed four books and two magazines at a time, and Camps Echo, Iguana and 4 are allowed five books, three magazines and one personal DVD at a time.

Compliant detainees (except those in Camp 7) are also afforded opportunities to participate in Literacy, Humanities, and Art programs.  The Detainee Literacy Program consists of classes in Arabic or Pashtu at the beginner, intermediate, and advanced level curriculum.  The Humanities Program consists of classes Arabic or English.  The Art Program consists of classes to learn and enhance art skills.

D.  Team Analysis.  Detainees at all levels of security are provided opportunity for intellectual stimuli through access to books, magazines, newspapers, library services, television, and DVDs.  Compliant detainees are also provided access to a variety of educational programs.

---

[32] See Appendix 12, Figures 10-1 through 10-10.

34

E. <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Continue to provide the current level of programs.**

**Recommend:**

- **Expand program content for intellectual stimulation, and provide for wider detainee access, subject to legitimate security concerns.**

35

*Mail*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  Under DoDD 2310.01E, detainees are to be treated humanely and respected as human beings.  The ICRC may provide "services."  Additional reference material may be found in GPW (Art. 71, 76, 123), GCC (Art. 107, 112, 137), and AR 190-8 (6-8), which allows detainees to send and receive letters, cards, and telegrams; censoring is to be done as soon as possible; and Red Cross correspondence will be facilitated.

B. <u>Detainee/NGO input</u>.  There are recommendations that the JTF create a more expedient method to screen detainee mail so that it may be delivered more quickly to the detainees.  Some have also recommended the staff explain to the detainee why the detainee's mail was censored so future correspondence would not be censored again, and have recommended the JTF no longer censor mail.  Some commentators recommend that detainees be allowed to send photographs to family.

C. <u>Practice/Implementation</u>.  Incoming mail for detainees includes three categories:  ordinary mail, processed through a designated Washington, D.C. postal address and delivered to and from Naval Station Guantánamo, Guantánamo Bay; International Committee of the Red Cross mail, written by the detainee in presence of ICRC representative and delivered by ICRC members, or Red Cross Messages written by outside sources and delivered by ICRC to detainees; legal mail, sent from lawyers or courts to and from the detainee.

Outgoing Mail.  Trained mail clerks collect detainee outgoing mail twice weekly in each camp (dates vary for each camp).  Detainees in compliant status are authorized to write as many letters and postcards they desire, using stationary and pens provided by the staff.  According to procedures, guards do not otherwise handle detainee mail, unless conducting an authorized search or inspection of a detainee's cell.  Detainees in a discipline status are also provided pens and stationery with which to write letters, but are limited to only one hour daily to write mail, in each camp.

ICRC Mail.  During periodic ICRC visits to Guantánamo Bay, ICRC representatives meet with detainees and collect any outgoing Red Cross Messages (RCM) from the detainee.  These representatives consolidate ICRC mail daily and provide to members of the Joint Detention Group staff in the Detainee Mail Processing Center (DMPC) for screening.  At the DMPC, the staff rapidly screens the correspondence for security and force protection violations.  Any RCM that includes violations of force protection or security rules will be redacted by the DMPC and will be returned to the ICRC with redactions to provide to the detainee.

Cleared Mail.  All detainee ordinary mail – both incoming and outgoing – is screened by designated members of the JTF-Guantánamo staff in the Detainee Mail Processing Center (DMPC) for security and force protection violations.  Upon review, the detainee receives the inbound correspondence with redactions as appropriate.  Correspondence that violates force protection rules is redacted by the JDG staff and distributed promptly to detainees.  Properly cleared outgoing detainee letters and postcards are mailed to the APO by members of the DMPC.  Detainees are not authorized to ship or receive boxes or containers.

Plaintiffs' MSJ Appx. 2123

Legal Mail.  There is no limit on the number of letters a detainee may write to his lawyer, and no limit to the amount of legal mail the detainee may keep in his cell.  Detainees who are in discipline status are limited to one hour daily to review and write legal correspondence, but may request an extension (CJDG retains authority to grant an extension).  In each camp, additional storage bins are provided to detainees who choose to store mail outside the cell, in designated spaces.  The guard force may search envelopes used to store legal mail—for contraband—but are prohibited from reading detainee legal mail.  Outbound legal mail is picked-up from detainees by the guard force and mailed to the DoD Privilege Team at the designated secure location, for delivery to detainees' attorneys.  In-bound legal mail is sent by the DoD Privilege Team to the JTF-Guantánamo Staff Judge Advocate (SJA).  The SJA's office delivers the inbound legal mail to the intended detainee.  At all times in the process, the attorney-client privilege is protected.

D.  <u>Team Analysis</u>.  We reviewed the Joint Detention Group SOP and observed procedures for handling, distributing and storing detainee mail in all JTF camps.  We interviewed the JDG and the SJA, to include the members responsible for processing detainee mail, observed detainee cells and designated storage areas used to secure each detainee's mail, and observed the distribution of mail to and from detainees.  Additionally, our team reviewed seven consecutive JDG weekly reports used to track consolidated incoming and outgoing mail for detainees during the period 5 December 2008 to 16 January 2009 and recorded an average of 17 days to redact, distribute and release detainee mail.  Yet, according to staff records of detainee mail delivered during a one-week period in July 2008, review and redactions averaged approximately 60 days, which slowed delivery.  We interviewed DMPC personnel and confirmed the report contents.  Since August 2008, the mail review process has indicated shorter time periods to clear and deliver detainee mail.  Additionally, new procedures have been established to enable the ICRC to take photographs of each willing detainee and provide him with five copies so detainees may send photos to family and friends.  Moreover, detainees are allowed to post up to five photographs in their cells, and store all mail and correspondence in envelopes and bins provided by the guards.  A review of Camp 7 mail indicates it takes a longer time to process and deliver mail than in other camps due to, *inter alia*, the lack of dedicated resources, such as Bahasa and Swahili linguists.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Recommend:**

- **Hire Bahasa and Swahili linguists to assist with mail process.**

- **Add more properly trained staff and qualified translators to the Detainee Mail Processing Center (DMPC) for reviewing and redacting detainee mail, to further expedite its delivery.**

37

*Protection from Violence*

A.  Legal/Policy Authority.  Common Article 3.  Under DoDD 2310.01E, detainees are to be protected from violence to life and person, including threats of violence, rape, assault, bodily injury, and reprisals.  Additional reference material may be found in GPW (Art. 13, 17, 87), GCC (Art. 31-33, 100), DoDD 5210.56, *Use of Force*, the UCMJ (Art. 93, 128), AR 190-8 (1-5, 6-11), and FM 3-19.40 (5-52), which provide that no person will use physical force against a detainee except to defend themselves, prevent an escape, prevent injury to other persons or property, quell a disturbance, move an unruly detainee, or as otherwise authorized in AR 190-14 (*Use of Force*).  No corporal punishment is permitted.

B.  Detainee/NGO Input.  Whenever possible, look for the means to ease the use of restrictive security measures to ensure more humane treatment.  Take disciplinary action against personnel mistreating detainees.

C.  Practice/Implementation.  The guard force has been trained on humane treatment standards.  In the face of severe provocation, including constant verbal assaults and physical assaults with bodily fluids, including human waste, the guard force acts in a professional manner and protects the detainees from all forms of physical abuse.

The compliance Review Team inspected records of internal investigations of allegations regarding the improper use of force.  The allegations were reported by detainees, attorneys, outside organizations, and members of the guard force and investigated by the command, with the assistance of the JDG Military Police Investigators (MPI).  These allegations included slamming the food tray door, excessive use of force during FCEs or other movements of detainees, restraints being placed on too tightly, inappropriate use of pepper spray, and threats.  Of allegations of excessive use of force investigated, only a handful were substantiated, and of these the vast majority were for minor violations of the SOP, including inappropriate use of pepper spray and slamming closed the food tray door.[33]

D.  Team Analysis.  Guards clearly understand their responsibility for humane treatment, as well as their obligation to refrain from the use of excessive force.  Allegations of misconduct on the part of the guard force are infrequent and isolated.  The actions of the guard force far exceed standards.  Any allegations of abuse or mistreatment are investigated, documented, and appropriate action taken, if such allegations of abuse are substantiated.

---

[33] For example, three individuals were counseled and given additional training, while one sergeant was relieved from duty for a minor SOP violation.  The guard who was counseled for inappropriate use of OC pepper spray had already been assaulted twice that day and was anticipating a third assault, when he preemptively used OC on the detainee.

38

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to train and emphasize humane treatment, investigate all allegations, and take appropriate action as warranted.**

39

*Protection from Violence – Use of Force*

A.  <u>Legal/Policy Authority</u>.  Common Article 3.  Under DoDD 2310.01E, detainees are to be protected from violence to life and person, including threats of violence, rape, assault, bodily injury, and reprisals.  Additional reference material may be found in GPW (Art. 13, 17, 87), GCC (Art. 31-33, 100), DoDD 5210.56, *Use of Force*, the UCMJ (Art. 93, 128), AR 190-8 (1-5, 6-11), and FM 3-19.40 (5-52), which provide that no person will use physical force against a detainee except to defend themselves, prevent an escape, prevent injury to other persons or property, quell a disturbance, move an unruly detainee, or as otherwise authorized in AR 190-14 (*Use of Force*).  No corporal punishment is permitted.

B.  <u>Detainee/NGO Input</u>.  Whenever possible, look for the means to ease the use of restrictive security measures to ensure more humane treatment.  Investigate and punish for excessive use of force.

C.  <u>Practice/Implementation</u>.  Guard force personnel and staff are properly trained to use the minimum amount of force necessary at all times.  Security measures are adjusted and employed commensurate with the security risk.  All personnel interviewed knew how to report allegations of abuse up their chain of command and all felt compelled and willing to report any allegation or suspicion of abuse.  There is an active "anonymous" abuse telephone hot line listed in the SOP.  It was responsive when tested by our team; however, we learned that no complaints have ever been called into the hotline.  Complaints of excessive force were well documented and investigated.  Most of these claims were reported by habeas or military commission attorneys, or the detainees themselves.  The team traced several allegations of excessive force, from initial report to final resolution.  The JDG Deputy Commander conducts an initial credibility review, or Rule of Court Martial 303 "Commander's Inquiry," based on the video tapes of the FCE, or movement, and the medical report available in the Detainee Information Management System (DIMS).  If there is a credible allegation or injury to a detainee, the Military Police Investigators (MPI) open a case.  Of the MPI cases reviewed, none were substantiated for excessive force by the guard force.  Several guards were disciplined for violations of the SOP, however, including shutting the food service door too abruptly, or use of Oleoresin Capiscum (OC) pepper spray inappropriately.  Administrative sanctions imposed on the guards, including Non-Judicial Punishment, were appropriate and measured, in relation to the offenses noted.[34]

D.  <u>Team Analysis</u>.  All detainees are well protected from violence, and current practices are consistent with legal authority cited above.  The JDG SOP and use of force tactics, techniques, and procedures (TTPs) were reviewed and found to be in compliance with governing regulations.  The JDG force is professional, well trained, knowledgeable, and conscious of their responsibility to treat the detainees in a humane manner.  There is a consistent effort to perform directly in accordance with the published SOP.  Every member of the JTF-Guantánamo team interviewed was aware of his or her responsibilities to protect the detainees from abuse and mistreatment.  In a review of relevant records, it was evident that leadership took allegations of staff misconduct

---

[34] Of the MPI cases reviewed, the majority were allegations of excessive use of force.  Of claims of excessive use of force in FCEs or shackling, discussed below, none were substantiated.  Of the other claims, only a handful were substantiated for minor violations; guard force personnel received administrative punishment or non-judicial punishment.

Plaintiffs' MSJ Appx. 2127

seriously and took appropriate action to ensure that even the appearance of impropriety was addressed.  There were no incidents of excessive force observed.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to train and supervise the guard force in proper uses of force, investigate all allegations, and take appropriate action as warranted.**

Plaintiffs' MSJ Appx. 2128

*Protection from Violence—Forced Cell Extractions*

A.  Legal/Policy Authority.  Common Article 3.  Under DoDD 2310.01E, detainees are to be protected from violence to life and person, including threats of violence, rape, assault, bodily injury, and reprisals.  Additional reference material may be found in GPW (Art. 13, 17, 87), GCC (Art. 31-33, 100), DoDD 5210.56, *Use of Force*, the UCMJ (Art. 93, 128), AR 190-8 (1-5, 6-11), and FM 3-19.40 (5-52), which provide that no person will use physical force against a detainee except to defend themselves, prevent an escape, prevent injury to other persons or property, quell a disturbance, move an unruly detainee, or as otherwise authorized in AR 190-14 (*Use of Force*).  No corporal punishment in permitted.

B.  Detainee/NGO Input.  Commentators have expressed concern about unprofessional behavior on the part of FCE team, including the use of excessive force.

C.  Practice/Implementation.  Similar to procedures used in detention facilities throughout the United States, FCE is a level of force authorized by CJDG in response to certain acts of non-compliance and/or emergency situations that cannot be resolved with lesser levels of force.  Before an FCE is ordered, every effort is made to resolve the matter without entering the cell or using force (e.g., using linguists to convince the detainee to comply with direction).  The FCE Team is not deployed as a punishment or for interrogation purposes.  All FCE Team members use the minimum amount of force necessary to accomplish the extraction.  When it is believed the detainee is in the process of committing self harm or there are signs of a potential self harm (no visual sight of the detainee/covered window), then an immediate response force is deployed.  Non-emergent FCEs are not conducted during prayer call or within 30 minutes after call to prayer unless specifically authorized by the CJDG.  The camp OIC briefs the FCE Team prior to each FCE:  "When conducting the FCE, your primary focus is safety and security.  Use the minimum amount of force necessary."  Prior to entering the cell, the FCE team directs the detainee to lie down and not move.  In the vast majority of cases, the detainee follows the directions and the FCE proceeds without incident.  The standard FCE team will include five trained security force personnel, a medical staff member, and a videographer.  All FCEs are videotaped from the team brief until detainee is moved and secured.  A Medical Corpsman is on standby during FCEs with an Emergency Response Kit to assess and provide care to the detainee and/or guard force.  The Corpsman does not participate in the FCE.  While the guard force wears protective gear and clothing to protect against a combative detainee, most FCEs are non-confrontational and accomplished with little, if any, force.  The guard force is also trained and instructed on modified FCE procedures to use if a detainee is less than 85% of his ideal body weight or has another medical condition that requires FCE procedure modification.

D.  Team Analysis.  The team observed FCE actions and reviewed tapes of FCEs conducted during a period of increased detainee resistance to authority.[35]  All guards were observed using

---

[35] For example, the team received a complaint from a detainee that he had been severely beaten during an FCE six weeks ago.  The JDG provided a video tape of the FCE, which showed no evidence of excessive force.  On the contrary, the detainee had assaulted the guard force, leaping across the room to attack the guards when they placed him back in his cell.  The FCE team subdued the detainee again with the minimum amount of force necessary.  Investigation into his medical status revealed no broken bones, injuries to the thigh, or dislocated fingers (as he claimed).  And allegations associated with FCE efforts have been repeatedly refuted with comprehensive video

42

the minimum amount of force necessary, and used caution to prevent harm to the detainee within required levels of safety and security.

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to train and supervise the guard force in proper uses of force, investigate all allegations, and take appropriate action as warranted**.

---

taping of the events.  Of 20 FCE/excessive use of force claims since the beginning of 2007, none has been substantiated.

43

Plaintiffs' MSJ Appx. 2130

*Protection from Violence—Shackling*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  Under DoDD 2310.01E, detainees are to be protected from violence to life and person, including threats of violence, rape, assault, bodily injury, and reprisals.  Additional reference material may be found in GPW (Art. 13, 17, 87), GCC (Art. 31-33, 100), DoDD 5210.56, *Use of Force*, the UCMJ (Art. 93, 128), AR 190-8 (1-5, 6-11), and FM 3-19.40 (5-52), which provide that no person will use physical force against a detainee except to defend themselves, prevent an escape, prevent injury to other persons or property, quell a disturbance, move an unruly detainee, or as otherwise authorized in AR 190-14 (*Use of Force*).  No corporal punishment is permitted.

B. <u>Detainee/NGO Input</u>.  The use of shackles should be minimized and used only when necessary; in such cases they should not be placed tightly on bare skin.  Minimize the use of shackles when transporting a detainee to and from the hospital.

C. <u>Practice/Implementation</u>.  Detainees are unrestrained when they are in their cells, communal living bays, and recreation areas.  Detainees are restrained when outside such areas, and only for safety and security purposes, and never for discipline.  All detainees are routinely restrained with hand restraints when removed from their cells or bays for movement within the camp.  Leg restraints will be added if security concerns warrant.  Except for detainees at Camp Iguana, leg restraints will be applied if being moved outside of the camp.  The primary means of leg restraint is by use of soft leather restraints with padded fleece lining; however, non-padded leg restraints will be used for FCEs.  Detainees are restrained in classrooms, TV/movie rooms, interview rooms, and Camp 6 communal recreation bay areas by use of soft leg restraints through an eye bolt or table leg.  This is for the protection of staff members including instructors present for such activities.  All guards are trained in the proper procedures for applying restraints to ensure security and prevent injury to detainees.  Hospital transports will follow the same restraint procedures, but may be modified if there is a threat of injury or harm to the detainee.  It is noteworthy that in the past, detainees have become combative during medical procedures assaulting staff.  Supervisors inspect restraints after guards apply them.[36]

D. <u>Team Analysis</u>.  The CJDG maintains responsibility for the safety and security of all visitors, staff and detainees.  The use of restraints is strictly limited to reasons of safety and security.  The JDG uses restraint equipment that provides the required level of security, but also takes into consideration detainee comfort.  The JDG considered outside input in making its decision to use soft leg restraints.

E. <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**
- **Continue to train and supervise the guard force in the proper use of restraints.**
- **Continue to seek ways to satisfy security requirements but also take into account humane treatment of detainees.**

---

[36] Of several allegations of excessive use of force with regard to shackling that the team looked at, none was found to be substantiated by appropriate investigations conducted by the JDG.

Plaintiffs' MSJ Appx. 2131

*Protection from Sensory Deprivation—Solitary Confinement*

A.  Legal/Policy Authority.  Common Article 3.  Under DoDD 2310.01E, detainees are to be treated humanely and respected as human beings.  Sensory deprivation is not authorized. Additional reference material may be found in GPW (Art. 13, 17, 21, 22), GCC (Art. 27. 30-33, 84), and AR 190-8 (1-5, 6-1), which provides for individual or collective accommodations; and, where possible, to group detainees by nationality, language, or custom.  Except for disciplinary or penal sanctions, detainees may not be held in "close confinement."

B.  Detainee/NGO Input.  Keep solitary confinement to a minimum.  Solitary confinement must only be used as a deterrent against bad behavior and nothing else.  Limit the amount of time in solitary confinement.  The mental health of detainees in solitary confinement should be checked regularly by physicians.  Stop holding detainees in Camps 5 and 6 in solitary confinement.

C.  Practice/Implementation.  Detainees in Guantánamo are never placed in solitary confinement or isolation.  All detention spaces and cells have been built to support a program that enhances the safety and security of both detainees and staff members alike.  All detention cells, except in Camp 7, permit easy communication and interaction with other detainees in adjoining cells.  In addition, all detainees are allowed times outside of their cells daily for communal recreation with other detainees in open air adjoining recreation spaces.  Compliant detainees are offered no less than four hours recreation daily, and even noncompliant detainees in a discipline status are offered two hours recreation daily.  Discipline is administered through a process of reduced levels of privileges, and not by use of isolation or solitary confinement.  Detainees in Camp 7 are housed in cells that do not permit communication with adjacent cells.  Detainees in Camp 7 also do not have the same level of socialization as detainees in other camps in Guantánamo.[37]  To mitigate the potential adverse effects of less socialization, Camp 7 detainees are offered the opportunity to socialize daily through four hours of recreation, and weekly through two hours of socialization management.  This is a program that seeks to maintain detainees' mental well-being through intellectual stimulation.

D.  Team Analysis.  Solitary confinement is normally defined as confinement of a detainee in isolation from other detainees, and is not a procedure authorized for or applied to any detainees. Contrary to many criticisms, the facility designs of Camps 5 and 6 exceed those typical of medium and maximum-security detention facilities throughout the United States in terms of design, cell configuration, cell space, and ease of communications between cells.  It is worth noting that JTF-Guantánamo handles detainees who are a threat to themselves, other detainees, or staff in the same way that detention facilities across the United States do so, through the use of single cells in maximum-security facilities.  In fact, these cells, and many of the practices of JTF-Guantánamo in its maximum-security facilities, are utilized to mitigate threats posed by detainees to themselves, other detainees, and staff.  JTF-Guantánamo has medium security facilities (Camp 4 and soon certain areas of Camp 6) available to detainees who follow camp rules and refrain from acts that could threaten themselves, other detainees, and staff.  As described elsewhere in the report, JTF-Guantánamo has a vetting program to move detainees within and between camps, depending upon their behavior and threat level.  Detainees are well

---

[37] Commander, USSOUTHCOM has consistently sought to maximize socialization and intellectual stimulation during the time detainees have been held in Camp 7.

aware of the requirements necessary to move into medium-security facilities, principally Camp 4, and the consequences of non-compliance (e.g., remaining in Camps 5 or 6, or movement from Camp 4 into Camps 5 or 6).  Use of single cells in Guantánamo is solely undertaken for purposes of maintaining good order within the detention facilities and is not used as a form of punishment.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Increase detainee-to-detainee contact in Camp 7, including the ability for detainees to communicate with each other from within their cells.**

**Recommend:**

- **Maximize interaction between detainees, communal living and recreation interaction, subject to security concerns.**

- **Regularly conduct vetting, and ensure that qualified detainees are moved to communal living conditions subject to reasonable security concerns.**

46

*Protection from Sensory Deprivation—Human-to-Human Contact*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  Under DoDD 2310.01E, detainees are to be treated humanely and respected as human beings.  Sensory deprivation is not authorized.  Additional reference material may be found in GPW (Art. 13, 17, 21, 22), GCC (Art. 27. 30-33, 84), and AR 190-8 (1-5, 6-1), which provides for individual or collective accommodations; and, where possible, to group detainees by nationality, language, or custom.  Except for disciplinary or penal sanctions, detainees may not be held in "close confinement."

B. <u>Detainee/NGO Input</u>.  Cease using sensory deprivation methods, such as goggles, during movements of detainees between camps or any other areas.  Detainees should be allowed phone calls, video-teleconferences, and visits from family members.  Immediate family members that are detainees should be allowed to visit or be housed together.  Ensure proper translation of all information.  Expand access to outside news (in several relevant languages) with little or no censorship.

C. <u>Practice/Implementation</u>.  Sensory deprivation is defined in FM 2.22-3 as an arranged situation causing significant psychological distress due to a prolonged absence, or significant reduction, of the usual external stimuli and perceptual opportunities.  Sensory deprivation is prohibited.  The use of goggling and earmuffs for security purposes is not prohibited in DoD policy or directives.   FM 3-19.40 specifically contemplates the use of such devices for security purposes.

During security transports of detainees outside of their respective camps, it is necessary to temporarily apply shielding devices for security purposes only.  Blackened goggles and ear muffs are only placed on detainees for transports outside of their respective camps.  These devices are immediately removed upon arrival to the point of destination.

For all detainees, except those in Camp 7, telephone calls are continually offered on a rotational basis through the population, and all detainees are offered at least one call quarterly, and more frequently if logistically possible.[38]  Additionally, telephone calls can be approved for humanitarian purposes upon request.

Camps 1-6, Echo and Iguana offer ample human-to-human contact daily.  Detainees are housed within either individual adjoining cells or communal bays, and are allowed to see and speak in conversational tone with neighboring detainees in cells/bays, and while at recreation periods.  Most of the detainees are offered recreation for a minimum of four hours daily, and detainees in a discipline status are offered at least two hours of recreation daily with other detainees in either adjoining or shared recreation areas.  In addition, the guard force maintains a minimum of 3-minute checks on all detainees, and routine medical checks are conducted daily.

Camp 7 consists of single cells that do not allow for communication between cells.  However, detainees there are allowed to recreate in adjacent, but separated open-air recreation spaces for at least four hours daily with a recreation partner.  These detainees are also offered special socialization management opportunities once per week for two hours.

---

[38] For a photo of a telephone room, see Appendix 12, Figure 11-1.

Plaintiffs' MSJ Appx. 2134

D. <u>Team Analysis</u>.  The JDG recognizes the importance of human-to-human contact and has taken steps to maximize such contact, consistent with security considerations within the various camps.  Throughout the detention facilities, except in Camp 7, detainees are allowed to interact and communicate with detainees in neighboring bay/cells without restrictions, and compliant detainees are allowed to recreate in the presence of other detainees for at least four hours per day; even the least compliant are offered two hours of recreation per day with neighboring detainees.  In addition, throughout all camps the guards continually observe and interact with all detainees, as required to insure safety and security of detainees.

Camp 7 cells limit human-to-human contact, but detainees are given opportunity to socialize daily through four hours of recreation, and weekly for two hours for socialization management.  This is a program that seeks to maintain detainees' mental well-being through intellectual stimulation.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Increase detainee-to-detainee contact in Camp 7, including the ability for detainees to communicate with each other from within their cells.**

- **Continue to allow maximum interaction between detainees, and maximize communal living and recreation interaction within reasonable security concerns.**

**Recommend:**

- **Seek ways to provide more frequent telephone calls.**

- **Approve and implement family visits.**

- **Approve and implement video teleconferencing with families.**

48

*Protection from Humiliation*

A. <u>Legal/Policy Authority</u>.  Common Article 3.  According to DoDD 2310.01E, detainees will be treated humanely and respected as human beings.  It prohibits "outrages upon personal dignity, in particular humiliating and degrading treatment," forced prostitution, rape, indecent assault, and subjecting detainees to public curiosity and other inhumane treatment.  Additional reference material includes: GPW (Art. 13, 14, 17); GCC (Art 27); AR 190-8 (1-5), which protect detainees against insults or public curiosity and entitles them, in all circumstances, to respect for their persons and their honor.

B. <u>Detainee/NGO Input</u>.  Teach personnel the safe and humane way to treat detainees and take disciplinary action against personnel mistreating detainees.  Investigate and punish personnel who humiliate detainees.

C. <u>Practice/Implementation</u>.  JDG SOPs emphasize respect for the person.  Search for and seizure of contraband take a graduated approach: guards use a detainee "pat-down" search first, followed by an electronic wand or "Rapiscan" system to search private areas; if those means are not available or sufficient, guards conduct a modified strip search, respecting detainee privacy; complete strip searches are a last resort, only authorized by CJDG.[39]  Female guards are not authorized in areas of the camps that would provide them a view of detainees showering; female guards are not permitted to be present when strip searches occur, nor are they authorized to operate "Rapiscan" systems.  To minimize public exposure, media are restricted from taking identifying photos of detainees.

The team conducted spot-checks of guard behavior and analyzed the MPI log of incidents looking for allegations of "humiliating and degrading" conduct.  Our review revealed substantiated violations of the SOPs (like calling the detainees names, making obscene gestures, or conducting a search improperly), in which cases guards were awarded Non-Judicial Punishment (NJP) or administrative sanctions for their conduct.[40]  The team confirmed that guard mount training[41] and other sustainment training contained discussion of the humane treatment standards discussed above.

D. <u>Team Analysis</u>.  JDG SOPs and training emphasize respect for the person.  Any allegations of abuse or mistreatment are appropriately investigated and documented, and appropriate action is taken.  While there are occasional minor violations of the SOP against humiliating treatment of any kind, the camp leadership properly supervises the guard force, investigates allegations of mistreatment, and appropriately sanctions any misconduct identified and substantiated.  Complaints of this nature from the external community have declined over time.

---

[39] Several guards interviewed did not recall ever using full strip search, even with the most uncooperative detainees.
[40] Of 20 allegations obscene gestures, derogatory comments, or inappropriate conduct with detainees investigated that we looked at, 14 allegations of comments or gestures were substantiated.  Five received NJP, four received a reprimand, and five received a verbal reprimand, according to staff disciplinary records.
[41] Guard mount training is conducted adjacent to each camp, prior to each shift, for up to an hour.

49

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to train and enforce the standards already established in the SOP for the proper conduct of the guard force.**

50

*Healthcare Services—Quality of Care and Access*

A. Legal /Policy Authority.  Common Article 3.  Governing authorities for provision of medical care to detainees include DoDD 2310.01E and DoDI 2310.08E.  The former requires that "adequate medical treatment" be provided to all detainees.  The latter charges health care personnel with protecting the detainees' "physical and mental health and provid[ing] appropriate treatment for disease;" health care providers may only participate in procedures necessary for the "protection of the physical or mental health or the safety of the detainee."  Additional reference material includes GWS (Art. 12), GPW (Art. 30, 31), GCC (Art. 91, 92) AR 190-8 (3-4, 6-6) and FM 3-19.40, which provide for an adequate infirmary, protection from infectious diseases, monitoring of the detainees' health and weight, non-discriminatory treatment; and the provision that only urgent medical reasons will authorize priority in the order of treatment to be administered.

B. Detainee/NGO Input.  Ensure that only medical personnel, not interrogators or guard personnel, are involved in decisions involving the medical care of detainees; have facilities well equipped and supplied; explain to detainees that medical care is not tied to cooperation in interrogations, whether they are hunger striking, or whether they are on disciplinary status; allow medical professionals to have a greater say in a detainee's confinement conditions; and allow outside medical organizations access to the detainees for an independent medical evaluation.  Some commentators have alleged that detainees' health has been neglected—that adequate medical care was either not available or withheld.  Specific allegations have included charges of neglect of mental health and cardiologic conditions, and failure to diagnose and treat hepatitis and tuberculosis, to name just a few.  Finally, it has been suggested that dedicated linguists be used for medical purposes.

C. Practice/Implementation.  There are several JMG SOPs governing detainee care delivered at the Joint Medical Group (JMG).  The JMG's staffing/resources are adequate to meet workload requirements, and are augmented by the Navy as necessary.  Detainees can access medical care 24 hours per day without regard to disciplinary status or detainees' cooperation with intelligence gathering and legal processes.[42]  For emergency care, Corpsmen and nurses are can respond to every camp within minutes.  Physicians are present at the hospital during normal working hours and available on call, no more than a few minutes away after hours.  There are three ambulances available (at Camp 6, Camp 7 and at the Detainee Hospital) for emergency transport, and a recent appendectomy was started within an hour of diagnosis.  Formal sick call is conducted at least weekly on all blocks, but is available daily as Corpsmen make medication rounds in the camps.  Corpsmen are readily identifiable by their uniforms and the equipment they carry.  The guard force and/or Corpsman annotates requests for medical attention or a request for a medical appointment through DIMS, which nurses check frequently to process requests in timely manner.

Routine medical and dental care is available as needed, with timing of medical care based upon the severity of the condition.[43]  Routine appointments are normally scheduled within seven days.

---

[42] For photos of medical facilities inside Camps 5 and 6, see Appendix 12, Figures 12-7 and 12-8.

[43] There are approximately 3400 block sick call visits per year on average. The JMG has completed an average of 1400 routine appointments per year and there have been over 400 medical and dental surgeries and 6500 dental appointments since commencement of detention operations in Guantánamo.

Plaintiffs' MSJ Appx. 2138

Medical specialty evaluation and treatment is provided by local specialists and sub-specialists who visit Guantánamo on a quarterly or semi-annual basis, or as necessary.[44] Local specialty care referrals are completed within two weeks. If a detainee requires inpatient services, he is transported to the Detainee Hospital for inpatient care. The Detainee Hospital is staffed with nurses and Corpsmen 24 hours per day and averages approximately 12 inpatient admissions per year.[45]

The Behavioral Health Unit provides mental health evaluations, supportive psychotherapy, psychotherapeutic medication management, suicide prevention education, initial, weekly follow-up and final evaluations for hunger strikers and monthly preventive screenings to a diverse group of detainees.[46] According to one of the providers at the Behavioral Health Unit, the current population of detainees with active symptoms of mental disorders is less than eight percent which is relatively low compared to prison populations in the United States in which mental disorders average around forty to fifty-five percent. The mental health staff provides mental health screens, empathetic listening and are helping detainees with coping and/or communication skills. In addition, they are actively engaged with the detainee population to help promote socialization and prevent self harm. In addition to the robust outpatient services provided, the unit averages four inpatients per day. During hospitalization, detainees receive care from the attending physician or psychologist, nurses and Corpsmen 24 hours per day and are afforded the same access to recreation, basic and comfort items as other detainees.

Dedicated medical linguists are available during normal duty hours to assist with general, specialty, and behavioral healthcare. However, for emergencies, when medical linguists are unavailable, other non-medical linguists are used.

D. <u>Team Analysis</u>. The professionalism and dedication of the JMG staff are noteworthy. Healthcare personnel are protecting detainees' physical and mental health and provide appropriate treatment for disease. The scope, quality and documentation of care provided to detainees are similar, and in most cases identical, to care received by U.S. Armed Forces personnel. Primary care and medical specialty services are provided to meet detainees' healthcare needs in a timely manner. The JMG provides medical care based upon medical need and operates independently of the JDG or JIG. The JMG does not communicate with interrogators, or support intelligence collection activities. Care is delivered without regard to hunger striking, disciplinary status or detainees' cooperation with intelligence gathering or legal processes. Medical personnel are available 24 hours per day, and respond to emergencies in all detainee camps within minutes. Guards are trained as first responders and can stop bleeding or initiate Cardiopulmonary Resuscitation if the need arises while awaiting the arrival of medical personnel. All care by Corpsmen is reviewed by nurses or physicians, and physicians and other licensed independent practitioners participate in a regular peer review program. Medical personnel are aware of the requirement to report any observed or suspected abuse, and are knowledgeable about the reporting chain. Dedicated medical interpreters are assigned to the

---

[44] Over the past year, there have been over 50 consults requested for various specialties, including dermatology; urology; cardiology; prosthetics services; neurology; radiology; prosthodontics; ear, nose and throat; and gastroenterology consultants to name a few.

[45] For photos of Detention Hospital facilities, see Appendix 12, Figures 12-1 through 12-6.

[46] The staff averages 100-120 visits per week including preventive screenings within the camps.

Plaintiffs' MSJ Appx. 2139

Detainee Hospital.  However, use of non-medical interpreters for provision of health care is sometimes necessary due to manpower shortages.  Medical personnel provide pertinent information during the vetting process that helps the JDG make decisions about moves between and within the camps, and provides requests and advice for medically necessary items for detainees.  Per the Geneva Conventions, ICRC provides periodic review of medical services. Additionally, the JMG requested the American Correctional Association to provide a consultative assist visit in the Spring of 2008, the results of which are confidential.

E.  <u>Findings/Recommendations.</u>  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Expand detainee access to dedicated linguists to assist with medical evaluation and treatment during evening and weekend hours, to enhance detainee trust in the role of medical providers and to improve the quality of medical care.**

- **Continue to focus on appropriate detainee access to healthcare services.**

- **Continue to use input from appropriate external experts and agencies, as is currently practiced, to assess and maintain quality of healthcare services.**

Plaintiffs' MSJ Appx. 2140

*Medical/Dental Confidentiality of Medical Records and Information*

A. <u>Legal/Policy Authority</u>.  DoDI 2310.08E requires maintenance of accurate and complete medical records (Para 4.2).  Paragraph 4.4 requires the safeguarding of patient confidences and privacy within the constraints of the law.  Under U.S. law and applicable medical practice standards, there is no absolute confidentiality of medical information for any person.  When patient-specific medical information is disclosed for purposes other than treatment, healthcare personnel must record the circumstances of the disclosure, including the name of the approving medical unit commander.  Similar to legal standards applicable to U.S. citizens, permissible purposes for disclosure include preventing harm to any person, maintaining public health and order in detention facilities, any lawful law enforcement, intelligence, or national security-related activity.  The May 2, 2008 Memorandum "Access to Detainee Medical Records by the Office of Military Commissions" from the Office of the Assistant Secretary of Defense (Global Security Affairs) provides additional guidance for a procedure to be used for any requests for medical information by the Office of the Military Commissions.

B. <u>Detainee/NGO Input</u>.  Medical-patient confidentiality is a right.  Records should be maintained as private and only seen by medical personnel.  Both the detainee and his legal counsel should have direct access to the detainee's medical records.  Guards should remain out of hearing range when medical providers are talking with the detainees.

C. <u>Practice/Implementation</u>.  JTF-JMG SOPs are in place to govern medical records and confidentiality.  Medical records for detainees were established upon in-processing and are maintained throughout detention.  The medical record is organized in a standardized health record format.  The JMG staff ensures the confidentiality, security, and integrity of all health records.[47] Only essential medical personnel are authorized admittance to the medical records areas.  The approving authority for release of medical/dental information is designated as the JTF Surgeon, per procedural guidelines, in accordance with DoD policy.  In an interview, the Medical Plans Officer detailed the process for medical information requests.  Requests for medical records by an outside agency, non-medical JDG staff, detainee attorney, and/or prosecution attorney are submitted to the Staff Judge Advocate (SJA) for validation.  If records are cleared for release, certified copies are provided through the SJA to the requestor.  Documentation of the appropriate authority for disclosure is kept on file.

D. <u>Team Analysis</u>.  Guantánamo complies with governing authorities with respect to confidentiality of medical information.  Medical care is documented in medical records, which have been established for detainees and are appropriately maintained in a secure location with access limited only to medical personnel who are providing healthcare services.  A computerized information system is also in use at the detainee medical treatment facilities for reporting of laboratory studies, x-rays, etc.  Corpsmen passing medications on the cell blocks take as much precaution as safety allows to preserve confidentiality between medical staff and detainees.

---

[47] The Detainee Hospital stores detainee medical records for Camps 1-6, Echo and Iguana in the Medical Administration Bldg within locked file cabinets.  The outside door is equipped with a cipher lock. Active records for Camps 1-4 and Iguana are located at the nursing station in the Detention Hospital within a secured area.  Active medical records for Camp 5, 6 and Echo are kept in the nursing office in Camp 6.  It is secured when not manned. Active medical records for Camp 7 are kept in Camp 7 medical clinic.

Plaintiffs' MSJ Appx. 2141

Requests for medical information by non-medical personnel require approval by the JTF Surgeon per DoD policies and JMG SOPs.  Behavioral Science Consultants have no access to medical records or medical information systems.  During a review of non-medical electronic systems, DIMS[48] and JDIMS,[49] the potential to share specific medical information with non-medical personnel was discovered.  JMG personnel stated that they do not have access to the JDIMS module and were unaware of medical information in the system.  Additionally, the JDIMS OIC and JIG OIC personnel were notified and are aggressively working to identify the root cause of and to correct the problem.  Health records are being maintained, and medical records and information are being protected.  Requests for medical information are being answered in accordance with established procedures and policies, and only with approval of the JTF Surgeon.

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Modify policy and training regarding entry of specific medical information into DIMS (from which JDIMS data is drawn), which will ensure compliance with current medical information policies regarding confidentiality.**

**Recommend:**

- **Consider implementing Armed Forces Health Longitudinal Technology Application-Theater (AHLTA-T), the Military Health System's electronic health record system, for detainee operations, which could help with document preservation.  JTF-JMG has submitted an Operational Needs Statement.**

---

[48] Detainee Information Management System (DIMS) is a web-based intranet application running on a dedicated and isolated server.  It provides real time visibility to all essential elements of information needed for detention operation.  It can include general requests for medical personnel, but should not include specific medical information.

[49] Joint Detainee Information Management System (JDIMS) is an information management tool controlled by the Joint Intelligence Group (JIG), developed and used primarily to support interrogations.  Information stored on this database includes interrogation reports, intelligence messages, intelligence reports, analyst products, and periodic detainee assessments by DoD and other U.S. Government organizations, such as the U.S. Army Criminal Investigation Task Force (CITF).

Plaintiffs' MSJ Appx. 2142

*Medical Ethics—Medical Treatment of Hunger Strikers*

A.  Legal /Policy Authority.  Common Article 3.  U.S. Government policy is to prevent self-harm and to protect the life and health of those in its custody.  DoDI 2310.08E states that health care personnel are to "uphold the humane treatment of detainees and to ensure that no individual in the custody or under the physical control of the Department of Defense…shall be subject to cruel, inhuman, or degrading treatment or punishment…"  Health care personnel caring for detainees also "have a duty to protect detainees' physical and mental health and provide appropriate treatment of disease."  Paragraph 4.7 says "[i]n general, health care will be provided with the consent of the detainee.  To the extent practicable, standards and procedures for obtaining consent will be consistent with those applicable to consent from other patients."  Paragraph 4.7.1 goes on to say "In the case of a hunger strike, attempted suicide, or other attempted self-harm, medical treatment or intervention may be directed without the consent of the detainee to prevent death or serious harm.  Such action must be based on a medical determination that immediate treatment or intervention is necessary to prevent death or serious harm, and, in addition, must be approved by the commanding officer of the detention facility or other designated senior officer responsible for detainee operations."  DoD policy for treatment of hunger strikers is similar to that used by the Bureau of Prisons, as authorized in Title 28, Code of Federal Regulations, Part 549.  Additional references include GPW (Art. 30, 31) and FM 3-19.40, which provide for monitoring of the detainees' health and weight.

B.  Detainee/NGO Input.  The World Medical Association (WMA) has stated in its Declaration of Malta that force feeding is "never ethically acceptable" and "feeding accompanied by…coercion, force or use of physical restraints…is a form of inhuman and degrading treatment."  Others add, "Have medical personnel comply with the international medical and ethical standards, especially if they participate in enteral feedings of detainees.  Cease enteral feeding of hunger striking detainees.  Avoid any method of coercion to get them to stop hunger striking."

C.  Practice/Implementation.  Healthcare services provided to detainees are generally done with the consent of the detainee.  Detainees frequently refuse vital signs, laboratory studies, recommended medical and dental procedures, and preventive services, such as flu shots.  Some detainees have refused food or water as a means to protest various aspects of their detention.  When a detainee begins refusing water or when he has eaten less than 25 percent of nine consecutive meals, medical personnel are notified and begin medical assessment and monitoring, which includes a thorough review of medical history, physical examination and mental health assessment.  The initial psychological assessment is conducted by a psychologist or psychiatrist, followed by weekly mental health follow-ups, which may be done by a psychiatric technician.  Close medical monitoring and daily weights are continued until the detainee either chooses to resume eating or his medical condition deteriorates to a point, which in the judgment of the attending physician, would present a significant threat to life or health if the fasting were to continue.

A medical recommendation for intervention with involuntarily intravenous therapy or enteral feeding must be approved by the CJTF.  A physician directs and oversees the enteral feeding

process,[50] the goal of which is to sustain the life and health of hunger strikers. The physician is assisted by a feeding nurse and one or more Corpsmen, and receives periodic consultations from a nutritionist. Detainee medical complaints during hunger striking may be addressed by the enteral feeding team or may be referred to the hospital or clinic medical team in the same way as provided for other detainees. Guards weigh hunger strikers daily, offer a regular meal to all hunger striking detainees at each meal time and provide information to medical personnel about quantities of food and water the detainee has taken. This information is relayed to the attending physician, who makes a determination of whether enteral feeding or other therapy is indicated and provides appropriate medical orders.

Enteral feedings may be withheld for detainees who are taking nutrition orally or when otherwise clinically indicated. Detainees who take nine consecutive meals (or three if they have not required enteral feeding) are no longer considered to be a hunger striker. Medical monitoring by the attending physician is continued for a period following the end of a hunger strike to ensure stability of any medical conditions and maintenance of body weight. Enteral feeding is administered twice daily for most hunger strikers. The Review Team observed multiple enteral feedings in Camps 3, 5, and 6. Many detainees refused requests to come out of their cells for enteral feedings. When this occurred, guards relayed this information to the CJDG, who authorized an FCE to accomplish the enteral feeding. Detainees requiring FCE during our observations appeared passive throughout the process. Medical personnel were standing by for all FCEs. FCE teams placed detainees in feeding chairs or on gurneys when deemed necessary by medical personnel. Restraints were used for enteral feedings for the minimum possible time as necessary to protect both the detainee and staff. Feedings were accomplished in feeding chairs,[51] except for one detainee who was placed on a gurney due to a back problem that made sitting in the chair uncomfortable.[52] Many of the feeding chairs observed had been customized with pillows and padding for comfort. None of the feedings observed involved use of head restraints.[53] Detainees appeared generally cooperative with medical administration of the feedings.

New sterile feeding tubes are generally used for each feeding.[54] Per JMG SOP, time in the feeding chair may not exceed two hours and is rigorously monitored by the staff.

---

[50] Enteral feeding is the process of providing nutritional support for a patient by passing a tube through the nose into the stomach (a nasogastric feeding tube), through which nutritional supplements, such as Ensure Plus or Boost Plus, can be infused. This is a common medical procedure used to safely provide nutrition to a patient who is not taking food by mouth, but whose intestinal function is intact (e.g., a patient whose jaw is wired shut). The nasogastric tube used is size 10 or 12 French, which would be 3.5-4.5 millimeters in diameter (slightly larger in diameter than a piece of cooked spaghetti but less than a pencil eraser). The tube should be well lubricated (viscous lidocaine should be offered, but some patients prefer other lubricants). After insertion of the tube, its placement in the stomach is confirmed prior to allowing the nutritional supplement to flow in from a hanging bag by gravity. This procedure usually takes about an hour, after which the feeding tube is removed. Once stabilized, most patients can be sustained on two feedings per day. For a photo of a typical enteral feeding kit, see Appendix 12, Figure 13-1.
[51] See Appendix 12, Figure 13-2.
[52] Medical staff reports that similar accommodations are made for other detainees as clinically indicated. Photo at Appendix 12, Figure 13-4.
[53] For an example of a chair with head restraints, see Appendix 12, Figure 13-3.
[54] The JMG SOP, which guides cleaning requirements for feeding tubes, has been reviewed and approved by the Infection Control Officer. Per manufacturer guidelines tubes may not be used for more than 14 days and are always used for only one detainee.

57

D.  Team Analysis.  DoD and JTF-Guantánamo policy is to preserve the life and health of those detained and under its care.  The process of ordering life sustaining nutritional support for detainees whose continued fasting poses a significant threat to life or health, is similar to that used by the U.S. Bureau of Prisons, and has been upheld in U.S. Federal Courts.

The current feeding program is being conducted solely as a medical procedure to sustain the life and health of hunger strikers.  Hunger strikers receive individualized medical care and access to the same medical treatment services as other detainees.  The current process is lawful and is being administered in a humane manner.

It is important to note that medical care is generally provided with the consent of the detainee.  Processes for permitting detainees to refuse diagnostic tests, examinations and treatments are similar to those used for other patients.  Exceptions may apply for lifesaving emergency medical care provided to a patient incapable of providing consent or for care necessary to protect public health.  Enteral feeding of hunger strikers for whom continued fasting might result in death or serious harm is being conducted as a medical procedure with the sole purpose of preserving life and health, and in accordance with Common Article 3 and DoD policy.  Detainees are weighed monthly by guard staff.  Hunger strikers are weighed daily.  Guards in Camp 4 reported that detainees are permitted to weigh themselves and report their weight.

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Require JMG or JDG personnel to directly observe and record detainee weights.**

- **Continue safe and humane treatment of hunger strikers whose life or health is jeopardized by hunger striking.**

- **Continue to provide sufficient medical staffing at the JMG to fully support medical treatment necessary to sustain the life and health of detainees on hunger strike.**

Plaintiffs' MSJ Appx. 2145

*Healthcare Personnel Management—Behavioral Science Consultants (BSC)*

A. <u>Legal Policy/Authority</u>.  Common Article 3.  DoDI 2310.08E, in Para 4.1 states that all health care personnel have a duty to uphold the humane treatment of detainees and to ensure that no individual in the custody of the DoD is subject to cruel inhuman or degrading treatment.  Para 4.9 speaks to management of healthcare personnel.  Enclosure 2 of the reference authorizes BSCs to make psychological assessments of the character, personality and other behavioral characteristics of detainees and based on such assessments; advise authorized personnel performing lawful interrogations and other lawful detainee operations, including intelligence activities and law enforcement.  Their professional role is not in a provider-patient relationship, but in relation to a person who is the subject of a lawful governmental inquiry, assessment, investigation, interrogation, adjudication, or other proper action.

B. <u>Detainee/NGO Input</u>.   As part of an ongoing medical ethical debate, the following professional organizations have, at times, been critical of current military practice with respect to Behavioral Science Consultants.  The two most vocal organizations on this matter are the American Psychiatric Association and the American Psychological Association.  Each view is summarized below:

> The American Psychiatric Association opposes the use of psychiatrists in interrogating prisoners. The proper role of psychiatrists is to provide humane and compassionate care for those suffering from mental illnesses.  We believe that the use of psychiatrists to aid in interrogations is a serious violation of medical ethics and should be discontinued.
> The American Psychological Association prohibits psychologists from any involvement in interrogations or any other operational procedures at detention sites that are in violation of the U.S. Constitution or international law.

C. <u>Practice/Implementation</u>.   JTF and JMG SOPs provide guidance for healthcare professionals assigned to the JMG about their mission and interaction with the Behavioral Science Consultant Team (BSCT).  In short, no JMG personnel are involved with interrogations and no BSC personnel are involved in medical treatment of detainees.

The JMG provides all medical care including mental health evaluations and treatment for the detainees.  Moreover, interviews with JMG personnel confirmed that they work completely independently from the JDG and JIG.  The medical staff is aware of requirements to report instances of observed or suspected violation of applicable standards for the protection of detainees to the chain of command.

As of 2007, the BSCT reports directly to the CJTF, and provides advice to the CJDG.  One of the two BSCs assigned and the BSC technician work full time advising the CJDG regarding camp operations.  When the BSCs are in the detention camps, they do not have any contact with detainees or medical personnel.  They do not provide medical care except in the event of an emergency when no other medical professional is available. They also provide behavioral analysis in preparation for the vetting process to ensure safe and effective planning for detainee moves within the camps and provide training to the guard force.  They went on to say that, they are doing very little if any work with the JIG personnel except for occasional training provided for new interrogators and personnel arriving at JTF-Guantánamo Detention Facilities.  When/if a

59

BSC is present for an interrogation, they are located outside of the room and only observe.  They are charged with reporting any observed or suspected abuse during the interrogation.

JTF-Guantánamo has been in the process of approving a local JTF-BSCT SOP (currently still in draft form), that provides additional guidance to strengthen the informational firewall between the duties of medical personnel and BSCs.  This guidance provides for establishment of a forum for the BSCT, JTF Surgeon and Senior Medical Officer (SMO) to meet as needed to reinforce compliance with DoDI 2310.08E, but they have not had a need for this meeting to date.  The current BSCs emphasized that their duties are distinctly separate from those of the JMG, and stated that they do not have any access to medical records or information.  If the BCST had a request for medical information, it would be submitted the same way as any other outside agency, (filtered through the SJA to evaluate appropriateness of request, then sent to JTF Surgeon for approval).  Similarly, if they want to consult with a JMG psychologist, they must gain the approval of the JTF Surgeon.

D.  Team Analysis.  Medical care is provided only by JMG staff.  The currently assigned BSCs are both clinical psychologists and are operating in accordance with governing policies and procedures.  According to the CJTF, the BSCT function in this operational environment is a vital resource for commanders.  Their primary role as behavioral advisors to the CJTF and CJDG is helping bring about improvements in detention camp dynamics.  They are aware of requirements to report instances of observed or suspected violations of applicable standards for the protection of detainees to the chain of command.  Finally, they have taken great care to keep their BSC roles separate from the delivery of health care services and health information, and to ensure that they are not perceived by detainees as healthcare personnel.  Once updated and approved, the additional measures within the draft JTF SOP of July 2007 would firmly establish a firewall that more clearly delineates healthcare personnel from the BSC role.

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**
- **Sustain BSC resource to ensure continued mission support to JDG Commander and, to a lesser extent, the JIG Director.**

- **Expedite routing and approval of the draft JTF BSCT SOP to ensure the inclusion of appropriate firewalls and safeguards between the intelligence and other roles of BSCs and JMG medical care providers.**

- **Continue to have Behavioral Science Consultants observe and support the separation of medical information from intelligence operations and continue to provide behavioral consultation aimed at optimizing the safety of the camps.**

**Recommend:**
- **Dedicate two Behavioral Science Consultants solely to provide psychological consultation to the CJDG, JIG and CJTF in order to support safe, legal ethical and effective detention and interrogation operations at JTF-Guantánamo.**

Plaintiffs' MSJ Appx. 2147

*Interrogation*

A.  Legal/Policy Authority.  Common Article 3 of the Geneva Conventions requires humane treatment, and prohibits violence to life and person, cruel treatment and torture, outrages upon personal dignity (humiliating and degrading treatment), and punishment without due process. From that overarching policy, DoDD 2310.01E, DoDD 3115.09, and Army Field Manual 2-22.3 delineate the proper means of handling and interrogation of detainees such as those held in Guantánamo.  The Detainee Treatment Act of 2005 prohibits cruel, inhuman or degrading treatment or punishment, and specifically mandates that no person detained by DoD may be interrogated using techniques not authorized by FM 2-22.3.

B.  Detainee/NGO Input.  The gathering of information from detainees should be done in accordance with international standards, and must not supersede humanitarian concerns.  Along those lines, the detainee should not be punished or rewarded based on his cooperation with interrogators, and it should be made clear to detainees that interrogators are not responsible for detention operations.  Use of detention practices to set conditions for interrogation should be prohibited.

Medical personnel should not assist with interrogations, nor should medical information be exploited for intelligence purposes.  Moreover, medical care should not be made contingent upon cooperation with interrogators.

The use of "solitary confinement," "Fear Up," sleep deprivation, and degrading treatment as interrogation techniques is inhumane.  Detainees must be permitted free exercise of their religion; therefore, possession of religious items should not be contingent on cooperation with interrogations.

C.  Practice/Implementation.  Only interrogation techniques and approaches permitted in FM 2-22.3 are used in Guantánamo.  However, not all techniques and approaches from the FM are used.  Separation is permitted only when approved, case by case, by the Commander, USSOUTHCOM.  Such authorization has only been requested and granted on four occasions, and has not been used since early 2007.  In local practice, interrogation approaches not permitted in Guantánamo include False Flag, Fear Up, and Ego Down.

The Joint Intelligence Group (JIG) Interrogation Control Element (ICE) has adopted a Standard Operating Procedure (SOP) which sets forth guidance and limitations for all aspects of interrogations, including the development of interrogation plans, scheduling and conduct of interrogations, use of incentive items, employment of linguists, interrogation techniques and approaches that may be used, interrogation training, and oversight mechanisms.

Interrogations of Guantánamo detainees are all voluntary.  Approximately one-third of all interrogations take place at the request of the detainee.  Detainees are permitted to decline participation in interrogations at any time, with no negative disciplinary consequences.  At no time does the Joint Detention Group (JDG) allow any level of non-participation or non-cooperation in interrogations to influence the disciplinary status of any detainee.

61

Interrogators are permitted to provide incentives to detainees who participate in interrogations. These incentives are items such as fast food from restaurants available on the Guantánamo Naval Station, cookies, sweets, and the like.  Also, on occasion the interrogation team may provide a home cooked meal from a recipe from the detainee's home country.  Tea and coffee are often served during the interrogation, and sometimes the detainee, the interrogator, and the translator, where one is needed, watch a video selected based on the preferences of the detainee.  Videos with political, religious, or violent content are not permitted.  Detainee cooperation with interrogation has no effect on comfort items or basic issue items provided to the detainee while in the detention camps.

Joint Medical Group personnel do not participate in interrogations, do not provide patient-provider information to interrogators, and do not medicate or otherwise prepare detainees for interrogation.  Medical personnel may recommend to the CJDG that a detainee not be available for interrogation.  When the CJDG puts a detainee off limits for interrogation, that detainee is off limits until the CJDG rescinds that status.

JTF Behavioral Science Consultant Team (BSCT) personnel may observe interrogations, but may not conduct them or be present in the interrogation room.  The BSCT advises interrogators in a manner similar to psychologists assisting in criminal investigations, but does not plan, conduct or direct interrogations.  The BSCT also serves as yet another oversight mechanism; responsible for observing interrogators for "drift" in their personalities or interrogation practices that may tend toward unauthorized interrogation behavior.

Detainees are restrained during interrogations only to the minimum level required for safety of all personnel involved, consistent with security requirements.  Restraints are determined by the JDG, and delineated in interrogation plans.

Interrogations do not infringe upon the detainees' exercise of religion.  The JDG issues every detainee a Koran, prayer rug, prayer cap, and prayer beads, regardless of disciplinary status and regardless of the detainee's cooperativeness in interrogation.  None of these items are impacted by a detainee's level of cooperation with interrogators.  The exercise of religion is respected at all stages during the interrogation process.  Interrogations cease during prayer time at the detainee's request/preference.

D.  <u>Team Analysis</u>.  Interrogation practices in Guantánamo are in compliance with Army FM 2-22.3.  While approach techniques are authorized by FM 2-22.3, JTF-Guantánamo does not, as a matter of local practice, use them.  The use of incentive items in connection with interrogations continues to be standard practice at Guantánamo, and does not violate principles of humane treatment.  The use of couches and soft chairs, offering of food items and movies or books, as well as time away from the detainee's cell, are intended to provide the detainee an environment of comfort, not coercion.  Neither basic items nor additional comfort items provided by the JDG are conditioned upon a detainee's cooperation with interrogators.  Many of the changes made to standard interrogation practices within JTF-Guantánamo have been instituted under the leadership of the current JIG Director – yet they have not been formally incorporated into the SOP for interrogators, which was last updated in April 2007.  The long-standing view of commentators concerning interrogation in Guantánamo contrast sharply with current practice.

Significant changes made in Guantánamo have moved interrogation practices far beyond the minimum standards articulated in Common Article 3, U.S. law and DoD regulations.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Update the JIG Interrogation Control Element (ICE) SOP to reflect current intelligence collection practices in Guantánamo.**

- **Continue to train JIG personnel on strict compliance with local and DoD-wide policy, directives, and instructions, as well as U.S. law, particularly Geneva Conventions Common Article 3.**

**Recommend:**

- **Video record and archive interrogations in Guantánamo to confirm compliance with law and policy, subject to security concerns.**

Plaintiffs' MSJ Appx. 2150

*Outside Access to Detainees*

A.  <u>Legal/Policy Authority</u>.  Common Article 3.  According to DoDD 2310.01E, the ICRC shall be allowed to offer its services.  Additional reference material includes GPW (Art. 70-75, 78, 125, 126); GCC (Art. 104, 140, 142); AR 190-8 (1-5, 3-4, 3-5, 3-16, 6-8) state that: ICRC services may be offered in the areas of communication, relief parcels, detainee complaints, and camp administration.

B.  <u>Detainee/NGO Input</u>.  Other than the International Committee of the Red Cross (ICRC), enhance the transparency of operations by allowing authorized organizations, NGOs and selected personnel from the UN to visit and speak with the detainees.

C.  <u>Practice/Implementation</u>.  The Geneva Conventions address the matter of access by the International Committee of the Red Cross (ICRC) to persons detained during armed conflict.  Per the DoD Directive, the ICRC shall be allowed to offer its services during an armed conflict, however characterized, to which the United States is a party.  Traditionally, the ICRC has performed this important function during the conduct of detention operations and has historically enhanced DoD's ability to conduct detention operations effectively.  Since the opening of the detention facilities at Guantánamo, the ICRC has been afforded the ability to meet privately with the detainees during regular visits to Guantánamo.  These visits occur in locations within the camps that prevent the conversation from being overheard by camp personnel.  After every visit, the ICRC debriefs the camp authorities, describing the general state of detention, making recommendations for improvement and relaying any detainee allegations and complaints received.  Any substantive written or oral reports provided by the ICRC are promptly forwarded for consideration and action where appropriate.

D.  <u>Team Analysis</u>.  The ICRC is the only international or non-governmental organization with a special responsibility under the Law of War, including the full Geneva Conventions and Common Article 3, to provide services to the detaining power.  They visit at least quarterly, have access to all detainees in a private setting, and provide regular communications with camp authorities concerning their conversations.  The communications between the ICRC and the U.S. Government are confidential and intended to assist the detaining power in providing humane treatment for detainees.  The unique modalities that govern the relationship between the ICRC and the United States encourage a candid, thoughtful exchange of ideas concerning the conditions of detention.  The involvement of other international and non-governmental organizations, though unable to provide the same comprehensive and confidential services to the detainees, may be beneficial in making the operations at Guantánamo more transparent, and in offering their services for the humane care and treatment of detainees as well as assistance in repatriation of certain detainees.

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to encourage and maintain the ongoing relationship with the ICRC as they periodically visit Guantánamo.**

**Recommend:**

- ▪ **Consider inviting non-governmental organizations and appropriate international organizations to send representatives to visit Guantánamo, in a manner that does not jeopardize the current relationship with the ICRC and is consistent with security and safety of the detainees and guard force.**

65

*Attorney Access to Detainee-Clients*

A. <u>Legal/Policy Authority</u>.  Judge Joyce Hens Green, U.S. District Court for the District of Columbia, Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba ("Protective Order")  November 5, 2004; Military Commissions Act of 2006; Commander, JTF-Guantánamo Memorandum "Military Commissions Counsel Visitation of Detainees Practices Guide ("Practices Guide")" 19 May 2008.

B. <u>Detainee/NGO Input</u>.  Detainees have been denied access to attorneys in Guantánamo. Attorneys have been denied access to their detainee-clients.

C. <u>Practice/Implementation</u>.  Currently there are more than 200 detainee habeas corpus petitions filed with the U.S. District Court for the District of Columbia.  Those cases are proceeding under the cognizance of various federal judges.  Detainees have been advised of the means by which they may request attorneys from federal courts.  There are 14 detainees charged under the Military Commissions Act.  Attorneys for habeas corpus and military commissions cases are permitted to travel to Guantánamo and meet with their clients.

There are 13 attorney visitation rooms in Camp Delta, including ten in Camp Echo, two in Camp 6, and one in Camp 5.  JTF-Guantánamo received over 1,300 habeas corpus attorney visits and more than 500 Military Commissions attorney visits on behalf of detainees in calendar year 2008.  In addition, 30 attorney-detainee client telephone calls were facilitated in calendar year 2008, most occurring after the Supreme Court's decision in <u>Boumediene v. Bush</u>, when it became clear that the detainee habeas corpus cases filed in the U.S. District Court for the District of Columbia would be permitted to move forward and the Chief Judge of the District Court ordered all parties to expedite the cases.  For JTF-Guantánamo, this meant expanding attorney-detainee client meeting times, to include weekends and installing telephone capability to permit the calls between detainees in Guantánamo and attorneys calling from a designated secure location in Alexandria, Virginia.

The JDG and the JTF-Guantánamo Office of the Staff Judge Advocate (SJA) facilitate attorney visitation and telephone calls in accordance with the Protective Order, in the case of habeas corpus related visits, and the Practices Guide in the case of military commissions related visits. The foregoing respectively govern all aspects of attorney visitation and communications with their detainee clients in Guantánamo, including entry into and exit from the camps, inspection of personal belongings and papers for security purposes, and the collection, delivery, and handling of legal mail by JTF-Guantánamo staff.  The Protective Order requires legal counsel to comply with various security procedures implemented by Commander, JTF-Guantánamo.  The Practices Guide contains similar language.  The rules in place seek to protect the attorney client privilege, facilitate legal representation of the detainees, facilitate access by the detainees to U.S. Federal Courts, and protect legitimate security interests of JTF-Guantánamo and the United States Government.

66

Counsel have the opportunity to raise concerns about JTF-Guantánamo's security practices with the SJA and if they cannot reach a satisfactory resolution, challenge such security procedures before courts of competent jurisdiction.

D.  Team Analysis.  Detainees have access to federal court.  Attorneys have access to their detainee clients and the means to seek redress in the event they believe their access is unreasonably curtailed.  Detainees who are representing themselves or who otherwise desire to do so, have the ability to access the federal courts.  Attorneys have access to their detainee-clients and the means to seek redress for concerns that cannot be resolved locally.

E.  Findings/Recommendations.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue JTF-Guantánamo efforts to facilitate attorney-detainee client communications.**

- ▪ **Continue JTF-Guantánamo efforts to provide attorney access to detainee clients.**

67

*Detainees Ordered or Approved for Release*

A.  <u>Legal/Policy Authority</u>.  Common Article 3.  Under DoDD 2310.01E, detainees are to be treated humanely and respected as human beings.  Additional reference material may be found in GPW (Art. 13, 17, 21, 22), GCC (Art. 27. 30-33, 84), U.S. District Court Order, Boumediene v. Bush, 20 November 2008; Convening Authority Appointment Letter of 9 July 2004; Deputy Secretary of Defense CSRT Implementation Guidance of 14 July 2006. <u>Boumediene v. Bush</u>, 128 S.Ct. 2229 (2008); DEPSECDEF Action Memo 4 August 2008; ASD Action Memo 15 August 2008, and, ASD Action Memo 25 September 2008.

B.  <u>Detainee/NGO Input</u>.  As a general matter, NGOs have complained about the amount of time it has taken to repatriate individuals who have the status of those currently held in Camp Iguana. They point to the last group of Uighurs who were housed in Camp Iguana for many months before they were transferred to Albania and note that many of the detainees who are there now, have been there since August 2008.  Additionally, many commentators have complained about insufficient personal freedoms afforded to those who they say should be free because they believe that, in essence, a judicial determination has been made that these individuals "did nothing wrong."

C.  <u>Practice/Implementation</u>.  Camp Iguana currently holds two detainees in whose case the U.S. District Court for the District of Columbia ordered the United States "to take all necessary and appropriate diplomatic steps to facilitate [their release]."  In addition, Camp Iguana holds one detainee whose CSRT the U.S. Court of Appeals for the D.C. Circuit struck down as invalid and approximately 15 other detainees in whose habeas corpus petitions, the DoD has declined to assert their continued enemy combatant status.

In the case of each of these individuals, the Department of Defense is awaiting successful diplomatic efforts to secure a willing nation to accept the detainees and an agreement from the detainees to go to such nations.  In the case of approximately 15 of the detainees in Camp Iguana, there are legitimate concerns that their home nation will mistreat them upon their return. No other acceptable solution has been found for their transfer out of Guantánamo.  In the case of several other detainees, the nation to which they would like to be transferred has declined to accept them and they have expressed concerns of mistreatment if they are returned to their home nation.

While JTF-Guantánamo continues to hold these individuals, as diplomatic efforts proceed, it is noteworthy that the detainees have been removed from the detention facilities and placed in Camp Iguana, which essentially is a holding facility (similar to the concept relied upon by Immigrations and Customs Enforcement to detain individuals in the U.S.) for individuals in the categories above awaiting transfer.  As described elsewhere in this report, the limitations placed upon detainees' living arrangements, movements, recreation, dining arrangements, access to televisions, access to snacks purchased at the local Navy Exchange, and similar activities are considerably less onerous than is the case in JTF-Guantánamo's detention facilities.  The JDG exercises the minimum level of restriction over detainee activities in Camp Iguana practicable, subject to the necessity to maintain good order and discipline within the camp.  For example, guards generally do not enter the camp.  Detainees establish their own living arrangements

Plaintiffs' MSJ Appx. 2155

among themselves, decide whether to watch television and what to watch, decide their own recreation schedule, and even decide whether to allow their lawyers into the camp. Security is maintained by guards stationed outside of the camp who stand watch using guard towers, personal observation through chain link fencing, and cameras inside the living quarters.

D. <u>Team Analysis</u>. Individuals in Camp Iguana should be transferred as quickly as possible. In the past—either because they refuse to be transferred to appropriate destination countries, or because no acceptable country has been found to take them—detainees in Camp Iguana have resided there for many months before their transfer. Detainees in Camp Iguana awaiting transfer should be permitted maximum personal freedom, subject to legitimate security measures to maintain good order and discipline within the camp. JTF-Guantánamo has taken steps to institute more personal freedoms within Camp Iguana than exist in any other camps in Guantánamo. If detainees feel that they are entitled to additional freedoms, they have access to guard staff within the camp to whom they may direct complaints. They also have attorneys who have access to the courts to bring complaints in the event issues cannot otherwise be resolved to their satisfaction. Uighur detainees have been residing in Camp Iguana since August 2008. Their frustration at remaining in Camp Iguana is understandably growing as time passes. This puts increasing pressure on the guard staff and other detainees within the camp.

E. <u>Findings/Recommendations</u>. **Conditions are in compliance with Common Article 3 of the Geneva Conventions. No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- **Make status determinations and repatriation/transfer of designated detainees a priority including, at minimum, by seeking immediate assistance from the interagency to repatriate/transfer detainees who have been cleared for immediate release in connection with litigation.**

- **Continue to maximize personal freedoms of Camp Iguana detainees consistent with their status, subject to legitimate security measures required to maintain good order and discipline within the camp.**

69

*Repatriation/Transfer*

A.  <u>Legal/Policy Authority</u>.  Common Article 3.  According to DoDD 2310.01E, the ICRC shall be allowed to offer its services to detainees.  Available reference material includes GPW (Art. 70-75, 78, 125, 126); GCC (Art. 104, 140, 142); and AR 190-8 (1-5, 3-4, 3-5, 3-16, 6-8) which state:  ICRC services may be offered in the areas of communication, relief parcels, detainee complaints, and camp administration.

B.  <u>Detainee/NGO Input</u>.  Consider medical professional options when discussing the repatriation of detainees on humanitarian grounds.  When a detainee has been identified for repatriation, keep him informed of the progress of his status.  Detainees who are eligible for repatriation are in no way forced to do so; they have the right to refuse, and that right must be explained to them.

C.  <u>Practice/Implementation</u>.  Detainees have several opportunities to make inputs into the repatriation or transfer process.  The JTF SJA meets with the detainee to advise him of the possibility and ask if he has any fear of going to the destination country, then notifies the chain of command.  The ICRC will offer each detainee identified for movement an opportunity to talk to them, called an "exit interview."  Immediately upon completion of the interview, the ICRC notifies the Department of Defense of the results so that any fears expressed can be reviewed and, when appropriate, acted upon.  Finally, a detainee with habeas corpus counsel can, where appropriate, discuss with his attorney (including by phone), efforts to repatriate him and to clarify any concerns he might have.  This information is provided to the appropriate authorities for consideration during the repatriation/transfer process.  Should there be changes to the transfer schedule of a detainee, the camp authorities advise the detainee and keep him advised of the status of his repatriation/transfer.  Finally, the detainee is allowed to take his legal mail and other personal property with him as he departs Guantánamo.

The opinions and recommendations of medical professionals are one factor in decisions about detainee repatriation.  During transfer preparations, JTF-Guantánamo medical personnel prepare a detailed narrative medical summary on the identified detainees.  A copy of this summary, along with 90 days or more worth of medication (as appropriate), are given to the flight crew of the repatriation aircraft for delivery to receiving government officials.  In addition, all detainees leaving Guantánamo are offered a physical exam.  This, in part, is to ensure the detainee is able to travel and to identify any special considerations for travel.

D.  <u>Team Analysis</u>.  Detainees are afforded the opportunity to have an input into the final destination for their repatriation/transfer, through the JTF SJA, the ICRC, and their habeas corpus attorney (where appropriate).  Fears expressed by the detainee concerning the repatriation/transfer country are taken under consideration by the U.S. Government, consistent with U.S. treaty obligations.  Accountability for the detainee is maintained throughout the process, until he is delivered to the destination country.

70

E.  <u>Findings/Recommendations</u>.  **Conditions are in compliance with Common Article 3 of the Geneva Conventions.  No prohibited acts were found and conditions are humane.**

**Strongly recommend:**

- ▪ **Continue to solicit detainee input into proposed repatriation/transfer destinations, using all appropriate means.**

**Recommend:**

- ▪ **Accelerate negotiation efforts to send those detainees who have been determined to be suitable for transfer or release, who have legitimate fears of persecution, to an appropriate third country.**

Plaintiffs' MSJ Appx. 2158

**Conclusions**

I have completed the review directed to determine whether the conditions of detention in Guantánamo Bay, Cuba are "in conformity with applicable laws governing the conditions of confinement, including Common Article 3 to the Geneva Conventions." As a collective result of the efforts of the team that assisted me in this review, it is my judgment that the conditions of confinement in Guantánamo are in conformity with Common Article 3 to the Geneva Conventions and conform to the requirements outlined in the Executive Order.

As discussed in the introductory remarks, there are two components in the scope of the compliance review taken from Common Article 3: the first is the explicit prohibition against specified acts (at any time and in any place). As indicated previously, substantiated evidence of prohibited acts discovered in the course of the review would have warranted a finding of "Non-compliance" with Common Article 3 and resulted in the requirement for immediate corrective action. No prohibited acts were found.

Additionally, determining conformity with Common Article 3 also requires examination of the directive aspect of the Article, this being that "Persons . . . shall in all circumstances be treated humanely." This element of the effort demanded that the team examine conditions of detention from a subjective viewpoint, relying upon their experience and professional backgrounds, informed and challenged by outside commentary. As a result of that effort, I find that conditions of confinement in Guantánamo also meet the directive requirements of Common Article 3 of the Geneva Conventions.

The concept of humane treatment requires the examiner to look at various factors in a continuum to assess whether what is humane today, is or will be humane over a longer period of detention. Treatment must be viewed in the context of specific and relevant circumstances to determine whether it is adequate. While our review has determined that all conditions of confinement are currently in conformity with Common Article 3, our list of recommendations calls attention to those actions that we think will assist USSOUTHCOM in its continuing efforts to enhance humane conditions of detention in Guantánamo.

The Review Team recognized the value of socialization throughout the detention facilities, especially considering the length of time individuals at Guantánamo have been detained. The key to socialization is providing more human-to-human contact, recreation opportunities with several detainees together, intellectual stimulation, and group prayer. Socialization is essential to maintain humane treatment over time.

With regard to detainees held at Camp 7, who are the most limited in their human-to-human contact, the Review Team vigorously urges that additional steps be taken to increase detainee-to-detainee contact, and offer them opportunities for group prayer and expanded recreation options, consistent with Commander, USSOUTHCOM initiatives. The conditions in Camp 7 are designed with security in mind, but limit communication and physical interaction between detainees. Detainees are currently limited to recreation with a single partner. In the area of religious practice, the detainees in all other camps are able to conduct group prayer and communal recreation. Allowing a variety of different detainees in groups of three or more to

72

participate in recreation and prayer together will be a positive step toward greater socialization. In sum, Camp 7 procedures and its physical plan need to be modified in accordance with USSOUTHCOM initiatives in order to increase detainee-to-detainee contact.

Additionally, the Review Team recognized that detainee access to high quality healthcare services is a fundamental aspect of humane treatment that is greatly enhanced by appropriate human-to-human contact and socialization between detainees and healthcare providers. Delivery of quality healthcare requires development of trusting relationships between providers and their patients. Although difficult to achieve in a custodial environment, several actions may serve to facilitate improvements to enhance further the high quality of care delivered to detainees. We recommend expanding detainee access to dedicated linguists to assist with medical evaluation and treatment during evening and weekend hours to enhance detainee trust in the role of medical providers and to improve the quality of medical care. Moreover, we recommend JDG or JMG personnel directly observe and record detainee weights, since weight loss may be an early and sensitive indicator of a developing healthcare problem. Finally, we also recommend implementing policies and training regarding entry of specific medical information into non-medical databases such as DIMS and JDIMS to support an appropriate level of medical confidentiality.

As detention operations in Guantánamo enter their eighth year, JTF-Guantánamo will continue to require extensive resources. Enhancement of humane treatment, as the operation continues, and as the detainee population spends more time under U.S. control, will also require strengthening of internal controls and continued dedication of both funds and personnel. BSCs are a vital resource for understanding and improving the operational environment. Their ability to provide behavioral analysis has proven effective in identifying developing tensions and recommending options for strategies to improve camp dynamics. We must develop courses of action to ensure the sustainment of the BSCT as a core capability at Guantánamo.

Internal controls are equally critical in maintaining the course established toward improving stability. The JTF must expedite final approval of the draft JTF BSCT SOP and the JIG ICE SOP to reflect current practices at Guantánamo and to ensure that the appropriate firewalls are maintained, including the firewall between healthcare and intelligence. The Review Team also found several additional new actions that involve internal controls. In that regard, we would endorse the use of video recording in all camps and for all interrogations. The use of video recordings to confirm humane treatment and limit disruption of operations from false complaints will be an important enabler for detainee operations. Just as internal controls provide standardization, the use of video recordings would provide the capability to monitor performance and maintain accountability.

The Review Team has also identified several actions that we believe are important to maintaining a humane treatment standard during the period of prolonged detention. The most critical activity in this regard is the improvement in Camp 6 to provide socialization incentives. Camp 4 currently offers the greatest degree of socialization opportunities, including communal living, frequent human-to-human contact, recreation, intellectual stimulation, and religious gatherings, which clearly assisted in management of that camp. The CJDG has recognized this

Plaintiffs' MSJ Appx. 2160

and is moving quickly to institute greater socialization in Camp 6. It is essential to accelerate the completion of Camp 6 recreation areas and facilities, supporting enhancements for socialization.

The Review Team is convinced that the ability of detainees to understand their future has a direct correlation to detainee behavior and conditions inside the camp population, and will impact the long-term ability to comply with Common Article 3 of the Geneva Conventions. Rising tension and anxiety among the detainees leads to acts of defiance, non-compliance with camp rules, and manifestations of self-harm or attempts to injure or kill camp personnel. Therefore, we recommend seeking immediate assistance through the interagency process to expeditiously determine the detainees' future and take action to repatriate or transfer detainees as appropriate. Increased emphasis in this regard will help the JDG Commander manage the detainee population consistent with Common Article 3 of the Geneva Conventions.

Not knowing when they might depart Guantánamo (for home or elsewhere) has almost certainly increased tension and anxiety within the detainee population. This tension is further exacerbated in one particular population – the Chinese Uighurs. For several years the DoD and the State Department have been struggling to transfer 17 Chinese Uighur detainees from Guantánamo to a suitable third country. Due to U.S. obligations, the U.S. cannot send them back to China. Recent court rulings increased the pressure to move these detainees out of Guantánamo as soon as a suitable third country has been selected.

In addition to the Chinese Uighurs, there are now two additional detainees (Algerian, but captured in Bosnia) that the court has ordered be released from U.S. custody. All these detainees are now housed in Camp Iguana, a holding camp that provides the greatest amount of freedom for the detainees while ensuring continued camp and U.S. naval base security. Despite increased freedoms at Camp Iguana, the detainees there continue to vocally and physically express their extreme frustration with their continued detention at Guantánamo.

Therefore, the Review Team requests that emphasis be placed on providing immediate assistance within the interagency process on where to transfer these detainees (especially those currently housed in Camp Iguana).

74

## Glossary

### A

| | |
|---|---|
| **AHLTA-T** | Armed Forces Health Longitudinal Technology Application - Theater |
| **APO** | Army Postal Office |
| **AR** | Army Regulation |
| **ARB** | Administrative Review Board |
| **Army MedCom** | Army Medical Command |
| **Assisting Military Officer** | responsible for meeting with the detainee prior to the Administrative Review Board hearing |

### B

| | |
|---|---|
| **Behavioral Science Consultants** | Behavioral science experts who provide reports concerning the predictability of violence, threat assessment and personality assessment of a subject |
| **BHU** | Behavioral Health Unit |
| **BSCT** | Behavioral Science Consultation Team |

### C

| | |
|---|---|
| **CAT** | UN Convention Against Torture |
| **CJDG** | Joint Detention Group Commander |
| **CJTF** | Commander, Joint Task Force |
| **Corpsman** | Hospital Corpsman (HM) is a rating in the U.S. Navy and a member of the Navy's Medical Corps |
| **CRT** | Compliance Review Team |
| **CSRT** | Combatant Status Review Tribunal |

### D

| | |
|---|---|
| **DH** | Detention Hospital |
| **DIMS** | Detainee Information Management System |
| **DMO** | Detainee Movement Operations |
| **DMPC** | Detainee Mail Processing Center |
| **DoDD** | Department of Defense Directive |
| **DoDI** | Department of Defense Instruction |
| **DTA** | Detainee Treatment Act of 2005 |

### E

| | |
|---|---|
| **EMR** | Emergency Medical Response |

### F

| | |
|---|---|
| **FCE** | Forced Cell Extraction |
| **FM** | Field Manual |

### G

75

| | |
|---|---|
| **GCC** | Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva IV) |
| **GPW** | Geneva Convention Relative to the Treatment of Prisoners of War (Geneva III) |
| **GTMO** | Guantánamo Bay |
| **GWS** | Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (Geneva I) |

**<u>H</u>**

| | |
|---|---|
| **Halal Meals** | The term is widely used to designate food seen as permissible according to Islamic law. |

**<u>I</u>**

| | |
|---|---|
| **ICE** | Intelligence Control Element, Or, Immigration and Customs Enforcement |
| **ICRC** | International Committee of the Red Cross |
| **IP** | Interrogation Plan |
| **IPF** | Interrogation Plan Form |
| **ISN** | Internment Serial Number |

**<u>J</u>**

| | |
|---|---|
| **JDG** | Joint Detention Group |
| **JDIMS** | Joint Detainee Information Management System |
| **JIG** | Joint Intelligence Group |
| **JMG** | Joint Medical Group |
| **JTF-GTMO** | Joint Task Force Guantánamo |

**<u>M</u>**

| | |
|---|---|
| **MCA** | Military Commissions Act |
| **MMC** | Manual for Military Commissions |
| **MP** | Military Police |
| **MPO** | Medical Plans Officer |

**<u>N</u>**

| | |
|---|---|
| **NCOIC** | **Non-Commissioned Officer in Charge** |
| **NGO** | Non-Government Organization |

**<u>O</u>**

| | |
|---|---|
| **OIC** | Officer in Charge |

**<u>P</u>**

| | |
|---|---|
| **Pashtu** | (Naskh: پښتو - IPA: [pa 'to]; alternative spelling: |

76

|  |  |
|---|---|
|  | (*Pakhto*, *Pushto*, *Pukhto*, *Pashtu*, or *Pushtu*), also known as **Afghani**, is an Indo-European language spoken primarily in Afghanistan and northwestern Pakistan. |
| **PPD** | Purified Protein Derivative |

**R**

|  |  |
|---|---|
| **Rainbow Chart Code System** | Chart code system the JDG/JMG uses to activate its Emergency Response System |
| **Ramadan** | A Muslim religious observance that takes place during the ninth month of the Islamic calendar, requiring the faithful to fast from the rising to the setting of the sun every day of the month |
| **RCM** | Red Cross Message |

**S**

|  |  |
|---|---|
| **S2** | Intelligence Officer |
| **SC** | Supreme Court |
|  | Or, U.S. Southern Command |
|  | Or, Section Chief |
| **SJA** | Staff Judge Advocate |
| **SMO** | Senior Medical Officer |
| **SOP** | Standard Operating Procedures |

**T**

|  |  |
|---|---|
| **Tafseer** | (aka Tafsir) is the Arabic word for exegesis or commentary, usually of the Qur'an |
| **TB** | Tuberculosis |
| **TTP** | Tactics, Techniques and Procedures |

**U**

|  |  |
|---|---|
| **UCMJ** | Uniform Code of Military Justice |
| **UN** | United Nations |

**W**

|  |  |
|---|---|
| **WMA** | World Medical Association |

77

## Bibliography

Authorities

- Executive Order:  *Review and Disposition of Individuals Detained at the Guantánamo Bay Naval Base and Closure of Detention Facilities*, http://www.whitehouse.gov/the_press_office/Closure_Of_Guantánamo_Detention_Facilities/, January 22, 2009.
- Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), adopted and opened for signature by General Assembly Resolution 39/40 of December 10, 1984, http://www.unhchr.ch/html/menu3/b/h_cat39.htm.
- *Rasul v. Bush*, 542 U.S. 466 (2004), U.S. Supreme Court
- *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), U.S. Supreme Court
- *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), U.S. Supreme Court
- *Boumediene v. Bush*, 553 U.S. ___ (2008)
- Department of Defense Directive 2310.01E, *The Department of Defense Detainee Program*, http://www.dtic.mil/whs/directives/corres/html/231001.htm, September 5, 2006.
- Department of Defense Directive 3115.09, *DoD Intelligence Interrogations, Detainee Debriefings, and Tactical Questioning*, http://www.dtic.mil/whs/directives/corres/pdf/311509p.pdf, October 9, 2008.
- FM 2.22-3, *Human Intelligence Collector Operations*, Headquarters, Department of the Army, http://www.army.mil/institution/armypublicaffairs/pdf/fm2-22-3.pdf, September 2006.
- Department of Defense Instruction 2310.08E, *Medical Program Support for Detainee Operations*, http://www.dtic.mil/whs/directives/corres/pdf/231008p.pdf, June 6, 2006.
- Memorandum on Amended Policy Guidance on International Committee of the Red Cross (ICRC) Communications, October 5, 2007.
- Policy Memorandum, *Application of Common Article 3 of the Geneva Conventions to the Treatment of Detainees in the Department of Defense*, July 7, 2006
- *Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba (Protective Order)*, Judge Joyce Hens Green, 344 F.Supp.2d 174 (D.D.C. 2004), 5 November 2004
- Memorandum, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantánamo Bay, Cuba*, Gordon R. England, 14 July 2006
- Memorandum, *Order Establishing Combatant Status Review Tribunal*, Paul Wolfowitz, 7 July 2004
- Memorandum, *Clarification of Intelligence Interrogation Policy—Detainee Status Determinations and the Conduct of Interrogations during Segregation and Separation*, James R. Clapper, Jr., 20 Sep 2007.

References

- Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949 (GPW), http://www.icrc.org/ihl.nsf/7c4d08d9b287a42141256739003e63bb/6fef854a3517b75ac125641e004a9e68.

- Geneva Convention Relative to the Protection of Civilian persons in Time of War of August 12, 1949 (GCC), http://www.icrc.org/ihl.nsf/FULL/380?OpenDocument.
- AR 190-8, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees*, http://www.army.mil/usapa/epubs/pdf/r190_8.pdf, October 1, 1997.
- FM 3-19.40, *Internment/Resettlement Operations*, http://www.army.mil/usapa/doctrine/19_Series_Collection_1.html, September 4, 2007.
- AR15-6, *Investigation into FBI Allegations of Detainee Abuse at Guantánamo Bay, Cuba Detention Facility* (Final Report), www.defenselink.mil/news/Jul2005/d20050714report.pdf , 1 April 2005 (Amended 9 June 2005)
- Code of Federal Regulations, Title 28 *Judicial Administration*, Chapter V *Bureau of Prisons*, Subchapter C *Institutional Management*, Part 549 *Medical Services*, http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&tpl=/ecfrbrowse/Title28/28cfr549_main_02.tplDetainee Treatment Act of 2005 (Sections 1002-1005)
- *Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment*, Adopted by General Assembly resolution 43/173 of 9 December 1988
- *Standard Minimum Rules for the Treatment of Prisoners*, Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955, and approved by the Economic and Social Council by its resolution 663 C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977
- Joint Detention Group (JGD) Standard Operating Procedure (SOP)
- Joint Task Force Guantánamo (JTF-GTMO) Standard Operating Procedure (SOP)
- JTF-Guantánamo Joint Medical Group Standard Operating Procedure (SOP)
- JTF-Guantánamo Joint Interrogation Group (JIG) Intelligence Collection Element (ICE) Standard Operating Procedure (SOP)
- JTF-Guantánamo Memorandum, *Military Commissions Counsel Visitation of Detainees Practices Guide (Practices Guide)*, 19 May 2008
- Memorandum on Behavioral Science Consultation Policy from Headquarters, U.S. Army Medical Command, October 20, 2006.
- Sondra S. Crosby; Caroline M. Apovian; Michael A. Grodin, *Hunger Strikes, Force-feeding, and Physicians' Responsibilities,* JAMA, August 1, 2007; 298: 563 - 566.
- DoD Designated Civilian Official (DCO) Memorandum, *Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantánamo Bay, Cuba*, of 14 September 2004
- Deputy Secretary of Defense Memorandum, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Navy Base Guantánamo Bay, Cuba*, of 14 July 2006
- Deputy Secretary of Defense Memorandum, *Order Establishing Combatant Status Review Tribunal*, 7 Jul 2004
- USSOUTHCOM Inspector General inspection results, Inspection of JTF-Guantánamo, 5-9 May 2008
- USSOUTHCOM Inspector General inspection results, Inspection of JTF-Guantánamo , 9-15 September 2007
- USSOUTHCOM Unannounced Periodic Inspection Report for Detainee Camps, period of inspection: 10-12 July 2008

Plaintiffs' MSJ Appx. 2166

- USSOUTHCOM Unannounced Periodic Inspection Report for Detainee Camps, period of inspection: 10 December 2007
- USSOUTHCOM Unannounced Periodic Inspection Report for Detainee Camps, period of inspection: 07 August 2007
- USSOUTHCOM Unannounced Periodic Inspection Report for Detainee Camps, period of inspection: 21 May 2007

External input
- Letter from ACLU, Amnesty International, Human Rights First and Human Rights Watch to President Obama, http://www.aclu.org/pdfs/safefree/coalitionlettertoobama.pdf, January 30, 2009.
- *Locked Up Alone:  Detention Conditions and Mental Health at Guantánamo*, Human Rights Watch, http://www.hrw.org/sites/default/files/reports/us0608_1.pdf, June 9, 2008.
- *Cruel and Inhuman:  conditions of isolation for detainees at Guantánamo Bay*, Amnesty International, http://www.amnestyusa.org/document.php?id=ENGAMR510512007&lang=e, May 4, 2007.
- Letter from ACLU Human Rights Program Director J. Dakwar to Secretary of Defense R. Gates, January 9, 2009.
- Letter from ACLU Executive Director A.D. Romero to ASD J.A. Benkert, February 6, 2009.
- Letter from Amnesty International Executive Director L. Cox to DASD(DA) S. Hodgkinson and ODA Principal Director A. Liotta, February 6, 2009.
- Letter from Human Rights First CEO E. Massimino to ASD J. Benkert, February 6, 2009.
- *Guantánamo and its Aftermath:  U.S. Detention and Interrogation Practices and their Impact on Former Detainees*, Human Rights Center, U.C. Berkeley, International Human Rights Clinic, U.C. Berkeley, Center for Constitutional Rights, http://hrc.berkeley.edu/pdfs/Gtmo-Aftermath.pdf, November 12, 2008.
- *Situation of Detainees at Guantánamo Bay: Report of the Chairperson-Rapporteur of the Working Group on Arbitrary Detention*, United Nations Economic and Social Council, http://daccessdds.un.org/doc/UNDOC/GEN/G06/112/76/PDF/G0611276.pdf, February 27, 2006.
- *Standard Minimum Rules for the Treatment of Prisoners,* First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955, and approved by the Economic and Social Council by its resolution 663 C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977.
- *Abuse of Iraqi POWs by GIs Probed*, 60 Minutes II, Rebecca Leung, April 28, 2004, www.cbsnews.com/stories/**2004**/04/27/60II/main614063.shtml
- Jamie Mayerfeld, *"Playing by Our Own Rules: How U.S. Marginalization of International Human Rights Law Led to Torture,"* Harvard Human Rights Journal, Spring 2007, 20 Harv. Hum. Rts. J. 89.
- Report of the American Psychological Association Presidential Task Force on Psychological Ethics and National Security, June 2005.
- Report of the Council on Ethical and Judicial Affairs, CEJA 10-A-06, Physician Participation in Interrogation, 2006.

Plaintiffs' MSJ Appx. 2167

- The World Medical Association Policy, October 2006,
  http://www.wma.net/e/policy/h31.htm,
- *World Medical Association Declaration on Hunger Strikers*, Adopted by the 43rd World Medical Assembly Malta, November 1991and editorially revised at the 44th World Medical Assembly Marbella, Spain, September 1992
  and revised by the WMA General Assembly, Pilanesberg, South Africa, October 2006
- *Military Medical Ethics- Physician First, Last, Always*, George J. Annas, J.D., M.P.H, Boston School of Public Health, Department of Health Law, Bioethics & Human Rights, 11 Aug 2008, New England Journal of Medicine
- *The Istanbul Statement on the Use and Effects of Solitary Confinement*, adopted on 9 December 2007 at the International Psychological Trauma Symposium, Istanbul, as reported in TORTURE Volume 18, Number 1, 2008.
- *Report of the APA Presidential Advisory Group on the Implementation of the Petition Resolution*, American Psychologist Association Council of Representatives, December 2008
- *Report of the APA Presidential Advisory Group on the Implementation of the Petition Resolution* Elena J Eisman, Ed.D.,ABPP; Armand R Cerbone, Ph.D. *et al*, December 2008
- Program Statement # P5566.06, *Use of Force and Application of Restraints,* Harley G Lappin, U.S. Department of Justice, Federal Bureau of Prisons, 30 November 2005
- Program Statement # P6031.01, *Patient Care,* Harley G Lappin, U.S. Department of Justice, Federal Bureau of Prisons, 15 January 2005
- Program Statement # P6010.01, *Administrative Safeguards for Psychiatric Treatment and Medication*, Kathleen M Hawk, U.S. Department of Justice, Federal Bureau of Prisons, 21 September 1995 (Effective 25 September 1995)
- Program Statement # P 5562.05, *Hunger Strikes*, Harley G Lappin, U.S. Department of Justice, Federal Bureau of Prisons, 29 July 2005

Previous reports
- Church Report, 25 May 2004, Vice Admiral Albert T. Church III,
  http://www.defenselink.mil/news/Mar2005/d20050310exe.pdf
- Investigation into FBI Allegations of Detainee Abuse at Guantánamo Bay, Cuba Detention Facility, Schmidt-Furlow Report, 1 April 05, as amended 9 Jun 05,
  http://www.defenselink.mil/news/Jul2005/d20050714report.pdf

81

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 134

## Body Mass Index Table

Body Weight (pounds)

| BMI | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Category | Normal | | | | | | Overweight | | | | | Obese | | | | | | | | | | Extreme Obesity | | | | | | | | | | | | | | | |
| Height (inches) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 58 | 91 | 96 | 100 | 105 | 110 | 115 | 119 | 124 | 129 | 134 | 138 | 143 | 148 | 153 | 158 | 162 | 167 | 172 | 177 | 181 | 186 | 191 | 196 | 201 | 205 | 210 | 215 | 220 | 224 | 229 | 234 | 239 | 244 | 248 | 253 | 258 |
| 59 | 94 | 99 | 104 | 109 | 114 | 119 | 124 | 128 | 133 | 138 | 143 | 148 | 153 | 158 | 163 | 168 | 173 | 178 | 183 | 188 | 193 | 198 | 203 | 208 | 212 | 217 | 222 | 227 | 232 | 237 | 242 | 247 | 252 | 257 | 262 | 267 |
| 60 | 97 | 102 | 107 | 112 | 118 | 123 | 128 | 133 | 138 | 143 | 148 | 153 | 158 | 163 | 168 | 174 | 179 | 184 | 189 | 194 | 199 | 204 | 209 | 215 | 220 | 225 | 230 | 235 | 240 | 245 | 250 | 255 | 261 | 266 | 271 | 276 |
| 61 | 100 | 106 | 111 | 116 | 122 | 127 | 132 | 137 | 143 | 148 | 153 | 158 | 164 | 169 | 174 | 180 | 185 | 190 | 195 | 201 | 206 | 211 | 217 | 222 | 227 | 232 | 238 | 243 | 248 | 254 | 259 | 264 | 269 | 275 | 280 | 285 |
| 62 | 104 | 109 | 115 | 120 | 126 | 131 | 136 | 142 | 147 | 153 | 158 | 164 | 169 | 175 | 180 | 186 | 191 | 196 | 202 | 207 | 213 | 218 | 224 | 229 | 235 | 240 | 246 | 251 | 256 | 262 | 267 | 273 | 278 | 284 | 289 | 295 |
| 63 | 107 | 113 | 118 | 124 | 130 | 135 | 141 | 146 | 152 | 158 | 163 | 169 | 175 | 180 | 186 | 191 | 197 | 203 | 208 | 214 | 220 | 225 | 231 | 237 | 242 | 248 | 254 | 259 | 265 | 270 | 278 | 282 | 287 | 293 | 299 | 304 |
| 64 | 110 | 116 | 122 | 128 | 134 | 140 | 145 | 151 | 157 | 163 | 169 | 174 | 180 | 186 | 192 | 197 | 204 | 209 | 215 | 221 | 227 | 232 | 238 | 244 | 250 | 256 | 262 | 267 | 273 | 279 | 285 | 291 | 296 | 302 | 308 | 314 |
| 65 | 114 | 120 | 126 | 132 | 138 | 144 | 150 | 156 | 162 | 168 | 174 | 180 | 186 | 192 | 198 | 204 | 210 | 216 | 222 | 228 | 234 | 240 | 246 | 252 | 258 | 264 | 270 | 276 | 282 | 288 | 294 | 300 | 306 | 312 | 318 | 324 |
| 66 | 118 | 124 | 130 | 136 | 142 | 148 | 155 | 161 | 167 | 173 | 179 | 186 | 192 | 198 | 204 | 210 | 216 | 223 | 229 | 235 | 241 | 247 | 253 | 260 | 266 | 272 | 278 | 284 | 291 | 297 | 303 | 309 | 315 | 322 | 328 | 334 |
| 67 | 121 | 127 | 134 | 140 | 146 | 153 | 159 | 166 | 172 | 178 | 185 | 191 | 198 | 204 | 211 | 217 | 223 | 230 | 236 | 242 | 249 | 255 | 261 | 268 | 274 | 280 | 287 | 293 | 299 | 306 | 312 | 319 | 325 | 331 | 338 | 344 |
| 68 | 125 | 131 | 138 | 144 | 151 | 158 | 164 | 171 | 177 | 184 | 190 | 197 | 203 | 210 | 216 | 223 | 230 | 236 | 243 | 249 | 256 | 262 | 269 | 276 | 282 | 289 | 295 | 302 | 308 | 315 | 322 | 328 | 335 | 341 | 348 | 354 |
| 69 | 128 | 135 | 142 | 149 | 155 | 162 | 169 | 176 | 182 | 189 | 196 | 203 | 209 | 216 | 223 | 230 | 236 | 243 | 250 | 257 | 263 | 270 | 277 | 284 | 291 | 297 | 304 | 311 | 318 | 324 | 331 | 338 | 345 | 351 | 358 | 365 |
| 70 | 132 | 139 | 146 | 153 | 160 | 167 | 174 | 181 | 188 | 195 | 202 | 209 | 216 | 222 | 229 | 236 | 243 | 250 | 257 | 264 | 271 | 278 | 285 | 292 | 299 | 306 | 313 | 320 | 327 | 334 | 341 | 348 | 355 | 362 | 369 | 376 |
| 71 | 136 | 143 | 150 | 157 | 165 | 172 | 179 | 186 | 193 | 200 | 208 | 215 | 222 | 229 | 236 | 243 | 250 | 257 | 265 | 272 | 279 | 286 | 293 | 301 | 308 | 315 | 322 | 329 | 338 | 343 | 351 | 358 | 365 | 372 | 379 | 386 |
| 72 | 140 | 147 | 154 | 162 | 169 | 177 | 184 | 191 | 199 | 206 | 213 | 221 | 228 | 235 | 242 | 250 | 258 | 265 | 272 | 279 | 287 | 294 | 302 | 309 | 316 | 324 | 331 | 338 | 346 | 353 | 361 | 368 | 375 | 383 | 390 | 397 |
| 73 | 144 | 151 | 159 | 166 | 174 | 182 | 189 | 197 | 204 | 212 | 219 | 227 | 235 | 242 | 250 | 257 | 265 | 272 | 280 | 288 | 295 | 302 | 310 | 318 | 325 | 333 | 340 | 348 | 355 | 363 | 371 | 378 | 386 | 393 | 401 | 408 |
| 74 | 148 | 155 | 163 | 171 | 179 | 186 | 194 | 202 | 210 | 218 | 225 | 233 | 241 | 249 | 256 | 264 | 272 | 280 | 287 | 295 | 303 | 311 | 319 | 326 | 334 | 342 | 350 | 358 | 365 | 373 | 381 | 389 | 396 | 404 | 412 | 420 |
| 75 | 152 | 160 | 168 | 176 | 184 | 192 | 200 | 208 | 216 | 224 | 232 | 240 | 248 | 256 | 264 | 272 | 279 | 287 | 295 | 303 | 311 | 319 | 327 | 335 | 343 | 351 | 359 | 367 | 375 | 383 | 391 | 399 | 407 | 415 | 423 | 431 |
| 76 | 156 | 164 | 172 | 180 | 189 | 197 | 205 | 213 | 221 | 230 | 238 | 246 | 254 | 263 | 271 | 279 | 287 | 295 | 304 | 312 | 320 | 328 | 336 | 344 | 353 | 361 | 369 | 377 | 385 | 394 | 402 | 410 | 418 | 426 | 435 | 443 |

Source: Adapted from Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults: The Evidence Report.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § |
| PLAINTIFFS | § § |
| v. | § § § |
| | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 135

| INDIVIDUAL VALIDATION | | | |
|---|---|---|---|
|  | **ARIZONA DEPARTMENT OF CORRECTIONS** | **CHAPTER**: 400 <br><br> **PHYSICAL PLANT/FACILITIES** | OPR: <br><br> Division Director, Administrative Services |
| **401-T-PPS TECHNICAL MANUAL PHYSICAL PLANT STANDARDS** | | **DEPARTMENT ORDER:  401** <br><br> **PRISON CONSTRUCTION** | SUPERSEDES: N/A <br><br> **EFFECTIVE DATE: 10/1/00** <br> **Rev. 07/01/02** <br> **Rev. 08/02/06** <br> **Rev. 11/01/09** <br> **Rev. 04/09/10** <br> **Rev. 05/17/10** <br> **Rev. 01/27/12** <br> **Rev. 02/23/12** |
| | | | |

## FEBRUARY 23, 2012 REVISION SUMMARY

**The Arizona Department of Corrections *401-T-PPS Technical Manual Physical Plant Standards* was revised on February 23, 2012. Changes are identified in <span style="color:red">red</span> below:**

### 3.2.1 Medium Custody Housing Requirements

Medium Custody inmates may be housed in dormitory or cell style buildings. Optimal number of beds per pod/housing unit will be based on sound correctional practice, which ensures the safety of staff and inmates as well as effective security.  The housing unit shall have a control room per section 1.6.19.1.3, centrally located, capable of directly observing no more than 6 pods within a maximum of a 180 degree field of view. Pod size shall be limited to a maximum of 50 inmates per pod in dormitory style buildings. No more than 200 inmates shall be monitored by each control room officer for dormitory style buildings. Buildings shall be constructed to meet an I-3 condition 2 occupancy requirement. Exit and entry doors into the Pod areas shall be lockable. Movement between pods shall be restricted by an electronically and manually operated door or gate. Building may be constructed of masonry, concrete (pre-cast or cast-in-place), pre-engineered metal building or other materials that meet the above and code requirements.

Plaintiffs' MSJ Appx. 2172

DEPARTMENT ORDER 401-PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

## JANUARY 27, 2012 REVISION SUMMARY

**The Arizona Department of Corrections *401-T-PPS Technical Manual Physical Plant Standards* was revised on January 27, 2012. Changes are identified in red below:**

**Fencing**: In all references to razor wire the standard shall be 5 point detainer hook and barb razor wire.

**Fencing**: In all references to fencing, fence ties shall be mechanically twisted and all straps and bolts shall be tack welded

**1.4.1.5 Facility Appearance: Paint Colors**
Specific color specifications shall match colors as manufactured by TriCom Coatings, Inc. and as listed:
**Interior Trim** – Blue Chip 302L20F
**Buildings (Exterior Walls)** – Drumhill Grey Latex 302A78F/ (metals) Drumhill Grey DTM 600A69F
**Buildings (Exterior Walls)** – Battleship Grey Latex 302A15F /(metals) Battleship Grey DTM 600A68F
**Building Interior Walls** – Chalky White 302W127
**Cell Walls** – Navajo White 302W05F or Florence Navajo White 302W210F

**1.6.13.1 Area Requirements: Dental**
3 Chairs per 1000 inmates

**1.6.17.1 Area Requirements: Pharmacy**
Deleted State Law and inserted per AZ Board of Pharmacy requirements

**1.6.19.1.3 Security and Control Areas**
Control rooms are required in Level 3, 4 and Level 5 facilities and may be required in Level 2 facilities depending on operational and security factors. Level 2 and 3 control rooms may be accessed from inmate occupied areas and require only a single security door. Level 2 and 3 control rooms shall have a means of egress for staff to evacuate the control room either through a roof hatch or to a safe area at ground level via an exit door. Level 4 and 5 control rooms shall be equipped with an escape ladder to the roof of the building, and be equipped with a means of securing the hatch from the roof side of the hatch

**2.1.5.3 Minimum Custody Perimeter and Area Lighting**
Two foot candles of lighting on perimeter

**2.2.1 Housing: Minimum Custody Officer Station**
The housing unit shall have an officer station for direct supervision; it shall be elevated 2' and located against the wall at the front of each pod. It shall have 2 access points with dutch type doors installed at each.

**2.2.1.1.1 Minimum Custody Pod Area**
Movement between pods shall be restricted by an electronically and manually operated door or gate.

**3.1.4 Medium Custody Facility Size Requirements**
Must be designed to separate recreation yards

**3.2.1 Medium Custody Housing Requirements**
The housing unit shall have a control room per section 1.6.19.1.3. Movement between pods shall be restricted by an electronically and manually operated door or gate.

| INDIVIDUAL VALIDATION | | | |
|---|---|---|---|
| | **ARIZONA DEPARTMENT OF CORRECTIONS** | **CHAPTER**: 400<br><br>**PHYSICAL PLANT/FACILITIES** | OPR:<br><br>Division Director, Administrative Services |
| **401-T-PPS**<br>**TECHNICAL MANUAL**<br>**PHYSICAL PLANT STANDARDS** | | **DEPARTMENT ORDER: 401**<br><br>**PRISON CONSTRUCTION** | SUPERSEDES: N/A<br><br>EFFECTIVE DATE: **10/1/00**<br>**Rev. 07/01/02**<br>**Rev. 08/02/06**<br>**Rev. 11/01/09**<br>**Rev. 04/09/10**<br>**Rev. 05/17/10**<br>**Rev. 01/27/12** |
| | | | |

# TABLE OF CONTENTS

**Statement of Philosophy**

**Executive Summary**

**Part 1 General Parameters**

**Part 2 Security Level Minimum Facility Requirements**

**Part 3 Security Level Medium Facility Requirements**

**Part 4 Security Level Close Facility Requirements**

**Part 5 Security Level Maximum Facility Requirements**

**Part 6 Complex**

**Part 7 Appendixes:**

Appendix I -   Regulatory Codes
Appendix III -  Fences
Appendix IV -  Furniture
Appendix V -   PAR Course Requirements
Appendix VI -  Finish Schedules

Plaintiffs' MSJ Appx. 2174

## STATEMENT OF PHILOSOPHY

The design, construction and remodeling for prisons must promote a safe environment as well as an efficient, effective and operational facility. Health and safety measures must enable the elimination, control or minimization of the risk of injury to both staff and inmates. Facility organization must advance the security perspectives of controlled inmate activity management and restricted movement. Managing safety at the workplace requires those involved to continually seek to attain innovative ways to improve employee safety as new prisons or modifications are contemplated. ADC developed this Standards Manual to ensure these outcomes are realized.

## EXECUTIVE SUMMARY

This manual is to be considered a work in progress that will be updated as revisions in statute, relevant case law, improved technology and sound correctional practices dictate. Physical plant design, construction, FF&E (Fixed Furnishings/Fixtures and Equipment) and hardware requirements beyond those generally described in this manual will be detailed in procurement documents developed by subject matter experts or described in detail in response to Requests for Proposals (RFP) from prospective offerors for consideration by the Department.

This document contains general information about the operational levels within the prison system and the specific requirements for various prison risk levels. A review of case law and statutes has been performed, listing current relevant citations, clarifying and supporting the specific Standard(s).

The *Physical Plant Standards Technical Manual* was promulgated to enable all parties engaged in a prison construction effort understands in general terms what ADC requires to enhance and protect the Agency Public Safety Mission, while meeting the needs of the staff and inmates for a safe, secure and operationally efficient work/living environment. It is expected that those who may compete for available contracts with the Department, will meet or exceed these standards. This manual will be used as a basis for the review of proposed facilities. All other new construction will be required to adhere to the standards described in this manual. Additionally, in support of the Arizona Correctional Industries (ACI), items produced and typically used in prison environments that are produced by inmates working for ACI, have been specified for installation or use.

This manual has been developed in seven parts, which will allow the State to define the requirements of any specific prison facility by combining requirements of specific parts of this manual. As an example, Part 1 combined with Part 2 – (Minimum Facility Requirements) and Part 7 – (Appendix) fully defines the design requirements of a Minimum facility.

## Part 1 - General Parameters

1.1 **Definition of Terms**……………………………………………………2
1.2 **Building and Safety Code**
    1.2.1 Code Compliance.................................................................4
1.3 **Site Location Parameters**
    1.3.1 Emergency Medical Response Requirements...........................4
    1.3.2 Population Center Requirements ...........................................4
    1.3.3 Zoning and Use Permits.......................................................4
    1.3.4 Fire Protection Services .......................................................5
1.4 **Facility Parameters**
    1.4.1 General Requirements .........................................................5
    1.4.2 Fencing Design ..................................................................6
    1.4.3 Parking.............................................................................6
1.5 **Environmental Parameters**
    1.5.1 HVAC ...............................................................................6
    1.5.2 Plumbing Requirements..................................................... 12
    1.5.3 Fire Protection ................................................................ 15
    1.5.4 Lighting ......................................................................... 16
    1.5.5 Electric Power and Telecommunications ............................. 18
    1.5.6 Emergency Generator ...................................................... 19
    1.5.7 Fire Alarm System .......................................................... 20
    1.5.8 Acoustics ....................................................................... 20
    1.5.9 Water Quality & System Design ........................................ 20
    1.5.10 Waste Water System ...................................................... 21
    1.5.11 Natural Lighting ............................................................ 21
    1.5.12 Female Facilities Specifications ....................................... 22
    1.5.13 Temporary Holding Enclosures ....................................... 22
1.6 **Common Support Requirements**
    1.6.1 Finish Schedules ............................................................. 23
    1.6.2 Facility Administration / Operations ................................... 23
    1.6.3 Visitation ....................................................................... 25
    1.6.4 In-Take and Processing..................................................... 26
    1.6.5 Hearing .......................................................................... 27
    1.6.6 Resource Center .............................................................. 28
    1.6.7 Classroom ...................................................................... 28
    1.6.8 Property and Mail ............................................................ 29
    1.6.9 Counseling ..................................................................... 29
    1.6.10 Recreation .................................................................... 30
    1.6.11 Medical / Dispensary ...................................................... 31
    1.6.12 Laundry ........................................................................ 32
    1.6.13 Dental Services .............................................................. 33
    1.6.14 Warehouse .................................................................... 34
    1.6.15 Maintenance.................................................................. 34
    1.6.16 Vehicle Maintenance ...................................................... 35
    1.6.17 Pharmacy ..................................................................... 36
    1.6.18 Hair Care...................................................................... 36
    1.6.19 Detention ..................................................................... 37
    1.6.20 Kitchen......................................................................... 38
    1.6.21 Nurse Line Area............................................................. 39
    1.6.22 Medical Dispensary/Mental Health/Nurse Line ................... 40

# PART 1 - GENERAL PARAMETERS

**APPLICATION:** This technical manual is designed to provide direction in matters related to the design and construction of prison facilities. Deviations from authorized standards and requirements will be considered if they are in the Department's opinion consistent with sound correctional practices. Request for approved changes to the standards shall be made in writing to the Administrator of the Engineering and Facilities Bureau for consideration with final approval of any changes forwarded to the Department Director, citing the Physical Plant Standards number, the specific proposed change and the reason for the change. The Director will review the request and if approved, provide written approval of any acceptable changes to these standards. The standards and requirements contained herein are intended to apply to new construction of ADC facilities and contracted private facilities that have entered into a contract with ADC to house inmates, with limited application to renovations of ADC prisons. Those Standards also applicable to renovations are: 1.2.1; 1.4.1.5; 1.4.2; 1.4.1.3, 1.5.3.1 through 1.5.3.4 inclusive and 1.5.7.1.

## 1.1    DEFINITION OF TERMS

### 1.1.1    ABBREVIATIONS, WORDS, TERMS AND PHRASES DEFINED: For the purpose of this standards technical manual the following list of words, terms and phrases are defined for the sole purpose of construction and renovation and are not official definitions as used in other written instruction. The words are to provide clarity to the technical information provided. Terms related to correctional facilities are used differently throughout the United States, and can cause confusion related to facility design and operational requirements.

### 1.1.2    ACCEPTED EXPRESSIONS:

**ACA:**         American Correctional Association

**ACI:**          Arizona Correctional Industries

**ADC:**         Arizona Department of Corrections

**AIMS:**       Adult Information Management System.

**CCTV:**       Closed Circuit Television system used for surveillance purposes.

**NCCHC:**    National Commissions on Correctional Health Care.

**COMPLEX CONTROL:** The Control Room from which security and control for a prison Complex occurs. It includes monitoring of systems within each prison unit and is responsible for overall site security and control issues.

**COMPLEX:** A prison consisting of a grouping of prison units with individual and/or shared perimeter fences and share centralized administrative and support functions located outside the units themselves.

**DETENTION:** High security housing unit used to isolate inmates from the general population on a short-term basis.

**DORMITORY:** A large single-space for the housing of inmates. The room provides spaces for multiple inmate living. Size of the space varies based on the requirements within this manual. Suitable for minimum and medium custody levels.

**FACILITY:** A stand-alone prison, which contains all of the functions, defined in a prison unit and some of the functions found at a complex level. It is a facility that is capable of operating in a self-sufficient manner. Support buildings and functions that are not available on site are normally contracted out.

**FACILITY CONTROL:** The control room responsible for security and control of the standalone facility, including perimeter security and all site-wide security and control issues. This control room provides monitoring of other control rooms within the facility (e.g., housing control, yard control, sally port positions, etc.).

**HOUSING UNIT:** A building or portion thereof that provides a complete security barrier around all spaces that is consistent with the custody level contained. Housing unit styles may be either dormitory and/or celled. Officer Stations for Minimum level custody facilities and Control rooms for Medium, Close and Maximum level custody facilities staff to observe all beds in the dormitories or doors of the cells they control, and are an integral and required element of a housing unit.

**MAJOR ADDITION:** "A Major Addition" is defined as the addition of permanent housing and the Complex and/or Facility Support Building necessary to support the additional inmate population to be housed. In this case, all of the requirements contained in these Standards apply. This requires the additional square footages of all Complex and Support Buildings.

**MANAGEMENT UNIT:** A portion of the facilities' population made up of a manageable number of inmates, which are divided by fencing.

**MATV:** Master Antenna Television system.

**POD:** A pod is a grouping of cells and an adjacent common space or dayroom. The entry/exit doors are locked, providing a secure barrier suitable for the custody level. Each pod contains showers and janitor closet to support the living activities. Several pods may be grouped around an officer station or control room to form a housing unit.

**RENOVATION:** A major modification to an existing prison structure or a significant change to the use or occupancy of a prison structure. [Standards designated (Renovation) apply to renovation efforts as well as to new construction].

**SECURE VESTIBULE:** A space developed to provide controlled movement of inmates, the public or staff between various functions. The space shall consist of at least two interlocked remotely controlled doors, and be designed to provide a continuation of the buildings' security barriers.

**UNIT:** A group of prison buildings and recreation fields that are within a fenced area and are designed to meet the facility size requirements per the custody level being housed in this unit. The buildings contain the housing, support, education, work based education, visitation, kitchen, dining and administration spaces necessary to support the activities of the staff, inmates and public. Two custody levels may be contained in a single unit, provided the design and construction will yield adequate separation.

**UNIT CONTROL:** The control room responsible for the security and control of a prison unit, including its perimeter security system and all internal security and control functions. This control room provides monitoring of other control rooms within the facility (e.g., housing control, yard control, sally port positions, etc.). The unit control is generally not responsible for perimeter patrol activities. Complex Control coordinates patrol activities.

**WING:** A wing is a portion of a housing unit with cells or small pods aligned along a corridor.

## 1.2    BUILDING AND SAFETY CODES

### 1.2.1    CODE COMPLIANCE:

All work shall comply with applicable federal, state, and/or local building, fire safety codes and the standards herein.

Code compliance shall be demonstrated through licensure and where a license is not issued, through inspection certificates.

The codes in Appendix 1 shall be adhered to as well as any revisions promulgated subsequently.

## 1.3.    SITE LOCATION PARAMETERS

### 1.3.1    EMERGENCY MEDICAL RESPONSE REQUIREMENTS: A Facility or Complex shall be sited in proximity to a city or town such that emergency services are within a 30-minute travel time from the prison. Renovated existing facilities shall also be located within the time constraints listed above.

### 1.3.2    POPULATION CENTER REQUIREMENTS: Proximity to a civilian population center is to augment the services provided directly by the institution, to provide greater recruitment and training opportunities for staff, to accommodate visitors, and to provide employment opportunities for inmates.

### 1.3.3    ZONING AND USE PERMITS: Facilities to be utilized by ADC shall be renovated or constructed on property with proper zoning which will allow the operation of a correctional facility of the level of the security level required by ADC. Special Use Permits shall be in place if they are a requirement of the zoning restrictions.

**1.3.4** **FIRE PROTECTION SERVICES:** A prison complex or facility shall be sited in proximity to a city or town such that emergency services are within a 30 minute travel time from the prison. The use of a volunteer or internal fire department is acceptable for compliance, assuming that the fire station is readily accessible in case of fire and that it is the primary alternative source available. If the fire station is not continually staffed, fire alarm notification (telephonic or direct link) must be made to a local law enforcement unit or equally reliable source.

## 1.4    FACILITY PARAMETERS

**1.4.1** **GENERAL REQUIREMENTS:** ADC has developed general terms defining the levels of security risk within the Arizona Department of Corrections. The following general parameters and specific requirements in Part 2 through 7 of this manual shall be complied with based on the level of security of the facility. Appendix 2 provides a definition of each Risk Level.

**1.4.1.1** **Facility or Unit Capacity:** The capacity of a facility or a unit within a prison complex may be designed to house a maximum of 1,000 inmates.

In determining size, the Department shall consider the custody level and the ability of staff to observe unit dynamics and security requirements. Inmate housing areas are the foundation of institutional living and must promote the safety and well being of both staff and inmates.

**1.4.1.2** **Facility Gross Square Footage:** The minimum gross square footage of the entire complex or facility based on required building square footages shall be a minimum of 175 s.f./inmate. In some circumstances (such as the addition of a unit to an existing complex) some of the structures and/or services may be out-sourced or served by the main complex. In those cases, documentation must be provided on the out-sourced services and justification provided for reduction of square footages. Reductions in square footages are to be itemized and shall be reviewed by an ADC review panel for approval by the director. The following square footages that are not to be included in the total for the purpose of this paragraph, (water treatment plant buildings, wastewater treatment plant buildings and/or other buildings) that are not specifically required by these Standards.

**1.4.1.5** **Facility Appearance:** Facilities or complex buildings shall be painted grey. (It is acceptable to leave CMU or concrete on the interior of a building without paint if waterproofing is not required.) All interior building trim and miscellaneous metals shall be painted blue. Exterior metals shall be painted with DTM type paint to match exterior wall color. Cell walls shall be painted Navajo White. Employee office areas shall be painted white. Pre-engineered metal buildings shall not be painted, but color selection shall match as closely as possible to Department color selections.

<span style="color:red">Specific color specifications shall match colors as manufactured by TriCom Coatings, Inc. and as listed:</span>

<span style="color:red">► Interior Trim – Blue Chip 302L20F</span>
<span style="color:red">► Buildings (Exterior Walls) – Drumhill Grey Latex 302A78F / (metals) Drumhill Grey DTM 600A69F</span>

> ▶ Buildings (Exterior Walls) – Battleship Grey Latex 302A15F / (metals) Battleship Grey DTM 600A68F
> ▶ Building Interior Walls – Chalky White 302W127
> ▶ Cell Walls – Navajo White 302W05F or Florence Navajo White 302W210F

**1.4.2    FENCING DESIGN:**  Fencing structure and footings are to be designed to meet the soil conditions at the site based on the geotechnical recommendations and to meet the wind loading and seismic conditions of the area per code recommendations.  Minimum requirements for wind loading shall be 90 mph and seismic zone 2.  Provide sealed structural calculations for ADC approval.

**1.4.3    PARKING:**  Provide 287 parking spaces adjacent to the main entry point to the Unit. If utilizing a Complex Parking Lot then provide 287 parking spaces per Unit based on the following requirements:

**Staff/Visitor Parking:**  Provide 280 vehicle parking spaces per individual prison unit.

**Accessible Parking:**  Provide 7 Handicapped Accessible parking spaces per individual prison unit.

## 1.5    ENVIRONMENTAL PARAMETERS

### 1.5.1    HVAC

#### 1.5.1.1    GENERAL:

**1.5.1.1.1**    Mechanical design shall consider the degree of difficulty and cost for maintaining and operating a prison, as related to placement and potential abuse of equipment.

**1.5.1.1.2**    For buildings located within the security area, security, staff safety and inmate safety take precedence over energy conservation issues.

**1.5.1.1.3**    Buildings must meet the energy conservation requirements of ASHRAE Standard 90.1. In addition, they must comply with the following current Arizona Statutes and Executive orders:

| | |
|---|---|
| **ASRS §34-451** | Energy conservation standards for public buildings |
| **ASRS §34-452** | Solar design standards for state buildings; energy life cycle costing |
| **Executive Order 2005-5** | Implementing Renewable Energy and Energy Efficiency in New State Buildings |
| **Executive Order 2004-28** | Statewide 5% Water Use Reduction |
| **Executive Order 2003-14** | Implementing Statewide Efficiency Review |

**1.5.1.1.4**    New construction in either modernization or renovation projects shall conform to the level of minimum standards as described for new prisons.

**1.5.1.1.5**    Alterations to existing, or installation of new mechanical systems in existing structures shall be accomplished in conformance with the requirements for new prisons.

**1.5.1.1.6**    Redundant A/C systems shall be designed for telephone and computer server rooms to insure continued operation should one system fail.

## 1.5.1.2    SECURITY

**1.5.1.2.1    Wall Openings and Duct Penetrations:**

**1.5.1.2.1.1**    Security shall be maintained for openings exceeding 5 inches in any dimension or duct penetrations in perimeter walls, floors, or ceiling/roof of secure rooms or areas, by fitting to the opening (on the side away from the opening if possible) an assembly of round steel bars welded to a perimeter welded steel frame or an acceptable manufacturer's product

**1.5.1.2.1.2**    The areas and buildings requiring these security bars are those in Close, Maximum, and all detention housing units (including control rooms), inmate canteen, receiving and release, armory, locksmith, visiting, central control, complex control and pharmacy.

**1.5.1.2.2    Security Bar Assembly**:

**1.5.1.2.2.1**    Duct mounted security barrier shall be constructed of vertical 3/4" diameter, tool-resistant steel bars on maximum 6" centers with horizontal 2" x 1/4" flat steel bars on maximum 8" centers. Horizontal and vertical bars shall be welded at each cross-point. Barrier bars shall be welded into 1/4" x 2" steel frame.

**1.5.1.2.2.2**    Security barriers in shower exhaust ducts and dishwasher exhaust ducts shall be stainless steel.

**1.5.1.2.3    Security Air Inlets and Outlets:**  Security type air inlets and outlets shall be provided for all openings in perimeter walls, floors or ceilings/roofs of secure room or areas.

**1.5.1.2.4    Grilles:**  Supply and return grilles in Close, Maximum and all detention building cells, shall be constructed of 3/16" steel to comply with ASTM A36.

**1.5.1.2.4.1**    The face of the grille shall be perforated with 5/16" diameter holes arranged on 7/16" staggered centers.

**1.5.1.2.4.2**    The grille shall have a 1 inch steel border around the entire perimeter.

**1.5.1.2.5** The areas and buildings requiring these security bars are those in Close, maximum and all detention housing units (including control rooms), inmate canteen, receiving, and release, armory, locksmith, visiting, central control, complex control and pharmacy.

**1.5.1.2.6** Any equipment that is accessible to inmates from the yard shall have a 10 foot high chain link fencing enclosure constructed around it of with 1—36" wide gate and 1 coil of 30" <span style="color:red">5 point detainer hook and barb</span> concertina razor ribbon around the top of the enclosure.

## 1.5.1.3 HVAC DESIGN CONDITIONS

### 1.5.1.3.1 Outdoor Conditions:

**1.5.1.3.1.1** The outdoor design conditions shall be determined from the Climatic Data for Region X Arizona, California and Nevada issued by ASHRAE.

**1.5.1.3.1.2** The summer design dry bulb and design wet bulb shall be taken from the 0.5 percent columns. The winter dry bulb shall be taken from the 0.2 percent column.

### 1.5.1.3.2 Indoor Environmental Requirements:

**1.5.1.3.2.1** Mechanical cooling shall be provided to maintain a maximum indoor temperature of 78°F within the ASHRAE summer comfort zone. Unless contradicted by security considerations or site and design conditions, equipment shall be ground-set. Ground-set equipment shall be located in areas not accessible to inmates or secured by fencing. Equipment selected shall be of the highest EER/SEER rating available.

**1.5.1.3.2.2** Evaporative cooling may be provided for warehouse or industrial buildings. 12" Glasdek media shall be used as a minimum media thickness and be comprised of 4" thick and 8" thick media to allow replacement of the 4" media during regular maintenance.

Inmate spaces in the Minimum and Medium Custody facilities shall be designed for air conditioning to maintain a maximum indoor temperature of 80°F within the ASHRAE summer comfort zone.

**1.5.1.3.2.3** Heating shall be provided for inmate, mixed use, and staff only spaces to maintain a minimum indoor temperature of 68°F within the ASHRAE winter comfort zone.

**1.5.1.3.2.4** The following areas have special requirements:

**1.5.1.3.2.4.1** Within Close and Maximum level custody facilities the housing unit control room, central control and complex control

shall have an independent separate air conditioning system, which is separated from the remaining structure, in order to prevent intrusion of chemical agents or smoke. Space shall be positively pressurized and air conditioned space is to be completely sealed to prevent passage of chemical agents or smoke.

**1.5.1.3.2.4.2** The dry food storage area shall be air conditioned and shall be maintained between 68$^{\circ}$F and 78$^{\circ}$F.

**1.5.1.3.2.5** Except for areas indicated specifically elsewhere, warehouses and storage facilities shall be maintained at a maximum of 80$^{\circ}$F. If evaporative cooling is used, the summer temperatures shall be maintained with evaporative cooling with 12" deep minimum Glasdek.

**1.5.1.3.2.6** Work Based Education (WBE) areas shall be treated as typical inmate occupied areas, unless the equipment or type of operation used to teach the inmates in the specific areas places either a greater or lesser demand for temperature requirements.

**1.5.1.3.3 Energy Sources:**

**1.5.1.3.3.1 Heating:** Where natural gas is available, it shall be distributed throughout the site as the source of heating.

**1.5.1.3.3.2 Hot Water:** The use of solar technology for water heating is strongly recommended.

**1.5.1.4 VENTILATION**

**1.5.1.4.1 General:** Close and Maximum housing units shall receive a minimum of 40 cfm outside air per cell.

**1.5.1.4.2 Exhaust Ventilation Requirements:**

**1.5.1.4.2.1** Restrooms and public toilets require exhaust at 2 cfm per square foot.

**1.5.4.1.2.2** Janitor's closets require exhaust at 2 cfm per square foot.

**1.5.1.4.2.3** Kitchen exhaust shall comply with NFPA 96.

**1.5.1.4.2.4** Showers shall be exhausted to provide for 100 cfm per shower head.

**1.5.1.4.2.5** There shall be a minimum exhaust of 100 cfm from each cell.

**1.5.1.4.2.6** There shall be exhaust from the bench in the armory to exhaust fumes. A slotted hood is preferred.

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 215 of 380

DEPARTMENT ORDER OF PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

### 1.5.1.4.3    Smoke Exhaust:

**1.5.1.4.3.1**    Smoke exhaust for all "I" occupancy buildings shall be in accordance with NFPA, UBC, and UFC, with modifications as accepted by State Fire Marshal.

**1.5.1.4.3.2**    In cell areas, upon detection in a zone, the smoke exhaust shall be energized.  Air handlers in adjacent zones shall operate normally.  Air handlers in smoke zone shall go to 100% outside air.  If smoke is detected in supply duct, AHU shall shut down.

**1.5.1.4.3.3**    The operation of the smoke exhaust mode for the air conditioning systems shall be controlled by:

**1.5.1.4.3.3.1**    Smoke detection systems in the exhaust/return air ducts.

**1.5.1.4.3.3.2**    Area smoke detectors.

**1.5.1.4.3.4**    Consideration should be given into the use of two speed exhaust fans in accomplishing the smoke evacuation.

### 1.5.1.5    DUCT SYSTEMS

### 1.5.1.5.1    Ductwork:

**1.5.1.5.1.1**    The ducts shall be designed as low pressure galvanized ductwork in accordance with SMACNA Low Pressure Duct Construction Standards and ASHRAE handbooks, except as noted in the following:

**1.5.1.5.1.1.1**    Spiral wound round ducts may be used.

**1.5.1.5.1.1.2**    Exhaust ducts from showers, kitchen dishwasher hood, and other wet areas shall be aluminum or stainless steel.

### 1.5.1.5.2    Ducts Exposed to Inmate Reach:

**1.5.1.5.2.1**    Ducts are considered exposed to inmate access if they are located within twelve feet of the floor, mezzanine or ground in an inmate accessible area.

**1.5.1.5.2.2**    When ducts are exposed in inmate accessible areas, the duct shall be welded rectangular ducts.  The sheet metal shall be at least 14 gauge in thickness.  The sections shall be welded or screwed together with tamper-proof fasteners.  Slip joints are not allowed.

**1.5.1.5.2.3**    If, due to unevenness of duct or ceiling, there is a crack exceeding 1/32 inch between duct and ceiling, within reach in inmate accessible areas, then such crack must be covered by a 1 x 1 x 1/4 inch angle iron which is spot welded to the duct and bolted to the ceiling with tamper-proof fasteners.

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

### 1.5.1.5.3 Ductwork Accessories:

**1.5.1.5.3.1** All ductwork accessories shall be standard accessories conforming to SMACNA, NFPA and UL requirements for grilles, registers, balancing dampers, fire dampers and combined smoke and fire dampers, except as noted below:

**1.5.1.5.3.1.1** Grilles and registers shall provide for a proper air distribution, and shall be designed to avoid blowing air directly at inmates or staff.

**1.5.1.5.3.1.2** Grilles and registers at showers and wet locations shall be of aluminum or stainless steel for minimum and medium security and stainless steel for close and maximum security and all detention units.

## 1.5.1.6 CONTROLS

**1.5.1.6.1 Air Conditioning Control:** Control systems may be independent and stand-alone for each building. A/C design may provide for central controls. Energy efficient central plant chillers are strongly recommended and should always be evaluated against independent systems to achieve the greatest energy efficiency.

**1.5.1.6.2 Smoke Control:** Smoke management is required in the housing buildings.

**1.5.1.6.3 Thermostats:**

**1.5.1.6.3.1** Thermostats controlling inmate accessible areas shall be of the remote sensor type, where the sensor is located in the return air ductwork, and the controller located in the equipment or mechanical rooms whenever possible.

**1.5.1.6.3.2** If it is not possible to use or mount thermostats outside the inmate accessible areas, the thermostat shall be provided with a minimum 14 gauge tamper-proof enclosure.

All controls shall be installed in such a manner as to be accessible only to authorized staff. If this is not possible, security grade, lockable covers may be used.

## 1.5.2 PLUMBING REQUIREMENTS

### 1.5.2.1 General

#### 1.5.2.1.1 Accessibility:

**1.5.2.1.1.1** The prison shall be designed to provide for access spaces or chases adjacent to inmate cell toilet-lavatory combos, inmate toilets, urinals and showers. They shall contain the sanitary and domestic water piping in addition to other required utilities.

**1.5.2.1.1.2** These spaces or chases shall not be accessible to inmates.

**1.5.2.1.1.3** Fixture isolation valves, water closet and urinal flush valves, lavatory P-trap and lavatory valves shall be designed to be serviced only from inside these access spaces or chases where the necessary work space shall be provided.

**1.5.2.1.1.4** Design documents shall contain a large scale detailed layout of plumbing for the plumbing chase between the cells.

**1.5.2.1.1.5** A "mock-up" of the design for all ductwork, plumbing and electrical and control wire in the chase between cells shall be built and approved by ADC prior to installation.

**1.5.2.1.1.6** Water conservation fixtures, controls, and valves are required. Urinal fixtures should not exceed 1 gallon per flush and waterless urinals are to be installed in staff areas. Toilets should not exceed 1.5 gallons per flush. Showerheads should not exceed 2.5 gpm and lavatory faucets should not exceed 2 gpm and must be equipped with aerators. In kitchen areas, low-flow pre-rinse valves shall not exceed 1.6 gpm, door-type dishwashing machines shall be utilized consuming 1.5 gallons per rinse cycle shall be utilized.

#### 1.5.2.1.2 Domestic Hot Water:

**1.5.2.1.2.1** In accordance with section 1.5.1.1.3 and 1.5.1.3.3.2, the use of thermal solar technology is strongly encouraged.

**1.5.2.1.2.2** Where natural gas is available, the domestic hot water shall be heated in local gas fired water heaters or high efficiency boilers in each building. Tankless, on demand type water heaters may be utilized in some locations if approved by the Engineering and Facilities Bureau. In kitchens and other high use areas a redundant system is desirable in case of equipment failure.

**1.5.2.1.2.3** Electrical water heaters may only be used in structures with a low occupancy and low water usage, if this is more economical than providing long supply lines for natural gas or hot water. The use off "instant", "tankless" or "point of use" electric hot water heaters is preferred.

**1.5.2.1.2.4** Hot water shall be provided at 105 degrees (adjustable from 100 degrees to 120 degrees) for sinks, lavatories and showers.

**1.5.2.1.2.5** Hot water at 140 degrees shall be provided for the kitchen.

**1.5.2.1.2.6** Hot water at 180 degrees shall be provided if required by dishwashing equipment by local booster heaters for usage in the kitchen automated dishwashing equipment.

**1.5.2.1.2.7** The hot water main lines shall have a re-circulating loop system.

**1.5.2.1.3 Contamination Prevention**: The domestic water system shall be protected from potential contamination.

**1.5.2.1.4 Water Conserving Fixtures:** All fixtures shall be selected to minimize their water usage and comply with State statutory requirements.

**1.5.2.1.5 Laundries:** Laundries shall utilize wastewater heat recovery systems and simple rinse water reuse systems.

**1.5.2.1.6 Evaporative Coolers:** are to be equipped with timers for bleed water discharge. Discharge water from evaporative coolers shall not be discharged to the sanitary system if on-site waste water treatment facilities are provided.

**1.5.2.2 PIPING**

**1.5.2.2.1 Interior Waste and Vent Lines:** Pipes shall be concealed where possible. Where piping is exposed in areas accessible to inmates, "Hub-type" joints shall be used.

**1.5.2.2.2 Drains and Cleanouts:** Drains and cleanout covers shall be secured using tamper-proof fasteners in all areas. Drains shall be provided at all toilet rooms.

**1.5.2.2.3 Baffles in Drain Lines:** Sanitary waste piping connections for water closets in inmate rooms, where installed Aback-to-back@ with common chase, shall be piped utilizing a sanitary tee fitting with integral baffle so that there cannot be any direct pass-through in the piping.

**1.5.2.2.4 Domestic Water Piping:**

**1.5.2.2.4.1** Piping shall be concealed where possible. Exposed piping shall be identified at approximately 20 foot intervals.

**1.5.2.2.4.2** Sectional valves to isolate sections of piping for maintenance and repairs shall be provided.

**1.5.2.2.5    Freeze Protection:**

**1.5.2.2.5.1**    All exterior exposed plumbing shall be protected from freezing.

**1.5.2.2.5.2**    Assume ASHRAE 0.2% standard temperature for design.

**1.5.2.2.5.3**    Use insulation in lieu of heat trace where insulation alone will provide the required protection at the ASHRAE design temperature.

**1.5.2.2.5.4**    Where no ASHRAE temperature is listed for the site, confer with ADC for selection of appropriate design temperature.

## 1.5.2.3    INTERCEPTORS

**1.5.2.3.1    Grease Interceptors:**

**1.5.2.3.1.1**    Sizing of grease interceptors shall be in accordance with the requirements of the formula for full service kitchen of the UPC.

**1.5.2.3.1.2**    The sizing shall be based on emptying the grease interceptor twice monthly.

**1.5.2.3.1.3**    The grease interceptor may be sectionalized, but installed on a solid unitary base.

**1.5.2.3.1.4**    Only grease bearing effluents shall be discharged into the grease interceptor.

**1.5.2.3.2    Oil Interceptors:**

**1.5.2.3.2.1**    Floor drains in any area, such as garages, automobile repair and maintenance shops or fuel storage and handling areas, where the runoff may contain oil or spilled fuel, shall be provided with an oil interceptor to prevent oil or fuel from entering the sanitary sewer or storm drainage system.

**1.5.2.3.2.2**    Only oil bearing, grease bearing, or flammable effluents shall be discharged into the oil interceptor.

**1.5.2.3.3    Soil Interceptors:**

**1.5.2.3.3.1**    Soil interceptors shall be provided in the drain lines, where there is a risk of contaminating the drain water with soil, sand or gravel, such as runoff from areas where trucks are washed, or runoff from areas where potting of plants, gardening or landscaping is performed.

**1.5.2.3.3.2**    Only solid, sand or gravel bearing effluents shall be discharged into the soil interceptor.

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 220 of 380

DEPARTMENT ORDER ON: PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

**1.5.2.3.3.3**     Oil and soil interceptors may be combined into one, where there is a mixing of the oil and soil contaminations, such as runoff from truck washing areas.

## 1.5.3     FIRE PROTECTION

### 1.5.3.1     Codes and Requirements

**1.5.3.1.1**     Extinguishment requirements and sprinkler systems shall comply with NFPA 13 and UFC.

### 1.5.3.2     Sprinkler heads

**1.5.3.2.1**     Sprinkler heads used in inmate acceptable areas within the inner security perimeter shall be institutional type and tamper-resistant.  If the sprinkler head is equipped with an escutcheon, it shall require a special tool for removal.

**1.5.3.2.2**     When sprinkler heads are required in inmate accessible areas with limited head height, they shall be security type with flush mounting.

**1.5.3.2.3**     In dayrooms of housing units, piping and sprinkler heads shall be designed to be out of reach of inmates.  Where piping must be exposed in activity areas, pendant type sprinkler heads will be used and the pipe will be strapped to the ceiling or roof slab overhead at intervals sufficiently close to maintain straight alignment.

**1.5.3.2.4**     At least 4 spare sprinkler heads of each type used shall be provided at the site, together with any special tools required for head replacement for each building.

**1.5.3.2.5**     Before final design or installation, a sample of all proposed security area sprinkler heads shall be presented to ADC for inspection/approval.

**1.5.3.2.6**     Sprinkler heads installed in radio, security and electrical rooms within another structure shall not be located above equipment, in order to prevent equipment damage due to water leakage.

### 1.5.3.3     Isolation Valve

**1.5.3.3.1**     An isolation valve shall be provided for each sprinkler system with a water flow detection alarm switch and a valve tamper switch connected into the central detection and alarm system.  Valves and switches shall not be installed in areas accessible to inmates.

### 1.5.3.4     Fire Protection Water

**1.5.3.4.1**     If on-site water storage is required, the capacity shall be determined by local jurisdiction requirements, NFPA, UBC and UFC.

**1.5.3.4.2**    Fire protection water shall be provided from the site domestic water system, but with separate entries to the buildings that require fire water for sprinklers or standpipes.

## 1.5.4    LIGHTING

### 1.5.4.1    Exterior Lighting Fixtures

**1.5.4.1.1**    Exterior lighting shall conform to local lighting codes.  These codes shall be verified with the local jurisdiction.  Foot candle levels shall be provided as required in parts 2-6 under 1.5 Physical Security.  Building and site lighting shall be controlled by a combination photocell on, and time clock off.  Time clock shall be digital with battery backup.

**1.5.4.1.2**    High mast lighting shall be utilized where allowed by local codes.  Poles shall be round steel with the lowering mechanism in the pole powered by a portable motor.  High mast lighting shall be a top latch system with a maximum pole height of 100 feet.  Bases shall be designed and certified by a Structural Engineer.  Light source shall be high pressure sodium or an energy efficient type that has the ability to deliver the required light levels.

**1.5.4.1.3**    Pole mounted lights shall consist of a sealed optical system, sharp cut off utilizing 400W high pressure sodium light.  The sealed optical system shall consist of neoprene seal on the lens and a permanent gasket at wire penetration from ballast to the optical chamber.  Poles shall be round steel.  Energy-efficient fixtures capable of providing the required foot candle levels are required whenever available.

**1.5.4.1.4**    Building mounted lights shall be the same style as pole lights except 150 or 250 watt high pressure sodium or metal halide lamps.  Energy-efficient fixtures capable of providing the required foot candle levels are required whenever available.

**1.5.4.1.5**    All high pressure sodium lamps shall be stand-by (SBY) rated for instant re-strike.

### 1.5.4.2 General Light Levels

Lighting throughout the prison is determined by the tasks to be performed, interior surface finishes and colors, type and spacing of light sources, outside lighting, shadows and glares.

Lighting levels indicated herein refer to maintained foot-candle level of illumination calculated with the light loss factor, and maintenance factor of 0.70 % based on lumen output for lamps after initial burn in. Where specific foot-candle levels of illumination are not specified, the median recommendations of the Society of Illuminating Engineers shall be used.

| Area | Foot Candle Limit/Specification |
|------|-------------------------------|
| Office/Work Spaces | 60 |
| Restrooms | 30 |
| Corridors | 20 |
| Security Areas and housing | 30 - 50 |
| Dayrooms | 30 |
| Sally ports | 20 |
| Vestibules | 10 |
| Barber Shop / Storage Room | 50 |
| Food Server | 50 |
| Counselor | 60 |
| Mechanical/Electric Equip. Room | 20 |
| Showers/Lavatory/Toilet | 20 |
| Stairway | 10 |
| Officers Station | 50 |
| Walkways/Balconies | 10 |
| Classroom | 65 - 75 |
| Work Based Education Classroom | 65 - 75 |
| Shops | 20 - 50 |
| Warehouse | 20 |

**1.5.4.2.1** Shop areas where grid ceilings are utilized, 3 lamp fluorescent troffers with T-8 or better tubes and electronic ballasts at a minimum shall be utilized. Troffers shall have .125 inch acrylic lens. Two lamps troffers may be utilized in corridors. T-5 lighting is preferred.

**1.5.4.2.2** Strip fixtures with exposed lamps shall not be used anywhere in the facility. Wire guards are not acceptable. All fixtures shall have an appropriate lens. Industrial style fluorescent fixtures may be used in warehouse areas providing they are mounted ten or more feet above finished floor.

**1.5.4.2.3** In Minimum and Medium Custody dormitories, general area lighting shall be provided by vandal resistant T-8 or better fluorescents with a minimum 3/16" polycarbonate lens. Approximately every 16 feet install a PL-5 fluorescent night light fixture separately switched from the unit control station.

**1.5.4.2.4** Close Custody cells shall be equipped with a porcelain keyless socket and appropriate lamp. LED or CFL lamps are preferred.

**1.5.4.2.5** Maximum Custody cells shall be equipped with a 12 gauge steel up/down fixture with 1/2" house side polycarbonate lens and a 1/8" acrylic lens fixture side or an appropriate approved manufacturer's product. Provide appropriate biax lamp.

**1.5.4.2.6** Exit signs shall utilize LED, CFL or Self-Luminous/Tritium technology

**1.5.5** **ELECTRIC POWER AND TELECOMMUNICATIONS**

**1.5.5.1** Provide a minimum of four duplex electrical outlets (one per wall) in all offices. It is preferred that they be on their own circuits. Provide one four-plex data/communications outlet for each occupant of the office space.

**1.5.5.2** Cells shall be equipped with two duplex electrical outlets located near the bunk and two outlets for cable TV. Boxes for power and cable shall not be back to back with adjacent cells. Cover plates for electrical and cable TV outlets shall be equipped with security type screws.

**1.5.5.3** Dormitories shall be equipped with one outlet and one cable TV outlet per bed. Cover plates for electrical and cable TV outlets shall be equipped with security type screws.

**1.5.5.4** Provide two duplex electrical outlets and one four-plex data/communication outlets per 80 s.f. for all multiple occupancy office areas.

**1.5.5.5** Provide one duplex electrical outlet per 120 s.f. for all general office storage or work rooms.

**1.5.5.6** Provide a 20 amp. dedicated circuit, duplex receptacle in all corridors at a maximum of 50 foot intervals.

**1.5.5.7** Provide two separate high voltage (12,000 – 13,000) primary feeders from 2 independent high voltage transmission lines.

Primary (single metering) is to be utilized and all underground distribution electrical feeders are to be run in conduit.

Underground duct systems are to be run to each unit, support/complex buildings, and facilities and to major on-site utilities such as domestic wells, wastewater treatment plant, and water treatment plant.

Provide conduit for the basic requirements, plus 2 spare conduits for each of the following:

&#9658; Telephone
&#9658; MATV
&#9658; Radio

▶ Security
▶ Aims computer
▶ LAN

## 1.5.6 EMERGENCY GENERATOR

### 1.5.6.1 Generator Requirements

**1.5.6.1.1** Provide a diesel driven engine generator in a weatherproof enclosure sized to accommodate load plus 25% spare capacity. The generator shall be a four stroke engine. Provide a skid mounted UL listed fuel tank with a 24 hour capacity at full load. All permits required by ADEQ for to the operation of the generator must be included as part of the installation.

**1.5.6.1.2** The following loads shall be on the emergency system:

▶ All security doors
▶ Master control
▶ Perimeter & area lighting
▶ Freezers & refrigerators
▶ Communications systems (e.g., phone, radio and air conditioner for communication rooms) should be a redundant system.
▶ Other lighting as specified by ADC
▶ Equipment room lighting
▶ Sally ports
▶ Unit control rooms
▶ Perimeter electronic security systems
▶ Computer systems
▶ Telephone switches
▶ Communication Rooms
▶ Waste Water Treatment Plant Lift Stations
▶ Water distribution systems for both potable and fire fighting water.
▶ Class "A" Fire Alarm Systems
▶ Visitation Area Air Handlers (to be used as a refuge in event of a prolonged power outage during summer months.) Each building shall have a transfer switch wired to automatically start the generator when an outage occurs.

### 1.5.6.1.3 Lighting controls shall be as follows:

**1.5.6.1.3.1** Exterior building and site lighting shall be controlled by an astronomic time clock. The time clock shall be digital with battery back up.

**1.5.6.1.3.2** Perimeter quartz lights shall be connected to the security system such that 300 linear feet of fence is lighted in the event of a breach in the secured perimeter, along with one 300 foot section adjacent to each side of the alarmed segment.

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 225 of 380

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

### 1.5.7  FIRE ALARM SYSTEMS

**1.5.7.1**   An addressable Class "A" fire alarm system shall be provided to meet the State of Arizona fire code for all occupancies.

**1.5.8  ACOUSTICS:** Acoustic quality of spaces in a correctional facility play an important role in improving communication and interaction between staff and inmates, and greatly improve staffs' safety and ability to monitor inmate activities.  The materials approved for each building function have been selected to provide improved acoustic and lower dba levels.

**1.5.8.1**   Sound Level Requirements.  The sound levels in inmate occupied areas shall be maximum of 70 dba daytime and 45 dba (using the A scale) at night.  Not all areas such as industrial areas will be able to comply with these requirements.  Effort shall be made to reduce noise levels where possible. The facility shall make protective ear gear available for all when work levels exceed maximum level.

**1.5.9  WATER QUALITY & SYSTEM DESIGN:**  The following are minimum requirements or water quality and system design.  Detail information for water quality shall be as defined in water quality regulation in force in the area of the facility.  In addition water treatment plants shall meet the requirements of the Arizona Department of Environmental Quality (ADEQ).

The domestic water source may be supplied by a utility or by the drilling of wells on site.  The type of material used for the casing and column shall be based on water quality at the site and shall be selected based on the recommendations of a hydro geologist's analysis of the water composition. Municipal water sources should be utilized whenever possible.

The source of water if on site wells are utilized shall be from two separate, interconnected wells, such that only one well is required to provide the full daily use of the facility.  Private utilities must provide written documentation indicating ability to provide two separate sources of water should one source become inoperative.

**1.5.9.1**   **Temperature:** Water temperature throughout the State varies, but some areas have excessively high water temperatures.  Action may be required to lower drinking water temperatures.  Testing should be conducted to verify water conditions.

**1.5.9.2**   **Water Quality:**  All state and local regulations shall be followed in the design and operation of the water systems.  In addition, treatment will be required for all facility domestic water uses if water quality exceeds 600 ppm of dissolved solids.  Dental and Kitchen areas shall be further treated to meet or exceed less than 500 ppm of total dissolved solids.

**1.5.9.3**   **Domestic Water and Fire Protection System:**  On site tank sized to handle storage for fire flows required by code and one days supply for the inmate population based on historic use rates of 200 gallons of domestic water per inmate/day.  Staff

consumption of domestic water is included in the 200 gallons usage number of water per day/inmate. These design parameters shall be used for the total number of inmates to be housed at the facility or complex.

The domestic water distribution system that serves more than one building is to be a loop system design with valves that allows the loop to provide continuous operation if a damaged portion of the pipe is shut down during the repair period.

**1.5.10** **WASTE WATER SYSTEM:** The waste water collection system, and on-site treatment plant, if required, is to be designed to handle 187 gallons per inmate per day. If an on-site waste water treatment facility is provided, it shall be equipped with, at minimum:

- ► Recording flow meters on the intake and discharge side.
- ► Flow meters on the re-use effluent pumps, if this are provided.
- ► A muffin monster/grinder on the intake lines.
- ► Methods of mechanically or manually removing solids and other debris on a daily basis from all ponds.

**1.5.11** **NATURAL LIGHTING:** Natural lighting is an essential part of a quality environment for inmate housing and activity areas. Natural light shall be provided in as many areas as possible where inmate and staff activities take place. The following general requirements shall be incorporated in all housing buildings:

**1.5.11.1** Cell housing areas shall have natural light provided in dayrooms and cells as follows:

**Dayrooms:** Windows or skylights must meet a minimum net glazed area of not less than 8% of the floor area of the room served.

**Cells:** 1.15 s.f. of glazed area with at least one dimension not exceeding 6". Windows shall be glazed with 1/4" tempered glass or other manufacturer's approved product.

**1.5.11.2** Dormitory housing areas shall have natural light provided in living areas as follows:

**Sleeping areas and dayrooms:** Windows or skylights must meet a minimum net glazed area of not less than 8% of the floor area of the room served.

Dormitory housing areas shall utilize skylights for day lighting when ceilings are 12 feet or higher.

**1.5.12**   **FEMALE FACILITIES SPECIFICATIONS:**  The Departments standards are based on Prison designs for the adult male population and it is recognized that there are differences in their requirements, security needs and privacy needs. The following is a listing of modifications that shall be made in addressing Adult Female need in facilities designated for their incarceration.

  **1.5.12.1**   **Toilet Fixtures:**  Urinals are not to be provided for female inmates. Substitute china water closets for urinals on a one to one basis. Stainless combination water closets are to be used for Administrative Lock Up and Special Management Inmates.

  **1.5.12.2**   **Quiet Room:**  Adjacent to and accessible from each Dayroom, provide one 200 s.f. Quiet Room with furniture groupings that provide several small, private areas to be used for reading and other low noise functions. Visual observation by the Officers is mandatory.

  **1.5.12.3**   **Cell Areas:**  Provide a cell layout that separates the water closet and the sink from sleeping areas in a manner that provides inmates privacy.

  **1.5.12.4**   **Mirrors:**  Stainless steel mirrors are to be used only in Special Management or Administrative Segregation cells but must be approved for any type of application. Use tempered glass for all other areas.

  **1.5.12.5**   **Toilet Areas:**  Should be designed to provide privacy for female inmates in the water closet areas by installation of doors from plus 12" to plus 48" high with 54" high reinforced masonry partitioned dividers for close and maximum custody levels. Standard commercial toilet partitions shall be utilized in minimum and medium custody levels.

  Showers should have opaque curtain material from the knee level to shoulder height to enable Officer's to view heads and feet of inmates.

  **1.5.12.6**   **Visitation areas:**  Provide a minimum of 300 s.f. of additional space designed and set aside from the General Visitation for Children's space and play area.

  **1.5.12.7**   **Housing Area in Appendix 7.4 Fig. 1:**  Change the height of the inmate storage locker from 36" to 48".

**1.5.13**   **Temporary Holding Enclosures:**  Used to control, confine, or restrict inmate movement on a short term basis. These enclosures can be inside (Mental Health Observation) or outside (Recreation, Central Intake Processing, Medical Waiting Area, Ingress/Egress or Movement Building) and must comply with Department Order 704. The following are required for Outdoor Enclosures:

        ►  Shall be covered to provide shade
        ►  Shall be provided with a misting system or evaporative cooler
        ►  Shall be provided with a continuous source of water for drinking

1.6     **COMMON SUPPORT REQUIREMENTS:**  The support buildings in this section are similar for all levels of security.  Variations or special requirements for these buildings at each security level can be found in the corresponding Part of this manual.

It is the intention of ADC that all furniture and fixtures that are manufactured by ACI shall be purchased from ACI, unless a written waiver is secured from the Director or designee.  Furniture includes inmate furnishings, office/work areas, millwork, counter and storage, dining and visitation, officer stations, control rooms and cabinets.

1.6.1     **FINISH SCHEDULES:**  Finish schedules for the spaces listed below (that are shared by all prison facilities regardless of level assignment) are located in Appendix VII.

1.6.2     **FACILITY ADMINISTRATION/OPERATIONS:**  The administration and operation functions shall be centrally located within a facility. The Deputy Warden's office on a unit should be located to provide a view of the unit yard(s).  Inmates should be restricted from this area.  Access to the administrative areas from the inmate yard shall be through controlled entries.  The building may be constructed of masonry, concrete (pre-cast or cast-in-place), prefabricated steel buildings, or other materials that meet code requirements.

1.6.2.1     **AREA REQUIREMENTS:**

1.6.2.1.1     **Office/Work Areas:**     Administrative areas shall provide at a minimum, space for the following functions:

| Staff Member | Type of Office | Equipment Required |
|---|---|---|
| Warden or Deputy Warden | Private office | work desk, 4 person conference table, credenza, lateral file cabinet and bookcase |
| A.D.W. | Private office | work desk, 4 person conference table, lateral filing cabinet |
| General Administrative Offices | Work station (may be modular) | lateral filing cabinet |
| Operations Offices | Private office | work desk, 2 person conference table, credenza, lateral filing cabinet |
| Reception and Administrative Support | Open space to accommodate a work station for each staff member | space for lateral filing cabinets and copier and work table |
| Chaplin, IT, Other Support | Private office | work desk, bookcase and lateral filing cabinet |

A stand alone facility will require more offices in the administrative area than a unit administration building.  The Department in the design documents or RFP shall define additional spaces.

Inmate record storage facility shall be located outside of the secure perimeter or in a secure portion of the Administration Building.  Walls and ceilings, if not constructed of masonry block, shall be

reinforced with expanded metal. Rooms shall have security doors, frames and locks.

**1.6.2.1.2    Hygiene Areas:** The prison provides conveniently located staff facilities that are appropriately sized to meet the operational needs, including:

▶ Restricted toilets and wash basins not used by inmates
▶ Female staff toilets, shower stalls, benches and 3 tier lockers proportioned according to the projected female staff complement in close/maximum custody units.
▶ Male staff toilets/urinals, shower stalls, benches and 3 tier lockers proportioned according to the projected male staff complement in close/maximum custody units
▶ Female shower stalls, benches and 3 tier lockers proportioned according to the projected female staff complement in a stand-alone (complex) facility
▶ Male shower stalls, benches and 3 tier lockers proportioned according to the projected male staff complement in a stand-alone (complex) facility

**1.6.2.1.3    Support Areas:** Additional spaces shall be provided in proportion to the size of the facility and the number of staff and shall include:

▶ Conference Room............ To accommodate a minimum of 12 people
▶ Video / Office.................. 160 s.f.
▶ Copier Room ................... 25 s.f.
▶ Briefing / Training........... 600 s.f.
▶ Public Lobby ................... As required.
▶ Reception/Work Area...... 225 s.f.
▶ Property Area .................. 120 s.f.
▶ Storage............................. As required

A stand alone (complex) facility will require more support space in the administrative area than a unit administration building.

**1.6.2.2    FF&E / Detention Equipment / Special Systems:**

**1.6.2.2.1    Office / Work Areas:** Furniture shall be purchased from ACI and consist of modular furniture systems.

Detention equipment is limited in a Minimum and Medium custody facility. If the facility is a stand alone or complex prison, a weapons storage locker shall be provided near the officer station or control room on the exterior of the building. There shall be a minimum of one locker for every ten employees. Administrative offices shall be protected by security barred windows and appropriate fencing when designed as a part of the perimeter or inside the perimeter in close/maximum.

Special systems for the complex administrative area shall consist of video monitoring equipment and inmate telephone system monitoring station.

**1.6.2.2.2    Hygiene Areas:** If not furnished at a complex level, the following items shall be provided at a facility or unit administration building in close/maximum custody levels:

► Female staff toilets, shower stalls, benches and 3 tier lockers proportioned according to the projected female staff complement
► Male staff toilets/urinals, shower stalls, benches and 3 tier lockers proportioned according to the projected male staff complement

**1.6.2.2.3    Support Areas:** The reception area shall be equipped with built-in millwork counter for visitor processing. The counter shall be designed to ADA accessibility requirements.

A metal detector shall be furnished in the visitation lobby area for screening of visitors and staff.

**1.6.3    VISITATION:** Each facility shall provide space for visitation including contact and non contact areas and in close or maximum facilities, if a part of the facility perimeter, shall be reinforced with #4 bars 8" on center both ways and solid grouted. Visitation areas shall be designed for maximum visibility including exterior visitation areas. Wall of visiting areas shall be of masonry or concrete (or high impact gyp board in minimum/medium facilities). Acoustic quality is very important in the visiting area. Doors in this area will be controlled.

**1.6.3.1    Area Requirements:** There is adequately designed space to permit registration, screening and searching of both inmates and visitors. Visitation areas shall be provided for each yard within the unit to eliminate inmate's crossing over within the visiting area.

**1.6.3.1.1    Work Areas:** A minimum of 4000 s.f. shall be provided for a General indoor visiting area. Minimum and Medium custody facilities or units shall have an outdoor visiting area of at least 500 s.f.. This outdoor space shall be enclosed with a 10 foot high fence with one coil of 30" five-point detainer hook and barb concertina razor ribbon attached to the top of the fence. There shall be at least two rooms (80 s.f. minimum) for attorney/client visits that provide a confidential environment.

There shall be a strip search room, which is at least 100 s.f. for each visiting room for searching of inmates before they return to the yard.

Dedicated rooms shall be provided for non-contact visitation and in close/max and there shall be two stations for the first 100 inmates and one additional station for each 100 additional inmates. In minimum/medium facilities there shall be two non-contact visitation stations per 500 inmates. Each station shall be at least 70 s.f.. Non-contact visitation stations may also be designed to be used for attorney/client visits.

A visitation area security (counter) staff station shall be provided.

Vending area shall be provided for a minimum of 6 full sized vending machines in each visiting area.

**1.6.3.1.2    Hygiene Areas:**  Restroom facilities shall be placed inside the visiting room in a location that permits continuous observation by security personnel. There shall be male and female restroom with handicap accessible features for visitors and a separate restroom for inmate use. The doors to toilet rooms shall be lockable with a key operated by staff.  Visitor restrooms shall possess a changing table for small children.  One high-low drinking fountain shall be provided near the restrooms.

**1.6.3.1.3    Support Areas:**  Janitor rooms shall be provided in each visiting area and shall be large enough to store cleaning equipment and a small supply of toiletries.  Janitor room shall be equipped with a janitor sink and mop holder racks. The doors to the janitor rooms shall be lockable with a key operated by staff.

### 1.6.3.2    FF&E / Detention Equipment / Special Systems

**1.6.3.2.1    Visitation Areas:**  Visitation areas shall be equipped with movable 4 man tables.  A work station fabricated of millwork shall be provided for the officer's station.

Non-contact stations shall have communication devices (e.g., phones) or a method that permits the occupants to communicate, without interfering with parties visiting in other non-contact stations. A window frame with secure, passive baffled speaking port built into the frame may be utilized.

Doors and door and window frames in the visiting area shall be constructed of 14 gauge steel. Doors leading to public exits shall be interlocked with another door in a security vestibule.

Visitation areas shall be equipped with a paging or intercom system.  Cameras may be required to provide complete coverage of all visiting areas.

**1.6.3.2.2    Support Areas:**  The strip search room shall be equipped with a built-in non-moveable concrete bench in close/maximum custody or steel/wood bench anchored to the floor in minimum/medium custody.

**1.6.4    IN-TAKE AND PROCESSING:**  At the complex level, In-Take and Processing areas shall be located so that the processing of inmates is not visible from the yard.  This area shall be accessible from the service yard with bus / van access capability.  The space should be of sufficient size to accommodate all functions related to In-Take and Processing.

### 1.6.4.1    AREA REQUIERMENTS:

**1.6.4.1.1    Office/Work Areas:**  The following areas shall be provided:

- ▶ Five offices .................................. 100 s.f. each
- ▶ One count & movement room ..... 300 s.f.

**1.6.4.1.2  Hygiene Areas:** Restrooms shall be provided for both male and female staff and shall be equipped with handicap accessible fixtures.  One high-low drinking fountain shall be provided near the restrooms.  Inmates shall use an adjacent yard/inmate toilet.

**1.6.4.1.3  Support Areas:** Support areas consist of a 50 s.f. storage room and a 35 s.f. janitor room.  At a stand alone facility, outside holding areas shall be provided adjacent to the in-processing area.  Enclosure shall be of chain link fencing material, fully enclosed.  Enclosures shall be protected from direct sunlight with a shade structure.  The enclosed space will be sufficient to hold 10 inmates in a minimum/medium facility.  In close/maximum facilities, individual inmate holding areas of one space per inmate shall be provided.

### 1.6.4.2  FF&E / Detention Equipment/Special Systems

**1.6.4.2.1  Office/Work Areas:** Furniture shall be modular systems.

If holding areas are provided, the gates shall be equipped with cuffing slots.

Special systems shall include outlet connections and conduit for the A.I.M.S. computer system.

## 1.6.5  HEARING:  A hearing room and associated support offices shall be developed at each unit or at a central location in the complex.

### 1.6.5.1  AREA REQUIERMENTS:

**1.6.5.1.1  Office/Work Areas:** The following spaces shall be provided per hearing area:

- ▶ Two private offices ..................... 100 s.f. each
- ▶ One hearing room........................ 240 s.f.

**1.6.5.1.2  Hygiene Areas:** One unisex toilet shall be provided for staff and shall be handicap accessible or adjacent toilet facilities may be utilized.  Inmates shall use an adjacent yard/inmate toilet.

**1.6.5.1.3  Support Areas:** Storage rooms shall be approximately 60 s.f. in size.

### 1.6.5.2  FF&E/Detention Equipment/Special Systems

**1.6.5.2.1  Office/Work Areas:**   FF&E shall be modular furniture.  Special systems shall consist of cabling for an A.I.M.S. computer terminal.

**1.6.6**     **RESOURCE CENTER:**  Each unit shall have a Resource Center situated in a physical location that permits appropriate access and traffic flow.

    **1.6.6.1**     **AREA REQUIERMENTS:**

        **1.6.6.1.1**    Library Areas. General indoor library space shall provide seating and tables for 24 inmates. Library shall be approximately 1,000 s.f. including an office for the Librarian of approximately 100 s.f.

        **1.6.6.1.2**    Hygiene Areas. No toilet facilities shall be provided in the Resource Center. Inmates and staff shall utilize adjacent facilities.

        **1.6.6.1.3**    Support Areas. Support areas consist of one storage room of approximately 100 s.f.

    **1.6.6.2**     **FF&E/Detention Equipment / Special Systems:**

        **1.6.6.2.1**    **Library Areas:** Fixed millwork shall be provided for library counter with a swing gate to separate counter area from general library. Within Library provide built-in millwork for six (6) computer work stations with electrical and data outlets.

**1.6.7**     **CLASSROOM:**  Classrooms shall be distributed equally on each yard and observable by staff through windows from the yard or corridor. Lockable offices shall be enclosed in ceiling height glazing to provide observation of classrooms.

    **1.6.7.1**     **AREA REQUIERMENTS:**

        **1.6.7.1.1**    **Office/Classroom Areas:** Classroom area shall be a minimum of 750 s.f. including an Instructor's Office of approximately 200 s.f. Seating shall be provided for a maximum of 25 inmates. A ratio of one classroom for each 200 inmates shall be provided for each unit.

        **1.6.7.1.2**    **Hygiene Areas:** Inmates shall use the adjacent yard/inmate toilet.

        **1.6.7.1.3**    **Support Areas:** Lockable storage cabinets shall be furnished in the classrooms for supplies.

    **1.6.7.2**     **FF&E/Detention Equipment/Special Systems:** Movable furniture shall be used in the classroom. Windows in classrooms that face onto the yard shall be protected by bar grills in close/maximum custody.

        **1.6.7.2.1**    **Office/Classroom Areas:** Classrooms shall be provided with 13 tables and 26 chairs, two chalk boards or dry erase marker boards, two built-in millwork computer stations and modular office furniture. Storage cabinets shall be millwork. Special systems consist of two jacks for connection of computer workstations.

**1.6.8**    **PROPERTY AND MAIL:** Mail and property areas shall be provided on each unit with a roll up door that is accessible by the inmates from the yard.   Property storage areas shall be enclosed by a chain link fence and be viewable by staff working in mail and property area.  Access shall be provided to the service yard.

**1.6.8.1    AREA REQUIERMENTS:**

**1.6.8.1.1    Property Storage/Work Areas:** Property room area shall be a minimum of 1000 s.f. per unit.  Mailroom shall be designed to effectively process and distribute mail.

**1.6.8.1.2    Hygiene Areas:** Inmates shall use the adjacent yard toilet.

**1.6.8.2    FF&E/Detention Equipment/Special Systems:**

**1.6.8.2.1    Property Storage/Work Areas:** Property room shall contain storage shelving to house inmate effects.  Modular furniture shall be used for workstations.

Detention grade doors and locks shall be used on this area.

Cabling shall be provided for the A.I.M.S. computer terminal.

**1.6.9**    **COUNSELING:**  In a facility where substance abuse treatment programs are provided as a component of the mission of the facility, dedicated spaces shall be provided as listed below.  Windows for visible monitoring of the entire room from outside is preferred for staff safety and security.  Substance Group Small Group, Substance Abuse One-on-One Counseling and Case Management /Correctional Additions Officer Counseling Offices shall be sound proof so that conversations are not audible in adjacent areas.

**1.6.9.1    AREA REQUIREMENTS:** The following counseling spaces shall be provided:

Substance Abuse Large Groups (didactic).... 16-40 students, 600 s.f. minimum
Substance Abuse Small Groups (therapeutic)6-16 students, 240 s.f. minimum
Substance Abuse One-on-One Counseling ... 80 s.f. minimum
Case Management/Correctional Addictions . 100 s.f. minimum.
Officer Counseling Office's......................... 100 s.f. minimum

**1.6.9.2    FF&E/Detention Equipment/Special Systems:**

**1.6.9.2.1    Substance Abuse Large Groups (didactic)** Shall be equipped with tables and chairs in rows or individual student desks.  One wall shall contain a white board.  Education classrooms may also be substituted by scheduling.

**1.6.9.2.2    Substance Abuse Small Groups (therapeutic)** Shall be equipped with movable chairs, and a portable or permanently mounted white board.

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 235 of 380

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

**1.6.9.2.3    Substance Abuse One-on-one Counseling:** Room shall contain two chairs.

**1.6.9.2.4    Case Management/Correctional Addictions Officer Counseling Offices**: Room shall contain a desk, desk chair and two side chairs.

**1.6.10    RECREATION:** Outdoor recreation and exercise areas for general population inmates are provided in sufficient number to ensure that each inmate is offered at least one hour of access daily.

### 1.6.10.1  AREA REQUIREMENTS:

**1.6.10.1.1    Recreation Areas:** Covered/enclosed multi-purpose areas with 18 foot ceilings must be available for use in inclement weather if the prison is to be located in a geographic region that is above 5000 feet in elevation. Covered/enclosed exercise areas can be designed for multiple uses as long as the design and furnishings do not interfere with scheduled exercise activities. The minimum space requirements for covered/enclosed exercise areas are as follows:

- 10 s.f. per inmate for the maximum number of inmates expected to use the space at one time, but not less than 1,500 s.f. of unencumbered space. (Special Program Units shall have no less than 75 s.f. per inmate while in use by segments of the population)  This space shall include a full-court basketball court.

- For each 500 inmates or fraction thereof, provide one granite surface running track, a full-court basketball court and a PAR course.  For 1,000 or more inmates, provide one softball field, two full or four half-court basketball courts, one running track, one PAR course and two volleyball courts.

- For each 500 inmates or fraction thereof, provide 300 s.f. of covered shade space.

**1.6.10.1.2    Hygiene Areas:** Recreation areas are supported by open air yard toilets with a ratio of one combination toilet/urinal/drinking fountain unit per 500 inmates.

**1.6.10.1.3    Support Areas:** Each prison yard shall have a recreation office and secure storage area of at least 200 s.f..

### 1.6.10.2  FF&E/Detention Equipment/Special Systems:

**1.6.10.2.1    Recreation Areas:** The institution (each recreation/field area) shall have a PAR Course per Department specifications (See Part 7, Appendix IV

Special systems include CCTV cameras mounted on yard control building to monitor recreation areas, and site paging system with speakers mounted on area light poles or buildings.

**1.6.10.2.2  Hygiene Areas:** In Close custody, outdoor urinal partitions shall be provided by ACI and be of a cantilevered design.

**1.6.10.2.3  Support Areas.** Office shall be equipped with modular office furniture. Equipment storage shall be an enclosed, lockable chain link enclosure.

### 1.6.11    MEDICAL/DISPENSARY

#### 1.6.11.1    AREA REQUIREMENTS:

**1.6.11.1.1  Office/Work Areas:** The square footage for the medical facility shall be sized appropriately consistent with the activities of the complex and availability of out-sourced services. Within that area, the following spaces may include:

- Inmate holding cells (close and maximum)
- Secure Medication Storage
- Medication Room
- Medical Records
- Medical Record Storage
- Exam rooms
- Emergency Treatment Room
- Nurse Station
- Telemeter Exam Room
- Blood Lab
- Clean/Soiled Linen
- Library (Medical)
- Staff workspace
- Staff Toilet/Locker rooms
- Staff Break room
- Conference room

#### 1.6.11.2    FF&E/Detention Equipment/Special Systems

In stand alone facilities, the medical facilities may include medical ward beds, single bed medical rooms and isolation rooms

Nurses Line Areas shall be provided in all facilities or units. Refer to 1.6.21 – Nurses Line Area.

**1.6.11.1.2  Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates. The ratio of handicap accessible toilets shall be governed by ADA Standards.

**1.6.11.1.3  Support Areas:** At the complex level, Medical shall contain storage for records, offices and break room for staff, laundry facilities for linens, holding cells for inmates in close/maximum custody, and secure medication storage.

**1.6.11.2.1  Office/Work Areas:** Institutions with temporary medical storage areas

shall locate such facilities outside of the secure perimeter or in a secure portion of the Administration Building. Rooms shall have security doors, frames and locks. All sinks shall have plaster traps. A dispensary may be located within the secure perimeter for the purpose of dispensing of medication. The dispensary shall have the following:

- A secure pass through for the distribution of medical supplies to staff and inmates shall be located on an exterior wall
- A speaking device/port
- Security doors, frames and locks

Nurse Station shall have the following detention grade components:

- Security doors
- Security frames
- Security locks

Special systems for the medical shall include:

- Security Control systems including door controls (from waiting area to internal corridors), intercom, and camera systems.
- Fire alarm monitoring equipment.
- Phone system
- Radio System
- Dedicated telecommunication cables for Telemeter communications
- Nurse call system

**1.6.11.2.2 Support Areas:** Staff offices and support areas shall be separated from inmate occupied areas by secure corridors.

## 1.6.12 LAUNDRY

**Close/Maximum Facilities:** The central laundry shall be capable of cleaning clothing and bedding for the facility on a defined schedule. Clothing requirements will vary for different climatic regions within the state. ADC will provide clothing requirements. A central laundry shall include a work area, clothing storage, an office with a staff toilet, inmate toilet, janitor's room with a mop sink and secure storage for chemicals.

**Minimum/Medium Facilities:** Inmates will do their own laundry. 4 each heavy-duty Laundromat type washers and dryers will be installed into each 100 man pod. Dryers will be fueled with natural gas. Appliances will be Energy-Star rated.

### 1.6.12.1 AREA REQUIREMENTS:

**1.6.12.1.1 Office/Work Areas:** The size of the central laundry shall be determined by the amount of material to be processed in a 24 hour period. The formula is the weight (pounds) of clothing/day x number of cycles/week. The laundry shall contain a secure office from which the entire laundry can be viewed. Laundry shall contain a separate, secure mechanical room to house water heaters and heat reclamation system (if included).

**1.6.12.1.2 Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

**1.6.12.2 FF&E/Detention Equipment/Special Systems:**

**1.6.12.2.1 Office / Work Areas:** In a central laundry, there shall be a secure corridor behind the washing machines (constructed of chain link fencing) that contains the plumbing and soap/bleach dispensing system.

## 1.6.13 DENTAL SERVICES

**1.6.13.1 AREA REQUIREMENTS:** Dental operatories shall be designed with a minimum of 3 chairs per 1000 inmates or be provided as an out-sourced service.

**1.6.13.1.1 Office/Work Areas:** Dental areas shall be designed within the medical unit for the facility. Required areas are: operatories, lab, offices, x-ray, panorex, secure medication storage and equipment storage.

**1.6.13.1.2 Hygiene Areas** A separate staff toilet shall be provided adjacent to the dental lab.

**1.6.13.2 FF&E / Detention Equipment/Special Systems:** Emergency shut-off systems shall be provided for all dental equipment.

**1.6.13.2.1 Office/Work Areas:** Dental lab shall be furnished with built-in millwork counters and cabinets. All equipment for lab, x-ray and operatories shall be provided by ADC. All sinks to be provided with plaster traps.

**1.6.13.2.2 Support Areas:** Secure medication storage shall consist of masonry block wall construction (or full-height reinforced walls in minimum/medium custody) with steel security door, frame and lock.

### 1.6.14    WAREHOUSE

**1.6.14.1    AREA REQUIREMENTS:** Warehouse shall be located outside the perimeter security fence to allow for deliveries of food and supplies in a non-secure environment. Delivery trucks shall be routed so that they do NOT pass through a vehicle sally port.  At minimum, provide a facility sized on the basis of 8-9 s.f. per total inmate population.

**1.6.14.1.1    Office/Work Areas:**  Office areas shall be provided for staff with full view of warehouse and loading dock.

**1.6.14.1.2    Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates and be located adjacent to and visible from the warehouse office.

**1.6.14.1.3    Support Areas:** Warehouse to contain facility telephone room for the routing of lines into the facility.

**1.6.14.2    FF&E / Detention Equipment/Special Systems:**  Door to the warehouse shall be monitored by a security control system from Central Control.

**1.6.14.2.1    Office/Work Areas:**  Storage rack system shall be provided for the storage of bulk materials.  Walk-in freezer and cooler may be required for food storage based on the operation of the facility.

### 1.6.15    MAINTENANCE: Maintenance shall be located outside the facility perimeter in the general area of the Warehouse.  A separate storage area for combustible and/or high pressure gases must be provided.  The facility shall be capable of providing maintenance for most of the equipment and building systems.

**1.6.15.1    AREA REQUIREMENTS:**

**1.6.15.1.1    Office/Work Areas:**  In Complex/Standalone facilities Maintenance area shall include a staff office (200 s.f.) with a staff toilet, secure tool storage, inmate toilet, general storage space, and work areas. The size of maintenance area shall be determined by the size of the facility and shall be calculated on 9 s.f. of the total inmate population.  If the stand-alone facility is in close proximity to a complex, some of these functions may be outsourced at the complex level.  The Maintenance Building shall consist of separate areas for the following functions:

| | | |
|---|---|---|
| Staff Offices | Conference Room | HVAC Shop |
| Locksmith | Tool Crib | Plumbing Shop |
| Carpentry Shop | Electrical Shop | Welding Shop |
| Electronic Technician Shop | Paint Storage | Secure Storage |
| Outdoor Work Area | Indoor General Storage | Outdoor General Storage |

**1.6.15.1.2 Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

**1.6.15.2 FF&E/Detention Equipment/Special Systems:**

**1.6.15.2.1 Office/Work Areas:** Local area network cabling system shall be provided.

**1.6.16 VEHICLE MAINTENANCE:** Vehicle maintenance is one of the services that are often contracted out. If the facility size or location warrants a vehicle maintenance facility, the number of vehicle repair bays will be determined by ADC on a project by project basis.

**1.6.16.1 AREA REQUIREMENTS:**

**1.6.16.1.1 Office/Work Areas:** The main vehicle maintenance building, if required, shall contain the appropriate number of vehicle maintenance bays, supply and secure storage, tool room, auto technician office and exterior lube and wash bays.

**1.6.16.1.2 Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

**1.6.16.1.3 Support Areas:** Vehicle maintenance shall also contain the facility Fire Safety Staff. That area shall consist of fire truck(s) storage, transportation office, fire safety office and break room for the fire crew.

**1.6.16.2 Equipment and Accessories:** Standard equipment for vehicle maintenance shall consist of:

- Compressed Air (tanks and racks)
- 1 Vehicle Lift per Bay
- Drill Press
- 1 Work Bench per Bay
- Tire Balancer
- Tire Changer
- Alignment Machine
- Brake Lathe

**1.6.16.2.1 Office/Work Areas:** The Break room shall contain built-in millwork.

**1.6.16.2.2 Hygiene Areas:** In addition to separate toilet facilities for staff and inmates, a first aid eye wash area shall be included in the general vehicle maintenance area.

**1.6.16.2.3 Support Areas:** Fire safety shall contain auxiliary equipment to support the individual type of vehicles to be stored (rescue, ladder truck, hose truck, etc.).

**1.6.17    PHARMACY:** A regional or centralized pharmacy is acceptable to provide deliveries to a facility. Any pharmacy must meet all state regulatory standards. If a pharmacy is to be on-site within the facility and is to be located in the facility administration building to allow unit control room monitoring of deliveries and secure access by staff only. The Pharmacy shall be located outside the perimeter security fence.

**1.6.17.1    AREA REQUIREMENTS:** Pharmacy square footage is 300 s.f. minimum per AZ board of Pharmacy requirements. If out-sourced, secure on site storage must be provided that meets ADC and State Pharmacy Board requirements.

**1.6.17.1.1    Office/Work Areas:** The pharmacy shall consist of the following spaces:

- Large Workroom
- Pharmacist's Office

**1.6.17.1.2    Hygiene Areas:** Staff shall use the toilet facilities provided by the facility administration building in which it is housed.

**1.6.17.2    FF&E/Detention Equipment/Special Systems**

**1.6.17.2.1    Office/Work Areas:** Pharmacy shall contain the following:

- Built-in Mill Work (Counters and Storage Cabinets)
- Security Door
- Security Frame
- Security Lock

**1.6.18    HAIR CARE:** This area shall be located in the facility support building and be accessible from the inmate yard. This area shall include the following:

- 1 Barber Chair per 500 inmates
- Counter space
- Lockable Storage Cabinets
- Sink.

**1.6.18.1    AREA REQUIREMENTS**

**1.6.18.1.1    Office/Work Areas:** The square footage for this space is 100 s.f.

**1.6.18.2    FF&E/Detention Equipment/Special Systems**

**1.6.18.2.1    Office/Work Areas:** This area shall have a built-in millwork counter tops and storage cabinets.

**1.6.19    DETENTION:**  To the extent feasible, considering staff safety and security requirements, the environment in Detention Housing shall approximate those of the general maximum population.  Detention cells enable staff to safely observe and communicate with inmates.  A dry cell may be included and used to securely observe an inmate who is suspected of having secreted narcotics or foreign items within their body.

**1.6.19.1    AREA REQUIREMENTS:**  Cells shall be 80 s.f., double occupancy. Detention housing units have an area outside the room or cell for indoor exercise; this area has minimum of 200 s.f. of floor space and at least 35 s.f. of floor space for each inmate who is exercising at any one time.

**1.6.19.1.1    Pod Area:**  The facilities total inmate population determines the number of detention cells required at a ratio of 1 bed for every 26 inmates.  The building will be divided into separate pod areas and shall be limited to a maximum of 26 beds in each pod.

**1.6.19.1.2    Hygiene Areas:**  Each cell shall contain a stainless steel lavatory/toilet combination unit.

**1.6.19.1.3    Security and Control Areas:**  Each detention area shall contain an enclosed, secure control room, positioned to allow direct vision into each pod's living, dayroom, and hygiene areas.

The control room shall not be excessive in size, reducing the requirement to move from position to position to observe inmate areas.

Each control room shall have an adjacent toilet room, which can be used by control staff without leaving the control room.

Control rooms are required in Level 3, 4 and Level 5 facilities and may be required in Level 2 facilities depending on operational and security factors. Level 2 and 3 control rooms may be accessed from inmate occupied areas and require only a single security door.  Level 2 and 3 control rooms shall have a means of egress for staff to evacuate the control room either through a roof hatch or to a safe area at ground level via an exit door.  Level 4 and 5 control rooms shall be equipped with an escape ladder to the roof of the building, and be equipped with a means of securing the hatch from the roof side of the hatch.

**1.6.19.1.4    Recreation Areas:**  One secure, enclosed recreation yard shall be constructed adjacent to the administrative segregation building for the use of the maximum 26 bed pod.  The number of enclosures shall be a ratio of 1 per 10 inmates or fraction thereof.

**1.6.19.2    FF&E/Detention Equipment/Special Systems**

**1.6.19.2.1    Pod Area:**  Each cell shall be equipped with a pneumatic or electro-mechanical locking sliding   steel door with locking cuffing slot and viewing panel. Each door will be controlled from the control room.  Natural lighting shall be provided by one 8" x 48" barred steel window slot.

**1.6.19.2.2 Hygiene Areas:** Each cell shall contain a stainless steel lavatory/toilet combination unit with flushing override located in the master control room. Showers door shall be remotely unlocked and remote controlled water shut-offs shall be provided.

**1.6.19.2.3 Security and Control Areas:** Control room shall contain built-in millwork and computer equipment cabinet. Windows shall be steel, bar construction. Doors and frames shall be security steel construction with security locks.

**1.6.20 KITCHEN:** The kitchen shall be capable of providing meals for inmates in accordance with ADC's 6-Week Cycle Standard Menu.

**1.6.20.1 AREA REQUIREMENTS:** Kitchen square footage should be sufficient to provide ample space for equipment and staff/inmates required to produce the number of meals within the serving time allotted.

**1.6.20.1.1 Office/Work Areas:** The areas comprising the kitchen shall consist of the following:

| | | |
|---|---|---|
| Kitchen Office | Cooking Kitchen | Toilet Facilities |
| Walk-in Freezer | Walk in Coolers | Serving Line(s) |
| Dish Wash | Pot Wash | Clean Dish |
| Trash Room | Cart Wash | Receiving Dock |
| Dry Food Storage | Chemical Storage | Secure Storage |

Serving or thermalization kitchens utilized in the units of a complex with a central food factory kitchen will not have all of the equipment above. All kitchen equipment must have a "prison security package", no wire racks are allowed in ovens or any other kitchen equipment and no wire rack shelving is allowed.

**1.6.20.1.2 Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

**1.6.20.2 FF&E/Detention Equipment/Special Systems**

**1.6.20.2.1 Office/Work Areas:** The kitchen areas will contain equipment necessary to support the current State of Arizona Correctional Department's prison menu.

**1.6.21    NURSES LINE AREA:**  Each facility or unit that has an inmate population of 800 or more shall incorporate the Nurse Line Area, which provides a medical assessment of inmate health.  In minimum/medium facilities, medication and record room walls shall extend to the roof deck and be reinforced with security steel mesh.   This area's responsibilities within the nursing protocol will cleanse wounds, provide medications, perform various testing, handle emergencies on the yard, provide temporary care of wounds and broken bones on the yard, administer insulin injections and testing of inmate conditions, assess the inmate status and refer to providers as needed.  Female inmates require three to four times the amount of service calls as male inmates.

**1.6.21.1   AREA REQUIREMENTS:**  A typical breakdown of room requirements for each Nurse Line Area is as follows:

- 3 - 120 s.f. Exam Rooms with Delvic Chairs and sink/counter ------ 360
- 1 - 120 s.f. Nurse Supervisor Office ------------------------------------- 120
- 1 - 160s.f. Waiting Room / Security Entry with 6 Chairs ------------- 160
- 2 - 60 s.f.  Nurse Assessment Areas ------------------------------------- 120
- 1 - 140s.f. Lab Room 10' x 14' ------------------------------------------- 140
- 1 - 100 s.f. Process / Records Room ------------------------------------- 100
- 1 - 200 s.f. Storage Room ------------------------------------------------ 200
- 1 - 150 s.f. Medical Records Room -------------------------------------- 150
- 2 - 60 s.f. Toilets – 1 Staff and 1 Inmate (testing) -------------------- 120
- 2 - 120 s.f. Mental Health Treatment ----------------------------------- 240
- Circulation:    30% of Sub-Total:1,710 -------------------------------- 513
- Total S.f.: --------------------------------------------------------------- 2,223

**1.6.21.2   Hygiene Area:**  Staff and inmates use separate toilets and inmate's toilet will be used for test samples.

**1.6.21.3   FF&E/Detention Equipment/Special Systems**
- Provide built in cabinets, counter tops with sinks in Exam Rooms, Lab Area, and Nurse Assessment Area.
- Provide for storage for Hazardous materials.

### 1.6.22    MEDICAL DISPENSARY/MENTAL HEALTH/NURSE LINE

The requirements of separate building area is to be used where an addition of inmate housing is to be added and the complex medical space will not provide for all inmate health needs, exclusive of Pharmacy requirements.  This facility is to be located within the perimeter fence of the Unit it serves and is to serve only that population.  It should be located to allow for ambulance access.  In minimum/medium facilities, medication and record room walls shall extend to the roof deck and be reinforced with security steel mesh.

Provide the following functional spaces:
- Waiting entry area and security desk
- Dental Operator    Double if complex dental facilities are not sufficient
- Dental Equipment Room if complex dental facilities are not sufficient
- Dental Lab if complex dental facilities are not sufficient
- Dental Office if complex dental facilities are not sufficient
- Mental Health Offices      2 each
- X-Ray Room if complex x-ray facilities are not sufficient
- Doctor Exam Rooms        One per 500 inmates
- Emergency Room
- Nurse Station
- Records
- Narcotic cabinet
- Staff Toilet          1 each Male/Female
- Blood Lab if complex lab facilities are not sufficient
- Inmate Toilet

Following requirements outlined above will negate the space requirements outlined in Paragraph 1.6.11 – Medical/Dispensary, 1.6.13 – Dental Services and 1.6.21 – Nurses Line Area and 6.6 – Complex Medical.

## Part 2 – Minimum Security Facility Requirements

**2.1 General Facility Requirements**

2.1.1 Facility Description ................................................... 2

2.1.2 Facilities Support Services (Complex Level) ...................... 2

2.1.3 Facilities Support Services (Stand Alone Facilities) ............. 2

2.1.4 Facility Size Requirements ...................................... 2

2.1.5 Physical Security ............................................... 2

**2.2 Building Requirements**

2.2.1 Housing ........................................................ 4

2.2.2 Facility/Unit Control .......................................... 7

2.2.3 Yard Control ................................................... 8

2.2.4 Commissary ..................................................... 9

2.2.5 Work Based Education ........................................... 9

2.2.6 Dining/Kitchen ................................................ 10

2.2.7 Finish Schedule ............................................... 11

# PART 2    MINIMUM SECURITY FACILITY REQUIREMENTS

## 2.1    GENERAL FACILITY REQUIREMENTS

**2.1.1    FACILITY DESCRIPTION:**  A Minimum Level facility or unit is constructed to house inmates classified as minimum risk to the public.  These inmates present a low level of risk to the public community should escape occur from custody.  The facility should be capable of restricting inmate movement within the facility.  A Minimum facility or unit could be a part of a larger complex of prison units and as such will be referred to as a Minimum unit.   Support functions vary if the prison is stand alone or part of a larger complex.

**2.1.2    FACILITIES SUPPORT SERVICES (COMPLEX LEVEL):** If a Minimum facility is constructed as a part of a larger complex, it can be expected that the unit will be supported by complex wide functions.  Warehousing, maintenance, medical services, pharmacy, vehicle maintenance and complex administration are but a few of the centralized functions.  Perimeter patrol and monitoring of critical systems such as water supply, wastewater systems and emergency power generation, will be provided at a complex level.

**2.1.3    FACILITIES SUPPORT SERVICES (STAND ALONE FACILITIES):**  If a prison is stand-alone, the support functions will become a part of the facility and must be designed and constructed in accordance with the provisions of those standards.  Some services may be furnished from other ADC facilities, and if so, the facility shall take into account those reduced service requirements.

**2.1.4    FACILITY SIZE REQUIREMENTS:**   The maximum inmate population of a Minimum unit is 1000 beds. Physical separation of inmate populations within a unit may be required depending on such circumstances as facility design, staffing patterns, and operational plan.   The primary determining objective shall be the need for sound correctional practice, which ensures the safety of staff and inmates as well as effective security. Support and program functions should be designed to minimize inmate movement from yard to yard, and will require some duplication of functions. ADC developed RFPs and Project Descriptions may further define facility services and size requirements.

**2.1.5    PHYSICAL SECURITY:**  The facility shall be designed to withstand abuse, wear and tear, and require relatively low maintenance.  Physical security shall be installed as listed in sub-sections below.

**2.1.5.1    Perimeter Security:**  The facilities perimeter security is made up of integrated systems and will provide a relatively good barrier against escape.  The institutions perimeter system is designed such that inmates remain within the perimeter and that access by the general public is precluded except with proper authorization.  A four strand barb wire barrier fence shall serve as a delineation of prison property.  The barb wire fence shall have signage every 100 feet that indicates "**No Trespassing**".  The perimeter security fence shall be located a minimum of 300 feet from the prison property line.

**2.1.5.2    Fencing**  The perimeter fencing shall comply with Appendix III, Figure 1. The  perimeter fence shall be a 14 foot high looped top fence (3 foot overhang) with 6 feet of 1/4" security mesh on the inside of the upper portion of the looped top.  A single continuous row of 30" 5 point detainer hook and barb concertina razor ribbon shall be installed at the top of the fence.   Razor ribbon shall be secured in place by tying to the top tension wire. If the perimeter fence contacts a building, a 30" diameter section of 5 point detainer hook and barb razor ribbon shall be installed vertically at the intersection, on the yard side of the fence. The fence shall have a concrete anti-dig barrier footing 6" wide by 24" deep.  The bottom of the fence shall be secured by a (1-1/2" minimum) bottom rail secured to the concrete base by an anchor bolt or method approved by the Department.

- All fence ties shall be equally spaced (5 per 10' section at a minimum). Fence ties and bolts in areas that are in inmate access areas will be mechanically twisted and all straps and bolts shall be tack welded. This also applies to gates, which access those areas.

**2.1.5.3    Perimeter and Area Lighting:** Lighting on the perimeter shall be sufficient to visually detect movement.  Lighting on the vehicle gate and adjacent pedestrian gate shall be at least 5 foot-candles and 2-foot candles on the pedestrian gate and entry to the Administration Building maintained, as documented by an independent, qualified source. Foot-candles listed are minimum maintained.  Light poles shall be kept a minimum of 10 feet clear from the inner-most portion of the perimeter fence.

- Minimum facilities shall have a perimeter lighting zone with a two foot candle level.  Perimeter zone shall be defined as the area 40' inside the fence to 20' outside the fence. Area lighting is defined as the remainder of the area within the facility from the 40 foot perimeter zone inside dimension and shall be maintained at 0.5 foot candle.

**2.1.5.4    CCTV Systems:** Closed Circuit Surveillance Cameras shall be positioned to monitor areas of the yard that are not directly visible from the office station in the Administration Building.  These cameras shall be monitored from the Facility Control Room.  Recording is optional for interior cameras

**2.1.5.5    Sand Trap:** Outside and adjacent to the perimeter fence, a sand trap shall be constructed and maintained to provide an indication of escape path or fence tampering from outside sources.  The trap shall be 15 feet in width and sloped to provide drainage without erosion of sand material.

**2.1.5.6    Perimeter Road:** A paved perimeter road shall be constructed around the entire Complex facility.  The road surface shall be 12 feet wide and have shoulder widths of 6 feet.  Turn around shall be provided at each turn in the road and at intervals of 400 yards. A perimeter road is not required on an individual unit within the complex.  A perimeter road shall be required at a unit or stand-alone facility that is not in close proximity to a complex.

**2.1.5.7    Sally ports:** Sally ports for vehicles and or pedestrians are required in a Minimum facility.

**2.1.5.8 Pedestrian Entry Gate:** There shall be a single point of controlled entry into a Minimum facility or unit. The pedestrian entry gate shall be equipped with a remotely controlled lock on a swing gate. These gates shall be controlled from the facility or unit control room.

**2.1.5.9 Vehicle Gate:** There shall be one vehicle and pedestrian access on the Perimeter Security Fence per facility. Vehicle gates shall be 14' wide and shall be electrically operated from the Main Officer Station and both gates shall be monitored by a TV camera with a Remote Recording monitored from the Administration Building Officer Station.

- Provide an Intercom box at both the vehicle gate and the pedestrian gate to the Administration Building Officer Control Room.

**2.1.5.10 Interior Security:** A combination of systems can be utilized to create and secure functions within the perimeter of the facility. The following is the minimum requirements for systems to be utilized.

**2.1.5.11 Fencing:** Interior fencing shall be provided to define the limits of the inmate yards and provide separation of inmate activity areas. There shall be an interior fence connecting the fronts of all buildings surrounding the yard to provide a complete barrier and define a "No-Man's" Zone behind the buildings. Interior fencing for Minimum yards shall be a straight vertical 10' high fence with one coil of 30" 5 point detainer hook and barb concertina razor ribbon mounted at the top of the fence.

- Outdoor visitation space shall be enclosed with a 10 foot high (minimum) fence with one coil of 30" 5 point detainer hook and barb concertina razor ribbon mounted at the top of the fence.

**2.1.5.12 Closed Circuit Surveillance Cameras:** Shall be positioned to monitor all areas of the yard that are not directly visible from the Officer Station in the Administration Building. These cameras shall be monitored from the Facility Control. Recording is optional for interior cameras.

## 2.2 BUILDING REQUIREMENTS

**2.2.1 HOUSING:** Minimum Custody inmates shall be housed in dormitory style "R" occupancy buildings in Pods of 100 inmates maximum. Optimal number of beds per pod/housing unit will be based on sound correctional practice, which ensures the safety of staff and inmates as well as effective security. The housing unit shall have an officer station for direct supervision, it shall be elevated 2' and located against the wall at the front of each pod. it shall have 2 access points with dutch type doors installed at each capable of observing no more than 2 pods of 100 inmates. Pods in dormitories shall be divided from other adjacent Pods by aisles that are 6 feet minimum width. Buildings shall be constructed to meet "R" occupancy requirements. Exit and entry doors shall be lockable with alarmed emergency egress.

**2.2.1.1 AREA REQUIREMENTS**

**2.2.1.1.1   Pod Area:** Housing unit pods shall be developed to house up to a maximum of 100 inmates and have only 2 pods in one area visible from the Officers' station. . Movement between pods shall be restricted by an electronically and manually operated door or gate. Each inmate shall be provided with an individual living space with a gross area of no more than 40 S.F. A diagram of the approved living unit can be found in Appendix IV, Figure 1. In addition to the individual living space, an area shall be provided for code required circulation and access to toilet and shower areas. No aisles shall be less than 48" in width.

**2.2.1.1.2   Hygiene Areas:** Accessible from each pod shall be a hygiene area(s) equipped with toilets, shower, lavatories, and urinals (male facilities). Toilets and showers shall be provided at a ratio of 1 per 8 inmates. Lavatories shall be provided at a ratio of 1 per 12 inmates. Each hygiene area shall be equipped with at least two ADA compliant accessible toilets, lavatories and showers. In pods with 100 inmates showers and toilets may be limited to 12 each and lavatories may be limited to 8 each. Urinals may replace 1/3 of the required toilets. At least one of the urinals shall be installed in compliance with ADA accessible standards.

- Toilet paper holders, seat cover holders and soap dispensers are not required in these areas. A shelf in which to place toilet paper will be installed at each toilet area.

- A janitor's closet in close proximity to or within the shower and toilet area shall be provided and equipped with a mop sink and mop rack. A faucet with tempered hot and cold water shall be provided for filling of buckets.

**2.2.1.1.3   Support Areas:** Within each housing building, support area for property, equipment and cleaning supplies storage shall be provided. Storage shall be provided based on the number of inmates housed and shall be a minimum of 100 s.f. and a maximum of 300 s.f. Ceilings in support areas shall be limited to 10 feet in height or less.

**2.2.1.1.4   Program Areas:** Each housing building shall have area(s) dedicated for multi-purpose program functions. Space shall be provided based on 4 s.f. per inmate with a minimum room size of 250 s.f. Multi-purpose areas shall be observable from the housing control room. Program area shall be separated from living area to provide acoustical separation.

**2.2.1.1.5   Officer Station:** Each housing building shall be equipped with an officer station, positioned to allow direct vision into each pod's living area, hygiene area, and program area(s). The officer station shall not be excessive in size, approximately 12 ft x 12 ft it shall be elevated 2' and located against the wall at the front of each pod. it shall have 2 access points with dutch type doors installed at each with one opening into it; if designed on an exterior wall two openings may be provided to access the work area, and counter space with lockable drawers and storage compartments. Designed with walls and counters 48 inches high. This allows full vision of all inmate living areas, and other support and hygiene areas.

- If it is determined that a control room is necessary, it will comply with the

requirements of Section 1.6.19.1.3 of this Standard. Each officer station shall have an adjacent toilet room, which can be used by other staff.

- The Officer's Station in Minimum housing can be accessed from inmate occupied areas and is not an enclosed space.

**2.2.1.1.6    Recreation Areas:** No dedicated indoor recreation area is required within the Minimum units if built at an altitude less than 5000 ft above sea level.

### 2.2.1.2    FF&E/Detention Equipment/Special Systems

**2.2.1.2.1    Pod Area:** Individual inmate living areas furniture shall be manufactured by ACI in accordance with diagrams shown in Appendix IV, Figure 1. At least two living spaces in each 100 bed pod shall be designed to provide ADA required accessibility. An additional 6" shall be provided between the bed and the wardrobe unit to provide a 36" clearance. All bolts securing furniture to the floor shall be tack welded.

- Each pod shall be equipped with a gas drop port near the entry to the shower area. The port is utilized by officers on the roof. The port shall extend from 6" above the roof to the ceiling of the dayroom. No other detention equipment is required in the pod areas.

- Each pod shall be equipped with remote lighting control, controlled from the electrical closet immediately adjacent to this living area. The toilet area and dayroom space shall be controlled by different switches. Breaker shall not be utilized for switching.

Each inmate living space shall be equipped with a single duplex power outlet and an MATV outlet, complete with cable system. Cover plates for electrical and cable TV outlets shall be equipped with security type screws.

The facility shall have installed a "collect only" telephone system, with a mechanism to monitor and record conversations. There shall be a minimum of one phone for every 15 inmates located in a position where staff can observe phones used by inmates

**2.2.1.2.2    Hygiene Areas:** Commercial toilet compartments shall be utilized. Each compartment shall be equipped with a toilet paper holder. Accessible toilet stall shall be equipped with grab bars.

- Hang-proof robe hooks shall be provided at each shower stall or in the drying area adjacent to showers. Robe hooks of a soft material shall be furnished between each lavatory, mirrors shall be furnished at each sink.

- Shower stalls shall be equipped with shower curtains with ceiling mounted tracks, mesh top section down to 60" above the floor, and opaque curtain down to 18" above the floor. ADA accessible showers shall be equipped with grab bars and folding seat. Wheel-in accessible showers 30" x 60" will not require a seat. Accessible showers shall be equipped with a removable, flexible and

hand held shower hose and head. Access panels in shower areas are stainless steel. Shower floor must not hold water; the floor is to slope to drain.

**2.2.1.2.3    Support Areas:** Storage rooms shall be equipped with high security grade commercial locks and at a minimum a solid wood door. A 5"x24" view panel shall be provided in the door to allow observation of the room by security staff.

**2.2.1.2.4    Program Areas:** Multi-purpose program areas shall be equipped with MATV system cable and adequate electrical outlets.

**2.2.1.2.5    Officer Station:** Adequate working surface space shall be provided to accommodate two officers, phone system, radios and writing materials.

- Officer station shall be equipped with radio, phone or intercom systems to allow communication with facility or unit control. Installation of a 1-1/2" conduit with weather head through the roof of the building will be required for a radio antenna.

**2.2.2    FACILITY/UNIT CONTROL:**    Unit or Facility Control is responsible for monitoring activities of the facility complex or unit. In a standalone facility, this control position will also be responsible for monitoring all perimeter activities and systems. Main control rooms shall be constructed to provide view of all areas controlled. Security frames shall be 12 Gauge Steel with 12 Gauge Face sheets.

**2.2.2.1    AREA REQUIREMENTS:**

**2.2.2.1.1    Work Areas:** Unit or Facility control rooms shall be designed to allow for three staff working at one time. All support functions shall be accessible without leaving the control room. Approximate area for a central control room shall be 225 s.f.

**2.2. 2.1.2    Hygiene Areas:** The Main control room officers shall be provided with access to a wash basin and toilet. A procedure shall be established to accommodate staff use of restroom facilities, if there are no facilities directly accessible to the control center.

**2.2.2.1.3    Support Areas:** In a Stand Alone (not within the complex) Level 2 Facility a secure room shall be provided for the storage and distribution of DART equipment. The room or areas shall have controlled access, electronic monitoring, and be observable from Main Central Control Room.

- Access to a control room shall be through a secure vestibule. The vestibule may serve as controlled access to other facility areas as well as the control room.

**2.2.2.2    FF&E/Detention Equipment/Special Systems**

**2.2.2.2.1    Work Areas:** The Officer Station shall be equipped with built-in millwork to accommodate control equipment and provide adequate writing surfaces

for all staff working the control room and storage of miscellaneous control equipment such as radios, chargers, phones, facility computers and procedure manuals. Space should be provided for incorporation of an under counter refrigerator, filing cabinet and a coffee maker.

Special systems for the Officer Station shall include:
- Security Control systems including door controls, intercom, camera and inmate tracking systems.
- Fire alarm monitoring equipment.
- Phone system
- Radio System

**2.2.3** **YARD CONTROL:** Each facility or unit shall have a centralized control and observation post, located in the Administration building, which affords observation of all yard areas. The room is to be located to view both inmate recreation areas and all housing entry doors.

### 2.2.3.1 AREA REQUIREMENTS:

**2.2.3.1.1** **Control Areas:** The observation posts shall be a minimum of 100 s.f.

**2.2.3.1.2** **Support Areas:** An enclosed room with locking door shall be provided for enclosure of control equipment.

### 2.2.3.2 FF&E/Detention Equipment/Special Systems

**2.2.3.2.1** **Control Areas:** Built-in millwork shall be provided for installation of control panels and observation of CCTV Monitors and gate controls.

- Detention equipment shall include a pass drawer to each yard and speaking devices to each yard.

**Special systems shall include:**

- Intercom
- CCTV
- Radio Systems

**2.2.4**     **COMMISSARY:** The commissary will provide inmates access to goods and supplies. The commissary shall be placed on each yard and roll up doors shall be observable by yard control. Commissary shall have a roll up delivery door to the service yard. Commissary walls shall extend to the roof deck and be reinforced with security steel mesh.

**2.2.4.1**     **AREA REQUIREMENTS:**

**2.2.4.1.1**     **Commissary Areas:** A minimum of 960 s.f. of space shall be provided for this function.

**2.2.4.1.2**     **Hygiene Areas:** Staff and inmates shall use the adjacent toilet facilities.

**2.2.4.2**     **FF&E/Detention Equipment/Special Systems**

**2.2.4.2.1**     **Commissary Areas:** Built-in millwork counter top shall be provided in the commissary area for assembly of inmate orders, free standing work table and workstation furniture. Refrigerators and freezers as required.

- Detention equipment shall consist of a security roll up door and pass counter. Rooms shall be equipped with 12 gauge security doors and frames with detention hardware.

**2.2.5**     **WORK BASED EDUCATION:** In institutions offering work based educational training programs, classrooms are designed as multi-purpose rooms to offer academic and/or specific training programs, as well as use by various religious groups. 10' wide by 14' high roll up doors shall be included in design for the movement of raw and finished materials. Work based education areas shall be adjacent to the service yard with roll-up doors opening onto service yard. Clearances within the building shall be maintained at 14 ft. Lighting levels in the work based education training areas shall be maintained at 50 ft. candles. Natural lighting shall be provided in work shop areas.

**2.2.5.1**     **AREA REQUIREMENTS:** Provide a minimum of 10,000 s.f. for Work Based Educational areas and a minimum of 10,000 s.f. for ACI Industrial areas. Classrooms shall be 750 s.f. and contain seating and tables for a maximum of 25 inmates.

**2.2.5.1.1**     **Office/Work Areas:** Staff offices shall be provided with a clear, unobstructed view of work shops and shall have 50 ft. candle maintained level of illumination.

**2.2.5.1.2**     **Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

**2.2.5.1.3**     **Support Areas:** A minimum of 300s.f. for storage areas shall be provided for materials and tools for each 10,000 s.f. of work based education space. Secure storage shall be provided, if necessary.

**2.2.5.2    FF&E/Detention Equipment/Special Systems**

**2.2.5.2.1    Office/Work Areas:** Furniture requirements shall be required by the program provided. Windows to classroom offices or work based educational areas that face onto the yard shall be protected by bar grills.

**2.2.5.2.2    Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates in each work based educational area or in a common area to support classroom activities.

**2.2.6    DINING/KITCHEN:** Dining shall be provided in a dining area. If inmates receive food directly from a kitchen serving line, a blind serving port shall be utilized. The movement of inmates in the serving line shall be controlled by railing to reduce the problem of inmates returning for additional servings. Dining halls shall be designed to serve a maximum of 500 inmates based on serving requirements set forth in **2.2.6.1.1.**

**2.2.6.1    AREA REQUIREMENTS**

**2.2.6.1.1    Dining Areas:** Dining areas shall be sized to complete feeding of all meals in one and one half hours with a maximum of four turns, and 20 minutes per turn. The minimum square footage requirement shall be calculated at 7s.f./inmate for dining room seating area.

**2.2.6.1.2    Hygiene Areas:** Staff and inmates shall use the adjacent toilet facilities.

**2.2.6.2    FF&E/Detention Equipment/Special Systems**

**2.2.6.2.1    Dining Areas:** Dining tables shall be constructed of moveable 4-man tables of sturdy construction or 4 man permanently installed tables. Food line shall be separated from main dining area by a 42" high guard rail. Dining areas shall be equipped with a chemical agent drop port from the roof.

### 2.2.7      FINISH SCHEDULE

#### Legend:        Floors

CAR ............. Carpet
CT................. Ceramic Tile
SC................. Sealed Concrete
VCT.............. Vinyl Composition Tile
SC................. Sealed Concrete

#### Legend:        Base

CT................. Ceramic Tile
VIN............... Vinyl Base

#### Legend:        Walls

CONC............ Concrete or masonry block
GYP.............. Gypsum Board
FRP............... Fiberglass Reinforced Panels
PE................. Paint Enamel
EXP .............. Exposed

#### Legend:        Ceiling

AP................. Acoustical Panel
EXP .............. Exposed
GYP.............. Gypsum Board

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|------|-------|------|-------|---------|-----|
| **Facility Control** | | | | | |
| Office | VCT OR SC | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | CAR | VIN | GYP/PE | AP | 9'-0" |
| Toilet | CT | CT | CT | GYP | 8'-0" |
| Support | CAR | VIN | GYP/PE | GYP | 9'-0" |
| **Commissary** | | | | | |
| Commissary | SC | | CONC/PE | EXP | 9'-0" |
| **Dining** | | | | | |
| Dining | SC | VIN | CONC GYP/PE | EXP | 12'-0" |
| **Housing** | | | | | |
| Pod/ Day Room | SC | | GYP / RFP | AP or EXP | 15'-0" |
| Toilets/Showers | CT | CT | CT | GYP | 10'-0" |
| Support | SC | | GYP RFP | GYP | 9'-0" |
| Program | VCT | | GYP | AP | 9'-0" |
| Officer Station | SC | VIN | GYP/PE | AP or EXP | 8'-0" |
| **WORK BASED EDUCATION** | | | | | |
| Office | VCT | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | SC | | EXP or GYP/FRP | EXP | |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | | GYP | EXP | 8'-0" |
| **Yard Control** | | | | | |
| Control | VCT | VIN | GYP | AP | 8'-0" |
| Toilet | CT | CT | CT | GYP | 8'-0" |
| Support | VCT | VIN | GYP | EXP | 8'-0" |

# Part 3 – Medium Security Facility Requirements

## 3.1 General Facility Requirements

3.1.1 Facility Description ................................................................ 2
3.1.2 Facilities Support Services (Complex Level) ...................... 2
3.1.3 Facilities Support Services (Stand Alone Facilities) ........... 2
3.1.4 Facility Size Requirements ................................................. 2
3.1.5 Physical Security ................................................................ 2

## 3.2 Building Requirements

3.2.1 Housing .............................................................................. 5
3.2.2 Facility/Unit Control ......................................................... 7
3.2.3 Yard Control ...................................................................... 8
3.2.4 Commissary ....................................................................... 9
3.2.5 Work Based Education ....................................................... 9
3.2.6 Dining/Kitchen .................................................................. 10
3.2.7 Finish Schedule ................................................................. 11

# PART 3     MEDIUM SECURITY CUSTODY FACILITY REQUIREMENTS

## 3.1     GENERAL FACILITY REQUIREMENTS

**3.1.1**     **FACILITY DESCRIPTION:** A Medium facility or unit is constructed to house inmates whose public risk is medium. These inmates present a moderate risk to the public community should escape occur from custody. The facility should be capable of restricting inmate movement within the facility and must be constructed to a I-3 condition 2 occupancy standard per the IBC. A Medium Custody facility could be a part of a larger complex of prison units and as such will be referred to as a Medium Custody unit. Support functions vary if the prison is stand alone or part of a larger complex.

**3.1.2**     **FACILITIES SUPPORT SERVICES (COMPLEX LEVEL):** If a Medium prison is constructed as a part of a larger complex it can be expected that the unit will be supported by complex wide functions. Warehousing, maintenance, medical services, pharmacy, vehicle maintenance and complex administration are but a few of the centralize functions. Perimeter patrol and monitoring of critical systems such as water supply, wastewater systems and emergency power generation, will be provided at a complex level.

**3.1.3**     **FACILITIES SUPPORT SERVICES (STAND ALONE FACILITIES):** If a prison is stand alone, the support functions will become a part of the facility, and must be designed and constructed in accordance with the provisions of these standards. Some services may be furnished from other ADC facilities and if so the facility shall take into account those reduced service requirements.

**3.1.4**     **FACILITY SIZE REQUIREMENTS:** The maximum inmate population of a Medium unit is 1,000 beds. Physical separation of inmate populations within a unit may be required depending on such circumstances as facility design, staffing patterns, and operational plan. At minimum a 1,000 bed unit <span style="color:red">must</span> be designed to divide the recreation area into two 500 inmate yards. The primary determining objective shall be the need for sound correctional practice, which ensures the safety of staff and inmates as well as effective security. Support and program functions should be designed to minimize inmate movement from yard to yard, and will require some duplication of functions. ADC developed RFP's and Project Descriptions may further define facility services and size requirements.

**3.1.5**     **PHYSICAL SECURITY:** Due to the moderate level of escape risk of Medium Custody inmates, the facility is designed with a moderate level of physical security. The facility shall be designed to withstand abuse, wear and tear, and require relatively low maintenance. Physical Security shall be installed as listed in sub-sections below.

**3.1.5.1**     **Perimeter Security:** The facilities' perimeter security is made up of integrated systems and will provide a good barrier against escape. The institution's perimeter system is designed such that inmates remain within the perimeter and that access by the general public is precluded except with proper authorization. A four strand barb wire barrier fence shall serve as a delineation of prison property. The barb wire fence shall have signage every 100 feet that indicates **"No Trespassing"**. The perimeter security fence shall be located a minimum of 300 feet from the prison property line.

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 260 of 380

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

**3.1.5.1.1    Fencing:** The perimeter fencing shall comply with Appendix III, Figure 2.  A Medium facility shall have a single perimeter fence which serves as a physical containment barrier.  The perimeter fence shall be 14 foot high looped top fence with 6 feet of 1/4" security mesh on the inside of the upper portion of the looped top.  The perimeter fence shall contain one 30" diameter 5 point detainer hook and barb concertina razor ribbon row at the top and three rows at the bottom, one directly above the other starting at grade.  If the perimeter fence contacts a building, a 30" diameter section of 5 point detainer hook and barb razor ribbon shall be installed vertically at the intersection, on the yard side of the fence.  The fence shall have a concrete anti-dig barrier footing 6" wide by 24" deep.  The bottom of the fence shall be secured by a (1-1/2" minimum) bottom rail secured to the concrete base by a anchor bolt or method approved by the Department.

- All fence ties shall be equally spaced (5 per 10' section at a minimum).  Fence ties shall be mechanically twisted and all straps and bolts in areas that may permit inmate access shall be tack welded.    This also applies to gates, which access those areas.

- A single continuous row of 30" 5 point detainer hook and barb concertina razor ribbon shall be installed at the top of the fence and 3 rows of 30" diameter 5 point detainer hook and barb razor ribbon shall be stacked vertically on the yard side base of the fence beginning at grade and fastened securely to the fence with metal ties spaced every 3 feet   Top of fence Razor ribbon shall be secured in place by tying to the top tension wire.

**3.1.5.1.2    Detection Systems:** Electronic detection system will be placed as indicated in Figure 2, Appendix III in the form of ported cable.  The alarm system shall be broken up into zones with zone links of approximately 300 feet.  An alarm condition will trigger the quartz lights associated with the alarmed zone and one lighting zone adjacent to either side of the alarmed zone.  Notification of an alarm condition will be received by the unit control room.

**3.1.5.1.3    Perimeter and Area Lighting:** Lighting on the perimeter shall be sufficient to visually detect movement.  Lighting on the vehicle sally port is at least 5 foot-candles and 2-foot candles to the pedestrian sally port at the lowest level, as documented by an independent, qualified source.  Foot-candles listed are minimum maintained.  Light poles shall be kept a minimum of 10 feet clear from the inner-most portion of the perimeter fence.  There shall be supplemental quartz light system outside the perimeter fence consisting of 1500 watt quartz fixtures or metal halide lights of a wattage to provide the required foot-candles mounted on 10 foot high poles, spaced 75 feet on center and installed 5 feet clear of the exterior perimeter fence.

**3.1.5.1.3.1    Medium** facilities shall have perimeter lighting zone with a two foot candles level.  Perimeter zone shall be defined as the area 40' inside the fence to 20' outside the fence.

**3.1.5.1.3.2**     Area lighting is defined as the remainder of the area within the facility from the 40 foot perimeter zone inside dimension and shall be maintained at one foot candle.

**3.1.5.1.4     CCTV Systems:** Closed Circuit Television cameras shall be installed to monitor both the pedestrian and vehicle sally ports.  Cameras shall be monitored from the facility control room.  Recording of the cameras is optional but highly recommended.  Closed circuit surveillance cameras shall be positioned to monitor any area of the yard that is not directly visible from a control room.  These cameras shall be monitored from facility control.  Recording is optional for interior cameras.

**3.1.5.1.5     Sand Trap:** Outside and adjacent to the perimeter fence, a sand trap shall be constructed and maintained to provide an indication of escape path or fence tampering from outside sources.  The trap shall be 15 feet in width and sloped to provide drainage without erosion of sand material.

**3.1.5.1.6     Perimeter Road:** A paved perimeter road shall be constructed around the entire Complex facility.  The road surface shall be 12 feet wide and have shoulder widths of 6 feet.  Turn around shall be provided at each turn in the road and at intervals of 400 yards. A perimeter road is not required on an individual unit within the complex.  A perimeter road shall be required at a unit or stand-alone facility that is not in close proximity to a complex.

**3.1.5.1.7     Sally ports:** Sally ports for vehicles and or pedestrians are required in a Medium Facility.

**3.1.5.1.8     Pedestrian Entry Gate:** There shall be a single point of controlled entry into a Medium facility or unit.  The pedestrian entry gate shall be equipped with a remotely controlled lock on a swing gate.  These gates shall be controlled from the facility or unit control room.

**3.1.5.1.9     Vehicle Gate:** There shall be one vehicle and pedestrian access on the Perimeter Security Fence per facility.  Vehicle gates shall be 14' wide and shall be electrically operated from the Main Officer Station or sally port building and both gates shall be monitored by a TV camera with a Remote Recording monitored from the Administration Building Officer Station.

- Provide an Intercom box at both the vehicle gate and the pedestrian gate to the Administration Building Officer Control Room.

**3.1.5.2     Interior Security:** A combination of systems can be utilized to create and secure functions within the perimeter of the facility.  The following is the minimum requirements for systems to be utilized.

**3.1.5.2.1    Fencing:**  Interior fencing shall be provided to define the limits of the inmate yards and provide separation of inmate activity areas.  There shall be an interior fence connecting the fronts of all buildings surrounding the yard to provide a complete barrier and define a "**No-man's Zone**" behind the buildings.  Interior fencing for Medium Custody yards shall be a straight vertical 10' high fence with one coil of 30" 5 point detainer hook and barb concertina razor ribbon mounted on top.  No-climb (1/4" hardware cloth) shall be installed for a distance of 6' on both sides of the interior fence, where an interior fence contacts the perimeter fence and at building.

Outdoor visitation space shall be enclosed with a 10 foot high (minimum) fence and 1 coil of 30" 5 point detainer hook and barb concertina razor ribbon mounted around the top of the enclosure.

## 3.2    BUILDING REQUIREMENTS

**3.2.1**    Medium Custody inmates may be housed in dormitory or cell style buildings. Optimal number of beds per pod/housing unit will be based on sound correctional practice, which ensures the safety of staff and inmates as well as effective security.  The housing unit shall have a control room per section 1.6.19.1.3, centrally located, capable of directly observing no more than 6 pods within a maximum of a 180 degree field of view. Pod size shall be limited to a maximum of 50 inmates per pod in dormitory style buildings. No more than 200 inmates shall be monitored by each control room officer for dormitory style buildings. Buildings shall be constructed to meet an I-3 condition 2 occupancy requirement. Exit and entry doors into the Pod areas shall be lockable. Movement between pods shall be restricted by an electronically and manually operated door or gate. Building may be constructed of masonry, concrete (pre-cast or cast-in-place), pre-engineered metal building or other materials that meet the above and code requirements.

### 3.2.1.1    AREA REQUIREMENTS

**3.2.1.1.1    Pod Area:** Each inmate shall be provided with an individual living space with a gross area of 40 s.f.  A diagram of the approved living unit can be found in Appendix IV, Figure 1.  In addition to the individual living space, area shall be provided for code required circulation and access to toilet and shower areas.  No aisles shall be less than 48" in width.

**3.2.1.1.2    Hygiene Areas:** Accessible in each pod shall be a hygiene area(s) equipped with toilets, shower, lavatories, and urinals (male facilities). Toilets and showers shall be provided at a ratio of 1 per 8 inmates.  Lavatories shall be provided at a ratio of 1 per 12 inmates.  Each hygiene area shall be equipped with at least one ADA compliant accessible toilet, lavatory and shower. Urinals may replace 1/3 of the required toilets.  At least one of the urinals shall be installed in compliance with ADA accessible standards. Toilet paper, toilet seat cover, and soap dispensers are not required to be installed in these hygiene areas. A shelf to hold toilet paper will be installed at each toilet.

- A space within or in close proximity to the shower and toilet area shall be

provided and equipped with a mop sink and mop rack. A faucet with tempered hot and cold water shall be provided for filling of buckets.

**3.2.1.1.3  Support Areas:** Within each housing building, support area for property, equipment and cleaning supplies storage shall be provided. Storage shall be provided based on the number of inmates housed and shall be calculated at 8 cu. ft. per inmate. Ceilings in support areas shall be limited to 10 feet in height.

**3.2.1.1.4  Program Areas:** Each housing building shall have area(s) dedicated for multi-purpose program functions. Space shall be provided based on 4 s.f. per-inmate with a minimum room size of 250 s.f. Multi-purpose areas shall be observable from the housing Officer Station. Program areas shall be separated from living area to provide acoustical separation.

**3.2.1.1.5  Security and Control Areas:** Each housing building shall be equipped with a control room per section 1.6.19.1.3, positioned to allow direct vision into each pods living, hygiene and program area(s). The control room shall not be excessive in size, approximately 12 ft x 12 ft and counter space with lockable drawers and storage compartments. Designed with counters on walls 48 inches high. The control room will comply with the requirements of 1.6.19.1.3.

- The control room in Medium Custody housing can be accessed from inmate occupied areas.

**3.2.1.1.6  Recreation Areas:** No dedicated indoor recreation area is required within the Medium housing units.

### 3.2.1.2    FF&E/Detention Equipment/Special Systems

**3.2.1.2.1  Pod Area:** Individual inmate living areas furniture shall be manufactured by ACI in accordance with diagrams shown in Appendix IV, Figure 2. At least two (2) living spaces in each 50 bed pod shall be designed to provide ADA required accessibility. An additional 6" shall be provided between the bed and the wardrobe unit to provide a 36" clearance.

- Tack weld all bolts securing the furniture to the floor within inmate accessible areas.

- Each pod shall be equipped with a gas drop port near the entry to the shower area. The port is utilized by officers on the roof. The port shall extend from 6" above the roof to the ceiling of the dayroom. No other detention equipment is required in the pod areas.

- Each pod shall be equipped with remote lighting control, controlled from the adjacent electrical closet.

- The toilet area and dayroom space shall be controlled by different switches. Breaker shall not be utilized for switching.

- Each inmate living space shall be equipped with a single duplex power outlet

and an MATV outlet, complete with cable system. Cover plates for electrical and cable TV outlets shall be equipped with security type screws.

- The prison shall have installed a **collect only** telephone system, with a mechanism to monitor and record conversations. There shall be a minimum of one phone for every 15 inmates located in a position where staff can observe phones used by inmates.

**3.2.1.2.2 Hygiene Areas:** Each toilet shall be equipped with Commercial toilet partitions. Each compartment shall be equipped with a toilet paper holder. Accessible toilet stall shall be equipped with grab bars.

- Hang-proof robe hooks of a soft material shall be provided at each shower stall or in the drying area adjacent to showers. Robe hooks shall be furnished between each lavatory.

- Mirrors shall be furnished at each sink.

- Shower stalls shall be equipped with shower curtains with ceiling mounted tracks, mesh top section down to 60" above the floor, and opaque curtain down to 18" above the floor. ADA accessible showers shall be equipped with grab bars and folding seat. Wheel-in accessible showers 30" x 60" will not require a seat. Accessible showers shall be equipped with a removable, flexible and hand held shower hose and head. Access panels in shower areas are stainless steel.

**3.2.1.2.3 Support Areas:** Storage rooms shall be equipped with high security grade commercial locks and at a minimum a solid wood door. A 5" x 24" view panel shall be provided in the door to allow observation of the room by security staff.

**3.2.1.2.4 Program Areas:** Multi-purpose program areas shall be equipped with MATV system cable and adequate electrical outlets.

**3.2.1.2.5 Security and Control Areas:** Control consoles shall be installed in built-in millwork or electronic equipment enclosures. Adequate working surface space shall be provided to accommodate two officers, phone system, radios and writing materials.

- Control room shall be equipped with radio, phone or site intercom systems to allow communication with facility or unit control. Installation of a 1-1/2" conduit with weather head through the roof above the officer station will be required for radio antenna.

**3.2.2 FACILITY/UNIT CONTROL:** Unit or Facility Control is responsible for monitoring activities of the facility (standalone) or unit (complex). In a standalone facility, this control position will also be responsible for monitoring all perimeter activities and systems. Control rooms shall be constructed to provide view of all areas controlled. Wall shall be reinforced steel security mesh. Security frames shall be 12 gauge Steel with 12 gauge face sheets.

### 3.2.2.1 AREA REQUIREMENTS

**3.2.2.1.1 Work Areas:** Unit or Facility control rooms shall be designed to allow for three staff working at one time. All support functions shall be accessible without leaving the control room. Approximate area for a central control room shall be 225 s.f.

**3.2.2.1.2 Hygiene Areas:** The control room officers shall be provided with access to a wash basin and toilet. A procedure shall be established to accommodate staff use of restroom facilities, if there are no facilities directly accessible to the control center.

**3.2.2.1.3 Support Areas:** A secure room shall be provided for the storage and distribution of DART equipment. In a complex or stand-alone facility the room or areas shall have controlled access, electronic monitoring, and be observable from Main central control.

- Access to a control room shall be through a secure vestibule. The vestibule may serve as controlled access to other facility areas as well as the control room

### 3.2.2.2 FF&E/Detention Equipment/Special Systems

**3.2.2.2.1 Work Areas:** The officer station shall be equipped with built-in millwork to accommodate control equipment and provide adequate writing surfaces for all staff working the control room and storage of miscellaneous control equipment such as radios, chargers, phones, facility computers and procedure manuals. Space should be provided for incorporation of an under counter refrigerator, filing cabinet and a coffee maker.

Special systems for the officer station shall include:
- Security Control systems including door controls, intercom, camera and inmate tracking systems.
- Fire alarm monitoring equipment.
- Phone system
- Radio System

### 3.2.3 YARD CONTROL: Each facility or unit shall have a centralized control and observation post, located in the Administration building, which affords observation of all yard areas. The room is to be located to view both inmate recreation areas and all housing entry doors.

### 3.2.1.1 AREA REQUIERMENTS

**3.2.3.1.1 Control Areas:** The observation posts shall be a minimum of 100 s.f.

**3.2. 3.1.2 Support Areas:** An enclosed room with locking door shall be provided for enclosure of control equipment.

### 3.2.3.2    FF&E / Detention Equipment / Special Systems.

**3.2.3.2.1    Control Areas:**  Built-in millwork shall be provided for installation of control panels and observation of CCTV Monitors and gate controls.

- Detention equipment shall include a pass drawer to each yard and speaking devices to each yard.

- Special systems shall include intercom, CCTV, and radio systems.

**3.2.4    COMMISSARY:**  The commissary will provide inmates access to goods and supplies on a controlled basis.  Delivery method for commissary goods is optional for Medium Custody facilities.  Pre-bagged and delivered to housing areas is an option to a yard based pick-up commissary.  If yard pick-up is utilized, the commissary shall be placed on each yard and roll up doors shall be observable by yard control.  Commissary shall have a roll up delivery door to the service yard.  Commissary walls shall extend to the roof deck and be reinforced with security steel mesh.

### 3.2.4.1    AREA REQUIREMENTS:

**3.2.4.1.1    Commissary Areas:**  A minimum of 960 s.f. of space shall be provided for this function.

**3.2.4.1.2    Hygiene Areas:**  Staff and inmates shall use the adjacent toilet facilities.

### 3.2.4.2    FF&E/Detention Equipment/Special Systems

**3.2.4.2.1    Commissary Areas:**  Built-in millwork counter in commissary area for assembly of inmate orders, free standing work table and workstation furniture. Refrigerators and freezers as required.

- Detention equipment shall consist of a security roll up door and pass counter. Rooms shall be equipped with 12 gauge security doors and frame and detention hardware.

**3.2.5    WORK BASED EDUCATION:**  In institutions offering work based educational training programs, classrooms are designed as multi-purpose rooms to offer academic and/or specific training programs, as well as use by various religious groups. 10' wide by 14' high roll up doors shall be included in design for the movement of raw and finished materials.  Work based education areas shall be adjacent to the service yard with roll-up doors opening onto service yard.  Clearances within the building shall be maintained at 14 ft.  Lighting levels in the work based education training areas shall be maintained at 50 ft. candles. Natural lighting shall be provided in work shop areas.

**3.2.5.1    AREA REQUIREMENTS:**  Provide a minimum of 10,000 s.f. for Work Based Educational areas and a minimum of 10,000 s.f. for ACI Industrial areas. Classrooms shall be 750 s.f. and contain seating and tables for a maximum of 25 inmates.

**3.2.5.1.1** **Office/Work Areas:** Staff offices shall be provided with a clear, unobstructed view of work shops.

**3.2.5.1.2** **Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

**3.2.5.1.3** **Support Areas:** A minimum of 300s.f. for storage areas shall be provided for materials and tools for each 10,000 s.f. of work based education space. Secure storage shall be provided, if necessary.

**3.2.5.2** **FF&E/Detention Equipment/Special Systems**

**3.2.5.2.1** **Office/Work Areas:** Furniture requirements shall be required by the program provided. Windows to classroom offices or work based educational areas that face onto the yard shall be protected by bar grills. Exit doors to service yards or no-man areas shall be alarmed

**3.2.5.2.2** **Hygiene Areas:** Toilets for use by inmates and staff shall be provided in each work based educational areas or in a common area to support classroom activities.

**3.2.6** **DINING/KITCHEN:** Dining shall be provided in a dining area. If inmates receive food directly from a kitchen serving line, a blind serving port shall be utilized. The movement of inmates in the serving line shall be controlled by railing to reduce the problem of inmates returning for additional servings. Dining halls shall be designed to serve a maximum of 500 inmates based on serving requirements set forth in 3.2.6.1.1.

**3.2.6.1** **AREA REQUIREMENTS:**

**3.2.6.1.1** **Dining Areas:** Dining areas shall be sized to complete feeding of all meals in one and one half hours with a maximum of four turns, and 20 minutes per turn. The minimum Square footage requirement shall be calculated at 7s.f./inmate for dining room seating area.

**3.2.6.1.2** **Hygiene Areas:** Staff and inmates shall use the adjacent toilet facilities for Dining Area. Separate toilet facilities shall be provided for staff and inmates within the Kitchen area.

**3.2.6.2** **FF&E/Detention Equipment/Special Systems**

**3.2.6.2.1** **Dining Areas:** Dining tables shall be constructed of moveable 4-man tables. Food line shall be separated from main dining area by a 32" high guard rail.

- Dining areas shall be equipped with a chemical agent drop port from the roof.

### 3.2.7 FINISH SCHEDULE

**Legend:** **Floors**

CAR ............. Carpet
CT.................. Ceramic Tile
SC.................. Sealed Concrete
VCT.............. Vinyl Composition Tile
SC.................. Sealed Concrete

**Legend:** **Base**

CT.................. Ceramic Tile
VIN............... Vinyl Base

**Legend:** **Walls**

CONC............ Concrete or masonry block
GYP.............. Gypsum Board
FRP............... Fiberglass Reinforced Panels
PE ................. Paint Enamel
EXP .............. Exposed

**Legend:** **Ceiling**

AP.................. Acoustical Panel
EXP .............. Exposed
GYP.............. Gypsum Board

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|---|---|---|---|---|---|
| **Facility Control** | | | | | |
| Office | VCT OR SC | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | CAR | VIN | GYP/PE | AP | 9'-0" |
| Toilet | CT | CT | CT | GYP | 8'-0" |
| Support | CAR | VIN | GYP/PE | GYP | 9'-0" |
| **Commissary** | | | | | |
| Commissary | SC | | CONC/PE | EXP | 9'-0" |
| **Dining** | | | | | |
| Dining | SC | VIN | CONC GYP/PE | EXP | 12'-0" |
| **Housing** | | | | | |
| Pod/ Day Room | SC | | GYP / RFP | AP or EXP | 15'-0" |
| Toilets/Showers | CT | CT | CT | GYP | 10'-0" |
| Support | SC | | GYP RFP | GYP | 9'-0" |
| Program | VCT | | GYP | AP | 9'-0" |
| Officer Station | SC | VIN | GYP/PE | AP or EXP | 8'-0" |
| **WORK BASED EDUCATION** | | | | | |
| Office | VCT | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | SC | | EXP or GYP/FRP | EXP | |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | | GYP | EXP | 8'-0" |
| **Yard Control** | | | | | |
| Control | VCT | VIN | GYP | AP | 8'-0" |
| Toilet | CT | CT | CT | GYP | 8'-0" |
| Support | VCT | VIN | GYP | EXP | 8'-0" |

## Part 4   Close Security Facility Requirements

## 4.1   General Facility Requirements

4.1.1   Facility Description ................................................................ 2
4.1.2   Facilities Support Services (Complex Level) ....................... 2
4.1.3   Facilities Support Services (Stand Alone Facilities) ............ 2
4.1.4   Facility Size Requirements .................................................. 2
4.1.5   Physical Security ................................................................. 2

## 4.2   Building Requirements

4.2.1   Housing ................................................................................ 5
4.2.2   Facility/Unit Control ........................................................... 7
4.2.3   Yard Control ........................................................................ 8
4.2.4   Commissary .......................................................................... 9
4.2.5   Work Based Education ....................................................... 10
4.2.6   Dining ................................................................................. 10
4.2.7   Finish Schedule .................................................................. 11

# PART 4      CLOSE SECURITY FACILITY REQUIREMENTS

## 4.1    GENERAL FACILITY REQUIREMENTS

**4.1.1**    **FACILITY DESCRIPTION:** A Close Security facility or unit is constructed to house inmates whose public risk is high. These inmates present a moderately high risk to the public should escape from custody occur. The facility should be capable of restricting inmate movement within the facility. A Close facility could be a part of a larger complex of prison units.. Support functions vary if the prison is stand alone or part of a larger complex.

**4.1.2**    **FACILITIES SUPPORT SERVICES (COMPLEX LEVEL):** If a Close facility is constructed as a part of a larger complex it can be expected that the unit will be supported by complex wide functions. Warehousing, maintenance, medical services, pharmacy, vehicle maintenance and complex administration are but a few of the centralize functions. Perimeter patrol and monitoring of critical systems such as water supply, wastewater systems and emergency power generation, will be provided at a complex level.

**4.1.3**    **FACILITIES SUPPORT SERVICES UNIT:** If a prison is stand-alone, the support functions will become a part of the facility, and must be designed and constructed in accordance with the provisions of these standards. Some services may be furnished from other ADC facilities, and if so the facility shall take into account those reduced service requirements.

**4.1.4**    **FACILITY SIZE REQUIREMENTS:** The maximum inmate population of a Level 4 unit is 1000 beds. Physical separation of inmate populations within a unit may be required depending on such circumstances as facility design, staffing patterns, and operational plan and at the minimum; an 1000 bed unit is to be designed to divide the recreation area into two 500 inmate yards. The primary determining objective shall be the need for sound correctional practice, which ensures the safety of staff and inmates as well as effective security. Support and program functions should be designed to minimize inmate movement from yard to yard, and will require some duplication of functions. ADC developed RFP's and Project Descriptions may further define facility services and size requirements.

**4.1.5**    **PHYSICAL SECURITY:** Due to the high level of escape risk of Close Custody inmates, the facility is designed with a high level of physical security. The facility shall be designed to withstand abuse, wear and tear, and require relatively low maintenance. Physical Security shall be installed as listed in the sub-sections below.

     **4.1.5.1**    **Perimeter Security:** The facilities perimeter security is made up of integrated systems and will provide a good barrier against escape. The institution's perimeter system is designed such that inmates remain within the perimeter and that access by the general public is precluded except with proper authorization. A four strand barb wire barrier fence shall serve as a delineation of prison property. The barb wire fence shall have signage every 100 feet that indicates "No Trespassing".The perimeter security fence shall be located a minimum of 300 feet from the prison property line.

**4.1.5.1.1    Fencing:** The perimeter fencing shall comply with Appendix III, Figure 3. A Level 4 facility shall have a double perimeter fence which serves as a physical containment barrier. An additional "**No-Man's Zone**" fence shall be provided consisting of a four foot, four stand barbed wire fence denoting the interior perimeter of the no-man zone. Both perimeter fences shall be 14 foot high looped top fence with 6 feet of 1/4" security mesh on the inside of the upper portion of the looped top. Both perimeter fences shall contain one 30" 5 point detainer hook and barb diameter concertina razor ribbon row at the top and three rows, one directly above the other starting at grade. If the perimeter fence contacts a building, a 30" diameter section of razor ribbon shall be installed vertically at the intersection, on the yard side of the fence. The fence shall have a concrete anti-dig barrier footing 6" wide by 24" deep. The bottom of the fence shall be secured by a (1-1/2" minimum) bottom rail secured to the concrete base by a anchor bolt or method approved by the Department.

- All fence ties shall be equally spaced (5 per 10' section at a minimum). Fence ties and bolts in areas that may permit inmate access shall be tack welded (e.g., exercise, work, trash etc.). Any fenced area that serves as a temporary inmate holding area (e.g., recreation, health unit, intake, transportation, detention unit holding areas, etc.) shall use permanent straps to attach fabric to poles which shall be bolted and tack welded. This also applies to gates, which access those areas.

**4.1.5.1.2    Detection Systems:** Electronic detection system will be placed as indicated in Figure 3, Appendix III. The alarm system shall be broken up into zones with zone links of approximately 300 feet. An alarm condition will trigger the quarts lights associated with the alarmed zone and one lighting zone adjacent to either side of the alarmed zone. Notification of an alarm condition will be received by the unit control room

**4.1.5.1.3    Perimeter and Area Lighting:** Lighting on the perimeter shall be sufficient to visually detect movement. Lighting on the vehicle sally port is at least 5 foot-candles and 2-foot candles to the pedestrian sally port at the lowest level, as documented by an independent, qualified source. Foot-candles listed are minimum maintained. Light poles shall be kept a minimum of 10 feet clear from the inner-most portion of the perimeter fence. There shall be a supplemental quartz light system outside the perimeter fence with 1500 watt quartz fixtures or metal halide fixture that will provide the necessary foot candles mounted on 10 foot high poles, spaced 75 feet on center and installed 5 feet clear of the exterior perimeter fence.

**4.1.5.1.3.1**    Close facilities shall have perimeter lighting zone with a two foot candles level. Perimeter zone shall be defined as the area 40' inside the fence to 20' outside the fence.

**4.1.5.1.3.2**    Area lighting is defined as the remainder of the area within the facility from the 40 foot perimeter zone inside dimension and shall be maintained at one foot candle.

**4.1.5.1.4    CCTV Systems:** Closed Circuit Television cameras shall be installed to monitor both the pedestrian and vehicle sally ports. Cameras shall be monitored from the facility control room. Recording of the cameras is optional but highly recommended. Closed circuit surveillance cameras shall be positioned to monitor any area of the yard that is not directly visible from a control room. These cameras shall be monitored from facility control. Recording is optional for interior cameras.

**4.1.5.1.5    Sand Trap:** Outside and adjacent to the perimeter fence, a sand trap shall be constructed and maintained to provide an indication of escape path or fence tampering from out side sources. The trap shall be 15 feet in width and sloped to provide drainage without erosion of sand material. A sand trap will also be located between the two perimeter fences.

**4.1.5.1.6    Perimeter Road:** A paved perimeter road shall be constructed around the entire facility. The road surface shall be 12 feet wide and have shoulder widths of 6 feet. Turn around shall be provide at each turn in the road and at intervals of 400 yards.

**4.1.5.1.7    Sally ports:** Sally ports are designed to control movement into and out of a prison. All sally ports shall be designed with two interlocked gates. Sally port at units may be equipped with local gate control with override functions at Unit control. Facility sally ports (Stand-alone) shall be controlled only from the facility control.

> **4.1.5.1.7.1    Pedestrian Sally port:** There shall be a single point of controlled entry into a Close Custody facility or unit. The pedestrian sally port shall be equipped with remotely controlled sliding gates. These gates shall be controlled from the facility or unit control room. The gates shall be interlocked and an interlock override shall be provided,

> **4.1.5.1.7.2    Vehicle Sally port:** There shall be one vehicle access and pedestrian sally port per facility. The vehicle sally port shall accommodate the size of a typical fire truck serving the area. At a minimum the sally port shall be 80' long and 20' wide with concrete paving a minimum of 14'wide in line with the sliding gates. There shall be a vehicle crash bar on the yard side of the interior sally port gate. Sally port gates shall be 14' wide and 14' clear in height. There shall be an intercom station provided in the sally port for communication to the central control room.

**4.1.5.2    Interior Security:** A combination of systems can be utilized to create and secure functions within the perimeter of the facility. The following is the minimum requirements for systems to be utilized.

Plaintiffs' MSJ Appx. 2243

**4.1.5.2.1** **Fencing:** Interior fencing shall be provided to defined the limits of the inmate yards and provide separation of inmate activity areas. There shall be an interior fence connecting the fronts of all buildings surrounding the yard to provide a complete barrier and define a "**No-Man's Zone**" behind the buildings. Interior fencing for Level 4 yards shall be a straight vertical 10' high fence with one coil of 30" 5 point detainer hook and barb concertina razor ribbon. No-climb (1/4" hardware cloth) shall be installed for a distance of 6' on both sides of the interior fence, where an interior fence contacts the perimeter fence. Install one section of 30" 5 point detainer hook and barb razor ribbon vertically in each corner and the fence intersection, and on the yard side where fences contact buildings.

- Outdoor visitation space shall be enclosed with a 12 foot high (minimum) fence and shall meet all the above requirements for interior fences.

## 4.2 BUILDING REQUIREMENTS

**4.2.1** **HOUSING:** Close Custody inmates shall be housed in two story cell style buildings. Optimal number of beds per pod/housing unit will be based on sound correctional practice, which ensures the safety of staff and inmates as well as effective security. The housing unit shall have a control room, centrally located, capable of observing all inmate occupied areas. Buildings shall be constructed to meet an "I-3"occupancy requirement. Exit and entry doors shall be lockable with remote release capability. Building may be constructed of masonry, concrete (precast or cast-in-place) or other materials that meet the above and code requirements.

### 4.2.1.1 AREA REQUIREMENTS:

**4.2.1.1.1** **Pod Area:** Housing unit pods shall be developed to house up to 50 inmates maximum. Two inmates shall be provided with a cell living space with a gross area of 80 s.f. Each cell shall contain a combination unit of lavatory/toilet. Each pod shall contain a minimum of 1750 s.f. of dayroom space for communal gathering of inmates. Each pod shall contain one one-man handicap cell.

**4.2.1.1.2** **Hygiene:** Each dayroom shall contain showers for the use of inmates in that level of the pod. The ratio for showers is one per 8 inmates. Each cell shall contain a combination lavatory/toilet for the cells occupants. Toilet paper, toilet seat cover, and soap dispensers are not required to be installed in these hygiene areas.

**4.2.1.1.3** **Support Areas:** Within each housing building, support area for property, equipment and cleaning supplies storage shall be provided. Storage shall be provided based on the number of inmates housed and shall be a minimum of 100 s.f. and a maximum of 300 s.f. Ceilings in support areas shall be limited to 10 feet in height or less.

**4.2.1.1.4** **Program Areas:** Each housing building shall have area(s) dedicated for multi-purpose program functions. Space shall be provided based on 4 s.f. per inmate with a minimum room size of 250 s.f. Multi-purpose areas shall be observable from the housing control room. Program area shall be separated from

living area to provide acoustical separation.

**4.2.1.1.5 Security and Control Areas:** Each housing building shall be equipped with an enclosed, secure control room, positioned to allow direct vision into each pods living and hygiene area, and program area(s). The control room shall not be excessive in size, reducing the requirement to move from position to position to observe inmate areas.

- Each control room shall have an adjacent toilet room, which can be used by control staff.

- The control room in Level 4 housing units can be accessed from a secure staff corridor and requires only a single security door. No secure vestibule will be required. Each officer station shall be equipped with an escape ladder to the roof of the building, and be equipped with a means of securing the hatch from the roof side of the hatch.

**4.2.1.1.6 Recreation Areas:** No dedicated indoor recreation area is required within the Level 4 housing units.

### 4.2.1.2 FF&E/Detention Equipment/Special Systems

**4.2.1.2.1 Cell and Pod Areas:** Cell furniture shall be manufactured by ACI. Each cell shall contain two bunks, desks with stool, and two lockable storage cabinets. Cell doors will be constructed of 14 ga. steel with a 6"x18" view panel, contain a cuffing slot/food pass, and be operated by the control room.

- Each cell shall be equipped with two single duplex power outlets and two MATV outlets complete with cable system.

- Each pod shall be equipped with a gas drop port near the entry to the shower area. The port is utilized by officers on the roof. The port shall extend from 6" above the roof to the ceiling of the day room. No other detention equipment is required in the pod areas.

- Each pod shall be equipped with a one way paging system. An intercom station located near the pod entry doors, on both sides of the door, shall be installed so inmates and staff can communicate with control officers. Each pod shall contain one handicap accessible cell with a single bunk, handicap combo unit with grab bars, and one desk.

- Each pod shall be equipped with remote lighting control, controlled from the control room. The toilet area and dayroom space shall be controlled by different switches. Breaker shall not be utilized for switching.

- The prison shall have installed a collect only telephone system, with a mechanism to monitor and record conversations. There shall be a minimum of one phone for every 25 inmates located in a position where staff can observe phones used by inmates. Additionally there shall be sufficient jacks installed in cell blocks located strategically for use by inmates who will not have access

during recreation periods.

**4.2.1.2.2    Hygiene Areas:** Shower area stalls shall have remote operable doors of the same type as cell doors fabricated of stainless steel. ADA accessible showers shall be equipped with grab bars and folding seat. Wheel-in accessible showers 30" x 60" will not require a seat. Accessible showers shall be equipped with a removable, flexible and hand held shower hose and head. Combination unit lavatory/toilets within the cells shall be of stainless steel. Access panels in shower areas are stainless steel.

- **Doors, jambs and locks:** Doors and jambs shall be security type in showers, constructed with 12 gauge stainless steel face sheets with flush closed top and bottom plates. Locks, remote electrical operated from control rooms are to be of water proof design.

**4.2.1.2.3    Support Areas:** Storage rooms shall be equipped with high security grade commercial locks and at a minimum a solid wood door. A 5"x24" view panels shall be provided in the door to allow observation of the room by security staff.

**4.2.1.2.4    Program Areas:** Multi-purpose program areas shall be equipped with paging system, MATV system cable and adequate electrical outlets.

**4.2.1.2.5    Security and Control Areas:** Control consoles shall be installed in built-in millwork or electronic equipment enclosures. Adequate working surface space shall be provided to accommodate two officers, phone system, radios and writing materials.

- Control room shall be secured with 13/16" security glazing protected by steel bar grilles. Bar grilles shall be constructed as indicated in Appendix IV, Figure 5. Doors to the officer station shall be constructed with 12 ga. steel and be equipped with a high security commercial lock.

- Control room shall be equipped with radio, phone or site intercom systems to allow communication with facility or unit control. Installation of a 1-1/2" conduit with weather head through the roof above the officer station will be required for radio antenna.

**4.2.2    FACILITY/UNIT CONTROL:** Unit or Facility Control is responsible for monitoring activities of the facility (standalone) or unit (complex). In a standalone facility, this control position will also be responsible for monitoring all perimeter activities and systems. Control rooms shall be constructed to provide view of all areas controlled. Wall shall be solid grouted and reinforced with #4 bars and 8" on center both ways. Security frames shall be 12 ga. steel.

**4.2.2.1    AREA REQUIREMENTS:**

**4.2.2.1.1    Work Areas:** Unit or Facility control rooms shall be designed to allow for three staff working at one time. All support functions shall be accessible without leaving the control room. Approximate area for a central control room

shall be 225 s.f.

**4.2.2.1.2    Hygiene Areas:** The control room officers shall be provided with access to a wash basin and toilet.  A procedure shall be established to accommodate staff use of restroom facilities, if there are no facilities directly accessible to the control center.

**4.2.2.1.3    Support Areas:** A secure room shall be provided for the storage and distribution of DART equipment. In a complex or stand-alone facility the room or areas shall have controlled access, electronic monitoring, and be observable from Main central control.

- Access to a control room shall be through a secure vestibule.  The vestibule may serve as controlled access to other facility areas as well as the control room.

### 4.2.2.2    FF&E/Detention Equipment/Special Systems

**4.2.2.2.1    Work Areas:** The control room shall be equipped with built-in millwork to accommodate control equipment and provide adequate writing surfaces for all staff working the control room and storage of miscellaneous control equipment such as radios, chargers, phones, facility computers and procedure manuals. Space should be provided for incorporation of an under counter refrigerator, filing cabinet and a coffee maker.

Control Rooms shall have the following detention grade components:
- Security doors, frames and locks
- A secure pass drawer to the public lobby and the secure vestibule for the distribution of materials to staff and public
- A ladder and escape hatch to the roof
- A speaking device/port
- Control room windows with 2" lexan composite glazing HP White Level A.
- Bars protecting for all openings or windows (1/4" x 1" steel bars vertically positioned 5" on center per Part 7-Appendix, 7.4, Figure 5).

Special systems for the control room shall include:
- Security Control systems including door controls, intercom, camera and inmate tracking systems
- Fire alarm monitoring equipment
- Phone system
- Radio System

**4.2.3    YARD CONTROL:** Each facility or unit shall have a centralized control and observation post, located in approximately the center of the facility, which affords observation of all yard areas.  Yard control room shall be constructed as two story structure with control position at both levels. The upper level should provide a view of building roof tops.

### 4.2.3.1   AREA REQUIREMENTS:

**4.2.3.1.1   Control Areas:** The control rooms at each level shall be 250 s.f. Each level shall be connected by a secured spiral stair.

**4.2.3.1.2   Hygiene Areas:** A unisex toilet facility shall be provided on the lower level of the control building.

**4.2.3.1.3   Support Areas:** An enclosed room with locking door shall be provided for enclosure of control equipment.

### 4.2.3.2   FF&E/Detention Equipment/Special Systems

**4.2.3.2.1   Control Areas:** Built-in millwork shall be provided for installation of control panels at both levels of the tower.

- Detention equipment shall include a pass drawer to each yard and speaking devices to each yard.

- Special systems shall include door controls, intercom, CCTV, and radio systems.

**4.2.4   COMMISSARY:** The commissary will provide inmates access to goods and supplies on a controlled basis. Delivery method for commissary goods is optional for Level 4 facilities. Pre-bagged and delivered to housing areas is an option to a yard based pick-up commissary. If yard pick-up is utilized, the commissary shall be placed on each yard and roll up doors shall be observable by yard control. Commissary shall have a roll up delivery door to the service yard.

### 4.2.4.1   AREA REQUIREMENTS:

**4.2.4.1.1   Commissary Areas:** There shall be a minimum of 400 s.f. (200 for commissary and 200 for storage).

**4.2.4.1.2   Hygiene Areas:** Staff and inmates shall use the adjacent yard toilet.

### 4.2.4.2   FF&E/Detention Equipment/Special Systems

**4.2.4.2.1   Commissary Areas:** Built-in millwork counter in commissary area for assembly of inmate orders, free standing work table and workstation furniture. Refrigerators and freezers as required.

- Detention equipment shall consist of a security roll up door and pass counter. Rooms shall be equipped with 12 gauge security doors, frame, and detention hardware.

- Doors shall be monitored remotely from yard control and unit control.

4.2.5 **WORK BASED EDUCATION**: In institutions offering work based educational training programs, classrooms are designed as multi-purpose rooms to offer academic and/or specific training programs, as well as use by various religious groups. 10' wide by 14' high roll up doors shall be included in design for the movement of raw and finished materials. Work based education areas shall be adjacent to the service yard with roll-up doors opening onto service yard. Clearances within the building shall be maintained at 14 ft. Lighting levels in the work based education training areas shall be maintained at 50 ft. candles. Natural lighting shall be provided in work shop areas.

4.2.5.1 **AREA REQUIREMENTS:** Provide a minimum of 10,000 s.f. for Work Based Educational areas and a minimum of 10,000 s.f. for ACI Industrial areas. Classrooms shall be 750s.f. and contain seating and tables for a maximum of 25 inmates.

4.2.5.1.1 **Office/Work Areas:** Staff offices shall be provided with a clear, unobstructed view of work shops.

4.2.5.1.2 **Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

4.2.5.1.3 **Support Areas:** A minimum of 300s.f. for storage areas shall be provided for materials and tools for each 10,000 s.f. of work based education space. Secure storage shall be provided, if necessary.

4.2.5.2 **FF&E/Detention Equipment/Special Systems**

4.2.5.2.1 **Office/Work Areas:** Furniture requirements shall be required by the program provided. Windows to classroom offices or work based educational areas that face onto the yard shall be protected by bar grills. Exit doors to service yards or no-man areas shall be monitored.

4.2.5.2.2 **Hygiene Areas:** Toilets for use by inmates and staff shall be provided in each work based education areas or in a common area to support classroom activities.

4.2.6 **DINING/KITCHEN:** Dining shall be provided either in dining area(s) or in housing unit dayrooms. If inmates receive food directly from a kitchen serving line, a blind serving port shall be utilized. The movement of inmates in the serving line shall be controlled by railing to reduce the problem of inmates returning for additional servings.

4.2.6.1 **AREA REQUIREMENTS**

4.2.6.1.1 **Dining Areas:** Dining areas shall be sized to complete feeding of all meals in one and one half hours with a maximum of four turns, and 20 minutes per turn. The minimum square footage requirement shall be calculated at 7s.f./inmate for dining room seating area.

4.2.6.1.2 **Hygiene Areas:** Staff and inmates shall use the adjacent yard toilet.

4.2.6.2 **FF&E/Detention Equipment/Special Systems**

**4.2.6.2.1** **Dining Areas:** Dining tables shall be constructed of unpainted stainless steel with table and seating secured to the floor. Tables may be of 4 or 6-man configuration, Appendix IV, Figures 3 and 4. Food line shall be separated from main dining area by a ceiling height guard rail.

- Dining areas shall be equipped with a chemical agent drop port from the roof.

## 4.2.7 FINISH SCHEDULE

### Legend:        Floors

CAR ............. Carpet
CT................. Ceramic Tile
SC................. Sealed Concrete
VCT.............. Vinyl Composition Tile
SC................. Sealed Concrete

### Legend:        Base

CT................. Ceramic Tile
VIN............... Vinyl Base

### Legend:        Walls

CONC........... Concrete or masonry block
GYP.............. Gypsum Board
FRP............... Fiberglass Reinforced Panels
PE ................. Paint Enamel
EXP .............. Exposed

### Legend:        Ceiling

AP................. Acoustical Panel
EXP .............. Exposed
GYP.............. Gypsum Board

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|------|-------|------|-------|---------|-----|
| **Facility Control** | | | | | |
| Office | VCT OR SC | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | CAR | VIN | GYP/PE | AP | 9'-0" |
| Toilet | CT | CT | CT | GYP | 8'-0" |
| Support | CAR | VIN | GYP/PE | GYP | 9'-0" |
| **Commissary** | | | | | |
| Commissary | SC | | CONC/PE | EXP | 9'-0" |
| **Dining** | | | | | |
| Dining | SC | VIN | CONC GYP/PE | EXP | 12'-0" |
| **Housing** | | | | | |
| Pod/ Day Room | SC | | GYP / RFP | AP or EXP | 15'-0" |
| Toilets/Showers | CT | CT | CT | GYP | 10'-0" |
| Support | SC | | GYP RFP | GYP | 9'-0" |
| Program | VCT | | GYP | AP | 9'-0" |
| Officer Station | SC | VIN | GYP/PE | AP or EXP | 8'-0" |
| **WORK BASED EDUCATION** | | | | | |
| Office | VCT | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | SC | | EXP or GYP/FRP | EXP | |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | | GYP | EXP | 8'-0" |
| **Yard Control** | | | | | |
| Control | VCT | VIN | GYP | AP | 8'-0" |
| Toilet | CT | CT | CT | GYP | 8'-0" |
| Support | VCT | VIN | GYP | EXP | 8'-0" |

Plaintiffs' MSJ Appx. 2251

# Part 5  Maximum Security Facility Requirements

## 5.1    General Facility Requirements

5.1.1  Facility Description ...................................................................... 2

5.1.2  Facilities Support Services (Complex Level) ....................... 2

5.1.3  Facilities Support Services (Stand Alone Facilities)............ 2

5.1.4  Facility Size Requirements .................................................. 2

5.1.5  Physical Security .................................................................. 2

## 5.2    Building Requirements

5.2.1  Housing ................................................................................ 5

5.2.2  Facility / Unit Control ......................................................... 7

5.2.3  Yard Control ........................................................................ 8

5.2.4  Commissary ......................................................................... 9

5.2.5  Work Based Education......................................................... 9

5.2.6  Dining................................................................................... 9

5.2.7  Visitation ............................................................................10

5.2.8  Finish Schedule ..................................................................11

## PART 5      MAXIMUM SECURITY FACILITY REQUIREMENTS

### 5.1    GENERAL FACILITY REQUIREMENTS

**5.1.1**    **FACILITY DESCRIPTION:** A Maximum Facility or unit is constructed to house inmates whose public risk is Maximum. These inmates present a high risk to the public community should escape from custody occur. The facility should be capable of restricting inmate movement within the facility and designed for 23-hour lock-down. A Maximum Security Facility could be a part of a larger complex of prison units and as such will be referred to as a Maximum Security Facility unit. Support functions vary if the prison is stand alone or part of a larger complex.

**5.1.2**    **FACILITIES SUPPORT SERVICES (COMPLEX LEVEL):** If a Maximum Facility is constructed as a part of a larger complex it will not be supported by complex medical or inmate-intake, but may share warehousing, maintenance, pharmacy, vehicle maintenance and complex administration. Perimeter patrol and monitoring of critical systems such as water supply, wastewater systems and emergency power generation, will also be provided at a complex level.

**5.1.3**    **FACILITIES SUPPORT SERVICES (STAND ALONE FACILITIES):** If a facility is stand-alone, the support functions will become a part of the facility, and must be designed and constructed in accordance with the provisions of these standards. Some services may be furnished from other ADC facilities, and if so the facility shall take into account those reduced service requirements.

**5.1.4**    **FACILITY SIZE REQUIREMENTS:** The maximum inmate population of a Maximum Security is 1,000 beds. Physical separation of inmate populations within a unit may be required depending on such circumstances as facility design, staffing patterns, and operational plan. The primary determining objective shall be the need for sound correctional practice, which ensures the safety of staff and inmates as well as effective security. Support and program functions should be designed to minimize inmate movement from yard to yard, and will require some duplication of functions. The RFP and Project Description as applicable may further define facility services and size requirements.

**5.1.5**    **PHYSICAL SECURITY:** Due to the high level of escape risk of Maximum Security inmates, the facility is designed with a high level of physical security. The facility shall be designed to withstand abuse, wear and tear, and require relatively low maintenance. Physical security shall be installed as listed in the sub-sections below.

     **5.1.5.1**    **Perimeter Security:** The facilities perimeter security is made up of integrated systems and will provide a good barrier against escape. The institution's perimeter system is designed such that inmates remain within the perimeter and that access by the general public is precluded except with proper authorization. A four strand barb wire barrier fence shall serve as a delineation of prison property. The barb wire fence shall have signage every 100 feet that indicates **"No Trespassing".** The perimeter security fence shall be located a minimum of 300 feet from the prison property line.

**5.1.5.1.1     Fencing:** The perimeter fencing shall comply with Appendix III, Figure 3.   A Level 5 Facility shall have a double perimeter fence which serves as a physical containment barrier.   An additional "**No-Man's Zone**" fence shall be provided consisting of a four foot, four stand barbed wire fence denoting the interior perimeter of the "**No-Man's Zone**". Both perimeter fences shall be 14 foot high looped top fence with 6 feet of ¼" security mesh on the inside of the upper portion of the looped top.  Both perimeter fences shall contain one 30" diameter 5 point detainer hook and barb concertina razor ribbon row at the top and three rows, one directly above the other starting at grade.  If the perimeter fence contacts a building, a 30" diameter  section of  5 point detainer hook and barb razor ribbon shall be installed vertically at the intersection, on the yard side of the fence.  The fence shall have a concrete anti-dig barrier footing 6" wide by 24" deep.  The bottom of the fence shall be secured by a (1-1/2" minimum) bottom rail secured to the concrete base by a anchor bolt or method approved by the Department.

All fence ties shall be equally spaced (5 per 10' section at a minimum).  Fence ties shall be mechanically twisted and bolts in areas that may permit inmate access shall be tack welded (e.g., exercise, work, trash etc.).  Any fenced area that serves as a temporary inmate holding area (e.g., recreation, health unit, intake, transportation, detention unit holding areas, etc.) shall use permanent straps to attach fabric to poles which shall be bolted and tack welded.    This also applies to gates, which access those areas.

**5.1.5.1.2     Detection Systems:** Electronic detection system will be placed as indicated in Figure 3, Appendix III.    The alarm system shall be broken up into zones with zone links of approximately 300 feet.  An alarm condition will trigger the quarts lights associated with the alarmed zone and one lighting zone adjacent to either side of the alarmed zone.  Notification of an alarm condition will be received by the unit control room

**5.1.5.1.3     Perimeter and Area Lighting:** Lighting on the perimeter shall be sufficient to visually detect movement.  Lighting on the vehicle sally port is at least 5 foot-candles and 2-foot candles to the pedestrian sally port at the lowest level, as documented by an independent, qualified source.  Foot-candles listed are minimum maintained.  Light poles shall be kept a minimum of 10 feet clear from the inner-most portion of the perimeter fence.  There shall be a supplemental quartz light system outside the perimeter fence consisting of 1500 watt quartz fixtures or metal halide fixtures that provide the required foot candle mounted on 10 foot high poles, spaced 75 feet on center and installed 5 feet clear of the exterior perimeter fence.

> **5.1.5.1.3.1**     A Level 5 Facility shall have perimeter lighting zone with a three foot candles level.  Perimeter zone shall be defined as the area 40' inside the fence to 20' outside the fence.

> **5.1.5.1.3.2**     Area lighting is defined as the remainder of the area within the facility from the 40 foot perimeter zone inside dimension and shall be maintained at one foot candle.

**5.1.5.1.4    CCTV Systems:** Closed Circuit Television cameras shall be installed to monitor both the pedestrian and vehicle sally ports. Cameras shall be monitored from the facility control room. Recording of the cameras is optional but highly recommended. Closed circuit surveillance cameras shall be positioned to monitor any area of the yard that is not directly visible from a control room. These cameras shall be monitored from facility control. Recording is optional for interior cameras.

**5.1.5.1.5    Sand Trap:** Outside and adjacent to the perimeter fence, a sand trap shall be constructed and maintained to provide an indication of escape path or fence tampering from outside sources. The trap shall be 15 feet in width and sloped to provide drainage without erosion of sand material. A sand trap will also be located between the two perimeter fences.

**5.1.5.1.6    Perimeter Road:** A paved perimeter road shall be constructed around the entire facility. The road surface shall be 12 feet wide and have shoulder widths of 6 feet. Turn around shall be provide at each turn in the road and at intervals of 400 yards.

**5.1.5.1.7    Sally ports:** Sally ports are designed to control movement into and out of a prison. All sally ports shall be designed with two interlocked gates. Sally port at units may be equipped with local gate control with override functions at Unit control. Facility sally ports (Stand-alone) shall be controlled only from the facility control.

**5.1.5.1.7.1    Pedestrian Sally port:** There shall be a single point of controlled entry into a Maximum Security Facility or unit. The pedestrian sally port shall be equipped with remotely controlled sliding gates. These gates shall be controlled from the facility or unit control room. The gates shall be interlocked and an interlock override shall be provided.

**5.1.5.1.7.2    Vehicle Sally port:** There shall be one vehicle access and pedestrian sally port per facility. The vehicle sally port shall accommodate the size of a typical fire truck serving to the area. At a minimum the sally port shall be 80' long and 20' wide with concrete paving a minimum of 14'wide in line with the sliding gates. There shall be a vehicle crash bar on the yard side of the interior sally port gate. Sally port gates shall be 14' wide and 14' clear in height. There shall be an intercom station provided in the sally port for communication to the central control room.

**5.1.5.2    Interior Security:** A combination of systems can be utilized to create and secure functions within the perimeter of the facility. The following is the minimum requirements for systems to be utilized.

Plaintiffs' MSJ Appx. 2255

**5.1.5.2.1** **Fencing:** Interior fencing shall be provided to define the limits of the inmate yards and provide separation of inmate activity areas. There shall be an interior fence connecting the fronts of all buildings surrounding the yard to provide a complete barrier and define a "**No-Man's Zone**" behind the buildings. Interior fencing for Maximum Facility yards shall be a straight vertical 10' high fence with one coil of 30" 5 point detainer hook and barb concertina razor ribbon. No-climb (1/4" hardware cloth) shall be installed for a distance of 6' on both sides of the interior fence, where an interior fence contacts the perimeter fence. Install one section of 30" 5 point detainer hook and barb razor ribbon vertically in each corner and the fence intersection, and on the yard side where fences contact buildings.

## 5.2   BUILDING REQUIREMENTS

**5.2.1** **HOUSING:** Maximum Security inmates shall be housed in two story cell style buildings. Optimal number of beds per pod/housing unit will be based on sound correctional practice which ensures the safety of staff and inmates as well as effective security. The housing unit shall have a control room, centrally located, capable of observing all inmate occupied areas. Buildings shall be constructed to meet I-3 occupancy requirements. Exit and entry doors shall be lockable with remote release capability. Cuff and Food Slots must be provided in all cell and shower doors. Building may be constructed of masonry, concrete (pre-cast or cast-in-place) or other materials that meet the above and code requirements.

### 5.2.1.1   AREA REQUIREMENTS

**5.2.1.1.1** **Pod Area:** Inmates shall be provided with a cell living space with a gross area of 80 s.f.. Each cell shall contain a combination lavatory/toilet unit. Each pod shall contain at least 1 one-man handicap cell. Each dayroom area shall have skylights to provide natural lighting for the pod. Skylights shall be configured to bring light to within 20 feet of all cell fronts. Cells shall have no windows.

**5.2.1.1.2** **Hygiene:** Each dayroom shall contain showers for the use of inmates in that level of the pod. The ratio for showers is two per pod. Each cell shall contain a combination lavatory/toilet for the cells occupants.

**5.2.1.1.3** **Support Areas:** Within each housing building, support area for property, equipment and cleaning supplies storage shall be provided. Storage shall be provided based on the number of inmates housed and shall be a minimum of 100 s.f. and a maximum of 300 s.f. Ceilings in support areas shall be limited to 10 feet in height or less.

**5.2.1.1.4    Security and Control Areas:** Each housing building shall be equipped with an enclosed, secure control room, positioned to allow direct vision into each pods living and hygiene area, and program area(s). The control room shall not be excessive in size, reducing the requirement to move from position to position to observe inmate areas.

- Each control room shall have an adjacent toilet room, which can be used by control staff.

- The control room in a Maximum Security housing unit can only be accessed from a secure staff corridor and requires only a single security door. No secure vestibule will be required. Each officer station shall be equipped with an escape ladder to the roof of the building, and be equipped with a means of securing the hatch from the roof side of the hatch.

**5.2.1.1.5    Recreation Areas:** Each pod shall have two fenced or walled attached outdoor recreation areas connected to the pod dayroom. The size of the exercise yards shall be 28 s.f./inmate for the number of inmates expected to use the space at any one time. Door to exercise area shall have a window for officer observation. The space may be further divided by individual exercise cubicles constructed of chain link.

**5.2.1.2    FF&E/Detention Equipment/Special Systems**

**5.2.1.2.1    Pod Area:** Cell furniture shall be manufactured by ACI. Each cell shall contain 2 bunks, and one desk with stool.

- Each pod shall be equipped with a one way paging system. An intercom station located near the pod entry doors, on both sides of the door, shall be installed so inmates and staff can communicate with control officers.

- Each pod shall be equipped with remote lighting control, controlled from the control room. The toilet area and dayroom space shall be controlled by different switches. Breaker shall not be utilized for switching. The control room shall also be equipped with lavatory and toilet flushing override capability.

- Each cell shall be equipped with two single duplex power outlets and two MATV outlets complete with cable system.

- The prison shall have installed a collect only telephone system, with a mechanism to monitor and record conversations. There shall be a minimum of one phone for every 25 inmates located in a position where staff can observe phones used by inmates. Additionally there shall be sufficient jacks installed in cell blocks located strategically for use by inmates who will not have access during recreation periods.

**5.2.1.2.2  Hygiene Areas:**  Shower stalls shall be equipped with a stainless steel door with window for officer observation.   ADA accessible showers shall be equipped with grab bars and folding seat. Wheel-in accessible showers 30" x 60" will not require a seat.   Accessible showers shall be equipped with a fixed head. Combination unit lavatory/toilets within the cells shall be of stainless steel. Access panels in shower areas are stainless steel.

- **Doors, Jambs and Locks –** Doors and jambs shall be security type in showers constructed with 12 gauge stainless steel face sheets with flush closed top and bottom plates.  Locks, remote electrical operated from control rooms are to be of water proof design.

**5.2.1.2.3  Support Areas:**  Storage rooms shall be equipped with high security grade detention locks and steel doors.

**5.2.1.2.4  Security and Control Areas:**  Control consoles shall be installed in built-in millwork or electronic equipment enclosures.  Adequate working surface space shall be provided to accommodate two officers, phone system, radios and writing materials.

- Control room shall be secured with 13/16" security glazing protected by steel bar grilles.  Bar grilles shall be constructed as indicated in Appendix IV, Figure 5.  Doors to the officer station shall be constructed with 12 gauge steel and be equipped with a high security commercial lock.

- Officer station shall be equipped with radio, phone or site intercom systems to allow communication with facility or unit control.  Installation of a 1-1/2" conduit with weather head through the roof above the officer station will be required for radio antenna.

**5.2.1.2.5  Recreation Areas:**  Recreation areas may be constructed of two story tilt-up concrete walls with a secure, permanent steel grill over the top.

**5.2.2  FACILITY/UNIT CONTROL:**  Unit or Facility Control is responsible for monitoring activities of the facility (standalone) or unit (complex).  In a standalone facility, this control position will also be responsible for monitoring all perimeter activities and systems.  Control rooms shall be constructed to provide view of all areas controlled. Wall shall be solid grouted and reinforced with #4 bars and 8" on center both ways. Security frames shall be 12 gauge steel.

**5.2.2.1  AREA REQUIREMENTS:**

**5.2.2.1.1  Work Areas:**  Unit or Facility control rooms shall be designed to allow for three staff working at one time. All support functions shall be accessible without leaving the control room.  Approximate area for a central control room shall be 225 s.f.

**5.2.2.1.2     Hygiene Areas:** The control room officers shall be provided with access to a wash basin and toilet.  A procedure shall be established to accommodate staff use of restroom facilities, if there are no facilities directly accessible to the control center.

**5.2.2.1.3     Support Areas:** A secure room shall be provided for the storage and distribution of DART equipment. In a complex or stand-alone facility the room or areas shall have controlled access, electronic monitoring, and be observable from Main central control. Control rooms shall be through a secure vestibule.  The vestibule may serve as controlled access to other facility areas as well as the control room.

### 5.2.2.2     FF&E/Detention Equipment/Special Systems

**5.2.2.2.1     Work Areas:** The control room shall be equipped with built-in millwork to accommodate control equipment and provide adequate writing surfaces for all staff working the control room and storage of miscellaneous control equipment such as radios, chargers, phones, facility computers and procedure manuals. Space should be provided for incorporation of an under counter refrigerator, filing cabinet and a coffee maker.

**Control Rooms shall have the following detention grade components:**

- Security doors, frames and locks
- A secure pass drawer to the public lobby and the secure vestibule for the distribution of materials to staff and public.
- A ladder an escape hatch to the roof
- A speaking device/port
- Control room windows shall be made with 2" Lexan Composite Glazing (HP White Level A).
- Bars protecting all openings or windows shall be (1/4" x 1" square tube steel vertically positioned 5" on center per Part 7-Appendix, 7.4, Figure 5).

**Special systems for the control room shall include:**

- Security Control systems including door controls, intercom, camera and inmate tracking systems.
- Fire alarm monitoring equipment.
- Phone system
- Radio System

**5.2.3     YARD CONTROL:** Maximum custody does not allow for any inmate activity in the yard area.

**5.2.4 COMMISSARY:** If provided the commissary will provide inmates access to goods and supplies on a controlled basis. Delivery method for commissary goods for a Maximum Facility is delivery by staff

### 5.2.4.1 AREA REQUIREMENTS

**5.2.4.1.1 Commissary Areas:** There shall be a minimum of 400 s.f. (200s.f. for commissary area and 200s.f. for a storage area).

**5.2.4.1.2 Hygiene Areas:** Staff and inmates shall use the adjacent yard toilet.

### 5.2.4.2 FF&E/Detention Equipment/Special Systems

**5.2.4.2.1 Commissary Areas:** Built-in millwork counter in commissary area for assembly of inmate orders, free standing work table and workstation furniture. Refrigerators and freezers as required.

**5.2.5 WORK BASED EDUCATION:** Maximum custody does not allow for any inmate activity in Work Based Education.

**5.2.6 DINING/FOOD CART STORAGE:** Most Maximum custody inmates take all meals in their cells. Should a program be instituted to allow a few inmates to eat together, a small separate dining room shall be located next to the kitchen. This dining area will be observable from a concealed, staff position outside the dining room. Visibility will be provided by a one-way window.

### 5.2.6.1 AREA REQUIREMENTS

**5.2.6.1.1 Dining Areas:** Dining areas shall be sized to accommodate the number of inmates in the rehabilitation program prescribed by the Department of Corrections and varies from facility to facility. Square footage requirement shall be calculated at 7s.f./inmate in the seating area.

**5.2.6.1.2 Hygiene Areas:** Staff and inmates shall use the adjacent toilet facilities.

### 5.2.6.2 FF&E/Detention Equipment/Special Systems

**5.2.6.2.1 Dining Areas:** If provided dining tables shall be constructed of unpainted stainless steel with table and seating secured to the floor. Tables may be of 4 man configuration, Appendix IV, Figure 3. Food line shall be separated from main dining area by a ceiling height guard rail.

- Dining areas shall be equipped with a chemical agent drop port from the roof.

**5.2.6.2.2    Food Preparation Areas:** Sufficient space shall be provided with electrical outlets, to accommodate the number of food carts needed to feed the number of inmates being housed in this unit.

**5.2.7    VISITATION:** Maximum Security Facilities have no contact visiting. All visiting is performed at windowed booths.

### 5.2.7.1    AREA REQUIREMENTS

**5.2.7.1.1    Visitation Area:** One visitation booth shall be provided for every 40 inmates. There shall be a manned officer station in the center of the public side of the visitation booths. Inmate side shall also contain search and staging areas.

**5.2.7.1.2    Hygiene Areas:** Toilets shall be provided for visitors and located in the adjacent lobby.

### 5.2.7.2    FF&E/Detention Equipment/Special Systems

**5.2.7.2.1    Visitation Area:** All visitation booths shall consist of a fixed stool for inmate and visitor and a speaking window. No phones or other appliances shall be used for communication.

### 5.2.8 FINISH SCHEDULE

**Legend:** **Floors**

CAR ............. Carpet
CT.................. Ceramic Tile
SC.................. Sealed Concrete
VCT.............. Vinyl Composition Tile

**Legend:** **Base**

CT.................. Ceramic Tile
VIN................ Vinyl Base

**Legend:** **Walls**

CONC............ Concrete or masonry block
GYP............... Gypsum Board
FRP................ Fiberglass Reinforced Panels
PE .................. Paint Enamel
EXP ............... Exposed

**Legend:** **Ceiling**

AP.................. Acoustical Panel
EXP ............... Exposed
GYP............... Gypsum Board

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|---|---|---|---|---|---|
| **Facility Control** | | | | | |
| Office | SC | VIN | GYP/PE | GYP/PE | 9'-0" |
| Work Areas | SC | VIN | GYP/PE | GYP/PE | 9'-0" |
| Toilet | CT | CT | CT | GYP/PE | 8'-0" |
| Support | SC | VIN | GYP/PE | GYP/PE | 8'-0" |
| **Commissary** | | | | | |
| Commissary | SC | | CONC/PE | EXP | 9'-0" |
| **Dining** | | | | | |
| Dining | SC | VIN | CONC/PE | EXP | 12'-0" |
| **Housing** | | | | | |
| Pod/Day Room | SC | | CONC/PE | EXP | 15'-0" |
| Showers | CT | CT | CT | CONC | 8'-0" |
| Support | SC | | CONC | GYP | 8'-0" |
| Control | SC | VIN | GYP/PE | GYP/PE | 8'-0" |
| Cell | SC | | CONC/PE | CONC/PE | 8'-0" |
| **Work Based Education** | | | | | |
| Office | SC | VIN | GYP/PE | GYP/PE | 9'-0" |
| Work Areas | SC | | CONC | EXP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | | CONC | EXP | 8'-0" |

**Part 6 Complex**

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

6.1    Complex Administration ................................................................. 2
6.2    Complex Maintenance ..................................................................... 4
6.3    Complex Vehicle Maintenance ....................................................... 4
6.4    Complex Visitor Processing ........................................................... 5
6.5    Complex Inmate Processing ........................................................... 5
6.6    Complex Medical ............................................................................ 6
6.7    Complex Vehicle Control ................................................................ 8
6.8    Finish Schedule ............................................................................... 9

# PART 6    COMPLEX

## 6.1    COMPLEX ADMINISTRATION:

To enhance the reduction of staffing needs and the duplication of certain support functions, prison units may be grouped within one major perimeter fence if topographic conditions permit or may be placed in close proximity to one another.

Complex functions that include a Complex Warden's staff; business procurement; armory and communications; internal investigations; warehouse; security; personnel inmate records; food factory; transportation; fuel island; vehicle maintenance; building maintenance; visitation; processing; health and in-patient care; and systems for domestic water supply and distribution; WWTP processing and collection, natural gas; electrical and telephone, CCTV.

Distribution may be grouped in a manner to increase their efficiency and in manner to serve all of the prison units.  Spaces to contain these functions are designed and for the most part are located outside the main perimeter security fence in a manner to serve and service the units they support.

### 6.1.1    AREA REQUIREMENTS

**6.1.1.1    Office/Work Areas:** The complex administration will contain the following areas:

- Warden or Deputy Warden Office ................ 300 s.f.
- A.D.W Office ................................................ 200 s.f.
- General Administrative Offices .................... 100 s.f.
- Operations Offices ........................................ 100 s.f.
- Reception and Administrative Support ......... 300 s.f. for open space workstation
- Accounting .................................................... 1200 s.f. for open space/offices
- Personnel ...................................................... 400 s.f. offices
- Records.......................................................... 1680 s.f. for  open space/offices
- Education Offices.......................................... 800 s.f. for open space/offices
- Inmate Phone Monitoring ............................. 200 s.f.
- Staff Training ............................................... 1500 s.f. classroom/ 500 s.f. offices
- Inspection & Investigation Offices ............... 1025 s.f.
- Complex Control........................................... 250 s.f.
- Armory .......................................................... 650 s.f.
- I.T. & Chaplin Offices ................................. 200 s.f.

▶ Record storage facility shall be located outside of the secure perimeter or in a secure portion of the Administration Building.  Walls and ceilings, if not constructed of masonry block, shall be reinforced with expanded metal.  Rooms shall have security doors, frames and locks.

■    Inmates are generally prohibited from accessing institutional records. *ARS § 31-221.*

**6.1.1.2    Hygiene Areas:**  The prison provides conveniently located staff facilities that are appropriately sized to meet the operational needs, including:

- Toilets and wash basins that are not used by inmates
- Female staff toilets, shower stalls, benches and 3 tier lockers proportioned according to the projected female staff complement
- Male staff toilets/urinals, shower stalls, benches and 3 tier lockers proportioned according to the projected male staff complement
- Central control shall have one dedicated unisex toilet.

**6.1.1.3    Support Areas**:  Additional spaces shall be provided in proportion to the size of the facility and the number of staff and shall include:

- Conference Room............ 600 s.f.
- Video / Office.................. 160 s.f.
- Copier Room ................... 125 s.f.
- Public Lobby .................. 225 s.f.
- Storage.................... As required

## 6.1.2    FF&E/Detention Equipment/Special Systems

**6.1.2.1    Office/Work Areas:**  Furniture shall be purchased from ACI and consist of modular furniture systems.

- A weapons storage locker shall be provided near the control room on the exterior of the building.  There shall be a minimum of one locker for every ten employees.   Administrative offices shall be protected by security barred windows and appropriate fencing.  Access doors to staff support areas shall be mechanically/electrically controlled from the central control room and openings shall be provided with intercom stations on each side of the doors.

- Special systems for the administrative area shall consist of video monitoring equipment and inmate telephone system monitoring station.

**6.1.2.2    Hygiene Areas:**  The following items shall be provided at a facility administration building:

- Central control shall have one dedicated unisex toilet.

**6.1.2.3    Support Areas:**  The reception area shall be equipped with built-in millwork counter for visitor processing.  The counter shall be designed to ADA accessibility requirements.

- A metal detector shall be furnished in the lobby area for screening of visitors and staff.  The metal detector shall enunciate in the control room.

## 6.2 COMPLEX MAINTENANCE

### 6.2.1 AREA REQUIREMENTS

**6.2.1.1 Office/Work Areas:** Maintenance area shall include a staff office (200 s.f.) with a staff toilet, secure tool storage, inmate toilet, general storage space and work areas. The size of maintenance shall be determined by the size (number of inmates) of the facility and shall be calculated on 9 s.f./inmate. Various areas shall consist of:

| Reception Desk | Staff Offices | Conference Room |
| --- | --- | --- |
| Locksmith Shop | Tool Crib | Secure Storage |
| Carpentry Shop | Plumbing Shop | Electrical Shop |
| Welding Shop | HVAC Shop | Paint Storage |
| Indoor General Storage | Outdoor General Storage | Outdoor Work Area |

**6.2.1.2 Hygiene Areas:** Separate toilets shall be provided for inmates and staff.

### 6.2.2 FF&E/Detention Equipment/Special Systems

**6.2.2.1 Office/Work Areas:** Local area network cabling system shall be provided.

## 6.3 COMPLEX VEHICLE MAINTENANCE: Vehicle maintenance is one of the services that are often contracted out. If the facility size or location warrants a vehicle maintenance facility, the number of vehicle repair bays will be determined by ADC on a project by project basis.

### 6.3.1 AREA REQUIREMENTS

**6.3.1.1 Office/Work Areas:** The main vehicle maintenance building, if required, shall contain the appropriate number of vehicle maintenance bays, supply and secure storage, tool room, auto technician office and exterior lube and wash bays.

**6.3.1.2 Hygiene Areas:** Separate toilet facilities shall be provided for staff and inmates.

**6.3.1.3 Support Areas:** Vehicle maintenance shall also contain the facility fire safety staff. This area shall consist of fire truck(s) storage, transportation office, fire safety office and break room for fire crew.

### 6.3.2 FF&E/Detention Equipment/Special Systems: Vehicle maintenance shall consist of the following Standard equipment:

| Compressed Air (tanks and racks) | One Vehicle Lift per Bay | One Work Bench per Bay |
| --- | --- | --- |
| Drill Press | Tire Balancer | Tire Changer |
| Alignment Machine | Brake Lathe | |

**6.3.2.1 Office / Work Areas:** Break room shall contain built-in millwork.

**6.3.2.2   Hygiene Areas:**  In addition to separate toilet facilities for staff and inmates, a first aid eye wash area shall be included in the general vehicle maintenance area.

**6.3.2.3   Support Areas:**   Fire safety shall contain auxiliary equipment to support the individual type of vehicles to be stored (rescue, ladder truck, hose truck, etc.).

## 6.4   COMPLEX VISITOR PROCESSING

**6.4.1   AREA REQUIREMENTS:** Complex visitor processing shall serve three functions: To process visitors, to process staff, and to provide a clothing changing area for staff.

**6.4.1.1   Office/Work Areas:** The following spaces shall be designed into this area:

- Control (identification check and package check)
- Secure Storage
- Staff Office (used as office and search room)
- Staff Physical Training Room

**6.4.1.2   Hygiene:** Public toilets (men and women) and staff locker rooms (men and women)

**6.4.2   FF&E/Detention Equipment/Special Systems**

**6.4.2.1   Office/Work Areas:**  Turnstiles shall separate both visitors and staff from the transportation pick up area.  Turnstiles shall operate in one direction only – allowing egress onto the complex perimeter road and egress back into visitor processing.  Staff and visitor areas shall be divided by chain link fencing.  Metal detectors shall be located at the first turnstiles for egress to the complex perimeter road on both staff and visitor sides of the building.

## 6.5   COMPLEX INMATE PROCESSING

**6.5.1   AREA REQUIREMENTS**

**6.5.1.1   Office/Work Areas:** The inmate processing area shall consist of the following spaces:
- Property Search
- Property Storage
- Holding Cells (inside and outside)
- Vehicle sally port

**6.5.1.2   Hygiene:** Separate unisex staff toilet shall be located adjacent to property search area and an inmate toilet will be located in the inmate processing room.

### 6.5.2 FF&E/Detention Equipment / Special Systems

**6.5.2.1 Office/Work Areas:** The property search room shall be designed for package x-ray machine, while the property storage area shall contain racks for inmate personal property storage. Exterior holding pens (chain link enclosures) shall be located adjacent to the vehicle sally port for immediate detention of inmates upon debarking transport vehicle. 80 s.f. interior holding cells shall be dry and accommodate one man each.

**6.5.2.2 Hygiene:** A single occupancy, inmate toilet (handicap accessible) shall be located adjacent to the interior holding cells.

## 6.6 COMPLEX MEDICAL

### 6.6.1 AREA REQUIREMENTS:

**6.6.1.1 Office/Work Areas:** The square footage for the medical facility shall be sized appropriately consistent or at minimum based on 6 s.f. per inmate in the Complex Medical Building and Nurse Call Area and with the activities of the unit and availability of out-sourced services. Within that area, the following spaces shall include:

> Interior Inmate holding cells
> Exterior Inmate holding cells
> Secure Medication Storage
> Pharmacy
> Medical Records
> Exam rooms
> Emergency Treatment Room
> Nurse Station
> Medical Record Storage
> Medication Room
> Clean/Soiled Linen
> Telemedia Exam Room
> Library (Medical)
> Blood Lab
> Staff Offices
> Staff Toilet/Locker rooms
> Conference room
> Staff Break room

- In stand alone facilities, the medical facilities may include medical ward beds, single bed medical rooms and isolation rooms. Areas for visitation and fenced exercise shall provide segregation of inmates by classification and shall be covered by video monitoring.

- Dental operatories shall be designed with a minimum of 2 chairs. Required areas are: operatories, lab, offices, x-ray, panorex, secure medication storage and equipment storage.

**6.6.1.2 Hygiene Areas:** Separate toilet facilities will be designed for inmates and

staff.  The ratio of handicap accessible toilets shall be governed by ADA Standards.

**6.6.1.3    Support Areas:**  Medical shall contain storage for records, offices and break room for staff, laundry facilities for linens, holding cells for inmates, and secure medication storage.

**6.6.2     FF&E/Detention Equipment/Special Systems**

**6.6.2.1    Office/Work Areas:**  Institutions with temporary medical storage areas, shall locate such facilities outside of the secure perimeter or in a secure portion of the Administration Building.  Rooms shall have security doors, frames and locks. All sinks shall have plaster traps.  A dispensary may be located within the secure perimeter for the purpose of dispensing of medication.  The dispensary shall have:

- A secure pass through for the distribution of medical supplies to staff and inmates
- A speaking device/port
- Security doors, frames and locks

Nurse Station shall have the following detention grade components:

- Security doors, frames and locks

Special systems for the medical shall include:

- Security Control systems including door controls (from waiting area to internal corridors), intercom, and camera systems.
- Fire alarm monitoring equipment.
- Phone system
- Radio System
- Dedicated telecommunication cables for Telemedia communications
- Nurse call system

Emergency shut-off systems shall be provided for all dental equipment.

Dental lab shall be furnished with built-in millwork counters and cabinets.  All equipment for lab, x-ray and operatories shall be provided by ADC.  All sinks to be provided with plaster traps.

**6.6.2.2    Support Areas:** Staff offices and support areas shall be separated from inmate occupied areas by secure corridors.  Secure medication storage shall consist of masonry block wall construction with steel security door, frame and lock.

**6.7 COMPLEX VEHICLE CONTROL:** The main entry roadway to the Complex is to be designed to funnel all vehicle and pedestrian traffic through one Security Check Point, which becomes a portion of the four strand barbed wire barrier fence that delineates the prison boundary. The Complex Vehicle Control Building is a concrete block structure approximately 10' wide and 16' long, that is protected by a multitude of 8" concrete filled pipe columns 4'0" O.C. around entire building exterior, 4'0" above grade. The building is air conditioned and heated by a heat pump, has window visibility on all three sides facing in coming traffic, has a minimal sized toilet room facing exiting traffic, with a control facing in coming traffic and doors on both sides. Drinking fountain, colored concrete floor, rubber base and 2" insulated walls faced with drywall finishes the inside.

The design is to include double vehicle on the entry and exit with manually operated lift arms. The second lane is to be used for emergency vehicles. A 10 car parking area is to be provided outside the barbed wire fence to be used a holding area for visitors that need to be escorted.

**6.8 FINISH SCHEDULE**

**Legend:      Floors**

CAR ............. Carpet
CT................. Ceramic Tile
SC................. Sealed Concrete
VCT.............. Vinyl Composition Tile

**Legend:      Base**

CT................. Ceramic Tile
VIN............... Vinyl Base

**Legend:      Walls**

CL................. Chain Link Fence
CONC........... Concrete or masonry block
GYP.............. Gypsum Board
FRP............... Fiberglass Reinforced Panels
PE ................. Paint Enamel

**Legend:      Ceiling**

AP................. Acoustical Panel
EXP .............. Exposed
GYP.............. Gypsum Board
SHC.............. Shade Cloth
GYP/SM........ Gypsum Board and Security Mesh

DEPARTMENT OF CRIMINAL JUSTICE CORRECTIONAL INSTITUTIONS
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|------|-------|------|-------|---------|-----|
| **Administration** | | | | | |
| Office | CAR | VIN | GYP/PE | AP | 9'-0" |
| Open Work Areas | CAR | VIN | GYP/PE | AP | 9'-0" |
| Toilet | CT | CT | CT | AP | 9'-0" |
| Support | CAR or VCT | VIN | GYP/PE | AP | 9'-0" |
| **Maintenance** | | | | | |
| Office | SC | VIN | CONC/PE OR GYP/PE | AP | 9'-0" |
| Work Areas | SC | - | CONC or GYP/PE | EXP | |
| Toilets | CT | CT | CT | AP | 9'-0" |
| **Vehicle Maintenance** | | | | | |
| Office | SC | VIN | CONC/PE or GYP/PE | AP | 9'-0" |
| Work Areas | SC | | CONC | EXP | - |
| Toilets | CT | CT | CT | AP | 8'-0" |
| Support | SC | - | CONC | EXP | - |
| **Visitor Processing** | | | | | |
| Office / Control | SC | VIN | GYP/PE | AP | 8'-0" |
| Public Toilets | CT | CT | CT | AP | 8'-0" |
| Staff Locker rooms | SC | VIN | GYP/PE | AP | 8'-0" |
| Staff Toilets | CT | CT | CT | AP | 8'-0" |
| **Inmate Processing** | | | | | |
| Office | SC | VIN | GYP/PE | AP | 8'-0" |
| Exterior Holding | SC | - | CL | SHC | 12'-0" |
| Interior Holding | SC | - | CONC | CONC | 12'-0" |
| Toilet | CT | CT | CT | AP | 8'-0" |
| Support | SC | - | CONC or GYP/PE | EXP OR GYP/PE | 8'-0" |
| **Medical** | | | | | |
| Office | CAR | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | VCT | VIN | GYP/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | AP | 8'-0" |
| Support | SC | | CONC or GYP/PE | EXP | 9'-0" |
| Inmate Holding (Interior) | SC | | CONC or GYP/PE | EXP | |
| Medication Storage | VCT | VIN | CONC or GYP/PE | GYP/SM | |
| Inmate Holding (Exterior) | SC | | CL | SHC | 12'-0" |
| Nurse Call Area | SC | VIN | GYP/PE | AP | 9'0" |

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

# Part 7 - Appendix

**7.1    Appendix I - Regulatory Codes**
 7.1.1    Federal, Statutory and Regulatory.............................................. 2
 7.1.2    Building Fire Code and Safety ...................................................... 3
 7.1.3    Uniform Fire Code - 1988 Ed. ...................................................... 3
**7.3    Appendix III - Fences**
 Fig 1 - Perimeter Fence - Minimum Facilities .................................... 1
 Fig 2 - Perimeter Fence - Medium Facility ........................................ 2
 Fig 3 - Perimeter Fence – Close and Maximum Facilities ................. 3
 Fig 4 – Vehicle Sally Port Control Building ....................................... 4
**7.4    Appendix IV - Furniture**
 Fig. 1 ACI Bunk Bed / Desk / Storage – Minimum and Medium Custody............... 1
 Fig. 2 Inmate Stool – For Minimum and Medium Custody ..................... 2
 Fig. 3 4-Man Dining Table ...................................................... 3
 Fig. 4 6-Man Dining Table ...................................................... 4
 Fig. 5 Housing Control Room Window Bar Grilles ........................... 5
 Fig. 6 Typical Cell Plan (Close and Maximum Custody) ................... 6
 Fig. 7 Typical Cell Elevation (Close and Maximum Custody) ........... 7
**7.5    Appendix V - Par Course Requirements**
 Station #1    3 Stage Pull-up Bar ............................................... 1
 Station #3    Female Parallel Dip Bar ......................................... 2
 Station #4    Pull-up Bar ............................................................ 3
 Station #5    Elevated Push-up Bar ............................................ 4
 Station #6    Male Parallel Dip Bar ............................................. 5
 Station #7    Back & ABS Station ............................................... 6
 Station #8    Triceps Dip Station ............................................... 7
 Station #9    Hand Walk Station ................................................. 8
 Station #10    Calf Raise Station ................................................ 9
 Station #11    Stair Climb ......................................................... 10
 Station #12    Sit-up Station...................................................... 11
**7.6    Appendix VI - Finish Schedules**
 Finish Schedule Legend .............................................................. 1
 Finish Schedule Chart ................................................................. 2

# PART 7 - APPENDIX

## 7.1 APPENDIX I - REGULATORY CODES
### 7.1.1 Federal, Statutory and Regulatory

- Arizona Revised Statute, Title 34, et al, Public Buildings and Improvements.
- *A.R.S 34-451 Energy conservation standards for public buildings*
- *A.R.S. 34-452, Solar design standards for state buildings; energy life cycle costing.*
- *A.R.S. 34-461, Applicability of local codes, exceptions, definition.*
- A.R.S. 36-136, Powers *and duties of Director; compensation of personnel*. (Department of Health Services)
- A.R.S. 37-321, *Permission required for person other than holder of certificate of purchase to make improvements; forfeiture for failure to obtain permission; report of improvements.*
- A.R.S. 40-441, Commission *safety regulations, rules and orders; definitions. (Pipeline Safety)*
- A.R.S. 41-511.04, *Duties; board; partnership fund; state historic preservation officer*. (State Board of Historic Preservation)
- A.R.S. 41-790, et al, Management of State Properties.
- A.R.S. 41- 844, Duty to report discoveries; disposition of discoveries, definitions. (Archeological Discoveries)
- A.R.S. 41-861, Agency responsibilities. (Historic Preservation)
- A.R.S. 41-1492 et seq, Public Accommodation and Services.
- A.R.S. 41-2151, *et al, Office of Manufactured Housing; purpose*.
- A.R.S. 41-2161, et al, Office of State Fire Marshal.
- *A.R.S. 41-2163, Powers and duties, arson investigators.*
- A.R.S. 45-101, et al, Department of Water Resources.
- A.R.S. 49-104, Powers *and duties of the department and director. (Arizona Department of Environmental Quality)*
- Executive Order 2005-5, Implementing Renewable Energy and Energy Efficiency in New State Buildings
- Executive Order 2004-28, Statewide 5% Water Use Reduction
- Executive Order 2003-14, Implementing Statewide Efficiency Review
- A.A.C. R18-2-1101; Federal Hazardous Air Pollutants
- 40 CFR Part 61, National Emission Standards for Hazardous Air Pollutants; Asbestos
- NESHAP Revision; Final Rule.
- Appendix A, Subpart F, 40 CFR Part 763, Section 1, Polarized Light Microscopy (PLM)
- Americans with Disabilities Act of 1990, Titles I-V.

### 7.1.2 Building Fire Code and Safety

- International Fire Code Standards—2003 Edition
- International Building Code—2006 Edition
- International Mechanical Code—2006 Edition
- Uniform Plumbing Code—1994 Edition with Local Amendments
- Occupational, Safety and Health Administration Standards.
- American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc., (ASHRAE) Design reviews will conform to local City and County Codes of Jurisdiction.

### 7.1.3 International Fire Code—2003 Edition

- NFPA#10 Portable Fire Extinguishers—2002 Edition
- NFPA# 12A Halon 1301Fire Extinguishing System—2004 Edition
- NFPA# 12B Halon 1211 Fire Extinguishing Systems—2004 Edition
- NFPA# 13 Installation of Sprinkler Systems—2002 Edition.
- NFPA# 13 Inspection, Testing and Maintenance of Sprinkler Systems—2002 Edition
- NFPA#13R Installation of Sprinkler System in Residential Occupancies up to Four Stories Height—2002 Edition.
- NFPA# 14 Standpipe & Hose Systems—2003 Edition
- NFPA# 15 Water Spray Fixed Systems—2001 Edition
- NFPA# 16 Foam Water Spray Systems—2003 Edition
- NFPA# 17 Dry Chemical Extinguishing Systems—2002 Edition
- NFPA# 17A Wet Chemical Extinguishing Systems—2002 Edition
- NFPA# 20 Centrifugal Fire Pumps—2003 Edition
- NFPA# 22 Water Tanks For Private Fire Protection—2003 Edition
- NFPA# 24 Private Fire Service Mains—2002 Edition
- NFPA# 51 Cutting & Welding Processes—2002 Edition
- NFPA# 58 Liquefied Petroleum Gases—2004 Edition
- NFPA# 70 National Electrical Code—2005 Edition
- NFPA# 72B Auxiliary Protective Signaling Systems—2002 Edition
- NFPA# 72C Remote Station Protective Signaling Systems—2002 Edition
- NFPA# 72D Proprietary Protective Signaling Systems—2002 Edition
- NFPA# 72E Automatic Fire Detectors—2002 Edition
- NFPA# 72H Testing Procedures for Local, Auxiliary, Remote Station and Proprietary Protective Signaling Systems—2002 Edition
- NFPA# 80 Fire Doors and Windows—99 Edition
- NFPA# 86 Ovens and Furnaces, Design, Location, and Equipment—2003 Edition
- NFPA#110 Emergency Power—2002 Edition
- NFPA# 230 General Storage—2003 Edition
- NFPA# 303 Fire Protection Standard for Malians and Boatyards—2000 Edition
- NFPA# 407 Aircraft Fuel Service—2001 Edition.
- NFPA# 409 Aircraft Hangars—2001 Edition
- NFPA# 490 Ammonium Nitrate, Storage of —2002 Edition
- NFPA# 498 Explosive Motor Vehicle Terminals—2001 Edition
- NFPA# 651 Aluminum and Magnesium Powder—2002 Edition
- NFPA# 704 Identification of the Fire Hazards of Materials—2001 Edition
- State Fire Marshal Approved Modifications—2003 Edition

## 7.3    Appendix III  Fences



DEPARTMENT ORDER 4T-PPS ADC PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12





DEPARTMENT ORDER 04: PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12



CURRENT CLOSE & MAXIMUM CUSTODY
PERIMETER SECURITY FENCE

① TYPICAL FENCE POST @ DIG BARRIER



PERIMETER FENCE
CLOSE & MAXIMUM CUSTODY FACILITY

PRISON PHYSICAL PLANT
STANDARDS MANUAL

FIG. 3

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 310 of 380

DEPARTMENT ORDER 04—PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12



**TYPICAL SECURITY OFFICE**
① ————

**VEHICLE SALLY PORT CONTROL BUILDING**

**PRISON PHYSICAL PLANT STANDARDS MANUAL**

**FIG. 4**

## 7.4 APPENDIX IV-Furniture
### 7.4.1 Figure 1 ACI Bed/Desk/Storage





Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 312 of 380

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

### 7.4.2 FIGURE 2 INMATE STOOL



INMATE STOOL

PRISON PHYSICAL PLANT
STANDARDS MANUAL

FIG. 2

### 7.4.3 FIGURE 3 4 MAN DINING TABLE



4-MAN DINING TABLE

PRISON PHYSICAL PLANT STANDARDS MANUAL

FIG. 3

### 7.4.4 FIGURE 4 6 MAN DINING TABLE



6-MAN DINING TABLE

PRISON PHYSICAL PLANT
STANDARDS MANUAL

FIG. 4

## 7.4.5 FIGURE 5 HOUSING CONTROL ROOM WINDOW BAR GRILLS





HOUSING CONTROL ROOM WINDOW BAR GRILLS

PRISON PHYSICAL PLANT STANDARDS MANUAL

FIG. 5

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 316 of 380



TYPICAL CELL PLAN

PRISON PHYSICAL PLANT
STANDARDS MANUAL

FIG. 6



TYPICAL CELL ELEVATION

PRISON PHYSICAL PLANT
STANDARDS MANUAL

FIG. 7

## 7.5    Appendix V   Par Course Design Requirements



3 STAGE PULL—UP AREA @ STATION 1

APPENDIX V — PAR COURSE REQUIREMENTS



BOLT DOWN
ALL EQUIP.

PRE-FAB DIP BAR
PART #01814300
B.S.N. SPORTS-OR EQUAL
BY G.C.

6x6 10 GA. W.W.F.

3" ABC

CONSTRUCTION NOTES:

1. COMPACT AGGREGATE BASE COURSE TO 95 % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING ¾" MINUS AGGREGATE

FEMALE PARALLEL DIPS @ STATION 3

APPENDIX V – PAR COURSE REQUIREMENTS

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 320 of 380



CONSTRUCTION NOTES:
1. COMPACT AGGREGATE BASE COURSE TO 95   % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING ¾" MINUS AGGREGATE

PULL—UP @ STATION 4

APPENDIX V — PAR COURSE REQUIREMENTS

Case 4:14-cv-03253 Document 301-13 Filed on 09/08/16 in TXSD Page 321 of 380

DEPARTMENT ORDER ON PRISON CONSTRUCTION
CHAPTER: 401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12



FABRICATE BY G.C.

6x6 W.W.F.

3" ABC

CONSTRUCTION NOTES:

1. COMPACT AGGREGATE BASE COURSE TO 95 % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS. CONCRETE SHALL BE 3500 PSI, HAVE A 4"
4. SLUMP USING $\frac{3}{4}$" MINUS AGGREGATE

ELEVATED PUSH UPS @ STATION 5

APPENDIX V    PAR COURSE REQUIREMENTS



CONSTRUCTION NOTES.

1. COMPACT AGGREGATE BASE COURSE TO 95  % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING  ¾" MINUS AGGREGATE

PARALLEL DIPS @ STATION 6

APPENDIX V – PAR COURSE REQUIREMENTS



CONSTRUCTION NOTES:

1. COMPACT AGGREGATE BASE COURSE TO 95 % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING ¾" MINUS AGGREGATE

BACK & ABS STATION @ STATION 7

APPENDIX V – PAR COURSE REQUIREMENTS

Plaintiffs' MSJ Appx. 2293
6



2" DIA. STL. PIPE
FAB. BY G.C.

CONSTRUCTION NOTES:
1. COMPACT AGGREGATE BASE COURSE TO 95 % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING $\frac{3}{4}$" MINUS AGGREGATE

TRICEP DIP STATION @ STATION 8

APPENDIX V — PAR COURSE REQUIREMENTS

Plaintiffs' MSJ Appx. 2294



CONSTRUCTION NOTES:
1. COMPACT AGGREGATE BASE COURSE TO 95 % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING ¾" MINUS AGGREGATE

HANDWALK @ STATION #9

APPENDIX V    PAR COURSE REQUIREMENTS



CALF RAISE @ STATION 10

APPENDIX V — PAR COURSE REQUIREMENTS



2" Ø STL. PIPE
FABRICATE BY G.C.

6x6 #10 W.W.F.

CONCRETE STAIR 24" WIDE

3" ABC

4' X 8' SLABS

CONSTRUCTION NOTES:
1. COMPACT AGGREGATE BASE COURSE TO 95 % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING ¾" MINUS
   AGGREGATE

STAIR CLIMB @ STATION 11

APPENDIX V — PAR COURSE REQUIREMENT



CONSTRUCTION NOTES:
1. COMPACT AGGREGATE BASE COURSE TO 95 % STANDARD
2. PLACE AGGREGATE BASE COURSE TO A DEPTH OF 3"
3. USE 6"x6", 10 GA. WWF IN ALL CONCRETE PADS.
4. CONCRETE SHALL BE 3500 PSI, HAVE A 4" SLUMP USING $\frac{3}{4}$" MINUS AGGREGATE

SIT UPS @ STATION 12

APPENDIX V — PAR COURSE REQUIREMENTS

## 7.6    APPENDIX VI - FINISH SCHEDULE

### Legend:    Floors

CAR ............. Carpet
CT ................. Ceramic Tile
QT ................ Quarry Tile
SC ................. Sealed Concrete
VCT .............. Vinyl Composition Tile

### Legend:    Base

CT ................. Ceramic Tile
VIN ............... Vinyl Base
SS ................. Stainless Steel

### Legend:    Walls

CL ................. Chain Link Fence
CONC ........... Concrete or masonry block
GCMU .......... Glazed CMU
GYP .............. Gypsum Board
FRP ............... Fiberglass Reinforced Panels
PE ................. Paint Enamel

### Legend:    Ceiling

AP ................. Acoustical Panel
EXP ............... Exposed
GYP .............. Gypsum Board
SHC .............. Shade Cloth
GYP/SM ........ Gypsum Board and Security Mesh

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|---|---|---|---|---|---|
| **Administration** | | | | | |
| Office | CAR | VIN | GYP/PE | AP | 9'-0" |
| Open Work Areas | CAR | VIN | GYP/PE | AP | 9'-0" |
| Toilet | CT | CT | CT | AP | 9'-0" |
| Support | CAR or VCT | VIN | GYP/PE | AP | 9'-0" |
| **Classrooms** | | | | | |
| Classroom/Office | SC | VIN | CONC/PE | GYP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | VIN | CONC/PE | AP | 9'-0" |
| **Count & Movement** | | | | | |
| Office Work Areas | VCT | VIN | GYP/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | VIN | CONC/PE | AP | 9'-0" |
| **Dental** | | | | | |
| Office Work Areas | VCT | VIN | GYP/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| **Detention** | | | | | |
| Pod/Day Room | SC | | CONC/PE | CONC/PE | 9'-0" |
| Control | SC | VIN | GYP/PE | AP | 9'-0" |
| Recreation | CONC | | CONC | GRILL | 10'-0" |
| **Hair Care** | | | | | |
| Work Areas | VCT | VIN | GYP/PE | AP | 9'-0" |
| **Hearing** | | | | | |
| Offices | VCT | VIN | GYP/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | VCT | VIN | GYP/PE | AP | 9'-0" |
| **Kitchen** | | | | | |
| Work Areas | QT | SS | GCMU | AP | 9'-0" |
| Office | QT | QT | GYP/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | | CONC | EXP | |
| **Library** | | | | | |
| Library | VCT | VIN | GYP/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | VIN | CONC/PE | GYP | 9'-0" |
| | | | | | |
| | | | | | |
| **Maintenance** | | | | | |
| Office | SC | VIN | CONC/PE OR GYP/PE | AP | 9'-0" |

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|------|-------|------|-------|---------|-----|
| Work Areas | SC | - | CONC or GYP/PE | EXP | |
| Toilets | CT | CT | CT | AP | 9'-0" |
| **Medical** | | | | | |
| Office | CAR | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | VCT | VIN | GYP/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | AP | 8'-0" |
| Support | SC | | CONC or GYP/PE | EXP | 9'-0" |
| Inmate Holding (Interior) | VCT | | CONC or GYP/PE | EXP | |
| Medication Storage | VCT | VIN | CONC or GYP/PE | GYP/SM | |
| Inmate Holding (Exterior) | SC | | CL | SHC | 12'-0" |
| Nurse Call Area | SC | VIN | GYP/PE | AP | 9'0" |
| **Pharmacy** | | | | | |
| Office/Work Area | VCT | VIN | GYP/PE | AP | 9'-0" |
| **Property/Mail** | | | | | |
| Property Storage | SC | | CONC | EXP | |
| Work Areas | SC | | CONC | EXP | |
| **Recreation** | | | | | |
| Recreation | SC | | CONC | EXP | |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | | CONC | EXP | |
| **Vehicle Maintenance** | | | | | |
| Office | SC | VIN | CONC/PE or GYP/PE | AP | 9'-0" |
| Work Areas | SC | | CONC | EXP | - |
| Toilets | CT | CT | CT | AP | 8'-0" |
| Support | SC | - | CONC | EXP | - |
| **Visitor Processing** | | | | | |
| Office / Control | VCT | VIN | GYP/PE | AP | 8'-0" |
| Public Toilets | CT | CT | CT | AP | 8'-0" |
| Staff Locker rooms | VCT | VIN | GYP/PE | AP | 8'-0" |
| Staff Toilets | CT | CT | CT | AP | 8'-0" |
| **Visitation** | | | | | |
| Visitation | SC | VIN | CONC/PE | AP | 9'-0" |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | VIN | CONC/PE | GYP | 9'-0" |
| | | | | | |
| **Inmate Processing** | | | | | |
| Office | SC | VIN | GYP/PE | AP | 8'-0" |
| Exterior Holding | SC | - | CL | SHC | 12'-0" |

| AREA | FLOOR | BASE | WALLS | CEILING | HT |
|------|-------|------|-------|---------|-----|
| Interior Holding | SC | - | CONC | CONC | 12'-0" |
| Toilet | CT | CT | CT | AP | 8'-0" |
| Support | SC | - | CONC or GYP/PE | EXP or GYP/PE | 8'-0" |
| **Warehouse** | | | | | |
| Offices | VCT | VIN | GYP/PE | AP | 9'-0" |
| Work Areas | SC | | CONC | EXP | |
| Toilets | CT | CT | CT | GYP | 8'-0" |
| Support | SC | | CONC | EXP | |

Plaintiffs' MSJ Appx. 2302

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 136



## NEW MEXICO CORRECTIONS DEPARTMENT

*"We commit to the safety and well-being of the people of New Mexico by doing the right thing, always."*
**C**ourage **R**esponsibility **E**thics **D**edication - **CRED**ibly serving the public safety of New Mexico

| ISSUE DATE: | 01/12/05 | REVIEW/REVISED: | 03/09/15 |
|---|---|---|---|
| EFFECTIVE DATE: | 01/12/05 | | |

**CD-163000**

TITLE:   **Physical Plant Requirements**

**AUTHORITY**:

Policy *CD-010100*

**REFERENCE:**

A.  ACA Standard 2-CO-2A-01, 2-CO-2A-02, 2-CO-2B-01, 2-CO-2B-02, 2-CO-2B-03 and 2-CO-2B-04, *Standards for the Administration of Correctional Agencies*, 2nd Edition.

B.  ACA Standards 4-4123, 4-4125, 4-4127 thru 4-4130, 4-4132, 4-4134 thru 4-4141, 4-4145 thru 4-4147-1, 4-4149 thru 4-4153, 4-4157, 4-4162, 4-4163, 4-4165, 4-4167 thru 4-4169, 4-4278, and 4-4417 thru 4-4419 *Standards for Adult Correctional Institutions*, 4th Edition.

C.  ACA Standards 4-APPFS-3D-12, *Performance Based Standards for Adult Probation and Parole Field Services*, 4th Edition.

D.  ACA Standards 1-CTA-2A-01, 1-CTA-2B-01, 1-CTA-2B-02, 1-CTA-2B-03 and 1-CTA-2D-01, *Standards for Correctional Training Academies,* 1993.

**PURPOSE**:

To standardize physical plant requirements for existing facilities and new construction and to provide for adequate space to meet all departmental needs.

**APPLICABILITY**:

All correctional facilities and Probation and Parole field offices under the jurisdiction of the New Mexico Corrections Department and facilities contracted to house inmates for the Department.

**FORMS:**

None

**ATTACHMENTS:**

None

**DEFINITIONS**:

None

NUMBER: **CD-163000**          REVIEW/REVISION: **03/09/15**          PAGE: **2**

**POLICY**:

    A.    All agency facilities shall meet and conform to appropriate federal, state, and local fire, sanitation, safety, building and health codes. **[2-CO-2A-01] [4-4123] [1-CTA-2A-01]**

    B.    All Department facilities shall be inspected by representatives of appropriate governmental agencies at specified intervals and that each report is reviewed and remedial action taken if indicated. **[2-CO-2A-02]**

    C.    The physical plant design shall facilitate personal contact and interaction between staff and inmates (*Renovation, Addition, and New Construction only*). **[2-CO-2B-01] [4-4125]**

    D.    New correctional institutions being constructed or existing facilities being expanded shall have a needs evaluation study conducted prior to beginning construction. **[2-CO-2B-02]**

    E.    All remodeling or additional construction shall have all applicable permits and approvals prior to construction.  The facility Manager must be informed in writing of proposed work.

    F.    All new facilities shall be planned with the participation from the community in which they are to be located. **[2-CO-2B-03]**

    G.    Reasonable accommodation is made to ensure all parts of the institution that are accessible to the public are also accessible and usable by staff and visitors with disabilities.     **[2-CO-2B-04]**

    H.    The maximum size of a single management unit is variable and is based on the characteristics of its inmate population. The exact size of each management unit is determined by: **[4-4127]**

- The security classification of the inmate occupants (higher security levels require smaller unit size);
- The ability of staff to complete regular security checks, maintain visual and auditory contact, maintain personal contact and interaction with inmates, and be aware of unit conditions.

    I.    Single-cell living units shall not exceed 80 inmates (*New Construction only*). **[4-4128]**

    J.    The number of inmates does not exceed maximum allowable inmate population based on the Standards Compliant Bed Capacity (SCBC) formula (See ACA 2010 Supplement, pg 47). **[4-4129]**

Plaintiffs' MSJ Appx. 2305

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **3**

K.   Cells/rooms used for housing inmates shall provide at a minimum, twenty-five (25) square feet of unencumbered space per occupant.  Unencumbered space is usable space that is not encumbered by furnishings or fixtures.  At least one dimension of the unencumbered is no less than seven feet.  In determining unencumbered space in the cell or room, the total square footage is obtained and the square footage of fixtures and equipment is subtracted.  All fixtures and equipment must be in operational position and must provide the following minimum per person:  **[4-4132]**
  - Bed.
  - Plumbing fixtures (if inside the cell/room),
  - Desk,
  - Locker,
  - Chair or stool.

L.   Each inmate confined to a cell/room for ten (10) or more hours daily is provided a sleeping area with the following: a sleeping surface and mattress at least twelve (12) inches off of the floor; a writing surface and proximate area to sit; storage for personal items; and adequate storage space for clothes and personal belongings. **[4-4134]**

M.   Each inmate confined to a cell/room for less than ten (10) hours daily is provided a sleeping area with the following: a sleeping surface and mattress at least twelve (12) inches off of the floor; storage for personal items; and adequate storage space for clothes and personal belongings. **[4-4134]**

N.   Dayrooms with space for varied inmate activities are situated immediately adjacent to the inmate sleeping areas.  Dayrooms provide a minimum of thirty-five (35) square feet of space per inmate (exclusive of lavatories, showers, and toilets) for the maximum number of inmates who use the dayroom at one time, and no dayroom encompasses less than 100 square feet of space (exclusive of lavatories, showers, and toilets). **[4-4135]**

O.   Dayrooms shall provide sufficient seating and writing surfaces.  Dayroom furnishings shall be consistent with the custody level of the inmates assigned.  **[4-4136]**

P.   Inmates have access to toilets and hand-washing facilities 24 hours per day and are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas. **[4-4137]**

Q.   Toilets are provided at a minimum ratio of one (1) for every twelve (12) inmates in male facilities and one (1) for every eight (8) inmates in female facilities. Urinals may be substituted for up to one-half of the toilets in male facilities. All housing units with three (3) or more inmates have a minimum of two (2) toilets.  These ratios apply unless national or state building or health codes specify a different ratio. **[4-4137**]

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **3**

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **4**

R.    Inmates have access to operable wash basins with hot and cold running water in the housing units at a minimum ratio of one (1) basin for every twelve (12) occupants, unless national or state building or health codes specify a different ratio. **[4-4138]**

S.    Adequate space is provided for janitorial closets accessible to the living and activity areas. The closets are equipped with a sink and cleaning implements. **[4-4162]**

T.    Space is provided in the institution to store and issue clothing, bedding, cleaning supplies, and other items required for daily operation. **[4-4163]**

U.    Inmates have access to operable showers with temperature-controlled hot and cold running water, at a minimum ratio of one shower for every eight inmates, unless national or state building codes specify a different ratio. Water for showers is thermostatically controlled to temperatures ranging from 100° degrees Fahrenheit to 120° Fahrenheit to ensure the safety of inmates and to promote hygienic practices. **[4-4139]**

V.    Segregation housing units provide living conditions that approximate those of the general inmate population; all exceptions are clearly documented. Segregation cells/rooms permit the inmates assigned to them to converse with and be observed by staff members. **[4-4140]**

W.    All cells/rooms in segregation provide a minimum of 80 square feet, of which 35 square feet is unencumbered space. **[4-4141]**

X.    Lighting throughout the facility is determined by the tasks to be performed, interior surface finishes and colors, type and spacing of light sources, outside lighting, and shadows and glare. **[4-4145] [1-CTA-2B-01] [1-CTA-2B-03]**

Y.    Lighting in inmate rooms/cells is at least 20 foot candles at desk level and in personal grooming areas, as documented by an independent, qualified source and is checked at least once per accreditation cycle. **[4-4146]**

Z.    All inmate rooms/cells provide access to natural light. (Existing only.) **[4-4147]**

AA.   All inmate rooms/cells shall provide inmates with access to natural light by means of at least three square feet of transparent glazing, plus two additional square feet of transparent glazing per inmate in rooms/cells with three or more inmates. (Renovation, Addition only) **[4-4147-1**]

BB.   Each dayroom provides inmates with access to natural light by means of at least 12 square feet of transparent glazing in the dayroom, plus two additional square feet of glazing per inmate whose room/cell is dependant on access to natural light through the dayroom. (*New Construction Only*) **[4-4149]**

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **4**

CC.  Noise levels in inmate housing units do not exceed 70dBA (A Scale) in daytime and 45dBA (A Scale) at night. **[4-4150] [1-CTA-2B-03]**

DD.  Noise levels in housing areas (in other words, dayrooms with adjacent cells or dorms) shall not exceed the following (*New Construction Only*) **[4-4150-1]**:
- Unoccupied – 45 dba (A Scale), building service systems shall be on and in normal operating conditions.  Mid-frequency average reverberation time (T 60) must be less than one second.
- Occupied – 70 dba (A Scale), for a minimum of 15 seconds of continuous average measurement in normal operating conditions.

All monitoring shall be conducted in close proximity to the correctional officer's post.  If a correctional officer's post is not identified, then monitoring shall be conducted at a location considered best to monitor housing noise levels.  Measurements shall be conducted a minimum of once per accreditation cycle by a qualified source.

EE.  Circulation is at least 15 cubic feet of outside or recirculated filtered air per minute per occupant for cells/rooms, officer stations, and dining areas, as documented by a qualified technician and should be checked not less than once per accreditation cycle. (Accreditation cycle is interpreted as within the past three years.) (*Renovation, Addition, New Construction Only*) **[4-4151]**

FF.  Circulation shall be at least 10 cubic feet of fresh or re-circulated filtered air per minute per occupant for inmate rooms/cells, officer stations, and dining areas, as documented by a qualified technician and should be checked not less than once per accreditation cycle. (Accreditation cycle is interpreted as within the past three years.) (*Existing*) **[4-4152]  [1-CTA-2B-03]**

GG.  Temperatures in indoor living and work areas shall be appropriate to the summer and winter comfort zone. **[4-4153] [1-CTA-2B-02]**

HH.  In institutions offering academic and vocational training programs, classrooms are designed in consultation with school authorities. (Renovation, Addition, New Construction *Only*) **[4-4157]**

II.  Separate and adequate space is provided for mechanical and electrical equipment.  **[4-4165]**

JJ.  Adequate space is provided for administrative, security, professional, and clerical staff; this space includes conference rooms, storage room for records, public lobby, and toilet facilities. **[4-4167] [1-CTA-2D-01]**

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **5**

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **6**

KK.  Staff shall be provided adequate spaces in locations that are convenient for use including; **[4-4168]**
- An area to change clothes and to shower,
- An area, room, and/or employee lounge that offers privacy from inmates and provides space for meals,
- Access to exercise/physical training facilities and equipment,
- Space for training,
- Space for shift change briefings,
- Toilets and wash basins that are not used by inmates.

LL.  Reasonable accommodation is made to ensure that all parts of the facility are accessible to the public are accessible and usable by staff and visitors with disabilities. **[4-4169]**

MM.  When male and female inmates are housed in the same facility, separate sleeping quarters but equal access to all available services and programs shall be provided. Neither sex shall be denied opportunities solely on the basis of their smaller number in the population. **[4-4278]**

NN.  Infirmary (LTCU)

1.  There are sufficient bathing facilities in the medical housing unit or infirmary area to allow offenders housed there to bathe daily. **[4-4417]**

2.  Offenders have access to operable washbasins with hot and cold running water in the medical housing unit or infirmary area at a minimum ration of one basin for every 12 occupants, unless state or local building or health codes specify a different ratio. **[4-4418]**

3.  Offenders have access to toilets and hand-washing facilities 24 hours per day and are able to use toilet facilities without staff assistance when they are confined in the medical housing unit or in the infirmary area.  Toilets are provided at a minimum ratio of 1 for every 12 offenders in male facilities and 1 for every 8 offenders in female facilities.  Urinals may be substituted for up to one-half of the toilets in male facilities.  All housing units with three or more offenders have a minimum of 2 toilets.  These ratios apply unless state or local building or health codes specify a different ration. **[4-4419]**

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **6**

Plaintiffs' MSJ Appx. 2309

NUMBER:  **CD-163000**          REVIEW/REVISION:  **03/09/15**          PAGE:  **7**

OO.  Probation and Parole

4.   The agency provides adequate facilities for all agency operations.  Facility needs are reviewed at least annually. **[4-APPFS-3D-12]**


_____          03/09/15
Gregg Marcantel, Secretary of Corrections          Date
New Mexico Corrections Department

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 137

# TENNESSEE CORRECTIONS INSTITUTE

RULES OF THE
TENNESSEE CORRECTIONS INSTITUTE
CORRECTIONAL FACILITIES INSPECTION

## CHAPTER 1400-1
## MINIMUM STANDARDS FOR
## LOCAL ADULT CORRECTIONAL FACILITIES



### NASHVILLE TN
(Rev. 01/15)

Plaintiffs' MSJ Appx. 2312

# TABLE OF CONTENTS

**WEBSITE:**
www.tn.gov/tci/

**PHONE:**
(615) 741 - 3816

**FAX:**
(615) 532 - 2333

**ADDRESS:**
500 JAMES
ROBERTSON
PKWY.
NASHVILLE, TN
37243



1400-01-.01   Preface

1400-01-.02   Basic Information

1400-01-.03   Definitions

1400-01-.04   Physical Plant

1400-01-.05   Administration/Management

1400-01-.06   Personnel

1400-01-.07   Security

1400-01-.08   Discipline

1400-01-.09   Sanitation/Maintenance

1400-01-.10   Food Services

1400-01-.11   Mail and Visiting

1400-01-.12   Inmate Programs and Activities

1400-01-.13   Medical Services

1400-01-.14   Admission, Records and Release

1400-01-.15   Hygiene

1400-01-.16   Supervision of Inmates

1400-01-.17   Classification

1400-1-.01 Preface

    (1)    Under the authority of T.C.A. 41-4-140, the Tennessee Corrections Institute is required to establish minimum standards for local jails, lock-ups, workhouses and detention facilities in the state and conduct an annual inspection of each facility.

    (2)    Local correctional facilities are the first step in the handling of the arrested offender and in it he receives his first impression of the correctional process. His experience in a county jail or a municipal lock-up facility will be a potent force molding his attitude toward law enforcement officials, the correctional system and the community itself.

    (3)    The Board of Control of the Tennessee Corrections Institute hopes that in carrying out the responsibilities of Tennessee Code Annotated 41-4-140, avenues of communication and cohesiveness will be developed with local agencies that will tend to upgrade the correctional system in the State of Tennessee.

Authority:T.C.A. §41-4-140.

1400-01-.02 Basic Information.

    (1)    Statutory Authority: The standards contained in this document are authorized pursuant to T. C. A. § 41-4-140 to establish minimum standards for the inspection of local jails, lock-ups, workhouses and detention facilities.

    (2)    Categories Covered by Standards: The minimum standards established and recorded herein will cover the following categories:

        (a)    Physical Plant

        (b)    Administration/Management

        (c)    Personnel

        (d)    Security

        (e)    Discipline

        (f)    Sanitation/Maintenance

        (g)    Food Services

        (h)    Mail and Visiting

        (i)    Inmate Programs and Activities

        (j)    Medical Services

        (k)    Admission Records and Release

        (l)    Hygiene

        (m)    Supervision of Inmates

        (n)    Classification

Plaintiffs' MSJ Appx. 2314

(3)     Other Standards:  Nothing contained in these standards shall be construed to prohibit a city, county, or city and county agency operating a local correctional agency from adopting standards governing its personnel and facility, provided such standards meet or exceed and do not conflict with the standards established and recorded herein.  Nor shall these standards be construed as authority to violate any state fire safety standards, building standards or health and safety codes.

(4)     Validity:  In determining the application of these minimum facility standards, the Tennessee Corrections Institute Board of Control has enacted the following:

(a)     Standards contained herein shall apply to specific types of local correctional facilities as noted at the end of each document.  For the purpose of this document, primarily adult jails or workhouses which house inmates for over seventy-two (72) hours will be considered Type I; primarily adult jails which house inmates for no more than seventy-two (72) hours will be considered Type II; primarily adult jails which house inmates between one (1) and twelve (12) hours will be considered Type III. Type III does not include facilities used primarily for fingerprinting, photographing, interviewing or interrogating.

(b)     Detention facilities shall be classified according to construction date.  Facilities constructed after June 2000, shall be considered as new, while facilities constructed prior to or during the month of June 2000, shall be considered existing facilities.

(c)     An existing facility must meet all applicable standards referring to such facilities and all other applicable standards.  A new facility must comply with all applicable standards referring to such facilities and all other applicable standards.

(d)     Any additions or renovations to existing facilities must comply with all applicable standards for new facilities.

(e)     The number of inmates awaiting transfer to the Department of Correction penal system may be discounted from any computations used to determine compliance with standards (2), (3), (4), (5), (6), and (7) of Section 1400-01-.04 Physical Plant under the following conditions:

1.     The Governor must have invoked the power of delayed intake pursuant to T.C.A. § 41-1-504(a)(2) and/or a federal or state court has delayed intake into the Department of Correction penal system and,

2.     More than six (6%) percent of the county's total average inmate population over the preceding ninety (90) days in all of its correctional facilities consists of inmates sentenced to the Department of Corrections whose commitments have been delayed pursuant to 1. then,

3.     The number of inmates awaiting transfer to the Department of Correction at a particular facility in excess of six (6%) percent shall not be used in any computations used to determine compliance with the above stated standards.

(5)     Certification of Facilities:  Facilities which meet all applicable standards as determined by an annual inspection shall be recommended for certification by the inspector to the Tennessee Corrections Institute's Board of Control during the first board meeting following the completion of the inspection.  Facilities which do not meet all applicable standards shall be recommended for non-certification.  Facilities whose annual inspections are completed prior to the fifteenth (15th) of the month shall be

3

Plaintiffs' MSJ Appx. 2315

recommended for certification or non-certification to be effective on the first (1st) day of the month during which the inspection was completed.  Facilities whose annual inspections are completed after the fifteenth (15th) of the month shall be recommended for certification or non-certification to be effective on the first (1st) day of the month following the month in which the inspection was completed.  The Judicial Cost Accountant in the Office of the Comptroller shall be immediately notified of any proposed change in a facility's status.

(6)    No currently certified local facility shall be decertified if the local government has submitted a plan of action within sixty (60) days of the initial annual inspection that is reasonably expected to eliminate fixed ratio deficiencies in that facility and cause that facility to remain certified.

Authority:  T.C.A. § 41-4-140.

1400-01-.03 Definitions.

(1)    Basic Training - The introductory training provided by the Tennessee Corrections Institute which prepares a facility employee with general and specific knowledge about the detention of inmates in a local facility.

(2)    Booking- An official recording of an arrest and the identification of the person, place, time, arresting authority, and the reason for the arrest. It is the procedure for the admission of a person charged with or convicted of an offense, which includes searching, fingerprinting, photographing, medical screening, and collecting personal history data.  Booking also includes the inventory and storage of the individual's personal property.

(3)    Cell Block - A separate, secure group or cluster of single and/or multiple occupancy cells or detention rooms immediately adjacent and directly accessible to a day or activity room. In some facilities the cell block consists of a row of cells fronted by a dayroom or corridor-like proportion.

(4)    Censor - To read communications such as letters to delete material which might be considered harmful to the interests of the organizations, agency or facility.

(5)    Chemical Agent – An active substance, such as pepper spray, used to deter acts that might cause personal injury or property damage.

(6)    Classification - A process for determining the needs and requirements of those for whom confinement has been ordered and for assigning them to housing units and programs according to their needs and existing resources.

(7)    Clear Floor Space - Floor space that is free of obstructions such as bunks, showers, commodes, and lavatories.

(8)    Contraband – An item that has not been approved for possession or use by inmates or detainees by those legally charged with the responsibility for administration and operation of the facility.

(9)    Control Center – A very secure, self-contained unit designed to maintain the security of the facility. Policies governing the design, staffing, and accessibility of the control center should ensure that it cannot be commandeered by unauthorized persons.

(10)    Corporal Punishment -Physical punishment, as distinguished from pecuniary punishment, inflicted on the body of an inmate or detainee for the purpose of interrupting an impermissible act or deterring undesirable behavior.

4

Plaintiffs' MSJ Appx. 2316

(11)     Daily Log - A record of all significant activities that take place during the course of a day.

(12)     Dayroom - A secure area directly adjacent to inmate living area, to which inmates may be admitted for activities such as bathing, exercise, recreation and dining.  Spaces originally designed for circulation, such as corridors, are not dayrooms.

(13)     Detainee - A person confined in a local facility not serving a sentence for a criminal offense.

(14)     Detainer - A writ or instrument, issued or made by a competent officer, authorizing the keeper of a prison/jail to keep in his custody a person therein named.

(15)     Detention - The confinement of an inmate in a secure area (usually pretrial inmates).

(16)     Detention Facility - A confinement facility, usually operated by a local law enforcement agency, which holds persons detained pending adjudication and/or persons committed after adjudication.

(17)     Detention Officer – A person who is employed or authorized to detain or guard inmates.

(18)     Disciplinary Action - An action taken upon an inmate that is intended to correct or punish.

(19)     Disciplinary Hearing - A non-judicial administrative procedure to determine if substantial evidence exists to find an inmate guilty of a rule violation.

(20)     Disciplinary Report - An account, or announcement that is prepared, presented or delivered, usually in formal or organized form based on the possibility of a rule violation.

(21)     Disciplinary segregation – A form of separation from the general population in which inmates who committed serious violations of conduct regulations are confined for short periods of time to individual cells separated from the general population by the disciplinary committee or other authorized group. Placement in disciplinary detention may only occur after a finding of a rule violation at an impartial hearing and when there is not an adequate alternative disposition to regulate the inmate's behavior.

(22)     Document - To support with written sources.

(23)     Due Process Guarantees – Those procedures that ensure just, equal, and lawful treatment of an individual involved in all stages of the criminal justice system, such as a notice of allegations, impartial and objective fact finding, a written record of the proceedings, a statement of any disposition ordered with the reasons for it, and the right to confront accusers, call witnesses, and present evidence.

(24)     Existing Facility - Detention facility built prior to or during the month of June 2000.

(25)     Facility Administrator - An official who has primary responsibility for managing and operating a local detention facility.

(26)     Flushable Drain - A pipe or channel which is cleaned by a rapid, brief gush of water.

(27)     Foot-candle - A unit for measuring the intensity of illumination; the amount of light thrown on a surface one foot away from the light source.

Plaintiffs' MSJ Appx. 2317

(28)     Furnishings – Applies to all living quarters. Includes draperies, curtains, furniture, mattresses and bedding, upholstered or cushioned furniture, wastebaskets, decorations, and similar materials that can burn.

(29)     General Population - A group of individuals confined in an institution who have no institutional restrictions on them, such as segregation.

(30)     Grievance/Grievance Process – A circumstance or action considered to be unjust and grounds for complaint or resentment and/or a response to that circumstance in the form of a written complaint filed with the appropriate body.

(31)     Health/Medical Screen – A structured inquiry and observation to prevent newly-arrived offenders who pose a health and safety threat to themselves or others from being admitted to the general population and to identify offenders who require immediate medical attention. The screen can be initiated at the time of admission by health care personnel or by a health-trained correctional officer.

(32)     Housing Area - A high-security, medium-security, or low-security cell or room, excluding holding, detoxification, infirmary, and segregation cells or rooms.

(33)     Informed Consent – The agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts regarding the nature, consequences, risks, and alternatives concerning the proposed treatment, examination, or procedure.

(34)     Inmate – A person, whether in pretrial, un-sentenced, or sentenced status, who is confined in a correctional facility.

(35)     In-Service Training - Training which is given to an employee on an annual basis to reinforce or add to his basic training.

(36)     Jail - A confinement facility, usually operated by a local law enforcement agency, which holds persons detained pending adjudication and/or persons committed after adjudication.  Jails, while intended for the confinement of adults, may also confine juveniles.

(37)     Jailer – A person who is charged by an institution to detain or guard inmates.

(38)     Library Service – A service that provides reading materials for convenient use; circulation of reading materials; service to help provide users with library materials, educational and recreational materials, or a combination of these services.

(39)     Medical Records - Records of medical examinations and diagnoses maintained by the responsible medical provider for each inmate separate from the inmate's file.  Medical records shall include the date and time of the medical examination and copies of standing or direct medical orders from the physician.

(40)     Medication Receipt System - A method that accounts for the administering of medications.

(41)     Menu Pattern - The outline of food items to be included in each meal.

(42)     Monitor - To keep watch over, supervise.

(43)     New Facility - Detention facility built after June 2000.

6

(44)     Physical Force - Any use of firearms, chemical agents, clubs or other devices in controlling an inmate.  Also, any situation which requires an officer to "lay hands" on an inmate or physical force used which subjects an inmate to pain, discomfort or physical incapacitation.

(45)     Physical Plant - A building, set of buildings, portion of a building, or area that is used for the lawful custody and/or treatment of individuals.

(46)     Plan of Action – A written plan that will eliminate or correct deficiencies noted in the annual inspection.

(47)     Potentially Hazardous Food - Any food that consists, in whole or in part, of milk or milk products, eggs, meat, poultry, fish, shellfish, edible crustacea, or other ingredients, including synthetic ingredients, in a form capable of supporting rapid and progressive growth of infectious or toxigenic microorganisms. Does not include clean, whole, uncracked, odor-free shell eggs, foods which have a pH level of 4.6 or below, or a water activity (aw) value of 0.85 or less.

(48)     Pre-Service Orientation - Training accomplished prior to assignment of duty, which is intended to familiarize new employees with the operations of the particular jail to which they are to be assigned.

(49)     Preventative Maintenance – A system designed to enhance the longevity and/or usefulness of buildings or equipment in accordance with a planned schedule.

(50)     Range of Sanctions - The various penalties for noncompliance of rules specified by the facility administrator.

(51)     Receiving Area - The point of inmate entry into a jail or detention facility where an inmate undergoes admission processing, which may include orientation and initial classification prior to regular assignment to the housing area.

(52)     Receiving Screening - An observation/initial health assessment to identify newly-arrived inmates who pose a health or safety threat to themselves or others.

(53)     Regular Access - The documented number of hours an inmate may utilize additional living space available as described by facility policy.

(54)     Sally Port - An enclosure situated either in the perimeter wall or fence of the facility or within the interior of the facility, containing gates or doors at both ends, only one of which opens at a time.  This method of entry and exit ensures there will be no breach in the perimeter or interior security of the facility.

(55)     Security Devices - Locks, gates, doors, bars, fences, screens, ceilings, floors, walls, and barriers used to confine and control inmates.  Also, electronic monitoring equipment, security alarm systems, security light units, auxiliary power supply, and other equipment used to maintain facility safety.

(56)     Security Perimeter - Outer portions of a facility which provide for secure confinement of inmates.  This perimeter may vary for individual facilities, depending upon their security classification.

(57)     Segregation – Confinement of an inmate to an individual cell separated from the general population.

7

(58)     Sick Call - A function which provides inmates the opportunity to receive required medical attention.

(59)     Strip Search – Examination of an inmate's naked body for weapons, contraband, and physical abnormalities and includes a thorough search of all of the individual's clothing while it is not being worn.

(60)     Structural Projections - Some part of the construction that protrudes with sharp or pointed edges.

(61)     Trusty - An inmate, usually in a minimum security classification, who is responsible for performing various maintenance tasks under supervision in a jail.

(62)     Type I Facility – A detention facility housing primarily adults for more than seventy-two (72) hours.

(63)     Type II Facility – A detention facility housing primarily adults for not more than seventy-two (72) hours.

(64)     Type III Facility – A detention facility where persons are detained between one (1) and twelve (12) hours and does not include detention facilities used primarily for fingerprinting, photographing, interviewing or interrogating.

(65)     Unencumbered Space – Usable space that is not encumbered by furnishings or fixtures. In determining unencumbered space in the area, the total square footage is obtained and the square footage of fixtures and equipment is subtracted.  All fixtures and equipment must be in operable position.

(66)     Work Stoppage - A halt by those employed by the facility; usually refers to a strike.

(67)     Workhouse - A county detention facility operated by or for a county which holds primarily sentenced, minimum security inmates.

(68)     Working Inmate – An inmate who has been screened, selected, and assigned to a formal jail work program (occurring within the security area of the jail, or external to the jail). This includes those inmates who are taken out by various persons/agencies to work offsite (for example, a county employee comes to the jail each day to take a group of inmates to work at a recycling center).

Authority:  T.C.A. § 41-4-140.

1400-01-.04 Physical Plant.

(1)     All types of facilities shall meet the following requirements:

(a)     New and existing facilities shall have, on average, lighting of at least twenty (20) foot-candles in activity areas to be measured three (3) feet off the floor.

(b)     New and existing facilities shall have forced air ventilation in sleeping and activity areas.

(c)     New facilities shall have access to natural light in sleeping and activity areas.

(d)     New and existing facilities shall have a temperature of not less than sixty-five (65) degrees Fahrenheit and not more than eighty (80) degrees Fahrenheit in sleeping and activity areas.

8

Plaintiffs' MSJ Appx. 2320

(e)      New facilities shall have lighting of not less than five (5) average foot-candles in sleeping areas to be measured three (3) feet off the floor.

Applies to Types I, II, and III.

(2)      In new and existing facilities, the minimum size of a single-occupancy cell shall be thirty-five (35) square feet of clear floor space with a ceiling height of not less than eight (8) feet. At least seventy (70) square feet of total floor space shall be provided when the occupant is confined for more than ten (10) hours per day. All dimensions of cell length and width for both single and multiple-occupancy cells shall allow for a reasonable amount of usable floor space for any in-cell activities of inmates. Each cell shall contain a bunk, water closet and lavatory. Any questions pertaining to sufficiency of cell dimensions shall be decided by the Tennessee Corrections Institute.

Applies to Types I, II, and III.

(3)      In new and existing facilities, the minimum size of a multiple-occupancy cell (2-64 occupants) shall be twenty-five (25) square feet of clear floor space for each occupant in the sleeping areas, with a ceiling elevation of not less than eight (8) feet. At least thirty-five (35) square feet of clear floor space shall be provided for each occupant when the occupant is confined for more than ten (10) hours per day.

Applies to Types I, II, and III.

(4)      In new jails and workhouses, dormitories shall be designed to accommodate not more than sixty-four (64) persons.  A minimum of twenty-five (25) square feet of clear floor space for each inmate must be provided in the housing area with a ceiling elevation of not less than eight (8) feet.

In existing jails and workhouses, dormitories shall provide not less than twenty-five (25) square feet of floor space per occupant, exclusive of the area occupied by bunks, and a ceiling height of not less than eight (8) feet.  If an inmate who occupies a dormitory has regular access to additional living areas, the additional area may be added on a pro rata basis to the square footage available to an inmate.

A dayroom is required with thirty-five (35) square feet per inmate for the maximum number of users at one time.

Applies to Type I.

(5)      New facilities shall have a dayroom for each cell block or cluster of cells, which has a minimum of thirty-five (35) square feet of floor space per inmate.

Existing facilities are not required to provide dayrooms.

Applies to Type I.

(6)      Inmates, including those in medical housing units or infirmaries, shall have access to toilets and washbasins with temperature-controlled hot and cold running water twenty-four (24) hours per day.  All facilities shall provide operable toilets and washbasins to inmates on a ratio of at least one (1) toilet and washbasin to every twelve (12) male inmates and one (1) toilet and washbasin for every eight (8) female inmates and one (1) toilet and washbasin accessible to occupants of any single-occupancy cell without their having to leave their cell.  Urinals may be substituted for up to one-half of the toilets in male facilities. Inmates shall be able to use toilet facilities without staff assistance when

9

they are confined in their cells/sleeping areas. All new facilities constructed after January 1, 2015 shall be required to provide an unbreakable toilet, washbasin or water closet in maximum security areas.

Applies to Types I, II, and III.

(7)      Jails shall have at least one (1) operable shower for every sixteen (16) inmates, which shall be accessible to inmates without their having to leave their cell block.

Workhouses shall have at least one (1) operable shower for every sixteen (16) inmates, which shall be accessible to inmates on a daily basis.

Applies to Types I, and II.

(8)      New facilities shall have at least one (1) single cell for the separation and control of problem inmate(s). The cell shall conform to the single-occupancy cell dimensions and shall have, at a minimum:

(a)      High security light fixture;

(b)      Unbreakable water closet and lavatory with control valve located outside the cell;

(c)      Forced air ventilation; and,

(d)      Concrete bed, a minimum of twelve (12) inches off of the floor and no higher than sixteen (16) inches off of the floor, with rounded edges.

The cell shall contain no structural projections or furnishings that would allow the inmate to harm himself/herself.  The cell shall be located to allow continuous monitoring by detention officers.

Applies to Types I, II, and III.

(9)      (a)      All facilities shall have at least one (1) special purpose cell for males and one (1) special purpose cell for females to provide for the temporary detention of persons under the influence of intoxicants. The special purpose cells shall conform to multiple-occupancy cell dimensions and capacity.  These cells shall have, at a minimum:

1.      Flushable drain or unbreakable water closet and lavatory;

2.      High security light fixture;

3.      Forced air ventilation; and,

4.      No structural projections.

(b)      New facilities shall also provide a concrete bed in the special purpose cell, a minimum of twelve (12) inches off of the floor and no higher than sixteen (16) inches off of the floor with rounded edges.

(c)      In new facilities, this cell shall be located so as to allow continuous monitoring by detention officers.

(d)      The requirement for one (1) special purpose cell applies only to facilities that have construction plans reviewed and approved by the Tennessee Corrections

10

Plaintiffs' MSJ Appx. 2322

Institute after June 1, 2000.  The requirement for two (2) special purpose cells applies to plans reviewed and approved after January 1, 2015.

Applies to Types I, II, and III.

(10)    New facilities shall provide space inside the security perimeter, separate from inmate living areas and administrative offices, for inmate processing as inmates are received and discharged from the facility.  This space shall have the following components:

(a)    Pedestrian and/or vehicle sally port;

(b)    Telephone facilities for inmate use;

(c)    Temporary holding rooms which have fixed benches to seat inmates; and,

(d)    A shower, toilet and washbasin.

Existing facilities shall provide space where inmates are received, searched, showered, and issued clothing (if provided by the facility) prior to assignment to the living quarters.

Applies to Types I and II.

(11)    Provisions shall be made for a visiting area which shall allow each inmate at least one (1) hour of visitation each week.

Applies to Type I.

(12)    Provisions shall be made for a private interview room for the use of attorneys and for interrogation of inmates by law enforcement agencies.

Applies to Types I, II, and III.

(13)    New facilities shall have at least one (1) multi-purpose room for conducting programs and for inmate exercise.

Applies to Type I.

(14)    New facilities shall provide a secure outdoor recreation area with dimensions of at least nine hundred (900) square feet.  Covered/enclosed exercise areas in facilities where less than one hundred (100) inmates utilize one recreation area shall have fifteen (15) square feet per inmate for the maximum number of inmates expected to use the space at one time, but not less than five hundred (500) square feet of unencumbered space.

Applies to Type I.

(15)    Facilities shall have space where a physician may conduct sick call, examine patients in privacy and render routine medical treatment.

Applies to Types I, II, and III.

(16)    Facilities shall have a secure control center, manned twenty-four (24) hours per day, through which telephone and other communications are channeled.  The location of the control center shall provide good visibility or be equipped with a monitoring device.  The control center shall monitor the operation of various systems, including fire alarm, smoke and thermal detection, public address, radio and other mechanical and electrical systems as warranted.

11

Applies to Types I, II, and III.

(17)    Access to potable water shall be located in all housing areas.  In existing facilities, if the water from washbasins is potable, drinking cups must be made available.

Applies to Types I, II, and III.

(18)    Facilities shall have an emergency power source of sufficient capacity to operate security and evacuation electrical devices and equipment and to provide minimum lighting within the facility and its perimeter at times of power failure.  The power source shall be checked for functional readiness quarterly and the dates logged.

Applies to Types I, II, and III.

(19)    Facilities shall provide that any electric locks have the capability for manual operation.

Applies to Types I, II, and III.

(20)    Facilities shall have exit signs at each exit which are distinctly marked and continuously illuminated.  Exits shall be kept clear and in usable condition to insure the timely evacuation of inmates and staff in the event of fire or other emergency.

Applies to Types I, II, and III.

(21)    Facilities shall have documentation of compliance with applicable sanitation and fire safety standards.

Applies to Types I, II, and III.

(22)    All kitchens, dining rooms, multiple toilet areas and corridors shall contain operable floor drains.

Applies to Types I, II, and III.

(23)    Facilities shall have cells to accommodate the facility's classification plan.  Facilities that house males and females, and juveniles and adults shall have provisions to separate accordingly. Such provisions shall not allow physical contact or sight and sound communication. Provisions shall also be made to separate minimum, medium, and maximum security inmates.

Applies to Types I, II, and III.

(24)    Plans for any new facility to be built and for any existing facility to be renovated shall be in compliance with minimum standards recorded herein and be submitted to the Tennessee Corrections Institute for review and the State Fire Marshal's Office for review and approval pursuant to Tenn. Comp. R. & Regs 0780-02-03.

Plans for the construction of any new facility and the renovation of any existing facility shall state whether the facility's function will be for temporary holding or for permanent confinement of inmates.  The facility's primary function may encompass both of these functions.

A plan for operating the facility shall be developed in the initial stages of planning the facility so that the facility can be designed around the operating plan, rather than the

12

reverse.  This approach will contribute to the simplification of design and effective use of operating controls.

Applies to Types I, II, and III.

(25)    Any temporary inmate housing shall meet all standards for existing facilities. Temporary housing for inmates shall not be in use for more than eighteen (18) months unless an extension is approved by the Tennessee Corrections Institute Board of Control.

Applies to Types I, II, and III.

Authority:  T.C.A. § 41-4-140.

1400-01-.05 Administration/Management.

(1)    Facilities shall maintain fiscal records which clearly indicate the total cost for operating the facility according to generally accepted accounting principles.  Such records shall have an itemized breakdown of the total operating expenses, such as wages and salaries, food, and operating supplies.

Applies to Types I, II, and III.

(2)    Facilities shall maintain written policies and procedures governing the facility's operations.  The policies and procedures shall be reviewed at least annually and updated as needed.  These policies and procedures shall be approved by the sheriff, chief, or warden and shall be made available to all facility employees.

Applies to Types I, II, and III.

(3)    Facilities shall maintain written plans developed in advance for dealing with emergencies such as escape, inmate disturbances, assaults on facility employees, hostage taking, and emergency evacuation plans.  The written plans shall be incorporated into the facility's manual.  Each facility employee shall be familiar with these plans.

Applies to Types I, II, and III.

(4)    Facilities shall maintain a written policy and procedure to provide for fire drills every three (3) months for all staff members on every shift and document dates of said drills.

Applies to Types I, II, and III.

(5)    Facility administrators shall develop a list of articles and materials that shall be allowed in the cell area.  Inmates shall be informed of this list upon admission.

Applies to Types I and II.

(6)    Facilities shall have a written and graphic evacuation plan posted in the housing area, as well as any other specified locations. The plan shall be approved by a contractor or local fire inspector trained in the application of fire safety codes and shall be reviewed annually.

Applies to Types I, II, and III.

(7)    Written policy and procedure shall ensure that inmates shall not be subjected to discrimination based on race, national origin, color, creed, sex, economic status or

13

political belief. When both males and females are housed in the same facility, available services and programs shall be comparable.

Applies to Types I and II.

(8)    A facility preventative maintenance program shall be in place. All equipment shall be in working order. Safety and security equipment shall be repaired or replaced without undue delay. The use of padlocks and/or chains to secure inmate cells or housing area doors is prohibited.

Applies to Types, I, II, and III.

(9)    Each facility relying on regular access to additional living space to comply with minimum cell size requirements under Tenn. Comp. R. & Regs. 1400-01-.04 shall maintain a written policy regarding the number of hours of access to additional living space outside an inmate's cell that inmates will be allowed.  This policy should take into consideration any relevant factors regarding inmates, including but not limited to inmate classifications. Records shall be maintained on the number of hours per day inmates have access to additional living areas in such facilities.

Applies to Types I and II.

(10)    Facilities shall provide an inmate grievance procedure to all inmates. The grievance procedure must include at least one (1) level of appeal.

*Applies to Types I, II, and III.*

Authority:  T.C.A. § 41-4-140.

14

1400-01-.06 Personnel.

(1)    A criminal record check shall be conducted on all new facility employees, service providers with continuous access to restricted areas, contractors, and volunteers prior to their assuming duties to identify if there are criminal convictions that have a specific relationship to job performance. This criminal record check includes comprehensive identifier information to be collected and run against law enforcement indices. If suspect information on matter with potential terrorism connections is returned on the person, this information shall be forwarded to the local Joint Terrorism Task Force (JTTF) or other similar agency.

Applies to Types I, II, and III.

(2)    Facilities shall develop a personnel policy manual made available to each employee, and which provides information on the following subjects:

(a)    Description of organizational structure;

(b)    Position descriptions;

(c)    Personnel rules and regulations;

(d)    Recruitment procedures;

(e)    Equal employment opportunity provisions;

(f)    Work hours;

(g)    Personnel records;

(h)    Employee evaluation;

(i)    In-Service training;

(j)    Hostage policy; and,

(k)    Use of force.

Applies to Type I.

(3)    Prior to assuming duties, all detention facility employees, support employees and non-facility support staff shall receive orientation training regarding the functions and mission of the facility under the supervision of a qualified detention officer.  This training may be accomplished through classroom instruction, supervised on-the-job training, an individual review of policies and procedures, or any combination of the three and shall include:

(a)    Facility policies and procedures;

(b)    Suicide prevention;

(c)    Use-of-force;

(d)    Report writing;

(e)    Inmate rules and regulations;

(f)    Key control;

(g)    Emergency plans and procedures;

15

     (h)    Cultural diversity;

     (i)    Communication skills; and,

     (j)    Sexual misconduct.

Applies to Types I, II, and III.

(4)    A Facility Training Officer (FTO) shall coordinate the staff development and training program. This person shall have specialized training for that position (assigned as a primary or additional duty). The FTO shall complete the Training the Trainer (3T) course and attend the annual FTO Conference conducted by the Tennessee Corrections Institute.

Applies to Types I, II, and III.

(5)    All support employees who have minimal inmate contact shall receive at least sixteen (16) hours of facility training during their first year of employment. All employees in this category shall receive an additional sixteen (16) hours of facility training each subsequent year of employment.

Applies to Types I, II, and III.

(6)    All non-facility support staff who have regular or daily inmate contact, shall receive a minimum of four (4) hours continuing annual training, which may include:

     (a)    Security procedures and regulations;

     (b)    Supervision of inmates;

     (c)    Signs of suicide risk;

     (d)    Suicide precautions;

     (e)    Use-of-force regulations and tactics;

     (f)    Report writing;

     (g)    Inmate rules and regulations;

     (h)    Key control;

     (i)    Rights and responsibilities of inmates;

     (j)    Safety procedures;

     (k)    All emergency plans and procedures;

     (l)    Interpersonal relations;

     (m)    Social/cultural lifestyles of the inmate population;

     (n)    Cultural diversity;

     (o)    CPR/first aid;

     (p)    Counseling techniques;

     (q)    Sexual harassment/sexual misconduct awareness;

     (r)    Purpose, goals, policies, and procedures for the facility and the parent agency;

Plaintiffs' MSJ Appx. 2328

(s)   Security and contraband regulations;

(t)   Appropriate conduct with inmates;

(u)   Responsibilities and rights of employees;

(v)   Universal precautions;

(w)   Occupational exposure;

(x)   Personal protective equipment;

(y)   Bio-hazardous waste disposal; and,

(z)   Overview of the correctional field.

Applies to Types I, II, and III

(7)   All detention facility employees, including part-time employees, whose primary duties include the industry, custody, or treatment of inmates shall be required during the first year of employment to complete a basic training program consisting of a minimum of forty (40) hours and provided or approved by the Tennessee Corrections Institute.

Applies to Types I, II, and III.

(8)   All detention facilities employees, including part-time employees, whose primary duties include the industry, custody, or treatment of inmates shall be required to complete an annual in-service program designed to instruct them in specific skill areas of facility operations.  This annual in-service shall consist of forty (40) hours with at least sixteen (16) of these hours provided or approved by the Tennessee Corrections Institute.  The remaining twenty-four (24) hours may be provided by the facility if course content is approved and monitored by the Tennessee Corrections Institute.

Applies to Types I, II, and III.

(9)   A minimum number of hours of training and any additional courses for basic and in-service training shall be in compliance with the requirements established by the Tennessee Corrections Institute Board of Control.

Applies to Types I, II, and III.

(10)  All facility employees who are authorized to use firearms and less lethal weapons shall receive basic and ongoing in-service training in the use of these weapons. Training shall include decontamination procedures for individuals exposed to chemical agents. All such training shall be recorded with the dates completed and kept in the employee's personnel file.

Applies to Types I and II.

(11)  Facilities shall maintain records on the types and hours of training completed by each correctional employee, support employee and non-facility support staff.

Applies to Types I, II, and III.

Authority: T.C.A. § 41-4-140.

Plaintiffs' MSJ Appx. 2329

1400-01-.07 Security.

(1)     Each newly admitted inmate shall be thoroughly searched for weapons and other contraband immediately upon arrival in the facility, regardless of whether the arresting officer previously conducted a search.

Applies to Types I and II.

(2)     A record shall be maintained on a search administered to a newly admitted inmate.

Applies to Types I and II.

(3)     Facilities shall maintain policy and procedures to require that all inmates, including trusties, shall be searched thoroughly by detention officers when the inmates enter and leave the security area.

Applies to Type I.

(4)     Facilities shall maintain a written policy and procedure to provide for searches of the facilities and inmates to control contraband.

Applies to Type I.

(5)     Procedure shall differentiate between the searches allowed (orifice, pat, or strip) and identify when these shall occur and by whom such searches may be conducted.  All orifice searches shall be done under medical supervision.  Inmates shall be searched by facility employees of the same sex, except in emergency situations.

Applies to Types I,II, and III.

(6)     Facilities shall maintain a written policy and procedure for key control, including the inventory and use of keys, and the operator of the control center shall have knowledge of who has the keys in use and the location of duplicate keys.  All day-to-day operations shall be centralized and controlled through the control center.

Applies to Types I.

(7)     There shall be one (1) full set of well-identified keys, other than those in use, secured in a place accessible only to facility personnel for use in the event of an emergency. These keys shall be easily identifiable by sight and touch under adverse conditions.

Applies to Types I.

(8)     Written policy and procedures shall govern the availability, control, inventory, storage, and use of firearms, less-lethal weapons, and related security devices, and specify the level of authority required for their access and use.  Chemical agents and electrical disablers shall be used only with the authorization of the facility administrator or designee. Access to storage areas shall be restricted to authorized facility employees and the storage space shall be located in an area separate from and apart from inmate housing or activity areas. A written report shall be submitted to the facility administrator when such weapons are used.

Applies to Types I, II, and III.

(9)     Facilities shall develop a written policy and procedure to require that firearms, chemical agents, and related security and emergency equipment are inventoried and tested at least quarterly to determine the condition and expiration dates.  This written policy and procedure shall provide for regular inspection of ABC type fire extinguishers, smoke detectors, and other detection and suppression systems.

Applies to Types I, II, and III.

Plaintiffs' MSJ Appx. 2330

(10)     All tools, toxic, corrosive and flammable substances and other potentially dangerous supplies and equipment shall be stored in a locked area which is secure and located outside the security perimeter of the confinement area.  Tools, supplies and equipment which are particularly hazardous shall be used by inmates only under direct supervision.

Applies to Types I and II.

(11)     Facilities shall develop a written policy and procedure to require at least weekly inspection of all security facilities and documentation of the dates of inspections.

Applies to Types I and II.

(12)     Facilities shall develop a written policy and procedure to provide for continuous inspection, inventory, and maintenance of all locks, tools, kitchen utensils, toxic, corrosive, and flammable substances and other potentially dangerous supplies and equipment.

Applies to Type I.

(13)     Facilities shall develop a written plan that provides for continuing operations in the event of a work stoppage or other job action. Copies of this plan shall be available to all supervisory personnel who are required to familiarize themselves with it.

Applies to Type I.

(14)     Detention officer posts shall be located in close proximity to inmate living areas to permit officers to see or hear and respond promptly to emergency situations. There shall be written orders for every detention officer duty and post.

Applies to Types I, II, and III.

(15)     The facility administrator or designee shall visit the facility's living and activity areas at least weekly.

Applies to Types I, II, and III.

(16)     The facility perimeter shall ensure that inmates are secured and that access by the general public is denied without proper authorization.

Applies to Types I, II, and III.

(17)     All inmate movement from one area to another shall be controlled by facility employees.

Applies to Types I, II, and III.

(18)     Facility employees shall maintain a permanent log and prepare shift reports that record routine information, emergency situations, and unusual incidents.

Applies to Types I, II, and III.

(19)     Facilities shall have sufficient staff, including designated supervisor, to provide, at all times, the performance of functions relating to the security, custody, and supervision of inmates as needed to operate the facility in conformance with the standards.

Applies to Types I, II, and III.

(20)     Restraint devices shall never be applied as punishment. Facilities shall define circumstances under which supervisory approval is needed prior to application.

Applies to Types I, II, and III.

Plaintiffs' MSJ Appx. 2331

(21)     Four/five-point restraints shall be used only in extreme instances and only when other types of restraints have proven ineffective. Advance approval shall be secured from the facility administrator/ designee before an inmate is placed in a four/five-point restraint. Subsequently, the health authority or designee shall be notified to assess the inmate's medical and mental health condition, and to advise whether, on the basis of serious danger to self or others, the inmate should be in a medical/mental health unit for emergency involuntary treatment with sedation and/or other medical management, as appropriate. If the inmate is not transferred to a medical/mental health unit and is restrained in a four/five-point restraint, the following minimum procedures shall be followed:

(a)     Continuous direct visual observation by facility employees prior to an assessment by the health authority or designee;

(b)     Subsequent visual observation is made at least every fifteen (15) minutes;

(c)     Restraint procedures are in accordance with guidelines approved by the designated health authority; and

(d)     Documentation of all decisions and actions.

Applies to Types I, II, and III.

(22)     The use of firearms shall comply with the following requirements:

(a)     A written policy and procedure that governs the availability, control, and use of chemical agents and firearms;

(b)     Firearms, chemical agents, and related security and emergency equipment are inventoried and tested at least quarterly;

(c)     Weapons are subjected to stringent safety regulations and inspections;

(d)     A secure weapons locker is located outside the secure perimeter of the facility;

(e)     Except in emergency situations, firearms and authorized weapons are permitted only in designated areas to which inmates have no access;

(f)     Facility employees supervising inmates outside the facility perimeter follow procedures for the security of weapons;

(g)     Facility employees are instructed to use deadly force only after other actions have been tried and found ineffective, unless the employee believes that a person's life is immediately threatened;

(h)     Facility employees on duty use only firearms or other security equipment that has been approved by the facility administrator;

(i)     Appropriate equipment is provided to facilitate safe unloading and loading of firearms; and,

(j)     A written report shall be submitted to the facility administrator when such weapons are used.

Applies to Types I, II, and III.

Authority:  T.C.A. § 41-4-140.

Plaintiffs' MSJ Appx. 2332

1400-01-.08 Discipline.

(1)    Facilities shall maintain policies and procedures to insure that written or electronic facility rules along with the corresponding range of sanctions for rule violations and disciplinary procedures to be followed shall be provided to each inmate during the booking process prior to being placed into the general population.  A record shall be maintained of this transaction.  Socially, mentally, or physically impaired inmates shall be assisted by facility employees in understanding the rules. The rules and regulations shall be available for viewing during confinement and shall be translated into those languages spoken by a significant number of inmates.

    Applies to Type I.

(2)    Disciplinary reports shall be prepared by facility employees and must include, but are not limited to, the following information:

    (a)    Names of persons involved;

    (b)    Description of the incident;

    (c)    Specific rule(s) violated;

    (d)    Employee or inmate witnesses;

    (e)    Any immediate action taken, including use of force; and,

    (f)    Reporting staff member's signature, date and time report is made.

    Applies to Type I.

(3)    Facilities shall maintain written policies and procedures governing disciplinary actions, administrative actions, and criminal offenses. Each county is required by T.C.A § 41-2-111 to have a disciplinary review board.

    Applies to Type I.

(4)    Facilities shall maintain written policies and procedures to provide for disciplinary hearings to be held in cases of alleged violations of inmate conduct rules.  Hearings shall include the following administrative due process guarantees:

    (a)    Inmates shall receive written notice of charges and time of hearing;

    (b)    The inmate shall be allowed time, not less than twenty-four (24) hours, to prepare for appearance before an impartial officer or board;

    (c)    The inmate shall have the right to call and cross examine witnesses and present evidence in his own defense, when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals;

    (d)    An inmate may be excluded during testimony. An inmate's absence or exclusion shall be documented;

    (e)    The reasons for any limitations placed on testimony or witnesses shall be stated in writing by the hearing officer;

    (f)    There must be a written statement by the fact finders to include, at a minimum, evidence relied on and reasons for the disciplinary action; and,

    (g)    Appeals process is available.

    Applies to Type I.

21

(5)        Facilities shall maintain a written policy and procedure to allow inmates to receive a hearing prior to segregation, except in cases where the security of the facility is threatened, as determined by the facility administrator or his/her designee.

        Applies to Type I.

(6)        For segregated inmates, a disciplinary hearing must be held within seventy-two (72) hours of placement in segregation, excluding holidays, weekends and emergencies, and for other inmates, a disciplinary hearing must be held within seven (7) days of the write-up.

        Applies to Type I.

(7)        The facility shall give the inmate a copy of the disciplinary decision and the facility shall keep a copy of the disciplinary decision in the inmate's record.

        Applies to Type I.

(8)        Facilities shall maintain a written policy and procedure to provide that the disciplinary reports are removed from all files on inmates found not guilty of an alleged violation.

        Applies to Type I.

(9)        Corporal punishment is not permitted under any circumstance in a disciplinary proceeding.

        Applies to Types I, II, and III.

(10)      Use of physical force may be used when authorized and shall be thoroughly documented with detailed account of who was involved, the force that was used, and justification for its use.  This report shall be submitted to the facility administrator. Force may be used to:

        (a)      Overcome resistance;

        (b)      Repel aggression;

        (c)      Protect life; and,

        (d)      Retake inmate or property.

        Applies to Type I.

Authority:  T.C.A. § 41-4-140.

1400-01-.09 Sanitation/Maintenance.

(1)        Facilities shall be clean and in good repair. Floors throughout the facility shall be kept clean, dry, and free of any hazardous materials or substance.

        Applies to Types I, II, and III.

(2)        A facility employee shall make daily sanitation and safety inspections.  Dates of inspections shall be recorded and conditions noted.  Any maintenance problems shall be recorded on a regular maintenance report.

        Applies to Type I.

(3)        Facilities shall provide for regularly scheduled disposal of liquid, solid, and hazardous material complying with applicable government regulations.

Plaintiffs' MSJ Appx. 2334

Applies to Type I.

(4)     Facilities shall provide for control of vermin and pests and shall remove inmates from treatment areas if there is a risk of illness.

Applies to Types I, II, and III.

(5)     Inmate housing area walls shall be kept clean and free of pictures or other objects which provide hiding places for vermin or create a fire hazard.

Applies to Type I.

(6)     All walls, ceilings, floors, showers, and toilets shall be kept free from mold and mildew.

Applies to Types I, II, and III.

Authority:  T.C.A. § 41-4-140.

1400-01-.10 Food Services.

(1)     Food service guidelines and a menu pattern approved by a dietician, at least annually, shall be used by each facility in the preparation of meals.  Menu evaluations shall be conducted, at least quarterly, by food service supervisory staff to verify adherence to the established basic dietary servings.

Applies to Type I.

(2)     Working inmates shall receive at least three (3) meals every twenty-four (24) hours with no more than fourteen (14) hours between any two (2) meals.  At least two (2) of these meals shall be hot. Non-working inmates shall receive at least two (2) meals every twenty-four (24) hours with no more than fourteen (14) hours between any two (2) meals.  Variations may be allowed based on weekend and holiday food service demands, as long as basic nutritional goals are met.

Applies to Type I.

(3)     All meals shall be prepared (except when catered) and served under the direct supervision of staff.

Applies to Types I, II, and III.

(4)     Inmates involved in the preparation of the food shall receive an agency-approved pre-assignment medical screening to ensure freedom from illness transmittable by food or utensils. Facilities shall have a policy to insure those currently assigned to food service preparation duties who are identified by food service staff as having an illness or infection shall be removed from those duties.

Applies to Types I, II, and III.

(5)     Written policy and procedure shall require that accurate records are maintained on the number of meals served per day, the actual food served, and meal schedule.

Applies to Type I.

(6)     Facilities shall inspect all food service areas on a weekly basis, including dining and food preparation areas and equipment by administrative, medical, or food service personnel.

Applies to Types I, II, and III.

(7)     Written policy shall require that food shall never be used as a reward or disciplinary measure.

23

Applies to Types I and II.

(8)     Modified diets shall be prepared for inmates when requested by medical staff or by a physician's order, and all reasonable efforts shall be made to accommodate dietary needs of a religion.

Applies to Types I and II.

(9)     Shelf goods shall be maintained between forty-five (45) degrees and eighty (80) degrees Fahrenheit; refrigerated foods between thirty-five (35) degrees and forty (40) degrees Fahrenheit; and frozen foods at zero (0) degrees Fahrenheit or below.

Applies to Types I, II, and III.

(10)    The preparation or storage of open food, other than a reasonable amount of commissary food, shall not be permissible in the immediate housing area.

Applies to Types I, II, and III.

(11)    Refrigerators shall be clean and contain a thermometer.

Applies to Types I, II, and III.

(12)    All food products shall be stored at least six (6) to eight (8) inches off the floor on shelves or in shatter-proof containers with tight fitting lids.

Applies to Types I, II, and III.

(13)    Insecticide, cleaning agents and poisonous substances shall be plainly labeled and stored away from food.

Applies to Types I, II, and III.

(14)    Culinary equipment (knives and other sharp instruments) shall be securely stored, inventoried and their use controlled.

Applies to Types I, II, and III.

(15)    Stoves shall be equipped with operable hooded exhaust systems and the filters shall be kept clean.

Applies to Types I, II, and III.

Authority:  T.C.A. § 41-4-140.

1400-01-.11 Mail and Visiting.

(1)     Facilities shall maintain a written policy outlining the facility's procedures governing inmate mail.

Applies to Type I.

(2)     Facilities shall develop a written policy governing the censoring of mail.  Any regulation for censorship must meet the following criteria:

(a)     The regulation must further an important and substantial governmental interest unrelated to the suppression of expression (e.g., detecting escape plans which constitute a threat to facility security and/or the well-being of employees and/or inmates); and,

24

(b)    The limitation must be no greater than is necessary for the protection of the particular governmental interest involved.

Applies to Type I.

(3)    Both incoming and outgoing mail shall be inspected for contraband items prior to delivery, unless received from the courts, attorney of record, or public officials, where the mail shall be opened in the presence of the inmate.

Applies to Type I.

(4)    Outgoing mail shall be collected and incoming mail shall be delivered without unnecessary delay.

Applies to Type I.

(5)    An inmate shall be notified if a letter addressed to the inmate or written by the inmate is rejected. If the inmate wrote the rejected letter, the inmate must be given a reasonable opportunity to protest the rejection.

Applies to Type I.

(6)    Written policy and procedure shall provide that the facility permits postage for two (2) free personal letters per week for inmates who have less than two dollars ($2.00) in their account. Facilities shall also provide postage for all legal or official mail.

Applies to Type I.

(7)    Facilities shall maintain a written policy to define the facility's visitation policies which shall include, at a minimum:

(a)    One (1) hour of visitation each week for each inmate;

(b)    A list of possible visitors submitted by each inmate;

(c)    Children shall be allowed to visit their parents;

(d)    Visitors shall register before admission and may be denied admission for refusal to register, for refusal to consent to search, or for any violation of posted institutional rules; and,

(e)    Probable cause shall be established in order to perform a strip or body cavity search of a visitor.  When probable cause exists, the search shall be documented.

Applies to Type I.

Authority:  T.C.A. § 41-4-140.

1400-01-.12 Inmate Programs And Activities.

(1)    Library services shall be made available to all inmates.

Applies to Type I.

(2)    Inmates shall have access to exercise and recreation opportunities. A written plan shall provide that all inmates have the opportunity to participate in an average of one (1) hour of physical exercise per day outside the cell. Outdoor recreation may be available when weather and staffing permit.

Plaintiffs' MSJ Appx. 2337

Applies to Type I.

(3)     Written policy and procedure requires that the facility shall provide for inmates to voluntarily participate in religious activity at least once each week.

Applies to Type I.

(4)     Policy and procedure shall provide that the inmates have reasonable access to a telephone. Telephone procedure, including any limitations, shall be in writing and posted so as to be conspicuous to inmates.  The procedure shall include, at a minimum:

(a)     The hours during which such access shall generally be provided;

(b)     A statement regarding the privacy of telephone communication; and,

(c)     Inmates with hearing and/or speech disabilities shall be afforded access to a Telecommunications Device for the Deaf (TDD), or comparable equipment. Public telephones with volume control shall be made available to inmates with a hearing impairment. Information regarding the availability of TDD communication devices shall be posted.  Inmates with hearing and/or speech impairments shall be afforded access similar to those inmates without impairments.

Applies to Types I, II, and III.

(5)     Release programs shall require:

(a)     Written operational procedures;

(b)     Careful screening and selection procedures;

(c)     Written rules of inmate conduct;

(d)     A system of supervision to minimize inmate abuse of program privileges;

(e)     A complete record-keeping system;

(f)     A system for evaluating program effectiveness; and,

(g)     Efforts to obtain community cooperation and support.

Applies to Type I.

(6)     Written policy shall provide that inmates be allowed to have confidential access to attorneys and their authorized representatives at any reasonable hour.

Applies to Types I, II, and III.

(7)     Inmates shall have unrestricted and confidential access to the courts.  Inmates shall have the right to present any issue before a court of law or governmental agency.  The facility shall establish reasonable hours during which attorneys may visit and/ or telephonically communicate. Inmates shall have access to legal materials.

Applies to Types I, II, and III.

(8)     Written policy shall provide that pretrial detainees shall not be required to work, except to do personal housekeeping.

Applies to Types I and II.

Plaintiffs' MSJ Appx. 2338

(9)        Foreign nationals shall have access to the diplomatic representatives of their country of citizenship through the State Department consular notification protocols and contact information.

         Applies to Types I, II, and III.

Authority:  T.C.A. § 41-4-140.

1400-01-.13 Medical Services.

(1)        The provision of medical services for the facility shall be the responsibility of a designated health authority such as a hospital, clinic, or physician.  There shall be an agreement between the governmental funding agency responsible for the facility and the hospital/clinic/physician responsible for such services.  The designated health authority must be notified in instances where an inmate may be in need of medical treatment and the facility shall document this notification. The health authority shall meet with the Sheriff and/ or facility administrator at least annually.

         Applies to Types I, II, and III.

(2)        Medical decisions are the sole province of the responsible health care provider and shall not be countermanded by non-medical personnel.

         Applies to Types I, II, and III.

(3)        All health care professional staff shall comply with applicable state and federal licensure, certification, or registration requirements. Verification of current credentials shall be available upon request from the provider. Health care staff shall work in accordance with profession-specific job descriptions approved by the health authority. If inmates are assessed or treated by non-licensed health care personnel, the care shall be provided pursuant to written standing or direct orders by personnel authorized to give such orders.

         Applies to Type I, II, and III.

(4)        Continuity of care is required from admission to transfer or discharge from the facility, including referral to community-based providers, when indicated. When health care is transferred to providers in the community, appropriate information shall be shared with the new providers in accordance with consent requirements. Prior to release from custody or transfer, inmates with known serious health conditions shall be referred to available community resources by the facility's health care provider currently providing treatment.

         Applies to Types I, II, and III.

(5)        Written policy and procedure shall prohibit inmates from performing patient care services, scheduling health care appointments or having access to medications, health records or medical supplies and equipment.

         Applies to Type I.

(6)        First aid kits shall be available and a physician shall approve the number, contents, and location of such kits on an annual basis.  Documentation of such approval must be in the facility's permanent records or attached to the kit itself.

         Applies to Types I, II, and III.

(7)        Receiving screening shall be performed on all inmates upon admission to the facility and before placement in the general housing area.  The findings shall be recorded on a printed screening form.  The officer performing this duty shall check for:

        (a)       A serious illness;

Plaintiffs' MSJ Appx. 2339

(b)     A comatose state;

(c)     Obvious wounds;

(d)     Prescribed medications; and,

(e)     Suicide risk assessment, including suicidal ideation or history of suicidal behavior or other mental health illness.

Applies to Types I, II, and III.

(8)     A more complete examination shall be completed on inmates within fourteen (14) days of the inmate's initial confinement date. If the facility can document that a health appraisal was conducted within the previous ninety (90) days, this fourteen (14)-day physical is not required unless medical conditions dictate otherwise.  This examination shall be performed by a physician or a person who has been designated by a physician as capable of performing such examination. If a designee performs the examination, he/she must do so under supervision of a physician and with a protocol or set of instructions and guidelines from the physician.  This examination shall include:

(a)     Inquiry into current illness and health problems, including those specific to women;

(b)     Inquiry into medications taken and special health requirements;

(c)     Screening of other health problems designated by the responsible physician;

(d)     Behavioral observation, including state of consciousness and mental status;

(e)     Notification of body deformities, trauma markings, bruises, lesions, jaundice, ease of movement, etc.;

(f)     Condition of skin and body orifices, including rashes and infestations;

(g)     Disposition/referral of inmates to qualified medical personnel on an emergency basis;

(h)     A review of the initial intake receiving screening; and,

(i)     An individual treatment plan as appropriate.

Applies to Type I.

(9)     All intersystem transfer inmates (transferred from one confinement facility to another within the same county's jurisdiction) shall receive a health screening by trained or qualified health care personnel, which commences on their arrival at the facility.  All findings are recorded on a screening form approved by the health authority. At a minimum, the screening includes the following:

(a)     A review of the inmate's medical, dental, and mental health problems;

(b)     Current medications; and,

(c)     Current treatment plan.

Applies to Types I, II, and III.

(10)    Sick call, conducted by a physician or other person designated by a physician as capable of performing such duty, shall be available to each inmate according to written procedure for sick call.  The inmate shall be informed of these procedures, including any copayment requirements,

Plaintiffs' MSJ Appx. 2340

as well as procedures for submitting grievances, upon admission.

Applies to Types I, II, and III.

(11)    Inmates shall have access to mental health services as clinically warranted in accordance with protocols established by the health authority that include:

    (a)    Screening for mental health problems;

    (b)    Referral to outpatient services, including psychiatric care;

    (c)    Crisis intervention and management of acute psychiatric episodes;

    (d)    Stabilization of the mentally ill and prevention of psychiatric deterioration in the facility;

    (e)    Referral and admission to inpatient facilities; and,

    (f)    Informed consent for treatment.

Applies to Types I, II, and III.

(12)    A suicide prevention program shall be approved by the health authority and reviewed by the facility administrator.  The program must include specific procedures for handling intake, screening, identifying, and continually supervising the suicide-prone inmate.  All facility employees responsible for supervising suicide-prone inmates shall be trained annually on program expectations.

Applies to Types I, II, and III.

(13)    At least one (1) person per shift, assigned to work at the facility, shall be trained in First Aid/CPR, as defined by the American Red Cross, and CPR, as defined by the American Heart Association. Training shall also cover:

    (a)    Awareness of potential emergency situations;

    (b)    Transfer to appropriate health care provider;

    (c)    Recognition of symptoms of illness most common to the facility; and,

    (d)    Giving of medication to inmates.

In addition, the health authority shall approve policies and procedures that insure that emergency supplies and equipment are readily available and in working order.

Applies to Types I, II, and III.

(14)    Detoxification from alcohol, opiates, hypnotics, and other stimulants shall be conducted under medical supervision in accordance with local, state, and federal laws. When performed at the facility, detoxification shall be prescribed in accordance with clinical protocols approved by the health authority.  Specific criteria shall be established for referring symptomatic inmates suffering from withdrawal or intoxication for more specialized care at a hospital or detoxification center.

Applies to Types I, II, and III.

(15)    Facilities shall provide dental treatments, not limited to extractions, when the health of the inmate would otherwise be adversely affected during confinement, as determined by a physician or dentist.

Applies to Type I.

Plaintiffs' MSJ Appx. 2341

(16)     Facilities shall confiscate all medications in the possession of an inmate at the time of admission to the facility. The identification of and the need for such medication shall be verified by a physician or qualified health care personnel before it is administered.

Applies to Types I, II, and III.

(17)     Medications issued to inmates shall be strictly controlled and shall be kept in a secure place within the administrative or medical offices in the facility.

Applies to Types I and II.

(18)     All medications shall be prescribed by a physician or his designee at the time of use. An officer or qualified health care personnel shall verify that the medication is taken as directed and a medication receipt system established.  This shall include controlled drugs and injections.

Applies to Types I and II.

(19)     Medical and mental health records on the inmate's physical condition on admission, during confinement, and at discharge shall be kept in a separate file from the inmate's other facility records.  The medical record shall indicate all medical orders issued by the facility's physician and/or any other health care personnel who are responsible for rendering health care services. These medical records shall be retained for a period of ten (10) years after the inmate's release.

Applies to Types I, II, and III.

(20)     Informed consent standards of the jurisdiction shall be observed and documented for inmate care in a language understood by the inmate.  In the case of minors, the informed consent of a parent, guardian, or a legal custodian applies when required by law. Inmates routinely have the right to refuse medical interventions. When health care is rendered against the inmate's will, it shall be in accordance with state and federal laws and regulations.

Applies to Types I, II, and III.

(21)     Involuntary administration of psychotropic medication(s) to inmates shall be authorized by a physician and provided in accordance with policies and procedures approved by the health authority, and in accordance with applicable laws and regulations of the jurisdiction.

Applies to Types I, II, and III.

(22)     The use of inmates in medical, pharmaceutical, or cosmetic experiments is prohibited. This does not preclude inmate access to investigational medications on a case-by-case basis for therapeutic purposes in accordance with state and federal regulations.

Applies to Types I, II, and III.

(23)     In case of medical emergencies, there shall be specific information readily accessible to all employees, such as telephone numbers and names of persons to be contacted, so that professional medical care can be received.  There shall also be available the names and telephone numbers of persons to contact in case of death.

Applies to Types I, II, and III.

(24)     Inmates suffering from communicable diseases and those who are sick but do not require hospitalization shall be housed separate from other inmates as recommended by health care authorities.

Applies to Types I, II, and III.

(25)     When an inmate is placed in segregation for health concerns, health care personnel shall

Plaintiffs' MSJ Appx. 2342

be informed as soon as practical and provide assessment and review as indicated by the protocols established by the health authority.

Applies to Types I and II.

(26)     Medical/dental instruments and supplies (syringes, needles, and other sharp instruments) shall be inventoried, securely stored, and use shall be controlled.

Applies to Types I and II.

(27)     Pregnant inmates shall have access to obstetrical services (prenatal, partum, and post-partum care) by a qualified health care provider.

Applies to Types I and II.

(28)     Inmates with chronic medical conditions, such as diabetes, hypertension, and mental illness shall receive periodic care by a qualified health care provider in accordance with individual treatment plans that include monitoring of medications and laboratory testing.

Applies to Types I, II, and III.

(29)     Information shall be provided to inmates about sexual abuse/assault including:

(a)     Prevention/ intervention;

(b)     Self-protection;

(c)     Reporting sexual abuse/assault; and,

(d)     Treatment and counseling.

This information shall be communicated in writing or electronically, in a language clearly understood by the inmate, upon arrival at the facility.

Applies to Types I, II, and III.

(30)     Sexual conduct between facility employees, volunteers or contract personnel and inmates is prohibited and subject to administrative, disciplinary and criminal sanctions. The prohibition applies regardless of consent.

Applies to Types I, II, and III.

(31)     The health authority shall develop and approve protocols for identifying and evaluating major risk management events related to inmate health care, including inmate deaths, preventable adverse outcomes, and serious medication errors.

Applies to Types I, II, and III.

Authority:  T.C.A. § 41-4-140.


1400-01-.14 Admission, Records And Release.

(1)     An intake form shall be completed for every inmate, except detainees, admitted to the facility and shall contain the following information, unless otherwise prohibited by statute:

(a)     Picture;

Plaintiffs' MSJ Appx. 2343

(b)     Booking number;

(c)     Date and time of intake;

(d)     Name and aliases of person;

(e)     Last known address;

(f)     Date and time of commitment and authority therefore;

(g)     Names, title, signature and authority therefore;

(h)     Specific charge(s);

(i)     Sex;

(j)     Age;

(k)     Date of birth;

(l)     Place of birth;

(m)     Race;

(n)     Occupation;

(o)     Last place of employment;

(p)     Education;

(q)     Name and relationship of next of kin;

(r)     Address of next of kin;

(s)     Driver's license and social security numbers;

(t)     Disposition of vehicle, where applicable;

(u)     Court and sentence (if sentenced inmate);

(v)     Notation of cash and property;

(w)     Bonding company;

(x)     Amount of bond;

(y)     Date of arrest;

(z)     Warrant number;

(aa)     Court date and time;

(bb)     Cell assignment;

(cc)     Fingerprints; and,

(dd)     Criminal history check.

Plaintiffs' MSJ Appx. 2344

Applies to Types I, II, and III.

(2)     The admitting officer shall ensure that each inmate received is committed under proper legal authority.

Applies to Types I, II, and III.

(3)     At the time of booking, a telephone shall be available within the receiving or security area.  The detainee shall be allowed to complete at least one (1) telephone call to the person of his choice.  Pursuant to T.C.A. § 40-7-106(b), no person under arrest by any officer or private citizen shall be named in any book, ledger, or any other record until after the person has successfully completed a telephone call to an attorney, relative, minister, or any other person that the person shall choose, without undue delay.  One (1) hour shall constitute a reasonable time without undue delay.

Applies to Types I, II, and III.

(4)     Cash and personal property shall be taken from the inmate upon admission, listed on a receipt form in duplicate, and securely stored pending the inmate's release.  The receipt shall be signed by the receiving officer and the inmate, the duplicate given to the inmate, and the original kept for the record.  If the inmate is in an inebriated state, there shall be at least one witness to verify this transaction.  As soon as the inmate is able to understand what he is doing, he shall sign and be given the duplicate of the receipt.

Applies to Types I, II, and III.

(5)     Facilities shall maintain custody records on all inmates committed to or assigned to the facility, which shall include but are not limited to the following:

(a)     Intake/ booking information;

(b)     Court generated background information;

(c)     Cash and property receipts;

(d)     Reports of disciplinary actions, grievances, incidents, or crime(s) committed while in custody;

(e)     Disposition of court hearings;

(f)     Records of program participation;

(g)     Work assignments; and,

(h)     Classification records.

Inmates shall have reasonable access to information in their records.  Access is only limited due to safety or security concerns for the inmate, other inmates, or the facility.

Applies to Types I, II, and III.

(6)     Written policy and procedure shall ensure that inmate records are current and accurate.

Applies to Types I, II, and III.

(7)     Inmate records shall be safeguarded from unauthorized and improper disclosure.

Applies to Types I, II, and III.

Plaintiffs' MSJ Appx. 2345

(8)     As part of the inmate accounting system, facilities shall maintain on a daily basis the following information:

    (a)     Admissions

        1.     Adult - Juvenile

        2.     Male - Female

        3.     Race

        4.     Charge

    (b)     Releases

        1.     Adult - Juvenile

        2.     Male - Female

        3.     Race

        4.     Charge

    (c)     Inmate Population

        1.     Sentenced - Non-sentenced

        2.     Adult - Juvenile

        3.     Male - Female

        4.     Felons - Misdemeanants

        5.     Race

Applies to Type I.

(9)     Facilities shall keep records on each inmate specifying:

    (a)     Date of confinement;

    (b)     Length of sentence;

    (c)     Reduction of sentences provided by statutes; and,

    (d)     Release date.

Applies to Type I.

(10)    The administrator of a facility or designee shall maintain a record which indicates:

    (a)     When an inmate is to be discharged and under what conditions;

    (b)     If any detainers or pending detainers are placed against the inmate and if so, the appropriate authorities to be notified of his/her release date; and,

    (c)     The time when and the authority by which the inmate was released.

Applies to Type I.

Plaintiffs' MSJ Appx. 2346

(11)     Facilities shall maintain written policy and procedures for releasing inmates from the facility which include, but are not limited to, the following:

    (a)     Identification of outstanding warrants, wants, or detainers;

    (b)     If released into the custody of another officer, appropriate credentials must be reviewed;

    (c)     Positive identification of the inmate by the releasing officer;

    (d)     Verification of release papers;

    (e)     Completion of release arrangements, including notification of the parole authorities in the jurisdiction of release, if required;

    (f)     Return of personal property including cash. All items shall be inventoried on a receipt and witnessed by the releasing officer. This receipt shall be kept in the permanent records of the facility;

    (g)     Provision of a listing of available community resources; and,

    (h)     Provision of medication as directed by the health authority.

    Applies to Types I, II, and III.

(12)     All inmates released from the facility shall sign a receipt for property, valuables and cash returned at the time of release. All items shall be carefully inventoried on the receipt and witnessed by the releasing officer. The receipt shall be kept in the permanent records of the facility.

    Applies to Types I, II, and III.

Authority: T.C.A. § 41-4-140.

1400-01-.15 Hygiene.

(1)     Inmates shall be issued clothing within a reasonable time frame that is properly fitted and suitable for the climate and shall include the following:

    (a)     Clean socks;

    (b)     Clean undergarments;

    (c)     Clean outer garments; and,

    (d)     Footwear.

    (e)     Inmates' personal clothing (if available and clean) may be substituted for institutional clothing at the discretion of the facility administrator.

    Applies to Types I and II.

(2)     Provisions shall be made so that inmates can regularly obtain the following minimum hygiene items:

    (a)     Soap;

    (b)     Toothbrush;

    (c)     Toothpaste or toothpowder;

    (d)     Comb;

35

(e)    Toilet paper;

(f)    Hygiene materials for women; and,

(g)    Shaving equipment.

(h)    These items or services shall be made available at the inmate's expense unless the inmate cannot afford to pay, in which case the inmate shall be provided the item or services free of charge.

Applies to Types I and II.

(3)    An inmate commissary may be available by which inmates can purchase approved items that are not furnished by the facility. The commissary operations shall be strictly controlled using standard accounting procedures.

Applies to Types I and II.

(4)    Inmates shall be allowed freedom in personal grooming except when a valid governmental interest justifies otherwise. Arrangements for haircuts shall be made available, at the inmate's expense, on a regular basis.  If an inmate cannot afford this service, it shall be provided free of charge.

Applies to Type I.

(5)    Each inmate who is detained overnight shall be provided with the following standard issue:

(a)    One (1) clean fire-retardant mattress in good repair;

(b)    One (1) clean mattress cover;

(c)    If pillows are provided, they shall be fire-retardant and a clean pillowcase shall be provided;

(d)    Sufficient clean blankets to provide comfort under existing temperature conditions; and,

(e)    One (1) clean bath-size towel.

Applies to Types I and II.

(6)    Facilities shall maintain an adequate supply of bedding and towels so that the following laundry or cleaning frequencies may be adhered to:

(a)    Sheets, pillowcases, mattress covers, and towels shall be changed and washed at least once a week;

(b)    All mattresses shall be disinfected quarterly and documented; and,

(c)    Blankets shall be laundered monthly and sterilized before re-issue.

Applies to Type I.

(7)    Inmate clothing, whether personal or institutional, shall be exchanged and cleaned at least twice weekly unless work, climatic conditions or illness necessitate more frequent change.

Applies to Type I.

Authority:  T.C.A. § 41-4-140.

1400-01-.16 Supervision Of Inmates.

(1)    All inmates shall be personally observed by a facility employee at least once every hour on an irregular schedule.  More frequent observation shall be provided for inmates who are violent, suicidal, mentally ill, intoxicated, and for inmates with other special problems or needs.  The time of all such checks shall be logged, as well as the results.

    Applies to Types I, II, and III.

(2)    The facility shall have a system to physically count inmates and record the results on a twenty-four (24) hour basis. At least one (1) formal count shall be conducted for each shift.

    Applies to Types I, II, and III.

(3)    Incidents which involve or endanger the lives or physical welfare of staff or inmates shall be recorded in a daily log and retained.  Incidents shall include, at a minimum:

    (a)    Death;

    (b)    Attempted suicide;

    (c)    Escape;

    (d)    Attempted escape;

    (e)    Fire;

    (f)    Riot;

    (g)    Battery on a staff member or inmate;

    (h)    Serious infectious disease within facility; and,

    (i)    Sexual assault.

        1.    An investigation shall be conducted and documented whenever a sexual assault or threat is reported; and,

        2.    Victims of sexual assault are referred under appropriate security provisions to a community facility for treatment and gathering of evidence.

    Applies to Types I, II, and III.

(4)    Facilities that are utilized for the confinement of females shall have a trained female officer on duty or on call when a female is confined in the facility, to perform the following functions:

    (a)    Searches; and,

    (b)    Health and welfare checks.

    Applies to Types I, II, and III.

(5)    Inmates shall not be permitted to supervise, control, assume or exert authority over other inmates.

    Applies to Type I.

(6)    Nonsmoking inmates shall not be exposed to second-hand smoke.

Plaintiffs' MSJ Appx. 2349

Applies to Types I, II and III.

Authority:  T.C.A. § 41-4-140.

1400-01-.17 Classification

(1)     There shall be a written plan for inmate classification specifying criteria and procedures for classifying inmates in terms of level of custody required, housing assignment and participation in correctional programs. The plan shall include a process for review and appeal of classification decisions.

        Applies to Types I, II, and III.

(2)     This plan ensures total sight, sound or physical contact separation between male and female inmates and between adults and juveniles being tried as adults.

        Applies to Types I, II, and III.

(3)     Inmates with disabilities, including temporary disabilities, shall be housed and managed in a manner that provides for their safety and security. Housing used by inmates with disabilities, including temporary disabilities, shall be designed for their use and shall provide for integration with other inmates. Program and service areas shall be accessible to inmates with disabilities.

        Applies to Types I, II, and III.

Authority:  T.C.A. § 41-4-140.

Plaintiffs' MSJ Appx. 2350