UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 143

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Stephanie McCollum, *et al.*, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-02037 |
| | § | |
| Brad Livingston, *et al.*, | § | |
| Defendants. | § | JURY DEMAND |

DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE'S RESPONSES TO
PLAINTIFFS' REQUESTS FOR PRODUCTION AND INTERROGATORIES

# TDCJ - RFP #25

# AMERICAN CORRECTIONAL ASSOCIATION

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22014

703.224.0000 FAX 703.224.0079

www.aca.org

May 7, 2010

Texas Department of Criminal Justice
Hutchins Unit
Dallas, texas

Congratulations!

It is a pleasure to officially inform you that the Hutchins Unit was accredited by the Commission on Accreditation for Corrections at the Correctional Accreditation Managers Association 2010 Conference on May 2, 2010 in Columbus, Ohio.

Your accreditation represents the satisfactory completion of a rigorous self-evaluation, followed by an outside review by a team of independent auditors.

Every profession strives to provide a high quality of service to society. To know that you, your staff, and other officials are complying with the requirements of the accreditation process is indeed a statement of a high level of commitment to the staff and persons under your care.

On behalf of the Commission on Accreditation for Corrections, thank you for your commitment to the corrections profession.

Sincerely,

*Lannette Linthicum*

Lannette Linthicum, Chairperson
Commission on Accreditation for Corrections

# AMERICAN CORRECTIONAL ASSOCIATION

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org

For Immediate Release

# Hutchins Unit Awarded National Accreditation

Lannette Linthicum, Chairperson of the Commission on Accreditation for Corrections (CAC), and Kathy Black-Dennis, Director of Standards and Accreditation, American Correctional Association recently announced the accreditation of the Hutchins Unit. The award was presented in conjunction with the Correctional Accreditation Managers Association Conference held in Columbus, Ohio, on May 2, 2010.

The accreditation program is a professional peer review process based on national standards that have evolved since the founding of the Association in 1870. The standards were developed by national leaders from the field of corrections, law, architecture, health care, and other groups who are interested in sound correctional management.

ACA standards address services, programs, health care and security operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for agencies and facilities throughout the world.

The three-year accreditation award granted to the Hutchins Unit does not signal the end of their involvement in the accreditation process. During the award period, staff will work to improve any deficiencies identified during the audit and maintain continuous compliance with the standards.

*American Correctional Association*

# ACCREDITATION
# REPORT



*Commission on Accreditation for Corrections*

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
HUTCHINS UNIT
DALLAS, TEXAS

*The mission of the Commission on Accreditation for Corrections is to upgrade and improve practices and conditions in adult and juvenile correctional facilities and programs through an accreditation process which is founded on a commitment to accountability, professionalism and respect for basic human rights and which recognizes sound and effective correctional practices, while striving towards excellence in the field of corrections.*

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org



FOUNDED 1870

EXECUTIVE
COMMITTEE

Harold W. Clark, MA
President

Patricia L. Caruso, MI
Vice President

Daron Hall, TN
President-Elect

Christopher B. Epps, MS
Treasurer

Gary D. Maynard, MD
Immediate Past President

Ana T. Aguirre, TX
Board of Governors
Representative

Mark H. Saunders, OH
Board of Governors
Representative

James A. Gondles, Jr., CAE
Executive Director

Congratulations on your accreditation award! You are now a member of the elite in achieving correctional excellence. The certificate you have received is but a small symbol of the enormous dedication and commitment demonstrated by each and every member of your staff to the accreditation process, and I urge you to display it prominently as a continual reminder of the level of professionalism achieved. This is just the beginning of your journey, however, for the true test of excellence is the test of time. It is critical that your operation be able to sustain this achievement over time and be constant through both prosperity and adversity.

The logo of the Commission on Accreditation for Corrections depicts a sextant. Those who chose this symbol did so because "the sextant is an instrument used by a navigator to pinpoint the location of his ship in relation to the established points of reference in the universe, with the purpose of charting his future course." This is the exact purpose of accreditation; objectively reviewing an agency or facility and giving it a goal for which to strive, a destination to reach. Accreditation is the sextant for our profession; let it be your guide as well.

Thank you for your commitment to the American Correctional Association and the standards and accreditation process.

Kathy Black-Dennis, Director
Standards and Accreditation
American Correctional Association

## Overview of the American Correctional Association

The American Correctional Association is the oldest and most prestigious correctional membership organization in the United States. Founded in 1870, ACA currently represents more than 20,000 correctional practitioners in the United States and Canada. Members include all levels of staff from a wide variety of correctional disciplines and programs as well as professionals in allied fields and representatives from the general public. In addition, the Association represents the interests of 74 affiliated organizations whose goals, while similar to those of ACA, focus on specialized fields and concerns within the realm of corrections.

At its first organizational meeting held in Cincinnati, Ohio, in 1870, the Association elected then-Ohio governor and future U.S. President, Rutherford B. Hayes, as its first president. The *Declaration of Principles* developed at that first meeting became the guidelines for correctional goals in both the United States and Europe.

Since that time, ACA has continued to take a leadership role in corrections and work toward a unified voice in correctional policy. In recent years, one of the Association's major goals has been the development of national correctional policies and resolutions of significant issues in corrections. These policies are considered for ratification at the Association's two annual conferences and ratified policies are then disseminated to the field and other interested groups. ACA has also had a major role in designing and implementing professional standards for correctional practices, as well as methods for measuring compliance with those standards.

The Association conducts research and evaluation activities, provides training and technical assistance, and carries out the regular responsibilities of any professional membership organization, including a full publications program. The Association's two annual conferences, held in varying cities across the nation, attract more than 5,000 delegates and participants each year from the 50 states, U.S. territories, and several foreign countries.

Membership in ACA is open to any individual, agency, or organization interested in the improvement of corrections and the purposes and objectives of the Association. Members include the majority of state, local, provincial, and territorial correctional agencies; individual correctional institutions and local jails, pretrial programs and agencies, schools of criminal justice in colleges and universities, libraries; and various probation, parole, and correctional agencies. Most of ACA's members are employed at the federal, state, and local levels. Members also include more than 200 volunteers affiliated with these agencies as administrators or as members of advisory boards and committees.

## Organizational Purposes of the American Correctional Association

Among the most significant purposes of the Association as outlined in its Constitution, are:

*To promote the coordination of correctional organizations, agencies, programs, and services to reduce fragmentation and duplication of effort and increase the efficiency of correctional services on a national basis.*

*To develop and maintain liaisons and a close working relationship in America with national, regional, state, and local associations and agencies in the correctional, criminal justice, civic, and related fields for mutual assistance and the interchange of ideas and information, and to extend and strengthen cooperative working relationships with similar associations and agencies on the international level.*

*To develop and promote effective standards for the care, custody, training, and treatment of offenders in all age groups and all areas of the correctional field: detention facilities and services, institutions and other facilities for juvenile and adult offenders, probation, parole, community residential centers, and other community-based programs and services.*

*To conduct studies, surveys, and program evaluations in the correctional field, and provide technical assistance to correctional organizations, departments, institutions, and services.*

*To publish and distribute journals and other professional materials dealing with all types of correctional activities.*

*To promote the professional development of correctional staff at all levels.*

In carrying out these purposes, ACA sponsors programs for policy analysis, demonstration, and research. ACA also provides testimony, consultation, publications, conferences, workshops, and other activities designed to stimulate constructive action regarding correctional problems.

### Standard and Accreditation

Perhaps ACA'S greatest influence has been the development of national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,500 correctional agencies in the United States.

## Organizational Structure of the American Correctional Association

### Executive Committee

The Executive Committee is composed of the elected officers of the Association - president, vice president, treasurer, two Board of Governors' members, the immediate past president, the president-elect, and the ACA executive director. The Executive Committee meets at least quarterly and exercises most of the powers of the Board of Governors during the intervals between meetings of the board.

### Board of Governors

ACA's bylaws vest control of the Association with an 18-member elected Board of Governors composed of the officers of the Association and five at-large members. To ensure the interdisciplinary nature of the Association, board members must represent the following areas:

At-Large Citizen (not employed in corrections)
Correctional Administration (Adult)
Correctional Administration (Juvenile)
Institutions (Adult)
Institutions (Juvenile)
Probation (Adult)
Probation (Juvenile)
Parole or Post-Release Supervision (Adult)

Community Programs (Adult)
Community Programs (Juvenile)
Aftercare or Post-Release Supervision (Juvenile)
Detention (Adult)
Detention (Juvenile)
At-Large (Ethnic Minority) (3)
Education
Member At-Large

### Delegate Assembly

The Delegate Assembly is composed of delegates from the professional affiliates, geographical chapters, membership at-large, Board of Governors, past presidents of ACA, and representatives of each military service. The Delegate Assembly can establish policy, define Association positions on broad social and professional issues, and determine major programs and legislative priorities. They meet at least twice annually, at the Winter Conference and Congress of Correction.

### Committees

The majority of the Association's activities take place through committees. Each committee chair reports to the Association's Board of Governors at least twice a year. In this way, the Association collectively benefits from the involvement and contribution of the hundreds of individuals who function on the various committees. Ad-hoc committees are appointed by the president of the Association.

The current committees and councils are:

Committee on Affirmative Action

Committee on Constitution and Bylaws

Committee on International Relations
Committee on Congress Program Planning
Committee on Legal Issues
Committee on Correctional Awards
Committee on Membership
Committee on Military Affairs
Council of Professional Affiliates
Council of Dual-Membership Chapters and
State and Geographical Affiliates
Nominating Committee

Council on Professional Education
Credentials Committee
Research Council
Eligibility Committee
Resolutions & Policy Development
Comm
Committee on Ethics
Standards Committee
Legislative Affairs Committee

**Affiliates and Chapters**

Affiliates and state chapters are major features of the Association's structure.  They
represent professional, regional, and state groups across the United States and Canada.
Affiliates and chapters contribute to the professional development of all members by
providing consultation in their respective areas of interest and by participating in seminars
and workshops at ACA's annual conferences.

The following affiliates and chapters are currently associated with ACA:

Alabama Council on Crime and Delinquency
Alston Wilkes Society
American Assn for Correctional Psychology
American Correctional Chaplains Association
American Correctional Food Service
Association
American Correctional Health Services Assn
American Institute of Architects
American Jail Association
American Probation and Parole Association
Arizona Probation, Parole, and Corrs Assn
Association for Corrl Research and Info Mgmt
Assn of Paroling Authorities, International
Assn of State Correctional Administrators
Assn of Women Executives in Corrections
International Assn of Correctional Officers
Iowa Corrections Association
Juvenile Justice Trainers Association
Kansas Correctional Association
Kentucky Council on Crime and Delinquency
Louisiana Correctional Association
Maryland Criminal Justice Association
Michigan Corrections Association
Middle Atlantic States Correctional
Association
Minnesota Corrections Association
Missouri Corrections Association

National Association of Adult and Juvenile
State
Corrections Mental Health Directors
National Assn of Blacks in Criminal Justice
National Association of Juvenile Corrl
Agencies
Oregon Criminal Justice Association
Parole and Probation Compact
Administrators Association
Pennsylvania Assn of Probation, Parole, and
Corrections
Prison Fellowship
South Carolina Correctional Association
Tennessee Corrections Association
Association on Programs for Female
Offenders
Central States Correctional Association
Colorado Correctional Association
Connecticut Criminal Justice Association
Correctional Association of Massachusetts
Correctional Accreditation Managers Assn
Correctional Education Association
Correctional Industries Association
Family and Corrections Network
Florida Council on Crime and Delinquency
Illinois Correctional Association
Indiana Correctional Association

International Assn of Corrl Training Personnel
International Community Corrections Assn
National Association of Probation Executives
National Coalition for Mental and Substance
Abuse Health Care in the Justice System
National Correctional Recreation Association
National Council on Crime and Delinquency
Nation Juvenile Detention Association
Nebraska Correctional Association
Nevada Correctional Association
New Jersey Chapter Association
New Mexico Correctional Association
New York Corrections and Youth Svcs Assn

North American Association of Wardens &
Superintendents
North Carolina Correctional Association
Ohio Correctional and Court Svcs
Association
Texas Corrections Association
The Salvation Army
Utah Correctional Association
Virginia Correctional Association
Volunteers of America
Washington Correctional Association
Wisconsin Correctional Association

## Major Activities of the American Correctional Association

### Legislation

The American Correctional Association is involved with all major issues affecting corrections today. Members and ACA staff maintain close working relationships with committees of the U.S. Congress and all federal agencies and groups whose decisions affect correctional policy. Expert testimony on a wide range of correctional issues is prepared for congressional committee and subcommittee hearings, and recommendations are provided to federal administrative agencies.

To ensure that the concerns and issues of the corrections profession are represented in proposed legislation and public policy, ACA's legislative liaison is addressing legislative and government concerns that will impact the corrections profession. ACA has established partnerships between chapters and affiliates and other national policy making organizations to present a strong collective voice for correctional reform throughout the world.

### Professional Development

The purpose of the Association's Professional Development Department is to plan, promote, and coordinate professional development through training seminars, workshops, and published materials including curriculums, resource guides, and monographs.

ACA's training plan calls for a variety of professional development activities. Nationally advertised workshops cover topics such as training for trainers, management training, community-based employment programs, and stress management. On-site workshops for state and local departments of corrections are offered in curriculum development, supervision, communications, and report-writing skills.

The *Training for Correctional Staff Trainers* workshops further the skills of correctional professionals qualified to initiate and deliver training. These workshops also enable agencies to comply with national standards for accreditation and ensure that training is job-related and professionally developed and presented.

The department also offers correspondence courses to further professional development. More than 6,000 correctional personnel have completed or are in the process of completing ACA's self-instruction training program for correctional officers. This program, developed under the auspices of the National Institute of Corrections, provides 40 hours of basic training in accordance with ACA standards. A score of at least 80 percent on the comprehensive examination must be attained to achieve certification.

The Association has similar courses available for correctional supervisors, juvenile caseworkers, and food service employees. Additional courses which cover report writing skills, correctional management skills, legal issues for probation and parole officers, and legal issues for correctional officers are also available.

## Publications

As one of the leading publishers of practical correctional publications, ACA produces books, videos, and lesson plans. Among the wide ranging subjects available are management, community, security, counseling, law, history, and health. These excellent resources for career advancement appeal to practitioners and scholars alike. Directories for every major sector of corrections are also published by ACA.

The following is just a few of the many publications that ACA offers:

*Corrections Today* is the major corrections magazine in the United States. Published seven times a year, it focuses on the interests of the professional correctional employee and administrator. Articles include reports of original research, experiences from the field, discussion of public policy, and the perspectives of prominent practitioners and academicians.

*On the Line* is published five times a year and contains national and local news of interest to the criminal justice professional.

*Corrections Compendium Newsletter* publishes cutting-edge information about the corrections environment. Survey information is compiled from 52 U.S. and 14 Canadian correctional systems.

*The Juvenile and Adult Directory* has been published since 1939. A revised edition of the directory is released each January. This publication is the only up-to-date, comprehensive directory of all U.S. and Canadian juvenile and adult correctional departments, institutions, agencies, and paroling authorities.

*The National Jail and Adult Detention Directory* was first published in 1978. It is a source of information concerning jails. The directory, published every two years, attempts to list all jails in the United States that house offenders or detainees for more than 48 hours.

*The Probation and Parole Directory*, updated every two years, provides over 500 pages of information regarding federal, state, and county adult and juvenile probation, parole and aftercare systems in the United States. It includes statistics on caseloads, expenditures, and personnel.

*The State of Corrections*, formerly *The Proceedings*, includes the events of both the Congress of Correction and the Winter Conference. Published since 1870, it includes selected speeches and panel presentations concerning the latest thoughts and practices in the criminal justice field.

*Correctional standards* are the most significant improvement in correctional programming. As the basis for accreditation, they give administrators a nationally recognized system for upgrading and improving their correctional services. The Association currently publishes over 20 manuals for every correctional discipline.

> To aid in the development of policy with relation to accreditation, *Guidelines for the Development of Policies and Procedures* are available for adult correctional institutions, adult parole authorities/adult probation and parole field services, adult local detention facilities, adult community residential services, juvenile detention facilities, and juvenile training schools.

### Conventions

ACA hosts two national conventions each year that attract more than 5,000 professionals from all aspects of corrections; the Winter Conference held in January, and the Congress of Correction, held in August. These events include a variety of workshops, exhibits, and seminars devoted to addressing topics specific to the corrections profession.

### Contracts and Grants

The American Correctional Association has a history of successful grant and contract management and administration. ACA has completed contracts and grants of more than $30 million. These diverse initiatives, which are funded through federal and private sources, add to the technical expertise and knowledge of the organization as well as to the total field of corrections.

### Standards and Accreditation

Perhaps ACA's greatest influence has been the development of national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,200 correctional agencies in the United States.

## Overview of the Commission on Accreditation for Corrections

The Commission on Accreditation for Corrections (CAC) is a private, nonprofit organization established in 1974 with the dual purpose of developing comprehensive, national standards for corrections and implementing a voluntary program of accreditation to measure compliance with those standards.

The Commission was originally developed as part of the American Correctional Association. In 1979, by joint agreement, the Commission separated from the Association in order to independently administer the accreditation program. Between 1978 and 1986, the organizations shared the responsibility for developing and approving standards and electing members of the Commission. On November 7, 1986, the Commission on Accreditation for Corrections officially realigned itself with the American Correctional Association.

The Commission meets at least twice each year.   The responsibility of rendering accreditation decisions rests solely with this board.   The members of the Commission represent the full range of adult and juvenile corrections and the criminal justice system. They are elected from the following categories:

> National Association of Juvenile Correctional Agencies (1 representative)
> Council of Juvenile Correctional Administrators (1 representative)
> Association of State Correctional Administrators (2 representatives)
> National Sheriffs' Association (2 representatives)
> American Jail Association (1 representative)
> North American Association of Wardens and Superintendents (1 representative)
> International Community Corrections Association (1 representative)
> American Probation and Parole Association (1 representative)
> Association of Paroling Authorities International (1 representative)
> National Juvenile Detention Association (1 representative)
> American Bar Association (1 representative)
> American Institute of Architects (1 representative)
> National Association of Counties (1 representative)
> Correctional Health (Physician) (1 representative)
> Juvenile Probation/Aftercare (1 representative)
> Adult Probation/Parole (1 representative)
> At-Large (17 representatives)
> Citizen At-Large (Not in Corrections) (1 representative)

### Association Staff

Accreditation activities are supported by the staff of the American Correctional Association, Standards and Accreditation Department, under the leadership of the director of the department.   Standards and Accreditation Department staff is responsible for the daily operation of the accreditation program. Agencies in the process have contact primarily with the accreditation specialist responsible for their state or agency.

Auditors

Over 600 corrections professionals in the United States have been selected, trained, and employed on a contract basis by the Association. These individuals perform the field work for the Association which includes providing assistance to agencies working toward accreditation, conducting on-site audits of agencies to assess compliance with standards and confirming that requirements are met, and monitoring to ensure maintenance of the conditions required for accreditation. Teams of auditors, referred to visiting committees or audit teams, are formed to conduct standards compliance audits of agencies seeking accreditation and reaccreditation.

Auditors are recruited nationally through announcements in prominent criminal justice publications and at major correctional meetings. Affirmative action and equal employment opportunity requirements and guidelines are followed in the recruitment of auditors. All auditors employed by the Association have a minimum of three years of responsible management experience, have received a recommendation from an agency administrator, and have demonstrated knowledge in the substantive area(s) in which they are employed to assist the Association. In addition, all auditors must successfully complete the Association's auditor training and be members of the ACA in good standing.

Standards Development

Development of the ACA standards began in 1974 with an extensive program of drafting, field testing, revising, and approving standards for application to all areas of corrections. Since then, over 1,200 correctional facilities and programs have adopted the standards for implementation through accreditation, and many others have applied the standards informally themselves.

In the development of standards, the goal was to prescribe the best possible practices that could be achieved in the United States today, while being both realistic and practical. Steps were taken to ensure that the standards would be representative of past standards development efforts, reflect the best judgment of corrections professionals regarding good corrections practice, recognize current case law, and be clear, relevant, and comprehensive. The standards development and approval process has involved participation by a wide range of concerned individuals and organizations. Twenty-three manuals of standards are now used in the accreditation process:

> *Standards for the Administration of Correctional Agencies*
> *Standards for Adult Parole Authorities*
> *Standards for Adult Probation and Parole Field Services*
> *Standards for Adult Correctional Institutions*
> *Standards for Adult Local Detention Facilities*
> *Standards for Small Jail Facilities*
> *Standards for Electronic Monitoring Programs*
> *Standards for Adult Community Residential Services*
> *Standards for Adult Correctional Boot Camps*
> *Standards for Correctional Industries*
> *Standards for Core Jails*

*Standards for Correctional Training Academies*
*Standards for Juvenile Community Residential Facilities*
*Standards for Correctional Facilities*
*Standards for Juvenile Detention Facilities*
*Standards for Juvenile Day Treatment Programs*
*Standards for Juvenile Correctional Boot Camps*
*Standards for Therapeutic Communities*
*Standards for Small Juvenile Detention Facilities*
*Standards for Performance-Based Health Care in Adult Correctional Institutions*
*Certification Standards for Health Care Programs*
*Standards for Adult Correctional Institutions (in Spanish)*

The standards establish clear goals and objectives critical to the provision of constitutional and humane correctional programs and services. The standards include the requirement for practices to promote sound administration and fiscal controls, an adequate physical plant, adherence to legal criteria and provision of basic services. Basic services called for by the standards include the establishment of a functional physical plant, training of staff, adoption of sanitation and safety minimums, and provision of a safe and secure living environment. In offering specific guidelines for facility and program operations, the manuals of standards address due process and discipline, including access to the courts, mail and visitation, searches, and conditions of confinement of special management offenders.

The standards are systematically revised to keep pace with the evolution of different correctional practices, case law, and after careful examination of experiences, applying them over a period of time and circumstances. The ACA Standards Committee, which includes membership from the Commission on Accreditation for Corrections, is responsible for standards development and revision.

The ACA publishes biannual supplement to the standards with updated information and clarifications until new editions of standards manuals are published. Each supplement addresses standards interpretations, deletions, revisions, and additions for all manuals of standards issued by the Standards and Accreditation Department.

Suggestions and proposals for revisions to the standards from the field and interested others are encouraged. The Standards and Accreditation Department has developed a standards proposal form specifically for this purpose. The standards proposal form can be obtained from the Standards Supplement, the ACA website, or Standards and Accreditation Department staff (Appendix A). Proposals should be submitted via the ACA website.

## Accreditation Process Descriptions

For over 120 years, the American Correctional Association has been the only national body involved in the development of standards for the correctional field. ACA standards are supported by ACA's Standards and Accreditation Department and the Commission on Accreditation for Corrections, which is the evaluating and certifying body for accreditation. The department is responsible for the administration of accreditation and ongoing development of correctional standards.

The accreditation process is a voluntary program for all types of correctional agencies. For these agencies, accreditation offers the opportunity to evaluate their operations against national standards, to remedy deficiencies, and to upgrade the quality of programs and services. The recognized benefits of such a process include: improved management; a defense against lawsuits through documentation; demonstration of a "good faith" effort to improve conditions of confinement; increased accountability and enhanced public credibility for administrative and line staff; a safer and more humane environment for personnel and offenders; and the establishment of measurable criteria for upgrading programs, staffing, and physical plant on a continuous basis.

A major component of the accreditation process is the standards compliance audit conducted by a visiting committee. The purpose of the audit is to measure operations against the standards, based on documentation provided by the agency.

### The Visiting Committee Report

The results of the standards compliance audit are contained in the visiting committee report, a document prepared by the visiting committee chairperson. The report is distributed to the agency administrator and members of the visiting committee. This report is also submitted to the Commission on Accreditation for Corrections for consideration at the accreditation hearing.

The following information is usually contained in the visiting committee report:

*Agency and Audit Narrative*

The agency narrative includes a description of program services, a description of physical plant, number of offenders served on the days of the audit, a summary significant incidents and consent decrees, class action lawsuits and/or judgments against the agency/facility, if applicable. The audit narrative, prepared by the visiting committee chairperson, describes audit activities and findings. The narrative examines issues or concerns that may affect the quality of life and services in an agency or facility. Quality of life issues include areas such as staff training, adequacy of medical service, sanitation, use of segregation and detention, reported and/or documented incidences of violence and crowding in institutions, offender activity levels, programming and provision of basic services. The audit narrative also contains comments as a result of staff and offender interviews, and a detailed explanation of all noncompliant and not applicable standards.

*Agency Response*

The agency has three options for standards found in noncompliance: a plan of action; an appeal; or a waiver request.

A **plan of action** is a detailed statement of tasks to be performed in order to achieve compliance with a standard found in noncompliance at the time of the audit. The plan of action designates staff responsibilities and timetables for completion.

An **appeal** is the agency's attempt to change the visiting committee's decision on a standard. The result of a successful appeal is a change in the status of the standard and a recalculation of the compliance tally.

A **waiver** may be requested when noncompliance with a standard does not adversely affect the life, health, or safety of staff and offenders and when quality of life conditions compensate for the lack of implementation of a plan of action. The granting of a waiver by the Commission waives the requirement for submitting a plan of action; however, it does not change the noncompliant finding.

A **discretionary compliance request** is when there are circumstances in which agencies choose not to comply with a particular standard for a variety of reasons.  These reasons include:

- An unwillingness to request funds from a parent agency or funding source.

- A preference to satisfy the standard/expected practice's intent in an alternative fashion.

- An objection from a parent agency, higher level government official or funding source to the nature of the standard/expected practice.

- A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice.

- An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

*Auditor's Response*

This section contains the visiting committee's final reply to all responses received from the agency and includes comments regarding the acceptability of plans of action, appeals, and waivers.

## Accreditation Hearings

The Commission on Accreditation for Corrections is solely responsible for rendering accreditation decisions and considers an agency's application at its next regular meeting following completion of the visiting committee report. The Commission is divided into panels that are empowered to reach and render accreditation decisions. These panels hear the individual application for accreditation and include a quorum of at least three Commissioners which includes the panel hearing chairperson. Agencies are notified in writing of the date, time, and location of the hearings by Standards and Accreditation Department Staff.

The panel hearing is the last step in the process. With the panel chairperson presiding, panel members discuss issues and raise questions relative to all aspects of agency operations and participation in the process. The information presented during the hearing and in the visiting committee report is considered by the panel members in rendering accreditation decisions.

The agency is invited to have a representative at the hearing and, in most cases, one or more individuals attend. When special conditions warrant, the visiting committee chairperson or a member of the visiting committee also may be asked to attend the hearings. When this occurs, the auditor provides information to help clarify controversial issues and responds to questions and concerns posed by panel members.

Attendance by any other parties (i.e. media representatives, public officials, or personnel from agencies other than the applicant) occurs only with the permission of the applicant agency. In these cases, the applicant agency representatives and panel members discuss procedures to be followed before commencement of the hearing.

### Conduct of Hearings

The panel schedule provides ample time for review of each individual agency pursuing accreditation. Hearings are conducted by the panel chairperson in accordance with established procedures. Panel proceedings require that a formal vote be taken on all final actions, i.e., agency appeals, waiver requests, and the final accreditation decision of the Commission. All panel proceedings are tape-recorded to assist in preparing minutes of the hearings. Panel activities generally occur as follows:

- Applicant agency representatives are requested by Standards and Accreditation Department staff to be on-call to allow for scheduling flexibility.

- A designated waiting area is usually provided for this purpose.

- When the panel is ready to review the agency, the Standards and Accreditation Department staff representative notifies agency representative(s).

- The hearing opens with an introduction by the panel chairperson.

- The agency representative is asked to give a brief description of the program.

- If a visiting committee member is present at the hearing, the panel chairperson may request that the auditor present an account of the visit, focusing on matters particularly pertinent to the decision or specific panel actions. In some cases, however, the panel may wish to call on the visiting committee member only to request additional information at different points during the hearing.

- The panel chairperson leads a standard by standard review of non-compliance issues. The agency representative presents information relative to their request for waivers, plans of action, appeals, and discretionary compliance requests. The agency may also present additional materials, including photographs or documentation, for review by the panel.

- Following the agency presentation, the chairperson has the option of calling the panel into executive session to consider the information provided, determine findings, and make an accreditation decision. Whether or not panel deliberations occur in the presence of agency personnel or in executive session varies from panel to panel, considering the preference of panel members and the sensitivity of issues to be discussed regarding the application.

In final deliberations, the Commission panel:

- Ensures compliance with all mandatory standards and at least 90 percent of all other standards.

- Responds with a formal vote to all appeals submitted by the applicant agency.

- Responds with a formal vote to all request for waivers, discretionary compliance, and plans of action submitted by the applicant agency.

At this time, the panel also:

- Assures that an acceptable plan of action will be submitted for every non-compliant standard, including those standards for which appeals of non-compliance and waiver requests have been denied by the panel. In judging the acceptability of plans of action, the panel ensures that all of the information requested on the form is provided. Furthermore, the feasibility of plans to achieve compliance is considered, including specific tasks, time frames, and resource availability (staff and funding) for implementing proposed remedies.

- Addresses to its satisfaction any concerns it has with visiting committee comments about the quality of life in the facility or program, patterns of

non-compliance, or any other conditions reviewed by the panel relating to the life, health, and safety of residents and staff.

For each application, a roll call vote to award accreditation, extend an agency in Candidate or Correspondent Status, or deny accreditation is conducted. The options for final action available to the panel are outlined in the next chapter.

If the panel has deliberated in executive session, agency representatives are invited back into the meeting and informed of the panel's final decision and actions or recommendations on all other issues raised by the applicant. If accreditation has not been granted, the chairperson discusses with agency personnel specific reasons for the decision and the conditions of extension in Candidate or Correspondent Status and procedures for appeal.

**Accreditation Decisions**

Three decisions relative to the accreditation of an agency are available to panels:

- *Three-year accreditation award* based on sufficient compliance with standards, acceptance of adequate plans of action for all non-compliant standards and satisfaction of any other life, health, and safety conditions established by the panel. The balance of the contract must be paid in full in order to receive a certificate of accreditation.

- *Extension of the applicant agency in Candidate Status* (initial accreditation only) for reasons of insufficient standards compliance, inadequate plans of action, or failure to meet other requirements as determined by the panel. The Commission may stipulate additional requirements for accreditation if, in its opinion, conditions exist in the facility or program that adversely affect the life, health, or safety of the offenders or staff. Extension of an applicant in Candidate Status is for period of time specified by the panel and for identified deficiencies if in the panel's judgment, the agency is actively pursuing compliance.

- *Probationary Status* is determined when the panel specifies that compliance levels are marginal, there is a significant decrease in compliance from the previous audit (in the case of reaccreditation), or there are quality of life issues that would indicate continued monitoring. While an award of accreditation is granted, a monitoring visit must be completed and the report presented at the next meeting of the Commission. The cost for a monitoring visit is borne by the agency at a rate of cost plus 25%. The agency does not have to appear before the Commission for the review of the monitoring visit report. If they choose to do so, all related travel expenses are borne by the agency. Specific expectations for removal from probation are outlined.

- *Denial of accreditation* removes the agency from Accredited Status (in the case of reaccreditation) and withdraws the agency from the accreditation program. Situations such as insufficient standards compliance, inadequate plans of action, failure to meet other requirements as determined by the

panel or quality of life issues may lead to the denial of accreditation, it is withdrawn from the process and is not eligible to re-apply (as an applicant) for accreditation status for a minimum of six months from the date of that panel hearing. The Commission will explain the process for appeal.

The agency receives written notification of all decisions relative to accreditation after the hearing.

Appeal Process

The accreditation process includes an appeal procedure to ensure the equity, fairness, and reliability of its decisions, particularly those that constitute either denial or withdrawal of Accredited Status. Therefore, an agency may submit an appeal of any denial or withdrawal of accreditation.

The basis for reconsideration is based on grounds that the decision(s) were:

- Arbitrary, capricious, or otherwise in substantial disregard of the criteria and/or procedures promulgated by the Commission.

- Based on incorrect facts or an incorrect interpretation of facts.

- Unsupported by substantial evidence.

- Based on information that is no longer accurate.

The reasonableness of the standards, criteria, and/or procedures for the process may not serve as the basis for reconsideration. The procedures for reconsideration are as follows:

- The agency submits written request for reconsideration to the Director of Standards within 30 days of the adverse decision stating the basis for the request.

- The Executive Committee of the Commission, composed of the officers of the Commission, reviews the request and decides whether or not the agency's request presents sufficient evidence to warrant a reconsideration hearing before the Commission. The agency is notified in writing of the Executive Committee's decision.

- If the decision is made to conduct a hearing, the hearing is scheduled for the next full Commission meeting and the agency is notified of the date.

- The agency, at its option and expense, has the right of representation, including counsel.

- Following the hearing held before the Commission, the decision, reflecting a majority opinion, is made known to the agency immediately.

■    Pending completion of the reconsideration process, the agency maintains its prior status.  Until a final decision has been reached, all public statements concerning the agency's accredited status are withheld.

■    Following completion of the reconsideration process, any change in the status of an agency is reflected in the next regularly published list of accredited agencies.

## Accredited Status

The accreditation period is three years, during which time the agency must maintain the level of standards compliance achieved during the audit and work towards compliance of those standards found in non-compliance. Regular contact with Standards and Accreditation Department staff should also be maintained.

**Annual Report**

During the three year accreditation period, the agency submits an annual report to the Standards and Accreditation Department. This statement is due on the anniversary of the accreditation (panel hearing) date and contains the following information:

*Current standards compliance levels* – This includes any changes in standards compliance since accreditation, listing on a standard-by-standard basis any standard with which the agency has fallen out of compliance or achieved compliance.

*Update of plans of action* – A progress report is included with respect to plans of action submitted to the hearing panel, indicating completion of plans resulting in compliance with standards and revised plans reflecting the need for additional time, funds, and/or resources to achieve compliance.

*Significant Events*- A report is made of events and occurrences at the agency during the preceding year that impact on standards compliance, agency operation, or the quality of services provided by the agency. This might include:

- A change in the agency administration and/or major staffing changes mission change or program revisions.

- Mission change or program revisions.

- Changes in the offender population, including number of offenders or general offender profile.

- Physical plant renovations, additions, or closing.

- Any major disturbances, such as extended periods or lock-down, employee work stoppages, etc.

- Any significant incident to include allegations of physical/sexual abuse.

- A death from other than natural causes.

Standards and Accreditation Department staff review the annual report received from the agency and respond to clarity issues or request additional information if necessary.

In addition to submission of the annual report, the agency is responsible for notifying Standards and Accreditation Department staff of any major incident, event, or circumstances

that might affect standards compliance. This notice must be provided to the Standards and Accreditation Department immediately following the event. For example, an agency must notify the Standards and Accreditation Department if it is the subject of a court order, has a major disturbance, escape, physical/sexual abuse (to include allegations), employee work stoppage, death from unnatural causes, or experiences a major fire or other disaster. It it the responsibility of the accredited agency to inform Standards and Accreditation Department staff or provide them with copies of news articles, special reports, or results of investigations that address conditions that affect standards compliance.

Finally, the Standards and Accreditation Department may request that the agency respond to public criticism, notoriety, or patterns of complaint about agency activity that suggests failure to maintain standards compliance. The Standards and Accreditation Department may conduct an on-site monitoring visit to the agency to verify continued compliance.

**Monitoring Visits**

Monitoring visits to agencies in Accredited Status are conducted by an ACA auditor(s) in order to assess continuing compliance with the standards. A monitoring visit may be conducted at anytime during the accreditation period, with advance notice to the agency. The determination of need for a monitoring visit is based on:

- Compliance levels, findings, and recommendations by the Commission on Accreditation for Corrections during the hearing.

- Incidents or events reported by the agency in its annual report.

- Problems indicated by adverse media reports or correspondence received by Standards and Accreditation Department staff, disturbances at the agency, or special investigations.

The length of the visit varies depending on the number of standards or special issues that must be addressed during the visit. The visits are conducted similar to standards compliance audits, but on a reduced scale. Monitoring visits are charged to the agency at a rate of cost plus twenty-five percent.

Activities, as a general rule, involve a review of all mandatory standards, all standards found in non-compliance at the time of accreditation, and any other concerns identified by the Commission. The visit also involves a tour of the agency and interviews with staff and offenders to ensure maintenance of the requirements of accreditation. It concludes with an exit interview during which the auditor informs the agency staff of the findings of the visit.

Following the visit, the auditor prepares a monitoring visit report that addresses findings of the visit. The report includes a list of standards reviewed, explanation of non-compliance findings, results of the tour and interviews with agency staff and offenders, and discussion of any issues believed to be relevant to the agency's accreditation. The report, as with others prepared by auditors, is reviewed and sent to the agency by Standards and Accreditation staff.

When a monitoring visit to the agency reveals deficiencies in maintaining compliance levels that existed at the time of accreditation, or less than 100 percent compliance with mandatory standards, the agency prepares a response providing explanation of the problems indicated in the report. When the agency has failed to maintain compliance with all mandatory standards, the monitoring visit report and the agency response are submitted to the Commission on Accreditation for Corrections for review during a regular hearing. Agency representatives are advised of the date, time, and location of the review, and are invited to attend. At the discretion of the Commission, the agency may be placed in probationary status and a revisit conducted to determine if deficiencies have been corrected.

**Revocation of Accreditation**

If the Commission panel believes that an agency's failure to maintain continuous compliance with certain standards is detrimental to life, health, and safety of residents and staff, the Commission may place an agency on probation. Probationary status last for a specific period of time designated by the Commission at its next regularly schedule meeting. The Commission again reviews the program and considers removing the probationary status or revoking accreditation. When the agency corrects the deficiencies within the probationary status period and the corrections have been verified and accepted, the agency resumes its status as an accredited agency. An agency that does not satisfactorily correct the deficiencies may be withdrawn from accreditation.

Another condition that may result in a rehearing and consideration of revocation is following a significant event in an agency (i.e. major disturbance, death from other than natural causes or allegations of physical/sexual abuse of offenders). Failure to notify the Standards and Accreditation Department in a timely manner may result in suspension of the agency's accreditation. Once ACA is notified of the major event, the Director of Standards and Accreditation may consult with the Executive Committee of the Commission, who may request a monitoring visit. If a visit is warranted, ACA will notify the agency and a date will be established with the concurrence of the facility. The monitoring visit will take place within 14 days of this notification. The monitoring visit report will be sent to the Director of Standards within 7 days of the monitoring visit and then forwarded to the Executive Committee of the Commission. Following review of the report, a determination will be made by the Executive Committee as to whether revocation of accreditation is warranted. Prior to any rehearing, agency representatives will be notified, so that any issues may be addressed and responded to in writing.

Accreditation is revoked for the following reasons:

- Failure on the part of the agency to adhere to the provisions on the contract.

- Failure on the part of the agency to maintain continuous compliance with the standards at levels sufficient for accreditation.

- Intentional misrepresentation of facts, lack of good faith, or lack of deliberate speed or a concerted effort to progress in the accreditation process, including the implementation of plans of action.

- Failure to notify ACA of significant incidents in the annual report to the Commission.

- Adverse conditions of confinement that affect the life health, and/or safety of staff and offenders.

- Failure to comply with the conditions of probation or suspension.

Standards and Accreditation Department staff notify the agency in writing of the specific reasons identified by the Commission for the revocation hearing. Agencies may appeal the decision of the Executive Committee to the full board of the Commission on Accreditation for Corrections. Appeals must be submitted within 30 days. The agency may apply to re-enter the process 180 days after the revocation of accreditation.

**Expiration of Accredited Status**

Accreditation is granted for a three year period. Unless the agency has applied for reaccreditation and completed activities in the process required for reaccreditation, the Commission withdraws the agency from Accreditation Status after this three year period.

For agencies in Accredited Status that are seeking subsequent accreditation, administrative extensions of Accredited Status may be granted under certain conditions. For example, relocation of the facility, staff turnover, and major renovations often warrant an extension. In these cases, a written request to the Director of Standards and Accreditation is required, outlining the reasons for extending the accreditation period. Agencies that fail to successfully complete an audit within the three year period, or do not receive an extension prior to their expiration date, are withdrawn from Accredited Status.





**Visiting Committee Report and Hearing Minutes**

| CONFIDENTIALITY |
| --- |
| *The American Correctional Association and the Commission on Accreditation for Corrections do not disclose to external parties specific information contained in this Accreditation Report or information discussed in the Accreditation Hearing. The Association encourages all participating agencies to provide information to the media about their accreditation activities, including disclosure of the Self-Evaluation and Accreditation Report.* |

## COMMISSION ON ACCREDITATION FOR CORRECTIONS
### PANEL ACTION REPORT

Doubletree Hotel
Columbus, Ohio

May 1, 2010

---

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

Agency Representatives:      Jackie Edwards, Director, ARRM Division
                            Rick Thaler, Director, CID Division
                            Keith Clendennen, Manager, Review and Standards
                            Craig Peters, Practice Manager, UTMB
                            Dan Mayer, Physician Review, Correctional
                            Managed Care UTMB

Panel Members:              Marge Webster, Chair
                            Denise Robinson
                            Angela Goehring
                            Kevin Myers

Staff:                      Terri Jackson

## Panel Action

Standard # 4-4062          The systemic waiver previously granted continued.

Standard # 4-4147-1        The request for a waiver was granted.

Standard # 4-4149          The request for a waiver was granted.

Standard # 4-4150          The request for discretionary compliance was
                           granted.

Standard # 4-4270          The request for discretionary compliance was
                           granted.

---

Prepared by Terri Jackson, Standards and Accreditation Specialist

**Accreditation Panel Decision**

Moved:                          Commissioner Robinson
Seconded:                       Commissioner Myers

Three-Year Accreditation:       Yes

| **Accreditation Vote** | **Yes** | **No** |
|---|---|---|
| Commissioner Webster | ✓ | |
| Commissioner Robinson | ✓ | |
| Commissioner Goehring | ✓ | |
| Commissioner Myers | ✓ | |

**Final Tally**

Mandatory                       100%
Non-Mandatory                   98.4%

---

Prepared by Terri Jackson, Standards and Accreditation Specialist

COMMISSION ON ACCREDITATION FOR CORRECTIONS

STANDARDS COMPLIANCE REACCREDITATION AUDIT

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 11-13, 2010

<u>VISITING COMMITTEE MEMBERS</u>

Jim Curington, Chairperson
Correctional Consultant
10015 NW 52nd Terrace
Gainesville, Florida  32653
(352) 538-2636
jecjrboy@aol.com

Joe Costello
Correctional Consultant
7533 Fox Road
Holland Patent, New York 13354
(315) 269-4296
joedowneast@netzero.net

Fletcher Morgan
Correctional Consultant
805 New Hampton Way
Merritt Island, Florida  32953
(321) 537-5602
Fmorgan4@cfl.rr.com

A.   **Introduction**

The re-accreditation audit of the Hutchins State Jail, Texas Department of Criminal Justice (TDCJ), Dallas, Texas was conducted on January 11-13, 2010, by the following team: James (Jim) Curington, Chairperson; Joe Costello, Member; and Fletcher Morgan, Member.

B.   **Facility Demographics**

Rated Capacity: 2276
Actual Population: 2103 [1344 Jail Confinees (JC) and 759 TDCJ State Institutional Division Inmates (TF)]
Average Daily Population for the last 12 months: 2015
Average Length of Stay: 180 days
Security/Custody Level: Minimum
Age Range of Offenders: 18-70
Gender: Male
Full-Time Staff: 433
5 Administrative, 78 Support/Program, 287 Security, 23 Other, 40 Contract [University of Texas Medical Branch (UTMB) and Drug and Alcohol Program (DAAP)]

C.   **Facility Description**

The Hutchins Unit State Jail Facility is one of 15 state jail facilities operated by the Texas Department of Criminal Justice (there are also four privately contracted state jail facilities under the auspices of TDJC). Hutchins is a large minimum security all male facility with a maximum capacity of 2276.

The facility is located at 1500 Langdon Road, Dallas, Texas, 75241 about 12 miles south of downtown Dallas, TX. The facility itself is composed of ten large mostly metal buildings surrounded by a single inward curved perimeter fence with appropriate lighting and a security vehicle road. The Unit is in an industrial/government area (Sheriff Farm/Ranch and City Road/Transportation construction operation) on about 60 acres of land. Entrance to the facility is about 1 mile off Interstate Highway 20 (I-20) easily accessible by staff and visitors.

The mission of Hutchins State Jail is defined in its Mission Statement:
"The mission of the Hutchins State Jail is to accomplish the mission as set forth by the agency. That is to protect the public, to promote positive change in offender behavior, to reintegrate offenders into society and to assist victims of crime. This is to be accomplished by Successful Teamwork that includes Communication, Coordination, Cooperation, and Consideration among all staff members."

D.   **Pre-Audit Meeting**

The Audit Team was met on the afternoon of January 10, 2010, by staff and Warden Tina

2

Carmona at the Dallas/Fort Worth Airport and taken to the host hotel/motel in Mesquite, Texas about 15 miles from the facility. That evening, the Audit Team, the Warden, the Regional Accreditation Manager, the Health Director and the Chief of Security met for supper, casual greetings and exchange of information.

Later that evening, the Audit Team met to discuss the information provided by the Association staff and the officials from the Hutchins State Jail Facility.

The chairperson divided standards into the following groups:

Standards # 4-4001 - # 4-4169 to Chairperson, James Curington
Standards # 4-4170 - # 4-4343 to Member, Joe Costello
Standards # 4-4344 - # 4-4530 to Member, Fletcher Morgan

E.    **The Audit Process**

    1.    Transportation

        The team was escorted to and from the facility, hotel/motel in Mesquite, TX by Mr. Tim Ault, the Regional Monitoring and Standards Coordinator.

    2.    Entrance Interview

        On Monday morning on arrival at the Hutchins Unit Mr. Ault escorted the Audit Team into the facility and to the Wardens office for a Pre-entrance meeting with Warden Tina Carmona, the Regional Director, Mr. Brian Rodeen and a few key staff. After short introductions and a brief review of the Agenda/Schedule, the team expressed the appreciation of the Association for the opportunity to be involved with Hutchins Unit State Jail in the accreditation process. Warden Carmona escorted the Audit Team to the facility's visiting park/meeting room where the formal entry meeting was held.

        Each auditor introduced themselves, made encouraging remarks on the process and indicated which areas he would review. The warden recognized the staff attending. Thirty-nine staff introduced themselves and indicated their areas of expertise and responsibility.

        The following persons were in attendance:

        Tina Carmona, Senior Warden
        May Terry, Major
        Kyron Session, Building Captain
        Steven Scott, Building Captain
        Carol Cozart, Administrative Assistant II
        Dale Hale, K Bld.
        Chartle Burns, STG. Sgt.

3

Ardra Scott-Burger, Grievance
Tim Jones, Operational Review Sgt
William Whiddon, Food Service Manager, IV
Kimberly Moore, Coord. II Unit Supply/Property
L. Alaniz, Commissary
Tracy Murphy, Medical Practice Manager
Dr. Henry Clint Davis, Academic Principal/Education
Beverly Wilson, Administration Assistant III Mailroom Supervisor
Pamela Meshack, Case Manager III Classification
O. McGrady, Turning Point Dapp Program Supervisor
Deborah Johnson, ACA
S. Williams, Recreation
Larry Kines, Human Resources Specialist II
Roy Storie, Safety Officer I Risk Management
Jerry Pugh, PA II Unit Maint. Sup.
Gene Bartholf, Chaplain II
Gloria Miller, Admin. Assist. IV Intake
Capt. Skeens, Laundry
Michael Tutt, Community Service Lt.
Pandora Cauley, Law Library
Angie Buro, UTMB
Gilford Yonette, Medical
Mark Davis, UTMB Nursing
Joe Simentic, SMHM
K. Weer, Security
A. Muzgit, Armory
H L Wooten, Recreation
Frank L. Heinan, Dental
Kevin Brown, Security
Abbie Whitt, Inmate Records
Judy Nichols, 2nd. Shift
Sarino Mauro, Security

It was explained that the goal of the visiting team was to be as helpful and non-intrusive as possible during the conduct of the audit. The chairperson emphasized the goals of accreditation toward the efficiency and effectiveness of correctional systems throughout the United States. The audit schedule was also discussed at this time.

3.   Facility Tour

The team toured the entire facility from approximately 8:30 a.m. to 2:30 p.m. The following persons accompanied the team on the tour and responded to the team's questions concerning facility operations:

Warden Tina Carmona

4

Major Terry May
Captain Kyron Session
ACA officer D. Johnson
Risk Manager Roy Storie
CO Judy Nichols
CO Sarina Mauro
Ms. Abbie Whitt
Regional Director Brian Rodeen
Regional Monitoring & Standards Coordinator, Tim Ault
TDCJ ACA Monitoring & Standards Director, Tommy Gattis
Assistant Regional Director, T.C. Hendrix
Assistant Regional Director, S. Bauer
Regional Risk Manager M. Parker

The Audit Team toured the following areas and ate the lunch meal with the inmate population. Areas toured: Mailroom, Human Resources, Count room, Offender Records, A-E dorms/recreation yards, Laundry, Commissary, Unit Supply, Dock area (kitchen and supply), Food Service, Dining Hall, Maintenance, Chapel, Intake/Receiving, K-building (segregation/solitary), Medical, G-Building (administrative offices/training, Education).

4.    Conditions of Confinement/Quality of Life

During the tour, the team evaluated the conditions of confinement at the facility. The following narrative description of the relevant programmatic services and functional areas summarizes the findings regarding the quality of life.

Security

The Hutchins Unit is an all male minimum security facility surrounded by an inward curved "no climb" fence with two rolls of razor ribbon. There is an armed roving vehicle patrol 24/7. There are 21 closed circuit television cameras that monitor the fence line as well as 18 cameras monitoring dorm and recreation areas and one camera for H-Building (administration). All cameras are monitored in G-Building (control). The Audit Team was present all three shifts and noted lighting and inmate supervision was/is appropriate. There are interior fences designed for offender movement. Dorms are all well secured with secured officer stations. Supervision of all movement is well maintained throughout the facility, in the dorms and on the central corridor/walkway of the Unit. Even with the large population and the various offender classifications, inmate supervision is noticeably well-controlled.

The Security Department is staffed by the following officer ranks: One Major, 2 Captains, 9 Lieutenants, 15 Sergeants and 260 Correctional Officers (grades 1-5).

Additionally, the Audit Team noted that security is established and maintained

5

because of the minimum designation of the facility and the fact that the inmate population has two years or less on their sentences as defined by the classification system, that the average length of stay is 180 days, the custody, control and supervision exercised by staff. This has contributed to a low number of assaults, no forced moves, limited use of chemical agents and a low number of grievances as documented on the Significant Incident Summary. (The Significant Incidence Summary will be addressed later in the report but suffice it to say, for the security section, the Hutchins Unit with its large population and high inmate turnover, had no numbers on the SIS table that were out-of-line, or revealed any "red flags".)

Environmental Conditions

There are 10 major buildings at the Hutchins State Jail, major construction is metal. Each dormitory building has its own recreational yard with appropriate areas for sports, exercise and general recreation. All areas of the facility are smoke free. Sanitation and cleanliness is a high priority and it was noticeable to the Audit Team that living areas were clean and well maintained.

The facility meets ACA standards providing sufficient furnishings, air flow, adequate shower, toilet/urinal and sink ratios, and unencumbered space requirements. Natural lighting is not available to some areas specifically some dayrooms and some dorm areas do not meet the ACA standards with respect to natural lighting. The large population does cause for excessive noise levels and by the institutions own admission, it does not meet the appropriate decibel level for ACA compliance. Additionally, it was very cold (for Dallas) and the heating of dormitory space was noticeably inconsistent. Some dorms were very warm and others comfortable. These issues were discussed with the administration.

Housekeeping plans are in place and with the supply of inmate labor for maintenance, cleanliness and sanitation, the facility has a clean, neat, and well-organized appearance.

Sanitation

The overall cleanliness and sanitation in the Hutchins Unit was appropriate/audit ready and presented an orderly, neat appearance. Cleaning schedules were available in all of the areas; it was apparent that regular cleaning schedules were followed. Inspections were done on a daily, weekly and monthly basis. Documentation indicated that the deficiencies cited during regular inspections were corrected quickly.

Landscaping was minimal but not inappropriate for the prison setting. Litter was almost none and the Audit Team noted that general sanitation is constantly "policed" by staff and is a very high priority at the Hutchins Unit.

Fire Safety

6

Fire safety is maintained/inspected by the Risk Management section of the TDCJ. Moreover, the Texas State Fire Marshall has delegated to the TDCJ, the authority and responsibility for annual fire inspections and reports. This system seems to be working but obviously with so many prisons and the lives of staff and inmates, the responsibility cannot be over-emphasized.

The fire safety program/alarm system is a Fire Watch Plan appropriately monitored on a shift by shift basis and inspected weekly, monthly and annually. It was noted by the Audit Team that the original alarm system of 72 enunciators and 296 smoke detectors is not operational and is replaced with the Watch System. The Team does suggest review of this situation and maybe address a supplement such as "house" smoke alarms in dormitories and/or secluded areas of the facility or other appropriate fire alert complimentary system..

Flammable, toxic and caustic materials are controlled, well maintained and appropriately inventoried. Nine safety storage cabinets are located and secured in appropriate locations within the Hutchins Unit. Central inventory and control of these flammable, toxic and caustic materials is a highlight of good management and supervision. This is to be noted later in the highlights section of the report.

The Institutional Risk Management coordinator has a positive and cooperative relationship with all departments and makes sure all fire logs, inspections, and fire safety codes are maintained in accordance with the Texas Department of Criminal Justice Risk Management Office as delegated by the State Fire Marshal's Office.

Local Fire Rescue is within minutes of the facility located in the same industrial/community area, and all appropriate agreements and review of fire plans are shared with this local authority.

Food Service

The first thing the audit team noticed in the kitchen was the cleanliness and organization. The appropriate supervision of the inmates contributed to this fine operation.

A food service manager IV and 10 staff manage the Hutchins Unit food service department. A licensed dietician approves the menus and the menus are planned on a 30-day cycle. Inmates are allowed 20 minutes to eat and can refuse any portion of the meal they do not want. Offenders with special medical needs are coordinated in medical and given appropriate substitutes. The team ate a meal with the inmates and found it to be tasteful and appealing in presentation. The kitchen/food service department employs/works about 200 offenders on assigned shifts.

As with Fire/Safety, Health and Sanitation inspections are delegated to the Texas Department of Criminal Justice, Risk Management, this authority and

7

responsibility is assigned through a Memo of Understanding with the Department of Health. The Risk Management section is maintaining and conducting the mandated weekly, monthly and annual inspections, but as with any food service operations "you're only as good as your last meal". The Audit Team is pleased to note and repeat as indicated above, that the meal was good.

Medical Care

Comprehensive health care services are provided to the 2103 (average daily) offenders housed at the Hutchins State Jail through a legislatively established partnership between the Texas Department of Criminal Justice and the University of Texas Medical Branch at Galveston. The partnership is governed by the Correctional Managed Health Care Committee (CMHCC). The health services clinic is staffed with licensed professional health care staff 16 hours per day Monday – Friday and 12 hours per day on weekends and holidays. During the hours the clinic is not open, licensed professional health care staff are on-call for emergencies.

Access to Care

For routine medical, dental and mental health care needs, an offender submits a written sick call request by placing it in one of the eight designated receptacles on the Hutchins Facility – one outside each of the two offender dining rooms and six in the Administrative Segregation and housing areas. The sick call requests are collected each morning, date/time stamped and triaged by qualified credentialed health care staff.

For urgent health care needs, an offender may request that a security officer notify Health Services by telephone on his behalf. A qualified health professional makes the determination whether the offender should come to the medical department immediately or submit a sick call request.

Emergency health care is accessed either by a security officer/employee notifying Health Services by telephone and medical staff responding to the scene with emergency equipment/supplies or by a security officer/employee escorting the offender to the medical department, as the situation dictates.

Offenders are educated during the intake process on methods of accessing health care.

All members of the Health Services and the security staff are trained on the procedures for obtaining emergency medical care and responding to emergencies.

Intake Screening

The Hutchins State Jail receives an average of about 358 offenders from county

8

jail each month. A member of the health services staff completes an initial health screening on all offenders immediately upon arrival from county jail. The initial screening identifies any acute or current health-related conditions or requirements. Offenders with immediate health care needs, or those taking medications, are referred to the facility medical department for further evaluation and treatment on the day of arrival. Offenders reporting current suicidal ideation, urgent complaints, or who exhibit severely disturbed behavior are immediately evaluated by a qualified mental health professional.

Chronic Care

Each offender with a chronic disease has an Individual Treatment Plan developed and documented in his medical record by a qualified health practitioner within 30 days of identification and/or diagnosis of the disease.

Mental Health Services

Three full-time masters level mental health clinicians and a psychiatrist provide outpatient mental health services, consisting of screening assessment, individual counseling, case management, crisis intervention, psychiatric evaluation and medication management.

Dental Services

A full-time dentist, half-time dental hygienist, and two full-time dental assistants provide for the routine and emergency dental needs of the Hutchins offender population.

The medical unit was very good. The area was spacious, clean, amply staffed and organized. Suggestions were made to: place a sign on the pharmacy door – "This door to remain locked at all times", place trash can lids on trash cans in exam rooms, place Bio-Hazard bags and trash cans in all exam rooms, add an additional AED on opposite end of compound for additional coverage.

The staff was knowledgeable, professional and very enthusiastic.

Sharps/syringe and medication control was accurate. Sanitation and safety was adequate. Sick call and grievance process was normal and clearly explained to offenders. Mental health and dental services were accurate. The medical folders were complete and easy to process. The medical outcome measures were within normal limits.

Also impressive was the more than adequate space for providing services.
Recreation

The Offender Orientation Handbook forthrightly states that offenders will be

9

provided the opportunity for outdoor exercise. To this end, a recreation yard is attached to each housing unit with a basketball court, a pavilion and athletic equipment.

Dayroom and leisure activities are also available- television, reading, correspondence and other limited activities help occupy the offenders free time. A special note, TDCJ has recently added telephone use to the general population through contractual telephone service. The telephone operation is carefully administered by administration and security.

Religious Programming

The religious program is managed and directed by a full-time ordained/certified Chaplain and assisted by numerous volunteers from the community.

A large chapel, The Chapel of Hope, is located inside the compound. The chapel has offices, training/prayer rooms, library area and a large chapel/service area. This, as with many chapels, has been built by volunteer donations and services.

A Chapel Schedule is routinely published along with a description of programs. The following twenty-six programs are offered to the general population: Voyager, Overcomers, Life After Prison, New Life Behavior, Operation Timothy, Christian Basics, Promise Keepers, Protestant Worship Service, Catholic Worship Service, Jumah Prayer Service, Bridges to Life, Arabic Class, First Contact Family Ministry, R.O.D. 1 (New Beginnings), R.O.D. 2 (New Foundations), R.O.D. 3 (New Freedoms), R.O.D. (Spanish), Anger Solutions, Experiencing God in Spanish, Spanish Salvation, Intercessory Prayer, Taleem, Jehovah Witness, Mormon Studies, Onesimus, Operation Redound and Kairos Ministries.

As can be seen from the above listing, there is ample and extensive opportunities for the offenders and in the Audit Teams opinion, a real vision of hope within the Chapel of Hope.

It should also be noted that within the dormitory setting the Chaplain and his volunteers have established, with administrative approval and oversight, a faith based dormitory in dorm E-4. This program was visited by the Audit Team and it was immediately evident to the team that the living area, inmate behavior, staff-inmate interaction revealed a high level of discipline, organization, cleanliness, and exceptional optimism.

Offender Work Programs

All offenders have been assigned a job. Texas does not pay prisoners to work but does award time and privileges to those who work. Work assignments include; food service, laundry, maintenance, janitors, teacher's aide, full time students, offender clerks, field squads, community service and assignment to the Drug and

10

Alcohol Program (which will be further addressed under Social Services).

Academic and Vocational Education

The Hutchins Unit has a large educational program headquartered in G-Building and as with all Texas Department of Criminal Justice Schooling, this program is headed and under the auspices of the Windham School District. The Windham School District (WSD) was established by the Texas Legislature as an entity separate and distinct from the Texas Department of Criminal Justice, with the Texas board of Criminal Justice serving as the Board of Trustees for the WSD. It is the policy of the Board that the WSD shall provide academic, as well as career and technology education, to eligible offenders incarcerated within the TDCJ. The establishment and mission of the District is: "The mission of the Windham School District is to provide appropriate educational programming and services to meet the needs of the eligible offender population in TDCJ and reduce recidivism by assisting offenders in becoming responsible, productive members of their communities".

In keeping with the above mission, the following is a list of opportunities at Hutchins State Jail:

EA Testing – Administered to incoming offenders without a current Educational Achievement (EA) score.
Literacy – Work on earning their GED (offenders under 21 must enroll in 6 hours of academic classes).
Changes – Offenders must be within 2 years of voted release to qualify for this 60 day program (assists with re-entry into the free world). State Jail offenders are eligible for placement as well. Completion requires 180 or more hours.
Cognitive Intervention – Involves changing the criminal addictive way of thinking to pro-social constructive productive thinking that will meet their needs over time.
Parenting – Provides information and teaches skills to become a better parent. Six weeks to complete and three hours per day.
BCIS (Business Computer Information Systems) – 300 hour vocational class (2 ½ - 3 months to complete).
CAD (Computer Aided Drafting) – 450-600 hour vocational class (6-6 ½ months to complete).
College Sales Marketing Associate Certificate – 18 college credit hour program designed to prepare students for careers in selling and marketing, with emphasis on the foundations of marketing and effective communication.

Classes (Mon.-Fri.) – Morning – 6:00-9:00, 9:15-12:15; Afternoon – 12:30-3:30, 3:45-6:45
Vocational Classes (Mon.-Fri.) – 6:00 a.m. – 12:00 p.m.
College Classes (Mon.-Fri.) – Times vary per semester

Social Services

11

Social Services can and does cover a wide spectrum of inmate/offender services, programs and attention. From their first arrival at the Hutchins Unit the offender is assisted, reviewed and classified. Intake begins with photo ID, Testing (Health to Education), Interview and specifically of interest in this section, review and interview by one of the Sociologists in the intake unit.

In addition to the normal security, education, religious, health, work and identification programs, of special interest to the Audit Team were:

The Drug and Alcohol Program
The Safe Prisons Program
The Re-integration for Offenders Program (RIO)
The Prisoner Re-entry Initiative (PRI)

The DAAP is a controlled substance abuse, education program that is offered to the population (over 200 hundred offenders participating) at Hutchins under the parent company Turning Point Inc.   The Turning Point, Inc. provides education/treatment for substance abusing dependent offenders as contracted with TDCJ.  The mission of Turning Point, Inc. is "to provide effective evidence-based, client-centered outpatient and residential substance disorder treatment with an emphasis on the 'best practices' and the family unit.   Accessibility and responsiveness to our clients is imperative".

The Safe Prisons Program has been established state wide by TDCJ to prevent Sexual Abuse and Rape Avoidance.   The goal is Zero Sexual Assaults and "Achieving a safe environment for all through positive change by all".  This program and pamphlets are presented to the inmate on arrival at the Hutchins Unit.

Project RIO is the governor's statewide plan to successfully reintegrate ex-offenders into the community by offering a linkage system between training and service and job placement in the local communities.

The PRI Pre-Release program is a 90 day voluntary program that assesses an inmate's reentry needs and provides him with the resources that connect him back to the community.  This is the inmate's chance to take advantage of the resources that can assist him with:  employment opportunities; job readiness training; life skills training; housing referral; substance abuse issues; mentoring; anger management; education; counseling and parenting.  PRI, an inmate Networking Resource Guide.

Visitation

Visitation is provided to inmates for two hours on weekends.  Each offender is allowed two visitors per visit.  Children under 16 may visit without being counted as the second visitor.  With a large inmate population from Dallas and Tarrant

12

counties (Ft. Worth) and only eleven miles from downtown Dallas, the visiting area is generally full but with the two hour time limit and the easiness of visitation (in terms of location), needs and opportunities are being met. Space and supervision is minimally adequate thus the Audit Team suggests continued review of policy by the administration (i.e. extended hours, weekday and evening visits, especially as inmates approach their release dates).

Library Services

Library services are available for the inmates daily by dorm assignment. Individual dorms are scheduled on a daily basis. There is adequate space and resources in this area. A Law library is available from Tuesday through Saturday at scheduled hours. Access is provided to all inmates. A staff of three operate the services to include not only the reading and legal material but documentation and notary services.

Laundry

It was evident to this Audit Team, when examined on tour, that the Laundry was clean, neat and well supervised. There are six institutional size washers and dryers. Offenders are provided two sets of clothing and all offenders are provided with a daily change of socks, underwear, change of pants and shirts each working day but not less than three times a week. The inmate clothing was observed to be clean and appropriate to the climate. Laundry equipment was found to be in good working order.

F.   Examination of Records

Following the facility tour, the team proceeded to the Warden's Conference Room to review the accreditation files and evaluate compliance levels of the policies and procedures. The facility has no notices of non-compliance with local, state, or federal laws or regulations.

1.   Litigation

Over the last three years, the facility had no consent decrees, class action lawsuits or adverse judgments.

2.   Significant Incidents/Outcome Measures

The Audit Team reviewed the Significant Incident Summary Report, Outcome Measures for Health Services and Grievances and observed the numbers were consistent with the level of security and the mission of this facility with no major concerns. Specifically the Audit Team did review the number of Medical referrals as a result of injuries but with the larger population, various job assignments, and the turnover of the inmate population, in our professional

13

opinion were within expected limits. The one suicide in November 2008 was also reviewed and again in the Audit Team's professional opinion, staff and the administration are managing and supervising appropriately.

Grievances were also reviewed and the Audit Team finds that the Hutchins Unit uses this process both to help with communications and administration of the facility and clearly there are no "red flags" that reveal any significant problems/issues.

3. Departmental Visits

The Audit Team members visited and/or revisited the following departments to review conditions relating to departmental policy and operations:

| Department Visited | Person(s) Contacted |
| --- | --- |
| Security | Captain K. Sessions |
| | Captain S. Scott |
| | Lt. D. Hale |
| | Lt. B. Smith |
| | Lt. C. Hernandez |
| | Officer L. Gilmore, CO IV |
| | Officer J. McDonald, CO V |
| | Officer V. McKinney, CO III |
| | Officer G. Davis, CO III |
| | Officer C. Davis, CO IV |
| | Officer T. Pagitt, CO IV |
| | Officer N. Oparaeke, CO IV |
| | Officer M. Brown, CO V |
| | Officer Gonzales, CO III |
| | Officer S. Hayes, CO V |
| | Officer L. White, CO V |
| | Officer S. Greene, CO V |
| | Officer C. Christian, CO V |
| | Officer N. Shanawong, CO V |
| | Officer S. Harley, CO V |
| | Officer A. Simpson, CO IV |
| | Officer Byrd, CO V |
| | Officer Olatunde, CO IV |
| | Officer Rayford, CO IV |
| | Officer James, CO V |
| | Officer Kalibe, CO V |
| | Officer Adewale, CO IV |
| | Officer Alli, CO V |
| | Officer Elliott, CO III |
| | Officer Faleti, CO III |

14

|  | Officer Gutierrez, CO IV |
|  | Officer Hamilton, CO V |
|  | Officer Oberinde, CO III |
|  | Officer Ogbonnaya, CO III |
|  | Officer Olloh, CO IV |
|  | Officer Onyekaba, CO IV |
|  | Officer Ross, CO IV |
|  | Officer Wallace, CO V |
|  | Officer B. Stradford, CO V |
|  | Officer S. Shanawong, CO V |
| Medical | Ms. T. Murphy, Practice Manager – Medical |
|  | Ms. I. Bello, Medical Assistant |
|  | Ms. M. Whitley, Supervisor Psychotherapist |
|  | Mr. D. Duncan, Psychotherapist |
|  | Mr. I. Smith, Psychotherapist |
|  | Mr. S. Reddy, Psychiatrist |
|  | Ms. T. Bentley, Medical |
|  | Ms. K. Weaver, Medical |
|  | Ms. C. Waymier, Dental |
| Maintenance | Mr. J. Pugh, Maintenance |
|  | Mr. R. Delaney, Maintenance |
|  | Mr. A. Wormly, Maintenance |
| Food Service | Captain W. Whiddon, Food Service Manager |
| Mail Room | Ms. B. Wilson, Mail Room Supervisor |
| Human Resources | Mr. Larry Kines, HR Specialist II |
|  | Ms. T. Rodriquez, HR Clerk |
|  | Ms. C. Hernandez, HR Clerk |
| Community Service | Lt. M. Tutt, Community Service |
|  | Officer A. Muzzicato, CO V, Community Service |
| Classification/Count Room | Ms. P. Meshack, Case Manager/Classification Supervisor |
|  | Ms. T. Chapman, Clerk II |
| DAAP Program | Mr. O. McGrady, Supervisor Turning Point |
|  | Ms. D. Christopher, Assistant Turning Point |
| Safety Officer | Mr. Storie, R., Supervisor Safety Officer |
| Unit Supply | Ms. K. Moore, Unit Supply |

15

| | |
|---|---|
| Chaplain | Chaplain Bartholf |
| Intake/Sociology | Ms. G. Miller, Intake Clerk |
| | Ms. V. Eldridge, Intake Photo I.D. |
| | Ms. S. Burnett, Intake Tester |
| | Ms. S. Hill, Sociologist |
| Commissary | Ms. L. Alaniz, Commissary Supervisor |
| FTO | Ms. L. Roberts, FTO |
| STG | Sgt. Burns, STG |
| | Ms. M. Vessey, STG |
| Education | Mr. J. Owens, Education |
| | Ms. K. Love, Education |
| | Ms. L. Jones, Education |
| | Ms. R. Darby, Education |
| Grievance | Ms. A. Scott-burger, Grievance Investigator |
| | Ms. S. Goolsby, Assistant |
| ACA Coordinator | Ms. D. Johnson, ACA Coordinator |
| Law Library | Ms. P. Cauley, Law Library |
| OIG | Mr. R. Morris, OIG Investigator |
| Laundry | Captain K. Skeens |
| | Officer K. Minks, Laundry |

4.  Shifts

Audit team members were present on all shifts.

a.  Day Shift (5:45 a.m. – 2:30 p.m.)

The team was present at the facility during the day shift from 8:00 a.m. to 6:00 p.m. The shift transitioned smoothly. Staff was professional and knowledgeable in their areas. Inmates were busy with their schedules and no concerns were noted. Inmates were observed cleaning the building and performing their work assignments. Inmate morale and attitude were satisfactory. Staff morale was good to very good.

b.  Evening Shift (1:45 p.m. to 10:30 p.m.)

16

The team was present at the facility during the evening shift from 2:45 p.m. to 10:30 p.m. All team members were present on this shift. Staff morale was good to very good. Inmate attitude was satisfactory.

c.   Night Shift (9:45 p.m. to 6:30 a.m.)

The team was present at the facility during the night shift from 9:45 p.m. to 11:15 p.m. The team attended the staff shift briefing, talked with the staff and reported to post assignments with officers. Staff was positive, professional and informative. Staff morale was good to very good. Inmate attitudes were satisfactory.

5.   Status of Previously Non-compliant Standards/Plans of Action

The team reviewed the status of standards previously found non-compliant, for which a waiver was not granted, and found the following: of the eight standards non-compliant on the compliance tally initial report of 2007, this Audit Team found four still in non-compliance

Standard # 4-4062  TDCJ policy does not require physical exams
Standard # 4-4149  There are no windows in some dorm cells
Standard # 4-4150  Offender housing does not meet the decibel level of 45 dBA (best achieved was 46dBA, this for night levels)
Standard # 4-4270  TDCJ policy does not allow recreation for solitary status and four additional were compliant for this re-accreditation

Standard # 4-4082
Standard # 4-4254
Standard # 4-4432
Standard # 4-3385

G.   **Interviews**

During the course of the audit, team members met with both staff and offenders to verify observations and/or to clarify questions concerning facility operations.

1.   Offender Interviews

The team talked with over 100 inmates. The comments from them were generally positive. Inmates made comments about staff being supportive and available to address their concerns and issues. They stated their needs were being met and no serious concerns were expressed.

2.   Staff Interviews

The team talked to over seventy-five staff. Staff was supportive of the Institution.

17

The morale was good and there was a team approach throughout. Staff appeared to enjoy their jobs and support each other. No serious concerns were noted. Staff had attended trainings and felt they received support when needed and/or requested.

3.   General Discussion/*Highlights*

The Audit Team would like to acknowledge the following areas of noted professionalism, expertise, inmate/staff/public benefit:
Faith Based Dorm in E-4 and volunteers
Safe Prisons Program
Training class – Professional Ethics
The Eleven Community Work Squads
The Human Resources (Personnel) Department
The responsiveness of the Maintenance Department
The control, inventory, and supervision of toxics, flammables and caustics

## H.   Exit Discussion

The exit interview was held at 12:00 noon in the Chapel of Hope with the Senior Warden and about 150 staff and visitors were in attendance.

The following notable persons were also in attendance:

Mr. Brian Rodeen, Regional Director
Mr. Tim Ault, Regional Coordinator ACA
Mr. Tommy Gattis, Director ACA Monitoring
Several wardens from the region and special guest commissioner
Ms. Janice Loard with the TDCJ Commission

The chairperson explained the procedures that would follow the audit. The team discussed the compliance levels of the mandatory and non-mandatory standards and reviewed their individual findings with the group.

The chairperson expressed appreciation for the cooperation of everyone concerned and congratulated the facility team for the progress made and encouraged them to continue to strive toward even further professionalism within the correctional field.

18

COMMISSION ON ACCREDITATION FOR CORRECTIONS

AND THE

AMERICAN CORRECTIONAL ASSOCIATION

## COMPLIANCE TALLY

| Manual Type | Adult Correctional Institutions, fourth edition |
|---|---|
| Supplement | 2008 Standards Supplement |
| Facility/Program | Texas Department of Criminal Justice |
| Audit Dates | January 11-13, 2010 |
| Auditor(s) | James (Jim) Curington, Chairperson<br>Joe Costello, Member<br>Fletcher Morgan, Member |

|  | MANDATORY | NON-MANDATORY |
|---|---|---|
| Number of Standards in Manual | 61 | 470 |
| Number Not Applicable | 5 | 41 |
| Number Applicable | 56 | 427 |
| Number Non-Compliance | 0 | 5 |
| Number in Compliance | 56 | 422 |
| Percentage (%) of Compliance | 100% | 98.88% |

- Number of Standards minus Number of Not Applicable equals Number Applicable

- Number Applicable minus Number Non-Compliance equals Number Compliance

- Number Compliance divided by Number Applicable equals Percentage of Compliance

19

COMMISSION ON ACCREDITATION FOR CORRECTIONS

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 11-13, 2010

Visiting Committee Findings

Non-Mandatory Standards

Non-Compliance

**Standard #4-4062**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT EMPLOYEES WHO HAVE DIRECT CONTACT WITH INMATES RECEIVE A PHYSICAL EXAMINATION PRIOR TO JOB ASSIGNMENT. ALL OTHER EMPLOYEES RECEIVE A MEDICAL SCREENING PRIOR TO JOB ASSIGNMENT. EMPLOYEES RECEIVE REEXAMINATIONS ACCORDING TO A DEFINED NEED OR SCHEDULE.

FINDINGS:

TDCJ policy does not require physical exams prior to being hired.

AGENCY RESPONSE

Waiver

A Systemic Waiver was granted for this standard.

AUDITOR'S RESPONSE

Systemic waiver is requested, Audit Team concurs

**Standard #4-4147-1 Added August 2006.**

ALL INMATE ROOMS/CELLS PROVIDE INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST THREE SQUARE FEET OF TRANSPARENT GLAZING, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE IN ROOMS/CELLS WITH THREE OR MORE INMATES. (RENOVATION, ADDITION, NEW CONSTRUCTION)

20

FINDINGS:

Due to construction, some dayroom areas do not have windows allowing natural light.

AGENCY RESPONSE

Waiver

Dormitories and cells are located in the building's interior, and the cell walls are shared with other offender housing or service areas. Based on the design of the building, the installation of windows to satisfy the standard is not feasible. Each room/cell is equipped with artificial lighting in order to facilitate reading and letter writing activities, and depending on the offender's classification may be allowed to exit the living areas daily for outdoor recreation where natural light is available. TDCJ and the Hutchins Unit request a waiver for standard #4-4147-1.

AUDITOR'S RESPONSE

Waiver is requested, Audit Team concurs

**Standard #4-4149 Revised January 2003.**

EACH DAYROOM PROVIDES INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST 12 SQUARE FEET OF TRANSPARENT GLAZING IN THE DAYROOM, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE WHOSE ROOM/CELL IS DEPENDENT ON ACCESS TO NATURAL LIGHT THROUGH THE DAYROOM. (NEW CONSTRUCTION ONLY)

FINDINGS:

Due to construction, some dorm areas do not have windows allowing natural light.

AGENCY RESPONSE

Waiver

Dayrooms are located in the interior of the building, and do not provide a possible location for window placement. Each dayroom is equipped with artificial lighting in order to facilitate reading and letter writing activities, and depending on the offender's classification may be allowed to exit the living areas daily for outdoor recreation where natural light is available. TDCJ and the Hutchins Unit request a waiver for standard #4-4149.

AUDITOR'S RESPONSE

Waiver is requested, Audit Team concurs

21

**Standard #4-4150**

NOISE LEVELS IN INMATE HOUSING UNITS DO NOT EXCEED 70 DBA (A SCALE) IN DAYTIME AND 45 DBA (A SCALE) AT NIGHT.

FINDINGS:

Offender housing does not meet noise requirement for night time (the 45 dBA minimum night level is 46dBA at best measured in several areas).

AGENCY RESPONSE

Discretionary Compliance

The Hutchins Unit was in compliance with all mandatory standards and 98.8% of the non-mandatory standards at the time of the audit, and is submitting a Discretionary Compliance Request on Standard #4-4150.

AUDITOR'S RESPONSE

Discretionary compliance is requested, Audit Team concurs

**Standard #4-4270**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES IN SEGREGATION RECEIVE A MINIMUM OF ONE HOUR OF EXERCISE PER DAY OUTSIDE THEIR CELLS, FIVE DAYS PER WEEK, UNLESS SECURITY OR SAFETY CONSIDERATIONS DICTATE OTHERWISE.

FINDINGS:

TDCJ policy does not allow recreation for solitary status offenders.

AGENCY RESPONSE

Discretionary Compliance

The Texas Department of Criminal Justice (TDCJ) is compliant with Standard #4-4270 in all areas of segregation, except solitary confinement. Solitary confinement is a punitive action that can only be assessed after an offender is found guilty at disciplinary hearing for a major offense (e.g. staff assault). TDCJ requests discretionary compliance with standard 4-4270.

AUDITOR'S RESPONSE

Discretionary compliance is requested, Audit Team concurs

22

COMMISSION ON ACCREDITATION FOR CORRECTIONS

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 11-13, 2010

Visiting Committee Findings

Mandatory Standards

Not Applicable

**Standard #4-4191**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT WHEN AN OFFENDER IS PLACED IN A FOUR/FIVE-POINT RESTRAINT (ARMS, HEAD AND LEGS SECURED), ADVANCE APPROVAL MUST BE OBTAINED FROM THE WARDEN/SUPERINTENDENT OR DESIGNEE.  SUBSEQUENTLY, THE HEALTH AUTHORITY OR DESIGNEE MUST BE NOTIFIED TO ASSESS THE INMATE'S MEDICAL AND MENTAL HEALTH CONDITION, AND TO ADVISE WHETHER, ON THE BASIS OF SERIOUS DANGER TO SELF OR OTHERS, THE INMATE SHOULD BE PLACED IN A MEDICAL/MENTAL HEALTH UNIT FOR EMERGENCY INVOLUNTARY TREATMENT WITH SEDATION AND/OR OTHER MEDICAL MANAGEMENT, AS APPROPRIATE.  IF THE OFFENDER IS NOT TRANSFERRED TO A MEDICAL/MENTAL HEALTH UNIT AND IS RESTRAINED IN A FOUR/FIVE-POINT POSITION, THE FOLLOWING MINIMUM PROCEDURES WILL BE FOLLOWED:

- DIRECT VISUAL OBSERVATION BY STAFF MUST BE CONTINUOUS PRIOR TO OBTAINING APPROVAL FROM THE HEALTH AUTHORITY OR DESIGNEE
- SUBSEQUENT VISUAL OBSERVATION MUST BE MADE AT LEAST EVERY 15 MINUTES
- RESTRAINT PROCEDURES ARE IN ACCORDANCE WITH GUIDELINES ENDORSED BY THE DESIGNATED HEALTH AUTHORITY.

FINDINGS:

4/5 point Medical restraints are not used by the Medical Department at the Hutchins Unit

AGENCY RESPONSE

23

<u>Waiver</u>

Dayrooms are located in the interior of the building, and do not provide a possible location for window placement. Each dayroom is equipped with artificial lighting in order to facilitate reading and letter writing activities, and depending on the offender's classification may be allowed to exit the living areas daily for outdoor recreation where natural light is available. TDCJ and the Hutchins Unit request a waiver for standard #4-4149.

**Standard #4-4353**

IF FEMALE OFFENDERS ARE HOUSED, ACCESS TO PREGNANCY MANAGEMENT IS SPECIFIC AS IT RELATES TO THE FOLLOWING:

- PREGNANCY TESTING
- ROUTINE PRENATAL CARE
- HIGH-RISK PRENATAL CARE
- MANAGEMENT OF THE CHEMICALLY ADDICTED PREGNANT INMATE
- POSTPARTUM FOLLOW-UP
- UNLESS MANDATED BY STATE LAW, BIRTH CERTIFICATES/REGISTRY DOES NOT LIST A CORRECTIONAL FACILITY AS THE PLACE OF BIRTH

FINDINGS:

The Hutchins Unit does not house female offenders

**Standard #4-4376**

DETOXIFICATION IS DONE ONLY UNDER MEDICAL SUPERVISION IN ACCORDANCE WITH LOCAL, STATE, AND FEDERAL LAWS. DETOXIFICATION FROM ALCOHOL, OPIATES, HYPNOTICS, OTHER STIMULANTS, AND SEDATIVE HYPNOTIC DRUGS IS CONDUCTED UNDER MEDICAL SUPERVISION WHEN PERFORMED AT THE FACILITY OR IS CONDUCTED IN A HOSPITAL OR COMMUNITY DETOXIFICATION CENTER. SPECIFIC GUIDELINES ARE FOLLOWED FOR THE TREATMENT AND OBSERVATION OF INDIVIDUALS MANIFESTING MILD OR MODERATE SYMPTOMS OF INTOXICATION OR WITHDRAWAL FROM ALCOHOL AND OTHER DRUGS.

FINDINGS:

This facility does not provide detoxification service

**Standard #4-4401**

24

THE INVOLUNTARY ADMINISTRATION OF PSYCHOTROPIC MEDICATION(S) TO AN OFFENDER IS GOVERNED BY APPLICABLE LAWS AND REGULATIONS OF THE JURISDICTION. WHEN ADMINISTERED, THE FOLLOWING CONDITIONS MUST BE MET:

- AUTHORIZATION IS BY A PHYSICIAN WHO SPECIFIES THE DURATION OF THERAPY
- LESS RESTRICTIVE INTERVENTION OPTIONS HAVE BEEN EXERCISED WITHOUT SUCCESS AS DETERMINED BY THE PHYSICIAN OR PSYCHIATRIST
- DETAILS ARE SPECIFIED ABOUT WHY, WHEN, WHERE, AND HOW THE MEDICATION IS TO BE ADMINISTERED
- MONITORING OCCURS FOR ADVERSE REACTIONS AND SIDE EFFECTS
- TREATMENT PLAN GOALS ARE PREPARED FOR LESS RESTRICTIVE TREATMENT ALTERNATIVES AS SOON AS POSSIBLE

FINDINGS:

This facility does not compel psychotropic medications

**Standard #4-4405**

THE USE OF RESTRAINTS FOR MEDICAL AND PSYCHIATRIC PURPOSES IS DEFINED, AT A MINIMUM, BY THE FOLLOWING:

- CONDITIONS UNDER WHICH RESTRAINTS MAY BE APPLIED
- TYPES OF RESTRAINTS TO BE APPLIED
- IDENTIFICATION OF A QUALIFIED MEDICAL OR MENTAL HEALTH PRACTITIONER WHO MAY AUTHORIZE THE USE OF RESTRAINTS AFTER REACHING THE CONCLUSION THAT LESS INTRUSIVE MEASURES WOULD NOT BE SUCCESSFUL
- MONITORING PROCEDURES FOR OFFENDERS IN RESTRAINTS
- LENGTH OF TIME RESTRAINTS ARE TO BE APPLIED
- DOCUMENTATION OF EFFORTS  FOR LESS RESTRICTIVE TREATMENT ALTERNATIVES AS SOON AS POSSIBLE
- AN AFTER-INCIDENT REVIEW

FINDINGS:

Medical restraints are not used by the Medical Department at the Hutchins Unit

25

## COMMISSION ON ACCREDITATION FOR CORRECTIONS

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 11-13, 2010

Visiting Committee Findings

Non-Mandatory Standards

Not Applicable

**Standard #4-4057**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT ALL
PERSONNEL COVERED BY MERIT SYSTEMS, CIVIL SERVICE REGULATIONS,
OR UNION CONTRACTS ARE SELECTED, RETAINED, AND PROMOTED ON
THE BASIS OF MERIT AND SPECIFIED QUALIFICATIONS. NEW EMPLOYEES
RECEIVE CREDIT FOR THEIR PRIOR TRAINING.

FINDINGS:

TDCJ employees are not covered by merit system, or union

**Standard #4-4059**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT
EMPLOYEES COVERED BY MERIT SYSTEMS, CIVIL SERVICE REGULATIONS,
OR UNION CONTRACT ARE APPOINTED INITIALLY FOR A PROBATIONARY
TERM OF AT LEAST SIX MONTHS BUT NO LONGER THAN ONE YEAR.

FINDINGS:

TDCJ employees are not covered by merit system, or union

**Standard #4-4143**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE
ASSIGNMENT OF APPROPRIATELY TRAINED INDIVIDUALS TO ASSIST
DISABLED OFFENDERS WHO CANNOT OTHERWISE PERFORM BASIC LIFE
FUNCTIONS.

26

FINDINGS:

The Hutchins Unit does not house totally disabled offenders

**Standard #4-4147**

ALL INMATE ROOMS/CELLS PROVIDE INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST THREE SQUARE FEET OF TRANSPARENT GLAZING, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE IN ROOMS/CELLS WITH THREE OR MORE INMATES.

FINDINGS:

The Hutchins Unit is considered 'New Construction' therefore this standard is non-applicable

**Standard #4-4152**

CIRCULATION IS AT LEAST 15 CUBIC FEET OF OUTSIDE OR RE-CIRCULATED FILTERED AIR PER MINUTE PER OCCUPANT FOR CELLS/ROOMS, OFFICER STATIONS, AND DINING AREAS, AS DOCUMENTED BY A QUALIFIED TECHNICIAN AND SHOULD BE CHECKED NOT LESS THAN ONCE PER ACCREDITATION CYCLE. (RENOVATION, ADDITION, NEW CONSTRUCTION ONLY)

FINDINGS:

The Hutchins Unit is considered 'New Construction' therefore this standard is non-applicable

**Standard #4-4181**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT WHEN BOTH MALES AND FEMALES ARE HOUSED IN THE FACILITY, AT LEAST ONE MALE AND ONE FEMALE STAFF MEMBER ARE ON DUTY AT ALL TIMES.

FINDINGS:

The Hutchins Unit is an adult male unit and does not house female offenders

**Standard #4-4208**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICED PROVIDE THE FOLLOWING:

- A MISSION STATEMENT, INCLUDING GOALS AND OBJECTIVES EMERGENCY PLANS THAT ARE INTEGRATED INTO THE

27

OVERALL EMERGENCY PLANS OF THE FACILITY

FINDINGS:

The Hutchins Unit does not have a canine program

**Standard #4-4209**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE FOR TRAINING OF HANDLERS/DOG TEAMS AND UPKEEP AND CARE OF THE ANIMALS PROVIDE FOR THE FOLLOWING:

- CRITERIA FOR SELECTION, TRAINING, AND CARE OF ANIMALS
- CRITERIA FOR SELECTION AND TRAINING REQUIREMENTS OF HANDLERS
- AN APPROVED SANITATION PLAN WHICH COVERS INSPECTION, HOUSING, TRANSPORTATION, AND DAILY GROOMING FOR DOGS

EACH HANDLER/DOG TEAM SHOULD BE TRAINED, CERTIFIED, AND RE-CERTIFIED ANNUALLY BY A NATIONALLY RECOGNIZED ACCREDITING BODY OR A COMPARABLE INTERNAL TRAINING AND PROFICIENCY TESTING PROGRAM.

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE FOR TRAINING OF HANDLERS/DOG TEAMS AND UPKEEP AND CARE OF THE ANIMALS PROVIDE FOR THE FOLLOWING:

- CRITERIA FOR SELECTION, TRAINING, AND CARE OF ANIMALS
- CRITERIA FOR SELECTION AND TRAINING REQUIREMENTS OF HANDLERS
- AN APPROVED SANITATION PLAN WHICH COVERS INSPECTION, HOUSING, TRANSPORTATION, AND DAILY GROOMING FOR DOGS

EACH HANDLER/DOG TEAM SHOULD BE TRAINED, CERTIFIED, AND RE-CERTIFIED ANNUALLY BY A NATIONALLY RECOGNIZED ACCREDITING BODY OR A COMPARABLE INTERNAL TRAINING AND PROFICIENCY TESTING PROGRAM.

FINDINGS:

The Hutchins Unit does not have a canine program

**Standard #4-4210**

28

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE PROVIDE DAILY AND CURRENT RECORDS ON TRAINING, CARE OF DOGS, AND SIGNIFICANT EVENTS.

FINDINGS:

The Hutchins Unit does not have a canine program

**Standard #4-4251**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT AN INMATE IS ADMITTED TO THE SEGREGATION UNIT FOR PROTECTIVE CUSTODY ONLY WHEN THERE IS DOCUMENTATION THAT PROTECTIVE CUSTODY IS WARRANTED AND NO REASONABLE ALTERNATIVES ARE AVAILABLE.

FINDINGS:

The Hutchins Unit does not house protective custody offenders

**Standard #4-4254**

WRITTEN POLICY, PROCEDURE, AND PRACTICE SPECIFY THE REVIEW PROCESS USED TO RELEASE AN INMATE FROM ADMINISTRATIVE SEGREGATION AND PROTECTIVE CUSTODY.

FINDINGS:

Inmates may not be released from Administrative Segregation or Protective Custody due to the average length of stay (180 days)

**Standard #4-4278**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT MALE AND FEMALE INMATES HOUSED IN THE SAME INSTITUTION HAVE SEPARATE SLEEPING QUARTERS BUT EQUAL ACCESS TO ALL AVAILABLE SERVICES AND PROGRAMS. NEITHER SEX IS DENIED OPPORTUNITIES SOLELY ON THE BASIS OF THEIR SMALLER NUMBER IN THE POPULATION.

FINDINGS:

The Hutchins Unit is an adult male unit and does not house female offenders

**Standard #4-4307**

IF YOUTHFUL OFFENDERS ARE HOUSED IN THE FACILITY, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THEY ARE HOUSED

29

IN A SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS EXCEPT WHEN:

- A VIOLENT, PREDATORY YOUTHFUL OFFENDER POSES AN UNDUE RISK OF HARM TO OTHERS WITHIN THE SPECIALIZED UNIT; AND/OR
- A QUALIFIED MEDICAL OR MENTAL-HEALTH SPECIALIST DOCUMENTS THAT THE YOUTHFUL OFFENDER WOULD BENEFIT FROM PLACEMENT OUTSIDE THE UNIT

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE PREPARATION OF A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR HOUSING A YOUTHFUL OFFENDER OUTSIDE THE SPECIALIZED UNIT AND A CASE-MANAGEMENT PLAN SPECIFYING WHAT BEHAVIORS NEED TO BE MODIFIED AND HOW THE YOUTHFUL OFFENDER MAY RETURN TO THE UNIT. THE STATEMENT OF REASONS AND CASE-MANAGEMENT PLAN MUST BE APPROVED BY THE WARDEN OR HIS OR HER DESIGNEE. CASES ARE REVIEWED AT LEAST QUARTERLY BY THE CASE MANAGER, THE WARDEN OR HIS OR HER DESIGNEE, AND THE YOUTHFUL OFFENDER TO DETERMINE WHETHER A YOUTHFUL OFFENDER SHOULD BE RETURNED TO THE SPECIALIZED UNIT.

FINDINGS:

The Hutchins Unit is an adult male unit and does not house youthful offenders

**Standard #4-4308**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE DIRECT SUPERVISION OF YOUTHFUL OFFENDERS HOUSED IN THE SPECIALIZED UNIT TO ENSURE SAFETY AND SECURITY.

FINDINGS:

The Hutchins Unit is an adult male unit and does not house youthful offenders

**Standard #4-4309**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR CLASSIFICATION PLANS FOR YOUTHFUL OFFENDERS THAT DETERMINE LEVEL OF RISK AND PROGRAM NEEDS DEVELOPMENTALLY APPROPRIATE FOR ADOLESCENTS. CLASSIFICATION PLANS SHALL INCLUDE CONSIDERATION OF PHYSICAL, MENTAL, SOCIAL, AND EDUCATIONAL MATURITY OF THE YOUTHFUL OFFENDER.
FINDINGS:

The Hutchins Unit is an adult male unit and does not house youthful offenders

30

**Standard #4-4310**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT ADEQUATE PROGRAM SPACE BE PROVIDED TO MEET THE PHYSICAL, SOCIAL, AND EMOTIONAL NEEDS OF YOUTHFUL OFFENDER AND ALLOWS FOR THEIR PERSONAL INTERACTIONS AND GROUP-ORIENTED ACTIVITIES.

FINDINGS:

The Hutchins Unit is an adult male unit and does not house youthful offenders

**Standard #4-4311**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS HAVE NO MORE THAN INCIDENTAL SIGHT OR SOUND CONTACT WITH ADULT OFFENDERS FROM OUTSIDE THE UNIT IN LIVING, PROGRAM, DINING, OR OTHER COMMON AREAS OF THE FACILITY. ANY OTHER SIGHT OR SOUND CONTACT IS MINIMIZED, BRIEF, AND IN CONFORMANCE WITH APPLICABLE LEGAL REQUIREMENTS.

FINDINGS:

The Hutchins Unit is an adult male unit and does not house youthful offenders

**Standard #4-4312**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT PROGRAM PERSONNEL WHO WORK WITH YOUTHFUL OFFENDERS FROM THE SPECIALIZED UNIT BE TRAINED IN THE DEVELOPMENTAL, SAFETY, AND OTHER SPECIFIC NEEDS OF YOUTHFUL OFFENDERS. WRITTEN JOB DESCRIPTIONS AND QUALIFICATIONS REQUIRE TRAINING FOR STAFF SPECIFICALLY ASSIGNED TO THE UNIT OR STAFF WHO ARE RESPONSIBLE FOR PROGRAMMING OF YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT BEFORE BEING ASSIGNED TO WORK WITH YOUTHFUL OFFENDERS. THE TRAINING SHOULD INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING AREAS:

- ADOLESCENT DEVELOPMENT
- EDUCATIONAL PROGRAMMING
- CULTURAL AWARENESS
- CRISIS PREVENTION AND INTERVENTION
- LEGAL ISSUES
- HOUSING AND PHYSICAL PLANT
- POLICIES AND PROCEDURES
- THE MANAGEMENT OF, AND PROGRAMMING FOR, SEX OFFENDERS

31

- SUBSTANCE-ABUSE SERVICES
- COGNITIVE-BEHAVIORAL INTERVENTIONS, INCLUDING ANGER MANAGEMENT, SOCIAL-SKILLS TRAINING, PROBLEM SOLVING, AND RESISTING PEER PRESSURE
- SUICIDE PREVENTION
- NUTRITION
- MENTAL-HEALTH ISSUES
- GENDER-SPECIFIC ISSUES
- CASE-MANAGEMENT PLANNING AND IMPLEMENTATION

FINDINGS:

The Hutchins Unit is an adult male unit and does not house youthful offenders

**Standard #4-4352**

OFFENDERS ARE PROVIDED ACCESS TO INFIRMARY CARE EITHER WITHIN THE CORRECTIONAL SETTING OR OFF SITE. IF INFIRMARY CARE IS PROVIDED ONSITE, IT INCLUDES, AT A MINIMUM, THE FOLLOWING:

- DEFINITION OF THE SCOPE OF INFIRMARY CARE SERVICES AVAILABLE
- A PHYSICIAN ON CALL OR AVAILABLE TWENTY-FOUR HOURS PER DAY
- HEALTH CARE PERSONNEL HAVE ACCESS TO A PHYSICIAN OR A REGISTERED NURSE AND ARE ON DUTY TWENTY-FOUR HOURS PER DAY WHEN PATIENTS ARE PRESENT
- ALL OFFENDERS/PATIENTS ARE WITHIN SIGHT OR SOUND OF A STAFF MEMBER
- AN INFIRMARY CARE MANUAL THAT INCLUDES NURSING CARE PROCEDURES
- COMPLIANCE WITH APPLICABLE STATE STATUTES AND LOCAL LICENSING REQUIREMENTS

FINDINGS:

The Hutchins Unit does not have an infirmary

**Standard #4-4353**

IF FEMALE OFFENDERS ARE HOUSED, ACCESS TO PREGNANCY MANAGEMENT IS SPECIFIC AS IT RELATES TO THE FOLLOWING:

- PREGNANCY TESTING
- ROUTINE PRENATAL CARE
- HIGH-RISK PRENATAL CARE

32

- MANAGEMENT OF THE CHEMICALLY ADDICTED PREGNANT INMATE
- POSTPARTUM FOLLOW-UP
- UNLESS MANDATED BY STATE LAW, BIRTH CERTIFICATES/REGISTRY DOES NOT LIST A CORRECTIONAL FACILITY AS THE PLACE OF BIRTH

FINDINGS:

The Hutchins Unit is an adult male unit and does not house female offenders

**Standard #4-4363**

ALL INTRASYSTEM TRANSFER OFFENDERS RECEIVE A HEALTH SCREENING BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL WHICH COMMENCES ON THEIR ARRIVAL AT THE FACILITY. ALL FINDINGS ARE RECORDED ON A SCREENING FORM APPROVED BY THE HEALTH AUTHORITY. AT A MINIMUM, THE SCREENING INCLUDES THE FOLLOWING:

INQUIRY INTO:
- WHETHER THE OFFENDER IS BEING TREATED FOR A MEDICAL OR DENTAL PROBLEM
- WHETHER THE OFFENDER IS PRESENTLY ON MEDICATION
- WHETHER THE OFFENDER HAS A CURRENT MEDICAL OR DENTAL COMPLAINT

OBSERVATION OF:
- GENERAL APPEARANCE AND BEHAVIOR
- PHYSICAL DEFORMITIES
- EVIDENCE OF ABUSE OR TRAUMA

MEDICAL DISPOSITION OF OFFENDERS:
- TO GENERAL POPULATION
- TO GENERAL POPULATION WITH APPROPRIATE REFERRAL TO HEALTH CARE SERVICE
- REFERRAL TO APPROPRIATE HEALTH CARE SERVICE FOR SERVICE FOR EMERGENCY TREATMENT

FINDINGS:

The Hutchins Unit does not have a chemical dependency program

**Standard #4-4364**

ALL IN-TRANSIT OFFENDERS RECEIVE A HEALTH SCREENING BY HEALTH-

33

TRAINED OR QUALIFIED HEALTH CARE PERSONNEL ON ENTRY INTO THE AGENCY SYSTEM. FINDINGS ARE RECORDED ON A SCREENING FORM THAT WILL ACCOMPANY THE OFFENDER TO ALL SUBSEQUENT FACILITIES UNTIL THE OFFENDER REACHES HIS OR HER FINAL DESTINATION. HEALTH SCREENS WILL BE REVIEWED AT EACH FACILITY BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL. PROCEDURES WILL BE IN PLACE FOR CONTINUITY OF CARE.

FINDINGS:

The Hutchins Unit does not house transient offenders.

**Standard #4-4377**

OFFENDERS HAVE ACCESS TO A CHEMICAL DEPENDENCY TREATMENT PROGRAM. WHEN A CHEMICAL DEPENDENCY PROGRAM EXISTS, THE CLINICAL MANAGEMENT OF CHEMICALLY DEPENDENT OFFENDERS INCLUDES, AT A MINIMUM, THE FOLLOWING:

- A STANDARDIZED DIAGNOSTIC NEEDS ASSESSMENT ADMINISTERED TO DETERMINE THE EXTENT OF USE, ABUSE, DEPENDENCY, AND/OR CO-DEPENDENCY
- AN INDIVIDUALIZED TREATMENT PLAN DEVELOPED AND IMPLEMENTED BY A MULTI DISCIPLINARY CLINICAL TEAM THAT INCLUDES MEDICAL, MENTAL HEALTH, AND SUBSTANCE ABUSE PROFESSIONALS
- PRE-RELEASE RELAPSE-PREVENTION EDUCATION, INCLUDING RISK MANAGEMENT
- THE OFFENDER SHALL BE INVOLVED IN AFTERCARE DISCHARGE PLANS

FINDINGS:

The Hutchins Unit does not have a chemical dependency program

**Standard #4-4383**

WHEN INSTITUTIONS DO NOT HAVE QUALIFIED HEALTH CARE STAFF, HEALTH-TRAINED PERSONNEL COORDINATE THE HEALTH DELIVERY SERVICES IN THE INSTITUTION UNDER THE JOINT SUPERVISION OF THE RESPONSIBLE HEALTH AUTHORITY AND WARDEN OR SUPERINTENDENT.

FINDINGS:

The Hutchins Unit uses only full-time qualified Health Care staff

34

**Standard #4-4391**

IF VOLUNTEERS ARE USED IN THE DELIVERY OF HEALTH CARE, THERE IS A DOCUMENTED SYSTEM FOR SELECTION, TRAINING, STAFF SUPERVISION, FACILITY ORIENTATION, AND DEFINITION OF TASKS, RESPONSIBILITIES AND AUTHORITY THAT IS APPROVED BY THE HEALTH AUTHORITY. VOLUNTEERS MAY ONLY PERFORM DUTIES CONSISTENT WITH THEIR CREDENTIALS AND TRAINING. VOLUNTEERS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS:

TDCJ does not utilize volunteer Health Care Personnel

**Standard #4-4393**

UNLESS PROHIBITED BY STATE LAW, OFFENDERS (UNDER STAFF SUPERVISION) MAY PERFORM FAMILIAL DUTIES COMMENSURATE WITH THEIR LEVEL OF TRAINING. THESE DUTIES MAY INCLUDE:

- PEER SUPPORT AND EDUCATION
- HOSPICE ACTIVITIES
- ASSIST IMPAIRED OFFENDERS ON A ONE-ON-ONE BASIS WITH ACTIVITIES OF DAILY LIVING
- SUICIDE COMPANION OR BUDDY IF QUALIFIED AND TRAINED THROUGH A FORMAL PROGRAM THAT IS PART OF SUICIDE PREVENTION PLAN
- HANDLING DENTAL INSTRUMENTS FOR THE PURPOSE OF SANITIZING AND CLEANING, WHEN DIRECTLY SUPERVISED AND IN COMPLIANCE WITH APPLICABLE TOOL CONTROL POLICIES, WHILE IN A DENTAL ASSISTANTS TRAINING PROGRAM CERTIFIED BY THE STATE DEPARTMENT OF EDUCATION OR OTHER COMPARABLE APPROPRIATE AUTHORITY

OFFENDERS ARE NOT TO BE USED FOR THE FOLLOWING DUTIES:

- PERFORMING DIRECT PATIENT CARE SERVICES
- SCHEDULING HEALTH CARE APPOINTMENTS
- DETERMINING ACCESS OF OTHER OFFENDERS TO HEALTH CARE SERVICES
- HANDLING OR HAVING ACCESS TO SURGICAL INSTRUMENTS, SYRINGES, NEEDLES, MEDICATIONS, OR HEALTH RECORDS
- OPERATING DIAGNOSTIC OR THERAPEUTIC EQUIPMENT EXCEPT UNDER DIRECT SUPERVISION (BY SPECIALLY

35

TRAINED STAFF) IN A VOCATIONAL TRAINING PROGRAM

FINDINGS:

Offenders only perform janitorial duties in the Health Care unit

**Standard #4-4416**

WHEN STANDARD ISSUED CLOTHING PRESENTS A SECURITY OR MEDICAL RISK (FOR EXAMPLE, SUICIDE OBSERVATION), PROVISIONS ARE MADE TO SUPPLY THE OFFENDER WITH A SECURITY GARMENT THAT WILL PROMOTE OFFENDER SAFETY IN A WAY THAT IS DESIGNED TO PREVENT HUMILIATION AND DEGRADATION.

FINDINGS:

The Hutchins Unit does not utilize security clothing

**Standard #4-4417**

THERE ARE SUFFICIENT BATHING FACILITIES IN THE MEDICAL HOUSING UNIT AND INFIRMARY AREA TO ALLOW OFFENDERS HOUSED THERE TO BATHE DAILY.

FINDINGS:

The Hutchins Unit does not maintain a 24 hour Medical Department

**Standard #4-4418**

OFFENDERS HAVE ACCESS TO OPERABLE WASHBASINS WITH HOT AND COLD RUNNING WATER IN THE MEDICAL HOUSING UNIT OR INFIRMARY AREA AT A MINIMUM RATIO OF ONE BASIN FOR EVERY 12 OCCUPANTS, UNLESS STATE OR LOCAL BUILDING/HEALTH CODES SPECIFY A DIFFERENT RATIO.

FINDINGS:

The Hutchins Unit does not maintain a 24 hour Medical Department

**Standard #4-4419**

OFFENDERS HAVE ACCESS TO TOILETS AND HAND-WASHING FACILITIES 24 HOURS PER DAY AND ARE ABLE TO USE TOILET FACILITIES WITHOUT STAFF ASSISTANCE WHEN THEY ARE CONFINED IN THE MEDICAL HOUSING UNIT OR IN THE INFIRMARY AREA. TOILETS ARE PROVIDED AT A MINIMUM RATIO OF ONE FOR EVERY 12 OFFENDERS IN MALE FACILITIES

36

AND ONE FOR EVERY 8 OFFENDERS IN FEMALE FACILITIES. URINALS MAY BE SUBSTITUTED FOR UP TO ONE-HALF OF THE TOILETS IN MALE FACILITIES. ALL HOUSING UNITS WITH THREE OR MORE OFFENDERS HAVE A MINIMUM OF TWO TOILETS. THESE RATIOS APPLY UNLESS STATE OR LOCAL BUILDING OR HEALTH CODES SPECIFY A DIFFERENT RATIO.

FINDINGS:

The Hutchins Unit does not maintain a 24 hour Medical Department

**Standard #4-4436**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT COMPREHENSIVE COUNSELING AND ASSISTANCE ARE PROVIDED TO PREGNANT INMATES IN KEEPING WITH THEIR EXPRESSED DESIRES IN PLANNING FOR THEIR UNBORN CHILDREN.

FINDINGS:

The Hutchins Unit is an adult male unit and does not house female offenders

**Standard #4-4438**

WHERE A DRUG TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE ALCOHOL AND DRUG ABUSE TREATMENT PROGRAM HAS A WRITTEN TREATMENT PHILOSOPHY WITHIN THE CONTEXT OF THE TOTAL CORRECTIONS SYSTEM, AS WELL AS GOALS AND MEASURABLE OBJECTIVES.

FINDINGS:

The Hutchins Unit is not a Therapeutic Community

**Standard #4-4439**

WHERE A DRUG TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR AN APPROPRIATE RANGE OF PRIMARY TREATMENT SERVICES FOR ALCOHOL AND OTHER DRUG ABUSING INMATES THAT INCLUDE, AT A MINIMUM, THE FOLLOWING:

- INMATE DIAGNOSIS
- IDENTIFIED PROBLEM AREAS
- INDIVIDUAL TREATMENT OBJECTIVES
- TREATMENT GOALS
- COUNSELING NEEDS
- DRUG EDUCATION PLAN

37

- RELAPSE PREVENTION AND MANAGEMENT
- CULTURALLY SENSITIVE TREATMENT OBJECTIVES, AS APPROPRIATE
- THE PROVISION OF SELF-HELP GROUPS AS AN ADJUNCT TO TREATMENT
- PRERELEASE AND TRANSITIONAL SERVICE NEEDS
- COORDINATION EFFORTS WITHIN COMMUNITY SUPERVISION AND TREATMENT STAFF DURING THE PRERELEASE PHASE TO ENSURE A CONTINUUM OF SUPERVISION AND TREATMENT

FINDINGS:

The Hutchins Unit is not a Therapeutic Community

### Standard #4-4440

WHERE A DRUG AND ALCOHOL TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE FACILITY USES A COORDINATED STAFF APPROACH TO DELIVER TREATMENT SERVICES. THIS APPROACH TO SERVICE DELIVERY SHALL BE DOCUMENTED IN TREATMENT PLANNING CONFERENCES AND INDIVIDUAL TREATMENT FILES.

FINDINGS:

The Hutchins Unit is not a Therapeutic Community

### Standard #4-4441

WHERE A DRUG AND ALCOHOL TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE INCENTIVES FOR TARGETED TREATMENT PROGRAMS TO INCREASE AND MAINTAIN THE INMATE'S MOTIVATION FOR TREATMENT.

FINDINGS:

The Hutchins Unit is not a Therapeutic Community

### Standard #4-4443

TEMPORARY RELEASE PROGRAMS SHOULD INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING:

- WRITTEN OPERATIONAL PROCEDURES
- CAREFUL SCREENING AND SELECTION PROCEDURES
- WRITTEN RULES OF CONDUCT AND SANCTIONS

38

- A SYSTEM OF SUPERVISION TO MINIMIZE INMATE ABUSE OF PROGRAM PRIVILEGES
- A COMPLETE RECORDKEEPING SYSTEM
- A SYSTEM FOR EVALUATING PROGRAM EFFECTIVENESS
- EFFORTS TO OBTAIN COMMUNITY COOPERATION AND SUPPORT

FINDINGS:

TDCJ does not have a Temporary Release Program

**Standard #4-4457**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE SECURITY AND PROGRAM DETERMINATIONS NECESSARY FOR ANY INDIVIDUAL TO BE ELIGIBLE FOR INDUSTRIES WORK ARE MADE BY THE CLASSIFICATION COMMITTEE.

FINDINGS:

The Hutchins Unit does not have an Industry Program

**Standard #4-4458**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE NUMBER OF INMATES ASSIGNED TO INDUSTRIES OPERATIONS MEET THE REALISTIC WORKLOAD NEEDS OF EACH INDUSTRIES OPERATING UNIT.

FINDINGS:

The Hutchins Unit does not have an Industry Program

**Standard #4-4459**

EACH INDUSTRIES OPERATING UNIT HAS A WRITTEN QUALITY CONTROL PROCEDURE THAT PROVIDES FOR RAW MATERIAL, IN-PROCESS, AND FINAL PRODUCT INSPECTION.

FINDINGS:

The Hutchins Unit does not have an Industry Program

**Standard #4-4462**

PRIVATE INDUSTRIES ON THE INSTITUTION GROUNDS EMPLOYING INMATES IN POSITIONS NORMALLY FILLED BY PRIVATE CITIZENS PAY

39

INMATES THE PREVAILING WAGE RATE FOR THE POSITION OCCUPIED.

FINDINGS:

The Hutchins Unit does not have a Prison Enhancement Program

**Standard #4-4502**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES WITH APPROPRIATE SECURITY CLASSIFICATIONS ARE ALLOWED FURLOUGHS TO THE COMMUNITY TO MAINTAIN COMMUNITY AND FAMILY TIES, SEEK EMPLOYMENT OPPORTUNITIES, AND FOR OTHER PURPOSES CONSISTENT WITH THE PUBLIC INTEREST.

FINDINGS:

TDCJ does not have a program that allows furloughs into the Community

40

**Significant Incident Summary**

This summary is required to be provided to the chair of your audit team upon their arrival. The information contained on this form will also be summarized in the narrative portion of the visiting committee report and will be incorporated into the final report. It should contain data for the last 12 months; indicate those months in the boxes provided. Please type the data. If you have questions on how to complete the form, please contact your regional manager.

Facility Hutchins                                      Year 2009

| Incidents | | Nov 08 | Dec 08 | Jan 09 | Feb 09 | Mar 09 | Apr09 | May 09 | Jun 09 | Jul 09 | Aug 09 | Sep 09 | Oct 09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Assault: Offenders/ Offenders* | Indicate types (sexual**, physical, etc.) | N/A | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY |
| | # With Weapon | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 1 |
| | # Without Weapon | 0 | 1 | 3 | 1 | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 1 |
| ssault: Offender/ Staff | Indicate types (sexual**, physical, etc.) | N/A | N/A | N/A | N/A | PHY | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | # With Weapon | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Without Weapon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Number of Forced Moves Used*** | (Cell extraction or other forced relocation of offenders) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Disturbances**** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Number of Times Chemical Agents Used | | 0 | 1 | 2 | 1 | 0 | 1 | 4 | 1 | 0 | 2 | 0 | 1 |
| Number of Times Special Reaction Team Used | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Four/Five Point Restraints | Number | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Indicate type (chair, bed, board, etc.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Offender Medical Referrals as a Result of Injuries Sustained | #'s should reflect incidents on this form, not rec or other source | 1 | 3 | 7 | 1 | 6 | 2 | 3 | 2 | 3 | 3 | 3 | 4 |
| Escapes | # Attempted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Actual | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Substantiated Grievances (resolved in favor of offender) | Reason (medical, food, religious, etc.) | See | Attach ment | | | | | | | | | | |
| | Number | See | Attach ment | | | | | | | | | | |
| Deaths | Reason (violent, illness, suicide, | NAT | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | Number | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |



*Any physical contact that involves two or more offenders
**Oral, anal or vaginal copulation involving at least two parties
***Routine transportation of offenders is not considered "forced"
****Any incident that involves four or more offenders. Includes gang fights, organized multiple hunger strikes, work stoppages, hostage situation major fires, or other large scale incidents

41

| Standard | Outcome Measure | Numerator/Denominator | Value | Calculated O.M. |
|---|---|---|---|---|
| | | Health Care Outcomes | | |
| 1A | (1) | Number of offenders diagnosed with a MRSA infection within the past twelve (12) months | 109 | |
| | divided by | The average daily population | 1968 | 5.54% |
| | (2) | Number of offenders diagnosed with active tuberculosis in the past twelve (12) months | 1 | |
| | divided by | Average daily population. | 109 | 0.92% |
| | (3) | Number of offenders who are new converters on a TB test that indicates newly acquired TB infection in the past twelve (12) months | 18 | |
| | divided by | Number of offenders administered tests for TB infection in the past twelve (12) months as part of periodic or clinically-based testing, but not intake screening. | 83 | 21.69% |
| | (4) | Number of offenders who completed treatment for latent tuberculosis infection in the past twelve (12) months | 23 | |
| | divided by | Number of offenders treated for latent tuberculosis infection in the past twelve (12) months. | 112 | 20.54% |
| | (5) | Number of offenders diagnosed with Hepatitis C viral infection at a given point in time | 180 | |
| | divided by | Total offender population at that time. | 1927 | 9.34% |
| | (6) | Number of offenders diagnosed with HIV infection at a given point in time | 34 | |
| | divided by | Total offender population at that time. | 1927 | 1.76% |
| | (7) | Number of offenders with HIV infection who are being treated with highly active antiretroviral treatment (HAART) at a given point in time | 14 | |
| | divided by | Total number of offenders diagnosed with HIV infection at that time. | 34 | 41.18% |
| | (8) | Number of selected offenders with HIV infection at a given point in time who have been on antiretroviral therapy for at least six months with a viral load of less than 50 cps/ml | 2 | |
| | divided by | Total number of treated offenders with HIV infection that were reviewed. | 34 | 5.88% |
| | (9) | Number of offenders diagnosed with an Axis I disorder (excluding sole diagnosis of substance abuse) at a given point in time | 136 | |

42

| | | | | |
|---|---|---|---|---|
| | divided by | Total offender population at that time. | 1927 | 7.06% |
| | (10) | Number of offender admissions to off-site hospitals in the past twelve (12) months | 16 | |
| | divided by | Average daily population. | 1968 | 0.81% |
| | (11) | Number of offenders transported off-site for treatment of emergency health conditions in the past twelve (12) months | 122 | |
| | divided by | Average daily population in the past twelve (12) months. | 1968 | 6.20% |
| | (12) | Number of offender specialty consults completed during the past twelve (12) months | 236 | |
| | divided by | Number of specialty consults (on-site or off-site) ordered by primary health care practitioners in the past twelve (12) months. | 313 | 75.40% |
| | (13) | Number of selected hypertensive offenders at a given point in time with a B/P reading > 140 mmHg/ >90 mm Hg | 99 | |
| | divided by | Total number of offenders with hypertension who were reviewed. | 226 | 43.81% |
| | (14) | Number of selected diabetic offenders at a given point in time who are under treatment for at least six months with a hemoglobin A1C level measuring greater than 9 percent | 0 | |
| | divided by | Total number of diabetic offenders who were reviewed. | 57 | 0.00% |
| | (15) | The number of completed dental treatment plans within the past twelve (12) months | 136 | |
| | divided by | the average daily population during the reporting period. | 1968 | 6.91% |
| 2A | (1) | Number of health care staff with lapsed licensure or certification during a twelve (12) month period | 0 | |
| | divided by | Number of licensed or certified staff during a twelve (12) month period. | 25 | 0.00% |
| | (2) | Number of new health care staff during a twelve (12) month period that completed orientation training prior to undertaking their job | 7 | |
| | divided by | Number of new health care staff during the twelve (12) month period. | 7 | 100.00% |
| | (3) | Number of occupational exposures to blood or other potentially infectious materials in the past twelve (12) months | 2 | |
| | divided by | Number of employees. | 33 | 6.05% |
| | (4) | Number of direct care staff (employees and contractors) with a conversion of a TB test that indicates newly acquired TB infection in the past twelve (12) months | 0 | |
| | divided by | Number of direct care staff tested for TB infection in the past twelve (12) months during periodic or clinically indicated evaluations. | 2 | 0.00% |
| 3A | (1) | Number of offender grievances related to health care services found in favor of the offender in the past twelve (12) months | 15 | |
| | divided by | Number of evaluated offender grievances related to health care services in the past twelve (12) months. | 71 | 21.13% |

43

| | (2) | Number of offender grievances related to safety or sanitation sustained during a twelve (12) month period | 4 | |
| | divided by | Number of evaluated offender grievances related to safety or sanitation during a twelve (12) month period. | 14 | 28.57% |
| | (3) | Number of adjudicated offender lawsuits related to the delivery of health care found in favor of the offender in the past twelve (12) months | 0 | |
| | divided by | Number of offender adjudicated lawsuits related to healthcare delivery in the past twelve (12) months | 0 | #DIV/O1 |
| 4A | (1) | Number of problems identified by quality assurance program that were corrected during a twelve (12) month period | 5 | |
| | divided by | Number of problems identified by quality assurance program during a twelve (12) month period. | 4 | 125.00% |
| | (2) | Number of high-risk events or adverse outcomes identified by the quality assurance program during a twelve (12) month period. | 0 | |
| | (3) | Number of offender suicide attempts in the past twelve (12) months | 1 | |
| | divided by | Average daily population | 1968 | 0.05% |
| | (4) | Number of offender suicides in the past twelve (12) months | 0 | |
| | divided by | Average daily population | 1968 | 0.00% |
| | (5) | Number of unexpected natural deaths in the past twelve (12) months | 1 | |
| | divided by | Total number of deaths in the same reporting period. | 1 | |
| | (6) | Number of serious medication errors in the past twelve (12) months | 0 | |
| 5A | None | | | |
| 6A | None | | | |
| 7A | None | | | |
| 7B | None | | | |
| 7C | None | | | |

44

**From:** Tina Carmona/Institutional/TDCJ
**To:** Carol Cozart/Institutional/TDCJ

**Date:** Wednesday, May 12, 2010 10:17AM
**Subject:** Fw: ACA Final Report

Please print this and all attachments. Be sure to give copy to ACA for files.

     ⸙ Russell Bailey

     ----- Original Message -----
       **From:** Russell Bailey
       **Sent:** 05/12/2010 10:16 AM CDT
       **To:** Tina Carmona
       **Cc:** pamager@utmb.edu
       **Subject:** ACA Final Report
Warden Carmona,
Attached below is the ACA Final Report for the Hutchins Unit. We no longer mail out a hard copy, so please print the report, and ensure that a copy is maintained in the ACA Office. The Panel Hearing Minutes are located on page 28. Again, congratulations to you and your staff on your Reaccreditation.

Russell Bailey, Administrator
TDCJ Monitoring & Standards

Attachments:

Hutchins Unit Final Report.pdf

# AMERICAN CORRECTIONAL ASSOCIATION

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org



FOUNDED 1870

August 29, 2007

EXECUTIVE COMMITTEE

Gary Maynard, IA
President

J. Daron Hall, TN
Vice President

Harold Clarke, WA
President-Elect

Evelyn Ridley-Turner, IN
Treasurer

Gwendolyn Chunn, NC
Immediate Past President

Glenn Goord, NY
Board of Governors
Representative

Mark Saunders, OH
Board of Governors
Representative

James A. Gondles, Jr., VA
Executive Director

John Rupert, Senior Warden
Hutchins Unit
1500 East Langdon Road
Dallas, Texas 75241

Dear Warden Rupert:

Congratulations!

It is a pleasure to officially inform you that the Hutchins Unit was accredited by the Commission on Accreditation for Corrections at the 137th Congress of Corrections on August 10, 2007 in Kansas City, Missouri.

Your accreditation represents the satisfactory completion of a rigorous self-evaluation, followed by an outside review by a team of independent auditors.

Every profession strives to provide a high quality of service to society. To know that you, your staff, and other officials are complying with the requirements of the accreditation process is indeed a statement of a high level of commitment to the staff and persons under your care.

On behalf of the Commission on Accreditation for Corrections, thank you for your commitment to the corrections profession.

Sincerely,

*Robert Garvey*

Robert Garvey, Chairperson
Commission on Accreditation
for Corrections

cc:
   Russell Bailey



*American Correctional Association*



*Commission on Accreditation for Corrections*

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### HUTCHINS UNIT
### DALLAS, TX

*The mission of the Commission on Accreditation for Corrections is to upgrade and improve practices and conditions in adult and juvenile correctional facilities and programs through an accreditation process which is founded on a commitment to accountability, professionalism and respect for basic human rights and which recognizes sound and effective correctional practices, while striving towards excellence in the field        of        corrections.*

# AMERICAN CORRECTIONAL ASSOCIATION

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org



FOUNDED 1870

**EXECUTIVE COMMITTEE**

Gary Maynard, IA
President

J. Daron Hall, TN
Vice President

Harold Clarke, WA
President-Elect

Evelyn Ridley-Turner, IN
Treasurer

Gwendolyn Chunn, NC
Immediate Past President

Glenn Goord, NY
Board of Governors
Representative

Mark Saunders, OH
Board of Governors
Representative

James A. Gondles, Jr, VA
Executive Director

Congratulations on your accreditation award!  You are now a member of the elite in achieving correctional excellence.  The certificate you have received is but a small symbol of the enormous dedication and commitment demonstrated by each and every member of your staff to the accreditation process, and I urge you to display it prominently as a continual reminder of the level of professionalism achieved.  This is just the beginning of your journey, however, for the true test of excellence is the test of time.  It is critical that your operation be able to sustain this achievement over time and be constant through both prosperity and adversity.

The logo of the Commission on Accreditation for Corrections depicts a sextant.  Those who chose this symbol did so because "the sextant is an instrument used by a navigator to pinpoint the location of his ship in relation to the established points of reference in the universe, with the purpose of charting his future course."  This is the exact purpose of accreditation; objectively reviewing an agency or facility and giving it a goal for which to strive, a destination to reach.  Accreditation is the sextant for our profession; let it be your guide as well.

Thank you for your commitment to the American Correctional Association and the standards and accreditation process.

Mark A. Flowers, Director
Standards and Accreditation
American Correctional Association

## OVERVIEW OF THE AMERICAN CORRECTIONAL ASSOCIATION

The American Correctional Association is the oldest and most prestigious correctional membership organization in the United States. Founded in 1870, ACA currently represents more than 20,000 correctional practitioners in the United States and Canada. Members include all levels of staff from a wide variety of correctional disciplines and programs as well as professionals in allied fields and representatives from the general public. In addition, the Association represents the interests of 74 affiliated organizations whose goals, while similar to those of ACA, focus on specialized fields and concerns within the realm of corrections.

At its first organizational meeting held in Cincinnati, Ohio, in 1870, the Association elected then-Ohio governor and future U.S. President, Rutherford B. Hayes, as its first president. The *Declaration of Principles* developed at that first meeting became the guidelines for correctional goals in both the United States and Europe.

Since that time, ACA has continued to take a leadership role in corrections and work toward a unified voice in correctional policy. In recent years, one of the Association's major goals has been the development of national correctional policies and resolutions of significant issues in corrections. These policies are considered for ratification at the Association's two annual conferences and ratified policies are then disseminated to the field and other interested groups. ACA has also had a major role in designing and implementing professional standards for correctional practices, as well as methods for measuring compliance with those standards.

The Association conducts research and evaluation activities, provides training and technical assistance, and carries out the regular responsibilities of any professional membership organization, including a full publications program. The Association's two annual conferences, held in varying cities across the nation, attract more than 5,000 delegates and participants each year from the 50 states, U.S. territories, and several foreign countries.

Membership in ACA is open to any individual, agency, or organization interested in the improvement of corrections and the purposes and objectives of the Association. Members include the majority of state, local, provincial, and territorial correctional agencies; individual correctional institutions and local jails; pretrial programs and agencies; schools of criminal justice in colleges and universities; libraries; and various probation, parole, and correctional agencies. Most of ACA's members are employed at the federal, state, and local levels. Members also include more than 200 volunteers affiliated with these agencies as administrators or as members of advisory boards and committees.

## ORGANIZATIONAL PURPOSES OF THE AMERICAN CORRECTIONAL ASSOCIATION

Among the most significant purposes of the Association as outlined in its Constitution, are:

> *To promote the coordination of correctional organizations, agencies, programs, and services to reduce fragmentation and duplication of effort and increase the efficiency of correctional services on a national basis.*

> *To develop and maintain liaisons and a close working relationship in America with national, regional, state, and local associations and agencies in the correctional, criminal justice, civic, and related fields for mutual assistance and the interchange of ideas and information, and to extend and strengthen cooperative working relationships with similar associations and agencies on the international level.*

> *To develop and promote effective standards for the care, custody, training, and treatment of offenders in all age groups and all areas of the correctional field: detention facilities and services, institutions and other facilities for juvenile and adult offenders, probation, parole, community residential centers, and other community-based programs and services.*

> *To conduct studies, surveys, and program evaluations in the correctional field, and provide technical assistance to correctional organizations, departments, institutions, and services.*

> *To publish and distribute journals and other professional materials dealing with all types of correctional activities.*

> *To promote the professional development of correctional staff at all levels.*

In carrying out these purposes, ACA sponsors programs for policy analysis, demonstration, and research. ACA also provides testimony, consultation, publications, conferences, workshops, and other activities designed to stimulate constructive action regarding correctional problems.

ORGANIZATIONAL STRUCTURE OF THE AMERICAN CORRECTIONAL ASSOCIATION

### Executive Committee

The Executive Committee is composed of the elected officers of the Association - president, vice president, treasurer, two Board of Governors' members, the immediate past president, the president-elect, and the ACA executive director. The Executive Committee meets at least quarterly and exercises most of the powers of the Board of Governors during the intervals between meetings of the board.

### Board of Governors

ACA's bylaws vest control of the Association with an 18-member elected Board of Governors composed of the officers of the Association and five at-large members. To ensure the interdisciplinary nature of the Association, board members must represent the following areas:

At-Large Citizen (not employed in corrections)
Correctional Administration (Adult)
Correctional Administration (Juvenile)
Institutions (Adult)
Institutions (Juvenile)
Probation (Adult)
Probation (Juvenile)
Parole or Post-Release Supervision (Adult)
Community Programs (Adult)

Community Programs (Juvenile)
Aftercare or Post-Release Supervision (Juvenile)
Detention (Adult)
Detention (Juvenile)
At-Large (Ethnic Minority) (3)
Education
Member At-Large

### Delegate Assembly

The Delegate Assembly is composed of delegates from the professional affiliates, geographical chapters, membership at-large, Board of Governors, past presidents of ACA, and representatives of each military service. The Delegate Assembly can establish policy, define Association positions on broad social and professional issues, and determine major programs and legislative priorities. They meet at least twice annually, at the Winter Conference and Congress of Correction.

### Committees

The majority of the Association's activities take place through committees. Each committee chair reports to the Association's Board of Governors at least twice a year. In this way, the Association collectively benefits from the involvement and contribution of the hundreds of individuals who function on the various committees. Ad-hoc committees are appointed by the president of the Association.

The current committees and councils are:

Committee on Affirmative Action
Committee on Constitution and Bylaws
Committee on International Relations

Committee on Congress Program Planning
Committee on Legal Issues
Committee on Correctional Awards

Committee on Membership
Committee on Military Affairs
Council of Professional Affiliates
Council of Dual-Membership Chapters and
State and Geographical Affiliates
Nominating Committee
Council on Professional Education
Credentials Committee

Research Council
Eligibility Committee
Resolutions & Policy Development Comm
Committee on Ethics
Standards Committee
Legislative Affairs Committee

### Affiliates and Chapters

Affiliates and state chapters are major features of the Association's structure. They represent professional, regional, and state groups across the United States and Canada. Affiliates and chapters contribute to the professional development of all members by providing consultation in their respective areas of interest and by participating in seminars and workshops at ACA's annual conferences.

The following affiliates and chapters are currently associated with ACA:

Alabama Council on Crime and Delinquency
Alston Wilkes Society
American Assn for Correctional Psychology
American Correctional Chaplains Association
American Correctional Food Service Association
American Correctional Health Services Assn
American Institute of Architects
American Jail Association
American Probation and Parole Association
Arizona Probation, Parole, and Corrs Assn
Association for Corrl Research and Info Mgmt
Assn of Paroling Authorities, International
Assn of State Correctional Administrators
Assn of Women Executives in Corrections
International Assn of Correctional Officers
Iowa Corrections Association
Juvenile Justice Trainers Association
Kansas Correctional Association
Kentucky Council on Crime and Delinquency
Louisiana Correctional Association
Maryland Criminal Justice Association
Michigan Corrections Association
Middle Atlantic States Correctional Association
Minnesota Corrections Association
Missouri Corrections Association
National Association of Adult and Juvenile State
Corrections Mental Health Directors

Association on Programs for Female Offenders
Central States Correctional Association
Colorado Correctional Association
Connecticut Criminal Justice Association
Correctional Association of Massachusetts
Correctional Accreditation Managers Assn
Correctional Education Association
Correctional Industries Association
Family and Corrections Network
Florida Council on Crime and Delinquency
Illinois Correctional Association
Indiana Correctional Association
International Assn of Corrl Training Personnel
International Community Corrections Assn
National Assn of Blacks in Criminal Justice
National Association of Juvenile Corrl Agencies
National Association of Probation Executives
National Coalition for Mental and Substance
Abuse Health Care in the Justice System
National Correctional Recreation Association
National Council on Crime and Delinquency
National Juvenile Detention Association
Nebraska Correctional Association
Nevada Correctional Association
New Jersey Chapter Association
New Mexico Correctional Association
New York Corrections and Youth Svcs Assn

North American Association of Wardens & Superintendents
North Carolina Correctional Association
Ohio Correctional and Court Svcs Association
Oregon Criminal Justice Association
Parole and Probation Compact Administrators Association
Pennsylvania Assn of Probation, Parole, and Corrections
Prison Fellowship
South Carolina Correctional Association

Southern States Correctional Association
Tennessee Corrections Association
Texas Corrections Association
The Salvation Army
Utah Correctional Association
Virginia Correctional Association
Volunteers of America
Washington Correctional Association
Western Correctional Association
Wisconsin Correctional Association

## MAJOR ACTIVITIES OF THE AMERICAN CORRECTIONAL ASSOCIATION

### Legislation

The American Correctional Association is involved with all major issues affecting corrections today. Members and ACA staff maintain close working relationships with committees of the U.S. Congress and all federal agencies and groups whose decisions affect correctional policy. Expert testimony on a wide range of correctional issues is prepared for congressional committee and subcommittee hearings, and recommendations are provided to federal administrative agencies.

To ensure that the concerns and issues of the corrections profession are represented in proposed legislation and public policy, ACA's legislative liaison is addressing legislative and government concerns that will impact the corrections profession. ACA has established partnerships between chapters and affiliates and other national policy making organizations to present a strong collective voice for correctional reform throughout the world.

### Professional Development

The purpose of the Association's Professional Development Department is to plan, promote, and coordinate professional development through training seminars, workshops, and published materials including curriculums, resource guides, and monographs.

ACA's training plan calls for a variety of professional development activities. Nationally advertised workshops cover topics such as training for trainers, management training, community-based employment programs, and stress management. On-site workshops for state and local departments of corrections are offered in curriculum development, supervision, communications, and report-writing skills.

The *Training for Correctional Staff Trainers* workshops further the skills of correctional professionals qualified to initiate and deliver training. These workshops also enable agencies to comply with national standards for accreditation and ensure that training is job-related and professionally developed and presented.

The department also offers correspondence courses to further professional development. More than 6,000 correctional personnel have completed or are in the process of completing ACA's self-instruction training program for correctional officers. This program, developed under the auspices of the National Institute of Corrections, provides 40 hours of basic training in accordance with ACA standards. A score of at least 80 percent on the comprehensive examination must be attained to achieve certification.

The Association has similar courses available for correctional supervisors, juvenile caseworkers, and food service employees. Additional courses which cover report writing skills, correctional management skills, legal issues for probation and parole officers, and legal issues for correctional officers are also available.

### Publications

As one of the leading publishers of practical correctional publications, ACA produces books, videos, and

lesson plans. Among the wide ranging subjects available are management, community, security, counseling, law, history, and health. These excellent resources for career advancement appeal to practitioners and scholars alike. Directories for every major sector of corrections are also published by ACA.

The following is just a few of the many publications that ACA offers:

*Corrections Today* is the major corrections magazine in the United States. Published seven times a year, it focuses on the interests of the professional correctional employee and administrator. Articles include reports of original research, experiences from the field, discussion of public policy, and the perspectives of prominent practitioners and academicians.

*On the Line* is published five times a year and contains national and local news of interest to the criminal justice professional.

*Corrections Compendium Newsletter* publishes cutting-edge information about the corrections environment. Survey information is compiled from 52 U.S. and 14 Canadian correctional systems.

*The Juvenile and Adult Directory* has been published since 1939. A revised edition of the directory is released each January. This publication is the only up-to-date, comprehensive directory of all U.S. and Canadian juvenile and adult correctional departments, institutions, agencies, and paroling authorities.

*The National Jail and Adult Detention Directory* was first published in 1978. It is a source of information concerning jails. The directory, published every two years, attempts to list all jails in the United States that house offenders or detainees for more than 48 hours.

*The Probation and Parole Directory*, updated every two years, provides over 500 pages of information regarding federal, state, and county adult and juvenile probation, parole and aftercare systems in the United States. It includes statistics on caseloads, expenditures, and personnel.

*The State of Corrections*, formerly *The Proceedings*, includes the events of both the Congress of Correction and the Winter Conference. Published since 1870, it includes selected speeches and panel presentations concerning the latest thoughts and practices in the criminal justice field.

*Correctional standards* are the most significant improvement in correctional programming. As the basis for accreditation, they give administrators a nationally recognized system for upgrading and improving their correctional services. The Association currently publishes over 20 manuals for every correctional discipline.

To aid in the development of policy with relation to accreditation, *Guidelines for the Development of Policies and Procedures* are available for adult correctional institutions, adult parole authorities/adult probation and parole field services, adult local detention facilities, adult community residential services, juvenile detention facilities, and juvenile training schools.

### Conventions

ACA hosts two national conventions each year that attract more than 5,000 professionals from all aspects of corrections; the Winter Conference held in January, and the Congress of Correction, held in August. These events include a variety of workshops, exhibits, and seminars devoted to addressing topics specific to the corrections profession.

### Contracts and Grants

The American Correctional Association has a history of successful grant and contract management and administration.  ACA has completed contracts and grants of more than $30 million.  These diverse initiatives, which are funded through federal and private sources, add to the technical expertise and knowledge of the organization as well as to the total field of corrections.

### Standards and Accreditation

Perhaps ACA's greatest influence has been the development of national standards and the accreditation process.  ACA standards address services, programs, and operations essential to effective correctional management.  Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,200 correctional agencies in the United States.

## OVERVIEW OF THE COMMISSION ON ACCREDITATION FOR CORRECTIONS

The Commission on Accreditation for Corrections (CAC) is a private, nonprofit organization established in 1974 with the dual purpose of developing comprehensive, national standards for corrections and implementing a voluntary program of accreditation to measure compliance with those standards.

The Commission was originally developed as part of the American Correctional Association. In 1979, by joint agreement, the Commission separated from the Association in order to independently administer the accreditation program. Between 1978 and 1986, the organizations shared the responsibility for developing and approving standards and electing members of the Commission. On November 7, 1986, the Commission on Accreditation for Corrections officially realigned itself with the American Correctional Association.

The Commission meets at least twice each year. The responsibility of rendering accreditation decisions rests solely with this board. The members of the Commission represent the full range of adult and juvenile corrections and the criminal justice system. They are elected from the following categories:

> National Association of Juvenile Correctional Agencies (1 representative)
> Council of Juvenile Correctional Administrators (1 representative)
> Association of State Correctional Administrators (2 representatives)
> National Sheriffs' Association (2 representatives)
> American Jail Association (1 representative)
> North American Association of Wardens and Superintendents (1 representative)
> International Community Corrections Association (1 representative)
> American Probation and Parole Association (1 representative)
> Association of Paroling Authorities International (1 representative)
> National Juvenile Detention Association (1 representative)
> American Bar Association (1 representative)
> American Institute of Architects (1 representative)
> National Association of Counties (1 representative)
> Correctional Health (Physician) (1 representative)
> Juvenile Probation/Aftercare (1 representative)
> Adult Probation/Parole (1 representative)
> At-Large (17 representatives)
> Citizen At-Large (Not in Corrections) (1 representative)

## ACA Staff

Accreditation activities are supported by the staff of the American Correctional Association, Standards and Accreditation Department, under the leadership of the director of the department. ACA staff is responsible for the daily operation of the accreditation program. Agencies in the process have contact primarily with the regional manager responsible for their state or agency.

## Consultants

Over 500 corrections professionals in the United States have been selected, trained, and employed on a contract basis by the Association. These individuals perform the field work for the Association, which includes providing assistance to agencies working toward accreditation; conducting on-site audits of agencies to assess compliance with standards, and confirming that requirements are met; and monitoring to ensure maintenance of the conditions required for accreditation. Teams of consultants, referred to as visiting committees or audit teams, are formed to conduct standards compliance audits of agencies seeking accreditation and reaccreditation.

Consultants are recruited nationally through announcements in prominent criminal justice publications and at major correctional meetings. Affirmative action and equal employment opportunity requirements and guidelines are followed in the recruitment of consultants. All consultants employed by the Association have a minimum of three years of responsible senior-level management experience and demonstrated knowledge in the substantive area(s) in which they are employed to assist the Association. In addition, all consultants must successfully complete the Association's consultant training program and be members of the ACA.

## Standards Development

Development of the ACA standards began in 1974 with an extensive program of drafting, field testing, revising, and approving standards for application to all areas of corrections. Since then, over 1,200 correctional facilities and programs have adopted the standards for implementation through accreditation, and many others have applied the standards informally themselves. In the development of standards, the goal was to prescribe the best possible practices that could be achieved in the United States today, while being both realistic and practical. Steps were taken to ensure that the standards would be representative of past standards development efforts; reflect the best judgment of corrections professionals regarding good corrections practice; recognize current case law; and be clear, relevant, and comprehensive. The standards development and approval process has involved participation by a wide range of concerned individuals and organizations. Twenty manuals of standards are now used in the accreditation process:

*Standards for the Administration of Correctional Agencies*
*Standards for Adult Parole Authorities*
*Standard for Adult Probation and Parole Field Services*
*Standard for Adult Correctional Institutions*
*Standards for Adult Local Detention Facilities*
*Standards for Small Jail Facilities*
*Standards for Electronic Monitoring Programs*
*Standards for Adult Community Residential Services*
*Standards for Adult Correctional Boot Camps*
*Standards for Correctional Industries*
*Standards for Correctional Training Academies*
*Standards for Juvenile Community Residential Facilities*
*Standards for Juvenile Probation and Aftercare Services*
*Standards for Juvenile Detention Facilities*

*Standards for Juvenile Day Treatment Programs*
*Standards for Juvenile Correctional Boot Camps*
*Standards for Substance Abuse Programs*
*Standards for Small Juvenile Detention Facilities*
*Certification Standards for Health Care Programs*
*Certification Standards for Food Service Programs*

The standards establish clear goals and objectives critical to the provision of constitutional and humane correctional programs and services. They include the recruitment for practices to promote sound administration and fiscal controls, an adequate physical plant, adherence to legal criteria and provision of basic services. Basic services called for by the standards include the establishment of a functional physical plant, training of staff, adoption of sanitation and safety minimums, and provision of safe and secure living environment. In offering specific guidelines for facility and program operations, the standards address due process and discipline, including access to the courts, mail and visitation, searches, and conditions of confinement of special management offenders.

The standards are systematically revised to keep pace with the evolution of different correctional practices, case law, and after careful examination of experiences, applying them over a period of time and circumstances. The ACA Standards Committee, which includes membership from the Commission on Accreditation for Corrections, is responsible for standards development and revision.

The ACA publishes periodic supplements to the standards with updated information and clarifications until new manuals are completed. Each supplement addresses standards interpretations, deletions, revisions, and additions for all manuals of standards issued by the Association.

Suggestions and proposals for revisions to the standards from the field and interested others are encouraged and may be submitted in writing to the Association. The Association has developed a form for these purposes, copies of which are contained in the *Standards Supplement* or are available from ACA staff.

## ACCREDITATION PROCESS DESCRIPTIONS

For over 120 years, the American Correctional Association has been the only national body involved in the development of standards for the correctional field. ACA standards are supported by ACA's Standards and Accreditation Department and the Commission on Accreditation for Corrections, which is the evaluating and certifying body for accreditation. The department is responsible for the administration of accreditation and ongoing development of correctional standards.

The accreditation process is a voluntary program for all types of correctional agencies. For these agencies, accreditation offers the opportunity to evaluate their operations against national standards, to remedy deficiencies, and to upgrade the quality of programs and services. The recognized benefits of such a process include: improved management; a defense against lawsuits through documentation; demonstration of a "good faith" effort to improve conditions of confinement; increased accountability and enhanced public credibility for administrative and line staff; a safer and more humane environment for personnel and offenders; and the establishment of measurable criteria for upgrading programs, staffing, and physical plant on a continuous basis.

A major component of the accreditation process is the standards compliance audit conducted by a visiting committee. The purpose of the audit is to measure operations against the standards, based on documentation provided by the agency.

### The Visiting Committee Report

The results of the standards compliance audit are contained in the visiting committee report, a document prepared by the visiting committee chairperson. The report is distributed to the agency administrator and members of the visiting committee. This report is also submitted to the Commission on Accreditation for Corrections for consideration at the accreditation hearing.

The following information is usually contained in the visiting committee report:

*Agency and Audit Narrative*

The agency narrative includes a description of program services, a description of physical plant, number of offenders served on the days of the audit, a summary significant incidents and consent decrees, class action lawsuits and/or judgments against the agency/facility, if applicable.
The audit narrative, prepared by the visiting committee chairperson, describes audit activities and findings. The narrative examines issues or concerns that may affect the quality of life and services in an agency or facility. Quality of life issues include areas such as staff training, adequacy of medical service, sanitation, use of segregation and detention, reported and/or documented incidences of violence and crowding in institutions, offender activity levels, programming and provision of basic services. The audit narrative also contains comments as a result of staff and offender interviews, and a detailed explanation of all noncompliant and not applicable standards.

*Agency Response*

The agency has three options for standards found in noncompliance: a plan of action; an appeal; or a waiver request.

A **plan of action** is a detailed statement of tasks to be performed in order to achieve compliance with a standard found in noncompliance at the time of the audit. The plan of action designates staff responsibilities and timetables for completion.

An **appeal** is the agency's attempt to change the visiting committee's decision on a standard. The result of a successful appeal is a change in the status of the standard and a recalculation of the compliance tally.

A **waiver** may be requested when noncompliance with a standard does not adversely affect the life, health, or safety of staff and offenders and when quality of life conditions compensate for the lack of implementation of a plan of action. The granting of a waiver by the Commission waives the requirement for submitting a plan of action; however, it does not change the noncompliant finding.

*Auditor's Response*

This section contains the visiting committee's final reply to all responses received from the agency and includes comments regarding the acceptability of plans of action, appeals, and waivers.

## Panel Hearings

The Commission on Accreditation for Corrections appoints accreditation hearing panels comprised of members of the Commission. Panels are responsible for conducting the hearings and rendering the accreditation decisions.

The hearing serves as a fact-finding session in the accreditation process. The information presented during the hearing is considered by the panel members in rendering accreditation decisions. With the panel chairperson presiding, panel members discuss the noncompliant findings and raise questions relative to all aspects of agency operation, quality of life, and participation in accreditation.

The agency is invited to have a representative at the accreditation hearing. Attendance by parties other than the panel and agency representatives (i.e., media representatives, public officials, legal counsel, etc.) occurs only with the expressed permission of the applicant agency. In these cases, the agency representatives and panel members discuss procedures to be followed before commencement of the hearing. Media representatives and other participants function only as observers.

Panel proceedings require that a formal vote be taken on all final actions (the acceptance or non-acceptance of agency appeals, plans of action, waiver requests) and the final accreditation decision or recommendations of the Commission. All panel proceedings are tape recorded to assist in preparing minutes of the hearing.

## Accreditation Decisions

Three decisions relative to the accreditation of an agency are available to panels:

> A three year accreditation award is granted based on sufficient compliance with standards, acceptance of adequate plans of action for all noncompliant standards and satisfaction of any other life, health, and safety conditions established by the panel.

> An extension of the applicant agency in candidate status is given for reasons of insufficient standards compliance, inadequate plans of action, or failure to meet other requirements as determined by the panel. It is the position of the Association that it may stipulate additional requirements for accreditation if, in its opinion, conditions exist in the facility or program that adversely affect the life, health, or safety of the offenders or staff. Extension of an applicant in candidate status is for a period of time specified by the panel and for identified deficiencies.

> The third possible decision made by the panel is denial of accreditation. Those agencies denied accreditation, but not extended in candidate status, may reapply for accreditation after 180 days.

## Reconsideration

The Commission denies or revokes accreditation for reasons of insufficient standards compliance, inadequate plans of action or failure to meet other requirements as determined by the Commission, including, but not limited to, the quality of life in a given program. It is the position of the Commission that it may stipulate additional requirements for accreditation, if, in its opinion, conditions exist in the agency, facility, or program that adversely affect constitutional safeguards or the life, health, or safety of the staff or offenders. In not awarding accreditation, the Commission may extend an agency in Candidate Status for a specified period of time for identified deficiencies, if, in its judgment, the agency is actively pursuing compliance.

The accreditation program includes a reconsideration process to ensure the equity, fairness, and reliability of it decisions, particularly those that constitute either denial or withdrawal of Accredited Status. Therefore, an agency may request reconsideration of any denial or withdrawal of accreditation.

Reconsideration is based on the grounds that the adverse decision was:

- arbitrary, capricious, or otherwise in substantial disregard of the criteria and/or procedures for accreditation as promulgated by the Commission;
- based on incorrect facts or an incorrect interpretation of facts;
- unsupported by substantial evidence;
- based on information which is no longer accurate.

The reasonableness of the standards, criteria, and/or procedures for accreditation may *not* serve as the basis for reconsideration.

The procedures for reconsideration are as follows:

1. The agency must submit a written request for reconsideration to staff within 30 days of the adverse decision, stating the basis for the request.

2. The Executive Committee of the Commission will review the request and decide whether or not the agency's request presents sufficient evidence to warrant a reconsideration hearing before the Board of Commissioners. The agency will be notified in writing of the Executive Committee's decision.

3. If the decision is made to conduct a hearing, the hearing will be scheduled at the next full Commission meeting, and the agency will be notified of the date.

4. The agency, at its option and expense, has the right of representation.

5. Following the hearing held before the Board of Commissioners, the decision, reflecting a majority opinion, is made known to the agency immediately.

6. Pending completion of the reconsideration process, the agency maintains its prior status. Until a final decision has been reached, all public statements concerning the agency's accreditation status are withheld.

7. Following completion of the reconsideration process, any change in the accreditation status of an agency is reflected in the next regularly published list of accredited agencies.

Revocation of Accreditation

If the Commission panel believes that an agency's failure to maintain continuous compliance with certain standards is detrimental to life, health, and safety of residents and staff, the Commission may place an agency on probation. Probationary Status lasts for a period of time designated by the panel to allow for correction of deficiencies. At the end of the Probationary Status, another monitoring visit will be conducted to ensure that the deficiencies have been corrected. The cost of this visit is borne by the agency. Following the visit, a report is prepared for review by the Commission at its next regularly scheduled meeting. The Commission again reviews the program and considers removing the Probationary Status or revoking accreditation. When the agency corrects the deficiencies within the Probationary Status period and the corrections have been verified and accepted, the agency resumes its status as an accredited agency. An agency that does not satisfactorily correct the deficiencies may be withdrawn from accreditation.

Another condition that may result in a rehearing and consideration of revocation is following a significant event in an agency (i.e. major disturbance, death from other than natural causes or allegations of physical/sexual abuse of offenders). Once ACA is notified of the major event, staff will consult with the Executive Committee of the Commission to determine the need for a monitoring/investigatory visit and the issues to be examined. If a visit is warranted, ACA will notify the agency and a date will be established with the concurrence of the facility and ACA, but not later than 14 days following notification of the

incident. The monitoring/investigatory visit report will be forwarded to the Executive Committee of the Commission within ten days of completion of the visit. Following review of the report, a determination will be made by the Executive Committee as to whether revocation of accreditation is warranted. Prior to any rehearing, agency representatives will be notified so that any issues may be addressed and responded to in writing.

Accreditation is revoked for the following reasons:

- failure on the part of the agency to adhere to the provisions on the contract;
- failure on the part of the agency to maintain continuous compliance with the standards at levels sufficient for accreditation; or
- intentional misrepresentation of facts, lack of good faith, or lack of deliberate speed or a concerted effort to progress in the accreditation process, including the implementation of plans of action.
- failure to notify ACA of significant events in the annual report to the Commission
- adverse conditions of confinement that affect the life health, and/or safety of staff and offenders.

ACA staff notifies the agency in writing of the specific reasons identified by the Commission for the revocation hearing. Agencies may appeal the decision of the Executive Committee to the full board of the Commission on Accreditation for Corrections. Appeals must be submitted within 30 days. The agency may apply to re-enter the process 180 days after the revocation of accreditation.

The Next Three Years

The accreditation award is granted for three years. During this time, the agency will have to maintain standards compliance as required for accreditation and maintain regular contact with the assigned regional manager on the Association staff.

Annual Certification Reports

During the three-year accreditation period, agencies are required to submit annual certification reports to the Association on the anniversary date of the accreditation award. This document includes any changes in standards compliance since the accreditation award was granted. Completion of plans resulting in compliance with standards or revised plans reflecting the need for additional time, funds and/or resources to achieve compliance must also be indicated.

Significant events or occurrences during the preceding year that had an impact on standards compliance, agency operation, or the quality of services provided should also be included in the report. This might include a change in the agency administration and/or major staffing changes; mission change or program revisions; changes in the offender population, including number of offenders or general offender profile; physical plant renovations, additions or closings; and any major disturbances, extended periods of lock-down, employee work stoppages, etc. Association staff review certification statements and respond to clarify issues or provide additional information.

Notice of Major Events

In addition, the agency is responsible for notifying Association staff of any major incident, event or circumstance which might affect standards compliance. This notice should be provided to the Association immediately following the event. For example, an agency should notify the Association if it is the subject of a court order or has a major disturbance. It is the responsibility of the agency to inform the Association and provide them with copies of news articles, special reports or results of investigations that address conditions which affect standards compliance.

Finally, the Association may request that the agency respond to public criticism, notoriety or patterns of complaints about agency activity which suggests a failure to maintain standards compliance. The Association may, at its own expense, conduct an on-site monitoring visit to the agency to verify continued compliance. All monitoring visits are prearranged; the Association does not conduct surprise monitoring visits of accredited facilities. The monitoring visit usually involves a one-day visit to the facility by an auditor. The length of the visit varies depending on the number of standards or special issues which must be addressed during the visit. The visits are similar to standards compliance audits but on a reduced scale. Activities, as a general rule, involve a review of all mandatory standards, all standards found in noncompliance at the time of the accreditation audit and a select number of other standards. The visit also includes a tour of the agency and interviews with staff and offenders. It concludes with an exit interview during which the auditor informs agency staff of the findings of the visit.

Following a monitoring visit, a report is prepared which addresses findings of the visit that were presented to agency staff during the exit interview. The report will be similar to the visiting committee report, but less detailed.

When a monitoring visit to an agency reveals deficiencies in maintaining compliance levels which existed at the time of the accreditation award or less than 100 percent compliance with mandatory standards, the agency prepares a response to the Association providing an explanation of the problems indicated in the report. When the agency has failed to maintain compliance with all mandatory standards, the report and the agency response are reviewed by a panel at the time of the next scheduled panel hearings. Agency representatives are advised of the date, time and location of the review and are invited to attend. At the discretion of the Commission on Accreditation for Corrections, the agency may be placed on probationary status, and a revisit may be conducted to determine if deficiencies have been corrected. At the conclusion of the probationary period, if deficiencies have not been corrected, the Commission may revoke the accreditation award.

Expiration of Accredited Status

Again, accreditation is granted for a three-year period. To maintain accredited status, application must be made nine months prior to the anniversary of accreditation. Unless the agency has reapplied for a subsequent accreditation, the Commission on Accreditation for Corrections withdraws the agency from Accredited Status after three years.

For agencies in accredited status that are seeking reaccreditation, administrative extensions of accredited status may be granted when the agency has completed a standards compliance audit and is awaiting an

accreditation hearing for consideration of the reaccreditation award. Agencies which fail to successfully complete an accreditation audit within the three-year accreditation period or do not receive accreditation at the ensuing hearing are withdrawn from accredited status.





# VISITING COMMITTEE REPORT AND HEARING MINUTES

CONFIDENTIALITY

*The American Correctional Association and the Commission on Accreditation for Corrections do not disclose to external parties specific information contained in this Accreditation Report or information discussed in the Accreditation Hearing. The Association encourages all participating agencies to provide information to the media about their accreditation activities, including disclosure of the Self-Evaluation and Accreditation Report.*

COMMISSION ON ACCREDITATION FOR CORRECTIONS
PANEL ACTION REPORT

Marriott Downtown-Muehlebach Tower
Kansas City, Missouri

Sunday August 12, 2007

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

| | |
|---|---|
| Agency Representatives: | Nathaniel Quarterman, Director, CID |
| | Bobby Lumpkin, Manager, Review and |
| Standards | |
| | John Pulvino, UTMB Quality Coordinator |
| | Bryan Schneider, Director, UTMB Support Services |
| | Casi Doughty, UTMB, Management Resources Specialist |
| Panel Members: | Christopher Epps, Chairperson |
| | Lynn Branham |
| | Pamela Hearn |
| | Timothy Ryan |
| | Marge Webster |
| Staff: | Nicole Spann |

Panel Action

| | |
|---|---|
| Standard #4-4062 | The waiver is granted. |
| Standard #4-4082 | The appeal is denied. The panel requests a plan of action that meets the requirements of the standard. |
| Standard #4-4149 | The waiver is granted. |
| Standard #4-4150 | The plan of action is accepted. |

| | |
|---|---|
| Standard #4-4254 | The appeal is denied. The panel requests a plan of action that meets the requirements of the standard. |
| Standard #4-4270 | The discretionary compliance request is denied. The panel requests a plan of action that meets the requirements of the standard. |
| Standard #4-4485 | The appeal is denied. The panel requests a plan of action that meets the requirements of the standard. |
| Standard #4-4429-1 | The appeal is denied. The panel requests a plan of action that meets the requirements of the standard. |
| Standard #4-4432 | The appeal is granted. |

Accreditation Panel Decision

| | |
|---|---|
| Moved: | Marge Webster |
| Seconded: | Timothy Ryan |

Three-Year Accreditation:    Yes

Accreditation Vote

| | Yes | No | Other |
|---|---|---|---|
| Christopher Epps, Chairperson | ✔ | | |
| Lynn Branham | ✔ | | |
| Pamela Hearn | ✔ | | |
| Timothy Ryan | ✔ | | |
| Marge Webster | ✔ | | |

Final Tally

Mandatory - 100%
Non-Mandatory – 98.1%

*Nicole Spann*

_____
Nicole Spann, Regional Manager

COMMISSION ON ACCREDITATION FOR CORRECTIONS

STANDARDS COMPLIANCE INITIAL AUDIT

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 29-31, 2007

VISITING COMMITTEE MEMBERS

Marilyn H. Heck, Chairperson
Retired Assistant Warden
Florida Department of Corrections
185 Hidden Hills Drive
Ormond Beach, Florida 32174
386-290-3778

Steve Wennmaker
Program Manager
Cornell Interventions
2600 North Brinton Avenue
Dixon, Illinois 61021
(815)288-5561 ext. 2927

Jean Moltz
Correctional Consultant
P.O. Box 1182
Buena Vista, Colorado 81211
(719)395-2311

A.      Introduction

The audit of the Hutchins State Jail Facility was conducted on January 29-31, 2007, by the following team:  Marilyn H. Heck, Chairperson; Steve Wennmaker, Member; and Jean Moltz, Member.  The facility is located in Hutchins, Texas south of Dallas, Texas.

A.      Facility Demographics

Rated Capacity:  2,276
Actual Population:  2,105
Average Daily Population for the last 12 months:  2,044
Average Length of Stay:  180 days
Security/Custody Level:  Minimum
Age Range of Offenders:  17-70
Gender:  Male
Full-Time Staff:  413
74 Administrative Support, 19 Program, 286 Security, 34 Medical Contracted

B.      Facility Description

The Hutchins State Jail is a 2,276 bed, minimum custody State Jail Facility.  The mission is "to protect the public, to promote positive change in offender behavior, to reintegrate offenders into society and to assist victims of crime.  This is to be accomplished by successful teamwork that includes Communication, Coordination, Cooperation, and Consideration among all staff members."  As part of the newest correctional initiatives the facility is designed to house state jail offenders and inmates from overcrowded county jails awaiting transfers to state prisons.

The facility is located on 69 acres of land that has ten metal buildings surrounded by a perimeter fence with razor wire.  There is a lighted perimeter road with security surveillance in place.  The physical plant was clean and in good repair.

C.      Pre-Audit Meeting

The team met on January 29, 2007 in Ennis, Texas located approximately 30 miles from the institution to discuss the information provided by the Association staff and the officials from the Hutchins State Jail Facility.

The chairperson divided standards into the following groups:

Standards # 4-4001 - #4-4169 to Chairperson, Marilyn H. Heck
Standards # 4-4170 - #4-4343 to member, Steve Wennmaker

Standards # 4-4344 - #4-4521 to member, Jean Moltz

D.   The Audit Process

1.   Transportation

Senior Warden, John A. Rupert, escorted the team to the facility.

2.   Entrance Interview

Warden Rupert escorted the team to the warden's conference room where the formal entry meeting was held.   The team expressed the appreciation of the Association for the opportunity to be involved with Hutchins Unit State Jail in the accreditation process.

Each auditor was introduced and made encouraging remarks on the process.   The warden recognized various lead staff.   The room was at capacity with staff that was involved in the process.

It was explained that the goal of the visiting team was to be as helpful and non-intrusive as possible during the conduct of the audit.   The chairperson emphasized the goals of accreditation toward the efficiency and effectiveness of correctional systems throughout the United States.   The audit schedule was also discussed at this time.

3.   Facility Tour

The team toured the entire facility from 8:00 a.m. to 2:30 p.m.   The following persons accompanied the team on the tour and responded to the team's questions concerning facility operations:

Senior Warden Rupert
Assistant Warden Gordy
Major Polk, Chief of security
Mr. Storie, Risk Management Manager
Ms. Tate, CO III, ACA Coordinator
Ms. Gonner, COV, Asst. Coordinator
Mr. Stephens, Region II Director
Mr. Pace, Asst. Region II Director
Ms. Odom, Asst. Region II Director
Mr. Wisener, Region II ACA Coordinator
Mr. Bailey, Operational Review Huntsville
Mr. Wicks, Operational Review Huntsville

Captain Herod, Beto Building Captain
Captain Walker, Michael unit ACA Captain
Officer Briley, CO IV, ACA Coordinator Michael Unit
Sgt. Smith, HJ, Region II Rotational Sergeant

4. Conditions of Confinement/Quality of Life

During the tour, the team evaluated the conditions of confinement at the facility. The following narrative description of the relevant programmatic services and functional areas summarizes the findings regarding the quality of life.

Security

The Hutchins Unit is a minimum custody facility. The inmate movement is controlled. There are interior fences designed for control movement and to maintain separation among certain populations. A security fence surrounds the perimeter of the facility. This fence has two rows of concertina ribbon affixed. There is an armed roving patrol is in place. There are 21 closed circuit television cameras that monitor the fence line. The facility space is well planned leaving little unsupervised space on the grounds. The housing areas are well lighted. However, there does appear to be some areas that have restricted sight from the control monitor. This was discussed and a camera readjustment will be reviewed.

Environmental Conditions

The facility is a no smoking facility. The atmosphere was pleasant with no indications of tension among staff and inmates. The weather was cold and appropriate heating and clothing was available. The facility was clean, neat, and well organized.

Sanitation

The facility was clean throughout with evidence of a good housekeeping plan in effect. Cleaning practices were in effect in administration, programs and operational areas. The grounds were well maintained from the entrance to the sally port. Cleaning supplies were distributed through the unit supply department with systems of accountability strongly established.

Fire Safety

The Unit Risk Management Coordinator, Troy Storie, manages the Hutchins Unit fire and safety department. The facility operates under a fire watch system, which is agency wide. Fire watch logs are maintained in accordance with the

Texas State Fire Marshal's Office. The Hutchins Fire Department is located approximately two miles from the facility and responds to a major fire incident. Mr. Stories has established a positive working relationship with this department, and fire safety codes are maintained in accordance with the Texas Department of Criminal Justice Risk Management office and the State Fire Marshal's Office.

Food Service

Food service manager IV, William Whiddon, manages the Hutchins Unit food service department. A licensed dietician approves the menus and the menus are planned on a 30-day cycle. Inmates are allowed 20 minutes to eat and can refuse any portion of the meal they do not want. Offenders with special medical needs are coordinated in medical and given appropriate substitutes. The team ate a meal with the staff and inmates and found it to be tasteful and appealing in presentation. The dietary department is composed of 11 additional food service staff and 220 offenders working on assigned shifts.

Medical Care

The medical and mental health care is contracted through the University of Texas Medical Branch (UTMB). Hutchins State Jail (HSJ) receives its inmates as transfers from other facilities in Texas and a variety of county jails on any day of the week. The intake orientation, which includes, i.e. access to care, over the counter medications, $3.00 co-pay charge, grievance requests and communicable disease education, is initiated immediately upon arrival. Upon arrival, the nurse completes a medical and mental health screen on all inmates. She may continue prescribed medications if the inmates arrive with medication cards, place on chronic care clinic lists or refer to mental health or medical for immediate treatment as required. A psychologist within 48 hours of arrival identifies urgent mental health needs and does a mental health appraisal.

HSJ is an organized clinical facility including a two chair dental suite, x-ray room, emergency room, laboratory and sick call rooms. Dr. Bowers, regional physician, is on site all week and Dr. Reed is on duty Fridays each week. A physician assistant and nurse practitioner is also full time staff. Routine x-ray services are provided on site by an x-ray technician. Laboratory blood work is drawn on site and sent out five days per week to Lab Corp.

Sick call slips are picked up, triaged seven days per week and scanned into the electronic medical record by nursing staff. Sick call slips are available in the living units and the inmate places them in boxes located by the dining halls. The nurses make rounds daily and deliver medications door to door in solitary or segregation. Inmates are brought to the outpatient area from each of these units if an in-depth

examination is needed.  Inmates are also escorted to the medical area for insulin shots.

First Aid, CPR and four minute response training is provided for all direct care staff annually.  Nursing staff is on site 16 hours and on call the other eight hours. The nurse on call phone triages any calls from security and determines if the inmate's care can wait until morning or must be taken to the emergency room immediately.  A crash bag and AED are ready for response to anywhere in the facility.  Sufficiently stocked cabinets are also available in an emergency room. Emergency transportation is provided by Hutchins EMS in Hutchins, TX. Inmates are taken to Lancaster Hospital ten miles away or Parkland Hospital in Dallas, TX for emergency treatment and/or stabilization.  Infirmary care or an observation room is not provided on site, but available at several other facilities. The two observation rooms on site should probably be made available for inmate observation while nursing staff is on site instead of the present use for storage.

A secure pharmacy/medication room, where medication cards are received from a central pharmacy and separated for each medication area, is part of the medical area.  Medication orders are electronic and are usually received in 24 hours. Stock cards are available for "stat" medication and "start today" medications.  The sharps and narcotics are counted at the beginning and end of the each shift.  The counts in the medical and dental areas were randomly checked and found to be accurate.  Inmates are allowed to self-administer prescriptions and/or over the counter medications i.e. aspirin, Tylenol and antacids.  Certified Medication Aides administer all medications at the medication window.  Medications are passed twice a day at meal times to accommodate this large population.

A trained nurse, who refers to the psychologist or psychiatrist, does the initial intake mental health screening.  HSJ currently employs two psychologists, and a part time psychiatrist.  Suicide prevention and intervention is taught to all staff at basic training.  Any inmate with suicide ideations is evaluated and transferred immediately to a higher-level facility for observation.  Approximately 200 inmates are on psychotropic medications.

All staff uses a UTMB electronic medical record.  All records are electronic and kept confidential.  Only health care staff is allowed to view the health care screens. Information is shared with the warden as needed.  Inmates are requested to sign informed consents whenever treatments are going to be performed.  Transfer forms are sent to the outside facilities electronically.  Inactive health records remain in the system.

Dental Services are provided in a well-equipped area adjacent to the medical clinic. A fulltime dentist, two dental assistants and a dental hygienist participate in the dental orientation, screening, providing routine and emergency care. They are on site five days per week. The inventories of the instruments, syringes and toxics were randomly checked and were accurate. Spore testing log was reviewed and were according to the procedure.

HSJ clinical unit funnels their statistics and information into the monthly and quarterly meetings. This information is reviewed and investigations, studies and/or evaluations may be determined by the committee. UTMB central office also schedules regular quality studies in all areas. The infection control information, risk management issues and staffing problems are also reviewed at quarterly meetings. Mortality Reviews are included as required. This information is also shared quarterly with the warden. There appears to be good communication between clinical and facility staff. Peer Review is also part of the QM program and the physicians receive their peer reviews from external sources.

Current staff licenses and job descriptions were available to the auditor. Everyone was up to date with training hours. The clinic areas were sufficiently stocked with supplies. The clinic was very clean and sanitary. Most inmates appeared clean and neatly dressed. Inmates are only used to provide janitorial services in the medical area. .

Communicable diseases (i.e. tuberculosis) are treated in a chronic clinic. Universal precautions are taught in training and practiced throughout the facility. Any new PDD converters are treated with INH/B6 and given a chest x-ray. Annual chest x-rays are done on converters and known positives. HIV testing is done on admission, discharge and upon request by the inmate. Staffs are given annual PPD tests and Hepatitis B vaccine is offered at the time of employment to direct care employees. HSJ had a significant outbreak of MRSA in April 2006 with 45 cases identified. A change in procedure reduced that number to 19 in July, 2006. Inmates, with diagnosed MRSA, now shower daily in the medical area, dressing changes are provided and clothing is exchanged.

The outcome measures were gathered and presented for the following year: December 2005 to November 2006. The baseline number of daily population is 2044. ACA staff has approved the interpretation of how to collect the outcome measures. One unexpected death in 2005-06 (1A.14) was reviewed. The inmate had an identified thyroid storm, which terminated with a cardiac arrest. All deaths are reviewed at the quarterly meetings of the Joint Mortality and Morbidity Committee. Appropriate emergency care was given according to the report and investigation. All of the outcome measures were reviewed with the practice manager, infectious control nurse and/or psychologist.

## Recreation

A recreation yard is attached to each housing unit with a basketball court, pavilion and other equipment. Segregation has indoor and outdoor recreation areas as well. The Hutchins Unit does not allow for recreation of offenders in solitary confinement. These inmates are recreated based upon security level. The Hutchins Unit has not interacted with the community through recreational activities.

## Religious Programming

The facility has 20 programs that are offered by volunteers that include; parenting, life after prison and a literacy program. Inmates also participate in a volunteer program overseen by the Chaplain to assist other inmates in basic educational skills.

## Offender Work Programs

All offenders have been assigned a job. Texas does not pay prisoners to work but do award time and privileges to those who work. Work assignments include; food service, laundry, maintenance, janitors, teacher's aide, full time students, offender clerks, field squads and community service. There are 16 other work placements available.

## Academic and Vocational Education

The educational program is well equipped with a variety of programs offered to include; computer lab and literacy. The Hutchins Unit has the following Continuing Education classes available: Macroeconomics, Human Resource Development, Intro to Psychology, World Religion, Intro to Speech, and Retail Sales.

## Social Services

A volunteer conducting weekly AA meeting provides substance abuse support. The Hutchins Jail provides a special project called Project RIO (Re-integration for offenders) to 280 inmates. This is the governor's statewide plan to successfully reintegrate ex-offenders into the community by offering a linkage system between training and service and job placement in the local communities.

Visitation

Visitation is provided to inmates for two hours on weekends. Each offender is allowed two visitors per visit. Children under 16 may visit without being counted as the second visitor. Visiting space was appropriate for its purpose.

Library Services

Library services are available for the inmates daily by dorm assignment. Four Dorms are scheduled per day. There is adequate space and resources for this area. A Law library is available from Tuesday through Saturday at scheduled hours. Access is provided to all inmates.

Laundry

All offenders are provided with a daily change of socks, underwear, change of pants and shirts each working day but not less than three times a week. The inmate clothing was observed to be clean and appropriate to the climate. The laundry facilities were neat, clean and well organized. Laundry equipment was found to be in good working order.

E.    Examination of Records

Following the facility tour, the team proceeded to the Warden's Conference Room to review the accreditation files and evaluate compliance levels of the policies and procedures. The facility has no notices of non-compliance with local, state, or federal laws or regulations.

1. Litigation

Over the last three years, the facility had no consent decrees, class action lawsuits or adverse judgments.

2. Significant Incidents/Outcome Measures

There were no concerns noted on the Significant Incident Report. The numbers were consistent with the level of security and the mission of this facility.

Discussion was held on the number of inmate on inmate assaults and it was provided that this was due to gang associations. Systems were in place to monitor this closely by their in-house STG Sgt. There was no tension observed during this audit. Assaults were of a simple assault nature.

3. Departmental Visits

Team members revisited the following departments to review conditions relating to departmental policy and operations:

| Department Visited | *Person(s) Contacted |
|---|---|
| Classification and Count Room | Ms. Meshack CMIII |
| Inmate Records | Ms. Williams, Clerk IV |
| Turnout Room | Senior Warden Rupert |
| Human Resources | Ms. Perez, Specialist II |
| Mailroom | Ms. Wilson, Adm. Asst. III |
| Armory | Mr. Burton, COV |
| Laundry | Captain Perry |
| Commissary | Ms. Delgado, Coordinator |
| Unit Supply | Ms. Moore, Inventory Coordinator |
| Food Service | Captain Whiddon |
| Maintenance | Mr. Vest |
| Small Engines | Ms. Walton |
| ChapelChaplain | Barthof |
| Medical | Ms. Davidson, Supervisor |
| Education | Ms. Linda |
| K Building (confinement) | Lt. Hale |
| K Building Picket | Officer Jackson |
| Offender receiving | Officer Spencer |
| Intake | Ms. Miller |
| G Building | Major Polk |
| Education | Principle Davis |
| Law Librarian | Ms. Killon |
| General Library | Ms. Newman |

4. Shifts

All team members were present on all shifts.

a.     Day Shift (5:45 a.m. – 2:45 p.m.)

The team was present at the facility during the day shift from 8:00 a.m. to 6:00 p.m. The shift ran smoothly. Staff was professional and knowledgeable in their areas. Inmates were busy with their schedules and no concerns were noted. Inmates were observed cleaning the building and performing their work assignments.

The following departments and staff members visited:

| | |
|---|---|
| Classification and Count Room | Ms. Meshack CMIII |
| Inmate Records | Ms. Williams, Clerk IV |
| Turnout Room | Senior Warden Rupert |
| Human Resources | Ms. Perez, Specialist II |
| Mailroom | Ms. Wilson, Adm. Asst. III |
| Armory | Mr. Burton, COV |
| Laundry | Captain Perry |
| Commissary | Ms. Delgado, Coordinator |
| Unit Supply | Ms. Moore, Inventory Coordinator |
| Food Service | Captain Whiddon |
| Maintenance | Mr. Vest |
| Small Engines | Ms. Walton |
| Chapel | Chaplain Barthof |
| Medical | Ms. Davidson, Supervisor |
| Education | Ms. Linda |
| K Building (confinement) | Lt. Hale |
| K Building Picket | Officer Jackson |
| Offender receiving | Officer Spencer |
| Intake | Ms. Miller |
| G Building | Major Polk |
| Education | Principle Davis |
| Law Librarian | Ms. Killon |
| General Library | Ms. Newman |

b.      Evening Shift 1:45 p.m. to 9:45 p.m.

The team was present at the facility during the evening shift from 2:45 p.m. to 9:45 p.m. All team members were present on this shift. The following departments and staffs were contacted:

Education, Mr. Davis Principle
Confinement, Lt. Hale
Building A, Officer Whitmire
Building B2, Officer White
Building C2 Officer Anders
Building F, Officer Williams
Building B1, Officer Odife
Building D, Officer Uko
Building E, Officer Eme
Building C1, Officer Greene
Food Service, Chaptain Whiddon

Staff was observed to be professional and knowledgeable in their area. Inmate and staff contacts were observed to be appropriate. There was no tension noted among staff or inmates.

    c.    Night Shift

The team was present at the facility during the night shift from 9:45 p.m. to 5:45a.m.

The team attended the staff shift briefing and talked with the staff. Staff was positive, professional and informative. They were appreciative of our presence and speaking with them.

5.  Status of Previously Non-compliant Standards/Plans of Action

This was an initial audit.

F.    Interviews

During the course of the audit, team members met with both staff and offenders to verify observations and/or to clarify questions concerning facility operations.

1.  Offender Interviews

The team talked with approximately 35 inmates. The comments from there were positive. Inmates made comments to staff being supportive and available to address their concerns and issues. They stated their needs were being met and no concerns were expressed. Inmates expressed appreciation for the opportunity to go to school and learn.

2.  Staff Interviews

The team talked to approximately fifty staff. Staff was supportive of the Institution. The morale was good and there was a team approach throughout. Staff appeared to enjoy their jobs and support each other. No concerns were noted. Staff had attended trainings and felt they received support when requested.

G.    Exit Discussion

The exit interview was held at 11:00 a.m. in the staff training room with the senior warden and 150 staff and visitors were in attendance.

The following persons were also in attendance:

Mr. Rodney Cooper, Director
Mr. John Weisner, Region office
Mr. Bill Stevens, Region Office
All Wardens from the region

The chairperson explained the procedures that would follow the audit.  The team discussed the compliance levels of the mandatory and non-mandatory standards and reviewed their individual findings with the group.

The chairperson expressed appreciation for the cooperation of everyone concerned and congratulated the facility team for the progress made and encouraged them to continue to strive toward even further professionalism within the correctional field.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

AND THE

AMERICAN CORRECTIONAL ASSOCIATION

## COMPLIANCE TALLY

| Manual Type | Adult Correctional Institutions, fourth edition |
|---|---|
| Supplement | 2006 Standards Supplement |
| Facility/Program | Texas Department of Criminal Justice<br>Hutchins Unit – Dallas, Texas |
| Audit Dates | January 29-31, 2007 |
| Auditor(s) | Marilyn H. Heck, Chairperson<br>Steve Wennmaker and Jean Moltz, Members |

| | MANDATORY | NON-MANDATORY |
|---|---|---|
| Number of Standards in Manual | 63 | 470 |
| Number Not Applicable | 4 | 40 |
| Number Applicable | 59 | 430 |
| Number Non-Compliance | 0 | 8 |
| Number in Compliance | 59 | 422 |
| Percentage (%) of Compliance | 100% | 98.1% |

- Number of Standards *minus* Number of Not Applicable *equals* Number Applicable

- Number Applicable *minus* Number Non-Compliance *equals* Number Compliance

- Number Compliance *divided by* Number Applicable *equals* Percentage of Compliance

COMMISSION ON ACCREDITATION FOR CORRECTIONS

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 29-31, 2007

<u>Visiting Committee Findings</u>

Non-Mandatory Standards

Non-Compliance

Standard #4-4062

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT EMPLOYEES WHO HAVE DIRECT CONTACT WITH INMATES RECEIVE A PHYSICAL EXAMINATION PRIOR TO JOB ASSIGNMENT. ALL OTHER EMPLOYEES RECEIVE A MEDICAL SCREENING PRIOR TO JOB ASSIGNMENT. EMPLOYEES RECEIVE REEXAMINATIONS ACCORDING TO A DEFINED NEED OR SCHEDULE.

FINDINGS

Texas does not require physical exams of employees prior to job assignment.

AGENCY RESPONSE

<u>Waiver</u>

Waiver was granted at the 2007 Winter Conference in Tampa, FL.

AUDITOR'S RESPONSE

The visiting committee supports the waiver.

Standard #4-4082

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT ALL NEW FULL-TIME EMPLOYEES RECEIVE 40 HOURS OF ORIENTATION - TRAINING   BEFORE   UNDERTAKING   THEIR   ASSIGNMENTS.

ORIENTATION TRAINING INCLUDES AT A MINIMUM THE FOLLOWING: ORIENTATION TO THE PURPOSE, GOALS, POLICIES, AND PROCEDURES OF THE INSTITUTION AND PARENT AGENCY; WORKING CONDITIONS AND REGULATIONS; EMPLOYEES' RIGHTS AND RESPONSIBILITIES; AND AN OVERVIEW OF THE CORRECTIONAL FIELD. DEPENDING ON THE EMPLOYEE(S) AND THE PARTICULAR JOB REQUIREMENTS, ORIENTATION AND TRAINING MAY INCLUDE PREPARATORY INSTRUCTION RELATED TO THE PARTICULAR JOB.

FINDINGS

New fulltime employees are not required to have 40 hours of orientation prior to job assignment.

AGENCY RESPONSE

Appeal

The Hutchins Unit appeal is based on the fact that all TDCJ employees receive 40 hours of Orientation Training prior to assignment to a job. Although the policy states within 30 days, staff members are considered OJT employees until completion of the orientation process.

AUDITOR'S RESPONSE

The visiting committee does not support the appeal. The auditor encourages a corrective action plan to include a policy change to allow for the necessary standard compliance.

Standard #4-4149

EACH DAYROOM PROVIDES INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST 12 SQUARE FEET OF TRANSPARENT GLAZING IN THE DAYROOM, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE WHOSE ROOM/CELL IS DEPENDENT ON ACCESS TO NATURAL LIGHT THROUGH THE DAYROOM. (NEW CONSTRUCTION ONLY)

FINDINGS

The Hutchins Unit does not meet the natural light requirements.

AGENCY RESPONSE

Waiver

Due to the design of the facility, it would be cost prohibitive to add windows in, or adjacent to, the Administrative Segregation dayroom. Each Administrative Segregation dayroom is equipped with artificial lighting in order to facilitate reading and letter writing activities.

AUDITOR'S RESPONSE

The visiting committee supports the waiver.

Standard #4-4150

NOISE LEVELS IN INMATE HOUSING UNITS DO NOT EXCEED 70 DBA (A SCALE) IN DAYTIME AND 45 DBA (A SCALE) AT NIGHT.

FINDINGS

The Hutchins Unit does not meet the noise level requirement.

AGENCY RESPONSE

Plan of Action

Unit administration will continue to reduce the noise level through all available resources.

Task

a.   Ensure air handlers are operating optimally for reduced noise.
b.   Ensure structural issues that may affect noise levels are in good repair (i.e., windows, weather stripping).
c.   Stress to staff the need to keep noise levels down at night (i.e., do not slam doors, lower voices when possible)

Responsible Agency

a.   TDCJ
b.   TDCJ
c.   TDCJ

Assigned Staff

a.   Warden & Maintenance staff

b.    Warden & Maintenance staff
c.    Warden & Maintenance staff

Anticipated Completion Date

a.    Ongoing
b.    Ongoing
c.    Ongoing

AUDITOR'S RESPONSE

The visiting committee finds the plan of action acceptable. While visiting the noise levels were very appropriate. However, the outside inspection reflected they did not meet the standard.

Standard #4-4254

WRITTEN POLICY, PROCEDURE, AND PRACTICE SPECIFY THE REVIEW PROCESS USED TO RELEASE AN INMATE FROM ADMINISTRATIVE SEGREGATION AND PROTECTIVE CUSTODY.

FINDINGS

The Texas Department of Criminal Justice has identified Security Threat Groups who are verified members to be confined in administrative confinement due solely to their being a verified security threat group membership. Written policy, procedure and practice documentation regarding the review process used to release inmates from administrative segregation does not address the inmates in these security threat groups.

AGENCY RESPONSE

Appeal

The TDCJ Administrative Segregation Plan states in section VI. that Security Threat Group offenders can be released in accordance with the Security Threat Group Plan which requires a graduated release system.

AUDITOR'S RESPONSE

The visiting committee does not support the appeal. The auditor will support a corrective action plan that includes a policy and procedure with actual documented events demonstrating this practice occurs. Documentation was not present to support this at the time of the audit and it was with direct conversation in addition to lack of documentation

that clearly reflected non-compliance.

Standard #4-4270

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES IN SEGREGATION RECEIVE A MINIMUM OF ONE HOUR OF EXERCISE PER DAY OUTSIDE THEIR CELLS, FIVE DAYS PER WEEK, UNLESS SECURITY OR SAFETY CONSIDERATIONS DICTATE OTHERWISE.

FINDINGS

The Texas Department of Criminal Justice and the Hutchins Unit does not allow for recreation for inmates in solitary status.

AGENCY RESPONSE

Discretionary Compliance

☒    A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice.

TDCJ policy AD-03.53, "Solitary Confinement", states that offenders assigned to solitary confinement will not be recreated. The TDCJ Recreation Department makes available the pamphlet "Physical Fitness: An In-Cell Exercise Program" to all offenders assigned to solitary confinement. The maximum term for solitary confinement is 15 days. In the event that an offender is given more than one term of solitary confinement the offender will be placed in temporary detention for 72 hours between terms and recreated according to the schedule for his/her custody level. Offenders in solitary confinement are visited daily by medical staff for health and wellness needs.

AUDITOR'S RESPONSE

The visiting committee does not support the discretionary compliance request. The auditor supports a revision of the TDCJ policy AD-03.53, "Solitary Confinement"; states that offenders assigned to solitary confinement will not be recreated. An action plan for revision should be submitted to include actual times and schedules recreation occurs.

Standard #4-4485

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR INTERACTION WITH THE COMMUNITY THROUGH RECREATIONAL ACTIVITIES.

FINDINGS

The Hutchins Unit has not interacted with the community to provide recreational activities involving individuals or organizations from the community.

AGENCY RESPONSE

Appeal

The Hutchins Unit has hosted Mike Barber and Bill Glass Ministries during which time community volunteers participated with offenders in various forms of recreation activities, to include; volleyball, checkers, chess, and arm wrestling contests.

AUDITOR'S RESPONSE

The visiting committee does not support the appeal. The auditor is in support of the Barber and Glass Ministries but feel strongly that the institution should develop a stronger relationship with the community to build upon the recreational programs *throughout the year.* An action plan to assign this task and develop partnerships should be included. This was discussed with the warden and he concurred this was something that needed to be done.

Standard #4-4429-1

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR STAFF AND OFFENDER ACCESS TO AN APPROPRIATELY TRAINED AND QUALIFIED INDIVIDUAL WHO IS EDUCATED IN THE PROBLEMS AND CHALLENGES FACED BY OFFENDERS WITH PHYSICAL AND/OR MENTAL IMPAIRMENTS, PROGRAMS DESIGNED TO EDUCATE AND ASSIST DISABLED OFFENDERS, AND ALL LEGAL REQUIREMENTS FOR THE PROTECTION OF OFFENDERS WITH DISABILITIES.

FINDINGS

There was no policy for this standard and practice was not apparent to support this standard.

AGENCY RESPONSE

Appeal

The Unit Risk Manager has been trained on ADA liabilities and requirements, in the

event that further investigative activity is warranted, the TDCJ Central Office Licensed personnel will conduct an outside investigation/review if it is required/warranted.

AUDITOR'S RESPONSE

The visiting committee does not support the appeal. The auditor encourages the development of a corrective action plan to include the creation of a Policy and procedure to ensure this practice is being utilized and appropriate documentation of trainings, meetings, etc. are placed in the file to document compliance.

### Standard #4-4432

THE SOCIAL SERVICES PROGRAM IS ADMINISTERED AND SUPERVISED BY A QUALIFIED, TRAINED PERSON WITH A MINIMUM OF A BACHELORS DEGREE IN THE SOCIAL OR BEHAVIORAL SCIENCES OR A RELATED FIELD.

FINDINGS

No trained or qualified person has been identified to administer the social services program.

AGENCY RESPONSE

Appeal

The Hutchins Unit does have a qualified employee to administer the social services program. The employee holds a Master of Science degree and also has a certificate from the State of Texas that is entitled "Psychological Associate". This information was provided at the time of the audit but it is believed that the certificate's title was mistakenly interpreted to be understood that the employee held an Associates Degree instead of a Master's Degree. The certificate from the State of Texas has "M.S". written behind the employee's name.

AUDITOR'S RESPONSE

The visiting committee does not support the appeal. The auditor encourages a corrective action plan to include the designation of the qualified employee to be in writing in a position description and placed in the file along with documentation of social services actions to include meetings, staffing, etc.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 29-31, 2007

Visiting Committee Findings

Mandatory Standards

Not Applicable

Standard # 4-4191

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT WHEN
AN OFFENDER IS PLACED IN A FOUR/FIVE-POINT RESTRAINT (ARMS,
HEAD AND LEGS SECURED), ADVANCE APPROVAL MUST BE OBTAINED
FROM       THE       WARDEN/SUPERINTENDENT       OR       DESIGNEE.
SUBSEQUENTLY, THE HEALTH AUTHORITY OR DESIGNEE MUST BE
NOTIFIED TO ASSESS THE INMATE'S MEDICAL AND MENTAL HEALTH
CONDITION, AND TO ADVISE WHETHER, ON THE BASIS OF SERIOUS
DANGER TO SELF OR OTHERS, THE INMATE SHOULD BE PLACED IN A
MEDICAL/MENTAL HEALTH UNIT FOR EMERGENCY INVOLUNTARY
TREATMENT   WITH   SEDATION   AND/OR   OTHER   MEDICAL
MANAGEMENT, AS APPROPRIATE.   IF THE OFFENDER IS NOT
TRANSFERRED TO A MEDICAL/MENTAL HEALTH UNIT AND IS
RESTRAINED IN A FOUR/FIVE-POINT POSITION, THE FOLLOWING
MINIMUM PROCEDURES WILL BE FOLLOWED:
1.   DIRECT   VISUAL   OBSERVATION   BY   STAFF   MUST   BE
     CONTINUOUS PRIOR TO OBTAINING APPROVAL FROM THE
     HEALTH AUTHORITY OR DESIGNEE;
2.   SUBSEQUENT VISUAL OBSERVATION MUST BE MADE AT LEAST
     EVERY 15 MINUTES; AND,
3.   RESTRAINT   PROCEDURES   ARE   IN   ACCORDANCE   WITH
     GUIDELINES   ENDORSED   BY   THE   DESIGNATED   HEALTH
     AUTHORITY.

FINDINGS

The Hutchins Unit does not use four/five point restraints.

Standard #4-4353

IF FEMALE OFFENDERS ARE HOUSED, ACCESS TO PREGNANCY MANAGEMENT IS SPECIFIC AS IT RELATES TO THE FOLLOWING:

- PREGNANCY TESTING
- ROUTINE PRENATAL CARE
- HIGH-RISK PRENATAL CARE
- MANAGEMENT OF THE CHEMICALLY ADDICTED PREGNANT INMATE
- POSTPARTUM FOLLOW-UP
- UNLESS MANDATED BY STATE LAW, BIRTH CERTIFICATES/REGISTRY DOES NOT LIST A CORRECTIONAL FACILITY AS THE PLACE OF BIRTH

FINDINGS

There is no female offender at this facility.

Standard #4-4405

THE USE OF RESTRAINTS FOR MEDICAL AND PSYCHIATRIC PURPOSES IS DEFINED, AT A MINIMUM BY THE FOLLOWING:
- CONDITIONS UNDER WHICH RESTRAINTS MAY BE APPLIED
- TYPES OF RESTRAINTS TO BE APPLIED
- IDENTIFICATION OF A QUALIFIED MEDICAL OR MENTAL HEALTH PROFESSIONAL WHO MAY AUTHORIZE THE USE OF RESTRAINTS AFTER REACHING THE CONCLUSION THAT LESS INTRUSIVE MEASURES WOULD NOT BE SUCCESSFUL
- MONITORING PROCEDURES FOR OFFENDERS IN RESTRAINTS
- LENGTH OF TIME RESTRAINTS ARE TO BE APPLIED
- DOCUMENTATION OF EFFORTS FOR LESS RESTRICTIVE TREATMENT ALTERNATIVES AS SOON AS POSSIBLE
- AN AFTER-INCIDENT REVIEW.

FINDINGS

Medical and psychiatric restraints are not used at this facility.

Standard #4-4363-1

WRITTEN POLICY, PROCEDURE AND PRACTICE PROVIDE FOR EARLY IDENTIFICATION AND TREATMENT OF   OFFENDERS WITH ALCOHOL

AND DRUG ABUSE PROBLEMS THROUGH A STANDARDIZED BATTERY ASSESSMENT.   THIS BATTERY SHALL BE DOCUMENTED AND INCLUDE, AT A MINIMUM, THE FOLLOWING:

- SCREENING AND SORTING
- CLINICAL ASSESSMENT AND REASSESSMENT
- MEDICAL   ASSESSMENT   FOR   APPROPRIATE   DRUG   AND ALCOHOL PROGRAM ASSIGNMENT TO THE NEEDS OF      THE INDIVIDUAL INMATES
- REFERRALS

FINDINGS

The Hutchins Unit is not a diagnostic center where testing for drug and alcohol problems are conducted.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

Texas Department of Criminal Justice
Hutchins Unit
Dallas, Texas

January 29-31, 2007

Visiting Committee Findings

Non-Mandatory Standards

Not Applicable

Standard #4-4439

WHERE A DRUG TREATMENT PROGRAM EXISTS, WRITTEN POLICY,
PROCEDURE, AND PRACTICE PROVIDE FOR AN APPROPRIATE RANGE
OF PRIMARY TREATMENT SERVICES FOR ALCOHOL AND OTHER DRUG
ABUSING INMATES THAT INCLUDE, AT A MINIMUM, THE FOLLOWING:

- INMATE DIAGNOSIS
- IDENTIFIED PROBLEM AREAS
- INDIVIDUAL TREATMENT OBJECTIVES
- TREATMENT GOALS
- COUNSELING NEEDS
- DRUG EDUCATION PLAN
- RELAPSE PREVENTION AND MANAGEMENT
- CULTURALLY SENSITIVE TREATMENT OBJECTIVES, AS APPROPRIATE
- THE PROVISION OF SELF-HELP GROUPS AS AN ADJUNCT TO TREATMENT
- PRERELEASE AND TRANSITIONAL SERVICE NEEDS
- COORDINATION EFFORTS WITHIN COMMUNITY SUPERVISION AND TREATMENT STAFF DURING THE PRERELEASE PHASE TO ENSURE A CONTINUUM OF SUPERVISION AND TREATMENT

FINDINGS

There is no therapeutic community at this site.

25

Standard #4-4440

> WHERE A DRUG AND ALCOHOL TREATMENT PROGRAM EXISTS,
> WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE
> FACILITY USES A COORDINATED STAFF APPROACH TO DELIVER
> TREATMENT SERVICES.   THIS APPROACH TO SERVICE DELIVERY
> SHALL BE DOCUMENTED IN TREATMENT PLANNING CONFERENCES
> AND INDIVIDUAL TREATMENT FILES.

> FINDINGS

> There is no therapeutic community at this site.

Standard #4-4441

> WHERE A DRUG AND ALCOHOL TREATMENT PROGRAM EXISTS,
> WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE INCENTIVES
> FOR TARGETED TREATMENT PROGRAMS TO INCREASE AND
> MAINTAIN THE INMATE'S MOTIVATION FOR TREATMENT.

> FINDINGS

> There is no therapeutic community at this site.

Standard #4-4443

> TEMPORARY RELEASE PROGRAMS SHOULD INCLUDE BUT NOT BE
> LIMITED TO THE FOLLOWING:
>
> - WRITTEN OPERATIONAL PROCEDURES
> - CAREFUL SCREENING AND SELECTION PROCEDURES
> - WRITTEN RULES OF CONDUCT AND SANCTIONS
> - A SYSTEM OF SUPERVISION TO MINIMIZE INMATE ABUSE OF
>   PROGRAM PRIVILEGES
> - A COMPLETE RECORDKEEPING SYSTEM
> - A SYSTEM FOR EVALUATING PROGRAM EFFECTIVENESS
> - EFFORTS TO OBTAIN COMMUNITY COOPERATION AND
>   SUPPORT

> FINDINGS

> There is no temporary release program at this site.

26

Standard #4-4458

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE NUMBER OF INMATES ASSIGNED TO INDUSTRIES OPERATIONS MEET THE REALISTIC WORKLOAD NEEDS OF EACH INDUSTRIES OPERATING UNIT.

FINDINGS

There is no industry at this site.

Standard #4-4459

EACH INDUSTRYOPERATING UNIT HAS A WRITTEN QUALITY CONTROL PROCEDURE THAT PROVIDES FOR RAW MATERIAL, IN-PROCESS, AND FINAL PRODUCT INSPECTION.

FINDINGS

There is no industry at this site.

Standard #4-4462

PRIVATE INDUSTRIES ON THE INSTITUTION GROUNDS EMPLOYING INMATES IN POSITIONS NORMALLY FILLED BY PRIVATE CITIZENS PAY INMATES THE PREVAILING WAGE RATE FOR THE POSITION OCCUPIED.

FINDINGS

There is no Private industry at this site.

Standard #4-4463

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES EMPLOYED IN THE COMMUNITY BY PUBLIC OR PRIVATE ORGANIZATIONS IN POSITIONS NORMALLY OCCUPIED BY PRIVATE CITIZENS ARE COMPENSATED AT THE PREVAILING WAGE RATE FOR THE POSITION OCCUPIED. INMATES RECEIVING SUCH COMPENSATION REIMBURSE THE JURISDICTION FOR A REASONABLE SHARE OF ITS COST IN MAINTAINING THEM.

27

FINDINGS

Inmates are not employed at this site.

Standard #4-4497-1

ADDED AUGUST 2002. WRITTEN POLICY, PROCEDURE, AND PRACTICE
ENSURE THAT OFFENDERS HAVE ACCESS TO REASONABLY PRICED
TELEPHONE SERVICES. CORRECTIONAL AGENCIES ENSURE THAT:

- CONTRACTS INVOLVING TELEPHONE SERVICES FOR
  OFFENDERS COMPLY WITH ALL APPLICABLE STATE AND
  FEDERAL REGULATIONS.
- CONTRACTS ARE BASED ON RATES AND SURCHARGES THAT
  ARE COMMENSURATE WITH THOSE CHARGED TO THE GENERAL
  PUBLIC FOR LIKE SERVICES. ANY DEVIATION FROM ORDINARY
  CONSUMER RATES REFLECTS ACTUAL COSTS ASSOCIATED
  WITH THE PROVISION OF SERVICES IN A CORRECTIONAL
  SETTING.
- CONTRACTS FOR OFFENDER TELEPHONE SERVICES PROVIDE
  THE BROADEST RANGE OF CALLING OPTIONS DETERMINED BY
  THE AGENCY ADMINISTRATOR TO BE CONSISTENT WITH THE
  REQUIREMENTS OF SOUND CORRECTIONAL MANAGEMENT.

FINDINGS

There is no outside contract for phone service.

Standard #4-4501

WHERE STATUTE PERMITS, WRITTEN POLICY, PROCEDURE, AND
PRACTICE PROVIDE FOR EXTENDED VISITS BETWEEN INMATES AND
THEIR FAMILIES.

FINDINGS

There are no inmate furloughs into the community for extended visits.

Standard #4-4502

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT
INMATES WITH APPROPRIATE SECURITY CLASSIFICATIONS ARE
ALLOWED FURLOUGHS TO THE COMMUNITY TO MAINTAIN

28

COMMUNITY AND FAMILY TIES, SEEK EMPLOYMENT OPPORTUNITIES, AND FOR OTHER PURPOSES CONSISTENT WITH THE PUBLIC INTEREST.

FINDINGS

No inmate furloughs are allowed.

Standard#4-4057

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT ALL PERSONNEL COVERED BY MERIT SYSTEMS, CIVIL SERVICE REGULATIONS, OR UNION CONTRACTS ARE SELECTED, RETAINED, AND PROMOTED ON THE BASIS OF MERIT AND SPECIFIED QUALIFICATIONS. NEW EMPLOYEES RECEIVE CREDIT FOR THEIR PRIOR TRAINING.

FINDINGS

Employees are not covered by a merit system, civil service or union.

Standard#4-4059

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT EMPLOYEES COVERED BY MERIT SYSTEMS, CIVIL SERVICE REGULATIONS, OR UNION CONTRACT ARE APPOINTED INITIALLY FOR A PROBATIONARY TERM OF AT LEAST SIX MONTHS BUT NO LONGER THAN ONE YEAR.

FINDINGS

Employees are not covered by merit system, civil service or union.

Standard#4-4128

SINGLE-CELL LIVING UNITS SHALL NOT EXCEED 80 INMATES. (NEW CONSTRUCTION ONLY)

FINDINGS

The Hutchins Unit does not house inmates in single cell.

29

Standard#4-4143

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE ASSIGNMENT OF APPROPRIATELY TRAINED INDIVIDUALS TO ASSIST DISABLED OFFENDERS WHO CANNOT OTHERWISE PERFORM BASIC LIFE FUNCTIONS.

FINDINGS

The Hutchins Unit does not house disable offenders.

Standard#4-4147

ALL INMATE ROOMS/CELLS PROVIDE INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST THREE SQUARE FEET OF TRANSPARENT GLAZING, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE IN ROOMS/CELLS WITH THREE OR MORE INMATES. (EXISTING, RENOVATION, ADDITION ONLY)

FINDINGS

The Hutchins Unit is new construction.

Standard#4-4152

CIRCULATION IS AT LEAST TEN CUBIC FEET OF FRESH OR RECIRCULATED FILTERED AIR PER MINUTE PER OCCUPANT FOR INMATE ROOMS/CELLS, OFFICER STATIONS, AND DINING AREAS, AS DOCUMENTED BY AN INDEPENDENT, QUALIFIED SOURCE AND SHOULD BE CHECKED NOT LESS THAN ONCE PER ACCREDITATION CYCLE. (EXISTING)

FINDINGS

The Hutchins Unit is considered new construction.

Standard#4-4181

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT WHEN BOTH MALES AND FEMALES ARE HOUSED IN THE FACILITY, AT LEAST ONE MALE AND ONE FEMALE STAFF MEMBER ARE ON DUTY AT ALL TIMES.

30

FINDINGS

The Hutchins Unit does not house female offenders.

Standard#4-4208

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICED PROVIDE THE FOLLOWING:

- A MISSION STATEMENT, INCLUDING GOALS AND OBJECTIVES
- EMERGENCY PLANS THAT ARE INTEGRATED INTO THE OVERALL EMERGENCY PLANS OF THE FACILITY

FINDINGS

The Hutchins Unit does not have a canine unit.

Standard#4-4209

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE FOR TRAINING OF HANDLERS/DOG TEAMS AND UPKEEP AND CARE OF THE ANIMALS PROVIDE FOR THE FOLLOWING:

- CRITERIA FOR SELECTION, TRAINING, AND CARE OF ANIMALS
- CRITERIA FOR SELECTION, TRAINING, AND PHYSICAL FITNESS REQUIREMENTS OF HANDLERS
- AN APPROVED SANITATION PLAN WHICH COVERS INSPECTION, HOUSING, TRANSPORTATION, AND DAILY GROOMING FOR DOGS

EACH HANDLER/DOG TEAM SHALL BE TRAINED, CERTIFIED, AND RECERTIFIED ANNUALLY BY A NATIONALLY RECOGNIZED ACCREDITING BODY OR COMPLETE COMPARABLE TRAINING AND PROFICIENCY TESTING BY AN INDEPENDENT, OUTSIDE SOURCE.

FINDINGS

The Hutchins Unit does not have a canine unit.

Standard#4-4210

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE PROVIDE DAILY AND CURRENT RECORDS ON TRAINING, CARE OF

31

DOGS, AND SIGNIFICANT EVENTS.

FINDINGS

The Hutchins Unit does not have a canine unit.

Standard#4-4251

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT AN INMATE IS ADMITTED TO THE SEGREGATION UNIT FOR PROTECTIVE CUSTODY ONLY WHEN THERE IS DOCUMENTATION THAT PROTECTIVE CUSTODY IS WARRANTED AND NO REASONABLE ALTERNATIVES ARE AVAILABLE.

FINDINGS

The Hutchins Unit does not house protective custody inmates.

Standard#4-4278

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT MALE AND FEMALE INMATES HOUSED IN THE SAME INSTITUTION HAVE SEPARATE SLEEPING QUARTERS BUT EQUAL ACCESS TO ALL AVAILABLE SERVICES AND PROGRAMS. NEITHER SEX IS DENIED OPPORTUNITIES SOLELY ON THE BASIS OF THEIR SMALLER NUMBER IN THE POPULATION.

FINDINGS

The Hutchins Unit does not house female offenders.

Standard#4-4307

IF YOUTHFUL OFFENDERS ARE HOUSED IN THE FACILITY, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THEY ARE HOUSED IN A SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS EXCEPT WHEN:

- A VIOLENT, PREDATORY YOUTHFUL OFFENDER POSES AN UNDUE RISK OF HARM TO OTHERS WITHIN THE SPECIALIZED UNIT
- A QUALIFIED MEDICAL OR MENTAL-HEALTH SPECIALIST DOCUMENTS THAT THE YOUTHFUL OFFENDER WOULD

32

BENEFIT FROM PLACEMENT OUTSIDE THE UNIT.

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE PREPARATION OF A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR HOUSING A YOUTHFUL OFFENDER OUTSIDE THE SPECIALIZED UNIT AND A CASE-MANAGEMENT PLAN SPECIFYING WHAT BEHAVIORS NEED TO BE MODIFIED AND HOW THE YOUTHFUL OFFENDER MAY RETURN TO THE UNIT. THE STATEMENT OF REASONS AND CASE-MANAGEMENT PLAN MUST BE APPROVED BY THE WARDEN OR HIS OR HER DESIGNEE. CASES ARE REVIEWED AT LEAST QUARTERLY BY THE CASE MANAGER, THE WARDEN OR HIS OR HER DESIGNEE, AND THE YOUTHFUL OFFENDER TO DETERMINE WHETHER A YOUTHFUL OFFENDER SHOULD BE RETURNED TO THE SPECIALIZED UNIT.

FINDINGS

The Hutchins Unit does not house youthful offenders

Standard#4-4308

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE DIRECT SUPERVISION OF YOUTHFUL OFFENDERS HOUSED IN THE SPECIALIZED UNIT TO ENSURE SAFETY AND SECURITY.

FINDINGS

The Hutchins Unit does not house youthful offenders.

Standard#4-4309

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR CLASSIFICATION PLANS FOR YOUTHFUL OFFENDERS THAT DETERMINE LEVEL OF RISK AND PROGRAM NEEDS DEVELOPMENTALLY APPROPRIATE FOR ADOLESCENTS. CLASSIFICATION PLANS SHALL INCLUDE CONSIDERATION OF PHYSICAL, MENTAL, SOCIAL, AND EDUCATIONAL MATURITY OF THE YOUTHFUL OFFENDER.

FINDINGS

Hutchins Unit does not house youthful offenders.

33

Standard #4-4310

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT ADEQUATE PROGRAM SPACE BE PROVIDED TO MEET THE PHYSICAL, SOCIAL, AND EMOTIONAL NEEDS OF YOUTHFUL OFFENDER AND ALLOWS FOR THEIR PERSONAL INTERACTIONS AND GROUP-ORIENTED ACTIVITIES.

FINDINGS

Hutchins Unit does not house youthful offenders.

Standard#4-4311

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS HAVE NO MORE THAN INCIDENTAL SIGHT OR SOUND CONTACT WITH ADULT OFFENDERS FROM OUTSIDE THE UNIT IN LIVING, PROGRAM, DINING, OR OTHER COMMON AREAS OF THE FACILITY. ANY OTHER SIGHT OR SOUND CONTACT IS MINIMIZED, BRIEF, AND IN CONFORMANCE WITH APPLICABLE LEGAL REQUIREMENTS.

FINDINGS

Hutchins Unit does not house youthful offenders.

Standard#4-4312

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT PROGRAM PERSONNEL WHO WORK WITH YOUTHFUL OFFENDERS FROM THE SPECIALIZED UNIT BE TRAINED IN THE DEVELOPMENTAL, SAFETY, AND OTHER SPECIFIC NEEDS OF YOUTHFUL OFFENDERS. WRITTEN JOB DESCRIPTIONS AND QUALIFICATIONS REQUIRE TRAINING FOR STAFF SPECIFICALLY ASSIGNED TO THE UNIT OR STAFF WHO ARE RESPONSIBLE FOR PROGRAMMING OF YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT BEFORE BEING ASSIGNED TO WORK WITH YOUTHFUL OFFENDERS.  THE TRAINING SHOULD INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING AREAS:

- ADOLESCENT DEVELOPMENT
- EDUCATIONAL PROGRAMMING
- CULTURAL AWARENESS

34

- CRISIS PREVENTION AND INTERVENTION
- LEGAL ISSUES
- HOUSING AND PHYSICAL PLANT
- POLICIES AND PROCEDURES
- THE MANAGEMENT OF, AND PROGRAMMING FOR, SEX OFFENDERS
- SUBSTANCE-ABUSE SERVICES
- COGNITIVE-BEHAVORIAL INTERVENTIONS, INCLUDING ANGER MANAGEMENT, SOCIAL-SKILLS TRAINING, PROBLEM SOLVING, AND RESISTING PEER PRESSURE
- SUICIDE PREVENTION
- NUTRITION
- MENTAL-HEALTH ISSUES
- GENDER-SPECIFIC ISSUES
- CASE-MANAGEMENT PLANNING AND IMPLEMENTATION

FINDINGS

Hutchins Unit does not house youthful offenders.

Standard#4-4353-1

WHERE NURSING INFANTS ARE ALLOWED TO REMAIN WITH THEIR MOTHERS, PROVISIONS ARE MADE FOR A NURSERY, STAFFED BY QUALIFIED PERSONS, WHERE THE INFANTS ARE PLACED WHEN THEY ARE NOT IN THE CARE OF THEIR MOTHERS.

FINDINGS

Hutchins Unit does not house female offenders.

Standard#4-4364

ALL IN-TRANSIT OFFENDERS RECEIVE A HEALTH SCREENING BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL ON ENTRY INTO THE AGENCY SYSTEM. FINDINGS ARE RECORDED ON A SCREENING FORM THAT WILL ACCOMPANY THE OFFENDER TO ALL SUBSEQUENT FACILITIES UNTIL THE OFFENDER REACHES HIS OR HER FINAL DESTINATION. HEALTH SCREENS WILL BE REVIEWED AT EACH FACILITY BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL. PROCEDURES WILL BE IN PLACE FOR CONTINUITY OF CARE.

35

FINDINGS

The Hutchins Unit does not house in transit inmates.

Standard#4-4377

OFFENDERS HAVE ACCESS TO A CHEMICAL DEPENDENCY TREATMENT PROGRAM. WHEN A CHEMICAL DEPENDENCY PROGRAM EXISTS, THE CLINICAL MANAGEMENT OF CHEMICALLY DEPENDENT OFFENDERS INCLUDES AT A MINIMUM THE FOLLOWING:

- A STANDARDIZED DIAGNOSTIC NEEDS ASSESSMENT ADMINISTERED TO DETERMINE THE EXTENT OF USE, ABUSE, DEPENDENCY, AND/OR CO-DEPENDENCY;
- A MEDICAL EXAMINATION TO DETERMINE MEDICAL NEEDS AND/OR OBSERVATION REQUIREMENTS;
- AN INDIVIDUALIZED TREATMENT PLAN DEVELOPED AND IMPLEMENTED BY A MULTI DISCIPLINARY TEAM;
- PRE-RELEASE RELAPSE-PREVENTION EDUCATION INCLUDING RISK MANAGEMENT; AND
- THE OFFENDER SHALL BE INVOLVED IN AFTERCARE DISCHARGE PLANS.

FINDINGS

The Hutchins Unit does not have a chemical dependency program.

Standard#4-4391

IF VOLUNTEERS ARE UTILIZED IN THE DELIVERY OF HEALTH CARE, THERE IS A DOCUMENTED SYSTEM FOR SELECTION, TRAINING, STAFF SUPERVISION, FACILITY ORIENTATION, AND DEFINITION OF TASKS, RESPONSIBILITIES AND AUTHORITY THAT IS APPROVED BY THE HEALTH AUTHORITY.   VOLUNTEERS MAY ONLY PERFORM DUTIES CONSISTENT WITH THEIR CREDENTIALS AND TRAINING. VOLUNTEERS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS

Volunteers are not used in health care delivery.

36

Standard#4-4392

ANY STUDENTS, INTERNS, OR RESIDENTS DELIVERING HEALTH CARE IN THE FACILITY, AS PART OF A FORMAL TRAINING PROGRAM, WORK UNDER STAFF SUPERVISION, COMMENSURATE WITH THEIR LEVEL OF TRAINING. THERE IS A WRITTEN AGREEMENT BETWEEN FACILITY AND TRAINING/ EDUCATIONAL FACILITY THAT COVERS SCOPE OF WORK, LENGTH OF AGREEMENT, AND ANY LEGAL/LIABILITY ISSUES. STUDENTS/INTERNS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS

No student or interns are used in health care delivery

Standard #4-4416

WHEN STANDARD ISSUED CLOTHING PRESENTS A SECURITY/MEDICAL RISK (I.E. SUICIDE OBSERVATION), PROVISIONS ARE MADE TO SUPPLY THE OFFENDER WITH A SECURITY GARMENT THAT WILL PROMOTE OFFENDER SAFETY IN A WAY THAT IS DESIGNED TO PREVENT HUMILIATION AND DEGRADATION.

FINDINGS

Security clothing is not used for suicide prevention, inmates are immediately transferred.

Standard#4-4417

THERE ARE SUFFICIENT BATHING FACILITIES IN THE MEDICAL HOUSING UNIT AND INFIRMARY AREA TO ALLOW OFFENDERS HOUSED THERE TO BATHE DAILY.

FINDINGS

The Hutchins Unit Does not have an infirmary

Standard#4-4418

OFFENDERS HAVE ACCESS TO OPERABLE WASHBASINS WITH HOT AND COLD RUNNING WATER IN THE MEDICAL HOUSING UNIT/INFIRMARY AREA AT A MINIMUM RATIO OF ONE BASIN FOR

37

EVERY 12 OCCUPANTS, UNLESS STATE OR LOCAL BUILDING/HEALTH CODES SPECIFY A DIFFERENT RATIO.

FINDINGS

The Hutchins Unit Does not have an infirmary.

Standard#4-4419

OFFENDERS HAVE ACCESS TO TOILETS AND HAND-WASHING FACILITIES 24 HOURS PER DAY AND ARE ABLE TO USE TOILET FACILITIES WITHOUT STAFF ASSISTANCE WHEN THEY ARE CONFINED IN THE MEDICAL HOUSING UNIT/INFIRMARY AREA. TOILETS ARE PROVIDED AT A MINIMUM RATIO OF ONE FOR EVERY 12 OFFENDERS IN MALE FACILITIES AND ONE FOR EVERY 8 OFFENDERS IN FEMALE FACILITIES. URINALS MAY BE SUBSTITUTED FOR UP TO ONE-HALF OF THE TOILETS IN MALE FACILITIES. ALL HOUSING UNITS WITH THREE OR MORE OFFENDERS HAVE A MINIMUM OF TWO TOILETS.    THESE RATIOS APPLY UNLESS STATE OR LOCAL BUILDING/HEALTH CODES SPECIFY A DIFFERENT RATIO.

FINDINGS

The Hutchins Unit Does not have an infirmary.

Standard#4-4436

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT COMPREHENSIVE COUNSELING AND ASSISTANCE ARE PROVIDED TO PREGNANT INMATES IN KEEPING WITH THEIR EXPRESSED DESIRES IN PLANNING FOR THEIR UNBORN CHILDREN.

FINDINGS

The Hutchins Unit Does not house female offenders.

Standard#4-4438

WHERE A DRUG TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE ALCOHOL AND DRUG ABUSE TREATMENT PROGRAM HAS A WRITTEN TREATMENT PHILOSOPHY WITHIN THE CONTEXT OF THE TOTAL CORRECTIONS SYSTEM, AS WELL AS GOALS AND MEASURABLE OBJECTIVES. THESE

38

DOCUMENTS ARE REVIEWED AT LEAST ANNUALLY AND UPDATED AS NEEDED.

FINDINGS

There is no therapeutic Community at this site.

39

## Significant Incident Summary

This summary is required to be provided to the chair of your audit team upon their arrival. The information contained on this form will also be summarized in the narrative portion of the visiting committee report and will be incorporated into the final report. It should contain data for the last 12 months; indicate those months in the boxes provided. If you have questions on how to complete the form, please contact your regional manager.

Facility: Hutchins Unit – Dallas, Texas

Year: December 2005 – November 2006

| Incidents | | Months | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 01/06 | 02/06 | 03/06 | 04/06 | 05/06 | 06/06 | 07/06 | 08/06 | 09/06 | 10/06 | 11/06 | 12/06 |
| Assault: Offender/ Offenders¹ | Indicate types (sexual**, physical, etc.) | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY | PHY |
| | # With Weapon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Without Weapon | 1 | 3 | 1 | 2 | 0 | 7 | 0 | 6 | 3 | 2 | 1 | 0 |
| Assault: Offender/ Staff | Indicate types (sexual**, physical, etc.) | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| | # With Weapon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Without Weapon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Number of Forced Moves Used*** | (Cell extraction or other forced relocation of offenders) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Disturbances**** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Number of Times Chemical Agents Used | | 0 | 1 | 1 | 6 | 5 | 1 | 4 | 3 | 2 | 4 | 2 | 0 |
| Number of Times Special Reaction Team Used | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Four/Five Point Restraints | Number | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| | Indicate type (chair, bed, board, etc.) | - | - | - | - | - | - | - | - | - | - | - | - |
| Offender Medical Referrals as a Result of Injuries Sustained | #'s should reflect incidents on this form, not rec or other source | 5 | 3 | 3 | 2 | 2 | 8 | 0 | 6 | 7 | 2 | 5 | 0 |
| Escapes | # Attempted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Actual | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Substantiated Grievances (resolved in favor of offender) | Reason (medical, food, religious, etc.) | See Attached | | | | | | | | | | | |
| | Number | See Attached | | | | | | | | | | | |
| Deaths | Reason (violent, illness, suicide, natural) | NA | NA | NA | NA | NA | NA | NA | NAT | NA | NA | NA | NA |
| | Number | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |

*Any physical contact that involves two or more offenders
**Oral, anal or vaginal copulation involving at least two parties
***Routine transportation of offenders is not considered "forced"
****Any incident that involves four or more offenders. Includes gang fights, organized multiple hunger strikes, work stoppages, hostage situations, major fires, or other large scale incidents



40

## ACI Outcome Measures
### Hutchins Unit – Dallas, Texas
### December 2005 – November 2006

| Standard | Outcome Measure | Numerator /Denominator | Value | Calculated Outcome Measure |
|---|---|---|---|---|
| 1A | (1) | Number of offenders with a positive tuberculin skin test on admission in the past 12 months | 74 | |
| | divided by | Annual number of admissions in the past 12 months | 3,791 | 1.95% |
| | (2) | Number of offenders diagnosed with active tuberculosis in the past 12 months. | 0 | |
| | divided by | Average daily population in the past 12 months in the past 12 months: | 2,044 | 0.00% |
| | (3) | Number of conversions to a positive tuberculin skin test in the past 12 months. | 4 | |
| | divided by | Number of tuberculin skin tests given in the past 12 months | 3,165 | 0.13% |
| | (4) | Number of offenders with a positive tuberculin skin test who complete prophylaxis treatment for tuberculosis in the past 12 months | 23 | |

41

| | | | | |
|---|---|---|---|---|
| | divided by | Number of offenders with a positive tuberculin skin test on prophylaxis treatment for tuberculosis in the past 12 months | 41 | 55.98% |
| | (5) | Number of Hepatitis C positive offenders in the past 12 months | 108 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 5.28% |
| | (6) | Number of HIV positive offenders in the past 12 months | 28 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 1.37% |
| | (7) | Number of HIV positive offenders who are being treated with highly active antiretroviral treatment in the past 12 months | 7 | |
| | divided by | Number of known HIV positive offenders in the past 12 months | 29 | 23.58% |
| | (8) | Number of offenders diagnosed with an Axis I diagnosis (excluding sole diagnosis of substance abuse) in the past 12 months | 166 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 8.12% |

42

| | | | | |
|---|---|---|---|---|
| | (9) | Number of offender suicide attempts in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 0.00% |
| | (10) | Number of offender suicides in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 0.00% |
| | (11) | Number of deaths due to homicide in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 0.00% |
| | (12) | Number of deaths due to injuries in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 0.00% |
| | (13) | Number of medically expected deaths in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 0.00% |
| | (14) | Number of medically unexpected deaths in the past 12 months | 1 | |

43

| | | | | |
|---|---|---|---|---|
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 0.05% |
| | (15) | Number of offender admissions to infirmary (where available) in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 0.00% |
| | (16) | Number of offender admissions to off-site hospitals in the past 12 months | 30 | |
| | divided by | Average daily population in the past 12 months in the past 12 months. | 2,044 | 1.47% |
| | (17) | Number of offenders transported off-site (via ambulance or correctional vehicle) for treatment of emergency health conditions in the past 12 months | 42 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 2.05% |
| | (18) | Number of offender specialty consults completed during in the past 12 months. | 139 | |

44

| | | | | |
|---|---|---|---|---|
| | divided by | Number of specialty consults (on-site or off-site) ordered by primary health care provider (MD, NP, PA) in the past 12 months. | 317 | 43.85% |
| | (19) | Number of offender grievances about access to healthcare services found in favor of the offender in the past 12 months. | 3 | |
| | divided by | Number of offender grievances about access to healthcare services in the past 12 months. | 41 | 7.32% |
| | (20) | Number of offender grievances related to quality of health care found in favor of offender in the past 12 months. | 2 | |
| | divided by | Number of offender grievances related to quality of health care in the past 12 months. | 16 | 12.50% |
| | (21) | Number of offender grievances related to unfair treatment or rights violation found in favor of the offender in the past 12 months. | 0 | |
| | divided by | Number of offender grievances related to unfair treatment or rights violation in the past 12 months. | 26 | 0.00% |

Plaintiffs' MSJ Appx. 2526
TDCJ- RPP #25 - 143

| | | | | |
|---|---|---|---|---|
| | (22) | Number of offender grievances related to safety or sanitation found in favor of the offender in the past 12 months | 0 | |
| | divided by | Number of offender grievances related to safety or sanitation in the past 12 months | 7 | 0.00% |
| | (23) | Number of offender lawsuits about access to healthcare services found in favor of the offender in the past 12 months. | 0 | |
| | divided by | Number of offender lawsuits about access to healthcare services in the past 12 months. | 0 | 0.00% |
| | (24) | Number of individual sick call encounters in the past 12 months | 3,664 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 1.79 |
| | (25) | Number of physician visits contacts in the past 12 months. | 5,519 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 2.70 |
| | (26) | Number of individualized dental treatment plans in the past 12 months. | 3 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 0.15% |

46

| | | | | |
|---|---|---|---|---|
| | (27) | Number of hypertensive offenders enrolled in chronic care clinic in the past 12 months | 96 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 4.70% |
| | -28 | Number of diabetic offenders enrolled in chronic care clinic in the past 12 months | 24 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 1.18% |
| | (29) | Number of incidents involving pharmaceuticals as contraband in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months. | 2,044 | 0.00% |
| | (30) | Number of cardiac received by offenders with cardiac disease in the past 12 months | 15 | |
| | divided by | Number of cardiac diets prescribed in the past 12 months | 15 | 100.00% |
| | (31) | Number of hypertensive diets received by offenders with hypertension in the past 12 months | 96 | |
| | divided by | Number of hypertensive diet prescribed in the past 12 months | 96 | 100.00% |
| | (32) | Number of diabetic diets received by offenders with diabetes in the past 12 months | 24 | |

47

| | | | | |
|---|---|---|---|---|
| | divided by | Number of diabetic diets prescribed in the past 12 months | 24 | 100.00% |
| | (33) | Number of renal diets received by offenders with renal disease in the past 12 months | 0 | |
| | divided by | number of renal diets prescribed in the past 12 months | 0 | 100.00% |
| | (34) | Number of needle stick injuries in the past 12 months | 0 | |
| | divided by | Number of employees on average in the past 12 months | 412 | 0.00% |
| | (35) | Number of pharmacy dispensing errors in the past 12 months | 0 | |
| | divided by | Number of prescriptions dispensed by the pharmacy in the past 12 months | 28,816 | 0.00% |
| | (36) | Number of nursing medication administration errors in the past 12 months | 4 | |
| | divided by | Number of medications administered in the past 12 months | 28,816 | 0.01% |
| 2A | (1) | Number of staff with lapsed licensure and or certification in the past 12 months. | 0 | |
| | divided by | Number of licensed and or certified staff in the past 12 months. | 27 | 0.00% |

48

| | | | | |
|---|---|---|---|---|
| | (2) | Number of new employees in the past 12 months that completed orientation training prior to undertaking job assignments. | 8 | |
| | divided by | Number of new employees during a twelve month period. | 8 | 100.00% |
| | (3) | Number of employees completing in-service training requirements. | 31 | |
| | divided by | Number of employees eligible. | 31 | 100.00% |
| | (4) | Number of staff turnover per position category (MD, RN, LPN, medical records etc.) in the past 12 months. | | |
| | | MD Staff Members | 0.20 | |
| | | MD Positions | 0.70 | |
| | | RN Staff Members | 0.00 | |

49

| | | | | |
|---|---|---|---|---|
| | | RN Positions | 3.00 | |
| | | DDS Staff Members | 0.00 | |
| | | DDS Positions | 1.00 | |
| | (5) | Number of staff terminations for violation of drug-free work policy in the past 12 months. | 0 | |
| | divided by | Number of staff terminations in the past 12 months | 0 | 0.00% |
| 3A | (1) | Number of offender lawsuits related to unfair treatment or rights violation found in favor of the offender in the past 12 months. | 0 | |
| | divided by | Number of offender lawsuits related to unfair treatment or rights violation in the past 12 months | 0 | 0.00% |
| | (2) | Number of state court malpractice or torte liability cases found in favor of the offender in the past 12 months | 0 | |

50

| | | | | |
|---|---|---|---|---|
| | divided by | Number of state court malpractice or torts liability cases in the past 12 months | 0 | 0.00% |
| 4A | (1) | Number of problems identified by internal review that were corrected in the past 12 months. | 3 | |
| | divided by | Number of problems identified by internal review in the past 12 months. | 4 | 75.00% |
| | (2) | Vacancy rate for full time equivalents for each category within the health care staff, i.e.: physician, nursing, mid-level practitioner, ancillary staff, in the past 12 months | | 1.00% |
| 5A | (1) | Number of offenders diagnosed with hygiene related conditions (scabies, lice, fungal infections) during a 12-month period. | 601 | |
| | divided by | Average daily population in the past 12 months | 2,044 | 29.40% |
| | (2) | Number of offender grievances related to hygiene found in favor of the offender during a 12- month period. | 3 | |
| | divided by | Number of offender grievances related to hygiene in the past 12 months. | 13 | 23.08% |

51

| | | | | |
|---|---|---|---|---|
| | (3) | Number of offender lawsuits related to hygiene found in favor of the offender in the past 12 months. | 0 | |
| | divided by | Number of offender lawsuits related to hygiene in the past 12 months. | 0 | 0.00% |
| 6A | (1) | Number of fire code violations corrected in the past 12 months | 0 | |
| | divided by | Number of fire code violations cited by jurisdictional authority in the past 12 months | 0 | 0.00% |
| | (2) | Number of offender injuries resulting from fires requiring medical treatment in a 12-month period. | 0 | |
| | divided by | Average daily population in the past 12 months of offenders | 2,044 | 0.00% |
| | (3) | Number of offender injuries (other than fire) requiring medical treatment in a 12-month period. | 73 | |
| | divided by | Average daily population in the past 12 months of offenders | 2,044 | 3.57% |
| | (4) | Number of staff injuries resulting from fires requiring medical treatment in a 12-month period. | 0 | |
| | divided by | Average daily population in the past 12 months of staff. | 412 | 0.00% |

52

| | | | | |
|---|---|---|---|---|
| | (5) | Number of staff injuries (other than fire) requiring medical treatment in a 12-month period. | 12 | |
| | divided by | Average daily population in the past 12 months of staff | 412 | 2.91% |
| | (6) | Number of offender lawsuits related to safety or sanitation found in favor of the offender in the past 12 months. | 0 | |
| | divided by | Number of offender lawsuits related to safety or sanitation in the past 12 months. | 0 | 0.00% |
| | (7) | Number of assaults - offender/offender, offender/staff in the past 12 months. | | |
| | | Offender on Offender | 27 | |
| | | Offender on Staff | 0 | |
| | divided by | Average daily population in the past 12 months (Offender on Offender) | 2,044 | 1.32% |
| | divided by | Average daily population in the past 12 months (Offender on Staff) | 2,044 | 0.00% |
| | (8) | Number of lost key incidents in the past 12 months | | 0 |

| | (9) | Number of health code violations corrected in the past 12 months. | 0 | |
| | divided by | Number of health code violations in the past 12 months | 0 | 0.00% |
| 7A | None | | | |
| 7B | None | | | |

54