UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 152

# The Epidemiology of Heat-Related Deaths, Texas—1950, 1970–79, and 1980

Jerome H. Greenberg, MD, Jill Bromberg, MPH, Christie M. Reed, MPH, Tracy L. Gustafson, MD, and Richard A. Beauchamp, MD

**Abstract:** A study of the deaths during a 1980 heat wave in Texas revealed death rates that were highest in males, the elderly, Blacks and those engaged in heavy labor, the latter two factors perhaps reflecting socioeconomic status. The data suggest that persistent high temperatures were related to death to a greater degree than the temperature peaks reached. Higher heat death rates in earlier years are believed to be attributable to the limited availability of air conditioning in those years. (*Am J Public Health* 1983; 73:805–807.)

## Introduction

Afternoon temperatures in much of northwestern Texas were in excess of 100°F for 61 of the 71 days between June 18th and August 27th, 1980. There were 31 consecutive days when the daily high temperature ranged from 101°F to 112°F in Dallas County. The average daily high temperature during this period was 104.5°F. High temperatures up to 102°F continued to occur intermittently until September 22nd.

From May through September 1980, there were 107 deaths reported as due to heat, the largest number of such deaths reported since 1951. The literature on the effects of excessive heat on mortality rates has suggested that excess mortality is the best retrospective indicator of the effect of hot weather because of underreporting of heat deaths;[1-5] there is a lag period of one to three days between maximum temperature and maximum mortality and consecutive days of high temperature have a greater effect on mortality than variable temperatures.[1,3,5-7] The experience of the 1980 heat wave in Texas is consistent with these observations and suggests that preventive measures must be undertaken very early in a heat wave to be effective.

## Methods

The term "heat-related death" was selected because of the variation in terminology found on death certificates.* Only those certificates coded as heat-caused deaths occurring during May through September are included.**

*All death certificated counted contained a reference to heat in some form in the first line of the death certificate.
**Nineteen of 390 total reported heat deaths occurring during the years 1951, 1970–1979, and 1980 were excluded. The excluded deaths occurred at times of the year and under circumstances inconsistent with death due to elevated environmental temperatures.
Address reprint requests to Dr. Jerome H. Greenberg, Associate Commissioner for Preventable Diseases, Texas Department of Health, 1100 W. 49th Street, Austin, TX 78756. Within the Texas Department of Health, authors Bromberg and Reed are staff epidemiologists, Dr. Gustafson is Director of Surveillance and Biostatistics Division, and Dr. Beauchamp is Director of the Special Studies Section, Bureau of Epidemiology. This paper, submitted to the Journal July 26, 1982, was revised and accepted for publication December 23, 1982.

© 1983 American Journal of Public Health   0090-0036/83 $1.50

All data analyzed were taken from the death certificate. In 1980, a block for designating "Spanish Origin" first appeared; prior to 1980, this category was assigned on the basis of a Hispanic surname. Laborers, construction workers, farmers and others whose listed occupation usually involves continuous physical exertion were considered to be engaged in heavy labor. Everyone over 70 years of age was considered to have been retired.

Temperature data for Dallas County were obtained from the Texas Natural Resources Information Service; population estimates based on national census reports for 1950, 1960, 1970, and 1980 were provided by the Bureau of State Health Planning and Resource Development, Texas Department of Health.

## Results

Figure 1 shows the heat-related death rates reported in Texas from 1950 through 1980. During this period, there were 919 such deaths, 453 (49.3 per cent) of which occurred from 1950 through 1959. Six years (1951, 1952, 1954, 1962, 1978, and 1980) accounted for 468 or 50.9 per cent of the deaths.

The greatest number of deaths during the 1980 heat wave occurred in late June and early July, although hot weather persisted into September (Figure 2). Forty deaths occurred during the week of June 26. Only six occurred in August and one in September despite increased physician alertness for this cause of death.

Age specific mortality of heat-related deaths in 1980 increased from 1.9 among those under age 40 to 58.7 per million among those over 70 years of age; mortality in males equaled or exceeded that of females in all age groups. The age-adjusted rate for Blacks, 21.1 per million, was higher than the 8.1 per million rate in Whites (including Hispanics).[6]

An occupation involving heavy labor predominated among males with heat-related death (Table 1). However, among Black males there was also a predominance of heavy



FIGURE 1—Number of Deaths per Million Attributed to Heat, Texas, 1950–1980

Plaintiffs' MSJ Appx. 2657

PUBLIC HEALTH BRIEFS



FIGURE 2—Maximum Temperatures and Numbers of Heat-Related Deaths by Day, Dallas-Fort Worth Metroplex, June 15–September 4, 1980

TABLE 1—Racial and Occupational Distribution of Heat-Related Deaths in Males, Texas, May through September 1980

|  | White | | Black | | |
|---|---|---|---|---|---|
|  | Heavy* Labor | All Other Occupations | Heavy* Labor | All Other Occupations | Total Deaths |
| Heat-related Deaths | 32 | 15 | 19 | 5 | 71 |
| Deaths from Other Causes** | 17 | 29 | 17 | 7 | 70 |

*Occupations involving continuous physical exertion such as construction work and farming.
**Matched for heat-related deaths for age, sex, race, region, and month of death.

TABLE 2—Number of Heat-Related Deaths, Annual Maximum Temperatures, and Number of Days in which the Maximum Temperature was >100°F and the Minimum was >80°F, Dallas County, May through September, 1951 and 1970–1980

|  | 1951 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Deaths | 28 | 0 | 0 | 1 | 1 | 2 | 1 | 1 | 2 | 17 | 0 | 19 |
| Maximum Temperature (°F) | 107 | 103 | 104 | 104 | 104 | 108 | 102 | 103 | 109 | 110 | 103 | 112 |
| Number of Days with Afternoon High Temperature >100°F | 34 | 19 | 16 | 11 | 1 | 14 | 5 | 6 | 43 | 39 | 3 | 70 |
| Number of Days with Maximum Temperature >100°F and Minimum Temperature >80°F | 20 | 13 | 12 | 4 | 0 | 9 | 0 | 0 | 8 | 19 | 2 | 26 |

labor in a comparison group of non-heat-related deaths in 1980,*** making it difficult to establish the relative effects of occupation and socioeconomic status.

Thirty deaths, 28 per cent of the total for the state in 1980, occurred in Dallas and Tarrant Counties where temperatures were generally the highest in the state. All but two of those deaths occurred during the period June 23rd through July 22nd when the maximum temperature reached 101°F or higher every day. Eleven of the 28 deaths during the period occurred during the three days June 27–29 immediately

following the peak temperatures of 112°F on June 26th and 27th.

In Dallas, temperatures rose to highs of 107°F in 1951 and 112°F in 1980, the two years with the highest heat-related mortality (Table 2). The number of days when afternoon high temperatures were over 100°F correlated less well with excess heat deaths (r = .653) than the number of days when the high temperature was over 100°F and the low was above 80°F (r = .799).

*Discussion*

Heat-related mortality rates appear to be associated with peak afternoon temperatures, duration of excessive

___
***The comparison group was matched for age, sex, race, region, and month of death.

Plaintiffs' MSJ Appx. 2658

heat each day, and number of consecutive days of excessive heat. The first heat wave of a summer appears to produce the majority of heat-related deaths, suggesting that physiologic and behavioral adaptations are important (Figure 2). The 1980 heat wave was early in the season, perhaps catching people unadapted or unprepared.[2]

Populations at particular risk are those of low socioeconomic status, those engaged in heavy physical labor, and the aged. Low socioeconomic status probably limits the availability of air conditioning. The aged are more likely to have one or more chronic diseases which compromise their ability to make the physiologic adaptations necessary to tolerate prolonged periods of excessive heat.[3,5,8,9]

In spite of the fact that there were higher temperatures and more prolonged periods of heat in 1980, the mortality rate in 1980 was less than one-third that of 1951 in Dallas County. We ascribe the lower incidence of heat-related death in recent years to the wider availability of air conditioning.[7] The differences in incidence of heat death by race may also reflect the access to air-conditioned facilities as a function of economic status. Other socioeconomic factors such as overcrowding, poor housing conditions, and jobs involving outside heavy labor probably play a part as well.

Access to air-conditioned facilities is essential in preventing heat deaths, particularly in the elderly. With high energy costs, many of the elderly, as well as the economical-ly underprivileged, will be at risk of heat death whenever there is a severe heat wave. Prevention of heat-related deaths also requires early recognition that a heat wave is in progress. In Dallas County, a useful indicator might be two consecutive days with high temperatures above 100°F and low temperatures above 80°F.

## REFERENCES

1. Gover M: Mortality during periods of excessive temperature. Public Health Rep 1938; 53:1122–1143.
2. Ellis FP: Mortality from heat illness and heat-aggravated illness in the United States. Environ Res 1972; 5:1–58.
3. Schuman SH: Patterns of urban heat-wave deaths and implications for prevention: data from New York and St. Louis during July 1966. Environ Res 1972; 5:59–75.
4. Ellis FP, Nelson F: Mortality in the elderly in a heat wave in New York City. August 1975. Environ Res 1978; 15:504–512.
5. Lye M, Kamal A: Effects of a heatwave on mortality-rates in elderly inpatients. Lancet 1977; 1:529–531.
6. Henschel A, Burton LL, Margolies L, Smith JE: An analysis of the heat deaths in St. Louis during July 1966. Am J Public Health 1969; 59:2232–2242.
7. Oechsli FW, Buechley RW: Excess mortality associated with three Los Angeles September hot spells. Environ Res 1970; 34:277–284.
8. Sullivan-Bolyai JZ, Lumish RM, Smith EWP, et al: Hyperpyrexia due to air conditioning failure in a nursing home. Public Health Rep 1979; 94:466–470.
9. Sprung CL: Hemodynamic alterations of heat stroke in the elderly. Chest 1979; 75:362–366.

---

## Two Summer Programs at MIT in Health Management

The Sloan School of Management at Massachusetts Institute of Technology announces two summer programs in the area of health management:

● ''The Dynamics of Health Service Systems: Strategic Planning for Complex Health Organizations'' will be offered July 25–29, 1983. This program is intended primarily for responsible health care administrators, practitioners, and educators interested in pursuing new approaches to health system problems.

● ''Management of Medical Technologies and Health Care Practices: Development, Utilization, and Costs'' will be offered August 1–5, 1983. This program is of particular interest to health care managers and policy-makers faced with resource allocation decisions and the acquisition of medical technologies; biomedical scientists and engineers in academia and industry who are interested in the medical applications of their research; medical practitioners who would like to better understand current use of analytic tools such as cost/benefit analysis and decision analysis applied to health problems.

Continuing medical education credit for both programs is being offered by the Office of Continuing Medical Education at Tufts University School of Medicine. A detailed description of the above programs is available upon request from the Director of the Summer Session, Room E19-356, Massachusetts Institute of Technology, Cambridge, MA 02139.

Plaintiffs' MSJ Appx. 2659

Copyright of American Journal of Public Health is the property of American Public Health Association and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 153

SR 90-23
7/1/90

Technical Attachment

# The Heat Index "Equation"
# (or, More Than You Ever Wanted to Know About Heat Index)

Lans P. Rothfusz
Scientific Services Division
NWS Southern Region Headquarters, Fort Worth, TX

Now that summer has spread its oppressive ridge over most of the Southern Region, NWS phones are ringing off their hooks with questions about the Heat Index. Many questions regard the actual equation used in calculating the Heat Index. Some callers are satisfied with the response that it is extremely complicated. Some are satisfied with the nomogram (see Attachment 1). But there are a few who will settle for nothing less than the equation itself. No *true* equation for the Heat Index exists. Heat Index values are derived from a collection of equations that comprise a model. This Technical Attachment presents an equation that approximates the Heat Index and, thus, should satisfy the latter group of callers.

The Heat Index (or apparent temperature) is the result of extensive biometeorological studies. The parameters involved in its calculation are shown below (from Steadman, 1979). Each of these parameters can be described by an equation but they are given assumed magnitudes (in parentheses) in order to simplify the model.

\# **Vapor pressure**. Ambient vapor pressure of the atmosphere. (1.6 kPa)

\# **Dimensions of a human**. Determines the skin's surface area. (5' 7" tall, 147 pounds)

\# **Effective radiation area of skin**. A ratio that depends upon skin surface area. (0.80)

\# **Significant diameter of a human**. Based on the body's volume and density. (15.3 cm)

\# **Clothing cover**. Long trousers and short-sleeved shirt is assumed. (84% coverage)

\# **Core temperature**. Internal body temperature. (98.6°F)

\# **Core vapor pressure**. Depends upon body's core temperature and salinity. (5.65 kPa)

\# **Surface temperatures and vapor pressures of skin and clothing**. Affects heat transfer from the skin's surface either by radiation or convection. These values are determined by an iterative process.

\# **Activity**. Determines metabolic output. (180 W $m^2$ of skin area for the model person walking outdoors at a speed of 3.1 mph)

\# **Effective wind speed**. Vector sum of the body's movement and an average wind speed. Angle between vectors influences convection from skin surface (below). (5 kts)

\# **Clothing resistance to heat transfer**. The magnitude of this value is based on the assumption that the clothing is 20% fiber and 80% air.

\# **Clothing resistance to moisture transfer**. Since clothing is mostly air, pure vapor diffusion is used here.

\# **Radiation from the surface of the skin**. Actually, a radiative heat-transfer coefficient determined from previous studies.

\# **Convection from the surface of the skin**. A convection coefficient also determined from previous studies. Influenced by kinematic viscosity of air and angle of wind.

\# **Sweating rate**. Assumes that sweat is uniform and not dripping from the body.

Plaintiffs' MSJ Appx. 2662

As an aside, these assumptions are important for the forecaster to keep in mind. For example, a common perception is that wind is not taken into account in the Heat Index. In actuality it is. It is assumed to be 5 knots. This may seem trivial but a forecaster may be able to use this information creatively when writing Public Information Statements regarding heat stress, heat stroke, etc.

\# **Ventilation rate**. The amount of heat lost via exhaling. (2-12%, depending upon humidity)
\# **Skin resistance to heat transfer**. A function of activity, skin temperature, among others.
\# **Skin resistance to moisture transfer**. A function of the vapor-pressure difference across the skin (and, therefore, relative humidity). It decreases with increasing activity.
\# **Surface resistance to heat transfer**. As radiation and convection from the skin increases, this value decreases.
\# **Surface resistance to moisture transfer**. Similar to heat transfer resistance but also depends upon conditions in the boundary layer just above skin's surface.

These last five variables are used explicitly to derive the apparent temperature. By an iterative procedure which relies on the assumptions in the first list, the model is reduced to a relationship between dry bulb temperature (at different humidities) and the skin's resistance to heat and moisture transfer. Since these resistances are directly related to skin temperature, we now have a relationship between ambient temperature and relative humidity versus skin (or apparent) temperature. As a result of this procedure, there is a base relative humidity at which an apparent temperature (e.g., 90°F) "feels" like the same air temperature (90°F). Increasing (decreasing) humidity and temperature result in increasing (decreasing) apparent temperature, and, yes, apparent temperature *can* be lower than air temperature. Steadman (1979) developed a table based on this relationship and the nomogram in Attachment 1 summarizes that table.

In order to arrive at an equation which uses more conventional independent variables, a multiple regression analysis was performed on the data from Steadman's table. The resulting equation could be considered a Heat Index equation, although it is obtained in a "round-about" way. Thus, here is an ersatz version of the Heat Index equation:

$$HI = -42.379 + 2.04901523T + 10.14333127R - 0.22475541TR - 6.83783 \times 10^{-3}T^2$$
$$- 5.481717 \times 10^{-2}R^2 + 1.22874 \times 10^{-3}T^2R + 8.5282 \times 10^{-4}TR^2 - 1.99 \times 10^{-6}T^2R^2$$

where  T = ambient dry bulb temperature (°F)
        R = relative humidity (integer percentage).

Because this equation is obtained by multiple regression analysis, the heat index value (HI) has an error of ±1.3°F. Even though temperature and relative humidity are the only two variables in the equation, all the variables on the lists above are implied.

*References*

Steadman, R.G., 1979: The assessment of sultriness. Part I: A temperature-humidity index based on human physiology and clothing science. *J. Appl. Meteor.*, **18**, 861-873.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 154

## AFFIDAVIT OF FACT

Scott Gray appeared in person before me today and stated under oath:

"My name is Scott Gray.  I am above the age of eighteen years, and I am fully competent to make this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the attorney in charge for the plaintiff, Samuel Alvin Ashley, Jr., in Civil Action No. 3:14-cv-02654-D currently pending in the United States District Court for the Northern District of Texas, Dallas Division.

In this case Mr. Ashley suffered a heat stroke due to the extreme temperatures in his prison cell at FCI Seagoville on August 5, 2011. I have interviewed numerous witnesses regarding this case including my client, and at the time of Mr. Ashley's heat stroke most of the buildings that housed inmates were climate controlled with full air conditioning. However, where Mr. Ashley was being housed at the time of his stroke was not one of those fully climate controlled buildings.

Furthermore, I have personally visited several prisons under the Bureau of Prisons control and every one of them that I visited have been climate controlled and air conditioned."

_____
Scott Gray

State of Texas                                    §

County of Kaufman                           §

SIGNED under oath before me on ___September 7, 2016___.

_____
Notary Public, State of Texas

MARIE DECATOR
My Notary ID # 128925127
Expires March 19, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 155

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 JUL 22   PM 4: 43

DEPUTY CLERK _____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

JUSTIN BORUM and CHELSEA          §
RUSHING, individually and as heirs-at-   §
law to the ESTATE OF TERRY BORUM,   §
and GRADY BORUM,                  §
                                  §
            Plaintiffs,           §
                                  §          2:14-CV-127-BB
v.                                §
                                  §
SWISHER COUNTY,                   §
                                  §
            Defendant.            §

## ORDER DENYING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL OR REMITTITUR

Before the Court is defendant's Renewed Motion for Judgment as a Matter of Law (Doc. No. 134)

and defendant's Motion for New Trial or Remittitur and Brief In Support Subject to Swisher County's

Renewed Judgment as a Matter of Law (Doc. No. 135).

## I.  BACKGROUND

Plaintiffs filed a lawsuit alleging claims of civil rights violations under 42 U.S.C. § 1983 together

with claims under the Americans with Disabilities Act (ADA) against defendant Swisher County, Texas.

Plaintiff's claims relate to the detention of and ultimate death of Terry Borum, a pretrial detainee at the

Swisher County Jail from January 28, 2013 to February 2, 2013.  The case was tried to a jury on October

19–22, 2015.  The jury returned a verdict in favor of plaintiffs and awarded collective damages of

$1,000,000.  Judgment was entered in favor of plaintiffs against defendant on October 23, 2015.

## II.  JUDGMENT AS A MATTER OF LAW

Defendant asserts judgment as a matter of law is appropriate for four reasons: (1) plaintiffs have

conflated their ADA claim with a negligence claim; (2) plaintiffs have conflated their ADA claim with

1 of 22

a § 1983 claim; (3) plaintiffs' Fourteenth Amendment violation claim based on inadequate medical care

was not supported by legally sufficient evidence; (4) and plaintiffs' Fourteenth Amendment violation

claim based on the failure to train was based on legally insufficient evidence.  Def. Swisher Cty.'s

Renewed Mot. for J. as a Matter of Law and Br. in Supp., ECF No. 134.

**A. Standard**

Judgment as a matter of law (JMOL) is appropriate when "a party has been fully heard on an issue

. . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find

for that party on the issue." Fed. R. Civ. P. 50(a).  The Court must view the evidence in the light most

favorable to the party opposed to the motion.  *Leatherwood v. Houston Post Co.*, 59 F.3d 533, 536 (5th

Cir. 1995).  "'If the facts and inferences point so strongly and overwhelmingly in favor of one party that

the court believes that reasonable men could not arrive at a contrary verdict,' the court should enter

judgment as a matter of law." *Id.* at 535.

**B.   Whether there was sufficient evidence for the jury to find that defendant violated the Fourteenth Amendment.**

Plaintiffs claimed defendant violated the Fourteenth Amendment to the United States Constitution

in two ways: (1) deliberate indifference to plaintiff's severe medical needs by failing to treat Terry

Borum's alcohol withdrawal and (2) failure to train officers on treatment of alcohol withdrawal. *Id.*

The Eighth Amendment's proscription of cruel and unusual punishments applies to convicted

persons but claims of violations of constitutional rights of pretrial detainees is governed by the Fourteenth

Amendment.  The standard of protection afforded to both classes of prisoners is the same. *Palmer v.*

*Marion County*, 327 F.3d 588, 593 (7th Cir. 2003).  Terry Borum's claims are governed by the Fourteenth

Amendment since he was a pretrial detainee.

Prior to submission of the case to the jury, the Court determined plaintiffs' Fourteenth

Amendment claims were properly characterized as "episodic act or omission" claims.  To prevail on such

Plaintiffs' MSJ Appx. 2668

a claim, a plaintiff must show, "(1) a county employee violated [plaintiff's] clearly established constitutional rights with subjective deliberate indifference; and (2) the violation resulted from a county policy or custom adopted or maintained with objective deliberate indifference." *Anderson v. Dallas Cty.*, F. App'x. 850, 860 (5th Cir. 2008). A plaintiff must also demonstrate a causal link establishing that their injury resulted from the deliberate indifference. *Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997). Subjective indifference is when (1) a jailer " knows that an inmate faces a substantial risk of serious bodily harm, and (2) he disregards that risk by failing to take reasonable measures to abate it." *Anderson*, 286 F. App'x 850, 860 (5th Cir. 2008).

## 1. Failure to provide adequate medical care

Unsuccessful medical treatment, mere negligence, neglect, or even medical malpractice are not sufficient to establish a § 1983 claim. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 2007). A defendant's failure to meet an optimal standard of care is not synonymous with deliberate indifference. *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006). "Whether the prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inferences from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842, 1145 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994). The fact finder should consider "the seriousness of the prisoner's illness, the need for immediate treatment, the likely duration of his incarceration, the possibility of substantial harm caused by postponed treatment, the prospects of some cure or substantial improvement in his condition, and the extent to which the prisoner presents a risk of danger to himself or other[s]. . . . [and] the availability and expense." *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. Unit A 1981).

Plaintiffs' MSJ Appx. 2669

### a. Subjective Deliberate Indifference

Defendant asserts the evidence does not support a finding it was deliberately indifferent to Mr. Borum's medical needs because its employees were "monitoring him closely, encouraging him to eat, providing him special food and honey and orange juice and immediately call[ed] an ambulance when staff became aware of a medical emergency." Def.'s Mot., at 24, ECF No. 134. Defendant also asserts "there was no diagnosis that Swisher County employees were aware of while Terry Borum was in the jail."

In considering defendant's argument, the Court must first look to whether the evidence is in conflict and, if it is, whether the conflicting evidence supports the verdict or whether defendant has shown that no competent evidence of record supports the jury's verdict.

Trial testimony indicated jailers were aware Mr. Borum was not only a medical risk, but that he was also suffering from alcohol withdrawal. Witness Sanchez testified:

- The jail, from the outset, was an inappropriate place for Terry Borum because of his facial deformities, his feeding issues, and his alcoholism and withdrawal. Transcript of Trial Testimony of Martin Sanchez, ECF No. 136., 13–14.

- He, Sheriff Grubb, and Judge Keeter all knew Terry Borum was sick in the jail. *Id.* at 20.

- Mr. Borum received "no medical care from Swisher County . . ." *Id.* at 12.

- He told Sheriff Grubb Mr. Borum needed to be placed elsewhere. *Id.* at 21.

- He was aware Mr. Borum was scratching and itching, that he was hearing conversations with people who were not present, that he was having hallucinations and he was trying to pull people out of the toilet, that Mr. Borum appeared moderately anxious, that he thought a bomb had exploded in the jail, and that at times, he did not even know he was in jail. *Id.* at 30–33.

- They administered honey and orange juice to Mr. Borum as a treatment for his alcohol withdrawal. *Id.* at 36–37.

Plaintiffs' MSJ Appx. 2670

- He was subjectively aware that he should not be prescribing a substitute for medication and that what they were doing was dangerous. *Id.* at 38–39.

Other jail employees gave similar testimony, testifying Mr. Borum presented an obvious risk for which the Swisher County Jail could not provide adequate care. Jail employees testified Mr. Borum was having hallucinations, was hearing things, appeared anxious, was scratching and itching, was unable to sleep, and was incoherent. Plaintiffs presented sufficient evidence from which the jury could find that Mr. Borum was in need of medical treatment, and that the need was sufficiently obvious to alert defendant's employees of his need for treatment. There was also sufficient evidence for the jury to find defendant's treatment of Terry Borum, including its "three-step protocol" and provision of honey and orange juice, was not adequate. In the words of the Fifth Circuit, "There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help." *Fielder*, 590 F.2d at 108.

Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence defendant's employees (1) were aware of the risk to Mr. Borum, as demonstrated by their knowledge that he was in alcohol withdrawal and his exhibition of symptoms associated with such withdrawal that even a lay person could see this constituted a serious risk of bodily harm; and (2) there was sufficient evidence defendant disregarded the risks by failing to take reasonable measures to treat Mr. Borum and/or abate that risk. Accordingly, the requirement of subjective deliberate indifference was satisfied.

### b. Objective Deliberate Indifference

A municipality, such as defendant, can be liable under § 1983 in circumstances involving a policy or custom that caused a constitutional deprivation. Municipal liability requires proof of three elements: (1) a policymaker, (2) an official policy or custom, and (3) "a violation of constitutional rights whose

Plaintiffs' MSJ Appx. 2671

'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.

2001). Official policy is typically evidenced in policy statements, ordinances, or regulations, but a policy

may be indicated by a custom that is "a persistent, widespread practice of City officials or employees,

which, although not authorized by officially adopted and promulgated policy, is so common and well-

settled as to constitute a custom that fairly represents municipal policy." *Id.* at 579 (quoting *Webster v.

City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984)). Even a "facially innocuous policy will support

liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that

constitutional violations would result." *Id.* (quoting *Bryan Cty. v. Brown*, 520 U.S. 397, 407, 117 S. Ct.

1382, 1389–90, 137 L. Ed. 2d 626 (1997)). Under certain circumstances, even a single decision by a

policy maker may constitute a policy that gives rise to municipal liability. *Brown v. Bryan Cty., Okla.*,

219 F.3d 450, 458–62 (5th Cir. 2000). Plaintiffs contend Sheriff Grubb was the official policymaker for

the Swisher County Jail and that any policies he implemented are the official policy of the County.

Defendant asserts plaintiffs failed to show (1) the county had a policy of failing to provide

medical care because of their "three-step protocol" which provided access to medical care and (2) Sheriff

Grubb's actions constituted a policy implemented without knowledge of any "known or obvious

consequences" that a constitutional violation would result. Def.'s Mot., at 26–27. Defendant asserts the

evidence showed Mr. Borum was evaluated upon intake into the jail and when it became obvious he was

in alcohol withdrawal, he was moved to a cell closer to the jailers for better observation and was given

honey and orange juice for his symptoms. Defendant argues Sheriff Grubb's actions were not the

equivalent of a policy implemented "despite the known or obvious consequences" because Sheriff Grubb

expressed sympathy for Mr. Borum's death and testified he would not change his actions if given the

opportunity. According to the defendant, this is direct evidence that the policy could not have resulted

from deliberate indifference. Unlike the deliberate indifference standard used to evaluate an individual

Plaintiffs' MSJ Appx. 2672

employee's actions, which is subjective deliberate indifference, the standard applied to a municipality is one of objective deliberate indifference. Consequently, the jury could have considered "not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *Lawson v. Dallas Cty.*, 286 F.3d 257, 264 (5th Cir. 2002).

Plaintiffs argue the evidence at trial proved Mr. Borum's rights were violated by several policies that were made and maintained by the policymaker, *i.e.* Sheriff Grubb or which were persistent, widespread practices. Specifically, plaintiffs point to (1) the lack of policy for treatment of inmates from alcohol withdrawal, (2) defendant's use of honey and orange juice to treat alcohol withdrawal rather than providing medical care, (3) the lack of training regarding the dangers of alcohol withdrawal, and (4) defendant's inadequate budget for medical care.

The evidence and testimony at trial indicated (1) some of the jailers disagreed with the providing of honey and orange juice as treatment for withdrawal but followed the Sheriff's orders; (2) after the Terry Borum incident Sheriff Grubb would have provided the same treatment to inmates suffering from withdrawal; and (3) Sheriff Grubb wanted to stay within the limited funds budgeted for medical care and chose not to seek independent medical care for Mr. Borum.

Viewing the evidence in the light most favorable to plaintiffs, the jury could have found that the defendant, through its policymaker Sheriff Grubb, had a policy of providing honey and orange juice as treatment for alcohol withdrawal in lieu of medical care or instead of determining if medical care was needed. There was evidence of record that even at a point when Mr. Borum was hearing things, exhibiting anxiety, and experiencing hallucinations and disorientation, the county's policymaker made it clear that the treatment Mr. Borum was to receive was the providing of honey and orange juice. While defendant asserted and offered evidence it had a three-step medical protocol, the evidence at trial

Plaintiffs' MSJ Appx. 2673

indicated Mr. Borum was not evaluated under that three-step protocol nor was he ever given access to medical care pursuant to it.

Based upon the evidence at trial, a reasonable jury could have determined that the policy of the Sheriff of providing a "home remedy" such as honey and orange juice for a condition the Sheriff knew was potentially very serious, and by not obtaining adequate medical care or at least a medical diagnosis, whether due to the expense or for some other reason, demonstrated objective deliberate indifference to "known or obvious consequences" that constitutional violations would result. *See Piotrowski*, 237 F.3d at 579.

Even if the Sheriff incorrectly determined Mr. Borum was not suffering withdrawal, but was in the process of "sobering up," and that the provision of honey and orange juice was appropriate to address that condition, the evidence from both penological expert witnesses established the prevalence of alcohol withdrawal in jails. Terry Borum's alcohol withdrawal would have been a condition defendant should have recognized and presented a known or obvious condition to the degree that the failure to adequately treat it constituted <u>objective</u> deliberate indifference.

Defendant next states there was insufficient evidence to support the jury's finding that Mr. Borum's fall resulted from deliberate indifference to his need for medical care. Def.'s Mot., at 25. It asserts that at most the county was negligent in the administration of medical treatment and cites to cases discussing negligent medical care or medical malpractice. *Id.* All but one of the cases defendant cites, however, involve the detainee or prisoner receiving care from an actual medical professional, rather than a non-medical professional making treatment decisions. *See Gobert*, 463 F.3d at 346 (inmate was treated at a hospital for his surgery and initial recovery, then by his primary medical doctor, a nurse practitioner, other doctors, and medical staff); *Domino*, 239 F.3d at 756 (inmate was treated by a psychiatrist); *Mendoza v. Lynaugh*, 989 F.2d 191, 192 (5th Cir. 1993) (prisoner was treated by "various medical

Plaintiffs' MSJ Appx. 2674

personnel"); *Varnado v. Lynaugh*, 920 F.2d 320 (prisoner underwent several surgeries, was treated by medical personnel, and was in a unit for handicapped individuals). Defendant's argument that "at most, [it] was negligent in its administration of medical treatment" and that "negligent medical care does not constitute a valid § 1983 claim" is an argument rejected by the fact finder. *See* Def.'s Mot., at 25. There was evidence Mr. Borum was never examined by any medical professional until after he had fallen and was taken to the hospital. The evidence was that the Sheriff was making the primary decisions on how to treat Mr. Borum's alcohol withdrawal and decided not to seek medical advice and/or treatment at any time before Mr. Borum was injured. The jury found that evidence to be credible.

### c. Causation

The only testimony on causation was from the plaintiffs' expert, Dr. Goldenson. Dr. Goldenson testified it was more likely than not that Mr. Borum's fall was from alcohol withdrawal and on cross-examination, he stated that while it was possible he could have fallen for some other reason, it was unlikely. Goldenson Testimony Transcript, at 44, 60–61. Defendant did not offer any testimony, medical expert or otherwise, refuting Dr. Goldenson or establishing that Mr. Borum's fall, more likely than not, wasn't a result of his severe alcohol withdrawal.

The issue of causation is close, but there was legally sufficient evidence to support the jury's verdict and their determination that the defendant's failure to provide adequate medical care was a proximate cause of Terry Borum's fall and death. Accordingly, defendant's Renewed Motion for Judgment as a Matter of Law on plaintiffs' Fourteenth Amendment claim of deliberate indifference to his serious medical needs is DENIED.

### 2. Failure to Train

Defendant next asserts there was an absence of legally sufficient evidence to support the plaintiffs' Fourteenth Amendment violation for failure to train. Def.'s Mot., at 27.

Plaintiffs' MSJ Appx. 2675

A municipality may be liable under § 1983 for constitutional violations resulting from a failure to train municipal employees only when the municipality's "failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton, OH v. Harris*, 489 U.S.378, 392, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989). Further, it must be a municipal policy that causes the constitutional deprivation. *Id.* Considering the duties of certain officers or employees, if "the need for more or different training is so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* Municipal liability may then attach if the failure to provide proper training caused the ultimate injury. *Id.* The focus in failure to train claims must be the "adequacy of the training program in relation to the tasks the particular officers must perform." *Valle v. City of Houston*, 613 F. 3d 536, 544 (5th Cir. 2010). In summary, a plaintiff must show "(1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing the violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policies." *Id.*

Evidence at trial established that alcohol withdrawal is one of the most common problems in jails across the entire country and that it is a serious, potentially life-threatening situation. While the Swisher County jailers had received the basic-jailer training required by the State of Texas, testimony from some of those jailers was that they could not recall receiving any specific training regarding alcohol withdrawal, and that they were generally ignorant of the topic or that it could result in an emergency situation. Jail Administrator Sanchez testified he had received no training regarding alcohol withdrawal and how to deal with prisoners suffering from it, although he did reference watching some films that brought up "the basics" about health and alcohol. He also testified he brought up the need for more training for himself and the jailers on more than one occasion, and that Sheriff Grubb stated, "Look, it's not in the budget,"

Plaintiffs' MSJ Appx. 2676

and "Look, you can argue, but it ain't going anywhere." Sanchez Trial Testimony, at 10–11. He also testified that the only training any jailers would have received on the dangers of alcohol withdrawal was if anything had been included in the basic-jailer training mandated by the state.

Given the evidence presented at trial, the jury could reasonably have concluded that Sheriff Grubb, a policy maker for the county, had actual or constructive notice of the need for training on the dangers of alcohol withdrawal and failed to properly train defendant's jailers in light of facts demonstrating an obvious need for training. From that same evidence the jury could reasonably have concluded the need for training and that the consequences of failing to train on alcohol withdrawal were so obvious that defendant was culpable for its failure to train. There was sufficient evidence for the jury to find the training provided to the jailers was inadequate and that defendant was deliberately indifferent in its training policies.

To the extent defendant is contending the Sheriff and the jailers did not know or understand the seriousness of alcohol withdrawal, and therefore they were not deliberately indifferent because the risks were not apparent, such argument provides defendant no relief. Given the expert testimony regarding the prevalence of alcohol withdrawal in jails, defendant Swisher County was obligated to make some provisions for it. This is not to say that all of the jailers or even a majority of them would necessarily have to have undergone medical training. It is possible a jail could meet this need if it had a medical officer, paramedic, or other individual who had sufficient training to adequately recognize medical issues, including withdrawal, presented by prisoners and whether those issues warranted professional medical care or were capable of being treated with basic to advanced first aid care. If, as defendant argues, the jail size and number of prisoners did not warrant the cost of such personnel, then the need to obtain outside medical evaluation and care is more evident. It is not acceptable, in light of the plaintiffs' expert witness testimony, to not address the issue of withdrawal either in house or outside the jail.

Plaintiffs' MSJ Appx. 2677

The defendant should not, on the one hand, be able to claim they weren't deliberately indifferent because they did not appreciate nor fully realize the seriousness of alcohol withdrawal and simply did the best they could, and then also claim, on the other hand, that they did not have to educate and train the jail employees on the seriousness of alcohol withdrawal.

Defendant also claims that even if there were sufficient evidence for the jury to find deliberate indifference, plaintiffs failed to show that the inadequate training policy was the "moving force" in causing the violation of Mr. Borum's rights. Def.'s Mot., at 30. They argue that there was no direct evidence regarding the cause of Mr. Borum's injury and because there were other potential explanations, plaintiffs have failed to meet this element of their claim. As discussed above, the only testimony regarding causation was from Dr. Goldenson, who stated it was more likely than not that Mr. Borum's fall was from the alcohol withdrawal and that any other hypothetical causes were unlikely. Dr. Goldenson Testimony Transcript, at 44, 60–61. Defendant did not offer any contrary medical testimony, expert or otherwise. There was also testimony from Mr. Sanchez that if had he "received training that alcohol withdrawal like Mr. Borum was experiencing could lead to potentially deadly results," he "would have contacted a doctor or hospital." Sanchez Trial Testimony, at 24-26. He testified that if he had training that he should contact a doctor when an inmate is going through withdrawal and is disoriented, agitated, and seeing things, Mr. Borum would have gone to see a doctor and would presumably not have been in the jail at the time he hit his head. *Id.* at 27–28.

The jury's finding that defendant's policy or custom of failing to properly train violated plaintiffs' constitutional rights was supported by legally sufficient evidence and the jury's verdict regarding the failure to train claim was supported by that legally sufficient evidence. Accordingly, defendant's Renewed Motion for Judgment as a Matter of Law as to plaintiffs' Fourteenth Amendment claim for failure to train is DENIED.

Plaintiffs' MSJ Appx. 2678

**C. Sufficient evidence existed for the jury to find that defendant violated the ADA.**

Defendant asserts there was insufficient evidence to support the jury's finding that it violated Mr. Borum's rights under the ADA.

The Court initially notes it does not appear necessary to reach the question of whether sufficient evidence existed for the jury to find that defendant violated the ADA because the Court has already found that the jury's verdict was supported by legally sufficient evidence on the Fourteenth Amendment claims. Plaintiffs may only obtain damages for one injury once, even if there are multiple grounds for recovery. *See Reynolds v. Octel Communications Corp.*, 924 F. Supp. 743, 746 (N. Dist. Tex. 1995) (stating plaintiff could not recover damages twice even though she had alleged both sex discrimination and age discrimination and it was the court's duty to enter a judgment providing plaintiff with the maximum recovery allowed by the law for all the damages sustained from the discriminatory act, no matter the nature of the discrimination) (citing *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438, 441 (5th Cir. 1987) ("Plaintiffs cannot recover the same damages twice, even though recovery is based on two different theories.")). While the Court believes the jury's damages are supported by the Fourteenth Amendment violations alone, it will, nevertheless, briefly address the merits of defendant's argument regarding the ADA claim.

<u>ADA CLAIM</u>

To succeed on an ADA claim, a plaintiff must show that (1) he was a qualified individual under the ADA; (2) he was excluded from participation in, or was denied benefits of, services, programs or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such an exclusion, denial of benefits, or discrimination was by reason of his disability. *Lightbourn v. Cty. of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).

Defendant contends plaintiffs conflated their ADA claim with a negligence claim and their § 1983

claim. *Id.* at 8–11. It also asserts the evidence before the jury was insufficient to support the jury's determination that defendant failed to reasonably accommodate Mr. Borum's disabilities.

- **A Qualified Individual**

Defendant stipulated and it is undisputed Mr. Terry Borum was a qualified individual under the ADA. Accordingly, the first element is satisfied.

- **Excluded From Participation, Denied Benefits of Services, Programs, or Activities or Otherwise Discriminated Against**

Defendant argues it was only required to make reasonable accommodations, not "preferred" accommodations (Def.'s Mot., at 13.). Other than moving Mr. Borum to a cell closer to the jailer on duty, and the providing of fluids, defendant does not set out the reasonable accommodations it contends were made. Plaintiffs set out several ways defendant "could have reasonably accommodated Mr. Borum." Pl.'s Br. in Supp., at 29–39, ECF No. 141, but defendant was not required to provide every accommodation plaintiff asserts was a potential reasonable accommodation. Defendant was, however, under an "affirmative obligation" to provide Mr. Borum with some reasonable accommodation that would have provided Mr. Borum with "meaningful access" to the programs and services at the jail. The issue is whether defendant failed to provide an accommodation that would have allowed Mr. Borum access to medical services, either by use of the three-step protocol or otherwise. *See Tennessee v. Lane*, 541 U.S. 509, 533, 1245 S. Ct. 1978, 1994, 158 L. Ed. 2d 820 (2004); Jury Charge, at 10, ECF No. 127.

The jury found "by a preponderance of the evidence that Swisher County failed to reasonably accommodate either of Terry Borum's disabilities." Verdict of the Jury, at 2, ECF No. 129. The reasonableness of an accommodation is an appropriate fact issue for the jury.[1] *See Coker v. Dallas Cty.*

---

[1] While the reasonableness of an accommodation is an appropriate fact issue for the jury, there is case law holding that certain accommodations are or are not reasonable for a particular condition. Defendant has not cited any authority that the accommodations it alleges it made were reasonable as a matter of law.

14 of 22

*Jail*, 2009 WL 1953038, *18 (N.D. Tex. Feb. 25, 2009); *McCoy v. Tex. Dep't of Crim. Justice*, 2006 WL 2331055, *9 (S.D. Tex. Aug. 9, 2006). The jury heard evidence regarding (1) what actions Swisher County took while Mr. Borum was confined it the jail, which primarily consisted of giving him honey and orange juice to treat his alcohol withdrawal and moving him to a cell closer to the jailers for monitoring as he "detoxed"; and (2) what actions it considered taking, such as transferring Mr. Borum to another jail or seeking treatment for him by a medical professional.

Obviously, merely considering whether to provide an accommodation such as seeking treatment from a medical provider does not suffice, and the measures already taken by defendant were not an acceptable method to deal with Mr. Borum's disability. Testimony was that withdrawal from alcohol can not only be a life-threatening problem but that the Sheriff knew that it was always a serious issue and could arise to the level of a medical emergency. Though the jailers and the Sheriff were confronted with objective symptoms of severe alcohol withdrawal exhibited by Mr. Borum, the jury heard testimony that Sheriff Grubb made an intentional decision not to call a medical professional. The jury heard the testimony from several witnesses, including jailers, who believed the Swisher County Jail could not provide the care Mr. Borum needed. Further, the jury heard evidence the defendant did not move Mr. Borum to a medical facility or a more adequate detention facility.

The ADA claim is a closer question, however, because inadequate medical care does not provide a basis for an ADA claim unless medical services are withheld by reason of a disability. *Lee v. Valdez*, 2009 WL 1406244 at *13 (U.S. Dist. Ct., N.D. Texas, Dallas Division May 20, 2009) citing *Marlor v. Madison County, Idaho*, 50 Fed. Appx. 872, 873 (9th Cir. 2002). In *Lee*, the Court found plaintiffs had offered no evidence to show a denial of adequate medical care <u>because of an inmate's mental disability</u>. The Court further determined the plaintiff's evidence would only permit a jury to find that <u>all</u> detainees, not just disabled ones, were denied adequate medical care. Further, the Court found the denial of

Plaintiffs' MSJ Appx. 2681

adequate medical care for the disabled inmate was for reasons not related to her disability.

At trial, and in this motion, defendant maintains that it did provide medical care to inmates generally, *i.e.* the three-step medical protocol.  Defendant also contends the three-step protocol was available to Mr. Borum, but the evidence on that question is conflicting and the jury found against defendant.  Consequently, viewing the evidence in the light most favorable to the non-movant, that evidence is sufficient to establish Mr. Borum was denied medical services which were available to other detainees.

There was sufficient evidence for the jury to find that defendant failed to reasonably accommodate Mr. Borum's disability.

- **Failure to Accommodate Mr. Borum Was Discrimination by Reason of His Disability**

The ADA requires a showing of intentional discrimination; acts of negligence or inadvertence do not meet this requirement.  *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002); *Carter v. Orleans Par. Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984).  The Fifth Circuit has not defined "intentional discrimination," but other circuits have held that "the standard for intentional violation is deliberate indifference to the strong likelihood of a violation."[2]  In a § 1983 case, however, the Fifth Circuit has said that deliberate indifference requires the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  A prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

---

[2] *See A.F. v. Lower Merian Sch. Dist.*, 542 F. App'x 194, 198 (3d Cir. 2013)*; Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *Meagley v. Little Rock*, 639 F. 3d 384 (8th Cir. 2011); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009); *Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228–29 (10th Cir. 2009); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

The jury heard testimony from Sheriff Grubb by video deposition.  Sheriff Grubb stated he intentionally chose not to call a doctor, though he knew Mr. Borum was an alcoholic, knew he was experiencing alcohol withdrawal,  and knew alcohol withdrawal can result in "really terrible things," including "medical emergenc[ies]," Mr. Borum was experiencing severe, objectively-serious symptoms of withdrawal, and anytime someone is in alcohol withdrawal there are complications associated with that.  Sheriff Grubb was not alone in witnessing symptoms indicating that Mr. Borum was going through serious alcohol withdrawal; several other employees of Swisher County who worked at the jail expressed their belief that Mr. Borum's condition warranted medical care beyond what the jail could provide.

The evidence before the jury was Mr. Borum had an undisputed disability, which manifested during his time at the jail.  Defendant Swisher County asserted it had a "three-step protocol" for providing detainees with medical care, the first step of which is to ask for medical treatment.  Plaintiffs challenged whether such a protocol was actually in practice at the Swisher County Jail, but if it was, the jury could have found that Mr. Borum was denied access to it.  Testimony by multiple witnesses indicated Mr. Borum was shaking, itching, experiencing auditory and visual hallucinations, did not seem coherent or lucid, and had insomnia.  With that evidence, a reasonable jury could have found that even if a three-step protocol existed, Mr. Borum did not access it, either because his disability rendered him unable to request it because he would not have been self-aware enough to realize he needed medical treatment or to vocalize such a need, or because it was never offered to him.  The jury also had evidence to support a belief that Swisher County, through its jailers and elected officials who witnessed these symptoms and knew Mr. Borum was in alcohol withdrawal should have provided a reasonable accommodation for that disability. By failing to provide Mr. Borum with reasonable accommodations for an undisputed disability with objectively serious symptoms, the jury had legally sufficient evidence to support a finding that defendant acted with deliberate indifference, and accordingly, satisfied the "intentional discrimination"

Plaintiffs' MSJ Appx. 2683

requirement.

The Court is not aware of any requirement that the intentional denial of an accommodation must be malicious. Here, the evidence supports a conclusion that Sheriff Grubb, the policy maker, made some provisions for Mr. Borum's disability in the form of honey and orange juice, but that the Sheriff did not seek medical care or even a medical evaluation. That evidence supports the jury's determination of intentional discrimination as well as their determination that medical care services were withheld because of Mr. Borum's disability.

The jury is the ultimate fact finder, and it is within the province of the jury to weigh the evidence and the credibility of the witnesses and render a verdict. Accordingly, the jury's finding in favor of plaintiffs' ADA claim was supported by legally sufficient evidence and the appropriate standard was satisfied. Defendant has not made the requisite showing to warrant Judgment in its favor as a matter of law or for a new trial.

Accordingly, defendant's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial as to plaintiffs' ADA claim is DENIED.

### III. Remittitur or New Trial

In addition to defendant's Renewed Motion for Judgment as a Matter of Law, it has also filed a Motion for New Trial or Remittitur (ECF No. 135). Defendant asserts the verdict is so at odds with reason in consideration of the evidence that the jury's award of damages was influenced by passion or prejudice. It asserts that there was no evidence that plaintiffs collectively suffered $1,000,000.00 in damages.

The jury awarded the following damages:

- Chelsea Rushing, daughter of Mr. Borum:

  (1) $100,000 for past mental anguish;

Plaintiffs' MSJ Appx. 2684

(2)  $50,000 for future mental anguish;

(3)  $50,000 for past loss of companionship and affection of her father;

(4)  $50,000 for future loss of companionship and affection of her father.

- Justin Borum, son of Mr. Borum:

   (1)  $100,000 for past mental anguish;

   (2)  $50,000 for future mental anguish;

   (3)  $50,000 for past loss of companionship and affection of his father;

   (4)  $50,000 for future loss of companionship and affection of his father.

- Grady Borum, father of Mr. Borum

   (1)  $100,000 for past mental anguish;

   (2)  $100,000 for future mental anguish;

   (3)  $100,000 for past loss of companionship and affection of his son;

   (4)  $100,000 for future loss of companionship and affection of his son.

- Estate of Terry Borum

   (1)  $100,000 for Mr. Borum's conscious pain and suffering.

## A. Standard

There is a "strong presumption in favor of affirming a jury award of damages." *Giles v. General Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001). The court must grant a remittitur only if the jury's award is "entirely disproportionate to the injury sustained." *Calcarea v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th 1983). In other words, a remittitur is only appropriate when "left with the perception that the verdict is clearly excessive." *Thomas v. Tex. Dep't of Crim. Justice*, 297 F.3d 361 (5th Cir. 2002). An award is "entirely disproportionate" when it is "so large as to 'shock the judicial conscience,''so gross or inordinately large as to be contrary to right reason,' so exaggerated as to indicate 'bias, passion,

Plaintiffs' MSJ Appx. 2685

prejudice, corruption, or other improper motive,' or as 'clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to.'" *Id.*   If remittitur is granted, courts in this circuit apply the maximum-recovery rule to determine what the award of damages should be.   *Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003).  Though loosely defined, the basic rule is that a court will look to actual awards of damages made in similar cases but may also apply a 50% multiplier to past similar awards.  *Id.*

## B.  A new trial or remittitur is not warranted.

Defendant asserts the evidence does not support that the plaintiffs suffered collective damages of one million dollars, but the defendant neither details which portions of the award it claims are so excessive that the jury must have been motivated by passion or prejudice nor does it cite to any federal or state authority that the amount awarded is so excessive or exaggerated compared to other cases within the forum establishing that a new trial or remittitur would be appropriate.  Essentially, defendant provides a recitation of the applicable law but includes no analysis or argument specific to the damages in the case at hand.

The jury heard testimony that would support the damages awarded to Mr. Borum's children and to his father regarding their relationship with Mr. Borum.  Plaintiff Chelsea Rushing testified that while there had been struggles with their relationship with Mr. Borum, after his failed attempt at suicide, the family felt like they had been given a second chance to have a relationship with Mr. Borum.  She testified that second chance was taken away from them when he sustained a life-threatening injury at the Swisher County Jail that led to his death.  She testified there had been an improved relationship with their father and testified as to their hope that they would now be able to have a healthier, stronger relationship.  Her testimony regarding the plaintiffs' and Mr. Borum's desire to improve their relationships after his suicide attempt and the family's grief at the loss of that opportunity was credible.  Her brother and Terry Borum's

Plaintiffs' MSJ Appx. 2686

son, Justin Borum, gave similar testimony.  The jury also heard the testimony of Grady Borum, Terry

Borum's father.  The jury obviously heard the evidence on that question and found it credible in assessing

damages.  The jury placed a higher dollar value on the loss of a child versus the loss of a parent, even

considering the health of the child and age of the parent.  Placing a high value on the loss of a child was

not unreasonable.  Parents of children in wrongful death cases have received significantly more than the

$400,000.00 the jury awarded Grady Borum.  *See* n. 3.

Plaintiffs cite to several cases arising in Texas as examples that the jury's award of damages in

the present case was not excessive[3].  Of note, in a case tried in this division over thirty years ago, the jury

awarded a collective $1,430,000.00 to the family of a man wrongfully killed, an award of which the

present-day value far exceeds the amount of the damages awarded here.  *Grandstaff v. City of Borger*,

767 F.2d 161, 164 (5th Cir. 1985).  In considering the result, if the court were to grant remittitur and

apply the maximum recovery rule, the Court notes that the collective award in *Grandstaff* was

$430,000.00 more than the collective award made by the jury in the present case.  While verdicts of this

size may not be common in this jurisdiction, they are not unheard of.  The jury obviously considered the

differing relationships between the named plaintiffs and the deceased Terry Borum.  An award of

$400,000.00 total for the loss of a child and an award of $250,000.00 to each child of Terry Borum for

the loss of their parent was not unreasonable and the Court will not disturb the damages awarded by the

jury.

---

[3] *Grandstaff v. City of Borger*, 767 F.2d 161, 164 (5th Cir. 1983) (awarding $1,430,000 collectively, including an award of $200,000 to the decedent's father for loss of society and companionship and for his mental anguish); *Harris Cty. v. Nagle*, 349 S.W.3d 769 (Tex. App.—Houston, 14th Dist. 2011, pet. denied) (awarding $3,000,000 collectively in an excessive force case–$2.4 million to the decedent's mother for mental anguish and loss of companionship of her mentally ill, adult son and $600,000 to the son's estate); *Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594 (Tex. App.—Corpus Christi 2009, no pet.)(upholding a verdict of $47,500,000 to the family of a prisoner, including a $10 million dollar award to the decedent's mother.  The court noted it was not bound by previous awards as the facts in a case such as this one may give rise to a higher award, but noted that the defendant had cited a case in which each parent received $15 million dollars for the death of a child), *abrogated on other grounds by, Zorilla v. Aypco Const. II*, 469 S.W.3d 143, 155 (Tex. 2015).

Plaintiffs' MSJ Appx. 2687

Defendant has provided no support for its Motion for New Trial or Remittitur, and plaintiffs have cited to cases that are comparable or larger than the damages awarded in the present case. There is no evidence before the Court that would support defendant's assertion that the award was "so exaggerated as to indicate bias, prejudice, corruption, or improper motive."

## IV.  CONCLUSION

Defendant's Motion for Judgement as a Matter of Law (ECF No. 134) and Motion for New Trial or Remittitur (ECF No. 135) are DENIED.

IT IS SO ORDERED.

ENTERED this _____ day of July, 2016.


CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

Plaintiffs' MSJ Appx. 2688