McCollum/ Cardwell-422



Copy of OIG case to Litigation Support on 06.26.2013 by scm
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

McCollum/ Cardwell-423



ALARM *VT > 2* CCU-RM8 CARDWELL 4-AUG-2001 17:51:18 ALM VOL 10*
@25 MM/S  HR 99 VT > 2 ARR FULL PVC 27 NBP 104/83 (91) @ 17:49
SPO2 79 RATE 114 RR 124

ALARM SAVED *V BRADY* CCU-RM8 CARDWELL 4-AUG-2001 17:50:59 ALM VOL 10*
@25 MM/S  HR 99  V BRADY ARR FULL PVC 10 NBP 104/83 (91) @ 17:49
SPO2 85 RATE 121 RR 47

MANUAL SAVED CCU-RM8 CARDWELL 4-AUG-2001 17:50:47 ALM VOL 10* @25 MM/S
HR 91  ARR FULL PVC 8 NBP 77/56 (64) @ 17:47 SPO2 85 RATE 107 RR 108

MANUAL SAVED CCU-RM8 CARDWELL 4-AUG-2001 17:48:36 ALM VOL 10* @25 MM/S
HR 92  ARR FULL PVC 0 NBP 77/56 (64) @ 17:47 SPO2 90 RATE 62
RR 22

Copy of OMG Case 91 Litigation Support 281/776.24.301.370.com
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

McCollum/ Cardwell-424

NBP 104/83 (91) @ 17:49 SPO2 93 RATE 110 RR 109

MANUAL SAVED CCU-RM8 CARDWELL 4-AUG-2001 17:52:49 ALARM PAUSE
ALM VOL 10% @25 MM/S V FAIL HR 138 V TACH ARR FULL PVC 24
NBP 104/83 (91) @ 17:49 SPO2 94 RATE 109 RR 112

ALARM SAVED *V TACH* CCU-RM8 CARDWELL 4-AUG-2001 17:51:54 ALM VOL 10%
@25 MM/S HR 111 V TACH ARR FULL PVC 57 NBP 104/83 (91) @ 17:49
SPO2 81 RATE 95 RR 113

Compressions

27-164

ALARM *VT > 2* CCU-RM8 CARDWELL 4-AUG-2001 17:51:18 ALM VOL 10%
@25 MM/S HR 99 VT > 2 ARR FULL PVC 27 NBP 104/83 (91) @ 17:49
SPO2 79 RATE 114 RR 124

Compressions

25 MM/S
62

Copy of OIG case to Litigation Support on 06.26.2013 by scm
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



MANUAL SAVED CCU-RM8 CARDWELL 4-AUG-2001 17:58:06 ALM VOL 10% @25 MM/S
HR 0 VFIB/VTAC ARR FULL PVC 1 NBP 132/14 (51) @ 17:54
SPO2 CHECK PROBE RR 90

McCollum/ Cardwell-425

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

07/27/2001  09:21   9155482657                    WESTERN REGION TRANS                    PAGE  02

<div align="center">

Texas Department of Criminal Justice
**INSTITUTIONAL DIVISION**

## INTER-OFFICE COMMUNICATIONS

</div>

**To**  WARDEN TREON - ALLRED UNIT         **Date**   07-27-2001

**From**   SGT. L. SNODGRASS                **Subject**   OFFENDER CARDWELL
WESTERN REGION TRANSPORTATION                    DELIVERY INFORMATION

Warden Treon,

    As per our phone conversation, here is the information that you requested.

1. Offender Cardwell #1041651 was picked by our Officers at the Robertson Unit on 07-16-2001.
2. He was transported on Bluebird Bus #53443.  This bus is equipped with Air Conditioning, but according to our records was malfunctioning (inoperative) on that day.
3. Data from our official trip sheet (TN-28) reflects that we picked him up on the F.M. Robertson Unit somewhere between 0543 and 0558 hours, and delivered him to the James V. Allred Unit somewhere between the hours of 0852 and 092 hours.

    If you need any further information please feel free to contact us at any time.

Sgt. L. Snodgrass

Western Region Transportation

SO-4

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

28-1

JUL 27 2001 10:25                              9155482657       PAGE 02

McCollum vs Cardwell 4126

Texas Department of Criminal Justice
INSTITUTIONAL DIVISION

# Inter-Office Communications

To  Robert Treon, Senior Warden          Date    July 19, 2001

From   Richard Partridge, RMC          Subject   Temperature Survey

On July 18, 2001 at 4:00 P.M. Richard B. Partridge, Unit
Risk Management Coordinator went to 7 Building on the James
V. Allred Unit and conducted a temperature survey of the
Building.

The outside temperature reading was 102.4.
At the searchers desk 100.1.
G Pod "D space" 100.0.
G Pod Day Room near exit 97.7.
G Pod Day Room near outside air intake 101.1.
G Pod Cell 7-G-21B at bunk level, window closed, 97.6.
G Pod Cell 7-G-21B at bunk level, window open, 97.8.

Various times during the last 6 years I have conducted
temperature surveys of the temperatures in the offender
housing.  It has been my experience that even on days when
the outside temperature was 110 that the above temperatures
are consistent with my previous findings.  I have never seen
the temperature readings be any higher than 98.2 degrees in
the Day Room, 98.6 on 3rd Row Run, 98.5 inside any cells on
3rd Row at the sink area, 101 on the bed near outside window
when the window was left open, or 98.6 with window closed.
These previous high readings were taken in cells facing West
during the hottest time of the days 4-5 P.M.

Cell 7G-21 faces North so it would be some what cooler, or
not any hotter than the previous temperatures taken during
times of comparable temperatures of July 16, 2001.

If I used the highest temperature I have even taken in any
general population cell with the window open and on the bed
of 101 degrees and used the relative humidity of 25% which
is what was recorded at 4:00 P.M. by the James V. Allred
Unit "B" Tower Officer which records and broadcast the
apparent temperatures hourly any time the air temperature
exceeds 90 degrees.

Utilizing the above information in trying to approximate the
heat stress conditions in 7G-21 cell on July 16, 2001 at
4:00 P.M., and the TDCJ Heat and Humidity Matrix.

Assuming 101 degrees air temperature, 25 % relative
humidity, and utilizing the Heat and Humidity Matrix the
Apparent temperature would be 105 degrees.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

29-1

SO-4

Texas Department of Criminal Justice
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To   R. PARTRIDGE - RMC                        Date   7-16-01

From   B. Tower                        Subject   HOURLY HEAT & HUMIDITY LOG

|  | 10:00 | 11:00 | 12:00 | 13:00 | 14:00 | 15:00 | 16:00 | 17:00 | 18:00 |
|---|---|---|---|---|---|---|---|---|---|
| AIR TEMPERATURE | 94 | 99 | 102 | 106 | 108 | 109 | 110 | 109 | 108 |
| RELATIVE HUMIDITY | 44 | 39 | 37 | 33 | 31 | 29 | 25 | 24 | 24 |
| APPARENT TEMPERATURE | 101 | 110 | 110 | 118 | 123 | 123 | 123 | 118 | 118 |
| TIME TEMPERATURE IS TAKEN | 1000 | 1100 | 1200 | 1300 | 1400 | 1500 | 1600 | 1700 | 1800 |
|  | 83 | 83 | 83 | 82 | 87 | 82 | 82 | 82 | 8.T. |

HOURLY I ANNOUNCED OVER THE UNIT RADIO THE APPARENT TERMERATURE
EVERY TIME THE APPARENT TEMPERATURE WAS ABOVE 90 DEGREES.

STEWART                           Stewart
PRINTED NAME FIRST HALF           SIGNATURE FIRST HALF

Thompson
PRINTED NAME SECOND HALF          SIGNATURE SECOND HALF

CC:

GP CAPTAIN 1st shift

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

29-2

SO-4

## Texas Department of Criminal Justice
### INSTITUTIONAL DIVISION

## Inter-Office Communications

**To:**  Department Heads & Key Supervisors          **Date:**  2 May, 2001

**From:**  Richard Partridge – Risk Manager          **Subject:**  Temperature Monitoring
          James V. Allred Unit

In order to lessen the possibility of any heat related injuries the James V. Allred Unit has begun to monitor and log the temperature and humidity at "B" Tower on an hourly basis. The Picket Officer shall announce over the radio the apparent temperature (Heat Stress Index) on an hourly basis from 10 am to 6 pm when the apparent temperature reaches 90 degrees or greater during the summer months.

Supervisors shall monitor the radio and take the appropriate steps to protect their employee and offender workers as required.

See the attached Heat and Humidity Matrix and Preventive Measures for further information.

**SO- 4**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

29-3

It is the responsibility of the Texas Department of Criminal Justice (TDCJ) to provide a safe and healthful work environment for staff and offenders. Every reasonable effort must be made to prevent heat related injuries and illnesses in the workplace. As temperatures and heat indices rise, every effort must be made to notify supervisors and employees of changes that increase the risk of heat related injuries and illnesses.

TDCJ Risk Management has determined that the best way to accomplish the monitoring of temperature extremes in the workplace is to maintain Temperature and Humidity Logs on an hourly basis from 10 A.M. to 5 P.M..

The hourly Temperature and Humidity Log shall be maintained daily by 1st Shift "B Tower" Officer utilizing the electronic measurement device located in B-Tower. The completed logs shall be daily turned into the 1st Shift Captain who will make a file copy and turn the original into the Risk Management message box in the 1 Bldg. countroom

The Heat and Humidity Matrix (see attachment "A") shall be used to determine the "Apparent Temperature". The apparent temperature shall be used to determine the risk Of possible heat injury/illness.

At a minimum at least hourly the B Tower officer shall announce over the unit radio the current apparent temperature any time the apparent temperature exceeds 90 degrees.

All supervisors shall monitor the radio and take appropriate preventive measures to prevent heat related injuries for the staff and offenders.

<u>PREVENTIVE MEASURES</u>

HEAT EXHAUSTION:  <u>90</u> through <u>104</u> APPARANT TEMPERATURE
Staff to ensure adequacy of water intake, look for signs of exhaustion. Five (5) minute rest breaks every hour.

HEATSTROKE POSSIBLE:  <u>105</u> through <u>129</u> APPARNAT TEMPERATURE
Staff to promote high water intake, five (5) minute rest breaks every one-half (1/2) hour-lay down with feet up. Reduce work pace by one-third (1/3).

HEATSTROKE IMMINENT:  <u>130+</u> APPARANT TEMPERATURE
Secure outside work or reduce work pace by one-half (1/2) to two-thirds (2/3). Ten (10) minute breaks every one-half (1/2) hour-lay down, feet up. Insist on excessive water intake.

HEAT AND HUMIDITY:
At high temperatures, the human body normally cools itself through the evaporation of perspiration. But humidity interferes with this process. The Heat and Humidity Matrix from the National Weather Service, SHOWS how discomfort and health risks grow as heat and humidity increase.

29-4

Texas Department of Criminal Justice
INSTITUTIONAL DIVISION

# Inter-Office Communications

To  R. PARTRIDGE - RMC                        Date _____

From _____          Subject  HOURLY HEAT & HUMIDITY LOG

|                          | 10:00 | 11:00 | 12:00 | 13:00 | 14:00 | 15:00 | 16:00 | 17:00 | 18:00 |   |
|--------------------------|-------|-------|-------|-------|-------|-------|-------|-------|-------|---|
| AIR TEMPERATURE          |       |       |       |       |       |       |       |       |       |   |
| RELATIVE HUMIDITY        |       |       |       |       |       |       |       |       |       |   |
| APPARENT TEMPERATURE     |       |       |       |       |       |       |       |       |       |   |
| TIME TEMPERATURE IS TAKEN |       |       |       |       |       |       |       |       |       |   |

HOURLY I ANNOUNCED OVER THE UNIT RADIO THE APPARENT TERMERATURE
EVERY TIME THE APPARENT TEMPERATURE WAS ABOVE 90 DEGREES.

_____                    _____
PRINTED NAME FIRST HALF                        SIGNATURE FIRST HALF

_____                    _____
PRINTED NAME SECOND HALF                       SIGNATURE SECOND HALF

CC:

GP CAPTAIN 1st shift

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

29-5

HEAT AND HUMIDITY MATRIX

AIR TEMPERATURE
(Degrees Fahrenheit)

| | 70 | 75 | 80 | 85 | 90 | 95 | 100 | 105 | 110 | 115 | 120 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Relative Humidity: | | | | | Apparent Temperature | | | | | | |
| 0% | 64 | 69 | 73 | 78 | 83 | 87 | *91 | *95 | *99 | *103 | +107 |
| 10% | 65 | 70 | 75 | 80 | 85 | *90 | *95 | *100 | +105 | +111 | +116 |
| 20% | 66 | 72 | 77 | 82 | 87 | *93 | *99 | +105 | +112 | +120 | !130 |
| 30% | 67 | 73 | 78 | 84 | *90 | *96 | *104 | +113 | +123 | !135 | !148 |
| 40% | 68 | 74 | 79 | 86 | *93 | *101 | +110 | +123 | !137 | !151 | |
| 50% | 69 | 75 | 81 | 88 | *96 | +107 | +120 | !135 | !150 | | |
| 60% | 70 | 76 | 82 | *90 | *100 | +114 | !132 | !149 | | | |
| 70% | 70 | 77 | 85 | *93 | +106 | +124 | !144 | | | | |
| 80% | 71 | 78 | 86 | *97 | +113 | !136 | | | | | |
| 90% | 71 | 79 | 88 | *102 | +122 | | | | | | |
| 100% | 72 | 80 | *91 | +108 | | | | | | | |

* - Heat Exhaustion Possible

+ - Heatstroke Possible

! - Heatstroke Imminent

EXAMPLE OF HOW TO DETERMINE THE APPARENT TEMPERATURE READINGS:

AIR TEMPERATURE 100 DEGREES

HUMIDITY 50%

APPARENT TEMPERATURE  +120 DEGREES

SUPERVISORS WOULD KNOW THAT HEATSTROKE IS POSSIBLE AND TAKE
APPROPRIATE PREVENTIVE ACTION.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

29-6



**Weather Wise**

Heating Degree Day: A form of degree day used to estimate the required energy for heating. One heating day occurs for each degree the daily mean temperature is below 65 degrees Fahrenheit.

Brought to you by Skip McBride and



KFDX 3 NEWSCENTER

# No kidding

A treasury of information

## THEM VS. US
### Counting Chromosomes

1. Human — 46 chromosomes
2. Domestic dog — 78 chromosomes
3. House mouse — 40 chromosomes
4. Garden pea — 14 chromosomes
5. Fruit fly — 8 chromosomes
6. Ant — 2 chromosomes
7. Crayfish — 200 chromosomes
8. Garden fern — 1,260 chromosomes

*Source: World Features Syndicate*

# Correction



# AccuWeather® Forecast

5-City Forecast for Wichita Falls

| Tuesday | Wednesday | Thursday | Friday | Saturday |
|---------|-----------|----------|--------|----------|
| Another hot day with sunshine. | Sunny and hot. | Hot with blazing sun. | More stifling heat. | Sunny to partly cloudy; still hot. |
| High 104, Low 78 | High 100, Low 76 | High 100, Low 76 | High 102, Low 76 | High 102, Low 76 |
| Wind SE at 6-12 mph | Wind SE at 6-12 mph | Wind SSE at 6-12 mph | Wind SE at 5-10 mph | Wind SSE at 5-10 mph |

## Local Statistics

Statistics for Wichita Falls through 7 p.m. Monday

**Temperature**
High ....................................108
Low ......................................79
Normal high ..........................98
Normal low ...........................73
Last year's high ....................trace
Last year's low .....................75
Record high ..........109 in 2000
Record low ............65 in 1973
**Precipitation**
Total Monday .........................0.00"
Total month to date ...............trace
Normal month to date ...........0.96"
Total year to date ................10.46"
Normal year to date .............16.29"
Last year to date ..................12.84"

## Sun

| | Sunrise | Sunset |
|---|---------|--------|
| Tuesday: | 6:33 a.m. | 8:45 p.m. |
| Wednesday: | 6:36 a.m. | 8:45 p.m. |

## Moon

| | Moonrise | Moonset |
|---|----------|---------|
| Tuesday: | 3:25 a.m. | 5:50 p.m. |
| Wednesday: | 4:13 a.m. | 6:57 p.m. |

New    First    Full    Last

July 20   July 27   Aug 4   Aug 12

## Pollen

Pollen ..........................24, Moderate
Mold .............................4, Low

**Pollen Scale:** Low: 0-15; Moderate: 16-90; High: 91-1500; Very High: 1501+
**Mold Scale:** Low: 0-900; Moderate: 901-2500; High: 2501-25000; Very High: 25001+
**Source:** Dr. Mac Fitzsimmons of Wichita Falls, TX

## UV Index

| | Tuesday | Wednesday |
|---|---------|-----------|
| 9 a.m. | ...5 | ...5 |
| Noon | ...9 | ...10 |
| 3 p.m. | ...5 | ...5 |

1-3, Low; 4-5, Minimal; 6-7, Moderate; 8-9, High; 10+, Very High
Higher index numbers represent higher eye and skin exposure to UV.

## Regional Forecast



**Monday's Texas Extremes**
Low: 65 in Dalhart
High: 108 in Wichita Falls

Shown is Tuesday weather. Temperatures are Tuesday highs and Tuesday night's lows.

Amarillo 09/67
Wichita Falls 104/78
Lubbock 102/70
Abilene 100/76
Dallas 100/78
Longview 96/74
El Paso 96/74
Midland 101/74
San Angelo 102/74
Austin 97/75
Houston 94/74
San Antonio 98/76
Laredo 100/76
Corpus Christi 95/76
Brownsville 96/78



## Across Texas

| City | Monday | | |
|------|--------|---|---|
| | Hi Lo W | | |
| Abilene | 104 80 pc | | |
| Amarillo | 103 75 pc | | |
| Austin | 100 77 pc | | |
| Brownsville | 96 77 pc | | |
| Childress | 105 105 s | | |
| Corpus Christi | 94 77 pc | | |
| Dallas | | | |
| El Paso | 100 81 pc | | |

All maps, forecasts and data provided by

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

**Wayne Scott**
**Executive Director**

P.O. Box 99 ● Huntsville, TX  77342-0099

Gary Johnson
Director
Institutional Division

Administrative Incident Review

Incident Number: I-05831-07-01

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
JAMES V. ALLRED UNIT
July 27, 2001

TO:    Ms. Janie Cockrell
       Deputy Director of Operations

THRU:   Mr. John Gilbert
       Region V Director

FROM:  Mr. Robert R. Treon, Senior Warden
       James V. Allred Unit

SUBJECT: Heat Stroke
           I-05831-07-01

PERSONS
INVOLVED: Offender Cardwell, John #1041651 is a thirty-nine year old White male who is currently serving a nine year sentence for DWI out of Williamson County

SUMMARY:  On 07-16-01 at approximately 1820 hours, Offender Cardwell, John TDCJ# 10441651 was transported via ambulance to the 11th Street Campus of United Regional Hospital due to an elevated temperature.  Upon arrival, Offender Cardwell was listed in critical condition.  Senior Warden Robert Treon arrived at the hospital at approximately 1900 hours and was advised Offender Cardwell was suffering from elevated body temperature as well as cardiac and liver problems.  At that time, no clear diagnosis for Offender Cardwell's condition was available.  On 07-18-01 at approximately 1100 hours, the attending physician at United Regional Hospital informed Warden Treon Offender Cardwell's condition was the result of heat stroke.  At that time, EAC was notified of the situation and an incident number was assigned.

An ongoing investigation into the incident shows Offender Cardwell arrived at the Allred Unit on 07-16-01 at approximately 0830 hours on a routine chain transport.  All offenders arriving on the chain were held in the chain receiving area between Ten and Twelve buildings.  At approximately 0930 hours, Offender Cardwell and the rest of the chain were escorted to Seven gym for their initial UCC hearings.  At approximately 1045 hours all chain offenders were escorted to the chow hall and fed the noon meal.  They were then taken to supply where they picked up their mattresses enroute to the Three building multipurpose room where they were held until they were housed at around 1530 hours.  Offender Cardwell was escorted to Seven Building G Pod.  Up to this point Offender Cardwell had not complained of any problems and appeared to be normal.  However, after arriving in 7G Pod, Offender Cardwell stepped into a shower stall and began to act somewhat irrationally.  According to officers and offenders accounts of the incident Offender Cardwell appeared to be frightened and concerned about being in General Population.  The rover assigned to 7G Pod placed Offender

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-1

Page 2

Cardwell in his cell at which time she noted his behavior was growing more erratic and that he was hot to the touch. The officer requested to see a ranking supervisor regarding Offender Cardwell. Prior to the arrival of a supervisor, Offender Cardwell was found unresponsive in his cell. Medical staff was notified and Offender Cardwell was transported to the unit infirmary

An examination of the Three Building multipurpose room revealed the windows were open for ventilation and air was being circulated. There was also water available. All officers involved had received training regarding heat related illness in spring of this year. Offender Cardwell currently remains in critical condition. Investigation into the incident is ongoing.

EMPLOYEE
NEGLIGENCE: Under investigation.

ATTACHMENTS: TGN-93, Teletype, IOC's, Heat-related training records

WARDEN'S
COMMENTS:

_____        _____
ROBERT R. TREON, SENIOR WARDEN               DATE   7-27-01
JAMES V. ALLRED UNIT
TEXAS DEPARTMENT OF CRIMINAL JUSTICE
INSTITUTIONAL DIVISION

REGIONAL
DIRECTOR'S
COMMENTS:

_____        _____
MR. JOHN GILBERT                             DATE
TEXAS DEPARTMENT OF CRIMINAL JUSTICE
INSTITUTIONAL DIVISION

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-2

McCollum v Cardwell 4435

Texas Department of Criminal Justice
## INSTITUTIONAL DIVISION
# INCIDENT REPORT
**EMERGENCY ACTION CENTER**

C O N F I D E N T I A L
**FOR OFFICIAL USE ONLY**

EAC # ___A-1941-07-01___
CROSS
REF # ___n/a___

☐ HOMICIDE
☐ STABBING
☐ STAFF - ASSAULT
☐ GANG
☐ RAPE

| TYPE OF INCIDENT | UNIT CODE | DATE / TIME REPORTED | REPORTED BY |
|---|---|---|---|
| EMERGENCY TRANSPORT | JA | 7-17-01/0755 | LT. L. BERGER |

| DATE / TIME OCCURED | SPECIFIC LOCATION | AS | AG | GANG RELATED YES | NO | GANG IDENTIFICATION |
|---|---|---|---|---|---|---|
| 7-16-01/1820 HOURS | MEDICAL | | | | X | |

**MOTIVE:** _____

**SHIFT:** 1ST SHIFT 1ST CARD          ## EMPLOYEE INFO.

NAME _____ SSN _____ RANK _____ RACE _____ SEX _____ AGE _____
      last name / first name / mi.

**DISPOSITION:** _____

## INMATE INFO.

| NAME | TDCJ # | RACE SEX | AGE | CUSTODY CODE | INJURIES | A - V |
|---|---|---|---|---|---|---|
| CARDWELL, JOHN | #1041651 | W/M | | MI | UNKNOWN | n/a |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## WEAPON INFO.

WEAPON: DESCRIBE IN DETAIL: (TYPE) _____
_____
_____

CUSTODY CODE _____          ## DEATH INFO.

NAME OF INMATE _____ TDCJ # _____ UNIT _____
                  last name / first name / mi.

RACE _____ SEX _____ AGE _____ DIED AT OR IN ROUTE TO _____

CAUSE OF DEATH _____ WHO DECLARED DEATH _____

DISPOSITION OF BODY _____ AUTOPSY _____ YES _____ NO

NEXT OF KIN NTFD YES ☐ NO ☐ BY: _____

## LOCAL LAW ENFORCEMENT

TIME / DATE NOTIFIED _____ AGENCY _____

WILL RESPOND _____ YES _____ NO-NAME OF INVESTIGATOR _____

AGENCY CASE # _____ REMARKS _____      30~3

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

C O N F I D E N T I A L

```
                                                                      A-1941-07-01
*****************************************************************************
*** REQUESTOR: ROG3470 - OGLESBY, ROBERT        ALLRED UNIT              ***
*****************************************************************************
***                 S Y S M   O U T B A S K E T   P R I N T             ***

MESSAGE ID: 610707      DATE: 07/17/01  TIME: 07:55am  PRIORITY: 000

SUBJECT:   OFFENDER CARDWELL, 1041651


ON 7-16-01, AT APPROXIMATELY 1750 HOURS, I, LT. L. BERGER, WAS
NOTIFIED BY SGT. F. MARCH THAT SHE HAD A UNRESPONSIVE OFFENDER ON 7
BUILDING. SHE STATED THAT MEDICAL ADVISED THAT THEY NEEDED TO PLACE HIM
UPON A STRETCHER AND BRING HIM TO MEDICAL. I LEFT THE COUNT ROOM AND
WALKED TO MEDICAL. WHEN I ARRIVED AT MEDICAL, MS. NEWMAN, LVN, WALKED
WITH ME TO GET THE STRETCHER. I RETRIEVED THE STRETCHER AND WALKED TOWARD
THE FRONT OF MEDICAL. OFFICER MERKLIN WAS WALKING UP AT THIS TIME AND
RESPONDED WITH LT. BERGER TO 7 BUILDING. AT 7 BUILDING, THE OFFENDER,
CARDWELL, JOHN, TDCJ #1041651, WAS ASSISTED TO THE ROLLING STRETCHER.
CARDWELL WAS UNRESPONSIVE AND WAS ON THE GREEN STRETCHER WHICH WAS
BREAKING. THE OFFENDER WAS WHEELED TO MEDICAL AND TREATED WITH ICE
PACKS, IV AND OXYGEN. THE OFFENDER WAS IN THE ER AT 1800 AND HIS TEMP
WAS 106.9, CAPTAIN R. OGLESBY WAS THEN NOTIFIED BY LT. BERGER.
THE OFFENDER WAS TRANSPORTED BY AMBULANCE TO 11TH STREET
CAMPUS OF UNITED REGIONAL HOSPITAL. THE OFFENDER LEFT THE UNIT AT
1820. CAPTAIN OGLESBY THEN NOTIFIED THE DUTY WARDEN, (MAJOR BOWMAN)
AND WARDEN TREON. THE OFFENDER WAS PLACED IN CCU #8 IN CRITICAL
CONDITION. HE WAS EVALUATED WITH ELEVATED TEMPERATURE.

AUTHORITY: LT. L. BERGER/DWD

Sent to:   JAIOC              (list)              (to)
```

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-4

McCollum v Cardwell 4437

```
*************************************************************************
*** REQUESTOR: JAUNT22 - RECORDS, INMATE      ALLRED UNIT          ***
*************************************************************************
***              S Y S M   O U T B A S K E T   P R I N T          ***
```

MESSAGE ID: 626999       DATE: 07/18/01   TIME: 02:41pm  PRIORITY: 000

SUBJECT:   HEAT STROKE

TO:    EMERGENCY ACTION CENTER

FROM:  JAMES V. ALLRED UNIT

RE: I-05831-07-01

PERSON INVOLVED: OFFENDER CARDWELL, JOHN #1041651 IS A THIRTY-NINE (39) YEAR OLD WHITE MALE WHO IS CURRENTLY SERVING A NINE (9) YEAR SENTENCE FOR DWI OUT OF WILLIAMSON COUNTY.

ON JULY 16, 2001 AT APPROXIMATELY 1735 HOURS, OFFICER F. REDDER WAS PERFORMING A ROSTER COUNT ON 7 BUILDING G-POD 1 SECTION 3 ROW WHEN HE APPROACHED 21 CELL AND OBSERVED OFFENDER CARDWELL ON THE CELL FLOOR UNRESPONSIVE. OFFICER REDDER CALLED FOR MEDICAL AND A SUPERVISOR. OFFENDER CARDWELL WAS TAKEN TO THE UNIT INFIRMARY AND AN AMBULANCE WAS CALLED. AT APPROXIMATELY 1820 HOURS, OFFENDER CARDWELL WAS TRANSPORTED TO UNITED REGIONAL MEDICAL CENTER (URMC) 11TH STREET CAMPUS FOR ELEVATED TEMPERATURE AND AT THAT TIME MEDICAL WAS UNABLE TO GIVE A DIAGNOSES WITHOUT FURTHER TEST. ON JULY 18, 2001 AT APPROXIMATELY 1100 HOURS, MEDICAL PERSONNEL AT URMC NOTIFIED SENIOR WARDEN R. TREON THAT OFFENDER CARDWELL CONDITION WAS THE RESULT OF A HEAT STROKE. IT SHOULD BE NOTED THAT ON JULY 16, 2001 AT APPROXIMATELY 1800 HOURS THE TEMPERATURE WAS 108 DEGREES WITH THE HEAT INDEX OF 118 DEGREES.

OFFENDER CARDWELL'S CONDITION AT THIS TIME IS CRITICAL WITH A POOR PROGNOSIS.


AUTHORITY: SENIOR WARDEN R. TREON

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-5

```
***********************************************************************
*** REQUESTOR: JAUOF22 - OFFICE, USE OF FORCE  ALLRED UNIT         ***
***********************************************************************
***              S Y S M   I N B A S K E T   P R I N T            ***
MESSAGE ID: 610600     DATE: 07/17/01  TIME: 07:34am  PRIORITY: 000

TO:       JAUOF22 - OFFICE, USE OF FORCE
          USE OF FORCE OFFICE/CLERK
          ALLRED UNIT
          2101 FM 369 N
          IOWA PARK, TEXAS 76367


FROM:     ROG3470 - OGLESBY, ROBERT
          CAPTAIN/CORRECTIONAL OFFICERS
          ALLRED UNIT
          2101 FM 369 N
          IOWA PARK, TEXAS 76367


SUBJECT:  OFFENDER CARDWELL, 1041651


ON 7-16-01, AT APPROXIMATELY 1800, OFFENDER CARDWELL, JOHN, TDCJ
#1041651, WAS TRANSPORTED VIA AMBULANCE TO THE 11TH STREET CAMPUS OF
UNITED REGIONAL HOSPITAL DUE TO AN ELEVATED TEMPERATURE. OFFENDER IS
LISTED AS CRITICAL IN CCU #8.

Sent to:   JAIOC              (list)                    (to)
```

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-6

McCollum/Cardwell 4439

**SPECIALIZED TRAINING RECORD**

| LAST | FIRST | MI | S.S.# | EMPLOYMENT DATE | UNIT |
|---|---|---|---|---|---|
| Redden | Frederick | L | 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 | 06-01-95 | Ja |

| DATE | INSTRUCTOR | COURSE TITLE | EVALUATION Sat. | EVALUATION UnSat. |
|---|---|---|---|---|
| 9-28-00 | Cpt Gresham | Chemical Agent Instructor 38 Questions | | |
| 10-01/10-00 | Lt. Ragsdale | Use of Force Plan | | |
| 10-23/11-3-00 | Sgt Sowler | Positional Asphyxiation | | |
| 7-19-00 | Cpt. Levy | COP Chemical Agents | | |
| 03-01 | Sgt Sowler | Video Camera Training | | |
| 4-01 | Sgt Fowler | Sexual Harassment - PD 13 | | |
| 4-16-01 | Hewes | Heat Related Issues | | |

30~7

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

## SPECIALIZED TRAINING RECORD

| LAST | FIRST | MI | S.S.# | EMPLOYMENT DATE | UNIT |
|------|-------|----|-------|-----------------|------|
| Stewart | Retha | F | 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 | | 3A |

| DATE | INSTRUCTOR | COURSE TITLE | EVALUATION Sat. | EVALUATION UnSat. |
|------|-----------|--------------|------|--------|
| 10/23-26/00 | Sgt. Ward | Use of Force / Asphyxia | | |
| 11-11-00 | Sgt. Ward | Video Camera Training | | |
| 11-27-00 | Sgt. Taylor | Proper Use of Chemicals | | |
| 12/8-00 | Cpt. Grey | OC Chemical Agent | | |
| 12/15/00 | Sgt. Ward | Use of Force / Types of Chemical Agents | | |
| 5-2001 | Sgt. Grant | Heat Related Issues | | |
| 5-2-01 | Lt. Hembree | Video Camera Training | | |

Copy of OIG case in Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-8

**Texas Department of Criminal Justice**
## INSTITUTIONAL DIVISION

## Inter-Office Communications

**To:** ___Senior Warden Treon_____   **Date:** ___18 July, 2001_____

**From:** _Richard Partridge – Risk Manager_   **Subject:** _Past Heat Training_
        James V. Allred Unit

Attached are copies of heat training conducted by the Risk Management office. A breakdown of the attachments is as follows:

- Attachment 1 dated 2 April, 2001 is the heat index training and worksheets for the B tower officer.

- Attachment 2 dated 20 April, 2001 is the mandatory heat training required by the TDCJ Risk Manager for all offenders and employees.

- Attachment 3 dated 25 April, 2001 is part of the May 2001 CDSO training pertaining to heat stress.

- Attachment 4 dated 2 May, 2001 is the heat index training and worksheets for the B tower officer.

- Attachment 5 dated June, 2001 is part of the June 2001 CDSO training pertaining to heat stroke.

- Attachment 6 dated 18 June, 2001 is part of the July 2001 CDSO training pertaining to heat exhaustion.

**SO- 4**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-9

*April*
*Monthly*

## Texas Department of Criminal Justice
## INSTITUTIONAL DIVISION

## Inter-Office Communications

To:  See Distribution                           Date:   02 April, 2001

From:  Richard Partridge – Risk Manager        Subject:  Monthly CDSO Safety Training
        James V. Allred Unit

The Texas Department of Criminal Justice Occupational Safety & Health Manual policy numbers 02-B-2 and 02-B-3 require initial and monthly safety training for all TDCJ employees and offenders. This training is to be given by the employees/offenders supervisors and records of this training are to be kept in the employees/offenders workplace. A record of this training is to be furnished to the Unit Risk Manager. The monthly safety training sessions shall be either five minutes per day, twenty minutes per week, or one hour per month.

These reports must be into the Risk Management Office by the **25th of April**. Department heads must attach a roster to the monthly training verification IOC, which will show the number of employees/offenders you are accountable for, and the number who have received training. Offender reports will be accounted for separately from employees. Any employee/offender who did not receive monthly safety training must be justified as to why he did not receive the required training.

Attached is the proposed safety training topics for the month  *APRIL*

1. Severe Weather                    2. Disaster Plans
3. Heat Stress                       4. Infectious Disease Control

If you have any questions concerning any of the above please feel free to contact Mr. Partridge – Risk Manager at ext. 206 or come by the office in building 2, the 3 building gymnasium.

cc:

| | | | |
|---|---|---|---|
| Security GP Major Bowman | Security Ad-Seg Lt. 2/1 | Food Service Captain | Courtroom GP/Inmate Records |
| Security Ad-Seg Major Bright | Security Ad-Seg Lt. 1/2 | Maintenance | Administration Ad-Seg |
| Security HS Major Weston | Security Ad-Seg Lt. 2/2 | Medical | Laundry |
| Security GP Captain 1 Card | Security HS Lt. 1/1 | Supply/Property | Human Resources |
| Security GP Captain 2 Card | Security HS Lt. 2/1 | Chaplains | |
| Security AS Captain 1 Card | Security HS Lt. 1/2 | Mail Room | |
| Security HS Captain 1 Card | Security HS Lt. 2/2 | Counsel Substitute | |
| Security HS Captain 2 Card | Disciplinary Captain | Education/Vocation | |
| Security GP Lt. 1/1 | Field Sergeant | Recreation /Craft Shop | |
| Security GP Lt. 2/1 | Internal Affairs | Kennel/Stock | |
| Security GP Lt. 1/2 | Grievance | Back Dock | |
| Security GP Lt. 2/2 | Law Library | Community Squad | |
| Security Ad-Seg Lt. 1/1 | Compliance/Gang Intelligence | Commissary A, B, HS | |
| | Parole | Administration High Security | |

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-10



# HEAT AND HUMIDITY

| Relative Humidity | AIR TEMPERATURE (Degrees Fahrenheit) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 70 | 75 | 80 | 85 | 90 | 95 | 100 | 105 | 110 | 115 | 120 |
| | Apparent Temperature | | | | | | | | | | |
| 0% | 64 | 69 | 73 | 78 | 83 | 87 | *91 | *95 | *99 | *103 | ÷107 |
| 10% | 65 | 70 | 75 | 80 | 85 | *90 | *95 | *100 | ÷105 | ÷111 | ÷116 |
| 20% | 66 | 72 | 77 | 82 | 87 | *93 | *99 | ÷105 | ÷112 | ÷120 | $130 |
| 30% | 67 | 73 | 78 | 84 | *90 | *96 | ÷104 | ÷113 | ÷123 | $135 | $148 |
| 40% | 68 | 74 | 79 | 86 | *93 | ÷101 | ÷110 | ÷123 | $137 | $151 | |
| 50% | 69 | 75 | 81 | 88 | *96 | ÷107 | ÷120 | $135 | $150 | | |
| 60% | 70 | 76 | 82 | *90 | ÷100 | ÷114 | $132 | $149 | | | |
| 70% | 70 | 77 | 85 | *93 | ÷106 | ÷124 | $144 | | | | |
| 80% | 71 | 78 | 86 | *97 | ÷113 | $136 | $ Heatstroke imminent | | | | |
| 90% | 71 | 79 | 88 | *102 | ÷122 | ÷ Heatstroke possible | | | | | |
| 100% | 72 | 80 | *91 | ÷108 | * Heat exhaustion possible | | | | | | |

Heat exhaustion: Staff to insure adequacy of water intake, look for signs of exhaustion. 5 minute rest break every hour.

Heatstroke possible: Staff to promote high water intake, 5 minute rest break every ½ hour-lay down, feet up. Reduce work by 1/3.

Heatstroke imminent: Secure outside work or reduce work pace by ½ to 2/3. 10 minute break every ½ hour-lay down, feet up. Insist on excessive water intake.

Heat and Humidity: At high temperatures, the human body normally cools itself through the evaporation of perspiration. But humidity interferes with this process. The table above, from the National Weather Service, shows how discomfort and health risks grow as heat and humidity increase. Remember: Apparent temperatures may run 15 to 30 degress higher in urban areas with their vast expanses of concrete and asphalt.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-11

**Texas Department of Criminal Justice**
## INSTITUTIONAL DIVISION

## Inter-Office Communications

To:   Department Heads /Key Supervisors            Date:   20 April, 2001

From:  Richard Partridge – Risk Manager            Subject:  Required Heat Training
       James V. Allred Unit

Summer time is upon us and so are heat-related injuries. To help minimize this danger the Region V Risk Manager has required that all staff and offenders do training on heat related injuries. This training is due in to the Risk Management Office **no later than** the 13th of May. Attached are several examples of heat-related training, and policies, you may use. The Risk Management Office also has many more examples of heat related training and a short videotape created by Ms. Tucker on heat related injuries.

Please note on your training the number of staff and offenders assigned and the number trained. Training totals must be submitted to the Region V Risk Manager and your assistance is appreciated. This training does not supercede the regular monthly training. Please mark the training documents clearly as **Hot Weather Training** to ensure your department receives proper credit.

If you wish to access our training files, use the heat training tape, or have any questions concerning this required training, please contact the Risk Management Office at ext. 206.

cc:

| | | |
|---|---|---|
| GP Major Bowman | Security AS Lt. 2/2 | Supply/Property |
| AS Major Bright | Security HS Lt. 1/1 | Chaplains |
| HS Major Weston | Security HS Lt. 2/1 | Mail Room |
| Security GP Captain 1 Card | Security HS Lt. 1/2 | Counsel Substitute |
| Security GP Captain 2 Card | Security HS Lt. 2/2 | Education/Vocation |
| Security AS Captain 1 Card | Disciplinary Captain | Recreation Coach |
| Security AS Captain 2 Card | Field Sergeant | Craft Shop Supervisor |
| Security HS Captain 1 Card | Internal Affairs | Kennel/Stock |
| Security HS Captain 2 Card | Grievance | Back Dock |
| Security GP Lt. 1/1 | Law Library | Community Squad |
| Security GP Lt. 2/1 | Compliance | Commissary |
| Security GP Lt. 1/2 | Gang Intelligence | Administration High Security |
| Security GP Lt. 2/2 | Parole | Courtroom GP/Inmate Records |
| Security AS Lt. 1/1 | Food Service Captain | Administration Ad-Seg |
| Security AS Lt. 2/1 | Maintenance | Laundry |
| Security AS Lt. 1/2 | Medical | Human Resources |

**SO- 4**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-12

```
*  ***************************************************************
*** REQUESTOR: EME5892 - METZGER, ERIC B      ALLRED UNIT       ***
*  ***************************************************************
***           S Y S M   I N B A S K E T   P R I N T            ***

MESSAGE ID: 960379T     DATE: 04/17/01  TIME: 12:46pm  PRIORITY: 000

TO:        EME5892 - METZGER, ERIC B
           RISK MANAGEMENT ALTERNATE
           ALLRED UNIT
           2101 FM 369 N
           IOWA PARK, TEXAS 76367


FROM:      JAUNT01 - FOLMAR, DEEDRA
           ADMIN TECH II, WARDEN SEC'Y
           ALLRED UNIT
           2101 FM 369 N
           IOWA PARK, TEXAS 76367


SUBJECT:   HEAT RELATED ILLNESSES

*** Original Author:  HQMD001 - SCOTT, ANDREA; 04/17/01 12:24pm

TO ALL UNIT WARDENS & SECURITY OPERATIONS PERSONNEL

DURING THE SUMMER MONTHS THE INCIDENTS OF HEAT-RELATED ILLNESSES RISE
DRAMATICALLY.  DURING PRE-SERVICE TRAINING MANY OF YOU WERE INTRODUCED
TO HEAT EMERGENCIES AND INSTRUCTED ON HOW TO RECOGNIZE SIGNS AND
SYMPTOMS OF THESE ILLNESSES AND TO CORRECTLY DESCRIBE WHAT YOU SEE.
SECURITY STAFF ARE WITH OFFENDERS EVERY DAY AND IF YOU SEE SIGNS THAT
SUGGEST SOMEONE MIGHT BE ILL, IT IS IMPORTANT FOR YOU TO LET THE
MEDICAL STAFF KNOW WHAT YOU HAVE OBSERVED:

HEAT CRAMPS.
HEAT CRAMPS ARE MUSCULAR SPASMS DUE TO LOSS OF SALT WITH PROFUSE
SWEATING.  THESE CRAMPS MAY BE SPASMODIC IN THE ABDOMEN, LEGS OR ARMS.
HAVE THE PERSON COOL OFF AND DRINK WATER OR LEMONADE WITH ONE-HALF
TEASPOON OF SALT ADDED TO A GLASS.  GATORADE, IF AVAILABLE, IS ALSO
GOOD.

HEAT EXHAUSTION.
THIS IS CHARACTERIZED BY FATIGUE, WEAKNESS, DIZZINESS, HEADACHE, NAUSEA
AND SOMETIMES ABDOMINAL CRAMPING OR THE VICTIM MAY SUDDENLY COLLAPSE.
 HEAT EXHAUSTION IS A REACTION TO HEAT, WITH LOSS OF BODY FLUIDS DUE TO
PERSPIRATION AND AN INADEQUATE INTAKE OF FLUIDS.  AN AFFECTED PERSON
PERSPIRES, THE SKIN IS COOL AND WET.  TREATMENT CONSISTS OF PLACING THE
PERSON IN THE SHADE WITH FEET ELEVATED (IF DIZZY OR FAINT).  APPLY
COOL, WET CLOTHS AND FAN THE VICTIM.  GIVE WATER IN SMALL AMOUNTS.
```

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-13

HEAT STROKE.
THIS IS A LIFE-THREATENING MEDICAL EMERGENCY.  ONE-HUNDRED PERCENT OF
AFFECTED PERSONS DIE IF NOT TREATED, AND 50% DIE EVEN WHEN TREATED,
COMBINED WITH STRENUOUS ACTIVITY OR EXERCISE, THE SKIN IS HOT AND DRY,
THE SWEATING MECHANISM IS NOT WORKING.  HEAT STROKE VICTIMS MAY
COLLAPSE AND RAPIDLY PROGRESS TO A COMA OR DEATH IF NOT TREATED.
     -- COOL THE PERSON AT ONCE.  GET HIM/HER OUT OF THE SUN.
     --- SPONGE OFF OR APPLY COLD PACKS TO THE SIDES OF ATHE BODY
     --- GET MEDICAL HELP QUICKLY]]]

AUTH:  LANNETTE LINTHICUM, M.D.
       DIVISION DIRECTOR FOR HEALTH SERVICES

COPY:  GARY JOHNSON
       JANIE COCKRELL
       TOM BAKER

*** Comments From: JAUNT01 - FOLMAR, DEEDRA; 04/17/01 12:46pm

Sent to:    JAUNT                   (list)                         (to)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-14

# EXERCISE IN THE HEAT

Fluid Hydration

## JUST A FEW HELPFUL DEFINITIONS:

Heat Stress is the sum of the metabolic and environmental heat loads. The total thermal load is related to the exercise intensity (metabolic load), the environmental temperature, and the evaporative potential of the environment.

Heat Strain is the bodily effect of heat stress, i.e., the relative elevation of body core temperature, average skin temperature, and heart rate over that occurring in a cool environment.

Heat Exhaustion is the fatigue that develops during exercise in the heat. This fatigue may be caused by excess body heat, this occurs when the rate of heat loss from the body is not enough to balance the body's rate of heat production and/or gain from the environment. Heat exhaustion may also be caused by dehydration, which can lead to an inability to maintain adequate blood flow to the contracting skeletal muscles.

Heat Stroke is a potentially fatal disorder that occasionally follows heat exhaustion. It is characterized by a lack of consciousness (coma) following exertion and by clinical symptoms of damage to the central nervous system, liver, and kidney.

Information taken from the 1st World Conference on Heat Stress: Physical Exertion and Environment, held in Sydney, Australia, April 27-May 1, 1987, which was then accepted by the American College of Sports Medicine.

## HOW CAN HEAT-RELATED ILLNESSES BE PREVENTED?

1. **Education.** It is important to understand that the heat produced during exercise is not easily dissipated from the body in a hot and/or humid environment. Exercise intensity should be moderated in the heat.

2. **Clothing.** Clothing adds insulation to the body and reduces the effective surface area for heat transfer. It is important to minimize clothing to provide an optimal skin surface area from which evaporation can occur. Clothing worn should be light colored and reflect the sunlight.

3. **Hydration.** Progressive dehydration reduces sweating and blood flow to the skin and leads to excessive body heating. It is essential to keep well hydrated before, during, and following exercise in the heat

4. **Fitness.** Physical training and heat acclimation can expand blood volume and provide a more sensitive heat dissipation response to an increase in body core temperature. The majority of heat illness victims are novice runners, the elderly, and those with circulatory or respiratory disorders. These are people who have become unfit by choice or due to an inability to remain active. People at risk should avoid extremes of heat or activity

Copy of OIG case to Litigation Support on 06.26.2013by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

more.....                30-15

# HERE ARE THE BASICS

*Water is essential for the body. It plays a key role in all activities by maintaining our blood volume, this is necessary for cardiovascular function and for regulating body temperature.

*On average, the body uses more than 2 liters of water per day. Increased losses from environmental heat and from exercise can rapidly increase these minimal needs.

*In hot weather, the only way the body rids itself of the heat load is by evaporation of sweat. While a high rate of evaporation cools the body, it also removes water and sodium from the body. By doing so, blood volume is lowered as is the amount of blood that the heart can deliver with each beat. Although the body can partially compensate for dehydration, athletic performance will decline as the degree of dehydration increases.

*The most important point about hydration during exercise is that athletes cannot depend upon the sensation of thirst to drive drinking either during or after exercise because the water retention and sodium dilution that occur in the plasma remove the thirst drive.

* Humans have a notoriously poor ability to rehydrate after becoming dehydrated. This is known as involuntary dehydration because of the prolonged maintenance of a partially dehydrated state despite voluntary and unrestricted fluid intake. It appears that humans lack the capacity to take in and retain fluids at the same rate that fluids are lost as sweat.

*Although it might seem inappropriate to consider training as a method to prevent the ill effects of dehydration, several adaptations that occur with increased physical fitness help prevent dehydration problems.

*It should be obvious that the ill effects of dehydration will be postponed if one is well hydrated prior to exercise. The principles concerning prehydration are the same as with rehydration. A person who drinks only water prior to exercise will dilute the blood and will stimulate a rapid increase in urine output.

*Plain water is absorbed from the gut; and can lead to blood dilution removing the salt-dependent portion of the thirst drive, and stimulates urine production. If small amounts of sodium are taken with the rehydration drink, the salt-dependent thirst drive will be maintained for a longer period, and urine production will be delayed, providing for better rehydration.

*Body weight assessments are useful techniques for ensuring that fluids lost during exercise are replaced on a regular basis. Athletes weigh in ( w/o clothes daily before and after exercise. Every pound of weight lost should be replaced by drinking 500 ml (16 oz) of fluid. Training should be reduced if body weight has not returned to within 1 or 2 lb of the previous day's weight.

more.....

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-16

.*. REMEMBER THAT OFFENDER FANS SHOULD NOT BE CONFISCATED DUE TO
PROPERTY RESTRICTION DURING THIS TIME.  FANS SHOULD ONLY BE
CONFISCATED IF THEY ARE CONSIDERED CONTRABAND (I.E., IF THEY HAVE
BEEN ALTERED).

YOUR ATTENTION TO THIS MATTER IS GREATLY APPRECIATED.  PLEASE BRING ANY
QUESTIONS OR CONCERNS TO THE ATTENTION OF YOUR REGIONAL DIRECTOR AT
THE NEXT REGIONAL WARDEN'S MEETING.

AUTHORITY:
JANIE COCKRELL
DEPUTY DIRECTOR FOR SECURITY

NATHANIEL QUARTERMAN
DEPUTY DIRECTOR FOR
STATE JAIL DIVISION

*** Comments From: JAUNT01 - FOLMAR, DEEDRA; 04/19/01 07:26am

Sent to:      JAUNT              (list)                        (to)
              JAWAR04            MOONEYHAM, JAMES D.            (to)
              JAWAR15            WATHEN, RICHARD E.             (to)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-17

# EXERCISE IN THE HEAT

**Fluid Hydration**

*JUST A FEW HELPFUL DEFINITIONS:*

**Heat Stress** is the sum of the metabolic and environmental heat loads. The total thermal load is related to the exercise intensity (metabolic load), the environmental temperature, and the evaporative potential of the environment.

**Heat Strain** is the bodily effect of heat stress, i.e., the relative elevation of body core temperature, average skin temperature, and heart rate over that occurring in a cool environment.

**Heat Exhaustion** is the fatigue that develops during exercise in the heat. This fatigue may be caused by excess body heat, this occurs when the rate of heat loss from the body is not enough to balance the body's rate of heat production and/or gain from the environment. Heat exhaustion may also be caused by dehydration, which can lead to an inability to maintain adequate blood flow to the contracting skeletal muscles.

**Heat Stroke** is a potentially fatal disorder that occasionally follows heat exhaustion. It is characterized by a lack of consciousness (coma) following exertion and by clinical symptoms of damage to the central nervous system, liver, and kidney.

Information taken from the 1st World Conference on Heat Stress: Physical Exertion and Environment, held in Sydney, Australia, April 27-May 1, 1987, which was then accepted by the American College of Sports Medicine.

## HOW CAN HEAT-RELATED ILLNESSES BE PREVENTED?

1. **Education.** It is important to understand that the heat produced during exercise is not easily dissipated from the body in a hot and/or humid environment. Exercise intensity should be moderated in the heat.

2. **Clothing.** Clothing adds insulation to the body and reduces the effective surface area for heat transfer. It is important to minimize clothing to provide an optimal skin surface area from which evaporation can occur. Clothing worn should be light colored and reflect the sunlight.

3. **Hydration.** Progressive dehydration reduces sweating and blood flow to the skin and leads to excessive body heating. It is essential to keep well hydrated before, during, and following exercise in the heat

4. **Fitness.** Physical training and heat acclimation can expand blood volume and provide a more sensitive heat dissipation response to an increase in body core temperature. The majority of heat illness victims are novice runners, the elderly, and those with circulatory or respiratory disorders. These are people who have become unfit by choice or due to an inability to remain active. People at risk should avoid extremes of heat or activity

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30~18

more.....

## HERE ARE THE BASICS

*Water is essential for the body. It plays a key role in all activities by maintaining our blood volume, this is necessary for cardiovascular function and for regulating body temperature.

*On average, the body uses more than 2 liters of water per day. Increased losses from environmental heat and from exercise can rapidly increase these minimal needs.

*In hot weather, the only way the body rids itself of the heat load is by evaporation of sweat. While a high rate of evaporation cools the body, it also removes water and sodium from the body. By doing so, blood volume is lowered as is the amount of blood that the heart can deliver with each beat. Although the body can partially compensate for dehydration, athletic performance will decline as the degree of dehydration increases.

*The most important point about hydration during exercise is that athletes cannot depend upon the sensation of thirst to drive drinking either during or after exercise because the water retention and sodium dilution that occur in the plasma remove the thirst drive.

* Humans have a notoriously poor ability to rehydrate after becoming dehydrated. This is known as involuntary dehydration because of the prolonged maintenance of a partially dehydrated state despite voluntary and unrestricted fluid intake. It appears that humans lack the capacity to take in and retain fluids at the same rate that fluids are lost as sweat.

*Although it might seem inappropriate to consider training as a method to prevent the ill effects of dehydration, several adaptations that occur with increased physical fitness help prevent dehydration problems.

*It should be obvious that the ill effects of dehydration will be postponed if one is well hydrated prior to exercise. The principles concerning prehydration are the same as with rehydration. A person who drinks only water prior to exercise will dilute the blood and will stimulate a rapid increase in urine output.

*Plain water is absorbed from the gut; and can lead to blood dilution removing the salt-dependent portion of the thirst drive, and stimulates urine production. If small amounts of sodium are taken with the rehydration drink, the salt-dependent thirst drive will be maintained for a longer period, and urine production will be delayed, providing for better rehydration.

*Body weight assessments are useful techniques for ensuring that fluids lost during exercise are replaced on a regular basis. Athletes weigh in ( w/o clothes daily before and after exercise. Every pound of weight lost should be replaced by drinking 500 ml (16 oz) of fluid. Training should be reduced if body weight has not returned to within 1 or 2 lb of the previous day's weight.

more.....

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30~19

*Mandatory Heat*

## Texas Department of Criminal Justice
## INSTITUTIONAL DIVISION

# Inter-Office Communications

**To:** Department Heads and Key Supervisors          **Date:** 8 May, 2001

Richard Partridge
**From:** Through Warden Mooneyham
James V. Allred Unit          **Subject:** Required Heat Training

On 20 April, 2001 the attached IOC was sent to all departments requesting heat training be conducted and turned in to the Risk Management Office by 13 May, 2001. As of this date the following departments have completed the training:

| DEPARTMENT | EMPLOYEE | OFFENDER |
|---|---|---|
| COMPLIANCE, GI, UOF, WARDENS, SECRETARIES, INMATE RECORDS, COUNTROOM, CLASSIFICATION | YES | N/A |
| GP 1/1 | YES | NO |
| AS 2/2 | YES | NO |
| HS 1/2 | YES | YES |
| HS 2/2 | YES | NO |
| AS & HS ADMIN | YES | N/A |
| GRIEVANCE | YES | N/A |
| HUMAN RESOURCES | YES | N/A |
| KENNEL & STOCK | YES | YES |
| RECREATION & CRAFTSHOP | YES | YES |

If your department is **not** one of these departments, or is one of the departments but has not completed the training, please complete this training and have it turned in to the Risk Management Office before 16:00 on 13 May, 2001. The Risk Management Office has been tasked by the TDCJ-ID Risk Management Office to have 100% compliance from all unit departments ensuring all staff and offenders are trained on heat injury prevention. Any department not turning in the training will cause the unit to be out of compliance.

cc:

| | | | |
|---|---|---|---|
| Security GP Major Bowman | Security AS Lt. 1/1 | Administration AS | Gang Intelligence |
| Security GP Captain 1/1 | Security AS Lt. 2/1 | Back Dock | Human Resources |
| Security GP Captain 2/1 | Security AS Lt. 1/2 | Chaplains | Inmate Records/Countroom |
| Security GP Captain 1/2 | Security AS Lt. 2/2 | Commissary A | Kennel/Stock |
| Security GP Captain 2/2 | Security HS Major Weston | Commissary B | Laundry |
| Security GP Lt. 1/1 | Security HS Captain 1/1 | Commissary HS | Law Library |
| Security GP Lt. 2/1 | Security HS Captain 2/1 | Compliance | Mail Room |
| Security GP Lt. 1/2 | Security HS Captain 1/2 | Community Squad | Maintenance |
| Security GP Lt. 2/2 | Security HS Captain 2/2 | Counsel Substitute | Medical |
| Security AS Major Bright | Security HS Lt. 1/1 | Disciplinary Captain | Parole |
| Security AS Captain 1/1 | Security HS Lt. 2/1 | Education/Vocation | Recreation /Craft Shop |
| Security AS Captain 2/1 | Security HS Lt. 1/2 | Field Sergeant | Supply |
| Security AS Captain 1/2 | Security HS Lt. 2/2 | Food Service Captain | |
| Security AS Captain 2/2 | Administration HS | Grievance | |

**SO- 4**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-20

MONTHLY REPORTS

Month of _HEAT TRAINING_                                    _2001_ Year

| DEPARTMENT | SAFETY TRAINING EMPLOYEE | SAFETY TRAINING OFFENDER | PPE | WEEKLY INSPECTION | FIRE DRILL | COLLATERAL DUTY SAFETY OFFICER |
|---|---|---|---|---|---|---|
| GP 1/1 | Ⓧ | 1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 200 Houss, William |
| GP 2/1 | Ⓧ | Ⓧ | 3rd shift | 1 2 3 4 | 1 2 3 4 | 200 Neal, C. |
| GP 1/2 | ① | Ⓧ |  | 90 ⎮ 35 | 1 2 3 4 | 200 Skelton, David |
| GP 2/2 | Ⓧ | Ⓧ | 3rd shift | 1 2 3 4 | 1 2 3 4 | 200 Smith, Emmit |
| AS 1/1 | Ⓧ | 1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 361 Perkins, Paul |
| AS 2/1 | Ⓧ | ① | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 361 Maynard, T. |
| AS 1/2 | Ⓧ | ① | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 331 Haney, Chay & King, Selma |
| AS 2/2 | Ⓧ | ① | 3rd shift | 1 2 3 4 | 1 2 3 4 | 361 Thomas, Christopher |
| HS 1/1 | ① | ① | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 600 West, Gary |
| HS 2/1 | Ⓧ | ① | 3rd shift | 1 2 3 4 | 1 2 3 4 | 600 Bourne, C. |
| HS 1/2 | Ⓧ | ① | 1-3 shift | 1 2 3 4 | 1 2 3 4 | 600 West, David |
| HS 2/2 | Ⓧ | ① | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 600 Theien, Charles |
| AS & HS ADMIN | Ⓧ | n/a | n/a | 1 2 3 4 | 1 | 354 Tammen, Molly |
| COMPLIANCE - GI - UOF - WARDENS - SECRETARIES - INMATE RECORDS - COURTROOM - CLASSIFICATION | 1 | n/a | n/a | 1 2 3 4 | 1 | 151 Burton, Lanna & Grann, Michele |
| CHAPLAINS | Ⓧ | 6/a | n/a | 2-1 | 1 | 149 Smith, Jeffery |
| A COMMISSARY | Ⓧ | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 204 Thomas, Ronald |
| B COMMISSARY | ① | 1 | 1 2 3 4 | 3 ⎮ | 1 | 268 Brumbelow, Rooney |
| HS COMMISSARY | ① | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 685 Gonzales, David |
| DISCIPLINARY - GRIEVANCE - MAILROOM - SUBSTANCE ABUSE | 1 | n/a | n/a | 3 0- ⎮ | 1 | 159 McNulty, Lisa & Metzger, Tamas |
| GP FOOD SERVICE | 1 | 1 | 1 2 3 4 | 3.⎮ 3⎮ | 1 | 293 Taylor, William |
| HS FOOD SERVICE | 1 | 1 | 1 2 3 4 | 1 2 3 4 | 1 | 616 Weaks, Kimberly |
| HUMAN RESOURCES | Ⓧ | n/a | n/a | 1 2 3 4 | 1 | 125 Kirkpatrick, Joy |
| KENNEL & STOCK | Ⓧ | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 451 Hobbs, David |
| LAUNDRY & NECESSITIES | Ⓧ | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 288 Richards, Chad |
| LAW LIBRARY | Ⓧ | Ⓧ | n/a | 1 2 3 4 | 1 | 311 Spears, Lee |
| MAINTENANCE | Ⓧ | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 390 Wage, Robert |
| MEDICAL | 1 | 1 | 1 2 3 4 | 1 2 3 4 | 1 | 300 Cuellar, Michele |
| RECREATION & CRAFTSHOP | Ⓧ | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 207 Walker, John |
| RISK MANAGEMENT | Ⓧ | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 206 Metzger, Eric & Hiott, Gregory |
| UNIT SUPPLY | Ⓧ | Ⓧ | 1 2 3 4 | 1 2 3 4 | 1 | 292 Wyatt, Corless |
| WINDHAM SCHOOLS | Ⓧ | Ⓧ | n/a | 1 2 3 4 | 1 | 329 Prebosh, K. |
| AUTO SHOP | n/a | n/a | 1 2 3 4 | 1 2 3 4 | 1 | Long |
| CARPENTER SHOP | n/a | n/a | 1 2 3 4 | 1 2 3 4 | 1 | Mitche |
| MASONRY SHOP | n/a | n/a | 1 2 3 4 | 1 2 3 4 | 1 |  |
| PLUMBING SHOP | n/a | n/a | 1 2 3 4 | 1 2 3 4 | 1 | Bevent |
| SMALL ENGINE REPAIR | n/a | n/a | 1 2 3 4 | 1 2 3 4 | 1 | Lambert |
| WINDHAM LIBRARY | n/a | n/a | n/a | 1 2 3 4 | 1 | 335 Richmond |
| FIELD SQUAD | Ⓧ | Ⓧ | no. GS | 6 1 | n/a | Bowles & Earl |
| COMMUNITY SQUAD | n/a | n/a | 1 2 3 4 | 1 2 3 4 | n/a | Bowles |
| INSIDE YARD SQUAD | n/a | n/a | 1 2 3 4 | 1 2 3 4 | n/a | Bathrot |
| OUTSIDE YARD SQUAD | n/a | n/a | 1 2 3 4 | 1 2 3 4 | n/a | Dawson |
| BACK DOCK | n/a | n/a | 1 2 3 4 | 1 2 3 4 | n/a | Morga |

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-21

McCollum/Cardwell 454

McCollum/ Cardwell-455

*MAY 2001*
*HEAT TRAINING*   **MONTHLY REPORTS**

30-22



| DEPARTMENT | WEEKLY PPE INVENTORY | DAILY PPE LOG | DAILY CHEMICAL LOG | WEEKLY SUPERVISORS INSPECTION | WEEKLY FIRE DRILLS | MONTHLY SAFETY TRAINING EMPLOYEE ASSD | TRND | OFFENDER ASSD | TRND | CDSO SIGNATURE | RISK MANAGERS SIGNATURE | DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GP 1/1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | |
| GP 2/1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | |
| GP 1/2 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 94 | 90 | 75 | | | | |
| GP 2/2 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 23 | 23 | | | | | |
| AS 1/1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | |
| AS 2/1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 51 | | | | | | |
| AS 1/2 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | 40 | 34 | 34 | | | |
| AS 2/2 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 31 | 34 | 18 | 19 | | | |
| HS 1/1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | |
| HS 2/1 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | 15 | | | | |
| HS 1/2 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | 40 | 40 | | | |
| HS 2/2 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | 34 | | | | | |
| AS & HS ADMIN | | | | 1 2 3 4 | 1 | 5 | | | | | | |
| UNIT - GI - WARDENS INMATE RECORDS CLASSIFICATION GP PROPERTY COURTROOM COMPLIANCE | | | | 1 2 3 4 | 1 | | | | | | | |
| CHAPLAINS | | | | 1 2 3 4 | 1 | 3 | 3 | | | | | |
| A COMMISSARY | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | 5 | 5 | | | |
| B COMMISSARY | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 3 | 3 | 3 | | | | |
| HS COMMISSARY | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | 2 | 2 | | | |
| DISCIPLINARY SUBSTANCE ABUSE LAW ROOM - GRIEVANCE | | | | 1 2 3 4 | 1 | | 28 | | | | | |
| GP FOOD SERVICE | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 34 | 31 | 251 | 251 | | | |
| HS FOOD SERVICE | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 8 | 8 | 8 | | | | |
| HUMAN RESOURCES | | | | 1 2 3 4 | 1 | | | | | | | |
| KENNEL & STOCK | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | | | | | |
| LAUNDRY & NECESSITIES | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 13 | 13 | 17 | | | | |
| LAW LIBRARY | | | | 1 2 3 4 | 1 | | | | | | | |

**REVIEWED BY: Richard Partridge**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**DATE:**

McCollum/ Cardwell-456

30-23

# MONTHLY REPORTS

| DEPARTMENT | WEEKLY PPE INVENTORY | DAILY PPE LOG | DAILY CHEMICAL LOG | WEEKLY SUPERVISORS INSPECTION | WEEKLY FIRE DRILL | MONTHLY SAFETY TRAINING | | | | CDSO SIGNATURE | RISK MANAGERS SIGNATURE | DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EMPLOYEE | | OFFENDER | | | | |
| | | | | | | ASSD | TRND | ASSD | TRND | | | |
| MAINTENANCE | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 19 | 17 | 47 | 41 | | | |
| MEDICAL | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 14 | 49 | 5 | 5 | | | |
| RECREATION & CRAFTSHOP | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 3 | 2 | 4 | 4 | | | |
| RISK MANAGEMENT | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 5 | 5 | 1 | 1 | | | |
| UNIT SUPPLY | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 2 | 2 | 5 | | | | |
| WINDHAM SCHOOLS | | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | 18 | 18 | 14 | 14 | | | |
| AUTO SHOP | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | | | | | |
| CARPERNTER SHOP | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | | | | | |
| MASONRY SHOP | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | | | | | |
| PLUMBING SHOP | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | | | | | |
| SMALL ENGINE REPAIR | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | | | | | |
| WINDHAM LIBRARY | | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 | | | | | | | |
| FIELD SQUAD | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | 6 | 6 | 1386 | 325 | | | |
| COMMUNITY SQUAD | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | | |
| INSIDE YARD SQUAD | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | | |
| OUTSIDE YARD SQUAD | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | | |
| BACK DOCK | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | 1 2 3 4 | | | | | | | | |
| | | | | WINDHAM | 18 | 140 | | | | | | |
| | | | | MED | 94 | 724 | | | | | | |
| | | | | TDCJ | 937 | 864 | | | | | | |
| | | | | | 1049 | | | | | | | |
| | | | | SICK/OUT | - 30 | | | | | | | |
| | | | | | 1019 | | | | | | | |

(150)

760  451
+ 806  809
1766  1260

**REVIEWED BY: Richard Partridge**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

DATE: _____

Plaintiffs' MSJ Appx. 4508

MAY's

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

**Inter-Office Communications**

To:   See Distribution List                           Date:   25 April, 2001

From:  Richard Partridge – Risk Manager           Subject:  Mandatory Monthly CDSO Safety Training
        James V. Allred Unit

There will be an Allred Unit Safety and Fire Team training meeting of the CDSO's, alternates, and for any other interested personnel on Wednesday May 2nd at 0530 for 2 card night shift employees and 0830 for H card and 2 card day shift employees; Friday May 4th at 0530 for 1card night shift employees and 0830 for 1 card day shift and H card employees, in the inmate visitation area of Building 1.

Please make plans to attend one of these meetings. Attendance is mandatory. Essential information will be presented and roll will be taken. If unable to attend either meeting, it is the primary CDSO's responsibility to have an alternate CDSO receive this training. If there is no alternate CDSO somebody from that department must be present for the training. Training will be conducted on the following subjects.

1.  Lawn Mower Safety Practices
2.  Rollerblading/Skating and Skateboarding
3.  Watercraft Safety
4.  Heat Stress
5.  Occupational Exposure
6.  Workplace Violence

If you have any questions concerning any of the above please feel free to contact Mr. Partridge - Risk Manager at Ext. 206 or come by the office in Building 2, 3 Gymnasium.

CC:

| | | | |
|---|---|---|---|
| Security GP Major Bowman | Security Ad-Seg Lt. 1/1 | Compliance | Kennel/Stock |
| Security Ad-Seg Major Bright | Security Ad-Seg Lt. 2/1 | Gang Intelligence | Back Dock |
| Security HS Major Weston | Security Ad-Seg Lt. 1/2 | Parole | Community Squad |
| Security GP 1 Card Captain | Security Ad-Seg Lt. 2/2 | Food Service Captain | Commissary |
| Security GP 2 Card Captain | Security HS Lt. 1/1 | Maintenance | Administration High Security |
| Security AS 1 Card Captain | Security HS Lt. 2/1 | Medical | Courtroom GP/Inmate Records |
| Security AS 2 Card Captain | Security HS Lt. 1/2 | Supply/Property | Administration Ad-Seg |
| Security HS 1 Card Captain | Security HS Lt. 2/2 | Chaplains | Laundry |
| Security HS 2 Card Captain | Disciplinary Captain | Mail Room | Human Resources |
| Security GP Lt. 1/1 | Field Sergeant | Counsel Substitute | |
| Security GP Lt. 2/1 | Internal Affairs | Education/Vocation | |
| Security GP Lt. 1/2 | Grievance | Recreation Coach | |
| Security GP Lt. 2/2 | Law Library | Craft Shop Supervisor | |

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-24



# HEAT STRESS

You probably know how draining working or playing in too much heat can be. But if the heat and humidity are very high, there is a danger of heat cramps, heat exhaustion, or heat stroke. This is most likely to occur when the temperature is 90°F or more. First aid for heat cramps and exhaustion can make the person much more comfortable, and able to return to normal activities more quickly.

## Causes of Heat Stress

You know that as your body moves, you get warmer. Perspiring is one of the ways your body has of cooling off. Your body also directs more of your blood to the surface of the skin, which is why your skin may look flushed when you're hot. Sometimes your body gets too hot. This is called heat stress. You may be working too hard, or not drinking enough water when it is very hot or humid. You may not be used to working in the heat. Or, the air may be very still, with no breeze or fan to help cool you. When your body overheats, it begins to pay most of its attention to cooling off. But other jobs your body must do may not get done, and you can have symptoms of heat stress.

## First Aid For Heat Cramps

If you're working or playing hard in the heat, you can get cramps, pains, or spasms. Often they are in your arms, legs, or abdomen. You will probably be perspiring heavily. You can also get heat cramps from drinking too many cold liquids, or

by drinking them too quickly. Massage or use firm pressure on the muscle that is cramping. Drink small sips of water with a little salt added (if you have a heart or blood pressure problem, drink plain water) to help cool your body. Move into the shade or a cooler (not cold) place.

## Avoiding Heat Stress

It takes about 4-7 days to get used to unusual heat. If you know you'll be exposed to hot temperatures, spend more time each day in the heat for about a week before beginning your task. Always drink plenty of cool



Rest and drink cool water often when you are working in hot, humid weather.

## First Aid For Heat Exhaustion

People with heat exhaustion have some or all of the following symptoms: sweating, clammy, flushed, or pale skin, dizziness, weakness, nausea, rapid and shallow breathing, headache, vomiting, or fainting.

Those with heat exhaustion should lie down in a cooler (not cold) place, with feet raised and tight clothing loosened. Give them sips of cool water, adding 1 teaspoon of salt per quart of water. (If they have heart or blood pressure problems, give plain water.) Call a doctor, especially is there is vomiting or fainting.

water when you're in the heat. You may not be thirsty, but your body can still be losing as much as three gallons of water a day in hot weather. Wear hats, sunglasses, and loose cotton fabrics to help you stay cool. Take frequent breaks in a cool place.

## Know About Heat Stress

Too much heat can make people lose their concentration, get tired, or grouchy. Understanding how to deal with heat stress can help you avoid accidents and misunderstandings. Extreme heat can be bad for your health, so learning first aid for heat stress can be important to your health and well-being.

©1988 PARLAY INTERNATIONAL

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30~25

**Texas Department of Criminal Justice**
## INSTITUTIONAL DIVISION

## Inter-Office Communications

**To:** ___Department Heads & Key Supervisors___        **Date:** ___2 May, 2001___

**From:** ___Richard Partridge – Risk Manager___        **Subject:** ___Temperature Monitoring___
            James V. Allred Unit

In order to lessen the possibility of any heat related injuries the James V. Allred Unit has begun to monitor and log the temperature and humidity at "B" Tower on an hourly basis. The Picket Officer shall announce over the radio the apparent temperature (Heat Stress Index) on an hourly basis from 10 am to 6 pm when the apparent temperature reaches 90 degrees or greater during the summer months.

Supervisors shall monitor the radio and take the appropriate steps to protect their employee and offender workers as required.

See the attached Heat and Humidity Matrix and Preventive Measures for further information.

**SO- 4**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-26

It is the responsibility of the Texas Department of Criminal Justice (TDCJ) to provide a safe and healthful work environment for staff and offenders. Every reasonable effort must be made to prevent heat related injuries and illnesses in the workplace. As temperatures and heat indices rise, every effort must be made to notify supervisors and employees of changes that increase the risk of heat related injuries and illnesses.

TDCJ Risk Management has determined that the best way to accomplish the monitoring of temperature extremes in the workplace is to maintain Temperature and Humidity Logs on an hourly basis from 10 A.M. to 5 P.M..

The hourly Temperature and Humidity Log shall be maintained daily by 1st Shift "B Tower" Officer utilizing the electronic measurement device located in B-Tower. The completed logs shall be daily turned into the 1st Shift Captain who will make a file copy and turn the original into the Risk Management message box in the 1 Bldg. countroom

The Heat and Humidity Matrix (see attachment "A") shall be used to determine the "Apparent Temperature". The apparent temperature shall be used to determine the risk Of possible heat injury/illness.

At a minimum at least hourly the B Tower officer shall announce over the unit radio the current apparent temperature any time the apparent temperature exceeds 90 degrees.

All supervisors shall monitor the radio and take appropriate preventive measures to prevent heat related injuries for the staff and offenders.

## PREVENTIVE MEASURES

HEAT EXHAUSTION: 90 through 104 APPARANT TEMPERATURE
Staff to ensure adequacy of water intake, look for signs of exhaustion. Five (5) minute rest breaks every hour.

HEATSTROKE POSSIBLE: 105 through 129 APPARNAT TEMPERATURE
Staff to promote high water intake, five (5) minute rest breaks every one-half (1/2) hour-lay down with feet up. Reduce work pace by one-third (1/3).

HEATSTROKE IMMINENT: 130+ APPARANT TEMPERATURE
Secure outside work or reduce work pace by one-half (1/2) to two-thirds (2/3). Ten (10) minute breaks every one-half (1/2) hour-lay down, feet up. Insist on excessive water intake.

HEAT AND HUMIDITY:
At high temperatures, the human body normally cools itself through the evaporation of perspiration. But humidity interferes with this process. The Heat and Humidity Matrix from the National Weather Service shows how discomfort and health risks grow as heat and humidity increase.

30-27

Texas Department of Criminal Justice

INSTITUTIONAL DIVISION

# Inter-Office Communications

To  R. PARTRIDGE - RMC                          Date _____

From _____    Subject  HOURLY HEAT & HUMIDITY LOG

|  | 10:00 | 11:00 | 12:00 | 13:00 | 14:00 | 15:00 | 16:00 | 17:00 | 18:00 |
|---|---|---|---|---|---|---|---|---|---|
| AIR TEMPERATURE |  |  |  |  |  |  |  |  |  |
| RELATIVE HUMIDITY |  |  |  |  |  |  |  |  |  |
| APPARENT TEMPERATURE |  |  |  |  |  |  |  |  |  |
| TIME TEMPERATURE IS TAKEN |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

HOURLY I ANNOUNCED OVER THE UNIT RADIO THE APPARENT TERMERATURE
EVERY TIME THE APPARENT TEMPERATURE WAS ABOVE 90 DEGREES.

_____          _____
    PRINTED NAME FIRST HALF                    SIGNATURE FIRST HALF

_____          _____
   PRINTED NAME SECOND HALF                   SIGNATURE SECOND HALF

CC:

GP CAPTAIN 1st shift

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

3028

## HEAT AND HUMIDITY MATRIX

### AIR TEMPERATURE
### (Degrees Fahrenheit)

| | 70 | 75 | 80 | 85 | 90 | 95 | 100 | 105 | 110 | 115 | 120 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Relative:<br>Humidity: | | | | Apparent Temperature | | | | | | | |
| 0% : | 64 | 69 | 73 | 78 | 83 | 87 | *91 | *95 | *99 | *103 | +107 |
| 10% : | 65 | 70 | 75 | 80 | 85 | *90 | *95 | *100 | +105 | +111 | +116 |
| 20% : | 66 | 72 | 77 | 82 | 87 | *93 | *99 | +105 | +112 | +120 | !130 |
| 30% : | 67 | 73 | 78 | 84 | *90 | *96 | *104 | +113 | +123 | !135 | !148 |
| 40% : | 68 | 74 | 79 | 86 | *93 | *101 | +110 | +123 | !137 | !151 | |
| 50% : | 69 | 75 | 81 | 88 | *96 | *107 | +120 | !135 | !150 | | |
| 60% : | 70 | 76 | 82 | *90 | *100 | +114 | !132 | !149 | | | |
| 70% : | 70 | 77 | 85 | *93 | +106 | +124 | !144 | | | | |
| 80% : | 71 | 78 | 86 | *97 | +113 | !136 | | | | | |
| 90% : | 71 | 79 | 88 | *102 | +122 | | | | | | |
| 100% : | 72 | 80 | *91 | +108 | | | | | | | |

* - Heat Exhaustion Possible

+ - Heatstroke Possible

! - Heatstroke Imminent

EXAMPLE OF HOW TO DETERMINE THE APPARENT TEMPERATURE READINGS:

AIR TEMPERATURE 100 DEGREES

HUMIDITY 50%

APPARENT TEMPERATURE  +120 DEGREES

SUPERVISORS WOULD KNOW THAT HEATSTROKE IS POSSIBLE AND TAKE APPROPRIATE PREVENTIVE ACTION.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-29

*Safety Framing Training*
*June 2011*

522 • *Environmental Emergencies*



**HEAT AND HUMIDITY RISK SCALE**

☐ Safe    ☐ Cautious    ☐ Danger

Adapted from Fox, E.L. and Matthews, D.K.: *The Physiological Basis of Physical Education and Athletics*, 3rd ed. Saunders College Publishing, Philadelphia and Danzl, D.F. and Vicario, S.: "How Serious is Heat-Related Illness?", *Diagnosis*, August 1985.

**FIGURE 36-5.**

## Heatstroke

Heat stroke, a true life-threatening emergency, has a mortality ranging from 20 to 70 percent. Heat stroke is sometimes called SUNSTROKE, although the sun is not required for its onset. The condition results when the heat-regulating mechanisms of the body break down and fail to cool the body sufficiently. The body becomes overheated, the body temperature rises to between 105 and 110 degrees F., and no sweating occurs in about half the victims. Because no cooling takes place, the body stores increasingly more heat, the heat-producing mechanisms speed up, and eventually the brain cells are damaged, causing permanent disability or death.

There are two basic kinds of heat stroke. Classic heat stroke, in which people lose the ability to sweat, generally affects the elderly or the chronically ill during a heat wave. Exertional heat stroke, in which victims retain the ability to sweat, is accompanied by physical exertion and muscle stress (Figure 36-6).

Heat stroke most seriously affects the aged, infants and children (who sweat less, generate more

heat, and have a smaller body surface); debilitated, malnourished, and inexperienced athletes; those who have a prior history of heat stroke; or those who are short, stocky, and heavily muscled. It is more apt to affect those who have had recent fever or those with chronic diseases, such as renal (kidney) disease, cerebrovascular disease, mental retardation, PARKINSON'S DISEASE, diabetes, alcoholism, obesity, and dermatological (skin) diseases such as ECZEMA, SCLERODERMA, and healed burns. Drug abusers are especially susceptible, especially those who use barbiturates and hallucinogens. Even healthy individuals, when overexerted, can fall victim. Young people who suffer from heat stroke may not completely lose the ability to sweat, and their skin may be moist and hot instead of characteristically dry.

Heat stroke commonly occurs during times of high temperatures combined with high humidity and low wind velocity. It may be due to other factors: fever that will not respond to therapy, consumption of alcohol, use of diuretics, or use of some kinds of drugs that act either to promote internal body heat or to hamper sweating.

### Signs and Symptoms

Heat stroke is indicated by the following signs and symptoms (Figure 36-7):

■ Temperature of 105 degrees F. or higher.

■ Hot, reddish skin; skin can be wet or dry, since approximately half of all heat stroke victims sweat profusely.

■ An initially rapid, strong pulse of 160 or more, continuing rapid but becoming weak as damage progresses.

■ Initially constricted pupils, later becoming dilated.

■ Tremors.

■ Mental confusion and anxiety; victims may show unusual irritability, aggression, combative agitation, or — in the extreme — psychotic or hysterical behavior.

■ Initially deep, rapid breathing that sounds like snoring; breathing becomes shallow and weak as damage progresses.

■ Headache.

■ Dry mouth.

■ Shortness of breath.

Copyright OIG Case Litigation Support on 06.26.2013 by scm. DO NOT COPY, SCAN OR EMAIL WITHOUT PERMISSION.

30 30



**SWEATING: DEFENSE AGAINST HEAT STROKE**

**1** Heat storage occurs when external heat sources exceed body heat loss through surface cooling by sweating.

**2** The rate of sweating determines amount of body heat loss when the air temperature exceeds normal ranges.

**3** Environmental factors that effect body surface cooling (low wind, high humidity) and interference with normal sweating can lead to a net gain of body heat, and heat stroke may occur.

**4** Exertional heat stroke results from increased internal heat load from muscular exercise combined with high external temperature. If this combined heat load exceeds the rate of body surface cooling by sweating, a net heat gain results, and heat stroke may occur.

COMPLICATIONS

| Brain swelling, convulsions, coma, possible death! | Heart Failure | High Blood Pressure | Kidney Failure Liver Failure |

FIGURE 36-6.

- Loss of appetite, nausea, or vomiting.
- Increasing dizziness and weakness.
- Decreased blood pressure.
- Convulsions, sudden collapse, and possible unconsciousness; *all* heatstroke victims have compromised levels of consciousness, ranging from disorientation to coma.
- Seizures.
- Decreased urinary output.

Patients may lapse into a coma, become delirious, and die. About 4,000 Americans die of heat stroke each year; 80 percent of those deaths occur among people over the age of fifty. Heat stroke is the second most common cause of death among high school athletes (second only to spinal cord injury).

Untreated, all patients die. The longer care is delayed, the more permanent and disabling the damage, particularly to the central nervous system.

### Emergency Care

Emergency care of heat stroke is aimed at *immediate* cooling of the body. *Act fast;* do whatever is necessary to cool the body. The priority of treatment is to remove the patient from the source of heat when possible; other top priorities include airway, ventilation, oxygenation, circulation, and transport. To treat:

1. Remove the patient when possible from the source of heat, establish an airway, and administer high-concentration oxygen.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-31

524 • *Environmental Emergencies*



## SIGNS AND SYMPTOMS OF HEAT STROKE

The most common victims of heat stroke include drug abusers, the elderly, the physically disabled, and persons with alcoholic intoxication, chronic illness, fever or malnourishment.

Dry mouth

Deep, rapid, snore-like breathing

Hot, dry, red skin

Muscular twitching

Sudden collapse

Headache
Mental confusion
Constricted pupils

Nausea and/or vomiting

Rapid, strong pulse

Temperature 105° - 110°F

Decreased blood pressure

FIGURE 36-7.

2. Remove as much of the patient's clothing as possible or reasonable, pour cool water over his body (avoiding his nose and mouth), fan him briskly, and shade him from the sun if he is still outdoors. Place cold packs under the patient's arms, around his neck, and around his ankles to cool the large surface blood vessels (Figure 36-8). Simple ice packs or HYPERTHERMIA blankets will not effectively lower temperature when used alone; use a variety of methods. Wrapping a wet sheet around the patient's body and then directing an electric fan at the patient are also good ways of cooling (Figure 36-9). Use slower cooling if the patient starts to shiver, since shivering produces heat. Continue until his temperature falls below 103 degrees F., and transport as soon as possible. Continue cooling measures during transport.



FIGURE 36-8. Use cold applications on the head and body to cool a heat stroke patient.

Copy of OIG case to Litigation Support for scanning of exhibits
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-31

· CHAPTER 36

*Heat and Cold Emergencies* · 525



**FIGURE 36-9.** Wrapping a heat stroke victim in a wet sheet and directing a fan at the patient are good ways of cooling.

3. When the patient's body temperature has dropped to 102 degrees F., take measures to prevent chilling. Monitor temperature carefully throughout treatment, taking the temperature every five minutes with a thermometer that records up to 108 degrees F. Keep working to reduce the temperature throughout transport. If the patient's temperature does not drop to below 100 degrees, hyperthermia could recur.

4. Elevate the patient's head and shoulders slightly during cooling, and make sure that he is comfortable.

5. Never give the patient stimulants or hot drinks.

6. Because heat stroke involves the entire body, a number of complications may result from the ailment itself or from necessary care. Be prepared to care for the following complications as cooling proceeds:

   ■ Convulsions. Tremors and convulsions tend to accompany rapid cooling and, because convulsions produce great body heat, they can impair treatment. Convulsions are most likely to occur once the body cools to 104 degrees F.

   ■ Aspiration of vomitus. Vomiting commonly accompanies convulsions caused by cooling techniques. Position the patient for easy drainage and suctioning.

7. If you succeed in lowering the core body temperature at least four degrees F. over a thirty- to sixty-minute period, discontinue active cooling measures and transport the patient; the body will usually continue to cool spontaneously. Monitor core temperature every ten minutes during transport to make sure that temperature keeps dropping.

8. Watch the patient closely and maintain normal body temperature. If hyperthermia recurs before you have transported or completed transport, begin cooling procedures again. The core temperature must drop below 100 degrees F. and must stay that low before the danger has passed.

9. During transport, run the vehicle's air-conditioning system at maximum capacity if possible. If that is not possible, wrap the patient in wet sheets and direct a fan at him.

10. *Always* transport a victim of heat stroke, even if you are able to lower the body temperature; a victim of heat stroke always needs hospital care.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-31

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

*July's*

| | |
|---|---|
| **To:** See Distribution | **Date:** 18 June, 2001 |
| **From:** Richard Partridge – Risk Manager<br>James V. Allred Unit | **Subject:** Monthly CDSO Safety Training |

The Texas Department of Criminal Justice Occupational Safety & Health Manual policy numbers 02-B-2 and 02-B-3 require initial and monthly safety training for all TDCJ employees and offenders. This training is to be given by the employees/offenders supervisors and records of this training are to be kept in the employees/offenders workplace. A record of this training is to be furnished to the Unit Risk Manager. The monthly safety training sessions shall be either five minutes per day, twenty minutes per week, or one hour per month.

The training will be completed by the 25th of each month and completion annotated on the CDSO Checklist. A copy of the completed Checklist will be turned in to the Risk Management Office. The original Checklist will be kept by the department and brought with them to the monthly CDSO training, along with all the required monthly safety documents, for inspection. Document inspections will begin 30 minutes prior to CDSO training and will be handled on a "first come first served" basis.

Attached is the proposed safety training topics for the month of July:

1. Heat Exhaustion
2. Water Emergencies
3. Travel Tips for the Motoring Public
4. Bicycle Safety
5. Hazardous Communication and Chemical Inventories

If you have any questions concerning any of the above please feel free to contact Mr. Partridge – Risk Manager at ext. 206 or come by the office in building 2, the 3 building gymnasium.

cc:

| | | | |
|---|---|---|---|
| Security GP Captain 1 Card | Security Ad-Seg Lt. 2/1 | Law Library | Recreation /Craft Shop |
| Security GP Captain 2 Card | Security Ad-Seg Lt. 1/2 | Compliance/Gang Intelligence | Kennel/Stock |
| Security AS Captain 1 Card | Security Ad-Seg Lt. 2/2 | Parole | Back Dock |
| Security AS Captain 2 Card | Security HS Lt. 1/1 | Food Service Captain | Community Squad |
| Security HS Captain 1 Card | Security HS Lt. 2/1 | Maintenance | Commissary A, B, HS |
| Security HS Captain 2 Card | Security HS Lt. 1/2 | Medical | Administration High Security |
| Security GP Lt. 1/1 | Security HS Lt. 2/2 | Supply/Property | Courtroom GP/Inmate Records |
| Security GP Lt. 2/1 | Disciplinary Captain | Chaplains | Administration Ad-Seg |
| Security GP Lt. 1/2 | Field Sergeant | Mail Room | Laundry |
| Security GP Lt. 2/2 | Internal Affairs | Counsel Substitute | Human Resources |
| Security Ad-Seg Lt. 1/1 | Grievance | Education/Vocation | |

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-32



## Heat Exhaustion

HEAT EXHAUSTION, the most common heat injury, occurs in an otherwise fit person who is involved in extreme physical exertion in a hot, humid environment. It results from a serious disturbance of the blood flow, similar to the circulatory disturbance of shock. Heat exhaustion is, in fact, a mild state of shock brought on by the pooling of blood in the vessels just below the skin, causing blood to flow away from the major organs of the body. Due to prolonged and profuse sweating, the body loses large quantities of salt and water. Heat exhaustion can also occur among the elderly or the infirm, who have too little salt even without activity. When the water is not adequately replaced, blood circulation diminishes, affecting brain, heart, and lung functions. Heat exhaustion is sometimes, though not always, accompanied by HEAT CRAMPS due to salt loss.

There are two basic kinds of heat exhaustion:

- Salt-depletion (sodium depletion), in which unacclimatized individuals exert themselves and drink enough water but do not replace the sodium.

- Water-depletion, which usually occurs among the elderly or chronically ill who do not drink enough water during extreme heat. This type of heat exhaustion is characterized by extreme anxiety

30~33

Copy of OIG case to Litigation Support Office as of
UNAUTHORIZED COPYING IS PROHIBITED

526 • *Environmental Emergencies*

and agitation, intense thirst, headache, weakness, fever, muscle incoordination, and decreased sweating.

The most critical problem in heat exhaustion is dehydration; salt loss poses an additional problem. Patients who are on diuretic therapy or have some other physical problem are at high risk. Heat exhaustion also normally strikes at those who are sedentary or poorly acclimatized and who suddenly participate in strenuous exercise in a hot climate. Their water and salt levels become unbalanced: either the salt depletion is greater than the water depletion, or the water depletion is greater than the salt depletion.

## Signs and Symptoms

Primary signs and symptoms of heat exhaustion are much like flu symptoms. They can include the following:

- Headache, giddiness, and extreme weakness.
- Nausea and possible vomiting.
- Dizziness and faintness.
- Profuse sweating.
- Loss of appetite.
- Fatigue.
- Diarrhea.
- Collapse and unconsciousness (usually brief).

- Below-normal body temperature or normal body temperature; in occasional cases, body temperature may be slightly elevated.
- Dilated pupils.
- Weak and rapid pulse.
- Rapid, shallow breathing.
- Pale, cool, sweaty skin, usually ashen gray in color.
- Possible heat cramps or muscle aches.
- Inelastic skin.
- Difficulty in walking.

## Heat Exhaustion Versus Heat Stroke

While the signs and symptoms of heat exhaustion may seem similar to those of heat stroke to the casual observer or to an uninformed patient, there are some distinct differences that will help you make the correct evaluation (Figure 36-10).

The two most reliable and distinct differences are the condition of the skin and the body temperature. In heat stroke, the skin is flushed and hot to the touch; patients experiencing heat exhaustion usually have wet or clammy, pale, cool skin. Body temperature in a patient with heat stroke can soar above 106 degrees F.; in a victim of heat exhaustion it usually stays at normal or sometimes even below normal.



**HEAT EXHAUSTION**

- Moist and clammy skin, usually pale
- Pupils dilated
- Normal or subnormal temperature
- Weak, dizzy or faint
- Headache
- No appetite, nausea

**HEAT STROKE**

- Dry hot skin, usually red
- Pupils constricted
- Very high body temperature
- Coma or near coma
- Pulse strong and rapid

**FIGURE 36-10.**

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-34

## Emergency Care

To treat a patient of heat exhaustion:

1. Move the patient to a cool place away from the source of heat, but make sure that he does not become chilled. Apply cold, wet compresses to his skin, and fan him lightly.

2. Have the patient lie down. Raise his feet eight to twelve inches, and lower his head to help increase blood circulation to the brain. Remove as much of the patient's clothing as possible, and loosen what you cannot remove. Help make the patient as comfortable as possible (Figure 36-11).

3. If the patient is fully conscious, administer cool water at the rate of one-half glassful every fifteen minutes for one hour (Figure 36-12).

4. If the patient is unconscious, remove his clothing and sponge him off with cool water.

5. If the patient vomits, stop giving him fluids and transport him immediately to a hospital, where he can receive intravenous fluids. (This is usually the only instance in which a heat exhaustion patient will require hospitalization.)

6. Take the patient's temperature every ten or fifteen minutes; transport as soon as possible. If the patient's temperature is above 101 degrees F. or rising, transport immediately.



**FIGURE 36-11.** Have the heat exhaustion patient lie down with feet elevated.



**FIGURE 36-12.** If the heat exhaustion patient is fully conscious, administer cool water.

Copy of OIG case to Litigation Support on 06.26.2013 by scm. UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-35

### Texas Department of Criminal Justice
### INSTITUTIONAL DIVISION

## Inter-Office Communications

| | |
|---|---|
| To: __John Gilbert__ | Date: __August 3, 2001__ |
| __Region V Director__ | |
| From: __Robert R. Treon-Senior Warden__ | Subject: __Redder, Frederick L.__ |
| __James V. Allred Unit__ | SSN ▓▓▓▓ |

On 8-1-01, I conducted an employee disciplinary hearing on COIV Frederick Redder SSN ▓▓▓▓ for possibly violating rule number 5A-Reckless Endangerment of the Employee General Rules of Conduct. During the incident in question, Officer Redder was assigned to the 7G-pod control picket when he was made aware by Officer R. Stewart SSN ▓▓▓▓ 7G-pod Rover) there was a problem with a newly arrived offender assigned to 7G-21 cell. According to the available evidence, Officer Stewart advised Officer Redder on two occasions over the intercom something was wrong with the offender and she needed a supervisor.  Officer Stewart states during their second conversation, she advised Officer Redder the offender was sick. Officer Redder denied this allegation; however, it was corroborated by offenders in the immediate area who overheard Officer Redder on the intercom.  Officer Redder also denied he spoke with Officer Stewart twice. Officer Redder did admit Officer Stewart had told him "something" was wrong with the offender and that she requested a supervisor immediately.  Officer Redder also admitted he did not contact anyone. When questioned Officer Redder could offer no reasonable explanation for not calling a supervisor to the scene.  Officer Redder's admission and the preponderance of the available evidence clearly indicate Officer Redder failed to act in an appropriate manner to Officer Stewart's request for assistance.  Based on this evidence and the fact the offender in question was subsequently diagnosed as suffering from heat stroke and remains in critical condition, I find Officer Redder guilty of violating rule 5A-Reckless Endangerment and have recommended his dismissal per PD22 guidelines.  It should be noted Officer Redder received training on heat related illness in April of this year.  This is submitted for your information.

RT/df

CC: File

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-36

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To:   Warden Treon – Sr. Warden                    Date:   July 25, 2001
          Allred Unit

From:  Richard Wathen, Assist. Warden              Subject:  Investigation
          James V. Allred Unit

On July 25, 2001 interviews were conducted with staff members concerning the July 16, 2001 incident involving Offender Cardwell, John #1041651 in Seven (7) Building, G Pod. The following is a timeline and occurrence record as related from accounts given by the staff involved.

1630 hours – Offender Cardwell arrives at Seven (7) Building, G Pod. Other offenders begin to tease him and made statements such as fresh meat, etc. (This reaffirms staff's original belief that the offender was displaying behavior due to being scared rather than being ill).

1635 hours – Officer Stewart and other offenders discover Offender Cardwell in the shower. The offender is acting scared and other offenders and Officer Stewart spend the next 10 minutes trying to calm him down and reassure him he will be all right.

1645 hours – Officer Stewart proceeds to the D space and informs Officer Redder that she needs Sgt. March because there is something wrong with an offender. Officer Redder either replies "So" or "Fuck him" depending on which witness statements are considered (Officer Redder denies making either statement but is unable to recall what his response was). Officer Redder does acknowledge that he did not call for a supervisor.

1646 hours – Officer Stewart goes back into the section to check on the offender. At this point she discovers the offender is very hot. She and some offenders continue to talk to Offender Cardwell in an attempt to calm him down.

1650 hours – Officer Redder claims Officer Stewart leaves the Pod at this time to inform the desk of the problem and when she returns he assumes the situation is resolved. Officer Stewart and Officer Morales both claim that this did not occur (Officer Redder states that he could be mistaken about this point).

1656 hours – Officer Stewart proceeds back to the D space to again have Officer Redder call for the sergeant because the offender is hot. Officer Redder claims that this second trip to the D space never occurred because Officer Stewart had already secured the offender in his cell. Officer Stewart is positive on this point as she claims she secured the offender only a minute before she started her count, which occurs later.

1659 hours – Officer Stewart enters the section again to check on the offender.

1709 hours – Officer Stewart secures the offender in his cell.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-37

1710 hours – Officer Stewart begins her count.

1725 hours – Officer Stewart completes her count and proceeds toward the Seven (7) Building desk. Sgt. March is on the telephone so the tells Officer Morales to have Sgt. March come to the pod when she gets off the telephone. Officer Morales affirms that this is her first contact with Officer Stewart regarding any problem on the pod.

1730 hours – Officer Stewart and Redder switch duty posts. Officer Redder begins his count, arrives at cell 7G-21 and notices Offender Cardwell unresponsive. Officer Redder instructs Officer Stewart to call the sergeant. Officer Stewart notifies the desk. Officer Morales contacts the Medical Department and speaks with LVN Newman.

1730 hours – Officer Morales calls Officer Stewart and inquires as to whether the offender is breathing.

1733 hours – Staff respond to the building with a gurney.

1743 hours – Offender Cardwell is taken from the building to the Unit Infirmary.

Be advised that times are only approximate as all staff times varied slightly. The course of events is believed to be factual as they were verified through witness accounts. The only events which are being contested are the actual number of times Officer Stewart proceeded to the D space and notified Officer Redder of a need for a supervisor and what Officer Redder's response was when notified of the offender's condition. Preponderance of evidence indicates the course of events as listed above are correct and Officer Redder most likely issued an inappropriate response to Officer Stewart's request.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-38

**Texas Department of Criminal Justice
INSTITUTIONAL DIVISION**

**Inter-Office Communications**

To: <u>Warden R. Treon – Sr. Warden</u>          Date: <u>July 24, 2001</u>

From: <u>Richard Wathen, Assist. Warden</u>          Subject: <u>Offender Interviews</u>
James V. Allred Unit

On July 24, 2001 I interviewed four- (4) offender SSI's regarding the July 16, 2001 incident involving Offender John Cardwell #1041651.  These four offenders claim to be witnesses to different events surrounding this incident.  The offenders interviewed were Roland Rojas #859646, J. W. McCowan #786708, Christopher Lassiter #573946, and Eugenio Ceniceros #641115.

Offender Lassiter informed me that after Offender Cardwell had been in the section for approximately 15-20 minutes he informed Officer Stewart the offender was sick.  He claims prior to this no one knew that the offender was sick as he was responding to questions and moving around without difficulty.  He stated during this time period Officer Stewart was checking cells and talking with other offenders.  After notifying Officer Stewart of Offender Cardwell's condition, Offender Lassiter claims that she attempted to get the control officer's attention but he did not see her and the intercoms did not work.  All of this activity occurred on three- (3) row of One (1) section in G Pod.  Offender Lassiter states that Officer Stewart then proceeded to the D space to speak with the control officer via the intercom.  He did not hear any of the conversation between Officer Stewart and Officer Redder.  He further claims that approximately 15-20 minutes elapsed after that before the sergeant and other officers entered the pod to check on Offender Cardwell.

Offenders McCowan and Ceniceros both claim that they were in the D space when Officer Stewart came out of one section.  They state that she attempted to use the intercom by the one section door but it was not working.  She then went to the three-section intercom inside the D space and informed the control picket officer that there was a sick offender in the section.  Officer Redder made the statement "Fuck him if he dies" or something similar.  Both offenders claim to have only been about twenty (20) feet from Officer Stewart and the intercom when this was stated and heard it plainly.  They claim Officer Stewart then went towards the desk and told Officer Morales to notify Sgt. March of the situation when she got off the phone (all the offenders claim that the desk was dealing with an offender at the time who was refusing to house).  Approximately 15 minutes later the sergeant and other officers came to the pod.

Offender Rojas claims he did not hear any of the conversation between the officers but did verify the times the other offenders provided.

In summation, it appears as if the offenders relate enough of the same information, without it being exact, to indicate truthfulness.  The time lines given all indicate that Offender Cardwell was in the section approximately 15-20 minutes prior to anyone being aware that he was ill.  It appears that Officer Stewart made two (2) separate attempts to notify appropriate staff of the situation.  It also appears that Officer Redder was notified in a sufficient manner and gave an inappropriate

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30~39

response and failed to take further action.    Offender Cardwell remained in the section approximately 15 minutes beyond Officer Stewart's notification to the desk before assistance arrived.


RW/ayh

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-40

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

# Inter-Office Communications

To: _____Warden R. Treon_____          Date: _____7-19-01_____

From: _____Major J. Bowman_____          Subject: ____As Stated____

While interviewing Officer Stewart, Retha SSN # ████████ she stated that she asked Officer Redder, Frederick SSN # ████████ twice to call a supervisor.  She stated she told Officer Redder something was wrong with the offender.  He stated, "So", and to rack him up for count.  Officer Stewart admits that she put the offender in the cell and proceeded to count.  Officer Stewart then turned in her count sheets and asked the desk officer to have Sgt. March come to the pod when she got off the phone.  She never stated the offender needed medical attention.

Officer Redder admits he did not call for a supervisor when Officer Stewart asked for one. He then stated she never said it was for medical reasons.  He later admitted that she might have said it was for medical reasons, and he just stated, "So", but he could not remember.  Officer Redder later recanted that version and stated she never said it was for medical reasons.  Officer Redder still stated he did not call for a supervisor until he saw the offender laying on the cell floor.

I acknowledge receipt of a copy of this action and understand that this information shall be placed in my unit disciplinary file and employee master personnel file.

_Retha Stewart_____          _07-31-01_____
NAME                                                      DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30~41

**Texas Department of Criminal Justice**
INSTITUTIONAL DIVISION

## Inter-Office Communications

To: _____ Warden R. Treon _____   Date: _____ July 16, 2001 _____

From: _____ Officer R. Stewart, CO III _____   Subject: _____ Offender Cardwell #1041651 _____

At approximately 1630, Offender Cardwell TDCJ #1041651 was brought to 7G to be housed in 21B cell.. At approximately 1635 when I, Officer Stewart CO IV, found Offender Caldwell in the shower, he seemed to be very scared and when he spoke, he rambled. He was taking his shoes off, and the offenders in 7G-1 section were telling him that he would be alright. Offender Edwards went to get him a towel, and Offender Lassiter borrowed some shower slides from an offender in 20 cell. The offenders were telling him to take a shower and calm down. At approximately 1645. I went down to the picket (because you can hardly hear over the speakers). I told Officer Redder to call Sgt. March because something was wrong with the offender. Officer Redder's response was, "So?"

At approximately 1646, I went back to 3 row 1 section shower, and the offender stood up and was coming out of the shower. He told me that he was going to the bus to get his stuff. These were the first words that I understood. He appeared to be shaky. He came out of the shower with Offender Lassiter sort of guiding him. Offender Lassiter said, "Ms. Stewart, touch his arm. He is burning up." I touched his arm (above the wrist), and it was just that, very hot. Offender Cardwell sat back down in the shower stall, and at approximately 1656, I went back down to the picket to call the Sgt. I told Officer Redder that the offender was red hot. Officer Redder said, "What do you mean-red hot?" I said, "His skin is very hot. He is talking out of his head. He is sick or something is wrong." I asked him to call the Sgt. Officer Redder said, "My advice is to rack him up and count." I said, "Is it 5:15?" Officer Redder said, "Close enough for me!"

At approximately 1659, I again went to 3 row 1 section shower. I went back to the offender, and he was walking around like he might not know where he was. I thought that he might be a psych. patient needing some meds. and that he was scared. With the assistance of other offenders, I got the offender out of the shower and racked him up. At approximately 1710, I went to the floor, got my clipboard, and proceeded with count. I racked up and counted all 3 sections and at approximately 1725 I took my count sheet down front. Sgt. March was on the phone, so I got Officer Morales' attention and told her to tell the Sergeant that I needed to talk to her. I went into 7G control picket, and Officer Redder began the roster count. When he got to 21 cell at approximately 1730, he motioned for me to call rank. Immediately, I called the desk and talked to Ms. Morales and told her that Offender Cardwell had passed out. She hung up, then called me back at approximately 1731 and asked if the offender was breathing. I told her that he was breathing but not responding. At approximately 1733, the desk sent officers and offenders with a gurney to take Offender Cardwell to medical. At approximately 1743, they carried the offender out of 7 Building.

Copy of OIG case to Litigation Support on 06.26.2013by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-42

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

# Inter-Office Communications

To: _____ Warden R. Treon _____    Date: _____ July 16, 2001 _____

From: _____ F. Redder, CO IV _____    Subject: _____ Cardwell, John #1041651 _____

On 07-16-01 at approx. 1630, Offender Cardwell, John #1041651 came onto the wing to move into 21 cell. At the time said offender came in, the rover was doing an out in 3 section. At approximately 1635, the rover went up to three row so the offender could put his mattress and pillow into his cell. Said offender was walking up and down the three row walkway. At approximately 1640, the rover came down to the D-space and told me that she needed a Sgt. to the pod and the said offender was not refusing housing, but that he would not go into his house. I told her to try to get him into his cell again. At no time did she notify me that she needed medical. I did not call a supervisor. At approximately 1645, she went back up to three row and was talking to the offender. The offender went into his cell, and she closed the cell door and came to the D-space. At approximately 1650, she walked to the desk and came back into the D-space. I thought the problem was resolved. At approximately 1710, she got her count sheet and started counting in 1 section. At approx. 1735, I went to 1 section 3 row to do the roster count. When I got to 21 cell, I saw that the offender was layiing in the cell floor not responding to my call for his I.D. card. I got the picket to roll the cell door. I then told the other offender in 21 to step out. I then started trying to get said offender to respond. At approximately 1740. I told Officer Stewart that I needed a Sgt. and that the offender was not responding. Officer Shults and Officer Toll arrived on the pod at approximately 1745 with a cloth gurney to carry him from three row. Due to the offender's weight, I told Officer Stewart that we needed more help. Four SSI's showed up. Me, Officer Shults and Officer Toll placed the offender on the gurney, and the four SSI's carried him from the cell to the front of the desk. At that time, the cloth gurney was ripping, so the SSI's placed him on the floor in front of the desk, while Officer Merklin went to medical to retrieve a gurney to roll him to medical. At approximately 1755, Officer Merklin showed up on the building with the gurney and the offender was placed on the gurney and immediately rolled to medical. At approximately 1800, I went to medical to assist. At approximately 1810, I was asked by a nurse to help take off said offender's boots. I then left medical and returned to 7 Building. At approximately 1820 I left 7 Building to turn the roster counts in and then went to medical to talk to the captain. At the time said offender was being rolled to the ambulance. At approximately 1830 I was asked to give the E-mail to the officer leaving. I then left medical. I have no further knowledge of this incident. 30-43

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

## Texas Department of Criminal Justice
### INSTITUTIONAL DIVISION

## Inter-Office Communications

To: _____Warden R. Treon_____          Date: _____July 16, 2001_____

*Eugene A. Anuced #641115*

From: _____Offender Eugenio Ceniceros #641115_____          Subject: _____As Stated_____

On 7-16-01 inmate arrived at 7-G.  SSI's were carrying a mattress and pillow to 21-3 Row.
I saw Mrs. Stewart with the inmate, inmate did not want to go to the cell.  He went to the shower
and stayed in there.  I thought he was scare.  His face started to get blue.  Mrs. Stewart told the
picted officer that the inmate was very sick.  Officer reply was Fuck Him.  I'm on the telephone
now, if he dies he dies.  Then Mrs. Steward went to the desk and said to Mrs. Morales that there
was a sick man to tell Sgt. March.  Mrs. Morales alright alright.  Mrs. Morales told us SSI's to the
end of H pot hall and sit down.  Sgt. March said you all SSI's go to your pot's.  Sgt. March was
coming out when inmates were carrying the sick man.  Sgt. said put him down and told Morales to
call inforey for a gurney and told the officers to get the camera.  The officer did not know how to
turn it on or was having trouble with it.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*30-44*

Texas Department of Criminal Justice
INSTITUTIONAL DIVISION

## Inter-Office Communications

To: _____ Warden R. Treon _____     Date: _____ July 16, 2001 _____

From: ___ Offender J. W. McCowan TDC #786708 (7G-16T)     Subject: _____ As Stated

On the 16th of July, 2001 while I was working in 7 building G pod, a new inmate was brought in with mattress and what I assumed was his property. This inmate was complaining say, "I sick" and he was acting somewhat strange. There was some sort of problem as to getting him in a house, because he was in the shower. After housing this inmate Ms. Steward came out and told the boss something to the fact that this inmate "was not going to make it." The picket boss's response was, "Fuck him, if he dies he dies or something to that effect." Soon there after she went to the desk and told Ms. Morales. But nothing was done.

Then we went about our jobs, as cleaning and staying with Ms. Steward. Then count was called and all SSI(s) was called to the front. After 30 or 40 minute we were called to assist the office in getting this inmate from 3 row because he was out for the count.

While carry him the gurny began falling apart from dry rot and the inmates weight. After, get him to the front desk. The Sg. Ms. March called the infirmary for a wheel chair, but was told there was anyone available to bring it, so, she send a duty office.

At this time I notice that the inmate's face was beginning to turn blue, I inform the Sg. She order the camera be put on him and sent us back to our assigned pod.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30 ~45

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

# Inter-Office Communications

To: _____Warden R. Treon_____      Date: ____July 16, 2001_____

From: ___Offender Christopher Lassiter #573946_____      Subject: ____As Stated_____

On 7-16-01 between the hrs. of 4:20 and 5:20 p.m. I had introduced myself to Inmate Powers who was new on the farm and assigned to 7G-21 (B). The reason why I introduced myself to this inmate is because I thought he was afraid because he was sitting in the shower on the metal ledge and wouldn't come out. I explained to the guy that things were cool on this farm and that nobody wanted to hurt him or to take his stuff. He seemed to understand. His physical appearance wasn't exactly good and his skin was extremely hot. I know this because I shook his hand. After I shook his hand and realized how hot it was, I touched his arm. It was even more hot than his hand. I alerted Officer Stuart to this guys skin temperature who in turn escorted the offender to his cell and locked the cell door. Officer Stuart then left to inform Officer Redder in the control picket while I stayed in front of Offender Powers cell to make sure he was well enough untill medical could get to his cell. Once the security personel was alerted to the inmates condition and since there was nothing else I could do for inmate Powers, I left and proceeded with my SSI duties. AT around 5:15-5:20 cleaning the outside recreation yard when I saw officers with a green stretcher. A few minutes later several inmates went to G-pod to help bring Inmate Powers to the infirmary because he was heavy (at least that's what I assume). The stretcher was ripping while the inmate was on it. So he was sat down in front of the searchers desk while another female officer left to go to get a gurney form the building. While the inmate was on the stretcher on the floor he was shaking and having a hard time breathing and his whole head was turning a dark blue. It was almost like he was going into convulsion. Officer Schulz put the video camera on the inmate and we were told by Sgt. March to go to our assigned pods. We left.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30 - 46

Texas Department of Criminal Justice
**INSTITUTIONAL DIVISION**

# Inter-Office Communications

To  <u>WARDEN MOONEYHAM</u>          Date  <u>AUGUST 1, 2001</u>

From  <u>CHAPLAIN SMITH</u>          Subject  <u>RABBINICAL STUDENT VISIT</u>
                                              <u>MONDAY AM--08/13/01</u>

On Monday morning, August 13, 2001 the rabbinical students from the
Aleph Institute will be on the unit to have a ministerial visit with
one of the inmates on the unit. The inmate's name is as below:
    Stiner, Edward     #696310     10M-09

The volunteers coming to the unit is as below:
    Schneur Zalman Roth       FL ████████
    Zalman Shimon Abramowitz  CA ████████

Chaplain Anderson will be the chaplain on the unit this day.  Security
will need to be provided for the duration of the visit.  The visit
is to take place in the visitation area and is to be a <u>contact</u> visit.

Please let me know if this meets your approval.

AUG 0 2 2001
APPROVED: _____     DISAPPROVED: _____

        J.D. MOONEYHAM

cc  Upon Approval
    Warden Treon
    Duty Warden
    Major Bowman
    Captains--1st Shift
    Lieutenants--1st Shift
    13 Building
    Control Picket
    File

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-47

SO-4

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To:   __WARDEN TREON__                              Date: ___07-16-01___

From: __LT. L. BERGER__ _L.B._                Subject: __OFFENDER CARDWELL, JOHN #1041651__

On 7-16-01 at approximately 1750 hours, I was notified by Sgt. March that she had a unresponsive offender on 7 building. She stated that medical advised that they needed to load him upon the stretcher and come to medical. I left the count room and walked to medical. When I arrived at medical, there were 4 medical personal sitting at the desk. I knew two of the medical personal, LVN Newman and Mrs. Sherman. The two others I didn't pay attention to. Ms. Newman then stated to me, are you here to get a gurney? She then said why are you looking at me that way. I must have had a frown. I then stated; you know we have a unresponsive offender on 7 building. Ms. Newman then said I'm not going down there. She did walk with me to get the stretcher. I advised her I was not here to get it, but when it became obvious that no one was, I retrieved the stretcher. I then proceeded towards the front of medical where I spoke with Ms. Sherman. She wanted to know if the offender was faking it! I advised her I did not know, I was not down there and I did not do any pain compliance techniques to see if he was faking. At this time, we were at the nurses station. Ms Sherman then stated: I'll go with you and we started out the door and into the lobby. As we reached the exit door of 10 building she asked if I was going down to the building and I said yes. Officer Merklin was walking up at that time Ms. Sherman then said: I'll wait here for you. Officer Merklin and I responded to 7 building. I viewed an Offender on the floor on a green stretcher that was broken ( Offender Cardwell, John #1041651 ). I then picked the offender up with assistance of another offender on the other end and placed him on the gurney. The offender was then wheeled to medical. The offender was screened by LVN Newman, Sherman and Dr. Wipperman. The offender had a temperature of 106.8 at 1800 hours. I then requested Capt. oglesby to respond to medical. The offender was treated with ice packs, IV and oxygen. There was an ambulance that was pulling into the unit for another transport (Pierce, Williams 773279 7G-44B) who had stomach pains. Dr. Wipperman was telling the ambulance to load up offender Peirce, because the ambulance was from Electra, and the offender needed to go there. I spoke with the ambulance personal and advised that there was an offender

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-48

(Cardwell) who had a very temp. of 106.8. the paramedic advised he could take Cardwell if he was a priority. I then started to unsecure the offender to get him off the gurney. Dr. Wipperman then asked the paramedic, you can do that? and he said yes they could divert, to W.G.H. She then said ok then take Cardwell. At this point, Pierce was already up and off the gurney. Offender Cardwell was assisted to the gurney, and then to the ambulance. I then gave a short narrative of the situation. It should be noted that I sent offender Pierce to the infirmary at chow time at approx. 3:45 due to complaints of throwing up water. Medical advised they would look at him. I was never informed of any other incidents with this offender, or medical needs. Offender Cardwell left the unit at approximately 1820 hours in route to W.G.H. I then Proceeded up to 1 building were Officers were writing their statements. I spoke with Offender Edwards who stated he was Cardwell's cellie. Edwards stated that his cellie came into the cell and was acting like he was a psych. patient and was scared. Cardwell was on the run and in the shower, Edwards states he was acting like he was on heavy meds. Edwards stated he sat on the bottom bunk and Ms. Stewart got ready to count, and counted. After she entered 2 section Edwards states his cellie fell off the bunk and would not talk. Edwards states that when Redder came to do the roster count, he told him he would not respond.

Officer Redder then opened the cell door and attempted to get him to respond without any success. Officer Redder then requested Sgt. March and advised there was a unresponsive offender. The desk called medical from there.

I was present during the interview with Retha Stewart. She advised that she found the offender in the shower on the run. She said he was acting funny, and seemed to be a psych. patient. She said that he was given a towel by an offender and was fixing to shower but he got up, walked out of the shower, went, and sat on the end of the run. She then stated tat she talked him into his cell. About that time, Capt. Ogelsby took a telephone call from Warden Treon. Ms Stewart and I stepped outside of the office, at which time she told me that she touched the offender before this and he was very hot. She told Redder to call Sgt. March twice, and advised she finally went to the D-space sallyport and yelled at the desk officer Morales to have Sgt. March come see her.

Capt. Oglesby finished his telephone call and I advised Officer Stewart she needed to make sure that the Captain was aware of this and it was in her statement as such. We then reentered the office and Captain Oglesby finished his interview with Ms. Stewart (see IOC).

Officer Redder had already left the unit. I attempted to call his residence, but no answer. A message to call the unit was left on his answering machine to call the unit as soon as possible.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-49

**Texas Department of Criminal Justice**
INSTITUTIONAL DIVISION

## Inter-Office Communications

To:  __WARDEN R. TREON__                              Date:  __7-16-01__

From:  _____OFFICER C. KRUSE COIV__  C.K.   Subject:  ____OFFENDER CARDWELL, #1041651__

On 7-16-01 I worked in 10 building infirmary.  At approximately 1755 Lt. Berger came in to the infirmary and said that a gurney was needed on Seven building. I had my back to the door, but one of the nurses said, " we're not going to get him". Lt. Berger got the gurney and I opened the door for him as he left.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-50

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To: <u>WARDEN R. TREON</u>                    Date:     7-16-01

From:        OFFICER R. TOLL COIII          Subject:     OFFENDER CARDWELL #1041651

I Officer Toll at approx. 530p.m was doing paperwork when Desk Officer Morales told me to go relieve officer redder, he had an offender down on G pod cell 21who was on the floor unresponsive.  Officer Redder asked for SSI's to help. Redder, Sults and I assisted putting the offender on the gurney and get him out of the cell.  I then saw them off the pod and continued roster counting.  I never viewed the offender again.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-51

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To: __WARDEN R. TREON__                    Date: ___07-16-01___

From: _____N RODRIGUEZ CO IV_____       Subject: ___OFFENDER CARDWELL # 1041651___

I CO IV Rodriguez was assigned as chain officer.  At approx. 0900 the chain bus arrived from Robertson Unit. Offender Cardwell # 1041651 got off chain bus and I properly I.D.'d him and the rest of the incoming chain.  He had no complaints.  At that time he was put in the cage in 12 sallyport for approx. 10 minutes.  At approx. 0930 I was told that UCC would be run in 7 gym.  I then proceeded to take all the offenders to 7 gym.  UCC arrived at 7 gym at approx. 1000 and ran the incoming chain first.  When UCC was finished at approx. 1045 I took the chain to the chowhall and feed them. Then at approx. 1115 I went to unit supply and they were given mattresses and rolls.  I then escorted the chain to 3 building and they were put in the multi purpose room and I began to inventory their property.  After inventorying the property the offenders were left in the multi purpose room until approx. 1530 when I housed the offender in 7 G pod 21 cell.  At no time did Offender Cardwell complain of any heat problems

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-52

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To:   **WARDEN R. TREON**                          Date:   7-16-01

From:      OFFICER R. SHULTS COIII            Subject:      OFFENDER CARDWELL # 1041651

At 1730 Officer Morales instructed me Officer Shults and Officer Toll to get the medical gurney, go
to G pod 21 cell with Officer Redder waiting we loaded offender cardwell on the gurney and call for
assistance, four SSI's arrived carried him down from 3rd row and to the building desk.  When the
gurney ripped, Officer Morales called for a wheeled gurney from the infirmary.  Sgt. March then
handed me the video camera I turned it on and recorded offender to the infirmary and ambulance.
Lt. Berger told me to turn off when the rear door of the ambulance closed.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30 - 53

Texas Department of Criminal Justice
INSTITUTIONAL DIVISION

## Inter-Office Communications

To: _____ Warden R. Treon _____     Date: _____ 7-19-01 _____

From: _____ Major J. Bowman _____     Subject: _____ As Stated _____

    While interviewing Officer Stewart, Retha SSN #▮▮▮▮ she stated that she asked Officer Redder, Frederick SSN #▮▮▮▮ twice to call a supervisor.  She stated she told Officer Redder something was wrong with the offender.  He stated, "So", and to rack him up for count.  Officer Stewart admits that she put the offender in the cell and proceeded to count.  Officer Stewart then turned in her count sheets and asked the desk officer to have Sgt. March come to the pod when she got off the phone.  She never stated the offender needed medical attention.

    Officer Redder admits he did not call for a supervisor when Officer Stewart asked for one.  He then stated she never said it was for medical reasons.  He later admitted that she might have said it was for medical reasons, and he just stated, "So", but he could not remember.  Officer Redder later recanted that version and stated she never said it was for medical reasons.  Officer Redder still stated he did not call for a supervisor until he saw the offender laying on the cell floor.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-54

## Texas Department of Criminal Justice
### INSTITUTIONAL DIVISION

## Inter-Office Communications

To: _____Warden R. Treon_____   Date: _____7-16-01_____

From: _____Oficer Morales G. P. 1/1_____   Subject: _____Offender Cardwell # 1041651_____

On 07-16-01, I, Officer Morales was working 7 desk. At approximately 1630 hours, Officer Rodriguez brought in chain for the day. At approximately 1734 hours, Officer Stewart turned in her first count and asked me to have Sgt. March call her because at that count Sgt. March was on the phone trying to take care of another on-going situation with another offender. At approximately 1738 hours, Sgt. March hung up the phone and placed another phone call. She hung up at approximately 1741 hours. At that point, she escorted another offender back to his cell on "H" pod. At 1743 hours, Sgt. March came back from "H" pod and placed one more phone call. Meanwhile, I was getting information on the offender that was just escorted away for disciplinary purposes. Between 1744 and 1747 hours Sgt. March gathered all the count sheets and post orders and headed out the door. The exact time is unknown due to my gathering of information on the other side of the cage. At approximately 1750 hours I received a phone call from Officer Stewart, who at the time was working "G" pod, informed me that an offender was looking ill and that medical attention might be needed. I hung up the phone at approximately 1752 hours. At 1752 hours, I called medical to inform them of the situation and told Miss Newman I would call her back after we checked the physical status of the offender. At approximately 1753 hours, I called Sgt. March in 1 bldg. to inform her of the situation and told her I would call her back with more information. At 1753 hours, I called Officer Stewart back to check the offender's status, and she informed me that the offender was breathing but not responding. At 1754 hours, I called Miss Newman back in medical with that information, and she instructed to have someone place the offender on the stretcher and bring him over to medical because she said she was the only nurse on duty. At 1755 hours, I handed the stretcher to Officer Shults, sent him down to "G" pod and instructed him to help Officer Redder place the offender on the stretcher and take him to medical. At 1755 hours, Officer Stewart called me to request additional help due to the offender being too heavy too lift. At that point due to the seriousness of the situation, I had no other choice but to send two support staff inmates to assist in the transport. At 1757 hours the offender was brought out of "G" pod on the stretcher and set down on the floor in front of 7 desk due to the headpiece ripping through. Sgt. March arrived on 7 bldg. at approximately 1755 hours. At 1757 hours, Sgt.

**Continued**

Copy of OIG case to Legal report on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

90~55

Page #2 of 2

March sent for the rolling gurney. At 1759 hours, the offender was placed on the gurney and rolled towards medical. At 1800, I, Officer Morales, went down to 7G 21 cell to retrieve Offender Cardwell's TDC #104651 property, and his cellmate informed me that all he owned was a bible. The bible was a state bible. I informed him that all his property was inventoried prior to being housed that afternoon and that it would be investigated. He reiterated that all the offender had was a bible. The bible was tagged, placed in 1 bldg. holding cell, and that is the extent of my knowledge in this situation.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-56

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

# Inter-Office Communications

To: _____Warden R. Treon_____     Date: ___July 16, 2001_____

From: ___Offender J. W. McCowan TDC #786708 (7G-16T)___     Subject: _____As Stated_____

On the 16th of July, 2001 while I was working in 7 building G pod, a new inmate was brought in with mattress and what I assumed was his property. This inmate was complaining say, "I sick" and he was acting somewhat strange. There was some sort of problem as to getting him in a house, because he was in the shower. After housing this inmate Ms. Steward came out and told the boss something to the fact that this inmate "was not going to make it." The picket boss's response was, "Fuck him, if he dies he dies or something to that effect." Soon there after she went to the desk and told Ms. Morales. But nothing was done.

Then we went about our jobs, as cleaning and staying with Ms. Steward. Then count was called and all SSI(s) was called to the front. After 30 or 40 minute we were called to assist the office in getting this inmate from 3 row because he was out for the count.

While carry him the gurny began falling apart from dry rot and the inmates weight. After, get him to the front desk. The Sg. Ms. March called the infirmary for a wheel chair, but was told there was anyone available to bring it, so, she send a duty office.

At this time I notice that the inmate's face was beginning to turn blue, I inform the Sg. She order the camera be put on him and sent us back to our assigned pod.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30~57

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To: _____Warden R. Treon_____     Date: _____July 16, 2001_____

*Eugene A. Amcuw #641115*

From: ___Offender Eugenio Ceniceros #641115____     Subject: _____As Stated_____

      On 7-16-01 inmate arrived at 7-G.  SSI's were carrying a mattress and pillow to 21-3 Row. I saw Mrs. Stewart with the inmate, inmate did not want to go to the cell.  He went to the shower and stayed in there.  I thought he was scare.  His face started to get blue.  Mrs. Stewart told the picted officer that the inmate was very sick.  Officer reply was Fuck Him.  I'm on the telephone now, if he dies he dies.  Then Mrs. Steward went to the desk and said to Mrs. Morales that there was a sick man to tell Sgt. March.  Mrs. Morales alright alright.  Mrs. Morales told us SSI's to the end of H pot hall and sit down.  Sgt. March said you all SSI's go to your pot's.  Sgt. March was coming out when inmates were carrying the sick man.  Sgt. said put him down and told Morales to call inforey for a gurney and told the officers to get the camera.  The officer did not know how to turn it on or was having trouble with it.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-58

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

## Inter-Office Communications

To: ____Warden R. Treon____       Date: ____July 16, 2001____

From: ____Offender Christopher Lassiter #573946____   Subject: ____As Stated____

On 7-16-01 between the hrs. of 4:20 and 5:20 p.m. I had introduced myself to Inmate Powers who was new on the farm and assigned to 7G-21 (B). The reason why I introduced myself to this inmate is because I thought he was afraid because he was sitting in the shower on the metal ledge and wouldn't come out. I explained to the guy that things were cool on this farm and that nobody wanted to hurt him or to take his stuff He seemed to understand. His physical appearance wasn't exactly good and his skin was extremely hot. I know this because I shook his hand. After I shook his hand and realized how hot it was, I touched his arm. It was even more hot than his hand. I alerted Officer Stuart to this guys skin temperature who in turn escorted the offender to his cell and locked the cell door. Officer Stuart then left to inform Officer Redder in the control picket while I stayed in front of Offender Powers cell to make sure he was well enough untill medical could get to his cell. Once the security personel was alerted to the inmates condition and since there was nothing else I could do for inmate Powers, I left and proceeded with my SSI duties. AT around 5:15-5:20 cleaning the outside recreation yard when I saw officers with a green stretcher. A few minutes later several inmates went to G-pod to help bring Inmate Powers to the infirmary because he was heavy (at least that's what I assume). The stretcher was ripping while the inmate was on it. So he was sat down in front of the searchers desk while another female officer left to go to get a gurney form the building. While the inmate was on the stretcher on the floor he was shaking and having a hard time breathing and his whole head was turning a dark blue. It was almost like he was going into convulsion. Officer Schulz put the video camera on the inmate and we were told by Sgt. March to go to our assigned pods. We left.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-59

**Texas Department of Criminal Justice**
**INSTITUTIONAL DIVISION**

# Inter-Office Communications

To: _____ Warden R. Treon _____        Date: _____ July 16, 2001 _____

From: _____ Offender Roland Rojas #859646 _____        Subject: _____ As Stated _____

7/16/01 Mon.

When the guy came in with the chain boss I help escort him into the section and greeted him.  At that point the guy said he was feeling sick.  I went to the front desk to inform the Desk Boss Ms. Morales that the guy that just came in is not feeling well and looks sick...She just said so and get out of her face....I left not wanting trouble.  This is all I saw and know....

*Roland Riojas*
*— 859646 —*

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

30-60

| | | |
|---|---|---|
| **_TDCJ_<br>_HEALTH SERVICES DIVISION_<br>_POLICY MANUAL_** | Effective Date: 10/95 | NUMBER: E-41.1 |
| | Reviewed: 10/99 | |
| | Replaces: NEW | Page _1_ of _1_ |
| | Formulated: 5/95 | |
| | **EMERGENCY SERVICES** | |

PURPOSE:           To provide a mechanism by which offenders will receive 24 hour emergency health care for acute illnesses or unexpected health needs that cannot be deferred until the next scheduled sick call or clinic.

POLICY:

I.           All members of the Health Services and security staff will be familiar and comply with the procedures for obtaining emergency medical care and responding to emergencies. Ambulance transportation for the movement of any offender whose medical condition requires this mode of travel will be provided.

II.           During hours of operation, emergency room services are available on every facility and will be documented on an appropriate Emergency Room Record form (HSM-16). A plan for emergency services will be in place to cover off hours and for levels of services not available on the facilities.

PROCEDURE:

I.           Each facility health administrator (TTUHSC)/practice manager (UTMB) or his/her designee will post the procedure for activating the appropriate emergency medical services, to include names, addresses and telephone numbers of people to be notified and/or services such as ambulance and hospital to be used. This information will be readily accessible to all personnel (health care and correctional staff).

II.           The decision to transfer a patient for further medical care, choice of appropriate facility, and mode of transportation are determined by the physician or senior Health Services provider on-site in compliance with Utilization Review protocols. See Health Services Policy A-08.2 for notification of transfer procedures.

III.          Emergency drugs, medical supplies and equipment will be regularly maintained and accessible in the event of an emergency.

Index:          Emergency health care

Reference:      NCCHC Standard P-41, Emergency Services (essential)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.<br>UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*31 - 1*

FACILITY:                    J. V. Allred

HEALTH SERVICES POLICY
UNIT ADDENDUM

POLICY/PROCEDURE          **Emergency Services**
NUMBER:                   E-41.1
EFFECTIVE DATE.           November 1, 1998
REPLACES
NUMBER:
DATE:

FACILITY SPECIFIC ADDENDUM

TITLE:                       **Emergency Services**

PURPOSE:        To provide a mechanism by which offenders will receive 24 hour emergency
health care for acute illnesses or unexpected health needs that cannot be
deferred until the next scheduled sick call or clinic.

POLICY:        **Transfer to Emergency Department**
I.   An inmate is evacuated to a health care facility in the event of a health
care emergency that cannot be handled appropriately in the clinic setting.
These determinations are made by the physician at the unit or by the charge
nurse in the provider's absence.  The following steps apply:
A.   An emergency is reported to the nursing staff by security and the
inmate is escorted to the Clinic area by security or by Clinic staff.

B.   An assessment is made of the inmate's condition.  The unit
physician or extender will assess the capabilities of the unit infirmary
to handle the inmate's care.  If it is determined that the inmate needs
more acute care than can be provided in the emergency room or
infirmary of the clinic, the inmate will be transferred to a local hospital.
1.   The security department of the local hospital will be notified
of the transfer of an inmate to their emergency department.

C.   The inmate may be transferred by security van or by local
ambulance service as his condition warrants.

D.   The medical record is sent with the inmate.

E.   Two security officers accompany the inmate.  One is armed.

F.   E-mail is sent notifying the Warden, the count room, classification,
and Utilization Management of the transfer.  Security will have a copy of
the E-mail in hand prior to transport.  The shift supervisor is also notified
by telephone.
1.   An approval number is obtained from Utilization

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

31-2

McCollum v Stephens 497

Management. Before 1700 hours, it may be gotten over the phone. After 1700 hours, the E-mail is sent, and an approval number is obtained the next working day. This number is recorded in the Medical Record.

### Care in the Unit Emergency Room

I. The emergency room on the unit is equipped with adequate medications and equipment to care for the inmate's emergent needs. This equipment is checked on a routine basis to assure that it is in working order. The medications are checked by the pharmacy tech each month and those that are expired are replace.

A. Equipment found in the ER includes: crash cart with defibrillator, laryngoscope, suction machine, IV equipment, EKG machine.

II. The staff of the clinic are required to be certified in basic life support. The physicians are certified in advanced cardiac life support. Adequate time is given to each group to allow for certification. A record of same is kept within the personnel jacket.

**REFERENCE:** NCCHC Standard P-41, *Emergency Services*

REVIEWED BY AND DATE

UNIT HEALTH AUTHORITY _____ 2/15/99

HEALTH SERVICES ADMINISTRATOR _____ 2 19 99

FACILITY ADMINISTRATOR _____ 2-26-99

TTUHSC _____

ANNUAL FACILITY REVIEW
DATE:

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

31-3

| | Effective Date: 10/95 | NUMBER: E-42.1 |
|---|---|---|
| **TDCJ HEALTH SERVICES DIVISION POLICY MANUAL** | Reviewed: 10/99 | |
| | Replaces: 1-16 | Page  1  of  1 |
| | Formulated: 1/85 | |

| OFFENDER TRANSPORT AND TRANSFER |
|---|

PURPOSE:   To establish guidelines to assure that offenders are transported in a safe and timely manner for medical, mental health and dental clinic appointments both on and off site.

POLICY:

I.   Each facility is required to develop written procedures to describe how offenders access services or are transported to services under the following applicable circumstances:

    A.   On-site care:

        1.   General population
        2.   Administrative segregation
        3.   Lock down
        4.   Other housing situations
        5.   Disciplinary Segregation

    B.   Off-site care:

        1.   General population
        2.   Administrative segregation
        3.   Lock down
        4.   Other housing situations
        5.   Disciplinary Segregation

II.   The responsible physician or his/her designee provides instructions to transporting personnel regarding medication, therapy or other special treatment required by offenders during transit.

III.   The offender's health record accompanies him/her upon transfer off the facility of assignment.

Index:   Transportation
Transfer

Reference:   NCCHC Standard P-42, Patient Transport (important)
NCCHC Standard P-08, Communication on Special Needs Patients (essential)
NCCHC Standard P-64, Transfer of Health Records (important)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

31-4

FACILITY:                    J. V. Allred

## HEALTH SERVICES POLICY
## UNIT ADDENDUM

POLICY/PROCEDURE        **Offender Transport and Transfer**
NUMBER:                 **E-42.1**
EFFECTIVE DATE:         November 1, 1998
REPLACES                **New**
NUMBER:                 **E.33**
DATE:

**FACILITY SPECIFIC ADDENDUM**

TITLE:                       **Offender Transport and Transfer**

PURPOSE:     To establish guidelines to assure that offenders are transported in a safe
             and timely manner for medical, mental health and dental clinic
             appointments both on and off site.  A system to track unmet appointments
             will be maintained.

POLICY:      I. Offenders are transported to services in the following manner:
                 A.  On-site care:
                     1. General Population - Inmates are scheduled for routine
                     appointments in the Clinic area according to their housing
                     and custody levels.  They are given printed passes the night
                     before that allows them to leave work and come to Medical
                     for their appointment.

                     2. Administrative Segregation - Lay-ins are scheduled the
                     day before for nurse and doctor sick call the next day.  The
                     inmate's name is placed on the lay-in sheet and the inmate
                     is brought to the appropriate medical exam room in the
                     custody of security and in handcuffs.  Inmates that require
                     Dental, EKG or X-ray testing are scheduled in the main
                     Medical Clinic.  They are escorted by two security officers.
                     Offenders in High Security are seen in that building.

                     3. Lock down - Inmates on lock down status are afforded
                     access to care by submitting HSA-9 and being scheduled
                     appropriately. These offenders may be brought to the
                     Medical Department for priority appointments by security
                     with prior notification of the Building Major or Acting
                     Supervisor.  Cell side visits are recorded in a lock down log.

                     4. Disciplinary Segregation - Offenders in disciplinary
                     segregation are seen daily by the nursing staff to assess
                     their physical and mental condition.  If needed the offender
                     may be brought to the Medical Building for assessment by a
                     provider.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

31-5

**B. Off-site Care**

    **1. General Population, Administrative Segregation, Close Custody, Lock Down Status - An inmate is escorted to a physician's office, the hospital, or other health care facility either in security van or ambulance. Two security officers accompany the inmate. One is armed. The inmate is hand and ankle cuffed with a belly chain.**

    **2. E-mail is sent to notify the Warden, the count room and any other personnel that are required, of the plan to transport the inmate. A copy of the E-mail is in the hand of the security officer responsible for transport. A telephone call is made by the sending department to the shift supervisor to assure that he is aware of the transport. The Medical Record should be chained out by nursing staff and security tape should be used to assure confidentiality.**

**II. A listing of proposed chain out inmates is delivered to the Medical Department the evening before they are to leave. It is the responsibility of the Charge Nurse to review the chart and ascertain the presence of scheduled testing, procedures, doctor's appointments, specific medical needs. This nurse will notify the physician on call to cancel the chain if necessary or to modify the HSM-18 to reflect changes in condition. If there is a question regarding medical capabilities of the receiving unit, the inmate should be pulled from the chain and the Count Room notified. Medications, X-rays, and the medical record should accompany the inmate to the receiving facility.**

REFERENCE:  NCCHC Standard P-42, *Patient Transport*
               NCCHC Standard P-08, *Communication on Special Needs Patients*
               NCCHC Standard P-64, *Transfer of Health Records*

REVIEWED BY AND DATE  C. Tucker, RN  DON  4-19-00

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

31-6

FACILITY:                     J. V. Allred Unit

HEALTH SERVICES POLICY
UNIT ADDENDUM

POLICY/PROCEDURE
NUMBER:
EFFECTIVE DATE:              May 11, 2000
REPLACES
NUMBER:
DATE:

**FACILITY SPECIFIC ADDENDUM**

**TITLE:**      Transfer of Offender from Emergency Facility to Emergency Facility

**PURPOSE:**    To facilitate transfer of offender from one emergency facility to another
                when the condition of the offender is deemed too critical and potentially
                beyond the capability of the sending facility.

**POLICY:**     I. An offender is transferred to an emergency facility following assessment
                by unit physician or by nursing staff after regular business hours.

                II. The receiving physician at the local emergency room will assess the
                offender and determine if care is needed. The physician will also determine
                the level of care and capability of the emergency room and hospital. If the
                physician decides that the offender can be better treated at another
                emergency room or hospital, arrangements will be made to transfer. It is
                the responsibility of the attending physician to make report to the
                accepting physician at the second hospital.

                III. It is the responsibility of the nursing staff at the sending emergency
                room to contact the prison medical unit to generate e-mail notifying those
                concerned of the offender transport. Medical staff at the prison unit will
                type the e-mail and send it to the appropriate personnel. They will also fax
                a copy of the e-mail to the sending hospital so that unit security officers
                will have a copy of the e-mail during transport.

                For instance:   a. Offender is sent to Electra Memorial Hospital.
                                b. Physician at Electra decides that offender condition
                warrants transfer to another hospital.
                                c. Physician at Electra calls physician at another ER to give
                report and to have patient accepted for transfer.
                                d. Nurse at Electra calls Allred unit to notify medical that
                offender will transfer to another facility.
                                e. Nurse at Allred generates e-mail for transfer.
                                f. Nurse at Allred faxes a copy to officers at Electra hospital.
                                g. Offender is transferred to another hospital by van or
                ambulance as is deemed necessary.

REVIEWED BY AND DATE   C. Tucker, RN  DON  May 11, 2000

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

31-7

McCollum v Stephens 562

# Texas Tech University Health Sciences Center
## Division of Forensic Pathology
3601 4th Street, Mail Stop 8122
Lubbock, Texas  79430-8122
(806) 743-2158

*DX- 8-4-01*
*# 1041651*
*01-1359*

*FC*
*RV*

## AUTOPSY EXAMINATION REPORT

**Name:** John Wesley Cardwell
**Approximate Age:** 39 Years
**Height:**  66 Inches

**Case No:** FA01-0541
**Sex:** Male
**Weight:**  229.6 Pounds
**Date:**  August 6, 2001

**Autopsy Authorized By:**    **Grady Smith**
**Wichita County, Texas**

---

**CIRCUMSTANCES OF DEATH:** This 39 year old man was incarcerated.  He was found unresponsive in his cell.  He was diagnosed with heat stroke.  He was transported to a hospital where a body temperature of 108.5 F. degrees was recorded on 7-16-01.  He remained unresponsive throughout his hospital course.  He progressively deteriorated and expired on 8-4-01.  He had been transported to this prison facility in the morning of 7-16-01.  The National Weather Service recorded a temperature of 103 F at approximately 5PM.  The facility had no air conditioning.  His skin was hot and dry.  In addition, he was prescribed neuroleptic medication for recurrent major depression.

**DIAGNOSES:**

I.      Heat Stroke by clinical history.
        A.  Rhabdomyolysis by clinical history.
        B.  Bronchopneumonia.
        C.  Infarct of prostate.
II.     Mental depression by clinical history.
III.    Chronic alcoholism and drug abuse by clinical history.
        A.  Hepatitis C viral infection by clinical history
        B.  Cirrhosis of the liver.
        C.  Congestive splenomegaly.
IV.     Arteriosclerotic heart disease.

*9/28/01 COPIED*
*AND MAILED XR*
*OR.L.*
*DOC*
*OIG*
*Co bidg*

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**CAUSE OF DEATH:** Heat Stroke

**CONTRIBUTING CAUSE OF DEATH:** Neuroleptic Medication (Resperidone) Administered for Mental Depression.

**MANNER OF DEATH:** To be determined by the Justice of the Peace.

Robert E. Lyon, D.O.
Forensic Pathologist
Deputy Medical Examiner

Date    16 September 2001

Jerry D. Spencer, M.D.
Lubbock County Medical Examiner

Date    Sept 18, 2001

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

AUTOPSY REPORT  FA01-0541
CARDWELL, John Wesley

# AUTOPSY EXAMINATION

**DATE AND TIME:** August 6, 2001 at 9:10 am.

**EXTERNAL EXAMINATION:** The body is that of a 66 inch, 229.6 pound, well developed, well nourished, white man appearing the stated age of 39 years. Rigor mortis is passing. Lividity is posterior, moderately developed, and partially fixed. The torso is cool.

The scalp hair is 1 inch long, black, and straight.   The irides are of indeterminate color.  The conjunctivae have numerous petechiae and small hemorrhages. The globes have moderate chemosis.  The teeth are natural and in good repair.  Facial hair is comprised of a black and gray mustache, and black and gray stubble distributed on the beard region at about 3-5 duration of growth.  The left earlobe has been remotely pierced twice.  The body has anasarca.  The external genitalia are those of a normally developed, circumcised adult male.  The anterior superior aspect of the left leg has small red crust.  The posterior lateral aspect of the left foot and lateral aspect of the right ankle have occasional, moderate sized, roughly rectangular red-tan cutaneous pressure ulcers penetrating to dermis.  The body has jaundice.

# SCARS:

1.  The posterior aspect of the left forearm has a moderate length vertical oriented linear scar
2.  The lateral aspect of the left wrist has a moderate size roughly circular scar.
3.  The posterior aspect of the left hand scar has a short thin curvilinear scar.
4.  The posterior medial aspect of the right elbow has a horizontally oriented short linear scar.
5.  The anterior aspect of the right thigh has an obliquely oriented short linear scar.
6.  The left knee has two moderate length, roughly horizontally oriented linear scars.   The posterior aspect of the left forearm has a moderate size circular scar.

# TATTOOS:

1.  The left aspect of the chest has a black tattoo of the name Judy with an asterisk on each side of the word, and above this the word and illegible curvilinear black tattoo.
2.  The abdomen just to the right and left of the umbilicus each have a tattoo of a black illegible letter.
3.  The right aspect of the chest has a black tattoo of a marijuana leaf.
4.  The lateral aspect of the left arm has a black tattoo of a heart with a banner.
5.  The posterior aspect of the left arm has a black tattoo of an illegible word oriented in a vertical array.

1

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

AUTOPSY REPORT  FA01-0541
CARDWELL, John Wesley

6.  The posterior aspect of the right arm has a black tattoo of the word Natasha oriented
vertically.
7.  The posterior aspect of the left forearm has a black tattoo of a picture of the state of Texas
within which is a Mickey Mouse like figure behind jail bars, and stars circumscribe the
tattoo.
8.  The posterior aspect of the right forearm has a black tattoo of a clown face.
9.  The posterior aspect of the right hand has a black tattoo of a small cluster of lines.
10. The superior lateral aspect of the left thigh has a black tattoo of two adjacent letters S.
11. The anterior medial aspect of the left leg has a black tattoo of a spider web with a spider
12. The medial aspect of the right ankle has a black tattoo of two illegible letters.

## THERAPEUTIC:

1.  The left naris has a nasal gastric tube with its terminal end appropriately positioned within the
stomach.
2.  The anterior aspect of the neck has a tracheotomy tube.
3.  The right clavicular region has an intravascular catheter with its terminal end positioned
within the superior vena cava and connected to clear plastic bag  labeled lytes in hepatosol
8% and a plastic bag labeled 0.9 % sodium chloride solution and containing an estimated 300
ml of remaining clear liquid.  The anterior aspect of the right arm, and the anterior lateral
aspects of the left wrist and anterior aspect of left 3rd, 4th, and 5th fingers each have a skin
puncture (Comment:  These findings are consistent with sites of previous intravascular
catheters or venipunctures).
4.  The anterior aspect of the torso and the anterior lateral aspect of the left forearm has
electrocardiogram patches.
5.  The right wrist has a clear bracelet bearing the name of the decedent and identification
number.
6.  The left fourth finger has a pulse oximeter.
7.  The penis has a foley catheter with its terminal end appropriately positioned within the
urinary bladder and connected to a collecting bag containing a few ml of yellowish green
urine
8.  The rectum has a catheter connected to a collecting bag containing a few ml of greenish
liquid.

## INTERNAL EXAMINATION:

**HEAD:**  The scalp has no contusions.  The skull has no fractures.  There are no epidural or
subdural blood accumulations.  The brain weighs 1,306 grams.   The leptomeninges are thin.  The

2

Copy of OIG case to Litigation Support on 06.26.2013by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

AUTOPSY REPORT   FA01-0541
CARDWELL, John Wesley

cranial nerves have no nodules . The cerebral arteries have no sclerosis. The external and cut
surfaces of the brain are unremarkable.

**NECK:** The cervical spine, the laryngeal cartilages, the hyoid bone, and the strap muscles of the
neck have no injuries.  The upper airways have a red congested mucosa and contain no foreign
material. The tongue has no contusions or bite marks.

**BODY CAVITIES:** The abdominal cavity contains an estimated 800 ml of clear amber liquid.
The right and left chest cavities and pericardial cavity have no liquid accumulations.  The
pneumothorax test is negative bilaterally.  The organs are normally situated, moderately congested
and have no abnormal odors.

**CARDIOVASCULAR:** The aorta is unremarkable. The vena cavea have no thrombi.  The
pulmonary trunk and arteries have no thromboemboli.  The great vessels and the chambers of the
heart are under filled and contain a moderate quantity of dark red liquid and clotted blood.  The
heart weighs 425 grams.   The epicardial surfaces are smooth and have a moderate quantity of fat.
The coronary arteries arise from normally situated, normal size ostia, and distribute in a right
dominant pattern.  The proximal part of the left anterior descending coronary artery has mild
atherosclerosis manifested by yellow soft eccentric plaque with 20% focal stenosis.  Elsewhere the
main epicardial coronary arteries have mild atherosclerosis without obstruction. The myocardial cut
surfaces are red-brown with no gross evidence of fibrosis or necrosis.  The tricuspid, pulmonary,
mitral, and aortic valves are thin and unremarkable.  The chambers have no dilatation.

**LUNGS:** The left lung weighs 1,065 grams and the right lung weighs 1,184 grams.  The pleural
membranes are thin and unremarkable.  The cut surfaces are reddish-tan, firm and have occasional
tiny to small geographic zones of yellow consolidation.  The pulmonary arteries have no
thromboemboli. The bronchial mucosa is reddish-pink and congested.  No evidence of tumors,
infarcts, emphysematous changes, or pulmonary edema are identified.

**LIVER, GALLBLADDER AND PANCREAS:**  The liver weighs 2,474 grams.  The
capsule is thin.  The cut surfaces are tan-green, firm and have micro nodular cirrhosis.  The
gallbladder is distended and contains an estimated 30 ml of thick green bile and has no stones.  The
pancreas has tan lobulated cut surfaces.

**HEMIC AND LYMPHATIC:** The spleen weighs 684 grams.  The capsule is thin.  The cut
surfaces are dark red and partial autolyzed. The lymph nodes are not enlarged.  The thymus gland is
replaced by fat.   The vertebral marrow is dark red.

3

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

AUTOPSY REPORT  FA01-0541
CARDWELL, John Wesley

**GENITOURINARY:** The left kidney weighs 202 grams and the right kidney weighs 173 grams. The cortical surfaces are smooth.  The cut surfaces are red-brown and have the usual corticomedullary pattern.  The ureters have no dilatation.  The urinary bladder is not distended and contains no residual urine.  The prostate is moderately increased in size and the cut surfaces are reddish-tan-yellow, soft, and congested and has no nodules.  The seminal vesicles are unremarkable.  The testes have tan stringy cut surfaces.

**ENDOCRINE:**  The pituitary, adrenal, and thyroid glands have no hyperplasia or nodules.

**DIGESTIVE:** The esophagus, stomach, and duodenum have no chronic ulcers.  The stomach contains approximately 25 ml of thin tan nondescript liquid.  The small and large intestines are unremarkable.

**MUSCULOSKELETAL:**  The clavicles, sternum, ribs, spine, and pelvis have no recent fractures.  The musculature is unremarkable.

**MICROSCOPIC DESCRIPTION:**

Lung: Cirrhosis. Collections of large pleomorphic hepatocytes with prominent nucleoli suggestive of hepatocellular carcinoma.

Prostate: Infarct manifested by necrosis and marked acute in flammation.

Skeletal muscle: Unremarkable.

Lung: Anthracosis.  Bronchopneumonia manifested by pink proteinaceous material and sheets of neutrophils with karryorhexis in alveoli, necrosis of alveolar septa, reactive pneumocytes and fibroblast proliferation.  Organizing thrombus of small vessel.

Heart from posterior wall of left ventricle: Epicardium, myocardium, and endocardium, unremarkable.

## SPECIMENS AND EVIDENCE COLLECTED

1.	Photographs are taken.
2.	Vitreous, blood, bile, urine, gastric contents, liver and brain are retained.
3.	Routine tissue sections are submitted.

4

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**AUTOPSY REPORT   FA01-0541**
**CARDWELL, John Wesley**

<u>CONCLUSION:</u>  The lungs had bronchopneumonia.  The prostate had an acute infarct.  The liver had cirrhosis.  The spleen had congestive splenomegaly.  The heart had arteriosclerotic heart disease.  The clinically suspected myocardial infarct, and pseudomembranous colitis were not confirmed.

Based on all of the available information, **John Wesley** Cardwell died form heat stroke. Neuroleptic medications suppress central heat loss mechanisms and contribute to heat stroke. Therefore the neuroleptic medication administered for mental depression was a contributing cause of death.

5

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**INTERNAL AFFAIRS DIVISION**

# CRIMINAL CASE INFORMATION WORKSHEET

(1) __01-1359TDCJ__  (2) __JA__  (3) __08-04-2001__  (4) __08-06-2001__

CRIMINAL CASE NUMBER (assigned by CASE MANAGEMENT)    UNIT OR LOCATION    DATE OF OFFENSE    DATE CASE OPENED (assigned by CASE MANAGEMENT)

(5)

| VICTIM, COMPLAINANT, OR WITNESS | V/C/W | TDC NUMBER / RANK | DOB | RACE | SEX | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(6)

| SUSPECT'S NAME | TDC NUMBER / RANK | DOB | RACE | SEX | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|
| **CARDWELL, JOHN W.** | **01014651** | **09-01-1961** | **W** | **M** | - - |
| | | | | | |
| | | | | | |

(7) __OFFENDER CARDWELL WENT INTO CARDIAC ARREST AND SUBSEQUENT EFFORTS TO RESUS-__

__CITATE CARDWELL WERE OF NO AVAIL. CARDWELL HAD BEEN HOSPITALIZED SINCE__

__7/16/01, AFTER BEING FOUND UNRESPONSIVE IN HIS CELL. HOSPITAL RECORDS INDI-__

__CATE PRE-ARREST DIAGNOSIS HEAT STROKE MULTI-SYSTEM FAILURE.__

SUMMARY OF OFFENSE

(8) EXACT LOCATION OF INCIDENT: **UNITED REGIONAL HEALTH CARE SYSTEM, CCU**

(9) VIOLATION OF STATE STATUTE(S): **CCP 49.18**  **DEATH IN CUSTODY**

WHICH IS A _____ DEGREE FELONY or A CLASS _____ MISDEMEANOR.

(10) INVESTIGATOR INITIALS: __TRL__

REQUEST FOR CASE OPENING

| | |
|---|---|
| | Concur ( ) |
| TEAM CHIEF/C.I.O.B./C.A.S.B.        DATE | Non-Concur ( ) |
| INVESTIGATOR SIGNATURE        DATE | Approved ( ) |
| A.D.I.A.D./C.I.O.B./C.A.S.B.        DATE | Disapproved ( ) |

IA-03C (Rev. 02/92)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

08/06/2001  09:53  6762614              AAD                         PAGE  01
AUG-06-01 10:59 AM  TDCJ INTERNAL AFFAIRS    9400902040

## Texas Department of Criminal Justice
### INTERNAL AFFAIRS DIVISION

## CRIMINAL CASE INFORMATION WORKSHEET

(1) _01- 1359_  (2) _ALLRED UNIT_  (3) _August 4, 2001_  (4) _____
    CRIMINAL CASE NUMBER        UNIT OR LOCATION      DATE OF OFFENSE

(5)
| VICTIM, COMPLAINANT, OR WITNESS | V/C/W | TDCJ#/RANK | DOB | RACE | SEX | SOCIAL SECURITY # |
|---|---|---|---|---|---|---|
| STATE OF TEXAS | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(6)
| SUSPECT'S NAME | TDCJ#/RANK | DOB | RACE | SEX | SOCIAL SECURITY # |
|---|---|---|---|---|---|
| CARDWELL, JOHN WESLEY | 1041651 | 09/01/61 | W | M | |

(7)
ON AUGUST 4, 2001, AT APPROX. 5:50 P.M., OFFENDER CARDWELL WENT INTO CARDIAC ARREST AND SUBSEQUENT EFFORTS TO RESUSCITATE OFFENDER CARDWELL WERE OF NO AVAIL. OFFENDER CARDWELL HAD BEEN HOSPITALIZED SINCE 07/18/01, AFTER BEING FOUND UNRESPONSIVE IN HIS CELL. HOSPITAL RECORDS INDICATE PRE-ARREST DIAGNOSIS HEAT STROKE MULTI SYSTEM FAILURE.

↑ SUMMARY OF INCIDENT (Include Specific Details) ↑

(8)  EXACT LOCATION OF INCIDENT: _UNITED REGIONAL HEALTH CARE SYSTEM, CCU_

(9)  VIOLATION OF STATE STATUTE(S): _CCP. 49.10 DEATH IN CUSTODY_

     WHICH IS A _____ DEGREE FELONY OR CLASS _____ MISDEMEANOR.

(10)  INVESTIGATOR INITIALS: _TRL_

REQUEST FOR CASE OPENING

| _INV. TERRY LAMBETH_ _08/01/01_ | _____ _8/5/01_ | Concur |
|---|---|---|
| INVESTIGATOR         DATE | TEAM CHIEF/C.I.O.B./C.A.S.S.   DATE | Non-Concur |
| | | Approved |
| | | Disapproved |

IA-03C (05/03/1999)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

AUG 31 2001 14:12 FR JAMES V ALLRED          9408553928 TO 19364578715          P.01



**Texas Department of Criminal Justice**
INTERNAL AFFAIRS DIVISION

## BRIEFING MEMORANDUM

TO:      <u>Mr. Ciro de la VEGA</u>          DATE:   <u>August 8, 2001</u>
         Chief of Inv. Operations Bureau
         OIG Hqtrs., Huntsville, Tx.

THRU:    <u>Mr. Anthony HOWARD</u>
         Region V Acting Chief
         Region V OIG Hqtrs.

FROM:    <u>Inv. II Thomas R. SMYTH</u>          SUBJECT:  <u>Death In-Custody #01-1359</u>
         Allred Unit OIG Investigator
         Iowa Park, Tx.


**VICTIM (s):**
CARDWELL, John Wesley, TDCJ-ID# 1041651

**SUSPECT (s):**


**DATE/TIME:**
Date of initial incident 07/16/01, at approx. 5:50 p.m.
Date of death 08/04/01, at approx 6:03 p.m.

**STATUS:**
Investigation is ongoing with an autopsy being ordered and results pending.

_____

**SYNOPSIS:**
On 07/16/01, at approximately 5:50 p.m., Offender CARDWELL was found unresponsive in his cell
(general population), a subsequent investigation conducted by unit authorities has revealed that a
security officer (a rover) had reported that Offender CARDWELL did not look right or was not
acting right...etc., approximately (45) minutes *earlier* to the security officer, who was working the
control picket.  The unit level investigation was quite comprehensive with multiple statements being
taken from staff and offenders who were in the area, some of which are inconsistent as to the
comments that were allegedly made by the picket officer the *first time* the matter was brought to his
attention, which has only added a great deal of ambiguity as to the validation of the *response issues*
that have developed in the ensuing investigation of this matter.

_____

IA-25 (6/12/1996)                                                          Page 1 of 2

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

AUG 31 2001 14:12 FR JAMES V ALLRED      9408553928 TO 19364578715      P.02

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
IAD – BRIEFING MEMORANDUM
AUGUST 8, 2001

Subject: Death In-Custody #01-1359

Offender CARDWELL arrived at the unit infirmary with a body core temperature of 106.3, where he remained unresponsive and was treated with ice packs. Offender CARDWELL was transported to the 11th Street Campus of United Regional Health Care Center by an ambulance which happened to be at the Allred Infirmary for another offender in reference to an (unrelated matter). Offender CARDWELL arrived at URHCC where his body core temperature had risen to 108.5 and was hospitalized in critical condition and remained hospitalized in the Coronary Care Unit on life support devices until his death the evening of August 4, 2001. All medical documentation from the inception of this incident until Offender CARDWELL's death is indicative of his condition being heat related, specifically heat stroke, thermal injuries.....etc. Pre-arrest diagnosis specifically indicates *"Heat Stroke - Multi System Failure."* Investigation has disclosed that Offender CARDWELL was currently prescribed two Psychotropic Medications, specifically Risperidone and Nortriptyline, when he arrived at the Allred Unit on July 16, 2001.

Unit Authorities have since taken disciplinary action against both the picket officer and rover, with the picket officer being dismissed and the rover receiving (8) months probation. Both were charged with *Reckless Endangerment.* Texas Tech Medical Authorities have initiated disciplinary action towards one of their staff members, of which I was notified this morning that she had resigned her employment this date, pending disciplinary. On August 7, 2001, Region V/Wichita Falls, Chief SPU., Mrs. Gina DeBottis was briefed on case specifics to date and Texas Tech's involvement in this incident who felt as though their involvement/response did not help the overall complexion of the incident, but their involvement is at best on the back end of the matter.

Inv. LAMBETH who is the case agent forwarded the death packed overnight to OIG Hqtrs., on Monday 08/06/01, which is inclusive of the last seventy-two hours of medical records. Attached to this briefing are copies of all statements taken during the unit level investigation of this matter, some of which have multiple drafts, specifically those of the picket office and the rover. Please reference the statement given by Lieutenant BERGER, as it probably gives the best overview of the incident.

Investigation of this matter is ongoing at this time with preliminary findings disclosing that several sidebar/collateral issues exist that will undoubtedly need further investigation, as the issues are an integral part of how this incident was handled at *it's onset.* At such point that further investigation reveals or discloses culpability of a higher degree upon staff participants, case perspective will change at that time to meet the needs and dynamics of the investigation.

Update will follow on the basis of case altering or the development of significant case findings.

IA-25 (6/12/1999)                                                                Page 2 of 2

** TOTAL PAGE.02 **

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED