UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 204

## BUSINESS RECORDS AFFIDAVIT

STATE OF TEXAS

COUNTY OF Travis

RE:     Cause Number 3:12-CV-2037;
        Stephen McCollum, et al.  v. Brad Livingston, et al.
        U.S. District Court, Northern District, Dallas Division

        BEFORE ME, the undersigned authority, personally appeared John C. West, who, being duly sworn by me, deposed as follows:

        "My name is John C. West.  I am over 18 years of age, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

        "I am employed as the General Counsel for the Office of the Inspector General (OIG) – Texas Department of Criminal Justice.  I am the custodian of the attached records of the OIG.  These records are kept by the OIG in the regular course of business, and it was the regular course of business of the OIG for an employee or representative of the OIG, with knowledge of the act, event, condition, or opinion, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.  The attached record is an exact duplicate of the record on file with the Office of the Inspector General in Criminal Case File No. 2004-1679 concerning Offender Ricky Robertson, TDCJ #1172218 on the death of Offender Robertson on 07/16/2004.

John C. West
General Counsel
Office of the Inspector General

SWORN TO AND SUBSCRIBED before me on this the 26st day of June 2013.

NOTARY PUBLIC in and for
The State of Texas
Printed Name: Susan Machutt
My commission expires: May 20, 2015

Susan Machutt
Notary Public, State of Texas
My Commission Expires
05/20/2015
Notary Without Bond



**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL

## SUPPLEMENT CRIMINAL CASE REPORT

| OFFENSE Evidence Destruction | CASE #: 2004.1679 |
|---|---|
| LOCATION: Hospital Glaveston | DATE OF OFFENSE: 08/01/2012 |
| VICTIM: None | DATE OF SUPPLEMENT REPORT: 10/05/2012 |

Case Number 2012.03547 was opened as an Information Only Criminal Case to document the final disposition of evidence stored in the OIG Region B Evidence Room for multiple cases listed under this case number.

All evidence pertaining to this particular case number, 2004.1679, which are itemized in Judge Harden's destruction order, was disposed of in accord with the mandates of the order.

The disposition and destruction documents, with original signatures, are filed under Case Number 2012.03547.

INVESTIGATING OFFICER(S)

| | | | |
|---|---|---|---|
| (1) _[signature]_ | #220 | October 4, 2012 | IS FURTHER INVESTIGATIVE ACTION REQUIRED? |
| | ID# | DATE | |
| (2) _____ | | | ___ YES __X__ NO |
| | ID# | DATE | |
| _[signature]_ | #321 | October 04, 2012 | |
| APPROVING SUPERVISOR | ID# | DATE | |

| CC-0255 (07/2005) | Copy of OIG case to Litigation Support on 06.26.2013 by scm. UNAUTHORIZED COPYING OR VIEWING PROHIBITED |
|---|---|

33333333333

333

2

2

2

0

1

1

1

SUMMARY of ACTIVITIES:

Investigator
Name _____ 04-1679

| DATE & INITIAL | ACTIONS/COMMENTS |
|---|---|
| MAR 2 1 2005 | Case Audit  *Joe Nesmith* 108    C. Joe Nesmith |
| 4-1-2005 | Case forwarded for review C. Eckert, #175 C. Eckert |
| APR 0 4 2005 | Return to Mr. Mullen.  *Joe Nesmith* 108   C. Joe Nesmith |
| 4-18-05 | Met with Dr. Linthicum requesting her review of this offender's medical history and medications. Returning case to Cpt. Nesmith for Inv. Eckert to gather more information before presenting to the SPU. D. Rhoten  *Dan Rhoten* |
| 4-2505 | Case received. C. Eckert #175, C. Eckert |
| 6-2-05 | Case resubmitted to CJN. C. Eckert #175, C. Eckert |
| 6/6/05 | Reviewed - present to Cdr. Mullen.  *Joe Nesmith* 08   C. Joe Nesmith |
| 7/6/2005 | EJ Mullen! Case re-reviewed by me and Mr. Rhoten. Per discussion with Mr. Rhoten, we have concerns regarding the factors and circumstances surrounding offender's death; i.e. heat factors; medications; transportation issues; and potential for culpability. Need to discuss these and any other concerns with SPU and present copy of case for prosecutive consideration or declination and ~~return to Region B~~ document in supplemental report as appropriate. Return to Region B. |
| 07/16/05 EK | To Region B |
| 7/29/05 | Presented copy to SPU Hall.  *Joe Nesmith* 108 |
| NOV 0 8 2005 | Checked w/ SPU Hall - he will take it to HJ  *Joe Nesmith* 108 |
| DEC 2 1 2005 | TO RECORDS - CLOSURE  *Joe Nesmith* 108   C. Joe Nesmith |
| RECEIVED DEC 2 8 2005 | |

OFFICE OF THE
INSPECTOR GENERAL

AC-0105 (08/2001)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

McCollum v Roberts 5-3

SUMMARY
INVESTIGATIVE ACTIVITIES:      CASE#    **04-1679TDCJ**

| DATE & INITIAL | ACTIONS/COMMENTS |
|---|---|
| **07-19-2004 CJA** | |
| | **Assigned to Region B** |
| JUL 27 Rec'd | **Case assigned to Investigator** _CXS_ . |
| 7-28-04 | Cesar Sanchez ; case rec. |
| SEP 2 5 2004 | Reassigned to SDP          C. Joe Nesmith |
| 10-20-04 | Susan D. Poole |
| | Spoke to Joe Nesmith concerning this case. |
| | There are no investigative notes, no photographs of |
| | deceased — no autopsy — |
| | Joe instructed me to return this case to Rosharon. |
| 10-21-04 | Susan D. Poole |
| | Submitted to Lt Bowers to be returned to |
| | J. Nesmith. |
| 11-8-04 Mark T Bowers | Returned to Capt. Nesmith. |
| NOV 1 9 2004 | Reassigned to CXS |
| 11-22-04 | Cesar Sanchez ; case rec. |
| DEC 1 7 2004 | **TO RECORDS - CLOSURE**        C. Joe Nesmith |
| 1-7-05 | CASE Reviewed and it is obvious that the investigator |
| | never investigated this death, only gathered |
| | documents and placed them in this folder. |
| | Returned for Inv. Colleen Eckert to Investigate |
| | as her top priority. D. Rhoten |
| JAN 1 0 2005 | Case rec'd @ Reg B, Rosharon, to Capt. Nesmith   T. Sandlin |
| JAN 1 1 2005 | To Inv. Eckert.        Jo Nesmith 108   C. Joe Nesmith |
| 11-2005 | Case received, C Eckert #175   C. Eckert |

IA-04 (Rev. 08/90)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**OFFICE OF THE INSPECTOR GENERAL - INVESTIGATIONS DEPARTMENT** 27

# CRIMINAL CASE INFORMATION WORKSHEET

(1) **04-1679TDCJ**   (2)  **HG**   (3)  **07-16-2004**   (4)  **07-19-2004**
CRIMINAL CASE NUMBER   UNIT OR LOCATION   DATE OF OFFENSE   DATE CASE OPENED

(5)

| VICTIM, COMPLAINANT, OR WITNESS | V/C/W | TDCJ NUMBER / RANK | DOB | RACE | SEX | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| ROBERTSON, RICKEY | V | 01172218 | 08-21-1966 | B | M | ▨ |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

(6)

| SUSPECT'S NAME | TDCJ NUMBER / RANK | DOB | RACE | SEX | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

(7)   **ON 7/16/04, AT APPROXIMATELY 12:30 AM, OFFENDER ROBERTSON WAS FOUND**

**UNRESPONSIVE IN HIS CELL. OFFENDER ROBERTSON WAS TAKEN TO THE MEDICAL, WHERE**

**HE HAD 108* TEMPERATURE. OFFENDER WAS LIFE FLIGHTED TO HOSPITAL GALVESTON.**

**AT 3:10 PM, OFFENDER ROBERTSON DIED. PROVISIONAL CAUSE OF DEATH IS OVERDOSE/**

**SEPSIS (NEUROLEPTIC MALIGANT SYNDROME). LIKELY MANNER OF DEATH IS ACCIDENTAL**
SUMMARY OF OFFENSE

(8) EXACT LOCATION OF INCIDENT: **HOSPITAL/GALVESTON**

(9) VIOLATION OF STATE STATUTE(S): **CCP 49.18**      **DEATH IN CUSTODY**

WHICH IS A _____ DEGREE FELONY or A CLASS _____ MISDEMEANOR.

(10) INVESTIGATOR INITIALS:_____**CXS**_____     .   OPENED BY:_____**CJA**_____

| REQUEST FOR CASE OPENING | | |
|---|---|---|
|  | TEAM CAPTAIN          DATE | Concur        ( ) |
| INVESTIGATOR SIGNATURE          DATE | | Non-Concur    ( ) |
|  | COMMANDER          DATE | Approved      ( ) |
|  |  | Disapproved ( ) |

IA-03C (Rev. 07/03)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

JUL-19-2004 09:26  FROM:REGION B OIG 281-595-2558          TO:RECORDS            P:1

JUL-19-2004 10:25  FROM:OIG DARRINGTON 2815953465+2320     TO:912915952558       P:1/1

**Texas Department of Criminal Justice**
**OFFICE OF THE INSPECTOR GENERAL**
**INVESTIGATIONS DEPARTMENT**
Fax Number: (936) 437-6996

## CASE OPENING REQUEST

(1) **04·1679**   (2) Hospital/Galveston   (3) 7/16/2004

CASE #                UNIT / LOCATION OF OFFENSE / VIOLATION(S)     DATE OF OFFENSE / VIOLATION(S)

(4)

| VICTIM, COMPLAINANT, SUSPECT OR WITNESS | VIC/S/W | ID# / RANK | DOB | RACE | SEX | SOCIAL SECURITY # |
|---|---|---|---|---|---|---|
| Robertson, Rickey | V | 1172218 | 8/21/1966 | B | M | ▓▓▓▓▓ |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(5) **ALLEGATIONS**

On July 16, 2004, at 3:10 p.m., Offender Robertson died at the Hospital/Galveston. Provisional cause of death is overdose/sepsis (Neuroleptic Malignant Syndrome). Likely manner of Death is accidental.

On July 16, 2004, approximately 12:30 a.m., Offender was found unresponsive in his cell. at the Darrington Unit. He was taken to the medical department where it was discovered that he had 108° F in temperature. He was Life Flighted to the hospital in Galveston, Texas, where he later died.

(7)  VIOLATION OF STATE STATUTE(s)  49.18
     DEGREE/CLASS:        Death in Custody

     or EXECUTIVE DIRECTIVE PD-22, RULE(s) #:  N/A

(8)  MUOF#:  N/A

(9)  INV INITIALS:  CXS      INV EMAIL:  CSA6222      OTHER EMAIL: _____

REQUEST FOR CASE OPENING

| | | ADDENDUM ATTACHED No |
|---|---|---|
| | | Administrative — ☐ |
| | | Criminal — ☒ |
| | | IF to Field — ☐ |
| | | IF Retention Only — ☐ |

Cesar Sanchez    7/19/2004     Joe Nesmith    7/19/04
INVESTIGATOR     DATE       APPROVING SUPERVISOR   DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

McGriff v. Roberts 5-6



**Texas Department of Criminal Justice**
**OFFICE OF THE INSPECTOR GENERAL**
**INVESTIGATIONS DEPARTMENT**

## OFFENSE/INVESTIGATIVE REPORT

| OFFENSE: Death in Custody Art. 49.18 | | | | ORI#: 236065C | CASE #: 04-1679 |
|---|---|---|---|---|---|

| EXACT LOCATION OCCURRED: Hospital/Galveston | | | COUNTY IN WHICH OFFENSE OCCURRED / CODE#: Galveston / 04 | TYPE OF PREMISES: State Prison |
|---|---|---|---|---|

| DATE OF OFFENSE: 7/16/2004 | TIME: 3:10 p.m. | DAY: Friday | DATE REPORTED: 7/16/2004 | TIME REPORTED: 4:00 P.M. | INVESTIGATED BY: C. Sanchez, Invest. |
|---|---|---|---|---|---|

| PERSON REPORTING OFFENSE: Lt. Mickens | CONTACT ADDRESS: Hospital/Galveston |
|---|---|

| BUSINESS PHONE: 409-772-2875 | CONTACT PHONE: 409-772-2875 |
|---|---|

| VICTIM #1 NAME: (LAST, First, MI) Robertson, Ricky | CONTACT ADDRESS: Darrington Unit | |
|---|---|---|

| ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) 1172218 | SID#: 06651475 | FBI#: 584105DA3 | CONTACT PHONE: N/A |
|---|---|---|---|

| OCCUPATION: Offender | RACE: W | SEX: Male | DOB: 8/21/1966 | EMPLOYED BY: N/A |
|---|---|---|---|---|

| VICTIM #2 NAME: (LAST, First, MI) | CONTACT ADDRESS: | |
|---|---|---|

| ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) | SID# | FBI# | CONTACT PHONE: |
|---|---|---|---|

| OCCUPATION | RACE: | SEX: | DOB: | EMPLOYED BY: |
|---|---|---|---|---|

| SUBJECT #1 NAME: (LAST, First, MI) | CONTACT ADDRESS: | CONTACT PHONE: |
|---|---|---|

| RACE: | SEX: | DOB: | HEIGHT: | WEIGHT: | BUILD: | HAIR: | EYES: | COMPLEXION: | ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) |
|---|---|---|---|---|---|---|---|---|---|

| TDCJ EMPLOYEE? ☐ Yes ☐ No | EMPLOYEE JOB TITLE: | EMPLOYEE JOB LOCATION |
|---|---|---|

| TDCJ OFFENDER? ☐ Yes ☐ No | PAROLEE? ☐ Yes ☐ No | SID# | FBI# | ADDITIONAL INFORMATION: (DO NOT USE SS#) |
|---|---|---|---|---|

| SUBJECT #2 NAME: (LAST, First, MI) | ADDRESS: |
|---|---|

| RACE: | SEX: | DOB: | HEIGHT: | WEIGHT: | BUILD: | HAIR: | EYES: | COMPLEXION: | ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) |
|---|---|---|---|---|---|---|---|---|---|

| TDCJ EMPLOYEE? ☐ Yes ☐ No | EMPLOYEE JOB TITLE: | EMPLOYEE JOB LOCATION |
|---|---|---|

| TDCJ OFFENDER? ☒ Yes ☐ No | PAROLEE? ☐ Yes ☐ No | SID# | FBI# | ADDITIONAL INFORMATION: (DO NOT USE SS#) |
|---|---|---|---|---|

| DRUG RELATED? ☐ Yes ☐ No | TYPE: | | AMOUNT: |
|---|---|---|---|

| BOOKED? ☐ Yes ☒ No | LOCATION: | BOND: | PROPERTY SEIZED/CONFISCATED? ☐ Yes ☒ No | IF YES, DESCRIBE: |
|---|---|---|---|---|

**SUMMARY:**                                                                                 ADDENDUM ATTACHED YES

On July 15, 2004, at approximately 9:35 p.m., Offender Robertson was found unresponsive in his cell at the Darrington Unit. He was transported to the medical department where he was found to have 108° F in temperature. He was then Life Flighted to Hospital/Galveston for emergency medical treatment.

| Investigator's Signature | ID#: 139 | DATE: 12-15-04 |
|---|---|---|
| Approving Supervisor's Signature | ID#: 08 | DATE: DEC 1 7 2004 |

CC-0240 (08/2003)                                                                                          Page 1 of 2

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

OFFENSE/INVESTIGATIVE REPORT
SUMMARY CONTINUATION

CASE #: 04-1679

On July 16, 2004, at 3:10 p.m., Offender Robertson expired. Provisional cause of death was established to be overdose/sepsis (Neuroleptic Malignant Syndrome).

Dr. Olano with the Galveston Medical Examiner's office performed an autopsy. The results are as follows:

*In summary, this 39-year old man died of complications of severe hyper-thermia and heat stroke. An important contributing fact was a toxic level of tricyclics in serum. The manner of death is accidental.*

| Investigator's Signature | 139 ID# | 12-13-04 DATE |
|---|---|---|
| Approving Supervisor's Signature | ID# | DATE |

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

 

**Texas Department of Criminal Justice**
**OFFICE OF THE INSPECTOR GENERAL**
**INVESTIGATIONS DEPARTMENT**

## CRIMINAL CASE REPORT

| OFFENSE | CASE #: |
|---|---|
| Death in Custody 49.18 | 04-1679TDCJ |
| LOCATION: | DATE OF OFFENSE: |
| Hospital/Galveston | 07-16-2004 |
| VICTIM: | DATE OF SUPPLEMENT REPORT: |
| Robertson, Rickey, TDCJ# 1172218 | 12-13-2004 |

### CASE NARRATIVE:

Offender Rickey L. Robertson, TDCJ# 1172218, arrived to the Texas Department of Criminal Justice-Institutional Division on June 25, 2003. Robertson was serving a 3-year sentence for Deadly Conduct. Offender Robertson was assigned to the Darrington Unit.

Offender Robertson had a history of bipolar disorder, borderline personality disorder and substance abuse. Robertson was taking the following medications: Lithium 600 mg, Chloropromazine 100 mg, benztropin 2 mg, amantadine 100 mg, and nortryptyline 75 mg.

On July 15, 2004, at approximately 9:35 p.m., Robertson was found unresponsive in H-line, 2-row, 3-cell. Robertson was placed on the floor and examined by medical staff. The nurse instructed the officers to take Robertson to the unit infirmary. Sergeant Michael W. Stephens, Officer Michael D. Knight Jr., Officer Fidel Gallegos and Officer Everest Mbonu carried Robertson out of the cell. They placed him on a medical board, and took him down the stairs where Robertson was transferred to a gurney. Robertson was transported to the medical department. Robertson's temperature was documented at 108* degrees and his vital signs showed him with very low blood pressure. Robertson was sent via life-flight to UTMB-Galveston, Texas, where his condition continued to deteriorate.

On July 16, 2004, Dr. Movva placed Robertson on the critical list and the next of kin was notified of his deteriorating condition. The family of Robertson agreed on a "do not resuscitate" decision as well as withholding all medical intervention.

On July 16, 2004, at 3:05 p.m., Offender Robertson expired.

Dr. Juan P. Olano with the Galveston medical examiner's office conducted an autopsy. The results are as follows:

| INVESTIGATING OFFICER(S) | IS FURTHER ACTION REQUIRED? | STATUS OF CASE - Date _12-13-04_ | |
|---|---|---|---|
| (1) _Bailey_ 139 | | U – Unfounded | I – INACTIVE Investigation Suspended |
| (2) _____ | YES ✓ NO | P – Closed by Arrest | ✓ A – CLD/ADMN Closed Administratively |
| APPROVING SUPERVISOR   ID# | | E – Cleared by Exception | |

CC-0260 (08/2003)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679TDCJ

*In summary, this 39-year old man died of complications of severe hyper-thermia and heat stroke. An important contributing factor was a toxic level of tricyclics in serum. The manner of death is accidental.*

## VICTIM(S) STATEMENT:
**Robertson, Rickey L., TDCJ# 1172218, Offender, Darrington Unit:** Deceased.


## SUSPECT(S) STATEMENT:
**None.**


## WITNESSES:
**Mbonu, Everest, Correctional Officer, Darrington Unit:** He can testify that he was the officer assigned to H-line. He can testify that two offenders notified him of Robertson's condition and he responded by calling for assistance. He can testify that he assisted in placing Robertson on the gurney.

**Gallegos, Fidel, Correctional Officer, Darrington Unit:** He can testify that responded to H-line where he observed Offender Robertson toward the desk. He can testify that he assisted in placing the offender on the floor. He can testify that he assisted in placing the offender on the gurney. He can testify that the nurse strapped Robertson on the gurney and Robertson was carried away.

**Knight, Michael, D. Jr., Correctional Officer, Darrington Unit:** He can testify that he observed the offender sitting on the far end of the cubicle leaning over the desk. He can testify that he assisted in placing the offender on the floor. He can testify that assisted in carrying him down the stairs to the medical department.


## EVIDENCE:

None.

Investigator's Signature     139     12-13-04
                                                 ID#      DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679TDCJ

PAGE 3 of 3

## ATTACHMENTS:

1. Investigative Notes

2. Custodial Death report.

3. Investigator's report of Custodial Death.

4. Offender Robertson's clinic notes.

5. TDCJ-Autopsy Order.

6. Shift Lieutenant's Report–Offender Death Notification.

7. Offender Death Notification Work Sheet.

8. Chaplain's letter to the family.

9. Serious/Critical Notification Report.

10. Copy of Offender Robertson's travel card.

11. EAC report of Darrington Unit.

12. Final Autopsy report.

13. Pictures of deceased taken by pathologist.


CXS


| | | |
|---|---|---|
| _Investigator's Signature_ | 139 ID# | 12-13-04 DATE |
| Approving Supervisor's Signature | ID# | DATE |

CC-0260 (02-2003)

Page 3 of 3

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

11/4/2005

Joe, something is seriously wrong with this case. ~~xxxxxxxxxxxxxxxxxxxxxxxx~~

① Investigative notes are incomplete & poorly written; insufficiently documented; why is first entry 11/22/04 when death occurred 7/16/04?

② Did any OIG Investigator respond to Unit or HG on date of incident? HG

③ Narrative does not indicate what OIG did to investigate this questionable death.

④ Conflicting manners of death — natural & accidental — are not fully explained in report.

⑤ What was temperature in cell on date of incident?

⑥ Was Robertson alone when he expired?

⑦ Why was case reassigned to Susan Poole & then reassigned to Sanchez?

⑧ What investigative activity occurred between date of incident & Sept. 25 and from Sept. 25 – Nov. 22?

⑨ Why no pictures taken by OIG of scene & body?

Copy of OIG case to Litigation Support on 06.25.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

10. No explanation of how mediations were distributed to Robertson; did he have any meds in his cell; what was each med taken for? Where they dispensed appropriately?

11. The causes + manner of death are not clear. More explanation needed. How was death accidental? Overdose?

12. Who actually found the offender + reported his unresponsiveness?

13. Single cell - report does not say.

14. Offender supposedly had just returned to DA from Jester 4 on the date of incident. This is not mentioned in OIG report.

15. Who, if anyone, did OIG interview during this investigation?

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Did TDCJ cause this death?
If so who is the persons? persons?

1. Offense Report
      Date of offense = 7-16-04
      Date of Report = 7-16-04
   Summary says: on July 15, 04 the
   offender was found unresponsive in his
   cell.

2. No medical records in the case.

3. TDCJ has a strict Heat prevention
   policy with lengthy written instructions
   for staff every spring.
      what policies, if any, were violated on
   this offender who was taking psych.
   meds?                                    none

4. There is no time line for the
   chain of events and responses
   during this emergency.

5. Again, no medical charts to document
   medical response to this offender's
   medical problem.

6. Was any CPR started at the cell? no
   If not when — what time and
   by whom?

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

7. Was offender ever cooled down with ice. Yes - in medical by Prater.

8. When did the life flight get there? When did it leave. When did it arrive at hospital?

9. Says Dr. Mouva placed offender on the critical list the next day. Where are the hospital and Dr. Mouva's medical reports on this offender? all in

10. Says on July 16th at 3:05pm offender expired. Who pronounced him deceased? Dr.

11. Says Dr. Olmo did autopsy - Does not say (when)

12 - Witnesses

M1bonu - 2 officers notified him of vic. cond. & he "responded"

G Allegos - Assisted after "responding"

Knight - Saw vic. sitting.

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Inv. Notes.

13. SAup
11-22-04 Received case Summary —
7-19-04 He opened the case

A Review of my planner disclosed
that he responded to Hosp. Galv.
& completed the paperwork.

No Record of pictures

14. IOC from Lt. Haley.
SAup Sanchez had
unit "Search offenders cell & photograph it"

15. EAC Report repeats the same as 14

16. EAC say temp. readings were taken on
cell Block — when? (2:00 Am)
Say were NORMAL — (What were they?)
who took them?

17. TOX shows negative for
All of his meds except (Notriptyline)
— what was the (level?)

* Sanchez say:
All meds on record were within
NORMAL prescription ranges for
age & Weight —

TOO Many other problems to even list —

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED





**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL

## SUPPLEMENT CRIMINAL CASE REPORT

| OFFENSE | CASE #: |
|---|---|
| Death in Custody | 04-1679 |
| LOCATION: | DATE OF OFFENSE: |
| UTMB Galveston | 7/16/2004 |
| VICTIM: | DATE OF SUPPLEMENT REPORT: |
| Robertson, Ricky TDCJ # 1172218 | 1/5/2006 |

On July 21, 2005, I met with SPU Phil Hall and presented this case to him. I explained that the offender died in Galveston, but any act of negligence would have occurred either at the Jester IV Unit or at the Darrington Unit. Robertson was pronounced deceased in Galveston County. Mr. Hall reviewed the case and stated that he did not see any criminal offense on the part of any employee. I did voice the concerns of Ms. Mullen and Mr. Rhoten concerning the transportation, medication, and housing of the decedent. Mr. Hall still stated that he saw no criminal violations. Mr. Hall requested that I contact Galveston County Assistant District Attorney Mohamed Ibrahim.

On July 25, 2005, I contact Mr. Ibrahim and left a message for him to call me. I spoke to Mr. Ibrahim and provided him with the details of the case. Mr. Ibrahim concurred with Mr. Hall and deferred the case to Mr. Hall for his disposition.

July 26, 2005, I discussed this case again with Mr. Hall and gave him Mr. Ibrahim's response. Mr. Hall stated that even though there was *no* criminal offense he would present the case to the Brazoria County grand jury. Mr. Hall requested a copy of the case.

On July 29, 2005, the original case folder was submitted after a copy was made for Mr. Hall and the copy was provided to Mr. Hall.

This information was provided in my investigator's notes dated July 29, 2005.

On December 12, 2005, Mr. Hall declined the case and stated that there was no further criminal action needed by his office. Mr. Hall made this decision after the case was discussed with Brazoria County First Assistant District Attorney Keith Allen.

| INVESTIGATING OFFICER(S) | | | | |
|---|---|---|---|---|
| (1) C Eckert | 175 | 1/5/06 | | IS FURTHER INVESTIGATIVE ACTION REQUIRED? |
| | ID# | DATE | | |
| (2) Jon Nesmith | 108 | 1/5/06 | | YES __ NO ✓ |
| APPROVING SUPERVISOR | ID# | DATE | | |

CC-0255 (02/2005)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL
INVESTIGATIONS DIVISION

## CRIMINAL CASE TRACKING DISPOSITION

Case #: 04-1679                          Offense Date: 7-16-2004
Unit of Occurrence: Jester IV / Darrington     OIG Investigator: Colleen Eckert

| To: | Please Return To: |
|---|---|
| Phil Hall<br>Brazoria County District Attorney's Office<br>111 East Locust<br>Angleton, Texas 77515 | Joe Nesmith<br>Region III Captain<br>1400 FM 655<br>Rosharon, Texas 77583 |

Defendant Name:   Multiple Defendants ☐   , deceased

| Robertson, Ricky | Race | Sex | Age | Date of Birth |
|---|---|---|---|---|
| Last          First          MI | B | M | 37 | 8/21/1966 |

TDCJ Identification # 1172218      SID #: 06651475

### CHARGES FILED

1. Offender Death in Custody    CCP. 49.18
2.
3.

### Presented to Prosecutor / District Attorney

Date: 12/12/05     ☐ Accepted   ☒ Declined

By: _____  ☒ D.A.  ☒ SPU  County: Brazoria
    (Prosecutor's/D.A.'s Signature)

Philip Hall                    Plea: ☐ Nolo Contendere ☐ Not Guilty ☐ Guilty
(Prosecutor's/D.A.'s Printed Name)
                                     ☐ Dismissed   Reason:

Remarks: 12/8/05 Met 1st Assistant Keith Allen ~ No further Criminal action
needed by this Office

### Presented to Grand Jury

Date: _____   ☐ True Billed  ☐ No Billed   Cause # _____
Remarks:

### Trial Result / Disposition

Date: _____
Plea: ☐ Nolo Contendere ☐ Not Guilty ☐ Guilty ☐ Dismissed   Reason: _____
Remarks:

### Final Charges

☐ Same      ☐ Reduced to:      ☐ Other

1.
2.
3.

Years TDCJ _____ and/or  Fine: $ _____     Probation: _____
☐ Concurrent   ☐ Consecutive
Remarks:

RECEIVED
JUL 28 2005

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



| TDCJ – Office of the Inspector General | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

7/11/2005      10:00 a.m.
I spoke to Ms. Craven at the SPU office that Mr. Hall was on vacation and would only be
returning on 7/14/2005, and then would be back on vacation. C. Eckert, # 175

7/18/2005      10:00 a.m.
Spoke to Ms. Craven at the SPU office. She stated that Mr. Hall would be back on 7/20/2005. C.
Eckert, #175

7/20/2005      10:30 a.m.
I called Mr. Hall and Ms. Craven and left messages on both of their answering machines about a
possible meeting on 7/21/2005. C. Eckert, # 175

7/21/2005      9:15 a.m.
Ms. Craven called and stated that Mr. Hall would be available at 10:00 a.m., C. Eckert, # 175

7/21/2005      10:15 a.m.
I met with SPU Phil Hall and presented this case to him. I explained that the offender died in
Galveston, but any act of negligence would have occurred either at the Jester IV Unit or at the
Darrington Unit. Mr. Hall reviewed the case and stated that he did not see any criminal offense
on the part of any employee. I did voice the concerns of Ms. Mullen and Mr. Rhoten concerning
the transportation, medication, and housing of the decedent. Mr. Hall still stated that he saw no
criminal violations. Mr. Hall requested that I contact Galveston County DA Mohamed Ibrahim
Robertson was pronounced deceased in Galveston County. C. Eckert, # 175

7/25/2005      1:30 p.m
I contact Mr. Ibrahim and left a message for him to call me. C. Eckert, # 175

7/25/2005      4:20 p.m.
I spoke to Mr. Ibrahim and provided him with the details of the case. Mr. Ibrahim concurred with
Mr. Hall and deferred the case to Mr. Hall for his disposition. C. Eckert, # 175

7/26/2005      1:00 p.m.
I discussed this case again with Mr. Hall and gave him Mr. Ibrahim's response. Mr. Hall stated
that even though there was on criminal offense he would present the case to the Brazoria County
grand jury. Mr. Hall requested a copy of the case. C. Eckert, # 175

INVESTIGATING OFFICER

(1)  C Eckert                                                     175        7/29/05
                                                                 ID#        DATE

CC-00045 (02/2005)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| TDCJ – Office of the Inspector General | | Death in Custody |
|---|---|---|
| INVESTIGATIVE NOTES | | CASE #: 04-1679 |

7/29/2005       9:20 a.m.
The original case folder was submitted after a copy was made for Mr. Hall. C. Eckert, # 175
7/29/2005       1:00 p.m.
A copy of this case was provided to Mr. Hall. C. Eckert, # 175

INVESTIGATING OFFICER

(1) C Eckert                                    175        7/29/05
                                                ID#         DATE

CC-00045 (02/2005)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



**Texas Department of Criminal Justice**
**OFFICE OF THE INSPECTOR GENERAL**
**INVESTIGATIONS DEPARTMENT**

## OFFENSE/INVESTIGATIVE REPORT

| OFFENSE: | | | | | ORI#: | CASE #: |
|---|---|---|---|---|---|---|
| Death in Custody  Art. 49.18 | | | | | 236065C | 04-1679 |

| EXACT LOCATION OCCURRED: | | | COUNTY IN WHICH OFFENSE OCCURRED / CODE#: | | TYPE OF PREMISES: |
|---|---|---|---|---|---|
| Hospital Galveston | | | Galveston / 84 | | State Prison |

| DATE OF OFFENSE: | TIME: | DAY: | DATE REPORTED: | TIME REPORTED: | INVESTIGATED BY: |
|---|---|---|---|---|---|
| 7/16/2004 | 3:10 p.m. | Friday | 7/16/2004 | 4:00 p.m. | C. Eckert |

| PERSON REPORTING OFFENSE: | CONTACT ADDRESS: |
|---|---|
| Lieutenant Stacy Mickens | Hospital Galveston |

| BUSINESS PHONE: | CONTACT PHONE: |
|---|---|
| 409-772-2875 | 409-772-2875 |

| VICTIM #1 NAME: (LAST, First, MI) | CONTACT ADDRESS: |
|---|---|
| Robertson, Ricky | Hospital Galveston |

| ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) | SID# | FBI# | CONTACT PHONE: |
|---|---|---|---|
| 1172218 | 06651475 | 584105DA3 | N/A |

| OCCUPATION | RACE: | SEX: | DOB: | EMPLOYED BY: |
|---|---|---|---|---|
| Offender | W | Male | 8/21/1966 | N/A |

| VICTIM #2 NAME: (LAST, First, MI) | CONTACT ADDRESS: |
|---|---|
| | |

| ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) | SID# | FBI# | CONTACT PHONE: |
|---|---|---|---|
| | | | |

| OCCUPATION | RACE: | SEX: | DOB: | EMPLOYED BY: |
|---|---|---|---|---|
| | | | | |

| SUBJECT #1 NAME: (LAST, First, MI) | | CONTACT ADDRESS: | | CONTACT PHONE: |
|---|---|---|---|---|
| | | | | |

| RACE: | SEX: | DOB: | HEIGHT: | WEIGHT: | BUILD: | HAIR: | EYES: | COMPLEXION: | ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| TDCJ EMPLOYEE? | EMPLOYEE JOB TITLE: | EMPLOYEE JOB LOCATION |
|---|---|---|
| ☐ Yes ☐ No | | |

| TDCJ OFFENDER? | PAROLEE? | SID# | FBI# | ADDITIONAL INFORMATION: (DO NOT USE SS#) |
|---|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No | | | |

| SUBJECT #2 NAME: (LAST, First, MI) | | ADDRESS: |
|---|---|---|
| | | |

| RACE: | SEX: | DOB: | HEIGHT: | WEIGHT: | BUILD: | HAIR: | EYES: | COMPLEXION: | ID #: (DO NOT USE SS#) (USE RANK FOR EMPLOYEE) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| TDCJ EMPLOYEE? | EMPLOYEE JOB TITLE: | EMPLOYEE JOB LOCATION |
|---|---|---|
| ☐ Yes ☐ No | | |

| TDCJ OFFENDER? | PAROLEE? | SID# | FBI# | ADDITIONAL INFORMATION: (DO NOT USE SS#) |
|---|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No | | | |

| DRUG RELATED? | TYPE: | | AMOUNT: |
|---|---|---|---|
| ☐ Yes ☐ No | | | |

| BOOKED? | LOCATION: | BOND: | PROPERTY SEIZED/CONFISCATED? | IF YES, DESCRIBE: |
|---|---|---|---|---|
| ☐ Yes ☒ No | | | ☐ Yes ☒ No | |

| SUMMARY: | ADDENDUM ATTACHED NO |
|---|---|

On July 15, 2004, at 9:30 p.m., Offender Robertson was found unresponsive in his cell at the Darrington Unit with a 108-degree temperature. Robertson was transported by Life Flight to Hospital Galveston for treatment of possible heat stroke. Treatment and life saving measures were unsuccessful. On July 16, 2004, at 3:10 p.m., Robertson was pronounced deceased.

| Investigator's Signature | ID# 175 | DATE 4-4-2005 |
|---|---|---|
| Approving Supervisor's Signature | ID# 108 | DATE APR 0 4 2005 |

CC-0240 (08/2003)                                                                Page 1 of 1

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED





**Texas Department of Criminal Justice**
**OFFICE OF THE INSPECTOR GENERAL**
**INVESTIGATIONS DEPARTMENT**

## CRIMINAL CASE REPORT

| OFFENSE | CASE #: |
|---|---|
| Death in Custody  CCP 49.18 | 04-1679 |
| LOCATION: | DATE OF OFFENSE: |
| Darrington Unit | July 16, 2004 |
| VICTIM: | DATE OF SUPPLEMENT REPORT: |
| Robertson, Ricky | April 1, 2005 |

### CASE NARRATIVE:

Offender Ricky Robertson, TDCJ # 1172218, was a thirty-eight year old male serving a three-year sentence out of Harris County for Deadly Conduct. The Texas Department of Criminal Justice-Institutional Division received Offender Robertson on June 23, 2003.

On June 25, 2004, Robertson began receiving Benztropine Mesylate 2 mg (Cogentin) and Symmetrel 100 mg (Amantadine). Robertson was already prescribed Chlorpromazine 50 mg (Thorazine), and Lithium Carbonate 300 mg. The orders were for Robertson to be transferred to Jester IV for stabilization and crisis management.

On June 27, 2004, Offender Robertson was transferred from the Lopez Unit to the Jester IV Unit. Robertson was transferred after he complained that he was seeing spiders and things that were not there since his medications were changed.

On June 28, 2004, Robertson was seen for a Mental Health Assessment at the Jester IV Unit. The assessment noted that Robertson was psychotic, disoriented, rambling, paranoid thinking, delusional, and having visual hallucinations. After being evaluated it was suggested that Robertson be seen by the attending psychiatrist to evaluate and adjust his medication.

On June 30, 2004, Nortriptyline 75 mg was added to his medications. On July 7, 2004, after being evaluated, the dosage of Chlorpromazine was increased to 150 mg. On July 9, 2004, Robertson was ready for discharge to his unit of assignment and to continue on his current medication. Robertson was not transferred from the Jester IV Unit until July 15, 2004.

On July 15, 2004, at 6:15 a.m., Offender Robertson was received at the Darrington Unit from the Jester IV Unit. Robertson was in transit status enroute to his unit of assignment, which was the

| INVESTIGATING OFFICER(S) | IS FURTHER ACTION REQUIRED? | STATUS OF CASE - Date _____ | |
|---|---|---|---|
| (1) C. Eckert | | U – Unfounded | I – INACTIVE Investigation Suspended |
| (2) | YES ___  NO ✓ | P – Cleared by Arrest | ✓ A – CLD/ADMN Closed Administratively |
| APPROVING SUPERVISOR          ID# | | E – Cleared by Exception | |

CC-0260 (08/2003)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679

Lopez Unit. Robertson was assigned to H Wing, Two Row, Three Cell. Robertson was the only offender assigned to the cell.

Robertson's Health Summary showed that he had the following medical restrictions:

No Temperature Extremes
No Humidity Extremes
No Exposure to Direct Sunlight

There were no special orders provided to security or medical personnel concerning any of the medications taken by Robertson. When Robertson arrived at the Darrington Unit, Robertson voiced no complaints of feeling ill or of being overheated. Robertson, due to being placed in transit status, did not have the opportunity to go to recreation. Robertson received his meals at his cell and was provided his medications at the appropriate times.

The last time Robertson received medication was on June 15, 2004, at 4:46 p.m. At that time Robertson received Lithium Carbonate 300 mg, Chlorpromazine 100mg, Benztropine Mesylate 2 mg, Amantadine 100 mg, Nortriptyline 75 mg, and Chlorpromazine 50 mg.

On July 15, 2004, at 9:15 p.m., Robertson was found by Officer Everest Mbonu sitting on the bottom bed in his cell with his pants around his ankles. Robertson was unresponsive and having difficulty breathing. Medical staff and additional security personnel were summoned. Robertson was moved from the bed and placed on the floor by Officer Michael Knight and Officer Fidel Gallegos. Robertson was assessed by Nurse Vesta Barnes. Nurse Barnes observed Robertson with no shirt on and his pants down. Robertson was sweating like a person would in heat, but not sweating profusely. Robertson's breathing was rhythmic and his mouth was open. Robertson did not respond to verbal or painful stimuli. Robertson's eyes were open in a stare and he did not blink. Nurse Barnes instructed security personnel to move Robertson to the infirmary. Robertson was placed on a backboard and carried downstairs to an awaiting gurney. Robertson was then taken to the medical department for further treatment.

After arriving in the medical department, Nurse Mary Prater was called to assist in the treatment of Robertson. Nurse Prater observed Robertson to have a fixed stare and rhythmic head movements. Robertson's vital signs were taken and Robertson's axillary temperature was noted as being 108 degrees. Robertson's blood pressure was 98/40, his respirations were 32 per minute, and his pulse was 100 per minute. Security officers in the room were told to get ice packs and bags of ice were placed on Robertson's neck, chin, both armpits, groin, under knees, on his abdomen, and his lower back. An intravenous line of normal saline was started and the on-call

C Eckert

_____
Investigator's Signature

175          4-4-05
ID#          DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



physician, Doctor Abraham, was called. Correctional Managed Care paramedics were also called and arrived within five minutes. The paramedics began bagging Robertson with an ambu bag and orders were received to transport Robertson to the nearest hospital. All attempts to intubate Robertson were unsuccessful. The paramedics called Life Flight and another saline bag was started after the first one was emptied. When Life Flight arrived the team members took Robertson's rectal temperature, which was now at 103.6. Robertson was bundled in a blanket with ice to his groin area and taken to the helicopter. Life Flight departed on July 15, 2004, at approximately 11:55 p.m.

On July 16, 2004, at approximately 12:24 a.m., Robertson arrived at the University of Texas Medical Branch-Galveston. Robertson was treated in the UTMB Emergency Room. Robertson developed hypotension, which was treated with Dopamine and Epinephrine. A toxicology study indicated a level of tricyclic antidepressants at 600 ng/ml, which is a toxic, but not lethal level. Additional laboratory results revealed acute renal insufficiency, disseminated intravascular coagulopathy, rhabdomyolysis, lactic acidosis, and myocardial damage.

On July 16, 2004, at 4:00 a.m., Robertson was admitted to the Intensive Care Unit for altered mental status, hypotension, and respiratory failure. At 4:20 a.m., Doctor Sunil Movva placed Robertson on the critical list. Robertson's condition continued to deteriorate. At 2:45 p.m., Robertson's family was notified of his status. Robertson's brother, Roy Robertson, was informed of the poor prognosis and agreed with the "Do Not Resuscitate" decision as well as withholding all medical intervention. Robertson was on a ventilator and remained unresponsive. Robertson's blood pressure dropped and an EKG showed a flat line (asystole). On July 16, 2004, at 3:10 p.m., Robertson was pronounced deceased by Doctor William Beary.

On July 16, 2004, at 3:58 p.m., Office of the Inspector General, Investigator Cesar Sanchez, was notified and responded to UTMB. Investigator Sanchez examined the body and took photographs of the decedent. The decedent was then transferred to the UTMB Morgue awaiting an autopsy.

On July 16, 2004, an attempt was made to contact Roy Robertson, Robertson's brother. On July 17, 2004, Lieutenant Stacy Mickens made contact with Roy Robertson and asked if the family would claim Robertson's remains. Mr. Robertson called back on July 19, 2004, and stated that the family would not claim the remains and requested Robertson be buried at the Huntsville Cemetery.

On July 19, 2004, at 10:30 a.m., Doctor Juan Olano, Pathologist, with the University of Texas Medical Branch-Autopsy Division performed the autopsy on Robertson. In the report the Neuropathology Consultation showed that the main cause of death was cardiac arrest secondary

Investigator's Signature          ID# 17S    DATE 4-4-0S

Copy of OIG case to Litigation Support on 06.26.2014 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679

PAGE 4 of 11

to tricyclic antidepressant overdose. The manner of death was listed as natural. This was not, however, the complete and final report. On November 22, 2004, Investigator Sanchez received the final autopsy report. **The final report listed the cause of death as complications of severe hyperthermia and heat stroke with an important factor being a toxic level of tricyclics in serum. The manner of death was accidental.**

I telephoned Doctor Olano, who performed the autopsy on Offender Robertson. Doctor Olano was asked about the conflict in the reporting of the manner of death. Doctor Olano stated that the Neuropathology Consultation listed the clinical history and the causes known to that department. Many of the things listed as contributing factors were caused when Robertson's body shut down from the hyperthermia. The overall autopsy, including toxicology, revealed a broader picture of the cause of death. The cause of death was listed as severe hyperthermia and heat stroke. Doctor Olano stated that this was due to environmental (outside) temperatures, which produced the accidental manner of death. Doctor Olano stated that some anti-depressants and anti-psychotic medications leave the person taking these medications at a high risk of heat stroke. Doctor Olano stated that a normal person with high outside temperatures (100 degrees or higher), who exercises, and has limited or no fluid intake would be susceptible to heat stroke. Those taking anti-depressants and anti-psychotic medications while exercising, with lower temperatures (high 90's), and/or dehydration could have the same effect. Doctor Olano stated that the medications "mess up" heat loss mechanisms in the body. Doctor Olano stated that extreme dehydration causes a person to sweat profusely to bring down the body temperature, and at some point a person will stop sweating. Doctor Olano stated that at this point the body temperature would rise. Doctor Olano stated that there was no evidence to support that Robertson's condition was related to an overdose. Doctor Olano stated that the tricyclic serum level was at 660 ng/ml, which was a toxic, but not lethal level. Doctor Olano stated that the serum level after the time of death was probably lower before death. Doctor Olano stated that medications were not measured post mortem because there was not enough serum to quantitate.

I obtained a copy of the Administrative Directive related to temperature extremes. Most of the directive is related to work assignments, not to actual housing assignments. The directive included a heat and humidity index. I also obtained a temperature history for July 15, 2004. Based on the temperature history for Houston, Texas, the highest temperature for the day was listed at 98.1 with a humidity of 40%. Based on the heat and humidity matrix, the scale listed the average temperature would have been close to 101, with may have created a situation where heat exhaustion was possible.

I obtained copies of the pharmaceutical information and alerts for the medications taken by Robertson. When reviewing the adverse reactions for Chlorpromazine Hydrochloride it stated

Investigator's Signature

ID# 175   DATE 4-4-05

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679                                                           PAGE 5 of 11

that in the central nervous system there could be extrapyramidal reactions, drowsiness, sedation, seizures, tardive dyskinesia, pseudoparkinsonism, dizziness, or **neuroleptic malignant syndrome**. It also noted an alert to watch for evidence of neuroleptic malignant syndrome (extrapyramidal effects, **hyperthermia**, autonomic disturbance), **which was rare but usually fatal**. It noted that this may not be related to length of the drug use or type of neuroleptic, but more than 60% of affected patients are men.

The housing area where Robertson was assigned was cooled by fans only. Robertson was in transit status back to his original unit of assignment and the Darrington Unit was used routinely to house offenders transferring between units. There were no special instructions specifically listed for Robertson concerning an air-conditioned housing location. Doctor Olano stated that the environmental (outside) temperatures, produced the accidental manner of death.

**VICTIM(S) STATEMENT:**
The victim is deceased.

**SUSPECT(S) STATEMENT:**
No suspects.

**WITNESSES:**
**Mbonu, Everett, Correctional Officer, Darrington Unit:** Mbonu stated that Offender Robertson was an offender in transit status. Mbonu stated that Robertson was brought to H Line during his shift from 1:30 p.m. to 9:30 p.m. Mbonu stated that Robertson was placed in H-2-3 cell and at the time he showed no signs of illness. Mbonu stated that Robertson never complained to him of being ill. Officer Mbonu stated that he provided Robertson with a mattress and sheets, and also provided him with a meal. Officer Mbonu stated that during his security check at 9:15 p.m., Robertson was in a state that he felt required immediate medical attention Officer Mbonu stated that he called for assistance and other officers and medical staff responded. Officer Mbonu stated that Robertson was placed on a stretcher and moved to the infirmary. Officer Mbonu provided a written statement. C. Eckert

**King, Clifford, Sergeant, Darrington Unit:** Sergeant King told me that on July 15, 2004, at 9:35 p.m., he and other supervisors were called to H-Line. He stated that he went to H-2-3 cell and saw Robertson lying on the bottom bunk with his back against the wall and his feet hanging off the bunk. Sergeant King stated that it looked like Robertson was having a seizure. Sergeant King stated that Robertson was moved from the cell to a gurney and transported to the medical department. Sergeant King stated that the medical staff checked Robertson's medical folder and found no history of seizures, or diabetes, but Robertson was on mental health medication.

_C Eckert_
Investigator's Signature

175        4-4-05
ID#        DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679                                                                 PAGE 6 of 11

Sergeant King stated that the medical staff tried ammonia tabs and a needle to test for pain and there was no effect. Sergeant King stated that medical staff took Robertson's temperature and it registered at 108 degrees. Sergeant King stated that medical staff placed ice packs around Robertson to bring his temperature down. Sergeant King noticed that Robertson's pants were around his ankles and a visual rectal exam was completed. Sergeant King stated that an intravenous line (IV) was started and medical staff contacted the on call doctor. The doctor ordered that Robertson be life-flighted to Hospital Galveston. Sergeant King stated that the Southern EMS arrived, took vitals and started another IV. Sergeant King stated that at 11:45 p.m. Robertson was life-lighted to Hospital Galveston. Sergeant King stated that on July 16, 2004, at 12:30 a.m., he went to Robertson's cell and found that there was no other offender assigned to the cell and Robertson had no property or keep on person (KOP) medication in the cell. Sergeant King stated that he noticed what appeared to be vomit on the mattress of the top bunk. Sergeant King stated that photographs were taken of the cell and the cell was secured with red tape to prevent access. Sergeant King provided a written statement.

**Haley, Howard, Lieutenant, Darrington Unit:** Lieutenant Haley told me that based on the count room information Robertson arrived at the Darrington Unit on July 15, 2004, at 6:15 a.m. and was housed in H-2-3 cell. Lieutenant Haley also stated that Robertson was taken to the pill window at 4:30 p.m. on July 15, 2004, and had no other documentation of any activity involving Robertson until 9:35 p.m. Lieutenant Haley stated that Robertson was in transit status and would not have participated in recreation on July 15, 2004. Lieutenant Haley stated that at 9:35 p.m., he responded to H-Line. Lieutenant Haley stated that he remembered that Robertson was sitting on the bunk leaning back and his breathing was irregular. Lieutenant Haley stated that Sergeant Stephens shook Robertson and got no response. Lieutenant Haley stated that Nurse Prater tried ammonia capsules with no response. Lieutenant Haley stated that Robertson was placed on a backboard, carried to a gurney, and then transported to the infirmary. Lieutenant Haley stated that while in the infirmary, ammonia capsules were again used with no response. Lieutenant Haley stated that Nurse Prater used a needle to check for pain stimuli and at this point he was in and out of the infirmary on several occasions. Lieutenant Haley stated that he was informed that Robertson's vital signs were checked and Robertson's temperature was recorded at 108 degrees. Lieutenant Haley stated that medical staff gathered ice packs and covered Robertson's body with ice. Lieutenant Haley also stated that when Robertson was found his pants were down around his ankles. Lieutenant Haley stated that due to this fact, Nurse Prater examined Robertson's rectal area for signs of a sexual assault and no signs were found. Lieutenant Haley stated that Southern Region EMS arrived and the diagnosis was heat stroke at that point. Lieutenant Haley stated that throughout this time he was busy contacting key personnel with updates. Lieutenant Haley stated that he was notified that Robertson had stopped breathing and was being assisted by medical staff. Lieutenant Haley stated that Life-Flight was ordered and he had security personnel go to the parking lot to secure the landing zone. Lieutenant Haley stated that he left the infirmary and returned when Robertson was being moved to the parking lot. Lieutenant Haley stated that he went to the parking lot along with medical staff. Lieutenant Haley stated that medical staff

_C. Echart_                                               _175_        _4-4-05_
Investigator's Signature                                  ID#          DATE

_____
Approving Supervisor's Signature                          ID#          DATE

CC-0260 (02-2003)                                                      Page 6 of 11

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

McCollum/Robertson 527



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679

loaded Robertson on the helicopter and the helicopter left. Lieutenant Haley stated that the cell was secured as a crime scene and Robertson had no property in the cell and had no cell partner.

**Stephens, Michael, Sergeant, Darrington Unit:** Sergeant Stephens stated that at 9:35 p.m. on July 15, 2004, the control picket told him that there was an emergency on H-Line. Sergeant Stephens stated that he went to H-2-3 cell where he observed Offender Robertson lying on the bottom bunk with his feet on the floor. Sergeant Stephens stated that Robertson was unresponsive, his breathing was irregular, and he was slightly shaking. Sergeant Stephens stated that he called for medical staff and a gurney, but Nurse Barnes had already arrived. Sergeant Stephens ordered that the door be opened to the cell and he entered the cell with other officers. Sergeant Stephens stated that he gently shook Robertson to check for responsiveness, but Robertson did not respond. Sergeant Stephens stated that Nurse Barnes then tried to use an ammonia capsule, but Robertson still did not respond. Sergeant Stephens stated that Robertson was the only offender in the cell. Sergeant Stephens stated that he and the officers carried Robertson out of the cell, carried him downstairs, and placed Robertson on a gurney. Sergeant Stephens stated that he and Nurse Barnes took Robertson to the infirmary where he was placed in the emergency room. Sergeant Stephens stated that Lieutenant Haley and Sergeant King then relieved him. Sergeant Stephens provided a written statement.

**Knight, Michael, Correctional Officer, Darrington Unit:** Officer Knight told me that on July 15, 2004, at 9:35 p.m., he responded to a medical emergency call at H-2-3 cell. Officer Knight stated that when he entered the cell he observed the offender sitting on his bunk at the far end of the bunk, his hands at his side, and his pants down around his ankles, leaning over the desk in the cell. Officer Knight stated that it appeared that the offender was not breathing. Officer Knight stated that he helped place the offender on the floor and he was unresponsive. Officer Knight stated that the nurse tried an ammonia pack and he was still unresponsive. Officer Knight stated that he assisted in placing the offender on a backboard, carrying the offender down the stairs, and placing the offender on a gurney. Officer Knight stated that he and Sergeant Stephens escorted the offender to the infirmary. Officer Knight stated that he returned to his assigned duties. Officer Knight added that the offender was alone in the cell. Officer Knight provided a written statement.

**Gallegos, Fidel, Correctional Officer, Darrington Unit:** Officer Gallegos stated that he was advised of a medical emergency on H-Line and went to H-2-3 cell. Gallegos stated that he observed Offender Robertson sitting on the bottom bunk with his pants around his ankles leaning toward the desk. Gallegos stated that Offender Robertson was having problems breathing and was unresponsive. Gallegos stated that the cell door was opened and he helped place Robertson on the floor. Gallegos stated that after the nurse assessed Robertson; he assisted in placing Robertson on a backboard. Gallegos stated that Robertson was carried downstairs and placed on a gurney. Gallegos stated that he was then ordered to return to his duty post.

| Investigator's Signature | ID# | DATE |
|---|---|---|
| *C Echert* | 175 | 4-4-05 |

| Approving Supervisor's Signature | ID# | DATE |
|---|---|---|
| | | |

CC-0260 (02-2003)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679                                                                PAGE 8 of 11

**Barnes, Vesta, Nurse, Darrington Unit:** Nurse Barnes told me that she responded to H Line. Nurse Barnes stated that security was in the cell and the cell door was open. Nurse Barnes stated that she entered the cell and observed Robertson with no shirt on and his pants down. Barnes stated that it was a hot night and Robertson was sweaty. Barnes described that Robertson was sweating like a person would in heat, but not sweating profusely. Nurse Barnes stated that Robertson was breathing rhythmically with his mouth open. Nurse Barnes stated that Robertson did not respond to verbal or painful stimuli. Nurse Barnes stated that Robertson's eyes were open in a stare and he did not blink. Nurse Barnes stated that Robertson was immediately placed on a stretcher and she did no treatment or further assessment at the cell. Nurse Barnes stated that once Robertson was placed on a stretcher he was taken to the infirmary emergency room. Nurse Barnes stated that she took Robertson's temperature auxiliary and his temperature was 108 degrees. Nurse Barnes stated that they began packing Robertson in ice. Nurse Barnes stated that she was in and out of the room calling the doctor, emergency medical services (EMS), and sending messages. Nurse Barnes stated that Nurse Prater stayed in the room with Robertson and then EMS came to assist. Nurse Barnes stated that she did recall that it was a very hot night, but not unusual for the middle of July, and there were only fans in the cellblock area. Nurse Barnes stated that while at the cell she did not notice anything unusual.

**Prater, Mary, Nurse, Darrington Unit:** Nurse Prater stated she was in the medical department when she was called to assist Nurse Barnes. Prater stated that when she first saw Robertson, she observed his fixed stare and rhythmic head movements. Prater stated that Robertson's axillary temperature was 108, but would probably be one degree higher, orally. Prater stated that Robertson's blood pressure was 98/40 and his respirations were 32 per minute. Prater stated that Robertson's pulse was 100 per minute. Prater stated that officers in the room were told to get ice packs and bags of ice were placed on Robertson's neck, chin, both armpits, groin, under knees, as well as on his abdomen and lower back. Prater stated that an IV of normal saline was started and someone called the on-call physician. Prater stated that paramedics were also called and arrived within five minutes. Prater stated that the paramedics began bagging Robertson with an ambu bag and orders were received to transport Robertson to the nearest hospital. Prater stated that all attempts to intubate Robertson were unsuccessful. Prater stated that the paramedics called Life Flight and another saline bag was started after the first one was emptied. Prater stated that when Life Flight arrived the team members took Robertson's rectal temperature, which was now at 103.6. Prater stated that Robertson was bundled in a blanket with ice to his groin area and taken to the helicopter.

There were several offenders at the Darrington Unit that were on the same row of housing cells as Robertson. Most of the offenders were in transit status at the time and have since been released from TDCJ. The two offenders that were closest to Robertson's cell on July 15, 2004, were interviewed. Neither one of the two offenders remembered hearing or seeing anything unusual and neither knew who Offender Robertson was. The two offenders that were interviewed were:

C. Eckert                                                         175    4-4-05
Investigator's Signature                              ID#         DATE

Approving Supervisor's Signature                      ID#         DATE

CC-0260 (02-2003)                                                Page 8 of 11

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679

PAGE 9 of 11

**Wallace, Nathan, TDCJ # 1220328, Offender, Dawson State Jail:** Offender Wallace was assigned to cell H Wing, Two Row, Two Cell at the Darrington Unit on July 15, 2004.

**Peavy, Ricky, TDCJ # 657072, Offender, McConnell Unit:** Offender Peavy was assigned to H Wing, Two Row, Five Cell, at the Darrington Unit on July 15, 2004.

**EVIDENCE:**

1. Ten photographs of Robertson after death.
2. One micro cassette tape of the interview of Nurse Barnes.

The original photographs and the micro cassette tape are being held in the evidence room at the Region B OIG Headquarters.

**ATTACHMENTS:**

1. Investigative Notes

2. A copy of the Attorney General Custodial Death Report completed by Investigator Sanchez.

3. The Investigator's Report of Custodial Death completed by Investigator Sanchez.

4. Ten photographs of Robertson preceding his death. The photographs were taken by Investigator Sanchez.

5. A copy of the TDCJ Autopsy Order.

6. A copy of the Hospital Galveston death notification forms.

7. A copy of Robertson's travel card.

8. Copies of the teletype messages sent concerning Robertson's condition and death, incident number I-07458-07-04.

9. A copy of Robertson's TDCJ/UTMB Medical records dated from April 5, 2004 to July 15, 2004.

10. A copy of Robertson UTMB medical records dated July 15, 2004 to July 16, 2004.

11. A copy of Robertson's entire lab results from July 16, 2004.

12. A copy of the medical transfer order from the Darrington Unit to UTMB on July 15, 2004.

| C. Echert | 175 | 4-4-05 |
|---|---|---|
| Investigator's Signature | ID# | DATE |
|  |  |  |
| Approving Supervisor's Signature | ID# | DATE |

CC-0260 (02-2003)

Page 9 of 11

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679                                                          PAGE 10 of 11

13. A copy of telex information containing Robertson's unit classification review, medical profile inquiry, medical information history inquiry and health summary classification.

14. A copy of the weather history from July 15, 2004.

15. A copy of the guidelines for health summary classification for offenders.

16. A copy of Administrative Directive 10.64, titled Temperature Extremes in the TDCJ Work Place.

17. A copy of Robertson's medication list from June 27, 2004, and July 7, 2004.

18. A copy of Robertson's medication compliance from June 1, 2004, to July 15, 2004.

19. A copy of the pharmaceutical information on the medications prescribed to Robertson.

20. A copy of the Darrington Unit's administrative review concerning the death of Offender Robertson.

21. A copy of the employee roster for July 15, 2005, for the second shift.

22. The written statement of Officer Everest Mbonu dated January 12, 2005.

23. The written statement of Sergeant Clifford King dated January 12, 2005.

24. The written statement of Lieutenant Harold Haley dated January 12, 2005.

25. The written statement of Sergeant Michael Stephens dated January 12, 2005.

26. The written statement of Officer Michael Knight dated January 12, 2005.

27. The written statement of Officer Fidel Gallegos dated January 13, 2005.

28. The written statement of Nurse Mary Prater dated January 13, 2005.

29. The written statement of Safety Officer Mike Dattalo dated January 12, 2005, and a copy of the temperature reading he took on the morning of July 16, 2004.

30. A copy of the offender roster for H Wing at the Darrington Unit dated July 14, 2004.

C Eckert                                    175         4-4-05
Investigator's Signature                    ID#         DATE

Approving Supervisor's Signature            ID#         DATE
CC-0260 (02-2003)                                       Page 10 of 11

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ-OIG-ID SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679
PAGE 11 of 11

31. The supplement report of the interview of Offender Nathan Wallace dated March 14, 2005.

32. The supplement report of the interview of Offender Ricky Peavy dated March 14, 2005.

33. The supplement report of the interview of Nurse Vesta Barnes dated March 29, 2005.

34. A copy of the chain of evidence card for the tape-recorded interview of Nurse Barnes.

35. A copy of the final autopsy report.

36. Copies of Robertson's body taken by UTMB Autopsy Division.

37. A supplement report of the interview with Doctor Olano dated January 11, 2005.


CSE


| C Eckert | | 175 | 4-4-05 |
|---|---|---|---|
| Investigator's Signature | | ID# | DATE |
| Approving Supervisor's Signature | | ID# | DATE |
| CC-0260 (02-2003) | | | Page 11 of 11 |

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Malcolm Robertson 592




**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL
INVESTIGATIONS DEPARTMENT

**INVESTIGATIVE NOTES**

| TYPE OF INVESTIGATION: | CASE #: |
|---|---|
| Criminal Case    Death in Custody | 04-1679TDCJ |

07-15-2004, at approximately 10:30 p.m., I received a call from Warden Weston at the Darrington Unit. He explained that at approximately 9:35 p.m., Offender Ricky Robertson was found in his cell H-2-03 at the Darrington Unit unresponsive. Offender was moved to the infirmary where it was discovered that his blood pressure was low and his temperature was 108* degrees. I requested that his cell be photographed by security and then checked for drugs or any other items that might be useful in his diagnosis and/or for the investigation, incase the offender died. I was notified by telephone that a search of the cell by the supervisor disclosed no suicide note, drugs, etc. The cell was again secured after this search.

07-16-2004, 8:30 a.m., I checked with Warden Weston. The offender was at HG. Since no other evidence could be found and no foul play was suspected, I released the cell to security.

07-16-2004, 3:58 p.m., I received a call from Lieutenant Mickens in Hospital/Galveston that Offender Ricky Robertson died at the facility at 3:10 p.m. I contacted Mark Bowers and obtained authorization to responded and work over time. I responded to Hospital/Galveston. I completed the Custodial Death report, the Investigator's Report of Custodial Death and took pictures of the body. The Medical Examiner's office was contacted and an autopsy was ordered. The provisional cause of death was Sepsis/overdose—Neuroleptic Malignant Syndrome. Likely manner of death is accidental since there is no evidence of foul play.

07-19-2004, I received E-mail from Lt. Mickens where she reported that the brother of offender Robertson, Roy Robertson, would not give an answer whether he would accept the body.

11-22-2004, I received case from Investigator Poole. Pictures of body misplaced. I will request pictures of body prior to autopsy from ME's office. I called Banos in reference to autopsy report; answering machine was on. I contacted Pam and requested the autopsy report. Pam faxed the autopsy report. I read the report.

The report disclosed the following:

INVESTIGATING OFFICER

(1) _Stanley_        _139_

     ID#       DATE

AC-00045 (08/2003)        PAGE 1

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679TDCJ |

The main cause of death is cardiac arrest secondary to tricyclic antidepressant overdose. The manner of death is natural.

I discussed the finding with Lt. Bowers. He explained that the one thing to look for is what the normal dosage for the medications were and factor any precipitating factors, such as drug abuse and/or organ failure into the equation. What this means, as he explained, is that the dosage might have been the proper dosage for the person's weight and age. However, based on the extenuating circumstances, such as a history of drug abuse and/or organ failure—kidney, liver, etc.—could have altered the percentage of the medication in the body, causing the body to overdose without the physician knowing it was occurring.

In this case, Offender Robertson was taking the following medications:

Nortriptyline 75mg
Lithium Carbonate 300mg
Chlorpromazine 100mg
Benztropine Mes 2mg
Amantadine 100mg
Chlorpromazine 50mg

All of the medications on record were within normal prescription ranges for the age and weight of the patient according to PDR-Edition 45, 1991.

The clinical summary of the autopsy report disclosed that the laboratory results revealed the following: (1) acute renal insufficiency (2) disseminated intravascular coagulopathy (3) rhabdomyolysis (4) lactic acidosis (5) myocardial damage.

In the final report of the autopsy, page #9 disclosed that Offender Ricky Robertson "...died of complications of severe hyperthermia and heat stroke," and that "an important contributing factor was a toxic level of tricylics in serum." **Dr. Juan P. Olano ruled the manner of death as accidental.** Cesar Sanchez

I spoke with Dr. Juan P. Olano on the telephone in reference to the initial findings that were reported as to the cause of death. He advised that the report that I was reading was actually the neuropathology consultation report. He reported that when they wrote the initial report the main cause of death was cardiac arrest secondary to tricyclic antidepressant overdose and that the manner of death was natural. He advised that this report was transferred as the initial report to

INVESTIGATING OFFICER

(1) _Saucy_                                    _139_
                                              ID#        DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

\ \

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679TDCJ |

the neuropathology. He reported that he did not have control of over the report that the neuropathologist completed. He also reported that **upon reviewing the laboratory results, he ruled the cause of death to be accidental and his final report supported this.** He faxed the final report that supported the manner of death as being accidental. I requested pictures of the body and the pictures were E-mails to OIG. Case completed. Cesar Sanchez

INVESTIGATING OFFICER

(1)  _____        *139*
                                                    ID#          DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1.2

 

**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL
INVESTIGATIONS DEPARTMENT



**INVESTIGATIVE NOTES**

| TYPE OF INVESTIGATION: | CASE #: |
|---|---|
| Criminal Case | 04-1679TDCJ |

11-22-2004, I received case. Summary: I opened case on 07-19-2004. A review of my planer disclosed that I responded to HG and completed the paperwork. No record of pictures. However, under the circumstances it would be procedural to take photographs of the body. I searched for evidence release form for the pictures, but was unable to come up with one. I contacted Investigator Autrey and asked him to research the evidence log for the pictures. I contacted Banos; answering machine was on. I contacted Pam and requested the autopsy report. Pam faxed the autopsy report. I read the report.

The report disclosed the following:

**The main cause of death is cardiac arrest secondary to tricyclic antidepressant overdose. The manner of death is natural.**

Question: How can this be?

I discussed the finding with Lt. Bowers. He explained that the one thing to look for is what the normal dosage for the medications were and factor any precipitating factors, such as drug abuse and/or organ failure into the equation. What this means, as he explained, is that the dosage might have been the proper dosage for the person's weight and age. However, based on the extenuating circumstances, such as a history of drug abuse and/or organ failure—kidney, liver, etc.—could have altered the percentage of the medication in the body, causing the body to overdose without the physician knowing it was occurring.

In this case, Offender Robertson was taking the following medications:

Nortriptyline 75mg
Lithium Carbonate 300mg
Chlorpromazine 100mg
Benztropine Mes 2mg
Amantadine 100mg
Chlorpromazine 50mg

INVESTIGATING OFFICER

(1) *Chauey*                          139      12-13-04
                                      ID#       DATE

AC-00045 (08/2003)                                    PAGE 1

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

13

| TBCJ-OIG-INVESTIGATIONS DIVISION | |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679TDCJ |

All of the medications on record were within normal prescription ranges for the age and weight of the patient according to PDR-Edition 45, 1991.

The clinical summary of the autopsy report disclosed that the laboratory results revealed the following: (1) acute renal insufficiency (2) disseminated intravascular coagulopathy (3) rhabdomyolysis (4) lactic acidosis (5) myocardial damage.

In the final report of the autopsy, page #9, disclosed that Offender Ricky Robertson "…died of complications of severe hyperthermia and heat stroke," and that "an important contributing factor was a toxic level of tricylics in serum." Dr. Juan P. Olano ruled the manner of death as accidental. Cesar Sanchez

I spoke with Dr. Juan P. Olano on the telephone in reference to the initial findings that were reported as to the cause of death. He advised that the report that I was reading was actually the neuropathology consultation report. He reported that when they wrote the initial report the main cause of death was cardiac arrest secondary to tricyclic antidepressant overdose and that the manner of death was natural. He advised that this report was transferred as the initial report to the neuropathology. He reported that he did not have control of over the report that the neuropathologist completed. He also reported that upon reviewing the laboratory results, he ruled the cause of death to be accidental and his final report supported this. He faxed the final report that supported the manner of death as being accidental.

INVESTIGATING OFFICER

(1) _Oncez_                                          139          12-13-04
                                                    ID#            DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1.4



**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL
INVESTIGATIONS DEPARTMENT

## INVESTIGATIVE NOTES

| TYPE OF INVESTIGATION: | CASE #: |
|---|---|
| Criminal Case     Death in Custody | 04-1679 |

01-11-2005   I was called to Captain Nesmith's office. I was assigned this case to reinvestigate and clarify several points concerning the death of Offender Ricky Robertson, TDCJ # 1172218. Offender Robertson was assigned to the Darrington Unit on July 15, 2004, when he was found unresponsive in his cell. Robertson was found to have a temperature of 108, and was life-flighted to Hospital Galveston. Robertson died the next day. The cause of death on the final autopsy report was listed as complications of severe hyperthermia and heat stroke with an important contributing factor was a toxic level of tricyclics in serum. The manner of death was ruled as accidental. The case was reassigned to me to answer questions not included in the original case report. C. Eckert

01-11-2005   I made a list of all the employees that needed to be interviewed. Most would be working the next several days. Both nurses working at the time of the incident are still assigned to the Darrington Unit, but one is out on medical leave. C. Eckert

01-11-2005   I telephoned Doctor Juan Olano, Pathologist, with the University of Texas Medical Branch-Autopsy Division. Doctor Olano performed the autopsy on Offender Robertson. Doctor Olano was asked about the conflict in the reporting of the manner of death. Doctor Olano stated that Neuropathology Consultation listed the clinical history and the causes known to that department. Many of the things listed as contributing factors were caused when his body shut down from the hyperthermia. The overall autopsy, including toxicology, revealed a broader picture of the cause of death. The cause of death was listed as severe hyperthermia and heat stroke. Doctor Olano stated that this was due to environmental (outside) temperatures, which produced the accidental manner of death.    Doctor Olano stated that some anti-depressant and anti-psychotic medications leave the person taking these medications at a high risk of heat stroke. Doctor Olano stated that a normal person with high outside temperatures (100 degrees or higher), exercise, and limited or no fluid intake would be susceptible to heat stroke. Those taking these medications while exercising, lower temperatures (high 90's), and/or dehydration could have the same effect. Doctor Olano stated that the medications "mess up" heat loss mechanisms in the body.

INVESTIGATING OFFICER

(1)  C Eckert                                          175     4-1-2005
                                                    ID#        DATE

AC-00045 (08/2003)                                              PAGE 1

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death In Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

Doctor Olano stated that extreme dehydration causes a person to sweat profusely to bring down the body temperature, and at some point a person will stop sweating. Doctor Olano stated that at this point the body temperature would rise. Doctor Olano stated that there was no evidence to support an overdose. Doctor Olano stated that the tricyclic serum level was at 660 ng/ml, which was a toxic, but not lethal level. Doctor Olano stated that the serum level at the time of death was probably lower before death. Doctor Olano stated that medications were not measured post mortem because there was not enough serum to quantitative. Doctor Olano stated that if he could be of any further assistance, to call or page him. C. Eckert

01-11-2005   I contacted the Darrington Unit and requested a completed copy of the unit administrative incident review report. C. Eckert

01-11-2005   I contacted TDCJ/UTMB Decedent Affairs and made contact with Shantel Humphrey. I requested medical records on Robertson from the last three months prior to his death to include any additional records during that time from Hospital Galveston and the Jester IV Unit. I also requested medication information for the same amount of time. I requested that the clinic notes from July 15, 2004, be faxed to me. Ms. Humphrey stated that she would fax the needed information and send the rest by mail. C. Eckert

01-11-2005   I contacted Lucy Limones with UTMB Medical Records. I left a message with Ms. Limones to contact me because I needed the medical records from the day that Robertson was under care at Hospital Galveston preceding his death.

01-11-2005   I telephoned Nurse Prater who was one of the nurses on duty on July 15, 2004. I informed Nurse Prater that as soon as I received the clinic notes from that day I would need her to provide a written statement. Nurse Prater stated that she did remember what occurred on that day and would provide any needed information. Nurse Prater stated that she worked until 6:00 p.m. today and would come to work at 6:00 p.m. tomorrow. C. Eckert

01-11-2005   I received faxed documentation from Ms. Humphrey. The requested clinic notes did not fax to the machine. I contacted Ms. Humphrey who was in a meeting. By 5:00 p.m., I had not heard from Ms. Humphrey or Ms. Limones. C. Eckert

INVESTIGATING OFFICER

(1)  C. Eckert            175    4-1-2005
                          ID#    DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

16

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

01-12-2005   I telephoned Ms. Humphrey. She stated that the information was sent and may have not gone through. She told me she would send it again. Within minutes I received the requested clinic notes. C. Eckert

01-12-2005   I went to the Darrington Unit. Upon entering the unit I stopped at the warden's office and picked up the copies I requested. I read the documentation and discovered that Robertson was assigned to the Darrington Unit on the morning of July 15, 2004. I also read that Robertson did go to the pill window to take his medication at 4:30 p.m., on July15, 2004. Awaiting medical documentation to support this fact. C. Eckert

01-12-2005   I interview Sergeant Clifford King at the Darrington Unit. Sergeant King told me that on July 15, 2004, at 9:35 p.m., he and other supervisors were called to H-Line. He stated that he went to H-2-3 cell and saw Robertson lying on the bottom bunk with his back against the wall and his feet hanging off the bunk. Sergeant King stated that it looked like Robertson was having a seizure. Sergeant King stated that Robertson was moved from the cell to a gurney and transported to the medical department. Sergeant King stated that the medical staff checked Robertson's medical folder and found no history of seizures, or diabetes, but Robertson was on mental health medication. Sergeant King stated that the medical staff tried ammonia tabs and a needle to test for pain and there was no effect. Sergeant King stated that medical staff took Robertson's temperature and it registered at 108 degrees. Sergeant King stated that medical staff placed ice packs around Robertson to bring his temperature down. Sergeant King noticed that Robertson's pants were around his ankles and a visual rectal exam was completed. Sergeant King stated that an intravenous line (IV) was started and medical staff contacted the on call doctor. The doctor ordered that Robertson be life-flighted to Hospital Galveston. Sergeant King stated that the Southern EMS arrived, took vitals and started another IV. Sergeant King stated that at 11:45 p.m. Robertson was life-lighted to Hospital Galveston. Sergeant King stated that on July 16, 2004, at 12:30 p.m., he went to Robertson's cell and found that there was no other offender assigned to the cell and Robertson had no property or keep on person (KOP) medication in the cell. Sergeant King stated that he noticed what appeared to me vomit on the mattress of the top bunk. Sergeant King stated that photographs were taken of the cell and the cell was secured with red tape to prevent access. Sergeant King provided a written statement. C. Eckert

INVESTIGATING OFFICER

(1)   C Eckert                                               175      4-1-2005
                                                             ID#         DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1.7

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

01-12-2005    I interviewed Mike Dattalo, who is the Darrington Unit Safety Officer. Mr. Dattalo told me that he was called and told to respond to the Darrington Unit to take temperature readings. Mr. Dattalo stated that he took the temperature readings on July 16, 2004, at 2:00 a.m. Mr. Dattalo stated that he took reading from the beginning, middle, and the end of each row on H-Line. Mr. Dattalo reported that the temperature on H-2 row in front of # 3 cell was 86 degrees and the humidity was 95%. The rest of the temperatures for H Line are listed in his written statement that he provided. I asked Mr. Dattalo if there were any records kept on temperatures and humidity throughout the year. Mr. Dattalo told me to contact Mike Southard tomorrow because he thought Mr. Southard had a program on his computer containing this information. C. Eckert

01-12-2005    I interviewed Lieutenant Harold Haley. Lieutenant Haley told me that based on the count room information Robertson arrived at the Darrington Unit on July 15, 2004, at 6:15 a.m. and was housed in H-2-3 cell. Lieutenant Haley also stated that Robertson was taken to the pill window at 4:30 p.m. on July 15, 2004, and had no other documentation of any activity involving Robertson until 9:35 p.m. Lieutenant Haley stated that Robertson was in transit status and would not have participated in recreation on July 15, 2004. Lieutenant Haley stated that he at 9:35 p.m., he s responded to H-Line. Lieutenant Haley stated that he remember that Robertson was sitting on the bunk leaning back and his breathing was irregular. Lieutenant Haley stated that Sergeant Stephens shook Robertson and got no response. Lieutenant Haley stated that Nurse Prater tried ammonia capsules with no response. Lieutenant Haley stated that Robertson was placed on a backboard, carried to a gurney, and then transported to the infirmary. Lieutenant Haley stated that while in the infirmary, ammonia capsules were again used with no response. Lieutenant Haley stated that Nurse Prater used a needle to check for pain stimuli and at this point he was in and out of the infirmary on several occasions. Lieutenant Haley stated that he was informed that Robertson's vital signs were checked and Robertson's temperature was recorded at 108 degrees. Lieutenant Haley stated that medical staff gathered ice packs and covered Robertson's body with ice. Lieutenant Haley also stated that when Robertson was found his pants were down around his ankles. Lieutenant Haley stated that due to this fact, Nurse Prater examined Robertson's rectal area for signs of a sexual assault and no signs were found. Lieutenant Haley stated that Southern Region EMS arrived and the diagnosis heat stroke at that point. Lieutenant Haley stated that throughout this time he was busy contacting key personnel with updates. Lieutenant Haley stated

INVESTIGATING OFFICER

(1)  C Eckert                                        175    4-1-2005

                                                    ID#      DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1.8

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

that about this time he was notified that Robertson had stopped breathing and was being assisted by medical staff. Lieutenant Haley stated that Life-Flight was ordered and he had security personnel go to the parking lot to secure the landing zone. Lieutenant Haley stated that he left the infirmary and returned when Robertson was being moved to the parking lot. Lieutenant Haley stated that he went to the parking lot along with medical staff. Lieutenant Haley stated that medical staff loaded Robertson on the helicopter and the helicopter left. Lieutenant Haley stated that the cell was secured as a crime scene and Robertson had no property in the cell and had no cell partner. While talking to Lieutenant Haley, he informed me that one thing that was not included in any report was the officer who rode on the helicopter. Lieutenant Haley stated the name of the officer was Cheryl Davis and she was assigned to third shift. Lieutenant Haley provided a written statement. C. Eckert

01-12-2005    I interviewed Sergeant Michael Stephens. Sergeant Stephens stated that at 9:35 p.m. on July 15, 2004, the control picket told him that there was an emergency on H-Line. Sergeant Stephens stated that he went to H-2-3 cell where he observed Offender Robertson lying on the bottom bunk with his feet on the floor. Sergeant Stephens stated that Robertson was unresponsive, his breathing was irregular, and he was slightly shaking. Sergeant Stephens stated that he called for medical staff and a gurney, but Nurse Barnes had already arrived. Sergeant Stephens ordered that the door be opened to the cell and he entered the cell with other officers. Sergeant Stephens stated that he gently shook Robertson to check for responsiveness, but Robertson did not respond. Sergeant Stephens stated that Nurse Barnes then tried to use an ammonia capsule, but Robertson still did not respond. Sergeant Stephens stated that Robertson was the only offender in the cell. Sergeant Stephens stated that he and the officers carried Robertson out of the cell, carried him downstairs, and placed Robertson on a gurney. Sergeant Stephens stated that he and Nurse Barnes took Robertson to the infirmary where he was placed in the emergency room. Sergeant Stephens stated that Lieutenant Haley and Sergeant King then relieved him. Sergeant Stephens provided a written statement. C. Eckert

01-12-2005    I interviewed Officer Michael Knight. Officer Knight told me that on July 15, 2004, at 9:35 p.m., he responded to a medical emergency call at H-2-3 cell. Officer Knight stated that when he entered the cell he observed the offender sitting on his bunk at the far end of the bunk, his hands at his side, and his pants

INVESTIGATING OFFICER

_C Eckert_                                          175      4-1-2005
(1)                                                 ID#        DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

down around his ankles, leaning over the desk in the cell. Officer Knight stated that it appeared that the offender was not breathing. Officer Knight stated that he helped place the offender on the floor and he was unresponsive. Officer Knight stated that the nurse tried an ammonia pack and he was still unresponsive. Officer Knight stated that he assisted in placing the offender on a backboard, carrying the offender down the stairs, and placing the offender on a gurney. Officer Knight stated that he and Sergeant Stephens escorted the offender to the infirmary. Officer Knight stated that he returned to his assigned duties. Officer Knight added that the offender was alone in the cell. Officer Knight provided a written statement. C. Eckert

01-12-2005   I checked with inmate records at the Darrington Unit. I attempted to ascertain the H-Line housing roster for July 15, 2004. I was informed that if the roster was kept, it was already moved to storage. An attempt to locate the roster will be made. C. Eckert

01-12-2005   I interviewed Officer Everest Mbonu. Mbonu stated that Offender Robertson was an offender in transit status. Mbonu stated that Robertson was brought to H Line during his shift. Mbonu stated that Robertson was placed in H-2-3 cell and at the time he showed no signs of illness. Mbonu stated that Robertson never complained to him of being ill. Officer Mbonu stated that he provided Robertson with a mattress and sheets, and also provided him with a meal. Officer Mbonu stated that during his security check at 9:15 p.m., Robertson was in a state that he felt required immediate medical attention Officer Mbonu stated that he called for assistance and other officers and medical staff responded. Officer Mbonu stated that Robertson was placed on a stretcher and moved to the infirmary. Officer Mbonu provided a written statement. C. Eckert

01-13-2005   I received the requested medical records from TDCJ/UTMB Decedent Affairs. The records revealed that Offender Robertson was transferred from the Lopez Unit to the Jester IV Unit on June 27, 2004, after he complained that he was seeing spiders and things that were not there, since his medications were changed. On June 25, 2004, Robertson began receiving Benztropine Mesylate 2 mg (Cogentin) and Symmetrel 100 mg (Amantadine). Robertson was already prescribed Chlorpromazine 50 mg (Thorazine), and Lithium Carbonate 300 mg. The orders were for Robertson to be transferred to Jester IV for stabilization/crisis management. On June 28, 2004, Robertson was seen for a Mental Health

INVESTIGATING OFFICER
C Eckert                    175    4-1-2005
(1)                          ID#    DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

110

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

Assessment. The assessment noted that Robertson was psychotic, disoriented, rambling, paranoid thinking, delusional, with visual hallucinations. After being evaluated it was suggested that Robertson be seen by the attending psychiatrist to evaluate and adjust medication. On June 30, 2004, Nortriptyline was added to his medications. On July 7, 2004, after being evaluated the dosage of Chlorpromazine was increased from to 150 mg a day. On July 9, 2004, Robertson was ready for discharge to his unit of assignment and to continue on current medication. Robertson was not transferred from the Jester IV until July 15, 2004. C. Eckert

01-13-2005   I interviewed Officer Fidel Gallegos at the Ramsey III Training Academy. Officer Gallegos was attending in-service training. Officer Gallegos stated that he was advised of a medical emergency on H-Line and went to H-2-3 cell. Gallegos stated that he observed Offender Robertson sitting on the bottom bunk with his pants around his ankles leaning toward the desk. Gallegos stated that Offender Robertson was having problems breathing and was unresponsive. Gallegos stated that the cell door was opened and he helped place Robertson on the floor. Gallegos stated that after the nurse assessed Robertson; he assisted in placing Robertson on a backboard. Gallegos stated that Robertson was carried downstairs and placed on a gurney. Gallegos stated that he was then ordered to return to his duty post. Officer Gallegos provided a written statement. C. Eckert

01-13-2005   I interviewed Nurse Mary Prater. Nurse Prater stated she was in the medical department when she was called to assist Nurse Barnes. Prater stated that when she first saw Robertson, she observed his fixed stare and rhythmic head movements. Prater stated that Robertson's axillary temperature was 108, but would probably be one degree higher, orally. Prater stated that Robertson's blood pressure was 98/40 and his respirations were 32 per minute. Prater stated that Robertson's pulse was 100 per minute. Prater stated that officers in the room were told to get ice packs and bags of ice were placed on Robertson's neck, chin, both armpits, groin, under knees, and well as on his abdomen and lower back. Prater stated that an IV of normal saline was started and someone called the on-call physician. Prater stated that paramedics were also called and arrived within five minutes. Prater stated that the paramedics began bagging Robertson with an ambu bag and orders were received to transport Robertson to the nearest hospital. Prater stated that all attempts to intubate Robertson were unsuccessful. Prater stated that the paramedics called Life Flight and another saline bag was started after the first one was emptied. Prater stated that when Life Flight arrived the team members

INVESTIGATING OFFICER

(1) _C. Eckert_                175   4-1-2005
                              ID#        DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death In Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

took Robertson's rectal temperature, which was now at 103.6. Prater stated that Robertson was bundled in a blanket with ice to his groin area and taken to the helicopter. Nurse Prater provided a written statement. C. Eckert

01-13-2005   I obtained a copy of a medication reference handbook for nurses from Nurse Prater. I copied information on all the medications taken by Offender Robertson. One of the medications taken by Robertson, Chlorpromazine Hydrochloride showed an alert which, which stated, "Watch for evidence of neuroleptic malignant syndrome (extrapyramidal effects, hyperthermia, autonomic disturbance), which is rare but usually fatal. It may not be related to length of drug use or type of neuroleptic; more than 60% of affected patients are men." C. Eckert

01-14-2005   I contacted Ms. Humphrey again and requested blood work completed at Hospital Galveston and a detailed list of when and how much medication Robertson received from June 25, 2004, until the date of his death. Ms. Humphrey faxed the blood work, but stated that the medication information would take a little longer. C. Eckert

01-14-2005   Lucy Limones with UTMB left a message for me to contact her. C. Eckert

01-14-2005   I contacted Lucy Limones. I told her that I needed medical records expedited to me. Ms. Limones told me to send the request to Julia Solis in Medical Records Release and she would contact her and tell her to expedite. I faxed the request to Ms. Solis. C. Eckert

01-24-2005   I received the medical records from UTMB Galveston showing the records for Robertson's last day before death. C. Eckert

01-28-2005   Captain Nesmith contacted me and told me that Mr. Rhoten requested that I check on the transportation of Robertson and if any orders were provided about the medication sensitivity. C. Eckert, # 175

01-28-2005   I contacted Mr. Rogers, Nurse Manager, at the Jester IV Unit. Mr. Rogers stated that there was no separate blue chart for Roberson, because he was not admitted. Mr. Rogers stated that he was only there for evaluation. Mr. Rogers stated that there was probably no separate order for Robertson and that there were a large

INVESTIGATING OFFICER

_C. Eckert_     175   4-1-2005

(1)                ID#    DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1,12

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

number of offenders on the medications taken by Roberson. Mr. Rogers stated that because Robertson was not admitted, the medical staff may have not seen him every day and that is why there were days with no entries. C. Eckert, # 175

01-28-2005    I contacted Classification Chief Dickerson at the Ramsey II Unit and asked him for a copy of guidelines for completing health summary for classification. Robertson's Health Summary list no extreme temperatures or humidity. These classifications are mostly for work assignments. I also contacted Zack Thomas, Safety Officer, Ramsey II Unit, and requested a copy of the Administrative Directive related to temperature extremes. Most of that is related to work assignments, but did provide a heat and humidity index. Based on the temperature history for Houston, Texas, the highest temperature for the day was listed at 98.1 with a humidity of 40%. Based on the matrix, the scale listed the average temperature would have been close to 101, with heat exhaustion possible. This was at 4:53 p.m. C. Eckert, # 175

01-31-2005    I contacted Shantel Humphrey to check on the status of the medicine records and if there were any nurses' notes that were not in the records concerning the transportation of Robertson. Ms. Humphrey stated that the records were sent to UTMB for peer review, but she recalled there were no other records than what was sent. Ms. Humphrey stated that she would check the computer screen to see if any other notes were documented there. Ms. Humphrey stated that she has not heard anything about the medicine dispense records and would look into it and get back with me. C. Eckert, # 175

2-10-2005    I received the medication compliance report requested on Offender Robertson. The discharge summary was still not available. C. Eckert, # 175

3-14-2005    I still have not received the discharge summary from Ms. Humphrey. C. Eckert, # 175

3-14-2005    I contacted Investigator Belinowski for an RFA. I requested to speak with Offender Nathan Wallace, TDCJ# 1220328, who was assigned to the Dawson State Jail. Investigator Belinowski checked with security and found that Wallace suffered from mental health issues and security had to fight him anytime they attempted to escort him from his cell. Investigator Belinowski stated that he would go to Wallace's cell and ask him about the incident. Investigator

INVESTIGATING OFFICER

(1) C Eckert            175    4-1-2005

                                                            ID#       DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death In Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

Belinowski contacted me after he talked to Wallace and told me that Wallace did not know Robertson or remember hearing anyone complain of illness or injury. C. Eckert, # 175

3-14-2005    I contacted Investigator Shelia Thomas at the McConnell Unit and requested to speak with Offender Ricky Peavy, TDCJ # 657072. I spoke to Offender Peavy who told me that he did not remember anyone having any medical problems or needing any medical assistance. Peavy stated that he was transferred to Darrington occasionally on his way to and from Hospital Galveston. Peavy stated that the only incident that he recalled was one time when a black female officer worked and he heard an unknown offender ask for his medication. Peavy stated that the incident happened a long time ago and he does not remember anything unusual happening. C. Eckert, # 175

3-21-2005    I attempted to make contact with Nurse Barnes who is out on medical leave. I left a message on her answering machine at her residence. I included my name and return telephone number. C. Eckert, # 175

3-25-2005    I attempted to contact Nurse Barnes. I left another message on her answering machine. C. Eckert, # 175

3-28-2005    Nurse Barnes called the office, but I was not available. C. Eckert, # 175

3-29-2005    I contacted Nurse Barnes and advised her of the reason that I needed to speak with her. Nurse Barnes agreed to be audio recorded. Nurse Barnes told me that she responded to H Line. Nurse Barnes stated that security was in the cell and the cell door was open. Nurse Barnes stated that she entered the cell and observed Robertson with no shirt on and his pants down. Barnes stated that it was a hot night and Robertson was sweaty. Barnes described that Robertson was sweating like a person would in heat, but not sweating profusely. Nurse Barnes stated that Robertson was breathing rhythmically with his mouth open. Nurse Barnes stated that Robertson did not respond to verbal or painful stimuli. Nurse Barnes stated that Robertson eyes were open in a stare and he did not blink. Nurse Barnes stated that Robertson was immediately placed on a stretcher and did no treatment or further assessment at the cell. Nurse Barnes stated that once Robertson was placed on a stretcher he was taken to the infirmary emergency room. Nurse Barnes stated that she took Robertson's temperature auxiliary and his temperature was 108

INVESTIGATING OFFICER

(1) C. Eckert

175                    4-1-2005

ID#              DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1.14

| TBCJ-OIG-INVESTIGATIONS DIVISION | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

degrees. Nurse Barnes stated that they began packing Robertson in ice. Nurse Barnes stated that she was in and out of the room calling the doctor, emergency medical services (EMS), and sending messages. Nurse Barnes stated that Nurse Prater stayed in the room with Robertson and then EMS came to assist. Nurse Barnes stated that she did recall that it was a very hot night, but not unusual for the middle of July, and there were only fans in the cellblock area. Nurse Barnes stated that while at the cell she did not notice anything unusual. C. Eckert, # 175

4-1-2005    The case was typed and forwarded for review.  C. Eckert, # 175

INVESTIGATING OFFICER

(1) *C. Eckert*     175    4-1-2005

ID#    DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED





**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL

## SUPPLEMENT CRIMINAL CASE REPORT

| OFFENSE | CASE #: |
|---|---|
| Death in Custody  CCP 49.18 | 04-1679 |
| LOCATION: | DATE OF OFFENSE: |
| Hospital Galveston | July 16, 2004 |
| VICTIM: | DATE OF SUPPLEMENT REPORT: |
| Robertson, Ricky TDCJ # 1172218 | June 1, 2005 |

On April 25, 2005, I received this case to gather additional information concerning the medications administered to Offender Robertson and whether the dosage or mixture of medications contributed to Robertson's death. I also gathered additional information concerning whether the medications in conjunction with the temperature extremes may have contributed to Robertson's death.

On April 25, 2005, I contacted the Texas Department of Criminal Justice-Health Services Division and asked to speak with Director Lannette Linthicum, M.D.,FACP. Doctor Linthicum returned my call on April 26, 2005, and informed me that she was familiar with the death of Offender Ricky Robertson and that two committees had reviewed the case. Doctor Linthicum stated that the peer review and any findings or recommendations could not be released. Doctor Linthicum stated that the proceedings and findings were protected by statute from disclosure. I asked Doctor Linthicum if a letter could be written explaining what could be disclosed and any other information that could be useful to the investigation. Doctor Linthicum stated that she would provide a letter detailing what could be disclosed. I also asked Doctor Linthicum if it could be determined if the medication taken by Robertson was administered properly and in the correct dosage. Doctor Linthicum stated that she would have Stephanie Zepeda, Assistant Director of Pharmacy complete a clinical pharmacology consult on the medication taken by Robertson.

On May 3, 2005, I received a copy of the letter completed by Doctor Linthicum. In the letter it stated that two Health Care Committees of the Correctional Managed Health Care Program had reviewed the death of Ricky Robertson. The committees were the Joint Morbidity and Mortality Committee and the Physician Peer Review Committee. Doctor Linthicum stated that she was unable to share specific actions taken by the committees because the proceedings and findings are protected by statute from disclosure. Doctor Linthicum stated that corrective action was recommended with respect to clinical process and care issues. Doctor Linthicum stated that she expressed her concern about some of the clinical issues in this case and expressed her desire that the corrective action outline by the Peer Review process be "expeditiously completed."

| INVESTIGATING OFFICER(S) | | | IS FURTHER INVESTIGATIVE ACTION REQUIRED? |
|---|---|---|---|
| (1) C Eckert | 17S | 6-2-05 | |
| | ID# | DATE | |
| (2) | 108 | 6/4/05 | ___ YES   ✓ NO |
| APPROVING SUPERVISOR | ID# | DATE | |

CC-0255 (02/2005)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

TDCJ – OIG SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679

Doctor Linthicum also stated that TDCJ does not have any tempered air or air conditioned units/facilities and there are only 2,000 psychiatric beds, which are air-conditioned, that serve the entire TDCJ system. Doctor Linthicum further stated that the majority of the mental health offenders are outpatient and do not meet clinical criteria for inpatient care. Doctor Linthicum stated that there are approximately **17,000 offenders** on outpatient mental health caseloads and large portions of them receive psychotropic medication. Doctor Linthicum stated that there has been a marked reduction of heat related illnesses in offenders and staff, and short of building new facilities with tempered air or air conditioning, she did not know what else could be done.

Offender Robertson was received at the Darrington Unit in transit status enroute back to his unit of assignment and would have been on the outpatient mental health caseload. Offender Robertson arrived at the Darrington Unit at 6:15 a.m., which would have been one of the cooler times of day for transporting offenders from the Jester IV Unit. Based on Correctional Managed Health Care Policy Manual, B-15.2, Heat Stress, Procedures, Section VII, Transportation, there were no violations of this policy.

On May 3, 2005, I also received a message on the TDCJ mainframe, which was sent to Stephanie Zepeda by Doctor Linthicum requesting a clinical pharmacology consult in evaluating the list of medications taken by Robertson for a possible drug interaction. Doctor Linthicum provided Ms. Zepeda with a list of the medications taken by Robertson and asked Ms. Zepeda to answer a number of questions (listed below). On May 9, 2005, Ms. Zepeda provided the following answers to the questions:

1. Could any of the drugs potentiate (i.e., increase) the levels of tricyclics?

   There is potential drug-drug interaction between nortriptyline and chlorpromazine. The onset is generally delayed, severity minor, and documentation is possible. Effect-increased serum concentration of TCA. Mechanism-possibly competitive inhibition of TCA metabolism. Management-decrease TCA dose if adverse effects are seen.

2. How many of the drugs listed could affect heat regulation mechanisms?

   The most commonly used drugs that can affect thermoregulation mechanisms include antipsychotic agents (e.g., chlorpromazine), serotonin antagonists, sympathomimetic agents, and anticholinergics (e.g., benztropine).

Investigator's Signature          ID# 175          DATE 6-2-05

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



TDCJ – OIG SUPPLEMENT OFFENSE REPORT
CASE #: 04-1679

PAGE 3 of 3

Chlorpromazine- May cause NMS (neuroleptic malignant syndrome), which is characterized by muscle rigidity, **hyperthermia, autonomic instability**, and altered mental status. It is also considered a "poikilothermic" (drug that may disrupt the body's normal temperature regulating mechanisms). Cases of heat stroke have been reported in the literature.

Nortriptyline- is considered a "potentiator" (drug which **may** potentiate the effects of anhidrotics or poikilothermics).

Benztropine- is considered a "anhidrotic" (drug which **may** inhibit perspiration).

3.  Are there any synergistic effects from this combination of medication with respect to heat regulation?

    The patient was prescribed three medications that **may** affect heat regulation: chlorpromazine, nortriptyline, and benztropine. Use of these agents concomitantly **may have additive effects on heat regulation.**

**ATTACHMENTS:**

1.  Investigative Notes.
2.  The letter from Doctor Linthicum dated May 3, 2005.
3.  A copy of the e-mail message sent to Stephanie Zepeda by Doctor Linthicum dated May 3, 2005.
4.  A copy of the e-mails sent and received by Stephanie Zepeda .
5.  A copy of the clinical pharmacology consult completed by Ms. Zepeda dated May 9, 2005.
6.  A copy of Correctional Managed Health Care Policy Manual, B-15.2, Heat Stress, Procedures, Section VII, Transportation.

CSE

C lchert
Investigator's Signature

175
ID#

6-2-05
DATE

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



**Texas Department of Criminal Justice**
OFFICE OF THE INSPECTOR GENERAL

## INVESTIGATIVE NOTES

| TYPE OF INVESTIGATION: | CASE #: |
|---|---|
| Criminal Case    Death in Custody | 04-1679 |

4/18/2005        12:58 p.m.
I received a copy of Correctional Managed Health Care Policy Manual, B-15.2, Heat Stress, Procedures, Section VII, Transportation, from Mr. Rhoten. I was also informed that this case would be returned to me to gather more information about the medication that Robertson was taking at the time of his death, and if there was any violations committed by medical personnel. C. Eckert, # 175

4/25/2005        11:00 a.m.
I received the case from Huntsville. C. Eckert, # 175

4/25/2005        1:00 p.m.
I contacted Doctor Linthicum's office and left a message for her to call me in reference to this investigation. C. Eckert, # 175

4/26/2005        9:00 a.m.
I contacted Doctor Linthicum's office and was hold she would be in meetings all day. C. Eckert, # 175

4/26/2005        1:00 p.m.
Doctor Linthicum called me. Doctor Linthicum informed me that she was familiar with the death of Offender Ricky Robertson and that two committees had reviewed the case. Doctor Linthicum stated that the peer review and any findings or recommendations could not be released. Doctor Linthicum stated that the proceedings and findings were protected by statute from disclosure. I asked Doctor Linthicum if a letter could be written explaining what could be disclosed and any other information that could be useful to the investigation. Doctor Linthicum stated that she would provide a letter detailing what could be disclosed. I also asked Doctor Linthicum if it could be determined if the medication taken by Robertson was administered properly and in the correct dosage. Doctor Linthicum stated that she would have Stephanie Zepeda, Assistant Director of Pharmacy complete a clinical pharmacology consult on the medication taken by Robertson. C. Eckert, # 175

5/3/2005        11:00 a.m.
I received a fax from Doctor Linthicum, which was the letter that I requested. C. Eckert, # 175

INVESTIGATING OFFICER

(1)  C. Eckert                                               175        6-2-05
                                                            ID#        DATE

CC-00045 (02/2005)                                                   PAGE 1

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| TDCJ – Office of the Inspector General | Death in Custody |
|---|---|
| INVESTIGATIVE NOTES | CASE #: 04-1679 |

5/3/2005          1:22 p.m.
I received an e-mail message sent by Doctor Linthicum to Ms. Zepeda requesting a clinical pharmacology consult in evaluating the medications taken by Robertson. C. Eckert, #175

5/5/2005          8:52 a.m.
I sent Ms. Zepeda an e-mail message concerning whether she had completed the consult. C. Eckert

5/5/2005          11:00 a.m.
Ms. Zepeda sent me an e-mail message that stated that she would try to have it done today or tomorrow. C. Eckert, # 175

5/9/2005          11:56 a.m.
I received the clinical pharmacology consult from Ms. Zepeda. C. Eckert, # 175

5/10.2005          10:00 a.m.
This case was discussed with Captain Nesmith. The information provided will be supplemented to the case. C. Eckert, # 175

6/2/2005          11:00 a.m.
This case was submitted for review. C. Eckert, # 175

INVESTIGATING OFFICER

(1)   C Eckert                                    175        6-2-05
                                              ID#          DATE

CC-00045 (02/2005)

Copy of OIG case to Litigation Support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



**Texas Department of Criminal Justice**

Brad Livingston
Executive Director

**CONFIDENTIAL**

To:     Dennis Rhoten
        Director, Investigations
        Office of Inspector General

From:   Lannette Linthicum, MD, CCHP-A, FACP
        Director, Health Services Division

Date:   May 3, 2005

Re:     Ricky Robertson
        TDCJ #1172218 (Deceased)

The death of Offender Ricky Robertson, TDCJ #1172218 has been reviewed by two Health Care Committees of the Correctional Manage Health Care Program – namely, the Joint Morbidity and Mortality Committee and the Physician Peer Review Committee. I am not able to share with you any specific detail action taken by these committees because the proceedings and findings of these committees are protected by statute from disclosure. However, I can tell you that corrective action was recommended with respect to clinical process and care issues. I have personally met with the UTMB, Interim, Director of Mental Health Services, Dr. Pradan Nathan regarding this case. I have unequivocally expressed my concern about some clinical issues in this case. I have also expressed my desire that the corrective action outline via the Peer Review process be expeditiously completed.

I have requested that the Joint Mental Health Working Group (the latter is composed primarily of mental health staff from the three partner agencies – TDCJ, UTMB and Texas Tech) address the issue of offenders on psychotropic medications and their housing needs. The Joint Mental Health Working Group is scheduled to meet on May 19, 2005 from 1:00 p.m. – 3:00 p.m. The group will address modifying the current Health Summary for Classification form (HSM-18) to add a designator for offenders receiving psychotropic medications and instructions regarding housing considerations.

Housing considerations will be extremely limited. As you know, the Texas Department of Criminal Justice (TDCJ) does not have any tempered air or air conditioned units/facilities. There are 2,000 inpatient psychiatric beds, which are air-conditioned that serve the entire system. However, the majority of mental health offenders are outpatient and do not meet clinical criteria for inpatient care. In fact, there are approximately 17,000 offenders on the outpatient mental health caseloads. A large portion of them are receiving psychotropic medication. This issue is

P.O. Box 99
Huntsville, Texas 77342-0099
Copy of OIG case/w/litigation support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

complex and certainly cannot be solved by the Health Services Division alone.  The system has made tremendous strives in attempting to keep the unit/facility temperature at eighty-five (85) degrees as outlined in A.D. 10.64, "Temperature Extremes in the TDCJ Workplace."  This has been evident in the marked reduction of heat related illnesses in offenders and staff over the past several years.  Short of building new facilities with tempered air or air conditioning; I do not know what else can be done.  Strict adherence to the heat directive is imperative.

I hope this satisfies your concerns.  Please do not hesitate to contact me should there be any remaining outstanding issues.  Thank you.

c:   Owen J. Murray, DO, MBA, Medical Director, UTMB Correctional Manage Health Care
     Pradan Nathan, MD, UTMB-CMHC, Interim, Mental Health Director
     Colleen Eckert, Investigator III, Office of Inspector General

P.O. Box 99
Huntsville, Texas 77342-0099
Copy of OIG case w/ligitjost support on 06.26.2013 by scm.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED