# CARDIOPULMONARY RESUSCITATION RECORD

Date 8/13/11 Time Event Recog 0341 Location Ambulance Age 52 Weight ____ Length ____

Was Hospital-Wide Resuscitation Response Activated? ☒ Yes ☐ No

Condition when Need for Chest Compression / Defibrillation was Identified? ☐ Pulse (poor perfusion) ☒ Pulseless

Witnessed: ☒ Yes ☐ No Indicate all Monitors that were Present at Onset: ☒ ECG ☒ Pulse Ox. ☒ Apnea

Patient Conscious at Onset: ☒ Yes ☐ No Did the Patient with a Pulse Become Pulseless? ☒ Yes ☐ No

PATIENT I
JAMES, KENNETH WAYNE
REG ER Admit: 08/13/11
M/52 L.ER
MR# L000194299 KNOWLES,HEIDI C
Acct# L00103392104

Patient Name ____ MR # ____

## AIRWAY / VENTILATION

At Onset: ☒ Spontaneous ☐ Apnea ☐ Agonal ☐ Assisted

Types of Ventilation: ☐ Mouth/Mouth ☐ Mouth/Mask ☒ BVM ☒ ETT ☐ Tracheotomy ☐ Other:

Time of First Assisted Ventilation: PTA See Run Sheet

ETT Intubation: Time 0335 Size 7.5mm

By Whom: M. Neel RN

Secondary Confirmation: ☒ Auscultation ☒ Ex. $CO_2$ ☐ Other:

## CIRCULATION

First Documented Rhythm: PTA

Time Chest Compressions Were Started: PTA

First Documented Pulseless Rhythm:

Patient Defibrillated ☐ Yes ☒ No

If Yes, Time of First Shock:

AED Applied ☒ Yes ☐ No

AED Shock ☐ Advised ☐ Delivered ☐ 1st Shock

Pacemaker On ☐ Yes ☒ No

## OUTCOME

Resuscitation Event Ended @ 0416 Status: ☐ Alive ☒ Dead

Reason Resuscitation Ended:
☐ Return of Circulation (>20 min.) ☐ Efforts Terminated (No Sustained ROC)
☒ Medical Futility
☐ Advance Directives ☐ Restrictions by Family

| TIME | RESP. SPONTANEOUS/ ASSISTED | PULSE SPONTANEOUS/ COMPRESSIONS | BP | RHYTHM | DEFIB / CARDIOV JOULES | BOLUS DOSE / ROUTE: AMIODARONE DOSE / IV or IO | ATROPINE DOSE / ROUTE | EPINEPHRINE DOSE / ROUTE | LIDOCAINE DOSE / ROUTE | VASOPRESSIN DOSE / IV or IO | Sodium Bicarb | INFUSIONS DOSE / cc PER HOUR | DOPAMINE | DOBUTAMINE | EPINEPHRINE | NOREPINEPHRINE | COMMENTS: (i.e.: Peripheral / Central Line Placement, IO, Chest Tube, Vital Signs, Response to Interventions) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0353 | A | C | | | | | | i Amp | | | | | | | | | CPR in progress |
| 0355 | A | C | | | | | | | | | | | | | | | 16g to (R) EJ c blood draw |
| 0356 | A | C | | | | | | i Amp | | | | | | | | | NS started |
| 0359 | A | C | | | | | | i Amp | | | i Amp | | | | | | Central line to (R) groin |
| 0400 | A | C | | | | | | | | | | | | | | | FSBG 265 |
| 0401 | A | C | | | | | | i Amp | | | | | | | | | pt intubated |
| 0404 | A | C | | | | | | i Amp | | | | | | | | | CPR cont. |
| 0405 | A | C | | | | | | | | | | | | | | | 7.5mm ETT 24 @ lip c color A |
| 0407 | A | C | | | | | | i Amp | | | ~~i Amp~~ | | | | | | pt extubated |
| 0408 | A | C | | | | | | | | | | | | | | | CPR cont. |
| 0409 | A | C | | | | | | | | | i Amp | | | | | | 7.5mm ETT 24 @ lip c color |
| 0410 | A | C | | | | | | i Amp | | | | | | | | | 16 Fr NG tube placed - placement checked by [illegible] |

RECORDER'S SIGNATURE & ID
HEIDI KNOWLES

PHYSICIAN'S PRINTED NAME

U / CODE TEAM NURSE'S SIGNATURE

PHYSICIAN'S SIGNATURE

Form 26232 (Rev. 5/04) Page ____ of ____

PRRH / PALESTINE REGIONAL MEDICAL CENTER • 2900 S. LOOP 256 • PALESTINE, TX 75801

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# CARDIOPULMONARY RESUSCITATION RECORD

Date________ Time Event Recog.________ Location________ Age____ Weight____ Length____

Was Hospital-Wide Resuscitation Response Activated? ☐ Yes ☐ No

Condition when Need for Chest Compression / Defibrillation was Identified? ☐ Pulse (poor perfusion) ☐ Pulseless

Witnessed: ☐ Yes ☐ No Indicate all Monitors that were Present at Onset: ☐ ECG ☐ Pulse Ox ☐ Apnea

Patient Conscious at Onset: ☐ Yes ☐ No Did the Patient with a Pulse Become Pulseless? ☐ Yes ☐ No

PATIENT LABEL OR ADDRESSOGRAPH
JAMES, KENNETH WAYNE
REG ER Admit: 08/13/11
[redacted] M/52 L.ER
MR# L000194299 KNOWLES, HEIDI C
Acct# L00103392104

## AIRWAY / VENTILATION

At Onset: ☐ Spontaneous ☐ Apnea ☐ Agonal ☐ Assisted

Types of Ventilation: ☐ Mouth/Mouth ☐ Mouth/Mask ☐ BVM ☐ ETT ☐ Tracheotomy ☐ Other:________

Time of First Assisted Ventilation:________

ETT Intubation: Time________ Size________

By Whom:________

Secondary Confirmation: ☐ Auscultation ☐ Ex. $CO_2$ ☐ Other:________

## CIRCULATION

First Documented Rhythm:________

Time Chest Compressions Were Started:________

First Documented Pulseless Rhythm:________

Patient Defibrillated ☐ Yes ☐ No

If Yes, Time of First Shock:________

AED Applied ☐ Yes ☐ No

AED Shock ☐ Advised ☐ Delivered ☐ 1st Shock

Pacemaker On ☐ Yes ☐ No

Patient Name________ MR #________

## OUTCOME

Resuscitation Event Ended @________ Status: ☐ Alive ☐ Dead

Reason Resuscitation Ended:

☐ Return of Circulation (>20 min.) ☐ Efforts Terminated

☐ Medical Futility (No Sustained ROC)

☐ Advance Directives ☐ Restrictions by Family

| TIME | RESP. SPONTANEOUS/ ASSISTED | PULSE SPONTANEOUS/ COMPRESSIONS | BP | RHYTHM | DEFIB / CARDIOV JOULES | AMIODARONE DOSE / IV or IO | ATROPINE DOSE / ROUTE | EPINEPHRINE DOSE / ROUTE | LIDOCAINE DOSE / ROUTE | VASOPRESSIN DOSE / IV or IO | | | DOPAMINE | DOBUTAMINE | EPINEPHRINE | NOREPINEPHRINE | COMMENTS: (i.e.: Peripheral / Central Line Placement, IO, Chest Tube, Vital Signs, Response to Interventions) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0412 | A | C | | | | | | | | | | | | | | | Rectal temp 105.3 — [initials] |
| 0413 | A | C | | | | | | 1 Amp | | | | | | | | | CPR cont — [initials] |
| 0416 | | | | | | | | | | | | | | | | | CPR stopped — see NN [initials] |

BOLUS DOSE / ROUTE — INFUSIONS DOSE / cc PER HOUR

RECORDER'S SIGNATURE & ID

ICU / CODE TEAM NURSE'S SIGNATURE

PHYSICIAN'S PRINTED NAME HEIDI KNOWLES MD

PHYSICIAN'S SIGNATURE [signature]

Form 26232 (Rev. 5/04) Page____ of____

PRRH / PALESTINE REGIONAL MEDICAL CENTER • 2900 S. LOOP 256 • PALESTINE, TX 75801

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# EMERGENCY DEPARTMENT
# CHEST PAIN NURSING ASSESSMENT

**Palestine Regional Medical Center**

Name: JAMES, KENNETH W Pt#: L00103392104
Age: 52YRS DOB: [redacted] Sex: M MR#: L000194299
EDP: KNOWLES, HEIDI PCP: NO LOCAL DOCTOR

Date In: 8/13/2011 Time: 0352

**Subjective Notes:** Code Blue, Temp 108 @ Unit

**Pain** ☐ Patient denies pain
Location: unable Quality: ☐ Sharp ☐ Dull ☐ Cramping ☐ Burning ☐ Aching Severity Scale: Onset:
Provocation: ☐ Other: Aggravating Factors:
Radiating: ☐ No ☐ Yes (see below) ☐ Constant ☐ Intermittent Relieving Factors:

**Psychosocial**
Appearance: ☐ Clean ☐ Unkempt ☐ Other
Mood / Affect / Behavior: ☐ Appropriate ☐ Depressed ☐ Anxious ☐ Tearful ☐ Other
Caregiver: ☐ Self ☐ Family member ☐ Significant Other ☐ Group home
Activity level: ☐ Ambulates independently ☐ Requires assistance ☐ Non-ambulatory ☐ Performs ADL's independently ☐ Requires assistance with ADL's
Environment: ☒ No steps ☐ Few steps ☐ Many steps
Nutritional status: ☒ Normal ☐ Cachetic ☐ Obese
Religious / Cultural preference: ☒ None (specify)
Best learn by: ☒ Verbal ☐ Written ☐ Return demo
Learning Barriers: ☐ TDD phone ☐ Interpreter ☒ No ☐ Yes ☐ Other:

**Symptoms prior to arrival** ☐ Asymptomatic
Mode of Onset: ☒ Sudden ☐ Gradual ☐ Intermittent Onset: Date: 8-13-11 Time: unknown Duration:
Onset > 24 hrs. medical attention was sought? ☐ No ☐ Yes Date:

**Status at onset**
☒ Rest
☐ Exertion
☐ Awakened from sleep
☐
☐

**Radiation**
☐ Substernal ☐ Back
☐ Epigastric ☐ LUE
☐ Left Chest ☐ RUE
☐ Right Chest ☐ Shoulder
☐ Neck / Jaw ☐

**Quality**
☐ Pressure / Heavy ☐ Indigestion
☐ Burning ☐ Indescribable
☐ Sharp / Stabbing ☐ Ache
☐ Constant ☐ Crushing
☐ Intermittent ☐

**Relief Measures**

| | Yes | No |
|---|---|---|
| Rest | ☐ | ☐ |
| Food | ☐ | ☐ |
| NTG SL | ☐ | ☐ |
| | ☐ | ☐ |

**Associated signs and symptoms**
☐ Dyspnea ☐ Nausea ☐ Syncope ☐ Palpitations ☐
☐ Diaphoresis ☐ Vomiting ☐ Near Syncope ☐ Extreme fatigue ☐

**Chest discomfort with**
☐ Deep breathing ☐ Changes in position ☐
☐ Palpation ☐ Exercise / Activity ☐

**Past Medical History and Risk Factors**
**PMH from triage** UNKNOWN

☐ High Cholesterol ☐ Diabetes ☐ Pacemaker
☐ Peripheral Vascular Disease ☐ Angina ☐ Family History
☐ Previous Cardiac Arrest ☐ HTN ☐ Smoker: ___ PPD ___ Yrs
☐ MI Date: ☐ COPD ☐ Other

**Procedures:** Date
☐ Heart cath
☐ Stress Test
☐ Angioplasty
☐ CABG
☐ Other

**Physical Assessment (Objective)**
**Heart Sound** Asystole
☐ WNL ☐ Click / Rub
☐ Murmur ☐ Rub
☐ Muffled ☐ Other:
Cap Refill: ☐ < 2 sec. (Normal) ☐ > 2 sec. (Delayed)
Edema: ☐ No ☐ Yes Location:
Degree: ☐ 1+ ☐ 2+ ☐ 3+

**Palpation** Asystole
Chest pain with palpation: ☐ No ☐ Yes Location:
Pulses: Carotid Femoral
Brachial Popliteal
Radial Dorsalis Pedis
S=Strong W=Weak D=Doppler A=Absent

Abdomen
☐ Soft ☐ Distended
☒ Firm ☐ Non-Tender
☐ Rigid ☐ Tender
☐ Rebound Tenderness
☐ Other:

Cardiac Rhythm: ☐ NSR ☐ Sinus Bradycardia ☐ Sinus Tachycardia ☐ SVT ☒ Other: Asystole
Apical Pulse: SpO2: 100% ☐ Room Air ET

**System Review**
**Neurological**
☐ Alert ☐ Uncooperative
☐ Oriented X ___ ☐ Combative
☐ Cooperative ☐ Agitated
☐ Awake but confused ☐ Restrained
unresponsive

**Cardiovascular**
Skin: ☐ Warm ☒ Dry ☐ Moist ☐ Diaphoretic
Color: ☐ Pink ☒ Pale ☐ Ashen ☐ Flushed
☐ Cyanotic ☐ Jaundiced

**Respiratory**
Airway: ☐ Clear ☒ Other: Intubated
Effort: ☐ Unlabored ☐ Mildly ☐ Severely
☐ Retractions ☐ Stridor ☐ Nasal Flaring
Lung: ☐ Clear ☐ Wheezing ☐ Crackles
☐ Rhonchi ☐ Decreased

Vital Signs: 03:52 T: R: P: Regular BP: 000/000 Nurse Signature: [signature] RN

Copy of OIG case to Litigation Support on 04.19.2013 by ce. UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Rev. 03/05/04

**ORDER PROCEDURE FORM**
**CARDIOVASCULAR EMERGENCIES**

**Palestine Regional Medical Center**

Name: JAMES, KENNETH W    Pt#: L00103392104
Age: 52YRS  DOB: [redacted]  Sex: M  MR#: L000194299
EDP: KNOWLES, HEIDI  PCP: NO LOCAL DOCTOR

Date In: 8/13/2011  Time: ________

| Laboratory Tests | | | | Other Diagnostic Tests | | | |
|---|---|---|---|---|---|---|---|
| Order Time | | Order Sent | By | Order Time | Radiology | Order Sent | By |
| | | | | | CXR (PA/LAT - Portable) | | |
| | Cardiac Profile | | | | | | |
| | CBC | | | | | | |
| | BMP CMP | | | | | | |
| | Troponin | | | | | | |
| | Myoglobin | | | | | | |
| | CPK | | | | | | |
| | Magnesium | | | | Cardiopulmonary | | |
| | BNP | | | | EKG | | |
| | PT/PTT | | | | ABG | | |
| | | | | | O2 LPM | | |
| | Misc. Orders | | | | | | |
| | Previous Medical Records | | | Medical Necessity Information: | | | |
| | Physical Therapy - Eval & Tx | | | | | | |

Weight: lbs: 240 kgs: 109.1
Allergies: UNKNOWN

| Order Time | Medication / Dosage / Route | VO | Read Back | Adm time | Adm by | Site | Time | Reassessment | Pain | Initials |
|---|---|---|---|---|---|---|---|---|---|---|
| 0353 | EPI | ☐ | | 0353 | MC | IV | | ☐ Improved ☐ Worse ☐ Unchanged | | |
| 0356 | EPI | ☐ | | 0356 | MC | IV | | ☐ Improved ☐ Worse ☐ Unchanged | | |
| 0359 | EPI | ☐ | | 0359 | MC | IV | | ☐ Improved ☐ Worse ☐ Unchanged | | |
| 0359 | Sodium Bicarb | ☐ | | 0359 | MC | IV | | ☐ Improved ☐ Worse ☐ Unchanged | | |
| 0401 | EPI | ☐ | | 0401 | MC | IV | | ☐ Improved ☐ Worse ☐ Unchanged | | |
| 0404 | EPI | ☐ | | 0404 | MC | IV | | ☐ Improved ☐ Worse ☐ Unchanged | | |
| 0407 | EPI | ☐ | | 0407 | MC | IV | | ☐ Improved ☐ Worse ☐ Unchanged | | |

| Order Time | IV / Solution / Added Medication | StartTime Device / Size Location # Attempts Amount | Start by | D/C Time | Amt Infused | D/C by |
|---|---|---|---|---|---|---|
| | ☐ KVO Device: | | | | | |
| | ☐ IV Fluid: NS (1) | PTA | | | | |
| 0 | NS (2) 0355 | | | | | |
| | | | | | | |

**Procedures / Nursing Assistance**

| | | |
|---|---|---|
| ☐ Cardiac Monitor Rate____ Rhythm____ | ☐ External Pacer | ☐ Urinary Catheter |
| ☐ NIBP Monitor | ☐ Internal Pacer (Temporary) | ☐ Arterial Line Placement |
| ☐ Pulse Oximetry | ☐ Central Line Placement | ☐ NGT Insertion Tube Size____ |
| ☐ Thrombolytic Therapy (Thrombolytic Flow Sheet) | ☐ CVP Monitoring | |
| ☐ Carotid Massage | ☐ CPR | |
| ☐ Cardioversion | ☐ Endotracheal Intubation | |

**Discharge Instructions**

| Initials/Signature: [signature] | Initials/Signature: | Initials/Signature: | Initials/Signature: |
|---|---|---|---|
| PA/ARNP: | | Physician's Signature: [signature] | HEIDI KNOWLES MD #M3818 |

Copy of OIG case to Litigation Support on 04-19-2013 by ce
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**ORDER PROCEDURE FORM**
**ADDITIONAL MEDS AND IVS**

**Palestine Regional Medical Center**

Name: **JAMES, KENNETH W** Pt#: **L00103392104**
Age: 52YRS DOB: [redacted] Sex: M MR#: L000194299
Date In: 8/13/2011 EDP: KNOWLES, HEIDI PCP: NO LOCAL DOCTOR

| Weight: lbs: 240 kgs: 109.1 | Allergies: *UNKNOWN* |
|---|---|

| Order Time | Medication / Dosage / Route | Adm Time | Site | Adm by | Time | Reassessment | Reassess by |
|---|---|---|---|---|---|---|---|
| 0408 | Sodium Bicarb | 0408 | IV | ML | | | |
| 0410 | EPI | 0410 | IV | ML | | | |
| 0413 | EPI | 0413 | IV | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Order Time | IV / Solution / Added Medication | Start Time | Device / Size Location # Attempts Amount | Start by | D/C Time | Amt Infused | D/C by |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time | Nurses Progress Notes & Reassessment | Initials | Time | T | P | R | BP | Urine | NG / Emesis | Chest Tube | O2 Sat | GCS | Pain Scale |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Initials/Signature: ML [signature] Initials/Signature: Initials/Signature: Initials/Signature:

PA/ARNP: Physician's Signature: [signature]

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Rev. 03/05/04

**EMERGENCY DEPARTMENT**
**MEDICATION ADMINISTRATION RECORD**

**Palestine Regional Medical Center**

Name: **JAMES, KENNETH W** Pt#: **L00103392104**
Age: 52YRS DOB: [redacted] Sex: M MR#: L000194299
Date In: 8/13/2011 EDP: KNOWLES, HEIDI PCP: NO LOCAL DOCTOR

**Allergies:** *UNKNOWN-*

**INFUSION & INJECTION INTERVENTION**

| Site | Location | Gauge | Attempts | Initials | Complications / Comments | Date / Time |
|---|---|---|---|---|---|---|
| A | (R) ES | 16 | 1 | MC | Ø | 8-13-11 |
| B | (R) Leg IO | | EMS | | Ø | |

**INFUSION ≥ 15 MIN**

IV #1: Solution NS Flow Rate Bolus (Hydration) Initial Sequential Concurrent
Start PTA Stop 0416 Ongoing ____ Site: A (B) Rate chg/Time ____ Rate chg/Time ____ Nurse MC

IV #2: Solution NS Flow Rate Bolus (Hydration) Initial Sequential Concurrent
Start 0355 Stop 0416 Ongoing ____ Site: (A) B Rate chg/Time ____ Rate chg/Time ____ Nurse MC

IV #3: Solution ____ Flow Rate ____ Hydration Initial Sequential Concurrent
Start ____ Stop ____ Ongoing ____ Site: A B Rate chg/Time ____ Rate chg/Time ____ Nurse ____

IV #4: Solution ____ Flow Rate ____ Hydration Initial Sequential Concurrent
Start ____ Stop ____ Ongoing ____ Site: A B Rate chg/Time ____ Rate chg/Time ____ Nurse ____

**INJECTION < 15 MIN**

| Medication | Response | Site | Dose | Time | Route | Nurse |
|---|---|---|---|---|---|---|
| EPI | Improved Worse Unchanged | B | | 0353 | IM SUBQ (IV Push) | MC |
| EPI | Improved Worse Unchanged | B | | 0356 | IM SUBQ (IV Push) | MC |
| EPI | Improved Worse Unchanged | A | | 0359 | IM SUBQ (IV Push) | MC |
| Sodium Bicarb | Improved Worse Unchanged | A | | 0359 | IM SUBQ (IV Push) | MC |
| EPI | Improved Worse Unchanged | A | | 0401 | IM SUBQ (IV Push) | MC |

**VACCINATIONS**

Influenza (Site) ____ SUBQ/IM Lot# ____ Time ____ VIS Version Given: ____ Nurse ____
Pneumovax (Site) ____ SUBQ/IM Lot# ____ Time ____ VIS Version Given: ____ Nurse ____
Hepatitis (Site) ____ SUBQ/IM Lot# ____ Time ____ VIS Version Given: ____ Nurse ____
Other (Toxoid Name) ____ SUBQ/IM Lot# ____ Time ____ VIS Version Given: ____ Nurse ____
Did the patient have a reaction?(circle one) YES / NO If YES, describe in detail ____

**ALL OTHER MEDICATIONS: ORAL, RECTAL, TOPICAL OR INHALATION MEDICATIONS**

Medication ____ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ____ Nurse ____
Medication ____ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ____ Nurse ____
Medication ____ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ____ Nurse ____
Medication ____ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ____ Nurse ____
Medication ____ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ____ Nurse ____

**RESPIRATORY INTERVENTIONS BY NURSING PERSONNEL**

Aerosol Medications ____ Time given ____ Patient Response ____ Nurse ____
Was the patient, or family member in the event of a minor, educated on the use of aerosol treatment (circle one) YES / NO Nurse ____

[signature] 8-13-11
Nursing #1 Signature Date / Time Nursing #2 Signature Date / Time

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**EMERGENCY DEPARTMENT MEDICATION ADMINISTRATION RECORD**

**Palestine Regional Medical Center**

Name: **JAMES, KENNETH W** Pt#: **L00103392104**
Age: 52YRS DOB: [redacted] Sex: M MR#: L000194299
Date In: 8/13/2011 EDP: KNOWLES, HEIDI PCP: NO LOCAL DOCTOR

**Allergies:** *UNKNOWN-*

## INFUSION & INJECTION INTERVENTION

| Site | Location | Gauge | Attempts | Initials | Complications / Comments | Date / Time |
|---|---|---|---|---|---|---|
| A | (R) FA | 16 | | MC | Ø | 8-13-11 |
| B | (L) FA 20 | | 2 MS | | | |

## INFUSION > 15 MIN

IV #1: Solution ______ Flow Rate ______ Hydration Initial Sequential Concurrent
Start ______ Stop ______ Ongoing ______ Site: A B Rate chg/Time ______ Rate chg/Time ______ Nurse ______

IV #2: Solution ______ Flow Rate ______ Hydration Initial Sequential Concurrent
Start ______ Stop ______ Ongoing ______ Site: A B Rate chg/Time ______ Rate chg/Time ______ Nurse ______

IV #3: Solution ______ Flow Rate ______ Hydration Initial Sequential Concurrent
Start ______ Stop ______ Ongoing ______ Site: A B Rate chg/Time ______ Rate chg/Time ______ Nurse ______

IV #4: Solution ______ Flow Rate ______ Hydration Initial Sequential Concurrent
Start ______ Stop ______ Ongoing ______ Site: A B Rate chg/Time ______ Rate chg/Time ______ Nurse ______

## INJECTION < 15 MIN

| Medication | | Site | Dose | Time | Route | Nurse |
|---|---|---|---|---|---|---|
| EPI | Improved Worse Unchanged | A | | 0404 | IM SUBQ (IV Push) | MC |
| EPI | Improved Worse Unchanged | A | | 0407 | IM SUBQ (IV Push) | MC |
| Sodium Bicarb | Improved Worse Unchanged | A | | 0408 | IM SUBQ (IV Push) | MC |
| EPI | Improved Worse Unchanged | A | | 0410 | IM SUBQ (IV Push) | MC |
| EPI | Improved Worse Unchanged | A | | 0413 | IM SUBQ (IV Push) | MC |

## VACCINATIONS

Influenza (Site) ______ SUBQ/IM Lot# ______ Time ______ VIS Version Given: ______ Nurse ______
Pneumovax (Site) ______ SUBQ/IM Lot# ______ Time ______ VIS Version Given: ______ Nurse ______
Hepatitis (Site) ______ SUBQ/IM Lot# ______ Time ______ VIS Version Given: ______ Nurse ______
Other (Toxoid Name) ______ SUBQ/IM Lot# ______ Time ______ VIS Version Given: ______ Nurse ______

Did the patient have a reaction?(circle one) YES / NO If YES, describe in detail ______

## ALL OTHER MEDICATIONS: ORAL, RECTAL, TOPICAL OR INHALATION MEDICATIONS

Medication ______ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ______ Nurse ______
Medication ______ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ______ Nurse ______
Medication ______ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ______ Nurse ______
Medication ______ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ______ Nurse ______
Medication ______ Improved Worse Unchanged R PO SL INHAL TOPICAL Time given ______ Nurse ______

## RESPIRATORY INTERVENTIONS BY NURSING PERSONNEL

Aerosol Medications ______ Time given ______ Patient Response ______ Nurse ______

Was the patient, or family member in the event of a minor, educated on the use of aerosol treatment (circle one) YES / NO Nurse ______

[signature] Nursing #1 Signature Date / Time Nursing #2 Signature Date / Time

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**'MERGENCY DEPARTMENT**
**'ALL / ENTRAPMENT RISK ASSESSMENT**

**Palestine Regional Medical Center**

Name: JAMES, KENNETH W Pt#: L00103392104
Age: 52YRS DOB: [redacted] Sex: M MR#: L000194299
EDMD: KNOWLES, HEIDI PMD: NO LOCAL DOCTOR

ate In: 8/13/2011

**FALL / ENTRAPMENT RISK** **Score less than 10 = low risk** **Score greater than 10 - high risk for fall (follow hospital protocol)**

| | Score | 0 | 1 | 2 | 3 | 4 | 5 | Other |
|---|---|---|---|---|---|---|---|---|
| **Age** | O | Less than 60 | 80 or over | 60 - 69 | 70 - 79 | | | |
| **Mental Status** | O | Oriented or Comotose | | Confused 100% of the time | Unable to follow directions | Nighttime or intermittent confusion | | |
| **Elimination** | O | Continent Independent | Continent | | Requires assistance | | Incontinent | |
| **Impairments** | O | None known | | Vision/glasses or hearing/hearing aid | Confined to bed or chair | Blind or deaf | | |
| **BP** | O | Within normal limits | Systolic BP consistently less than 90 | Dizziness with position changes | | | | |
| **Gait / Mobility** | O | | (1 pt each item) Uses cane/walker Holds furniture Balance problems | | | | | History of recent falls (2 or more in past 6 months) = 7 points |
| **Current Medications** | O | | (1 pt each med) sedatives Narcotics Diuretics, Antihypertensives Benzodiazepines Post-anesthesia Psychotropics Laxatives Cathartics | | | | | |
| **Predisposition Conditions** | O | | (1 pt each item) CVA, Hypertension, Dehydration, Seizures, Arthritis, Parkinson's Disease, Loss of limbs, Post-op 1st 3 days | | | | | |
| **Total** | Ø | | | | | | | |

**Circle each item that applies. Document points in score column. Total at bottom of page.**

ro-MED Forms

Rev. 12/6/06 v.1.1

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

A Owens 2011-03304

CERTIFICATION OF VITAL RECORD

# DEPARTMENT OF STATE HEALTH SERVICES
## VITAL STATISTICS UNIT

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS
AUG 31 2011

STATE OF TEXAS — CERTIFICATE OF DEATH — STATE FILE NUMBER 142-11-107249

1. LEGAL NAME OF DECEASED (Include AKA's, if any) (First, Middle, Last): KENNETH WAYNE JAMES
(Maiden):
2. DATE OF DEATH ACTUAL OR PRESUMED: 08/13/2011
3. SEX: MALE
4. DATE OF BIRTH: [redacted]
5. AGE-Last Birthday (Years): 52
IF UNDER 1 YR (Mo, Days) / IF UNDER 1 DAY (Hours, Min):
6. BIRTHPLACE (City & State or Foreign Country): LUBBOCK, TX
7. SOCIAL SECURITY NUMBER: [redacted]
8. MARITAL STATUS AT TIME OF DEATH: ☒ Married ☐ Widowed ☐ Divorced ☐ Never Married ☐ Unknown
9. SURVIVING SPOUSE'S NAME (If wife, give name prior to first marriage): CARLETT HUNTER
10a. RESIDENCE STREET ADDRESS: 1385 FM 3328
10b. APT. NO:
10c. CITY OR TOWN: TENNESSEE COLONY
10d. COUNTY: ANDERSON
10e. STATE: TEXAS
10f. ZIP CODE: 75861
10g. INSIDE CITY LIMITS? ☐ Yes ☒ No
11. FATHER'S NAME: CLAUDE IVORY JAMES
12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE: MARY LOU ROSS
13. PLACE OF DEATH (CHECK ONLY ONE)
IF DEATH OCCURRED IN A HOSPITAL: ☐ Inpatient ☒ ER/Outpatient ☐ DOA
IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify)
14. COUNTY OF DEATH: ANDERSON
15. CITY/TOWN, ZIP (IF OUTSIDE CITY LIMITS, GIVE PRECINCT NO): PALESTINE, 75801
16. FACILITY NAME (If not institution, give street address): PALESTINE REGIONAL MEDICAL CENTER
17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED: TEXAS DEPARTMENT OF CRIMINAL JUSTICE PRISON - LISA A D'CUNHA
18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code): 262 FM 3478 STE B, HUNTSVILLE, TX 77320
19. METHOD OF DISPOSITION: ☒ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Removal from state ☐ Other (Specify)
20. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH: PHILLIP E BUSH ,BY ELECTRONIC SIGNATURE - 113653
21. ☒ Unknown — Section / Block / Lot / Space
22. PLACE OF DISPOSITION (Name of cemetery, crematory, other place): PEACEFUL GARDEN
23. LOCATION (City/Town, and State): LUBBOCK, TX
24. NAME OF FUNERAL FACILITY: CARNES - TDCJ
25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code): 3100 GULF FREEWAY, TEXAS CITY, TX 77591
26. CERTIFIER (Check only one)
☐ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☒ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred at the time,date and place, and due to the cause(s) and manner stated.
27. SIGNATURE OF CERTIFIER: JAMES E TODD , BY ELECTRONIC SIGNATURE
28. DATE CERTIFIED (Mo/Day/Yr): 08/30/2011
29. LICENSE NUMBER:
30. TIME OF DEATH (Actual or presumed): 04:16 AM
31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City, State, Zip Code): JAMES E TODD 500 N CHURCH, PALESTINE, TX 75801
32. TITLE OF CERTIFIER: JP

CAUSE OF DEATH
33. PART 1 ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH. — Approximate interval Onset to death
IMMEDIATE CAUSE (Final disease or condition ----> resulting in death) a. PENDING INVESTIGATION
Due to (or as a consequence of):
Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated, the events resulting in death) LAST b.
Due to (or as a consequence of):
c.
Due to (or as a consequence of):
d.
PART 2 ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I.
34. WAS AN AUTOPSY PERFORMED? ☒ Yes ☐ No
35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☐ Yes ☒ No
36. MANNER OF DEATH: ☐ Natural ☐ Accident ☐ Suicide ☐ Homicide ☒ Pending Investigation ☐ Could not be determined
37. DID TOBACCO USE CONTRIBUTE TO DEATH? ☐ Yes ☒ No ☐ Probably ☐ Unknown
38. IF FEMALE: ☐ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to one year before death ☐ Unknown if pregnant within the past year
39. IF TRANSPORTATION INJURY, SPECIFY: ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify)
40a. DATE OF INJURY (Mo/Day/Yr):
40b. TIME OF INJURY:
40c. INJURY AT WORK? ☐ Yes ☐ No
40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area):
40e. LOCATION (Street and Number, City State Zip Code):
40f. COUNTY OF INJURY:
41. DESCRIBE HOW INJURY OCCURRED:
42a. REGISTRAR FILE NO.: 01-353
42b. DATE RECEIVED BY LOCAL REGISTRAR: 08/31/2011
42c. REGISTRAR: REGISTRAR - ANDERSON COUNTY CLERK, ELECTRONICALLY FILED
EDR NUMBER 000001004667

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS UNIT

WARNING: The penalty for knowingly making a false statement in this form can be 2-10 years in prison and a fine up to $10,000. (Health and Safety Code, Sec. 195, 1989)

VS-112 REV 1/2006

1726849

Q009557225

ARU 35.0

This is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Section 191.051, Health and Safety Code.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

ISSUED SEP 01 2011

GERALDINE R. HARRIS
STATE REGISTRAR

THE STATE OF TEXAS.
DEPARTMENT OF STATE HEALTH SERVICES — STATE OF TEXAS

1 409 772 5109 AUTOPSY SERVICE 12 4 p.m. 08-24-2011 3/

2011 - 03304 A
Owens

Patient Account: 20005972-517
Med. Rec. No.: (0150)1726849
Patient Name: JAMES, KENNETH W
Age: 52 YRS DOB Sex: M Race: B
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 08/17/11 - 0811
Copies to:

UTMB
University of Texas Medical Branch
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

1726849

## PROVISIONAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**AUTOPSY INFORMATION:**

Occupation: INMATE Birthplace: UNKNOWN Residence: TEXAS
Date/Time of Death: 8/13/2011 4:16 Date/Time of Autopsy: 8/17/2011
Pathologist/Resident: WALKER/XU Service: TDC CONTRACT
Restriction: NONE

***
The on-line version of the final autopsy report is abbreviated. If you would like a copy of the complete final report, or if you have any questions regarding this report, please contact the Autopsy Division Office, (409)772-2858.
***

### PROVISIONAL AUTOPSY DIAGNOSIS

**I. Body as a whole: Clinical history of hyperthermia, hypertension, depression, back injury, and sudden unexpected death, status post unsuccessful cardiopulmonary resuscitation**
- **A. Heart: Cardiomegaly (weight 500 g)**
- **B. Heart, ventricle, left: Hypertrophy**
- **C. Heart, left ventricle, posterior wall: Mottled myocardium, histology pending**
- **D. Coronary arteries: Moderate atherosclerosis**
- **E. Aorta, infrarenal segment: Mild atherosclerosis**
- **F. Lung, bilateral: Congestion and edema (weight, right 760 g; left 700 g)**
- **G. Rib: Fracture with hemorrhage, consistent with cardiopulmonary resuscitation**
  - **1. Left 6th rib: Fracture**

**II. Other findings:**
- **A. Adrenal gland, right: Cortical adenoma**
- **B. Prostate: Mild nodular benign prostatic hyperplasia**
- **C. Colon, serosa: Fibrotic adhesions**
- **D. Vertebrae, lumbar: Spur**
- **E. Ileum: Meckel's diverticulum**

The decedent was a 52-year-old black male TDCJ inmate with a past medical history of hypertension (BP, 170/107 mmHg), depression, and back injury who was found unresponsive in his cell at 0300 on 8/13/2011. His body temperature was 108 0F with dry and pale skin. He was transported to Palestine Regional Medical Center at 0352. Despite attempted cardiopulmonary resuscitation, the patient was unable to be revived and was pronounced dead at 0416 on 8/13/2011. A complete autopsy was performed on 8/17/2011.

At autopsy, the aorta revealed mild atherosclerosis, and the coronary arteries exhibited moderate atherosclerosis. The heart demonstrated left ventricular hypertrophy. There was mottled myocardium in posterior wall of left ventricle.

RECEIVED
AUG 24 2011
COPIED AND SENT

*** The above diagnoses are based on gross findings and are subject to modification after microscopic study. This report should not be used for insurance or medicolegal purposes. Final report will follow. ***

*Patient Name:*
*Patient Location:*
*Room/Bed:*
*Printed Date / Time:* ***JAMES, KENNETH W***
***AUTOPSY*** *Page:*
***08/24/11 - 1316***

Copy of OIG case to Litigation Support on 04.19.2013 by ce. UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Account:* 20005972-517
*Med. Rec. No.:* (0150)1726849
*Patient Name:* JAMES, KENNETH W
*Age:* 52 YRS *DOB:* [redacted] *Sex:* M *Race* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 - 0811
*Copies to:*

UTMB
University of Texas Medical Branch
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**

## PROVISIONAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

Both lungs were congested with edema. There was no pulmonary embolus. The cause of death is likely hyperthermia in a patient with cardiovascular disease.

*Patient Name:*
*Patient Location:*
*Room/Bed:*
*Printed Date / Time:*

*JAMES, KENNETH W* *Page*
*AUTOPSY*

*** The above diagnoses are based on gross findings and are subject to modification after microscopic study. This report should not be used for insurance or medicolegal purposes. Final report will follow. ***

Copy of OIG case to Litigation Support on 04.18.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1 409 772 5109 AUTOPSY 12: p.m. 08-24-2011 5/5

Patient Acct: 20005972-517
Med. Rec. No.: (0150)1726849
Patient Name: JAMES, KENNETH W
Age: 52 YRS DOB: [redacted] Sex: M Race: B
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 08/17/11 - 0811
Copies: DAVID H. WALKER, M.D., PATHOLOGIST
08/18/11
YX /da

UTMB
University of Texas Medical Branch
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

Pathology Report

(Electronic Signature)

** The above diagnoses are based on gross findings and are subject to modification after microscopic study. This report should not be used for insurance or medicolegal purposes. Final report will follow. **

Patient Name:
Patient Location:
Room/Bed:
Printed: JAMES, KENNETH W
AUTOPSY
Page:
08/24/11 - 1316

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Account:* 20005972-517
*Med. Rec. No.:* (0150)1726849
*Patient Name:* JAMES, KENNETH W
*Age:* 52 YRS *DOB:* [redacted] *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 0811
*Copies to:*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

11D3304
Region A
MHO

1726849

# FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**AUTOPSY INFORMATION:**

Occupation: INMATE Birthplace: UNKNOWN Residence: TEXAS
Date/Time of Death: 8/13/2011 4:16 Date/Time of Autopsy: 8/17/2011
Pathologist/Resident: WALKER/XU Service: TDC CONTRACT
Restriction: NONE

***
The on-line version of the final autopsy report is abbreviated. If you would like a copy of the complete final report, or if you have any questions regarding this report, please contact the Autopsy Division Office, (409)772-2858.
***

## FINAL AUTOPSY DIAGNOSIS

I. Body as a whole: Clinical history of hyperthermia, hypertension, depression, back injury, and sudden unexpected death, status post unsuccessful cardiopulmonary resuscitation — C1,2
- A. Heart: Cardiomegaly (weight 500 g) — A3
- B. Heart, ventricle, left: Hypertrophy — A3
- C. Heart, left ventricle, posterior wall: focal patchy myocardial necrosis — A3
- D. Skeletal muscle: Rhabdomyolysis — A3
- E. Coronary arteries: Moderate atherosclerosis — A3
- F. Aorta, infrarenal segment: Mild atherosclerosis — A3
  1. Left anterior descending artery: 50% stenosis with atherosclerotic plaque, 2.5 cm from origin — A3
  2. Left circumflex artery: 50% stenosis with atherosclerotic plaque, 1.8 cm from origin — A3
  3. Right coronary artery: 30% stenosis with atherosclerotic plaque, 2.0 cm from the origin — A3
- G. Lung, bilateral: Congestion with edema (weight, right 760 g; left 700 g) — A3
- H. Lung, right: Aspiration pneumonia — A3
- I. Ribs: Fracture with hemorrhage, consistent with cardiopulmonary resuscitation
  1. Left 6th rib: Fracture — A5

II. Other findings:
- A. Adrenal gland, right: Cortical adenoma — A5
- B. Prostate: Mild nodular benign hyperplasia — A5
- C. Colon, serosa: Fibrotic adhesion — A5
- D. Vertebrae, lumbar: Spurs — A5
- E. Ileum: Meckel's diverticulum — A5

****TYPE: Anatomic(A) or Clinical(C) Diagnosis.*
*IMPORTANCE: 1-immediate cause of death (COD); 2-underlying COD; 3-contributory COD; 4-concomitant, significant; 5-incidental****

Copy of ... by ce. ... PROHIBITED

*Patient Name:* JAMES, KENNETH W
*Patient Location:* AUTOPSY
*Room/Bed:* -
*Printed Date / Time:* 09/12/11 - 0717
Page: 1

*Patient Account:* 20005972-517
*Med. Rec. No.:* **(0150)1726849**
*Patient Name:* **JAMES, KENNETH W**
*Age:* 52 YRS *DOB:* [redacted] *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 0811
*Copies to:*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**CLINICAL SUMMARY:**

The decedent was a 52-year-old black male TDCJ inmate with a past medical history of hypertension (BP, 170/107 mmHg), depression, back injury (2002, 2004), and drug abuse (marijuana, cocaine). The list of his medications was: Hydrochlorothiazide, Propranolol, Enalapril, Lisinopril, Cyclobenzaprine (muscle relaxant), Neurontin (Gabapentin), Ultram (opioid analgesic), and Naproxen (nonsteroidal anti-inflammatory drug). On 8/12/2011, he was in clinic for physical examination. He had not been to the pill window to pick up medication since arrival to the Gurney Unit on 8/10/2011. His vital signs were: BP 170/107 mmHg, P 108, R 18, T 96.7. He was treated with Clonidine 0.25 mg at 1155, and his BP went down to 129/74 mmHg with pulse 100 at 1230 on 8/12/2011.

He was found unresponsive with temperature 108 deg F (42.2 deg C) in his cell at 0300 on 8/13/2011. His skin was dry and pale. CPR was initiated, and he was intubated. He was transported to Palestine Regional Medical Center with CPR in progress at 0352. Cardiac monitor showed asystole. CBC at 0357 showed WBC 8.1 x 103/ l, RBC 5.11 x 106/ l, HGB 14.9 g/dl, MCV 88.5, and PLT 94 x 103/ l (PLT clumps). He was given epineprine and sodium bicarbonate. The patient was unable to be revived and was pronounced dead at 0416 on 8/13/2011.

A complete autopsy was performed on 8/17/2011.

YX /da
09/08/11

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Patient Account: 20005972-517
Med. Rec. No.: (0150)1726849
Patient Name: JAMES, KENNETH W
Age: 52 YRS DOB: [redacted] Sex: M Race: B
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 08/17/11 0811
Copies to :

UTMB
University of Texas Medical Branch
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**GROSS DESCRIPTION:**

EXTERNAL EXAMINATION: The decedent, identified by left toe tag as "James, Kenneth", is a well nourished, well developed, black male, measuring 179 cm in length, and weighing approximately 254 lbs according to recent medical records. The general appearance is consistent with the reported age of 52 years. The body is unclothed. Rigor mortis is present in the arms and legs, and there is fixed lividity on the dorsal surface. The head is normocephalic with essentially no scalp hair anteriorly and with short black and gray scalp hair posteriorly.

The irides are brown with equal pupils measuring 0.4 cm in diameter. The corneas are cloudy, the conjunctivae are congested, and the sclerae are slightly congested and edematous. The nares are patent with no exudate. The patient is partially edentulous. The trachea is midline. Palpation of the neck reveals no lymphadenopathy or thyromegaly.

Body hair distribution is normal male. The chest diameters are normally proportioned. The abdomen is slightly protuberant. Lymph nodes in the supraclavicular, axillary and inguinal regions are not palpable.

The back is unremarkable. The arms and legs are unremarkable. The genitalia are normal male for the age.

The following evidence of medical intervention is present:
1. There is a nasogastric tube in the right nose
2. An intubation tube is in the mouth with holder around the head
3. There are four EKG leads, two on upper chest and another two on left lateral abdominal wall
4. Two AED pads on the chest
5. There is IV line on the right side of the neck
6. Triple lumen IV catheter in the right groin area
7. There is an intraosseous infusion line on the right lower leg

The following marks and scars are present:
1. A well healed longitudinal linear scar on the middle abdominal wall, measuring 30 cm in length with 1.5 cm in width.
2. A well healed oval scar on the left knee medially measuring 1.5 x 0.5 cm.
3. Another oval shaped well healed scar located on the left lower leg medially, measuring 2 x 1.7 cm.
4. A healed scar on the right upper leg laterally, measuring 5 x 2 cm.
5. Two well healed longitudinal linear scars on the lower back, one 7 cm in length, 1 cm in width and another one 3 cm in length and 1 cm in width.

There are multiple tattoos on the body: Tattoo of letters on the upper front

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Account:* 20005972-517
*Med. Rec. No.:* **(0150)1726849**
*Patient Name:* **JAMES, KENNETH W**
*Age:* 52 YRS *DOB:* 11/25/58 *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 0811
*Copies to:*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**

## FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**GROSS DESCRIPTION:**

chest and the letters are Lurlene with two stars on each side; the second tattoo is a design of heart located on the left upper arm laterally; the third tattoo is on the left forearm laterally with the following letters "LEXAS"; the fourth tattoo is naked female upper part of body which is located at right upper arm anteriorly; the sixth tattoo is with the following letters "EBVCK" which is located on the right forearm posteriorly; the seventh tattoo is on the back with the letters "Jims and Mary" which is located on the upper back.

INTERNAL EXAMINATION: The body is opened using a standard Y shaped incision, to reveal a 2.5 cm thick panniculus and the thoracic and abdominal organs in the normal anatomic positions. The left pleural cavity contains 200 ml of bloody fluid, and the right contains 70 ml of similar fluid.

The pericardial sac contains approximately 10 ml of clear yellowish fluid.

The thymus is largely replaced by fat. No thromboemboli are found in the large pulmonary arteries.

The abdominal cavity contains no fluid. There are moderate peritoneal adhesions with ascending colon, transverse colon and descending colon adherent to the abdominal wall and to the stomach and mesenteric connective tissue.

CARDIOVASCULAR SYSTEM: Heart: The heart weighs 500 gm (normal male 270-360 gm). The pericardium is essentially smooth and glistening with small areas of hemorrhage (possibly due to CPR). There is a moderate amount of epicardial fat. The left and right coronary ostia are identified in the normal locations. The heart is examined by transverse serial slicing of four sections from apex and then opening following the flow of blood. The myocardium is homogeneous red-brown with mottled myocardium in the posterior wall of the left ventricle. The endocardium is normal. The left ventricular wall is 1.5 cm thick (normal 1.0-1.8 cm) at the junction of the posterior papillary muscle and free wall, and the right ventricle is 0.3 cm thick (normal 0.25-0.3 cm) 2 cm below the pulmonic valve annulus, anteriorly. The valve leaflets and cusps are white, delicate and membranous.

Valve circumferences measured on the fresh heart are: tricuspid valve 11.5 cm (normal 12-13 cm), pulmonic valve 8 cm (normal 8.5-9.0 cm), mitral valve 10 cm (normal 10.5-11.0 cm), and aortic valve 8 cm (normal 7.7-8.0 cm). The foramen ovale is closed.

Blood vessels: The coronary circulation is right dominant based on the origin of the posterior descending artery. The apex is supplied by the left anterior descending artery. The coronary arteries reveal moderate atherosclerosis involving left anterior descending artery with 50% stenosis located 2.5 cm from the origin, left circumflex artery with 50% stenosis located 1.8 cm from

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Account:* 20005972-517
*Med. Rec. No.:* **(0150)1726849**
*Patient Name:* **JAMES, KENNETH W**
*Age:* 52 YRS *DOB:* ██████ *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 0811
*Copies to:*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

## FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**GROSS DESCRIPTION:**

the origin and right coronary artery with 30% stenosis located 2.0 cm from the origin. The aorta exhibits mild atherosclerosis in the arch and aortic root segments. The infrarenal aortic segment exhibits mild atherosclerosis, with less than 10% surface area involved with plaques. The celiac, superior and inferior mesenteric, and renal arteries are unremarkable with minimal atherosclerosis. The bilateral iliac arteries exhibit mild atherosclerosis. The superior and inferior vena cavae and their branches are normal. The portal vein is normal.

RESPIRATORY SYSTEM: Larynx and trachea: The laryngeal mucosa is normal, and the vocal cords are normal with no lesions. The tracheal mucosa is normal.

Lungs: The right lung weighs 760 gm (normal male 435 gm), and the left 700 gm (normal male 385 gm). The pleural surfaces are smooth and transparent with a moderate amount of carbon deposition. There are subpleural bullae on the pleural surface of right upper lobe. Lividity is present on the dorsal surface. The left lung is inflated with formalin before sectioning. The bronchial and vascular trees are normal. The hilar nodes are normal. The right and left lung parenchyma is dark red with fine porosity, and without consolidation.

GASTROINTESTINAL TRACT: Esophagus: The esophageal mucosa is normal. The esophagus is firmly anchored to the diaphragm.

Tongue: The tongue has a finely granular surface with no coating.

Stomach and duodenum: The stomach contains about 100 ml of bloody dark red fluid. The mucosa is dark red.

The duodenal mucosa is normal.

Pancreas: The pancreas has a normal conformation. It is tan-yellow, normally lobulated and firm in consistency. The pancreatic duct is patent.

Biliary tract: The gallbladder serosa is gray-green and glistening. The gallbladder contains about 15 ml of green bile and with no stones. The mucosa is green and velvety. The cystic duct, hepatic duct, and common duct are normal, and bile is expressed freely from the ampulla on compressing the gallbladder.

Liver: The liver weighs 1790 gm (normal male 1400-1900 gm). The liver surface is smooth with a tan-pale area. Glisson's capsule is transparent and glistening. The liver is serially sliced to reveal a homogeneous lobular pattern. The cut surface is normal without lesions.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Account:* 20005972-517
*Med. Rec. No.:* (0150)1726849
*Patient Name:* JAMES, KENNETH W
*Age:* 52 YRS *DOB:* [redacted] *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted :* 08/17/11 0811
*Copies to :*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**

## FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**GROSS DESCRIPTION:**

Small bowel: The serosa is smooth and transparent with no adhesions. The bowel is normal throughout. The lumen contains green-gray digested food stuff. The mucosa is normal.

Large bowel: The serosa is smooth and transparent with adhesions to the peritoneal wall, stomach and mesentery. The lumen contains loosely formed stool. The mucosa is normal.

The appendix is grossly normal.

Rectum and anus: The rectum and anus are normal.

Reticulo-endothelial System: Spleen: The spleen weighs 120 gm (normal 125-195 gm). It is normal in shape with decreased size. The cut surface is soft and red-purple with no lesions.

Lymph nodes: Lymph nodes in the mediastinum, abdomen and retroperitoneum are normal.

Spine: Multiple spurs are identified in the lower lumbar spine.

Bone marrow: The thoracic and lumbar spine marrow is grossly normal. The trabeculae and cortical bone are of normal density.

GENITO-URINARY SYSTEM: Kidneys: The kidneys are symmetric. The right kidney weighs 160 gm and the left 140 gm (normal male 125-170 gm). The capsules strip with ease to reveal dark red cortical surfaces. The cut surfaces reveal well demarcated cortico-medullary junctions. The pelves and calyces are normal. The renal pelvic mucosa is normal. Perihilar adipose tissue is moderate.

Ureters: The ureters are normal throughout their length, measuring 4.4 cm in maximal external diameter. They are probe-patent into the bladder.

Bladder: The bladder mucosa is trabeculated. The trigone is normal. There is a small area of submucosal hemorrhage, measuring 1.5 x 1.0 cm.

Prostate: The prostate is normal in size, color, consistency, and texture. Serial slicing reveals normal granular surfaces with small nodular architecture. The seminal vesicles are normal.

Testes: The right testis weighs 18.5 gm, and the left 22.3 gm (normal 20-25 gm). The tunica albugineas are tan-white, smooth and glistening. The cut surfaces are soft and tan-yellow, with no lesions.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Account:* 20005972-517
*Med. Rec. No.:* (0150)1726849
*Patient Name:* JAMES, KENNETH W
*Age:* 52 YRS *DOB:* [redacted] *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 0811
*Copies to:*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**GROSS DESCRIPTION:**

ENDOCRINE SYSTEM: Thyroid: The thyroid weighs 23.8 gm (normal 10-22 gm), and is red-brown, bosselated and glistening. The cut surface is homogeneous, translucent, red-brown with no lesions

Parathyroids: Several brown, soft fragments of tissue are collected as possible parathyroids.

Adrenal glands: The right adrenal gland weighs 8.9 gm and the left 8.5 gm (normal 5-6 gm). The adrenal glands have a normal conformation and position. Serial slicing in the transverse plane reveals 1 mm thick firm golden yellow/brown cortices, with gray soft medullae and one golden yellow nodule in the right adrenal gland measuring 1.7 x 1.5 x 1 cm.

BRAIN AND SPINAL CORD: The scalp, calvarium, base of the skull and dura mater are normal. The brain weighs 1380 gm (normal male 1200-1400 gm). The gyri and sulci display a normal pattern. The leptomeninges are unremarkable. The circle of Willis, basilar and vertebral arteries show no atherosclerosis. No indentation/herniation of the cingulate gyri, unci or molding of the cerebellar tonsils are noted. The brain is fixed in formalin for later examination by a neuropathologist (see neuropathology report).

SPINAL CORD: The grossly normal spinal cord is fixed in formalin for later examination by a neuropathologist.

PITUITARY GLAND: The grossly normal pituitary gland is fixed in formalin for subsequent examination by a neuropathologist.

Deltoid muscle, psoas muscle and gastrocnemius muscle: The skeletal muscles are grossly normal and samples are collected.

Blood and vitreous samples are collected. Vitreous sample was submitted for analysis of electrolytes and osmolarity measurement. Samples of liver, kidney, heart, lung and spleen were frozen for potential further examination.

YX /da
08/23/11

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Patient Account: 20005972-517
Med. Rec. No.: (0150)1726849
Patient Name: JAMES, KENNETH W
Age: 52 YRS DOB: [redacted] Sex: M Race: B
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 08/17/11 0811
Copies to:

UTMB
University of Texas Medical Branch
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

Autopsy Office (409)772-2858

Autopsy No.: AU-11-00174

**MICROSCOPIC DESCRIPTION:**

Heart, right and left ventricle, Slides 10-15, (6 H&E) (consultation: Dr. Boor for slide 13, posterior wall of left ventricle):
In the posterior wall of left ventricle, there is focal contraction-band myocardial necrosis in a pattern of patchy-widespread (not associated with ischemic distribution). Cardiomyocytes of left ventricle exhibit hypertrophy. There is no fibrosis in the left and right ventricle.

Left anterior descending coronary artery, Slide 27, (1 H&E):
There is 50% occlusive atherosclerotic plaque.

Left circumflex coronary artery, Slide 28, (1 H&E):
There is 50% occlusive atherosclerotic plaque.

Right coronary artery, Slide 29, (1 H&E):
There is 30% occlusive atherosclerotic plaque.

Lung, left, Slides 16 and 17 (2 H&E, 1 Von-Kossa, 1 DAPI):
The architecture is preserved and demonstrates congestion. In the inner surface of the arterioles and veins, there is a layer of accumulated autolyzed nucleic acids (hematoxylin stained). It is Von-Kossa negative for calcium but DAPI stain positive for nucleic acids which is suggestive of denatured DNA in the vessel. Anthracosis is noted. No inflammation or thrombi are noted.

Lung, right, Slides 18-20 (3 H&E, 1 Acid Fast, 1 GMS and 1 Gram stain):
The architecture is preserved and demonstrates congestion with anthracosis. There is focal hemorrhage, fibrinous exudates and macrophages in the alveolar spaces. There is lymphocytic infiltration and foreign body reaction with multinucleated giant cell formation in the right upper lobe suggesting aspiration pneumonia. Acid fast and GMS stains are negative for organisms. Gram stain shows postmortem bacterial growth in the tissue.
No thrombus is noted.

Kidneys, bilateral, Slides 3 and 4, (2 H&E):
There is severe autolysis, but the general architecture is preserved. There are a few completely sclerotic glomeruli. There is interstitial hemorrhage and intraglomerular hemorrhage. The wall of the arterioles is thickened suggesting arteriosclerosis.

Adrenal glands, Slides 1 and 2, (2 H&E):
There is a cortical adenoma in right adrenal gland. There is autolysis but normal architecture without pathologic change in left adrenal gland.

Liver, Slide 5, (1 H&E):
There is mild steatosis. Lymphocytic infiltration in the portal triads. A Russell body is noted in the triad.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Account:* 20005972-517
*Med. Rec. No.:* **(0150)1726849**
*Patient Name:* **JAMES, KENNETH W**
*Age:* 52 YRS *DOB:* [redacted] *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 0811
*Copies to:*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**MICROSCOPIC DESCRIPTION:**

Spleen, Slide 6, (1 H&E):
There is severe congestion. The red pulp is expanded due to congestion, and the white pulp is normal. There is arteriosclerosis.

Pancreas, Slide 7, (1 H&E):
There is severe autolysis but normal architecture without pathologic change.

Thyroid, Slide 7, (1 H&E):
There is no pathologic change.

Parathyroid, Slide 25, (1 H&E):
One piece of parathyroid gland is identified, and there is no pathologic change.

Testes, Slides 1 and 2, (2 H&E):
There is active spermatogenesis, and it is appropriate for given age.

Prostate, Slide 21, (1 H&E):
Benign prostatic hyperplasia.

Urinary bladder, Slide 21, (1 H&E):
There is autolysis. No pathologic change is noted.

Tongue, Slide 8, (1 H&E):
No pathologic change is noted.

Esophagus, Slide 8, (1 H&E):
There is mucosal autolysis but otherwise no pathologic change.

Stomach, Slide 8, (1 H&E):
There is severe autolysis, but the architecture is preserved.

Gallbladder, Slide 9, (1 H&E):
There is severe autolysis with no pathologic change.

Ileum, Slide 9, (1 H&E):
There is severe autolysis with no pathologic change.

Colon, Slide 9 (1 H&E):
There is severe autolysis with no pathologic change.

Bone marrow, Slide 25, (1 H&E):
Cellularity is 40%. Myeloid, erythroid, and thrombocytic lineages are identified.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Patient Account: 20005972-517
Med. Rec. No.: (0150)1726849
Patient Name: JAMES, KENNETH W
Age: 52 YRS DOB: [redacted] Sex: M Race: B
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 08/17/11 0811
Copies to :

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**MICROSCOPIC DESCRIPTION:**

Deltoid muscle, Slide 22, (1 H&E)(consultation: Dr. Campbell):
Focal hypercontracted and eosinophilic rhabdomyocytes are noted.

Psoas muscle, Slide 23, (1 H&E) (consultation: Dr. Campbell):
Focal hypercontracted and eosinophilic rhabdomyocytes are noted.

Gastrocnemius muscle, Slide 24, (1 H&E, 1 Masson's Trichrome) (consultation: Dr. Campbell):
Focal hypercontracted myocytes, eosinophilic myocytes, and disorganization of sarcomeres with loss of cross striations indicating myofiber injury. Masson's trichrome stain emphasizes loss of cross striation in necrotic myofibers, with fragmentation in focal myofibers.

YX /da
09/08/11

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Patient Account: 20005972-517
Med. Rec. No.: (0150)1726849
Patient Name: JAMES, KENNETH W
Age: 52 YRS DOB: [redacted] Sex: M Race: B
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 08/17/11 0811
Copies to:

UTMB
University of Texas Medical Branch
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

Autopsy Office (409)772-2858

**Autopsy No.: AU-11-00174**

**CLINICOPATHOLOGIC CORRELATION:**

The decedent was a 52-year-old black male TDCJ inmate with a past medical history of hypertension, depression, back injury (2002, 2004), and drug abuse (marijuana, cocaine). The list of his medications was: Hydrochlorothiazide, Propranolol, Enalapril, Lisinopril, Cyclobenzaprine (muscle relaxant), Neurontin (Gabapentin), Ultram (opioid analgesic), and Naproxen (nonsteroidal anti-inflammatory drug, NSIAD). On 8/12/2011, he was treated with Clonidine 0.25 mg at 1155 for BP 170/107 mmHg, and his BP went down to 129/74 mmHg with pulse 100/min at 1230. He was found unresponsive with temperature 108 deg F (42.2 deg C) in his cell at 0300 on 8/13/2011. His skin was dry and pale. CPR was initiated and he was intubated. CBC at 0357 showed WBC 8.1 x 103/ l, RBC 5.11 x 106/ l, HGB 14.9 g/dl, MCV 88.5, and Platelet 94 x 103/ l (PLT clumps). He was given epineprine and sodium bicarbonate. The patient was unable to be revived and was pronounced dead at 0416 on 8/13/2011. A complete autopsy was performed on 8/17/2011.

At autopsy, the aorta revealed mild atherosclerosis, and the coronary arteries exhibited moderate atherosclerosis. The heart demonstrated cardiomegaly and left ventricular hypertrophy. There was focal patchy contraction-band myocardial necrosis in the posterior wall of the left ventricle. Both lungs were congested. Right lung showed focal hemorrhage with aspiration pneumonia. Gastrocnemius muscle demonstrated focal hypercontracted myocytes, eosinophilic myocytes, and disorganization of sarcomeres with loss of cross striation indicating myofiber injury.

Based on this patient's body temperature (42.2 deg C), advanced autolysis of organs, focal patchy myocardial necrosis, rhabdomyolysis, decreased platelet count and no other cause of death. Environmental hyperthermia related heat stroke is considered though toxicology tests and vitreous analysis are still pending. Heat stroke (HS) is a serious and potentially life-threatening condition defined as a core body temperature > 40.6 deg C. Two forms of HS are recognized, classic heat stroke, usually occurring in very young or elderly persons, and exertional heat stroke, more common in physically active individuals. An elevated body temperature and neurologic dysfunction are necessary but not sufficient to diagnose HS. Associated clinical manifestations such as extreme fatigue; hot dry skin or heavy perspiration; nausea; vomiting; diarrhea; disorientation to person, place, or time; dizziness; uncoordinated movements; and reddened face are frequently observed. Potential complications related to severe HS are acute renal failure, disseminated intravascular coagulation, rhabdomyolysis, acute respiratory distress syndrome, acid-base disorders, and electrolyte disturbances. Long-term neurologic sequelae (varying degrees of irreversible brain injury) occur in approximately 20% of patients. The prognosis is optimal when HS is diagnosed early and management with cooling measures and fluid resuscitation and electrolyte replacement begins promptly. The prognosis is poorest when treatment is delayed > 2 hours (1).

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Patient Name: JAMES, KENNETH W
Patient Location: AUTOPSY
Room/Bed: -
Printed Date / Time: 09/12/11 - 0717

*Patient Account:* 20005972-517
*Med. Rec. No.:* **(0150)1726849**
*Patient Name:* **JAMES, KENNETH W**
*Age:* 52 YRS *DOB:* ██████ *Sex:* M *Race:* B
*Admitting Dr.:* OUTSIDE TDCJ
*Attending Dr.:* OUTSIDE TDCJ
*Date / Time Admitted:* 08/17/11 0811
*Copies to:*

UTMB
**University of Texas Medical Branch**
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683

**Pathology Report**

# FINAL AUTOPSY REPORT

**Autopsy Office (409)772-2858**

**Autopsy No.: AU-11-00174**

**CLINICOPATHOLOGIC CORRELATION:**

A heat wave is defined as three or more consecutive days of air temperatures > 32.2 deg C. Exposure to excessive heat may cause illness, as heat directly induces tissue injury, the severity of which is dependent upon the critical thermal maximum (i.e., the level and duration of core heating). The critical thermal maximum in humans is a body temperature of 41.6 deg C to 42 deg C for between 45 minutes and 8 hours. At extreme body temperatures (eg, 49 -50 deg C), all cellular structures are destroyed, and cellular necrosis occurs in < 5 minutes (1).

The precise incidence of HS is unknown for many reasons. First, in the United States, heat-related death is not a reportable condition in any state. Second, the definition of HS varies, resulting in underreporting of HS cases. Third, many heat-related illnesses and deaths are unrecognized as such and are not reported. Therefore, the reported incidence of HS in the United States varies from 17.6 to 26.5/100,000. Why some cases progress to HS and others do not is unclear, but it appears that genetic polymorphisms may determine susceptibility; the likely candidate genes include those that encode cytokines, coagulation proteins, and heatshock proteins. Mortality rates for HS range from 10% to 70%, depending on the severity and age of the patient. The greatest numbers of deaths occur when treatment is delayed for >2 hours (1).

This patient had several risk factors of HS: lack of air conditioning, chronic illness, and use of diuretics (Hydrochlorothiazide) and beta blockers (Propranolol). Studies have shown that diuretics and beta blockers may impair thermoregulation (2). In addition, the patient was treated with Clonidine for his hypertension one day before his death. A research group has demonstrated that Clonidine induces hyperthermia in experimental rats at high ambient temperature (3). Confirmation of dehydration was attempted via vitreous humor electrolyte analysis, but the prolonged postmortem interval and putrefaction complicated the assessment.

The cardiovascular system is frequently compromised in HS. The initial response is hyperdynamic, followed by hypotension, tachycardia and tachydysrhythmia (4). There is focal patchy myocardial necrosis in this patient. One study has showed that a subpopulation of HS victims will develop myocardial ischemia (5).

In summary, it is our opinion that the manner of death is natural. The immediate cause of death is most likely environmental hyperthermia-related classic heat stroke though toxicology tests and vitreous humor tests are still pending. Results of the toxicology tests and vitreous humor analysis will be reported as an addendum.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

*Patient Name:* ***JAMES, KENNETH W***
*Patient Location:* ***AUTOPSY***
*Room/Bed:* -
*Printed Date / Time:* *09/12/11 - 0717*

Patient Account: 20005972-517
Med. Rec. No.: (0150)1726849
Patient Name: JAMES, KENNETH W
Age: 52 YRS DOB: [redacted] Sex: M Race: B
Admitting Dr.: OUTSIDE TDCJ
Attending Dr.: OUTSIDE TDCJ
Date / Time Admitted: 08/17/11 0811
Copies to:

UTMB
University of Texas Medical Branch
Galveston, Texas 77555-0543
(409) 772-1238
Fax (409) 772-5683
**Pathology Report**

# FINAL AUTOPSY REPORT

Autopsy Office (409)772-2858

Autopsy No.: AU-11-00174

**CLINICOPATHOLOGIC CORRELATION:**

References:

1.T. Yeo, Heat Stroke, A comprehensive review, AACN Clinical Issues, 2004; 15 (2): 280-293
2.Prevention and treatment of heat injury. Med Lett Drugs Ther. 2003; 45:58-60.
3.E. Mogilnicka, V. Klimek, G. Nowak, and A. Czyrak, Clonidine and beta-agonists induce hyperthermia in rats at high ambient temperature. J. Neural Transmission 1985; 63, 223-235
4.H. Grogan and PM. Hopkins. Heat stroke: implications for critical care and anesthesia. Br J. Anaesth. 2002;88:700-707.
5.J.E. Dematte, K. OMara, J. Bueschler. Near-fatal heat stroke during the 1995 heat wave in Chicago. Ann Intern Med. 1998;129:173-181.

YX /da
09/08/11

DAVID H. WALKER, M.D., PATHOLOGIST (Electronic Signature)

09/09/11

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Patient Name: JAMES, KENNETH W
Patient Location: AUTOPSY
Room/Bed: -
Printed Date / Time: 09/12/11 - 0717

# Certificate of Analysis

Aegis Sciences Corporation
515 Great Circle Road Nashville, TN 37228
(615) 255-2400 - Fax (615) 256-3030
www.aegislabs.com

**Client Information**

**Client:** UTMB - Galveston
**Report To:** Dr. Walker
UTMB - Galveston
301 University Blvd
Route 0747
Galveston, TX 77555

**Work Order / Sample Information**

**Case ID:** AU11-174 James,Kenneth
**Reason for Test:** Post-mortem
**Specimen Type:** Femoral Blood

**Lab Information**

**Laboratory ID:** 4446209
**Collected:** 08/17/2011 00:00
**Received:** 09/07/2011 15:28
**Completed:** 09/18/2011 14:35
**Reported:** 09/18/2011 16:05

**Test(s) Requested**

40610 - ME Targeted Toxicology Profile 70591 - Confirmation Tricyclics

| Drug Class | Result | Quantitation | Reporting Threshold |
|---|---|---|---|
| Alcohol - Volatiles | NEGATIVE | | 10 mg/dL |
| Acetaminophen | NONE DETECTED | | 5 mcg/mL |
| Amphetamines | NONE DETECTED | | 50 ng/mL |
| Barbiturates | NONE DETECTED | | 1 ng/mL |
| Benzodiazepines | NONE DETECTED | | 25 ng/mL |
| Cannabinoids (Marijuana) | NONE DETECTED | | 1 ng/mL |
| Cocaine Metabolite | NONE DETECTED | | 10 ng/mL |
| Opiates | NONE DETECTED | | 50 ng/mL |
| Methadone | NONE DETECTED | | 50 ng/mL |
| Meperidine | NONE DETECTED | | 100 ng/mL |
| Propoxyphene | NONE DETECTED | | 100 ng/mL |
| Fentanyl Analogues | NONE DETECTED | | 1 ng/mL |
| Carisoprodol/Meprobamate | NONE DETECTED | | 200 ng/mL |
| Fentanyl Group | NONE DETECTED | | 1 ng/mL |
| Salicylates | NONE DETECTED | | 50 mcg/mL |
| **Tricyclic Antidepressants** | **POSITIVE** | | |
| **Cyclobenzaprine** | **POSITIVE** | 136 ng/mL | 50 ng/mL |
| Amitriptyline | NONE DETECTED | | 50 ng/mL |
| Nortriptyline | NONE DETECTED | | 50 ng/mL |
| Clomipramine | NONE DETECTED | | 50 ng/mL |
| Desmethylclomipramine | NONE DETECTED | | 50 ng/mL |
| Doxepin | NONE DETECTED | | 50 ng/mL |
| Desmethyldoxepin | NONE DETECTED | | 50 ng/mL |
| Imipramine | NONE DETECTED | | 50 ng/mL |
| Desipramine | NONE DETECTED | | 50 ng/mL |
| Protriptyline | NONE DETECTED | | 50 ng/mL |
| Trimipramine | NONE DETECTED | | 50 ng/mL |
| Mirtazapine | NONE DETECTED | | 50 ng/mL |

I certify that the specimen identified by this acession number has been handled and analyzed in accordance with all applicable requirements.

* Examiner: Missy Mathis, M.S.

Date: 9/18/2011

* - Electronic Signature represented by plain textual name and date of when individual applied Electronic Signature Certification in Aegis LIMS
Aegis CRIMES is accredited by the American Society of Crime Laboratory Directors – Laboratory Accreditation Board (ASCLD Lab #377)
© Aegis Sciences Corporation

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1 409 772 5109 AUTOPSY SERVICES 1' 36 a.m. 02-01-2012

# Certificate of Analysis

Aegis Sciences Corporation
515 Great Circle Road Nashville, TN 37228
(615) 255-2400 - Fax (615) 255-3030
www.aegislabs.com

**Client Information**

**Client:** UTMB - Galveston
**Report To:** Dr. Walker
UTMB-Galveston
301 University Blvd.
Route 0747
Galveston, TX 77555

**Work Order / Sample Information**

**Case ID:** AU11-174 James, Kenneth W.
**Reason for Test:** Post-mortem
**Specimen Type:** Vitreous

Xu Walker

**Lab Information**

**Laboratory ID:** 4446201
**Collected:** 08/17/2011 00:00
**Received:** 08/22/2011 11:52
**Completed:** 09/07/2011 16:40
**Reported:** 09/07/2011 17:05

**Test(s) Requested**

42197 - Vitreous Electrolyte Profile

| Drug Class | Result | Quantitation | Reporting Threshold |
|---|---|---|---|
| Vitreous Electrolyte Profile | NONE DETECTED | | 0.1 mg/dL |
| Glucose | CANCELLED | | 20 mg/dL |
| Blood Urea Nitrogen(BUN) | CANCELLED | | 1 mg/dL |
| Sodium(Na) | CANCELLED | | 1 mmol/L |
| Potassium(K) | CANCELLED | | 1 mmol/L |
| Chloride(Cl) | CANCELLED | | 1 mmol/L |
| Carbon Dioxide(CO2) | CANCELLED | | 1 mmol/L |
| Creatinine | NONE DETECTED | <1 mg/dL | 0.1 mg/dL |

**Sample Comments**

Unable to obtain valid results for the vitreous electrolyte profile.

I certify that the specimen identified by this acession number has been handled and analyzed in accordance with all applicable requirements.

* Examiner Missy Mathis, M.S.

Date: 9/7/2011

* - Electronic Signature represented by plain textual name and date of when individual applied Electronic Signature Certification in Aegis LIMS
Aegis CRIMES® is accredited by the American Society of Crime Laboratory Directors – Laboratory Accreditation Board (ASCLD Lab #377)
© Aegis Sciences Corporation

Copy of OIG case AU Litigation support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# Texas Department of Criminal Justice
## REPRIMAND FORM

OIG#: ______ EEO#: ______
MAUF/MIUF#: ______

Employee Name: Seda (Last) Matthew (First) L (MI) SSN: [redacted]

Payroll Job Title: Sergeant of Correctional Officers Unit/Dept: Joe F.Gurney Unit

Date(s) of Violation(s): 08/13/2011 Date Pre-Hearing Investigation Completed: 09/1[illegible]

VIOLATION(S): FINDINGS (check one [1]) GUILTY

Level: 2 No. 20 Rule Title: Violation of Statutory Authority/Court Order/Rules/Regulations/Policies ☒ Yes ☐ No

Level: ______ No. ______ Rule Title: ______ ☐ Yes ☐ No

Synopsis of Incident(s):
ON 08/13/11 Sergeant Seda was notified by CO V Edwards and CO IV Dodd that offfender James, Kenneth #1726849 was displaying abnormal behavior and that other offenders in the housing area had reported that the had unrinated on himself . Sergeant Seda failed to respond to the building due to an ongoing investigation of a physical altercation in another housing area. The incident, which was the eventual death of offender James was reported as I-11520-08-11

DISCIPLINARY ACTION:
Is this a subsequent violation(s)? ☐ Yes ☒ No If yes, list applicable previous Rule No. violation(s) and disciplinary date(s)

Check and complete one (1) or more of the following:

☐ NO DISCIPLINE IMPOSED (Provide justification at bottom of page.)

☐ REPRIMAND ONLY

☒ DISCIPLINARY PROBATION: 9 Calendar Months Beginning: 9/21/11 Ending*: 6/20/12

*Note to Employee: If you are on a full calendar month of leave without pay during your period of disciplinary probation, including a full calendar month of suspension without pay, the probation period ending date shall be adjusted by adding one full calendar month to the original ending date. If you are in a career ladder position, any period of disciplinary probation and an adjusted disciplinary probation ending date shall postpone future career ladder salary adjustments.

☐ SUSPENSION WITHOUT PAY: ______ Workdays Beginning: ______ Return: ______

☐ REDUCTION IN PAY TO: $ ______ Beginning: ______ Ending: ______

☐ DEMOTION TO (Title/Salary Group) ______ Beginning: ______ Ending: ______

☐ DISMISSAL RECOMMENDED, WITH FOLLOWING ACTION DURING INTERIM:
- ☐ Involuntary Use of Compensatory Time/Holiday Time
- ☐ Voluntary Use of Overtime/Vacation Time (Attach a copy of PERS 24, Leave Request)
- ☐ Suspension Without Pay
- ☐ Change to Another Job Assignment
- ☐ Administrative Leave (can only be granted by the Executive Director)

DISCIPLINE IS: ☒ Within ☐ Above ☐ Below the guidelines (Provide justification at bottom of page if above or below.)

For violations of Rule No. 24 or 25, check one (1) of the following: This violation ☐ did ☐ did not involve an aggravated use of excessive force.

**JUSTIFICATION** (If applicable): ______

Dennis Miller Warden I [signature] 9/21/11
Reprimanding Authority Name/Title (printed) Signature Date

**Employee's Acknowledgment: I have been advised of the procedures of progressive disciplinary actions, and my right to file a grievance. I acknowledge receipt of a copy of this reprimand and know the original is to be placed in my Master Human Resources File. If recommended for dismissal, I verify the following are my current address and phone number:**

Mailing Address: ______

Phone Number, Including Area Code: ______

Employee Signature: [signature] Date: 09-21-2011

**Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004, you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.**

Original: Labor Relations Section, HRHQ (with copy of support documentation)
Copy: Employee
Copy: Unit/Department Employee Disciplinary File

PERS 185 (01/09)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**Texas Department of Criminal Justice**
**NOTIFICATION OF EMPLOYEE HEARING**

OIG # ______
MAUF/MIUF# ______
EEO# ______

DATE: 09/15/11 EMPLOYEE NAME: Seda, Matthew L SSN: [redacted]

UNIT/DEPT.: Joe F.Gurney Unit PAYROLL JOB TITLE: Sergeant Of Correctional Officers

You are scheduled for an Employee Hearing to be held ☒ in person ☐ telephonically ☐ via videoconference at Wardens Office (Location) at 7.15 (am/pm) on 09/21/2011 (mm/dd/yyyy)

The purpose of the Employee Hearing is to consider allegations that you committed the following rule violation(s) as referenced in the Listing of Employee General Rules of Conduct and Disciplinary Violations.

No. L2 #20 Violation: Violation of Statutory Authority/Court Order/Rules/Regualations/Policies
No. ______ Violation: ______
No. ______ Violation: ______

Synopsis of Incident(s): On 08/13/11 Sergeant Seda was notified by Co V Edwards and CO IV Dodd that offender James, Kenneth #1726849 was displaying abnormal behavior and that other offenders in the housing area had reported that he had urinated on himself Sergeant Seda failed to respond to the building due to an ongoing investigation of a physical altercation in another housing area. The incident, which was the eventual death of offender James, was reported as I-11520-08-11/

The hearing shall be conducted in accordance with the PERS 560, Guidelines for Employee Hearings and a copy of these guidelines is being provided to you. These guidelines provide information relating to scheduling extensions, representatives, witnesses and other related matters.

**I ☑ do ☐ do not wish to appear at the Employee Hearing. I understand my failure to appear may constitute a waiver of the right to an Employee Hearing, and the Employee Hearing may be conducted in absentia.**

☐ I wish to waive the 24-hour Notice of Employee Hearing. I understand the Reprimanding Authority or designee may reschedule the hearing to be held earlier than the date and time indicated above. If I have indicated that I wish to appear at the Employee Hearing, I shall be notified in writing of the rescheduled time and date prior to the hearing.

☑ I do not wish to waive the 24-hour Notice of Employee Hearing.

Today's Date: 9-16-11 If Notified in Person, Time Notified: 10:07 ☒ A.M. ☐ P.M.

[signature]
Employee Signature

**Note to Employee: With few exceptions, *you are entitled upon request:* (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004 you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.**

**Notification of Rescheduled Employee Hearing:**
The Reprimanding Authority or designee has rescheduled the hearing to be held at a different date and time than indicated above. (If later, and outside the applicable scheduling time frame, attach justification.)

The rescheduled hearing shall be held at: ______ (Location) at ______ (am/pm) on ______ (mm/dd/yyy) ______ (Employee Initials/Date & Time [am/pm])

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

PERS 184 (01/09)

**Texas Department of Criminal Justice**
**GUIDELINES FOR EMPLOYEE HEARINGS**

Employee Name: Seda (Last) Matthew (First) L (MI) SSN: [redacted]

1. Request for an Extension: If you are on approved sick leave at the time the PERS 184, Notification of Employee Hearing was provided to you, you may make a one-time request for the Employee Hearing date to be rescheduled within 30 calendar days. This request shall be made within 48 hours of receipt of this form, made in writing or made verbally with a written follow-up. You must state the specific reason an extension is necessary. The Reprimanding Authority may deny the request; however, the Reprimanding Authority shall provide you with a written explanation for denying the request.

2. Presenting Your Defense and Use of a Representative: During the Employee Hearing, you may elect to speak for yourself or be represented at the Employee Hearing by a designee of your choice, as long as your representative: (1) does not claim the right to strike; and (2) is not an individual under the supervision, custody or incarceration of the TDCJ. The designation of a representative does not prohibit you from: (1) attending or having input into the Employee Hearing, or (2) responding to questions from the Reprimanding Authority or designee, or your designated representative.

   a. An Employee Hearing is administrative in nature and is not subject to common law or statutory rules of evidence. Objections at the Employee Hearing by you or your representative shall be limited to Agency policy and procedural issues that pertain to the Employee Hearing.

   b. At the beginning of the Employee Hearing, you must specify whether your representative is the party responsible for presenting your defense. Both you and your representative may provide information to the Reprimanding Authority for consideration. However, only one (1) person may be designated as the party responsible for presenting your defense, and only one (1) person may speak at a time. Regardless of the party responsible for presenting your defense, you and your representative shall be allowed to have quiet conversations regarding information that may be provided to the Reprimanding Authority.

3. Witnesses on Your Behalf: You may elect to have witnesses with first-hand knowledge of the events under review provide testimony on your behalf. The Agency is under no obligation to interview or consider testimony from character witnesses or witnesses with "hearsay" information. Prior to the hearing, it is your responsibility to: (1) obtain statements from witnesses for presentation at the Employee Hearing; (2) provide any written questions for witnesses to the Reprimanding Authority; or (3) arrange for witnesses to be available to present testimony during the hearing at the Reprimanding Authority's discretion. If you provide written questions, the Reprimanding Authority or designee is not required to ask these questions. If the Reprimanding Authority elects to ask the witnesses these questions, this may occur prior to or after the Employee Hearing. If witnesses are available to appear in person at the Employee Hearing, the Reprimanding Authority has the discretion to determine whether the witnesses are questioned. Witnesses who are available to appear on the employee's behalf shall be available at no expense to the Agency other than the recording of such time as time worked.

4. Witnesses Appearing on Behalf of the Reprimanding Authority: At the Reprimanding Authority's discretion, you may be allowed to ask questions of a person(s) who appears at the Employee Hearing as a witness(es) against you.

5. Conduct by Participants: All parties, including your representative, shall conduct themselves in a professional manner and afford the persons present due respect. Only one (1) reminder of the conduct expected at the Employee Hearing may be issued. The offending party may be required to leave the proceedings if conduct that is contradictory to these guidelines continues. If you or your representative leaves during the proceedings, the Employee Hearing may be conducted and concluded in your or your representative's absence.

6. Recording of an Employee Hearing: Audio taping, video taping or verbatim written recording of an Employee Hearing is not permitted. Note taking is permissible.

7. Americans with Disabilities Act (ADA) Accommodation: You may notify the TDCJ ADA Coordinator, Human Resources Division, if you require an accommodation.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

8. Time Reporting/Expenses:

   a. Your attendance at the Employee Hearing or attendance by an employee acting as a witness shall be considered official business, and you and any employee acting as a witness shall be released by the supervisor on paid time during working hours. You and any employee acting as a witness are required to provide sufficient advance notice to the supervisor to ensure adequate staffing.

   b. There is no authority for the Agency to pay compensation to or reimburse the expenses of a representative, whether the representative is a state employee or an individual from outside state service. Appearance as a representative at an Employee Hearing shall not be considered official business. If an employee acting as a representative attends an Employee Hearing held during working hours, that employee must obtain prior approval to use accrued leave or, if accrued leave is not available, leave without pay to attend the Employee Hearing.

9. Copies of Investigative Files: At the time of this notification, you were provided a copy of the applicable pre-hearing investigation report along with support documentation that is subject to disclosure and being used as evidence. In order to obtain copies of evidence that is not subject to disclosure (e.g., confidential portions of OIG and EEO reports), you must request the documents in writing through a Public Information request. The request shall be processed in accordance with the rules governing a Public Information request, and the requested documents may not be available before the Employee Hearing.

10. Dismissal Recommended: If the Employee Hearing results in a dismissal recommendation, you shall have the opportunity to request independent dismissal mediation in accordance with PD-35, "Independent Dismissal Mediation and Dispute Resolution."

11. Grievance: You may submit a grievance in accordance with PD-30, "Employee Grievance Procedures" relating to disciplinary action after it has been imposed.

[signature]
Employee Signature

09/16/2011
(mm/dd/yyyy)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
EMPLOYEE OFFENSE AND PRE-HEARING INVESTIGATION REPORT

**Purpose:** This form shall be used to record alleged violations of rules or regulations by employees. It shall also serve as a pre-hearing investigation report. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the Charging Official:**

**Employee Name:** Seda (Last) Matthew (First) L (MI) **SSN:** ____________

**Payroll Job Title:** Sergeant of Correctional Officers **Date(s) of Incident(s):** August 13, 2011 (mm/dd/yyyy)

**Description of employee's specific conduct (do not reference Rule No. or describe the rule):** Sergeant Matthew Seda was notified by Correctional Officer V Doris Edwards and Correctional Officer IV Revoyda Dodd that offender James, Kenneth #1726849 was displaying abnormal behavior and that other offenders in the housing area had reported that he had urinated on himself. Sergeant Seda failed to respond to the building due to an ongoing investigation of a physical altercation in another housing area. The incident, which was the eventual death of offender James, was reported as I-11520-08-1[illegible]. See attached IOC for additional information.

The employee's conduct may be a violation of Rule No.: #20 - Violation of Policy

| Ricky Minton, Lieutenant | [signature] | September 14, 2011 ~~August 13, 2011~~ |
|---|---|---|
| **Charging Official Name/Title (print)** | **Signature** | **Date** |

**II. Employee's Statement:** The pre-hearing investigator shall obtain an employee's statement even when a Use of Force (UOF) Fact-Finding Inquiry, Risk Management Incident Review Board or Office of the Inspector General (OIG) investigation has been conducted. I SERGEANT MATTHEW SEDA STEND BY MY ORIGINAL STATEMENT AND TAKE FULL RESPONSIBILITY FOR MY DECISIONS. I WOULD ALSO LIKE TO STATE THAT OFFICERS DODD AND EDWARDS DID INFORM ME OF OFFENDER JAMES AND THAT MY LACK OF PROPER PRIORITIZING BETWEEN AN OFFENDER FIGHT ALTERCATION AND AN OFFENDER WITH POSSIBLE HEAT RELATED ILLNESS SHOULD BY MY RESPONSIBILITY AND NOT THERES.

**Employee's Signature:** [signature] **Date:** 09-14-2011

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004 you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

PERS 325 (01/09)

**Texas Department of Criminal Justice**
**EMPLOYEE OFFENSE AND PRE-HEARING INVESTIGATION REPORT**

**IV. Pre-Hearing Investigator's Review/Recommendation:**

An Employee Pre-Hearing Investigation Report (i.e., EPHIR) was conducted on 14 September 2011 regarding Sgt. Seda's failure to respond in a timely and appropriate manner to an offender with heat extreme symptoms that resulted in death (Offender James, Kenneth #1726849). The EPHIR relied on statement(s) submitted by staff, the Incident Report # I-11520-08-11, and Sgt. Seda's Employee Statement from Section II. of the EPHIR.

The EPHIR established:

1. Sgt. Seda was informed at 0020 hrs by Officer Edwards that offender James #1726849 was exhibiting abnormal behavior and appeared disoriented and may have urinated on himself;
2. Officer Dodd made an additional report to Sgt. Seda regarding offender James #1726849. Sgt. Seda instructed Officer Dodd to leave the offender in the dorm and he would respond as soon as possible;
3. At 0235 hrs Sgt. Seda responded to a radio request for additional staff from A1-Building where offender James #1726849 was housed and experiencing a medical emergency;
4. Officers Edwards and Dodd reported to Sgt. Seda that offender James appeared dizzy, confused, and possibly had urinated on himself, symptoms that suggest heat related illness or other appropriate medical emergency (i.e., seizure or stroke, etc.); and,
5. Sgt. Seda failed to adhere to Agency Policy (AD-10.64 [rev. 6]) Temperature Extremes in the TDCJ Workplace, Section IV.A. ([1] *the first aid process shall be initiated immediately by security or other unit staff.)*

It should be noted that Sgt. Seda was responding to unit count (bed-book) as well as a fight and its subsequent investigation to determine assailant and victim. Sgt. Seda's actions on the night in question suggest that he failed to properly prioritize his response to the medical emergency regarding offender James #1726849 in a timely manner as dictated in AD-10.64 rev. 6.

Based on the statements provided by staff, Incident Report #I-11520-08-11, and Sgt. Seda's employee statement, the Pre-Hearing Investigator recommends disciplinary action for the following violation of Agency Policy:

PD-22, Rule #20, Violation of Statutory Authority/Rules, Level 2.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**III. Witnesses:** See attached.

**IV. Pre-Hearing Investigator's Review/Recommendation:**

**Employee Hearing:** ■ Yes ☐ No **If Yes, Alleged Rule Violation No(s):** ____________

**Comments:** (See attached)

Jesse H. Wicks, Asst. Warden
**Investigator's Name/Title (print)** **Signature** **Date** 9/14/11

**V. Reprimanding Authority's Action:**

☒ Proceed to Employee Hearing Alleged Rule Violation No(s): 20

☐ No Employee Hearing and no action taken

☐ No Employee Hearing and other action taken (e.g., dispute resolution, training). Attach explanation of action taken.

Dennis Miller Warden
**Reprimanding Authority's Name/Title (print)** **Signature** **Date** 9/15/11

PERS 325 (01/09)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Reprimanding Authority<br>Joe F. Gurney Transfer Facility | Date | September 14, 2011 |
| From | Ricky Minton, Lieutenant<br>Joe F. Gurney Transfer Facility | Subject | **Employee Offense Report:**<br>Sergeant Matthew L. Seda |

On August 13, 2011 at 0416 hours, offender James, Kenneth #1726849 was pronounced deceased by Medical Doctor Heidi Knowles at Palestine Regional Medical Center. The death of offender James was reported as incident number I-11520-08-11 and an Administrative Review was conducted according to agency policy. During the Administrative Review, it was determined that Sergeant Matthew L. Seda violated agency policy as it relates to the subsequent response to the incident once it became known to security staff that offender James was in distress and may need medical attention.

On August 13 at approximately 0020 hours, Correctional Officer V Doris Edwards, assigned to B1-Building, reported to Sergeant Seda that offender James, who was housed in B3-Dorm on B1-Building, was exhibiting abnormal behavior, specifically, that he appeared disoriented and that he may have urinated on himself. Sergeant Seda, who was assisting with the unit count, after confirming that offender James was in a secure area, instructed Officer Edwards to maintain a visual on offender James and indicated that he would respond shortly.

After the initial notification by Officer Edwards, Correctional Officer V Robert Tatum, assigned as a correctional officer in the Food Service Department, reported an injury to a food service offender worker which was consistent with having been involved in a physical altercation. The offender, housed on A1-Building, was instructed to wait in the hallway immediately outside of the Building Lieutenant's Office until an investigation could be initiated into his injuries.

Following Sergeant Seda's discussion with Officer Tatum, Correctional Officer IV Revoyda Dodd, also assigned to B1-Building, made an additional report regarding the behavior of offender James. Sergeant Seda instructed Officer Dodd to leave offender James in the dorm and that he would respond as soon as possible and that if the situation regarding offender James' condition should change and warrant a more immediate response, to notify him.

At approximately 0035 hours, immediately following the conclusion of the unit count, Sergeant Seda made contact with the offender who had been involved in the physical altercation and began questioning the offender regarding the circumstances of that physical altercation. When the offender refused to identify the other participant in the physical altercation, Sergeant Seda proceeded to A1-Building thus failing to respond to the report of abnormal behavior of offender James.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

At approximately 0235 hours, the investigation into the physical altercation produced the identity of the other participant. As Sergeant Seda was exiting A1-Building, a request for additional staff on B1-Building was heard via radio at which time Sergeant Seda responded.

Offender James was moved to the Gurney Unit Medical Department where, due to no on-site medical staff, Beto Unit Medical Department was contacted. Upon instructions from Beto Unit medical staff, Emergency Medical Services were contacted and offender James was transported to Palestine Regional Medical Center where, at approximately 0416 hours, he was pronounced deceased. There are indications that the death of offender James may be heat related.

AD-10.64 (rev. 6) *Temperature Extremes in the TDCJ Workplace,* section IV.A reads:

> "In all cases of temperature related incidents or injuries: (1) The first aid process shall be initiated immediately by security or other unit staff. (2) Medical staff and the unit risk manager shall be notified immediately."

On May 11, 2011, Sergeant Seda acknowledged by his signature that he was trained on AD-10.64 (rev. 6) and the dangers of extreme temperatures to include the warning signs of heat exhaustion and the appropriate response to heat related injuries. *See Employee Training Acknowledgement Form, May 11, 2011. Also, see copy of AD-10.64 (rev. 6) Temperature Extremes in TDCJ Workplace.*

Sergeant Seda reported in his statement on the date of the incident that Officer Edwards and Officer Dodd reported that offender James appeared dizzy and had possibly urinated on himself. The appearance of dizziness, loss of coordination and confusion are clear symptoms of a possible heat related illness and appears on the heat related illness cards that all staff are required to carry on their person. *See written statements of Sergeant Seda, Officer Edwards and Officer Dodd, August 13, 2011. Also, see copy of heat illness card.*

While true that it may be impossible to say with any degree of certainty that a more immediate response would have resulted in offender James' survival, it is equally impossible to say that a more immediate response would have not resulted in his survival.

Sergeant Seda's actions, by failing to immediately respond to the incident and initiate first aid procedures for offender James was a violation of PD-22 *General Rules of Conduct for Employees*, specifically:

**Rule No. 20: Violation of Statutory Authority/Court Order/Rules/Regulations/Policies:**
It is the employee's responsibility to know, have a clear understanding of and comply with rules, regulations, policies, court orders and statutory authority governing the operation of the Agency. Not being aware of the existence of any of the aforementioned is not a defense for violation of the same.

The specific policy violated in this case, as stated, was the failure to immediately respond to the housing area and initiate the first aid process for offender James.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

This report is submitted to the unit reprimanding authority for review and disposition as appropriate.

Ricky Minton, Lieutenant
Joe F. Gurney Transfer Facility

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

To: Toby Whitfield, Lieutenant
Joe F. Gurney Transfer Facility

Date: August 13, 2011

From: Matthew Seda, Sergeant *MS*
Joe F. Gurney Transfer Facility

Subject: I-11520-08-11

---

On August 13, 2011 at approximately 0020hours, I, Sergeant Matthew Seda, was in the Buildin. Lieutenant's Office assisting with the unit count. This was a bed book count which required that assist by verifying the first count sheets that are turned in and then conducting a thorough check of th. bed book rosters to ensure that all offenders were accurately accounted for in my area of assignment, th West End of the facility.

During this count, Officer Doris Edwards, CO V called and notified me that an offender on B1-Buildin. later identified as offender James, Kenneth #1726849, appeared dizzy and may have urinated on himsel. After verifying that the offender was in a secured area, I instructed Officer Edwards to maintain a visua on the offender and that I would respond when able. If the situation warranted a more immediat. response that she was to let me know.

After talking to her, Officer Robert Tatum, CO IV entered the Building Lieutenant's Office accompanied by an offender who works for him in the Food Service Department, and reported that h. had injuries consistent with having been involved in a recent physical altercation.

Immediately after the report by Officer Tatum, Officer Revoyda Dodd, CO IV, while calling in he count, notified me of similar behavior of offender James and was provided the same instructions.

Officer Edwards and Officer Dodd were instructed to notify me if the situation required an immediat. response.

During this time, Sergeant Tully Flowers was also assisting with the unit count, conducting the sam. verifications of count sheets for the East End of the facility.

At 0035 hours, the unit count cleared. Upon exiting the Building Lieutenant's Office, I encountered th. offender that was involved in the physical altercation on A1-Building and began questioning hin. regarding the circumstances and identity of the other assailant involved in the physical altercation. I then proceeded to A1-Building to investigate further and identify the other involved offender. In doing so, I forgot about the previous report involving offender James on B1-Building.

At approximately 0235 hours, the other participant in the physical altercation was identified and was being escorted from the building when Lieutenant Toby Whitfield, via radio, alerted staff that a wheelchair was needed on B1-Building. Along with Sgt. Flowers, I proceeded to B1-Building where.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

upon arrival, I found offender James in the dayroom area of B3-Dorm standing next to the benche Upon entering B3-Dorm and making contact with offender James, he kneeled to his knees. Office Ronald Burt, CO V entered the building followed shortly afterwards by Officer Torrance Stephens, C V and Officer Kenneth Mangan, CO IV with a wheelchair. Officer Burt and Officer Stephens assiste offender James into the wheelchair and he was moved to the Gurney Unit Medical Department.

Once in the medical department, Sgt. Flowers contacted on-call medical staff at the Beto Unit, due to n on-site medical. Sgt. Flowers stated that he was instructed by Licensed Vocational Nurse Lind McKnight to obtain the offenders vitals. Officer Burt, on Sgt. Flower's instructions, obtained the vita and reported a temperature of 108 and blood pressure of 89/57. Sgt. Flowers then stated that LVN McKnight had requested that offender James be transported to her location for examination. A offender James was being prepared for transport, he bent over in the wheelchair and becam unresponsive. Lt. Whitfield was immediately notified who immediately requested that Central Contr request Emergency Medical Services by 9-1-1. Lt. Whitfield reported to the medical department an instructed me to place offender James on a gurney in the emergency room. Officer Stephens move offender James, by pushing the wheelchair, into the emergency room where I, Lt. Whitfield, and Office Vincent McKnight, CO V lifted the offender from the wheelchair and placed him on the gurney.

While offender James was on the gurney, his eyes were open but he appeared disoriented. He wa taking shallow breaths and, upon checking, Lt. Whitfield indicated that offender James did have a puls As a result, Cardiopulmonary Resuscitation was not initiated and offender James was closely monitore until arrival of EMS.

Lt. Whitfield instructed me to notify Warden Dennis Miller of the off-unit transport by EMS; Warde Miller was notified at 0305 hours.

At approximately 0320 hours, EMS arrived and began evaluating offender James' condition. Afte connecting their equipment which required affixing adhesive pads to offender James' upper body, th EMS requested assistance in moving offender James to their gurney, with Lt. Whitfield assisting in tha process. EMS personnel then moved offender James to the ambulance where he was placed inside. On of the EMS personnel requested assistance from an officer. Officer McKnight entered the ambulanc and was provided a breathing bag by EMS personnel and, upon instruction, began pumping air int offender James lungs. EMS personnel would stop Officer McKnight's actions in increments so that tube could be inserted into his mouth, to no avail.

The ambulance remained at the back door of the medical department for several minutes. At 0338 hour the ambulance departs the unit.

Lt. Whitfield instructed me, along with Officer Burt, to go to Palestine Regional Medical Cente ("PRMC") via unit van. At 0405 hours, we arrived at PRMC, where offender James was placed in Exam Room #1. PRMC medical staff began life saving measures and at 0410 hours, report offende James has a pulse.

At 0416 hours, Doctor Heidi Knowles pronounced offender James deceased. I immediately notified Lt. Whitfield and am instructed to remain with the remains until I was properly relieved.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

At 0500 hours, Precinct #4 Justice of the Peace James Todd arrived and began his documentation. A 0511 hours, Investigator Mark Owens of the Office of the Inspector General arrived and began h report and obtained photographs. They leave shortly after their arrival.

At approximately 0530 hours, Officer McKnight and Officer Burt depart PRMC enroute back to th facility.

I remained with the remains until Officer John Crawford, CO V relieved me at 0700 hours, at which time; I obtained a total of six (6) digital photos of the offender.

I then returned to the Gurney Unit to provide a statement of my actions in this incident.

Matthew Seda, Sergeant

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Lieutenant Toby Whitfield | Date | August 13, 2011 |
| From | Revoyda Dodd, COIV | Subject | Offender James, Kenneth #1726849 |

At approximately 2200 hours I, Revoyda Dodd COIV reported to my assigned duty post on B1-building as the control picket officer. At approximately 0015 hours I was conducting a bed book count in B3-dormitory. When arrived around B323 bunk, the offenders around 23-bunk, informed me that offender James, Kenneth #1726849 had urinated on himself. I approached B3-23 bunk and identified him by his TDCJ-ID card for the purpose of the bed book count.

The offender was lying in his assigned bunk. The offender was restless and was moving around in his bunk did not notice any urine on the offender at this time. I completed my bed book count for the rest of the building and before returned to the control picket I went back into B3-dormitory due to several offenders not being properly dressed in the dayroom. Shortly afterwards, I was in the control picket and noticed offender James sitting on the toilet in the restroom area. I then observed the offender leaving the restroom area. While he was walking, he bumped into the wall of the restroom, urinal and began to stumble. The offender made it back to his living area and fell into his bunk. I asked Officer Doris Edwards if she seen what the offender did. I notified Sergeant Matthaw Seda that the offender appeared to be drunk or on some kind of medication.

I went on with my normal duties in the control picket and continued to monitor offender activity in the dorm.

When Officer Glorie Harris came into the building, she noticed the offender in the dayroom and called Lieutenant Toby Whitfield on the radio. The offender was standing in the dayroom and would not respond to her questions. Shortly afterwards, Sergeant Tully Flowers, Sergeant Seda, Officers Ronald Burt COV, Kenneth Mangan COIV, and Torrance Stephens COV arrived on the building with a wheelchair. The offender was placed in the wheelchair and transported out of the building.

I then returned to my normal duties.

Revoyda Dodd CO4

Revoyda Dodd, COIV
Joe F. Gurney Transfer Facility

SO-4

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

To Lieutenant Toby Whitfield    Date August 13, 2011

From Doris Edwards, COV    Subject Offender James, Kenneth #1726849

At approximately 1800 hours I, Officer Doris Edwards COV was assigned to the control picket of B1-building. When I arrived on the Officer Brandon Matthews was in the control picket. I began to inventory the equipment on the building. At no time while first shift officers were on the building was I notified of any offenders being ill.

Until the special bed book count, at no time did I observe offender James, Kenneth #1726849 in any kind of distress.

At approximately 0005 hours, I conducted the count on B1-building. When I entered B3-dormitory, the offenders in the dorm told me that offender James was in his bed and urinated on himself. When I went over to his bunk the offender didn't say anything about urinating on himself. When I looked at him, he looked back at me. He did not look to be in distress at this time.

While Officer Revoyda Dodd COIV was conducting the bed book count, I observed the offender go to the restroom area and back to his bunk area. He appeared to be dizzy while he was walking, he was wobbling back and forth as he was walking. Offenders in the housing area came up to the intercom and told me that offender James was sick.

While I was calling in the count, I notified Sergeant Matthew Seda and he informed me to keep an eye on the offender.

After Sergeant Seda told me to watch the offender, I did not notice any more abnormal behavior from the offender.

Shortly afterwards, Officer Glorie Harris COIV entered the building after coming in from the outside perimeter picket. I notified her that other offenders in the dorm stated that offender James had urinated by his bunk and was not urinating in the urinal.

At approximately 0200 hours, I exited the building to assist with other activities that were taking place on the unit.

At approximately 0240 hours, I was on the main hallway when Officer Torrance Stephens COV was pushing offender James in a wheelchair toward the unit infirmary. The offender was sitting up.

I remained on the main hallway.

Doris Edwards CO V

Doris Edwards, COV
Joe F. Gurney Transfer Facility

SO-4

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# RECOGNITION OF HEAT ILLNESS

## HEAT EXHAUSTION

- Weakness, anxiety, fatigue, dizziness, headache, nausea
- Profuse sweating, rapid pulse, rapid breathing
- Possible confusion or loss of coordination
- May lead to heat stroke if not treated

## HEAT COLLAPSE

- Sudden collapse, brief duration
- Skin cold and clammy
- May lead to heat stroke if not treated

## HEAT STROKE

- Headache
- Gooseflesh, chills
- Unsteady gait
- Incoherent speech progressing to coma
- Rapid pulse
- Skin hot and dry

# TREATMENT AND PREVENTION

## TREATMENT OF HEAT ILLNESS (ALL TYPES)

- Move person out of direct sunlight into air-conditioned environment if possible
- Remove clothing, maintaining modesty
- Have them drink water if conscious
- Sprinkle water on them; fan them if there is no breeze
- Get medical attention ASAP

## HIGHER RISK FOR HEAT ILLNESS

- Newly assigned to job
- On psychiatric medications
- Over age 60
- High temperature and humidity conditions
- No breeze

## PREVENTION OF HEAT ILLNESS

- Drink at least ½ cup of water ever 15 minutes when working in hot environments
- Take a 5 minute break every 30-60 minutes
- Decrease intensity of work under extreme conditions

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
Correctional Institutional Division

Employee Training Acknowledgment Form

RECEIVED
MAY 2 3 20
U.R.M.

To: The Unit Risk Manager
Date: 5/11/11
From: L. Davis CO5
Subject: Safety Training

☐ Initial Training
☑ Monthly Training
☐ Target Training
☐ Annual Training

Department: Intake Receiving
Shift: 1st H card
Date(s) training was conducted: 5/11/11
Length of training: 5 minutes
Conducted by: (Print name) ~~Hot~~ L. Davis CO5
Topic: Hot Weather
Main points of discussion: To determine the heat index which is a factor in determining safe hot weather working conditions. When the temp. is over 85 degrees the Warden shall determine whether or not the environment is safe by referring to the heat and humidity matrix(B)
Number of employees assigned: 14
Number of employees trained: 14
Be aware of heat exhaustion, or heat stroke

| Name (print) | | Signature |
|---|---|---|
| Abke G. | 8/12 | [signature] |
| Davis L. | 6/03 | Lisa Davis |
| Davis W. | 4/25 | Willie Davis |
| Freshour S. | 11/08 | [signature] |
| Handorf M. | 6/28 | M. Handorf |
| McClure, N. | 7/09 | N. McClure |
| Miller R. | 4/09 | [signature] |
| Moore C. | 1/02 | C Moore |
| Parker R. | [illegible] | [signature] |
| Sexton W. | 8/22 | [signature] |

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



Employee Training Acknowledgment Form

| Name (print) | Signature |
|---|---|
| Smith, T. 10/19 | [signature] 10/19 |
| Thorn, M. 1/29 | [signature] |
| Sgt. Bauer, S. 11/02 | [signature] |
| Sgt. Seda, M. 8/19 | [signature] 8/19 |
| Lt. V. Dawkins, 9/11 | [signature] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

[illegible] AD1064 TEMP EXTREMES IN TDCJ (REV. 6)

TEXAS DEPARTMENT NUMBER: AD-10.64 (REV. 6)

OF DATE: NOVEMBER 10, 2006

CRIMINAL JUSTICE SUPERSEDES: AD-10.64 (REV. 5)
SEPTEMBER 19, 2006

ADMINISTRATIVE DIRECTIVE

SUBJECT: TEMPERATURE EXTREMES IN THE TDCJ WORKPLACE

AUTHORITY: TEXAS GOVERNMENT CODE 492.004

REFERENCE: AMERICAN CORRECTIONAL ASSOCIATION (ACA) STANDARDS: 4-4153 AND 4-4337

APPLICABILITY: TEXAS DEPARTMENT OF CRIMINAL JUSTICE (TDCJ OR AGENCY)

POLICY:

THE TDCJ SHALL ESTABLISH GUIDELINES TO ASSIST UNIT ADMINISTRATION IN ADAPTING OFFENDER WORK ASSIGNMENTS TO TEMPERATURES IN THE WORK ENVIRONMENT THAT CANNOT BE CONTROLLED BY THE AGENCY. GUIDELINES FOR OUTSIDE RECREATION ARE FOUND IN THE TDCJ RECREATION DEPARTMENT POLICY MANUAL.

EVERY REASONABLE EFFORT SHALL BE MADE TO PREVENT EXTREME TEMPERATURE-RELATED INJURIES IN THE WORKPLACE. SINCE THE TDCJ HAS UNITS THROUGHOUT THE STATE OF TEXAS, THE DECISION TO EXPOSE OFFENDERS TO EXTREME TEMPERATURE (I.E., COLD/HEAT) SHALL BE MADE BY THE APPROPRIATE ON-SITE STAFF.

TDCJ OFFENDERS ARE, AT TIMES, REQUIRED TO WORK IN CONDITIONS OF EXTREME COLD OR EXTREME HEAT. FREQUENTLY, SITUATIONS MAY OCCUR REQUIRING SPECIFIC WORK BE COMPLETED REGARDLESS OF THE TEMPERATURE OR WEATHER CONDITIONS.

PROCEDURES:

PRIOR TO EXPOSING OFFENDERS TO EXTREME TEMPERATURE CONDITIONS (I.E., COLD/HEAT), THE WARDEN AND INVOLVED DEPARTMENT SUPERVISORS SHALL ENSURE APPROPRIATE MEASURES ARE INSTITUTED WHICH PREVENT EXTREME TEMPERATURE-RELATED INJURIES. THE WARDEN AND INVOLVED DEPARTMENT SUPERVISORS ARE ENCOURAGED TO CONSULT MEDICAL STAFF TO ASCERTAIN SPECIFIC HAZARDS. IN ALL CASES OF TEMPERATURE-RELATED INCIDENTS OR INJURIES, THE UNIT MEDICAL STAFF AND THE UNIT RISK MANAGER SHALL BE NOTIFIED IMMEDIATELY. UPON ARRIVAL ON THE SCENE, MEDICAL STAFF SHALL TAKE CONTROL OF THE INDIVIDUAL'S MEDICAL CARE. THE INJURED OFFENDER SHALL BE REMOVED FROM THE ENVIRONMENT BY THE MOST EXPEDITIOUS MEANS AVAILABLE TO RECEIVE PROPER MEDICAL TREATMENT.

I. PROCEDURES AND EXPOSURE CHARTS (WIND CHILL INDEX "ATTACHMENT A" AND HEAT AND HUMIDITY MATRIX "ATTACHMENT B") ARE PROVIDED TO ASSIST UNIT OFFICIALS IN DETERMINING SAFE WORKING CONDITIONS IN EXTREME TEMPERATURE CONDITIONS.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

[illegible] OFFENDERS SHALL BE EXPOSED TO NO MORE

CONDITIONS. APPROPRIATE CLOTHING SHALL BE WORN TO PROTECT THE

OFFENDER FROM EXTREME TEMPERATURE CONDITIONS AT ALL TIMES.

B. UNIT STAFF SHALL MONITOR THE TEMPERATURE ONCE EVERY HOUR BETWEEN 6:30 A.M. AND 6:30 P.M. THE TEMPERATURE SHALL BE ANNOUNCED OVER THE RADIO AND DOCUMENTED ON THE TEMPERATURE LOG (ATTACHMENT C). IF CONDITIONS WARRANT, THE WARDEN MAY ALSO REQUEST ADDITIONAL READINGS.

C. TEMPERATURE LOG

1. THE WARDEN SHALL DESIGNATE A CENTRAL LOCATION TO MAINTAIN THE TEMPERATURE LOG.

2. THE TEMPERATURE LOG SHALL INDICATE THE WIND CHILL OR HEAT INDEX.

3. TEMPERATURE INFORMATION IS AVAILABLE THROUGH THE FOLLOWING:

A. THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION (NOAA) WEBSITE (WWW.NOAA.GOV);

B. NOAA WEATHER RADIO;

C. LOCAL WEATHER RADIO AND TELEVISION STATIONS; OR

D. ONSITE WEATHER INSTRUMENTATION (IF AVAILABLE).

4. TEMPERATURE LOGS SHALL BE MAINTAINED IN ACCORDANCE WITH THE TDCJ RECORDS RETENTION SCHEDULE.

II. EXTREME COLD CONDITIONS

A. DETERMINATION

1. THE WARDEN SHALL USE THE WIND CHILL INDEX, THE LOCAL NEWS/WEATHER MEDIA AND/OR WEATHER CONDITIONS RECORDED BY INSTRUMENTS LOCATED AT THE UNIT/PICKET IN DETERMINING THE SAFETY OF COLD WEATHER WORKING CONDITIONS.

2. CLOTHING CONSIDERED APPROPRIATE FOR OFFENDERS WORKING IN COLD WEATHER SHALL INCLUDE: THERMAL UNDERWEAR, INSULATED JACKETS, COTTON OR LEATHER GLOVES, INSULATED HOODS, WORK SHOES AND SOCKS. THE WIND CHILL INDEX SHALL BE USED TO DETERMINE THE NEED FOR INSULATED HOODS AND LEATHER GLOVES. APPROPRIATE CLOTHING SHALL BE ISSUED EVEN WHEN THE INDEX INDICATES LITTLE DANGER OF EXPOSURE INJURY.

3. IF GUIDANCE IS NEEDED, MEDICAL STAFF SHALL BE CONTACTED TO DETERMINE APPROPRIATE CLOTHING AND FOOTWEAR NEEDED TO PREVENT COLD INJURY.

4. CARE SHALL BE TAKEN TO PREVENT PERSPIRATION WHICH COULD SOAK CLOTHING AND THUS COMPROMISE THE CLOTHING'S INSULATING VALUE.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

THE EFFECTIVE TEMPERATURE AND LEVEL OF PHYSICAL ACTIVITY.

1. HYPOTHERMIA IS A CONDITION OCCURRING WHEN THE BODY LOSES

HEAT FASTER THAN THE BODY CAN PRODUCE IT. WITH THE ONSET OF THIS CONDITION, BLOOD VESSELS IN THE SKIN CONSTRICT (I.E., TIGHTEN) IN AN ATTEMPT TO CONSERVE VITAL INTERNAL BODY HEAT, THUS AFFECTING THE HANDS AND FEET FIRST.

2. IF ONE'S BODY CONTINUES TO LOSE HEAT, INVOLUNTARY SHIVERS BEGIN. THIS REACTION IS THE BODY'S WAY TO PRODUCE MORE HEAT AND IS USUALLY THE FIRST REAL WARNING SIGN OF HYPOTHERMIA.

3. FURTHER HEAT LOSS PRODUCES SPEECH DIFFICULTY, FORGETFULNESS, LOSS OF MANUAL DEXTERITY, COLLAPSE AND FINALLY DEATH.

C. TYPES OF HYPOTHERMIA

HYPOTHERMICS ARE DIVIDED INTO THE FOLLOWING THREE (3) CATEGORIES, DEPENDING ON THE DEGREE OF INJURY.

1. CATEGORY ONE

INJURED INDIVIDUALS ARE CONSCIOUS, BUT COLD, WITH A RECTAL TEMPERATURE ABOVE 90 DEGREES FAHRENHEIT (°F). THESE INDIVIDUALS SHALL BE HANDLED CAREFULLY, INSULATED AND TRANSPORTED TO MEDICAL CARE.

2. CATEGORY TWO

INJURED INDIVIDUALS ARE UNCONSCIOUS AND WITH A RECTAL TEMPERATURE OF 90°F OR BELOW. THESE INDIVIDUALS SHALL BE HANDLED CAREFULLY AND INSULATED FROM FURTHER HEAT LOSS. THE INDIVIDUAL SHALL BE TRANSPORTED TO THE UNIT MEDICAL DEPARTMENT FOR ADDITIONAL CARE.

3. CATEGORY THREE

INJURED INDIVIDUALS ARE COMATOSE WITH NO PALPABLE PULSE AND NO VISIBLE RESPIRATION. ALTHOUGH THESE INDIVIDUALS APPEAR TO BE DECEASED, THE INJURED INDIVIDUAL MAY HAVE A SLIGHT CHANCE OF RECOVERY IF THE RECTAL TEMPERATURE IS 80.8°F OR HIGHER. IF POSSIBLE, MEDICAL STAFF SHALL PROCEED AS FOLLOWS:

A. APPLY POSITIVE PRESSURE VENTILATION WITH OXYGEN.

B. JUDGE THE POSSIBILITY OF ADMINISTERING SUCCESSFUL CARDIOPULMONARY RESUSCITATION (CPR). CONSIDERATION SHALL BE GIVEN TO THE FOLLOWING PRIOR TO ADMINISTERING CPR:

(1) THE DIFFICULTY IN VERIFYING THAT THE HEART HAS STOPPED WITHOUT MEDICAL EQUIPMENT;

(2) THE COMPROMISE OF RESCUERS TO ADMINISTER PROCEDURE DURING EVACUATION;

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

(3) [illegible]

(5) CONTINUING CIRCULATION BY COMPRESSING A COLD, STIFF CHEST AND HEART MUSCLE IS UNLIKELY.

C. THE INJURED INDIVIDUAL SHALL BE INSULATED AND TRANSPORTED TO A MEDICAL CARE FACILITY.

III. EXTREME HEAT CONDITIONS

A. DETERMINATION

1. GUIDELINES ASSISTING THE WARDEN IN MAKING THE DETERMINATION CAN BE FOUND IN THE HEAT AND HUMIDITY MATRIX. WEATHER CONDITIONS RECORDED BY INSTRUMENTS ON THE UNIT/PICKET OR REPORTS BY THE LOCAL NEWS MEDIA SHALL BE USED CONFIRMING SPECIFIC TEMPERATURE AND HUMIDITY CONDITIONS. WHEN THE TEMPERATURE IS OVER 85°F, THE WARDEN SHALL USE THE HEAT AND HUMIDITY MATRIX TO DETERMINE THE HEAT INDEX. THE HEAT INDEX SHALL BE USED AS AN INDICATOR OF THE RISK FOR HEAT-RELATED INJURY.

2. AT ANY POINT WHEN THE HEAT AND HUMIDITY MATRIX INDICATES THE POSSIBILITY OF HEAT EXHAUSTION OR HEATSTROKE, THE WARDEN SHALL INSTRUCT THE APPROPRIATE STAFF TO IMMEDIATELY INITIATE THE PRECAUTIONARY MEASURES IDENTIFIED IN THE HEAT AND HUMIDITY MATRIX.

3. IF GUIDANCE IS NEEDED, MEDICAL STAFF SHALL BE CONTACTED PRIOR TO EXPOSING OFFENDERS TO EXTREMELY HOT WORKING CONDITIONS TO EVALUATE THE HAZARDS OF THE CURRENT TEMPERATURES AND HUMIDITY, INCLUDING INDOOR WORK AREAS (E.G., BOILER ROOM). THE HAZARD OF SUNBURN AND OTHER RESULTS OF ULTRAVIOLET (UV) RADIATION SHALL ALSO BE CLOSELY MONITORED.

4. OFFENDERS SHALL BE PROVIDED AND REQUIRED TO WEAR CLOTHING APPROPRIATE FOR THE EFFECTIVE TEMPERATURES AND THE HAZARDS IMPOSED BY UV RADIATION (E.G., LIGHT-COLORED HATS CAN BE USED TO AN ADVANTAGE IN HIGH HEAT AND DIRECT SUNLIGHT).

5. DRINKING WATER SHALL ALWAYS BE AVAILABLE TO OFFENDERS. IN CONDITIONS OF HOT WEATHER, ACCORDING TO INDIVIDUAL MEDICAL ADVICE, LIQUIDS CONTAINING SODIUM MAY BE USED DEPENDING ON AN OFFENDER'S STATE OF ACCLIMATIZATION TO HOT WEATHER CONDITIONS.

6. NEWLY ASSIGNED OFFENDERS, WHO MAY NOT BE ACCLIMATED TO THE HEAT, SHALL BE MEDICALLY EVALUATED PRIOR TO EXPOSURE TO SIGNIFICANT HEAT STRESS AND CLOSELY MONITORED BY SUPERVISORS FOR EARLY EVIDENCE OF HEAT INTOLERANCE.

7. HIGH WATER INTAKE, ACCORDING TO THE HEAT AND HUMIDITY MATRIX, SHALL BE ENFORCED.

8. OFFENDERS UNDER [illegible] INHIBITING SWEAT [illegible] [illegible]

Copy of OIG case to Litigation Support on 04.19.2013 by ce
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

A. DIMINISHED OR ABSENT PERSPIRATION (SWEATING);

B. HOT, DRY AND FLUSHED SKIN; AND

C. INCREASED BODY TEMPERATURES, WHICH IF UNCONTROLLED MAY LEAD TO DELIRIUM, CONVULSIONS AND EVEN DEATH. MEDICAL CARE IS URGENTLY NEEDED.

2. HEAT CRAMP SYMPTOMS INCLUDE:

A. PAINFUL, INTERMITTENT SPASMS OF THE VOLUNTARY MUSCLES FOLLOWING HARD PHYSICAL WORK IN A HOT ENVIRONMENT; AND

B. CRAMPS USUALLY OCCURRING AFTER HEAVY PERSPIRING, AND OFTEN BEGINNING AT THE END OF A WORK SHIFT.

3. HEAT EXHAUSTION SYMPTOMS INCLUDE:

A. PROFUSE PERSPIRING, WEAKNESS, RAPID PULSE, DIZZINESS AND HEADACHES;

B. COOL SKIN, SOMETIMES PALE AND CLAMMY, WITH PERSPIRATION;

C. NORMAL OR SUBNORMAL BODY TEMPERATURE; AND

D. NAUSEA, VOMITING AND UNCONSCIOUSNESS MAY OCCUR.

IV. EMERGENCY TREATMENT

A. IN ALL CASES OF TEMPERATURE-RELATED INCIDENTS OR INJURIES:

1. THE FIRST AID PROCESS SHALL BE INITIATED IMMEDIATELY BY SECURITY OR OTHER UNIT STAFF.

2. MEDICAL STAFF AND THE UNIT RISK MANAGER SHALL BE NOTIFIED IMMEDIATELY.

B. IN EXTREME COLD CONDITIONS, STAFF SHALL:

1. BRING THE INJURED OFFENDER OUT OF THE COLD AND REMOVE WET CLOTHING;

2. WRAP THE INJURED OFFENDER IN WARM BLANKETS OR CLOTHING;

3. IF FROSTBITE EXISTS, GENTLY HEAT THE AFFECTED AREA WITH WARM WATER OR WARM TOWELS. DO NOT RUB THE AFFECTED AREA. A HEATING PAD OR HOT WATER BOTTLES MAY ALSO BE USED TO TREAT THE AFFECTED AREA;

4. CONTINUE THE TREATMENT UPON ARRIVAL AT THE SITE OR WHEN THE OFFENDER IS DELIVERED TO MEDICAL STAFF'S CARE;

5. APPLY THE "ABC" OF LIFE SUPPORT (OPEN AIRWAY, ASSIST BREATHING AND RE

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

6. IF COLD INJURY IS SUSTAINED, THE FOLLOWING FIRST AID





[illegible] UNTIL SEVERITY IS EVALUATED

B. REMOVE ALL CONSTRICTING ITEMS OF CLOTHING AND FOOTGEAR FROM INJURED AREAS;

C. REMOVE WET CLOTHING AND INSULATE THE OFFENDER WITH DRY CLOTHING AND BLANKETS, ENSURING THE INJURED AREA IS COVERED;

D. DO NOT RUPTURE BLISTERS;

E. ENCOURAGE CONSUMPTION OF WARM, SWEETENED LIQUIDS;

F. IF A LOWER EXTREMITY IS AFFECTED, TREAT AS A STRETCHER PATIENT BY SLIGHTLY ELEVATING THE AFFECTED LOWER EXTREMITY;

G. IF EVACUATION FROM COLD REQUIRES TRAVEL ON FOOT, DO NOT THAW THE AFFECTED AREA UNTIL THE OFFENDER REACHES MEDICAL HELP; AND

H. TRANSPORT THE OFFENDER TO MEDICAL CARE AS SOON AS POSSIBLE.

C. IN EXTREME HEAT CONDITIONS, STAFF SHALL:

1. IMMEDIATELY BEGIN AN ATTEMPT TO DECREASE THE OFFENDER'S TEMPERATURE BY PLACING THE OFFENDER IN A COOL AREA;

2. ONLY FORCE ORAL FLUID INTAKE IF THE OFFENDER IS CONSCIOUS AND ABLE TO SAFELY SWALLOW;

3. REMOVE HEAVY CLOTHING OR EXCESS LAYERS OF CLOTHING; SATURATE REMAINING LIGHTWEIGHT CLOTHING WITH WATER. POSITION THE OFFENDER IN THE SHADE WITH AIR MOVEMENT PAST THE OFFENDER. FAN THE OFFENDER IF NECESSARY TO CREATE AIR MOVEMENT;

4. IF ICE IS AVAILABLE, PLACE ICE PACKS IN ARMPIT AND GROIN AREAS;

5. TAKE ALL OF THESE MEASURES WHILE MOVING THE OFFENDER IN THE MOST EXPEDITIOUS MEANS AVAILABLE TO CONTINUE WITH AND OBTAIN PROPER MEDICAL TREATMENT; AND

6. ENSURE, WHENEVER MEDICAL STAFF ARE ON-SITE, TO CONTINUE TREATMENT AS DIRECTED BY THE PHYSICIAN OR MEDICAL STAFF.

V. TRAINING

A. EACH WARDEN SHALL ENSURE TRAINING IN THE PREVENTION OF TEMPERATURE EXTREME INJURY IS PROVIDED BY UNIT MEDICAL STAFF TO ALL SUPERVISORS DESIGNATED BY THE WARDEN. COLD TRAINING SHALL BE COMPLETED IN SEPTEMBER, AND HEAT TRAINING SHALL BE COMPLETED IN MAY OF EACH YEAR.

1. SUPERVISORS SHAL[illegible] [illegible]

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

B. A COPY OF ALL TRAINING ROSTERS SHALL BE PROVIDED TO THE UNIT RISK MANAGER AND HUMAN RESOURCES REPRESENTATIVE (STAFF TRAINING). THE UNIT RISK MANAGER SHALL FORWARD A COPY OF THE TRAINING ROSTER TO THE RESPECTIVE REGIONAL RISK MANAGER. THE REGIONAL RISK MANAGER SHALL FORWARD THE TOTAL NUMBER OF EMPLOYEES AND OFFENDERS TRAINED TO THE RISK MANAGEMENT CENTRAL OFFICE.

C. A STANDARDIZED TRAINING PROGRAM SHALL BE DEVELOPED BY THE TDCJ DEPARTMENT OF PREVENTIVE MEDICINE IN CONJUNCTION WITH THE UNIVERSITY OF TEXAS MEDICAL BRANCH (UTMB) DEPARTMENT OF EDUCATION AND PROFESSIONAL DEVELOPMENT.

1. THE INITIAL EXTREME TEMPERATURE CONDITIONS TRAINING IS PROVIDED IN THE PRE-SERVICE TRAINING SESSIONS, AND ADDITIONAL TRAINING SHALL BE PROVIDED IN ANNUAL IN-SERVICE TRAINING SESSIONS.

2. THE TRAINING IS GIVEN IN A GROUP SETTING.

3. ALL UNITS ARE RESPONSIBLE FOR CONDUCTING AN ANNUAL STANDARDIZED TRAINING PROGRAM UTILIZING UNIT-BASED MEDICAL STAFF.

4. REQUESTS FOR SELECTED UNIT TRAINING SHALL BE SUBMITTED TO THE DIRECTOR FOR PREVENTIVE MEDICINE.

BRAD LIVINGSTON
EXECUTIVE DIRECTOR

END AD-10.64 (REV. 6)
CONTACT THE ADMINISTRATIVE REVIEW AND RISK MANAGEMENT DIVISION FOR ATTACHMENTS A, B, AND C.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# Texas Department of Criminal Justice
*INSTITUTIONAL DIVISION*

## Inter-Office Communications

To: Whom it May Concern Date: 9-16-11

From: Human Resources Office Subject: Receipt of Information

I, Matthew Seda ,received the following information from the Human Resources Office, and acknowledge that a copy will be placed in my unit Disciplinary File and Employee Master Human Resources File:

1. Notification of Employee Hearing
2. Guidelines for Employee Hearings
3. Pers 325 Employee Pre Hearing Investigation Report
4. IOC from Lieutenant Minton ( 2 pages )
5. IOC from Officer Dodd
6. IOC from Officer Edwards
7. IOC from Sergeant Seda ( 3 pages )
8. TDCJ Employee Training Acknowledgement Form 05/19/11 ( 3 pages )
9. Admin Directive Temperature Extremes (7 pages)
10. Recognition of Heat Illness

I understand that receipt of the attached documents is standard operational procedure and that my signature below, confirms receipt of this packet. I will retain this original IOC and return a copy to Human Resources, Gurney Facility.

Signature [signature] Date 9.16.2011

Witness ____________________

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**Texas Department of Criminal Justice**
**REPRIMAND FORM**

OIG#: ________ EEO#: ________
MAUF/MIUF#: ________

Employee Name: Edwards (Last) Doris (First) M (MI)
SSN: [redacted]

Payroll Job Title: CO V
Unit/Dept: Joe F.Gurney Unit
Date(s) of Violation(s): 08/13/2011
Date Pre-Hearing Investigation Completed: 09/[illegible]

VIOLATION(S):
FINDINGS (check one [1]): GUILTY

Level: 2 No. 20 Rule Title: Violation of Statutory Authority/Court ORder/Rules/Regulations/Policies ☒ Yes ☐ No

Level: ____ No. ____ Rule Title: ____ ☐ Yes ☐ No

Synopsis of Incident(s):
On 08/13/11 CO Doris Edwards received reports from offenders assigned to B#-Dorm of offender James, Kenneth #172684[illegible] being [illegible] and possibly urinating on himself. Officer Edwards observed offender James and notified Sergeant Seda; however, when Sergeant Seda did not respond, she took no further action such as initiating first aid procedures or contacting a lieutenant to obtain assistance. The incident, which was the eventual death of offender James, was reported as I-11520-08-11.

DISCIPLINARY ACTION:
Is this a subsequent violation(s)? ☐ Yes ☒ No If yes, list applicable previous Rule No. violation(s) and disciplinary date(s):

Check and complete one (1) or more of the following:

☐ NO DISCIPLINE IMPOSED (Provide justification at bottom of page.)
☐ REPRIMAND ONLY
☒ DISCIPLINARY PROBATION: 6 Calendar Months Beginning: 9/21/11 Ending*: 3/20/12

*Note to Employee: If you are on a full calendar month of leave without pay during your period of disciplinary probation, including a full calendar month of suspension without pay, the probation period ending date shall be adjusted by adding one full calendar month to the original ending date. If you are in a career ladder position, any period of disciplinary probation and an adjusted disciplinary probation ending date shall postpone future career ladder salary adjustments.

☐ SUSPENSION WITHOUT PAY: ____ Workdays Beginning: ____ Return: ____
☐ REDUCTION IN PAY TO: $ ____ Beginning: ____ Ending: ____
☐ DEMOTION TO (Title/Salary Group) ____ Beginning: ____ Ending: ____
☐ DISMISSAL RECOMMENDED, WITH FOLLOWING ACTION DURING INTERIM:
- ☐ Involuntary Use of Compensatory Time/Holiday Time
- ☐ Voluntary Use of Overtime/Vacation Time (Attach a copy of PERS 24, Leave Request)
- ☐ Suspension Without Pay
- ☐ Change to Another Job Assignment
- ☐ Administrative Leave (can only be granted by the Executive Director)

DISCIPLINE IS: ☑ Within ☐ Above ☐ Below the guidelines (Provide justification at bottom of page if above or below
For violations of Rule No. 24 or 25, check one (1) of the following: This violation ☐ did ☐ did not involve an aggravated use of exce[illegible]
JUSTIFICATION (If applicable): ____

Dennis Miller Warden I — Reprimanding Authority Name/Title (printed)
[Signature] — Signature
9/2[illegible] — Date

**Employee's Acknowledgment: I have been advised of the procedures of progressive disciplinary actions, and my right to file a grievance. I acknowledge receipt of a copy of this reprimand and know the original is to be placed in my Master Human Resources File. If recommended for dismissal, I verify the following are my current address and phone number:**

Mailing Address: ____

Phone Number, Including Area Code: ____

Employee Signature: Doris M Edwards Date: 9-21-2011

**Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004, you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.**

Original: Labor Relations Section, HRHQ (with copy of support documentation)
Copy: Employee
Copy: Unit/Department Employee Disciplinary File

PERS 185 (01/09)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# Texas Department of Criminal Justice
## NOTIFICATION OF EMPLOYEE HEARING

OIG # ______
MAUF/MIUF# ______
EEO# ______

DATE: 09/15/11 EMPLOYEE NAME: Edwards, Doris M SSN: [redacted]

UNIT/DEPT.: Joe F.Gurney Unit PAYROLL JOB TITLE: CO IV

You are scheduled for an Employee Hearing to be held
☒ in person ☐ telephonically ☐ via videoconference at Wardens Office (Location) at 7:00 (am/pm) on 09/21/2011 (mm/dd/yyyy)

The purpose of the Employee Hearing is to consider allegations that you committed the following rule violation(s) as referenced in the Listing of Employee General Rules of Conduct and Disciplinary Violations.

No. L2 # 20 Violation: Violation of Statutory Authority/Court Order/Rules/Regulations/Policies
No. ______ Violation: ______
No. ______ Violation: ______

Synopsis of Incident(s): On 08/13/11 CO V Doric Edwards received reports from offenders assigned to B3-Dorm of Offender James, Kenneth #1726849 being ill and possibly urinating on hiimself. Officer Edwards observed offender James and notified Sergeant Seda. When Sergeant Seda did not respond, she took no further action such as initiating first-aid procedures or contacting a Lieutenant to obtain assistance. The incident, which was the eventual death of offender James was reported as I-11520-08-11.

The hearing shall be conducted in accordance with the PERS 560, Guidelines for Employee Hearings and a copy of these guidelines is being provided to you. These guidelines provide information relating to scheduling extensions, representatives, witnesses and other related matters.

**I ☑ do ☐ do not wish to appear at the Employee Hearing. I understand my failure to appear may constitute a waiver of the right to an Employee Hearing, and the Employee Hearing may be conducted in absentia.**

☐ I wish to waive the 24-hour Notice of Employee Hearing. I understand the Reprimanding Authority or designee may reschedule the hearing to be held earlier than the date and time indicated above. If I have indicated that I wish to appear at the Employee Hearing, I shall be notified in writing of the rescheduled time and date prior to the hearing.

☑ I do not wish to waive the 24-hour Notice of Employee Hearing.

Today's Date: 9-16-11 If Notified in Person, Time Notified: 6:10 ☑ A.M. ______ P.M.

Doris Edwards
Employee Signature

*Note to Employee:* ***With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004 you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.***

**Notification of Rescheduled Employee Hearing:**
The Reprimanding Authority or designee has rescheduled the hearing to be held at a different date and time than indicated above. (If later, and outside the applicable scheduling time frame, attach justification.)

The rescheduled hearing shall be held at: ______ (Location) at ______ (am/pm) on ______ (mm/dd/yyy) ______ (Employee Initials/Date & Time [am/pm])

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

PERS 184 (01/09)

## Texas Department of Criminal Justice
## GUIDELINES FOR EMPLOYEE HEARINGS

Employee Name: Edwards (Last) Doris (First) M (MI) SSN: [redacted]

1. Request for an Extension: If you are on approved sick leave at the time the PERS 184, Notification of Employee Hearing was provided to you, you may make a one-time request for the Employee Hearing date to be rescheduled within 30 calendar days. This request shall be made within 48 hours of receipt of this form, made in writing or made verbally with a written follow-up. You must state the specific reason an extension is necessary. The Reprimanding Authority may deny the request; however, the Reprimanding Authority shall provide you with a written explanation for denying the request.

2. Presenting Your Defense and Use of a Representative: During the Employee Hearing, you may elect to speak for yourself or be represented at the Employee Hearing by a designee of your choice, as long as your representative: (1) does not claim the right to strike; and (2) is not an individual under the supervision, custody or incarceration of the TDCJ. The designation of a representative does not prohibit you from: (1) attending or having input into the Employee Hearing or (2) responding to questions from the Reprimanding Authority or designee, or your designated representative.

   a. An Employee Hearing is administrative in nature and is not subject to common law or statutory rules of evidence. Objections at the Employee Hearing by you or your representative shall be limited to Agency policy and procedural issues that pertain to the Employee Hearing.

   b. At the beginning of the Employee Hearing, you must specify whether your representative is the party responsible for presenting your defense. Both you and your representative may provide information to the Reprimanding Authority for consideration. However, only one (1) person may be designated as the party responsible for presenting your defense, and only one (1) person may speak at a time. Regardless of the party responsible for presenting your defense, you and your representative shall be allowed to have quiet conversations regarding information that may be provided to the Reprimanding Authority.

3. Witnesses on Your Behalf: You may elect to have witnesses with first-hand knowledge of the events under review provide testimony on your behalf. The Agency is under no obligation to interview or consider testimony from character witnesses or witnesses with "hearsay" information. Prior to the hearing, it is your responsibility to: (1) obtain statements from witnesses for presentation at the Employee Hearing; (2) provide any written questions for witnesses to the Reprimanding Authority; or (3) arrange for witnesses to be available to present testimony during the hearing at the Reprimanding Authority's discretion. If you provide written questions, the Reprimanding Authority or designee is not required to ask these questions. If the Reprimanding Authority elects to ask the witnesses these questions, this may occur prior to or after the Employee Hearing. If witnesses are available to appear in person at the Employee Hearing, the Reprimanding Authority has the discretion to determine whether the witnesses are questioned. Witnesses who are available to appear on the employee's behalf shall be available at no expense to the Agency other than the recording of such time as time worked.

4. Witnesses Appearing on Behalf of the Reprimanding Authority: At the Reprimanding Authority's discretion, you may be allowed to ask questions of a person(s) who appears at the Employee Hearing as a witness(es) against you.

5. Conduct by Participants: All parties, including your representative, shall conduct themselves in a professional manner and afford the persons present due respect. Only one (1) reminder of the conduct expected at the Employee Hearing may be issued. The offending party may be required to leave the proceedings if conduct that is contradictory to these guidelines continues. If you or your representative leaves during the proceedings, the Employee Hearing may be conducted and concluded in your or your representative's absence.

6. Recording of an Employee Hearing: Audio taping, video taping or verbatim written recording of an Employee Hearing is not permitted. Note taking is permissible.

7. Americans with Disabilities Act (ADA) Accommodation: You may notify the TDCJ ADA Coordinator, Human Resources Division, if you require an accommodation.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

8. Time Reporting/Expenses:

   a. Your attendance at the Employee Hearing or attendance by an employee acting as a witness shall be considered official business, and you and any employee acting as a witness shall be released by the supervisor on paid time during working hours. You and any employee acting as a witness are required to provide sufficient advance notice to the supervisor to ensure adequate staffing.

   b. There is no authority for the Agency to pay compensation to or reimburse the expenses of a representative whether the representative is a state employee or an individual from outside state service. Appearance as a representative at an Employee Hearing shall not be considered official business. If an employee acting as a representative attends an Employee Hearing held during working hours, that employee must obtain prior approval to use accrued leave or, if accrued leave is not available, leave without pay to attend the Employee Hearing.

9. Copies of Investigative Files: At the time of this notification, you were provided a copy of the applicable pre-hearing investigation report along with support documentation that is subject to disclosure and being used as evidence. In order to obtain copies of evidence that is not subject to disclosure (e.g., confidential portions of OIG and EEO reports), you must request the documents in writing through a Public Information request. The request shall be processed in accordance with the rules governing a Public Information request, and the requested documents may not be available before the Employee Hearing.

10. Dismissal Recommended: If the Employee Hearing results in a dismissal recommendation, you shall have the opportunity to request independent dismissal mediation in accordance with PD-35, "Independent Dismissal Mediation and Dispute Resolution."

11. Grievance: You may submit a grievance in accordance with PD-30, "Employee Grievance Procedures" relating to disciplinary action after it has been imposed.

Doris Edwards
Employee Signature

(mm/dd/yyyy)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# RECOGNITION OF HEAT ILLNESS

## HEAT EXHAUSTION

- Weakness, anxiety, fatigue, dizziness, headache, nausea
- Profuse sweating, rapid pulse, rapid breathing
- Possible confusion or loss of coordination
- May lead to heat stroke if not treated

## HEAT COLLAPSE

- Sudden collapse, brief duration
- Skin cold and clammy
- May lead to heat stroke if not treated

## HEAT STROKE

- Headache
- Gooseflesh, chills
- Unsteady gait
- Incoherent speech progressing to coma
- Rapid pulse
- Skin hot and dry

# TREATMENT AND PREVENTION

## TREATMENT OF HEAT ILLNESS (ALL TYPES)

- Move person out of direct sunlight into air-conditioned environment if possible
- Remove clothing, maintaining modesty
- Have them drink water if conscious
- Sprinkle water on them; fan them if there is no breeze
- Get medical attention ASAP

## HIGHER RISK FOR HEAT ILLNESS

- Newly assigned to job
- On psychiatric medications
- Over age 60
- High temperature and humidity conditions
- No breeze

## PREVENTION OF HEAT ILLNESS

- Drink at least ½ cup of water ever 15 minutes when working in hot environments
- Take a 5 minute break every 30-60 minutes
- Decrease intensity of work under extreme conditions

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
EMPLOYEE OFFENSE AND PRE-HEARING INVESTIGATION REPORT

**Purpose:** This form shall be used to record alleged violations of rules or regulations by employees. It shall also serve as a pre-hearing investigation report. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the Charging Official:**

**Employee Name:** Edwards (Last) Doris (First) M (MI) **SSN:** [redacted]

**Payroll Job Title:** Correctional Officer V

**Date(s) of Incident(s):** August 13, 2011 (mm/dd/yyyy)

**Description of employee's specific conduct (do not reference Rule No. or describe the rule):** On August 13, 2011, Correctional Officer V Doris Edwards received reports from offenders assigned to B3-Dorm of offender James, Kenneth #1726849 being ill and possibly urinatiing on himself. Officer Edwards observed offender James and notified Sergeant Matthew Seda; however, when Sergeant Seda did not respond, she took no further action such as initiating first-aid procedures or contacting a lieutenant to obtain assistance. The incident, which was the eventual death of offender James, was reported as I-11520-08-11. See attached IOC for additional information.

The employee's conduct may be a violation of Rule No.: #20 - Violation of Policy

Ricky Minton, Lieutenant — **Charging Official Name/Title (print)**
[signature] — **Signature**
September 14, 2011 — **Date**

**II. Employee's Statement:** The pre-hearing investigator shall obtain an employee's statement even when a Use of Force (UOF) Fact-Finding Inquiry, Risk Management Incident Review Board or Office of the Inspector General (OIG) investigation has been conducted.

I stand by my statement (Please see attached I.O.C.)

**Employee's Signature:** D Edwards **Date:** 9-14-2011

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004 you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

PERS 325 (01/09)

**Texas Department of Criminal Justice**
**EMPLOYEE OFFENSE AND PRE-HEARING INVESTIGATION REPORT**

**IV.     Pre-Hearing Investigator's Review/Recommendation:**

An Employee Pre-Hearing Investigation Report (i.e., EPHIR) was conducted on 14
September 2011 regarding Officer Edwards failure to respond in a timely manner to an
offender medical emergency (offender James #1726849 [heat extreme related
symptoms]) that resulted in death.  The EPHIR relied on statement(s) submitted by staff,
the Incident Report #I-11520-08-11, and Officer Edwards' Employee Statement from
Section II. of the EPHIR.

Officer Edwards initially informed Sgt. Seda that offender James #1726849 was reported
to be displaying symptoms of dizziness and disorientation.  A time period of over one
hour elapsed without Sgt. Seda responding.  Officer Edwards did not make follow-up
contact with Sgt. Seda or other supervisory staff available on the unit.  Also, Officer
Edwards failed to check on the offender during this time period or offer first aid
assistance as required by Agency Policy (AD-10.64 [rev. 6])..

Based on statements provided by staff, Incident Report #I-11520-08-11, and Officer
Edwards'employee statement, the Pre-Hearing Authority recommends disciplinary action
for the following violation of Agency Policy:

PD-22, Rule #20, Violation of Statutory Authority/Rule, Level 2.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**III. Witnesses:** See attached.

**IV. Pre-Hearing Investigator's Review/Recommendation:**

**Employee Hearing:** ■ Yes ☐ No **If Yes, Alleged Rule Violation No(s):** ____________

**Comments:** (See attached)

Jesse Wicks, Asst. Warden
Investigator's Name/Title (print)

Signature

9/14/11
Date

**V. Reprimanding Authority's Action:**

☒ Proceed to Employee Hearing Alleged Rule Violation No(s): 20

☐ No Employee Hearing and no action taken

☐ No Employee Hearing and other action taken (e.g., dispute resolution, training). Attach explanation of action taken.

Dennis Miller Warden
Reprimanding Authority's Name/Title (print)

Signature

9/15/11
Date

PERS 325 (01/09)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Reprimanding Authority<br>Joe F. Gurney Transfer Facility | Date | September 14, 2011 |
| From | Ricky Minton, Lieutenant<br>Joe F. Gurney Transfer Facility | Subject | **Employee Offense Report:**<br>Officer Doris Edwards, CO V |

On August 13, 2011 at 0416 hours, offender James, Kenneth #1726849 was pronounced deceased by Medical Doctor Heidi Knowles at Palestine Regional Medical Center. The death of offender James was reported as incident number I-11520-08-11 and an Administrative Review was conducted according to agency policy. During the Administrative Review, it was determined that Correctional Officer V Doris Edwards violated agency policy as it relates to the subsequent response to the incident once it became known to security staff that offender James was in distress and may need medical attention.

On August 13 at approximately 0005 hours, while conducting a count in B3-Dorm, Officer Edwards was approached by unknown offenders who reported that offender James was ill, had urinated on himself and was in need of medical attention. Officer Edwards reported that she observed offender James in his assigned bunk and that she did not observe any urine on his clothing nor did he report to her that he had urinated on himself. Officer Edwards completed her count and proceeded to the building control picket where she relieved Correctional Officer V Revoyda Dodd so that she could conduct the second count. While Officer Dodd was counting, Officer Edwards reported that she observed offender James walking to the restroom area. As he was exiting to return to his bunk, she reported that offender James appeared dizzy and was "wobbling back and forth as he was walking."

Officer Edwards, when calling her count into the Building Lieutenant's Office, reported to Sergeant Matthew Seda of the reports she received from offenders and her observations of offender James. Sergeant Seda indicated that he would report to her building at the conclusion of the unit count; however, never did so. Officer Edwards, other than observing the offender while he was lying in his assigned bunk, took no further action, did not initiate any first-aid procedures nor did she contact another supervisor when it was apparent that Sergeant Seda was not reporting to her building to investigate her report.

At approximately 0235 hours, offender James was escorted to the unit medical department and eventually to Palestine Regional Medical Center where he was pronounced dead by Medical Doctor Heidi Knowles.

AD-10.64 (rev. 6) *Temperature Extremes in the TDCJ Workplace,* section IV.A reads:

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

"In all cases of temperature related incidents or injuries: (1) The first aid process shall be initiated immediately by security or other unit staff. (2) Medical staff and the unit risk manager shall be notified immediately."

On May 19, 2011, Officer Edwards acknowledged by her signature that she was trained on AD-10.64 (rev. 6) and the dangers of extreme temperatures to include the warning signs of heat exhaustion and the appropriate response to heat related injuries. *See Employee Training Acknowledgement Form, May 19 2011. Also, see copy of AD-10.64 (rev. 6) Temperature Extremes in TDCJ Workplace.*

Further, Officer Edwards was aware of the symptoms of heat related illnesses and is required to maintain, in her possession at all times while working, a heat related illness card to guide her with this concern. That card lists the symptoms of heat illness which consist of, in part, dizziness and loss of coordination which are two of the symptoms she reported to have observed during her dealings with offender James.. *See heat illness card.*

While true that it may be impossible to say with any degree of certainty that a more immediate response would have resulted in offender James' survival, it is equally impossible to say that a more immediate response would have not resulted in his survival.

Officer Edwards, by failing to immediately initiate first aid procedures for offender James was in violation of PD-22 *General Rules of Conduct for Employees*, specifically:

**Rule No. 20: Violation of Statutory Authority/Court Order/Rules/Regulations/Policies:**
It is the employee's responsibility to know, have a clear understanding of and comply with rules, regulations, policies, court orders and statutory authority governing the operation of the Agency. Not being aware of the existence of any of the aforementioned is not a defense for violation of the same.

The specific policy violated in this case, as stated, was the failure to immediately initiate the first aid process for offender James.

This report is submitted to the unit reprimanding authority for review and disposition as appropriate.

Ricky Minton, Lieutenant
Joe F. Gurney Transfer Facility

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| To | Lieutenant Toby Whitfield | Date | August 13, 2011 |
|---|---|---|---|
| From | Doris Edwards, COV | Subject | Offender James, Kenneth #1726849 |

At approximately 1800 hours I, Officer Doris Edwards COV was assigned to the control picket of B1-building. When I arrived on the Officer Brandon Matthews was in the control picket. I began to inventory the equipment on the building. At no time while first shift officers were on the building was I notified of any offenders being ill.

Until the special bed book count, at no time did I observe offender James, Kenneth #1726849 in any kind of distress.

At approximately 0005 hours, I conducted the count on B1-building. When I entered B3-dormitory, the offenders in the dorm told me that offender James was in his bed and urinated on himself. When I went over to his bunk the offender didn't say anything about urinating on himself. When I looked at him, he looked back at me. He did not look to be in distress at this time.

While Officer Revoyda Dodd COIV was conducting the bed book count, I observed the offender go to the restroom area and back to his bunk area. He appeared to be dizzy while he was walking, he was wobbling back and forth as he was walking. Offenders in the housing area came up to the intercom and told me that offender James was sick.

While I was calling in the count, I notified Sergeant Matthew Seda and he informed me to keep an eye on the offender.

After Sergeant Seda told me to watch the offender, I did not notice any more abnormal behavior from the offender.

Shortly afterwards, Officer Glorie Harris COIV entered the building after coming in from the outside perimeter picket. I notified her that other offenders in the dorm stated that offender James had urinated by his bunk and was not urinating in the urinal.

At approximately 0200 hours, I exited the building to assist with other activities that were taking place on the unit.

At approximately 0240 hours, I was on the main hallway when Officer Torrance Stephens COV was pushing offender James in a wheelchair toward the unit infirmary. The offender was sitting up.

I remained on the main hallway.

Doris Edwards CO V

Doris Edwards, COV
Joe F. Gurney Transfer Facility

SO-4

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Lieutenant Toby Whitfield | Date | August 13, 2011 |
| From | Revoyda Dodd, COIV | Subject | Offender James, Kenneth #1726849 |

At approximately 2200 hours I, Revoyda Dodd COIV reported to my assigned duty post on B1-building as the control picket officer. At approximately 0015 hours I was conducting a bed book count in B3-dormitory. When I arrived around B323 bunk, the offenders around 23-bunk, informed me that offender James, Kenneth #1726849 had urinated on himself. I approached B3-23 bunk and identified him by his TDCJ-ID card for the purpose of the bed book count.

The offender was lying in his assigned bunk. The offender was restless and was moving around in his bunk. did not notice any urine on the offender at this time. I completed my bed book count for the rest of the building and before returned to the control picket I went back into B3-dormitory due to several offenders not being properly dressed in the dayroom. Shortly afterwards, I was in the control picket and noticed offender James sitting on the toilet in the restroom area. I then observed the offender leaving the restroom area. While he was walking, he bumped into the wall of the restroom, urinal and began to stumble. The offender made it back to his living area and fell into his bunk. I asked Officer Doris Edwards if she seen what the offender did. I notified Sergeant Matthaw Seda that the offender appeared to be drunk or on some kind of medication.

I went on with my normal duties in the control picket and continued to monitor offender activity in the dorm.

When Officer Glorie Harris came into the building, she noticed the offender in the dayroom and called Lieutenant Toby Whitfield on the radio. The offender was standing in the dayroom and would not respond to her questions. Shortly afterwards, Sergeant Tully Flowers, Sergeant Seda, Officers Ronald Burt COV, Kenneth Mangan COIV and Torrance Stephens COV arrived on the building with a wheelchair. The offender was placed in the wheelchair and transported out of the building.

I then returned to my normal duties.

Revoyda Dodd CO4
Revoyda Dodd, COIV
Joe F. Gurney Transfer Facility

SO-4

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Toby Whitfield, Lieutenant<br>Joe F. Gurney Transfer Facility | Date | August 13, 2011 |
| From | Matthew Seda, Sergeant *MS*<br>Joe F. Gurney Transfer Facility | Subject | I-11520-08-11 |

---

On August 13, 2011 at approximately 0020hours, I, Sergeant Matthew Seda, was in the Buildi[ng] Lieutenant's Office assisting with the unit count. This was a bed book count which required that [I] assist by verifying the first count sheets that are turned in and then conducting a thorough check of th[e] bed book rosters to ensure that all offenders were accurately accounted for in my area of assignment, th[e] West End of the facility.

During this count, Officer Doris Edwards, CO V called and notified me that an offender on B1-Buildi[ng], later identified as offender James, Kenneth #1726849, appeared dizzy and may have urinated on hims[elf]. After verifying that the offender was in a secured area, I instructed Officer Edwards to maintain a visu[al] on the offender and that I would respond when able. If the situation warranted a more immedia[te] response that she was to let me know.

After talking to her, Officer Robert Tatum, CO IV entered the Building Lieutenant's Offic[e] accompanied by an offender who works for him in the Food Service Department, and reported that h[e] had injuries consistent with having been involved in a recent physical altercation.

Immediately after the report by Officer Tatum, Officer Revoyda Dodd, CO IV, while calling in he[r] count, notified me of similar behavior of offender James and was provided the same instructions.

Officer Edwards and Officer Dodd were instructed to notify me if the situation required an immediat[e] response.

During this time, Sergeant Tully Flowers was also assisting with the unit count, conducting the sam[e] verifications of count sheets for the East End of the facility.

At 0035 hours, the unit count cleared. Upon exiting the Building Lieutenant's Office, I encountered th[e] offender that was involved in the physical altercation on A1-Building and began questioning hi[m] regarding the circumstances and identity of the other assailant involved in the physical altercation. [I] then proceeded to A1-Building to investigate further and identify the other involved offender. In doin[g] so, I forgot about the previous report involving offender James on B1-Building.

At approximately 0235 hours, the other participant in the physical altercation was identified and was being escorted from the building when Lieutenant Toby Whitfield, via radio, alerted staff that a wheelchair was needed on B1-Building. Along with Sgt. Flowers, I proceeded to B1-Building where,

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

upon arrival, I found offender James in the dayroom area of B3-Dorm standing next to the benches. Upon entering B3-Dorm and making contact with offender James, he kneeled to his knees. Officer Ronald Burt, CO V entered the building followed shortly afterwards by Officer Torrance Stephens, CO V and Officer Kenneth Mangan, CO IV with a wheelchair. Officer Burt and Officer Stephens assisted offender James into the wheelchair and he was moved to the Gurney Unit Medical Department.

Once in the medical department, Sgt. Flowers contacted on-call medical staff at the Beto Unit, due to no on-site medical. Sgt. Flowers stated that he was instructed by Licensed Vocational Nurse Linda McKnight to obtain the offenders vitals. Officer Burt, on Sgt. Flower's instructions, obtained the vitals and reported a temperature of 108 and blood pressure of 89/57. Sgt. Flowers then stated that LVN McKnight had requested that offender James be transported to her location for examination. As offender James was being prepared for transport, he bent over in the wheelchair and became unresponsive. Lt. Whitfield was immediately notified who immediately requested that Central Control request Emergency Medical Services by 9-1-1. Lt. Whitfield reported to the medical department and instructed me to place offender James on a gurney in the emergency room. Officer Stephens moved offender James, by pushing the wheelchair, into the emergency room where I, Lt. Whitfield, and Officer Vincent McKnight, CO V lifted the offender from the wheelchair and placed him on the gurney.

While offender James was on the gurney, his eyes were open but he appeared disoriented. He was taking shallow breaths and, upon checking, Lt. Whitfield indicated that offender James did have a pulse. As a result, Cardiopulmonary Resuscitation was not initiated and offender James was closely monitored until arrival of EMS.

Lt. Whitfield instructed me to notify Warden Dennis Miller of the off-unit transport by EMS; Warden Miller was notified at 0305 hours.

At approximately 0320 hours, EMS arrived and began evaluating offender James' condition. After connecting their equipment which required affixing adhesive pads to offender James' upper body, the EMS requested assistance in moving offender James to their gurney, with Lt. Whitfield assisting in that process. EMS personnel then moved offender James to the ambulance where he was placed inside. One of the EMS personnel requested assistance from an officer. Officer McKnight entered the ambulance and was provided a breathing bag by EMS personnel and, upon instruction, began pumping air into offender James lungs. EMS personnel would stop Officer McKnight's actions in increments so that a tube could be inserted into his mouth, to no avail.

The ambulance remained at the back door of the medical department for several minutes. At 0338 hours the ambulance departs the unit.

Lt. Whitfield instructed me, along with Officer Burt, to go to Palestine Regional Medical Center ("PRMC") via unit van. At 0405 hours, we arrived at PRMC, where offender James was placed in Exam Room #1. PRMC medical staff began life saving measures and at 0410 hours, report offender James has a pulse.

At 0416 hours, Doctor Heidi Knowles pronounced offender James deceased. I immediately notified Lt. Whitfield and am instructed to remain with the remains until I was relieved.

Copy of OIG case to Litigation Support on 04-19-2013 by ice
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

At 0500 hours, Precinct #4 Justice of the Peace James Todd arrived and began his documentation. At 0511 hours, Investigator Mark Owens of the Office of the Inspector General arrived and began his report and obtained photographs. They leave shortly after their arrival.

At approximately 0530 hours, Officer McKnight and Officer Burt depart PRMC enroute back to the facility.

I remained with the remains until Officer John Crawford, CO V relieved me at 0700 hours, at which time; I obtained a total of six (6) digital photos of the offender.

I then returned to the Gurney Unit to provide a statement of my actions in this incident.

Matthew Seda, Sergeant

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

# Texas Department of Criminal Justice
# Correctional Institutional Division

RECEIVED MAY 27 2011

**Employee Training Acknowledgement Form**

To: Unit Risk Manager    Date: May 19, 2011

From: Lt. Toby Whitfield    Subject: Safety Training

☐ Initial Training    ☐ Target Training

☒ Monthly Training    ☐ Annual Training

Department: Security    Shift: 2A

Date(s) Training was conducted: 05/01/2011 - 05/31/2011

Length of training: 10 minutes

Conducted by: Lt. Toby Whitfield

Topic: Hot Weather

**Main points of discussion:**

Increase water intake: at least one gallon should be consumed in extreme heat conditions. Watch for signs of heat stroke, heat exhaustion, and heat cramps. Seek medical attention immediately if you stop sweating or feel dehydrated, dizzy, or get chills. Limit salt intake. Wear long sleeves and a hat; protect as much skin as possible from direct sun exposure. Use sunscreen. Be aware of the heat index and the effects of high humidity.

Number of employees assigned: 62  Number of employees trained: 60

| | Name | Signature |
|---|---|---|
| 1. | Barber, Cody | [signature] |
| 2. | Beumel, Kirk | [signature] |
| 3. | Boyd, Gary | [signature] |
| 4. | Braisher, Enoch | [signature] |
| 5. | Burt, Ronald | [signature] |
| 6. | Caldwell, Tricia | [signature] |
| 7. | Chamberlain, Patricia | [signature] |
| 8. | Cox, Lauren | [signature] |
| 9. | Derrett, Lawanda | [signature] |
| 10. | Dodd, Revoyda | [signature] |

September 2010    RM-06-7

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

| | Name | Signature |
|---|---|---|
| 11. | Douglas, George | |
| 12. | Douglas, Tina | |
| 13. | Duncan, James | |
| 14. | Edwards, Doris | Edwards |
| 15. | Few, Minnie | Few, Minnie |
| 16. | Fitzgerald, Casey | |
| 17. | George, Ashley | George |
| 18. | Golden, Frankie | Golden Frankie |
| 19. | Harris, Glorie | |
| 20. | Harrison, Richard | Richard E. Harrison |
| 21. | Hays, Aaron | Hays |
| 22. | Henson, Connie | FMLA |
| 23. | Hewlett, Annette | |
| 24. | Hill, Michael | FMLA |
| 25. | Hollowell, Bessie | |
| 26. | Hyatt, Albert | Hyatt |
| 27. | Johnson, Marcus | |
| 28. | Kennedy, Oliver | Kennedy |
| 29. | Lane, Donna | Lane |
| 30. | Lane, Terry | |
| 31. | Mangan, Kenneth | K Mangan |
| 32. | Martin, Dena | D. Mat |
| 33. | Martin, Steve | S Martin |
| 34. | McKnight, Vincent | |
| 35. | Melton, Joshua | |
| 36. | Meyners, Nathanael | N Meyners |
| 37. | Milton, Joshua | |
| 38. | Morrow, Deborah | |
| 39. | Ndubueze, Nkechinyere | |
| 40. | Ogungbire, Thomas | |
| 41. | Parker, Rufus | Parker |
| 42. | Paul, Joseph | J. Paul |
| 43. | Peach, Corey | |

September 2010

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

RM-05-8

| | Name | Signature |
|---|---|---|
| 44. | Pedigo, Kimberly | Pedigo |
| 45. | Quick, Jimmy | Jimmy Quick |
| 46. | Rabb, Timothy | Rabb |
| 47. | Raines, Sarah | S Raines |
| 48. | Rogers, Allesia | Rogers |
| 49. | Russell, Christopher | C - Russell |
| 50. | Sandlin, Rickard | Sandlin |
| 51. | Schulle, Deborah | Schulle |
| 52. | Sheffler, Kyle | Kyle Sheffler |
| 53. | Sherrick, Chase | C Sherrick |
| 54. | Stephens, Torrance | Stephens |
| 55. | Tatum, Florine | [illegible] |
| 56. | Upton, Sammy | S Upton |
| 57. | Williams, Dan | Williams |
| 58. | Womack, Marion | M. Womack |
| 59. | Wood, Justin | [illegible] |
| 60. | | |
| 61. | | |
| 62. | | |
| 63. | | |
| 64. | | |
| 65. | | |
| 66. | | |
| 67. | | |
| 68. | | |
| 69. | | |
| 70. | | |
| 71. | | |
| 72. | | |
| 73. | | |
| 74. | Sgt. Flowers, Tully | Sgt. Flowers |
| 75. | Sgt. Hash, James | Sgt Hash |
| 76. | Lt. Whitfield, Toby | Lt. Whitfield |

September 2010

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

RM-06-6

[illegible] AD1064 TEMP EXTREMES IN TDCJ REV. [illegible]

| TEXAS DEPARTMENT OF CRIMINAL JUSTICE | NUMBER: AD-10.64 (REV. 6) |
|---|---|
| | DATE: NOVEMBER [illegible], [illegible] |
| | SUPERSEDES: AD-10.64 (REV. 5) SEPTEMBER 19, 2006 |

ADMINISTRATIVE DIRECTIVE

SUBJECT: TEMPERATURE EXTREMES IN THE TDCJ WORKPLACE

AUTHORITY: TEXAS GOVERNMENT CODE 493.006

REFERENCE: AMERICAN CORRECTIONAL ASSOCIATION (ACA) STANDARDS: 4-4153 AND 4-4337

APPLICABILITY: TEXAS DEPARTMENT OF CRIMINAL JUSTICE (TDCJ OR AGENCY)

POLICY:

THE TDCJ SHALL ESTABLISH GUIDELINES TO ASSIST UNIT ADMINISTRATION IN ADAPTING OFFENDER WORK ASSIGNMENTS TO TEMPERATURES IN THE WORK ENVIRONMENT THAT CANNOT BE CONTROLLED BY THE AGENCY. GUIDELINES FOR OUTSIDE RECREATION ARE FOUND IN THE TDCJ RECREATION DEPARTMENT POLICY MANUAL.

EVERY REASONABLE EFFORT SHALL BE MADE TO PREVENT EXTREME TEMPERATURE-RELATED INJURIES IN THE WORKPLACE. SINCE THE TDCJ HAS UNITS THROUGHOUT THE STATE OF TEXAS, THE DECISION TO EXPOSE OFFENDERS TO EXTREME TEMPERATURE (I.E., COLD/HEAT) SHALL BE MADE BY THE APPROPRIATE ON-SITE STAFF.

TDCJ OFFENDERS ARE, AT TIMES, REQUIRED TO WORK IN CONDITIONS OF EXTREME COLD OR EXTREME HEAT. FREQUENTLY, SITUATIONS MAY OCCUR REQUIRING SPECIFIC WORK BE COMPLETED REGARDLESS OF THE TEMPERATURE OR WEATHER CONDITIONS.

PROCEDURES:

PRIOR TO EXPOSING OFFENDERS TO EXTREME TEMPERATURE CONDITIONS (I.E., COLD/HEAT), THE WARDEN AND INVOLVED DEPARTMENT SUPERVISORS SHALL ENSURE APPROPRIATE MEASURES ARE INSTITUTED WHICH PREVENT EXTREME TEMPERATURE-RELATED INJURIES. THE WARDEN AND INVOLVED DEPARTMENT SUPERVISORS ARE ENCOURAGED TO CONSULT MEDICAL STAFF TO ASCERTAIN SPECIFIC HAZARDS. IN ALL CASES OF TEMPERATURE-RELATED INCIDENTS OR INJURIES, THE UNIT MEDICAL STAFF AND THE UNIT RISK MANAGER SHALL BE NOTIFIED IMMEDIATELY. UPON ARRIVAL ON THE SCENE, MEDICAL STAFF SHALL TAKE CONTROL OF THE INDIVIDUAL'S MEDICAL CARE. THE INJURED OFFENDER SHALL BE REMOVED FROM THE ENVIRONMENT BY THE MOST EXPEDITIOUS MEANS AVAILABLE TO RECEIVE PROPER MEDICAL TREATMENT.

I. PROCEDURES AND EXPOSURE CHARTS (WIND CHILL INDEX "ATTACHMENT A" AND HEAT AND HUMIDITY MATRIX "ATTACHMENT B") ARE PROVIDED TO ASSIST UNIT OFFICIALS IN DETERM[illegible] EXTREME TEMPERATURE CONDITIONS.

Copy of OIG case to Litigation Support on 04.19.2013 by ce:
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

OFFENDER FROM EXTREME TEMPERATURE CONDITIONS AT ALL TIMES.

B. UNIT STAFF SHALL MONITOR THE TEMPERATURE ONCE EVERY HOUR BETWEEN 6:30 A.M. AND 6:30 P.M. THE TEMPERATURE SHALL BE ANNOUNCED OVER THE RADIO AND DOCUMENTED ON THE TEMPERATURE LOG (ATTACHMENT C). IF CONDITIONS WARRANT, THE WARDEN MAY ALSO REQUEST ADDITIONAL READINGS.

C. TEMPERATURE LOG

1. THE WARDEN SHALL DESIGNATE A CENTRAL LOCATION TO MAINTAIN THE TEMPERATURE LOG.

2. THE TEMPERATURE LOG SHALL INDICATE THE WIND CHILL OR HEAT INDEX.

3. TEMPERATURE INFORMATION IS AVAILABLE THROUGH THE FOLLOWING:

A. THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION (NOAA) WEBSITE (WWW.NOAA.GOV);

B. NOAA WEATHER RADIO;

C. LOCAL WEATHER RADIO AND TELEVISION STATIONS; OR

D. ONSITE WEATHER INSTRUMENTATION (IF AVAILABLE).

4. TEMPERATURE LOGS SHALL BE MAINTAINED IN ACCORDANCE WITH THE TDCJ RECORDS RETENTION SCHEDULE.

II. EXTREME COLD CONDITIONS

A. DETERMINATION

1. THE WARDEN SHALL USE THE WIND CHILL INDEX, THE LOCAL NEWS/WEATHER MEDIA AND/OR WEATHER CONDITIONS RECORDED BY INSTRUMENTS LOCATED AT THE UNIT/PICKET IN DETERMINING THE SAFETY OF COLD WEATHER WORKING CONDITIONS.

2. CLOTHING CONSIDERED APPROPRIATE FOR OFFENDERS WORKING IN COLD WEATHER SHALL INCLUDE: THERMAL UNDERWEAR, INSULATED JACKETS, COTTON OR LEATHER GLOVES, INSULATED HOODS, WORK SHOES AND SOCKS. THE WIND CHILL INDEX SHALL BE USED TO DETERMINE THE NEED FOR INSULATED HOODS AND LEATHER GLOVES. APPROPRIATE CLOTHING SHALL BE ISSUED EVEN WHEN THE INDEX INDICATES LITTLE DANGER OF EXPOSURE INJURY.

3. IF GUIDANCE IS NEEDED, MEDICAL STAFF SHALL BE CONTACTED TO DETERMINE APPROPRIATE CLOTHING AND FOOTWEAR NEEDED TO PREVENT COLD INJURY.

4. CARE SHALL BE TAKEN TO PREVENT PERSPIRATION WHICH COULD SOAK CLOTHING AND THUS COMPROMISE THE CLOTHING'S INSULATING VALUE.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED.

THE EFFECTIVE TEMPERATURE AND LEVEL OF PHYSICAL ACTIVITY.

1. HYPOTHERMIA IS A CONDITION OCCURRING WHEN THE BODY LOSES

HEAT FASTER THAN THE BODY CAN PRODUCE IT. WITH THE ONSET OF THIS CONDITION, BLOOD VESSELS IN THE SKIN CONSTRICT (I.E., TIGHTEN) IN AN ATTEMPT TO CONSERVE VITAL INTERNAL BODY HEAT, THUS AFFECTING THE HANDS AND FEET FIRST.

2. IF ONE'S BODY CONTINUES TO LOSE HEAT, INVOLUNTARY SHIVERS BEGIN. THIS REACTION IS THE BODY'S WAY TO PRODUCE MORE HEAT AND IS USUALLY THE FIRST REAL WARNING SIGN OF HYPOTHERMIA.

3. FURTHER HEAT LOSS PRODUCES SPEECH DIFFICULTY, FORGETFULNESS, LOSS OF MANUAL DEXTERITY, COLLAPSE AND FINALLY DEATH.

C. TYPES OF HYPOTHERMIA

HYPOTHERMICS ARE DIVIDED INTO THE FOLLOWING THREE (3) CATEGORIES, DEPENDING ON THE DEGREE OF INJURY.

1. CATEGORY ONE

INJURED INDIVIDUALS ARE CONSCIOUS, BUT COLD, WITH A RECTAL TEMPERATURE ABOVE 90 DEGREES FAHRENHEIT (°F). THESE INDIVIDUALS SHALL BE HANDLED CAREFULLY, INSULATED AND TRANSPORTED TO MEDICAL CARE.

2 CATEGORY TWO

INJURED INDIVIDUALS ARE UNCONSCIOUS AND WITH A RECTAL TEMPERATURE OF 90°F OR BELOW. THESE INDIVIDUALS SHALL BE HANDLED CAREFULLY AND INSULATED FROM FURTHER HEAT LOSS. THE INDIVIDUAL SHALL BE TRANSPORTED TO THE UNIT MEDICAL DEPARTMENT FOR ADDITIONAL CARE.

3. CATEGORY THREE

INJURED INDIVIDUALS ARE COMATOSE WITH NO PALPABLE PULSE AND NO VISIBLE RESPIRATION. ALTHOUGH THESE INDIVIDUALS APPEAR TO BE DECEASED, THE INJURED INDIVIDUAL MAY HAVE A SLIGHT CHANCE OF RECOVERY IF THE RECTAL TEMPERATURE IS 60.8°F OR HIGHER. IF POSSIBLE, MEDICAL STAFF SHALL PROCEED AS FOLLOWS:

A. APPLY POSITIVE PRESSURE VENTILATION WITH OXYGEN.

B. JUDGE THE POSSIBILITY OF ADMINISTERING SUCCESSFUL CARDIOPULMONARY RESUSCITATION (CPR). CONSIDERATION SHALL BE GIVEN TO THE FOLLOWING PRIOR TO ADMINISTERING CPR:

(1) THE DIFFICULTY IN VERIFYING THAT THE HEART HAS STOPPED WITHOUT MEDICAL EQUIPMENT;

(2) THE COMPROMISE OF RESCUERS TO ADMINISTER PROCEDURES [illegible]

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

(3) [illegible]



(5) CONTINUING CIRCULATION BY COMPRESSING A COLD, STIFF CHEST AND HEART MUSCLE IS UNLIKELY.

C. THE INJURED INDIVIDUAL SHALL BE INSULATED AND TRANSPORTED TO A MEDICAL CARE FACILITY.

III. EXTREME HEAT CONDITIONS

A. DETERMINATION

1. GUIDELINES ASSISTING THE WARDEN IN MAKING THE DETERMINATION CAN BE FOUND IN THE HEAT AND HUMIDITY MATRIX. WEATHER CONDITIONS RECORDED BY INSTRUMENTS ON THE UNIT/PICKET OR REPORTS BY THE LOCAL NEWS MEDIA SHALL BE USED CONFIRMING SPECIFIC TEMPERATURE AND HUMIDITY CONDITIONS. WHEN THE TEMPERATURE IS OVER 85°F, THE WARDEN SHALL USE THE HEAT AND HUMIDITY MATRIX TO DETERMINE THE HEAT INDEX. THE HEAT INDEX SHALL BE USED AS AN INDICATOR OF THE RISK FOR HEAT-RELATED INJURY.

2. AT ANY POINT WHEN THE HEAT AND HUMIDITY MATRIX INDICATES THE POSSIBILITY OF HEAT EXHAUSTION OR HEATSTROKE, THE WARDEN SHALL INSTRUCT THE APPROPRIATE STAFF TO IMMEDIATELY INITIATE THE PRECAUTIONARY MEASURES IDENTIFIED IN THE HEAT AND HUMIDITY MATRIX.

3. IF GUIDANCE IS NEEDED, MEDICAL STAFF SHALL BE CONTACTED PRIOR TO EXPOSING OFFENDERS TO EXTREMELY HOT WORKING CONDITIONS TO EVALUATE THE HAZARDS OF THE CURRENT TEMPERATURES AND HUMIDITY, INCLUDING INDOOR WORK AREAS (E.G., BOILER ROOMS). THE HAZARD OF SUNBURN AND OTHER RESULTS OF ULTRAVIOLET (UV) RADIATION SHALL ALSO BE CLOSELY MONITORED.

4. OFFENDERS SHALL BE PROVIDED AND REQUIRED TO WEAR CLOTHING APPROPRIATE FOR THE EFFECTIVE TEMPERATURES AND THE HAZARDS IMPOSED BY UV RADIATION (E.G., LIGHT-COLORED HATS CAN BE USED TO AN ADVANTAGE IN HIGH HEAT AND DIRECT SUNLIGHT).

5. DRINKING WATER SHALL ALWAYS BE AVAILABLE TO OFFENDERS IN CONDITIONS OF HOT WEATHER. ACCORDING TO INDIVIDUAL MEDICAL ADVICE, LIQUIDS CONTAINING SODIUM MAY BE USED DEPENDING ON AN OFFENDER'S STATE OF ACCLIMATIZATION TO HOT WEATHER CONDITIONS.

6. NEWLY ASSIGNED OFFENDERS, WHO MAY NOT BE ACCLIMATED TO THE HEAT, SHALL BE MEDICALLY EVALUATED PRIOR TO EXPOSURE TO SIGNIFICANT HEAT STRESS AND CLOSELY MONITORED BY SUPERVISORS FOR EARLY EVIDENCE OF HEAT INTOLERANCE.

7. HIGH WATER INTAKE, ACCORDING TO THE HEAT AND HUMIDITY MATRIX, SHALL BE ENFORCED.

8. OFFENDERS UNDER TREATMENT WITH DIURETICS OR DRUGS INHIBITING SWEA[illegible]

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

A. DIMINISHED OR ABSENT PERSPIRATION (SWEATING);



B. HOT, DRY AND FLUSHED SKIN; AND

C. INCREASED BODY TEMPERATURES, WHICH IF UNCONTROLLED MAY LEAD TO DELIRIUM, CONVULSIONS AND EVEN DEATH. MEDICAL CARE IS URGENTLY NEEDED.

2. HEAT CRAMP SYMPTOMS INCLUDE:

A. PAINFUL, INTERMITTENT SPASMS OF THE VOLUNTARY MUSCLES FOLLOWING HARD PHYSICAL WORK IN A HOT ENVIRONMENT; AND

B. CRAMPS USUALLY OCCURRING AFTER HEAVY PERSPIRING, AND OFTEN BEGINNING AT THE END OF A WORK SHIFT.

3. HEAT EXHAUSTION SYMPTOMS INCLUDE:

A. PROFUSE PERSPIRING, WEAKNESS, RAPID PULSE, DIZZINESS AND HEADACHES;

B. COOL SKIN, SOMETIMES PALE AND CLAMMY, WITH PERSPIRATION;

C. NORMAL OR SUBNORMAL BODY TEMPERATURE; AND



D. NAUSEA, VOMITING AND UNCONSCIOUSNESS MAY OCCUR.

IV. EMERGENCY TREATMENT

A. IN ALL CASES OF TEMPERATURE-RELATED INCIDENTS OR INJURIES:

1. THE FIRST AID PROCESS SHALL BE INITIATED IMMEDIATELY BY SECURITY OR OTHER UNIT STAFF.

2. MEDICAL STAFF AND THE UNIT RISK MANAGER SHALL BE NOTIFIED IMMEDIATELY.

B. IN EXTREME COLD CONDITIONS, STAFF SHALL:

1. BRING THE INJURED OFFENDER OUT OF THE COLD AND REMOVE WET CLOTHING;

2. WRAP THE INJURED OFFENDER IN WARM BLANKETS OR CLOTHING

3. IF FROSTBITE EXISTS, GENTLY HEAT THE AFFECTED AREA WITH WARM WATER OR WARM TOWELS. DO NOT RUB THE AFFECTED AREA. A HEATING PAD OR HOT WATER BOTTLES MAY ALSO BE USED TO TREAT THE AFFECTED AREA.

4. CONTINUE THE TREATMENT UPON ARRIVAL AT THE [illegible] OR UNTIL THE OFFENDER IS DELIVERED TO MEDICAL STAFF'S CARE;



5. APPLY THE "ABC" OF LIFE SUPPORT (OPEN AIRWAY, ASSIST BREATHING AND RE[illegible]

Copy of OIG case to Litigation Support on 04.19.2013 by ce; UNAUTHORIZED COPYING OR VIEWING PROHIBITED

6. IF COLD INJURY IS SUSTAINED, THE FOLLOWING FIRST AID



[illegible]

B. REMOVE ALL CONSTRICTING ITEMS OF CLOTHING AND FOOTWEAR FROM INJURED AREAS;

C. REMOVE WET CLOTHING AND INSULATE THE OFFENDER WITH DRY CLOTHING AND BLANKETS, ENSURING THE INJURED AREA IS COVERED;

D. DO NOT RUPTURE BLISTERS;

E. ENCOURAGE CONSUMPTION OF WARM, SWEETENED LIQUIDS;

F. IF A LOWER EXTREMITY IS AFFECTED, TREAT AS A STRETCHER PATIENT BY SLIGHTLY ELEVATING THE AFFECTED LOWER EXTREMITY;

G. IF EVACUATION FROM COLD REQUIRES TRAVEL ON FOOT, DO NOT THAW THE AFFECTED AREA UNTIL THE OFFENDER REACHES MEDICAL HELP; AND

H. TRANSPORT THE OFFENDER TO MEDICAL CARE AS SOON AS POSSIBLE.

C. IN EXTREME HEAT CONDITIONS, STAFF SHALL:

1. IMMEDIATELY BEGIN AN ATTEMPT TO DECREASE THE OFFENDER'S TEMPERATURE BY PLACING THE OFFENDER IN A COOL AREA;

2. ONLY FORCE ORAL FLUID INTAKE IF THE OFFENDER IS CONSCIOUS AND ABLE TO SAFELY SWALLOW;

3. REMOVE HEAVY CLOTHING OR EXCESS LAYERS OF CLOTHING; SATURATE REMAINING LIGHTWEIGHT CLOTHING WITH WATER. POSITION THE OFFENDER IN THE SHADE WITH AIR MOVEMENT PAST THE OFFENDER. FAN THE OFFENDER IF NECESSARY TO CREATE AIR MOVEMENT;

4. IF ICE IS AVAILABLE, PLACE ICE PACKS IN ARMPIT AND GROIN AREAS;

5. TAKE ALL OF THESE MEASURES WHILE MOVING THE OFFENDER IN THE MOST EXPEDITIOUS MEANS AVAILABLE TO CONTINUE WITH AND OBTAIN PROPER MEDICAL TREATMENT; AND

6. ENSURE, WHENEVER MEDICAL STAFF ARE ON-SITE, TO CONTINUE TREATMENT AS DIRECTED BY THE PHYSICIAN OR MEDICAL STAFF.

V. TRAINING

A. EACH WARDEN SHALL ENSURE TRAINING IN THE PREVENTION OF TEMPERATURE EXTREME INJURY IS PROVIDED BY UNIT MEDICAL STAFF TO ALL SUPERVISORS DESIGNATED BY THE WARDEN. COLD TRAINING SHALL BE COMPLETED IN SEPTEMBER, AND HEAT TRAINING SHALL BE COMPLETED IN MAY OF EACH YEAR.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

1. SUPERVISORS SHALL [illegible] EMPLOYEES [illegible]



03/DPPM/10 AD10.64 TEMP EXTREMES IN TDCJ (REV 6)

B. A COPY OF ALL TRAINING ROSTERS SHALL BE PROVIDED TO THE UNIT RISK MANAGER AND HUMAN RESOURCES REPRESENTATIVE (STAFF TRAINING). THE UNIT RISK MANAGER SHALL FORWARD A COPY OF THE TRAINING ROSTER TO THE RESPECTIVE REGIONAL RISK MANAGER. THE REGIONAL RISK MANAGER SHALL FORWARD THE TOTAL NUMBER OF EMPLOYEES AND OFFENDERS TRAINED TO THE RISK MANAGEMENT CENTRAL OFFICE.

C. A STANDARDIZED TRAINING PROGRAM SHALL BE DEVELOPED BY THE TDCJ DEPARTMENT OF PREVENTIVE MEDICINE IN CONJUNCTION WITH THE UNIVERSITY OF TEXAS MEDICAL BRANCH (UTMB) DEPARTMENT OF EDUCATION AND PROFESSIONAL DEVELOPMENT.

1. THE INITIAL EXTREME TEMPERATURE CONDITIONS TRAINING IS PROVIDED IN THE PRE-SERVICE TRAINING SESSIONS, AND ADDITIONAL TRAINING SHALL BE PROVIDED IN ANNUAL IN-SERVICE TRAINING SESSIONS.

2. THE TRAINING IS GIVEN IN A GROUP SETTING.

3. ALL UNITS ARE RESPONSIBLE FOR CONDUCTING AN ANNUAL STANDARDIZED TRAINING PROGRAM UTILIZING UNIT-BASED MEDICAL STAFF.

4. REQUESTS FOR SELECTED UNIT TRAINING SHALL BE SUBMITTED TO THE DIRECTOR FOR PREVENTIVE MEDICINE.

BRAD LIVINGSTON
EXECUTIVE DIRECTOR

END AD-10.64 (REV. 6)
CONTACT THE ADMINISTRATIVE REVIEW AND RISK MANAGEMENT DIVISION FOR ATTACHMENTS A, B, AND C.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

4r 2d

**Texas Department of Criminal Justice**
**REPRIMAND FORM**

OIG#: EEO#
MAUF/MIUF#:
SSN: [redacted]

Employee Name: Dodd (Last) Revoyda (First) (MI)
Payroll Job Title: CO IV
Unit/Dept: Joe F.Gurney Unit
Date(s) of Violation(s): 08/13/2011
Date Pre-Hearing Investigation Completed: 09/
VIOLATION(S):
FINDINGS (check one [1])

Level: 2 No. 20 Rule Title: Violation of Statutory Authority/Court ORder/Rules/Regulations/Policies [X] Yes [ ] No

Level: ____ No. ____ Rule Title: ____ [ ] Yes [ ] No

Synopsis of Incident(s):
On 08/13/11 CO Revoyda Dodd received reports from offenders assigned to B#-Dorm of offender James, Kenneth #17268[illegible] being ill and possibly urinating on himself. Officer Dodd observed offender James and notified Sergeant Seda; however, when Serge[illegible] did not respond, she took no further action such as initiating first aid procedures or contacting a lieutenant to obtain assistan[illegible] The incident, which was the eventual death of offender James, was reported as I-11520-08-11.

DISCIPLINARY ACTION:
Is this a subsequent violation(s)? [ ] Yes [X] No If yes, list applicable previous Rule No. violation(s) and disciplinary date[illegible]

Check and complete one (1) or more of the following:

[ ] NO DISCIPLINE IMPOSED (Provide justification at bottom of page.)
[ ] REPRIMAND ONLY
[X] DISCIPLINARY PROBATION: 6 Calendar Months Beginning: 9/22/11 Ending*: 3/2[illegible]/12

*Note to Employee: If you are on a full calendar month of leave without pay during your period of disciplinary probation, including a full calen[illegible] of suspension without pay, the probation period ending date shall be adjusted by adding one full calendar month to the original ending date. If you are in a [illegible] ladder position, any period of disciplinary probation and an adjusted disciplinary probation ending date shall postpone future career ladder salary adjustments.

[ ] SUSPENSION WITHOUT PAY: ____ Workdays Beginning: ____ Return: ____
[ ] REDUCTION IN PAY TO: $ ____ Beginning: ____ Ending: ____
[ ] DEMOTION TO (Title/Salary Group) ____ Beginning: ____ Ending: ____
[ ] DISMISSAL RECOMMENDED, WITH FOLLOWING ACTION DURING INTERIM:
- [ ] Involuntary Use of Compensatory Time/Holiday Time
- [ ] Voluntary Use of Overtime/Vacation Time (Attach a copy of PERS 24, Leave Request)
- [ ] Suspension Without Pay
- [ ] Change to Another Job Assignment
- [ ] Administrative Leave (can only be granted by the Executive Director)

DISCIPLINE IS: [X] Within [ ] Above [ ] Below the guidelines (Provide justification at bottom of page if above or belov

For violations of Rule No. 24 or 25, check one (1) of the following: This violation [ ] did [ ] did not involve an aggravated use of exc[illegible]

**JUSTIFICATION** (If applicable): ____

Dennis Miller Warden I
Reprimanding Authority Name/Title (printed) Signature [signature] Date 9/22/11

**Employee's Acknowledgment: I have been advised of the procedures of progressive disciplinary actions, and my right to file a gr[illegible]evance. I acknowledge receipt of a copy of this reprimand and know the original is to be placed in my Master Human Resources File. If re[illegible]commended for dismissal, I verify the following are my current address and phone number:**

Mailing Address: ____

Phone Number, Including Area Code: ____

Employee Signature: [signature] Revoyda Dodd Date: 9.22.11

**Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004, you are also entitl[illegible] to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.**

Original: Labor Relations Section, HRHQ (with copy of support documentation)
Copy: Employee
Copy: Unit/Department Employee Disciplinary File

PERS 185 (01/09)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

**Texas Department of Criminal Justice**
**NOTIFICATION OF EMPLOYEE HEARING**

OIG # ______
MAUF/MIUF# ______
EEO# ______

DATE: 09/15/11 EMPLOYEE NAME: Dodd, Revoyda SSN: [redacted]

UNIT/DEPT.: Joe F.Gurney Unit PAYROLL JOB TITLE: CO IV

You are scheduled for an Employee Hearing to be held
☒ in person ☐ telephonically ☐ via videoconference at Wardens Office (Location) at 4.15 (am/pm) on 09/22/2011 (mm/dd/yyyy)

The purpose of the Employee Hearing is to consider allegations that you committed the following rule violation(s) as referenced in the Listing of Employee General Rules of Conduct and Disciplinary Violations.

No. L2 # 20 Violation: Violation of Statutory Authority/Court Order/Rules/Regulations/Policies
No. ______ Violation: ______
No. ______ Violation: ______

Synopsis of Incident(s): On 08/13/11 CO IV Revoyda Dodd received reports from offenders assigned to B3-Dorm of Offender James, Kenneth #1726849 being ill and possibly urinating on hiimself. Officer Dodd observed offender James and notified Sergeant Seda. When Wergeant Seda did not respond, she took no further action such as initiating first-aid procedures or contacting a Lieutenant to obtain assistance. The incident, which was the eventual death of offender James was reported as I-11520-08-11.

The hearing shall be conducted in accordance with the PERS 560, Guidelines for Employee Hearings and a copy of these guidelines is being provided to you. These guidelines provide information relating to scheduling extensions, representatives, witnesses and other related matters.

**I ☒ do ☐ do not wish to appear at the Employee Hearing. I understand my failure to appear may constitute a waiver of the right to an Employee Hearing, and the Employee Hearing may be conducted in absentia.**

☐ I wish to waive the 24-hour Notice of Employee Hearing. I understand the Reprimanding Authority or designee may reschedule the hearing to be held earlier than the date and time indicated above. If I have indicated that I wish to attend the Employee Hearing, I shall be notified in writing of the rescheduled time and date prior to the hearing.

☒ I do not wish to waive the 24-hour Notice of Employee Hearing.

Today's Date: 09/16/2011 If Notified in Person, Time Notified: 9.53 ☒ A.M. ______ ☐ P.M.

Revoyda Dodd
Employee Signature

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004, you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.

**Notification of Rescheduled Employee Hearing:**
The Reprimanding Authority or designee has rescheduled the hearing to be held at a different date and time than indicated above. (If later, and outside the applicable scheduling time frame, attach justification.)

The rescheduled hearing shall be held at: ______ (Location) at ______ (am/pm) on ______ (mm/dd/yyy) ______ (Employee Initials/Date & Time [am/pm])

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

PERS 184 (01/09)

Texas Department of Criminal Justice
GUIDELINES FOR EMPLOYEE HEARINGS

Employee Name: Dodd (Last) Revovda (First) (MI) SSN: [redacted]

1. Request for an Extension: If you are on approved sick leave at the time the PERS 184, Notification of Employee Hearing was provided to you, you may make a one-time request for the Employee Hearing date to be rescheduled within calendar days. This request shall be made within 48 hours of receipt of this form, made in writing or made verbally with a written follow-up. You must state the specific reason an extension is necessary. The Reprimanding Authority may deny the request; however, the Reprimanding Authority shall provide you with a written explanation for denying the request.

2. Presenting Your Defense and Use of a Representative: During the Employee Hearing, you may elect to speak for yourself or be represented at the Employee Hearing by a designee of your choice, as long as your representative: (1) does not claim the right to strike; and (2) is not an individual under the supervision, custody or incarceration of the TDCJ. The designation of a representative does not prohibit you from: (1) attending or having input into the Employee Hearing; or (2) responding to questions from the Reprimanding Authority or designee, or your designated representative.

   a. An Employee Hearing is administrative in nature and is not subject to common law or statutory rules of evidence. Objections at the Employee Hearing by you or your representative shall be limited to Agency policy and procedural issues that pertain to the Employee Hearing.

   b. At the beginning of the Employee Hearing, you must specify whether your representative is the party responsible for presenting your defense. Both you and your representative may provide information to the Reprimanding Authority for consideration. However, only one (1) person may be designated as the party responsible for presenting your defense, and only one (1) person may speak at a time. Regardless of the party responsible for presenting your defense, you and your representative shall be allowed to have quiet conversations regarding information that may be provided to the Reprimanding Authority.

3. Witnesses on Your Behalf: You may elect to have witnesses with first-hand knowledge of the events under review provide testimony on your behalf. The Agency is under no obligation to interview or consider testimony from character witnesses or witnesses with "hearsay" information. Prior to the hearing, it is your responsibility to: (1) obtain statements from witnesses for presentation at the Employee Hearing; (2) provide any written questions for witnesses to the Reprimanding Authority; or (3) arrange for witnesses to be available to present testimony during the hearing at the Reprimanding Authority's discretion. If you provide written questions, the Reprimanding Authority or designee is not required to ask these questions. If the Reprimanding Authority elects to ask the witnesses these questions, this may occur prior to or after the Employee Hearing. If witnesses are available to appear in person at the Employee Hearing, the Reprimanding Authority has the discretion to determine whether the witnesses are questioned. Witnesses who are available to appear on the employee's behalf shall be available at no expense to the Agency other than the recording of such time as time worked.

4. Witnesses Appearing on Behalf of the Reprimanding Authority: At the Reprimanding Authority's discretion, you may be allowed to ask questions of a person(s) who appears at the Employee Hearing as a witness(es) against you.

5. Conduct by Participants: All parties, including your representative, shall conduct themselves in a professional manner and afford the persons present due respect. Only one (1) reminder of the conduct expected at the Employee Hearing may be issued. The offending party may be required to leave the proceedings if conduct that is contradictory to these guidelines continues. If you or your representative leaves during the proceedings, the Employee Hearing may be conducted and concluded in your or your representative's absence.

6. Recording of an Employee Hearing: Audio taping, video taping or verbatim written recording of an Employee Hearing is not permitted. Note taking is permissible.

7. Americans with Disabilities Act (ADA) Accommodation: You may notify the TDCJ ADA Coordinator, Human Resources Division, if you require an accommodation.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

8. Time Reporting/Expenses:

   a. Your attendance at the Employee Hearing or attendance by an employee acting as a witness shall be [illegible] official business, and you and any employee acting as a witness shall be released by the supervisor on [illegible] during working hours. You and any employee acting as a witness are required to provide sufficient advan[illegible] to the supervisor to ensure adequate staffing.

   b. There is no authority for the Agency to pay compensation to or reimburse the expenses of a representative, [illegible] the representative is a state employee or an individual from outside state service. Appearance as a represe[illegible] an Employee Hearing shall not be considered official business. If an employee acting as a representative a[illegible] Employee Hearing held during working hours, that employee must obtain prior approval to use accrued le[illegible] accrued leave is not available, leave without pay to attend the Employee Hearing.

9. Copies of Investigative Files: At the time of this notification, you were provided a copy of the applicable pre[illegible] investigation report along with support documentation that is subject to disclosure and being used as evidence. In [illegible] obtain copies of evidence that is not subject to disclosure (e.g., confidential portions of OIG and EEO reports), [illegible] request the documents in writing through a Public Information request. The request shall be processed in accorda[illegible] the rules governing a Public Information request, and the requested documents may not be available before the E[illegible] Hearing.

10. Dismissal Recommended: If the Employee Hearing results in a dismissal recommendation, you shall have the op[illegible] to request independent dismissal mediation in accordance with PD-35, "Independent Dismissal Mediation and [illegible] Resolution."

11. Grievance: You may submit a grievance in accordance with PD-30, "Employee Grievance Procedures" rel[illegible] disciplinary action after it has been imposed.

Reveuda Dodd
Employee Signature

9.16.11
(mm/dd/yyyy)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
EMPLOYEE OFFENSE AND PRE-HEARING INVESTIGATION REPORT

**Purpose:** This form shall be used to record alleged violations of rules or regulations by employees. It shall also serve as a pre-hearing investigation report. If additional space is needed for any portion of this report, a continuation sheet may be attached.

**I. To be completed by the Charging Official:**

**Employee Name:** Dodd (Last) Revoyda (First) (MI) **SSN:** ____________

**Payroll Job Title:** Correctional Officer IV **Date(s) of Incident(s):** August 13, 2011 (mm/dd/yyyy)

**Description of employee's specific conduct (do not reference Rule No. or describe the rule): On August 13, 2011, Correctional Officer IV Revoyda Dodd received reports from offenders assigned to B3-Dorm of offender James, Kenneth #1726849 being ill and possibly urinating on himself. Officer Dodd observed offender James and notified Sergeant Matthew Seda; however, when Sergeant Seda did not respond, she took no further action such as initiating first-aid procedures or contacting a lieutenant to obtain assistance. The incident, which was the eventual death of offender James, was reported as I-1152[illegible]-08-11. See attached IOC for additional information.**

*The employee's conduct may be a violation of Rule No.:* #20 - Violation of Policy

Ricky Minton, Lieutenant — [signature] — September 14, 2011
**Charging Official Name/Title (print)** — **Signature** — **Date**

**II. Employee's Statement:** The pre-hearing investigator shall obtain an employee's statement even when a Use of Force (UOF) Fact-Finding Inquiry, Risk Management Incident Review Board or Office of the Inspector General (OIG) investigation has been conducted. I, Revoyda Dodd have already submitted a statement, (see attached page)

**Employee's Signature:** Revoyda Dodd **Date:** 9.14.11

Note to Employee: With few exceptions, you are entitled upon request: (1) to be informed about the information the Agency collects about you; and (2) under Texas Government Code §§552.021 and 552.023, to receive and review the collected information. Under Texas Government Code §559.004 you are also entitled to request, in accordance with the Agency's procedures, that incorrect information the Agency has collected about you be corrected.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

PERS 325 (01/09)

Texas Department of Criminal Justice
EMPLOYEE OFFENSE AND PRE-HEARING INVESTIGATION REPORT

**IV.     Pre-Hearing Investigator's Review/Recommendation:**

An Employee Pre-Hearing Investigation Report (i.e., EPHIR) was conducted on 14
September 2011 regarding Officer Dodd's failure to respond in a timely manner to an
offender medical emergency (offender James #1726849 [heat extreme related
symptoms]) that resulted in death.  The EPHIR relied on statement(s) submitted by staff,
the Incident Report #I-11520-08-11, and Officer Dodd's Employee Statement from
Section II. of the EPHIR.

Officer Dodd initially informed Sgt. Seda that offender James #1726849 was reported to
be displaying symptoms of dizziness and disorientation.  A time period of over one hour
elapsed without Sgt. Seda responding.  Officer Dodd did not make follow-up contact with
Sgt. Seda or other supervisory staff available on the unit.  Also, Officer Dodd failed to
check on the offender during this time period or offer first aid assistance as required by
Agency Policy (AD-10.64 [rev. 6])..

Based on statements provided by staff, Incident Report #I-11520-08-11, and Officer
Dodd's employee statement, the Pre-Hearing Authority recommends disciplinary action
for the following violation of Agency Policy:

PD-22, Rule #20, Violation of Statutory Authority/Rule, Level 2.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

III. Witnesses: See attached.

IV. Pre-Hearing Investigator's Review/Recommendation:

Employee Hearing: ☒ Yes ☐ No If Yes, Alleged Rule Violation No(s): ______

Comments: (See attached)

Jesse Wicks, Asst. Warden
Investigator's Name/Title (print) Signature [signature] Date 9/14

V. Reprimanding Authority's Action:

☒ Proceed to Employee Hearing Alleged Rule Violation No(s): 20

☐ No Employee Hearing and no action taken

☐ No Employee Hearing and other action taken (e.g., dispute resolution, training). Attach explanation of action taken.

Dennis Miller Warden
Reprimanding Authority's Name/Title (print) Signature [signature] Date 9/15/1

PERS 325 (01/09)

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Reprimanding Authority<br>Joe F. Gurney Transfer Facility | Date | September 14, 2011 |
| From | Ricky Minton, Lieutenant<br>Joe F. Gurney Transfer Facility | Subject | **Employee Offense Report:**<br>Officer Revoyda Dodd, CO IV |

On August 13, 2011 at 0416 hours, offender James, Kenneth #1726849 was pronounced deceased by Medical Doctor Heidi Knowles at Palestine Regional Medical Center. The death of offender James was reported as incident number I-11520-08-11 and an Administrative Review was conducted according to agency policy. During the Administrative Review, it was determined that Correctional Officer V Revoyda Dodd violated agency policy as it relates to the subsequent response to the incident once it became known to security staff that offender James was in distress and may need medical attention.

On August 13 at approximately 0015 hours, while conducting a count in B3-Dorm, Officer Dodd was approached by unknown offenders in the area of B3-23 bunk, the assigned housing for offender James, and advised that offender James had urinated on himself. Officer Dodd reported that she observed offender James in his assigned bunk and that he "was restless and moving around in his bunk." She then completed her count on the remaining housing areas on the building; however, returned to B3-Dorm due to multiple offenders not being properly dressed in the dayroom; however, did not make any observations or attempt to assist offender James while in the area. Shortly afterwards, Officer Dodd observed offender James as he was exiting the restroom area. She reported that, while he was walking, he "bumped into the wall of the restroom. urinal and began to stumble." After conferring with Correctional Officer V Doris Edwards, also assigned to the housing area,

Officer Dodd reported to Sergeant Matthew Seda the reports she received from offenders and her observations of offender James. Sergeant Seda indicated that he would report to her building at the conclusion of the unit count; however, never did so. Officer Dodd, other than observing the offender while he was lying in his assigned bunk, took no further action, did not initiate any first-aid procedures nor did she contact another supervisor when it was apparent that Sergeant Seda was not reporting to her building to investigate her report.

At approximately 0235 hours, offender James was escorted to the unit medical department and eventually to Palestine Regional Medical Center where he was pronounced dead by Medical Doctor Heidi Knowles.

AD-10.64 (rev. 6) *Temperature Extremes in the TDCJ Workplace,* section IV.A reads:

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

"In all cases of temperature related incidents or injuries: (1) The first aid process shall be initiated immediately by security or other unit staff. (2) Medical staff and the unit risk manager shall be notified immediately."

On May 19, 2011, Officer Dodd acknowledged by her signature that she was trained on AD-10.64 (rev. 6) and the dangers of extreme temperatures to include the warning signs of heat exhaustion and the appropriate response to heat related injuries. *See Employee Training Acknowledgement Form, May 19 2011. Also, see copy of AD-10.64 (rev. 6) Temperature Extremes in TDCJ Workplace.*

Further, Officer Dodd was aware of the symptoms of heat related illnesses and is required to maintain in her possession at all times while working, a heat related illness card to guide her with this concern. That card lists the symptoms of heat illness which consist of, in part, loss of coordination which is one of the symptoms she reported to have observed during her dealings with offender James. *See heat illness card.*

While true that it may be impossible to say with any degree of certainty that a more immediate response would have resulted in offender James' survival, it is equally impossible to say that a more immediate response would have not resulted in his survival.

Officer Dodd, by failing to immediately initiate first aid procedures for offender James was in violation of PD-22 *General Rules of Conduct for Employees*, specifically:

**Rule No. 20: Violation of Statutory Authority/Court Order/Rules/Regulations/Policies:**
It is the employee's responsibility to know, have a clear understanding of and comply with rules, regulations, policies, court orders and statutory authority governing the operation of the Agency. Not being aware of the existence of any of the aforementioned is not a defense for violation of the same.

The specific policy violated in this case, as stated, was the failure to immediately initiate the first aid process for offender James.

This report is submitted to the unit reprimanding authority for review and disposition as appropriate.

Ricky Minton, Lieutenant
Joe F. Gurney Transfer Facility

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

To Lieutenant Toby Whitfield Date August 13, 2011

From Revoyda Dodd, COIV Subject Offender James, Kenneth #1726849

At approximately 2200 hours I, Revoyda Dodd COIV reported to my assigned duty post on B1-building as the control picket officer. At approximately 0015 hours I was conducting a bed book count in B3-dormitory. When arrived around B323 bunk, the offenders around 23-bunk, informed me that offender James, Kenneth #1726849 had urinated on himself. I approached B3-23 bunk and identified him by his TDCJ-ID card for the purpose of the bed book count.

The offender was lying in his assigned bunk. The offender was restless and was moving around in his bunk. I did not notice any urine on the offender at this time. I completed my bed book count for the rest of the building and before returned to the control picket I went back into B3-dormitory due to several offenders not being properly dressed in the dayroom. Shortly afterwards, I was in the control picket and noticed offender James sitting on the toilet in the restroom area. I then observed the offender leaving the restroom area. While he was walking, he bumped into the wall of the restroom, urinal and began to stumble. The offender made it back to his living area and fell into his bunk. I asked Officer Doris Edwards if she seen what the offender did. I notified Sergeant Matthew Seda that the offender appeared to be drunk or on some kind of medication.

I went on with my normal duties in the control picket and continued to monitor offender activity in the dorm.

When Officer Glorie Harris came into the building, she noticed the offender in the dayroom and called Lieutenant Toby Whitfield on the radio. The offender was standing in the dayroom and would not respond to her questions. Shortly afterwards, Sergeant Tully Flowers, Sergeant Seda, Officers Ronald Burt COV, Kenneth Mangan COIV and Torrance Stephens COV arrived on the building with a wheelchair. The offender was placed in the wheelchair and transported out of the building.

I then returned to my normal duties.

Revoyda Dodd CO4

Revoyda Dodd, COIV
Joe F. Gurney Transfer Facility

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

SO-4

Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Lieutenant Toby Whitfield | Date | August 13, 2011 |
| From | Doris Edwards, COV | Subject | Offender James, Kenneth #1726849 |

At approximately 1800 hours I, Officer Doris Edwards COV was assigned to the control picket of B1-buildin[illegible] When I arrived on the Officer Brandon Matthews was in the control picket. I began to inventory the equipment [illegible] the building. At no time while first shift officers were on the building was I notified of any offenders being ill.

Until the special bed book count, at no time did I observe offender James, Kenneth #1726849 in any kind [illegible] distress.

At approximately 0005 hours, I conducted the count on B1-building. When I entered B3-dormitory, the offende[illegible] in the dorm told me that offender James was in his bed and urinated on himself. When I went over to his bun[illegible] the offender didn't say anything about urinating on himself. When I looked at him, he looked back at me. He d[illegible] not look to be in distress at this time.

While Officer Revoyda Dodd COIV was conducting the bed book count, I observed the offender go to th[illegible] restroom area and back to his bunk area. He appeared to be dizzy while he was walking, he was wobbling bac[illegible] and forth as he was walking. Offenders in the housing area came up to the intercom and told me that offende[illegible] James was sick.

While I was calling in the count, I notified Sergeant Matthew Seda and he informed me to keep an eye on th[illegible] offender.

After Sergeant Seda told me to watch the offender, I did not notice any more abnormal behavior from the offende[illegible]

Shortly afterwards, Officer Glorie Harris COIV entered the building after coming in from the outside perimeter picket. I notified her that other offenders in the dorm stated that offender James had urinated by his bunk an[illegible] was not urinating in the urinal.

At approximately 0200 hours, I exited the building to assist with other activities that were taking place on the unit.

At approximately 0240 hours, I was on the main hallway when Officer Torrance Stephens COV was pushing offender James in a wheelchair toward the unit infirmary. The offender was sitting up.

I remained on the main hallway.

Doris Edwards CoV

Doris Edwards, COV
Joe F. Gurney Transfer Facility

SO-4

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED



Texas Department of Criminal Justice
CORRECTIONAL INSTITUTIONS DIVISION

# Inter-Office Communications

| | | | |
|---|---|---|---|
| To | Toby Whitfield, Lieutenant<br>Joe F. Gurney Transfer Facility | Date | August 13, 2011 |
| From | Matthew Seda, Sergeant MS<br>Joe F. Gurney Transfer Facility | Subject | I-11520-08-11 |

On August 13, 2011 at approximately 0020hours, I, Sergeant Matthew Seda, was in the Building Lieutenant's Office assisting with the unit count. This was a bed book count which required that assist by verifying the first count sheets that are turned in and then conducting a thorough check of the bed book rosters to ensure that all offenders were accurately accounted for in my area of assignment, the West End of the facility.

During this count, Officer Doris Edwards, CO V called and notified me that an offender on B1-Building later identified as offender James, Kenneth #1726849, appeared dizzy and may have urinated on himself. After verifying that the offender was in a secured area, I instructed Officer Edwards to maintain a visual on the offender and that I would respond when able. If the situation warranted a more immediate response that she was to let me know.

After talking to her, Officer Robert Tatum, CO IV entered the Building Lieutenant's Office accompanied by an offender who works for him in the Food Service Department, and reported that he had injuries consistent with having been involved in a recent physical altercation.

Immediately after the report by Officer Tatum, Officer Revoyda Dodd, CO IV, while calling in her count, notified me of similar behavior of offender James and was provided the same instructions.

Officer Edwards and Officer Dodd were instructed to notify me if the situation required an immediate response.

During this time, Sergeant Tully Flowers was also assisting with the unit count, conducting the same verifications of count sheets for the East End of the facility.

At 0035 hours, the unit count cleared. Upon exiting the Building Lieutenant's Office, I encountered the offender that was involved in the physical altercation on A1-Building and began questioning him regarding the circumstances and identity of the other assailant involved in the physical altercation. I then proceeded to A1-Building to investigate further and identify the other involved offender. In doing so, I forgot about the previous report involving offender James on B1-Building.

At approximately 0235 hours, the other participant in the physical altercation was identified and was being escorted from the building when Lieutenant Toby Whitfield, via radio, alerted staff that a wheelchair was needed on B1-Building. Along with Sgt. Flowers, I proceeded to B1-Building where.

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

upon arrival, I found offender James in the dayroom area of B3-Dorm standing next to the benche Upon entering B3-Dorm and making contact with offender James, he kneeled to his knees. Offic Ronald Burt, CO V entered the building followed shortly afterwards by Officer Torrance Stephens, C V and Officer Kenneth Mangan, CO IV with a wheelchair. Officer Burt and Officer Stephens assiste offender James into the wheelchair and he was moved to the Gurney Unit Medical Department.

Once in the medical department, Sgt. Flowers contacted on-call medical staff at the Beto Unit, due to r on-site medical. Sgt. Flowers stated that he was instructed by Licensed Vocational Nurse Linc McKnight to obtain the offenders vitals. Officer Burt, on Sgt. Flower's instructions, obtained the vita and reported a temperature of 108 and blood pressure of 89/57. Sgt. Flowers then stated that LV McKnight had requested that offender James be transported to her location for examination. A offender James was being prepared for transport, he bent over in the wheelchair and becam unresponsive. Lt. Whitfield was immediately notified who immediately requested that Central Contr request Emergency Medical Services by 9-1-1. Lt. Whitfield reported to the medical department an instructed me to place offender James on a gurney in the emergency room. Officer Stephens move offender James, by pushing the wheelchair, into the emergency room where I, Lt. Whitfield, and Office Vincent McKnight, CO V lifted the offender from the wheelchair and placed him on the gurney.

While offender James was on the gurney, his eyes were open but he appeared disoriented. He wa taking shallow breaths and, upon checking, Lt. Whitfield indicated that offender James did have a pulse As a result, Cardiopulmonary Resuscitation was not initiated and offender James was closely monitore until arrival of EMS.

Lt. Whitfield instructed me to notify Warden Dennis Miller of the off-unit transport by EMS; Warde Miller was notified at 0305 hours.

At approximately 0320 hours, EMS arrived and began evaluating offender James' condition. Afte connecting their equipment which required affixing adhesive pads to offender James' upper body, th EMS requested assistance in moving offender James to their gurney, with Lt. Whitfield assisting in tha process. EMS personnel then moved offender James to the ambulance where he was placed inside. On of the EMS personnel requested assistance from an officer. Officer McKnight entered the ambulanc and was provided a breathing bag by EMS personnel and, upon instruction, began pumping air int offender James lungs. EMS personnel would stop Officer McKnight's actions in increments so that a tube could be inserted into his mouth, to no avail.

The ambulance remained at the back door of the medical department for several minutes. At 0338 hour the ambulance departs the unit.

Lt. Whitfield instructed me, along with Officer Burt, to go to Palestine Regional Medical Cente ("PRMC") via unit van. At 0405 hours, we arrived at PRMC, where offender James was placed in Exam Room #1. PRMC medical staff began life saving measures and at 0410 hours, report offende James has a pulse.

At 0416 hours, Doctor Heidi Knowles pronounced offender James deceased. I immediately notified Lt. Whitfield and am instructed to remain with the remains until I was properly relieved.

Copy of OIG case to Litigation Support on 04.19.2013 by ce
UNAUTHORIZED COPYING OR VIEWING PROHIBITED

At 0500 hours, Precinct #4 Justice of the Peace James Todd arrived and began his documentation. At 0511 hours, Investigator Mark Owens of the Office of the Inspector General arrived and began his report and obtained photographs. They leave shortly after their arrival.

At approximately 0530 hours, Officer McKnight and Officer Burt depart PRMC enroute back to the facility.

I remained with the remains until Officer John Crawford, CO V relieved me at 0700 hours, at which time; I obtained a total of six (6) digital photos of the offender.

I then returned to the Gurney Unit to provide a statement of my actions in this incident.

Matthew Seda, Sergeant

Copy of OIG case to Litigation Support on 04.19.2013 by ce.
UNAUTHORIZED COPYING OR VIEWING PROHIBITED