UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 270

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   STEPHEN McCOLLUM and        §
     SANDRA McCOLLUM,            §
 4   individually and as        §
     independent administrator  §
 5   of the Estate of LARRY      § Civil Action
     GENE McCOLLUM,              §
 6                              § Number 4:14-CV-3253
                                §
 7              Plaintiffs,     §
                                §
 8   vs.                        §
                                §
 9                              §
     BRAD LIVINGSTON, JEFF       §
10   PRINGLE, RICHARD CLARK,    §
     KAREN TATE, SANDREA        §
11   SANDERS, ROBERT EASON,     §
     THE UNIVERSITY OF TEXAS    §
12   MEDICAL BRANCH and THE     §
     TEXAS DEPARTMENT OF        §
13   CRIMINAL JUSTICE,          §
                                §
14              Defendants.     §

15   ----------------------------------------------------

16

17

             ORAL AND VIDEOTAPED DEPOSITION OF
18
                 CHARLES ADAMS, M.D.
19
                   MAY 18, 2016
20

21

     ----------------------------------------------------
22

23

24

25
```

1          ORAL AND VIDEOTAPED DEPOSITION OF CHARLES

2    ADAMS, M.D., produced as a witness at the instance

3    of the PLAINTIFFS, and duly sworn, was taken in the

4    above-styled and numbered cause on MAY 18, 2016,

5    from 8:22 a.m. to 4:54 p.m., before Melody Reneé

6    Campbell, CSR in and for the State of Texas,

7    reported by method of machine shorthand, at the

8    offices of the Attorney General, 300 West 15th

9    Street, Austin, Texas, pursuant to Notice and Court

10   Order and the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:
             Mr.  Jeff Edwards, Esq.
 3           Mr. Scott Medlock, Esq.
             The Edwards Law Firm
 4           1101 East Eleventh Street
             Austin, Texas  78702
 5           512.623.7727
             512.727.3365 (Fax)
 6           Jeff@edwards-law.com
             Scott@edwards-law.com
 7

 8

 9   FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
             Mr. Graig J. Alvarez, Esq.
10           Ms. Kara Philbin, Esq.
             Fernelius Alvarez Simon
11           1221 McKinney Street, Suite 3200
             Houston, Texas  77010
12           713.654.1200
             GAlvarez@fa-lawfirm.com
13           KPhilbin@f-alawfirm.com
                   -and-
14           Ms. J. Lee Haney, Esq.
             Assistant Attorney General
15           Office of the Attorney General of Texas
             P.O. Box 12548, Capitol Station
16           Austin, Texas  78711
             512.463.2080
17           512.963.2109 (Fax)
             Lee.Haney@texasattorneygeneral.gov
18

19
     OR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE,
20   RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT
     EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
21           Mr. Derek Kammerlocher, Esq.
             Mr. Phillip Boyd, Esq.
22           Assistant Attorney General
             Post Office Box 12548
23           Austin, Texas  78711
             512.463.2080
24           512.936.2109
             Derek.Kammerlocher@texasattorneygeneral.gov
25           Phillip.Boyd@texasattorneygeneral.gov
```

```
 1    ALSO PRESENT:
              Dr. Glenda Adams
 2            Ms. Shanna Molanre
              Ms. Ashley Palermo
 3            Ms. Jennifer Osteen
              Ms. Jennifer Daniel
 4            Ms. Deborah M. Woltersdorf
              Mr. Kevin J. Schaefer (Videographer)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    testimony.

2              MR. ALVAREZ:  And asked and answered.

3    And I agree and join in those objections.

4              THE WITNESS:  Do you want me to

5    answer?

6              MR. ALVAREZ:  Yeah.  It's asked and

7    answered.  But if you want to answer it, go ahead.

8         A.   I answered it.  They deserve to be

9    protected from heat.  And I have no knowledge about

10   the armory at Hutchins.

11        Q.   (BY MR. EDWARDS)  If the Texas Department

12   of Criminal Justice is air-conditioning the bullets

13   in the armory and not air-conditioning the housing

14   areas where Mr. McCollum lived and suffered a

15   heatstroke and eventually died, do you think that

16   they're providing the same amount of protection from

17   the heat?

18             MR. KAMMERLOCHER:  Objection; calls

19   for speculation and incomplete hypothetical.

20        A.   Well, there's really nothing the bullets

21   can do for themselves.  Again -- and I'll go back to

22   my default.  I think adequate hydration does a whole

23   lot to prevent heatstroke.  I do.

24             MR. EDWARDS:  I guess I'll object,

25   nonresponsive, after, "Well, there's really nothing

1    the bullets can do for themselves."

2         Q.  (BY MR. EDWARDS)  Okay.  So you go to -- I

3    mean not only -- this is about the Gurney Unit.

4    Right?  This --

5         A.  Are we through with this one?

6         Q.  No.  We're just getting started.

7              MR. ALVAREZ:  We really haven't even

8    gotten started yet, have we?

9              MR. EDWARDS:  I don't think we have.

10        Q.  (BY MR. EDWARDS)  You mentioned a

11   long-term strategy.  You need a better long-term

12   strategy than drink some water.  Right?

13        A.  Well, I think --

14             MR. KAMMERLOCHER:  Objection;

15   mischaracterizes testimony.

16        A.  There's other options.  I'm not a

17   mechanically inclined person.  I don't know what

18   those would be.  But I threw out the fact that I

19   think we need a long-term strategy for this kind of

20   weather.  Now, I don't know what it would be.

21        Q.  Fair enough.  You're not mechanically

22   inclined, you're not capable of designing a cooling

23   system.  Is what you're telling me?

24        A.  I promise you, I'm not.

25        Q.  But you are capable of knowing that it's

1    really hot and that -- right?

2         A.    Yes.

3         Q.    Okay.  And so it would seem to me that the

4    long-term strategy ought to be cooling the

5    temperatures down.

6         A.    And that probably could be done in a

7    variety of ways, and I just don't know what they

8    would be.

9         Q.    Fair enough.  But make no mistake, when

10   you say long-term strategy, it needs to be to get

11   the temperatures down so that this doesn't happen in

12   the future.  Right?

13        A.    Well, that's certainly what I was

14   implying, I think.

15        Q.    Appreciate that.  Given the obvious

16   implication of that and what you're testifying

17   today -- did anybody call you up from UTMB or TDCJ

18   to say, let's work on a long-term strategy?

19                  MR. KAMMERLOCHER:  Objection; vague.

20        A.    No.

21        Q.    (BY MR. EDWARDS)  Have you ever been --

22   have you ever been on kind of a long-term strategy

23   planning committee with relation to cooling down the

24   temperatures in any prison units?

25        A.    No.

1          A.    Well, that's why he substituted -- that's

2     why he substituted hydrochlorothiazide.  He stopped

3     one medicine and started another.

4          Q.    Right.  And I thought you told me he did

5     that because clonidine is not a good medication for

6     hypertension and you don't prescribe it, anyway, for

7     nonemergencies?

8          A.    Correct.

9          Q.    Okay.  So he takes -- he takes

10    Mr. McCollum off of the clonidine and he replaces it

11    with hydrochlorothiazide?

12         A.    Correct.

13         Q.    Now, did Dr. Babbili -- or PA Babbili meet

14    with Mr. McCollum before making this decision?

15         A.    It doesn't appear so.

16         Q.    Would you agree that, when you're taking

17    somebody off of medication like clonidine, you ought

18    to meet with the patient?

19         A.    I would.

20         Q.    Okay.  Now, another thing it says here, it

21    says -- it says that it warranted initial assessment

22    of blood pressure and subsequent monitoring.

23         A.    Uh-huh.

24         Q.    So does that mean that when you meet with

25    him, you would have taken the blood pressure to

1    determine is it elevated, is it low, is it

2    controlled, is it uncontrolled, that type of thing?

3         A.   Correct.

4         Q.   Okay.  That was not done?

5         A.   It was not done.

6         Q.   Okay.  I guess if you say you would have

7    done that, presumably it would be possible to do

8    that, to meet with Mr. McCollum as a medical

9    provider at the Hutchins Unit.  Right?

10         A.   Yeah.  And I -- I think many providers

11    would have done that.

12         Q.   Many providers would have met with

13    Mr. McCollum?

14         A.   Brought him in, got his blood pressure,

15    change -- told him, we're changing your medicine,

16    here is the deal.

17         Q.   And I want to make sure.  Many prison

18    medical providers would have done that.  Right?

19         A.   Sure.

20         Q.   Because the standard of care requires it.

21    Right?

22         A.   Yes.

23         Q.   And because people at prison, as I've

24    heard throughout this case, deserve the same

25    standard of care as a free-world clinic.  Right?

1         A.    Yes.

2         Q.    All right.  So that wasn't done.  The

3    blood pressure wasn't done.  Now, the subsequent

4    monitoring, what does that mean?  Does that -- what

5    does that mean?

6         A.    Bringing them in a couple of times over

7    the next couple days to take a random blood

8    pressure.

9         Q.    Okay.  So had the standard of care been

10   followed, we would know what Mr. McCollum's blood

11   pressure was day one of him coming into the prison.

12   Right?

13        A.    Yeah.  Day one or two, depending on when

14   he came in.

15        Q.    Fair enough.  Day one or two.  And also,

16   because if you're going to take somebody's blood

17   pressure, you would certainly take their vital

18   signs.  Right?

19        A.    Yeah.  That's part of your vital signs.

20        Q.    So we would also know his temperature, his

21   respiratory rate and his pulse rate.  Right?

22        A.    Correct.

23        Q.    And if you're going to be examining a

24   patient and taking the vital signs, presumably you

25   could also have done an intake physical?

1    When would you do the check, the monitoring?

2         A.   At least the next day and probably the day

3    following.

4         Q.   Okay.  So that means that sometime

5    within -- certainly by day two his blood pressure

6    and vital signs would have been checked, Larry

7    McCollum, if things had been done correctly.  Right?

8         A.   Yes.

9         Q.   And then certainly by days three and four

10   he would have been brought back to the clinic for

11   another blood pressure check on those two days,

12   right, if things were done properly?

13        A.   That would be my preference, yes.

14        Q.   And I think you told me that it generally

15   takes about three days to get a number from TDCJ.

16   Is that accurate?

17        A.   Three to four.

18        Q.   Three to four.  So assuming that he was

19   coming in day three or four, he would have had his

20   number and you could -- and Doctor -- PA Babbili or

21   somebody else, Dr. Org, there could have done an

22   intake physical.  Right?

23        A.   Yes.

24        Q.   Okay.

25        A.   Excuse me.  Depending on the time and how

1    the process is working at that unit, and -- you

2    know, because they have got to get a dental exam.

3    They have got a bunch of stuff they have to do on

4    the day they get their physical, including lab work

5    and that stuff.

6         Q.   Would have been three more chances for a

7    competent medical provider to notice that

8    Mr. McCollum is morbidly obese and needs a lower

9    bunk restriction, though.  Right?

10        A.   True.

11        Q.   And it would have been three more times to

12   determine if Mr. McCollum's blood pressure was out

13   of whack.  Right?

14        A.   Well, we don't know that it was.

15        Q.   Well, we don't know because nobody took

16   his blood pressure.  Right?

17        A.   True.

18        Q.   So it would have been three or more times

19   to determine if his blood pressure was out of whack

20   or not out of whack.  Right?

21        A.   I agree.

22        Q.   And it would be three or four more times

23   to check his temperature to determine whether or not

24   he was getting sick.  Right?

25        A.   Okay.

```
 1              Q.    Is that true?

 2              A.    True.

 3              Q.    And it would have been three or four more

 4     times to determine if he was adequately hydrating.

 5     Right?

 6              A.    Possibly.

 7              Q.    Three or four more times to determine if

 8     he was --

 9              A.    It would have been seen.

10              Q.    Sure.  Because he would have been seen, it

11     would have been three or four more times for him to

12     be noticed whether or not he was profusely sweating.

13     Right?

14              A.    Uh-huh.

15              Q.    Is that true?

16              A.    He would have been seen by a provider,

17     yes.

18              Q.    And if he was profusely sweating, that

19     would have -- should have been noticed by a

20     provider.  Right?

21              A.    We don't know that he was, because he

22     wasn't seen.

23              Q.    He wasn't seen by --

24              A.    A medical provider.

25              Q.    Right.  But if he was -- if he was
```

```
 1        A.   Correct.

 2        Q.   Okay.  Nobody evaluated him for diabetes

 3   at any point at TDCJ.  Right?

 4        A.   No.

 5        Q.   And the significance of that is that

 6   his -- if he -- he may have had diabetes; he may not

 7   have had diabetes.  Do you agree with that?

 8        A.   Yes.

 9        Q.   Okay.  We would know or have better

10   information if someone had bothered to evaluate him,

11   though.  Right?

12             MR. ALVAREZ:  Objection; calls for

13   speculation.

14             MR. KAMMERLOCHER:  Join the

15   objection.

16        A.   Yes.

17        Q.   (BY MR. EDWARDS)  Let's talk about

18   Mr. Bogus.  What do you know about him?

19        A.   Where are we reading from?

20        Q.   Case Number 4.

21        A.   Is this Exhibit 12?

22        Q.   Yeah.  Did Mr. Boggus suffer a

23   heat-related illness?

24        A.   Let me read this.  I haven't read this

25   before.
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § § |
| PLAINTIFFS | § § |
| v. | § § § |
| | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 271

**GLENDA M. ADAMS, M.D. - March 07, 2014**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
STEPHEN McCOLLUM, and SANDRA    §
McCOLLUM, individually, and     §
STEPHANIE KINGREY, individually §
and as independent administrator§
of the Estate of LARRY GENE     §
McCOLLUM,                       §
     Plaintiffs,                §
                                §     CIVIL ACTION NO.
VS.                             §      3:12-cv-02037
                                §       JURY DEMAND
BRAD LIVINGSTON, JEFF PRINGLE,  §
RICHARD CLARK, KAREN TATE,      §
SANDREA SANDERS, ROBERT EASON,  §
the UNIVERSITY OF TEXAS MEDICAL §
BRANCH and the TEXAS DEPARTMENT §
OF CRIMINAL JUSTICE,            §
     Defendants.                §
```

                ************************************************
                    ORAL & VIDEOTAPED DEPOSITION OF
                        GLENDA M. ADAMS, M.D.
                            MARCH 7, 2014
                ************************************************

        ORAL & VIDEOTAPED DEPOSITION OF GLENDA M. ADAMS,

M.D., produced as a witness at the instance of

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

March, 2014, from 10:14 a.m. to 3:48 p.m., before

LORI A. BELVIN, CSR, and Notary Public in and

for the State of Texas, reported by videographic and

stenographic means, at the offices of Glenda M. Adams,

M.D., 200 River Pointe, Suite 200, Conroe, Texas,

77304, pursuant to the Federal Rules of Civil Procedure.

GLENDA M. ADAMS, M.D. - March 07, 2014

```
 1              A P P E A R A N C E S:

 2   COUNSEL FOR THE PLAINTIFFS, STEPHEN McCOLLUM, ET AL.:

 3        Mr. Jeff Edwards
          THE EDWARDS LAW FIRM
 4        The Haehnel Building
          1101 East 11th Street
 5        Austin, Texas  78702
              Telephone:  (512) 623.7727
 6            Facsimile:  (512) 623.7729
              Email:  jeff@edwards-law.com
 7

 8   COUNSEL FOR DEFENDANT, UNIVERSITY OF TEXAS MEDICAL
     BRANCH, ET AL.:
 9
          Ms. Kim Coogan
10        Ms. Shanna Elizabeth Molinare
          ATTORNEY GENERAL OF TEXAS - GREG ABBOTT
11        P. O. Box 12548, Capitol Station
          Austin, Texas  78711-2548
12            Telephone:  (512) 463.2080
              Facsimile:  (512) 495.9139
13            Email:  kim.coogan@texasattorneygeneral.gov
              Email:  shanna.molinare@texasattorneygeneral.gov
14

15   COUNSEL FOR DEFENDANT, TEXAS DEPARTMENT OF CRIMINAL
     JUSTICE, ET AL.:
16
          Mr. Seth Dennis
17        ATTORNEY GENERAL OF TEXAS - GREG ABBOTT
          P. O. Box 12548, Capitol Station
18        Austin, Texas  78711-2548
              Telephone:  (512) 463.2080
19            Facsimile:  (512) 495.9139
              Email:  seth.dennis@texasattorneygeneral.gov
20

21   ALSO PRESENT:

22        Ms. Jennifer Osteen, UTMB Representative

23        Mr. Glen Tune, Videographer

24        Ms. Lori A. Belvin, Texas CSR No. 2572

25
```

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1  is "Obesity."

2     A.  Okay.  2011, it goes over to the second page.  It

3  looks like there was 13,998.

4          MR. EDWARDS:  Okay.  Let me object as

5  nonresponsive.                                                    11:39

6     Q.  (BY MR. EDWARDS)  Listen to my question, though.

7  At he Hutchins Unit --

8     A.  Oh, at the Hutchins Unit?

9     Q.  How many inmates for the year 2011 would be

10  categorized as "obese"?                                          11:39

11     A.  Hutchins?  You know, I don't know if this is a

12  point in time a statistic or if this is the total for

13  the year.  I would suspect a point in time.  It says

14  "170."

15     Q.  Okay.  Well, what you raise is an interesting      11:40

16  point, because what I'm trying to figure out is:  Is

17  that a reliable document?

18          MS. COOGAN:  Objection, vague.

19     Q.  (BY MR. EDWARDS)  And what I mean by that,

20  Dr. Adams, is:  What does that number "170" mean?  Do       11:40

21  you know?

22     A.  I would have to ask Mr. King how he gathered his

23  data; but, roughly speaking, that is an estimate.

24     Q.  Okay.  You have no idea what that number "170"

25  represents; is that correct?                                    11:40

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1  A.  At this point in time, I don't know exactly how

2  he collected that data.

3  Q.  Have you had conversations with Mr. King about

4  how he collected that data?

5  A.  No, I haven't.                                    11:40

6  Q.  Okay.  Could that mean for the entire year 2011

7  that there were 170 offenders categorized as "obese"?

8  A.  I don't know if that's a point-in-time statistic

9  or if that is the total that were documented as "obese"

10 throughout the year coming -- going through Hutchins.  11:41

11 Q.  Very significant for us to know that, right --

12         MS. COOGAN:  Objection, vague.

13 Q.  (BY MR. EDWARDS)  -- in order to evaluate this,

14 correct?

15 A.  Well, it depends on how you intend to use it ti   11:41

16 evaluate it.

17 Q.  How do you intend to use it?  It's your document.

18         MS. COOGAN:  Objection -- objection,

19 misstates the evidence and the testimony, vague.

20 A.  It's -- it's information that you requested.  Any 11:41

21 data that you're going to get, it's the most reliable

22 data that we can provide to you.

23 Q.  (BY MR. EDWARDS)  My question to you:  Is it

24 reliable if you have no idea what it represents?

25         MS. COOGAN:  Objection.  She didn't create    11:41

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1          Okay.  Why is -- I mean, it looks like his

2    vitals are on -- I mean, why are these vitals like from

3    2004 on --

4        A.  On this note?

5        Q.  On these notes.                                    04:16

6        A.  Because our EMR imports the most recent vitals on

7    record.  If vital signs had been taken that day, that's

8    the date that would have been on them.

9        Q.  So, the last time UTMB took Mr. McCollum's vitals

10   was back in --                                             04:16

11       A.  2003 --

12       Q.  -- 2003?

13       A.  -- during his prior incarceration.

14       Q.  So, relying on prior incarceration, like, housing

15   restriction records, that would not have been a good      04:16

16   thing in this situation with Mr. McCollum at the

17   Hutchins Unit, right?

18       A.  He would have been re-assessed and given new

19   restrictions.

20       Q.  Okay.  And that would have taken place at his      04:17

21   intake physical?

22       A.  Yes.

23       Q.  Now, let's -- before we dive into the actual heat

24   stroke, I want to ask you about that -- the physical.

25   You write that the policy of UTMB and TDCJ is that an      04:17

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1  intake physical exam has to happen within 7 business

2  days of arrival at the Hutchins Unit; is that correct?

3      A.  Well, the current policy requires within.

4  10 business days.  I believe it was 7 business days back

5  then, but it could have just been 7 days.                    04:17

6      Q.  You've gone the opposite direction after this

7  death?  You've made the intake physical, delaying it

8  longer --

9      A.  I didn't.  The Policy & Procedure Committee

10  allows up to 10 business days for the intake history and  04:18

11  physical.

12      Q.  Okay.  All right.  So, in July of 2011, you had a

13  policy "We have to an intake physical within 7 business

14  days"; is that accurate?

15      A.  Correct.                                              04:18

16      Q.  Okay.  Now, the policy of UTMB and, I guess, the

17  TDCJ is that the physical -- the intake physical can

18  take 10 business days?

19      A.  It can.  That's consistent with community

20  standards of an appointment with a physician within       04:18

21  about two weeks.

22      Q.  Who's told you that?

23      A.  That's -- lots of people.

24      Q.  Who?

25      A.  When I asked them how long it takes them to get    04:18

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1    A.   TDCJ would have -- are you talking about security

2  on the unit?

3    Q.   (BY MR. EDWARDS)  You know, help me out.  Tell me

4  what you're talking about.

5    A.   Okay.  If it was determined that it was medically          04:27

6  necessary for him to have air-conditioning, they -- the

7  unit medical director might have called TDCJ Health

8  Services, okay?

9         But they would have referred him to

10  utilization review, UTMB utilization review, okay; and,     04:27

11  then, his condition would have been assessed to make a

12  determination if he needed to be moved to an

13  air-conditioned environment.  At that time, he would

14  have gone into one of the infirmary beds.

15    Q.   (BY MR. EDWARDS)  And there's a limited number of     04:28

16  beds, right?

17    A.   Yes.

18    Q.   So that Utilization Review Committee is, rally,

19  performing some sort of triage situation; is that right?

20    A.   Pretty much.  That's a fair description.              04:28

21    Q.   Okay.  So you've got -- do you know how many of

22  those triage beds or cells you're talking about?

23    A.   How many there are?

24    Q.   Yeah.

25    A.   Absolutely, four-hundred-and -- well, there were     04:28

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1  471 at the time.  We now have 481.

2    Q.  Okay.  Well, do you think that's enough to

3  protect the offenders who are susceptible to extreme

4  heat or especially vulnerable to extreme heat?

5    A.  No, but it's all we have.                    04:28

6    Q.  Okay.  And I understand that.  And what you're

7  telling me, just so I understand, is "Look, this is an

8  impossible situation.  We have to evaluate really

9  serious conditions on down and perform almost like a

10  MASH unit would in war to determine who gets these    04:28

11  481 beds," right?

12    A.  Essentially, yes.

13    Q.  Okay.  Now, that -- do you think that's fair to

14  UTMB to put you in that position?

15    A.  Is it fair to UTMB?  I don't know that it's a    04:29

16  statement of fairness.  That's what we're given to work

17  with and we manage them as best we can.

18    Q.  Okay.  Do you not see as a -- you know, you're

19  talking about community standards in Dallas, right, as

20  being appropriate?                                 04:29

21    A.  Uh-huh.

22    Q.  I mean, could you imagine a hospital or a school

23  saying "Look, we've only got so many spots.  I mean, we

24  can only take the absolutely sickest.  You guys, who are

25  totally vulnerable to heat, good luck to you"?  I mean,  04:29

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1   within -- by a nurse, at least, within 48 hours and by a

2   provider within 7 days.

3       Q.   Okay.

4       A.   If it's a serious condition, they have to be seen

5   immediately.                                                        04:43

6       Q.   Mr. McCollum had a serious condition, didn't he?

7       A.   Nobody notified medical that he had a serious

8   condition.

9       Q.   Okay.  In your report, there was an exhibit that

10  said something like TDCJ wouldn't allow you to recommend         04:43

11  air-conditioning or something like that.  It's like

12  Exhibit 9 [sic], I think, of your affidavit?

13              MS. COOGAN:  The facilities list.

14      A.   Oh, the facilities list.

15      Q.   (BY MR. EDWARDS)  Yeah, I just want to ask you          04:43

16  about that and then we'll get back to the nursing triage

17  note.

18      A.   All right.  It's 7 (which is within the marked

19  Adams Exhibit No. 2.

20      Q.   This is Exhibit 7 to your list of attachments to       04:43

21  your affidavit and it is, also, in Exhibit 2 to this

22  deposition.

23              This is a policy by TDCJ, which is

24  explicitly instructing you that, though, there are some

25  housing areas with air-conditioning or climate control,         04:44

GLENDA M. ADAMS, M.D. - March 07, 2014

1  they're saying to -- they're saying to UTMB that they

2  can't specifically request an air-conditioned

3  environment for their patients.  Is that what they're

4  saying.

5      A.  They're saying that if an air-conditioned          04:44

6  environment is medically necessary they have to go

7  through utilization review and placed in an inpatient

8  bed.

9      Q.  All right.  Is there anything that prevents a

10  UTMB physician's assistant, doctor from recommending    04:44

11  air-conditioning as a housing placement on that HSM 18?

12      A.  There's -- it's a computerized form and there's

13  no selection for air-conditioned or climate-controlled

14  housing.

15      Q.  Okay.  Is it impossible to write it in and say "I  04:45

16  recommend this"?

17      A.  It is impossible to write it in.  It's a computer

18  form.

19      Q.  Okay.  Who made it impossible to write in

20  "Air-Conditioning would be better for this patient,"     04:45

21  UTMB or TDCJ?

22      A.  It is a form that is on the TDCJ Forbus system.

23      Q.  Any discussion after 10 people died of

24  hyperthermia in the Texas prison system of changing

25  that?                                                    04:45

GLENDA M. ADAMS, M.D. - March 07, 2014

1    A.  No, not without a protocol.

2    Q.  Okay.  Do you know -- or is it your understanding

3  that the UTMB nurse here delayed the contacting of 9-1-1

4  or that they immediately said "Contact 9-1-1"?

5         MS. COOGAN:  Objection, vague.                    04:50

6    Q.  (BY MR. EDWARDS)  Do you know?  Do you know how

7  long it took for the UTMB nurse to say "Contact 9-1-1"?

8    A.  She would have said that immediately once she was

9  given this information, but there's no documentation as

10 how long.                                                04:50

11   Q.  Fair enough.  Your expectation would be that that

12 nurse would have said "Get 9-1-1 there immediately,"

13 right?

14   A.  Yes.

15   Q.  Okay.  Do you know that that report there, that   04:50

16 the seizure had only been lasting five minutes is wrong?

17   A.  I go by what's in the medical record.

18   Q.  Okay.  What if it was, like, 30 minutes, would

19 that be more or less of a medical emergency?

20   A.  Any -- five minutes or whatever, if you're in     04:50

21 status epileptic -- yes, it's an emergency.  It's a

22 9-1-1 situation.

23   Q.  Right.  You wouldn't just sit there and watch

24 somebody seize and go in and out of convulsions for,

25 you know, 20 or 30 minutes, right?                       04:51

GLENDA M. ADAMS, M.D. - March 07, 2014

1  TDCJ trains and what UTMB trains?

2    A.  Yes, TDCJ normally trains the -- they may train

3  additional folks, but by policy they're required to

4  train the security, whoever the -- whomever the warden

5  decides should be trained by medical.                      04:56

6    Q.  That's very helpful.  Now, 15 depositions in and

7  I very much appreciate it.  I finally have a clearer

8  understanding of that.

9            So, UTMB's got the sergeants and the

10 lieutenants and the warden, you know, making clear that  04:56

11 this is an emergency, right?

12           MS. COOGAN:  Objection.  What?

13   Q.  (BY MR. EDWARDS)  Heat stroke, that's it's a

14 medical emergency, right?

15   A.  Heat stroke is an emergency.  Everybody's trained 04:56

16 in that, even offenders.

17   Q.  Okay.  And, luckily, an offender -- do you know

18 the -- are you aware that an offender actually went and

19 got a correctional officer about Mr. McCollum's heat

20 stroke?                                                     04:57

21   A.  I vaguely remember that.  I did not re-read the

22 OIG report before we came to this deposition.

23   Q.  Okay.  All right.  Have you ever done any of the

24 heat trainings?

25   A.  No.                                                  04:57

**GLENDA M. ADAMS, M.D. - March 07, 2014**

1    Q.   Okay.  In any event, 9-1-1 should have been

2    contacted just immediately?

3             MS. COOGAN:  Objection, repetitive.

4    Q.   (BY MR. EDWARDS)  Well -- is that correct,

5    immediately?                                            04:59

6    A.   9-1-1 as soon as it's safe and you're able to,

7    yes, should have been called.

8    Q.   Perfect.

9             Okay.  So the ambulance gets there, right --

10   or did you review the EMS records.                     04:59

11   A.   EMS records have never been made available to me.

12   I've -- I've never seen them.

13   Q.   Oh, okay.  Well, you should ask your Counsel for

14   them.

15            MS. COOGAN:  Objection to the sidebar.         04:59

16   Q.   (BY MR. EDWARDS)  Do you think that that would be

17   helpful to you?

18   A.   As -- I'm -- at this point, I am not sure.  If

19   there's something in there that I'm not expecting,

20   perhaps; but, otherwise, EMS would have done EMS things 04:59

21   until they got him to the hospital.

22   Q.   Right.  Okay.

23   A.   I don't think it would change any of my opinions.

24   Q.   Okay.  Now, you're not an emergency -- are you --

25   do you have any expertise with EMS?  Are you a certified 05:00

GLENDA M. ADAMS, M.D. - March 07, 2014

1          UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3   STEPHEN McCOLLUM, and SANDRA      §
    McCOLLUM, individually, and       §
4   STEPHANIE KINGREY, individually  §
    and as independent administrator§
5   of the Estate of LARRY GENE       §
    McCOLLUM,                         §
6       Plaintiffs,                   §
                                      §        CIVIL ACTION NO.
7   VS.                               §         3:12-cv-02037
                                      §          JURY DEMAND
8   BRAD LIVINGSTON, JEFF PRINGLE,    §
    RICHARD CLARK, KAREN TATE,        §
9   SANDREA SANDERS, ROBERT EASON,    §
    the UNIVERSITY OF TEXAS MEDICAL   §
10  BRANCH and the TEXAS DEPARTMENT   §
    OF CRIMINAL JUSTICE,              §
11      Defendants.                   §

12

13       REPORTER'S CERTIFICATION OF THE ORAL &
       VIDEOTAPED DEPOSITION OF GLENDA M. ADAMS, M.D.
14                  MARCH 7, 2014

15

16       I, Lori A. Belvin, a Certified Shorthand

17  Reporter and Notary Public in and for the State of

18  Texas, hereby certify to the following:

19       That the witness, GLENDA M. ADAMS, M.D., was duly

20  sworn by the officer and that the transcript of the oral

21  deposition is a true record of the testimony given by

22  the witness;

23       That the original deposition was delivered to

24  MR. JEFF EDWARDS.

25       That a copy of this certificate was served on

GLENDA M. ADAMS, M.D. - March 07, 2014

1  all parties and/or the witness shown herein on

2  _____.

3        I further certify that pursuant to FRCP Rule

4  30(f)(1) that the signature of the deponent:

5        __X__ was requested by the deponent or a party

6  before the completion of the deposition and that the

7  signature is to be before any notary public and returned

8  within 30 days from date of receipt of the transcript.

9  If returned, the attached Changes and Signature Page

10  contains any changes and the reasons therefore:

11        ____ was not requested by the deponent or a

12  party before the completion of the deposition.

13        I further certify that I am neither counsel for,

14  related to, nor employed by any of the parties or

15  attorneys in the action in which this proceeding was

16  taken, and further that I am not financially or

17  otherwise interested in the outcome of the action.

18        Certified to by me on this, the 14th day of

19  March, 2014.

20

21

22        _____
         Lori A. Belvin, CSR No. 2572
23        Firm Registration No. 225
         Expiration Date:  12-31-2013
24        7800 North Mopac, Suite 120
         Austin, Texas  78759
25        (512) 474-4363

WRIGHT WATSON & ASSOCIATES, LLC
(512) 474-4363
Plaintiffs' MSJ Appx. 6338

GLENDA M. ADAMS, M.D. - March 07, 2014

```
 1  COUNTY OF HARRIS   )

 2  STATE OF TEXAS     )

 3      I hereby certify that the witness was notified

 4  on _____  that the witness has 30 days or

 5  (_____ days per agreement of counsel) after being

 6  notified by the officer that the transcript is available

 7  for review by the witness and if there are changes in

 8  the form or substance to be made, then the witness shall

 9  sign a statement reciting such changes and the reasons

10  given by the witness for making them;

11      That the witness' signature was/was not returned as

12  of _____.

13      Subscribed and sworn to on this, the _____ day of

14  _____, 2014.

15

16

17         _____
           Lori A. Belvin, Texas CSR No. 2572
18         Firm Registration No. 225
           Expiration Date:  12-31-2015
19         7800 North Mopac, Suite 120
           Austin, Texas  78759
20         (512) 474-4363

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 272

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION

................................................:
                                                :
STEPHEN McCOLLUM, STEPHANIE                      :
KINGREY, and SANDRA McCOLLUM,                    :
individually and as heirs                        :
at law in the Estate of                          :
LARRY GENE McCOLLUM,                             :
            Plaintiffs,                           :
                                                :
                                                :  CIVIL ACTION NO.
VS.                                              :
                                                :   3:12-cv-02037
BRAD LIVINGSTON, JEFF PRINGLE,                   :
RICHARD CLARK, KAREN TATE,                       :
SANDREA SANDERS, ROBERT EASON,                   :
THE UNIVERSITY OF TEXAS                          :
MEDICAL BRANCH and the TEXAS                     :
DEPARTMENT OF CRIMINAL JUSTICE,:
            Defendants.                           :
                                                :
................................................:


            ORAL AND VIDEOTAPED DEPOSITION OF
            THE DESIGNATED REPRESENTATIVE OF
        THE UNIVERSITY OF TEXAS MEDICAL BRANCH
                    BY AND THROUGH
                  GLENDA ADAMS, M.D.

                  NOVEMBER 19, 2013


................................................
     ORAL AND VIDEOTAPED DEPOSITION OF THE DESIGNATED
REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH
BY AND THROUGH GLENDA ADAMS, M.D., produced as a witness
at the instance of the Plaintiffs, and duly sworn, was
taken in the above-styled and numbered cause on Tuesday,
November 19, 2013, from 11:11 a.m. to 6:03 p.m., before
Mary C. Dopico, Certified Shorthand Reporter No. 463 and
Notary Public in and for the State of Texas, reported by
machine shorthand and audio/video recording at the
offices of Rebecca Sealy Hospital, 404 8th Street, Room,
4.204, Galveston, Houston, Texas, pursuant to Notice and
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.
```

2

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   A P P E A R A N C E S

2

3   COUNSEL FOR PLAINTIFFS:

4        Mr. Jeff Edwards
         The Edwards Law Firm
5        The Hachnel Building
         1101 East 11th Street
6        Austin, Texas  78702
         Tel: 512/623-7727  Fax: 512/623-7729
7        E-mail: jeff@edwards-law.com

8

9   COUNSEL FOR DEFENDANT UNIVERSITY OF TEXAS MEDICAL
    BRANCH:

10       Ms. Kim Coogan
         Ms. Shanna Molinare
11       Assistant Attorneys General
         P.O. Box 12548
12       Austin, Texas  78711-2548
         Tel: 512/463-2080  Fax: 512/495-9139
13       E-mail: kim.coogan@texasattorneygeneral.gov
                 shanna.molinare@texasattorneygeneral.gov

14

15  COUNSEL FOR DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL
    JUSTICE AND INDIVIDUAL TDCJ DEFENDANTS:

16

17       Mr. Bruce R. Garcia
         Mr. Jonathan Stone
         Assistant Attorneys General
18       P.O. Box 12548
         Austin, Texas  78711-2548
19       Tel: 512/463-2080  Fax: 512/495-9139
         E-mail: bruce.garcia@texasattorneygeneral.gov
20               jonathan.stone@texasattorneygeneral.gov

21

    ALSO PRESENT:
22       Dr. Owen Murray      Karen Matlock
         Jennifer Osteen      Carol Londa Bremmond
23

24  REPORTED BY:                  VIDEO BY:
    Mary C. Dopico, CSR, RPR, CRR   Tim Bishop
25  Wright Watson & Associates

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6342

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   diagnosis of hyperthermia.

2       Q.   Do you know if that definition is different

3   from other parts of the University of Texas Medical

4   Branch, not the Correctional Managed Care Division?

5       A.   I do not know.

6       Q.   Okay.  It's your -- your testimony though that

7   UTMB, the correctional part of it, only considers a

8   heat-related death if there is a formal diagnosis of

9   hyper -- hyperthermia?

10      A.   Correct.

11      Q.   Okay.  Do you -- Do you acknowledge that

12  deaths by cardiac arrest may have heat as a contributing

13  factor?

14      A.   Yes.  You're talking about all mortality?

15      Q.   No.  I'm asking you a specific question.

16           Do you agree that cardiac arrests that

17  are not diagnosed as hyperthermia could be the result --

18  could have heat as a contributing factor?

19           MR. GARCIA:  Objection, speculation.

20      A.   Cardiac arrest is the final cause of all

21  deaths, so -- and, yes, heat could contribute to all

22  cause mortality.

23      Q.   (By Mr. Edwards)  Heat can contribute to many

24  more mortality findings than hyperthermia; correct?

25      A.   Yes, as can cold weather and lots of other

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6343

Stephen McCollum, et al v.                     Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

1   death --

2       Q.   Okay.

3       A.   -- that, in fact, it was for hyperthermia.

4       Q.   Well, let me ask you, do you know of any

5   changes made to UTMB policy as a result of

6   Mr. Cardwell's death?

7       A.   UTMB policy -- health services policy is the

8   same as TDCJ's.  We're obligated by contract to follow

9   the policies they put forth.

10      Q.   Do you know of any changes being made as a

11  result of Mr. Cardwell's death?

12              MS. COOGAN:  Objection, vague.

13              Go ahead.

14      A.   No.

15      Q.   (By Mr. Edwards)  Okay.

16      A.   No.

17      Q.   Did UTMB make any changes as a result of

18  Mr. Cardwell's death --

19              MS. COOGAN:  Objection, calls for

20  speculation.

21      Q.   (By Mr. Edwards)  -- to its policies?

22              MS. COOGAN:  Same objection.

23      A.   As I previously said, UTMB doesn't have

24  separate policies.

25      Q.   (By Mr. Edwards)  Did UTMB or TDCJ make any

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  which housing restrictions are placed on inmates?

2      A.   Yes.

3      Q.   Would you tell the jury generally how housing

4  restrictions are made for prisoners who come to the

5  prison?

6      A.   Okay.

7      Q.   Is that an okay question?  I can repeat it

8  if --

9              MS. COOGAN:  Objection, vague.

10     Q.   (By Mr. Edwards)  Okay.  Would you tell me how

11  housing restrictions are placed -- are put into place

12  for inmates when they come to the prison?

13             MS. COOGAN:  Same objection.

14             Go ahead, Dr. Adams.

15     A.   During intake, if they have a medical -- an

16  immediate medical need for housing other than general

17  population, they will be removed to the appropriate

18  unit.  For example, somebody in a wheelchair would be

19  moved to a wheelchair facility.

20     Q.   (By Mr. Edwards)  I -- I don't mean to

21  interrupt, but I -- but right now this is the one time

22  where I really am very interested in the process of what

23  happens, and then I'm going to ask -- then I'll follow

24  up with questions like:  Okay.  You've mentioned the

25  wheelchair example.  Tell me how that really -- really

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6345

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   works.

2        A.    Okay.

3        Q.    But you mentioned -- and I want to make sure

4   that I -- that I -- that I have a full understanding of

5   it, because this is my one chance to talk to the person

6   that -- that knows here.

7                At intake, there is some sort of

8   assessment?

9        A.    At --  As soon as they arrive, they're

10  assessed if -- for any urgent or immediate medical

11  needs.

12       Q.    Okay.  So first thing, they get off the bus or

13  however they're transported, there is some sort of

14  assessment by some sort of medical provider at UTMB

15  that's not TDCJ; is that correct?

16       A.    Correct.

17       Q.    Okay.  And is that -- is that a -- a

18  particular type of professional in the UTMB system?  Is

19  that a licensed vocational nurse?  Is that something

20  more than that?  Is it --

21       A.    At one time it was primarily E.M.T.s.  Now it

22  can be an L.V.N. or a certified medical assistant.

23       Q.    Now, is -- is another way of saying it, now it

24  has to be an L.V.N. or a certified medical assistant?

25       A.    Generally, the screen, yes, that's who does

Stephen McCollum, et al v.                Glenda Adams, M.D.
Brad Livingston, et al                    November 19, 2013

1  it -- just so we're talking about the same thing here.

2              (Adams Exb. No. 8 was marked.)

3      Q.   (By Mr. Edwards)  Okay.  That's that

4  initial --

5      A.   Yes, sir.

6      Q.   Okay.  All right.  Now, we'll -- we'll

7  probably talk about that in a minute, but I want to

8  know --  Okay.

9              From that, what housing restriction -- I

10  mean, that's a way that UTMB can accommodate people with

11  needs by making sure that there's a restriction in place

12  right away; is that fair?

13             MS. COOGAN:  Objection, legal conclusion

14  and terms included and vague.

15     Q.   (By Mr. Edwards)  Okay.  Can you --  You can

16  answer that.

17     A.   Okay.  If it was determined immediately that

18  a -- a special accommodation was needed for housing,

19  there wouldn't be an HSM-18 to complete at that time

20  because this patient isn't in the electronic medical

21  record.  He could have been given a pass, a medical

22  pass.

23     Q.   Okay.  So is that something that the initial

24  person, though, this C.M.A. Haywood, is empowered to do?

25     A.   No.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6347

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

1       Q.    Who does that?

2       A.    The medical provider.

3       Q.    So in that situation, where there is a need

4  for an accommodation, how does that happen?

5       A.    If there is a recognized need for

6  accommodation, the offender is referred to the medical

7  department.

8       Q.    Right away?

9       A.    As soon as the form is completed.

10      Q.    Okay.

11      A.    Before he goes to his housing, yes.

12      Q.    Okay.  What I'm --  What I'm trying to --

13 What I'm trying to make sure is that there doesn't have

14 to be like a six- or seven-day wait before, you know,

15 one of these needs for accommodation are -- are dealt

16 with.

17              It can happen very quickly; right?

18              (Cell phone ringing.)

19              THE WITNESS:  Pardon me.

20              MR. EDWARDS:  Okay.

21              THE WITNESS:  I thought I had turned it

22 off.

23              MR. EDWARDS:  It's a very -- very

24 skillful tactic.  Just kidding.

25              MS. COOGAN:  And if it's a call you need

Stephen McCollum, et al v.                     Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

 1   Institutes of Health.

 2       Q.   Okay.

 3       A.   Okay?

 4       Q.   Okay.

 5       A.   And they periodically review certain medical

 6   conditions, in this case hypertension; and they set

 7   standards for diagnosis and for treatment.

 8       Q.   Okay.  And in this particular case, I assume

 9   you would tell me it was appropriate to make the change

10   to HCTZ from clonidine; correct?

11       A.   Correct.

12       Q.   Okay.  Now, in a consequence of -- of using

13   HCTZ is that it impacts the abilities body to hydrate

14   [sic]?

15       A.   HCTZ can cause some mild dehydration.

16       Q.   That --  That's one of the warnings on the

17   label of HCTZ, that it does, in fact, cause the body to

18   dehydrate; correct?

19       A.   I haven't read the label currently.

20       Q.   Does it cause the body to dehydrate when you

21   take it?

22       A.   Yes, it can.

23       Q.   Okay.

24       A.   Mild dehydration.

25       Q.   You say "mild dehydration."  What's the

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1       A.    Hydrochlorothiazide is first-line treatment

2   for mild to moderate hypertension, no matter your age.

3       Q.    Whether or not you can acclimate and

4   compensate for the dehydration would depend on the heat,

5   your medical condition, your age, things like that;

6   right?

7                  MR. GARCIA:   Objection, speculation.

8       Q.    (By Mr. Edwards)   If you know.

9       A.    It would vary from individual situations and

10  the patient, yes.   And those are some of the factors

11  that would be included, yes.

12      Q.    Okay.   All right.   So I -- I guess --  Would

13  it be your position that UTMB has in place a way to

14  place housing restrictions or suggest housing

15  restrictions on -- on inmates right away when they come

16  in?

17      A.    For --

18      Q.    For medical conditions?

19      A.    Okay.   If a special accommodation is needed,

20  yes, they can write a pass.

21      Q.    So if Mr. McCollum needed to be on a bottom

22  bunk as opposed to a top bunk because of his medical

23  condition and weight, should that have happened at this

24  initial intake?

25      A.    Only if that need was recognized, okay, either

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6350

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

 1        Q.    Okay.  But just so I'm clear, in 2010 and

 2    2011, numerous facilities reduced the hours in which

 3    they operated medical care; correct?

 4        A.    Correct.

 5        Q.    Okay.  Do you know if Hutchins is one of those

 6    units?

 7        A.    Hutchins, they were still a 12-hour facility.

 8        Q.    Are you sure?

 9        A.    Yes.

10        Q.    Okay.

11        A.    They started out a 16-hour when they opened --

12        Q.    Hutchins --

13        A.    -- originally.

14        Q.    Sorry.  I --  Hutchins was reduced in 2010

15    from a 16-hour facility to a 12-hour facility, to the

16    best of your knowledge?

17              MS. COOGAN:   Objection, speculation on

18    the date.

19        A.    That is correct.  I don't have the exact date.

20              That was when --  Do you know which one

21    of your questions that was?  Because I talked directly

22    to -- with the nurse manager to confirm what hours

23    Hutchins was reduced to.

24              MS. COOGAN:   17, maybe?

25        Q.    (By Mr. Edwards)   17 would be generally.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6351

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1     A.   No.  There was a specific --

2          MS. COOGAN:  21?

3     A.   There was a specific question about Hutchins.

4     Q.   (By Mr. Edwards)  21.

5     A.   Yes, 21.  It opened in April '95 as a 16-hour

6  facility, and it was reduced in 2011 to being a 12-hour

7  facility.

8     Q.   When in 2011?

9     A.   I can't tell you for sure.  Usually, it's

10  September 1st that those kind of changes occur.

11     Q.   I need to know that one.  I mean, you -- you

12  don't know whether that happened in September 1 of 2011

13  or earlier?

14     A.   I don't know the exact date.  No, I do not.

15     Q.   All right.  Could you find that out?

16     A.   I --  Yes.  I suspect I can.

17     Q.   Could you find that out so that Dr. Murray

18  knows tomorrow?

19          MS. COOGAN:  We'll try.

20     A.   We will try.

21     Q.   (By Mr. Edwards)  Okay.  All right.

22          Okay.  In any event, the new -- the new

23  form, rather than barrier-free --  What --  What was

24  barrier-free?  What did that mean?

25     A.   That was primarily for wheelchair patients.

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1        Q.   Okay.  Would you agree with me on the housing

2   restriction policy, HSM-18, and all the guidelines for

3   completing it, there is no reference to any sort of

4   restriction based on indoor housing temperatures and

5   dangers thereof?

6        A.   Yes.

7        Q.   There --  There is reference, however, on the

8   HM 18 -- HSM-18, which is the -- that intake form -- to

9   restrictions on work based on temperature; is that

10  correct?

11       A.   That's correct.

12       Q.   In fact, there are policies at TDCJ and UTMB

13  relating to workplace temperatures and have been for a

14  long time; right?

15       A.   Correct.

16       Q.   I assume that these policies relating to

17  extreme temperatures in the workplace are in effect

18  because the extreme temperatures pose dangers to the

19  inmates; is that correct?

20       A.   Extreme temperatures can -- it -- you know,

21  provide -- cause risk if -- especially if -- for

22  extended periods of times or under strenuous work

23  conditions.

24       Q.   Okay.  Let me ask that again.

25            These policies relating to extreme

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6353

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

1  number 20, yes, deals with extreme heat.

2      Q.   Well, there -- there are policies about

3  preventing and monitoring heat stress illness in the

4  workplace; right?

5      A.   Correct.

6      Q.   You're familiar with that; right?

7      A.   Yes.

8      Q.   Okay.  As --  As a doctor, don't you think

9  that those policies are necessary?

10     A.   As --  As a doctor, I think that extreme heat

11 can be dangerous; and, yes, there -- there -- there

12 needs to be clearly outlined, you know, safety

13 precautions.

14     Q.   Sure.  Cyanide can be dangerous; right?

15     A.   Correct.  We don't have a policy on cyanide.

16     Q.   But if you were dealing with cyanide on a

17 daily basis, you darn well better have one; right?

18     A.   Correct.

19     Q.   Okay.  And you deal with extreme heat in Texas

20 on a daily basis during the summer; right?

21     A.   I don't know that I could say on a daily

22 basis; but, yes, there are a lot of hot days during the

23 summer.

24     Q.   Really hot days, far greater than 100 degrees

25 when you do heat index; right?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6354

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1              Now, would you agree with me that there

2      are no policies, to your knowledge, about dealing with

3      extreme heat inside the prison?

4          A.   You mean indoors; right?

5          Q.   Yes.

6          A.   Okay.

7          Q.   I mean indoors.

8          A.   No, there is no policy that I know of.

9          Q.   But the temperatures are just as hot; right?

10         A.   The temperatures -- the heat index can -- I've

11     seen where it can reach high levels, yes.

12         Q.   Well, as high as the outside; correct?

13         A.   Yes, sometimes even higher.

14         Q.   Sometimes even higher, because you're in kind

15     of cement or metal boxes, and it can be even higher

16     temperature inside than outside; correct?

17         A.   It probably has more to do with the number of

18     people in the dorm in a confined space.

19         Q.   That's --  You know, that's another excellent

20     point -- point.  The more people you put into a dorm,

21     the higher the temperature is going to be; correct?

22         A.   Correct, depending on the cooling method --

23     methods that you have.

24         Q.   Right.  And there are no cooling methods in --

25     at least in the Hutchins Unit; correct?

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1    not an expert to tell you who should do that analysis.

2                    MR. EDWARDS:  Okay.  Let me object as

3    non-responsive.

4         Q.   (By Mr. Edwards)  Extreme heat, as it's

5    defined by -- by you, that has an impact on people with

6    medical conditions; right?

7         A.   Correct.

8         Q.   Okay.  There's a --  It has a greater impact,

9    I believe you told me, on people with particular medical

10   conditions like hypertension or who are on psychotropic

11   medications or who suffer from depression or who have

12   diabetes; right?

13                   MS. COOGAN:  Speculation, objection.

14        A.   It can, yes.

15        Q.   (By Mr. Edwards)  And when you say "it can," I

16   mean, is it more likely than not that a temp -- extreme

17   heat temperature is going to have a greater effect on a

18   60-year-old man who has hypertension than a 22-year-old

19   kid --

20                   MS. COOGAN:  Objection --

21        Q.   (By Mr. Edwards)  -- without those conditions?

22                   MS. COOGAN:  Objection, calls for

23   speculation.

24                   MR. GARCIA:  Join.

25        A.   Okay.  It would --  It would depend on what

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6356

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   other medical conditions that the -- the kid had.

2       Q.    (By Mr. Edwards)  Sure.  A healthy kid.

3       A.    A healthy kid?  Heat, age, okay, and

4   hypertension and its medicines are associated with

5   increased risks for sensitivity to heat, yes.

6       Q.    There's nothing earth-shattering about that.

7   It's just basic common sense.  Any medical student

8   should know that; right?

9       A.    Well, I'm not going to testify as to what any

10  medical student should know; but, yes, it is a bit of --

11  it's common sense.

12      Q.    Well, here's my question to you, as one of the

13  chief people that -- the architects of UTMB with regard

14  to the prison system.  Is --  Is it fair that you are

15  one of the people at the highest levels of UTMB with

16  regard to the prison system, at least until you retire?

17      A.    I don't think that makes me an architect; but,

18  yes, I am.

19      Q.    Well, fair enough.

20            Don't you see a problem if you're not

21  telling TDCJ about the dangers that there -- the

22  conditions that they're in charge of -- are causing?

23            MS. COOGAN:  Objection, vague.

24            Go ahead, Dr. Adams.  Tell him.

25      A.    Every year UTMB tells TDCJ and its officers

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6357

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

1        A.   I'm --  I'm sure the ambient temperature could

2   have been that, and they might have been working in a --

3   in a situation to where -- but, no, I'm not aware of all

4   the deaths in the -- in the world, period.

5        Q.   Okay.  Anything that you know of that would

6   prevent you from having a policy re --  Well, strike

7   that.

8                This --  This HSM-18 policy, that's

9   not -- is that a correctional care managed care -- or

10  correctional managed care committee policy, or is that a

11  TDCJ policy?

12       A.   It started out as a TDCJ policy.  It was in

13  effect before correctional managed care came into

14  existence.  Correctional managed care has made changes

15  to it.

16       Q.   So it's -- it's really a joint policy that

17  TDCJ, UTMB are --

18       A.   Currently, yes.

19       Q.   -- kind of responsible for; right?

20       A.   Yes.  Currently, yes, sir.

21       Q.   Okay.  Anything that would prevent you from

22  putting onto this policy "recommend placement in

23  air-conditioned facility"?

24       A.   Yes.

25       Q.   What?

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1        A.    There just aren't enough beds that are

2   air-conditioned.

3        Q.    Well, how do you think that change -- how do

4   you think that changes?

5              MS. COOGAN:  Objection, vague.

6        A.    I --  I don't understand the question.

7        Q.    (By Mr. Edwards)  Okay.

8        A.    I'm sorry.

9        Q.    Is there anything that prevents you from

10  saying:  You know what?  His medical condition, we would

11  recommend an air-conditioned facility?

12       A.    No.  T -- TDCJ and the committee isn't going

13  to allow us to put a -- a medical requirement or

14  accommodation that simply is not available.

15       Q.    Well, is there anything that would -- would

16  sug -- would prevent you from putting on an

17  accommodation like:  Need to place this inmate in an

18  air-conditioned environment for four hours a day?

19       A.    Same thing.  I don't know if there's

20  air-conditioning four hours a day available.  Okay?

21  Unless TDCJ Health Services agrees for such a

22  restriction to go on there, no, it's not -- it's not

23  going to go on there until whatever you're recommending

24  is actually available.

25       Q.    Well, is it your --  Is it UTMB's

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6359

130

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  understanding that -- that air-conditioned spaces in the

2  Hutchins Unit are not available to be used by inmates?

3      A.   Okay.  K dorms are edu -- are air-conditioned

4  at the Hutchins Unit.  Okay?  But you don't have that at

5  all the intake units.  And even at Hutchins, those are

6  security utilizations.  It's ad seg.  It's protective

7  custody.  Those aren't medic -- cells that medical

8  normally has an opportunity to use.

9      Q.   If --  If there were --  I mean, assume with

10 me that there were spaces that were air-conditioned that

11 could be utilized.  Okay?  Would it then be a good idea

12 to place inmates who are vulnerable to these high

13 temperatures at least in these air-conditioned spaces

14 for sometime during the day?

15         MS. COOGAN:  Objection, speculation and

16 incomplete hypothetical.

17     A.   I -- I think that you're talking about cooling

18 centers; correct?

19     Q.   (By Mr. Edwards)  Or just spaces in the -- in

20 the prison that are air-conditioned that could be

21 utilized.

22     A.   Partic --

23         MR. GARCIA:  Objection, vague.

24     A.   There could be security reasons that that

25 would not be possible.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6360

Stephen McCollum, et al v.            Glenda Adams, M.D.
Brad Livingston, et al                November 19, 2013

1             Do you know that he should --  Well,
2  strike that.
3             He should not have been placed in a top
4  bunk; correct?
5             MS. COOGAN:  Objection, speculation.
6      A.   I don't think you can definitely say that.
7      Q.   (By Mr. Edwards)  Was he morbidly obese?
8      A.   He was mor --  He was obviously obese.  He
9  weighed anywhere from 320 --  I think at his death, he
10 was 345 pounds.
11     Q.   Do you know the definition of "morbidly
12 obese"?
13     A.   Yes.
14     Q.   What is it?
15     A.   A BMI greater than 40, I believe.
16     Q.   Okay.  Would it surprise you to learn that he
17 did have --
18     A.   This was --
19     Q.   Are you sure that's the -- that that's the
20 definition of "morbid obesity," a BMI over 40?
21     A.   As best I recall.
22     Q.   Okay.
23     A.   I could be incorrect.  I haven't looked it up
24 recently.
25     Q.   Regardless, if he meets the criteria for

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  morbid obesity, would you agree that he should have been

2  placed in a -- in a top bunk -- in a bottom bunk?

3  Strike that.  Let me repeat that.

4              If he meets the criteria for morbid

5  obesity, would you agree that he should have been placed

6  in a bottom bunk?

7       A.   Yes.  And he would have been, if he had

8  requested it and brought it to medical's attention.

9       Q.   Okay.  Well, maybe or maybe not.  We don't

10 know what would have happened if he had brought it to

11 medical's attention; fair?

12      A.   I feel fairly certain he would have been given

13 a bottom bunk.

14      Q.   He should have been given a bottom bunk if he

15 asked for it; right?

16      A.   If he asked medical for it, he would have been

17 given a pass for a bottom bunk.

18      Q.   Okay.  Well, isn't it medical's responsibility

19 to -- to do that on their own without him asking as

20 well?

21      A.   Well, the way I understand the ADA law, you --

22 you don't get --

23              MS. COOGAN:  No, no, no, no, no.  He

24 didn't ask you --

25              MR. EDWARDS:  Excuse me.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6362

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   give him a bottom bunk.

2       Q.   Okay.  Now, again, I'm not a doctor.  But

3   5'10", 330 pounds, odds are they're morbidly obese;

4   right?

5       A.   Probably, unless they're an offensive lineman.

6       Q.   You're right.  Unless they're playing for the

7   Dallas Cowboys, they're probably morbidly obese; right?

8       A.   Probably.

9       Q.   Okay.

10          MR. EDWARDS:  Okay.  I apologize.  I'm

11  going to have a take a -- a short break because the --

12          MS. COOGAN:  Okay.

13      Q.   (By Mr. Edwards) -- The water's gone through

14  me.

15          MS. COOGAN:  Okay.

16          MR. EDWARDS:  Thank you very much.  Let's

17  take a five -- five-minute break if that's all right.

18          MS. COOGAN:  Sure.

19          THE VIDEOGRAPHER:  2:19, off the record.

20          (Off the record from 2:19 - 2:33.)

21          THE VIDEOGRAPHER:  This is video --

22  videotape 4, 2:33, on the record.

23      Q.   (By Mr. Edwards)  Prior to -- and I'm looking

24  at the Exhibit 5.  Prior to the effective date of this

25  policy, which I believe you said was October 2012, there

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6363

Stephen McCollum, et al v.                Glenda Adams, M.D.
Brad Livingston, et al                    November 19, 2013

 1 | raise as well?

 2 |     A.   Yes.

 3 |     Q.   Okay.

 4 |     A.   I think --  Yes.

 5 |     Q.   All right.   These attachments on Exhibit 5,

 6 | would you take a look at them, please?

 7 |     A.   Yes, sir.

 8 |     Q.   All that information was known to people at

 9 | UTMB prior to the implementation of that policy;

10 | correct?

11 |               MS. COOGAN:   Objection, calls for

12 | speculation.

13 |     Q.   (By Mr. Edwards)  Let me re-ask that.

14 |               On attachment --  What is Attachment A?

15 |     A.   It's drugs associated with heat stress.

16 |     Q.   Those drugs associated with heat stress on

17 | that particular attachment, that's been long known to

18 | UTMB; correct?

19 |     A.   It's --

20 |               MS. COOGAN:   Same objection.

21 |               Go ahead, Dr. Adams.

22 |     A.   Okay.   It's been --  It's been in the policy

23 | for a long time.

24 |     Q.   (By Mr. Edwards)  Yeah.

25 |     A.   For UTMB.

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1           The references on Attachment A, do you

2   believe that the references are materials that are

3   accurate and could provide guidance to us about the

4   effects of drugs and heat stress, or do you have any

5   reason to question the accuracy of those articles?

6       A.   I cannot say that I have actually read all

7   these articles.  Okay?

8           But I don't have any personal reason to

9   doubt the accuracy of these articles.

10      Q.   Who authored that -- this policy?

11      A.   Who authored it?

12      Q.   It's the correctional managed health care

13  policy manual; right?

14      A.   Correct.

15      Q.   Are you on the committee that -- that prepared

16  this?

17      A.   Yes.

18      Q.   All right.  Look at Attachment B.

19           Would you read Attachment B for the jury?

20      A.   It's Comorbidities That May Affect Heat

21  Tolerance.

22      Q.   Would you expect any competent medical

23  provider to be aware of that -- and let -- let's change

24  that.

25           Would you expect any competent medical

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   provider in a correctional facility to be aware of those

2   comorbidities?

3        A.   Yes.

4        Q.   Okay.  Were these well known to UTMB before

5   2007?

6                MS. COOGAN:  Objection, calls for

7   speculation.

8                MR. EDWARDS:  It actually doesn't.

9                MS. COOGAN:  It's just the word "well."

10  When you enhance it, it makes it harder.

11       A.   I think most medical practitioners would

12  recognize those as conditions that can negatively impact

13  heat tolerance.

14       Q.   (By Mr. Edwards)  They're comorbidities that

15  may affect heat tolerance; right?

16       A.   Correct.

17       Q.   These were well --  These were known to UTMB

18  before 2005; correct?

19       A.   They were in the policy, yes.

20       Q.   Okay.  UTMB's known -- known about this

21  certainly since you were working there; right?

22       A.   Yes.

23       Q.   Okay.  Any of the references --  Have you read

24  any of the references that support the policy?

25       A.   I believe that I've read 1 and 2.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6366

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   any -- do with the amount of resources.  Okay?

2        Q.   (By Mr. Edwards)  Okay.

3        A.   If it's --

4        Q.   So --

5        A.   If it's medically necessary for someone to be

6   in air-conditioning, we will place them in

7   air-conditioning.  We will -- in one of our medical

8   beds.  Okay?  But if --

9        Q.   Do you know the dangers associated with --  Do

10  you know the process of acclimating from cool

11  temperatures to really hot temperature?

12       A.   Yes, I do.

13       Q.   Okay.  Do you know that that poses a

14  particular danger to people with hypertension who are --

15  or who are older?

16       A.   Yes, I do.

17       Q.   Do you know that that's --  Do you know that

18  by law county jails are -- are air-conditioned?

19       A.   Yes, I do.

20       Q.   So you know that people are coming from

21  air-conditioned facilities and are thrown into

22  temperatures that are much hotter and endanger them;

23  correct?

24            MS. COOGAN:  Objection --

25            MR. GARCIA:  Objection --

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6367

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1          MS. COOGAN:  -- calls for speculation.

2          MR. GARCIA:  Join.

3     A.   I know that the -- that they are coming into

4  you un-air-conditioned TDCJ facilities, yes.

5     Q.   (By Mr. Edwards)  Okay.  And that process puts

6  them in possible risk; correct?

7          MS. COOGAN:  Objection, calls for

8  speculation.

9     A.   Depending upon the patient and the conditions,

10  the duration of exposure, that sort of time, yes, it

11  can.

12    Q.   (By Mr. Edwards)  Until they acclimate their

13  bodies, they're at an increased risk; correct?

14         MS. COOGAN:  Speculation.

15    Q.   (By Mr. Edwards)  Of harm to them?

16         MS. COOGAN:  Speculation.

17    Q.   (By Mr. Edwards)  It is not speculation.

18  You're a doctor.

19    A.   Individuals that are exposed to increased heat

20  are at increased risk until they acclimate.

21    Q.   Right.  And a 22-year-old kid, it takes him

22  time to acclimate; right?

23    A.   It takes everybody time to acclimate.

24    Q.   Right.  And one of the problems with the heat

25  vulnerable population -- people with hypertension who

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1      Q.   Okay.  So it's UTMB's testimony that

2  hypertension does not increase the risk for -- for heat

3  illness?

4      A.   I didn't say that.  I'm saying it is a risk

5  factor.  Okay?

6      Q.   Okay.

7      A.   Particularly if it's poorly controlled or long

8  standing.  But simple, well-controlled hypertension,

9  people still work in the heat.

10     Q.   Okay.  Fine.

11          Okay.  Do you consider people with

12 hypertension in the free world able to do whatever they

13 want to do whenever they want to do it the same -- the

14 same as people who are under the custody and supervision

15 of a correctional facility?

16          MS. COOGAN:  Objection, incomplete

17 hypothetical when you say "hypertension" when she has

18 distinguished between controlled and not controlled,

19 speculation and vague.

20     Q.   (By Mr. Edwards)  You can answer my question.

21     A.   Could you repeat it, please?

22     Q.   Yeah.  Do you --  I mean, do you see any

23 differences between, you know, a guy working on the ship

24 channel, free to go home and watch television on the

25 couch in an air-conditioned home, and someone with

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1              MS. COOGAN:   -- calls for speculation.

2              MR. GARCIA:  Join.

3        A.   I know that the -- that they are coming into

4    you un-air-conditioned TDCJ facilities, yes.

5        Q.   (By Mr. Edwards)  Okay.  And that process puts

6    them in possible risk; correct?

7              MS. COOGAN:  Objection, calls for

8    speculation.

9        A.   Depending upon the patient and the conditions,

10   the duration of exposure, that sort of time, yes, it

11   can.

12       Q.   (By Mr. Edwards)  Until they acclimate their

13   bodies, they're at an increased risk; correct?

14             MS. COOGAN:  Speculation.

15       Q.   (By Mr. Edwards)  Of harm to them?

16             MS. COOGAN:  Speculation.

17       Q.   (By Mr. Edwards)  It is not speculation.

18   You're a doctor.

19       A.   Individuals that are exposed to increased heat

20   are at increased risk until they acclimate.

21       Q.   Right.  And a 22-year-old kid, it takes him

22   time to acclimate; right?

23       A.   It takes everybody time to acclimate.

24       Q.   Right.  And one of the problems with the heat

25   vulnerable population -- people with hypertension who

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6370

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

```
 1  are taking diuretics, people on psychotropic meds,

 2  people with diabetes -- is that it's very hard for them

 3  to acclimate to the new hot temperature; correct?

 4      A.   There are increased difficulties acclimating.

 5      Q.   Okay.  That's a problem that -- that UTMB

 6  knows about and knew about before Mr. McCollum came into

 7  the Hutchins Unit; correct?  Or an issue?

 8              MS. COOGAN:  Objection, vague and

 9  speculation.

10      A.   I -- I believe that everyone knows that there

11  could possibly be a problem with going from an

12  air-conditioned environment into a non-air-conditioned

13  environment, yes.

14      Q.   (By Mr. Edwards)  In light of that problem,

15  isn't it really important to monitor the people who are

16  coming in for, you know, four or five days to make sure

17  they're not having problems acclimating?

18              MS. COOGAN:  Objection, vague, "monitor."

19      A.   They are monitored by the se -- security staff

20  that's in the -- in the housing areas.

21      Q.   (By Mr. Edwards)  And --  And your training

22  talks about the problems of -- of acclimating and the

23  need to monitor these -- the people who just come in?

24      A.   That -- that just come in?

25      Q.   From air-conditioned county jails?
```

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   heatstroke or heat exhaustion unless they're really

2   monitored in a way that's different.

3                    And I'll withdraw all that.  That's just

4   the preface.  Okay?  All right?

5                    You've got --  You've got an intake that

6   happens where you do it right away; right?  Right off

7   the bus, people get intakes; right -- or not intake.

8                    MR. GARCIA:  Objection, asked and

9   answered.

10     Q.    (By Mr. Edwards)  You've got a system where

11  there's -- there's some -- some -- some anal -- some --

12  some evaluation of a patient by a certified medical

13  assistant or a -- or an L.V.N.; right?

14                   MR. GARCIA:  Objection, asked and

15  answered.

16     A.    Okay.  Yes, they are screened.  They're also

17  given information on how to access medical care should

18  they have any problems.

19     Q.    (By Mr. Edwards)  To your knowledge, are they

20  told about the dangers of acclimating from cold to hot

21  temperatures?

22                   MS. COOGAN:  Objection, calls for

23  speculation.

24     A.    I'm un -- unsure of what they're told.

25     Q.    (By Mr. Edwards)  Is it the policy of UTMB to

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6372

180

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

1  tell inmates who are coming in about the dangers of

2  acclimation from cold temperatures or cool temperatures

3  to the hotter temperatures in the summer?

4       A.    They are not told -- told at intake, that I'm

5  aware of; but they are -- there is annual training for

6  the offenders at -- at the -- to where they're --

7  they're also included, if you look in the sign-in list.

8             So there are other offenders there who

9  are -- are aware.

10      Q.    Do you know if Mr. McCollum was given any

11 training by UTMB or TDCJ on this issue?

12      A.    No, but I don't think it takes training to

13 know if you're feeling bad.

14      Q.    Well, that's not my question, though; is it?

15            My question is:  Was he given any

16 training about the dangers of acclimation that you

17 talked about?

18      A.    I do not know.

19      Q.    Okay.  Would it be --  And there's no policy

20 from UTMB or TDCJ or anybody else instructing these

21 first-line medical providers what to tell inmates; is

22 there?

23      A.    No policy.

24      Q.    Okay.

25      A.    Actually, any time at intake or as they move

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6373

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1        A.    If possible.   There are situations where that

2    isn't possible.

3        Q.    (By Mr. Edwards)   If it's possible, he should

4    have been moved to a cooler place; right?

5        A.    If possible, yes.

6        Q.    Sure.   Okay.

7                Then it says:   Heatstroke, it's a true

8    medical emergency.

9        A.    True.

10       Q.    And then one -- one of the things it says here

11   is that:   Coma, paralysis and death can follow if

12   emergency treatment is not immediately given.   Is that

13   true?

14       A.    The prognosis is worse if the -- if the

15   condition goes on for longer than two hours, yes.

16       Q.    Well, no.

17                MR. EDWARDS:   Let me --  Let me object as

18   non-responsive because that's not the question I -- I

19   asked you at all.

20       A.    Okay.

21       Q.    (By Mr. Edwards)   Okay.   The question I asked

22   you is this says:   Coma, paralysis and death can follow

23   if emergency treatment is not immediately given.

24                Do you agree with that?

25       A.    Yes.   Emergency measures need to be taken as

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6374

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   soon as possible.

2        Q.   Immediately; right?

3        A.   That's as soon as possible.

4        Q.   Okay.  Now, with regards to treatment of

5   heatstroke, it looks like that the -- the training is

6   that the patient needs to be removed from external

7   source -- sources of heat; is that correct?

8        A.   Yes.

9        Q.   Clothing needs to be removed; is that correct?

10       A.   (Nods head affirmatively.)  If possible, yes.

11       Q.   If possible.  And they need -- and you need to

12  promote evapor -- evaporative cooling by applying cool

13  or iced water to the entire skin.  Is that correct?

14       A.   Most the time we like to use tepid; but, yes,

15  you can use ice water.

16       Q.   Well, my understanding is that you -- you

17  ought to, if you can, pack somebody in ice if they're --

18  if they're suffering a heatstroke.  Is that your

19  understanding as well?

20       A.   We usually put ice, if it's available, in the

21  armpits, groin, neck and under the knees.  Some

22  situations you can do ice water submersion, but that's

23  not done very often because it's so difficult.

24       Q.   It's more practical to have ice available to

25  pack the areas you just talked about; right?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6375

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

 1  non-responsive.

 2      Q.   (By Mr. Edwards)  They should have used ice on

 3  Mr. McCollum --

 4              MS. COOGAN:  Objection --

 5              MR. GARCIA:  Object --

 6              MS. COOGAN:  -- incomplete hypothetical.

 7      Q.   (By Mr. Edwards) --  is that correct?

 8              MR. GARCIA:  And objection, speculation.

 9      A.   Only if they recognized that he was having a

10  heatstroke.

11      Q.   (By Mr. Edwards)  And the whole point of the

12  training is that you train people to recognize that

13  people are having heatstrokes; right?  That's the point

14  of the training?

15      A.   There --  The point of the training is to

16  recognize that someone is having a heatstroke.  Okay?

17  That doesn't, you know, always happen.  It's not always

18  very obvious that someone is having a heatstroke.

19      Q.   Does UTMB consider a seizure a serious medical

20  condition?

21      A.   Seizure disorder is --

22      Q.   No.  Please.  Does UTMB consider a seizure to

23  be a serious medical condition?

24              MS. COOGAN:  Objection, vague; undefined;

25  calls for speculation; incomplete hypothetical.

Stephen McCollum, et al v.                 Glenda Adams, M.D.
Brad Livingston, et al                     November 19, 2013

```
 1              Answer the best you can.
 2       A.   It depends on what you mean by "seizure."
 3  Okay?
 4       Q.   (By Mr. Edwards)  How so?
 5       A.   Some individuals with known seizure disorders
 6  have very short seizures.  Okay.  And, medically, all
 7  that you need to do is to make certain that they don't
 8  harm themselves, place them on the side so that they
 9  don't aspirate, and allow them time to awaken from the
10  postictal, or sleepy state, after a seizure.  There --
11  That's one.
12              There --  Other seizures can be quite
13  serious, and it's an emergency situation that needs to
14  be handled immediately.
15       Q.   Okay.  Let me --  Let's discuss the -- the
16  person with a seizure disorder who just has a serious.
17  That's serious; right?
18       A.   Seizure disorders are a serious medical
19  condition --
20       Q.   Sure.
21       A.   -- yes.
22       Q.   If I have a seizure disorder and I have a --
23  what -- you know, an easy-going seizure and I convulse
24  and then I -- you know, and --  That's still a
25  significant issue that needs to be dealt with; correct?
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6377

Stephen McCollum, et al v.          Glenda Adams, M.D.
Brad Livingston, et al              November 19, 2013

```
 1        A.   Correct.
 2        Q.   It's not for a correctional office --  I mean,
 3   is a correctional officer equipped to diagnose the
 4   difference between, you know, a -- an -- an easier -- a
 5   less violent seizure and a more violent seizure?
 6        A.   No.
 7        Q.   Off course not; right?  You have to be trained
 8   to do that; right?
 9        A.   Trained or have knowledge of seizure
10   disorder --
11        Q.   Sure.
12        A.   -- because you or somebody in your family --
13        Q.   Sure.
14        A.   -- has it.
15        Q.   Okay.  Now, you know, just to follow up on
16   what Ms. Coogan was talking about, you know, convulsions
17   in which a person is not responsive for extended periods
18   of time, that sounds serious to me.  Would you agree
19   with that?
20        A.   Yes.
21        Q.   Okay.  Someone with a heatstroke, you need to
22   get them to an emergency room as fast as possible;
23   right?
24        A.   Yes.
25             MS. COOGAN:  Are you okay?  Need a break?
```

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  depend on -- not necessarily, no.

2      Q.   Okay.  It seems to me like --  Is --  Are

3  those determinations made during the intake physical?

4      A.   Those determinations are made at -- during the

5  intake physical, and each time -- they're reviewed each

6  time a pa -- an offender moves from one facility to

7  another.

8      Q.   Okay.  Now, my understanding of, you know,

9  once -- once the initial review is done by that

10 certified medical assistant or -- or nurse, that

11 eventually UTMB sees the prisoner for an actual intake

12 physical, where the P.A. or a doctor actually sees them

13 and looks them over; is that correct?

14     A.   That's correct.

15     Q.   Okay.  And the --  Is there a --  Is there a

16 time in which UTMB expects this to occur?

17     A.   It's expected to occur within seven days.

18     Q.   Okay.  Why did they pick seven days?

19     A.   Because there is a lot of variables that can

20 interfere with seeing them sooner.  One of the major

21 ones is we have an electronic medical record that has to

22 be populated that usually takes at least 24 to 48 hours,

23 sometimes longer.

24          There also are other documents, past

25 medical records and -- and things like that that may

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6379

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   have to be obtained.  And a lot of these offenders are

2   busy going through other processes, security processes,

3   that have to be done when they come in.

4        Q.   Okay.  So apparent -- apparently there's

5   records that might have to be ordered, there's your own

6   electronic database, and there's some other security

7   issues that you really have nothing to do with.  That --

8   that's the reason why you guys have picked seven days?

9        A.   The se -- yes.

10        Q.   Okay.  Is there anything medically relevant to

11   seven days?

12        A.   Not that I am aware of, no.

13        Q.   It's just a bureaucratic decision?

14        A.   Correct.

15        Q.   Do you know if Mr. McCollum received an intake

16   physical?

17        A.   He did not.

18        Q.   Now, I --  I think you told me that -- that

19   you had read reports that Mr. McCollum was not eating,

20   was not drinking, and was sick; is that correct?

21        A.   I read some of the statements from other

22   offenders that said that.

23        Q.   Okay.  Based on your review of that and then

24   seeing what happened to him, does that sound consistent

25   with what occurred with Mr. McCollum?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6380

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  that cups were not available to inmates who were

2  newly-arrived, would you have recommended to TDCJ:  Hey,

3  you ought to give cups to people so that they can access

4  water more easily?

5              MS. COOGAN:  Speculation.

6              Go ahead.

7      A.   I would have contacted TDCJ Health Services

8  and informed them of the situation.

9      Q.   (By Mr. Edwards)  And what would you have

10 expected TDCJ Health Services to have done?

11     A.   They would have then contacted the security at

12 the Hutchins Unit and -- and discussed it with them.

13 Medical things tend to go through TDCJ Health Services.

14     Q.   All right.

15             Oh, the intake physical that one gets

16 from UTMB medical providers --

17     A.   Uh-huh.

18     Q.   -- is that more involved than that initial

19 what -- the -- the initial kind of meeting with the

20 certified medical assistant when they get off the bus?

21     A.   Yes.  It's a -- a complete physical exam.

22     Q.   So a complete --  Would it --  You know, would

23 it detect --  I mean, if someone was sick or fatigued,

24 is -- would that be a place where that could be

25 recognized or spotted by a trained certified medical

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6381

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  fountains particularly difficult; but, yes, I have a

2  cup.

3       Q.   (By Mr. Edwards)  Of water, right?

4       A.   Correct.

5       Q.   Okay.  When you're telling -- if -- if, for

6  instance, you tell people:  Hey, drink lots of water,

7  wouldn't it be important for you to know whether or not

8  TDCJ is making available a cup to an inmate?

9       A.   I would have no reason to assume they weren't

10 providing access to water.

11      Q.   Neither would I, but I have learned in this

12 case that they weren't making cups available to the

13 newly-arrived inmates.  Okay?

14            Do you --  Do you know that to be true?

15      A.   No, I do not.

16      Q.   Okay.  Would it surprise you if it were true?

17      A.   If they didn't have another means for them to

18 drink water, yes.

19      Q.   Okay.  I suppose you could go to a sink and

20 stick your -- your mouth under and -- and access water;

21 right?  That's one way, I guess, you could do it; right?

22      A.   I guess you could do it, yeah.

23      Q.   Okay.  Not having a cup, though, it makes it

24 harder to access water at the Hutchins Unit; right?

25            MR. GARCIA:  Objection, speculation.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6382

Stephen McCollum, et al v.                 Glenda Adams, M.D.
Brad Livingston, et al                     November 19, 2013

1     Q.   (By Mr. Edwards)  If --

2     A.   I don't know what's available at -- in -- in

3  the Hutchins living areas.  I -- I don't know if there

4  are water fountains.  I don't know if there are paper

5  cups.  I -- I just -- I don't know.

6     Q.   Okay.  All right.  Well, if you don't know,

7  you don't know.

8          I'll represent to you that there weren't

9  cups available to Mr. Hutchins [sic].

10    A.   Okay.

11    Q.   Okay?

12         MR. GARCIA:  Do you mean Mr. McCollum?

13         MR. EDWARDS:  Yeah.  I'm terrible about

14  that.  Thank you, Bruce.

15    Q.   (By Mr. Edwards)  I'll represent to you that

16  Mr. McCollum didn't have access to a cup.

17    A.   Okay.

18    Q.   Should he have, at least from a medical

19  standpoint?

20         MS. COOGAN:  Objection, calls for

21  speculation.

22         Go ahead, Doctor.

23    A.   He should have had access to water and a --

24  and a means to acquire that water, yes.

25    Q.   (By Mr. Edwards)  All right.  Had you known

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6383

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

```
 1  medically --  Okay.  Facility of assignment, no
 2  restriction -- if they required one of the other -- 3,
 3  that's the default.  Medical can request -- at the time
 4  in 2011 -- could request a barrier-free facility, a
 5  single-level facility; and then, of course, they would
 6  mark if they were suitable for the trustee camp.
 7      Q.   Okay.  Let me -- if -- if you wanted to
 8  suggest that a person be placed in an air-conditioned
 9  facility, you could; correct?
10               MS. COOGAN:  Objection, vague.
11               Go ahead.
12      A.   Actually, what would happen is -- if you'll
13  look at the handout I gave you --
14      Q.   (By Mr. Edwards)  Uh-huh.
15      A.   -- where there's an outline, it says that
16  health services doesn't reassign units because of a need
17  for air-conditioning.
18               If there is --  If it's medically
19  necessary, as I've said so many times before, then we
20  move them to a medical facility.  There are instances
21  where we could ask security if they have available
22  air-conditioned housing, if a patient could be put there
23  temporarily until they are moved to a medical facility;
24  and they might or might not be able to accommodate us.
25      Q.   Okay.  So you can do it.  Whether or not it's
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6384

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  effective and actually results in placement in

2  air-conditioning, you know --  Well, strike that.

3              You can request air-conditioning if you

4  want to.

5      A.   That's not going to work.  Okay?  It's not if

6  you want to.  It's if it -- it's medically necessary and

7  then only temporarily until we transfer them to a

8  medical facility.

9      Q.   Well, if it's medically necessary, you have

10 to; right?  It's not a choice.  You have to get them

11 into air-conditioning; right?

12     A.   Right.

13     Q.   Okay.  If it's medically beneficial, you could

14 request it; and then it's up to TDCJ whether or not

15 they -- they follow through on it; correct?

16     A.   It's not something you can select on this

17 (Indicating).  What would happen is they would refer you

18 to health services liaison, and health services liaison

19 would tell the provider:  If he needs air-conditioning,

20 you need to put him in a medical facility.

21             They --  They've clearly stated they

22 won't reassign the patient based on -- on that need.

23     Q.   So, U -- TDCJ has told UTMB:  We are not

24 moving people based on air-conditioning -- based --

25 based on air-conditioning being beneficial for them; is

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6385

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1       A.    This is taken directly from the most recent

2   health services liaison facility types lists that is

3   sent out whenever there is a change of available

4   housing, and it states that:  Health services liaison

5   cannot request reassignment of offender to an

6   air-conditioned or climate-controlled facilities.

7   Providers requesting reassignment of offenders to this

8   type of environment should be referred to their

9   utilization review management department for inpatient

10  placement.

11      Q.    That doesn't apply to medically necessary

12  conditions that require climate control, or does it?

13              MS. COOGAN:  You can answer the question.

14      A.    Okay.  I -- I don't think I understand.

15              This doesn't apply to medical?

16      Q.    (By Mr. Edwards)  Okay.  I guess what you're

17  telling me is:  Look, if UTMB determines that it's

18  medically necessary for someone to have a climate-

19  controlled housing --

20      A.    Uh-huh.

21      Q.    -- they do it.  They request that; correct?

22      A.    Yes.

23      Q.    Okay.  So, you know, one of the issues, I

24  guess, is you don't think Mr. McCollum met the criteria

25  to be -- to be medically -- that he medically needed

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1       A.   He actually went to the medical department on

2   the -- not only on the 15th and saw -- but he was also

3   in the medical department on the 18th.

4       Q.   (By Mr. Edwards)  Okay.

5       A.   He could have, you know, asked to see someone

6   then.

7       Q.   So -- So you would be critical of

8   Mr. McCollum?

9       A.   Absolutely not.  I'm just saying he could have

10  if he had felt bad and wished to be seen by medical.

11      Q.   Okay.  All right.  Okay.

12           Oh, this air-conditioned

13  climate-controlled facilities policy that we're learning

14  about today, when did that go into effect?

15      A.   It's --  It's been in effect all along.

16           It was only put into writing fairly

17  recently with one of the newer health services liaison

18  facility type lists that were put out.

19      Q.   When did it actually go into effect in

20  writing?

21      A.   In writing?  Just recently.  It's been in

22  effect, it's been understood, for as long as I've been

23  with TDCJ.

24      Q.   Did anyone actually tell you that?

25      A.   Yes.

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1       Q.   Okay.  Who?

2       A.   Phyllis McWhorter in health services liaison.

3  She's the one that I frequently work with in order to

4  find -- make accommodations for offender patients.

5       Q.   So she told you:  Look --  She told you the

6  sum and substance of this, which is called

7  air-conditioned climate-controlled facilities; right?

8       A.   Yes.

9       Q.   Okay.

10      A.   We've known that for a long time.

11      Q.   Okay.  Did she specifically tell you that?

12      A.   Yes.  We've discussed it.

13      Q.   Okay.  When would a prisoner have a single

14  cell restriction?

15      A.   Some psychiatric patients are single-celled.

16  Some patients with infectious diseases are

17  single-celled.

18      Q.   That's a restriction that T -- UTMB makes?

19      A.   Yes.

20      Q.   When would a prisoner have a cell block only

21  restriction?

22      A.   Those that are psychiatrically not suitable

23  for dormitory housing.

24      Q.   That, again, is a decision that UTMB makes;

25  right?

Stephen McCollum, et al v.               Glenda Adams, M.D.
Brad Livingston, et al                   November 19, 2013

1       A.   Yes.   It's a restriction that we apply to the

2   HSM-18.

3       Q.   And even if -- even if there weren't available

4   psych beds, it's still a restriction that you would

5   expect TDCJ to follow; correct?

6       A.   What?

7       Q.   Even if there weren't available cell block

8   only placements, you would still expect TDCJ to follow

9   it to make -- to make that stuff available; right?

10      A.   There's no shortage of cell blocks -- I mean,

11  there is, because they're frequently at capacity; but

12  they will find a way to single cell somebody if

13  necessary.

14      Q.   You would ex -- you -- they have to find a

15  way; right?  Because you're telling them:  Look, this is

16  a restriction that they need; right?  From a medical

17  standpoint?

18      A.   Yes.

19      Q.   Okay.  And if --  Look.  It appears --  Is --

20  Is the debate that we seem to be having, you -- you

21  don't think:  Look, air-conditioned or

22  climate-controlled housing, that's not medically

23  necessary for people with similar traits to

24  Mr. McCollum; right?

25      A.   It's medically appropriate.  Okay.  Perhaps

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

 1  that you would consider; right?

 2       A.   The --  Of putting someone on -- on the heat

 3  lists?

 4       Q.   Yeah --  No.  No.  On the work -- workplace

 5  restriction; right?

 6       A.   Not necessarily.

 7       Q.   Right.  Because you've got to figure out

 8  whether it's controlled or not; right?

 9       A.   Well, correct; but those heat lists are

10  relatively new.  Are you talking about the new ones?

11       Q.   Yeah.  Well, tell -- tell me when they came

12  into being, from your understanding.

13       A.   Okay.  Lists of people with specific

14  restrictions have been around since I've been with TDCJ.

15  Okay?

16       Q.   Workplace restrictions.

17       A.   They're --  They're --  Yes.  They're --

18  Complete the HSM-18, it goes into their computer system

19  FORVUS, and they can print out lists of who has what

20  restrictions.

21       Q.   My question, though, is:  When do you recall

22  these heat lists being implemented?

23       A.   I didn't find out these heat lists --  I

24  didn't find out about these heat lists until May of

25  2013.

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1     Q.   Okay.  And you were, again, the dir -- you
2  were the director of medical care for an entire region?
3     A.   Okay.  These heat lists were a TDCJ project.
4  They did not involve UTMB leadership.
5     Q.   Okay.  So first you heard about any -- any
6  heat list at a -- at a facility May 2013.
7     A.   The first I read about the heat list was when
8  doc -- I think it was Mr. Stephenson put out his 2013
9  heat notice.
10    Q.   Okay.
11    A.   It wasn't clear to me at the time that UTMB
12 was involved with creating these heat lists.  I assume
13 TDCJ was getting these lists out of FORVUS, combined
14 with the list of new intake offenders.  I only found out
15 towards the end of May that the wardens were having
16 medical create lists.
17    Q.   Okay.  So you found out in May of 2013 that
18 wardens would have the med -- the -- the onsite medical
19 create lists of people who they thought would be
20 vulnerable to heat so that they could be better
21 monitored?
22    A.   The wardens at various units were having it
23 done different ways.  Okay?  Medical was involved at
24 some of the units that I asked about it, classification
25 at -- at other units.  But the lists were essentially

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

 1  information that TDCJ already had, the FORVUS list and

 2  the intake list.

 3        Q.   Okay.  I'm just trying to figure out how it --

 4  how it got implemented and how it got implemented

 5  without you knowing about it?

 6        A.   I find that interesting, also.

 7        Q.   Why?  Why?

 8        A.   It would be speculation for me to say why --

 9        Q.   Well --

10        A.   -- why I -- what I think.

11        Q.   Would you tell me what you think even if it is

12  speculation?

13             MS. COOGAN:  I -- I would not recommend

14  that you do that.

15             THE WITNESS:  Okay.

16        Q.   (By Mr. Edwards)  Why do you think it --

17             MS. COOGAN:  Objection, vague.

18        A.   I think I was just told not to answer; wasn't

19  I?

20        Q.   (By Mr. Edwards)  Well, I don't think --

21             MS. COOGAN:  Objection, vague.

22        A.   Because it's speculation.

23             MR. EDWARDS:  Are you going to instruct

24  her not to answer?

25        Q.   (By Mr. Edwards)  I would like to know why you

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6392

257

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1    Q.   Is it important for the person doing the

2  intake -- and I forget if it was Ms. Haywood or

3  Ms. McKinney.  It's important for those -- those people

4  to accurately take notes as to people's conditions;

5  correct?

6    A.   Yes.  It's important that that document is

7  correct.

8    Q.   Okay.  Now, I don't --  Did that form indicate

9  that Mr. McCollum had a history of diabetes?

10    A.   He indicated he had a history of diabetes.  He

11  did not indicate that diabetes was a current problem.

12    Q.   Okay.

13         MR. EDWARDS:  Let me object as

14  non-responsive.

15    Q.   (By Mr. Edwards)  Just on this --  That form

16  indicated he had a history of diabetes; is that correct?

17    A.   Correct.

18    Q.   Did that form indicate he had high blood

19  pressure?

20    A.   I need to look at it.  I be --  I believe that

21  it did.

22    Q.   Okay.

23    A.   But his form from the county jail definitely

24  indicated he had high blood pressure.

25    Q.   Okay.

258

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1        A.    I believe he did list hypertension, yes.  I'm

2   pretty sure.

3        Q.    Is high blood pressure the same thing as

4   hypertension?

5        A.    Yes.  It's a layman's term for hypertension.

6        Q.    And depression, is that on that form?

7        A.    I believe that, yes, he did list depression.

8        Q.    Is there any reason you know of why you

9   couldn't use this particular form to identify people

10  with heat-sensitive conditions?

11       A.    Actually, we do.

12       Q.    So no reason you couldn't have done it

13  forever; right?

14              MS. COOGAN:  Objection, vague.

15       A.    I -- I don't -- I -- I don't understand.

16       Q.    (By Mr. Edwards)  You know --

17       A.    What do you mean "done it forever"?

18       Q.    Well, you -- you just told me you do use that

19  form to identify people with heat-sensitive conditions;

20  right?

21       A.    Correct.

22       Q.    Okay.  Okay.  Do you --  Do you know that

23  Mr. Mc -- have you reviewed records that indicate that

24  Mr. McCollum's cellmate said that he was a diabetic?

25       A.    In the OI -- OIG report, I believe there is a

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1      Q.   All right.  How does hypertension affect the

2  circulatory system?

3                  MS. COOGAN:  Objection.  You're back to

4  the 23, 24 and 25 that the judge --

5                  MR. EDWARDS:  Oh, okay.

6                  (INSTRUCTION NOT TO ANSWER.)

7      Q.   (By Mr. Edwards)  Well, all right.  If I ask

8  you any questions about the effects of hypertension or

9  diabetes or depression, you're just not going to answer

10  them based on counsel; fair?

11     A.   At this time, yes.

12     Q.   Okay.  Do you consider obesity a medical

13  condition?  Morbid obesity?

14     A.   Yes.

15     Q.   It can limit physical activity?

16     A.   It can, yes.

17     Q.   It can affect breathing of people?

18     A.   Yes, it can.

19     Q.   It can affect people's ability to walk or to

20  run; correct?

21     A.   It can.

22     Q.   It can even affect people's ability to stand

23  up; right?

24     A.   If they're obese enough, yes.

25     Q.   Okay.  Do you know if it was safe to house

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Plaintiffs' MSJ Appx. 6395

Stephen McCollum, et al v.                Glenda Adams, M.D.
Brad Livingston, et al                    November 19, 2013

1  secure --  Security determines what their policy and

2  procedure is on that.

3      Q.   Okay.  Would you consider it to be dangerous

4  if there was a requirement at the Hutchins facility --

5  if that only supervisors could initiate 9-1-1 calls?

6              MS. COOGAN:  Objection, calls for

7  speculation; incomplete hypothetical.

8              Go ahead, Dr. Adams.

9      A.   Again, I wouldn't know because I don't know

10 how quickly a supervisor would be available.

11     Q.   (By Mr. Edwards)  When dealing with medical

12 emergencies, time is of the essence; fair?

13     A.   Correct.

14     Q.   Heatstroke --

15     A.   Often.

16     Q.   -- is --  Okay.

17              Heatstroke, you -- you need immediate

18 treatment?

19     A.   You need treatment as soon as possible, yes.

20     Q.   Right.  Okay.

21              Has anyone from UTMB, to your knowledge,

22 ever discussed the medical benefits of climate control

23 or air-conditioning with Executive Director Livingston,

24 to your knowledge?

25     A.   To my knowledge, I don't know.

299

Stephen McCollum, et al v.                          Glenda Adams, M.D.
Brad Livingston, et al                              November 19, 2013

```
1                    CHANGES AND SIGNATURE

2   WITNESS: THE DESIGNATED REPRESENTATIVE OF THE

3            UNIVERSITY OF TEXAS MEDICAL BRANCH

4        BY AND THROUGH GLENDA ADAMS, M.D.

5   DATE: NOVEMBER 19, 2013

6   PAGE   LINE   CHANGE                     REASON

7    26     20    OREG TO ORIG               INCORRECT SPELLING

8    30     20    "TDCJ" TO "UTMB"           MISSPOKE

9    30     22    UTMB HAS CONTRACT WITH "TDCJ"  MISSPOKE
                  TO PROVIDE HEALTHCARE
10   40     15    "DID HE NOT" TO "HE DID NOT"   CLARITY

11  168     17    176,000 SHOULD BE 156,000  MISSPOKE

12  176     10    "time" SHOULD BE "thing"   ? MISSPOKE

13  185     20    ZAROTA SHOULD BE ZEPEDA    INCORRECT SPELLING

14  219     11    "WATER" SHOULD BE "diuretic"  ? MISSPOKE

15  220     20    "EMR" SHOULD BE "MAR"      ? MISSPOKE V TYPO

16  234      1    "distance" SHOULD BE "defect"  ? TYPO

17  290     24    SHOULD BE "THIS IS NOT     MISSPOKE V TYPO

18   ___    ___   _____        _____

19   ___    ___   _____        _____

20   ___    ___   _____        _____

21   ___    ___   _____        _____

22   ___    ___   _____        _____

23   ___    ___   _____        _____

24   ___    ___   _____        _____

25   ___    ___   _____        _____
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ed4af7ad-12d7-431a-9322-dd8468e9e55c

Stephen McCollum, et al v.                     Glenda Adams, M.D.
Brad Livingston, et al                          November 19, 2013

```
1        I, GLENDA ADAMS, M.D., have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5                              _____
                                      GLENDA ADAMS, M.D.
6                              GLENDA ADAMS, M.D.

7

8   THE STATE OF  Texas          :

9   COUNTY OF  Montomery         :

10

11        Before me,  Phoebe M Langley,

12  on this day personally appeared GLENDA ADAMS, M.D.,

13  known to me or proved to me on the oath of

14  _____ or through _____

15  (description of identity card or other document) to be

16  the person whose name is subscribed to the foregoing

17  instrument and acknowledged to me that he\she executed

18  the same for the purpose and consideration therein

19  expressed.

20        Given under my hand and seal of office on this

21  30 th day of December        , 2013  .

22

23                              _____
                                NOTARY PUBLIC IN AND FOR
24
    ┌─────────────────────────┐   THE STATE OF  Texas
    │  PHOEBE M. LANGLEY       │
25  │ Notary Public, State of  │   My Commission Expires: 12-30-15
    │        Texas             │
    │  My Commission Expires   │
    │   December 30, 2015      │
    └─────────────────────────┘
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

ed4af7ad-12d7-431a-9322-dd8468e9e55c

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

```
 1 |          IN THE UNITED STATES DISTRICT COURT
   |          FOR THE NORTHERN DISTRICT OF TEXAS
 2 |                    DALLAS DIVISION
   |
 3 | .....................................................
   |                          :
 4 | STEPHEN McCOLLUM, STEPHANIE     :
   | KINGREY, and SANDRA McCOLLUM,   :
 5 | individually and as heirs       :
   | at law in the Estate of         :
 6 | LARRY GENE McCOLLUM,            :
   |            Plaintiffs,          :
 7 |                                :   CIVIL ACTION NO.
   | VS.                            :
 8 |                                :   3:12-cv-02037
   | BRAD LIVINGSTON, JEFF PRINGLE, :
 9 | RICHARD CLARK, KAREN TATE,      :
   | SANDREA SANDERS, ROBERT EASON, :
10 | THE UNIVERSITY OF TEXAS         :
   | MEDICAL BRANCH and the TEXAS    :
11 | DEPARTMENT OF CRIMINAL JUSTICE,:
   |            Defendants.          :
12 |                                :
   | .....................................................
13 |
   |               REPORTER'S CERTIFICATION
14 |                       TO THE
   |          ORAL AND VIDEOTAPED DEPOSITION OF
15 |          THE DESIGNATED REPRESENTATIVE OF
   |       THE UNIVERSITY OF TEXAS MEDICAL BRANCH
16 |                  BY AND THROUGH
   |                GLENDA ADAMS, M.D.
17 |                NOVEMBER 19, 2013
   |
18 |
   | .....................................................
19 |      I, Mary C. Dopico, Certified Shorthand.  Reporter
   | in and for the State of Texas, do hereby certify that
20 | the facts stated by me in the caption hereto are true;
   | that the foregoing deposition of THE DESIGNATED
21 | REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH
   | BY AND THROUGH GLENDA ADAMS, M.D., the witness
22 | hereinbefore named, was taken by me in machine
   | shorthand, the said witness having been by me first duly
23 | cautioned and sworn to tell the truth, the whole truth,
   | and nothing but the truth, and later transcribed from my
24 | machine shorthand notes to typewritten form by me.
   |
25 |      I further certify that the above and foregoing
```

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363

Plaintiffs' MSJ Appx. 6399
ed4af7ad-12d7-431a-9322-dd8468e9e55c

302

1   deposition, as set forth in typewriting, is a full, true
    and correct transcript of the proceedings had at the
2   time of taking said deposition.

3       I further certify that pursuant to FRCP Rule
    30(f)(1) that the signature of the deponent was
4   requested by the deponent or a party before the
    completion of the deposition and returned within 30 days
5   from date of receipt of the transcript.  If returned,
    the attached Changes and Signature Pages contain any
6   changes and the reasons therefor;

7       _____ was not requested by the deponent or a party
    before the completion of the deposition.
8

9       I further certify that I am neither attorney or
    counsel for, nor related to or employed by any of the
    parties to the action in which this deposition is taken,
10  and further that I am not a relative or employee of any
    attorney or counsel employed by the parties hereto, or
11  financially interested in the action.

12      I further certify that charges for the preparation
    of the foregoing completed deposition were $ 1745.45
13  for the original thereof, charged to Attorney(s) for
    Plaintiffs.
14
        GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd
15  day of December, 2013.

16      [Notary Seal: MARY C DOPICO
17      My Commission Expires
        January 31, 2017]                _Mary C. Dopico_
18                              Mary C. Dopico, CSR, RPR, CRR
                                CSR No. 463, Exp. 12-31-2014
19                              Notary Public, State of Texas
                                Commission Expires 1-31-2017
20  Independent Contractor To:
    Wright, Watson & Associates
21  Firm Registration No. 225
    Expires 12-31-2013
22  3307 Northland Drive, Suite 185
    Austin, Texas  78731
23  512/474-4363  Fax 512/474-8802

24

25

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3   ...........................................................
                                         :
 4   STEPHEN McCOLLUM, STEPHANIE          :
     KINGREY, and SANDRA McCOLLUM,        :
 5   individually and as heirs           :
     at law in the Estate of             :
 6   LARRY GENE McCOLLUM,                 :
                  Plaintiffs,            :
 7                                        :  CIVIL ACTION NO.
     VS.                                  :
 8                                        :    3:12-cv-02037
     BRAD LIVINGSTON, JEFF PRINGLE,       :
 9   RICHARD CLARK, KAREN TATE,           :
     SANDREA SANDERS, ROBERT EASON,       :
10   THE UNIVERSITY OF TEXAS              :
     MEDICAL BRANCH and the TEXAS         :
11   DEPARTMENT OF CRIMINAL JUSTICE,:
                  Defendants.            :
12   ...........................................................

13                   REPORTER'S CERTIFICATION
14                          TO THE
               ORAL AND VIDEOTAPED DEPOSITION OF
15             THE DESIGNATED REPRESENTATIVE OF
          THE UNIVERSITY OF TEXAS MEDICAL BRANCH
16                       BY AND THROUGH
                      GLENDA ADAMS, M.D.
17                     NOVEMBER 19, 2013

18   ...........................................................
19        I, Mary C. Dopico, Certified Shorthand.  Reporter
     in and for the State of Texas, do hereby certify that
20   the facts stated by me in the caption hereto are true;
     that the foregoing deposition of THE DESIGNATED
21   REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH
     BY AND THROUGH GLENDA ADAMS, M.D., the witness
22   hereinbefore named, was taken by me in machine
     shorthand, the said witness having been by me first duly
23   cautioned and sworn to tell the truth, the whole truth,
     and nothing but the truth, and later transcribed from my
24   machine shorthand notes to typewritten form by me.

25        I further certify that the above and foregoing
```

**WRIGHT WATSON & ASSOCIATES**

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   deposition, as set forth in typewriting, is a full, true
    and correct transcript of the proceedings had at the
2   time of taking said deposition.

3       I further certify that pursuant to FRCP Rule
    30(f)(1) that the signature of the deponent was
4   requested by the deponent or a party before the
    completion of the deposition and returned within 30 days
5   from date of receipt of the transcript.  If returned,
    the attached Changes and Signature Pages contain any
6   changes and the reasons therefor;

7       I further certify that I am neither attorney or
    counsel for, nor related to or employed by any of the
8   parties to the action in which this deposition is taken,
    and further that I am not a relative or employee of any
9   attorney or counsel employed by the parties hereto, or
    financially interested in the action.

10

11      I further certify that charges for the preparation
    of the foregoing completed deposition were $ _____
    for the original thereof, charged to Attorney(s) for
12  Plaintiffs.

13      GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd
    day of December, 2013.

14

15

16
                          _____
                          Mary C. Dopico, CSR, RPR, CRR
17                        CSR No. 463, Exp. 12-31-2014
                          Notary Public, State of Texas
18                        Commission Expires 1-31-2017
    Independent Contractor To:
19  Wright, Watson & Associates
    Firm Registration No. 225
20  Expires 12-31-2013
    3307 Northland Drive, Suite 185
21  Austin, Texas  78731
    512/474-4363  Fax 512/474-8802

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 273

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                   DALLAS DIVISION

STEPHEN McCOLLUM,        §
STEPHANIE KINGREY, and §
SANDRA McCOLLUM,         §
individually and as      §
heirs at law to the      §
Estate of LARRY GENE     §
McCOLLUM,                §
          Plaintiffs,    §
                         §
VS                       §     CIVIL ACTION NO.
                         §     3:12-cv-02037
BRAD LIVINGSTON, JEFF    §
PRINGLE, and the TEXAS   §
DEPARTMENT OF CRIMINAL   §
JUSTICE,                 §
          Defendants.    §
```

---------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

ANANDA D. BABBILI

FEBRUARY 7, 2013

---------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF

ANANDA D. BABBILI, produced as a witness at the instance

of the PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

February, 2013, from 9:52 a.m. to 12:50 p.m., before

TINA TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

2

McCollum, et al. v.                          Ananda D. Babbili
Brad Livingston, et al.                      February 07, 2013

```
 1                   A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3        Mr. Jeff Edwards
          Mr. Scott Medlock
 4        THE EDWARDS LAW FIRM
          The Bremond Houston House
 5        706 Guadalupe
          Austin, Texas  78701
 6        jeff@edwards-law.com
          scott@edwards-law.com
 7

 8   FOR THE DEFENDANTS:

 9        Mr. Bruce R. Garcia
          Mr. David A. Harris
10        OFFICE OF THE ATTORNEY GENERAL
          P.O. Box 12548
11        Austin, Texas 78711-2548
          512.463.2080  Fax 512.495.9139
12        bruce.garcia@oag.state.tx.us
          david.harris@oag.state.tx.us
13

14   FOR THE WITNESS:

15        Ms. Kim Coogan
          OFFICE OF THE ATTORNEY GENERAL
16        P.O. Box 12548
          Austin, Texas 78711-2548
17        512.463.2080  Fax 512.495.9139
          kim.coogan@oag.state.tx.us
18

19   ALSO PRESENT:

20        Mr. Jeremy Gilliam (Videographer)
          512.565.4799
21

22

23

24

25
```

3

McCollum, et al. v.                    Ananda D. Babbili
Brad Livingston, et al.                February 07, 2013

```
 1                        INDEX

 2                                        PAGE

 3   Appearances...................................  2

 4   WITNESS:  ANANDA D. BABBILI

 5   Examination by Mr. Edwards...................  4

 6   Signature and Changes....................... 120

 7   Reporter's Certificate...................... 122

 8

 9

10                      EXHIBITS

11   NO.   DESCRIPTION                        PAGE

12   1     Notice...................................  9

13   2     Clinic Notes 7/15/11....................  10

14   3     Intake History and Health Screening
           7/15/11................................  19
15
     3-A   Texas Uniform Health Status Update
16         7/15/11................................  71

17   4     Clinic Notes - Nursing 7/22/11..........  29

18   5     Death Summary 11/23/11..................  37

19   6     Autopsy Report 7/29/11..................  39

20   7     Signs of Hypertension Excerpt...........  46

21   8     Health Summary for Classification
           7/20/11................................  66
22
     9     Mr. Babbili's Resume....................  --
23
     10    Card for Treatment and Prevention of
24         Heat Illness...........................  --

25
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
a77f4372-87b7-4f0b-bb74-2a2636af2a31

Plaintiffs' MSJ Appx. 6406

McCollum, et al. v.                           Ananda D. Babbili
Brad Livingston, et al.                       February 07, 2013

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE VIDEOGRAPHER:  Going on the record |
| 3 | February 7th, 2013.  The time is approximately 9:52 a.m. |
| 4 | Will the court reporter please swear in the witness? |
| 5 | ANANDA D. BABBILI, |
| 6 | having been first duly sworn, testified as follows: |
| 7 | EXAMINATION |
| 8 | BY MR. EDWARDS: |
| 9 | Q.   Would you kindly state your name for the |
| 10 | record, sir? |
| 11 | A.   My name is Ananda D. Babbili. |
| 12 | Q.   My name is Jeff Edwards, and I represent the |
| 13 | McCollum family -- |
| 14 | A.   Okay. |
| 15 | Q.   -- the children and wife of the man that died |
| 16 | from hyperthermia in the Hutchins State Jail.  Do you |
| 17 | understand that? |
| 18 | A.   Yes, I do. |
| 19 | Q.   Okay.  You -- did you bring any materials with |
| 20 | you today, sir? |
| 21 | A.   I have -- |
| 22 | MS. COOGAN:  In response to the subpoena? |
| 23 | Here. |
| 24 | MR. EDWARDS:  Okay.  Are you handing me |
| 25 | all the -- |

McCollum, et al. v.                    Ananda D. Babbili
Brad Livingston, et al.                February 07, 2013

1  provide me with information that you reviewed in

2  preparation for your deposition?

3                 MS. COOGAN:  Yes.

4       A.   Yes.

5       Q.   Okay.  Can you hand me that deposition notice?

6       A.   (Witness complies.)

7       Q.   Tell me what the next document is, sir.

8       A.   The next document is dated July 15th, the day

9  Mr. McCollum arrived, and this is the medication ordered

10 by me to the patient.

11      Q.   Okay.

12                 (Exhibit 2 marked.)

13      Q.   Does this document reflect kind of your --

14 what you -- what your treatment decision with

15 Mr. McCollum was as of July 15th, 2011?

16      A.   Yes.

17      Q.   Okay.  And I'm going to ask you a bunch more

18 questions about that later on in the deposition, but did

19 you actually see Mr. McCollum?

20      A.   No.

21      Q.   How did you make a decision to discontinue a

22 drug without seeing Mr. McCollum?

23      A.   Because Clonidine is a nonformulated drug.  We

24 don't use it on the unit, and it was given in the county

25 as needed basis if the blood pressure is high, and

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
a77f4372-87b7-4f0b-bb74-2a2636af2a31

Plaintiffs' MSJ Appx. 6408

McCollum, et al. v.                          Ananda D. Babbili
Brad Livingston, et al.                      February 07, 2013

1   because of that reason, because we don't use the

2   medicine for routine hypertension patients, I wanted to

3   supplement that with a daily small dose of

4   hydrochlorothiazide until he was seen by the provider.

5        Q.    Is your understanding -- and I'm going to

6   butcher this -- but this hydro -- tell me --

7        A.    Hydrochlorothiazide.

8        Q.    Hydrochlorothiazide.

9        A.    Uh-huh.

10       Q.    Can we call that HCZ?

11       A.    HCTZ, yes.

12       Q.    HCTZ.

13       A.    Uh-huh.

14       Q.    Is it your understanding that HCTZ is the

15   equivalent of Clonidine?

16       A.    No.

17       Q.    How -- how are they different?

18       A.    Clonidine is an alpha blocker agonist, which

19   is a central nervous system acting drug.

20   Hydrochlorothiazide acts on the kidneys to deplete any

21   extra amount of water being retained by the body.  By

22   decreasing the volume of the fluid in the body, it

23   decreases the workload on the heart.  The pressure will

24   be normalized or stabilized or decreased.

25       Q.    But it's your understanding that Clonidine is

McCollum, et al. v.                    Ananda D. Babbili
Brad Livingston, et al.                February 07, 2013

 1     Q.   You can still answer.

 2     A.   I did not see the patient, so I cannot answer

 3  that.

 4     Q.   Well, okay.

 5          MR. EDWARDS:   Let me object as

 6  nonresponsive.

 7     Q.   Would you expect, based on your training,

 8  experience and observation of correctional officers,

 9  that a correctional officer, faced with the situation

10  that they found Mr. McCollum in, to contact the triage

11  nurse immediately?

12          MR. HARRIS:   Objection, improper

13  hypothetical.  Lack of foundation.  Calls for

14  speculation.

15     Q.   You can answer, sir.

16     A.   In my experience, a correction officer,

17  sensing the emergency situation of the patient, have a

18  right to call the -- whoever they needed to call

19  immediately.

20     Q.   You said they have a right to call them.  Did

21  you mean -- is that what you meant, that they had the

22  ability to?

23     A.   Common sense.  Common sense.

24     Q.   Common sense says, look, contact them

25  immediately; is that fair?

McCollum, et al. v.                    Ananda D. Babbili
Brad Livingston, et al.                February 07, 2013

1      A.    Uh-huh.

2      Q.    And that would be your expectation as a PA on

3   the facility, right?

4      A.    Yes.

5      Q.    Okay.  And, you know, I'm not saying it

6   happened, but if there was a delay, a significant delay

7   of, you know, 40 minutes, an hour, as a medical person,

8   I assume you'd have a problem with that; is that

9   correct?

10      A.    Yes.

11      Q.    Okay.  All right.  What are your other

12   documents there, sir?

13      A.    This is the death summary I did for Dr. Orig,

14   who asked me to do that.

15      Q.    I'm sorry.  I apologize.  Would you tell me

16   the name of the doctor?

17      A.    Dr. Orig, O-R-I-G.  He's the medical director

18   of Hutchins Medical Department.

19      Q.    Okay.  And he went to medical school, and he

20   has an M.D. after his name?

21      A.    Yes.

22      Q.    Okay.

23                  (Exhibit 5 marked.)

24      Q.    Would you take a look at Exhibit 5?

25      A.    Uh-huh.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
a77f4372-87b7-4f0b-bb74-2a2636af2a31

Plaintiffs' MSJ Appx. 6411

82

McCollum, et al. v.                          Ananda D. Babbili
Brad Livingston, et al.                      February 07, 2013

1   medications the patient came with, and if there is a

2   psych medicine, the psych will address that issue, but

3   medically, I assign the restrictions if he is in need of

4   a restriction.

5        Q.   For instance, some -- some drugs are like

6   diuretics?

7        A.   Uh-huh.

8        Q.   Okay.   Diuretics cause people to dehydrate.

9   Is that accurate?

10       A.   If the patient is paying attention to his

11  body's needs and what the body is telling him.   Most of

12  the time, they will feel thirsty, and they replace the

13  fluid which is being lost in a sweat form or vapor form.

14  So the body will tell.   When the heat -- when the body

15  is getting dehydrated, before we use the dehydration

16  word, the body will tell.   That's why I tell the

17  patients, drink a lot of water.

18       Q.   Gotcha.   But in terms of like -- well, that

19  drug that you prescribed, that H --

20       A.   HCTZ.

21       Q.   HTCZ?

22       A.   HC.

23       Q.   HCTZ, thanks.   That's a diuretic, right?

24       A.   Yes.

25       Q.   That makes somebody more susceptible to

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
a77f4372-87b7-4f0b-bb74-2a2636af2a31

Plaintiffs' MSJ Appx. 6412

McCollum, et al. v.                    Ananda D. Babbili
Brad Livingston, et al.                February 07, 2013

1   dehydrating, right?

2       A.   Yes.

3       Q.   Okay.  The Dallas area -- and I'm just asking

4   generally -- that's -- it's generally extremely hot in

5   the summer.  Is that fair?

6       A.   Generally, yes.

7       Q.   Okay.  I've seen in the documents lots of

8   temperature readings that are taken from 6:30 a.m. until

9   6:30 p.m. by someone on Warden Pringle's staff.  Are

10  those temperatures made known to you?

11      A.   No.

12      Q.   So you'd just have to -- you walk in, and it's

13  105 degrees?

14      A.   By what you feel, yeah.

15      Q.   Yeah.  Okay.  Someone with hypertension is

16  more susceptible to extreme heat than someone without

17  hypertension as a practical matter; isn't that correct?

18      A.   Not all the hypertensive patients are

19  extremely prone for heat problems.

20      Q.   As a general matter then, are more -- is it

21  more likely than not that someone suffering from

22  hypertension would be more susceptible to extreme heat

23  than someone who's not?

24      A.   If the patient is on diuretics.

25      Q.   Okay.  And Mr. McCollum was on diuretics,

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
a77f4372-87b7-4f0b-bb74-2a2636af2a31

Plaintiffs' MSJ Appx. 6413

McCollum, et al. v.                          Ananda D. Babbili
Brad Livingston, et al.                      February 07, 2013

1  medically speaking.  We would like to take all the

2  precautionary methods, but it is important, yeah.

3       Q.   Do you know why the Hutchins Unit and -- do

4  you know why they don't -- they do not prescribe

5  Clonidine?

6       A.   Well, Clonidine is a centrally acting --

7  central nervous system acting medication, which has a

8  potential for more major side effects comparing to

9  diuretics, and it also has a tendency to develop

10 habituation problems within meds, addiction problems

11 with the inmates, and it is hard to monitor the

12 compliance, especially with relationship to

13 discontinuing the drug, or side effects.

14      Q.   Does -- does Clonidine have the same effect on

15 the body as HCTZ?

16           MR. HARRIS:  Objection, asked and

17 answered.

18      A.   No.

19      Q.   Oh, what are your hours, sir?

20      A.   I come at 6:00 -- between 6:00 and 6:15 and

21 leave at -- between 2:15 and 2:30 or 2:45 or 3:00,

22 sometimes later than that.

23      Q.   Is there any medical staff at the facility

24 after 6:30 p.m.?

25      A.   Not to my knowledge.

McCollum, et al. v.                    Ananda D. Babbili
Brad Livingston, et al.                February 07, 2013

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3  STEPHEN McCOLLUM,        §
    STEPHANIE KINGREY, and   §
 4  SANDRA McCOLLUM,         §
    individually and as      §
 5  heirs at law to the      §
    Estate of LARRY GENE     §
 6  McCOLLUM,                §
              Plaintiffs,    §
 7                           §
    VS                       §   CIVIL ACTION NO.
 8                           §   3:12-cv-02037
    BRAD LIVINGSTON, JEFF    §
 9  PRINGLE, and the TEXAS   §
    DEPARTMENT OF CRIMINAL   §
10  JUSTICE,                 §
              Defendants.    §
11

12

13      --------------------------------------

14            REPORTER'S CERTIFICATION

15       ORAL AND VIDEOTAPED DEPOSITION OF

16              ANANDA D. BABBILI

17              FEBRUARY 7, 2013

18      --------------------------------------

19

20      I, Tina Terrell Burney, Certified Shorthand

21  Reporter in and for the State of Texas, hereby certify

22  to the following:

23          That the witness, ANANDA D. BABBILI, was duly

24  sworn by the officer and that the transcript of the oral

25  deposition is a true record of the testimony given by
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
a77f4372-87b7-4f0b-bb74-2a2636af2a31

Plaintiffs' MSJ Appx. 6415

123

McCollum, et al. v.                          Ananda D. Babbili
Brad Livingston, et al.                      February 07, 2013

1   the witness;

2        I further certify that pursuant to FRCP Rule

3   30(f)(1) that the signature of the deponent:

4        _____ was requested by the deponent or a

5   party before the completion of the deposition and is to

6   Be returned within 30 days from date of receipt of the

7   transcript.  If returned, the attached Changes and

8   Signature Page contains any changes and the reasons

9   therefor;

10       _____ was not requested by the deponent or a

11  party before the completion of the deposition.

12       I further certify that I am neither attorney

13  or counsel for, nor related to or employed by, any of

14  the parties or attorneys to the action in which this

15  deposition was taken.  Further, I am not a relative or

16  employee of any attorney of record in this case, nor am

17  I financially interested in the outcome of the action.

18       Subscribed and sworn to on this the _____

19  day of February, 2013.

20

21       _____

22       TINA TERRELL BURNEY
         Texas CSR No. 2908
         Expiration Date:  12/31/14
23       WRIGHT WATSON & ASSOCIATES, L.L.C.
         3307 Northland Drive, Suite 185
24       Austin, Texas  78731
         800.375.4363  Fax 512.474.8802
25       Firm Registration No. 225

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

a77f4372-87b7-4f0b-bb74-2a2636af2a31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § |
| PLAINTIFFS | § § |
| v. | § § § |
| | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 274

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM,          §
STEPHANIE KINGREY, and §
SANDRA McCOLLUM,           §
individually and as    §
heirs at law to the    §
Estate of LARRY GENE    §
McCOLLUM,               §
          Plaintiffs,  §
                        §
VS                      §     CIVIL ACTION NO.
                        §     3:12-cv-02037
BRAD LIVINGSTON, JEFF  §
PRINGLE, and the TEXAS §
DEPARTMENT OF CRIMINAL §
JUSTICE,               §
          Defendants.  §


-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD J. CLARK

FEBRUARY 7, 2013
-----------------------------------


          ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD J. CLARK, produced as a witness at the instance

of the PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

February, 2013, from 1:55 p.m. to 3:50 p.m., before TINA

TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

2

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3        Mr. Scott Medlock
          Mr. Jeff Edwards
 4        THE EDWARDS LAW FIRM
          The Bremond Houston House
 5        706 Guadalupe
          Austin, Texas  78701
 6        jeff@edwards-law.com
          scott@edwards-law.com
 7

 8   FOR THE DEFENDANTS:

 9        Mr. Bruce R. Garcia
          Mr. David A. Harris
10        OFFICE OF THE ATTORNEY GENERAL
          P.O. Box 12548
11        Austin, Texas 78711-2548
          512.463.2080  Fax 512.495.9139
12        bruce.garcia@oag.state.tx.us
          david.harris@oag.state.tx.us
13

14   ALSO PRESENT:

15        Mr. Jeremy Gilliam (Videographer)
          512.565.4799
16        Warden Pringle

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6419

3

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1                          INDEX

2                                                    PAGE

3    Appearances...................................  2

4    WITNESS:  RICHARD J. CLARK

5    Examination by Mr. Medlock....................   4

6    Signature and Changes........................  79

7    Reporter's Certificate.......................  81

8

9

10                         EXHIBITS

11   NO.   DESCRIPTION                             PAGE

12   11    Training Circular on Heat................ 16

13   12    Sergeant Tate's Statement 7/22/11........ 34

14   13    Lieutenant Sanders' Statement 7/22/11..... 34

15   14    Mr. Clark's Statement 7/22/11............ 34

16   15    Anonymous Letter Written to Mr. Edwards... 77

17   16    Mr. Clark's Diagram of Dorms............. 78

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6420

11

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1      Q.   So the -- like what year were you working at
2  Powledge?
3      A.   '95.
4      Q.   '95.  Do you enjoy working for TDCJ?
5      A.   Sometimes.
6      Q.   Okay.  Fair enough.  Let's see, and just to
7  confirm, in July 2011, you were a CO-5; is that right?
8      A.   Yes.
9      Q.   Okay.  Who was your direct supervisor in July
10  of 2011?
11      A.   Sergeant Tate.
12      Q.   Sergeant Tate.  I just want to quickly go
13  through kind of what the hierarchy was at that point.
14  So Sergeant Tate was your immediate supervisor?
15      A.   Yes.
16      Q.   Who was Sergeant Tate's supervisor, if you
17  know?
18      A.   Lieutenant Sanders.
19      Q.   Lieutenant Sanders.  Then who was above
20  Lieutenant Sanders?
21      A.   Those were the only ones that were working
22  when I was -- when I was here.
23      Q.   On the night that Mr. McCollum --
24      A.   Yes.
25      Q.   -- had his episode, right?

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1        Q.   Do you remember hearing anything in your

2    training about the inmates' safety?

3        A.   Not in training.

4        Q.   Okay.  What did they say the consequences of

5    not being hydrated could be during your training?

6        A.   They didn't really say what the consequences

7    were.

8        Q.   Have you ever heard that you could develop

9    heat stroke from continued exposure to extreme

10   temperatures?

11       A.   Yes.

12       Q.   Do you know that heat stroke could result in

13   death if it's not treated?

14       A.   Yes.

15       Q.   Did you know that when someone has heat

16   stroke, they need to be moved to a cool environment?

17       A.   Yes.

18       Q.   And did you know that they need to be -- you

19   just need to do whatever you can to try to bring their

20   body temperature down?

21       A.   Yes.

22       Q.   Okay.  Did you know that that's a medical

23   emergency that requires immediate medical treatment?

24       A.   Yes.

25       Q.   Okay.  I think the -- the court reporter would

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6422

19

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

```
 1  appreciate it if -- you're -- you know the question I'm
 2  asking, and you know what the answer is, but you're
 3  stepping on my question a little bit.  I think it will
 4  help the court reporter out if you can just wait for me
 5  to complete the question.  Okay?
 6              When you have a training before the shift
 7  turnout, how long does that normally last?
 8      A.   10 to 15 minutes.
 9              MR. MEDLOCK:  Can I see the previous
10  exhibits?
11              MR. GARCIA:  They're right here.
12              MR. MEDLOCK:  Is that the notice?
13      Q.   Take a look at that, that's marked Exhibit 10
14  for me, Mr. Clark.
15      A.   Yes.
16      Q.   Do you recognize that document?
17      A.   Yes.
18      Q.   And if you flip over to the other page --
19      A.   Yes.
20      Q.   -- do you recognize that?
21      A.   Yes.
22      Q.   Is that usually on a little card --
23      A.   Yes.
24      Q.   -- a wallet-sized card?  Have you ever
25  received one of those wallet-sized cards?
```

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1       A.    Yes, I do.

2       Q.    Were you ever trained on how to use it?

3       A.    Well, we've gone over some of the symptoms and

4   looked at the card.

5       Q.    Can you describe for the jury what you do with

6   the card?

7       A.    Keep it with us at all times while we're at

8   work.

9       Q.    What's it good for?

10      A.    If we come up to someone, we're not sure

11  what's wrong with them, if they're exhibiting some

12  symptoms, we can take it out and kind of look and see

13  what kind of symptoms.

14      Q.    So the -- the -- you would reference the card

15  to tell you, you know, I see this gentleman has some

16  problem, and you look on the card to see if maybe this

17  is heat stroke because the symptom is listed on the

18  card.  Is that about right?

19      A.    I'd ask for -- for rank and what they call

20  video camera and stuff to come to the building first.

21      Q.    Okay.  You'd ask -- you'd call for rank and

22  the video camera --

23      A.    Yes.

24      Q.    -- before you consulted the card?

25      A.    Yes.

30

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1        Q.   Okay.  Does it depend on where you're working?

2        A.   Yes.

3        Q.   Sometimes you will only be working in a place

4   where it's air conditioned, right?

5        A.   No.

6        Q.   No.  Like if -- you wouldn't just work the

7   front door where you come in?

8        A.   No.

9        Q.   You'd work somewhere else.  You'd rotate with

10  somebody who's working the front door if working at the

11  front door was part of your duty that night?

12       A.   Well, we only -- we only have the front door

13  for an hour in the -- in the morning.

14       Q.   Okay.  I see, because you work the night

15  shift?

16       A.   Yes.

17       Q.   Okay.  Have you always worked the night shift?

18       A.   Yes.

19       Q.   Okay.  So when you say that people are taking

20  breaks in air-conditioned spots, officers are taking

21  these breaks, they're even doing that during the night

22  shift, right?

23       A.   Yes.

24       Q.   Okay.  Because it's still hot in the middle of

25  the night when you're working?

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

```
 1        A.    Yes.

 2        Q.    Now, the dorms, the windows to those dorms

 3   don't open; is that right?

 4        A.    No.

 5        Q.    And you said there are fans.  How many fans

 6   are there?

 7        A.    There are two big fans that are up on the

 8   wall.

 9        Q.    Okay.  Were there only two fans there in July

10   of 2011 when Mr. McCollum was here?

11        A.    Yes.

12        Q.    Prisoners don't have personal fans here at

13   the --

14        A.    No.

15              MR. GARCIA:  Let him finish his question.

16   Okay?

17        Q.    They don't have personal fans here at the

18   Hutchins Unit?

19        A.    No.

20        Q.    Is that because there's no plug outlets in the

21   dorms?

22        A.    Yes.

23        Q.    As far as you know, there's no security reason

24   that inmates living in the dorms here at the Hutchins

25   Unit couldn't have a personal fan?
```

Stephen McCollum, et al.                     Richard J. Clark
Brad Livingston, et al.                      February 07, 2013

1      Q.   And is this the statement from Sergeant -- or
2   from Lieutenant Sanders that you reviewed?
3      A.   Yes.
4                MR. MEDLOCK:  Mark that one as 13.
5                (Exhibit 13 marked.)
6      Q.   Now, in addition to those two statements and
7   your statement, were there any other documents you
8   looked at before your deposition today?
9      A.   No.
10      Q.   Okay.  Can you go ahead and hand me the copy
11   of your statement?
12      A.   (Witness complies.)
13                MR. MEDLOCK:  Let's mark this one.
14                (Exhibit 14 marked.)
15      Q.   Okay.  Now, what time did you come on duty the
16   day that's described in the statement?
17      A.   10:30.
18      Q.   Is that 10:30 --
19      A.   At night, night.
20      Q.   10:30 p.m. --
21      A.   Yes.
22      Q.   -- on July the 21st of 2011?
23      A.   Yes.
24      Q.   And what's your -- was that typically the time
25   you'd start?

Stephen McCollum, et al.                     Richard J. Clark
Brad Livingston, et al.                      February 07, 2013

```
 1        A.    No.

 2        Q.    Is it just entirely voluntary if they want to

 3   go or not?

 4        A.    Yes.

 5        Q.    Okay.  Are there some guys who -- who don't

 6   go?

 7        A.    If -- if an offender decides he wants to sleep

 8   and not go to chow, that's what he does.

 9        Q.    Would you notice if there was someone who was

10   consistently not going to chow?

11        A.    No.

12        Q.    Mr. McCollum was a large individual, right?

13        A.    That's a -- kind of a roundabout way of saying

14   it.  There's -- there's other offenders that are -- that

15   are -- I don't want to call it fat.

16        Q.    Larger?

17        A.    Larger.

18        Q.    Mr. McCollum was on the -- a top bunk, though,

19   right?

20        A.    Yes.

21        Q.    Is it unusual for a prisoner of Mr. McCollum's

22   size to be on a top bunk?

23        A.    Most offenders that are -- that are large do

24   have a lower bunk, not all, but...

25        Q.    But most?
```

50

Stephen McCollum, et al.                     Richard J. Clark
Brad Livingston, et al.                      February 07, 2013

1       Q.   So when this happened, you just wrote the

2  statement.  You didn't need anybody to tell you?

3       A.   It would have been either the sergeant or the

4  lieutenant told us, you know, to make sure we get our

5  statement in before we leave.

6       Q.   Did you talk with anyone about what you wrote

7  in it?

8       A.   No.

9       Q.   What were you doing immediately before you

10 learned Mr. McCollum was in trouble?

11      A.   I was doing count in -- in that dorm.

12      Q.   In the -- in the C7 dorm?

13      A.   Yes.

14      Q.   Do you remember where in the dorm you were?

15      A.   I'm not sure where it was.  One of the

16 offenders -- there was -- that was in the bunk

17 underneath of him told me that the guy up above him was

18 shaking.

19      Q.   And was it approximately 2:10 a.m.?

20      A.   Approximately.

21      Q.   What did you see when you got over to the

22 bunk?

23      A.   The offender was shaking.

24      Q.   Were his eyes closed?

25      A.   I don't remember.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6429

Stephen McCollum, et al.                          Richard J. Clark
Brad Livingston, et al.                          February 07, 2013

1      Q.   Was his whole body shaking?

2      A.   Yes.

3      Q.   Were the lights on in the dorm at that point?

4      A.   I don't know.

5      Q.   There must be some lights on in the dorm for

6  you to see where you're going?

7      A.   Yes.

8      Q.   Okay.  How -- can you see pretty well --

9      A.   Yes.

10     Q.   -- at 2:00 a.m. in the dorms?

11     A.   (Nods head.)

12     Q.   What did you think when you saw him shaking?

13 What did you think was wrong with him?

14     A.   He was having a seizure.

15     Q.   And why did you think it was a seizure?

16     A.   Because a body that -- that's shaking like

17 that, it's usually a caesar -- seizure that whoever it

18 is has.

19     Q.   What's -- what is that opinion based on?  Like

20 have you seen other guys have seizures?

21     A.   I've seen a few other guys in other dorms that

22 I responded to that were having seizures.  I see it on

23 television.

24     Q.   So based on what you've seen before and what

25 you've seen on TV, you thought that he was having a

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6430

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1  seizure?

2       A.   Yes.

3       Q.   Okay.  Did -- did you think he was in pretty

4  bad shape when you saw him?

5       A.   Yes.

6       Q.   You could tell he needed medical attention?

7       A.   I'm not a nurse or anything.  That's an

8  opinion on whoever is -- is there at the time.  I --

9       Q.   But you knew -- I'm sorry.

10      A.   It looked like he needed -- needed -- well,

11 I'm not sure exactly what he needed, but...

12      Q.   But from looking at him, you knew that he was

13 having a medical problem, and that it was beyond your

14 ability to help him because you -- as we talked about

15 previously, you've only had basic first-aid training,

16 right?

17      A.   Yes.

18      Q.   So you knew that he needed medical help at

19 that time?

20      A.   Yes.

21      Q.   Okay.  At least to be evaluated, because you

22 couldn't tell what the problem was?

23      A.   Yes.

24      Q.   Okay.  McCollum was still on the top bunk when

25 you saw him, when you got there?

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

 1  seizure?

 2       A.   Yes.

 3       Q.   Okay.  Did -- did you think he was in pretty

 4  bad shape when you saw him?

 5       A.   Yes.

 6       Q.   You could tell he needed medical attention?

 7       A.   I'm not a nurse or anything.  That's an

 8  opinion on whoever is -- is there at the time.  I --

 9       Q.   But you knew -- I'm sorry.

10       A.   It looked like he needed -- needed -- well,

11  I'm not sure exactly what he needed, but...

12       Q.   But from looking at him, you knew that he was

13  having a medical problem, and that it was beyond your

14  ability to help him because you -- as we talked about

15  previously, you've only had basic first-aid training,

16  right?

17       A.   Yes.

18       Q.   So you knew that he needed medical help at

19  that time?

20       A.   Yes.

21       Q.   Okay.  At least to be evaluated, because you

22  couldn't tell what the problem was?

23       A.   Yes.

24       Q.   Okay.  McCollum was still on the top bunk when

25  you saw him, when you got there?

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

 1        A.    Yes.

 2        Q.    What was he wearing?

 3        A.    I don't remember what he was wearing.

 4        Q.    Do you remember if he had the full uniform on

 5   or...

 6        A.    No, I don't.

 7        Q.    Do you remember if he had a shirt on?

 8        A.    I don't remember that either.

 9        Q.    Okay.  Do you remember if he had pants on?

10        A.    I'm pretty sure he had boxers on.  I don't

11   know if he had anything else on at that time.

12        Q.    Did you touch him?

13        A.    Yeah, yes.

14        Q.    What did his skin feel like?

15        A.    It felt hot.

16        Q.    It felt hot.  Was his skin -- was he sweaty?

17        A.    I don't remember.

18        Q.    Okay.  But you remember he was hot.  Was he

19   breathing?

20        A.    He was breathing.

21        Q.    Did his breathing seem normal, or was it fast

22   or slow or...

23        A.    I don't remember.

24              MR. GARCIA:  Hold on a second.  Let me

25   make my objection.  Objection, compound.  Now you can

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6433

54

Stephen McCollum, et al.                          Richard J. Clark
Brad Livingston, et al.                           February 07, 2013

 1  answer.

 2       Q.   You don't remember if he was breathing

 3  normally?

 4       A.   No.

 5       Q.   You don't remember if he was breathing too

 6  fast?

 7       A.   No.

 8       Q.   You don't remember if he was breathing too

 9  slow?

10       A.   All I know is he was breathing.

11       Q.   He was.  Okay.  Did you try to talk to him?

12       A.   Yes.

13       Q.   What did you say to him?

14       A.   If he was okay.  I tried to get him to -- to

15  speak.  That was -- that was about it until -- until I

16  went to get the -- some more staff down there and the

17  sergeant.

18       Q.   Did he respond when you tried to get him to

19  speak?

20       A.   No.

21       Q.   What happened when you did try to get a

22  response from him?

23       A.   What do you mean?

24       Q.   Well, did he just keep shaking or did he --

25       A.   Yes.

55

Stephen McCollum, et al.                     Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1        Q.   He didn't respond to you in any way?

2        A.   No.

3        Q.   Okay.  Could you smell anything odd?

4        A.   No.

5        Q.   Did you try to give him water or get him to

6   drink?

7        A.   No.

8        Q.   Did you fan him with your hand or...

9        A.   No.

10       Q.   At that point, did you have any -- any theory

11   about what was wrong with him?

12       A.   Only that he was having a seizure.

13       Q.   Did you talk with any of the other prisoners

14   around him?

15       A.   No.  The -- the additional staff I called

16   arrived there shortly after I called for them.

17       Q.   Okay.  What did the -- let's talk a minute

18   about the prisoner who alerted you to Mr. McCollum's

19   problem.  Do you remember which bunk that prisoner was

20   in?

21       A.   He was in the bottom bunk right below the...

22       Q.   Right below Mr. McCollum?

23       A.   Yes.

24       Q.   If Mr. McCollum was Bunk 46, what bunk would

25   be the man below him?

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1       A.   Yes.

2       Q.   Okay.   Now, the -- the prisoner that came up

3    to you, do you remember his name?

4       A.   No, I don't.

5       Q.   Do you remember if he was -- what race -- what

6    racial background he was?

7       A.   No, I don't.

8       Q.   You don't remember if he was black or white?

9       A.   No.

10      Q.   Okay.   You don't remember if he was old or

11   young?

12      A.   Not -- no.

13      Q.   You don't remember if he was tall or short?

14      A.   No.

15      Q.   Okay.   Now, what you in your statement say,

16   that you ran to the picket and told the officer in the

17   picket to call a first supervisor; is that right?

18      A.   Yes.

19      Q.   How long were you standing at Mr. McCollum's

20   bunk before you went to the picket?

21      A.   Just a short time.   Once I saw that he wasn't

22   responding and he was shaking, I ran to the picket to

23   the additional staff down there.

24      Q.   Was that maybe less than five minutes that you

25   were standing at his bunk?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6436

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1      Q.    What did the -- what did you tell the officer

2   in the picket?

3      A.    I needed a supervisor, video camera,

4   additional staff.

5      Q.    Did you tell him what the problem was, the

6   officer in the picket?

7      A.    No.

8      Q.    Okay.  You didn't say like, this guy's having

9   a seizure?

10     A.    No.

11     Q.    You didn't ask him to call 911 or...

12     A.    Well, we -- we can't do -- we can't dial 911.

13     Q.    You've worked in the picket, I assume.

14     A.    Yes.

15     Q.    You can't dial 911 from the picket?

16     A.    No.

17     Q.    Do you know why you can't call 911 from the

18  picket?

19     A.    The only one who can dial outside of the unit

20  is H Control.

21     Q.    And where is H Control?

22     A.    It's the control right out -- right out here

23  attached, just before you go through the doors to the

24  rest of the unit.

25     Q.    It's in a separate building from the C

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1   Building?

2       A.   Yes.

3       Q.   Okay.  And that's the only place that has an

4   outside line?

5       A.   Yes.

6       Q.   Can you call the H Building from the picket?

7       A.   Yes.

8       Q.   So someone from the picket could tell someone

9   in H Building to call 911?

10      A.   No, we can't do that.  It has to be a

11  lieutenant, is the one that makes the final decision

12  whether to dial 911.

13      Q.   Okay.  So the only person who can make --  who

14  can make the decision to call 911 is the lieutenant?

15      A.   Yes.

16      Q.   You as a CO-5 can't make that decision?

17      A.   No.

18      Q.   Okay.  Do you know why only a lieutenant is

19  allowed to call 911?

20      A.   It's -- it's probably a directive or something

21  that is done by maybe the wardens or the -- or TDC, plus

22  it's the ranking officer on the unit at that time who's

23  in charge of everything that goes on in the unit.

24      Q.   Did you know that there were no medical staff

25  at the unit in the middle of the night?

61

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1        A.    Yes.

2        Q.    So you knew that if Mr. McCollum was going to

3   get medical attention, it would have to be outside of

4   the prison; is that right?

5        A.    Yes.

6        Q.    Was there any way to get him medical attention

7   outside of the prison short of calling 911?

8        A.    That, I don't know.

9        Q.    If there was, you were never informed of it?

10       A.    Right.

11       Q.    The statement says that you asked for a

12   supervisor and a camera.  That's what you did?

13       A.    Yes, and additional staff.

14       Q.    Okay.  Did additional staff come?

15       A.    Yes.

16       Q.    Who came?

17       A.    I don't remember any -- any of the other staff

18   except one.

19       Q.    Who was that?

20       A.    Officer Williams, who's on first shift now.  I

21   don't -- I don't remember the other people that were

22   there.

23       Q.    What's Officer Williams' first name?

24       A.    Ross, I believe.

25       Q.    How many other officers showed up?

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1       Q.   Is it standard practice for when there's an

2    incident like this, for someone to bring a video camera?

3       A.   Yes.

4       Q.   Now, your statement says that you got there at

5    2:10 a.m.  That's the correct time?

6       A.   2 -- when -- that's when I was -- that's when

7    I was doing the count.

8       Q.   Okay.  So that's how you know it was 2:10 a.m.

9    when --

10      A.   Like I said, it -- it was approximately then.

11   I don't actually look at my watch to make sure what time

12   I'm taking the count.

13      Q.   Okay.  But you do the count at approximately

14   the same time every day, right?

15      A.   Yeah, approximately.

16      Q.   So it would have been around 2:10 a.m. when

17   you were there initially?

18      A.   (Nods head.)

19      Q.   That's a yes?

20      A.   Yes.

21      Q.   Okay.  And then you say that the -- in your

22   statement, that the -- whoever it was that told you to

23   go to this other problem got there in about 10 minutes;

24   is that right?

25      A.   I'm not sure when they got there.  They might

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
90933177-1bdb-4036-bcfc-61a44aaa6c62

Plaintiffs' MSJ Appx. 6440

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

 1  have been there a little bit before then.

 2       Q.   Okay.  But you think that it was --

 3       A.   These two -- two situations happened pretty

 4  close together.

 5       Q.   Okay.  But it would have been -- you don't

 6  think it was more than 10 minutes when --

 7       A.   No.

 8       Q.   So whoever it was that told you to move on,

 9  would have been there around 2:20 a.m.?

10       A.   Like I said, I didn't -- I didn't look at my

11  watch.

12       Q.   But if it's -- if you found Mr. McCollum at

13  about 2:10 a.m., and if the other staff got there about

14  10 minutes later, it would have been about 2:20 a.m.,

15  right?

16       A.   I'm not sure how long it took them.  I thought

17  it took them about five minutes before they started

18  arriving.

19       Q.   So it would have been about 2:15 a.m. then?

20       A.   Approximately.

21       Q.   Approximately.  Okay.  Was Mr. McCollum still

22  on the bunk when you left?

23       A.   Yes.

24       Q.   What was going on when you left?

25       A.   They were trying to figure out how to get him

Stephen McCollum, et al.                    Richard J. Clark
Brad Livingston, et al.                     February 07, 2013

1    A.   If medical was on the unit at night, I would

2    have.

3    Q.   Okay.  And if there wasn't a procedure saying

4    a lieutenant has to call 911, would you have called 911

5    at that point?

6    A.   Well, I don't know what the procedure is

7    for -- for calling 911.  I know I can't do it.

8    Q.   Okay.  If you had found -- if we weren't at

9    the prison, and you had seen Mr. McCollum in this

10   situation, would you have called 911?

11   A.   Like where?

12   Q.   Say you're in the grocery store, and you see

13   him collapse like that, would you call 911?

14   A.   Yes.

15   Q.   Okay.  And you would have done that because

16   you recognized it was an emergency that required medical

17   care and that you couldn't provide that care, right?

18   A.   Right.

19   Q.   That's a yes?

20   A.   Yes.

21   Q.   Okay.  Now, there were some officers who went

22   to guard Mr. McCollum while he was in the hospital.  Did

23   you know that?

24   A.   Yes.

25   Q.   Okay.  Were you ever one of them?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, <br><br>          PLAINTIFFS <br><br> v. <br><br><br> BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. <br>          DEFENDANTS | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § CIVIL ACTION NO. <br> § 4:14-cv-3253 <br> § JURY DEMAND <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 275



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| STEPHEN MCCOLLUM AND SANDRA MCCOLLUM, INDIVIDUALLY AND STEPHANIE KINGREY, INDIVIDUALLY AND AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF LARRY GENE MCCOLLUM, | § § § § § § § | |
| PLAINTIFFS | § § | CIVIL ACTION NO. 4:14-CV-3253 |
| VS. | § § | |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, THE UNIVERSITY OF TEXAS MEDICAL BRANCH AND THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE , | § § § § § § § § | |
| DEFENDANTS | § | |

---

**ORAL AND VIDEOTAPED DEPOSITION OF**
**ROGER CLARK**

**APRIL 18, 2016**

---



**TRICIA ROSATE, CRR**                          **SAN DIEGO, CA**

| Austin | Dallas | Houston | San Antonio |
|---|---|---|---|
| tel \|512\|320 8690 | tel \|972\|364 9777 | tel \|281\|471 8500 | tel \|210\|277 6200 |
| fax \|512\|320 8692 | fax \|972\|364 9778 | fax \|281\|471 8504 | fax \|210\|277 6232 |

3100 West Slaughter Lane  |  Suite 101  |  Austin, Texas 78748  |  toll free 877 720 8690  |  toll free fax 866 720 8692  |  www.integrity-texas.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

STEPHEN McCOLLUM, et al.,          )
                                   )
                                   )
                  Plaintiffs,      ) Civil Action No.
vs.                                ) 4:14-CV-3253
                                   )
BRAD LIVINGSTON, et al.,           )
                                   )
                  Defendants.      )
_____   )

VIDEOTAPED DEPOSITION OF ROGER CLARK

San Diego, California

Monday, April 18, 2016

Reported by:
Tricia Rosate, RDR, RMR, CRR, CCRR
CSR No. 10891
Job No. 123342214

2

2

```
 1   A P P E A R A N C E S:

 2

 3   For the Plaintiffs:

 4        EDWARDS LAW
          1101 East 11th Street
 5        Austin, Texas  78702

 6        BY:  SCOTT MEDLOCK, ESQ.
               scott@edwards-law.com
 7

 8

 9

10   For the Defendants:

11        TEXAS ATTORNEY GENERAL
          LAW ENFORCEMENT DEFENSE DIVISION
12        Post Office Box 12548
          Austin, Texas  78711-2548
13        512/463-2080
          BY:  MATTHEW J. GREER, ESQ.
14             matthew.greer@texasattorneygeneral.gov
               DANIEL C. NEUHOFF, ESQ.
15             daniel.neuhoff@texasattorneygeneral.gov
               HEATHER RHEA, ESQ. (Via teleconference)
16             heather.rhea@texasattorneygeneral.gov

17

18

19

20   Also Present:

21        DANIEL PAYAN, The Videographer

22

23

24

25
```

3

Plaintiffs' MSJ Appx. 6446

Roger Clark - 4/18/2016

3

1          VIDEOTAPED DEPOSITION OF ROGER CLARK,

2    taken at 600 West Broadway, Suite 1800, San Diego,

3    California, commencing at 9:32 a.m. and ending at

4    4:43 p.m., Monday, April 18, 2016, before Tricia Rosate,

5    RDR, RMR, CRR, CCRR, CSR 10891, a Certified Shorthand

6    Reporter.

7

8

9                    I N D E X

10   WITNESS:  Roger Clark

11   EXAMINATION                                PAGE

12   By Mr. Greer   ......................... 5, 121, 227

13   By Ms. Rhea    ..........................      199

14   By Mr. Medlock .........................      221

15

16                  E X H I B I T S

17   EXHIBIT              DESCRIPTION             PAGE

18   Exhibit 1   Defendant's Amended Notice of      6
             Deposition of Roger Clark
19

20   Exhibit 2   Plaintiff's Amended Objections to  11
             Defendant's Subpoena Duces Tecum to
21           Roger Clark

22   Exhibit 3   December 16, 2013, report by       12
             Roger Clark
23

     Exhibit 4   Performance-Based Standards for   171
24           Adult Local Detention Facilities

25

Plaintiffs' MSJ Appx. 6447

161

1   **appropriate for him to rely on his subordinates and**

2   **experts in that field of -- of medicine to decide**

3   **where and how those cuts should be made.**

4        A   No.  It falls on the head of the facility --

5   head -- head administrator of the department because

6   only the department head can establish policies and

7   make changes, enforce training, and make sure that the

8   entire system is well-ordered and safe.

9            And that responsibility cannot fall on

10  anybody else's shoulders.  It's -- that authority is

11  passed down, but it begins with him, so he has to --

12  like I did when I was a lieutenant, "What's going on

13  in the" -- and I wasn't there -- "What's going on, and

14  what could go bad?"  That's his constant thought.  And

15  if he doesn't have a medical person in a facility of

16  2,000, that is -- he's got to know that's a problem.

17       Q   If -- okay.  Well, are you saying that the

18  **administrator of the system should basically make his**

19  **own judgments on these factors, or -- or can he**

20  **rely -- isn't it appropriate for him to rely on the**

21  **people in the medical field, if he's -- he knows he**

22  **has to make cuts, to decide where those cuts should be**

23  **made?**

24            **Should he specifically micromanage the**

25  **medical schedules at the units, or should he tell**

Plaintiffs' MSJ Appx. 6448

1   other people with medical expertise, "We have to make

2   these cuts.  You guys decide where it would be most

3   appropriate"?

4             MR. MEDLOCK:  Object to form.

5             THE WITNESS:  I think it probably would start

6   with that last sentence, and then when they come back

7   with some notion that it's okay not to have a medical

8   nurse onboard, at least one person 24 hours, he would

9   say, "Wait a second.  You're telling me that I can

10  have 2,000 guys locked up and not have a nurse on

11  board?  How does that work?"

12            And then if the -- if the explanation is

13  reasonable, I suppose, but I can't -- I can't imagine

14  any kind of a reasonable explanation.

15  BY MR. GREER:

16      Q    Well, certainly the Hutchins State Jail isn't

17  the only facility in this country that doesn't have

18  24-hour medical care; right?

19      A    I don't know.  I know that none of ours are

20  like that.

21      Q    In the California prison system, all prisons

22  are staffed with medical, 24 hours a day?

23      A    Well, to my knowledge, but certainly in the

24  L.A. County system.

25      Q    Okay.  You're just speaking of L.A. County

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 276

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
                  HOUSTON DIVISION

STEPHEN McCOLLUM and        )
SANDRA McCOLLUM,            )
individually and as        )
independent administrator  )
of the Estate of LARRY     ) Civil Action
GENE McCOLLUM,             )
                           ) Number 4:14-CV-3253
                           )
            Plaintiffs,    )
                           )
vs.                        )
                           )
                           )
BRAD LIVINGSTON, JEFF      )
PRINGLE, RICHARD CLARK,    )
KAREN TATE, SANDREA        )
SANDERS, ROBERT EASON,     )
THE UNIVERSITY OF TEXAS    )
MEDICAL BRANCH and THE     )
TEXAS DEPARTMENT OF        )
CRIMINAL JUSTICE,          )
                           )
            Defendants.    )
```

-----------------------------------------------------


                ORAL AND VIDEOTAPED DEPOSITION OF

                        BRYAN COLLIER

                       MARCH 30, 2016


-----------------------------------------------------

2

1          ORAL AND VIDEOTAPED DEPOSITION OF BRYAN

2     COLLIER, produced as a witness at the instance of

3     the PLAINTIFFS, and duly sworn, was taken in the

4     above-styled and numbered cause on MARCH 30, 2016,

5     from 9:39 a.m. to 6:29 p.m., before Melody Renee

6     Campbell, CSR in and for the State of Texas,

7     reported by method of machine shorthand, at the

8     offices of the Attorney General, 300 West 15th

9     Street, Austin, Texas, pursuant to Notice and Court

10    Order and the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bryan Collier - 3/30/2016

3

1                          A P P E A R A N C E S

2     FOR THE PLAINTIFFS:
             Mr. Jeff Edwards, Esq.
3            The Edwards Law Firm
             1101 East Eleventh Street
4            Austin, Texas  78702
             512.623.7727
5            Jeff@edwards-law.com
                      -and-
6            Mr. Michael Singley, Esq.
             The Singley Law Firm
7            4131 Spicewood Springs Road, Suite O-3
             Austin, Texas  78759
8            512.334.4302
             Mike@Singleylawfirm.com

9

10
      FOR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE,
11    RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT
      EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
12           Ms. Cynthia L. Burton, Esq.
             Mr. Matthew J. Greer, Esq.
13           Ms. Karen Matlock, Esq.
             Ms. Kamilla L. Stokes, Esq.
14           Assistant Attorneys General
             Office of the Attorney General of Texas
15           P.O. Box 12548, Capitol Station
             Austin, Texas  78711
16           512.463.2080
             512.963.2109 (Fax)
17           Cynthia.Burton@texasattorneygeneral.gov
             Karen.Matlock@texasattorneygeneral.gov
18           Matthew.Greer@texasattorneygeneral.gov
                      -and-
19           Ms. Sharon Felfe Howell, Esq.
             Ms. Kamilla L. Stokes, Esq.
20           Texas Department of Criminal Justice
             Post Office Box 13084, Capitol Station
21           Austin, Texas  78711
             512.463.9693
22           512.936.2159 (Fax)
             Sharon.Howell@tdcj.state.tx.us
23           Kamilla.Stokes@tdcj.texas.gov

24

25

Plaintiffs' MSJ Appx. 6453

Bryan Collier - 3/30/2016

4

```
 1   FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
             Mr. Graig J. Alvarez
 2           Fernelius Alvarez Simon
             1221 McKinney Street, Suite 3200
 3           Houston, Texas  77010
             713.654.1200
 4           GAlvarez@fa-lawfirm.com
                  -and-
 5           Ms. J. Lee Haney, Esq.
             Assistant Attorneys General
 6           Office of the Attorney General of Texas
             P.O. Box 12548, Capitol Station
 7           Austin, Texas  78711
             512.463.2080
 8           512.963.2109 (Fax)

 9

10   ALSO PRESENT:
             Ms. Shanna Molanre
11           Ms. Ashley Palermo
             Mr. James Rheams
12           Mr. Cody Ginsel

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Plaintiffs' MSJ Appx. 6454

Bryan Collier - 3/30/2016

5

1                          I N D E X
                                                    PAGE
2   EXAMINATION
       By Mr. Edwards................................    7
3
    CHANGES AND SIGNATURE..........................356
4   REPORTER'S CERTIFICATE.........................357

5


6                       E X H I B I T S
    NO.  DESCRIPTION                                 PAGE
7
     1   Bryan Collier's Response and Objections to     7
8        Plaintiffs' Subpoena Duces Tecum

9    2   TDCJ Daily Executive Summary Report as of     93
         07/16/13
10
     3   Resume                                       127
11
     4   08/01/11 E-mail from Michelle Lyons to       128
12       Media Run re: Media Contacts for monday
         Aug. 1
13
     5   E-mail String Ending 08/10/11 from Hollis    133
14       Murray to Kathy Cleere re: Clip No. 1 -
         Texas Inmates Complain of Sweltering
15       Prison Conditions

16   6   08/12/11 Letter from Sylvester Turner to     177
         Brad Livingston
17
     7   08/19/111 TBCJ 156th Meeting Minutes         222
18
     8   06/26/09 Memo from Linthicum to Livingston   228
19       re: Heat Related Deaths 2007 to Present

20   9   08/16/13 Texas Tribune Article:             261
         "Climate-Controlled Swine Buildings Dismay
21       Inmates' Advocates"

22  10   PQA Plus Cert Excerpt                        273

23  11   03/08/07 TDCJ Swine Program management       286
         Procedures
24
    12   E-mail String Ending 09/04/13 from Cherie   327
25       Miller obo Oscar Mendoza to William
         Stephens re: Temperature Information

Plaintiffs' MSJ Appx. 6455

6

13   E-mail String Ending 04/24/14 from Bryan      333
     Collier to Alison Brock re: Deadly Heat in
     Texas Prisons Report

14   Declaration of Bryan Collier                  344

*-*-*-*-*

Plaintiffs' MSJ Appx. 6456

346

1      A.    I'm not sure that it would have been

2  before.

3      Q.    **Probably after?**

4      A.    May have been.

5      Q.    **If you don't know, you don't know.  But**

6  **there's no date on it.  That's why I'm asking.**

7      A.    No, sir.  I'm specifically not sure what

8  date I did the document.

9      Q.    **Okay.  Quickly letting somebody die in**

10 **front of you and not calling for an ambulance for a**

11 **period of 50 minutes is off-the-charts unacceptable**

12 **from TDCJ's position?  Yes or no?**

13     A.    Could you give me more detail?

14     Q.    **No.**

15     A.    If, hypothetically, we watched someone

16 with a medical emergency or -- I don't know that we

17 would know he's dying or not dying -- for 50 minutes

18 before we sought medical attention?

19     Q.    **Called 911.**

20     A.    Called 911, that would not be what we

21 would want to happen.

22     Q.    **Well, I would hope it would not be what**

23 **you would want to happen.  It would be indefensible**

24 **and wrong.  Fair?**

25     A.    It would not be our protocol or our policy

Bryan Collier - 3/30/2016

357

1                    REPORTER'S CERTIFICATE

2   STATE OF TEXAS     )

3   McLENNAN COUNTY    )

4

5        I, Melody Renee Campbell, Certified Shorthand

6   Reporter in and for the State of Texas, do hereby

7   certify that the foregoing deposition is a full,

8   true and correct transcript;

9        That BRYAN COLLIER, the witness hereinbefore

10  named, was duly sworn by the officer and that the

11  oral deposition was taken by the officer in machine

12  shorthand on MARCH 30, 2016, and is a true record of

13  the testimony given by the witness;

14       I further certify that the signature of the

15  deponent was requested and is to be returned within

16  30 days from date of receipt of the transcript.  If

17  returned, the attached Changes and Signature Page

18  contains any changes and the reasons therefor;

19       That $ _____ is the deposition

20  officer's charges for preparing the original

21  deposition transcript and any copies of exhibits,

22  charged to PLAINTIFFS;

23       I further certify that I am neither counsel

24  for, related to, nor employed by any of the parties

25  in the action in which this proceeding was taken,

Plaintiffs' MSJ Appx. 6458

358

1    and further that I am not financially or otherwise

2    interested in the outcome of the action.

3            Subscribed and sworn to on this the 13TH day

4    of APRIL 2016.

5

6

7    _____

8    MELODY RENEE CAMPBELL
     Integrity Legal Support Solutions
9    3100 W. Slaughter Lane, Suite A-101
     Austin, Texas 78748
10   512.320.8690
     512.320.8692 (Fax)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 6459

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 277

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM, and SANDRA    :
McCOLLUM, individually, and     :
STEPHANIE KINGREY, individually :
and as independent administrator:
of the Estate of LARRY GENE     :
McCOLLUM,                        :
                                :
PLAINTIFFS,                     :
                                :
VS.                             : CIVIL ACTION NO.
                                : 4:14-cv-3253
BRAD LIVINGSTON, JEFF PRINGLE,  : JURY DEMAND
RICHARD CLARK, KAREN TATE,      :
SANDREA SANDERS, ROBERT EASON,  :
the UNIVERSITY OF TEXAS MEDICAL :
BRANCH and the TEXAS DEPARTMENT :
OF CRIMINAL JUSTICE,            :
                                :
        DEFENDANTS              :

*****************************************
ORAL AND VIDEOTAPED DEPOSITION OF
GEORGE CRIPPEN
MARCH 24, 2016
*****************************************

        ORAL AND VIDEOTAPED DEPOSITION OF GEORGE

CRIPPEN, produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on March 24, 2016, from

10:23 a.m. to 7:20 p.m., before PHYLLIS WALTZ, RMR, CRR,

Texas CSR, TCRR, Louisiana CCR, in and for the State of

Texas, recorded by machine shorthand, at the Office of

the University of Texas Medical Branch, 200 River

Pointe, Conroe, Texas, pursuant to the Federal Rules of

2

1  Civil Procedure and the provisions stated on the record

2  or attached hereto; that the deposition shall be read

3  and signed before any Notary Public.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 6462

George Crippen - 3/24/2016

```
                                                                3
 1                    A P P E A R A N C E S

 2

 3   COUNSEL FOR PLAINTIFFS:
             Mr. Jeff Edwards
 4           Mr. Scott Medlock
             EDWARDS LAW
 5           The Haehnel Building
             1101 East 11th Street
 6           Austin, Texas  78702
             Tel:  (512) 623-7727
 7           Fax:  (512) 623-7729

 8

     COUNSEL FOR DEFENDANT TDCJ:
 9           Ms. Cynthia L. Burton
             ASSISTANT ATTORNEY
10           LAW ENFORCEMENT DEFENSE DIVISION GENERAL
             P.O. Box 12548
11           Austin, Texas  78711-2548
             Tel:  (512) 463-2080
12           Fax:  (512) 936-2109
             E-mail: cynthia.burton@texasattorneygeneral.gov
13

14
     COUNSEL FOR DEFENDANT UTMB:
15           Ms. Lee Haney
             Ms. Shanna Molinare
16           ASSISTANT ATTORNEY GENERAL
             P.O. Box 12548, Capitol Station
17           Austin, Texas  78711
             Fax:  (512) 495-9139
18
                     AND
19
             Ms. Ashley Palermo
20           THE UNIVERSITY OF TEXAS SYSTEM
             OFFICE OF GENERAL COUNSEL
21           201 West 7th Street, Suite 600
             Austin, Texas  78701-2901
22           Tel:  (512) 499-4471
             E-mail:  apalermo@utsystem.edu
23

24

25
```

4

1          A P P E A R A N C E S (Continuing)

2

3          Ms. Kara Stauffer Philbin
           FERNELIUS ALVAREZ SIMON, P.L.L.C.
4          LyondellBasell Tower
           1221 McKinney Street, Suite 3200
5          Houston, Texas  77010-2011
           Tel:  (713) 654-5165
6          Fax:  (713) 654-4039
           E-mail:  kphilbin@fa-lawfirm.com

7

8   VIDEOGRAPHER:
           Mr. Kevin J. Schaefer

9

10  ALSO PRESENT:
           Mr. James Rheams
11         Ms. Jennifer K. Osteen

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 6464

George Crippen - 3/24/2016

5

1                              INDEX

2                                                    PAGE
   Appearances  . . . . . . . . . . . . . . . . .  3
3  Stipulations . . . . . . . . . . . . . . . . . 320

4  GEORGE CRIPPEN
            Examination by Mr. Edwards . . . . . . . .  8
5
   Signature and changes  . . . . . . . . . . . . 321
6  Reporter's Certificate . . . . . . . . . . . . 323

7
                             EXHIBITS
8

9                                                    PAGE
   CRIPPEN EXHIBIT NO. 1 . . . . . . . . . . . . .  24
10            Curriculum Vitae of Mr. Crippen, two pages

11 CRIPPEN EXHIBIT NO. 2 . . . . . . . . . . . . . 137
            George Crippen's Response and Objections to
12          Plaintiffs' Subpoena Duces Tecum Attached
            to Their March 15, 2016 Amended Notice to
13          Take George Crippen's Deposition, six pages

14 CRIPPEN EXHIBIT NO. 3 . . . . . . . . . . . . . 142
            E-mail string, top e-mail from Mr. Crippen
15          to Mr. Williams, et al., dated 6/27/2013,
            TDCJ017312 - TDCJ017313
16
   CRIPPEN EXHIBIT NO. 4 . . . . . . . . . . . . . 147
17          August 2013 Clinical Education Department
            NEWSLETTER, Care of the Urgent/Emergent
18          patient in corrections, UTMB Emails - 540
            - UTMB Emails - 550
19
   CRIPPEN EXHIBIT NO. 5 . . . . . . . . . . . . . 153
20          E-mail string, top e-mail from Ms. Maxwell
            to Ms. Taylor, et al., dated August 09,
21          2010, UTMBEmails000028134 -
            UTMBEmails000028135
22
   CRIPPEN EXHIBIT NO. 6 . . . . . . . . . . . . . 208
23          E-mail from Ms. Buendel to Mr. Adams,
            et al., dated 6/26/2009, TDCJ027338
24

25

Plaintiffs' MSJ Appx. 6465

George Crippen - 3/24/2016

6

1                        EXHIBITS (Continued)

2
                                                            PAGE
3   CRIPPEN EXHIBIT NO. 7 . . . . . . . . . . . . . . 218
            E-mail string, top e-mail from Mr. Crippen
4           to Mr. Adams, et al., dated 7/9/2009,
            TDCJ027336 - TDCJ027337
5
    CRIPPEN EXHIBIT NO. 8 . . . . . . . . . . . . . . 231
6           E-mail from Mr. Williams to Ms. McWhorter,
            et al., dated 8/18/2010, TDCJ019583
7
    CRIPPEN EXHIBIT NO. 9 . . . . . . . . . . . . . . 233
8           E-mail string, top e-mail from Mr. Crippen
            to Mr. Williams, dated 8/23/2010,
9           TDCJ017797 - TDCJ017798

10  CRIPPEN EXHIBIT NO. 10 . . . . . . . . . . . . . . 235
            E-mail string, top e-mail from Mr. Crippen
11          to Mr. Williams, dated 8/5/2011,
            TDCJ017709 - TDCJ017715
12
    CRIPPEN EXHIBIT NO. 11 . . . . . . . . . . . . . . 259
13          E-mail string, top e-mail from Ms. Linthicum
            to Mr. Stephens, et al., dated 8/16/2012,
14          TDCJ017527 - TDCJ017530

15  CRIPPEN EXHIBIT NO. 12 . . . . . . . . . . . . . . 270
            E-mail from Ms. Buskirk to Mr. Williams,
16          et al., dated 8/8/2011, TDCJ017699

17  CRIPPEN EXHIBIT NO. 13 . . . . . . . . . . . . . . 281
            E-mail string, top e-mail from Mr. Crippen
18          to Mr. Stephens, et al., dated 8/10/2011,
            TDCJ017684 - TDCJ017685
19
    CRIPPEN EXHIBIT NO. 14 . . . . . . . . . . . . . . 284
20          E-mail string, top e-mail from Mr. Crippen
            to Mr. Williams, dated 8/10/2011, TDCJ017681
21          - TDCJ017682

22  CRIPPEN EXHIBIT NO. 15 . . . . . . . . . . . . . . 288
            E-mail string, top e-mail from Mr. Crippen
23          to Ms. Beardsley, et al., dated 8/5/2010,
            TDCJ027335
24

25

George Crippen - 3/24/2016

7

1                    EXHIBITS (Continued)

2
                                              PAGE
3   CRIPPEN EXHIBIT NO. 16 . . . . . . . . . . . . . . 293
           E-mail string, top e-mail from Mr. Crippen
4          to Mr. Williams, dated 8/9/2011,
           TDCJ014489 - TDCJ014491
5
    CRIPPEN EXHIBIT NO. 17 . . . . . . . . . . . . . . 304
6          E-mail string, top e-mail from Ms. McCleskey
           to Ms. Rader, dated August 8, 2011,
7          Webb - 1357 - Webb - 1358

8   CRIPPEN EXHIBIT NO. 18 . . . . . . . . . . . . . . 310
           UTMB Correctional Managed Care Facility
9          Death Review for Total Quality Management
           (TQM), Webb - 1285 - Webb - 1288
10
    CRIPPEN EXHIBIT NO. 19 . . . . . . . . . . . . . . 310
11         UTMB Correctional Managed Care Facility
           Death Review for Total Quality Management
12         (TQM), McCollum/ James-96 -
           McCollum/ James-101
13
    CRIPPEN EXHIBIT NO. 20 . . . . . . . . . . . . . . 315
14         Documentation, Nurse Triage Form,
           McCollum/ James-145
15

16

17

18

19

20

21

22

23

24

25

144

1      A.    I don't know.

2      Q.    **You don't know if a peer review was done?**

3      A.    No.

4      Q.    **You don't know that correctional officers left**

5  **him unresponsive for nearly an hour before calling 911?**

6      A.    No.

7              MS. BURTON:  Object -- objection;

8  misstates the evidence.

9              MR. EDWARDS:  It doesn't --

10             MS. BURTON:  Assumes facts not in

11  evidence.

12             MR. EDWARDS:  -- misstate the evidence.

13     Q.    **(BY MR. EDWARDS)  Okay.  Just so we're crystal**

14  **clear, correctional officers did not call 911 for at**

15  **least 50 minutes while Mr. McCollum was going through a**

16  **heat stroke.  Mr. McCollum was then taken to the**

17  **hospital where he spent several days and died --**

18             MS. BURTON:  Objection.

19     Q.    **(BY MR. EDWARDS)  -- of confirmed**

20  **hyperthermia.  Is this the first time you're hearing**

21  **about any of those facts, sir?**

22     A.    There are multiple cases of -- I may have been

23  aware of it, but --

24     Q.    **Okay.**

25     A.    -- from 2011 to 2016, I cannot definitely tell

145

 1  you that I remember that particular case.

 2      Q.   Well, is what I described to you, if it's

 3  true, that sounds pretty egregious; do you agree with

 4  me?

 5      A.   Yes, if it happened that way, yes.

 6      Q.   Okay.  I take it if you did a nursing review

 7  and determined that that had, in fact, happened, you

 8  would have been on the phone with Mr. Eubank and said,

 9  what on earth was going on here, right?

10      A.   Correct, but --

11      Q.   I guess that's if nurses were there to help,

12  right?

13      A.   Yes.

14      Q.   Okay.  And if nurses weren't there to help the

15  correctional officers because of the cutting back of the

16  hours, then I guess you'd tell the jury, look, it's even

17  more important to call 911 when you're dealing with a

18  nonresponsive man in the middle of the night in these

19  conditions of extreme heat, right?

20      A.   I -- can you rephrase the question, I guess?

21      Q.   Yeah.  And if nurses weren't there to help the

22  correctional officers because of the cutting back of the

23  hours, then I guess you'd tell the jury, look, it's even

24  more important for the officers to call 911 if you're

25  dealing with a nonresponsive man in the middle of the

George Crippen - 3/24/2016

323

1   THE STATE OF TEXAS :
    COUNTY  OF  HARRIS :
2
    I, PHYLLIS WALTZ, a Texas Certified Shorthand Reporter,
3   Texas Certified Realtime Reporter, Louisiana Certified
    Court Reporter, Registered Merit Reporter and Certified
4   Realtime Reporter in and for the State of Texas, do
    hereby certify that the facts as stated by me in the
5   caption hereto are true; that the above and foregoing
    answers of the witness, GEORGE CRIPPEN, to the
6   interrogatories as indicated were made before me by the
    said witness after being first duly sworn to testify the
7   truth, and same were reduced to typewriting under my
    direction; that the above and foregoing deposition as
8   set forth in typewriting is a full, true, and correct
    transcript of the proceedings had at the time of taking
9   of said deposition.

10  I further certify that I am not, in any capacity, a
    regular employee of the party in whose behalf this
11  deposition is taken, nor in the regular employ of his
    attorney; and I certify that I am not interested in the
12  cause, nor of kin or counsel to either of the parties.

13  GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this, the 1ST
    day of APRIL, 2016.
14

15

16  _____
    PHYLLIS WALTZ
17  Integrity Legal Support Solutions
    3100 Slaughter Lane, Suite A-101
18  Austin, Texas  78748
    (512) 320-8690
19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 6470