UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |


Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 278

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

STEPHEN MCCOLLUM, STEPHANIE    )
KINGREY, and SANDRA McCOLLUM,  )
individually and as heirs at   )
law to the Estate of LARRY GENE)
McCOLLUM,                       )
    Plaintiffs,                )
                               )
vs.                            )      CIVIL ACTION NO.
                               )      3:12-CV-02037
BRAD LIVINGSTON, JEFF PRINGLE, )
AND THE TEXAS DEPARTMENT OF    )
CRIMINAL JUSTICE,              )
    Defendants.                )

*************************************************************

ORAL AND VIDEOTAPED RULE 30(B)(6) DEPOSITION OF

THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE (ROBERT EASON)

MARCH 26, 2013

*************************************************************

ORAL RULE 30(B)(6) DEPOSITION OF THE TEXAS
DEPARTMENT OF CRIMINAL JUSTICE (ROBERT EASON), produced as
a witness at the instance of the Plaintiffs and duly
sworn, was taken in the above-styled and numbered cause on
the 26th day of March, 2013, from 9:42 a.m. to 12:00 noon
and 1:05 p.m. to 6:39 p.m., before Kathleen Nevils,
Certified Shorthand Reporter in and for the State of
Texas, reported by computerized stenotype machine at the
offices of the Attorney General, 300 West 15th St.,
Austin, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

```
 1  attached hereto.
 2                      APPEARANCES
 3
 4  FOR PLAINTIFFS:
 5
        Jeff Edwards
 6      The Edwards Law Firm
        The Bremond Houston House
 7      706 Guadalupe
        Austin, TX 78701
 8      Telephone: 512.623.7727 - Fax: 512.623.7729
 9      And
10      Scott Medlock
        Texas Civil Rights Project
11      1405 Montopolis Dr.
        Austin, TX 78741-3438
12      E-mail: scott@texascivilrightsproject.org
13  FOR DEFENDANTS:
14      Bruce R. Garcia
        Office of the Attorney General
15      P.O. Box 12548
        Capitol Station
16      Austin, TX 78711-2548
        Telephone: 512.463.2080
17      E-mail: bruce.garcia@oag.state.ux.us
18
19  ALSO PRESENT:
20
        Tobias Hunziker
21      Texas Department of Criminal Justice
        Austin, TX 78751
22      Telephone: 512.463.9420
23      Jeff Pringle
        Christin Cobe
24      Arthur Passes, Videographer
25
```

**WRIGHT WATSON & ASSOCIATES**

**(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363**
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6473

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                     March 26, 2013

```
1                            INDEX

2

3    Appearances...........................................2

4

5    TEXAS DEPARTMENT OF CRIMINAL JUSTICE (ROBERT EASON)

6       Examination by Mr. Edwards.........................5

7    Signature and Changes ............................341

     Reporter's Certificate............................343

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT  WATSON  &  ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75
Plaintiffs' MSJ Appx. 6474

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

```
 1                          EXHIBITS

 2

 3   NO.      DESCRIPTION        PAGE MARKED    PAGE REFERRED

 4   37 Plaintiffs' Amended Rule      5              14

        30(b)(6) Deposition Notice

 5      to Defendant Department

        of Criminal Justice

 6

     38 Correctional Managed Care     5              90

 7      Intake History and Health

        Screening form for Mr.

 8      McCollum

 9   39 Heat precaution e-mail       162            162

10   40 Training Circular           167            167

11   41 TDCJ Risk Management        263            263

        Incident Reporting System

12      Complete Incident Report

13   42 TDCJ Risk Management        264            265

        Incident Reporting System

14      Complete Incident Report

15   43 Hutchins State Jail         296            296

        Time Lines

16

17   44 TDCJ Hutchins Unit         314            314

        random sampling of

18      temperatures

19   45 Not identified             339            339

20   46 Final Autopsy Report       339             98

        on Kenneth W. James

21

22

23

24

25
```

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                            March 26, 2013

1   Unit?

2       A.     Can you repeat the question?

3       Q.     What is your understanding of the reasons that

4   Mr. McCollum, Larry Eugene McCollum, died at the Hutchins

5   Unit?

6       A.     Well, my understanding of the issue is is that

7   when Mr. McCollum was incarcerated there at the Hutchins

8   Unit, there were several factors, as I understand it, that

9   took place when he went through intake.  And he was housed

10  at the Hutchins Unit, I believe in C-7 dorm.  Mr. McCollum

11  basically -- he was housed on a top bunk.  Mr. McCollum

12  didn't get up to eat, as I understand it.  He didn't stay

13  hydrated as he was instructed to do.

14             And then at some point Mr. McCollum

15  basically became ill.  An officer that was assigned to

16  that dormitory, I believe somewhere around two o'clock in

17  the morning, was counting, discovered Mr. McCollum.  The

18  officer initiated ICS, which was one of our procedures

19  that we use when we deal with any type of issues in a

20  correctional setting, and additional staff, supervisor

21  responded, assessed the situation, handled that situation

22  the best they could with everything else going on in an

23  institution.

24             And Mr. McCollum was transported by EMS to,

25  I believe, Parkland Hospital, and later he was pronounced

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6476

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                           March 26, 2013

 1  deceased, I believe four or five days later there in the

 2  hospital.  And we were told at the beginning of this issue

 3  from Parkland is that the offender died of natural causes.

 4  And later it was determined -- I believe documentation on

 5  the autopsy that was issued with hypothermia, but it was

 6  ruled an accidental death, so that's my understanding of

 7  the situation.

 8      Q.    Okay.  What is -- is that your -- basically your

 9  full understanding of the situation, the reasons for

10  Mr. -- Mr. McCollum's death, sir?

11      A.    Yes, sir.

12      Q.    Okay.  What -- where did that understanding come

13  from?

14      A.    From the documentation that I reviewed for the

15  -- for my deposition and from discussing the issue with

16  Warden Pringle.

17      Q.    Anything else?

18      A.    No, sir.

19      Q.    Okay.  What documents did you review in

20  preparation for -- for this deposition?

21      A.    Is it okay if I look at these notes?

22      Q.    Absolutely.

23      A.    I can give these to you.

24      Q.    That would be great.

25      A.    I reviewed, of course, the administrative

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                    March 26, 2013

```
 1  deceased, I believe four or five days later there in the
 2  hospital.  And we were told at the beginning of this issue
 3  from Parkland is that the offender died of natural causes.
 4  And later it was determined -- I believe documentation on
 5  the autopsy that was issued with hypothermia, but it was
 6  ruled an accidental death, so that's my understanding of
 7  the situation.
 8      Q.   Okay.  What is -- is that your -- basically your
 9  full understanding of the situation, the reasons for
10  Mr. -- Mr. McCollum's death, sir?
11      A.   Yes, sir.
12      Q.   Okay.  What -- where did that understanding come
13  from?
14      A.   From the documentation that I reviewed for the
15  -- for my deposition and from discussing the issue with
16  Warden Pringle.
17      Q.   Anything else?
18      A.   No, sir.
19      Q.   Okay.  What documents did you review in
20  preparation for -- for this deposition?
21      A.   Is it okay if I look at these notes?
22      Q.   Absolutely.
23      A.   I can give these to you.
24      Q.   That would be great.
25      A.   I reviewed, of course, the administrative
```

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                            March 26, 2013

1  review.  I reviewed our policy on temperature extremes in

2  the workplace, AD 10.64.  I reviewed the Hutchins Unit

3  profile, of course the lawsuit notification.  I reviewed

4  our unit classification procedures concerning health

5  summaries.  I reviewed inclement weather policies, KD

6  Memorandum 06.07.

7         Q.    Would you tell me what that one was again, sir?

8         A.    Dealing with inclement weather, like --

9         Q.    Inclement --

10        A.    -- when we have bad weather outside, and it

11  talks about not recreating offenders outside, of course

12  not working them outside, things like that, just general

13  procedures.

14        Q.    When you say "bad weather outside," would that

15  include really hot weather like that weather would be over

16  a hundred degrees?

17        A.    Well, what we do in the institution is when the

18  weather is extremely hot outside, then of course we limit

19  our outside work details.  We do everything we can to

20  bring our inmates in from working outside as well as

21  recreating them on the outside rec yard.  When it's --

22  when it's hot outside, we bring them in and we don't do

23  that.

24        Q.    No, and I appreciate that, but I just want to --

25  when you say "inclement weather," with regard to heat,

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1  you're talking about temperatures greater than 95, greater
 2  than a hundred?
 3      A.    I don't recall -- and I could be wrong, but I
 4  don't recall high temperatures being part of that policy
 5  because I remember looking at it and I thought this really
 6  doesn't relate to what -- what I'm going to be dealing
 7  with here, so I didn't spend a lot of time reading it,
 8  but...
 9      Q.    Okay.  What else?
10      A.    Okay.  And our agency e-mail that the director
11  puts out every spring about all the steps that -- that I'm
12  supposed to ensure as regional director get taken on the
13  units to mitigate heat issues on our facilities and the
14  things that I talk to the wardens about every month, just
15  all the steps that we're supposed to take to mitigate the
16  heat.
17              And then risk management -- risk management
18  puts out a training circular or curriculum during the
19  summer months dealing with heat and how to handle the heat
20  in the summertimes, things like that, heat training.  I
21  looked at some of that documentation.
22      Q.    Now, I want to make sure I have a clear
23  understanding of that.  You referred to that as a training
24  circular or curriculum or heat training.  Are we talking
25  about like a one-page document that people -- that gets
```

Stephen McCollum, et al v.                         Robert Eason
Brad Livingston, et al.                        March 26, 2013

```
 1  read to correctional officers at some point?
 2      A.    No.  It's more than one page.  It's --
 3      Q.    How many pages is it?
 4      A.    I would say three or four pages --
 5      Q.    Okay.
 6      A.    -- if I remember correctly.
 7      Q.    Okay.  We're not talking about like -- when I
 8  hear the word "curriculum," I think of like courses; I
 9  think of extensive documentation and training.  We're
10  talking about a short document that can be read to the
11  officers; is that fair?
12      A.    Yes.  Maybe circular is a better word.
13      Q.    No, that's fine.  I just want to make sure that
14  we're on the same page.
15      A.    Yes.
16      Q.    Please continue, sir.
17      A.    That's -- that's basically the only documents
18  that I reviewed for --
19      Q.    Okay.  And then you also mentioned that you had
20  conversations with Warden Pringle.  When did you have
21  conversations with Warden Pringle?
22      A.    I had conversations with Warden Pringle.  Any
23  time that we have an offender death, of course the wardens
24  call me, let me know the circumstances surrounding the --
25  the death and we talk about the issue.  We talk about, you
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6481

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   know, lots of things, and they're required to call me.  Of

2   course we take every offender death very seriously.  And

3   so we talked, I guess early -- early morning hours of the

4   -- that morning where Offender McCollum was transported to

5   the hospital and then later when he was pronounced

6   deceased there at Parkland.

7        Q.    Okay.  Other than the night of the -- well,

8   the -- in the week or so when he was taken to the

9   hospital, have you had any other conversations with Warden

10  Pringle about Mr. McCollum's situation and death?

11       A.    Yes.  We talked after it was -- we found out

12  that an admin review should have been done on

13  Mr. McCollum's death.  I talked to Warden Pringle about

14  that and -- because we had to go back and gather all the

15  documentation and get the admin -- admin review put

16  together and send it in to our Emergency Action Center,

17  who is the official, I guess, recordkeeper for all of our

18  admin reviews for the agency.

19       Q.    Now, when you say "an admin review should have

20  been done," was one not done?

21       A.    We did one.  It was later, but when we have an

22  offender death that is ruled a death from natural causes,

23  an admin review is not required by our policy.

24       Q.    Okay.

25       A.    And --

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6482

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                           March 26, 2013

1     Q.    And, again, who told you that the death was

2  natural causes?

3     A.    It was one of the doctors there at Parkland was

4  the information that we were given.

5     Q.    And that was told to Warden Pringle or somebody

6  and --

7     A.    Yes.

8     Q.    -- then Warden Pringle relayed that information

9  to you?

10    A.    Yes, sir.  I can't recall the doctor's name, but

11  --

12    Q.    Is your understanding that a heart attack is a

13  death by natural causes?

14    A.    Yes, sir, my understanding.  I'm not, of course,

15  a medical professional, but that's my understanding.

16    Q.    And that's important, and we're getting a little

17  bit ahead of ourselves, but I want to make -- you're here

18  to talk as the Texas Department of Criminal Justice.  Do

19  you understand that?

20    A.    Yes, sir.

21    Q.    Okay.  And you're here to talk about various

22  categories of information, and within these categories I'm

23  going to be doing my best to ask you particular questions.

24  Do you understand that?

25    A.    Yes, sir.

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                        March 26, 2013

```
 1      Q.    Okay.

 2                  MR. EDWARDS:  Did I -- did we get that

 3  exhibit marked?

 4                  THE REPORTER:  Yes.  Did I not give it to

 5  you?

 6                  MR. EDWARDS:  Oh, you did.

 7      Q.    (By MR. EDWARDS) And, sir, are these the -- the

 8  categories of information that you've prepared for at

 9  least to talk about today in the deposition?  And feel

10  free to show that to your counsel, Mr. Garcia.

11                  MR. GARCIA:  Is that the amended?

12                  MR. EDWARDS:  Yes.

13                  THE WITNESS:  Yes, sir, I believe I'm

14  prepared to talk about these.  No. 10 is -- I'm at

15  somewhat a disadvantage on No. 10, but I will do my best.

16      Q.    (By MR. EDWARDS) Okay.  Well, and -- and I don't

17  -- I appreciate that.  That sounds very magnanimous of

18  you, but what I -- if you're not -- if you're not

19  comfortable being the representative or feeling that you

20  have as much knowledge as anybody else as to No. 10, I'd

21  rather have you just tell me and we'll get the right

22  person here.  If at any point when we're discussing those

23  topics you say, "You know what?  I'm the wrong guy," just

24  please let me know, okay?  Our goal is accuracy above all,

25  and I appreciate you looking through that so thoroughly.
```

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                     March 26, 2013

```
 1        A.    Sure.

 2        Q.    Okay.  Is hyperthermia a death by natural

 3   causes, to your understanding?

 4        A.    I couldn't comment on that.  I'm not a medical

 5   professional.

 6        Q.    Okay.  Let me ask it again.

 7        A.    Nobody has, you know --

 8        Q.    The reason I'm asking this particular question

 9   is because I thought -- and, again, please tell me if I --

10   if I've misunderstood you.  I thought you said when there

11   are deaths by natural causes, TDCJ's policy does not

12   require an Emergency Action Center report or an

13   administrative review.  Did I understand your testimony

14   correctly?

15        A.    Yes, sir, you did.

16        Q.    Okay.  Therefore, TDCJ is the one making that

17   determination, not University of Texas Medical Branch or

18   some doctor that you guys consult; is that correct?

19        A.    That's true.

20        Q.    Okay.  So what I want to know is:  Hypothermia,

21   which is -- or excuse me, hyperthermia, heat stroke or

22   death by heat, is that something that the department,

23   Texas Department of Criminal Justice, considers a death by

24   natural causes?

25        A.    That question, I'm not the one to answer that
```

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   question.  However, when we have an offender death and if

2   it's even questionable whether it could have been heat

3   related or it could have been from other causes, it's my

4   understanding that Mr. McCollum -- of course, there were

5   other causes as far as his death.

6              When I looked at that autopsy report about

7   his obesity and -- and things like that, that that was

8   some information in there that could have been a cause of

9   his death as well.  And we do an admin review for anything

10  that might be deemed heat related or that could be deemed

11  heat related at some point --

12      Q.    Well --

13      A.    -- and require an admin review, so that's why we

14  had to go back and put the admin review together for this

15  -- for this incident.

16      Q.    Right.  At the time of Mr. McCollum's death, was

17  it TDCJ policy to do an admin review for any death that

18  could be heat related?

19      A.    I'm trying to remember.  At that point, I don't

20  think it was.  I don't think it was.  And, again, I might

21  -- I might be way off base there, but I don't -- I don't

22  think it was at that point.

23      Q.    Okay.  I just -- okay.  It sounds to me -- okay?

24  And I don't want to testify.  I want to listen, okay?  But

25  it sounds to me like -- well, was this kind of a one --

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

 1  Warden Pringle.

 2      Q.    Prior to the autopsy that came back that said

 3  his death was due to hyperthermia, were you aware that

 4  Mr. McCollum was found unresponsive some time around two

 5  o'clock in the morning?

 6      A.    I don't know the exact timeline.  I think it was

 7  a little after two o'clock.

 8      Q.    2:10, does that --

 9      A.    Yes.

10      Q.    -- sound better?

11      A.    Warden Pringle and I talked about that.

12      Q.    Okay.  Were you aware -- do you know when he was

13  transported to the hospital?

14      A.    Without looking at the timeline, the official

15  timeline, I couldn't tell you.

16      Q.    Okay.  Okay.  If he arrived --

17      A.    I haven't -- I haven't reviewed any EMS records

18  or anything like that as far as their timeline, anything

19  like that.

20      Q.    Why not?

21      A.    I haven't -- I don't have those records.

22      Q.    Aren't those records --

23      A.    From EMS.

24      Q.    -- important in terms of you, as the Texas

25  Department of Criminal Justice, evaluating whether or not

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                    March 26, 2013

```
 1  your officers performed their jobs appropriately?

 2      A.    My officers performed their jobs appropriately,

 3  and --

 4              MR. EDWARDS:  Let me object as --

 5              THE WITNESS:  -- I reviewed -- I'm sorry.

 6              MR. EDWARDS:  Let me object as

 7  nonresponsive.

 8      Q.    (By MR. EDWARDS) Let -- and I think there was

 9  just confusion on the question, sir.  Isn't requesting or

10  evaluating EMS records something that would be important

11  to you in terms of evaluating whether your officers did

12  their jobs appropriately the night of Mr. McCollum's

13  seizure and ultimate death?

14      A.    What I looked at is our unit-based timeline, and

15  to my knowledge, we've never requested any EMS records as

16  part of our admin review.

17      Q.    Okay.  Well, you --

18      A.    We get --

19      Q.    -- mentioned EMS --

20      A.    We get --

21      Q.    -- records.  That's why I asked you about them.

22      A.    I understand.  We get a -- we get a timeline

23  based on what occurs on our facility, and we try to put

24  that timeline with -- with the report and the admin

25  review.
```

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                         March 26, 2013

1      Q.    You reviewed that timeline in preparation for

2   your deposition today, right?

3      A.    Yes, sir.

4      Q.    Okay.  Was there anything that jumped out at you

5   as a potential problem when you looked at that timeline?

6      A.    No, sir.

7      Q.    You didn't find it troubling that a man was

8   nonresponsive and seizing and didn't get emergency

9   personnel to him in upwards of an hour?

10     A.    Sir, I'm going to tell you this, is when this

11  incident happened and Warden Pringle and I talked about

12  it, and we looked at the timeline.  You know, every --

13  every offender death concerns me, okay?  As regional

14  director, every offender death concerns me, and we try to

15  look at those deaths, you know, the best we can.  And

16  Warden Pringle and I talked about the timeline.

17             And given what all was going on at the unit

18  at that time of the morning -- I believe they had another

19  emergency situation where an offender -- responded to an

20  offender death, being short-staffed, that I believe that

21  the -- the lieutenant and the sergeant, when they were

22  called about that emergency, about that situation, they

23  handled it the very best that they could handle it.

24             They assessed -- they called ICS.  They

25  assessed the situation.  The lieutenant responded.  She

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1  assessed the situation.  She got on DMS, Digital
 2  Monitoring System, talked to one of the nurses at the
 3  Crain facility.  And of course Mr. McCollum was a newly
 4  received offender, didn't have any restrictions noted in
 5  the computer.  The nurse advised her to call 911, and
 6  that's what the lieutenant did, and we got that ambulance
 7  there as quickly as possible.  And --
 8      Q.    Do you --
 9      A.    -- if I may --
10      Q.    Sure.
11      A.    Okay.
12      Q.    No, no.  You -- I didn't mean to interrupt you.
13      A.    No --
14      Q.    If you may.  Please continue.  I don't want to
15  --
16      A.    There's -- I mean that timeline, it's not
17  unusual for it to take sometimes 45 minutes maybe to an
18  hour to get an ambulance on a facility depending on where
19  the facility's at, depending on what's going on on a
20  facility.  There's -- a lot of times on large facilities,
21  when I was a warden, if you have an offender, that's in a
22  cell, that needs medical care for whatever reason, by the
23  time the officer gets to the cell, assesses that
24  situation -- all right? -- initiates ICS, says, you know,
25  "I'm in command of this incident.  This is the
```

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                    March 26, 2013

```
 1   personnel -- this is what I need.  This is what I've got."
 2   Those folks respond.  They assess the situation.
 3              If it's a facility that has 24-hour medical
 4   care, whatever the case may be, by the time that
 5   assessment is made and if it's determined that an
 6   ambulance is needed, we call the ambulance.  By the time
 7   the ambulance gets out there, gets through our back-gate
 8   procedures, gets on a facility, gets down to the offender,
 9   wherever the offender is at, whether they're in the
10   infirmary or they're down in a dormitory on a cell block.
11              And it's been my experience that most of
12   the time EMS is going to, you know, perform medical
13   procedures, work on that offender.  I know that's not a
14   good word, but for a period of time there on the facility,
15   before they actually leave the facility with the offender.
16   So it's -- those timelines -- that's -- that's not
17   uncommon.  Sometimes that happens, and...
18        Q.    Okay.
19        A.    That's the best way I know how to explain it,
20   sir.
21        Q.    Okay.  I mean do you think it's okay for TDCJ
22   officers to not notify a hospital or an emergency room for
23   a half hour after determining that someone is in need of
24   emergency care?
25        A.    I'll tell you this, sir:  I wasn't there the
```

Plaintiffs' MSJ Appx. 6491

Stephen McCollum, et al v.                         Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   night --

2       Q.    I understand that.  My question, sir, is:  Do

3   you think, as the corporate representative of Texas

4   Department of Criminal Justice, that it is okay to not

5   call 911 or get an ambulance -- the process started for a

6   half hour after it has been determined that an inmate is

7   in need of emergency medical care?

8       A.    I tell you this:  They -- again, I wasn't there.

9   I can't testify to what they were dealing with, what they

10  were assessing at the time.  My understanding of the

11  situation is is that Mr. McCollum, when he was discovered,

12  was having a seizure.  And of course I wasn't here during

13  the depositions of the sergeant and the lieutenant, but my

14  understanding is they said he was having a seizure.  He

15  had an open airway; he was breathing; he had a pulse.

16              And seizures are very common in an

17  institutional setting.  They occur all the time.  When

18  I -- I started as a CO, came up through the ranks.  Every

19  facility I've worked on have a lot of offenders that have

20  seizures, and at some point they'll come out of that

21  seizure and we take them to medical.  Sometimes they stay

22  in the medical department, they're observed for a while

23  and they don't leave the facility by 911.

24              And at the Hutchins Unit, they deal with

25  seizures quite often, and that's -- that's -- that's

Stephen McCollum, et al v.                      Robert Eason
Brad Livingston, et al.                       March 26, 2013

1  common, but I can't sit here and tell you what was

2  actually going through their mind.  They assessed that

3  situation the best that they could.  They got on DMS; they

4  contacted medical personnel; they contacted 911 and got

5  the offender to the hospital.

6              MR. EDWARDS:  Let me object as

7  nonresponsive.

8              Could you go back to my question?

9      Q.   (By MR. EDWARDS) Sir, I don't -- again, I want to

10  -- I need an actual answer to my question, all right?  And

11  I'm not asking you to get inside anybody's head.

12      A.   Okay.

13      Q.   Okay?  But it appears that you're willing to do

14  that because you're saying they did the best they could,

15  right?  That's getting inside their head; is that correct?

16      A.   I disagree with that.

17      Q.   Okay.

18              MR. EDWARDS:  Would you please repeat the

19  question then?

20      Q.   (By MR. EDWARDS) And, sir, I really just need an

21  answer as the representative of the Texas Department of

22  Criminal Justice.

23              (The record was read as follows:

24              "My question, sir, is:  Do you think, as

25              the corporate representative of Texas

**WRIGHT WATSON & ASSOCIATES**

29

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1   question, again, ma'am?
 2                   (The record was read as follows:
 3                   "My question, sir, is:  Do you think, as
 4                   the corporate representative of Texas
 5                   Department of Criminal Justice, that it is
 6                   okay to not call 911 or get an ambulance --
 7                   the process started for a half hour after
 8                   it has been determined that an inmate is in
 9                   need of emergency medical care?").
10                   MR. GARCIA:  The key to the question --
11                   MR. EDWARDS:  Bruce, please.
12       Q.   (By MR. EDWARDS) Sir, I need an answer to that
13   question.
14       A.    If it's determined to be emergency medical care,
15   then, yes, we should call an ambulance right away.
16       Q.    Off --
17       A.    Okay?
18       Q.    -- the charts unacceptable to not do so in that
19   situation that I've provided you --
20       A.    Is this --
21       Q.    -- is that fair?
22       A.    -- determined to be an emergency?
23       Q.    Okay.
24       A.    That's what I'm saying, is my understanding --
25       Q.    Okay.
```

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                               March 26, 2013

```
 1      A.    -- from reading officers' statements, talking to

 2   the staff, they didn't determine this to be an emergency.

 3   They deal with seizures all the time, and the offender was

 4   breathing, he had a pulse, and they didn't determine it to

 5   be emergency at that point, and that's -- that is the

 6   decision that the supervisor made.

 7                  MR. EDWARDS:  Let me object --

 8                  THE WITNESS:  So --

 9                  MR. EDWARDS:  -- again as nonresponsive

10   everything after "yes."

11      Q.    (By MR. EDWARDS) Sir, since you seem to want to

12   talk about it, you seem to think that nobody determined

13   that -- that Mr. McCollum was in need of emergency medical

14   care.  Is that your understanding?

15      A.    At that -- at that first -- at that -- at that

16   onset, that's my understanding.

17      Q.    Your understanding is that the first officer who

18   came and found Mr. McCollum seizing and unresponsive

19   didn't believe it was an emergency situation?  Is that

20   your testimony?

21      A.    I can't testify for those officers.

22      Q.    You are.

23      A.    No, I'm not.  I can't --

24      Q.    Okay.

25      A.    -- testify for those officers.
```

31

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    Q.    Do you -- do you have an understanding as -- you

2    told me those officers did the best they could.  You told

3    me that you thought those officers didn't believe there

4    was an emergency happening before their eyes.  Is that

5    correct?

6    A.    That's -- that's my understanding.  That's --

7    Q.    Okay.

8    A.    That's my belief.

9    Q.    Which -- do you not know what they were thinking

10   or do you have an understanding as to what they were

11   thinking?  Because it really matters.

12   A.    I don't -- I can't get inside their head.  I

13   don't know what they were thinking at the time.  I'm not

14   -- I wasn't there at the incident, and you asked me

15   earlier, "It's obvious that you want to talk about this

16   certain situation, sir."  You're just asking me questions

17   about it, and I'm just trying to talk about it.

18   Q.    Okay.

19   A.    And that's...

20   Q.    Once it is determined that an inmate is in a

21   medical emergency, an ambulance should be called right

22   away; is that correct?

23   A.    If it's determined to be a medical emergency.

24   Q.    Okay.

25   A.    If the on-duty lieutenant or the sergeant --

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   okay?  When they assess that offender, if at that point
2   that, you know, they think it's an emergency, then there's
3   an option there to call 911.  That's a -- that's a call
4   that the lieutenant and sergeant make.  And, again, I
5   wasn't there.  I can't talk about all the decisions they
6   made or why or anything else.
7         Q.    Okay.
8         A.    I'm just...
9         Q.    You're just?
10        A.    Trying to answer your questions, sir.
11        Q.    Okay.  Well, in your -- in your answer, you
12  mentioned that -- does it have to be a sergeant or a
13  lieutenant that calls 911 based on Texas Department of
14  Criminal Justice policy or can a lower-level correctional
15  officer?
16        A.    There's no -- this is my understanding, okay?  I
17  don't think there is a per se policy that's -- that's out
18  there, from UTMB or the agency, about only certain people
19  can call 911.  Our process is is when we have any type of
20  situation on a unit, whether it's a medical issue from an
21  offender, a staff member, a disturbance, any -- any type
22  of issue on the unit, we use the ICS protocol.
23              Part of that protocol is the officer gets
24  on the radio to explain the situation they're having.
25  They're saying, "I'm the on C commander."  The first thing

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                       March 26, 2013

1   they do is call for the resources that they need, which is

2   the supervisor, things like that.  That supervisor will

3   respond as quickly as possible, depending on what's going

4   on in the institution at the time.  And then they will

5   take over what we call a lateral transfer of command and

6   verbal transfer of command, and they'll take over that

7   situation, assess the situation and we go from there.

8       Q.    As you testify here testify, do you know if the

9   first officer who encountered Mr. McCollum and the state

10  he was in believed that Mr. McCollum was in the midst of a

11  medical emergency?  Do you know?

12      A.    No, sir, I don't know that.

13      Q.    Do you know, as you testify here today, whether

14  or not the sergeant who came after Officer Clark, that

15  first officer, contacted her believed that Mr. McCollum

16  was in a state of medical emergency?

17      A.    No, sir.  I wasn't there.  I don't know that.

18      Q.    Do you know whether or not Lieutenant Sanders,

19  who ultimately was -- who ultimately arrived and looked at

20  Officer McCollum, believed that Mr. McCollum was in a

21  state of medical emergency?

22      A.    No, sir.  No.

23      Q.    You don't?

24      A.    Like I say, I wasn't --

25      Q.    Okay.

34

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                     March 26, 2013

1      A.    I wasn't there and I wasn't dealing with what
2  they were dealing with, no, sir.  I can't really comment
3  on that.
4      Q.    Are you the person that would ultimately
5  evaluate whether or not a supervisory official at the
6  Hutchins Unit acted appropriately?
7      A.    I'm in that chain, yes, sir.
8      Q.    Are you, like, the highest person in the chain
9  or are you -- where are you in the chain?
10      A.    Well, I'm Warden Pringle's supervisor, immediate
11  supervisor, and I have 11 wardens that work for me in the
12  region, and so I would be part of that process.
13      Q.    Is there someone above you that would be in the
14  process?
15      A.    The disciplinary process or what -- I guess
16  repeat --
17      Q.    Yeah.
18      A.    Can you repeat the question?
19      Q.    I don't care about the disciplinary process
20  right now.  We'll get into that.  I'm trying to figure out
21  who is in charge at the Texas Department of Criminal
22  Justice for evaluating whether or not officers do their
23  jobs appropriately with regards to inmates in the throes
24  of medical emergencies.
25      A.    First of all, the main person in that process

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

35

1  would be Warden Pringle.  He's the warden of the facility,

2  and then if there's an issue, then of course -- and, like

3  I said earlier, he calls me on all offender deaths and --

4      Q.    Okay.

5      A.    -- we talk through those.

6      Q.    He's the main person and then he would call you

7  and talk through those, right?

8      A.    Yes, sir.

9      Q.    What if -- again, this is a hypothetical.  What

10 if Warden Pringle doesn't think anybody is doing wrong,

11 but objectively they are doing something wrong?  How would

12 that be determined, if at all?

13     A.    It would be determined through, I guess --

14 repeat the question.  I'm not sure what you're asking.

15     Q.    What if Warden Pringle or one of the 11 wardens

16 is -- believes that his officers are doing everything

17 fine, but they're not?  I mean would you be the person

18 that would say, "Hey, you got to change this" or would it

19 be somebody else?  How would -- how would that situation

20 get fixed?

21     A.    It would be me.  If --

22     Q.    Okay.

23     A.    If there was a situation -- any type of

24 situation on a facility and we talk about it.  Warden

25 says, "Well, I think everything looked okay," and if I

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                       March 26, 2013

```
 1  at Robertson from September of '05 until September of '09.
 2              I was promoted to regional director in
 3  Region IV in Beeville.  Was regional director -- so I was
 4  regional director down there for approximately a year.
 5  The regional director in Region II retired and I called
 6  and asked my director if I could transfer to Region II to
 7  live a little closer to home.  He said "Absolutely."
 8              I transferred to Region II as the regional
 9  director and I've been the Region II director since end of
10  September of 2010.
11      Q.    How long have you been in the position of
12  regional director, though, sir?
13      A.    Let's see.  Would be four years in September,
14  so...
15      Q.    Okay.  Tell me or tell the jury basically what
16  the -- what the responsibilities and duties of a regional
17  director are.
18      A.    Okay.  Basically I'm responsible for managing a
19  regional budget of $30 million.  I have 11 wardens and 13
20  facilities I'm responsible for.  I have approximately
21  almost 900 non-security employees in the region and I have
22  somewhere around 5400 correctional officers.  That's COs
23  and ranking officers that work in my region.  I'm
24  responsible for conducting employee mediations.  I'm
25  responsible for the general operations of the regional
```

45

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1  office.  I'm responsible for visiting the facilities as

2  much as -- much as I can.  I'm responsible for

3  coordinating all our security audits in the region, and

4  there are some facilities that require a security audit

5  every year, and there are some facilities that require

6  security audits every two years.

7       Q.    Tell the jury -- and I don't mean to interrupt

8  you, but tell the jury, when you say "security audit," I

9  know you know what that means, and I may even sort of know

10  what it means, but if you could tell the jury what you're

11  talking about so they get a fuller understanding of your

12  job.

13       A.    It's a -- it's a very comprehensive in-depth

14  audit in every part of our facility, whether perimeter

15  security, back-gate procedures, cell block procedures,

16  count procedures or security procedures in our food

17  service departments, laundry departments.  There's a check

18  list that we use to make sure that we're following our

19  security policies and procedures, all the security

20  memorandums and that the officers are following their post

21  orders.

22       Q.    And is that generally to make -- to make

23  everybody feel safer, that, look, everybody is doing the

24  job to make sure that people aren't escaping from prisons?

25       A.    Absolutely.  It's to make sure that we're

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   earlier as far as the e-mail that the agency puts out

2   every year about all the steps that we should be taking on

3   the units to mitigate heat issues.

4       Q.    Okay.  So from the time you started serving as a

5   regional director -- was it '09?

6       A.    Yes, sir.

7       Q.    Okay.

8       A.    September or October of '09.

9       Q.    Sure.  Until the present time, the issue of

10  heat-related illness has been something that has been

11  known to the agency?

12      A.    Yes.  We've been -- we've been taking those

13  steps since I've been a regional director, doing

14  everything we can to -- to mitigate the heat --

15      Q.    Okay.

16      A.    -- and that's -- if I may, there's --

17      Q.    Sure.

18      A.    As a warden and regional director, it's very

19  important that we take those steps to mitigate heat, and

20  we're doing everything possible to mitigate those heat

21  issues out there on our facilities, and -- because a big

22  piece of what we deal with, especially in the summer, is

23  to try to mitigate those heat issues, to try to keep the

24  inmates as comfortable as possible, keep the staff as

25  comfortable as possible, you know, so we don't have any

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

 1  major issues out there on our facilities.  We want

 2  everything to run as smoothly as possible.  That's a big

 3  part of our mission statement --

 4      Q.    Sure.

 5      A.    -- public safety, keep the inmates safe.

 6      Q.    Sure.  Well, you --

 7      A.    We --

 8      Q.    As the agency, I mean your desire would be to

 9  have conditions that aren't responsible for killing

10  people, right?

11      A.    We don't have conditions responsible for killing

12  people.

13      Q.    Okay.

14      A.    And that's what all these heat steps are about.

15      Q.    Okay.  It would be important to -- well, all

16  right.  You don't have conditions that are responsible for

17  killing people?  Is that what you just told me?

18      A.    Yes.

19      Q.    Okay.  And that's at the Hutchins Unit, all the

20  units, there are no conditions that you consider to be

21  contributory to the cause of any deaths?

22      A.    No.

23      Q.    Okay.  Nonetheless, you're -- everybody at TDCJ

24  in the higher-up -- and I mean your level and higher, to

25  your knowledge, are certainly aware that in the summer,

**WRIGHT WATSON & ASSOCIATES**

**(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363**
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6504

```
 1   it's extremely hot in Texas; is that fair?

 2        A.    It gets hot in Texas in the summer.  That's --

 3   that's why we conduct our heat training; that's why we

 4   take all the steps to reduce the -- to mitigate the heat

 5   issues --

 6        Q.    Sure.

 7        A.    -- and we take that very seriously.

 8        Q.    Okay.  Is it fair, sir, that you take the need

 9   to mitigate heat issues seriously because to not do so

10   would be to place inmates' lives in danger?  Is that fair?

11        A.    We take issues to mitigate the heat because

12   that's our agency directive, and part of our -- part of

13   our -- a big part of our mission is -- is to keep inmates

14   safe, try to keep them as healthy as possible, provide a

15   humane, clean living environment for offenders and staff,

16   and that's -- that's why we do what --

17        Q.    Sure.

18        A.    -- we do to mitigate the heat.

19        Q.    Sure.  The heat presents a danger to inmates and

20   employees during the summer months in Texas, at least at

21   the Hutchins Unit, right?

22        A.    I believe the heat poses a danger to -- to

23   anyone, whether you're living out in the free world, if

24   you don't take those steps, but we do everything we can.

25   We take all those steps, and if the offenders and the
```

Plaintiffs' MSJ Appx. 6505

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

```
1   staff -- they'll stay hydrated, they'll take the steps
2   that we tell them to take, then they can make it through
3   the summer just fine.  Been doing it for years.  I've
4   worked as a correctional officer in the summertime.  I
5   stayed hydrated.  Never had a problem.
6        Q.    Do you have diabetes?
7        A.    Sir?
8        Q.    Do you have diabetes?
9        A.    No, sir, I do not.
10       Q.    Do you have hypertension?
11       A.    I was on blood pressure medicine at one time,
12  and I made the -- the decision to lose a lot of weight,
13  take care of myself, and now I'm off blood pressure
14  medication and haven't felt this good in years.
15                  MR. GARCIA:  Jeffrey, are you at a good
16  breaking point --
17                  MR. EDWARDS:  Oh, sure.
18                  MR. GARCIA:  -- for about five minutes?  I
19  just --
20                  MR. EDWARDS:  Yeah, absolutely, absolutely,
21  absolutely.  Thanks.
22                  THE VIDEOGRAPHER:  Off the record, 10:43.
23                  (Recess taken).
24                  THE VIDEOGRAPHER:  We're back on the record
25  with tape No. 2 at 10:55.
```

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                          March 26, 2013

1      A.    I believe I'm right on that.

2      Q.    Why do -- what's the point of having formal

3  policies like 10.64?  Why not just shoot off an e-mail?

4      A.    The policy for 10.64 is just to make sure

5  that -- that we are taking all the steps to mitigate the

6  heat in a working environment, and it's the same thing

7  as -- as an e-mail.  An e-mail is -- we consider an e-mail

8  a policy, instructions, and we follow an e-mail from the

9  director just like we'd follow any other policy.

10     Q.    Got you.  Who does the -- who does the e-mail

11 come from?  Is that Director Livingston or Director Thaler

12 or Director Stephens or --

13     A.    It comes from Mr. Stephens and Mr. Thaler.

14     Q.    So is it your testimony that, yes, we have a

15 formal policy, 10.64, for dealing with heat temperatures

16 in the workplace and we also have a policy for dealing

17 with extreme heat temperatures inside?  It just comes in

18 the form of an administrative e-mail once a year?

19     A.    Yes, sir.

20     Q.    And is it your testimony on behalf of TDCJ that

21 that e-mail instructs wardens that they have a duty to

22 take all steps necessary to mitigates extreme heat inside

23 their facilities?

24     A.    Yes, sir, within --

25     Q.    And if --

37

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                      March 26, 2013

```
 1        A.    I'm sorry.
 2        Q.    If wardens do not take all steps necessary to
 3   mitigate heat inside their facilities, in particular their
 4   housing areas, what are the consequences?
 5        A.    If I may ask a question, can you -- what steps
 6   are we talking about that the wardens are not taking?
 7   Because to my knowledge, all the wardens in my region and
 8   across the state are following that directive and they're
 9   doing everything absolutely possible to mitigate the heat.
10        Q.    Okay.  There seems -- let me -- there seems to
11   be some confusion, and if your lawyer thinks I'm speaking
12   out of turn, I'm sure he'll tell me.  But when I am asking
13   you questions, I'm doing my best to just try and figure
14   out what it is is the policy, the practice at TDCJ, okay?
15   Some of my questions will be, well, what if this.  It
16   doesn't mean that it's going on.  It doesn't mean that I'm
17   asking a specific question about the Hutchins Unit or some
18   other unit.  Okay?  So if you could -- and, sir, I say
19   this respectfully -- try to do your best to just answer
20   the particular question I'm asking.  The depo will go, I
21   think -- I think, more quickly, I think.
22              And so my question is basically:  Well, if
23   the wardens aren't taking all the steps necessary to
24   mitigate extreme heat inside the facilities -- okay? --
25   that I suppose are delineated on that administrative
```

38

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

1   e-mail?  What would the consequences be?

2        A.     The consequences would be as regional director

3   stepping in and correcting the issue.

4        Q.     Okay.  Well, then I guess what steps does -- has

5   that administrative e-mail been going out since 2009?

6        A.     Yes, sir.

7        Q.     Okay.  Has it changed at all since 2009?

8        A.     Not much.  I can't -- I can't sit here and tell

9   you every little change on the e-mail, but it's -- I can't

10  remember any huge changes.

11       Q.     Okay.  Since 2009, when you stepped into your

12  job as regional director, it's your -- it's your

13  understanding that, look, TDCJ has considered extreme heat

14  temperatures inside its facilities, inside its housing

15  areas to be something that it needs to take steps to

16  mitigate the heat during the summer months; is that fair?

17       A.     Yes.

18       Q.     Okay.  Roughly, since 2009, maybe -- maybe

19  earlier, but you know from 2009 an administrative e-mail

20  has gone out instructing all wardens that they do in fact

21  need to take steps to mitigate the heat inside the housing

22  areas, correct?

23       A.     Yes.

24       Q.     Okay.  That administrative e-mail, has that

25  given specific instructions as to what they need to do in

39

Stephen McCollum, et al v.                         Robert Eason
Brad Livingston, et al.                          March 26, 2013

1  order to mitigate the heat or is that left to the

2  discretion of the individual wardens?

3      A.   Of course, the wardens review the e-mail and

4  they do the best they can to make sure we're carrying out

5  every one of those steps.

6      Q.   How do you know they do the best they can?

7      A.   Because when I visit my facilities in the

8  summertime, I personally walk housing areas and review

9  those -- look at those heat-related or those steps to

10 mitigate the heat.  I personally go look at those housing

11 areas.  I personally walk in a housing area and I look to

12 make sure that offenders are wearing their shorts in the

13 dayroom, that their fans are operational.  All those

14 different steps, I personally look at those issues.

15     Q.   Okay.  Let's -- let's go through -- what are the

16 steps?  Since the same e-mail has been going out roughly

17 since 2009 and it's gone out every year and you're the

18 person responsible for make sure that happens, what are

19 the steps that are -- that are supposed to be taken to

20 mitigate the heat inside the housing areas?

21     A.   Number one -- without looking at the document,

22 but number one, when we have transportation buses coming

23 on our unit, if they're sitting still for a certain period

24 of time, we have fans at the back gate we put on the bus,

25 just to keep the air moving through the bus.  We have to

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1  let -- we let offenders wear their commissary shorts and

2  T-shirts in the dayroom.

3          We -- and I talked about this earlier:  We

4  curtail offender activities as much as possible during the

5  heat.  That's outside recreation; that's offenders working

6  outside, things of that nature.  We make sure that all the

7  ventilation systems in the housing areas, work areas, what

8  have you, are operating properly.  We make sure that all

9  the fans in those particular areas are operating properly.

10  Of course, we follow that AD 10.64 and take outside

11  temperatures.  We provider ice water to the inmate

12  population using Igloo coolers and we deliver them ice as

13  much as possible.  We try to make as much ice on each

14  facility as we can.

15          I have a large icehouse at the Beto

16  facility in Tennessee Colony, and I ship ice out to

17  facilities that -- for whatever reason in the summer

18  months, a lot of times our ice machines and our freezer

19  vaults struggle just, you know, because it's -- it's hot

20  you know, or I'll ship ice out to them if they're getting

21  low on ice, so we make sure we're getting that ice out to

22  the staff and the offenders.

23      Q.    Do you -- and I'll -- I'll let you continue, but

24  do you know if there was a problem with ice at the

25  Hutchins Unit in 2011?

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

```
 1      A.    Absolutely, yes, sir.

 2      Q.    Okay.  You acknowledged that you certainly

 3  should provide as much as possible; is that fair?

 4      A.    Yes.

 5      Q.    Okay.  Please continue.  And I'll just -- I'll

 6  go through the litany that I heard you say:  Fans on

 7  buses, shirts and shorts in the dayrooms; you curtail

 8  outside activities; you do your best to make sure

 9  ventilation areas are working properly; if there are fans,

10  you make sure they're operating properly.  Pursuant to

11  that policy you mentioned, you take outside temperatures

12  and then you provide as much as ice water as possible.

13  That's what I've got so far.

14      A.    Yes, sir.

15      Q.    Anything else that you do to mitigate the heat?

16      A.    We make sure that the facilities -- the

17  offenders, if they have a fan there, they're allowed to

18  use their -- their personal fan.  That's one of the steps.

19  We also conduct wellness checks on offenders who have

20  temperature extremes, have a work restriction that's

21  called no temperative extremes.  We -- we do check on

22  those offenders every 30 minutes.  There's a -- there's a

23  list of those -- those offenders in the housing area.

24  I'd sure there's -- there's a few I probably just forgot,

25  but that's -- that's the majority of them.
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6512

66

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                           March 26, 2013

 1      Q.    If you didn't take these steps, would you agree
 2   with me that you would not be protecting inmates from a
 3   serious condition known as heat extremes?
 4      A.    Possible.  Just depends on what the outside
 5   temperature was at the time.
 6      Q.    Sure.
 7      A.    And we're taking those steps.
 8      Q.    Okay.  And just so that we're crystal clear with
 9   the jury, I mean the highest ranking officials at the
10   Texas Department of Criminal Justice know, virtually to a
11   certainty, that during the summer months, it's going to be
12   extremely hot and that there are going to be extremely
13   high temperatures inside and outside the facility,
14   correct?
15      A.    I -- what do you call extremely high
16   temperatures inside of our facility?
17      Q.    What do you call it?
18      A.    Just -- you know, of course we have that policy
19   where we use the heat index, and it gets hot in some of
20   our facilities, but as long as the offenders are taking
21   all those steps to mitigate the heat, they're staying
22   hydrated, our staff are staying hydrated, there's not a
23   problem with the heat in our facilities.
24      Q.    Yeah, I know.  That's not really what I asked
25   you though.  What I'm asking -- look, you mentioned these

67

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

1  various mitigation steps to mitigate extreme heat?

2      A.    Yes, sir.

3      Q.    My question was, look, you're one of the highest

4  ranking people at the Texas Department of Criminal

5  Justice.  I want to just confirm for the jury, so that

6  we're crystal clear, that since 2009, you have known --

7  you and your colleagues, to the best of your knowledge,

8  have known that there are extreme heat temperatures inside

9  and outside the facilities you oversee during the summer

10 months; is that fair?

11     A.    We start taking these -- we start making sure

12 these -- all these heat steps are in place before it

13 starts getting hot.  We take these heat steps every day

14 regardless of what the temperature is during the summer

15 months, regardless.

16     Q.    Is that because you know that during the summer

17 months --

18     A.    Because we know that it --

19     Q.    -- it's most likely going to be extremely hot?

20     A.    That's because -- yes, that's because in the

21 summer, it gets hot, and if we don't take these steps,

22 it's possible that offenders could become ill and it's

23 possible staff could become ill.

24     Q.    They could suffer heat stroke, heat exhaustion;

25 they could die if you don't take steps to mitigate the

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

1   heat, right?

2       A.    It's possible, yes, sir.

3       Q.    And that's inside the facility as well as

4   outside the facility, right?

5       A.    It's possible, yes, sir, and that's why we take

6   the steps.

7       Q.    What -- what steps are you -- what -- strike

8   that.  Let's see here.  What does the expression "heat

9   stroke imminent" mean to you?  And by "you," I mean the

10  Texas Department of Criminal Justice.

11      A.    "Heat stroke imminent."  That, I believe, is

12  part of the policy that we have as 10.64 temperature

13  extremes in the workplace, and it talks about, I believe,

14  if I'm not mistaken, "heat stroke imminent" when the

15  temperature range gets between -- or gets in a certain

16  range that if you continue to work offenders outside in

17  those temperatures and you're not taking those steps to

18  mitigate the heat, that it's possible that an offender

19  could possibly have a heat stroke or a staff member could

20  have a heat stroke.

21      Q.    Okay.  Does "imminent" to you mean possible?

22      A.    Yes, it does.

23      Q.    Okay.  Now, you mentioned fans.  I want to -- I

24  think I may be helping you out here.  I think that in the

25  -- in that e-mail it mentioned that even indigent

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                         March 26, 2013

1   offenders who can't afford fans, that TDCJ takes steps

2   to -- to help get them -- to help get those people fans to

3   use during the summer months.  Did I read that correctly?

4       A.    Yes, sir.  That's one I -- I missed, and I

5   apologize.

6       Q.    No, no.  That's fine.  Is that done because TDCJ

7   thinks it's so important for inmates to be able to kind of

8   cool their bodies down themselves?

9       A.    Yes.  We take the heat very seriously.  We think

10  it's very important, and, yes, we try to give inmates a

11  fan that do not have a fan.

12      Q.    And it is your testimony you take extreme heat

13  very seriously, right?

14      A.    Yes, sir, I do.

15      Q.    And that's -- that's not just you, Regional

16  Director Eason.  That's the Texas Department of Criminal

17  Justice, right?

18      A.    Yes, sir.

19      Q.    You mentioned that another thing that happens is

20  conducting wellness checks for people that are on an

21  extreme heat list.  Did I write that down correctly?

22      A.    Yes, sir.

23      Q.    Okay.  Now, I want to be --

24      A.    Can I --

25      Q.    Oh, sure.

Stephen McCollum, et al v.                                Robert Eason
Brad Livingston, et al.                                  March 26, 2013

1   to make sure they're doing okay.  Is that accurate?

2            MR. GARCIA:  I'll object to the

3   mischaracterization that it is treated as a housing -- I

4   don't think he said that.

5            MR. EDWARDS:  That's fine.

6            MR. GARCIA:  Okay.

7            THE WITNESS:  We check on those offenders

8   that come out on that work restriction list.  We check on

9   them every 30 minutes.

10   Q.    (By MR. EDWARDS) And are there documents that --

11   that -- would the correctional officers have to fill out

12   like, hey, I checked on inmate A and inmate B?  Is that

13   something that they have to do as part of their job?

14   A.    Yes, sir.

15   Q.    I guess -- I guess that would mean to me that if

16   such a policy were in place when Mr. McCollum suffered his

17   incident, then I guess correctional officers should have

18   been checking on him every 30 minutes before the --

19            MR. GARCIA:  Objection:  Speculation.

20   Q.    (By MR. EDWARDS) -- the seizure, right, if that

21   were in place?

22            MR. GARCIA:  If what were in place, a heat

23   restriction or this procedure?  Because he had no heat

24   restrictions on his HSAT.

25   Q.    (By MR. EDWARDS) If the procedure were in place

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   and if Mr. McCollum were on this work restriction list,

2   then I suppose your testimony would be that officers would

3   have had an obligation to check on him every 30 minutes

4   that he was in a housing area, right?

5        A.    If he would have been on the list, but Mr.

6   McCollum was not on the list.

7        Q.    Right.  Do you know why he wasn't on the list?

8        A.    No, sir, I don't know the particulars.  I sure

9   didn't do the medical exam.

10       Q.    Yeah.  Did anybody?

11       A.    I can't testify to that.

12       Q.    Yeah.  It's --

13       A.    I don't have that -- I don't have that

14   knowledge.

15       Q.    Seems like one of the really important things

16   about having one of these lists would be identifying

17   inmates to put on the list.  Would you agree with that?

18       A.    That's something that the medical department has

19   to do.

20       Q.    Well, in conjunction with you, right?  And by

21   "you," I mean the Texas Department of Criminal Justice.

22       A.    I'll answer that to the best of my ability.  If

23   -- if I'm on a particular facility or if an inmate writes

24   me or he files a grievance and a grievance coordinator

25   gets with me and says, "Hey, I'm having problems with the

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6518

74

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                           March 26, 2013

```
 1  heat," then I'm going to make sure that we try to get that
 2  inmate down to the medical department and let the medical
 3  department evaluate that particular offender, and then
 4  it's the doctor's responsibility -- if the doctor thinks
 5  that they need this heat restriction -- takes a doctor to
 6  put a heat restriction on.
 7      Q.    That --
 8      A.    That's --
 9      Q.    You know what?  I appreciate that.  What you're
10  telling me is, look, you don't expect your correctional
11  officers, your sergeants, your supervisors, to be doctors,
12  right?
13      A.    No, I do not.
14      Q.    You don't expect them to be physicians'
15  assistants.  You don't even expect them to be nurses,
16  right?
17      A.    No, I do not.
18      Q.    Okay.  And that's because they don't have the
19  type of training that really lets them diagnose particular
20  medical conditions, right?
21      A.    Yes, that's right.
22      Q.    Okay.  I assume you rely on UTMB or Texas Tech
23  or whoever is managing the healthcare at the particular
24  prison to make those decisions, right?
25      A.    Yes, sir.
```

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                     March 26, 2013

1    Q.    Now, to your knowledge, did UTMB, any of the

2  medical staff at the Hutchins Unit or any of those 11

3  units you oversee know that you were treating work

4  restrictions as housing restrictions as well?  I mean I

5  expect they would have, but I want to -- I want to be

6  sure.

7    A.    That work restriction is not a housing

8  restriction.  We just utilize that documentation to

9  identify offenders that might have a heat issue, and we

10  just check on them, just check on their wellness.  It's

11  not a housing --

12    Q.    Yeah, I don't --

13    A.    -- restriction by our policies.  It's not a

14  housing restriction.

15    Q.    Okay.  I don't want -- I don't want to get

16  caught up in the word -- the word "restriction."  It's an

17  important thing that you do to make sure that people don't

18  die from high temperatures inside because of

19  susceptibility to heat, right?

20    A.    It's an important thing that we do, yes, sir.

21    Q.    Okay.  And certainly you knew that it was an

22  important thing to do at least from 2009 onward, right?

23    A.    No.  I said I can't remember exactly when we

24  started that process, but, yes, it's very important.  If

25  they're on that heat restriction list, it's very important

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   that we -- we check on them.

2       Q.    Okay.  And just to be -- it's -- you knew -- and

3   I'm talking to you, Mr. Eason, everybody high up in TDCJ,

4   at least in your expectation, would know that, look, it's

5   important for you to monitor the well-being of inmates who

6   are susceptible to extreme heat as documented by a medical

7   person even when they're inside your facility, not just

8   outside, correct?

9       A.    Yes, sir, if they're on that heat -- if they're

10  on that work restriction heat list.

11      Q.    For example, if in 2009 an inmate were put on

12  work restriction because they have diabetes, and that

13  endangered them outside, your policies say, look, you've

14  got to take special steps for that person when they're --

15  when they're working, right?

16      A.    Yes.

17      Q.    Okay.  Likewise, you'd utilize that sort of --

18  I'll call it restriction, but that kind of, I don't know,

19  diagnosis, whatever.  You guys utilize that inside the

20  jails to conduct wellness checks to make sure those

21  individuals aren't endangered by the inside heat, right?

22      A.    Yes.

23      Q.    Okay.  Now, and you acknowledge that that would

24  be very important for you to do and to fail to do that --

25  I'm not saying you did, but to fail to do that would not

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                           March 26, 2013

```
 1        Q.    (By MR. EDWARDS) Is that fair?

 2                   MR. GARCIA:  If you heard a question, feel

 3   free to answer it.

 4                   THE WITNESS:  I think what you're wanting

 5   me to explain is the difference between an officer making

 6   a round in a housing area and performing a wellness check?

 7        Q.    (By MR. EDWARDS) On a particular inmate, yeah.

 8        A.    On a particular inmate.  If I'm making -- if I'm

 9   an officer making a round in a housing area, I'm going to

10   walk through the housing area, and part of that housing

11   area is where the offenders are assigned in their bunks.

12   I'm going to walk and look at those offenders, look for

13   any, you know, abnormal behavior, anything going on, make

14   sure to check on what's going on in the dayroom and then

15   go to the next -- to the next dormitory.  A wellness

16   check, I'll look at the list and go check on that

17   particular offender.

18        Q.    Okay.  Is it fair to say that a wellness check

19   is a more -- is a better way to check on somebody who's

20   susceptible to extreme heat than just doing a round?

21        A.    Yes.

22        Q.    Has there been any discussion at TDCJ about

23   closing this seven-day loophole to make sure that medical

24   intakes are done right away at the facility?

25        A.    I have -- I really can't testify to that.  I
```

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

 1        A.    Again, I'm not a medical professional.  I'm not

 2    there when that nurse triages offenders off the bus.

 3        Q.    Why not?

 4        A.    They're the medical professional.  I'm the

 5    regional director.  I can't be on all my facilities at the

 6    same time.

 7        Q.    Let me hand you Exhibit 38, sir.  Is that what

 8    you understand that quote, unquote triage to be or do you

 9    know?

10        A.    I don't know what document they use when they --

11    when they triage the offenders coming off the bus.  I

12    don't know what the medical department uses.

13        Q.    How many people have died due to heat-related

14    illnesses, let's say 2011 to 2012?

15        A.    I don't have that exact information in front of

16    me.  I couldn't testify to --

17        Q.    More than 10?

18        A.    -- how many offenders have died.  Do you have

19    something you can show me that --

20        Q.    I'm asking you.  Do you know?  You're --

21              MR. GARCIA:  He's just answered.

22              THE WITNESS:  I don't know.

23              MR. GARCIA:  It's asked and answered.

24        Q.    (By MR. EDWARDS) You --

25        A.    I don't know that.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6523

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                     March 26, 2013

1    Q.    Do you know if it's more than 10?

2    A.    No, sir.

3    Q.    Would it surprise you that it is more than 10?

4    A.    Like I said, I haven't received a document from

5    my leadership or from anyone about confirmed heat-related

6    deaths that you're talking about, so I couldn't talk about

7    that.

8    Q.    Does the Texas Department of Criminal Justice

9    know how many deaths from heat-related illnesses there

10   have been since 2010 at the prisons it oversees?

11   A.    I'm responsible for the prisons in my region,

12   and I'm --

13   Q.    I'm not asking you as Regional Director Eason.

14   I'm asking you as the representative of the Texas

15   Department of Criminal Justice.  As you testify here

16   today, do you know how many individuals, inmates inside

17   your prisons, have died due to heat-related illnesses?

18   A.    No, I do not know that.

19   Q.    Okay.  Have you had any conversations with

20   anybody at UTMB about the need to document people who are

21   susceptible to extreme heat from a medical standpoint?

22   Have you had any conversations with anybody at UTMB about

23   that?

24   A.    I've had not really one-on-one conversations,

25   but when I have my wardens' meetings, personnel from UTMB

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1       A.    Yes, sir.
 2       Q.    The training that TDCJ provides to everybody,
 3  right, that --
 4       A.    Yes, sir.
 5       Q.    -- three- or four-page circular?
 6       A.    Yes, sir.
 7       Q.    Do you know if obesity is mentioned in that?
 8       A.    I can't recall.
 9       Q.    Okay.  Has --
10       A.    I can't recall.
11       Q.    Has anybody ever provided -- does TDCJ provide
12  any sort of training relating to, you know -- well, what
13  does TDCJ consider obesity, if you know?
14       A.    I don't know that, sir.
15       Q.    Would you agree with me that someone who's five
16  ten and 350 pounds is overweight?
17       A.    I'd agree to that.
18       Q.    That that's not -- that's obesity.  That's not
19  the type of obesity that we're talking about where, hey,
20  somebody's six two, 225.  Maybe their doctor says they're
21  obese, but -- to wake you up, but that's -- that's an
22  easily observable problem with weight, right?
23       A.    Yes, sir.
24       Q.    Okay.  Do you have any idea how heavy
25  Mr. McCollum was?
```

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                    March 26, 2013

 1  weren't sure how many people had died of heat-related

 2  illnesses in the summer of 2011.  Do you recall that?

 3      A.    Yes.

 4      Q.    Okay.  If I represent to you that 11 men died of

 5  hyperthermia in the summer of 2011, would that surprise

 6  you?

 7      A.    Can you show me a document that -- can you show

 8  me that documentation?  Because I haven't seen anything

 9  that says that.

10      Q.    No.  Let me represent to you that 11 people in

11  TDCJ custody did in fact die due to hyperthermia in the

12  summer of 2011.

13      A.    I have not been told that information.

14      Q.    You've never been told that?  Okay.

15      A.    No, sir.

16      Q.    All right.  To me, that borders on an epidemic.

17  Would you agree with me?

18      A.    I wouldn't agree to that because I haven't seen

19  the documentation.

20      Q.    Okay.  Assume that I'm telling you the truth,

21  that 11 people in TDCJ custody actually did die from

22  hyperthermia.  Would that -- I mean that -- does -- if

23  that were the case, does that not suggest that the -- the

24  things that TDCJ is doing to mitigate the dangers from

25  extreme heat aren't working?

107

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                         March 26, 2013

1    A.    Again, sir, I don't have that documentation in

2   front of me to sit here and give truthful testimony about

3   if we have a problem or not because I haven't been told we

4   had 11 heat-related deaths.

5       Q.    I understand that.  Nobody ever told you that 11

6   people died in the summer of 2011 from hyperthermia,

7   right?

8       A.    No, sir.

9       Q.    Okay.  Assume that that's the case.  If -- if

10  that's the case, does that suggest to you a pretty serious

11  problem at TDCJ?

12              MR. GARCIA:  Objection:  Speculation.

13              THE WITNESS:  No, it does not.

14      Q.   (By MR. EDWARDS) Okay.  Why not?

15      A.    Because we are doing everything possible to

16  mitigate the heat in our institutions.

17      Q.    Are you air-conditioning your institutions?

18      A.    No, sir.

19      Q.    Okay.  So then you're not doing everything

20  possible to mitigate the heat, correct?

21              MR. GARCIA:  Objection:  Argumentative.

22              THE WITNESS:  Yes, we are.

23      Q.   (By MR. EDWARDS) Okay.  Is it possible to

24  air-condition the facilities that you oversee?

25      A.    It's possible, but it's not needed.

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                        March 26, 2013

1        Q.    Well, it's your opinion that it's not needed,

2   right?

3        A.    It's my experience that it's not needed.

4        Q.    Okay.  If 11 people died in the summer of 2011

5   due to hyperthermia, would you change your opinion?

6        A.    I don't know that 11 people died.

7        Q.    If they did?

8        A.    Well, if -- I don't know if they did or not.

9   You're sitting here giving me these -- these numbers, 11

10  people.  I haven't seen anything that shows me that 11

11  people died of hyperthermia, so how can I accurately try

12  to answer that question?

13       Q.    Well, what if a thousand people died from

14  hyperthermia?

15            MR. GARCIA:  Objection:  Speculation.

16       Q.    (By MR. EDWARDS) Would that cause you pause?

17       A.    It would cause me concern.

18       Q.    Okay.  Well, what if -- what if 10 or more

19  people died from hyperthermia in the summer of 2011?

20            MR. GARCIA:  Objection:  Speculation.

21       Q.    (By MR. EDWARDS) Would that cause you pause?

22       A.    That would cause me concern if that happened.  I

23  don't have any documentation in front of me to say that,

24  but there's not a need to air-condition our prisons.

25  We're taking all the steps to mitigate heat.

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                       March 26, 2013

1      Q.    Okay.

2      A.    There's no Constitutional requirement for us to

3  air-condition our prison.

4                 MR. EDWARDS:   Let me object as

5  nonresponsive.

6      Q.    (By MR. EDWARDS) Whether or not there's a need to

7  air-condition the prisons that TDCJ administers, it's your

8  opinion that there's not, right?

9      A.    Yes, sir.

10     Q.    Okay.  What would change your opinion, if

11  anything?

12     A.    At this point, my opinion stands.  Just what I

13  told you:  There's not a need to air-condition our

14  institutions.

15     Q.    Okay.  Would a certain number of deaths due to

16  extreme heat be something that would cause you to change

17  your opinion?

18     A.    Again, we're assuming that something might

19  happen.  I mean you haven't showed me any documentation to

20  show that we've had 11 deaths, and, no, my stance is we do

21  not need to air-condition our institutions.

22     Q.    What if -- what if I was able to show you

23  documents indicating that 11 people died in the summer of

24  2011 due to hyperthermia?  Would your opinion change?

25     A.    No, it would not.

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

```
 1      Q.    Why not?
 2      A.    Because we are taking all the steps that we --
 3  we can take to mitigate the heat.  We're doing that every
 4  summer, and when you look how vast our operation is
 5  throughout the state, and how many offenders that we move
 6  through our institutions every summer, how many employees
 7  we have working in our institutions every summer, we have
 8  very little problems with heat-related illness when you
 9  look at the numbers.
10      Q.    Was that true in the summer of 2011, that you
11  had very little problems with heat-related illnesses?
12      A.    In my opinion, yes.  When you look at the
13  numbers, I think we do a wonderful job at taking those
14  steps, taking it very seriously and mitigating the heat on
15  our facilities.
16      Q.    Just to be crystal clear, it's your testimony,
17  as the Texas Department of Criminal Justice
18  representative, that you do a wonderful job mitigating the
19  heat at your facilities?
20      A.    Yes.
21      Q.    Do you believe you did a wonderful job at the
22  Hutchins Unit with regard to Larry Eugene McCollum?
23      A.    Yes, we do -- we did a -- a good job.
24      Q.    Did you make any changes -- I mean the Texas
25  Department of Criminal Justice -- based on Mr. McCollum's
```

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                       March 26, 2013

```
 1  death and the circumstances that surrounded it?

 2      A.    Not that I'm aware of.  We still implement

 3  our -- our mitigation -- or all the steps that we take to

 4  reduce heat issues on our facilities.  We've been doing

 5  that, conducting our heat training, and we continue to

 6  stay focused on that during the summer months as we always

 7  have.

 8      Q.    Where do you office out of again, sir?

 9      A.    Palestine, Texas.

10      Q.    Okay.  Is there like a -- is it just your -- is

11  there like an administrative office that you and maybe

12  your secretary are in, other people?

13      A.    Yes, yes.  We have a regional office there in

14  Palestine.  It's on one of the facilities.

15      Q.    Is it air-conditioned?

16      A.    Yes, it is.

17      Q.    Okay.  Is Warden Pringle's office

18  air-conditioned?

19      A.    Yes.

20      Q.    Is every warden's office that you oversee

21  air-conditioned?

22      A.    Yes.

23      Q.    It's possible to provide air-conditioning if you

24  want to, right?

25                MR. GARCIA:  Objection:  Vague.
```

113

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                   March 26, 2013

```
 1   here.  Are you just the wrong person with no knowledge of
 2   whether or not TDCJ can air-condition its prisons?
 3        A.    As far as how much it's going to cost and what
 4   it would take, as far as physical plan issues and
 5   construction issues and things like that, yes.
 6        Q.    Okay.  Have you ever investigated how much it
 7   would cost to air-condition any of the facilities --
 8        A.    No, I have --
 9        Q.    -- that you oversee?
10        A.    No, sir.
11        Q.    Have you ever asked anybody at the Attorney
12   General's -- well, strike that.  Have you ever asked
13   anybody to investigate how much it would cost?
14        A.    No, sir.
15        Q.    Have you ever -- to your knowledge, has anybody
16   at the Texas Department of Criminal Justice ever asked
17   those questions?
18        A.    To my knowledge, the facilities division looked
19   at what it would take.
20        Q.    When?
21        A.    I'm not sure when, but...
22        Q.    Then how can you say to your knowledge the
23   facilities division -- I'm not trying --
24        A.    Well, at some time -- some times this --
25        Q.    -- to be argumentative.  I'm just trying to
```

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   figure out who I need to ask these questions to and why

2   nobody has asked these questions.

3       A.    Some time I think last fiscal year, this fiscal

4   year.

5       Q.    Okay.  So you believe -- and correct -- I don't

6   want to mischaracterize.  You believe, but you're not

7   certain that the facilities division analyzed the cost of

8   air-conditioning, or some aspect of the cost of

9   air-conditioning this past fiscal year?

10      A.    Yeah.  To what level, I don't know.  I don't

11  have that information.  I don't work in the facilities

12  division.

13      Q.    Well -- okay.  The facilities division wouldn't

14  do that on their own, would they, if you know?

15      A.    I don't know that, sir.

16      Q.    Well, who would -- who would -- who would begin

17  the process for asking the facilities division to prepare

18  a report or analyze the cost?

19      A.    I want assume -- well, again, I'm assuming -- I

20  don't know the -- I don't know the answer to that

21  question.

22      Q.    Okay.  Well, you're here to testify on behalf of

23  the Texas --

24      A.    Uh-huh.

25      Q.    -- Department of Criminal Justice.

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

1      A.    Yes, sir.

2      Q.    And then you, right?

3      A.    Yes, sir.

4      Q.    Okay.

5      A.    For my particular region.

6      Q.    How many regions are there?

7      A.    There are six.

8      Q.    Okay.  So Mr. Thaler, Mr. Stephens, six heads of

9  which you are one?

10     A.    Of -- yes, six heads of the region.  Now,

11 there's two other -- there's two other deputies as well.

12     Q.    Two other deputies in Mr. Stephens' job?

13     A.    Same capacity as Mr. Stephens.

14     Q.    Who are those other deputies?

15     A.    Michael Upshaw and Thomas Prasifka.

16     Q.    Okay.  Prasifka?

17     A.    Prasifka.

18     Q.    Okay.  Any discussion about air-conditioning

19 facilities at any of these CID meetings?

20     A.    No, sir, not -- no.

21     Q.    There hasn't been a single --

22     A.    I can't recall of --

23     Q.    -- discussion, that you can recall, relating to

24 whether or not facilities should be air-conditioned at any

25 of these CID meetings?

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                        March 26, 2013

1    A.    We discuss all the steps to mitigate the heat
2  making sure those processes are in place, but I don't
3  recall any specific discussions about air-conditioning
4  facilities, no.
5    Q.    Did nobody say, "Hey, why aren't we
6  air-conditioning these facilities?"
7              MR. GARCIA:  Objection:  Argumentative.
8    Q.    (By MR. EDWARDS) You can answer it, sir.
9    A.    I just -- I just told you, sir.
10   Q.    No is the answer?
11   A.    Haven't had that --
12   Q.    Okay.
13   A.    -- discussion.
14   Q.    All right.  Well, then, okay.  Do you know if
15  any -- if the CID was at all responsible for -- strike
16  that.  How do you know that the facilities division looked
17  at the cost of air-conditioning?
18   A.    There was a -- I thought I got that information
19  from my regional manager, Kim Farguson.
20   Q.    Okay.  Tell me where -- is it Kim Ferguson?
21   A.    Farguson.
22   Q.    Farguson.  Excuse me.  Tell me where in the kind
23  of the -- the hierarchical -- I want to say food chain.  I
24  don't mean that disrespectfully, but where in the chain of
25  command Ms. Farguson would be?

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   conversation.  He said, "Give me that information."  I

2   said okay.

3       Q.    Do you think it would be a waste of money to

4   air-condition the housing areas?

5       A.    It's not needed, so yes.

6       Q.    Okay.  Is that -- that kind of your opinion that

7   air-conditioning is not needed, is that shared, to your

8   knowledge, with those people you mentioned above you in

9   the -- the chain of command:  Mr. Thaler, Mr. Stephens,

10  Mr. Upshaw and Mr. Prasifka?

11      A.    I can't speak for shared knowledge or what they

12  think or anything else, sir, or what's going through their

13  mind.  I can't --

14      Q.    Okay.  Has -- have you ever talked about

15  air-conditioning with -- with Mr. Livingston?

16      A.    No, sir, I have not.

17      Q.    Okay.  So none of these individuals,

18  Mr. Livingston, Mr. Thaler, Mr. Stephens, Mr. Upshaw or

19  Mr. Prasifka, have told you that air-conditioning is not

20  needed in the facilities that TDCJ oversees?

21      A.    I haven't discussed it with them.  The

22  conversation hasn't come up.

23      Q.    Okay.  Do you know what the budget is for TDCJ

24  in any given year?

25      A.    The entire budget for --

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1      A.    Yes.

2      Q.    You're making a choice to air-condition your

3   office, and that costs money, right?

4      A.    Yes.

5      Q.    Okay.  So you're making choices here as to what

6   you want to spend money on, right?

7      A.    Yes.

8      Q.    Okay.  So if you stopped air-conditioning the

9   wardens' offices, you'd have money to spend on some of

10   these heat mitigation factors if you wanted to, right?

11      A.    We're not going to stop air-conditioning the

12   wardens' offices.  That's an administrative area.  You

13   have computers and things in there that have to be kept

14   cool.  And again, I'm not a maintenance expert, but, you

15   know, there's -- like I said before, we are doing

16   everything we can to mitigate the heat.  There's not a

17   need to air-condition our facilities, and we use all the

18   money that the Legislature gives us in a very wise manner.

19      Q.    In your opinion, right?

20      A.    Yes, sir.

21      Q.    Okay.  Of all the things you told me that --

22   that you do to mitigate the heat, do any of them cost TDCJ

23   money?

24      A.    Yes.

25      Q.    What ones?

Plaintiffs' MSJ Appx. 6537

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                           March 26, 2013

1      Q.    What about just putting ice water in a cooler?

2   Does that cost the agency a lot of money?

3      A.    It costs money to buy the coolers.

4      Q.    Yes, it does.  Does it cost the agency any money

5   to allow inmates to have fans?

6      A.    No, sir, not that I can --

7      Q.    Cost the --

8      A.    Not that I can see as far as -- talk about

9   electrical costs for all the fans.  There's a cost there

10  that we have to pay or the taxpayers pay.

11     Q.    But nonetheless, you think it's important enough

12  to force the taxpayers to absorb that cost, correct?

13     A.    For an offender to have a fan?

14     Q.    Yeah.

15     A.    Yes, sir, we make sure that's part of our

16  heat -- our steps to mitigate the heat.

17     Q.    Okay.  Conducting wellness checks, does that

18  cost you any money?

19     A.    It's going to cost money in paper.

20     Q.    If it's documented, correct?

21     A.    To print -- to print the wellness checks, print

22  the list off the computer and things like that.  You know,

23  most of our supply budgets on our units go to paper.

24     Q.    Okay.  Is it your testimony that TDCJ is doing

25  everything it can financially to mitigate the heat?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6538

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

 1      A.      Yes.

 2      Q.      Okay.  Could TDCJ afford solar shades or solar

 3  screens to be placed on windows in the facilities?

 4      A.      With -- sitting here without talking to our

 5  agency budget manager, I couldn't accurately answer that.

 6      Q.      Okay.

 7      A.      We're talking different facilities, and I don't

 8  know how many windows you're talking about or anything

 9  else, so I couldn't accurately answer that question.

10      Q.      They're your -- they're your prisons, sir, okay?

11      A.      I understand that.

12      Q.      It doesn't seem like much to ask to do that.  It

13  doesn't seem like it would be expensive, but if I'm wrong,

14  you know, I mean you're the one --

15      A.      I don't know --

16      Q.      -- who controls the budget.  You're the one

17  making the choices.

18              MR. GARCIA:  Objection:  Argumentative.

19  Counsel, do you have a question or a statement?

20              MR. EDWARDS:  Yeah.

21              THE WITNESS:  I don't know how much it

22  would cost.

23              MR. GARCIA:  Wait, wait.

24              THE WITNESS:  I'm sorry.

25      Q.      (By MR. EDWARDS) Okay.  Do you know how much it

145

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                        March 26, 2013

 1  designated, sir, as the person most knowledgeable in the

 2  whole agency to talk about this, on behalf of the agency.

 3  That's what you've been designated for.

 4        A.    I understand that.

 5        Q.    And so I want -- I want to make sure I

 6  understand.  Okay.  The -- earlier you talked about the

 7  heat restriction, the work restriction.

 8        A.    Yes, sir.

 9        Q.    Okay.  Is that one of the policies?

10        A.    Well, there's a list that when the inmate goes

11  to medical, sees a medical professional, a provider, and

12  the doctor evaluates the offender, and the doctor or the

13  P.A. makes that determination that offender needs to have

14  that work restriction of no temperature extremes, then

15  that's entered into the electronic medical records.  And

16  then that information is -- goes into our system's

17  database, and that information goes to the count room.  We

18  make sure that information is accurate and correct, and

19  that work -- that heat/work restriction list is generated

20  off -- off of that.

21        Q.    Okay.  Other than that, is there any other

22  policy, practice or procedure relating to the creation of

23  lists of prisoners with medical conditions affected by

24  heat, high temperature or high heat indexes?

25        A.    That's the only one to my knowledge.

146

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

1      Q.    Okay.  And I thought you told me you weren't

2   sure -- well, that policy has been in place since 2009?  I

3   don't want to --

4      A.    I didn't say that.

5      Q.    Fair enough.  When has that policy or practice

6   been in place at TDCJ?

7      A.    I don't believe I said when that came into

8   place.

9      Q.    Okay.  And I -- I think you're accurate, sir,

10  and I don't mean -- I certainly -- I want to understand

11  this.  Do you know when that practice or policy was put

12  into place at TDCJ?

13     A.    I don't know for sure.

14     Q.    Okay.  Do you know if -- well, I think I'm

15  afraid to know this.  Do you know if it was in place at

16  the time Larry Eugene McCollum entered the Hutchins

17  facility?

18     A.    That's in 2 -- in 2011.

19     Q.    That's in July -- I believe July 15th, 2011.

20     A.    Yes, sir, to my knowledge, it was in place.

21     Q.    Okay.  By the same token, it certainly should

22  have been in place, right?

23     A.    Yes.

24     Q.    Okay.  Now --

25     A.    He wouldn't have been on the list.

162

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1              THE WITNESS:  Can I stand up a minute?  Is
2    it okay?
3              MR. EDWARDS:  Any time you want, yes, sir,
4    you can.  Would you like to take a break?  Now is as good
5    a time --
6              MR. GARCIA:  Are you at a good spot?
7              MR. EDWARDS:  Yeah, sure.
8              THE VIDEOGRAPHER:  Off the record at 2:26.
9              (Recess taken).
10             (Exhibit No. 39 marked).
11             THE VIDEOGRAPHER:  We're on the record with
12   tape No. 4 at 2:34.
13       Q.   (By MR. EDWARDS) Okay.  Let me hand you what's
14   been marked Exhibit 39, sir.  Is that the infamous heat
15   precaution e-mail that you've been talking about earlier?
16             MR. GARCIA:  Objection:  Characterization.
17       Q.   (By MR. EDWARDS) All right.  Is that the heat
18   e-mail that you were talking about earlier that we've
19   referred to as an administrative e-mail?
20       A.   Yes, sir, it looks like it.  It looks like the
21   one that they put out every year.
22       Q.   Take -- take a look at it.  It's --
23       A.   Yes, sir.
24       Q.   It appears -- it appears to be signed or at
25   least type signed by William Stephens, the Deputy Director

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                       March 26, 2013

1    Q.   Okay.  I'm not aware of any documents that --

2    that they're given.  I don't believe we've been provided

3    any documents.  Do you believe that those are -- those are

4    out there somewhere?

5    A.   Again, I don't -- I'm not involved right in

6    there with that intake process, so I can't tell you

7    exactly what kind of information they're given or what

8    kind of document it's put out on, things like that.

9    Q.   Well, line 1 on this Heat Precaution 2011 memo,

10   this e-mail that we've been talking about, is:  "Ensure

11   employees and offenders are aware of the signs and

12   treatment for heat related illnesses by conducting

13   training," right?

14   A.   Yes, sir.  We're doing that.

15   Q.   Well, you may be doing that, I suppose.  I'm not

16   aware of any --

17           MR. GARCIA:  Objection:  Argumentative.

18   Q.   (By MR. EDWARDS) I'm not aware of any documents

19   to suggest that you are at least with regards to

20   offenders.  Now, you're telling me about stuff, and I'm

21   trying to figure out are there documents that you've seen

22   which show that you provided training to offenders --

23   A.   I get a --

24   Q.   -- about -- excuse me -- about --

25   A.   I'm sorry.

174

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                      March 26, 2013

1    Q.    No, it's okay -- about the signs and treatment
2  for heat-related illness?
3    A.    I get a document from my regional risk manager
4  every summer that tells me that all employees and all the
5  offenders in the region on the facilities have been
6  trained.
7    Q.    Okay.  Well, how extensive --
8    A.    And that information is relayed from the risk
9  management or risk manager on the unit to my regional risk
10  manager.
11    Q.    Okay.  And you think that that was in effect in
12  the summer of 2011?
13    A.    Yes.
14    Q.    Okay.  I assume, if you're going to have all
15  this training, it better happen, right?
16    A.    Yes.
17    Q.    Okay.  So I assume you'd be critical -- well, if
18  the inmates didn't -- do you know how extensive the
19  training is that's -- that's allegedly given to inmates
20  about the signs and treatment of heat-related illnesses?
21    A.    No, I can't speak about how extensive it is, no,
22  sir.  Sorry.
23    Q.    All right.  That would be a question for the
24  intake coordinator or the risk management coordinator at
25  the Hutchins Unit?

175

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

1        A.     Yes, sir.

2        Q.     Okay.  In any event, it absolutely should happen

3   and there should be training about signs and treatment for

4   every inmate, right?

5        A.     Yes, sir.

6        Q.     Okay.  In this training circular, I just want to

7   make sure that TDCJ agrees with this -- "As summer months

8   approach, the occurrence of heat-related illnesses rise.

9   Recognition and prompt treatment of these symptoms are

10  imperative."  Does the Texas Department of Criminal

11  Justice agree with that, stand by that statement?

12       A.     Where you are reading that at, sir, page 1?

13       Q.     Page 1, the third column --

14       A.     Okay.

15       Q.     -- from the top.

16       A.     Okay.  I've seen that.  Okay.  Yes, sir.  It's

17  in our training.

18       Q.     To me, that means -- prompt treatment means like

19  as soon as you recognize signs or symptoms of heat-related

20  illness, you got to take steps immediately to deal with

21  that.  Is that fair?

22       A.     Yes, sir.

23       Q.     Okay.  Now, it also says, "During prolonged heat

24  waves, the risk of heat-related illnesses, injuries and

25  deaths climbs dramatically," right?  The second column,

176

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                         March 26, 2013

1  sir, second paragraph, second column.

2      A.    Yes, it says that.

3      Q.    Do you agree with it?

4      A.    I don't agree with the deaths.

5      Q.    Why not?

6      A.    Because with our track record, and as long as

7  we're doing all these steps to mitigate the heat, then

8  when you look at our numbers, we don't have a problem with

9  heat-related deaths.

10     Q.    So your risk management team says that the risk

11 of death climbs dramatically during heat waves.  You don't

12 think so because you're taking steps to mitigate it,

13 right?

14     A.    Yes, we're taking all the steps necessary to

15 mitigate it.

16     Q.    And if you're wrong about the fact of -- well,

17 strike that.  If there happened to be, let's say, more

18 than five deaths related to hyperthermia, I don't know,

19 during the summer of 2011, that would be consistent with

20 the training that the risk management provides, right?

21          MR. GARCIA:  Objection:  Speculation.

22          THE WITNESS:  I don't know if there's --

23 like I said, I don't have a document saying -- you keep

24 talking about these --

25     Q.    (By MR. EDWARDS) I know.

177

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                      March 26, 2013

```
 1        A.      -- five deaths, sir.  Without researching the
 2   information, looking at that information, looking at the
 3   circumstances surrounding if these deaths even took place,
 4   were they in the offender housing areas, were they
 5   outside, what were their health problems?  What were all
 6   the circumstances.  That's something that we'd have to
 7   look at to see if -- if there was an issue there that we
 8   --
 9        Q.      You'd look at it, right?
10        A.      Yes.
11        Q.      You would analyze it, you'd determine if there
12   was an issue there, and you'd take steps to remedy the
13   problem; is that what you're telling me?
14        A.      Yes, and we're taking those steps.  We've been
15   -- I've been talking about that.  We've been -- we're
16   taking those steps and...
17        Q.      And according to you, that's why people don't
18   die from hyperthermia in Texas Department of Criminal
19   Justice facilities, right?
20        A.      Yeah, because we're engaged in these steps and
21   we're doing everything possible using all the resources we
22   can to mitigate the heat.  That's why we're successful
23   with this policy.
24        Q.      Okay.  Is Mr. McCollum just an outlier then to
25   you?
```

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

1      Q.    Okay.  Would you read the conclusions from the

2   Dallas County Institute of Forensic Sciences who conducted

3   the autopsy, sir?  Just read that paragraph under

4   "Conclusions."

5      A.    What page are you on, sir?

6      Q.    Emergency Action Center document page 41.

7      A.    Oh, I'm sorry.  "Based on the autopsy and the

8   history available to me, it is my opinion that Larry Gene

9   McCollum, a 58-year-old white male, died as a result of

10  hyperthermia, was in a hot environment without

11  air-conditioning.  He may have further predisposed to

12  developing hyperthermia due to morbid obesity and

13  treatment with a diuretic for hypertension.  Manner of

14  death:  Accident."

15     Q.    Okay.  Can we agree that Mr. McCollum died of a

16  heat-related illness?

17     A.    Again, I'm not a medical professional, but based

18  on that document --

19     Q.    I'm not --

20     A.    -- this is what that's telling me.

21     Q.    Okay.  I'm not a medical professional either.

22  I'm just -- just a lawyer looking at documents asking you

23  questions, okay?

24     A.    Yes, sir.

25     Q.    Will you agree with me that at least one person

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                           March 26, 2013

1   during the summer of 2011 died from hyperthermia?

2       A.    Yes, sir.  That's what this document says.

3       Q.    That was during the summer months in which your

4   risk management said that heat-related illnesses, injuries

5   and deaths climb dramatically, right?

6       A.    Yes.

7       Q.    Okay.  That's why I get that the risk of death

8   is very real when you've got temperatures this hot inside

9   your housing areas, right?

10              MR. GARCIA:  Objection:  Speculation.

11              THE WITNESS:  I don't know that there's a

12  risk as long as we're taking those steps to mitigate the

13  heat, and, you know, we're talking about a facility at

14  Hutchins that's been open since 1995 and never had a --

15  never had a heat case.  All offenders that come through,

16  come through that facility every summer, all different

17  ages, sizes, throughout our entire system, we're talking

18  about, you know, a very unfortunates incident here, but

19  that doesn't necessarily mean that we've got a problem in

20  our system with offenders dying of heat illness because we

21  do not.

22              MR. EDWARDS:  Okay.  Let me object as

23  nonresponsive.

24      Q.    (By MR. EDWARDS) What -- what would it take for

25  you to conclude that there is a problem within your system

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

1  of offenders dying from heat-related illnesses?

2      A.    I don't think I could make that decision

3  without -- or that -- that call without a medical

4  professional and talking to a medical professional.

5      Q.    Have you talked to a medical professional about

6  whether or not there is a problem at the Texas Department

7  of Criminal Justice during the summer months with people

8  dying from heat-related illnesses?

9      A.    No, I have not.

10     Q.    Why not?

11     A.    We talk about these -- these steps during the

12 summer months.  In my wardens' meetings, I talk to the

13 wardens.  They talk to their staff.  UTMB is part of those

14 meetings and --

15     Q.    How do you know --

16     A.    -- that's the discussions I have.

17     Q.    I'm sorry.  How do you know they're working,

18 sir, these steps?

19     A.    The steps?

20     Q.    Yeah.

21     A.    Because we got close to 150,000 offenders in our

22 system, and from 1995 -- you're talking about a -- a

23 facility at Hutchins that houses 2276 offenders.  Just

24 again, I'm not good at math, but just think about all the

25 offenders that have come through that -- that -- that

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                           March 26, 2013

 1  unit, and we've had one issue with the heat, one.  And if

 2  it was a big, huge issue, we'd be having a lot more

 3  problems, and --

 4       Q.    Five, six --

 5       A.    -- we're not having that.

 6       Q.    -- seven, eight?

 7       A.    I don't know that.  Where is that information?

 8  I would like to see it.  And I would have to evaluate it,

 9  look -- you know, what were the circumstances surrounding

10  these -- these heat deaths that you're telling me about.

11       Q.    Well, it's just -- it's surprising to me that

12  you don't have this knowledge already without me having to

13  tell it to you since --

14            MR. GARCIA:  Is there a question, Counsel,

15  or are you going to argue?

16       Q.    (By MR. EDWARDS) -- since you run the system?

17            MR. GARCIA:  Objection:  Argumentative.

18  Don't answer that.  Do you have a question, Counsel?

19       Q.    (By MR. EDWARDS) Do you run the TDCJ system with

20  regards to analyzing heat-related illnesses?

21       A.    No, I don't run the entire system, no, sir, I do

22  not.

23       Q.    Who ultimately has responsibility at TDCJ for

24  analyzing whether or not there are a disproportionate

25  number of heat-related deaths in the system?

192

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1      A.    We consider --

2      Q.    -- as indicated on this document.

3      A.    We consider heat stroke to be very serious and

4   we take it very seriously, absolutely.  And we take all

5   heat issues very seriously for our inmates and staff.

6   That's why we have all these steps in place to mitigate

7   the heat.

8      Q.    Okay.  Again, do you, the Texas Department of

9   Criminal Justice, consider heat stroke a true medical

10  emergency?

11     A.    Yes.

12     Q.    Okay.  Do you agree that when you encounter --

13  when one of your employees encounters a true medical

14  emergency, that would require immediate steps to be taken

15  to get that person hospitalized?

16              MR. GARCIA:  Objection to the extent it

17  calls for speculation.

18              THE WITNESS:  If -- and, again, concerning

19  Mr. McCollum's situation, I wasn't there that night.

20              MR. GARCIA:  Just answer his question.  He

21  wasn't talking about the McCollum situation.

22              THE WITNESS:  Could you repeat the

23  question?  I'm sorry.

24              MR. EDWARDS:  Sure.

25              (The record was read as follows:

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                      March 26, 2013

1              "Do you agree that when you encounter --
2              when one of your employees encounters a
3              true medical emergency, that would require
4              immediate steps to be taken to get that
5              person hospitalized?").
6              THE WITNESS:  Yes.
7         Q.   (By MR. EDWARDS) And not to -- not to make too
8    simple -- of course that's what it requires, right?
9         A.    Yes, sir.
10        Q.    Okay.  Because you're not a doctor, you're not
11   capable -- none of your employees are doctors, and they're
12   not capable of providing medical care for medical
13   emergencies, right?
14        A.    Yes, sir, sure.
15        Q.    Your employees aren't capable of providing
16   medical care for seizures, are they?
17        A.    No, sir.
18        Q.    Okay.  Your employees aren't capable of
19   providing medical care for heat stroke, are they?
20        A.    No, sir.
21        Q.    And to pretend otherwise would just be
22   ridiculous, right?
23              MR. GARCIA:  Objection:  Argumentative.
24   Don't answer that.
25        Q.    (By MR. EDWARDS) To pretend or to suggest that

194

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                          March 26, 2013

1  your employees could handle a seizure or a heat stroke

2  situation medically would be inaccurate, correct?

3            MR. GARCIA:  Objection:  Vague; confusing;

4  improper hypothetical.  Answer as best you can.

5            THE WITNESS:  When an employee -- yes, an

6  employee is not -- they don't have -- when I say

7  "employee," I'm talking about correctional staff or a

8  supervisor.  They don't have extensive medical training.

9  They get this training here to try to recognize the signs

10 of certain -- certain issues, and we do the best -- the

11 absolute best we can to assess that situation and get on

12 medical treatment.

13    Q.    (By MR. EDWARDS) And as soon as that situation is

14 assessed to be, "My gosh, I can't handle this.  This is --

15 this is an emergency," you've got to get that guy to a

16 hospital, or that woman to a hospital, right?

17    A.    Once that supervisor, that employee makes a call

18 that, "Hey, I think this is a true medical emergency,"

19 then, yes, we've got to contact medical and we've got to

20 get them to the hospital.

21    Q.    Okay.

22            (Discussion off the record).

23    Q.    (By MR. EDWARDS) Now, your training -- your

24 training says that you have to always transfer heat stroke

25 victims to a medical facility.  Do you agree with that?

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1      A.      Yes.  If it's determined they've had a heat

2  stroke, yes, I agree with that.

3      Q.      Okay.  Are you capable of determining -- strike

4  that.  Are any of your employees, without any medical

5  training, capable of determining whether or not someone is

6  definitively suffering a heat stroke?

7      A.      No.  They're just trained on the -- the signs

8  and symptoms.

9      Q.      So if they see signs or symptoms of heat stroke,

10 they have to always get that person transferred to a

11 medical facility, right?

12     A.      For the heat stroke?

13     Q.      If the person has signs or symptoms of heat

14 stroke, a medical emergency, according to the Texas

15 Department of Criminal Justice risk management's training

16 circular, and a correctional officer observes signs and

17 symptoms of that type of injury, they have to, have to get

18 them to a hospital, right?

19     A.      Right.  We assess the situation.  I covered that

20 earlier.

21     Q.      You've got that -- what was Mr. McCollum's body

22 temperature when he was taken to the hospital, according

23 to the autopsy?  It's on, again, page EAC 41.

24     A.      Okay.  109.4.

25     Q.      Now, again, I know you're not a medical doctor.

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                            March 26, 2013

1   lot of different things going on and you've got to secure

2   housing areas that you're dealing with; you've got other

3   offenders that you're dealing with.  You can't just throw

4   all the doors open and let inmates come and go as they

5   please.  There's -- there's protocols in place to get down

6   to that offender to keep the area secure.  There are, you

7   know, other offenders that are in the area.  Trying to

8   secure the area that the offender is in.  There's just a

9   lot of different issues out there that you have to deal

10  with on any -- any situation, not just a medical

11  situation.

12       Q.    I want to just talk about medical situations,

13  okay?  And my question, sir, was:  Do you acknowledge --

14  I'm asking you as the Texas Department of Criminal

15  Justice -- that there are some situations which -- which

16  are life-threatening, which do not allow for multiple

17  supervisors to be called to assess a situation?

18                  MR. GARCIA:  Objection:  Speculation.

19                  THE WITNESS:  Again, I wasn't -- I wasn't

20  there the night of the -- of the incident, so I can't

21  really say for sure, you know, about the supervisors, you

22  know, what Mr. McCollum's symptoms were, things like that.

23       Q.   (By MR. EDWARDS) Well, is there any set of

24  circumstances that you can see, as the -- as the Texas

25  Department of Criminal Justice, which would lead you to

**WRIGHT WATSON & ASSOCIATES**

(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
                                                      01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6556

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                           March 26, 2013

```
 1   conclude an ambulance needs to be called right away and

 2   multiple supervisors should not be called?

 3        A.    There could be a situation, depending on the

 4   situation and the circumstances, yes.

 5        Q.    Can you tell me one?

 6        A.    If we respond to an incident and -- let's say an

 7   offender is in a cell and they're not responding; they

 8   don't have a pulse; they don't have a heartbeat.  We're

 9   going to initiate CPR.  We're still going to go through

10   that ICS protocol.  A supervisor is going to be called

11   down there to assess the situation, and that's our

12   protocol.  A supervisor makes that -- makes that

13   assessment.

14             If medical staff is on the unit, of course

15   they're going to respond as well, and if medical staff is

16   on the unit, then those are the folks that's going to

17   initiate that 911 phone call if it's necessary.  And if

18   medical staff is not on the unit, when supervisors get

19   there, they're going to make that call to, you know, when

20   to call 911.

21        Q.    Okay.

22        A.    That's the best I can explain it.

23        Q.    Fair enough.

24        A.    That's the best I can explain it.

25        Q.    That's the policy and practice that's at the
```

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                    March 26, 2013

1     A.    It's possible, yes.

2     Q.    And as you testify here today on behalf of the

3  Texas Department Of Criminal Justice, you don't see any

4  potential problems with the delay that is almost necessary

5  when you -- when you don't initiate 911 calls until a

6  supervisor is -- is present?

7     A.    Like I said earlier, there's no specific

8  protocol, but the -- the timeline for 911 or, you know,

9  who's required to call 911, we have those ICS protocols.

10  We respond quickly to those situations.  And, no, I don't

11  have an issue with that.

12     Q.    Okay.  Just so I'm --

13     A.    In my experience.

14     Q.    Just so I'm clear, tell me what an ICS protocol

15  is, just so I haven't missed that.

16     A.    That's an Incident Command System is what that

17  stands for.

18     Q.    What happens with ICS -- when you say "ICS

19  protocols initiated," tell me exactly what you mean.

20     A.    If we have an incident, whatever the -- you

21  know, there's all kinds of incidents in a prison setting.

22  If we have an incident in one of the dormitories, the

23  officer is going to either respond to the incident -- if

24  they have a radio, they're going to announce over the

25  radio what the incident is, that they're -- that they're

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   the on-scene commander, that they need additional staff, a

2   supervisor.

3               If they don't have a radio, they're going

4   to try to relay that information to the officer in the

5   picket.  That information could be relayed over the radio

6   by the picket officer or with a telephone, and then when

7   the staff and a supervisor get down there, they respond.

8   Then that supervisor is going to take over to call the

9   transfer of command.  They take over the situation and

10  assess the situation and they -- they deal with it from

11  there.

12      Q.    And that is -- that's the ICS protocol you're

13  talking about?

14      A.    Yes, sir, for the most part, and we go through

15  the -- you know, we go through the steps of, you know,

16  whether it's getting the inmate to medical, you know,

17  whatever we need to do until the incident is completely

18  over, and then we terminate ICS and go back to what we

19  call normal operations in the facility because, you know,

20  you have to understand when you have any type of situation

21  in a prison setting, there's -- there's certain things

22  that you have to do.  You have to shut down traffic; you

23  have to move offenders to different cell blocks or

24  different areas.  You just can't have inmates running

25  around because everywhere it's a secure environment.

Stephen McCollum, et al v.                      Robert Eason
Brad Livingston, et al.                         March 26, 2013

1   receptacles in the cells.  They all have personal fans.  I

2   believe that's all, sir.

3        Q.    Hutchins, Gurney, and what was the other one?

4        A.    Hutchins, Gurney --

5                   MR. GARCIA:  Cole.

6                   THE WITNESS:  -- and Cole, yes, sir.  I

7   believe I'm accurate on Cole.  I might -- could be wrong,

8   but...

9        Q.    (By MR. EDWARDS) Okay.  And we know at Hutchins,

10  Mr. McCollum died, right?

11       A.    Can you repeat that, sir?

12       Q.    We know at Hutchins Mr. McCollum died, right?

13       A.    Yes, sir.

14       Q.    Are you aware of any heat-related deaths at

15  Gurney from 2010 onward?

16       A.    Yes.

17       Q.    How many heat-related deaths are you aware of at

18  Gurney from 2010 onward?

19       A.    One.

20       Q.    Whose death are you -- are you aware of as being

21  heat related at the Gurney Unit?

22       A.    Rodney Adams.

23       Q.    Did you become aware of that because the Texas

24  Department of Criminal Justice received notice that

25  Mr. Adams' family intended to sue the Texas Department of

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6560

214

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   operations budget.  I took a -- a needed step to purchase

2   additional fans with maintenance money in the region, and

3   we do the best we can to mitigate the heat with the money

4   that we're appropriated.

5       Q.    We're not asking -- I'm not asking for water to

6   be turned into wine.  Let me take that away, but you would

7   tell the jury that one of the important ways in which you

8   mitigate excessive heat is by providing fans, personalized

9   fans to your inmates; is that fair?

10      A.    When it's possible, we -- we provide

11  personalized fans, but it's not always possible to provide

12  a --

13      Q.    Why --

14      A.    -- personalized fan.

15      Q.    Oh, okay.  Well, why is it not possible?

16      A.    Well, there's some institutions that don't have

17  receptacles at the bunks where they can operate a

18  personalized fan.

19      Q.    Which are those institutions?

20      A.    In my region, sir?

21      Q.    Sure.  Let's talk about your region.

22      A.    I believe it's Hutchins, Gurney, I believe the

23  Cole Unit.

24      Q.    How about Hodge?

25      A.    Hodge is cell block.  They have their

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                      March 26, 2013

1   receptacles in the cells.  They all have personal fans.  I
2   believe that's all, sir.
3       Q.    Hutchins, Gurney, and what was the other one?
4       A.    Hutchins, Gurney --
5             MR. GARCIA:  Cole.
6             THE WITNESS:  -- and Cole, yes, sir.  I
7   believe I'm accurate on Cole.  I might -- could be wrong,
8   but...
9       Q.    (By MR. EDWARDS) Okay.  And we know at Hutchins,
10  Mr. McCollum died, right?
11      A.    Can you repeat that, sir?
12      Q.    We know at Hutchins Mr. McCollum died, right?
13      A.    Yes, sir.
14      Q.    Are you aware of any heat-related deaths at
15  Gurney from 2010 onward?
16      A.    Yes.
17      Q.    How many heat-related deaths are you aware of at
18  Gurney from 2010 onward?
19      A.    One.
20      Q.    Whose death are you -- are you aware of as being
21  heat related at the Gurney Unit?
22      A.    Rodney Adams.
23      Q.    Did you become aware of that because the Texas
24  Department of Criminal Justice received notice that
25  Mr. Adams' family intended to sue the Texas Department of

217

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   in the Texas Department of Criminal Justice, right?

2        A.    We had another offender that died.

3        Q.    Prior to Mr. Adams --

4        A.    I don't know -- I can't sit here and testify

5   that if the medical circumstances and all the certain

6   situations surrounding it is similar to what we're talking

7   about today.

8        Q.    You haven't gone over it in as great of detail

9   as you have with Mr. McCollum's in preparation for this

10  deposition; is that fair?

11       A.    Yes, sir.

12       Q.    Okay.  As you testify here today, are you aware

13  of other deaths at the Gurney Unit that were heat-related?

14       A.    No, sir.

15       Q.    If -- if people died -- let's say if two people

16  had died at the Gurney Unit in 2011, the summer of 2011,

17  should you have been made aware of it given your job as

18  regional director?

19       A.    I am made aware of it, sir.

20       Q.    Well, let me ask --

21       A.    I'm made aware of every offender death in my

22  region.

23       Q.    Okay.  Other than Mr. Adams and Mr. McCollum, as

24  you testify here today, are you aware of any other

25  heat-related illness/deaths at any of the Texas Department

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

 1  of Criminal Justice facilities you oversee?

 2       A.    To my knowledge, those are the only two that

 3  have been ruled heat-related to my knowledge.

 4       Q.    All right.  What about at other units where you

 5  don't have direct oversight responsibility?

 6       A.    I can't -- I don't have any knowledge of other

 7  deaths on other facilities in other regions.  That stuff

 8  doesn't go through me or -- that information is not shared

 9  with me.

10       Q.    Well, let me ask you this:  Have you made your

11  counterparts aware of the heat-related illnesses and

12  deaths that you -- you do know about?

13       A.    I don't do that.  Our CID leadership does that.

14       Q.    Who's that?

15       A.    That is Mr. Thaler or Mr. Stephens.

16       Q.    Mr. Thaler's -- not Mr. Livingston; Mr. Thaler;

17  is that fair?

18       A.    Mr. Thaler is the one who conducts our CID

19  meetings, yes.

20       Q.    At the CID meetings -- and I may be

21  misremembering this, so please correct me if I'm wrong --

22  have any of these heat-related deaths been discussed?

23       A.    We discussed -- he mentioned Mr. McCollum's

24  death during the CID meeting.

25       Q.    Mr. Stephens did?

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

 1      A.    No.  Mr. Thaler did.

 2      Q.    I'm sorry.  Mr. Thaler?

 3      A.    Yes, sir.

 4      Q.    Was that before or after this lawsuit was filed?

 5      A.    If I told you, I wouldn't be accurate.  I don't

 6   know if it was before or after, but yes.

 7      Q.    All right.  Has Mr. Adams' death been discussed?

 8      A.    Yes.

 9      Q.    At the CID meetings?

10      A.    At a CID meeting briefly.  I can't tell you

11   which one.  We have them monthly them, so...

12      Q.    But it still remains the conclusion of the Texas

13   Department of Criminal Justice that they're taking all the

14   steps that are necessary to mitigate the heat and that

15   they're doing a wonderful job with relation to protecting

16   inmates from heat-related illnesses?

17      A.    Yes, sir.

18            MR. EDWARDS:  Why don't we take a short

19   break and change the tape, sir.

20            THE VIDEOGRAPHER:  Off the record at 3:52.

21            (Recess taken).

22            THE VIDEOGRAPHER:  We're on the record with

23   tape No. 5 at 4:02.

24      Q.    (By MR. EDWARDS) Do you know how many, on

25   average, people die every summer in the -- the 11

Stephen McCollum, et al v.                                    Robert Eason
Brad Livingston, et al.                                    March 26, 2013

```
 1   -- at the point where the -- the supervisor says that or
 2   determines that this offender is seizing and they believe
 3   it to be a medical emergency, then we're going to either
 4   contact medical there on the unit; we're going to try to
 5   contact 911 and get them there, depending on all the --
 6        Q.   (By MR. EDWARDS) Sure.
 7        A.      -- circumstances going on in the unit at the
 8   time.
 9        Q.      Any time one of your officers in their own mind
10   determines that it's a medical emergency, then 911 needs
11   to be called right away, right?
12        A.      Yes, we try to get 911 out as quickly as
13   possible with all other situations going on in the unit,
14   yes.
15        Q.      This is a more global question though, okay?
16        A.      Okay.
17        Q.      Does -- given the proclivity of seizures on
18   units at TDCJ, does TDCJ provide any training about the
19   need to get immediate care for seizures in which the
20   person remains nonresponsive?
21        A.      Are we saying -- are we asking if the officers
22   go through certain training or that medical provides the
23   training to the staff or --
24        Q.      Do Texas Department of Criminal Justice officers
25   receive any training about the need to treat seizures in
```

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                              March 26, 2013

1  treating that as not a medical emergency would be

2  unacceptable, correct?

3      A.     Again, I wasn't there to make that -- to make

4  that medical call during that situation.  I'm not a

5  medical professional.  I don't know exactly what those

6  officers or the supervisors saw at that particular time,

7  all the issues going on.

8              You know, he was -- appeared to be having a

9  seizure, from the way I understand it, and breathing, had

10 a pulse, so I -- I wasn't there.  I can't actually say

11 what they were thinking and the decisions they made.  They

12 made -- did the best they could with -- given the

13 circumstances.

14             MR. EDWARDS:  Let me object as

15 nonresponsive.

16     Q.    (By MR. EDWARDS) I'm not asking about what these

17 officers did with Mr. McCollum.  They've told us what they

18 did.

19     A.     I understand.

20     Q.     I'm asking you, as the Texas Department of

21 Criminal Justice, okay?  Does the Texas Department of

22 Criminal Justice consider a person who has just gone

23 through convulsions which are perceived to be seizures,

24 who is not responsive, unable to communicate with the

25 officer to be the type of emergency which requires

229

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1   immediate intervention and medical care?
 2       A.    Yes.  We train our staff to try to assess that
 3   situation, try to make that call to the best of their
 4   ability --
 5       Q.    Okay.
 6       A.    -- and give them emergency medical care, but --
 7       Q.    Right.  They're not doctors?
 8       A.    -- there's -- they're not doctors.  There's no
 9   specific timeline or, you know...
10       Q.    Because they're not doctors, they need to err on
11   the side of caution, right?
12                  MR. GARCIA:  Objection:  Speculation.
13       Q.    (By MR. EDWARDS) Isn't that what the TDCJ trains
14   its officers to do?
15       A.    We -- we do the best we can.  We provide all the
16   offenders as much medical care as possible, get them down
17   to medical, and I think we do a good job of that.
18       Q.    You wouldn't get somebody down to medical if
19   there's no medical staff on site?
20       A.    Right, but we -- yeah, if the officer or the
21   supervisors assess the situation and, you know, they
22   determine that 911 needs to be called, then we do a good
23   job of getting 911, getting them out to the unit as
24   quickly as possible.
25                  MR. EDWARDS:  Let me object as
```

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

 1   nonresponsive.

 2       Q.   (By MR. EDWARDS) I'm not asking you what they did

 3   or what you think they do or whether somebody does the

 4   best they can.  That's really somebody else's

 5   determination, okay?  All right?  That would be like me

 6   saying, "Well, maybe they did the worst they could," but

 7   it's opinions as far as I'm concerned.  All withdrawn, not

 8   a question, okay?

 9             I'm trying to figure out what the Texas

10   Department of Criminal Justice actually teaches people,

11   okay?  Don't -- to me, a seizure in which the person who

12   has the seizure is incapable of responding is serious.  Do

13   you agree with that?

14       A.   I'm not a medical professional to be able to

15   respond -- to be able to talk professionally about that.

16       Q.   Okay.  To me, someone who has convulsions and is

17   seizing and is unable to respond is serious as just --

18   it's not a medical issue as just an issue of someone who's

19   charged with their care-taking.  Do you agree with that?

20       A.   Yes, I agree that we have to assess that

21   offender and we have to try to get him medical care or get

22   him to a hospital as quick as we can, given the

23   circumstances on the facility.

24       Q.   And if you don't get him to a hospital as

25   quickly as you can, that's not paying appropriate

256

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    Q.    All right.  What about seizures in which the

2   person convulses and is nonresponsive and can't

3   communicate with your officers?  Does the Texas Department

4   of Criminal Justice consider those situations to be

5   medical emergencies in which we need to get an ambulance

6   in right away?

7    A.    Yes, as quickly as possible, we need to get an

8   ambulance --

9    Q.    All right.

10   A.    -- if there's not medical personnel on the unit.

11   Q.    Okay.  Transfer facilities versus non-transfer

12   facilities, what's the difference?

13   A.    Well, there's -- you know, there's -- there's

14   small transfer facilities to large, but in general, a

15   transfer facility is where we do intake processing, and

16   it's basically inmates can stay there for up to -- up to

17   two years, and there are several transfer facilities, you

18   know, within the state.  And -- and then they're sent out

19   to the different prisons throughout the state, but they

20   can stay there for up to two years.

21   Q.    Is it fair to say that TDCJ initially knows less

22   about inmates who are coming into transfer facilities than

23   other prisons?

24   A.    As far as their criminal history are we talking

25   -- what are we talking --

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    Q.    All right.  How does -- how do people get placed

2    on -- with heat-sensitive medical conditions get placed on

3    a list in which they get these welfare checks in the -- in

4    the prison?

5    A.    What happens is is when they -- when they come

6    in through the intake process, when they see the

7    healthcare provider, okay?  The P.A. or the doctor --

8    Q.    Sure.

9    A.    -- they evaluate the offender, and if the doctor

10   determines that the offender -- you know, I think there's

11   24 or 26 different restrictions.  And if they determine

12   the offender needs a heat restriction as far as in the

13   workplace, then the doctor can write an order.  They put

14   the heat restriction on the offender.  That is entered in

15   the EMR.

16              And the EMR is now linked with our -- our

17   database, and so it's changed on the HSM 18, for that

18   particular offender, that he has a heat restriction.  And

19   then it automatically comes out on the list -- the

20   facility list for offenders that have a work restriction:

21   No working with extreme heat conditions.

22   Q.    Okay.  Is there any other way to get on a heat

23   list?

24   A.    It takes -- it takes to be seen by a doctor and

25   the doctor's order --

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1      Q.     Okay.

2      A.     -- a P.A.'s order to do that.

3      Q.     So the only times when a doctor or a P.A. puts a

4   heat restriction on someone -- someone's work assignment,

5   that will go into the system, and a heat list -- a list

6   will be generated of people with heat-susceptible medical

7   conditions who need to be checked every 30 minutes?

8      A.     That's -- that's my understanding, sir.

9      Q.     When did that process begin, if you know?

10     A.     We've always -- I mean that -- we've had the --

11  the work-related heat restriction for years, sir.  This --

12  this process where they have to see the doctor and the

13  doctor makes that determination, that's been around -- I

14  don't know when the HSM 18 program came into play, but

15  ever since I can remember since I've been in the system,

16  that's pretty much been protocol.

17     Q.     Okay.  Not every inmate works, right?

18     A.     No, sir.

19     Q.     Okay.  Do mentally ill inmates have to work?

20     A.     Some of them work, yes, sir.

21     Q.     Some don't though?

22     A.     Some don't.

23     Q.     Okay.

24     A.     That's, again, a doctor's determination.  If

25  they decide the inmate's mentally ill, then you'll have a

Stephen McCollum, et al v.                              Robert Eason
Brad Livingston, et al.                             March 26, 2013

 1  sensitive.  I've -- we've been -- I've been taught that my

 2  entire career.

 3      Q.    Okay.  Do you know what HIPAA is?

 4      A.    It's a law, but I don't know all the ins and

 5  outs of it.  No, I do not.

 6      Q.    Okay.  So I just want to be clear you are not

 7  saying, "HIPAA prevents me from doing X, Y and Z."  You

 8  don't really know what HIPAA prevents.  You just -- you

 9  just know that you got to treat medical information

10  carefully?

11      A.    Yes.

12      Q.    Okay.

13      A.    We've always been -- been taught to do that.

14      Q.    By the highest levels of the agency, right?

15      A.    Yes, sir, we've been trained to do that.

16      Q.    Okay.  By?

17      A.    No one in particular, but I just -- when I was

18  coming up through the -- through the system, we've always

19  been told that medical information is sensitive, and

20  they're not going to release medical information to

21  anybody on a facility.

22      Q.    Okay.  Are you aware of the obligation of the

23  Texas Department of Criminal Justice to accommodate people

24  with disabilities?

25      A.    Yes, sir.

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    Q.    Okay.  Would you agree that one important factor
2  about accommodating someone with a disability is finding
3  out if they have a disability and communicating that to
4  your staff?
5    A.    Yes, sir, if that information is shared with us.
6    Q.    Okay.  And that's not just physical
7  disabilities.  That's also mental disabilities, right?
8    A.    As far as sharing that with all -- with all the
9  staff or --
10    Q.    No, just -- well --
11    A.    -- or are you talking about --
12    Q.    -- your obligation --
13    A.    -- disability?  Can you repeat that?
14    Q.    Sure.  You have an obligation to accommodate not
15  just physical disabilities, but mental disabilities as
16  well, correct?
17    A.    Yes, sir.  If there's an inmate that has a
18  mental illness, then it's evaluated by -- we have a psyche
19  department, and they handle that.  Then if it's determined
20  they need to be on medication or need to be on a specific
21  psyche facility, then we transport them to a psyche
22  facility where they get that care.
23    Q.    Sure.  Diabetes is a -- is a disability, right?
24    A.    I don't know it to be a disability.  Nobody's --
25  no one's ever shared that with me.

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1        Q.    Let me -- does the Texas Department of Criminal

2   Justice consider diabetes to be a disability which

3   requires accommodation by its correctional officers and

4   correctional staff?  You don't know?

5        A.    I don't know that --

6        Q.    Okay.

7        A.    -- the answer to that question.

8        Q.    What about hypertension?  Does the Texas

9   Department of Criminal Justice consider hypertension to be

10  a disability that requires accommodation by its

11  correctional staff?

12       A.    If a doctor -- if the inmate goes in to see a

13  doctor and the doctor says, "This guy's got hypertension,"

14  then a doctor says he needs a certain restriction, they're

15  going to put that restriction on him.  Now, that sensitive

16  information isn't going to be shared with every

17  correctional officer out there on the facility.

18              MR. EDWARDS:  That wasn't my question, sir,

19  so let me object as nonresponsive.

20       Q.    (By MR. EDWARDS) My question is:  Do you

21  consider -- does TDCJ consider hypertension to be a

22  disability which requires accommodation by correctional

23  staff?

24       A.    I can't answer that.  I don't know if UTMB or

25  Health Services consider that a disability or not as far

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1  as hypertension or diabetes.

2      Q.    Well, okay.  So no one at TDCJ provides any sort

3  of training as to whether or not hypertension is a

4  disability; is that fair?

5               MR. GARCIA:  No.  Objection:

6  Mischaracterizes his testimony.

7      Q.    (By MR. EDWARDS) I'm asking.

8      A.    I've never -- I've never gone through any

9  training.

10      Q.    Okay.  What about diabetes?  Does anybody at

11  TDCJ instruct correctional officers about diabetes being a

12  disability which requires accommodation?

13      A.    I've never been -- I've never been told that.

14      Q.    So TDCJ doesn't provide training like that; is

15  that fair?

16      A.    Training of our correctional staff that diabetes

17  is a disability?

18      Q.    Yeah.

19      A.    To my knowledge, no.

20      Q.    Okay.  Tell me exactly what EAC stands for.

21      A.    Emergency Action Center.

22      Q.    What's its purpose?

23      A.    Basically that is -- they just bring in all the

24  information for a variety -- it's a -- for better lack of

25  words, they bring in all the information for all the

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    Q.    Okay.  So you obviously can, right?

2    A.    We have done -- it depends on -- there's a lot

3  of circumstances here.  It depends on the area you're

4  talking about, depends on what time of day that you're

5  talking about.

6    Q.    I'm sure it does.  You told me that -- I asked

7  you can you rotate prisoners on a heat list to an

8  air-conditioned area during the day.  You told me, "We do

9  that," or "We have done that."  Did I misunderstand --

10   A.    We have done that on -- I know of for sure two

11 facilities.

12   Q.    Is the Hutchins Unit one of those facilities?

13   A.    Yes.

14   Q.    What's the other facility that you have done

15 that on?

16   A.    Gurney.

17   Q.    Okay.  So on Gurney and Hutchins, you have the

18 capability of rotating prisoners into air-conditioned

19 areas if you so choose, fair?

20   A.    Depending on the time of day, you know, if --

21 depending on unit operations, what's going on at the unit

22 at the time, you know, what departments are working, if

23 it's -- you know, there's not mass movement going on.

24 There's a lot of factors there that determine, you know,

25 if we can rotate offenders to certain -- certain areas.

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                           March 26, 2013

1   sir.  When -- when Larry Eugene McCollum was in your -- in

2   your prison --

3        A.    Yes, sir.

4        Q.    -- at the Hutchins Unit -- okay? -- was there a

5   policy in place relating to moving prisoners into

6   air-conditioned areas, to your knowledge?

7        A.    No, there's not a -- there's not an agency

8   policy about that.

9        Q.    Was there some sort of practice that was

10  documented at the prison by anybody suggesting that

11  prisoners were moved into air-conditioned areas if --

12       A.    There was no -- there was no policy, but if I

13  remember correctly -- and, again, I might be wrong, but if

14  I remember correctly, I think at that time Warden Pringle

15  was letting some of them have access to a multipurpose

16  room at Hutchins facility.

17       Q.    Okay.

18       A.    And I don't know if it was --

19       Q.    This is --

20       A.    -- every day or --

21       Q.    Well, what's this based on?  Have you ever seen

22  a document showing that?

23       A.    I'm just trying to answer your question.

24       Q.    I understand.  And you're doing fine.  Is that

25  -- that's based just on a -- is that based on

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1   twice --
 2                MR. EDWARDS:  Well --
 3                MR. GARCIA:  -- and he's just told you he's
 4   answered the question.  So you want to ask him a third
 5   time and have me instruct him not to answer it?
 6                MR. EDWARDS:  Sure.
 7                MR. GARCIA:  Go ahead.  Ask him a third
 8   time.
 9                MR. EDWARDS:  Sure, sure.
10       Q.   (By MR. EDWARDS) Are there any other items on
11   this list which don't apply equally to all the facilities
12   you oversee?
13       A.   No, sir.
14       Q.   Are you sure?
15       A.   Best of my knowledge, sir.
16       Q.   Okay.  So all the facilities you oversee, they'd
17   better be doing this or they're not doing what they're
18   supposed to be doing?
19       A.   To the best of their ability, yes, sir.
20       Q.   I thought you said on here it says get fans to
21   people, right?
22       A.   Personal fans?
23       Q.   Yeah.
24       A.   Yes, sir.
25       Q.   There are no fans at the Hutchins Unit, right?
```

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1        A.    We have fans in the dayrooms.

2        Q.    You don't have personal fans at the Hutchins

3    Unit; isn't that -- because that's my understanding.  Is

4    that correct?

5        A.    That's true.  There's not receptacles at the

6    bunks.

7        Q.    Okay.  So are you critical of Warden Pringle for

8    not having personal fans at the Hutchins Unit?

9        A.    No.  It doesn't have receptacles at the bunks.

10       Q.    Couldn't do it, right?

11       A.    What do you mean we couldn't do it?

12       Q.    Well, can you -- can you provide fans to people

13   at the Hutchins Unit?

14       A.    We have -- what we did is we've gathered all the

15   information in the system about which units don't have

16   receptacles at the bunks, okay?  And we sent all that

17   information in to Huntsville, and it was my understanding

18   that they're researching as far as how much it's going to

19   cost to put receptacles at each bunk, how much material

20   we're going to need, how much, you know, the request is

21   going to be for.  We've sent all that documentation in to

22   Huntsville.

23       Q.    Okay.  So you need the fans, you need to come up

24   with a system that lets the fans be at the Hutchins Unit,

25   but it hasn't -- the decision to actually do that

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1   twice --
 2                 MR. EDWARDS:  Well --
 3                 MR. GARCIA:  -- and he's just told you he's
 4   answered the question.  So you want to ask him a third
 5   time and have me instruct him not to answer it?
 6                 MR. EDWARDS:  Sure.
 7                 MR. GARCIA:  Go ahead.  Ask him a third
 8   time.
 9                 MR. EDWARDS:  Sure, sure.
10       Q.   (By MR. EDWARDS) Are there any other items on
11   this list which don't apply equally to all the facilities
12   you oversee?
13       A.   No, sir.
14       Q.   Are you sure?
15       A.   Best of my knowledge, sir.
16       Q.   Okay.  So all the facilities you oversee, they'd
17   better be doing this or they're not doing what they're
18   supposed to be doing?
19       A.   To the best of their ability, yes, sir.
20       Q.   I thought you said on here it says get fans to
21   people, right?
22       A.   Personal fans?
23       Q.   Yeah.
24       A.   Yes, sir.
25       Q.   There are no fans at the Hutchins Unit, right?
```

Stephen McCollum, et al v.                        Robert Eason
Brad Livingston, et al.                        March 26, 2013

1              THE WITNESS:  I'm confused.

2              MR. EDWARDS:  I know you're trying to help

3  me, but on this particular question, you're not, okay?

4  Oh, we're out?  Okay.  We'll hold that question.

5              MR. GARCIA:  And, you know, if you want me

6  to respond on the record, I'll wait until we get the tape.

7              THE VIDEOGRAPHER:  Off the record at 5:24.

8              (Recess taken).

9              THE VIDEOGRAPHER:  On the record, tape No.

10  6 at 5:34.

11      Q.    (By MR. EDWARDS) Okay.  Sir, does the Texas

12  Department of Criminal Justice have a policy that requires

13  officers to consult with a nurse when there's no medical

14  staff on a unit prior to calling 911?

15      A.    I don't know of a policy.

16      Q.    Okay.

17      A.    I don't have any knowledge of -- of that.

18      Q.    Okay.  Does the Texas Department of Criminal

19  Justice have a policy that requires consulting with a

20  lieutenant before calling an ambulance at a particular

21  unit?

22      A.    Again, that supervisor piece, as I've talked

23  about before, is part of our ICS piece where we respond to

24  emergencies.

25      Q.    Right.

**WRIGHT WATSON & ASSOCIATES**

(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75
Plaintiffs' MSJ Appx. 6582

294

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                      March 26, 2013

1      A.    Yes, that's correct.

2      Q.    In those situations, I believe TDCJ makes

3   available to a unit offsite Telemedicine; is that correct?

4      A.    Yes, sir.

5      Q.    Okay.  Now, in this particular instance, the

6   Crain Unit had a nurse offsite, I don't know, a hundred

7   miles away or so.  Is that -- is that your understanding

8   as well?

9      A.    Yes.  It's from the Crain facility.

10     Q.    Okay.  Is it TDCJ policy that in all situations

11  in which an inmate is found to be need -- in need of

12  medical intervention that the offsite Telemedicine nurse

13  be contacted first before contacting an ambulance?

14     A.    It depends on the situation.  If the officer

15  deems it appropriate, then, yes, that's what that --

16  that's what that process is there for, to ask questions or

17  --

18     Q.    Fair enough.  There's no requirement, though,

19  that in all situations the offsite medical nurse be

20  contacted before an ambulance is called, right?

21     A.    Not to my knowledge, no, sir.

22     Q.    Okay.  Now, if Warden Pringle testified that he

23  did not believe any of the officers who eventually came to

24  -- came to see Larry McCollum the night of the -- or the

25  early morning of July 22nd did anything wrong -- okay? --

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6583

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    is that your -- do you agree with Warden Pringle?

2         A.    Yes, sir.

3         Q.    Okay.  As TDCJ has looked at it, has looked at

4    this incident, you think there was no problem at all with

5    the care that Mr. McCollum received from the correctional

6    officers from the point that they first arrived, I believe

7    at 2:10 in the morning, until EMS arrived?

8         A.    Based on all the circumstances that were going

9    around the facility at that time, what they -- you know,

10   what they deal with on any given night, they responded to

11   the incident and, you know, they didn't ignore the

12   incident.  They made the best call that they knew to make.

13   They were doing the best that they could.  And, yes, I

14   would consider it was appropriate.  I know we've

15   discussed, you know, all the procedures and processes it

16   takes to get an ambulance on a facility and possibly how

17   long it might take to get an ambulance on a facility.

18   Yes.

19                   MR. EDWARDS:  What number are we on, 41?

20                   THE REPORTER:  I'm not sure, actually.

21                   THE WITNESS:  Yes, sir.

22                   MR. EDWARDS:  These two --

23                   THE WITNESS:  I don't think these were

24   marked.

25                   MR. GARCIA:  They were marked, but you

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                           March 26, 2013

```
 1   put out to our staff.
 2        Q.    This was a medical emergency, correct?
 3        A.    Yes, sir.
 4        Q.    Okay.  There was in fact a 54-minute delay in
 5   calling for an ambulance, correct?
 6        A.    Yes, sir, by this timeline, and again --
 7        Q.    Okay.
 8        A.    -- I wasn't there, but --
 9        Q.    By that time -- I understand you weren't there.
10        A.    Well, that's here, yes.
11        Q.    Okay.  As a -- as a -- as the Texas Department
12   of Justice, doesn't it concern -- well, strike that.
13   Delays in getting emergency medical treatment to people
14   can be problematic; would you agree with that?
15        A.    Yes.
16        Q.    Okay.  I mean in emergency situations, time is
17   of the essence, correct?
18        A.    Can be, yes, sir, depending on what -- depending
19   on the situation at hand.
20        Q.    Okay.  Do -- in this particular situation, time
21   certainly mattered, right?
22        A.    As the situation unfolded, at some point, yes.
23        Q.    Well --
24        A.    But, again, I wasn't there at -- at the --
25        Q.    I --
```

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                    March 26, 2013

1  take.  We do the best we can with --

2      Q.    With what?

3      A.    With the tools that he have, the tools that

4  we're provided, the resources that we're provided.

5      Q.    Okay.  Well, let me ask, if you weren't -- if an

6  institution wasn't continually refilling the water jugs,

7  would they still be doing the best they can to make sure

8  water is available to the inmates?

9      A.    Which institution are we talking about that's

10 not refilling water jugs?

11     Q.    Any institution.  I mean I assume you'd have a

12 problem with it if they weren't continually refilling

13 water jugs.

14     A.    Yes, sir.  I don't have any knowledge that I

15 have an institution out there that's not refilling water

16 jugs --

17     Q.    Okay.

18     A.    -- during the summer months.

19     Q.    Okay.  How often is ice supposed to be brought

20 out in the water jugs?

21     A.    There's no policy and there's no specific

22 timeline on how often ice is supposed to be brought out.

23     Q.    Okay.  You -- did anybody from TDCJ provide any

24 instruction to officers at the Hutchins Unit or Warden

25 Pringle, for that matter, about how often ice needed to be

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1   documents showing that there's about 300 people on the

2   heat list at any given time, does that help you in any

3   way?

4       A.   Help me as in to --

5       Q.   Well, if there are 300 people on -- on -- at the

6   Hutchins Unit on the heat list, that means you're doing

7   welfare checks at 300 people every day every 30 minutes,

8   right?

9       A.   Yes, sir.

10      Q.   Okay.  That means you can certainly do that,

11  right?

12      A.   Yes, sir, we're doing that.

13      Q.   Okay.  Well, why couldn't you do 348 or 400, for

14  that matter, for an extra week?

15      A.   I don't -- we're checking on the offenders that

16  have heat restrictions.  We're doing that now.  We're

17  checking on those guys now.

18      Q.   You're checking on them once the doctors do the

19  intake physical and place the heat restriction on them,

20  right?

21      A.   Yes.

22      Q.   Okay.  That means that in order for you to start

23  checking on them and performing these welfare checks, they

24  have to first have that intake physical, correct?

25      A.   Yes.

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

 1     Q.   Okay.  That means that there is a window of time
 2  in which there appears to me to be a hole in the system.
 3  It could be three, four, five, six, seven days, however
 4  long it takes to get that intake physical.  My question to
 5  you is:  In order to fix that hole and potentially protect
 6  inmates who are susceptible to heat, extreme heat, from
 7  potential death, couldn't you place everyone that comes in
 8  on the bus on a heat restriction list and perform those
 9  check welfare situations until they've had that intake
10  physical with the P.A.?
11             MR. GARCIA:  Objection:  Compound; vague;
12  incomplete hypothetical; speculation.  Answer as best you
13  can.
14             THE WITNESS:  That would be something that
15  we would have to -- it would be different on every intake
16  facility.  That would be something that we'd have to look
17  at and consider, say, "Hey, you know, can we do this based
18  on the number of staff that we have, the activities that
19  are going on on the particular facility?"  That would be
20  something we'd just have to research.
21     Q.   (By MR. EDWARDS) Okay.
22     A.    I can't sit here and answer, yes, definite we
23  could do that.
24     Q.   Has anybody thought to begin that process and
25  start to research that?

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1    A.    As far as my knowledge, that hasn't been

2    researched.  I haven't talked about that.

3    Q.    Is there anything that you can think of that

4    would prevent you from researching that and determining

5    whether or not that's a possible solution?

6    A.    No, there's nothing that would prevent the

7    research, no, sir.

8    Q.    Do you believe that in the next, I don't know,

9    couple of months that will be researched?

10   A.    That's something I can discuss with my CID

11   leadership.

12   Q.    Okay.  And, again, if there's something like

13   that to be implemented, at least at the Hutchins Unit,

14   that would be a decision that would be made by you,

15   Mr. Stephens, Mr. Thaler?

16   A.    Well, if -- if it was determined that we could

17   -- that we could make this happen and we were going to do

18   this, it wouldn't just be implemented at Hutchins.  It

19   would be implemented on other facilities across the board

20   because, you know, we're responsible for mitigating heat

21   all over the system, not just at -- not just at the

22   Hutchins facility.

23   Q.    Sure.  Are the other prisons that you operate --

24   they're not transfer facilities, are they?  Operate.

25   Oversee those 11 prisons.  Are those transfer --

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

 1    from UTMB?  If you don't know, I understand.

 2        A.    I don't know, sir.

 3        Q.    Okay.  With regard to housing assignments, do

 4    you know if Mr. McCollum was placed on any sort of

 5    restriction?

 6        A.    Are you talking about a housing restriction?

 7        Q.    Yeah, like a bed restriction.

 8        A.    I reviewed -- as part of the admin review,

 9    getting ready for the deposition, I reviewed the HSM 18,

10    and I don't recall seeing any housing restrictions.

11        Q.    Should he have -- that means -- he was placed on

12    a -- do you understand that he was placed in a top bunk?

13        A.    Yes, sir, I understand that.

14        Q.    And assume that he's five ten, 300 plus pounds.

15    Should he have been placed on a top bunk?

16        A.    I don't make that decision.  That's -- that's

17    the doctor's decision, whoever evaluates the offender,

18    because there's specific restrictions for lower and --

19    lower bunk only, lower level only.

20        Q.    Let me ask you about that because he gets off

21    the bus, a nurse does some sort of basic triage and then

22    he gets into the facility, right?  He hasn't seen the P.A.

23    or the doctor, right?

24        A.    Yes, sir.

25        Q.    Okay.  So is it the -- the nurse that does that

Stephen McCollum, et al v.                           Robert Eason
Brad Livingston, et al.                           March 26, 2013

```
 1  initial triage, to your understanding, is supposed to do
 2  bunk restrictions?
 3      A.    No.
 4      Q.    Who does bunk restrictions?
 5      A.    That's -- that's a housing restriction just like
 6  a work restriction.  The doctor would do that or P.A.
 7      Q.    Okay.  So that would be part of that initial
 8  intake physical?
 9      A.    Yes, sir.
10      Q.    Okay.  So just like the -- well, so there's --
11  it appears to be then there would be a window of time when
12  someone might be improperly placed in a top bunk when they
13  should have a lower bunk restriction; is that fair?
14      A.    I don't know that to be accurate.  Like I said,
15  I don't know which particular inmates we're talking about.
16      Q.    Larry McCollum.
17      A.    Okay.
18      Q.    Larry McCollum shouldn't have been placed on a
19  top bunk, right?
20              MR. GARCIA:  Objection:  Speculation.
21              THE WITNESS:  I don't know that, sir.  I'm
22  not a medical professional.  I didn't evaluate him.
23      Q.    (By MR. EDWARDS) Today, if Larry McCollum went to
24  the Hutchins Unit, are policies in place to make sure that
25  a person of his size and stature would not be placed on
```

338

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

1      A.      Without looking at the documents, I can't --

2      Q.      Okay.

3      A.      -- I'm not that familiar with it.

4      Q.      What about Charles Cook on August 8th, 2011, at

5    the Hodge Unit dying with a body temperature of 107.9

6    degrees?

7      A.      My testimony will be the same on that one as

8    well.

9      Q.      Not familiar with that?

10     A.      I know we have offender deaths, but without

11   looking at the documents, I wouldn't be familiar with all

12   the --

13     Q.      Okay.

14     A.      -- the reports and if it was deemed

15   hyperthermia.

16     Q.      Okay.  The Michael Unit, that's a unit that's

17   under your control?

18     A.      Yes, sir.

19     Q.      Okay.  Are you familiar with the death of

20   Alexander Togonidze, who died on August 8th, 2011, with a

21   body temperature above 106 degrees?

22     A.      My testimony would be the same:  Without looking

23   at the documents --

24     Q.      Okay.

25     A.      -- and researching it where I could talk about

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                           March 26, 2013

```
 1   it, yes, sir.

 2              MR. EDWARDS:  Do you mind going off the

 3   record for one second, Bruce?  And then we're probably

 4   done.

 5              MR. GARCIA:  Off the record 6:36.

 6              (Discussion off the record).

 7              (Exhibits Nos. 45-46 marked).

 8              THE VIDEOGRAPHER:  We're back on the record

 9   at 6:38.

10      Q.   (By MR. EDWARDS) Okay.  We just have a very, very

11   brief time, but we mentioned Kenneth James at the Gurney

12   Unit who died on August 13th, 2011.  Let me show you an

13   autopsy, sir.  With regard to Mr. James, who died at the

14   Gurney Unit, I've highlighted what I believe to be the

15   cause of death in that case.  Would you read that for the

16   jury, sir?

17      A.   Just the highlighted area?

18      Q.   Just the highlighted area, yes.

19      A.   "Cause of death is most likely environmental

20   hyperthermia-related to classic heat stroke."

21      Q.   Okay.  Now, assuming that -- that Mr. James was

22   housed at the Gurney Unit and died from classic heat

23   stroke, that would be heat-related illness which should be

24   brought to your attention and an administrative review

25   should be done, right?
```

Stephen McCollum, et al v.                    Robert Eason
Brad Livingston, et al.                     March 26, 2013

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3   STEPHEN MCCOLLUM, STEPHANIE     )
     KINGREY, and SANDRA McCOLLUM,   )
 4   individually and as heirs at    )
     law to the Estate of LARRY GENE )
 5   McCOLLUM,                       )
          Plaintiffs,                )
 6                                   )
     vs.                             )    CIVIL ACTION NO.
 7                                   )    3:12-CV-02037
     BRAD LIVINGSTON, JEFF PRINGLE,  )
 8   AND THE TEXAS DEPARTMENT OF     )
     CRIMINAL JUSTICE,               )
 9        Defendants.                )
10              REPORTER'S CERTIFICATE FOR THE
11      ORAL RULE 30(B)(6) DEPOSITION Of TEXAS DEPARTMENT OF
12             CRIMINAL JUSTICE (ROBERT EASON)
13                    MARCH 26, 2013
14       I, Kathleen Nevils, a Certified Shorthand Reporter
15   in and for the State of Texas, do hereby certify that the
16   foregoing deposition is a full, true and correct
17   transcript;
18       That the foregoing deposition of TEXAS DEPARTMENT
19   OF CRIMINAL JUSTICE (ROBERT EASON) was taken by me in
20   stenograph on March 26, 2013, the said witness having been
21   by me first duly cautioned and sworn to tell the truth,
22   the whole truth and nothing but the truth, and the same
23   was thereafter reduced to typewriting by me or under my
24   direction.  The charge for the completed deposition is
25   $_____ due from Plaintiffs;
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
01c94668-e863-437c-979f-dc2b61ebab75

Plaintiffs' MSJ Appx. 6594

Stephen McCollum, et al v.                          Robert Eason
Brad Livingston, et al.                          March 26, 2013

```
 1        That the amount of time used by each party at the
 2   deposition is as follows:
 3        Jeff Edwards - (05:58)
 4        I further certify that I am neither counsel for,
 5   related to, nor employed by any of the parties in the
 6   action in which this proceeding was taken, and further
 7   that I am not financially or otherwise interested in the
 8   outcome of the action.
 9        I further certify that before the completion of the
10   deposition, the Deponent and/or the Plaintiff/Defendant
11   did request to review the transcript.
12        WITNESS MY HAND, this the 10th day of April, 2013.
13
14
15                        _____
                          Kathleen Nevils
16                        Certified Shorthand Reporter in
                          and for the State of Texas
17                        Certificate No. 1628
                          Expires December 2013
18                        Wright Watson & Associates, LLC
                          Registration No. 225
19                        Expiration Date:  12-31-13
                          3307 Northland Drive
20                        Suite 185
                          Austin, Texas 78731-4960
21                        512.474.4363
22   Job No. 130326KVN
23
24
25
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

Plaintiffs' MSJ Appx. 6595

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 279

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   STEPHEN McCOLLUM and         §
     SANDRA McCOLLUM,             §
 4   individually and as          §
     independent administrator    §
 5   of the Estate of LARRY       § Civil Action
     GENE McCOLLUM,               §
 6                                § Number 4:14-CV-3253
                                  §
 7                Plaintiffs,     §
                                  §
 8   vs.                          §
                                  §
 9                                §
     BRAD LIVINGSTON, JEFF        §
10   PRINGLE, RICHARD CLARK,      §
     KAREN TATE, SANDREA          §
11   SANDERS, ROBERT EASON,       §
     THE UNIVERSITY OF TEXAS      §
12   MEDICAL BRANCH and THE       §
     TEXAS DEPARTMENT OF          §
13   CRIMINAL JUSTICE,            §
                                  §
14                Defendants.     §

15
     --------------------------------------------------------
16

17

            ORAL AND VIDEOTAPED DEPOSITION OF
18
                      GARY EUBANK
19
                     MAY 6, 2016
20

21
     --------------------------------------------------------
22

23

24

25
```

1                ORAL AND VIDEOTAPED DEPOSITION OF GARY

2       EUBANK, produced as a witness at the instance of the

3       PLAINTIFFS, and duly sworn, was taken in the

4       above-styled and numbered cause on MAY 6, 2016, from

5       8:37 a.m. to 5:20 p.m., before Melody Reneé

6       Campbell, CSR in and for the State of Texas,

7       reported by method of machine shorthand, at the

8       offices of the Attorney General, 300 West 15th

9       Street, Austin, Texas, pursuant to Notice and Court

10      Order and the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gary Eubank                                                                        3

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:
             Mr. Jeff Edwards, Esq.
 3           Mr. Scott Medlock, Esq.
             The Edwards Law Firm
 4           1101 East Eleventh Street
             Austin, Texas  78702
 5           512.623.7727
             512.727.3365 (Fax)
 6           Jeff@edwards-law.com
             Scott@edwards-law.com
 7


 8
     FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
 9           Mr. Graig J. Alvarez, Esq.
             Ms. Kara Philbin, Esq.
10           Fernelius Alvarez Simon
             1221 McKinney Street, Suite 3200
11           Houston, Texas  77010
             713.654.1200
12           GAlvarez@fa-lawfirm.com
             KPhilbin@fa-lawfirm.com
13                 -and-
             Ms. J. Lee Haney, Esq.
14           Assistant Attorney General
             Office of the Attorney General of Texas
15           P.O. Box 12548, Capitol Station
             Austin, Texas  78711
16           512.463.2080
             512.963.2109 (Fax)
17           Lee.Haney@texasattorneygeneral.gov


18

19   OR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE,
     RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT
20   EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
             Mr. Phillip Boyd, Esq.
21           Mr. Derek Kammerlocher, Esq.
             Assistant Attorneys General
22           Post Office Box 12548
             Austin, Texas  78711
23           512.463.2080
             512.936.2109
24           Phillip.Boyd@texasattorneygeneral.gov
             Derek.Kammerlocher@texasattorneygeneral.gov
25
```

```
 1    ALSO PRESENT:
              Dr. Glenda Adams
 2            Ms. Deborah M. Woltersdorf
              Ms. Shanna Molanre
 3            Ms. Ashley Palermo
              Ms. Jennifer Osteen
 4            Ms. Ashley Palermo
              Mr. Derek Kammerlocher
 5            Ms. Amanda Kates
              Ms. Jennifer Daniel
 6            Mr. Kevin J. Schaefer (Videographer)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

                                             PAGE
 2   EXAMINATION
       By Mr. Edwards............................  7
 3
     CHANGES AND SIGNATURE.........................364
 4   REPORTER'S CERTIFICATE........................365

 5


 6                    E X H I B I T S
     NO.  DESCRIPTION                           PAGE
 7
       1  McCollum Administrative Review          34
 8
       2  CID Intake Review                       75
 9
       3  Intake History and Health Screening     77
10
       4  Curriculum Vitae                        99
11
       5  McCollum Medical Records               132
12
       6  E-mail String Ending 10/31/13 from     161
13          Williams to Linthicum re: Life-Threatening
            Conditions
14
       7  E-mail String ending 07/05/13 from James  221
15          Fields to Angela Osborn, et al re:
            Heat-Related Stress SDO
16
       8  E-mail String Ending 08/09/10 from     233
17          McWhorter to Williams re: Offender 911

18     9  E-mail String ending 08/10/11 from     245
            Williams to Crippen re: Heat Illness
19
      10  RIF Position Titles by Unit            267
20
      11  E-mail String Ending 08/05/11 from Herrera  269
21          to Mendez, et al. Re: Heat Stroke or
            NMS/Serotonin Syndrome, with Attachments
22
      12  E-mail String Ending 08/09/11 from Archie  288
23          to Raney, et al. Re: Heat Stroke or
            MS/Serotonin Syndrome
24

25
```

1                        E X H I B I T S – Cont'd

     NO.  DESCRIPTION                                      PAGE
      14  E-mail String Ending 04/15/14 from Jerri        299
3         Robison to Eubank re: Huntsville Area
          Transient Unit Concerns

4
      13  E-mail String Ending 08/10/11 from Charles      299
5         Adams to Crippen re: Heat Stress and
          Offenders on Antipsychotic Medications

6
      15  E-mail String Ending 08/11/11 from Webb to      313
7         Noble re: Eight-Hour Units

8     16  08/08/11 E-mail from Justin Robison to          321
          Eubank re: Hodge – Patient Deaths

9
      17  E-mail String Ending 10/13/14 from              357
10        Greathouse to McWhorter re: E-42.3
          Subcommittee

11

12
                          *–*–*–*–*–*
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        the protocol book, and the book then gives the nurse

 2        the guidance and the direction as to how to proceed,

 3        depending upon the information that the nurse

 4        receives from the officer.

 5             Q.   You're a nurse.  Right?

 6             A.   I am.

 7             Q.   You've been a nurse for a long time.

 8        Right?

 9             A.   Very long time.

10             Q.   Registered nurse?

11             A.   Yeah.

12             Q.   If you were told that someone was seizing

13        and nonresponsive for the better part of a half

14        hour, what would you do, sir?

15                       MR. ALVAREZ:  Again, calls for

16        speculation.

17             Q.   (BY MR. EDWARDS)  A hundred times out of a

18        hundred, what would you do, sir?  Just those facts.

19                       MR. BOYD:  Objection.  Incomplete

20        hypothetical.

21             A.   And this is from a non -- I mean, I don't

22        see the patient.  They're not in my presence.  I'm

23        not assessing them.  I've just received that

24        information.

25             Q.   (BY MR. EDWARDS)  Mr. Eubank, if I fell
```

1    over and was seizing and was nonresponsive and Graig

2    was kind enough to call you on the phone and say,

3    what should we do, what would you tell him to do?

4         A.   Call 911.

5              MR. BOYD:  Objection.  Incomplete

6    hypothetical.

7         Q.   (BY MR. EDWARDS)  Okay.  Now, is there

8    anything different about -- should a prisoner get at

9    least, and maybe more, care than I get if I keel

10   over in this deposition?

11             MR. BOYD:  Objection; incomplete

12   hypothetical.

13        A.   We provide a standard -- a standard care

14   that's equal to the free world.

15        Q.   (BY MR. EDWARDS)  Absolutely.  And so just

16   because somebody is a prisoner and convulsing and

17   seizing in a dorm at a prison doesn't mean they

18   deserve any less care than if a member of the jury

19   were to suffer a seizure and be nonresponsive.

20   Right?

21        A.   Correct.

22        Q.   Okay.  Now, if my son suffered a seizure

23   and I contacted any sort of medical provider, a

24   nurse, a doctor, anybody, and called, what should I

25   do, I would hope they would say, get that person to

```
 1        a hospital right away.  Right?

 2               A.   Yes, sir.

 3               Q.   Okay.  That's what you would expect your

 4        nurses to do, right, if they're competent?

 5               A.   Yes.

 6               Q.   Certainly that's what you would do if

 7        personally called.  Right?

 8               A.   Yes.

 9               Q.   Do you -- having reviewed the quality

10        review thing, do you know if that occurred with

11        regards to Mr. McCollum?

12                    MR. BOYD:  Objection; vague.

13               A.   I recall -- I recall that he was sent out

14        911.

15               Q.   (BY MR. EDWARDS)  Yeah.  And did you -- do

16        you recall reviewing like the Office of Inspector

17        General, I think it's called, OIG report?

18               A.   No.

19               Q.   All right.  The OIG report made it -- or

20        there are many records that I've reviewed that make

21        it seem like Mr. McCollum was sent offsite to a

22        hospital and 911 was called immediately.  Do you

23        recall reviewing records like that?  If you don't,

24        that's fine.

25               A.   I recall reviewing the quality review that
```

1       Part 2, the nurse fills out; and 3 and 4, again,

2       there's -- there's several documents that we deal

3       with during the intake process.

4            Q.   Okay.  What is -- and let's take the case

5       of Larry McCollum.  Okay?

6            A.   Yes.

7            Q.   He came from a county jail in Waco and he

8       arrived at the Hutchins facility on July 15th, 2011.

9       Okay?  You with me?

10           A.   Okay.

11           Q.   All right.  What was supposed to happen

12      with regards to the interview that he received by

13      somebody from UTMB?  What was UTMB's responsibility,

14      if anything, with Larry McCollum when he got off the

15      bus?

16                MR. BOYD:  Objection; compound.

17           Q.   (BY MR. EDWARDS)  Let me ask it again.

18      What's your understanding of what UTMB is supposed

19      to do once Mr. McCollum gets off the bus, prior to

20      entering the prison?

21           A.   We want to know if -- we ask those fellows

22      or ladies if they have any complaints.  We need to

23      find out what medicine that you're on.  And there is

24      a document that they get from County that we look

25      at.

```
 1                       We get ahold of a provider to say

 2      this is the medicine and we get orders to -- from

 3      our providers as to what meds these people need to

 4      be on.  I mean, I -- there's a process that we

 5      follow and I can't -- I mean, that's what I recall.

 6      I would have to look at it to see all of the stuff.

 7      But it's -- we have -- there's documents that we

 8      expect the nursing staff to fill out.

 9           Q.   Okay.  Do you know how long that's

10      supposed to take?

11           A.   No, sir.  I don't recall.

12           Q.   Okay.  It's not a full-fledged physical.

13      Right?

14           A.   That nursing does?

15           Q.   Yeah.

16           A.   No, sir, it isn't.

17           Q.   Okay.

18           A.   The medical staff does the physical and

19      history.

20                       (Exhibit Number 2 marked.)

21           Q.   (BY MR. EDWARDS)  Is this what you're

22      talking about, the CID intake interview?

23           A.   This is a component.

24           Q.   Okay.  Did I forget two pages?  Is that

25      also a component?
```

```
 1        speculation.
 2             A.   I -- I'm not sure about the heat index.
 3             Q.   (BY MR. EDWARDS)  How much training did
 4        you get about preventing heat-related illness inside
 5        the hospital system you worked at in Cincinnati?
 6             A.   We didn't really get any there.
 7             Q.   You didn't need it.  Right?
 8             A.   Correct.
 9             Q.   Because you had air conditioning.  Right?
10             A.   Right.
11             Q.   No need to train people about the dangers
12        of high temperatures if you're going to keep the
13        temperature at a safe level.  Right?
14             A.   Uh-huh.
15             Q.   Okay.  Now, to be fair to you-all at UTMB,
16        you have nothing to do with whether or not the
17        prison system chooses to air condition.  Right?
18             A.   That's correct.
19             Q.   UTMB doesn't determine how to build a
20        prison.  Right?
21             A.   Yes, sir.
22             Q.   UTMB doesn't get to make the call, hey,
23        TDCJ, what are you guys, insane, please install some
24        air conditioning?  You don't get to do that, do you?
25                       MR. BOYD:  Objection.
```

1          Q.   Okay.  But what you've reviewed of the

2     records is, once you learn seizure, you've got to

3     get that person to a hospital.  Right?

4          A.   That's correct.

5          Q.   Okay.  So the UTMB admin review, do you

6     know why it was initiated?  Was it just because

7     somebody died?

8          A.   As I recall, Dr. Coglianese sent me an

9     e-mail and asked for the record to be reviewed.

10         Q.   Do you know why it wasn't done until

11    September of 2011?

12         A.   No, sir.

13         Q.   Do you know who would know that?

14         A.   I do recall that it got lost, the request.

15    And I do recall writing on it to Kirk or something

16    that I apologize for not keeping up with this.

17         Q.   Okay.  You -- you specifically recall

18    losing the request to --

19         A.   Misplacing it.

20         Q.   Okay.  Do you recall receiving it before

21    it was misplaced?

22         A.   No.

23         Q.   How do you know that Dr. Coglianese

24    actually requested it?

25         A.   I've seen it, the request.

```
1          Q.    Okay.  All right.  So it should have been

2     done sooner.  Correct?

3          A.    Yes.

4          Q.    It should have been done -- when should it

5     have been done?  In July?

6          A.    I think -- I think we -- we have, kind of

7     as a rule, that we try to respond within like 30

8     days of the requests.

9          Q.    Do you know that or is that just something

10    you're thinking?

11         A.    Yeah.  I'm just -- I -- I don't know that

12    exactly.

13         Q.    All right.  Could you turn to the last

14    page, sir.

15                    MR. ALVAREZ:  Is this Exhibit 6?

16                    MR. EDWARDS:  Oh, I'm sorry.  I

17    didn't put an exhibit sticker on that.  Thank you,

18    Graig.

19         Q.    (BY MR. EDWARDS)  Dr. -- I'm sorry.

20    Mr. Eubank, would you mind just putting that

21    anywhere on that document?  Thank you very much.

22                    (Exhibit Number 6 marked.)

23         Q.    (BY MR. EDWARDS)  Do you know if there was

24    a policy directive requiring officers to contact the

25    hub before 911 was called in the summer of 2011?
```

1        A.    Could you repeat that again, please?

2        Q.    Sure.  Do you know if there was a policy

3   directive from UTMB or, frankly, from TDCJ or

4   anybody else, requiring correctional officers to

5   contact the hub before initiating a 911 call?

6        A.    Sir, what I remember is, when the DMS

7   system was initiated, then there were directions

8   that were sent to -- TDCJ agreed upon that they sent

9   to their officers.  And I can't -- I mean, that's a

10  long time ago.  I cannot remember what those

11  instructions were.

12             But they sort of led the security

13  officer through how do you set somebody up for DMS

14  and so on and so forth.  I mean, there were a set of

15  instructions, I do remember that.

16       Q.    Okay.  But the goal was always, from you

17  and Dr. Murray, to have a registered nurse available

18  via video or telephone?

19       A.    That was the goal.

20       Q.    Okay.

21       A.    If a unit was closed, you understand.

22       Q.    If a medical department was not open.

23  Right?

24       A.    Yeah, right.

25       Q.    Okay.  And I assume you'd agree with me

```
 1      but I want to make sure, that there are certain

 2      conditions that, you know, you need to provide

 3      training to the nursing staff and the correctional

 4      officers that these are life-threatening conditions

 5      that require 911 in order for them to do their jobs

 6      well.  Right?

 7           A.   For the nursing staff?

 8           Q.   Yeah.

 9           A.   I expect the nursing staff to know that,

10      yes, sir.

11           Q.   Okay.  And if you look at the last -- if

12      you look at the last page, beginning TDCJ 18085.

13           A.   Yes, sir.

14           Q.   Okay.  It looks like there's an e-mail

15      from Monty Hudspeth to a host of people.

16           A.   Yes.

17           Q.   Do you see that?

18           A.   Yes, I do.

19           Q.   And at the very back it says, "The

20      following are life-threatening conditions that are

21      taught in our training academy"?

22           A.   I see that.

23           Q.   Okay.  Now, is this a TDCJ training

24      academy or is this a UTMB training academy, or do

25      you know?
```

Gary Eubank                                                                     164

1          A.    It's TDC.

2          Q.    TDC.  Okay.  If you flip to the next

3     page --

4          A.    The last one?

5          Q.    Yes.  Some of the life-threatening

6     conditions that were taught in the TDCJ training

7     academy were seizures.  Is that correct?

8          A.    I see that.

9          Q.    And you agree with that.  Right?

10         A.    I do.

11         Q.    You would expect your nurses to understand

12    that, as well, right, licensed vocational nurses and

13    registered nurses?  Right?

14         A.    Yes.

15         Q.    Okay.  Cool, pale, clammy skin with a

16    decreased level of consciousness, that's also a

17    life-threatening condition.  Right?

18         A.    Symptom, uh-huh.

19         Q.    All right.  For life-threatening

20    conditions, the only appropriate response is to

21    contact 911 and get the person to a hospital.

22    Right?

23         A.    In the absence of a medical staff.  We

24    could initiate -- we could initiate emergency

25    treatment if we're available --

Gary Eubank                                                                165

1          Q.   Of course.

2          A.   -- and then still call 911.

3          Q.   You could do both.  That would be the

4     appropriate thing to do.  Right?

5          A.   Yeah.

6          Q.   And in Mr. McCollum's case, had nursing

7     staff been on site, they could have come to

8     Mr. McCollum's dorm and brought ice packs and done

9     whatever they could to help Mr. McCollum, who was

10    undergoing a heatstroke?  Had they been available,

11    they could have done that.  Right?

12         A.   They could have intervened.

13         Q.   Now, you still would need a doctor, but

14    certainly even nursing staff can help with ice packs

15    and help get to a cool air-conditioned space.

16    Right?

17         A.   Yes, sir.

18         Q.   Okay.  Now, altered mental status is also

19    a life-threatening condition.  Right?

20         A.   It's listed here, right.

21         Q.   And you agree with that.  Right?

22         A.   After an assessment is done, yes.

23         Q.   And altered mental status just means

24    nonresponsive, confused, things like that.  Right?

25         A.   Well, nonresponsive is different than

1    being, you know, kind of confused.

2         Q.   What does altered mental status mean to

3    you and the nurses you train and supervise?

4                   MR. ALVAREZ:  Objection; calls for

5    speculation.

6         Q.   (BY MR. EDWARDS)  The question was, what

7    does altered mental status mean to you and what you

8    would assume the nurses you supervise?

9         A.   Your mental status has become altered,

10   just like it says.  So you are not behaving --

11   you're behaving in some suspicious manner and we --

12   it needs to be assessed to determine what's

13   motivating that.

14        Q.   Okay.  What is ICS?

15        A.   It's like calling a code blue.  I don't

16   really remember what ICS stands for, but I do know

17   that it's kind of like an overhead page that

18   security has that says there's an emergent

19   condition.

20        Q.   Coming back to that, I just want to be

21   certain.  There's nothing from UTMB which requires

22   it to be the decisionmaker as to whether 911 is

23   called, as opposed to a correctional officer, that

24   you're aware of.  Is that correct?

25        A.   Could you ask me that again?

```
1    nonresponsive, these nurses would have followed

2    protocol and gotten them to a cooler place and begun

3    ice packs immediately, right, and directed the

4    officers to call 911.  Right?

5                     MR. BOYD:  Objection; calls for

6    speculation.

7         A.   We have the triage protocols and so there

8    are -- there are directions to the nurse in the hub

9    facility based on the complaints that they have

10   received.

11        Q.   (BY MR. EDWARDS)  Okay.  If Mr. McCollum

12   had been -- if this had been in effect when

13   Mr. McCollum seized and had his heatstroke, the hub

14   people wouldn't have just said call 911, they would

15   have told the officers, "Move the patient to a cool,

16   air-conditioned place."  Right?

17                    MR. BOYD:  Objection; calls for

18   speculation.

19        A.   I'm not sure.  They need to call -- the

20   important thing is to get 911 and to get the patient

21   to the hospital.  And I can't judge the

22   circumstances that the patient was in and -- I mean,

23   I don't know where the patient was and what security

24   was doing and all of that.  But what the nurse was

25   instructed to do by the protocols were, you've got
```

```
 1    to get the guy to a hospital emergent -- quickly.

 2         Q.   Right.  But that's step one, right?

 3    That's the most important step?

 4         A.   That's very important.

 5         Q.   Sure.  And to not do that is off the

 6    charts.  But also to not do more while -- it takes a

 7    few minutes for the ambulance to arrive.  Right?

 8    Right?

 9         A.   Sure.

10         Q.   And you know that heatstroke is a

11    life-threatening medical emergency.  Right?

12         A.   Heatstroke is.

13         Q.   Yeah.  And that's what Mr. McCollum was

14    experiencing.  You know that.  Right?

15         A.   No, sir, I don't.

16         Q.   Okay.  Well, if he was, then the order

17    here would have been, call 911 and move him to a

18    cool, air-conditioned place.  Right?

19              MR. BOYD:  Objection; it's vague and

20    it calls for speculation.

21         Q.   (BY MR. EDWARDS)  Take a look at -- would

22    you answer my question before I go to another one?

23         A.   Yes, sir.  The hub nurse, the nurse in the

24    hub is instructed to follow the telephone triage

25    protocols.
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § <br> § <br> § <br> § <br> § |
| PLAINTIFFS | § <br> § |
| v. | § <br> § <br> § | CIVIL ACTION NO.<br>4:14-cv-3253<br>JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § <br> § <br> § <br> § <br> § <br> § <br> § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 280

ORAL DEPOSITION OF STEPHANIE KINGREY

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION

3   STEPHEN MCCOLLUM, et al,        )
            Plaintiffs,            )
4                                   )
    V.                              )  C.A. No. 3:12-CV-02037
5                                   )
                                    )
6   BRAD LIVINGSTON, et al,         )
            Defendants.            )
7

8   ********************************************************

9                     ORAL DEPOSITION OF

10                   STEPHANIE KINGREY

11                   November 22, 2013

12  ********************************************************

13

14

15       ORAL DEPOSITION OF STEPHANIE KINGREY, produced as a

16  witness at the instance of the Defendant University of

17  Texas Medical Branch and duly sworn, was taken in the

18  above-styled and numbered cause on the 22nd of

19  November, 2013, from 12:09 p.m. to 3:25 p.m., before

20  DEBRA L. McGREW, CSR in and for the State of Texas,

21  reported by machine shorthand at the offices of

22  Edwards Law, 1101 E. 11th Street, Austin, Texas,

23  pursuant to the Federal Rules of Civil Procedure.

24

25
```

ORAL DEPOSITION OF STEPHANIE KINGREY

```
1                  A P P E A R A N C E S

2
   FOR THE PLAINTIFFS:
3
           Mr. Scott Medlock
4          Edwards Law
           1101 E. 11th Street
5          Austin, Texas  78702
           Phone:  512-623-7727
6
   FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
7
           Ms. Kim Coogan
8          Ms. Shanna Elizabeth Molinare
           Assistant Attorney General
9          P.O. Box 12548
           Austin, Texas  78711-2548
10         Phone:  512-463-2080

11 FOR THE DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
   ROBERT EASON AND JEFF PRINGLE:
12
           Mr. Jonathan Stone
13         Assistant Attorney General
           P.O. Box 12548
14         Austin, Texas  78711-2548
           Phone:  512-463-2080
15
   FOR THE DEFENDANTS BRAD LIVINGSTON, RICK THALER AND
16 BILL STEPHENS:

17         Mr. Kyle M. Smith
           Assistant Attorney General
18         P.O. Box 12548
           Austin, Texas  78711-2548
19         Phone:  512-463-2080

20 ALSO PRESENT:

21         Jennifer Osteen
           Sandra Sue McCollum
22         Stephen Michael McCollum

23

24                  *-*-*-*-*

25
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6620

ORAL DEPOSITION OF STEPHANIE KINGREY

1                            INDEX

2  Appearances...................................   2

3  STEPHANIE KINGREY
        Examination by Ms. Coogan..................   4
4       Examination by Mr. Stone..................  55
        Examination by Mr. Smith..................  90
5
   Reporter's Certificate........................  94
6


7

                            EXHIBITS
8
   NO.  DESCRIPTION                              PAGE
9
   1    ........................................   5
10      Six Photographs Labeled A, B, D, D, E, F

11 2    ........................................  42
        Handwritten Notes
12
   3    ........................................  43
13      Photograph of Davalene Lying Under Table

14 4    ........................................  43
        Photograph of Brain Scan
15
   5    ........................................  52
16      Photograph of Stephanie and Father

17 6    ........................................  52
        Photograph of Stephanie's Parents and Brother
18
   7    ........................................  52
19      Senior Photograph of Stephanie's Father

20 8    ........................................  52
        Photograph of Stephanie's Father and Sandra
21      at WinStar Entrance

22

23

24

25

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6621

ORAL DEPOSITION OF STEPHANIE KINGREY

```
1        A.    Not at that point, no.
2        Q.    As far as you know, did he ever take any
3   medications for diabetes?
4        A.    Not that I know of.
5        Q.    Do you know -- are you aware of him ever being
6   diagnosed with diabetes?
7        A.    He told me before he went in to Waco that he
8   was a diabetic.
9        Q.    And was that a surprise to you?
10        A.    No, because it runs in the family.
11        Q.    Okay.  And did you ask him whether he was
12   taking any medication for that?
13        A.    No.
14        Q.    Did you have any concerns about how he might
15   pay for medication for that diabetes?
16        A.    My guess?
17        Q.    Uh-huh.
18        A.    Yeah.
19        Q.    I'm sorry?
20        A.    Yes.
21        Q.    You --
22        A.    I didn't know how he would pay for it if he had
23   to.
24        Q.    Okay.  And did you ever ask him, Hey, Dad,
25   you're not working, how are you paying for your diabetes
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6622

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 281

Lannette Linthicum – 1/13/2016

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                     HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA     )
McCOLLUM, individually, and     )
STEPHANIE KINGREY,              )
individually and independent    )
administrator of the Estate     )
of LARRY GENE McCOLLUM          )
                    PLAINTIFFS  )       CIVIL ACTION NO.
                                )          4:14-cv-3253
v.                              )        JURY DEMAND
                                )
                                )
LANNETTE LINTHICUM, JEFF        )
PRINGLE, RICHARD CLARK,         )
KAREN TATE, SANDREA SANDERS,    )
ROBERT FASON, the UNIVERSITY    )
OF TEXAS MEDICAL BRANCH and     )
the TEXAS DEPARTMENT OF         )
CRIMINAL JUSTICE                )
                    DEFENDANTS  )
_____)  _____
KEITH COLE, JACKIE BRANNUM,     )
RICHARD KING, DEAN ANTHONY      )
MOJICA, RAY WILSON, FRED        )
WALLACE, and MARVIN RAY         )
YATES, individually and on      )
behalf of those similarly       )
situated,                       )
                                )       CIVIL ACTION NO.
            Plaintiffs,         )          4:14-cv-1698
                                )
v.                              )
                                )
LANNETTE LINTHICUM, in his      )
official capacity, ROBERTO      )
HERRERA, in his official        )
capacity, and TEXAS             )
DEPARTMENT OF CRIMINAL          )
JUSTICE,                        )
            Defendants.         )
```

**WRIGHT  WATSON  &  ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

Plaintiffs' MSJ Appx. 6624

Lannette Linthicum - 1/13/2016

1

2

3

4

5

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

6

7               REPORTER'S CERTIFICATION
           DEPOSITION OF LANNETTE LINTHICUM

8                 January 13, 2016
                    VOLUME 1

9

10    \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

11

12

13

14            ORAL AND VIDEOTAPED DEPOSITION OF LANNETTE

15    LINTHICUM, produced as a witness at the instance of the

16    Plaintiffs, and duly sworn, was taken in the above-styled and

17    numbered cause on the 13th day of January, 2016, from 9:18 a.m.

18    to 3:59 p.m., before Abigail Guerra, CSR, in and for the State

19    of Texas, reported by machine shorthand, before Honorable Keith

20    Ellison, at the United States District Courthouse, 515 Rusk,

21    Houston, Texas, pursuant to the Federal Rules of Civil

22    Procedure and the provisions stated on the record or attached

23    hereto.

24

25

**WRIGHT WATSON & ASSOCIATES**
**1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363**
2d32d627-930d-45a8-92e3-94b44101e0f1

Plaintiffs' MSJ Appx. 6625

Lannette Linthicum – 1/13/2016

```
 1                    A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3       STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and
    STEPHANIE KINGREY, individually and independent administrator
 4  of the Estate of LARRY GENE McCOLLUM

 5  Mr. Jeff Edwards
    Mr. Scott Medlock
 6  EDWARDS LAW
    1101 East 11th Street
 7  Austin, Texas 78702
    Phone:  (512) 623-7727

 8

 9       - and -

10  Mr. Michael Singley
    Mr. David James
11  THE SINGLEY LAW FIRM, PLLC
    4131 Spicewood Springs Road
12  Suite O-3
    Austin, Texas 78759
    Phone:  (512) 334-4302
13

14  FOR THE DEFENDANT:
         TEXAS DEPARTMENT OF CRIMINAL JUSTICE
15
    Ms. Cynthia L. Burton
16  Mr. Matthew Greer
    OFFICE OF ATTORNEY GENERAL
17  300 W. 15th Street
    7th Floor
18  Austin, Texas 78701
    Phone:  Phone:  (512) 463-2080

19
         - and -
20
    Ms. Sharon Felfe Howell
21  TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
    209 West 14th Street
22  Suite 500
    Austin, Texas 78711
23  Phone: (512) 463-9899

24

25
```

**WRIGHT  WATSON  &  ASSOCIATES**

Lannette Linthicum – 1/13/2016

```
 1                    A P P E A R A N C E S (cont'd)

 2

     FOR UTMB:
 3
     Ms. J. Lee Haney
 4   Ms. Shanna Molinare
     Office of Attorney General
 5   300 W. 15th Street
     7th Floor
 6   Austin, Texas 78701
     Phone:  (512) 463-2080
 7
          - and -
 8
     Mr. Graig J. Alvarez
 9   Ms. Kara Stauffer Philbin
     FERNELIUS ALVAREZ SIMON, PLLC
10   Lyondell Basell Tower
     1221 McKinney Street
11   Suite 3200
     Houston, Texas 77010
12   Phone:  (713) 654-1200

13   ALSO PRESENT:
          Mr. Kevin Schaeffer, Videographer
14        Ms. Jennifer Osteen
          Ms. Kamilla L. Stokes
15        Ms. Ashley Palermo
          Ms. Brian M. Sears
16        Mr. Daniel C. Neuhoff
          Ms. Heather Rhea
17        Ms. Lori K. Erwin
          Ms. Glenda Adams
18        Ms. Ariel Wiley
          Mr. Phillip Boyd
19        Mr. Derek Kammerlacher
          Dr. Owen Murray
20        Judge Keith P. Ellison
          Ms. Rebbeca Vogel

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1

Plaintiffs' MSJ Appx. 6627

5

Lannette Linthicum - 1/13/2016

1                               INDEX

2   Appearances............................................    3

3   LANNETTE LINTHICUM

4        Examination by Mr. Edwards........................   15

5   Signature and Changes................................  225

6   Reporter's Certificate...............................  227

7

8

9                              EXHIBITS

10  NO. DESCRIPTION                                     PAGE

11  1    Interoffice Communication Dated May 3, 2005      168
         Bates Nos. McCollum 02507-08
12
    2    Final Autopsy Report                             169
13       Bates Nos. CADDELL P0319 to 331

14  3    Administrative Directive AD-10.64 Dated August 9, 178
         2006
15       Bates Nos. BAILEY 03054 to 55

16  4    Administrative Directive AD-10.64 Dated July 11,  180
         2003
17       Bates Nos. BAILEY 031022 to 31

18  5    Heat Stress Policy                               195
         BAILEY 03070 to 71
19
    6    Email Dated June 26, 2009                        215
20       Bates Nos. TDCJ013582 to 84

21

22

23

24

25

**WRIGHT  WATSON  &  ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1

Plaintiffs' MSJ Appx. 6628

Lannette Linthicum – 1/13/2016

1      A.    The construction of the medical units were

2  constructed -- all of those units that I just named for you,

3  were constructed as part of the Ruiz healthcare reforms under

4  Judge Justice.  All of those facilities were built under the

5  Ruiz lawsuit.  The design and architecture and whether or not

6  air-conditioning went in preceded my tenure as medical

7  director.

8      Q.    So you don't know why the places you choose to place

9  long-term people with healthcare needs, why those are

10  air-conditioned?

11              THE COURT:  Okay.  I think we've already covered

12  this.  Why don't we move on?

13              MR. EDWARDS:  All right.

14              THE COURT:  I think the doctor has not done an

15  inquiry as to what other places around the state are

16  air-conditioned.  Is that fair?

17              THE WITNESS:  Yes, Your Honor.

18      Q.    (BY MR. EDWARDS)  Who makes the criteria as to what

19  HSM -- well -- strike that.

20              Do you know what an HSM-18 form is?

21      A.    Yes.

22      Q.    What is it?

23      A.    It's the Health Summary for Medical Classification.

24      Q.    What does that mean?

25      A.    It's a medical form that's completed by the unit

Lannette Linthicum – 1/13/2016

```
 1   medical staff, and it's a form that's used by the Corrections
 2   Institution Division, specifically their classification and
 3   records department, to make decisions about unit of assignments
 4   for offenders and work assignments and other restrictions.
 5        Q.   Do you have any input into criteria that go on the
 6   HSM-18?
 7        A.   There is a joint committee called the Joint Policy
 8   and Procedure Committee which consists of representatives from
 9   the three partner agencies, UTMB, Texas Tech, and TDCJ Health
10   Services staff.  They work together collaboratively, and they
11   review all of the Correctional Managed Healthcare policies and
12   make decisions about those forms and whether any changes that's
13   necessary to those forms.
14        Q.   So, yes, you do have a role in the criteria of
15   HSM-18?
16        A.   I don't have a direct role.  The committee does the
17   work.  After the committee does its work, that work is
18   forwarded on to the university medical directors.
19        Q.   You're on the committee, right?
20        A.   No, I'm not.
21        Q.   Who's on the committee?
22        A.   I appoint people on committee out of the Health
23   Services Division.
24        Q.   You could appoint yourself if you wanted to?
25        A.   No.  The medical directors don't serve on the joint
```

Lannette Linthicum - 1/13/2016

```
 1        Q.   Did you have a safe operating prison system in 2011?

 2        A.   Yes.

 3        Q.   Even for the men who died from heatstroke in 2011?

 4   Do you believe your prison system was safe for them?

 5        A.   Yes.  It was very unfortunate that those 11 offenders

 6   lost their lives, but you can't use that to say the entire

 7   system is unsafe.  There were far for offender that died from

 8   cardiovascular disease and cancer and liver disease than the 11

 9   that succumbed to heat.

10        Q.   Okay.  When someone responds to you with the

11   following words:  "So what?"  What do you mean by that?  What

12   is the significance to you that more people died from heart

13   attacks or cancer than heatstroke in 2011?  What is it that you

14   as a policy making person draw from that?

15        A.   What I'm saying is that you're implying that those

16   offenders who died from heatstroke, that in some way they

17   counted more than the other offenders that died from all the

18   other diseases.

19             THE COURT:  Hold on.  I don't think that's his

20   import.  I think what he's asking indirectly, isn't it easier

21   to deal the problems caused by intensive heat than it is to

22   deal with the problems caused by cancer or heart disease?

23             Is that right?

24             MR. EDWARDS:  Yes.

25             THE COURT:  So that's the question.  The fact
```

Lannette Linthicum - 1/13/2016

1  that there are heart disease deaths and cancer deaths is

2  tragic.  Every life is precious.

3              THE WITNESS:  Yes.

4              THE COURT:  But isn't there fix at hand for

5  heat-related deaths that's not available for other kinds of

6  deaths?

7              THE WITNESS:  Yes, it is, Your Honor.  For those

8  offenders that we feel are the greatest risk, we bring into our

9  impatient areas, those 738 infirmary beds.  Probably 70 percent

10 of those beds are filled with offenders who are permanently

11 assigned to those beds because of coexisting comorbidities,

12 that we feel they cannot survive in general population.  It's

13 unsafe.  Some of them are on oxygen.  Some of them have what we

14 call "multiorgan system disease."  They may have asthma.  They

15 may have cardiovascular disease.  They may have --

16             THE REPORTER:  Slow down, please.

17             THE WITNESS:  Sorry.

18             THE COURT:  I think I understand now.

19             THE WITNESS:  They may have, you know, disease

20 in multiple systems.

21             THE COURT:  But the existence of these other

22 diseases doesn't really bear on the question of how we deal

23 with people who have heat sensitivity, does it?

24             THE WITNESS:  It does because some of these

25 other diseases make people more susceptible to heat illnesses.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1

Plaintiffs' MSJ Appx. 6632

Lannette Linthicum - 1/13/2016

```
 1        A.    One is classic.  Is that what you're --

 2        Q.    Do you know the medical conditions that people are

 3   suffering from which impair the body's ability to

 4   thermoregulate or render them more susceptible to heatstroke?

 5   For instance, is diabetes one of those conditions?

 6        A.    Diabetes is a condition that may cause a person to be

 7   susceptible to a heat-related illness.  I would not go as far

 8   as to say that if you're diabetic, you're going to

 9   automatically develop a heatstroke because you're diabetic.

10        Q.    Okay.  What about COPD?

11        A.    What about it?

12        Q.    Is that something that causes one or can cause one to

13   have their body impaired and lead to a heatstroke?

14        A.    Well, again, it gets back to-- not a heatstroke, but

15   maybe a heat-related illness.  They may be more predisposed to

16   heat-related exhaustion, and primarily a lot of these diseases

17   is because of the medications that they are taking for

18   treatment of disorders, not because of the disorder itself.

19        Q.    What about cardiovascular disease?

20        A.    Cardiovascular disease -- again, you may have a

21   predisposition to a heat-related illness because of systemic

22   issues with your -- with your ability to respond metabolically

23   to increased demands related to heat and activity and exertion.

24        Q.    What about morbid obesity?

25        A.    Morbid obesity in and of itself can cause certain
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1

Plaintiffs' MSJ Appx. 6633

Lannette Linthicum – 1/13/2016

```
1    individuals to have issues with heat output.

2         Q.   What about hypertension?

3         A.   Hypertension is more of the medications that are used

4    to treat hypertension, primarily a diuretic, thiazide.  All of

5    this is potential.

6         Q.   Sure.

7         A.   Mr. Edwards, we've got 30,000 hypertensive patients.

8    They're not all having heat-related illnesses.  We've got 9,000

9    diabetics statewide.  They're not all having heat-related

10   illnesses.

11        Q.   Well, and what troubles me, Doctor, is the conclusion

12   you seem to be advocating is because we have 9,000 diabetics

13   and only a few of them suffer heatstroke, that we're -- that

14   you're doing an okay job.

15        A.   Well, we are doing an okay job.  I think we're doing

16   better than an okay job.  These university medical schools are

17   providing outstanding care to the offender population, and we

18   are very lucky to have them providing care within our

19   facilities.  And we monitor.  We have dashboards where we

20   monitor ourselves and benchmark ourselves against large HMO

21   corporations in terms of management of these chronic illnesses,

22   and we're doing better than most of them.

23        Q.   It's your position that the healthcare you provide

24   for chronic healthcare conditions, that you're doing better

25   than the private sector?
```

Lannette Linthicum - 1/13/2016

1

2          I further certify that I am neither attorney, nor

3  counsel for, nor related to, nor employed by any of the parties

4  or attorneys to the action in which this deposition was taken;

5          Further, I am not a relative, nor an employee of any

6  attorney of record in this cause, nor am I financially or

7  otherwise interested in the outcome of the action.

8          Certified to by me this 28th day of January, 2016.

9

10

11

12

13  _____

14  ABIGAIL GUERRA, Texas CSR 9059
    Expiration Date:  12/31/17
15  WRIGHT WATSON & ASSOCIATES
    Firm Registration No. 225
    Expiration Date:  12-31-17
16  1250 S. Capital of Texas Highway
    Building 3, Suite 400
17  Austin, Texas 78746
    512-474-4363/512-474-8802 (fax)
18  www.wrightwatson.com

19  Job No. 160113AG

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
2d32d627-930d-45a8-92e3-94b44101e0f1

Plaintiffs' MSJ Appx. 6635