UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 282

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA      )
McCOLLUM, individually, and      )
STEPHANIE KINGREY,               )
individually and independent     )
administrator of the Estate      )
of LARRY GENE McCOLLUM           )
                PLAINTIFFS       )
                                 )
                                 )
VS.                              )        CIVIL ACTION NO.
                                 )          4:14-cv-3253
                                 )          JURY DEMAND
                                 )
BRAD LIVINGSTON, JEFF            )
PRINGLE, RICHARD CLARK,          )
KAREN TATE, SANDREA SANDERS,     )
ROBERT FASON, the UNIVERSITY     )
OF TEXAS MEDICAL BRANCH and      )
the TEXAS DEPARTMENT OF          )
CRIMINAL JUSTICE                 )
                DEFENDANTS       )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

BRAD LIVINGSTON

October 1, 2015

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

Plaintiffs' MSJ Appx. 6637

Brad Livingston - 10/1/2015

1          ORAL AND VIDEOTAPED DEPOSITION OF BRAD LIVINGSTON,

2  produced as a witness at the instance of the Plaintiffs, and

3  duly sworn, was taken in the above-styled and numbered cause on

4  the 1st day of October, 2015, from 11:31 a.m. to 5:39 p.m.,

5  before Abigail Guerra, CSR, in and for the State of Texas,

6  reported by machine shorthand, before Honorable Keith Ellison,

7  at the United States District Courthouse, 515 Rusk, Houston,

8  Texas, pursuant to the Federal Rules of Civil Procedure and the

9  provisions stated on the record or attached hereto.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brad Livingston - 10/1/2015

```
 1              A P P E A R A N C E S

 2


 3
      FOR THE PLAINTIFF:
 4         STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and
      STEPHANIE KINGREY, individually and independent administrator
 5    of the Estate of LARRY GENE McCOLLUM

 6    Mr. Jeff Edwards
      Mr. Scott Medlock
 7    EDWARDS LAW
      1101 East 11th Street
 8    Austin, Texas 78702
      Phone:  (512) 623-7727
 9
           - and -
10
      Mr. Michael Singley
11    Mr. David James
      THE SINGLEY LAW FIRM, PLLC
12    4131 Spicewood Springs Road
      Suite O-3
13    Austin, Texas 78759
      Phone:  (512) 334-4302
14

15    FOR THE DEFENDANT:
           TEXAS DEPARTMENT OF CRIMINAL JUSTICE
16
      Ms. Cynthia L. Burton
17    Mr. Matthew Greer
      OFFICE OF ATTORNEY GENERAL
18    300 W. 15th Street
      7th Floor
19    Austin, Texas 78701
      Phone:  Phone:  (512) 463-2080
20
           - and -
21
      Ms. Sharon Felfe Howell
22    TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
      209 West 14th Street
23    Suite 500
      Austin, Texas 78711
24    Phone: (512) 463-9899

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6639

Brad Livingston - 10/1/2015

```
 1              A P P E A R A N C E S (cont'd)

 2
     FOR THE WITNESS:
 3         UTMB

 4   Ms. J. Lee Haney
     Ms. Shanna Molinare
 5   Office of Attorney General
     300 W. 15th Street
 6   7th Floor
     Austin, Texas 78701
 7   Phone:  (512) 463-2080

 8        - and -

 9   Mr. Graig J. Alvarez
     Ms. Kara Stauffer Philbin
10   FERNELIUS ALVAREZ SIMON, PLLC
     Lyondell Basell Tower
11   1221 McKinney Street
     Suite 3200
12   Houston, Texas 77010
     Phone:  (713) 654-1200

13

14   ALSO PRESENT:
           Mr. Kevin Schaeffer, Videographer
15         Ms. Jennifer Osteen
           Ms. Kamilla L. Stokes
16         Ms. Ashley Palermo
           Ms. Carolanda Bremond, JD
17         Judge Keith P. Ellison
           Rebbeca Vogel
18         Stephanie Loewe

19

20

21

22

23

24

25
```

Brad Livingston – 10/1/2015

```
 1                          INDEX

 2

 3    Appearances...........................................  3

 4    BRAD LIVINGSTON

 5        Examination by Mr. Edwards                         10

 6    Signature and Changes................................  186

 7    Reporter's Certificate...............................  187

 8

 9

10                          EXHIBITS

11    NO. DESCRIPTION                                      PAGE

12    1   Plaintiffs' Response                               64

13    2   Heat Precaution 2011                              109
          Bates Nos. TDCJ – 04806 to 04808
14
      3   Document                                          123
15        Bates No. TDCJ 83506 to 508

16    4   Employee Injury Breakdown List                    160
          Bates Nos. TDCJ009779 to 80
17
      5   Administrative Directive
18        Bates Nos. TDCJ017170 to 180                      184

19

20

21

22

23

24

25
```

**WRIGHT  WATSON  &  ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474–4363

f7bdc968-3423-47fb-b2ad-79863b539fb5

Brad Livingston - 10/1/2015

```
 1              THE COURT:  I'm Keith Ellison.  Thank you all
 2   for your presence.
 3              You've been through the appearance of counsel, I
 4   assume, Court Reporter?
 5              MR. EDWARDS:  No, Your Honor.
 6              THE COURT:  You've gotten everything you need?
 7              THE REPORTER:  No, we haven't been through it.
 8              THE COURT:  Oh, we haven't gone through it.
 9   Let's do it then.  Starting with plaintiffs.
10              MR. EDWARDS:  Jeff Edwards for the plaintiffs.
11              MR. MEDLOCK:  Scott Medlock.
12              MR. SINGLEY:  Mike Singley.
13              MR. JAMES:  David James for the plaintiffs.
14              THE COURT:  Welcome to all of you.
15              Okay, for defendants.
16              MS. BURTON:  Good morning.  Cynthia Burton.
17              MR. GREER:  Matt Greer.
18              MS. BURTON:  And this is Sharon Howell.  She's
19   Texas Department of Criminal Justice general counsel and our
20   agency representative today.
21              THE COURT:  Thank you for being here.
22              MS. BURTON:  This is Mr. Livingston, the
23   witness.
24              THE COURT:  Thank you, all.
25              MS. HANEY:  Your Honor, for UTMB, Lee Haney.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6642

Brad Livingston - 10/1/2015

```
 1              I think it's -- it's accurate to state that I'm
 2  aware that as an agency we have an responsibility to have
 3  policies and procedures in place, which we do.  We've continued
 4  to expand those policies and procedures.  I have an overall
 5  approach to leadership and management that we should always
 6  seek to improve our effectiveness.  But as it relates to your
 7  question, yes, I'm aware that we have an obligation to have
 8  policies and procedures and practices in place to mitigate the
 9  impact of heat.
10      Q.   (BY MR. EDWARDS)  And that's because heat can be
11  dangerous for your inmate population, right?
12      A.   Absent the provision of adequate policies and
13  procedures and practices, I think it's also important to have a
14  specific example with -- because not all individuals would
15  react the same -- same way.
16      Q.   Sure.
17              But you'd agree with me that, at least from 2004
18  onward, you un- -- you've understood, you, personally, Brad
19  Livingston, have understood that it's important for TDCJ to
20  have policies and practice that mitigate the dangers of extreme
21  heat inside the Texas prison system.  Fair?
22      A.   I think it's important for us to have policies and
23  procedures and practices in place to mitigate the impact heat.
24      Q.   Because the impact of heat on the prisoner population
25  can be very dangerous, correct?
```

Brad Livingston - 10/1/2015

```
 1      A.   Again, in the absence of practices and procedures
 2  intended to mitigate and in the absence of a whole host of
 3  support parameters and support functions that we have, it can
 4  be, yes.
 5      Q.   Sure.
 6           Look, you know, the heat in Texas during the
 7  summer is a known danger, and you expect it to be known to all
 8  of administrators, correct?
 9      A.   We have extensive policies that outline the steps
10  first to outline and first to recognize -- recognize and
11  prevent and ultimately also treat the impacts of heat stress.
12      Q.   Do you have what you contend to be policies and
13  practices that mitigate the dangers of heat because you
14  understand that without them the heat can pose a danger to your
15  inmate population?
16           MR. ALVAREZ:  This line of questioning has been
17  asked and answered multiple ways and multiple times.
18           MR. EDWARDS:  I don't know that it's been
19  answered.
20           THE COURT:  I'm going to give some room.  I'll
21  allow it.
22           MR. EDWARDS:  Would you mind repeating my
23  question to Mr. Livingston so he recalls it, ma'am?
24           (Requested portion read back).
25      A.   Yes.
```

Brad Livingston - 10/1/2015

```
 1  neither has a facilities division director.  I would rely
 2  certain on their judgment and expertise to -- to put forward a
 3  recommendation such as that.
 4           I think also to the extent that -- to the extent
 5  that a consideration was ever made on the part of the dialogue
 6  and discussion and consideration would have to include what
 7  funding or what expenditures you would have to forego to move
 8  -- to move down that path, which also, again, as I said a few
 9  minutes ago, we don't have extra money laying around; and we
10  typically are required and have reduced medical shortfalls in
11  -- in our agency's budget as a matter -- as a matter of course.
12  So I think there would be a lot of things that would have to be
13  considered, but none of my staff have recommended that we do
14  so.
15           Certainly, if that occurred, we would look at --
16  we would look at every aspect of the -- of the request.  We
17  would also factor in the overall history of our mitigation
18  efforts and the steps we have taken in the last few years to
19  enhance those mitigation efforts and make a judgment.
20  Q.   I'm going to ask the question that I asked you one
21  more time, but I appreciate the -- the response nevertheless.
22           Have you ever considered adding air-conditioning
23  or retrofitting any aspect of any nonair-conditioned housing
24  area ever?  You, Mr. Livingston?
25  A.   No.
```

Brad Livingston - 10/1/2015

1    Q.   Have you ever asked her whether or not we should

2  air-condition specific parts of the housing areas?

3    A.   I've not -- I've not specifically asked her that

4  question.

5    Q.   Is there anything that you would have prevented you

6  from specifically asking that question that we need to be aware

7  of?

8    A.   No.

9    Q.   Did you ever specifically ask -- and I -- Mr. Thaler,

10 what is his first name?

11   A.   Rick.

12   Q.   Did you ever specifically ask Rick -- Rick Thaler,

13 just so the court knows, he was the former head of the

14 Institution's Division?

15   A.   Correctional Institutions division, correct.

16   Q.   Thank you, sir.

17        Did you ever specifically ask Mr. Thaler if we

18 should air-condition portions of the housing area?

19   A.   No.  But as I pointed with just as with

20 Dr. Linthicum, I had ongoing discussions about a range of

21 operations with Rick Thaler to include our mitigation efforts

22 with respect to heat.

23   Q.   What about Mr. Immon?  Did you ever specifically ask

24 him if we should consider air-conditioning any aspect of the

25 housing area --

Brad Livingston - 10/1/2015

```
 1       A.    No.

 2       Q.    -- area housing areas?

 3             Did anything prevent you from specifically

 4  asking that question of Mr. Thaler or Mr. Immon?

 5       A.    No.

 6       Q.    When did Mr. Stephens take over for Mr. Thaler?

 7       A.    I may not get the exact date right, but --

 8       Q.    Ballpark, sir.

 9       A.    -- but I believe it was -- I believe it was the early

10  summer of 2013, if I'm not mistaken.

11             THE COURT:  What is Mr. Thaler doing now, if you

12  know?

13             THE WITNESS:  I believe Mr. Thaler he's retired

14  from TDCJ.  I believe he works for Sam Houston State

15  University.  I'm not for sure in what capacity.

16             THE COURT:  Thank you.

17       Q.    (BY MR. EDWARDS)  You ever specifically asked

18  Mr. Steven if we should -- if the agency should consider

19  air-conditioning portions of the housing areas?

20       A.    No, but I have asked Mr. Stephens specifically if he

21  believes the mitigation efforts and all of the steps that we

22  take to mitigate the efforts of heat are appropriate and

23  effective.

24       Q.    And does he say, yes, they are?

25       A.    Yes, sir.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6647

Brad Livingston - 10/1/2015

1  prison facilities in Texas, if any of them are air-conditioned?

2      A.   I do not know.

3      Q.   In the last -- you're coming up around 11 years?

4      A.   Yes, sir.

5      Q.   In the last 11 years, is there anything that we need

6  to be aware of that would have prevented you from inquiring as

7  to whether or not there were certain federal facilities that

8  had air-conditioning housing areas?  Anything prevented you

9  from finding that?

10     A.   No.

11     Q.   Anything prevent you from asking legislatures why

12 they may have made some distinction between TDCJ facilities and

13 county jail facilities?

14     A.   No.

15     Q.   Sir, I think I know the answer to this, but have

16 you -- has TDCJ ever sought an outside independent study of

17 whether or not it should reduce the temperatures inside its

18 housing areas?

19     A.   Let me make sure I understand the question.  Have we

20 ever sought a study, an outside independent study?

21     Q.   Do you know what an outside independent study is?

22          THE COURT:  Are you asking whether he sought

23 one, or whether he knows if one exists?

24          MR. EDWARDS:  Okay.

25     Q.   (BY MR. EDWARDS)  Well, do you know if there's ever

Brad Livingston - 10/1/2015

1  been an independent non-TDCJ study done about the need to

2  reduce temperatures in the Texas prison system housing areas?

3      A.   Not that I'm aware of.

4      Q.   Okay.  As the head of agency for the past 11 years,

5  did you ever authorize such a study?

6      A.   No.

7      Q.   Should you have?

8      A.   I don't believe so on the basis of policies and

9  procedures and in mitigation efforts that we have in our agency

10 and the steps that we've taken.

11     Q.   Let me go through -- did you ever have any specific

12 conversations with Mr. Thaler as to whether or not he thought

13 an independent study would be beneficial?

14     A.   I don't recall specifically discussing that with him.

15     Q.   Did you ever have any conversations with

16 Dr. Linthicum as to whether or not she thought an independent

17 study on temperatures would have been beneficial?

18     A.   I don't recall having that discussion.

19     Q.   Did you ever have any conversations with Mr. Immon,

20 the director of facility, whether or not an independent study

21 would have been beneficial?

22     A.   I don't recall having that discussion.

23     Q.   Did you ever have any conversations with Mr. Stephens

24 as to whether or not an independent study would have been

25 beneficial?

Brad Livingston - 10/1/2015

1     A.    There is a recent engineering study for four of our

2  facilities that we undertook.  I can't recall the exact same --

3  the exact time frame, but I believe the reports have been

4  recently released.

5     Q.    Those are the reports that your expert witnesses

6  filed that you paid for after being sued, correct?

7     A.    I can't recall the exact time.

8     Q.    Well, I'll represent to you that that TRAC

9  Engineering was designated as an expert in litigation, and that

10  they were not retained by you until after the litigation.  Is

11  that different in any respect from your understanding, sir?

12     A.    Again, I don't recall the exact timing.

13     Q.    Do you think that retained experts testifying in a

14  court case is an independent study?

15          THE COURT:  He's just asking whether you think

16  that's a sufficient degree of independence if party requesting

17  the study is paying for it.

18          THE WITNESS:  Your Honor, if that's the

19  characterization of the question, I'd certainly believe that a

20  study can be independent and valid even if we pay for it.

21          THE COURT:  Okay.  That's all he was asking.

22     Q.    (BY MR. EDWARDS)  All right.  Before you were sued

23  relating -- regarding being responsible for causing the deaths

24  of many, many, people due to indoor temperatures, did you ever

25  request a study about the cost of reducing the temperatures in

Brad Livingston - 10/1/2015

```
 1  the Texas prison system?
 2              MS. BURTON:  Objection to the argumentative
 3  nature of that question, Your Honor.
 4              MR. EDWARDS:  This is a deliberative
 5  indifference case.  I'd ask for some --
 6              THE COURT:  I'll allow it.
 7              MR. EDWARDS:  Abby, would you --
 8      A.   No, sir.
 9      Q.   (BY MR. EDWARDS)  Have you been informed that 20
10  people have died with a diagnosis of hypothermia while housing
11  in Texas Department of Criminal Justice facilities since 1998?
12      A.   I don't recall the exact number being 20, but
13  certainly in 2011, I'm aware of ten.  I'm aware of two in 2012,
14  and I believe two in 2007, if I'm not mistaken; and I know
15  there may have been in the early years prior to that, I don't
16  recall the exact number.
17      Q.   Okay.  I'll represent to you that there was
18  heatstrokes -- let me -- is that all the heatstroke deaths that
19  you think there could in the Texas prison system during that
20  time frame?
21      A.   Could you repeat the question?
22      Q.   Do you know that hypothermia is a notoriously
23  underreported cause of death?
24      A.   I don't know that.
25      Q.   Have you ever asked Dr. Linthicum if that's, in fact,
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6651

Brad Livingston - 10/1/2015

1  their responsibility and expectation of the agency and the unit

2  management is to engage in that from start to finish with --

3  within the summer.

4       Q.   Are the mitigation measures the same at 80 degrees as

5  they are 106 degrees?

6       A.   With respect to the -- again, with respect to the

7  access to water, the access to showers, the access to all of

8  those things we've identified, the expectation is that that

9  staff provide those wellness checks and other -- other

10  mitigation efforts throughout the course of the summer.

11       Q.   Well, I hear that, but are you telling me the

12  mitigation efforts you have in effect during the course of the

13  summer to deal with this known danger of the extreme heat that

14  they're the same whether the temperature is --

15       A.   I'm not --

16       Q.   -- please, sir -- 82 degrees, 88 degrees, or

17  105 degrees?

18       A.   What I'm saying is that the baseline steps that we

19  take are in place for the entirety of the summer.  As -- as the

20  conditions necessitate, our staff are obviously -- for example,

21  we don't transport offenders in the heat of the day.  We -- the

22  objective with respect to transporting our offenders is to move

23  them earlier in day before it gets hot.  We've also placed fans

24  in addition to water in our buses.  So there are clearly some

25  steps that we take that we try to take early in the day before

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6652

Brad Livingston - 10/1/2015

1  it gets hot.

2      Q.    And you do those steps in June, July, August, and

3  September, right?

4      A.    Correct.

5      Q.    Whether it's 82 degrees or 107 degrees, you still do

6  those steps, right?

7      A.    Yeah.  Correct.

8      Q.    Right.

9      A.    There may well be some -- obviously, if an offender

10 is showing symptoms, we have a process for staff to identify

11 that and -- and to seek medical attention.

12     Q.    Okay.  But the precautions that you're talking about,

13 okay, temperatures of shower, ventilation flow, fans, ice

14 water, you even talked about wellness checks, those are done

15 and performed at least according to the policy every day in the

16 summer, right?

17     A.    Correct.

18     Q.    Do you --

19     A.    Continuously.

20     Q.    Do you -- and I mean TDCJ -- do anything differently

21 if it's 107 degrees than you do at 84 on a random July day,

22 policy-wise?

23     A.    I would refer back to our detailed -- for example,

24 our detailed heat message to -- to recall if we have specific

25 instructions.  I do know that our staff are instructed to be

Brad Livingston - 10/1/2015

1   measures -- whatever measures are necessary to make sure that

2   offenders and staff alike are -- the effects of the heat are

3   mitigated.

4       Q.   Let me try the help you.

5            Are you aware that when the temperature is above

6   95 degrees your department has a policy which prohibits certain

7   people from working or limits the amount of activity they do

8   during work at greater than 95 degrees.  Are you aware of that?

9       A.   That it would certainly depend if an offender has

10  work-related restrictions.

11           THE COURT:  He's asking if you know of such a

12  policy.

13      Q.   Do you know if such a policy exists that curtails

14  work activities after 95 for a certain segment of population?

15      A.   Certainly, I would have to see the policy to refresh

16  my memory on details, but I do know that we do have policies as

17  you've described.

18      Q.   Okay.  Do you know if there's a similar policy once

19  the indoor temperatures go above 95 degrees with any aspect of

20  your population?

21      A.   Again, the indoor population or the indoor policies

22  are not temperature dependent, in that we are providing cooling

23  showers and more ice water and fans and ventilation,

24  irrespective of the given temperature.  The temperature outside

25  is tied specifically to offenders.  The temperature logs

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6654

Brad Livingston - 10/1/2015

1  outside and the restrictions on whether they are working is

2  tied specifically to their work restriction, given their

3  medical condition.

4      Q.   I believe you've answered interrogatory -- do you

5  know an interrogatory is?  It's a fancy word for question.  Are

6  you aware?

7      A.   I'm aware that occurs extensively in lawsuits.

8      Q.   I believe in interrogatory or request for admission

9  you said it's you're understanding that many of the housing --

10 many of the facilities, the indoor and outdoor temperature are

11 relatively similar, give or take, a couple of degrees.  Is that

12 your understanding as you testify here today?

13     A.   I would --

14          MS. BURTON:  Objection.  Objection.  Your Honor,

15 that's improper impeachment.

16          MR. EDWARDS:  It's not impeachment.

17          THE COURT:  Just a second.  Just a second.  Let

18 me get the objection.

19          MS. BURTON:  It lacks foundation, and it's

20 improper attempt at impeachment.  If he plans to show him the

21 interrogatory --

22          THE COURT:  He just -- he's asked whether he's

23 aware that happened, and maybe the witness is unaware, maybe it

24 didn't happen, but the witness can say that.

25     A.   I'm not aware of the specific interrogatory either

Brad Livingston - 10/1/2015

1    Q.   Do you recall during the summer of 2011 there being a

2  prolonged heat wave?

3    A.   As I pointed out in the previous answer, it was a

4  record-heat event, a record-heat summer with -- with a

5  prolonged high temperatures.  So both the duration and

6  intensity of the heat was greater than had been the case in

7  prior summers or subsequent summers.

8           And, again, as I understand it, that was not

9  predicted to be an unusually different summer that what had

10 typically been the case.  And as I pointed out, our mitigation

11 efforts had for the most part worked over the years.  We relied

12 on those, and we had no reason to believe that they wouldn't

13 work in -- in the summer of 2011.

14   Q.   So let me just make sure I understand what you're

15 saying.  You're saying, look, it was a really, really hot

16 summer.  It was record-breaking summer.  It could not have been

17 anticipated and was not predicted that such a summer like this

18 was coming or could come; and we did the best we could; and we

19 had no indication based on our prior mitigation measures that

20 the inmates were at risk even given these record-setting

21 temperatures; is that correct?

22   A.   I'm not sure I would frame it exactly as you have.

23 Clearly, our objective is to mitigate that risk and to reduce

24 the risk and take every step and measure we can to mitigate the

25 impacts of the heat and to pay very close attention to those

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6656

Brad Livingston - 10/1/2015

 1      Q.   I'm asking about these two.

 2      A.   This page delineates what occurred in the summer of

 3  2011 and 2012.  This is more comprehensive.  It includes this

 4  and everything subsequent to that.

 5      Q.   What happened this?

 6      A.   All three page to me, I view it as sort of one

 7  document.

 8      Q.   Who made these two pages who wrote these?

 9      A.   Again -- again operational staff worked on these

10  three pages.

11          MR. EDWARDS:  Your Honor, can we -- any way for

12  us to get a copy of this.

13          THE COURT:  Sure.

14          MR. EDWARDS:  Can we go off the record for a

15  minute?

16          MS. BURTON:  I've got copies.

17          THE COURT:  You want this back, or you want me

18  to have it.

19          MR. GREER:  And for the record, this was

20  disclosed in response to the subpoena that was served on the

21  plaintiffs this week.

22      Q.   (BY MR. EDWARDS)  All right, so the first page of

23  Exhibit 3 -- the 1, 2, 3, 4, 5, 6, 7 -- the top seven bullet

24  points, your understanding that they were implemented sometime

25  in 2011?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6657

Brad Livingston - 10/1/2015

1  generally brought to your attention by Mr. Thaler?

2      A.   No.

3      Q.   Do you know that employee related -- heat-related

4  injuries to employees go up beginning in the months --

5  beginning in June, July, and August?

6      A.   We have -- we have reports that are generated that I

7  know are unit-based staff utilized regularly.  I'm on a

8  distribution list.  I don't -- it's not -- It's not a report

9  that I read regularly, but I am familiar with the reports, and

10 it would be consistent with the trends I've seen over time

11 for -- for that to occur.

12     Q.   And just so everybody's clear, you are on the email

13 distribution list, which discusses the numbers of

14 employee-related-heat-related illnesses and offender-related

15 heat illness, right?

16     A.   It's --it's, I believe, a monthly report.  It just

17 simply shows a chart and indicates the numbers.

18     Q.   And I've looked at several of the charts, and it

19 looks like there are very few weather-related injuries until

20 you get to May, June, July, and August and September and then

21 the numbers go up appreciably; and that would have been

22 consistent with your understanding as well, correct?

23     A.   Yes.

24     Q.   And you may not read them religiously or pore over

25 them, but you'd familiar with them when they're provided to

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6658

Brad Livingston - 10/1/2015

1  certain point, fans are actually counterproductive in terms of

2  mitigating the effects of heat?

3      A.   I can't -- I'm not knowledgeable enough in -- in this

4  particular field to know whether what you're saying is accurate

5  or not.

6      Q.   After this many people have died of heatstroke inside

7  the prison system, don't you think that you should be?

8      A.   Don't you think that I should be what?

9      Q.   Don't you think that you should be knowledgeable

10  about the effect of fans on mitigation of heat, given that

11  they're in your policy, sir?

12     A.   Let me back up.  In this case, when you're saying

13  "don't you think you" as the collective agency, I believe as an

14  agency we are.  If you're, in this case, referring to you, as

15  Brad Livingston, I'm -- I'm not sure I would agree with that

16  assertion.

17     Q.   Okay.  I am asking you, Brad Livingston, as the

18  person who has the ability to, on your own take out or add to

19  any one of these precautions, right?  You have that ability,

20  sir, correct?

21     A.   As the executive director, I can strike or add an

22  item to this email.

23     Q.   Have you ever had a conversation with anybody at

24  Health Services or anybody with an expertise of engineering or

25  fans as to the effect of fans when the temperature goes above

Brad Livingston - 10/1/2015

1  95 degrees?

2      A.   I have not posed specific question as you've

3  articulated it.  I've had ongoing discussions with all those

4  experts within the agency as to what they believe the best

5  course of action is for operating our system during the summer

6  months, and they pull together in -- in -- frankly, they meet

7  year round.

8           The key players in this agency have multiple

9  occasions to meet on a variety of topics, but they meet very

10 specifically on this topic in the spring.

11          And it's my judgment, as the executive director,

12 not to second guess their more specific and targeted skill sets

13 and expertise on these areas than mine.  That's why I've hired

14 them.  That's why I put them this place.  That's why I rely on

15 them.  And to me it would be shortsighted and potentially

16 problematic to, without more specific expertise myself, go in

17 and strike out items or add items.

18          I rely on their judgment.  And I would say,

19 again, come back to is that the protocols this agency has had

20 in place for many, many years, although we have built upon

21 them, have worked systematically before 2011.  We had every

22 reason to expect that they would work during 2011 and could not

23 have anticipated and did not anticipate a heat event with

24 record temperatures, both in terms of duration and intensity

25 during the 2011.

Brad Livingston - 10/1/2015

1    Q.    Sure.

2          You know your employees are injured due to

3    heat-related illnesses during the summer, right?

4    A.    I know we track any and all workers' compensation

5    claims to include illness or injuries related to heat, and that

6    there would be -- there would be a number.

7    Q.    And we spoke about the uptake during the summer.  Did

8    you -- have you ever reached out to any of the individual

9    employees injured by the heat or hot weather to find out what

10   their perspective was?

11   A.    No, I haven't.

12   Q.    Did you ever instruct Mr. Thaler or Mr. Stephens,

13   hey, I noticed there were 30 heat-related injuries in July.

14   Why don't we talk to these people to find out what's going on

15   with them?

16   A.    I'm not aware of 30 heat-related-employees injuries

17   in July.

18   Q.    How ever many they were, sir.

19   A.    Well, I didn't think --

20   Q.    Let's go talk to them and find out what's going on?

21   A.    I think the number is relevant because my

22   understanding of the number is relative to 38,000 employees, 32

23   of whom work on our units.  It's a very, very small number.  So

24   from that standpoint, I understand you were using a

25   hypothetical example, but I think it's -- it's relevant.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6661

Brad Livingston - 10/1/2015

```
 1          I, ABIGAIL L. GUERRA, Certified Shorthand Reporter,

 2  in and for the State of Texas, hereby certify to the following:

 3          That the witness, BRAD LIVINGSTON, was duly sworn by

 4  the officer and that the transcript of the oral deposition is a

 5  true record of the testimony given by the witness;

 6          I further certify that pursuant to Federal Rules of

 7  Civil Procedure (30)(e)(1)(A) and (B) as well as Rule

 8  (30)(e)(2) that the signature of the deponent:

 9          I further certify that pursuant to FRCP Rule

10  30(f)(1) that the signature of the deponent:

11

12          __X_ was requested by the deponent or a party before

13  the completion of the deposition and that signature is to be

14  before any notary public and returned within 30 days from date

15  of receipt of the transcript.

16      If returned, the attached Changes and Signature Page

17  contains any changes and the reasons therefore:

18

19          ____ was not requested by the deponent or a party

20  before the completion of the deposition.

21

22          That $_____ is the deposition

23  officer's charges for preparing the original deposition

24  transcript and any copies of exhibits, charged to STEPHEN

25  McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE
```

Brad Livingston - 10/1/2015

```
1   KINGREY, individually and independent administrator of the

2   Estate of LARRY GENE McCOLLUM, individually and on behalf of

3   those similarly situated;

4

5          That pursuant to information given to the deposition

6   officer at the time said testimony was taken, the following

7   includes all parties of record:

8   FOR THE PLAINTIFFS:
        STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and
9   STEPHANIE KINGREY, individually and independent administrator
    of the Estate of LARRY GENE McCOLLUM
10
    Mr. Jeff Edwards
11  Mr. Scott Medlock
    EDWARDS LAW
12  1101 East 11th Street
    Austin, Texas 78702
13  Phone:  (512) 623-7727

14      - and -

15  Mr. Michael Singley
    Mr. David James
16  THE SINGLEY LAW FIRM, PLLC
    4131 Spicewood Springs Road
17  Suite O-3
    Austin, Texas 78759
18  Phone:  (512) 334-4302

19
    FOR THE DEFENDANT:
20      TEXAS DEPARTMENT OF CRIMINAL JUSTICE

21  Ms. Cynthia L. Burton
    Mr. Matthew Greer
22  OFFICE OF ATTORNEY GENERAL
    300 W. 15th Street
23  7th Floor
    Austin, Texas 78701
24  Phone:  Phone:  (512) 463-2080

25      - and -
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
f7bdc968-3423-47fb-b2ad-79863b539fb5

Plaintiffs' MSJ Appx. 6663

Brad Livingston - 10/1/2015

```
 1   Ms. Sharon Felfe Howell
     TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
 2   209 West 14th Street
     Suite 500
 3   Austin, Texas 78711
     Phone: (512) 463-9899
 4

 5   FOR THE WITNESS:
          UTMB
 6
     Ms. J. Lee Haney
 7   Ms. Shanna Molinare
     Office of Attorney General
 8   300 W. 15th Street
     7th Floor
 9   Austin, Texas 78701
     Phone:  (512) 463-2080
10
          - and -
11
     Mr. Graig J. Alvarez
12   Ms. Kara Stauffer Philbin
     FERNELIUS ALVAREZ SIMON, PLLC
13   Lyondell Basell Tower
     1221 McKinney Street
14   Suite 3200
     Houston, Texas 77010
15   Phone:  (713) 654-1200

16

17

18

19

20         I further certify that I am neither attorney, nor

21   counsel for, nor related to, nor employed by any of the parties

22   or attorneys to the action in which this deposition was taken;

23         Further, I am not a relative, nor an employee of any

24   attorney of record in this cause, nor am I financially or

25   otherwise interested in the outcome of the action.
```

Brad Livingston - 10/1/2015

1            Certified to by me this 16th day of October, 2015.

2

3

4

5

6            _____
             ABIGAIL GUERRA, Texas CSR 9059
7            Expiration Date:  12/31/15
             WRIGHT WATSON & ASSOCIATES
8            Firm Registration No. 225
             Expiration Date:  12-31-15
9            1250 S. Capital of Texas Highway
             Building 3, Suite 400
10           Austin, Texas 78746
             512-474-4363/512-474-8802 (fax)
11           www.wrightwatson.com

12   Job No. 151001AG

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 283

Brad Livingston – 10/2/2015

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEPHEN McCOLLUM and SANDRA       )
McCOLLUM, individually, and       )
STEPHANIE KINGREY,                )
individually and independent      )
administrator of the Estate       )
of LARRY GENE McCOLLUM            )
                                  )          CIVIL ACTION NO.
VS.                               )            4:14-cv-3253
                                  )            JURY DEMAND
                                  )
BRAD LIVINGSTON, JEFF             )
PRINGLE, RICHARD CLARK,           )
KAREN TATE, SANDREA SANDERS,      )
ROBERT FASON, the UNIVERSITY      )
OF TEXAS MEDICAL BRANCH and       )
the TEXAS DEPARTMENT OF           )
CRIMINAL JUSTICE                  )

*************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

BRAD LIVINGSTON

October 2, 2015

Volume 2

*************************************************************

**WRIGHT  WATSON  &  ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

Brad Livingston – 10/2/2015

1          ORAL AND VIDEOTAPED DEPOSITION OF BRAD LIVINGSTON,

2    produced as a witness at the instance of the Plaintiff, and

3    duly sworn, was taken in the above-styled and numbered cause on

4    the 2nd day of October, 2015, from 9:01 a.m. to 4:37 p.m.,

5    before Abigail Guerra, CSR, in and for the State of Texas,

6    reported by machine shorthand, before Honorable Keith Ellison,

7    at the United States District Courthouse, 515 Rusk, Houston,

8    Texas, pursuant to the Federal Rules of Civil Procedure and the

9    provisions stated on the record or attached hereto.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brad Livingston - 10/2/2015

```
1                    A P P E A R A N C E S

2

     FOR THE PLAINTIFF:
3         STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and
     STEPHANIE KINGREY, individually and independent administrator
4    of the Estate of LARRY GENE McCOLLUM

5    Mr. Jeff Edwards
     Mr. Scott Medlock
6    EDWARDS LAW
     1101 East 11th Street
7    Austin, Texas 78702
     Phone:  Phone:  (512) 623-7727
8

9    FOR THE DEFENDANTS:
          TEXAS DEPARTMENT OF CRIMINAL JUSTICE
10
     Ms. Cynthia L. Burton
11   Office of Attorney General
     300 W. 15th Street
12   7th Floor
     Austin, Texas 78701
13   Phone:  Phone:  (512) 463-2080

14   ALSO PRESENT:
          Mr. Kevin Schaefer
15        Ms. Ashley Palermo
          Ms. Kamilla L. Stokes
16        Judge Keith P. Ellison

17

18

19

20

21

22

23

24

25
```

**WRIGHT  WATSON  &  ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6669

Brad Livingston – 10/2/2015

```
 1                            INDEX

 2

 3   Appearances...........................................    3

 4   BRAD LIVINGSTON

 5        Examination by Mr. Edwards........................    6

 6   Signature and Changes................................  207

 7   Reporter's Certificate...............................  209

 8

 9

10                           EXHIBITS

11   NO. DESCRIPTION                                        PAGE

12   6    Correctional Managed Health Care Policy Manual      8
          Bates No. TDCJ030446 to 449
13
     7    "Comorbidities That May Affect Heat Tolerance       9
14        Bates No. TDCJ030458

15   8    Correctional Managed Health Care Policy Manual      9
          Effective Date:  10/30/2013
16        Bates Nos. TDCJ05530 to 537

17   9    Document Dated June 26, 2009                       52
          Bates Nos. TDCJ013583 to 84
18
     10   Guidelines for Completing the Health Summary for   71
19        Classification Form
          Bates Nos. TDCJ019152 to 55
20
     11   Health Summary for Classification                  71
21
     12   "Deadly Heat in Texas Prison"                     112
22
     13   ACA Standard Comment                              126
23
     14   Letter Dated August 12, 2011                      165
24        Bates No. 000008

25   15   Letter Dated August 16, 2011                      165
          Bates Nos. 000026 to 27
```

Brad Livingston - 10/2/2015

```
 1                     BRAD LIVINGSTON,
 2  having been first duly sworn, testified as follows:
 3                      EXAMINATION
 4  BY MR. EDWARDS:
 5      Q.   Thank you for being patient, Mr. Livingston.
 6               THE COURT:  You ready to proceed?
 7               MR. EDWARDS:  Thank you, Your Honor.  I'm trying
 8  to gather some thoughts.
 9               THE COURT:  Okay.
10      Q.   (BY MR. EDWARDS)  Sir, TDCJ operates in accordance
11  with heat stress policies, is that your understanding?  Or --
12  strike that.
13               Does TDCJ operate in accordance with heat stress
14  policies?
15      A.   We have a number of policies regarding heat stress,
16  both in terms of agency operating procedures and correctional
17  managed healthcare policies.  In addition to that, we utilize
18  the heat message in practice on our units.
19      Q.   Okay.  All right.  In those policies, do you identify
20  numerous risk factors that render inmates or prisoners
21  particularly vulnerable to heat stress.  I think it does, but
22  is that a "yes"?
23      A.   If I could take a look at the policy you're
24  referencing, I would appreciate it.
25      Q.   Sure.  Before you do, though, are you aware if a
```

Brad Livingston - 10/2/2015

1      A.   It would certainly depend on the specific
2  circumstances in the individual case, but it would be possible.
3      Q.   Okay.  Well, you know it's possible because you know
4  that you know that 20 people have died in your system -- at
5  least 20 people, since 1998, correct?  From heatstroke?
6             MS. BURTON:  Objection.  Assumes facts not in
7  evidence.
8             THE COURT:  I'll allow it.
9      A.   What -- in terms of your preparatory questions, I
10 think you referenced cardiovascular disease.  Certainly, that's
11 one vulnerability.  I'm not specifically knowledgeable about
12 all of those cases to know if they had -- they all had
13 cardiovascular disease as one of their conditions.
14     Q.   (BY MR. EDWARDS)  Okay.  Just so we're clear, you do
15 know, don't you, that 20 people have died of heatstroke,
16 confirmed heatstroke hypothermia, while housing in the Texas
17 prison system since 1998; is that correct?
18     A.   I'm specifically aware of the list of 10 offenders
19 who died in 2011, 2 who died in 2008, I believe; and 2 in 2012.
20     Q.   Are you aware of the people that have died before
21 that?
22     A.   I am aware of -- I've been made aware of their deaths
23 by virtue looking at a list.  I don't recall the exact numbers
24 on that list for the exact instances.
25     Q.   How were you made aware of Ricky Robertson heatstroke

Brad Livingston - 10/2/2015

1  death in July of 2004 at the Darrington Unit?

2      A.   Only by virtue of preparing for this deposition and

3  seeing -- I believe, seeing that listed -- seeing that death

4  listed on a list.

5      Q.   Just so I'm clear, prior to a week ago, you -- you

6  were never told about or were made aware about the death of

7  Ricky Robertson by hypothermia at the Darrington Unit?

8      A.   It would have been prior to more than a week ago, but

9  what year are you referencing his death?

10     Q.   2004, sir.

11     A.   I don't have a recollection of -- of being aware of

12  that specific death prior to the last few weeks.

13     Q.   Well, when you were told about the pattern of heat

14  deaths sometime in July or early August of 2011, did you ask,

15  "Hey, how many other people have died of heatstroke?"  To

16  anyone?

17     A.   Yes.  I had that discussion with Dr. Linthicum and

18  Rick Thaler.

19     Q.   Okay.  Did Rick Thaler tell you about any of the

20  deaths between 1998 and 2004?

21     A.   As I recall we had the discussion of prior years

22  back.  I can't tell you specifically if it went back to 2000 --

23  I can't recall if it went all the way back to '98.

24     Q.   All right.  So Mr. Thaler clearly told you about

25  prior deaths by heatstroke, you just don't have a specific

Brad Livingston - 10/2/2015

1   memory if it included the 1998 to 2004 deaths?

2       A.   Correct.

3       Q.   Okay.  You also had this conversation with Lannette

4   Linthicum, who is the director of Health Services?

5       A.   That's correct.

6       Q.   Do you recall her telling you about prior heatstroke

7   deaths before 2011?

8       A.   I recall --

9       Q.   During this meeting of July--

10      A.   I recall a discussion with her with respect to the

11  deaths, I believe, in 2008.  It may have been 2007.  I'm not

12  clear on the exact dates.

13      Q.   Yeah.

14      A.   Without the list in front of me.

15      Q.   Fair enough.

16           And is that a separate conversation from the

17  conversation you were talking about with Mr. Thaler and

18  Dr. Linthicum in late July early August, 2011?

19      A.   I don't recall, and I have ongoing discussions with

20  the -- with Dr. Linthicum and the correctional institution's

21  division director, irrespective of who it is.  I can't recall

22  exact conversation or whether they were both in my office at

23  the same time.  I don't think they were.  I think they were

24  individual and separate conversations.

25      Q.   Well, it's important for me to know, do you believe

Brad Livingston - 10/2/2015

```
 1  not responsible for specifically adhering to the policies and
 2  procedures that are -- that are established to -- to govern and
 3  guide our employees who, in fact, do deliver the operations day
 4  in and day out on our facilities.
 5      Q.   (BY MR. EDWARDS)  Okay.  But as the chief executive
 6  of the Texas Department of Criminal Justice, your job is to
 7  make sure that policies you have in place work, right?
 8      A.   My job through -- through the staff who work for me
 9  and who are tasked with the responsibility of making
10  recommendations, reviewing, and analyzing and studying the very
11  aspects of our -- of our operations, to include heat and heat
12  stress, my responsibility is to make sure that I have the right
13  team in place who, in fact, do handle these responsibilities,
14  both in terms of operationalizing the policies that are in
15  place and also making changes to and modifying policies when --
16  when it's necessary.
17      Q.   Okay.  Cardiovascular disease, sir, is, in fact, a
18  comorbidity that can affect heat tolerance, correct?
19      A.   Again, it's listed on this list; so I would think so.
20      Q.   The agency acknowledges that cardiovascular disease
21  is, in fact, a comorbidity that may affect heat tolerance?
22      A.   Yes, sir.
23      Q.   Likewise, the agency acknowledges that cirrhosis of
24  the liver is a comorbidity or condition that can affect heat
25  tolerance?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6675

Brad Livingston - 10/2/2015

1  reviewed both for the specifics for that particular case and

2  whether -- how it fits into the overall trend.  One of the

3  things that we have put in place after 2011 is every -- every

4  death during the summer months that is -- that appears to be in

5  any -- in any way, shape, or form anything other than an

6  accidental death, I won't get the exact term of art correct,

7  but there is an additional review of all deaths that occur

8  during that time frame so that we cast an especially wide net

9  to make sure that that everything is reviewed as -- as it

10  should be.

11      Q.   Well, wouldn't it be safer to have a policy in place

12  where all inmates over 65 were on wellness checks during the

13  summer months?

14      A.   I don't know.

15      Q.   Have you ever asked any of your medical providers or

16  health services team whether it would be safer to have

17  everybody on a wellness check?

18      A.   I have not.

19      Q.   Over 65 in the summer months?

20      A.   I have not asked that specific question.

21      Q.   Isn't that the job of the policy maker to ask those

22  questions, sir?

23      A.   I don't know.

24      Q.   You don't know if that's your job?

25      A.   I asked --

Brad Livingston - 10/2/2015

1       A.      What I'm -- what I'm testifying to is that I do not

2  know for sure that you can eliminate heatstroke deaths --

3  eliminate by reducing the heat.

4       Q.      Well, have you asked any medical provider that

5  question?

6       A.      Within the context of my dialogue with my senior

7  staff, specifically Dr. Linthicum, we have talked about a

8  variety of aspects of offender health, offender illness,

9  offender death, specifically as it relates to heat.  I'm not

10  sure I framed the question exactly as you've stated.

11      Q.      So that would be, no, you haven't asked any medical

12  provider if you could eliminate heatstroke deaths inside your

13  prison system by eliminating extreme heat?

14      A.      I believe I just answered that, but I've -- I've not

15  posed the question exactly as you've posed it.

16      Q.      Shouldn't you have posed that question a long time

17  ago to Lannette Linthicum or some other doctor?

18      A.      The questions I've posed to Dr. Linthicum are, I

19  believe, inclusive of open-ended questions that seek to clarify

20  and inform me as to what, if any, additional steps we, as an

21  agency, need to take, which gives her the broad latitude to

22  recommend any number of things to include reducing

23  temperatures.  So I believe that my questions were more

24  comprehensive and impactful than just the narrow language that

25  you've chosen in this question.  But to infer that I have not

Brad Livingston - 10/2/2015

1      A.   Again, the dialogue and discussions I've had with my

2   division director, specifically Bill Stephens and

3   Dr. Linthicum, have been expansive and open ended and broad,

4   which would have included the opportunity to have that

5   discussion.

6      Q.   Well, you always have the opportunity to have that

7   discussion.  Do you recall --

8      A.   Let me -- let me clarify.  The discussions and the

9   questions that I asked are broad and open ended such that the

10   division directors and the experts in this agency have had an

11   opportunity to recommend and to discuss with me the elements of

12   and contributions of air-conditioning in our facilities.  To

13   infer that I have not asked that question or other questions

14   again, I think is inaccurate.

15      Q.   Well, do you recall, specifically, posing questions

16   about how effective air-conditioning would be in terms of

17   eliminating all these heatstroke deaths that you've had?

18      A.   I've not posed the question exactly as you've framed

19   it.

20            MR. EDWARDS:  Could you get me the 2009 letter?

21      Q.   (BY MR. EDWARDS)  Sir, yesterday, I believe you

22   talked a lot about the unpredictable nature of the 2011 summer.

23   Am I accurately recalling your testimony?

24      A.   I believe what I've testified to is that it was a

25   record heat wave, that it was a record heat event, both in

Brad Livingston - 10/2/2015

```
 1  right?
 2      A.   Again, it would depend on the specific
 3  characteristics of the offender population that would be moved.
 4  It would depend on the size of the cohort.  There would be a
 5  variety of factors that would have to be considered to include
 6  the housing -- the housing decisions and needs of those
 7  offenders that would be displaced from the facilities that
 8  are -- that these offenders would be moved to.
 9      Q.   Sure.  Just a couple of more questions about this.
10           You move people if hurricanes are going to come
11  through, right?
12      A.   Depending on the circumstances and the details of --
13      Q.   During Hurricane Ike, you evacuated several prisons,
14  right?
15      A.   Yes, sir.
16      Q.   That was challenging logistically, right?
17      A.   I think that's a fair characterization.
18      Q.   You got it done, right?
19      A.   Yes, sir.
20           MR. EDWARDS:  Could you hand them that 2009
21  letter?
22      Q.   (BY MR. EDWARDS)  Sir, I want to move back to you
23  being updated about heat deaths of inmates.
24           MR. EDWARDS:  Yes, please.
25      Q.   (BY MR. EDWARDS)  And I'm going to hand you a
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6679

Brad Livingston - 10/2/2015

```
 1  document that was authored by Lannette Linthicum and sent to
 2  you.  I believe it's Exhibit 9.
 3                 THE COURT:  You're going to give it to the
 4  witness?
 5                 MR. EDWARDS:  Yes, please.
 6                 (Exhibit 9 marked.)
 7      Q.   (BY MR. EDWARDS)  Take a moment and look over that
 8  document.  When you've had sufficient time to review that
 9  document, would you please identify it for the jury and the
10  Court?
11      A.   Identify the document?
12      Q.   Yes, sir.
13      A.   This is a memo from Dr. Linthicum to myself dated
14  October 26, 2009, in reference to James Shriver, date of death
15  August 8, 2007.
16      Q.   Would you read the RE line please?
17      A.   Could I read the what?
18      Q.   The R-E, I call it the RE line, maybe the reference
19  line.
20      A.   Heat-related deaths, 2007 to present.
21      Q.   And would you read the date of that document?
22      A.   June 26th, 2009.
23      Q.   Did you read this document?
24      A.   Yes.
25      Q.   Did you read it around June 26th, 2009, or
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6680

53

Brad Livingston - 10/2/2015

1   thereabouts?

2       A.   I don't recall what day, but it would be consistent

3   with my habit to read memos from my division directors --

4       Q.   You think you read it --

5       A.   -- when they arrived to my office.

6       Q.   All right.  It looks look you've got two deaths

7   in 2007 where people died of hypothermia while they were

8   inside; is that correct?

9       A.   Correct.

10      Q.   Well, did you ask Dr. -- did you have a meeting with

11  Dr. Linthicum about this?

12      A.   Dr. Linthicum and I meet regularly and often.  I know

13  that we discussed this memo and its contents during one of our

14  meetings.

15      Q.   Okay.  Why did you limit it from 2007 to the present?

16  Why not include -- I don't know.  Why don't you go ten years

17  back?

18      A.   I was the recipient of this memo.  I don't recall

19  specifically the details surrounding Dr. Linthicum structuring

20  this memo to include only those 2007 deaths.

21      Q.   Did you ask her to prepare the memo, or did people in

22  your office ask her to prepare the memo, or did she just do

23  this on her own?

24      A.   I don't recall.

25      Q.   Who's Karen Hall?

Brad Livingston - 10/2/2015

```
1       A.   Okay.

2                 MS. BURTON:  Objection.  Sidebar.

3                 THE COURT:  The sidebar will not come into

4    trial.

5                 MR. EDWARDS:  I'll withdraw it.  That's fine.

6                 THE COURT:  Okay.

7       Q.   (BY MR. EDWARDS)  In 2009, you were actually made

8    aware of a type of individual who was vulnerable to heat death

9    on two occasions in 2007, correct?

10      A.   Through dialogue with my team and this memo, yes.

11      Q.   Okay.  Now this memo comes from Dr. Linthicum,

12   correct?

13      A.   That's correct.

14      Q.   Does she have the authority to on her own

15   air-condition any aspect of a housing unit?

16      A.   No.

17      Q.   Who else on your team were you discussing this with

18   in 2009?  Would that be Mr. Thaler?

19      A.   Mr. Thaler was the correctional institution's

20   director then, and the vast majority of my dialogue and

21   discussion about operations within our correctional

22   institutions would have been with him.

23      Q.   Would it have included his deputy, William Stephens?

24      A.   On occasion, but more regularly with Rick Thaler.

25      Q.   Okay.  And I trust -- did you talk about this with
```

Brad Livingston - 10/2/2015

1  died inside of hypothermia in 2009, 2010, or 2011?

2      A.   I don't recall what changed between those three

3  years.

4      Q.   Well, did you change anything about your policies

5  between 2007 and 2011?

6      A.   I can't recall specifically what changes may or may

7  not have occurred on those policies and practices during that

8  time frame.

9      Q.   Okay.  Well, you were made aware that two -- every

10  death is serious, right?  That's what you told me?

11      A.   Yes, sir.

12      Q.   Okay.  And Lannette Linthicum alerted you to a

13  problem that these people died because it was really hot inside

14  the prison system, right?

15      A.   I'm not sure this memo directly states that.  Let me

16  read it again.

17      Q.   Or to that effect?  I'm not asking you for a verbatim

18  recitation, but as the chief policy maker for the agency, isn't

19  that what this memo is telling you and the point of the memo?

20      A.   I would not immediately conclude that that was the

21  point of memo.

22      Q.   All right.  Well, what did you conclude was the point

23  of memo, sir?

24      A.   She was -- again, I don't recall the exact specifics

25  as to why this was memo was generated, whether I asked for it

Brad Livingston - 10/2/2015

```
 1       Q.   Well, would a fair characterization of this memo be
 2   that Dr. Linthicum is sounding the alarm about a potential
 3   problem with regards to inmates who have these vulnerabilities?
 4       A.   No.  That's not a fair characterization.
 5       Q.   She said, "Look even though these people died, we
 6   shouldn't make any changes"?
 7       A.   I wouldn't characterize that she said that either,
 8   specifically, in this memo.
 9       Q.   Well, you didn't make any changes as a result of this
10   memo, did you?
11            MS. BURTON:  Objection.  Assumes facts not in
12   evidence.
13            THE COURT:  Well, he just asked him whether
14   changes were made or not, and I think this witness is competent
15   to answer that.
16            MS. BURTON:  Well, I would ask that he look at
17   all the policies.
18            THE COURT:  He can look at anything he wishes
19   to.  Let's let him ask for it though, if...
20       A.   I don't recall all the specific elements of all the
21   policies surrounding this during that time frame.
22       Q.   (BY MR. EDWARDS)  Okay.  Is it -- do you know if any
23   sort of analysis has been done of the 20 documented hypothermia
24   deaths in the system as to how many of them were on mental
25   health or psychiatric medications?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6684

Brad Livingston - 10/2/2015

1    Q.    100 percent of the time, right?

2    A.    We strive for 100 percent success on a whole range of

3    things, particularly inmate safety.

4    Q.    Would you directly answer this question?  Inmate

5    safety is important 100 percent of the time; correct?

6    A.    That's correct.

7    Q.    Okay.  Assume that there's a form called a HSM-18,

8    okay, that has a variety of restrictions that can placed on

9    inmates.  Assume that to be correct.  Would it be within your

10   power, sir, as the executive director of the Texas Department

11   of Criminal Justice, to add an additional line to make it

12   easier for clinicians to recommend air-conditioned housing, if

13   you felt like it?

14   A.    It depends on if the form you're referencing is a

15   correctional managed healthcare or whether it's a TDCJ form.  I

16   think it's important to note that even if it's within my power

17   to add a line for check off, it would be foolish to assume that

18   I ought to end, you know -- fashion in the corner office to

19   devise myself what the policies and procedures ought to be for

20   operations on our facilities.  My expectation is, and our

21   practice is, that the number of multidisciplines are included

22   in the process of policy making and the right proponents within

23   the agency, all of whom have direct operating experience and

24   expertise, play a role in developing our policies and

25   procedures.  It would be, I believe, both ineffective and

Brad Livingston - 10/2/2015

```
 1  inappropriate for me just to simply dictate a certain element
 2  be either removed or included on our operating policies, even
 3  if I have the specific power to do so.
 4       Q.   You don't believe that if you are given information
 5  which would dictate the need for an additional policy, that you
 6  should do that, sir?
 7       A.   That's a different question than you previously asked
 8  me that -- and that I answered.
 9       Q.   Why don't you answer that one, sir?
10       A.   Repeat it, please.
11            MR. EDWARDS:  Abby, would you please ask the
12  question to Director Livingston?
13            (Requested portion read back.)
14       A.   Okay.  This particular question, unless you expect me
15  to devise the policy in my office, the way I would respond to
16  this question is that, clearly, if I'm given information that
17  would necessitate the creation of a new policy, I would have,
18  and do have, dialogue and discussion with my staff, and then
19  the right cohort of individuals within our agency from
20  multidisciplines and multifunctions would begin that effort,
21  but more practically and more regularly, those individuals who
22  are in our agency working on the front lines, working on our
23  units, managing and leading our units, and supervising those
24  who do so, are proactive in the process as it relates to policy
25  adjustment, policy modification, and policy creation, is
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6686

Brad Livingston - 10/2/2015

1  handled from the bottom up in that respect by those staff who

2  have responsibility of carrying them out.  But, yes, I would be

3  involve and am involved as it relates to having discussion with

4  staff about, again, the general parameters of what we do.

5        Q.   (BY MR. EDWARDS)  If you wanted to, sir, add a line

6  to a housing recommendation form, you could do so, but you're

7  choosing not to, correct?

8        A.   Given the narrow parameters of that question, yes.

9        Q.   Okay.  You ever had a conversation about the dangers

10  of heat with Kyle Janek?

11        A.   I don't recall that I have.

12        Q.   You ever had a conversation about the deaths in the

13  Texas prison system with Kyle Janek?

14        A.   I don't recall that I have.

15        Q.   You ever have a conversation with anybody on the

16  CMHCC board about the deaths by heatstroke in the Texas prison

17  system?

18        A.   Two of the individuals who I rely on regularly are --

19  are regular participants on correctional managed healthcare

20  board and meetings, Dr. Linthicum and Bryan Collier, deputy

21  executive director.  I have multiple and ongoing conversations

22  with both of them, Bryan Collier, in particular, on a broad

23  range of topics more extensively than in healthcare, and I also

24  know just by in daily practice in terms of how we manage and

25  lead, that Bryan Collier has much more frequent and ongoing

Brad Livingston - 10/2/2015

1    Q.   Sure.

2    A.   -- I had in front of me yesterday includes a more

3 comprehensive list of those changes.

4    Q.   Well, is it -- is the biggest one, the most important

5 one from your perspective, the wellness checks or are they all

6 just the same?

7    A.   I wouldn't say they're all just the same.  I'm not

8 sure I would characterize the wellness check as the most

9 important.  I think it's a very significant addition to our

10 process, particularly as relates to those wellness checks and

11 the identification of --

12    Q.   What is your understanding?

13    A.   -- at our intake facilities.

14    Q.   When you say "intake facilities," do you mean

15 transfer facilities?

16    A.   Not all of our transfer facilities are set up to be

17 intake facilities for the processing of offenders coming into

18 our system, but I believe it's fair to say that most of our

19 intake facilities are also transfer facilities.

20    Q.   Okay.  And what you're -- okay.  We're talking -- the

21 Gurney Unit is a transfer facility?

22    A.   That's correct.

23    Q.   The Hutchins Unit is transfer facility?

24    A.   The Hutchins Unit is a state jail.

25    Q.   Is it also a transfer facility, sir?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6688

Brad Livingston - 10/2/2015

1      A.    It's designated as state jail.  Our state jails

2  oftentimes house transfer offenders as well.

3      Q.    So would that be:  Yes, it is also a transfer

4  facility?

5      A.    Yes.

6      Q.    Garza West and Garza East, those are both transfer

7  facilities?

8      A.    Correct.  One of the two of them is an intake

9  facility.

10     Q.    Okay.  Before 2012, inmates weren't placed on

11 wellness checks until they had their intake physical; is that

12 correct?  Or do you know?

13     A.    I don't recall specifically the timing of all those

14 intake activities or when they are identified for a list.  I

15 know we have moved upstream, so to speak, so that offenders are

16 assessed even before they exit the bus upon arrival at our

17 system.

18     Q.    A --

19     A.    I would have to refer to our documents as to whether

20 that was in place in 2012 or not.

21     Q.    Okay.  How many people died -- are you aware of died

22 at Gurney Unit from heatstroke due to environmental conditions

23 inside?

24     A.    I can't speak to whether they died to heatstroke due

25 to the environmental conditions inside.  I believe through the

Brad Livingston - 10/2/2015

1  in 2011, it's not unreasonable to do so.

2      Q.   Well, I think it's more than not unreasonable to do

3  so.  Let me withdraw that.

4          Anything preventing you from having a procedure

5  in place to notify your board of heatstroke deaths in the Texas

6  prison system?

7      A.   Not that I'm aware of, no.

8      Q.   That's your decision, right?

9      A.   It would ultimately be, I'm sure.

10     Q.   You didn't notify them in 2009 despite Sylvester

11 Turner asking for update about heat-related deaths, to your

12 knowledge?

13     A.   I don't recall.

14     Q.   This is:  Should you have?

15     A.   I thought you asked me if I did.

16          (Simultaneous cross-talk.)

17     Q.   (BY MR. EDWARDS)  It was a follow-up question.  I

18 know you didn't.  Now my question is:  Should you have notified

19 your board in 2009 about these confirmed heatstroke deaths?

20     A.   Again --

21     Q.   And if you don't think you should have, then say so.

22          THE COURT:  Just a second.  Let him finish his

23 answer.

24          MR. EDWARDS:  Sorry.

25     A.   With the benefit of hindsight, particularly with the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6690

Brad Livingston - 10/2/2015

1  benefit of the events in 2011, I wouldn't take issue with the

2  assumption that it would make sense to do so.  What you're

3  asking me is with -- whereas I'm interpreting the question:

4  Should I have at the time?  At the time, they appeared to be

5  isolated incidents.  They appeared not to be, from my

6  perspective when I look at the entirety of the system, which

7  is -- which is important, it would not have appeared to be the

8  type of incident that I would automatically pick up the phone

9  and notify the board chair.

10              What I don't know, again, without checking our

11  documents and with staff is, what all is included in our

12  notification of the board for incidents on our facilities.

13      Q.    (BY MR. EDWARDS)  How many homicides do you have in a

14  given summer?

15              THE COURT:  Within the prison system at large?

16              MR. EDWARDS:  Thank you, sir, yes.

17      Q.    (BY MR. EDWARDS)  Within the prison system at large.

18      A.    I'm not sure I could answer that within the summer.

19  I know with respect to a given year.  Some years it would be 0.

20  Some years it would be 1, 2, 3, and some --

21              THE COURT:  What's the highest it's ever been?

22              THE WITNESS:  I believe one year we had 10 or

23  12.  I would have to refer back to our historical documents to

24  recall the exact number, but, ordinarily, it would be in single

25  digits.

Brad Livingston - 10/2/2015

1      Q.    (BY MR. EDWARDS)   I take it you've never had 10 in a

2   three-month -- one-month period, right?

3      A.    I would hesitate to say that we never have.

4   Certainly, during my tenure we have not.

5      Q.    Have you ever had 2 at the same prison in a ten-day

6   period?

7      A.    I don't recall.

8      Q.    Those deaths in 2007 that you were notified about,

9   they were at the same unit, weren't they?

10     A.    I believe that's right.   The Byrd Unit.

11     Q.    That Byrd Unit is a transfer facility, right?

12     A.    That's correct.

13     Q.    And you spoke yesterday about the well-known danger

14   and "well known" is my word, so if you take issue with it,

15   please let me know.

16              You spoke yesterday of well-known danger in

17   terms of vulnerable inmates acclimating to heat.   Okay.   Do you

18   recall talking about acclimation yesterday?

19     A.    I recall talking about acclimation the and potential

20   danger heat stress poses.

21     Q.    Okay.   It's well known, and certainly you've known

22   prior to 2007 let's say, that inmates who are vulnerable to

23   heat stress are particularly vulnerable during periods of

24   acclimating to the higher temperatures, correct?

25     A.    In the absence of mitigation efforts, correct.

Brad Livingston - 10/2/2015

```
1    Q.   Sure.

2              What mitigation efforts, prior to the deaths in

3    2011 -- or prior to the first death in 2011, did you have in

4    place that were specific to inmates and transfer facilities who

5    you knew to have trouble acclimating to the high temperatures?

6    A.   Our practices, processes, and procedures during that

7    time frame are certainly documents that are included in what we

8    have provided for this deposition.  I can't speak specifically

9    to those items, but I also know that our processes and

10   procedures and practices in place at that time are focused

11   certainly on recognizing the symptoms of heatstroke and/or heat

12   illness and delivering access to Health care.

13             We have made changes in our practices and

14   procedures over the course of the last several years which are

15   delineated in one of the documents in exhibit here.  I can't

16   tell you specifically what --

17   Q.   Can you tell me --

18   A.   -- what we had in place or have in place with respect

19   to that -- transfer facilities in general.

20   Q.   Can you tell me a single precautionary measure that

21   -- well -- strike that.

22             It seems to me, sir, the precautionary measures

23   that you have in place from 2004 until up the summer of 2011

24   were geared towards everyone, without special thought towards

25   to people who are acclimating in transit facilities; is that
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6693

Brad Livingston - 10/2/2015

1  fair?

2      A.   I'm not sure I would agree with that statement.  I

3  know -- certainly, it's important to provide -- or mitigation

4  efforts for everyone in a given housing area.  I know that we

5  have paid attention to and -- identified offenders that have

6  medical conditions during the course of the intake process.

7  Again, I can't tell you exactly at what point in that intake

8  process that occurred or -- or back in that time frame or

9  specifically what occurs or the day it occurs at now.  I know

10 we have accelerated the review of -- the medical review of

11 assessment of offenders as they are processed into our

12 facilities.

13     Q.   Can you name a single precautionary measure that was

14 geared towards people you knew to be danger, including the

15 types of inmates you know to be vulnerable and who were

16 especially vulnerable in the transit facilities while trying to

17 acclimate to the heat, can you name a single precautionary

18 measure that was specifically geared towards those individuals?

19     A.   Without looking at those policies and practices and

20 procedures, I would -- I would not recall.

21     Q.   Okay.  Do you know how many of the ten people that

22 you acknowledge died in the summer of 2011, died in transit

23 facilities shortly after they arrived?

24     A.   I would have to look at a complete list to know, but

25 I know several of them did.

Brad Livingston - 10/2/2015

```
 1      Q.   Is that your objective?  To obtain zero deaths by
 2  heatstroke?  Is that what you're trying to do with your
 3  mitigation measures?
 4      A.   Our -- excuse me -- our objective is, again, to take
 5  the necessary steps with respect to our mitigation practices,
 6  to keep the offender population safe from a systemic
 7  perspective.
 8      Q.   You have the ability, don't you, sir, to keep the
 9  offender population safe from the dangers of extreme heat if
10  you move them out of the heat, right?
11      A.   Could you repeat the question, please.
12          MR. EDWARDS:  Abby, would you repeat my question
13  for Director Livingston, please.
14              (Requested portion read back.)
15      A.   Again, it would certainly be a mitigation step.  I
16  wouldn't disagree with that.
17      Q.   (BY MR. EDWARDS)  Would it be a more effective and
18  better mitigation step than what you've got currently?
19      A.   I don't know.
20      Q.   Would it have been a better and more effective
21  mitigation step than what you had in effect before the summer
22  of 2011?
23      A.   Again, as I've -- as I've testified, we had a record
24  heat event in 2011 and had made a substantial number of changes
25  to our protocols and practices since then.  We had a long
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6695

Brad Livingston - 10/2/2015

1  Obviously 2011 trumped the all of the history.

2      Q.   Let's go through it again then, because I thought you

3  didn't know.

4           2007 was not a record heat event, correct?

5  According to the staff members you consulted with?

6      A.   Okay.  What I don't know is whether at the time it

7  was.  Okay.  I don't -- I don't recall whether at the time in

8  2007 that particular year was a record at the time.  I think

9  with the benefit of hindsight and the benefit of passage of

10  time, we now know that 2011 was hotter than those other years.

11  I simply don't know.

12      Q.   If you don't know, that's fine.  But you've given

13  some conflicting -- I want to know for sure.

14      A.   Within the context of the last -- within the context

15  of the last several weeks and months, I've come to learn from

16  my staff that 2011 was a record heat event and hotter than

17  those other years that we've been discussing.

18      Q.   Okay.  Who from your staff made you aware of that --

19  that contention?  You've come to learn in the last couple of

20  months that 2011 was a record heat event.  Who made you aware

21  of that?

22      A.   I can't -- I can't recall exactly who made me aware

23  of that.  I know, you know, as in my preparations for this

24  deposition.

25      Q.   Other than your lawyers, can you name a single person

Brad Livingston - 10/2/2015

1  position can and should use is to have an ongoing network of

2  peers who you discuss a variety of things with a variety of

3  topics with -- which, in fact, I do.  I'm very active in the

4  Association of State Correctional Administrators, which is, in

5  fact, the organization for those who hold my position in all 50

6  states and a number of the largest jail systems in the country.

7  We cover a variety of topics and have done so for many years.

8      Q.   Have you ever spoken to them about the situation you

9  had to deal with in 2007 with regard to the heat related deaths

10  at the Byrd Unit?

11      A.   I don't recall specifically having a discussion about

12  the 2007 deaths at the Byrd Unit.

13      Q.   Do you recall ever having discussion with these

14  administrators about the deaths in 2011?

15      A.   I recall having discussions with a number of

16  administrators about the topic of heat-related illnesses and

17  then challenges, approaches, and best practices throughout the

18  country with some of my peers, yes.

19      Q.   Which ones?

20      A.   I don't recall off the top of my head.  Again, those

21  meetings include -- everyone's invited to the meetings.  They

22  don't always -- you don't always know who's there.  I can't

23  remember over the years who I've had certain discussions with

24  on this specific topic or others.

25      Q.   Well, if I represent to you that it's my

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6697

Brad Livingston - 10/2/2015

1  understanding that the State of Arkansas air-conditions its

2  prisons, is there anything stopping you from contacting them

3  and finding out how they manage to do that?

4      A.   No.

5      Q.   Could you take a look at --

6           MR. EDWARDS:  David, would you hand that exhibit

7  out?

8      Q.   (BY MR. EDWARDS) I'm going to show you an ACA

9  standard comment, sir, and I'd like you to take a moment to

10 review it.  In particular, I'm going to ask you about No.

11 4.4153, and that's the only one on that page I'm going to ask

12 you about.  At least I think so.

13     A.   Tell me, again, which one you're going to ask about.

14     Q.   4.4153.

15          (Exhibit 13 marked.)

16     A.   Okay.

17     Q.   (BY MR. EDWARDS)  Looks like as of -- as of 2012 that

18 according to the ACA standards, "Temperatures in indoor living

19 and work areas should be appropriate to the summer and winter

20 comfort zones."

21          Do you see that?

22     A.   Yes, sir.

23     Q.   And then under there is a comment which says,

24 "Temperatures should be capable of being mechanically raised or

25 lowered to an acceptable comfort level."

Brad Livingston - 10/2/2015

```
 1                 Do you see that?
 2      A.    I do.
 3      Q.    Did I accurately read that statement?
 4      A.    I believe so.
 5      Q.    Would you agree that many of the Texas prisons do not
 6  follow that standard?
 7      A.    My hesitancy in agreeing with you on that is the
 8  context of a single page taken out of the entire book.  What I
 9  don't know is if this is in relation to new construction, for
10  example, or if it's in relation to all of -- all of the
11  standards.  What I can say is that the standards -- the
12  accreditation process within ACA has a very small number of
13  voluntarily or discretionary standards in a significant and a
14  number of other standards, which are mandatory.  And as I
15  understand it, in order to be accredited, you have 100 percent
16  compliance with those that are mandatory, and to the best of my
17  recollection, 90 percent compliance with the ones that are
18  non-mandatory, and all of our facilities in Texas, in the Texas
19  Department of Criminal Justice are -- are accredited.  So by
20  virtue of that -- and we have been reaccredited many times in
21  most cases.  So by virtue of that, I can only conclude that we
22  are in overall compliance with ACA standards.  Again, without
23  having a context of the entire book here, I can't speak
24  specifically to this.
25                 MR. EDWARDS:  Let me object as nonresponsive.
```

Brad Livingston - 10/2/2015

1      Q.    In the non air-conditioned area, correct?

2      A.    In some of the housing areas that I'd been into, it's

3  fair to say that they have been hot.

4      Q.    And those would be the housing areas that -- even the

5  housing areas that you may not even recall being into, based on

6  your acknowledge of the ones that you've been in, you've

7  acknowledged you were well aware prior to summer of 2011 that

8  the housing areas that weren't air conditioned were hot during

9  the summer, fair?

10     A.    They can be.

11     Q.    Well, let me ask my question again then.  Prior to

12  the summer of 2011, based on your experience in many of the --

13  visiting many of the units and experiencing visiting the units

14  non air-conditioned housing areas during the summer months,

15  would you agree with me that housing areas in non

16  air-conditioned facilities are often hot during the summer?

17     A.    Yes.

18     Q.    And you knew that that heat posed a danger to the

19  inmates that you had to adopt measures to protect them from,

20  correct?

21     A.    I'm aware of potential dangers that require ongoing

22  mitigation activities and policies and procedures.

23     Q.    Did you discuss with Mr. Thaler or Mr. Stephens the

24  purchase of swine barns?

25     A.    No.

Brad Livingston - 10/2/2015

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3   STEPHEN McCOLLUM and SANDRA    )
     McCOLLUM, individually, and    )
 4   STEPHANIE KINGREY,             )
     individually and independent   )
 5   administrator of the Estate    )
     of LARRY GENE McCOLLUM         )
 6                                  )    CIVIL ACTION NO.
     VS.                            )      4:14-cv-3253
 7                                  )      JURY DEMAND
                                    )
 8   BRAD LIVINGSTON, JEFF          )
     PRINGLE, RICHARD CLARK,        )
 9   KAREN TATE, SANDREA SANDERS,   )
     ROBERT FASON, the UNIVERSITY   )
10   OF TEXAS MEDICAL BRANCH and    )
     the TEXAS DEPARTMENT OF        )
11   CRIMINAL JUSTICE               )

12

13

14

15

16

17  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

18                  REPORTER'S CERTIFICATION
                 DEPOSITION OF BRAD LIVINGSTON
19                     October 2, 2015
                         VOLUME 2
20

21  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6701

Brad Livingston - 10/2/2015

```
 1          I, ABIGAIL L. GUERRA, Certified Shorthand Reporter,

 2   in and for the State of Texas, hereby certify to the following:

 3          That the witness, BRAD LIVINGSTON, was duly sworn by

 4   the officer and that the transcript of the oral deposition is a

 5   true record of the testimony given by the witness;

 6          I further certify that pursuant to Federal Rules of

 7   Civil Procedure (30)(e)(1)(A) and (B) as well as Rule

 8   (30)(e)(2) that the signature of the deponent:

 9          I further certify that pursuant to FRCP Rule

10   30(f)(1) that the signature of the deponent:

11

12          _X__ was requested by the deponent or a party before

13   the completion of the deposition and that signature is to be

14   before any notary public and returned within 30 days from date

15   of receipt of the transcript.

16      If returned, the attached Changes and Signature Page

17   contains any changes and the reasons therefore:

18

19          ____ was not requested by the deponent or a party

20   before the completion of the deposition.

21

22          That $_____ is the deposition

23   officer's charges for preparing the original deposition

24   transcript and any copies of exhibits, charged to STEPHEN

25   McCOLLUM and SANDRA McCOLLUM, individually, and STEPHANIE
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6702

Brad Livingston - 10/2/2015

```
 1    KINGREY, individually and independent administrator of the

 2    Estate of LARRY GENE McCOLLUM, individually and on behalf of

 3    those similarly situated;

 4

 5              That pursuant to information given to the deposition

 6    officer at the time said testimony was taken, the following

 7    includes all parties of record:

 8    FOR THE PLAINTIFFS:
            STEPHEN McCOLLUM and SANDRA McCOLLUM, individually, and
 9    STEPHANIE KINGREY, individually and independent administrator
      of the Estate of LARRY GENE McCOLLUM
10
      Mr. Jeff Edwards
11    Mr. Scott Medlock
      EDWARDS LAW
12    1101 East 11th Street
      Austin, Texas 78702
13    Phone:  (512) 623-7727

14       - and -

15    Mr. Michael Singley
      Mr. David James
16    THE SINGLEY LAW FIRM, PLLC
      4131 Spicewood Springs Road
17    Suite O-3
      Austin, Texas 78759
18    Phone:  (512) 334-4302

19
      FOR THE DEFENDANT:
20          TEXAS DEPARTMENT OF CRIMINAL JUSTICE

21    Ms. Cynthia L. Burton
      Mr. Matthew Greer
22    OFFICE OF ATTORNEY GENERAL
      300 W. 15th Street
23    7th Floor
      Austin, Texas 78701
24    Phone:  Phone:  (512) 463-2080

25       - and -
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
08989e93-e7a6-40ed-b160-1071899ffbb3

Plaintiffs' MSJ Appx. 6703

Brad Livingston - 10/2/2015

```
 1  Ms. Sharon Felfe Howell
    TEXAS DEPARTMENT OF CRIMINAL JUSTICE - GENERAL COUNSEL
 2  209 West 14th Street
    Suite 500
 3  Austin, Texas 78711
    Phone: (512) 463-9899
 4

 5  FOR THE WITNESS:
         UTMB
 6
    Ms. J. Lee Haney
 7  Ms. Shanna Molinare
    Office of Attorney General
 8  300 W. 15th Street
    7th Floor
 9  Austin, Texas 78701
    Phone:  (512) 463-2080
10
         - and -
11
    Mr. Graig J. Alvarez
12  Ms. Kara Stauffer Philbin
    FERNELIUS ALVAREZ SIMON, PLLC
13  Lyondell Basell Tower
    1221 McKinney Street
14  Suite 3200
    Houston, Texas 77010
15  Phone:  (713) 654-1200

16

17

18

19

20         I further certify that I am neither attorney, nor

21  counsel for, nor related to, nor employed by any of the parties

22  or attorneys to the action in which this deposition was taken;

23         Further, I am not a relative, nor an employee of any

24  attorney of record in this cause, nor am I financially or

25  otherwise interested in the outcome of the action.
```

Brad Livingston - 10/2/2015

```
1              Certified to by me this 16th day of October, 2015.

2

3

4

5

6                          _____
                           ABIGAIL GUERRA, Texas CSR 9059
7                          Expiration Date:  12/31/15
                           WRIGHT WATSON & ASSOCIATES
8                          Firm Registration No. 225
                           Expiration Date:  12-31-15
9                          1250 S. Capital of Texas Highway
                           Building 3, Suite 400
10                         Austin, Texas 78746
                           512-474-4363/512-474-8802 (fax)
11                         www.wrightwatson.com

12   Job No. 151002AG

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Plaintiffs' MSJ Appx. 6705

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 284

Major Matthew McClarin - 7/14/2015

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                     HOUSTON DIVISION

KEITH COLE, JACKIE BRANNUM,      )
RICHARD KING, DEAN ANTHONY,      )
MOJICA, RAY WILSON, FRED         )
WALLACE, AND MARVIN RAY          )
YATES, individually and on       )
behalf of those similarly        )       CIVIL ACTION NO.
situated,                        )         4:14-cv-1698
                                 )
              Plaintiffs,        )
                                 )
                                 )
v.                               )
                                 )
                                 )
BRAD LIVINGSTON, in his          )
official capacity, ROBERTO       )
HERRERA, in his official         )
capacity, and TEXAS              )
DEPARTMENT OF CRIMINAL           )
JUSTICE,                         )
                                 )
              Defendants.        )
```

*************************************************************

ORAL DEPOSITION OF

MAJOR MATTHEW MCCLARIN

July 14, 2015

Volume 1

*************************************************************

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

Plaintiffs' MSJ Appx. 6707

Major Matthew McClarin - 7/14/2015

1          ORAL DEPOSITION OF MAJOR MATTHEW MCCLARIN, produced

2   as a witness at the instance of the Plaintiffs, and duly sworn,

3   was taken in the above-styled and numbered cause on the 14th

4   day of July, 2015, from 10:29 a.m. to 5:38 p.m., before Abigail

5   Guerra, CSR, in and for the State of Texas, reported by machine

6   shorthand, at the Wallace Pack Unit, 2400 Wallace Pack Road,

7   Navasota, Texas, pursuant to the Federal Rules of Civil

8   Procedure and the provisions stated on the record or attached

9   hereto.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Major Matthew McClarin - 7/14/2015

```
1                   A P P E A R A N C E S

2

   FOR THE PLAINTIFFS:
3      KEITH COLE, JACKIE BRANNUM, RICHARD KING, DEAN ANTHONY,
   MOJICA, RAY WILSON, FRED WALLACE, AND MARVIN RAY YATES,
4  individually and on behalf of those similarly situated,

5  Mr. Scott Medlock
   EDWARDS LAW
6  1101 East 11th Street
   The Haehnel Building
7  Austin, Texas 78702
   Phone:  (512) 623-7727

8

9  FOR THE WITNESS AND DEFENDANT:
       MAJOR MATTHEW MCCLARIN AND TEXAS DEPARTMENT OF CRIMINAL
10 JUSTICE

11 Ms. Cynthia L. Burton
   Mr. Matthew J. Greer
12 OFFICE OF ATTORNEY GENERAL
   300 West 15th Street
13 7th Floor
   Austin, Texas 78701
14 Phone:  (512) 463-8020

15

   ALSO PRESENT:
16     Mr. Cody Ginsel, TDCJ Director
       Ms. Debra Allison, Pack Unit Risk Manager
17     Ms. Jennifer L. Daniel
       Mr. Roberto Herrera

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
d7ed815e-dfd2-436d-bfd1-cc0a81c92c82

Plaintiffs' MSJ Appx. 6709

Major Matthew McClarin - 7/14/2015

```
 1                            INDEX

 2

 3   Appearances..........................................    3

 4   MAJOR MATTHEW MCCLARIN

 5        Examination by Mr. Medlock                        13

 6        Examination by Ms. Burton                        177

 7        Examination by Mr. Medlock                       179

 8        Examination by Ms. Burton                        181

 9        Examination by Mr. Medlock                       181

10   Signature and Changes................................  188

11   Reporter's Certificate...............................  190

12

13

14                          EXHIBITS

15   NO. DESCRIPTION                                      PAGE

16   1    Defendants' Response to Plaintiffs' July 10, 2015   13
          Amended Notice to Take 30(B)(6) Depositions
17
18   2    Defendants' Response to Plaintiffs' July 10, 2015   13
          Amended Notice to Take 30(B)(6) Depositions Dated
          February 11, 2015
19
20   3    Defendants Herrera, Livingston, and Texas           71
          Department of Criminal Justice First Supplemental
          Response Dated November 17, 2014 to Plaintiffs'
21        First Set of Interrogatories
22   4    Diagram                                             86
23   5    Pack I Building Schedule Master Chronological        93
          Listing Updated 05/09/2014
24
25   6    Correctional Managed Healthcare Policy Manual       156
          Dated 8/21/2014
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
d7ed815e-dfd2-436d-bfd1-cc0a81c92c82

Major Matthew McClarin - 7/14/2015

1      Q.    And how -- when does lunch typically end?

2      A.    Typically, if it starts at 10:00, it's around --

3   before that count -- well, see the count starts at 12:30.  We

4   will have lunch done before 12:30.  We will not -- unless

5   there's stipulation.

6      Q.    Something happens?

7      A.    Something happens.

8      Q.    12:30 to when supper ends at 1600 or 4:00 p.m., is

9   the chow hall being used for anything aside from clean up, the

10  inmate workers eat their meals?  Anything else going on there?

11     A.    That -- that's it.

12     Q.    And what time does supper usually end?

13     A.    Supper is usually done before 6:00, unless their

14  counts, you know, unless there's some -- some area that takes

15  longer, but usually between 6:00 to 6:15 time, but way before

16  that 6:30 count they're done.  They will not start counting

17  until the meal is done.

18     Q.    Okay.

19     A.    That's kind of your buffer zone is they'll have

20  everything done before the counts.

21     Q.    Sure.  Okay.  Okay.

22           Major, is there any -- well let me -- okay.

23           Major, is there any security reason why the

24  armory at the Pack Unit is air-conditioned?

25           MR. GREER:  That's not --

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d7ed815e-dfd2-436d-bfd1-cc0a81c92c82

Plaintiffs' MSJ Appx. 6711

Major Matthew McClarin - 7/14/2015

1          MS. BURTON:  It is -- it's outside -- I'm going
2    to object.  It's outside his 30(b)(6) notice.
3          You can answer if you know, but not speaking for
4    TDCJ, just if you know.
5      Q.   (BY MR. MEDLOCK)  Answer the question if you know.
6      A.   Oh, I can answer the question.  Again, it's outside
7    our compound, our armory.  It's away from -- no inmates have
8    any type of access to our armory at all for any reason at all.
9    Also, we have, based on our equipment that we have in the
10   armory with our chemical agents that we have, with our
11   ammunition, with our guns that we store, we try to have that
12   placed with some sort of AC to make sure that it doesn't
13   overheat or get too hot, and then we have an explosion -- an
14   unnecessary explosion.
15     Q.   Make sure the weapons keep functioning.  Is that
16   fair?
17     A.   Yes.
18     Q.   Is there -- is there officers stationed at the
19   armory?
20     A.   There's an officer that's assigned to the armory.
21     Q.   One of the things you need staff for at the Pack Unit
22   is supervising inmate movement?  Is that a fair statement?
23     A.   Yes.
24     Q.   Is it fair to say that security is also a concern
25   when inmates are being moved around?

Major Matthew McClarin - 7/14/2015

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   KEITH COLE, JACKIE BRANNUM,     )
     RICHARD KING, DEAN ANTHONY,     )
 4   MOJICA, RAY WILSON, FRED        )
     WALLACE, AND MARVIN RAY         )
 5   YATES, individually and on      )
     behalf of those similarly       )      CIVIL ACTION NO.
 6   situated,                       )         4:14-cv-1698
                                     )
 7                Plaintiffs,        )
                                     )
 8                                   )
     v.                              )
 9                                   )
                                     )
10   BRAD LIVINGSTON, in his         )
     official capacity, ROBERTO      )
11   HERRERA, in his official        )
     capacity, and TEXAS             )
12   DEPARTMENT OF CRIMINAL          )
     JUSTICE,                        )
13                                   )
                 Defendants.         )
14

15
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
16              REPORTER'S CERTIFICATION
            DEPOSITION OF MAJOR MATTHEW MCCLARIN
17                    July 14, 2015
                       VOLUME 1
18
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
19

20            I, ABIGAIL L. GUERRA, Certified Shorthand Reporter,

21   in and for the State of Texas, hereby certify to the following:

22            That the witness, MAJOR MATTHEW MCCLARIN, was duly

23   sworn by the officer and that the transcript of the oral

24   deposition is a true record of the testimony given by the

25   witness;
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
d7ed815e-dfd2-436d-bfd1-cc0a81c92c82

Plaintiffs' MSJ Appx. 6713

Major Matthew McClarin - 7/14/2015

1    I further certify that pursuant to Federal Rules of

2  Civil Procedure (30)(e)(1)(A) and (B) as well as Rule

3  (30)(e)(2) that the signature of the deponent:

4    I further certify that pursuant to FRCP Rule

5  30(f)(1) that the signature of the deponent:

6

7    __X__ was requested by the deponent or a party before

8  the completion of the deposition and that signature is to be

9  before any notary public and returned within 30 days from date

10 of receipt of the transcript.

11   If returned, the attached Changes and Signature Page

12 contains any changes and the reasons therefore:

13

14    ____ was not requested by the deponent or a party

15 before the completion of the deposition.

16

17    That $_____ is the deposition

18 officer's charges for preparing the original deposition

19 transcript and any copies of exhibits, charged to PLAINTIFFS

20 KEITH COLE, JACKIE BRANNUM, RICHARD KING, DEAN ANTHONY, MOJICA,

21 RAY WILSON, FRED WALLACE, AND MARVIN RAY YATES, individually

22 and on behalf of those similarly situated;

23

24    That pursuant to information given to the deposition

25 officer at the time said testimony was taken, the following

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
d7ed815e-dfd2-436d-bfd1-cc0a81c92c82

Plaintiffs' MSJ Appx. 6714

Major Matthew McClarin - 7/14/2015

1  includes all parties of record:

2  FOR THE PLAINTIFFS:
        KEITH COLE, JACKIE BRANNUM, RICHARD KING, DEAN ANTHONY,
3  MOJICA, RAY WILSON, FRED WALLACE, AND MARVIN RAY YATES,
   individually and on behalf of those similarly situated,
4            Mr. Jeff Medlock
             EDWARDS LAW
5            1101 East 11th Street
             The Haehnel Building
6            Austin, Texas 78702
             Phone:  (512) 623-7727
7
   FOR THE WITNESS AND DEFENDANT:
8      TEXAS DEPARTMENT OF CRIMINAL JUSTICE

9            Ms. Cynthia L. Burton
             OFFICE OF ATTORNEY GENERAL
10           300 West 15th Street
             7th Floor
11           Austin, Texas 78701
             Phone:  (512) 463-2080

12

13

14           I further certify that I am neither attorney, nor

15  counsel for, nor related to, nor employed by any of the parties

16  or attorneys to the action in which this deposition was taken;

17           Further, I am not a relative, nor an employee of any

18  attorney of record in this cause, nor am I financially or

19  otherwise interested in the outcome of the action.

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

d7ed815e-dfd2-436d-bfd1-cc0a81c92c82

Major Matthew McClarin – 7/14/2015

1          Certified to by me this 29th day of July, 2015.

2

3          _____
           ABIGAIL GUERRA, Texas CSR 9059
4          Expiration Date:  12/31/15
           WRIGHT WATSON & ASSOCIATES
5          Firm Registration No. 225
           Expiration Date:  12-31-15
6          1250 S. Capital of Texas Highway
           Building 3, Suite 400
7          Austin, Texas 78746
           512-474-4363/512-474-8802 (fax)
8          www.wrightwatson.com

9    Job No. 150714AG

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
d7ed815e-dfd2-436d-bfd1-cc0a81c92c82

Plaintiffs' MSJ Appx. 6716

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 285

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   STEPHEN MCCOLLUM, et al,        )
                Plaintiffs,          )
 4                                   )
     V.                              )   C.A. No. 3:12-CV-02037
 5                                   )
                                     )
 6   BRAD LIVINGSTON, et al,         )
                Defendants.          )
 7

 8   ********************************************************

 9                     ORAL DEPOSITION OF

10                   SANDRA SUE MCCOLLUM

11                    November 22, 2013

12   ********************************************************

13

14

15        ORAL DEPOSITION OF SANDRA SUE MCCOLLUM, produced as

16   a witness at the instance of the Defendant University of

17   Texas Medical Branch and duly sworn, was taken in the

18   above-styled and numbered cause on the 22nd of

19   November, 2013, from 10:35 a.m. to 11:58 a.m., before

20   DEBRA L. McGREW, CSR in and for the State of Texas,

21   reported by machine shorthand at the offices of

22   Edwards Law, 1101 E. 11th Street, Austin, Texas,

23   pursuant to the Federal Rules of Civil Procedure.

24

25
```

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

```
 1              A P P E A R A N C E S

 2

    FOR THE PLAINTIFFS:
 3
            Mr. Scott Medlock
 4          Edwards Law
            1101 E. 11th Street
 5          Austin, Texas  78702
            Phone:  512-623-7727
 6
    FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
 7
            Ms. Kim Coogan
 8          Ms. Shanna Elizabeth Molinare
            Assistant Attorney General
 9          P.O. Box 12548
            Austin, Texas  78711-2548
10          Phone:  512-463-2080

11  FOR THE DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
    ROBERT EASON AND JEFF PRINGLE:
12
            Mr. Jonathan Stone
13          Assistant Attorney General
            P.O. Box 12548
14          Austin, Texas  78711-2548
            Phone:  512-463-2080
15
    FOR THE DEFENDANTS BRAD LIVINGSTON, RICK THALER AND
16  BILL STEPHENS:

17          Mr. Kyle M. Smith
            Assistant Attorney General
18          P.O. Box 12548
            Austin, Texas  78711-2548
19          Phone:  512-463-2080

20  ALSO PRESENT:

21          Jennifer Osteen
            Stephanie Kingrey
22          Stephen Michael McCollum

23

24                  *-*-*-*-*

25
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6719

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

1                          INDEX

2   Appearances....................................    2

3   SANDRA SUE MCCOLLUM
         Examination by Ms. Coogan..................    4
4        Examination by Mr. Stone..................   39
         Examination by Mr. Smith..................   50
5        Examination by Ms. Coogan.................   53

6   Reporter's Certificate.......................   55

7

8   (No exhibits were marked during this deposition).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6720

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

1  any medical problems?

2      A.    Ma'am, all that I know of -- he -- he didn't

3  take no medication or nothing while we were together.

4  He did not go see a doctor while we were together.  Only

5  thing he took was maybe Tylenol if he had a headache or

6  something.  That's the only medication I knew of.

7      Q.    Did he ever mention whether he had ever been

8  diabetic in the past?

9      A.    Not in the past, but while he was in the -- the

10  jail there in Waco, he had told me that they had done

11  some blood work and it showed his blood sugar was up and

12  they were going to give him medication for it.

13      Q.    For diabetes?

14      A.    For diabetes, yes, ma'am.

15      Q.    But during the time that you were married, you

16  don't recall him ever being diagnosed with diabetes?

17      A.    No medication that I knew of.

18      Q.    And he didn't take any shots of insulin or --

19      A.    No, ma'am.

20      Q.    Okay.  What about high blood pressure?  When

21  y'all were living together, did he ever take any high

22  blood pressure medicine?

23      A.    No, ma'am.

24      Q.    And when he was at the McLennan County Jail, do

25  you remember if he told you about any --

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6721

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

1      A.    Blood pressure?  They checked his blood
2  pressure.  It was up.  They didn't know whether it was
3  because he just got put in jail or why it was raised,
4  but they did give him medication for blood pressure.
5      Q.    Do you know what they gave him?
6      A.    I'm not for sure of the type of medicine they
7  gave him, no, ma'am.
8      Q.    Okay.  Do you know how often he took it?
9      A.    I don't know how often, but he was taking it
10 every day.  They were giving it to him every day while
11 he was there.
12     Q.    Okay.  And -- and do you know while he was in
13 McLennan County Jail what -- what medicine, if any, that
14 he got for diabetes?
15     A.    I'm not for sure the type of medicine, ma'am.
16     Q.    Okay.  Do you know if he was even getting any?
17 Sometimes --
18     A.    He told me hisself that they were giving him
19 the medication for the diabetes and for the high blood
20 pressure.  They had started him on it.
21     Q.    Okay.  Did he say anything about whether he was
22 feeling better because of that?
23     A.    No, ma'am, he didn't say.
24     Q.    Were there any other conditions that he told
25 you they had found while he was in the McLennan County

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6722

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 286

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3   STEPHEN MCCOLLUM, et al,         )
             Plaintiffs,             )
 4                                    )
     V.                               )  C.A. No. 3:12-CV-02037
 5                                    )
                                      )
 6   BRAD LIVINGSTON, et al,          )
             Defendants.             )
 7

 8   *******************************************************

 9                      ORAL DEPOSITION OF

10                  STEPHEN MICHAEL MCCOLLUM

11                       November 22, 2013

12   *******************************************************

13

14

15       ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM,

16   produced as a witness at the instance of the Defendant

17   University of Texas Medical Branch and duly sworn, was

18   taken in the above-styled and numbered cause on the 22nd

19   of November, 2013, from 3:35 p.m. to 5:22 p.m., before

20   DEBRA L. McGREW, CSR in and for the State of Texas,

21   reported by machine shorthand at the offices of Edwards

22   Law, 1101 E. 11th Street, Austin, Texas, pursuant to the

23   Federal Rules of Civil Procedure.

24

25
```

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

```
 1              A P P E A R A N C E S

 2
    FOR THE PLAINTIFFS:
 3
            Mr. Scott Medlock
 4          Edwards Law
            1101 E. 11th Street
 5          Austin, Texas  78702
            Phone:  512-623-7727
 6
    FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
 7
            Ms. Kim Coogan
 8          Ms. Shanna Elizabeth Molinare
            Assistant Attorney General
 9          P.O. Box 12548
            Austin, Texas  78711-2548
10          Phone:  512-463-2080

11  FOR THE DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
    ROBERT EASON AND JEFF PRINGLE:
12
            Mr. Jonathan Stone
13          Assistant Attorney General
            P.O. Box 12548
14          Austin, Texas  78711-2548
            Phone:  512-463-2080
15
    FOR THE DEFENDANTS BRAD LIVINGSTON, RICK THALER AND
16  BILL STEPHENS:

17          Mr. Kyle M. Smith
            Assistant Attorney General
18          P.O. Box 12548
            Austin, Texas  78711-2548
19          Phone:  512-463-2080

20  ALSO PRESENT:

21          Jennifer Osteen
            Stephanie Kingrey
22          Sandra Sue McCollum

23

24                  *-*-*-*-*

25
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6725

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

1                           INDEX

2    Appearances...................................    2

3    STEPHEN MICHAEL MCCOLLUM
          Examination by Ms. Coogan..................    4
4         Examination by Mr. Stone..................   41
          Examination by Mr. Smith..................   74
5
     Reporter's Certificate........................   84
6

7    (No exhibits were marked during this deposition).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6726

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

```
 1        A.   Her name was Nicole, NICOLE, maiden name
 2  Jorgenson, and now it's -- she's remarried.
 3        Q.   And were you ever married to anybody else?
 4        A.   No.  Just that and my current wife.
 5        Q.   Okay.  I want to ask you some questions
 6  primarily about your father.
 7        A.   Yes, ma'am.
 8        Q.   Many of them are going to be the same.
 9        A.   I understand.
10        Q.   Do you know whether your father was ever
11  diagnosed with diabetes?
12        A.   I do not.  I only know what he told my sister
13  as -- as far as like them saying that he had diabetes
14  while he was in -- in jail because of his blood sugar
15  and things like that and them putting him on medicine
16  for diabetes while in jail.
17        Q.   Okay.  So you -- you just told me a lot of
18  stuff in that one little sentence.
19        A.   Okay.  Sorry.
20        Q.   That's okay.  Did -- is it -- okay.
21             What is your understanding of who told
22  your dad that he had diabetes?
23        A.   I'm --
24        Q.   Or tell me that again.
25        A.   Okay.  I would say whenever he went to jail in
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6727

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

1  Bonham, that's whenever, to my understanding, he was
2  told that he had diabetes, because of his blood sugar
3  and his heart -- blood pressure.
4        Q.   And that was by somebody at the prison the
5  first time he went when he went to the Bonham unit or
6  the --
7        A.   Yes, ma'am.
8        Q.   -- unit that's in Bonham?
9        A.   Yes, ma'am.
10       Q.   Okay.
11       A.   And that was mainly just, you know, hearing
12  what he said they made him take while he was in prison.
13       Q.   And what did you hear him say they made him
14  take?
15       A.   Diabetic medication, not -- not insulin.  I do
16  not know the name of the medication, though.
17       Q.   Okay.  And did your dad tell you that, or did
18  your sister tell you that?
19       A.    It's just a combination of things I've heard
20  over the years.  You know, his brother Terry and I went
21  and picked him up from that prison and so, you know, his
22  brother knew a lot more about his condition because he
23  lived with his brother for a while, and I just remember
24  hearing that over the years.  I couldn't tell you
25  exactly when.

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6728

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

1  get involved with it.  That's just how he was.

2      Q.   Did -- Did he say whether -- and I -- I think I

3  know the answer to this, but did he say whether your dad

4  had asked the guards or the other people for either a

5  cup or a lower bunk or different shoes that was denied?

6  Do you see what I'm saying?

7      A.   He did not say that specifically, no.  I -- I

8  do not know the answer to that.

9      Q.   Okay.  And -- and I assume you never got a call

10 from your dad saying, Hey, can you send me a cup and

11 some shoes?

12     A.   I did not.  I -- I wish I would have.

13     Q.   Did you consider your father to be disabled?

14          MR. MEDLOCK:  Object to the extent that it

15 calls for a legal conclusion.

16     Q.   (BY MS. COOGAN)  Okay.  Go ahead.

17     A.   In -- during that time, yes, because -- because

18 of his knee and his obesity, yes, I -- disabled, yes.

19     Q.   Because of his knee and his obesity?

20     A.   Yes, ma'am.

21     Q.   Okay.  And his knee being from the automobile

22 accident?

23     A.   Yes, ma'am.

24     Q.   Did his doctor from the automobile accident

25 give him any kind of a cane or special walking

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6729

ORAL DEPOSITION OF STEPHEN MICHAEL MCCOLLUM

1 | equipment?

2 |     A.   To my knowledge, he -- he had a boot on for a

3 | while, and that was removed long before going to

4 | McLennan County.

5 |     Q.   And, yet, for some -- whatever reason, it

6 | really never did get right again?

7 |     A.   Yes, ma'am, I -- I believe due to his weight.

8 |     Q.   His weight.  Okay.

9 |             Did you ever -- did you feel like you were

10 | right with your dad when he passed?

11 |     A.   Yeah, because a lot of the things that happened

12 | when we were -- when I was a kid, I'd already talked to

13 | him after I'd become an adult, you know, just pretty

14 | much what not to do.  I -- I forgave him for all of that

15 | long before he went to prison.

16 |     Q.   Since he passed away, I heard your sister say

17 | that she's really struggled with it and is seeing a

18 | counselor now.

19 |     A.   Yes, ma'am.

20 |     Q.   Have you sought any kind of counseling?

21 |     A.   I have not.

22 |     Q.   Do you think that you need to seek some

23 | counseling?

24 |     A.   Not really.  I -- I have, you know, friends and

25 | family that I speak with about things and I -- I don't

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 6730

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 287

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                       DALLAS DIVISION

.........................................................
                             :
STEPHEN McCOLLUM, STEPHANIE  :
KINGREY, and SANDRA McCOLLUM, :
individually and as heirs    :
at law in the Estate of      :
LARRY GENE McCOLLUM,         :
             Plaintiffs,     :
                             :  CIVIL ACTION NO.
VS.                          :
                             :   3:12-cv-02037
BRAD LIVINGSTON, JEFF PRINGLE, :
RICHARD CLARK, KAREN TATE,   :
SANDREA SANDERS, ROBERT EASON, :
THE UNIVERSITY OF TEXAS      :
MEDICAL BRANCH and the TEXAS :
DEPARTMENT OF CRIMINAL JUSTICE,:
             Defendants.      :
                             :
.........................................................


     ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY, M.D.

                    NOVEMBER 20, 2013



.........................................................
        ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY,
M.D., produced as a witness at the instance of the
Plaintiffs, and duly sworn, was taken in the
above-styled and numbered cause on Wednesday, November
20, 2013, from 9:07 a.m. to 12:58 p.m., before Mary C.
Dopico, Certified Shorthand Reporter No. 463 and Notary
Public in and for the State of Texas, reported by
machine shorthand and audio/video recording at the
offices of Rebecca Sealy Hospital, 404 8th Street, Room,
4.204, Galveston, Texas, pursuant to Notice and the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.
```

Stephen McCollum, et al v.                    Owen Murray, M.D.
Brad Livingston, et al                        November 20, 2013

```
 1  A P P E A R A N C E S

 2

 3  COUNSEL FOR PLAINTIFFS:

 4      Mr. Jeff Edwards
        The Edwards Law Firm
 5      The Hachnel Building
        1101 East 11th Street
 6      Austin, Texas  78702
        Tel: 512/623-7727  Fax: 512/623-7729
 7      E-mail: jeff@edwards-law.com

 8

    COUNSEL FOR DEFENDANT UNIVERSITY OF TEXAS MEDICAL
 9  BRANCH:

10      Ms. Shanna Molinare
        Ms. Kim Coogan
11      Assistant Attorneys General
        P.O. Box 12548
12      Austin, Texas  78711-2548
        Tel: 512/463-2080  Fax: 512/495-9139
13      E-mail: shanna.molinare@texasattorneygeneral.gov
                 kim.coogan@texasattorneygeneral.gov
14

15  COUNSEL FOR DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL
    JUSTICE AND INDIVIDUAL TDCJ DEFENDANTS:
16
        Mr. Jonathan Stone
17      Mr. Bruce R. Garcia
        Assistant Attorneys General
18      P.O. Box 12548
        Austin, Texas  78711-2548
19      Tel: 512/463-2080  Fax: 512/495-9139
        E-mail: jonathan.stone@texasattorneygeneral.gov
20               bruce.garcia@texasattorneygeneral.gov

21
    ALSO PRESENT:
22      Dr. Glenda Adams      Karen Matlock
        Jennifer Osteen       Carol Londa Bremmond
23

24  REPORTED BY:              VIDEO BY:
    Mary C. Dopico, CSR, RPR, CRR   Tim Bishop
25  Wright Watson & Associates
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

6435e48d-47ea-4ab9-b843-01a742fd09bd

```
Stephen McCollum, et al v.          Owen Murray, M.D.
Brad Livingston, et al              November 20, 2013
```

```
                          INDEX
      ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY, M.D.
                   NOVEMBER 20, 2013
                                                   PAGE
Appearances........................................   2
Proceedings/Stipulations...........................   4
Changes and Signature Page......................... 156
Reporter's Certification........................... 158


OWEN MURRAY, M.D.

     Examination, by Mr. Edwards...................   4


MURRAY EXHIBITS

Exhibit 1..........................................   4

     Plaintiffs' First Amended Notice of Intention to
     Take Oral and Videotaped Deposition of Dr. Owen
     Murray and Subpoena Duces Tecum (6 pages)

Exhibit 2.......................................... 108

     Winter 2010 UTMB Magazine article titled "Big House
     Health Care:  Why and how UTMB treats the
     incarcerated (6 pages)

Exhibit 3.......................................... 151

     06-14-13 chart titled Texas Department of Criminal
     Justice Offender Hyperthermia Deaths CY2001 -
     CY2013 (YTD June) (1 page)

Exhibit 4.......................................... 151

     Texas Department of Criminal Justice Temperature
     Logs (001488-001495)


VIDEOTAPES
Tape 1.............................................   4
Tape 2.............................................  55
Tape 3.............................................  95
Tape 4............................................. 149
```

Stephen McCollum, et al v.                    Owen Murray, M.D.
Brad Livingston, et al                        November 20, 2013

1   nurse is just not doing that.  She's making a mistake or

2   for whatever reason.

3           What's the process that UTMB has in place

4   to remedy that or supervise that or make sure these

5   policies are actually being followed?

6       A.    At most facilities, we have a director of

7   nurses and the nursing organization flows under that

8   with our R.N., L.V.N., C.M.A. level care.

9           If there is an issue with anyone's

10  performance, it is -- it works up the chain within that

11  facility.  And if that care practice needs to be

12  modified, then the appropriate level individual does

13  that remedial discussion and...

14      Q.    Okay.  Oh, do you know if there are policies

15  in place with UTMB relating to accommodations and

16  modifications that need to be made with regards to work

17  when dealing with extreme temperatures?

18      A.    Again, there are no UTMB specific policies --

19  policies.  These are all Correctional Managed Health

20  Care policies; and there is a policy to which we do --

21  provide work restrictions using that HSM 18.

22      Q.    Do you know if there are any policies relating

23  to handling extreme temperatures in the housing areas --

24           MS. MOLINARE:  Objection, speculation.

25      Q.    (By Mr. Edwards)  -- at the state prison

Stephen McCollum, et al v.                    Owen Murray, M.D.
Brad Livingston, et al                        November 20, 2013

1   facilities in which they're not -- there is not

2   air-conditioning or climate control for the housing for

3   the prisoners?

4        A.   And when you say "policies," you're talking

5   about health care policies or --

6        Q.   Well --

7        A.   -- TDC policies?

8        Q.   Okay.  Well, let's start with health care

9   policies.

10       A.   I don't be --  There is not a health care

11  policy as it relates to -- that I'm aware of -- that

12  relates to the conditions in the actual living

13  facilities.  We have a health care policy that relates

14  to the work restrictions in regard to heat.

15       Q.   And when you say health care policy, you're

16  talking about the CM -- the correctional managed care

17  policy?

18       A.   That is correct.

19       Q.   So there is a correctional managed care policy

20  that deals with work and the heat; correct?

21       A.   Correct.

22       Q.   But there is no such correctional managed care

23  policy or UTMB policy for that matter that deals with

24  extreme heat inside -- inside the prison?

25       A.   Not that I am aware of, right.

73

Stephen McCollum, et al v.                    Owen Murray, M.D.
Brad Livingston, et al                        November 20, 2013

```
 1  said:  It "wasn't discussed as being necessary."
 2                   And my question was:  "Why not?"
 3       A.    Because it wasn't necessary.
 4       Q.    How many people died in the summer of 2011?
 5       A.    Ten.
 6       Q.    Are you sure that it wasn't necessary to bring
 7  those temperatures down, sir?
 8                   MS. MOLINARE:  Objection --
 9                   MR. STONE:  Objection, argumentative.
10                   MS. MOLINARE:  And objection,
11  speculation.
12       A.    Your question again?
13       Q.    (By Mr. Edwards)  Yeah.  Are you sure that
14  it's -- it wasn't necessary to bring those temperatures
15  down inside?
16                   MS. MOLINARE:  Objection, argumentative;
17  objection, speculation.
18       A.    Again, I don't know the details of the ten
19  cases; and so what -- what could have altered the
20  outcome in any of those cases, I'm not aware.
21       Q.    (By Mr. Edwards)  The number one preventative
22  factor in cases of preventing heatstroke is access to
23  air-conditioning; correct?
24       A.    Correct.  Well, no.  Actually I don't know
25  that.  I should not say that.  I don't know that.
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
6435e48d-47ea-4ab9-b843-01a742fd09bd

Plaintiffs' MSJ Appx. 6737

Stephen McCollum, et al v.                Owen Murray, M.D.
Brad Livingston, et al                    November 20, 2013

1   etcetera, unless we're going to get into bariatric

2   surgery and other things, I mean, it really becomes a

3   patient-dependent process.

4        Q.   Certainly you would agree that obesity can

5   limit one's physical activity?

6        A.   I would agree with that.

7        Q.   Certainly you would agree that morbid obesity

8   can affect people's ability to breathe?

9              MS. MOLINARE:   Objection, speculation;

10  objection, foundation; objection, vague.

11       A.   Again, not knowing the specific circumstances,

12  but morbid obesity can have -- can complicate the

13  respiratory process.

14       Q.   (By Mr. Edwards)  It can affect the ability to

15  walk or run; right?

16       A.   Again, not knowing the specifics, yes.

17       Q.   It can affect the ability to climb; correct?

18       A.   Stairs, like --  Or not like --  You're

19  talking stairs, not mountains or climb any --

20       Q.   Let's start with stairs.

21       A.   Yes, it can.  It can affect someone's ability

22  to -- to climb.

23       Q.   It can affect someone's ability to climb into

24  a top bunk; correct?

25       A.   Again, not knowing the circumstances

Stephen McCollum, et al v.                    Owen Murray, M.D.
Brad Livingston, et al                        November 20, 2013

1   specifically, that could possibly occur.

2        Q.   Okay.  And morbidly obese people are at a

3   higher risk to develop heat illness if they're exposed

4   to higher temperatures; correct?

5              MS. MOLINARE:  Objection, vague;

6   objection, foundation; objection, speculation.

7        A.   Again, not knowing the specifics, morbid

8   obesity can be a risk factor for heat-related illness.

9        Q.   (By Mr. Edwards)  And that risk factor is

10  something that UTMB should take into account when making

11  housing recommendations to TDCJ; correct?

12             MS. MOLINARE:  Objection, speculation.

13       A.   In making housing recommendations to TDCJ?

14       Q.   (By Mr. Edwards)  Uh-huh.

15       A.   It would be --  A patient's morbid obesity

16  would be part of our medical assessment, and part of and

17  play into a decision to -- about potentially that

18  patient requiring special housing.

19       Q.   Do you practice medicine currently and treat

20  patients?

21       A.   No.  Not --  Not on a day-to-day basis.

22       Q.   Have you ever treated anyone for heat -- for

23  heatstroke?

24       A.   Not --  Not to my recollection.  It is --  It

25  is possible that I could have in Illinois; but -- as I