UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 288

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM, STEPHANIE   *
KINGREY, and SANDRA           *
McCOLLUM, individually and as *
heirs at law to the Estate of *
LARRY GENE McCOLLUM,          *
                              *
        PLAINTIFFS            *
                              *
vs.                           *   CIVIL ACTION NO.
                              *    3:12-CV-02037
                              *
BRAD LIVINGSTON, JEFF PRINGLE,*
RICHARD CLARK, KAREN TATE,    *
SANDREA SANDERS, ROBERT EASON,*
the UNIVERSITY OF TEXAS       *
BRANCH and the TEXAS          *
DEPARTMENT OF CRIMINAL JUSTICE*
                              *
        DEFENDANTS            *

ORAL VIDEOTAPED 30(B)6 DEPOSITION OF JEFF PRINGLE

August 12th, 2013

ORAL VIDEOTAPED 30(B)6 DEPOSITION OF JEFF

PRINGLE, produced as a witness at the instance of the

Plaintiffs and duly sworn, was taken in the above-styled

and numbered cause on the 12th day of August, 2013, from

10:33 a.m. to 1:33 p.m., before Curtis High, Certified

Shorthand Reporter in and for the State of Texas,

reported by computerized stenotype machine at the

Hutchins Unit of the Texas Department of Criminal

Justice, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFFS:

 3           Jeff Edwards, Esq.
             THE EDWARDS LAW FIRM
 4           1101 E. Eleventh Street
             Austin, Texas 78702
 5           Telephone: 512-623-7727 - Fax: 512-623-7729
             E-mail:  jeff@edwardslaw.com
 6

 7   FOR THE DEFENDANTS:

 8           Bruce R. Garcia, Esq.
                    -and-
 9           David A. Harris, Esq.
             ATTORNEY GENERAL OF TEXAS
10           Law Enforcement Defense Division
             P.O. Box 12548, Capitol Station
11           Austin, Texas 78711-2548
             Telephone: 512-463-2080 - Fax : 512-495-9139
12           E-mail: bruce.garcia@texasattorneygeneral.gov
             E-mail: david.harris@texasattorneygeneral.gov
13

14   FOR THE DEFENDANT; UNIVERSITY OF TEXAS MEDICAL BRANCH:

15           Kim Coogan, Esq.
                    -and-
16           Erika D. Hime, Esq.
                    -and-
17           Lacey E. Mase, Esq.
             ATTORNEY GENERAL OF TEXAS
18           Law Enforcement Defense Division
             P.O. Box 12548, Capitol Station
19           Austin, Texas 78711-2548
             Telephone: 512-463-2080 - Fax : 512-495-9139
20           E-mail: kim.coogan@texasattorneygeneral.gov
             E-mail: erika.hime@texasattorneygeneral.gov
21           E-mail: lacey.mase@texasattorneygeneral.gov

22

23   ALSO PRESENT:

24           Tim Bishop, Videographer

25
```

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

```
 1                            INDEX

 2                                                   PAGE

 3

 4   Appearances ....................................2

 5                         EXAMINATIONS

 6   JEFF PRINGLE

 7   Examination by Mr. Edwards .....................5
     Examination by Ms. Coogan ...................107
 8   Further Examination by Mr. Edwards ..........114

 9

10                          EXHIBITS

11

12   EXHIBIT              DESCRIPTION         PAGE LINE

13   36A       Copy of Form HMS 18 titled .........114   1
               Health Summary for
14             Classification for Larry Gene
               McCollum
15
     Reporter's Certificate .....................118
16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**

**(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363**
087976f4-51b9-4331-8395-79329bc5d60b
Plaintiffs' MSJ Appx. 6743

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                  August 12, 2013

```
 1      Q    (By Mr. Edwards) Isn't that what officers
 2   should do when they come upon someone who is
 3   nonresponsive and who has collapsed, get 911 there as
 4   fast as possible?
 5                  MR. GARCIA:  Objection, speculation.
 6                  THE WITNESS:  Training is begin first aid
 7   CPR as a first responder.
 8      Q    (By Mr. Edwards) So did these officers not do
 9   the right thing then?
10      A    They took the right actions.
11      Q    Sir, as the head of a jail where people could
12   collapse a lot, shouldn't 911 be called upon a collapse
13   all the time?
14                  MR. GARCIA:  Objection, speculation.
15   Objection, argumentative.  Objection,
16   mischaracterization of this facility.
17                  THE WITNESS:  No, it should not.
18      Q    (By Mr. Edwards) Okay.  So to be crystal clear,
19   TDCJ is not critical of the delay in contacting 911 in
20   the McCollum case?
21                  MR. GARCIA:  Objection, asked and
22   answered.
23                  THE WITNESS:  I don't know.
24      Q    (By Mr. Edwards) Okay.  You are not critical of
25   the delay in calling 911 as the senior security
```

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                   August 12, 2013

1   supervisor of the Hutchins Unit though; is that correct?

2       A    I am not.

3       Q    Okay.  Have you had discussions with your

4   supervisor, Director Eason, about the delay in getting

5   911 called in the McCollum case?

6       A    That was covered in the previous deposition

7   that we did have discussion.

8       Q    Did he tell you he was concerned about the

9   delay in contacting 911 given the McCollum

10  circumstances?

11      A    He did have a concern.

12      Q    Okay.  You don't share that concern though; is

13  that correct?

14      A    That doesn't mean that he didn't agree with the

15  report.

16              MR. EDWARDS:  Let me object as

17  nonresponsive.

18      Q    (By Mr. Edwards) You don't agree with Director

19  Eason's concern about the delay in getting -- in

20  contacting 911 in the McCollum case; is that true?

21      A    That is not true.

22      Q    Do you have any concerns about the delay in

23  contacting 911 in the McCollum matter?

24      A    The concerns that he and I talked is not the

25  question you are asking.

Stephen McCollum, et al                                      Jeff Pringle
Brad Livingston, Jeff Pringle, et al                     August 12, 2013

1   Q    Okay.  Do you see any problems with that, sir,
2   from a supervisory standpoint?
3   A    I do not.
4   Q    All right.  Let's talk about policies regarding
5   heat at the Hutchins Unit, okay?
6   A    Okay.
7   Q    What are they -- strike that.  At the time in
8   July of 2011, before and up until Mr. McCollum died,
9   what policies were in place relating to heat at the
10  Hutchins Unit?
11  A    Each year around the month of May an e-mail
12  directive from the leadership comes out outlining
13  several bullets of actions that are to be taken by the
14  units and it also referenced AD 1064 which is extremes
15  in the workplace.
16  Q    Okay.  Are those -- is that it in terms of heat
17  policies at the Hutchins Unit?
18  A    Yes.
19  Q    Okay.  Do you know if -- well, what are the
20  bullet points in that e-mail memo?  You get that every
21  year, right?
22  A    Yes.
23  Q    Okay.  Like you have gotten that five, six
24  years in a row, right, at least?
25  A    At least.

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al              August 12, 2013

1   available to inmates, right?

2       A    No, I did not.

3       Q    How did inmates get them?

4       A    They were placed in their housing area.

5       Q    So personal fans, those weren't available at

6   the Hutchins Unit, right?

7       A    Correct.

8       Q    In the e-mail directive do you think they were

9   talking about these big portable fans or do you think

10  they were talking about personal fans since you reviewed

11  it for six, seven, eight years?

12      A    There is a bullet about offenders and personal

13  fans.

14      Q    Does that apply at the Hutchins Unit?

15      A    Personal fans do not apply.

16      Q    That's a decision that you make you are not

17  going to provide them with access to personal fans,

18  right, at the Hutchins Unit?

19      A    That is not my decision.

20      Q    Whose decision is it?

21      A    I do not know.

22      Q    Well, is it Director Eason's?

23      A    I do not know.

24      Q    So you don't know if it's Director Eason,

25  Director Thaler, Director Stephens, Director Livingston?

Stephen McCollum, et al                                          Jeff Pringle
Brad Livingston, Jeff Pringle, et al                        August 12, 2013

1      A    I do not.

2      Q    That would be the appropriate -- those would be

3   the people above you who would be making policy; is that

4   fair?

5      A    At that time it would be.

6      Q    Okay.  Could you if you wanted to provide

7   personal fans to inmates?

8      A    I have already answered these questions in my

9   previous deposition.

10     Q    You haven't answered that one.  Could you if

11  you wanted to, sir, provide personal fans to inmates?

12            MR. GARCIA:  Objection, asked and

13  answered.

14            THE WITNESS:  I have already answered that

15  in my previous deposition.  No, I could not.

16     Q    (By Mr. Edwards) Why not?

17     A    There are no electrical outlets.

18     Q    Are all fans electrical, sir?

19     A    Fans that the agency sells that I have seen

20  are.

21     Q    If you wanted to bring in or make available at

22  the commissary nonelectric fans or battery operated

23  fans, could you do so?

24     A    No, I could not.

25     Q    Why not?

Stephen McCollum, et al                                         Jeff Pringle
Brad Livingston, Jeff Pringle, et al                         August 12, 2013

1      A      Because I don't approve or have discussion with

2   those that make the decision on what commissary sells.

3      Q      Knowing that these fans -- personal fans are

4   not available at the Hutchins Unit, have you ever had a

5   discussion with any of your supervisors about other

6   types of fans that the unit could make available to

7   inmates at the Hutchins Unit?

8      A      No, I have not.

9      Q      Do you think you should?

10     A      No, I do not.

11     Q      Okay.  Following Mr. McCollum's death have you

12  had any such discussions?

13     A      No, I have not.

14     Q      Do you think you should?

15     A      I do not.

16     Q      Why not?

17     A      That's a decision between the leadership and

18  whoever is involved in those meetings there.

19     Q      Not you?

20     A      It is not me.

21     Q      Okay.  Do you know who the leadership is that

22  would be involved in those decisions?

23     A      I do not.

24            MR. GARCIA:  Objection, asked and

25  answered.

**WRIGHT WATSON & ASSOCIATES**

**(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363**
087976f4-51b9-4331-8395-79329bc5d60b

Plaintiffs' MSJ Appx. 6749

Stephen McCollum, et al                                      Jeff Pringle
Brad Livingston, Jeff Pringle, et al                   August 12, 2013

```
 1              MR. GARCIA:  Objection.

 2              MR. EDWARDS:  We talked about that in the

 3  last deposition.

 4              MR. GARCIA:  Exactly.  Asked and answered.

 5      Q    (By Mr. Edwards) Okay.  As you testify here

 6  today you don't think it's important for you to know

 7  what the warning signs of heat stroke are?

 8      A    I do not recall what they are.

 9      Q    I know you don't recall what they are.  My

10  question is don't you think it's important that you do

11  know that?

12      A    No, I do not.

13      Q    Don't you think it's really important that your

14  correctional officers know that?

15      A    I do not know what is important that they need

16  to know.

17      Q    Aren't you their supervisor?

18      A    I am the highest ranking security supervisor on

19  the Hutchins Unit.

20      Q    Do you take no responsibility for what your

21  officers ought to know relating to warning signs of heat

22  stroke?

23      A    No, I do not.

24      Q    Okay.  Just so I am clear because I think that

25  question may be -- I want to make perfectly clear.  Sir,
```

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

1      A      They have two lists which is a monthly list and

2   then they have a bi-monthly list.

3      Q      Do you know if they generate this list

4   following the intake physical?

5      A      I do not know.

6      Q      Do you know if they generate this list

7   following the first time somebody comes off the bus and

8   there is some sort of -- I don't know what you would

9   call it -- some sort of meeting with some nurse?

10     A      I do not know.

11     Q      You don't know.  Do you think you should know

12  that?

13     A      I do not.

14     Q      Why not?

15     A      Because that's not one of my job duties.

16     Q      Protecting inmates who are vulnerable to heat

17  from heat stroke is a job duty of yours, correct?

18     A      No, it is not.

19     Q      Is protecting inmates who are vulnerable to

20  extreme heat from heat stroke one of the duties of your

21  correctional officers?

22     A      I am not familiar with their job postings and

23  procedures.

24     Q      You're their boss, right?

25     A      I am the highest ranking security official on

**WRIGHT WATSON & ASSOCIATES**

**(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363**
087976f4-51b9-4331-8395-79329bc5d60b

Plaintiffs' MSJ Appx. 6751

53

Stephen McCollum, et al                              Jeff Pringle
Brad Livingston, Jeff Pringle, et al               August 12, 2013

1   two screens are you talking about?

2       A     The monthly and the bi-monthly.

3       Q     Okay.  So not like some sort of assessment form

4   or anything like that.  It's a specific list UTMB

5   generates and you have got some officer whose

6   responsibility it is to review that?

7       A     Correct.

8       Q     Okay.  So let me just -- I mean if -- if I am

9   an inmate coming to the facility and I get off the bus

10  and I don't know, I have hypertension and diabetes which

11  are clearly, according to TDCJ, vulnerable to heat

12  extremes.  And I come at like let's say the 7th of the

13  month and it turns out that UTMB generates this list on

14  the 15th of the month, I won't get a white armband

15  until the 16th?

16            MR. GARCIA:  Objection, speculation.

17      Q     (By Mr. Edwards) According to your policy and

18  the way you run things?

19      A     Can you be more specific with the question?

20      Q     Not really.  I mean let's say somebody who is

21  vulnerable to heat shows up at your prison on the 7th of

22  the month.  You with me?

23      A     No, I am not.

24      Q     You are a transfer facility, right?

25      A     Correct.

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

1      Q    That means people come here, right?  They are

2    brought here from county jails and other places,

3    correct?

4      A    Yes.

5      Q    Okay.  So some of those people are going to be

6    vulnerable to heat, right?

7      A    I do not know.

8      Q    Seriously, you don't know if some of the people

9    that come into your prison are going to be vulnerable to

10   extreme heat, is that your testimony?

11               MS. COOGAN:  Objection, vague.

12               THE WITNESS:  I don't know that.

13     Q    (By Mr. Edwards) Okay.  Sir, do you suspect

14   that some of the people that come into your facility are

15   going to have diabetes?

16     A    I do not know.

17     Q    Do you suspect that some of the people that

18   come into your facility are going to have hypertension?

19     A    I do not know.

20     Q    Do you suspect that some of the people that

21   come into your facility are going to be, I don't know,

22   older than 60?

23     A    I don't know.

24     Q    Do you suspect that some of the people that

25   come into your facility are going to be older than 40?

55

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                   August 12, 2013

1      A     I do not know.

2      Q     Do you suspect that some of the people that are

3   going to come into your facility are going to be on

4   psychotropic medications?

5      A     I do not know.

6      Q     Do you suspect some of the people that come

7   into your facility are going to be on diuretic

8   medications?

9      A     I do not know.

10     Q     I mean shouldn't any competent supervisor know

11  the answers to those questions?

12     A     Can you repeat the question?

13     Q     Wouldn't any competent supervisor, shouldn't he

14  or she know the answers to those questions?

15     A     I do not know.

16     Q     Does Director Eason know you don't know the

17  answers to those questions?

18           MR. GARCIA:  Objection, speculation.

19           THE WITNESS:  I don't know.

20     Q     (By Mr. Edwards) Does Executive Director

21  Livingston know you don't know the answers to those

22  questions?

23           MR. GARCIA:  Objection, speculation.

24           THE WITNESS:  I don't know.

25     Q     (By Mr. Edwards) Do you see any problems with

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

1   the practice that you have instituted relating to this

2   white armband list from a protecting people who are

3   vulnerable to heat from extreme heat?

4              MR. GARCIA:  Objection, vague.

5              THE WITNESS:  You please reask the

6   question?

7        Q    (By Mr. Edwards) You see any flaws in the

8   system that you have created?

9        A    Could you please be more specific?

10       Q    Do you see any flaws in the armband system that

11  you have implemented at the Hutchins Unit?

12       A    I do not.

13       Q    Okay.  You don't think it might leave some

14  people who are vulnerable to heat exposed to those

15  temperatures before they are identified by UTMB or TDCJ?

16       A    I do not.

17       Q    But to be fair you don't even know if people

18  over 40 are showing up at your jail, right?

19       A    I do not know.

20       Q    Do you believe that that's an honest and

21  truthful answer, sir?

22       A    Yes, I do.

23       Q    All right.  Do you agree with Director Eason

24  that TDCJ is doing -- prior to Mr. McCollum's death was

25  doing a wonderful job protecting inmates from heat?

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                  August 12, 2013

```
 1   wrong room.
 2               MR. GARCIA:  Me to.  Withdraw the
 3   objection.
 4       Q     (By Mr. Edwards) What is the room where
 5   sometimes there is storage, sometimes there is tables?
 6   What is that room called that is air conditioned at the
 7   Hutchins Unit?
 8       A     In that building?
 9       Q     I think it's in all the buildings but I could
10   be wrong.
11       A     The multipurpose room.
12       Q     The multipurpose room.  Thank you very much.
13   Do you recall specifically what the multipurpose room
14   was used for in July of 2011?
15       A     As I testified in the last deposition that one
16   would have been used for programming.
17       Q     Is there any record that you're aware of that
18   would show the programming that went on in the
19   multipurpose room in the C Building?
20       A     That was also testified in the last deposition
21   and the records of that room being utilized for AA and
22   UCC was submitted to my counsel.
23       Q     Okay.  Other than for AA, and what was the
24   other thing you said?
25       A     UCC.
```

76

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                   August 12, 2013

1    Q    UCC.  What's UCC?

2    A    Unit Classification Committee.

3    Q    Other than those two things do you know if it

4  was used for anything else?

5    A    No.

6    Q    All right.  Let's talk about training relating

7  to the heat.  When an inmate comes upon someone who is

8  exhibiting signs of heat stroke -- strike that.  When a

9  correctional officer comes upon someone exhibiting signs

10  of heat stroke, what are they supposed to do?

11    A    You are supposed to do the CPR, assess them,

12  and depending on what the signs are at that time would

13  depend on your next action.

14    Q    Okay.  They are having a heat stroke.

15    A    They would identify if he is hot, clammy,

16  unresponsive, and then their response would be as I

17  testified earlier already.  Place cold water on them,

18  towels.  Also stabilize their head to keep them from

19  injuring themselves and keep them from biting their

20  tongue or swallowing the tongue.

21    Q    Anything else?

22    A    That's all I recall.

23    Q    Okay.  You recall being trained that you should

24  put some cold towels on them?

25    A    Cool them off immediately.

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                   August 12, 2013

1  know?

2      A    I would not have an opinion.

3      Q    Fair enough.  Okay.  Let's talk about ice

4  water, okay.  Did a directive come down that was

5  different in either 2012 or 2013 concerning ice water?

6      A    No.

7      Q    Same old -- same old policy relating to ice

8  water, right?

9      A    Same guidelines.

10     Q    And I believe you told me you bring in a jug of

11 ice water for the dorm I believe you said three times a

12 day, is that accurate?

13     A    Yes, it is.

14     Q    Okay.  Do you know if actual ice was placed

15 into these jugs on July 15th, 16th, 17th, 18th,

16 19th, 20th, 21st or 22nd of 2011?

17     A    I do not know.

18     Q    Is there any way I could find out?

19     A    There are no records kept.

20     Q    Okay.  You would agree with me that it

21 absolutely should have; is that fair?

22     A    No, I do not.

23     Q    Okay.  You just think it should have been water

24 then?

25             MR. GARCIA:  What are we talking about?

88

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

1  delivered?

2      A    For 12:00 and 11:00 it should have, yes.

3      Q    So you are changing your prior answer?

4      A    Yes.

5      Q    Okay.  It absolutely should have, and if it

6  wasn't, then would you agree with me that the prison

7  wasn't doing what it should to protect inmates from

8  extreme heat?

9                MR. GARCIA:  Objection, speculation.

10               THE WITNESS:  No.

11     Q    (By Mr. Edwards) Okay.  So if by some chance it

12  wasn't placed.  The ice wasn't placed in the jug the way

13  it is supposed to be, you would disagree with me that

14  the prison is not doing what it is supposed to be doing

15  to protect vulnerable people from extreme heat?

16     A    I disagree with it.

17               MS. COOGAN:  Objection.

18     Q    (By Mr. Edwards) Okay.  If inmates testify that

19  the water that was brought in to Mr. McCollum's dorm was

20  not iced down would you dispute that in any way?

21     A    No, I would not.

22     Q    Do you know that the Center for Disease Control

23  recommends that a person drink two to four glasses of

24  water an hour in periods of extreme heat?

25     A    No, I do not.

**WRIGHT WATSON & ASSOCIATES**

**(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363**
087976f4-51b9-4331-8395-79329bc5d60b

Plaintiffs' MSJ Appx. 6759

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

 1  evidence doesn't assume.

 2              MR. GARCIA:  Well, that part about the

 3  CDC, the hypothetical you gave him, that's a whole lot

 4  of stuff you just made up.

 5              MR. EDWARDS:  That's great, and if you had

 6  objected to the prior question --

 7              MR. GARCIA:  I am objecting now.

 8              MR. EDWARDS:  -- I suppose that might be

 9  somewhat legitimate.  You can't, Bruce.  That's not how

10  it works.

11              MR. GARCIA:  It's working that way today,

12  Jeff.

13              MR. EDWARDS:  Well, you do it.  It's just

14  improper.

15      Q    (By Mr. Edwards) Sir, is there any reason you

16  couldn't bring the jugs of water more often than you did

17  back in July of 2011?

18      A    We could take jugs of water all day long to a

19  dorm.

20      Q    In periods of extreme heat then why don't you?

21      A    Because we don't have -- the water jugs are

22  intended to have ice in them and the ice does not

23  produce enough to provide ice water all day long.  The

24  offenders have access to other drinking abilities within

25  their dorm to obtain that water you are talking about.

91

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                  August 12, 2013

```
1       Q    Would another solution be to get more ice?

2       A    It would be.

3       Q    You are making a choice not to do that, right?

4            MR. GARCIA:  Objection, mischaracterizes

5  testimony.

6       Q    (By Mr. Edwards) Hold on a second.  How are you

7  not making the choice not to get more ice to bring ice

8  water more often?

9            MR. GARCIA:  Objection, argumentative.

10            THE WITNESS:  We don't have a way to

11  produce more ice.

12       Q    (By Mr. Edwards) Could you -- you think it's

13  impossible to get more ice?  Do you believe it's

14  impossible to get more ice currently?

15       A    Yes.

16       Q    Okay.  In 2011, prior to Mr. McCollum entering

17  the prison, do you believe it was impossible to get

18  additional ice so that you could bring jugs of water

19  more often to inmates?

20       A    I don't know.

21       Q    Okay.  Well, then why didn't you bring the jugs

22  of water filled with ice more often than you did --

23            MR. GARCIA:  Objection, assumes facts.

24            MR. EDWARDS:  -- back in July of 2011?

25            MR. GARCIA:  Objection, speculation.
```

Stephen McCollum, et al                           Jeff Pringle
Brad Livingston, Jeff Pringle, et al              August 12, 2013

1   Assumes facts not in evidence.  Mischaracterizes prior

2   testimony.

3                 THE WITNESS:  There is nothing that

4   supports that it wasn't being brought in.

5      Q    (By Mr. Edwards) It was brought in a couple of

6   times a day, right?

7      A    It was scheduled three times a day.

8      Q    Okay.  And you told me look, you could have

9   brought it more than that if you wanted to, fair?

10     A    Water jugs.

11     Q    Sure.  You could have brought more water and

12  jugs, correct?

13     A    Correct.

14     Q    Now my question is couldn't you also have

15  brought more ice water?

16                MR. GARCIA:  And it's asked and answered.

17  Objection.

18                THE WITNESS:  And I have already answered

19  that.

20     Q    (By Mr. Edwards) Which was?

21     A    No.

22     Q    You couldn't have?

23     A    We don't produce enough ice.

24     Q    And my question is in July of 2011, is it your

25  testimony that it would have been impossible to get more

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                   August 12, 2013

 1   ice to make additional trips with jugs of water full of

 2   ice?

 3        A    Yes.

 4        Q    Okay.  If you learned that the heat index was

 5   135 degrees, would you do anything differently at the

 6   Hutchins Unit?

 7             MR. GARCIA:  Objection, incomplete

 8   hypothetical.  Asks for speculation.

 9             THE WITNESS:  No, I wouldn't.

10        Q    (By Mr. Edwards) Okay.  If you learned that the

11   heat index was 149 degrees, would that cause you to

12   pause?

13             MR. GARCIA:  Objection, speculation, and

14   incomplete hypothetical.  Vague.

15             THE WITNESS:  No, I would not.

16        Q    (By Mr. Edwards) So if the logs from the Texas

17   Department of Criminal Justice for the Hutchins facility

18   logged temperatures of 135 degrees, 149 degrees,

19   150 degrees, 112 degrees, 115 degrees.  Even in

20   temperatures that high, apparent temperatures, you

21   wouldn't run the prison any differently, is that your

22   testimony?

23             MR. GARCIA:  Objection, mischaracterizes

24   the testimony.  Misstates the facts in evidence and

25   speculation.  Answer if you can.

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

1          THE WITNESS:  I wouldn't do anything

2   different.

3      Q     (By Mr. Edwards) Okay.  Do you know that there

4   are people with hypertension in the Hutchins facility?

5      A     I am aware of that.

6      Q     And diabetes?

7      A     I am aware of that.

8      Q     And you are aware that those are conditions

9   which make you vulnerable to heat, correct?

10         MR. GARCIA:  Objection, asked and

11  answered.

12         THE WITNESS:  No, I do not.

13     Q     (By Mr. Edwards) You don't know that?

14     A     Repeat the question, please?

15     Q     Do you know if hypertension or diabetes make

16  you more vulnerable to the heat than if you don't have

17  those conditions?

18     A     Yes, because I have one of the conditions.

19     Q     Okay.  Let's start.  Hypertension makes you

20  more vulnerable to the heat, right?

21     A     Yes.

22     Q     Okay.  Diabetes makes you more vulnerable to

23  the heat, right?

24     A     I don't know.

25     Q     You received any training to that effect?

**WRIGHT WATSON & ASSOCIATES**

**(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363**
087976f4-51b9-4331-8395-79329bc5d60b

Plaintiffs' MSJ Appx. 6764

Stephen McCollum, et al                                    Jeff Pringle
Brad Livingston, Jeff Pringle, et al                    August 12, 2013

1    STATE OF TEXAS

2    COUNTY OF DALLAS

3                    REPORTER'S CERTIFICATE

4      ORAL VIDEOTAPED 30(B)6 DEPOSITION OF JEFF PRINGLE

5                    August 12th, 2013

6

7         I, the undersigned Certified Shorthand Reporter

8    in and for the State of Texas, certify that the facts

9    stated in the foregoing pages are true and correct.

10        Signature of the witness was not requested by

11   the witness or any party before the completion of the

12   deposition.

13        I further certify that I am neither attorney or

14   counsel for, related to, nor employed by any parties to

15   the action in which this testimony is taken and,

16   further, that I am not a relative or employee of any

17   counsel employed by the parties hereto or financially

18   interested in the action.

19        SUBSCRIBED AND SWORN TO under my hand and seal

20   of office on this the 21st day of August, 2013.

21

22   CURTIS HIGH, CSR NO. 484
     Expiration Date:  12/31/14
23   Wright Watson & Associates
     Firm Registration No. 225
24   3307 Northland Drive
     Suite 185
25   Austin, Texas 78731

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

087976f4-51b9-4331-8395-79329bc5d60b

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 289

```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                       DALLAS DIVISION


STEPHEN McCOLLUM,                §
STEPHANIE KINGREY, and           §
SANDRA McCOLLUM,                 §
individually and as heirs        §
at law to the Estate of          §
LARRY GENE McCOLLUM,             §
     Plaintiffs,                 §
                                 §
V.                               §   CIVIL ACTION NO.
                                 §   3:12-CV-2037-L
                                 §
BRAD LIVINGSTON, JEFF            §
PRINGLE, and TEXAS               §
DEPARTMENT OF CRIMINAL           §
JUSTICE,                         §
     Defendants.                 §

****************************************************
                  ORAL DEPOSITION OF
                    JEFFERY PRINGLE
                  FEBRUARY 15, 2013
****************************************************
```

ORAL AND VIDEOTAPED DEPOSITION OF JEFFERY

PRINGLE, produced as a witness at the instance of the

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 15TH of FEBRUARY

2013, from 9:51 a.m. to 4:48 p.m., before Suzanne Villa,

Certified Shorthand Reporter in and for the State of

Texas, reported by machine shorthand, at the Office of

the Attorney General, 300 W. 15th Street, 7th Floor,

Austin, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

```
 1                        APPEARANCES

 2   For the Plaintiffs:
          Mr. Jeff Edwards
 3        THE EDWARDS LAW FIRM
          The Bremond Houston House
 4        706 Guadalupe
          Austin, Texas  78701
 5        (512) 623-7727
          jeff@edwards-law.com
 6
     For the Texas Civil Rights Project
 7        Mr. Scott Medlock
          Ms. Michelle Smith
 8        1405 Montopolis Drive
          Austin, Texas  78741-3438
 9        (512) 474-5073 X105
          scott@texascivilrightsproject.org
10
     For the Defendants:
11        Mr. Bruce R. Garcia
          OFFICE OF THE ATTORNEY GENERAL
12        PO Box 12548
          Austin, Texas  78711-2548
13        (512) 463-2080
          bruce.garcia@oag.state.tx.us
14
     Also Present:
15
          Jerry Mohn, videographer
16
     Texas Department of Criminal Justice Office of the
17   General Counsel
          Tobias D. Hunziker
18
          Attorney General's Office:
19             Christin A. Cobe
               Rachael Osaze-Ediae
20             Erika Hime
               Craig Jacobs
21             Lacey Mase
               Leah O'Leary
22             Patrick Pope
               Michael Ritter
23             Johnathan Stone

24

25
```

**WRIGHT  WATSON  &  ASSOCIATES**
**(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363**
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

Plaintiffs' MSJ Appx. 6768

Stephen McCollum, et al v.                     Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

```
 1                           INDEX

 2   Appearances.......................................    2

 3   JEFFERY PRINGLE
          Examination by Mr. Edwards..................    4
 4   Changes and Signature............................  237
     Reporter's Certificate...........................  239
 5
                           EXHIBITS
 6   NO.        DESCRIPTION                    PAGE MARKED

 7   23         Correctional Managed Care Intake History
                and Health Screening                    81
 8
     24         Texas Uniform Health Status Update;
 9              Bates Nos. TDCJ-RFP #25-71 - #25-74      91

10   25         Health Care Outcomes                    107

11   26         Hand drawn diagram                      119

12   27         Crain Triage note                       135

13   28         Texas Department of Criminal Justice
                Temperature Log;
14              Bates Nos. 001488 - 001495              151

15   29         Heat and Humidity Matrix;
                Bates No. TDCJ-RFP #3-15                153
16
     30         SKIPPED
17
     31         Southwestern Institute of Forensic
18              Sciences at Dallas Autopsy;
                Bates Nos. EAC-36 - EAC-42              159
19
     32         Interoffice Communication;
20              Bates No. 001383                        165

21   33         E-mail; Bates Nos. TDCJ-RFP #3-3 - 3-5  176

22   34         Administrative Incident Review;
                Bates Nos. EAC-02 - EAC-09              198
23
     35         E-mail; Bates No. 001414                232
24
     36         Interoffice Communication;
25              Bates Nos. 001395 - 001397              233
```

**WRIGHT WATSON & ASSOCIATES**

e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

Plaintiffs' MSJ Appx. 6769

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                   February 15, 2013

```
 1              THE VIDEOGRAPHER:  Today is February 15th,

 2   2013.  The time is 9:51.

 3              Will the reporter please swear in the

 4   witness.

 5              JEFFERY PRINGLE,

 6   having been first duly sworn, testified as follows:

 7              EXAMINATION

 8   BY MR. EDWARDS:

 9      Q    Good morning.  Would you kindly state your name

10   for the record?

11      A    My birth name is Jeffery Pringle.

12      Q    Okay.  And what is your job currently, sir?

13      A    I'm considered -- job title is Warden of the

14   Hutchins State Jail.

15      Q    Okay.  And at the time that Larry Gene McCollum

16   was in the Hutchins Unit, were you the acting warden?

17      A    I was the highest-ranking administrator for

18   security on that facility.

19      Q    Okay.  And when you say "highest-ranking

20   administrator," does that mean kind of colloquially you

21   run the show at the Hutchins Unit?  Is that fair?

22      A    I make all the security decisions for the

23   facility and the safety of the offenders and staff.

24      Q    Okay.  Before we get started, I want to thank

25   you for your flexibility in coming down to Austin,
```

```
 1    of the practice at that time.

 2        Q    What is the protocol when a correctional

 3    officer comes upon someone they believe is in the midst

 4    of a medical emergency?

 5            MR. GARCIA:  I'll object to the extent of

 6    speculation and vague as to "medical emergency."

 7        Q    (BY MR. EDWARDS)  Do you understand what I mean

 8    when I say "medical emergency?"

 9        A    Not necessarily, no.

10        Q    Okay.  What do you -- what do you -- okay.

11            Well, when I'm using the word "medical

12    emergency," I mean, correctional officer doesn't know

13    what's going on and they need immediate medical

14    attention.  Okay?

15        A    That's a very open-ended comment.  And in those

16    cases, they probably would not call for an ambulance

17    just because on offender needs medical attention.

18        Q    Immediate medical attention.

19        A    Immediate medical attention they wouldn't call.

20        Q    Who would they call?

21        A    They would call their shift supervisor.

22        Q    And what would the shift supervisor do?  And

23    that's the lieutenant?

24        A    That would be the sergeant or the lieutenant.

25        Q    Okay.  Would you agree with me that that delays
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                      February 15, 2013

1   getting an ambulance into the facility?

2        A    Not necessarily.

3        Q    How could it not delay getting an ambulance in

4   the facility?

5        A    Because not all situations require an ambulance

6   to be called.

7        Q    Okay.  Do your lieutenants or sergeants have

8   more medical training than correctional officers?

9        A    No.

10       Q    Okay.  Do you consider a person going through

11  convulsions, seizing, nonresponsive and unable to

12  communicate, the type of situation where an ambulance

13  needs to be called?

14       A    No, I do not.

15       Q    Why not?

16       A    Because as long as he's got an airway, he's

17  breathing and circulation, and there's not a life of

18  limbs, then it's triage by first aid for the first

19  responders on the facility.

20       Q    Okay.  Explain that.  As long as he's got an

21  airway and he's breathing, and he's got life or limb,

22  the policy of the Hutchins Unit is to contact the

23  offsite medical?  Is that --

24            MR. GARCIA:  Objection.

25       Q    (BY MR. EDWARDS)  Is that your testimony?

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1          MR. GARCIA:  Objection.  That

2  mischaracterizes his testimony.  He never said it was

3  his policy.  You asked me him about a hypothetical, he

4  gave an answer; not the policy of the Hutchins Unit.

5          MR. EDWARDS:  Okay.

6     Q    (BY MR. EDWARDS)  You run the Hutchins Unit.

7  Right, sir?

8     A    I'm the highest-ranking security supervisor.

9     Q    Okay.  You -- I'm asking you personally if you

10  consider medical emergencies.  Okay?  You personally.

11          You told me if an airway is open and

12  breathing, and there's some -- something about life and

13  limb being okay, I guess, then you wouldn't consider it

14  a medical emergency.  Is that what you told me?  Because

15  I -- I want to understand your testimony.

16     A    No.  You left out two other factors.

17     Q    What were the two other factors?

18     A    Airway's open.

19     Q    Okay.

20     A    He has circulation and you have visual

21  breathing.  And then it would be based upon loss of limb

22  or the trauma.

23     Q    What does that mean, "or the trauma"?

24     A    You have visual -- you're able to visualize

25  extent of injury.

47

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                      February 15, 2013

1      Q      Able to visualize the extent of injury?

2      A      A blunt, a loss of limb, the extent, whether

3  it's a -- there or not.

4      Q      So if a man had his arm cut off, would that be

5  a medical emergency?

6      A      Yes, it would.

7      Q      Okay.  In that situation would you expect a

8  correctional officer to radio for an ambulance right

9  away?

10     A      Yes, I would.

11     Q      Okay.  What do you mean by "circulation"?

12     A      During the first responder's training, you

13  check for pulse.

14     Q      That's what you mean, has a pulse?

15     A      Circulation, yes, pulse.

16     Q      Okay.  What the airway open to me means

17  breathing.  Does it mean something different to you?

18     A      It would mean that he's able to take a breath

19  and there's nothing obstructing his ability to breathe.

20     Q      He's not choking?

21     A      Correct.

22     Q      Okay.  And there's not -- there's not a piece

23  of food in there.  There's not a piece of paper, a wrap,

24  whatever.  There's not something obstructing his airway.

25     A      Correct.

48

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1      Q     Okay.  So if someone doesn't have a pulse, you
2  would expect the correctional officer to immediately
3  contact an ambulance?
4      A     They would not have the ability to personally
5  contact them.
6      Q     How does that happen then?  How does an
7  ambulance get into the facility?
8      A     In a situation where they know that -- that one
9  of those issues that we've discussed have been
10 identified, they would go ahead and call on the radio
11 that they would need a supervisor, the individual has no
12 pulse, airway is blocked or there's loss of limb, and it
13 requires the immediate attention of an ambulance.
14     Q     And then what would hap- -- or what should
15 happen?
16     A     Then the radio transmission is identified
17 through -- through the supervisors and through central
18 control.
19     Q     And then what happens?
20     A     They would verify the information, such as a
21 repeating system, supervisor would radio at that time
22 and reconfirm that the officer in central patrol is
23 approved to call 911.
24     Q     Help me out with that.  What do you mean when
25 you say "repeating system"?

49

Stephen McCollum, et al v.                         Jeffery Pringle
Brad Livingston, et al.                          February 15, 2013

1      A    We use a Instant Command System, which is a

2    national system that's set up with all -- most

3    government agencies and law enforcement.  So once the

4    officer comes on the radio and identifies who they are,

5    location, a situation, then another radio that receives

6    the transmission will repeat the information.  So that

7    way staff on the unit are aware of where it's at and who

8    needs to respond and a type of a level of response.

9      Q    Okay.  So I'm -- well, let me give you this

10   situa- -- well, it meets your definition of medical

11   emergency.  It's radioed in that there's an immediate

12   need for help.  What -- to -- that gets radioed to a

13   sergeant or a lieutenant or does everybody hear it on

14   the radio?

15     A    Everybody would hear it on the radio.

16     Q    Okay.  And then so the lieutenant would run it

17   through the system?

18     A    I'm not familiar with what you're asking.

19     Q    Yeah.  I'm just trying to -- I'm just trying to

20   figure out the whole process from somebody concludes

21   there's a medical emergency, to getting an ambulance

22   into the Hutchins Unit.  Walk me through that because I

23   need to understand that process.

24     A    Once the situation's been repeated and it's

25   verified a second time -- the first time's the officer,

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

```
 1  not responding?
 2              MR. GARCIA:  Objection.
 3      Q     (BY MR. EDWARDS)  Does that change your
 4  opinion?
 5              MR. GARCIA:  Speculation.
 6      A     Ten minutes, no, I would not call.
 7      Q     (BY MR. EDWARDS)  Okay.  Twenty minutes?
 8              MR. GARCIA:  Objection; speculation.
 9      A     I would have to be there at the scene, assess
10  the surrounding, whether he's in any life-threatening
11  danger and whether or not he's harmed himself while he's
12  having convulsions.
13      Q     Now, how would you know if he's in
14  life-threatening danger being a warden and not a doctor?
15      A     Because he's breathing and he has circulation.
16  He has no blunt trauma and he has no loss of limbs.
17      Q     And you think that means categorically that a
18  person isn't in it a life-threatening state?
19              MR. GARCIA:  Objection; speculation.
20      A     Based on -- I would have to be there during the
21  incident.  I would have to do the assessment.  And then
22  from there based upon my first-aid training, I would
23  make that decision at that time.
24      Q     (BY MR. EDWARDS)  Okay.  What about an hour of
25  not responding?
```

Stephen McCollum, et al v.                        Jeffery Pringle
Brad Livingston, et al.                           February 15, 2013

1     Q    Okay.  We'll get back to that in a second.
2             But the people who do the prison rape
3  elimination, is that somebody under your direct control,
4  a TDCJ employee or no?
5     A    It would be a sergeant or correctional officer.
6     Q    With TDCJ.  Fair?
7     A    Yes.
8     Q    Okay.  Same with the gang tattoos?
9     A    Yes.
10    Q    Okay.  Is it your understanding that a prisoner
11 receives an intake physical the day they arrive at the
12 Hutchins Unit Jail -- or Prison?
13    A    I do not know that they receive an intake
14 physical upon arrival, no.
15    Q    Do you know if they're supposed to?
16    A    Upon arrival, no.  The intake procedures are
17 within the first ten days, usually.
18    Q    Who decides that practice or policy?
19    A    I do not know.
20    Q    Is it you?
21    A    No, it is not me.
22    Q    Okay.  Do you know if -- I mean, do you know
23 when inmates have had inmate physicals completed?
24    A    We would know that a physical's completed
25 because he's usually ready for classification, which is

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1    A    I've described the intake receiving and the
2  duties that they do there.  During that intake
3  receiving, also the offenders are given showers,
4  haircuts.  If they're identified with any injuries, we
5  would take pictures and document it.  So that way we can
6  show they came in from the county with them.  From that
7  point, they're housed in the facility and then they go
8  through an intake processing; and intake processing
9  consists of EA testing to determine their education
10  level.  They would receive a photo, fingerprints.  They
11  would receive a intake interview.
12    Q    With whom?
13    A    With the intake processing staff.
14    Q    Is that your staff or is that...
15    A    That's TDCJ staff.
16    Q    Okay.  Do you know if Mr. McCollum received an
17  intake processing interview?
18    A    I do not know.
19    Q    Okay.  Should he have?
20    A    I do not know where they were at in the
21  processing days or procedures.
22    Q    Okay.  With regards to the intake processing,
23  would that include medical issues?
24    A    The medical would do their evaluation within
25  the first ten days, which would be part of the

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                      February 15, 2013

1   processing.

2       Q    Okay.  Would you do -- would TDCJ do its intake

3   processing before medical completed it's intake

4   physical?

5       A    It's kind of a dual schedule based upon

6   different days on different locations they go to.

7       Q    Help me out.  Elaborate a little bit more on

8   that, please.

9       A    Depending on the number of offenders that came

10  in on what day, the intake processing staff may get the

11  offenders from a specific county that came in on a

12  specific day, and the medical staff would get a

13  different group that came in together on a different

14  day.  And at times, they've been known to switch out

15  days within that ten-day process.

16      Q    Okay.  Who makes the decision like whether a

17  particular type of drug is permitted at the Hutchins

18  Unit?  Would that be UTMB or would that be TDCJ?

19      A    I do not know.

20      Q    Okay.  Do you have any role in whether or not

21  medications are allowed at the Hutchins Unit?

22      A    I have limited role based upon whether the

23  offender does a KOP, keep on person, or whether he goes

24  to the window.

25      Q    Okay.  What exactly does that mean?

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1   so it's not something that I would have to recall based

2   on the policies or the form.

3       Q    As the senior-most ranking official at the

4   Hutchins Unit, isn't it your responsibility to know

5   that?

6       A    No, it's not.

7       Q    Okay.  Do you know if cups were issued to

8   inmates upon arrival at the Hutchins Unit?

9       A    During the 2011, cups were not issued and

10  they're not on the item to be issued list.

11      Q    Do you agree with me that a cup is an important

12  part of assisting someone to drink water?

13      A    In that terminology to obtain water, yes.

14      Q    Okay.  You knew in July 2011, that many inmates

15  suffered from hypertension, correct, at the Hutchins

16  Unit?

17      A    No, I did not know that.

18      Q    Should you have known that?

19      A    No, I should not.

20      Q    Tell me why.

21      A    Because that's a medical process that the

22  offender would go through medical for his medical needs

23  and it's not available to correctional staff.

24      Q    And the choice to not make it available to

25  correctional staff, again, is whose?

116

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

```
 1              MR. GARCIA:  That doesn't make
 2  Mr. McCollum diabetic.
 3              MR. EDWARDS:  Good point.
 4              MR. MEDLOCK:  It's personal history.
 5              MR. GARCIA:  It's family history above it,
 6  where diabetes is circled.
 7      Q    (BY MR. EDWARDS)  Do you know whether or not
 8  Mr. McCollum was diabetic?
 9      A    I do not know.
10      Q    If you learned throughout this litigation that
11  Mr. McCollum was, in fact, diabetic and wasn't treated
12  for it, what steps would you take after the fact now
13  that Mr. McCollum is dead, if any?
14      A    It would be the same steps I would take as
15  mentioned before.  I would call the medical, have them
16  either verify it, find out if he's following doctor's
17  orders, and then whether or not it's an issue of him
18  getting to medical or if it's just his choice for not
19  following doctor's orders.
20      Q    Okay.  When are -- when are prisoners first
21  allowed to go to commissary, sir?
22      A    Offenders that are newly arrived or offenders
23  that are transferred in?
24      Q    Well, what type of offender was Mr. McCollum?
25      A    He was a intake, newly received from county.
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1        Q      Was he in the state jail system or the

2    institutional division?

3        A      He would have been state jail system.

4        Q      Okay.  How long would it take him to get access

5    to the commissary?

6        A      Those days are different for different

7    offenders.

8        Q      What would your expectation be, sir?

9        A      Within 30 to 45 days.

10       Q      Thirty to 45 days.

11              So is that -- does that mean that

12   Mr. McCollum would not have the ability to buy a cup for

13   30 to 45 days at the Hutchins Unit?

14       A      That would be true.

15       Q      Do you see any problems with that in the summer

16   when it's extremely hot?

17       A      Offenders have to have money on the commissary

18   account before they can go and buy a cup.

19              MR. EDWARDS:  Let me object as

20   nonresponsive.

21       Q      (BY MR. EDWARDS)  Do you see any problems with

22   delaying 30 to 45 days a prisoner's ability to buy a cup

23   in the extremely hot summer months?

24       A      I do not see a problem with it.

25       Q      You don't think it would be harder for that

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                  February 15, 2013

```
1   there blind spots in the C7 dorm?

2       A    Yes, there would be.

3       Q    Okay.  Are there blind spots in all of the

4   dorms?

5       A    All the dorm housings on the unit do have those

6   same general blind spots.

7       Q    Okay.  Do you find that to be less than

8   optimal?

9       A    No, I do not.

10      Q    You don't find that that might endanger

11  inmates?

12      A    No, I do not.

13      Q    Have there been any rapes in the dorms at the

14  Hutchins Unit in the last five years?

15      A    Not to my knowledge.

16      Q    Have there been any fights in the dorms at the

17  Hutchins Unit in the last five years?

18      A    Yes, there have been fights.

19      Q    Do the fights tend to happen in the blind

20  spots?

21      A    They do at times.

22      Q    Do you see any problems with having blind spots

23  in the dorms, sir?

24      A    No, I do not.

25      Q    Okay.  All right.  Does the dorm have -- oh,
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

```
 1   how many men are in each dorm?  Like in C7, how many men
 2   are in there?
 3       A    This particular dorm, I do not know how many
 4   men are in there in, but there are 58 bunks.
 5       Q    Okay.  So up to 58 people?
 6       A    Yes.
 7       Q    Okay.  Are there windows in the C7 dorm?
 8       A    Yes, there will be windows in the dorm.
 9       Q    Will you show me where the windows are?
10       A    (Complies).
11       Q    And would you just label them "W" so we know
12   what you're doing.
13       A    (Complies).
14       Q    Thank you.
15            Are they open?
16       A    These windows do not open.
17       Q    Are they sealed shut?
18       A    They are by design sealed shut.
19       Q    Why are they by design sealed shut?
20       A    I do not know.
21       Q    Have you ever asked anyone if you could open
22   them?
23       A    I have not.
24       Q    Do you believe that if you opened them it would
25   increase airflow into C7?
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1    Q    Okay.  Do you know who you would begin the

2  pro- -- if you decided, hey, we need to get fans in

3  here, it's just too hot in here during the summer, who

4  would you contact?

5    A    I do not have a procedure that says here's how

6  you contact.  But it would involve several entities.

7  One would be Mr. Eason, facilities divisions, risk

8  management.

9    Q    Giving prisoners fans would enable them to cool

10  off a little bit.  Is that true?

11    A    No, it's not.

12    Q    Tell me why that's not true?

13    A    Because you're pushing the same heat index or

14  the same heat that you would have inside the housing

15  area.

16    Q    Okay.  So even giving fans in a really hot area

17  would just be blowing more hot air on people?

18    A    From my perception, yes.

19    Q    Okay.  Is there air-conditioning in the C7

20  unit?

21    A    C7, no air-conditioning.

22    Q    Are there air handlers or anything like that or

23  fans?

24    A    There are air handlers which produce outside

25  air, and then there are large mounted fans.

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1      Q    I guess the outside air coming in is pretty

2  hot?

3      A    It would be whatever the outside temperature

4  is.

5      Q    So if it's 115 outside -- if it's 115 outside,

6  it's 115 coming inside?

7      A    That would be the air, possibly.

8      Q    Okay.  These fans, I guess, they also would

9  blow hot air around?

10     A    The ones mounted or --

11     Q    Yeah, the ones mounted.

12     A    Yes, they would circulate the air within the

13  dorm.

14     Q    Okay.  Do you know if that fan -- those fans

15  were working back in July of 2011?

16     A    I do not have firsthand knowledge.

17     Q    Okay.  Do you know if they've ever been broken?

18     A    Those particular fans for that housing area, I

19  do not if they've been broken.

20     Q    When a fan in a unit breaks, what's the --

21  well, how long does it usually take to get fixed?

22     A    Those particular fans, the time frames could

23  always vary.

24     Q    Could it be more than a month?

25     A    Could it be?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

Plaintiffs' MSJ Appx. 6787

137

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1      A    We've been told there's a nurse that takes

2   those calls.

3      Q    Okay.  Who told you that?

4      A    It have been Ms. Gilford or Ms. Brady.

5      Q    So if there's an emergency medical need, what

6   happens if it's after hours, as a general manner?

7      A    What would be the definition of a emergency

8   medical need?

9      Q    What's your definition of emergency medical

10  need, sir?

11     A    From my experience, being a first responder, if

12  I arrive on the scene and the airway's blocked or if

13  there's no circulation and they're not breathing, then

14  that would be a medical emergency.

15     Q    Okay.  Do you believe that there could be

16  medical emergencies where an inmate is still breathing?

17     A    Yes.

18     Q    Okay.  And doesn't have his arm chopped off or

19  anything like that?

20     A    No.

21     Q    Okay.  What about a situation where a person's

22  sweating profusely and having chest pains but is capable

23  of responding and having a conversation with you.  In

24  that situation, would you expect your staff to consider

25  that a medical emergency?

138

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

```
 1        A    No.
 2        Q    What training, if any, do you make sure that
 3   your people at the Hutchins Unit get relating to
 4   recognizing medical emergencies?
 5        A    You repeat the question, please?
 6        Q    What training, if any, do you make sure your
 7   people at the Hutchins Unit get relating to recognizing
 8   emergency conditions?
 9        A    I don't make sure the training gets done.
10        Q    Who does?
11        A    The training is sent out through training
12   department and risk management and --
13        Q    Who runs the --
14        A    -- UTMB.
15        Q    Sorry.  Who runs the training department at
16   TDCJ?
17        A    The training director would be Mr. Morales.
18        Q    Do you know his first name?
19        A    No, I do not.
20        Q    You mentioned the risk management division.
21   Who runs the risk management division at -- at TDCJ?
22        A    I do not know.
23        Q    Do you believe that your understanding of
24   medical emergency is consistent with risk management's?
25             MR. GARCIA:  If you know.
```

Stephen McCollum, et al v.                        Jeffery Pringle
Brad Livingston, et al.                        February 15, 2013

```
 1   chow time so that people could drink more water?

 2       A    No, there was not.

 3       Q    Should there have been?

 4       A    No.

 5                 (Deposition Exhibit No. 28 marked)

 6       Q    (BY MR. EDWARDS)  Would you take a look at

 7   what's been marked as Exhibit 20 --

 8                 THE REPORTER:  Eight.

 9       Q    (BY MR. EDWARDS)  Eight.  Those appear to be

10   the temperature logs for July 15th until July 22nd.

11       A    Correct.

12       Q    Okay.  Now I believe there's been testimony in

13   this case, I want to make sure that it's accurate, that

14   these temperature readings are taken every day from

15   6:30 a.m. till 6:30 p.m.

16       A    Correct.

17       Q    Okay.  Are you aware that it was extremely

18   hot -- or strike that.

19                 Back in the summer of July 2011, were you

20   aware that it was extremely hot in Texas and

21   particularly the Dallas area was experiencing a heat

22   wave?

23       A    I was aware of temperatures that are identified

24   on the documents.

25       Q    Gotcha.  Okay.
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1            How were you made aware of the

2    temperatures identified on the documents?

3        A    The officer that's taking the temperatures will

4    do a radio call.

5        Q    Okay.  How does that -- how does that work,

6    sir?

7        A    For instance, on the first page, whenever he

8    would use a graph chart -- I don't see it here -- and if

9    the graph chart went into a specific section, then he

10   would radio either extreme conditions or the identifiers

11   that go along with that condition so all staff would

12   know.

13       Q    Okay.  Would the actual temperature be read

14   aloud?

15       A    I don't recall if the temperatures were read

16   aloud by the staff member or not.

17       Q    There's been testimony in this case that the

18   temperatures were read aloud.  Do you have any reason to

19   dispute that?

20       A    No, I do not.

21       Q    Okay.  So assuming that that testimony's

22   correct, that the temperatures were read aloud, your

23   understanding is it's also -- the officer's also

24   supposed to note whether or not it's an extreme risk of

25   heat?

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1      A    I don't ever recall Texas being 149 degrees.

2      Q    Okay.  Do you ever recall the heat index being

3  149 degrees?

4      A    I do not recall that.

5      Q    Okay.  It's on this piece of paper.  Right?

6      A    I do see the heat index.

7      Q    Okay.  Was this ever brought to your attention?

8      A    The document?

9      Q    Or the heat index, sir, I mean...

10     A    No, not this particular heat index; no.

11     Q    Those numbers mean that heatstroke is imminent.

12  Right?

13          MR. GARCIA:  Objection; speculation.

14     Q    (BY MR. EDWARDS)  According to your heat

15  matrix, those numbers indicate that heatstroke is

16  imminent.  Correct?

17     A    Correct.

18     Q    Is imminent heatstroke the type of condition in

19  a jail that endangers inmates?

20     A    Not necessarily.

21     Q    Do you think that type of attitude provides

22  adequate protection for inmates from extreme heat

23  conditions, sir?

24          MR. GARCIA:  Objection; argumentative.

25     A    The matrix provides a guideline and identifies

Plaintiffs' MSJ Appx. 6792

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

 1     A    Yes, I did.

 2     Q    Did risk management talk to you about the

 3  dangers associated with working in those conditions?

 4     A    I don't recall them personally talking to me

 5  about that, no.

 6     Q    Was you -- did your office feel about as hot as

 7  it was outside?

 8     A    Yes, it did.

 9     Q    Do you recall if this was before or after

10  Mr. McCollum's death?

11     A    I don't recall.

12     Q    Would you take a look at the log for July 21st,

13  2011?

14     A    Yes.

15     Q    Okay.  Would you agree with me that the outside

16  air temperature was between 103 and 107 degrees during

17  the hours of 1:30 and 6:30 p.m.?

18     A    Yes.

19     Q    Would you agree that the heat index rose to

20  somewhere between 114 and 118 during that time period?

21     A    Yes.

22     Q    You probably were aware of that, sir?

23     A    Not of the actual numbers, no.

24     Q    You were just aware that there was the

25  potential for heatstroke?

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

```
 1              MR. GARCIA:  Objection; speculation.
 2       A    I don't recall what I would have been made
 3  aware of at that time.
 4       Q    (BY MR. EDWARDS)  You were aware that those
 5  were extreme heat conditions?
 6       A    Yes.
 7       Q    Okay.  And then look at 7/22/11.  Would you
 8  agree that from 1:30 in the afternoon until 6:30 in the
 9  afternoon, the temperature varied from 101 to 104?
10       A    Yes.
11       Q    That the heat index was somewhere between 110
12  and 113?
13       A    Yes.
14       Q    You would have been aware that those
15  constituted extreme heat conditions, sir?
16       A    Yes.
17       Q    Has anybody at the Hutchins facility looked
18  into whether or not it would be possible to get
19  air-conditioning in the dorms?
20       A    No, I do not know.
21       Q    Well, have you?
22       A    Have I questioned --
23       Q    Have you made a phone call and said, hey, can
24  we get air-conditioning in the dorms for the prisoners?
25       A    This incident would have been general knowledge
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1     A     Yes.

2     Q     That just means drink a lot of water.  Right?

3     A     Uh-huh.

4     Q     Okay.  And you were told and all of your

5   employees were told during this training that these

6   symptoms we talked about of heat exhaustion can progress

7   to heat collapse and heatstroke if they're not treated.

8   Right?

9     A     Yes.

10    Q     Okay.  They need to be treated right away.

11   Right?

12    A     Yes.

13    Q     Okay.  If you don't treat them right away, heat

14   exhaustion or, you know, heat illness can turn into, you

15   know, a potentially deadly condition.  Right?

16    A     I believe it could.

17    Q     Yeah.  People can die from heatstroke.  Right?

18    A     I assume, yes.

19    Q     Mr. McCollum did.  We know that.  Right?

20    A     Based on the forensic documents that we have.

21    Q     Right.  Well, and it was your understanding in

22   July of 2011, that people who were suffering from heat

23   illness, who went untreated or went without quick

24   treatment could potentially die.  You knew that.  Right?

25    A     I don't know of any people that suffered that

1    A    To alert us of the present danger, yes.

2    Q    Okay.  Okay.  So I want to go through that list

3  and if I've written it down incorrectly, please make

4  sure you tell me.  Okay?

5         We talked about the heat awareness

6  training that y'all received.  Right?

7    A    Correct.

8    Q    Okay.  And then I wrote down "heatstroke."  And

9  I believe you -- I believe we may have just talked about

10  that.  But during this training, it was explained to you

11  that, look, if not treated, this can lead to heatstroke

12  which can lead to death.  Is that correct?

13    A    Correct.

14    Q    And so accommodations that you made for

15  individuals were lowering the temperatures of water in

16  the showers?

17    A    Correct.

18    Q    Okay.  What did you lower them to?

19    A    The showers that I took temperature checks on

20  were, approximately, about 95 degrees.

21    Q    What were they before?

22    A    Policy requires them to stay around 107.

23    Q    Do you know why the number 95 was chosen?

24    A    The 95 would have been just chosen because of

25  the way the shower mixing valve and adjustments are

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1    storage sometimes?

2       A     There are a couple that are used for storage.

3       Q     Okay.  So is it possible that the C building

4    multipurpose room was used partly for storage?

5       A     I do not know.

6       Q     Okay.  Is it possible?

7       A     It could have been possible.

8       Q     Okay.  Do you have any knowledge as to whether

9    or not Larry McCollum was told that if he was

10   struggling, he could go to one of these areas?

11      A     No, I do not personally know.

12      Q     Do you believe that Larry McCollum should have

13   been told that by correctional officers at your

14   facility, sir?

15      A     No, I do not.

16      Q     Do you agree an important part of an

17   accommodation is making sure that people know the

18   accommodation exists?

19      A     That is done at this present time when the

20   offenders arrive.

21      Q     At the present time now, now that we're in

22   2013, you make sure to tell people that they have access

23   to these air-conditioned areas?

24      A     Yes.  Because they've shown that they may not

25   have the abilities or take the responsibility that they

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

Plaintiffs' MSJ Appx. 6797

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1  should to be able to obtain those facilities.  So we've

2  taken advantage and are letting them know at the time of

3  receiving.

4      Q    You've take the initiative to make sure, look,

5  you know that this is available.  Right?

6      A    Yes.  I put it to my staff.

7      Q    Okay.  When did you do that?

8      A    That would have occurred probably August of

9  2011.

10     Q    After Mr. McCollum's death.

11     A    Correct.

12     Q    Okay.  After Mr. McCollum's death, did you guys

13  review the way you were doing things?

14     A    Yes, we did.

15     Q    Okay.  Do you make some changes?

16     A    There were a few changes.

17     Q    What changes did you make in addition to

18  actually telling inmates about the ability to go to

19  air-conditioned areas?

20     A    Even though inmates had not taken upon

21  themselves to identify issues and we did not identify

22  them, we put five cone cups in their receiving bag.  We

23  ensure that cone cups are available in the pickets

24  during the heat, June, July and August times.  And we've

25  added a third fan to the walls.  And during the summer

Stephen McCollum, et al v.                          Jeffery Pringle
Brad Livingston, et al.                        February 15, 2013

```
 1       Q    You don't believe getting him to the hospital
 2  more quickly would have made a difference?
 3       A    I do not.
 4       Q    Do you have any sort of medical basis for
 5  making that statement?
 6       A    No, I do not have medical basis.
 7       Q    You don't think if he had been on a heat list
 8  and watched every 30 minutes that this situation could
 9  have been avoided?
10            MR. GARCIA:   Objection; speculation.
11       A    During that time, there was not a heat list.
12  The heat list came after the death.
13       Q    (BY MR. EDWARDS)  Right.  So you write that the
14  unit has also began dorm checks of offenders who appear
15  on the extreme temperature list?
16       A    Correct.
17       Q    That's something that came into being after
18  Mr. McCollum's death?
19       A    The extreme temperature work restriction list
20  has always been there.
21       Q    Okay.  Was Mr. McCollum on that list?
22       A    No, he was not.
23       Q    Would you tell the jury why he wasn't?
24       A    I would only be speculating why he wasn't
25  because that's a list that's generated by UTMB.
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                      February 15, 2013

1    air-conditioning?

2        A    Yes, they are.

3        Q    Okay.  The armory.  Do you have an armory at

4    the Hutchins Unit?

5        A    Yes, we do.

6        Q    Okay.  Is that air-conditioned?

7        A    It's on the same system as ministration [sic].

8        Q    Okay.  Do you know why the armory would be

9    air-conditioned?

10       A    Because of gun powder and chemicals need to be

11   kept at a cooler temperature.

12       Q    Okay.  Or they get ruined?

13       A    They would get ruined, yes.

14       Q    Do you know at what temperature they get

15   ruined, gun powder and the chemicals you're talking

16   about?

17       A    The policy just says it has to be kept, I

18   believe, somewhere around 72 or 78 degrees below.

19       Q    Okay.

20       A    And it controls the humidity in that area.

21       Q    Okay.  What about rooms with -- are there rooms

22   where you keep paper files, are those kept in the

23   administrative offices?

24       A    We have security administrative offices.

25       Q    Are those air-conditioned?

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3   STEPHEN McCOLLUM,              §
     STEPHANIE KINGREY, and        §
 4   SANDRA McCOLLUM,              §
     individually and as heirs     §
 5   at law to the Estate of       §
     LARRY GENE McCOLLUM,           §
 6        Plaintiffs,              §
                                   §
 7   V.                            §   CIVIL ACTION NO.
                                   §   3:12-CV-2037-L
 8                                 §
     BRAD LIVINGSTON, JEFF          §
 9   PRINGLE, and TEXAS            §
     DEPARTMENT OF CRIMINAL         §
10   JUSTICE,                      §
          Defendants.             §
11   **********************************************************
12                   REPORTER'S CERTIFICATE
              ORAL AND VIDEOTAPED DEPOSITION OF
13                       JEFFERY PRINGLE
                           VOLUME 1
14                   FEBRUARY 15, 2013
     **********************************************************
15

16        I, SUZANNE VILLA, Certified Shorthand Reporter

17   in and for the State of Texas, hereby certify to the

18   following:

19        That the witness, JEFFERY PRINGLE, was duly

20   sworn by the officer and that the transcript of the oral

21   deposition is a true record of the testimony given by

22   the witness;

23        That the deposition transcript was submitted

24   on _____, 2013 to the witness or to the

25   attorney for the witness for examination, signature and
```

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                    February 15, 2013

1  return to MR. JEFF EDWARDS by _____, 2013;

2         That the amount of time used by each party at

3  the deposition is as follows:

4              MR. JEFF EDWARDS - 5 HRS. 5 MINS.
               MR. BRUCE R. GARCIA - NO TIME

5

6         That pursuant to information given to the

7  deposition officer at the time said testimony was taken,

8  the following includes all parties of record:

9  For the Plaintiffs:
        Mr. Jeff Edwards
10      THE EDWARDS LAW FIRM
        The Bremond Houston House
11      706 Guadalupe
        Austin, Texas  78701
12      (512) 623-7727
        jeff@edwards-law.com
13

14 For the Texas Civil Rights Project
        Mr. Scott Medlock
15      Ms. Michelle Smith
        1405 Montopolis Drive
16      Austin, Texas  78741-3438
        (512) 474-5073 X105
17      scott@texascivilrightsproject.org

18 For the Defendants:
        Mr. Bruce R. Garcia
19      OFFICE OF THE ATTORNEY GENERAL
        PO Box 12548
20      Austin, Texas  78711-2548
        (512) 463-2080
21      bruce.garcia@oag.state.tx.us

22         That $_____ is the deposition officer's

23 charges to the PLAINTIFFS for preparing the original

24 deposition transcript and any copies of exhibits;

25         I further certify that I am neither counsel

Stephen McCollum, et al v.                    Jeffery Pringle
Brad Livingston, et al.                       February 15, 2013

1   for, related to, nor employed by any of the parties or

2   attorneys in the action in which this proceeding was

3   taken, and further that I am not financially or

4   otherwise interested in the outcome of the action.

5          Certified to by me this _____ day

6   of _____, 2013.

7

8

9

10

11   _____
     SUZANNE VILLA, Texas CSR No. 8323
12   Expiration Date: 12-31-14
     WRIGHT WATSON & ASSOCIATES
13   Registration No. 225
     Expiration Date: 12-31-13
14   3307 Northland Drive
     Suite 185
15   Austin, Texas  78731-4946
     (512) 474-4363
16   JOB NO. 130215SV

17

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e34f4e41-b96a-4f84-a2ac-a1ada2a1fa88

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 290

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
                  HOUSTON DIVISION


                                §
KEITH COLE, JACKIE              §
BRANNUM, RICHARD KING,          §
DEAN ANTHONY MOJICA, RAY        §
WILSON, FRED WALLACE, AND       §
MARVIN RAY YATES,               §
individually and on             §    CIVIL ACTION
behalf of those similarly       §
situated,                       §    NO.: 4:14-cv-1698
                                §
         Plaintiffs,            §
                                §
VS.                             §
                                §
BRAD LIVINGSTON, in his         §
official capacity,              §
ROBERTO HERRERA, in his         §
official capacity, and          §
TEXAS DEPARTMENT OF             §
CRIMINAL JUSTICE,               §
                                §
         Defendants.            §
```

**************************************************************

ORAL DEPOSITION OF

DEAN RIEGER, M.D.

MAY 23, 2016

**************************************************************

**WRIGHT WATSON & ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

Dean Rieger, M.D. – 5/23/2016

1              ORAL DEPOSITION OF DEAN RIEGER, M.D., produced

2   as a witness at the instance of the Plaintiffs, and duly

3   sworn, was taken in the above-styled and numbered cause

4   on the 23rd day of May, 2016, from 10:10 a.m. to

5   6:37 p.m., before Becky Landers, CSR, RPR and CRR in and

6   for the States of Texas and California, reported by

7   machine shorthand, at the Office of the Attorney

8   General, 300 West 15th Street, Seventh Floor, pursuant

9   to the Federal Rules of Civil Procedure and the

10  provisions stated on the record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

Dean Rieger, M.D. - 5/23/2016

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         Mr. Jeff Edwards
           -and-
 5         Mr. David James
           THE EDWARDS LAW FIRM
 6         The Haehnel Building
           1101 E. 11th Street
 7         Austin, Texas  78702
           512-623-7727/512-623-7729 (fax)
 8         jeff@edwards-law.com

 9

10    FOR THE DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE:

11         Mr. Phillip P. Boyd
           Ms. Cynthia L. Burton
12         Ms. Pat Tulinski
           Mr. Matthew J. Greer
13         Mr. Derek Kammerlocher
           Assistant Attorney General
14         Law Enforcement Defense Division
           P. O. Box 12548
15         William P. Clements Building
           300 West 15th Street
16         Seventh Floor
           Austin, Texas  78701
17         512-463-2080/512-936-2109 (fax)
           phillip.boyd@texasattorneygeneral.gov
18         cynthia.burton@texasattorneygeneral.gov
           pat.tulinski@texasattorneygeneral.gov
19         matthew.greer@texasattorneygeneral.gov
           derek.kammerlocher@texasattorneygeneral.gov
20
           -and-
21
           Mr. Graig J. Alvarez
22         FERNELIUS, ALVAREZ, SIMON, P.L.L.C.
           LyondellBasell Tower
23         1221 McKinney Street
           Suite 3200
24         Houston, Texas 77010-2011
           713-654-1200/713-654-4039 (fax)
25         galvarez@fa-lawfirm.com
```

Dean Rieger, M.D. – 5/23/2016

```
1   FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:

2        Mr. J. Lee Haney
         Ms. Jennifer L. Daniel
3        Ms. Shanna Molinare
         Ms. Heather Rhea
4        Assistant Attorney General
         Law Enforcement Defense Division
5        P. O. Box 12548
         William P. Clements Building
6        300 West 15th Street
         Seventh Floor
7        Austin, Texas  78701
         512-463-2080/512-936-2109 (fax)
8        lee.haney@texasattorneygeneral.gov
         jennifer.daniel@texasattorneygeneral.gov
9        shanna.molinare@texasattorneygeneral.gov
         heather.rhea@texasattorneygeneral.gov
10

11
    ALSO PRESENT:
12       Ms. Francis Finley
         Ms. Nadia Sheikh
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dean Rieger, M.D. - 5/23/2016

```
 1        Q.   Congratulations.

 2        A.   Thank you.

 3        Q.   So what is your income now that you've

 4   retired?

 5        A.   We'll see.  I'm not -- my wife and I have been

 6   lucky enough that if we have no income we'll be fine.

 7        Q.   Are you deriving income from expert witness

 8   services?

 9        A.   Yes.

10        Q.   Prior to retirement was the money from the

11   Texas Department of Criminal Justice for this case going

12   to you personally, Dr. Rieger?

13             Is it "Reeger" or "Ryeger," first of all?

14        A.   "Reeger."

15        Q.   "Reeger," sorry.

16             The money that they were paying you from

17   TDJC prior to your retirement, was that going directly

18   to you or to Correct Care?

19        A.   To me.

20        Q.   And I trust it will continue to go to you as

21   you work on this case?

22        A.   Yes.

23        Q.   Have you been retained in any other cases

24   involving injuries related to the heat in the Texas

25   prison system?
```

Dean Rieger, M.D. - 5/23/2016

1      A.    Yes.

2      Q.    What other cases have you been retained in,

3  sir?

4      A.    McCollum.

5      Q.    Are you a consulting expert in the McCollum

6  case?

7      A.    I am not familiar with the term "consulting

8  expert," so I don't know how to answer that.

9      Q.    You're not a testifying expert in the McCollum

10 case, so are you providing consulting expert services?

11     A.    I will provide the expert services that the

12 TDCJ requests.

13     Q.    Okay.  Other than the McCollum case, have you

14 been retained in any of the other plethora of

15 health-related injury cases against the Texas prison

16 system?

17     A.    Not to this point.

18     Q.    Has anyone spoken to you about being retained

19 in any of the other cases?

20     A.    Not to this point.

21     Q.    Are you aware of any of the other cases?

22     A.    I think I am now.

23     Q.    Oh, before I kind of flippantly mentioned it

24 you weren't aware of them?

25     A.    I don't know if any other cases have been

Dean Rieger, M.D. - 5/23/2016

```
1       Q.   Could I see it for one second?  And I don't --
2   I just don't have it here.  Looks like we've got deaths
3   from 1998 until 2012.  Would you take us -- and when I
4   say "deaths" I mean hyperthermia deaths --
5       A.   Okay.
6       Q.   -- for documented heat stroke deaths.
7       A.   Yes.  That's -- that's what this looks like.
8       Q.   How many deaths on that -- are there on that
9   chart that occurred before 2011?
10      A.   Before 2011?
11      Q.   Yeah.
12      A.   Eight.
13      Q.   That's a pretty high number, right?
14           MR. BOYD:  Objection, vague.
15      A.   I would say it's a significant number.
16      Q.   (By Mr. Edwards)  That's a much better way of
17  saying it.
18           You would agree that that's a significant
19  number of deaths, right?
20      A.   Yes.
21      Q.   And you would agree that in light of that
22  number of deaths the policies and procedures and the
23  practices ought to be investigated to determine whether
24  or not they're really working?
25           MR. BOYD:  Objection, incomplete
```

Dean Rieger, M.D. - 5/23/2016

1  hypothetical.

2      A.   Yes, I would.  I think "investigate" is the

3  wrong term.  I think I would use the word "reviewed,"

4  but --

5      Q.   (By Mr. Edwards)  Review, evaluate it?

6      A.   Yes.

7      Q.   Okay.  Now, do you know -- now I want to ask

8  you, count them all up.  Include the summer of 2011 and

9  2012.

10     A.   I'm going to count them again.

11     Q.   Thank you.

12     A.   20.

13     Q.   That also would be a very significant number

14  of deaths, right?

15     A.   Yes.

16     Q.   Do you know if an outside study was ever

17  ordered by TDCJ prior to being sued about the high --

18  the significant number of heat stroke deaths in the

19  system?

20     A.   No, I don't.

21     Q.   Okay.  At some point review from the outside

22  becomes necessary?  Wouldn't you agree?

23              MR. BOYD:  Objection, incomplete

24  hypothetical.

25     A.   No.  I don't think it necessarily becomes

**WRIGHT WATSON & ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
4653dfdd-8546-44c2-bb3b-62c8ca61921c

Plaintiffs' MSJ Appx. 6812

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 291

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   STEPHEN McCOLLUM and        §
     SANDRA McCOLLUM,            §
 4   individually and as        §
     independent administrator   §
 5   of the Estate of LARRY      § Civil Action
     GENE McCOLLUM,              §
 6                               § Number 4:14-CV-3253
                                 §
 7              Plaintiffs,      §
                                 §
 8   vs.                         §
                                 §
 9                               §
     BRAD LIVINGSTON, JEFF       §
10   PRINGLE, RICHARD CLARK,     §
     KAREN TATE, SANDREA         §
11   SANDERS, ROBERT EASON,      §
     THE UNIVERSITY OF TEXAS     §
12   MEDICAL BRANCH and THE      §
     TEXAS DEPARTMENT OF         §
13   CRIMINAL JUSTICE,           §
                                 §
14              Defendants.      §

15   ------------------------------------------------

16

17

             ORAL AND VIDEOTAPED DEPOSITION OF
18
                 JERRI DENEÉ ROBISON
19
                  APRIL 27, 2016
20

21
     ------------------------------------------------
22

23

24

25
```

1            ORAL AND VIDEOTAPED DEPOSITION OF JERRI

2    DENEÉ ROBISON, produced as a witness at the instance

3    of the PLAINTIFFS, and duly sworn, was taken in the

4    above-styled and numbered cause on APRIL 27, 2016,

5    from 9:37 a.m. to 6:11 p.m., before Melody Reneé

6    Campbell, CSR in and for the State of Texas,

7    reported by method of machine shorthand, at the

8    offices of the Attorney General, 300 West 15th

9    Street, Austin, Texas, pursuant to Notice and Court

10   Order and the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jerri Denee Robison                                                         3

```
 1                  A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:
             Mr. Scott Medlock, Esq.
 3           The Edwards Law Firm
             1101 East Eleventh Street
 4           Austin, Texas  78702
             512.623.7727
 5           Scott@edwards-law.com

 6

 7
      FOR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE,
 8    RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT
      EASON, THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE:
 9           Mr. Daniel Neuhoff, Esq.
             Assistant Attorney General
10           Office of the Attorney General of Texas
             P.O. Box 12548, Capitol Station
11           Austin, Texas  78711
             512.463.2080
12           512.963.2109 (Fax)
             Daniel.Neuhoff@texasattorneygeneral.gov
13

14

15    FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
             Mr. Graig J. Alvarez, Esq.
16           Ms. Kara Philbin, Esq.
             Fernelius Alvarez Simon
17           1221 McKinney Street, Suite 3200
             Houston, Texas  77010
18           713.654.1200
             GAlvarez@fa-lawfirm.com
19           KPhilbin@f-alawfirm.com
                   -and-
20           Ms. J. Lee Haney, Esq.
             Assistant Attorneys General
21           Office of the Attorney General of Texas
             P.O. Box 12548, Capitol Station
22           Austin, Texas  78711
             512.463.2080
23           512.963.2109 (Fax)
             Daniel.Neuhoff@texasattorneygeneral.gov
24           Lee.Haney@texasattorneygeneral.gov

25
```

```
 1    ALSO PRESENT:
            Ms. Shanna Molanre
 2          Ms. Ashley Palermo
            Ms. Kimberly Kauffman
 3          Mr. Richard Huntpalmer
            Ms. Caroland Bremond
 4          Ms. Heather Rhea
            Ms. Jennifer Osteen
 5          Ms. Deborah M. Woltersdorf

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jerri Denee Robison                                                          5

```
 1                        I N D E X
                                                    PAGE
 2   EXAMINATION
        By Mr. Medlock................................   7
 3
     CHANGES AND SIGNATURE............................240
 4   REPORTER'S CERTIFICATE...........................241

 5

 6                     E X H I B I T S
     NO.  DESCRIPTION                               PAGE
 7
        1   Deneé Robison's Objections and Responses   12
 8          to Plaintiffs' Subpoena Duces Tecum
            Attached as Exhibit A to their April 14,
 9          2016 Notice to Take Deneé Robison's
            Deposition
10
        2   06/16/11 E-mail from Virginia Robinson to  133
11          Samual Hallman re: Psych Meds and the Heat

12      3   E-mail String Ending 08/04/11 from Kelly   144
            Maxwell to Lisa Blalack, et al, re:
13          Reporting Heat-Related Illnesses

14      4   E-mail String Ending 08/05/11 from George  161
            Crippen to Robert Williams re: Heat
15
        5   E-mail String Ending 08/05/11 from Charles 176
16          Adams to Robert Williams re : Bradshaw

17      6   E-mail String ending 08/05/11 from         178
            Maximiliano Herrera to Avrian Mendez, et
18          al, re: Heat Stroke or NMS/Serotonin
            Syndrome
19
        7   E-mail String Ending 08/09/11 from Jewel   199
20          Archie to William Raney, et al. Re: Heat
            Stroke or NMS/Serotonin Syndrome
21
        8   E-mail String ending 08/10/11 from Robert  203
22          Williams to George Crippen re: Heat
            Illness
23
        9   E-mail String Ending 04/15/14 from Jerri   210
24          Robison to Gary Eubank re: Huntsville Area
            Transient Unit Concerns
25
```

Jerri Denee Robison                                                                    6

```
 1              E X H I B I T S - Cont'd
      NO.  DESCRIPTION                              PAGE
 2
      10  E-mail String Ending 08/11/11 from Lucinda  214
 3        Webb to Sheri Noble re: 8 Hour Units

 4    11  E-mail String Ending 07/03/12 from Harold   221
          Clayton to Gary Wright, et al. Re: SDO
 5        Heat Related Complaints

 6    12  E-mail String Ending 07/03/13 from Kathy    223
          Grey to Aboidun Alade, et al. Re: Heat
 7        Related Stress SDO

 8    13  E-mail String Ending 07./05/13 from James   226
          Fields to Angela Osborn re: Heat Related
 9        Stress SDO

10    14  E-mail String Ending 08/13/12 from Bobby    232
          Vincent to Jerri Robison re: Offender
11        Rodriguez

12    15  E-mail String Ending 05/28/13 from Jerri    234
          Robison to Kelly Maxwell re: Heat
13        Restrictions

14

15                    *-*-*-*-*

16

17

18

19

20

21

22

23

24

25
```

Jerri Denee Robison

1    that system yet.

2         Q.   Okay.  So that kind of relies on the

3    provider seeing the patient and making the evaluation

4    and inputting that information into the HSM-18.

5    Right?

6         A.   Well, prior to them seeing the patient,

7    when they come in -- when they come in, we can get

8    just hard copy lists initially.  When the patient

9    arrives, just based on their medication, the provider

10   will say, yes, you need to put them on the hard copy

11   list.  And then when their provider does see them,

12   then they will update the HSM-18 because by that time

13   they will be in the system.

14        Q.   Was that the process that was taking place

15   in summer of 2011, or was there a different process

16   in the summer of 2011?  Were people taking that hard

17   copy list you mentioned and adding inmates to a heat

18   restriction list before they were seen by a provider?

19        A.   I don't know if that was happening

20   consistently back then.

21        Q.   Do you know if that was happening at all,

22   or was it just not happening consistently?

23        A.   I don't know.

24        Q.   Okay.  You would agree that when a patient

25   comes into the system, that there is a gap between

```
 1    when they are brought in at intake and when they see

 2    a provider and have the HSM-18 filled out.  Right?

 3         A.   Yes.  That's usually...

 4         Q.   And it's my understanding that that gap can

 5    be up to ten days.  Is that right?

 6         A.   By policy, it's up to seven days.

 7         Q.   Okay.  And that was the same policy UTMB

 8    was operating under in 2011?

 9         A.   I believe so.

10         Q.   Okay.  Now, when a patient first comes off

11    the bus and ends up in one of the TDCJ facilities, a

12    kind of triage assessment is done pretty soon after

13    they arrive, like the same day they arrive.  Right?

14         A.   Yes, the same day, we do an intake

15    assessment.

16         Q.   And that's frequently an LVN that's doing

17    that kind of first assessment.  Right?

18         A.   Could be an LVN or it could be a CCA, which

19    is a correctional care associate.  They -- that

20    particular form does not -- or that -- that does not

21    require a licensed person to do.

22         Q.   In looking at those forms, that kind of

23    looks like the kind of form that I might go fill out

24    when I first go see a new doctor, because it has like

25    check for family history, check for personal history,
```

Jerri Denee Robison

1          A.   I don't know if I'd call it a crisis or a

2     category -- I mean, if he wants to call it that,

3     I'm --

4          Q.   You wouldn't disagree with him?

5          A.   I don't have any opinion about it.

6          Q.   As a nurse in the UTMB system, caring for

7     patients in the TDCJ, if a correctional officer

8     reported to you that an inmate was having convulsions

9     in the middle of the night at a facility where there

10    was no medical staff on site, what would you tell

11    that correctional officer to do?

12         A.   They were actively having convulsions?

13         Q.   Right.

14         A.   I would tell them to call 911.

15         Q.   And you would do that a hundred times out

16    of a hundred.  Right?

17         A.   Yes.

18         Q.   All right.  Are you aware of any

19    correctional practice of allowing patients to have a

20    seizure in the middle of the night and just waiting

21    to have them be seen by medical in the morning?

22              MR. ALVAREZ:  Objection; vague.

23              MR. NEUHOFF:  Same objection.

24         A.   Can you be a little more specific about --

25         Q.   (BY MR. MEDLOCK)  Let's assume that