UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 292

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM,          §
STEPHANIE KINGREY, and §
SANDRA McCOLLUM,          §
individually and as    §
heirs at law to the    §
Estate of LARRY GENE   §
McCOLLUM,              §
          Plaintiffs,    §
                         §
VS                       §     CIVIL ACTION NO.
                         §     3:12-cv-02037
BRAD LIVINGSTON, JEFF  §
PRINGLE, and the TEXAS §
DEPARTMENT OF CRIMINAL §
JUSTICE,                §
          Defendants.    §


-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

SANDREA YVONNE SANDERS

FEBRUARY 8, 2013
-----------------------------------


          ORAL AND VIDEOTAPED DEPOSITION OF

SANDREA YVONNE SANDERS, produced as a witness at the

instance of the PLAINTIFFS, and duly sworn, was taken in

the above-styled and numbered cause on the 8th day of

February, 2013, from 10:08 a.m. to 1:35 p.m., before

TINA TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3        Mr. Scott Medlock
          Mr. Jeff Edwards
 4        THE EDWARDS LAW FIRM
          The Bremond Houston House
 5        706 Guadalupe
          Austin, Texas  78701
 6        jeff@edwards-law.com
          scott@edwards-law.com
 7

 8   FOR THE DEFENDANTS:

 9        Mr. Bruce R. Garcia
          Mr. David A. Harris
10        OFFICE OF THE ATTORNEY GENERAL
          P.O. Box 12548
11        Austin, Texas 78711-2548
          512.463.2080  Fax 512.495.9139
12        bruce.garcia@oag.state.tx.us
          david.harris@oag.state.tx.us
13

14   ALSO PRESENT:

15        Mr. Jeremy Gilliam (Videographer)
          512.565.4799
16        Warden Pringle

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
**(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363**
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6825

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

```
 1                           INDEX

 2                                                   PAGE

 3   Appearances....................................   2

 4   WITNESS:  SANDREA YVONNE SANDERS

 5   Examination by Mr. Medlock....................   4

 6   Signature and Changes........................ 143

 7   Reporter's Certificate....................... 145

 8

 9

10                         EXHIBITS

11   NO.   DESCRIPTION                             PAGE

12   19   Administrative Directive Re Temperature
          Extremes 11/10/06........................  40
13
     20   Lieutenant Sanders' Drawing of Dorms...... 102
14
     21   Email from Lieutenant Sanders to
15        Mr. Eason, et al., Re Mr. McCollum
          7/22/11.................................. 130
16
     22   Revised Email from Lieutenant Sanders to
17        Mr. Eason, et al., Re Mr. McCollum
          7/22/11.................................. 135
18

19

20

21

22

23

24

25
```

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                        February 08, 2013

1        A.    Yes.

2        Q.    And third -- when would you come on on third

3   shift?

4        A.    Actually when third shift started, the

5   officers are supposed to be here at 9:45.  I personally

6   arrived at 6:00 in the evening.

7        Q.    And when would you go home?

8        A.    At 6:00 in the morning.

9        Q.    So you were working about 6:45 p.m. to 6:00

10  a.m.?

11       A.    Yes.

12       Q.    Okay.  When you started working at TDCJ, that

13  would have been around 2000?

14       A.    2001.

15       Q.    2001.  Did you receive some training before

16  you started at TDCJ?

17       A.    Yes, sir.

18       Q.    Describe that for me.

19       A.    It's preservice training, and basically what

20  happens in preservice is that they're basically teaching

21  us policy and procedure on a general level, you know,

22  just pulling the policy and showing us this is what

23  happens.  And then, you know, they let us know when you

24  get to a unit, you have to apply it according to your

25  own unit.

---

Stephen McCollum, et al.                Sandrea Yvonne Sanders
Brad Livingston, et al.                     February 08, 2013

1  to handle, you know, or something that would work itself
2  out, then, yes, we would get with medical.
3      Q.   What would you mean -- what do you mean, if
4  it's something that would work itself out?
5      A.   We have offenders here who are -- who have
6  seizures, and that doesn't always require me to call
7  medical.  Sometimes an offender has a seizure.  As long
8  as he's in a secure area, he's safe -- let's say he's in
9  his bunk, you know, and we're alerted that we have this
10 offender here having a seizure, we would go down to the
11 building and monitor what was going on.
12          Once he finishes seizing, we're watching
13 to see if he's breathing.  A lot of times, you know,
14 people don't respond after -- after having a seizure,
15 and we would leave an officer there with that offender
16 so that when they came out of, you know, the aftermath
17 of the seizure, then we can talk with them and
18 everything.  If there was another issue on top of it,
19 then we would call medical.
20     Q.   What do you mean "if there was another issue
21 on top of it"?
22     A.   Say, he didn't -- he wasn't breathing.
23     Q.   Or he didn't respond at some point?
24     A.   Right.
25     Q.   Okay.  And when you found somebody having a

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6828

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1  seizure, would you immediately call medical, or would

2  you wait for the issue to resolve itself first?

3       A.   We dealt with it on such a large scale basis,

4  that we would wait for it to resolve itself.

5       Q.   How long would you wait?

6       A.   Usually seizures would generally last a few

7  minutes.  If it looked like it was going beyond that, or

8  if they hit their head on a bunk or something and

9  started to bleed out or something like that, then we

10  would call, you know, medical and let them know.

11            We will call anyway in a situation like

12  that, but we wouldn't necessarily have anything else to

13  do.  We were calling medical to notify them that, hey,

14  this offender had this issue.  You know, he needs to be

15  given what's called a lay-in to go see medical in the

16  morning, basically an appointment to go see medical in

17  the morning.

18       Q.   And you don't have any medical training,

19  right?

20       A.   No.

21       Q.   Do you consider a seizure to be a serious

22  medical problem?

23       A.   I can't really answer that question.

24       Q.   If somebody in your family had a seizure,

25  would you get them to a doctor?

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                      February 08, 2013

1      Q.   In the 12 years that you've worked here at the
2  Hutchins Unit, was there ever medical staff here on the
3  third shift?
4      A.   There was a point where -- it wouldn't -- no,
5  it wouldn't have been third shift, because they left at
6  10:00 o'clock, so, no.
7      Q.   Okay.  So as far as you know, in the 12 years
8  you've worked here at the Hutchins Unit, there's never
9  been medical staff after 10:00 o'clock?
10     A.   As far as I know, there's never been medical
11 staff after 10:00.
12     Q.   Okay.  When did it change from there being no
13 medical staff after 10:00 p.m. to no medical staff
14 after -- well, let's take a step back.
15          When does medical staff leave the
16 Hutchins Unit today?
17     A.   They leave at 6:00.
18     Q.   When did that change happen that they leave at
19 6:00 instead of having somebody here until 10:00?
20     A.   I don't remember.
21     Q.   Was it more than five years ago?
22     A.   I don't remember.
23     Q.   Okay.  You don't remember if you were a
24 correctional officer or a sergeant when that happened?
25     A.   The only reason I even remember that they used

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6830

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1  situation like this but the offender was not working?

2      A.   Was not working?

3      Q.   Uh-huh.

4      A.   Again, it would depend.  I mean, if this was a

5  rec yard situation, they were outside playing basketball

6  or something like that, or if they -- it would just

7  really depend, because a lot of times, it's not that we

8  know anything one way or the other.  We don't have any

9  access to these offenders' information, so I'm assuming

10 that this is the problem.

11     Q.   If a prisoner was on the heat list, and they

12 started -- they collapsed or were having convulsions,

13 would then you follow those policies --

14     A.   Yes --

15     Q.   -- assuming that it's the middle of the

16 summer?

17     A.   -- because I would assume that.

18     Q.   Okay.  So it sounds like that information on

19 the heat list would have been important to you in making

20 a decision about what to do in a situation where you

21 find a prisoner having convulsions.

22     A.   I wouldn't say that it was important as much

23 as it was a better guideline.

24     Q.   If a prisoner was on the heat list and they

25 were found having convulsions, are there any

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6831

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                         February 08, 2013

1      Q.    Yeah.

2      A.    It would depend on the situation.  You know,

3  it would -- I would have to see, again, just kind of a

4  combination of these symptoms, you know, and that might

5  trigger, okay, well, this might be heat related.  In the

6  sun, that would almost be a given, but in -- not in the

7  sun, I don't know that that would be my first thought.

8      Q.    Okay.  So the sun is a factor?

9      A.    Right.

10     Q.    Okay.  Now, you see here under where it says

11 "Heat Stroke" where it says "Treatment"?  Do you see

12 that?

13     A.    Yes.

14     Q.    There's -- among other things, there's a

15 little picture of an ambulance.  Do you see that?

16     A.    Yes.

17     Q.    Does that imply to you that need to have an

18 ambulance for someone with -- who's had a heat stroke?

19     A.    That implies that, yes.

20     Q.    If you knew someone had suffered heat stroke,

21 is there any circumstances where you wouldn't call an

22 ambulance?

23     A.    No.

24     Q.    And here it says on the top of the third

25 column that you should always transfer heat stroke

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6832

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                        February 08, 2013

1   victims to a medical facility.  Do you see that?

2        A.   I do see that.

3        Q.   Do you agree with that statement?

4        A.   Yes.

5        Q.   That's what you'd do in that situation?

6        A.   If I knew for a fact that this was a heat

7   stroke victim, yes.

8        Q.   Okay.  When you received this document, this

9   training circular, what form did you receive it in?

10       A.   What do you mean?

11       Q.   Well, let's -- do you remember who gave it to

12  you?

13       A.   These particular training circulars are given

14  to us by a risk management officer.

15       Q.   Okay.  Is that Officer Story?

16       A.   Yes.

17       Q.   And what would have happened when he gave it

18  to you?

19       A.   They're given to us so that we can do what's

20  called signature -- signature block training where we

21  train over this in a turnout situation, or for staff

22  that doesn't go to turnout, you kind of pull them in,

23  train over this, and once they've been trained, and it's

24  up to that staff member to decide if they fully

25  understand what this says, then they sign for it.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6833

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1      Q.   Do you see this document's been marked Exhibit
2  17?
3      A.   Okay.
4      Q.   Is this a -- you just described a -- you
5  called it a block signature?
6      A.   Signature block training, yes.
7      Q.   Signature block training.  Is that a document
8  that would be produced after signature block training
9  like you just described?
10     A.   Yes.  Once that officer felt that they
11  understood this, then they are supposed to sign.
12     Q.   Okay.  We can go back to the training
13  circular.  When you received -- so you would receive the
14  training circular from Officer Story --
15     A.   Uh-huh.
16     Q.   -- and it was your responsibility to make sure
17  the officers at turnout were trained on it, correct?
18     A.   Yes.
19     Q.   Would somebody train you on the training
20  circular, like a Train the Trainer?
21     A.   No.
22     Q.   You would just receive it, read it, and then
23  make sure it was read to the officers?
24     A.   Yes.  We would go through it, you know, make
25  sure that we had a general feeling of it, and then give

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6834

Stephen McCollum, et al.                Sandrea Yvonne Sanders
Brad Livingston, et al.                      February 08, 2013

1    that same information to the officers.

2        Q.   And then would it be your responsibility to

3    make sure that the officers were conducting their duties

4    in accordance with what was in the training circular?

5        A.   That goes back to that same question.  My

6    responsibility is to train the officer on what they're

7    supposed to know, to follow up on whether or not those

8    processes are being followed, and if they're not, then I

9    need to bring you back in for retraining.

10       Q.   Okay.  A few minutes ago we talked about a

11   heat card.

12       A.   Yes.

13       Q.   Is that the heat card, Exhibit 10?

14       A.   Yes.

15       Q.   Okay.  So you have a little copy of that in

16   your wallet?

17       A.   Well, I keep it on my uniform.

18       Q.   Okay.  It's something that you carry with you

19   when you're working?

20       A.   Yes.

21       Q.   Do you see on here it says, "Heat stroke

22   emergency, death is imminent"?

23       A.   Yes.

24       Q.   And you see that it lists some symptoms there?

25       A.   Yes.

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                         February 08, 2013

1    Q.   Okay.  And so you would have been familiar

2  with this card in July of 2011?

3    A.   Yes.

4    Q.   Do you see that -- I'm not sure if it's the

5  first page or the second page, it says "Treatment and

6  Prevention"?

7    A.   Yes.

8    Q.   It says "Treatment of Heat Illness" and has

9  some things you're supposed to do, like move the person

10 out of direct sunlight into an air-conditioned

11 environment?

12   A.   Uh-huh.

13   Q.   That's something you would have been trained

14 to do when someone was having a heat emergency?

15   A.   Yes, but it also says "if possible."

16   Q.   Okay.  When would that not be possible?

17   A.   If there were -- say, for instance, this is --

18 I have to say it should be possible at all times, but I

19 can't think of a reason why it wouldn't be possible or

20 why it would be impossible.

21   Q.   Okay.  So it says that you need to get medical

22 attention ASAP.  That means medical attention as soon as

23 possible?

24   A.   Correct.

25   Q.   And it lists some people that are at higher

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6836

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                       February 08, 2013

1  risk for heat illness?

2       A.   Uh-huh.

3       Q.   It says that there'd be higher risk if there

4  were high temperature and humidity conditions?

5       A.   Yes.

6       Q.   Okay.  And that's all things that you were

7  trained on?

8       A.   Yes.

9       Q.   Okay.  So based on this -- the training

10 information in this card and the training circular, you

11 were aware that a heat stroke could cause death in July

12 of 2011, right?

13      A.   Yes.

14      Q.   Okay.  Do you see this document labeled

15 Exhibit 18, Lieutenant?

16      A.   Okay.

17      Q.   Have you ever seen a document like that

18 before?

19      A.   I have.

20      Q.   When have you seen that before?

21      A.   These are kept in our line control building,

22 and I would see them pretty much every day.

23      Q.   When -- when would -- would you see those as a

24 lieutenant or as a sergeant or...

25      A.   As a sergeant or lieutenant.

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1        A.   One of us, one of -- either a sergeant or a

2   lieutenant would assign an officer to do it.

3        Q.   In July of 2011 on third shift, do you

4   remember assigning officers to take the temperature

5   indoors?

6        A.   I can't remember if we did or did not at that

7   point.

8        Q.   Okay.  When you do take the temperature

9   indoors, do you take the temperature indoors in all of

10  the dorms or all parts of the prison or just parts

11  without air conditioning?  How does that work?

12       A.   We were taking it in any of the housing areas,

13  in all of the housing areas.

14       Q.   So that would be -- include the housing areas

15  where there is air conditioning; is that right?

16       A.   Yes.

17       Q.   And just to establish where that is, the K

18  Building is administrative segregation on the Hutchins

19  Unit; is that right?

20       A.   We do have a section of K Building that's

21  administrative segregation.

22       Q.   Okay.  And the administrative segregation

23  section of K Building is air conditioned; is that right?

24       A.   To my knowledge, it is.

25       Q.   Is the rest of K Building air conditioned?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6838

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

 1   come from --

 2        Q.   Let me -- let me rephrase.

 3        A.   Oh.

 4        Q.   If it's a prisoner who's being processed in

 5   who's new to TDCJ, not somebody who's been transferred

 6   here for some other reason, then do they have immediate

 7   access to commissary?

 8        A.   No.

 9        Q.   For a prisoner like who's just come into TDCJ,

10   what do they need to go through before they can go to

11   commissary?

12        A.   They have to be processed.  They have to go

13   through medical and intake processing first.

14        Q.   And about how long did that take in July of

15   2011?

16        A.   I -- I can't really say, because it depends on

17   how fast medical and intake are going.

18        Q.   Okay.  But you don't have any memory of how

19   long that was taking?

20        A.   I mean, it takes three to four weeks

21   generally.

22        Q.   And before a prisoner can go to commissary,

23   they're issued some property by TDCJ like a uniform; is

24   that right?

25        A.   Yes.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6839

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                         February 08, 2013

```
 1        Q.   What else are they issued by the state?

 2        A.   I believe they get like a toothbrush and a

 3   razor and some toilet paper.  That's pretty much it.

 4        Q.   Do they get a cup?

 5        A.   No.

 6        Q.   Do they get a fan?

 7        A.   No.

 8        Q.   Are personal fans ever issued to prisoners at

 9   the Hutchins Unit?

10        A.   No.

11        Q.   Okay.  I just want to clarify something we've

12   kind of already talked about.  In the C7 dorm, there's

13   no air conditioning, correct?

14        A.   Correct.

15        Q.   Okay.  And there's no air conditioning in most

16   of the dorms --

17        A.   There's --

18        Q.   -- in any of the dorms?

19        A.   In general population, no.

20        Q.   Okay.  And you know that because you work in

21   those areas?

22        A.   Correct.

23        Q.   You'd agree with me that it gets pretty hot in

24   those areas, right?

25        A.   It does.
```

81

Stephen McCollum, et al.                     Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1       Q.    Okay.  Do you hear staff complain about the

2   heat in the summer?

3       A.    Yes.

4       Q.    As lieutenant, you probably hear a lot of

5   staff complaints about the heat?

6       A.    Uh-huh.  This is Texas.

7       Q.    Do you ever complain to anyone about the heat

8   in the dorms?

9       A.    The heat in the -- I complain about heat

10  generally.

11      Q.    I'm sorry, you --

12      A.    I complain about heat generally.

13      Q.    Okay.

14      A.    Outside, inside.

15      Q.    Have you ever complained to Warden Pringle

16  about the heat in the dorms?

17      A.    No.

18      Q.    Okay.  I assume the prisoners also complain

19  about the heat in the dorms in the summer.

20      A.    They do.

21      Q.    That's probably a complaint you've heard all

22  12 years you've worked here at the Hutchins Unit, right?

23      A.    Yes, I have.

24      Q.    If I told you the temperature inside those

25  dorms was only a few degrees cooler than the temperature

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6841

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1  outside, would you agree with that?  Does that sound

2  reasonable to you?

3       A.   It does.

4       Q.   Okay.  When you have officers working in the

5  dorms, do they spend the entire shift working in the

6  dorms, or do they rotate -- in the summer when it's hot,

7  or do they rotate to other parts of the prison while

8  they're working?

9       A.   Those officers are assigned to that -- for the

10 most part are assigned to that building the entirety of

11 a shift.  Now, we do have officers who work outside that

12 if someone who's inside a building has to go home, if

13 they're sick or something like that, or their children

14 have some emergency, then that officer will go to a

15 building.

16      Q.   Okay.  The officers who work in the building,

17 they can take -- when they have a break, can they take

18 their break in an air conditioned part of the prison?

19      A.   If they so choose to, yes.

20      Q.   So they could go into the picket and have

21 their lunch in there?

22      A.   They couldn't -- they would have to switch out

23 with the officer that was in the picket.  That officer

24 would have to come out, or they could go to the ODR or

25 something like that.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6842

84

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                        February 08, 2013

1    Q.   Okay.  Are there places after-hours on third

2  shift where an officer could go to have lunch or take a

3  break, get out of the heat for a little bit?

4    A.   Yes.

5    Q.   Okay.  You'd agree with me that the air

6  conditioning makes a big difference for how you feel

7  when you're working here in the summer, right?

8    A.   It does.

9    Q.   Okay.  As a lieutenant, have you ever had to

10 tell an officer you're taking too many breaks during the

11 summer in places that are air conditioned?

12   A.   Well, they're -- those officers have to be

13 properly relieved in order to take a break, so they're

14 only afforded one 15-minute break per shift.  So if an

15 officer takes a break aside from the one that I've sent

16 someone down there to give them, then they're -- they're

17 probably somewhere way out of policy.

18   Q.   Okay.  Now, an officer -- in the dorms,

19 there's officers who work in the pickets, and there's

20 officers, who they're called rovers, that walk around

21 the dorms to supervise what's going on; is that right?

22   A.   Correct.

23   Q.   The -- can the rovers ever trade with the

24 officer in the air-conditioned picket to say, hey, you

25 know, Picket Officer, I need some time to take a break

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6843

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                       February 08, 2013

1  from the heat, can we switch for half an hour?

2      A.   It has to be approved by a supervisor.

3      Q.   Okay.  Is that something that you would

4  approve to happen?

5      A.   Yes.

6      Q.   Is that something that you would approve

7  during the summer?

8      A.   Yes.

9      Q.   Okay.  That's probably something somebody

10  would ask for and you'd approve about every night during

11  the summer, right?

12      A.   If they called me, yes.

13      Q.   And you'd agree that it remains hot in those

14  dorms even at night?

15      A.   Yes.

16      Q.   Okay.  You can't open the windows in the

17  dorms, right?

18      A.   Right.  You can't open the windows.

19      Q.   And the prisoners don't have a personal fan?

20      A.   Right.

21      Q.   There's some other TDCJ prisons, to your

22  knowledge, where they can have a personal fan, right?

23      A.   To my knowledge, yes.

24      Q.   You mentioned that there are plug outlets in

25  the K Building in some of those inmate housing areas.

100

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1          A.    Yes.

2          Q.    Officer Clark was one of the officers you were

3    supervising that night; is that right?

4          A.    Yes.

5          Q.    Does officer Clark do a good job?  Is he a

6    good officer?

7          A.    Yes, he is.

8          Q.    And Sergeant Tate was also one of the

9    officers?

10         A.    Yes.

11         Q.    Is Sergeant Tate a good sergeant?

12         A.    Yes.

13         Q.    She follows procedure?

14         A.    Yes.

15         Q.    She's a --

16         A.    She's a stickler.

17         Q.    She's a stickler for procedure?

18         A.    Yes.

19         Q.    Okay.  Is Officer Clark a stickler?

20         A.    Not in the same way that -- that Sergeant Tate

21   is.

22         Q.    Sergeant -- Sergeant Tate is very by the book?

23         A.    Very much so.

24         Q.    Okay.  You'd consider them both to be

25   truthful?

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                         February 08, 2013

1      Q.    So did you wait for Sergeant Tate to then call

2  you?

3      A.    Well, during an ICS situation, we're given

4  updates over the radio.  I can tell that in this time

5  frame it was count time, so I was taking count.  And so

6  I'm probably asking, you know, give me an update on the

7  situation, you know, every few minutes or so, or she's

8  just going ahead and radioing back whatever the

9  situation is.

10     Q.    So you wouldn't -- when did you decide that

11  you needed to go down to the dorm?

12     A.    Oh, I really don't remember, but I know that

13  there was some communication between myself and Sergeant

14  Tate that concerned me, so I went on down there to kind

15  of make an assessment myself.

16     Q.    What concerned you that she said?

17     A.    I -- I don't remember what exactly she said,

18  but I know that there was something that said let me go

19  look at this and see what's going on.

20     Q.    Sergeant Tate and officer Clark testified

21  yesterday that they, according to the policy and

22  procedure at the Hutchins Unit, could not make a phone

23  call to 911.  Is that your -- that a lieutenant needed

24  to do that.  Is that your understanding of the procedure

25  in July 2011?

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1      A.    That may have been their understanding, but it

2   would have had to be routed through me, yes.

3      Q.    So you would have had to approve someone

4   calling 911?

5      A.    Right.

6      Q.    Okay.  And would that be in any circumstance

7   that 911 needed to be called, no one could call 911

8   without going through you?

9      A.    It's not -- this is how it is.  If Officer

10  Smith is down on a building, and they see an offender,

11  you know, bleeding from his head or whatever, and he's

12  nonresponsive and everything, he can radio that

13  information to me and say, okay, we need 911.  The

14  officer who would actually call 911 that has access to

15  the phones would more than likely hear that and go ahead

16  and just do it, but I've been notified.

17              I don't know if that answers your

18  question.

19     Q.    No, that -- in Mr. McCollum's situation, you

20  were the one who decided to call 911; is that right?

21     A.    This was -- it was after speaking with the

22  triage nurse and, you know, just kind of getting

23  detailed about what was going on.

24     Q.    Could Officer Clark or Sergeant Tate have

25  talked to the triage nurse?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6847

Stephen McCollum, et al.                Sandrea Yvonne Sanders
Brad Livingston, et al.                      February 08, 2013

1      Q.    Okay.  At this point, did you think this was

2  an emergency situation?

3      A.    Yes, I did.

4      Q.    When you got to Mr. McCollum's bunk, was he

5  convulsing at that point?

6      A.    I don't recall that he was.

7      Q.    What do you remember about what you could --

8  what you observed about his condition?

9      A.    I remember seeing his feet, and because of --

10 because of my experience with diabetics in my own

11 family, I remember thinking, he's probably diabetic.

12     Q.    Why did you think that?

13     A.    It was something about toenails and the

14 coloring, that was it, and it was a passing thought.

15     Q.    Did anyone tell you that he was diabetic?

16     A.    No.

17     Q.    Did anyone say -- his cellmate mention that he

18 was diabetic?

19     A.    No.  I remember -- I just know that I looked

20 at -- that's one of the things that stuck with me, is

21 that I looked at his feet, and I was like, oh, he's

22 probably diabetic, and just kept on.

23     Q.    Did you think it was an emergency when you

24 finally saw Mr. McCollum?

25     A.    By that time, I understood that there was

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6848

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1   something going on beyond the scope of what we could

2   handle, yes.

3        Q.   Okay.  And is that because he hadn't been

4   responsive?

5        A.   Correct.

6        Q.   Okay.  Because Sergeant Tate told you that she

7   had tried to wake him up and she couldn't?

8        A.   Yes.

9        Q.   Okay.  At that point did you have any theory

10   about what was wrong with Mr. McCollum?

11        A.   What do you mean by theory?

12        Q.   Well, did you have any idea in your mind what

13   might be wrong with him?

14        A.   I mean, I could -- I could speculate all day.

15   There was a lot of things that, you know, ran through my

16   mind, but nothing that -- that caused me to act one way

17   or another.

18        Q.   What were the things that ran through your

19   mind?

20        A.   I was told that -- that he was hot, and I

21   thought -- at one point I thought, okay, febrile

22   seizure.  Like I said, I looked at his feet, and I

23   thought diabetic.  So, of course, you know, I'm

24   thinking, well, this might be -- this might have

25   something to do with it.  It was, you know, just those

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6849

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                         February 08, 2013

1   couple of things that kind of ran across my mind.

2        Q.   When you -- so when you eventually got to his

3   bunk, you thought this man obviously has a medical

4   problem that we can't take care of here, he needs to go

5   to the emergency room?

6        A.   I mean, I thought, well, something's going on,

7   I don't know what it is, but he's going to the emergency

8   room.

9        Q.   Okay.

10            MR. MEDLOCK:   There's five minutes left

11  on the tape.   We'll take a quick break.

12            THE VIDEOGRAPHER:   Off the record at

13  12:57 p.m.

14            (Recess.)

15            THE VIDEOGRAPHER:   Going on the record at

16  1:03 p.m.

17       Q.   Lieutenant, you said that you knew that you

18  would have been conducting count when you received this

19  call; is that right?

20       A.   Yes.

21       Q.   And do you -- do you count the same time every

22  day approximately?

23       A.   Approximately.

24       Q.   So that's how you know that -- and when would

25  that count have been conducted approximately?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6850

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

1  and we could have discussed it later.

2       Q.   Okay.  That's not what happened here, though.

3       A.   Correct.

4       Q.   She waited for you to arrive?

5       A.   Correct.

6       Q.   And then you talked to the nurse at the Crain

7  Unit?

8       A.   Right.

9       Q.   And then you and the nurse at the Crain Unit

10  made the decision to call 911; is that right?

11      A.   Correct.

12      Q.   Okay.  What information did you feel you

13  needed from the nurse at the Crain Unit before deciding

14  to call 911?

15      A.   Like I said, it had been a situation where it

16  was called over the radio that the offender was having a

17  seizure.  We dealt with seizure issues quite often.  It

18  was only when -- I don't know -- like I said, I don't

19  know what the situation -- what triggered it, but we

20  would have called Crain anyway.  We would have called

21  the Crain Unit anyway to notify them that this offender

22  was having a seizure.

23           But what it was, he never was responding

24  to the things.  You know, we give the chest rub.  It --

25  it makes you, even if you're unconscious -- well, not

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6851

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                          February 08, 2013

```
 1  unconscious, but if you are asleep, it will make you

 2  twitch.  He wasn't responding to that.  He wasn't

 3  responding to anyone speaking to him.

 4           And so it was that that triggered me

 5  saying to the -- to the triage nurse -- you know, I'm

 6  telling the triage nurse all of this, and she's looking.

 7  There's no history of seizure.  We don't know why he's

 8  having a seizure.  Go ahead.  Call 911.

 9           So -- and this is all happening pretty

10  much together.  I'm getting this information and relying

11  on it at the same time pretty much.

12      Q.   Do you know who did the sternum rub?

13      A.   I do not.

14      Q.   Okay.  You didn't do it yourself?

15      A.   No, I didn't do it myself.

16      Q.   Were you there when it happened?

17      A.   No.

18      Q.   Okay.  Someone told you that the sternum rub

19  had been performed before you got there?

20      A.   Yes.

21      Q.   Why did you call the nurse at the Crain Unit

22  before calling 911?

23      A.   Just kind of to get some guidance on what was

24  going on.  This was an unusual situation.  We were

25  thinking that this is a seizure.  We're treating it the
```

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                         February 08, 2013

1  same way that we would have treated any other seizure,

2  but this has gone beyond what normally happens, so let

3  me get some guidance from medical at this point.

4       Q.   Would you -- if you'd thought it was a

5  seizure, and he woke up when you did the sternum rub,

6  would you still have called medical?

7       A.   I mean, just to notify them that he'd had a

8  seizure and to get him a lay in for the next day.

9       Q.   Okay.  So you would have talked to medical

10 regardless of what happened?

11      A.   Regardless.

12      Q.   Okay.  You knew that night that if he was to

13 get medical attention, though, that it would have to be

14 off of the Hutchins Unit, correct?

15      A.   Yes.  If he needed direct medical attention,

16 he would have had to go off.

17      Q.   And that would have been having to go to the

18 emergency room?

19      A.   Yes.

20      Q.   Okay.  Because there's nowhere else you could

21 have sent them?

22      A.   Correct.

23      Q.   Okay.  Were you still in the dorm when EMS

24 arrived?

25      A.   No.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6853

Stephen McCollum, et al.                 Sandrea Yvonne Sanders
Brad Livingston, et al.                       February 08, 2013

1      Q.   And Warden Polk was the duty warden, meaning

2   he was the one that you, as lieutenant, had to call if

3   there was something going on at the prison?

4      A.   Yes.

5      Q.   Okay.

6                  MR. MEDLOCK:   Let's go ahead and mark

7   this one.

8                  (Exhibit 21 marked.)

9      Q.   Do you recognize this document, Lieutenant

10  Sanders?

11     A.   I do.

12     Q.   This is an email you sent on July 22nd at 7:57

13  a.m.; is that right?

14     A.   Yes.

15     Q.   Let's briefly go over who the people this was

16  sent to are.   Who is Robert Eason?

17     A.   He is the regional director.

18     Q.   And Jeff Pringle is the warden here at the

19  Hutchins Unit?

20     A.   Yes.

21     Q.   And Balden Polk was the assistant warden and

22  the duty warden here at the Hutchins Unit?

23     A.   Yes.

24     Q.   Terry May, was he a major at the Hutchins

25  Unit?

Stephen McCollum, et al.                Sandrea Yvonne Sanders
Brad Livingston, et al.                      February 08, 2013

```
1       A.   Yes.

2       Q.   Kyron Session, who was he?

3       A.   He's the captain.

4       Q.   At the Hutchins Unit?

5       A.   Yes.

6       Q.   Who's Tedral Towery?

7       A.   He's also a captain here.

8       Q.   Who is Della Hale?

9       A.   She's a lieutenant.

10      Q.   At the Hutchins Unit?

11      A.   Yes.

12      Q.   Who is Christopher Hernandez?

13      A.   He is -- oh, he was a lieutenant at the time.

14      Q.   Okay.  What about Kevin Brown?

15      A.   He's a lieutenant.

16      Q.   At the Hutchins Unit?

17      A.   Yes.

18      Q.   And what about Johnny Roberts?

19      A.   He's a lieutenant.

20      Q.   Why did you send this email to these people?

21      A.   Okay.  Any time we have an incident where we

22   have an off-site medical transport, we're to notify

23   Mr. Eason, unit administration, which would be all the

24   people in the "to" section, and then we also notify the

25   lieutenants, the other lieutenants because they have to
```

Stephen McCollum, et al.                    Sandrea Yvonne Sanders
Brad Livingston, et al.                        February 08, 2013

1  keep -- as we get more information about what's going

2  on, we have a packet that we put together called an OMT

3  packet, and so any updates, we would make emails and add

4  to that packet so they --

5             This is kind of like notifying the next

6  lieutenant that's coming on that we do have this going

7  on.

8      Q.   Is OMT off-site medical treatment?

9      A.   Transport.

10     Q.   Transport?

11     A.   Yes.

12     Q.   Okay.  Any time somebody goes to the emergency

13  room, you would follow this protocol?

14     A.   Yes.

15     Q.   Okay.  It says on here that -- do you see

16  Number 3 in the middle there, "Custody Level:

17  Unassigned Processing"?

18     A.   Yes.

19     Q.   What does that mean?

20     A.   That means that he had come in from one of the

21  counties, and he was going through the processing -- the

22  process of being processed into state jail.

23     Q.   And most of the people who are here, because

24  it's a transfer unit, do they have that same status, or

25  does that status change as they progress through the in

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
6b5ad5e8-bdd4-49b9-8953-3acf90de724a

Plaintiffs' MSJ Appx. 6856

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 293

**ORIGINAL**

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   STEPHEN McCOLLUM,            §
     STEPHANIE KINGREY, AND       §
 4   SANDRA McCOLLU,              §
     INDIVIDUALLY AND AS          §
 5   HEIRS AT LAW TO THE          §
     ESTATE OF LARRY GENE         §
 6   McCOLLUM,                    § CIVIL ACTION NO.
            Plaintiffs,           § 3:12-CV-02037
 7                                §
     VS.                          §
 8                                §
     BRAD LIVINGSTON, JEFF        §
 9   PRINGLE, RICHARD CLARK,      §
     KAREN TATE, SANDREA          §
10   SANDERS, ROBERT EASON,       §
     THE UNIVERSITY OF TEXAS      §
11   MEDICAL BRANCH AND THE       §
     TEXAS DEPARTMENT OF          §
12   CRIMINAL JUSTICE,            §
            Defendants.           §
13
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
14

15          ORAL AND VIDEOTAPED DEPOSITION OF
               WILLIAM L. STEPHENS
16                    VOLUME 1

                  October 18, 2013
17
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
18
          ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM L.

19   STEPHENS, produced as a witness at the instance of the

20   PLAINTIFFS, and duly sworn, was taken in the

21   above-styled and numbered cause on October 18, 2013,

22   from 4:50 p.m. to 8:05 p.m., before Brenda J. Wright,

23   RPR, CSR in and for the State of Texas, reported by

24   machine shorthand, at the Office of the Attorney

25   General, 300 West 15th Street, Suite 1200, Austin,
```

ORIGINAL

1   **Texas**, pursuant to the *Federal Rules of Civil*

2   *Procedure* and the provisions stated on the record or

3   attached herein.

**APPEARANCES**

5   For the Plaintiffs:
         Mr. Jeff Edwards
6         THE EDWARDS LAW FIRM
         The Haehnel Building
7         1101 East 11th Street
         Austin, Texas 78702
8         512-623-7727/512-623-7729 (fax)
         jeff@edwards-law.com
9              -and-
         Mr. Scott Medlock
10        TEXAS CIVIL RIGHTS PROJECT
         1405 Montopolis Drive
11        Austin, Texas 78741
         512-474-5073/512-474-0726 (fax)
12
     For the Defendants Jeff Pringle, Richard Clark, Karen
13   Tate, Sandrea Sanders, Robert Eason and Texas
     Department of Criminal Justice:
14        Mr. Bruce R. Garcia
         Assistant Attorney General
15        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         Law Enforcement Defense Division 012
16        Post Office Box 12548
         300 West 15th Street
17        Austin, Texas 78711-2548
         512-463-2080/512-495-9139 (fax)
18        bruce.garcia@texasattorneygeneral.gov

19   For the Defendants Brad Livingston, William Stephens
     and Richard Thaler:
20        Mr. Demetri Anastasidis
         Assistant Attorney General
21        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         Law Enforcement Defense Division 012
22        Post Office Box 12548
         300 West 15th Street
23        Austin, Texas 78711-2548
         512-463-2153/ 512-495-9139 (fax)
24        demetri.anastasidis@texasattorneygeneral.gov

25

```
 1              APPEARANCES - CONTINUED

 2
      For the Defendant University of Texas Medical Branch:
 3           Ms. Kim Coogan
                  -and-
 4           Ms. Erika Hime
                  -and-
 5           Ms. Lacey Mase
             Assistant Attorney General
 6           Law Enforcement Defense Division
             OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 7           Post Office Box 12548
             Austin, Texas 78711-2548
 8           512-463-2080/512-495-9139 (fax)
             kim.coogan@texasattorneygeneral.gov
 9
      Videographer:
10           Mr. Patrick Knapick

11    Also Appearing:
             Ms. Deborah Woltersdorf
12           Paralegal, OFFICE OF THE ATTORNEY GENERAL
             deborah.woltersdorf@texasattorneygeneral.gov
13
             Mr. Josh Barron
14
             Mr. Tobias D. Hunziker
15           TEXAS DEPARTMENT OF CRIMINAL JUSTICE

16           Mr. Richard Thaler

17           Mr. Neal Spradlin

18           Mr. Kyle Smith

19

20

21

22

23

24

25
```

Plaintiffs MSJ Appx. 6860

## STIPULATIONS

The attorneys for all parties present stipulate and agree to the following items:

That the deposition of **WILLIAM L. STEPHENS** is being taken pursuant to Notice;

That the deposition is being taken pursuant to the Federal Rules of Civil Procedure;

That the original transcript will be submitted to the witness' attorney, MR. DEMETRI ANASTASIDIS;

That the witness or the witness' attorney will return the signed transcript to the court reporter within **30** days of the date the transcript is provided to the witness' attorney.  If not returned, the witness may be deemed to have waived the right to make the changes, and an unsigned copy may be used as though signed.

*WRIGHT WATSON & ASSOCIATES*
*3307 Northland Drive, Suite 185  Austin, Texas  78731-4946*
*(800) 375-4363*     *(512) 474-4363*

Plaintiffs' MSJ Appx. 6801

```
1                          INDEX

2

3   Appearances......................................    2
    Stipulations.....................................    3
4
    WILLIAM L. STEPHENS
5
         Examination by Mr. Medlock...............    6
6

7   Changes and Corrections..........................  146
    Witness' Signature...............................  147
8   Reporter's Certificate...........................  148

9                          EXHIBITS

10                                                    PAGE
    NO.     DESCRIPTION                              MARKED
11
12  64...............................................    6
         Resume
13  65...............................................   31
         Heat Precaution memorandum - 06/20/2013
14  66...............................................  123
         August 8, 2011 E-mails
15  67...............................................  131
         August 9, 2011 E-mails

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
**3307 Northland Drive, Suite 185  Austin, Texas  78731-4946**
**(800) 375-4363    (512) 474-4363**

Plaintiffs' MSJ Appx. 6962

STEPHENS - By Mr. Medlock

17:01  1        A.    That's correct.

17:01  2        Q.    Then the McConnell Unit?

17:01  3        A.    Yes, sir.

17:01  4        Q.    And then you became the Regional II director

17:01  5    in 2005.  Is that right?

17:01  6        A.    Yes, sir.  That's correct.

17:01  7        Q.    What facilities are in Region II?

17:01  8        A.    Okay.  You -- the Hutchins Unit is in

17:01  9    Region II, the Boyd Unit, the Buster Cole, the Choice

17:01 10    Moore, the Telford, Johnston, Skyview Hodge, Coffield,

17:01 11    Michael, Beto, Powledge, and Gurney.

17:02 12        Q.    And that's the region where Mr. Eason was

17:02 13    also formerly the regional director.  Is that right?

17:02 14        A.    That's correct.  He was a regional director

17:02 15    in Region II.

17:02 16        Q.    In Region II.  Okay.  And as of Mr. Thaler's

17:02 17    retirement, you are the Correctional Institutions

17:02 18    Division director?

17:02 19        A.    That's correct.

17:02 20        Q.    Okay.  And your educational background, you

17:02 21    have a bachelors degree from criminology and

17:02 22    corrections from Sam Houston.  Is that right?

17:02 23        A.    That's correct.

17:02 24        Q.    And do you have any additional education

17:02 25    beyond the bachelors degree?

STEPHENS - By Mr. Medlock

17:10 1      A.    Do you have the report available so I could

17:10 2  look at it?  If you're going to ask me questions about

17:10 3  a specific report, I'd like to have a chance to look

17:10 4  at it.

17:10 5      Q.    And, you know, I don't think I have a copy

17:10 6  of that with me right now.

17:10 7      A.    Okay.

17:10 8      Q.    But do you remember having any criticism of

17:10 9  those officers?

17:10 10     A.    Me personally having criticism of the

17:10 11 officers?  Difficult to say.  I wasn't there in the

17:10 12 entire situation.  Certainly, in retrospect, looking

17:11 13 back on the incident, I wish we would have called 911

17:11 14 sooner.

17:11 15     Q.    You would agree with Mr. Thaler that the

17:11 16 delay in calling 911 was too long in that situation.

17:11 17 Is that fair?

17:11 18     A.    I agree there was a significant delay and I

17:11 19 wish they would have called 911 sooner, yes, sir.

17:11 20     Q.    Okay.  And would you agree that it wasn't --

17:11 21 that in a situation like Mr. McCollum, where the

17:11 22 inmate is having a seizure, is convulsing, is

17:11 23 unresponsive, that that would -- it would be

17:11 24 inappropriate to wait for the sergeant and then wait

17:11 25 for the lieutenant and cause an hour delay before

STEPHENS - By Mr. Medlock

17:11 1  calling 911?

17:11 2       A.    Yeah.   As I understand, reading it, the

17:11 3  first officer on the scene approached Mr. McCollum on

17:11 4  the bed and witnessed what he did, and he initially

17:11 5  called the supervisor to report to the scene, as well

17:12 6  as a video camera.   He initiated -- our terminology is

17:12 7  ICS, Incident Command System.   That is certainly a

17:12 8  standard protocol.

17:12 9            I certainly think that at some point

17:12 10 when there was a delay for the supervisor to get

17:12 11 there, I wish the officer would have took some

17:12 12 initiative, notified his -- whoever he contacted the

17:12 13 first time that I'm calling 911.

17:12 14      Q.    So maybe after ten minutes when the

17:12 15 supervisor doesn't --

17:12 16      A.    I really can't put a time on it, I'm sorry.

17:12 17      Q.    Such just as an example --

17:12 18      A.    Yes, sir.

17:12 19      Q.    -- at some point, you think that he should

17:12 20 have stepped up and said, I'm going to call 911 now,

17:12 21 or I'm going to tell the person who has access to the

17:12 22 telephone, we need 911?

17:12 23      A.    Not having the report in front of me, okay,

17:12 24 I believe the officer -- there was an radio down there

17:12 25 on the wing.   I do believe they had the opportunity to

Plaintiffs' MSJ Appx. 6865

_____STEPHENS - By Mr. Medlock_____

17:12  1    tell whomever, their supervisor on the radio, we need

17:13  2    911 and let's call it.

17:13  3        Q.    And you think that would have been

17:13  4    appropriate in this situation?

17:13  5        A.    Yes, sir.

17:13  6        Q.    Okay.  If the officer who -- the

17:13  7    correctional officer who first arrived, if he believed

17:13  8    it was an emergency at that point, should he have

17:13  9    waited any time before calling 911?  Or making sure

17:13 10    911 was called?

17:13 11        A.    The message that I have put out all along

17:13 12    has been, if you feel like you need Emergency Medical

17:13 13    Services and they're not on the unit, call 911.

17:13 14        Q.    Okay.  So you would agree, if the officer

17:13 15    thought that it was an emergency and there was no

17:13 16    medical services available at the unit, that he should

17:13 17    have immediately called 911?

17:13 18        A.    If the officer makes a -- an ascertation

17:14 19    that it needs -- that this is an emergent medical,

17:14 20    serious life-causing situation, then the officer

17:14 21    should call 911.

17:14 22        Q.    Okay.

17:14 23        A.    Or excuse me, the officer doesn't have the

17:14 24    ability in the housing area.  The officer could make a

17:14 25    request, either by phone or by the radio, and I

17:20 **1**      Q.    What are the other things?

17:20 **2**      A.    If you'll let me see the annual e-mail, as

17:20 **3**  we've referenced, I'll read them to you.

17:20 **4**      Q.    Exhibit 50 is the annual e-mail.

17:20 **5**      A.    If you'll show me the one that was signed in

17:20 **6**  2013, that would probably be the more current one.

17:20 **7**      Q.    Okay.  I don't know that we have a copy of

17:20 **8**  the 2013 e-mail with us.

17:20 **9**      A.    Then I probably wouldn't be able to testify

17:20 **10**  based on the exhibit you've given me.

17:20 **11**      Q.    Do you know what changes are being made from

17:20 **12**  this 2011 e-mail?

17:20 **13**      A.    Not by the 2011.  I have a good idea about

17:21 **14**  the 2013 e-mail.

17:21 **15**      Q.    So -- but you can't tell me what those

17:21 **16**  changes are?

17:21 **17**      A.    I'm not sure what -- if anything changed

17:21 **18**  from the 2011 to the 2013 as I sit here today.

17:21 **19**      Q.    So you're not sure if there were any changes

17:21 **20**  made from the 2011 e-mail?

17:21 **21**      A.    To 2013, that's correct.

17:21 **22**      Q.    2013.  Okay.  Do you think that there should

17:21 **23**  have been changes made from the 2011 e-mail to the

17:21 **24**  2013 e-mail?

17:21 **25**      A.    I think there were.

_STEPHENS - By Mr. Medlock_

17:21 1     Q.   Okay.  But you don't know what --

17:21 2     A.   And I do know the wellness checks was one of

17:21 3  them.

17:21 4     Q.   Do you know --

17:21 5     A.   And it might have been the only one, but I'm

17:21 6  not sure.

17:21 7          MR. MEDLOCK:  Can we make this an

17:21 8  exhibit.

17:21 9          MR. EDWARDS:  Demetri, do you have the

17:21 10  2013?

17:21 11          MR. ANASTASIDIS:  Yeah, that's it right

17:21 12  there.

17:22 13          MR. EDWARDS:  Okay.

17:22 14          (Deposition Exhibit No. 65 marked.)

17:22 15     Q.   (BY MR. MEDLOCK)  I'm going to mark this

17:22 16  Number 65.  Does that appear to be the 2013 e-mail

17:22 17  that we were discussing?

17:22 18     A.   That does appear to be that e-mail.

17:22 19     Q.   Okay.  Looking at the 2013 e-mail, can you

17:22 20  tell me what changes were being made there?

17:22 21     A.   It appears, between 2011 and 2013, the

17:23 22  change was the inclusion of some wording on the

17:23 23  wellness check.

17:23 24     Q.   No other changes?

17:23 25     A.   I don't see any right now.  Of course, I

_STEPHENS - By Mr. Medlock_

19:15 1  directors to communicate that down the chain of

19:15 2  command to report things like that back up?

19:15 3       A.   That is --

19:16 4       Q.   When there is a heat-related issue?

19:16 5       A.   Yes, sir.

19:16 6       Q.   If there were correctional officers who

19:16 7  testify they were discouraged from making heat-related

19:16 8  workers' compensation claims, what would you say to

19:16 9  that?

19:16 10      A.   I would say that that's -- that's not

19:16 11 appropriate, for one.  I don't know who would

19:16 12 discourage them.  But all employees have avenues on

19:16 13 how to report problems, complaints, grievances,

19:16 14 issues.  I mean, those avenues are there.

19:16 15      Q.   Would one of those avenues be through their

19:16 16 union?

19:16 17      A.   Could they talk to a union representative?

19:16 18 Sure.  They have that access.

19:16 19      Q.   Do you ever communicate with the union

19:16 20 representatives about concerns that employees have?

19:16 21      A.   Yes, sir.

19:16 22      Q.   Is heat ever a concern that --

19:16 23      A.   I can't remember any of the meetings I sat

19:17 24 in that heat was an issue, no, sir.

19:17 25      Q.   Okay.  Let's move on to the March 2012.  Do

STEPHENS - By Mr. Medlock

19:17  1    you see that, Mr. Stephens?

19:17  2         A.    Yes, sir.  I'm sorry.  58?

19:17  3         Q.    Yes, Exhibit 58.  Yes.  If I could refer you

19:17  4    to page 649.  The first page, I'm sorry.

19:17  5         A.    These start with seven.

19:17  6         Q.    749.

19:17  7         A.    Okay.  All right.  749.

19:17  8         Q.    It looks like you discuss security reviews

19:17  9    at this meeting and had a handout?

19:17 10         A.    Yes, sir.

19:17 11         Q.    And then on page 750, it looks like you --

19:17 12    excuse me.  It looks like, on page 751, it indicates

19:17 13    you discussed heat preparations?

19:18 14         A.    Yes, sir.

19:18 15         Q.    Given that this is the March minutes, what

19:18 16    would it mean that you were discussing heat

19:18 17    preparations?

19:18 18         A.    Getting ready, preparing for the upcoming

19:18 19    summer months.

19:18 20         Q.    And what would that include?

19:18 21         A.    Make sure they have sufficient water

19:18 22    coolers, make sure the fans are in operational order,

19:18 23    make sure that we're starting to reemphasize training

19:18 24    and having an awareness out there in the field.

19:18 25         Q.    Anything else?

STEPHENS - By Mr. Medlock

19:18 1     A.   I can't think of it right now.

19:18 2     Q.   Okay.  You see page 754?

19:18 3     A.   Yes, sir.

19:18 4     Q.   Do you see where it says Heat-Related

19:18 5 Illness at the bottom?

19:18 6     A.   Yes, sir.

19:18 7     Q.   Do you see where it says, talk about every

19:19 8 month?

19:19 9     A.   Yes, sir.

19:19 10    Q.   Is that, again, part of emphasizing --

19:19 11    A.   I make that assumption, yes, sir.  Based

19:19 12 upon -- I didn't write these notes either.

19:19 13    Q.   And you don't have any direct memory of this

19:19 14 meeting?

19:19 15    A.   No, sir.

19:19 16    Q.   You see page 757?

19:19 17    A.   Yes, sir.

19:19 18    Q.   You see on that first line all the way on

19:19 19 the right, it says, B. Livingston?

19:19 20    A.   I see that, yes, sir.

19:19 21    Q.   I assume that is Brad Livingston?

19:19 22    A.   Yes, sir.

19:19 23    Q.   Do you remember if he was at this meeting?

19:19 24    A.   I don't remember if he was at the meeting,

19:19 25 but my assumption is, based upon these notes, he

STEPHENS - By Mr. Medlock

19:19 1 probably was.

19:19 2      Q.   How often does Mr. Livingston attend one of

19:19 3 these meetings?

19:19 4      A.   Not very often.  He has been known to stick

19:19 5 his head in there, though, and if he -- I don't know.

19:19 6 Not often.  I couldn't guess.

19:19 7      Q.   From your point of view, how involved is

19:19 8 Mr. Livingston with the day-to-day operations of the

19:19 9 actual prison units as opposed to the other things

19:20 10 that TDCJ does?

19:20 11      A.   Well, my experience dealing directly with

19:20 12 Mr. Livingston has started in the last four months,

19:20 13 and I can tell you, he is involved.

19:20 14      Q.   Do you ever send e-mails to Mr. Livingston?

19:20 15      A.   I can't think of a time I've sent him an

19:20 16 e-mail, no, sir.

19:20 17      Q.   I'll refer you to page 760.

19:20 18      A.   Yes, sir.

19:20 19      Q.   Do you see that?  Do you see where it says

19:20 20 Heat-Related Illness in the middle?

19:20 21      A.   Yes, sir.

19:20 22      Q.   On the side there is an asterisk, then it

19:20 23 says, talk to WS.  I assume that's you?

19:20 24      A.   I make that assumption, too.  Again, I

19:20 25 didn't write the note, so...

STEPHENS - By Mr. Medlock

19:21  1        Q.   Okay.  I'm going to hand you Exhibit 59,
19:22  2  sir.
19:22  3        A.   Yes, sir.
19:22  4        Q.   This is the April 2012 minutes.  Is that
19:22  5  right?
19:22  6        A.   Yes, sir.
19:22  7        Q.   And from that first page, it looks like --
19:22  8  it's a little hard to read, but it looks like you
19:22  9  discussed heat-related deaths?
19:22 10        A.   Yes, sir.
19:22 11        Q.   Is that accurate?  Then on page 769 --
19:22 12        A.   Yes, sir.
19:22 13        Q.   -- again, you discussed that there were ten
19:23 14  deaths in 2011?
19:23 15        A.   Yes, sir.
19:23 16        Q.   Do you remember that?
19:23 17        A.   Oh, I don't remember the meeting
19:23 18  specifically, no, sir.
19:23 19        Q.   Does that sound like something you would
19:23 20  have discussed at a meeting around that time?
19:23 21        A.   I don't have any reason not to -- when the
19:23 22  subject is offender deaths, not to say that there was
19:23 23  ten deaths, no, sir.
19:23 24        Q.   And you wouldn't dispute that this was
19:23 25  probably something that you all talked about at this

_____STEPHENS - By Mr. Medlock_____

19:23  1    meeting --

19:23  2         A.    Yeah.  Not being the person or whoever wrote

19:23  3    it, no.

19:23  4         Q.    Would Mr. Eason have been at this meeting?

19:23  5         A.    Typically, all the regional directors are

19:23  6    there.  I can't tell you whether he was there or not.

19:23  7         Q.    Okay.  But, generally, he should have been

19:23  8    there?

19:23  9         A.    Typically, all the regional directors are.

19:23 10         Q.    And he was a regional director at that time?

19:23 11         A.    Yes, sir.

19:23 12         Q.    Okay.  If Mr. Eason wasn't there, would

19:23 13    these notes be provided to him or would this

19:23 14    information otherwise be conveyed to him?

19:23 15         A.    He would send a representative.

19:23 16         Q.    And then that person should report back to

19:24 17    him?

19:24 18         A.    Sure.

19:24 19         Q.    Especially on a topic important, where ten

19:24 20    people had died the previous year?

19:24 21         A.    All topics.  He would be there -- a

19:24 22    representative would be there for every topic.

19:24 23         Q.    You would expect whoever his representative

19:24 24    was to communicate all that to him?

19:24 25         A.    Yes, sir.

STEPHENS - By Mr. Medlock

19:55 1    the agency is facing.  Is that fair?

19:55 2        A.    I would say he's engaged, yes, sir.

19:55 3        Q.    If Director Livingston told you to -- that

19:55 4    he thought we needed to implement air conditioning in

19:55 5    some part of the Hutchins Unit, would you take steps

19:55 6    to make that happen?

19:55 7        A.    I wouldn't be involved in that.

19:55 8    Mr. Livingston would actually coordinate the folks on

19:55 9    the facilities side of the agency.

19:56 10       Q.    He would talk to the folks like Mr. Vian and

19:56 11   that --

19:56 12       A.    Or Mr. Inmon.

19:56 13       Q.    Mr. Inmon is Mr. Vian's supervisor?

19:56 14       A.    Yes, sir.

19:56 15       Q.    Okay.  But he would go down through the

19:56 16   Facilities Division to make that happen?

19:56 17       A.    Sure.  And probably budget and finance area.

19:56 18       Q.    If you wanted -- if you decided,

19:56 19   hypothetically, that you thought, we really need to

19:56 20   air condition parts of the Hutchins Unit, would you

19:56 21   take that up to Mr. Livingston, and then if he agreed,

19:56 22   it would go back down through the Facilities?

19:56 23       A.    Yes, sir.  That would be my route.

19:56 24       Q.    Okay.  Are you familiar with TDCJ's

19:56 25   agricultural program?

Plaintiffs MSJ Appx. 6873

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3   STEPHEN McCOLLUM,              §
     STEPHANIE KINGREY, AND         §
 4   SANDRA McCOLLU,                §
     INDIVIDUALLY AND AS            §
 5   HEIRS AT LAW TO THE            §
     ESTATE OF LARRY GENE           §
 6   McCOLLUM,                      § CIVIL ACTION NO.
             Plaintiffs,            § 3:12-CV-02037
 7                                  §
     VS.                            §
 8                                  §
     BRAD LIVINGSTON, JEFF          §
 9   PRINGLE, RICHARD CLARK,        §
     KAREN TATE, SANDREA            §
10   SANDERS, ROBERT EASON,         §
     THE UNIVERSITY OF TEXAS        §
11   MEDICAL BRANCH AND THE         §
     TEXAS DEPARTMENT OF            §
12   CRIMINAL JUSTICE,              §
             Defendants.            §
13
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
14              REPORTER'S CERTIFICATION
           ORAL AND VIDEOTAPED DEPOSITION OF
15                WILLIAM L. STEPHENS
                      VOLUME 1
16                 October 18, 2013
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
17        I, BRENDA J. WRIGHT, Certified Shorthand

18   Reporter in and for the State of Texas, hereby certify

19   to the following:

20        That the witness, WILLIAM L. STEPHENS, was duly

21   sworn by the officer and that the transcript of the

22   oral deposition is a true record of the testimony

23   given by the witness;

24        I further certify that pursuant to Federal

25   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as
```

1  well as Rule 30(e)(2) that the signature of the

2  deponent:

3       __X__ was requested by the deponent and/or a

4  party before completion of the deposition and is to be

5  returned within 30 days from date of receipt of the

6  transcript.  If returned, the attached Changes and

7  Corrections and Signature pages contain any changes

8  and the reasons therefor;

9       ____ was not requested by the deponent and/or a

10  party before the completion of the deposition.

11       That $918.95_____ is the deposition

12  officer's charges for preparing the original

13  deposition transcript and any copies of exhibits,

14  charged to PLAINTIFFS;

15       That pursuant to information given to the

16  deposition officer at the time said testimony as

17  taken, the following includes all parties of record:

18  For the Plaintiffs:
    **Mr. Jeff Edwards**
19  **THE EDWARDS LAW FIRM**
    **The Haehnel Building**
20  **1101 East 11th Street**
    **Austin, Texas 78702**
21  **512-623-7727/512-623-7729 (fax)**
    **jeff@edwards-law.com**
22       **-and-**
    **Mr. Scott Medlock**
23  **TEXAS CIVIL RIGHTS PROJECT**
    **1405 Montopolis Drive**
24  **Austin, Texas 78741**
    **512-474-5073/512-474-0726 (fax)**
25

```
 1  For the Defendants Jeff Pringle, Richard Clark, Karen
    Tate, Sandrea Sanders, Robert Eason and Texas
 2  Department of Criminal Justice:
         Mr. Bruce R. Garcia
 3       Assistant Attorney General
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 4       Law Enforcement Defense Division 012
         Post Office Box 12548
 5       300 West 15th Street
         Austin, Texas 78711-2548
 6       512-463-2080/512-495-9139 (fax)
         bruce.garcia@texasattorneygeneral.gov
 7
    For the Defendants Brad Livingston, William Stephens
 8  and Richard Thaler:
         Mr. Demetri Anastasidis
 9       Assistant Attorney General
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
10       Law Enforcement Defense Division 012
         Post Office Box 12548
11       300 West 15th Street
         Austin, Texas 78711-2548
12       512-463-2153/ 512-495-9139 (fax)
         demetri.anastasidis@texasattorneygeneral.gov
13
    For the Defendant University of Texas Medical Branch:
14       Ms. Kim Coogan
         Assistant Attorney General
15       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         Law Enforcement Defense Division
16       Post Office Box 12548
         Austin, Texas 78711-2548
17       512-463-2080/512-495-9139 (fax)
         kim.coogan@texasattorneygeneral.gov
18
19       I further certify that I am neither attorney
20  nor counsel for nor related to nor employed by any of
21  the parties to the action in which this deposition is
22  taken;
23       Further, I am not a relative nor an employee of
24  any attorney of record in this cause, nor am I
25  financially or otherwise interested in the outcome of
```

1   the action.

2          Certified to by me this 1ST day of NOVEMBER,

3   2013.

4

5

6   BRENDA J. WRIGHT, Texas CSR No. 1780
    Expiration Date:  12-31-14

7   WRIGHT WATSON & ASSOCIATES
    Firm Registration No. 225

8   Expiration Date:  12-31-13
    3307 Northland Drive

9   Suite 185
    Austin, Texas 78731

10   512-474-4363/51-474-8802 (fax)
    www.wrightwatson.com

11  JOB NO. 131018BJW

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 294

ROY STORIE - March 04, 2014

```
            THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN  DISTRICT OF TEXAS
                    DALLAS DIVISION
STEPHEN McCOLLUM, STEPHANIE    *
KINGREY, and SANDRA            *
McCOLLUM, individually and as  *
heirs at law to the Estate of  *
LARRY GENE McCOLLUM,           *
                               *
          PLAINTIFFS           *
                               *
vs.                            *   CIVIL ACTION NO.
                               *    3:12-CV-02037
                               *
BRAD LIVINGSTON, JEFF PRINGLE,*
RICHARD CLARK, KAREN TATE,     *
SANDREA SANDERS, ROBERT EASON,*
the UNIVERSITY OF TEXAS        *
MEDICAL BRANCH and the TEXAS   *
DEPARTMENT OF CRIMINAL JUSTICE*
                               *
          DEFENDANTS           *
          ORAL 30(B)6 DEPOSITION OF ROY STORIE
                    March 4th, 2014
```

ORAL 30(B)6 DEPOSITION OF ROY STORIE, produced
as a witness at the instance of the Plaintiffs and duly
sworn, was taken in the above-styled and numbered cause
on the 4th day of March, 2014, from  10:10 a.m. to 1:12
p.m., before Curtis High, Certified Shorthand Reporter
in and for the State of Texas, reported by computerized
stenotype machine at the Hutchins Unit of the Texas
Department of Criminal Justice, 1500 E. Langdon Road,
Dallas, Texas 75241, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record
or attached hereto.

**ROY STORIE - March 04, 2014**

```
 1                    APPEARANCES
 2  FOR THE PLAINTIFFS:
 3            Scott Medlock, Esq.
              THE EDWARDS LAW FIRM
 4            1101 E. Eleventh Street
              Austin, Texas 78702
 5            Telephone: 512-623-7727 - Fax: 512-623-7729
              E-mail:  scott@edwardslaw.com
 6
 7  FOR THE DEFENDANTS:
 8            Bruce R. Garcia, Esq.
                    -and-
 9            Seth B. Dennis, Esq.
              ATTORNEY GENERAL OF TEXAS
10            Law Enforcement Defense Division
              P.O. Box 12548, Capitol Station
11            Austin, Texas 78711-2548
              Telephone: 512-463-2080 - Fax : 512-495-9139
12            E-mail: bruce.garcia@texasattorneygeneral.gov
              E-mail: seth.dennis@texasattorneygeneral.gov
13
14  FOR THE DEFENDANT; UNIVERSITY OF TEXAS MEDICAL BRANCH:
15            Erika D. Hime, Esq.    (Via Telephone)
              ATTORNEY GENERAL OF TEXAS
16            Law Enforcement Defense Division
              P.O. Box 12548, Capitol Station
17            Austin, Texas 78711-2548
              Telephone: 512-463-2080 - Fax : 512-495-9139
18            E-mail: erika.hime@texasattorneygeneral.gov
19
20
21
22
23
24
25
```

ROY STORIE - March 04, 2014

```
 1                          INDEX
 2                                              PAGE
 3
 4  Appearances ...................................2
 5                      EXAMINATIONS
 6  ROY STORIE
 7  Examination by Mr. Medlock .....................4
 8
 9                        EXHIBITS
10
11  EXHIBIT              DESCRIPTION          PAGE LINE
12  Number 1   Heat and Humidity Matrix ............37  8
               identified as TDCJ - RFP #3-15
13  Number 2   Inter-Office Communication ..........43 16
               from R. Storie concerning dorm
14             temp, fans and mattresses
               dated 7/29/2011
15  NUMBER 3   A Texas Department of Criminal .......48  9
               Justice Inter-Office
16             Communication concerning
               dormitory temps from Roy
17             Storie dated 07/13/2011
    Number 4   A Texas Department of Criminal .......52  1
18             Justice inter-office
               communication to Maj. May from
19             Roy Storie dated 7/22/2011
               concerning B-2 and C-2 dorm
20             temps
    Number 5   A Texas Department of Criminal .......63 22
21             Justice inter-office
               communication from Roy Storie
22             dated 8/01/2011 concerning
               dorm temperatures
23  Number 6   An e-mail to Warden Pringle ..........65 24
               describing the temperatures in
24             the C-1 and 8-2 Buildings
    Number 7   Risk Management Department ...........67 13
25             Memo to Maj. May dated
               08/06/2010 concerning
```

**WRIGHT WATSON & ASSOCIATES, LLC**
**(512) 474-4363**
Plaintiffs' MSJ Appx. 6883

ROY STORIE - March 04, 2014

```
 1               temperatures on the dorms
    Number 8   A collection of heat related .........78  5
 2               incidence reports that have
                 taken place at the Hutchins
 3               Unit
    Number 9   A Notice to be posted in .............93  7
 4               offender housing titled Heat
                 Illness and listing
 5               precautions for heat related
                 injuries
 6  Number 10  A Bulletin titled Recognition .......94  2
                 of Heat Illness
 7  Number 11  A Texas Department of Criminal ......99 16
                 Justice Temperature Log for
 8               the Hutchins Unit dated
                 7/15/2011
 9
    Changes and Signature .........................102
10
    Reporter's Certificate ........................104
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ROY STORIE - March 04, 2014

1    Q    I know that operating a prison there is a lot

2  of different things that go into keeping the prison

3  safe.  And I just want to be clear about like what you

4  are responsible for because I know that there is like

5  the -- you know, kind of the security aspects of the

6  prison.  You know, making sure that the inmates are well

7  behaved and going and coming from where they are

8  supposed to be.  But then there is also aspects like,

9  you know, making sure the ventilation is working, and

10  then there is another like making sure inmates get

11  medical care, so I was just wondering if you could help

12  me to identify which of those, or all of them, or what

13  subsection of safety issues you work on at the Hutchins

14  Unit?

15    A    Well, for instance Food Service I would check

16  for the correct temperature of the food.  Sanitation

17  issues.  Community Service I would inspect the vans, the

18  transportation to make sure, you know, the

19  transportation they have a safe vehicle as far as tire

20  tread, that sort of thing.  First-aid kit, fire

21  extinguisher.

22    Q    Anything else?

23    A    That pretty much covers all I can think of

24  right now.

25    Q    Do you also monitor the temperatures at the

**ROY STORIE - March 04, 2014**

1  prison?

2      A      We are required to take temperatures at one

3  location on the unit from 6:30 to 6:00.  Well, 6:30 to

4  6:30 and I do monitor that.  It's a heat index and

5  temperature recording.

6      Q      You say from 6:30 to 6:30.  Is that 6:30 a.m.

7  to 6:30 p.m.?

8      A      Correct.

9      Q      And you do that year-round or only --

10     A      Yes.

11     Q      Anything else you do related to temperature at

12  the Hutchins Unit?

13     A      Well, in the wintertime we do monitor the air

14  that is coming into the buildings from the outside air

15  handler because it is conditioned.  Heated as it comes

16  in.  So if that's not working I would alert someone.

17  Maintenance or someone about that.

18     Q      You monitor to make sure that the heating

19  element is working in the winter?

20     A      Right, that they are provided with heat.

21     Q      Okay.  And if you find a problem with any of

22  these areas, whether it's food service, sanitation,

23  transportation for community service, you know, the

24  first-aid kits are missing, what -- what do you do if

25  you were to observe that type of problem?

**ROY STORIE - March 04, 2014**

1    A   Yes, or the wiring for the trailer they are

2  towing is not connected or working.

3    Q   Okay.  So tell me if I am wrong but it sounds

4  like your job is kind of to identify problems and then

5  refer them to the correct people to solve those

6  problems?

7    A   Correct.

8    Q   If you identified during the summer that there

9  were high temperatures inside some of the dorms, who

10  would you refer that problem to?

11    A   Well, high temperatures would be normal unless

12  equipment is not working.

13    Q   Would you do anything if you found there were

14  high temperatures inside the dorms during the summer?

15    A   Well, if there was anything additional to do,

16  yes.

17    Q   Explain what you mean by if there was anything

18  additional to do?

19    A   Well, if all of the -- the equipment is working

20  properly that would be the first thing I would do is to

21  check the equipment, the floor fans, the outside air

22  handler.

23    Q   And if all of that equipment is working

24  properly, do you report the high temperatures to anyone?

25    A   I don't do individual building temperature

ROY STORIE - March 04, 2014

1  checks.  Like I say we are required by policy to take

2  the temperatures at one location from 6:30 to 6:30.

3       Q     Is that a location outside or inside?

4       A     It is an outside temperature and humidity.

5       Q     And what is the purpose of taking the

6  temperature outside?

7       A     To advise the working crews that work outside

8  in the heat to take necessary precautions.

9       Q     Who is that information disseminated to, that

10  information about the outside temperatures?

11       A     It's assimilated by the G-Control radio picket

12  to all radio equipped personnel.

13       Q     Is G-Control where the temperatures are

14  recorded outside?

15       A     Yes.

16       Q     So the person working in G-Control would take

17  the temperature and then get on the radio and tell

18  everyone this is what the temperature is at this hour.

19  Is that basically how it works?

20       A     Correct.  This is what the temperature and the

21  humidity index is.

22       Q     So they are reporting the heat index, not just

23  the temperature?

24       A     Correct.  Cross-reference the humidity with the

25  temperature.

**ROY STORIE - March 04, 2014**

1    Q    And you said that goes to everyone who has a
2 radio.  Does that -- are there -- what types of
3 personnel at the unit would have a radio?
4    A    Well, all of your supervisors are going to have
5 a radio, and all of your departments such as Community
6 Service, and certain department heads such as
7 maintenance and myself will have radios.
8    Q    So like a sergeant working in a building would
9 have a radio but the individual officers working
10 underneath that sergeant in the building would not have
11 radios; is that fair?
12    A    Yes, the sergeant will have a radio, and right
13 now the officers in the building have a radio.
14    Q    Uh-huh.
15    A    On the time period that we are talking about I
16 am not sure if it was implemented at that time.
17    Q    So today every officer in the building has a
18 radio but you don't remember in 2011 in the summer?
19    A    Correct.
20    Q    Okay.  You are not the one actually taking the
21 outdoor temperatures at the G-Control, correct?
22    A    Correct.
23    Q    Let's take a quick step back.  Can you describe
24 for the Jury what G-Control is?
25    A    G-Control is the control picket in G Building.

ROY STORIE - March 04, 2014

1    Q    Describe for the Jury what that means.

2    A    It means that they disseminate information to

3  the other security staff.  For instance when there is an

4  incident they will go into ICS mode and describe what is

5  happening and request additional supervisors and staff

6  to a certain location if it's needed.

7    Q    Is G-Control sort of like the switchboard for

8  the unit?  Is that a comparison?

9    A    Well, it's a radio picket and it's also the

10  CCTV monitors are there.

11    Q    Okay.  And physically where does G-Control take

12  the temperatures?

13    A    There is a monitor on the inside or the

14  equipment is on the inside with the thermocouple on the

15  outside.

16    Q    So there is like a display inside the picket

17  that tells you what the temperature is outside the

18  picket?

19    A    Yes, and the humidity.

20    Q    And the humidity.  And where is the -- can we

21  call the device outside the thermometer; is that fair?

22    A    You could.

23    Q    I am just trying to find a word so we can be on

24  the same page what we are talking about.

25    A    Okay.

**ROY STORIE - March 04, 2014**

1    Q    How so?

2    A    Well, you have, you know, 50 plus bodies in the

3 dorm, and that will affect the humidity index alone, and

4 you have people taking showers in the dorm.  That will

5 affect the humidity.

6    Q    So would the number of bodies inside the dorm

7 increase or decrease the humidity level inside the dorm?

8    A    It would increase.

9    Q    And would the use of showers inside the dorm

10 increase or decrease the amount of humidity inside the

11 dorm?

12    A    It would increase.

13    Q    So is it fair to say that the heat index inside

14 the dorm can't be calculated by combining the humidity

15 reading outside plus the temperature inside because the

16 humidity value inside is actually probably higher?

17    A    That would be a correct assumption.

18    Q    Have you ever attempted to calculate how much

19 higher it would be?

20    A    No.

21    Q    Is there any reason why you haven't done that?

22    A    Because I can recognize the humidity level when

23 it's extreme in the dorm versus the outside if the air

24 handler is not working because the air handler is key to

25 pushing out the humidity in the dorm.

ROY STORIE - March 04, 2014

1    Q    Yeah.  That's something you would know about
2  the Hutchins Unit as the Risk Manager at the Hutchins
3  Unit; is that fair?
4    A    Yes.
5    Q    Okay.  Mr. Storie, I would like to show you
6  this document -- let's go ahead and mark this as
7  Exhibit 1.
8              (Exhibit 1 marked and attached.)
9    Q    (By Mr. Medlock) You see Exhibit 1 in front of
10 you, Mr. Storie?
11   A    Yes.
12   Q    Can you describe briefly for the Jury what
13 Exhibit 1 is?
14   A    It's AD-10.64, Attachment B, Heat and Humidity
15 Matrix.
16   Q    Is that the document that TDCJ uses to
17 calculate the heat index?
18   A    Yes.
19   Q    As far as you know is this document accurate?
20   A    Yes.
21   Q    Okay.  You wouldn't dispute that using this
22 heat and humidity matrix is the proper way to calculate
23 the heat index?
24   A    Rephrase the question.
25   Q    You wouldn't dispute that using this heat and

ROY STORIE - March 04, 2014

1  humidity matrix is the proper way to calculate the heat

2  index, would you?

3      A    No.

4      Q    Now, looking at this document, Mr. Storie,

5  there are certain apparent temperature values.  Apparent

6  temperature basically means the heat index, correct, is

7  that your understanding?

8      A    Yes.

9      Q    There are certain apparent temperature values

10  in this matrix where there are asterisks.  Either one,

11  two or three asterisks next to the number.  Do you see

12  that?

13      A    Yes.

14      Q    And those -- what do those one, two or three

15  asterisks mean?

16      A    Well, one asterisk means heat exhaustion

17  possible.  Two asterisks, heat stroke possible.  Three

18  asterisks, heat stroke imminent.

19      Q    What does heat stroke imminent mean to you?

20      A    Well, it means precautions should be taken to

21  make sure that anyone working in those conditions are

22  not going to be affected by the heat.

23      Q    Does it mean that you should do anything for

24  people other than the people who are working?

25      A    Well, it means that everyone should have access

ROY STORIE - March 04, 2014

1   to potable water, and if they are not working then they
2   are out of the sun, but for -- other than for crews or
3   offenders that are working there is not much else.

4       Q    Okay.  We talked about how there is one, two
5   and three asterisks.  One being heat exhaustion
6   possible.  Two being heat stroke possible and three
7   being heat stroke imminent.  Is it fair to say that that
8   from one to three asterisks on this matrix means that
9   there is an escalating concern as the more asterisks you
10  have next to an apparent temperature value?

11      A    Yes.

12      Q    And that the agency does more things at the
13  three asterisks level than at the one asterisk level?

14      A    Yes.

15      Q    Now, you said that at the three asterisks level
16  for heat stroke imminent the thing that you should be
17  doing for prisoners who are not working is making sure
18  they have access to potable water; is that right?

19      A    Correct.

20      Q    Is that any different than what you do with the
21  one asterisk level for offenders who are not working?

22      A    No, they should always have access to potable
23  water.

24      Q    Is it fair to say that the agency doesn't do
25  anything different for prisoners who are not working at

ROY STORIE - March 04, 2014

1    the one asterisk level than the three asterisk level?

2                    MR. GARCIA:  Objection, speculation.

3                    THE WITNESS:  Could you repeat the

4    question?

5        Q    (By Mr. Medlock) Sure.  For prisoners who are

6    not working is there any difference between what the

7    agency does at the one asterisk level and the three

8    asterisks level?

9        A    Yes, there -- there is.  We -- we do do things.

10   Are you talking about working crews now?

11       Q    No, I am talking about inmates who are not

12   working.

13       A    Oh, okay.  No.

14       Q    And just to make the record clear was there

15   anything in 2011, in the summer of 2011, that the agency

16   was doing differently for inmates not working at the one

17   asterisk level versus the three asterisks level?

18       A    I don't recall.

19       Q    Since the summer of 2011, have there been any

20   changes in how the agency approaches protecting

21   prisoners from temperature extremes at the Hutchins

22   Unit?

23       A    I couldn't speculate on the agency level.

24       Q    At the Hutchins Unit level have you seen any

25   changes as to what the agency does?

**ROY STORIE - March 04, 2014**

1  dorm the air handler should be purging that?

2      A     Correct.

3      Q     Prior to July, 2011, were you aware that

4  inmates with certain medical conditions were more

5  susceptible to heat related illness?

6      A     Yes.

7      Q     Do you know what those medical conditions were?

8      A     High blood pressure, diuretics.  Those are the

9  most common that I am aware of, but I am sure there are

10  other medications, but I am not a medical person.

11      Q     Sure.  For those inmates that were -- had high

12  blood pressure or were taking diuretics in the summer of

13  2011, inmates who are not working, did you as the Risk

14  Manager do anything to assist those inmates on the

15  hottest days of the summer?

16      A     If they weren't in distress, I didn't.  I

17  didn't know who they were or what conditions they had.

18      Q     It's fair to say you don't know which inmates

19  are taking diuretics?

20      A     Correct.

21             (Interruption at door.)

22      Q     (By Mr. Medlock) I was asking you about high

23  blood pressure.  You don't know which inmates have high

24  blood pressure, right?

25      A     No, sir.

ROY STORIE - March 04, 2014

1    Q    (By Mr. Medlock) You don't have any medical
2    training, correct, Mr. Storie?
3    A    No.
4    Q    If you found a prisoner hot to the touch,
5    convulsing and nonresponsive, would you think it would
6    be appropriate to wait for an hour before calling 911?
7              MR. GARCIA:  Objection, speculation, lack
8    of foundation.
9              THE WITNESS:  I have no medical training
10   to make that decision whether I would have or not.  I
11   may have.
12   Q    (By Mr. Medlock) You may have called 911 sooner
13   than that?
14   A    Well, you know, it's going to depend on the
15   circumstances and I would probably notify supervision.
16   Q    You would go through your supervisor before
17   calling 911; is that fair?
18   A    Okay.  If I found someone in that condition in
19   a hot environment I would probably err on the side of
20   caution and arrange for 911.
21             MR. GARCIA:  Objection, nonresponsive.
22   Q    (By Mr. Medlock) Okay.  Is there any reason why
23   there aren't cold water fountains in the dorms at the
24   Hutchins Unit that you are aware of?
25   A    I am not aware of why there are not any.

**ROY STORIE - March 04, 2014**

1    Q    Okay.  From -- are you aware of any discussion

2  about using portable air-conditioning units in the dorms

3  at the Hutchins Unit?

4    A    No, sir.

5    Q    Okay.  Are you aware of any studies on the cost

6  of putting air-conditioning in any part of the Hutchins

7  Unit?

8    A    No, sir.

9    Q    Are you aware of any studies on the cost of

10  putting air-conditioning in any part of the Texas

11  Department of Criminal Justice?

12    A    No, sir.

13            MR. MEDLOCK:  Take a quick break?

14            MR. GARCIA:  Sure.

15            (Recess from 1:04 p.m to 1:09 p.m.)

16            (Exhibit 11 marked and attached.)

17    Q    (By Mr. Medlock) Mr. Storie, I have handed you

18  a document marked Exhibit 11.

19    A    Yes, sir.

20    Q    Is that the temperature logs that we were

21  talking about earlier today?  They are recorded between

22  6:30 a.m. and 6:30 p.m.; is that right?

23    A    Yes.

24    Q    Do you actually review this document at any

25  point or are you just aware that they keep these

ROY STORIE - March 04, 2014

1  temperature logs?

2      A    No, I monitor it and make sure that they are

3  actually recording the temperatures and the humidity.

4      Q    Okay.  How do you monitor it?  Like do you look

5  at these daily, weekly?

6      A    It's usually daily.  Now I may, you know, miss

7  a day or two during the week depending on what is going

8  on.

9      Q    Uh-huh.

10     A    But I try to monitor it.  Like when I come in

11  in the morning I ask for the log.

12     Q    That's kind of on your list of things that you

13  do every day?

14     A    Yes.

15     Q    And are you doing it more to see what the

16  temperature is or to see that the temperatures are being

17  recorded?

18     A    I am doing it more to see that the temperatures

19  are being recorded because I am probably aware of what

20  the temperatures are and have been.

21     Q    Okay.  That's from just doing your job as the

22  Risk Manager?

23     A    Correct.

24     Q    I want you to go to the Page 1492.  You see

25  there a page number at the bottom right-hand corner?

ROY STORIE - March 04, 2014

1    A     Uh-huh, okay.

2    Q     There are some numbers there in the middle of

3  the page, 149 degrees plus.  Do you see that?

4    A     Yes.

5    Q     Do you have any reason to dispute that those

6  readings are accurate?

7    A     Well, doesn't seem to be.  I would have to

8  cross index it on our chart.  With 65 percent humidity.

9  Yes, sir, it appears it's going to be accurate.

10   Q     Okay.  You have no reason to dispute the

11  accuracy of those numbers at least?

12   A     I am referring to the chart and the chart

13  indicates it's the same as what is on the log.

14   Q     Okay.  And that's the only way you know to

15  determine the heat index is from looking at the matrix

16  that is marked Exhibit 1?

17   A     Correct.

18              MR. MEDLOCK:  Okay.  I will pass the

19  witness.

20              MR. GARCIA:  Nothing further or no

21  questions at this time.  That's it.  Erika?

22              MS. HIME:  We will reserve our questions

23  for trial.

24              MR. GARCIA:  We are done.

25              (Proceedings concluded at 1:12 p.m.)

**ROY STORIE - March 04, 2014**

```
 1   STATE OF TEXAS
 2   COUNTY OF DALLAS
 3                REPORTER'S CERTIFICATE
 4             ORAL DEPOSITION OF ROY STORIE
 5                  March 4th, 2014
 6        I, the undersigned Certified Shorthand Reporter
 7   in and for the State of Texas, certify that the facts
 8   stated in the foregoing pages are true and correct.
 9        I further certify that I am neither attorney or
10   counsel for, related to, nor employed by any parties to
11   the action in which this testimony is taken and,
12   further, that I am not a relative or employee of any
13   counsel employed by the parties hereto or financially
14   interested in the action.
15        SUBSCRIBED AND SWORN TO under my hand and seal
16   of office on this the  11th   day of   March,2014.
17
18
19   _____
     CURTIS HIGH, CSR NO. 484
20   Expiration Date:  12/31/14
     Wright Watson & Associates
21   Firm Registration No. 225
     7800 North MoPac
22   Suite 120
     Austin, Texas 78759
23   Telephone: 512-474-4363
24
25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 295

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM,           §
STEPHANIE KINGREY, and §
SANDRA McCOLLUM,            §
individually and as        §
heirs at law to the        §
Estate of LARRY GENE       §
McCOLLUM,                   §
          Plaintiffs,       §
                            §
VS                          §      CIVIL ACTION NO.
                            §      3:12-cv-02037
BRAD LIVINGSTON, JEFF       §
PRINGLE, and the TEXAS      §
DEPARTMENT OF CRIMINAL      §
JUSTICE,                    §
          Defendants.       §

-----------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

KAREN SUE TATE

FEBRUARY 7, 2013
-----------------------------------


          ORAL AND VIDEOTAPED DEPOSITION OF KAREN

SUE TATE, produced as a witness at the instance of the

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

February, 2013, from 3:57 p.m. to 5:49 p.m., before TINA

TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

2

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                   February 07, 2013

 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3         Mr. Scott Medlock
           Mr. Jeff Edwards
 4         THE EDWARDS LAW FIRM
           The Bremond Houston House
 5         706 Guadalupe
           Austin, Texas  78701
 6         jeff@edwards-law.com
           scott@edwards-law.com
 7

 8   FOR THE DEFENDANTS:

 9         Mr. David A. Harris
           Mr. Bruce R. Garcia
10         OFFICE OF THE ATTORNEY GENERAL
           P.O. Box 12548
11         Austin, Texas 78711-2548
           512.463.2080  Fax 512.495.9139
12         bruce.garcia@oag.state.tx.us
           david.harris@oag.state.tx.us
13

14   ALSO PRESENT:

15         Mr. Jeremy Gilliam (Videographer)
           512.565.4799
16         Warden Pringle

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 6904

3

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                   February 07, 2013

```
 1                        INDEX

 2                                               PAGE

 3   Appearances...................................  2

 4   WITNESS:  KAREN SUE TATE

 5   Examination by Mr. Medlock....................  4

 6   Signature and Changes......................... 78

 7   Reporter's Certificate........................ 80

 8

 9

10                      EXHIBITS

11   NO.  DESCRIPTION                              PAGE

12   17   Risk Management Training on Heat-Related
          Incidents 5/11/11........................ 19
13
     18   7/19/111 Temperature Logs................ 33
14

15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6905

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      Q.   -- Unit?  Okay.  So your --

2              MR. HARRIS:  Take a breath between the

3    question and answer.  Let him get the question out.

4      Q.   Your entire time at the Hutchins Unit, you've

5    been a sergeant -- or, I'm sorry.  Let me -- all of your

6    time as a sergeant has been spent at the Hutchins Unit?

7      A.   Yes, sir.

8      Q.   Okay.  Who was your direct supervisor in July

9    of 2011?

10     A.   Lieutenant Sanders.

11     Q.   And do you know who Sanders -- Lieutenant

12   Sanders' supervisor was?

13     A.   The senior warden.

14     Q.   Or the duty warden, whoever was on duty?

15     A.   Or the duty warden, yes, sir.

16     Q.   So her supervisor would have been Warden

17   Pringle or whoever else -- whoever the duty warden was

18   that particular day?

19     A.   Yes, sir.

20     Q.   Okay.  Now, as a sergeant, you supervise other

21   officers; is that correct?

22     A.   Yes, sir.

23     Q.   How many officers did you supervise in July of

24   2011?

25     A.   I don't know the exact number.  On duty

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6906

Stephen McCollum, et al.                          Karen Sue Tate
Brad Livingston, et al.                        February 07, 2013

```
 1              MR. HARRIS:  Well, Counsel, I'm going to
 2   object to you mischaracterizing what's written in the
 3   document.  It says:  "If heating continues, the
 4   condition can progress to a heat stroke and death."
 5   That's what it says, and that's what was read.
 6        A.   Yes, sir.
 7        Q.   You agree that's what was read?
 8        A.   Yes, sir.
 9        Q.   That little -- that sentence right there.  Do
10   you know, Sergeant, if heat stroke can cause death?
11        A.   I've read that, sir.
12        Q.   Okay.  You wouldn't have any reason to not
13   believe that?
14        A.   No, sir.
15        Q.   You would have believed in the summer of 2011
16   that it was possible for heat stroke to cause death?
17        A.   Extreme temperatures, yes, sir.
18        Q.   So extreme temperatures could cause heat
19   stroke and then death?
20        A.   Yes, sir.
21        Q.   Okay.  On the second page here where it says
22   "Heat Exhaustion," it lists some symptoms of heat
23   exhaustion.  You were aware that symptoms of heat
24   exhaustion could include weakness, anxiety, fatigue,
25   thirst, dizziness, headaches, paleness, muscle cramps,
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6907

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1   nausea, vomiting and faintness?

2       A.   I read that, sir.

3       Q.   Okay.  So you were aware that that was true?

4       A.   Yes, sir.

5       Q.   Okay.  You see that treatment for heat

6   exhaustion is moving the patient to a cool area and

7   having them lie down?

8       A.   I read that, sir.

9       Q.   So you would know that that was the treatment

10  that was required when someone had heat exhaustion?

11      A.   That's recommended, sir, yes.

12      Q.   To move them to a cool place?

13      A.   Yes, sir.

14      Q.   Okay.  You see in the middle of the second

15  column that heat stroke is a true medical emergency, and

16  it can progress to heat stroke?

17      A.   Yes, sir.

18      Q.   So you would have known that heat stroke is a

19  medical emergency?

20      A.   Yes, sir.

21      Q.   And that symptoms of heat stroke include hot

22  and dry skin, pulse rate, respirations are rapid and

23  weak?

24      A.   I read that, sir.

25      Q.   Okay.  So you would have known that in July of

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1  of 2011?

2      A.   Yes, sir.

3      Q.   And you see that there's a little picture of

4  an ambulance under the description of heat stroke where

5  it says, again, that it's a -- do you see -- see the

6  picture of the ambulance?

7      A.   Yes, sir.

8      Q.   Does that imply to you that, again, this is a

9  medical emergency, and someone needs to be put in an

10  ambulance?

11      A.   Yes, sir.

12      Q.   And in the top of the third column at the end

13  of that first paragraph it says, "Always transfer heat

14  stroke victims to a medical facility."  Do you see that?

15      A.   Yes, sir.

16      Q.   At the Hutchins Unit, there are no medical

17  staff during the night shift; is that right -- or there

18  were not in the summer of 2011?

19      A.   On site, no, sir.

20      Q.   So you would have known in July of 2011 that

21  if someone was going to get to a medical facility to get

22  any medical attention at all, it would have to be off of

23  the Hutchins Unit; is that right?

24      A.   Yes, sir.

25      Q.   Okay.  Is there still no medical staff at the

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6909

27

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1  Hutchins Unit during the night shift?

2      A.   No, sir.

3      Q.   So it's -- it would still be true today that

4  if someone was going to get medical attention during the

5  night shift, it would have to be off of the Hutchins

6  Unit?

7      A.   We do have DMS where we contact the Crain

8  Unit.

9      Q.   What -- for the jury, what's DMS?

10     A.   I'm not real sure what the DMS stands for,

11 Medical System, I know that, Direct Medical System or...

12              MR. HARRIS:  If you don't know, just say

13 you don't know.

14     A.   I don't know exactly, no.

15     Q.   How does it work?  From what you do know, what

16 is it?

17     A.   The offender, if able, is taken before --

18 taken into medical, and the Crain Unit is notified, and

19 they come on a television and actually look and talk to

20 the offender.

21     Q.   So it's like a telemedicine?

22     A.   Yes, sir.

23     Q.   Okay.  Would you always use the DMS for

24 someone who was having a -- would you have -- let me

25 start over.  Would you use DMS for someone who is having

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6910

28

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1   an emergency?

2       A.   If applicable, yes, sir.

3       Q.   When would you use it?  Like if someone is

4   found collapsed having a seizure and is nonresponsive,

5   would you take him to DMS?

6       A.   It depends -- not necessarily, sir.

7       Q.   What would it depend on?

8       A.   The extent of the seizure, sir.

9       Q.   If they remained unresponsive, would you take

10  them to DMS?

11      A.   Yes, and notify them by phone immediately.

12      Q.   Okay.  So you would call -- why would you do

13  that?

14      A.   To notify them.  They have access to the

15  medical records if they have medical records built.

16      Q.   Okay.  So you would do that to see what

17  information the Crain Unit had on them?

18      A.   And see what treatment they wanted us to go

19  with.

20      Q.   Okay.  Would you always do that before calling

21  911?

22      A.   Not necessarily, sir.

23      Q.   Okay.  Well, let's take a step back.  As a

24  sergeant, could you call 911?

25      A.   I would notify my immediate supervisor first.

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                    February 07, 2013

1      Q.   That would be the lieutenant?

2      A.   Yes, sir.

3      Q.   Would you -- according to the policies here at

4  the Hutchins Unit, and the practice and procedure that

5  you follow, can you, as a sergeant, pick up the phone

6  and call 911?

7      A.   I would notify my lieutenant.

8      Q.   You have to notify your lieutenant before

9  calling 911?

10     A.   I would notify my lieutenant.

11     Q.   You would.  Okay.  Is there a policy or

12 procedure that says you have to notify your lieutenant

13 before calling 911?

14     A.   No, sir, I don't believe so.

15     Q.   Is that how you've been instructed to contact

16 911, that you go through the lieutenant first?

17     A.   I go through -- I mean, we've always called

18 ranking officers.  I would call the lieutenant.

19     Q.   Who told you that you needed to call a ranking

20 officer before you called 911?

21     A.   No one.

22     Q.   That's just the way things are done here at

23 the Hutchins Unit?

24     A.   Through the chain of command, I would contact

25 my lieutenant.

30

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1       Q.   Okay.  Officer Clark had similar testimony,

2   that he would go through the chain of command before

3   calling 911.  Is that how things are done here at the

4   Hutchins Unit, you go through your chain of command

5   before you call 911?

6       A.   I would.

7       Q.   You would.  Do you know if everybody would

8   here at the Hutchins Unit?

9       A.   I can't speak for everyone.

10      Q.   Is that the way things are supposed to be done

11  at the Hutchins Unit?

12      A.   That's the way I do it.

13      Q.   Okay.  And you do things the ways things are

14  supposed to be done?

15      A.   I try to, sir.

16      Q.   Okay.  Is there anything that you know of that

17  would prevent you from using the DMS system and calling

18  911 at the same time?

19      A.   No, sir.

20      Q.   So you could do that?  You could call DMS and

21  call 911 at the same time?

22      A.   Yes, sir.

23      Q.   And just to be clear, did the DMS system exist

24  in the -- in July of 2011?

25      A.   I believe so, sir.

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      Q.   Okay.  Do you know -- the DMS would just

2  connect you with who?  How -- do you know who the DMS

3  system would connect you with?  Would it be a doctor or

4  a registered nurse?

5      A.   A registered nurse.

6      Q.   A registered nurse.  Okay.  So would you ever

7  see a doctor through the DMS system?

8      A.   I have not, sir.

9      Q.   Okay.  So then you were aware in July of 2011

10 that if someone was going to see a doctor, it would have

11 to -- it wouldn't be through DMS?

12     A.   Yes, sir.

13     Q.   Okay.  I want you to go back to your -- the

14 training roster, Exhibit 17.  Can you look and see if

15 Officer Clark attended that training?

16     A.   Yes, sir.

17     Q.   Officer Clark did attend?

18     A.   Yes, sir.

19     Q.   How about Officer Jolayemi?

20     A.   Yes, sir.

21     Q.   She did as well?

22     A.   Yes, sir.

23     Q.   Okay.  Do you -- when you do the training, do

24 you do anything to make sure that the officers are

25 actually paying attention?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6914

Stephen McCollum, et al.                          Karen Sue Tate
Brad Livingston, et al.                       February 07, 2013

```
 1      A.   No, sir.

 2      Q.   Okay.  What shift do you work?

 3      A.   Third shift, sir.

 4      Q.   And third shift is from 10:30 p.m. to 6:30

 5 a.m.?

 6      A.   9:45 p.m. to 6:45 a.m.

 7      Q.   And is that the shift you've always worked at

 8 the Hutchins Unit?

 9      A.   No, sir.

10      Q.   Do you still work that shift today?

11      A.   Yes, sir.

12      Q.   Have you worked that shift the entire time

13 since July 2011 to today?

14      A.   Yes, sir.

15      Q.   When -- how long have you worked that shift?

16      A.   I would have to guess.

17      Q.   That's fine.

18      A.   It would probably be since approximately

19 February of 2011.

20      Q.   Okay.  So almost two years you've been working

21 that shift?

22      A.   Yes, sir.

23      Q.   Okay.  Have you ever -- has it ever been your

24 responsibility to create this temperature log?

25      A.   No, sir.
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6915

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      Q.   Or a document like it?

2      A.   No, sir.

3      Q.   Okay.  If you had heard over the radio that it

4  was 150 degrees, what would you have done for the

5  prisoners?

6           MR. HARRIS:  Objection,

7  mischaracterization of the evidence and the testimony,

8  and it calls for speculation.

9      A.   I would encourage them to stay hydrated, and

10 if they need to get in the shower and cool down, that

11 would be an option.

12     Q.   Would you have done anything else?

13     A.   I would be checking on them.  I check on all

14 of them the best I can, yes, sir.

15     Q.   You would agree that a heat index of 150 is

16 dangerous temperatures, right?

17     A.   I'll agree that it's hot.  I'm working in it

18 too, sir.

19     Q.   Would you agree that it's dangerous at that

20 level?

21     A.   Yes, sir.

22     Q.   In July 2011, had you ever seen a list of

23 prisoners with medical conditions that make the heat

24 especially dangerous for them?

25     A.   I do not recall.

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      Q.    And the officers that you supervise work in

2   those dorms where there's no air conditioning, right?

3      A.    Yes, sir.

4      Q.    You'd agree with me that it gets pretty hot in

5   there during the summer, wouldn't you?

6      A.    Yes, sir.

7      Q.    Do you hear staff complain to you about the

8   heat in the dorms?

9      A.    Yes, sir.  I complain.

10     Q.    You complain.  Who have you complained to?

11     A.    I fuss right along with the officers and the

12  offenders about the heat.

13     Q.    Do you complain to your supervisors, or do you

14  just...

15     A.    They don't predict the weather or make it

16  happen.  No, sir.  We all just fuss about the heat.

17     Q.    Okay.  But everybody is kind of aware at the

18  prison that it's very hot in the dorms?

19     A.    Yes, sir.

20     Q.    And you mentioned the prisoners complain about

21  the heat?

22     A.    Yes, sir.

23     Q.    I assume that probably every summer you've

24  worked here, you've heard complaints about the heat from

25  prisoners and from staff?

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      Q.   You'd agree that when the air conditioning is
2  working in the picket, that that makes a big difference,
3  that's a big difference in the temperature between the
4  picket and the dorm, though, right?
5      A.   Yes.
6      Q.   When you're working in the dorms, like we've
7  talked about, do you ever take a break somewhere where
8  there's air conditioning in the summer?
9      A.   If possible.
10     Q.   Probably every time you could take a break,
11  you'd take a break in the air conditioning; is that
12  right?
13     A.   I'd have to complete the duties first, sir.
14     Q.   Assuming that you could take a break, that
15  you'd done everything you were supposed to, you know,
16  you had time for your lunch or whatever, you'd -- you'd
17  have your lunch in a place that was air conditioned,
18  right?
19     A.   If possible, sir, yes.
20     Q.   Okay.  And you'd agree that it stays hot in
21  those dorms even in the middle of the night, right?
22     A.   It stays warm, yes, sir.
23     Q.   It's more than warm.  It's -- it's hot, right?
24     A.   Yes, sir.
25     Q.   And you can't open the windows in those dorms,

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6918

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      Q.   One large Igloo?

2      A.   Yes, sir.

3      Q.   To explain to the jury what a large Igloo is,

4   is that like one the jugs of Gatorade that you see get

5   dumped on the coach at the Super Bowl?

6      A.   Yes, sir.

7      Q.   Okay.  About that size?

8      A.   Yes, sir.

9      Q.   Is that about a ten-gallon jug?

10     A.   I don't know the exact weight, sir.

11     Q.   Okay.  Where -- where is the Igloo kept?

12     A.   It's in a rack on the wall.

13     Q.   And where's the rack on the wall in the dorm?

14     A.   In the glass area at the front door.

15     Q.   Is that by where the picket is located?

16     A.   You can see it from the picket.

17     Q.   Okay.  And do prisoners need a cup to get

18   water out of the jug?

19     A.   They would have a cup, yes.

20     Q.   If the prisoner had a cup, that's what they

21   would use to get water out of the jug?

22     A.   Yes, sir.

23     Q.   If the prisoner didn't have a cup, could they

24   get water out of the jug?

25     A.   Yes, sir, I'm sure.  We provide the snow cone

Stephen McCollum, et al.                     Karen Sue Tate
Brad Livingston, et al.                   February 07, 2013

```
 1  cups.
 2        Q.    Okay.  The little Dixie cup?
 3        A.    Yes, sir.
 4        Q.    Where are those kept?
 5        A.    They're dispensed to the offenders.
 6        Q.    Are they in a rack next to the jugs, or are
 7  they passed out?
 8        A.    No, sir.  They're passed out.
 9        Q.    Who passes those out?
10        A.    The officers.
11        Q.    When do the officers pass those out?
12        A.    I would -- as needed.  If the offender tells
13  them they need a cup, they should be able to get them
14  one.
15        Q.    So the prisoner would have to ask the officer
16  for the cup, for the officer to give them one.  There's
17  no set -- is that right?
18        A.    Not to my knowledge, no, sir.
19        Q.    Okay.  That was a very poorly worded question.
20  I can reword that one.  The -- the cups aren't passed
21  out regularly at a certain time; is that right?
22        A.    I believe, I'm not sure, but I believe it's
23  each shift is passing them out, yes, sir.
24        Q.    Passes out the Dixie cups.  Okay.  Have you
25  done that --
```

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      A.    I wouldn't think so, no.

2      Q.    When you arrived at the dorm, what other

3  officers were there?

4      A.    Officer Clark and Officer Jolayemi.

5      Q.    Was Officer Jolayemi still in the picket, or

6  had she come out to the bunk?

7      A.    She -- she came with me to the bunk.

8      Q.    Okay.  So you came into the building, and she

9  went with you?

10     A.    She was with him.

11     Q.    She was already there with him?

12     A.    Yes.

13     Q.    Were there any other officers there?

14     A.    Officer Clark.

15     Q.    Okay.  Besides officer Clark and Officer

16 Jolayemi, those were all the officers that were there

17 when you arrived?

18     A.    When I arrived.  I --

19     Q.    I'm sorry?

20     A.    No, sir.

21     Q.    Did other officers show up after you arrived?

22     A.    Yes, sir, the A responders, yes, sir.

23     Q.    Describe what the A responders means for the

24 jury.

25     A.    We assign A and B responders for incidents

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1      A.   I believe there was two others that responded,

2  but I'm not sure on who they were at this moment.

3      Q.   After an incident like this, should all of the

4  A responders -- or the responders write a statement?

5      A.   I don't know -- I mean, if it's needed, yes,

6  sir.

7      Q.   Who would determine if it was needed?

8      A.   Myself and the lieutenant.

9      Q.   Did you tell any of the A responders to write

10 a statement?

11     A.   Not that I recall.

12     Q.   When you arrived at Mr. McCollum's bunk,

13 describe what he -- what was going on with him.

14     A.   He was trembling.  I assumed it was a seizure.

15     Q.   It looked like what your understanding of a

16 seizure looks like?

17     A.   Yes, sir.

18     Q.   Like what -- if you saw someone have a seizure

19 on TV, what it would look like?

20     A.   Yes, sir.

21     Q.   His whole body was shaking; is that right?

22     A.   Yes, sir.

23     Q.   Was his whole body shaking the entire time

24 that you were there?

25     A.   No, sir.

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                    February 07, 2013

1    Q.   Did it kind of stop and start again, or how
2   did that go?
3    A.   I know it stopped, but I don't remember the
4   entire details of it.
5    Q.   You remember it stopped, but you don't
6   remember if it started again?
7    A.   No, sir.
8    Q.   You'd agree that he looked like he was in
9   pretty bad shape, that he needed medical attention when
10  you got there, right?
11   A.   I would agree that he was in a little
12  distress.  I'm not medically -- medically trained as far
13  as the severity of the need.
14   Q.   Would you agree that someone from medical
15  needed to see him at that point?
16   A.   I would have liked for them to.
17   Q.   Okay.  So you thought that he needed medical
18  attention at that point?
19   A.   I wanted to get him the proper attention.
20   Q.   Was Mr. McCollum still on the top bunk when
21  you arrived?
22   A.   Yes.
23   Q.   Do you remember what he was wearing?
24   A.   His boxers.
25   Q.   Was he wearing anything else?

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

1        A.    Not that I recall.

2        Q.    Do you remember what his skin looked like?

3        A.    Flushed.  It was hot.

4        Q.    His -- his body look flushed.  Did you touch

5    him?

6        A.    Yes.

7        Q.    Was his body hot?

8        A.    He was warm.

9        Q.    Warm like a normal body temperature or warm

10   like he had a fever?

11       A.    I didn't touch him all over.  I just touched

12   his face, and it was warm.

13       Q.    Okay.  But warm like --

14       A.    Like he could be running a fever.

15       Q.    Like he could be running a fever.  Okay.  When

16   you touched his face, was he sweaty or clammy?

17       A.    I don't remember.

18       Q.    Do you remember seeing if he was breathing?

19       A.    Yes, sir.

20       Q.    Did his breathing seem normal to you?

21       A.    Yes, sir.

22       Q.    Did you talk to Mr. McCollum?

23       A.    I talked to him, yes, sir.

24       Q.    What did you say to him?

25       A.    I asked -- you know, asked him to calm down,

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6924

Stephen McCollum, et al.                              Karen Sue Tate
Brad Livingston, et al.                              February 07, 2013

1    Q.    Tell me about that.  Describe what happened

2  there.

3    A.    I gave him two drips of water off of my

4  fingers to see if he would respond, but then I decided

5  if he's asleep -- heavily asleep, he's not -- may not

6  swallow, and I did not want to choke him, so I did not

7  go any further.

8    Q.    So you dipped your fingers in some water and

9  held it over his lips --

10    A.    Yes, sir.

11    Q.    -- and let it drip on there?

12    A.    Yes, sir.

13    Q.    Did he respond to that?

14    A.    I want to say that he made a noise, but I

15  cannot say for sure.

16                MR. MEDLOCK:  It looks like we have five

17  minutes left on the tape, so why don't we take a quick

18  break?

19                MR. HARRIS:  Okay.

20                THE VIDEOGRAPHER:  Going off the record

21  at 5:24 p.m.

22                (Recess.)

23                THE VIDEOGRAPHER:  Going on the record at

24  5:31 p.m.

25    Q.    All right.  Sergeant Tate, your statement says

Stephen McCollum, et al.                          Karen Sue Tate
Brad Livingston, et al.                         February 07, 2013

1   anyone with a video camera there at the scene?

2       A.   I do not remember.

3       Q.   Should there have been somebody with a video

4   camera, according to policy or practice?

5       A.   Probably, yes, sir.

6       Q.   If there had been somebody with a video

7   camera, what would have happened to the video after the

8   event was over?  Do you know?

9       A.   It would have been -- the lieutenant would

10  have took it and put it with whatever information we

11  had.

12      Q.   That's the lieutenant's job to collect...

13      A.   Yes, sir.

14      Q.   Does the lieutenant collect the statements?

15      A.   You're going to turn it in to her, yes.

16      Q.   Your statement says that you were in constant

17  contact with Lieutenant Sanders; is that right?

18      A.   Yes.

19      Q.   How were you in contact with her?

20      A.   She came on to the building.

21      Q.   You didn't talk with her before she got on the

22  building?

23      A.   I called her to the building and talked to her

24  by phone.

25      Q.   Okay.  Had anyone else called her before you

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                     February 07, 2013

```
 1   at that point?

 2       A.   I don't remember exactly, no.

 3       Q.   Okay.  What did -- then Lieutenant Sanders

 4   went from the bedside to the picket?

 5       A.   Yes.

 6       Q.   How long was she in the picket, do you know?

 7       A.   It would be a guess.  I really couldn't tell

 8   you.

 9       Q.   What would your guess be?

10       A.   10, 15 minutes.

11       Q.   Did she come back out of the picket then?

12       A.   Yes.

13       Q.   And was she at the -- then she went back to

14   the bedside?

15       A.   She came back in, yes.

16       Q.   And do you know where she called 911 from?

17       A.   I'm assuming the picket.

18       Q.   She couldn't actually call 911 from the picket

19   though, right?  Someone at another part of the prison

20   would have to call 911?

21       A.   Yes.

22       Q.   All she could do from the picket would be to

23   tell someone to call 911?

24       A.   Yes.

25       Q.   Were you there when the EMTs arrived?
```

Stephen McCollum, et al.                      Karen Sue Tate
Brad Livingston, et al.                    February 07, 2013

1      Q.   Okay.  So you could open all those doors --

2      A.   Yes.

3      Q.   -- pretty quickly?

4      A.   Yes.

5      Q.   Okay.  What happened when the EMTs arrived in

6   the dorm?

7      A.   We went in the -- I went in the dorm, told the

8   other offenders to get away from the bunk area.  We went

9   in with the stretcher, removed him from the bunk, put

10  him on the stretcher and took him to medical.

11     Q.   Who -- how did you get him off the bunk onto

12  the stretcher?

13     A.   It took quite a few people.

14     Q.   Do you remember how many?

15     A.   I would say at least five.

16     Q.   Were officers and EMTs lifting him off the

17  bunk?

18     A.   Yes.

19     Q.   How did they do that?  Did they just pick up

20  an arm and a leg and --

21     A.   With the sheet.

22     Q.   With the sheet.  With the sheet that he was

23  laying on?

24     A.   He was lying on, yes.

25     Q.   How long did it take to get him off the bunk?

Stephen McCollum, et al.                         Karen Sue Tate
Brad Livingston, et al.                       February 07, 2013

1       A.   I would guess five or six minutes, not long.

2       Q.   Did you -- you spoke with the EMTs during this

3  whole process?

4       A.   I was more or less hurrying them.

5       Q.   Because you knew it was urgent?

6       A.   I wanted him to get help if he needed it.

7       Q.   Okay.  Did they tell you anything about Mr.

8  McCollum?

9       A.   I don't remember them doing much other than

10  getting him in the ambulance and telling me that they

11  would be going on code status.

12      Q.   Did you know what code status meant?

13      A.   Not completely, no.

14      Q.   What did -- to your knowledge, what did it

15  mean?

16      A.   Serious.

17      Q.   Okay.  That's why you put that in the report?

18      A.   Yes.

19      Q.   Do you know if the EMTs took his temperature

20  while he was at the facility?

21      A.   No, sir, I don't know.

22      Q.   Okay.  I understand from reviewing records in

23  this case that there were some officers who went to the

24  hospital to guard Mr. McCollum while he was there.  Did

25  you ever -- was that ever part of your duties, or did

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409

Plaintiffs' MSJ Appx. 6929

75

Stephen McCollum, et al.                    Karen Sue Tate
Brad Livingston, et al.                   February 07, 2013

1       Q.    It would be harder for someone --

2       A.    Yes.

3       Q.    -- walking around to be sleeping on the job?

4       A.    He's driving.

5       Q.    Okay.  The week before July 22nd, do you

6   recall there being any lockdowns or security emergencies

7   at the prison?

8       A.    No, sir, I don't remember.

9       Q.    Okay.  Officer Clark told us that when you

10  arrived at the scene at Mr. McCollum's bunk, that you

11  told him to go to another event happening in the prison;

12  is that right?

13      A.    Yes, sir.

14      Q.    Why did you tell him to do that?

15      A.    He was one of my responding officers.

16      Q.    So you -- was he like a B responder?

17      A.    He was -- I don't remember if he was A or B,

18  but he was one of my responders.

19      Q.    Okay.  Why did you send him away instead of --

20  when he was already at an emergency situation?

21      A.    It was another emergency situation, and I

22  needed to know the details.

23      Q.    Okay.  So why did you send Officer Clark

24  instead of somebody else?

25      A.    I could not tell you.

Stephen McCollum, et al.                     Karen Sue Tate
Brad Livingston, et al.                    February 07, 2013

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                     DALLAS DIVISION

3   STEPHEN McCOLLUM,       §
    STEPHANIE KINGREY, and  §
4   SANDRA McCOLLUM,        §
    individually and as     §
5   heirs at law to the     §
    Estate of LARRY GENE    §
6   McCOLLUM,               §
            Plaintiffs,     §
7                           §
    VS                      §   CIVIL ACTION NO.
8                           §   3:12-cv-02037
    BRAD LIVINGSTON, JEFF   §
9   PRINGLE, and the TEXAS  §
    DEPARTMENT OF CRIMINAL  §
10  JUSTICE,                §
            Defendants.     §

11

12      ---------------------------------------

13            REPORTER'S CERTIFICATION

14      ORAL AND VIDEOTAPED DEPOSITION OF

15              KAREN SUE TATE

16             FEBRUARY 7, 2013

17      ---------------------------------------

18

19      I, Tina Terrell Burney, Certified Shorthand

20  Reporter in and for the State of Texas, hereby certify

21  to the following:

22          That the witness, KAREN SUE TATE, was duly

23  sworn by the officer and that the transcript of the oral

24  deposition is a true record of the testimony given by

25  the witness;
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
484356b4-0d0c-4ff0-8574-db7131818409
Plaintiffs' MSJ Appx. 6931

Stephen McCollum, et al.                      Karen Sue Tate
Brad Livingston, et al.                    February 07, 2013

1          I further certify that pursuant to FRCP Rule

2    30(f)(1) that the signature of the deponent:

3               _____ was requested by the deponent or a

4    party before the completion of the deposition and is to

5    Be returned within 30 days from date of receipt of the

6    transcript.  If returned, the attached Changes and

7    Signature Page contains any changes and the reasons

8    therefor;

9               _____ was not requested by the deponent or a

10   party before the completion of the deposition.

11         I further certify that I am neither attorney

12   or counsel for, nor related to or employed by, any of

13   the parties or attorneys to the action in which this

14   deposition was taken.  Further, I am not a relative or

15   employee of any attorney of record in this case, nor am

16   I financially interested in the outcome of the action.

17         Subscribed and sworn to on this the _____

18   day of February, 2013.

19

20

21         _____

22         TINA TERRELL BURNEY
           Texas CSR No. 2908
23         Expiration Date:  12/31/14
           WRIGHT WATSON & ASSOCIATES, L.L.C.
24         3307 Northland Drive, Suite 185
           Austin, Texas  78731
25         800.375.4363  Fax 512.474.8802
           Firm Registration No. 225

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 296

```
       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
                 DALLAS DIVISION

STEPHEN McCOLLUM,           §
STEPHANIE KINGREY, AND      §
SANDRA McCOLLU,             §
INDIVIDUALLY AND AS         §
HEIRS AT LAW TO THE         §
ESTATE OF LARRY GENE        §
McCOLLUM,                   §  CIVIL ACTION NO.
        Plaintiffs,         §  3:12-CV-02037
                            §
VS.                         §
                            §
BRAD LIVINGSTON, JEFF       §
PRINGLE, RICHARD CLARK,     §
KAREN TATE, SANDREA         §
SANDERS, ROBERT EASON,      §
THE UNIVERSITY OF TEXAS     §
MEDICAL BRANCH AND THE      §
TEXAS DEPARTMENT OF         §
CRIMINAL JUSTICE,           §
        Defendants.         §
```

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

        ORAL AND VIDEOTAPED DEPOSITION OF
                 RICHARD C. THALER
                     VOLUME 1

                  October 18, 2013

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

        ORAL AND VIDEOTAPED DEPOSITION OF RICHARD C.

THALER, produced as a witness at the instance of the

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on October 18, 2013,

from 9:00 a.m. to 4:35 p.m., before Brenda J. Wright,

RPR, CSR in and for the State of Texas, reported by

machine shorthand, at the Office of the Attorney

General, 300 West 15th Street, Suite 1200, Austin,

2

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

```
 1   Texas, pursuant to the Federal Rules of Civil

 2   Procedure and the provisions stated on the record or

 3   attached herein.

 4                    APPEARANCES

 5   For the Plaintiffs:
             Mr. Jeff Edwards
 6           THE EDWARDS LAW FIRM
             The Haehnel Building
 7           1101 East 11th Street
             Austin, Texas 78702
 8           512-623-7727/512-623-7729 (fax)
             jeff@edwards-law.com
 9              -and-
             Mr. Scott Medlock
10           TEXAS CIVIL RIGHTS PROJECT
             1405 Montopolis Drive
11           Austin, Texas 78741
             512-474-5073/512-474-0726 (fax)
12
     For the Defendants Jeff Pringle, Richard Clark, Karen
13   Tate, Sandrea Sanders, Robert Eason and Texas
     Department of Criminal Justice:
14           Mr. Bruce R. Garcia
             Assistant Attorney General
15           OFFICE OF THE ATTORNEY GENERAL OF TEXAS
             Law Enforcement Defense Division 012
16           Post Office Box 12548
             300 West 15th Street
17           Austin, Texas 78711-2548
             512-463-2080/512-495-9139 (fax)
18           bruce.garcia@texasattorneygeneral.gov

19   For the Defendants Brad Livingston, William Stephens
     and Richard Thaler:
20           Mr. Demetri Anastasidis
             Assistant Attorney General
21           OFFICE OF THE ATTORNEY GENERAL OF TEXAS
             Law Enforcement Defense Division 012
22           Post Office Box 12548
             300 West 15th Street
23           Austin, Texas 78711-2548
             512-463-2153/ 512-495-9139 (fax)
24           demitri.anastasidis@texasattorneygeneral.gov

25
```

Plaintiffs' MSJ Appx. 6935

3

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

```
 1              APPEARANCES - CONTINUED

 2
     For the Defendant University of Texas Medical Branch:
 3           Ms. Kim Coogan
                  -and-
 4           Ms. Erika Hime
                  -and-
 5           Ms. Lacey Mase
             Assistant Attorney General
 6           Law Enforcement Defense Division
             OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 7           Post Office Box 12548
             Austin, Texas 78711-2548
 8           512-463-2080/512-495-9139 (fax)
             kim.coogan@texasattorneygeneral.gov
 9
     Videographer:
10           Mr. Patrick Knapick

11   Also Appearing:
             Ms. Deborah Woltersdorf
12           Paralegal, OFFICE OF THE ATTORNEY GENERAL
             deborah.woltersdorf@texasattorneygeneral.gov
13
             Mr. Josh Barron
14
             Mr. Tobias D. Hunziker
15           TEXAS DEPARTMENT OF CRIMINAL JUSTICE

16           Mr. William Stephens
             TEXAS DEPARTMENT OF CRIMINAL JUSTICE
17
             Mr. Neal Spradlin
18
             Mr. Kyle Smith
19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6936

10

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1     Q.    Do you believe that high temperatures inside
2  the Texas prison system can be dangerous, sir?
3     A.    I surely believe that extreme temperatures,
4  hot or cold, inside our institutions require our
5  attention and could affect the wellness of offenders,
6  yes, sir.
7     Q.    Okay.  Let me ask you specifically.  As you
8  testify here today, based on your knowledge of the
9  Texas prison system, would you agree with me that high
10 temperatures, above 90 degrees, inside Texas prisons
11 can be dangerous and deadly to offenders?
12    A.    Again, I would -- I would agree that under
13 certain circumstances, high temperatures create an
14 additional risk to the offender population and staff
15 working in those facilities.
16    Q.    And that additional risk is that people can
17 die.  Correct?
18    A.    In certain circumstances that has occurred,
19 yes, sir.
20    Q.    Okay.  And certainly, you know that now,
21 based on your experience in the Texas prison system.
22 Correct?
23    A.    Yes, sir.
24    Q.    And certainly, you knew that back in 2007,
25 2008, or 2009, based on your experience in the Texas

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6937

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  prison system.  Correct?

2       A.   No, sir.

3       Q.   You didn't know in 2009 that high level --

4  high temperatures were dangerous for offenders?

5       A.   I did know they were dangerous, yes, sir.  I

6  thought you were asking the question about those

7  temperatures could cause death.

8       Q.   Okay.  You knew in 2009 that high

9  temperatures were dangerous for offenders, but you

10  weren't sure if they could cause death?

11       A.   I knew in 2009, high temperatures could

12  cause additional risks to offenders in our population,

13  yes, sir.

14       Q.   Including death?

15       A.   In extreme circumstances, yes, sir.

16       Q.   Okay.  What are the extreme circumstances

17  that you're talking about?

18       A.   It would be a multitude of circumstances.

19  But just from -- in 2009, I couldn't outline those for

20  you, except that just from common knowledge as an

21  individual, not necessarily from experiences within

22  the system, extremely high temperatures, particularly

23  in a work environment, could lead to heat stroke and

24  death.

25       Q.   So fair to say that as of 2009, just based

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6938

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1   on your experience as just a human being, you knew

2   that high temperatures inside could lead to heat

3   stroke?

4        A.   I knew that high temperatures could lead to

5   the risk of heat stroke, yes, sir.

6        Q.   What is the difference between the risk of

7   heat stroke and actual heat stroke, in your opinion?

8        A.   Well, there are certain risk factors which

9   would cause the probabilities of heat stroke to occur

10  to be higher, when I refer to that, but to directly

11  answer your question, it could cause -- high

12  temperatures could cause heat stroke.

13       Q.   Sure.  And I appreciate that.  I mean, I

14  think you were answering my question.  What are those

15  additional risk factors that you knew about, let's

16  say, back in 2009, that would make it even more

17  probable that someone would suffer a heat stroke?

18       A.   Through training within the system,

19  strenuous activity in those high-temperature

20  conditions, failure to adequately intake liquids,

21  fluids, water, could add to those conditions.

22       Q.   What else?

23       A.   In certain circumstances, health-related

24  issues could cause to -- additional risk.

25       Q.   What health-related issues in particular,

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6939

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

```
 1  sir?
 2       A.    There are a multitude of health-related
 3  issues out there.  Most commonly would be those that
 4  were on medications that -- that would cause -- cause
 5  that individual to have difficulty dealing with heat.
 6       Q.    Are you talking about antipsychotic
 7  medications?
 8       A.    Yes, sir.
 9       Q.    Psychotropic medications?
10       A.    Yes, sir.
11       Q.    Diuretics that might cause the body to
12  dehydrate?
13       A.    Possibly, yes, sir.
14       Q.    All right.  So you knew about that back in
15  2009.  What about, did you know that heart disease or
16  hypertension made the risk of heat stroke higher for
17  an individual?
18       A.    I can't say that I actually was in any
19  discussions about that particular illness, but surely
20  it would be logical to assume that maybe it could.
21       Q.    Are you aware of training documents in the
22  Texas Department of Criminal Justice which indicate
23  that hypertension does, in fact, increase the
24  likelihood of a person suffering a heat stroke in high
25  temperatures?
```

15

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  ensuring that the policy in the field was followed.

2      Q.   Okay.  Is another way -- and I want to be

3  fair here -- another way to say that policy is being

4  followed in the field, making sure that your

5  subordinates are doing their jobs correctly?

6      A.   Sure.

7      Q.   What about other medical conditions like

8  diabetes, were you aware that that would pose a higher

9  risk of potential heat stroke in the Texas prison

10 system if temperatures were high?

11     A.   Again, to my recollection, that wouldn't

12 have been specifically something that I -- that I

13 would have knowledge of, but it very well could be.

14     Q.   What about age, are you familiar with age

15 being a risk factor with exposure to high temperatures

16 inside?

17     A.   Again, generally, those -- those individuals

18 that are higher -- at higher risk to any susceptible

19 illness or injury, I relied heavily on health service

20 to help me with.  But I could certainly see where age

21 could result in additional health concerns.

22     Q.   Common sense.  Fair?

23     A.   I would agree.

24     Q.   Okay.  Likewise, common sense would tell you

25 that -- that I should remember my question before I

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6941

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1    start asking it.

2                Let's take a step back.

3        A.    Okay.

4        Q.    Tell me about your background.  And I

5    know -- I know how long you've been with the agency,

6    so just, if you could, just give me your kind of

7    nutshell summary of your background from the time you

8    began with the agency, and then I'll probably ask some

9    more pointed questions -- hopefully, better than the

10   last one -- about kind of your role and

11   responsibility.

12       A.    Okay.  I began my career with the Texas

13   Department of Criminal Justice in 1980 as a

14   correctional officer at the Huntsville Unit.

15                In March of 1983, I promoted to the

16   position of sergeant of correctional officers at

17   the -- at that time -- Ramsey III facility.

18       Q.    Okay.

19       A.    In Brazoria County.

20                In September 1984, I promoted to

21   lieutenant of correctional officers at that same

22   facility.

23                In March of 1986, I promoted to captain

24   of correctional officers at the Clemens Unit, again,

25   in Brazoria County.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6942

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1               In 1989, I promoted to major of

2       correctional officers at the Retrieve Unit there in

3       Angleton, Texas.

4               And in 1990, I was promoted to

5       assistant warden at the Pack 2 Unit.

6               In 1992, I was promoted to senior

7       warden at the Smith Unit in Lamesa, Texas.

8               I served in that capacity until 1994,

9       when I was promoted to a warden's position at the

10      Ramsey I Unit back in Brazoria County.

11              In 1996, again, I was promoted to the

12      position of warden, senior warden, at the

13      Telford Unit, T-e-l-f-o-r-d, Unit in Bowie County,

14      Texas.

15              And in 1999, I was transferred to the

16      Estelle Unit in Walker County as a warden.

17              In 2003, I was promoted to regional

18      director for Region I, which encompassed into the

19      Huntsville area.

20              In 2006, I was promoted to division

21      director of the Manufacturing Logistics Division,

22      there in Huntsville, Texas.

23              And in 2000 -- July of 2009, I was

24      promoted into the director's position of the

25      Correctional Institutions Division and served in that

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6943

18

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1    capacity until my retirement in May of this year,

2    2013.

3        Q.   All right.  So let's go back to 2003 when I

4    believe you told me that you became the regional

5    director of the region that would include Huntsville?

6        A.   Right.

7        Q.   Who would be serving in that position today,

8    or has kind of the structural situation changed?

9        A.   As far as the named individual?

10       Q.   Sure.

11       A.   I believe Richard Alford is currently the

12   Region I director.

13       Q.   Okay.

14       A.   At least he was when I left in May.

15       Q.   Walk me through -- each region has its own

16   director?

17       A.   Correct.  There is six regions across the

18   state of Texas.

19       Q.   Okay.  So we've met Mr. Eason in this case.

20   Is he a regional director?

21       A.   Yes, sir.

22       Q.   Currently?  Okay.  Or -- okay.

23       A.   Well, I say currently --

24       Q.   He was one of the six --

25       A.   I believe since I left, I believe he --

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6944

19

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1      Q.    He was promoted?

2      A.    He has moved to another position.

3      Q.    Okay.  So we've got the six regional

4   directors.  And as I understand it, and please correct

5   me if I'm wrong, their job is to supervise wardens at

6   individual prisons in those regions?

7      A.    Their job is to supervise the unit

8   administration, which would be the warden at each

9   facility within their region, yes, sir.

10     Q.    Fair to say that their responsibility is

11  staying on top of issues in their particular region?

12     A.    Their responsibility is to ensure that

13  appropriate actions are being taken on their facility,

14  yes, sir.

15     Q.    Fair to say that they should be

16  knowledgeable about deaths that are occurring to

17  offenders in their region?

18     A.    In all cases that there is a death in their

19  region, they would be involved in that notification

20  process.

21     Q.    So if there was an epidemic of heat stroke

22  in a particular region, is it fair to say that the

23  regional director should know about that?

24     A.    The regional director should know about any

25  deaths in their region, yes, sir.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6945

Stephen McCollum, et al. v.                Richard C. Thaler
Brad Livingston, et al.                    October 18, 2013

1           The last position that identified the

2     prison and jails, that would be the individual that

3     would be responsible for overseeing all of the other

4     basic activities that occurred on the facilities,

5     reviewing most reports that are generated from the

6     regional office would report directly to that prison

7     and jail deputy director.

8           Q.   Okay.  Okay.  Does each region have three

9     deputy directors?

10          A.   No, sir.  Those three deputy directors are

11    located in the central office and support all six

12    regional directors.  And at that time, it was all 95

13    facilities out in the field.

14          Q.   Gotcha.

15          Who were the three deputy directors for

16    the time period, let's say, 2009 through your

17    retirement?

18          A.   Okay.  Initially, the three deputy directors

19    in -- that reported to me were Oscar Mendoza.  He was

20    in management operations.  I want to say he assumed

21    that position in 2000 -- October 2009, September or

22    October 2009.  I'm not specific on that date.

23          Q.   Okay.

24          A.   He held that position until fairly recently.

25    Just prior to my retirement, he moved into a --

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6946

Stephen McCollum, et al. v.                Richard C. Thaler
Brad Livingston, et al.                    October 18, 2013

1  another position within the agency.

2      Q.    Do you know what position he moved into?

3      A.    The division director over administrative

4  review and risk management.

5      Q.    Okay.

6      A.    Support operations was Tommy Prasifka.

7  Tommy held that position the entire time that I was in

8  my position.

9      Q.    Okay.

10     A.    And then the third individual in prison and

11 jail operations was Bill Stephens.  And, again, he

12 held that position shortly after -- again, all of

13 those were selected in September or October of 2009

14 and held their positions as I indicated.

15     Q.    And it's my understanding that Mr. Stephens

16 replaced you upon retirement?

17     A.    Yes, sir, he did.

18     Q.    And Mr. Stephens is in the room listening to

19 this deposition.  Correct?

20     A.    Yes, he is.

21     Q.    Okay.  All right.  Now, as we go up the

22 regional directors and then the deputy directors, then

23 do we get to your position, sir?

24     A.    Yes, sir.

25     Q.    And tell me again a little bit about your

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1      A.   No, sir.

2      Q.   Okay.  In fact, you wouldn't even be in that

3 line of implementation or ability to stop that?

4      A.   No, sir.

5      Q.   We would go Director Livingston, CFO

6 McGinty, Mr. Matt Demny.  Fair?

7      A.   Again, I don't know who is the final

8 approval for that, but Matt Demny, as the division

9 director, would be involved in that process.

10      Q.   Okay.  Prior to this year, were you aware

11 that TDCJ was spending hundreds of thousands of

12 dollars on cooling equipment for pigs?

13      A.   No, sir.

14      Q.   Does that offend you, when they don't spend

15 it on inmates?

16      A.   Again, I wouldn't compare my offender

17 population to swine, but again --

18      Q.   Why not?

19      A.   I can't speak -- I can't speak to what the

20 needs are of the agriculture division.

21      Q.   Would you place the needs of your inmate

22 population on at least an equal level to the needs of

23 the swine in the division?

24      A.   Again, I wouldn't -- I wouldn't put them in

25 the same priority level.  It's obvious that the

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6948

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1   offender population is our ultimate responsibility and

2   appropriate care of them surely takes priority.

3        Q.   Okay.  All right.  Is Director Livingston at

4   your regional director meetings?

5        A.   No, sir.  Not normally, no, sir.

6        Q.   Normally not?

7        A.   Normally not.

8        Q.   Does he get -- how is he made aware of

9   issues in the system that you have identified as

10  needing policies or needing changes?

11       A.   Again, there is a -- the major communication

12  and efforts between myself in my role as a division

13  director and Mr. Livingston was face-to-face

14  communication, and myself delivering information to

15  Mr. Livingston on current issues within my division or

16  reviewing, in some cases, particular incidents.

17       Q.   Do you ever send him e-mails?

18       A.   Not very often.  I was right down the

19  hallway from him.  So if there was an incident where

20  he happened to be maybe in Austin during the

21  legislative session and I happened to be in Huntsville

22  and there was an incident, I might have sent him an

23  e-mail.  But -- but in most cases I either picked up

24  the phone and told him directly or went down with a

25  face-to-face meeting and briefed him on issues.

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  130 degrees.  Would that cause you concern?

2      A.   It would surely cause me to make sure that

3  those individuals at that unit were taking -- making

4  all mitigation attempts to address issues to ensure

5  that all of the mitigation steps that we have put in

6  place were put in place, to make sure that those unit

7  administrators were discussing any necessary issues

8  with risk management, with health services, to ensure

9  that all actions that were being taken were sufficient

10 to deal with the issue.

11     Q.   Okay.  So if you -- those high temperatures,

12 you would say, look, wardens have to review those

13 temperature logs.  Correct?

14     A.   Yes, sir.  I would hope that the wardens

15 were reviewing the temperature logs.  Yes, sir.

16     Q.   And your expectation would be that the

17 warden would then take appropriate measures when

18 you're dealing with extreme temperatures.  Correct?

19     A.   Yes, sir.

20     Q.   Okay.  Are you aware of the chart by the --

21 the weather chart that's in a lot of your training

22 documents?

23     A.   I believe it's similar to the one that is in

24 1064, I believe.

25     Q.   Exactly.  Where it talks about heat stroke

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  may be possible, or heat stroke might be probable, or

2  heat stroke is imminent?

3      A.   Yes, sir.

4      Q.   Okay.  What does the word "imminent" mean to

5  you?

6      A.   Immediate.

7      Q.   Okay.  That's what it means to me.  Would it

8  surprise you that that's not what it means to

9  Warden Pringle?

10          MR. ANASTASIDIS:  Objection.  Calls for

11  this witness to speculate as to what another person

12  might believe or might not believe.

13      A.   Again, imminent, to me, is immediate.  I

14  would think that most individuals would interpret it

15  as that.

16      Q.   (BY MR. EDWARDS)  Okay.  It would be

17  dangerous to interpret it any other way.  Right?

18          MR. GARCIA:  Objection.  Speculation.

19      A.   Again, that would be my interpretation of it

20  as being immediate.

21      Q.   (BY MR. EDWARDS)  I appreciate that because

22  I think we can agree that's what the word actually

23  means.  But my question -- and let me withdraw that

24  part of it -- but my question is, if you treat the

25  word "imminent" as meaning just possible, and that's

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6951

Stephen McCollum, et al. v.                 Richard C. Thaler
Brad Livingston, et al.                      October 18, 2013

1   Department of Criminal Justice, at least was it your

2   position, that it required a death before you examined

3   whether or not the extreme heat was posing a danger to

4   inmates?

5        A.   No.  We address that issue going into it.

6        Q.   Of course not.  Right?

7        A.   We address that issue going into every

8   season.

9        Q.   Well, okay.  But you had a number of

10  heat-related illnesses before Mr. McCollum died in the

11  summer of 2011, didn't you?

12       A.   There were heat-related illnesses, yes, sir.

13       Q.   Employee heat-related illnesses and inmate

14  heat-related illnesses.  Right?

15       A.   There were some, yes, sir.

16       Q.   Okay.  Does it require a death before you

17  take precautions and change these measures that you

18  allege mitigate the heat?

19       A.   No.

20       Q.   It certainly shouldn't.  Right?

21       A.   No, sir.

22       Q.   If people are suffering heat exhaustion,

23  complaining of heat, fainting, whatever, you ought to

24  examine that right away.  Right?

25            MR. GARCIA:  Objection.  Compound.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6952

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1      A.   And we did.

2      Q.   (BY MR. EDWARDS)  And you did.  Okay.  And

3  you did and, to your knowledge, Director Stephens did.

4  Correct?

5      A.   Yes, sir.

6      Q.   And to your knowledge, Director Eason would

7  have examined that.  Right?

8      A.   Yes, sir.

9      Q.   Okay.  And you certainly would hope that

10 Warden Pringle would exam those that occurred at his

11 facility.  Right?

12     A.   Reviewed the fact -- circumstances, yes,

13 sir.

14     Q.   Okay.  And certainly your directors meetings

15 you would be updating Regional Director Eason and

16 making sure that he tells his wardens that he's

17 supervising, look, this summer is extremely hot.

18 We've got to take extra precautions.  Right?

19     A.   Surely -- surely was addressed at every

20 regional directors meeting that we had, the need to

21 take precautions relating to heat-related illnesses.

22     Q.   And you recall specifically doing that and

23 addressing that at these regional meetings in the 2011

24 time period before Mr. McCollum died.  Right?

25     A.   I surely had it on my agenda, so I am sure I

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6953

Stephen McCollum, et al. v.                Richard C. Thaler
Brad Livingston, et al.                    October 18, 2013

1    addressed it.

2        Q.   Okay.  And this is my question.  To not

3    address it would have been unacceptable.  Correct?

4        A.   Well, again, to bring attention to it and

5    take appropriate action is --

6        Q.   And I appreciate --

7        A.   -- is appropriate.

8        Q.   And that's what you did.  That's what you're

9    telling this jury you personally did.  Correct, sir?

10       A.   Right.

11       Q.   Okay.  Now, my question, though, is a little

12   bit different.  You would agree with me that to not do

13   that would be dangerous to the inmate population.

14   Right?

15            MR. GARCIA:  Objection.  Speculation.

16       A.   To not review incidents and make a

17   determination as to anything that could be done to

18   avoid future incidents?

19       Q.   (BY MR. EDWARDS)  Of course.

20       A.   Right.

21       Q.   Look, you're at the top of the food chain.

22   You and Director Stephens, Director Eason, you guys

23   are responsible for making sure these policies, even

24   if they're informal e-mails, actually get implemented.

25   Right?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6954

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  indeed it's a true statement that there is legislative

2  intent for all county jails to be air conditioned,

3  then that was mandated by the legislature, so county

4  jails follow those instructions.

5       Q.   (BY MR. EDWARDS)   Any other reason you can

6  think of?

7            MS. COOGAN:   Objection.   Speculation.

8       A.   No.

9       Q.   (BY MR. EDWARDS)   Okay.   You don't need

10  this -- this high heat in order to effectively punish

11  the inmates for the crimes they've committed, do you?

12      A.   No, sir, not at all.

13      Q.   Okay.   Is there any penal purpose like

14  specifically for keeping -- there being no air

15  conditioning in the prisons?

16      A.   No -- no -- as it relates to not bringing

17  conditioned air into systems as a form of punishment,

18  absolutely not.

19      Q.   Okay.   Tell me what the EAC system is, sir.

20      A.   It's the Emergency Action Center.   It's a

21  hub that collects information from different

22  divisional components, different facilities and units,

23  on incidents that have occurred throughout the system.

24      Q.   Is it fair to say that the purpose is to

25  inform supervisors about problems at the prison?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6955

Stephen McCollum, et al. v.                Richard C. Thaler
Brad Livingston, et al.                    October 18, 2013

1      A.   In some cases it disseminates information

2  about incidents that have occurred.  Some are

3  problems, some are just incidents.

4      Q.   I understand -- I appreciate that.  It would

5  include prisoner injuries?

6      A.   To the EAC center, yes, sir.  In some cases

7  it would, yes.

8      Q.   Including prisoners that die?

9      A.   Prisoners that have died in the institution,

10 there would be an EAC report sent to the Emergency

11 Action Center.

12     Q.   Prisoners who suffer heat stroke and die,

13 there would be an EAC report.  Right?

14     A.   There should be an EAC report on any death

15 in our system.

16     Q.   Who reviews the reports from the EAC system?

17 If you know?

18     A.   Again, depending on the category of the

19 report, most reports are filed -- are forwarded to the

20 EAC center.  They're filed there in the Emergency

21 Action Center.  If there is an action plan that

22 accompanies that report, then that action plan and a

23 copy of that report would be forwarded to the

24 appropriate, in most cases, deputy director within the

25 division to ensure that the -- any action plan was

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6956

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                         October 18, 2013

1   implemented.

2                Again, those reports are available for

3   review, but as far as when they come in from the

4   facilities, the EAC department is the depository for

5   that information.

6        Q.   With regards to the McCollum case, I guess,

7   would regional -- then Regional Director Eason have

8   seen the EAC reports?

9        A.   Yes.  That EAC report, when it leaves the

10  facility, funnels through the regional director's

11  office prior to forwarding to the EAC center.

12       Q.   And then would it also get to you and

13  Mr. Stephens?

14       A.   Not necessarily in all cases.  Again, if it

15  required an action plan, then that is something that

16  would surely have gone to the appropriate deputy

17  director, depending on what the circumstances were of

18  the EAC report.

19       Q.   Do you review most reports involving deaths?

20       A.   Many -- many of the reports I have reviewed,

21  but I can't say that I review every report that

22  involves an offender death.

23       Q.   Okay.  Did you review the report involving

24  Mr. McCollum?

25       A.   I have subsequently reviewed that report.  I

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6957

124

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                         October 18, 2013

1   can't -- I cannot remember, in 2011, at what point

2   that I personally became aware of it or what documents

3   I reviewed, but I have reviewed it prior to this

4   deposition.

5       Q.   Okay.  Do you believe -- I mean, I'm trying

6   to drill down on it a little bit.  Should you have

7   reviewed it in 2011 when it came in?

8       A.   Well, again, there is multiple entities that

9   report to me, particularly as it -- as it relates to

10  an offender's death.  So in some cases that report is

11  actually reviewed personally by me, in other cases

12  there are discussions with my appropriate deputy

13  director.  Potentially, in these cases, discussion

14  with the Health Services Division director regarding

15  the circumstances surrounding the particular incident.

16  So, again, I can't assure you that in all cases I

17  review every report.

18      Q.   But it's important for the people in the

19  hierarchical chain to be reviewing these to discover

20  patterns.  Right?

21      A.   Well, it's surely important that we discuss

22  the facts concerning the particular incident and

23  determine if there is any modifications to procedures

24  or policies that should take place as we move forward,

25  yes, sir.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6958

Stephen McCollum, et al. v.                Richard C. Thaler
Brad Livingston, et al.                    October 18, 2013

1  medications where the heat affects them?

2       A.   Again, I would say that list would be

3  inclusive of those that take medications that would

4  increase their propensity to heat-related illness.

5  But, again, I'm not the subject matter expert in

6  there, so I don't want to tell you anything for

7  definite that I'm not sure of.

8       Q.   Okay.  What about obesity, is that something

9  that TDCJ teaches people, that people who are obese

10 are vulnerable to extreme heat as well?

11      A.   Again, surely they can be.  At what level

12 that individual is placed on that list, again, I'm --

13 I cannot tell you.

14      Q.   All right.  But after the summer of 2011,

15 the policy changed at TDCJ to rely on UTMB to identify

16 these people who were vulnerable to extreme heat and

17 actually place them on a list where your officers

18 would conduct wellness checks on them throughout the

19 day?

20      A.   Right.  Prior to 2011, we've always relied

21 on UTMB to ensure that the individuals could be

22 appropriately housed on any of our facilities.  But

23 subsequent to the incidents in 2011, that additional

24 measure of development of that checklist was

25 developed.

150

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  entity and say, I need the supervisor, or I need

2  emergency care.  But that individual themselves would

3  have no capabilities of dialing 911.

4       Q.  Sure.  Let's take my example.  Okay.  A

5  person, seizure, nonresponsive.  We've agreed he needs

6  immediate medical care.  Right?

7       A.  Right.

8       Q.  Okay.  In that situation, a correctional

9  officer is there, should they initiate the 911

10  process, or contact their supervisor, wait ten,

11  15 minutes for the supervisor to come and not initiate

12  the 911 process?

13       A.  And, again, in the explanation that I gave

14  you, their first contact would be their supervisor as

15  they initiate our emergency incident response process.

16  Okay?  That supervisor should immediately go to there.

17  If for some reason there is delay, that correctional

18  officer surely has the opportunity to inform that

19  supervisor by radio, we need 911, this is what I have,

20  and that process could be initiated.

21       Q.  Okay.  So nothing prevents, at least to your

22  knowledge, a correctional officer from initiating a

23  911 process if people -- if there is a delay in

24  getting people to help him?

25       A.  There is no policy out there that prohibits

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185    Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6960

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1   that from occurring, no, sir.

2       Q.   If there was a -- not a policy, but just a

3   practice, a way of doing things of just waiting until

4   your supervisor shows up before initiating the 911

5   process, would you agree with me that that could delay

6   potentially lifesaving care?

7       A.   Again, in an emergency situation, I would

8   hope the supervisor would respond immediately.  But,

9   indeed, if that was not happening, then -- then surely

10  that would be a situation of concern.

11      Q.   Okay.  Are you aware of the time delay in

12  this particular case between recognizing Mr. McCollum

13  having seizures and being nonresponsive and contacting

14  911?

15      A.   I'm aware of the time, by reviewing the

16  report and discussing it with others, yes, sir.

17      Q.   Okay.  It's an hour delay.  Right?

18      A.   Just short of an hour, I believe.

19  50-something minutes, yes, sir.

20      Q.   Somewhere between 50 minutes and a little

21  more than an hour, somewhere like that.  Right?

22      A.   Yes.

23      Q.   You would agree that's off the charts

24  unacceptable in this situation.  Right?

25      A.   Again, in -- in reviewing the facts as they

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6961

152

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  were there, again, the encouragement and the direction

2  to the field is, when in doubt, seek -- seek treatment

3  for -- for the offender.

4        Q.   Sure.

5        A.   So in retrospect, not knowing all that the

6  staff was dealing with there, I would surely say that

7  it would have been appropriate to initiate that 911

8  call earlier, yes, sir.

9        Q.   Okay.  Inappropriate to not initiate that

10  911 call sooner.  Right?

11       A.   Well, again, looking at the circumstances as

12  I can see them now, surely would have initiated it

13  earlier, yes, sir.

14       Q.   Okay.  That happened in July of 2011, I

15  think July 22nd, 2011.  Is that your understanding as

16  well?

17       A.   I believe that was the date of the

18  occurrence, yes, sir.

19       Q.   Okay.  And you were notified about -- and

20  you received an EAC report and there was an

21  administrative review in which all of this situation

22  was discussed and described.  Right?

23       A.   Again, I don't know exactly what documents I

24  reviewed.  At some point I would have been notified of

25  that, but I cannot recall exactly when that

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6962

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1   notification took place.

2       Q.   Do you know if these officers have been

3   disciplined for the delay in contacting 911?

4       A.   I do not know whether they have been

5   disciplined, no, sir.

6       Q.   Should they be?

7       A.   Well, again, it's a determination that is

8   made through the review process of the warden and the

9   regional director, and in some cases as they review

10  the administrative review, looking at the officers'

11  actions afterward, they surely -- surely can criticize

12  the fact that there was a delay in the call.  I don't

13  know that -- where any level of responsibility lies in

14  that entire process, but there is officers out there

15  that, as you know, make difficult decisions every day

16  dealing with the offender population, and as to

17  whether or not formal disciplinary should have been

18  taken, at what level, again --

19      Q.   Well, let's change the question.  Should

20  formal retraining have been done?

21      A.   I surely believe that retraining, not only

22  for that particular -- those particular staff members,

23  but for staff on that facility to ensure that the

24  correct message was out there to the staff.

25      Q.   You don't want this to happen again.  Right?

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6963

154

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1    A.   That's correct.

2    Q.   I mean, Warden Pringle ought to have had

3  those officers in and said, look, guys, in all

4  circumstances initiate 911 when someone is seizing and

5  nonresponsive.  Right?  Whether he disciplined them or

6  not, he should have had that conversation.  Right?

7              MR. GARCIA:  Objection.  Compound.

8  Speculation.

9    A.   Again, as a warden, that's something that

10  surely I would have done.

11   Q.   (BY MR. EDWARDS)  And if you were that

12  warden, of course you would have done that.  Fair?

13   A.   Again, as a warden, I surely would have

14  reviewed those circumstances with staff involved.

15   Q.   Do you know if Warden Pringle has done that?

16   A.   No, sir, I do not.

17   Q.   Would you be critical of Warden Pringle if

18  he had not had those conversations with his officers?

19   A.   Again, I would -- I would hope that subject

20  matter relating to those incidents and dealing with

21  those incidents was covered with all staff, to include

22  those officers, by Warden Pringle.

23   Q.   Okay.  Otherwise, nothing changes and you're

24  destined to repeat your failures.  Right?

25   A.   Surely if there is not additional

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1  instructions given, the same decisions could be made,

2  yes, sir.

3       Q.    This -- after this e-mail is sent out, I

4  believe there has been previous testimony that --

5  well, strike that.

6            Are you responsible for sending out

7  Exhibit 50 or is somebody else responsible for it?

8  And I'm talking about that '09 to before you retired

9  time period.

10      A.    Yeah.   In most cases that would come from my

11 office.   In some cases it might have been disseminated

12 from Mr. Stephens' office.

13      Q.    Okay.   There has been testimony in this case

14 that a circular, a risk management circular was read

15 aloud to officers about recognizing the signs and

16 symptoms of heat stroke and heat exhaustion.   Were you

17 aware that that was going on in -- at the

18 Hutchins facility?

19      A.    Not -- not directly aware, but heat

20 preparedness training, as I mentioned before, is

21 required to be conducted on each facility, in addition

22 to the training that the correctional staff receive as

23 they go through their pre-service and in-service

24 training.

25      Q.    And this training was going on from the time

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6965

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3    STEPHEN McCOLLUM,           §
      STEPHANIE KINGREY, AND      §
 4    SANDRA McCOLLU,             §
      INDIVIDUALLY AND AS         §
 5    HEIRS AT LAW TO THE         §
      ESTATE OF LARRY GENE        §
 6    McCOLLUM,                   § CIVIL ACTION NO.
              Plaintiffs,         § 3:12-CV-02037
 7                                §
      VS.                         §
 8                                §
      BRAD LIVINGSTON, JEFF       §
 9    PRINGLE, RICHARD CLARK,     §
      KAREN TATE, SANDREA         §
10    SANDERS, ROBERT EASON,      §
      THE UNIVERSITY OF TEXAS     §
11    MEDICAL BRANCH AND THE      §
      TEXAS DEPARTMENT OF         §
12    CRIMINAL JUSTICE,           §
              Defendants.         §
13
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
14                  REPORTER'S CERTIFICATION
              ORAL AND VIDEOTAPED DEPOSITION OF
15                   RICHARD C. THALER
                        VOLUME 1
16                   October 18, 2013
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
17         I, BRENDA J. WRIGHT, Certified Shorthand

18    Reporter in and for the State of Texas, hereby certify

19    to the following:

20         That the witness, RICHARD C. THALER, was duly

21    sworn by the officer and that the transcript of the

22    oral deposition is a true record of the testimony

23    given by the witness;

24         I further certify that pursuant to Federal

25    Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185   Austin, TX 78731-4946   (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6966

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

```
 1  well as Rule 30(e)(2) that the signature of the

 2  deponent:

 3       __X__ was requested by the deponent and/or a

 4  party before completion of the deposition and is to be

 5  returned within 30 days from date of receipt of the

 6  transcript.  If returned, the attached Changes and

 7  Corrections and Signature pages contain any changes

 8  and the reasons therefor;

 9       ____ was not requested by the deponent and/or a

10  party before the completion of the deposition.

11       That $_____ is the deposition

12  officer's charges for preparing the original

13  deposition transcript and any copies of exhibits,

14  charged to PLAINTIFFS;

15       That pursuant to information given to the

16  deposition officer at the time said testimony as

17  taken, the following includes all parties of record:

18  For the Plaintiffs:
            Mr. Jeff Edwards
19          THE EDWARDS LAW FIRM
            The Haehnel Building
20          1101 East 11th Street
            Austin, Texas 78702
21          512-623-7727/512-623-7729 (fax)
            jeff@edwards-law.com
22               -and-
            Mr. Scott Medlock
23          TEXAS CIVIL RIGHTS PROJECT
            1405 Montopolis Drive
24          Austin, Texas 78741
            512-474-5073/512-474-0726 (fax)
25
```

270

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

```
 1  For the Defendants Jeff Pringle, Richard Clark, Karen
    Tate, Sandrea Sanders, Robert Eason and Texas
 2  Department of Criminal Justice:
            Mr. Bruce R. Garcia
 3          Assistant Attorney General
            OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 4          Law Enforcement Defense Division 012
            Post Office Box 12548
 5          300 West 15th Street
            Austin, Texas 78711-2548
 6          512-463-2080/512-495-9139 (fax)
            bruce.garcia@texasattorneygeneral.gov
 7
    For the Defendants Brad Livingston, William Stephens
 8  and Richard Thaler:
            Mr. Demetri Anastasidis
 9          Assistant Attorney General
            OFFICE OF THE ATTORNEY GENERAL OF TEXAS
10          Law Enforcement Defense Division 012
            Post Office Box 12548
11          300 West 15th Street
            Austin, Texas 78711-2548
12          512-463-2153/ 512-495-9139 (fax)
            demitri.anastasidis@texasattorneygeneral.gov
13
    For the Defendant University of Texas Medical Branch:
14          Ms. Kim Coogan
            Assistant Attorney General
15          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
            Law Enforcement Defense Division
16          Post Office Box 12548
            Austin, Texas 78711-2548
17          512-463-2080/512-495-9139 (fax)
            kim.coogan@texasattorneygeneral.gov
18
19          I further certify that I am neither attorney

20  nor counsel for nor related to nor employed by any of

21  the parties to the action in which this deposition is

22  taken;

23          Further, I am not a relative nor an employee of

24  any attorney of record in this cause, nor am I

25  financially or otherwise interested in the outcome of
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6968

Stephen McCollum, et al. v.                    Richard C. Thaler
Brad Livingston, et al.                        October 18, 2013

1   the action.

2        Certified to by me this 29TH day of OCTOBER,

3   2013.

4                    BRENDA J. WRIGHT, Texas CSR No. 1780
5                    Expiration Date:  12-31-14
                     WRIGHT WATSON & ASSOCIATES
6                    Firm Registration No. 225
                     Expiration Date:  12-31-13
7                    3307 Northland Drive
                     Suite 185
8                    Austin, Texas  78731
                     512-474-4363/51-474-8802 (fax)
9                    www.wrightwatson.com
    JOB NO. 131018BJW
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363

e4b80f89-fea3-48f6-8dfc-0e54f7ce7f83

Plaintiffs' MSJ Appx. 6969