UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § § | |
| v. | § § § | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 297

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3    KEITH COLE, JACKIE BRANNUM,        )
      RICHARD KING, DEAN ANTHONY         )
 4    MOJICA, RAY WILSON, FRED WALLACE,  )
      AND MARVIN RAY YATES individually  )
 5    and on behalf of those similarly   )
      situated,                          )    CIVIL ACTION NO.
 6                                        )    4:14-cv-1698
              Plaintiffs,                )
 7                                        )
      VS.                                )
 8                                        )
      BRAD LIVINGSTON, in his official   )
 9    capacity, ROBERTO HERRERA, in his  )
      official capacity, and TEXAS       )
10    DEPARTMENT OF CRIMINAL JUSTICE,    )
                                          )
11            Defendants.                )
      _____
12
      STEPHEN McCOLLUM, and SANDRA       )
13    McCOLLUM, individually, and        )
      STEPHANIE KINGREY, individually    )
14    and as independent administrator   )
      of the Estate of LARRY GENE        )
15    McCOLLUM,                          )    CIVIL ACTION NO.
                                          )    4:14-cv-03253
16            Plaintiffs,                )
                                          )
17    VS.                                )
                                          )
18    BRAD LIVINGSTON, JEFF PRINGLE,     )
      RICHARD CLARK, KAREN TATE, SANDREA )
19    SANDERS, ROBERT EASON, the         )
      UNIVERSITY OF TEXAS MEDICAL BRANCH )
20    and the TEXAS DEPARTMENT OF        )
      CRIMINAL JUSTICE,                  )
21                                        )
              Defendants.                )
22
                   ******************************
23                ORAL AND VIDEOTAPED DEPOSITION OF
                       FRANK M. TRAKNYAK, P.E.
24                        March 22, 2016
                   ******************************
25
```

FRANK M. TRAKNYAK, P.E. - 3/22/2016          2

```
1              ORAL AND VIDEOTAPED DEPOSITION OF FRANK M.

2    TRAKNYAK, P.E., produced as a witness at the instance of

3    the PLAINTIFFS, and duly sworn, was taken in the

4    above-styled and numbered cause on March 22, 2016, from

5    9:02 a.m. to 3:58 p.m., by machine shorthand before

6    MICHELLE R. PROPPS, CSR, in and for the State of Texas,

7    reported at the Office of the Attorney General of Texas,

8    808 Travis Street, Suite 1520, Houston, Texas, pursuant

9    to the Federal Rules of Civil Procedure and the

10   provisions stated in the record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2      FOR THE PLAINTIFFS:

 3           MR. MICHAEL SINGLEY
             The Singley Law Firm, PLLC
 4           4131 Spicewood Springs Road, Suite O-3
             Austin, Texas 78759
 5           Tel: 512.334.4302
             Fax: 512.727.3365
 6           E-mail: mike@singleylawfirm.com

 7           MR. DAVID JAMES
             Edwards Law
 8           The Haehnel Building
             1101 East 11th Street
 9           Austin, Texas 78702
             Tel: 512.623.7727
10           Fax: 512.623.7729
             E-mail: david@edwards-law.com
11
        FOR THE DEFENDANTS THE STATE OF TEXAS:
12
             MS. CYNTHIA L. BURTON
13           MR. PHILLIP P. BOYD
             Assistant Attorney General
14           Law Enforcement Defense Division
             300 West 15th Street, 7th Floor
15           William P. Clements Building
             Austin, Texas 78701
16           Tel: 512.463.2080
             Fax: 512.936.2109
17           E-mail: cynthia.burton@texasattorneygeneral.gov
                     phillip.boyd@texasattorneygeneral.gov
18
        FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
19
             MS. JENNIFER L. DANIEL
20           Assistant Attorney General
             Law Enforcement Defense Division
21           300 West 15th Street, 7th Floor
             William P. Clements Building
22           Austin, Texas 78701
             Tel: 512.463.2080
23           Fax: 512.936.2109
             E-mail: jennifer.daniel@texasattorneygeneral.gov
24

25
```

```
1   FOR THE DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE:

2       MR. BRIAN M. SEARS
        Assistant General Counsel
3       P.O. Box 13084
        Capitol Station
4       Austin, Texas  78711
        Tel: 512.475.4384
5       Fax: 512.936.2159
        E-mail: brian.sears@tdcj.state.tx.us
6
    ALSO PRESENT:
7
        Mr. Kevin J. Schaefer, Videographer
8

9                   * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX

 2                                        PAGE
     Appearances...................................... 2

 3   FRANK M. TRAKNYAK, P.E.

 4   EXAMINATION BY MR. MICHAEL SINGLEY............... 6

 5

 6   CHANGES and SIGNATURE.......................... 222

 7   REPORTER'S CERTIFICATION...................... 224

 8
                           EXHIBITS
 9
     EXHIBIT NO.          DESCRIPTION            PAGE
10
     Exhibit 1    Plaintiff's Amended Notice to Take
11                the Oral Deposition of Frank M.
                  Traknyak and Subpoena Duces Tecum...  8
12   Exhibit 2    Defendant's Response and
                  Objections to Plaintiffs' Amended
13                Notice to Take the Oral Deposition
                  of Frank M. Traknyak and Subpoena
14                Duces Tecum........................  9
     Exhibit 3    Wallace Pack Unit Study of Indoor
15                Climate Control Modifications (No
                  Bates Nos.)........................ 12
16   Exhibit 4    Hutchins State Jail Study of
                  Indoor Climate Control
17                Modification (No Bates Nos.)........ 13
     Exhibit 5    Owning and Operating Costs - Table
18                4: Comparison of Service Life
                  Estimates.......................... 13
19   Exhibit 6    Produced E-mails (No Bates Nos.)... 102
     Exhibit 7    Report of Ronald W. Brown, P.E.
20                (No Bates Nos.)....................203

21

22

23

24

25
```

```
1                      (Exhibit No. 4 marked.)
2          Q.   All right.  And then we've marked as Exhibit 4
3     your report in the McCollum case regarding the
4     Hutchins -- I guess I called it a prison -- state jail,
5     the Hutchins State Jail.  Correct?
6          A.   That's correct.
7          Q.   And I think you've indicated that your copy of
8     the report may have some pages out of sequence.  If we
9     go through it and we need to sort anything out, let's
10    just figure out what we need to do and we'll make clear
11    and get it all straightened out.  So if that happens,
12    you let me know.  Okay?
13         A.   Yes.  And that's just mainly in the
14    calculations.
15         Q.   Got it.  So we may not run into problems
16    potentially.
17         A.   Okay.
18                     (Exhibit No. 5 marked.)
19         Q.   And then we've got one -- as far as documents
20    you've brought with you today, we've got a document that
21    we've marked as Exhibit No. 5.  If you could pull that
22    out and tell me, briefly, what is Exhibit 5, sir?
23         A.   So Exhibit 5 are various excerpts of codes and
24    standards such as the ASHRAE Application Standard, the
25    TCT -- I'm sorry -- TDCJ Design Criteria Manual, some
```

1    excerpts out of the International Energy Conservation

2    Code 2009, the -- the State Energy Conservation Office,

3    where it -- it talks about what codes that state-funded

4    buildings need to comply to the Energy Codes -- various

5    energy codes.  And the ASHRAE Standard 90.1, 2007.  This

6    just talks about various system types.  And then I just

7    put together a -- an Excel spreadsheet that talks about

8    just various combinations of temperatures and humidities

9    that can equate to an 88-degree heat index.

10        Q.   Okay.  So we have a -- kind of, a polyglot of

11   stuff in there, it sounds like.  We'll go into more

12   detail on all of this, but that's the overview.

13             You -- you said -- used the acronym

14   ASHRAE.  That's A-S-H-R-A-E?

15        A.   Yes.  It's a --

16        Q.   What does it stand for?

17        A.   ASHRAE, A-S-H-R-A-E, American Society of

18   Heating Refrigeration and Air Conditioning Engineers.

19        Q.   Okay.  And that's -- that's an engineers

20   standards association?

21        A.   Engineers standard association that is --

22   let's call it the bible of HVAC, if -- if we may.

23        Q.   The bible of HVAC.  That's a pretty good way

24   of describing it.  Okay.  Good deal.

25             I'm going to go into all this stuff in --

```
 1          A.   I -- it's something I have not looked into.  I
 2    would -- I would assume that there's probably some
 3    warehouse-type work where workers are in that might not
 4    be air conditioned.  There's possibly some
 5    manufacturing-type -- type work that's -- where workers
 6    are that's not air conditioned.
 7          Q.   Some workplaces?
 8          A.   I would say some workplaces.
 9          Q.   Okay.  But if you move away from workplaces
10    and we just take places where people live and sleep, are
11    you personally aware of any such place in the state of
12    Texas that's been built without air conditioning, other
13    than a prison, to your knowledge?
14          A.   To my knowledge, not in the state of Texas --
15          Q.   Right.
16          A.   -- that -- that I know of.
17          Q.   Right.  Other states, different climates,
18    different issue, obviously.  Right.  You might -- you
19    might see in New --
20          A.   Right.
21          Q.   -- England something built without air
22    conditioning is what you're getting at.
23          A.   Right.
24          Q.   If --
25               (Interruption.)
```

```
 1    conditions are going to be by the time I've done the
 2    HVAC work.  What are we going to end up with?  Right?
 3         A.   That's -- that's correct.
 4         Q.   And what you're looking to -- you referred to
 5    -- I think to ASHRAE as the HVAC bible.  We've got
 6    ASHRAE 55, one of the things in the HVAC bible, it looks
 7    like.
 8         A.   That's correct.
 9         Q.   Tell me what ASHRAE 55 is, if you would,
10    please.
11         A.   It's a -- a standard that's also adopted in
12    many of the codes that talk about comfort levels for
13    humans under various scenarios of being -- you know,
14    what they're bearing, what the velocity in the room is,
15    what temperatures and humidities, what type of activity
16    they're doing.  And so there are -- it's based on -- on
17    a voting system.
18              So, usually, you know, maybe men might
19    feel more comfortable with cooler temperatures, maybe
20    some women might feel comfortable with warmer
21    temperatures.  So it -- it incorporates a lot of
22    different criteria.  And there's this range of comfort,
23    temperature and humidity, areas that if -- you know, if
24    you're within that range, most likely, you know, you
25    will be comfortable; there might be other people more
```

1    comfortable, there might be other people less

2    comfortable, but it's -- it's a comfort range.  And so,

3    you know, you can't please everyone -- you know,

4    everybody wants a different temperature and everybody

5    wants a thermostat.  So it -- it does vary from person

6    to person, and the size, and -- and things of that

7    nature.  But that is something that they've performed

8    research on to say, Okay, so as long as we're in this

9    range, we're -- you know, you should be comfortable.

10              And, typically, when we design an office,

11   there's a -- a standard point that you would design an

12   office to.  And that may be 75 degrees at 50 percent RH.

13   So, you know, without even looking at ASHRAE 55 or any

14   other code, that's kind of an industry standard point to

15   design various facilities for comfort.

16              Now, there may be instances where you

17   might have an operating room where you need it cooler

18   because of pathogens and whatnot, or a laboratory they

19   need to do this research at a certain precise

20   temperature and humidity.  So you could go still within

21   that -- that region, but for the most part, it

22   establishes that region to design to.

23        Q.   And this is one of these, in your blood, use

24   it all the time, every project industry standards that's

25   a regular part of your work, it sounds like?

```
 1        A.   It is.  But, there again, I usually design to
 2   that 75 degrees and 50, you know, for an office, because
 3   it's what we've been doing for 30 years.  And that
 4   was -- that point was -- was somewhat established by
 5   ASHRAE 55, but I don't refer to ASHRAE 55 every single
 6   day because I know where that point is.
 7        Q.   And I hear what you're saying.  You don't have
 8   to -- in fact, this is such an important regular
 9   standard that you've just become familiar with what it
10   dictates, you don't have to keep looking back to it, you
11   know, on a regular basis, for every project, here's what
12   I'm going to be designing to, 75 degrees and 50 percent
13   humidity.
14        A.   Right.
15        Q.   Right.  But all of that -- the foundation for
16   all of that is ASHRAE 55.
17        A.   That's correct.
18        Q.   And this is generally accepted in the
19   industry; I mean, that engineers like you, everyone uses
20   this for the type of work you do?
21        A.   Yes.  I would say that for the type of work I
22   do, it's -- it's a standard.  So going outside that
23   standard, again, you know, you're -- you're assuming a
24   liability risk.  So we designed -- when we picked a
25   point, it was somewhere within that region.
```

1   people comfort [sic] --

2        A.   Right.

3        Q.   -- you've got it taken care of.

4        A.   That's correct.

5        Q.   Okay.  And when you design buildings, that's

6   what you think about and that's what you do in your

7   industry.  We design buildings for comfort.

8        A.   That's correct.

9        Q.   And the only reason I was asking about health

10  and safety, on Page 5 of your Pack report, under what

11  standards are used in the analysis, "The professional

12  design community relies on codes and standards in order

13  to ensure the health and safety of the public and/or

14  occupants of a building."

15            You see that sentence?

16       A.   Yes, I -- I --

17       Q.   That's kind of what I was asking you about

18  health and safety standards.

19       A.   Yes.  And it's -- it's a requirement by our

20  licensing that -- that we design to protect the health,

21  safety and welfare of the public and property.

22       Q.   Right.  And I mean, there's various ways that

23  you can have a problem with health or safety, but one of

24  them will be if people are in too hot conditions, that

25  could be a health or safety problem.  Right?

```
1        A.   Obviously, it can be if -- if there's a
2   situation where they're adversely affected because of
3   hyperthermia.
4        Q.   Right.  Now, I mean, obviously, you're not a
5   medical doctor.
6        A.   Right.
7        Q.   You're not here to give medical testimony and
8   I'm not asking that.
9        A.   Right.
10       Q.   But you're just aware that, you know, when you
11  have health and safety standards, one thing among the
12  hazards is to avoid it being too hot and the bad health
13  consequences.  You don't want that.  Right?
14       A.   No, I don't want that.
15       Q.   And you take care of it with ASHRAE 55 and
16  that 75 temperature, 50 humidity.  When you're designing
17  buildings to that, you know you're going to take care of
18  the health and safety for the heat, because you're going
19  to actually make it comfortable.  Right?
20       A.   That's correct.
21       Q.   And you -- you view yourself as -- by your
22  license and just being an engineer, that's the way that
23  you build buildings, that's the way that you do it?
24       A.   That's correct.
25       Q.   Okay.  So I want to talk to you a little bit
```

1    to learn more about it, all the details about it and,

2    you know, how they came up with all the aspects of those

3    graphs and -- and things of that nature.  But that's

4    about the extent of the research that -- that I know.

5         Q.   So there's a lot of work that's gone into

6    this.

7         A.   It has, yes.

8         Q.   And when you say "they," is it the American

9    National Standards Institute who's done all this

10   research work?  Is it ASHRAE?  That's probably a stupid

11   question.  But who's doing the work?

12        A.   I mean, it's ASHRAE, the Association --

13   American Standard Heating, Refrigeration and Air

14   Conditioning Engineers.

15        Q.   Okay.  And since 1966, you said?

16        A.   Since 1966.

17        Q.   Okay.  And so there's been a comfort range

18   standard since that time that's roughly in this 75-50

19   point or has it changed over time?

20        A.   The earliest I could find is a graph in 1981.

21        Q.   But if the standard went in place in 1966,

22   what was the standard between '66 and '81?  Do you know?

23        A.   I don't, because I couldn't find any -- you

24   know, anything published, you know, earlier than the

25   1981.

```
 1          Q.   What did the 1981 graph show you?

 2          A.   It was very similar to the graph that we -- we

 3     show in -- in our report on -- let's see.  What page is

 4     it on? -- on Page 19.

 5          Q.   Right.  Okay.  So the standard that's in

 6     effect today, ASHRAE 55, basically the same version of

 7     the standard was in effect at the earliest time you

 8     could find in 1981.  Right?

 9          A.   That's correct.

10          Q.   Okay.  And what you've described is ASHRAE has

11     spent a whole lot of time doing research work to figure

12     out nuances of where the comfort range should be, and

13     interviewing people, and looking at clothing, and

14     conditions and all sort of stuff.  They put a lot of

15     work into trying to get this right, it sounds like.

16          A.   Yes, that's correct.

17          Q.   And I take it you'd agree that's a good thing.

18     I mean, you want to -- want to get this right about the

19     comfort range.  Right?

20          A.   Right.  And it also gives a tool that, Hey, if

21     we're going to design something, let's design to

22     something tangible, which is this -- this standard.

23          Q.   Right.  You've got a -- right.  You've got a

24     tangible standard written down that everyone can look

25     to.  Right?
```

1          Q.   Right.  Right.

2          A.   So a lot of our codes and standards are

3     adopted throughout the world.

4          Q.   Here's one other thing I wanted to ask you

5     about on Page 6.  Again, this is the Pack report.  And

6     so, in addition to ASHRAE 55, you've also mentioned the

7     American Correctional Association Standards; is that

8     right?

9          A.   That's correct.

10          Q.   Okay.  And, in fact, you've cited to, let's

11     see, the 4 Edition, Standard 4-4153.  Correct?

12          A.   Yes.

13          Q.   And it looks like you're citing that in

14     support of ASHRAE 55 standard, that the -- that American

15     Correctional Association Standard directs that the

16     temperature and humidity levels to be capable of being

17     mechanically raised or lowered to an acceptable comfort

18     level.  Correct?

19          A.   Yes.

20          Q.   And is that your understanding of what the

21     American Correctional Association requires?

22          A.   Yes.

23          Q.   Which is consistent with the -- the ASHRAE 55

24     HVAC bible standard.  Right?

25          A.   Right.  That's correct.

1    Q.   And that's a good thing.  Right?

2    A.   I would say so, yes.

3    Q.   Yeah.  You want people to be comfortable, just

4    like we talked about.

5    A.   Yes.

6    Q.   Okay.  So you've got -- you've got no quarrel

7    with that.  You agree with that standard.

8    A.   Yes.

9    Q.   Okay.  All right.  Let's -- so let's talk

10   about how you've applied ASHRAE 55 for your work here.

11   And I'm going to confess, I don't need -- I don't know

12   how to read your figure and I'm going to ask you to walk

13   me through it.  I think you said it was on Page --

14   A.   19.

15   Q.   Yeah.  But let's start on Page 17 and 18,

16   because I'm even dumber than you think I am, so I need

17   all the help that I can get.

18        And so this is kind of the -- start with

19   Page 17.  And I saw Outdoor Design Conditions Table.

20   Tell me what that is.

21   A.   So the ASHRAE fundamentals have various

22   weather data for most of -- every -- every state in the

23   country.  And the majority that -- the major cities

24   and -- and they also have information on, you know,

25   different parts of the world, different countries.  So

1  this is a cut-and-paste typo.  But on the Hutchins

2  report, that first category on the building envelope,

3  Hutchins -- the Hutchins' buildings were built in

4  1995 -- right? -- later than the original Pack stuff.

5          A.   You're on Page 4?  Oh, no.

6          Q.   No.

7          A.   Page 3?

8          Q.   It's actually -- let's see.  Take a look at --

9  take a look at Page 9.

10         A.   (Complies.)

11         Q.   Right?

12         A.   All right.  So, yeah --

13         Q.   You're talking about the existing conditions

14  at Hutchins.  Right?

15         A.   Yes.

16         Q.   And you're describing what you got and when it

17  was built.  And in describing when it was built, it

18  says -- the construction documents were dated 1994 and

19  the unit was brought on line in 1995.  Right?

20         A.   Yes.

21         Q.   Okay.  And then when we were looking at the

22  cost chart that we were just talking about back on

23  Page 4, you're talking about modifying the building

24  envelope in -- it says, "Four original 1981 dormitories

25  and trustee camp."

FRANK M. TRAKNYAK, P.E. - 3/22/2016          211

1    Right?

2          A.    That's correct.

3          Q.    The ASHRAE 55 standard has been in effect, I

4    think you said, at least since 1981.  Right?

5          A.    1966 is when it was first adopted -- or

6    first --

7          Q.    You were first able to find a chart or graph

8    in 1981?

9          A.    In 1981, yes.

10         Q.    And that's what showed you to be able to

11   quantify that the 1981 standard is basically the same

12   comfort standard as today.  Right?

13         A.    Yes.  It -- it appears to be --

14         Q.    Close.

15         A.    -- very close, yeah.

16         Q.    And as we've discussed for many hours, that

17   ASHRAE 55 standard is one of the crucial standards for

18   you in doing your work.

19         A.    Yes.

20         Q.    So that the Hutchins housing units were built

21   in 1995 with no air conditioning.  Right?

22         A.    That's correct.

23         Q.    And that means there's a lot of days in the

24   summer when they'll be well outside the ASHRAE comfort

25   zone.  Right?

```
 1        A.   That is correct.
 2        Q.   And so if TDCJ had come to you in 1995 and
 3   asked you to build those Hutchins housing areas with no
 4   air conditioning, I take it you would have walked away
 5   from the work?
 6        A.   Possibly.
 7        Q.   Well, that's what you told us earlier --
 8        A.   Yes.
 9        Q.   -- you would have walked away from work.
10   Right?
11        A.   I just recently walked away from a job and it
12   was a great job and I did not want to walk away from it.
13        Q.   Right.
14        A.   So I probably would.
15        Q.   Okay.  And same answer for if they'd
16   approached you in 1981 to build non-air conditioned
17   dorms at Pack, same thing, you'd have walked away from
18   it?
19        A.   Yes.
20        Q.   Okay.  Let me shift gears.  And I want to ask
21   you about compensation for doing your work and
22   preparation time for this deposition.
23             You may have discussed this with the
24   attorneys, but we have particular financial methods that
25   we do here, where I've got to break out, in terms of
```

FRANK M. TRAKNYAK, P.E. - 3/22/2016          224

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3
   KEITH COLE, JACKIE BRANNUM,          )
 4 RICHARD KING, DEAN ANTHONY MOJICA,   )
   RAY WILSON, FRED WALLACE, AND        )
 5 MARVIN RAY YATES individually and    )
   on behalf of those similarly        )  CIVIL ACTION NO.
 6 situated,                            )  4:14-cv-1698
                                        )
 7      Plaintiffs,                     )
                                        )
 8 VS.                                  )

 9 BRAD LIVINGSTON, in his official
   capacity, ROBERTO HERRERA, in his
10 official capacity, and TEXAS
   DEPARTMENT OF CRIMINAL JUSTICE,
11      Defendants.

12 _____

13 STEPHEN MCCOLLUM, and SANDRA        )
   MCCOLLUM, individually, and        )
14 STEPHANIE KINGREY,  individually    )
   and as independent administrator    )
15 of the Estate of LARRY GENE         )
   McCOLLUM,                           )  CIVIL ACTION NO.
16                                     )   4:14-cv-03253
        Plaintiffs,                    )
17                                     )
   VS.                                 )
18                                     )
   BRAD LIVINGSTON, JEFF PRINGLE,      )
19 RICHARD CLARK, KAREN TATE, SANDREA  )
   SANDERS, ROBERT EASON, the          )
20 UNIVERSITY OF TEXAS MEDICAL BRANCH  )
   and the TEXAS DEPARTMENT OF         )
21 CRIMINAL JUSTICE,                   )
                                       )
22      Defendants.                    )

23              REPORTER'S CERTIFICATION
                  ORAL DEPOSITION OF
24              FRANK M. TRAKNYAK, P.E.
                   MARCH 22, 2016
25
```

FRANK M. TRAKNYAK, P.E. - 3/22/2016          225

```
1              I, MICHELLE R. PROPPS, Certified Shorthand
2    Reporter in and for the State of Texas, hereby certify
3    to the following:
4              That the witness, FRANK M. TRAKNYAK, P.E., was
5    duly sworn by the officer and that the transcript of the
6    oral deposition is a true record of the testimony given
7    by the witness;
8              I further certify that pursuant to FRCP Rule
9    30 (f) (1) that the signature of the deponent:
10             ___X__ was requested by the deponent or a
11   party before the completion of the deposition and
12   returned within 30 days from date of receipt of the
13   transcript.  If returned, the attached Changes and
14   Signature Page contains any changes and the reasons
15   therefor;
16             _____ was not requested by the deponent or a
17   party before the completion of the deposition.
18             I further certify that I am neither attorney
19   nor counsel for, related to, nor employed by any of the
20   parties to the action in which this testimony was taken.
21   Further, I am not a relative or employee of any attorney
22   of record in this cause, nor am I financially or
23   otherwise interested in the outcome of the action.
24   Subscribed and sworn to on this the 31st day of
25   March, 2016.
```

FRANK M. TRAKNYAK, P.E. - 3/22/2016

1

2

3          MICHELLE PROPPS, CSR
           Expiration  Date  12-31-16
4          Hanna  &  Hanna,  Inc.
           Firm  Registration  No.  581
5          1812  W  Sam  Houston  Parkway  N
           Houston,  Texas   77043
6          713.840.8484

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 6993

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 298

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3    STEPHEN McCOLLUM, et al., )
               Plaintiffs,     )
 4                             )
      v.                       )  CIVIL ACTION
 5                             )  NO. 3:12-CV-02037
                               )
 6    BRAD LIVINGSTON, et al.,  )
               Defendants.     )

 7

 8

 9                      ORAL DEPOSITION

10                   SUSI VASSALLO, M.D.

11                     March 5, 2014

12

13

14

15        ORAL DEPOSITION OF SUSI VASSALLO, M.D., produced as

16    a witness at the instance of the Defendant UTMB and duly

17    sworn, was taken in the above-styled and numbered cause

18    on the 5th day of March, 2014, from 10:03 a.m. to

19    5:06 p.m., before Dalia F. Inman, Certified Shorthand

20    Reporter in and for the State of Texas, reported by

21    computerized stenotype machine at the offices of The

22    Edwards Law Firm, 1101 E. 11th Street, Austin, Texas

23    78702, pursuant to the Federal Rules of Civil Procedure

24    and the provisions stated on the record or attached

25    hereto.
```

```
 1                        APPEARANCES

 2     FOR PLAINTIFFS:

 3          Mr. Jeff Edwards
            The Edwards Law Firm
 4          1101 E. 11th Street
            Austin, Texas 78702
 5          Email:  jeff@edwards-law.com

 6     FOR DEFENDANT UTMB:

 7          Ms. Kim Coogan
            Assistant Attorney General
 8          Attorney-in-Charge
            300 W. 15th Street, 7th Floor
 9          Austin, Texas 78701
            Telephone: (512)463-2080
10          Fax:  (512)495-9139

11          Ms. Shanna Elizabeth Molinare
            Assistant Attorney General
12          Law Enforcement Defense Division
            300 W. 15th Street, 7th Floor
13          Austin, Texas 78701
            Telephone: (512)463-2080
14          Fax:  (512)495-9139
            E-mail: shanna.molinare@texasattorneygeneral.gov
15
       FOR DEFENDANTS EASON, PRINGLE, SANDERS, TATE, CLARK,
16     TDCJ:

17          Mr. Bruce Garcia
            Assistant Attorney General
18          300 W. 15th Street, 7th Floor
            Austin, Texas 78701
19          Telephone: (512)463-2080
            Fax:  (512)495-9139
20
            Mr. Matthew J. Greer
21          Assistant Attorney General
            Law Enforcement Defense Division
22          300 W. 15th Street, 7th Floor
            Austin, Texas 78701
23          Telephone: (512)463-2080
            Fax:  (512)495-9139
24          E-mail: matthew.greer@texasattorneygeneral.gov

25
```

Susi Vassallo, M.D.                                                                    3

1                      APPEARANCES (cont.)

2   FOR DEFENDANTS EASON, PRINGLE, SANDERS, TATE, CLARK,
    TDCJ:

3
         Mr. Seth Dennis
4        Assistant Attorney General
         Law Enforcement Defense Division
5        300 W. 15th Street, 7th Floor
         Austin, Texas 78701

6

7   ALSO PRESENT:

8        MS. JENNIFER OSTEEN, UTMB LEGAL AFFAIRS

9        MR. LARS HAGEN, ATTORNEY, U.T. SYSTEM

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Susi Vassallo, M.D.                                                      54

1   Mr. McCollum is at least there from June 24th to

2   July 7th of 2011?

3        A    Yes.

4        Q    He may have been there more, but we at least

5   know he was in during that time, right?

6        A    Yes.

7        Q    And of the time that he was there, the records

8   indicate that he only got the actual clonidine on four

9   occasions.

10       A    Yes.

11       Q    Does that indicate to you that -- well, strike

12  that.

13            Do you see the other blood pressure

14  readings for the other days?

15       A    Yes.

16       Q    And were those blood pressure readings high?

17       A    Some of them were, yes.

18       Q    And some of them were not?

19       A    I see two that were not high and -- out of a

20  total of -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 -- 13.

21            So two that were not high, is what I

22  believe I'm counting, out of 13 that I'm looking at.

23       Q    And for you, what is the -- what is the

24  baseline for high or not high?

25            MR. EDWARDS:  Objection, vague.

1           THE WITNESS:  So the -- the standards for

2    the diagnosis of hypertension depend a little bit on the

3    co-morbidities of the individual.  For example, the

4    blood pressure -- any diastolic blood pressure greater

5    than 90 -- that's the lower number -- is considered

6    hypotensive.  So for somebody who has diabetes, the

7    current standard is a systolic blood pressure greater

8    than or equal to 140; for someone who does not have

9    diabetes, a systolic blood pressure of 150.

10        Q    (By Ms. Coogan)  Okay.  And --

11        A    And -- excuse me -- I'm relying there -- I

12   notice that Dr. Adams relied on JNC 7, and since -- I'm

13   relying on JNC 8 so -- for that -- those numbers.

14        Q    And do you know when JNC 8 came into effect?

15        A    In the last two years.

16        Q    After 2011?

17        A    Yes.

18             And the diastolic blood pressure held in

19   seven as well.  So those -- in other words, that is not

20   a point of difference.

21        Q    Okay.  Before we get ahead of ourselves, let me

22   finish this train of thought.

23        A    Okay.

24        Q    Do you have an opinion why the McLennan County

25   Sheriff's Office did not give clonidine to him every

1    time his -- you say his blood pressure was high?

2        A    I do not -- I can't speculate as to why this

3    was the treatment course that he was given.  This is not

4    an acceptable way to treat hypertension.  And this is

5    a -- outside of the standard of care at that time to

6    treat in this manner.

7        Q    What is, in your opinion, the first-line

8    treatment for hypertension?

9        A    So I think, if I understand your question,

10   you're asking for the chronic disease and the chronic

11   day-to-day treatment of hypertension.

12       Q    Well, that's a good clarification.  Let me ask

13   you.

14            Did Mr. McCollum, in your opinion, have

15   day-to-day chronic hypertension when he came to

16   Hutchins?

17       A    In my opinion, he had hypertension and -- the

18   opinion is yes, he did have hypertension.  He had been

19   diagnosed with it previously.  We have blood pressures

20   in the records that show hypertensive blood pressures,

21   and he had hypertension.

22       Q    And is it your opinion that he did not have

23   intermittent hypertension?

24       A    Well, whether or not somebody has a diagnosis

25   of hypertension, all of our blood pressures go up at

Susi Vassallo, M.D.                                                              57

1   some time and go down at some time.

2              So there will be intermittent changes in

3   the blood pressure readings, but it's -- I don't -- it's

4   my opinion that he had hypertension.  Sometimes the

5   blood pressure readings were higher; sometimes they were

6   lower depending on the -- on a number of factors.  But

7   in any case, he had hypertension in my opinion.

8        Q    Did he have chronic hypertension?

9        A    Yes.

10       Q    And in your opinion, if you had been treating

11  this patient, what medication would you have prescribed?

12       A    Well, the recommendations are to start with a

13  diuretic such as hydrochlorothiazide.

14       Q    Do you have any complaint the fact that

15  Mr. Babbili prescribed hydrochlorothiazide for this

16  patient?

17       A    No.

18       Q    While he was at the McLennan County Jail, did

19  he receive any treatment for diabetes?

20       A    No.

21       Q    And when he came in to McLennan County, did he

22  report currently having diabetes?

23       A    The medical record does not have diabetes

24  checked off.  Now, I'm not certain as to who was

25  actually marking that, if it was himself with the chart

Susi Vassallo, M.D.                                                                61

1          Q     Okay.  Now, I'm going to change and go to

2     Hutchins intake now.

3          A     Okay.

4          Q     Okay.  And so that's Exhibit 14.

5          A     I'll give you that one back.

6          Q     Okay.  And I'm going to give you this one

7     because this is actually the original.  And show you --

8     direct your attention to page 27 of Exhibit 14.  And is

9     that an intake form that is used -- or if you know --

10    when inmates go to Hutchins Jail?

11         A     It appears to be that.  It says "Correctional

12    Managed Care Intake History and Health Screening."

13         Q     Did Mr. McCollum, at least by this document,

14    indicate that he was diabetic?

15         A     Yes.

16         Q     Where does he indicate that he was diabetic?

17         A     Excuse me.  He -- I started at the top, and

18    that is the family history -- excuse me.  That's the

19    family history of diabetes that I was referring to in

20    error.

21         Q     Okay.

22         A     Okay.  Now, the personal history, he has also

23    circled -- somebody has circled the word "diabetes,

24    yes."  That's number seven.

25         Q     Okay.  And can you tell if he indicates if that

Susi Vassallo, M.D.                                                                        62

```
 1    is a current problem or a historical problem?

 2        A    Well, when we ask patients if they have a

 3    history of an illness, that is -- refers for chronic

 4    illnesses to, did you ever have it and do you have it.

 5    Both of those are answered by that.

 6                 MS. COOGAN:  Objection, nonresponsive.

 7        Q    (By Ms. Coogan) Can you tell from this record

 8    whether that is a current problem or an historical

 9    problem?

10                 MR. EDWARDS:  Objection, asked and

11    answered.

12        Q    (By Ms. Coogan) Or are you making an

13    assumption?

14                 MR. EDWARDS:  Objection, asked and

15    answered.  Argumentive.

16                 THE WITNESS:  The -- the -- having been a

17    physician for 27 years, I'm speaking to the usual way to

18    document, in the current tense, a medical problem.  In

19    other words, this is not so much an assumption as it is

20    based on the meaning of -- the personal history.

21    Diabetes, when someone says yes, that means they have

22    diabetes in the present.  So to answer your question,

23    that means in the present.

24        Q    (By Ms. Coogan) Okay.  I thought you testified

25    earlier that there was no uniform way of documenting
```

Susi Vassallo, M.D.                                                      67

1        A    No.

2        Q    In your opinion, did Mr. McCollum have

3    diabetes?

4        A    Yes.

5        Q    And what is your opinion based on?

6        A    The -- my opinion is based on his telling his

7    family that he was diagnosed with diabetes earlier in

8    Waco.

9        Q    Really?  Where did you learn that?

10       A    From the deposition testimony of his family.

11       Q    And it's your opinion that he told his family

12   he had diabetes?

13       A    Well, that's from the deposition of those

14   people.

15       Q    Okay.  Where else did you get your opinion?

16       A    They had several blood sugars that were

17   elevated.  He --

18       Q    Which blood sugars were elevated?

19       A    The blood sugar of 130 on the morning of 7/20.

20   This was elevated.  He had hemoglobin A1c of 6.2.  He

21   was massively obese, which is a major risk factor for

22   diabetes.

23       Q    What does the American Diabetes Association --

24   do you consider the American Diabetes Association, the

25   International Diabetes Federation, and the European

1    Association for the Studies of Diabetes to be reputable

2    sources for diagnosis of diabetes?

3         A    I -- they are reputable; however, there's

4    disagreement.  And I also think that the New England

5    Journal -- and there are many other sources that discuss

6    the subtleties of the diagnosis of diabetes.

7         Q    Do you think the American Diabetes Association

8    and the International Diabetes Federation and the

9    European Association for the Study of Diabetes probably

10   have some understand of the subtleties involved in the

11   diagnosing diabetes?

12        A    Yes.

13        Q    Do you know what those organizations use as the

14   standard for when a person's A1c should be diagnosed as

15   diabetic or as having diabetes?

16        A    Well, the cutoff of 6.5 of hemoglobin A1c is

17   one of them.  The -- and random glucose above 200 is one

18   of them.

19        Q    Do you --

20             MR. EDWARDS:  Are you done, doctor?

21             THE WITNESS:  Well, I just want to say

22   that when -- when these numbers from these international

23   and national organizations are taken, there is a

24   clinical context in which they're applied.  Any single

25   number -- for example, 6.5 is taken by the American

1    Diabetes Association to provide some clinical guidelines

2    regarding risk primarily of retinopathy and diabetes.

3    That's how that number was established.

4            The more nuanced approach is to -- to look

5    at an individual.  So these statistics and these

6    recommendations, when applied by a physician to an

7    individual, there is room there for -- as was brought up

8    in the New England Journal and many other, including the

9    American Diabetes Association and the other

10   organizations -- there's some nuance to -- to the value

11   with the establishment of diabetes.

12           So 6.5 is a number that was derived to

13   indicate an abrupt rise in the risk of retinopathy.

14   That does not mean that somebody with 6.2 is -- does not

15   have -- is not diabetic.  If that person has got a

16   49-point-something BMI and if the person is -- has

17   elevated fasting blood sugars, all of those things would

18   be taken together.

19           And as -- the article I've shown you, the

20   New England Journal has a nice review of this subject.

21   And there are many other reviews on the subject.

22           The -- the nuance piece there is that all

23   of this has to do with prognosis in terms of treatment,

24   lifestyle changes.  It's not as if -- if you're not 6.5

25   period, you don't have diabetes.  So that is a

 1    mischaracterization of the meaning of 6.5.  And should

 2    we -- should -- want to discuss it more, but 6.5 has a

 3    certain sensitivity and specificity with regards to

 4    diabetes and every risk.  So it's not as cut-and-dry as

 5    the American Diabetes and so forth.  These are

 6    guidelines for the discussion with the patient about

 7    risks, lifestyle changes, and treatment.

 8                  But to take that particular number in the

 9    context of, if you're not 6.5, you don't have diabetes

10    is a misapplication of a single lab value.  In this

11    case, his hemoglobin A1c was 6.2.  All of these

12    organizational bodies recommend repeating the value and

13    taking it in the context also of the blood sugars and

14    the entire clinical picture.

15        Q    (By Ms. Coogan)  Okay.  And Mr. McCollum's A1c

16    was 6.2; is that right?

17        A    Yes.

18        Q    Do you consider yourself an expert in diabetes?

19        A    I'm not a diabetologist.  I'm a physician who's

20    treated thousands of patients with diabetes and have

21    diagnosed diabetes hundreds and hundreds of times in the

22    emergency department.  And this is a very common

23    question.  There are physicians who dedicate their

24    careers only to the study of diabetes.  I am not one of

25    those people.

1   have heat stroke; some morbidly obese people don't have

2   heat stroke.  And so I am asking you whether that means

3   that -- who is going have heat stroke and who isn't,

4   that there's no real predictability for that; is that

5   fair?

6        A    I think that there are certain people who are

7   at greater risk and we cannot always predict exactly who

8   those people are, especially when we compare a group of

9   people with the same risk factors, obesity and

10  hypertension.  But I think that everybody with obesity

11  and hypertension and cardiomyopathy are at risk.

12            So I don't want to opine about

13  air-conditioning.  My -- I think that the conditions at

14  Hutchins are dangerous for everybody because of the

15  temperatures in the hundreds in the living areas, and

16  that includes corrections officers.

17            Do I think that this is a dangerous

18  temperature for everybody?  Yes, I do.

19            Is it more dangerous for some people than

20  others?  Yes.

21            Should the facility, in order to be safer

22  for everybody who enters that facility and stays there,

23  should it be cooler?  Yes.

24            I'm not making a recommendation as to how

25  that should be done.  I'll leave that to the mechanical

1    him at that time?

2        A    Yes.

3        Q    Okay.  Can there be a difference in how

4    convulsions appear versus how a seizure appears?

5        A    It's the same thing.  Convulsions are seizures

6    and seizures are convulsions.

7        Q    And in your experience, do you call 9-1-1 for a

8    seizure event?

9        A    I'm a physician.  I don't call 9-1-1.  I am

10   9-1-1.  However, if I came out on the street and I saw

11   someone having a seizure, I would call 9-1-1.

12       Q    What about if you're working in a correctional

13   institution and you have people who come out of seizures

14   all the time, would you recommend that every time

15   there's a seizure 9-1-1 is called?

16       A    This seizure was -- the answer to your question

17   is no.  But my point of view is different in this case.

18   The man's body felt hot.  He was -- and he was hot to

19   the touch and he was convulsing and the temperature was

20   a hundred.

21       Q    Okay.

22       A    Those things make the circumstances different

23   here than every man who has a seizure.  And a lot of

24   people, they know they have seizures.

25       Q    So in your view -- and correct me if I'm

1    wrong -- Mr. Clark should've known that this was

2    something more than a seizure based upon --

3         A    No.

4         Q    -- the convulsing, the temperature, and the

5    temperature of his skin, and the temperature of the

6    dorm?

7         A    Yes.

8         Q    Okay.  He should've been able to draw the

9    conclusion that this was a life-threatening emergency

10   and he needed to make that call?

11        A    Well, every seizure is a life-threating

12   emergency whether or not we call 9-1-1 or get a history.

13   I mean, seizures kill people all the time without heat

14   stroke.  People lose their airway and -- and seizures

15   have a potential to cause death.

16        Q    So do we call 9-1-1 for every seizure, or do we

17   let some of them try to resolve themselves and ride them

18   out?  Or is it a case-by-case basis, Doctor?

19                   MR. EDWARDS:  Objection, foundation.

20                   THE WITNESS:  It's -- who is "we"?

21        Q    (By Mr. Garcia) Well, you just testified that

22   you don't advise people call 9-1-1 for every seizure

23   event.  Did I -- am I mischaracterizing --

24        A    I didn't say that.

25        Q    Okay.  What did you testify earlier to in

1    Mr. Clark calling her until essentially the end of the

2    incident.  Do you recall that?

3        A    Mm-hmm.

4        Q    And I'd like to know, if you can, tell me what

5    Sergeant Tate did that was inappropriate in this

6    situation, at least as it faced her when she arrived.

7        A    Well, the -- she should have had called 9-1-1.

8    So here we have someone who's having a seizure, which

9    Mr. Clark observed.  She's observing the same seizure.

10   There's a time component here.  She also is carrying a

11   card and has the training, and 9-1-1 is part of that

12   training, and Dr. Murray said it's part of that

13   training.  And so we're in an environmental condition

14   that is being taught to -- they're being taught what to

15   do, and part of -- 9-1-1 is part of that and

16   individually taught.

17            And in the meantime, nobody called 9-1-1.

18   Time is passing.  So the call came in to 9-1-1 at

19   3:05 a.m., but the testimony of the officers and

20   everybody else says it was about 2:10 when this whole

21   activation started.  So we've lost 55 minutes.

22       Q    Okay.  Now, you're aware that theses officers

23   each arrived in sequence --

24       A    Yes, I am.

25       Q    And so each one was not there for the entire

1      Q     (By Mr. Garcia) Are you aware of that?

2      A     Well, I know that someone called 9-1-1, and I

3   know that the medical person on the other end of the

4   phone tried to ascertain if he had had a history of

5   seizures and said call 9-1-1.  So I'm not exactly sure

6   at this moment if that phone call originated from the

7   nurse.  I don't quite remember; although, I know there

8   was a call back to a health professional to say how is

9   it going.  So that makes me think that call was between

10  two health care professionals.

11     Q     Now, convulsions and seizures are exactly the

12  same.  They look exactly the same; is that correct?

13     A     They're exactly the same thing.

14     Q     The only thing that would be different to some

15  extent in a heat event would be the heat of the skin; is

16  that correct?  Is that what you're telling me?

17           What the officer should've been aware of

18  that should've made them know that this was a heat

19  exhaustion event was -- it's not just the seizures,

20  because that could be a seizure event also, right?  It's

21  the heat of the skin; that's the difference you're

22  telling me?

23     A     No.  I'm not simplifying it like you're

24  simplifying it.  I'm saying that there was a set of

25  circumstances.  They were in hot conditions.  Everybody

1    knew it was a hundred degrees all day.  That was the

2    temperature.  Everybody knew it was hot there.  And

3    they're hot themselves.  And they are trained about

4    the -- and warned repeatedly about the situation.  They

5    see -- and -- and they come upon a man who is

6    unresponsive, has a seizure, and now 55 minutes pass

7    where he's still unresponsive.  They can feel that he's

8    hot; whether they did or they didn't, it doesn't matter.

9    It could have been no heat stroke.  This man needed

10   9-1-1.  Whether they did or didn't appreciate the

11   feeling of his skin and his appearance, I don't know.

12              But any man on the street -- you don't

13   have to be a corrections officer -- recognizes that when

14   somebody is having seizures and unresponsive for 55 --

15   for 5, 10, 15 minutes, whatever it is, they need an

16   ambulance and they need to go somewhere.

17        Q    Have you ever seen seizures that resolved after

18   10 minutes with nothing wrong with the person?

19        A    Hundreds of times.

20        Q    Okay.  Now, you are also aware that the unit is

21   taking certain activities to try to help with the heat

22   conditions, are you not?

23        A    Yes.

24        Q    Okay.  And some of these things are access to

25   ice water, to have plenty of ice water.  Are you aware

 1   actually, all of the officers could have started cooling

 2   measures and called 9-1-1 according to their training

 3   and the fact that this was clearly an emergency.

 4       Q    In the face of a clear emergency, can you think

 5   of any reason to delay contacting 9-1-1 for 55 minutes?

 6       A    No.

 7       Q    Okay.  How would you describe such action?

 8       A    I would describe it as unacceptable and a

 9   contributor to this man's death from heat stroke.

10               MR. EDWARDS:  Okay.  We'll reserve the

11   rest of our questions for trial.  Thank you.

12               MS. COOGAN:  I just have a couple.  And

13   I'm sorry.

14                           EXAMINATION

15   BY MS. COOGAN:

16       Q    Do you know how many people in 2011 in Texas in

17   the free world died from heat stroke?

18       A    The -- the answer is, I don't know.  Those

19   kinds of numbers usually come out with the CDC.  The CDC

20   reported on the Arizona heat deaths -- and there were a

21   number of them, but not on the Texas deaths, if there

22   were.  We know there are.  But -- so I don't know the

23   answer.

24       Q    If the percentage of people who died in the

25   free world is the same or less than the percentage of

Susi Vassallo, M.D.                                                      199

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3    STEPHEN McCOLLUM, et al., )
                 Plaintiffs,    )
 4                              )
      v.                        )  CIVIL ACTION
 5                              )  NO. 3:12-CV-02037
                                )
 6    BRAD LIVINGSTON, et al.,  )
                 Defendants.    )
 7

 8

 9

10                 REPORTER'S CERTIFICATION
                    ORAL DEPOSITION OF
11                   SUSI VASSALLO, M.D.
                      March 5, 2014
12

13              I, Dalia F. Inman, Certified Shorthand

14    Reporter in and for the State of Texas, hereby certify

15    to the following:

16              That the witness, SUSI VASSALLO, M.D., was

17    duly sworn by the officer and that the transcript of the

18    oral deposition is a true record of the testimony given

19    by the witness;

20              I further certify that pursuant to FRCP Rule

21    30(f)(1)the signature of the deponent:

22              __X__ was requested by the deponent or a party

23    before the completion of the deposition and returned

24    within 30 days from date of receipt of the transcript.

25    If returned, the attached Changes and Signature page
```

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1    contains any changes and the reasons therefor;

2            _____ was not requested by the deponent or a

3    party before the completion of the deposition.

4            I further certify that I am neither attorney

5    nor counsel for, related to, nor employed by any of the

6    parties to the action in which this testimony was taken.

7    Further, I am not a relative or employee of any attorney

8    of record in this cause, nor am I financially or

9    otherwise interested in the outcome of the action.

10           Subscribed and sworn to on this the 13th day

11   of March, 2014.

12

13

14   _____

15   Dalia F. Inman, CSR 7423
     Expiration:  12/31/2015

16   Sunbelt Reporting & Litigation
     Firm #87

17   1016 La Posada Drive, Suite 294
     Austin, Texas  78752

18   (512)465-9100 Phone
     (512)465-9132 Fax

19   Job No. 176390

20

21

22

23

24

25

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, §§§§§ | |
| PLAINTIFFS § | |
| § | |
| v.  § | CIVIL ACTION NO. |
| § | 4:14-cv-3253 |
| § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. §§§§§§§ | |
| DEFENDANTS § | |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 299

```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION


STEPHEN McCOLLUM, STEPHANIE *
KINGREY, and SANDRA         *
McCOLLUM, individually and  *
as heirs at law to the      *
Estate of LARRY GENE        *
McCOLLUM,                    *
         Plaintiffs,        *
                            *
VS.                         *   CIVIL ACTION NO.
                            *     3:12-cv-02037
BRAD LIVINGSTON, JEFF       *
PRINGLE, and the TEXAS      *
DEPARTMENT OF CRIMINAL      *
JUSTICE,                    *
         Defendants.        *



     ******************************************

              ORAL 30(b)(6) DEPOSITION OF

          TEXAS DEPARTMENT OF CRIMINAL JUSTICE

                    THOMAS L. VIAN

                   MARCH 27, 2013

                      VOLUME 1

     ******************************************
```

Stephen McCollum, et al      Texas Department Of Criminal Justice
Brad Livingston, et al      March 27, 2013

```
1              ORAL DEPOSITION OF THOMAS L. VIAN,
2   produced as a witness at the instance of the Plaintiffs
3   and duly sworn, was taken in the above-styled and
4   numbered cause on the 27th day of March, 2013, from
5   1:33 p.m. to 4:35 p.m., before KIMBERLY G. KEEPER,
6   Certified Shorthand Reporter in and for the State of
7   Texas, reported by machine shorthand, at the Office of
8   the Attorney General, 300 West 15th Street, 7th Floor,
9   Austin, Texas 78701 pursuant to the Federal Rules of
10  Civil Procedure and that the deposition shall be
11  signature having been waived.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                    March 27, 2013

```
 1                        APPEARANCES

 2


 3
      FOR THE PLAINTIFFS:
 4
                  MR. SCOTT MEDLOCK
 5                TEXAS CIVIL RIGHTS PROJECT
                  1405 Montopolis Drive
 6                Austin, Texas  78741-3438
                  512-474-5073 X105
 7                scott@texascivilrightsproject.org


 8
      FOR THE DEFENDANTS:
 9
                  MR. BRUCE R. GARCIA
10                OFFICE OF THE ATTORNEY GENERAL
                  P.O. Box 12548
11                Austin, Texas  78711-2548
                  512-463-2080
12                bruce.garcia@oag.state.tx.us


13
      ALSO PRESENT:
14
                  Warden Jeff Pringle
15                Mr. Tobias D. Hunziker

16

17

18

19

20

21

22

23

24

25
```

Plaintiffs' MSJ Appx. 7020

4

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                        March 27, 2013

```
 1                        INDEX

                                                  PAGE
 2
     Appearances...................................    3
 3

 4   THOMAS L. VIAN

 5        Examination by Mr. Medlock................    5

 6

 7   Reporter's Certificate........................  134

 8

 9                       EXHIBITS

10

11   NO. DESCRIPTION                               PAGE

12
     48............................................   10
13        Notice of Deposition

14   49............................................   70
          Floor Plan
15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7021

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

1  area for inmates to go such as play dominoes in or just

2  have quiet time, and that particular area was needed for

3  a treatment area, some type of treatment or classroom

4  areas for some type of treatment program that was -- or

5  a classroom that was being treated for some type of

6  program that they may have at a particular unit, could

7  be anywhere from -- from some type of drug treatment

8  program that they needed a classroom place and the unit

9  was not originally designed to have a drug treatment

10  program there, so they'd needed a design -- they needed

11  a room with air conditioning in it so that they could

12  have a classroom atmosphere.  So the choice was made for

13  that need and it would have been run through the proper

14  channels to be approved and that need addressed through

15  that.

16      Q.  Do you know what -- what those channels would

17  be, who -- who would -- whose desk would that have to go

18  over to get approved?

19      A.  Yes, sir, it would have had to be the

20  requester.

21      Q.  Uh-huh.

22      A.  Okay.  The requester normally -- it could be a

23  department on the unit, but the requester would be that

24  department on the unit would get the maintenance

25  supervisor.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7022

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

1     Q.    Uh-huh.

2     A.    They would fill out the major work request.

3  That major work request would then be submitted through

4  the unit warden, he would approve it, then that major

5  work request would flow to regional maintenance for the

6  regional maintenance manager to look at that request, to

7  make a determination to make sure that it was accurate

8  and had all the necessary requirements and materials

9  that would be needed to complete that task if he was

10 able to provide that, or it would be designated on there

11 that engineering assistance would be needed.  It would

12 flow from there to the regional director of CID, in one

13 of the six regions, it would then flow from there to the

14 CID leadership, which would be Mr. Stephens and

15 Mr. Thaler for their approval process.  Before it got to

16 Mr. Stephens and Mr. Thaler, if there was another

17 division, that division director would have to sign off

18 on it.

19    Q.    When you say if there was another division,

20 what do you mean?

21    A.    Well, if agriculture was needing it or it was a

22 medical type thing that was needed and somebody in

23 medical that was the liaison for -- for that particular

24 branch would need to sign off to it to attest that there

25 is truly a need.

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

1    Q.   So if the -- just as a hypothetical, if the

2    medical department at the Hutchins unit were to say, "We

3    need to repurpose the multipurpose room for medical

4    treatment and it's going to have to be air conditioned,"

5    then it would have to go through the medical -- like the

6    health services department at TDCJ, too, as opposed to

7    if Warden Pringle said we need a -- to air condition a

8    multipurpose room for some programatic reason that's not

9    related to medical; is that --

10   A.   Yes.

11   Q.   -- a fair --

12   A.   Yes, sir.

13   Q.   -- assessment?  Okay.

14            And you said that who -- the requester

15   would initiate the process.  That would be like the --

16   for example, if like the principal of the school at the

17   prison said, "We need the multipurpose room," that

18   person would be the requester; is that fair?

19   A.   Could be, yes, sir.

20   Q.   Okay.

21   A.   Could I finish the process?

22   Q.   Oh, I'm sorry.

23   A.   Okay.

24   Q.   I apologize, I thought you had.

25   A.   No, sir.  No, sir.  When it's completed by the

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7024

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

1   CID leadership --

2        Q.    Uh-huh.

3        A.    -- which would be Mr. Stephens and Mr. Thaler

4   has to sign off on it, then it would come to the

5   facilities division, and at that time it would be given

6   a tracking number or an MWR approval.  It could be

7   declined at any one of those levels.  When it comes to

8   the facilities division, then it's given a number.

9        Q.    Uh-huh.

10       A.    Okay.  At this day and time, it meets a

11  committee.  The committee decides on what the -- the

12  need is and which category it would fall into.  If that

13  request is less than $50,000, then it does not have to

14  leave the facilities division -- or let me say this:  If

15  the overall cost is less than 50,000, because there is

16  engineering fees and overhead that has to be added to it

17  of the agency.

18            If it's less than $50,000, then it stays

19  in-house there at the -- in the facilities division.  If

20  it's more than $50,000, it goes to what's referred to as

21  an FRB, which is the facilities review board.  It's a

22  four-member board chaired by Mr. Collier.  Okay.  If

23  it's greater than 500,000 and less than a million --

24       Q.    Uh-huh.

25       A.    -- it has to have the executive leadership;

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7025

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                          March 27, 2013

1  Mr. Livingston has to sign off on it.  If it's greater

2  than a million dollars, then it has to go to the TDCJ

3  Board of Criminal Justice and you have to get on their

4  agenda many months in advance to get on that agenda for

5  approval.

6              In between that process, it normally has

7  to be designed, it has to be bid out, and all that takes

8  long terms of time because the way that the -- the

9  agency is set up by legislative mandates.  And there

10 also has to be a funding source.

11     Q.   And when you say a funding source, that could

12 mean, you know, that there was left -- extra money left

13 over in the budget from the previous year that could be

14 applied to that or that could mean that there needs to

15 be a legislative appropriation.  Are those the types of

16 funding sources that you --

17     A.   Yes.

18     Q.   Okay.  Theoretically, someone could give the

19 prison a grant for --

20     A.   I don't -- I have never heard of a grant, but I

21 don't know -- most money comes through --

22     Q.   Sure --

23     A.   Well, I take it back.  Yes, there is -- there

24 are grants where we build -- that we have built chapels

25 where an outside group will pay for that cost.  So I

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7026

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                          March 27, 2013

1   guess you could consider that a grant.

2                  But yes, there has to be a funding source,

3   and depending on what the legislature has granted us,

4   bond funds -- and all of those processes, if it's

5   greater than $500,000, it's paid for out of bond funds

6   and those bonds funds are granted by the legislature

7   every two years and that amount is determined, it's not

8   a set amount.  The legislature determines how much money

9   that they're going to fund for the biennium.  This year

10  the rumors are it's either 38 or 50 million.  It's been

11  as high as 80 million.

12      Q.   And that -- that bond fund, is that used for --

13  is that earmarked for construction or --

14      A.   It's --

15      Q.   -- what is that -- what is that used?

16      A.   It's earmarked for renovations and construction

17  and -- minor construction.  Major construction, any --

18  any expansion of beds have to be -- have legislative

19  approval.

20      Q.   So even if there were -- you wanted to install

21  a bed and it would only cost $5,000, you'd -- or less

22  than $5,000, you'd still have to go through the

23  legislature for that; is that fair?

24      A.   There are certain rules, and I'm not exactly

25  familiar with them, because we -- when we closed down

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7027

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                    March 27, 2013

1  central, we actually moved those beds to different

2  locations.  There is a process, a de minimus process

3  that they can add a percentage of beds without

4  legislative approval, but they have to have public

5  hearings --

6      Q.   Uh-huh.

7      A.   -- this, that and the other to approve that

8  process.  That's laid out by the legislature on what

9  that process is, but if we decided that we wanted to

10 take part of this money that the legislature

11 appropriates and we want to go build a thousand bed

12 brand new prison out here, it can't happen.  The

13 legislature is the only one that's got approval to do

14 that.

15     Q.   Okay.  So there is some minimal number -- de

16 minimus number of beds that you could do without getting

17 the legislature to approve, but at some point there is a

18 number that they have to approve all additional --

19     A.   Yes, sir.

20     Q.   -- beds.

21     A.   Any new building or new prison that would be

22 built would have to be legislatively mandated and

23 approved.

24     Q.   Okay.  Let's -- obviously I cut you off when we

25 were going over this, so let's go back and go over it.

WRIGHT WATSON & ASSOCIATES
(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363
ec7c4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7028

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

1  I've got some additional questions about the -- the

2  process you've just described to me.  Let's see.

3              So there is a different -- it sounds like

4  the -- there is -- the more money basically a project

5  costs, the more levels of scrutiny it has to go through;

6  is that --

7      A.   Yes, sir.

8      Q.   -- fair?

9              Okay.  You said that if a -- there -- if

10 it's more than $50,000, it has to go through a committee

11 that's chaired by Mr. Collier.

12     A.   Yes, sir.  Can I -- can I back up and

13 clarify --

14     Q.   Please.

15     A.   -- something on that?

16     Q.   Uh-huh.

17     A.   That is with the exception of direct

18 replacement.

19     Q.   Uh-huh.

20     A.   Okay?  Direct replacement is when I'm taking

21 out a piece of equipment and I'm replacing it with the

22 same like piece of equipment.  We don't have to have

23 approval until $500,000 there.

24              I am in the process -- or we are in the

25 process of replacing many air handling units, air

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7029

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                        March 27, 2013

1  conditioning units throughout the state, and we do this

2  on a regular basis, that they cost like $350,000 apiece.

3  Okay?  Those do not take the approval of the FRB board,

4  although the FRB board has to approve me a lump sum of

5  money for direct replacement purposes and maintenance

6  less than 50, because those are bond funds that's still

7  spent.  I ask for X number of dollars periodically when

8  we have these FRBs to where I have a amount of money

9  that I can -- we can make decisions on to replace

10  equipment that's needed to be replaced, whether it be

11  hot water heater, boilers.

12           We have a project going on at the Montford

13  unit now that we are replacing the chilled water system

14  and putting new chillers in -- in there, new --

15  rebuilding the existing cooling tower, and then we have

16  large numbers of units where we are replacing the air

17  conditioning unit on a lot of the medical facilities

18  that we're replacing in the medical, some of it in

19  administration, particular parts of the building.

20  Sometimes it has to do with -- with like

21  administrative-segregation parts of it -- of a prison.

22           The Allred unit, for example we are fixing

23  to change the chillers out for 12 Building there.  Most

24  of the 2250s, we have changed those chillers out within

25  the last three years because basically the life span on

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7030

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

1    those pieces of equipment are about 20 years.

2         Q.   Is about how many years?

3         A.   About 20 years.

4         Q.   20 years?  Uh-huh.

5         A.   Most of those got their life expectancy.  We

6    have already changed many of them out.  We are in the

7    process, you know, because of the age.  So we're

8    constantly asking for money on that direct replacement

9    fund.

10        Q.   Okay.

11        A.   So that -- that fund is where we -- there is an

12   exception to the -- to the over 50,000-dollar.

13        Q.   So the direct replacement funds, if you're

14   swapping out a 20-year-old heating unit that's about to

15   break or maybe already has broken, that where the

16   replacement cost is $100,000, for example, you wouldn't

17   have to go through that FRB process because you're

18   essentially swapping like for like.

19        A.   Yes, sir.

20        Q.   Okay.  Now, you said that you're in the process

21   of replacing a number of air conditioning and air

22   handler units at a number of different facilities

23   because the -- a whole bunch of these facilities were

24   built in the 1990s and presumably they're running up on

25   the life span of the mechanisms that were installed;

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7031

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

1   is --

2        A.    Yes, sir.

3        Q.    -- that fair?

4        A.    Yes, sir.

5        Q.    Does that mean -- are you then familiar with

6   the cost of a new air conditioning unit versus the cost

7   of a -- the H -- a heating unit that doesn't air

8   condition?

9        A.    Familiar, yes, sir.

10       Q.    What --

11       A.    Not exact cost.

12       Q.    That's fine, I don't need you to be to dollars

13  and cents, but what is the cost difference between one

14  of the air conditioning units that you've been

15  describing versus one of the heating units that you've

16  described?

17       A.    A air handling unit that is just going to heat

18  and provide air ventilation would be roughly 35 to

19  40 percent of the cost of a like unit that has the air

20  conditioning components in it.

21       Q.    So a -- and I'm about to try to do math, so I

22  have to warn you that this could get dangerous.  An air

23  handler -- if the air conditioning unit costs $100,000,

24  you would expect the air handler unit that doesn't air

25  condition, just provides heat, to be 30 to $40,000.  Is

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7032

Stephen McCollum, et al                Texas Department Of Criminal Justice
Brad Livingston, et al                              March 27, 2013

1   that --

2       A.   Yes, sir.  I can -- I can --

3       Q.   More or less?

4       A.   Yes, sir, that's more or less.  And I'm not

5   going to challenge your math, let me give you some

6   realistic figures that -- that we're looking at.  Some

7   328,000-dollar units that provide air conditioning, we

8   are putting in some very similar units at another

9   location -- and this is just equipment, not labor costs,

10  not for contractors doing it, we're doing it with our

11  labor -- you're looking at about $328,000 versus about

12  118,000, I believe the figures were.  Now, I don't want

13  you to quote me exact on that, but that's -- that's

14  roughly the difference on the same type of units.  The

15  only difference in the 358,000 is it does have the air

16  conditioning capability built within that system.

17      Q.   So that might be -- the 358,000 might buy you a

18  chiller unit that would --

19      A.   An air conditioning unit.

20      Q.   An air conditioning unit that -- running on

21  refrigerated air or a water chiller like you described?

22      A.   Refrigerated air.

23      Q.   Okay.  So that would be less expensive than a

24  chiller unit for the reasons we talked about before.

25      A.   Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7033

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                         March 27, 2013

1      Q.    Okay.  And those -- those two numbers that you

2    just approximately quoted me, again I'm not trying to

3    hold you to anything, but 358 versus 128; is that the --

4      A.    I think it was 118.

5      Q.    118.  Around 350 and around 120, can we round

6    to --

7      A.    Uh-huh.

8      Q.    -- for the purposes of this?  Would those two

9    units, would those heat or cool the same amount of

10   space?

11     A.    Roughly.

12     Q.    Roughly.

13     A.    Yes, sir.

14     Q.    Okay.  And then I assume, because the

15   difference -- if you were to -- if you wanted to swap

16   a -- an AC unit for an old exhausted heat unit, you

17   would need to go through this FRB process because the

18   difference between those two systems is more than

19   $50,000.

20     A.    Yes, sir.

21     Q.    Is that correct?  Okay.  Okay.

22     A.    Can I add --

23     Q.    Please.

24     A.    Because you're changing, you're not doing your

25   direct for direct --

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7034

1      Q.    Uh-huh.

2      A.    -- to have to go through the FRB process, but

3  you also have to have a design on it.

4      Q.    Yeah.  Let's -- let's hold off on that for a

5  second.  I want to talk a little bit more about the FRB

6  process and then we'll -- I want to talk about that,

7  too, but you've given me this long list of things; I

8  don't want to forget what --

9      A.    That's fine.

10      Q.    So the FRB process, that has to go through a

11  committee that's chaired by Mr. Collier.  Who -- and

12  Mr. Collier is the deputy director?

13      A.    Yes, sir.  Mr. Livingston is deputy director.

14      Q.    He is right below Mr. Livingston.

15      A.    Yes, sir.

16      Q.    Okay.  And you said there is a committee that

17  he chairs.  Who else is on that committee?

18      A.    That committee has Mr. McGinty on it, which is

19  the chief financial officer, Mr. --

20      Q.    Okay.

21      A.    -- Mr. Thaler which is the correctional

22  institution division's director.

23      Q.    Uh-huh.

24      A.    And Mr. Frank Inmon, which is the facilities

25  division director.

Plaintiffs' MSJ Appx. 7035

Stephen McCollum, et al                    Texas Department Of Criminal Justice
Brad Livingston, et al                                      March 27, 2013

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 2                   DALLAS DIVISION

 3
       STEPHEN McCOLLUM, STEPHANIE *
 4     KINGREY, and SANDRA         *
       McCOLLUM, individually and  *
 5     as heirs at law to the      *
       Estate of LARRY GENE        *
 6     McCOLLUM,                    *
                Plaintiffs,         *
 7                                  *
       VS.                          *   CIVIL ACTION NO.
 8                                  *     3:12-cv-02037
       BRAD LIVINGSTON, JEFF        *
 9     PRINGLE, and the TEXAS       *
       DEPARTMENT OF CRIMINAL       *
10     JUSTICE,                     *
                Defendants.         *
11

12      *******************************************
               REPORTER'S CERTIFICATION
13           ORAL 30 (b)(6) DEPOSITION OF
        TEXAS DEPARTMENT OF CRIMINAL JUSTICE
14               THOMAS L. VIAN
                 MARCH 27, 2013
15                  VOLUME 1
        *******************************************
16

17              I, KIMBERLY G. KEEPER, Certified Shorthand

18     Reporter in and for the State of Texas, hereby certify

19     to the following:

20              That the witness, THOMAS L. VIAN, was duly

21     sworn by the officer and that the transcript of the oral

22     deposition is a true record of the testimony given by

23     the witness;

24              I further certify that pursuant to FRCP

25     Rule 30(f)(1) that the signature of the deponent:
```

WRIGHT WATSON & ASSOCIATES
(800) 375-4363   3307 Northland Dr., Ste. 185  Austin, TX 78731-4946   (512) 474-4363
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7036

Stephen McCollum, et al                 Texas Department Of Criminal Justice
Brad Livingston, et al                                    March 27, 2013

1            _____ was requested by the deponent or a

2    party before the completion of the deposition and is to

3    be returned within 30 days from date of receipt of the

4    transcript.  If returned, the attached Changes and

5    Signature Page contains any changes and the reasons

6    therefor;

7            XXX was not requested by the deponent or a

8    party before the completion of the deposition.

9            I further certify that I am neither

10   counsel for, related to, nor employed by any of the

11   parties or attorneys to the action in which this

12   proceeding was taken.  Further, I am not a relative or

13   employee of any attorney or record in this cause, nor am

14   I financially or otherwise interested in the outcome of

15   the action.

16           Subscribed and sworn to on this the 8th

17   day of April, 2013.

18

19                  *Kimberly G. Keeper*

20           _____
             KIMBERLY G. KEEPER, TEXAS CSR No. 2162
21           Expiration Date:  12/31/13
             WRIGHT WATSON & ASSOCIATES
22           Firm Registration No. 225
             Firm Expiration:  12/31/13
23           3307 Northland Drive, Suite 185
             Austin, Texas  78731
24           512-474-4363/512-474-8802 (fax)

25   JOB NO. 130327KGK

**WRIGHT WATSON & ASSOCIATES**
**(800) 375-4363    3307 Northland Dr., Ste. 185   Austin, TX 78731-4946    (512) 474-4363**
ec7e4eee-e5f7-4e08-9d4a-f7c828c2916a

Plaintiffs' MSJ Appx. 7037

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § |
| PLAINTIFFS | § § |
| v. | § § § |
| | CIVIL ACTION NO. 4:14-cv-3253 JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § § |
| DEFENDANTS | § |

Plaintiffs' Consolidated Summary Judgment Response Appendix

# EXHIBIT 300

```
               IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       HOUSTON DIVISION

STEPHEN McCOLLUM and       )
SANDRA McCOLLUM,           )
individually and STEPHANIE )
KINGREY, individually and as)
independent administrator  ) Civil Action
of the Estate of LARRY GENE )
McCOLLUM,                   )
                           ) Number 4:14-CV-3253
          Plaintiffs,      )
                           )
vs.                        )
                           )
                           )
BRAD LIVINGSTON, JEFF      )
PRINGLE, RICHARD CLARK,    )
KAREN TATE, SANDREA        )
SANDERS, ROBERT EASON,     )
THE UNIVERSITY OF TEXAS    )
MEDICAL BRANCH and THE     )
TEXAS DEPARTMENT OF        )
CRIMINAL JUSTICE,          )
                           )
          Defendants.      )
-------------------------------------------------------
```

ORAL AND VIDEOTAPED DEPOSITION OF

ROBERT LEWIS WILLIAMS, MD, CCHP, CPH

MARCH 07, 2016

```
-------------------------------------------------------
```

2

1          ORAL AND VIDEOTAPED DEPOSITION OF ROBERT

2    LEWIS WILLIAMS, MD, CCHP, CPH, produced as a witness

3    at the instance of the PLAINTIFFS, and duly sworn,

4    was taken in the above-styled and numbered cause on

5    MARCH 07, 2016, from 9:31 a.m. to 7:31 p.m., before

6    Melody Renee Campbell, CSR in and for the State of

7    Texas, reported by method of machine shorthand, at

8    the offices of the Attorney General, 300 West 15th

9    Street, Austin, Texas, pursuant to Notice and Court

10   Order and the Federal Rules of Civil Procedure.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ Appx. 7040

3

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:
             Mr. Jeff Edwards, Esq.
 3           Mr. Scott Medlock, Esq.
             The Eddards Law Firm
 4           1101 East Eleventh Street
             Austin, Texas  78702
 5           512.623.7727
             Jeff@edwards-law.com
 6           Scott@edwards-law.com

 7

 8   FOR THE DEFENDANTS BRAD LIVINGSTON, JEFF PRINGLE,
     RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT
 9   EASON, THE TEXAS DEPARTMENT OF CRIMINAL
     JUSTICE:^ add boyd
10           Cynthia L. Burton, Esq.
             Matthew J Greer, Esq.
11           Mr. Daniel C. Neuhoff, Esq.
             Assistant Attorneys General
12           Office of the Attorney General of Texas
             P.O. Box 12548, Capitol Station
13           Austin, Texas  78711
             512.463.2080
14           512.963.2109 (Fax)
             Cynthia.Burton@texasattorneygeneral.gov
15           Karen.Matlock@texasattorneygeneral.gov
             Matthew.Greer@texasattorneygeneral.gov
16           Daniel.Neuhoff@texasattorneygeneral.gov
                -and-
17           Mr. Brian M. Sears
             Texas Department of Criminal Justice
18           Post Office Box 13084
             Austin, Texas  78711
19           512.475.4384
             Brian.Sears@tdcj.state.tx.us
20

21   FOR THE UNIVERSITY OF TEXAS MEDICAL BRANCH:
22           Mr. Graig J. Alvarez
             Fernelius Alvarez Simon
23           1221 McKinney Street, Suite 3200
             Houston, Texas  77010
24           713.654.1200
             GAlvarez@fa-lawfirm.com
25              -and-
             MS. J. Lee Haney, Esq.
```

4

```
 1          Assistant Attorneys General
            Office of the Attorney General of Texas
 2          P.O. Box 12548, Capitol Station
            Austin, Texas  78711
 3          512.463.2080
            512.963.2109 (Fax)

 4

 5   ALSO PRESENT:
            Mr. Kevin J. Schaefer (Videographer)
 6          Shanna Molanre
            Ashley Palermo
 7          Deborah Woltersdaz
            James Rheams
 8          Jennifer Ostreen

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Robert Williams, MD, CCHP, CPH - 3/7/2016

225

1    likely reason they die is from a disarrhythmia,

2    which means the heartbeats in an abnormal manner and

3    that -- that's not compatible with life.

4            So in the course of the field the

5    cardiology, medications were created that can

6    prevent abnormal rhythms.  And so someone -- it

7    became practice, for a while, that when someone was

8    diagnosed with heart attack while they were in the

9    hospital, one of these medications, called an

10   anti-dysrhythmogenic agent, would be initiated.

11           What they found -- even though that

12   made common sense and seemed like a sensible

13   approach, what they found in reality is, the people

14   who were started on the anti-dysrhythmogenic agents

15   actually died at a faster rate than the people who

16   had not been started.

17           And with hindsight what was realized

18   is the medication that can stop stop a disarrhythmia

19   can also be dysrhythmogenic and it can -- in the

20   heart that has no indication of abnormal rhythms,

21   that medication can actually, instead of preventing

22   the abnormal rhythm from ever happening, can

23   stimulate the heart to have the abnormal rhythm.

24      Q.   If you were to fall out of your chair

25   during this deposition and have a seizure and be

Robert Williams, MD, CCHP, CPH - 3/7/2016

226

1  nonresponsive, what should someone at this table do

2  100 times out of a hundred?

3      A.   All emergency services.

4      Q.   Okay.  In light of the budget cuts,

5  there's been testimony at different times in

6  different cases that officers, correctional officers

7  receive training about the need to contact emergency

8  services.  Are you aware of any such training?  And

9  I'm talking about prior to the summer of 2011.

10     A.   With the time constraint I have no

11 knowledge of what correctional officers have been

12 taught.

13     Q.   What's been represented to us, I believe,

14 in testimony -- may be from Dr. Linthicum but I

15 can't be exactly positive -- is that in light of the

16 budget cuts and the fact that there were going to be

17 fewer hours of care available at certain units, that

18 training was given to officers about the need to

19 contact emergency services if they encountered

20 particular situations.

21              Were you involved in any way, in any

22 discussion relating to increase the training in

23 light of decreasing the staff hours at certain

24 clinics?

25     A.   I do not recall participating in any such

Plaintiffs' MSJ Appx. 7044

Robert Williams, MD, CCHP, CPH - 3/7/2016

315

1          ROBERT LEWIS WILLIAMS, MD, CCHP, CPH

2

3                  REPORTER'S CERTIFICATE

3    STATE OF TEXAS       )

4    McLENNAN COUNTY      )

5

6         I, Melody Renee Campbell, Certified Shorthand

7    Reporter in and for the State of Texas, do hereby

8    certify that the foregoing deposition is a full,

9    true and correct transcript;

10        That ROBERT LEWIS WILLIAMS, MD, CCHP, CPH, the

11   witness hereinbefore named, was duly sworn by the

12   officer and that the oral deposition was taken by

13   the officer in machine shorthand on MARCH 7, 2016,

14   and is a true record of the testimony given by the

15   witness;

16        I further certify that the signature of the

17   deponent was requested and is to be returned within

18   30 days from date of receipt of the transcript.  If

19   returned, the attached Changes and Signature Page

20   contains any changes and the reasons therefor;

21        That $ _2537.10_    is the deposition

22   officer's charges for preparing the original

23   deposition transcript and any copies of exhibits,

24   charged to PLAINTIFFS     ;

25        I further certify that I am neither counsel

Robert Williams, MD, CCHP, CPH - 3/7/2016

316

1   for, related to, nor employed by any of the parties

2   in the action in which this proceeding was taken,

3   and further that I am not financially or otherwise

4   interested in the outcome of the action.

5          Subscribed and sworn to on this the 22nd day of

6   March 2016.

7

8

9   _____

    MELODY RENEE CAMPBELL, RMR, CRR
10  Integrity Legal Support Solutions
    3100 W. Slaughter Lane, Suite A-101
11  Austin, Texas 78748
    512.320.8690
12  512.320.8692 (fax)

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiffs' MSJ App. 7046

314

1                    CHANGES AND SIGNATURE

2    RE: McCOLLUM v. LIVINGSTON

3    WITNESS:   ROBERT LEWIS WILLIAMS, MD, CCHP, CPH

4    PAGE/LINE      CHANGE           REASON

5

6

7

8

9

10

11

12

13

14    _____

15

16

17

18

19

20          I, ROBERT LEWIS WILLIAMS, MD, CCHP, CPH,

21    have read the foregoing deposition and hereby affix

22    my signature that same is true and correct, except

23    as noted above.

24

25

Robert Williams, MD, CCHP, CPH - 3/7/2016

314

1          CHANGES AND SIGNATURE

2    RE: McCOLLUM v. LIVINGSTON

3    WITNESS:   ROBERT LEWIS WILLIAMS, MD, CCHP, CPH

4    PAGE/LINE      CHANGE          REASON

5        Please see attached list of corrections.

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20        I, ROBERT LEWIS WILLIAMS, MD, CCHP, CPH,

21   have read the foregoing deposition and hereby affix

22   my signature that same is true and correct, except

23   as noted above.

24

25                    _____

Plaintiffs' MSJ Appx. 7048

Deposition Changes and Corrections: McCollum v. Livingston
Deposition Witness: Robert Lewis Williams, MD, CHP, CCHP on March 7, 2016

| Page/Line | Change | Reason |
|---|---|---|
| 7/25 | "hyperthermia" instead of *hyperthermic* | To correct transcription error |
| 8/1-2 | It was the understanding of Dr Williams that Mr Edwards said "Hutchins" instead of *much continues.* | To correct transcription error |
| 8/9 | "the" instead of shoots other.<br>Delete the word, *it.* | To correct transcription error |
| 8/23 | "Temple" instead of temperature | To correct transcription error |
| 9/1 | "wound care and hyperbarics" instead of *wound and hyper bar rings.* | To correct transcription error |
| 10/4 | "hyperbaric" instead of *hyperthermia* | To correct transcription error |
| 14/23 | It was the understanding of Dr Williams that Mr Edwards said "free world" instead of *43.* | To correct transcription error |
| 20/4 | "Buskirk" instead of *Buzz Kirk.* | To correct transcription error |
| 22/3 | "We" instead of I. | To conform to the facts |
| 24/6 | "until" instead of *follow* | To correct transcription error |
| 24/7 | Dr Williams' employment with TDCJ began Dec 10, 2007 | To conform to the facts |
| 28/2-3 | "2011" instead of 2007 | To correct transcription error |
| 28/8-21 | My response is consistent with my recollection and perspective.  However, on review of additional documentation, I was reminded that I attended the 12/12/07 M&M meeting as part of my orientation.  It was my first full day to work in Health Services Division headquarters, and I did not participate in the meeting as a voting member but was merely observing.  Although I do not recall any details of cases discussed that day, the 2007 deaths attributed to hyperthermia were discussed in that meeting. | To conform to the facts |
| 30/9 | "cut my house in two" instead of *gut my house in.* | To correct transcription error |
| 30/16 | "their" instead of *there* | To correct transcription error |
| 30/21 | "offender" instead of *offend* | To correct transcription error |
| 31/23 | "individual" instead of *slid* | To correct transcription error |
| 32/15 | "concerning" instead of *conserving* | To correct transcription error |
| 34/11 | "begin doing" instead of *beginning* | To correct transcription error |
| 35/11 | Delete "association" | To correct transcription error |
| 36/8 | "measures" instead of *measured* | To correct transcription error |
| 42/14 | "Thaler" instead of *That I her* | To correct transcription error |
| 45/9 | "missing" instead of *miss* | To correct transcription error |
| 47/17 | Delete "loose" | To correct transcription error |
| 52/15 | "his illness" instead of *hisleness* | To correct transcription error |
| 56/7 | "height" instead of *highest* | To correct transcription error |
| 60/13 | "dentists" instead of *dent activities* | To correct transcription error |
| 61/8 | "general counsel" instead of *gentle down* | To correct transcription error |
| 62/21 | "responding" instead of *sponged* | To correct transcription error |

1

Deposition Changes and Corrections: McCollum v. Livingston
Deposition Witness: Robert Lewis Williams, MD, CHP, CCHP on March 7, 2016

| Page/Line | Change | Reason |
|---|---|---|
| 63/8 | Upon reflection, I recall a telephone conversation when I briefly explained the M&M Review process and was advised to produce the worksheets.  However, I do not recall the name of the person to whom I spoke, the office that individual represented, or whether the person was a lawyer. | To conform to the facts |
| 65/23-24 | Delete "end you can't hazard a guess" | To correct transcription error |
| 65/25 | Delete "when" | To correct transcription error |
| 67/12 | "people" instead of *female* | To correct transcription error |
| 70/13 | "mortality" instead of *morality* | To correct transcription error |
| 71/21 | "assists" instead of *assistance* | To correct transcription error |
| 72/17 | Administrative Assistant IVs assisting with M&M Sherry Williford (Jan 1998-Jan 2003) Marjorie Davis-Fletcher (Jan 2003-Dec 2010) Paul Hardy (Jan 2011-May 2012) Marjorie Davis-Fletcher (May 2012-Aug 2012) Krista Greathouse (Aug 2012-Mar 2015) Helen Buendel (Mar 2015-present) | Other:  to provide the Information requested |
| 73/3 | "mortality" instead of *morality* | To correct transcription error |
| 77/11 | "a list" instead of *lace* | To correct transcription error |
| 79/12 | "result" instead of *advance* | To correct transcription error |
| 80/15 | "without" instead of *would you* | To correct transcription error |
| 99/21 | "whether" instead of *wouldn't* | To correct transcription error |
| 102/9 | "collect or" instead of *collector* | To correct transcription error |
| 104/5 | "in and without" instead of *and would you* | To correct transcription error |
| 116/12 | "mortality" instead of *morality* | To correct transcription error |
| 117/13 | Insert *were* so that it reads, "results were available", instead of *results available*. | To correct transcription error |
| 118/15 | "the scenario" instead of *that scene Joe* | To correct transcription error |
| 120/16 | Delete "were" | To correct transcription error |
| 121/13 | Delete "occurs in" | To correct transcription error |
| 122/6 | "it's" instead of *ice* | To correct transcription error |
| 123/1 | Insert *meeting* so that it reads, "at the next meeting", instead of *at the next*. | To correct transcription error |
| 123/2 | "are" instead of *have* | To correct transcription error |
| 124/2 | "processes" instead of *repossess* | To correct transcription error |
| 124/10 | "prepared" instead of *presented* | To correct transcription error |
| 124/16 | Delete "incidental" | To correct transcription error |
| 125/10 | "to" instead of *would you* | To correct transcription error |
| 126/1 | Delete "as" | To correct transcription error |
| 126/11 | "establishing" instead of *loose dating* | To correct transcription error |
| 126/24 | Delete "be" | To correct transcription error |
| 128/14 | "My" instead of *Eye* | To correct transcription error |
| 138/22 | "performing" instead of *telephoning* | To correct transcription error |

2

Deposition Changes and Corrections: McCollum v. Livingston
Deposition Witness: Robert Lewis Williams, MD, CHP, CCHP on March 7, 2016

| Page/Line | Change | Reason |
|---|---|---|
| 141/12 | "mind" instead of *behind* | To correct transcription error |
| 152/23 | "vertigo" instead of *veteran* | To correct transcription error |
| 158/21 | Change *is* to "enters" and delete "oats", so the line reads as follows: "So, the clerk enters offender name and number on it,". | To correct transcription error |
| 160/24 | "offender" instead of *vendor* | To correct transcription error |
| 162/16 | "headquarters" instead of *headaches* | To correct transcription error |
| 162/17 | "located" instead of *locate* | To correct transcription error |
| 162/22 | "based" instead of *basically* | To correct transcription error |
| 166/11 | "days" instead of *dates* | To correct transcription error |
| 169/23 | "squiggle" instead of *angle* | To correct transcription error |
| 170/20 | "able" instead of *anal* | To correct transcription error |
| 171/24 | Delete "somebody happened to" | To correct transcription error |
| 172/17 | "services" instead of *offices* | To correct transcription error |
| 173/12 | "ARRM" instead of *arm*. It stands for Administrative Review and Risk Management. | To correct transcription error |
| 173/19 | Delete "eq" | To correct transcription error |
| 173/23 | "OPS" instead of *OP* | To correct transcription error |
| 184/20 | "My" instead of *any* | To correct transcription error |
| 188/13 | This line should end with a period and was not a question. | To correct transcription error |
| 188/24 | "mortality" instead of *morality* | To correct transcription error |
| 190/22 | "assigned" instead of *say assigned* | To correct transcription error |
| 193/16 | Delete "marihuana" | To correct transcription error |
| 193/21 | "Perspective" instead of *percent* | To correct transcription error |
| 194/8 | "out" instead of *sought* | To correct transcription error |
| 195/11 | "related" instead of *relate* | To correct transcription error |
| 198/3 | "attain" instead of *contain* | To correct transcription error |
| 198/4 | Comma after "consensus" | To correct transcription error |
| 198/5 | Comma after "discussion" | To correct transcription error |
| 198/24 | Add "listening" after "is" | To correct transcription error |
| 201/2 | "were not" instead of *worked* | To correct transcription error |
| 207/6-7,9 | My response is consistent with my recollection and perspective. However, on review of additional documentation, I was reminded that I attended the 12/12/07 M&M meeting as part of my orientation. It was my first full day to work in Health Services Division headquarters, and I did not participate in the meeting as a voting member but was merely observing. Although I do not recall any details of cases discussed that day, the 2007 deaths attributed to hyperthermia were discussed in that meeting. | To conform to the facts |
| 208/20-24 | Beginning with "Did Dr Linthicum ever" through lines 21, 22, 23, and 24, this is a question asked by Mr. Edwards. My only response to the preceding question was "I don't think so." | To correct transcription error |

3

Plaintiffs' MSJ Appx. 7051

Deposition Changes and Corrections: McCollum v. Livingston
Deposition Witness: Robert Lewis Williams, MD, CHP, CCHP on March 7, 2016

| Page/Line | Change | Reason |
|---|---|---|
| 210/13 | "compliance" instead of *appliance* | To correct transcription error |
| 212/14 | "ascertain" instead of *certain* | To correct transcription error |
| 215/14 | "less man" instead of *Lessman* | To correct transcription error |
| 216/16 | Add "24" before "hours" | To correct transcription error |
| 219/23 | "to" instead of *toll* | To correct transcription error |
| 220/19 | "or" instead of *approximate* | To correct transcription error |
| 221/8 | "co-located" instead of *collocated* | To correct transcription error |
| 222/6 | Add "known" after "have" to read as follows:  ...I have known nurses... | To correct transcription error |
| 223/8 | "is" instead of *ask* | To correct transcription error |
| 224/21 | "later" instead of *rater* | To correct transcription error |
| 226/3 | "Call" instead of *all* | To correct transcription error |
| 230/6-8 | These lines are still part of Dr Williams's response that began at line 1. | To correct transcription error |
| 233/11 | "restrictions" instead of *transitions* | To correct transcription error |
| 234/25 | "department" instead of *garment* | To correct transcription error |
| 241/5 | "one" instead of *run* | To correct transcription error |
| 242/21 | The line should read as follows:  "As standing in for Dr. Linthicum's" | To correct transcription error |
| 242/24 | "consultation" instead of *consult* | To correct transcription error |
| 244/25 | "Eason" instead of *oh son* | To correct transcription error |
| 245/21 | It was the understanding of Dr Williams that Mr Edwards was referring to George Crippen. | To correct transcription error |
| 247/9-10 | These lines were Dr Williams's response to the question in lines 5-7.  The sentence was a statement and should end with a period rather than a question mark. | To correct transcription error |
| 256/6 | "discussion" instead of *discuss or* | To correct transcription error |
| 257/8 | Delete "he" | To correct transcription error |
| 257/9 | "communicating" instead of *will availability it* | To correct transcription error |
| 260/3 | "concern" instead of *certain for* | To correct transcription error |
| 260/5 | "of" instead of *and* | To correct transcription error |
| 263/6-7 | "And, I may have incorrectly assumed that cups were provided" was my response and not a question from Mr. Edwards.  The sentence should end with a period rather than a question mark. | To correct transcription error |
| 267/6 | "discussed" instead of *decreased* | To correct transcription error |
| 274/13 | "we" instead of *he* | To correct transcription error |
| 275/5 | "extent" instead of *innocent* | To correct transcription error |
| 276/7 | "I am sorry, what do you mean by 17619?" was the response of Dr Williams and not asked by Mr Edwards. | To correct transcription error |
| 277/19 | "recreate" instead of *regular rate* | To correct transcription error |
| 279/13 | "measured" instead of *meshed* | To correct transcription error |
| 279/16 | "or were" instead of *would* | To correct transcription error |
| 279/17 | "they measuring" instead of *you their measuring* | To correct transcription error |

4

Plaintiffs' MSJ Appx. 7052

Deposition Changes and Corrections: McCollum v. Livingston
Deposition Witness: Robert Lewis Williams, MD, CHP, CCHP on March 7, 2016

| Page/Line | Change | Reason |
|---|---|---|
| 288/2 | Delete "didn't that there" | To correct transcription error |
| 288/3 | Delete "are--of those" | To correct transcription error |
| 289/23 | "was" instead of *wasn't* | To correct transcription error |
| 291/23 | "directly" instead of *director* | To correct transcription error |
| 293/22 | "correctly" instead of *collect and* | To correct transcription error |
| 293/23 | "promptly is" instead of *promptlyS* | To correct transcription error |
| 295/6 | "susceptibility" instead of *skill set ability* | To correct transcription error |
| 297/12 | Add "division" after "services" | To correct transcription error |
| 298/5 | "seen" instead of *season* | To correct transcription error |
| 299/9 | "the more" instead of *some* | To correct transcription error |
| 299/22 | "basis" instead of *preparation* | To correct transcription error |
| 299/23 | Delete "if" | To correct transcription error |
| 302/17 | "pathologists" instead of *technologists* | To correct transcription error |
| 303/3 | Delete "and" | To correct transcription error |
| 304/7 | "he" instead of *I* | To correct transcription error |
| 305/15 | "restriction" instead of *medicine* | To correct transcription error |
| 305/20 | "we" instead of *with* | To correct transcription error |
| Page/Line | Change | To correct transcription error |
| 305/21 | There should not be a comma after "practice", and "So" should not be capitalized. | To correct transcription error |
| 306/3 | Delete "I have", and add a comma after "But". | To correct transcription error |
| 307/5 | "devises" instead of *devices* | To correct transcription error |
| 307/16 | "seen" instead of *spoken* | To correct transcription error |
| 308/1 | "TUHSU" instead of *2C*.  Stands for Texas Uniform Health Status Update. | To correct transcription error |
| 311/1 | "Denee" instead of *Den nay* | To correct transcription error |
| 311/2 | "regional" instead of *region* | To correct transcription error |
| 311/16 | "functions" instead of *functioned* | To correct transcription error |
| 311/18 | It was Dr Williams' impression that Mr Edwards said "Robison" instead of *reason son*. | To correct transcription error |
| 311/19 | It was Dr Williams' impression that Mr Edwards said "Denee Robison" instead of *den nay reason son*. | To correct transcription error |

5

Plaintiffs' MSJ Appx. 7053