UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, et al.,<br>    Plaintiffs, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 4:14-cv-03253 |
| BRAD LIVINGSTON, et al.,<br>    Defendants. | §<br>§<br>§ | |

---

**APPENDIX TO DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH'S
REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

| | |
|---|---|
| Tab 1, 1 | Additional Portions of the Deposition of Stephanie Kingrey, Changes and Signature Page, November 22, 2013. |
| Tab 2, 2-4 | Additional Portions of the Deposition of Sandra Sue McCollum, November 22, 2013. |
| Tab 3, 5-16 | Additional Portions of the Deposition of Dr. Glenda Adams, November 19, 2013. |
| Tab 4, 17-19 | Additional Portions of the Deposition of Dr. Owen Murray, November 20, 2013. |
| Tab 5, 20-21 | Deposition of Dr. Ananda Babbili, February 7, 2013. |
| Tab 6, 22-30 | Deposition of Dr. Susi Vassallo, February 26, 2016. |
| Tab 7, 31-34 | American Correctional Association Standards for Adult Correctional Institutions, 4th ed. |
| Tab 8, 35-36 | The Americans with Disabilities Act Title II Technical Assistance Manual, II-2.4000. |
| Tab 9, 37-39 | *Green v. JP Morgan Chase Bank, N.A.*, 562 F. App'x 238 (5th Cir. 2013). |
| Tab 10, 40-48 | *Tex. Sales and Mktg., Inc. v. Distinctive Appliances, Inc.*, Civil Action No. H-05-3555, 2007 WL 399292 (S.D.Tex. – Houston 2007). |
| Tab 11, 49- 58 | *Munoz v. Echosphere, L.L.C.*, No. 09-CV-0308-KC, 2010 WL 2838356 (W.D.Tex. – El Paso 2010). |
| Tab 12, 59-63 | *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180 (5th Cir. 2015). |

Jan. 6. 2014 3:56PM    S____lt Reporting & ___igation    RECEIVED 01/06/2014 15:53
From: Jeff Edwards    Fax: (888) 325-5877    To: +15124659132    Fax: +15124659132    No. 8099    P. 3/4
                                                                          ___ of 5  1/6/2014 11:54

Page 93

ORAL DEPOSITION OF STEPHANIE KINGREY

1              CHANGES AND SIGNATURE

2    WITNESS NAME: STEPHANIE KINGREY          DATE:  11-22-13

3    PAGE   LINE   CHANGE                 REASON

4    55     1    add "But I knew he had        more complete

5                 difficulty walking because of      answer

6                 his leg, that he had been

7                 diagnosed with diabetes and

8                 hypotension, and that he

9                 was obese."

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20      I, STEPHANIE KINGREY, have read the foregoing

21   deposition and hereby affix my signature that same is

22   true and correct, except as noted herein.

23

24                 STEPHANIE KINGREY

25                 Job No. 113925

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

**Reply Appendix 001**

1

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

1     IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2               DALLAS DIVISION

3  STEPHEN MCCOLLUM, et al,         )
          Plaintiffs,               )
4                                    )
   V.                               )   C.A. No. 3:12-CV-02037
5                                    )
                                     )
6  BRAD LIVINGSTON, et al,          )
          Defendants.               )
7

8  *********************************************************

9                    ORAL DEPOSITION OF

10                  SANDRA SUE MCCOLLUM

11                   November 22, 2013

12  *********************************************************

13

14                      ORIGINAL

15        ORAL DEPOSITION OF SANDRA SUE MCCOLLUM, produced as

16  a witness at the instance of the Defendant University of

17  Texas Medical Branch and duly sworn, was taken in the

18  above-styled and numbered cause on the 22nd of

19  November, 2013, from 10:35 a.m. to 11:58 a.m., before

20  DEBRA L. McGREW, CSR in and for the State of Texas,

21  reported by machine shorthand at the offices of

22  Edwards Law, 1101 E. 11th Street, Austin, Texas,

23  pursuant to the Federal Rules of Civil Procedure.

24

25

ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

1     Q.   And during the time that you were married, do

2  you believe he had any problems with substances?

3     A.   No, ma'am.

4     Q.   Do you know -- a lot of the questions are going

5  to be "Do you know," because I don't know if you even

6  know.  If you don't, you just say, "No, I don't know."

7          During the time that he was in Hutchins,

8  the one letter that he wrote, did he make any complaints

9  about the -- about Hutchins?

10     A.   Yes, ma'am.

11     Q.   What kind of complaints did he make?

12     A.   He said, It seems like hell here.

13     Q.   Did he make any other complaints in his letter

14  that you can recall?

15     A.   No, ma'am.

16     Q.   Do you remember what -- or did you know what he

17  was referring to when he said it seemed like hell?

18     A.   He said some of the prisoners, when he got

19  there, told him, Welcome to hell.  And he -- he said, It

20  is hell here.

21     Q.   It's my understanding that Mr. McCollum was --

22  was kind of a big man?

23     A.   Yes, ma'am.

24     Q.   Did he have any trouble getting around, as far

25  as you can recall?

Sunbelt Reporting & Litigation Services
Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   Houston   San Antonio

Reply Appendix 003

### ORAL DEPOSITION OF SANDRA SUE MCCOLLUM

1      A.   Yes, ma'am, he did.  He recently was in a wreck

2   and hurt his leg.

3      Q.   Did he use a cane or any kind of walking help?

4      A.   Not since -- he had a foot cast on.  When they

5   took it off, he did not have to.

6      Q.   And then after the accident and after his foot

7   got healed, did he have any trouble getting around, as

8   far as you know?

9      A.   His foot was still bothering him a lot.

10     Q.   Do you know -- did he tell you if he had any

11  problems getting up and down off of his bunk?

12     A.   Yes, ma'am.  He said he could not -- this is

13  hearsay or -- I -- I don't really know because I didn't

14  hear it from him myself, but in the -- in the letter I

15  think he said the bunk was too tall or he could not get

16  up and down on it.

17          MS. COOGAN:  You don't have -- Shanna, you

18  don't have any initial disclosures with you by any

19  chance, do you?  I thought I did, but I guess I don't.

20          We'll get it at the break, maybe.

21          MR. MEDLOCK:  Yeah.

22     Q.   (BY MS. COOGAN)  And -- and do you remember if

23  he said any -- any other complaints about the bunk or

24  the heat or anything else?

25     A.   Not to me, he didn't.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                        :
STEPHEN McCOLLUM, STEPHANIE          :
KINGREY, and SANDRA McCOLLUM,        :
individually and as heirs            :
at law in the Estate of              :
LARRY GENE McCOLLUM,                 :
          Plaintiffs,                :
                                     :   CIVIL ACTION NO.
VS.                                  :
                                     :     3:12-cv-02037
                                     :
BRAD LIVINGSTON, JEFF PRINGLE,       :
RICHARD CLARK, KAREN TATE,           :
SANDREA SANDERS, ROBERT EASON,       :
THE UNIVERSITY OF TEXAS              :
MEDICAL BRANCH and the TEXAS         :
DEPARTMENT OF CRIMINAL JUSTICE,      :
          Defendants.                :
                                     :
. . . . . . . . . . . . . . . . . . . . . . . . . . . .:. . . . . . . . . . . . . . . . . . . . . . . . .


ORAL AND VIDEOTAPED DEPOSITION OF
THE DESIGNATED REPRESENTATIVE OF
THE UNIVERSITY OF TEXAS MEDICAL BRANCH
BY AND THROUGH
GLENDA ADAMS, M.D.

NOVEMBER 19, 2013


. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
     ORAL AND VIDEOTAPED DEPOSITION OF THE DESIGNATED
REPRESENTATIVE OF THE UNIVERSITY OF TEXAS MEDICAL BRANCH
BY AND THROUGH GLENDA ADAMS, M.D., produced as a witness
at the instance of the Plaintiffs, and duly sworn, was
taken in the above-styled and numbered cause on Tuesday,
November 19, 2013, from 11:11 a.m. to 6:03 p.m., before
Mary C. Dopico, Certified Shorthand Reporter No. 463 and
Notary Public in and for the State of Texas, reported by
machine shorthand and audio/video recording at the
offices of Rebecca Sealy Hospital, 404 8th Street, Room,
4.204, Galveston, Houston, Texas, pursuant to Notice and
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

**Reply Appendix 005**

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

1  which housing restrictions are placed on inmates?

2      A.   Yes.

3      Q.   Would you tell the jury generally how housing

4  restrictions are made for prisoners who come to the

5  prison?

6      A.   Okay.

7      Q.   Is that an okay question?  I can repeat it

8  if --

9           MS. COOGAN:  Objection, vague.

10     Q.   (By Mr. Edwards)  Okay.  Would you tell me how

11 housing restrictions are placed -- are put into place

12 for inmates when they come to the prison?

13          MS. COOGAN:  Same objection.

14          Go ahead, Dr. Adams.

15     A.   During intake, if they have a medical -- an

16 immediate medical need for housing other than general

17 population, they will be removed to the appropriate

18 unit.  For example, somebody in a wheelchair would be

19 moved to a wheelchair facility.

20     Q.   (By Mr. Edwards)  I -- I don't mean to

21 interrupt, but I -- but right now this is the one time

22 where I really am very interested in the process of what

23 happens, and then I'm going to ask -- then I'll follow

24 up with questions like:  Okay.  You've mentioned the

25 wheelchair example.  Tell me how that really -- really

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   it -- just so we're talking about the same thing here.

2                    (Adams Exb. No. 8 was marked.)

3       Q.   (By Mr. Edwards)  Okay.  That's that

4   initial --

5       A.   Yes, sir.

6       Q.   Okay.  All right.  Now, we'll -- we'll

7   probably talk about that in a minute, but I want to

8   know --  Okay.

9                    From that, what housing restriction -- I

10  mean, that's a way that UTMB can accommodate people with

11  needs by making sure that there's a restriction in place

12  right away; is that fair?

13                   MS. COOGAN:  Objection, legal conclusion

14  and terms included and vague.

15      Q.   (By Mr. Edwards)  Okay.  Can you --  You can

16  answer that.

17      A.   Okay.  If it was determined immediately that

18  a -- a special accommodation was needed for housing,

19  there wouldn't be an HSM-18 to complete at that time

20  because this patient isn't in the electronic medical

21  record.  He could have been given a pass, a medical

22  pass.

23      Q.   Okay.  So is that something that the initial

24  person, though, this C.M.A. Haywood, is empowered to do?

25      A.   No.

82

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1      Q.    Who does that?

2      A.    The medical provider.

3      Q.    So in that situation, where there is a need

4  for an accommodation, how does that happen?

5      A.    If there is a recognized need for

6  accommodation, the offender is referred to the medical

7  department.

8      Q.    Right away?

9      A.    As soon as the form is completed.

10     Q.    Okay.

11     A.    Before he goes to his housing, yes.

12     Q.    Okay.  What I'm --  What I'm trying to --

13  What I'm trying to make sure is that there doesn't have

14  to be like a six- or seven-day wait before, you know,

15  one of these needs for accommodation are -- are dealt

16  with.

17            It can happen very quickly; right?

18            (Cell phone ringing.)

19            THE WITNESS:  Pardon me.

20            MR. EDWARDS:  Okay.

21            THE WITNESS:  I thought I had turned it

22  off.

23            MR. EDWARDS:  It's a very -- very

24  skillful tactic.  Just kidding.

25            MS. COOGAN:  And if it's a call you need

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

```
 1   to take --

 2                   THE WITNESS:  Is it me?

 3                   MS. COOGAN:  It's not me.

 4                   THE WITNESS:  I think it's me.  I can't

 5   even find my phone right now.

 6                   MS. COOGAN:  It sounded like it was kind

 7   of --

 8                   MR. EDWARDS:  Well, I've had that

 9   happen --

10                   MS. COOGAN:  Yeah.

11                   MR. EDWARDS:  -- before a federal judge

12   in Marshall.  So --

13                   MS. COOGAN:  Yeah.  I have.

14                   THE WITNESS:  Well, it sounds like me

15   ring; but I can't seem to find my phone.  Can we go off

16   the record until I do?

17                   MS. COOGAN:  Sure.

18                   MR. EDWARDS:  Let's go off the record and

19   find it.

20                   THE VIDEOGRAPHER:  We're off the record.

21                   (Off the record from 12:58 - 12:59.)

22                   THE VIDEOGRAPHER:  On the record.

23                   MR. EDWARDS:  Would you repeat the

24   question before the -- the phone maker?

25                   (The record was read back by the reporter
```

84

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1   as follows:

2              QUESTION:   "What I'm trying to make sure

3   is that there doesn't have to be like a six- or

4   seven-day wait before, you know, one of these needs for

5   accommodation are dealt with.  It can happen very

6   quickly; right?")

7        A.    Correct.

8        Q.    (By Mr. Edwards)  Okay.  All right.  So, is

9   there any formal policy that you're aware of that

10  directs C.M.A.s or -- or L.V.N.s to, you know, deal with

11  these, you know, accommodations right away?

12             MS. COOGAN:  Objection, vague.

13       A.    There is an intake screening policy.  Let's

14  see if I can find that number for you.

15             I think it's like 8.1.

16       Q.    (By Mr. Edwards)  Okay.

17       A.    I don't know if that's accessed here.  I will

18  do it off the top of my head.

19             There is a -- an intake screening policy

20  that if urgent care, including special accommodations,

21  are needed, they will be referred to the medical

22  department.

23       Q.    Okay.  So give me some examples of things that

24  would -- that you understand are referred to the medical

25  department right away.

90

Stephen McCollum, et al v.                     Glenda Adams, M.D.
Brad Livingston, et al                          November 19, 2013

1      A.     Hydrochlorothiazide is first-line treatment

2   for mild to moderate hypertension, no matter your age.

3      Q.     Whether or not you can acclimate and

4   compensate for the dehydration would depend on the heat,

5   your medical condition, your age, things like that;

6   right?

7                    MR. GARCIA:   Objection, speculation.

8      Q.   (By Mr. Edwards)   If you know.

9      A.    It would vary from individual situations and

10  the patient, yes.   And those are some of the factors

11  that would be included, yes.

12     Q.    Okay.   All right.   So I -- I guess --  Would

13  it be your position that UTMB has in place a way to

14  place housing restrictions or suggest housing

15  restrictions on -- on inmates right away when they come

16  in?

17     A.    For --

18     Q.    For medical conditions?

19     A.    Okay.   If a special accommodation is needed,

20  yes, they can write a pass.

21     Q.    So if Mr. McCollum needed to be on a bottom

22  bunk as opposed to a top bunk because of his medical

23  condition and weight, should that have happened at this

24  initial intake?

25     A.    Only if that need was recognized, okay, either

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1  morbid obesity, would you agree that he should have been
2  placed in a -- in a top bunk -- in a bottom bunk?
3  Strike that.  Let me repeat that.
4        If he meets the criteria for morbid
5  obesity, would you agree that he should have been placed
6  in a bottom bunk?
7     A.   Yes.  And he would have been, if he had
8  requested it and brought it to medical's attention.
9     Q.   Okay.  Well, maybe or maybe not.  We don't
10 know what would have happened if he had brought it to
11 medical's attention; fair?
12    A.   I feel fairly certain he would have been given
13 a bottom bunk.
14    Q.   He should have been given a bottom bunk if he
15 asked for it; right?
16    A.   If he asked medical for it, he would have been
17 given a pass for a bottom bunk.
18    Q.   Okay.  Well, isn't it medical's responsibility
19 to -- to do that on their own without him asking as
20 well?
21    A.   Well, the way I understand the ADA law, you --
22 you don't get --
23         MS. COOGAN:  No, no, no, no, no.  He
24 didn't ask you --
25         MR. EDWARDS:  Excuse me.

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1          A.    He actually went to the medical department on

2     the -- not only on the 15th and saw -- but he was also

3     in the medical department on the 18th.

4          Q.    (By Mr. Edwards)  Okay.

5          A.    He could have, you know, asked to see someone

6     then.

7          Q.    So -- So you would be critical of

8     Mr. McCollum?

9          A.    Absolutely not.  I'm just saying he could have

10    if he had felt bad and wished to be seen by medical.

11         Q.    Okay.  All right.  Okay.

12                Oh, this air-conditioned

13    climate-controlled facilities policy that we're learning

14    about today, when did that go into effect?

15         A.    It's --  It's been in effect all along.

16                It was only put into writing fairly

17    recently with one of the newer health services liaison

18    facility type lists that were put out.

19         Q.    When did it actually go into effect in

20    writing?

21         A.    In writing?  Just recently.  It's been in

22    effect, it's been understood, for as long as I've been

23    with TDCJ.

24         Q.    Did anyone actually tell you that?

25         A.    Yes.

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1      Q.    Okay.   Who?

2      A.    Phyllis McWhorter in health services liaison.

3  She's the one that I frequently work with in order to

4  find -- make accommodations for offender patients.

5      Q.    So she told you:   Look --   She told you the

6  sum and substance of this, which is called

7  air-conditioned climate-controlled facilities; right?

8      A.    Yes.

9      Q.    Okay.

10     A.    We've known that for a long time.

11     Q.    Okay.   Did she specifically tell you that?

12     A.    Yes.   We've discussed it.

13     Q.    Okay.   When would a prisoner have a single

14  cell restriction?

15     A.    Some psychiatric patients are single-celled.

16  Some patients with infectious diseases are

17  single-celled.

18     Q.    That's a restriction that T -- UTMB makes?

19     A.    Yes.

20     Q.    When would a prisoner have a cell block only

21  restriction?

22     A.    Those that are psychiatrically not suitable

23  for dormitory housing.

24     Q.    That, again, is a decision that UTMB makes;

25  right?

238

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                        November 19, 2013

1        A.    Yes.   It's a restriction that we apply to the

2   HSM-18.

3        Q.    And even if -- even if there weren't available

4   psych beds, it's still a restriction that you would

5   expect TDCJ to follow; correct?

6        A.    What?

7        Q.    Even if there weren't available cell block

8   only placements, you would still expect TDCJ to follow

9   it to make -- to make that stuff available; right?

10       A.    There's no shortage of cell blocks -- I mean,

11  there is, because they're frequently at capacity; but

12  they will find a way to single cell somebody if

13  necessary.

14       Q.    You would ex -- you -- they have to find a

15  way; right?  Because you're telling them:  Look, this is

16  a restriction that they need; right?  From a medical

17  standpoint?

18       A.    Yes.

19       Q.    Okay.  And if -- Look.  It appears --  Is --

20  Is the debate that we seem to be having, you -- you

21  don't think:  Look, air-conditioned or

22  climate-controlled housing, that's not medically

23  necessary for people with similar traits to

24  Mr. McCollum; right?

25       A.    It's medically appropriate.  Okay.  Perhaps

Stephen McCollum, et al v.                    Glenda Adams, M.D.
Brad Livingston, et al                         November 19, 2013

1      Q.    All right.  How does hypertension affect the

2   circulatory system?

3                  MS. COOGAN:   Objection.  You're back to

4   the 23, 24 and 25 that the judge --

5                  MR. EDWARDS:   Oh, okay.

6                  (INSTRUCTION NOT TO ANSWER.)

7      Q.    (By Mr. Edwards)  Well, all right.  If I ask

8   you any questions about the effects of hypertension or

9   diabetes or depression, you're just not going to answer

10  them based on counsel; fair?

11     A.    At this time, yes.

12     Q.    Okay.  Do you consider obesity a medical

13  condition?  Morbid obesity?

14     A.    Yes.

15     Q.    It can limit physical activity?

16     A.    It can, yes.

17     Q.    It can affect breathing of people?

18     A.    Yes, it can.

19     Q.    It can affect people's ability to walk or to

20  run; correct?

21     A.    It can.

22     Q.    It can even affect people's ability to stand

23  up; right?

24     A.    If they're obese enough, yes.

25     Q.    Okay.  Do you know if it was safe to house

```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                              :
STEPHEN McCOLLUM, STEPHANIE    :
KINGREY, and SANDRA McCOLLUM,  :
individually and as heirs      :
at law in the Estate of        :
LARRY GENE McCOLLUM,           :
         Plaintiffs,           :
                              :   CIVIL ACTION NO.
VS.                            :
                              :     3:12-cv-02037
BRAD LIVINGSTON, JEFF PRINGLE, :
RICHARD CLARK, KAREN TATE,     :
SANDREA SANDERS, ROBERT EASON, :
THE UNIVERSITY OF TEXAS        :
MEDICAL BRANCH and the TEXAS   :
DEPARTMENT OF CRIMINAL JUSTICE,:
         Defendants.           :
                              :
. . . . . . . . . . . . . . . . . . . . .:. . . . . . . . . . . .


     ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY, M.D.

               NOVEMBER 20, 2013



. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
     ORAL AND VIDEOTAPED DEPOSITION OF OWEN MURRAY,
M.D., produced as a witness at the instance of the
Plaintiffs, and duly sworn, was taken in the
above-styled and numbered cause on Wednesday, November
20, 2013, from 9:07 a.m. to 12:58 p.m., before Mary C.
Dopico, Certified Shorthand Reporter No. 463 and Notary
Public in and for the State of Texas, reported by
machine shorthand and audio/video recording at the
offices of Rebecca Sealy Hospital, 404 8th Street, Room,
4.204, Galveston, Texas, pursuant to Notice and the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.
```

Stephen McCollum, et al v.                    Owen Murray, M.D.
Brad Livingston, et al                        November 20, 2013

1   etcetera, unless we're going to get into bariatric

2   surgery and other things, I mean, it really becomes a

3   patient-dependent process.

4        Q.   Certainly you would agree that obesity can

5   limit one's physical activity?

6        A.   I would agree with that.

7        Q.   Certainly you would agree that morbid obesity

8   can affect people's ability to breathe?

9             MS. MOLINARE:  Objection, speculation;

10  objection, foundation; objection, vague.

11       A.   Again, not knowing the specific circumstances,

12  but morbid obesity can have -- can complicate the

13  respiratory process.

14       Q.   (By Mr. Edwards)  It can affect the ability to

15  walk or run; right?

16       A.   Again, not knowing the specifics, yes.

17       Q.   It can affect the ability to climb; correct?

18       A.   Stairs, like --  Or not like --  You're

19  talking stairs, not mountains or climb any --

20       Q.   Let's start with stairs.

21       A.   Yes, it can.  It can affect someone's ability

22  to -- to climb.

23       Q.   It can affect someone's ability to climb into

24  a top bunk; correct?

25       A.   Again, not knowing the circumstances

Stephen McCollum, et al v.                    Owen Murray, M.D.
Brad Livingston, et al                        November 20, 2013

1   specifically, that could possibly occur.

2       Q.    Okay.   And morbidly obese people are at a

3   higher risk to develop heat illness if they're exposed

4   to higher temperatures; correct?

5               MS. MOLINARE:   Objection, vague;

6   objection, foundation; objection, speculation.

7       A.    Again, not knowing the specifics, morbid

8   obesity can be a risk factor for heat-related illness.

9       Q.    (By Mr. Edwards)  And that risk factor is

10  something that UTMB should take into account when making

11  housing recommendations to TDCJ; correct?

12              MS. MOLINARE:   Objection, speculation.

13      A.    In making housing recommendations to TDCJ?

14      Q.    (By Mr. Edwards)  Uh-huh.

15      A.    It would be --  A patient's morbid obesity

16  would be part of our medical assessment, and part of and

17  play into a decision to -- about potentially that

18  patient requiring special housing.

19      Q.    Do you practice medicine currently and treat

20  patients?

21      A.    No.   Not --  Not on a day-to-day basis.

22      Q.    Have you ever treated anyone for heat -- for

23  heatstroke?

24      A.    Not --  Not to my recollection.  It is --  It

25  is possible that I could have in Illinois; but -- as I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STEPHEN McCOLLUM,              §
STEPHANIE KINGREY, and         §
SANDRA McCOLLUM,               §
individually and as            §
heirs at law to the            §
Estate of LARRY GENE           §
McCOLLUM,                      §
          Plaintiffs,          §
                               §
VS                             §        CIVIL ACTION NO.
                               §        3:12-cv-02037
BRAD LIVINGSTON, JEFF          §
PRINGLE, and the TEXAS         §
DEPARTMENT OF CRIMINAL         §
JUSTICE,                       §
          Defendants.          §


------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

ANANDA D. BABBILI

FEBRUARY 7, 2013

------------------------------------


          ORAL AND VIDEOTAPED DEPOSITION OF

ANANDA D. BABBILI, produced as a witness at the instance

of the PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th day of

February, 2013, from 9:52 a.m. to 12:50 p.m., before

TINA TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the Hutchins State

Jail, 1500 E. Langdon Road, Dallas, Texas 75241,

pursuant to the Federal Rules of Civil Procedure.

Reply Appendix 020

McCollum, et al.                                    Ananda D. Babbili
Brad Livingston, et al                              February 07, 2013

1  There's no other blood pressure recorded after that

2  because he was not seen in the medical.

3          Q.   Right.   The H -- and I'm going to butcher it.

4          A.   HCTZ.

5          Q.   HCTZ, that's, effectively, blood pressure

6  medication?

7          A.   Uh-huh.

8          Q.   Do you not think that knowing a person's blood

9  pressure is important before prescribing blood pressure

10 medication?

11         A.   Not according to the information I have, and

12 it usually takes two weeks for hydrochlorothiazide to go

13 into full effect.

14         Q.   Did you know whether he had high blood

15 pressure or low blood pressure, Mr. McCollum?

16         A.   Not according to the records I have, no, I

17 don't.   The only record I saw was in 2003 at the time of

18 my death summary.

19         Q.   Right.   You didn't see anything -- anything

20 when you made this prescription.

21         A.   That is right.   And I say that because, if

22 there was a need for McCollum's blood pressure needs to

23 be monitored, it would have reflected on the county

24 summary papers this patient was being monitored, and his

25 pressures have been fluctuating.   He received Clonidine

**WRIGHT WATSON & ASSOCIATES**
(800) 375-4363    3307 Northland Dr., Ste. 185  Austin, TX 78731-4946    (512) 474-4363
8345d34a-fbb0-4e5d-8294-fc9118ad9091

**Reply Appendix 021**

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

```
1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3   STEPHEN McCOLLUM, et al.,  )
            Plaintiffs,        )
4                              )
    v.                         )   CIVIL ACTION
5                              )   NO. 3:12-CV-02037
                               )
6   BRAD LIVINGSTON, et al.,   )
            Defendants.        )
7

8

9                    ORAL DEPOSITION

10               SUSI VASSALLO, M.D.

11                  March 5, 2014

12

13

14

15       ORAL DEPOSITION OF SUSI VASSALLO, M.D., produced as

16   a witness at the instance of the Defendant UTMB and duly

17   sworn, was taken in the above-styled and numbered cause

18   on the 5th day of March, 2014, from 10:03 a.m. to

19   5:06 p.m., before Dalia F. Inman, Certified Shorthand

20   Reporter in and for the State of Texas, reported by

21   computerized stenotype machine at the offices of The

22   Edwards Law Firm, 1101 E. 11th Street, Austin, Texas

23   78702, pursuant to the Federal Rules of Civil Procedure

24   and the provisions stated on the record or attached

25   hereto.
```

Reply Appendix 022

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1    some time and go down at some time.

2              So there will be intermittent changes in

3    the blood pressure readings, but it's -- I don't -- it's

4    my opinion that he had hypertension.  Sometimes the

5    blood pressure readings were higher; sometimes they were

6    lower depending on the -- on a number of factors.  But

7    in any case, he had hypertension in my opinion.

8         Q    Did he have chronic hypertension?

9         A    Yes.

10        Q    And in your opinion, if you had been treating

11   this patient, what medication would you have prescribed?

12        A    Well, the recommendations are to start with a

13   diuretic such as hydrochlorothiazide.

14        Q    Do you have any complaint the fact that

15   Mr. Babbili prescribed hydrochlorothiazide for this

16   patient?

17        A    No.

18        Q    While he was at the McLennan County Jail, did

19   he receive any treatment for diabetes?

20        A    No.

21        Q    And when he came in to McLennan County, did he

22   report currently having diabetes?

23        A    The medical record does not have diabetes

24   checked off.  Now, I'm not certain as to who was

25   actually marking that, if it was himself with the chart

Reply Appendix 023

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1    Q    These are, I'll represent to you, the McLennan
2  County records, and then number 14 are the Hutchins
3  records.  I separated them out because I get them
4  confused sometimes.
5         My question for you now is --
6    A    Could you say that again?
7    Q    Yeah.
8    A    You said 15 is just Mc -- McLellan?
9    Q    McLe -- Mc -- McLellan County.
10   A    McLennan.
11   Q    McLennan County.
12   A    Okay.  15.  That's very helpful.  Thank you.
13   Q    Okay.
14        MR. EDWARDS:  And, Kim, you're
15  representing those are the complete set of records; is
16  that what you're representing?
17        MS. COOGAN:  That's what I'm representing.
18  But if somebody knows something different, speak now.
19   Q    (By Ms. Coogan) And my question for you,
20  Doctor, is, do you -- have you seen anything in the
21  McLennan County records to indicate that he ever told
22  anybody at McLennan County that he was diabetic; not
23  whether they asked or not, but whether he told anybody
24  that he was?
25   A    No.

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Reply Appendix 024

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1     Q    Okay.  Now, I'm going to change and go to

2  Hutchins intake now.

3     A    Okay.

4     Q    Okay.  And so that's Exhibit 14.

5     A    I'll give you that one back.

6     Q    Okay.  And I'm going to give you this one

7  because this is actually the original.  And show you --

8  direct your attention to page 27 of Exhibit 14.  And is

9  that an intake form that is used -- or if you know --

10  when inmates go to Hutchins Jail?

11     A    It appears to be that.  It says "Correctional

12  Managed Care Intake History and Health Screening."

13     Q    Did Mr. McCollum, at least by this document,

14  indicate that he was diabetic?

15     A    Yes.

16     Q    Where does he indicate that he was diabetic?

17     A    Excuse me.  He -- I started at the top, and

18  that is the family history -- excuse me.  That's the

19  family history of diabetes that I was referring to in

20  error.

21     Q    Okay.

22     A    Okay.  Now, the personal history, he has also

23  circled -- somebody has circled the word "diabetes,

24  yes."  That's number seven.

25     Q    Okay.  And can you tell if he indicates if that

Reply Appendix 025

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1  is a current problem or a historical problem?

2      A    Well, when we ask patients if they have a

3  history of an illness, that is -- refers for chronic

4  illnesses to, did you ever have it and do you have it.

5  Both of those are answered by that.

6              MS. COOGAN:  Objection, nonresponsive.

7      Q    (By Ms. Coogan) Can you tell from this record

8  whether that is a current problem or an historical

9  problem?

10             MR. EDWARDS:  Objection, asked and

11  answered.

12      Q    (By Ms. Coogan) Or are you making an

13  assumption?

14             MR. EDWARDS:  Objection, asked and

15  answered.  Argumentive.

16             THE WITNESS:  The -- the -- having been a

17  physician for 27 years, I'm speaking to the usual way to

18  document, in the current tense, a medical problem.  In

19  other words, this is not so much an assumption as it is

20  based on the meaning of -- the personal history.

21  Diabetes, when someone says yes, that means they have

22  diabetes in the present.  So to answer your question,

23  that means in the present.

24      Q    (By Ms. Coogan) Okay.  I thought you testified

25  earlier that there was no uniform way of documenting

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Reply Appendix 026

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1  like he needed to have his tooth pulled and how he was

2  depressed.

3      Q     (By Ms. Coogan) You speak about Mr. McCollum as

4  if you knew him.  Did you ever meet him?

5      A     No.

6               MR. EDWARDS:  Objection, argumentive.

7      Q     (By Ms. Coogan) Are you -- so when you tell us

8  about his thought process, are you speculating about

9  that?

10              MR. EDWARDS:  Objection, mischaracterizes

11 the testimony.

12              THE WITNESS:  I'm basing my opinion on a

13 lifetime as a physician taking histories and

14 understanding the ways that doctors and patients

15 communicate and where we miscommunicate.  And these --

16 the word "current" happens to be one of those areas

17 where patients think sometimes extremely concretely.

18 They mean at the minute they're talking to the doctor,

19 do they need a tooth pulled.  May be that they have much

20 more serious problems, but that's may not be what the

21 word "current" means to them.

22              MS. COOGAN:  Objection, nonresponsive.

23     Q     (By Ms. Coogan) Okay.  If I may direct your

24 attention to page 21 of the same exhibit.  Do you see

25 that?

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Reply Appendix 027

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1    A    No.

2    Q    In your opinion, did Mr. McCollum have

3 diabetes?

4    A    Yes.

5    Q    And what is your opinion based on?

6    A    The -- my opinion is based on his telling his

7 family that he was diagnosed with diabetes earlier in

8 Waco.

9    Q    Really?  Where did you learn that?

10    A    From the deposition testimony of his family.

11    Q    And it's your opinion that he told his family

12 he had diabetes?

13    A    Well, that's from the deposition of those

14 people.

15    Q    Okay.  Where else did you get your opinion?

16    A    They had several blood sugars that were

17 elevated.  He --

18    Q    Which blood sugars were elevated?

19    A    The blood sugar of 130 on the morning of 7/20.

20 This was elevated.  He had hemoglobin A1c of 6.2.  He

21 was massively obese, which is a major risk factor for

22 diabetes.

23    Q    What does the American Diabetes Association --

24 do you consider the American Diabetes Association, the

25 International Diabetes Federation, and the European

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Reply Appendix 028

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1   of 6.5 or greater indicates diabetes?

2           MR. EDWARDS:  Objection, mischaracterizes

3   her testimony.  That's not what she said.

4       Q    (By Ms. Coogan) It's a question.

5       A    Well, I can't answer your question because I

6   feel like you're mischaracterizing my answer.

7       Q    Okay.  Let's take your answer off the table.

8   Let's pretend like the question was never asked and

9   we're starting all over again.

10      A    Okay.  So the --

11      Q    Let me ask you a question now.

12          If I represent to you that in 2009 an

13  international expert committee was gathered that

14  included representatives of the American Diabetes

15  Association, the International Diabetes Federation, and

16  that European Association for the Study of Diabetes, and

17  that international group recommended the use of a A1c to

18  diagnose diabetes with a threshold of 6.5 or greater

19  being diabetic, do you disagree with that?

20      A    Yes.

21      Q    Okay.

22      A    And I will tell you why.

23      Q    I'm not interested.  Thank you.

24          MR. EDWARDS:  Are you refusing to let her

25  tell you why she answered yes to that question,

Reply Appendix 029

ORAL DEPOSITION OF SUSI VASSALLO, M.D.

1  the deposition testimony of his family stating that

2  he -- it was their understanding that he was prescribed

3  medicine for diabetes.  I don't know which of the

4  hospitalizations or where it was or if he was in the

5  free world or not at that time.

6      Q    So do you know whether he ever took medication

7  for his diabetes on a daily or otherwise basis?  Do you

8  know?

9      A    I -- I don't know for sure.  I'm only looking

10  at the family's relating that he was prescribed

11  medication.  Whether he took it or not, I don't know.

12     Q    What kind of medication was it?

13     A    I don't know.  And they did not know what the

14  name of the medication was.

15     Q    When he -- and we know when he was in the

16  McLennan County Jail he didn't report having diabetes

17  and he didn't take any medication, right?

18             MR. EDWARDS:  Objection, compound.

19             THE WITNESS:  So I think we have

20  established that the medical records that I've looked at

21  were from -- that showed diabetes circled and present

22  was from Hutchins.

23     Q    (By Ms. Coogan)  Do you know whether he ever --

24  have you seen any evidence that when he got to Hutchins

25  he said to anybody, "I need my diabetes medicine"?

Reply Appendix 030

# STANDARDS
# FOR
# ADULT CORRECTIONAL
# INSTITUTIONS

### Fourth Edition

American Correctional Association

in cooperation with the
Commission on Accreditation for Corrections

January 2003

Updated with corrections from the Errata Sheet
of the 4th Edition, July 1, 2003.

**Reply Appendix 031**          TDCJ 107422

**Mission of the American Correctional Association**
The American Correctional Association provides a professional organization for all individuals and groups, both public and private, that share a common goal of improving the justice system.

**American Correctional Association Staff**

Charles J. Kehoe, President
James A. Gondles, Jr., CAE, Executive Director
Robert J. Verdeyen, Director, Standards and Accreditation
Gabriella Daley Klatt, Director, Communications and Publications
Alice Heiserman, Manager of Publications and Research
Michael Kelly, Associate Editor
Dana M. McCoy, Graphics and Production Manager
Michael Selby, Graphics and Production Associate

Cover design by Michael Selby. Photo by Lew Long/The Stock Market.

Copyright 2003 by the American Correctional Association. Updated with corrections from the Errata Sheet of the 4th Edition, July 1, 2003. All rights reserved. The reproduction, distribution, or inclusion in other publications or in electronic form of materials in the this book is prohibited without prior written permission from the American Correctional Association. No part of this book may be reproduced by any electronic means, including information storage and retrieval systems, without permission in writing from the publisher.

ISBN: 1-56991-157-6

Printed in the United States of America by Victor Graphics, Inc., Baltimore, Maryland.

Information on accreditation may be obtained from:

American Correctional Association
Department of Standards and Accreditation
206 N. Washington Street, Suite 200
Alexandria, VA 22314
1-800-222-5646 ext. 0080

This publication may be ordered from:

American Correctional Association
c/o PMDS
P.O. Box 201
Annapolis Junction, Maryland 20701
1-800-222-5646, ext. 0129

For information on publications and videos available from ACA, visit our Web site: www.aca.org.

Part 4: Institutional Services

_Protocols_: Written policy and procedure. Screening form.

_Process Indicators_: Health records. Completed screening forms. Transfer logs. Interviews.

4-4363-1
(Ref. 3-4344-1)

**Written policy, procedure, and practice provide for early identification and treatment of offenders with alcohol and drug abuse problems through a standardized battery assessment. This battery shall be documented and include, at a minimum, the following:**

- **screening and sorting**
- **clinical assessment and reassessment**
- **medical assessment for appropriate drug and alcohol program assignment to the needs of the individual inmates**
- **referrals**

_Comment_: None.

4-4364
(New)

**All in-transit offenders receive a health screening by health-trained or qualified health care personnel on entry into the agency system. Findings are recorded on a screening form that will accompany the offender to all subsequent facilities until the offender reaches his or her final destination. Health screens will be reviewed at each facility by health-trained or qualified health care personnel. Procedures will be in place for continuity of care.**

_Comment_: None.

_Protocols_: Written policy and procedure.

_Process Indicators_: Health records. Completed screening forms. Transfer logs. Interviews.

## Health Appraisal

4-4365
(Ref. 3-4345)

**(MANDATORY) A comprehensive health appraisal for each offender, excluding intrasystem transfers, is completed as defined below, after arrival at the facility. If there is documented evidence of a health appraisal within the previous 90 days, a new health appraisal is not required, except as determined by the designated health authority. Health appraisals include the following:**

**Within 14 days after arrival at the facility:**
- **review of the earlier receiving screen**
- **collection of additional data to complete the medical, dental, mental health, and immunization histories**
- **laboratory or diagnostic tests to detect communicable disease, including venereal disease and tuberculosis**
- **record of height, weight, pulse, blood pressure, and temperature**
- **other tests and examinations, as appropriate**

**Within 14 days after arrival for inmates with identified significant health care problems:**
- **medical examination, including review of mental and dental status (for those inmates with significant health problems discovered on**

**Reply Appendix 033**

earlier screening such as cardiac problems, diabetes, communicable diseases, and so forth)
- review of the results of the medical examination, tests, and identification of problems by a physician or other qualified health care personnel, if such is authorized in the medical practice act
- initiation of therapy, when appropriate
- development and implementation of a treatment plan, including recommendations concerning housing, job assignment, and program participation

<u>Within 30 days after arrival for inmates without significant health care problems:</u>
- medical examination, including review of mental and dental status (for those inmates without significant health care concerns identified during earlier screening–no identified acute or chronic disease, no identified communicable disease, and so forth)
- review of the results of the medical examination, tests, and identification of problems by a physician or other qualified health care professional, if such is authorized in the medical practice act
- initiation of therapy, when appropriate
- development and implementation of a treatment plan, including recommendations concerning housing, job assignment, and program participation

*Comment*: Test results, particularly for communicable diseases, should be received and evaluated before an offender is assigned to housing in the general population. Information regarding the offender's physical and mental status may also dictate housing and activity assignments. When appropriate, additional investigation should be conducted into alcohol and drug abuse and other related problems.

*Protocols*: Written policy and procedure. Health appraisal form.
*Process Indicators*: Health records. Completed health appraisal forms. Transfer logs. Interviews.

**4-4366**
**(Ref. 3-4346)**

**Health appraisal data collection and recording will include the following:**
- a uniform process as determined by the health authority
- health history and vital signs collected by health-trained or qualified health care personnel
- collection of all other health appraisal data performed only by qualified health personnel
- review of the results of the medical examination or tests
- identification of problems is performed by a physician or mid-level practitioner, as allowed by law

*Comment*: None.

*Protocols*: Written policy and procedure.
*Process Indicators*: Health records.

**Reply Appendix 034**                                      TDCJ 107564

# The Americans with Disabilities Act

## Title II Technical Assistance Manual

### Covering State and Local Government Programs and Services

Introduction

This technical assistance manual addresses the requirements of title II of the Americans with Disabilities Act, which applies to the operations of State and local governments. It is one of a series of publications issued by Federal agencies under section 506 of the ADA to assist individuals and entities in understanding their rights and duties under the Act.

This manual is part of a broader program of technical assistance conducted by the Department of Justice to promote voluntary compliance with the requirements not only of title II, but also of title III of the ADA, which applies to public accommodations, commercial facilities, and private entities offering certain examinations and courses.

The purpose of this technical assistance manual is to present the ADA's requirements for State and local governments in a format that will be useful to the widest possible audience. The guidance provided in the Department's regulations and accompanying preambles has been carefully reorganized to provide a focused, systematic description of the ADA's requirements. The manual attempts to avoid an overly legalistic style without sacrificing completeness. In order to promote readability and understanding, the text makes liberal use of questions and answers and illustrations.

The manual is divided into nine major subject matter headings with numerous numbered subheadings. Each numbered heading and subheading is listed in a quick reference table of contents at the beginning of the manual.

Contents

II-1.0000 COVERAGE

    II-1.1000 General
    II-1.2000 Public entity
    II-1.3000 Relationship to title III
    II-1.4000 Relationship to other laws

        II-1.4100 Rehabilitation Act
        II-1.4200 Other Federal and State laws

II-2.0000 QUALIFIED INDIVIDUALS WITH DISABILITIES

    II-2.1000 General
    II-2.2000 Physical or mental impairments
    II-2.3000 Drug addiction as an impairment
    II-2.4000 Substantial limitation of a major life activity
    II-2.5000 Record of a physical or mental impairment that substantially limited a major life activity
    II-2.6000 "Regarded as"
    II-2.7000 Exclusions
    II-2.8000 Qualified individual with a disability

II-3.0000 GENERAL REQUIREMENTS

    II-3.1000 General
    II-3.2000 Denial of participation
    II-3.3000 Equality in participation/benefits
    II-3.4000 Separate benefit/integrated setting

        II-3.4100 Separate programs
        II-3.4200 Relationship to "program accessibility" requirement
        II-3.4300 Right to participate in the regular program
        II-3.4400 Modifications to the regular program

    II-3.5000 Eligibility criteria

        II-3.5100 General
        II-3.5200 Safety
        II-3.5300 Unnecessary inquiries
        II-3.5400 Surcharges

    II-3.6000 Reasonable modifications

        II-3.6100 General
        II-3.6200 Personal services and devices

    II-3.7000 Licensing and certification

        II-3.7100 Contracting
        II-3.7200 Licensing

    II-3.8000 Illegal use of drugs
    II-3.9000 Discrimination on the basis of association
    II-3.10000 Maintenance of accessible features
    II-3.11000 Retaliation or coercion
    II-3.12000 Smoking

II-4.0000 EMPLOYMENT

    II-4.1000 General
    II-4.2000 Relationship among title II and other Federal laws that prohibit employment discrimination by public entities of their employees
    II-4.3000 Basic employment requirements

        II-4.3100 Nondiscriminatory practices and policies
        II-4.3200 Reasonable accommodations
        II-4.3300 Nondiscrimination in selection criteria and the administration of tests
        II-4.3400 Preemployment medical examinations and medical inquiries

II-5.0000 PROGRAM ACCESSIBILITY

    II-5.1000 General
    II-5.2000 Methods for providing program accessibility
    II-5.3000 Curb ramps

**Reply Appendix 035**
10/18/2016 3:11 PM

symptoms of a mental or psychological disorder

*Does title II prohibit discrimination against individuals based on their sexual orientation?* No. The phrase "physical or mental impairment" does not include homosexuality or bisexuality.

**II-2.3000 Drug addiction as an impairment.** Drug addiction is an impairment under the ADA. A public entity, however, may base a decision to withhold services or benefits in most cases on the fact that an addict is engaged in the current and illegal use of drugs.

*What is "illegal use of drugs?"* Illegal use of drugs means the use of one or more drugs, the possession or distribution of which is unlawful under the Controlled Substances Act. It does not include use of controlled substances pursuant to a valid prescription, or other uses that are authorized by the Controlled Substances Act or other Federal law. Alcohol is not a "controlled substance," but alcoholism is a disability.

*What is "current use?"* "Current use" is the illegal use of controlled substances that occurred recently enough to justify a reasonable belief that a person's drug use is current or that continuing use is a real and ongoing problem. A public entity should review carefully all the facts surrounding its belief that an individual is currently taking illegal drugs to ensure that its belief is a reasonable one.

*Does title II protect drug addicts who no longer take controlled substances?* Yes. Title II prohibits discrimination against drug addicts based solely on the fact that they previously illegally used controlled substances. Protected individuals include persons who have successfully completed a supervised drug rehabilitation program or have otherwise been rehabilitated successfully and who are not engaging in current illegal use of drugs. Additionally, discrimination is prohibited against an individual who is currently participating in a supervised rehabilitation program and is not engaging in current illegal use of drugs. Finally, a person who is erroneously regarded as engaging in current illegal use of drugs is protected.

*Is drug testing permitted under the ADA?* Yes. Public entities may utilize reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual who formerly engaged in the illegal use of drugs is not now engaging in current illegal use of drugs.

**II-2.4000 Substantial limitation of a major life activity.** To constitute a "disability," a condition must substantially limit a major life activity. Major life activities include such activities as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

*When does an impairment "substantially limit" a major life activity?* There is no absolute standard for determining when an impairment is a substantial limitation. Some impairments obviously or by their nature substantially limit the ability of an individual to engage in a major life activity.

ILLUSTRATION 1: A person who is deaf is substantially limited in the major life activity of hearing. A person with a minor hearing impairment, on the other hand, may not be substantially limited.

ILLUSTRATION 2: A person with traumatic brain injury may be substantially limited in the major life activities of caring for one's self, learning, and working because of memory deficit, confusion, contextual difficulties, and inability to reason appropriately.

An impairment substantially interferes with the accomplishment of a major life activity when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people.

ILLUSTRATION 1: A person with a minor vision impairment, such as 20/40 vision, does not have a substantial impairment of the major life activity of seeing.

ILLUSTRATION 2: A person who can walk for 10 miles continuously is not substantially limited in walking merely because, on the eleventh mile, he or she begins to experience pain, because most people would not be able to walk eleven miles without experiencing some discomfort.

*Are "temporary" mental or physical impairments covered by title II?* Yes, if the impairment substantially limits a major life activity. The issue of whether a temporary impairment is significant enough to be a disability must be resolved on a case-by-case basis, taking into consideration both the duration (or expected duration) of the impairment and the extent to which it actually limits a major life activity of the affected individual.

ILLUSTRATION: During a house fire, M received burns affecting his hands and arms. While it is expected that, with treatment, M will eventually recover full use of his hands, in the meantime he requires assistance in performing basic tasks required to care for himself such as eating and dressing. Because M's burns are expected to substantially limit a major life activity (caring for one's self) for a significant period of time, M would be considered to have a disability covered by title II.

*If a person's impairment is greatly lessened or eliminated through the use of aids or devices, would the person still be considered an individual with a disability?* Whether a person has a disability is assessed without regard to the availability of mitigating measures, such as reasonable modifications, auxiliary aids and services, services and devices of a personal nature, or medication. For example, a person with severe hearing loss is substantially limited in the major life activity of hearing, even though the loss may be improved through the use of a hearing aid. Likewise, persons with impairments, such as epilepsy or diabetes, that, if untreated, would substantially limit a major life activity, are still individuals with disabilities under the ADA, even if the debilitating consequences of the impairment are controlled by medication.

**II-2.5000 Record of a physical or mental impairment that substantially limited a major life activity.** The ADA protects those individuals with disabilities who actually have a physical or mental impairment that substantially limits a major life activity, but also those with a record of such an impairment. This protected group includes --

1) A person who has a history of an impairment that substantially limited a major life activity but who has recovered from the impairment. Examples of individuals who have a history of an impairment are persons who have histories of mental or emotional illness, drug addiction, alcoholism, heart disease, or cancer.

2) Persons who have been misclassified as having an impairment. Examples include persons who have been erroneously diagnosed as mentally retarded or mentally ill.

**II-2.6000 "Regarded as."** The ADA also protects certain persons who are regarded by a public entity as having a physical or mental impairment that substantially limits a major life activity, whether or not that person actually has an impairment. Three typical situations are covered by this category.

1) An individual who has a physical or mental impairment that does not substantially limit major life activities, but who is treated as if the impairment does substantially limit a major life activity.

ILLUSTRATION: A, an individual with mild diabetes controlled by medication, is barred by the staff of a county-sponsored summer camp from participation in certain sports because of her diabetes. Even though A does not actually have an impairment that substantially limits a major life activity, she is protected under the ADA because she is treated as though she does.

2) An individual who has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others towards the impairment.

ILLUSTRATION: B, a three-year-old child born with a prominent facial disfigurement, has been refused admittance to a county-run day care program on the grounds that her presence in the program might upset the other children. B is an individual with a physical impairment that substantially limits her major life activities only as the result of the attitudes of others toward her impairment.

3) An individual who has no impairment, but who is treated by a public entity as having an impairment that substantially limits a major life activity.

ILLUSTRATION: C is excluded from a county-sponsored soccer team because the coach believes rumors that C is infected with the HIV virus. Even though these rumors are untrue, C is protected under the ADA, because he is being subjected to discrimination by the county based on the belief that he has an impairment that substantially limits major life activities (e.g., the belief that he is infected with HIV).

**II-2.7000 Exclusions.** The following conditions are specifically excluded from the definition of "disability": transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, other sexual behavior disorders, compulsive gambling, kleptomania, pyromania, and psychoactive substance use disorders resulting from current illegal use of drugs.

**II-2.8000 Qualified individual with a disability.** In order to be an individual protected by title II, the individual must be a "qualified" individual with a disability. To be qualified, the individual with a disability must meet the essential eligibility requirements for receipt of services or participation in a public entity's programs, activities, or services with or without --

1) Reasonable modifications to a public entity's rules, policies, or practices;

2) Removal of architectural, communication, or transportation barriers; or

3) Provision of auxiliary aids and services.

The "essential eligibility requirements" for participation in many activities of public entities may be minimal. For example, most public entities provide information about their programs, activities and services upon request. In such situations, the only "eligibility requirement" for receipt of such information would be the request for it. However, under other circumstances, the "essential eligibility requirements" imposed by a public entity may be quite stringent.

ILLUSTRATION: The medical school at a public university may require those admitted to its program to have successfully completed specified undergraduate science courses.

*Can a visitor, spectator, family member, or associate of a program participant be a qualified individual with a disability under title II?* Yes. Title II protects any qualified individual with a disability involved in

**Reply Appendix 036**
10/18/2016 3:11 PM

562 Fed.Appx. 238 (Mem)
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Zan E. GREEN, Plaintiff–Appellant

v.

JP MORGAN CHASE BANK, N.A., as alleged
successor-in-interest to Washington Mutual Bank
FA; Washington Mutual Bank; CTX Mortgage
Company, L.L.C.; Merscorp, Incorporated; Mortgage
Electronic Registration Systems, Incorporated,
"MERS" as nominee for CTX Mortgage Company,
L.L.C. and its successors and assigns and the
successors and assigns of MERS; Merscorp
Holdings, Incorporated, Defendants–Appellees.

No. 13–10508
|
Summary Calendar.
|
April 14, 2014.

**Attorneys and Law Firms**

Carl Donald Hughes, Jr., Dallas, TX, for Plaintiff–
Appellant.

Marcie Lynn Schout, Esq., William Lance Lewis, Esq.,
Quilling, Selander, Lownds, Winslett & Moser, P.C.,
Gregg D. Stevens, Esq., Aimee G. Szygenda, Mcglinchey
Stafford, P.L.L.C., Dallas, TX, for Defendant–Appellee.

Appeal from the United States District Court for the
Northern District of Texas, USDC No. 3:11–CV–1498.

Before DAVIS, SOUTHWICK, and HIGGINSON,
Circuit Judges.

**Opinion**

PER CURIAM:[*]

Finding no error, we AFFIRM the district court in this
mortgage foreclosure dispute.

**FACTUAL BACKGROUND**

On March 30, 2004, Zan Green executed a Note in favor
of CTX Mortgage Company, LLC. Green also executed
a Deed of Trust that securitized the payment of the
Note with her property. On June 27, 2011, Green sued
multiple defendants in Texas state court alleging, among
other things, that JPMorgan Chase Bank, N.A. ("JPMC")
did not have the right to foreclose on her property.
JPMC removed the action to United States District
Court for the Northern District of Texas. Defendants–
Appellees, JPMC, Mortgage Electronic Registration
System, Inc. and the other MERS entities ("MERS")
moved for summary judgment. Defendant–Appellee,
CTX Mortgage Company, LLC (CTX) also moved to
dismiss Green's complaint. The district court granted both
motions. Green timely appealed.

**STANDARDS OF REVIEW**

We review the grant of summary judgment *de novo.*
*Stauffer v. Gearhart,* 741 F.3d 574, 581 (5th Cir.2014).
Summary judgment is proper "if the movant shows that
there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a).

This court reviews dismissal under Rule 12(b)(6) *de novo,*
"accepting all well-pleaded facts as true and viewing those
facts in the light most favorable to the plaintiff." *Toy
v. Holder,* 714 F.3d 881, 883 (5th Cir.2013) (internal
quotation marks omitted). "To survive a motion to
dismiss, a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678,
129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl.
Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167
L.Ed.2d 929 (2007)).

## DISCUSSION

Green presents three issues on appeal: (1) whether the district court erred when it **\*240** refused to consider her argument that the Note was improperly accelerated, (2) whether the district court erred in finding that JPMC had standing even though the Note was "bifurcated," and (3) whether the district court erred when it held that Texas Government Code § 192.007 does not require a Mortgagee to record an assignment of a Deed of Trust as a prerequisite to the validity of the assignment.

### I.

In granting defendants' motion for summary judgment, the district court recognized that "Green asserts for the first time in her response to the MSJ Defendants' motion that she is entitled to a declaratory judgment that JPMC did not comply with the terms of the Deed when it sent Green a notice that it was accelerating the Note's maturity date." The district court refused to consider this new theory because "Green did not assert this claim in her amended complaint."

"A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir.2005). As such, we have noted that "district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment." *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 Fed.Appx. 200, 204 (5th Cir.2012). Green's complaint does allege that the defendants lacked "authority to accelerate the alleged Note," but nowhere does it allege that the defendants failed to properly provide her notice of default and an opportunity to cure. Accordingly, the district court did not abuse its discretion in disregarding this new theory at the summary-judgment stage.

### II.

Green next argues that JPMC lacks standing to foreclose because JPMC has not provided evidence of the assignment of the Deed of Trust and Note. As our cases have recognized, JPMC has standing because it holds the original Note, which is endorsed in blank. *See e.g., Kiggundu v. Mortgage Elec. Registration Sys.*, Inc., 469 Fed.Appx. 330, 331–32 (5th Cir.2012) ("Because the note was endorsed in blank and the Bank of New York was in possession of the note, under Texas law, the Bank of New York was entitled to collect on it. Moreover, under Texas law, the mortgage follows the note." (internal citations omitted)); *Reeves v. Wells Fargo Home Mortg.*, 544 Fed.Appx. 564, 570 (5th Cir.2013) (unpublished) ("Ownership of the Note was sufficient to allow Wells Fargo to foreclose.").

Green also argues that JPMC lacks standing because the Note and Deed of Trust were "bifurcated." As Green acknowledges, we rejected this argument in *Martins v. BAC Home Loans Servicing, L.P.*, 722 F.3d 249, 255 (5th Cir.2013): "The 'split-the-note' theory is therefore inapplicable under Texas law where the foreclosing party is a mortgage servicer and the mortgage has been properly assigned. The party to foreclose need not possess the note itself." Nonetheless, Green argues we should certify this question. But certification is not "a proper avenue to change our binding precedent." *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1247 (5th Cir.1997). Accordingly, the district court did not err in concluding that JPMC has standing, and we refuse Green's certification request.

### III.

Green's remaining argument is that § 192.007 imposes an obligation on the **\*241** mortgagee to show an unbroken chain of title. Green again recognizes this argument is foreclosed by *Reinagel v. Deutsche Bank Nat'l Trust Co.*, 735 F.3d 220, 228 n. 27 (5th Cir.2013), which noted that "this obscure provision has never been cited in a state court decision and is best read as a procedural directive to county clerks, not as a prerequisite to the validity of assignments." *See also Hudson v. JP Morgan Chase Bank, N.A.*, 541 Fed.Appx. 380, 383 (5th Cir.2013). The district court did not err, and we again deny Green's certification request. *See Jefferson*, 106 F.3d at 1247. The futility of this argument is equally dispositive of Green's appeal of the district court's dismissal of her claims against CTX.

Green v. JP Morgan Chase Bank, N.A., 562 Fed.Appx. 238 (2014)

**CONCLUSION**

For the above stated reasons, we AFFIRM.

**All Citations**

562 Fed.Appx. 238 (Mem)

Footnotes

\*       Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent
        except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

End of Document                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works

Case 4:14-cv-03253   Document 316   Filed on 10/19/16 in TXSD   Page 41 of 64

Texas Sales and Marketing, Inc. v. Distinctive Appliances, Inc., Not Reported in...

2007 WL 399292

2007 WL 399292
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

TEXAS SALES AND MARKETING, INC., and
Charles J. Beck, Sr., Individually, Plaintiffs
v.
DISTINCTIVE APPLIANCES, INC., Dacor, Inc.,
and Mike Joseph, Individually., Defendants.

Civil Action No. H-05-3555.
|
Jan. 31, 2007.

**Attorneys and Law Firms**

Allan K. Dubois, Green & Dubois PC, Benjamin
Sifuentes, Attorney at Law, San Antonio, TX, for
Plaintiffs.

Greg McCarthy, Miller & McCarthy, Dallas, TX, Don
Allen Weitinger, Attorney at Law, Houston, TX, for
Defendants.

## *MEMORANDUM OPINION & ORDER*

MELINDA HARMON, United States District Judge.

 **\*1** Pending before the court are (1) Plaintiffs Texas
Sales and Marketing, Inc. ("TSM") and Charles J.
Beck, Sr. ("Beck") (collectively "Plaintiffs' ") motion
for leave to amend their original complaint (Doc. 46);
and (2) Defendants Distinctive Appliances, Inc., d/b/a
Dacor, incorrectly served as Dacor Inc., ("DAI") and
Mike Joseph ("Joseph") (collectively "Defendants' ")
motion for summary judgment (Doc. 47). For the reasons
articulated below, the court ORDERS that Plaintiffs'
motion to amend their complaint (Doc. 46) is DENIED,
and the court further ORDERS that Defendants' motion
for summary judgment (Doc. 47) is GRANTED.

### I. Background and Relevant Facts

TSM, owned and operated by the Beck family, is
an independent distributor of home goods, appliances,
and remodeling products. DAI manufacturers high-end

appliances and supplied approximately 80% of TSM's
business. The two entities had worked amicably together
for years. In 1998, TSM and DAI entered into a
Distribution Agreement ("Agreement"), giving TSM the
right to market and sell DAI products in South Texas.
Agreement (Doc. 47, Ex. 1). The Agreement "remain [ed]
in full force and effect" until terminated by either party,
*"with or without cause,* by giving not less than thirty (30)
days *notice in writing* to the other party." *Id.* at ¶ 6.1
(emphasis added). Moreover, the Agreement could "not
be altered or amended *except in writing* signed by both
parties. *Id.* at ¶ 8.1 (emphasis added).

By late August of 2001, DAI had decided to terminate
the Agreement. Instead of mailing the customary letter of
termination, it sent two top-level executives, Dave Wick
("Wick") and Duncan Black ("Black"), to deliver the bad
news. Wick and Black met with Beck on August 30, 2001
to discuss the situation and the imminent termination.
Beck claims Wick and Black orally represented that the
Agreement was "cancelled," and Beck had no doubt in his
mind that the Agreement was terminated. *See* Affidavit
of Charles J. Beck ("Beck Aff.") at 4 (Doc. 58, Appendix
Ex. II). The two DAI executives did not, however, give
Beck anything in writing at this meeting. *See* Deposition
of Beck ("Beck Dep.") at 115:6-10 (Doc. 47, Ex. 2(d)).

The following day, DAI's president, Joseph, called Beck to
discuss the relationship between TSM and DAI. Praising
TSM's loyalty, Joseph indicated that DAI had changed its
mind about the forthcoming termination and wanted to
keep TSM on as an independent distributor. According
to Beck, Joseph also promised "security that [TSM and
the Beck family] had not felt in years" and that TSM
would be treated as a "factory branch." Beck Aff. at 5
(Doc. 58, Appendix Ex. II).[1] Joseph did not mention
the 1998 Agreement explicitly, but he suggested that the
relationship between DAI and TSM would not materially
change.[2] Wick followed up Joseph's call the same day
and also mentioned the possibility of TSM functioning
"like a factory branch."[3] Like Joseph, Wick did not
bring up the 1998 Agreement. Neither the Joseph nor
the Wick conversation was memorialized in writing. After
the close brush with termination, TSM continued as an
independent distributor with DAI for an additional two
years. In 2003, DAI sent an official letter terminating the
relationship pursuant to the 1998 Agreement.

**Reply Appendix 040**

2007 WL 399292

**\*2** Plaintiffs brought suit against DAI and Joseph, individually, alleging (1) unfair business practices, restraint of trade, and violations of Section 15.05(c) of the Texas Business and Commerce Code; (2) tortious interference with prospective business relationships; (3) breach of contract; (4) breach of a duty of good faith and fair dealing; (5) fraud; (6) negligent misrepresentation, and (7) violations of the Deceptive Trade Practices Act ("DTPA"), TEX. BUS. & COM.CODE § 17.50 *et seq.* Defendants have moved for summary judgment on all of Plaintiffs' claims.

Shortly before Defendants moved for summary judgment, Plaintiffs filed a motion to amend their original complaint. The proposed amended complaint seeks to "clarify" the parties and issues by (1) including Texas Sales and Marketing II, L.L.P. ("TSM II"), the limited partnership in which TSM is a general partner, as a plaintiff; and by (2) dismissing their anti-trust and tortious interference claims. *See* Motion for Leave to Amend Plaintiffs' Complaint (Doc. 46). Defendants do not object to the dismissal of the claims, but they do strenuously object to the addition of TSM II as a "new" party. *See* Defendants' Response to Motion to Amend (Doc. 53). Before resolving the motion for summary judgment, the court turns first to the pending motion to amend.

## II. Plaintiffs' Motion to Amend

Plaintiffs filed their motion for leave to amend their original complaint on December 1, 2006, despite the fact that the deadline for filing motions for leave to amend pleadings expired May 2, 2006. *See* Scheduling Order at ¶ 1 (Doc. 22). When a scheduling order deadline has been issued by the district court and has expired, Federal Rule of Civil Procedure 16(b) governs the amendment of the pleadings. *S & W Enterprises, L.L.C. v. Southtrust Bank of Ala., NA,* 315 F.3d 533, 535-36 (5th Cir.2003). Under Rule 16(b), a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge." FED. R. CIV. P. 16(b). To establish "good cause," a party needing an extension must demonstrate to the court that the deadlines cannot reasonably be met despite the party's due diligence. *S & W Enterprises,* 315 F.3d at 535 (citing 6A Charles Alan Wright, Federal Practice and Procedure § 1522.1 (2d ed.1990)). Only once the moving party demonstrates good cause to modify the scheduling order deadline may a court address whether amendment

is proper under the more liberal standards of Federal Rule of Civil Procedure 15(a). *Id.* at 536. [4]

Four factors are weighed to determine whether to grant or deny untimely motions for leave to amend: (1) the explanation for the failure to timely move for leave to amend, (2) the importance of the amendment, (3) potential prejudice in allowing the amendment, and (4) the availability of a continuance to cure such prejudice. *S & W Enterprises,* 315 F.3d at 536. In this case, at least three of the four factors weigh against allowing Plaintiffs to amend. Plaintiffs have not provided any explanation for their delay in identifying TSM II as a potential party in interest. Plaintiffs' allegation that "this is not truly a situation of 'undue delay' ... but one of recently discovered information" is unpersuasive. There is no elaboration on why this information was recently discovered, especially considering that TSM and TSM II are closely-held business entities. There is no suggestion or argument that this relationship was newly formed or came into existence after the lawsuit was filed. Plaintiffs have essentially provided no explanation for the delay. Moreover, Defendants would be substantially prejudiced in trying to prepare a defense for the new plaintiff with a trial term beginning the week of February 20, 2007. Finally, a continuance to allow Defendant the opportunity to take this additional discovery will unduly delay trial, especially in light of Plaintiffs' failure to adequately explain the delay. Plaintiffs have not demonstrated good cause, and their motion for leave to amend is denied.

## III. Defendants' Motion for Summary Judgment

### A. *Legal Standard on Summary Judgment*
**\*3** A party moving for summary judgment must inform the court of the motion's basis and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Once the movant makes this showing, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 323-24. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *citing U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson,* 477 U.S. at 248. The non-movant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.,* 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation,* 102 F.3d 137, 139-40 (5th Cir.1996); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Texas Tech University,* 80 F.3d 1042, 1046 (5th Cir.1996), *citing Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc* ). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita,* 475 U.S. at 587-88. In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir.1988). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 198-200 (5th Cir.1988). The non-moving party may also identify evidentiary documents already in the record that

establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990). A party cannot, however, manufacture a fact issue by simply contradicting previous sworn testimony without explanation. *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806-07, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (citing, *inter alia, Albertson v. T.J. Stevenson & Co., Inc.,* 749 F.2d 223, 228 (5th Cir.1984)).

### B. *Analysis*

**\*4** Plaintiffs' claims for relief hinge on two critical issues: (1) whether DAI's oral representations in 2001 terminated the 1998 Agreement, and with it, the termination-at-will provision, and (2) whether the oral representations created a "new agreement" without a termination-at-will provision. Addressing each issue in turn, the court finds that the 1998 Agreement governed the DAI/TSM relationship at all times, and no "new agreement" was formed. DAI terminated the relationship properly under the Agreement, and all of Plaintiff's claims for relief must fail as a matter of law.

### 1. Whether DAI's oral representations in 2001 terminated the 1998 Agreement.

Plaintiffs' basic contention that Defendants orally terminated the 1998 Agreement is without merit because the Agreement expressly provided that termination was only effective through a writing. When the terms of a contract are unambiguous, the construction of the contract is a matter of law for the courts. *Willis v. Donnelly,* 199 S.W.3d 262, 275 (Tex.2006) (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650 (Tex.1990)). [5] A court, for purposes of interpretation, must ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). [6] To flesh out this true intent, the court examines "the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." *MCI Telecomms.,* 995 S.W.2d at 65. [7]

Here, the terms of the contract are not ambiguous. Section 6.1 states, without qualification, that termination must be made "in writing." Agreement (Doc. 47, Ex. 1). Indeed, the very same provision continues:

Texas Sales and Marketing, Inc. v. Distinctive Appliances, Inc., Not Reported in...

2007 WL 399292

*The right of termination contained herein is absolute* and neither party shall incur any liability by reason thereof, each party releasing the other from any claims resulting from, or arising out of such termination; provided, however, that nothing in this section shall be construed as a release of any payment obligation arising prior to termination.

*Id.* (emphasis added). Beck understood and acknowledged that the Agreement could only be terminated in writing. *See* Beck Dep. at 96:10-98:22 (Doc. 59, Ex. D). Moreover, he admits DAI never sent a letter, or any other *writing,* terminating the agreement:

> Q. (Defense Counsel): ... You never-and I mean TSM-never ever got a letter in writing terminating this 1998 distributor agreement until September of 2003. Isn't that true?
>
> A. (Beck): In writing, yes.

Beck Dep. at 115:6-10 (Doc. 47, Ex. 2(d)). Reluctantly, Beck also concedes that the oral representations made by Joseph did not and could not terminate the Agreement:

> Q. (Defense Counsel): And when you hung up the phone with [Joseph], you knew very well that [the 1998 Agreement] had not been cancelled; correct?
>
> A. (Beck): That's a very difficult question. I mean-
>
> **\*5** Q. (Defense Counsel): It's actually fairly simple.
>
> A. (Beck):-technically it wasn't cancelled *because of the writing.* But orally from [Joseph] I had no doubt in my mind that that distributor thing was cancelled ...

Beck Dep. at 309:10-22 (Doc. 59, Ex. D) (emphasis added). Oral representations made to Beck would have no legal effect on the continued viability of the Agreement. For the court to hold the Agreement was orally terminated in 2001, it would have to essentially remove Section 6.1 from the Agreement, which impermissibly frustrates the intent of the parties and renders a primary term of the Agreement meaningless. Therefore, as a matter of law, TSM and DAI remained bound by the terms of the Agreement.

Nevertheless, Plaintiffs have invoked numerous formulations of the equitable estoppel doctrine to argue that Defendants should be prevented from relying on

the 1998 Agreement.[8]  Under general equitable estoppel principles, a party may be estopped from relying on a legal right where the party, through his own fault, has induced another to change his position for the worse. *See Vessels v. Anschutz Corp.,* 823 S.W.2d 762, 765 (Tex.App.-Texarkana 1992, writ denied) (citing *The Praetorians v. Strickland,* 66 S.W.2d 686, 688-89 (Tex. Comm'n App.1933, judgm't approved). A sub-set of equitable estoppel is "quasi estoppel," which "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him." *Id.* Neither pure equitable estoppel nor quasi estoppel apply in this case. In terms of pure equitable estoppel, Plaintiffs have not provided any evidence of detrimental reliance. TSM, at the time the Agreement was signed, agreed with the terms governing termination, including the provisions of Section 6.1. TSM knew about the terms of the 1998 Agreement and cannot have reasonably relied on any oral representations made by DAI regarding termination. Moreover, TSM benefitted from the distributorship agreement both in 1998 and for the additional two-year reprieve after 2001. Therefore, there is no evidence that Plaintiffs were induced to change their position for the worse. In addition, quasi estoppel does not apply because Plaintiffs offer no evidence that Defendants have asserted a right inconsistent with a position previously taken by them. DAI has consistently maintained that the 1998 Agreement governed the relationship of DAI and TSM at all relevant times. Principles of equity, therefore, do not prevent the court from effectuating the parties' clear and voluntary assent to termination only through a writing, as manifested in Section 6.1 of the Agreement. As such the 1998 Agreement was not orally terminated in 2001 and continued to govern the legal relationship between DAI and TSM.

> 2. Whether DAI's oral representations in 2001 constituted a "new agreement" between the parties.

Plaintiffs second contention is that Joseph made certain oral promises to lure TSM into a "new agreement" with DAI. *See* Beck Aff. at 5-6 (Doc. 58, Appendix Ex. II). The court disagrees. Plaintiffs have provided no evidence that a valid contract, other than the 1998 Agreement, existed between DAI and TSM. A valid contract requires (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the understanding that it be mutually

**Reply Appendix 043**  4

2007 WL 399292

binding. *Baroid Equip., Inc. v. Odeco Drilling, Inc.,* 184 S.W.3d 1, 17 (Tex.App.-Houston [1st Dist.] 2005, pet. denied); *accord Copeland v. Alsobrook,* 3 S.W.3d 598, 604 (Tex. App-San Antonio 1999, pet. denied). The terms of a contract must be sufficiently definite and agreed upon to be legally binding. *See Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966) ("A court cannot enforce a contract unless it can determine what it is."). Where an essential term is open for future negotiations, there is no binding contract. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992) (citing *Gerdes v. Mustang Exploration Co.,* 666 S.W.2d 640, 644 (Tex.App.-Corpus Christi 1984, no writ).

**\*6** Here, there is no evidence as to either the certainty of the terms or the meeting of the minds necessary for the court to hold that a valid contract existed. Plaintiffs allege that the "new agreement" included terms of "financial security" and treatment of TSM as a "factory branch." Beck testified, however that he never discussed specific terms of the new agreement with Joseph. Beck Dep. at 165:2-12 (Doc. 59, Ex. D). Beck further testified that the essential terms of the new agreement were left open for future negotiations. *Id.* at 173:3-9. Yet in his affidavit, Beck claims that "financial security" meant "the removal of the no fault, thirty day kiss of death clause." Beck Aff. at 6 (Doc. 58, Appendix Ex. II.). This claim is directly contradicted by his prior sworn testimony without any explanation for the discrepancy. When an affidavit is impeached by prior sworn testimony without sufficient explanation, the court must view that affidavit with profound skepticism. *See Herrera v. CTS Corp.,* 183 F.Supp.2d 921, 928 (S.D.Tex.2002). Indeed, it is within the court's discretion to disregard the affidavit altogether should the court determine that it is dealing with a "sham affidavit." *See Doe v. Dallas Indep. Sch. Dist.,* 220 F.3d 380, 386 (5th Cir.2000) (noting that the utility of summary judgment would be greatly diminished if courts were unable to screen out "sham issues of fact"). [9] To the extent that Beck's affidavit attempts to manufacture a fact issue, the affidavit is disregarded. Therefore, Plaintiffs have not directed the court to the specific terms of the agreement they now want enforced. Nor have they produced evidence that a "meeting of the minds" occurred during Beck's conversation with Joseph and Wick. It is undisputed that none of the parties discussed the 1998 Agreement. Moreover, Joseph and Wick repeatedly mentioned that the relationship would remain unchanged. It is not reasonable for Beck

to assume that a reference to "financial security" meant that Section 6.1 no longer applied, especially considering the 1998 Agreement requirements regarding a writing for termination and modification. As such, there is no evidence of the manifestation of mutual assent necessary for finding a valid contract. Without specific terms or the manifestation of mutual assent, TSM and DAI did not enter into a "new agreement" in 2001.

The Plaintiffs' reliance on the doctrine of promissory estoppel is misplaced. Promissory estoppel requires (1) a promise; (2) the foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to his detriment. *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983). Plaintiffs fail to provide proof of all three elements. First, vague and amorphous references to "financial stability" and "factory branches" do not constitute definite promises. Second, assuming Joseph's statements did constitute promises, DAI could not have foreseen any reliance by TSM when the 1998 Agreement clearly required a writing for either termination or modification of the distributorship agreement. Third, Plaintiffs have not shown detrimental reliance despite the affidavit testimony to the contrary of John Jackson ("Jackson"), an experienced participant in the high-end appliance industry and close confidant of Beck *See* Affidavit of John Jackson ("Jackson Aff.") (Doc. 58, Appendix Ex. I). [10] Joseph testifies to his ability to "de-code" and interpret the "sub-language" of the oral discussions between DAI and TSM in 2001. *Id.* at 4-5. He ultimately concludes that a reasonable distributor in Beck's position would have relied on the oral statements made by DAI representatives. *See id.* at 7, 12-14, and 17-18. However, Jackson's testimony is predicated on the verbal "cancellation" [11] of the 1998 Agreement, which did not occur. In addition, his conclusion regarding Beck's "reasonable reliance" is undercut by Beck's knowledge that the Agreement continued to operate in the absence of a writing. Finally, Jackson's interpretations of Beck's "detriment" is unreasonable. TSM continued to do business with DAI for an additional two years, and benefitted accordingly. Therefore, Plaintiffs have not demonstrated, either at law or in equity, that a new or modified agreement between DAI and TSM arose during the oral conversations in 2001.

**\*7** Having found that the 1998 Agreement operated to legally bind the parties until properly terminated in September 2003 and that the parties did not enter into

a "new agreement" in 2001, the court finds the rest of Plaintiffs' claims for relief do not survive summary judgment. The remaining claims are addressed in turn.

### 3. Plaintiffs' anti-trust and tortious interference claims. [12]

Plaintiffs' original complaint alleges that Defendants violated the Texas Anti-Trust Act. *See* Plaintiffs Original Complaint (Doc. 47, Ex. 3). The Texas Anti-trust Act states in relevant part:

> It is unlawful for any person to sell, lease, or contract for the sale or lease of any goods ... on the condition, agreement, or understanding that the purchaser or lessee shall not use or deal in the goods of a competitor or competitors of the seller or lessor, where the effect of the condition, agreement, or understanding may be to lessen competition substantially in any line of trade or commerce.

TEX. BUS. & COM.CODE ANN. § 15.05(c). Plaintiffs have produced no evidence that Defendants' actions constituted an unlawful restraint of trade. As such, Defendants are entitled to summary judgment on Plaintiffs' anti-trust claim.

Plaintiffs also bring a claim for tortious interference with prospective business relationships. *See* Plaintiffs Original Complaint (Doc. 47, Ex. 3). To establish this cause of action, a plaintiff must show (1) a reasonable probability that it would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Baty v. Protech Ins. Agency,* 63 S.W.3d 841, 860 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *see also Decorative Ctr. of Houston v. Direct Response Publishers, Inc.,* 264 F.Supp.2d 535, 556 (S.D.Tex.2003) (applying Texas law). Plaintiffs have not provided any evidence that Defendants interfered with a prospective relationship. Nor have they provided evidence that TSM or Beck would have entered into a relationship

with another supplier but for the actions of Defendants. No genuine issues of material fact remain regarding this claim, and Defendants are entitled to judgment as a matter of law.

### 4. Plaintiffs' breach of contract and breach of good faith and fair dealing claims

Plaintiffs' claim that Defendants breached the "new agreement" by terminating the relationship in 2003 without cause. As discussed above, a "new agreement" was never formed between the parties. Defendants could not breach an agreement that did not exist. Plaintiffs' claim, therefore, fails as a matter of law.

**\*8** Plaintiffs also argue that the conduct of DAI and Joseph constitutes a breach of the duty of good faith and fair dealing. Texas law recognizes that a duty of good faith and fair dealing does not exist in every contract. *Id.* at 522. Nevertheless, certain exceptions exist for "special relationships," such as those between insurers and insureds, principal and agent, joint venturers, and partners. *See id.* at 522, 524 (Spears, J., concurring); *Aranda v. Ins. Co. of N. Am.,* 748 S.W.2d 210, 212-13 (Tex.1988). The relationship between supplier and distributor does not typically find itself classified as "special." *See Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 481 (Tex.App.-Corpus Christi 1989, writ denied) ("The "special relationship" cause of action in tort for breach of the duty of good faith and fair dealing, however, does not extend to ordinary commercial contractual relationships such as the supplier-distributor relationship."); *see also ARA Auto. Group v. Central Garage,* 124 F.3d 720, 723 (5th Cir.1997) ("Under Texas law, a supplier/distributor relationship is not the type of formal relationship that automatically gives rise to a fiduciary duty."). However, Plaintiffs allege additional facts that may give rise to an *informal* fiduciary relationship, or "confidential relationship." *See Crim. Truck & Tractor Co. v. Navistar Int'l. Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992). Although the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law. *Id.* (citing *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962)).

In his affidavit, Beck repeatedly references the close, personal relationship he felt with Joseph and DAI. He speaks of the first TSM-DAI contract being written on a piece of napkin. Beck Aff. at 1 (Doc. 58, Appendix Ex. II).

Texas Sales and Marketing, Inc. v. Distinctive Appliances, Inc., Not Reported in...
2007 WL 399292

He remembers being referred to as "members of the [DAI] family." *Id.* He points to a shared religious faith between himself and Joseph. *Id.* at 2. Beck claims to have felt a deep trust and confidence not only in DAI but in Joseph personally. *See id.* at 4-7. Nevertheless, the evidence of trust, friendship, and reliance cited by Plaintiffs does not ultimately give rise to a fiduciary duty because it is not evidence of a relationship requiring DAI to put TSM's interest before its own. *See ARA Auto. Group,* 124 F.3d at 726-27; *Crim Truck,* 823 S.W.2d at 594-95. A cordial, long-term business relationship does not create a fiduciary relationship. *Crim Truck,* 823 S.W.2d at 594-95 (holding that a 42-year relationship was insufficient to create a fiduciary duty). Nor is close friendship adequate. *See Thigpen,* 363 S.W.2d at 253. Like the parties in *Crim Truck,* TSM and DAI remained free to pursue their own interests. DAI did not owe a fiduciary duty to TSM and, therefore, did not owe a duty of good faith and fair dealing. Plaintiffs' claim for breach of that duty must fail as a matter of law.

### 5. Plaintiffs' misrepresentation claims

**\*9** Plaintiffs' final claims include fraud, both actual and constructive, negligent misrepresentation, and violations of the DTPA. As explained below, none raise a genuine issue of material fact, and Defendants are entitled to summary judgment on all four claims.

A fraud cause of action arises from a material misrepresentation which was false when it was made, or was asserted without the knowledge of its truth, the speaker knew it was false or made it recklessly without any knowledge of its truth, which was acted upon, which was relied upon, and which caused injury. *Formosa Plastics v. Presidio Engineers,* 960 S.W.2d 41, 48 (Tex.1998). A promise to do an act in the future is actionable fraud only when made with the intention, design and purpose of deceiving, and with no intention of performing the act. *Airborne Freight Corp. v. C.R. Lee Enterprises, Inc.,* 847 S.W.2d 289, 294 (Tex.App.-El Paso 1992, writ denied). Plaintiffs must show that the promise was false at the time it was made. *Schindler v. Austwell Farmers Cooperative,* 841 S.W.2d 853 (Tex.1992). As in *Airborne,* the 1998 Agreement vitiates any reliance the distributor may have placed in "sweeping, off-hand statements" made by the other party as a matter of law. *Airborne,* 847 S.W.2d at 297. The 30-day termination provision in the Agreement clearly gives notice that any oral promises to the contrary would not control. *See also San Antonio Garment Finishers*

*v. Levi Strauss & Co.,* 18 F.Supp. 669, 674 (W.D. Tex 1998) (holding under similar facts that a contractor should have obtained promises in writing if it believed the statements to change the obligations of the parties under their agreement). Therefore, the fraud claim asserted by the Plaintiffs fails for lack of justifiable reliance.

In order to prevail on a constructive fraud theory, a plaintiff must first prove that a fiduciary relationship existed between the parties. *American Medical Int'l, Inc. v. Giurintano,* 821 S.W.2d 331, 339 (Tex.App.-Houston [14th Dist.] 1991, no writ); *San Antonio Garment Finishers v. Levi Strauss & Co.,* 18 F.Supp. 669, 674 (W.D. Tex 1998). Having determined that no fiduciary relationship exists, Plaintiffs' constructive fraud claim must likewise fail.

As under the actual fraud theory, Plaintiffs' cause of action for negligent misrepresentation falls absent proof of reliance. To establish a cause of action for negligent misrepresentation, Plaintiffs must prove: (1) the representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by *justifiably relying* on the representation. *Federal Land Bank Association of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (emphasis added). Although a fact question may exist as to the substance of DAI's representations during the oral conversations in 2001, there is no fact question regarding TSM's justifiable reliance on those conversations. The Agreement's requirements must control. Thus, Defendants are entitled to summary judgment on Plaintiffs' claim of negligent misrepresentation.

**\*10** Plaintiffs final claim involves misrepresentations under the DTPA. Plaintiffs argue that Defendants violated the DTPA by "representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." *See* TEX. BUS. & COM.CODE ANN. § 17.46(b) (12) (Vernon 2002). As discussed in Part 2 supra, DAI and TSM did not enter into a new or modified agreement in 2001. This conclusion of law ultimately negates Plaintiffs' contention that "Joseph made ... misrepresentations regarding the rights, qualities, security and benefits of

Texas Sales and Marketing, Inc. v. Distinctive Appliances, Inc., Not Reported in...
2007 WL 399292

their new agreement, and so did Wick." [13] Defendants are therefore entitled to summary judgment on this final claim as well.

### IV. Conclusion

No genuine issues of material fact remain on any of Plaintiffs claims for relief. The 1998 Agreement continued to govern the TSM/DAI relationship at all material times, and DAI properly terminated the relationship in accordance with the express provisions of the Agreement. Accordingly, it is hereby

**ORDERED** that Plaintiffs' motion to amend their complaint (Doc. 46) is **DENIED;** and

**ORDERED** that Defendants' motion for summary judgment (Doc. 47) is **GRANTED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 399292

### Footnotes

1  In his affidavit, Beck also claims that Joseph promised TSM a "builder program" to aid TSM's profitability. *See* Beck Aff. at 6 (Doc. 58, Appendix Ex. II). Nevertheless, a full review of the transcript of the Joseph-Beck conversation (provided by Plaintiffs and objected to by Defendants) does not support this claim. *See* Joseph-Beck Conversation ("Joseph-Beck Conv.") (Doc. 58, Appendix Ex. II, Ex. B). Defendants object to the admissibility of all the telephone transcripts (Exhibits A, B, and C) because, as attached to Appendix Ex. I, the transcripts have not been properly authenticated pursuant to Fed. R Evid. 901. Nevertheless, the transcripts are also attached to Appendix Ex. I (Beck's affidavit), and Defendants do not object to Beck's ability to authenticate the transcripts. Therefore, Defendants' objection is OVERRULED.

2  *See, e.g., id.* at 2:19-20, 8:4-8, and 10:14-19.

3  *See* Wick-Beck Conversation ("Wick-Beck Conv.") at 2:18-20 and 3:14-17 (Doc. 58, Appendix Ex. II, Ex. C).

4  Rule 15(a) instructs that "leave [to amend] shall be freely given when justice so requires." FED. R. CIV. P. 15(a).

5  *See also Parsons v. Bristol Dev. Co.,* 62 Cal.2d 861, 44 Cal.Rptr. 767, 402 P.2d 839, 842 (Cal.1965) ("It is solely a judicial function to interpret a written instrument unless the interpretation turns on the credibility of extrinsic evidence."). The Agreement stipulates if "any of its provisions become a subject of dispute, the law of the State of California shall govern." Agreement at ¶ 8.4 (Doc. 47, Ex. 1). However, the parties briefed the court only with respect to Texas law, and neither raised the choice of law provision as an issue. Nevertheless, the laws of Texas and California do not materially differ on basic principles of contract interpretation. Therefore, the court will provide a parallel citation to California law when applicable.

6  *See also* Cal. Civ.Code § 1636 (Deering 2006) ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.").

7  *See also Ratcliff Architects v. Vanir Constr. Mgmt.,* 88 Cal.App.4th 595, 602, 106 Cal.Rptr.2d 1 (2001) ("Courts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless.").

8  The court addresses Plaintiffs' theories of promissory estoppel in Part 2 *infra.*

9  A court may consider, however, an affidavit supplementing or clarifying, rather than contradicting, prior sworn testimony when evaluating genuine issues in a motion for summary judgment. *S.W.S Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 496 (5th Cir.1996).

10  In a prior court order, Jackson was disqualified as an expert on the termination and formation of contracts even in the high-end appliance industry. *See* Memorandum and Order at 5 (Doc.60).

11  Jackson references the 1998 Agreement's cancellation repeatedly throughout his affidavit. *See id.* at 2, 5-7, 12-14, 17-18, and 20.

12  The court notes that Plaintiffs' proposed amended complaint dispenses with the anti-trust and tortious interference claims. Plaintiffs assumed that their leave to amend would be granted, so they did not address these two claims in their response to summary judgment. *See* Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Plaintiffs' Response") at F.N. 1 (Doc. 58). Having denied leave to amend, the court will examine the two claims under the applicable summary judgment standards.

13  Plaintiff's Response at 19 (Doc. 58).

Texas Sales and Marketing, Inc. v. Distinctive Appliances, Inc., Not Reported in...

2007 WL 399292

End of Document                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works

Munoz v. Echosphere, L.L.C., Not Reported in F.Supp.2d (2010)

2010 WL 2838356, 41 NDLR P 165

KeyCite Yellow Flag - Negative Treatment
Distinguished by Villalon v. Del Mar College Dist., S.D.Tex., August 13, 2010

2010 WL 2838356
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
El Paso Division.

Marta MUNOZ, Plaintiff,
v.
ECHOSPHERE, L.L.C., Defendant.

No. 09–CV–0308–KC.
|
July 15, 2010.

**Attorneys and Law Firms**

Bernardo Gonzalez, El Paso, TX, for Plaintiff.

David Michael Noll, Stephanie Ahrens Waller, Hagan Noll & Boyle LLC, Houston, TX, Steven Joseph Blanco, Blanco Ordonez & Wallace, P.C., El Paso, TX, for Defendant.

## ORDER

KATHLEEN CARDONE, District Judge.

*1  On this day, the Court considered Defendant's Motion for Summary Judgment ("Motion") (Doc. No. 25), Plaintiff's Response to it ("Response") (Doc. No. 26) and Defendant's Reply to the Respnose ("Reply") (Doc. No. 27). Also considered are Plaintiff's Objections to Defendant's Evidence ("Plaintiff's Evidence Objections") (Doc. No. 26–1), Defendant's Motion to Strike Portions of Plaintiff's Summary Judgment Evidence ("Defendant's Evidence Objections") (Doc. No. 28), and the relevant responses to these objections. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

## I. EVIDENCE OBJECTIONS

Both Plaintiff Marta Munoz ("Munoz") and Defendant Echosphere, LLC ("Echosphere") have lodged various objections to each other's summary judgment evidence. These issues are addressed first, as the admissibility of the challenged evidence may affect the factual narrative. However, after due consideration and for the reasons set forth below, the Court does not sustain any of these objections.

Proffered evidence must meet certain standards of admissibility in order to be relied upon by a court in ruling on a summary judgment motion. On the one hand, a Court may rely on affidavits and declarations, even though such testimonial documents are generally inadmissible at trial. See FED. R. CIV. P. 56(e); see also Thomas v. Atmos Energy Corp., 223 F. App'x 369, 374 (5th Cir.2007) ("evidence [may] be submitted in a form, such as an affidavit, that would ordinarily not be admitted at trial"). On the other hand, rules against hearsay, requiring personal knowledge, and requiring the authentication of documents and exhibits are generally applied to evidence submitted in support of a summary judgment motion. See FED. R. CIV. P. 56(e) (requiring affidavits be made from personal knowledge); see also Thomas, 223 F. App'x at 373 ("Rule 56(e) requires the adversary to set forth facts that would be admissible in evidence at trial.") (citing Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 192 (5th Cir.1991)).

### A. Munoz's Evidence Objections

Munoz makes a number of objections that may be grouped into three categories. The first category contains objections to the Declaration of David Noll. Pl.'s Evid. Obj. ¶¶ 2–4. The second category contains objections to the Declaration of Omar Arroyo. Pl.'s Evid. Obj. ¶¶ 5–13. The third category contains objections to various documentary exhibits filed by Echosphere, but relates to the same subject matter at issue in the David Noll objections. See Pl.'s Evid. Obj. ¶¶ 14–16. Accordingly, the first and third categories will be discussed together, followed by the second category.

The objections to the Declaration of David Noll, Pl.'s Evid. Obj. ¶¶ 2–4, which argue that he is not competent to authenticate certain documents which he purports to authenticate, are overruled as moot. The Court does not need to rely on any of the objected-to material to reach the conclusions on the merits set forth below, so the admissibility of the evidence does need not be considered. Also, Munoz's objects directly to the various documentary exhibits, filed by Echosphere, which are the subject of the disputed Noll authentications. Compare Pl.'s Evid. Obj. ¶¶ 2–4 with ¶¶ 14–16. The Court does need not rely on David Noll's authentication of a leave extension request

Munoz v. Echosphere, L.L.C., Not Reported in F.Supp.2d (2010)

2010 WL 2838356, 41 NDLR P 165

document related to the February 2009 period, or refer to the document itself, because the Court finds Munoz's admissions, and testimonial descriptions of her dealings with Echosphere, to be sufficient for present purposes. *See* Pl.'s Evid. Obj. ¶ 2. Similarly, the Court can decide the issues presented without the need to consider the authentication of any notes from Dr. Benito Marrazzini or any notes in Echosphere's files. *See* Pl.'s Evid. Obj. ¶¶ 3–4. Accordingly, the objections to the documents themselves and to David Noll's purported authentication of them are overruled as moot.

*2 The objections to the Declaration of Omar Arroyo, Pl.'s Evid. Obj. ¶¶ 5–13, center around the contention that there is no basis to believe "that Mr. Arroyo was personally involved in the events he describes," which render his statements "hearsay" or "speculation." *See, e.g.,* Pl.'s Evid. Obj. ¶ 5. Indeed, Munoz never states that she had dealings with Omar Arroyo on this subject; instead, she dealt with other human resources representatives. *See, e.g.,* Marta Munoz Dep. 22:8–13, Mar. 2, 2010 ("Munoz Dep.") (Doc. No. 26–3). While summary judgment affidavits must be made on personal knowledge, Munoz's argument is misplaced. *See* FED. R. CIV. P. 56(e). Omar Arroyo asserts, in as many words, that "the facts stated in this declaration are within my personal knowledge and are true and correct and if called to testify concerning them under oath, I could and would testify completely thereto." Decl. of Omar Arroyo ("Arroyo Decl.") ¶ 1 (Doc. No. 25–4). Moreover, the Fifth Circuit has held that personal knowledge may be implied by an employee's position in a corporate hierarchy. *See DirecTV, Inc. v. Budden,* 420 F.3d 521, 529–30 (5th Cir.2005) (admitting as evidence an affidavit that did not purport, on its face, to be based on personal knowledge, on the grounds that personal knowledge may be implied by the maker's position). Personal knowledge, in a corporate setting, may also be based—at least in part—on access to company records and reports, and not just personal presence during the events at issue. *See id .* at 530 n. 40 (citing *Diamond Offshore Co. v. A & B Builders, Inc.,* 302 F.3d 531, 544 n. 13 (5th Cir.2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 788 & n. 8 (5th Cir.2009)). Given that Omar Arroyo purports to have personal knowledge, to be the "Human Resources Manager" for Echosphere, and to have access to the company's internal records, and that Munoz has not offered a cross-examination or any extrinsic evidence

which controverts these sworn assertions, the Court may consider the Arroyo Declaration. *See* Arroyo Decl. ¶¶ 1, 2, 10. Accordingly, this objection is overruled.

### B. Echosphere's Evidence Objections

Echosphere has lodged its own objections to the evidence that Munoz presents when opposing its motion for summary judgment. *See generally* Def.'s Evid. Obj. Specifically, Echosphere makes four hearsay objections to pieces of testimony contained in Munoz's deposition. *See id.* 1–2.

Echosphere's first three objections assert that Munoz's recounting of statements allegedly made to her by her physicians constitutes hearsay. *See id.* The Court does not need to reach this issue, however, because the summary judgment issues can be decided without reference to the truth of the matters asserted in these statements. For the sake of setting forth the undisputed facts in this case, the Court can simply treat these statements as reflections of Munoz's own beliefs or mental state, which is a permissible use of hearsay-like statements. *See Wallace v. Tex. Tech. Univ.,* 80 F.3d 1042, 1048 n. 4 (5th Cir.1996) (citing FED.R.EVID. 801(c)). For instance, Echosphere argues that Munoz's statement that "her [specialist] told her that the [medical] paperwork should be completed by her primary care physician" is hearsay. Def.'s Evid. Obj. 2. However, the Court may view this evidence as simply a reflection of what assumptions Munoz possessed during the relevant time-frame—her state of mind—without professing knowledge as to what her medical specialist actually said to her.

*3 Echosphere's fourth objection is that Munoz's recollection of a telephone conversation she had with an Echosphere employee named Rebecca Nichols also constitutes hearsay. Def.'s Evid. Obj. 2 (referring to Munoz Dep. 22:4–23:9). Echosphere acknowledges that a hearsay exception might apply and preemptively argues that this statement is not covered by the exception for admissions of a party opponent. *See id.* (citing FED.R.EVID. 801(d)(2) (requiring, in the case of admissions by employees of party opponents, that the admissions to be within the scope of employment)). Echosphere contends that these purported admissions were not within the scope of Rebecca Nichols's authority because, in an employment discrimination case, the "declarant must be involved in the [employment] decisionmaking process" and there "is no evidence that a

Reply Appendix 050

benefits representative in Colorado had any involvement whatsoever in Munoz's termination." *Id.* at 3 (citing *Young v. James Green Mgmt., Inc.,* 327 F.3d 616, 622 n. 2 (7th Cir.2003) (discussing the party admission rule in the context of employment discrimination cases)).

This argument is unpersuasive. First, Echosphere cites no Fifth Circuit authority showing that this narrowing of the usually-broad scope of Rule 801(d)(2) in the context of employment-discrimination cases, by requiring the declarant's involvement in the particular employment decision at issue. Echosphere only cites Seventh Circuit authority on this point. *See* Def.'s Evid. Obj. 3 (citing Seventh Circuit authority); *see also Aliotta v. Nat'l R.R. Passenger Corp.,* 315 F.3d 756, 761–62 (7th Cir.2003) (observing that the rule requiring the declarant to be involved in the particular decision at issue is an unusual narrowing of the usual party admission rule). Second, Echosphere cites no evidence showing that Rebecca Nichols was a mere "benefits representative" in Colorado with insufficient connections to the decisions surrounding Munoz's firing. Echosphere's brief makes this allegation, but the passages it cites in Munoz's deposition only show that, to Munoz's recollection at least, Rebecca Nichols was "from HR" in Colorado, and that Munoz had dealings with her. Echosphere offers no other evidence to verify Rebecca Nichols's job responsibilities, or her closeness or remoteness to the decisions concerning Munoz's employment. Third, even if this Court were to adopt the Seventh Circuit standard cited by Echosphere, that standard seemingly only requires that the declarant "be in management or in the company personnel function[ ] in order for [his or her] statements to qualify as" a party admission. *Aliotta,* 315 F.3d at 762. It appears likely that Rebecca Nichols—as an "HR" functionary—would satisfy the Seventh Circuit test, if it did apply in this Circuit. Accordingly, the Court overrules this objection.

## II. BACKGROUND

Echosphere is a Colorado business entity which is part of the business group which operates the satellite television broadcast service called the "Dish Network." *See* Def.'s Proposed Undisputed Facts ¶ 1 ("Def.'s Facts") (Doc. No. 25–1). This group is also sometimes called "Echostar." *See* Munoz Dep. 7:20–8:3. Echosphere has a call center located in El Paso, Texas. Def.'s Facts ¶ 1. Munoz is a resident of El Paso County, Texas, who started working at Echosphere's El Paso call center in September 1999.

Munoz Dep. 5:1–6; *see also* Pl.'s Statement of Relevant Facts ¶ 1 ("Pl.'s Facts") (Doc. No. 26–2 at 4–9).

*\*4* On December 21, 2008, Munoz suffered an acute medical episode related to her diabetes, which required a multi-day stay in a hospital. Def.'s Facts ¶ 1; *see also* Munoz Dep. 25:11–16. While hospitalized, Munoz contacted Echosphere to apprise them of her condition and request medical leave. *See* Munoz Dep. 25:17–26:13. Echosphere determined that she was qualified to take leave under the Family and Medical Leave Act ("FMLA") and forwarded her some paperwork in this connection. Def.'s Facts ¶ 2. Munoz completed the paperwork, which included a request that her doctor certify that she had a serious medical condition, returned it to Echosphere, and was granted approximately one month of leave. *Id.* ¶ 4. In January 2009, Munoz requested an extra ten days of leave. *Id.* ¶ 5. Echosphere granted this leave without requesting an additional medical certificate. *Id.* On January 30, 2009, Munoz asked for a further period of leave. *Id.* ¶ 6. Echosphere claims that she then asked for an additional month. *Id.* Munoz claims that her request was more open ended and that she did not specify an exact amount of extra leave. *Id.; see also* Pl.'s Facts ¶¶ 14–15.

In response to the January 30, 2009, request for additional leave, Echosphere asked Munoz to submit another doctor's certification, verifying that her medical condition rendered her unable to work during the month of February. Def.'s Facts ¶ 6. This was in addition to the original certification which covered January. *Id.* Munoz states that she was left with the distinct impression that Echosphere required this certification to be from her diabetes specialist, Dr. Marranzini. Munoz Dep. 72:1–6. Munoz brought the certificate to Dr. Marranzini, who neither signed it nor returned it. Def.'s Facts ¶ 9.

Munoz's primary care doctor, who could have completed the certificate, was apparently never contacted on this matter during the first half of February 2009. Def.'s Facts ¶¶ 16–18. Thus, he did not complete and return this supplemental certificate by the due date written on it, which was February 17, 2009. *Id.* On that day, Echosphere sent Munoz, by certified mail, a letter terminating her employment and stating that her separation date was being made retroactive to January 31, 2009. Def.'s Facts ¶ 19. In July 2009, Munoz sued Echosphere, alleging interference with her FMLA rights, retaliation for exercising her FMLA rights, and disability discrimination

Munoz v. Echosphere, L.L.C., Not Reported in F.Supp.2d (2010)

2010 WL 2838356, 41 NDLR P 165

under state law. *See generally* Pl.'s First Am. Compl. ("Compl.") (Doc. No. 9).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir.2006). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir.1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

**\*5** "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir.1996). If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir.2004)). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts ." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). "Inferences drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing" summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (ellipses in original). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### B. Munoz's Claims Under The Family & Medical Leave Act

Munoz makes two claims under the FMLA. *See* Compl. ¶¶ 18–22. Her first FMLA claim is that Echosphere denied or interfered with her substantive rights to medical leave and job reinstatement under the FMLA. *Id.* ¶¶ 19–20. Her second FMLA claim is that Echosphere retaliated against her for exercising her right to request leave under the FMLA, by firing her for attempting to request a permitted period of additional leave. *See id.* ¶ 21. These claims will be addressed in turn.

#### 1. Interference claim

Echosphere argues that it did not interfere with or deny Munoz's FMLA rights, emphasizing that it granted her a period of protected medical leave and only fired her when she failed to fulfill her own responsibilities. Mot. 2–5. Specifically, Echosphere states that Munoz failed to furnish a follow-up medical certificate to support her request for an additional period of medical leave, even though she had properly furnished an initial certificate to support her initial leave period. *Id.* Munoz argues that Echosphere's purported request for medical re-certification was defective and that she should therefore not be held responsible for failing to furnish a follow-up certificate. Resp. 5–7.

The FMLA provides substantive rights and protections to certain classes of workers who require time off work to care for their own medical needs or the medical needs of close family members.[1] *See* 29 U.S.C. § 2601 *et seq.* The central benefit conferred by this law is the qualified worker's right to take up to twelve weeks of leave in any given twelve-month period for such medical reasons; such leave may be unpaid, but the employer must go to certain lengths to keep the worker's job and benefits —or an equivalent job and benefits package—available upon the worker's return from leave. *See id.* §§ 2611–2614. The employer may require that the worker's health care provider certify that the worker (or the relevant family member) has the claimed serious health condition and certify the necessity of the worker taking time off on its account. *See* 29 U.S.C. § 2613 (permitting a certificate request and specifying the contents of such a certificate). The employer is not permitted to interfere with a worker's

**Reply Appendix 052**

Munoz v. Echosphere, L.L.C., Not Reported in F.Supp.2d (2010)

2010 WL 2838356, 41 NDLR P 165

exercise of FMLA rights. *Id.* § 2615. Any worker who suffers damages on account of such interference may sue the employer for damages as well as equitable relief. *See id.* § 2617.

**\*6** To prevail in an FMLA interference suit, a worker must show that he or she (1) was entitled to take FMLA leave; (2) gave proper notice to the employer of his or her intention of taking such leave; and (3) was denied benefits to which he or she was entitled under the FMLA. *See Schimek v. MCI, Inc.,* No. 05–CV–45–P, 2006 WL 2252034, at \*11 (N.D.Tex. Aug.7, 2006) (citing *Cavin v. Hondo of Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir.2003)). Whether a worker is entitled to take such leave is dependent on several other factors concerning the nature of the worker, the job position, and the employer. *See id.* While the statute does not specify the consequences of a worker's failure to provide a medical certificate in a timely fashion, the statute's implementing regulations provide that an employer may deny the worker leave under such circumstances. *See id.; see also* 29 U.S.C. § 2613; *see also* 29 C.F.R. § 825.305(d).

The first two elements are not disputed in this case. Echosphere acknowledges that Munoz was entitled to take FMLA leave and that she requested it for the period at issue here. *See* Def.'s Facts ¶¶ 2, 5–6. Regarding the third element, Echosphere argues that it did not interfere with Munoz's FMLA rights because it only denied the second extension after Munoz failed to comply with Echosphere's lawful request for an additional medical certificate. *See* Mot. 2–5. In this connection, Echosphere claims that the retroactive effect of this denial—the re-characterization of already-missed workdays in February 2009 from medical leave days to unexcused absences—was proper. *See id.* Because those days did not have FMLA status, Echosphere argues, it was justified in firing Munoz for excessive absences under its attendance policy. *See id.* Echosphere also argues that it had no legal obligation to inform Munoz that her medical certificate had not arrived by the deadline or to provide her with additional time to submit one. *Id.* at 5.

While Echosphere makes numerous correct legal assertions, it has failed to furnish adequate evidence on the critical issue of warning. Without such evidence, the Court cannot conclude that the request for re-certification was valid and effective, and for that reason the Court denies summary judgment. The FMLA implementing

regulations require that when "the employer requests certification, [it] must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification." 29 C.F.R. § 825.305(d). An employer's failure to provide an adequate warning, when required by regulation, makes it ineligible to rely on a worker's failure to furnish a requested medical certificate as a basis for denying FMLA leave. *See Lubke v. City of Arlington,* 455 F.3d 489, 496–98 (5th Cir.2006). While there is solid evidence showing that Munoz was warned of the consequences of failing to provide the first requested certificate, there is insufficient evidence to show that she was similarly warned about subsequent certificates. *See* Employer Response to FMLA Request ("Employer FMLA Resp.") (Doc. No. 25–5 at 6–7). The Employer FMLA Response, issued in connection with Munoz's December leave request, states that a failure to submit the initial certificate would "delay the commencement of [the worker's] leave or apply [the worker's] absences to the attendance policy in effect." *Id.* ¶ 3. However, when addressing the topic of re-certifications, the Employer FMLA Response does not state that such consequences would apply to a failure to submit a re-certification. *Id.* ¶ 9.

**\*7** Moreover, there is insufficient evidence to determine that Munoz was properly warned of the consequences of failure to submit the second certificate at the time Echosphere asked her to submit that certificate, which was in late January 2009. Def.'s Facts ¶ 6. Warning at this point —the time of request—is mandated by the regulations, and both initial certificate requests and subsequent ones require such contemporaneous warning. *See* 29 C.F.R. § 825.305(d) ("At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification.... This provision will apply in any case where an employer requests a certification permitted by these regulations, whether it is the initial certification, a recertification, a second or third opinion, or a fitness for duty certificate ...."); *see also Hurt v. Ecolab, Inc.,* No. 3:05–CV–1508–BD, 2006 WL 1947791, at \*4 (N.D.Tex. July 13, 2006) (holding that an oral warning to a worker that he "would be terminated" if the required medical re-certification was not timely submitted was sufficient after a written warning was furnished during the request for initial certification, which contained an advisory that follow-up certifications would also be requested).

Munoz v. Echosphere, L.L.C., Not Reported in F.Supp.2d (2010)

2010 WL 2838356, 41 NDLR P 165

Unlike the initial request for a medical certificate, Echosphere failed to submit to the Court documentary evidence regarding warning in the context of this follow-up request.[2] The only evidence regarding this request comes from the deposition testimony of Munoz herself. Munoz states that she was aware that she would be required to "turn in the additional medical certification in order to take additional family medical leave," and that "if the medical certification was not turned in [she] could be denied FMLA leave." Munoz Dep. 80:7–18. But she does not state how she came under that impression, and she does not state that she was made aware of any further consequences, such as the retroactive effect that a denial of FMLA certification would have or how the company would characterize the missed days. *See id.* The initial warning, by contrast, addresses these issues. *See* Employer FMLA Resp. ¶ 3.

Thus, there is only an inference that she may have been given a warning when the second certificate was requested, and the precise contents of that warning—if it happened at all—are uncertain, making it impossible to judge its adequacy under the regulations. Because "inferences drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing" summary judgment, the Court cannot bridge the evidentiary gap by drawing an inference in favor of Echosphere. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (ellipses in original). Moreover, there is evidence suggesting that the failure to adequately warn was prejudicial. Not only did Munoz submit the first certificate on time, she also demonstrated a high degree of diligence in apprising Echosphere of her whereabouts and condition after she initially fell ill. Munoz Dep. 25:11–26:5 ("When I was in the hospital —I was in the hospital on the 21st all the way through the 26th ... I would call ... the command center at EchoStar and I would tell them about me not going to work every single day."). Given Munoz's diligent habits, it is reasonable to infer that Munoz may well have properly returned the required paperwork had she been adequately informed of its importance. Thus, because there is inadequate evidence on the issue of Echosphere warning Munoz when it requested the subsequent medical certificate, the court cannot conclude that its denial of FMLA leave in February was justified. Summary judgment is therefore denied as to this claim.

### 2. Retaliation claim

*8 A worker may also bring a separate claim against an employer who has retaliated against that worker for engaging in FMLA activity. The statute prohibits employers from discharging or discriminating against "any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615. The regulations create a further set of anti-retaliation provisions, prohibiting an employer from "discriminating or retaliating against an employee ... for having exercised or attempted to exercise FMLA rights." 29 C.F.R. 825.220(c). The Fifth Circuit has recognized FMLA retaliation claims and applies a *McDonnell Douglas* type framework to such cases. *See Hunt v. Rapides Healthcare Sys., LLC,* 277 F.3d 757, 768 (5th Cir.2001). The *McDonnell Douglas* framework, commonly applied in various types of employment discrimination cases, provides that when no direct evidence of discrimination can be adduced, a plaintiff can move forward by setting forth an inferential prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once such a case is made, the employer may respond by showing that the adverse employment action was actually predicated on a legitimate, nondiscriminatory reason. *Id.* This burden of production requires the employer to "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [adverse treatment]." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The employee may then respond by showing that the proffered reason is untrue or is a mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804.

Regarding FMLA retaliation claims, a prima facie case requires the plaintiff to "show that: (1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." *Hunt,* 277 F.3d at 768. Echosphere argues that Munoz was not protected under the FMLA, and that even if she was, she cannot prove that her firing was because of her taking FMLA leave.[3] Mot. 6–7. Echosphere's argument regarding the first element is facially unavailing. Munoz was eligible for FMLA leave on account of her diabetes-related acute illness, as Echosphere itself acknowledged when it granted her the first period of FMLA leave. *See* Resp. 7; *see also* Def.'s Facts ¶ 4. Even if it is conclusively proved that Munoz

2010 WL 2838356, 41 NDLR P 165

did not qualify for an extension of leave through the end of February 2009, she was qualified for—and took—an initial period of FMLA leave and is therefore subject to the statute's protection. *See Powers v. Woodlands Religious Cmty. Inc.*, 323 F. App'x 300, 302 (5th Cir.2009) (citing *Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 583 (5th Cir.2006)).

Echosphere's argument regarding element (3b) is also misplaced. Requiring literal proof that the adverse decision was taken 'because' the worker took FMLA leave would obviate the need for creating a burden-shifting framework; by proving this one element, the case itself would be conclusively proved. Instead, this element of the prima facie case may be satisfied by showing (1) proximity in time, and (2) that the adverse employment action is "not completely unrelated" to the FMLA leave. *See Mauder*, 446 F.3d at 583. In the instant case, it is undisputed that Munoz's firing was proximate in time to her initial period of FMLA leave, that her firing was predicated on her being absent from work, and that absence was part of an attempt to take more permitted FMLA leave. Def.'s Facts ¶ 19. These facts alone satisfy the third element of the prima facie test, and Echosphere cannot prevail on a theory that Munoz fails to set forth such a case.

**\*9** Echosphere attempts to set forth a legitimate, nondiscriminatory reason for Muniz's firing by claiming that it was not motivated by animus toward her taking the first portion of FMLA leave. Rather, it claims that it was motivated by her failure to submit the second medical certificate, and the resulting determination that her February absences were unexcused. Mot. 7–8. There is a critical gap in the evidence here, however. The regulations permit Echosphere to deny FMLA leave in the event a properly requested medical certificate is not furnished by the employee. 29 C.F.R. § 825.305(d). The Fifth Circuit has held that the retroactive denial of FMLA status to leave already in progress may allow the employer to deem those days to be unexcused absences and accordingly discipline the worker under the employer's usual attendance policies. *See Urban v. Dolgencorp of Tex., Inc.*, 393 F.3d 572, 576 (5th Cir.2004). Echosphere takes this approach with its employees. *See* Employer FMLA Resp. ¶ 3 (stating that failure to furnish the required medical certificate would lead to missed days being deemed unexcused absences, which Echosphere will "apply ... to the attendance policy in effect."). In the instant case, however, Echosphere has

submitted no evidence of an attendance policy which would support the claim that firing Munoz was justified in the circumstances at issue. [4] This lack of evidence is fatal, as *Burdine* requires the employer to set forth its legitimate nondiscriminatory reason "by producing evidence." 450 U.S. at 255. Echosphere has provided no evidence that its attendance policies and internal procedures would actually justify the firing; it has thus not adequately set forth a legitimate, nondiscriminatory reason. *Cf. Powers*, 323 F. App'x at 302 (citing the relevant employee manual to support the legitimate, nondiscriminatory reason of absenteeism); *see also Pittman v. Collin County*, No. 4:08–CV–357, 2010 U.S. Dist. LEXIS 30879, at \*11, 2010 WL 2854402 (E.D.Tex. Mar. 30, 2010) (citing evidence concerning employee attendance policies to support a firing after failure to return from FMLA leave). Summary judgment is therefore denied on this claim.

### C. Munoz's Claim Under Texas Labor Code § 21.051

Munoz has also brought a state-law disability discrimination claim in connection with her firing. *See* Mot. 8. Both Ecosphere and Munoz agree that the *McDonnell Douglas* burden-shifting framework also applies to Munoz's claim of disability discrimination. *See* Mot. 9; Resp. 4; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir.2005) (applying the *McDonnell Douglas* framework to an age discrimination claim under the Texas Commission on Human Rights Act); *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir.1995) (applying the *McDonnell Douglas* framework to a disability discrimination claim under federal law). Both the Fifth Circuit and Texas state courts have held that disability discrimination claims under the TCHRA are analogous to claims under the Americans with Disabilities Act and should be interpreted similarly. *See Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 474–75 (5th Cir.2006); *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex.2003).

**\*10** As noted above in connection with Munoz's FMLA retaliation claim, *McDonnell Douglas* requires a plaintiff first to establish a prima facie case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802. If she is able to do so, the burden shifts to the defendant to show a legitimate business reason for the allegedly discriminatory conduct. *See id.* at 802–03. The plaintiff is then tasked with proving that the reason offered by the defense is merely pretext. *See id.* at 804.

Munoz v. Echosphere, L.L.C., Not Reported in F.Supp.2d (2010)

2010 WL 2838356, 41 NDLR P 165

To establish a prima facie case of disability discrimination, a plaintiff must establish that (1) she is disabled, (2) she was qualified for the job, and (3) she was subjected to an adverse employment action on account of her disability. *See Turco v. Hoechst Celanese Chem. Group,* 101 F.3d 1090, 1092 (5th Cir.1996) (citing *Rizzo v. Children's World Learning Ctr.,* 84 F.3d 758, 763 (5th Cir.1996)). Accordingly, the Court must first determine whether Munoz is disabled because of her diabetes or diabetic complications. *See Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir.1996) ("As a threshold requirement in [a disability discrimination] claim, the plaintiff must, of course, establish that he has a disability.")

### 1. Munoz possibly has a disability

The Texas Commission on Human Rights Act ("TCHRA") prohibits an employer from terminating an individual because of his or her disability. *See* TEX. LAB.CODE § 21.051. A disability is defined as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment." *Id.* at § 21.002(6).

The ADA, however, was amended by the ADA Amendments Act of 2008 (the "Federal Act"), which took effect on January 1, 2009. This bears on a TCHRA disability discrimination claim because the state law is understood to be analogous to federal ADA law. *Wal–Mart Stores,* 121 S.W.3d at 739. The Federal Act explicitly rejects certain elements of the holdings in the previously-controlling cases of *Sutton v. United Airlines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). *See* ADA Amendments Act of 2008, sec. 2(b)(2)-(4), Pub.L. No. 110–325, 122 Stat. 3553, 3554. The state law under which Munoz brings her disability discrimination claim was amended, in September of 2009, to reflect the changes to the ADA ("House Bill 978"). *See* H.B. 978, 81 Leg., Reg. Sess. (Tex.2009). However, House Bill 978 states that any amendments are applicable "only to conduct occurring after September 1, 2009." *Id.* Munoz received her termination letter in February 2009, and her termination was retroactively effective on January 31, 2009, all before the Texas Amendments took effect. *See* Pl.'s Facts ¶¶ 22–23. Accordingly, the amended Texas statute probably

does not apply to this matter. *See* TEX. GOV'T CODE § 311.022 ("A statute is presumed to be prospective in its operation unless expressly made retrospective."). However, "[o]ne express purpose of chapter 21 of the Labor Code is to 'provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments." *Little v. Tex. Dep't of Crim. Justice,* 148 S.W.3d 374, 381–82 (Tex.2004) (citing TEX. LAB.CODE § 21.001(3)). An attempt to conform to this purpose raises a question of whether *Sutton* and *Toyota Motor* are applicable precedent for claims under the Texas Labor Code arising after the effective date of the Federal Act but before the effective date of House Bill 978. Accordingly, it is unclear as to whether the pre-amendment or post-amendment law applies to Munoz's claim. Due to this uncertainty, the Court will examine the question of whether Munoz is disabled under both schemes.

**\*11** Munoz and Ecosphere agree that "diabetes is not a per se disability." Mot. 9 (citing *Nawrot v. CPC Int'l,* 277 F.3d 896, 904 (7th Cir.2002); *see also Ingles v. Neiman Marcus Group,* 974 F.Supp. 996, 1001 (S.D.Tex.1997) (stating that courts do not consider insulin-dependent diabetes, alone, to be a disability under the ADA); *see also Hearne v. Am West Sav. Ass'n,* 951 S.W.2d 950, 953 (Tex.Ct.App.1997)) (so holding under TCHRA); *see also* Resp. 9. Instead, a "plaintiff must still prove that the diabetes 'substantially limits one or more' major life activity" in order to be considered disabled *Hearne,* 951 S.W.2d at 953–54 (citing *Coughlan v. H.J. Heinz Co.,* 851 F.Supp. 808, 813 (N.D.Tex.1994)).

Ecosphere contends that Munoz's inability to perform her job was temporary and as such does not qualify as a disability. Mot. 5. Munoz did not have any difficulty performing her job due to her diabetes in the period proceeding her hospitalization on December 21, 2008. *See* Munoz Dep. 53:18–54–54:4. Rather, Munoz asserts that "at the relevant time" her diabetes substantially limited her ability to perform the major life activity of working. Resp. 9.[5] "In an ADA case, the relevant time for assessing the existence of a disability is the time of the adverse employment action." *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 618 (5th Cir.2009). To determine whether an impairment is substantially limiting, a court should examine the nature and severity of the impairment, the duration or expected duration of the impairment, and the long term impact of the impairment. *See Oswalt v. Sara*

**Reply Appendix 056**

*Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996) (citing 29 C.F.R. § 1630.2(j)(2)).

There is a genuine issue of material fact regarding the expected duration of Munoz's inability to work. In hindsight, the parties agree that Munoz's diabetes only temporarily affected her ability to work. *See Munoz Dep.* 54:5–8. However, there is evidence that, at the time of her discharge, the expected duration of her impairment was unclear. Ecosphere alleges that Munoz requested to extend her FMLA leave to February 28, 2009. Def.'s Facts ¶ 6. But in her deposition, Munoz stated that she didn't know how long she would need additional leave because she "was being referred to a consulting physician." *Munoz Dep* 60:1–8. Further, Munoz stated that she was requesting leave until her primary physician released her. *Id.* at 60:19–21. Though Munoz now admits that her physician approved her to return to work as of February 24, 2009, at the relevant time for determining disability status it was not known when or if Munoz would be released to return to work. *See id.* at 61:15–62:19. As "[i]nferences drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing" summary judgment, the Court finds that there is an issue of fact regarding whether Munoz's expected long-term ability to work was substantially limited at the time of her dismissal. *See Matsushita,* 475 U.S. at 587.

**\*12** Ecosphere's argument that Munoz was not actually disabled, because her disability was merely temporary, would likely fail under the amended ADA, but not the pre-amendment ADA, even if it is conceded that the parties knew of the disability's temporary nature all along. One of the purposes of the Federal Act is

> to reject the standards enunciated by the Supreme Court in *Toyota Motor Mfg., Ky. Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'

Sec. 2(b)(4), 122 Stat. at 3554.

The Federal Act does not explicitly overturn the finding in *Toyota Motor* that temporary disabilities do not qualify for ADA protection, and this Court is unaware of any precedent directly addressing this issue. However, the Federal Act states that "the definition of disability ... shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." Sec. 4(a), 122 Stat. at 3555; *see also Cockrell v. United Parcel Serv.,* 08–cv–128, 2009 U.S. Dist. LEXIS 70418, at \*11–12, 2009 WL 2448571 (N.D.Tex. Aug. 10, 2009) ("Congress made clear that it intends for the ADA to give broad protection to persons with disabilities."). Further, the Federal Act rejects the *Sutton* requirement that the substantially limiting nature of an impairment be assessed with reference to ameliorative effects, including medication. *See* Sec. 4(a), 122 Stat. at 3556.

Accordingly, if *Toyota Motor* and *Sutton* are not applicable to this case, Munoz's diabetes and diabetic complications may constitute a disability under the ADA. Even if Munoz's diabetes only temporarily limited her ability to work, the stringent requirements of *Toyota Motor* may be rejected by the amended statute in favor of a more inclusive standard. *See* Sec. 2(b) (4), 122 Stat. at 3554. Further, if ameliorative effects, like insulin shots, are not to be considered, then Munoz's disability may not be temporary at all. While her diabetes is currently controlled by insulin, it stands to reason that, without her medication, Munoz's diabetes would substantially impair her ability to work. *See* Munoz Dep. 37:15–19. Prior to beginning her insulin regiment, Munoz's blood sugar varied widely, such that she had a diabetic stroke, was unable to walk, had difficulty concentrating, and was not certified to work by her physician. *See* Resp. 10. Accordingly, if *Toyota Motor* and *Sutton* do not control this case, Munoz could likely establish that she is disabled.

### 2. Munoz is not a qualified individual

Though the Court may assume, on summary judgment, that Munoz had a disability, she has not established that she was a qualified individual for purposes of proving a prima facie case of disability discrimination. *See McDonnell Douglas,* 411 U.S. at 802. A qualified individual is an individual who can perform the essential functions of the job with or without reasonable accommodations. *See, e.g., Turco,* 101 F.3d at 1092 (citing 42 U.S.C. § 12111(8)). "As several courts have recognized, 'an essential element of any ... job is an ability to appear

Munoz v. Echosphere, L.L.C., Not Reported in F.Supp.2d (2010)

2010 WL 2838356, 41 NDLR P 165

for work.' " *Rogers*, 87 F.3d at 759 (ellipsis in original) (quoting *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994)). Munoz does not dispute that she was unable to attend work for what, at the time, appeared to be a prolonged and uncertain period. *See* Pl.'s Facts ¶ 15. Accordingly, without a reasonable accommodation, Munoz was not qualified to perform the essential functions of her job.

**\*13** Munoz alleges that she requested a reasonable accommodation—namely, FMLA leave—which Ecosphere denied. *See* Resp. 10. However, "FMLA leave is not a reasonable accommodation under the ADA; rather it is a right enforceable under a separate statutory provision." *Trevino v. United Parcel Serv.*, No. 3:08–CV–889–B, 2009 U.S. Dist. LEXIS 98738, at \*38–39, 2009 WL 3423039 (N.D.Tex. Oct. 23, 2009) (citing *Navarro v. Pfizer Corp.*, 261 F.3d 90, 101 (1st Cir.2001) and *Vice v. Blue Cross & Blue Shield of Okla.*, 113 F. App'x 854, 857 (10th Cir.2004)). Further, Munoz did not ask for any additional accommodation or a change to her position. *Burch*, 119 F.3d at 314 (stating that "an employee who requests only the opportunity to return to an unmodified, previously-held position fails to state a cognizable" reasonable accommodation claim).

Accordingly, Munoz was not capable of performing the essential functions of her job, had not requested a cognizable accommodation, and was therefore not a qualified individual for purposes of establishing a prima facie case of discrimination under the Texas Labor Code. Because Munoz does not satisfy the second prong of a prima facie case of disability discrimination, summary judgment is granted to Echosphere on this claim.

## IV. CONCLUSION

For the reasons set forth above, Echosphere's Motion for Summary Judgment (Doc. No. 25) is **GRANTED** in part and **DENIED** in part. The Motion is **DENIED** as to Munoz's FMLA claims. The Motion is **GRANTED** as to the disability discrimination claim. Echosphere's Motion to Strike (Doc. No. 28) is **DENIED**.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2838356, 41 NDLR P 165

Footnotes

1   There are also certain protections for close family members of military personnel who are called to active duty or deployed on operations but military family protections are not at issue in the instant case. *See* 29 U.S.C. § 2612(a)(1)(E).

2   While Echosphere submits into evidence an "FMLA Leave of Absence Request" covering the period of January 31, 2009, through February 28, 2009, (to which Munoz has lodged an objection, *see* Pl.'s Evid. Obj. ¶ 14), this document contains no request for medical re-certification. *See* Mot. Ex. 6 ("FMLA Leave of Absence Request") (Doc. No. 25–5 at 17). Similarly, the actual follow-up certificate form furnished by Echosphere to Munoz, which she was to bring to her doctor, contained no mention of any consequences of a failure to complete or return the form. *See* Mot. Ex. 7 ("Certif. of Health Care Provider") (Doc. No. 25–5 at 19). The Court is unaware of any other documentary evidence relating to this particular issue and time period.

3   Munoz does not attempt to state a claim using element (3a); namely, that she was treated worse than similarly situated employees who did not take FMLA leave.

4   Echosphere only points to Munoz's deposition testimony, where she admits that it would be legitimate to fire an employee for failure to return from FMLA leave. Def.'s Facts ¶ 21; *see also* Munoz Dep. 100:21–24. This sheds no light on what Echosphere's actual policies were, or on how such policies would apply in Munoz's case.

5   Munoz does not assert a "regarded as" or "record of" disability claim in her complaint. She only asserts that her diabetes substantially limited her ability to work. See Resp. 9 (citing Pl.'s Compl. ¶ 10).

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Perez v. Doctors Hosp. at Renaissance, Ltd., 624 Fed.Appx. 180 (2015)
51 NDLR P 152

KeyCite Yellow Flag - Negative Treatment
Distinguished by Silva v. Baptist Health South Florida, Inc.. S.D.Fla.,
October 9, 2015

624 Fed.Appx. 180
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

Rolando PEREZ; Miriam
Perez, Plaintiffs–Appellants

v.

DOCTORS HOSPITAL AT RENAISSANCE,
LIMITED, Defendant–Appellee.

No. 14–41349.
|
Aug. 28, 2015.

**Synopsis**
**Background:** Deaf and hearing-impaired parents of infant
who had been diagnosed with cancer brought suit against
hospital that they visited for failing to provide them
with appropriate auxiliary communication aids. parents
sought both compensatory damages and injunctive relief
under the Rehabilitation Act (RA) and the Americans
with Disabilities Act (ADA), as well as pursuant to state
law. The United States District Court for the Southern
District of Texas granted hospital's motion for summary
judgment, and parents appealed.

**Holdings:** The Court of Appeals held that:

[1] fact issue as to whether there continued to be real
and immediate threat of future harm to parents precluded
entry of summary judgment for hospital on parents' claims
for injunctive relief under the ADA based on their alleged
lack of standing, and

[2] fact issue as to whether hospital had intentionally
discriminated against parents precluded entry of summary
judgment for hospital on RA claim.

Reversed and remanded.

**Attorneys and Law Firms**

**\*181** Wayne Krause, Esq., Texas Civil Rights Project,
Austin, TX, Ralph I. Miller, Esq., Weil, Gotshal &
Manges, L.L.P., Washington, DC, Efren Carlos Olivares,
South Texas Civil Rights Project, Alamo, TX, for
Plaintiffs–Appellants.

Raymond L. Thomas, Kittleman Thomas, P.L.L.C.,
McAllen, TX, for Defendant–Appellee.

Appeal from the United States District Court for the
Southern District of Texas, USDC No. 7:13–CV–124.

Before WIENER, CLEMENT and SOUTHWICK,
Circuit Judges.

**Opinion**

**PER CURIAM:** [*]

Plaintiffs Rolando and Miriam Perez brought
claims against defendant Doctors **\*182** Hospital at
Renaissance, Limited, pursuant to Title III of the
Americans with Disabilities Act, Section 504 of the
Rehabilitation Act, and Chapter 121 of the Texas Human
Resources Code. The district court granted summary
judgment to DHR on all claims. We REVERSE the
judgment and REMAND for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2011, the plaintiffs took their four-
month-old daughter to the emergency room at Doctors
Hospital at Renaissance ("DHR"), located in Edinburg,
Texas. Their daughter was diagnosed with a brain tumor
that required monthly treatment at DHR. Mrs. Perez
is completely deaf and communicates exclusively in
American Sign Language ("ASL"). Her ability to read
and write is limited. Mr. Perez is completely deaf in his
right ear and cannot hear well in his left ear. His primary
language is ASL and he reads and writes in English only
with difficulty. DHR has known the plaintiffs required
auxiliary services during their hospital visits since at least
January 2011.

Reply Appendix 059

The plaintiffs allege that throughout 2011 and part of 2012, DHR repeatedly failed to provide them an interpreter. On the occasions DHR did provide them an interpreter, the plaintiffs allege they would sometimes have to wait "upwards of a full day" for the interpreter to arrive. The plaintiffs' daughter's first round of chemotherapy ended in January 2013. The plaintiffs do not allege that there were any problems with DHR's provision of auxiliary services for the time period of 2013 through early 2014. In April 2014, the plaintiffs' daughter was diagnosed a second time with cancer and ordered to undergo chemotherapy over an 80–week period. The plaintiffs allege that after this second diagnosis they again experienced problems with DHR's auxiliary services. They allege that an interpreter was not always provided. Furthermore, the video remote imaging ("VRI") machines, which DHR began to offer to the plaintiffs in late 2013, did not always function properly. They also allege that DHR's medical staff was, at times, unable to operate the machines and that some nurses did not understand or know about VRI.

The plaintiffs filed suit against DHR in March 2013. In June 2014, DHR moved for partial summary judgment on the plaintiffs' federal claims. In July, the district court held a hearing on the motion and granted summary judgment to DHR on the plaintiffs' Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claims. In August, DHR moved for summary judgment on the plaintiffs' state-law claims, which the district court granted. The plaintiffs timely appealed.

## DISCUSSION

"We review a district court's ruling on a motion for summary judgment *de novo* and apply the same legal standards as the district court." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir.2012). Summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).

### I. Title III of the Americans with Disabilities Act

[1] Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

*183 privileges, advantages, or accommodations of any place of public accommodation by any person who owns ... or operates a place of public accommodation." 42 U.S.C. § 12182(a). A hospital is a public accommodation under Title III of the ADA. *See id.* § 12181(7)(F). Damages are not available for a Title III ADA claim brought by a private party, but a private party may seek injunctive relief. *See id.* § 12188(a); *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir.1997).

Standing to seek injunctive relief requires plaintiffs to show that they suffer or will suffer an injury-in-fact, and therefore would benefit from the court's granting of such equitable relief. *Id.* Plaintiffs must demonstrate that they face a palpable present or future harm, not harm that is "conjectural or hypothetical." *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 n. 23 (5th Cir.1998) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Allegations of "past wrongs" alone do not "amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* at 563 (quoting *Lyons*, 461 U.S. at 103, 103 S.Ct. 1660) (alteration omitted). Past wrongs can be considered, however, as evidence of an actual threat of repeated injury. *Henschen v. City of Houston*, 959 F.2d 584, 588 (5th Cir.1992) (citing *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

At the summary judgment hearing on the plaintiffs' ADA claim, the district court found that "Mr. Perez had no complaint about the accommodations that were being made to [him] and his family by the Hospital after December of 2011." Therefore, the court stated, it "seemed to be clear from the evidence" that there was no "real and immediate threat of future harm." On the same day as the hearing, the court issued a one-page order granting summary judgment to DHR. The court referred to the reasons it stated in open court at the motion's hearing as explanation for its judgment. In the transcript from the hearing, the district court did not explicitly refer to standing. It is clear, though, that the court dismissed based on the lack of a real and immediate threat of future harm. That issue is part of the analysis for standing. Furthermore, both DHR's motion for summary judgment and the plaintiffs' response focused on standing as to the ADA claim.

The plaintiffs argue on appeal that there were genuine disputes of material fact as to whether there is a real threat

Perez v. Doctors Hosp. at Renaissance, Ltd., 624 Fed.Appx. 180 (2015)

51 NDLR P 152

of future harm. They refer to "overwhelming evidence of DHR's repeated and recent failures to provide effective communication through auxiliary aids or reasonably accommodate the Perez family's hearing disabilities." Included in the evidence is Mr. Perez's affidavit. He swore that during his family's visits to DHR in the three-month period prior to the court's summary judgment ruling, they encountered: (1) VRI machines that did not always work properly; (2) a nurse who did not know how to use the VRI machine; and (3) two nurses who "did not know what 'VRI' was." Mr. Perez also stated that he always "prefer[s] an in-person interpreter, but DHR does not always have one available, even after we have requested it."

Also introduced were Mr. Perez's handwritten notes describing the family's visits to DHR. The notes indicate that an interpreter was requested and not provided as late as April 2012. Moreover, Norma Teran, DHR's executive vice president for nursing, testified in her June 2014 deposition that DHR's ADA compliance policy for the hearing impaired was in need of revision. Teran also testified that she was unable to find any training sessions that had taken place at DHR related to addressing *184 the needs of the hearing impaired.

DHR acknowledges that Mr. Perez asserts in his affidavit that the plaintiffs have recently experienced problems. DHR contends, though, that Mr. Perez does not state that DHR refused to provide a VRI machine or interpreter when requested, that DHR was unable to get the VRI machine to work on any occasion, or that the nurse unfamiliar with how to use the VRI machine did not ultimately figure out how to use it or enlist the aid of someone familiar with the machine. DHR argues that "in light of the Perezes visiting DHR numerous times in the last three years without incident, the Perezes' minor VRI complications are insufficient to create an inference that they face a substantial risk of future harm."

In analyzing the propriety of summary judgment, "we consider all the facts contained in the summary judgment record and the inferences to be drawn therefrom in the light most favorable to the non-moving party." *Duarte v. City of Lewisville,* 759 F.3d 514, 517 (5th Cir.2014) (citation and internal quotation marks omitted). We conclude that the district court erred in holding there was no genuine dispute of material fact as to whether the plaintiffs faced a real and immediate threat of future harm. Mr. Perez's affidavit is evidence that the

plaintiffs have experienced recent problems with DHR's provision of auxiliary services. Furthermore, the evidence of DHR's failure to revise its ADA compliance policy, which it admits needs revision, and its lack of training on addressing the needs of the hearing impaired, creates a possible inference that the plaintiffs' problems with the provision of auxiliary services will continue in the future.

Because we conclude there is a genuine dispute of material fact on the question whether the plaintiffs have standing to bring their ADA claim, we reverse the district court's grant of summary judgment on that claim. [1]

*II. Section 504 of the Rehabilitation Act*

[2]    The RA protects the disabled who seek to participate in a program or activity receiving federal funds from discrimination: no otherwise qualified individual "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To receive compensatory damages under the RA, a plaintiff must offer proof of intentional discrimination. *Delano–Pyle v. Victoria County,* 302 F.3d 567, 574 (5th Cir.2002).

We did not define what we meant by intent in *Delano–Pyle.* Some circuits have held that deliberate indifference suffices. *See Liese v. Indian River Cty. Hosp. Dist.,* 701 F.3d 334, 345 (11th Cir.2012). The parties have not briefed the issue in any depth, and we decline to make new law on the nature of intent at this time. We conclude that on the present record, there is enough to show a dispute of material fact on whether DHR intentionally, i.e. purposefully, discriminated. Intent is usually shown only by inferences. *See Crawford v. Formosa Plastics Corp., La.,* 234 F.3d 899, 902 (5th Cir.2000). Inferences are for a fact-finder and we are not that. *185 See id.* Still, we conclude that actual intent *could* be inferred from the evidence before us.

At the summary judgment hearing, the district court stated that there was no evidence of intentional discrimination. The court held the DHR "did whatever [it] could to provide effective communication." The plaintiffs argue that the district court failed to view the facts in the light most favorable to them as the non-movants. They rely on Mr. Perez's handwritten notes on his daughter's

Reply Appendix 061

Perez v. Doctors Hosp. at Renaissance, Ltd., 624 Fed.Appx. 180 (2015)
51 NDLR P 152

medical records that document at least 18 dates on which an interpreter was not provided. Also, in Mr. Perez's deposition, he testified that when he asked one nurse for an interpreter, she told him one would be provided "[o]nly when the doctor shows up or if there's any questions you need help or concerns, then you can ask." Mrs. Perez also testified in her deposition that when she requested an interpreter, sometimes the "nurses would say no. They would say that the boss said no." Furthermore, Teran testified that DHR's policies as to the hearing impaired were "certainly" in need of revision, and had not been revised since May 2012, and that DHR did not provide any training on addressing the needs of the hearing impaired.

Our review of the evidence is through the summary judgment lens. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.,* 759 F.3d 498, 505 (5th Cir.2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (internal quotation marks omitted). In examining the evidence, we are guided by a case in which a plaintiff driver, who was severely hearing impaired, was involved in a car accident. *See Delano–Pyle,* 302 F.3d at 570. When a police officer arrived, the driver informed him of his hearing disability. *Id.* The officer nonetheless performed several sobriety tests on the driver without asking which form of communication would be effective. *Id.* The driver sued for violations of the ADA, the RA, and Chapter 121 of the Texas Human Resources Code. *Id.* at 571. A jury found the county liable, and the county appealed. *Id.* On appeal, on plain error review, we held that "[t]he facts addressed at trial support the jury's finding of intentional discrimination." *Id.* at 573, 575. We deemed it important that "no matter how many times [the officer] repeated himself and no matter how loudly he spoke, [the driver] could not understand most of what he was saying," yet the officer did not "try[ ] a more effective form of communication." *Id.* at 575.

We acknowledge the alleged RA violation here and in *Delano–Pyle* occurred in different contexts. Still, the evidence in each case could be seen as suggesting that the defendant's agents ignored clear indications that they were dealing with a hearing-impaired person with special communication needs.

The summary judgment evidence is sufficient to create a genuine dispute as to whether DHR intentionally discriminated against the plaintiffs. There is evidence indicating that on several occasions, an interpreter was requested but not provided. There is also evidence indicating that one of the forms of communication that DHR was utilizing, the VRI machines, was often ineffective. In *Delano–Pyle,* the plaintiff did not show he ever requested an interpreter or auxiliary aid, yet we concluded that the failure to provide an effective form of communication was evidence of intentional discrimination. Here, some evidence indicates that the plaintiffs made repeated requests for auxiliary aids, yet DHR failed on several occasions to provide **\*186** effective aids and in some instances refused to provide an interpreter after one had been requested.

We conclude that, even without applying a deliberate indifference standard, there is a genuine dispute of material fact as to whether DHR intentionally discriminated against the plaintiffs. Accordingly, the district court's dismissal of the plaintiffs' RA claim was error. On remand, the district court may, if necessary to resolve the case, make the initial effort to define intent under this statutory scheme.

*III. Chapter 121 of the Texas Human Resources Code*
The district court granted DHR's second motion for summary judgment after noting in its order that the parties did not dispute that Chapter 121 is analogous to the RA. The court found there was no "genuine issue of material fact on whether the steps taken by DHR to provide auxiliary aids and services to Plaintiffs demonstrate an intent to discriminate against Plaintiffs because of their disability." Because we hold that the plaintiffs have demonstrated that a factual dispute exists on the question of intentional discrimination, we reverse the district court's grant of summary judgment to DHR on the plaintiffs' Chapter 121 claims.

*IV. Declaratory Relief*
The plaintiffs argue that it was error for the district court to dismiss their claims because they specifically requested declaratory relief in their complaint. DHR responds that the plaintiffs only requested declaratory relief on their ADA claim, and that declaratory relief is not available when there is no risk of future harm. The district court did not address the issue of declaratory relief in either of its

Perez v. Doctors Hosp. at Renaissance, Ltd., 624 Fed.Appx. 180 (2015)

51 NDLR P 152

summary judgment orders or at the summary judgment hearing. We leave the question of declaratory relief for the district court to consider in the first instance on remand.

\* \* \*

We REVERSE the district court's dismissal of the plaintiffs' claims and REMAND for further proceedings consistent with this opinion.

**All Citations**

624 Fed.Appx. 180, 51 NDLR P 152

Footnotes

\*    Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1    The plaintiffs also appear to argue that the district court should have addressed the merits of their ADA claim. In their response to DHR's motion for partial summary judgment, the plaintiffs' only argument on the ADA claim was that they had standing to bring the claim because there was a real and immediate threat of future harm. They did not raise any argument as to the merits of their ADA claim. They may not raise that issue now. *See Brazos Valley Coal. for Life, Inc. v. City of Bryan,* 421 F.3d 314, 321 n. 7 (5th Cir.2005).

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Reply Appendix 063**