**Case No. 4:14-cv-03253**
_____

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**
_____

*Stephen McCollum, et al.*
*Plaintiffs,*

*v.*

*Brad Livingston, et al.*
*Defendants.*

**TDCJ DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**BRANTLEY STARR**
Deputy First Assistant
Attorney General

**JAMES E. DAVIS**
Deputy Attorney General
For Civil Litigation

**KAREN D. MATLOCK**
Chief, Law Enforcement Defense Division

**MATTHEW J. GREER**
Assistant Attorney General

**CYNTHIA LEE BURTON***
Assistant Attorney General

**OFFICE OF THE ATTORNEY
GENERAL OF TEXAS**
P.O. Box 12548, Capitol Station
Austin TX 78711
(512) 463-2080/Fax (512) 936-2109
COUNSEL FOR TDCJ DEFENDANTS

*Attorney in Charge

# TABLE OF CONTENTS

I.    DIRECTOR LIVINGSTON IS ENTITLED TO QUALIFIED IMMUNITY BASED
      ON THE CLEARLY ESTABLISHED AND UNCONTROVERTED FACTS ....... - 1-

      A.    Though Plaintiffs Claim there are Disputed Issues of fact, the universe of
            undisputed facts demonstrates Director Livingston's entitlement to qualified
            immunity. ............................................................................................. - 5-

      B.    Plaintiffs Failed to create material issues of fact that Director Livingston was
            subjectively aware that TDCJ's heat mitigation protocols would not keep
            inmates reasonably safe prior to the summer of 2011.  Such facts are necessary
            to support a deliberate indifference claim. ................................... - 6-

      C.    Even if accepted, expert testimony that an official should have taken another
            course of conduct is legally insufficient to overcome qualified immunity. - 10-

      D.    Plaintiffs' novel "willful ignorance" theory is supported by a single obviously
            inapplicable case and would require this court to rule against well-established
            law defining the relevant inquiry in terms irreconcilable with this theory .- 12-

II.   REGIONAL DIRECTOR EASON AND WARDEN PRINGLE ARE ENTITLED TO
      QUALIFIED IMMUNITY ................................................................................ - 13-

      A.    The lack of a pattern of constitutional violations is fatal to Plaintiffs' claim.
            ................................................................................................................ - 16-

III.  OFFICERS CLARK, TATE, AND SANDERS ARE ENTITLED TO QUALIFIED
      IMMUNITY. ............................................................................................... - 17-

      A.    The absence of clearly established law is demonstrated by Plaintiffs' attempts
            to cite to out-of-circuit and factually inapplicable law. ............................ - 18-

      B.    The undisputed facts demonstrate their entitlement to qualified immunity.- 19-

      C.    Under Fifth Circuit precedent, evidence that an Officer was following existing
            procedures and policies is relevant to the qualified immunity analysis ...... - 20-

      D.    Plaintiffs have failed to create a fact issue with regard to whether Clark, Tate,
            or Sanders were subjectively aware that McCollum was having a heat stroke
            as opposed to a seizure. ..................................................................... - 21-

IV.   PLAINTIFFS REQUEST THIS COURT TO FUNDAMENTALLY ALTER ADA
      LAW WITHOUT CITING PRECEDENT OR DOING SO. ................................. - 23-

**A.** **TDCJ was unaware of any of McCollum's alleged disabilities, and no evidence is cited to support the conclusion that TDCJ was aware McCollum's obesity was affecting his major life activity of thermoregulation.** ........................... -23-

**B.** **Without offering any legal support, Plaintiffs ask this Court to conflate knowledge of a condition associated with a risk with knowledge of an ongoing impairment of a major life activity.** ................................................ -25-

**C.** **By its terms, intentional conduct requires more than generalized knowledge of a potential for a risk.** ..................................................................... - 26-

**D.** **Plaintiffs fail to demonstrate the requisite proof for an ADA claim that TDCJ staff intentionally excluded McCollum from a program or service by reason of or because of his disability.** ........................................................... -29-

**E.** **Plaintiffs' attempts to distinguish or outright ignore binding precedent are ineffective and should be disregarded.** ......................................... - 31-

**V.** **PLAINTIFFS FAIL TO BRING FORTH ANY ISSUE OF FACT DEMONSTRATING ENTITLEMENT TO PUNITIVE DAMAGES.** ................. - 33-

**VI.** **PLAINTIFFS DO NOT MEET THE REQUIREMENTS FOR THIRD-PARTY STANDING ON BEHALF OF LIVING INMATES AT THE HUTCHINS UNIT** - 34-

**VII.** **CONCLUSION** ....................................................................... - 37-

TABLE OF AUTHORITIES

## Cases

*Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) .................................................. 16

*Ball v. LeBlanc*, 792 F.3d 584, 592–93 (5th Cir.2015).............................................. 25

*Blackmon v. Garza*, 484 F. App'x 866 (5th Cir. July 30, 2012) .................................. 13

*Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 550 (6th Cir. 2003) ........................... 36

*Borum v. Swisher Cty.*, No. 2:14-cv-127-J, 2015 WL 327508, at *7 (N.D. Tex. Jan. 26, 2015) . 30

*Burch v. Coca–Cola Co.*, 119 F.3d 305, 316 (5th Cir.1997) ...................................... 25

*Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir.2003) .............................. 16

*City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) ................................................ 34

*City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)............... 5, 12, 22

*Connick v. Thompson,* 563 U.S. 51 (2011) ................................................................ 10

*Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. Appx. 963, 965 (5th Cir.2004)............... 32

*Delano–Pyle v. Victoria County*, 302 F.3d 567, 575 (5th Cir.2002) ............................... 26, 27, 28

*Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir.2001)................................... 12

*Estrada v. San Antonio Indep. Sch. Dist.*, 575 F. App'x 541, 544 (5th Cir. 2014); ...................... 29

*Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363, 365 (5th Cir.2013)................................... 27, 29, 31

*Estate of Flores v. Fox,* 394 Fed. Appx. 170, 171 (5th Cir. 2010) ................................. 36

*Estate of Henson v. Krajca*, 440 Fed.Appx. 341, 346 (5th Cir. 2011)......................... 22

*Estate of Palo v. Dallas Cnty.*, No. 3:05-CV-0527-D, 2006 WL 3702655 (N.D. Tex. Dec. 15, 2006) .................................................................................................................... 36

*Estate of Schroeder v. Gillespie County*, 25 F. Supp. 3d 775, 785-86 (W.D. Tex. 2014)............ 21

*Estelle v. Gamble*, 429 U.S. 97, 104, (1976) ............................................................ 16

*Farmer v. Brennan*, 511 U.S. 825, 838 (1994) ........................................................ 12

*Garrett v. Thaler*, 560 Fed. App'x 375, 383 (5th Cir. 2014)........................................ 32

*Gates v. Cook*, 376 F.3d 323, 339-40 (5th Cir.2004)............................................. *passim*

*HDRE Business Partners Ltd. Group, L.L.C. v. Rare Hospitality Intern., Inc.*, 484 Fed. Appx. 875, 877 (5th Cir. 2012),..................................................................................... 29

*Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011) ....................................................... 32

*Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 (5th Cir.1996)................................ 22

*Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir.2012)..................................................... 32

*Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 934 (7th Cir.1995) ......................... 25

*Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 758 (S.D. Tex. 2011) ...................... 25

*Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir.2015) ......................................... 13

*Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2nd Cir. 1997) ............... 36

*Jacobs v. West Feliciana Sheriff's Dept.* 228 F.3d 388, 398 (5th Cir. 2000) ........................ 20, 21

*James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009) .................................... 13

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir.2004) ...................................................................................................... 16

*Johnson v. Texas Bd. of Criminal Justice*, 281 F. App'x 319, 321 (5th Cir. 2008) .................... 13

*King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012) ........................................... 16, 18

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-36 (1999) ........................................ 33

*Kowalski v. Turner*, 543 U.S. 125, 129 (2004)...................................................... 34, 35

*Lamb v. Mendoza*, 478 F. App'x 854, 855 (5th Cir. 2012) ......................................... 33

*Lee v. Valdez*, No. 3:07-CV-1298-D, 2009 WL 1406244 (N.D. Tex. May 20, 2009) .......... 33, 36

*Liberty Res. Inc. v. Se. Penn. Transp. Auth.*, 155 F.Supp.2d 242, 249 (E.D. Pa. 2001)............... 36

*Milton v. Tex. Dep't of Crim. Justice*, 707 F.3d 570, 572 (5th Cir. 2013). ................................. 6, 9

*Morgan v. Swanson*, 659 F.3d 359, 378–79 (5th Cir.2011)......................................... 18

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)........................................................... 5

*Mx Group, Inc. v. City of Covington* 293 F.3d 326, 334 (6th Cir. 2002)........................ 35

*Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir.2012)................................ 32

*Perez v. Doctor S Hosp. at Renaissance, Ltd.*, 624 Fed. Appx. 180, 182 (5th Cir. 2015)...... 27, 28

*Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) ....................................................................... 12

*Plumley v. Landmark Chrevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir.1997)................................... 35

*Quatroy v. Jefferson Parish Sheriff's Office*, 2009 WL 1380196, *10 (E.D. La. May 14, 2009) ....
...................................................................................................................................... 19, 20

*Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir.1999);............................................................. 25

*Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012) ...................................................................... 18

*Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996)..................................... 25

*Smith v. Sullivan*, 553 F.3d 373, 381 (5th Cir. 1977) ..................................................................... 3

*Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)................................... 33

*Sockwell v. Phelps*, 20 F.3d 187, 192 (1994).............................................................................. 33

*Spencer v. Kemna*, 523 U.S. 1, 17 (1998).................................................................................... 36

*Stewart v. Guzman*, 555 Fed.Appx. 425 (5th Cir.2014) ......................................................... 21, 22

*Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); ....................................................................... 1, 5

*Taylor v. Richmond State Supported Living Ctr.*, 2012 WL 6020372, n.2 (S.D. Tex. 2012)....... 26

*Tuft v. Texas*, 410 Fed.Appx. 770, 775 (5th Cir.2011) ................................................................ 32

*United States v. Freeman*, 434 F.3d 369, 378 (5th Cir. 2005)..................................................... 12

*United States v. Georgia*, 546 U.S. 151 (2006) .......................................................................... 30

*United States v. Griffin*, 84 F.3d 912, 927 (7th Cir. 1996............................................................. 2

*Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir. 2008) ...................................................... 3, 13

*Vela v. White*, 703 F.2d 147, 152 (5th Cir. 1983) ....................................................................... 21

*Zaragoza v. Dallas Cty.*, 2009 WL 2030436, at *11 (N.D. Tex. July 13, 2009)................... 25, 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN MCCOLLUM, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL NO. 4:14-CV-3253 |
| | § | |
| | § | |
| BRAD LIVINGSTON, *et al.*, | § | |
| *Defendants*. | § | |

**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**NOW COME** Brad Livingston, Robert Eason, Jeffery Pringle, Sandrea Sanders, Karen Tate, Richard Clark and the Texas Department of Criminal Justice and submit this reply to Plaintiffs' response to Defendants' Motion for Summary Judgment.

Throughout their response, Plaintiffs attempt to bypass the requirement under qualified immunity that the clearly-established law must dictate the unlawfulness of a defendant's conduct with a high degree of particularity, by simply ignoring it. Indeed, though the Supreme Court has squarely addressed and defined this legal standard three times, *within the last year*, in terms incompatible with Plaintiffs' theories, Plaintiffs do not so much as cite to or even mention these cases. Nor do they offer *any* argument as to why they do not control. *See City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). That Plaintiffs would attempt to argue this case without even a bare acknowledgement—much less counterargument—regarding this recent and binding law speaks volumes about the tenuousness of Plaintiffs' legal position. Rather than address the overwhelming legal precedent or the uncontested facts that demonstrate Defendants' entitlement to qualified immunity, Plaintiffs employ an oft-quoted adage: "If the law

is against you, argue the facts; if the facts are against you, argue the law; and if they both are against you, pound the table." *United States v. Griffin*, 84 F.3d 912, 927 (7th Cir. 1996). Overcoming qualified immunity requires a strong showing under the facts and law. Plaintiffs have supplied neither.

## I.  Director Livingston is entitled to qualified immunity based on the clearly established and uncontroverted facts.

Plaintiffs' tenuous stance is best illustrated by their argument against Director Livingston's entitlement to qualified immunity. First, it should be noted that it is entirely unclear what case law Plaintiffs rely upon that clearly established the illegality of Director Livingston's decisions because Plaintiffs appear to be citing incorrect pages of their own brief. (See D.E. 297 at 100)[1] Plaintiffs summarily refer to other portions of the brief which define the clearly established law, but, upon review, the pages cited (43-44, 71-72, 84) do not discuss this subject at all. (See D.E. 297 at 100, 51-52, 79-80, 92)[2] Assuming this is a typographical error, it appears Plaintiffs are relying on the generic assertion that "prisoners' entitlement to adequate protections against extreme temperatures is clearly established," for which they have cited *Hinojosa v. Livingston, et al.*, 807 F.3d 657, 669 (5th Cir. 2015) (citing *Gates v. Cook*, 376 F.3d 323, 339-40 (5th Cir. 2004); *Blackmon v. Garza*, 484 Fed. Appx. 866, 869 (5th Cir. 2012); *Smith v. Sullivan*, 553 F.3d 373, 381 (5th Cir. 1977)). *See also Webb*, 618 Fed. Appx. 201 (5th Cir. 2015) (unpublished). (See D.E. 297 at 84).

---

[1] All references to Plaintiffs' response will reference the page numbers assigned by the PACER filing system in blue in the top right corner of the page as opposed to the numbering applied by Plaintiffs in the original document.

[2] Plaintiffs' page number 43-44 appears on the Pacer page no. 51-52; Plaintiffs' page 71-72 appears at Pacer page no. 79-80, Plaintiffs page no 84 appears at Pacer page no. 92.

The Plaintiffs invite the court to commit a clear legal error by attempting to define the clearly established law through cases that post-date the conduct at issue.  *See Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). ("Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.").   Discounting the cases that post-date the incident, the only cases remaining which guide the analysis are *Gates*, *Valigura,* and *Smith v. Sullivan*, 553 F.3d 373, 381 (5th Cir. 1977).   Plaintiffs, nevertheless, offer no explanation as to how these cases define the issues with the level of particularity required under the clearly-established law inquiry.  Plaintiffs devote little briefing to the issue of the clearly-established law inquiry because the case law necessary to their theory of liability does not exist.

In *Smith*, the Fifth Circuit specifically held that federal courts did *not* have authority to mandate specific temperature ranges in a county jail.  *Smith*, 553 F.3d at 381.  The opinion on the relevant issue comprised two sentences containing 57 words, and includes nothing more than a generic statement that temperatures can implicate the Eighth Amendment.  *Id.*  The case has no discussion whatsoever as to heat mitigation measures or what the measures should comprise. *Id.* A reasonable prison official reading *Smith* in 2011 would gain no insight as to what his specific duties are under the Eighth Amendment.  As explored extensively in Defendants' motion, neither *Gates* nor *Valigura* clearly establish that the measures taken by TDCJ or Director Livingston were Constitutionally insufficient. (D.E. 288 at 53-55)  Indeed these cases strongly support Defendants' position that they ordered the implementation of the measures (or the functional equivalents) these cases define.

As they relate to Director Livingston, none of these cases remotely discuss the duties of a top level executive.  In fact, a review of Plaintiffs' briefing reveals that Plaintiffs cited to no cases

that even refer to the very acts that comprise Plaintiffs' claims against Director Livingston. Plaintiffs cite to no case that mandates that the top-level executives take personal involvement to investigate and review policies after the occurrence of one or two deaths in a prison system as large as TDCJ. Plaintiffs fail to offer any cases that find prison officials cannot delegate these types of matters to subordinates with far more expertise. (See D.E. 297 at 88 citing to no case law) Plaintiffs cite to no case mandating that air conditioning is required under the Eighth Amendment or that requires prison executives to order construction expenditures of state funds that they do not have authority to unilaterally order. (D.E. 297 at 93 citing to no case law)  Plaintiffs cite to no case that required 24-hour medical care, or held that prison executives cannot rely on the judgment of prison healthcare medical providers in terms of how medical care should be staffed at different facilities. (D.E. 297 at 89 citing to no case law)  Plaintiffs cite to no case that holds that the Eighth Amendment mandates that heat precaution measures must be communicated through a numbered policy as opposed to a yearly written order.[3] (D.E. 297 at 96 citing to no case law)  Finally, and most importantly, Plaintiffs have cited to no case law that requires the implementation of any heat mitigation measures that TDCJ and Director Livingston, through his delegated subordinates, had not already ordered throughout the TDCJ system. (See generally, D.E. 297 citing to no case law requiring, or even suggesting, the implementation of heat mitigation measures beyond those contained in *Gates*.)

Plaintiffs, instead, invite this Court to commit the exact same error that the Supreme Court has three times within the last year implored lower courts—"with some exasperation"—to avoid: that is, the Plaintiffs invite this Court to define the clearly-established law in broad generalities

---

[3] In fact, the Fifth Circuit has held directly to the contrary. *Gates*, 376 F.3d at 338–39 (holding no case that supports the proposition that trial court can further affect the internal operations of a state prison system by requiring it to produce a written policy because the Eighth Amendment does not impose such requirements).

rather than in particularity. *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The dispositive question is "whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308. (internal citations omitted). Plaintiffs' framing of the clearly-established law as merely the right to be free from high temperatures without remedial measures is precisely the type of broad generality prohibited by this recent and binding precedent. Defendants asserted the proper analysis of clearly established law throughout their Motion. Plaintiffs, however, failed to offer any counter argument or explanation on how the broad generality contained in their statement of clearly established law actually comports with the specificity required by Supreme Court's holding in *Sheehan*, *Taylor*, or *Mullinex*.

**A.      Though Plaintiffs claim there are disputed issues of fact, the universe of undisputed facts demonstrates Director Livingston's entitlement to qualified immunity.**

Undisputed facts also confirm Director Livingston's entitlement to qualified immunity. There is no dispute that high level officials within TDCJ meet each year to review and reissue orders requiring the implementation of 24 different measures that meet and exceed those required under *Gates*. (D.E. 288-12 at 30-32)  There is also no dispute that these orders are distributed system-wide. (D.E. 288-12 at 30-32)  Plaintiffs do not dispute that these measures were ordered in addition to written policies regarding heat safety contained in AD 10.64 and correctional managed health-care policy B-15.2. (D.E. 288-10 at 15-25; 28-35)  Plaintiffs offered no expert testimony or other evidence that disputes Director Livingston's view that effective leadership is impossible and ineffective if the executive director becomes personally involved in the minutia of daily operational functions. (D.E. 288-38 at 72-73)  Plaintiffs offered no evidence that Director Livingston was ever personally aware that the measures outlined in TDCJ heat mitigation protocols

(or their functional equivalents) were not being carried out on the unit level.  Plaintiffs offered no evidence that, where TDCJ tailored measures to fit the physical plant of a given facility (such as using air handlers for ventilation where windows do not open), that these functional equivalents were somehow insufficient. (D.E. 288-38 at 76; 81-82; 99)  Finally, though Plaintiffs identify a few isolated states that have air-conditioned prisons, Plaintiffs do not dispute that every state in the Fifth Circuit and the Gulf Coast operates prisons without air conditioning.[4] (D.E. 288 at 72-73)  These facts, to which Plaintiffs have offered no dispute, entitle Director Livingston to qualified immunity.

**B.     Plaintiffs failed to create material issues of fact that Director Livingston was subjectively aware that TDCJ's heat mitigation protocols would not keep inmates reasonably safe prior to the summer of 2011.  Such facts are necessary to support a deliberate indifference claim.**

Plaintiffs attempt to meet the deliberate indifference standard by chiefly relying upon artfully crafted excerpts from testimony while omitting the portions of the testimony and evidence that squarely undercut the argument or evidence offered.  "Conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence are insufficient to create a genuine issue of material fact." *Milton v. Tex. Dep't of Crim. Justice*, 707 F.3d 570, 572 (5th Cir. 2013).  Yet, laid bare, Plaintiffs' evidence is insufficient to support a cognizable claim of deliberate indifference as it rests entirely on conclusory allegations, unsubstantiated assertions, and evidence that is legally insufficient to survive summary judgment.

---

[4] Plaintiffs take great issue with the assertion that the Federal Bureau of Prisons ("BOP") operates prisons with un-air-conditioned cells, arguing that the majority are air-conditioned.  Even if this is so, it does not change the analysis because there is no dispute that the BOP operates at least some cells without air-conditioning, contrary to Plaintiffs' position that no prison in the South can comply with the Eighth Amendment without air conditioning.

In attempting to meet the subjective awareness standard under deliberate indifference, Plaintiffs claim Director Livingston was deliberately indifferent because he "ignored" heat *illnesses* suffered every summer. (D.E. 297 at 86)  Yet, the very report Plaintiffs cite as their lone proof of this point only documents "weather related injuries" among 20 other types of injuries ranging from animal bites to slip-and-fall incidents.[5] (D.E. 302-11 at 49-56)  More surprisingly, the "weather related" injuries in this report included incidents of sunburn, and "other similar situations." (D.E. 302-11 at 56)  TDCJ operates one of the nation's largest integrated agricultural operations and an outdoor workforce in the tens of thousands (or over a hundred thousand) of inmates and officers.  (D.E. 288-38 at 102-103)   TDCJ allows inmates to participate in outdoor recreation on a daily basis.  Director Livingston specifically testified that the notion that an average of 20 injuries documented as "weather related" (including sunburns) between June, July, and August must be considered in context given the size of TDCJ's inmate population (approx. 150,000) and workforce (approx. 38,000). (D.E. 288-38 at 93 & Appx. at 005)  Director Livingston testified—*and Plaintiffs' counsel twice agreed*—that the significance of these statistics in terms of the risk due to un-air conditioned housing areas require a detailed review of factual context of each injury (i.e. working in the field or just present in the housing area).[6]  Director Livingston testified

---

[5] It should also be noted that the very report relied upon to claim such knowledge was actually created well after McCollum's death, as it contains a report for the fiscal year of 2011, meaning it could not have been completed or reviewed prior to his death.

[6] Q.    All right.··Let's go to 2013.
   A.    I think to your point there that emphasizes that there are variety of things that might factor into injury weather-related injuries that may be separate and apart from the heat and specific conditions.
   Q.    Sure.··Sure. Now, the best way to find that out, though, is to --
   A.    -- look at each individual case.
(Appx. at 006:8-18)

Q.    Do you think that trend would go down if there was climate control in the housing area?

that he is not an expert in risk management, and thus relies on the experts and professionals in

TDCJ's risk management division to analyze these statistics and to determine whether the injuries

reported were outside the norm of what is common. Director Livingston also relies on TDCJ's risk

management division to call to his attention any statistics which might have presented a trend that

was problematic or outside of what these experts would normally expect for a population the size

of TDCJ performing as much outdoor work as TDCJ performs. (Appx. 003-004:15-25, 1-21)

Crucially, no one has ever done so with regard these statistics. (*Id.*)  In full view of the facts,

Plaintiffs' claim that Director Livingston is personally "ignoring non-fatal heat related injuries" is

flatly unsupported in the full view of the undisputed evidence, which is insufficient to create an

issue of fact.

Plaintiffs rely on similarly skewed evidence to try and claim that Director Livingston was

aware of every heat death, other than the two that occurred in 2007. (D.E. 297 at 91-92)  To support

this rather incredible claim, Plaintiffs cite a single-page document created in 1999 where Brad

Livingston, who was the deputy director of finance at the time, is listed as the second name in the

"from" line. (D.E. 305-5 at 2)  The document contains the finance division's comments to a

revision of AD 10.64 taking place during the winter of 1999. (*Id.*)  The document contains purely

grammatical and semantic suggestions. (*Id.*)  It contains no analysis of heat-safety measures or

protocols, or any evidence that the finance division in general, or Brad Livingston personally, ever

reviewed the policy with knowledge of any heat-related injuries or deaths.  Nor would this be

surprising; the finance division in TDCJ performs the following: "The mission of Business and

---

A.      I don't know because what I don't know is the percentage of these, without getting the case-by-case detail, I
        don't know the percentage of these occurred in the housing areas as opposed to out in the field working on
        job assignments.··So I would really hate to guess.
Q.      Fair enough.
(Appx. 007-008:20-25, 1-4)

Finance is to support the agency through sound fiscal management, provision of financial services and statistical information, purchasing and leasing services, agribusiness, land and mineral operations, maintaining a fiduciary responsibility over offender education and recreation funds, and ensuring fiscal responsibility through compliance with laws and court-mandated requirements." (See https://www.tdcj.texas.gov/divisions/finance/index.html)  Nowhere, does this division's mission include any topic remotely related to the review of heat-safety protocols or risk management.  More tellingly, the working group that reviewed and formulated TDCJ heat mitigation protocols after the summer of 1998 did not include Livingston or anyone from the finance division. (D.E. 288-11 at 59)  Director Livingston unequivocally testified that he was not aware of any pre-2011 heat deaths other than the two in 2007. (D.E. 288-38 at 78) This document—upon which Plaintiffs' entire claim of prior knowledge rests—in no way provides evidence to the contrary. "Conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence are insufficient to create a genuine issue of material fact." *Milton*, 707 F.3d at 572.

Plaintiffs also take great pain to highlight the similarities between the decedents in the two 2007 deaths of which Director Livingston was actually aware, but ignore the glaring circumstances that make these incidents so unique.  While it is accurate that both deaths occurred over night, in transfer facilities, and that each man had health complications, the unique conditions that the 2007 decedents had (which Plaintiffs do not dispute) are far more significant than their general similarities.  That Robles had no sweat glands and that Shriver had a sodium imbalance and an undiagnosed cardiac arrhythmia are circumstances that show that a reasonable correctional administrator could conclude that these two deaths were isolated incidents out of a population of

over 150,000.[7]  (D.E. 288-12 at 49; 52)  As such, Director Livingston could reasonably conclude the two deaths did not demonstrate any signal of a systemic, agency-wide problem.

In any event, knowledge of two deaths over a six year period does not demonstrate a "pattern of violations" necessary to prove supervisory liability.  The Supreme Court has cautioned against second guessing the specificity and coverage of existing policy and training in the context of §1983 damages actions because every time a state actor violates a constitutional right, "a §1983 plaintiff will be able to point to something the [state] 'could have done' to prevent the unfortunate incident." *See Connick v. Thompson,* 563 U.S. 51 (2011) (rejecting a claim of supervisory liability due to four *Brady* violations over a 10 year period).  Once again, the undisputed evidence negates the ability to raise a material issue of fact on this claim.

**C.     Even if accepted, expert testimony that an official should have taken another course of conduct is legally insufficient to overcome qualified immunity.**

Finally, Plaintiffs attempt to create fact issues by citing to expert testimony given in the *Cole* case.[8]  Even if this Court were to accept these opinions as evidence against TDCJ, this is insufficient to create an issue of fact under binding case law.  First, Plaintiffs attempt to attribute knowledge of a past heat death by citing Dr. Rieger's testimony that a policymaker could have identified a problem due to inmates death in 1998.  (See D.E. 297 at 91)  Yet, TDCJ did identify this problem in 1998, and worked system-wide to address it. (See D.E. 288-10 at 39-82; D.E. 288-11 at 1-56, 59)  But, there is no evidence that Director Livingston, who was the deputy director of finance in 1998, was involved in these efforts or apprised of the 1998 heat deaths. (*Id.*)  Despite

---

[7] Plaintiffs spend a great deal of time arguing that Director Livingston was not aware of these facts, though he is not claiming that he was.  The qualified immunity standard asks whether the defendants' conduct was objectively reasonable, and a reasonable correctional administrator in possession of these facts would be justified in concluding that they were not indications of a systemic problem.

[8] Defendants' incorporate by reference Defendants' Opposed Motion Designate Dr. Rieger as an Expert and to Supplement the record with his report.

this attempt to misrepresent, even if Dr. Rieger opined that either Director Livingston (or some other official) could have been aware of a pattern from the three 1998 heat deaths, this alone is insufficient to overcome qualified immunity.  The Supreme Court has expressly rejected such a notion. *See Sheehan*, 135 S. Ct. at 1777 (2015) (holding that a plaintiff cannot avoid summary judgment by simply producing an expert's opinion that the defendant should have chosen a different course of conduct).  Neither legally nor factually does Dr. Rieger's testimony create an issue of fact regarding Director Livingston's subjective knowledge.

Plaintiffs next claim Director Livingston violated the Eighth Amendment by not reducing the annual heat message to formal policy, as opposed to an annual written communication.  (D.E. 297 at 96)  Plaintiffs purport to create an issue of fact by claiming that Dr. Rieger testified that TDCJ heat mitigation protocol should have been promulgated in a policy, rather than communicated each year through the TDCJ Mainframe message system. (*Id.*)  An examination of the cited testimony is far from that which Plaintiffs claim it to be.

Even if this Court fully accepted Dr. Rieger's opinion, Plaintiffs cite no case law to support the proposition that prison administrators violate the Eighth Amendment by communicating orders though an annual message delivered via a system-wide messaging system as opposed to a written formal policy. Indeed, the Fifth Circuit has expressly rejected the notion that the Eighth Amendment requires prison systems to reduce its procedures to formal policies.  *Gates*, 376 F.3d at 338–39 (holding that no case law exists to allow a trial court to affect internal operations of a state prison by requiring it to produce a written policy, because the Eighth Amendment does not impose such requirements.)  Finally, this opinion (if accepted) standing alone is insufficient to create a material issue of fact because the mere presence of expert testimony that officials should

have chosen an alternate course of conduct is not sufficient to overcome qualified immunity.  *See Sheehan*, *supra*.

**D.    Plaintiffs' novel "willful ignorance" theory is supported by a single obviously inapplicable case and would require this Court to rule against well-established law defining the relevant inquiry in terms irreconcilable with this theory.**

In the absence of the evidence needed to sustain their claim, Plaintiffs throw up their hands and claim that even if there is no evidence that Director Livingston was aware of every past heat death prior to his becoming executive director, such evidence can be imputed because it was "willful blindness." (D.E. 297 at 92)   Such a theory is without legal precedent and runs counter to well-established precedent defining the necessary proof.   Plaintiffs cite to *United States v. Freeman*, 434 F.3d 369, 378 (5th Cir. 2005) for this convoluted and novel theory.   A careful reading of *Freeman*, however, shows that it is inapplicable.   *Freeman* is a criminal case involving claims of fraud in the operation of a Ponzi scheme.   In no way does it concern the Eighth Amendment, prison administration, or any topic related to this case.   The Court held that the lower court did not err when it gave a jury instruction that the *mens rea* for the crime could be proved through "deliberate indifference" because the applicable standard "permits the jury to convict without finding that the defendant was aware of the existence of illegal conduct." *Id.* at 378.   Such notions do not apply under the Eighth Amendment deliberate indifference standard, or qualified immunity.  *See Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (The "failure to alleviate a significant risk that [the official] should have perceived, but did not, is insufficient to show deliberate indifference."); *See also, Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) ("Pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the

circumstances."").   Plaintiffs' proposed "willful ignorance" standard is little more than a repackaged invitation for this Court to commit error by lowering the Eighth Amendment standard to negligence, something the Fifth Circuit has repeatedly rejected.  *See, e.g.*, *James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009) (Deliberate indifference "is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight.") (internal citations omitted).   This Court should reject it accordingly.

**II.     Regional Director Eason and Warden Pringle are entitled to qualified immunity.**

Plaintiffs' arguments regarding qualified immunity for Eason and Pringle fail for similar reasons.  At the outset, Plaintiffs once again invite the court to commit legal error by attempting to define the clearly-established law through a case issued years after the events of this case. (See D.E. 297 at 84 defining the clearly established law through citations to *Hinojosa*, 807 F.3d at 669 (5th Cir. 2015) *Blackmon*, 484 Fed. Appx. at 869 (5th Cir. 2012) and *Webb*, 618 Fed. Appx. 201 (5th Cir. 2015)).  The clearly established law simply cannot be defined by case opinions issued after the occurrences at issue. [9]  (See Section *I. A.*, *supra*)  Just as with Director Livingston, neither *Gates* nor *Valigura* mandate any action or measures in accordance with clearly established law that Eason or Pringle failed to order at the Hutchins Unit. (See D.E. 288-38 at 32-33, 42-43)

---

[9] Plaintiffs also attempt to distinguish the Fifth Circuit's rejection of the notion of air conditioned prisons in *Johnson v. Tex. Bd. of Crim. Justice*, 281 Fed. App'x 319, 321 (5th Cir. 2008) by claiming that the court did not address the question whether the lack of air conditioning can pose a substantial risk of heat to inmates. (See D.E. 297 at n.160) Plaintiffs appear to be reading the Fifth Circuit's opinion in isolation.  Plaintiffs did not examine the underlying claim in the district court or the district court's opinion (though this was cited in Defendants' Brief). The plaintiff's complaint in *Johnson* unequivocally raised the safety concerns posed by un-air-conditioned environments.  The district court's holding rejected these claims, and the Fifth Circuit affirmed.  A reasonable prison official reading the plaintiffs' complaint, the district court's dismissal, and the Fifth Circuit's affirmance would conclude Texas prisons were within the bounds of the Eighth Amendment, and the law was not clearly established to the contrary, even though both *Gates* and *Valigura* had previously been decided at the time.

Plaintiffs, nevertheless, attempt to disprove qualified immunity by claiming that neither Eason nor Pringle can be entitled to qualified immunity because their implementation of the *Gates* measures was not done in the precise manner as set out by the *Gates* Court in the context of the Parchman facility in Mississippi.  Plaintiffs, however, do not challenge the uncontested facts that the Hutchins Unit employed measures that were the functional equivalents of each of the *Gates* measures.  Plaintiffs also do not dispute that air handlers provide a robust air exchange with the outside air of over 15 cfm. (D.E. 288-24 at 8)  Plaintiffs, instead, contend that the Hutchins Unit violated the Eighth Amendment because its windows did not open. Plaintiffs, however, offer no explanation as to why ventilation through windows is Constitutional, but ventilation through an air handler is not. Nor do they cite any case law that would have clearly established this fact to Eason of Pringle. The same is true with regard to the use of fans.  Instead of individual fans, Plaintiffs do not dispute that the Hutchins Unit employed large wall mounted fans to circulate the air in the open-air dorm. (D.E. 288-38 at 127)

While Plaintiffs claim Eason or Pringle should have ordered battery powered fans, they cite to no clearly-established case law that large wall-mounted area fans in an open air dorm were Constitutionally insufficient or that prison officials could violate the Eighth Amendment if they did not purchase battery powered fans.[10]

Evidence shows that that multiple showers per day with lowered water temperature were made available to Hutchins Unit inmates. (D.E. 288-38 at 123-123)  Finally, it is undisputed that

_____

[10] It should be noted that there is no evidence in the record that such a measure would have been possible or feasible. With over 2000 inmates at the facility, this would entail buying, storing, and disposing of, thousands of batteries every day.  Plaintiffs offer no explanation or evidence as to how to this would be carried out.

water was constantly available in the dorm areas through sinks equipped with water fountains.[11] (D.E. 288-15 at 69) It is further undisputed that Pringle and the Hutchins Unit staff ordered either iced or chilled water to the dorm areas multiple times daily. (D.E. 288-34 at 24)  If ice was limited, Hutchins Unit staff placed water coolers full of water in a refrigerator to cool the water inside before distributing to the dorms.  Again, Plaintiffs cite to no case nor offer any explanation why iced water is Constitutionally adequate, but chilled water is not.[12]  Plaintiffs can point to some variance in the means of implementation of the *Gates* factors because of the uniqueness of the Hutchins facility. Plaintiffs cannot, however, identify why those variances create legal distinctions between conduct that is lawful and conduct that is not, nor do they cite to cases that would have clearly established these distinctions to either Eason or Pringle.

In addition, there is no fact dispute regarding a number of other measures utilized by the Hutchins Unit to address the risk of harm due to heat. TDCJ loosened clothing restrictions in the housing areas, lowered the water temperatures in the showers so the offenders could take cool showers, reduced work hours, allowed workers to take frequent breaks in shaded areas, and implemented safer summer transportation procedures. (D.E. 288-10 at 15-26; D.E. 288-14 at 41-43; D.E. 288-14 at 46; D.E. 288-15 at 805)

Plaintiffs cite to no case law that the emergency response procedures at the Hutchins Unit violated any clearly-established law.  First, in the scant two pages of briefing Plaintiffs devote to arguing against Eason's and Pringle's entitlement to qualified immunity, they cite absolutely no

---

[11] Despite overwhelming and conclusive evidence to the contrary, Plaintiffs persist in the narrative that Mr. McCollum was somehow forced or unable to drink water from a sink with his hands.  This is simply not so.  The sinks in the dorm were equipped with a bubbler to allow the user to drink from them like any normal water fountain.

[12] In addition, to the extent Plaintiffs allege that the water was not chilled, Plaintiffs have cited to no evidence showing that either Pringle or Eason was made aware of this fact, or that inmates were not going to be able to tolerate the heat because of it. (D.E. 288-21 at 35-39; D.E. 288-22 at 1-31)

case law for the proposition that emergency response procedures managed by a chain of command prior to calling 911 are unconstitutional. (See D.E. 297 at 84-86)  Plaintiffs' briefing regarding Defendants Clark, Tate, and Sanders is conclusory: "Prisoners, like Mr. McCollum, have a clearly-established Eighth Amendment right to receive medical care." Plaintiffs fail to cite any clearly established law that relates to Eason and Pringle on this issue. (See D.E. 297 at 53 citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (denying qualified immunity when inmate suffered heat stroke); *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012) (denying summary judgment to nurse who ignored inmate's seizures).  In any event, none of these cited cases address the topic of emergency response plans, and whether a plan that involves the use of a chain of command violates the Constitution.  The absence of such a holding is fatal to this claim.

**A.      The lack of a pattern of constitutional violations is fatal to Plaintiffs' claims.**

Plaintiffs appear to concede that neither Eason nor Pringle were aware of a "pattern of violations" prior to McCollum's death as to either 911 policy, heat training, or the implementation of heat mitigation measures.  Though such a showing is necessary to support their "failure to supervise" claims, the topic is addressed nowhere in their briefing regarding Pringle or Eason. (See D.E. 297 at 56-86) *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003)).  Fatal to their claims, Plaintiffs cannot and have not disputed that no such evidence exists.

While Plaintiffs point to reflective testimony on the chain of command in situations where 911 is needed, the have pointed to absolutely no evidence that such procedures have ever caused a violation in the past, much less a pattern of violations.  Plaintiffs place heavy emphasis on Director Thaler's and Deputy Director Stephens' testimony that, with the benefit of hindsight, they

wished 911 had been called sooner.  They both testified, however, that they were unaware of any past instances where following the chain of command for a 911 call led to an undue delay in an inmate receiving care. (D.E. 305-17 at 42-44, 138-42; D.E. 305-16 at 32; Appx. at 016)  Plaintiffs offered no evidence to the contrary, though binding case law requires such evidence to sustain a claim.

Likewise, Plaintiffs offered no evidence that either Pringle or Eason had knowledge of a pattern of violations due to inadequate heat mitigation measures or inadequate training given to officers.  Again, such evidence is required to sustain these claims under binding precedent. Both Eason and Pringle testified that in their experience working in multiple facilities across the State of Texas, in varying capacities in the chain of command, and for multiple decades worth of summers, neither had experienced or learned of inmates having heat-related illness aside from a rare and occasional minor heat related illness for an outdoor worker.[13] (D.E. 288-39 at 4; Appx. 019-020)  Their experience and the specific lack of a pattern of heat related illness over decades of Texas summers reinforced their belief that TDCJ heat mitigation measures and the training provided to staff were reasonably effective.  The absence of evidence to the contrary is fatal to Plaintiffs' claims.

## III.    Officers Clark, Tate, and Sanders are entitled to qualified immunity.

Though replete with conclusory allegations, Plaintiffs' response, with regard to Clark, Tate, and Sanders, again lacks the very thing necessary to overcome qualified immunity: citation to case

---

[13] Plaintiffs' attempts to create a fact-issue with regard to the state of mind of Regional Director Eason also fail. Plaintiffs devote several pages of briefing to answers Eason gave at deposition regarding the timing of his awareness of the number of heat deaths that occurred in 2011, or his belief in the efficacy of the TDCJ heat-mitigation measures in the years after the operative events in these cases.  Yet this testimony, even if entirely true, is utterly irrelevant to his belief and state of mind during the summer of 2011, prior to McCollum's death.  Notably, Plaintiffs have cited to no evidence *prior to* McCollum's death that either Eason or Pringle was aware of a pattern of heat-related illnesses or death.

law that clearly established their conduct violated the Eighth Amendment.  Specifically, Plaintiffs cite to no case law that supports the conclusion that officers are constitutionally required to summon 911 immediately upon discovering an inmate having a seizure.  No such holding exists, and this is fatal to Plaintiffs' efforts to overcome Clark, Tate, and Sanders' qualified immunity. While Plaintiffs' response purports to cite to numerous fact issues regarding their claim, the number of facts that are without dispute demonstrate the officers' entitlement to qualified immunity.

A.     **The absence of clearly established law is demonstrated by Plaintiffs' attempts to cite to out-of-circuit and factually inapplicable law.**

Plaintiffs argue that the issue of whether Clark, Tate, or Sanders were subjectively aware that McCollum was having a heat stroke or that he was simply suffering a seizure is irrelevant because either condition would require the officer to immediately call 911. (D.E. 297 at 49) Plaintiffs have cited to no authority that clearly establishes this legal proposition as required to overcome qualified immunity.  To meet the qualified immunity standard for clearly established law, the court must "be able to point to controlling authority—or a robust consensus of persuasive authority that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011).

The cases offered by Plaintiffs do not meet this standard.  First, Plaintiffs cite case law that occurred after McCollum's death. (See D.E. 297 at 49, citing *King*, 680 F.3d at 1018.  Even if it were anything more than persuasive authority, *King* can have no bearing on the qualified immunity analysis because it came after the events in this case. *See Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). ("Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."). Likewise, "a robust consensus of persuasive authority" can hardly

be established by citing to a single district court case from another jurisdiction. (See D.E. 297 at 49, citing *Quatroy v. Jefferson Parish Sheriff's Office*, 2009 WL 1380196, *10 (E.D. La. May 14, 2009)).[14]

Plaintiffs attempt to shift the relevant inquiry by arguing that a seizure is a "serious medical need" within the meaning of the Eighth Amendment. (See D.E. 297 at 49)  This argument misses the point.  The relevant issue is not whether a seizure is a serious medical need, but whether a seizure is a condition *so serious* that every like-situated officer would know that, based on the clearly-established law, an ambulance should be immediately summoned if medical staff are not on-site.  On this point, Plaintiffs have cited to no such holding.  There is no factual dispute that each took responsive actions according to policy and practice, which was to ensure the inmate remained safe while under the seizure, contact the medical department for advice and arrange for the inmate to see the medical staff the following morning. (D.E. 288 at 79-82)

**B.      The undisputed facts demonstrate their entitlement to qualified immunity.**

Here, regardless of what factual disputes Plaintiffs attempt to conjure, the undisputed facts are sufficient to demonstrate the officers' entitlement to qualified immunity.  There is no dispute that Clark, Tate, or Sanders lacked any knowledge of McCollum's specific medical history. This type of formation is not shared with officers as a matter of policy. (D.E. 288-6 at 55)  There is no dispute that at the time of the incident, procedures promulgated by the medical department instructed officers to contact off-site medical personnel who would make the determination whether or not to call 911. (D.E. 288-38 at 140)  Their practice was to ensure the inmate was in a safe position while the seizure ran its course, ensure his airway remained open and that he had a

---

[14] It should also be noted that while these cases did have issues related to seizures, neither is factually similar to the claim here with the particularity required under qualified immunity law.

pulse. (D.E. 288-6 at 22)   None of these officers had ever learned of an instance when this procedure led to an inmate suffering harm or dying. (D.E. 288-6 at 16-17, 22, 27-28) Despite having experience in dealing with seizures at the Hutchins Unit, none of the officers had ever been instructed by medical staff to call 911 any time an inmate had a seizure. (D.E. 288-6 at 17, 22-23, 28)   None of the inmate witnesses' statements (including the newly drafted affidavit of Santos Rodriguez) contain any evidence that any of the officers made any statement or took action that suggested that they understood Mr. McCollum to be suffering a heat stroke. (D.E. 300-10 at 317-344; D.E. 302-9 at 1-22)   None of the officers had ever heard of a person suffering a heat stroke in the coolest part of the night, after they had been sedentary for many hours. (D.E. 288-6 at 17-18, 23, 28)   Sgt. Tate initiated first-aid measures for a person suffering a seizure. (D.E. 288-6 at 22)   She ensured he was in a safe positon and checked that his airway was open, that he was breathing and had a pulse. (D.E. 288-6 at 22)   She ensured he remained in a safe position while the seizure ran its course. *Id.*   After McCollum had not come back to consciousness on his own, she applied a cold cloth to his face and dribbled water on his face to attempt to revive him. *Id.* at 21-22.   These uncontested facts demand dismissal of the claims asserted against Clark, Tate, and Sanders, due to their entitlement to the protection of the doctrine of qualified immunity.

**C.**     **Under Fifth Circuit precedent, evidence that an officer was following existing procedures and policies is relevant to the qualified immunity analysis.**

Both the established practice of Incident Command System and its use of the chain of command, and the specific Hutchins Unit procedure that placed the decision to call 911 in the hands of off-site medical staff, were not policies or practices created by Clark, Tate, or Sanders, or any other defendant.   Plaintiffs cite to non-binding case law to support their argument that this is somehow irrelevant to the qualified immunity analysis. (D.E. 297 at 54)   Fifth Circuit law, however, holds that it is.   In *Jacobs v. West Feliciana Sheriff's Dept.*, the district court found that

a deputy who was essentially following orders, had limited knowledge of the situation, and the fact that the orders he received from his two superiors were not facially outrageous, entitled him to qualified immunity.  228 F.3d 388, 398 (5th Cir. 2000); *see also Vela v. White*, 703 F.2d 147, 152 (5th Cir. 1983) (The Fifth Circuit held that defendant who arrested plaintiff on a direct order from his supervisor was entitled to qualified immunity based on the circumstances.); *Estate of Schroeder v. Gillespie County*, 25 F. Supp. 3d 775, 785-86 (W.D. Tex. 2014) (Like in *Jacobs*, the court found that the deputy in this case was "essentially following orders," and he was not involved in any of the crucial events or decisions leading up to the event and was thus entitled to qualified immunity.).   The fact that Clark, Tate, and Sanders followed established emergency response procedures, including contacting off-site medical providers who would make the determination to call 911, is relevant to whether they are entitled to qualified immunity.

**D.**    **Plaintiffs have failed to create a fact issue with regard to whether Clark, Tate, or Sanders were subjectively aware that McCollum was having a heat stroke as opposed to a seizure.**

Plaintiffs have not cited to sufficient evidence to create an issue of fact with regard to whether the officers were subjectively aware that McCollum was having a heat stroke as opposed to a seizure.  Each has testified that they did not. (D.E. 305-17 at 27-28, 100; D.E. 305-13 at 123) This is because McCollum was found during the coolest part of the night after being sedentary for several hours, and each of the officers testified that they had never experienced or heard of a person suffering a heat illness under those circumstances. (D.E. 288-6 at 17-18, 23, 28)

To attempt to infer this subjective knowledge and create an issue of fact, Plaintiffs employ two distinct, but insufficient, arguments.  First, they attempt to infer it by stating that knowledge can be inferred "because the risk was obvious." (D.E. 297 at 50 *citing Stewart v. Guzman*, 555 Fed. Appx. 425, 431 (5th Cir. 2014)).  This is plainly not so.  The symptoms Plaintiffs point to:

warm dry skin, rapid and weak breathing and unconsciousness can be symptoms of a myriad of medical ailments.  Unrebutted expert testimony confirms that it was reasonable for the officers to mistakenly believe that McCollum was having a seizure. (D.E. 288-6 at 42)  This conclusion is supported by the fact that this occurred during the night time hours after McCollum had been in his bunk for several hours, when heat-stroke most commonly occurs during high temperatures and during physical activity. (D.E. 288-39 at 54)  Plaintiffs cite to no case law where subjective awareness has been inferred under an "obviousness" standard based on such vague symptoms as occurred here.  Plaintiffs are asking this Court to reach an unprecedented conclusion under the deliberate indifference standard. [15]

Next, Plaintiffs attempt to create a fact issue as to subjective awareness based on the bare fact that the officers had received training on heat-stroke. (D.E. 297 at 50)  Both the Supreme Court and the Fifth Circuit have explicitly rejected this position. *See Sheehan*, 135 S. Ct. at 1777  ("Even if an officer acts contrary to her training, however, (and here, given the generality of that training, it is not at all clear that Reynolds and Holder did so), that does not itself negate qualified immunity where it would otherwise be warranted.").  "If deliberate indifference could be inferred solely from [a] failure to act in a manner consistent with training, 'the standard applied would be more akin to negligence than deliberate indifference.'"  *Estate of Henson v. Krajca*, 440 Fed.Appx. 341, 346 (5th Cir. 2011) (*quoting Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 (5th Cir. 1996) (en banc)).

---

[15] It should be noted that *Stewart v. Guzman*, 555 Fed. Appx. 425, 431 (5th Cir. 2014) does not support the proposition that subjective awareness could be inferred for Clark, Tate, and Sanders.  In *Stewart*, the Court held that knowledge could be inferred because officers actually knew that the inmate had asthma, and had intentionally disregarded his established treatment plan.  The Court did not base its holding on the fact that "the risk was obvious."  That is not so here.  Indeed, Defendants cite to Stewart to demonstrate the facts necessary to sustain the Eighth Amendment claim are not present here. *Id*.

In addition, the notion that subjective awareness is shown merely because officers are trained on a certain danger would virtually eliminate the need for such proof in any deliberate indifference case.  Officers are trained on all manner of risks from which they protect inmates ranging from assault, self-harm, or safety precautions.  The fact that an officer has received training on how to search for or identify weapons does not create a fact issue as to whether he was subjectively aware that an inmate possessed a weapon at a given time.  Holding that receipt of training satisfies subjective awareness of a particular risk to a particular inmate from a given cause turns the concept of deliberate indifference on its head.  Based on the undisputed facts, Plaintiffs have not marshalled sufficient evidence to create a question of material fact as to whether Clark, Tate, or Sanders were subjectively aware that McCollum was suffering a heat stroke.  Nor can Plaintiffs show that these officers were required, under clearly-established law, to circumvent the established procedures and immediately call an ambulance.  For all of these reasons, Clark, Tate and Sanders are entitled to summary judgment based on their entitlement to qualified immunity.

**IV.    Plaintiffs request this Court to fundamentally alter ADA law without citing precedent for doing so.**

In their response, Plaintiffs repeatedly ask this Court to expand both the coverage of the ADA and the requisite evidence necessary to show intentional discrimination.  Based on the undisputed evidence, TDCJ is entitled to summary judgment on these claims.

**A.    TDCJ was unaware of any of McCollum's alleged disabilities beyond obesity, and no evidence is cited to support the conclusion that TDCJ was aware McCollum's obesity was affecting his major life activity of thermoregulation.**

Plaintiffs have offered no evidence that TDCJ had any knowledge of McCollum's medical conditions beyond obesity.[16]  By offering a joint response, Plaintiffs conflate the facts and legal arguments against TDCJ with the claims against UTMB.  This is most glaring when it comes to knowledge of McCollum's purported disabilities, or knowledge that they were actively inhibiting a major life activity.  While Plaintiffs list in some length McCollum's alleged disabilities, they offer no explanation as to how TDCJ staff were aware of these facts.  Undisputed evidence shows that according to policy, medical information regarding inmates is not shared with TDCJ staff. (D.E. 288-6 at 55)  Further, bunk assignments are made by TDCJ staff who do not meet the inmates they are assigning and do so only with the information communicated by medical staff on the inmate's HSM-18 form. (D.E. 288-38 at 43-44)  If an inmate has mobility issues and needs a bottom bunk, it is for the medical providers to make this recommendation, which TDCJ will then follow. *Id*.  TDCJ agrees that most could regard McCollum as obese by general observation. Plaintiffs, however, have offered no evidence that TDCJ staff were aware that McCollum was diabetic, hypertensive, or depressed. (See D.E. 297 at 103-06)

As to the obesity, Plaintiffs do not appear to dispute the facts testified to by their own expert—that McCollum was suffering from an infection at the time of his death that would have limited his mobility.  Plaintiffs' expert, Dr. Susi Vassallo, confirms that his purported inability to get on or off his bunk was due at least in part to a transitory illness. (D.E. 288-39 at 53-54) Plaintiffs' expert testified that based on lab reports taken from McCollum just prior to his death, he was suffering from some sort of sickness or infection due to a high white blood cell count. (D.E. 288-39 at 46-47) She testified that this high white blood cell count was unrelated to dehydration.

---

[16] Of course, this assumes that McCollum was disabled in the first place.  Undisputed evidence shows that McCollum was not considered diabetic within medical guidelines published by the international organization of diabetes experts, and that his blood pressure made him at most a borderline hypertensive. (D.E. 288-6 at 43; D.E. 288-38 at 63-64)

(D.E. 288-39 at 47)  She testified that based on her review of the lab results and the inmate statements, his difficulties began around the time in which he was becoming ill, and his *illness* contributed to his alleged inability to get up and down from the bunk. (D.E. 288-39 at 53-54) Transitory illness does not serve as a qualifying disability under the ADA. See *Burch v. Coca–Cola Co.*, 119 F.3d 305, 316 (5th Cir.1997); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996). Plaintiffs' offered no argument in response.

**B.     Without offering any legal support, Plaintiffs ask this Court to conflate knowledge of a condition associated with a risk with knowledge of an ongoing impairment of a major life activity.**

Though TDCJ staff were arguably aware McCollum was obese, Plaintiffs have cited to no evidence that TDCJ staff were aware that his obesity would affect his major life activity of thermoregulation.  Federal courts, including this one, have held that the ADA does not "require public entities to 'guess' an individual's need for an accommodation." *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 758 (S.D. Tex. 2011) (Ellison, J.)  Instead, a plaintiff must show either that he requested an accommodation or that "defendant otherwise had knowledge of an individual's disability *and* needs, but took no action." *Id.* (emphasis added); *see also, Zaragoza v. Dallas Cty.*, 2009 WL 2030436, at *11 (N.D. Tex. July 13, 2009)  ("The accommodation provisions of the ADA and RA do not require public entities to "guess" an individual's need for an accommodation."); *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir.1999); *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 934 (7th Cir.1995) (stating that the "ADA does not require clairvoyance").  In the context of heat intolerance, this means proof that his disabilities actually interfered with his ability to thermoregulate. *Ball v. LeBlanc*, 792 F.3d 584,  597-598 (5th Cir. 2015)

Here, TDCJ could arguably have had knowledge that McCollum was obese, but there is no evidence that staff were aware that his obesity would affect his major life activity of thermoregulation, as is necessary to prove an ADA claim.  While obesity is listed as  a "co-morbidity" to heat intolerance in joint medical policies, there is no evidence that one automatically follows the other. (Appx. 011-013)  Indeed, it is just the opposite.  Thousands of obese inmates have lived through hot summers in Texas prisons. (D.E. 288-38 at 61)  Plaintiffs have cited to no case law to support the notion that mere knowledge of a potential risk factor that *might* affect a major life activity imparts knowledge of a specific offender's need for an accommodation.  Obesity is associated with asthma[17] and joint dysfunction,[18] yet one would not consider knowledge of obesity to be knowledge that one needs to be issued an inhaler or in need of mobility aid.  Yet, this is exactly what Plaintiffs ask this Court to hold, without offering any legal precedent for such a holding.

**C.    By its terms, intentional conduct requires more than generalized knowledge of a potential for a risk.**

The shortcomings in Plaintiffs' ADA case with regard to the lack of knowledge of a need for an accommodation is significantly compounded by the fact Plaintiffs must meet the heightened standard of "intentional discrimination."  Plaintiffs devote significant briefing to dispel the notion that individual animus or ill will is not required to maintain an ADA claim. (See D.E. 297 at 116-120)  Yet this is not the position Defendants have advocated.  Instead, Defendants argue that based on the Fifth Circuit's holding in *Delano-Pyle*, 302 F.3d at 575-76, and as noted in *Taylor v. Richmond State Supported Living Ctr.*, 2012 WL 6020372, n.2 (S.D. Tex. 2012) and *Zaragoza*,

---

[17]http://www.thoracic.org/statements/resources/allergy-asthma/an-official-american-thoracic-workshop-report-obesity-and-asthma.pdf

[18] http://www.arthritis.org/living-with-arthritis/comorbidities/obesity-arthritis/fat-and-arthritis.php

2009 WL 2030436, at * 13 the standard of intentional discrimination required proof beyond "deliberate indifference."  This is not akin to saying the standard of proof requires ill will or animus.

Under either a deliberate indifference standard or something higher, the very notion of "intentional" conduct requires at a minimum, specific knowledge of the individual, his disability, a limitation on a major-life activity, and a program or service he is attempting to access, but cannot because of it.  Plaintiffs concede that, with the exception of knowledge of McCollum's obesity, TDCJ had knowledge of none of these things. (See D.E. 297 at 120 (conceding that TDCJ did not have knowledge whether Mr. McCollum, specifically, would have difficulty thermoregulating); D.E. 297 at 123 ("[T]his is a case where the disability discrimination is particularly the result of high-level policy decisions."))  Instead, Plaintiffs predicate liability on intentional discrimination by arguing that TDCJ was generally aware that that obese individuals were among its inmates, and that this is a potential risk factor for heat related illness.  (See D.E. 297 at 120)  As noted above, Plaintiffs have cited to no ADA case law where simple knowledge of risk factor imparted knowledge of an impairment could form the basis for the heightened standard of intentional discrimination.  Essentially, Plaintiffs are asking this Court to transform the ADA into a general negligence statute—something the Fifth Circuit has expressly refused to do. *Estate of A.R. v. Muzyka*, 543 Fed.Appx. 363, 365 (5th Cir. 2013).

Plaintiffs' reliance on *Delano-Pyle* and *Perez*, regarding what evidence is sufficient to sustain an intentional discrimination claim, is misplaced.  The factual setting in these cases contained the very evidence that is lacking here: knowledge of a disability and knowledge of a certain need for an accommodation—not just a potential future health risk.  Both *Delano-Pyle* and *Perez* dealt with hearing-impaired individuals who were not given sufficient accommodation to

aid in communication with government actors.  In *Delano-Pyle*, this occurred in the context of a traffic stop and field sobriety test where the officer knew the individual was hearing impaired and thus unable to communicate with the individual. *Delano-Pyle*, 302 F.3d at 570-71.  Likewise, in *Perez*, this was in the context of two hearing-impaired parents who could not communicate with the doctors who were treating their daughter for cancer. *Perez v. Doctor S Hosp. at Renaissance, Ltd.*, 624 Fed. Appx. 180, 182 (5th Cir. 2015)  In short, in both cases, the defendant agencies knew not just of the disability, but knew that effective communication was essential to the government program or service, and that effective communication would be all but impossible without accommodation.[19]  Such is the nature of severe hearing impairment, where knowledge of the disability itself imparts knowledge that the impaired individual will almost always be unable to have effective oral communication without an accommodation.

Obesity is fundamentally different and Plaintiffs concede that TDCJ did not have specific knowledge that McCollum would suffer an impairment to his thermoregulatory system, causing a heat stroke. (See D.E. 297 at 120)  As noted above, TDCJ houses thousands of obese individuals in un-air-conditioned environments who pass through the summer needing no accommodations beyond the same types of mitigation measures present for McCollum. (D.E. 288-38 at 61)  This is simply inapposite to *Delano-Pyle* and *Perez* where the knowledge of the disability and knowledge of the need for an accommodation was both evident and acknowledged by the defendant agencie's specifically as to the plaintiff personally.

---

[19] In this way, Plaintiffs have either misunderstood *Perez* or have cited it for a proposition beyond what the court held. Plaintiffs argue: "*Perez* found that the mere failure to provide an accommodation sufficed to demonstrate intentional discrimination." (D.E. 297 at 119)  This is a misleading statement regarding the *Perez* court's holding.  The basis of the intentional discrimination holding was principally predicated on the fact that the hospital was aware of the parents' hearing impairment and the parents' need for accommodation.  There was evidence that on 18 different occasions, no interpreter or accommodation was offered. *Perez*, 624 Fed. Appx. at 185.  On some occasions, an electronic video device was used, but it was "ineffective." *Id*. at 182.  This fact did not form a particularly significant basis for the Court's holding, which appears to be cited for a broader proposition than was actually held.

This is also true of the need for lower bunk assignment.  It is not uncommon for obese inmates to be assigned to, and navigate on and off of, a top bunk. (D.E. 288-6 at 18, 24, 29)  The evidence is also undisputed that McCollum, due to his past incarceration, was fully aware of how to request and receive work or housing accommodations: he had done so in the past by submitting a sick call request and meeting with the medical providers who entered a restriction on his HSM-18. (D.E. 288-6 at 45)  The evidence is undisputed that he did not do so here. (*Id.*)  In sum, while TDCJ may have been aware that McCollum was obese, there is no evidence that it was ever aware that his obesity would affect his ability to tolerate the heat.

Finally, as a last ditch effort to avoid summary judgment due to the lack of intent, Plaintiffs cite to a single case *HDRE Business Partners Ltd. Group, L.L.C. v. Rare Hospitality Intern., Inc.*, 484 Fed. Appx. 875, 877 (5th Cir. 2012), and claim that this question of intent is a fact issue for the jury. (See D.E. 297 at 120)  Even a cursory examination of this case shows it is not remotely applicable here.  *HDRE* involves a contract dispute and question of whether the parties intended to execute a novation to a lease agreement. *HDRE*, 484 Fed. Appx. at 877.  It does not concern the ADA, prison administration, or any other subject remotely related to this case.  The Fifth Circuit has, on multiple occasions, affirmed the dismissal of ADA claims where the Plaintiffs have failed to adduce evidence of intentional discrimination. *See e.g., Estrada v. San Antonio Indep. Sch. Dist.*, 575 F. App'x 541, 544 (5th Cir. 2014); *Estate of A.R. v. Muzyka*, 543 Fed. App'x. 363, 364 (5th Cir. 2013).  In sum, Plaintiffs' evidence is insufficient to maintain their ADA claim under existing law.  This Court should decline Plaintiffs' misguided invitation to broaden the scope of the ADA where there is no legal support for such a holding.

**D.**     **Plaintiffs fail to demonstrate the requisite proof for an ADA claim that TDCJ staff intentionally excluded McCollum from a program or service by reason of or because of his disability.**

Plaintiffs offer a novel theory that death constitutes an exclusion from a program or service. (See D.E. 297 at 110 "His death prevented him from accessing any other programs and services available to able-bodied prisoners.")  Cases involving ADA claims (including those litigated by Plaintiffs' counsel) in the prison or jail context, however, consistently rely upon tangible programs or services from which the decedent was denied while alive.  In *United States v. Georgia*, 546 U.S. 151 (2006), the ADA claim was tethered to the fact that the lack of mobility accommodations prevented the inmate from access to the medical department or hygiene programs.  Even in *Borum v. Swisher County*, which was litigated by Plaintiffs' counsel, the court tied its rulings at summary judgment and on post-trial relief to actual programs (medical care and food) that the decedent was allegedly denied. *See Borum v. Swisher Cty.*, No. 2:14-cv-127-J, 2015 WL 327508, at *7 (N.D. Tex. Jan. 26, 2015); D.E. 302-1 at 27 (denying motion for a new trial on the basis that evidence at trial suggested that the procedures for requesting medical care were not available to the decedent jail inmate).[20]  Testimony was received that several members of the jail staff were actually aware of the decedent's disabilities, admitted that they did not have the resources to house or treat him, and admitted to ignoring these problems.  *Id.*

The *Borum* case, however, is fundamentally different from the facts here.  McCollum was able to access medical care.  Indeed, he was face to face with medical providers on at least four different occasions in the few days he was on the facility.  (D.E. 288-6 at 40-41; D.E. 288-21 at 15-30)  Though it is not clear, to the extent Plaintiffs claim McCollum was denied access to 911 because of allegedly faulty emergency response procedures, this denial could not be argued to be "by reason of his disability."  To the extent Plaintiffs claim there was some other service he tried

---

[20] Plaintiffs' counsel settled this claim post trial, before any of these issues could be raised on appeal.

to access while alive but was unable to, this is not identified in their response.  Even if it were, they have not identified how TDCJ was aware that he was unable to do so.  This is fatal to their ADA claim.

**E.    Plaintiffs' attempts to distinguish or outright ignore binding precedent are ineffective and should be disregarded.**

Plaintiffs' ADA claim is a negligence claim in that TDCJ failed to make the prison safe for his use, not that he was excluded from it.  In this regard, this case is consistent with the *Estate of A.R. v. Muzyka*, 543 Fed. Appx. 363, 364 (5th Cir. 2013) despite Plaintiffs' attempts to distinguish it. (D.E. 297 at 119)  First, the setting in *A.R.* (a school designed for special needs children) does not, as Plaintiffs argue, provide a distinguishing fact.  Though *the school* was for those with special needs, the summer enrichment program took place at a pool, which allegedly did not contain sufficient safety features for disabled children to safely use it. *Estate of A.R.*, 543 Fed. App'x. at 365 ("A.R. points out many things the school could have done to make the situation safer for the disabled in the pool area: additional lifeguards, different types of alarm devices, and so on.").  This is identical to Plaintiffs' claim here, that the Hutchins Unit did not have sufficient heat-safety measures for McCollum to be housed there.  The Fifth Circuit rejected this claim on the basis that the schools' failure to make the pool safe was not an "exclusion" from it within the meaning of the ADA—it was a negligence claim, which is exactly what the Plaintiffs have brought here. *See id.* ("The argument instead is that A.R.'s safe and meaningful access to the program was interrupted because of her disability…Even taking all the evidence A.R. presents as true, she at most only establishes negligence.")[21]

---

[21] Plaintiffs' statement: "It is the equivalent of placing a child with cerebral palsy in the pool, and hoping he can swim" is an absurd hyperbole. (See D.E. 297 at 123)  Tens of thousands of inmates with conditions similar to McCollum live safely (though perhaps uncomfortably) through the summer temperatures in Texas without incident. Such comparisons merely highlight the inapplicability of the facts here to the legal theory Plaintiffs attempt to utilize.

Plaintiffs further attempt to circumvent binding Fifth Circuit authority where the Court has repeatedly held counter to their claims under the ADA by pointing out that some of the cases were argued by *pro se* Plaintiffs. (See D.E. 297 at 114)  Plaintiffs cite to no legal authority for the proposition that cases argued by *pro se* Plaintiffs simply do not count and that district courts may ignore the fundamental points of law they establish.  No such holding exists.  The Fifth Circuit's holdings run counter to Plaintiffs' position here.  *See Nottingham v. Richardson*, 499 Fed. App'x. 368, 377 (5th Cir. 2012); *Hay v. Thaler*, 470 Fed. Appx. 411 (5th Cir. 2012); *Davidson v. Texas Dept. of Criminal Justice*, 91 Fed. App'x. 963, 965 (5th Cir. 2004); *Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011); *Tuft v. Texas*, 410 Fed. App'x. 770, 775 (5th Cir. 2011); *Garrett v. Thaler*, 560 Fed. App'x 375, 383 (5th Cir. 2014).  This applicable precedent simply cannot be ignored because it was litigated by *pro se* Plaintiffs.

As set out above, throughout Plaintiffs' ADA arguments, Plaintiffs ask this court to make a number of unprecedented expansions of the ADA's scope, the requisite evidence needed to state a claim for intentional discrimination, and the Court's ability to ignore case law based on the fact that the plaintiff proceeded *pro se*.  The strategic benefits to expending such effort to fit this square peg in a round hole have been publicly stated by Plaintiffs' counsel.[22]  This Court simply cannot deny summary judgment without ruling contrary to binding case law.  Based on the undisputed

---

[22] Plaintiffs' counsel has specifically written on the benefits of contorting the ADA into a general liability statute. Doing so would vitiate the protection of sovereign and qualified immunity and impermissibly allow access to deep agency pockets.  *See, e.g.*, James C. Harrington, *Back to the Future the ADA Strengthens Section 1983, but More Work Is Needed to Improve Compliance*, 78 Tex. B.J. 537 (2015); James C. Harrington, *The ADA and Section 1983: Walking Hand in Hand*, 19 Rev. Litig. 435, 437 (2000); James C. Harrington, *A Re-Birth for Civil Rights Litigation: Using the Americans with Disabilities Act to Overcome Section 1983 Hurdles and Hold Government and Police Accountable*, (July, 2007) available at: https://www.researchgate.net/publication/228206445_A_ReBirth_for_Civil_Rights_Litigation_Using_the_Americans_with_Disabilities_Act_to_Overcome_Section_1983_Hurdles_and_Hold_Government_and_Police_Accountable

evidence and controlling authority, this Court should grant TDCJ summary judgment on Plaintiffs' ADA and RA claims.

**V.      Plaintiffs fail to bring forth any issue of fact demonstrating entitlement to punitive damages.**

The TDCJ Defendants are entitled to summary judgment on the issue of punitive damages. To be entitled to punitive damages, a plaintiff must establish that a defendant's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Sockwell v. Phelps*, 20 F.3d 187, 192 (1994). In their response, Plaintiffs argue that a finding of deliberate indifference on a §1983 claim satisfies the "reckless or callous indifference" requirement for a punitive damages award.

Importantly, however, Plaintiffs do not cite any binding authority for their proposition. Instead, Plaintiffs argue that the Fourth, Sixth and Seventh Circuits (a minority) support its position. More recently, the Supreme Court reaffirmed the *Smith v. Wade* decision. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-36 (1999) (applying the *Smith* "subjective consciousness" standard of punitive damages to Title VII claim). Thus, Plaintiffs' argument that the "callous and reckless indifference" needed for a punitive damage award is the same as "deliberate indifference" in the Eighth Amendment context is unsupported by binding precedent.

The lone case Plaintiffs cite in support of their position is tenuous, at best. In *Lamb v. Mendoza*, an inmate alleged numerous TDCJ and UTMB personnel were deliberately indifferent to his serious medical needs. *Lamb v. Mendoza*, 478 F. App'x 854, 855 (5th Cir. 2012). Plaintiffs argued that "[the *Lamb* plaintiff] met the evidentiary predicate for a punitive damage award because his evidence proved defendants' deliberate indifference to constitutional rights." D.E. 297, at 118. This is incorrect. The *Lamb* plaintiff argued that punitive damages were proper because

Defendants acted with both "malice *and* reckless disregard." *Id.* at 857 (emphasis added). The plaintiff did not argue that he was entitled to punitive damages *because* the jury found Defendants were deliberately indifferent. This is hardly a "tacit" adoption of other Circuits' rulings, as Plaintiffs contend. Simply stated, Plaintiffs fail to offer any support of their contention that a finding of deliberate indifference in the Eighth Amendment context is the same as in the § 1983 context.

Plaintiffs cite no cases in their response to support their contention that issues of fact preclude summary judgment, instead opting to argue about the proper standard. No matter which standard the Court utilizes, TDCJ actually implemented policies and procedures above what is required by *Gates.* This is prima facie evidence that the TDCJ Defendants are entitled to summary judgment on punitive damages.

## VI. Plaintiffs do not meet the requirements for third-party standing on behalf of living inmates at the Hutchins Unit.

Plaintiffs have no justiciable interest in declaratory or injunctive relief; therefore, Plaintiffs lack standing to bring such claims.  Plaintiffs have cited to no authority that could grant them third-party standing to assert claims on behalf of inmates to whom they have no interest, about conditions in a prison in which they will never reside.  Such a holding would be an unprecedented expansion of the third-party standing.  Once again, Plaintiffs ask this court to grant relief for which there is no precedent.

The general rule of standing is that a party must assert his own legal rights and interests, and cannot rest a claim for relief on the legal rights or interests of third parties. *Kowalski v. Turner*, 543 U.S. 125, 129 (2004). The Supreme Court has held that a plaintiff seeking injunctive relief based on an alleged past wrong must show that there is a real or immediate threat that he will be wronged again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). "To obtain standing for

- 34 -

injunctive relief, a plaintiff must show that there is reason to believe that he would directly benefit from the equitable relief sought." *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997).

Essentially, (though not explicitly) Plaintiffs are seeking third-party standing to assert claims on behalf of current Hutchins Unit inmates.  A party seeking third-party standing must answer two questions in the affirmative: (1) does the party asserting the right have a close relationship with the person who possesses the right; and (2) is there a "hindrance" to the possessor's ability to protect his own interests. *Kowalski*, 543 U.S. at 130.  Here, Plaintiffs do not have a close relationship with current offenders at the Hutchins State Jail.  Second, there is no "hindrance" to current offenders to bring a lawsuit.  As Plaintiffs' counsel has demonstrated, they are more than willing to file class action lawsuits regarding summer temperatures even when multiple named plaintiffs end up paroled or leave the unit of assignment. *See, e.g., Cole*, 4:14-cv-1698 (S.D. Tex.). Plaintiffs have not met the requirements to assert third-party standing for injunctive relief, nor can they.

Plaintiffs rely heavily on *Mx Group, Inc. v. City of Covington*.  This case, however, is distinguishable from the case at bar.  293 F.3d 326, 334 (6th Cir. 2002) In *MX Group*, MX Group was an organization asserting third-party standing on behalf of its clients. *Id*. at 333. The Court found that MX Group had standing because it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities. *Id*. at 335. MX Group was not suing solely on behalf of its members, but also, as an entity suing primarily on its own behalf, due to injury it suffered as a result of its association with individuals with disabilities.  *Id*.  Plaintiffs are not an organization with clients at the Hutchins Unit, nor do they have any connection to anyone at the Hutchins Unit.  Plaintiffs here are the alleged heirs and administrators of the estate of one offender,

- 35 -

Larry McCollum. They do not represent other offenders at the Hutchins Unit. Plaintiffs do not have standing to assert third-party claims for injunctive relief in this case.[23]

The death of an offender renders a claim for prospective injunctive relief against the prison conditions moot. *Palo ex rel. Estate of Palo v. Dallas Cnty.*, No. 3:05-CV-0527-D, 2006 WL 3702655 (N.D. Tex. Dec. 15, 2006; *Lee v. Valdez*, No. 3:07-CV-1298-D, 2009 WL 1406244 (N.D. Tex. May 20, 2009) (citing *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 550 (6th Cir. 2003)). In *Flores ex rel. Estate of Flores v. Fox*, the Fifth Circuit held that plaintiff's death mooted his claim for injunctive relief. 394 Fed. Appx. 170, 171 (5th Cir. 2010). "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Bowman*, 350 F.3d at 550. In *Bowman*, the court held that "given the fact that Anthony is dead, any claim for injunctive relief is moot." *Id*. Here, Larry McCollum is deceased. Plaintiffs lack a justiciable interest in the claims for declaratory and injunctive relief brought on behalf of McCollum's estate or on behalf of any individually alleged heir-at-law because the claims are mooted by his death. As such, Plaintiffs lack standing to assert claims for declaratory and injunctive relief.

In addition, Plaintiffs' passing reference to the "capable of repetition but evading review" exception is meritless. This exception addresses mootness, not third-party standing. *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) ("1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration," and 2) "there [i]s a reasonable expectation that the same complaining party [will] be subject to the same action again.") Regardless, countless cases

---

[23] The remaining cases cited by Plaintiffs are inapplicable. The arguments in *McCoy*, 2006 WL 2331055, *6 were solely based on whether the family members could recover damages under the ADA, not injunctive relief for living prisoners. Similarly, *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2nd Cir. 1997) involved an outpatient drug- and alcohol-rehabilitation treatment center asserting ADA claims on behalf of it and its clients. *Liberty Res. Inc. v. Se. Penn. Transp. Auth.*, 155 F.Supp.2d 242, 249 (E.D. Pa. 2001) involved a center for independent living asserting ADA claims against a transportation provider on behalf of residents living in their facility. None of these cited cases support the proposition that third party standing can be conferred on the family of a deceased inmate on behalf of living inmates to whom they have no connection at correctional facility in which they will never reside.

have been brought by inmates at jail facilities with transitory populations.  The inmates at the Hutchins Unit are entirely capable of filing such a claim without the need for representative standing.  An injunction in this case would have no legal impact on Plaintiffs' legal interests.

Finally, the mediation agreement between TDCJ and Plaintiffs' counsel provides no basis to confer standing.  First, Plaintiffs demonstrably mispresented the posture and nature of the agreement in two distinct ways.  First, TDCJ did not "agree to implement" (D.E. 297 at 125) any measures whatsoever.  As stated in the agreement, TDCJ agreed to do nothing other than "*propose*" certain measures to TDCJ's leadership. (D.E. 300-11 at 2)  Second, this agreement was not "to settle Plaintiffs' claims" as Plaintiffs represent in their brief. (D.E. 300-11 at 2)  It specifically states the opposite: "It is further agreed that no aspect of Plaintiffs' case has been compromised or released in any fashion as a result of this agreement." (D.E. 300-11 at 2)  Although TDCJ agreed, in a collaborative fashion, to discuss potential reforms suggested by Plaintiffs' counsel with its leadership, nothing further was agreed and Plaintiffs discharged no part of their claims.  The mediation agreement neither makes Plaintiffs a prevailing party, nor does it confer standing for third party injunctive relief.  Plaintiffs' injunctive relief claims should be dismissed.

## VII.    Conclusion

For the foregoing to reasons, and for the reasons set out in Defendants' Motion for Summary Judgment, Defendants are entitled to qualified immunity and summary judgment.  Defendants, therefore, move this Honorable Court to dismiss all of Plaintiffs' claims with prejudice.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

- 37 -

**JEFFREY C. MATEER**
First Assistant Attorney General

**BRANTLEY STARR**
Deputy First Assistant Attorney General

**JAMES E. DAVIS**
Deputy Attorney General for Civil Litigation

**KAREN D. MATLOCK**
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/Matthew J. Greer_____
**MATTHEW J. GREER**
Assistant Attorney General
Co-Counsel
Texas Bar No. 24069825
Southern District ID No. 1171775
matthew.greer@texasattorneygeneral.gov

**CYNTHIA L. BURTON**
Assistant Attorney General
Attorney in Charge
Texas Bar No. 24035455
Southern District ID No. 35273
cynthia.burton@texasattorneygeneral.gov

**DANIEL C. NEUHOFF**
Assistant Attorney General
Co-counsel
Texas Bar No. 24088123
Southern ID No. 2374885
Daniel.neuhoff@texasattorneygeneral.gov

**DEREK J. KAMMERLOCHER**
Assistant Attorney General
Co-Counsel
State Bar No. 24097915
Southern District ID No. 2790636
Derek.Kammerlocher2@texasattorneygeneral.gov

Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin TX  78711

(512) 463-2080/Fax (512) 936-2109

**ATTORNEYS FOR TDCJ DEFENDANTS**

## NOTICE OF ELECTRONIC FILING

I, **MATTHEW J. GREER**, Assistant Attorney General of Texas, certify that I have electronically submitted for a copy of the foregoing for filing in accordance with the Electronic Case Files system of the Southern District of Texas on October 19, 2016.

/s/Matthew J. Greer_____
**MATTHEW J. GREER**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, **MATTHEW J. GREER**, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above **TDCJ Defendants Reply to Plaintiffs Response to Motion for Summary Judgment** has been served on all lead counsel of record electronically in accordance with ECF system of the Southern District of Texas on this 19th day of October, 2016.

/s/Matthew J. Greer_____
**MATTHEW J. GREER**
Assistant Attorney General