UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| DEFENDANTS | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
TO STRIKE SUMMARY JUDGMENT EVIDENCE**

## I.    STATEMENT OF ISSUES PRESENTED

Plaintiffs submitted evidence in support of a consolidated response to Defendants'

motions for summary judgment. *See* Doc. 297 (response); Docs. 299-305 (appendix).

Both TDCJ and UTMB filed objections. Docs. 321-322. Notably, both objected to a

summary table and generically objected to all references to any heat illness, practice, or

incident of any kind after Mr. McCollum's death. UTMB also objected generically to any

heat illness other than Mr. McCollum's. TDCJ further objected generically to virtually

every communication and document dated after Mr. McCollum's death. TDCJ also raised

objections to multiple inmate statements about the conditions at the Hutchins Unit.

Plaintiffs' summary judgment evidence is admissible against all Defendants.

Therefore, the Court should overrule Defendants' objections.

## II.    TABLE OF CONTENTS

I.  STATEMENT OF ISSUES PRESENTED ..................................................... i

II. TABLE OF CONTENTS ........................................................................ ii

III. TABLE OF AUTHORITIES ................................................................. vii

IV. STANDARD OF REVIEW .................................................................... 1

V.  ARGUMENT ..................................................................................... 2

   1.   Summary of Argument and Overview of Generally Applicable Legal Issues. ....... 2

      a.   Hearsay ............................................................................. 3

      b.   Relevance of earlier heat-related deaths and injuries ......................... 4

      c.   Relevance of subsequent heat-related deaths and injuries, the agencies' responses to them, and the Rule 407 exceptions ........................ 5

   2.   Exhibit 1, Doc. 300-2, Appx. 2 - The Summary of Undisputed Heat-Related Death at TDCJ Facilities is an accurate summary under Rule 1006 and is admissible as a statement of a party opponent. ........................ 9

   3.   Exhibits 2-22, 27-30, 301-302; Doc. 300-2 – 300-9, 305-19; Appx. 4-240, 256-306, 7055-7082 – The autopsies and their reports are relevant, not confusing and Defendants' statements and records ........................ 12

   4.   Exhibits 23, 303; Docs. 300-7, 299-2; Appx. 242-244, 7084-7184 – Joint Mortality and Morbidity Committee Review Worksheets show the feasibility of measures that could have protected McCollum and that both agencies could have implemented them. ........................ 13

   5.   Exhibit 25, Doc. 300-7, Appx. 251 - McWhorter's email and list of Possible Heat-Related Deaths are appropriate evidence. ........................ 14

   6.   Exhibit 26, Doc. 300-8, Appx. 254 – The agencies knew heat stroke was a risk before Mr. McCollum's death ........................ 14

   7.   Exhibits 31 & 290; Docs. 300-9 & 305-16; Appx. 311 & 6805 – Dr. Rieger's testimony on behalf of TDCJ is admissible as statements of a party opponent. ........................ 15

   8.   Exhibit 33, Doc. 300-10, Appx. 328-333 – The pre-trial conference is relevant to the parties' positions and the Court's prior rulings ........................ 15

   9.   Exhibit 37, Doc. 300-10, Appx. 640-641 – Stephanie Kingrey's declaration is

admissible and consistent with her prior testimony. ...................................................... 16

10.   Exhibit 38, Doc. 300-10, Appx. 643 – The Declaration of Santos Rodriguez, III is based on his personal knowledge. ................................................................................ 17

11.   Exhibit 39, Doc. 300-10, Appx. 648 – The Declaration of Ronald Chase is relevant and based on his personal knowledge. ............................................................ 18

12.   Exhibits 40-43, Doc. 300-10, Appx. 649-667 – The Declarations of David Deaton, Edwards Crockett, David Gleason, and Leonard Russell are relevant........... 19

13.   Exhibits 71-72, Doc. 300-19, Appx. 1334-1365 – The 2012 TDCJ CID meeting notes are relevant to an array of issues including the feasibility of refused accommodations. ........................................................................................................ 19

14.   Exhibits 74-75, Doc. 300-20, Appx. 1374-1378 – The Grievances of and responses to Steve Carrizales and Thomas Reed are relevant to the feasibility of accommodations that were refused to Mr. McCollum. ................................................. 20

15.   Exhibit 76, Doc. 300-20, Appx. 1380 – The work order on air conditioning at Hutchins is also relevant to the feasibility of a refused accommodation..................... 21

16.   Exhibit 77, Doc. 300-20, Appx. 1382 – The Byrd Unit is relevant because inmates there died under similar circumstances to Mr. McCollum. ............................ 21

17.   Exhibit 104, Doc. 301-4, Appx. 1526 – TDCJ's subsequent "Heat Precautions" email is admissible as to the feasibility of subsequent remedial measures and the agencies' continued indifference. ................................................................................ 22

18.   Exhibit 107, Doc. 301-4, Appx. 1542 – Hutchins' 2012 "Extreme Heat Precautions" is admissible as to the facility's 2011 practices...................................... 22

19.   Exhibits 108-109, Doc. 301-5, Appx. 1545-1550 – TDCJ's policies governing notification practices within the agency are relevant.................................................. 23

20.   Exhibits 121-126, 128-133, 141; Docs. 301-9 – 301-13 & Doc. 301-15; Appx. 1715-1772, 1778-2168, Appx. 2376-2378 – Government publications are non-hearsay under Rule 803(8); air conditioning outside TDCJ is relevant to contemporary standards of decency. ................................................................................................. 23

21.   Exhibits 135-138, Docs. 301-13 – 301-14, Appx. 2172-2365 – Air conditioning outside TDCJ is relevant to contemporary standards of decency and the feasibility of air conditioning. ...................................................................................................... 25

22.   Exhibits 149, 157-164; Docs. 301-17, 302-2 – 302-3; Appx. 2580, 2693-2724 – Newspaper articles contain admissible statements of agents of party opponents and are also admissible for matters other than the truth of the matter asserted......................... 25

iii

23.    Exhibit 150-152, Doc. 301-18, Appx. 2581 – Journal Articles ........................... 26

24.    Exhibit 153, Doc. 302-1, Appx. 2662 – Rothfusz's paper, "The Heat Index 'Equation,'" is a publication of the National Weather Service. .................................... 26

25.    Exhibit 154, Doc. 302-1, Appx. 2665 - Affidavit of Fact by Scott Gray is a factual affidavit going to an issue TDCJ raised in its Motion. .................................... 27

26.    Exhibit 155, Doc. 302-1, Appx. 2667-2688 – UTMB's objections to the order in *Borum* are incomprehensible. ....................................................................................... 28

27.    Exhibit 170, Doc. 302-9, Appx. 2900 – Jeremy Banks' statement in TDCJ's OIG File on McCollum's Death is plainly admissible. ........................................................ 28

28.    Exhibit 173, Doc. 302-11, Appx. 2966 – The Administrative Review of Mr. McCollum's death includes relevant facts and is not inadmissible under Rule 407. ... 29

29.    Exhibit 176, Doc. 302-11, Appx. 2974-2977 – The Joint Mortality and Morbidity Committee Review Worksheet of Mr. McCollum's death includes relevant facts and does not trigger Rule 407 at all. ..................................................................................... 30

30.    Exhibit 177, Doc. 302-11, Appx. 2978-3005 – Incidents of heat illness after Mr. McCollum's death are relevant. ................................................................................... 30

31.    Exhibit 180, Doc. 302-9, Appx. 3021-3059 – Bradley Caddell's EAC file is admissible as statements of party opponents and business records. ............................. 30

32.    TDCJ's EAC reports (Exhibits 184-201, 320-321; Docs. 302-15 – 303-13, 299-4 – 299-5; Appx. 3068-4009, 7182-7341) and OIG reports (Exhibits 202-210; Docs. 303-14 – 305-3, Appx. 4013-5169, 5174-5919) are TDCJ's statements and are all business records. Other deaths are relevant as discussed above. ............................................... 31

33.    Exhibits 236-249, 251-269, 323-329; Docs. 305-7 – 305-9, 299-6; Appx. 6119-6128, 6152-6153, 6168-6307, 7345-7384 – Emails by Defendants' agents are not hearsay and are relevant to notice, not just the truth of the matter asserted. ............... 32

   a.    Exhibit 236 – The agencies tracked heat-related illnesses before Mr. McCollum's death. ....................................................................................................... 33

   b.    Exhibit 237 – The executives at the agencies admitted their failure to protect their "aging and sicker population" on August 5, 2011, and declined to take immediate action in the midst of the 2011 deaths. .................................................... 33

   c.    Exhibit 238 – TDCJ's executives were apprised of heat deaths, in some cases almost immediately. ........................................................................................................ 34

   d.    Exhibits 239, 244 – Hutchins' walls did not keep the heat out. .......................... 34

e.   Exhibit 240 – TDCJ declined a suggestion from UTMB to start preventative inmate body temperature measurements in the midst of the 2011 crisis. ................ 35

f.   Exhibit 241 – UTMB admitted that inmates "need cooling." ............................ 35

h.   Exhibits 245 and 268 – UTMB had the power to protect Mr. McCollum and chose to shirk its responsibility. ............................................................... 36

i.   Exhibits 246, 248, & 251 – TDCJ's tracking heat-related deaths is relevant. ..... 37

j.   Exhibit 247 – Defendants' employees decided to conduct a review of Mr. McCollum's death because no vital signs were ever recorded despite his noted hypertension and diabetes. ........................................................... 38

k.   Exhibit 249 – Defendants' employees think inmates are aggressive because of the heat. ................................................................................. 38

l.   Exhibit 252 – TDCJ and UTMB admit Mr. McCollum's medications "can potentiate heat related illness." ............................................... 39

m.   Exhibits 253 and 257 – TDCJ's public relations efforts are admissible. .......... 39

n.   Exhibit 254 – TDCJ and UTMB know heat is dangerous and UTMB routinely asks for portable air conditioning units ..................................... 39

o.   Exhibit 255 – Air conditioning was available elsewhere in TDCJ inmate housing. ............................................................................... 40

p.   Exhibit 256 – The ACA's temperature control requirements apply. ................ 40

q.   Exhibits 258-260 – The Defendants admit their 911 policy was dangerous and they could have fixed their 911 policy at any time before Mr. McCollum's death .. 40

r.   Exhibit 261 – Dr. Charles Adams thought protecting inmates from the heat was unfinished business when he retired. ....................................... 41

s.   Exhibit 262 – TDCJ admits that 16 inmates died from heat between 2001 and 2012 ................................................................................... 42

t.   Exhibit 263 – TDCJ routinely requests portable air conditioning. ................... 42

u.   Exhibit 264 – UTMB and TDCJ know that fans do not help enough and the heat in TDCJ "creates medical concerns." ........................................ 42

v.   Exhibit 265 – TDCJ has tracked heat illnesses since before Mr. McCollum's death. .................................................................................. 43

w.   Exhibits 266-267 – TDCJ and UTMB could have implemented a Standing Delegated Order to improve nursing response to heat-related illness before Mr.

McCollum's death........................................................................................... 43

x.   Exhibit 269 – TDCJ and UTMB could have implemented "respite areas" before Mr. McCollum's death.................................................................................. 43

y.   Exhibit 323 – TDCJ and UTMB could have worked with security to identify and protect Mr. McCollum before his death............................................. 44

z.   Exhibits 324-325, 328-329 – TDCJ and UTMB could have worked together to monitor heat-related illnesses before Mr. McCollum's death. ................................ 44

aa.   Exhibits 326-327 – TDCJ and UTMB continue to fail to protect inmates. ..... 44

34.   Exhibits 270-273, 279, 287; Docs. 305-13 – 305-15; Appx. 6308-6416, 6597-6617, 6732-6739 – UTMB's objections during depositions are insufficiently developed and, to the extent specified, incorrect. .......................................................... 45

a.   Exhibit 270 – Dr. Charles Adams did not have to speculate: Mr. McCollum's diabetes, or lack thereof, would have been better determined by a physical............ 45

b.   Exhibit 272 – Dr. Glenda Adams did not have to speculate............................. 46

c.   Exhibit 273 – Ananda Babbili, P.A. did not have to speculate. ........................ 48

d.   Exhibit 279 – Gary Eubank, R.N. did not have to speculate. ........................... 49

VI. CONCLUSION.......................................................................................... 50

## III.    TABLE OF AUTHORITIES

**Cases**

*Baulch v. Johns*, 70 F.3d 813 (5th Cir. 1995) ............................................................. 1, 13

*Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416 (5th Cir. 2006) ......................... 5

*Clark v. Resistoflex Co.*, 854 F.2d 762 (5th Cir. 1988) .................................................... 17

*Coleman v. Dretke*, 409 F.3d 665 (5th Cir. 2005) .................................................... 22, 24

*Collins v. Wayne Corp.*, 621 F.2d 777 (1980), *superseded on other grounds as stated in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002) ............................. 15

*Fields v. City of S. Houston, Tex.*, 922 F.2d 1183 (5th Cir. 1991) ................................... 12

*Flooring Sys., Inc., v. Chow*, No. 4:12–CV–475, 2013 WL 4674667 (E.D.Tex. Aug. 27, 2013) ........................................................................................................................... 3

*Foley v. City of Lowell*, 948 F.2d 10 (1st Cir. 1991) ........................................................ 7

*Gray v. Sage Telecom, Inc.*, No. 3:05-CV-1677-G, 2006 WL 2820075 (N.D. Tex. Oct. 2, 2006), *aff'd*, 253 F. App'x 402 (5th Cir. 2007) ............................................................ 1

*Guzman v. Mem'l Hermann Hosp. Sys.*, No. CIV.A. H-07-3973, 2009 WL 427268 (S.D. Tex. Feb. 20, 2009) .................................................................................................... 30

*Henry v. County of Shasta,* 132 F.3d 512 (9th Cir.1997), *opinion amended on denial of rehearing en banc*, 137 F.3d 1372 (9th Cir. 1998) ..................................................... 7

*Herrera v. CTS Corp.*, 183 F.Supp.2d 291 (S.D. Tex. 2002) ........................................ 17

*Huthnance v. District of Columbia*, 793 F.Supp.2d 183 (D.D.C. 2011), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013) ................................................................................................... 7

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir. 1991) ................... 7

*Ismail v. Cohen*, 899 F.2d 183 (2nd Cir. 1990) ............................................................. 7

*Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, No. 4:08–cv–243, 2009 WL 901128 (E.D.Tex. Mar. 30, 2009) ............................................................................... 3

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77 (5th Cir. 1988) .......... 1

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 795 (E.D. Tex. 2014) ........................................................................................................................... 3

*Magee v. Unidentified Party*, 198 F.3d 242 (5th Cir. 1999) ............................................. 28

*Massingill v. Livingston*, 277 F. App'x 491 (5th Cir. 2008) ............................................. 28

*Miles Bramwell USA, LLC v. Weight Watchers Int'l, Inc.*, No. 4:12–CV–292, 2013 WL 1797031 (E.D.Tex. Mar. 27, 2013) ............................................................................................... 3

*Nearstar, Inc. v. Waggoner*, No. 4:09-cv-218, 2011 WL 817374 (E.D.Tex. Mar. 2, 2011) ................................................................................................................................ 3

*Payne v. Collins*, 986 F.Supp. 1036 (E.D. Tex. 1997) ................................................... 6, 7

*Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180 (5th Cir. 2015) .............. 8

*Peshlakai v. Ruiz*, 39 F.Supp.3d 1264 (D. N.M. 2014) ..................................................... 8

*Poole v. Glanz*, No. 11–CV–797–JED–TLW, 2014 WL 4286481 (N.D. Okla. 2014) ...... 7

*Rhodes v. JLG Industries, Inc.*, No. 1:13-cv-00872-TCB, 2015 WL 11199066 (N.D. Ga. 2015) ................................................................................................................................. 8

*Roper v. Simmons*, 543 U.S. 551 (2005) ......................................................................... 26

*Shepherd v. Dallas Co.*, 591 F.3d 445 (5th Cir. 2009) ................................................. 4, 7

*Soden v. Freightliner Corp.*, 714 F.2d 498 (5th Cir. 1983) ............................................. 5

*Tex. Sales & Mkt., Inc. v. Distinctive Appliances, Inc.*, No. H-05-3555, 2007 WL 399292 (S.D. Tex. 2007) ....................................................................................................... 1, 17

*United States v. Lewis*, 796 F.3d 543 (5th Cir. 2015) ............................................ 1, 3, 10

*United States v. Lynn*, 608 F.2d 132 (5th Cir. 1979) ....................................................... 1

*Wright v. Texas Dep't of Criminal Justice*, No. 7:13–cv–0116–O, 2013 WL 6578994 (N.D. Tex. 2013) .............................................................................................................. 4

## Statutes

28 U.S.C. § 12102 ............................................................................................................. 16

## Rules

Fed. R. Civ. Proc. 30 ........................................................................................................ 48

Fed. R. Civ. Proc. 56 ........................................................................................................ 28

Federal Rule of Evidence 401 ....................................................................................... 2, 5

Federal Rule of Evidence 402 ................................................................... 2

Federal Rule of Evidence 403 ............................................................... 2, 6

Federal Rule of Evidence 801 .......................................................... passim

Federal Rule of Evidence 802 ................................................................... 2

Federal Rule of Evidence 803 ................................................. 4, 24, 26, 27

Federal Rule of Evidence 807 ................................................................. 32

Federal Rule of Evidence 901 ................................................................. 32

Federal Rule of Evidence 902 ......................................................... 24, 27

### IV.    STANDARD OF REVIEW

"[A]n evidentiary objection must 'state[ ] the specific ground, unless it was apparent from the context.'" *United States v. Lewis*, 796 F.3d 543, 545 (5th Cir. 2015).

"In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form." *Tex. Sales & Mkt., Inc. v. Distinctive Appliances, Inc.*, No. H-05-3555, 2007 WL 399292, *3 (S.D. Tex. 2007) citing *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1988) ("[T]he papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party."). "We do not require district courts to find that authenticity is conclusively established before allowing the admission of disputed evidence." *Baulch v. Johns*, 70 F.3d 813, 816 (5th Cir. 1995).

Federal Rule of Evidence 407 provides that subsequent remedial measures "that would have made an earlier injury or harm less likely to occur" are not admissible to show negligence or culpable conduct—but it "the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving … the feasibility of precautionary measures." FED. R. EVID. 407.

"[A]dmissions by a defendant are not hearsay." *United States v. Lynn*, 608 F.2d 132, 135 (5th Cir. 1979). *See* FED. R. EVID. 801(d)(2). "Under Rule 801(d)(2)(E) statements are not hearsay if the statements are 'by a coconspirator of a party during the course and in furtherance of the conspiracy.' . . . [T]he co-conspirator exception applies to civil cases." *Gray v. Sage Telecom, Inc.*, No. 3:05-CV-1677-G, 2006 WL 2820075, at *5 n.8 (N.D. Tex. Oct. 2, 2006), *aff'd*, 253 F. App'x 402 (5th Cir. 2007).

## V.    ARGUMENT

UTMB and TDCJ's objections are without merit and should be denied in their entirety for the reasons stated below.

In the alternative, Plaintiffs respectfully request leave to include the exhibits to this response in the summary judgment record as needed to cure any admissibility issues addressed by these exhibits, as they create no unfair prejudice or surprise to Defendants.

### 1.    Summary of Argument and Overview of Generally Applicable Legal Issues.

TDCJ's second objection—which invokes Rules 401, 402, 403, and 802 without elaborating—is a carte blanche, generic objection to approximately 92 exhibits. Doc. 321, pp. 4-5. UTMB's objections are also particularly difficult to respond to, as they often repeat generic language throughout many of their 81 objections to numerous documents even when those objections seem to say that they only consider unspecified parts of each document to be objectionable.[1]

Due to this burdensome motion practice, Plaintiffs are unfairly prejudiced in their ability to fully and concisely respond, and so the Court should deem the vague objections waived even if Defendants should offer additional detail in reply briefs.  "Failure to raise an argument in a motion waives the argument; raising it for the first time in a reply memorandum is too late." *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 795, 811 (E.D. Tex. 2014);[2] *see also Lewis*, 796 F.3d at 545 (5th Cir. 2015).

---

[1] Specifically, UTMB objects to the relevance of "information about inmates other than McCollum" concerning 33 separate exhibits. Doc. 322, pp. 34, 36, 39. Further, UTMB objects generally that documents "contain[] inadmissible hearsay," implying that some

[2] *Citing Flooring Sys., Inc., v. Chow*, No. 4:12–CV–475, 2013 WL 4674667, at *1 n. 2 (E.D.Tex. Aug. 27, 2013); *Miles Bramwell USA, LLC v. Weight Watchers Int'l, Inc.*, No. 4:12–CV–292, 2013 WL 1797031, at *4 (E.D.Tex. Mar. 27, 2013); *Nearstar, Inc. v.*

Due in large part to the generic nature of the objections, many raise the same legal issues that, for the sake of brevity and clarity, are addressed below.

### a.  Hearsay

As to hearsay, TDCJ and UTMB seek to exclude evidence of their own statements and the statements of their co-defendants as hearsay with boilerplate language that fails to specify, in large part, exactly which statements are at issue or address obviously applicable exceptions and limits of hearsay. UTMB does not address any exception to hearsay save for 803(18), and TDCJ does not refer to any exceptions.

First, these Defendants must certainly bear the consequences of the statements of their employees and authorized agents, as such statements are not hearsay. FED. R. EVID. 801(d)(2)(A)-(E). UTMB is TDCJ's contractor, so its statements are fairly attributed to TDCJ. FED. R. EVID. 801(d)(2)(E). Further, nearly all of TDCJ's statements are made in the course and scope of implementing, with UTMB, the very same policies and practices that Plaintiffs allege wrongfully caused Mr. McCollum's death, and vice versa. FED. R. EVID. 801(d)(2)(C), (E). Therefore, many, if not all, of the statements complained of by any employees or agents of UTMB or TDCJ are not hearsay under Rule 801(d)(2).

Second, the statements of TDCJ's employees are often primarily relevant as to UTMB because the statement was made, such as to show notice, the agency's policies, or the TDCJ employees' state of mind, and not just because the statement might be true, and vice versa for UTMB's employees as to TDCJ. FED. R. EVID. 801(c)(2).

Third, virtually all of the records that TDCJ and UTMB complain of are business

---

*Waggoner*, No. 4:09-cv-218, 2011 WL 817374, at *4 (E.D.Tex. Mar. 2, 2011); *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, No. 4:08–cv–243, 2009 WL 901128, at *2 n. 1 (E.D.Tex. Mar. 30, 2009).

records or government publications. FED. R. EVID. 803(6), (8). Those business records that do not have a business records affidavit bear sufficient indicia of their business records status and trustworthiness to be admissible; most were produced by Defendants and bear the signatures of Defendants and their employees. *See* FED. R. EVID. 803(6).

### b.  Relevance of earlier heat-related deaths and injuries

UTMB seeks to strike any mention of any heat-related injury or death inside TDCJ, other than Mr. McCollum's death, including those occurring before his death. This position fundamentally misunderstands the scope of relevance and takes a position contrary to the law of the case.

The history of heat deaths and injuries in TDCJ shows that both agencies were well-aware of the danger that killed Mr. McCollum. This satisfies the ADA's "intentional discrimination" standard: The agencies failed to make accommodations for his disabilities that made him especially vulnerable to the known heat hazard. *See Wright v. Texas Dep't of Criminal Justice*, No. 7:13–cv–0116–O, 2013 WL 6578994 at *4-5 (N.D. Tex. 2013). The Fifth Circuit has approved admitting evidence of other similar incidents to establish liability of correctional facilities at trial in a civil rights case. *Shepherd v. Dallas Co.*, 591 F.3d 445, 457 (5th Cir. 2009) (admitting report into evidence showing jail's "specific incidents of failure to provide adequate medical care that occurred shortly before, during, and shortly after the period of [the prisoner's] detention").

UTMB cites no authority for its argument that prior inmate heat stroke deaths, and heat injuries to other inmates and TDCJ employees, are irrelevant. A wealth of precedent is to the contrary. Evidence is relevant if it relates to any fact of consequence in determining the action, and has any tendency to make the fact more or less probable than

it would be without the evidence. FED. R. EVID. 401. The other prisoners in TDCJ died of the same cause as Mr. McCollum and while subject to similar policies and practices.

Moreover, the rationale for the relevance of these other heat injuries and deaths is the same as that articulated by the well-established line of authority holding other similar injuries or accidents relevant in product liability cases—to show the condition of the product causing the danger and the level and nature of Defendant's knowledge of the relevant danger. *See, e.g., Soden v. Freightliner Corp.*, 714 F.2d 498, 508-510 (5th Cir. 1983); *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 426-427 (5th Cir. 2006). Indeed, the Fifth Circuit has affirmed even the admission of lawsuit complaints making allegations of other similar incidents. *Soden,* 714 F.2d 498, 508-510.  Here, the evidence is much stronger as it consists of actual proof, not just allegations, regarding prior incidents of heat related injury and deaths, and proven by autopsies with respect to the deaths. *See* Doc. 300-2 – 300-9; Appx. 4-240, 256-306; Doc. 305-19, Appx. 7055-7082.

The law of the case further counsels denial of UTMB's objections, as an earlier ruling in this litigation included the finding "that the history of heat-related deaths in TDCJ is relevant to Plaintiffs' claims, specifically as to Defendants' prior knowledge, if any, of the potential danger being housed in extreme temperatures in non-air conditioned facilities posed to inmates such as McCollum." Doc. 58, p. 3.

### c. Relevance of subsequent heat-related deaths and injuries, the agencies' responses to them, and the Rule 407 exceptions

TDCJ and UTMB also object to every reference to heat deaths, injuries, and anything else "containing information" that occurred after Mr. McCollum passed away. UTMB objects to an array of documents including emails, medical records, as well as reports of heat injuries, risk, and mitigation measures, as irrelevant simply because they

were created after Mr. McCollum's death or because they refer to possible subsequent remedial measures. *See generally* Doc. 322. TDCJ generically objects that they are all "irrelevant, impermissible hearsay, unfairly prejudicial, confusing, and/or causing impermissible imposition of significant time and effort to sift through the evidence," and does not elaborate further. Doc. 321, pp. 4-5.

The evidence of the deaths and injuries that followed Mr. McCollum's passing, as well as subsequent documents and emails regarding heat risk, heat mitigation measures, and heat injury, are highly relevant and therefore more probative than prejudicial.[3] As ruled earlier in this litigation for employee injuries, this information "is relevant to the more limited issue of the dangerous conditions at the institution where McCollum died." Doc. 58, p. 4.

But more than merely confirming that the conditions at the prisons are dangerous, this evidence also bolsters Plaintiffs' allegations that Defendants were deliberately indifferent to the heat risk and had a practice of failing to accommodate the disabilities of inmates making them especially susceptible to the heat. Courts in the Fifth Circuit admit evidence of post-injury conduct by prison officials to determine whether they acted with deliberate indifference. *See, e.g., Payne v. Collins*, 986 F.Supp. 1036, 1058 (E.D. Tex. 1997) (overruling objection to relevance of prison investigation "because it was instigated by events subsequent to the attacks on [plaintiff]") (citing *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502

---

[3] Neither Defendant purports to identify any particular unfair prejudice, cumulative evidence, or risk of misleading for any piece of evidence except Exhibit 1, despite nominally objecting under Rule 403. UTMB at least repeats the refrain that subsequent information "confuses the issues," without elaborating. But it does not. Any reasonable juror can easily understand how other, similar incidents are informative but distinct events, or how a person's knowledge can change over time.

U.S. 1059 (1992)).

In *Payne*, the trial court admitted an administrative review conducted by TDCJ that "assessed all aspects of the [prison] after a number of inmates attacked some [officers] and a prisoner was found dead." *Payne*, 986 F.Supp. at 1050. The report was completed months after a prisoner was beaten to death at the prison by other inmates, and discussed other assaults occurring after the death. *See id*. 1050 n.32.

The Fifth Circuit has also approved admitting evidence of post-incident conduct and occurrences to establish the prevailing unconstitutional conditions at correctional facilities in civil rights cases. *Shepherd v. Dallas Co.*, 591 F.3d 445, 457 (5th Cir. 2009) (admitting report into evidence showing jail's "specific incidents of failure to provide adequate medical care that occurred shortly before, during, *and shortly after* the period of [the prisoner's] detention") (emphasis added). Similarly, Courts outside the Fifth Circuit in civil rights cases routinely admit evidence of post-incident conduct or occurrences as evidence of ongoing practices, customs and/or deliberate indifference to a known risk.[4]

Courts similarly admit evidence of a defendant's post-incident conduct or occurrences in product liability and negligence cases to show the defendant's knowledge

---

[4] *See, e.g., Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir.1997), *opinion amended on denial of rehearing en banc*, 137 F.3d 1372 (9th Cir. 1998) ("Post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry."); *Foley v. City of Lowell*, 948 F.2d 10, 14-15 (1st Cir. 1991) ("On the facts of this case, it was well within the trial court's discretion to conclude that the Finnegan incident was competent, if indirect, evidence of a preexisting municipal policy of indifference."); *Ismail v. Cohen*, 899 F.2d 183, 188 (2nd Cir. 1990) (affirming admission of evidence regarding subsequent similar conduct by defendant as relevant to "pattern, intent, absence of mistake, etc."); *Poole v. Glanz*, No. 11–CV–797–JED–TLW, 2014 WL 4286481 at *1 (N.D. Okla. 2014) (post incident evidence relevant "to show the policymaker's disposition or the existence of a policy or custom at the time."); *Huthnance v. District of Columbia*, 793 F.Supp.2d 183, 210 (D. D.C. 2011), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013).

of, and disregard for, the danger or the nature of the dangerous condition of the product. *See, e.g.*, *Rhodes v. JLG Industries, Inc.*, No. 1:13-cv-00872-TCB, 2015 WL 11199066 at *4 (N.D. Ga. 2015); *Peshlakai v. Ruiz*, 39 F.Supp.3d 1264, 1338-9 (D. N.M. 2014).

The same rationale supports the relevance of the challenged evidence when offered in support of Plaintiffs' ADA claims against Defendants, as the evidence bears on the element of intentional discrimination: Defendants intentionally discriminated against Mr. McCollum by failing to provide accommodations despite knowing about the heat risk conditions which had caused deaths and injuries, and also knowing about Mr. McCollum's disabilities that made him heat vulnerable. The Fifth Circuit has yet to clarify whether the ADA element of intentional discrimination equates to the deliberate indifference standard, as every other Circuit to consider the issue has held. *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015). Whatever the answer, post-incident conduct and occurrences remain admissible here just as they are in civil rights claims, as evidence of Defendants' knowledge of the heat risk, and evidence of the prevailing heat conditions in the prisons, are crucial issues under any formulation of the standard. Moreover, UTMB contends that it is immune from the ADA and RA on the basis of constitutional law, directly bringing to bear the civil rights precedent. Doc. 285, p. 38.

Finally, evidence of new heat mitigation measures implemented after Mr. McCollum's death should not be excluded under Rule 407 regarding subsequent remedial measures. Rule 407 prohibits evidence of subsequent redial measures only when offered to show culpable conduct—such evidence is permitted to show a party's control or the feasibility of implementing the measures. In this case, the evidence is relevant and

admissible to establish the elements of control over, and the feasibility of, the implementation of heat mitigation measures, disputed by UTMB in its motion for summary judgment. As to control, the UTMB complains that its hands are tied and that it could do nothing to protect Mr. McCollum because it does not control the temperature, maintenance, policies, inmate housing assignment, or inmate housing restrictions inside TDCJ, as these matters lie only in the control of TDCJ. Doc. 285, pp. 3, 7, 9, 31-34. As discussed throughout this response, the evidence of subsequent remedial measures shows otherwise: Not only does UTMB play an influential and sometimes deciding role in the creation of the policies and practices at issue, but it has explicitly considered and **rejected** many of the accommodations that Plaintiffs complain were denied to Mr. McCollum.

The evidence is also admissible under Rule 407 to show the feasibility of better heat mitigation measures. As to feasibility, UTMB argues that every accommodation they could have made to help Mr. McCollum would have been unduly burdensome. Doc. 285, p. 17 n.17.  The fact that those accommodations were later implemented undermines this argument and demonstrates the feasibility of implementing the measures prior to Mr. McCollum's death.

> **2. Exhibit 1, Doc. 300-2, Appx. 2 - The Summary of Undisputed Heat-Related Death at TDCJ Facilities is an accurate summary under Rule 1006 and is admissible as a statement of a party opponent.**

As to Plaintiffs' Exhibit 1, both TDCJ and UTMB object on various grounds, but the Exhibit is the same as the table that TDCJ and Brad Livingston admitted to and is therefore admissible.[5] It is relevant to the risk posed by the heat in TDCJ housing areas.

---

[5] Neither party objected to this admission, even though it includes the same table, just in a

TDCJ's first objection is that the chart "implies an improper, highly prejudicial, standard of liability based upon negligence or strict liability." Doc. 321, p. 3. It is unclear from TDCJ's objection how anyone could infer either of these legal standards from a summation of facts. *See* Doc. 300-2, Appx. 2. TDCJ's position is too unclear to alert the Court or the parties to the basis of this objection. *See Lewis*, 796 F.3d at 545 ("[A]n evidentiary objection must 'state[ ] the specific ground, unless it was apparent from the context.'").

TDCJ further objects that the chart is missing the date that a final autopsy report was completed, apparently because they believe that a person reading the chart would make the inference that every Defendant immediately knew about every death as they happened. But Rule 1006 does not require that all contents of the underlying documents be summarized, and in any event Defendants have the autopsy reports and official investigations, so they possess this information. Moreover, the date that each Defendant knew about each death is in dispute—for example, Mr. Eason testified under oath, albeit falsely, as TDCJ's corporate representative that he did not know about any heat-related deaths except McCollum's and Adams' during his March 26, 2013 deposition, Doc. 305-14, Ex. 278, Appx. 6563:24-6564:3, even though other hyperthermia autopsies were completed years earlier. *See, e.g.*, Doc. 300-4, Appx. 102 (Hudson autopsy signed Oct. 5, 2011); Doc. 300-4, Appx. 128 (Meyers autopsy, signed Mar. 13, 2012); Doc. 300-5, Appx. 141 (Webb autopsy, signed Feb. 17, 2012).[6] Regardless, the date that each autopsy

---

stretched format. Exhibit 36 to Plaintiffs' Appendix, Doc. 300-10, Appx. 567-569.

[6] And Eason signed reports on other deaths prior to his deposition. *See, e.g.*, Doc. 302-20, Appx. 3237 (report of Webb's death stamped "Received" Nov. 10, 2011, with Eason's initials).

was completed is not the earliest date that Defendants were on notice of that death's pertinence to an individual like McCollum and executive Defendants like Eason were personally notified of numerous deaths. *See, e.g.*, Doc. 304-8, Appx. 4959 (noting that Hudson's body temperature was 104.8°F, and outdoor temperature was over 100, when he was found seizing at Gurney Unit on July 24, 2011). The purpose of the chart was to summarize information that TDCJ admitted to, not to introduce all facts about every death.

As to the eleven deaths after Mr. McCollum's, these are relevant as evidence of the objectively serious risk and, in conjunction with the information about TDCJ and UTMB's failure to substantially improve their policies, continuing deliberate indifference. *See* Section 1.c.

Finally, TDCJ and UTMB object to the lack of citations within the chart, which at any rate does not violate Rule 1006. Rule 1006 does not require any form of citations, only that the underlying documents be provided to Defendants. And although both Defendants complain about the chart's summation, they do not argue that the chart is mistaken in any way.

And the chart is not merely an accurate summary of the evidence in the record, it is also founded upon admissions adverse to the interests of party opponents: TDCJ and Brad Livingston. *See Cole v. Livingston*, No. 4:14-cv-01698, Doc. 432, p. 38 (copied into Doc. 300-10, Appx. 567-569). These two parties admitted that each death in the chart occurred in TDCJ, that autopsies determined them to be from hyperthermia, and only objected that the "facts" portion "lacks complete information." *Id.* When the two Defendants made these admissions, the chart had the same appearance as Exhibit 1. Thus,

the chart is not hearsay under Rule 801(d)(2).

> **3. Exhibits 2-22, 27-30, 301-302; Doc. 300-2 – 300-9, 305-19; Appx. 4-240, 256-306, 7055-7082 – The autopsies and their reports are relevant, not confusing and Defendants' statements and records.**

UTMB and TDCJ produced the autopsy reports in this record, *see, e.g.*, Ex. G, and both Defendant agencies either contracted for them or performed them through their agent employees. *See* Doc. 300-2, Appx. 6-246; *see, e.g.*, Doc. 300-2, Appx. 11 (showing UTMB letterhead). The autopsies are therefore vicarious statements of both agency Defendants by employees and/or agents specifically authorized to speak on the subject matter, and therefore not hearsay.

Final autopsy reports are recognized as business records in the Fifth Circuit. *Fields v. City of S. Houston, Tex.*, 922 F.2d 1183, 1191 n.9 (5th Cir. 1991). Further, the autopsy reports of Finke, White, Lopez, Moore, Cardwell, Robertson, Hudson, Webb, Martone, James, and Adams have separate business records affidavits.[7] To the extent necessary for any autopsy to remain in the summary judgment evidence, Plaintiffs request leave to supplement the summary judgment record with Exhibits G, O, P, and Q to this response.

Moreover, there is not any dispute about the authenticity of these records that TDCJ and UTMB itself possess and provided, either directly or indirectly, to Plaintiffs'

---

[7] *See* Exs. O, P, Q; Doc. 303-15, Appx. 4052 (business records affidavit for Cardwell); Doc. 303-16, Appx. 4101 (copy of Cardwell's autopsy report in the context of the OIG file); Doc. 302-15, Appx. 3068-3069 (Finke affidavit and autopsy); Doc. 304-1, Appx. 4567 (Robertson affidavit); Doc. 304-2, Appx. 4670 (Robertson autopsy); Doc. 304-8, Appx. 4943 (Hudson affidavit); Doc. 304-13, Appx. 5157 (Hudson autopsy); Doc. 304-15, Appx. 5174 (Webb affidavit); Doc. 304-15, Appx. 5197 (Webb autopsy); Doc. 304-18, Appx. 5276 (Martone affidavit); Doc. 304-19, Appx. 5388 (Martone autopsy); Doc. 304-20, Appx. 5409 (James affidavit); Doc. 304-24, Appx. 5641 (James autopsy); Doc. 305-1, Appx. 5734 (Adams affidavit); Doc. 305-2, Appx. 5800 (Adams autopsy).

counsel. *See Baulch v. Johns*, 70 F.3d 813, 816 (5th Cir. 1995) (holding autopsy report admissible and sanctioning defendant for disputing authenticity, even where no testimony established authenticity, because of internal indicia of reliability and a codefendant's production of the report).

As for relevance and admissibility, the heat stroke deaths both before and after Mr. McCollum's death are relevant and admissible for the reasons set forth above, including notice of the risk, the level of danger, and the Defendants' deliberate indifference. *See supra* Section 1.b-1.c.

> **4. Exhibits 23, 303; Docs. 300-7, 299-2; Appx. 242-244, 7084-7184 – Joint Mortality and Morbidity Committee Review Worksheets show the feasibility of measures that could have protected McCollum and that both agencies could have implemented them.**

TDCJ and UTMB object with boilerplate language to every Joint Mortality and Morbidity Committee Review Worksheets in Exhibit 303, even though Rule 407 does not forbid all evidence of remedial measures and even though these worksheets contain important details about each death including Mr. McCollum's. *See* Doc. 299-2, Appx. 7108. TDCJ makes an identical objection to Exhibit 23. Doc. 300-7, Appx. 242. The other heat-related deaths are relevant and admissible. *See supra* Sections 1.b-1.c and *infra* Sections 15-17. Moreover, the worksheets completed prior to Mr. McCollum's death provided the agencies notice of the problem.

The facts relayed in the worksheets provide a concise source of information allowing the jury to compare them to Mr. McCollum's death. For example, Archie White's 2000 review states that he was found shaking and unresponsive—similar to Mr. McCollum. Doc. 299-2, Appx. 7085.

The facts in the worksheets prior to Mr. McCollum's death also provided notice

of the risks; for example, in spite of Lopez's 1998 hyperthermia death and history of mental illness, the reviewers noted that he had no temperature extreme restriction on his HSM-18 form. Doc. 299-2, Appx. 7088. The same juxtaposition was noted for inmate Moore's 1998 death. *Id.* at 7090. By the time of Shriver's death in 2007, the reviewers were recommending referral to the Correctional Managed Health Care Committee for review of systemic issues affecting health care. *Id.* at 7099.

> **5. Exhibit 25, Doc. 300-7, Appx. 251 - McWhorter's email and list of Possible Heat-Related Deaths are appropriate evidence.**

TDCJ and UTMB vaguely object, as to relevance and hearsay, to the inclusion of a table that identifies inmates as "Possible Heat-Related Deaths," emailed to Lannette Linthicum on June 14, 2013. Doc. 300-7, Appx. 251-252.

TDCJ employees' statements regarding and evaluations of heat-related deaths are clearly admissible, including their suspicions about other deaths being heat-related. While both Phyllis McWhorter and Lannette Linthicum have medical training, it is unclear why the email should need to be "interpreted by a medical expert." *Contra* Doc. 322, p. 13. The deaths before Mr. McCollum's gave both agencies notice, while those after demonstrate the agencies' continuing indifference. *See supra* Section 1.b-1.c.

Moreover, these documents are not hearsay because they were created by Defendants' agents within the scope of their authority, and thus constitute the statements of the Defendants within the meaning of Rule 801(d)(2)(C) and (D).

> **6. Exhibit 26, Doc. 300-8, Appx. 254 – The agencies knew heat stroke was a risk before Mr. McCollum's death.**

TDCJ and UTMB object that Exhibit 26, an email from a UTMB employee email, is hearsay and irrelevant, even though Cacciatore's email states that an inmate, who was

found unresponsive, "most likely [had] heat stroke." Doc. 300-8, Appx. 254. This email is a statement of a party opponent and therefore not hearsay, and also is not hearsay as it goes to prove notice to Defendants of the heat risk (rather than only the facts of this incident).

This email is plainly relevant, as it shows the agencies' knowledge of the danger posed by heat prior to Mr. McCollum's death and supports the allegation that the agencies deliberately chose not to protect inmates like Mr. McCollum.

### 7. Exhibits 31 & 290; Docs. 300-9 & 305-16; Appx. 311 & 6805 – Dr. Rieger's testimony on behalf of TDCJ is admissible as statements of a party opponent.

UTMB objects to the in-court testimony and deposition testimony of TDCJ's witness in another case. TDCJ's retained expert is their agent for the purpose of Rule 801, and therefore his statements are an admission of a party and not hearsay. *See Collins v. Wayne Corp.*, 621 F.2d 777 (1980), *superseded on other grounds as stated in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002) (retained litigation investigator's statements are those of a party opponent, superseded regarding 103(a) preservation issue); Doc. 305-16, Appx. 6809:16-22 (Rieger is being paid for his testimony by TDCJ).

### 8. Exhibit 33, Doc. 300-10, Appx. 328-333 – The pre-trial conference is relevant to the parties' positions and the Court's prior rulings.

This Court may consider the status of the case in deciding summary judgment. The pre-trial conference transcript included in the summary judgment record is pertinent to the applicable deadlines on expert discovery, as this Court ruled in that hearing that "[t]here will be no new designation of experts." Doc. 300-10, Appx. 333:1-2.

**9. Exhibit 37, Doc. 300-10, Appx. 640-641 – Stephanie Kingrey's declaration is admissible and consistent with her prior testimony.**

UTMB asks the Court to determine Stephanie Kingrey's credibility and disregard her sworn declaration because it is allegedly "inconsistent" with her deposition testimony. Doc. 322, p. 16.

Ms. Kingrey's deposition testimony is in no way "inconsistent" with her declaration. At her deposition, without defining the term, Defense counsel asked Ms. Kingrey if she "considered [her] dad to be disabled." Ex. H, 54:25-55:1.[8] Of course, the common usage of "disabled" differs from the specific meaning assigned by the Americans with Disabilities Act and Rehabilitation Act. *Compare* 28 U.S.C. § 12102(1) ("physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment")[9] *with* Merriam Webster Dictionary (www.meriam-webster.com) ("incapacitated by illness or injury").[10] While Mr. McCollum's physical impairments were not so severe to "incapacitate" him, Ms. Kingrey's declaration (and her errata sheet) explain that his obesity did "ma[ke] it difficult for him to move compared to an average person," and that even normal activities like "walking short distances, standing, bending over, and climbing would tire him more quickly than they would a normal person." Doc. 300-10, Appx. 640-41. There is no inconsistency—her declaration supplements her

_____

[8] Pages 54 and 55 of Plaintiff's deposition are also included Defendant's appendix.

[9] The statute also defines the terms "major life activities" and "major bodily functions." 28 U.S.C. § 12102(2).

[10] She was separately asked about her father's obesity and diabetes. Ex. H, 22:7-8; 29:5-30:7, 56:22-58:9.

deposition and errata sheet, specifically because UTMB wields the word "disability" as a term of art when it has another plain meaning.

Notably, after she completed her errata sheet, UTMB complained about this very issue and, although the magistrate judge expressly found that she testified consistently, Defendants were granted an opportunity to depose Ms. Kingrey a second time to resolve alleged ambiguities in the deposition. Doc. 140, p. 7. Defendants chose not to use this second chance. *See* Doc. 140.

UTMB's authority stands in sharp contrast to the reality of Ms. Kingrey's declaration. In *Texas Sales & Marketing*, the plaintiff testified at his deposition that he "never discussed specific terms" of an alleged oral contract, then described alleged terms for the first time in an affidavit submitted to oppose summary judgment. 2007 WL 399292, at *6. Unlike in Ms. Kingrey's deposition testimony—where she discussed each of her father's disabilities (though without using the associated legal jargon)—the *Texas Sales* plaintiff's testimony was "directly contradicted without any explanation for the discrepancy." *Id*. Unlike the cases UTMB relies on, Ms. Kingrey has offered a wholly credible "sufficient explanation" for the alleged discrepancy—UTMB assigned a meaning to the word "disabled" that she did not. *Cf.*, *e.g. Herrera v. CTS Corp.*, 183 F.Supp.2d 291, 928-29 (S.D. Tex. 2002) (plaintiff testified at deposition he could not perform certain job duties, and in his affidavit that he could). Instead, Ms. Kingrey's declaration is far more like the affidavit which "supplements, rather than contradicts, [the] earlier deposition testimony" in *Clark v. Resistoflex Co.*, 854 F.2d 762, 766-67 (5th Cir. 1988), which was admitted as competent summary judgment evidence.

**10. Exhibit 38, Doc. 300-10, Appx. 643 – The Declaration of Santos Rodriguez, III is based on his personal knowledge.**

UTMB incorrectly characterizes many allegations from Mr. Rodriguez's personal knowledge as speculation and hearsay. Mr. Rodriguez recounts numerous instances of officers refusing to accommodate Mr. McCollum's disability, such as an officer refusing Mr. McCollum's request to use the unoccupied bottom bunk. Doc. 300-10, Appx. 644. All of these are indeed out-of-court statements—but they are primarily offered to prove *that the statements were made*, thereby showing that reasonable requests for accommodations were made directly to TDCJ and then were denied. Moreover, Mr. Rodriguez's memory of TDCJ officers' statements against interest are admissible against TDCJ as the statements of a party-opponent pursuant to Rule 801(d)(2)(D).

As to speculation, UTMB complains that Mr. Rodriguez attests "I do not remember seeing Mr. McCollum go to the chow hall," "he did not look well," "I would see [officers] sweat through their uniforms," and "[officers] would call all the prisoners to come up to the glass wall and show our identification cards so we could be counted." Doc. 300-10, Appx. 645. All of these are statements regarding Mr. Rodriguez's own perceptions and experiences, not speculation. *Contra* Doc. 322, p. 17.

### 11. Exhibit 39, Doc. 300-10, Appx. 648 – The Declaration of Ronald Chase is relevant and based on his personal knowledge.

Ronald Chase offers testimony about the Hutchins State Jail heat mitigation practices, including during the time of Mr. McCollum's death. Doc. 300-10, Appx. 648. As TDCJ and UTMB have not indicated that the practices mentioned in Mr. Chase's affidavit from after Mr. McCollum's death changed in 2012, his affidavit is entirely relevant.

UTMB also complains that Mr. Chase is not testifying from personal knowledge

18

when he says "it was extremely hot," "[t]here would be a long line to get water," "[s]ometimes people got in fights over how much water they got," "[t]he fans did nothing to cool down the dormitory," "[m]ost of us were drenched in sweat all day," and "I never remember anyone in my dorm being allowed to go into the multi-purpose room to cool down." Doc. 300-10, Appx. 648-651. These statements are not speculative; they cast light on Mr. Chase's own perceptions and experiences as a prisoner at the Hutchins Unit.

### 12. Exhibits 40-43, Doc. 300-10, Appx. 649-667 – The Declarations of David Deaton, Edwards Crockett, David Gleason, and Leonard Russell are relevant.

Neither UTMB nor TDCJ has shown that the practices mentioned in Mr. Deaton's Mr. Crockett's, Mr. Gleason's, or Mr. Russell's affidavits from after Mr. McCollum's death only began that year. A reasonable jury would infer that when UTMB and TDCJ policies remain substantially identical from 2011 to 2012, the agencies' practices will too. Therefore, these affidavits are relevant to show TDCJ and UTMB practices and the effect of heat on the inmates under their care. Even if the agencies later argue that they improved their practices, the facts of that improvement are relevant to the Defendants' control over and ability to undertake those efforts that could have improved Mr. McCollum's plight. *See* Section 1.c. In any event, the fact these inmates were not at the prison when Mr. McCollum died would only go to the weight of their declarations, not to their admissibility.

### 13. Exhibits 71-72, Doc. 300-19, Appx. 1334-1365 – The 2012 TDCJ CID meeting notes are relevant to an array of issues including the feasibility of refused accommodations.

TDCJ and UTMB complain that notes from high-level meetings inside TDCJ, even those notes that concern Mr. McCollum's death, are irrelevant. To the contrary,

these notes are a window into the agency's priorities and knowledge going into the summer of 2012. Most critically, though, the notes mention "10 deaths last year relating to heat" along with the words "Training. Wellness Checks." Doc. 300-19, Appx. 1346.

This shows that TDCJ executives, including the Defendants who attended this meeting, already knew about the deaths[11] and discussed ways that they might improve their practices. The feasibility of improvements is relevant to the reasonableness of the accommodations that the Defendants refused to implement earlier and to the lack of penological justification for the status quo. Although they are obviously business records and present sense impressions, a business records affidavit for this set of notes is included with this response as Exhibit I. To the extent necessary to allow consideration of Exhibits 71 and 72, Plaintiffs request leave to supplement the summary judgment record with Exhibit I to this response.

### 14. Exhibits 74-75, Doc. 300-20, Appx. 1374-1378 – The Grievances of and responses to Steve Carrizales and Thomas Reed are relevant to the feasibility of accommodations that were refused to Mr. McCollum.

Similarly, TDCJ and UTMB complain that Steve Carrizales' grievance and Thomas Reed's grievance are not relevant because they were filed in Hutchins during 2012. But TDCJ's response to both grievances is to promise to fix the problems, and had TDCJ provided the same relief to Mr. McCollum that it promised to those inmates, it could have protected him from the heat.

Mr. Carrizales grieved the broken air conditioning in the administrative segregation cells at Hutchins. Doc. 300-20, Appx. 1375. This indicates that there is no penological reason not to air condition other inmate housing areas in the Hutchins

---

[11] This is in spite of Eason's testimony to the contrary. Doc. 305-14, Ex. 278, Appx. 6563:24-6564:3.

facility.

Mr. Reed grieved obstruction to the air conditioning in the multi-purpose room, where "we are suppose [sic] to be able to enter this room to cool off." Doc. 300-20, Appx. 1368. This indicates that using the multi-purpose room as a place for inmates "to cool off" was feasible in 2012, and therefore should have been feasible in 2011.

TDCJ and UTMB also complain that the grievances and responses are hearsay, but the responses are signed with the authority of Jeffrey Pringle, a Defendant in this case, and the response does not dispute any of the complaints or descriptions of policy in the grievances. The grievances are also clearly part of TDCJ's business records, in addition to being statements of a party-opponent under Rule 801(d)(2)(A), (B) and (D).

### 15. Exhibit 76, Doc. 300-20, Appx. 1380 – The work order on air conditioning at Hutchins is also relevant to the feasibility of a refused accommodation.

UTMB also complains that Exhibit 76, documentation of the air conditioning in other inmate housing areas at Hutchins, is irrelevant. As discussed above, this work order, which is plainly a business record of TDCJ, shows the feasibility of air conditioning the prison, which is relevant to the claims in this case.

### 16. Exhibit 77, Doc. 300-20, Appx. 1382 – The Byrd Unit is relevant because inmates there died under similar circumstances to Mr. McCollum.

UTMB complains that Plaintiffs have cited to their employer's website to prove that the Byrd Unit, like Hutchins, is a transfer facility. Doc. 300-20, Appx. 1382. This evidence is helpful to show the similarities between Mr. McCollum and inmates who earlier died from heat at the Byrd Unit, Mr. Robles and Mr. Shriver. *See* Doc. 300-3, Appx. 79; Doc. 300-3, Appx. 66. These 2007 deaths were documented and the details

were known to executives at the highest levels of the Defendant agencies including to Brad Livingston. *See, e.g.*, Doc. 305-5, Appx. 6033. The jury should make a detailed evaluation of these deaths due to their relevance to notice of the heat risk in TDCJ's housing areas.

Moreover, the Court may take judicial notice of a government website. *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (denying rehearing en banc).

### 17. Exhibit 104, Doc. 301-4, Appx. 1526 – TDCJ's subsequent "Heat Precautions" email is admissible as to the feasibility of subsequent remedial measures and the agencies' continued indifference.

UTMB also complains that Exhibit 104, TDCJ's 2014 "Heat Precautions" email, violates Rule 407 and is irrelevant. Doc. 301-4, Appx. 1526. As mentioned above, the new practice of wellness checks is evidence that TDCJ and UTMB could have done more to help Mr. McCollum, despite their claims to the contrary. This feasibility evidence falls into an explicit exception to Rule 407.

But other than the addition of wellness checks and the clarification of formatting, the 2014 precautions are strikingly similar in substance to the 2011 precautions, showing that the Defendants did not see a need to change course—likely because they were not really surprised by the heat stroke deaths. *Compare* Doc. 301-4, Appx. 1522 *with* Appx. 1526. The *lack of* subsequent remedial measures is not inadmissible under Rule 407, and indeed evidence that Defendants saw no need to make more significant changes is powerful evidence of deliberate indifference.

### 18. Exhibit 107, Doc. 301-4, Appx. 1542 – Hutchins' 2012 "Extreme Heat Precautions" is admissible as to the facility's 2011 practices.

UTMB objects to Exhibit 107, which was part of TDCJ's response to Plaintiffs' request for "all relevant policy documents governing procedures **that were in place**

22

**during 2011** at the Hutchins Unit related to heat, temperature, or heat index." *See* Ex. A, TDCJ's Responses to Discovery, Appx. 7433 (Dec. 21, 2012) (emphasis added) (referring to "responses attached as TDCJ's response to request for production No.3 and No.4").[12] Further, UTMB has not argued that there is any reason to believe the Hutchins facility used a different policy during the summer of 2011, other than the date marked on the exhibit. (Notably, there is also a substantial fact issue about what those practices are, especially as to wellness checks that are not mentioned in the exhibit.)

Regardless, even if this exhibit only shows subsequent measures, and the lack thereof, it is admissible for the reasons discussed in Sections 1.c and 17.

### 19. Exhibits 108-109, Doc. 301-5, Appx. 1545-1550 – TDCJ's policies governing notification practices within the agency are relevant.

UTMB similarly complains that Exhibits 108 and 109 are not relevant or compliant with Rule 407 because they are dated after Mr. McCollum's death. But just because the agencies have not produced equivalent documents predating Mr. McCollum's death should not stop a reasonable jury from inferring that these policies were substantially identical at the time of Mr. McCollum's death, and that executives received reporting according to a similar process long before 2011.

Even if the jury declined to draw this inference, these policies are relevant to the feasibility of such a reporting practice before 2011 to recognize the pattern of illnesses from heat.

### 20. Exhibits 121-126, 128-133, 141; Docs. 301-9 – 301-13 & Doc. 301-15; Appx. 1715-1772, 1778-2168, Appx. 2376-2378 – Government

---

[12] For completeness, both "No.3" and "No.4" are attached in their entirety—there is no comparable, earlier-dated document in the set. *See* Exs. B, C. To the extent necessary to preserve Exhibit 107, Plaintiffs request leave to supplement the summary judgment record with Exhibits A, B, and C to this response.

**publications are non-hearsay under Rule 803(8); air conditioning outside TDCJ is relevant to contemporary standards of decency.**

UTMB has copied and pasted the same objection to hearsay for a large number of published documents from a variety of government sources: the Centers for Disease Control, the Center for Housing and Urban Development, the Department of Defense, the National Weather Service, Northwestern Oklahoma State University, the United States Census Bureau, and the United States Energy Information Institute. Most of these documents were simply printed directly from government websites, all are clearly marked as government publications, and each is within the scope of the respective agency's legal duties. UTMB does not even refer to Rule 803(8) in its objections, only Rule 803(18), and does not dispute authenticity. *See* Doc. 322, pp. 23-25, 27.

There is no reason to doubt the trustworthiness of these documents, which satisfy both Rule 803(8) and Rule 902(5). Additionally, these documents from government websites satisfy the requirements for judicial notice set out in *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (denying rehearing en banc). Therefore, these objections should be overruled.

UTMB makes additional misplaced relevance objections to Exhibits 128-130 and 132-133. As to Exhibits 128, 129, and 130, various HUD reports on home construction, the ubiquity of air conditioning in the free world is relevant to the inquiry into contemporary standards of decency. Doc. 301-11 – 301-13, Appx. 1778-2021. Exhibits 132 and 133 go to the same legal issue, but from different data: Exhibit 132 discusses the ubiquity of air conditioning by examining energy surveys and Exhibit 133 discusses the air conditioning at the prison in Guantanamo Bay. Doc. 301-13, Appx. 2083-2168.

Alternatively, if necessary Plaintiffs respectfully request that the Court take

judicial notice of these documents.

### 21. Exhibits 135-138, Docs. 301-13 – 301-14, Appx. 2172-2365 – Air conditioning outside TDCJ is relevant to contemporary standards of decency and the feasibility of air conditioning.

UTMB objects to Exhibits 135 through 138 with a common refrain, that these prison standards in other states are not probative merely because they are dated after Mr. McCollum's death. But what other prisons do is relevant to contemporary standards of decency—and UTMB does not argue that the other facilities meaningfully changed their practices after Mr. McCollum's death. The other facilities' standards are also relevant to what practices would have been feasible for UTMB and TDCJ to implement before 2011.

### 22. Exhibits 149, 157-164; Docs. 301-17, 302-2 – 302-3; Appx. 2580, 2693-2724 – Newspaper articles contain admissible statements of agents of party opponents and are also admissible for matters other than the truth of the matter asserted.

The newspaper articles that Plaintiffs seek to include in the record document Defendants' public statements over time, and there is no sign that Defendants ever attempted to correct these statements attributed to them. Moreover, the matters actually asserted in the articles are not particularly controversial (e.g., it is hot in Texas, many Texas prisons are not air conditioned, and lawsuits have been filed). Instead, the articles are evidence primarily of the Defendants' continued adherence to similar policies and practices *in spite of* their notice of the problem from, among other sources, the newspaper articles. Indeed, one of the articles was forwarded in its entirety among TDCJ employees. *See* Doc. 301-17, Appx. 2580. Accordingly, they are not hearsay, as they are statements of party opponents.

In addition, the newspaper articles show that Defendants were aware of the public reaction to the issue of heat in prison, but that they continue to this day to use nearly the

same practices that caused Mr. McCollum to suffer and die in the heat.[13]

Likewise, the positions of the various newspaper editorial boards are evidence of the community standard of decency – a "sufficient national consensus" can "label a particular punishment cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 562 (2005).

### 23. Exhibit 150-152, Doc. 301-18, Appx. 2581 – Journal Articles

Exhibits 150 through 152 are well-regarded articles on the subject of the dangers of heat that are brief and easy to understand. Exhibit 151 was disclosed in discovery by TDCJ on December 2, 2015 as Bates numbered item TDCJ 85888.

To the extent that Defendants successfully move to strike their inclusion, Plaintiffs respectfully offer, instead, each article that Dr. Vassallo brought to her 2013 deposition and testified that she relied upon as "some of the key articles" on the scientific issues in this case. While these articles are less concise, they go to the same subject matter as the summary judgment exhibits that Defendants seek to exclude. *See* Ex. D, Deposition of Dr. Vassallo, pp. 15:18-16:24, Appx. 7593-4; Ex. E, Exhibit 4 to Dr. Vassallo's Deposition; Ex. F, Exhibit 7 to Dr. Vassallo's Deposition; *see also* Ex. D, p. 10:8-15, Appx. 7592 (explaining that they are peer-reviewed). Accordingly, the articles in Exhibits E and F to this response satisfy Rule 803(18), and Plaintiffs request leave to supplement the summary judgment record with Exhibits D, E, and F if Exhibit 150, 151, or 152 is excluded.

### 24. Exhibit 153, Doc. 302-1, Appx. 2662 – Rothfusz's paper, "The Heat Index 'Equation,'" is a publication of the National Weather Service.

Exhibit 153 is another government publication. This paper explains the basis for

---

[13] In the related *Cole v. Livingston* case, this Court found that TDCJ had "made only minimal changes to its policies to protect inmates" in 2016. *See* Ex. J, *Cole v. Livingston*, No. 4:14-cv-1698, Doc. 477, p. 7 (S.D. Tex. June 21, 2016).

calculating the National Weather Service heat index and is currently hosted on the Centers for Disease Control website. *See* Lans Rothfusz, *The Heat Index "Equation,"* (NWS Southern Region Headquarters 1990) *available at* https://wonder.cdc.gov/wonder/help/Climate/ta_htindx.PDF. Therefore it is admissible as an exception to hearsay under Rule 803(8) and self-authenticating under Rule 902(5). *See supra* Section 20; *Coleman*, 409 F.3d at 667 (5th Cir. 2005).

### 25. Exhibit 154, Doc. 302-1, Appx. 2665 - Affidavit of Fact by Scott Gray is a factual affidavit going to an issue TDCJ raised in its Motion.

TDCJ and UTMB object to Grey's affidavit, but TDCJ cited to the very case that Scott Grey makes his declaration about. *See* Doc. 288, p. 59 *citing Ashley v. U.S.*, No. 3:14-CV-02654-D (N.D. Tex.) (no decision specified in citation). Broadly, the declaration of Scott Gray gives more factual context to an argument that TDCJ advances in its summary judgment motion: That air conditioning is the exception, rather than a common solution to the risk of heat-related injury in prisons and jails that would otherwise become dangerously hot in Texas. This issue is pertinent to the context and contemporary standards applicable to both TDCJ and UTMB's actions and omissions in this case.

Scott Grey also avers that he is stating facts within his personal knowledge. *See* Doc. 302-1, Appx. 2665. This provides a foundation for his short affidavit, evidence that his affidavit is not speculative, and evidence that his statements are not hearsay. It is unclear how TDCJ can contend that the affidavit of an attorney working for a different client in a different case can be dismissed in this case as "self-serving." *Contra* Doc. 321 p. 6. His statements regarding the basic facts of a different case are not "conclusory," nor does Mr. Gray give a medical expert opinion in his affidavit. *Contra* Doc. 321 p. 6.

27

TDCJ's complaint, without further explanation, that the affidavit is vague is not an appropriate objection at the summary judgment stage.

As to UTMB's objection to hearsay, the affidavit is not barred at this stage, as affidavits based upon personal knowledge and sworn under penalty of perjury are admissible at summary judgment. *See* FED. R. CIV. PROC. 56(c)(3).

### 26. Exhibit 155, Doc. 302-1, Appx. 2667-2688 – UTMB's objections to the order in *Borum* are incomprehensible.

Plaintiffs are unable to discern any meaningful objection from UTMB's motion to strike as to Exhibit 155, an unpublished order denying a motion for new trial in *Borum v. Swisher County* in the United States Court for the Northern District of Texas. Doc. 302-1, Appx. 2667.

UTMB concedes that the order is "persuasive authority with regard to legal issues in this case" but then objects that it may not be considered for its "legal precedent and legal conclusions applicable to this case." Doc. 322, p. 30. There is no doubt that this Court may consider similar facts and legal analysis of other district courts. *See, e.g.*, *Massingill v. Livingston*, 277 F. App'x 491, 493 (5th Cir. 2008) ("[O]ther circuits and district courts . . . are not binding precedent, being only persuasive authority."); *Magee v. Unidentified Party*, 198 F.3d 242 (5th Cir. 1999) ("Awards in similar cases constitute only persuasive authority."). Courtesy dictates inclusion of decisions not included in commonly available case reporters. Though the order in *Borum* is certainly not offered as admissible *evidence* in this case, it is properly included in Plaintiffs' appendix as persuasive authority the Court could consider, which is not (as of yet) available in any federal reporter.

### 27. Exhibit 170, Doc. 302-9, Appx. 2900 – Jeremy Banks' statement in

**TDCJ's OIG File on McCollum's Death is plainly admissible.**

TDCJ objects to the form of a statement that the agency itself collected as a part of its business records when it investigated McCollum's death. Doc. 321, p. 6. Jeremy Banks' affidavit from August 1, 2011—only a few days after McCollum's death—is part of the TDCJ Office of the Inspector General's investigation (OIG) file into the death. *See* Doc. 302-9, Appx. 2900 (stamped with both TDCJ's Bates label and OIG's file stamp); Doc. 302-4, Appx. 2740 (OIG's business records affidavit for the document). The inmate's close-in-time recollection is valuable evidence, even if the investigator eliciting the statement did not take pains to ensure that the form of the statement would satisfy TDCJ's counsel. As to the inmate's opinion of the officers' behavior, he was there. He does not need to be a trained officer to relay his perception and lay opinion under Rule 701 that they were not "professional" and not "knowledgeable." Doc. 302-9, Appx. 2900; *contra* Doc. 321, p. 6. These objections go to the weight of Mr. Banks' lay opinions, not to their admissibility.

> **28. Exhibit 173, Doc. 302-11, Appx. 2966 – The Administrative Review of Mr. McCollum's death includes relevant facts and is not inadmissible under Rule 407.**

UTMB conducted a review of the practice of its nurses related to Mr. McCollum's care, which found that Mr. McCollum was not seen or even scheduled for an intake physical. Doc. 302-11, Appx. 2968. This fact is important and not well-documented elsewhere in UTMB's records.

As to Rule 407, the reviewer recommended that an intake physical should be completed within a week. Doc. 302-11, Appx. 2968. An intake physical is one of the accommodations that UTMB failed to provide to Mr. McCollum that would have helped

29

prevent his death—and Exhibit 173 is evidence that UTMB agrees that such a physical is important, feasible, and within UTMB's power to implement contrary to their position in this motion, and thus not barred as evidence of a subsequent remedial measure.

### 29. Exhibit 176, Doc. 302-11, Appx. 2974-2977 – The Joint Mortality and Morbidity Committee Review Worksheet of Mr. McCollum's death includes relevant facts and does not trigger Rule 407 at all.

UTMB complains that Exhibit 176 is inadmissible because the purpose of such a worksheet is to suggest potential remedial measures. *See* Doc. 322, p. 40. But, in spite of this alleged purpose, Mr. McCollum's worksheet does not appear to include any mention of remedial measures. Doc. 302-11, Appx. 2977. Regardless, the worksheet recounts the pertinent facts of Mr. McCollum's death and was created by the agencies; it is relevant and admissible on this basis. *See also Guzman v. Mem'l Hermann Hosp. Sys.*, No. CIV.A. H-07-3973, 2009 WL 427268, at *3 (S.D. Tex. Feb. 20, 2009) ("Federal courts agree that although all fifty states and the District of Columbia recognize a medical peer review privilege, federal common law does not." (collecting cases)).

### 30. Exhibit 177, Doc. 302-11, Appx. 2978-3005 – Incidents of heat illness after Mr. McCollum's death are relevant.

UTMB complains that some of the incident reports in Exhibit 177 are of illnesses after Mr. McCollum's death, and therefore not admissible. These are admissible for the reasons set forth above, as subsequent heat-related illnesses show the agencies' deliberate indifference as well as demonstrate the level of the risk inside TDCJ housing areas. *See* Section 1.c.

### 31. Exhibit 180, Doc. 302-9, Appx. 3021-3059 – Bradley Caddell's EAC file is admissible as statements of party opponents and business records.

TDCJ and UTMB complain as to the relevance of Bradley Caddell's records, but

this falls into the same unduly narrow view of the issues as its other relevance objections to other heat-related illnesses. *See* Section 1.c.

Exhibit 180 is a shorter set of documents produced by TDCJ, but the same documents (produced in a different order and with the EAC report in a less legible format) are authenticated as business records in Exhibits K and L to this response. To the extent necessary due to Defendants' objections to hearsay, Plaintiffs request leave to substitute the substantively identical pages of Exhibits K and L for the corresponding pages in Exhibit 180, and add the business records affidavits to the record. *See* Doc. 302-9, Appx. 3021-3059.

> **32. TDCJ's EAC reports (Exhibits 184-201, 320-321; Docs. 302-15 – 303-13, 299-4 – 299-5; Appx. 3068-4009, 7182-7341) and OIG reports (Exhibits 202-210; Docs. 303-14 – 305-3, Appx. 4013-5169, 5174-5919) are TDCJ's statements and are all business records. Other deaths are relevant as discussed above.**

UTMB objects to all of the EAC and OIG Reports as hearsay and irrelevant when they do not directly concern Mr. McCollum. TDCJ generically objects to Exhibits 184 through 210. Exhibit 206 is photographs of Mr. McCollum's body from TDCJ's OIG file which are obviously relevant and not hearsay. *See* Doc. 304-14, Appx. 5171-5172.

First, Finke's, Moore's, James', and Lopez's EAC reports are all expressly authenticated as business records. *See* Doc. 302-15, Appx. 3068; Doc. 303-13, Appx. 4011. Although TDCJ produced the EAC records separately due to the organization of the agency, where the OIG file is available it contains most, if not all, of the same documentation, and nearly all of the OIG records are sworn business records. Doc. 303-15, Appx. 4052 (business records affidavit for Cardwell); Doc. 304-1, Appx. 4567 (Robertson affidavit); Doc. 304-8, Appx. 4943 (Hudson affidavit); Doc. 304-15, Appx.

5174 (Webb affidavit); Doc. 304-18, Appx. 5276 (Martone affidavit); Doc. 304-20, Appx. 5409 (James affidavit); Doc. 305-1, Appx. 5734 (Adams affidavit). Moreover, the documents themselves show that they are business records.

Second, both the Emergency Action Center and the Office of the Inspector General are departments of TDCJ, a Defendant in this action, whose purpose is to document inmate deaths on behalf of the agency. The routine reporting of TDCJ's EAC and OIG are statements of a party opponent, not hearsay.

Third, these are records of the Defendant TDCJ that TDCJ produced in this action. Apart from the business records affidavit for the file, the author signs almost every constituent document in each file, and virtually all of these authors are TDCJ employees, UTMB employees, or witnesses approached by TDCJ for the purpose of collecting a statement. Therefore, these records bear sufficient indicia of authenticity, trustworthiness, and reliability for admission. *See* FED. R. EVID. 807, 901.

As to relevance, these documents explain the facts and circumstances of numerous heat-related deaths inside the TDCJ facilities before and after Mr. McCollum's death. They are plainly relevant to notice when they are dated before Mr. McCollum's death, and the continuing deaths afterward bolster the evidence of the danger inside TDCJ and deliberate indifference by the agencies. *See supra* Sections 1.b-1.c.

### 33. Exhibits 236-249, 251-269, 323-329; Docs. 305-7 – 305-9, 299-6; Appx. 6119-6128, 6152-6153, 6168-6307, 7345-7384 – Emails by Defendants' agents are not hearsay and are relevant to notice, not just the truth of the matter asserted.

TDCJ and UTMB vaguely object that nearly all of the correspondence, including emails, sent by their agents are hearsay and irrelevant. But these are all sent from TDCJ and UTMB email addresses (with the exception of Sylvester Turner's letter Exhibit 242,

which is included to give context to TDCJ's response, Exhibit 243). The agencies' employees' statements are not hearsay under Rule 801 and, even if they are, the Defendants keep these emails as business records. *See supra* Section 1.a.

Throughout, UTMB generally objects to the extent that each of these emails pertains to a subsequent remedial measure under Rule 407. As stated above, however, subsequent remedial measures are admissible and go to the disputed facts of what the agencies could have feasibly done to protect Mr. McCollum. The failure of these measures is also admissible to show deliberate indifference. *See* Section I.1.c.

TDCJ and UTMB's objections to the relevance of these documents are particularly conclusory and difficult for Plaintiffs to fairly contest, as UTMB vaguely contests 21 and TDCJ contests 18. Although Plaintiffs attempt to respond to the sweeping relevance objections below, TDCJ and UTMB have not objected with sufficient clarity and the Court should thus deemed these objections waived..

### a. Exhibit 236 – The agencies tracked heat-related illnesses before Mr. McCollum's death.

Exhibit 236 is Phyllis McWhorter forwarding her own email on August 5, 2011 stating that the agency had developed a "temperature extreme database" last year—i.e., before Mr. McCollum's death. TDCJ's objection to relevance based on the timeline, then, is incomprehensible. Doc. 305-7, Appx. 6098.

Ms. McWhorter is a TDCJ employee, sending an email within that role, so her statements in Exhibit 236 are not hearsay.

### b. Exhibit 237 – The executives at the agencies admitted their failure to protect their "aging and sicker population" on August 5, 2011, and declined to take immediate action in the midst of the 2011 deaths.

33

TDCJ objects generically to Exhibit 237 because it was sent after Mr. McCollum's death. It is plainly an email exchange between the Defendants' employees, including Dr. Charles Adams, Dr. Robert Williams, and George Crippen. Doc. 305-7, Appx. 6100-6106. The exchange is relevant because in it, Dr. Adams admits "[w]ith our aging and sicker population, we really need a better long term strategy for dealing with this type of weather." *Id.* at 6101. Despite this realization, Dr. Williams later remarks that telling Dr. Linthicum about the illnesses "sounds like as much as can be done at this point." *Id.* at 6100. They would continue to do nothing as six more people died of heat stroke that summer, showing deliberate indifference. *See supra* Section 1.c.

### c. Exhibit 238 – TDCJ's executives were apprised of heat deaths, in some cases almost immediately.

TDCJ similarly objects to Exhibit 238 merely because it was sent after Mr. McCollum's death. This is an email from Stephens to Thaler and Mendoza, forwarding an email from Eason, showing all of these people were aware of Togonidze's death almost immediately on August 8, 2011. The email report included the detail that "[h]is core body temperature was 106 degrees," impeaching Eason's deposition testimony that he did not know Togonidze's death was heat-related. Doc. 305-7, Appx. 6107. As discussed in Section 1.c., this subsequent death (and Eason's inconsistent testimony) is relevant to the deliberate indifference and danger faced by Mr. McCollum.

### d. Exhibits 239, 244 – Hutchins' walls did not keep the heat out.

Exhibits 239 and 244 are emails from Roy Storie, the Hutchins Unit risk manager, recording the temperatures shortly after Mr. McCollum's death. Doc. 305-7, Appx. 6110; Doc. 305-8, Appx. 6124. These emails (admissible as business records and

statements of a party opponent) show that the agencies were aware of the indoor temperatures. Moreover, Storie's measurements show that the indoor temperatures at Hutchins tended to remain within a few degrees of the outdoor temperature even above 100 degrees. *Id.* TDCJ and UTMB offer no reason to think that the building became even worse at protecting inmates from the heat only days after Mr. McCollum's death. *See supra* Section 1.c. If anything, the later date of the recorded temperatures only go to the weight of the evidence, not its admissibility.

### e. Exhibit 240 – TDCJ declined a suggestion from UTMB to start preventative inmate body temperature measurements in the midst of the 2011 crisis.

TDCJ generically objects to Dr. Williams' email declining to approve security staff taking inmate temperatures after hours "[s]ince we have so many heat related illnesses and they are only going to get worse." Doc. 305-8, Appx. 6112-6113. This admission of the danger by UTMB, followed by the indifference by TDCJ and refusal to implement a possible accommodation, is plainly relevant, and the jury can fairly infer from this evidence that it existed prior to Mr. McCollum's death. *See supra* Section 1.c.

### f. Exhibit 241 – UTMB admitted that inmates "need cooling."

Exhibit 241 is an email from Denee Robison, a UTMB supervisor, forwarding a conversation about the fact that inmates "need cooling, water and electrolytes" with Dr. Charles Adams, another UTMB supervisor. Doc. 305-8, Appx. 6115. This was a judgment that TDCJ and UTMB should have (and most likely did) make long before the summer of 2011, relevant to whether the agencies failed to reasonably accommodate Mr. McCollum and were deliberately indifferent. It is plainly relevant. *See supra* Section 1.c.

### g. Exhibits 242 and 243 – The agencies continued to neglect their inadequate policies after Mr. McCollum's death.

Representative Sylvester Turner wrote Exhibit 242 on August 11, 2011 to advise the agency to review its policy—"I have reviewed TDCJ's policy regarding heat and am concerned that the measures provided do not adequately address the unprecedented heat being experienced." Doc. 305-8, Appx. 6119. TDCJ replied with Exhibit 243, Doc. 305-8, Appx. 6121, but ultimately neither agency revamped their policies significantly (at least not until multiple wrongful death lawsuits and class action litigation were filed). The agencies' (lack of) response to this high-profile criticism is relevant to Defendants' deliberately indifference prior to Mr. McCollum's death as discussed above in Sections 1.c, 15-17. Thus, Sylvester Turner's opinion about the agencies' policies is not the issue (as anyone can read the agencies' policies); the issue is the fact that the agency received that critical opinion, and then decided no changes in policy were needed.

### h. Exhibits 245 and 268 – UTMB had the power to protect Mr. McCollum and chose to shirk its responsibility.

Exhibit 245 is a critically important document that shows UTMB considered making an addition to the HSM-18 medical restriction form "for Air Conditioned Housing." Doc. 305-8, Appx. 6126. This discussion among high-level UTMB executives, agents of both party opponents operating within the scope of that agency, is not hearsay. *See* FED. R. EVID. 801(d)(2)(D). Nor may this document be excluded as evidence of a subsequent remedial measure because this exhibit goes directly to the issues of control and feasibility that UTMB contests in its motion for summary judgment—moreover, this is *not* a subsequent remedial measure because UTMB declined to make the change. *See* FED. R. EVID. 407.

The exhibit's direct relevance to these issues is obvious from UTMB's motion. UTMB specifically argues that *because* the option for air-conditioned housing is not on the HSM-18, UTMB cannot do anything. Doc. 285, p. 9. In contrast, Exhibit 245 is a discussion in which UTMB executives openly considered changing that very form to allow exactly that. Doc. 305-8, Appx. 6126. Why would high ranking UTMB employees, including Dr. Jane Moultrie and Dr. Glenda Adams, consider a new HSM-18 restriction if they had no control over whether or not inmates are housed in air conditioning?[14]

The answer is that they would not. TDCJ and UTMB seek to exclude this directly relevant document to obscure evidence that undermines their defense.

By contrast, Exhibit 268 is a concise explanation of the policy that TDCJ and UTMB still use: only inmates "with a rare medical condition requiring housing exclusively in a temperature controlled environment" could be moved during McCollum's incarceration, and an inmate's medical provider must go through the Utilization Review department to attempt to move the inmate. Doc. 305-12, Appx. 6303.

### i. Exhibits 246, 248, & 251 – TDCJ's tracking heat-related deaths is relevant.

TDCJ objects generically to Exhibits 246 and 248, which are among the emails in which TDCJ employees compose the agency's list of "Possible Heat-Related Deaths" and other statistics. Doc. 305-8, Appx. 6130-6132; Doc. 305-9, Appx. 6139-6149; *see also*

---

[14] *Compare* Doc. 305-8, Appx. 6126 ("I think such an HSM18 restriction available to all providers would result in numerous such classifications by unit staff (especially with the recent summer heat issue) and would far exceed the ability of the system to meet such a restriction.") *and* Appx. 6127 ("climate control housing would be better addressed by restrictions than by putting it on the problem list") *with* Doc. 285, p. 3 ("Housing, security, and management of the living conditions of the offender population are under the sole authority and control of TDCJ.") *and* p. 9 ("Beyond the options allowed by the HSM-18, medical is limited to issuing temporary passes where TDCJ can accommodate them, or sending an offender to a medical facility if they meet the criteria.").

*supra* Section 0.

Similarly, TDCJ objects to Exhibit 251, a formal report about illness system-wide that lists, for example, more than 100 weather-related injuries to employees in Fiscal Year 2011 (the breakdown for 2012, which had 95 such injuries, suggests that nearly all would have occurred in the summer). Doc. 305-10, Appx. 6160.[15]

This process of inquiring and admitting to the heat causing deaths (including Mr. McCollum's) and injuries is relevant and supports the allegations that the deaths were heat related. As to deaths and injuries after Mr. McCollum's, these are relevant because they show the conditions and level of risk as well as the agencies' deliberate indifference as discussed above. *See supra* Section 1.c.

### j. Exhibit 247 – Defendants' employees decided to conduct a review of Mr. McCollum's death because no vital signs were ever recorded despite his noted hypertension and diabetes.

TDCJ objects to its own employees' messages noting Mr. McCollum's diabetes and hypertension, and the failure of the agencies to collect vital signs, merely because they are dated after his death. Doc. 305-9, Appx. 6135. These admissions are plainly admissible and highly relevant to the basic facts, his disabilities, and failures to accommodate him that are in dispute.

### k. Exhibit 249 – Defendants' employees think inmates are aggressive because of the heat.

Exhibits 249 similarly provides insight into the internal operations of the Defendants' agencies, indicating the perception of employees that heat is so miserable that some inmates would attack officers to avoid being forced to work in the fields. Doc.

---

[15] TDCJ has elsewhere objected to Plaintiffs' interpretation of these numbers, but Appx. 6167 indicates that "Weather Related" includes injuries such as heat exhaustion (as well as sunburn and frostbite).

305-9, Appx. 6152. There is little reason to think that this perception was new in 2012.

### l. Exhibit 252 – TDCJ and UTMB admit Mr. McCollum's medications "can potentiate heat related illness."

Exhibit 252 includes statements of TDCJ's and UTMB's employees regarding "medications that can potentiate heat related illness." Doc. 305-10, Appx. 6169. This admission is obviously relevant to the risk posed to Mr. McCollum and Defendants' knowledge of that risk and need to accommodate him, as he took some of the medications referred to, even though the statements were made after Mr. McCollum's death. If anything, the date of the statements only goes to their weight, not their admissibility.

### m. Exhibits 253 and 257 – TDCJ's public relations efforts are admissible.

Exhibit 253 is an email from TDCJ's public relations officer to executives discussing the TDCJ system, in a draft response to *New York Times* questions about heat mitigation. Doc. 305-10, Appx. 6195. This document shows the executive officers' knowledge about TDCJ's internal workings and is corroborating evidence of what the agency does and does not do to protect inmates from the heat, admissible as a statement of a party opponent—as preparing answers like these was Jason Clark's job. *Id.* The document gives insight into the particular changes made to the public statements the executives of TDCJ made in conjunction with Exhibit 257. *See* Doc. 305-11, Appx. 6211.

### n. Exhibit 254 – TDCJ and UTMB know heat is dangerous and UTMB routinely asks for portable air conditioning units.

Exhibit 254 (misnumbered 253) is an email from a UTMB employee stating that "it certainly would make sense to invest in a small portable floor [AC] unit" in response to a TDCJ employee complaining that "the air conditioner in the Pill Window was not working and the temperature was over 90 degrees . . . [t]his is a serious issue because . . .

the staff members cannot function properly in the heat such as this." Doc. 305-10, Appx. 6199. This email, regardless of its date, is evidence of an admission by employees of both agencies that needlessly exposing people to this prolonged heat is unacceptable.

### o. Exhibit 255 – Air conditioning was available elsewhere in TDCJ inmate housing.

Exhibit 255 is an email showing the process by which TDCJ created an "AC Survey" showing data about the availability of air conditioning in TDCJ. Doc. 305-10, Appx. 6202. As no earlier such data is available, and neither Defendant contends that the agency began to rapidly construct new facilities or renovate existing facilities with air conditioning after 2011, the 2013 date of this email does not foreclose its relevance. To the contrary, the availability of air-conditioned housing system-wide to TDCJ and UTMB is relevant to the reasonableness of accommodations including air conditioning and wider use of housing restrictions to protect inmates like Mr. McCollum.

### p. Exhibit 256 – The ACA's temperature control requirements apply.

Exhibit 256 is an email among TDCJ executives regarding the ACA standards relating to heat. Doc. 305-10, Appx. 6208. These are pertinent to the contemporary standards of decency and the notice of the risk applicable to Mr. McCollum. Although the email is dated 2013, there is no evidence that these standards changed after 2011—the email is evidence supplementing Plaintiffs' position about which ACA standards apply, because it is a statement by TDCJ. Notably, they are also evidence of Livingston's knowledge of the issue, as he was a member of the ACA's standards committee at the time.

### q. Exhibits 258-260 – The Defendants admit their 911 policy was dangerous and they could have fixed their 911 policy at

**any time before Mr. McCollum's death.**

In 2013, Robert Williams, George Crippen, Gary Eubank, and Justin Robison—high ranking TDCJ and UTMB employees—explained why the very 911 policy Plaintiffs complain of in this case was changed in email chains reflected in Exhibits 258, 259, and 260. Doc. 305-11, Appx. 6214-6225. The agency's representatives explain their endorsement of the policy that symptoms such as difficulty breathing, seizures, altered mental status, and hot or dry skin require a 911 call if medical is off-site. Doc. 305-11, Appx. 6217. Moreover, the discussion includes numerous admissions on issues that are directly contested by both parties.

This evidence is relevant and should not be excluded as a subsequent remedial measure because, first and foremost, it shows that a change in 911 policy was feasible prior to Mr. McCollum's death and that both agencies exercise some control in the ability to make such a change. One UTMB executive, Gary Eubank, pushes back because "[t]his directive could have a significant cost impact." Doc. 305-11, Appx. 6215. Dr. Charles Adams is more forceful: "I think this is a big mistake and will result in MANY unneeded transfers. You won't like the bill either." Doc. 305-11, Appx. 6219. Meanwhile, Dr. Williams, a TDCJ employee, emphasizes the importance of the new policy because inmates with "life-threatening conditions need to go offsite 911 without delay." Doc. 305-11, Appx. 6214. This goes to deliberate indifference, especially that of Eason and Pringle who testified that such a policy was not needed.

> **r. Exhibit 261 – Dr. Charles Adams thought protecting inmates from the heat was unfinished business when he retired.**

Dr. Charles Adams, a former UTMB executive, sent Exhibit 261 as a parting message to a coworker "to share with Dr. Smith and my replacement." Doc. 305-11,

Appx. 6227. The documents that Dr. Adams thought would be this important included various tallies of heat-related illnesses and deaths inside TDCJ during 2011, his job description, and a poster reading "When it's hot, drink a lot." Doc. 305-11, Appx. 6228-6259. Obviously this message was sent after the events in question, but it is just as obvious that UTMB's statements and conclusions about those events are relevant.

### s. Exhibit 262 – TDCJ admits that 16 inmates died from heat between 2001 and 2012.

Dr. Lannette Linthicum's email to William Stephens with the running tally of hyperthermia deaths helps substantiate the allegations about the history of deaths in TDCJ, especially because it includes four of the deaths prior to 2011. Doc. 305-12, Appx. 6263.

### t. Exhibit 263 – TDCJ routinely requests portable air conditioning.

Dr. Lannette Linthicum's email to a TDCJ facilities supervisor requesting "temporary /portable chilling devices" to prevent inmate heat illness demonstrates the feasibility of reasonable accommodations that TDCJ and UTMB could have implemented to protect Mr. McCollum in 2011. Doc. 305-12, Appx. 6265.

### u. Exhibit 264 – UTMB and TDCJ know that fans do not help enough and the heat in TDCJ "creates medical concerns."

George Crippen, a top TDCJ executive, forwards along the complaints of UTMB employees, who wrote that when the AC went down in the medical department, "the temp is over 90 degrees which creates medical concerns. Although fans have been provided by security, she . . . indicated they are not helping. Obviously, the staff is complaining." Doc. 305-12, Appx. 6274. The agencies' response to this problem, even after Mr. McCollum's death, suggests the feasibility of protecting Mr. McCollum back in

2011—as well as their admission and general knowledge that fans provide little protection above 90 degrees.

### v. Exhibit 265 – TDCJ has tracked heat illnesses since before Mr. McCollum's death.

Phyllis McWhorter's email of heat-related illnesses reported in TDCJ's database is an important business record showing that the agencies knew about heat illnesses in 2010 and failed to correct the problem even after the disaster of 2011. Doc. 305-12, Appx. 6277.

### w. Exhibits 266-267 – TDCJ and UTMB could have implemented a Standing Delegated Order to improve nursing response to heat-related illness before Mr. McCollum's death.

Gary Eubank's email including a new 2014 "Standing Delegated Order" for possible heat-related illness is yet another reasonable accommodation that Mr. McCollum was denied. Doc. 305-12, Appx. 6295. The current existence of this order shows that it would have been just as feasible, and within UTMB's power to create, in 2011.

### x. Exhibit 269 – TDCJ and UTMB could have implemented "respite areas" before Mr. McCollum's death.

Jessica O'Donnell's email on behalf of Defendant Robert Eason shows that the agency formally began a "respite area" program in the middle of the summer in 2015, which would allow an inmate with "experiencing difficulty due to heat" to request access to air conditioning and advises officers to "immediately bring the [inmate] into the medical department for evaluation" if the inmate complaints of symptoms of heat illness. Doc. 305-12, Appx. 6306. This program is another accommodation that the agencies purport to implement now, so this email is evidence that such a program would have been feasible in 2011 to help protect Mr. McCollum and there is no reason that UTMB could

not have assisted in creating this practice, or at least stated that it would be medically beneficial to patients like Mr. McCollum.

To the extent that TDCJ or UTMB now contends that a similar practice was available to Mr. McCollum, this 2015 email is also evidence that it only began subsequent to his death.

### y. Exhibit 323 – TDCJ and UTMB could have worked with security to identify and protect Mr. McCollum before his death.

Dr. Glenda Adams and Dr. Bobby Vincent, UTMB employees, recommended that the agency work together with TDCJ security staff based on inmates' heat sensitivity to protect them on August 4, 2011. Doc. 299-6, Appx. 7345. This shows that such a practice could have been implemented on a wider scale to protect Mr. McCollum before his death, but it was not. This document is relevant to feasibility and control. *See* Section 1.c.

### z. Exhibits 324-325, 328-329 – TDCJ and UTMB could have worked together to monitor heat-related illnesses before Mr. McCollum's death.

Likewise, UTMB employees reported inmate illnesses after Mr. McCollum's death directly and indirectly to TDCJ supervisors. Doc. 299-6, Appx. 7349-7351, 7374-7384. If the agencies had been more serious about staying informed of such illnesses, they would have recognized the problem earlier and been able to react in time to help Mr. McCollum.

### aa. Exhibits 326-327 – TDCJ and UTMB continue to fail to protect inmates.

Exhibits 326 and 327 show that numerous heat-related illnesses were also reported after 2011, including of correctional officers. Doc. 299-6, Appx. 7354-7372. This evidence of the agencies' continued failure suggests that 2011 was not a wake-up

call because the Defendants were already aware of the risk, and had already decided to ignore it.

### 34. Exhibits 270-273, 279, 287; Docs. 305-13 – 305-15; Appx. 6308-6416, 6597-6617, 6732-6739 – UTMB's objections during depositions are insufficiently developed and, to the extent specified, incorrect.

UTMB raises its deposition objections but does not elaborate on them. The heading and introductory sentence to this portion of UTMB's motion specify different exhibits, and UTMB further specifies fewer exhibits with actual objections in the body of its discussion of them, such as listing no objections to Exhibits 272 or 287. *See* Doc. 322, p. 36. Plaintiffs will attempt to respond in good faith, but object that UTMB has not developed its position sufficiently.

### a. Exhibit 270 – Dr. Charles Adams did not have to speculate: Mr. McCollum's diabetes, or lack thereof, would have been better determined by a physical.

When probing Dr. Charles Adams for the importance of an earlier physical of Mr. McCollum, the following exchange took place:

Q.    Okay. Nobody evaluated him for diabetes at any point at TDCJ. Right?
A.    No.
Q.    And the significance of that is that his -- if he -- he may have had diabetes; he may not have had diabetes. Do you agree with that?
A.    Yes.
Q.    Okay. We would know or have better information if someone had bothered to evaluate him, though. Right?
MR. ALVAREZ: [UTMB] Objection; calls for speculation.
MR. KAMMERLOCHER: [TDCJ] Join the objection.
A.    Yes.

Doc. 305-13, Appx. 6322:2-16. Dr. Adams is a medical doctor with extensive prison administration experience. His opinion about whether or not a physical would help identify whether an inmate had diabetes is not only admissible, but far more credible than the unexplained objections of attorneys.

45

**b.  Exhibit 272 – Dr. Glenda Adams did not have to speculate.**

UTMB similarly objected to inquiries into the obvious as speculation numerous

times during Dr. Glenda Adams' deposition:

> Q.·    (By Mr. Edwards)··Extreme heat, as it's defined by -- by you, that has an
> impact on people with medical conditions; right?
> A.     Correct.
> Q.      Okay.··There's a --··It has a greater impact, I believe you told me, on
> people with particular medical conditions like hypertension or who are on
> psychotropic medications or who suffer from depression or who have
> diabetes; right?
> MS. COOGAN:···Speculation, objection.
> A.· ·   It can, yes.

Doc. 305-13, Appx. 6356:8-14. Not only is this point stated throughout the agencies'

policies (which Dr. Adams helped write), but on *the next page* she testifies that it's

"common sense." Doc. 305-13, Appx. 6357:6-11.

UTMB's objections on page 130, lines 9-16, of the deposition, Doc. 305-13,

Appx. 6360, are similarly incorrect, but, regardless, Plaintiffs' counsel clarified the

question before the witness answered.

UTMB's objections on page 136:3-5, Doc. 305-13, Appx. 6361, are also

incorrect, but, at any rate, Plaintiff's counsel narrowed the question and re-asked, without

objection, on the next page:

> [Q.]    If he meets the criteria for morbid obesity, would you agree that he should
> have been placed in a bottom bunk?
> A.       Yes. And he would have been, if he had requested it and brought it to
> medical's attention.

Doc. 305-13, Appx. 6362:4-8.

UTMB objected on pages 175 and 176, Doc. 305-13, Appx. 6367-6368, that Dr.

Glenda Adams was speculating about whether transferring inmates to air conditioned

County jails to un-air-conditioned TDCJ facilities increases their risk of heat illness until

they had time to acclimate. She agreed that "[i]ndividuals that are exposed to increased heat are at increased risk until they acclimate" after testifying that she "know[s] the process of acclimating from cool temperatures to really hot temperatures." Doc. 305-13, Appx. 6367:9-12, 6368:19-20. She even elaborated, without objection, that "[i]t takes everybody time to acclimate" but individuals on certain medication and with conditions such as hypertension and diabetes have "increased difficulties acclimating." Doc. 305-13, Appx. 6370:21-6371:4. Dr. Glenda Adams did not need to speculate here.

Immediately after the above discussion, this exchange was objected to on deposition page 177:

> Q.      Okay.··That's a problem that -- that UTMB knows about and knew about before Mr. McCollum came into the Hutchins Unit; correct?··Or an issue?
> MS. COOGAN:··Objection, vague and speculation.
> A.      I --·I believe that everyone knows that there could possibly be a problem with going from an air-conditioned environment into a non-air-conditioned environment, yes.

Doc. 305-13, Appx. 6371:5-13. But Dr. Glenda Adams' answer is not speculative. She has simply deduced, from one uncontroversial statement of basic medical facts, a straightforward application of those facts to the Hutchins Unit.

UTMB also objected to speculation on deposition page 179. Doc. 305-13, Appx. 6372:19-23. This question was clearly limited "[t]o your knowledge," as was the witness's answer ("I'm . . . unsure"), so the objection is baseless.

As to deposition page 193, Appx. 6376, UTMB asks the Court to rule on two objections. The first is below:

> ·Q.·    (By Mr. Edwards)··They should have used ice on Mr. McCollum --
> MS. COOGAN:··Objection --
> MR. GARCIA:··Object --
> MS. COOGAN:··-- incomplete hypothetical.
> Q.      (By Mr. Edwards) --·is that correct?

> MR. GARCIA:··And objection, speculation.
> A.      Only if they recognized that he was having a heatstroke.

Doc. 305, Appx. 6376:2-10. But this is not a hypothetical question at all, much less an incomplete one; it is a question about the facts of this case.

The second objection on deposition page 193 is another toothless speculation objection, as the witness clarified the issue before answering—and UTMB failed to object once the question was reasked. *See* Doc. 306-13, Appx. 6376:19-6377:19 ("Seizure disorders are a serious medical condition").

Dr. Glenda Adams' capacity as a 30(b)(6) witness in the above exchanges does not exempt her from her expertise in general or as UTMB's designated expert witness specifically, so it is unclear what UTMB intends to argue on this basis. *See* Doc. 322, p. 37.

### c.   Exhibit 273 – Ananda Babbili, P.A. did not have to speculate.

UTMB's sole objection to Ananda Babbili's deposition excerpts is on deposition page 35, Doc. 305-13, Appx. 6410, but the relevant exchange extends into the next page:

> Q.      Would you expect, based on your training, experience and observation of correctional officers, that a correctional officer, faced with the situation that they found Mr. McCollum in, to contact the triage nurse immediately?
> MR. HARRIS: [UTMB] Objection, improper hypothetical. Lack of foundation. Calls for speculation.
> Q.      You can answer, sir.
> A.      In my experience, a correction officer, sensing the emergency situation of the patient, have a right to call the -- whoever they needed to call immediately.
> Q.      You said they have a right to call them.··Did you mean -- is that what you meant, that they had the ability to?
> A.      Common sense. Common sense.
> Q.      Common sense says, look, contact them immediately; is that fair?
> A.      Uh-huh.
> Q.      And that would be your expectation as a PA on the facility, right?
> A.      Yes.
> Q.      Okay. And, you know, I'm not saying it happened, but if there was a delay,

> a significant delay of, you know, 40 minutes, an hour, as a medical person, I assume you'd have a problem with that; is that correct?
>
> A.    Yes.

Doc. 305-13, Appx. 6410:7-6411:10. The foundation for this question was established, however, as Mr. Babbilli testified that he reviewed the nursing triage form regarding McCollum's death which explained the correct facts describing "the situation that [the officers] found Mr. McCollum in"—"He is on the top bunk having a seizure that has lasted for 5 minutes." Ex. M, Deposition of Ananda Babbilli, p. 29:11-17, Appx. 7975; Ex. N, Exhibit 4 to Babbilli's deposition. To the extent necessary to preserve this testimony in the summary judgment record, Plaintiffs request leave to supplement the summary judgment evidence with Exhibits M and N. Nor was this a hypothetical question, it was a question about the actual facts. Accordingly, Mr. Babbilli also did not have to speculate.

Even if the Court grants UTMB's objections, the testimony in response to the follow up questions, which were not objected to, is just as powerful.

### d.  Exhibit 279 – Gary Eubank, R.N. did not have to speculate.

UTMB argues that a registered nurse in their employment cannot answer basic hypothetical questions unless a party designates him as an expert in reference to Doc. 305-14, Appx. 6603:12-66:04:6. This is false—and particularly ridiculous considering the hypothetical at issue, which concerning the standard of care for a seizure victim, but more importantly, UTMB did not actually object to the question preceding Nurse Eubank's answer, "Call 911."

> Q.    You're a nurse. Right?
>
> A.    I am.
>
> . . .
>
> Q.    If you were told that someone was seizing and nonresponsive for the better

part of a half hour, what would you do, sir?

MR. ALVAREZ: [UTMB] Again, calls for speculation.

Q.    (BY MR. EDWARDS) A hundred times out of a hundred, what would you
      do, sir? Just those facts.

MR. BOYD: [TDCJ] Objection. Incomplete hypothetical.

A.    And this is from a non -- I mean, I don't see the patient. They're not in my
      presence. I'm not assessing them. I've just received that information.

Q.    (BY MR. EDWARDS) Mr. Eubank, if I fell over and was seizing and was
      nonresponsive and [Mr. Alvarez] was kind enough to call you on the
      phone and say, what should we do, what would you tell him to do?

A.    Call 911.

MR. BOYD: [TDCJ] Objection. Incomplete hypothetical.

Q.    (BY MR. EDWARDS) Okay. Now, is there anything different about --
      should a prisoner get at least, and maybe more, care than I get if I keel
      over in this deposition?

MR. BOYD: [TDCJ] Objection; incomplete hypothetical.

A.    We provide a standard -- a standard care that's equal to the free world.

Q.    (BY MR. EDWARDS) Absolutely. And so just because somebody is a
      prisoner and convulsing and seizing in a dorm at a prison doesn't mean
      they deserve any less care than if a member of the jury were to suffer a
      seizure and be nonresponsive. Right?

A.    Correct.

Doc. 305-14, Appx. 6603:7-6604:21. Although UTMB cites to the second exchange to

which Nurse Eubank answered "Call 911", the only objection was from TDCJ. *See* Doc.

322, p. 37. Moreover, the hypothetical was sufficiently specific for Nurse Eubank to

answer. That is the point. No additional information is needed to know that a seizure is a

medical emergency, so it was unconscionable for officers to wait nearly an hour to call

911 while Mr. McCollum died in front of them.

## VI.    CONCLUSION

The Court should overrule Defendants' objections in their entirety for the reasons

stated above.

Respectfully submitted,

EDWARDS LAW
The Haehnel Building
1101 East 11th Street

50

Austin, TX 78702
      Tel.    512-623-7727
      Fax.    512-623-7729

By:    /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
SCOTT MEDLOCK
State Bar No. 24044783
DAVID JAMES
State Bar No. 24092572

Michael Singley
THE SINGLEY LAW FIRM, PLLC
State Bar No. 00794642
4131 Spicewood Springs Rd.
Austin, Texas 78759
      Tel.    (512) 334-4302
      Fax.    (512) 727-3365

Abigail Frank
Texas Bar No. 24069732
Southern District No. 1076613
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr.
Austin, TX 78751
Tel.    (512) 474-5073
Fax.    (512) 474-0726

Wallis Nader
Texas Bar No. 24092884
Southern District No. 2609150
TEXAS CIVIL RIGHTS PROJECT—
HOUSTON
2006 Wheeler Ave
Houston, TX 77004
      Tel.    (832) 767-3650
      Fax.    (832) 554-9981

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

51

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record on **November 4, 2016** through the Electronic Case File System of the Southern District of Texas.

/s/ Jeff Edwards
JEFF EDWARDS