UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| BRAD LIVINGSTON, JEFF PRINGLE, | § | JURY DEMAND |
| RICHARD CLARK, KAREN TATE, | § | |
| SANDREA SANDERS, ROBERT EASON, the | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH and the TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
TO STRIKE SUMMARY JUDGMENT EVIDENCE**

# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RAMONA HINOJOSA, individually as a wrongful | § | |
| death beneficiary and as the heir to the ESTATE OF | § | |
| ALBERT HINOJOSA, | § | |
| | § | |
| PLAINTIFF | § | CIVIL ACTION NO. 2:13-CV-319 |
| | § | JURY DEMANDED |
| v. | § | |
| | § | |
| BRAD LIVINGSTON, RICK THALER, | § | |
| WILLIAM STEPHENS, EILEEN KENNEDY, | § | |
| ERNEST GUTERREZ, JR., AND OWEN | § | |
| MURRAY in their individual capacities, the | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, and the UNIVERSITY OF | § | |
| TEXAS MEDICAL BRANCH. | § | |
| | § | |
| DEFENDANTS | § | |

**DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH'S
SUPPLEMENTAL RESPONSES TO PLAINTIFF RAMONA HINOJOSA'S
THIRD REQUESTS FOR PRODUCTION**

**TO: Plaintiff Ramona Hinojosa, by and through her attorneys of record, Jeff Edwards and Scott Medlock, The Edwards Law Firm, 1101 E. 11th Street, Austin, Texas 78702-1908 and Brian McGiverin and Wayne Krause-Yang, Texas Civil Rights Project, c/o TRLA 4920 N IH-35, Austin, TX 78751.**

COMES NOW the Defendant, University of Texas Medical Branch, by and through counsel, the Texas Attorney General's Office, and offers the following **Supplemental Responses to Plaintiff Ramona Hinojosa's Third Requests for Production**.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE

First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for
Defense Litigation

KAREN D. MATLOCK
Assistant Attorney General
Chief, Law Enforcement Defense Division

*Lacey E. Mase*

LACEY E. MASE
Assistant Attorney General
State Bar No. 00783867

P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 463-2080/Fax (512) 495-9139

**ATTORNEYS FOR UNIVERSITY OF
TEXAS MEDICAL BRANCH**


**CERTIFICATE OF SERVICE**

I, LACEY E. MASE, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing Defendant University of Texas Medical Branch's Supplemental Responses to Plaintiff Ramona Hinojosa's Third Request for Production has been served by placing same in the United States Mail on April 25, 2014, addressed to:

Jeff Edwards
Scott Medlock
The Edwards Law Firm
1101 E. 11th Street
Austin, Texas  78702-1908

Brian McGiverin
Wayne Krause-Yang
Texas Civil Rights Project
c/o TRLA 4920 N IH-35

Austin, TX  78751


Bruce R. Garcia                (Hand Delivered)
Assistant Attorney General
Office of the Attorney General
P. O. Box 12548
Austin, Texas  78711


Demetri Anatasiadis            (Hand Delivered)
Assistant Attorney General
Office of the Attorney General
P. O. Box 12548
Austin, Texas  78711

LACEY E. MASE
Assistant Attorney General

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**  Please produce all documents, and correspondence, including electronically stored information, related to any peer reviews, morbidity and mortality reviews, nursing reviews, or any other investigations related to any injuries or deaths of TDCJ prisoners receiving medical care from UTMB where the cause of death and/or injury was determined to be related to heat, high temperatures, lack of air conditioning, heat stroke, hyperthermia, heat exhaustion, or any other heat related cause.  This request specifically calls for, but is not limited to, any peer reviews, morbidity and mortality reviews, or nursing reviews related to any of the below listed individuals.  (The request is not limited to these individuals, whose names are provided solely to assist UTMB in identifying patients who were known to die to heat-related causes.)

1. Archie White, date of death June 30, 1998
2. Anselmo Lopez, date of death, July 14, 1998
3. James Moore, date of death July 30, 1998
4. John Cardwell, date of death August 4, 2001
5. Ricky Robertson, date of death July 16, 2004
6. James Shriver, date of death August 8, 2007
7. Dionicia Robles, date of death August 13, 2007
8. Douglas Hudson, date of death July 25, 2011
9. Larry McCollum, date of death July 28, 2011
10. Thomas Meyers, date of death August 3, 2011
11. Robert Allen Webb, date of death August 4, 2011
12. Alexander Togonidze, date of death August 8, 2011
13. Charles Cook, date of death August 8, 2011
14. Michael Martone, date of death August 8, 2011
15. Kelly Marcus, date of death August 12, 2011
16. Kenneth Wayne James, date of death August 13, 2011
17. Daniel Alvarado, date of death August 20, 2011
18. Rodney Adams, date of death August 3, 2012
19. Albert Hinojosa, date of death August 27, 2012

**SUPPLEMENTAL RESPONSE:** Objection. Request No. 1 is overbroad and seeks information irrelevant to any material issue in this case and not likely to lead to the discovery of admissible evidence. Also, UTMB does not have care, custody or control of mortality and morbidity review records.

Subject to and without waiving the foregoing objection, please see Exhibit B. Defendant UTMB reserves the right to supplement this response should any additional responsive documents become available.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § § § § § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| BRAD LIVINGSTON, JEFF PRINGLE, RICHARD CLARK, KAREN TATE, SANDREA SANDERS, ROBERT EASON, the UNIVERSITY OF TEXAS MEDICAL BRANCH and the TEXAS DEPARTMENT OF CRIMINAL JUSTICE. | § § § § § § | JURY DEMAND |
| DEFENDANTS | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO STRIKE SUMMARY JUDGMENT EVIDENCE**

# Exhibit H

ORAL DEPOSITION OF STEPHANIE KINGREY

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3   STEPHEN MCCOLLUM, et al,        )
               Plaintiffs,           )
 4                                   )
     V.                              )  C.A. No. 3:12-CV-02037
 5                                   )
                                     )
 6   BRAD LIVINGSTON, et al,         )
               Defendants.           )
 7

 8   ****************************************************

 9                      ORAL DEPOSITION OF

10                      STEPHANIE KINGREY

11                      November 22, 2013

12   ****************************************************

13

14

15        ORAL DEPOSITION OF STEPHANIE KINGREY, produced as a

16   witness at the instance of the Defendant University of

17   Texas Medical Branch and duly sworn, was taken in the

18   above-styled and numbered cause on the 22nd of

19   November, 2013, from 12:09 p.m. to 3:25 p.m., before

20   DEBRA L. McGREW, CSR in and for the State of Texas,

21   reported by machine shorthand at the offices of

22   Edwards Law, 1101 E. 11th Street, Austin, Texas,

23   pursuant to the Federal Rules of Civil Procedure.

24

25
```

ORAL DEPOSITION OF STEPHANIE KINGREY

```
 1              A P P E A R A N C E S

 2
     FOR THE PLAINTIFFS:
 3
             Mr. Scott Medlock
 4           Edwards Law
             1101 E. 11th Street
 5           Austin, Texas  78702
             Phone:  512-623-7727
 6
     FOR THE DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH:
 7
             Ms. Kim Coogan
 8           Ms. Shanna Elizabeth Molinare
             Assistant Attorney General
 9           P.O. Box 12548
             Austin, Texas  78711-2548
10           Phone:  512-463-2080

11   FOR THE DEFENDANTS TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
     ROBERT EASON AND JEFF PRINGLE:
12
             Mr. Jonathan Stone
13           Assistant Attorney General
             P.O. Box 12548
14           Austin, Texas  78711-2548
             Phone:  512-463-2080
15
     FOR THE DEFENDANTS BRAD LIVINGSTON, RICK THALER AND
16   BILL STEPHENS:

17           Mr. Kyle M. Smith
             Assistant Attorney General
18           P.O. Box 12548
             Austin, Texas  78711-2548
19           Phone:  512-463-2080

20   ALSO PRESENT:

21           Jennifer Osteen
             Sandra Sue McCollum
22           Stephen Michael McCollum

23

24                   *-*-*-*-*

25
```

Plaintiffs' MSJ Appx. 7830
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

1                          INDEX

2  Appearances.....................................    2

3  STEPHANIE KINGREY
        Examination by Ms. Coogan..................    4
4       Examination by Mr. Stone..................   55
        Examination by Mr. Smith..................   90
5
   Reporter's Certificate........................   94
6


7

                         EXHIBITS
8
   NO.  DESCRIPTION                              PAGE
9
   1   ........................................    5
10     Six Photographs Labeled A, B, D, D, E, F

11  2   ........................................   42
       Handwritten Notes
12
   3   ........................................   43
13     Photograph of Davalene Lying Under Table

14  4   ........................................   43
       Photograph of Brain Scan
15
   5   ........................................   52
16     Photograph of Stephanie and Father

17  6   ........................................   52
       Photograph of Stephanie's Parents and Brother
18
   7   ........................................   52
19     Senior Photograph of Stephanie's Father

20  8   ........................................   52
       Photograph of Stephanie's Father and Sandra
21     at WinStar Entrance

22

23

24

25

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 7831
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

```
 1  when he lived in -- at the Bonham facility about
 2  anything related to prison?
 3       A.   No.
 4       Q.   Do you recall if he claimed -- if he complained
 5  about the air-conditioning while he was at Bonham?
 6       A.   Not to my knowledge, no.
 7       Q.   And when he went to live at the Bonham unit,
 8  was he -- was he obese at that time?
 9       A.   Yes.
10       Q.   And so your testimony is that, prior to him
11  going to the Bonham unit, you had no -- you had no idea
12  if he had any psychiatric problems?
13       A.   Right.
14       Q.   Did you ever learn that he had some psychiatric
15  problems?
16       A.   No.
17       Q.   Well, when did he get out of the Bonham unit,
18  approximately?
19       A.   Around 2007, I believe, or 2008.
20       Q.   And when he -- was he married when he got out
21  of Bonham?
22       A.   No.
23       Q.   Where did he go to live after that?
24       A.   That's when me and my brother took him to Care
25  Center Ministries.
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 7832
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

```
 1        A.    Not at that point, no.
 2        Q.    As far as you know, did he ever take any
 3   medications for diabetes?
 4        A.    Not that I know of.
 5        Q.    Do you know -- are you aware of him ever being
 6   diagnosed with diabetes?
 7        A.    He told me before he went in to Waco that he
 8   was a diabetic.
 9        Q.    And was that a surprise to you?
10        A.    No, because it runs in the family.
11        Q.    Okay.  And did you ask him whether he was
12   taking any medication for that?
13        A.    No.
14        Q.    Did you have any concerns about how he might
15   pay for medication for that diabetes?
16        A.    My guess?
17        Q.    Uh-huh.
18        A.    Yeah.
19        Q.    I'm sorry?
20        A.    Yes.
21        Q.    You --
22        A.    I didn't know how he would pay for it if he had
23   to.
24        Q.    Okay.  And did you ever ask him, Hey, Dad,
25   you're not working, how are you paying for your diabetes
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 7833
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

```
 1        A.    2010.  We just did the deposition, though, a

 2   few weeks ago.

 3        Q.    Okay.  So you've already kind of got a little

 4   bit of experience going through this, especially

 5   recently, right?

 6        A.    Uh-huh, yes.

 7        Q.    So you understand that you've sworn an oath to

 8   tell the truth today --

 9        A.    Yes.

10        Q.    -- and that any testimony you give that's not

11   honest you could be subject to sanctions for?

12        A.    Right, yes.

13        Q.    Consequences if you lie?

14        A.    Yes.

15        Q.    Okay.  You mentioned earlier in your

16   testimony -- well, before I ask that -- strike that.

17              Is there any testimony that you've given

18   so far that you'd like to change right now --

19        A.    No.

20        Q.    -- during this deposition?

21              No.  Okay.

22              You testified earlier that diabetes runs

23   in your family, right?

24        A.    Yes.

25        Q.    Do you have diabetes?
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 7834
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

1      A.    No.

2      Q.    Do your children have diabetes?

3      A.    No.

4      Q.    Do your siblings, to your knowledge, have

5   diabetes?

6      A.    No.

7      Q.    Did your grandparents have diabetes?

8      A.    My grandfather did, yes.

9      Q.    Okay.  Did your great --

10     A.    And my uncle does.

11     Q.    And your uncle.

12            Do you know of anyone else in the family

13  who has diabetes?

14     A.    No.

15     Q.    Have you ever been tested for diabetes?

16     A.    Yes.

17     Q.    Is that because you know that it runs in the

18  family?

19     A.    Yes.

20     Q.    Do you know if your father was ever tested for

21  diabetes?

22     A.    Not to my knowledge, not that I know of.

23     Q.    Did you ever have conversations with him about

24  the fact that diabetes runs in the family?

25     A.    Yes.

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 7835
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

```
 1        Q.    What did he say?  Do you remember?
 2        A.    He just -- you know, he's the one that told me
 3   that my grandpa had it and that my uncle did.
 4        Q.    So he was aware that there was a family history
 5   of diabetes?
 6        A.    Yes.
 7        Q.    Okay.  Something that you would expect him to
 8   get tested for?
 9        A.    Right.
10        Q.    What about a history of alcoholism?  Is there a
11   history of alcoholism in your family?
12        A.    I mean, my dad was when he was married to my
13   mother.
14        Q.    Is there anyone else in your family that's an
15   alcoholic?
16        A.    Not that I know of.
17        Q.    Okay.  What about mental illness?  Are you
18   aware if that runs in the family?
19        A.    Not that I know of.
20        Q.    Okay.  Do you smoke?
21        A.    No.
22        Q.    Does your husband smoke?
23        A.    No.
24        Q.    Have you ever seen your father smoke?
25        A.    No.
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 7836
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

```
1        A.    We already have.

2        Q.    Okay.  I'm almost done.  Sorry.  Hang on.

3              (Discussion off the record).

4        Q.    (BY MS. COOGAN)  Do you know how much money

5   your dad made working for Yellow Cab?

6        A.    No.

7        Q.    Do you know the name of your dad's primary care

8   physician?

9        A.    No.

10       Q.    Do you know the name of any of the doctors that

11  might have seen or treated your dad in, let's say,

12  the years in between Bonham and Hutchins?

13       A.    If anybody, it would have been Hillcrest.

14       Q.    And probably the emergency room?

15       A.    Or one of their clinics.

16       Q.    Okay.  But in the Hillcrest system?

17       A.    Yes.

18       Q.    What makes you say that?

19       A.    Because they're all tied together.

20       Q.    And that was sort of his place of choice?

21       A.    Right.

22       Q.    Did you ever make any request for records under

23  the Open Records Act, do you know?

24       A.    Not that I'm aware of.

25       Q.    Did you consider your dad to be disabled?
```

Plaintiffs' MSJ Appx. 7837
(Supplemental)

ORAL DEPOSITION OF STEPHANIE KINGREY

```
 1        A.    No.
 2                   MS. COOGAN:  I'm going to pass the
 3   witness.
 4                   MR. STONE:  Do you want to take lunch
 5   right now?  Do you mind if we take a lunch break?
 6                   MR. MEDLOCK:  If that's what y'all would
 7   prefer.
 8                   MS. COOGAN:  Okay.
 9                   (Lunch recess from 1:24 to 2:43).
10                        EXAMINATION
11   BY MR. STONE:
12        Q.    Hi, Ms. McCollum.
13        A.    Hello.
14        Q.    Do you understand that you're under oath today?
15        A.    Yes.
16        Q.    Is this your first deposition?
17        A.    No.
18        Q.    How many depositions have you participated in
19   before?
20        A.    One other.
21        Q.    What was that deposition about?
22        A.    The wreck my dad was in.
23        Q.    And when was that?
24        A.    When was --
25        Q.    What year was that?
```

Sunbelt Reporting & Litigation Services
Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  Houston  San Antonio

Plaintiffs' MSJ Appx. 7838
(Supplemental)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| BRAD LIVINGSTON, JEFF PRINGLE, | § | JURY DEMAND |
| RICHARD CLARK, KAREN TATE, | § | |
| SANDREA SANDERS, ROBERT EASON, the | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH and the TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
TO STRIKE SUMMARY JUDGMENT EVIDENCE**

# Exhibit I

# BUSINESS RECORDS AFFIDAVIT

STATE OF TEXAS                              §
                                           §
COUNTY OF WALKER                           §


BEFORE ME, the undersigned authority, personally appeared Sandra Gerick, who being by me duly sworn, deposed as follows:

"My name is Sandra Gerick; I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

"I am a custodian of records for the Prison and Jail Operations division of the Texas Department of Criminal Justice. These records are kept by myself in the regular course of business, and it was the regular course of business of this office for an employee or representative of our department, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

"Attached are documents from 'Directors Meetings,' held between TDCJ regional directors and the Director of the TDCJ Correction Institutions Division since January 1, 2007. This request includes, but is not limited to: meeting agendas, meeting minutes, attendance records, audio/video recordings, summaries, and notes."

> COOKIE A. FILHART
> NOTARY PUBLIC, STATE OF TEXAS
> MY COMMISSION EXPIRES
> JANUARY 3, 2016
>
> Notary without Bond

Sandra Gerick, Executive Assistant I
Prison And Jail Operations
Texas Department of Criminal Justice

**SWORN TO AND SUBSCRIBED BEFORE ME,** on the ___1ˢᵗ___ day of July 2013.


_____
NOTARY PUBLIC in and for the State of Texas

_____
Cookie A. Filhart
NOTARY PUBLIC printed name

_____
1·3·2016
Commission Expiration Date

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN McCOLLUM, and SANDRA McCOLLUM, individually, and STEPHANIE KINGREY, individually and as independent administrator of the Estate of LARRY GENE McCOLLUM, | § | |
| PLAINTIFFS | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:14-cv-3253 |
| BRAD LIVINGSTON, JEFF PRINGLE, | § | JURY DEMAND |
| RICHARD CLARK, KAREN TATE, | § | |
| SANDREA SANDERS, ROBERT EASON, the | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH and the TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE. | § | |
| DEFENDANTS | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
TO STRIKE SUMMARY JUDGMENT EVIDENCE**

# Exhibit J

United States District Court
Southern District of Texas
**ENTERED**
June 21, 2016
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **KEITH COLE**, *et al*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:14-CV-1698** |
| | § | |
| **BRAD LIVINGSTON**, *et al*, | § | |
| | § | |
| **Defendants.** | § | |

<u>**ORDER FOR PRELIMINARY INJUNCTION**</u>

Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. No. 434) was filed on May 23, 2016. The parties agreed to an expedited hearing schedule and, at the request of all parties, an evidentiary hearing began on May 26, 2016. The hearing continued on May 27, 2016, and concluded on June 1, 2016.

Plaintiffs allege that the Texas Department of Criminal Justice (hereafter "TDCJ") is subjecting the inmates at the Wallace Pack Unit, a facility which houses many elderly inmates and inmates with chronic medical conditions, to unconstitutionally dangerous conditions. Namely, Plaintiffs allege that the inmates are exposed to extremely high temperatures during the summer months, without air conditioning in the housing areas and with limited access to air conditioning elsewhere. According to Plaintiffs, the primary mitigation measure that TDCJ uses to lower the risk to inmates of heat-related injuries and deaths is encouraging the inmates to drink copious amounts of water; however, Plaintiffs complain that the water at the Wallace Pack Unit contains between two and four-and-a-half times the levels of arsenic permitted by the United States Environmental Protection Agency ("EPA"). Arsenic is a known human

1

carcinogen.  Plaintiffs assert that, in a prison where a high percentage of inmates are over the age of 65 or have serious medical conditions, or both, the exposure to extreme heat, "mitigated" primarily through the provision of arsenic-laden drinking water, constitutes unconstitutional prison conditions.  For the reasons stated below, this Court finds that the inmates at the Wallace Pack Unit are entitled to a preliminary injunction requiring the Texas Department of Criminal Justice to provide drinking water that comports with EPA maximum contaminant level requirements during the hottest part of the year.

## I.     EVIDENCE PRESENTED

The parties have already briefed a Motion for Summary Judgment in this case, and the evidence submitted in conjunction with those briefings was admitted into evidence at the hearing on the requested Preliminary Injunction.  Additional exhibits were admitted into evidence over the course of the hearing, as listed in Docket Entry 457.  The Court also heard testimony from the following witnesses:

- Mr. Cody Ginsel, the Deputy Director of Management Operations in the Correctional Institutions Division of TDCJ;

- Dr. Michael Honeycutt, the Director of the Toxicology Division of the Texas Commission on Environmental Quality ("TCEQ");

- Dr. Heidi Bojes, an expert witness for the Defendants and the Director of Environmental Epidemiology Disease Registry Section of the Texas Department of State Health Services;

- Mr. Brian Carney, a project engineer at TDCJ;

- Dr. Michael McGeehin, an expert witness for the Plaintiffs who was a scientist for the Centers for Disease Control and Prevention ("CDC") for 33 years; and

2

- Dr. Susi Vassallo, an expert witness for the Plaintiffs who is a board-certified physician in Emergency Medicine and Medical Toxicology and is a clinical professor of emergency medicine at the New York University School of Medicine/Bellevue Hospital Center.[1]

## II.  FINDINGS OF FACT[2]

The evidence demonstrates that prisoners at the Wallace Pack Unit are exposed to extreme heat conditions during the summer, and that such exposure, without sufficient mitigation measures, would pose a substantial risk of serious harm to the prisoners.  TDCJ does not dispute the dangerousness to prisoners of the hot summer temperatures in Texas, but claims that the prisons implement a number of mitigation measures that reduce the risk of heat to the inmates; those measures include providing and encouraging inmates to drink copious amounts of water. Defendants asserted in their Motion for Summary Judgment that "[f]rom a medical perspective, access to ice water and regular water is the number one remedial measure that can be implemented during times of high temperatures because hydration is the single most important factor in the prevention of heat related injury and effectiveness of thermoregulation." (Defendants' Mot. for Summary Judgment, Doc. No. 326, at 15.)  TDCJ recommends that prisoners drink two gallons, or roughly 7.5 liters, of water per day on extremely hot days.

However, it is undisputed that, since 2006, the drinking water at the Wallace Pack Unit has contained between two and four-and-a-half times the amount of arsenic permitted by the EPA.  The EPA lowered the maximum contaminant level (MCL) of arsenic in drinking water

---

[1] The Court holds Defendants' objection to the inclusion of Dr. Vassallo's testimony to be waived, since the objection was not asserted during the hearing.  (Tr. of May 27, 2016 Hearing, at 158.)

[2] Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

3

from 50 parts per billion (ppb) to 10 ppb in 2001; the EPA mandated that water systems comply with the new standard by the year 2006. According to Brian Carney, in response to those events, "there was a filtration system put in place in about October of 2007. [TDCJ] tried troubleshooting it for years. [TDCJ] hired an outside consultant to have them troubleshoot it. No one could get it to work properly. So [TDCJ] finally reached the conclusion to replace it." (Tr. of May 26, 2016 Hearing at 245.) TDCJ now has plans to install a second filtration system and estimates that construction will be completed between January and June of 2017, over ten years after the 10 ppb requirement went into effect.

Currently, however, the prisoners in the Wallace Pack Unit are forced both to endure extremely high temperatures and to drink water with impermissibly high levels of arsenic. The evidence establishes that the increased risk of cancer posed by these arsenic levels (20-45 ppb) is very low, even over a period of two or nine years. But every day that passes in this manner contributes, albeit only slightly, to the inmates' risk of developing skin, lung, bladder, or kidney cancer due to arsenic in their drinking water.

Defendants point out that the Wallace Pack Unit is not the only public water system in violation of the EPA arsenic standard, although it is the only prison water system of which they are aware in violation of the standard. (Tr. of May 26, 2016 Hearing, at 9.) It is undisputed that many free world residents of the United States still drink water with arsenic concentrations at or above the concentrations in the Pack Unit water system.[3] But those individuals do so with EPA-mandated notice from the water system, and they do so voluntarily. A free individual who

---

[3] According to Defendants, approximately 65 public water systems (out of thousands) in Texas do not meet the EPA maximum contaminant level requirement for arsenic. (Tr. of May 26, 2016 Hearing, at 152.)

Plaintiffs' MSJ Appx. 7845
(Supplemental)

receives notice that his water system does not meet EPA regulations has several options[4]: he can drink the water, knowing it will (slightly) increase his risk of cancer; he can find or buy a different water source to drink from; he can buy and use a personal water filter; he can even move, if he wishes, if the water system has not been fixed within a year or within ten years. For prisoners, those options obviously do not exist.[5]

In addition to the above, this Court finds the following:

1.  Plaintiffs complied with all jurisdictional and procedural prerequisites for the filing of this suit, including exhaustion of all pre-suit remedies required by the Prison Litigation Reform Act.[6]

2.  The Wallace Pack Unit is a Type I Geriatric Facility operated by the Texas Department of Criminal Justice. The Wallace Pack Unit houses approximately 1,400 inmates, many of whom suffer from medical conditions. Approximately 728 inmates have been diagnosed with hypertension, approximately 212 with diabetes, approximately 142 with coronary artery disease, approximately 111 with obesity, approximately 53 with a psychiatric condition, approximately 22 with cirrhosis of the liver, approximately 84 with COPD, approximately 189 with thyroid dysfunction, and approximately 113 with asthma.

---

[4] *See* Tr. of May 26, 2016 Hearing (Testimony of Dr. Honeycutt), at 169-170.

[5] Water at the Wallace Pack Unit commissary costs thirty cents per bottle, and TDCJ recommends that inmates drink two gallons of water per day. (Tr. of May 26, 2016 Hearing (Testimony of Cody Ginsel), at 128-129.) Common sense dictates that most if not all of the inmates would be unable to buy enough water to last through the summer, and they should not have to. Defendants alluded to inmates' buying habits from the commissary. That inmates could spend their money more wisely is, even if true, not sufficient to defeat Plaintiffs' arguments.

[6] It is undisputed that Plaintiffs have properly exhausted their grievances regarding the inmates' allegedly unconstitutional exposure to extreme indoor temperatures. (Tr. of June 1, 2016 Hearing, at 19-20.) The Court notes that Plaintiffs need not administratively exhaust every remedy for the alleged constitutional violation.

Approximately 188 inmates are over the age of 65. Of course, many inmates suffer from several such conditions.

3. Inmates at the Wallace Pack Unit experience prolonged exposure to extremely high temperatures during the summer months. (*See* Expert Report of Professor Sager, Doc. No. 434-2, Appx. 10-19.)

4. The heat index is a measure of the apparent temperature, calculated from the ambient air temperature and the relative humidity, used by the National Weather Service to determine the risk to the general population of heat-related injuries.

5. Between June 17, 2014 and August 26, 2014, a 71-day period, inmates at the Wallace Pack Unit spent more than 43% of their time enduring a heat index of 90° F or above while indoors. On 28 of the 71 days, the heat index indoors never dropped below 80°.

6. During the first three weeks of September 2014, the heat index inside the Pack Unit exceeded 90° on all but two days and exceeded 95° on all but three days.

7. Without proper mitigation measures in place, such prolonged exposure to high temperatures poses a substantial risk to the health of all the inmates, young and old, whether or not they have comorbidities that affect their ability to thermoregulate.

8. As Dr. McGeehin testified: "These are heat indices that we know increase the risk of the general population to suffer effects from heat waves and certainly increase the risk [for] people who have risk factors that cause them to be more affected by heat." (Tr. of May 27, 2016 Hearing, at 83.)

9. Multiple scientific articles have shown that the danger posed by heat to a population increases sharply when the heat index exceeds a threshold of approximately 88° F, although the threshold itself may vary between 86° and 90°.

Plaintiffs' MSJ Appx. 7847
(Supplemental)

10. If the human body does not have time to recover from the hazard of extreme heat, the risk of heat-related injury or death increases. That is why the definition of a heat wave includes minimum temperature.

11. Heat is the number one cause of weather-related deaths in the United States. Forty-three percent of all deaths from heat in the United States occur in the South. Most people who die from heat are indoors.

12. At least 20 prisoners have died indoors in non-air-conditioned TDCJ prisons from hyperthermia since 1998. Others have suffered from heat exhaustion and other heat-related injuries such as headaches, nausea and vomiting, and dizziness.

13. Ten inmates died of heatstroke in 2011 while in TDCJ custody. Since that time, TDCJ has made only minimal changes to its policies to protect inmates from the dangers of extreme heat. TDCJ introduced the practice of "wellness checks," described below, and implemented changes regarding the production and distribution of ice to inmates, but TDCJ did not make any substantial changes that would meaningfully reduce the dangers to the inmates of prolonged exposure to extreme heat.

14. With limited exceptions, the housing areas in the Pack Unit are not air conditioned.

15. TDCJ does not currently monitor the temperatures or heat index inside the housing areas of the Wallace Pack Unit.

16. TDCJ is aware of the dangers of extreme heat, but has taken no steps to lower the temperatures inside the housing areas.

17. TDCJ does not have a specific policy in place to respond to heat waves, beyond its general incident command system. TDCJ's incident command system is designed to help TDCJ respond to various emergencies, including weather emergencies, but it has never

7

been implemented in response to extreme heat events, even in 2011 when multiple

prisoners died of heat stroke indoors.

18. TDCJ encourages the inmates to drink up to two gallons of water per day during periods
    of extreme heat.

19. TDCJ provides the inmates with ice and regular access to cold showers, and TDCJ allows
    inmates to wear light clothing during periods of extreme heat.

20. TDCJ allows inmates to have personal fans, and each housing area contains large fans.

21. TDCJ correctional officers perform "wellness checks" on inmates who TDCJ has
    determined are particularly susceptible to heat-related illness and injury. A "wellness
    check" is defined by TDCJ as "when a correctional officer performing routine security
    rounds goes to an offender's cell or bunk to visualize the offender for wellness due to the
    offender previously being identified as having a condition or being on a medication that
    makes the offender more susceptible to temperature-related issues." (Administrative
    Directive of March 17, 2015, Doc. No. 327-8, at 14.)

22. TDCJ claims to provide on demand access to air conditioned areas, called "respite areas,"
    to all inmates at the Pack Unit. On July 24, 2015, Deputy Director Robert Eason
    authorized an email to all TDCJ Wardens and Regional Directors ordering all Wardens to
    designate air-conditioned areas as respite areas, to allow staff to use respite areas as
    needed, to notify "all offenders of the location of respite areas on the unit, as well as
    instructions for requesting the use of a respite area," to require that "[a]ll offenders who
    are provided access to a respite area … be under direct supervision," and to allow inmates
    on the Wellness Checklist to "have access to respite areas during the late afternoon and

8

early evening hours during periods of low offender movement."  (Email of July 24, 2015,

Doc. No. 327-7 at 112.)

23. Despite TDCJ's contentions, declarations by inmates at the Pack Unit show that they do

not believe they have unlimited access to the respite areas.[7]

24. TDCJ has taken no steps to encourage inmates to use the respite areas, despite minimal

actual use by the inmates.

25. Although regular time spent in an air-conditioned environment would reduce the inmates'

risk of heat-related injury and death, an order from this Court making such respite areas

mandatory, rather than voluntary, could have a negative impact on the operation of the

Wallace Pack Unit.  Requiring the Pack Unit to carry out mandatory rotation of prisoners

in and out of respite areas for three hours per day may create a necessity to use force or

impose disciplinary measures if a prisoner did not want to go to the respite at the times

determined by the prison authorities.  A mandatory respite schedule also might disrupt

the Pack Unit's day-to-day operations to provide food, maintain cleanliness, and other

duties.

26. The Environmental Protection Agency requires that public water systems maintain their

water at a maximum contaminant level (MCL) of 10 ppb of arsenic.  Arsenic is a known

human carcinogen.

---

[7] *See, e.g.* 2nd Declaration of Fred Wallace, Doc. 340-2, Appx. 44-45 ¶ 9 ("I've only ever tried
to use an area listed on TDCJ's 'Notice to Offenders' once, and that was a bad experience.  In
mid-August 2015, I was standing out in front of the commissary when I started feeling faint and
overheated.  I felt like I was going to pass out.  I asked a guard if I could go into the barbershop
which was the closest listed area to where I was standing.  The posters TDCJ hung up said the
barbershops would be open to help with the heat, so I asked to go there.  The guard said no and
walked away.  I needed to go to an air conditioned area, and was unable to.").

9

27. Since 2006, the Wallace Pack Unit has been in violation of the EPA requirement, with levels of arsenic in the water that are two to four-and-a-half times the EPA maximum.

28. The arsenic levels in the water are still low enough that scientists would not expect them to cause any non-cancerous health effects.

29. However, the arsenic levels do pose a low, but measurable, increased risk of cancer. According to Dr. Bojes, if an inmate weighing 78 kilograms drinks an average of three liters of water per day, she would expect to find "a potential excess of lifetime cancer of 3.4 cases over 100,000 people … and 1.5 cases for 10,000 people for over a two- and nine-year period [respectively]."  (Tr. of May 26, 2016 Hearing, at 206.)  The inmates at the Wallace Pack Unit are encouraged to drink 7.4 liters of water during the summer to mitigate the effects of extreme heat, so it is possible that over the course of the year their intake exceeds an average of three liters per day; nevertheless, the Court accepts Dr. Bojes' estimate of the increased risk.

30. Low arsenic levels have also been associated with elevated risks of cardiovascular disease and diabetes.

31. There is no evidence in the record that the water at the Pack Unit poses a health risk if used for showering.  There is also no evidence addressing the effects of using ice made from the water, or how much ice diluted in clean water would be necessary to raise the overall arsenic level above the MCL.

32. TDCJ claims that the cost of providing bottled water to all the inmates and the storage of such large amounts of bottled water would be problematic, and the evidence in the record is not sufficient to show that such measures would indeed be feasible.

33. However, the evidence shows that TDCJ has the ability to bring in to the Pack Unit clean drinking water from other water sources.  Cody Ginsel testified that the "state currently has three large water tanker trucks and two small water tanker trucks."  He admitted that the state "routinely [has] water wells or city water supply sources that go down across the state in all of our facilities," and that TDCJ uses the water tanker trucks to move water to where it is needed.  If all of the trucks are in use, than an injunction requiring TDCJ to provide clean water to the inmates at the Pack Unit could mean that TDCJ would need to lease a truck.  It is possible, as well, that TDCJ would need to reallocate its drivers or even hire an additional driver capable of operating (and licensed to operate) an 18-wheeler.  It is also possible, depending on the functionality of the other water systems within the state, that TDCJ would be able to accomplish the task using the trucks and drivers already at its disposal.

34. The provision of ice that meets EPA requirements would be more difficult to accomplish. According to Cody Ginsel, the ice machines at the Pack Unit are directly hooked up to the current water supply. Making ice from imported water would place a heavy burden on the freezer system and potentially affect the operation of the Wallace Pack Unit.  Ginsel stated that "when you store ice inside of our freezer vaults, there is limited space because that's where we have to put our frozen food for the offender population. … [I]t is very burdensome on that freezer system and routinely those freezers will freeze up and go down because that water brings humidity into the freezer vault. And it is very tasking on that freezer to freeze water in cans or whatever way and means we have to freeze that, small bags, water, small containers."  (Tr. of May 16, 2016 Hearing, at 60.)

Plaintiffs' MSJ Appx. 7852
(Supplemental)

35. With regard to water used for cooking, the record is insufficient for this Court to determine the health risks posed to the inmates from the current water supply.

36. Every day that the inmates are forced to drink water with arsenic levels above the EPA requirements contributes, albeit minutely, to their risk of developing skin, lung, bladder, or kidney cancer.  The doses of arsenic ingested by the inmates cannot be undone or remedied in the future.

37. TDCJ has no plan or intention to supply safe drinking water to mitigate the effects of extreme heat during the summer of 2016.

38. The risks to the inmates' health posed by the combination of extreme heat exposure and arsenic-laden drinking water are obvious, and TDCJ is aware of those risks.

## III.   CONCLUSIONS OF LAW

The Supreme Court has stated that the Constitution "does not mandate comfortable prisons" (*Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)), but neither does it permit inhumane ones.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Eighth Amendment imposes on prison officials the duty to provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  This Court believes that among the duties imposed by the Eighth Amendment is the duty to provide safe drinking water when the temperatures are so hot that excessive water consumption is recommended, and necessary, to prevent heatstroke or other heat-related injuries.  According to EPA standards, the water currently provided at the Wallace Pack Unit is not safe to drink over extended periods of time, and the water has been out of compliance with EPA standards for more than ten years.

"The four elements a plaintiff must establish to secure a preliminary injunction are:

12

(1) a substantial likelihood of success on the merits,

(2) a substantial threat of irreparable injury if the injunction is not issued,

(3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and

(4) that the grant of an injunction will not disserve the public interest."

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). "[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (internal quotation marks omitted).

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their Eighth Amendment claim by showing:

1) That the prolonged exposure to extreme heat faced by the Wallace Pack inmates, with only the mitigation measures currently in place (including the arsenic-laden drinking water), poses an ongoing substantial risk of serious harm to the inmates; and

2) That TDCJ is deliberately indifferent to that risk.

Moreover, Plaintiffs have demonstrated that Defendants' current and ongoing conduct violates contemporary standards of decency.

Plaintiffs have clearly demonstrated that, if this Court denied relief to the inmates, they would face a substantial threat of irreparable injury, damages for which there is no adequate remedy at law.

Plaintiffs have shown that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted. After considering the burden on TDCJ of providing clean water, the Court concludes that the balance of equities tilts heavily in favor of

the Plaintiffs. The increased risk of cancer, although minute, is significantly more troublesome than the prospect of reassigning or leasing a truck and reassigning or hiring an employee to drive it.

The Court concludes that an injunction will not disserve the public interest, as it will prevent constitutional deprivations.

Pursuant to the Prison Litigation Reform Act, this Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A). This order, therefore, will not mandate that TDCJ provide ice from water that meets the EPA requirements. Inmates can choose whether or not to add ice to their water, and how much they wish to ingest. They cannot choose whether or not to drink the water. (On the contrary, in order to mitigate the dangerous impact of the extreme heat, all parties agree that the inmates must ingest copious amounts of water.) It would adversely affect the operation of the Wallace Pack Unit to require the prison to disconnect the ice machines currently in operation, and it has not been demonstrated that such course of action would substantially benefit the inmates' health. The Court also declines, at this time, to order TDCJ to amend its policy regarding respite areas, to adopt a formal policy to address the dangers of heat waves, or to regularly monitor the temperatures inside the Pack Unit.

The Court has weighed the adverse impact on the criminal justice system and finds that this relief is narrowly drawn. The Court finds that this relief extends no further than necessary to correct the violation of the Federal right of prisoners. The Court finds that this relief is the least intrusive means necessary to correct the violation of the Federal rights currently being denied to the inmates at the Pack Unit.

Plaintiffs' MSJ Appx. 7855
(Supplemental)

The Court reaches its holding reluctantly. It understands that no one should intrude cavalierly upon the administration of our state's prison systems, nor unnecessarily require expenditure of scarce criminal justice funds. But, in the ten years that the water at the Pack Unit has been in violation of federal standards, prison officials have not provided effective redress. Moreover, the funds expended by the State in litigating this case likely would have been sufficient to have afforded such redress.

## IV.    SECURITY

This Court finds that Plaintiffs are indigent prisoners seeking to vindicate Constitutional rights. Therefore, no bond will be required of Plaintiffs. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require no security at all.'").

## IV.    CONCLUSION

TDCJ is hereby **ORDERED** to provide drinking water to the inmates at the Wallace Pack Unit that conforms with EPA maximum contaminant level requirements for arsenic beginning not later than fifteen days from the date of this Order and continuing until September 22, 2016. TDCJ is free to provide drinking water, which complies with EPA standards, from whichever source and in whatever manner it deems best.

**IT IS SO ORDERED**.

**SIGNED** in Houston, Texas, on this the 21st day of June, 2016.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE