**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STEPHEN MCCOLLUM**, *et al*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-3253 |
| | § | |
| **BRAD LIVINGSTON**, *et al*, | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM & ORDER**

Plaintiffs Stephen McCollum and Sandra McCollum, individually, and Stephanie McCollum individually and as the independent administrator of the Estate of Larry Gene McCollum (collectively, "Plaintiffs"), brought suit under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). They allege that various Texas Department of Criminal Justice ("TDCJ") officials and employees promulgated and effectuated policies regarding the extreme heat in Hutchins State Jail, where McCollum was incarcerated, that violated the Eighth Amendment and led to McCollum's death from heat-related illness. Plaintiffs also claim that the TDCJ and the University of Texas Medical Department ("UTMB") violated the ADA and the RA in failing to accommodate McCollum. Plaintiffs seek damages against the TDCJ officials and employees, sued in their individual capacities under § 1983. Plaintiffs also seek damages and injunctive relief against TDCJ and UTMB.

McCollum died on July 28, 2011, and Plaintiffs filed their complaint on June 26, 2012 in the Northern District of Texas. (Doc. No. 1.) On November 10, 2014, the case was transferred to this Court. (Doc. No. 215.) Defendants have filed two motions for summary judgment, moving for dismissal on all claims. (Doc. Nos. 285, 288.) Plaintiffs responded (Doc. No. 297), and Defendants replied (Doc. Nos. 315; 324). Additionally, Plaintiffs filed a sur-reply to UTMB's

1

reply. (Doc. No. 336.) Based on the motions, the responses, replies, and sur-reply; the more than 9,000 pages of exhibits filed by both parties; and the applicable law, the Court grants in part and denies in part Defendants' motions for summary judgment.

## I.  Background

The Texas Department of Criminal Justice operates 109 prisons in Texas, housing approximately 150,000 incarcerated men and women. (Doc. No. 288 at 18.) The majority of these prisons do not have air-conditioning in the inmate housing areas (*Id.* at 11), but all of the prisons have some areas that are air-conditioned. For example, all of the wardens' offices are air-conditioned, as are all of the regional directors' offices and the correctional officers' stations (known as "pickets"). (Doc. Nos. 305-14 at 61; 305-17 at 20.)

Heat stroke—the most common cause of hyperthermia—is a "medical emergency" in which "the body has lost its ability to dissipate heat and maintain a normal body temperature. . . . Shock and death may occur. . . ." (Doc. No. 285-1 at 171.) It is undisputed that five men died in 1998 from environmentally-caused hyperthermia while incarcerated in TDCJ facilities.[1] Between 1999 and 2010, five more individuals are known to have died from hyperthermia or other heat-related illnesses while incarcerated in Texas prisons.[2]   In 2011, Texas experienced an

---

[1] Autopsy of Archie White, "the cause of death is due to a prolonged elevated core body temperature (exogenous hyperthermia)" (Doc. No. 300-2 at 5); Autopsy of Anselmo Lopez, "this 41 year old Hispanic male with history of exposure to high environmental temperatures, died following an episode of seizure—probably related to hyperthermia" (*Id.* at 19); Autopsy of James Moore, "Cause of death: Hyperthermia" (*Id.* at 21). Although autopsies for only three individuals are provided, TDCJ concedes that five individuals died from hyperthermia in TDCJ facilities in 1998. (Doc. No. 288 at 27.)

[2] Autopsy of Charles Finke, "we conclude that this individual died of heat stroke" (Doc. No. 300-2 at 31);  Autopsy of John Wesley Cardwell, "John Wesley Cardwell died from heat stroke" (*Id.* at 42); Autopsy of Ricky Robertson, "this 39-year-old man died of complications of severe hyperthermia and heat stroke" (Doc. No. 300-3 at 13);  Autopsy of James Shriver, "there is cause to suspect hyperthermia" (*Id.* at 26);  Autopsy of Dionicio Robles, "the patient died as a result of hyperthermia" (*Id.* at 39).

2

"unprecedented" heat wave (Doc. No. 288 at 75), and ten more individuals died from hyperthermia. (Doc. Nos. 300-4 at 3, 21, 40; 300-5 at 12, 23, 31, 49; 300-6 at 12, 26, 40.) McCollum was the second individual to die of heat-related illness during the summer of 2011. (Doc. No. 300-2 at 2.)

### A.  The Organizational Structures

There is considerable disagreement among the parties regarding the roles played by TDCJ, UTMB, and other pertinent actors, as well as the limits of each actor's authority. Although this will be discussed further in different sections of this opinion, the Court will provide a general overview here.

The Texas Department of Criminal Justice is "an agency of the State of Texas responsible for the incarceration of convicted felons." (Doc. No. 285-1 at 11.) TDCJ has jurisdiction over the entire adult criminal justice system in the state of Texas, including probation and parole. (Doc. No. 288 at 21.)

The Correctional Managed Health Care Committee ("CMHCC") is a statutorily created committee "responsible for developing, implementing, and monitoring the correctional managed health care services for offenders confined in institutions operated by TDCJ." (Doc. No. 285-1 at 8.) CMHCC is composed of two individuals from TDCJ, UTMB, and Texas Tech University Health Sciences Center ("TTUHSC"). *Id.* One of the two individuals from each agency must be a physician. *Id.* Three additional members of the committee are appointed by the Governor; two of these three members must be physicians. *Id.*

CMHCC has authority to contract for healthcare services "for and on behalf of the TDCJ." (*Id.* at 7.) The contract between TDCJ and CMHCC establishes that "[a]ll statewide

Health Services policies and procedures will be developed through a joint policy and procedure committee process that includes representatives of TDCJ, UTMB, TTUHSC and the CMHCC. . . The TDCJ Medical Director shall retain final approval authority for all statewide policies." (*Id.* at 14.) Regarding the quality of care delivered by UTMB and TTUHSC, the contract states that "TDCJ may require the health care providers to take corrective action if the care provided does not meet expectations . . . ." (*Id.* at 16.)

CMHCC contracted with UTMB and TTUHSC to provide direct patient care for men and women incarcerated in TDCJ facilities. UTMB, through its contract with CMHCC, provides direct patient care to approximately 78% of the men and women incarcerated in TDCJ facilities, including the men incarcerated in Hutchins State Jail. (Doc. No. 285 at 23.)

### B.  Hutchins State Jail

Hutchins State Jail ("Hutchins), where McCollum suffered the heat stroke that caused his death, is an "intake and transfer facility for all manner of felony offenders." (Doc. No. 288 at 36.) Hutchins also provided permanent housing for offenders convicted of lower-level state jail felony offenses. (*Id.*) Defendant Pringle was the Senior Warden of Hutchins in 2011. (*Id.*) Because Texas jails are required to be climate controlled, offenders transferred to Hutchins from state jails are not acclimated to extreme temperatures. Individuals who are not acclimated to heat are more vulnerable to heat-related illnesses. (Doc. No. 305-15 at 57; Doc. No. 285-1 at 172, CMHCC Policy Manual instructing correctional officers to acclimatize offenders working in conditions where apparent air temperature exceeds 90°F, and instructing officers to monitor non-acclimatized workers for signs of heat stress during the acclimatization period; Doc. No. 301-1 at 57, TDCJ Administrative Directive, requiring that offenders working in extreme heat "be exposed gradually to extreme temperature conditions").

4

Hutchins has primarily dormitory style housing. It is undisputed that in the days before his death, McCollum was housed in a dorm with 57 other men. (Doc. No. 297 at 27.) The dormitory windows are sealed shut, but an air handler was used for ventilation. (Doc. No. 288 at 37.) The dorms are not equipped with individual electrical outlets, so the inmates were not able to use personal fans. However, two large fans were mounted on the walls around the dormitory in addition to one large floor fan. (*Id.*)

The provision of water to the dormitories is a disputed issue in this case. Although Defendants contend that Warden Pringle ordered iced or chilled water to be distributed to the dorm areas "multiple times daily," Plaintiffs argue that, in fact, the water was often only delivered once a day, and was not adequately iced or chilled. (Doc. No. 324 at 21; Doc. No. 288 at 36.) Additionally, men incarcerated at Hutchins were to have "free and frequent access to the dorm showers while the dayrooms are open." (Doc. No. 288-14 at 43.) Neither party states what hours the dayroom was open in McCollum's dormitory. Defendants also maintain that Warden Pringle ordered that the water temperature for the showers be lowered to 95°F from 107°F. (Doc. Nos. 288 at 36; 305-16 at 57.)

### C.  McCollum's Death

Larry Gene McCollum ("McCollum") was 58 years old when he was convicted of forgery in McClennan County and sentenced to 12 months incarceration. (Doc. No. 285-2 at 59.) At 5'10" and 330 pounds, the parties agree that McCollum was morbidly obese.[3] Additionally,

---

[3] Plaintiffs refer to McCollum as "morbidly obese," while Defendants refer to him simply as "obese." (Compare Doc. No. 297 at 30 with Doc. Nos. 285 at 29 and 324 at 30.) According to Plaintiff's expert, McCollum was morbidly obese because his body mass index ("BMI") was greater than 40. (Doc. No. 300-11 at 111.) The autopsy conducted after his death also states that McCollum was morbidly obese, with a BMI of 49.5. (Doc. No. 300-4 at 21.) Defendant does not dispute that McCollum's BMI was greater than 40, or that this indicates morbid obesity. Therefore, the Court will refer to McCollum as morbidly obese.

McCollum had a history of hypertension. (Doc. No. 285 at 29.) While incarcerated in the McLennan County Jail, before his transfer to Hutchins, McCollum was prescribed an anti-hypertensive medication known as Clonidine. (*Id.* at 18.) Upon arrival at Hutchins on July 15, 2011, McCollum received an intake screening by a "certified medication aide" employed by UTMB. McCollum self-reported a history of diabetes, depression, high blood pressure and mental illness. Later that day, a physician assistant employed by UTMB substituted hydrochlorothiazide for clonidine to treat McCollum's hypertension.[4]

Hydrochlorothiazide is classified in the Correctional Managed Health Care Policy Manual as a diuretic, which acts as a "poikilothermic"—a drug that "disrupts the body's normal temperature regulating mechanisms"—and a "potentiator"—a drug that "potentiates" the effects of a poikilothermic. (Doc. No. 285-1 at 171, 175.) A diuretic is a drug that decreases blood pressure by removing water from the body, but increases a patient's risk of heatstroke by causing dehydration and impairing cooling. (Doc. No. 300-11 at 110.) Recognizing these risks, the Correctional Managed Health Care Policy Manual, which was to be followed by UTMB and TDCJ, advised that, "[i]n general, offenders on antipsychotic drugs should not be allowed to work or recreate in environments where the apparent air temperature is 95°F or higher. This restriction should also be considered for offenders who are on other drugs classified as . . . poikilothermics or potentiators . . . if they also have an underlying medical condition that places

---

[4] UTMB contends that McCollum never went to the pill window to receive his prescribed dosage of hydrochlorothiazide while he was incarcerated at Hutchins. (Doc. No. 285 at 20.) But Plaintiffs have raised a fact question regarding the accuracy of UTMB's records, pointing out that the same records allegedly indicating that McCollum did not take his medicine also seem to indicate that McCollum took the medicine on August 8, August 12, August 13, and August 14—weeks after his death. (Doc. No. 300-17 at 35.) UTMB does not offer an explanation for this incongruity. As such, a question exists as to whether McCollum took the hydrochlorothiazide he was prescribed by UTMB. However, the Court notes that even if McCollum did not take the medicine, it is still relevant that UTMB prescribed it, knowing the effects this medication had on individuals' reaction to heat.

them at increased risk . . . Decisions about suitability of work assignments and recreation areas for these offenders will be made by facility medical staff." (Doc. No. 285-1 at 175.) The manual does not state when this decision should be made, but UTMB contends that it could not have made any restrictions "based on housing, work, disciplinary process, transportation, and individual treatment plan requirements" until McCollum received his intake physical within a week after his arrival to TDCJ. (Doc. No. 285 at 16-17.) Because McCollum was incarcerated in Hutchins less than one week before he died, he did not receive an intake physical. (*Id.* at 20.) However, on July 15, McCollum went to the medical department to be screened for communicable diseases, and on July 18, McCollum had a routine mental health screening. (Doc. No. 285 at 20.) On July 20, McCollum had blood drawn for laboratory studies. (*Id.* at 21.) UTMB points out that during these trips to the medical department, McCollum did not voice health concerns regarding the heat or his bunk assignment.[5] (*Id.*)

A TDCJ employee in the classification department is responsible for making bunk assignments in Hutchins. (Doc. No. 288 at 40.) TDCJ states that inmates are placed in the next available bunk, with reference only to the inmate's medical forms. Therefore, TDCJ argues, if a UTMB employee noted that McCollum required a lower bunk, TDCJ would have assigned him to a lower bunk. (Doc. No. 324 at 30.) However, as stated above, UTMB contends that it cannot make any housing restrictions until the intake physical is completed, within seven days of the inmate's arrival.[6] (Doc. No. 285 at 16.) Thus, McCollum was initially assigned a lower bunk, but

---

[5] It should be noted that McCollum only saw the medical staff one time after he was moved from his lower bunk to an upper bunk.

[6] Glenda Adams, the Senior Medical Director of Inpatient Operations for UTMB, states in her affidavit that if McCollum had simply asked, "Mr. McCollum could have been provided a medical 'pass' for a lower bunk pending his intake physical…." (Doc. No. 285-1 at 133.) Plaintiffs agree that the employee who conducted McCollum's intake screening could not have entered the "lower bunk" restriction herself, but assert that she could have referred McCollum to

since there were no housing restrictions noted on his medical documents, he was moved to an upper bunk in the C-7 dorm room on July 18, where he remained until he died. (Doc. No. 288-14 at 49.)

Plaintiffs present evidence that, from July 18 until his death, McCollum had a difficult time climbing onto his bunk, and at some point stopped getting up to eat in the dining area. (Doc. No. 300-10 at 318-319.) On July 21, other inmates became concerned about McCollum, because he was not eating and did not look well. (*Id.*)

Shortly after 2:00 a.m. on July 22, 2011, Officer Richard J. Clark ("Clark") was performing a count when an offender informed him that McCollum was shaking. (Doc. No. 288-6 at 16.) Clark states in his affidavit that it looked like McCollum was having a seizure. *Id.* Clark attempted to elicit a response from McCollum, but could not. (*Id.* at 16-17.) At that point, Clark ran to the picket[7] to initiate Incident Command System (ICS) and to call for a supervisor. (Doc. No. 288 at 42.) Sergeant Tate arrived shortly afterwards, and soon after that a call went out over the radio that there was another medical situation in a different dorm, so Clark left to handle that situation. (Doc. No. 288-6 at 17.) Clark had no further involvement with McCollum. (*Id.*)

Sergeant Karen Sue Tate ("Tate") arrived at the scene approximately five minutes after Officer Clark summoned help.[8] (Doc. No. 302-11.) Tate states that McCollum was shaking and unresponsive, and she thought he was having a seizure, but that his skin was warm to the touch. (Doc. No. 288-6 at 21.) While in "constant contact" with her supervisor, Lieutenant Sanders, Tate tended to McCollum by monitoring his breathing and ensuring that his airway was open.

---

a UTMB employee with the authority to do so. (Doc. No. 297 at 40 n.71.)

[7] Correctional Officers do not have access to phones in the dormitories, and so they must inform a nearby officer who has access to a phone.

[8] Because these events occurred late at night, and because the records are somewhat inconsistent, these times have been approximated based on TDCJ's timeline and the depositions of the officers involved.

(*Id.*) She put a wet cloth on his neck, and put drops of water on his lips. (*Id.* at 21-22). After McCollum stopped seizing, he did not return to consciousness as Sanders expected him to. (*Id.* at 22.)

Around 2:40 a.m, over 30 minutes after McCollum had been discovered seizing, Lt. Sandrea Yvonne Sanders ("Sanders") arrived at the scene. (Doc. No. 302-11 at 6.) At this point, McCollum was no longer convulsing, and Sanders thought this was an emergency situation "beyond the scope of what we could handle." (Doc. No. 305-17 at 26-27.) But, before calling 911, she called off-site medical staff at the Crain Unit around 2:50 a.m. (there was no medical staff at the Hutchins Unit at this time). (Doc. Nos. 302-11 at 6; 305-17 at 29.) The nurse at Crain Unit looked at McCollum's medical records, saw that he had no history of seizures, and instructed Sanders to call 911. (Doc. No. 305-17 at 30.) At 3:04 a.m., almost an hour after McCollum had been discovered convulsing and unresponsive, 911 was called. (*Id.*)

Because of McCollum's size, and because he was on the top bunk, it took at least five Emergency Medical Technicians and Correctional Officers to lift his body off of the bunk. (Doc. No. 305-17 at 70.) When McCollum arrived at Parkland Hospital, his body temperature was 109.4°F. (Doc. No. 300-4 at 21.) McCollum died on July 28, 2016. (*Id.* at 17.) The doctor who performed his autopsy concluded that McCollum died "as the result of hyperthermia. The decedent was in a hot environment without air conditioning, and he may have been further predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension." (*Id.* at 21.)

### D.  Other Heat-Related Litigation

Over the course of less than a month in the summer of 2011, ten individuals died in TDCJ

prisons from hyperthermia or other heat-related illnesses.[9] In August 2012, two more individuals died in TDCJ custody from hyperthermia.[10] These deaths have spurred several lawsuits, all of which are ongoing.[11] This is the first of these cases to reach the summary judgment stage.

### E.  Defendants' Bases for Summary Judgment

In their motion for summary judgment, the individual defendants—TDCJ Director Brad Livingston, Regional Director Robert Eason, Warden Jeff Pringle, Correctional Officer Richard Clark, Sergeant Karen Tate, and Lieutenant Sandrea Sanders—argue that they are entitled to summary judgment based on qualified immunity, because their actions were not unreasonable in light of clearly established law. (Doc. No. 288 at 47.) However, even if this Court finds that they are not entitled to qualified immunity, the individual Defendants assert that they are still entitled to summary judgment because they were not deliberately indifferent—an element of the Eighth

---

[9] Autopsy of Douglas Hudson, "[I]t is our opinion that the cause of death is environmental hyperthermia (heat stroke)" (Doc. No. 300-4 at 13); Autopsy of Larry McCollum, "It is my opinion that Larry Gene McCollum…died as the result of hyperthermia" (*Id.* at 21); Autopsy of Thomas Meyers, "[T] cause of death for this 46-year-old male is hyperthermia" (*Id.* at 40); Autopsy of Robert Webb, "Based on the history of exposure to high ambient temperature and advanced organ autolysis, environmental-induced hyperthermia is likely a major factor contributing to death" (Doc. No. 300-5 at 12); Autopsy of Charles Cook, "[T]he cause of death is hyperthermia" (*Id.* at 23); Autopsy of Michael Martone, "Cause of Death: Hyperthermia" (*Id.* at 26); Autopsy of Alexander Togonidze, "[H]yperthermia is the cause of death in this case" (*Id.* at 49); Autopsy of Kenneth James, "The immediate cause of death is most likely environmental hyperthermia-related classic heat stroke" (Doc No. 300-6 at 13); Autopsy of Kelly Marcus, "The immediate cause of death is most likely environmental hyperthermia-related classic heat stroke" (*Id.* at 16); Autopsy of Daniel Alvarado, "The diagnosis of environmental hyperthermia was based on the postmortem axillary temperature of 105.2F and the lack of any other cause of death despite a complete autopsy and blood toxicologic studies" (*Id.* at 40).

[10] Autopsy of Rodney Adams, "[I]t is our opinion that the cause of death was hyperthermia" (Doc. No. 300-6 at 43); Autopsy of Albert Hinojosa, "The clinical history and record of hyperkalemia suggest environmental hyperthermia leading to fatal cardiac arrhythmia" (Doc. No. 300-7 at 13).

[11] Webb v. Livingston (14-cv-3302), Adams v. Livingston (14-cv-3326), Togonidze v. Livingston (14-cv-3324), Hinojosa v. Livingston (14-cv-3311), Caddell v. Livingston (14-cv-3323), Martone v. Livingston (13-cv-3369). All cases have been filed in or transferred to the Southern District of Texas.

Amendment claims that Plaintiffs are required to satisfy. (*Id.* at 82.) Defendants Livingston, Eason, and Pringle also claim that Plaintiffs cannot establish supervisor liability against them. (*Id.* at 85, 95.)

Defendants TDCJ and UTMB, against whom Plaintiffs have asserted ADA and RA violations, argue that McCollum was not a qualified individual under the ADA and RA. (*Id.* at 117; Doc. No. 285 at 25.) Even if the Court holds that a reasonable jury could find McCollum qualified, Defendants further assert that McCollum was not excluded from or denied the benefits of any services, programs or activities provided by TDCJ or UTMB. (Doc. Nos. 288 at 122; 285 at 37.) Finally, TDCJ and UTMB state that they are entitled to summary judgment because they did not intentionally discriminate against McCollum because of his disability. (Doc. Nos. 288 at 126; 285 at 35.)

## II.    The Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party bears the trial burden. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F. 3d 1069, 1075 (5th Cir.1994) (en banc). The moving party has the initial burden of showing that summary judgment is appropriate. *See Martco Ltd. Partnership v. Wellons, Inc.,* 588 F.3d 864, 871 (5th Cir. 2009) (citing *Celotex,* 477 U.S. at 323). Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *Celotex Corp.,* 477 U.S. at 322-23. If the moving party meets this burden, "[t]he nonmoving party 'must identify specific evidence in the record and articulate the manner in

which that evidence supports that party's claim.'" *Peterson v. City of Forth Worth, Tex.,* 588 F.3d 838, 844 (5th Cir. 2009) (quotation omitted). "The identified evidence 'must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial.'" *Id.* The nonmovant must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "A fact is material only if its resolution would affect the outcome of the action, . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Wiley v. State Farm Fire and Cas. Co.,* 585 F.3d 206, 210 (5th Cir. 2009) (internal citation and quotations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.,* 478 U.S. at 587-88; *Hill v. Carroll County, Miss.,* 587 F.3d 230, 233 (5th Cir. 2009). Factual controversies are resolved in favor of the nonmovant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds,* 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)). "[C]onclusory allegations" or "unsubstantiated assertions" do not meet the nonmovant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 399 (5th Cir. 2008). Instead, the nonmoving party must present specific facts showing "the existence of a genuine issue concerning every essential component of its case." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted). In the absence of proof, a reviewing court will not assume "'that the [nonmoving] party could or would prove the necessary facts,' and will grant summary judgment 'in *any* case where critical evidence is so weak or tenuous on an essential fact that it

could not support a judgment in favor of the nonmovant.'" *Boudreaux,* 402 F.3d at 540 (quoting *Little,* 37 F.3d at 1075) (emphasis in original). The court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (internal quotations omitted).

## III.   Section 1983 Claims

Section 1983 provides a right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. However, certain barriers stand in the way of a plaintiff suing under § 1983, most notably qualified immunity.

State officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects government employees against civil liability in their individual capacity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Wernicke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009). Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable under the circumstances presented in the case. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 408 (5th Cir. 2007). Thus, the doctrine of qualified immunity shields from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine whether a state official is entitled to qualified immunity for an alleged constitutional violation, reviewing courts engage in a two-prong inquiry. *Pearson v. Callahan*, 555 U.S. 223 (2009). Under the first prong, the court asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right. *Id.* at 231. The second prong of the analysis requires the court to ask whether qualified immunity is appropriate, notwithstanding an alleged violation, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir.2007). The reviewing court may consider these prongs in any sequence. *Pearson*, 555 U.S. at 235.

A law is "clearly established" if it is "sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citations omitted). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (citing *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

### A.  8th Amendment Conditions of Confinement Claim

Plaintiffs assert that Livingston, Eason and Pringle violated McCollum's Eighth Amendment right to humane conditions of confinement, and that these violations caused McCollum's death. The Eighth Amendment expressly prohibits "punishment" that is "cruel and

unusual." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement" by ensuring that inmates receive adequate food, clothing, shelter, and medical care, and that "reasonable measures" are taken for inmate safety. *Id.*

A plaintiff must meet two requirements to establish an Eighth Amendment violation. First, "the deprivation alleged must be, objectively, sufficiently serious." *Id.* at 834 (internal quotation marks and citations omitted). Conditions of confinement that deprive an inmate of "the minimal civilized measure of life's necessities…are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal quotation marks and citation omitted). Second, the plaintiff must show that the prison official acted with deliberate indifference to that known risk. *Farmer*, 511 U.S. at 834.

### i. Evidence Establishes A Genuine Question of Fact That Livingston, Eason and Pringle Violated McCollum's Constitutional Right to Humane Conditions of Confinement

The evidence presented by Plaintiffs creates a genuine issue as to whether the conditions in Hutchins Unit in the summer of 2011 posed a substantial risk of harm to McCollum. Temperature logs reveal that the temperature in Hutchins routinely exceeded 100°F. Although employees at Hutchins did not regularly track the air temperature or heat index inside the unit, evidence shows that the air temperatures outside were similar to those indoors. In a memo to Warden Pringle dated July 13, 2011—two days before McCollum arrived at Hutchins—it was reported that "[r]andom samplings of temperatures taken in the Offender housing areas…are 2 to 3 degrees lower than the outside temperature." (Doc. No. 305-6 at 2.) These samples revealed

that temperatures in various offender housing areas at approximately 2:00 p.m. were between 100°F and 102°F. *Id.* The outside air temperature at that time was 104°F *Id.* Another memo, dated July 22, 2011 reported that the outdoor temperature at 7:45 a.m. was 84°F, while the temperature in two dormitories was 84°F and 86°F. (*Id.* at 4.)

Hutchins employees did log the outside air temperature and humidity levels from 6:30 a.m. until 6:30 p.m. on a daily basis. (Doc. No. 300-17 at 38-45.) These figures were then used to calculate the heat index. The logs show that on July 21, 2011, the day preceding McCollum's heatstroke, the outside air temperature was above 90°F for at least nine hours, and above 100°F for at least six hours. (*Id.* at 44.) The temperature peaked at 107°F from 3:30 p.m. to 5:30 p.m., and was still 106°F at 6:30 p.m., when the last recording of the day was taken. Furthermore, the humidity levels never fell below 40%. At 3:30 p.m., the humidity level was recorded at 46%. Although the log represents that the heat index at 3:30 p.m. was 116°F, the chart provided in UTMB and TDCJ materials reveals that a temperature of 107°F coupled with a 46% humidity level would produce a heat index of approximately 150°F. (Doc. No. 285-1 at 190.) Defendants do not provide an explanation for this inconsistency.

On July 19, 2011, the temperature logs reveal air temperatures of 112°F and 114°F from 10:30 a.m. until 2:30 p.m. (Doc. No. 300-17 at 42.) With humidity levels of 65%, the heat index was recorded as "149+" for four hours in a row. (*Id.*) These temperatures, according to the "Heat and Humidity Matrix" disseminated by TDCJ in Administrative Directive 10.64, indicate that heat stroke is "imminent."[12]

---

[12] Defendants argue that the Heat and Humidity Matrix signifies that heat stroke is imminent only "*if protective measures are not observed.*" (Doc. No. 288 at 57.) Since, according to Defendants, they implemented adequate protective measures, no weight should be given to this label. The Court acknowledges that there is very little explanation in the Administrative Directive of what it means for heat stroke to be imminent, and it is possible that Defendants'

For each of the seven days that McCollum was incarcerated in Hutchins, the temperature logs recorded at least five hours during which the outside temperatures were above 100°F. Furthermore, the Risk Management Director for Hutchins testified that the presence of 58 bodies in one room raised the humidity levels inside the dormitory where McCollum was housed. (Doc. Nos. 297 at 27; 305-17 at 69.) As previously described, Hutchins did not have air conditioning in the inmate housing areas and the windows were sealed shut. (Doc. No. 305-16 at 46-47.) To provide ventilation, Hutchins used air handlers, which circulate outside air into the dormitory. (*Id.* at 47-48.) However, air handlers do not alter the temperature of the outside air, so the air brought inside is as hot as the air outside.[13] (*Id.* at 48.)

It is also undisputed that the inmates in Hutchins Unit could not obtain personal fans with which to cool themselves. (*Id.* at 8.) This is because, according to Defendants, the dormitory-style design of the prison did not allow for individual electrical outlets. (*Id.* at 9.) Instead, the dormitories in Hutchins were outfitted with industrial fans—in McCollum's dorm, there were two mounted on the wall and one on the floor. (Doc. No. 288-38 at 127.)

There is dispute about the provision of water in the dormitories in Hutchins. TDCJ contends that it is "undisputed" that Warden Pringle ordered iced or chilled water to be distributed to the dorm areas "multiple times daily." (Doc. No. 324 at 21; Doc. No. 288 at 36.) As support for this contention, TDCJ cites to the Operational Procedure for Hutchins Unit as of June 1, 2011, which states that "additional cool drinking water may be delivered to the housing

---

interpretation is correct. However, even if so, one of the keenly contested issues in this case is *whether* TDCJ implemented adequate protective measures. Thus, Defendants cannot rely on their assertion that they provided adequate protective measures to disclose all relevancy of the Heat and Humidity Matrix. Furthermore, the characterization of temperatures goes to Defendants' knowledge of the substantial risk of harm.

[13] Although the air handlers in Hutchins are equipped with a heating unit that heats the air as it comes in, they are not equipped with a cooling unit. (Doc. No. 305-17 at 65.)

areas during the day." (Doc. No. 288-14 at 43.) The use of the term *may*, as well as the vague meanings of "additional" and "cool," fail to support the contention that iced or chilled water was *ordered*, nor does it reveal how often water was brought. Defendants also cite to a 2008 inter-office communication for Hutchins, which states that "[o]ffenders will be provided additional cool drinking water in the housing areas at regular intervals during the hotter periods of the day." (Doc. No. 288-34 at 24.) This document suffers the same ambiguities as the one described above. Indeed, Regional Director Eason testified that "[t]here's no policy and there's no specific timeline on how often ice is supposed to be brought out." (Doc. No. 305-14 at 116.)

Helpfully, there is some evidence of the practices that were in place around the time of McCollum's incarceration at Hutchins. For example, a log of the water temperatures in coolers throughout Hutchins Unit was made on July 12, 2011. This log reveals that half of the eighteen coolers were empty, and the other nine contained water ranging from 75°F-80°F. (Doc. No. 288-15 at 69.) The Court takes judicial notice that ice water is 32°F. (Federal Rules of Evidence Rule 201.) Thus, it is clear that, at least on July 12, 2011, the water provided to the dormitories in Hutchins was not iced. The temperature log is consistent with the declaration of Santos Rodriguez III, who was incarcerated in the same dormitory as McCollum while McCollum was there. Rodriguez stated that "[t]he water in the jugs was not cold. I rarely remember ever seeing any ice in the jugs." (Doc. No. 300-10 at 318.)

In terms of the quantity of water, Plaintiffs' expert noted that one ten-gallon jug of water is used in the dormitory in which McCollum was housed with 57 other men, and Defendants do not deny this contention. (Doc. No. 300-11 at 109.) Rodriguez stated that "[s]ometimes [the guards] only brought the water in once per day." (Doc. No. 300-10 at 318.)

Furthermore, Plaintiffs claim, and Defendants concede, that McCollum was not issued a

cup upon his arrival at Hutchins with which to obtain water from the water coolers. (Doc. 305-16 at 42.) Although UTMB urges that McCollum could have simply bought a cup from commissary, Warden Pringle testified that as an inmate newly received from jail, McCollum would not have had access to the commissary for 30-45 days. (Doc. Nos. 285 at 42; 305-16 at 43-44.)

However, TDCJ also contends that water was constantly available in the dorm areas through sinks in the dormitory bathroom, which were equipped with a "bubbler" to allow the user to drink as though from a water fountain. (Doc. No. 324 at 21 n.11.) The same temperature log mentioned above recorded the temperature from the "cold tap" in the "Offender lavatories" as 85°F. (Doc. No. 288-15 at 69.) Thus, although TDCJ has presented evidence that the men incarcerated in Hutchins had access to water through the bathroom sinks, at 85°F this water was not cold, or even cool. And with regard to the water brought in the 10-gallon jugs, Plaintiffs have raised a genuine question of fact regarding the temperature and amount of water that was provided.

The extreme heat in Hutchins, combined with the sealed windows, lack of personal fans, and potentially insufficient amounts of cold water, could be considered a substantial risk for even the healthiest individual. McCollum came to Hutchins with pre-existing health conditions that made him even more sensitive to the heat. As discussed above, it is undisputed that McCollum was morbidly obese and suffered from hypertension, two conditions that make an individual more vulnerable to heat-related illness. (Doc. Nos. 324 at 32, 324-3 at 3-5.) The parties dispute whether McCollum additionally suffered from diabetes and depression. McCollum's preexisting vulnerability was exacerbated by two practices at Hutchins—failing to consider an individual's weight when assigning bunks, and failing to give newly-arrived individuals cups with which to drink the cool water that TDCJ asserts was provided in ten-gallon jugs. As a result, McCollum

was assigned to an upper bunk, and had no way to transport water from the ten-gallon jug or the bathroom sink to his bunk. Thus, he would have had to climb off his bunk every time he wanted to drink water, an arduous way to consume the two gallons of water per day that TDCJ recommended inmates drink during periods of extreme heat. (Doc. No. 299-2 at 8.) Indeed, Plaintiffs present evidence that McCollum struggled to get off and on his bunk, and that he resorted at least one time to asking another individual, Rodriguez, to bring him water in the cereal bowl that Rodriguez was using as a cup. (Doc. No. 300-10 at 318-319.)

Furthermore, because McCollum had arrived at Hutchins, a transfer facility, from McClennan County Jail, which was air-conditioned, McCollum was not acclimatized to the heat. This creates a further vulnerability to extreme heat. (Doc. No. 301-1 at 57, TDCJ Administrative Directive, requiring that offenders working in extreme heat "be exposed gradually to extreme temperature conditions"). A reasonable jury could easily find that the conditions described above combined to create a substantial risk of harm to McCollum.

This is further supported, tragically, by McCollum's death. When he arrived at Parkland Hospital, McCollum had a body temperature of 109.4°F. The autopsy revealed that his cause of death was "hyperthermia," in part as a result of a "hot environment without air conditioning." (Doc. No. 300-4 at 21.)

### ii. Evidence Establishes A Genuine Question of Fact As to Livingston, Eason and Pringle's Deliberate Indifference

Plaintiffs must show both a genuine question of fact regarding the substantial risk, and a genuine dispute regarding Defendants' deliberate indifference to these conditions. Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety. *Farmer,* 511 U.S. at 837. The deliberate-indifference standard is an "extremely high" standard to meet. *Domino v. Texas Dep't of*

20

*Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001). A prison official is not liable for deliberate indifference unless the official knows of and disregards an excessive risk to an inmate's health or safety. *Id.* The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also actually draw the inference. *Id.* "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015) (quoting *Farmer*, 511 U.S. at 826). However, a prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious. For example,

> if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk. *Farmer*, 511 U.S. at 829.

Livingston, Eason, and Pringle assert that they were not deliberately indifferent because they did not have "any interaction with McCollum or any knowledge of his presence at the Hutchins Unit." Livingston asserted the same defense in another prison heat case, *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015). There, the Fifth Circuit held that "[p]rison officials cannot escape liability in a conditions-of-confinement case like this one by arguing that, while they allegedly were aware of and consciously disregarded a substantial risk of serious harm to a discrete class of vulnerable inmates, they were not aware that the particular inmate involved in the case belonged to that class." *Id.* at 667. Thus, Plaintiffs need not show that Defendants were aware of McCollum's presence at Hutchins or his specific vulnerabilities. Instead, Plaintiffs must show that a reasonable jury could find that Defendants knew of, and

ignored, a substantial risk of harm to inmates like McCollum—inmates with medical conditions that made them more vulnerable to extreme heat.

**Brad Livingston**—Livingston argues that Plaintiffs cannot make out a supervisory liability claim against him because he "was not aware of a pattern of Constitutional violations related to heat . . . ." (Doc. No. 288 at 87.) Livingston contends that, in order to show that a policy reflects deliberate indifference, Plaintiffs must "demonstrate at least a pattern of similar violations." (*Id.* at 85, citing *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004).) Furthermore, Livingston argues, with regard to a failure to train claim, Plaintiffs must show that Livingston was on notice that a course of training was deficient in a particular respect. (Doc. No. 288 at 86, citing *Connick v. Thompson*, 563 U.S. 51, 62.)

The Court notes that the cases cited by Defendant are cases in which the plaintiff sued the municipality. "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury." *Connick v. Thompson*, 563 U.S. at 60 (internal quotation and citation omitted). In some cases, a failure to train employees regarding how to avoid violating citizens' rights may rise to the level of an official municipal policy. *Id.* at 51. However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

Here, Plaintiffs do not assert any claim against a municipality. They assert a claim against Livingston in his individual capacity for his own actions in promulgating—and failing to correct—intake and housing policies that exposed McCollum to extreme temperatures without adequate remedial measures. *Hinojosa v. Livingston*, 807 F.3d 657, 668 (5th Cir. 2015). "A supervisory official may be held liable . . . if . . . he implements unconstitutional policies that

causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir.2011) (internal quotation and citation omitted). However, with regard to Plaintiffs' failure to train claim, the Fifth Circuit has held that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Id.* at 447. Without this requirement, a failure to train claim would become de facto *respondeat superior* liability. *Id.*

Plaintiffs present sufficient evidence to create a genuine issue as to Livingston's knowledge and disregard of the dangers posed by the conditions of confinement in TDCJ prisons. Evidence reveals that Livingston, who was the Executive Director of TDCJ from 2004 until 2016, was aware of the extreme heat during Texas summers, and the fact that many TDCJ prisons did not have air conditioning in the housing areas. (Doc. No. 305-15 at 65, agreeing that he was aware "prior to summer of 2011 that the housing areas that weren't air conditioned were hot during the summer.")

Plaintiffs also show that Livingston was aware of at least two heat-related deaths in TDCJ before McCollum's death in 2011. In 2007, James Shriver and Dionicio Robles, both incarcerated at the Byrd Unit, died of heat-related illnesses.[14] Livingston concedes that he was made aware of these deaths in 2009, through a memo sent to him by the Director of the Health Services Division titled "Heat-related deaths, 2007 to present." (*Id.* at 45.) Livingston asserts that these two "lone" deaths did not suffice to put him on notice that TDCJ's heat mitigation policies were inadequate because they occurred under "extremely unique circumstances." (Doc. No. 288 at 66.) Both Shriver and Robles had pre-existing medical conditions that made them vulnerable

---

[14] Autopsy of James Shriver, "[t]he medication history and otherwise vague anatomic findings point to hyperthermia as a contributing factor in this patient's death" (Doc. No. 300-3 at 27); Autopsy of Dionicio Robles, "it is our opinion, based on the clinical history, scene investigation, and autopsy results, that the patient died as a result of hyperthermia, caused by environmental conditions plus pre-existing co-morbidities and medication" (*Id.* at 39).

to the heat—Shriver suffered from mental illness, hypertension, hepatitis C and asthma, while Robles suffered from mood and anxiety disorder. (Doc. No. 305-5 at 14.) But, as Plaintiffs point out, McCollum also suffered from preexisting medical conditions that made him sensitive to heat. Furthermore, Shriver and Robles died in the housing areas of their transfer facilities, in the middle of the night, when temperatures were coolest—circumstances that mirror McCollum's death. (Doc. Nos. 305-15 at 46, 57; 305-5 at 13-14.)  Thus, a reasonable jury could find that, far from being "extremely unique," these deaths not only put Livingston on notice of the dangerous nature of the heat in TDCJ facilities generally, but also of the dangerous set of circumstances that ultimately led to McCollum's death.[15]

However, heat-related deaths are not the only occurrences that demonstrate Livingston's awareness of the dangerous conditions in TDCJ facilities.  Plaintiffs demonstrate that Livingston was aware that a number of TDCJ employees suffered heat-related illnesses and injuries during the summers. (Doc. Nos. 305-15 at 26, Deposition of Brad Livingston, "I know we track any and all workers' compensation claims to include illness or injuries related to heat, and that there would be—there would be a number"; 302-11 at 50, EAC Executive Summary for Fiscal Year 2011, summarizing the number of employee and offender injuries for 2011 as compared to 2010, and indicating that, in August 2011, the number of employee injuries caused by weather was 37, while the number of offender injuries caused by 'contact with temperature extremes' was 72.) Furthermore, evidence shows that Livingston was aware of the importance of acclimatizing to extreme temperatures. (Doc. No. 305-15 at 57, Deposition of Brad Livingston, "Q:[Y]ou've

---

[15] Livingston states that at the time of McCollum's death, he did not know about the eight heat-related deaths that occurred before he was the Executive Director of TDCJ. (Doc. No. 305-15 at 38.) Plaintiffs argue that his failure to know of these deaths demonstrates deliberate indifference because it is willfully blind to a substantial risk of harm. (Doc. No. 297 at 92.) The Court need not reach this contention, however, as the Court finds that a reasonable jury could find Livingston deliberately indifferent even without considering the deaths prior to 2007.

known prior to 2007, let's say, that inmates who are vulnerable to heat stress are particularly vulnerable during periods of acclimating to the higher temperatures, correct? A: In the absence of mitigation efforts, correct.")

Finally, even without the evidence presented by Plaintiffs, a reasonable jury could find that Livingston was aware of the risk of substantial harm because it was obvious. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Ball v. LeBlanc*, 792 F.3d at 594. A jury could consider the extreme temperatures that regularly occur during Texas summers, as well as the heat wave that swept Texas the summer of 2011, the plaintiff's obesity, hypertension, and other medical conditions, and could conclude that the risk of harm was obvious. Indeed, in *Ball v. LeBlanc*, the District Court considered un-air-conditioned housing on Louisiana's death row and found that even without evidence of *any* heat related illnesses or deaths, prison officials were deliberately indifferent because of the obviousness of the risks. 988 F. Supp. 2d 639, 673 (M.D. La. 2013), *aff'd in part, vacated in part, remanded*, 792 F.3d 584 (5th Cir. 2015); *see also Gates v. Cook*, 376 F.3d 323, 335 (5th Cir. 2004).

In addition to presenting evidence that Livingston knew of the risk of substantial harm as a result of extreme heat in TDCJ prisons, Plaintiffs must also present credible evidence that Livingston disregarded this risk. Livingston argues that he did not disregard any risk because he implemented adequate heat mitigation measures, as contained in three documents before the Court. (Doc. No. 288 at 24, 90.) According to Livingston, he thought the procedures outlined in these documents were being implemented and were effective. (*Id.*, "Livingston believed the measures put in place by the TDCJ would reasonably and sufficiently protect all of the inmates in the care of the TDCJ.") However, Plaintiffs present evidence that the measures outlined in the

three documents were not sufficient and, moreover, were not implemented in Hutchins. Before delving into each side's assertions, it is necessary to review the three documents addressing extreme temperatures in TDCJ.

First is Administrative Directive 10.64, signed by Brad Livingston, with the subject "Temperature Extremes in the TDCJ Workplace." (Doc. No. 288-10 at 15.) This document outlines the procedures that TDCJ wardens, supervisors and guards should follow when "TDCJ offenders are…required to work in conditions of extreme cold or extreme heat." (*Id.* at 15.) The document states that "[d]uring work assignments, offenders shall be exposed to no more than three or four hours at a time, until acclimated to existing weather conditions." (*Id.* at 16, 19.) It mandates that workers be provided access to drinking water at all times during periods of extreme heat. (*Id.*) Further, the document describes symptoms of heat stroke, heat cramps, and heat exhaustion, with guidance for how to treat these ailments. (*Id.* at 19-21.) While this document indicates that Livingston was aware of the potential for heat-related illnesses, and the importance of acclimatizing to extreme temperatures, it is of little import with regard to mitigation measures in this case. McCollum was not working when he suffered from heat stroke, but was in his bunk in the housing area. In fact, Defendants produce no evidence that McCollum ever worked while he was at Hutchins. Thus, the measures outlined in this document did not apply to him.

The next document cited by Defendants is the Correctional Managed Health Care Policy Manual. Again, this document appears to be focused on the potential for heat stress while offenders are working, stating that "[e]very reasonable effort shall be made in the interest of preventing heat-related injuries in the workplace." (Doc. No. 285-1 at 170.) It is not clear if the measures outlined in the document were ever applied to McCollum, since he did not work at

Hutchins. But the document is relevant to the extent that it shows an awareness of the danger of heat related illness. The manual states that "heat stroke is a medical emergency…the onset is often sudden." (*Id.* at 171.) The document also lists the types of medications that cause "fluid depletion, interfere with sweating or interfere with the body's thermoregulatory system." (*Id.* at 171, 175.) Finally, the manual reviews the importance of acclimatization, work-rest cycle and fluid intake for staff and offenders working in temperatures over 90°F. The manual also includes a table for calculating the heat index (also called "apparent air temperature") based on the temperature and relative humidity. (*Id.* at 174.)

The final document—the only one to specifically address extreme heat in housing areas—is an email, sent at the beginning of every summer, titled "Heat Precaution."[16] (*Id.* at 178.) The email was the result of an annual meeting consisting of representatives from several departments within the TDCJ, with the goal of reviewing TDCJ's existing protocols and discussing ways to improve them. (Doc. No. 288 at 27.) The 2011 email listed 24 heat mitigation measures. Nine of these measures were specific to transporting offenders during extreme heat, and two were specific to offenders in work environments. The rest related to housing areas, as follows:

- Ensure employees and offenders are aware of the signs and treatment for heat related illnesses by conducting training.
- Provide additional water; ice should be provided, if available to employees and offenders in work and housing areas, and shall be coordinated with maintenance and laundry and food service.

---

[16] There is considerable debate about whether this email can be considered to be a policy. Defendants call it an "email directive" that "constitutes an order given by the TDCJ administration to all units and staff." (Doc. No. 288 at 28.) Plaintiffs, on the other hand, contend that the email was never adopted as a formal policy in the TDCJ policy manual, in contrast to the first document described, "Temperature Extremes in the TDCJ Workplace." (Doc. No. 297 at 95-96.) The Plaintiffs have demonstrated a genuine fact issue regarding whether or not the email constituted a policy. However, assuming *arguendo* that the email is a policy, the Court still finds that the measures outlined in the email were inadequate and were insufficiently followed.

- When using fans, air should be drawn through the structure and exhausted outside. Take full advantage of the fresh air exchange system or prevailing winds to assist in the movement of air as applicable.
- Increase air flow by using blowers, normally used to move hot air in the winter, when appropriate. Attach ribbons to vents to ensure blowers are used appropriately. Ensure all needed maintenance to blowers has been completed.
- Allow additional showers for offenders when feasible.
- Allow offenders to wear shorts in dayrooms and recreational areas.
- Wardens are encouraged to coordinate with their food service and maintenance departments to ensure ice-machines are working properly.
- Make sure window screens are clean so as not to restrict air flow.
- Remember, offender fans should not be confiscated due to property restriction during this time. Fans shall be confiscated only if they are altered.
- Fans shall be allowed to all custody levels…
- All offenders shall be permitted to purchase a fan if they do not have one.
- Ensure the fan program is in place allowing the permanent issue of a fan to an offender who has been indigent for the previous six months, on a first come first serve basis. Offenders who have significant medical needs, based on a condition or medication that is negatively impacted by the heat, shall be given priority. (Doc. No. 285-1 at 178.)

Because Hutchins had sealed windows and no electrical outlets, the last five measures could not be carried out at Hutchins. Furthermore, although Livingston asserts that this annual email was an official policy and was a direct order to subordinates, the wording of the policy allows for a wide range of behavior. For example, contrary to Livingston's contentions, the policy does not mandate that facilities provide ice water multiple times a day, but only that additional water be provided, and that it be iced "*if available*." (Doc. Nos. 288 at 62; 285-1 at 178 (emphasis added.)) Nor does it require that offenders be given "unlimited access to showers." (Doc. No. 288 at 62.) Instead, the policy states that facilities allow additional showers "*when feasible.*" (Doc. No. 285-1 at 178.)

Livingston strenuously argues that he delegated the review and management of TDCJ's heat mitigation protocols to subordinates. Although he was kept apprised of these measures, "prior to 2011 he had never seen cause to question their appropriateness, sufficiency, or efficacy." (Doc. No. 288 at 32.) Livingston testified that the protocols in place in 2011 "worked

systematically before 2011." (Doc. No. 305-15 at 25.) But these statements are belied by the fact that, in 2009, Livingston was made aware of the two 2007 heat-related deaths in the housing areas of a transfer facility. A review of the heat precaution email that was sent before the deaths in 2007 reveals that, substantively, the policies were exactly the same in 2007 as they were in 2011.[17] Thus, Livingston had knowledge that, even with the heat mitigation measures in place in TDCJ facilities, two individuals died of heat-related illness. Despite having the authority to add mitigation measures that would more adequately protect the men and women incarcerated in TCJ facilities, Livingston failed to do so.

Furthermore, Livingston attributes the ten deaths in the summer of 2011 to an "unprecedented and unpredicted heat wave,"[18] asserting that "the agency's past mitigation efforts without air conditioning had been very effective." (Doc. Nos. 288 at 75; 305-15 at 21, "it was a record-heat event, a record-heat summer with…prolonged high temperatures. So both the duration and intensity of the heat was greater than had been the case in prior summers or subsequent summers.") Ignoring the ten heat-related deaths that occurred before 2011—including five deaths in the summer of 1998—and the two deaths that occurred after 2011, the fact of an unprecedented heat wave does nothing to lessen Livingston's culpability. The heat wave started several weeks before McCollum's death, with Dallas experiencing temperatures exceeding 100°F for 30 of the 31 days in July, 2011.[19] In that time, Livingston could have done

---

[17] There were only two substantive changes to the policy from 2007 to 2011: the addition of "when feasible" to "allow additional showers for offenders," and the addition of "wardens are encouraged to coordinate with their food service and maintenance departments to ensure ice-machines are working properly." (Compare Doc. No. 301-4 at 3 to Doc. No. 301-4 at 18.)

[18] The Court notes that Defendants' own expert, John Nielsen-Gammon, writes, "In the part of Texas that includes the Hutchins Unit, the heat of 2011 was remarkably unusual." (Doc. No. 288-24 at 30.)

[19] National Centers for Environmental Information, National Oceanic and Atmospheric Administration, National Overview – July 2011, https://www.ncdc.noaa.gov/sotc/

many things to assess whether the mitigation measures in place since 1999 would suffice in an unprecedented heat wave: he could have convened emergency meetings and working groups with his directors to discuss the situation, made emergency purchases of fans or portable coolers, implemented new mitigation protocols or at least ensured that those in place were being stringently adhered to in the facilities. Yet Livingston did none of these things. Based on the evidence presented by Plaintiffs, a reasonable jury could conclude that Livingston ignored a substantial risk of harm caused by the inadequate mitigation measures proliferated by TDCJ. Accordingly, there is a genuine question of fact as to Livingston's deliberate indifference to the conditions of confinement in TDCJ facilities, including Hutchins Unit.

**Robert Eason**—Defendant Robert Eason was one of six TDCJ Regional Directors in 2011. He was the director of Region II, and in this role supervised 11 wardens and 13 facilities, including Hutchins. Eason is Warden Pringle's direct supervisor, and manages a regional budget of $30 million. (Doc. No. 305-14 at 31.) Plaintiffs have presented evidence that Eason had the authority to change policies that Warden Pringle implemented in Hutchins. (*Id.* at 30, "Q: What if Warden Pringle or one of the 11 wardens is—believes that his officers are doing everything fine, but they're not? I mean, would you be the person that would say, "Hey, you got to change this"…how would that situation get fixed? A: It would be me.") More specifically, Eason acknowledges that if "the wardens aren't taking all the steps necessary to mitigate extreme heat," it would have been Director Eason's responsibility to step in and "correct the issue." (*Id.* at 39.)

Among his many duties, Eason regularly visits the facilities within his region. (*Id.* at 32.) Eason testified that, when he visits the facilities in his region in the summer, he goes into the housing areas to review the mitigation steps that are in place. (*Id.* at 40.) Thus, Eason would have

national/201107.

known that Hutchins personnel could not fully implement the mitigation protocols listed in the email directive because its windows were sealed shut and it had no electrical outlets for fans. Furthermore, Eason testified that there were problems with the ice machines at Hutchins in the summer of 2011, so Eason shipped ice to Hutchins from an icehouse. (*Id.* at 41-42.) It is unclear how much ice was shipped, and whether Eason ensured that it was enough to distribute to all of the housing areas. As discussed above, Plaintiffs have presented a genuine dispute as to the temperature of the water that was distributed in the housing areas.

Eason was also aware that the summers in Texas get hot, and that "if we don't take these [mitigation] steps, it's possible that offenders could become ill and it's possible staff could become ill." (*Id.* at 44.) A reasonable jury could infer from these facts that Eason was on notice that Hutchins Unit did not adhere to many of the protocols listed in the annual heat precaution email, despite the extremely hot temperatures in the unit, creating a substantial risk of harm to those incarcerated there. In the alternative, Eason's knowledge of the substantial risk of harm may be inferred by the obviousness of the risk to McCollum and the other men incarcerated in Hutchins. *See Ball v. LeBlanc*, 988 F. Supp. 2d 639, 673 (M.D. La. 2013), aff'd in part, vacated in part, remanded, 792 F.3d 584 (5th Cir. 2015); *see also Gates v. Cook*, 376 F.3d 323, 335 (5th Cir. 2004).

Despite this knowledge, Eason did nothing to remedy the problems at Hutchins. Indeed, Eason testified that "to my knowledge, all the wardens in my region and across the state are following that directive.…" (Doc. No. 305-14 at 38.) Furthermore, he stated that, including the summer of 2011, TDCJ did a "wonderful job" mitigating the heat in their facilities and had "very little problems with heat-related illnesses." (*Id.* at 60.) Based on this evidence, a reasonable jury could conclude that Eason disregarded a substantial risk of harm at the units under his

supervision, and was therefore deliberately indifferent.

**Jeffrey Pringle**—Jeffrey Pringle was the Warden of Hutchins in 2011. As the "highest-ranking administrator," Pringle was responsible for making the security decisions for the facility and for ensuring the safety of the offenders and staff. (Doc. No. 305-16 at 31.) Plaintiffs have presented evidence that Pringle was aware of the extremely high heat index in the days before McCollum's death—reaching "149°+" on July 19, 2011—because the heat index was announced over the prison radio. (Doc. Nos. 300-17 at 42; 305-16 at 52; 305-17 at 66.) These temperatures, according to the "Heat and Humidity Matrix" disseminated by TDCJ in Administrative Directive 10.64, indicate that heat stroke is "imminent."[20]

Additionally, Pringle knew that the windows in the offender housing units did not open, and that the air handlers used for ventilation had no cooling effect. (Doc. No. 305-16 at 47-48.) He was also aware that the men incarcerated in Hutchins could not use personal fans, but testified that personal fans would not have helped to cool them off, because it would "just be blowing more hot air on people." (*Id.* at 47.) To this end, Pringle recognized that the large fans mounted on the walls in the housing areas had the same effect. (*Id.* at 47.) Thus, Pringle knew that, because of the design of Hutchins, the facility could not comply with several of the protocols listed in the heat precaution email.

Plaintiffs have also presented evidence that the water brought to McCollum's dormitory was not iced, as it should have been according to TDCJ's heat mitigation policies. Pringle argues that he was not deliberately indifferent because "the record is devoid of any indication that any offender (including McCollum) or staff member brought [this] to the attention of . . . Pringle." (Doc. No. 288 at 94.) But Pringle's own testimony creates a fact issue as to whether he was

---

[20] *See* note 12.

aware that the water was not iced. Pringle testified that he did not know if ice was placed into the jugs of water brought to the dormitories during the week that McCollum was incarcerated at Hutchins. (Doc. No. 305-16 at 19.) He stated that he would not dispute inmates' claims that the water was not iced, but asserted that this did not mean they were failing to protect vulnerable individuals from the heat. (*Id.* at 20.)

Even if the water provided in the jugs was iced, Pringle knew that individuals were not issued cups upon arrival at Hutchins, and that they would not have access to commissary in order to buy one for 30-45 days. (*Id.* at 42, 44.) Based on these facts, a reasonable jury could infer that Pringle was aware of the substantial risk of harm in Hutchins Unit. Alternatively, the Court concludes that a reasonable jury could infer Pringle's knowledge based on the obviousness of the risk to McCollum and the other men incarcerated at Hutchins. *Ball v. LeBlanc*, 988 F. Supp. 2d at 673; *see also Gates v. Cook*, 376 F.3d at 335.

Pringle took no additional steps to try to mitigate the heat, in spite of his knowledge of the extreme heat, his opinion that the fans in the dormitories had no cooling effect, and Hutchins' failures to conform to several of TDCJ's heat mitigation measures. He did not provide air-conditioned respite spaces for inmates, despite the availability of air-conditioned spaces at Hutchins. (Doc. No. 305-16 at 58.) In addition, Pringle testified that he did not provide more ice water to the housing areas because he thought it was impossible to get ice beyond what the facility was capable of producing. (*Id.* at 22.) But Pringle's testimony conflicts with that of Eason, who testified that he was shipping ice to Hutchins from an icehouse because Hutchins' icemakers were not functioning. (Doc. No. 305-14 at 41-42.) Thus, there is a disputed fact issue regarding Pringle's ability to access ice beyond what his facility was producing. Pringle also stated that he did not see any problem with the fact that newly arrived inmates did not have

access to cups with which to drink the water provided in the jugs. (Doc. No. 305-16 at 44, 59.) Based on these facts, a reasonable jury could infer that Pringle ignored a substantial risk of harm to the men incarcerated at Hutchins, and as such was deliberately indifferent.

### iii. Livingston, Eason and Pringle Are Not Entitled to Qualified Immunity

Despite holding that a reasonable jury could find that Livingston, Eason and Pringle were deliberately indifferent, Defendants may still be entitled to summary judgment if their actions were objectively reasonable in light of the clearly established law at the time of McCollum's death.

The most relevant case defining the scope of Eighth Amendment protections against extreme heat is *Gates v. Cook*,  376 F.3d 323 (5th Cir. 2004). In *Gates*, death row inmates brought suit against officials of the Mississippi Department of Corrections. *Id.* at 327. The plaintiffs raised numerous complaints regarding the conditions of confinement, including high temperatures. *Id.* Specifically, the district court found,

> [t]he summer temperatures in the Mississippi Delta average in the nineties with high humidity, and Death Row is primarily not an air-conditioned facility. There are industrial type fans in the hallways to help with air circulation, and most inmates have smaller fans. Relief from the heat can be obtained by keeping the windows open in the cell using fans. But keeping the windows open increases the mosquito population in the cells since there are holes in the cell window screens and the screen gauge is not sufficient to keep mosquitoes out. *Id.* at 334.

The court found that, because of the insufficient window screens, the plaintiffs "often must choose between opening the window for relief from the heat or closing the window for protection from mosquitoes." *Id.* at 340. Furthermore, the court found that while the probability of heat-related illness was extreme for all individuals confined on Mississippi's death row, it was especially so for people on medications that interfere with the body's ability to thermoregulate. *Id.* As a result, the district court ordered that the defendants ensure that all cell windows were

34

equipped with a window screen to keep the insects out, and that when the heat index reached 90°F or above, "the defendants will insure that each cell is equipped with a fan, that ice water is available to each inmate, and that each inmate may take one shower during each day." *Id.* at 336.

On appeal, the Fifth Circuit affirmed the district court's finding that the probability of heat-related illness was extreme and that the defendants were deliberately indifferent to this risk. *Id.* at 340. Although the defendants argued that the lower court's findings were erroneous because no one on death row had ever suffered any serious heat-related illness, the Court held that the plaintiffs did not need to show that death or serious injury had occurred in order to show that the conditions posed a substantial risk of harm, and that they had done so. *Id.* at 339. Accordingly, the Fifth Circuit upheld the relief mandated by the district court—that plaintiffs have cell windows that they could open, and that they have access to fans, ice water, and one shower per day. *Id.* at 340.

Defendants contend that they are entitled to qualified immunity because they enacted all of the remedies mandated in *Gates*, as well as others, and therefore their behavior was reasonable in light of the clearly established law. (Doc. No. 288 at 52.) At the heart of Defendants' claim is that, at the time *Gates* was decided, the remedies affirmed in *Gates* were the only ones required by law to mitigate extreme heat in any prison. Under this rigid interpretation, *Gates* would signify that, no matter what the circumstances, if a prison provides access to open windows, ice water, personal fans and one shower a day, there can be no constitutional violation. It seems clear that this cannot be a reasonable interpretation of *Gates*. As is evidenced by the fact-specific nature of the remedy in *Gates*, different weather conditions require different mitigating measures to adequately protect the confined individuals and the correctional officers. For example, while the average temperatures in Mississippi considered in *Gates* were in the mid-nineties,

temperatures in Dallas exceeded 100°F for 30 out of 31 days in July, 2011. *Gates* at 334; National Centers for Environmental Information, National Oceanic and Atmospheric Administration, National Overview – July 2011, https://www.ncdc.noaa.gov/sotc/ national/201107. And while the plaintiffs in *Gates* did not present evidence of past heat-related illnesses, Plaintiffs in this case present evidence of over ten prior heat-related deaths, including at least two deaths in 2007 that occurred after TDCJ implemented the policies that were in place when McCollum died—policies that Defendants contend are in compliance with *Gates*. Thus, *Gates* stands for the proposition that, in the face of extreme heat, prison officials must fashion adequate mitigating measures.

Several subsequent Fifth Circuit cases interpreting *Gates* support this conclusion. Although cases decided after 2011 do not contribute to the "clearly established law" in place at the time of McCollum's death, they do provide guidance as to how the Fifth Circuit has interpreted the holding of *Gates*.

For example, in *Ball v. LeBlanc*, an Eighth Amendment case stemming from the extreme heat faced by individuals confined on Louisiana's death row, the Fifth Circuit listed many potential remedies beyond those affirmed in *Gates*, explaining that "[t]hese are precisely the types of remedies this court endorsed in *Gates v. Cook*…." 792 F.3d 584, 599 (5th Cir. 2015). Thus, the Fifth Circuit in *Ball* did not interpret *Gates* as holding that only those remedies affirmed in *Gates* were the ones mandated to mitigate extreme heat. Instead, the Fifth Circuit read *Gates* as holding that extreme heat constitutes an Eighth Amendment violation, and as a result the prisons must develop remedial measures that adequately mitigate the heat.

In *Hinojosa v. Livingston*, a wrongful death lawsuit brought by the family of a TDCJ inmate who died from hyperthermia in 2012, the Fifth Circuit wrote that "[o]ur precedent clearly

establishes that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." 807 F.3d 657, 669 (5th Cir. 2015) (unpublished) (citing *Gates*, 376 F.3d at 339–40; *Blackmon v. Garza*, 484 F. App'x 866, 869 (5th Cir. 2012); and *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977)). The court found that the plaintiff in *Hinojosa* had alleged facts that, if true, "put Defendants on notice that they were 'overseeing a system that violated the Constitution.'" *Id.* at 669 (citing *Taylor v. Barkes*, 135 S.Ct. 2042 (2015)).

Finally, Defendants echo an argument made by the defendants in *Webb v. Livingston*, an appeal from a deferral on the defendants' qualified immunity in lawsuits stemming from the deaths of five other men in TDCJ in the summer of 2011. 618 F. App'x 201 (5th Cir. 2015) (per curiam) (unpublished). There, the defendants (including Livingston) argued that the clearly established law of this Circuit held that "subjecting inmates to extreme temperatures without remedial measures is unconstitutional." *Id.* at 209, n. 7. Because they had some remedial measures in place, the defendants contended, they were not in violation of the clearly established law. The Fifth Circuit disagreed, finding "no case law that so narrowly defines the boundaries of the clearly established law," and instead holding that "a prisoner's right to be free from extreme temperatures was clearly established" at the time of Webb's death. *Id.* at 209. The Fifth Circuit noted that the defendants were confusing right with remedy—while the remedy for extreme heat is the implementation of adequate mitigation measures, the measures prescribed by the court in *Gates* did not themselves become part of the right. Furthermore, the Fifth Circuit held that, even if the defendants' interpretation of *Gates* was correct, it was not enough to show that they had implemented mitigation measures, "as such measures must be adequate." *Id.* The Court concluded that the facts alleged by the plaintiffs—facts almost identical to the evidence

presented in this case—"demonstrate that Appellants violated the decedents' clearly established Eighth Amendment right to be free from extreme heat" and as such could overcome the appellants' qualified immunity defense. *Id.*

Here, Defendants argue more specifically that the clearly established law in 2011 required that prisons institute the exact remedial measures affirmed in *Gates*. For the reasons described above, this is an overly narrow interpretation of *Gates*, and one that has been rejected repeatedly by the Fifth Circuit.

However, the Court need not rest the denial of qualified immunity on its interpretation of *Gates*. Even assuming *arguendo* that Defendants' interpretation of *Gates* is correct, they are still not entitled to qualified immunity. Defendants contend that they implemented all of the remedial measures required by *Gates*, as well as additional measures not required by *Gates*. Yet there are significant differences between the conditions in Hutchins and the remedies required in *Gates*.[21] For example, the ventilation is different—in *Gates*, ventilation was provided by open windows, while in Hutchins the windows were sealed, requiring an air handler to ventilate the dorms. The district court in *Gates* found that relief from the heat could be provided by placing a fan in front of an open window. *Gates*, 376 F.3d at 334. But here, evidence shows that air handlers provide no cooling effect, and simply blow hot air. (Doc. No. 305-16 at 48.)

Furthermore, the prisoners in *Gates* were allowed personal fans in their cells, while the prisoners in Hutchins had no access to personal fans. Although Defendants assert that the three

---

[21] In *Blackmon v. Garza*, the Fifth Circuit considered, and reversed, a grant of summary judgment for defendants in a case presenting very similar facts to this one. 484 F. App'x 866, 871–72 (5th Cir. 2012)(unpublished). Like Hutchins Unit, the Unit where Blackmon was confined had an air handler instead of open windows, industrial fans instead of personal fans, and there were fact questions regarding the provision of water to the dorms. In reversing the district court's grant of summary judgment, the Court held that "despite the existence of some parallels between the remedial measures in place in the instant case and those required in Gates, the conditions in Gates were not identical to those in Blackmon's dorm." *Id.*

industrial fans in McCollum's dorm were the functional equivalent to the personal fans mandated in *Gates*, Defendants have provided no evidence that these fans provide a detectable cooling effect to each of the 58 men confined in the C-7 dorm. Indeed, in *Ball v. Leblanc*, the Fifth Circuit found that the arrangement of one large industrial fan for every two death row cells was distinct enough from the remedy prescribed in *Gates* to support a finding of deliberate indifference. *Ball v. LeBlanc*, 792 at 595–96 (5th Cir. 2015). In the C-7 dorm, by contrast, each fan had to cool approximately 19 inmates—a far cry from the personal fans mandated in *Gates*.

Finally, evidence presented by Plaintiffs, including the testimony of inmates incarcerated in the C-7 dorm at the same time as McCollum and the temperature records for the water provided on July 12, 2011, raises questions regarding whether prison officials provided iced or even cool water in sufficient amounts. And, although TDCJ also implemented other remedial measures, such as allowing inmates to wear shorts in housing areas and lowering the water temperature in the showers, they present no evidence that these measures made up for the distinctions between the *Gates* measures and the conditions of confinement at Hutchins. Furthermore, there is a question regarding whether the lower temperatures of the showers—95°F instead of 107°F—had any cooling effect. *See Ball v. LeBlanc*, 792 F.3d at 596 (finding that shower temperatures ranging from 100-120°F "provid[ed] little relief from the heat.")

Thus, despite some attempts by TDCJ to implement the remedies from *Gates*, there are material differences between the conditions in *Gates* and those in Hutchins. Furthermore, there are fact questions regarding the provision of iced or cool water to McCollum's dorm in the days leading up to his death. Accordingly, the Court holds that, even under Defendants' interpretation of *Gates*, Livingston, Eason and Pringle implemented policies that were unconstitutionally inadequate in light of clearly established law.

39

The Court concludes that a reasonable jury could find Defendants deliberately indifferent to the substantial risk of harm faced by McCollum, and that Defendants actions were unreasonable in light of clearly established law at the time. Defendants' motion for summary judgment with regard to Plaintiffs' Eighth Amendment conditions of confinement claim is therefore denied.

### B.  8th Amendment Access to Healthcare Claim

Next, Plaintiffs assert that Defendants Livingston, Eason, Pringle, Clark, Tate and Sanders violated McCollum's Eighth Amendment right to access to healthcare by delaying treatment for almost an hour after he was discovered convulsing. (Doc. No. 119 at 32-33.)

In 1976, the Supreme Court established the state's obligation to provide medical care for those incarcerated in its prisons. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976) "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death….In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* Accordingly, the Supreme Court held that a doctor or correctional officer's deliberate indifference to serious medical needs of prisoners violated the Eighth Amendment and stated a cause of action under § 1983. *Id.*

A prison inmate can demonstrate this violation by showing that a prison official "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001). "The mere delay of medical care can also constitute an

Eighth Amendment violation but only 'if there has been deliberate indifference [that] results in substantial harm.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (citing Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir.1993)). Because Plaintiffs plead delay of healthcare, they must show genuine disputes regarding not only whether there was an unconstitutional delay, but also whether there was deliberate indifference, on the part of each defendant, that led to substantial harm. Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable under the circumstances presented in the case. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 408 (5th Cir.2007).

> ### i.   Evidence Establishes A Genuine Question of Fact Regarding Whether Livingston, Eason, Pringle, Clark, Tate and Sanders Violated McCollum's Constitutional Right to Healthcare

The evidence reveals that McCollum was discovered convulsing and unresponsive in his bunk sometime between 2:00 a.m. and 2:10 a.m. on July 22, 2011. (Doc. No. 288-6 at 16.) Despite Defendants Tate and Sanders' subjective awareness that this was a serious situation, an ambulance was not called until 3:04 a.m., approximately an hour after McCollum was discovered. (*Id.* at 28, Affidavit of Sanders, admitting that a seizure is a "serious medical event"; Doc. No. 305-17 at 101, Deposition of Tate, stating that McCollum was "in a little distress" when she arrived at the scene.) EMS made contact with McCollum at 3:23 a.m. (Doc. No. 300-11 at 111.) By the time McCollum arrived at Parkland Hospital, his body temperature was 109.4°F. (Doc. No. 300-4 at 21.) Although Clark, Tate and Sanders all testified that they subjectively believed McCollum was suffering a seizure, he was in fact suffering from heatstroke. (Doc. No. 288-6 at 16, 21, 28.)

Plaintiffs' expert, Dr. Susi Vassallo, an M.D. and an expert on thermoregulation, asserts

that "[h]eat stroke is a true medical emergency. When a patient begins to suffer a heat stroke, they must immediately receive medical treatment or they are put at increased risk of death or serious injury." (Doc. No. 300-11 at 110.) Documents distributed by TDCJ and UTMB are consistent with this assertion. In the Correctional Managed Health Care Policy Manual, heat stroke is defined as a "medical emergency." Furthermore, the manual explains that "the onset is often sudden," and has "few premonitory signs." (Doc. No. 285-1 at 171.) TDCJ's Administrative Directive 10.64 explains that one of the symptoms of heat stroke is "increased body temperatures, which if uncontrolled may lead to…convulsions and even death. Medical care is urgently needed." (*Id.* at 185.) A memo sent to TDCJ, TTUHSC and UTMB employees from the Director of Clinical Administration for TDCJ Health Services Division on May 12, 2011, states that "During the summer months, the incident of Heat Related Illnesses rise dramatically.…It is imperative that supervisors are able to recognize the symptoms of heat related illness and respond to the danger signals." (*Id.* at 194.) A "training circular" distributed by TDCJ's Office of Risk Management in May 2010 emphasizes that "[r]ecognition and prompt treatment of [heat-related illnesses] are imperative." (Doc. No. 301-5 at 39.) With regard to heat stroke, the circular states that "[c]oma, paralysis and death can follow if emergency treatment is not immediately given…Always transfer heat stroke victims to a medical facility." (*Id.* at 40.) Finally, all TDCJ employees were required to carry "pocket cards" that list the different types of heat-related illnesses, their signs, symptoms and treatment. (Doc. Nos. 285-1 at 178; 288-15 at 763.) As to heat stroke, the card reads, "EMERGENCY! Death is imminent."

Yet, when Clark, Tate and Sanders found McCollum convulsing and unresponsive in the middle of a heat wave, they failed to call an ambulance for almost an hour. There appear to be three main policies and practices that explain this delay. First, in 2011 Texas suffered a budget

shortfall, and state agencies were required to make budget reductions. (Doc. No. 288 at 24.) As part of these reductions, TDCJ cut the clinic hours in Hutchins, meaning that, after 6:30 p.m., there were no trained medical providers on site. (Doc. Nos. 288-38 at 108; 305-13 at 107.) Because there would be stretches of time with no medical providers on site, TDCJ and UTMB put in place a policy whereby "[i]n the event of a potential emergency situation during times when Health Services staff are not on-site, the ranking Security officer on the facility contacts the nurse on-call to advise of the situation. Depending on the severity of the injury/illness, the nurse on-call may…advise Security to contact UTMB EMS Dispatch." (Doc. No. 288-34 at 29.)

This policy makes reference to the second problematic practice, whereby only ranking officers are able to contact the off-site nurse and, by extension, EMS. This policy is also referred to as "Incident Command System" ("ICS"). ICS required that officers follow a chain of command when they discovered a potential medical emergency. As explained by Rick Thaler, the Director of the Correctional Institutions Division of TDCJ in 2011, ICS dictates that, upon discovering a medical emergency, an officer's "first contact would be their supervisor as they initiate our emergency incident response process." (Doc. No. 305-17 at 138.) Defendant Eason also testified, "[o]ur process is when we have any type of situation on a unit, whether it's a medical issue from an offender, a staff member, a disturbance, any—any type of issue on the unit, we use the ICS protocol." (Doc. No. 305-14 at 27.) Although there does not appear to be any written policy disallowing correctional officers from calling 911 before their supervisors arrive, the practice is further evidenced by an email sent in 2013, establishing for the first time that "[i]f ICS is initiated and the on scene commander is a correctional officer, they will be empowered…to call 911 via radio if medical is off-site." (Doc. No. 305-11 at 11.)

The final practice implicated in the hour-long delay in medical treatment for McCollum

is the failure to treat seizures as medical emergencies.[22] All three TDCJ employees who saw McCollum on July 22, 2011, testified that they subjectively believed he was suffering from a seizure, not heat stroke. If these employees treated seizures as a medical emergency, however, this mistaken notion could have been discovered by medical personnel, and the proper treatment could have commenced. Indeed, when Defendant Sanders finally called the off-site medical provider at 2:50 a.m., over forty minutes after McCollum was found convulsing, the nurse looked at McCollum's medical records, discovered that he had no history of seizing, and accordingly informed Sanders to call 911. (Doc. No. 305-17 at 30.) But, because of a policy or practice in place at Hutchins, and potentially throughout TDCJ, Sanders and Tate did not think that seizures were medical emergencies requiring treatment. And because they were not medically-trained personnel, they could not discern that the symptoms they thought were a result of a seizure were actually the result of heat stroke.[23]

Thus, a reasonable jury could conclude that the policies and practices in place at the time of McCollum's death, combined with the actions of the TDCJ employees on duty on July 22,

---

[22] There is ample evidence that TDCJ did not treat seizures as medical emergencies. Warden Pringle testified that he did not consider "a person going through convulsions, seizing, nonresponsive and unable to communicate, the type of situation where an ambulance needs to be called." (Doc. No. 305-16 at 33.) Furthermore, in 2013, an email to UTMB employees stated, [i]f the Medical Department is closed on a Unit and the Security staff has a patient exhibiting one of the life threatening conditions below, they have been given the direction from the Regional Director to send the offender 911 to a local hospital." (Doc. No. 305-11 at 11.) One of those life threatening conditions is seizures. The response from one UTMB employee is, "This is a broad, sweeping change." *Id.* Furthermore, testimony from the Defendants on the scene reinforces this policy. For example, Defendant Tate testified, "[t]hough a seizure is certainly not a condition that I would take lightly, I do not recall a seizure where immediate emergency care was ordered." (Doc. No. 288-6 at 22.)

[23] This practice is all the more troubling in light of an autopsy report conducted by UTMB on Anselmo Lopez, who died of heat stroke in a TDCJ facility in 1999. The autopsy concludes that Lopez "died following an episode of seizure—probably related to hyperthermia." The autopsy explains that "One of the metabolic causes of seizures is hyperthermia which can occur with environmental heat exposure . . . " (Doc. No. 299-1 at 6.)

2011, led to an unconstitutional delay in the treatment of McCollum's heat stroke.

> ### ii. Evidence Establishes A Genuine Question of Fact Regarding Whether Livingston, Eason, Pringle, Clark, Tate and Sanders Were Deliberately Indifferent

In order to succeed on a claim of *delay* of medical care, it is not enough to show unconstitutional delay. Plaintiffs must also show deliberate indifference, on the part of each defendant, that resulted in substantial harm. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir.1993)).

The parties dispute the impact that the hour-long delay had on McCollum's prospects for survival. Plaintiffs' expert, Dr. Vassallo, contends that McCollum died of heat stroke in part because "officers ignored his life-threatening heat stroke, and delayed life-saving treatment or transport to a hospital for more than an hour." (Doc. No. 300-11 at 110.) Documents distributed by TDCJ and UTMB support the contention that emergency treatment for heat stroke is imperative. (Doc. No. 301-5 at 40, TDCJ Office of Risk Management Circular, stating that "[c]oma, paralysis and death can follow if emergency treatment is not immediately given;" Doc. No. 288-15 at 763, pocket cards carried by TDCJ employees that read, as to heat stroke, "EMERGENCY! Death is imminent.")

But Defendants' expert, Dr. Benjamin Leeah, the Northern Regional Medical Director for the Texas Tech University Health Sciences Center, states that by the time McCollum began convulsing, "[t]he time for realistic intervention had passed," and that "[i]f there was a delay in calling an ambulance, it did not make a difference." (Doc. No. 288-6 at 43.) Plaintiffs and Defendants have submitted contradicting expert reports. This is a classic question for the jury, and is inappropriate for the Court to decide. *Dossey v. Becton Dickinson & Co.*, No. 7-01-CV-026-R, 2001 WL 1636440, at *3 (N.D. Tex. Dec. 18, 2001). Therefore, the Court concludes that

there is a genuine issue of material fact as to the question of whether the hour-long delay in calling the ambulance caused substantial harm to McCollum.

**Richard Clark**—Correctional Officer Richard Clark was the first TDCJ employee to be aware of McCollum's condition. He was conducting count in the C building sometime after 2:00 a.m. on July 22, 2011 when an offender informed him that McCollum was shaking. (Doc. No. 288-6 at 16.) Clark thought that McCollum was suffering a seizure. *Id.* He immediately ran to the picket to call for a supervisor, and then returned to McCollum's bedside to monitor him while his supervisor was on the way. (*Id.* at 17.) Sergeant Tate arrived "within a few minutes," and shortly after that another emergency situation occurred in a different building, and Sgt. Tate ordered Clark to respond to that situation. (*Id.*) Clark had no further involvement with McCollum.

Plaintiffs argue that Clark was deliberately indifferent because he should have called 911 immediately upon finding McCollum convulsing in his bunk. (Doc. No. 297 at 51.) But, as described above, undisputed evidence reveals that the Incident Command System in place at the time of McCollum's heat stroke disallowed correctional officers from calling 911. The Hutchins Unit Facility Process Manual in place in 2011 states that "[i]n the event of a potential emergency situation during times when Health Services staff are not on-site, the ranking Security officer on the facility contacts the nurse on-call. Depending on the severity of the injury/illness, the nurse on-call may…advise Security to contact UTMB EMS Dispatch." (Doc. No. 288-34 at 29.) Clark was not the ranking security officer at Hutchins that night, and as such could not have contacted the nurse on-call or 911.

The testimony of TDCJ officials confirms this policy. Regional Director Eason testified that "[i]f the on-duty lieutenant or the sergeant…think[s] it's an emergency, then there's an option there to call 911. That's a…call that the lieutenant and sergeant make." Furthermore, in

2013, this protocol was changed to allow correctional officers to call 911 via radio if the medical staff is off-site. (Doc. No. 305-11 at 11.)

Evidence is presented that Clark could have informed his supervisor that EMS was necessary if there was a delay in his supervisor arriving at the scene. (Doc. No. 305-14 at 138, Deposition of Rick Thaler, Director of the Correctional Institutions Division of TDCJ in 2011, "[the correctional officer's] first contact would be their supervisor as they initiate our emergency incident response process.…That supervisor should immediately go to there. If for some reason there is delay, that correctional officer surely has the opportunity to inform that supervisor by radio, we need 911 . . . . ") However, it is undisputed that Clark's supervisor, Sgt. Tate, came immediately after Clark called for assistance, creating no delay that should have prompted Clark to call for EMS. And once Tate arrived, Clark left the scene, and as such was not present when the majority of the delay in treatment occurred. In hindsight, McCollum might have survived if Clark had broken protocol and the chain of command by calling for an ambulance, as the present policy allows correctional officers to do. But the Court finds that no reasonable jury could conclude that Clark was deliberately indifferent to McCollum's medical needs by failing to do so. As a result, Clark's motion for summary judgment is granted and he is dismissed.

**Karen Tate**—When Sergeant Karen Tate arrived on the scene less than five minutes after Clark called for a supervisor, she states that she thought that McCollum was suffering from a seizure. (Doc. No. 288-6 at 21.) She noticed that McCollum's skin was flushed and hot to the touch. (*Id*; Doc. No. 305-17 at 102.) In an effort to bring McCollum back to consciousness, she got a wet cloth and applied it to his neck and placed several drops of water on his lips. (Doc. No. 288-6 at 21-22.) At some point after Tate arrived, McCollum stopped shaking but still did not return to consciousness, as Tate expected he would. (*Id.* at 22.) During this time, Tate kept her

47

supervisor, Sanders, apprised of the situation. *Id.* However, Sanders did not arrive at the scene until 2:40 a.m., approximately 30 minutes after McCollum was discovered by Clark, and approximately 25 minutes after Tate reported to the scene.

Defendants write in their motion that "at the time of the incident, procedures promulgated by the medical department instructed officers to contact off-site medical personnel who would make the determination whether or not to call 911." (Doc. No. 324 at 25.) However, Tate concedes that "[i]n certain situations where the need for emergency medical attention is obvious, a Sergeant could possibly inform a superior of the situation and initiate the procedure to call 911." (Doc. No. 288-6 at 23.)

Thus, under the policies in place in 2011, Tate could have called off-site medical or 911 when presented with McCollum's condition. But Tate did neither. Despite conceding that McCollum was "in a little distress" when she arrived at the scene, and that she was "not medically—medically trained as far as the severity of the need," she did not call off-site medical, nor did she initiate the procedure to call 911. (Doc. No. 305-17 at 101.) If she had called the off-site medical staff, as she was authorized to do, they would have told her that McCollum had no history of seizures and to call 911 immediately, as they did when Sanders eventually called. This would have prevented Tate's misdiagnosis of McCollum's condition, as well as a significant portion of the delay in treatment that occurred.

However, Tate contends that her failure to call 911 or off-site medical is not deliberately indifferent because she thought McCollum was suffering from a seizure, and Tate "cannot recall an instance when the on-call medical staff advised a TDCJ officer to immediately call an ambulance simply because an offender is having a seizure." (Doc. No. 288-6 at 22.) Assuming, *arguendo*, that Tate believed McCollum was suffering a seizure, this belief is irrelevant. Tate's

statement that she cannot recall an instance when on-call medical staff advised an officer to call an ambulance when an offender was having a seizure is premised on the assumption that on-call medical was contacted within a reasonable time. Here, it was not. Furthermore, even if Tate believed initially that McCollum was having a seizure, Tate knew that McCollum needed medical care after the seizure ended and McCollum did not regain consciousness. (Doc. No. 305-17 at 89, Deposition of Tate, "Q: If they remained unresponsive, would you take them to [the Department of Medical Services]? A: Yes, and notify them by phone immediately.") Yet she still failed to call off-site medical or 911.

Furthermore, even though Tate asserts that she believed McCollum was having a seizure, there are disputes as to Tate's credibility that the Court cannot resolve. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002). Although "the court should give credence to…evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses," *Reeves*, 530 U.S. at 151, the Court finds that Tate is an interested witness and that her testimony is contradicted by facts presented by Plaintiffs. For example, Tate was aware that there was no air conditioning in the prison and that the summers in Texas were hot. She had received training on the symptoms and risks of heat stroke, which included "convulsing" and "hot and dry skin." (Doc. Nos. 285-1 at 185; 301-5 at 44.) Tate testified that McCollum was convulsing and that his skin was flushed and hot to the touch. Shortly after she arrived, McCollum stopped convulsing but did not regain consciousness, which was contrary to Tate's experiences with seizures. (Doc. No. 288-6 at 22.) Moreover, as Plaintiffs note, the actions that Tate took—applying a wet cloth to McCollum's neck and sprinkling water on his

49

lips—are consistent with the advice given on the pocket card that all TDCJ employees were required to carry. (Doc. Nos. 297 at 50; 301-5 at 44, instructing officers to "sprinkle water on them" if a person is suffering from a heat illness.) Thus, because Tate is an interested witness and contrary evidence has been presented, the question of whether or not Tate subjectively believed that McCollum was suffering a seizure must be decided by a jury. If a jury finds that Tate should have known that McCollum was suffering heatstroke, her failure to call medical services will not be excused by the informal TDCJ policy treating seizures as non-emergencies.

A reasonable jury could also infer from the evidence described above that the risk that McCollum was suffering a heat stroke was obvious, given the circumstances and Tate's training. *See, e.g., Blackmon v. Garza*, 484 F. App'x 866, 873 (5th Cir. 2012) (unpublished) ("[T]he evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners. The training highlighted the particular risks to prisoners such as Blackmon—an older inmate taking medications with a diuretic effect. Thus, the obvious nature of the risks to Blackmon would further support a jury finding that Defendants were deliberately indifferent to the risks to Blackmon's health."). Because there are questions of fact as to Tate's subjective belief as well as the obviousness of the risk, summary judgment is inappropriate.

**Sandrea Sanders**—When Officer Clark called for a supervisor shortly after 2:00 a.m., Lieutenant Sandrea Sanders was finishing count in another building, so she sent Sgt. Tate. (Doc. No. 288-6 at 27.) Tate kept Sanders informed of what was going on, and when McCollum failed to respond after the convulsing stopped, Sanders became concerned and went to assess McCollum at approximately 2:40 a.m. (*Id.* at 28.) Sanders does not have any medical training. (Doc. No. 305-17 at 7.) Sanders called off-site medical staff at 2:50 a.m., and they informed her

that she should call EMS. (Doc. Nos. 302-11 at 6; 305-17 at 29.) The call to EMS was placed at 3:04 a.m., roughly an hour after Sanders received the initial report that McCollum was convulsing and unresponsive. (Doc. No. 302-11 at 6.)

Sanders states that she followed unit protocol by contacting the off-site medical provider "to determine the appropriate course of action." (Doc. No. 288-6 at 28.) But in fact, Sanders determined on her own a course of action before she contacted off-site medical providers. Only when McCollum failed to regain consciousness a significant time after his convulsions ended did Sanders contact off-site medical providers for guidance—approximately 40 minutes after she was informed that McCollum was convulsing and unresponsive. This is contrary to the policy in place at the time, which clearly stated that "[i]n the event of a potential emergency situation during times when Health Services staff are not on-site, the ranking Security officer on the facility contacts the nurse on-call. Depending on the severity of the injury/illness, the nurse on-call may…advise Security to contact UTMB EMS Dispatch." (Doc. No. 288-34 at 29.) Although the Court has discussed the problematic delays that this policy can cause when a non-ranking Security officer discovers an inmate in distress, Sanders was the ranking Security officer, and had the authority to call the nurse on-call. Yet she failed to do so for 40 minutes, while two medically untrained officers tended to McCollum.

While Sanders concedes that seizures are "serious medical event[s]," she asserts that she had "never been instructed that 911 should be called each time a seizure occurs." (Doc. No. 288-6 at 28.) This argument fails for the same reason that Tate's similar argument fails—it assumes that Sanders called off-site medical to get instructions on how to handle the seizure, which she did not. Furthermore, a reasonable jury could find that seizures qualify as a "potential emergency situation" under the unit policy. (Doc. No. 288-34 at 29.) Yet Sanders testified that "[w]e dealt

with [seizures] on such a large scale basis, that we would wait for it to resolve itself" before

contacting medical. (Doc. No. 305-17 at 7.) She continued:

> Sometimes an offender has a seizure. As long as he's in a secure area, he's safe—
> let's say he's in his bunk, you know, and we're alerted that we have this offender
> here [is] having a seizure, we would go down to the building and monitor what
> was going on. Once he finishes seizing, we're watching to see if he's breathing. A
> lot of times, you know, people don't respond after—after having a seizure, and we
> would leave an officer there with that offender so that when they came out of, you
> know, the aftermath of the seizure, then we can talk with them and everything.
> (*Id.* at 6.)

Sanders testified that only if the offender wasn't breathing or didn't respond after

the seizure would she call medical staff. (*Id.* at 6.) Not only does Sanders' treatment of seizures

ignore their serious and harmful nature,[24] it also ignores the possibility, as occurred in this case,

that what looks like a seizure is in fact heat stroke or another potentially deadly condition.[25]

Indeed, in 2013, TDCJ changed its policy to allow TDCJ employees to directly call 911, instead

of first calling off-site medical staff, if an offender is having a seizure and the medical

department is closed. (Doc. No. 305-11 at 11.)

Importantly, Sanders testified that the seizures she saw "would usually last a few

minutes." (Doc. No. 305-17 at 7.) When McCollum's convulsing and unresponsiveness lasted

longer than a few minutes, Sanders should have known that this was not a seizure or that there

were complications that needed emergency treatment. At that point, she should have contacted

---

[24] The Court takes judicial notice that a condition called 'status epilepticus' can occur "when a
seizure lasts too long or when seizures occur close together and the person doesn't recover
between seizures." Epilepsy Foundation, http://www.epilepsy.com/learn/impact/seizure-
emergencies/status-epilepticus. Both 'convulsive status epilepticus' and 'nonconvulsive status
epilepticus' are life threatening and require "emergency treatment by trained medical personnel
in a hospital setting." *Id.*

[25] Although Sanders' statements may be reasonable for offenders who suffer from epilepsy, the
only way that Sanders would know if the offender suffered from epilepsy would be to contact
off-site medical, as the protocol instructed her to do. Furthermore, because of the potential for
epileptics to suffer from 'status epilepticus,' *see* note 24, the failure to contact medical staff
when an epileptic suffers a seizure might still constitute deliberate indifference.

the off-site medical providers or called 911, instead of waiting over thirty minutes before doing so.

Assuming that a jury finds that Sanders subjectively believed McCollum was suffering a seizure,[26] her failure to follow the protocol and call off-site medical providers for approximately 40 minutes caused a substantial delay in the treatment of McCollum, and a reasonable jury could find that Sanders was deliberately indifferent to the risk this delay would cause. However, for the same reasons described with regard to Tate, a reasonable jury could discredit Sanders' statements that heat stroke did not occur to her, or could infer from the evidence that Sanders was deliberately indifferent to the risk that McCollum was suffering from heat stroke. Because several factual issues remain, Sanders' motion for summary judgment is denied.

**Jeffrey Pringle**—Warden Jeffrey Pringle argues that Plaintiffs' access to healthcare claim against him must fail because it is a failure to train and supervise claim, which carries with it a high burden. (Doc. No. 288 at 95.) Although Plaintiffs do assert that Pringle "failed to adequately train and supervise Clark, Tate and Sanders," they also assert liability against Pringle under two theories that are not failure to train or supervise claims. (Doc. No. 119 at 33.) First, they claim that Pringle "knew about and ratified the decision to delay prisoners' access to medical care." (*Id.* at 32.) Plaintiffs also claim that Pringle "knew about and effectively ratified an informal TDCJ policy of failing to provide immediate medical attention to non-responsive prisoners suffering seizures at prisons where there was no available medical staff." (*Id.*) Thus, these two claims seek to hold Pringle liable for his own action in promulgating, and failing to correct, policies that delayed McCollum's access to healthcare. *See Hinojosa v. Livingston*, 807 F.3d 657, 668 (5th Cir. 2015) ("The complaint does not seek to hold Defendants vicariously

---

[26] The Court notes that as with Defendant Tate, Sanders' testimony that she subjectively believed McCollum was suffering a seizure cannot be credited, as it comes from an interested witness.

liable for the actions of their subordinates. Rather, it seeks to hold them liable for their own actions in promulgating—and failing to correct—intake and housing policies that exposed Hinojosa and other inmates like him to extreme temperatures without adequate remedial measures."). Furthermore, with regard to Plaintiffs' supervisory liability claim, the Fifth Circuit has found that failing to institute adequate policies, despite knowing the risk of not doing so, "could support the imposition of supervisory liability." *Webb v. Livingston*, 618 F. App'x 201, 208 (5th Cir. 2015) (per curiam) (unpublished).

The evidence reveals that Pringle was aware that, in the summer of 2011, Hutchins did not have medical staff on-site at night. (Doc. No. 305-16 at 49.) TDCJ's training academy lists seizures as a life-threatening condition. (Doc. No. 305-14 at 143.) Despite these facts, Pringle testified that, if a correctional officer came upon someone who needed "immediate medical attention," they would not call an ambulance, but would instead call their shift supervisor. (Doc. No. 305-16 at 32.) This is exactly what occurred on the night that McCollum suffered heat stroke. Pringle further testified that, if an incarcerated person was "going through convulsions, seizing, nonresponsive and unable to communicate," he would not see this as the type of situation where an ambulance needs to be called. (*Id.* at 33.) Indeed, Clark, Tate and Sanders all stated that "seizures are common in the correctional setting" and that, when a seizure occurred when medical staff was not on-site, "their practice is to monitor the offender suffering the seizure…[t]hen, they will contact offsite medical for further instructions." (Doc. No. 288 at 95.) Based on the statements of the officers and the testimony of Pringle, a reasonable jury can conclude that Pringle was aware that failing to immediately call 911 when there is no medical staff on-site and an offender is "convuls[ing], seizing, nonresponsive and unable to communicate" would create a substantial risk of harm.

Furthermore, a reasonable jury could find that, despite having the power, as the highest-ranking administrator for security at Hutchins, to make "all the security decisions for the facility and the safety of the offenders and staff," Pringle's failure to ensure that offenders suffering emergency medical conditions received prompt emergency medical treatment constituted deliberate indifference. (Doc. No. 305-16 at 31.) Indeed, even after McCollum died as a result of heat stroke, Pringle testified that he was not critical of the policies that led to the delay in calling 911. (*Id.* at 5-6.) As a result, Pringle's motion for summary judgment is denied.

**Robert Eason**—Regional Director Eason also asserts that Plaintiffs' Eighth Amendment access to healthcare claim against him must be dismissed because it is a failure to train and supervise claim. For the reasons explained above, this argument fails.

Fact questions exist as to Defendant Eason's knowledge of the risk of not treating seizures as emergency medical situations. Plaintiffs present evidence that TDCJ's training academy lists seizures as a life-threatening condition, and Eason testified that for a life-threatening condition, in the absence of medical staff, "the only appropriate response is to contact 911." (Doc. No. 305-14 at 143.) Eason also acknowledged that heat stroke is a "true medical emergency" that requires "immediate steps to be taken to get that person hospitalized." (*Id.* at 83.) Furthermore, Eason conceded that he would not expect correctional officers to be able to diagnose particular medical conditions, nor does he expect them to be able to provide medical care for seizures. (*Id.* at 49, 83.) Based on the evidence presented, a reasonable jury could conclude that Eason knew of a substantial risk of misdiagnosis and improper treatment of seizures at Hutchins Unit.

Yet, despite this knowledge, Eason failed to correct the policy at Hutchins of not treating seizures as medical emergencies. Eason was Pringle's supervisor, and had the power and

responsibility of correcting any problematic policies that Pringle put in place at Hutchins. (*Id.* at 30.) Indeed, when the policy of not treating seizures as medical emergencies was subsequently corrected, it was done so at the behest of a Regional Director. (Doc. No. 305-11 at 11-16.) Not only did Eason fail to correct this policy in 2011, he testified that the officers who saw McCollum convulsing and unresponsive did nothing wrong when they delayed calling for an ambulance for almost an hour. (Doc. No. 305-14 at 114.) In fact, Eason testified that seizures are common occurrences in the correctional setting. "They occur all the time…Every facility I've worked on have a lot of offenders that have seizures, and at some point they'll come out of that seizure and we take them to medical." (*Id.* at 22.) Based on the evidence presented, a reasonable jury could conclude that Eason was deliberately indifferent to the serious risk faced by the men incarcerated at Hutchins. As such, summary judgment for Eason is denied.

**Brad Livingston**—Director Livingston argues that he is entitled to summary judgment because the Eighth Amendment does not require 24-hour on-site medical care. (Doc. No. 288 at 69.) While this may be, this is not what Plaintiffs allege was unconstitutional. Plaintiffs allege that the combination of the following three policies led to an unconstitutional Eighth Amendment violation: 1) failing to provide 24-hour medical care, 2) an informal policy and practice of not immediately calling 911 when medical emergencies occur and medical staff is not on site, and 3) not treating seizures as medical emergencies. The evidence discussed above creates fact questions as to the existence of all three policies, in Hutchins Unit and in all TDCJ facilities.

As to Livingston, evidence reveals that, in 2011, Texas suffered a budget shortfall, and state agencies, including TDCJ, were directed to reduce their budgets. (Doc. No. 288-38 at 107.) The Health Services Division of TDCJ, in conjunction with UTMB and TTUHSC, reduced clinic

hours at certain facilities, which meant that, after 6:30 p.m., Hutchins did not have a trained medical provider on-site. (*Id.* at 108; 305-13 at 107.) Although it is unclear what role Livingston played in these decisions, he was certainly aware of the policy.

Furthermore, Livingston testified that TDCJ's Health Services Division "put in place a process whereby a staff on a given unit . . . if they had a medical emergency at a time where the clinic was not open, there was specifically delineated policies and procedures for staff to take . . ." (Doc. No. 288-38 at 109.) Thus, Livingston was aware of the need to have a policy allowing offenders access to medical care when medical staff was off site. Yet other evidence reveals that the policy in place the summer of 2011 required a correctional officer to report up the chain of command, even when he thought an individual required immediate medical assistance. As demonstrated in McCollum's case, this policy created untenable delays in getting potentially lifesaving medical treatment to the men and women in TDCJ's custody, and in 2013 was changed to empower correctional officers to immediately call 911 if an offender was seizing on a unit and medical staff was not on-site. (Doc. No. 305-11 at 11.)

Plaintiffs have not presented evidence tending to show that Livingston was aware that seizures were not being treated as medical emergencies in TDCJ facilities. Based on the seemingly widespread practice of not treating seizures as emergencies, it seems likely that Livingston was aware of this practice.[27] However, even if Livingston was not aware of this

---

[27] All three correctional officers at Hutchins, as well as Warden Pringle, concede that seizures were common and were not treated as medical emergencies. (Doc. No. 288 at 95, "Both the supervisory defendants and the unit level defendants testified that seizures are common in the correctional setting…The officers also testified that, when a seizure occurs afterhours, their practice is to monitor the offender suffering the seizure to ensure his safety and to ensure that his airway, breathing and circulation remain intact. *Then, they will contact offsite medical staff for further instructions*.") Regional Director Eason, who oversees 13 facilities and worked in various facilities before he was Regional Director, testified that "Every facility I've worked on have a lot of offenders that have seizures, and at some point they'll come out of that seizure and we take

practice, a jury could still find him aware of a substantial risk of harm as a result of the delayed access to emergency medical treatment caused by the first two policies. This is because ICS prohibited correctional officers from calling any medically trained individuals—whether 911 or off-site medical staff—regardless of the condition of the offender.

Although Livingston understandably delegated many tasks to his staff, he concedes that as the Executive Director of TDCJ, he has the authority to devise and enact policies relating to the functioning of TDCJ. (Doc. No. 305-15 at 51.) Livingston knew that most of the housing areas in TDCJ were not air-conditioned, and that they could become hot in the summer months. Furthermore, Livingston was aware of at least two prior deaths from hyperthermia caused by heatstroke, as well as the importance of "recognizing the symptoms of heatstroke and/or heat illness and delivering access to Health care." (*Id.* at 58.) Some of the symptoms of heat stroke, as described in TDCJ's Administrative Directive 10.64, are "increased body temperatures, which if uncontrolled may lead to…convulsions and even death." (Doc. No. 285-1 at 185.) Other TDCJ materials emphasize that "[r]ecognition and prompt treatment of [heat-related illnesses] are imperative…[c]oma, paralysis and death can follow if emergency treatment is not immediately given…Always transfer heat stroke victims to a medical facility." (Doc. No. 301-5 at 39.)

It is undisputed that, when McCollum was found, his skin was hot to the touch and he was convulsing. Yet, because there was no medical staff at Hutchins and the policy in TDCJ for handling medical emergencies led to long delays in access to treatment, McCollum suffered for over an hour before he was seen by a medically trained individual. Livingston was in a position of power to change the unconstitutional combination of these policies, yet he failed to take any

them to medical." (Doc. No. 305-14 at 22.)

action. As such, a jury could find that Livingston was deliberately indifferent to a denial of McCollum's Eighth Amendment right to access to healthcare.

### iii. Livingston, Eason, Pringle, Sanders & Tate Are Not Entitled to Qualified Immunity

It is well established that the Eighth Amendment "impos[es] a duty on prison officials to 'ensure that inmates receive adequate . . . medical care.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an unnecessary and wanton infliction of pain. "The mere delay of medical care can also constitute an Eighth Amendment violation but only 'if there has been deliberate indifference [that] results in substantial harm.'" *Id.* (quoting *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir.1993)).

Defendants Pringle and Eason argue that they are entitled to qualified immunity because "no clearly established law prior to McCollum's death established that officers must call 911 anytime an inmate suffers a seizure." (Doc. No. 288 at 79.) Likewise, Defendant Livingston asserts that he is entitled to qualified immunity because "no law required 24 hour medical care." (*Id.* at 69.) Yet both of these statements take an overly narrow view of Plaintiffs' claims. Plaintiffs do not argue that the policy of failing to call 911 any time an offender suffered a seizure was, on its own, unconstitutional. Nor do they argue that the policy of failing to have 24-hour on-site medical care was per se unconstitutional. Thus, they need not point to clearly established law holding such. As discussed above, Plaintiffs argue that the combination of these policies, in addition to the extreme heat in Texas prisons and the practice of not treating seizures as serious medical events, led to the unconstitutional delay in treatment in McCollum's case.

Livingston, Eason and Pringle were on notice of this delay in medical care, yet they instituted and promulgated policies and practices that denied McCollum the emergency treatment so desperately needed for heatstroke. Given the serious consequences of heatstroke, reasonable officials would not have put these policies and practices in place.

Defendants Tate and Sanders argue that they are entitled to qualified immunity "where the law was not clearly established that security staff who believe an inmate is suffering a serious—but not emergent—condition that most often does not require emergency medical care violated the Eighth Amendment by not immediately calling 911." (*Id.* at 79.) Not only do Defendants read the Eighth Amendment right to medical care too narrowly, they also misread Plaintiffs' complaint. Although Plaintiffs certainly believe that 911 should have been called sooner, Plaintiffs' main issue with Defendants' conduct was their failure to contact *any* medically trained individual, knowing that McCollum was convulsing and unresponsive. Even if the practice of not contacting medical staff for seizures is excused, it still does not explain why Tate and Sanders waited for 40 minutes before contacting the off-site medical staff, given their knowledge that seizures typically last for only a few minutes. If Defendants had contacted the off-site medical staff, they would have been instructed to call 911 immediately.[28] Their failure to do so led to a substantial delay in McCollum's access to emergency medical treatment. And given the indisputably serious consequences of heatstroke, and even considering the potentially

---

[28] The Court acknowledges the tension between the theories of liability for the responding officers and the higher-level supervisors. On the one hand, Plaintiffs present evidence that, if Tate and Sanders had called off-site medical, as the written policy indicates they should have, McCollum would not have suffered such a delay in medical care. On the other hand, Plaintiffs present evidence that the policy of not allowing correctional officers to call off-site medical or 911, and the informal policy of not treating seizures as medical emergencies, also caused the delay. Because Plaintiffs have presented evidence as to both theories of liability, it is not for the Court to determine whether the theories can coexist or, if not, which of the two is correct. This is a task for the jury.

grave consequences of uncontrolled seizures, Defendants' substantial delay was unreasonable and a violation of clearly established law.

### C. Punitive Damages

Finally, Defendants argue that Plaintiffs' punitive damages claim should be dismissed because Plaintiffs cannot show that Defendants' actions involved "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, L.Ed.2d 632 (1983). In response, Plaintiffs argue that the evidence precluding dismissal regarding Defendants' deliberate indifference also precludes dismissal of their punitive damages claim. Indeed, several Circuits have held that a finding of deliberate indifference in a §1983 claim supports an award of punitive damages because "[t]he callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the §1983 claim." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987); *see also Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir. 1992); *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205 (1st Cir.1987); *Walsh v. Mellas,* 837 F.2d 789, 801 (7th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988).

Plaintiffs cite *Lamb v. Mendoza*, 478 Fed. Appx. 854 (5th Cir. 2012), in arguing that the Fifth Circuit "appears to have reached the same conclusion" as these other Circuits. In *Lamb*, the plaintiff-appellant asserted that, because the jury found that the defendants were deliberately indifferent, the trial court should have presented the issue of punitive damages to the jury. *Id.* at 857. Without addressing the standard for punitive damages, the Fifth Circuit found that, because the jury found no proximate cause, which meant that the plaintiff-appellant was not entitled to any damages, there was no error in failing to instruct the jury on punitive damages. *Id.* Thus, the Fifth Circuit did not have to reach the plaintiff-appellant's argument, and as such this case cannot

be interpreted as indicating the Fifth Circuit's concurrence with the other Circuits.

However, even if the Fifth Circuit were to find that the standards of deliberate indifference and reckless indifference were not the same, the two standards are certainly similar. Given this similarity, the Court cannot say that the substantial evidence presented by Plaintiffs with regard to Defendants' deliberate indifference would not suffice to show the reckless indifference required for punitive damages.

## IV.    Americans with Disabilities Act and Rehabilitation Act Claim

Plaintiffs' third and final claim is that UTMB and TDCJ, as governmental agencies, violated McCollum's rights under the American with Disabilities Act and the Rehabilitation Act. (Doc. No. 119 at 30.) Plaintiffs seek damages and injunctive relief. Title II of the ADA, which governs access to "Public Services," states in part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). The Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The ADA states that "[t]he remedies, procedures and rights" available under the Rehabilitation Act are also accessible under the ADA. *Delano-Pyle v. Victoria County, Tex.,* 302 F.3d 567, 574 (5th Cir.2002) (quoting 42 U.S.C. § 12133). The Fifth Circuit has recognized that "[j]urisprudence interpreting either section is applicable to both," *Hainze v. Richards,* 207 F.3d 795, 799 (5th Cir.2000) and that "[t]he RA and the ADA are judged under the same legal

standards, and the same remedies are available under both Acts." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).

The Supreme Court has held that Title II of the ADA applies to state prison facilities and state prison services. *See Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (noting that state prisons "fall squarely within the statutory definition of 'public entity' " because the ADA, 42 U.S.C. § 12131(1)(B), defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government"). The Supreme Court has also recognized that, "insofar as Title II creates a private cause of action against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia,* 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) (emphasis in original). The RA applies to recipients of federal funding. *Delano-Pyle*, 302 F.3d at 574. Furthermore, when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA. *Id.* at 574–75.

A claim under Title II of the ADA requires a plaintiff to show that: (1) he is a qualified individual with a disability within the meaning of the ADA; (2) he was excluded from participation or denied meaningful access to services, programs, and activities, or that he was otherwise discriminated against by the defendants; and (3) such exclusion, denial of benefits, or discrimination is by reason of his disability. *See Lightbourn v. County of El Paso, Tex.,* 118 F.3d 421, 428 (5th Cir.1997). A plaintiff must show intentional discrimination in order to recover compensatory damages under the ADA and RA. *Delano-Pyle*, 302 F.3d at 574.

### A.  Plaintiffs' Standing to Demand Injunctive Relief

Pursuant to the ADA and RA, Plaintiffs request injunctive and declaratory relief in addition to monetary damages and attorney's fees. (Doc. No. 119 at 4, 34-35.) TDCJ argues that Plaintiffs lack standing to seek injunctive relief, because they cannot show a likelihood of future harm. (Doc. No. 288 at 129-130.) The three requirements that constitute the irreducible constitutional minimum of standing in federal courts are "injury in fact, causation, and redressability." *United States v. Holy Land Foundation for Relief and Development*, 445 F.3d 771, 779–80 (5th Cir. 2006); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In order to establish the redressability prong of standing, plaintiffs seeking injunctive relief must demonstrate that they are likely to suffer future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Defendants argue that because Plaintiffs—McCollum's children and wife, suing as individuals and on behalf of McCollum's estate—are not incarcerated in a TDCJ facility, "the TDCJ cannot cause the Plaintiffs any alleged harm in the future." (Doc. No. 288 at 129.) If McCollum were alive, he would be able to bring the ADA claim on his own behalf, so Defendants' argument necessarily rests on the fact that McCollum is dead. Thus, because Defendants' alleged discriminatory conduct led to McCollum's death, Plaintiffs cannot show any risk of future harm, and cannot move for injunctive relief.[29] As callous as this logic is, the result appears to be mandated by the future harm requirement established in *Lyons*. *See Blake v.*

---

[29] Although Defendants' argument is not stated as bluntly as that of the defendants in *Blake v. Southcoast Health System, Inc.*, the logic is identical. In that case, the parents of Betty Ann Blake sued the defendants under Title III of the ADA for injunctive relief after the defendants' discrimination allegedly led to Betty Ann's death. Defendants argued that "[i]n order to have standing to sue for an injunction, Betty Ann must be able to show a risk of future harm. Because Betty Ann is dead—strangled to death—she is at no risk of future harm. Therefore, the Estate has no standing to sue under Title III of the ADA." *Blake v. Southcoast Health Sys., Inc.*, 145 F. Supp. 2d 126, 131 (D. Mass. 2001).

*Southcoast Health Sys., Inc.*, 145 F. Supp. 2d 126, 132 (D. Mass. 2001) ("Under the *Lyons* standing standard, the fact that the defendants' discriminatory malpractice killed Betty Ann seemingly leads to the inevitable conclusion that the Estate cannot show any risk of future harm"); *see also Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997) (holding that the plaintiff's estate lacked standing for injunctive relief under the ADA because the plaintiff had died, and the claim did not survive his death because there was no longer a risk of future harm).

The Court notes, with disquiet, that this result "allows the most egregious cases of institutional disability discrimination in violation of the ADA to continue unabated." *Blake*, 145 F. Supp. 2d at 132. However, because McCollum's death means that TDCJ and UTMB can no longer harm him, Plaintiffs do not have standing to sue for an injunction.  Plaintiffs also bring claims for compensatory damages and attorney's fees under the ADA. Those claims remain.

### B. Evidence Creates a Fact Question as to McCollum's Status as a Qualified Individual

UTMB and TDCJ both contend that McCollum cannot present a genuine issue as to his qualification as a disabled individual under the ADA. (Doc. Nos. 285 at 27; 288 at 117.) The ADA requires that an individual suffer "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C.A. § 12102(1)(A). Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at (2).  The operation of a major bodily function, such as the functions of the immune system, digestive, bowel, bladder, respiratory, circulatory, and reproductive functions, is also considered to be a life activity. *Id.*

Because the alleged discrimination occurred after the effective date of the ADA Amendments Act of 2008 ("ADAAA"), the amended ADA applies. Pub.L. No. 110–325, 122 Stat. 3553 (2008); *see also Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F.Supp.2d 528, 538 (S.D.Tex. 2011). The ADAAA, among other things, broadened the standard for qualifying as disabled. See Pub.L. No. 110–325, 122 Stat. 3553 § 2 (2008). The regulations issued under the ADAAA state: "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. 1630.2(j).

Plaintiffs assert that McCollum was disabled because he was morbidly obese, suffered from and was treated for hypertension, and had diabetes and clinical depression. (Doc. No. 297 at 31-32.) Defendants do not dispute that McCollum was morbidly obese and had hypertension.

McCollum was 5'10" and weighed 330 pounds, with a body mass index of 49.5. (Doc. No. 300-4 at 21.) Plaintiffs submit affidavits from McCollum's daughter and an inmate whose bunk was close to McCollum's stating that McCollum's obesity limited his ability to walk short distances, stand, climb and bend over. (Doc. No. 300-10 at 314-20.)

Plaintiffs also argue that McCollum's hypertension, by definition, affected the functioning of his circulatory system, and made him more susceptible to heat-related illness. Furthermore, the medication prescribed by UTMB for McCollum's hypertension, hydrochlorothiazide, was known by UTMB to be a diuretic, to impede the body's ability to thermoregulate, and as such to increase the risk of heat-related illness. Although UTMB contends that McCollum did not take the medication while he was incarcerated, a fact question remains as to whether this is true.

66

Plaintiffs also contend that McCollum was diabetic, although UTMB and TDCJ firmly dispute this contention. On his intake triage form, McCollum stated that he had a history of diabetes. However, he was not being treated for diabetes at the McClennan County Jail, before he was transferred to Hutchins. Bloodwork conducted on McCollum before his death revealed a blood sugar level of 6.2 percent. Defendants show that the American Diabetes Association states that levels of 6.5% or above are necessary for a diabetes diagnosis, while levels between 5.7% and 6.4% indicate only an increased risk of diabetes. (Doc. No. 285 at 30.) However, Plaintiff's expert states that "based on his reported personal medical history, morbid obesity and lab results," McCollum was more likely than not diabetic. (Doc. No. 300-11 at 110-11.) Thus, there is a genuine issue of fact regarding McCollum's diabetes. If a jury did find that McCollum suffered from diabetes, that jury could also conclude that "diabetes substantially limits endocrine function" and is a qualifying disability. 29 C.F.R. § 1630.2(j)(3)(iii).

Finally, Plaintiffs argue that summary judgment must be denied because McCollum suffered from depression. Although not raised in Plaintiffs' live complaint, TDCJ's expert stated that "it is apparent from the records available that [McCollum] was suffering from major depressive disorder," and concluded that McCollum "died of heat stroke due to his depression" because the depression "blunted his survival instincts" such that he did not take advantage of TDCJ's mitigation measures. (Doc. No. 288-6 at 44-45.) Thus, in their response to UTMB and TDCJ's motions to dismiss, Plaintiffs allege that McCollum suffered from depression, as well as obesity, hypertension, and diabetes. (Doc. No. 297 at 106.) Depression can qualify as a disability under the ADA. *Palacios v. Cont'l Airlines, Inc.*, No. CIV.A. H-11-3085, 2013 WL 499866, at *4 (S.D. Tex. Feb. 11, 2013). UTMB asserts that Plaintiffs cannot raise McCollum's depression as a basis on which to avoid summary judgment because they failed to previously plead it. (Doc.

No. 315 at 7-8.) But McCollum's depression is not a new claim. It is simply another factual basis upon which to find that McCollum was a qualified individual. Furthermore, even without considering McCollum's potential depression, a fact question exists as to whether or not McCollum was a qualified individual under the ADA.

In addition to the evidence that each of McCollum's conditions substantially limited certain aspects of his life, Plaintiffs assert that each of the conditions, alone or in concert, substantially impaired McCollum's major life activity of thermoregulation—the body's ability to maintain a temperature of 98.6°F. (Doc. No. 297 at 106-107.) UTMB and TDCJ do not dispute that thermoregulation is a major life activity. The Fifth Circuit has not held that thermoregulation is a major life activity, but simply assumed *arguendo* that it is. *Ball v. LeBlanc*, 792 F.3d at 597. In light of the broadened standards for qualifying as disabled under the ADA amendments and the facts of this case, this Court finds that thermoregulation is a major life activity, given the evidence that McCollum's inability to thermoregulate led to his death.

UTMB and TDCJ argue that "no evidence exists demonstrating McCollum's ability to thermoregulate was actually impaired making him susceptible to heat stroke." (Doc. Nos. 285 at 33; 288 at 114.) Both Defendants cite *Ball v. LeBlanc*, in which the Fifth Circuit found that the plaintiff's ADA claims failed because there was "no evidence that the prisoners' ailments have ever caused their body temperatures to rise above 98.6° F." *Ball v. LeBlanc*, 792 F.3d at 597. But this argument is directly countered by the very fact of McCollum's death from hyperthermia—a condition caused by the body's inability to cool itself—and the evidence that his body temperature soared to 109.4°F. (Doc. No. 300-4 at 21.) According to the autopsy, McCollum "may have been further predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension." (*Id*.) Thus, Plaintiffs have

68

demonstrated a genuine issue regarding whether McCollum's conditions substantially impacted his ability to thermoregulate.

However, even if thermoregulation were not considered to be a major life activity, Plaintiffs present evidence that McCollum's other major life activities, such as his ability to walk, climb, or bend, were impaired by his conditions. This evidence suffices to preclude summary judgment as to McCollum's status as a qualified individual, at least as to UTMB.

TDCJ argues that it was not aware of McCollum's health conditions beyond his obesity, because UTMB does not communicate the medical conditions of offenders with TDCJ employees. (Doc. No. 324 at 30.) However, UTMB contends that its main accommodations for individuals with medical conditions—"restrictions based on housing, work, disciplinary process, transportation, and individual treatment plan requirements"—cannot be made until the intake physical, which is held within up to seven business days after arrival to TDCJ. (Doc. No. 285 at 16.) The implication of these two policies, then, is that an individual with serious medical conditions could go untreated for up to a week, while the employees responsible for the housing and daily activities of that individual would be unaware of the medical condition. To the extent that this is true, there is a fact question as to the propriety of these policies under the ADA.

Regardless of which of McCollum's conditions TDCJ should have known about, however, TDCJ concedes that it was aware of McCollum's obesity, both because it was observable and because the HSM-18 form, filled out by UTMB during the intake screening and used by TDCJ to assign bunks, lists the inmate's height and weight. (Doc. No. 324 at 30.) Courts are split as to whether obesity, on its own, can qualify as a disability under the ADA. Prior to the ADA Amendments Act of 2008 ("ADAAA"), the Equal Employment Opportunity Commission promulgated interpretive guidelines stating that except in "rare circumstances," obesity is not

considered a disabling impairment.[30] *See Melson v. Chetofield*, 2009 WL 537457, at *3 (E.D.La. Mar.4, 2009). Similarly, several courts found that obesity constituted a disability only if it was the result of a physiological condition. *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 440–443 (6th Cir.2007); *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir.1997). However, the ADAAA significantly expanded the meaning of "substantially limits" and "major life activities." Now, in EEOC's compliance manual, the Commission writes that "being overweight, in and of itself, is not generally an impairment . . . . On the other hand, severe obesity, which has been defined as body weight more than 100% over the norm, is clearly an impairment." *E.E.O.C. v. Res. for Human Dev., Inc.*, 827 F. Supp. 2d 688, 694 (E.D. La. 2011). Furthermore, courts have held that morbid obesity qualifies as a disability under the ADA. *Id.* at 695. UTMB and TDCJ's own medical policies list obesity as a co-morbidity to heat intolerance. (Doc. No. 324 at 32.) And Dr. Owen Murray, the Vice President of Correctional Managed Care and the Executive Director of Clinical Services for UTMB, testified that morbid obesity can affect an individual's respiratory process, ability to walk or run, and ability to climb into a top bunk. (Doc. No. 324-3 at 3-5.) Thus, the Court concludes that a reasonable jury could find that McCollum was a qualified individual under the ADA based solely on his morbid obesity.

### C.  A Fact Question Exists as to TDCJ and UTMB's Denial of Benefits or Services to, or Discrimination Against, McCollum

The ADA and RA provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a). Plaintiffs list several accommodations that

---

[30] Although the EEOC deals with employment discrimination under Title I of the ADA, the definition of disability is the same as in Title II, and as such the Commission's interpretation is helpful.

UTMB and TDCJ could have provided for McCollum, as a disabled individual: housing in a climate controlled environment, wellness checks, access to respite areas, access to portable coolers, an earlier intake physical, heat safety training, access to the commissary, and/or a bottom bunk. (Doc. No. 297 at 108.)

Plaintiffs allege that Defendants' failure to provide these accommodations for McCollum discriminated against McCollum because it caused him to suffer more pain and punishment than non-disabled prisoners. (*Id.* at 111.) Plaintiffs also argue that the failure to accommodate McCollum excluded him from participation in or denied him the benefits of safe confinement at Hutchins Unit. (*Id.* at 108.) Defendants dispute the viability of the proposed accommodations, as well as Plaintiffs' theories of liability. Because the accommodations at issue are the same for either theory of liability, the Court will address them first.

UTMB was in charge of direct patient care in Hutchins Unit, and also had a voice in creating the healthcare policies that were implemented in all TDCJ facilities, as a member of the Correctional Managed Health Care Committee. UTMB provides three main arguments for why it did not provide McCollum with accommodations while he was at Hutchins. First, UTMB argues that the ADA does not require that it provide McCollum "a benefit or service greater than that provided for other general population inmates." (Doc. No. 285 at 40.) Second, UTMB asserts that it could not accommodate McCollum in the ways specified by Plaintiffs because it is not responsible for the conditions of offender housing and climate control at Hutchins and all TDCJ facilities. Finally, UTMB argues that it could not have assigned McCollum to a lower bunk, because it does not assign offenders to bunks at Hutchins. These arguments are unpersuasive.

UTMB states that for McCollum to receive an "air-conditioned or climate controlled bed to the exclusion of the general population inmates would have been contrary to the purpose of

the ADA." *Id.* However, UTMB's interpretation of the ADA, and the purpose of the ADA, is unduly narrow. In enacting the ADA, Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion" or discrimination. *Tennessee v. Lane,* 541 U.S. 509, 531 (2004). Thus, the ADA mandates that disabled individuals receive certain accommodations in order to make their experiences on par with non-disabled individuals. The shape and extent of these accommodations vary depending on the individual and the circumstances. But the Court cannot say that providing air-conditioned housing as an accommodation for heat-sensitive individuals is contrary to the purposes of the ADA, especially since TDCJ already has thousands of bunks in air-conditioned housing areas. Indeed, balancing Plaintiff's need for accommodation against the hardship it would impose on UTMB and TDCJ, and assessing how essential that accommodation was to McCollum's survival in Hutchins, are tasks that are best left to the jury.

With regard to conditions of confinement and climate control at Hutchins, UTMB has a role in creating the policies, and has some discretion in applying them. As has been previously described, two physicians from UTMB are on the Correctional Managed Health Care Committee, which sets the healthcare policies for all TDCJ facilities. UTMB argues that it does not have the authority to provide climate controlled housing to disabled individuals, and that "[t]herefore, where the offenders are housed is left almost entirely within the discretion of TDCJ." (Doc. No. 285 at 39). "But the existence of multiple and overlapping authorities cannot, on its own, shield officers or official bodies from liability." *Odonnell v. Cty.*, No. CV H-16-1414, 2016 WL 7337549, at *38 (S.D. Tex. Dec. 16, 2016). Plaintiffs present evidence that, in September 2011, after McCollum and many other individuals died from heat-related illnesses, the Correctional Managed Health Care Committee considered adding an option onto the intake

physical form that would require air conditioned housing.[31] (Doc. No. 305-8 at 16.) This proposal was rejected, in part because UTMB employees were concerned that the policy would "result in numerous such classifications by unit staff (especially with the recent summer heat issue) and would far exceed the ability of the system to meet such a restriction." (*Id.* at 16.) Although UTMB is certainly not the only agency represented on the CMHCC, this evidence indicates that, even before McCollum's death, UTMB could have granted itself the authority to require air-conditioned housing for disabled individuals, but chose not to. This choice, if a jury finds that it was one, does not absolve UTMB of responsibility.

UTMB's assertion that it does not assign offenders to bunks is also unsatisfactory. Although TDCJ employees assign offenders to bunks, it is undisputed that they do so with reference to restrictions placed by UTMB. However, UTMB states that these restrictions are not determined until offenders have their intake physical, which occurs within ten business days[32] of arrival at the facility. (Doc. No. 285 at 16-17.) McCollum had not yet had his intake physical, and as such was assigned to a top bunk on his third day at Hutchins. If UTMB had conducted the intake physical more quickly, or had made the bunk restriction at the intake screening on the day that McCollum arrived, he would not have been assigned to a top bunk. Thus, although the bunk determination is ultimately made by a TDCJ employee, UTMB plays an important role in the process, and as such cannot shirk responsibility for McCollum's placement on a top bunk.

UTMB also argues that McCollum did not request the accommodation of a lower bunk, even though he had opportunity to do so. (*Id.* at 41.) "However, a disabled person's failure to expressly 'request' an accommodation is not fatal to an ADA claim where the defendant

---

[31] TDCJ has approximately 23,000 bunks in air-conditioned settings across the state. (Doc. No. 297 at 33.)

[32] The time in which to complete the intake physical was seven business days when McCollum died, but has since been extended to ten business days. (Doc. No. 305-13 at 22.)

otherwise had knowledge of the individual's disability and needs but took no action." *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 296 (5th Cir. 2012). "Taken together, there is a balance to be struck between a disabled individual's need to request accommodations when limitations are not obvious or apparent and a public entity's duty to provide accommodations without further notice or a request." *Id.* Therefore, McCollum's failure to ask UTMB for a lower bunk restriction is not determinative of their duty to provide him one. Finally, UTMB does not contest that it did not offer, at the time of McCollum's confinement, the other accommodations that McCollum proposes: wellness checks, earlier intake physicals, or respite areas.

TDCJ, in turn, argues that it provided reasonable accommodations for McCollum in the form of the heat mitigation measures "for McCollum and all the other inmates." (Doc. No. 288 at 121.) But TDCJ's argument misses the mark. Plaintiffs' ADA claim alleges that these mitigation measures were not sufficient because McCollum had disabilities that predisposed him to heat-related illness. Thus, McCollum needed something more than what was provided to the general population in order to ensure that McCollum did not suffer more pain. *See Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 843 (S.D. Tex. 2014) ("It is not enough for Defendant to claim that all prisoners . . . —whether suffering from a disability or not—endured the same housing and living conditions that the decedent did because…Plaintiff has alleged sufficient facts to state that those conditions were more onerous on the decedent due to his particular disabilities.")

TDCJ further argues that it was only aware of McCollum's morbid obesity, not his hypertension, diabetes or depression. The Court has already expressed concern regarding the policies that precluded TDCJ from being made aware of the health needs of an offender before he received his intake physical (and thus before UTMB could designate restrictions based on health concerns). But regardless of this concern, a factfinder could still find that TDCJ's failure

to place McCollum on a lower bunk, given his evident obesity, resulted in McCollum suffering more pain and punishment than non-disabled offenders. Plaintiffs provide the affidavit of Santos Rodriguez III, who was incarcerated in Hutchins at the same time as McCollum, and whose bunk was close to McCollum's. (Doc. No. 300-10 at 317.) Rodriguez states that it was very difficult for McCollum to climb onto his bunk, and that by July 21, 2011, McCollum was not getting off his bunk. (*Id.* at 317.) A reasonable jury could find that the difficulty of getting off his bunk would have reduced McCollum's ability to drink the amount of water TDCJ recommended as part of its heat mitigation protocols, leading in part to McCollum's dehydration and susceptibility to heat-related illness. Furthermore, the accommodation of assigning McCollum to a lower bunk was slight—Rodriguez states that there were many lower bunks available at the time that McCollum was assigned to a top bunk. (Doc. No. 318 at 344.) Again, balancing Plaintiff's need for accommodation against the hardship it would impose on TDCJ, and assessing how essential that accommodation was to McCollum's survival, are tasks that are best left to the jury.

### i. Discrimination

Disability discrimination under the ADA and RA "differs from discrimination in the constitutional sense" because the statutes contain their own definitions of discrimination. *Melton v. Dallas Area Rapid Transit,* 391 F.3d 669, 672 (5th Cir. 2004). For example, discrimination may include a defendant's failure to make reasonable accommodations to the needs of a disabled person. *See id.* (under Title II of the ADA "public entities generally are required . . . to make reasonable modifications to avoid discrimination on the basis of disability"); *see also Tennessee v. Lane,* 541 U.S. 509, 531 (2004) (Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion" or discrimination).

In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners. *See United States v. Georgia,* 546 U.S. 151 (2006) (allegations, if true, that defendant refused to provide reasonable accommodations to a paraplegic inmate, "in such fundamentals as mobility, hygiene, medical care," resulted in the disabled inmate suffering serious punishment "without penal justification"); *McCoy v. Texas Dep't of Criminal Justice*, No. C.A.C 05 370, 2006 WL 2331055, at *7-8 (S.D. Tex. Aug. 9, 2006) (denying summary judgment for TDCJ where TDCJ was on notice of plaintiff's disability, the need for accommodation was obvious, and the failure to accommodate caused plaintiff to suffer a fatal asthma attack); *Martone v. Livingston*, No. 4:13-CV-3369, 2014 WL 3534696, at *16 (S.D. Tex. July 16, 2014); *Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 843 (S.D. Tex. 2014).

As a result of UTMB and TDCJ's failure to accommodate McCollum, he was assigned to a top bunk in a dorm that reached extremely hot temperatures, without wellness checks or access to air-conditioned respite areas. These conditions, when combined with his pre-existing medical conditions, caused McCollum to suffer from hyperthermia that led to his death. That McCollum's death was caused, in part, by his pre-existing medical conditions is supported by substantial evidence. First, the autopsy concluded that McCollum may have been "predisposed to developing hyperthermia due to morbid obesity and treatment with a diuretic (hydrochlorthiazide) for hypertension." (Doc. No. 300-4 at 21.) Second, Plaintiff's expert, Dr. Vasallo, stated that "Mr. McCollum was at markedly increased risk of heat stroke under the conditions at the Hutchins Unit due to his medical conditions." (Doc. No. 300-11 at 110.) More generally, Dr. Vassallo testified that, while the extreme heat in Hutchins can be dangerous for

everybody, it is more dangerous for some people—those with disabilities predisposing them to hyperthermia—than others. (Doc. No. 305-18 at 39.) Indeed, UTMB and TDCJ's own materials recognize that individuals with certain medical conditions, or being treated with certain medications, are at increased risk for heat-related illness. Thus, there is ample support for Plaintiffs' claim that UTMB and TDCJ's failure to accommodate McCollum in any way led him to suffer more pain and punishment than other, non-disabled, men incarcerated in Hutchins.

### ii.    Exclusion from Participation or Denial of Services or Programs

Confinement in a jail or prison is a program or service for ADA/Rehabilitation Act purposes. *Wright v. Texas Dep't of Criminal Justice,* No. 7:13-CV-0116-O, 2013 WL 6578994, at *3 (N.D. Tex. Dec. 16, 2013), *citing Pa. Dep't of Corrs. v. Yeskey,* 524 U.S. 206, 213, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). In *Wright*, the mother of a man who killed himself while incarcerated in a TDCJ facility brought an ADA claim, alleging that TDCJ's failures to accommodate her son's suicide risk was a denial of safe housing and led to his death:

> Denying Wright safe housing is no different than denying wheelchairs or crutches to inmates with mobility impairments. Without wheelchairs or crutches, inmates with mobility disabilities cannot safely move about the prison and are at risk of injury. Without a cell mate, or a cell free from dangerous tie-off points, prisoners whose mental illnesses put them at severe risk of suicide are placed in much greater risk of death. *Id.*

The court found that based on these allegations, the plaintiff had adequately alleged that her son "was excluded from participation in or denied the benefits of the services, programs, or activities of the Allred Unit." *Id.* at *4.

Similarly, Plaintiffs in this case allege that, when UTMB and TDCJ failed to reasonably accommodate McCollum's disability, he was denied safe confinement at Hutchins. (Doc. No. 297 at 108.) Plaintiffs present evidence that TDCJ and UTMB jointly failed to give unit-level providers the power to assign disabled inmates to climate-controlled housing, did not train heat-

sensitive inmates about the hazards posed by extreme heat, and assigned McCollum to a top bunk despite his morbid obesity. A reasonable jury could find that these kinds of accommodations were reasonable and that the failure to utilize any of them led to the denial of safe confinement for McCollum at Hutchins Unit.

### A.  Intentional Discrimination

In order for a plaintiff to be entitled to compensatory damages in an ADA suit, she must show not only that an individual is disabled and that he was denied benefits or discriminated against, but also that the discrimination was intentional. TDCJ argues that, in *Delano-Pyle*, the Fifth Circuit "held that the standard for 'intentional discrimination' was actually *higher* than deliberate indifference." However, the Fifth Circuit has stated definitively that "We did not define what we meant by intent in *Delano-Pyle*." *Perez v. Doctors Hosp. at Renaissance, Ltd*., 624 F. App'x 180, 184 (5th Cir. 2015). While the Court acknowledged that other federal Courts of Appeal have have found that deliberate indifference suffices, it did not decide the law for this Circuit. *Id.* In *Perez*, the Court found that, regardless of whether the standard for intent was deliberate indifference or something more, the plaintiffs had demonstrated a genuine dispute about the defendant hospital's intent when they showed that, despite the hospital knowing that plaintiffs were deaf, it failed to provide an interpreter, even when requested, and used ineffective interpretation machines. *Id.* at 185. In *Delano-Pyle*, the Fifth Circuit found intentional discrimination when a police officer performed sobriety tests on a deaf individual without interpretation, even when the plaintiff did not request an interpreter or auxiliary aid. *Delano-Pyle*, 302 F.3d 567.

"Intent is usually shown only by inferences. Inferences are for a fact-finder and we are not that." *Perez*, 624 F. App'x at 184. In this case, Plaintiffs have presented ample evidence upon

which a reasonable jury could infer intentional discrimination, regardless of the standard ultimately decided by the Fifth Circuit.

As to both UTMB and TDCJ, Plaintiffs have presented numerous documents demonstrating both agencies' awareness that certain medical conditions and medications, including hypertension and hydrochlorothiazide, made individuals more vulnerable to heat-related illness. Indeed, all of the individuals who died from heat-related illness in TDCJ before McCollum's death had medical conditions or took medications that resulted in heat-sensitivity.[33] Many of the autopsies, some performed by UTMB, discussed the increased likelihood of hyperthermia for people given certain medications.[34]

---

[33] Archie White suffered from obesity, hypertension, schizophrenia, and depression, and was prescribed Hydrochlorothiazide, Doxepin, Benztropin, and other medications (Doc. No. 299-1 at 3); Anselmo Lopez suffered from schizophrenia and was prescribed Haldol and Cogentin, although not at the time of his death (*Id.* at 6); James Moore suffered from hypertension and paranoid schizophrenia, and was prescribed Hydrochlorothiazide, Haloperidol, Cogentin, and Atenolol (Doc. No. 300-2 at 22); Charles Finke suffered from depression and was prescribed Doxepin, Benztropine, and Hydroxyzine, all of which were on CMHCC's chart titled Drugs Associated with Heat Stress (*Id.* at 31); John Wesley Cardwell suffered from depression and was prescribed neuroleptic medications that "suppress[ed] central heat loss mechanisms and contribute[d] to heat stroke" (*Id.* at 48); Ricky Robertson had a history of bipolar disorder and was treated with nortriptyline, lithium, and other medications "which are known risk factors for developing hyperthermia" (Doc. No. 300-3 at 2, 16); James Shriver suffered from schizoaffective and borderline personality disorder and hypertension. "More compelling are his prescribed medications, many of which are known to cause temperature dysregulation, permitting hyperthermia" (*Id.* at 26); Dionicio Robles had mood and anxiety disorders, and hyperthermia was caused by "environmental conditions plus pre-existing co-morbidities and medication" (*Id.* at 39); Douglas Hudson "was taking amitriptyline which is a medication known to interfere with heat dissipation mechanisms" (Doc. No. 300-4 at 13).

[34] Neuroleptic medications "suppress[ed] central heat loss mechanisms and contribute[d] to heat stroke" (Doc. No. 300-2 at 48); nortriptyline, lithium, and other medications "are known risk factors for developing hyperthermia" (Doc. No. 300-3 at 2, 16); "More compelling are his prescribed medications, many of which are known to cause temperature dysregulation, permitting hyperthermia" (*Id.* at 26); "amitriptyline [] is a medication known to interfere with heat dissipation mechanisms" (Doc. No. 300-4 at 13).

Plaintiffs have also demonstrated the agencies' awareness that obesity is a co-morbidity to heat intolerance. This awareness was evident through UTMB and TDCJ's own policies, as well as the Director of UTMB's testimony that morbid obesity can affect an individual's respiratory process, ability to walk or run, and climb into a top bunk. Further, the agencies' policies reveal that they knew the importance of acclimatizing individuals to extreme temperatures, which is relevant because Hutchins was a transfer facility, in which newly arrived individuals were not acclimated to the extreme heat. More specifically, UTMB knew that McCollum was morbidly obese, had hypertension, and had a self-reported history of diabetes and depression. TDCJ knew that McCollum was morbidly obese.

Despite this knowledge, UTMB and TDCJ made the decision not to allow unit-level providers to require air-conditioned housing for heat-sensitive inmates. Although UTMB could give heat restrictions for heat-sensitive inmates in their jobs and other aspects of prison life, UTMB and TDCJ had reason to know that this would not suffice in all cases: in 1999, after the death of James Moore from hyperthermia, the Mortality Committee noted that Moore should have been placed on the heat restriction list because of his use of anti-psychotic medications. However, the Committee remarked, "[w]hether or not this would have prevented the Hyperthermia which may have resulted from his environmental temperature in his housing area cannot be determined." (Doc. No. 299-1 at 8.) Thus, UTMB and TDCJ were on notice that the accommodations in place to protect disabled individuals were not sufficient to prevent hyperthermia, yet they failed to take any other steps to mitigate this risk. Indeed, UTMB continued prescribing medications that they knew made individuals significantly more likely to suffer heat-related illnesses, and TDCJ continued housing individuals in extreme temperatures, regardless of their vulnerabilities to heat.

80

With regard to McCollum, UTMB placed McCollum on a medication for hypertension that is known to remove water from the body, and that at least two other individuals had been prescribed when they died of hyperthermia.[35] UTMB did this without providing any information to McCollum on the effects of this drug, the importance of staying hydrated, wellness checks, or any other accommodations. UTMB simply took no action to accommodate McCollum or any other disabled individuals, despite the long history of deaths that occurred as a result of extreme heat, pre-existing medical conditions, and certain kinds of medication.

TDCJ assigned McCollum to a top bunk, knowing that he was morbidly obese, and despite lower bunks being readily available. In fact, Plaintiffs present evidence that McCollum asked to stay on a bottom bunk, but was refused by a correctional officer.[36] (Doc. No. 300-10 at 318.) Plaintiffs also present evidence that McCollum had difficulty climbing on and off of his bunk, and that TDCJ employees were aware of this difficulty. (*Id.*) TDCJ also failed to provide any accommodations for McCollum or any other disabled individuals, including wellness checks, access to respite areas, training on extreme temperatures, or cups issued upon arrival. Despite a history of disabled individuals dying of heat-related illnesses in its facilities, TDCJ took no actions to make the facilities safer for the disabled individuals incarcerated in the summer of 2011.

As a result of UTMB and TDCJ's actions and inactions, McCollum was left to suffer for days, eventually succumbing to the heat and his medical conditions only seven days after entering Hutchins Unit. A reasonable jury could infer that both agencies intentionally discriminated against McCollum. Because Plaintiffs have presented genuine disputes as to each

---

[35] (Doc. No. 300-2 at 22, Doc. No. 299-1 at 3.)

[36] To the extent that UTMB objects to this statement as hearsay, the Court denies this objection, as the statement fits squarely within the "statement of a party opponent" exception to hearsay. FED. R. EVID. 801(d)(2).

element necessary to state an ADA and RA claim, summary judgment for UTMB and TDCJ is inappropriate.

## V.     Motions to Strike

Plaintiffs and Defendants have filed various motions to strike exhibits and evidence used in the motions for summary judgment, responses, and replies considered above. (Doc. Nos. 288, 321, 322, 323, 329.) The Court does not consider the exhibits objected to by Plaintiffs or by TDCJ Defendants, and denies these motions as moot.[37] (Doc. Nos. 288, 321.) Furthermore, the Court has already denied TDCJ Defendants' motion to extend the deadline for designating experts, and does not consider the testimony of Dr. Rieger quoted by Plaintiffs. As this is the only reason Defendants provide to reconsider the previous decision, the Court denies TDCJ Defendants' motion to designate Dr. Rieger as an expert. (Doc. No. 323.)

UTMB moves to strike all of the autopsies for individuals who died of heat-related illness in TDCJ, including those who died before McCollum, as irrelevant. Because Plaintiffs must show intentional discrimination in their ADA and RA claim against UTMB, the Court finds that the autopsies of individuals who died of heat-related illness before McCollum are relevant. UTMB also moves to strike the deposition of Stephanie Kingrey because it is "inherently inconsistent with her previous deposition testimony." (Doc. No. 322 at 16.) "Credibility determinations…are jury functions, not those of a judge." *Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002). While UTMB may be able to impeach Kingrey's testimony with any inconsistent deposition testimony, the Court cannot rule that her declaration carries no weight.

---

[37] Although the Court does reference the autopsies for heat related deaths after July 22, 2011, it does so only in the Background section, and does not consider them as they relate to the Defendants' liability.

UTMB also asserts that the Morbidity and Mortality Reviews of Prior Heat Related Deaths suggest remedial measures, and thus are inadmissible under Federal Rule of Evidence 407. Rule 407 states that "when measures are taken that would have made an *earlier* injury or harm less likely to occur, evidence of the subsequent measure is not admissible to prove . . . culpable conduct." Fed. R. Evid. 407 (emphasis added). Here, the Mortality Reviews for deaths before McCollum's are not used to prove culpability as to the prior deaths, but go only to show UTMB's knowledge of risk after the review. As such, Rule 407 does not apply and the Mortality Reviews of deaths prior to McCollum's are admissible. The rest of UTMB's objections are denied as moot, as the exhibits were not considered by the Court.

## VI.    Conclusion

Plaintiffs have adduced evidence that Larry McCollum's tragic death was not simply bad luck, but an entirely preventable consequence of inadequate policies. These policies contributed to the deaths of eleven men before McCollum and ten men after him. For the reasons stated above, the Court **GRANTS** Defendant Clark's Motion for Summary Judgment, and **DENIES** the motions of Defendants Livingston, Eason, Pringle, Sanders, Tate, TDCJ and UTMB.

**IT IS SO ORDERED**.

**SIGNED** in Houston, Texas, on this the 3rd day of February, 2017.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE